# BCI EXHIBIT

# 222

**From:**    Veksler, Irina
**Sent:**    Fri, 19 Sep 2008 17:28:24 GMT
**To:**    Gisonda, Thomas
**CC:**    Golaszewski, Richard; Jones, Craig L; Azerad, Robert
**Subject:** FW: Formatted changes LBI Exchange Postings.xls

Tom - what steps do we need to take to get out excess cash back from CME
as per Robert's email?

> _____
> From:    Azerad, Robert
> Sent: Friday, September 19, 2008 1:18 PM
> To:  Golaszewski, Richard; Veksler, Irina
> Cc:  Jones, Craig L
> Subject:    RE:  Formatted changes LBI Exchange Postings.xls
>
> We should get the cash back if possible in a non-Chase account.
>
> Robert
>
> _____
> From:    Golaszewski, Richard
> Sent: Friday, September 19, 2008 1:16 PM
> To:  Veksler, Irina; Azerad, Robert
> Cc:  Jones, Craig L
> Subject:    RE:  Formatted changes LBI Exchange Postings.xls
>
> Notable Changes:
>
> - CME has an excess of $207mm (195mm of USD, 12mm of FX).  The CME
> does want to return this at this time.  I can forward on contact info
> at the CME if you like.
>
>
> << File: LBI Exchange Postings (3).xls >>
> Thanks,
>
> Rich
>
> _____
> From:    Veksler, Irina
> Sent: Friday, September 19, 2008 11:54 AM
> To:  Veksler, Irina; Azerad, Robert
> Cc:  Jones, Craig L; Golaszewski, Richard
> Subject:    RE:  Formatted changes LBI Exchange Postings.xls
>
> Richard - as you get updated information on the exchange please update
> our file and send it to Robert and Craig. I have to run out for
> unplanned dr. appt.
>
> Thanks,
> Irina
>
>
> _____
> From:    Veksler, Irina
> Sent: Friday, September 19, 2008 11:35 AM
> To:  Azerad, Robert
> Cc:  Jones, Craig L; Golaszewski, Richard
> Subject:    Formatted changes LBI Exchange Postings.xls
>
>

# BCI EXHIBIT

# 223

**Unknown**

**Sent:** Sunday, March 22, 2009 2:51 AM

| | |
|---|---|
| **From:** | Lowitt, Ian T [ilowitt@lehman.com] |
| **Sent:** | Friday, September 19, 2008 6:27 PM (GMT) |
| **To:** | McDade, Bart [bmcdade@lehman.com] |
| **Subject:** | cls money all snarfed up by citi. The 15c3 lockup looks ok at 1.3 bn. Good faith not. So we are short 1.7 bn. The TBA and FX settlement don't work. We did find 5 bn of exchange listed options which we are investigating. Ian |

7/15/2009



138017

# BCI EXHIBIT

# 224

**From:**   Veksler, Irina
**Sent:**   Fri, 19 Sep 2008 18:59:52 GMT
**To:**   Azerad, Robert
**Subject:** Update on CME

---

Robert - just had a conference call with Mike Neilson and Craig Jones.
Per Mike - the CME's head of risk felt prudent under the circumstance
not to release the money. Craig asked Mike to draft a note of what
transpired in the conversation which Tom Russo will subsequently take to
the SEC.

I will keep you posted.

Irina

Regards,


Irina E. Veksler
Lehman Brothers
Asset and Liability Management Group
1301 Avenue of the Americas,  6th Floor
New York, New York 10019
Tel: (212) 320-4979
Fax: (212) 548-9340

# BCI EXHIBIT

# 225

From:          michaelklein@michaelsklein.com
Sent:          Friday, September 19, 2008 5:39 PM
To:            Ricci, Rich: Barclays Capital
Subject:       Re:


Hearing will begin in a few minutes
Sent via BlackBerry by AT&T

-----Original Message-----
From: michaelklein@michaelsklein.com

Date: Fri, 19 Sep 2008 20:50:13
To: Rich Ricci<Rich.ricci@barclayscapital.com>
Subject: Re:


Citi and JPM are here attacking leh-seperate motions

Not clear what they are but they are deemed extremely similar
Sent via BlackBerry by AT&T

-----Original Message-----
From: michaelklein@michaelsklein.com

Date: Fri, 19 Sep 2008 20:40:48
To: Rich Ricci<Rich.ricci@barclayscapital.com>
Subject: Re:


We are meeting creditors shortly on this

Weil, lazard, lehman all supporting with us aggressively
Sent via BlackBerry by AT&T

-----Original Message-----
From: <rich.ricci@barclayscapital.com>

Date: Fri, 19 Sep 2008 21:39:19
To: <michaelklein@michaelsklein.com>
Subject: Re:


He told me creditors were sqwaking. Let's get it then.

----- Original Message -----
From: michaelklein@michaelsklein.com <michaelklein@michaelsklein.com>
To: Ricci, Rich: Barclays Capital
Sent: Fri Sep 19 21:37:27 2008
Subject: Re:

I don't follow

We are being given 1.9 B of face

1

Highly Confidential



Δ π EXHIBIT 33 (
Deponent Ricci
Date 4/8/09 Rptr kk
WWW.DEPOBOOK.COM

BCI-EX-00078268

10335698

Sent via BlackBerry by AT&T

-----Original Message-----
From: <rich.ricci@barclayscapital.com>

Date: Fri, 19 Sep 2008 21:36:09
To: <michaelklein@michaelsklein.com>
Subject: Re:


Alex tells me they're killing us on 1.9 bucket and not paying anything for it. What gives.

----- Original Message -----
From: michaelklein@michaelsklein.com <michaelklein@michaelsklein.com>
To: Ricci, Rich: Barclays Capital
Sent: Fri Sep 19 21:31:30 2008

Rich

Three ring circus

Two overflow rooms

Couple hundred people
Sent via BlackBerry by AT&T

---

This e-mail may contain information that is confidential, privileged or otherwise protected
from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or
redistribute it by any means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this e-mail is not an offer to
buy or sell or a solicitation to buy or sell any securities, investment products or other
financial product or service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those of the author and do
not necessarily represent those of Barclays. This e-mail is subject to terms available at the
following link: www.barcap.com/emaildisclaimer. By messaging with Barclays you consent to the
foregoing.  Barclays Capital is the investment banking division of Barclays Bank PLC, a
company registered in England (number 1026167) with its registered office at 1 Churchill
Place, London, E14 5HP.  This email may relate to or be sent from other members of the
Barclays Group.

---

This e-mail may contain information that is confidential, privileged or otherwise protected
from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or
redistribute it by any means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this e-mail is not an offer to
buy or sell or a solicitation to buy or sell any securities, investment products or other
financial product or service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those of the author and do
not necessarily represent those of Barclays. This e-mail is subject to terms available at the
following link: www.barcap.com/emaildisclaimer. By messaging with Barclays you consent to the
foregoing.  Barclays Capital is the investment banking division of Barclays Bank PLC, a
company registered in England (number 1026167) with its registered office at 1 Churchill

Highly Confidential

BCI-EX-00078269

10335698

Place, London, E14 5HP.  This email may relate to or be sent from other members of the
Barclays Group.

3

Highly Confidential

BCI-EX-00078270

10335698

# BCI EXHIBIT

# 226

## Unknown

**Sent:** Sunday, March 29, 2009 8:25 PM

| | |
|---|---|
| **From:** | Hraska, James W <JHraska@lehman.com> |
| **Sent:** | Friday, September 19, 2008 10:30 PM (GMT) |
| **To:** | Palchynsky, John N <jpalchyn@lehman.com>; Tonucci, Paolo <paolo.tonucci@lehman.com>; Feraca, John <joferaca@lehman.com>; Aronow, David G <daronow@lehman.com> |
| **Cc:** | Blackwell, Alastair <ablackwe@lehman.com>; Forrest, Monty <mforrest@lehman.com>; Ullman, Neal (NY) <Neal.Ullman@lehman.com>; Fleming, Dan (TSY) <dfleming@lehman.com>; Jones, Craig L <cljones@lehman.com> |
| **Subject:** | RE: Urgent tri unwind |

Agreed.  In addition, I just want to make sure that everyone is clear
the 7B $ that was locked up for Barcap in Tri was returned to JP Chase.
If anyone has any questions, please call me.


-----Original Message-----
From: Palchynsky, John N
Sent: Friday, September 19, 2008 6:28 PM
To: Tonucci, Paolo; Hraska, James W; Feraca, John; Aronow, David G
Cc: Blackwell, Alastair; Forrest, Monty; Ullman, Neal (NY); Fleming, Dan
(TSY); Jones, Craig L
Subject: RE: Urgent tri unwind

I guess to address our overdraft before Lehman's assets are locked
during bankruptcy?

Anyway, see you all at Barcap.

It has been one hell of a week, challenging, but exhilarating too.

Have a great weekend! ;)

JP



-----Original Message-----
From: Tonucci, Paolo
Sent: Friday, September 19, 2008 6:15 PM
To: Palchynsky, John N; Hraska, James W; Feraca, John; Aronow, David G
Cc: Blackwell, Alastair; Forrest, Monty; Ullman, Neal (NY); Fleming, Dan
(TSY); Jones, Craig L
Subject: Re: Urgent tri unwind

Why are they doing this?



----------------------------------

----- Original Message -----
From: Palchynsky, John N
To: Palchynsky, John N; Hraska, James W; Feraca, John; Aronow, David G

7/15/2009

Exhibit
109 B
dGK 8-7-09

93219

Cc: Tonucci, Paolo; Blackwell, Alastair; Forrest, Monty; Ullman, Neal
(NY); Fleming, Dan (TSY); Jones, Craig L
Sent: Fri Sep 19 16:05:09 2008
Subject: RE: Urgent tri unwind

Also, as per Bill Gallagher, it looks like JPChase is moving DTC
positions out of Lehman's pledge account to the bank's account at DTC.


-----Original Message-----
From: Palchynsky, John N
Sent: Friday, September 19, 2008 3:57 PM
To: Hraska, James W; Feraca, John; Aronow, David G
Cc: Tonucci, Paolo; Blackwell, Alastair; Forrest, Monty; Ullman, Neal
(NY); Fleming, Dan (TSY); Jones, Craig L
Subject: RE: Urgent tri unwind

As per Barclay's request, $7 billion in cash was allocated to their
lockup last night. If securities were/can be used instead, that would
free up margin collateral by reducing the amount of higher haircut
securities allocated to the JPChase bank loan. This could potentially
help last night's situation with JPChase and one that could potentially
develop today.


-----Original Message-----
From: Hraska, James W
Sent: Friday, September 19, 2008 3:43 PM
To: Feraca, John; Aronow, David G
Cc: Tonucci, Paolo; Blackwell, Alastair; Forrest, Monty; Ullman, Neal
(NY); Palchynsky, John N; Fleming, Dan (TSY); Jones, Craig L
Subject: Urgent tri unwind

7B in barcap tri unwinds today? Are we rolling ? We had 14 B in chase
that could be allocated buit not sure the status of that relationship at
this point. We pledged only 800mm of new collat to barcap.   All is
frozen.

7/15/2009

93219

# BCI EXHIBIT

# 227



Michael
Lubowitz/NY/WGM/US
09/19/2008 08:12 PM

To    "Crayton L. Bell" <CBell@milbank.com>
cc
bcc
Subject    Fw: Revised Clarification Letter

David Murgio

----- Original Message -----
  **From:** David Murgio
  **Sent:** 09/19/2008 05:15 PM EDT
  **To:** PDowd@stblaw.com; pmartelli@stblaw.com; sberkenf@lehman.com;
akeller@stblaw.com; jfinley@stblaw.com; vlewkow@cgsh.com; dleinwand@cgsh.com;
feldsteinh@sullcrom.com; ClaytonW@sullcrom.com; Richard.Smith3@barcap.com;
Jonathan.Hughes@barcap.com; Kevin.Genirs@lehman.com; Lori Fife; Michael
Lubowitz; Robert Messineo; Rod Miller; Shai Waisman; James Grogan; Jane
McDonald; Harvey Miller
  **Subject:** Revised Clarification Letter
Please find attached a revised version of the Clarification Letter reflecting our conversation this afternoon.
The blackline is marked to reflect changes from the draft previously circulated by Cleary.

Regards.

David

    

Clarification Letter_#1916861.DOC    Clarification Letter_#1916861.DOC

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com



Δ π EXHIBIT 499
Deponent O'Donnell
Date 1/6/010 Rptr JL
WWW.DEPOBOOK.COM

WGM-LEHMAN-E 00002746

*WGM Draft · September 19, 2008 · 5:00 pm*

## BARCLAYS CAPITAL INC.

September __, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and supplements in certain respects the agreements of the parties stated therein and shall amend the Agreement to the extent necessary so as to be consistent with this letter, and is binding on the parties hereto upon its execution and delivery.

    1.    Purchased Assets; Excluded Assets.

    (a)    The Purchased Assets means all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets), including the items set forth in clauses (a) through (d) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets," plus, with respect to securities of LBI, shall also include municipal securities, residential mortgage securities and other securities of which a summary description, by category, is reflected in Exhibit A hereto; it being understood that the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 million. The categories of securities included among the "Purchased Assets" include only securities in such categories owned by LBI and not any other Affiliate of LBI and, with respect to collateralized short-term agreements, only those collateralized short agreements relating to short positions of LBI. Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA, (b) the government securities trading and mortgage trading operations of LBI and (c) all prime brokerage accounts, and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business). Purchased Intellectual Properties includes Intellectual Property Rights, Software and Technology, wherever in the world held by Holdings or

1

WGM-LEHMAN-E 00002747

any of its Subsidiaries, that are primarily used or necessary for the conduct by Purchaser of the Business and for conduct of the commodities business. For the avoidance of doubt, the Business includes the Sellers' commodities business.

(b)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of LBHI and its Subsidiaries. In lieu of the assets referred to in clause (k) of the definition of "Excluded Assets," the following shall be Excluded Assets: All of the investments held by Sellers or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement (as hereinafter defined). Also included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration, except as notified by the administrator to LBI from time to time. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Section 1.1(h) of the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business. As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and Purchased Assets and the Business include the private investment management business (other than the CTS (Corporate Cash) business). The employees of PIM of the Closing Date shall become Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the private investment management business of Seller (the "PIM Business") in the pool of Transferred Employees. Accordingly, Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business. The Transferred Employees of the PIM Business will be treated in a manner consistent with the principles set forth in Section 9.1(c). The Purchased Assets include forgivable notes issued by the Transferred Employees of the PIM Business to Seller. Purchaser agrees to pay any proceeds it receives in respect of such notes to Seller if and when received.

3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser, after the Closing, in connection with the

2

WGM-LEHMAN-E 00002748

Business. Nothing in this Paragraph 4 is intended to modify Section 8.12 of the Agreement and no Liabilities described in clause (i) shall be "Assumed Liabilities."

      4.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or a purchaser of any other businesses of Seller and its Subsidiaries, in each case solely for use in connection with the winding up of any such businesses.

      5.    Long Positions. The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (other than exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" and TBA MS, but not any other over-the-counter derivatives such as spot and forward currency contracts). The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

      6.    Subordinated Notes of LBI. The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

      7.    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

      8.    Certain Cash Proceeds. Any cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions, before the Closing, shall be delivered to Purchaser.

      11.    Payables, Deposits and Receivables. No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

      12.    Intercompany Obligations. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations, respectively, of Seller or its Subsidiaries or between or among any Seller or any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

WGM-LEHMAN-E 00002749

13.    <u>Schedule 12.3</u>.  Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

14.    <u>Barclays Repurchase Agreement</u>.  At the Closing, Purchaser and its Affiliates will release Seller and its Subsidiaries from any obligation under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates.

15.    <u>Risk of Loss of Artwork</u>.  During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

16.    <u>Records</u>.  The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail.  The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

17.    <u>Subleases</u>.  Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("<u>SF Property</u>"), (ii) 125 High Street, Boston, Massachusetts ("<u>Boston Property</u>"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("<u>Chicago Property</u>"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("<u>LA Property</u>" and together with the SF Property, Boston Property and Chicago Property, the "<u>Sublease Properties</u>"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering

4

WGM-LEHMAN-E 00002750

into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has

5

WGM-LEHMAN-E 00002751

recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

18.    Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

19.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

1.1    20.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

21.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Definition of Contract.  Contract shall not include swap agreements.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

6

WGM-LEHMAN-E 00002752

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.

By: __ _____
Name:
Title:


LEHMAN BROTHERS INC.

By: _____
Name:
Title:


LB 745 LLC

By: _____
Name:
Title:


NY2:\1916861\09\15325091.DOC\73683.1037

WGM-LEHMAN-E 00002753

CGSH WGM Comments Draft September 19, 2008 5:00 12:30pm

[Letterhead of Barclays]
**BARCLAYS CAPITAL INC.**

September [    ], 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

      Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and supplements in certain respects the agreements of the parties stated therein and shall amend the Agreement to the extent necessary so as to be consistent with this letter, and is binding on the parties hereto upon its execution and delivery.

      1.    Purchased Assets; Excluded Assets.

      (a)    The Purchased Assets means all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets), including the items set forth in clauses (a) through (d) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets"," plus, with respect to securities of LBI, shall also include municipal securities, residential mortgage securities and other securities of which a summary description, by category, is reflected in Exhibit A hereto; it being understood that the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 million. The categories of securities included among the "Purchased Assets" include only securities in such categories owned by LBI and not any other Affiliate of LBI and, with respect to collateralized short-term agreements, only those collateralized short agreements relating to short positions of LBI. Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA, (b) the government securities trading and mortgage trading operations of LBI (but mortgage securities only to the extent referred to below) and (c) all prime brokerage accounts, and repurchase agreement and agreement and securities lending operations of the Business (for the avoidance of doubt, other than those

1

WGM-LEHMAN-E 00002754

that are part of the IMD Business). ~~The categories of securities referred to in clause (d) of the "Purchased Assets" definition in the Agreement include only securities in such categories owned by LBI and not any other affiliate of LBI and with respect to collateralized short-term agreements, only those collateralized short-term agreements relating to short-term positions of LBI.~~ Purchased Intellectual Properties includes Intellectual Property Rights, Software and Technology, wherever in the world held by Holdings or any of its Subsidiaries, that are primarily used or necessary for the conduct by Purchaser of the Business and for conduct of the commodities business. <u>For the avoidance of doubt, the Business includes the Sellers' commodities business.</u>

(b)    <u>The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of LBHI and its Subsidiaries.  In lieu of the assets referred to in clause (k) of the definition of "Excluded Assets," the following shall be Excluded Assets:  All of the investments held by Sellers or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement (as hereinafter defined).  Also included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration, except as notified by the administrator to LBI from time to time.  Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries.  For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets).  The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller.  Section 1.1(h) of the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."</u>

2.    <u>IMD Business.</u>  For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business.  As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and Purchased Assets and the Business include the private investment management business (other than the CTS (Corporate Cash) business) ~~("PIM")~~.  The employees of PIM of the Closing Date shall become Transferred Employees.  For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the private investment management business of Seller <u>(the "PIM Business")</u> in the pool of Transferred ~~of~~ Employees.  Accordingly, ~~additional amounts shall be paid as bonuses in accordance with Section 9.1(c), and the employees of the PIM business~~ <u>Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business.  The Transferred Employees of the PIM</u>

2

WGM-LEHMAN-E 00002755

Business will be treated in a manner consistent with the principles set forth in Section 9.1(c). The Purchased Assets include forgivable notes issued by the Transferred Employees of the PIM Business to Seller.  Purchaser agrees to pay any proceeds it receives in respect of such notes to Seller if and when received.

3.    Excluded Assets.  Included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration.  Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries.  Clause (i) of the definition of "Assumed Liabilities includes only liabilities associated with assets owned by LBI and not assets owned by any Affiliate of LBI.  The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller.  Section 1.1(h) of the Agreement is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."4.    Assumed Liabilities.  Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser, after the Closing, in connection with the Business.  Nothing in this Paragraph 4 is intended to modify Section 8.12 of the Agreement; and no Liabilities described in clause (i) shall be "Assumed Liabilities."

5.4.    License.  All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement.  The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries).  The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or a purchaser of any other businesses of Seller and its Subsidiaries, in each case solely for use in connection with the winding up of any such businesses.

6.5.    Long Positions.  The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (other than exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" and TBA MS, but not any other over-the-counter derivatives such as spot and forward currency contracts).  The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

7.6.    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

8.    Residential Real Estate Mortgage Securities.  To facilitate the division of residential real estate mortgage securities referred to in clause (e) of the definition of Purchased

3

WGM-LEHMAN-E 00002756

~~Assets and clause (k) of the definition of Excluded Assets between Purchaser and Seller,
Purchaser will acquire non-agency residential mortgage-backed securities and manufactured
housing securities (which are therefore considered Purchased Assets) and Seller will retain
HELOC, ABS, CDO, CLO, VFN, franchise loan, student loan, [scratch and dent], second lien,
and reverse mortgage backed securities (which are therefore considered Excluded Assets), in
each case as will be further allocated by the parties. [What is happening with scratch and dent?]~~

9.<ins>7.</ins>    Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for
Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement
(each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

~~10.    Excluded Cash Assets and Retained Cash.   All cash, cash equivalents,
bank deposits or similar cash items of Seller and its Subsidiaries are Excluded Assets, other than
the "Retained Cash," which is a Purchased Asset.  The "Retained Cash" is $700 million in cash,
cash equivalents, bank deposits or similar cash items (rather than $1.3 billion), plus the~~<ins>8.  Certain
Cash Proceeds.</ins>   Any cash amount received from closing out Long Positions, less the cash
amount expended to close out Short Positions<ins>, before the Closing, shall be delivered to
Purchaser</ins>.

11.    Payables, Deposits and Receivables.  No payables or deposits of a Seller
or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased
Contract.  No receivables shall be Purchased Assets, except to the extent resulting from a
Purchased Contract.

12.    Intercompany Obligations.  Except as expressly contemplated by this
Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed
Liabilities shall not include any intercompany receivables or payables or other obligations,
respectively, of Seller or its Subsidiaries or between or among any Seller or any of LBHI or any
Subsidiary of LBHI.  It is understood that nothing contained in this letter shall affect the rights or
obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

13.    ~~Eagle Energy as Excluded Asset.  The equity interests and assets of
Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the
energy marketing and services business of Eagle Energy Management LLC, are Excluded
Assets (rather than Purchased Assets).  14.~~    <ins>Schedule 12.3.</ins>  Following the Closing, the parties
shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities)
among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to
be signed by the parties.

14.    <ins>Barclays Repurchase Agreement.  At the Closing, Purchaser and its
Affiliates will release Seller and its Subsidiaries from any obligation under the September 18,
2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its
Affiliates.</ins>

15.    Risk of Loss of Artwork.  During such period that Purchaser has the right
to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement,
Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged
or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent

4

WGM-LEHMAN-E 00002757

with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

    16.  Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

    17.  Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

    (a)  As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

    (b)  With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the

WGM-LEHMAN-E 00002758

demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

18.    Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of

6

Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

19.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

1.1    20.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

21.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

~~21.    Arrangements Regarding DTCC.  The parties have agreed to the arrangements with respect to accounts maintained by LBI with DTCC set forth on Exhibit I hereto.  [Will provide comments on revised version reflecting agreement in principal when provided]~~

21.    Definition of Contract.  Contract shall not include swap agreements.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.  This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page intentionally left blank.]*

7

WGM-LEHMAN-E 00002760

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:


NY2:\1916861\08\15325080S\15325091.DOC\73683.1037


WGM-LEHMAN-E 00002761

The following is based on an earlier preliminary draft and does not reflect the current agreement in principle; it is included only to facilitate inclusion of the final version.

EXHIBIT I: Liabilities Related to Clearing Securities Trades (DTCC)

(a)    Assumed Liabilities shall include Assumed Depositary Liabilities and Excluded Liabilities shall include Excluded Depositary Liabilities (each as defined below).

(b)    On September 19, 2008, Purchaser informed DTC that, if it is selected as the successful bidder to acquire the Business, Purchaser will guaranty the open trades and amounts due to DTCC on the accounts and subaccounts that were in the draft of DTCC which roll up into the 0074 Accounts, effective as of the opening of the trading day on Monday, September 21, 2008, in an aggregate net amount not to exceed $250 million.

(c)    Sections 3.2 and 3.3 of the Agreement shall hereby be amended and restated in their entirety as follows:

3.2    Payment of Cash Amount.   On the Closing Date, Purchaser shall pay to Seller an amount equal to the Cash Amount, less $250 million, which shall be paid by wire transfer of immediately available funds into an account designated by Seller.

3.3    Adjustments.

(a)    As soon as practicable, Seller shall determine, and notify Purchaser of, the amount of the Excluded Depositary Liabilities.  On the Business Day following the date on which Seller notifies Purchaser of such amount, Purchaser shall pay to Seller an amount equal to $250 million, less the Excluded Depositary Liabilities,[ which shall be paid by wire transfer of immediately available funds into an account designated by Seller; provided, however, that, if the Excluded Depositary Liabilities equals or exceeds $250 million, Purchaser shall not be required to pay any amount to Seller pursuant to this Section 3.3(a) [and Purchaser shall be entitled to a credit in the amount of such excess against amounts payable by Purchaser to Seller under the Transition Services Agreement].  The amount of any payment to be made pursuant to this Section 3.3(a) shall bear interest from and including the Closing Date to but excluding the date of payment at a rate per annum equal to the rate of interest published from time to time by the *Wall Street Journal* as the "prime rate" at JP Morgan Chase during the period from the Closing Date to the date of payment.  Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of three hundred sixty-five (365) days and the actual number of days elapsed.

(b)    Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including

_____

[ Can this amount be calculated with certainty?  Consider whether dispute resolution provisions are necessary]

9

WGM-LEHMAN-E 00002762

repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof). Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss. If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (i) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (ii) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant to this Section 3.3(b)). For purposes of this Section 3.3(b), the time value of money shall be disregarded and no interest shall be deemed earned.

3.4    Definitions. For purposes of this Article III, the terms set forth below shall have the following definitions:

(a)    "074 Accounts" means [all accounts and subaccounts in the draft of DTCC, prior to the Closing, that roll up into LBI's Account No. 0074.]

(b)    "Assumed Depositary Liabilities" means the net amount of all Depositary Liabilities incurred in respect of trades made subsequent to the Closing on 074 Accounts that constitute Purchased Assets.

(c)    "Depositary Liabilities" means Liabilities of LBHI and its Subsidiaries to DTCC in respect of 074 Accounts.

(d)    "DTCC" means the Depositary Trust & Clearing Corporation.

(e)    "Excluded Depositary Liabilities" means all net amount of all Depositary Liabilities, other than Assumed Depositary Liabilities. Excluded Depositary Liabilities shall include Depositary Liabilities incurred in respect of (A) trades made prior to the Closing on all 074 Accounts and (B) trades made subsequent to the Closing on 074 Accounts that constitute Excluded Assets.

10

WGM-LEHMAN-E 00002763

## Section 3.2 & 3.3 Escrow Alternative

3.2    Payment of Cash Amount.  On the Closing Date, Purchaser shall pay (a) $250 million of the Cash Amount to the Escrow Agent and (b) the remainder of the Cash Amount to Seller, each of which shall be paid by wire transfer of immediately available funds into an account designated by the Escrow Agent or Seller, as applicable.

3.3    Adjustments.

(a)    As soon as practicable, Seller shall determine, and notify the Escrow Agent of, the amount of the Excluded Depositary Liabilities.  On the Business Day following the date on which Seller notifies the Escrow Agent of such net amount, the Escrow Agent shall pay, by wire transfer of immediately available funds into an account designated by Seller or Purchaser, as applicable:

(i)    to Purchaser an amount equal to the Excluded Depositary Liabilities; and

(ii)    to Seller the remainder of the Escrow Funds.

provided, however, that, if the Excluded Depositary Liabilities equals or exceeds $250 million, the Escrow Agent shall pay to Purchaser all $250 million of Escrow Funds [and Purchaser shall be entitled to a credit in the amount of such excess against amounts payable by Purchaser to Seller under the Transition Services Agreement].  The amount of any payment to be made pursuant to this Section 3.3(a) shall bear interest from and including the Closing Date to but excluding the date of payment at a rate per annum equal to the rate of interest published from time to time by the *Wall Street Journal* as the "prime rate" at JP Morgan Chase during the period from the Closing Date to the date of payment.  Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of three hundred sixty-five (365) days and the actual number of days elapsed.

(b)    Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof).  Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss.  If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (i) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (ii) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant to this Section 3.3(b)).  For

11

WGM-LEHMAN-E 00002764

~~purposes of this Section 3.3(b), the time value of money shall be disregarded and
no interest shall be deemed earned.~~

12

WGM-LEHMAN-E 00002765

Document comparison done by DeltaView on Friday, September 19, 2008 5:10:19 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1916861/8 |
| Document 2 | pcdocs://ny2/1916861/9 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | Count |
|---|---|
| Insertions | 35 |
| Deletions | 64 |
| Moved from | 11 |
| Moved to | 11 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 121 |

WGM-LEHMAN-E 00002766

# BCI EXHIBIT

# 228



David Murgio/NY/WGM/US          To    James Grogan/NY/WGM/US@WGM
09/19/2008 08:27 PM             cc    "Nadav Weg" <nadav.weg@weil.com>
                                bcc
                           Subject    Re: Revised Clarification Letter 📄



NY12533-#230281-v1-Executed_First_Amendment_to_APA_for_BCI_and_LEH.PDF



Clarification Letter_#1916861.DOC

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com

James Grogan/NY/WGM/US

          James Grogan/NY/WGM/US
          09/19/2008 08:24 PM             To    David Murgio/NY/WGM/US@WGM, "Nadav Weg"
                                                <nadav.weg@weil.com>
                                          cc
                                     Subject    Re: Revised Clarification Letter 📄


David

Nadav is going to have a paralegal bring many copies of the First Amendment down to court. Please send
it to him. Thanks.

James Grogan
Weil, Gotshal & Manges LLP
700 Louisiana St, Ste. 1600
Houston, Texas 77002
Direct: 713.546.5190
Fax: 713.224.9511
          David Murgio

    ----- Original Message -----
    From: David Murgio
    Sent: 09/19/2008 05:15 PM EDT
    To: PDowd@stblaw.com; pmartelli@stblaw.com; sberkenf@lehman.com;
akeller@stblaw.com; jfinley@stblaw.com; vlewkow@cgsh.com; dleinwand@cgsh.com;

WGM-LEHMAN-E 00009395

feldsteinh@sullcrom.com; ClaytonW@sullcrom.com; Richard.Smith3@barcap.com; Jonathan.Hughes@barcap.com; Kevin.Genirs@lehman.com; Lori Fife; Michael Lubowitz; Robert Messineo; Rod Miller; Shai Waisman; James Grogan; Jane McDonald; Harvey Miller
    **Subject**: Revised Clarification Letter

Please find attached a revised version of the Clarification Letter reflecting our conversation this afternoon. The blackline is marked to reflect changes from the draft previously circulated by Cleary.

Regards.

David


[attachment "Clarification Letter_#1916861.DOC" deleted by James Grogan/NY/WGM/US]
[attachment "Clarification Letter_#1916861.DOC" deleted by James Grogan/NY/WGM/US]

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com

WGM-LEHMAN-E 00009396

EXECUTION VERSION

### FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

This FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 19, 2008, among LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("LBHI"), LEHMAN BROTHERS INC., a Delaware corporation ("LBI" and, together with LBHI, the "Seller"), LB 745 LLC, a Delaware limited liability company ("745"), and BARCLAYS CAPITAL INC., a Connecticut corporation ("Purchaser").

### WITNESSETH:

WHEREAS, Seller, 745 and Purchaser are parties to that certain Asset Purchase Agreement, dated as of September 16, 2008, among Seller, 745 and Purchaser (as amended and supplemented from time to time, the "Original Agreement");

WHEREAS, Seller, 745 and Purchaser desire to amend the Original Agreement as set forth below;

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein after contained, the parties hereby agree as follows:

1.    Certain Definitions.  Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Original Agreement.

2.    Excluded Assets. The following language in clause (k) of the definition of Excluded Assets is in the Original Agreement is hereby deleted in its entirety "50% of each position in the residential real estate mortgage securities" and is replaced with "[reserved]".

3.    Purchased Assets.  Clause (e) of the definition of Purchased Assets in the Original Agreement is hereby amended to delete "50%" and to insert "100%" in lieu thereof.

4.    Holdback and Adjustment.  Notwithstanding any other provision of the Original Agreement (including Section 3.2 and Section 12.2 of the Original Agreement), the Purchaser shall retain a portion of the Purchase Price equal to two hundred fifty million dollars ($250,000,000) (such amount the "Holdback") to secure the LBI obligations that the Purchaser has been required to guaranty (the "Guaranteed Obligations") with the Depository Trust Clearing Corporation and its Subsidiaries (the Depository Trust Company, the National Securities Clearing Corporation, and the Fixed Income Clearing Corporation).  To the extent that the value of fifty percent (50%) of the residential real estate mortgage securities transferred as part of the Agreement (such fifty percent (50%) the "Residential Adjustment") plus the Holdback exceeds the amount of the Guaranteed Obligations, Purchaser shall transfer the Residential Adjustment and the Holdback to the Seller as promptly as practicable following settlement of all Guaranteed Obligations.  All Assumed Liabilities shall be for the account of the Purchaser and shall not be charged against the Holdback or to the Residential Adjustment.  All Guaranteed Obligations shall be charged against the Holdback and the Residential Adjustment.  For the avoidance of

doubt, no intercompany liabilities for the account of LBHI and/or any LBHI Affiliate shall be required to be paid by the Purchaser.

     5.    <u>Governing Law</u>.  This Agreement shall be deemed to be made in and in all respects shall be interpreted, constructed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.

     6.    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or e-mail (PDF) shall be effective as delivery of a manually executed counterpart hereof.

     7.    <u>Severability</u>.  If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction in order to carry out the intentions of the parties hereto as nearly as may be possible and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

[Signature pages follow]

WGM-LEHMAN-E 00009398

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

    Name: STEVEN BERKENFELD
    Title: VICE PRESIDENT

LEHMAN BROTHERS INC.

By: _____

    Name: STEVEN BERKENFELD
    Title: MANAGING DIRECTOR

LB 745 LLC

By: _____

    Name: Mark Marcucci
    Title: President

BARCLAYS CAPITAL INC.

By: _____

    Name:
    Title:

WGM-LEHMAN-E 00009399

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
    Name:
    Title:

LEHMAN BROTHERS INC.

By: _____
    Name:
    Title:

LB 745 LLC

By: _____
    Name:
    Title:

BARCLAYS CAPITAL INC.

By: _____
    Name: *ARCHIBALD COX, JR*
    Title: *CHAIRMAN, BARCLAYS AMERICAS*

WGM-LEHMAN-E 00009400

*WGM Draft – September 19, 2008 –7:30 pm*

**BARCLAYS CAPITAL INC.**

September __, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn:  Steven Berkenfeld, Esq.
Facsimile:  (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser").  Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement.  This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and supplements in certain respects the agreements of the parties stated therein and shall amend the Agreement to the extent necessary so as to be consistent with this letter, and is binding on the parties hereto upon its execution and delivery.

1.    Purchased Assets; Excluded Assets.

(a)    The Purchased Assets means all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets), including the items set forth in clauses (a) through (d) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets," plus, with respect to securities owned by LBI, shall also include municipal securities, residential mortgage securities and other securities of which a summary description, by category, is reflected in Exhibit A hereto; it being understood that the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 billion. The categories of securities included among the "Purchased Assets" include only securities in such categories owned by LBI and not any other Affiliate of LBI and, with respect to collateralized short-term agreements, only those collateralized short agreements relating to short positions of LBI.  Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA, (b) the government securities trading and mortgage-backed securities trading operations of LBI and (c) all prime brokerage accounts, and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business).  Purchased Intellectual Properties includes Intellectual Property Rights, Software and Technology,

1

WGM-LEHMAN-E 00009401

wherever in the world held by Holdings or any of its Subsidiaries, that are primarily used or necessary for the conduct by Purchaser of the Business. For the avoidance of doubt, the Business includes LBI's commodities business.

(b)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of LBHI and its Subsidiaries. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement (as hereinafter defined). Also included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration, except as notified by the administrator to LBI from time to time. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Section 1.1(h) of the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business. As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and Purchased Assets and the Business include the private investment management business (other than the CTS (Corporate Cash) business). The employees of PIM of the Closing Date shall become Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the private investment management business of Seller (the "PIM Business") in the pool of Transferred Employees. Accordingly, Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business. The Transferred Employees of the PIM Business will be treated in a manner consistent with the principles set forth in Section 9.1(c). The Purchased Assets include forgivable notes issued by the Transferred Employees of the PIM Business to Seller ("PIM Employee Notes"). [Purchaser agrees to pay any proceeds it receives in respect of such PIM Employee Notes to Seller if and when received. After the date hereof, Purchaser and Seller agree to negotiate in good faith to determine whether an alternative means of addressing the PIM Employee Notes is preferable and agree, to the extent necessary, to jointly seek Bankruptcy Court approval of any such alternative means.] Excluded Liabilities shall include

2

WGM-LEHMAN-E 00009402

any pre-closing legal tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed Liabilities.  Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser, after the Closing, in connection with the Business.  Nothing in this Paragraph 3 is intended to modify Section 8.12 of the Agreement [and no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities."]

4.    License.  All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement.  The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries).  The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or a purchaser of any other businesses of Seller and its Subsidiaries, in each case solely for use in connection with the winding up of any such businesses.

5.    Hedges on Long Positions.  The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (it being understood that exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" are included in Long Positions, but TBA mortgage-backed securities and any over-the-counter derivatives, such as spot and forward currency contracts, are excluded).  The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

6.    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7.    Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    Certain Cash Proceeds.  Any cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions, before the Closing, shall be delivered to Purchaser.

11.    Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract.  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

3

WGM-LEHMAN-E 00009403

12.    Intercompany Obligations. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations, respectively, of Seller or its Subsidiaries or between or among any Seller or any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

13.    Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

14.    Barclays Repurchase Agreement. At the Closing, Purchaser and its Affiliates will release Seller and its Subsidiaries, and Seller and its Subsidiaries will release Purchaser and its Affiliates, from their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates. (the "Barclays Repurchase Agreement")

15.    Risk of Loss of Artwork. During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

16.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

17.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within

4

WGM-LEHMAN-E 00009404

a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease

WGM-LEHMAN-E 00009405

agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

18.    Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

19.    745 Seventh Avenue. The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

1.1    20.    Prorations. Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

21.    Schedules. Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

22.    Definition of Contract. Contract shall not include swap agreements.

6

WGM-LEHMAN-E 00009406

23.    PIM Business Leases. Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser. Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease. With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

7

WGM-LEHMAN-E 00009407

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:


NY2:\1916861\10\1532510!.DOC\73683.1037

WGM-LEHMAN-E 00009408

# BCI EXHIBIT

# 229

| From: | Rovira, Alex R. <ARovira@Sidley.com> |
|---|---|
| Sent: | Saturday, September 20, 2008 12:13 AM |
| To: | erosen@cgsh.com |
| Subject: | Options Clearing Corp |

Ed,

Are you still at the sale hearing? As discussed earlier at the hearing, we need
to get the transfer documents signed by Barclays and JPMorgan tonight. The SIPC
Trustee has signed the documents.  If you are not here please let me know who
at Clearly and Barclays I should speak with.

Regards,
Alex

Alex R. Rovira
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
tel:  212-839-5989
cell: 646-644-1929
fax:  212-839-5599
email: arovira@sidley.com


-------------------------------------------------------------------------------

--------------------
IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations,
we inform you
that, unless expressly stated otherwise, any U.S. federal tax advice contained
in this
communication, including attachments, was not intended or written to be used,
and cannot be
used, by any taxpayer for the purpose of avoiding any penalties that may be
imposed on such
taxpayer by the Internal Revenue Service.  In addition, if any such tax advice
is used or referred
to by other parties in promoting, marketing or recommending any partnership or
other entity,
investment plan or arrangement, then (i) the advice should be construed as
written in connection
with the promotion or marketing by others of the transaction(s) or matter(s)
addressed in this
communication and (ii) the taxpayer should seek advice based on the taxpayer's
particular
circumstances from an independent tax advisor.


*****************************************************************************
********************

CONFIDENTIAL

CGSH00033714

This e-mail is sent by a law firm and may contain information that is
privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any
attachments and notify us
immediately.

****************************************************************************
*******************

CONFIDENTIAL

CGSH00033715

# BCI EXHIBIT

# 230

| From: | Rovira, Alex R. <ARovira@Sidley.com> |
| Sent: | Saturday, September 20, 2008 2:18 AM |
| To: | McDaniel, James R. <jmcdaniel@sidley.com>; erosen@cgsh.com |
| Cc: | Attanasio, Lee S. <lattanasio@Sidley.com> |
| Subject: | OCC Transfer Documents |
| Attach: | Barclays Comments to OCC Transfer and Assumption Contract.pdf;Collateral Account Letter Signed by SIPC Trustee.pdf;Transfer and Assumption Agreement Signed by SIPC Trustee.pdf |

Jim,

Attached please find the comments to the Transfer and Assumption agreement provided by Barclays' counsel. I also attach the Transfer and Assumption Agreement and Collateral Letter signed by the SIPC Trustee.

Ed, will the SIPC Trustee be available at your offices tomorrow if we need to have him resign a revised agreement? We will circle up with you tomorrow and I plan on meeting up with you at your offices tomorrow midday.

<<Barclays Comments to OCC Transfer and Assumption Contract.pdf>>
<<Collateral Account Letter Signed by SIPC Trustee.pdf>> <<Transfer and Assumption Agreement Signed by SIPC Trustee.pdf>>

Kind regards,
Alex

Alex R. Rovira
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
tel: 212-839-5989
fax: 212-839-5599
email: arovira@sidley.com


---------------------------------------------------------------------------
---------------------

IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform you
that, unless expressly stated otherwise, any U.S. federal tax advice contained in this
communication, including attachments, was not intended or written to be used, and cannot be
used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such
taxpayer by the Internal Revenue Service. In addition, if any such tax advice is used or referred
to by other parties in promoting, marketing or recommending any partnership or other entity,
investment plan or arrangement, then (i) the advice should be construed as

BCI-CG00063900

written in connection
with the promotion or marketing by others of the transaction(s) or matter(s)
addressed in this
communication and (ii) the taxpayer should seek advice based on the taxpayer's
particular
circumstances from an independent tax advisor.


**********************************************************************
********************

This e-mail is sent by a law firm and may contain information that is
privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any
attachments and notify us
immediately.

**********************************************************************
********************


- Barclays Comments to OCC Transfer and Assumption Contract.pdf - Collateral
Account Letter Signed by SIPC Trustee.pdf - Transfer and Assumption Agreement
Signed by SIPC Trustee.pdf

CONFIDENTIAL

BCI-CG00063901

# TRANSFER AND ASSUMPTION AGREEMENT

Agreement (the "Agreement") dated as of the close of business on Friday, September 19, 2008 ("~~Effective Date~~") among Lehman Brothers, Inc. ("Lehman"), The Options Clearing Corporation, ("OCC", and Barclays Capital, Inc. ("Barclays"). All defined terms (the first instance of which is indicated by underlining) not defined herein shall have the meaning assigned to such terms in OCC's By-Laws or Rules (collectively, the "Rules").

## WITNESSETH:

WHEREAS, Lehman is a clearing member of OCC and carries one or more accounts (nos. 74, 84 and 273 (collectively the "Account")) that contain certain positions in cleared contracts into which Lehman has entered;

WHEREAS, Lehman maintains Clearing Fund and margin deposits with OCC;

WHEREAS, Lehman desires to terminate its OCC membership and transfer its rights, obligations and liabilities under and in respect of the Account pursuant to OCC's membership agreements and the Rules to Barclays, and Barclays desires to accept the transfer of all of Lehman's rights, obligations and liabilities under and in respect of the Account, including with respect to the Clearing Fund deposit and all margin deposits held by OCC with respect to the Account; [*as of the effective date ("Effective Date") of the consummation of the acquisition of and assumption of certain assets and liabilities of Lehman by Barclays*]

WHEREAS, OCC agrees to permit the transfer contemplated in the previous whereas clause;

NOW, THEREFORE, it is hereby agreed as follows:

1.   Transfer.

        (a)      For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lehman hereby sells, assigns, transfers, and sets over to Barclays, without recourse or without representation or warranty (other than as expressly provided herein), all of Lehman's rights, title, interests, powers, privileges, remedies, obligations, and duties in, to, under, and in respect of the Account, including with respect to: (i) the Clearing Fund deposit; (ii) all margin deposits held by OCC with respect to the Account; (iii) all settlement obligations with regard to transactions in cleared contracts ~~occurring on September 19, 2008;~~ and (iv) all rights and obligations in respect of exercises of option contracts ~~occurring on the Effective Date~~ and assignments of such exercises. [*as of the Effective Date*]

BCI-CG00063902

(b)    As of the Effective Date, Barclays hereby accepts such sale, assignment, and transfer of the Account, agrees to be bound by and receive the benefits of maintaining such Account, and assumes and agrees to perform each obligation arising out of or to be performed with respect to the activity in the Account.

2.    <u>Representations and Warranties</u>.

(a)    Lehman and Barclays each hereby represents and warrants to the other and to OCC as follows:

(i)    it is duly organized and validly existing and has the power and legal right to execute and deliver this Agreement and to transfer or assume the rights and obligations being transferred hereunder, as the case may be;

(ii)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action; and

(iii)    this Agreement is legal, valid and binding agreement, enforceable against it in accordance with its terms.

(b)    Lehman hereby represents and warrants that it is the legal and beneficial owner of the interest being transferred by it hereunder and that such interest is free and clear of any adverse claim (except for such claims or interests of OCC).

(c)    Barclays hereby: (i) represents and warrants that it has received such documents and other information as it has deemed appropriate to make its own credit analysis and decision to enter into this Agreement; (ii) agrees that it will, independently and without reliance upon Lehman or OCC and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions with respect to the Account; and (iii) agrees that it will perform in accordance with their terms all of the obligations that by the terms of the Rules and any related agreements entered into between it and OCC, are required to be performed by it.

3.    <u>Effective Date</u>.  The Effective Date for this Agreement shall be the date specified in the first paragraph of this Agreement.

4.    <u>Rights</u>.  As of the Effective Date, all rights, obligations and liabilities of Barclays pursuant to OCC's membership agreements and the Rules shall apply to the Account.

5.    <u>OCC Consent</u>.  OCC hereby consents to the transfer, assignment, assumption and release effected pursuant to this Agreement.

6.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to the conflict of law principles thereof.

CONFIDENTIAL    BCI-CG00063903

7.      Amendments and Waivers.  This Agreement may be amended or any of its provisions waived only by a written instrument executed and delivered by each of the parties hereto.

8.      Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement by their duly authorized officers as of the date set forth above.

**LEHMAN BROTHERS, INC.**

By:  _____

Print Name:  _____

Title:  _____

**BARCLAYS CAPITAL INC.**

By:  _____

Print Name:  _____

Title:  _____

**THE OPTIONS CLEARING CORPORATION**

By:  _____

Print Name:  _____

Title:  _____

CHI 4414675v.2

CONFIDENTIAL

BCI-CG00063904

# BCI EXHIBIT

# 231

| | |
|---|---|
| **To:** | Kobak, James B.[kobak@hugheshubbard.com]; Margolin, Jeff[margolin@hugheshubbard.com] |
| **Cc:** | McDaniel, James R.[jmcdaniel@sidley.com] |
| **From:** | Rovira, Alex R. |
| **Sent:** | Sat 9/20/2008 2:32:26 AM |
| **Importance:** | High |
| **Sensitivity:** | None |
| **Subject:** | Options Clearance Corporation Transfer Documents |
| **Categories:** | urn:content-classes:message |

**Barclays Comments to OCC Transfer and Assumption Contract.pdf**
**OCCJPMscan0001.pdf**
**Collateral Account Letter Signed by SIPC Trustee.pdf**
**Barclays Comments to OCC Transfer and Assumption Contract.pdf**

James, Jeffrey,

It was a pleasure meeting you and the SIPC Trustee today at the sale hearing.  Please find attached some clean up comments to the transfer documentation for the transfer of the OCC accounts.  We need to finalize these documents tomorrow.  I also attach a copy of the Trustee's executed Transfer Agreement and Collateral Account agreement.  We will be revising and finalizing the documents tomorrow and will circulate to you revised copies.  Please let us know if the SIPC Trustee will be available to execute the revised agreements tomorrow, or if you and the SIPC Trustee approve the revised documents please let us know whether you authorize us to use the executed signature page for the Transfer and Assumption Agreement for the finalized agreement.  We will circulate the final revised agreements tomorrow.


<<Barclays Comments to OCC Transfer and Assumption Contract.pdf>> <<OCCJPMscan0001.pdf>>
<<Collateral Account Letter Signed by SIPC Trustee.pdf>> <<Barclays Comments to OCC Transfer and
Assumption Contract.pdf>>

Kind regards,
Alex


Alex R. Rovira
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
tel: 212-839-5989
fax: 212-839-5599
email: arovira@sidley.com


--------------------------------------------------------------------------------------------------------

IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform you
that, unless expressly stated otherwise, any U.S. federal tax advice contained in this



HHR_00006072

communication, including attachments, was not intended or written to be used, and cannot be
used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such
taxpayer by the Internal Revenue Service.  In addition, if any such tax advice is used or referred
to by other parties in promoting, marketing or recommending any partnership or other entity,
investment plan or arrangement, then (i) the advice should be construed as written in connection
with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this
communication and (ii) the taxpayer should seek advice based on the taxpayer's particular
circumstances from an independent tax advisor.

************************************************************************
*********************
This e-mail is sent by a law firm and may contain information that is
privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any
attachments and notify us
immediately.
************************************************************************
*********************

Confidential

HHR_00006073

## TRANSFER AND ASSUMPTION AGREEMENT

Agreement (the "Agreement") dated as of the close of business on Friday, September 19, 2008 ("~~Effective Date~~") among Lehman Brothers, Inc. ("Lehman"), The Options Clearing Corporation, ("OCC", and Barclays Capital, Inc. ("Barclays"). All defined terms (the first instance of which is indicated by underlining) not defined herein shall have the meaning assigned to such terms in OCC's By-Laws or Rules (collectively, the "Rules").

### WITNESSETH:

WHEREAS, Lehman is a clearing member of OCC and carries one or more accounts (nos. 74, 84 and 273 (collectively the "Account")) that contain certain positions in cleared contracts into which Lehman has entered;

WHEREAS, Lehman maintains Clearing Fund and margin deposits with OCC;

WHEREAS, Lehman desires to terminate its OCC membership and transfer its rights, obligations and liabilities under and in respect of the Account pursuant to OCC's membership agreements and the Rules to Barclays, and Barclays desires to accept the transfer of all of Lehman's rights, obligations and liabilities under and in respect of the Account, including with respect to the Clearing Fund deposit and all margin deposits held by OCC with respect to the Account; *[as of the effective date (" Effective Date") of the consummation of the acquisition of and assumption of certain assets and liabilities of Lehman by Barclays]*

WHEREAS, OCC agrees to permit the transfer contemplated in the previous whereas clause;

NOW, THEREFORE, it is hereby agreed as follows:

1.   Transfer.

   (a)   For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lehman hereby sells, assigns, transfers, and sets over to Barclays, without recourse or without representation or warranty (other than as expressly provided herein), all of Lehman's rights, title, interests, powers, privileges, remedies, obligations, and duties in, to, under, and in respect of the Account, including with respect to: (i) the Clearing Fund deposit; (ii) all margin deposits held by OCC with respect to the Account; (iii) all settlement obligations with regard to transactions in cleared contracts ~~occurring on September 19, 2008;~~ and (iv) all rights and obligations in respect of exercises of option contracts ~~occurring on the Effective Date~~ and assignments of such exercises. *, as of the Effective Date*

Confidential

HHR_00006074

(b)    As of the Effective Date, Barclays hereby accepts such sale, assignment, and transfer of the Account, agrees to be bound by and receive the benefits of maintaining such Account, and assumes and agrees to perform each obligation arising out of or to be performed with respect to the activity in the Account.

2.    Representations and Warranties.

(a)    Lehman and Barclays each hereby represents and warrants to the other and to OCC as follows:

(i)    it is duly organized and validly existing and has the power and legal right to execute and deliver this Agreement and to transfer or assume the rights and obligations being transferred hereunder, as the case may be;

(ii)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action; and

(iii)    this Agreement is legal, valid and binding agreement, enforceable against it in accordance with its terms.

(b)    Lehman hereby represents and warrants that it is the legal and beneficial owner of the interest being transferred by it hereunder and that such interest is free and clear of any adverse claim (except for such claims or interests of OCC).

(c)    Barclays hereby: (i) represents and warrants that it has received such documents and other information as it has deemed appropriate to make its own credit analysis and decision to enter into this Agreement; (ii) agrees that it will, independently and without reliance upon Lehman or OCC and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions with respect to the Account; and (iii) agrees that it will perform in accordance with their terms all of the obligations that by the terms of the Rules and any related agreements entered into between it and OCC, are required to be performed by it.

3.    Effective Date.  The Effective Date for this Agreement shall be the date specified in the first paragraph of this Agreement.

4.    Rights.  As of the Effective Date, all rights, obligations and liabilities of Barclays pursuant to OCC's membership agreements and the Rules shall apply to the Account.

5.    OCC Consent.  OCC hereby consents to the transfer, assignment, assumption and release effected pursuant to this Agreement.

6.    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to the conflict of law principles thereof.

Confidential

7.    Amendments and Waivers. This Agreement may be amended or any of its provisions waived only by a written instrument executed and delivered by each of the parties hereto.

8.    Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement by their duly authorized officers as of the date set forth above.

**LEHMAN BROTHERS, INC.**

By: _____

Print Name: _____

Title: _____

**BARCLAYS CAPITAL INC.**

By: _____

Print Name: _____

Title: _____

**THE OPTIONS CLEARING CORPORATION**

By: _____

Print Name: _____

Title: _____

CHI 4414675v.2

CGSH Comments
20

September 19, 2008

The Options Clearing Corporation
One North Wacker Drive
Chicago, IL 60606                    on or before       [21]       (the "Transaction")

        Re:    BARCLAYS CAPITAL INC. COLLATERAL ACCOUNT WITH J.P. MORGAN
               CHASE BANK, N.A.

        Effective as of the close of business on September 19, 2008 it is expected that Lehman
Brothers, Inc. ("LBI") and Barclays Capital Inc. ("Barclays") will complete the transfer of
certain business assets and liabilities from LBI to Barclays.

        In connection with such transfer, LBI has assigned to Barclays all rights in securities
cash, and other property ("Collateral") pledged by LBI to The Options Clearing Corporation
("OCC") and held for OCC's benefit at J.P. Morgan Chase. Barclays Capital Inc. has assumed
all the rights and obligations of LBI in respect of said Collateral and LBI has consented to said
assignment and assumption. Therefore, LBI hereby authorizes and directs J.P. Morgan Chase to
transfer on its books as of the close of business on Friday, September 19, 2008, the Collateral
pledged to OCC, to the account or accounts of Barclays Capital Inc. and to reflect on the records
of J.P. Morgan Chase that such Collateral is pledged to OCC by Barclays Capital Inc. It is
agreed that such Collateral will be held subject to the exclusive control of OCC.

LEHMAN BROTHERS, INC.                        J.P. MORGAN CHASE BANK, N.A.

By: _____                  By: _____
     (Authorized Signer)                           (Authorized Signer)


    _____                      _____
     (Print Name and Title)                        (Print Name and Title)

BARCLAYS CAPITAL INC.

By: _____                  Consummation of the Transaction

     (Authorized Signer)


    _____
     (Print Name and Title)

CHI 4415073v1

September 19, 2008

The Options Clearing Corporation
One North Wacker Drive
Chicago, IL  60606

Re:    BARCLAYS CAPITAL INC. COLLATERAL ACCOUNT WITH J.P. MORGAN
CHASE BANK, N.A.

Effective as of the close of business on September 19, 2008, it is expected that Lehman
Brothers, Inc. ("LBI") and Barclays Capital Inc. ("Barclays") will complete the transfer of
certain business assets and liabilities from LBI to Barclays.

In connection with such transfer, LBI has assigned to Barclays all rights in securities
cash, and other property ("Collateral") pledged by LBI to The Options Clearing Corporation
("OCC") and held for OCC's benefit at J.P. Morgan Chase.  Barclays Capital Inc. has assumed
all the rights and obligations of LBI in respect of said Collateral and LBI has consented to said
assignment and assumption.  Therefore, LBI hereby authorizes and directs J.P. Morgan Chase to
transfer on its books as of the close of business on Friday, September 19, 2008, the Collateral
pledged to OCC, to the account or accounts of Barclays Capital Inc. and to reflect on the records
of J.P. Morgan Chase that such Collateral is pledged to OCC by Barclays Capital Inc.  It is
agreed that such Collateral will be held subject to the exclusive control of OCC.

*JAMES W. GIDDENS AS SIPA Trustee*

LEHMAN BROTHERS, INC.   *FOR*          J.P. MORGAN CHASE BANK, N.A.

By: _____        By: _____
    (Authorized Signer)                   (Authorized Signer)

    *JAMES B. KOBAK, JR.*
    (Print Name and Title)                _____
                                          (Print Name and Title)

BARCLAYS CAPITAL INC.

By:_____
   (Authorized Signer)

_____
   (Print Name and Title)

CHI 4415073v.1

**TRANSFER AND ASSUMPTION AGREEMENT**

Agreement (the "Agreement") dated as of the close of business on Friday, September 19, 2008 (~~"Effective Date"~~) among Lehman Brothers, Inc. ("Lehman"), The Options Clearing Corporation, ("OCC", and Barclays Capital, Inc. ("Barclays"). All defined terms (the first instance of which is indicated by underlining) not defined herein shall have the meaning assigned to such terms in OCC's By-Laws or Rules (collectively, the "Rules").

**WITNESSETH:**

WHEREAS, Lehman is a clearing member of OCC and carries one or more accounts (nos. 74, 84 and 273 (collectively the "Account")) that contain certain positions in <u>cleared contracts</u> into which Lehman has entered;

WHEREAS, Lehman maintains <u>Clearing Fund</u> and <u>margin deposits</u> with OCC;

WHEREAS, Lehman desires to terminate its OCC membership and transfer its rights, obligations and liabilities under and in respect of the Account pursuant to OCC's membership agreements and the Rules to Barclays, and Barclays desires to accept the transfer of all of Lehman's rights, obligations and liabilities under and in respect of the Account, including with respect to the Clearing Fund deposit and all margin deposits held by OCC with respect to the Account; *[ "as of the effective date ("Effective Date") of the consummation of the acquisition of and assumption of certain assets and liabilities of Lehman by Barclays* ]

WHEREAS, OCC agrees to permit the transfer contemplated in the previous whereas clause;

NOW, THEREFORE, it is hereby agreed as follows:

1.     <u>Transfer.</u>

(a)     For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lehman hereby sells, assigns, transfers, and sets over to Barclays, without recourse or without representation or warranty (other than as expressly provided herein), all of Lehman's rights, title, interests, powers, privileges, remedies, obligations, and duties in, to, under, and in respect of the Account, including with respect to: (i) the Clearing Fund deposit; (ii) all margin deposits held by OCC with respect to the Account; (iii) all settlement obligations with regard to transactions in cleared contracts ~~occurring on September 19, 2008;~~ and (iv) all rights and obligations in respect of exercises of <u>option contracts</u> ~~occurring on the Effective Date~~ and assignments of such exercises. *[ as of the Effective Date*

(b)    As of the Effective Date, Barclays hereby accepts such sale, assignment, and transfer of the Account, agrees to be bound by and receive the benefits of maintaining such Account, and assumes and agrees to perform each obligation arising out of or to be performed with respect to the activity in the Account.

2.    Representations and Warranties.

(a)    Lehman and Barclays each hereby represents and warrants to the other and to OCC as follows:

(i)    it is duly organized and validly existing and has the power and legal right to execute and deliver this Agreement and to transfer or assume the rights and obligations being transferred hereunder, as the case may be;

(ii)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action; and

(iii)    this Agreement is legal, valid and binding agreement, enforceable against it in accordance with its terms.

(b)    Lehman hereby represents and warrants that it is the legal and beneficial owner of the interest being transferred by it hereunder and that such interest is free and clear of any adverse claim (except for such claims or interests of OCC).

(c)    Barclays hereby: (i) represents and warrants that it has received such documents and other information as it has deemed appropriate to make its own credit analysis and decision to enter into this Agreement; (ii) agrees that it will, independently and without reliance upon Lehman or OCC and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions with respect to the Account; and (iii) agrees that it will perform in accordance with their terms all of the obligations that by the terms of the Rules and any related agreements entered into between it and OCC, are required to be performed by it.

3.    Effective Date. The Effective Date for this Agreement shall be the date specified in the first paragraph of this Agreement.

4.    Rights. As of the Effective Date, all rights, obligations and liabilities of Barclays pursuant to OCC's membership agreements and the Rules shall apply to the Account.

5.    OCC Consent. OCC hereby consents to the transfer, assignment, assumption and release effected pursuant to this Agreement.

6.    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to the conflict of law principles thereof.

7.    _Amendments and Waivers_.  This Agreement may be amended or any of its provisions waived only by a written instrument executed and delivered by each of the parties hereto.

8.    _Counterparts_.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement by their duly authorized officers as of the date set forth above.

**LEHMAN BROTHERS, INC.**

By: _____

Print Name: _____

Title: _____

**BARCLAYS CAPITAL INC.**

By: _____

Print Name: _____

Title: _____

**THE OPTIONS CLEARING CORPORATION**

By: _____

Print Name: _____

Title: _____

CHI 4414675v.2

# BCI EXHIBIT

# 232

| From: | Azerad. Robert [RAzerad@lehman.com]. | Sent:9/20/2008 10:34 AM. |
|---|---|---|
| To: | Tonucci. Paolo [paolo.tonucci@lehman.com]; Kelly, Martin [martin.kelly@lehman.com]; Blackwell, Alastair [ablackwe@lehman.com]; Beldner. Brett [brett.beldner@lehman.com]. | |
| Cc: | Stewart, Marie [marie.stewart@lehman.com]; Reilly, Gerard [greilly@lehman.com]: Veksler, Irina [irina.veksler@lehman.com]; Fleming, Dan (TSY) [dfleming@lehman.com]. | |
| Bcc: | . | |
| Subject: | RE: Opening balance sheet. | |

Details of the 15c3 (both customer and PAIB). Don't have the details on
how it was locked up (cash vs. securities) but this should not make a
difference from an accounting standpoint hopefully.

Robert

-----Original Message-----
From: Tonucci, Paolo
Sent: Saturday, September 20, 2008 10:31 AM
To: Azerad. Robert; Kelly, Martin; Blackwell, Alastair; Beldner. Brett
Cc: Stewart, Marie; Reilly. Gerard; Veksler, Irina; Fleming, Dan (TSY)
Subject: RE: Opening balance sheet

We also need to add the 15c3 cash as a receivable.

Dan.

The collateral that was locked up for 15c3 needs to be transferred over
the Barclays. How is that done? Has that already been moved with the
customer collateral?

-----Original Message-----
From: Azerad. Robert
Sent: 20 September 2008 10:27
To: Kelly, Martin; Blackwell, Alastair; Beldner, Brett
Cc: Stewart, Marie; Reilly, Gerard; Tonucci, Paolo; Veksler, Irina
Subject: RE: Opening balance sheet

Classification of the assets by asset class should be done by EOD today
assuming that what was transferred was:

1) Repo with Barclays as of Thursday night ($49 billion - $42 billion of
securities and $7 billion of cash)
2) Non-actionable box as shown to Barclays on Friday afternoon ($1.9
billion of collateral). Actual box is slightly bigger because it also
contains Lehman debt

Robert

PS: Prices will be per the repo file sent by Ops on Friday morning and
per the box report as of Friday morning.

-----Original Message-----
From: Kelly, Martin
Sent: Saturday. September 20, 2008 9:36 AM
To: Azerad, Robert: Blackwell, Alastair; Beldner. Brett
Cc: Stewart. Marie; Reilly, Gerard; Tonucci. Paolo
Subject: Opening balance sheet

EXHIBIT

ISIA

8-14.09  AW

Barclays (James Walker) called this am. They want an "opening balance sheet" today. 3 pieces to this. (1) Robert - do you have the final list of assets under the repo which they took possession of - need by gaap asset class versus the financing. Could you please assemble in a file which can be sent direct back to barclays (2) did we end up transferring the shorts and related reverse repo? If so, Robert/Alistair who has that list, were tickets booked for this etc.same as above need a list to be emailed back (3) Brett - could you please update the summary BS once we have this information later in the day.

I think we need to deliver back to narclays the simple BS together with inventory list and possibly shorts/reverses depending on what was done with this. Robert - could you please compile and coordinate with brett around BS.

Please give me ETA so I can update James at Barclays.

Thx - M

--------------------------------

FINAL

**Lehman Brothers Inc.**
**Customer/PAIB Reserve Analysis**

| Customer: | 09/17/08 | 09/16/08 | Variance | 3 Month Avg |
|---|---|---|---|---|
| **MTS** | | | | |
| Free Credits | 77,216 | 85,126 | (7,911) | 31,115 |
| SCS Cash | 46,462 | 62,778 | (16,316) | 393,585 |
| Option Margin | 15,824 | 12,105 | 3,719 | 63,353 |
| P & I | 22,858 | 22,253 | 605 | 22,809 |
| Aged Fails and Partly Secured Debits | 7,518 | 9,847 | (2,330) | 9,538 |
| Customer Receivable Versus Box | - | - | | (65) |
| Stock Record/P&C items | 86,809 | 49,550 | 37,259 | 33,719 |
| Overdrafts | - | 69,484 | (69,484) | 45,935 |
| Unapplied Cash / Suspense | 31,677 | 123,215 | (91,538) | 55,468 |
| 3% ADI | 216,477 | 295,389 | (78,911) | 35,350 |
| Sub-total | 504,841 | 729,747 | (224,906) | 691,407 |
| | | | | |
| **ADP** | | | | |
| Free Credits / Margin | 481,456 | 174,237 | 307,219 | 2,858,182 |
| | | | | |
| Net Customer Financing | (831,906) | 405,508 | (1,237,414) | (972,434) |
| OMNI Conversion Payable | - | - | - | |
| O/Drafts | 62,604 | 294,945 | (232,341) | 50,330 |
| Dividends | 5,322 | 3,648 | 1,675 | 15,695 |
| S/B L.O.C. vs. Customer Short | - | - | - | |
| S/B NQ vs. Customer Short | 5,287 | 6,981 | (1,694) | 14,152 |
| Non-Broker Dealer Affil. | 290,539 | 211,676 | 78,863 | 149,720 |
| OCC Proprietary Qualified Collateral | (349,858) | (487,071) | 137,213 | (831,762) |
| Firm Bank Loan - Firm Not Long | - | - | - | |
| Suspense | 39,897 | 39,897 | - | 14,203 |
| Unapplied Cash | 10,121 | 18,307 | (8,185) | 9,642 |
| Abandoned Property / Soft Dollars ($42 mil) | 85,212 | 85,212 | - | 81,066 |
| Other | 82,685 | 50,271 | 32,414 | 22,382 |
| 3% ADI | 322,692 | 321,529 | 1,163 | 132,964 |
| Sub-total | 204,052 | 1,125,139 | (921,087) | 1,544,142 |
| | | | | |
| **ITS** | | | | |
| Free Credits (primarily SCS cash) | 160,575 | 344,517 | (183,943) | 1,234,634 |
| Unsecured Shorts | 77,639 | 77,639 | - | 60,336 |
| Securities Related IC Payable (Mostly ITS) | 189,086 | 189,086 | - | 133,470 |
| Other | - | - | - | - |
| 3% ADI | 178,711 | 142,950 | 35,762 | 24,315 |
| Sub-total | 606,011 | 754,192 | (148,181) | 1,452,756 |
| | | | | |
| **Commodities** | | | | |
| O/Drafts | 176,487 | 97,367 | 79,120 | 54,728 |
| Non-Reg Commodity Credits | 52,000 | 52,000 | - | 106,668 |
| Sub-total | 228,487 | 149,367 | 79,120 | 161,396 |
| | | | | |
| Requirement | 1,543,392 | 2,758,446 | (1,215,054) | 3,849,701 |
| Cushion (plus 2% deduction) | 225,608 | 10,554 | 215,054 | 332,154 |
| Amount Segregated | 1,769,000 | 2,769,000 | (1,000,000) | 4,181,855 |
| | | | | |
| **PAIB:** | | | | |
| | | | | |
| Net PAIB Debits/Credits | 325,286 | 350,949 | (25,663) | 1,245,733 |
| Bank Loan | 3,560 | 9,509 | (5,949) | 719 |
| Stock Loan | 312,247 | 338,880 | (26,633) | 171,674 |
| F/R Vs PAIB Long | 31,031 | 23,095 | 7,936 | 1,147 |
| Firm Short vs. PAIB Long | 394,506 | 350,157 | 44,349 | 130,203 |
| Stock Borrow | (560,229) | (606,515) | 46,286 | (1,116,764) |
| Fail to Deliver | (40,281) | (21,581) | (18,700) | (2,633) |
| | | | | |
| Requirement | 466,120 | 444,494 | 21,626 | 430,079 |
| Cushion (plus 2% deduction) | 25,880 | 15,506 | 10,374 | 111,079 |
| Amount Segregated | 492,000 | 460,000 | 32,000 | 541,158 |
| | | | - | |
| Total Segregated | 2,261,000 | 3,228,999 | (967,999) | 4,723,013 |

* Denotes account net debit balances.

# BCI EXHIBIT

# 233

| From: | McDaniel, James R. <jmcdaniel@sidley.com> |
| Sent: | Saturday, September 20, 2008 12:45 PM |
| To: | Ronit.Berkovich@weil.com; Shai.Waisman@weil.com; rod.miller@weil.com; kgeneris@lehman.com; erosen@cgsh.com; kobak@hugheshubbard.com; giddens@hugheshubbard.com; margolin@hugheshubbard.com; Kcaputo@sipc.org; SHirshon@proskauer.com; SHirshon@proskauer.com; lsiebold@dtcc.com |
| Cc: | wnavin@theocc.com; Rovira, Alex R. <ARovira@Sidley.com>; Attanasio, Lee S. <lattanasio@Sidley.com> |
| Subject: | LBI Property at OCC |

To the Group:

OCC is seeking to confirm its understanding that the LBI accounts and all
positions, cash and securities collateral that are held by OCC in respect
of those accounts are intended to be transferred to Barclays and that
Barclays is assuming all obligations with respect to those accounts. The
mechanism by which OCC proposes to accomplish this purpose is to simply
rename the LBI accounts as accounts of Barclays and it would then be
Barclays obligation to make settlement in respect of those accounts on
Monday morning.  OCC needs to know whether Barclays will be using its BoNY
settlement account to effect Monday's settlements in the former LBI
accounts, and, if not, how Barclays proposes to effect settlement.  There
is also a letter of credit that secures LBI's obligations to OCC, and
arrangement should presumably be made to have that letter of credit
reissued with Barclays as the account party to avoid the possibility of a
large margin call against Barclays.

It is our understanding that certain parts of the APA are still being
negotiated, including an amendment relating to property at DTC which may
involve similar issues to those affecting OCC.  OCC circulated yesterday at
the hearing a Transfer and Assumption Agreement among OCC, LBI and Barclays
relating to these issues, and a proposed agreement dealing with collateral
of LBI consisting of government securities held at JPMorganChase as
custodian.  In addition, OCC is holding nearly $1 billion in cash for the
accounts of LBI.  It is important that the disposition of these assets is
understood and agreed to among all parties and that the documentation
addresses it in a consistent way.   We understand that there is a meeting
in Cleary's offices today and Bill Navin, OCC's General Counsel, and I would
like to participate by phone.  Sidley lawyer Alex Rovira is enroute to Cleary's
offices now.

James R. McDaniel
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312)853-2665
Fax: (312)853-7036

-----------------------------------------------------------------------------

CONFIDENTIAL

CGSH00033921

--------------------
IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform you
that, unless expressly stated otherwise, any U.S. federal tax advice contained in this
communication, including attachments, was not intended or written to be used, and cannot be
used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such
taxpayer by the Internal Revenue Service.  In addition, if any such tax advice is used or referred
to by other parties in promoting, marketing or recommending any partnership or other entity,
investment plan or arrangement, then (i) the advice should be construed as written in connection
with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this
communication and (ii) the taxpayer should seek advice based on the taxpayer's particular
circumstances from an independent tax advisor.


**********************************************************************************
********************
This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

**********************************************************************************
********************

CONFIDENTIAL                                                                CGSH00033922

# BCI EXHIBIT

# 234

| | |
|---|---|
| **To:** | 'Rovira, Alex R.'[ARovira@Sidley.com]; Margolin, Jeff[margolin@HughesHubbard.COM] |
| **Cc:** | McDaniel, James R.[jmcdaniel@sidley.com]; Giddens, James W.[giddens@hugheshubbard.com] |
| **From:** | Kobak, James B. |
| **Sent:** | Sat 9/20/2008 1:00:28 PM |
| **Importance:** | Low |
| **Sensitivity:** | None |
| **Subject:** | RE: Options Clearance Corporation Transfer Documents |
| **Categories:** | um:content-classes:message |

These are fine with the SIPA Trustee whom I represent and you are authorized to use the signatures assuming no material changes.

---

**From:** Rovira, Alex R. [mailto:ARovira@Sidley.com]
**Sent:** Saturday, September 20, 2008 2:32 AM
**To:** Kobak, James B.; Margolin, Jeff
**Cc:** McDaniel, James R.
**Subject:** Options Clearance Corporation Transfer Documents
**Importance:** High

James, Jeffrey,

It was a pleasure meeting you and the SIPC Trustee today at the sale hearing. Please find attached some clean up comments to the transfer documentation for the transfer of the OCC accounts. We need to finalize these documents tomorrow. I also attach a copy of the Trustee's executed Transfer Agreement and Collateral Account agreement. We will be revising and finalizing the documents tomorrow and will circulate to you revised copies. Please let us know if the SIPC Trustee will be available to execute the revised agreements tomorrow, or if you and the SIPC Trustee approve the revised documents please let us know whether you authorize us to use the executed signature page for the Transfer and Assumption Agreement for the finalized agreement. We will circulate the final revised agreements tomorrow.

<<Barclays Comments to OCC Transfer and Assumption Contract.pdf>> <<OCCJPMscan0001.pdf>>
<<Collateral Account Letter Signed by SIPC Trustee.pdf>> <<Barclays Comments to OCC Transfer and Assumption Contract.pdf>>

Kind regards,
Alex

Alex R. Rovira
Sidley Austin LLP
787 Seventh Avenue

Confidential

New York, NY 10019
tel: 212-839-5989
fax: 212-839-5599
email: arovira@sidley.com

-----------------------------------------------------------------------------------------

IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform you
that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication, including attachments, was not intended or written to be used, and cannot be
used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such
taxpayer by the Internal Revenue Service.  In addition, if any such tax advice is used or referred
to by other parties in promoting, marketing or recommending any partnership or other entity,
investment plan or arrangement, then (i) the advice should be construed as written in connection
with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this
communication and (ii) the taxpayer should seek advice based on the taxpayer's particular
circumstances from an independent tax advisor.

************************************************************************************
*************************
This e-mail is sent by a law firm and may contain information that is
privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any
attachments and notify us
immediately.
************************************************************************************
*************************

Confidential

# BCI EXHIBIT

# 235

**To:**    McDaniel, James R.[jmcdaniel@sidley.com]; Ronit Berkovich[Ronit.Berkovich@weil.com]; Shai Waisman[Shai.Waisman@weil.com]; rod miller[rod.miller@weil.com]; kgeneris[kgeneris@lehman.com]; Kobak, James B.[kobak@hugheshubbard.com]; Giddens, James W.[giddens@hugheshubbard.com]; Margolin, Jeff[margolin@hugheshubbard.com]; Kcaputo[Kcaputo@sipc.org]; SHirshon[SHirshon@proskauer.com]; lsiebold[lsiebold@dtcc.com]
**Cc:**    wnavin[wnavin@theocc.com]; Rovira, Alex R.[ARovira@Sidley.com]; Attanasio, Lee S.[lattanasio@Sidley.com]

| | |
|---|---|
| **From:** | Edward J ROSEN |
| **Sent:** | Sat 9/20/2008 1:09:07 PM |
| **Importance:** | Low |
| **Sensitivity:** | None |
| **Subject:** | Re: LBI Property at OCC |
| **Categories:** | urn:content-classes:message |

Jim - can you tell us more about the $1bn - is it excess margin?
*        *        *

Contact Information

Edward J. Rosen
Cleary, Gottlieb, Steen & Hamilton
One Liberty Plaza - 44th Floor
New York City, New York 10006
Tel. No. 212 225-2820
Fax. No. 212 225-3999

--------

From: "McDaniel, James R." [jmcdaniel@sidley.com]
Sent: 09/20/2008 11:44 AM EST
To: Ronit.Berkovich@weil.com; Shai.Waisman@weil.com; rod.miller@weil.com; kgeneris@lehman.com; Edward ROSEN; kobak@hugheshubbard.com; giddens@hugheshubbard.com; margolin@hugheshubbard.com; Kcaputo@sipc.org; SHirshon@proskauer.com; SHirshon@proskauer.com; lsiebold@dtcc.com
Cc: wnavin@theocc.com; "Rovira, Alex R." <ARovira@Sidley.com>; "Attanasio, Lee S." <lattanasio@Sidley.com>
Subject: LBI Property at OCC


To the Group:

OCC is seeking to confirm its understanding that the LBI accounts and all positions, cash and securities collateral that are held by OCC in respect of those accounts are intended to be transferred to Barclays and that Barclays is assuming all obligations with respect to those accounts. The mechanism by which OCC proposes to accomplish this purpose is to simply rename the LBI accounts as accounts of Barclays and it would then be Barclays obligation to make settlement in respect of those accounts on Monday morning. OCC needs to know whether Barclays will be using its BoNY settlement account to effect Monday's settlements in the former LBI accounts, and, if not, how Barclays proposes to effect settlement. There is also a letter of credit that secures LBI's obligations to OCC, and



Confidential

HHR_00006049

arrangement should presumably be made to have that letter of credit
reissued with Barclays as the account party to avoid the possibility of a
large margin call against Barclays.

It is our understanding that certain parts of the APA are still being
negotiated, including an amendment relating to property at DTC which may
involve similar issues to those affecting OCC.  OCC circulated yesterday at
the hearing a Transfer and Assumption Agreement among OCC, LBI and Barclays
relating to these issues, and a proposed agreement dealing with collateral
of LBI consisting of government securities held at JPMorganChase as
custodian.  In addition, OCC is holding nearly $1 billion in cash for the
accounts of LBI.  It is important that the disposition of these assets is
understood and agreed to among all parties and that the documentation
addresses it in a consistent way.   We understand that there is a meeting
in Cleary's offices today and Bill Navin, OCC's General Counsel, and I would
like to participate by phone.  Sidley lawyer Alex Rovira is enroute to
Cleary's offices now.

James R. McDaniel
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312)853-2665
Fax: (312)853-7036

------------------------------------------------------------------------------

IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we
inform you
that, unless expressly stated otherwise, any U.S. federal tax advice contained in this
communication, including attachments, was not intended or written to be used, and
cannot be
used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on
such
taxpayer by the Internal Revenue Service.  In addition, if any such tax advice is used or
referred
to by other parties in promoting, marketing or recommending any partnership or other
entity,
investment plan or arrangement, then (i) the advice should be construed as written in
connection
with the promotion or marketing by others of the transaction(s) or matter(s) addressed in
this
communication and (ii) the taxpayer should seek advice based on the taxpayer's
particular
circumstances from an independent tax advisor.

Confidential

************************************************************************
**********************
This e-mail is sent by a law firm and may contain information that is
privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any
attachments and notify us
immediately.
************************************************************************
**********************

This message is being sent from a law firm and may contain
confidential or privileged information.  If you are not
the intended recipient, please advise the sender
immediately by reply e-mail and delete this message and
any attachments without retaining a copy.

Confidential

# BCI EXHIBIT

# 236

| From: | McDaniel, James R. <jmcdaniel@sidley.com> |
|---|---|
| Sent: | Saturday, September 20, 2008 1:15 PM |
| To: | Edward J ROSEN <erosen@cgsh.com> |
| Cc: | wnavin@theocc.com |
| Subject: | RE: LBI Property at OCC |

Based on market movements on Friday, a significant amount of it may be excess, but OCC won't know until tomorrow. Also, Friday's trades may use some of the cash.

From: Edward J ROSEN [mailto:erosen@cgsh.com]
Sent: Saturday, September 20, 2008 12:09 PM
To: McDaniel, James R.; Ronit Berkovich; Shai Waisman; rod miller; kgeneris; kobak; giddens; margolin; Kcaputo; SHirshon; lsiebold
Cc: wnavin; Rovira, Alex R.; Attanasio, Lee S.
Subject: Re: LBI Property at OCC


Jim - can you tell us more about the $1bn - is it excess margin?
*        *        *

Contact Information

Edward J. Rosen
Cleary, Gottlieb, Steen & Hamilton
One Liberty Plaza - 44th Floor
New York City, New York 10006
Tel. No. 212 225-2820
Fax. No. 212 225-3999



From: "McDaniel, James R." [jmcdaniel@sidley.com]
Sent: 09/20/2008 11:44 AM EST
To: Ronit.Berkovich@weil.com; Shai.Waisman@weil.com; rod.miller@weil.com; kgeneris@lehman.com; Edward ROSEN; kobak@hugheshubbard.com; giddens@hugheshubbard.com; margolin@hugheshubbard.com; Kcaputo@sipc.org; SHirshon@proskauer.com; SHirshon@proskauer.com; lsiebold@dtcc.com
Cc: wnavin@theocc.com; "Rovira, Alex R." <ARovira@Sidley.com>; "Attanasio, Lee S." <lattanasio@Sidley.com>
Subject: LBI Property at OCC


To the Group:

OCC is seeking to confirm its understanding that the LBI accounts and all positions, cash and securities collateral that are held by OCC in respect of those accounts are intended to be transferred to Barclays and that

CGSH00034015

Barclays is assuming all obligations with respect to those accounts. The
mechanism by which OCC proposes to accomplish this purpose is to simply
rename the LBI accounts as accounts of Barclays and it would then be
Barclays obligation to make settlement in respect of those accounts on
Monday morning. OCC needs to know whether Barclays will be using its BoNY
settlement account to effect Monday's settlements in the former LBI
accounts, and, if not, how Barclays proposes to effect settlement. There
is also a letter of credit that secures LBI's obligations to OCC, and
arrangement should presumably be made to have that letter of credit
reissued with Barclays as the account party to avoid the possibility of a
large margin call against Barclays.

It is our understanding that certain parts of the APA are still being
negotiated, including an amendment relating to property at DTC which may
involve similar issues to those affecting OCC. OCC circulated yesterday at
the hearing a Transfer and Assumption Agreement among OCC, LBI and Barclays
relating to these issues, and a proposed agreement dealing with collateral
of LBI consisting of government securities held at JPMorganChase as
custodian. In addition, OCC is holding nearly $1 billion in cash for the
accounts of LBI. It is important that the disposition of these assets is
understood and agreed to among all parties and that the documentation
addresses it in a consistent way. We understand that there is a meeting
in Cleary's offices today and Bill Navin, OCC's General Counsel, and I would
like to participate by phone. Sidley lawyer Alex Rovira is enroute to
Cleary's offices now.


James R. McDaniel
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312)853-2665
Fax: (312)853-7036



------------------------------------------------------------------------
--------------------

IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations,
we inform you
that, unless expressly stated otherwise, any U.S. federal tax advice contained
in this
communication, including attachments, was not intended or written to be used,
and cannot be
used, by any taxpayer for the purpose of avoiding any penalties that may be
imposed on such
taxpayer by the Internal Revenue Service. In addition, if any such tax advice
is used or referred
to by other parties in promoting, marketing or recommending any partnership or
other entity,
investment plan or arrangement, then (i) the advice should be construed as
written in connection
with the promotion or marketing by others of the transaction(s) or matter(s)
addressed in this
communication and (ii) the taxpayer should seek advice based on the taxpayer's

CONFIDENTIAL

particular
circumstances from an independent tax advisor.


*****************************************************************************
*******************
This e-mail is sent by a law firm and may contain information that is
privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any
attachments and notify us
immediately.

*****************************************************************************
*******************


This message is being sent from a law firm and may contain
confidential or privileged information. If you are not
the intended recipient, please advise the sender
immediately by reply e-mail and delete this message and
any attachments without retaining a copy.

CONFIDENTIAL

CGSH00034017

# BCI EXHIBIT

# 237

Rod Miller/NY/WGM/US       To   "Robert Messineo" <robert.messineo@weil.com>,
09/20/2008 01:26 PM          akeller@stblaw.com, "David P. Murgio"
                     <david.murgio@weil.com>
           cc

          bcc

     Subject   BARCLAYS REPURCHASE AGREEMENT COLLATERAL
               Fw: Delivering other assets to Barclays


----- Original Message -----
From: "Tonucci, Paolo" [paolo.tonucci@lehman.com]
Sent: 09/20/2008 12:34 PM AST
To: Rod Miller
Cc: Azerad, Robert" <RAzerad@lehman.com>; "Fleming, Dan (TSY)"
<dfleming@lehman.com>; "Berkenfeld, Steven" <sberkenf@lehman.com>; "Lowitt,
Ian T" <ilowitt@lehman.com>
Subject: RE: Delivering other assets to Barclays


This is what our ops team delivered


-----Original Message-----
From: rod.miller@weil.com [mailto:rod.miller@weil.com]
Sent: 20 September 2008 11:38
To: Tonucci, Paolo
Cc: Azerad, Robert; Fleming, Dan (TSY); Berkenfeld, Steven; Lowitt, Ian
T
Subject: Re: Delivering other assets to Barclays

We still have the 50% of residentials to transfer at closing, right?
These were not thrown into the repo right?


----- Original Message -----
From: "Tonucci, Paolo" [paolo.tonucci@lehman.com]
Sent: 09/20/2008 11:35 AM AST
To: Rod Miller
Cc: Azerad, Robert" <RAzerad@lehman.com>; "Fleming, Dan (TSY)"
<dfleming@lehman.com>; "Berkenfeld, Steven" <sberkenf@lehman.com>;
"Lowitt, Ian T" <ilowitt@lehman.com>
Subject: RE: Delivering other assets to Barclays


Rod,

Yes.  I will be free in 1 hour or so.  We will also need help with SIPC
and the release of the locked up cash.

Those are the big things on my list.

My cell is 347 392 9946.



Δ π EXHIBIT 506
Deponent Miller
Date 7/21/10 Rptr. klk
WWW.DEPOBOOK.COM

WGM-LEHMAN-E 00006125

Paolo

-----Original Message-----
From: rod.miller@weil.com [mailto:rod.miller@weil.com]
Sent: 20 September 2008 11:29
To: Tonucci, Paolo
Cc: Azerad, Robert; Fleming, Dan (TSY); Berkenfeld, Steven; Lowitt, Ian
T
Subject: Re: Delivering other assets to Barclays

We need to understand this today as we are working through closing. Can
we talk in a bit?


----- Original Message -----
From: "Tonucci, Paolo" [paolo.tonucci@lehman.com]
Sent: 09/20/2008 11:22 AM AST
To: Rod Miller
Cc: "Azerad, Robert" <RAzerad@lehman.com>; "Fleming, Dan (TSY)"
<dfleming@lehman.com>; "Berkenfeld, Steven" <sberkenf@lehman.com>;
"Lowitt, Ian T" <ilowitt@lehman.com>
Subject: Delivering other assets to Barclays


We will need to deliver the other assets in the agreement to Barclays
next week.

In all the confusion of the last few days there will be challenges with
identification of the location of those assets and the lien over them.
In particular with JPM being the custodian and clearer there will no
doubt be disputes over the rights to these.   To add complexity we also
have inconsistent information from JPM around the positions they were
lending against on Thursday night.

This will need your assistance.  We are trying the get all the
information cleaned up over the weekend.

Paolo
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of
the designated recipient(s) named above.  If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited.  This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers.  Email
transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or
accurate and it should not be relied upon as such.  All information is
subject to change without notice.

--------
IRS Circular 230 Disclosure:

WGM-LEHMAN-E 00006126

Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of
the designated recipient(s) named above.  If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited.  This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers.  Email
transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or
accurate and it should not be relied upon as such.  All information is
subject to change without notice.


--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - -

This message is intended only for the personal and confidential use of the
designated recipient(s) named above.  If you are not the intended recipient of
this message you are hereby notified that any review, dissemination,
distribution or copying of this message is strictly prohibited.  This
communication is for information purposes only and should not be regarded as
an offer to sell or as a solicitation of an offer to buy any financial
product, an official confirmation of any transaction, or as an official
statement of Lehman Brothers.  Email transmission cannot be guaranteed to be
secure or error-free.  Therefore, we do not represent that this information is
complete or accurate and it should not be relied upon as such.  All
information is subject to change without notice.


--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within
this communication (including any attachments) is not intended or written to
be used and cannot be used for the purpose of (i) avoiding U.S. tax related
penalties or (ii) promoting, marketing or recommending to another party any
transaction or matter addressed herein.

BarCap collateral.xls

WGM-LEHMAN-E 00006127

| Collateral | Market Value |
|---|---|
| Fed Collateral | 28,490,469,091.33 |
| DTC 074 | 10,176,792,453.35 |
| DTC 636 | 4,235,663,352.52 |
| TPCASH | 7,000,000,000.00 |
| Total | 49,902,924,897.20 |

# Remainder of Exhibit Omitted

# BCI EXHIBIT

# 238





Robert
Messineo/NY/WGM/US
09/20/2008 02:38 PM

To  vlewkow@cgsh.com, dleinwand@cgsh.com

cc  akeller@stblaw.com, David Murgio/NY/WGM/US@WGM

bcc

Subject  LEHMAN-- Barclays

Here is the current version of the "clarification letter," along with a copy marked to show the changes from last night's version.



Current Version - Clarification Letter_#1916861.DOC

*Marked copy:*



Current Version - Clarification Letter_#1916861.DOC

Robert L. Messineo
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Telephone = 212-310-8835
Telecopy = 212-833-3862

WGM-LEHMAN-E 00006149

*WGM Final – September 20, 2008 am*

## BARCLAYS CAPITAL INC.

September 21, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respect and to be consistent with this provisions of this letter, and is binding on the parties hereto upon its execution and delivery.

    1.    Purchased Assets; Excluded Assets.

    (a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than LBI as a Subsidiary of LBHI) except as otherwise specifically provided in the Agreement or the Letter. Other than with respect to an Excluded Asset, the Purchased Assets shall include, without limitation:

    (i)    the items set forth in clauses (b), (c) and (g) through (o) and (q) through (s) of the definition of "Purchased Assets";

    (ii)    plus the securities owned by LBI and either (A) pledged to Purchaser or its Affiliates under the Barlcays Repurchase Agreement (as defined above0, as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates or (B) such securities as Purchaser may, within 60 days after the Closing select to receive and are held in the clearance "box" on the Closing Date as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates (it being understood that Purchaser in its discretion may select to receive all such securities); it being also understood that no securities owned by LBHI or any Subsidiary are Purchased Assets;

1

NY2:\1916861\10\15325061.DOC\73683.1037

WGM-LEHMAN-E 00006150

(iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA;

(iv)    the government securities trading and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller); and

(v)    all prime brokerage accounts and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business), subject, however, to the provisions of Section 2.5 of the Agreement to the extent any executory contract may be considered included therein.

Subject to Paragraph 22 of this Letter, Purchased Intellectual Properties include Intellectual Property Rights, Software and Technology, wherever in the world held by LBHI or any of its Subsidiaries, that are primarily used or necessary for the operation of the Business.

(b)    For the avoidance of doubt, the "Business" includes LBI's commodities business.

(c)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) of the definition of "Excluded Assets" and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement. Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Section 1.1(h) of the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and the Business includes the private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") and the Purchased Assets include the assets of the Seller used primarily in or necessary for the operation of the PIM Business, but not the forgivable notes issued by employees to Seller or its Affiliates.

2

The employees of PIM of the Closing Date shall become Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the PIM Business in the pool of Transferred Employees. Accordingly, Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business. The Transferred Employees of the PIM Business will be treated in a manner consistent with the principles set forth in Section 9.1(c). Excluded Liabilities shall include any pre-closing legal tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser after the Closing in connection with the Business. Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities" assumed by Purchaser.

4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission and, accordingly, the Cash Amount shall be $1,540,000,000. In light of the other provisions provided herein, the Cash Amount shall not be subject to adjustment under Section 3.3.

5.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

6.    Hedges on Long Positions. The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (it being understood that exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" are included in Long Positions, but TBA mortgage-backed securities and any over-the-counter derivatives, such as spot and forward currency contracts, are excluded). The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

3

WGM-LEHMAN-E 00006152

7.    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI are not Assumed Liabilities, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

8.    Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    DTC Arrangements.  Upon the Closing, Purchaser shall assume all of the rights and obligations under LBI's arrangements with the Depository Trust Clearing Corporation, including all settlement obligations and related rights thereunder.

9.    Deletion of Purchase Price Adjustment and Holdback Provisions.  Section 3.3 of the Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.  Section 4 of the First Amendment to the Asset Purchase Agreement, dated September 19, 2008, is hereby deleted in its entirety and shall be of no effect *ab initio*.

10.    Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract.  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

11.    Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations between or among any Seller and any of LBHI or any Subsidiary of LBHI.  It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    Schedule 12.3.  Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.    Barclays Repurchase Agreement.  At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, [and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates,] from their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates (the "Barclays Repurchase Agreement").

14.    Risk of Loss of Artwork.  During such period the Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

4

WGM-LEHMAN-E 00006153

15.    Records.  The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail.  The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

16.    Subleases.  Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and

5

WGM-LEHMAN-E 00006154

Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.    Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred

6

WGM-LEHMAN-E 00006155

Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

19.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Definition of Excluded Contract.  As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    PIM Business Leases.  Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease.  With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

23.    No Overseas Assets.  All assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time.  No assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that, to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to

7

WGM-LEHMAN-E 00006156

permit Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller not Purchaser shall be required to make any payment in order to establish such arrangement).

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

8

WGM-LEHMAN-E 00006157

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:


LEHMAN BROTHERS INC.

By: _____
Name:
Title:


LB 745 LLC

By: _____
Name:
Title:

NY2:\1916861\13\15325131.DOC\73683.1037

WGM-LEHMAN-E 00006158

*WGM—Draft Final – September 19 20, 2008 7:30 pm am*

BARCLAYS CAPITAL INC.

September —,21, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and, supplements in certain respects the agreements of the parties stated therein and shall amendamends the Agreement to the extent necessary so as in certain respect and to be consistent with this provisions of this letter, and is binding on the parties hereto upon its execution and delivery.

     1.    Purchased Assets; Excluded Assets.

     (a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets), including and (ii) none of the assets of Subsidiaries of LBHI (other than LBI as a Subsidiary of LBHI) except as otherwise specifically provided in the Agreement or the Letter. Other than with respect to an Excluded Asset, the Purchased Assets shall include, without limitation:

     (i)    the items set forth in clauses (ab), (c) and (g) through (o) and (q) through (s) of the definition of "Purchased Assets," plus, with respect to securities owned by LBI, shall also include municipal securities, residential mortgage securities and other securities of which a summary description, by category, is reflected in Exhibit A hereto;";

     (ii)    plus the securities owned by LBI and either (A) pledged to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined above0, as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates or (B) such securities as Purchaser may, within 60 days after the Closing select to receive and are held in the clearance "box" on the Closing Date as specified in the schedule

1

NY2:\1916861\10\15325OGI.DOC\73683.1037

WGM-LEHMAN-E 00006159

previously delivered by Seller to Purchaser or its Affiliates (it being understood that ~~the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 billion. The categories of securities included among the "Purchased Assets" include only securities in such categories owned by LBI and not any other Affiliate of LBI and, with respect to collateralized short-term agreements, only those collateralized short agreements relating to short positions of LBI. Also included in the Purchased Assets are (a)~~ Purchaser in its discretion may select to receive all such securities); it being also understood that no securities owned by LBHI or any Subsidiary are Purchased Assets;

(iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA~~,~~;

(b~~iv~~)    the government securities trading and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller); and

(e~~v~~)    all prime brokerage accounts~~,~~ and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business), subject, however, to the provisions of Section 2.5 of the Agreement to the extent any executory contract may be considered included therein.

Subject to Paragraph 22 of this Letter, Purchased Intellectual Properties ~~includes~~include Intellectual Property Rights, Software and Technology, wherever in the world held by ~~Holdings~~LBHI or any of its Subsidiaries, that are primarily used or necessary for the ~~conduct by Purchaser~~operation of the Business.

(b)    For the avoidance of doubt, the "Business" includes LBI's commodities business.

(b~~c~~)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) of the definition of "Excluded Assets" and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of ~~LBHI~~Seller and its Subsidiaries. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement ~~(as hereinafter defined)~~. Also included in the Excluded Assets are ~~(a)~~ the mortgage servicing rights for Ginnie Mae guaranteed securities ~~and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration, except as notified by the administrator to LBI from time to time~~. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Section 1.1(h) of

2

the definition of Excluded Liabilities is hereby amended to remove the following clause:
"other than customer account insurance supplemental to SIPC coverage included in the
Business."

2.     IMD Business.  For purposes of the Agreement, the IMD Business
consists of the asset management and the alternatives – private equity businesses of Seller and
the Subsidiaries, but not the private investment management business of Seller and the
Subsidiaries (other than the CTS (Corporate Cash) business).  As a result, Excluded Assets
include the asset management business, the alternatives-private equity business and the CTS
(Corporate Cash) business, and ~~Purchased Assets and the Business include~~includes the private
investment management business (other than the CTS (Corporate Cash) business) (the "PIM
Business") and the Purchased Assets include the assets of the Seller used primarily in or
necessary for the operation of the PIM Business, but not the forgivable notes issued by
employees to Seller or its Affiliates.  The employees of PIM of the Closing Date shall become
Transferred Employees.  For the avoidance of doubt, Purchaser's obligations pursuant to Section
9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result
from the inclusion of the ~~private-investment-management business of Seller~~ (the "PIM
Business") in the pool of Transferred Employees.  Accordingly, Purchaser shall increase the
amount available to be awarded as bonuses to Transferred Employees to take into account the
addition of the Transferred Employees of the PIM Business.  The Transferred Employees of the
PIM Business will be treated in a manner consistent with the principles set forth in Section
9.1(c).  ~~The Purchased Assets include forgivable notes issued by the Transferred Employees of
the PIM Business to Seller ("PIM Employee Notes").  [Purchaser agrees to pay any proceeds it
receives in respect of such PIM Employee Notes to Seller if and when received.  After the date
hereof, Purchaser and Seller agree to negotiate in good faith to determine whether an alternative
means of addressing the PIM Employee Notes is preferable and agree, to the extent necessary, to
jointly seek Bankruptcy Court approval of any such alternative means.]~~  Excluded Liabilities
shall include any pre-closing legal tax or compliance Liabilities associated with IRA accounts for
the benefit of clients of the PIM Business.

3.     Assumed Liabilities.  Clause (a) of the definition of "Assumed Liabilities"
consists solely of all Liabilities incurred by Purchaser, after the Closing, in connection with the
Business.  ~~Nothing in this Paragraph 3 is intended to modify Section 8.12 of the Agreement
[and~~Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of
the definition of Assumed Liabilities shall be "Assumed Liabilities."]" assumed by Purchaser.

4.     Consideration.  The parties, after considering the available appraisal
information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue,
the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the
aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission
and, accordingly, the Cash Amount shall be $1,540,000,000.  In light of the other provisions
provided herein, the Cash Amount shall not be subject to adjustment under Section 3.3.

5.     License.  All marks containing the words "LEHMAN" or "LEHMAN
BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section
8.9 of the Agreement.  The license to use the Licensed Marks granted pursuant to Section 8.9 of
the Agreement with respect to the investment banking and capital markets businesses of Seller

3

and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any other businessesbusiness of Seller and its Subsidiaries, in each case solely for use by such Subsidiaries or purchaser in connection with the winding up of any such businessesbusiness.

5.6.    Hedges on Long Positions.  The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (it being understood that exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" are included in Long Positions, but TBA mortgage-backed securities and any over-the-counter derivatives, such as spot and forward currency contracts, are excluded).  The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

6.7.    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7.8.    Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    Certain Cash Proceeds.  Any cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions, before the Closing, shall be delivered to Purchaser.

8.    DTC Arrangements.  Upon the Closing, Purchaser shall assume all of the rights and obligations under LBI's arrangements with the Depository Trust Clearing Corporation, including all settlement obligations and related rights thereunder.

9.    Deletion of Purchase Price Adjustment and Holdback Provisions.  Section 3.3 of the Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.  Section 4 of the First Amendment to the Asset Purchase Agreement, dated September 19, 2008, is hereby deleted in its entirety and shall be of no effect *ab initio*.

10.    Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract.  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

10.11.    Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations,

4

WGM-LEHMAN-E 00006162

respectively, of Seller or its Subsidiaries or between or among any Seller orand any of LBHI or
any Subsidiary of LBHI. It is understood that nothing contained in this letter shall affect the
rights or obligations of the parties to the Transition Services Agreement contemplated by the
Agreement.

11.12. Schedule 12.3. Following the Closing, the parties shall reasonably agree
to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased
Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the
parties.

12.13. Barclays Repurchase Agreement. At the Closing, Purchaser and its
Affiliates will provide a written release of Seller and its Subsidiaries, [and Seller and its
Subsidiaries will provide a written release of Purchaser and its Affiliates,] from their respective
obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its
Affiliates and LBI and/or its Affiliates (the "Barclays Repurchase Agreement").

13.14. Risk of Loss of Artwork. During such period thatthe Purchaser has the
right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement,
Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged
or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent
with the insured appraised value (as determined by an independent, recognized appraiser) for
such artwork, assuming such artwork had not been lost or damaged.

14.15. Records. The records referred to in Section 8.7 include all Documents that
are Purchased Assets and shall be considered to include all electronic documents, including e-
mail. The joint administrators of the Lehman European entities are parties to which records and
personnel shall be made available in accordance with the terms of Section 8.7.

15.16. Subleases. Notwithstanding anything to the contrary contained in Sections
4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises
located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High
Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois
("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA
Property" and together with the SF Property, Boston Property and Chicago Property, the
"Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying
leases affecting the Chicago Property, the LA Property and the Boston Property shall be
assumed by SellerLBHI or LBI in connection with theits bankruptcy
proceedingsproceeding and each of such leases shall be assigned by Seller to Purchaser
and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment
and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the
underlying lease affecting the SF Property shall be assumed by Seller in connection with
the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within
a commercially reasonable period of time following the Closing Date, negotiate in good

5

WGM-LEHMAN-E 00006163

faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to
both Purchaser and Seller and subject to the terms of the applicable underlying lease,
pursuant to which a portion of the demised premises under such underlying lease (such
portion of the premises to be agreed upon by the parties) shall be subleased to (A) with
respect to the SF Property, the Purchaser, and (B) with respect to the LA Property,
Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of
Seller) or any person who purchases the IMD Business (provided that the entityany such
purchaser entering into the sublease agreement as a subtenant shall be reasonably
acceptable to the Purchaser) (the landlord under such sublease being referred to as the
"Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"),
in each case, upon such terms as shall be mutually acceptable to the Sublandlord and
Subtenant provided that (1) the Subtenant shall pay rent and other charges under such
sublease agreement equal to its proportionate share of the rent and other charges payable
by the Sublandlord to the landlord under the underlying lease (which proportionate share
shall be based upon the relative square footage of the subleased space in proportion to the
square footage of the overall demised space under the underlying lease), (2) the term of
the sublease agreement shall be a period commencing on the Closing Date and ending on
the day immediately preceding the expiration date of the underlying lease (as the same
may be extended pursuant to the terms of the underlying lease), (3) any alterations or
modifications which the Sublandlord and Subtenant mutually agree need to be made to
the demised premises in order to segregate the subleased space from the remainder of the
demised premises under the underlying lease shall be performed by the Sublandlord and
the cost thereof (including the cost of any plans and specifications, drawings, permits,
licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and
Subtenant in proportion to the square footage of their respective spaces. Prior to the
execution and delivery of the sublease agreement for a particular Sublease Property,
subject to reasonable premises security procedures and giving due regard to regulatory
considerations (e.g., segregation) including the right to relocate such employees within
the applicable premises, and for a commercially reasonable period after the Closing Date,
(i) with respect to the SF Property, to the extent that Transferred Employees occupied any
portion of the SF Property prior to Closing, such Transferred Employees shall be
permitted to continue to occupy and use the SF Property to the same extent and for the
same purposes as the SF Property was occupied by such Transferred Employees prior to
the Closing; provided, that the foregoing shall be subject to Purchaser's ability to
substitute a substantially similar number of new employees of Purchaser for any such
Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each
Sublease Property other than the SF Property, to the extent that Excluded Employees
occupied any portion of such Sublease Property prior to Closing, such Excluded
Employees shall be permitted to continue to occupy and use such Sublease Property to
the same extent and for the same purposes as such Sublease Property was occupied by
such Excluded Employees prior to the Closing; provided, that the foregoing shall be
subject to Seller's ability to substitute a substantially similar number of new employees
of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each
case described in clauses (i) and (ii) above, no rent or other payments shall be made to the
party which is the tenant under the underlying lease until execution and delivery of the
applicable sublease agreement at which time all rent calculated under the sublease
agreement for the period from the Commencement Date (which date shall be the Closing

6

WGM-LEHMAN-E 00006164

Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

16.—17.    Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

17.—18.  745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

18.—19. Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

19.—20.  Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

20.—21.  Definition of Excluded Contract.  As used in the Agreement, the term "Excluded Contract" shall not include swap agreements include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

7

WGM-LEHMAN-E 00006165

21. 22.  PIM Business Leases.  Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease.  With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

23.    No Overseas Assets.  All assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time.  No assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that, to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller not Purchaser shall be required to make any payment in order to establish such arrangement).

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.  This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

8

WGM-LEHMAN-E 00006166

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:


LEHMAN BROTHERS INC.

By: _____
Name:
Title:


LB 745 LLC

By: _____
Name:
Title:

WGM-LEHMAN-E 00006167

Document comparison done by DeltaView on Saturday, September 20, 2008 2:31:22
PM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1916861/11 |
| Document 2 | pcdocs://ny2/1916861/13 |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved-deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | Count |
|---|---|
| Insertions | 85 |
| Deletions | 66 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 157 |

WGM-LEHMAN-E 00006168

# BCI EXHIBIT

# 239

| | |
|---|---|
| **From:** | Murray, James [JMurray@HLHZ.com] |
| **Sent:** | Saturday, September 20, 2008 2:49 PM |
| **To:** | JpMurray@optonline.net |
| **Subject:** | Fw: LEHMAN-- Barclays |
| **Attachments:** | Current Version - Clarification Letter_#1916861.DOC; Current Version - Clarification Letter_# 1916861.DOC |

------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: O'Donnell, Dennis C. <DODonnell@milbank.com>
To: Miller, Ann Marie; Aalto, Tanja; Murray, James; Das, Sam
Sent: Sat Sep 20 13:13:27 2008
Subject: FW: LEHMAN-- Barclays

<<Current Version - Clarification Letter_#1916861.DOC>>
<<Current Version - Clarification Letter_#1916861.DOC>>

--------------------

From: O'Donnell, Dennis C.
Sent: Saturday, September 20, 2008 3:24 PM
To: 'SBurian@HLHZ.com'; 'mfazio@hlhz.com'; 'bgeer@hlhz.com'; 'esiegert@hlhz.com'
Subject: Fw: LEHMAN-- Barclays

Fyi.

--------------------

From: Bell, Crayton L.
To: Despins, Luc; Dunne, Dennis; O'Donnell, Dennis C.
Cc: Kelly, Brian; Roisman, Elad
Sent: Sat Sep 20 15:09:35 2008
Subject: Fw: LEHMAN-- Barclays

Here is the draft clarification letter. This represents Weil's view of the deal and barclays is reviewing.

Dennis O'donnell, can you please send to the Houlihan team.

Crayton

--------------------

1

CONFIDENTIAL                                                                                          HLHZ0020090

From: david.murgio@weil.com
To: Bell, Crayton L.
Sent: Sat Sep 20 15:00:08 2008
Subject: Fw: LEHMAN-- Barclays


See below... I'll bring you a hard copy as soon as it is copied.

Regards.



_____
David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com

----- Forwarded by David Murgio/NY/WGM/US on 09/20/2008 02:59 PM -----

Robert Messineo/NY/WGM/US

09/20/2008 02:38 PM


To
        vlewkow@cgsh.com, dleinwand@cgsh.com
    cc
        akeller@stblaw.com, David Murgio/NY/WGM/US@WGM
Subject
        LEHMAN-- Barclays



Here is the current version of the "clarification letter," along with a copy marked to show the changes from last night's version.


Marked copy:


Robert L. Messineo
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Telephone = 212-310-8835
Telecopy = 212-833-3862

==================================================================
                                    2

CONFIDENTIAL                                                      HLHZ0020091

IRS Circular 230 Disclosure: U.S. federal tax advice in the foregoing message from Milbank, Tweed, Hadley & McCloy LLP is not intended or written to be, and cannot be used, by any person for the purpose of avoiding tax penalties that may be imposed regarding the transactions or matters addressed. Some of that advice may have been written to support the promotion or marketing of the transactions or matters addressed within the meaning of IRS Circular 230, in which case you should seek advice based on your particular circumstances from an independent tax advisor.

========================================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

3

CONFIDENTIAL

HLHZ0020092

*WGM Final – September 20, 2008 am*

## BARCLAYS CAPITAL INC.

September 21, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn:  Steven Berkenfeld, Esq.
Facsimile:  (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser").  Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement.  This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respect and to be consistent with this provisions of this letter, and is binding on the parties hereto upon its execution and delivery.

      1.     Purchased Assets; Excluded Assets.

      (a)     The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than LBI as a Subsidiary of LBHI) except as otherwise specifically provided in the Agreement or the Letter.  Other than with respect to an Excluded Asset, the Purchased Assets shall include, without limitation:

      (i)     the items set forth in clauses (b), (c) and (g) through (o) and (q) through (s) of the definition of "Purchased Assets";

      (ii)     plus the securities owned by LBI and either (A) pledged to Purchaser or its Affiliates under the Barlcays Repurchase Agreement (as defined above0, as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates or (B) such securities as Purchaser may, within 60 days after the Closing select to receive and are held in the clearance "box" on the Closing Date as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates (it being understood that Purchaser in its discretion may select to receive all such securities); it being also understood that no securities owned by LBHI or any Subsidiary are Purchased Assets;

1

NY2:\1916861\10\1532506!.DOC\73683.1037

CONFIDENTIAL                                                                                    HLHZ0020093

(iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA;

(iv)    the government securities trading and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller); and

(v)    all prime brokerage accounts and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business), subject, however, to the provisions of Section 2.5 of the Agreement to the extent any executory contract may be considered included therein.

Subject to Paragraph 22 of this Letter, Purchased Intellectual Properties include Intellectual Property Rights, Software and Technology, wherever in the world held by LBHI or any of its Subsidiaries, that are primarily used or necessary for the operation of the Business.

(b)    For the avoidance of doubt, the "Business" includes LBI's commodities business.

(c)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) of the definition of "Excluded Assets" and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement. Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Section 1.1(h) of the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and the Business includes the private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") and the Purchased Assets include the assets of the Seller used primarily in or necessary for the operation of the PIM Business, but not the forgivable notes issued by employees to Seller or its Affiliates.

2

CONFIDENTIAL

The employees of PIM of the Closing Date shall become Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the PIM Business in the pool of Transferred Employees. Accordingly, Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business. The Transferred Employees of the PIM Business will be treated in a manner consistent with the principles set forth in Section 9.1(c). Excluded Liabilities shall include any pre-closing legal tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser after the Closing in connection with the Business. Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities" assumed by Purchaser.

4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission and, accordingly, the Cash Amount shall be $1,540,000,000. In light of the other provisions provided herein, the Cash Amount shall not be subject to adjustment under Section 3.3.

5.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

6.    Hedges on Long Positions. The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (it being understood that exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" are included in Long Positions, but TBA mortgage-backed securities and any over-the-counter derivatives, such as spot and forward currency contracts, are excluded). The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

3

CONFIDENTIAL                                                                                        HLHZ0020095

7.    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI are not Assumed Liabilities, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

8.    Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    DTC Arrangements.  Upon the Closing, Purchaser shall assume all of the rights and obligations under LBI's arrangements with the Depository Trust Clearing Corporation, including all settlement obligations and related rights thereunder.

9.    Deletion of Purchase Price Adjustment and Holdback Provisions.  Section 3.3 of the Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.  Section 4 of the First Amendment to the Asset Purchase Agreement, dated September 19, 2008, is hereby deleted in its entirety and shall be of no effect *ab initio*.

10.    Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract.  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

11.    Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations between or among any Seller and any of LBHI or any Subsidiary of LBHI.  It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    Schedule 12.3.  Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.    Barclays Repurchase Agreement.  At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, [and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates,] from their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates (the "Barclays Repurchase Agreement").

14.    Risk of Loss of Artwork.  During such period the Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

4

CONFIDENTIAL                                                                                      HLHZ0020096

15.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

16.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and

5

CONFIDENTIAL

Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)     If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.     Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred

6

Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

19.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Definition of Excluded Contract.  As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    PIM Business Leases.  Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease.  With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

23.    No Overseas Assets.  All assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time.  No assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that, to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to

7

    HLHZ0020099

permit Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller not Purchaser shall be required to make any payment in order to establish such arrangement).

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

8

CONFIDENTIAL

HLHZ0020100

Sincerely,

BÁRCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:


NY2:\1916861\13\15325131.DOC\73683.1037

CONFIDENTIAL

HLHZ0020101

*WGM ~~Draft~~ Final – September ~~19,~~20, 2008 ~~7:30 pm~~ am*

# BARCLAYS CAPITAL INC.

September ~~—~~21, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement ~~and,~~ supplements in certain respects the agreements of the parties stated therein and ~~shall amend~~amends the Agreement ~~to the extent necessary so as~~in certain respect and to be consistent with this provisions of this letter, and is binding on the parties hereto upon its execution and delivery.

1.    Purchased Assets; Excluded Assets.

(a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets)~~, including~~ and (ii) none of the assets of Subsidiaries of LBHI (other than LBI as a Subsidiary of LBHI) except as otherwise specifically provided in the Agreement or the Letter. Other than with respect to an Excluded Asset, the Purchased Assets shall include, without limitation:

(i)          the items set forth in clauses (~~a~~b), (c) and (g) through (o) and (q) through (s) of the definition of "Purchased Assets,~~" plus, with respect to securities owned by LBI, shall also include municipal securities, residential mortgage securities and other securities of which a summary description, by category, is reflected in Exhibit A hereto;~~
".
~~,~~

(ii)     plus the securities owned by LBI and either (A) pledged to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined above0, as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates or (B) such securities as Purchaser may, within 60 days after the Closing select to receive and are held in the clearance "box" on the Closing Date as specified in the schedule

1

NY2:\1916861\10\15325061.DOC\73683.1037

                                                      HLHZ0020102

previously delivered by Seller to Purchaser or its Affiliates (it being understood that ~~the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 billion. The categories of securities included among the "Purchased Assets" include only securities in such categories owned by LBI and not any other Affiliate of LBI and, with respect to collateralized short-term agreements, only those collateralized short agreements relating to short positions of LBI. Also included in the Purchased Assets are (a)~~ Purchaser in its discretion may select to receive all such securities); it being also understood that no securities owned by LBHI or any Subsidiary are Purchased Assets;

(iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA~~,~~;

(b~~i~~v)    the government securities trading and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller); and

(e~~v~~)    all prime brokerage accounts~~,~~ and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business), subject, however, to the provisions of Section 2.5 of the Agreement to the extent any executory contract may be considered included therein.

Subject to Paragraph 22 of this Letter, Purchased Intellectual Properties ~~includes~~include Intellectual Property Rights, Software and Technology, wherever in the world held by ~~Holdings~~LBHI or any of its Subsidiaries, that are primarily used or necessary for the ~~conduct by Purchaser~~operation of the Business.

(b)    For the avoidance of doubt, the "Business" includes LBI's commodities business.

(b~~c~~)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) of the definition of "Excluded Assets" and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of ~~LBHI~~Seller and its Subsidiaries. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement ~~(as hereinafter defined)~~. Also included in the Excluded Assets are ~~(a)~~ the mortgage servicing rights for Ginnie Mae guaranteed securities ~~and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration, except as notified by the administrator to LBI from time to time~~. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Section 1.1(h) of

2

the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and ~~Purchased Assets and~~ the Business ~~include~~includes the private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") and the Purchased Assets include the assets of the Seller used primarily in or necessary for the operation of the PIM Business, but not the forgivable notes issued by employees to Seller or its Affiliates. The employees of PIM of the Closing Date shall become Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the ~~private investment management business of Seller (the "~~PIM Business~~")~~ in the pool of Transferred Employees. Accordingly, Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business. The Transferred Employees of the PIM Business will be treated in a manner consistent with the principles set forth in Section 9.1(c). ~~The Purchased Assets include forgivable notes issued by the Transferred Employees of the PIM Business to Seller ("PIM Employee Notes"). [Purchaser agrees to pay any proceeds it receives in respect of such PIM Employee Notes to Seller if and when received. After the date hereof, Purchaser and Seller agree to negotiate in good faith to determine whether an alternative means of addressing the PIM Employee Notes is preferable and agree, to the extent necessary, to jointly seek Bankruptcy Court approval of any such alternative means.]~~ Excluded Liabilities shall include any pre-closing legal tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser~~,~~ after the Closing~~,~~ in connection with the Business. ~~Nothing in this Paragraph 3 is intended to modify Section 8.12 of the Agreement [and~~Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities~~."]~~" assumed by Purchaser.

4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission and, accordingly, the Cash Amount shall be $1,540,000,000. In light of the other provisions provided herein, the Cash Amount shall not be subject to adjustment under Section 3.3.

5.........License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller

3

CONFIDENTIAL                                                            HLHZ0020104

and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any other businessesbusiness of Seller and its Subsidiaries, in each case solely for use by such Subsidiaries or purchaser in connection with the winding up of any such businessesbusiness.

5.6.    Hedges on Long Positions. The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (it being understood that exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" are included in Long Positions, but TBA mortgage-backed securities and any over-the-counter derivatives, such as spot and forward currency contracts, are excluded). The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

6.7.    Subordinated Notes of LBI. The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7.8.    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    Certain Cash Proceeds. Any cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions, before the Closing, shall be delivered to Purchaser.

8.    DTC Arrangements. Upon the Closing, Purchaser shall assume all of the rights and obligations under LBI's arrangements with the Depository Trust Clearing Corporation, including all settlement obligations and related rights thereunder.

9.    Deletion of Purchase Price Adjustment and Holdback Provisions. Section 3.3 of the Agreement is hereby deleted in its entirety and shall be of no effect ab initio. Section 4 of the First Amendment to the Asset Purchase Agreement, dated September 19, 2008, is hereby deleted in its entirety and shall be of no effect ab initio.

10.    Payables, Deposits and Receivables. No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

10.11. Intercompany Obligations. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations,

4

    HLHZ0020105

~~respectively, of Seller or its Subsidiaries or~~ between or among any Seller ~~or~~and any of LBHI or
any Subsidiary of LBHI. It is understood that nothing contained in this letter shall affect the
rights or obligations of the parties to the Transition Services Agreement contemplated by the
Agreement.

~~11.~~12. Schedule 12.3. Following the Closing, the parties shall reasonably agree
to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased
Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the
parties.

~~12.~~13. Barclays Repurchase Agreement. At the Closing, Purchaser and its
Affiliates will provide a written release of Seller and its Subsidiaries, [and Seller and its
Subsidiaries will provide a written release of Purchaser and its Affiliates,] from their respective
obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its
Affiliates and LBI and/or its Affiliates (the "Barclays Repurchase Agreement").

~~13.~~14. Risk of Loss of Artwork. During such period ~~that~~the Purchaser has the
right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement,
Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged
or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent
with the insured appraised value (as determined by an independent, recognized appraiser) for
such artwork, assuming such artwork had not been lost or damaged.

~~14.~~15. Records. The records referred to in Section 8.7 include all Documents that
are Purchased Assets and shall be considered to include all electronic documents, including e-
mail. The joint administrators of the Lehman European entities are parties to which records and
personnel shall be made available in accordance with the terms of Section 8.7.

~~15.~~16. Subleases. Notwithstanding anything to the contrary contained in Sections
4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises
located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High
Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois
("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA
Property" and together with the SF Property, Boston Property and Chicago Property, the
"Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying
leases affecting the Chicago Property, the LA Property and the Boston Property shall be
assumed by ~~Seller~~LBHI or LBI in connection with ~~the~~its bankruptcy
~~proceedings~~proceeding and each of such leases shall be assigned by Seller to Purchaser
and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment
and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the
underlying lease affecting the SF Property shall be assumed by Seller in connection with
the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within
a commercially reasonable period of time following the Closing Date, negotiate in good

5

faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to
both Purchaser and Seller and subject to the terms of the applicable underlying lease,
pursuant to which a portion of the demised premises under such underlying lease (such
portion of the premises to be agreed upon by the parties) shall be subleased to (A) with
respect to the SF Property, the Purchaser, and (B) with respect to the LA Property,
Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of
Seller) or any person who purchases the IMD Business (provided that the entityany such
purchaser entering into the sublease agreement as a subtenant shall be reasonably
acceptable to the Purchaser) (the landlord under such sublease being referred to as the
"Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"),
in each case, upon such terms as shall be mutually acceptable to the Sublandlord and
Subtenant provided that (1) the Subtenant shall pay rent and other charges under such
sublease agreement equal to its proportionate share of the rent and other charges payable
by the Sublandlord to the landlord under the underlying lease (which proportionate share
shall be based upon the relative square footage of the subleased space in proportion to the
square footage of the overall demised space under the underlying lease), (2) the term of
the sublease agreement shall be a period commencing on the Closing Date and ending on
the day immediately preceding the expiration date of the underlying lease (as the same
may be extended pursuant to the terms of the underlying lease), (3) any alterations or
modifications which the Sublandlord and Subtenant mutually agree need to be made to
the demised premises in order to segregate the subleased space from the remainder of the
demised premises under the underlying lease shall be performed by the Sublandlord and
the cost thereof (including the cost of any plans and specifications, drawings, permits,
licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and
Subtenant in proportion to the square footage of their respective spaces.  Prior to the
execution and delivery of the sublease agreement for a particular Sublease Property,
subject to reasonable premises security procedures and giving due regard to regulatory
considerations (e.g., segregation) including the right to relocate such employees within
the applicable premises, and for a commercially reasonable period after the Closing Date,
(i) with respect to the SF Property, to the extent that Transferred Employees occupied any
portion of the SF Property prior to Closing, such Transferred Employees shall be
permitted to continue to occupy and use the SF Property to the same extent and for the
same purposes as the SF Property was occupied by such Transferred Employees prior to
the Closing; provided, that the foregoing shall be subject to Purchaser's ability to
substitute a substantially similar number of new employees of Purchaser for any such
Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each
Sublease Property other than the SF Property, to the extent that Excluded Employees
occupied any portion of such Sublease Property prior to Closing, such Excluded
Employees shall be permitted to continue to occupy and use such Sublease Property to
the same extent and for the same purposes as such Sublease Property was occupied by
such Excluded Employees prior to the Closing; provided, that the foregoing shall be
subject to Seller's ability to substitute a substantially similar number of new employees
of Seller for any such Excluded Employees as provided in Paragraph 18 below.  In each
case described in clauses (i) and (ii) above, no rent or other payments shall be made to the
party which is the tenant under the underlying lease until execution and delivery of the
applicable sublease agreement at which time all rent calculated under the sublease
agreement for the period from the Commencement Date (which date shall be the Closing

6

CONFIDENTIAL

HLHZ0020107

Date) through end of the month in which the sublease agreement is executed shall be paid
to the Sublandlord contemporaneously with the execution and delivery of the sublease
agreement.

(c)    If any consent or approval from any landlord under an underlying lease is
required pursuant to the terms of the underlying lease in order to effectuate the applicable
sublease agreement and/or to the extent that any landlord under an underlying lease has
recapture and/or termination rights that would be triggered by the proposed sublease
arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser
will cooperate and use commercially reasonable efforts in obtaining such consent to the
applicable sublease agreement and/or obtaining waivers from the landlord with respect to
any such recapture and/or termination rights and shall otherwise comply in all respects
with the terms and provisions of the underlying lease in connection with the execution
and delivery of the applicable sublease agreement.

16.~17.    Deferred Transfers.  Notwithstanding anything to the contrary
contained in the Agreement, (a) the parties agree that during the nine month period after the
Closing Date that Excluded Employees are permitted to occupy and use real property subject to a
Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the
Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new
employees of Seller or its Affiliates for any such Excluded Employees, and that any such new
employees of Seller or its Affiliates shall be permitted to occupy and use such real property to
the same extent and on the same basis as the Excluded Employees in accordance with Section
8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that
Transferred Employees are permitted to occupy and use real property is not subject to a
Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the
Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of
new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any
such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real
property to the same extent and on the same basis as the Transferred Employees in accordance
with Section 8.11(g).

17.18.  745 Seventh Avenue.  The parties acknowledge that there is no mortgage
encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and
that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note
made by 745 in favor of its Affiliate will be fully repaid and extinguished.

18.~19.  Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent
that the parties are unable to agree upon all customary prorations for the Purchased Assets as of
the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days
following the Closing Date.

19.20.  Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

20.21.  Definition of Excluded Contract.  As used in the Agreement, the term
"Excluded Contract" shall not include swap agreementsinclude any ISDA Master Agreement and
any master swap agreement and any schedule thereto or supplement or amendment thereto.

7

21.22. PIM Business Leases. Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser. Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease. With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

23. No Overseas Assets. All assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time. No assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that, to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

8

CONFIDENTIAL

HLHZ0020109

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:


NY2:\1916861\11\1532511_13\1532513!.DOC\73683.1037

CONFIDENTIAL

HLHZ0020110

Document comparison done by DeltaView on Saturday, September 20, 2008 2:31:22
PM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1916861/11 |
| Document 2 | pcdocs://ny2/1916861/13 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 85 |
| Deletions | 66 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 157 |

CONFIDENTIAL

HLHZ0020111

# BCI EXHIBIT

# 240

| | |
|---|---|
| From: | O'Donnell, Dennis C. [DODonnell@milbank.com] |
| Sent: | Saturday, September 20, 2008 12:24 PM |
| To: | Burian, Saul; Fazio, Michael; Geer, Brad; Siegert, Eric |
| Subject: | Fw: LEHMAN-- Barclays |
| Attachments: | Current Version - Clarification Letter_#1916861.DOC; Current Version - Clarification Letter_# 1916861.DOC |

Fyi.

From: Bell, Crayton L.
To: Despins, Luc; Dunne, Dennis; O'Donnell, Dennis C.
Cc: Kelly, Brian; Roisman, Elad
Sent: Sat Sep 20 15:09:35 2008
Subject: Fw: LEHMAN-- Barclays

Here is the draft clarification letter. This represents Weil's view of the deal and barclays is reviewing.

Dennis O'donnell, can you please send to the Houlihan team.

Crayton

From: david.murgio@weil.com
To: Bell, Crayton L.
Sent: Sat Sep 20 15:00:08 2008
Subject: Fw: LEHMAN-- Barclays

See below... I'll bring you a hard copy as soon as it is copied.

Regards.

_____

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com

----- Forwarded by David Murgio/NY/WGM/US on 09/20/2008 02:59 PM -----

Robert Messineo/NY/WGM/US

                                         To  vlewkow@cgsh.com, dleinwand@cgsh.com
                                         cc  akeller@stblaw.com, David Murgio/NY/WGM/US@WGM
09/20/2008 02:38 PM                      Subject  LEHMAN-- Barclays

    Here is the current version of the "clarification letter," along with a copy marked to show the changes from last night's version.

1



*Marked copy:*

Robert L. Messineo
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Telephone = 212-310-8835
Telecopy = 212-833-3862

2

HLHZ0020163

*WGM Final – September 20, 2008 am*

## BARCLAYS CAPITAL INC.

September 21, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respect and to be consistent with this provisions of this letter, and is binding on the parties hereto upon its execution and delivery.

1.    Purchased Assets; Excluded Assets.

(a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than LBI as a Subsidiary of LBHI) except as otherwise specifically provided in the Agreement or the Letter. Other than with respect to an Excluded Asset, the Purchased Assets shall include, without limitation:

(i)    the items set forth in clauses (b), (c) and (g) through (o) and (q) through (s) of the definition of "Purchased Assets";

(ii)    plus the securities owned by LBI and either (A) pledged to Purchaser or its Affiliates under the Barlcays Repurchase Agreement (as defined above0, as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates or (B) such securities as Purchaser may, within 60 days after the Closing select to receive and are held in the clearance "box" on the Closing Date as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates (it being understood that Purchaser in its discretion may select to receive all such securities); it being also understood that no securities owned by LBHI or any Subsidiary are Purchased Assets;

1

NY2:\1916861\10\15325061.DOC\73683.1037

CONFIDENTIAL                                                  HLHZ0020164

        (iii)     the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA;

        (iv)     the government securities trading and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller); and

        (v)     all prime brokerage accounts and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business), subject, however, to the provisions of Section 2.5 of the Agreement to the extent any executory contract may be considered included therein.

Subject to Paragraph 22 of this Letter, Purchased Intellectual Properties include Intellectual Property Rights, Software and Technology, wherever in the world held by LBHI or any of its Subsidiaries, that are primarily used or necessary for the operation of the Business.

        (b)     For the avoidance of doubt, the "Business" includes LBI's commodities business.

        (c)     The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) of the definition of "Excluded Assets" and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement. Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Section 1.1(h) of the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

        2.     IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and the Business includes the private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") and the Purchased Assets include the assets of the Seller used primarily in or necessary for the operation of the PIM Business, but not the forgivable notes issued by employees to Seller or its Affiliates.

2

                                                                                              HLHZ0020165

The employees of PIM of the Closing Date shall become Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the PIM Business in the pool of Transferred Employees. Accordingly, Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business. The Transferred Employees of the PIM Business will be treated in a manner consistent with the principles set forth in Section 9.1(c). Excluded Liabilities shall include any pre-closing legal tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser after the Closing in connection with the Business. Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities" assumed by Purchaser.

4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission and, accordingly, the Cash Amount shall be $1,540,000,000. In light of the other provisions provided herein, the Cash Amount shall not be subject to adjustment under Section 3.3.

5.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

6.    Hedges on Long Positions. The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (it being understood that exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" are included in Long Positions, but TBA mortgage-backed securities and any over-the-counter derivatives, such as spot and forward currency contracts, are excluded). The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

3

7.    Subordinated Notes of LBI. The outstanding subordinated notes of LBI are not Assumed Liabilities, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

8.    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    DTC Arrangements. Upon the Closing, Purchaser shall assume all of the rights and obligations under LBI's arrangements with the Depository Trust Clearing Corporation, including all settlement obligations and related rights thereunder.

9.    Deletion of Purchase Price Adjustment and Holdback Provisions. Section 3.3 of the Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*. Section 4 of the First Amendment to the Asset Purchase Agreement, dated September 19, 2008, is hereby deleted in its entirety and shall be of no effect *ab initio*.

10.    Payables, Deposits and Receivables. No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

11.    Intercompany Obligations. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations between or among any Seller and any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.    Barclays Repurchase Agreement. At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, [and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates,] from their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates (the "Barclays Repurchase Agreement").

14.    Risk of Loss of Artwork. During such period the Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

4

CONFIDENTIAL                                                                    HLHZ0020167

15.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

16.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and

5

Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)     If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.     Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred

6

HLHZ0020169

Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

19.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Definition of Excluded Contract.  As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    PIM Business Leases.  Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease.  With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

23.    No Overseas Assets.  All assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time.  No assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that, to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to

7

permit Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller not Purchaser shall be required to make any payment in order to establish such arrangement).

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

8

CONFIDENTIAL

HLHZ0020171

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:


NY2:\1916861\13\15325131.DOC\73683.1037

CONFIDENTIAL

HLHZ0020172

*WGM~~Draft Final~~ -- September ~~19-20,~~ 20, 2008 ~~7:30 pm~~ am*

# BARCLAYS CAPITAL INC.

September ~~--~~ 21, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn:  Steven Berkenfeld, Esq.
Facsimile:  (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser").  Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement.  This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement ~~and,~~ supplements in certain respects the agreements of the parties stated therein and ~~shall amend~~ amends the Agreement ~~to the extent necessary so as~~ in certain respect and to be consistent with ~~this~~ provisions of this letter, and is binding on the parties hereto upon its execution and delivery.

      1.    Purchased Assets; Excluded Assets.

      (a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets), ~~including~~ and (ii) none of the assets of Subsidiaries of LBHI (other than LBI as a Subsidiary of LBHI) except as otherwise specifically provided in the Agreement or the Letter.  Other than with respect to an Excluded Asset, the Purchased Assets shall include, without limitation:

      (i)    the items set forth in clauses (a~~b~~), (c) and (g) through (o) and (q) through (s) of the definition of "Purchased Assets;" ~~plus, with respect to securities owned by LBI, shall also include municipal securities, residential mortgage securities and other securities of which a summary description, by category, is reflected in Exhibit A hereto;~~ ".

      (ii)    plus the securities owned by LBI and either (A) pledged to Purchaser or its Affiliates under the Barlcays Repurchase Agreement (as defined above0, as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates or (B) such securities as Purchaser may, within 60 days after the Closing select to receive and are held in the clearance "box" on the Closing Date as specified in the schedule

1

NY2:\1916861\10\15325061.DOC\73683.1037

CONFIDENTIAL

HLHZ0020173

previously delivered by Seller to Purchaser or its Affiliates (it being understood that ~~the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 billion. The categories of securities included among the "Purchased Assets" include only securities in such categories owned by LBI and not any other Affiliate of LBI and, with respect to collateralized short-term agreements, only those collateralized short agreements relating to short positions of LBI. Also included in the Purchased Assets are (a)~~ Purchaser in its discretion may select to receive all such securities); it being also understood that no securities owned by LBHI or any Subsidiary are Purchased Assets;

(iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA~~,~~;

(~~b~~iy)    the government securities trading and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller); and

(~~c~~v)    all prime brokerage accounts~~,~~ and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business), subject, however, to the provisions of Section 2.5 of the Agreement to the extent any executory contract may be considered included therein.

Subject to Paragraph 22 of this Letter, Purchased Intellectual Properties ~~includes~~include Intellectual Property Rights, Software and Technology, wherever in the world held by ~~Holdings~~LBHI or any of its Subsidiaries, that are primarily used or necessary for the ~~conduct by Purchaser~~operation of the Business.

(b)    For the avoidance of doubt, the "Business" includes LBI's commodities business.

(~~b~~c)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) of the definition of "Excluded Assets" and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of ~~LBHI~~Seller and its Subsidiaries. The following shall also be Excluded Assets:  All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement ~~(as hereinafter defined)~~. Also included in the Excluded Assets are ~~(a)~~ the mortgage servicing rights for Ginnie Mae guaranteed securities ~~and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration, except as notified by the administrator to LBI from time to time~~. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC,  are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller.  Section 1.1(h) of

2

CONFIDENTIAL

the definition of Excluded Liabilities is hereby amended to remove the following clause:
"other than customer account insurance supplemental to SIPC coverage included in the
Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business
consists of the asset management and the alternatives – private equity businesses of Seller and
the Subsidiaries, but not the private investment management business of Seller and the
Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets
include the asset management business, the alternatives-private equity business and the CTS
(Corporate Cash) business, and ~~Purchased Assets and~~ the Business ~~include~~includes the private
investment management business (other than the CTS (Corporate Cash) business) (the "PIM
Business") and the Purchased Assets include the assets of the Seller used primarily in or
necessary for the operation of the PIM Business, but not the forgivable notes issued by
employees to Seller or its Affiliates. The employees of PIM of the Closing Date shall become
Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section
9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result
from the inclusion of the ~~private investment management business of Seller (the "~~PIM
Business"~~)~~ in the pool of Transferred Employees. Accordingly, Purchaser shall increase the
amount available to be awarded as bonuses to Transferred Employees to take into account the
addition of the Transferred Employees of the PIM Business. The Transferred Employees of the
PIM Business will be treated in a manner consistent with the principles set forth in Section
9.1(c). ~~The Purchased Assets include forgivable notes issued by the Transferred Employees of
the PIM Business to Seller ("PIM Employee Notes"). [Purchaser agrees to pay any proceeds it
receives in respect of such PIM Employee Notes to Seller if and when received. After the date
hereof, Purchaser and Seller agree to negotiate in good faith to determine whether an alternative
means of addressing the PIM Employee Notes is preferable and agree, to the extent necessary, to
jointly seek Bankruptcy Court approval of any such alternative means.]~~ Excluded Liabilities
shall include any pre-closing legal tax or compliance Liabilities associated with IRA accounts for
the benefit of clients of the PIM Business.

3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities"
consists solely of all Liabilities incurred by Purchaser, after the Closing, in connection with the
Business. ~~Nothing in this Paragraph 3 is intended to modify Section 8.12 of the Agreement
[and~~Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of
the definition of Assumed Liabilities shall be "Assumed Liabilities."~~]"~~ assumed by Purchaser.

4.    Consideration. The parties, after considering the available appraisal
information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue,
the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the
aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission
and, accordingly, the Cash Amount shall be $1,540,000,000. In light of the other provisions
provided herein, the Cash Amount shall not be subject to adjustment under Section 3.3.

5.    License. All marks containing the words "LEHMAN" or "LEHMAN
BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section
8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of
the Agreement with respect to the investment banking and capital markets businesses of Seller

3

HLHZ0020175

and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the ~~perpetual~~ term of the license granted for use in connection with the IMD Business (including in respect of ~~any one or more of the private equity or other~~ investment funds ~~within the IMD Business~~) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any ~~other businesses~~business of Seller and its Subsidiaries, ~~in each case~~ solely for use by such Subsidiaries or purchaser in connection with the winding up of ~~any~~ such ~~businesses~~business.

    ~~5.~~6. Hedges on Long Positions.  The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (it being understood that exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" are included in Long Positions, but TBA mortgage-backed securities and any over-the-counter derivatives, such as spot and forward currency contracts, are excluded).  The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

    ~~6.~~7. Subordinated Notes of LBI.  The outstanding subordinated notes of LBI ~~and the proceeds thereof~~ are not Assumed Liabilities ~~or Purchased Assets~~, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

    ~~7.~~8. Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

    ~~8.————Certain Cash Proceeds.——Any cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions, before the Closing, shall be delivered to Purchaser.~~

    8. DTC Arrangements.  Upon the Closing, Purchaser shall assume all of the rights and obligations under LBI's arrangements with the Depository Trust Clearing Corporation, including all settlement obligations and related rights thereunder.

    9. Deletion of Purchase Price Adjustment and Holdback Provisions.  Section 3.3 of the Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.  Section 4 of the First Amendment to the Asset Purchase Agreement, dated September 19, 2008, is hereby deleted in its entirety and shall be of no effect *ab initio*.

    10. Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract.  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

    ~~10.~~11. Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations,

4

       HLHZ0020176

respectively, of Seller or its Subsidiaries or between or among any Seller orand any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

11.12. Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

12.13. Barclays Repurchase Agreement. At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, [and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates,] from their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates (the "Barclays Repurchase Agreement").

13.14. Risk of Loss of Artwork. During such period thatthe Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

14.15. Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

15.16. Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by SellerLBHI or LBI in connection with theits bankruptcy proceedingsproceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good

5

faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing

6

                                                    HLHZ0020178

Date) through end of the month in which the sublease agreement is executed shall be paid
to the Sublandlord contemporaneously with the execution and delivery of the sublease
agreement.

(c)    If any consent or approval from any landlord under an underlying lease is
required pursuant to the terms of the underlying lease in order to effectuate the applicable
sublease agreement and/or to the extent that any landlord under an underlying lease has
recapture and/or termination rights that would be triggered by the proposed sublease
arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser
will cooperate and use commercially reasonable efforts in obtaining such consent to the
applicable sublease agreement and/or obtaining waivers from the landlord with respect to
any such recapture and/or termination rights and shall otherwise comply in all respects
with the terms and provisions of the underlying lease in connection with the execution
and delivery of the applicable sublease agreement.

16. 17.    Deferred Transfers. Notwithstanding anything to the contrary
contained in the Agreement, (a) the parties agree that during the nine month period after the
Closing Date that Excluded Employees are permitted to occupy and use real property subject to a
Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the
Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new
employees of Seller or its Affiliates for any such Excluded Employees, and that any such new
employees of Seller or its Affiliates shall be permitted to occupy and use such real property to
the same extent and on the same basis as the Excluded Employees in accordance with Section
8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that
Transferred Employees are permitted to occupy and use real property is not subject to a
Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the
Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of
new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any
such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real
property to the same extent and on the same basis as the Transferred Employees in accordance
with Section 8.11(g).

17. 18.    745 Seventh Avenue. The parties acknowledge that there is no mortgage
encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and
that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note
made by 745 in favor of its Affiliate will be fully repaid and extinguished.

18. 19.    Prorations. Notwithstanding Section 12.2 of the Agreement, to the extent
that the parties are unable to agree upon all customary prorations for the Purchased Assets as of
the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days
following the Closing Date.

19. 20.    Schedules. Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

20. 21.    Definition of Excluded Contract. As used in the Agreement, the term
"Excluded Contract" shall not include swap agreements include any ISDA Master Agreement and
any master swap agreement and any schedule thereto or supplement or amendment thereto.

7

                                    HLHZ0020179

21.22. PIM Business Leases. Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser. Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease. With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

23.    No Overseas Assets. All assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time. No assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that, to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

8

CONFIDENTIAL                                                                    HLHZ0020180

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:

CONFIDENTIAL
HLHZ0020181

Document comparison done by DeltaView on Saturday, September 20, 2008 2:31:22
PM

| Input: | | |
|---|---|---|
| Document 1 | pcdocs://ny2/1916861/11 | |
| Document 2 | pcdocs://ny2/1916861/13 | |
| Rendering set | Standard | |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 85 |
| Deletions | 66 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 157 |

CONFIDENTIAL

# BCI EXHIBIT

# 241

**From:**    Walker, James: Finance (NYK)
**Sent:**    Sat, 20 Sep 2008 19:04:32 GMT
**To:**    Clackson, Patrick: Finance (LDN)
**CC:**    Romain, Gary: Finance (LDN)
**Subject:** FW: Scanned document from Douglas, Julia: Finance (NYK)

---

**From:**    Clackson, Patrick: Finance (LDN)
**Sent:**    Tuesday, September 16, 2008 2:53 PM
**To:**    Castell, Bill:
**Cc:**    Romain, Gary: Finance (LDN); Weidler, Chris: Finance (LDN); Walker, James: Finance (NYK)
**Subject:**    FW: Scanned document from Douglas, Julia: Finance (NYK)

Bill this is completion balance sheet from draft docks, LI side not Barcap, gives the final asset
split - neg good will from this method is sum of 2.25+2 = 4.25 - 1.35 (a/cing liab) = 2.9

**From:**    Douglas, Julia: Finance (NYK)
**Sent:**    Tuesday, September 16, 2008 2:46 PM
**To:**    Clackson, Patrick: Finance (LDN)
**Subject:**    Scanned document from Douglas, Julia: Finance (NYK)

<<...>>

**HIGHLY CONFIDENTIAL**

BCI-EX-(S)-00024313



9/16/2008
11:18 AM

## ASSETS

| | |
|---|---|
| Gov & Ag | $40.0 |
| Commercial Paper | 1.1 |
| Mortgages | 2.7 |
| Total Corp Debt | 4.9 |
| Corp Equity | 8.8 |
| Derivatives | 4.5 |
| Cash | 0.7 |
| **Total** | **$62.7** |
| Collateralized ST Agr | 10.0 |
| Receivables | 0.0 |
| Other Assets | 0.0 |
| Inv In Con Subs | 0.0 |
| Due From Subs | 0.0 |
| **Total** | **10.0** |
| **Adj. Total Assets** | **$72.65** |

## LIABILITIES

| | |
|---|---|
| ST Borrowings | $0.0 |
| Gov & Ag | 21.0 |
| Commercial Paper | 0.0 |
| Mortgages | 0.0 |
| Corp Debt | 2.1 |
| Corp Equities | 6.3 |
| Derivatives | 4.5 |
| **Total** | **$33.9** |
| Collateralized ST Fund | 34.5 |
| Payables | 0.0 |
| Deposits | 0.0 |
| Due To Subs | 0.0 |
| Sub Notes | 0.0 |
| **Total** | **34.5** |
| **Total** | **68.4** |
| Cure pmt | 2.25 |
| Comp | 2.0 |
| **Total** | **$72.65** |

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00024314

# BCI EXHIBIT

# 242

| | |
|---|---|
| **From:** | McDaniel, James R. <jmcdaniel@sidley.com> |
| **Sent:** | Saturday, September 20, 2008 3:52 PM |
| **To:** | Edward J ROSEN <erosen@cgsh.com> |
| **Cc:** | wnavin@theocc.com; jcawley@theocc.com; jfennell@theocc.com; Rovira, Alex R. <ARovira@Sidley.com>; Attanasio, Lee S. <lattanasio@Sidley.com> |
| **Subject:** | Issues re: LBI Accounts at OCC |

Ed:

Just to be clear, from OCC's perspective these are the three major open issues that we see now:

1) How much of the approximately $1 billion in cash that OCC is holding as margin for LBI accounts is intended to be transferred to Barclays at closing and how will cash margin not transferred be replaced?

2) How will Barclays replace approximately $252.3 million in letters of credit held by OCC as margin and clearing fund collateral for LBI accounts?

3) How to obtain the transfer from LBI to Barclays of about $927 million in government securities at JPM? (There is probably a workaround here if JPM can't be brought on board, but we should try to obtain their cooperation.)

While we have indicated that there may be some release of excess margin collateral on Monday, Saturday morning preliminary numbers actually showed a $5.1 million margin deficit, so I would not look for any large release.

While I did vet these numbers with OCC, they are just ballpark, working numbers.
Thanks for working with us on this,
Jim

James R. McDaniel
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312)853-2665
Fax: (312)853-7036


----------------------------------------------------------------------------
---------------------

IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform you
that, unless expressly stated otherwise, any U.S. federal tax advice contained in this
communication, including attachments, was not intended or written to be used, and cannot be
used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such
taxpayer by the Internal Revenue Service. In addition, if any such tax advice is used or referred

CONFIDENTIAL

to by other parties in promoting, marketing or recommending any partnership or
other entity,
investment plan or arrangement, then (i) the advice should be construed as
written in connection
with the promotion or marketing by others of the transaction(s) or matter(s)
addressed in this
communication and (ii) the taxpayer should seek advice based on the taxpayer's
particular
circumstances from an independent tax advisor.

*******************************************************************************
********************
This e-mail is sent by a law firm and may contain information that is
privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any
attachments and notify us
immediately.

*******************************************************************************
********************

CONFIDENTIAL

# BCI EXHIBIT

# 243

**From:**     Romain, Gary: Finance (LDN)
**Sent:**     Sat, 20 Sep 2008 20:48:24 GMT
**To:**       Walker, James: Finance (NYK)

**CC:**       Nash, Phillip: Finance (NYK); Morton, Marcus: Finance (NYK); Weidler, Chris: Finance (LDN); Gavenda, TJ: Finance (NYK); Hughey, Matthew: Finance (NYK); McCosker, Tom: Finance (NYK); Redman, Paul: Finance (LDN)

**Subject:** Balance sheet

James,

Please find attached a completion balance sheet based on the APA as amended plus the clarification letter (and our conversation with Patrick).  I have assumed zero value for the three new subs (Lehman Brothers Canada Inc, Lehman Brothers Sudamerica SA, Lehman Brothers Uruguay SA) - I've asked Martin to include these entities in his balance sheet later today (or give an indication of approx balance sheet value)

As discussed, the spreadsheet will need to be updated if Martin's information (and the business/PCG verification thereof) indicates differences.

There will also be some gross-ups due to IFRS vs US GAAP differences, but these should not impact on goodwill or capital.

I'm available on mobile.

Regards,

Gary

<<...>>

**HIGHLY CONFIDENTIAL**

BCI-EX-(S)-00052419

## Placeholder

# Document produced in native format

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00052420

**Long Island - Acquisition Summary**
**[Unaudited and unverified]**

|  | $bn | $bn |
|---|---|---|
| Govt & Agency | o/s | |
| Commercial Paper | o/s | |
| Mortgage-backed | o/s | |
| Corp Debt | o/s | |
| Corp Equity | o/s | |
| Derivatives | o/s | |
| Collateralised Finance | o/s | |
| Financial Assets | | 52.19 |
| Valuation adjustment | | -2.50 |
| | | 49.69 |
| Cash | | 1.30 |
| Assets in fed box (net of $0.9bn writedown) | | 1.00 |
| Previously excluded 50% MBS | | 1.40 |
| Additional subsidiaries (zero value assumed until details received) | | 0.00 |
| Financial Assets | | 53.39 |
| | | |
| 7th Avenue | 0.95 | |
| Data Centres | 0.50 | |
| Non-Financial Assets | | 1.45 |
| | | |
| Total Assets | | 54.84 |
| | | |
| Repo liability | 45.00 | |
| Cure payment | 2.25 | |
| Bonus accrual | 2.00 | |
| Financial Liabilities | | 49.25 |
| | | |
| | | |
| Net assets | | 5.59 |
| | | |
| Consideration: | | |
| Assets | 0.25 | |
| Properties | 1.45 | |
| | | 1.70 |
| | | |
| Negative goodwill | | 3.89 |

# BCI EXHIBIT

# 244

| From: | david.murgio@weil.com |
|---|---|
| Sent: | Saturday, September 20, 2008 5:25 PM |
| To: | vlewkow@cgsh.com; rdavis@cgsh.com |
| Subject: | Collateral |
| Attach: | BarCap collateral.xls |

Spreadsheet 1

---

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com

----- Forwarded by David Murgio/NY/WGM/US on 09/20/2008 05:21 PM -----

Rod Miller/NY/WGM/US

09/20/2008 01:26 PM

To
"Robert Messineo" <robert.messineo@weil.com>, akeller@stblaw.com, "David P.
Murgio" <david.murgio@weil.com>
cc

Subject
Fw: Delivering other assets to Barclays




----- Original Message -----
From: "Tonucci, Paolo" [paolo.tonucci@lehman.com]
Sent: 09/20/2008 12:34 PM AST
To: Rod Miller
Cc: "Azerad, Robert" <RAzerad@lehman.com>; "Fleming, Dan (TSY)"
<dfleming@lehman.com>; "Berkenfeld, Steven" <sberkenf@lehman.com>; "Lowitt, Ian
T" <ilowitt@lehman.com>
Subject: RE: Delivering other assets to Barclays

This is what our ops team delivered

-----Original Message-----
From: rod.miller@weil.com [mailto:rod.miller@weil.com]
Sent: 20 September 2008 11:38
To: Tonucci, Paolo
Cc: Azerad, Robert; Fleming, Dan (TSY); Berkenfeld, Steven; Lowitt, Ian
T
Subject: Re: Delivering other assets to Barclays

We still have the 50% of residentials to transfer at closing, right?
These were not thrown into the repo right?


----- Original Message -----
From: "Tonucci, Paolo" [paolo.tonucci@lehman.com]
Sent: 09/20/2008 11:35 AM AST
To: Rod Miller
Cc: "Azerad, Robert" <RAzerad@lehman.com>; "Fleming, Dan (TSY)"
<dfleming@lehman.com>; "Berkenfeld, Steven" <sberkenf@lehman.com>;
"Lowitt, Ian T" <ilowitt@lehman.com>
Subject: RE: Delivering other assets to Barclays


Rod,

Yes.  I will be free in 1 hour or so.  We will also need help with SIPC
and the release of the locked up cash.

Those are the big things on my list.

My cell is 347 392 9946.

Paolo

-----Original Message-----
From: rod.miller@weil.com [mailto:rod.miller@weil.com]
Sent: 20 September 2008 11:29
To: Tonucci, Paolo
Cc: Azerad, Robert; Fleming, Dan (TSY); Berkenfeld, Steven; Lowitt, Ian
T
Subject: Re: Delivering other assets to Barclays

We need to understand this today as we are working through closing. Can
we talk in a bit?



----- Original Message -----

                                                    CGSH00048019

From: "Tonucci, Paolo" [paolo.tonucci@lehman.com]
Sent: 09/20/2008 11:22 AM AST
To: Rod Miller
Cc: "Azerad, Robert" <RAzerad@lehman.com>; "Fleming, Dan (TSY)"
<dfleming@lehman.com>; "Berkenfeld, Steven" <sberkenf@lehman.com>;
"Lowitt, Ian T" <ilowitt@lehman.com>
Subject: Delivering other assets to Barclays


We will need to deliver the other assets in the agreement to Barclays
next week.

In all the confusion of the last few days there will be challenges with
identification of the location of those assets and the lien over them.
In particular with JPM being the custodian and clearer there will no
doubt be disputes over the rights to these. To add complexity we also
have inconsistent information from JPM around the positions they were
lending against on Thursday night.

This will need your assistance. We are trying the get all the
information cleaned up over the weekend.

Paolo
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of
the designated recipient(s) named above. If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited. This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers. Email
transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or
accurate and it should not be relied upon as such. All information is
subject to change without notice.


- - - - - - - -
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of
the designated recipient(s) named above. If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly

prohibited.  This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers.  Email
transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or
accurate and it should not be relied upon as such.  All information is
subject to change without notice.


--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - -

This message is intended only for the personal and confidential use of the
designated recipient(s) named above.  If you are not the intended recipient of
this message you are hereby notified that any review, dissemination,
distribution or copying of this message is strictly prohibited.  This
communication is for information purposes only and should not be regarded as an
offer to sell or as a solicitation of an offer to buy any financial product, an
official confirmation of any transaction, or as an official statement of Lehman
Brothers.  Email transmission cannot be guaranteed to be secure or error-free.
 Therefore, we do not represent that this information is complete or accurate
and it should not be relied upon as such.  All information is subject to change
without notice.


--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this
communication (including any attachments) is not intended or written to be used
and cannot be used for the purpose of (i) avoiding U.S. tax related penalties
or (ii) promoting, marketing or recommending to another party any transaction
or matter addressed herein.
- BarCap collateral.xls

                                                            CGSH00048021

| Collateral | Market Value |
|---|---|
| Fed Collateral | 28,490,469,091.33 |
| DTC 074 | 10,176,792,453.35 |
| DTC 636 | 4,235,663,352.52 |
| TPCASH | 7,000,000,000.00 |
| Total | 49,902,924,897.20 |

# Remainder of Exhibit
# Filed Under Seal

# BCI EXHIBIT

# 245

| | |
|---|---|
| **From:** | Azerad, Robert |
| **Sent:** | Sat, 20 Sep 2008 22:29:48 GMT |
| **To:** | Tonucci, Paolo; Kelly, Martin; Reilly, Gerard; Beldner, Brett; Veksler, Irina |
| **Subject:** | Opening Balance Sheet |

**Importance:** High

| Inventory | | |
|---|---|---|
| Government & Agencies | 29,810 | |
| Corporate Equities | 8,764 | |
| Mortgages & Mortgage Backed Securities | 3,241 | |
| Corporate Debt & Other | 2,998 | |
| Commercial Paper & Money Market Instruments | 32 | |
| Inventory Total | | 44,846 |
| | | |
| Receivables (15c3 lock up release) | | 1,000 |
| | | |
| Total Assets | | 45,846 |

# BCI EXHIBIT

# 246

**From:**  Azerad, Robert
**Sent:**  Sat, 20 Sep 2008 22:41:46 GMT
**To:**  Tonucci, Paolo; Kelly, Martin; Beldner, Brett; Reilly, Gerard; Veksler, Irina
**Subject:** Opening Balance Sheet (with cash of $7.0 bn)

| | | |
|---|---:|---:|
| Cash and cash equivalent | | 7,000 |
| | | |
| Inventory | | |
| Government & Agencies | 29,810 | |
| Corporate Equities | 8,764 | |
| Mortgages & Mortgage Backed Securities | 3,241 | |
| Corporate Debt & Other | 2,998 | |
| Commercial Paper & Money Market Instruments | 32 | |
| Inventory Total | | 44,846 |
| | | |
| Receivables (15c3 lock up release) | | 1,000 |
| | | |
| Total Assets | | 52,846 |

# BCI EXHIBIT

# 247

**Unknown**

Sent: Wednesday, March 25, 2009 10:34 AM

| | |
|---|---|
| **From:** | Beldner, Brett [brett.beldner@lehman.com] |
| **Sent:** | Sunday, September 21, 2008 12:40 AM (GMT) |
| **To:** | Kelly, Martin [martin.kelly@lehman.com] |
| **Cc:** | Azerad, Robert [RAzerad@lehman.com]; Stewart, Marie [marie.stewart@lehman.com] |
| **Subject:** | Balance Sheet |
| **Attach:** | Opening Balance Sheet vBB.xls |

Here's where we are so far before it gets forwarded to the rest of the group. While Robert focused on the asset side, I added the liabilities and equities to the form.

As you can see, Robert has tracked down the detailed information. However, there are a few open items:

1) There is about $2bn of assets included in the file that may be locked up (can't be transferred) for which we may need to substitute with different collateral - so asset classification may change..

2) Although everyone believes it to be the case, Robert did not receive legal confirmation that the shorts did not go.

3) We do not have any information as to which subsidiaries went (e.g., Eagle), so the balance sheet does not include any information about these.

4) I have not heard back from Kristie or Rose (Heather is out on vacation) on the three foreign subs that supposedly transferred.

5) The $1bn 15-C-3 receivable is an estimate from Paolo.

6) The comp accrual and cure payments accrual are just estimates. (Comp for a year should probably not be the full accrual and cure payments should be actual).

Robert, feel free to add any other comments as you see fit.

<<Opening Balance Sheet vBB.xls>>



EXHIBIT
154 A
8.14.09

444758

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Cash and cash equivalent | | | 7,000 |
| 2 | | | | |
| 3 | Inventory | | | |
| 4 | | Government & Agencies | 29,810 | |
| 5 | | Corporate Equities | 8,764 | |
| 6 | | Mortgages & Mortgage Backed Securities | 3,241 | |
| 7 | | Corporate Debt & Other | 2,998 | |
| 8 | | Commercial Paper & Money Market Instruments | 32 | |
| 9 | Inventory Total | | | 44,846 |
| 10 | | | | |
| 11 | Receivables (15c3 lock up release) | | | 1,000 |
| 12 | | | | |
| 13 | Total Assets | | | 52,846 |
| 14 | | | | |
| 15 | Financing for Cash received from Barclays ($45b for repo and $250m for purchase) | | | 45,250 |
| 16 | | | | |
| 17 | Accrued Bonuses (Assumed to be all accrued) | | | 2,000 |
| 18 | | | | |
| 19 | Cure Payments (Placeholder for actual accrual) | | | 2,250 |
| 20 | | | | |
| 21 | Equity | | | 3,346 |
| 22 | | | | |
| 23 | Total Liabilities and Equity | | | 52,846 |

# BCI EXHIBIT

# 248



**David Murgio/NY/WGM/US**
09/20/2008 11:12 PM

To Rod Miller/NY/WGM/US@WGM, Robert
Messineo/NY/WGM/US@WGM
cc Richard Krasnow/NY/WGM/US@WGM
bcc
Subject Re: LEHMAN

You're right, I think Klein may have wanted that, but then I thought Tom said afterwards that we weren't
going to get back with them piecemeak, but rather wait until we had the whole picture in the morning.

What do you think?

---

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com
    Rod Miller

----- Original Message -----
   **From:** Rod Miller
   **Sent:** 09/20/2008 10:51 PM EDT
   **To:** David Murgio; Robert Messineo
   **Cc:** Richard Krasnow
   **Subject:** Re: LEHMAN
I thought Klein wanted to hear back from us tonight on the $1.5 billion.

   David Murgio

----- Original Message -----
   **From:** David Murgio
   **Sent:** 09/20/2008 10:44 PM EDT
   **To:** Rod Miller; Robert Messineo
   **Cc:** Richard Krasnow
   **Subject:** Re: LEHMAN
I didn't think we wanted this for Cleary tonight.  And there's no call scheduled as far as I know.

---

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com
    Rod Miller

WGM-LEHMAN-E 00013873

----- Original Message -----
 From: Rod Miller
 Sent: 09/20/2008 10:42 PM EDT
 To: Robert Messineo
 Cc: Richard Krasnow; David Murgio
 Subject: Re: LEHMAN
Did we pass this information along to Cleary?  Is there a call tonight?
 Robert Messineo

----- Original Message -----
 From: Robert Messineo
 Sent: 09/20/2008 09:29 PM EDT
 To: Rod Miller
 Cc: Richard Krasnow; David Murgio
 Subject: LEHMAN
    I spoke briefly at the end, along with David, with Wilmer Hale and Paolo.  Long story short:
There is about $1.7 billion in cash and highly liquid securities in the 15c3-3 account.  These are LBI funds,
not customer funds, but funds intended to be available to protect customers.This is the only "reserve"
account (putting aside some possible futures-related accounts, about which no one has any clear info.);
there is not an additional separate J P Morgan reserve account; instead, part of this 15c3-3 account is at
Morgan and part is at Wells Fargo.  The amount required to be held in the account under the rules is
determined by a formula and calculated weekly but customarily more than the minimum required by the
formula is kept in the account and FINRA has required Lehman to keep an unusually high account.  The
calculation is being done for tomorrow but there probably is a very substantial amount that can be
withdrawn under the formula.  However, SEC or FINRA approval (here the approval is likely to be pushed
to the SEC) to take the funds out of the account is required (although theoretically the SEC could be
required to give approval if the formula was met).  So, there are five main issues as to the availability of
funds in this account for Barclays: (i) how much is available under the rules, (ii) will the SIPC trustee, who
now acts for LBI, seek to have the amount reduced, (iii) will the SEC allow the excess to come out of the
account and (iv) will the trustee and the SEC allow funds in the account, assuming release is approved,
go across to Barclays and (v) if all of this is ok from a regulatory perspective, what (if any) additional
approval of the B Ct is required ? The argument would be, as we discussed, that, as part of an integrated
transaction, the reserve account should go to Barclays along with the customer accounts and, if Barclays
is then permitted to withdraw any funds from the account (because of Barclays' better credit standing),
that is what it is entitled to do.  This would be based (assuming the SIPC trustee and SEC agree) on the
argument that the B Ct. has approved the sale of the brokerage business to Barclays, in part because
Barclays is a responsible credit-worthy party and so should get the benefit of the excess in the account.
The counterargument is that Barclays should put the money up on its own precisely because it was
approved to buy the business at so low a price as being a rare credit-worthy buyer who could protect
customers.

Robert L. Messineo
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Telephone = 212-310-8835
Telecopy = 212-833-3862

WGM-LEHMAN-E 00013874

# BCI EXHIBIT

# 249

| | |
|---|---|
| **From:** | David LEINWAND |
| **Sent:** | Saturday, September 20, 2008 11:13 PM |
| **To:** | akeller@stblaw.com; david.murgio@weil.com; Duane MCLAUGHLIN; harvey.miller@weil.com; 'jacqueline.marcus@weil.com' <jacqueline.marcus@weil.com>; jfinley@stblaw.com; 'lori.fife@weil.com' <lori.fife@weil.com>; michael.lubowitz@weil.com; Robert P DAVIS; summerse@sullcrom.com; Victor I LEWKOW; Brown, Alvin H <abrown@STBLAW.COM>; Richard.Smith3@barclayscapital.com; jonathan.hughes@barclayscapital.com; robert.messineo@weil.com |
| **Bcc:** | Duane MCLAUGHLIN |
| **Subject:** | Revised Clarification Letter |
| **Attach:** | 1951523_2(clarificationltr921).DOC;1951524_1(letterBL).DOC |

Attached is a revised draft of the clarification letter. The attached has not yet been reviewed by Barclays and remains subject to comment.

David Leinwand
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2838 | f: +1 212 225 3999
www.clearygottlieb.com | dleinwand@cgsh.com


EXHIBIT
37

FIDENTIAL

BCI-CG00024954

*CGSH Comments of September 20, 2008—9:00 pm*

## BARCLAYS CAPITAL INC.

As of September 20, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn:  Steven Berkenfeld, Esq.
Facsimile:  (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser").  Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement.  This letter agreement (this "Letter") clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respects, and is binding on the parties hereto upon its execution and delivery.

1.    Purchased Assets; Excluded Assets.

(a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than LBI as a Subsidiary of LBHI) except as otherwise specifically provided in the Agreement or this Letter.  Purchased Assets shall include:

(i)    the items set forth in clauses (b), (c) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets";

(ii)    with respect to clauses (d) and (e) of the definition of "Purchased Assets," (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule [A] hereto, (B) such securities and other assets specified on Schedule [B] as Purchaser may, within 60 days after the Closing elect to receive (it being understood that Purchaser in its discretion may select to receive all or any portion of such securities); provided, that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets and [(C) exchange-traded futures and collateralized short-term agreements];

(iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA; and

1

NY2:\1916861\10\1532506J.DOC\73683.1037

FIDENTIAL

BCI-CG00024955

(iv)    all prime brokerage business and accounts and repurchase
agreement and securities lending operations of the Business (for the avoidance of doubt,
other than those that are part of the IMD Business).

(b)    Subject to Paragraph [23] of this Letter, Purchased Intellectual
Property include Intellectual Property Rights, Software and Technology, wherever in the
world held by LBHI or any of its Subsidiaries, that are used primarily in the Business or
necessary for the operation of the Business.

(c)    For the avoidance of doubt, the "Business" includes LBI's
commodities business, government securities trading operations and mortgage-backed
securities trading operations of LBI (but not any securities of such nature held by Seller
except as otherwise specified herein or in the Agreement). [Confirm all government
securities Barclays expects to get are included in (a)(ii).]

(d)    The Excluded Assets shall mean the assets of Seller and its
Subsidiaries referred to in clauses (a), (c) through (j), and (l) through (q) of the definition
of "Excluded Assets." Except as otherwise specified in the definition of "Purchased
Assets," "Excluded Assets" shall include any cash, cash equivalents, bank deposits or
similar cash items of Seller and its Subsidiaries; provided that "Excluded Assets" shall
not include (i) any and all property of any customer, or maintained by or on behalf of LBI
to secure the obligations of any customer, whose account(s) are being transferred to
Purchaser as part of the Business, or (ii) cash, cash equivalents, bank deposits or similar
cash items maintained (A) by or on behalf of LBI pursuant to Rule 15c3-3 of the
Securities Exchange Act of 1934 or otherwise, or by or on behalf of any clearing agency
or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty
fund deposit or in any other form) the obligations of LBI or any other person in an
account maintained by or on behalf of LBI and for which Purchaser shall become
responsible as of the Closing pursuant to the requirements of any such clearing agency or
clearing organization. The following shall also be Excluded Assets: All of the
investments held by Seller or their Subsidiaries in collateralized debt obligations,
collateralized loan obligations, similar asset-backed securities and corporate loans, other
than those subject to the Barclays Repurchase Agreement. Also included in the Excluded
Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities. Included
in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by
Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of
Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets
of the energy marketing and services business of Eagle Energy Management LLC, are
Excluded Assets (rather than Purchased Assets). The reference to "third parties" in
clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates
of Seller. Clause (h) of the definition of Excluded Assets is hereby amended to remove
the following clause: "other than customer account insurance supplemental to SIPC
coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business
consists of the asset management and the alternatives – private equity businesses of Seller and
the Subsidiaries, but not the private investment management business of Seller and the

2

FIDENTIAL

BCI-CG000249!

Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business. The Business includes the private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") and the Purchased Assets include the assets of the Seller used primarily in or necessary for the operation of the PIM Business, but not the forgivable notes issued by PIM employees to Seller or its Affiliates. Excluded Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser after the Closing in connection with the Business. Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities."

4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission and, accordingly, the Cash Amount shall be $1,540,000,000 (subject to certain holdback amounts as agreed to by the parties).

5.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

6.    Subordinated Notes of LBI. The outstanding subordinated notes of LBI are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7.    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    Assumption of Accounts. Purchaser shall assume all customer accounts of the Business. In connection therewith, Purchaser shall receive (i) any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business, or (ii) cash, cash

3

FIDENTIAL

equivalents, bank deposits or similar cash items maintained (A) by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise, or by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any other person in an account maintained by or on behalf of LBI and for which Purchaser shall become responsible as of the Closing pursuant to the requirements of any such clearing agency or clearing organization.

9.      Deletion of Purchase Price Adjustment and Holdback Provisions. Section 3.3 of the Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*. [Consider any necessary adjustments to Amendment No. 1, including timing of release of $250m as discussed in court].

10.      Payables and Receivables. No payables of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

11.      Intercompany Obligations. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations between or among any Seller and any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this Letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.      Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.      Barclays Repurchase Agreement. At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates, from all their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates (the "Barclays Repurchase Agreement").[IS THIS A TRI-PARTY REPO? IF SO, WHO IS THE COLLATERAL AGENT?]

14.      Risk of Loss of Artwork. During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

15.      Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

4

IFIDENTIAL

BCI-CG00024!

16.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date,

5

IDENTIAL

(i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)     If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.     Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property

6

NFIDENTIAL

to the same extent and on the same basis as the Transferred Employees in accordance with
Section 8.11(g).

18.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage
encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and
that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note
made by 745 in favor of its Affiliate will be fully repaid and extinguished.

19.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent
that the parties are unable to agree upon all customary prorations for the Purchased Assets as of
the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days
following the Closing Date.

20.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Definition of Excluded Contract.  As used in the Agreement, the term
"Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement
and any schedule thereto or supplement or amendment thereto.

22.    PIM Business Leases.  Notwithstanding anything to the contrary contained
in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to
perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases").
At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller
to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume
and assign such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such
PIM Lease shall become a Transferred Real Property Lease.  With respect to any PIM Lease that
becomes a Transferred Real Property Lease, during the nine month period after the Closing Date,
to the extent that Excluded Employees occupied real property subject to such Transferred Real
Property Leases prior to Closing, such Excluded Employees, and a substantially similar number
of new employees of Seller or its Affiliates that may be substituted for any such Excluded
Employees, shall be permitted to occupy and use such real property on the same basis as
provided in Section 8.11(f) of the Agreement.

23.    No Overseas Assets.  All assets and rights of the Lehman companies
(other than Seller, 745 and any Subsidiaries sold pursuant to the Agreement) that have or do
come under governmental conservatorship or administration shall be considered "Excluded
Assets," except as notified by the administrator to LBI from time to time.  No assets owned (in
whole or in part) by any Subsidiary of LBHI (other than LBI, 745 and any Subsidiaries sold
pursuant to the Agreement) organized under the laws of a jurisdiction other than the United
States of America or a state thereof are included among the Purchased Assets; provided,
however, that, notwithstanding anything to the contrary contained in Section 13.12 of the
Agreement, to the extent any such asset is jointly owned by any such Subsidiary and Seller and
used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its
commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably
acceptable to Purchaser to permit Purchaser to acquire the interest of such Subsidiary in such
asset or to have the use thereof (provided that neither Seller not Purchaser shall be required to
make any payment in order to establish such arrangement).

7

FIDENTIAL

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

8

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LB 745 LLC

By: _____
Name:
Title:


ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

FIDENTIAL

BCI-CG00024963

)

~~WGM Final~~  *CGSH Comments of* September 20, 2008 ~~am    900 pm~~

## BARCLAYS CAPITAL INC.

<u>As of</u> September ~~21,~~20, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement **(this "Letter")** clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain ~~respect and to be consistent with this provisions of this letter~~**respects**, and is binding on the parties hereto upon its execution and delivery.

1.    <u>Purchased Assets; Excluded Assets.</u>

(a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than LBI as a Subsidiary of LBHI) except as otherwise specifically provided in the Agreement or the**this** Letter. ~~Other than with respect to an Excluded Asset, the~~ Purchased Assets shall include~~, without limitation~~:

(i)    the items set forth in clauses (b), (c) and (g**f**) through (o) and (q) through (s) of the definition of "Purchased Assets";

(ii)    ~~plus~~**with respect to clauses (d) and (e) of the definition of "Purchased Assets," (A)** the securities owned by LBI and ~~either (A) pledged~~**transferred** to Purchaser or its Affiliates under the ~~Barclays~~**Barclays** Repurchase Agreement (as defined ~~above0,~~**below)** as specified ~~in the schedule previously delivered by Seller to Purchaser or its Affiliates or~~**on Schedule [A] hereto,** (B) such securities **and other assets specified on Schedule [B]** as Purchaser may, within 60 days after the Closing ~~select to receive and are held in the clearance "box" on the Closing Date as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates~~**elect to receive** (it being understood that Purchaser in its discretion may select to receive all **or any portion of** such securities); ~~it being also understood~~**provided,** that no securities owned

FIDENTIAL

BCI-CG00024964

by LBHI or any Subsidiary **of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below)** are Purchased Assets **and [(C) exchange-traded futures and collateralized short-term agreements]**;

          (iii)     the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA; **and**

          (iv)     ~~the government securities trading and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller); and(v) ————~~all prime brokerage **business and** accounts and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business)~~, subject, however, to the provisions of Section 2.5 of the Agreement to the extent any executory contract may be considered included therein.~~

          **(b)**    Subject to Paragraph ~~22~~**[23]** of this Letter, Purchased Intellectual ~~Properties~~**Property** include Intellectual Property Rights, Software and Technology, wherever in the world held by LBHI or any of its Subsidiaries, that are **used** primarily ~~used~~**in the Business** or necessary for the operation of the Business.

          (b**c**)     For the avoidance of doubt, the "Business" includes LBI's commodities business~~.~~**, government securities trading operations and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller except as otherwise specified herein or in the Agreement). [Confirm all government securities Barclays expects to get are included in (a)(ii).]**

          (c**d**)     The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a)~~and~~**,** (c) through (j)**,** and (l) through (q) of the definition of "Excluded Assets"~~ and, except as otherwise provided below, any~~**."** **Except as otherwise specified in the definition of "Purchased Assets," "Excluded Assets" shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries; provided that "Excluded Assets" shall not include (i) any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business, or (ii)** cash, cash equivalents, bank deposits or similar cash items ~~of Seller and its Subsidiaries~~**maintained (A) by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise, or by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any other person in an account maintained by or on behalf of LBI and for which Purchaser shall become responsible as of the Closing pursuant to the requirements of any such clearing agency or clearing organization.** The following shall also be Excluded Assets:  All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement.  Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities.  Included in clause (h) of the definition of "Excluded

2

**2**

'FIDENTIAL

BCI-CG000249

Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. ~~Section 1.1~~**Clause** (h) of the definition of Excluded ~~Liabilities~~**Assets** is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business~~, and the.~~ **The** Business includes the private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") and the Purchased Assets include the assets of the Seller used primarily in or necessary for the operation of the PIM Business, but not the forgivable notes issued by **PIM** employees to Seller or _its_ Affiliates. ~~The employees of PIM of the Closing Date shall become Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(e) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the PIM Business in the pool of Transferred Employees. Accordingly, Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business. The Transferred Employees of the PIM Business will be treated in a manner consistent with the principles set forth in Section 9.1(e).~~ Excluded Liabilities shall include any pre-closing legal**,** tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser after the Closing in connection with the Business. Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities**,**" ~~assumed by Purchaser.~~

4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission and, accordingly, the Cash Amount shall be $~~1,540,000,000. In light of the other provisions provided herein, the Cash Amount shall not be subject to adjustment under Section 3.3.~~**1,540,000,000 (subject to certain holdback amounts as agreed to by the parties).**

5.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of

3

3

BCI-CG00024966

the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

6.    ~~Hedges on Long Positions.  The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (it being understood that exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" are included in Long Positions, but TBA mortgage-backed securities and any over-the-counter derivatives, such as spot and forward currency contracts, are excluded).  The reference to "government securities" in the definition of Long Positions includes securities of any government agency.7.~~    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI are not Assumed Liabilities, and __such subordinated notes and__ any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

~~8.~~__7.__    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    ~~DTC Arrangements.  Upon the Closing, Purchaser shall assume all of the rights and obligations under LBI's arrangements with the Depository Trust Clearing Corporation, including all settlement obligations and related rights thereunder.__Assumption of Accounts.  Purchaser shall assume all customer accounts of the Business.  In connection therewith, Purchaser shall receive (i) any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business, or (ii) cash, cash equivalents, bank deposits or similar cash items maintained (A) by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise, or by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any other person in an account maintained by or on behalf of LBI and for which Purchaser shall become responsible as of the Closing pursuant to the requirements of any such clearing agency or clearing organization.__

9.    Deletion of Purchase Price Adjustment and Holdback Provisions.  Section 3.3 of the Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.  ~~Section 4 of the First Amendment to the Asset Purchase Agreement, dated September 19, 2008, is hereby deleted in its entirety and shall be of no effect *ab initio*__[Consider any necessary adjustments to Amendment No. 1, including timing of release of $250m as discussed in court]__.

4

__4__

BCI-CG000249

10.    Payables, Deposits and Receivables. No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

11.    Intercompany Obligations. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations between or among any Seller and any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this letterLetter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.    Barclays Repurchase Agreement. At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, [and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates,] from all their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates (the "Barclays Repurchase Agreement"). [IS THIS A TRI-PARTY REPO? IF SO, WHO IS THE COLLATERAL AGENT?]

14.    Risk of Loss of Artwork. During such period thethat Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

15.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

16.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such

5

<u>5</u>

FIDENTIAL

BCI-CG00024968

leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to

6

<u>6</u>

BCI-CG00024!

the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below.  In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.    _Deferred Transfers_.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    _745 Seventh Avenue_.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

7

7

IDENTIAL

BCI-CG00024970

19.    Prorations. Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules. Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Definition of Excluded Contract. As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    PIM Business Leases. Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser. Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease. With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

23.    No Overseas Assets. All assets and rights of the Lehman companies (other than Seller or 745, 745 and any Subsidiaries sold pursuant to the Agreement) that have or do come under governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time. No assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745 and any Subsidiaries sold pursuant to the Agreement) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that, notwithstanding anything to the contrary contained in Section 13.12 of the Agreement, to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller not Purchaser shall be required to make any payment in order to establish such arrangement).

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

8

8

*[Remainder of page left blank.]*

9

2

FIDENTIAL

BCI-CG00024972

Sincerely,

BARCLAYS CAPITAL INC.


By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:


NY2:\1916861\13\15325131.DOC\73683.1037

IFIDENTIAL

BCI-CG000249

# BCI EXHIBIT

# 250

## Unknown

Sent: Sunday, May 17, 2009 1:16 AM

| | |
|---|---|
| **From:** | Blackwell, Alastair <ablackwe@lehman.com> |
| **Sent:** | Sunday, September 21, 2008 3:36 AM (GMT) |
| **To:** | Azerad, Robert <RAzerad@lehman.com>; Crepeau, Alex F <acrepeau@lehman.com> |
| **Cc:** | Kelly, Martin <martin.kelly@lehman.com> |
| **Subject:** | Re: Update 15c3-3 |

This won't be perfect.
Is tony taking that approach?

--------------------------------

----- Original Message -----
From: Azerad, Robert
To: Stucchio, Anthony; Tonucci, Paolo; Kelly, Martin; Blackwell, Alastair; Lowitt, Ian T
Cc: Crepeau, Alex F; McLaughlin, Kendall J; Burke, William T; Potenciano, Joel; Fleming, Dan (TSY); Aprigliano, Sindy
Sent: Sat Sep 20 23:27:24 2008
Subject: RE: Update 15c3-3

As of Thursday night, the repo situation was relatively straightforward:

1) We had a $42 billion repo trade with Barclays, which was funding Firm's collateral (since it is through this repo that we transferred our positions to Barclays)
2) We had three other repo trades with Street counterparties: BGI ($0.5 bn); Dresdner ($0.6 bn) - both funding equities; and Dwight AM ($0.3 billion) - funding corporates. Per Sindy Aprigliano's file (attached), which only shows Firm's positions, these trades were funding only Firm's positions
3) Chase provided us with a box loan backed with $5.1 bn of collateral - $5.0 bn of which being the Firm's RACERS
4) Chase attempted to put a HIC trade with Barclays for ~$15 bn but was not successful because Barclays did not agree to the trade - Dan has more color about this attempted trade

As a result, I am not sure where the $2 bn of customer collateral funded through repos are.

Robert

<<Secured Funding Cusips_091808_Firm Summary.xls>>

PS: What do the $642 million of unallocated repos represent?

From: Stucchio, Anthony
Sent: Saturday, September 20, 2008 11:10 PM
To: Azerad, Robert; Tonucci, Paolo; Kelly, Martin; Blackwell, Alastair; Lowitt, Ian T
Cc: Crepeau, Alex F; McLaughlin, Kendall J; Burke, William T; Potenciano, Joel; Fleming, Dan (TSY)
Subject:    Update 15c3-3

As I have mentioned previously, the number of stock record breaks are overwhelming. What is complicating the issue is that several Trustee accounts were set up for the LBIE liquidation in the firm's customer range, therefore polluting regular customer and firm activity causing potentially erroneous allocations. This is what we are seeing:

*    $2 billion of Customer payables (unallocated short positions with no offsetting debits). Normally these customer shorts, which are insignificant are included in the formula because it's difficult to prove we do not have a bonafide payable to the customer. There are over 1700 items on the stock record contributing to this problem.

*    The stock record currently shows that we repoed out $2 billion of customer collateral through repo. Dan is not sure if this is

7/15/2009

Exhibit
78 B
V.V   8 my

10252597

valid.

*     $642 million of unallocated repo, customer impact? Can't prove it at this point.

*     $150 million unallocated Fail to receives

We will have another status call at midnight.

Alex, Kendall, Joel, Dan  -please feel free to add any additional color.

Tony

7/15/2009

10252597