# BCI EXHIBIT

# 251

Rod Miller/NY/WGM/US     To   Lori Fife/NY/WGM/US@WGM
09/24/2008 07:43 PM     cc

      bcc

     Subject   schedule B

----- Forwarded by Rod Miller/NY/WGM/US on 09/24/2008 07:42 PM -----



"Tonucci, Paolo"
<paolo.tonucci@lehman.co     To   <rod.miller@weil.com>
m>
     cc   "Lowitt, Ian T" <ilowitt@lehman.com>
09/21/2008 06:11 AM
    Subject   FW: 1.9 bn 4:45am update:

```
This is the additional collateral that we would deliver.  As you can see
some of this was delivered on Frday to support the credit provided by
Barclays to DTCC.

Paolo

-----Original Message-----
From: Forrest, Monty
Sent: 21 September 2008 05:17
To: Lowitt, Ian T; Blackwell, Alastair; Ullman, Neal (NY); Hraska, James
W
Cc: Tonucci, Paolo; Azerad, Robert; Fleming, Dan (TSY)
Subject: RE: 1.9 bn 4:45am update:

 All - we have just completed the analysis for tonight.  There is one
issue so please read this thoroughly.

We have analyzed any unencumbered asset in all boxes that were not
picked up by financing systems.  Here is what we have confirmed:


                          Market Value
DTC 074                   862,639,264
DTC 636                   300,929,347.47
Euroclear 22780        32,390,617.24
·CAD                      3,554,083
Bony Tri Pledge  1,090,059,646.11 (this is the issues item)

          TOTAL           2,289,572,957.59


For the Bony Tri Pledge line item this number represents what the Front
End financing system is telling us was pledged to Bony Tri on Friday.
We have worked all night to get a separate file from the financing
system (normally run) that confirms which of this activity has actually
settled.  That file was not available for Friday end of day.  I spoke to
Mark Sharland and Brian Dolan about restoring the data and we engaged a
large group of senior technologist until moments ago.  It appears that
this particular file for Friday was overwritten and cannot be restored.
```



Δ π EXHIBIT 508
Deponent Miller
Date 1/7/010 Rptr. KK
WWW.DEPOBOOK.COM

WGM-LEHMAN-E 00015980

They only way to confirm the number of settled items is to request a
file from BoNY and cross check against our file. We believe the number
should be very close but would like to confirm.

We have created a spreadsheet(attached) with a tab for each depo and the
relevant underlying data.

Please send me a call in number for the meeting with Bart. Jim Hraska
and I can call in if you would like. Going to try and get an hour or so
rest now.

Rgds,

Monty

----Original Message-----
From: Lowitt, Ian T
Sent: Saturday, September 20, 2008 10:23 PM
To: Forrest, Monty; Blackwell, Alastair; Ullman, Neal (NY); Hraska,
James W
Cc: Tonucci, Paolo; Azerad, Robert; Fleming, Dan (TSY)
Subject: Re: 1.9 bn 9:15pm update:

Need a cusip level detail of the collateral, and where it is for a 7.00.
Am meeting with bart. Monty, you or alastair need to be at that 7 am
meeting. It to prep for a final weil meeting to finalize the agreement.
Thanks. Good luck getting additional collateral. But good accurate
presentation of the collateral is also critical as we will append to the
agreement. Thanks again for all the hard work. Ian ------Original
Message------
From: Forrest, Monty
To: Alastair Blackwell
To: Ullman, Neal (NY)
To: Hraska, James W
Cc: Ian Lowitt
Cc: Tonucci, Paolo
Cc: Robert Azerad
Cc: Daniel Fleming
Sent: Sep 20, 2008 9:38 PM
Subject: Re: 1.9 bn 9:15pm update:

Just got off the phone with the group. There were some issues with
files received and the amount we had identified prior has changed. It
is now 1.6b. As the Canadian seems to be mostly encumbered. We are
still working to identify more and have another update at 10:15

----- Original Message -----
From: Forrest, Monty
To: Blackwell, Alastair; Ullman, Neal (NY); Hraska, James W
Cc: Lowitt, Ian T; Tonucci, Paolo; Azerad, Robert; Fleming, Dan (TSY)
Sent: Sat Sep 20 20:38:49 2008
Subject: Re: 1.9 bn 8:00pm update:

Here is the lastest based on our 8:00 call.

1. 800mm at Bony ( R. Azarad working with lawyers)

2. We have 746mm in 074

3. We have identified 435mm in Canada

WGM-LEHMAN-E 00015981

4. We have identified another 300mm of mortgages in 636

That is a total of 2.181b.

We are now creating a spreadsheet of all data by cusip/value/depo and
are sending that to Paolo/Robert

We have a 9:15 status meeting and hope to have the spreadsheet completed
by that time.

We are also looking to validate how much JPCHASE put a lien on Friday by
cusip. Paolo needs this and I am reaching out to Neal to discuss.

Finally we need verification if we have  complete control of these
depos. Robert working with lawyers and I need to speak to Neal once
again to get his thoughts

Regards,

Monty

----- Original Message -----
From: Blackwell, Alastair
To: Forrest, Monty; Ullman, Neal (NY); Hraska, James W
Cc: Lowitt, Ian T
Sent: Sat Sep 20 19:14:16 2008
Subject: 1.9 bn update:


------Original Message Truncated------
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - -


This message is intended only for the personal and confidential use of the
designated recipient(s) named above. If you are not the intended recipient of
this message you are hereby notified that any review, dissemination,
distribution or copying of this message is strictly prohibited. This
communication is for information purposes only and should not be regarded as
an offer to sell or as a solicitation of an offer to buy any financial
product, an official confirmation of any transaction, or as an official
statement of Lehman Brothers. Email transmission cannot be guaranteed to be
secure or error-free. Therefore, we do not represent that this information is
complete or accurate and it should not be relied upon as such. All
information is subject to change without notice.


--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within
this communication (including any attachments) is not intended or written to
be used and cannot be used for the purpose of (i) avoiding U.S. tax related
penalties or (ii) promoting, marketing or recommending to another party any
transaction or matter addressed herein.

depot_analysis_9-19-2008 5.xls

|  | Market Value |  |
|---|---|---|
| DTC 074 | 862,639,264 |  |
| DTC 636 | 300,929,347.47 |  |
| Euroclear 22780 | 32,390,617.24 |  |
| CAD | 3,554,083 |  |
| Bony Tri Pledge | 1,090,059,646.11 | Pledged but not confirmed for settle |
|  | 2,289,572,957.59 |  |

# Remainder of Exhibit Omitted

# BCI EXHIBIT

# 252

**Rod Miller/NY/WGM/US**
09/21/2008 08:12 AM

To  akeller@stblaw.com, jfinley@stblaw.com,
david.murgio@weil.com, erika.weinberg@weil.com,
harvey.miller@weil.com, lori.fife@weil.com,
michael.lubowitz@weil.com, richard.krasnow@weil.com,
robert.messineo@weil.com, Shai.Waisman@weil.com,
thomas.roberts@weil.com

cc

bcc

Subject  Updated box numbers

History:    ✉ This message has been replied to and forwarded.

Here's the updated number for the box. They marked it down from $2.3bb to $2.0bb, primarily to adjust for Lehman paper to mark sr notes down to current trading value (75% haircut) and other Lehman paper down 100%. They also firmed up the BONY number and it went down slightly, but is now firm at $1.035 instead of $1.090.

----- Forwarded by Rod Miller/NY/WGM/US on 09/21/2008 08:07 AM -----
"Azerad, Robert" <RAzerad@lehman.com>

09/21/2008 07:55 AM

To  <rod.miller@weil.com>

cc  "Tonucci, Paolo" <paolo.tonucci@lehman.com>

Subject  Unencumbered collateral

Rod

Paolo Tonucci asked me to email you this file. Feel free to call me at
917-678-9112 if you have any questions.

Robert Azerad
Global Head of ALM
Lehman Brothers
Phone : (212) 320-7385; Fax: (646) 758 4235
Email : razerad@lehman.com


>    <<Copy of depot_analysis_9-19-2008 5 Adjusted.xls>>
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - -

This message is intended only for the personal and confidential use of the
designated recipient(s) named above. If you are not the intended recipient of
this message you are hereby notified that any review, dissemination,
distribution or copying of this message is strictly prohibited. This
communication is for information purposes only and should not be regarded as
an offer to sell or as a solicitation of an offer to buy any financial
product, an official confirmation of any transaction, or as an official
statement of Lehman Brothers. Email transmission cannot be guaranteed to be

WGM-LEHMAN-E 00018183

secure or error-free.  Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such.  All information is subject to change without notice.

--------

IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any



transaction or matter addressed herein. Copy of depot_analysis_9-19-2008 5 Adjusted.xls

WGM-LEHMAN-E 00018184



**This file has been provided in
native format**

WGM-LEHMAN-E 00018185

|                  | Market Value      |                                      |
|------------------|-------------------|--------------------------------------|
| DTC 074          | 862,639,264       |                                      |
| DTC 636          | 300,929,347.47    |                                      |
| Euroclear 22780  | 32,390,617.24     |                                      |
| CAD              | 3,554,083         |                                      |
| Bony Tri Pledge  | 1,035,356,662.11  | Pledged but not confirmed for settlement |
|                  | 2,234,869,973.59  |                                      |

**W/ Adj. LEH Paper**

862,639,264

300,929,347.47

32,390,617.24

3,554,083

777,263,571.04

1,976,776,882.53

# Remainder of Attachment Omitted

# BCI EXHIBIT

# 253

    David Murgio/NY/WGM/US          To   Ann Peterson/NY/WGM/US@WGM
                        09/21/2008 09:24 AM           cc
                                                      bcc
                                                 Subject   Fw: Revised Clarification Letter

Please print and staple 10 of these...

_____

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com

----- Forwarded by David Murgio/NY/WGM/US on 09/21/2008 09:23 AM -----

    "David LEINWAND"            To   akeller@stblaw.com, david.murgio@weil.com, "Duane
                        <dleinwand@cgsh.com>             MCLAUGHLIN" <dmclaughlin@cgsh.com>,
                        09/20/2008 11:12 PM              harvey.miller@weil.com, "jacqueline.marcus@weil.com'"
                                                         <jacqueline.marcus@weil.com>, jfinley@stblaw.com,
                                                         "lori.fife@weil.com'" <lori.fife@weil.com>,
                                                         michael.lubowitz@weil.com, "Robert P DAVIS"
                                                         <rdavis@cgsh.com>, summerse@sullcrom.com, "Victor I
                                                         LEWKOW" <vlewkow@cgsh.com>, "Brown, Alvin H"
                                                         <abrown@STBLAW.COM>,
                                                         Richard.Smith3@barclayscapital.com,
                                                         jonathan.hughes@barclayscapital.com,
                                                         robert.messineo@weil.com
                                                    cc
                                               Subject   Revised Clarification Letter

Attached is a revised draft of the clarification letter.  The attached has not yet been reviewed by Barclays
and remains subject to comment.

_____

David Leinwand
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2838 | f: +1 212 225 3999
www.clearygottlieb.com | dleinwand@cgsh.com

This message is being sent from a law firm and may contain
confidential or privileged information.  If you are not
the intended recipient, please advise the sender



WGM-LEHMAN-E 00013889

immediately by reply e-mail and delete this message and
any attachments without retaining a copy.

1951523_2(clarificationltr921).DOC

WGM-LEHMAN-E 00013890

*CGSH Comments of September 20, 2008—9:00 pm*

## BARCLAYS CAPITAL INC.

As of September 20, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement (this "Letter") clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respects, and is binding on the parties hereto upon its execution and delivery.

1.  Purchased Assets; Excluded Assets.

(a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than LBI as a Subsidiary of LBHI) except as otherwise specifically provided in the Agreement or this Letter. Purchased Assets shall include:

(i)    the items set forth in clauses (b), (c) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets";

(ii)    with respect to clauses (d) and (e) of the definition of "Purchased Assets," (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule [A] hereto, (B) such securities and other assets specified on Schedule [B] as Purchaser may, within 60 days after the Closing elect to receive (it being understood that Purchaser in its discretion may select to receive all or any portion of such securities); provided, that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets and [(C) exchange-traded futures and collateralized short-term agreements];

(iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA; and

1

WGM-LEHMAN-E 00013891

(iv)    all prime brokerage business and accounts and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business).

(b)    Subject to Paragraph [23] of this Letter, Purchased Intellectual Property include Intellectual Property Rights, Software and Technology, wherever in the world held by LBHI or any of its Subsidiaries, that are used primarily in the Business or necessary for the operation of the Business.

(c)    For the avoidance of doubt, the "Business" includes LBI's commodities business, government securities trading operations and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller except as otherwise specified herein or in the Agreement). [Confirm all government securities Barclays expects to get are included in (a)(ii).]

(d)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a), (c) through (j), and (l) through (q) of the definition of "Excluded Assets." Except as otherwise specified in the definition of "Purchased Assets," "Excluded Assets" shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries; provided that "Excluded Assets" shall not include (i) any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business, or (ii) cash, cash equivalents, bank deposits or similar cash items maintained (A) by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise, or by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any other person in an account maintained by or on behalf of LBI and for which Purchaser shall become responsible as of the Closing pursuant to the requirements of any such clearing agency or clearing organization. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement. Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Clause (h) of the definition of Excluded Assets is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the

2

WGM-LEHMAN-E 00013892

Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business. The Business includes the private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") and the Purchased Assets include the assets of the Seller used primarily in or necessary for the operation of the PIM Business, but not the forgivable notes issued by PIM employees to Seller or its Affiliates. Excluded Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

       3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser after the Closing in connection with the Business. Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities."

       4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission and, accordingly, the Cash Amount shall be $1,540,000,000 (subject to certain holdback amounts as agreed to by the parties).

       5.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

       6.    Subordinated Notes of LBI. The outstanding subordinated notes of LBI are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

       7.    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

       8.    Assumption of Accounts. Purchaser shall assume all customer accounts of the Business. In connection therewith, Purchaser shall receive (i) any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business, or (ii) cash, cash

3

WGM-LEHMAN-E 00013893

equivalents, bank deposits or similar cash items maintained (A) by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise, or by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any other person in an account maintained by or on behalf of LBI and for which Purchaser shall become responsible as of the Closing pursuant to the requirements of any such clearing agency or clearing organization.

9.    Deletion of Purchase Price Adjustment and Holdback Provisions. Section 3.3 of the Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*. [Consider any necessary adjustments to Amendment No. 1, including timing of release of $250m as discussed in court].

10.    Payables and Receivables. No payables of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

11.    Intercompany Obligations. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations between or among any Seller and any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this Letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.    Barclays Repurchase Agreement. At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates, from all their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates (the "Barclays Repurchase Agreement").[IS THIS A TRI-PARTY REPO? IF SO, WHO IS THE COLLATERAL AGENT?]

14.    Risk of Loss of Artwork. During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

15.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

4

WGM-LEHMAN-E 00013894

16.    <u>Subleases</u>. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("<u>SF Property</u>"), (ii) 125 High Street, Boston, Massachusetts ("<u>Boston Property</u>"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("<u>Chicago Property</u>"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("<u>LA Property</u>" and together with the SF Property, Boston Property and Chicago Property, the "<u>Sublease Properties</u>"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "<u>Sublandlord</u>" and the tenant under such sublease being referred to as the "<u>Subtenant</u>"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date,

WGM-LEHMAN-E 00013895

(i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.    Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property

6

WGM-LEHMAN-E 00013896

to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    745 Seventh Avenue. The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

19.    Prorations. Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules. Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Definition of Excluded Contract. As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    PIM Business Leases. Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser. Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease. With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

23.    No Overseas Assets. All assets and rights of the Lehman companies (other than Seller, 745 and any Subsidiaries sold pursuant to the Agreement) that have or do come under governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time. No assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745 and any Subsidiaries sold pursuant to the Agreement) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that, notwithstanding anything to the contrary contained in Section 13.12 of the Agreement, to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller not Purchaser shall be required to make any payment in order to establish such arrangement).

7

WGM-LEHMAN-E 00013897

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

8

WGM-LEHMAN-E 00013898

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LB 745 LLC

By: _____
Name:
Title:

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

WGM-LEHMAN-E 00013899

# BCI EXHIBIT

# 254



Shai Waisman/NY/WGM/US
09/21/2008 09:31 AM

To  "Keller, Andy R" <akeller@stblaw.com>, Rod
Miller/NY/WGM/US@WGM, "Finley, John G"
<jfinley@stblaw.com>, Thomas
Roberts/NY/WGM/US@WGM, Harvey R
Miller/NY/WGM/US@WGM, Lori Fife/NY/WGM/US@WGM,
Michael Lubowitz/NY/WGM/US@WGM, Richard
Krasnow/NY/WGM/US@WGM, Robert
Messineo/NY/WGM/US@WGM, David
Murgio/NY/WGM/US@WGM, Erika
Weinberg/NY/WGM/US@WGM

cc

bcc

Subject  Re: Here's what Lehman came up with in available
unencumbered assets in the "box"

There is no trustee for LBHI or 745. There is a trustee for LBI. If these are LBHI assets it does not require "trustee"
approval but may require court approval.

Shai Y. Waisman
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
P. 212.310.8274
F. 212.310.8007

---

**From:** "Keller, Andy R" [akeller@stblaw.com]
**Sent:** 09/21/2008 07:26 AM AST
**To:** Rod Miller; "Finley, John G" <jfinley@stblaw.com>; Thomas Roberts; Harvey Miller; Lori Fife; Michael
Lubowitz; Richard Krasnow; Robert Messineo; Shai Waisman; David Murgio; Erika Weinberg
**Subject:** Re: Here's what Lehman came up with in available unencumbered assets in the "box"

Need to be approved by trustee?

Andrew Keller
akeller@stblaw.com
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY  10017
Tel:  (212) 455-3577
Fax: (212) 455-2502

------ Original Message ------
From: rod.miller@weil.com <rod.miller@weil.com>
To: Keller, Andy R; Finley, John G; thomas.roberts@weil.com <thomas.roberts@weil.com>;
harvey.miller@weil.com <harvey.miller@weil.com>; lori.fife@weil.com <lori.fife@weil.com>;
michael.lubowitz@weil.com <michael.lubowitz@weil.com>; richard.krasnow@weil.com
<richard.krasnow@weil.com>; robert.messineo@weil.com <robert.messineo@weil.com>;

WGM-LEHMAN-E 00013875

Shai.Waisman@weil.com <Shai.Waisman@weil.com>; david.murgio@weil.com <david.murgio@weil.com>;
erika.weinberg@weil.com <erika.weinberg@weil.com>
Sent: Sun Sep 21 07:23:18 2008
Subject: Re: Here's what Lehman came up with in available unencumbered assets in the "box"

No. This would be additional purchased assets.

---

From: "Keller, Andy R" [akeller@stblaw.com]
Sent: 09/21/2008 07:20 AM AST
To: Rod Miller; "Finley, John G" <jfinley@stblaw.com>; Thomas Roberts; Harvey Miller; Lori Fife; Michael
Lubowitz; Richard Krasnow; Robert Messineo; Shai Waisman; David Murgio; Erika Weinberg
Subject: Re: Here's what Lehman came up with in available unencumbered assets in the "box"

To confirm: this is what can be offered to pledge to dtc, and is returned to lbhi to extent not used to satisfy claims
under barclays' indemnity to dtc for failed trades?

Andrew Keller
akeller@stblaw.com
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-3577
Fax: (212) 455-2502

----- Original Message -----
From: rod.miller@weil.com <rod.miller@weil.com>
To: Keller, Andy R; Finley, John G; thomas.roberts@weil.com <thomas.roberts@weil.com>;
harvey.miller@weil.com <harvey.miller@weil.com>; lori.fife@weil.com <lori.fife@weil.com>;
michael.lubowitz@weil.com <michael.lubowitz@weil.com>; richard.krasnow@weil.com
<richard.krasnow@weil.com>; robert.messineo@weil.com <robert.messineo@weil.com>;
Shai.Waisman@weil.com <Shai.Waisman@weil.com>; david.murgio@weil.com <david.murgio@weil.com>;
erika.weinberg@weil.com <erika.weinberg@weil.com>
Sent: Sun Sep 21 06:23:31 2008
Subject: Here's what Lehman came up with in available unencumbered assets in the "box"

They need to confirm the Tri Party amount with BONY, but believe it to be "very close". So, this represents $2.29
billion of securities that can be delivered free and clear.

----- Forwarded by Rod Miller/NY/WGM/US on 09/21/2008 06:19 AM -----

"Tonucci, Paolo" <paolo.tonucci@lehman.com>

09/21/2008 06:11 AM

WGM-LEHMAN-E 00013876

To
       <rod.miller@weil.com>
cc
       "Lowitt, Ian T" <ilowitt@lehman.com>
Subject
       FW: 1.9 bn 4:45am update:

This is the additional collateral that we would deliver.  As you can see
some of this was delivered on Frday to support the credit provided by
Barclays to DTCC.

Paolo

-----Original Message-----
From: Forrest, Monty
Sent: 21 September 2008 05:17
To: Lowitt, Ian T; Blackwell, Alastair; Ullman, Neal (NY); Hraska, James
W
Cc: Tonucci, Paolo; Azerad, Robert; Fleming, Dan (TSY)
Subject: RE: 1.9 bn 4:45am update:

All - we have just completed the analysis for tonight.  There is one
issue so please read this thoroughly.

We have analyzed any unencumbered asset in all boxes that were not
picked up by financing systems.  Here is what we have confirmed:

|                 | Market Value |
|-----------------|--------------|
| DTC 074         | 862,639,264 |
| DTC 636         | 300,929,347.47 |
| Euroclear 22780 | 32,390,617.24 |
| CAD             | 3,554,083 |
| Bony Tri Pledge | 1,090,059,646.11 (this is the issues item) |
| TOTAL           | 2,289,572,957.59 |

For the Bony Tri Pledge line item this number represents what the Front
End financing system is telling us was pledged to Bony Tri on Friday.
We have worked all night to get a separate file from the financing
system (normally run) that confirms which of this activity has actually
settled.  That file was not available for Friday end of day.  I spoke to
Mark Sharland and Brian Dolan about restoring the data and we engaged a
large group of senior technologist until moments ago.  It appears that
this particular file for Friday was overwritten and cannot be restored.
They only way to confirm the number of settled items is to request a
file from BoNY and cross check against our file.  We believe the number
should be very close but would like to confirm.

WGM-LEHMAN-E 00013877

We have created a spreadsheet(attached) with a tab for each depo and the relevant underlying data.

Please send me a call in number for the meeting with Bart. Jim Hraska and I can call in if you would like. Going to try and get an hour or so rest now.

Rgds,

Monty

----Original Message-----
From: Lowitt, Ian T
Sent: Saturday, September 20, 2008 10:23 PM
To: Forrest, Monty; Blackwell, Alastair; Ullman, Neal (NY); Hraska, James W
Cc: Tonucci, Paolo; Azerad, Robert; Fleming, Dan (TSY)
Subject: Re: 1.9 bn 9:15pm update:

Need a cusip level detail of the collateral, and where it is for a 7.00. Am meeting with bart. Monty, you or alastair need to be at that 7 am meeting. It to prep for a final weil meeting to finalize the agreement. Thanks. Good luck getting additional collateral. But good accurate presentation of the collateral is also critical as we will append to the agreement. Thanks again for all the hard work. Ian ------Original Message------
From: Forrest, Monty
To: Alastair Blackwell
To: Ullman, Neal (NY)
To: Hraska, James W
Cc: Ian Lowitt
Cc: Tonucci, Paolo
Cc: Robert Azerad
Cc: Daniel Fleming
Sent: Sep 20, 2008 9:38 PM
Subject: Re: 1.9 bn 9:15pm update:

Just got off the phone with the group. There were some issues with files received and the amount we had identified prior has changed. It is now 1.6b. As the Canadian seems to be mostly encumbered. We are still working to identify more and have another update at 10:15

----- Original Message -----
From: Forrest, Monty
To: Blackwell, Alastair; Ullman, Neal (NY); Hraska, James W
Cc: Lowitt, Ian T; Tonucci, Paolo; Azerad, Robert; Fleming, Dan (TSY)
Sent: Sat Sep 20 20:38:49 2008
Subject: Re: 1.9 bn 8:00pm update:

Here is the lastest based on our 8:00 call.

1. 800mm at Bony ( R. Azarad working with lawyers)

WGM-LEHMAN-E 00013878

2. We have 746mm in 074

3. We have identified 435mm in Canada

4. We have identified another 300mm of mortgages in 636

That is a total of 2.181b.

We are now creating a spreadsheet of all data by cusip/value/depo and
are sending that to Paolo/Robert

We have a 9:15 status meeting and hope to have the spreadsheet completed
by that time.

We are also looking to validate how much JPCHASE put a lien on Friday by
cusip. Paolo needs this and I am reaching out to Neal to discuss.

Finally we need verification if we have complete control of these
depos. Robert working with lawyers and I need to speak to Neal once
again to get his thoughts

Regards,

Monty

----- Original Message -----
From: Blackwell, Alastair
To: Forrest, Monty; Ullman, Neal (NY); Hraska, James W
Cc: Lowitt, Ian T
Sent: Sat Sep 20 19:14:16 2008
Subject: 1.9 bn update:


------Original Message Truncated------
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use of the designated recipient(s) named above.  If
you are not the intended recipient of this message you are hereby notified that any review, dissemination,
distribution or copying of this message is strictly prohibited.  This communication is for information purposes only
and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official
confirmation of any transaction, or as an official statement of Lehman Brothers.  Email transmission cannot be
guaranteed to be secure or error-free.  Therefore, we do not represent that this information is complete or accurate
and it should not be relied upon as such.  All information is subject to change without notice.


--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including any
attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax
related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter
addressed herein.

WGM-LEHMAN-E 00013879

# BCI EXHIBIT

# 255

| | |
|---|---|
| From: | Kelly, Brian [BKelly@milbank.com] |
| Sent: | Sunday, September 21, 2008 11:34 AM |
| To: | McComiskey, Anne |
| Cc: | Fazio, Michael |
| Subject: | Bar Cap |
| Attachments: | New WinZip File.zip |



=================================================================

**IRS Circular 230 Disclosure:** U.S. federal tax advice in the foregoing message from Milbank, Tweed, Hadley & McCloy LLP is not intended or written to be, and cannot be used, by any person for the purpose of avoiding tax penalties that may be imposed regarding the transactions or matters addressed. Some of that advice may have been written to support the promotion or marketing of the transactions or matters addressed within the meaning of IRS Circular 230, in which case you should seek advice based on your particular circumstances from an independent tax advisor.

=================================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.



EXHIBIT
461-B
12/17/09    W

1

CONFIDENTIAL

HLHZ0011913

| Collateral | Market Value |
|---|---|
| Fed Collateral | 28,490,469,091.33 |
| DTC 074 | 10,176,792,453.35 |
| DTC 636 | 4,235,663,352.52 |
| TPCASH | 7,000,000,000.00 |
| Total | 49,902,924,897.20 |

# Remainder of Exhibit Omitted

# BCI EXHIBIT

# 256

**From:**    Veksler, Irina
**Sent:**    Sun, 21 Sep 2008 18:16:57 GMT
**To:**    Azerad, Robert; Kelly, Martin; Beldner, Brett; Reilly, Gerard; Tonucci, Paolo
**Subject:** Opening Balance Sheet v2.xls

Cash and cash equivalent                                                7,000

Inventory
      Government & Agencies                          29,526
      Corporate Equities                              8,843
      Mortgages & Mortgage Backed Securities          3,150
      Corporate Debt & Other                          3,186
      Commercial Paper & Money Market Instruments        95
      Derivatives & Other Contr.                         80
Inventory Total                                                        44,880

Receivables (15c3 lock up release)                                      1,000

Total Assets                                                           52,880

# BCI EXHIBIT

# 257



David Murgio/NY/WGM/US          To  Ann Peterson/NY/WGM/US@WGM
09/21/2008 12:39 PM             cc

                                bcc

                        Subject  Fw: LEHMAN--Barclays

Please print and copy 15 of each of these and hold by your desk.  Thanks.

_____

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel:  (212) 310 8764
Fax: (212) 310 8007
e-mail:  david.murgio@weil.com

----- Forwarded by David Murgio/NY/WGM/US on 09/21/2008 12:39 PM -----



Robert
Messineo/NY/WGM/US             To  David Murgio/NY/WGM/US@WGM
09/21/2008 12:35 PM            cc

                       Subject  LEHMAN--Barclays

        Here is the current revision of the clarification letter, including a copy marked to show changes
from our last version.   Please have a bunch of copies made up for us and the Cleary group.



Current Version - Clarification Letter_#1916861.DOC

Marked copy:



Current Version - Clarification Letter_#1916861.DOC

Robert L. Messineo
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Telephone = 212-310-8835
Telecopy = 212-833-3862


Δ π EXHIBIT 501
Deponent O'Donnell
Date 11/6/010 Rptr KL
WWW.DEPOBOOK.COM

WGM-LEHMAN-E 00013962

*WGM Revision of Sept. 21 am (Responding to CGSH Comments of Sept. 20, 2008)*

## BARCLAYS CAPITAL INC.

As of September 20, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn:  Steven Berkenfeld, Esq.
Facsimile:  (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Original Agreement") as amended by the First Amendment thereto dated as of September 19, 2008 (the "First Amendment" and, as the Original Agreement as so amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser").  Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Original Agreement.  This letter agreement (this "Letter") clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respects, and is binding on the parties hereto upon its execution and delivery.

1.    Purchased Assets; Excluded Assets.

(a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than assets of LBI) except as otherwise specifically provided in the Agreement or this Letter.  Purchased Assets shall include:

(i)    the items set forth in clauses (b), (c) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets" in the Original Agreement;

(ii)    with respect to clauses (a), (d) and (e) of the definition of "Purchased Assets" in the Original Agreement, instead of the items referred to in such clauses, (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule [A] hereto, (B) such securities and other assets specified on Schedule [B] as Purchaser may, within 60 days after the Closing, elect to receive (it being understood that Purchaser in its discretion may select to receive all or any portion of such securities), provided that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets and [(C) exchange-traded derivatives and collateralized short-term agreements];

1

WGM-LEHMAN-E 00013963

        (iii)     the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA; and

        (iv)     all prime brokerage business and accounts and repurchase agreement operations and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business).

        (b)     Subject to Paragraphs 2 and 23 of this Letter, Purchased Intellectual Property include Intellectual Property Rights, Software and Technology, wherever in the world held by LBHI or any of its Subsidiaries, that are used primarily in the Business or necessary for the operation of the Business.

        (c)     For the avoidance of doubt, the "Business" includes LBI's commodities business, government securities trading operations and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller except as otherwise specified herein or in the Agreement). [Confirm all government securities Barclays expects to acquire are included in (c) or (d).]

        (d)     The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a), (c) through (f), and (l) through (r) of the definition of "Excluded Assets" in the Original Agreement and the other assets identified in this Letter as Excluded Assets. Except as otherwise specified in the definition of "Purchased Assets," Excluded Assets shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries; provided that Excluded Assets shall not include (i) any and all property of any customer or maintained by or on behalf of LBI to secure the obligations of any customer whose account(s) are being transferred to Purchaser as part of the Business, or (ii) cash, cash equivalents, bank deposits or similar cash items maintained by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise or by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any other person in an account maintained by or on behalf of LBI and for which Purchaser shall become responsible as of the Closing pursuant to the requirements of any such clearing agency or clearing organization. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement. Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities. Included in clause (h) of the definition of "Excluded Assets" in the Original Agreement are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Clause (h) of the definition of Excluded Assets in the Original Agreement is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2

WGM-LEHMAN-E 00013964

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business. The Business includes the private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") and the Purchased Assets shall include the assets of the Seller used exclusively in the PIM Business but shall not include any other assets used in the PIM Business and also used in the operation of the IMD Business or the forgivable notes issued by PIM employees to Seller or its Affiliates. Excluded Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser arising after the Closing in connection with the Business. Clause (d) of the definition of "Assumed Liabilities" in the Original Agreement is understood as though it read as follows: "accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business (other than accounts payable arising out of or in connection with any Excluded Contract), including, for the avoidance of doubt, to the extent arising after such date (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable)." Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities."

4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission and, accordingly, the Cash Amount shall be $1,540,000,000 (subject to certain adjustments relating to the real estate being transferred pursuant to the Agreement as provided by Section 4).

5.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

3

WGM-LEHMAN-E 00013965

6.    Subordinated Notes of LBI. The outstanding subordinated notes of LBI are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7.    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    Transfer of Customer Accounts. Upon the Closing, Purchaser shall assume all of the rights and obligations under LBI's arrangements with the Depository Trust Clearing Corporation and its subsidiaries (the Depository Trust Company, the National Securities Clearing Corporation and the Fixed Income Clearing Corporation) including LBI's settlement obligations and related rights thereunder. [ All customer accounts of LBI shall be transferred to Purchaser. In connection therewith, Purchaser shall receive (i) any and all property of any customer of, or maintained by or on behalf of LBI to secure the obligations of any customer whose accounts are being transferred to Purchaser as part of the Business, or (ii) cash, cash equivalents, bank deposits or similar cash items maintained (A) by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise, or (B) or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or any other form) the obligations of LBI or any other person in an account maintained by or on behalf of LBI and for which Purchaser shall become responsible as of the Closing pursuant to the requirements of any such clearing agency or clearing organization ]

9.    Deletion of Purchase Price Adjustment and Holdback Provisions. Section 3.3 of the Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*. [Consider any necessary adjustments to Amendment No. 1, including timing of release of $250m as discussed in court]

10.    Payables, Deposits and Receivables. No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract [and except for the deposits referred to in Section 8 or otherwise provided in the Agreement to be transferred to Purchaser]. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

11.    Intercompany Obligations. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations between or among any Seller and any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this Letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

4

WGM-LEHMAN-E 00013966

13.    Barclays Repurchase Agreement.  At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates, from all their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "Barclays Repurchase Agreement").

14.    Risk of Loss of Artwork.  During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

15.    Records.  The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail.  The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

16.    Subleases.  Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon

5

WGM-LEHMAN-E 00013967

such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the

6

WGM-LEHMAN-E 00013968

applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.    Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

19.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Definition of Excluded Contract.  As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    PIM Business Leases.

(a)  Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases").  At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease.  With respect to any PIM Lease that becomes a

7

WGM-LEHMAN-E 00013969

Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

(b) Notwithstanding the foregoing or anything to the contrary contained in Section 22(a) or any other provision of the Agreement, with respect to the PIM Lease for the premises located at 399 Park Avenue, New York, New York (the "New York Property"), the underlying lease shall not be subject to assignment to Purchaser and the Purchaser shall only have the option to require that Seller sublease to Purchaser or its Affiliates the sixth floor of the New York Property (or a portion of the sixth floor) (the "NY Sublease Premises"), and Seller agrees to sublease the NY Sublease Premises, subject to the parties' compliance with the terms of the underlying lease including, without limitation, any notice or consent requirements set forth therein. If Purchaser elects to sublease the NY Sublease Premises as provided herein, all of the terms and conditions set forth in this letter agreement applicable to the SF Property shall also apply to the sublease of the NY Sublease Premises.

23.    No Overseas Assets. Although LBI has been part of a global business and Purchaser remains interested in potentially acquiring other portions thereof and obtaining the services of the employees thereof, all assets and rights of the Lehman companies (other than Seller, 745 and any Subsidiaries sold pursuant to the Agreement) that have or do come under governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time. No assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745 and any Subsidiaries sold pursuant to the Agreement) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that, notwithstanding anything to the contrary contained in Section 13.12 of the Agreement, to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

The representations and warranties of the parties contained in this Letter and in the Agreement shall not survive the Closing. This Letter shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This Letter may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

8

WGM-LEHMAN-E 00013970

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:

WGM-LEHMAN-E 00013971

*WGM ~~Final — September~~Revision of Sept. 21 am (Responding to  CGSH Comments of Sept. 20, 2008 ~~am~~)*

## BARCLAYS CAPITAL INC.

<u>As of</u> September ~~21,~~20, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn:  Steven Berkenfeld, Esq.
Facsimile:  (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (~~as previously~~the "Original Agreement") as amended by the First Amendment thereto dated as of September 19, 2008 (the "First Amendment" and, as the Original Agreement as so amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser").  Each capitalized term used and not defined herein shall have the meaning ascribed to it in the <u>Original</u> Agreement. This letter agreement <u>(this "Letter")</u> clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain ~~respect and to be consistent with this provisions of this letter~~respects, and is binding on the parties hereto upon its execution and delivery.

1.    <u>Purchased Assets; Excluded Assets.</u>

(a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than <u>assets of</u>LBI ~~as a Subsidiary of LBHI~~) except as otherwise specifically provided in the Agreement or ~~the~~this Letter.  ~~Other than with respect to an Excluded Asset, the~~ Purchased Assets shall include~~, without limitation~~:

(i)    the items set forth in clauses (b), (c) and (<u>g</u>f) through (o) and (q) through (s) of the definition of "Purchased Assets"<u> in the Original Agreement</u>;

(ii)    ~~plus~~with respect to clauses (a), (d) and (e) of the definition of "Purchased Assets" in the Original Agreement, instead of the items referred to in such clauses, (A) ~~the securities owned by LBI and either (A) pledged~~transferred to Purchaser ~~or its Affiliates under the Barclays~~Barclays Repurchase Agreement (as defined above~~0,~~below) ~~as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates or~~on Schedule [A hereto, (B) such securities and other assets specified on Schedule [B] as Purchaser may ~~within 60 days after the Closing~~ select to receive ~~and are held in the clearance "box" on the Closing Date as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates~~elect to receive (it being understood that

1

WGM-LEHMAN-E 00013972

Purchaser in its discretion may select to receive all or any portion of such securities, it being also understood provided that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets and [(C) exchange-traded derivatives and collateralized short-term agreements];

(iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA; and

(iv)    ~~the government securities trading and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller); and (v)~~ all prime brokerage business and accounts and repurchase agreement operations and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business)~~, subject, however, to the provisions of Section 2.5 of the Agreement to the extent any executory contract may be considered included therein~~.

(b)    Subject to ~~Paragraph 22~~Paragraphs 2 and 23 of this Letter, Purchased Intellectual ~~Properties~~Property include Intellectual Property Rights, Software and Technology, wherever in the world held by LBHI or any of its Subsidiaries, that are used primarily ~~used~~in the Business or necessary for the operation of the Business.

(b~~c~~)    For the avoidance of doubt, the "Business" includes LBI's commodities business~~.~~, government securities trading operations and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller except as otherwise specified herein or in the Agreement). [Confirm all government securities Barclays expects to get are included in (a)(ii).]

(~~e~~d)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) ~~and (c)~~ through (D) and (I) through (q) of the definition of Excluded Assets and, except as otherwise provided below, any in the Original Agreement and the other assets identified in this Letter as Excluded Assets except as otherwise specified in the definition of Purchased Assets. Excluded Assets shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries; provided that Excluded Assets shall not include (i) any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business, or (ii) cash, cash equivalents, bank deposits or similar cash items ~~of Seller and its Subsidiaries~~ maintained by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise, or by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any other person in an account maintained by or on behalf of LBI and for which Purchaser shall become responsible as of the Closing pursuant to the requirements of any such clearing agency or clearing organization. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other

2

~~that those subject to the Barclays Repurchase Agreement~~ Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities. Included in clause (h) of the definition of "Excluded Assets" in the Original Agreement are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. ~~Section 1.1~~Clause (h) of the definition of Excluded ~~Liabilities~~Assets in the Original Agreement is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business~~, and the~~. The Business includes the private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") and the Purchased Assets shall include the assets of the Seller used ~~primarily in or necessary for~~exclusively in the PIM Business but shall not include any other assets used in the PIM Business and also used in the operation of the ~~PIM~~IMD Business~~, but not~~ or the forgivable notes issued by PIM employees to Seller or its Affiliates. ~~The employees of PIM of the Closing Date shall become Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(e) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the PIM Business in the pool of Transferred Employees. Accordingly, Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business. The Transferred Employees of the PIM Business will be treated in a manner consistent with the principles set forth in Section 9.1(e).~~ Excluded Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser arising after the Closing in connection with the Business. Clause (d) of the definition of "Assumed Liabilities" in the Original Agreement is understood as though it read as follows: "accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business (other than accounts payable arising out of or in connection with any Excluded Contract), including, for the avoidance of doubt, to the extent arising after such date (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable)." Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities" ~~assumed by Purchaser.~~

3

WGM-LEHMAN-E 00013974

4.    Consideration.  The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission and, accordingly, the Cash Amount shall be $1,540,000,000.  In light of the other provisions provided herein, the Cash Amount shall not be subject to adjustment under Section 3.3. 1,540,000,000 (subject to certain holdback amounts relating to the real estate being transferred pursuant to the Agreement as provided by Section  ).

5.    License.  All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement.  The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries).  The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

6.    Hedges on Long Positions.  The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (it being understood that exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" are included in Long Positions, but TBA mortgage-backed securities and any over-the-counter derivatives, such as spot and forward currency contracts, are excluded).  The reference to "government securities" in the definition of Long Positions includes securities of any government agency. 7.    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

8. 7.    Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    DTC Arrangements. Transfer of Customer Accounts.  [Upon the Closing, Purchaser shall assume all of the rights and obligations under LBI's arrangements with the Depository Trust Clearing Corporation and its subsidiaries (the Depository Trust Company, the National Securities Clearing Corporation and the Fixed Income Clearing Corporation), including all settlement obligations and related rights thereunder.]  [All customer accounts of LBI shall be transferred Purchaser.  In connection therewith, Purchaser shall receive (i) any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business, or (ii) cash, cash equivalents, bank deposits or similar cash items maintained (A) by or on behalf of LBI pursuant

4

to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise, or by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure or otherwise as margin, guaranty, fund, deposit or in any other form its obligations to LBI or any other person or in an account maintained by or on behalf of LBI and, on which, Purchaser shall become responsible as of the Closing pursuant to the requirements of any such clearing agency or clearing organization.]

9.    <u>Deletion of Purchase Price Adjustment and Holdback Provisions</u>.  Section 3.3 of the Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*. ~~Section 4 of the First Amendment to the Asset Purchase Agreement, dated September 19, 2008, is hereby deleted in its entirety and shall be of no effect *ab initio*~~[Consider any necessary adjustments to Amendment No. 1 including timing or release of $250m as discussed in court.]

10.    <u>Payables, Deposits and Receivables</u>.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract [and except for the deposits referred to in Section 8.7 or otherwise provided in the Agreement to be transferred to Purchaser].  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

11.    <u>Intercompany Obligations</u>.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations between or among any Seller and any of LBHI or any Subsidiary of LBHI.  It is understood that nothing contained in this ~~letter~~Letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    <u>Schedule 12.3</u>.  Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.    <u>Barclays Repurchase Agreement</u>.  At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, [and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates,] from all their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "<u>Barclays Repurchase Agreement</u>").

14.    <u>Risk of Loss of Artwork</u>.  During such period ~~the~~that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

15.    <u>Records</u>.  The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-

5

WGM-LEHMAN-E 00013976

mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

        16.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

        (a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

        (b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property,

6

subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.    Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its

7

Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.      745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

19.      Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.      Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.      Definition of Excluded Contract.  As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.      PIM Business Leases.

(a)  Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases").  At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease.  With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

(b)  Notwithstanding the foregoing or anything to the contrary contained in Section 22(a) or any other provision of the Agreement, with respect to the PIM Lease for the premises located at 399 Park Avenue, New York, New York (the "New York Property"), the underlying lease shall not be subject to assignment to Purchaser and the Purchaser shall only have the option to require that Seller sublease to Purchaser or its Affiliates the sixth floor of the New York Property (or a portion of the sixth floor) (the "NY Sublease Premises"), and Seller agrees to sublease the NY Sublease Premises, subject to the parties' compliance with the terms of the underlying lease including, without limitation, any notice or consent requirements set forth therein.  If Purchaser elects to sublease the NY Sublease Premises as provided herein, all of the

8

WGM-LEHMAN-E 00013979

terms and conditions set forth in this letter agreement applicable to the SF Property shall also apply to the sublease of the NY Sublease Premises.

      23.    No Overseas Assets. AllAlthough LBI has been part of a global business and Purchaser remains interested in potentially acquiring other portions thereof and obtaining the services of the employees thereof, all assets and rights of the Lehman companies (other than Seller or 745, 745 and any Subsidiaries sold pursuant to the Agreement) that have or do come under governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time. No assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745 and any Subsidiaries sold pursuant to the Agreement) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that, notwithstanding anything to the contrary contained in Section 13.12 of the Agreement, to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller notnor Purchaser shall be required to make any payment in order to establish such arrangement).

      This letter agreementThe representations and warranties of the parties contained in this Letter and in the Agreement shall not survive the Closing. This Letter shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreementLetter may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

9

WGM-LEHMAN-E 00013980

Sincerely,

BARCLAYS CAPITAL INC.


By: _____
Name:
Title:



Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:

WGM-LEHMAN-E 00013981

Document comparison done by DeltaView on Sunday, September 21, 2008 12:33:42
PM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1916861/13 |
| Document 2 | pcdocs://ny2/1916861/16 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | Count |
|---|---|
| Insertions | 78 |
| Deletions | 54 |
| Moved from | 4 |
| Moved to | 4 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 140 |

WGM-LEHMAN-E 00013982

# BCI EXHIBIT

## 258

*EX. 516*

| | |
|---|---|
| **From:** | david.murgio@weil.com |
| **Sent:** | Sunday, September 21, 2008 12:46 PM |
| **To:** | Kelly, Brian <bkelly@milbank.com>; mfazio@hlhz.com |
| **Subject:** | Fw: Spreadsheet |
| **Attach:** | BarCap collateral.xls |

Resend...

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com

----- Forwarded by David Murgio/NY/WGM/US on 09/21/2008 12:45 PM -----
David Murgio/NY/WGM/US

09/21/2008 12:42 PM

To bkelly@milbank.com

cc Lori Fife/NY/WGM/US@WGM

Subject Spreadsheet

See attached...

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310 8764
Fax: (212) 310 8007
e-mail: david.murgio@weil.com

CONFIDENTIAL

MTHM0000139

| Collateral | Market Value |
|---|---|
| Fed Collateral | 28,490,469,091.33 |
| DTC 074 | 10,176,792,453.35 |
| DTC 636 | 4,235,663,352.52 |
| TPCASH | 7,000,000,000.00 |
| Total | 49,902,924,897.20 |

CONFIDENTIAL

|   | A | B |
|---|---|---|
| 1 | Collateral | Market Value |
| 2 | Fed Collateral | 28,490,489,091.33 |
| 3 | DTC 074 | 10,176,792,453.35 |
| 4 | DTC 636 | 4,235,663,352.52 |
| 5 | TPCASH | 7,000,000,000.00 |
| 6 | Total | 49,902,924,897.20 |

MTHM0000140

# Remainder of Exhibit Omitted

# BCI EXHIBIT

# 259

**From:**    Pearn, Francis J
**Sent:**    Sun, 21 Sep 2008 17:05:27 GMT
**To:**      Stack, Tim: Futures (NYK)
**CC:**      McInerney, Lily
**Subject:** RE: Net Long Options - 9/18

Tim
I'm getting some information that leads me to think that all the
exchange traded option contracts were liquidated by the exchanges on
Friday. Here is a spreadsheet that shows $0 House account balances as
of the 19th at a number of exchanges. I am imploring Operations to get
us a definitive answer as to whether these contracts have in fact been
liquidated and will come back to you immediately upon hearing from them.
Thanks.
Frank


-----Original Message-----
From: Tim.Stack@barclayscapital.com
[mailto:Tim.Stack@barclayscapital.com]
Sent: Sunday, September 21, 2008 12:05 PM
To: Stephen.King@barclayscapital.com; Pearn, Francis J; McInerney, Lily;
Reilly, Gerard; Mincak, Christopher; Jasen.Yang@barclayscapital.com
Cc: Shi, Jerry; Liz.James@barclayscapital.com
Subject: RE: Net Long Options - 9/18

Frank
I have just been speaking to Stephen
Can you please call me on this one at 2124121834.
Thanks
Tim

-----Original Message-----
From: King, Stephen: Markets (NYK)
Sent: Sunday, September 21, 2008 11:26 AM
To: 'Pearn, Francis J'; McInerney, Lily; Reilly, Gerard; Mincak,
Christopher; Yang, Jasen: Markets (NYK)
Cc: Shi, Jerry; Stack, Tim: Futures (NYK)
Subject: RE: Net Long Options - 9/18


Just tried to call.


HIGHLY CONFIDENTIAL

-----Original Message-----
From: Pearn, Francis J [mailto:francis.pearn@lehman.com]
Sent: Sunday, September 21, 2008 11:22 AM
To: King, Stephen: Markets (NYK); McInerney, Lily; Reilly, Gerard;
Mincak, Christopher; Yang, Jasen: Markets (NYK)
Cc: Shi, Jerry; Stack, Tim: Futures (NYK)
Subject: Re: Net Long Options - 9/18

Stephen
I spoke with Gerry Reilly this morning and am reaching out to Lily and
Chris to get the most recent exchange traded option info. I am at 516
741 4541 if you want to speak. I will give you an update once Lily and I
connect.


Frank

----- Original Message -----
From: Stephen.King@barclayscapital.com
<Stephen.King@barclayscapital.com>
To: McInerney, Lily; Reilly, Gerard; Mincak, Christopher;
Jasen.Yang@barclayscapital.com <Jasen.Yang@barclayscapital.com>
Cc: Pearn, Francis J; Shi, Jerry; Tim.Stack@barclayscapital.com
<Tim.Stack@barclayscapital.com>
Sent: Sun Sep 21 11:18:47 2008
Subject: RE: Net Long Options - 9/18

Lily,

What's I'm trying to be sure about is that we have a clear list of all
exchange traded positions (options, futures, etc) as of Friday close.
Need this today.  Very important. Also, I need to know what the net
margin is at the relevant clearing house, and whether that reflects the
Friday close marks.

What is you number? Either tim or I will call you.

thx

-----Original Message-----
From: McInerney, Lily [mailto:lily.mcinerney@lehman.com]
Sent: Sunday, September 21, 2008 11:10 AM
To: King, Stephen: Markets (NYK); Reilly, Gerard; Mincak, Christopher;
Yang, Jasen: Markets (NYK)
Cc: Pearn, Francis J; Shi, Jerry
Subject: RE: Net Long Options - 9/18

Only equity exchange traded options as of 9/18 were included.

-----Original Message-----
From: Stephen.King@barclayscapital.com
[mailto:Stephen.King@barclayscapital.com]

HIGHLY CONFIDENTIAL

Sent: Sunday, September 21, 2008 9:12 AM
To: Reilly, Gerard; Mincak, Christopher; Jasen.Yang@barclayscapital.com
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry
Subject: RE: Net Long Options - 9/18

Don't forget we only want the exchange traded options, not the otc.

-----Original Message-----
From: Reilly, Gerard [mailto:greilly@lehman.com]
Sent: Sunday, September 21, 2008 9:11 AM
To: Mincak, Christopher; Yang, Jasen: Markets (NYK); King, Stephen:
Markets (NYK)
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry
Subject: RE: Net Long Options - 9/18

Chris

Does this include all equity exchange traded options?

-----Original Message-----
From: Mincak, Christopher
Sent: Friday, September 19, 2008 5:41 PM
To: 'Jasen.Yang@barclayscapital.com'; Stephen.King@barclayscapital.com
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry; Reilly, Gerard
Subject: RE: Net Long Options - 9/18

I've included short options, longs/shorts as of yesterday's close, 9/18.

-----Original Message-----
From: Jasen.Yang@barclayscapital.com
[mailto:Jasen.Yang@barclayscapital.com]
Sent: Friday, September 19, 2008 5:23 PM
To: Mincak, Christopher; Stephen.King@barclayscapital.com
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry; Reilly, Gerard
Subject: RE: Net Long Options - 9/18

is there a short options book as well?

these are current as of yesterday's close?

thanks,

jasen

-----Original Message-----
From: Mincak, Christopher [mailto:christopher.mincak@lehman.com]
Sent: Friday, September 19, 2008 4:45 PM
To: King, Stephen: Markets (NYK); Yang, Jasen: Markets (NYK)
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry; Reilly, Gerard
Subject: Net Long Options - 9/18

HIGHLY CONFIDENTIAL

Attached are the options. Awaiting the risk report from Risk.

Chris
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of
the designated recipient(s) named above. If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited. This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers. Email
transmission cannot be guaranteed to be secure or error-free. Therefore,
we do not represent that this information is complete or accurate and it
should not be relied upon as such. All information is subject to change
without notice.


- - - - - - - -
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.


This e-mail may contain information that is confidential, privileged or
otherwise protected from disclosure. If you are not an intended
recipient of this e-mail, do not duplicate or redistribute it by any
means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell
any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing. Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)
with its registered office at 1 Churchill Place, London, E14 5HP. This
email may relate to or be sent from other members of the Barclays Group.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of
the designated recipient(s) named above. If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited. This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any

transaction, or as an official statement of Lehman Brothers. Email
transmission cannot be guaranteed to be secure or error-free. Therefore,
we do not represent that this information is complete or accurate and it
should not be relied upon as such. All information is subject to change
without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.

This e-mail may contain information that is confidential, privileged or
otherwise protected from disclosure. If you are not an intended
recipient of this e-mail, do not duplicate or redistribute it by any
means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell
any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing. Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)
with its registered office at 1 Churchill Place, London, E14 5HP. This
email may relate to or be sent from other members of the Barclays Group.

------------------------------------
--------

This message is intended only for the personal and confidential use of
the designated recipient(s) named above. If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited. This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers. Email
transmission cannot be guaranteed to be secure or error-free. Therefore,
we do not represent that this information is complete or accurate and it
should not be relied upon as such. All information is subject to change
without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending

HIGHLY CONFIDENTIAL

to another party any transaction or matter addressed herein.

---

This e-mail may contain information that is confidential, privileged or
otherwise protected from disclosure. If you are not an intended
recipient of this e-mail, do not duplicate or redistribute it by any
means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell
any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing.  Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)
with its registered office at 1 Churchill Place, London, E14 5HP.  This
email may relate to or be sent from other members of the Barclays Group.

---

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of
the designated recipient(s) named above.  If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited.  This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers. Email
transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or
accurate and it should not be relied upon as such.  All information is
subject to change without notice.

- - - - - - - -
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.

---

This e-mail may contain information that is confidential, privileged or
otherwise protected from disclosure. If you are not an intended
recipient of this e-mail, do not duplicate or redistribute it by any
means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell

any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing. Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)
with its registered office at 1 Churchill Place, London, E14 5HP.  This
email may relate to or be sent from other members of the Barclays Group.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


This message is intended only for the personal and confidential use of the designated recipient(s) named
above.  If you are not the intended recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly prohibited.  This communication is for
information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to
buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman
Brothers. Email transmission cannot be guaranteed to be secure or error-free.  Therefore, we do not
represent that this information is complete or accurate and it should not be relied upon as such.  All
information is subject to change without notice.


IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including
any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or
matter addressed herein.

HIGHLY CONFIDENTIAL

# BCI EXHIBIT

# 260

**From:**    Azerad, Robert
**Sent:**    Sun, 21 Sep 2008 19:36:02 GMT
**To:**      Kelly, Martin; Gary.Romain@barclayscapital.com
**CC:**      James.Walker@barclayscapital.com
**Subject:** RE: Updated Opening Balance Sheet

Please find enclosed the CUSIP level details for the inventory
transferred to Barclays

Robert Azerad

-----Original Message-----
From: Kelly, Martin
Sent: Sunday, September 21, 2008 3:08 PM
To: 'Gary.Romain@barclayscapital.com'
Cc: 'James.Walker@barclayscapital.com'; Azerad, Robert
Subject: Re: Updated Opening Balance Sheet

Includes the $1.9b. Robert can bridge it for you

----------------------------------

----- Original Message -----
From: Gary.Romain@barclayscapital.com <Gary.Romain@barclayscapital.com>
To: Kelly, Martin
Cc: James.Walker@barclayscapital.com <James.Walker@barclayscapital.com>
Sent: Sun Sep 21 14:55:02 2008
Subject: RE: Updated Opening Balance Sheet

Martin - a basic question, but want to make sure I'm understanding this
summary.  Will the $44,880 correspond to what came across against the
repo - you mentioned an additional $1.9bn of assets (separate to the
15c3), which is included/excluded in this number...?

Thanks,

Gary

From: Azerad, Robert [mailto:RAzerad@lehman.com]
Sent: Sunday, September 21, 2008 2:21 PM
To: Romain, Gary: Finance (LDN); Walker, James: Finance (NYK); Gavenda,
TJ: Finance (NYK)
Cc: Kelly, Martin; Tonucci, Paolo; Reilly, Gerard; Beldner, Brett;
Lowitt, Ian T
Subject: Updated Opening Balance Sheet

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

- - - - - - - - This message is intended only for the personal and
confidential use of the designated recipient(s) named above. If you are
not the intended recipient of this message you are hereby notified that
any review, dissemination, distribution or copying of this message is
strictly prohibited. This communication is for information purposes only
and should not be regarded as an offer to sell or as a solicitation of
an offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers. Email
transmission cannot be guaranteed to be secure or error-free. Therefore,
we do not represent that this information is complete or accurate and it
should not be relied upon as such. All information is subject to change
without notice. -------- IRS Circular 230 Disclosure: Please be advised
that any discussion of U.S. tax matters contained within this
communication (including any attachments) is not intended or written to
be used and cannot be used for the purpose of (i) avoiding U.S. tax
related penalties or (ii) promoting, marketing or recommending to
another party any transaction or matter addressed herein.

This e-mail may contain information that is confidential, privileged or
otherwise protected from disclosure. If you are not an intended
recipient of this e-mail, do not duplicate or redistribute it by any
means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell
any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing.  Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)
with its registered office at 1 Churchill Place, London, E14 5HP.  This
email may relate to or be sent from other members of the Barclays Group.

**Long Island - Acquisition Summary**
**Unaudited and unverified**

|                                                                          | $bn   | $bn   |
|--------------------------------------------------------------------------|-------|-------|
| Govt & Agency                                                            | 29.53 |       |
| Commercial paper                                                         | 0.09  |       |
| Mortgage-backed                                                          | 3.15  |       |
| Corp debt                                                                | 3.19  |       |
| Corp equity                                                              | 8.84  |       |
| Derivatives                                                              | 0.08  |       |
| Inventory - current book value                                           |       | 44.88 |
| Valuation adjustment                                                     |       | -2.50 |
| Inventory - net                                                          |       | 42.38 |
| 15c3 asset                                                               |       | 1.00  |
| Cash                                                                     |       | 7.00  |
| Previously excluded 50% MBS (net of any loss due to guaranteed DTCC obligations) |       | 1.40  |
| Financial Assets                                                         |       | 51.78 |
|                                                                          |       |       |
| Subsidiaries                                                             |       | 0.00  |
| 7th Avenue & Data Centres                                                |       | 1.29  |
| Fixtures, fittings, telecomms, etc                                       |       | 0.19  |
|                                                                          |       |       |
| **Total Assets**                                                         |       | **53.25** |
|                                                                          |       |       |
| Repo liability                                                           | 45.00 |       |
| Cure payment                                                             | 2.25  |       |
| Retention payment                                                        | 0.00  |       |
| Bonus accrual                                                            | 2.00  |       |
|                                                                          |       |       |
| **Total Liabilities**                                                    |       | **49.25** |
|                                                                          |       |       |
| **Net assets**                                                           |       | **4.00** |
|                                                                          |       |       |
| Consideration:                                                           |       |       |
| Assets                                                                   | 0.25  |       |
| Properties                                                               | 1.29  |       |
| **Total consideration**                                                  |       | **1.54** |
|                                                                          |       |       |
| **Negative goodwill**                                                    |       | **2.46** |

Notes:

Intangible assets in respect of customer relationships/lists assumed immaterial
Zero value ascribed to the subs until details obtained
No value is currently ascribed to the potential retention payment of up to $750m - due to the $2.5bn buffer provide
The value ascribed to the 50% MBS is subject to legal clarification.
Assumes full cure payments of 2.25bn are required as an accrual

| New box | Repo |
|---|---|
| $bn | $bn |
| 0.35 | 29.18 |
| 0.00 | 0.09 |
| 0.25 | 2.90 |
| 0.50 | 2.69 |
| 0.73 | 8.11 |
| 0.08 | 0.00 |
| 1.91 | 42.97 |

ǝd by the valuation adjustment above (PCG to consider appropriateness)

## Long Island - Acquisition Summary
Unaudited and unverified

| | $bn | $bn | New box $bn | Repo $bn |
|---|---|---|---|---|
| Govt & Agency | 29.53 | | 0.35 | 29.18 |
| Commercial paper | 0.09 | | 0.00 | 0.09 |
| Mortgage-backed | 3.15 | | 0.25 | 2.90 |
| Corp debt | 3.19 | | 0.50 | 2.69 |
| Corp equity | 8.84 | | 0.73 | 8.11 |
| Derivatives | 0.08 | | 0.08 | 0.00 |
| Inventory - current book value | | 44.88 | 1.91 | 42.97 |
| Valuation adjustment | | -2.50 | | |
| Inventory - net | | 42.38 | | |
| 15c3 asset | | 1.00 | | |
| Cash | | 7.00 | | |
| Previously excluded 50% MBS (net of any loss due to guaranteed DTCC obligations) | | 1.40 | | |
| Financial Assets | | 51.78 | | |
| | | | | |
| Subsidiaries | | 0.00 | | |
| 7th Avenue & Data Centres | | 1.29 | | |
| Fixtures, fittings, telecomms, etc | | 0.19 | | |
| | | | | |
| Total Assets | | 53.25 | | |
| | | | | |
| Repo liability | 45.00 | | | |
| Cure payment | 2.25 | | | |
| Retention payment | 0.00 | | | |
| Bonus accrual | 2.00 | | | |
| | | | | |
| Total Liabilities | | 49.25 | | |
| | | | | |
| Net assets | | 4.00 | | |
| | | | | |
| Consideration: | | | | |
| Assets | 0.25 | | | |
| Properties | 1.29 | | | |
| Total consideration | | 1.54 | | |
| | | | | |
| Negative goodwill | | 2.46 | | |

Notes:

Intangible assets in respect of customer relationships/lists assumed immaterial
Zero value ascribed to the subs until details obtained
No value is currently ascribed to the potential retention payment of up to $750m - due to the $2.5bn buffer provided by the valuation adjustment above (PCG to consider appropriateness)
The value ascribed to the 50% MBS is subject to legal clarification.
Assumes full cure payments of 2.25bn are required as an accrual

# BCI EXHIBIT

# 261

| | |
|---|---|
| **From:** | Edward.Gilbert@shinseibank.com |
| **Sent:** | Sunday, September 21, 2008 3:53 PM |
| **To:** | DODonnell@milbank.com; araboy@cov.com; ccromie@metlife.com; dyu@metlife.com; dcoffino@cov.com; dkleiner@velaw.com; gerard.facendola@bnymellon.com; jmcginley@wilmingtontrust.com; jguiliano@bankofny.com; jbecker@wilmingtontrust.com; mspeiser@stroock.com; mbeeler@cov.com; mhopkins@cov.com; Nitin.Bajpai@shinseiinternational.com; noel.purcell@mizuhocbus.com; pcschmitter@bankofny.com; robailey@bankofny.com; rreid@sheppardmullin.com; sjohnston@cov.com; Taylor.Siedell@shinseibank.com; tpasuit@metlife.com |
| **Cc:** | LDespins@milbank.com; DDunne@milbank.com; PAronzon@milbank.com; Geer, Brad; Conor.Tully@fticonsulting.com; Dominic.Dinapoli@fticonsulting.com; Siegert, Eric; John.Siris@fticonsulting.com; Kevin.Lavin@fticonsulting.com; Michael.Eisenband@fticonsulting.com; Fazio, Michael; Philip.Stern@fticonsulting.com; Robert.Darefsky@fticonsulting.com; Ron.Greenspan@fticonsulting.com; Samuel.Star@fticonsulting.com; Burian, Saul; William.Nolan@fticonsulting.com |
| **Subject:** | RE: LEHMAN (URGENT--POSSIBLE EMERGENCY COMMITTEE CALL TODAY) |
| **Attachments:** | Transcript_Barclays-Lehman_Agreement_Announcement_-_17_Sept_08.pdf |





========================================================================

**IRS Circular 230 Disclosure:** U.S. federal tax advice in the foregoing message from Milbank, Tweed, Hadley & McCloy LLP is not intended or written to be, and cannot be used, by any person for the purpose of avoiding tax penalties that may be imposed regarding the transactions or matters addressed. Some of that advice may have been written to support the promotion or marketing of the transactions or matters addressed within the meaning of IRS Circular 230, in which case you should seek advice based on your particular circumstances from an independent tax advisor.

========================================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.


This e-mail message and any attachments are confidential and may be legally privileged. If you are not the intended recipient, we kindly ask you to notify the sender immediately by replying to the above address. Any unauthorized copying, duplication, reproduction, manipulation, dissemination or distribution hereof in any form is strictly prohibited. The statement set forth above serves for information purposes only, and shall not have any legally binding effect. We do not guarantee the accuracy and completeness of any information or materials contained herein. The information contained herein, and the terms for access to or use of such information, are subject to deletion or change at any time. It is not intended as an offer or solicitation for the purchase or sale of any financial instrument or as an official confirmation of any transaction.

???????(????????)????????????????????????????????????????????????????????????????????????????????????
????????????????????????????????????????????????????????????????????????????????????????????????????
??????????????????????????????????????????????????????????????????????

2



### Barclays Bank plc – Announcement

#### Wednesday 17 September 2008

Barclays announces agreement to acquire Lehman Brothers North American investment banking and capital markets businesses

John Varley

Good morning. I apologise if I have kept you waiting for a couple of minutes. But welcome to the call and thank you very much for joining us this morning. I am joined by Bob Diamond and Rich Ricci in New York and in London by Chris Lucas and Mark Merson.

What I am going to do is make a few comments to begin with and then we are happy in the usual way to take your questions. As you have seen, we have announced an agreement to acquire the core North American Investment Banking and Capital Market businesses of Lehman's. That acquisition is subject to approvals that we are now seeking from the US Bankruptcy Court.

When we look at transactions, we ask ourselves two questions. Does the transaction fit with our strategy? And does the transaction make economic sense to our shareholders? The acquisition of the businesses that we have announced today is in line with our strategy of seeking higher growth through time by geographical diversification. And it meets our financial tests, including delivering a strengthening of our capital ratios.

You will remember that when we talked to you about our Half Year Results, we said that our objective in 2008 was very simple. It was and is to manage the impact of the credit crunch whilst maintaining strategic momentum. And I think this transaction fits within that framework. The market backdrop is as challenging as anything we have ever seen. Our intention as we do our business around the Group is to stay close to our customers and clients and manage our risks whilst keeping our eye open to opportunities presented by the market disruption which might be attractive to our shareholders.

Having the licence from our owners to take those opportunities is, of course we fully recognise, dependent on our businesses continuing to perform, not withstanding the difficult circumstances. And you will see that as part of our announcement today, we have said that our trading performance in July and August was satisfactory. Group profits were a bit below the run rate of the first six months of the year which is what we would expect during the high summer. But all our businesses were profitable.

It was against that backdrop of strong relative financial performance that we looked hard at the Lehman Brothers opportunity over the last weekend. I should say that we thought some months back that it was possible that this opportunity might arise, but we were clear that we would only be interested in pursuing it at the right price. The knowledge that the opportunity might arise also caused us to manage our exposures to Lehman Brothers and we have minimum exposure arising out of the bankruptcy.

*1 of 18*

CONFIDENTIAL

HLHZ0009127

We knew from that work over the summer that there was a significant value opportunity in the business and we knew that there might be a good economic opportunity available to us. Furthermore we satisfied ourselves in the due diligence process which took place at the back end of last week and over the weekend, that the franchise of much of Lehman's and in particular the US broker/dealer business, remains strong and healthy.

I stress again that there are important approvals outstanding, including agreement from the United States Bankruptcy Court for the Southern District of New York. But subject to those, we have announced the following:

The acquisition of the core of old Lehman's based around the US broker/dealer operations, we have acquired the associated infrastructure. We will be taking on about 10,000 employees. We are acquiring trading assets with a current estimated value of 72 billion dollars and trading liabilities with a current estimated value of 68 billion dollars for a cash consideration of 250 million dollars.

In addition to acquiring these trading assets, we have made a decision to acquire three buildings. The Lehman's Headquarters in New York and two data centres.

We also mentioned in our announcement today that certain of our shareholders have expressed support for the transaction and an interest in increasing their shareholdings in Barclays. In fact the transaction is capital ratio accretive without additional equity issuance. And the source of that accretion is the negative goodwill from the transaction, which amounts to about 2 billion US dollars post tax.

The acquisition of these businesses and assets significantly enhances BarCap's position in the United States by a transaction that is de-risked by excluding the overwhelming majority of Lehman risk assets.

Before moving on this opportunity, we satisfied ourselves as to the fit between the two capital markets businesses in terms of activities and culture. And the large business would of course be part of IBIM, reporting to Bob. The transaction meets our financial test with significant margin for error. We expect it to be immediately economic profit positive. We expect it to be accretive to earnings on an ongoing basis in the first year, including the impact of equity raising. And the return on investment is very high.

So to summarise and before taking your questions, we have a transaction which subject to the consent of the US Court, makes good sense strategically and financially. I think that the transaction plays to our strengths. The acquisition transforms our position in the largest global capital market. It creates capital ratio enhancement and it meets and some, the financial tests that we have which are designed to ensure that we create shareholder benefit.

So with that I will open up to your questions. And just to remind you what we are concentrating on this morning is the transaction that we have announced.  Could you in the usual way when you ask a question, say your name and which organisation you represent.

CONFIDENTIAL

HLHZ0009128

Question and Answer Session

Question 1 : Mike Trippett, Oriel Securities

John good morning. It's Mike Trippett. Just a couple of questions actually. One, could you give an idea of the risk weighting of the assets?

Answer : John

Shall we take that one first of all and I will ask Chris to comment.

Answer : Chris

Yes in terms of the assets, we have taken, with risk weighted asset the number is about 13.5 billion for the trading assets and then there is obviously that which relates to the buildings on top of that to get to a total of 15. That is the dollar number.

John

And you had a second question Mike?

Further Question  : Mike

Yes the second question was just trying to get a sense of good assets, bad assets and impairments that would have been already taken either through the P&L or to AFS on the assets that you are acquiring?

John

Let me ask Chris to comment and Bob you may want to add. Chris you go first of all.

Answer : Chris

I should say that out of a total of 72.7 which is a net number, the vast majority of those assets are quoted equity Government and Agency paper, CP money market instruments and derivatives and a relatively sizeable cash and matched book. There is a small amount of mortgage paper which has been heavily written down and included in those numbers. So we have been through a process where we took the original marks, reviewed them and then took some further write downs, but that is against the very small portion, less than 5% of that book.

John

*3 of 18*

CONFIDENTIAL

HLHZ0009129

Bob anything you want to add?

Further Answer : Bob

Slightly repetitious but I think it is an important question and an important answer. Because of the way that this deal ended up happening through bankruptcy, a couple of things were important. First and foremost, as Chris said, we got to choose which inventory came with the deal. And primarily we chose things that were important to the underlying businesses. So for example, many of the positions that we took in equities, had to do with our cash equities business. I think the second thing that is important is we had just completed 72 hours of due diligence on every position. So when it came time to make the decision on what came, we personally had been doing due diligence and were able to establish the marks.

Further answer - Chris

Mike I should just say you did ask about AFS. These are entirely a trading book and therefore would go through the profit and loss account and the numbers I have given you reflect any of those adjustments.

Mike

Okay thank you very much.

Question 2 : Michael Helsby – Morgan Stanley

Hello, good afternoon. I was, it is not clear from looking at the Lehman quarterly numbers exactly what the generation, you know the underlying profit generation of net revenue generation of the businesses that you would be buying exactly is. I was wondering if you could give us a helping hand in terms of what you think the net revenue you have bought, ex-write downs and take Q3 as an example?

Answer : John

Well Michael, we won't give you a forecast, but we will try and give you a bit of help and I will ask Chris to make a comment or two.

Answer : Chris

I think, when we look at what we have acquired, which is predominately the broker/dealer business. If you take a normalised view of the Lehman business, that broker/dealer business is broadly about half of what we have seen historically. I think that is probably the best starting place I can give you.

Michael

That is better than what I heard. Thank you.

CONFIDENTIAL

HLHZ0009130

Question 3 : Tom Rayner – Citigroup

Yes good morning everybody. Tom Rayner from Citi here. A couple of questions. One just following up on your comments on the capital and the 15 billion. Am I right, I have just done this very quickly. But you would need to increase equity by about a billion dollars, given the extra 15. You have a buffer between the trading assets and liabilities of four. And you are indicating your accretive, even without the new equity being raised. Are you assuming though that that four billion buffer is likely to come down? Because I guess it could come down from four all the way to one, and still be accretive for capital at the end of the day. Or is that very much, this is mark to market as of last night, all the toxic stuff is outside of this portfolio. We are expecting if anything maybe to run profits from these positions?

Answer : John

The 'or is it' piece of your analysis Tom, is the right way of looking at it. So we absolutely expect to preserve that buffer and in the way that Chris has described we have marked, and the capital derived from the negative goodwill that arises from the transaction is actually more than is needed to support the 15 billion dollars of risk weighted assets. It is just the combination of that part of the transaction gives them an enhancement to the Tier 1 capital and equity Tier 1.

Tom

I understand that. In fact if that buffer is preserved, that is a reasonably significant enhancement, is that right?

Answer : Chris

Well yes you can do the arithmetic. But we have been careful in the way in which we have structured it Tom as you can see to ensure that it has that characteristic. You had a second one did you?

Further Question – Tom

Yes please. I was just having a look at the Lehman Brothers Press Release today. It mentions their discussions to acquire select operations outside of North America. No real comments unless I missed it in your Statement at the beginning about the UK businesses. Can you add anything to that?

Answer : John

CONFIDENTIAL                                                                    HLHZ0009131

Tom let me ask Bob to comment. What I would say generally is that beyond what we have announced, we think we have some options. But to be clear, we have no obligations. But I should ask Bob to give you something more specific.

Answer : Bob

Spot on. Tom an example of an opportunity would be this. Within the US broker/dealer one of the most exciting businesses which you will appreciate is the cash equities business. It is a absolute machine, it is extremely profitable. Jerry Danini and the team that run it have been there for a long time. Year after year it has got a completely integrated research sales, investment banking, it is fantastic. We wouldn't want to miss the opportunity to also add some of the talent from the UK and Europe to that team. But as John said, it is an option, none of it is required because of the deal. There are other areas in the UK and Europe for example, where BarCap already has a very strong position, we wouldn't have an interest in adding any staff. So it would most typically be around those areas where Lehman has strong position and BarCap had a weak one.  So it would be mostly around the equity and equity capital markets business.

Further Question

Is it not the case, if that is to happen given, I can see out my window what has been happening in the last couple of days, I mean if that's to happen, it has to happen reasonably quickly, or is it something you can take your time over?

Answer - Bob

You shouldn't assume we aren't already acting on the opportunities that we think are beneficial to us.

Tom

Okay, thanks a lot.

Question 4 : Simon Maughan. MF Global

Yeah hi, I just wondered is it just coincidence that you are acquiring assets that are roughly, a similar kind of size to the client receivables on the Lehman book?  I am just trying to get a figure because obviously the size of the assets you are getting are a tiny fraction of the overall balance sheet at Lehman, but obviously the size of the staff you are getting is pretty substantial and you haven't just bought a broker/dealer with no connected prop and own bank position. There are own bank positions in the 40 billion that you have acquired and you are just telling us that they are perfectly adequately marked, is that right?

John

CONFIDENTIAL                                                                    HLHZ0009132

Simon, I will ask Chris to comment to the detail, but I suppose what I would say to you is that you know, there is no coincidence in this transaction if you see what I mean. We have had, the circumstances in which we have been able to execute the transaction, mean that we have been able to be very deliberate in choosing either pro or con. So there isn't serendipity or coincidence in the transaction. The transaction is structured as we wanted it to be. It is of course subject to Court approval and we are respectful of the Court.  But we have been very deliberate in our choices here.

### Further Question

Just going back to the earlier question about what the revenues you are acquiring.  You are getting a fraction of the balance sheet and you are kind of hinting that this business could generate up to half of Lehman revenues which would make a fantastic deal from that perspective?

### Answer : John

And that is because we have not taken the entire balance sheet that creates that income. What we have taken is a portfolio of trading assets and liabilities that are first of all de-risked and secondly those that need to support the ongoing parts of the business that we have acquired. And therefore they are predominantly market making assets and liabilities and very tradable.

### Simon

Thanks

### Question 5 : Tim Sykes - Execution

Good morning gentlemen. Congratulations if you get it through. Philip Bourg will probably have to write a new book. The question I have really is about what it does to you as a Group. It is a tremendous deal essentially for EPS, but investment banking is going to become a more material part of your organisation and US investment banking is going to become a more material part of the organisation. So I have got a couple of questions.  Firstly did Lehman's have a system of economic capital? And the second question is, given that you are now a more material part of the US financial system, will the US regulatory protocols, for want of a better word, bite more acidulously into the way you run Barclays?

### Answer : John

Well do you want to talk about the second question first and then let me try and give Tim some help on the first part of what he asks?

### Answer : Bob

Tim on the economic capital. I am not sure I?

### John

CONFIDENTIAL                                                                    HLHZ0009133

It was on the US regulatory issue and we will come to economic capital and shape of Group in a moment.

Answer : Bob

Tim, just rephrase what the question is on the regulatory issue, I am sorry.

Tim

The US regulatory has got more focus on ratios which potentially the UK regulators put less emphasis, such as equity to asset. And also there are obviously discussions afoot to focus on a higher level of capital backing for investment banking operations. Given that this is now more material for Barclays, will that have an impact on the way you have to look at capital adequacy first, not only the bit that you are buying, but the bit that you have?

Answer : Bob

Basically no. It doesn't change the way that Barclays would approach all of these things, because it is all moving on. But let me ask Rich Ricci, our Chief Operating Officer who is the guy who has gone through all that over the last couple of days to answer in specifics.

Answer : Rich

Good morning Tim. Your point is right, but our intention is to be combining this entity with Barclays Capital. Our assumptions going in is that we will be held to the same regulatory standards as we have in our current broker/dealer in the US Barclays Capital that Barclays has. So if anything, as you know, the regulatory standards in the US for some of those things will be more favourable, but our assumptions going in are that this will be consolidated and will be subject to the same regulatory standards we are currently.

Answer : Chris

Tim on your EP point, I was going to say in terms of EP we used our own view of the economic capital to support these businesses because that is what we understand and they look very similar in most respects to those that run within Barclays Capitals broker dealer in the US.

Tim

Okay and presumably you have already explained all this to the rating agencies and they are going to be confirmed?

Answer : Chris

CONFIDENTIAL

HLHZ0009134

We have clearly spoken to the rating agencies, they are considering, as they continually do, our ratings. But we have not heard of any change of view.

Tim

Great. Thank you.

Question 6 : Peter Toeman : HSBC

Good morning. I just wanted to check with you.  The deal looks outstandingly attractive because obviously if one looks at the normalised revenues that Lehman's tell us they produce, they would have made maybe 2.8 billion in Q3, maybe you are taking some 50% of that, that gets you to 1.4 billion. Maybe 5 billion dollars of revenues per year.  But the addition to your WRA's is only sort of 15 billion dollars. Lehman's when it was operating had WRA's of about 200 billion. So I wonder if actually to attain the revenue stream that you have indicated, actually the WRA growth that the Lehman has to be very quick from this point.  Or is it possible to attain the 1.4 billion per quarter of revenues with just sort of 15 billion for trading WRA's?

John

Bob and Rich could you comment?

Answer : Rich

Hi, its Rich. I think a couple of things, one it is a good question. The assets that we have obtained, you know a lot of them are, probably as indicated earlier in the call are more liquid, you know Government agency types. There are some that are ongoing trading positions we have acquired. Clearly what has happened over the last few days, as you can imagine, is as Lehman was in the processes of filing bankruptcy. A lot of their positions began to roll off the street as you would expect was concerned about Lehman's future and how they were dealing with them. So we saw a huge dip in WRA's. I think going forward, keeping in mind the issue that we are going to run only certain of their businesses, we are going to need to wrap up that business. But it is going to happen over time. As you know, I think there is a great opportunity on the revenue side that WRA ramp up is going to happen over time, but I don't think it does happen very quickly in situations like this.

Answer : Chris

I would expect as Rich has said, some increase in WRA's, But what we would be doing is combining the business, that is of the broker/dealer, we will be using what is called consolidated supervised entity regime for capital treatment in US broker/dealers which enables us to aggregate risk positions for the capital purposes. So it won't be entirely additive.  I am sure though as Rich as said, there will be some increase.

Further question

*9 of 18*

CONFIDENTIAL

HLHZ0009135

Can I also ask you about revenue attrition in that although Lehman's seem to be a very good fit on the equity side in terms of fixed income markets that Barclays has been building out in the US for some time, so clearly in certain segments of fixed income markets like foreign exchange or corporate bonds, there must be quite a lot of overlap and how that will be treated and whether you expect that actually an element of revenue attrition will prevent you from getting the numbers, the sort of historic type of Lehman's revenue numbers?

John

Bob could you comment?

Answer : Bob

Yeah you know, it is a good question. But I am going to answer it slightly more broadly than you asked it. If you step back. This is a really unique, interesting opportunity. If you step back and look at the two organisations.  Barclays Capital which has done extremely well over the last 11 years, it has real scale and depth in UK, Europe, Middle East, Africa and into Asia. Lehman has the same type of scale and depth even more in the US, but not in those areas.  So if you look from a geographic point of view, it is a good balance and their US heft and depth is just what we are looking for. If you are looking at it by product, Lehman Brothers brings excellence, top tier excellence in MNA, equity sales and trading and equity capital markets in credits rating.  Two of those three areas we are not in, one we are quite weak in.  If you look at BarCap's strengths, it is commodities. Top three in the world, FX top three in the world, interest rate trading, top three in the world.  In investment grade debt top three in the world. Areas that Lehman Brothers has traditionally been in, but weaker. The two firms combined become top three in both prime services and leverage finance, areas neither were top three in. There will be overlap, but I want to be disingenuous. We have a three month integration plan that we will take you through as we develop it over the next couple of weeks. And all the people have to be adult about this because we are going to get on with it quickly.  But there is surprisingly little overlap because we are able to take just the US broker/dealer, not the entire operations and it was quite fortunate the way this worked out.

Question 7 : Manus Costello – Merrill Lynch

Hi everyone. I have a couple of questions please. One is back to this point about the future of risk weighted asset growth. If I look at the number of employees you are taking on, is that any kind of indication of where risk weighted assets might go in the future? Just thinking in terms of the relative size of the work force, versus the current size of the BarCap workforce. Can I make any kind of extrapolation about WRA per employee for example?

Answer : John

I don't think that would be very safe or scientific way of doing it no.

Further question

CONFIDENTIAL

HLHZ0009136

Is there anything inherent in any of the businesses you are buying which means that it is less capital intensive?

Answer : John

Only to the extent that the businesses we are buying are predominantly more vanilla in terms of the assets and liabilities that they trade with and therefore they tend to have more offsets against other similar risk positions and also lower capital charges.

Further question

So all else being equal, you would expect the acquired businesses to be less capital intensive than the current BarCap businesses?

John

Do you want to comment on that Bob?

Answer : Bob

Yes, I would say that. In other words it is not additive.  Absolutely. I don't want to say there is no growth, but it definitely will not be additive. Let me give you the two best examples. The M&A franchise from Lehman Brothers, this is a top tier global franchise. We already have the risk management and financing franchise. They integrate well and M&A is not capital intensive. It is an advisory business.  It is the same for the equity capital markets business. It is really additive on all of the other things we have been doing which do tend to use balance sheets. So we have a unique opportunity to leverage fee related advisory related businesses at a time in the market which is quite appropriate.

Manus

Okay thank you.

Chris

I was just going to add just one thing just to give you some help. If we look at our existing capital position in risk weighted asset utilisation, the broker/dealer in the US is less than 10% of BarCap's total risk weighted asset usage.  Did you have a second one?

Further question

Yes I just wondered, away from Lehman's, the rest of BarCap have been involved in something of a de-leveraging process during the first half of the year and I wondered if this impacts the thought process on that going forwards?

Answer : John

*11 of 18*

Well I mean the thought process as you know has been one of, we have tried to be very disciplined in the way in which we have managed the balance sheet. We talked at the Half Year about the capital ratios that we are seeking to run to. You should of course assume that those disciplines remain in place, but we have an opportunity here and in the way that Bob and Chris have described, through time we would expect to see some WRA growth in the businesses that we are acquiring. But the overall disciplines of capital management, never more important than today as you would tell us and we would agree. I mean of course those are unaffected by this transaction.

Manus

Okay, thank you very much.

Question 8 : Leigh Goodwin – Fox Pitt Kelton

Good morning gentlemen, afternoon. The question I had, many of them have been asked already, but I just wanted to follow up on capital. I mean it sounds as if this is going to be capital ratio accretive so to speak, even without the additional capital you will be raising. And so my question is, why are you raising the extra one billion of capital?

Answer : John

Well I think the way we look at it is that the business base of Barclays is growing as a result of this transaction in the way that we have been describing. We go into it with an expansive outlook, of course a risk adjusted outlook. Let me say that very clearly. But an expansive outlook and therefore it is right for us to be quite thoughtful about, so what feels like the right capital base to enable us to grow the business safely, but grow the business in the way that we contemplate and our assessment is not least because we have had some statements of support and inquiry as we said in our announcement today from certain of our shareholders, it is right to do those two things in tandem. Simple as that really.

Further question

Okay, but are you sort of signalling any backing away from the 5.25% target?

Answer : John

No. I mean that, remember though that is our target. And what we have said is that we intend to run ahead of target at a time of market turbulence such as we have seen and as you know, on a proforma basis, if you look at the equity ratio at the end of June, flexed for the capital raising that we did in June and July, that the resultant equity ratio on a proforma basis was 6.3%. So we are sort of running well ahead of target. But we did say that our expectation roughly was that half of what we raised would be directed at creating a margin between target and actual and roughly half over time will be directed at business growth. As it happens, the way in which the transaction is structured, actually creates without equity issuance, some capital ratio accretion as we spelt out.

CONFIDENTIAL                                                                                      HLHZ0009138

Leigh

Okay, thank you very much.

Question 9 : Sandy Chen – Panmure Gordon

Afternoon and a very well priced deal I say. There are two questions. One I missed the beginning of the call, but did you give a probability of approval with the US Bankruptcy Court for the deal?

Answer : John

It would be, and if I could put it this way impertinent of us to do that, we have to be respectful of the process of the Court. We have put a proposal which we hope the Court will think of as attractive to the protection of interest of creditors. I mean it is a big proposal within the overall bankruptcy and we will go in front of the Court as soon as we can and get a decision.

Further question

Okay. And then the second question related to the marks. Especially given the regulatory integration I guess that would occur rolling the Lehman's book that you have bought into the Barclays book, would you be able to comment on say relative marks on the RBS, ABS some of the CDO books that Lehman's? If you look at what they have been talking about in previous quarterly results, it would appear that they have taken significantly greater marks than some of their assets versus the Barclays ones. I don't know if you commented on that earlier?

Answer : John

No we haven't done Sandy and I will ask Chris to comment and Rich you might want to add.

Answer : Chris

Let me start Sandy. If we look at the portfolio of assets that we have acquired, it is less than 5% that you would regard as mortgage related. Those are marked down and then marked again through the due diligence process. So I think to do any direct comparison is actually very difficult for the reasons we have said before and the fact that the vast majority of the book is very high quality, easily tradable assets and liabilities.

John

Rich do you want to add anything?

Answer : Rich

CONFIDENTIAL

HLHZ0009139

Yes having gone through the due diligence on the weekend, again all our comments around risk is not generic proof true. I think we have come out of the process very comfortable and if anything confirmed our marks. The paper that any other institution holds, but Lehman in this particular case varies considerably and as Chris noted, I think the new entity will go into quite a cleansing process across all the asset classes. So we move forward comfortable with the marks of both entities.

Sandy

Thanks very much

Question 10 : James Alexander – M&G

Hi, I just wanted a question about the strategic rationale for buying Lehman's or the bits of Lehman's you are buying. It could be said that this is a bit of an old economy deal, given the carnage that investment banks have brought to the world over the last year or so. You couldn't just outline your vision for where investment banking is going to be over the next 2-3 years to explain why you decided to expand in this area, rather than global, retail and commercial banking?

Answer : John

James, I will start and then Bob will add. I think it is a new economy business model is what I would say to you. I mean it is very clear that advantage particularly in the stressed conditions of today, inures to those who have universal banking models with a capital markets business that is well integrated and I think you can see the differentiated performance of that business model, versus other business models very starkly in the experience of the last 12 months to be honest. If you ask me whether as a result of this transaction, we are in some sense de-emphasising the growth that we have been building in GRCB which again I think is pretty evident from the numbers that we showed for the first half, there is no de-emphasis at all. Our expectation is that the GRCB businesses will continue to grow quickly. That is absolutely the mandate that I have given Frits.

On the point about geography and asset allocation, just before asking Bob to add. I mean I do feel and I have said quite often actually in these sorts of conversations, that when I think about optimal asset allocation, I have felt for some time that we are underweight America. We, I would like us to see a greater percentage of our overall earnings come from the United States and this transaction enables us to do just that. But as you and I both know, if you are increasing your exposure to the United States, most especially if you are not a national player, by that I mean you are a foreign player, you have to choose your competitive ground very carefully. And it is no coincidence that we have chosen the businesses that we have chosen to grow in the United States through time, because we feel we have competitive advantage in them and in our capital markets business, it is very clear to us that the competitive advantage of Barclays Capital will be significantly amplified by this deal.

Bob do you want to add in the context of BarCap?

Answer : Bob

*14 of 18*

I do. But before I do, I just reiterate one of the things that John said, you know, John's vision for Barclays which has been very clear for a number of years, the universal banking model. We recognise that the Barclays Capital, BGI businesses benefit from being housed with the Global Retail and Commercial banking businesses. It is true in Spain, it is true in the UK, it is true in South Africa, it is going to be true in Russia and the other places where Frits is building. So you know, there is no competition here, we recognise that 1+1 can equal 3. And there is no change in emphasis on any of that. It is the universal banking model that allows us to get to those synergies.

In terms of investment banking, if you saw the Presentation I gave at the Lehman Brothers Conference, ironic as that is, last week, the pools of revenues in investment banking and investment management are large. They are just under a trillion. They are growing at double the rate of GDP, notwithstanding the fact that '08 will be a slow year. But most importantly they are beginning to consolidate. Investment banking and investment management is beginning to consolidate and watch this picture. We have been talking about it for two or three years. We have a strong position in wealth, in asset management and in investment banking. In each of those areas we are in the top five in the world, not net wealth, but in asset management and investment banking. Wealth, we are just outside the top ten. We are beginning to see serious consolidation. Five or six percentage points over the last year. JP Morgan, Merrills are not going to slow that down. Barclays acquiring Lehman Brothers is not going to slow that down. There is a great opportunity as these markets begin to consolidate.

James

That was a very full answer, thank you.

John

Sorry James. You asked, we gave it to you.

Question 11 : Joseph Shutt – Goldman

My question has been answered thank you.

Question 12 : John Kirk – Redburn

Good afternoon everyone. Most of my questions are done as well thanks. But just a couple. I am trying to understand. Ostensibly it appears you have a fantastically priced deal here and I am trying to understand why that is. And I suspect it is because you are in a situation of probably being the only bidder and also you are buying from what is effectively a forced seller. Is that a fair interpretation of what actually happened and is that why the price is so favourable to you?

Answer : John

Well as I said, we shouldn't be presumptuous about the deliberation of the Court, but you could read into what we said and into our remarks this morning that the businesses are strikingly

*15 of 18*

complementary and we are in a position where we can step up and do something substantial here which I hope the Court will conclude is very much in the interest of creditors because of the scale of what we are undertaking and offering. And there aren't a large number of people who would have that interest who would have that complementarity. I also think, I made some remarks to this effect in what I said at the beginning, I hope that we were reasonably well prepared and that we also had the benefit of the work we did last week and over the weekend. What it requires of course is speed because the system needs that. The clients of Lehman need that and the people of Lehman need that. So it is important that we have moved quickly.

**Further Question**

And sorry, can you confirm whether or not you were the only bidder for the business?

**Answer : John**

Well we can only comment about what we have done and we have put an application in front of the Court. So far as I am aware nobody else has done.

**Further Question**

Okay thanks. And then, apologies, a slightly more sensitive one. But clearly you have paid a very, apparently anyway, a very low price for the business. Are you planning to incentivise the 10,000 people you are planning to take on to remain with the bank? And the reason I ask is because clearly that could become a material part of the consideration actually.

**John**

I am going to ask Bob to comment. But let me just. There is an important I guess point of philosophy and point of culture and value that I would say up front. Again in my remarks I have said that our assimilation of the opportunity among other things was importantly based on whether the values and the vision of the two businesses were consistent with each other and compatible. And we do believe very strongly that the reason why we are optimistic about recruiting a large number of Lehman staff in the US broker dealer is because it is clear to us that they do share our vision and our values and that they are a client driven organisation who are excited by the sort of things that we think we can achieve over the course of the coming years.

Bob will you add to what I have said?

**Answer : Bob**

John that was absolutely spot on.  The only thing I would add is that the people at Lehman understand that the culture of pay for performance, a culture where we don't make long term deals, where we don't get percentage deals, that applies to them as well and they are delighted with it. They want an environment where it is about pay for performance.

**John**

*16 of 18*

CONFIDENTIAL

HLHZ0009142

Okay thanks.

<u>Question 13 : Michael Rogers - Goldman</u>

Yes with respect to the acquisition of Lehman's Brokerage side, has any consideration been given to Lehman Brothers International and Europe and how does that play in the overall part of the organisation?

Answer : John

It may be that you didn't hear the answer that we gave to a similar question a bit earlier. But if I could just sort of try to summarise what 'Bob and I said. What we said is that we have opportunities but no obligations in that regard. So we have acquired assets and businesses in the United States. We are recruiting a large number of people in the United States. We now have the opportunity and it is an opportunity that we are looking at quickly and seriously to see what else might fit with the businesses that we are developing elsewhere around the world. But think of it as opportunity and not obligation.

Further Question

Is that considered an obligation with respect to how the organisation is set up is that what you are saying?

Answer : John

No I am just saying that even if you ask me as part of this package are we required to acquire businesses and assets for example in London or in mainland Europe or in Asia, the answer is no. But it is possible to think that they would be people whose activities would be complementary to the businesses that we are buying and where bringing them in, we might create synergies, of course it is possible to contemplate that. But Bob's team is looking at that as we speak.

Michael

Thank you.

<u>Question 14 : Michael Chepnivitz - HSBC</u>

How are you. Just one question. I realise or I appreciate that you are limited in what you can say about the approval process and the Court proceedings here, but in the actual Court hearing, presumably the creditors have their representatives there and procedurally is the outcome binary? Is it just accept or reject? Or would the creditors through their representatives have the right to say well in principle it looks like a very solid transaction, but could we ask for different terms?

Answer : John

CONFIDENTIAL                                                      HLHZ0009143

I think it really and I apologise for giving you a boring answer. I am not trying in any sense to be obstructive, but I just shouldn't presume on what takes place in Court, that would be an inappropriate thing for me to do. We are very clear that there is an opportunity here which we can execute on it. Achieves a number of things. It achieves potentially good returns for our shareholders through time. It creates a level of certainty about a big business in the market which I think is good for the system. It creates a much greater level of certainty for Lehman's clients in the United States. It creates a certainty for the people of Lehman's and I very much hope that the Court will conclude that it is very much in the interests of creditors, but that is their deliberation and we respect it.

Are there any further questions? I am conscious of the fact that we have almost been running an hour and so if there is one more question, we are happy to take it, if not we will wrap up.

Question 15 : Clifford S? - UBS

Hi, thanks for taking my question. I noticed that the assets and liabilities is less than the amount at Lehman Brothers inc. And I was wondering if you could talk a little bit about the entities from which you are purchasing the assets and whether or not given that Lehman Brothers inc is a regulated indemnity in the States, that it is not in Chapter 11, whether there might be any regulatory approvals in addition to the Court if you were taking a portion of those assets out of that non bankrupt entity?

Answer : John

I will ask Rich to comment. Of course here in the United Kingdom, because our lead regulator is the FSA, of course we have ensured that we have had the appropriate dialogue with the FSA and we are announcing in the way that we are because the FSA is comfortable with what we are doing. Let me turn to Rich to talk about the United States angle.

Answer : Rich

Yes we are purchasing assets from Lehman Brothers inc. And the same as in the UK, we do acquire approval from the SEC which we have obtained.

John Varley

Well thank you very much indeed for joining us. We are really grateful to you for giving us so much time this morning.

End

*18 of 18*

CONFIDENTIAL

HLHZ0009144

# BCI EXHIBIT

# 262

| | |
|---|---|
| **From:** | McDaniel, James R. <jmcdaniel@sidley.com> |
| **Sent:** | Sunday, September 21, 2008 4:03 PM |
| **To:** | Edward J ROSEN <erosen@cgsh.com> |
| **Cc:** | giddens@hugheshubbard.com; kobak@hugheshubbard.com; Stephen P. Harbeck <sharbeck@sipc.org>; Michael A MAZZUCHI <mmazzuchi@cgsh.com>; wnavin@theocc.com; jcawley@theocc.com; Borrelli, Mark <mborrelli@sidley.com>; Rovira, Alex R. <ARovira@Sidley.com> |
| **Subject:** | Understandings relating to the transfer of LBI's accounts at OCC |
| **Attach:** | Untitled.pdf |

Ed:

Realizing that you have your hands full, we nevertheless need to communicate OCC's position to you:

1) OCC's willingness to transfer the LBI accounts to Barclays is conditioned upon obtaining Barclay's signature on the "Transfer and Assumption Agreement" among OCC, the Trustee and Barclays. The Trustee and OCC have signed the document, and the Trustee has consented to the use of the signature page for certain hand marked changes that were prepared by Barclays. Those changes were subsequently incorporated into the document in substantially the same form with no material changes. We subsequently received a copy of the document from Michael Mazzuchi of Cleary that added a paragraph 1(c) and then a later version from Michael that deleted the same paragraph at Alex Rovira's request. That paragraph is unacceptable to OCC, and it is OCC's understanding that Barclays is in agreement that it will not be included in the document. For the elimination of doubt, I have attached a copy of the document in pdf form that is acceptable to OCC. OCC's willingness to transfer the LBI accounts at OCC to Barclays is conditioned upon the execution of this agreement by Barclays.

2) Having heard nothing further from you with respect to cash held by OCC in respect of the LBI accounts, and in accordance with the terms of the Transfer and Purchase Agreement, all such cash in the accounts will be transferred to Barclays assuming that the transaction closes this evening.

3) If the transaction does not close tonight, OCC would need to immediately liquidate and close out the LBI accounts and is preparing to do so. These preparations are as a precautionary measure that OCC does not expect to have to use.

I am available at my office to discuss anything that you need to discuss. We would very much like to know what the plan is for execution of documents and when we might expect to have OCC's Transfer and Assumption Agreement executed by Barclays.

Thanks,
Jim
<<Untitled.pdf>>

James R. McDaniel
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

CONFIDENTIAL

BCI-CG00064703

(312)853-2665
Fax: (312)853-7036

James R. McDaniel
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312)853-2665
Fax: (312)853-7036
- Untitled.pdf

BCI-CG00064704

## TRANSFER AND ASSUMPTION AGREEMENT

Agreement (the "Agreement") executed on September 20, 2008 with effect from and as of the close of business on Friday, September 19, 2008 among Lehman Brothers Inc. ("Lehman"), The Options Clearing Corporation, ("OCC", and Barclays Capital Inc. ("Barclays"). All defined terms (the first instance of which is indicated by underlining) not defined herein shall have the meaning assigned to such terms in OCC's By-Laws or Rules (collectively, the "Rules").

### WITNESSETH:

WHEREAS, Lehman is a clearing member of OCC and carries one or more accounts (nos. 74, 84 and 273 (collectively the "Account")) that contain certain positions in cleared contracts into which Lehman has entered;

WHEREAS, Lehman maintains Clearing Fund and margin deposits with OCC;

WHEREAS, Lehman desires to terminate its OCC membership and transfer its rights, obligations and liabilities under and in respect of the Account pursuant to OCC's membership agreements and the Rules to Barclays, and Barclays desires to accept the transfer of all of Lehman's rights, obligations and liabilities under and in respect of the Account, including with respect to the Clearing Fund deposit and all margin deposits held by OCC with respect to the Account as of the effective date (the "Effective Date") of the consummation of the acquisition and assumption of certain assets and liabilities of Lehman by Barclays;

WHEREAS, OCC agrees to permit the transfer contemplated in the previous whereas clause;

NOW, THEREFORE, it is hereby agreed as follows:

1.    Transfer.

(a)    For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lehman hereby sells, assigns, transfers, and sets over to Barclays, without recourse or without representation or warranty (other than as expressly provided herein), all of Lehman's rights, title, interests, powers, privileges, remedies, obligations, and duties in, to, under, and in respect of the Account, as of the Effective Date including with respect to: (i) the Clearing Fund deposit; (ii) all margin deposits held by OCC with respect to the Account; (iii) all settlement obligations with regard to transactions in cleared contracts; and (iv) all rights and obligations in respect of exercises of option contracts and assignments of such exercises.

(b)    As of the Effective Date, Barclays hereby accepts such sale, assignment, and transfer of the Account, agrees to be bound by and receive the benefits of maintaining such Account, and assumes and agrees to perform each obligation arising out of or to be performed with respect to the activity in the Account.

CONFIDENTIAL

BCI-CG00064705

2.    Representations and Warranties.

(a)    Lehman and Barclays each hereby represents and warrants to the other and to OCC as follows:

(i)    it is duly organized and validly existing and has the power and legal right to execute and deliver this Agreement and to transfer or assume the rights and obligations being transferred hereunder, as the case may be;

(ii)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action; and

(iii)    this Agreement is legal, valid and binding agreement, enforceable against it in accordance with its terms.

(b)    Lehman hereby represents and warrants that it is the legal and beneficial owner of the interest being transferred by it hereunder and that such interest is free and clear of any adverse claim (except for such claims or interests of OCC).

(c)    Barclays hereby: (i) represents and warrants that it has received such documents and other information as it has deemed appropriate to make its own credit analysis and decision to enter into this Agreement; (ii) agrees that it will, independently and without reliance upon Lehman or OCC and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions with respect to the Account; and (iii) agrees that it will perform in accordance with their terms all of the obligations that by the terms of the Rules and any related agreements entered into between it and OCC, are required to be performed by it.

3.    Effective Date.  This Agreement is being entered into on September 20, 2008, following the order of the United States Bankruptcy Court for the Southern District of New York (Manhattan) (Case No. 08-13555) approving execution of the Asset Purchase Agreement dated as of September 16, 2008, as amended on or before September 20, 2008, by Lehman and Barclays and the other parties thereto (the "Asset Purchase Agreement"); but this Agreement shall be effective as of close of business on the Effective Date.

4.    Rights.  As of the Effective Date, all rights, obligations and liabilities of Barclays pursuant to OCC's membership agreements and the Rules shall apply to the Account.

5.    OCC Consent.  OCC hereby consents to the transfer, assignment, assumption and release effected pursuant to this Agreement.

6.    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to the conflict of law principles thereof.

[Washington DC #397038 v3]

2

CONFIDENTIAL

BCI-CG00064706

7.    Amendments and Waivers. This Agreement may be amended or any of its provisions waived only by a written instrument executed and delivered by each of the parties hereto.

8.    Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

· IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement by their duly authorized officers as of the date set forth above.

*James W. Giddens as SIPA Trustee for*

~~LEHMAN BROTHERS, INC.~~ *Lehman Brothers, Inc.*

By: *Jam B. Kol.*

Print Name: *James B. Kobak, Jr.*

Title: *Attorney for Trustee*

**BARCLAYS CAPITAL INC.**

By: _____

Print Name: _____

Title: _____

**THE OPTIONS CLEARING CORPORATION**

By: *William H Navin*

Print Name: *WILLIAM H. NAVIN*

Title: *EXECUTIVE VP*

CHI 4414675v.2

CONFIDENTIAL

# BCI EXHIBIT

# 263

**From:**   Pearn, Francis J
**Sent:**   Sun, 21 Sep 2008 20:07:37 GMT
**To:**   Tim.Stack@barclayscapital.com
**CC:**   McInerney, Lily; Jones, Craig L; Dziemian, Daniel
**Subject:**   FW: Net Long Options - 9/18

Tim
Here are the OCC statements for LBI as of 9/22 reflecting our cash and
securities collateral held for LBI account 074. Dan and Craig provided
these and can answer your questions. WE have a list of option contracts
still open that is being prepared for the firm/house and market making
accounts that we'll forward to you very shortly. Thanks.
Frank

-----Original Message-----
From: Jones, Craig L
Sent: Sunday, September 21, 2008 2:19 PM
To: Pearn, Francis J; Tennyson, Peter A; Butryn, Kirk; Blackwell,
Alastair; Reilly, Gerard; Stucchio, Anthony
Cc: McInerney, Lily
Subject: RE: Net Long Options - 9/18

Attached are the current statements for the OCC.

-----Original Message-----
From: Pearn, Francis J
Sent: Sunday, September 21, 2008 1:14 PM
To: Tennyson, Peter A; Jones, Craig L; Butryn, Kirk; Blackwell,
Alastair; Reilly, Gerard; Stucchio, Anthony
Cc: McInerney, Lily
Subject: FW: Net Long Options - 9/18

Who can get the OCC information and statement for Friday and determine
if these contracts are still outstanding?

-----Original Message-----
From: Tim.Stack@barclayscapital.com
[mailto:Tim.Stack@barclayscapital.com]
Sent: Sunday, September 21, 2008 1:12 PM
To: Pearn, Francis J
Cc: McInerney, Lily; Richard.Konefal@barclayscapital.com;
Liz.James@barclayscapital.com; alexandra.guest@barclayscapital.com
Subject: RE: Net Long Options - 9/18

This is for the futures options contracts that were liquidated as you
say on Thursday and will now be flat.

This does not include the OCC exchange positions..ie the VIX futures and

**HIGHLY CONFIDENTIAL**

all the equity option positions. We need the OCC statement...
-----Original Message-----
From: Pearn, Francis J [mailto:francis.pearn@lehman.com]
Sent: Sunday, September 21, 2008 1:05 PM
To: Stack, Tim: Futures (NYK)
Cc: McInerney, Lily
Subject: RE: Net Long Options - 9/18


Tim
I'm getting some information that leads me to think that all the
exchange traded option contracts were liquidated by the exchanges on
Friday. Here is a spreadsheet that shows $0 House account balances as
of the 19th at a number of exchanges. I am imploring Operations to get
us a definitive answer as to whether these contracts have in fact been
liquidated and will come back to you immediately upon hearing from them.
Thanks. Frank


-----Original Message-----
From: Tim.Stack@barclayscapital.com
[mailto:Tim.Stack@barclayscapital.com]
Sent: Sunday, September 21, 2008 12:05 PM
To: Stephen.King@barclayscapital.com; Pearn, Francis J; McInerney, Lily;
Reilly, Gerard; Mincak, Christopher; Jasen.Yang@barclayscapital.com
Cc: Shi, Jerry; Liz.James@barclayscapital.com
Subject: RE: Net Long Options - 9/18

Frank
I have just been speaking to Stephen
Can you please call me on this one at 2124121834.
Thanks
Tim

-----Original Message-----
From: King, Stephen: Markets (NYK)
Sent: Sunday, September 21, 2008 11:26 AM
To: 'Pearn, Francis J'; McInerney, Lily; Reilly, Gerard; Mincak,
Christopher; Yang, Jasen: Markets (NYK)
Cc: Shi, Jerry; Stack, Tim: Futures (NYK)
Subject: RE: Net Long Options - 9/18


Just tried to call.

-----Original Message-----
From: Pearn, Francis J [mailto:francis.pearn@lehman.com]
Sent: Sunday, September 21, 2008 11:22 AM
To: King, Stephen: Markets (NYK); McInerney, Lily; Reilly, Gerard;
Mincak, Christopher; Yang, Jasen: Markets (NYK)
Cc: Shi, Jerry; Stack, Tim: Futures (NYK)
Subject: Re: Net Long Options - 9/18

Stephen
I spoke with Gerry Reilly this morning and am reaching out to Lily and

HIGHLY CONFIDENTIAL

Chris to get the most recent exchange traded option info. I am at 516
741 4541 if you want to speak. I will give you an update once Lily and I
connect.


Frank

----- Original Message -----
From: Stephen.King@barclayscapital.com
<Stephen.King@barclayscapital.com>
To: McInerney, Lily; Reilly, Gerard; Mincak, Christopher;
Jasen.Yang@barclayscapital.com <Jasen.Yang@barclayscapital.com>
Cc: Pearn, Francis J; Shi, Jerry; Tim.Stack@barclayscapital.com
<Tim.Stack@barclayscapital.com>
Sent: Sun Sep 21 11:18:47 2008
Subject: RE: Net Long Options - 9/18

Lily,

What's I'm trying to be sure about is that we have a clear list of all
exchange traded positions (options, futures, etc) as of Friday close.
Need this today. Very important. Also, I need to know what the net
margin is at the relevant clearing house, and whether that reflects the
Friday close marks.

What is you number? Either tim or I will call you.

thx

-----Original Message-----
From: McInerney, Lily [mailto:lily.mcinerney@lehman.com]
Sent: Sunday, September 21, 2008 11:10 AM
To: King, Stephen: Markets (NYK); Reilly, Gerard; Mincak, Christopher;
Yang, Jasen: Markets (NYK)
Cc: Pearn, Francis J; Shi, Jerry
Subject: RE: Net Long Options - 9/18

Only equity exchange traded options as of 9/18 were included.

-----Original Message-----
From: Stephen.King@barclayscapital.com
[mailto:Stephen.King@barclayscapital.com]
Sent: Sunday, September 21, 2008 9:12 AM
To: Reilly, Gerard; Mincak, Christopher; Jasen.Yang@barclayscapital.com
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry
Subject: RE: Net Long Options - 9/18

Don't forget we only want the exchange traded options, not the otc.

-----Original Message-----
From: Reilly, Gerard [mailto:greilly@lehman.com]
Sent: Sunday, September 21, 2008 9:11 AM
To: Mincak, Christopher; Yang, Jasen: Markets (NYK); King, Stephen:
Markets (NYK)
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry

HIGHLY CONFIDENTIAL

Subject: RE: Net Long Options - 9/18

Chris

Does this include all equity exchange traded options?

-----Original Message-----
From: Mincak, Christopher
Sent: Friday, September 19, 2008 5:41 PM
To: 'Jasen.Yang@barclayscapital.com'; Stephen.King@barclayscapital.com
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry; Reilly, Gerard
Subject: RE: Net Long Options - 9/18

I've included short options, longs/shorts as of yesterday's close, 9/18.


-----Original Message-----
From: Jasen.Yang@barclayscapital.com
[mailto:Jasen.Yang@barclayscapital.com]
Sent: Friday, September 19, 2008 5:23 PM
To: Mincak, Christopher; Stephen.King@barclayscapital.com
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry; Reilly, Gerard
Subject: RE: Net Long Options - 9/18

is there a short options book as well?

these are current as of yesterday's close?

thanks,

jasen

-----Original Message-----
From: Mincak, Christopher [mailto:christopher.mincak@lehman.com]
Sent: Friday, September 19, 2008 4:45 PM
To: King, Stephen: Markets (NYK); Yang, Jasen: Markets (NYK)
Cc: Pearn, Francis J; McInerney, Lily; Shi, Jerry; Reilly, Gerard
Subject: Net Long Options - 9/18

Attached are the options.  Awaiting the risk report from Risk.

Chris
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of
the designated recipient(s) named above.  If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited.  This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers.  Email
transmission cannot be guaranteed to be secure or error-free.  Therefore,
we do not represent that this information is complete or accurate and it
should not be relied upon as such.  All information is subject to change

without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.

This e-mail may contain information that is confidential, privileged or
otherwise protected from disclosure. If you are not an intended
recipient of this e-mail, do not duplicate or redistribute it by any
means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell
any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing. Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)
with its registered office at 1 Churchill Place, London, E14 5HP. This
email may relate to or be sent from other members of the Barclays Group.

-------------------------------------
--------

This message is intended only for the personal and confidential use of
the designated recipient(s) named above.  If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited.  This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers.  Email
transmission cannot be guaranteed to be secure or error-free. Therefore,
we do not represent that this information is complete or accurate and it
should not be relied upon as such.  All information is subject to change
without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.

This e-mail may contain information that is confidential, privileged or
otherwise protected from disclosure. If you are not an intended
recipient of this e-mail, do not duplicate or redistribute it by any

**HIGHLY CONFIDENTIAL**

means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell
any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing. Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)
with its registered office at 1 Churchill Place, London, E14 5HP. This
email may relate to or be sent from other members of the Barclays Group.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -


This message is intended only for the personal and confidential use of
the designated recipient(s) named above. If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited. This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers. Email
transmission cannot be guaranteed to be secure or error-free. Therefore,
we do not represent that this information is complete or accurate and it
should not be relied upon as such. All information is subject to change
without notice.


- - - - - - - -
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.


This e-mail may contain information that is confidential, privileged or
otherwise protected from disclosure. If you are not an intended
recipient of this e-mail, do not duplicate or redistribute it by any
means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell
any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing. Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)
with its registered office at 1 Churchill Place, London, E14 5HP. This
email may relate to or be sent from other members of the Barclays Group.

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00131278

------------------------------------
--------

This message is intended only for the personal and confidential use of
the designated recipient(s) named above. If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited. This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers. Email
transmission cannot be guaranteed to be secure or error-free. Therefore,
we do not represent that this information is complete or accurate and it
should not be relied upon as such. All information is subject to change
without notice.


--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.


This e-mail may contain information that is confidential, privileged or
otherwise protected from disclosure. If you are not an intended
recipient of this e-mail, do not duplicate or redistribute it by any
means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell
any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing. Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)
with its registered office at 1 Churchill Place, London, E14 5HP. This
email may relate to or be sent from other members of the Barclays Group.


------------------------------------
--------

This message is intended only for the personal and confidential use of
the designated recipient(s) named above. If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited. This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers. Email
transmission cannot be guaranteed to be secure or error-free.

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00131279

Therefore, we do not represent that this information is complete or
accurate and it should not be relied upon as such. All information is
subject to change without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.

This e-mail may contain information that is confidential, privileged or
otherwise protected from disclosure. If you are not an intended
recipient of this e-mail, do not duplicate or redistribute it by any
means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell
any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing. Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)
with its registered office at 1 Churchill Place, London, E14 5HP. This
email may relate to or be sent from other members of the Barclays Group.

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00131280

```
THE OPTIONS CLEARING CORPORATION        ACTIVITY DATE: 09/22/2008 CYCLE-ID:                    CMO PAGE 1
ACCOUNT SUMMARY BY CMO                  SYSTEM DATE:   09/20/2008 SYSTEM TIME: 21:52:53        CM  PAGE 1
                                        REPORT-ID:     02000000035300074000010922008

CMO:
CLEARING MEMBER:          LEHMAN BROTHERS INC.
                          OCC  00074

TIER ACCOUNT:             OCC  00074 C
SETTLEMENT TIER ACCOUNT:  OCC  00074 C

        ACCOUNT SUMMARY PRIOR TO CASH CONVERSION                    ACCOUNT SUMMARY AFTER CASH CONVERSION

COLLATERAL TYPE (ALL IN USD)                              COLLATERAL TYPE (ALL IN USD)
CASH:                                                     CASH:
  USD:                                                      USD:
  FOREIGN:                 162,681,324.65                    FOREIGN:                 162,681,324.65
CASH TOTAL:                         0.00                   CASH TOTAL:                         0.00
GOVERNMENT (GS & GE) TOTAL: 162,681,324.65                GOVERNMENT (GS & GE) TOTAL: 162,681,324.65
LETTERS OF CREDIT TOTAL:    344,736,724.57                LETTERS OF CREDIT TOTAL:    344,736,724.57
MONEY MARKET FUNDS TOTAL:            0.00                  MONEY MARKET FUNDS TOTAL:            0.00
VALUED SECURITIES TOTAL:             0.00                  VALUED SECURITIES TOTAL:             0.00
                                     0.00                                                      0.00

TOTAL COLLATERAL VALUE (IN USD):   507,418,049.22         TOTAL COLLATERAL VALUE (IN USD):   507,418,049.22

TOTAL REQUIREMENT:                 320,149,775.00         TOTAL REQUIREMENT:                 320,149,775.00

MARGIN CREDIT:                              0.00          MARGIN CREDIT:                              0.00

ROLLED-UP MARGIN DEFICIT:                   0.00          ROLLED-UP MARGIN DEFICIT:                   0.00

EXCESS/DEFICIT:                187,268,274.22  EXC        EXCESS/DEFICIT:                187,268,274.22  EXC

        NET PAY/COLLECT AND CASH CONVERSION ACTIVITY

NET PAY/COLLECT:                   9,693,978.77  COL
CASH CONVERSION
CASH GAINED FROM CONVERSION:               0.00
CASH USED FOR CONVERSION:                  0.00
                                           0.00
DEFICIT:                                   0.00
NET SETTLEMENT:                    9,693,978.77  COL
================================================

ENP0450                           ****CONTINUED ON NEXT PAGE****
```

CMO PAGE 2
CM  PAGE 2

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE:  09/22/2008 CYCLE-ID:
SYSTEM DATE:    09/20/2008 SYSTEM TIME: 21:52:53
REPORT-ID:      0200000003530007400001092220008

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:              LEHMAN BROTHERS INC.
CLEARING MEMBER:  OCC  00074

SETTLEMENT TIER ACCOUNT:  OCC  00074 C

| PAY/COLLECT TYPE | AMOUNT | PAY/COL |
|---|---|---|
| INDEX CASH DIFFERENCE | 13,469,519.00 | COL |
| EQUITY CASH FIXED | 7.56 | COL |
| INDEX CASH FIXED | 70,000.00 | COL |
| EQUITY POST TRADE PREMIUM | 3,237,702.80 | PAY |
| INDEX POST TRADE PREMIUM | 641,289.99 | PAY |
| EQUITY TRADE PREMIUM | 33,445.00 | COL |
| NET PAY/COLLECT | 9,693,978.77 | COL |

****CONTINUED ON NEXT PAGE****

ENF0450

```
THE OPTIONS CLEARING CORPORATION                    ACTIVITY DATE: 09/22/2008 CYCLE-ID:              CMO PAGE 3
ACCOUNT SUMMARY BY CMO                              SYSTEM DATE:   09/20/2008 SYSTEM TIME: 21:52:53   CM  PAGE 3
                                                    REPORT-ID:     02000000035300074000010922200
CMO:
CLEARING MEMBER:        LEHMAN BROTHERS INC.
                        OCC  00074

TIER ACCOUNT:           OCC  00074 F
SETTLEMENT TIER ACCOUNT: OCC 00074 F

            ACCOUNT SUMMARY PRIOR TO CASH CONVERSION              ACCOUNT SUMMARY AFTER CASH CONVERSION

COLLATERAL TYPE (ALL IN USD)                        COLLATERAL TYPE (ALL IN USD)
  CASH:                                               CASH:
    USD:                   578,689,010.23              USD:                   578,689,010.23
    FOREIGN:                        0.00               FOREIGN:                        0.00
  CASH TOTAL:              578,689,010.23            CASH TOTAL:              578,689,010.23
  GOVERNMENT (GS & GE) TOTAL: 332,558,398.49         GOVERNMENT (GS & GE) TOTAL: 332,558,398.49
  LETTERS OF CREDIT TOTAL:    500,000.00             LETTERS OF CREDIT TOTAL:    500,000.00
  MONEY MARKET FUNDS TOTAL:         0.00             MONEY MARKET FUNDS TOTAL:         0.00
  VALUED SECURITIES TOTAL:          0.00             VALUED SECURITIES TOTAL:          0.00

TOTAL COLLATERAL VALUE (IN USD):   911,747,408.72   TOTAL COLLATERAL VALUE (IN USD):   911,747,408.72

TOTAL REQUIREMENT:                 641,926,510.00   TOTAL REQUIREMENT:                 641,926,510.00

MARGIN CREDIT:                              0.00    MARGIN CREDIT:                              0.00

ROLLED-UP MARGIN DEFICIT:                   0.00    ROLLED-UP MARGIN DEFICIT:                   0.00

EXCESS/DEFICIT:                269,820,898.72 EXC   EXCESS/DEFICIT:                269,820,898.72 EXC

            NET PAY/COLLECT AND CASH CONVERSION ACTIVITY


NET PAY/COLLECT:               358,905,701.00 COL
CASH CONVERSION
  CASH GAINED FROM CONVERSION:          0.00
  CASH USED FOR CONVERSION:             0.00
DEFICIT:                               0.00
NET SETTLEMENT:                358,905,701.00 COL
==============================================

                        ****CONTINUED ON NEXT PAGE****


ENP0450
```

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE: 09/22/2008 CYCLE-ID:
SYSTEM DATE:  09/20/2008 SYSTEM TIME: 21:52:53
REPORT-ID:    020000003530007400001092222008

CMO PAGE 4
CM  PAGE 4

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:              LEHMAN BROTHERS INC.
CLEARING MEMBER:  OCC  00074

SETTLEMENT TIER ACCOUNT:   OCC  00074 F

| PAY/COLLECT TYPE | AMOUNT | PAY/COL |
|---|---|---|
| INDEX CASH DIFFERENCE | 353,810,801.00 | COL |
| INDEX CASH FIXED | 480,000.00 | COL |
| STOCK LOAN MARK TO MARKET | 4,614,900.00 | COL |
| NET PAY/COLLECT | 358,905,701.00 | COL |

****CONTINUED ON NEXT PAGE****

ENP04450

THE OPTIONS CLEARING CORPORATION                      ACTIVITY DATE:   09/22/2008  CYCLE-ID:                        CMO  PAGE 5
ACCOUNT SUMMARY BY CMO                                SYSTEM DATE:     09/20/2008  SYSTEM TIME:  21:52:53            CM   PAGE 5
                                                      REPORT-ID:       0200000035330007400001092222008

CMO:
CLEARING MEMBER:          LEHMAN BROTHERS INC.
                          OCC   00074

TIER ACCOUNT:             OCC   00074 M
SETTLEMENT TIER ACCOUNT:  OCC   00074 M

        ACCOUNT SUMMARY PRIOR TO CASH CONVERSION                              ACCOUNT SUMMARY AFTER CASH CONVERSION

COLLATERAL TYPE (ALL IN USD)                                      COLLATERAL TYPE (ALL IN USD)
  CASH:                                                             CASH:
    USD:                                                              USD:
      FOREIGN:                     255,919,157.59                      FOREIGN:                     252,683,574.59
    CASH TOTAL:                              0.00                    CASH TOTAL:                              0.00
  GOVERNMENT (GS & GE) TOTAL:      255,919,157.59                  GOVERNMENT (GS & GE) TOTAL:      252,683,574.59
  LETTERS OF CREDIT TOTAL:          78,415,351.16                  LETTERS OF CREDIT TOTAL:          78,415,351.16
  MONEY MARKET FUNDS TOTAL:        211,550,000.00                  MONEY MARKET FUNDS TOTAL:        211,550,000.00
  VALUED SECURITIES TOTAL:                   0.00                  VALUED SECURITIES TOTAL:                   0.00
                                            0.00                                                            0.00

TOTAL COLLATERAL VALUE (IN USD):   545,884,508.75                TOTAL COLLATERAL VALUE (IN USD):   542,648,925.75

TOTAL REQUIREMENT:                           0.00                TOTAL REQUIREMENT:                           0.00

MARGIN CREDIT:                               0.00                MARGIN CREDIT:                               0.00

ROLLED-UP MARGIN DEFICIT:          379,138,758.00                ROLLED-UP MARGIN DEFICIT:          379,138,758.00

EXCESS/DEFICIT:                    166,745,750.75  EXC           EXCESS/DEFICIT:                    163,510,167.75  EXC

        NET PAY/COLLECT AND CASH CONVERSION ACTIVITY

NET PAY/COLLECT:                   3,235,583.00  PAY
CASH CONVERSION
  CASH GAINED FROM CONVERSION:              0.00
  CASH USED FOR CONVERSION:       3,235,583.00
DEFICIT:                                   0.00
NET SETTLEMENT:                            0.00
=================================================

                                                    ****CONTINUED ON NEXT PAGE****

ENF0450

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE: 09/22/2008  CYCLE-ID:
SYSTEM DATE:  09/20/2008  SYSTEM TIME: 21:52:53
REPORT-ID:    0200000035300074000010922208

CMO PAGE 6
CM  PAGE 6

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:
CLEARING MEMBER:        LEHMAN BROTHERS INC.
                        OCC  00074

SETTLEMENT TIER ACCOUNT:  OCC  00074 M

| PAY/COLLECT TYPE | AMOUNT | PAY/COL |
|---|---|---|
| INDEX CASH DIFFERENCE | 3,235,583.00 | PAY |
| NET PAY/COLLECT | 3,235,583.00 | PAY |

****CONTINUED ON NEXT PAGE****

ENP0450

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE:   09/22/2008 CYCLE-ID:
SYSTEM DATE:     09/20/2008 SYSTEM TIME: 21:52:53
REPORT-ID:       020000000353000740000109222008

CMO PAGE 7
CM  PAGE 7

CMO:                    LEHMAN BROTHERS INC.
CLEARING MEMBER:        OCC  00074

TIER ACCOUNT:           OCC  00074 M P
SETTLEMENT TIER ACCOUNT: OCC  00074 M

              MARGIN ACCOUNT DETAIL

COLLATERAL TYPE (ALL IN USD)
GOVERNMENT (GS & GE) TOTAL:                    0.00
LETTERS OF CREDIT TOTAL:                       0.00
MONEY MARKET FUNDS TOTAL:                      0.00
VALUED SECURITIES TOTAL:                       0.00

TOTAL COLLATERAL VALUE (IN USD):              0.00

TOTAL REQUIREMENT:                  379,138,758.00

MARGIN CREDIT:                                0.00

ROLLED-UP MARGIN DEFICIT:                     0.00

EXCESS/DEFICIT:                     379,138,758.00  DEF

****CONTINUED ON NEXT PAGE****

ENP0450

CMO PAGE 8
CM  PAGE 8

```
ACTIVITY DATE: 09/22/2008 CYCLE-ID:
ACCOUNT SUMMARY BY CMO                              SYSTEM DATE: 09/20/2008 SYSTEM TIME: 21:52:53
                                                   REPORT-ID:   020000000353000740000109222008

CMO:                         LEHMAN BROTHERS INC.
CLEARING MEMBER:             OCC  00074

TIER ACCOUNT:                OCC  00074 Z X
SETTLEMENT TIER ACCOUNT:     OCC  00074 Z X

                   CLEARING FUND ACCOUNT DETAIL

COLLATERAL TYPE (ALL IN USD)
  CASH:
    USD:                                       0.00
  CASH TOTAL:                                  0.00
  GOVERNMENT (GS) TOTAL:              171,121,642.25

TOTAL COLLATERAL VALUE (IN USD):     171,121,642.25

TOTAL REQUIREMENT:                   170,993,187.75

EXCESS/DEFICIT:                      128,454.50 EXC


                   ****END OF DATA****


ENP0450
```

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE:  09/22/2008  CYCLE-ID:
SYSTEM DATE:  09/20/2008 SYSTEM TIME: 21:52:53
REPORT-ID:  020000003530008400010922008

CMO PAGE  9
CM  PAGE  1

CMO:
CLEARING MEMBER:                    LEHMAN BROTHERS INC.
                                    OCC   00084

TIER ACCOUNT:                       OCC   00084  C
SETTLEMENT TIER ACCOUNT:            OCC   00084  C

ACCOUNT SUMMARY PRIOR TO CASH CONVERSION

COLLATERAL TYPE (ALL IN USD)
CASH:
   USD:                                    33,108,960.00
   FOREIGN:                                         0.00
   CASH TOTAL:                             33,108,960.00
GOVERNMENT (GS & GE) TOTAL:                          0.00
LETTERS OF CREDIT TOTAL:                    800,000.00
MONEY MARKET FUNDS TOTAL:                            0.00
VALUED SECURITIES TOTAL:                             0.00

TOTAL COLLATERAL VALUE (IN USD):           33,908,960.00

TOTAL REQUIREMENT:                            352,402.00

MARGIN CREDIT:                                      0.00

ROLLED-UP MARGIN DEFICIT:                           0.00

EXCESS/DEFICIT:                            33,556,558.00  EXC

NET PAY/COLLECT AND CASH CONVERSION ACTIVITY

NET PAY/COLLECT:                               16,180.00  COL
CASH CONVERSION
   CASH GAINED FROM CONVERSION:                     0.00
   CASH USED FOR CONVERSION:                        0.00
DEFICIT:                                            0.00
NET SETTLEMENT:                                16,180.00  COL
===========================================================

ACCOUNT SUMMARY AFTER CASH CONVERSION

COLLATERAL TYPE (ALL IN USD)
CASH:
   USD:                                    33,108,960.00
   FOREIGN:                                         0.00
   CASH TOTAL:                             33,108,960.00
GOVERNMENT (GS & GE) TOTAL:                          0.00
LETTERS OF CREDIT TOTAL:                    800,000.00
MONEY MARKET FUNDS TOTAL:                            0.00
VALUED SECURITIES TOTAL:                             0.00

TOTAL COLLATERAL VALUE (IN USD):           33,908,960.00

TOTAL REQUIREMENT:                            352,402.00

MARGIN CREDIT:                                      0.00

ROLLED-UP MARGIN DEFICIT:                           0.00

EXCESS/DEFICIT:                            33,556,558.00  EXC

****CONTINUED ON NEXT PAGE****

ENP0450

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE:  09/22/2008  CYCLE-ID:
SYSTEM DATE:    09/20/2008  SYSTEM TIME: 21:52:53
REPORT-ID:      0200000035300084000010922208

CMO PAGE 10
CM  PAGE 2

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:
CLEARING MEMBER:        LEHMAN BROTHERS INC.
                        OCC  00084

SETTLEMENT TIER ACCOUNT:  OCC  00084 C

| PAY/COLLECT TYPE | AMOUNT | PAY/COL |
|---|---|---|
| INDEX FUTURES MARK TO MARKET | 16,180.00 | COL |
| NET PAY/COLLECT | 16,180.00 | COL |

*****CONTINUED ON NEXT PAGE****

ENP0450

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE: 09/22/2008 CYCLE-ID:
SYSTEM DATE:  09/20/2008 SYSTEM TIME: 21:52:53
REPORT-ID:    0200000003530008400001092222008

CMO PAGE 11
CM  PAGE 3

CMO:
CLEARING MEMBER:          LEHMAN BROTHERS INC.
                          OCC  00084

TIER ACCOUNT:             OCC  00084  F
SETTLEMENT TIER ACCOUNT:  OCC  00084  F

ACCOUNT SUMMARY PRIOR TO CASH CONVERSION

COLLATERAL TYPE (ALL IN USD)
CASH:
  USD:                                46,406,394.00
  FOREIGN:                                     0.00
  CASH TOTAL:                         46,406,394.00
GOVERNMENT (GS & GE) TOTAL:                    0.00
LETTERS OF CREDIT TOTAL:              39,350,000.00
MONEY MARKET FUNDS TOTAL:                      0.00
VALUED SECURITIES TOTAL:                       0.00

TOTAL COLLATERAL VALUE (IN USD):      85,756,394.00

TOTAL REQUIREMENT:                    57,727,824.00

MARGIN CREDIT:                                 0.00

ROLLED-UP MARGIN DEFICIT:                      0.00

EXCESS/DEFICIT:                       28,028,570.00  EXC

NET PAY/COLLECT AND CASH CONVERSION ACTIVITY

NET PAY/COLLECT:                       9,173,290.00  COL
CASH CONVERSION
  CASH GAINED FROM CONVERSION:                 0.00
  CASH USED FOR CONVERSION:                    0.00
DEFICIT:                                       0.00
NET SETTLEMENT:                        9,173,290.00  COL
================================================

ACCOUNT SUMMARY AFTER CASH CONVERSION

COLLATERAL TYPE (ALL IN USD)
CASH:
  USD:                                46,406,394.00
  FOREIGN:                                     0.00
  CASH TOTAL:                         46,406,394.00
GOVERNMENT (GS & GE) TOTAL:                    0.00
LETTERS OF CREDIT TOTAL:              39,350,000.00
MONEY MARKET FUNDS TOTAL:                      0.00
VALUED SECURITIES TOTAL:                       0.00

TOTAL COLLATERAL VALUE (IN USD):      85,756,394.00

TOTAL REQUIREMENT:                    57,727,824.00

MARGIN CREDIT:                                 0.00

ROLLED-UP MARGIN DEFICIT:                      0.00

EXCESS/DEFICIT:                       28,028,570.00  EXC

****CONTINUED ON NEXT PAGE****

ENP0450

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE:  09/22/2008 CYCLE-ID:
SYSTEM DATE:    09/20/2008 SYSTEM TIME: 21:52:53
REPORT-ID:      0200000003530008400001092222008

CMO PAGE 12
CM  PAGE 4

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                 LEHMAN BROTHERS INC.
CLEARING MEMBER:     OCC  00084

SETTLEMENT TIER ACCOUNT:    OCC  00084 F

| PAY/COLLECT TYPE | AMOUNT | PAY/COL |
|---|---|---|
| EQUITY FUTURES MARK TO MARKET | 798,640.00 | COL |
| INDEX FUTURES MARK TO MARKET | 8,374,650.00 | COL |
| NET PAY/COLLECT | 9,173,290.00 | COL |

****CONTINUED ON NEXT PAGE****

ENP0450

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

AVAILABLE DATE: 09/22/2008    CMO PAGE 13
SYSTEM DATE: 09/20/2008 SYSTEM TIME: 21:52:53    CM PAGE 5
REPORT-ID: 020000000353000840000109222008

CMO:
CLEARING MEMBER:                          LEHMAN BROTHERS INC.
                                          OCC  00084

TIER ACCOUNT:                    OCC  00084 M
SETTLEMENT TIER ACCOUNT:         OCC  00084 M

ACCOUNT SUMMARY PRIOR TO CASH CONVERSION

COLLATERAL TYPE (ALL IN USD)
CASH:
  USD:
  FOREIGN:                                           0.00
  CASH TOTAL:                                        0.00
GOVERNMENT (GS & GE) TOTAL:                          0.00
LETTERS OF CREDIT TOTAL:                             0.00
MONEY MARKET FUNDS TOTAL:                            0.00
VALUED SECURITIES TOTAL:                             0.00
                                                     0.00

TOTAL COLLATERAL VALUE (IN USD):                     0.00

TOTAL REQUIREMENT:                                   0.00

MARGIN CREDIT:                                       0.00

ROLLED-UP MARGIN DEFICIT:                            0.00

EXCESS/DEFICIT:                                      0.00

NET PAY/COLLECT AND CASH CONVERSION ACTIVITY

NET PAY/COLLECT:                                     0.00
CASH CONVERSION
  CASH GAINED FROM CONVERSION:                       0.00
  CASH USED FOR CONVERSION:                          0.00
DEFICIT:                                             0.00
NET SETTLEMENT:                                      0.00
================================================

ACCOUNT SUMMARY AFTER CASH CONVERSION

COLLATERAL TYPE (ALL IN USD)
CASH:
  USD:
  FOREIGN:                                           0.00
  CASH TOTAL:                                        0.00
GOVERNMENT (GS & GE) TOTAL:                          0.00
LETTERS OF CREDIT TOTAL:                             0.00
MONEY MARKET FUNDS TOTAL:                            0.00
VALUED SECURITIES TOTAL:                             0.00
                                                     0.00

TOTAL COLLATERAL VALUE (IN USD):                     0.00

TOTAL REQUIREMENT:                                   0.00

MARGIN CREDIT:                                       0.00

ROLLED-UP MARGIN DEFICIT:                            0.00

EXCESS/DEFICIT:                                      0.00

*****CONTINUED ON NEXT PAGE****

ENP0450

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE: 09/22/2008 CYCLE-ID:
SYSTEM DATE:  09/20/2008 SYSTEM TIME: 21:52:53
REPORT-ID:    020000000353000840000109222008

CMO PAGE 14
CM  PAGE 6

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:              LEHMAN BROTHERS INC.
CLEARING MEMBER:  OCC  00084

SETTLEMENT TIER ACCOUNT:  OCC  00084 M

| PAY/COLLECT TYPE | AMOUNT | PAY/COL |
|---|---|---|
| NET PAY/COLLECT | 0.00 | |

****CONTINUED ON NEXT PAGE****

ENP0450

CMO PAGE 15
CM PAGE 7

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE: 09/22/2008 CYCLE-ID:
SYSTEM DATE: 09/20/2008 SYSTEM TIME: 21:52:53
REPORT-ID: 020000000353000840000109222008

CMO:
CLEARING MEMBER:                    LEHMAN BROTHERS INC.
                                    OCC  00084

TIER ACCOUNT:                       OCC  00084 M P
SETTLEMENT TIER ACCOUNT:            OCC  00084 M

                    MARGIN ACCOUNT DETAIL

COLLATERAL TYPE (ALL IN USD)
  GOVERNMENT (GS & GE) TOTAL:                 0.00
  LETTERS OF CREDIT TOTAL:                    0.00
  MONEY MARKET FUNDS TOTAL:                   0.00
  VALUED SECURITIES TOTAL:                    0.00

TOTAL COLLATERAL VALUE (IN USD):              0.00

TOTAL REQUIREMENT:                            0.00

MARGIN CREDIT:                                0.00

ROLLED-UP MARGIN DEFICIT:                     0.00

EXCESS/DEFICIT:                               0.00

****END OF DATA****

ENF0450

```
THE OPTIONS CLEARING CORPORATION                    ACTIVITY DATE:  09/22/2008  CYCLE-ID:                    CMO PAGE 16
ACCOUNT SUMMARY BY CMO                              SYSTEM DATE:    09/20/2008 SYSTEM TIME: 21:52:53         CM  PAGE 1
                                                    REPORT-ID:      0200000035302730000109222008

CMO:
CLEARING MEMBER:        LEHMAN BROTHERS INC.
                        OCC  00273

TIER ACCOUNT:           OCC  00273  C
SETTLEMENT TIER ACCOUNT: OCC 00273  C

          ACCOUNT SUMMARY PRIOR TO CASH CONVERSION                    ACCOUNT SUMMARY AFTER CASH CONVERSION

COLLATERAL TYPE (ALL IN USD)                        COLLATERAL TYPE (ALL IN USD)
  CASH:                                               CASH:
    USD:                                                USD:
    FOREIGN:               4,880,701.00                  FOREIGN:               4,880,701.00
    CASH TOTAL:                    0.00                  CASH TOTAL:                    0.00
    GOVERNMENT (GS & GE) TOTAL:  4,880,701.00           GOVERNMENT (GS & GE) TOTAL: 4,880,701.00
    LETTERS OF CREDIT TOTAL:       0.00                 LETTERS OF CREDIT TOTAL:        0.00
    MONEY MARKET FUNDS TOTAL:      0.00                 MONEY MARKET FUNDS TOTAL:       0.00
    VALUED SECURITIES TOTAL:       0.00                 VALUED SECURITIES TOTAL:        0.00
                                   0.00                                                 0.00

TOTAL COLLATERAL VALUE (IN USD):  4,880,701.00      TOTAL COLLATERAL VALUE (IN USD):  4,880,701.00

TOTAL REQUIREMENT:                  770,881.00      TOTAL REQUIREMENT:                  770,881.00

MARGIN CREDIT:                           0.00       MARGIN CREDIT:                           0.00

ROLLED-UP MARGIN DEFICIT:                0.00       ROLLED-UP MARGIN DEFICIT:                0.00

EXCESS/DEFICIT:                  4,109,820.00 EXC   EXCESS/DEFICIT:                  4,109,820.00 EXC

    NET PAY/COLLECT AND CASH CONVERSION ACTIVITY

NET PAY/COLLECT:                         0.00
CASH CONVERSION
  CASH GAINED FROM CONVERSION:           0.00
  CASH USED FOR CONVERSION:              0.00
DEFICIT:                                 0.00
NET SETTLEMENT:                          0.00
==================================================
```

****CONTINUED ON NEXT PAGE****

ENP0450

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE:  09/22/2008  CYCLE-ID:
SYSTEM DATE:    09/20/2008  SYSTEM TIME:  21:52:53
REPORT-ID:      020000003530027300001092222008

CMO PAGE 17
CM  PAGE 2

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:
CLEARING MEMBER:        LEHMAN BROTHERS INC.
                        OCC  00273

SETTLEMENT TIER ACCOUNT:  OCC  00273  C

PAY/COLLECT TYPE                          AMOUNT    PAY/COL

NET PAY/COLLECT                             0.00

****CONTINUED ON NEXT PAGE****

ENP0450

```
......  .... ........ .... ........          .........  ..... ...         CMO  PAGE 18
ACCOUNT SUMMARY BY CMO                 SYSTEM DATE:  09/20/2008 SYSTEM TIME: 21:52:53    CM   PAGE  3
                                       REPORT-ID:    0200000035300273000010922200B

CMO:                LEHMAN BROTHERS INC.
CLEARING MEMBER:    OCC  00273

TIER ACCOUNT:             OCC  00273  F
SETTLEMENT TIER ACCOUNT:  OCC  00273  F

      ACCOUNT SUMMARY PRIOR TO CASH CONVERSION              ACCOUNT SUMMARY AFTER CASH CONVERSION


COLLATERAL TYPE (ALL IN USD)                        COLLATERAL TYPE (ALL IN USD)
  CASH:                                               CASH:
    USD:                             0.00               USD:                             0.00
    FOREIGN:                         0.00               FOREIGN:                         0.00
  CASH TOTAL:                        0.00             CASH TOTAL:                        0.00
  GOVERNMENT (GS & GE) TOTAL:        0.00             GOVERNMENT (GS & GE) TOTAL:        0.00
  LETTERS OF CREDIT TOTAL:           0.00             LETTERS OF CREDIT TOTAL:           0.00
  MONEY MARKET FUNDS TOTAL:          0.00             MONEY MARKET FUNDS TOTAL:          0.00
  VALUED SECURITIES TOTAL:           0.00             VALUED SECURITIES TOTAL:           0.00

TOTAL COLLATERAL VALUE (IN USD):     0.00           TOTAL COLLATERAL VALUE (IN USD):     0.00

TOTAL REQUIREMENT:                   0.00           TOTAL REQUIREMENT:                   0.00

MARGIN CREDIT:                       0.00           MARGIN CREDIT:                       0.00

ROLLED-UP MARGIN DEFICIT:            0.00           ROLLED-UP MARGIN DEFICIT:            0.00

EXCESS/DEFICIT:                      0.00           EXCESS/DEFICIT:                      0.00


      NET PAY/COLLECT AND CASH CONVERSION ACTIVITY


NET PAY/COLLECT:                     0.00
CASH CONVERSION
  CASH GAINED FROM CONVERSION:       0.00
  CASH USED FOR CONVERSION:          0.00
DEFICIT:                             0.00
NET SETTLEMENT:                      0.00
===================================================


                        ****CONTINUED ON NEXT PAGE****


ENP0450
```

****CONTINUED ON NEXT PAGE****

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE: 09/22/2008  CYCLE-ID:
SYSTEM DATE:   09/20/2008  SYSTEM TIME: 21:52:53
REPORT-ID:     02000000353002730000L09222008

CMO PAGE 19
CM  PAGE 4

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:
CLEARING MEMBER:          LEHMAN BROTHERS INC.
                          OCC  00273

SETTLEMENT TIER ACCOUNT:  OCC  00273  F

PAY/COLLECT TYPE                            AMOUNT    PAY/COL

NET PAY/COLLECT                              0.00

****CONTINUED ON NEXT PAGE****

ENP0450

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE: 09/22/2008 CYCLE-ID:
SYSTEM DATE: 09/22/2008 SYSTEM TIME: 21:52:53
REPORT-ID: 02000000353002730001092222008

CMO PAGE 20
CM PAGE 5

CMO:
CLEARING MEMBER:              LEHMAN BROTHERS INC.
                             OCC  00273

TIER ACCOUNT:                OCC  00273  M
SETTLEMENT TIER ACCOUNT:     OCC  00273  M

ACCOUNT SUMMARY PRIOR TO CASH CONVERSION                    ACCOUNT SUMMARY AFTER CASH CONVERSION

COLLATERAL TYPE (ALL IN USD)                                COLLATERAL TYPE (ALL IN USD)
  CASH:                                                       CASH:
    USD:                                                        USD:
    FOREIGN:                          0.00                        FOREIGN:                          0.00
  CASH TOTAL:                         0.00                      CASH TOTAL:                         0.00
  GOVERNMENT (GS & GE) TOTAL:         0.00                      GOVERNMENT (GS & GE) TOTAL:         0.00
  LETTERS OF CREDIT TOTAL:            0.00                      LETTERS OF CREDIT TOTAL:            0.00
  MONEY MARKET FUNDS TOTAL:           0.00                      MONEY MARKET FUNDS TOTAL:           0.00
  VALUED SECURITIES TOTAL:            0.00                      VALUED SECURITIES TOTAL:            0.00

TOTAL COLLATERAL VALUE (IN USD):      0.00                   TOTAL COLLATERAL VALUE (IN USD):      0.00

TOTAL REQUIREMENT:                    0.00                   TOTAL REQUIREMENT:                     0.00

MARGIN CREDIT:                        0.00                   MARGIN CREDIT:                         0.00

ROLLED-UP MARGIN DEFICIT:             0.00                   ROLLED-UP MARGIN DEFICIT:              0.00

EXCESS/DEFICIT:                       0.00                   EXCESS/DEFICIT:                        0.00

NET PAY/COLLECT AND CASH CONVERSION ACTIVITY

NET PAY/COLLECT:                      0.00
CASH CONVERSION
  CASH GAINED FROM CONVERSION:        0.00
  CASH USED FOR CONVERSION:           0.00
DEFICIT:                              0.00
NET SETTLEMENT:                       0.00
==================================================

****CONTINUED ON NEXT PAGE****

ENP0450

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE:   09/22/2008   CYCLE-ID:
SYSTEM DATE:     09/20/2008   SYSTEM TIME: 21:52:53
REPORT-ID:       02000000353002730000109222008

CMO PAGE 21
CM  PAGE 6

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:
CLEARING MEMBER:            LEHMAN BROTHERS INC.
                           OCC  00273

SETTLEMENT TIER ACCOUNT:    OCC  00273 M

| PAY/COLLECT TYPE | AMOUNT | PAY/COL |
|---|---|---|
| NET PAY/COLLECT | 0.00 | |

****CONTINUED ON NEXT PAGE****

ENP0450

THE OPTIONS CLEARING CORPORATION
ACCOUNT SUMMARY BY CMO

ACTIVITY DATE:  09/22/2008  CYCLE-ID:
SYSTEM DATE:  09/20/2008  SYSTEM TIME:  21:52:53
REPORT-ID:  0200000000353002730000109222008

CMO PAGE 22
CM   PAGE 7

CMO:                          LEHMAN BROTHERS INC.
CLEARING MEMBER:              OCC  00273

TIER ACCOUNT:                 OCC  00273  M N
SETTLEMENT TIER ACCOUNT:      OCC  00273  M

MARGIN ACCOUNT DETAIL

| COLLATERAL TYPE (ALL IN USD) | |
|---|---|
| GOVERNMENT (GS & GE) TOTAL: | 0.00 |
| LETTERS OF CREDIT TOTAL: | 0.00 |
| MONEY MARKET FUNDS TOTAL: | 0.00 |
| VALUED SECURITIES TOTAL: | 0.00 |
| TOTAL COLLATERAL VALUE (IN USD): | 0.00 |
| TOTAL REQUIREMENT: | 0.00 |
| MARGIN CREDIT: | 0.00 |
| ROLLED-UP MARGIN DEFICIT: | 0.00 |
| EXCESS/DEFICIT: | 0.00 |

****END OF DATA****

ENP0450

CMO PAGE 1

COLLATERAL INVENTORY BY CMO

ACTIVITY DATE: 09/19/2008  CYCLE-ID:
SYSTEM DATE: 09/19/2008  SYSTEM TIME: 21:02:22
REPORT-ID: 0200000003530000000009192008

CMO:                LEHMAN BROTHERS INC.

TOTALS BY CURRENCY        USD

| COLLATERAL TYPE | RECORD QTY | FACE VALUE | QUANTITY | CONTRACT QTY |
|---|---|---|---|---|
| LETTERS OF CREDIT | 7 | 252,200,000.00 | | |
| CASH | 6 | 1,081,685,547.47 | | |
| GOVERNMENTS (GS & GE) | 15 | 814,295,000 | | |
| MONEY MARKET FUNDS (SHRS) | 0 | | 0 | |
| VALUED SECURITIES | 0 | | 0 | |
| SPECIFIC DEPOSITS | 273 | | 7,733,700 | |
| ESCROW DEPOSITS | 20 | | | 3,116 |

****CONTINUED ON NEXT PAGE****

ENP0450

THE OPTIONS CLEARING CORPORATION
COLLATERAL INVENTORY BY CMO

ACTIVITY DATE: 09/19/2008  CYCLE-ID:
SYSTEM DATE: 09/19/2008  SYSTEM TIME: 21:02:22
REPORT-ID: 02000000035300000000000009192008

CMO PAGE 2

CMO:              LEHMAN BROTHERS INC.
COLLATERAL TYPE:  LETTERS OF CREDIT

| ASSET MANAGER | LC# | RSTR | ISSUE DATE | EXP DATE | FACE VALUE FV CURN | MARKET VALUE | COLLATERAL VALUE |
|---|---|---|---|---|---|---|---|
| ANZBUS33XXX | SO4743/8200 | | 09/01/2008 | 03/01/2009 | 0.00 USD | 0.00 | 0.00 |
| ANZBUS33XXX | SO4744/8200 | | 09/01/2008 | 03/01/2009 | 0.00 USD | 0.00 | 0.00 |
| BNPAUS3NXXX | 91903950 CG CM# AT ID | | 08/28/2008 | 03/01/2009 | 800,000.00 USD | 800,000.00 | 800,000.00 |
| | OCC 00084 C | | | | 800,000.00 | 800,000.00 | 800,000.00 |
| BNPAUS3NXXX | 91903955 CG CM# AT ID | | 08/28/2008 | 03/01/2009 | 251,400,000.00 USD | 251,400,000.00 | 251,400,000.00 |
| | OCC 00074 F | | | | 500,000.00 | 500,000.00 | 500,000.00 |
| | OCC 00074 M | | | | 211,550,000.00 | 211,550,000.00 | 211,550,000.00 |
| | OCC 00084 F | | | | 39,350,000.00 | 39,350,000.00 | 39,350,000.00 |
| BOTKUS33XXX | S015193 | | 09/01/2008 | 03/01/2009 | 0.00 USD | 0.00 | 0.00 |
| HYVEUS33XXX | SB237405 | | 09/03/2008 | 03/01/2009 | 0.00 USD | 0.00 | 0.00 |
| LOYDUS33NYB | NYSB2008730 | | 09/01/2008 | 03/01/2009 | 0.00 USD | 0.00 | 0.00 |
| USD TOTAL | | | | | 252,200,000.00 | 252,200,000.00 | 252,200,000.00 |
| GRAND TOTAL | | | | | 252,200,000.00 | 252,200,000.00 | 252,200,000.00 |

****CONTINUED ON NEXT PAGE****

ENP0450

THE OPTIONS CLEARING CORPORATION
COLLATERAL INVENTORY BY CMO

ACTIVITY DATE: 09/19/2008 CYCLE-ID:
SYSTEM DATE:   09/19/2008 SYSTEM TIME: 21:02:22
REPORT-ID:     0200000035300074000010919200B

CMO PAGE 3
CM  PAGE 1

CMO:
CLEARING MEMBER:      LEHMAN BROTHERS INC.
                     OCC  00074

COLLATERAL TYPE:     CASH

| AT | ID | ASSET MANAGER | SEG CASH | FACE VALUE | FV CURN | MARKET VALUE | COLLATERAL VALUE |
|----|----|----|----|----|----|----|----|
| C | | BOFAUS6SXXX | | 162,681,324.65 | USD | 162,681,324.65 | 162,681,324.65 |
| F | | BOFAUS6SXXX | | 578,689,010.23 | USD | 578,689,010.23 | 578,689,010.23 |
| M | | BOFAUS6SXXX | | 255,919,157.59 | USD | 255,919,157.59 | 255,919,157.59 |
| USD TOTAL | | | | 997,289,492.47 | | 997,289,492.47 | 997,289,492.47 |
| CM TOTAL | | | | 997,289,492.47 | | 997,289,492.47 | 997,289,492.47 |

****CONTINUED ON NEXT PAGE****

ENP0450

```
THIS OPTIONS CLEARING CORPORATION                      ACTIVITY DATE: 09/19/2008 CYCLE-ID:                    CMO PAGE 4
COLLATERAL INVENTORY BY CMO                            SYSTEM DATE:   09/19/2008 SYSTEM TIME: 21:02:22        CM  PAGE 2
                                                       REPORT-ID:     020000000353000740000109192008

CMO:
CLEARING MEMBER:   LEHMAN BROTHERS INC.
                   OCC  00074

COLLATERAL TYPE:   GOVERNMENTS (GS & GE)
```

| ASSET MANAGER | PLGR ACCT | CUSIP | GOV CT TYPE | COUPON RATE | MAT DATE | SUB TYPE | FACE VALUE | FV CURN | MARKET VALUE | COLLATERAL VALUE |
|---|---|---|---|---|---|---|---|---|---|---|
| **AT: C    ID:** | | | | | | | | | | |
| CHASUS33XXX | | 912810FD5 | GS BOND | 3.625 | 04/15/2028 | PR | 59,175,000 | USD | 96,873,025.50 | 92,029,374.23 |
| CHASUS33XXX | | 912810FR4 | GS BOND | 2.375 | 01/15/2025 | PR | 175,000,000 | USD | 207,135,250.00 | 196,778,487.50 |
| CHASUS33XXX | | 912810FS2 | GS BOND | 2.000 | 01/15/2026 | PR | 55,560,000 | USD | 58,872,487.20 | 55,928,862.84 |
| **AT: F    ID:** | | | | | | | | | | |
| CHASUS33XXX | | 912810FH6 | GS BOND | 3.875 | 04/15/2029 | PR | 86,585,000 | USD | 144,880,082.95 | 137,636,078.80 |
| CHASUS33XXX | | 912810FR4 | GS BOND | 2.375 | 01/15/2025 | PR | 119,445,000 | USD | 141,378,685.35 | 134,309,751.08 |
| CHASUS33XXX | | 912810FR4 | GS BOND | 2.375 | 01/15/2025 | PR | 26,260,000 | USD | 31,082,123.80 | 29,528,017.61 |
| CHASUS33XXX | | 912810FV4 | GS BOND | 1.750 | 01/15/2028 | PR | 34,000,000 | USD | 32,720,580.00 | 31,084,551.00 |
| **AT: M    ID:** | | | | | | | | | | |
| CHASUS33XXX | | 912810FV4 | GS BOND | 1.750 | 01/15/2028 | PR | 85,770,000 | USD | 82,542,474.90 | 78,415,351.16 |
| **AT: Z    ID:  X** | | | | | | | | | | |
| CHASUS33XXX | | 912795G88 | GS BILL | | 10/02/2008 | PR | 19,000,000 | USD | 18,996,200.00 | 18,901,219.00 |
| CHASUS33XXX | | 912795H95 | GS BILL | | 12/04/2008 | PR | 42,000,000 | USD | 41,869,600.00 | 41,660,451.00 |
| CHASUS33XXX | | 912795J28 | GS BILL | | 12/11/2008 | PR | 41,000,000 | USD | 40,901,600.00 | 40,697,092.00 |
| CHASUS33XXX | | 912795G36 | GS BILL | | 12/18/2008 | PR | 14,500,000 | USD | 14,466,650.00 | 14,394,316.75 |
| CHASUS33XXX | | 912795J44 | GS BILL | | 12/26/2008 | PR | 25,000,000 | USD | 24,897,500.00 | 24,773,012.50 |
| CHASUS33XXX | | 912795J93 | GS BILL | | 01/29/2009 | PR | 28,000,000 | USD | 27,868,400.00 | 27,729,058.00 |
| CHASUS33XXX | | 912795K59 | GS BILL | | 02/26/2009 | PR | 3,000,000 | USD | 2,981,400.00 | 2,966,493.00 |
| **GS TOTAL** | | | | | | | 814,295,000 | | 967,466,259.70 | 926,832,116.47 |
| **GE TOTAL** | | | | | | | 0 | | 0.00 | 0.00 |
| **USD TOTAL** | | | | | | | 814,295,000 | | 967,466,259.70 | 926,832,116.47 |
| **CM TOTAL** | | | | | | | 814,295,000 | | 967,466,259.70 | 926,832,116.47 |

****CONTINUED ON NEXT PAGE****

ENP0450

THE OPTIONS CLEARING CORPORATION
COLLATERAL INVENTORY BY CMO

CMO:
CLEARING MEMBER:        LEHMAN BROTHERS INC.
                        OCC 00074

COLLATERAL TYPE:        MONEY MARKET FUNDS

ACTIVITY DATE: 09/19/2008  CYCLE-ID:
SYSTEM DATE: 09/19/2008  SYSTEM TIME: 21:02:22
REPORT-ID:              02000000353000740000109192008

CMO PAGE 5
CM  PAGE 3

| AT | ID | ASSET MANAGER | PLGR ACCT | CUSIP | SEC SYMB | SEC CURN | SHARE QTY | MARKET VALUE | COLLATERAL VALUE |
|----|----|---------------|-----------|-------|----------|----------|-----------|--------------|------------------|

NO DATA

****CONTINUED ON NEXT PAGE****

ENP0450

THE OPTIONS CLEARING CORPORATION
COLLATERAL INVENTORY BY CMO

ACTIVITY DATE: 09/19/2008 CYCLE-ID:
SYSTEM DATE: 09/19/2008 SYSTEM TIME: 21:02:22
REPORT-ID:    020000000353000740000109192008

CMO PAGE  6
CM  PAGE  4

CMO:
CLEARING MEMBER:    LEHMAN BROTHERS INC.
                   OCC  00074

COLLATERAL TYPE:    VALUED SECURITIES

| AT | ID | ASSET MANAGER | PLGR ACCT | CUSIP | RSTR | SEC SYMB | SEC CURN | CLASS | EQ TYPE | QUANTITY | MARKET VALUE |
|----|----|----|----|----|----|----|----|----|----|----|----|

NO DATA

****CONTINUED ON NEXT PAGE****

ENP0450

# Remainder of Exhibit
# Filed Under Seal

# BCI EXHIBIT

# 264

| | |
|---|---|
| **From:** | Romain, Gary: Finance (LDN) |
| **Sent:** | Sun, 21 Sep 2008 20:11:21 GMT |
| **To:** | Walker, James: Finance (NYK) |
| **CC:** | Nash, Phillip: Finance (NYK); Morton, Marcus: Finance (NYK); Weidler, Chris: Finance (LDN); Gavenda, TJ: Finance (NYK); Hughey, Matthew: Finance (NYK); McCosker, Tom: Finance (NYK); Redman, Paul: Finance (LDN); Akhtar, Yaseen: Treasury (NYK) |
| **Subject:** | RE: Balance sheet |

All,

The updated acquisition balance sheet is attached.

Additional points:

- If the positions are going to booked at current book value but the business believe this is $2.5bn overstated, we will need to book a central adjustment of some sort (Dr -ve goodwill (P&L), Cr Trading assets). The entry would be reversed once the positions are appropriately remarked to 'Barclays levels'. In principle the assets should be booked at these levels on day 1 but not feasible as I understand it.

- I've removed the 'Assets in Fed box' line since it is now included in the inventory number. The numbers in column F are from the attached listing received from Lehman - hopefully what is left (column G) will then agree to whatever listings we have on what previously came across against the repo.

REDACTED - PRIVILEGED

- We are awaiting information on the three subs from Lehman.
- I have ascribed no value to the retention payment we would be required to make if positions are liquidated at above book value. This is out of the money on day 1 due to the buffer provided by our $2.5bn write-down. However, if PCG could consider whether this is a fair assumption that would be much appreciated. If it were appropriate to ascribe a value to this payment, it would increase consideration payable (and, therefore, reduce negative goodwill).

Regards,

Gary

<<...>>

<<...>>

---

**From:** Romain, Gary: Finance (LDN)
**Sent:** Saturday, September 20, 2008 4:48 PM

---

**HIGHLY CONFIDENTIAL**                                                                 **BCI-EX-(S)-00110654**

**To:**    Walker, James: Finance (NYK)

**Cc:**    Nash, Phillip: Finance (NYK); Morton, Marcus: Finance (NYK); Weidler, Chris: Finance (LDN); Gavenda, TJ: Finance (NYK); Hughey, Matthew: Finance (NYK); McCosker, Tom: Finance (NYK); Redman, Paul: Finance (LDN)

**Subject:**    Balance sheet

James,

Please find attached a completion balance sheet based on the APA as amended plus the clarification letter (and our conversation with Patrick). I have assumed zero value for the three new subs (Lehman Brothers Canada Inc, Lehman Brothers Sudamerica SA, Lehman Brothers Uruguay SA) - I've asked Martin to include these entities in his balance sheet later today (or give an indication of approx balance sheet value)

As discussed, the spreadsheet will need to be updated if Martin's information (and the business/PCG verification thereof) indicates differences.

There will also be some gross-ups due to IFRS vs US GAAP differences, but these should not impact on goodwill or capital.

I'm available on mobile.

Regards,

Gary

<< File: Long Island - Acquisition Summary.xls >>

HIGHLY CONFIDENTIAL                                                                 BCI-EX-(S)-00110655



## Placeholder

### Document produced in native format

**HIGHLY CONFIDENTIAL**

**BCI-EX-(S)-00110656**

**Long Island - Acquisition Summary**
Unaudited and unverified

| | $bn | $bn | New box $bn | Repo $bn |
|---|---|---|---|---|
| Govt & Agency | 29.53 | | 0.35 | 29.18 |
| Commercial paper | 0.09 | | 0.00 | 0.09 |
| Mortgage-backed | 3.15 | | 0.25 | 2.90 |
| Corp debt | 3.19 | | 0.50 | 2.69 |
| Corp equity | 8.84 | | 0.73 | 8.11 |
| Derivatives | 0.08 | | 0.08 | 0.00 |
| Inventory - current book value | | 44.88 | 1.91 | 42.97 |
| Valuation adjustment | | -2.50 | | |
| Inventory - net | | 42.38 | | |
| 15c3 asset | | 1.00 | | |
| Cash | | 7.00 | | |
| Previously excluded 50% MBS (net of any loss due to guaranteed DTCC obligations) | | 1.40 | | |
| Financial Assets | | 51.76 | | |
| | | | | |
| Subsidiaries | | 0.00 | | |
| 7th Avenue & Data Centres | | 1.29 | | |
| Fixtures, fitings, telecomms, etc | | 0.19 | | |
| | | | | |
| Total Assets | | 53.25 | | |
| | | | | |
| Repo liability | 45.00 | | | |
| Cure payment | 2.25 | | | |
| Retention payment | 0.00 | | | |
| Bonus accrual | 2.00 | | | |
| | | | | |
| Total Liabilities | | 49.25 | | |
| | | | | |
| Net assets | | 4.00 | | |
| | | | | |
| Consideration: | | | | |
| Assets | 0.25 | | | |
| Properties | 1.29 | | | |
| Total consideration | | 1.54 | | |
| | | | | |
| Negative goodwill | | 2.46 | | |

Notes:

Intangible assets in respect of customer relationships/lists assumed immaterial
Zero value ascribed to the subs until details obtained
No value is currently ascribed to the potential retention payment of up to $750m - due to the $2.5bn buffer provided by the valuation adjustment above (PCG to consider appropriateness)
The value ascribed to the 50% MBS is subject to legal clarification.
Assumes full cure payments of 2.25bn are required as an accrual

# BCI EXHIBIT

# 265

## Stephen P. Harbeck

| | |
|---|---|
| **From:** | Stephen P. Harbeck |
| **Sent:** | Sunday, September 21, 2008 4:15 PM |
| **To:** | McDaniel, James R.; Edward J ROSEN |
| **Cc:** | giddens@hugheshubbard.com; kobak@hugheshubbard.com; Michael A MAZZUCHI; wnavin@theocc.com; jcawley@theocc.com; Borrelli, Mark; Rovira, Alex R. |
| **Subject:** | RE: Understandings relating to the transfer of LBI's accounts at OCC |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Jim and Bill:

I urge you in the strongest possible terms not to take precipitous action. I have every confidence that if all parties act responsibly, that all parties will actually be acting in their own best interest. The failure to do so will undoubtedly lead to litigation that will damage all concerned.

Steve

Stephen P. Harbeck
President and CEO
Securities Investor Protection Corporation

**From:** McDaniel, James R. [mailto:jmcdaniel@sidley.com]
**Sent:** Sunday, September 21, 2008 4:03 PM
**To:** Edward J ROSEN
**Cc:** giddens@hugheshubbard.com; kobak@hugheshubbard.com; Stephen P. Harbeck; Michael A MAZZUCHI; wnavin@theocc.com; jcawley@theocc.com; Borrelli, Mark; Rovira, Alex R.
**Subject:** Understandings relating to the transfer of LBI's accounts at OCC

Ed:
Realizing that you have your hands full, we nevertheless need to communicate OCC's position to you:
1) OCC's willingness to transfer the LBI accounts to Barclays is conditioned upon obtaining Barclay's signature on the "Transfer and Assumption Agreement" among OCC, the Trustee and Barclays. The Trustee and OCC have signed the document, and the Trustee has consented to the use of the signature page for certain hand marked changes that were prepared by Barclays. Those changes were subsequently incorporated into the document in substantially the same form with no material changes. We subsequently received a copy of the document from Michael Mazzuchi of Cleary that added a paragraph 1(c) and then a later version from Michael that deleted the same paragraph at Alex Rovira's request. That paragraph is unacceptable to OCC, and it is OCC's understanding that Barclays is in agreement that it will not be included in the document. For the elimination of doubt, I have attached a copy of the document in pdf form that is acceptable to OCC. *OCC's willingness to transfer the LBI accounts at OCC to Barclays is conditioned upon the execution of this agreement by Barclays.*

2) Having heard nothing further from you with respect to cash held by OCC in respect of the LBI accounts, and in accordance with the terms of the Transfer and Purchase Agreement, all such cash in the accounts will be transferred to Barclays assuming that the transaction closes this evening.

3) If the transaction does not close tonight, OCC would need to immediately liquidate and close out the LBI accounts and is preparing to do so. These preparations are as a precautionary measure that OCC does not expect to have to use.

1

000171

I am available at my office to discuss anything that you need to discuss. We would very much like to know what the plan is for execution of documents and when we might expect to have OCC's Transfer and Assumption Agreement executed by Barclays.

Thanks,
Jim
<<Untitled.pdf>>

James R. McDaniel
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312)853-2665
Fax: (312)853-7036

James R. McDaniel
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312)853-2665
Fax: (312)853-7036

2

000172

# BCI EXHIBIT

# 266

**From:** Leyhane, Nick: EDG (LDN)

**Sent:** Sun, 21 Sep 2008 20:20:29 GMT

**To:** Yang, Jasen: Markets (NYK); Copson, Paul: Finance (LDN); De Carolis, Andrea: Global Convertibles (LDN); King, Stephen: Markets (NYK); Long, Daniel: Markets (NYK); Mahon, John: Markets (LDN)

**CC:** Joshi, Dixit: EDG (LDN); Regan, David: Finance (LDN); Sell, Stephen: Markets (NYK); Mammola, Paolo: GFRM (LDN); Scalari, Alberto: GFRM (LDN); Guy, Lee: GFRM (LDN)

**Subject:** RE: Project Long Island Updated Assets - Cash Equities

| $mm | Beta | 19-Sep-08 | 18-Sep-08 |
|---|---|---|---|
| ADRs | 694 | 607 | 554 |
| Equity | 6866 | 6570 | 6249 |
| Conv | 0 | 22 | 22 |
| ConvPref | 0 | 105 | 105 |
| ETF | 711 | 1645 | 1622 |
| MFND | 0 | 51 | 51 |
| Prefs | 0 | 67 | 67 |
| Warrants | 0 | 221 | 221 |
| | | | |
| Total | 8271 | 9288 | 8891 |

- we estimate the portfolio to be worth $9.3bn as of Friday close
- beta is lower due to the presence of short exposure ETFs and some merger arbitrage deals
- first risk mitigant is to continue selling S&P futures (we sold $1bn on Friday) to reduce the overall beta of the portfolio; will use **BBplc accounts** for now as we do not have traders in Asia able to execute for BCI
- expect to sell $500m-$1bn during Asia hours, then $1-2bn during European hours and then the remainder during NY trading session
- once the beta is immunised we will work to refine the sector exposures

| Sectors | Beta |
|---|---|
| Autos | 103 |
| Banks | 449 |
| Basic Resources | 491 |
| Chemicals | 128 |
| Construction | 51 |
| Financials | 567 |
| Food Bev | 202 |
| Health Care | 386 |
| Industrials | 1205 |
| Insurance | 548 |
| Media | 173 |
| Oils | 742 |
| Personal | 217 |
| Retail | 371 |
| Technology | 864 |
| Telecom | 185 |

**HIGHLY CONFIDENTIAL**

Utilities        144
Index        1445

**Issues**

- there are > 70 names on this list where we would be purchasing >1% of market cap on an individual name; Compliance will revert on "large holdings"
- current short-selling restrictions in place means that we have to be confident that the transfers have settled before tackling the individual stock positions
- BCI reg cap requirements? we **do not** have VAR treatment for ETF vs futures positions (most US brokerdealers would)
- these deltas **do not include the listed option portfolio** which may still be in place


Nick

---

**From:**   Yang, Jasen: Markets (NYK)
**Sent:**   21 September 2008 18:07
**To:**   Copson, Paul: Finance (LDN); De Carolis, Andrea: Global Convertibles (LDN); King, Stephen: Markets (NYK); Long, Daniel: Markets (NYK); Mahon, John: Markets (LDN)

**Cc:**   Joshi, Dixit: EDG (LDN); Leyhane, Nick: EDG (LDN); Regan, David: Finance (LDN); Sell, Stephen: Markets (NYK)
**Subject:**    RE: Project Long Island Updated Assets - Cash Equities

Just got confirmation from James Walker that assets should be booked in BCI (seems to be some sort of special dispensation), and no long assets should be added to Bank entities.

Also got confirmation that just for day 1, at least, prices booked should be those in the BONY file. Hedges (when we get approval on the mandate) should be economically efficient, so if they can't be in BCI, that's shouldn't affect the strategy.

Let me know before the bookings actually go in, as I would ideally like a little more clarity on the entity & pricing.

As mentioned, need estimate of valuation gap vs BONY prices to current mkt, risk measures, and recommended hedging.

---

**From:**   Copson, Paul: Finance (LDN)
**Sent:**   Sunday, September 21, 2008 12:46 PM
**To:**    De Carolis, Andrea: Global Convertibles (LDN); Yang, Jasen: Markets (NYK); King, Stephen: Markets (NYK); Long, Daniel: Markets (NYK); Mahon, John: Markets (LDN)

**Cc:**    Joshi, Dixit: EDG (LDN); Leyhane, Nick: EDG (LDN); Regan, David: Finance (LDN)
**Subject:**    RE: Project Long Island Updated Assets - Cash Equities


Andrea - there's not been a decision made on the entity, so if BCSL is the best place to keep CBs vs Equity then we should do that until decision made.

**HIGHLY CONFIDENTIAL**

Rgds
Paul

**From:** De Carolis, Andrea: Global Convertibles (LDN)
**Sent:** 21 September 2008 17:14
**To:**    Yang, Jasen: Markets (NYK); King, Stephen: Markets (NYK); Long, Daniel: Markets (NYK); Mahon, John: Markets (LDN)

**Cc:**    Joshi, Dixit: EDG (LDN); Leyhane, Nick: EDG (LDN); Copson, Paul: Finance (LDN); Regan, David: Finance (LDN)
**Subject:**    RE: Project Long Island Updated Assets - Cash Equities

Jasen,

We have the booking sheet ready.

However we need to determine which entity these positions need to be booked under.

In BCI the Broker Dealer I immagine the reg-cap treatment would be punitive - BCSL is the best place to keep CBs vs Equity.

Shall we book into BCSL for now and then in case review tomorrow?

Thanks

**From:** Joshi, Dixit: EDG (LDN)
**Sent:** 21 September 2008 16:14
**To:**    De Carolis, Andrea: Global Convertibles (LDN)
**Subject:**    FW: Project Long Island Updated Assets - Cash Equities

**From:** Yang, Jasen: Markets (NYK)
**Sent:** Sunday, September 21, 2008 4:06 PM
**To:**    Leyhane, Nick: EDG (LDN); Simon, Christophe: GFRM (LDN); Mammola, Paolo: GFRM (LDN); Sharma, Deepak: EDG Middle Office (LDN)

**Cc:**    Joshi, Dixit: EDG (LDN); Long, Daniel: Markets (NYK); Chen, Hogan: Markets (NYK)
**Subject:**    RE: Project Long Island Updated Assets - Cash Equities

Guys, found some more converts-- attached (new converts in a separate tab).

<< File: Long Island Changed Equities List 2008-09-21 (sent).xls >>

**From:** Yang, Jasen: Markets (NYK)
**Sent:** Saturday, September 20, 2008 10:19 PM
**To:**    Leyhane, Nick: EDG (LDN); Simon, Christophe: GFRM (LDN); Mammola, Paolo: GFRM (LDN); Sharma, Deepak: EDG Middle Office (LDN)

**HIGHLY CONFIDENTIAL**

**Cc:**    Joshi, Dixit: EDG (LDN); Long, Daniel: Markets (NYK); King, Stephen: Markets (NYK)
**Subject:**    Project Long Island Updated Assets - Cash Equities

Guys, please find attached an updated cash equity instrument portfolio for the Lehman transfer.

The values in the file are the ones assigned by BONY custodial for Thursday close, so should not be relied on.

Generally speaking, the near term tasks are to develop transfer pricing and an initial view on risk by 6pm NY time Sunday and then to refine pricing and risk going forward. Booking entity details should be available tomorrow. These trades should be booked into a separate account, as I understand P&L from the positions need to be collected and reported separately.

Please let us know if anything here looks mis-classified.

 << File: Long Island Equities List 2008-09-20 (sent).xls >>

Jasen Yang
Barclays Capital
Principal Mortgage Trading Group
200 Park Avenue
New York, New York 10166
jasen.yang@barclayscapital.com
Tel: (212) 412 7613
Fax: (212) 412 5861

**HIGHLY CONFIDENTIAL**

# BCI EXHIBIT

# 267

| | |
|---|---|
| **From:** | McDaniel, James R. <jmcdaniel@sidley.com> |
| **Sent:** | Sunday, September 21, 2008 4:37 PM |
| **To:** | Stephen P. Harbeck <sharbeck@sipc.org>; Edward J ROSEN <erosen@cgsh.com> |
| **Cc:** | giddens@hugheshubbard.com; kobak@hugheshubbard.com; Michael A MAZZUCHI <mmazzuchi@cgsh.com>; wnavin@theocc.com; jcawley@theocc.com; Borrelli, Mark <mborrelli@sidley.com>; Rovira, Alex R. <ARovira@Sidley.com> |
| **Subject:** | RE: Understandings relating to the transfer of LBI's accounts at OCC |

Steve:

Bill has asked me to express OCC's intention not to act precipitously. As stated below and in the agreement that was attached to the e-mail, we believe that we have an understanding with Barclays as to how these accounts will be moved to Barclays. It continues to be our expectation that this transfer will occur. However, OCC cannot allow the positions to remain in place if no transaction is concluded tonight because OCC will then be exposed to loss if the market moves against LBI's positions. We remain available discuss all issues with Barclays. I note from Ed Rosen's e-mail response that we appear to agree on the intended result.

Kind regards,
Jim


From: Stephen P. Harbeck [mailto:sharbeck@sipc.org]
Sent: Sunday, September 21, 2008 3:15 PM
To: McDaniel, James R.; Edward J ROSEN
Cc: giddens@hugheshubbard.com; kobak@hugheshubbard.com; Michael A MAZZUCHI; wnavin@theocc.com; jcawley@theocc.com; Borrelli, Mark; Rovira, Alex R.
Subject: RE: Understandings relating to the transfer of LBI's accounts at OCC


Jim and Bill:


I urge you in the strongest possible terms not to take precipitous action. I have every confidence that if all parties act responsibly, that all parties will actually be acting in their own best interest. The failure to do so will undoubtedly lead to litigation that will damage all concerned.


Steve


Stephen P. Harbeck

President and CEO

Securities Investor Protection Corporation

CONFIDENTIAL

From: McDaniel, James R. [mailto:jmcdaniel@sidley.com]
Sent: Sunday, September 21, 2008 4:03 PM
To: Edward J ROSEN
Cc: giddens@hugheshubbard.com; kobak@hugheshubbard.com; Stephen P. Harbeck;
Michael A MAZZUCHI; wnavin@theocc.com; jcawley@theocc.com; Borrelli, Mark;
Rovira, Alex R.
Subject: Understandings relating to the transfer of LBI's accounts at OCC


Ed:
Realizing that you have your hands full, we nevertheless need to communicate
OCC's position to you:
1) OCC's willingness to transfer the LBI accounts to Barclays is conditioned
upon obtaining Barclay's signature on the "Transfer and Assumption Agreement"
among OCC, the Trustee and Barclays. The Trustee and OCC have signed the
document, and the Trustee has consented to the use of the signature page for
certain hand marked changes that were prepared by Barclays. Those changes
were subsequently incorporated into the document in substantially the same
form with no material changes. We subsequently received a copy of the
document from Michael Mazzuchi of Cleary that added a paragraph 1(c) and then
a later version from Michael that deleted the same paragraph at Alex Rovira's
request. That paragraph is unacceptable to OCC, and it is OCC's understanding
that Barclays is in agreement that it will not be included in the document.
For the elimination of doubt, I have attached a copy of the document in pdf
form that is acceptable to OCC. OCC's willingness to transfer the LBI accounts
at OCC to Barclays is conditioned upon the execution of this agreement by
Barclays.

2) Having heard nothing further from you with respect to cash held by OCC in
respect of the LBI accounts, and in accordance with the terms of the Transfer
and Purchase Agreement, all such cash in the accounts will be transferred to
Barclays assuming that the transaction closes this evening.

3) If the transaction does not close tonight, OCC would need to immediately
liquidate and close out the LBI accounts and is preparing to do so. These
preparations are as a precautionary measure that OCC does not expect to have
to use.

I am available at my office to discuss anything that you need to discuss. We
would very much like to know what the plan is for execution of documents and
when we might expect to have OCC's Transfer and Assumption Agreement executed
by Barclays.

Thanks,
Jim
<<Untitled.pdf>>

James R. McDaniel

CONFIDENTIAL

Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312)853-2665
Fax: (312)853-7036


James R. McDaniel
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312)853-2665
Fax: (312)853-7036

CONFIDENTIAL

BCI-CG00064724

# BCI EXHIBIT

# 268

| | |
|---|---|
| **From:** | Stephen P. Harbeck <sharbeck@sipc.org> |
| **Sent:** | Sunday, September 21, 2008 5:02 PM |
| **To:** | McDaniel, James R. <jmcdaniel@sidley.com>; wnavin <wnavin@theocc.com>; Edward J ROSEN <erosen@cgsh.com> |
| **Subject:** | OCC/Barclays issue |

Please keep me informed of the situation.  Thanks.


Steve

CONFIDENTIAL                                                                                    CGSH00034576

# BCI EXHIBIT

# 269

**To:**    gary.romain@barclayscapital.com[gary.romain@barclayscapital.com];
james.walker@barclayscapital.com[james.walker@barclayscapital.com];
tj.gavenda@barclayscapital.com[tj.gavenda@barclayscapital.com]
**Cc:**    Kelly, Martin[martin.kelly@lehman.com]; Tonucci, Paolo[paolo.tonucci@lehman.com]; Reilly,
Gerard[greilly@lehman.com]; Beldner, Brett[brett.beldner@lehman.com]; Lowitt, Ian
T[ilowitt@lehman.com]
**From:**    Azerad, Robert
**Sent:**    Sun 9/21/2008 6:20:35 PM
**Subject:**    Updated Opening Balance Sheet
**Categories:**    urn:content-classes:message

Copy of Opening Balance Sheet vBB2.xls



| | | |
|---|---:|---:|
| Cash and cash equivalent | | 7,000 |
| | | |
| Inventory | | |
| Government & Agencies | 29,526 | |
| Corporate Equities | 8,843 | |
| Mortgages & Mortgage Backed Securities | 3,150 | |
| Corporate Debt & Other | 3,186 | |
| Commercial Paper & Money Market Instruments | 95 | |
| Derivatives & Other Contr. | 80 | |
| Inventory Total | | 44,880 |
| | | |
| Receivables (15c3 lock up release) | | 1,000 |
| | | |
| Total Assets | | 52,880 |
| | | |
| Financing for Cash received from Barclays ($45b for repo and $250m for purchase) | | 45,250 |
| | | |
| Accrued Bonuses (Assumed to be all accrued) | | 2,000 |
| | | |
| Cure Payments (Placeholder for actual accrual) | | 2,250 |
| | | |
| Equity | | 3,380 |
| | | |
| Total Liabilities and Equity | | 52,880 |

# BCI EXHIBIT

# 270

**To:**      Frelinghuysen, Anson[frelingh@hugheshubbard.com]
**Cc:**      Giddens, James W.[giddens@hugheshubbard.com]; kcaputo@sipc.org[kcaputo@sipc.org];
Kiplok, Christopher[Kiplok@HughesHubbard.COM]; Kobak, James B.[kobak@hugheshubbard.com];
Margolin, Jeff[margolin@HughesHubbard.COM]; david.murgio@weil.com[david.murgio@weil.com]
**From:**    robert.messineo@weil.com
**Sent:**    Sun 9/21/2008 7:54:21 PM
**Importance:**   Low
**Sensitivity:**   None
**Subject:**   LEHMAN -- Barclays
**Categories:**   0x00000001

Current Version - Clarification Letter  #1916861.DOC

        Attached please find the most recent version of the so-called "clarification letter."   The portions
highlighted in yellow concern the points which depend on the resolution of the current discussions.
Otherwise, we reviewed the text of the letter with Cleary this morning and this draft reflects Cleary's
comments and, apart from a few possible incidental points where they have not yet signed off on the
wording changes made in response to their comments, I do not expect the letter to change.


        Robert L. Messineo
        Weil, Gotshal & Manges LLP
        767 Fifth Avenue
        New York, New York  10153
        Telephone = 212-310-8835
        Telecopy = 212-833-3862


"Frelinghuysen, Anson" <frelingh@hugheshubbard.com>

                                                                      09/21/2008 07:43 PM  To
<robert.messineo@weil.com>, <kcaputo@sipc.org>, "Margolin, Jeff" <margolin@HughesHubbard.COM>
                                                                                          cc
"Giddens, James W." <giddens@hugheshubbard.com>, "Kiplok, Christopher" <Kiplok@HughesHubbard.COM>, "Kobak, James B."
<kobak@hugheshubbard.com>
                                                                                          Subject




Bob,

As discussed, please reply with the current draft of the clarification letter.

Thanks

Anson



--------------------------------
Anson B. Frelinghuysen
Hughes Hubbard & Reed LLP
Tel: 212.837.6208
Fax: 212.299.6208
Cell: 646.404.3033

*********************************************************************
This email and any files transmitted with it may contain privileged or confidential
information. Use, disclosure, copying or distribution of this message by anyone other
than the intended recipient is strictly prohibited. If you have received this email in error
please notify the sender by reply email and destroy all copies of this message in your
possession, custody or control.
*********************************************************************

*WGM Revision of Sept. 21 pm (Responding to CGSH Comments of Sept. 20, 2008)*

## BARCLAYS CAPITAL INC.

As of September 20, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Original Agreement") as amended by the First Amendment thereto dated as of September 19, 2008 (the "First Amendment" and, as the Original Agreement as so amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed for it in the Original Agreement. This letter agreement (this "Letter") clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respects, and is binding on the parties hereto upon its execution and delivery.

      1.     Purchased Assets; Excluded Assets.

      (a)     The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than assets of LBI except as otherwise specifically provided in the Agreement or this Letter. Purchased Assets shall include:

      (i)     the items set forth in clauses (b), (c) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets" in the Original Agreement;

      (ii)     with respect to clauses (a), (d) and (e) of the definition of "Purchased Assets" in the Original Agreement, instead of the items referred to in such clauses, (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule [A] hereto, (B) such securities and other assets specified on Schedule [B] as Purchaser may, within 60 days after the Closing elect to receive (it being understood that Purchaser in its discretion may select to receive all or any portion of such securities); provided, that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets and [(C) exchange-traded derivatives and collateralized short-term agreements];

Confidential

(iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA; and

(iv)    all prime brokerage business and accounts and repurchase agreement operations and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business).

(b)    Subject to Paragraphs 2 and 23 of this Letter, Purchased Intellectual Property include Intellectual Property Rights, Software and Technology, wherever in the world held by LBHI or any of its Subsidiaries, that are used primarily in the Business or necessary for the operation of the Business.

(c)    For the avoidance of doubt, the "Business" includes LBI's commodities business, government securities trading operations and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller except as otherwise specified herein or in the Agreement). [Confirm all government securities Barclays expects to get are included in (a)(ii).]

(d)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a), (c) through (j), and (l) through (q) of the definition of "Excluded Assets" in the Original Agreement and the other assets identified in this Letter as Excluded Assets  Except as otherwise specified in the definition of "Purchased Assets," "Excluded Assets" shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries; provided that "Excluded Assets" shall not include (i) any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business, or (ii) cash, cash equivalents, bank deposits or similar cash items maintained by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise, or by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any other person in an account maintained by or on behalf of LBI and for which Purchaser shall become responsible as of the Closing pursuant to the requirements of any such clearing agency or clearing organization. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement. Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities. Included in clause (h) of the definition of "Excluded Assets" in the Original Agreement are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Clause (h) of the definition of Excluded Assets in the Original Agreement is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2

Confidential

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business. The Business includes the private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") and the Purchased Assets shall include the assets of the Seller used exclusively in the PIM Business but shall not include any other assets used in the PIM Business and also used in the operation of the IMD Business or the forgivable notes issued by PIM employees to Seller or its Affiliates. Excluded Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser arising after the Closing in connection with the Business. Clause (d) of the definition of "Assumed Liabilities" in the Original Agreement is understood as though it read as follows: "accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business (other than accounts payable arising out of or in connection with any Excluded Contract), including, for the avoidance of doubt, to the extent arising after such date (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable)." Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities."

4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission and, accordingly, the Cash Amount shall be $1,540,000,000 (subject to certain holdback amounts relating to the real estate being transferred pursuant to the Agreement as provided by Section __).

5.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

6.    Subordinated Notes of LBI. The outstanding subordinated notes of LBI

3

HHR_00007391

are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7.    Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    Transfer of Customer Accounts.  [Upon the Closing, Purchaser shall assume all of the rights and obligations under LBI's arrangements with the Depository Trust Clearing Corporation and its subsidiaries (the Depository Trust Company, the National Securities Clearing Corporation and the Fixed Income Clearing Corporation), including all settlement obligations and related rights thereunder.]  [All customer accounts of LBI shall be transferred Purchaser.  In connection therewith, Purchaser shall receive (i) any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business, or (ii) cash, cash equivalents, bank deposits or similar cash items maintained (A) by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise, or by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any other person in an account maintained by or on behalf of LBI and for which Purchaser shall become responsible as of the Closing pursuant to the requirements of any such clearing agency or clearing organization.]

9.    Deletion of Purchase Price Adjustment and Holdback Provisions.  Section 3.3 of the Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*. [Consider any necessary adjustments to Amendment No. 1, including timing of release of $250m as discussed in court].

10.    Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract [and except for the deposits referred to in Section 8 or otherwise provided in the Agreement to be transferred to Purchaser].  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

11.    Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations between or among any Seller and any of LBHI or any Subsidiary of LBHI.  It is understood that nothing contained in this Letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    Schedule 12.3.  Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.    Barclays Repurchase Agreement.  Effective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008 repurchase arrangement among

4

HHR_00007392

Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "Barclays Repurchase Agreement") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Buyer shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) the Barclays Repurchase Agreement shall terminate. Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void ab initio in all respects.

         14.    Risk of Loss of Artwork. During such period that Purchaser has the right to possess the artwork following to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

         15.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

         16.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

         (a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

         (b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and

5

        

the tenant under such sublease being referred to as the "Subtenant"), in each case, upon
such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided
that (1) the Subtenant shall pay rent and other charges under such sublease agreement
equal to its proportionate share of the rent and other charges payable by the Sublandlord
to the landlord under the underlying lease (which proportionate share shall be based upon
the relative square footage of the subleased space in proportion to the square footage of
the overall demised space under the underlying lease), (2) the term of the sublease
agreement shall be a period commencing on the Closing Date and ending on the day
immediately preceding the expiration date of the underlying lease (as the same may be
extended pursuant to the terms of the underlying lease), (3) any alterations or
modifications which the Sublandlord and Subtenant mutually agree need to be made to
the demised premises in order to segregate the subleased space from the remainder of the
demised premises under the underlying lease shall be performed by the Sublandlord and
the cost thereof (including the cost of any plans and specifications, drawings, permits,
licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and
Subtenant in proportion to the square footage of their respective spaces. Prior to the
execution and delivery of the sublease agreement for a particular Sublease Property,
subject to reasonable premises security procedures and giving due regard to regulatory
considerations (e.g., segregation) including the right to relocate such employees within
the applicable premises, and for a commercially reasonable period after the Closing Date,
(i) with respect to the SF Property, to the extent that Transferred Employees occupied any
portion of the SF Property prior to Closing, such Transferred Employees shall be
permitted to continue to occupy and use the SF Property to the same extent and for the
same purposes as the SF Property was occupied by such Transferred Employees prior to
the Closing; provided, that the foregoing shall be subject to Purchaser's ability to
substitute a substantially similar number of new employees of Purchaser for any such
Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each
Sublease Property other than the SF Property, to the extent that Excluded Employees
occupied any portion of such Sublease Property prior to Closing, such Excluded
Employees shall be permitted to continue to occupy and use such Sublease Property to
the same extent and for the same purposes as such Sublease Property was occupied by
such Excluded Employees prior to the Closing; provided, that the foregoing shall be
subject to Seller's ability to substitute a substantially similar number of new employees
of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each
case described in clauses (i) and (ii) above, no rent or other payments shall be made to
the party which is the tenant under the underlying lease until execution and delivery of
the applicable sublease agreement at which time all rent calculated under the sublease
agreement for the period from the Commencement Date (which date shall be the Closing
Date) through end of the month in which the sublease agreement is executed shall be paid
to the Sublandlord contemporaneously with the execution and delivery of the sublease
agreement.

(c)     If any consent or approval from any landlord under an underlying lease is
required pursuant to the terms of the underlying lease in order to effectuate the applicable
sublease agreement and/or to the extent that any landlord under an underlying lease has
recapture and/or termination rights that would be triggered by the proposed sublease
arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser

6

will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.    Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

19.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Definition of Excluded Contract.  As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    PIM Business Leases.

(a)  Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases").  At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease.  With respect to any PIM Lease that becomes a

7

HHR_00007395

Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

(b)  Notwithstanding the foregoing or anything to the contrary contained in Section 22(a) or any other provision of the Agreement, with respect to the PIM Lease for the premises located at 399 Park Avenue, New York, New York (the "New York Property"), the underlying lease shall not be subject to assignment to Purchaser and the Purchaser shall only have the option to require that Seller sublease to Purchaser or its Affiliates the sixth floor of the New York Property (or a portion of the sixth floor) (the "NY Sublease Premises"), and Seller agrees to sublease the NY Sublease Premises, subject to the parties' compliance with the terms of the underlying lease including, without limitation, any notice or consent requirements set forth therein.  If Purchaser elects to sublease the NY Sublease Premises as provided herein, all of the terms and conditions set forth in this letter agreement applicable to the SF Property shall also apply to the sublease of the NY Sublease Premises.

23.    No Overseas Assets.  Although LBI has been part of a global business and Purchaser remains interested in potentially acquiring other portions thereof and obtaining the services of the employees thereof, all assets and rights of the Lehman companies (other than Seller, 745 and any Subsidiaries sold pursuant to the Agreement) that have or do come under governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time.  No assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745 and any Subsidiaries sold pursuant to the Agreement) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that, notwithstanding anything to the contrary contained in Section 13.12 of the Agreement, to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

The representations and warranties of the parties contained in this Letter and in the Agreement shall not survive the Closing.  This Letter shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.  This Letter may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

8

Confidential

Sincerely,

BARCLAYS CAPITAL INC.

By:
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.

By:
Name:
Title:


LEHMAN BROTHERS INC.

By:
Name:
Title:


LB 745 LLC

By:
Name:
Title:


NY2 :1916861 :17:1532517!.DOC:73683.1037

Confidential

HHR_00007397

# BCI EXHIBIT

# 271

**To:**     Kelly, Martin[martin.kelly@lehman.com]
**From:**     Azerad, Robert
**Sent:**     Sun 9/21/2008 8:15:08 PM
**Subject:**     15c3 Lockup.ppt
**Categories:**     urn:content-classes:message

15c3 Lockup.ppt

<<15c3 Lockup.ppt>>



September 21, 2008

LEHMAN BROTHERS

15c3 Lockup



# $1.2 bn Cushion Against Failed Trades

◆ Because Lehman Brothers relies on multiple trading systems, the cushion is assessed for each trading system

  – Fixed income securities (MTS) - $394 million of Aggregate Debit Items ("ADI") can be released following an orderly liquidation of open customer fails

  – Equities (ADP) - $573 million of ADI can be released following an orderly liquidation of open customer balances

  – Foreign securities (ITS) - $228 million of ADI can be released following an orderly liquidation of open customer balances

  – Fx fails not related to securities transactions - $457 million can be released related to non-trading related overdrafts (SEK 244 million and CAD 277 million of CAD)

  – PAIB - $216 million can be released, which relates to the adjustment of PAIB long and PAIB short between primarily LBI and LOTC, Lehman Brothers "broker dealer lite"

# BCI EXHIBIT

# 272

**To:**      Kelly, Martin [martin.kelly@lehman.com]; Tonucci, Paolo [paolo.tonucci@lehman.com]; O'Meara,
Chris M (NY) [comeara@lehman.com]
**From:**          Azerad, Robert [RAzerad@lehman.com]
**Sent:**          Sun 9/21/2008 9:12:00 PM
**Subject:**       15c3 Lockup (Revised)

<u>15c3 Lockup v2.ppt</u>


    <<15c3 Lockup v2.ppt>>



EXHIBIT
186
KK 8/17/09

September 21, 2008

LEHMAN BROTHERS

# 15c3 Lockup



Confidential Presentation

# $X.X bn Cushion Against Failed Trades

◆ Out of the $1.0 billion reserve held for the protection of customers as of last Friday, only $200 million (approximately) is held for the benefit of customers transferring to Barclays (e.g., PIM (high net worth) customers).

◆ Although the excess of customer payables over customer receivables represents real customer claims that cannot be returned to Lehman Brothers / Barclays in a transfer scenario, the cushion against failed trades related to customers transferring to Barclays should be seen as a future source of cash for Barclays as the backlog of fails (both fails to deliver <u>and</u> fails to receive) clear up and the reserve gets released.

  – Assessment of this future benefit is in progress

LEHMAN BROTHERS

2

# BCI EXHIBIT

# 273

**To:**    O'Meara, Chris M (NY)[comeara@lehman.com]; Lee, Mark[mark.lee@lehman.com]; Kelly,
Martin[martin.kelly@lehman.com]; Azerad, Robert[RAzerad@lehman.com];
wburke@si.rr.com[wburke@si.rr.com]; Stucchio, Anthony[astucchi@lehman.com]; Stucchio,
Anthony[astucchi@lehman.com]; Tonucci, Paolo[paolo.tonucci@lehman.com]; Crepeau, Alex
F[acrepeau@lehman.com]

| | |
|---|---|
| **From:** | Potenciano, Joel |
| **Sent:** | Sun 9/21/2008 10:07:59 PM |
| **Subject:** | RE: Final 15c3-3 Reserve Formula as of 09/17/2008 |
| **Categories:** | urn:content-classes:message |

<u>Customer PAIB Reserve-091708.xls</u>

<<Customer PAIB Reserve-091708.xls>>

Hi Chris,

Attached is the condensed summary that you requested.  Please advise if
this works or you have comments.  We are still working on the 09/19
numbers as we have just received the reallocated amounts for ADP.
Please let me know if you have questions.


Thanks!

With kind regards,
Joel K. Potenciano
LEHMAN BROTHERS
Telephone  +1 (212) 320-6786
Fax  +1 (646) 885-9383
Email  joel.potenciano@lehman.com


> _____
> From:        O'Meara, Chris M (NY)
> Sent: Sunday, September 21, 2008 5:25 PM
> To:    Lee, Mark; Kelly, Martin; Azerad, Robert; Potenciano, Joel;
> 'wburke@si.rr.com'; Stucchio, Anthony; Stucchio, Anthony; Tonucci,
> Paolo
> Subject:        RE: Final 15c3-3 Reserve Formula as of 09/17/2008
>
> Team - We need to make some changes to this.  It is not easily clear
> which balances are truly customer related vs which are cushions, such
> as the ADI's.  So, I suggest we show one date of info, broken into 5
> columns, as follows: Cust dr's, cust cr's, net customer balances,
> cushions, total balances.  Can someone do this easily?  At min, make 3
> separate columns: net cust, cushions, total.  Thanks, Chris
>
> _____
> From:        Lee, Mark
> Sent: Sunday, September 21, 2008 5:24 PM
> To:    Kelly, Martin; Azerad, Robert; Potenciano, Joel;
> 'wburke@si.rr.com'; Stucchio, Anthony; O'Meara, Chris M (NY);
> Stucchio, Anthony
> Subject:        RE: Final 15c3-3 Reserve Formula as of 09/17/2008


EXHIBIT
187
KK 8/17/09

*LEHMAN BROTHERS INC.*
*CONSOLIDATED 15c3-3 RESERVE FORMULA*
*AS OF SEPTEMBER 17, 2008*
*(in 000's)*

|  | | *09/17/2008* *TOTAL* |
|---|---|---|
| TOTAL CUSTOMER CREDITS ITEMS | | 24,754,847 |
| TOTAL CUSTOMER DEBITS ITEMS | | 23,929,337 |
| NET CUSTOMER CREDITS | | 825,510 |
| % OF AGGREGATE DEBIT ITEMS | (717,880) | 717,880 |
| CUSHION | | 225,610 |
| CUSTOMER LOCK-UP | | 1,769,000 |

# BCI EXHIBIT

# 274

Cc:      O'Meara, Chris M (NY) [comeara@lehman.com]; Tonucci, Paolo [paolo.tonucci@lehman.com];
Stucchio, Anthony [astucchi@lehman.com]; Burke, William T [wburke@lehman.com]
To:      Kelly, Martin [martin.kelly@lehman.com]; Gary.Romain@barclayscapital.com
[Gary.Romain@barclayscapital.com]; James.Walker@barclayscapital.com
[James.Walker@barclayscapital.com]; tj.gavenda@barclayscapital.com
[tj.gavenda@barclayscapital.com]; matthew.hughey@barclayscapital.com
[matthew.hughey@barclayscapital.com]; robert.martini@barclayscapital.com
[robert.martini@barclayscapital.com]
From:        Azerad, Robert [RAzerad@lehman.com]
Sent:        Sun 9/21/2008 10:22:57 PM
Subject:     RE: 15c3

15c3 0919 Preliminary V3.xls

Here is the spreadsheet. Numbers are still preliminary.

Robert

---------

From: Kelly, Martin
Sent: Sunday, September 21, 2008 6:17 PM
To: 'Gary.Romain@barclayscapital.com';
'James.Walker@barclayscapital.com'; 'tj.gavenda@barclayscapital.com';
'matthew.hughey@barclayscapital.com';
'robert.martini@barclayscapital.com'
Cc: O'Meara, Chris M (NY); Tonucci, Paolo; Azerad, Robert; Stucchio,
Anthony; Burke, William T
Subject: RE: 15c3

Could we do a call in 5 minutes on the 15c3? Call in to the following #:
Robert will circulate a page or 2 which we can talk to.

Thx - M

Int'l 205 354 0155

Dom 866 831 2217

*3743693*

---------

From: Kelly, Martin
Sent: Sunday, September 21, 2008 5:33 PM
To: 'Gary.Romain@barclayscapital.com';
'James.Walker@barclayscapital.com'; 'tj.gavenda@barclayscapital.com';
'matthew.hughey@barclayscapital.com';
'robert.martini@barclayscapital.com'
Cc: O'Meara, Chris M (NY); Tonucci, Paolo; Azerad, Robert; Stucchio,
Anthony; Burke, William T
Subject: 15c3



EXHIBIT

188
KK 8/17/09

**FINAL**

**Lehman Brothers Inc.**
**Customer/PAIB Reserve Analysis**

| Customer: | Preliminary 09/19/2008 | Pending Adjustments | Preliminary Adjusted 09/19/2008 | 09/17/08 | Variance | Comments |
|---|---|---|---|---|---|---|
| **MTS** | | | | | | |
| Free Credits | 77,216 | | 77,216 | 77,216 | - | |
| SCS Cash | 38,194 | | 38,194 | 46,462 | (8,268) | |
| Option Margin | 7,130 | | 7,130 | 15,824 | (8,694) | |
| P & I | 22,858 | | 22,858 | 22,858 | - | |
| Aged Fails and Partly Secured Debits | 4,595 | | 4,595 | 7,518 | (2,923) | |
| Customer Receivable Versus Box | * | | | | - | |
| Stock Record/P&C Items | 160,127 | | 160,127 | 86,809 | 73,318 | |
| Overdrafts | - | | | | - | |
| Unapplied Cash / Suspense | 61,014 | | 61,014 | 31,677 | 29,337 | |
| 3% ADI | | | | 216,477 | (216,477) | |
| Sub-total | 371,134 | - | 371,134 | 504,841 | (133,708) | |
| **ADP** | | | | | | |
| Free Credits / Margin | (368,468) | | (368,468) | 481,456 | (849,925) | |
| Net Customer Financing | * (73,348) | | (73,348) | (831,906) | 758,558 | |
| OMNI Conversion Payable | | | | | - | |
| O/Drafts | 222,207 | | 222,207 | 62,604 | 159,603 | |
| Dividends | 5,322 | | 5,322 | 5,322 | - | |
| S/B L.O.C. vs. Customer Short | | | | | - | |
| S/B NQ vs. Customer Short | 337,017 | | 337,017 | 5,287 | 331,730 | |
| Non-Broker Dealer Affil. | 0 | | 0 | 290,539 | (290,539) | |
| OCC Proprietary Qualified Collateral | (477,614) | | (477,614) | (349,858) | (127,756) | |
| Firm Bank Loan - Firm Not Long | | | | | - | |
| Suspense | 39,897 | | 39,897 | 39,897 | - | |
| Unapplied Cash | 11,553 | | 11,553 | 10,121 | 1,432 | |
| Abandoned Property / Soft Dollars ($42 mil) | 85,319 | | 85,319 | 85,212 | 107 | |
| Other | 3,992,241 | (3,900,000) | 92,241 | 82,685 | 9,557 | |
| 3% ADI | 235,430 | | 235,430 | 322,692 | (87,262) | |
| Sub-total | 4,009,557 | (3,900,000) | 109,557 | 204,052 | (94,495) | |
| **ITS** | | | | | | |
| Free Credits (primarily SCS cash) | | | - | 160,575 | (160,575) | |
| Unsecured Shorts | | | - | 77,639 | (77,639) | |
| Securities Related IC Payable (Mostly ITS) | - | | - | 189,086 | (189,086) | Balances with affiliates that are in liquidation |
| Other | | | - | | - | |
| 3% ADI | 100,000 | | 100,000 | 178,711 | (78,711) | 228 mil of ADI assumes orderly liquidation of open customer balances |
| Sub-total | 100,000 | | 100,000 | 606,011 | (506,011) | |
| **Commodities** | | | | | | |
| O/Drafts | - | | - | 176,487 | (176,487) | Proposed SEC interpretation relief for FX related balances disregarding 244 mil of SEK and 277 mil of CAD foreign exchange overdrafts |
| Non-Reg Commodity Credits | - | | - | 52,000 | (52,000) | |
| Sub-total | - | | - | 228,487 | (228,487) | |
| Requirement | 4,480,690 | (3,900,000) | 580,690 | 1,543,392 | (962,702) | |
| Cushion (plus 2% deduction) | | | | 225,608 | (225,608) | |
| Amount Segregated | 4,480,690 | (3,900,000) | 580,690 | 1,769,000 | (1,188,310) | |
| **PAIB:** | | | | | | |
| Net PAIB Debits/Credits | 426,991 | | 426,991 | 325,286 | 101,705 | Adjustment relates to PAIB long and PAIB short |
| Bank Loan | 6 | | 6 | 3,560 | (3,554) | |
| Stock Loan | 124,856 | | 124,856 | 312,247 | (187,391) | |
| F/R Vs PAIB Long | 33,102 | | 33,102 | 31,031 | 2,071 | |
| Firm Short vs. PAIB Long | 68,691 | | 68,691 | 394,506 | (325,815) | |
| Stock Borrow | * (450,967) | | (450,967) | (560,229) | 109,262 | |
| Fail to Deliver | (106,395) | | (106,395) | (40,281) | (66,114) | |
| Requirement | 96,284 | - | 96,284 | 466,120 | (369,836) | |
| Cushion (plus 2% deduction) | - | | - | 25,880 | (25,880) | |
| Amount Segregated | 96,284 | | 96,284 | 492,000 | (395,716) | |
| Total Segregated | 4,576,975 | (3,900,000) | 676,975 | 2,261,000 | (1,584,025) | |

# BCI EXHIBIT

# 275

**From:**    Romain, Gary: Finance (LDN)

**Sent:**    Mon, 22 Sep 2008 03:11:16 GMT

**To:**    Grbic, Susan: Finance (NYK); Weidler, Chris: Finance (LDN); Gavenda, TJ: Finance (NYK); Hughey, Matthew: Finance (NYK)

**CC:**    Walker, James: Finance (NYK); Montaudy, Beatrice: Finance (NYK); Scott, Teri: Finance (NYK)

**Subject:** RE: Latest spreadsheet

---

Here is the latest updated balance sheet.  TJ and Chris can talk to the bookings and related issues.

---

**From:** Grbic, Susan: Finance (NYK)
**Sent:** Sunday, September 21, 2008 10:35 PM
**To:** Romain, Gary: Finance (LDN); Weidler, Chris: Finance (LDN); Gavenda, TJ: Finance (NYK); Hughey, Matthew: Finance (NYK)
**Cc:** Walker, James: Finance (NYK); Montaudy, Beatrice: Finance (NYK); Scott, Teri: Finance (NYK)
**Subject:** RE: Latest spreadsheet

While I realize this is preliminary, we need to focus on assets that should go an LLC under the terms of the Subscription Agreement we signed up on Friday night.  Specifically, we need to ensure that the mortgages (and MBS) can and are booked to the LLC (in addition to the real estate we are already aware of).  For the avoidance of doubt, attached is a final version of the Subscription Agreement describing the conceptual split between LLC and BCI.

As you may remember from our various discussions during the past week, the LLC is integral to our US tax analysis.  Let's discuss tomorrow morning please.  If there is an updated balance sheet tonight, please forward and we'll focus on that version.  Thanks everyone.

Susan

---

**From:** Romain, Gary: Finance (LDN)
**Sent:** Sunday, September 21, 2008 5:41 PM
**To:** Scott, Teri: Finance (NYK); Grbic, Susan: Finance (NYK); Weidler, Chris: Finance (LDN)
**Subject:** RE: Latest spreadsheet

Susan,

Please find attached latest version of the acquisition balance sheet (not yet finalised) - consolidated (no split between LLC and BCI).

Regards,



**HIGHLY CONFIDENTIAL**

**From:** Mackinnon, Iain: Group Tax (LDN)
**To:** King, Samantha J: M&A Tax (LDN)
**Cc:** Cunningham, Kim: Group Tax (LDN)
**Sent:** Sun Sep 21 21:24:23 2008
**Subject:** RE: Latest spreadsheet

I understand the negative goodwill could be as high as 4-5 million.
We will need to move more assets into LLC.
We could move a bit more of the property into LLC?
Also move the 1.3bn into BCI?
Any ideas?
Best Regards
Iain MacKinnon
00 44 (0) 207 773 2650
00 44 (0) 7850 913 040

**From:**   King, Samantha J: M&A Tax  (LDN)
**Sent:**   21 September 2008 21:00
**To:**   Mackinnon, Iain: Group Tax (LDN)
**Cc:**   Cunningham, Kim: Group Tax (LDN)
**Subject:**   Latest spreadsheet

Iain - this is latest version of spreadsheet with $1.3m comp provision in LLC.  It is based on the
figures in Susan and Beatrice's spreadsheet and assumes an integrated transaction for US tax
purposes with the only lower than Class I/II assets being real estate and mortgage
receivables.  Plus it uses the asset and liability split from the executed subscription agreement.

Cheers
Sam

<< File: Long Island Balance sheets v3.xls >>

HIGHLY CONFIDENTIAL                                                    BCI-EX-(S)-00052478

**Long Island - Acquisition Summary [draft - subject to detailed verification and audit]**

| | $bn | $bn | New box $bn | Repo $bn |
|---|---|---|---|---|
| Govt & Agency | 29.53 | | 0.35 | 29.18 |
| Commercial paper | 0.09 | | 0.00 | 0.09 |
| Mortgage-backed | 3.15 | | 0.25 | 2.90 |
| Corp debt | 3.19 | | 0.50 | 2.69 |
| Corp equity | 8.84 | | 0.73 | 8.11 |
| Derivatives | 0.08 | | 0.08 | 0.00 |
| Inventory - current book value | | 44.88 | 1.91 | 42.97 |
| Valuation adjustment | | -2.83 | | |
| Inventory - net | | 42.05 | | |
| 15c3 asset | | 1.00 | | |
| Cash | | 7.00 | | |
| Previously excluded 50% MBS (net of any loss due to guaranteed DTCC obligations) | | 1.40 | | |
| Financial Assets | | 51.45 | | |
| | | | | |
| Subsidiaries | | 0.00 | | |
| 7th Avenue & Data Centres | | 1.29 | | |
| Fixtures, fittings, telecomms, etc | | 0.19 | | |
| | | | | |
| **Total Assets** | | 52.92 | | |
| | | | | |
| Repo liability | 45.00 | | | |
| Cure payment | 2.25 | | | |
| Retention payment | 0.00 | | | |
| Bonus accrual | 2.00 | | | |
| | | | | |
| **Total Liabilities** | | 49.25 | | |
| | | | | |
| **Net assets** | | 3.67 | | |
| | | | | |
| Consideration: | | | | |
| Assets | 0.25 | | | |
| Properties | 1.29 | | | |
| **Total consideration** | | 1.54 | | |
| | | | | |
| **Negative goodwill** | | 2.13 | | |

Notes:

- Intangible assets in respect of customer relationships/lists assumed immaterial
- Zero value ascribed to the subs until details obtained
- No value is currently ascribed to the potential retention payment of up to $750m - due to the $2.83bn buffer provided by the valuation adjustment above
- The value ascribed to the 50% MBS is subject to clarification
- Assumes full cure payments of 2.25bn are required as an accrual

# BCI EXHIBIT

# 276

**From:** Romain, Gary: Finance (LDN)

**Sent:** Mon, 22 Sep 2008 03:12:47 GMT

**To:** Mackinnon, Iain: Group Tax (LDN); Grbic, Susan: Finance (NYK); Scott, Teri: Finance (NYK)

**CC:** Weidler, Chris: Finance (LDN); King, Samantha J: M&A Tax (LDN); Cunningham, Kim: Group Tax (LDN); Fowden, Rupert: Barclays Treasury (LDN); Walker, James: Finance (NYK)

**Subject:** RE: Latest spreadsheet

Iain,

I attach the latest view of the acquisition balance sheet.

Regards,

Gary

**From:** Mackinnon, Iain: Group Tax (LDN)
**Sent:** Sunday, September 21, 2008 6:19 PM
**To:** Grbic, Susan: Finance (NYK); Scott, Teri: Finance (NYK)
**Cc:** Romain, Gary: Finance (LDN); Weidler, Chris: Finance (LDN); King, Samantha J: M&A Tax (LDN); Cunningham, Kim: Group Tax (LDN); Fowden, Rupert: Barclays Treasury (LDN); Walker, James: Finance (NYK)
**Subject:** RE: Latest spreadsheet

HI
So we can assist Rupert in the morning with regard to the LLC split could we be included as soon as possible with anything on the balance sheet.
Also we can help sort tax consequences.

Thanks

Best Regards
Iain MacKinnon
00 44 (0) 207 773 2650
00 44 (0) 7850 913 040

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00052480

**From:** Grbic, Susan: Finance (NYK)
**Sent:** 21 September 2008 23:14
**To:** Mackinnon, Iain: Group Tax (LDN)
**Subject:** Fw: Latest spreadsheet

---

**From:** Romain, Gary: Finance (LDN)
**To:** Scott, Teri: Finance (NYK); Grbic, Susan: Finance (NYK); Weidler, Chris: Finance (LDN)
**Sent:** Sun Sep 21 17:40:52 2008
**Subject:** RE: Latest spreadsheet
Susan,

Please find attached latest version of the acquisition balance sheet (not yet finalised) -
consolidated (no split between LLC and BCI).

Regards,

Gary

---

**From:** Scott, Teri: Finance (NYK)
**Sent:** Sunday, September 21, 2008 5:35 PM
**To:** Grbic, Susan: Finance (NYK); Romain, Gary: Finance (LDN); Weidler, Chris: Finance (LDN)
**Subject:** RE: Latest spreadsheet

Susan,

RE the balance sheet you have shared - can I ask that you guys coordinated  between Tax and
Financial control to circulate one balance sheet that is agreed.

---

**From:** Grbic, Susan: Finance (NYK)
**Sent:** Sunday, September 21, 2008 5:00 PM
**To:** Scott, Teri: Finance (NYK)
**Subject:** Fw: Latest spreadsheet

Fyi - some prelim information.

---

**From:** Mackinnon, Iain: Group Tax (LDN)
**To:** Cunningham, Kim: Group Tax (LDN); King, Samantha J: M&A Tax (LDN)
**Cc:** Grbic, Susan: Finance (NYK)
**Sent:** Sun Sep 21 16:33:46 2008
**Subject:** RE: Latest spreadsheet
been told data centres should NOT have gone into BD! Was just on call to Reg people in
Barcap.   Also we should try to move the leases in BCI

Susan is looking into this.

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00052481

Best Regards
Iain MacKinnon
00 44 (0) 207 773 2650
00 44 (0) 7850 913 040

---

**From:** Cunningham, Kim: Group Tax (LDN)
**Sent:** 21 September 2008 21:29
**To:** Mackinnon, Iain: Group Tax (LDN); King, Samantha J: M&A Tax (LDN)
**Subject:** Re: Latest spreadsheet

I believe, unless there has been an update that the data centres need to stay in broker dealer so not sure we can move any more property. We had investigated with Susan and Jim, whether the IT could go and be leased back but they weren't overly keen so we dropped. Bruce weinrib had suggested so may be worth revisiting.

---

**From:** Mackinnon, Iain: Group Tax (LDN)
**To:** King, Samantha J: M&A Tax (LDN)
**Cc:** Cunningham, Kim: Group Tax (LDN)
**Sent:** Sun Sep 21 21:24:23 2008
**Subject:** RE: Latest spreadsheet

I understand the negative goodwill could be as high as 4-5 million.
We will need to move more assets into LLC.
We could move a bit more of the property into LLC?
Also move the 1.3bn into BCI?
Any ideas?
Best Regards
Iain MacKinnon
00 44 (0) 207 773 2650
00 44 (0) 7850 913 040

---

**From:** King, Samantha J: M&A Tax  (LDN)
**Sent:** 21 September 2008 21:00
**To:** Mackinnon, Iain: Group Tax (LDN)
**Cc:** Cunningham, Kim: Group Tax (LDN)
**Subject:** Latest spreadsheet

Iain - this is latest version of spreadsheet with $1.3m comp provision in LLC.  It is based on the figures in Susan and Beatrice's spreadsheet and assumes an integrated transaction for US tax purposes with the only lower than Class I/II assets being real estate and mortgage receivables.  Plus it uses the asset and liability split from the executed subscription agreement.

Cheers
Sam

<< File: Long Island Balance sheets v3.xls >>

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00052482

# **Placeholder**

# **Document produced in native format**

**HIGHLY CONFIDENTIAL**

**BCI-EX-(S)-00052483**

Long Island - Acquisition Summary [draft - subject to detailed verification and audit]

|  | $bn | $bn | New box $bn | Repo $bn |
|---|---|---|---|---|
| Govt & Agency | 29.53 |  | 0.35 | 29.18 |
| Commercial paper | 0.09 |  | 0.00 | 0.09 |
| Mortgage-backed | 3.15 |  | 0.25 | 2.90 |
| Corp debt | 3.19 |  | 0.50 | 2.69 |
| Corp equity | 8.84 |  | 0.73 | 8.11 |
| Derivatives | 0.08 |  | 0.08 | 0.00 |
| Inventory - current book value |  | 44.88 | 1.91 | 42.97 |
| Valuation adjustment |  | -2.83 |  |  |
| Inventory - net |  | 42.05 |  |  |
| 15c3 asset |  | 1.00 |  |  |
| Cash |  | 7.00 |  |  |
| Previously excluded 50% MBS (net of any loss due to guaranteed DTCC obligations) |  | 1.40 |  |  |
| Financial Assets |  | 51.45 |  |  |
| Subsidiaries |  | 0.00 |  |  |
| 7th Avenue & Data Centres |  | 1.29 |  |  |
| Fixtures, fittings, telecomms, etc |  | 0.19 |  |  |
| Total Assets |  | 52.92 |  |  |
| Repo liability | 45.00 |  |  |  |
| Cure payment | 2.25 |  |  |  |
| Retention payment | 0.00 |  |  |  |
| Bonus accrual | 2.00 |  |  |  |
| Total Liabilities |  | 49.25 |  |  |
| Net assets |  | 3.67 |  |  |
| Consideration: |  |  |  |  |
| Assets | 0.25 |  |  |  |
| Properties | 1.29 |  |  |  |
| Total consideration |  | 1.54 |  |  |
| Negative goodwill |  | 2.13 |  |  |

Notes:

- Intangible assets in respect of customer relationships/lists assumed immaterial
- Zero value ascribed to the subs until details obtained
- No value is currently ascribed to the potential retention payment of up to $750m - due to the $2.83bn buffer provided by the valuation adjustment above
- The value ascribed to the 50% MBS is subject to clarification
- Assumes full cure payments of 2.25bn are required as an accrual

# BCI EXHIBIT

## 277

**From:**   Romain, Gary: Finance (LDN)
**Sent:**    Mon, 22 Sep 2008 03:14:51 GMT
**To:**      Clackson, Patrick: Finance (LDN)
**Subject:** Acquisition balance sheet

---

Patrick - here's the latest view.

Heading off now, so will see you tomorrow.

Gary

<<...>>

**HIGHLY CONFIDENTIAL**

# Placeholder

## Document produced in native format

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00052485

**Long Island - Acquisition Summary [draft - subject to detailed verification and audit]**

|  | $bn | $bn | New box $bn | Repo $bn |
|---|---|---|---|---|
| Govt & Agency | 29.53 |  | 0.35 | 29.18 |
| Commercial paper | 0.09 |  | 0.00 | 0.09 |
| Mortgage-backed | 3.15 |  | 0.25 | 2.90 |
| Corp debt | 3.19 |  | 0.50 | 2.69 |
| Corp equity | 8.84 |  | 0.73 | 8.11 |
| Derivatives | 0.08 |  | 0.08 | 0.00 |
| Inventory - current book value |  | 44.88 | 1.91 | 42.97 |
| Valuation adjustment |  | -2.83 |  |  |
| Inventory - net |  | 42.05 |  |  |
| 15c3 asset |  | 1.00 |  |  |
| Cash |  | 7.00 |  |  |
| Previously excluded 50% MBS (net of any loss due to guaranteed DTCC obligations) |  | 1.40 |  |  |
| Financial Assets |  | 51.45 |  |  |
|  |  |  |  |  |
| Subsidiaries |  | 0.00 |  |  |
| 7th Avenue & Data Centres |  | 1.29 |  |  |
| Fixtures, fittings, telecomms, etc |  | 0.19 |  |  |
|  |  |  |  |  |
| **Total Assets** |  | **52.92** |  |  |
|  |  |  |  |  |
| Repo liability | 45.00 |  |  |  |
| Cure payment | 2.25 |  |  |  |
| Retention payment | 0.00 |  |  |  |
| Bonus accrual | 2.00 |  |  |  |
|  |  |  |  |  |
| **Total Liabilities** |  | **49.25** |  |  |
|  |  |  |  |  |
| **Net assets** |  | **3.67** |  |  |
|  |  |  |  |  |
| Consideration: |  |  |  |  |
| Assets | 0.25 |  |  |  |
| Properties | 1.29 |  |  |  |
| **Total consideration** |  | **1.54** |  |  |
|  |  |  |  |  |
| **Negative goodwill** |  | **2.13** |  |  |

Notes:

- Intangible assets in respect of customer relationships/lists assumed immaterial
- Zero value ascribed to the subs until details obtained
- No value is currently ascribed to the potential retention payment of up to $750m - due to the $2.83bn buffer provided by the valuation adjustment above
- The value ascribed to the 50% MBS is subject to clarification
- Assumes full cure payments of 2.25bn are required as an accrual

# BCI EXHIBIT

# 278

To:        Kelly, Martin[martin.kelly@lehman.com]
From:      Lee, Mark
Sent:      Mon 9/22/2008 12:37:06 AM
Subject:   RE: Final 15c3-3 Reserve Formula as of 09/17/2008
Categories: urn:content-classes:message

<u>2008 (4.24 KB)</u>

Just spoken to Robert. The numbers are taking too long to move
significantly and there is now mis-assumptions re the ADI required to
remain (see attached) so Robert is going to take the last Joel file and
make some assumptions - the guys are working to bring to 2.3bn down so
we have to take some hit for this now.
There is so little transparency into the way the data is structured it's
hugely frustrating on all sides.

We have a final call in 20 mins but I think we are about out of time

Mark
-----Original Message-----
From: Kelly, Martin
Sent: Sunday, September 21, 2008 7:33 PM
To: Lee, Mark
Subject: Re: Final 15c3-3 Reserve Formula as of 09/17/2008

We need to get for ourselves and give to barclays comfort that the adp
balances will be meaningfully reduced - we put in $3.9b as a
placeholder. What's the plan and when do you think we can achieve some
meaningful progress? Thx - M


--------------------------------

----- Original Message -----
From: Lee, Mark
To: Kelly, Martin
Sent: Sun Sep 21 19:30:03 2008
Subject: RE: Final 15c3-3 Reserve Formula as of 09/17/2008

Martin - it has taken much longer to get the ADP numbers reallocated and
we have a call starting in a minute to review with Ops and Fin. What are
your expectations this point this evening. Joel is currently trying to
allocate as per COM request?

Mark.

From:    Kelly, Martin
Sent:    Sunday, September 21, 2008 5:21 PM
To:      Azerad, Robert; Potenciano, Joel; 'wburke@si.rr.com'; Stucchio,
Anthony; Lee, Mark; O'Meara, Chris M (NY); Stucchio, Anthony



EXHIBIT
189
KL 2/7/09

**To:**      Potenciano, Joel[joel.potenciano@lehman.com]; Azerad, Robert[RAzerad@lehman.com];
wburke@si.rr.com[wburke@si.rr.com]; Stucchio, Anthony[astucchio@lehman.com]; Stucchio,
Anthony[astucchio@lehman.com]; Crepeau, Alex F[acrepeau@lehman.com]
**From:**    Lee, Mark
**Sent:**    Mon 9/22/2008 12:30:50 AM
**Subject:**  RE: Final 15c3-3 Reserve Formula as of 09/17/2008
**Categories:**  urn:content-classes:message

Joel

Need to reproduce an equivalent for 19th. Don't assume that the 3%ADI
will be adjusted to zero as per your last schedule, i.e. MTS will have
3% ADI raising from $216 to $395 based on the current breaks although
the assumption that this will be a balance that will be available for
Barclays post the clearing of all the fails. The free cash that I see
available to tfr is for the commodities of $225m only but I had expected
the ITS ADI to come down.

We need to estimate where we think we will get the $2.3bn down to this
evening for Martin / Chris / Paolo

Mark

> _____
> From:        Potenciano, Joel
> Sent: Sunday, September 21, 2008 6:08 PM
> To:    O'Meara, Chris M (NY); Lee, Mark; Kelly, Martin; Azerad, Robert;
> 'wburke@si.rr.com'; Stucchio, Anthony; Stucchio, Anthony; Tonucci,
> Paolo; Crepeau, Alex F
> Subject:      RE: Final 15c3-3 Reserve Formula as of 09/17/2008
>
>
> << File: Customer PAIB Reserve-091708.xls >>
>
> Hi Chris,
>
> Attached is the condensed summary that you requested.  Please advise
> if this works or you have comments.  We are still working on the 09/19
> numbers as we have just received the reallocated amounts for ADP.
> Please let me know if you have questions.
>
>
> Thanks!
>
> With kind regards,
> Joel K. Potenciano
> LEHMAN BROTHERS
> Telephone  +1 (212) 320-6786
> Fax  +1 (646) 885-9383
> Email  joel.potenciano@lehman.com
>
>
> _____
> From:        O'Meara, Chris M (NY)
> Sent: Sunday, September 21, 2008 5:25 PM

>
> Bill requested me to forward the following schedule to this
> distribution.  Thanks!
>
> With kind regards,
> Joel K. Potenciano
> LEHMAN BROTHERS
> Telephone  +1 (212) 320-6786
> Fax  +1 (646) 885-9383
> Email  joel.potenciano@lehman.com
>

# BCI EXHIBIT

## 279

| | |
|---|---|
| **Cc:** | Azerad, Robert [RAzerad@lehman.com]; Tonucci, Paolo [paolo.tonucci@lehman.com]; Lowitt, Ian T [ilowitt@lehman.com]; O'Meara, Chris M (NY) [comeara@lehman.com] |
| **To:** | Stucchio, Anthony [astucchi@lehman.com]; Burke, William T [wburke@lehman.com]; Lee, Mark [mark.lee@lehman.com] |
| **From:** | Kelly, Martin [martin.kelly@lehman.com] |
| **Sent:** | Mon 9/22/2008 1:07:32 AM |

Guys - s e c told us we need to do a 15c3 calc for each of the accounts that transfer and those which will not before they are comfortable releasing cushion/surplus to barclays. We agreed with Weil a mechanic to have value transferred to barclays as it frees. When we have the separate calculations done the s e c will permit us to transfer the $1b. Once the ADP break is resolved, the team needs to focus on separate calculations in the next day or so. Let's discuss this in the am. Thx - M

------------------------------



EXHIBIT

173A

8.14.09    9↝

# BCI EXHIBIT

# 280

**To:**      Frelinghuysen, Anson[frelingh@hugheshubbard.com]; Kobak, James
B.[kobak@hugheshubbard.com]
**From:**                 robert.messineo@weil.com
**Sent:**                 Mon 9/22/2008 4:36:10 AM
**Importance:**           High
**Sensitivity:**          None
**Subject:**              LEHMAN -- Barclays
**Categories:**           0x00000000

<u>Current Version - Clarification Letter  #1916861.DOC</u>


        Please see the attached.


Robert L. Messineo
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Telephone = 212-310-8835
Telecopy = 212-833-3862

Confidential

~~WGM Revision of Sept. 21 am (Responding to CGSH Comments of Sept. 20, 2008)~~

# BARCLAYS CAPITAL INC.

As of September 20, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Original Agreement") as amended by the First Amendment thereto dated as of September 19, 2008 (the "First Amendment" and, ~~as~~ the Original Agreement as so amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Original Agreement. This letter agreement (this "Letter") clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respects, and is binding on the parties hereto upon its execution and delivery. <u>All references herein to the Original Agreement are to the conformed copy attached hereto of the hand marked Original Agreement.</u>

      1.      <u>Purchased Assets; Excluded Assets.</u>

      (a)      The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than assets of LBI) except as otherwise specifically provided in the Agreement or this Letter. Purchased Assets shall include:

      (i)      the items set forth in clauses (b), (c) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets" in the Original Agreement;

      (ii)      with respect to clauses (a), (d) and (e) of the definition of "Purchased Assets" in the Original Agreement, instead of the items referred to in such clauses, (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule ~~[A] hereto~~<u>A previously delivered by Seller and accepted by Purchaser</u>, (B) such securities and other assets <u>held in LBI's "074 clearance box" at DTC (as defined below) as of the time of the Closing, which at the close of business on September 21, 2008 were as</u> specified on Schedule ~~[B] as Purchaser may, within 60 days after the Closing elect to~~

Confidential

receive (it being understood~~B~~ previously delivered by Seller and accepted by Purchaser (provided, however, that Purchaser in its discretion may ~~select to receive all or any portion of~~elect within 60 days after the Closing to return any such securities to LBI); provided, that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets and ~~[~~(C) exchange-traded derivatives and collateralized short-term agreements~~]~~;

(iii)     the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA; and

(iv)     all prime brokerage business and accounts and repurchase agreement operations and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business)~~;~~; and

~~(b)     Subject to Paragraphs 2 and 23 of this Letter, Purchased Intellectual Property include Intellectual Property Rights, Software and Technology, wherever in the world held by LBHI or any of its Subsidiaries, that are used primarily in the Business or necessary for the operation of the Business.~~

(v)     any rights Seller may have with respect to any escrow account set up in connection with the Global Research Analyst Settlement entered by the U.S. District Court on October 31, 2003 (the "Research Settlement"), but only to the extent that Purchaser is required to make payments in accordance with the Research Settlement as a result of its acquisition of LBI's investment banking and research operations and is viewed as the "firm" under the Reseach Settlement.

(~~e~~b)     For the avoidance of doubt, the "Business" includes LBI's commodities business, government securities trading operations and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller except as otherwise specified herein or in the Agreement). ~~[Confirm all government securities Barclays expects to get are included in (a)(ii).]~~

(~~d~~c)     The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a), (c) through (j), and (l) through (q) of the definition of "Excluded Assets" in the Original Agreement and the other assets identified in this Letter as Excluded Assets  Except as otherwise specified in the definition of "Purchased Assets," "Excluded Assets" shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries; provided that "Excluded Assets" shall not include (i) any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business, or (ii) cash, cash equivalents, bank deposits or similar cash items ~~maintained by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise, or by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any other person in an account maintained by or on behalf of LBI and for which Purchaser shall become responsible as of the Closing pursuant to the requirements of any such clearing agency or clearing organization~~as provided by Section 8 of the Letter.  The following shall also be Excluded

2

Confidential

Assets:  All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, TBAs and similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement.  Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities.  Included in clause (h) of the definition of "Excluded Assets" in the Original Agreement are life insurance policies owned by Seller and its Subsidiaries.  For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets).  The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller.  Clause (h) of the definition of Excluded Assets in the Original Agreement is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

(d)     Sections 3 and 4 of the First Amendment are hereby deleted in their entirety and shall be of no effect *ab initio*.  LBI hereby instructs Purchaser to pay at the Closing $250 million of the Cash Amount to the Depository Trust Clearance Corporation ("DTC") for deposit as collateral against LBI's obligations to DTC (including its affiliated clearing organizations).  Such collateral account shall be maintained in accordance with such agreement as LBI and DTC may agree upon.

(e)     Seller hereby represents and warrants to Purchaser that as of the Closing and as of the date on which LB I Group Inc. transferred to LBI Townsend Analytics, Ltd. LB I Group Inc. had and will have no material indebtedness or other liabilities.

2.     IMD Business.  For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business).  As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business.  The ~~Business includes the~~ private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") is a Purchased Asset and the Purchased Assets shall include the assets of the Seller used exclusively in the PIM Business ~~but shall not include any other assets used in the PIM Business and also used in the operation of the IMD Business or the~~. The forgivable notes issued by PIM employees to Seller or its Affiliates shall be an Excluded Asset.  Excluded Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.     Assumed and Excluded Liabilities.  Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser and arising after the Closing in connection with the Business.  Clause (d) of the definition of "Assumed Liabilities" in the Original Agreement is understood as though it read as follows:  "accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business (other than accounts payable arising out of or in connection with any Excluded Contract), including, for the avoidance

3

HHR_00001699

of doubt, to the extent arising after such date (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable)." Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities." For the avoidance of doubt, any liabilities of Seller or its Subsidiaries under the $15.8 billion tri-party repurchase facility funded by JP Morgan Chase shall be "Excluded Liabilities."

4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission and, accordingly, the Cash Amount shall be $1,540,000,000 (subject to certain holdback amounts relating to the real estate being transferred pursuant to the Agreement as provided by Section —12.2).

5.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

6.    Subordinated Notes of LBI. The outstanding subordinated notes of LBI are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7.    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    Transfer of Customer Accounts. [Upon the Closing, Purchaser shall assume all of the rights and obligations under LBI's arrangements with the Depository Trust Clearing Corporation and its subsidiaries (the Depository Trust Company, the National Securities Clearing Corporation and the Fixed Income Clearing Corporation), including all settlement obligations and related rights thereunder.] [All customer accounts of LBI (other than customer who are Affiliates of LBI) shall be transferred to Purchaser. In connection therewith, Purchaser shall receive (i) for the account of the customer, any and all property of any customer, or maintained including any held by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business, or (ii) cash, cash equivalents, bank deposits or similar cash items maintained (A) and (ii) to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the

4

HHR_00001700

Securities Exchange Act of ~~1934 or otherwise, or by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any other person in an account maintained by or on behalf of LBI and for which Purchaser shall become responsible as of the Closing pursuant to the requirements of any such clearing agency or clearing organization.]~~1934, as amended, or securities of substantially the same nature.

9.    Deletion of Purchase Price Adjustment and ~~Holdback~~ Provisions.  Section 3.3 of the Original Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*. ~~[Consider any necessary adjustments to Amendment No. 1, including timing of release of $250m as discussed in court].~~

10.    Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract [and except ~~for the deposits~~that LBI shall deliver to Purchaser the securities in the account referred to in Section ~~8 or otherwise provided in the Agreement to be transferred to Purchaser].~~8.  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

11.    Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations between or among any Seller and any of LBHI or any Subsidiary of LBHI.  It is understood that nothing contained in this Letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    Schedule 12.3.  Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.    Barclays Repurchase Agreement.  ~~At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates, from all their respective obligations~~Effective at Closing, (i) all securities and other assets held by Purchaser under the September 18, ~~2008,~~2008 repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "~~"~~Barclays Repurchase Agreement"~~")~~.") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Buyer shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) the Barclays Repurchase Agreement shall terminate. Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void *ab initio* in all respects.

14.    Risk of Loss of Artwork.  During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged

5

HHR_00001701

or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

15.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

16.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the

6

demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.    Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of

7

HHR_00001703

Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    745 Seventh Avenue. The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its AffiliateLW-LLP Inc. will be fully repaid and extinguished.

19.    Prorations. Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules. Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Definition of Excluded Contract. As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    PIM Business Leases.

(a) Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser. Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease. With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

(b) Notwithstanding the foregoing or anything to the contrary contained in Section 22(a) or any other provision of the Agreement, with respect to the PIM Lease for the premises located at 399 Park Avenue, New York, New York (the "New York Property"), the underlying lease shall not be subject to assignment to Purchaser and the Purchaser shall only have the option to require that Seller sublease to Purchaser or its Affiliates the sixth floor of the

8

Confidential

New York Property (or a portion of the sixth floor) (the "NY Sublease Premises"), and Seller agrees to sublease the NY Sublease Premises, subject to the parties' compliance with the terms of the underlying lease including, without limitation, any notice or consent requirements set forth therein. If Purchaser elects to sublease the NY Sublease Premises as provided herein, all of the terms and conditions set forth in this letter agreement applicable to the SF Property shall also apply to the sublease of the NY Sublease Premises.

        23.    <u>No Overseas Assets</u>.  Although LBI has been part of a global business and Purchaser remains interested in potentially acquiring other portions thereof and obtaining the services of the employees thereof, all assets and rights of the Lehman companies <u>that would otherwise be Purchased Assets </u>(other than Seller, 745 and any  Subsidiaries sold pursuant to the Agreement) that ~~have or do come under~~<u>cannot be sold pursuant to Section 2.1 of the Original Agreement as a result of being subject to</u> governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time.  ~~No~~ <u>or until such assets and rights can be so sold.  Except with respect to Purchased Intellectual Property, no</u> assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745 and any  Subsidiaries sold pursuant to the Agreement) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that~~, notwithstanding anything to the contrary contained in Section 13.12 of the Agreement,~~ to the extent any such asset is jointly owned by any such Subsidiary and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

        The representations and warranties of the parties contained in this Letter and in the Agreement shall not survive the Closing.  This Letter shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.  This Letter may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

9

Confidential

Sincerely,

BARCLAYS CAPITAL INC.

By:
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.

By:
Name:
Title:


LEHMAN BROTHERS INC.

By:
Name:
Title:


LB 745 LLC

By:
Name:
Title:


NY2:\1916861\16\15325161\7\15325171.DOC\73683.1037

Confidential                                                          HHR_00001706

Document comparison done by DeltaView on Monday, September 22, 2008 4:28:58 AM

| Input | |
|---|---|
| Document 1 | pcdocs://ny2/1916861/16 |
| Document 2 | pcdocs://ny2/1916861/17 |
| Rendering set | Standard |

| Legend | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics | Count |
|---|---|
| Insertions | 41 |
| Deletions | 35 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 78 |

HHR_00001707

# BCI EXHIBIT

# 281

| | |
|---|---|
| **From:** | Bell, Crayton L. [CBell@milbank.com] |
| **Sent:** | Monday, September 22, 2008 5:26 AM |
| **To:** | Despins, Luc; Fazio, Michael |
| **Cc:** | Kelly, Brian |
| **Subject:** | Lehman/Barclays Clarification Letter: |
| **Attachments:** | Current Version - Clarification Letter_#1916861.DOC |

# Redacted

**From:** david.murgio@weil.com
**To:** Bell, Crayton L.
**Sent:** Mon Sep 22 08:17:22 2008
**Subject:** Re:

We're closed.  Thanks for your help.

David

---

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel:  (212) 310 8764
Fax: (212) 310 8007
e-mail:  david.murgio@weil.com

"Bell, Crayton L." <CBell@milbank.com>                    To <david.murgio@weil.com>
                                                          cc
09/22/2008 08:08 AM                                       Subject

Δ π EXHIBIT 503
Deponent O'Donnell
Date 4/6/010 Rptr. KL
WWW.DEPOBOOK.COM

David,

Can you please email the final clarification letter to me as soon as possible?  Thank you.

===================================================================================

**IRS Circular 230 Disclosure:** U.S. federal tax advice in the foregoing message from Milbank, Tweed,
Hadley & McCloy LLP is not intended or written to be, and cannot be used, by any person for the
purpose of avoiding tax penalties that may be imposed regarding the transactions or matters addressed.
Some of that advice may have been written to support the promotion or marketing of the transactions or
matters addressed within the meaning of IRS Circular 230, in which case you should seek advice based
on your particular circumstances from an independent tax advisor.

1

CONFIDENTIAL                                                                      HLHZ0019919

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

2

                                                                                      HLHZ0019920

# BARCLAYS CAPITAL INC.

As of September 20, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Original Agreement") as amended by the First Amendment thereto dated as of September 19, 2008 (the "First Amendment" and, the Original Agreement as so amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Original Agreement. This letter agreement (this "Letter") clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respects, and is binding on the parties hereto upon its execution and delivery. All references herein to the Original Agreement are to the conformed copy attached hereto of the hand marked Original Agreement.

1.   Purchased Assets; Excluded Assets.

(a)   The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than assets of LBI) except as otherwise specifically provided in the Agreement or this Letter. Purchased Assets shall include:

(i)   the items set forth in clauses (b), (c) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets" in the Original Agreement;

(ii)   with respect to clauses (a), (d) and (e) of the definition of "Purchased Assets" in the Original Agreement, instead of the items referred to in such clauses, (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule A previously delivered by Seller and accepted by Purchaser, (B) such securities and other assets held in LBI's "clearance boxes" as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser (provided, however, that Purchaser in its discretion may

NY2:\1916861\10\1532506!.DOC\73682.1037

1

elect within 60 days after the Closing to return any such securities to LBI); provided, that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets and (C) exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives) and collateralized short-term agreements;

        (iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA; and

        (iv)    all prime brokerage business and accounts and repurchase agreement operations and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business); and

        (v)    any rights or interests Seller may have with respect to any escrow or other account established in connection with the Global Research Analyst Settlement entered by the U.S. District Court on October 31, 2003 (the "Research Settlement"), or funds otherwise set aside for the procurement of independent research pursuant to the Research Settlement, but only to the extent that Purchaser is required to make payments in accordance with the Research Settlement as a result of its acquisition of LBI's investment banking and research operations.

        (b)    For the avoidance of doubt, the "Business" includes LBI's commodities business, government securities trading operations and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller except as otherwise specified herein or in the Agreement).

        (c)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a), (c) through (j), and (l) through (q) of the definition of "Excluded Assets" in the Original Agreement and the other assets identified in this Letter as Excluded Assets. Except as otherwise specified in the definition of "Purchased Assets," "Excluded Assets" shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries; provided that "Excluded Assets" shall not include any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, over-the-counter derivatives, TBA mortgage notes and similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement, and until any securities pledged as collateral under Seller clearing arrangements with JP Morgan Chase & Co. or its Affiliates (other than those referred to in Section 1(a)(ii) of the Letter). Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities. Included in clause (h) of the definition of "Excluded Assets" in the Original Agreement are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The

2

reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Clause (h) of the definition of Excluded Assets in the Original Agreement is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

(d)    Sections 3 and 4 of the First Amendment are hereby deleted in their entirety and shall be of no effect *ab initio*. LBI hereby instructs Purchaser to pay at the Closing $250 million of the Cash Amount to the Depository Trust Clearance Corporation ("DTC") for deposit as collateral against LBI's obligations to DTC (including its affiliated clearing organizations). Such collateral account shall be maintained in accordance with the agreement among LBI, Purchaser and DTC entered into in connection with the Closing.

(e)    Seller hereby represents and warrants to Purchaser that LB I Group Inc. has and had as of the date on which LB I Group Inc. transferred to LBI the equity of Townsend Analytics, Ltd., LB I Group Inc. no indebtedness.

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business. The private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") is a Purchased Asset and the Purchased Assets shall include the assets of the Seller used exclusively in the PIM Business. The forgivable notes issued by PIM employees to Seller or its Affiliates shall be an Excluded Asset. Excluded Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed and Excluded Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser and arising after the Closing in connection with the Business. Clause (d) of the definition of "Assumed Liabilities" in the Original Agreement is understood as though it read as follows: "accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business (other than accounts payable arising out of or in connection with any Excluded Contract), including, for the avoidance of doubt, to the extent arising after such date (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable)." Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities." For the avoidance of doubt, any Liabilities of Seller or its Subsidiaries under the $15.8 billion tri-party repurchase facility dated on or about September 18, 2008 funded by JP Morgan Chase shall be "Excluded Liabilities."

4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission

3

HLHZ0019923

and, accordingly, the Cash Amount shall be $1,540,000,000 (subject to certain holdback amounts relating to the real estate being transferred pursuant to the Agreement as provided by Section 12.2 of the Agreement).

     5.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

     6.    Subordinated Notes of LBI. The outstanding subordinated notes of LBI are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

     7.    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

     8.    Transfer of Customer Accounts. All customer accounts of LBI (other than customer who are Affiliates of LBI) shall be transferred to Purchaser. In connection therewith, Purchaser shall receive (i) for the account of the customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business and (ii) to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value. Liabilities arising under Seller's arrangements with DTC and its affiliated clearing organizations shall be Excluded Liabilities.

     9.    Deletion of Purchase Price Adjustment Provisions. Section 3.3 of the Original Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.

     10.    Payables, Deposits and Receivables. No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract and except as provided in Section 8. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

     11.    Intercompany Obligations. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations

4

                          

between or among any Seller and any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this Letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.    Barclays Repurchase Agreement. Effective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008 repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "Barclays Repurchase Agreement") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Purchaser shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) the Barclays Repurchase Agreement shall terminate. Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void *ab initio* in all respects.

14.    Risk of Loss of Artwork. During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

15.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

16.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

5

CONFIDENTIAL                                                    HLHZ0019925

(b)       With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces.  Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below.  In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the

6

party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.    Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    745 Seventh Avenue. The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of LW-LLP Inc. will be fully repaid and extinguished.

19.    Prorations. Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules. Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

CONFIDENTIAL                                                                              HLHZ0019927

21.    Definition of Excluded Contract. As used in the Agreement, the term
"Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement
and any schedule thereto or supplement or amendment thereto.

22.    PIM Business Leases.

(a) Notwithstanding anything to the contrary contained in the Agreement,
Purchaser shall have a period of ten (10) days following the Closing Date to perform due
diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time
during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume
and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign
such PIM Leases to Purchaser. Upon assignment of a PIM Lease to Purchaser, such PIM Lease
shall become a Transferred Real Property Lease. With respect to any PIM Lease that becomes a
Transferred Real Property Lease, during the nine month period after the Closing Date, to the
extent that Excluded Employees occupied real property subject to such Transferred Real
Property Leases prior to Closing, such Excluded Employees, and a substantially similar number
of new employees of Seller or its Affiliates that may be substituted for any such Excluded
Employees, shall be permitted to occupy and use such real property on the same basis as
provided in Section 8.11(f) of the Agreement.

(b) Notwithstanding the foregoing or anything to the contrary contained in
Section 22(a) or any other provision of the Agreement, with respect to the PIM Lease for the
premises located at 399 Park Avenue, New York, New York (the "New York Property"), the
underlying lease shall not be subject to assignment to Purchaser and the Purchaser shall only
have the option to require that Seller sublease to Purchaser or its Affiliates the sixth floor of the
New York Property (or a portion of the sixth floor) (the "NY Sublease Premises"), and Seller
agrees to sublease the NY Sublease Premises, subject to the parties' compliance with the terms
of the underlying lease including, without limitation, any notice or consent requirements set forth
therein. If Purchaser elects to sublease the NY Sublease Premises as provided herein, all of the
terms and conditions set forth in this letter agreement applicable to the SF Property shall also
apply to the sublease of the NY Sublease Premises.

23.    No Overseas Assets. Although LBI has been part of a global business and
Purchaser remains interested in potentially acquiring other portions thereof and obtaining the
services of the employees thereof, all assets and rights of the Lehman companies that would
otherwise be Purchased Assets (other than Seller, 745 and any Subsidiaries sold pursuant to the
Original Agreement or the Letter) that cannot be sold pursuant to Section 2.1 of the Original
Agreement as a result of being subject to governmental conservatorship or administration shall
be considered "Excluded Assets," except as notified by the administrator to LBI from time to
time or until such assets and rights can be so sold. Except with respect to Purchased Intellectual
Property, no assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745
and any Subsidiaries sold pursuant to the Original Agreement or the Letter) organized under the
laws of a jurisdiction other than the United States of America or a state thereof are included
among the Purchased Assets; provided, however, that to the extent any such asset is jointly
owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of
the Business, Seller and Purchaser shall each use its commercially reasonable efforts to cause
such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit

8

Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

The representations and warranties of the parties contained in this Letter and in the Agreement shall not survive the Closing. This Letter shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This Letter may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

9

CONFIDENTIAL

HLHZ0019929

Sincerely,

BARCLAYS CAPITAL INC.

By: _____

Name:

Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name:

Title:

LEHMAN BROTHERS INC.

By: _____

Name:

Title:

LB 745 LLC

By: _____

Name:

Title:

NY2:\1916861\18\15325181.DOC\73683.1037

# BCI EXHIBIT

# 282



David Murgio/NY/WGM/US        To  mmazzuchi@cgsh.com
09/22/2008 05:58 AM           cc  mmazzuchi@cgsh.com
                             bcc
                         Subject  Re: clarification letter 

Current Version - Clarification Letter_#1916361.DOC

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel:  (212) 310 8764
Fax: (212) 310 8007
e-mail:  david.murgio@weil.com

"Michael A Mazzuchi" <mmazzuchi@cgsh.com>



"Michael A Mazzuchi"           To  david.murgio@weil.com
<mmazzuchi@cgsh.com>
Sent by: "Michael A            cc
MAZZUCHI"                  Subject  clarification letter
<mmazzuchi@cgsh.com>

09/22/2008 04:52 AM

Could I get an electronic copy asap so I can send it to DTC?  thanks

Michael A. Mazzuchi
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
t: +1 202 974 1572 | f: +1 202 974 1999
www.clearygottlieb.com | mmazzuchi@cgsh.com

This message is being sent from a law firm and may contain
confidential or privileged information.  If you are not
the intended recipient, please advise the sender
immediately by reply e-mail and delete this message and
any attachments without retaining a copy.

WGM-LEHMAN-E 00011083

**BARCLAYS CAPITAL INC.**

As of September 20, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Original Agreement") as amended by the First Amendment thereto dated as of September 19, 2008 (the "First Amendment" and, the Original Agreement as so amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Original Agreement. This letter agreement (this "Letter") clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respects, and is binding on the parties hereto upon its execution and delivery. All references herein to the Original Agreement are to the conformed copy attached hereto of the hand marked Original Agreement.

      1.     Purchased Assets; Excluded Assets.

      (a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than assets of LBI) except as otherwise specifically provided in the Agreement or this Letter. Purchased Assets shall include:

      (i)    the items set forth in clauses (b), (c) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets" in the Original Agreement;

      (ii)    with respect to clauses (a), (d) and (e) of the definition of "Purchased Assets" in the Original Agreement, instead of the items referred to in such clauses, (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule A previously delivered by Seller and accepted by Purchaser, (B) such securities and other assets held in LBI's "clearance boxes" as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser (provided, however, that Purchaser in its discretion may

1

WGM-LEHMAN-E 00011084

elect within 60 days after the Closing to return any such securities to LBI); provided, that
no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than
as specified in the Agreement or clause (iii) below) are Purchased Assets and (C)
exchange-traded derivatives and collateralized short-term agreements;

   (iii) the equity of Lehman Brothers Canada, Inc., Lehman Brothers
Sudamerica SA and Lehman Brothers Uruguay SA; and

   (iv) all prime brokerage business and accounts and repurchase
agreement operations and securities lending operations of the Business (for the avoidance
of doubt, other than those that are part of the IMD Business); and

   (v) any rights or interests Seller may have with respect to any escrow
or other account established in connection with the Global Research Analyst Settlement
entered by the U.S. District Court on October 31, 2003 (the "Research Settlement"), or
funds otherwise set aside for the procurement of independent research pursuant to the
Research Settlement, but only to the extent that Purchaser is required to make payments
in accordance with the Research Settlement as a result of its acquisition of LBI's
investment banking and research operations.

   (b) For the avoidance of doubt, the "Business" includes LBI's
commodities business, government securities trading operations and mortgage-backed
securities trading operations of LBI (but not any securities of such nature held by Seller
except as otherwise specified herein or in the Agreement).

   (c) The Excluded Assets shall mean the assets of Seller and its
Subsidiaries referred to in clauses (a), (c) through (j), and (l) through (q) of the definition
of "Excluded Assets" in the Original Agreement and the other assets identified in this
Letter as Excluded Assets  Except as otherwise specified in the definition of "Purchased
Assets," "Excluded Assets" shall include any cash, cash equivalents, bank deposits or
similar cash items of Seller and its Subsidiaries; provided that "Excluded Assets" shall
not include any and all property of any customer, or maintained by or on behalf of LBI to
secure the obligations of any customer, whose account(s) are being transferred to
Purchaser as part of the Business.  The following shall also be Excluded Assets: All of
the investments held by Seller or their Subsidiaries in collateralized debt obligations,
collateralized loan obligations, over-the-counter derivatives, TBA mortgage notes and
similar asset-backed securities and corporate loans, other than those subject to the
Barclays Repurchase Agreement, and until any securities pledged as collateral under
Seller clearing arrangements with JP Morgan Chase & Co. or its Affiliates (other than
those referred to in Section 1(a)(ii) of the Letter).  Also included in the Excluded Assets
are the mortgage servicing rights for Ginnie Mae guaranteed securities.  Included in
clause (h) of the definition of "Excluded Assets" in the Original Agreement are life
insurance policies owned by Seller and its Subsidiaries.  For the avoidance of doubt, the
equity interests and assets of Lehman Brothers Commodity Services, Inc., including the
equity of, as well as the assets of the energy marketing and services business of Eagle
Energy Management LLC, are Excluded Assets (rather than Purchased Assets).  The
reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes

2

WGM-LEHMAN-E 00011085

any person, including Affiliates of Seller. Clause (h) of the definition of Excluded Assets in the Original Agreement is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

(d)    Sections 3 and 4 of the First Amendment are hereby deleted in their entirety and shall be of no effect *ab initio*. LBI hereby instructs Purchaser to pay at the Closing $250 million of the Cash Amount to the Depository Trust Clearance Corporation ("DTC") for deposit as collateral against LBI's obligations to DTC (including its affiliated clearing organizations). Such collateral account shall be maintained in accordance with the agreement among LBI, Purchaser and DTC entered into in connection with the Closing.

(e)    Seller hereby represents and warrants to Purchaser that LB I Group Inc has and had as of the date on which LB I Group Inc. transferred to LBI the equity of Townsend Analytics, Ltd., LB I Group Inc. no material indebtedness.

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business. The private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") is a Purchased Asset and the Purchased Assets shall include the assets of the Seller used exclusively in the PIM Business. The forgivable notes issued by PIM employees to Seller or its Affiliates shall be an Excluded Asset. Excluded Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed and Excluded Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser and arising after the Closing in connection with the Business. Clause (d) of the definition of "Assumed Liabilities" in the Original Agreement is understood as though it read as follows: "accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business (other than accounts payable arising out of or in connection with any Excluded Contract), including, for the avoidance of doubt, to the extent arising after such date (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable)." Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities." For the avoidance of doubt, any Liabilities of Seller or its Subsidiaries under the $15.8 billion tri-party repurchase facility dated on or about September 18, 2008 funded by JP Morgan Chase shall be "Excluded Liabilities."

4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission and, accordingly, the Cash Amount shall be $1,540,000,000 (subject to certain holdback amounts

3

relating to the real estate being transferred pursuant to the Agreement as provided by Section 12.2 of the Agreement).

    5. License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

    6. Subordinated Notes of LBI. The outstanding subordinated notes of LBI are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

    7. Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

    8. Transfer of Customer Accounts. All customer accounts of LBI (other than customer who are Affiliates of LBI) shall be transferred to Purchaser. In connection therewith, Purchaser shall receive (i) for the account of the customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business and (ii) to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value. Liabilities arising under Seller's arrangements with DTC and its affiliated clearing organizations shall be Excluded Liabilities.

    9. Deletion of Purchase Price Adjustment Provisions. Section 3.3 of the Original Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.

    10. Payables, Deposits and Receivables. No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract and except as provided in Section 8. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

    11. Intercompany Obligations. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations between or among any Seller and any of LBHI or any Subsidiary of LBHI. It is understood that

4

WGM-LEHMAN-E 00011087

nothing contained in this Letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.    Barclays Repurchase Agreement. Effective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008 repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "Barclays Repurchase Agreement") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Purchaser shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) the Barclays Repurchase Agreement shall terminate. Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void *ab initio* in all respects.

14.    Risk of Loss of Artwork. During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

15.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

16.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

WGM-LEHMAN-E 00011088

(b)     With respect to each Sublease Property, Seller and Purchaser shall, within
a commercially reasonable period of time following the Closing Date, negotiate in good
faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to
both Purchaser and Seller and subject to the terms of the applicable underlying lease,
pursuant to which a portion of the demised premises under such underlying lease (such
portion of the premises to be agreed upon by the parties) shall be subleased to (A) with
respect to the SF Property, the Purchaser, and (B) with respect to the LA Property,
Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of
Seller) or any person who purchases the IMD Business (provided that any such purchaser
entering into the sublease agreement as a subtenant shall be reasonably acceptable to the
Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and
the tenant under such sublease being referred to as the "Subtenant"), in each case, upon
such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided
that (1) the Subtenant shall pay rent and other charges under such sublease agreement
equal to its proportionate share of the rent and other charges payable by the Sublandlord
to the landlord under the underlying lease (which proportionate share shall be based upon
the relative square footage of the subleased space in proportion to the square footage of
the overall demised space under the underlying lease), (2) the term of the sublease
agreement shall be a period commencing on the Closing Date and ending on the day
immediately preceding the expiration date of the underlying lease (as the same may be
extended pursuant to the terms of the underlying lease), (3) any alterations or
modifications which the Sublandlord and Subtenant mutually agree need to be made to
the demised premises in order to segregate the subleased space from the remainder of the
demised premises under the underlying lease shall be performed by the Sublandlord and
the cost thereof (including the cost of any plans and specifications, drawings, permits,
licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and
Subtenant in proportion to the square footage of their respective spaces.  Prior to the
execution and delivery of the sublease agreement for a particular Sublease Property,
subject to reasonable premises security procedures and giving due regard to regulatory
considerations (e.g., segregation) including the right to relocate such employees within
the applicable premises, and for a commercially reasonable period after the Closing Date,
(i) with respect to the SF Property, to the extent that Transferred Employees occupied any
portion of the SF Property prior to Closing, such Transferred Employees shall be
permitted to continue to occupy and use the SF Property to the same extent and for the
same purposes as the SF Property was occupied by such Transferred Employees prior to
the Closing; provided, that the foregoing shall be subject to Purchaser's ability to
substitute a substantially similar number of new employees of Purchaser for any such
Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each
Sublease Property other than the SF Property, to the extent that Excluded Employees
occupied any portion of such Sublease Property prior to Closing, such Excluded
Employees shall be permitted to continue to occupy and use such Sublease Property to
the same extent and for the same purposes as such Sublease Property was occupied by
such Excluded Employees prior to the Closing; provided, that the foregoing shall be
subject to Seller's ability to substitute a substantially similar number of new employees
of Seller for any such Excluded Employees as provided in Paragraph 18 below.  In each
case described in clauses (i) and (ii) above, no rent or other payments shall be made to the
party which is the tenant under the underlying lease until execution and delivery of the

6

WGM-LEHMAN-E 00011089

applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.    Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of LW-LLP Inc. will be fully repaid and extinguished.

19.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

WGM-LEHMAN-E 00011090

21.    Definition of Excluded Contract. As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    PIM Business Leases.

(a) Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser. Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease. With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

(b) Notwithstanding the foregoing or anything to the contrary contained in Section 22(a) or any other provision of the Agreement, with respect to the PIM Lease for the premises located at 399 Park Avenue, New York, New York (the "New York Property"), the underlying lease shall not be subject to assignment to Purchaser and the Purchaser shall only have the option to require that Seller sublease to Purchaser or its Affiliates the sixth floor of the New York Property (or a portion of the sixth floor) (the "NY Sublease Premises"), and Seller agrees to sublease the NY Sublease Premises, subject to the parties' compliance with the terms of the underlying lease including, without limitation, any notice or consent requirements set forth therein. If Purchaser elects to sublease the NY Sublease Premises as provided herein, all of the terms and conditions set forth in this letter agreement applicable to the SF Property shall also apply to the sublease of the NY Sublease Premises.

23.    No Overseas Assets. Although LBI has been part of a global business and Purchaser remains interested in potentially acquiring other portions thereof and obtaining the services of the employees thereof, all assets and rights of the Lehman companies that would otherwise be Purchased Assets (other than Seller, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) that cannot be sold pursuant to Section 2.1 of the Original Agreement as a result of being subject to governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time or until such assets and rights can be so sold. Except with respect to Purchased Intellectual Property, no assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall each use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit

8

WGM-LEHMAN-E 00011091

Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

The representations and warranties of the parties contained in this Letter and in the Agreement shall not survive the Closing. This Letter shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This Letter may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

9

WGM-LEHMAN-E 00011092

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:


NY2\1916861\18\15325181.DOC\73683.1037

WGM-LEHMAN-E 00011093