# BCI EXHIBIT

# 339

**Contains Highly Confidential Information**

# Expert Report on Compensation Issues

## In Re: Lehman Brothers Holdings, Inc., et al., Debtors

## and

## In Re: Lehman Brothers, Inc., Debtor

### Alan M. Johnson

### January 8, 2010

#### CONTAINS HIGHLY CONFIDENTIAL INFORMATION

**Contains Highly Confidential Information**

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Introduction |  | 2 |
| Qualifications |  | 2 |
| Documents Reviewed |  | 3 |
| I. | Summary of Conclusions | 3 |
| II. | Market Compensation Context | 4 |
|  | A. The 2008 Financial Crisis Was Unprecedented In Modern Times | 4 |
|  | B. Compensation Market Practice | 4 |
|  | C. Assessment Methodology | 5 |
| III. | Executive Compensation Issues | 6 |
|  | A. Market Practice On Executive Treatment | 6 |
|  | B. Reasonable Expectations | 7 |
|  | C. Barclays' Treatment Of Key Lehman Brothers' Executives (i.e. Barclays' General Compensation Formula) | 9 |
|  | D. Analyses for Executive Compensation | 10 |
| IV. | Aggregate Compensation Spend | 10 |
| V. | Conclusion | 12 |
| Appendix A: Curriculum Vitae |  | 13 |
| Appendix B: 2008 Agreements of Top 9 vs. Template and 2008 Agreements of Other Executives vs. Template |  | 14 |
| Appendix C: Multi-Year Bonus (Cash and Equity) Agreements for Executives |  | 17 |
| Appendix D: Other Transactions – Executive Compensation Treatment Summary |  | 18 |
| Appendix E: Key Employees Employment Agreement Termination Provisions |  | 20 |
| Appendix F: Aggregate Compensation Spend Build Up |  | 21 |
| Appendix G: Documents Reviewed |  | 23 |

**Contains Highly Confidential Information**

## Introduction

I have been retained in this matter to analyze Barclays Capital Inc.'s ("Barclays") retention in 2008 of key Lehman Brothers' executives under the circumstances of Barclays' acquisition of Lehman Brothers' North American broker dealer business ("LBI" or the "Business") (collectively, the "Barclays/LBI transaction"). This expert report discusses market practice for treatment of executives considered key to the success of a business during an acquisition such as the Barclays/LBI transaction, including how compensation packages are determined. Additionally, this report discusses the market norm for the elements of compensation and assesses the aggregate compensation spend by Barclays for former Lehman Brothers' employees. This report also considers the unusual/emergency circumstances in the finance industry at the time of the Barclays/LBI transaction.

My firm, Johnson Associates, was the designated compensation consultant to the compensation committee of LBI's parent company, Lehman Brothers Holdings Inc., from 2004–2008, but not at the time of the Barclays/LBI transaction. Although I, and others at my firm, are knowledgeable about Lehman Brothers Holdings Inc. and its compensation practices, we had no involvement in the Barclays/LBI transaction. Neither I, nor anyone at my firm, is using any confidential information for this report that we learned as a result of having advised Lehman Brothers Holdings Inc.

## Qualifications

I am an executive compensation consultant, and my firm, Johnson Associates, is a prominent boutique compensation consulting firm. My firm specializes in analyzing and advising the financial services industry, including major investment and commercial banks, insurance companies, asset management firms, hedge funds and other alternatives, and brokerage firms.

I have devoted my entire career to executive compensation consulting work. Prior to founding my own firm in 1992, I was a consultant at several of the leading compensation advisory firms in the country, including Hewitt Associates (consultant 1980-1983), Sibson & Company (principal 1983-86), Frederick W. Cook & Co. (partner/shareholder 1986-1989), Handy Associates (Managing Director 1989-1990), and GKR (Managing Director 1990-1992).

I have extensive experience with a wide range of executive compensation issues and am familiar with all facets of executive compensation. I have consulted on compensation practices in the financial services industry for many years and I am commonly quoted in the press regarding compensation issues in the financial services industry and across the broader economy. Most of my engagements are confidential so I will not list them here, but clients have included many of the world's most significant financial institutions and numerous prominent executives. My work has included the following:

- Analyzing compensation issues for acquisitions and troubled situations.

**Contains Highly Confidential Information**

- Designing annual and long-term incentive compensation programs and analysis of the impact of such programs on management behavior and performance.

- Consulting major financial firms and executives on total compensation programs, employment and severance agreements, and contracts governing change in control provisions.

- Providing advice regarding compensation aspects of mergers and acquisitions, public offerings, LBO transactions, recapitalizations, and restructurings.

- Reviewing practices and intentions of firms across business cycles and the entry/exit of firms from the financial services space.

- Participating frequently in compensation conferences and executive compensation programs.

- Serving as an expert witness in various cases involving executive compensation.

I attended the U.S. Naval Academy from 1973-1975, received a B.A. in History and Economics from the University of Florida in 1977, studied Economics at the graduate level at the University of Virginia, and obtained an M.B.A. in Finance from the University of Chicago in 1980.

A copy of my curriculum vitae is attached at Appendix A.

## Documents Reviewed

I reviewed extensive case materials, documents, and depositions relating to this litigation to prepare this report. I also relied on my significant experience in the executive compensation and financial services industry. I reserve the right to supplement or amend my opinions in response to new information or analyses.

## I.    Summary of Conclusions

Having considered extensive case materials, documents and depositions relating to this litigation, certain facts regarding the compensation and titles of various former LBI employees provided to me by counsel that I was asked to accept as true, and my own experience in the executive compensation industry, it is my opinion that it was both reasonable and necessary under the circumstances of the Barclays/LBI transaction for Barclays to make offers to the top Lehman Brothers' executives - some of whom are alleged to have been involved in negotiating the transaction - before closing in order to preserve the value of the Business. The amount and the timing of those offers were reasonable and to be expected.

There is nothing about the oral or written offers that suggests anything other than a business need on the part of Barclays to retain the top talent at LBI so as to purchase the Business without it disintegrating. Rival firms would have had the opportunity to poach the top talent from

**Contains Highly Confidential Information**

LBI at the time of the Barclays/LBI transaction and that fact created a serious business risk to Barclays in its acquisition of LBI. In fact, it would have run counter to best market practice for Barclays to fail to attempt to sign up the top Lehman Brothers' executives as quickly as possible in order to keep the Business intact.

There is nothing about the oral or written offers that suggests bad faith. The employment agreements I reviewed, as a group, reflect the economics and variations that would have been expected at the time. Said another way, the agreements were consistent with those found in the marketplace at that point in time, and consistent with Barclays' need to ensure that the talent needed to run the business it was buying would stay.

It is also my expert opinion based on industry standards that the estimate for "Comp" set forth in the financial schedule referenced by the Asset Purchase Agreement would be understood by compensation professionals to include multiple elements, such as cash bonus, deferred equity, severance, social tax, special awards, replacement awards, other future payable awards, and payroll taxes typically expected in the industry. Further, I find that the $2 Billion estimate for "Comp" was not unreasonable at that time or under the circumstances of this transaction.

## II.    Market Compensation Context

The compensation aspects of this transaction cannot be fairly evaluated without recognizing the extraordinary circumstances that existed at the time of the Barclays/LBI transaction in September 2008, not the least of which was the high degree of uncertainty in the financial industry.

### A.    The 2008 Financial Crisis Was Unprecedented In Modern Times

The 2008 financial crisis was an important consideration in my report. The crisis resulted in the demise of Bear Stearns and Lehman Brothers, and the severe wounding of many major financial firms both in the U.S. and globally, including Citibank, Morgan Stanley, Bank of America, and Merrill Lynch.

This report considers those extreme circumstances and perspectives that formed the atmosphere in which the Barclays/LBI transaction took place. Industry and compensation norms have evolved rapidly since the Barclays/LBI transaction and a number of proposals have been put forth since that time regarding how compensation should operate going forward. This report focuses on industry compensation practices and perspectives in place in September 2008, however, not on currently evolving ideas or future concepts.

### B.    Compensation Market Practice

Compensation is of significant importance to executives in the high-end financial services industry (the "Industry"). A primary reason why many employees work in the Industry is the opportunity to earn high compensation vis-à-vis other industries and careers. The Industry is demanding and competitive, often characterized by short-careers in which to accumulate savings and prepare for post-Industry employment.

**Contains Highly Confidential Information**

Employee compensation is by far the most significant cost for most Industry firms; it commonly consumes approximately 50% of total net revenue. The bulk of total annual compensation (often 70% - 95%) for most executives is delivered in a discretionary, year-end bonus comprised of an immediate cash payment and a deferred compensation award, which usually includes, or is entirely composed of, firm equity (e.g., restricted stock, stock options).

## C.    Assessment Methodology

In reaching my opinions, I considered the following important market issues:

The Barclays/LBI transaction occurred near the end of 2008. The fact that the transaction was near the end of the calendar year placed immense pressure on Barclays to make compensation commitments to LBI and to its employees regarding year-end 2008 bonuses. The stress and uncertainty in the financial markets only increased these pressures on Barclays.

Even if LBI had not required Barclays to commit to retaining their employees and paying 2008 year-end bonuses as a condition of the transaction, Lehman Brothers' employees generally would have wanted assurances they would be paid competitive bonuses for 2008 and competitive salaries/bonuses going forward. Lehman Brothers' executives, in particular, would have been looking to Barclays for competitive compensation and career commitments to keep them from looking elsewhere, especially considering the fact that Barclays was not as well known as LBI in the United States.

The labor market opportunities for financial service professionals had been generally robust in 2005-2007, with a weakening in 2008. In September 2008, however, there was not yet a clear indication of how difficult the market would become by the first quarter of 2009. In September 2008, the prevailing view in the Industry was that the labor market would be better than it turned out to be. The firms deciding what compensation to offer and the professionals deciding what compensation to demand or accept both made decisions according to that prevailing view. Firms believed they had greater retention needs, and professionals thought more opportunities would be available over the next 3-6 months.

Barclays' efforts to quickly retain key Lehman Brothers' employees with market-competitive compensation offers before they entered the labor market would have been viewed as standard market practice. Industry firms consider both their own financial results (e.g., profitability, ability to pay) and the anticipated actions of relevant competitors in determining annual total compensation levels and the mix of cash vs. deferred stock in bonus payments. There is a clear, long-standing view in the Industry that a firm has limited flexibility to vary from competitive norms without endangering its ability to retain and recruit talent.

**Contains Highly Confidential Information**

## III.    Executive Compensation Issues

### A.    Market Practice On Executive Treatment

It is generally considered important to retain key senior executives when acquiring a financial services firm such as LBI. Senior executives must be committed to the business and not spend major efforts developing their next career. The criticality of this issue is heavily dependent on the particular facts and circumstances. I believe the facts of the Barclays/LBI transaction suggest that a heavier than normal weight on retaining key senior executives was appropriate for the reasons I explain further below.

The executives considered "key" to a company may vary depending on the nature of the transaction and the companies involved. Barclays had a relatively small U.S. presence compared to the Lehman Brothers' businesses and therefore required the immediate retention of a team of local managers in the U.S. to run the Business in the short-to-intermediate term. In addition, LBI was heavily dependent on certain professional skills to operate, which Barclays did not necessarily have immediate access to in the United States. Barclays did not have a large retail branch system, brokerage business, conventional lending, or other businesses in the U.S. from which to draw specific professional skills that would have reduced its dependence on LBI's senior talent.

The Barclays/LBI transaction's timing in relation to hiring season in the Industry did not permit Barclays to be passive about retaining key talent. The typical Industry hiring season begins in January-February and, as stated above, Industry expectations at the time of the Barclays/LBI transaction were that there would be a reasonable labor market in early 2009 for executives. Therefore, both Barclays and Lehman Brothers' employees expected that rival firms would have the opportunity and incentive to poach top Lehman Brothers' talent in late 2008. It would have been poor market practice for Barclays to ignore this reality and sit idly by while key executives were approached by and tempted to accept offers at other firms, as some testified they were. Barclays simply could not abstain from or timidly approach retention of key executives without creating a serious risk to keeping the Business intact. Additionally, if Barclays did not act to retain Lehman Brothers' key executives critical to the Business, the Business could have dissipated due to the lack of institutional knowledge and the potential exodus of clients and other Lehman Brothers' professionals.

These concerns were only magnified by the 2008 financial crisis. Industry financials were in disarray, and historical financials and patterns could not be relied upon due to the difficulty of fairly valuing illiquid assets. LBI's parent company, Lehman Brothers Holdings Inc., had filed for bankruptcy, a SIPA proceeding was in process for LBI, and LBIE had entered into the equivalent of bankruptcy proceedings in the United Kingdom. Barclays needed employees with specific and immediate knowledge of LBI's business challenges to succeed in taking over the Business. Market perceptions were that turnover was high and it was unclear at the time of the Barclays/LBI transaction whether a firm such as LBI, which was dependent on the skills of senior professionals, could be kept together under such stressed conditions. Market perceptions regarding the Bear Stearns/J.P. Morgan transaction, which had occurred a few months prior to the Barclays/LBI transaction, had not been positive in terms of the approach to retention of professionals by the acquirer. All of those circumstances created tremendous uncertainty for Barclays surrounding

**Contains Highly Confidential Information**

survival of the Business overall, including maintaining its clients, relationships, and employees. Any acquirer of LBI would have an even greater need in these conditions to retain key employees to preserve continuity with clients and employees.

**B.    Reasonable Expectations**

It was reasonable for Barclays under the circumstances present in September 2008, some of which I outline above, to demand as a condition of the transaction the continued involvement of a small group (i.e., 8 or 9 key executives) and 70% of the top 200 Lehman Brothers' employees. It was also reasonable for Barclays to provide immediate, competitive compensation assurances to key senior employees so that those individuals remained focused on the success of the Business and did not look for jobs elsewhere.

Barclays was negotiating to buy a business whose key assets are its personnel. If Barclays could not be assured that those key assets would remain part of what it was buying, it would have had good reason to reconsider its willingness to engage in the transaction. As explained above, Barclays needed to have a team of leaders that could provide perspectives, guidance and institutional knowledge over the short-to-intermediate term. Executives in the positions held by the top eight or nine Lehman Brothers' individuals[1] would ordinarily have been viewed in the market as the types of executives most likely able to provide that leadership and services to Barclays. In addition, senior financial executives who receive offers from a new employer generally want to know before committing to the new employer if key members of their team, or other key professionals, will receive offers as well. Therefore, it is common for the number of commitments and contracts to expand somewhat in order to address these concerns.

The reasonableness of retaining select key senior executives was heightened because the visible, long-standing historical leader of Lehman Brothers, Richard Fuld, would not be going to Barclays. Mr. Fuld had been the only chief executive officer of Lehman Brothers Holdings Inc. since it went public in 1994. Moreover, there had been an exodus of senior management and a public feud concerning control of Lehman Brothers Holdings Inc. earlier in 2008. Several long-term key Lehman Brothers' executives had been pushed out over business disputes during that time. Therefore, it was even more critical than in a normal acquisition for Barclays to retain other key Lehman Brothers' executives so as to suggest some degree of Business leadership continuity to Lehman Brothers' employees, clients, and the public.

As to the specific facts involved during the week of the Barclays/LBI transaction negotiations, it is my understanding that there were up to 9 key executives that Barclays considered to be critically important to retain with the firm because they were generally the heads of the relevant businesses that Barclays was focused on, and one was LBI President Bart McDade. Barclays drew up proposed contracts early that week for those 9 executives (*see* Deposition Exhibit 101). However, it is my understanding that Barclays was told by counsel for LBI not to discuss an offer with Bart McDade, and therefore Barclays did not pursue such discussions with

---

[1] President, COO (Mr. McDade), Co-Heads of Fixed Income (Mr. Felder, Mr. Lee), CFO (Mr. Lowitt), Head of U.S. Equities (Mr. Donini), Managing Director and Head of Investment Banking (Mr. McGee), Senior Manager of Equity Administration (Mr. Nagpal), Head of Capital Markets (Mr. Gelband), Senior Manager of Fixed Income Administration (Mr. Humphrey).

**Contains Highly Confidential Information**

him.  Two of the other executives signed contracts prior to closing (Mr. Felder and Mr. Lowitt), but some did not sign agreements until after the closing (Messrs. Donini, Humphrey, Hyung, McGee, and Nagpal), and two did not sign agreements at all (Mr. McDade and Mr. Gelband).[2]  Some of those key executives had conversations with Barclays about their teams coming prior to closing as well.  For example, according to Mr. Tonucci's deposition, Mr. Lowitt approached Mr. Tonucci on September 19th about coming to Barclays.  This suggests that Mr. Lowitt may have discussed with key members of his team the likelihood that they would be assured employment.  This was reasonable and to be expected because the nature of LBI's business was one where Barclays had to preserve human capital immediately with competitive, aggressive offers or executives would leave quickly.  Given the competitiveness of the Industry and the high level of these key executives, it is not surprising that it took several weeks to negotiate many of the contracts.  I also have reviewed the specific offers made to the key individuals.  Some were a little higher than 2007, some were a little lower, and there were an expected number of outliers.  This distribution is predictable due to different negotiating tactics, changing market values of some executives from 2007, and the role they would play at Barclays.  The ultimate offers for these key executives were reasonable in amount and timing.

It is common in similar situations (both typical acquisitions and crisis environment acquisitions) to have compensation discussions with key senior executives prior to closing a deal, even if they are part of the team negotiating the deal, as part of the due diligence process.  The form and degree of those conversations will vary with the facts of the transaction.

I believe the relevant facts in the Barclays/LBI transaction necessitated an explicit, focused set of conversations and agreements.

Time was remarkably short for Barclays.  Barclays did not have time to establish relationships and start with broad, general conversations with the key employees it needed to retain.  Although there was uncertainty for Barclays surrounding the Barclays/LBI transaction, it is important to note that the Lehman Brothers senior executives would *not* have been uncertain about their personal market value to Barclays.  Barclays did not have as well known a brand in the U.S. as Lehman Brothers, a fact that was undoubtedly important to Lehman Brothers' executives.  At that time, there was no reason for Lehman Brothers' professionals to necessarily understand or believe that Barclays would provide compensation on a scale that Lehman Brothers' executives expected or that was competitive with U.S. market norms.  LBI's key U.S. competitors (e.g., Goldman Sachs, Citigroup) were unquestionably approaching senior Lehman Brothers' executives about jobs, as would be expected and is referenced in deposition testimony.  Lehman Brothers senior executives would have felt justified in demanding to be compensated by Barclays above and beyond what they would expect from Goldman or the like because they could view it as risky to come to Barclays.  These are not theoretical concerns, as is evidenced by the fact that an important Lehman Brothers' executive, Mark Shafir, a Managing Director and Co-Head of M & A, left for Citigroup in the middle of negotiations.  In addition, loyalty can be a strong motivator in the Industry and Barclays had to consider the fact that encouraging these top executives to come would likely mean that their teams would agree to come as well.  These facts show that it was reasonable and necessary for serious personal compensation discussions, not to mention actual

---

[2] Mr. McDade did join Barclays briefly and solely in order to assist with the transition.  He did not sign a contract and received only a base salary identical to his base salary at LBI.

Contains Highly Confidential Information

agreements or understandings, to occur between key Lehman Brothers' executives and Barclays prior to the close of the Barclays/LBI transaction. Barclays would not have had the certainty it needed to close the deal without such negotiations and agreements.

Experienced advisors and counsel to LBI and Barclays would have anticipated and expected the existence of such discussions. For example, the existence of similar discussions was explicitly mentioned in the J.P. Morgan/Bear Stearns and Bank of America/Merrill Lynch SEC filings, similar to the LBHI 8K. The discussions that occurred in those deals were similar in nature to the discussions that occurred in the Barclays/LBI transaction and, occurred pre-closing as well. (*See* Appendix D for executive retention language in their respective SEC filings filed pre-closing.)

It is common market practice and expected that the timing and content of agreements with executives will vary depending on individual circumstances. Some are, by nature, more trusting. Some may have client relationships or expertise with clear market value. Some have significant net worth. Since every executive is different, each requires a differing degree of negotiation to reach a compensation agreement. While contracts and agreements are often put in place prior to acquisition for select senior executives in firms being acquired, as they were in this case, it is almost universally true that those same executives have input into the content of their agreements and, thus, not all contracts are signed prior to the acquisition being completed.

## C.   Barclays' Treatment Of Key Lehman Brothers' Executives (i.e. Barclays' General Compensation Formula)

An important reasonableness test as to the amount of the offers is whether the final agreements reflect market norms for similar positions. Market norms are observed because there is an assumption in the market that a market-based agreement provides no obvious incentive to deviate from appropriate behavior by either side. My understanding is that Barclays' general compensation formula/model (the "Template") was used as an internal reference point and estimated the pool requirement for 75% of 2007 total compensation for 175-200 employees for 2008 and an additional median of 35% of 2007 total compensation, with significant variations, paid over two years as a retention payment. This was consistent with market practice at the time of the Barclays/LBI transaction.

Since Barclays' Template applied to a population level comprised of roughly the top 200 executives (i.e., not to individuals specifically), variation from the Template among individuals at the senior range of that level would be expected. Importantly, based on other transactions and situations I have observed over my career, it would be expected that some senior executives would receive better treatment than the Template would dictate. (*See* Appendix D for examples of other such transactions in the Industry.) These senior executives would be likely to receive higher compensation due to their symbolic importance in persuading other key executives to remain with the firm, role changes, or due to their negotiating leverage. As a general matter, the Barclays' agreements with Lehman Brothers' employees that I reviewed followed a consistent pattern. I specifically reviewed the compensation packages offered to members of the group of the top 9 key employees, to additional top level executives identified by either Lehman Brothers Holdings Inc. Debtor or the Official Committee of Unsecured Creditors filings as allegedly having been

Contains Highly Confidential Information

involved in negotiation of the LBI/Barclays transaction, and other representative senior executives. Those individuals were generally given offers at, or below (about 15% - 20%), their 2007 compensation. There were some expected exceptions to that trend, since, as I mentioned previously, executives negotiate with different personal characteristics, different market value, and different strategies. (*See* Appendix B for comparison of numbers for senior executives' 2007 compensation vs. Template compensation vs. actual compensation in Barclays' agreements.)

**D.    Analyses For Executive Compensation**

The following support the summary conclusions expressed here:

1)    The Template for Lehman Brothers' top 200 employees had 75% of 2007 total compensation as the reference point, with an additional median of 35% of 2007 total compensation, with significant variations, earned for continuing employment over 2010-2011. Differences likely reflect criticality to business vis-à-vis other professionals, role changes, and negotiation skills. Normally, I would expect key executives to be paid relatively better than the remainder of top 200 executives and other employees generally. (*See* Appendix B.)

2)    There were a moderate number of compensation agreements for 2009 among all the senior executive agreements I reviewed. These agreements were all at or below each individual's 2008 compensation levels. Based on my review, I believe these amounts were reasonable and not unexpected. (*See* Appendix C.)

3)    Disclosed executive treatment in other transactions highlights the prevalence of pre-closing agreements and other common practices in the treatment of top executives. (*See* Appendix D.)

4)    Comparison of employment agreement termination provisions offered by Barclays to Lehman Brothers' executives against the general market shows Barclays provided market competitive terms. (*See* Appendix E.)

5)    My significant, on-going experience advising major financial service firms on difficult executive compensation issues across industry cycles further confirms my conclusions.

**IV.    Aggregate Compensation Spend**

Section 9.1(c) of the Asset Purchase Agreement refers to Barclays' obligation to pay each Transferred Employee a 2008 bonus that is equal to the "bonus pool amounts accrued...and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser....Bonuses shall be awarded...in such forms and proportions as are consistent with Purchaser's customary practices[.]" (*See* APA at § 9.1(c).) I have not seen a September 16, 2008 financial schedule initialed by a Barclays' officer. I am assuming for discussion purposes, however, that the schedule referenced is that which was initialed by LBI employee Steve Berkenfeld (the "Berkenfeld Schedule"). The Berkenfeld Schedule states 2 0 for a line item called "Comp." It is my understanding that this represents a $2.0 Billion estimated number for Lehman Brothers' Transferred Employees 2008 compensation spend, including bonuses (*See* Berkenfeld Schedule reference to "Comp 2 0" under "Liabilities.)

**Contains Highly Confidential Information**

The reference to "Comp" in this schedule, rather than just bonus, indicates to me as an expert in this field that the estimate covers both cash bonuses and deferred equity, as well as other forms of compensation expenses, such as severance, social tax, special awards, replacement awards, other future payable awards, and payroll taxes typically expected in the Industry. It also would appear to me as an expert that the estimate for "Comp" should include severance because the Asset Purchase Agreeement explicitly requires Barclays to assume an obligation to pay severance payments to the Transferred Employees. Thus, looking at all parts of section 9.1 and the reference to "Comp" in the Berkenfeld Schedule reinforces my conclusion that the "Comp" estimate would include both bonus and severance.

Indeed, even if I focus solely on the term "bonus pool," Industry convention and practice is typically to define a "bonus pool" as referring to a wide range of compensation, including cash bonus, deferred equity, severance, social tax, special awards, replacement awards, other future payable awards, and payroll taxes typically expected in the Industry. Severance payments are typically included in a "bonus pool," especially near the end of the calendar year, since severance obligations are likely to be much larger (due to the build-up of a longer term of employment), and one's upcoming bonus is typically considered to be part, and often the bulk, of a severance package. It is not Industry practice to define bonus pool as including other types of compensation such as general payroll, benefits (e.g., health care, pension), or commissions paid to retail and high-net worth brokers. However, it is certainly possible that these items could be included in the more generic term "Comp."[3]

I do not have an accounting background and I am not commenting herein on accounting issues related to the 2008 figure. My findings below are based on my significant, on-going experience in helping clients develop compensation and bonus pools across industry cycles.

Based on that experience and my knowledge of where Industry thinking on compensation issues stood in September of 2008, it is my opinion that an estimate of $2.0 Billion for "Comp" for the approximately ten thousand employees involved was reasonable.

I have considered LBI historical data and Industry practice at the time to establish whether the estimate was reasonable. LBI had an intense process for determining 2007 compensation, and without an acquisition, LBI's (and therefore Barclays') starting place for 2008 year-end bonuses would have been 2007 year-end bonuses. As stated in Appendix F, from my reading of Deposition Exhibit 284B, the 2007 estimated total bonus for LBI employees was $2,481.9 Million. Even assuming some downward adjustment in 2008 as a conservative assumption, the estimate for the Lehman Brothers' employees' bonuses would have been their actual year-end bonus in 2007, adjusted for some of the conditions of the market for 2008. Using conservative assumptions of this adjustment, as shown in Appendix F, the adjustment would result in $1,737 Million as an estimated market level total bonus figure. To this must be added the other elements of compensation covered by the estimate such as severance and taxes: as explained above, these elements are included in the standard Industry understanding of "bonus pool" and are also certainly included in the standard Industry understanding of what "Comp" in the financial schedule would cover, given the obligations assumed by Barclays under the Asset Purchase Agreement. Any estimate for severance would necessarily have been tremendously uncertain,

---

[3] The term "Comp," on its face, would encompass a broader range of compensation than a "bonus pool."

**Contains Highly Confidential Information**

given that Barclays was taking on an entire business in a short amount of time, and could not know how many Transferred Employees would accept offers, how many Barclays would need, and how many would be terminated as redundant.  When reasonable estimates for these highly uncertain elements are included, the total figure is approximately $2.1 Billion.  (*See* analysis at Appendix F.)

Based on my extensive review of case materials, documents, and depositions, I believe the $2.0 Billion estimated compensation figure was a reasonable approximation of the potential exposure for 2008 compensation liabilities assumed by Barclays for the acquired Lehman Brothers' employees when considering the customary elements and considering the extreme circumstances of the Barclays/LBI transaction, where there was little time to conduct any due diligence, and no time to determine how many employees would be needed or would accept offers.

## V. Conclusion

For the many reasons I address above and as detailed further in the appendices below, it is my opinion that it was both reasonable and necessary under the circumstances of the Barclays/LBI transaction for Barclays to make offers to the top Lehman Brothers' executives to preserve the value of the Business – even when such offers were made prior to closing the Barclays/LBI transaction and to employees alleged to have been involved in negotiations.  It is also my opinion that the amount and the timing of those offers was reasonable and to be expected and in no way indicative of bad faith.

In addition, it is my expert opinion based on Industry standards that the estimated "Comp" or "bonus pool" described in the Barclays/LBI transaction documents would include multiple elements, especially as late in the year as September, such cash bonus, deferred equity, severance, social tax, special awards, replacement awards, other future payable awards, and payroll taxes typically expected in the Industry.  It is my opinion that the $2.0 Billion compensation estimate was a reasonable figure for potential exposure for 2008 LBI compensation liabilities, especially considering the lack of information available and the uncertainty created by the financial crisis and LBI's instability.

Dated:  January 8, 2010

Alan M. Johnson
Johnson Associates, Inc.
19 West 44th Street, Suite 511
New York, N.Y. 10036

Contains Highly Confidential Information

## Appendix A: Curriculum Vitae

**Alan M. Johnson**
Johnson Associates, Inc.
19 West 44th Street, Suite 511
New York, NY 10036
(212) 221-7400

**Professional Experience**

- Entire career as executive compensation consultant

| Years | Firm | Title or Equivalent | Duties |
|---|---|---|---|
| 1980 - 1983 | Hewitt Associates | Consultant | Executive Compensation Consultant |
| 1983 - 1986 | Sibson & Company | Principal | Executive Compensation Consultant |
| 1986 - 1989 | Frederic W. Cook & Co. | Partner/Shareholder | Executive Compensation Consultant |
| 1989 - 1990 | Handy Associates | Managing Director | Executive Compensation Consultant |
| 1990 - 1992 | GKR | Managing Director | Executive Compensation Consultant |
| 1992 - Present | Johnson Associates, Inc. | Managing Director | Executive Compensation Consultant |

**Education**

| | |
|---|---|
| 1973 - 1975 | U.S. Naval Academy |
| 1975 - 1977 | University of Florida, B.A. (History/Economics) |
| 1977 - 1978 | University of Virginia, Graduate Economics |
| 1978 - 1980 | University of Chicago, M.B.A. (Finance) |

**Consulting focus:**

- Since about 1990 the bulk of my consulting efforts have involved advising major financial and professional service firms. I consult on the design and magnitudes of compensation programs for senior executives on a regular basis. I am quoted extensively in the press on compensation issues related to major financial service firms.

**Contains Highly Confidential Information**

## Appendix B: 2008 Agreements of Top 9 vs. Template [1]

- Assessment reflects 2008 total compensation (i.e. 75% of 2007 total compensation) as the Template for Top 200

- The 75% of 2007 compensation Template is consistent with our market perspective. Select executives would receive better treatment than broader template.

| | | | 2007 Actual | 2008 Template | 2008 Actual |
|---|---|---|---|---|---|
| *all data in $000's* | | | Lehman | Barclays Template (75% of 2007 Comp) | Barclays (Employment Agreement) |
| Executive | LBI Title | Barclays Title | Total Comp | Total Comp | Total Comp |

Note: Total compensation includes both cash and deferred equity

**Top 9**

| Executive | LBI Title | Barclays Title | 2007 Actual | 2008 Template | 2008 Actual |
|---|---|---|---|---|---|
| Donini, Gerald [2] | Head, U.S. Equities | MD, Global Head of Equities | ▮ | ▮ | ▮ |
| Felder, Eric [3] | Co-Head, Fixed Income | MD, Head of Global Credit Trading | ▮ | ▮ | ▮ |
| Gelband, Michael [4] | Head, Capital Markets | Not Established | ▮ | | |
| Humphrey, Thomas | Senior Manager, Fixed Income Administration | MD, Head of U.S. FICC Sales | ▮ | ▮ | ▮ |
| Lee, Hyung [5] | Co-Head, Fixed Income | Not Established | ▮ | ▮ | ▮ |
| Lowitt, Ian | CFO | MD, Infrastructure Manager [6] | ▮ | ▮ | ▮ |
| McDade, Bart | President, COO | Transitional President, Lehman Brothers U.S. | ▮ | ▮ | ▮ |
| McGee, Hugh "Skip" | Global Head, Investment Banking | MD, Head of Investment Banking | ▮ | ▮ | ▮ |
| Nagpal, Ajay | Senior Manager, Equity Administration | MD, Global Head of Prime Services | ▮ | ▮ | ▮ |

1) Data based on depositions and other materials provided. As I created this chart, certain information reflected in this chart was not readily available in the depositions I reviewed for this matter. Where such information was not available, counsel for Barclays provided me with the figures and titles provided in this chart and asked me to assume they were true.

2) In 2007, the LBI U.S. Equities business was run by Mr. McDade, with Mr. Donini as his deputy. In 2008, Mr. Donini was promoted (upon Mr. McDade's promotion to President/COO) to head up the U.S. Equity business. Mr. Donini then joined Barclays as Head of the Global Equities business. As a result, his 2008 compensation is higher than his 2007 compensation, reflecting his promotion to a larger, global role.

3) Larger role with Barclays; from Co-Head of Fixed Income at LBI to Head of Global Credit Trading at Barclays. Mr. Felder had received a ▮ 2008 cash bonus advance from Lehman Brothers that, it is my understanding, he subsequently repaid to Lehman Brothers. As a result, Barclays simply matched his 2008 compensation at Lehman Brothers.

4) Mr. Gelband had been fired in 2007 and then brought back in mid 2008, with a salary of ▮ and no bonus. He came to Barclays but did not sign an agreement though one had been drafted for him, which included a 2008 bonus of ▮ He left Barclays in October 2008 and was given his 2008 bonus as part of his separation agreement, which is expected and reasonable.

5) After Mr. Lee signed his employment agreement, Barclays made the decision to terminate his employment. His employment agreement obligated Barclays to pay a guaranteed bonus of ▮ and a two-year "special cash award" of ▮ Upon termination, there was a dispute surrounding whether Barclays was obligated to honor the special payment portion of his contract. Barclays offered Mr. Lee the bonus, but he pursued litigation as he felt he was entitled to the additional $▮ Ultimately, the parties settled to give Mr. Lee ▮ of the ▮ special cash award.

6) Mr. Lowitt described his starting job at Barclays as Director of Integration for Lehman businesses. (Lowitt Dep. Tr. at 9:10.)

**Contains Highly Confidential Information**

## Appendix B: 2008 Agreements of Other Executives vs. Template [1]

| Executive | LBI Title | Barclays Title | 2007 Actual<br>Lehman<br>Total Comp | 2008 Template<br>Barclays Template (75% of 2007 Comp)<br>Total Comp | 2008 Actual<br>Barclays (Employment Agreement)<br>Total Comp |
|---|---|---|---|---|---|
| *all data in $000's* | | | | | |

Note: Total compensation includes both cash and deferred equity

**Other Identified Executives [2]**

| Executive | LBI Title | Barclays Title | 2007 Actual | 2008 Template | 2008 Actual |
|---|---|---|---|---|---|
| Azerad, Robert | Global Head, Assets and Liabilities Management | Director, Strategy & Planning | ▮ | ▮ | ▮ |
| Berkenfeld, Steven | Chief Investment Officer, Private Equity Division; Head , Legal, Compliance and Audit Division. | MD, IBD/Commitment & Credit | ▮ | ▮ | ▮ |
| Blackwell, Alastair | Global Head of Operations | MD, Operations Management | ▮ [3] | ▮ | ▮ |
| Fuld, Dick [4] | CEO | Not Applicable | -- | -- | -- |
| Hraska, James | SVP, Secured Financing Operations | Director, Global Financing | ▮ | ▮ | ▮ [5] |
| Kelly, Martin [6] | Global Financial Controller | MD, CFO Americas | ▮ | ▮ | ▮ |
| Kirk, Alex [7] | Global Head, Principal Businesses | Not Established | ▮ | ▮ | -- |
| Shafir, Mark [8] | MD, Co-Head of M&A | Not Applicable | ▮ | -- | -- |
| Shapiro, Mark | Co- Head, Restructuring IB | MD, Head of Restructuring & Finance | ▮ | ▮ | ▮ |
| Tonucci, Paolo | Global Treasurer | U.S. Treasurer | ▮ | ▮ | ▮ [9] |

**Other Representative Executives [10]**

| Executive | LBI Title | Barclays Title | 2007 Actual | 2008 Template | 2008 Actual |
|---|---|---|---|---|---|
| Coghlan, John | MD, Prime Services | MD, Prime Services | ▮ | ▮ | ▮ [11] |
| Gatto, Joseph | Co- Head, Corporate Finance; Chairman M&A | Co- Head, Corporate Finance (M&A) | ▮ | ▮ | ▮ |
| Hash, Steven | Head, Global Investment Banking | No Data Available | ▮ | ▮ | ▮ |
| Parker, Paul | Global Head, M&A | Global Head, M&A | ▮ | ▮ | ▮ |
| Stephenson, Ros | Co-Head, Corporate Finance | Co-Head, Corporate Finance | ▮ | ▮ | ▮ |
| Weiss, Jeffrey | Global Head, FIG Investment Banking | Head of Global Financial Institutions | ▮ | ▮ | ▮ |
| Wieseneck, Larry | Head, Global Finance | Head, Global Finance & Risk Solutions | ▮ | ▮ | ▮ |

(1) Data based on depositions and other material provided. As I created this chart, certain information reflected in this chart was not readily available in the depositions I reviewed for this matter. Where such information was not available, counsel for Barclays provided me with the figures and titles provided in this chart and asked me to assume they were true.

(2) Lehman employees identified in either the Lehman Brothers Holdings Inc. Debtor or Official Committee of Unsecured Creditors filings as allegedly having been involved in negotiation of the LBI/Barclays transaction, other than the top 9 already listed in the previous chart.

**Contains Highly Confidential Information**

(3)  Mr. Balckwell's 2007 LBI full figure total compensation was ██████████

(4) There is no indication of any intention by Barclays to offer employment to Mr. Fuld.

(5) Mr. Hraska's 2008 Barclays full figure total compensation was ██████████

(6) Role significantly changed at Barclays; from Global Financial Controller at LBI to CFO at Barclays.

(7) Mr. Kirk came to Barclays but did not sign an agreement, although he said in his deposition that Barclays had offered him his LBI annual salary, ██████████ and a ██████████ 2008 bonus.  He left the first week of November 2008 and was given his 2008 bonus as part of his separation agreement, which is expected and reasonable.   (Kirk Dep. Tr. at 9:25-11:2; 18:11.)

(8) Mr. Shafir left Lehman on September 17, 2008 to accept a position with Citigroup.  (McDade Dep. Tr. at 121:16 123:7.)

(9) Mr. Tonucci's 2008 Barclays full figure total compensation was ██████████

(10) Other top executives viewed by me as important team leaders.

(11) Mr. Coughlan's 2008 the full figure compensation appears to be ██████████ but the contract was difficult to read and this number may be slightly off.

**Contains Highly Confidential Information**

## Appendix C: Multi-Year Bonus (Cash and Equity) Agreements for Executives

- Multi-year agreements in financial services were not uncommon and not unexpected for key executives.

- Barclays provided 2008 and 2009 agreements in employment agreements for select executives. I am aware of the following based on the contracts I reviewed, although my understanding is that there were more individuals who received 2009 agreements.

| | | 2008 Actual | 2009 Actual |
|---|---|---|---|
| *all data in $000's* | | Barclays (Employment Agreement) | Barclays (Employment Agreement) |
| Executive | LBI Title | Total Bonus | Total Bonus |

Note: Total bonus includes both cash and deferred equity

| Top 9 | | | |
|---|---|---|---|
| Donini, Gerald | Global Head Equities | ▮ | ▮ |
| **Other Representative Executives** | | | |
| Parker, Paul | Global Head, M&A | ▮ | ▮ |
| Weiss, Jeffrey | Global Head, FIG Investment Banking | ▮ | ▮ |
| Stephenson, Ros | Co-Head, Corporate Finance | ▮ | ▮ |
| Wieseneck, Larry | Head, Global Finance | ▮ | ▮ |
| Gatto, Joseph | Co-Head, Corporate Finance; Chairman M&A | ▮ | ▮ |
| Blackwell, Alastair | Global Head of Operations | ▮ | ▮ |

- 2009 agreements generally were equal to 2008 levels, and Barclays likely would have paid that amount anyway for 2009, with improving business conditions.
- 2009 agreements offered by Barclays would not be charged against 2008 bonus.

17

Contains Highly Confidential Information

## Appendix D: Other Transactions – Executive Compensation Treatment Summary

- Past transactions in the Industry show a focus on retaining key employees from the acquired firm is common practice and expected.

  - It is important to consider different fact patterns across transactions.

  - Discussions on compensation for key employees is common practice and vary from specific, individual level to general pool.

  - Employment agreements commonly provide protection and accelerated vesting on existing equity.

### (Emphasis Added)

| Acquiror | Acquired | SEC Filing Date | Transaction Closing Date | Transaction Value (in $ Billion) | Accelerated Vesting on Equity | Severance Plan Upon Change of Control | New Employer Agreements for Top Executives | Comments from SEC Filing |
|---|---|---|---|---|---|---|---|---|
| Bank of America | Merrill Lynch | 10/1/08 | 1/1/09 | $50.0 | Yes | Not disclosed | Yes | • Bank of America has engaged in discussions with Merrill Lynch top 3 executives concerning the terms of their employment following completion of the merger and has discussed certain compensatory arrangements with each of them  <br>• Proposed arrangements seek to ensure continued service and align the executives' interests with the combined company after consummation of the merger |
| JPMorgan Chase | Bear Stearns | 4/11/08 | 5/30/08 | $31.1 ($1.1 equity value, $30 Federal Reserve special financing) | No unless terminated within 1 year | Not disclosed | Yes | • JPMorgan Chase has an oral agreement with Head of Fixed Income and Chairman  <br>• Executive officers other than Head of Fixed Income and Chairman may have had and/or may have conversations from time to time with JPMorgan Chase regarding employment and/or retention opportunities with JPMorgan Chase, which could result in such executive officers entering into employment arrangements with JPMorgan Chase on terms that are different from the retention guidelines |

Contains Highly Confidential Information

## Appendix D: Other Transactions – Executive Compensation Treatment Summary

(Emphasis Added)

| Acquirer | Acquiree | SEC Filing Date | Transaction Closing Date | Transaction Value (in millions) | Acceleration Vesting on Equity | Guaranteed Minimum Upon Change of Control | New Employment Agreements for Top Executives | Excerpts from SEC Filing |
|---|---|---|---|---|---|---|---|---|
| Bank of America | Countrywide Financial | 2/13/08 | 7/1/08 | $4.1 | Yes | $62 million total for 11 executives | Yes | • $37 million retention pool<br><br>• In connection with the merger agreement and a retention program previously implemented for other employees, Countrywide approved the grant of retention awards to named executive officers at the time that versions of this Registration Statement were filed<br><br>• Each name executive received a retention incentive payment on March 14, 2008 in respect of their annual bonus awards for Countrywide's 2007 fiscal year, and on February 1, 2008 were granted a cash-settled restricted stock unit award |
| JPMorgan Chase | Bank One | 2/20/04 | 7/1/04 | $58.0 | Yes | 2x sum of executive officer's 2005 guaranteed base and cash bonus | Yes | • Upon completion of the merger (or with respect to two executive officers, seven months following the merger) executive officers of Bank One selected by Bank One and JPMorgan Chase (other than CEO) provided a restricted stock unit award, guaranteed levels of compensation through 2005 (provided the executive officer remains employed) and severance protection for three years following the merger<br><br>• The restricted stock unit awards will generally have a value equal to 1.5X the sum of 2003 base salary and 2003 total annual incentive award consisting of cash and restricted stock units<br><br>• The restricted stock units will vest on the second anniversary of the completion of the merger, but will become immediately vested if the executive officer's employment is terminated without cause or if the executive officer resigns with good reason |
| Bank of America | MBNA | 8/2/05 | 1/1/06 | $34.2 | Yes | $37 million for senior executives | Not disclosed | • To reduce the incentive of MBNA executives to resign so as to collect such severance benefits, to better preserve management continuity and to align the interests of the executives with Bank of America's overall business strategy, Bank of America commenced discussions with certain of the executives regarding retention agreements<br><br>• As a result of these discussions, Bank of America has entered into retention agreements, effective on consummation of the merger, with certain of such executives (top 4 executives) that replace the change of control agreements (or in the case of one other executive officer, coverage under the MBNA change of control severance pay plan) |
| Bank of New York | Mellon Financial | 2/23/07 | 7/1/07 | $16.5 | Yes | 2x executive's highest base pay + 2x highest bonus paid in last 3 years | Yes | • Recommended at the organizational meeting of the Human Resources and Compensation Committee of Newco's Board of Directors that a special team equity award program be established in which certain Bank of New York executive officers who become members of Newco's executive management team upon the completion of the transaction would participate<br><br>• Under which such individuals will be granted special team bonus awards in the form of restricted share units that will vest and become payable on the third anniversary of the completion of the transaction, subject to any accelerated vesting or forfeiture provisions contained in the program |
| Capital One Financial | North Fork | 4/28/06 | 12/1/06 | $14.6 | Yes | $13.3 million for CEO, $9.2 million for Head of Commercial Banking, $5.4 million for CFO | Not disclosed | • $50 million retention pool<br><br>• In connection with the execution of the merger agreement, Capital One entered into restricted share agreements with CEO and Head of Commercial Banking to be effective upon completion of the merger in consideration of their future service<br><br>• Additionally a five year non-competition and non-solicitation covenants for the above executives |

Contains Highly Confidential Information

## Appendix E: Key Employees Employment Agreement Termination Provisions

- Termination Provisions in Barclays' offers appear market competitive. These terms could change or implementation of the terms could vary based on individual negotiations, particularly with senior executives. For example, in the event of involuntary termination, a firm may choose to vest 50% of remaining unvested amounts or add 1 year of service to vesting.

|  | Barclays' Offers to Key Lehman Employees[1] | Market Practice |
|---|---|---|
| Cash Bonus | • Forfeit if quit or are fired for cause before award date (February 2009)<br><br>• Entitled to payment if employed or terminated involuntary without cause before payment date | • Standard Market Practice |
| Stock Award | • Forfeit if voluntary resign to go to a competitor or terminated for cause<br><br>• Entitled to award in the event of involuntary termination without cause subject to non-solicit | • Standard Market Practice<br><br>• Standard Market Practice<br>  – Some firms may (i) vest 50% of remaining unvested amounts or (ii) add 1 year of service to vesting |
| Special Cash Award | • Forfeit if voluntary resign to go to a competitor or terminated for cause<br><br>• Entitled to award in the event of involuntary termination without cause | • Standard Market Practice |
| Notice Periods and Post-Employment Obligations | • 3 month garden leave<br><br>• Additional 3 months of non-solicit restrictions post termination | • Typically 6 months non-solicit<br><br>• Solicitation of employees treated similarly to "for cause" cases |

(1) Reflects summary of terms from Deposition Exhibit 292B.

**Contains Highly Confidential Information**

## Appendix F: Aggregate Compensation Spend Build-Up

- The first figure in Chart B below, as explained further in footnote seven, was in a Barclays document I reviewed which contained this number as the LBI 2007 total bonus figure. It is unclear whether the 2007 LBI total bonus figure represents only cash/equity or the full bonus pool spend (with additional forms of compensation such as severance and compensation associated taxes). However, my analysis in Chart B shows that if one adjusts for the conditions of the market for 2008, even without including the additional bonus pool elements listed below (other special awards, severance, taxes), the $2.0 Billion for "Comp" was still a reasonable estimated compensation exposure for Barclays.

**CHART A: Barclays' 2008 Compensation Spend [1] for LBI Employees (Deposition Exhibit 281B)**

| Acquisition Balance Sheet Summary | Total (in million) |
|---|---|
| **I. Payments** | |
| Pre 22/9 payroll items [2] | $12 |
| Replacement RSUs [3] | $11 |
| Bonus including social tax | $1,529 |
| IBD Grad programmes [4] | $11 |
| Severance | $238 |
| **+** | |
| **II. Payable in future** | |
| Severance | $27 |
| Payroll tax on Equity compensation | $9 |
| Acquisition Buyout vesting over 2 years [5] | $53 |
| Payroll taxes on Acq buyout | $3 |
| **+** | |
| **III. Other Items** | |
| ISP Awards [6] | $56 |
| Payroll taxes on ISP awards | $2 |
| **=** | |
| **Total Barclays Spend** | **$1,951** |

**CHART B: Market 2008 Compensation Spend Build-Up for LBI Employees**

| Summary | Total (in million) |
|---|---|
| **I. 2007 LBI Actual Cash/Equity Bonus** [7] | $2,481.9 |
| **-** | |
| **II. Mv/Johnson Associates 2008 Market Analysis** [8] **(September 2008 Estimate)** | Down 30% (From 2007) |
| **=** | |
| **III. 2008 Estimate of LBI Employees Cash/Equity Bonus (Not including other items below)** | $1,737 (Not including other items below) |
| **+** | |
| **IV. Additional bonus pool elements for 2008** [9] | |

| Payments | Total (in million) |
|---|---|
| Severance | $238 |
| | |
| **Payable in future** | |
| Severance | $27 |
| Payroll tax on Equity compensation | $9 |
| Acquisition Buyout vesting over 2 years | $53 |
| Payroll taxes on Acq buyout | $3 |
| | |
| **Other Items** | |
| ISP Awards | $56 |
| Payroll taxes on ISP awards | $2 |
| **=** | |
| **2008 Market Estimated Total Bonus** | **$2,125** |

1) This is a replication of part of a document discussed in and attached to Mr. Exall's deposition and the Rule 60 Motions of the LBHI Committee of Unsecured Creditors and LBHI Debtor, respectively.  Mr. Exall explained in his deposition that it was an updated version of an original schedule provided around the middle of July 2009 and reflected "an accurate picture of the discharge of compensation to previous -- former Lehman Brothers' employees in respect of their prior pre-acquisition service." (Exall Dep. Tr. at 62:11-63:12; Deposition Exhibit 281B.) (*See also* Creditor Committee Rule 60 Motion at page 36 and Exhibit 54; Debtor Rule 60 Motion at page 8 and Exhibit A.137.)

2) $5 Million of this figure was payroll and therefore, not related to the bonus pool. (Exall Dep. Tr. at 80:22-81:11.)

3) RSUs are defined as restricted stock award units.  (*See* "Source" under Deposition Exhibit 281B and Exall Dep. Tr. at 86:23-88:13.)

**Contains Highly Confidential Information**

4)  IBD Grad programmes are defined as 2008 bonuses paid in June 2009 to people in a particular Lehman graduate school program that had been in place pre-acquisition.  (*See* "Source" under Deposition Exhibit 281B and Exall Dep. Tr. at 100:16-103:41-105.)

5)  Acquisition Buyout is defined as a bonus relating to pre-acquisition performance by LBI people.  (*See* "Source" in Deposition Exhibit 281B and Exall Dep. Tr. at 128:14-21.)

6)  ISP Awards are defined as an incentive share plan stock award program which was part of the 2008 bonus for former LBI employees.  (*See* "Source" under Deposition Exhibit 281B and 141:24-143:19.)

7)  LBI 2007 annual bonus assumed to include only cash and equity for LBI employees transferred to Barclays after transaction based on my review of the headcount listed in Deposition Exhibit 284B, "Attachment 3."  Amount does not include approximately 1,400 recent joiners who did not receive a bonus in 2007, which would cost an estimated additional $75 Million to $100 Million. (*See* Deposition Exhibit 284B, Attachments 3-4.)

8)  Based on my firm, Johnson Associates' median 2008 2Q compensation estimates, which have been produced for more than 10 years and are sent to 600+ contacts.  Please refer to our document on our website: http://www.johnsonassociates.com/2Q08CompEst.pdf.

9)  Same equity bonus, severance and related tax items and amounts listed in Chart A of this page, as explained above in footnotes 1-6.

**Contains Highly Confidential Information**

## Appendix G: Documents Reviewed

"Barclays' Employment Contracts and/or Drafts of Contracts with the Following Individuals: Steven Berkenfeld, Alastair Blackwell, John F. Coghlan, Gerald Donini, Eric Felder, Daniel Fleming, Joseph D. Gatto, Michael Gelband, Steven Hash, James Hraska, Thomas P. Humphrey, Martin Kelly, Alex Kirk, Hyung Lee, Ian T. Lowitt, Herbert McDade III, Hugh E. McGee III, Ajay Nagpal, Paul G. Parker, Mark J. Shapiro, Ros Stephenson, Paolo Tonucci, Jeffrey L. Weiss, and Larry S. Wieseneck".

"Deposition of Robert Azerad". Robert Azerad, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 17, 2009).

"Deposition of Steven Berkenfeld". Steven Berkenfeld, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 6, 2009).

"Deposition of Alastair Blackwell". Alastair Blackwell, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 7, 2009).

"Deposition of John Coghlan". John Coghlan, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 13, 2009).

"Deposition of Nancy Denig". Nancy Denig, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 21, 2009).

"Deposition of Eric Felder". Eric Felder, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (July 31, 2009).

"Deposition of Daniel Fleming". Daniel Fleming, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 28, 2009).

"Deposition of James Hraska". James Hraska, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 14, 2009).

"Deposition of Martin Kelly (Day One)". Martin Kelly, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 18, 2009).

"Deposition of Martin Kelly (Day Two)". Martin Kelly, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (November 20, 2009).

"Deposition of Paul Exall". Paul Exall, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 27, 2009).

"Deposition of Alex Kirk". Alex Kirk, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 31, 2009).

"Deposition of Ian Lowitt". Ian Lowitt, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 20, 2009).

**Contains Highly Confidential Information**

"Deposition of Bart McDade". Bart McDade, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (September 2, 2009).

"Deposition of Hugh McGee". Hugh McGee, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 10, 2009).

"Deposition of David Petrie". David Petrie, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 26, 2009).

"Deposition of James Seery". James Seery, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (September 3, 2009).

"Deposition of Mark Shapiro". Mark Shapiro, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 7, 2009).

"Deposition of Paolo Tonucci". Paolo Tonucci, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 14, 2009).

"Acquisition Balance Sheet Summary". BCI-EX-00077287. Deposition Exhibit 280B.

"Acquisition Balance Sheet Summary". BCI-EX-00115843. Deposition Exhibit 281B.

Evans, Michael. "Summary of Current Spend – 08h30, 23 Sept 2008". (September 23, 2008).

Evans, Michael. "Summary of Current Spend – 08h30, 26 Sept 2008". (September 26, 2008).

Debtors' Motion to Schedule a Sale Hearing; Establish Sales Procedures; Approve A Break-Up Fee; and Approve The Sale of the Purchased Assets and Assumption and Assignment of Contracts Relating to the Purchased Assets.  (September 17, 2008).

"Waiver and General Release – Alex Kirk". Barclays Capital. (November 3, 2008).

"Waiver and General Release – Hyung Lee". Barclays Capital. (October 30, 2008).

Anthony Collerton May 7, 2009 Email cited as Deposition Exhibit 292B

Michael Evans September 23, 2008 Email cited as Deposition Exhibit 284B

"Affidavit of Rajesh Ankalkoti". Daniel McIsaac, United States Bankruptcy Court Southern District of New York, Case No. 08-01420 (JMP) SIPA (October 5, 2009).

 "Adversary Complaint". United States Bankruptcy Court Southern District of New York, Case No. 08-01420 (JMP) SIPA (November 16, 2009).

"Asset Purchase Agreement Among Lehman Brothers Holding Inc. Lehman Brothers Inc. LB 745 LLC. and Barclays Capital Inc". (September 16, 2008).

Master Repurchase Agreement between Lehman Brothers, Inc. and Barclays Capital, Inc. dated as of July 23, 1998.

**Contains Highly Confidential Information**

"First Amendment to Asset Purchase Agreement". (September 19, 2008).

"Clarification Letter (between LBHI, LBI, LB 745, and Barclays) and Schedules A and B". (September 20, 2008).

"The Trustee's Motion for Relief Pursuant to the Sale Order, Alternatively, For Certain Relief Under Rule 60(b)" (Rule 60 Motion). (September 15, 2009).

LBHI Subsidiary Bankruptcy Filings as of 2009.05.28.doc. (May 28, 2009).

"Creditors Committee Rule 60 Motion and Exhibits". United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP).

"Berkenfeld Schedule". (date stamped September 16, 2008).

"Amendment No. 2 to Form S-4 Registration Statement Under the Securities Act of 1933 - Bank of America and Merrill Lynch". U.S. Securities and Exchange Commission (Retrieved 1/8/2010). http://www.sec.gov/Archives/edgar/data/70858/000095012308013817/g15211a2sv4za.htm.

"Amendment No. 4 to Form S-4 Registration Statement Under the Securities Act of 1933 - Bank of America and Countrywide Financial". U.S. Securities and Exchange Commission (Retrieved 1/8/2010).
http://www.sec.gov/Archives/edgar/data/70858/000095014408004454/g11537a4sv4za.htm.

"Amendment No. 1 to Form S-4 Registration Statement Under the Securities Act of 1933 - Bank of America and MBNA". U.S. Securities and Exchange Commission (Retrieved 1/8/2010). http://www.sec.gov/Archives/edgar/data/70858/000095014405009662/g96430a1sv4za.htm.

"Amendment No. 2 to Form S-4 Registration Statement Under the Securities Act of 1933 – JPMorgan Chase and Bear Stearns". U.S. Securities and Exchange Commission (Retrieved 1/8/2010). http://www.sec.gov/Archives/edgar/data/19617/000119312508090606/ds4a.htm.

"Amendment No. 3 to Form S-4 Registration Statement Under the Securities Act of 1933 – JPMorgan Chase and Bank One". U.S. Securities and Exchange Commission (Retrieved 1/8/2010).
http://www.sec.gov/Archives/edgar/data/19617/000095012304004755/y93320a3sv4za.htm.

"Amendment No. 2 to Form S-4 Registration Statement Under the Securities Act of 1933 – Bank of New York and Mellon Financial". U.S. Securities and Exchange Commission (Retrieved 1/8/2010).
http://www.sec.gov/Archives/edgar/data/1390777/000095012307005516/y30440a2sv4za.htm.

"Amendment No. 3 to Form S-4 Registration Statement Under the Securities Act of 1933 – Capital One Financial and North Fork". U.S. Securities and Exchange Commission (Retrieved 1/8/2010). http://www.sec.gov/Archives/edgar/data/927628/000119312506143322/ds4a.htm.

"Financial Services Compensation: Second Quarter Trends and Year-End Projections". Johnson Associates. (Retrieved 1/8/2010). http://www.johnsonassociates.com/2q08compest.pdf.

# BCI EXHIBIT

# 340

**Contains Highly Confidential Material**

United States Bankruptcy Court

Southern District of New York

_____

                                   )

In Re: Lehman Brothers Holdings, Inc.   )     Chapter 11

et al.                                )     Case Number 08-13555 (JMP)

                                   )     (Joint Administration)

_____ )

### Report of Anthony J. Leitner

[January 8, 2010]

Contains Highly Confidential Information

# TABLE OF CONTENTS

I. INTRODUCTION......................................................................................1
II. QUALIFICATIONS ................................................................................1
III. SUMMARY OF OPINIONS....................................................................7
IV. SUMMARY AND ANALYSIS OF FACTUAL RECORD ..............................9
    A. LBI's Business...............................................................................9
    B. Relevant Characteristics of Exchange-Traded Derivatives ...........13
        1. Options..................................................................................13
        2. Futures ..................................................................................17
    C. The OCC ....................................................................................21
        1. OCC Requirements for Posting Margin and Clearing Funds .....21
        2. Self-Protective Measures Available to the OCC .......................22
    D. State of the Markets Between September 2, 2008 and September 22, 2008 ..24
    E. Events During the Period From September 15 to September 22, 2008 ..........25
V. OPINIONS AND ANALYSIS ................................................................38
    A. Opinion #1 .................................................................................38
    B. Opinion #2 .................................................................................39
    C. Analysis.....................................................................................40
        1. It Would Be Impossible, Given Only the Information Available to Barclays
        During the Time Frame of the Negotiations, to Value and Assess the Risk of the
        ETD Positions............................................................................40
        2. The Complexity of LBI's Business and the Short Time-frame Within Which
        the Parties Had To Negotiate This Deal Made it Even More Difficult Than It
        Otherwise Would Have Been To Assess the Risks Associated With this
        Component of the Transaction ......................................................42
        3. The Uncertainty and the Risk Associated With the ETD Positions Was Further
        Exacerbated by the Highly Volatile Market Conditions Leading Up to the
        Closing......................................................................................48
        4. Under the Circumstances, No Rational Acquirer Would Have Agreed To
        Complete this Transaction Without Receiving All of the Posted
        Collateral ..................................................................................49
        5. The Transaction Documents Are Entirely Consistent With Barclays' Claim
        That All Posted Collateral Was Included Among the Assets Purchased by
        Barclays ...................................................................................50
        6. LBI Was Facing The Imminent Threat That Its Exchange-traded Derivatives
        Would Be Liquidated If It Did Not Consummate This Deal by Monday,
        September 22, 2008 ....................................................................51
VI. CONCLUSIONS .................................................................................53

**Contains Highly Confidential Information**

## I.    INTRODUCTION.

1.    I have been retained, through my firm, A J Leitner & Associates, LLC, by Barclays Capital Inc. ("Barclays") to perform a review of facts as developed in discovery in this proceeding and information derived from public sources and through interviews with knowledgeable fact witnesses to render my opinion as a derivatives industry expert concerning Barclays' acquisition of exchange traded derivatives held by Lehman Brothers, Inc. ("LBI"), for its own account or for the benefit of LBI's affiliates and/or customers.

2.    In rendering my opinion, I am relying as to factual matters on the factual record set forth herein and contained in the sources listed in Schedule 1, attached hereto.

3.    As of the date of this report, I understand that discovery in this matter is continuing. I therefore reserve the right to alter or amend this report and any of the opinions rendered herein to take into account any changes in the factual predicates to my opinions or any rulings or interpretations by competent authorities that render any opinion expressed herein incorrect or that require any qualification thereof.

## II.    QUALIFICATIONS.

4.    I was employed in the legal department of Goldman, Sachs & Co., a broker-dealer and international investment bank, from October 1979 until November 2003 when I retired from that firm. At the time of my retirement, I was a Managing Director and Co-General Counsel of the Equities Division of Goldman, Sachs & Co. Since my retirement, I have continued to provide consulting services to Goldman, Sachs & Co. on securities and derivatives regulatory matters. In May 2007, I was retained to perform consulting services to NYSE-Euronext in the areas of securities and futures

**Contains Highly Confidential Information**

regulation and I continue to be so engaged. I formed my current firm, A J Leitner &

Associates, LLC, in March 2004.

5.      During my 24 years at Goldman, Sachs & Co., I advised sales, trading,

operations, credit and financial reporting departments on regulatory, risk management,

compliance and control issues. I drafted numerous business and trading agreements,

including securities lending agreements and repurchase agreements. I served for many

years as the head of the Legal Department's derivatives practice group, a role that

included responsibility for listed options and futures. I was also responsible for

counseling the Firm's Futures Services Department, which provided futures brokerage

and clearing services for clients and for the firm's proprietary futures trading. In the

course of my duties, I became familiar with, and provided legal advice with respect to,

the rules and procedures relating to the margining of exchange-traded and over-the-

counter options on securities in connection with the firm's customer business as well as

in connection with the margining of firm and customer exchange-traded derivatives (both

futures and options) at the various clearinghouses in which Goldman, Sachs & Co. and

affiliated companies were clearing members. I provided counsel to operations, finance

and administration departments of the firm in connection with the transfer of exchange

traded and over-the-counter derivatives by clients of the firm.

6.      I rendered opinions to the firm on the federal margin regulations and

related rules of the New York Stock Exchange (the "NYSE") as well as the customer

protection and net capital rules of the Securities and Exchange Commission ("SEC"). I

worked on or supervised the preparation of numerous compliance manuals, including

those dealing with clearance and settlement, possession and control of customer

securities, and securities lending.

2

Contains Highly Confidential Information

      7.     I counseled senior management of Goldman, Sachs & Co. in connection with the acquisition of firms engaged in trading and clearing exchange-traded derivatives. Specifically, in 1980, the Goldman Sachs Group, Inc, the parent company of Goldman, Sachs & Co., acquired the business of Spear, Leeds and Kellogg, including First Options Corp., a company that provided clearing services to smaller broker dealers and market professionals. At that time, I was General Counsel of the Equities Division of Goldman, Sachs & Co. and, in that capacity, I became familiar with the rules relating to the margining of market professionals and the special rules and procedures of the Options Clearing Corporation ("OCC") relating to margining of options market makers by clearing firms such as First Options.

      8.     In 1987, I initiated and was named Co-Chair of the Ad Hoc Regulation T Committee of the Securities Industry Association ("SIA," now called the Securities Industry and Financial Markets Association) and I served in that capacity from 1987 until 1997. I participated through that Committee in efforts by the securities industry to advocate amendments to the Federal margin regulations, and these efforts resulted in amendments to Regulation T in 1994 and 1997. These amendments included a provision that enabled broker-dealers to extend credit to purchase and carry exchange-traded options based on models approved by a securities self-regulatory organization (so-called "portfolio margin").

      9.     Subsequently, I was involved with counsel for other broker-dealers in negotiations with the NYSE, the SEC and the Commodity Futures Trading Commission ("CFTC") in the development of amendments to the NYSE's member firm regulations (specifically NYSE Rule 431) to permit member firms to margin listed options based on a customer's portfolio of options and related securities. These rules also permitted a

**Contains Highly Confidential Information**

member firm to extend portfolio margin treatment to customer accounts that included

futures on equity indexes as offsets to equity exposure (this is commonly called "cross-

margining").

10.    I further developed my knowledge of the clearing procedures of the

futures and options clearinghouses during what has become known as the "market break"

in the months following October 1987.    During this period, the value of the securities

markets dropped rapidly and substantially.    One of the consequences of this market

dislocation was huge mark-to-market margin calls (payable always in cash) by the futures

exchanges and the OCC.    I was asked to conduct an internal review of clearing firm

exposure to a potential default by a clearing house.    Such a default could be caused by the

inability of one or more clearing members to meet their mark-to-market margin

requirements and could subject other member firms to losses of clearing fund deposits

and, in some cases, to unlimited liability for such losses.

11.    The market break of October 1987 resulted in action by Federal regulators

to create greater legal certainty relating to collateral and the rights of clearinghouses to

take action to minimize systemic risk.    Two legislative developments were particularly

significant.  First, Congress required the SEC to determine whether state law relating to

the creation and perfection of security interests in securities held as collateral was

sufficient to protect the financial system and to adopt rules which would supersede state

law if the SEC found that such laws were insufficient.  (*See* Coordinated Clearance and

Settlement Act of 1990, P.L. 101-572.)  The SEC established the Market Transactions

Advisory Committee for that purpose, and I served as a member of that Committee from

1989 to1992.  During that period, Articles 8 and 9 of the Uniform Commercial Code

were substantially revised by the Uniform State Law Commissioners and those revisions

4

**Contains Highly Confidential Information**

were adopted promptly by most states. The Market Transactions Advisory Committee monitored the amendments and ultimately determined that state law, as so amended, made the adoption of national rules by the SEC unnecessary. I served on a subcommittee of the Uniform State Law Commissioners that reported on securities custodial and rehypothecation rules. My role was to advise the subcommittee on the mechanisms of the book entry system that had evolved in the securities clearing environment and the expectations of the parties holding interests in that system.

12.    Second, Congress enacted Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 (12 U.S.C. § 4401 et seq.). This law, among other provisions, permits the netting of debtor positions by a clearinghouse. This legislation ensured that a clearinghouse would have the legally enforceable right to close out the positions of defaulting clearing members in the event of a default to a single net payment. This legal right is a key element in protecting clearinghouses from losses that might occur if a clearing member's losses were allowed to increase as a result of adverse market movements following the clearing member's default. In the course of my responsibilities at Goldman, Sachs & Co., I monitored and advised senior management regarding this legislative development.

13.    In 1990, in connection with the collapse of the investment bank Drexel Burnham Lambert ("DBL"), I acted as senior attorney and advisor to management of Goldman, Sachs & Co. in a transaction involving the acquisition of DBL's mortgage-backed securities trading book (having a face value of approximately $18 billion). At the time, mortgage backed securities issued by the Government National Mortgage Association ("GNMA") were physically settled on a monthly basis. DBL was one of the largest market makers in GNMA bonds and its failure caused a major disruption in that

5

**Contains Highly Confidential Information**

market. Goldman, Sachs & Co. negotiated a transaction in which it proposed to clear all
DBL trades, essentially assuming all counterparty credit risk, and stabilizing the GNMA
market. The transaction required obtaining consent, through contract novation, of every
one of DBL's trading counterparties and customers. One of the results of DBL's failure
was the formation of a clearing house for mortgage backed securities. I monitored the
structure of the clearing house (then called the Mortgage Backed Securities Clearing
Corp, now Fixed Income Clearing Corp., a subsidiary of The Depository Trust and
Clearing Corp.).

14.    As a member of the SIA Derivative Products Committee during the
1990's, I was involved in negotiations with the SEC regarding the development of rules
permitting the establishment of a new category of broker-dealer – an "OTC Derivatives
Dealer" – and revisions to the SEC's customer protection and net capital rules in
connection therewith.  These rules permitted such a dealer to margin over-the-counter
options at levels determined by risk-based models.  I then led the legal team that formed
the first SEC registered OTC derivatives dealer.

15.    In 1999, I assisted Goldman, Sachs & Co. representatives in the
preparation of a report on counterparty risk management by The Counterparty Risk
Management Group I. The Report reviewed and recommended best practices in the areas
of credit, market and liquidity risks.

16.    I co-chaired the Legal-Regulatory Sub-Committee of a joint SIA and
Futures Industry Association Task Force formed to work with the SEC and the CFTC on
the development of joint agency regulation of listed security futures products as required
by the Commodity Futures Modernization Act of 2000.  This effort involved further
amendments of the Federal and self-regulatory organization margin rules.

Contains Highly Confidential Information

17.    My experience with broker-dealer and clearinghouse margining of derivative products, including listed options, continued following my retirement from Goldman, Sachs & Co. Through membership in the Futures Industry Association and the American Bar Association Business Law Section's Futures and OTC Derivative Products Committee, I have spoken on several panels to advocate adoption of rules that would facilitate the cross margining of futures and options both at the intermediary level and at the securities and futures clearinghouses.    I co-authored an article entitled "*Recent Developments in Portfolio Margining and Cross-margining*" (Capital Markets Law Journal, Vol.2, no. 3, (2007)).    I also authored: "*Clearing the Deck - Cross Margining Futures and Securities: a Fork in the Road Ahead*" (FI magazine, March/April 2007) and "*Portfolio Margining – Can We Put Securities and Futures on a Level Playing Field*" (FI Outlook, 2006).    In researching these articles and in preparation for testimony at a joint meeting of the SEC and CFTC concerning harmonization of the Securities and Futures laws on September 9, 2009, I have remained familiar with developments in OCC and futures clearing rules and procedures, including those related to margining and the procedures and rights of the clearinghouse in the event of the default of a clearing member.

18.    My firm, A J Leitner & Associates, is being compensated for my time at the rate of $500 per hour plus direct out-of-pocket expenses.

## III.    SUMMARY OF OPINIONS.

19.    Barclays contends in this litigation that, in the midst of the extreme and uncertain circumstances surrounding its acquisition of the capital markets, brokerage, futures commission merchant and other ETD businesses of LBI, Barclays entered into an agreement with LBI whereby (i) Barclays would assume all of LBI's rights and

7

**Contains Highly Confidential Information**

obligations in and to all exchange traded derivatives, including options and futures

(hereinafter collectively called "ETDs"), held for LBI's account as well as for the

accounts of LBI affiliates and LBI customers at clearing houses or clearing brokers in

connection with those businesses; and (ii) Barclays would receive all LBI's rights with

respect to the margin and related property (including clearing fund deposits) held by the

clearing houses or clearing brokers in relation to the ETDs (whether such property related

to proprietary positions or customer positions) (hereinafter, the "posted collateral"). Not

only are the governing agreements entirely consistent with this position, but so too are the

record facts, all of which lead me to conclude, based on my experience and expertise in

the derivatives industry, that no rational purchaser would have agreed to acquire the

ETDs, or to assume the financial responsibility of a clearing broker with respect to such

ETDs, without also receiving LBI's rights with respect to the entirety of the posted

collateral. This conclusion is based on the following risks that Barclays faced, each of

which was particularly acute under the circumstances surrounding this acquisition: (i) the

market risk associated with the tens of thousands of unvetted positions in LBI's portfolio

of ETDs, particularly given the extremely volatile market conditions that existed at the

time of this transaction; (ii) the open-ended risk of funding the margin requirements (and

potentially increased clearing fund deposits) and the related capital commitment for the

ETDs under the circumstances in this case, particularly since the size of the requirement

was virtually impossible to determine and fluctuated substantially on a daily and even

hourly basis given the market volatility at the time; and (iii) the risk of default by LBI

affiliates in connection with their ETD positions and the inability to determine the size of

any potential losses Barclays might incur as a result of such defaults.

8

**Contains Highly Confidential Information**

20.    Based on my consideration of the facts described herein, it is also my
opinion that there was a substantial risk – readily apparent to anyone with experience in
this industry – that absent a transfer of LBI's ETDs to Barclays, and the assumption by
Barclays of LBI's responsibilities as a clearing broker, the ETD accounts would have
been liquidated by the respective clearing houses and any intermediary clearing brokers.
In view of the extremely volatile market conditions during the period the deal was being
negotiated and the crisis in the credit markets, such a liquidation could have wiped out all
property held by the clearing houses or clearing brokers as margin.   LBI was well aware
of this risk because the Chicago Mercantile Exchange ("CME") had already liquidated
LBI's proprietary futures positions on its exchanges before the Barclays deal could be
completed and, in the process, all of the initial margin relating to those positions was
depleted.   It is equally apparent to me, as an expert in this industry, that in the event of
such a liquidation, LBI could have incurred additional losses beyond those that the posted
collateral would cover.   For each of these reasons, it was reasonable, in my opinion, for
LBI to conclude that it was in its best interest and the best interest of its customers to
effect a transfer of this business on the terms referenced in Paragraph 19 above.

## IV.    SUMMARY AND ANALYSIS OF FACTUAL RECORD.

### A.    LBI's Business.

21.    Lehman Brothers Inc. ("LBI") is a wholly-owned subsidiary of Lehman
Brothers Holdings, Inc ("LBHI").

22.    Prior to the commencement of liquidation proceedings by the Securities
Investor Protection Corp ("SIPC") on September 19, 2008 (the "SIPC Liquidation"), LBI
was a broker dealer registered with the SEC and was a futures commission merchant
("FCM") registered with the Commodity Futures Trading Commission ("CFTC").   In

9

**Contains Highly Confidential Information**

these capacities, LBI was a clearing member of several clearing organizations, including

the Options Clearing Corporation (the "OCC"), the CME Clearinghouse (the "CME"),

the National Securities Clearing Corporation (the "NSCC"), and the Depository Trust &

Clearing Corp (the "DTCC"). LBI was also a member of several securities and futures

exchanges and traded securities (including options) thereon, as well as on exchanges in

the United States and abroad where it was not a member[1]. On those exchanges, LBI

traded through affiliated and non-affiliated brokers. (*See* Declaration of Elizabeth James,

Jan. 8, 2010, ¶ 4 ("James Decl.").)

    23.    Prior to the SIPC Liquidation, LBI conducted a capital markets business

that included proprietary trading by various internal business units in equity securities

and related options and futures. (*See* Deposition of Stephen King, at 247:25-248:8

("King Dep.").) LBI or its affiliates acted as market makers in equity securities listed on

securities exchanges and as market makers on one or more options exchanges.[2] (*Id.*)

    24.    As of September 15, 2008, LBI's corporate equity inventory appears to

have included long positions worth approximately $8,432,000,000 and short positions

worth approximately $6,351,000,000. (E-mail from J. Yang to J. Walker and S. King,

Sept. 15, 2008, 10:58 a.m., BCI-EX-(S)-00074256 (attaching BCI-EX-(S)-00074257).)

    25.    Prior to the SIPC Liquidation, LBI's capital markets trading units traded

options and other exchange-traded derivatives in connection with various strategies.

These included profiting from market movements in the prices of the derivatives, using

---

[1] Exchanges on which LBI traded ETDs included: Osaka Securities Exchange, Tokyo Financial Exchange, Tokyo Commodity Exchange, Tokyo Grain Exchange, Hong Kong Futures Exchange, Korea Exchange, Bursa Malaysia, Australian Securities Exchange, ICE Futures Canada, Singapore Exchange, and Kansas City Board of Trade.

[2] A "market maker" is a person acting as a dealer for his own account who commits to make two-way markets during the trading day, usually in designated securities or options, on an exchange.

**Contains Highly Confidential Information**

the derivatives as a hedge against price movements in underlying cash instruments

acquired in the course of trading in those securities, facilitating customer transactions in

exchange-traded options by taking the other side of a transaction executed on an options

exchange (in which case LBI would hedge its options position by buying or selling the

underlying securities) and hedging customers' equity positions. (*See, e.g.*, King Dep., at

247:25-248:8.)  LBI was also a market maker in options and traded the underlying

equities or futures contracts as a hedge against the options positions it wrote.

26.    Prior to the SIPC Liquidation, LBI also acted as broker or dealer for its

affiliated companies, effecting transactions in domestic securities, exchange-traded

options and futures markets and acting as the clearing agent and custodian for such

affiliates in connection with such transactions.  (Declaration of Daniel Dziemian, Jan. 8

2010, ¶ 7 ("Dziemian Decl.").)  Certain transactions executed, and positions held, by LBI

on behalf of an affiliate, Lehman Brothers Special Financing Inc. ("LBSF") were

commingled with LBI's proprietary transactions, while transactions (and positions) for

LBI affiliates Lehman Brothers International Europe ("LBIE"), Lehman Brothers OTC

Derivatives, Inc. ("LOTC") and Lehman Brothers Finance A.G. ("LBF") were

commingled with customer transactions and positions at OCC.[3]  (*See* Dziemian Decl. ¶ 7;

Declaration of Eric Clark, Jan. 8, 2010, ¶ 5 ("Clark Decl.").)

27.    Prior to the SIPC Liquidation, LBI also acted as a securities broker and as

an FCM for public customers.  In those businesses, LBI maintained accounts to record

the purchase and sale of securities and futures for public customers, cleared such

---

[3] LBSF had subordinated its claims against LBI to the claims of customers which allowed LBI to treat LBSF as a "non-customer" for certain purposes under the Federal Securities Laws and certain SEC rules. One consequence of this situation was that LBI could extend "good faith" or portfolio margin treatment to LBSF as an intermediary and in LBI's account at OCC. This could reduce LBI's margin requirement at OCC for the proprietary account because any "long" options held by LBI for LBSF might offset the risk of "short" positions. See the discussion in paragraphs I.45-I.49 of this Report, *infra*.

**Contains Highly Confidential Information**

transactions, and held custody of customers' securities, options and futures. (Dziemian

Decl. ¶ 7.) LBI also maintained margin accounts for certain customers in which LBI

extended credit for the purchase and sale of securities and any positions in options that

required the customer to post collateral as margin. (*See* James Decl. ¶¶ 13-14.) For

certain institutional customers, LBI acted as broker and executed and cleared their

options trades, but did not hold custody of margin securing those customers' derivatives

positions. Such customers provided escrow deposit receipts in favor of OCC (pursuant to

OCC rules described more fully below) in a manner that satisfied margin rules applicable

to the customer and LBI and satisfied OCCs margin requirement applicable to the options

positions held for such customers. (Dziemian Decl. ¶ 8 & n.1.) Assets posted at OCC

by LBI to margin options positions acquired or sold on behalf of customers was property

of LBI and did not necessarily correspond to the amount of margin deposited with LBI by

the customers. (Dziemian Decl. ¶ 8.) Margin posted at futures clearing houses, although

subject to statutory treatment as "customer property," similarly may have been LBI

assets.

28.     Prior to the SIPC Liquidation, LBI maintained both options and futures

accounts at the OCC. Some of those accounts were established to hold proprietary

positions known as "firm" positions, others were established to hold proprietary positions

known as "market-maker" positions, and still others were established to hold customer

positions. (Dziemian Decl. ¶ 7; Declaration of Craig Jones, Jan. 8, 2010, ¶ 10 ("Jones

Decl.").) LBI also maintained accounts, including accounts in its own name and accounts

with affiliated and unaffiliated clearing brokers, in other domestic and foreign markets

for trading futures in those markets – both proprietary and customer. (James Decl. ¶¶ 4-

6.)

**Contains Highly Confidential Information**

29.    Prior to the SIPC Liquidation, LBI financed its long equity positions
through pledges, repurchase transactions and by lending securities to other broker dealers
against cash.    Short positions were covered by borrowing stock from institutions and
other broker dealers against cash collateral.    Seizures of these positions (i.e., the seizure
of a portfolio of long equity positions in the event of a failure by LBI to repay a loan that
was secured by those positions or the closing out of a stock borrow by the stock lender)
would naturally result in an immediate naked exposure on the ETDs that had been used
as hedges or in other trading strategies related to the long or short stock positions. (See
paragraph 36, *infra*, for an example of the market risk arising in such a situation.)    Due to
"self help" measures taken by institutions to close out financing and stock lending
transactions with LBI prior to the commencement of proceedings by the Securities
Investor Protection Corporation on September 19, 2008, very few long or short positions
in equity securities were available for transfer by the time the sale transaction was
approved, with the exception of whatever securities happened to be included among the
assets that had been pledged to the Federal Reserve Bank of New York (the "New York
Fed") as of the time Barclays stepped into its shoes. (*See, e.g.*, Deposition of Ian Lowitt,
at 25:5-11 ("Lowitt Dep.") (noting that "[p]eople were cancelling their repo trades and
returning the collateral for cash").)    With the limited information it had during
negotiations, Barclays had no way of verifying to what extent, if any, the equities posted
with the New York Fed hedged any of the ETD positions it was acquiring.

    **B.    Relevant Characteristics of Exchange Traded Derivatives.**

        *1.    Options.*

30.    Options traded on a securities exchange registered with the SEC are
subject to a number of regulations under the Securities Act of 1933, as amended (the

13

**Contains Highly Confidential Information**

"1933 Act") and the Securities Exchange Act of 1934, as amended (the "1934 Act").

Exchange-traded options (also called "standardized options") that are included within the

provisions of SEC Rule 9b-1 under the 1934 Act (17 C.F.R. § 240.9b-1) are exempt from

the registration requirements of the 1933 Act.[4]  Rule 9b-1 requires an exchange that

wishes to trade a standardized option to file with the Commission and to furnish to

members and customers an options disclosure document that meets information standards

set forth in the Rule.  OCC, an SEC registered clearing agency, is considered the "issuer"

of each option.  In its clearing role, OCC becomes the party responsible to its clearing

members for performing an option when exercised by its terms.  OCC records the rights

and obligations arising from its clearing function in accounts maintained for clearing

members.  LBI and Barclays were both clearing members of OCC.  The clearing member

is responsible for fulfilling all obligations to the OCC arising from the trading of options

that are held in such clearing member's account, regardless of the fact that the clearing

member may be holding the option in an account for a customer or a customer of an

affiliate.  These obligations include payment of the purchase price for options purchased

and performance of any transaction arising from the exercise of an option.

31.    An option is the right either to buy or to sell a specified amount or value of

a particular underlying interest at a fixed exercise price by exercising the option before its

specified expiration date.  An option that gives the right to buy is a "call option" and the

right to sell is a "put option."  In standardized options nomenclature, the seller of an

option is called a "writer" and the buyer is called a "holder."  The writer, who is

obligated to perform in the event the option is exercised, is said to be "short" the option.

---

[4]  See: Rule 238 (17 C.F.R. § 230.238) promulgated under the 1933 Act. The exemption applies to
"standardized options" as defined in Rule 9b-1 promulgated under the 1934 Act that are issued by a
clearing agency registered under section 17A of the 1934 Act and are traded on a national securities
exchange.

**Contains Highly Confidential Information**

The holder who has the right to exercise the option, is said to be "long" the option. All options have a specified expiration date (usually monthly), quantity and a specified price, called the "strike price," that is payable upon exercise of the option.

32.    There are of two basic exercise provisions on standardized options. "American" style options may be exercised by the holder thereof at any time prior to expiration. "European" style options are exercisable only upon their expiration date. All OCC options on individual securities are American style options.[5] Some options, such as those that have a value based on a securities index, or those based upon a specified value (for example, volatility), are European style options and are settled in cash rather than by delivery of an underlying instrument only on their expiration date.

33.    The purchase price of an option is called the premium. The buyer pays the premium and the seller receives the premium. Because OCC is the actual contractual party to all standardized options in the United States, OCC receives the premium from the buying party and pays the premium to the selling party. OCC only clears options in an account of a clearing member. For example, LBI established accounts at OCC for itself (and guarantied affiliates) and for customers. When LBI sold an option for a customer, LBI received the premium from OCC in its customer account and credited the premium to the customer in LBI's customer's account.

34.    Options are said to be "in the money" when the value of the underlying asset exceeds (in the case of a Call) or is less than (in the case of a Put) the strike price. For example, if XYZ security's current price is $100 and the strike price of a Call is $95,

---

[5] In the event a long option is exercised prior to its maturity, OCC uses a system to randomly determine the particular clearing member's account at OCC that contains a corresponding short option. OCC then "assigns" to that clearing member the obligation to complete the contract. If the assignment is made to a clearing member's customer account at OCC, the clearing member must use a fixed system to assign the option to a particular customer-writer.

**Contains Highly Confidential Information**

then the option is $5 "in the money." That is, the holder of a Call can exercise the option,

paying $95 per share, and theoretically sell the underlying security for $100 per share.

Conversely, options are said to be "out of the money" when the value of the underlying

asset is less than the strike price, in the case of a Call, or greater than the strike price, in

the case of a Put.

35.    The prices (or premiums) that market participants are prepared to pay or

receive for options are based upon widely accepted models that take into account the

following factors: Duration, that is, the amount of time remaining before the expiration

date (the value associated with the duration of an option is commonly called "time

value"), interest rates (relating to the theoretical cost of carrying the underlying asset) and

volatility (that is, a measure of the historical price fluctuation of the underlying security

or asset). In general, premiums increase as volatility increases and decline over time.

Because of the duration factor, long options are considered "wasting assets."

36.    Options can be traded for a number of purposes and strategies. For

example, a trader of stocks may buy Puts to hedge against the risk that the price of the

stock will decline. Another hedging strategy might be for the trader or investor to enter

into a "collar" by buying a Put at a price below the current market value of the stock and

selling a Call at a price above the stock. The premium paid for the short Call can be used

to offset the cost of the Put. While protecting against a decline in the value of the stock,

the investor is giving up the profit in the stock to the extent it rises in value above the

strike price of the Call. Sophisticated options traders can engage in strategies that take

advantage of changes in the volatility of options by selling options and then engaging in

buying or selling a number of shares of the underlying stock, based upon a valuation

model. The strategy is successful if the cost of trading the underlying stocks does not

16

**Contains Highly Confidential Information**

exceed the premium received for the option. If the stock positions (whether long or short) are not present, the short Put or Call is said to be "naked" and the trader is at the risk of the market. That is, the writer faces the possible need to cover every in-the-money written option (where a loss is virtually guaranteed). For example, assume a trader, while owning stock she bought at $20 per share wrote a 25 strike Call on that stock. Assume the stock is suddenly "gone" because a lender seized it. Assume the stock price moves to $30 per share and the trader's Call is assigned to her. The trader must go into the open market, buy the stock at $30 and complete exercise by delivering the stock to the option holder for $25 per share. This is essentially the market risk Barclays faced by acquiring the ETDs without the related inventory.

37.    The exercise of an option that requires delivery of a security results in a sale and purchase of the security at the strike price. If the security is an equity security traded in the United States, delivery and payment ("settlement") must be made in three business days following the date of exercise (the "trade date"). If the seller of a Call does not own the underlying security, the exercise results in a short sale and delivery must be made either by borrowing the stock or by buying it in the open market. OCC automatically exercises options that are "in the money" at expiration.

2.    *Futures.*

38.    Futures contracts, like options, derive their value from a specific underlying asset or other measure of value such as an index. They are standardized contracts that specify the quantity of the commodity to be purchased or sold, settle (or expire) on a specific date and have a "settlement price" determined on the trade date. Also like options, futures are traded on an exchange (known under the Commodity Exchange Act, which regulates the trading of futures contracts, as a "designated contract

17

**Contains Highly Confidential Information**

market"). Futures contracts can be either physically settled or settled by the payment of cash. The buyer of a physically settled futures contract (a "long" position) is obligated to take delivery and pay for a specified quantity of a commodity, while the seller is obligated to make delivery of the commodity in exchange for payment of the settlement price. Historically, all futures contract assets required physical settlement. More recently, cash-settled futures contracts are traded on a wide variety of underlying assets or indices, including stock indexes such as the Standard and Poors 500 Stock Index or the Chicago Board of Trade's Volatility Index. In order to avoid the obligation to make or take delivery of a commodity in a physically settled contract, the holder must close out the contract by an open market transaction. For example, a party "long" a futures contract would sell (that is, "short") the contract in the market. The FCM would then consider the customer to be "flat" and the customer would no longer have an open interest. The clearing house would make a similar adjustment on its books.

39.    Options on futures are contracts in which a buyer, in exchange for payment of a price negotiated on the exchange (the "premium"), has the right (but not the obligation) to acquire the underlying futures contract. The option may be either one giving the holder the right to acquire a "long" contract (that is, a contract to buy the underlying commodity) or a "short" contract (that is, a contract to sell the underlying commodity). The risk to the holder is that he may lose the premium paid for the futures option. Throughout the remainder of this report, all references to futures are intended to include options on futures as well, except to the extent the reference is in the context of a discussion that expressly distinguishes options.

40.    Futures contracts traded on designated contract markets in the United States are cleared through clearing houses approved by the CFTC. The CFTC has a

**Contains Highly Confidential Information**

separate approval process to authorize trading by FCMs of listed futures on foreign exchanges. As with options, the clearing house is responsible for the performance of every futures contract. As with the OCC, futures clearing houses generally require clearing members to establish clearing fund deposits and to provide margin to secure performance of obligations incurred under open contracts held for the clearing member and its customers. Futures clearing houses, like the CME, have broad discretionary powers to increase margin requirements, make intra-day calls for variation (or mark-to-market) margin, and to close out and liquidate a clearing member's futures positions.

41.     In the futures markets, FCMs collect from customers, and clearing houses collect from clearing members, a deposit generally called "initial margin" for every contract (whether long or short). In the futures markets, initial margin is considered equivalent to a good faith performance bond. That is, although neither the clearing house nor the FCM is considered to be extending credit[6] to the holder of the contract, the practical consequence is the same; in the event of a default by the contract holder, the FCM or the clearing house may immediately liquidate the underlying contract and apply the initial margin to cover any loss. The size of the initial margin is based on a percentage of the current market price of the underlying commodity or asset and is generally determined by a formula that takes into account the historical price volatility of the underlying commodity or index and other relevant factors. With respect to futures, unlike options, FCMs require customers, and clearing houses require clearing members, to make a daily payment (and sometimes an intra-day payment), commonly known as a daily settlement, variation or "mark-to-market" payment, in cash, equal to any adverse

---

[6] The industry view that initial margin is considered to collateralize performance and not an extension of credit is predicated on the fact that, because of daily variation payments described below, there is only a one business day market exposure risk and both parties are required to post initial margin.

**Contains Highly Confidential Information**

price movement in an open contract from the previous day's settlement price. Likewise, the clearing house will make a daily mark-to-market payment in cash to the clearing member (and the clearing member will make a corresponding payment to its customer) to reflect any positive change in the contract value. Thus, holders of futures contracts, whether they are long or short the contract, are at risk of loss in an amount that exceeds their initial margin if the contract value decreases (in the case of long contracts) or increases (in the case of short contracts) over time. Holders of options, on the other hand, only risk the loss of the premium paid for the contract if the option expires out of the money. Since futures are leverage contracts, small fluctuations in value can generate substantial variation margin payments relative to the amount of initial margin on deposit.

42.    Futures contracts are traded for one of two basic reasons: to hedge an exposure or to speculate on whether the price of the underlying instrument or asset will go up or down.

43.    The Commodity Exchange Act and CFTC regulations require that customer initial margin be segregated from the FCM's own assets. CFTC rules specify where and how initial margin may be held. (*See* 17 C.F.R. § 31.12.) In general, FCMs are permitted to transfer customer initial margin to customer segregated accounts designated for that purpose maintained by the clearing house. (*Id.*) Because CFTC rules require that the customer segregated account hold, at all times, enough initial margin to cover the requirements of all customers, an FCM will generally deposit additional funds or securities in the customer segregated account to ensure that this requirement is always met, for example, in the event a customer is late posting initial margin or is in default of its obligation to do so. An FCM may also typically maintain cash balances at the clearing house or clearing broker in order to meet daily (or intra-day) variation payments.

Contains Highly Confidential Information

## C.    The OCC.

44.    The vast majority of LBI's domestic exchange-traded derivatives as of the time of closing consisted of options and VIX futures cleared through the OCC. The following is a basic description of how the OCC works.

### 1.    OCC Requirements for Posting Margin and Clearing Funds.

45.    Broker dealers that act as broker for customers who engage in trading options are required by the rules of self-regulatory organizations such as the New York Stock Exchange or the Financial Institutions Regulatory Authority ("FINRA") to collect margin from customers who write (sell) options.

46.    Firms such as LBI and Barclays that clear options (whether for their own account or for customers) are required to margin these positions at the OCC. The OCC's margin rules are different for customer accounts, on the one hand, and for the clearing member's proprietary or market making accounts, on the other hand. For proprietary positions, OCC Rule 601(c) requires a clearing member to post margin in a firm "lien account" in an amount (expressed in U.S. dollars) "such that the minimum expected liquidating value of the account after excluding positions covered by deposits in lieu of margin . . . measured at such confidence levels as may be selected by the Corporation from time to time, will not be less than zero." (OCC Rule 601(c).) The Rule goes on to describe the methodology used to determine the liquidating value not only of the options positions but of any securities that are posted as margin and which are deemed to correlate to the value of the options. (*Id.*)

47.    The calculation of margin for customers is set forth in Rule 601(d). The same methodology is employed in determining customer margin except that long options have a zero value. (OCC Rule 601(d).) In other words, customer margin calculations are

21

**Contains Highly Confidential Information**

based on the liquidating value only of short positions, while the margin for proprietary accounts are based on all of the clearing members option positions, both long and short. (*Id.*).) Adverse market movements require additional margin to be posted to reflect the change in the value of the option position and to protect the clearing broker and OCC.

48.    OCC allows the following types of assets to be posted: a) cash; b) specified securities (including government securities, money market fund shares and debt and equity securities (subject to certain specified standards not relevant for this report)); and c) irrevocable letters of credit issued by an approved bank. (OCC Rule 604.)

49.    Article VIII of the OCC's Bylaws provides for the establishment of a "Clearing Fund" to which every clearing member must contribute. Its purpose is to secure the clearing member's obligation to make good losses suffered by OCC in the event of the failure of the clearing member or any other clearing member to discharge its obligations to OCC. The amount of the clearing fund required to be deposited is set pursuant to a formula. As of the open of business on September 19, 2008, the amount of LBI's clearing fund requirement was $170,993,187.75, and LBI had allocated government securities to meet that requirement which had a value at that time of $171,571,979.25.

2.    *Self-Protective Measures Available to the OCC.*

50.    A clearing member may withdraw margin that exceeds the amount required, subject to the limitation that certain officers of OCC "may, if such officer deems it advisable for any of the reasons described in Rule 609, reject any such withdrawal request." (OCC Rule 608.) Rule 609 deals with intra-day margin. It states in pertinent part:

**Contains Highly Confidential Information**

> A designated officer of the Corporation may require the deposit of such additional margin (intra-day margin) by any Clearing Member in any account at any time during any business day, as such officer deems advisable to reflect changes in ....(iv) the financial position of the Clearing Member, or otherwise to protect the Corporation, other Clearing Members or the general public.

(OCC Rule 609.)

51.     Chapter XI of OCC's Rules deals with OCC's right to suspend a clearing member. A clearing member that is "unable to meet its obligations or is insolvent" must immediately notify the OCC. (OCC Rule 1101.)

52.     The Board of Directors or the Chairman of OCC can summarily suspend any Clearing Member if, among other things, that member is in such financial or operating difficulty that suspension is necessary for the protection of the Corporation, other Clearing Members or the general public. (OCC Rule 1102.)

53.     Upon suspension of a clearing member, the OCC shall promptly convert to cash "in the most orderly manner possible" all margin deposited with OCC (exclusive of securities held in a specific deposit or escrow deposit) and all contributions to the clearing fund. (OCC Rule 1104(a).) The OCC also has the right to draw down cash from any letter of credit posted as margin. (*Id.*) "These and all other funds of the clearing member subject to the control of the [OCC]" (subject to certain exceptions relating to pending transactions) "shall be placed by [OCC] in a special account, to be known as the 'Liquidating Settlement Account'." (*Id.*)

54.     Rule 1106 provides for the close out of long and short positions "in the most orderly manner practicable" and permits OCC to deduct any amount required in connection with such closeouts from the Liquidating Settlement Account. (OCC Rule 1106.)

Contains Highly Confidential Information

**D.      State of the Markets Between September 2, 2008 and September 22, 2008.**

55.      In the months leading up to September of 2008, the equity markets were relatively stable.   But the markets began to deteriorate in September even before the Lehman situation came to a head.  On September 2, the Dow Jones Industrial Average (the "DJIA") stood at 11516, the Standard and Poors 500 Stock Index (the "S&P 500") was 1277, and the Chicago Board Options Exchange's volatility index (the "VIX", called by the media the "fear index") was 21.99.   On September 4, the DJIA fell 344 points, almost 3%, to 11188, and the VIX rose over 12% to 24.03.   On September 8, the DJIA rose by 289 points (over 2.5%), but fell the next day by 280 points.

56.      As news began to emerge on September 15 about the failure of Lehman, the DJIA fell by 504 points, or 4.4 %, and there was a commensurate drop in the S&P 500.  The VIX rose to 31.7, a 23.5 % increase from the previous trading day.  The DJIA now stood at 10917 and the S&P 500 was 1192.  The equity markets went up on the next day but fell again on the 17th, the DJIA falling by almost 450 points, or over 4%.  The VIX was now at 36.22, almost 60% higher than at the beginning of the month.

57.      Reacting to concern about the market volatility, particularly the market for shares of financial companies, the SEC adopted emergency orders restricting any short selling of certain financial stocks.  (Securities Exchange Act of 1934, Release No. 34-58592, Oct. 18, 2008.)  In its order, the Commission stated:

> The Commission is aware of the continued potential of sudden and excessive fluctuations of securities prices and the disruption in the functioning of the securities markets that could threaten fair and orderly markets.

(*Id.*)

24

Contains Highly Confidential Information

58.    In spite of the SEC's action, the markets remained volatile.  Although the

DJIA rose a total of 778 points on the next 2 trading days (September 18 and 19, 2008),

the DJIA fell a total of 534 points between September 22 and 23.  On October 10, the

S&P had declined to 899.  The DJIA was at 8451, down 3065 points from September 2, a

drop of nearly 27%.  The VIX index was at 69.95, an increase of over 200%.

E.    **Events During the Period From September 15 to September 22, 2008.**

59.    By the end of the weekend of September 13-14, 2008, it had become

apparent that LBHI's financial condition was precarious and that the firm would fail.

(See Hrg. Tr., Sept. 19, 2008, at 97:13-24.)  On September 15, 2008, LBHI filed for

bankruptcy.  In order to avoid the potentially disastrous consequences to the financial

markets of a liquidation of what had been one of the largest investment banks in the

United States, representatives of the United States Department of the Treasury, the Board

of Governors of the Federal Reserve System and the SEC actively participated in the

search for a party or parties to acquire LBI.  (Id. at 97:13-24, 10:18-25, 102:3-103:7.)

Barclays Bank, plc, was approached to ascertain whether Barclays or an affiliate would

be interested in acquiring some or all of the North American business of LBI.

60.    With no other party willing to effect an acquisition of LBI's business, (Id.

at 101:1-17), LBHI and Barclays negotiated in a 48 hour period an agreement by which

Barclays would acquire a substantial part of the North American business of LBI.  The

agreement was documented in an Asset Purchase Agreement dated as of September 16,

2008 (the "APA").  The APA was signed on September 17, 2008, and submitted to the

Bankruptcy Court on that same day.

**Contains Highly Confidential Information**

61.    The APA contemplated the acquisition of a substantially complete Business,[7] with the exception of certain "Excluded Assets." Encompassed within that Business were "exchange traded derivatives," which were identified as "Purchased Assets" in the APA (APA p. 6, defining "Purchased Assets," part (d)), and related short positions, which were included among the "Assumed Liabilities" in the APA (*id.*, ¶ 2.3(i)).    The APA contemplated that the Purchased Assets would include any assets supporting the defined Business unless specifically excluded. (*Id.*, p. 6, defining "Purchased Assets" as "all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets).")

62.    At the time of the signing of the APA, Barclays had received only limited, and in some respects inaccurate, information from LBI concerning the long and short positions Barclays had originally contracted to acquire (and even less information, if any, about the exchange-traded derivatives component of those positions).    Indeed, Barclays' only way to gauge the nature of the ETD positions prior to the Closing was to observe directional movements in the OCC's margin requirements.  (*See* Deposition of S. King, at 216:3-217:*14*.) This lack of information was partly the result of the setup of LBI's computer systems, which

---

[7] As defined in the APA, the "Business" being acquired was defined as follows:

> [T]he U.S. and Canadian investment banking and capital markets business of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory business, investment banking operations and LBI's business as a futures commission merchant.

(APA p. 2, defining "Business" (emphasis added)).

**Contains Highly Confidential Information**

lumped together both exchange-traded derivatives and over-the-counter derivatives. (*Id.*)

63.    Subsequent to the signing of the APA, the exchange-traded derivative assets and liabilities of LBI were constantly changing, as was the portfolio of equity securities that Barclays had originally intended to acquire, many of which hedged—or were hedged by—the exchange-traded derivatives. (*See* King Dep., at 91:21-92:3 (discussing shifting nature of assets to be transferred under APA); Ricci Dep., at 136:6-10 (same).)

64.    Many of these changes were the result of self-help that was being exercised by various clearing houses and counterparties to LBI transactions in which LBI's equity positions had been pledged as collateral. Indeed, so much of this collateral had been seized by Wednesday, September 17, 2008, that the parties had to re-negotiate the terms of the deal that were reflected in the APA to account for the fact that much of what LBI had agreed to deliver was either gone or already pledged to other counterparties. Another factor that contributed to the need for renegotiation was the insistence of the Federal Reserve Bank of New York (the "New York Fed") that Barclays step into the New York Fed's shoes on a repurchase agreement that it had entered into with LBI during the prior day[s]. (*See* Ricci Dep., at 131:9-13.) The result of these re-negotiations was an altered deal, pursuant to which Barclays was to receive the assets that were pledged to the New York Fed and certain additional assets instead of LBI's entire trading portfolio. But the re-negotiations did not change the fact that Barclays was to receive the assets and liabilities relating to LBI's exchange-traded derivatives. (*See* APA, p. 6.)

**Contains Highly Confidential Information**

65.    On or about Thursday, September 18, 2008, the CME seized and auctioned off all of LBI's proprietary commodity futures positions after demanding that Barclays guaranty all of the settlement obligations of LBI. Because the sale had not yet been approved by the Bankruptcy Court, Barclays was unable to provide the guaranty. The auctions resulted in a loss to LBI of approximately $1.6 billion – the entirety of the initial margin that LBI had posted in relation to those positions. (Hrg. Tr., Sept. 19, 2008, at 61:14-19 (H. Miller, counsel to LBHI).)

66.    In light of the CME liquidation, LBI believed that the rest of the assets it had deposited with clearing houses to secure its ETD positions were in danger of meeting a similar fate:

> [W]e had had assets like that [OCC margin and clearing deposits], for example, at the CME, and they lost those assets over the course of the week. So we had no confidence that those were potentially our assets given what had been transpiring.

(Deposition of B. McDade, at 275:8-13 ("McDade Dep.").)

67.    The volatility in the markets was reflected by volatility in LBI's OCC margin requirements. For all LBI's OCC accounts (including its clearing fund requirement) the requirement went from approximately $789.6 million at the opening of business on Monday, September 15, 2008 to over $2 billion on Thursday, September 18. The margin excess on September 15 was $476.8 million. By Thursday, LBI's account had a $338.1 million deficit. On Friday morning, just prior to the expiration of September option contracts, the requirement had dropped to $1.7 billion. On two of the days in that week, the margin requirements changed by over $500 million. (Jones Decl. Ex. 1.)

**Contains Highly Confidential Information**

68.    In short, throughout the week of September 15, 2008 (and to a lesser degree even prior to the 15th), LBI's trading positions and the assets supporting them were constantly changing and eroding. While this erosion was occurring, many of the valuations ("marks") for LBI's positions had not been updated since September 12, 2008, the last business day before LBHI filed for bankruptcy, and calculating an accurate valuation for such assets had become extremely difficult. (*See* Deposition of J. Kobak, at 38:18-39:11 ("Kobak Dep.") (agreeing that the "valuations given that week . . . might not have represented what you could actually sell the assets for in the market").)

69.    On September 18, 2008, SIPC issued a press release stating that on September 19, 2008, it would initiate proceedings under the Securities Investor Protection Act placing LBI in liquidation, thereby staying all actions against LBI.[8] In the early afternoon of September 19, SIPC formally initiated the liquidation proceeding. (*Securities Investor Protection Corp. v. Lehman Bros., Inc.*, Case No. 08-cv-8119 (Bankr. S.D.N.Y. Sept. 19, 2008).) As a result, any sale of LBI assets required approval of both SIPC and the Bankruptcy Court.

70.    Additional significant events relating to LBI's exchange-traded derivatives business occurred on September 19. These included two significant actions undertaken by the OCC to protect itself in light of the financial difficulties facing LBI.

71.    First, acting pursuant to OCC's Rule 604(c), the OCC drew down $80,797,001 on the letters of credit posted on behalf of LBI by Australia and New Zealand Bank, Lloyd's TSB Bank, and Bank of Tokyo-Mitsubishi just after noon on

---

[8] Available at http://www.sipc.org/media/release18Sept08.cfm

**Contains Highly Confidential Information**

September 19, thus increasing the amount of cash margin held by OCC. (*See* Interpleader Complaint, Case No. 08-1420 (JMP) (Bankr. S.D.N.Y. Dec. 4, 2008).)

72.    Second, that same day, the OCC refused to release any of the margin in LBI's OCC accounts – excess or otherwise – to LBI. (Jones Decl. ¶¶ 8-9; Declaration of S. Blake, Jan. 8, 2010, ¶¶ 4-5 ("Blake Decl.").) Thus, at the opening of business on September 19, LBI had a certain amount of assets posted with the OCC as margin in relation to LBI's open options and futures positions (consisting of a combination of cash, U.S. Government Treasury bills, and letters of credit issued by various banks),[9] and these assets exceeded, to some degree, the margin requirements the OCC had imposed as of that morning (which is typical in this industry, as discussed below). (*See* E-mail from S. Blake to C. Jones et al., Sept. 19, 2008, 9:31 a.m., attached as Exhibit 1 to the Blake Decl.; Jones Decl., ¶ 8; Blake Decl., ¶ 3.) But during the morning of September 19, 2008, in response to a call from LBI's operations personnel requesting that OCC return the "excess" to LBI, OCC notified LBI that OCC was exercising its right to refuse the release of any of the margin on deposit with OCC. This effectively increased the amount of assets required to satisfy OCC's margin requirements on LBI's options positions, leaving no "excess" in OCC accounts. (*See* E-mail from S. Blake to C. Jones et al., Sept. 19, 2008, 10:19 a.m., attached as Exhibit 1 to the Blake Decl.; Jones Decl., ¶¶ 8-9; Blake Decl., ¶ 4.)

73.    Late in the afternoon of Friday, September 19, 2008, and into the evening, hearings were held before Bankruptcy Judge Peck on a motion for approval of the sale to Barclays. During the hearing, attorneys for LBHI and

---

[9] Certain institutional customers arranged for their custodial banks to provide escrow or deposit receipts with OCC to directly secure performance of their obligations with respect to short options held in the 074C account at OCC.

**Contains Highly Confidential Information**

several other participants emphasized the extraordinary need for expedited approval of the sale, citing potential adverse consequences to customers, employees and the capital markets. (Hrg. Tr., Sept. 19, 2008, at 73:20-74:9, 79:15-20). Harvey Miller, LBHI's counsel, acknowledged that it would not be possible, in light of the circumstances, to await detailed "ordered reports, appraisals, physical inventories, a review of each and every document relating to the transaction." (*Id.* at 59:21-22).

74.    In connection with the Bankruptcy Court hearing on September 19, lawyers for the OCC approached lawyers for the Trustee and Barclays seeking additional measures to ensure that the OCC's interests were protected.  (*See* Kobak Dep., at 178:2-21.)  They asked for two things in particular: (i) that the proposed SIPC Sale Order include a paragraph making clear that Barclays would assume LBI's settlement obligations and acquire the exchange-traded derivatives and margin at the OCC *subject to* the OCC's rights to that property, in accordance with the OCC's bylaws and rules; and (ii) that the Trustee and Barclays enter into an agreement that expressly set forth Barclays' assumption of LBI's settlement obligations for the positions in LBI's OCC accounts and LBI's conveyance of all of its right, title, and interest to all margin and clearing funds held in respect of LBI's OCC accounts to Barclays.  (*See* E-mail from J. McDaniel to S. Grosshandler et al., Sept. 19, 2009, 11:39 a.m., CGSH 00033586-87; E-mail from J. McDaniel to J. Giddens et al., Sept. 20, 2009, 12:47 a.m., CG00023904-05)

75.    At the conclusion of the hearing, the Court approved the sale. (Hrg. Tr., Sept. 19, 2008, at 247:14-253:25).

31

**Contains Highly Confidential Information**

76.    The Court's Sale Order explicitly contemplated that the APA would be
subject to a "clarifying" letter to reflect, *inter alia*, the changes (discussed above) to the
LBI assets available for sale that had occurred during the period between the execution of
the APA on September 17 and the approval by the Court in the early hours of September
20.  (Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy
Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased
Assets Free and Clear of Liens and Other Interests and (b) Assumption and Assignment
of Executory Contracts and Unexpired Leases, Sept. 20, 2008, at 1 (the "Sale Order").)
The Sale Order also incorporated (in paragraph N) the language requested by OCC.  This
included the following statement:

> From and after the Closing Date, all securities, cash, collateral and other property
> transferred to the accounts of the Purchaser at OCC shall be subject to all rights of
> OCC therein in accordance with the By-Laws and Rules of OCC, including,
> without limitation, the security interests and setoff rights of OCC with respect
> thereto.

(Sale Order, ¶ N.)

77.    Immediately following the Sale Hearing, the OCC presented the Trustee
and Barclays with the current draft of a proposed agreement that would memorialize the
substance of the parties' agreement concerning the OCC accounts and solidify the
protections that the OCC received in Paragraph N of the Sale Order.  Among other
things, the proposed agreement provided as follows:

> Lehman hereby sells, assigns, transfers, and sets over to Barclays, without
> recourse or without representation or warranty (other than as expressly
> provided herein), all of Lehman's rights, title, interests, powers, privileges,
> remedies, obligations, and duties in, to, under, and in respect of the
> Account [defined in the agreement as all of LBI's accounts at the OCC],
> as of the Effective Date including with respect to: (i) the Clearing Fund
> deposit; (ii) all margin deposits held by OCC with respect to the Account;
> (iii) all settlement obligations with regard to transactions in cleared

**Contains Highly Confidential Information**

> contracts; and (iv) all rights and obligations in respect of exercises of
> option contracts and assignments of such exercises.

(E-mail from A. Rovira to J. Kobak, E. Rosen et al., Sept. 20, 2009, 2:18 a.m., BCI-
CG00063900 (attaching Trustee's executed copy of the Transfer and Assumption
Agreement ("TAA") along with proposed edits).)

78.    The Trustee signed the draft version of the TAA shortly after being
handed it (either very late on September 19, 2008, or very early on September 20, 2008),
requested no changes to the above text, and consented to the application of his signature
to Barclays' subsequent edits. (*See* Kobak Dep., at 275:17-276:14.) The subsequent
edits did not materially alter the agreement. (*See* E-mail from A. Rovira to J. McDaniel,
E. Rosen, and L. Attanasio, Sept. 20, 2008, 2:18 a.m., BCI-CG00063900.) Although
certain provisions of the agreement were subsequently changed by mutual agreement of
the parties, no party requested any change – and no change was made – to the provision
by which LBI agreed to convey "all margin deposits held by OCC with respect to the
Account" to Barclays. The TAA was executed by Barclays, in its final form, on Monday,
September 22. (*See* E-mail from M. Mazzuchi to J. McDaniel, A. Rovira, E. Rosen, J.
Giddens, J. Kobak, et al., Sept. 22, 2008, 7:51 a.m., LBI000017.)

79.    During the weekend of September 20-21, the three parties to the Transfer
and Assumption Agreement and their counsel corresponded in detail concerning the OCC
accounts and the parties' agreement with respect to the assets and liabilities contained
therein. During these discussions, the OCC's counsel explicitly stated his understanding
to the Trustee that all the margin at OCC would be transferred to Barclays and that the
margin at issue included cash of roughly $1 billion. Barclays' counsel expressly raised
the possibility in these emails that some or all of that margin might be "excess." (See

33

**Contains Highly Confidential Information**

bullet point chronology, *infra*.)    The Trustee never objected to the possibility that
"excess" margin might be transferred to Barclays, nor did the Trustee request any
revision to the proposed language of the TAA providing that Barclays was to receive "<u>all</u>
of Lehman's rights, title, interests, powers, privileges, remedies, obligations, and duties in
. . . <u>all</u> margin deposits held by OCC with respect to the Account." TAA, ¶ 1(a)
(emphasis added).  The communications included the following:

- The OCC wrote to counsel for LBI, the Trustee, and Barclays on Saturday,
September 20, 2008:  "To the Group:  OCC is seeking to confirm its
understanding that the LBI accounts and all positions, cash and securities
collateral that are held by OCC in respect of those accounts are intended to be
transferred to Barclays."  (E-mail from J. McDaniel to R. Berkovich, J.
Kobak, K. Caputo and E. Rosen, Sept. 20, 2008, 12:44 p.m., BCI-
CG00023904-05.)

- In that same email, the OCC raised the issue of a "letter of credit that
secures LBI's obligations to OCC," and recommended that arrangements be
made "to have that letter of credit reissued with Barclays as the account party
to avoid the possibility of a large margin call against Barclays." (*Id.*)

- The OCC also made clear to all parties that it was holding "nearly $1
billion in cash for the accounts of LBI," and the OCC viewed it as important
"that the disposition of these assets is understood and agreed to among all
parties and that the documentation addresses it in a consistent way." (*Id.*)

**Contains Highly Confidential Information**

- In response to the OCC's email, Barclays' counsel inquired, copying LBI and the Trustee's counsel, "Jim—can you tell us more about the $1 bn – is it excess margin?" (E-mail from E. Rosen to J. McDaniel, R. Berkovich, J. Kobak, and K. Caputo, Sept. 20, 2008, 1:09 p.m., BCI-CG00024086-88.)

- In a response written only to Barclays' counsel, counsel to the OCC explained that, "Based on market movements on Friday, a significant amount of it may be excess, but OCC won't know until tomorrow. Also, Friday's trades may use some of the cash." (E-mail from J. McDaniel to E. Rosen and OCC personnel, Sept. 20, 2008, 1:18 p.m., CGSH00025051-53.)

- In a second response written less than three hours later (again, only to Barclays' counsel and OCC personnel), counsel to the OCC explained that "while we have indicated that there may be some release of excess margin collateral on Monday, Saturday morning preliminary numbers actually showed a $5.1 million margin deficit, so I would not look for any large release." (E-mail from J. McDaniel to E. Rosen and OCC personnel, Sept. 20, 2008, 3:52 p.m., CGSH00034127-28.)

- In that same email, counsel to the OCC again raised the issue of the outstanding letter of credit in LBI's name: "How will Barclays replace approximately $252.3 million in letters of credit held by OCC as margin and clearing fund collateral for LBI accounts?" (*Id.*)

- The following day, Counsel to the OCC wrote the following to the Trustee, the Trustee's counsel, and Barclays' Counsel: "Having heard nothing

**Contains Highly Confidential Information**

further from you with respect to cash held by OCC in respect of the LBI accounts, and in accordance with the terms of the Transfer and Purchase Agreement [which, by that point, the Trustee had executed], all such cash in the accounts will be transferred to Barclays assuming that the transaction closes this evening." (E-mail from J. McDaniel to E. Rosen, J. Giddens, J. Kobak, S. Harbeck, Sept. 21, 2008, 4:04 p.m., BCI-OCC_0000993-994.)

• In that same email, OCC's Counsel noted that "[i]f the transaction does not close tonight, OCC would need to immediately liquidate and close out the LBI accounts and is preparing to do so." (*Id.* (emphasis added).)

• In response to the OCC's liquidation threat, SIPC CEO Stephen Harbeck implored the OCC not to liquidate the OCC accounts: "I urge you in the strongest possible terms not to take precipitous action. I have every confidence that if all parties act responsibly, that all parties will actually be acting in their own best interest." (E-mail from S. Harbeck to J. McDaniel, J. giddens, J. Kobak, M. Mazzuchi, W. Navin, J. Cawley, M. Borrelli, and A. Rovira, Sept. 21, 2008, 4:15 p.m., SIPC000171.)

• The OCC agreed not to act "precipitously," but nevertheless reiterated its reluctance to accept any exposure to market movements: "OCC cannot allow the positions to remain in place if no transaction is concluded tonight because OCC will then be exposed to loss if the market moves against LBI's positions." (E-mail chain from J. McDaniel to S. Harbeck, E. Rosen, J.

Contains Highly Confidential Information

Giddens, J. Kobak and OCC representatives, Sept. 21, 2008, 4:37 p.m., BCI-
CG00064722.)

- At 7:51 a.m. on Monday, September 22, 2008, Barclays' Counsel
transmitted to the OCC an executed copy of the TAA. (E-mail from M.
Mazzuchi to J. McDaniel, A. Rovira, E. Rosen, J. Giddens, J. Kobak, et al.,
Sept. 22, 2008, 7:51 a.m. EDT, LBI000017.)

80.    Barclays also specifically asked for information about the margin
posted at the OCC in relation to LBI's exchange-traded derivatives over the
weekend of September 20-21, 2008. (*See, e.g.*, E-mail from S. King to L.
McInerney et al., Sept. 21, 2008, 11:18 a.m. BCI-EX-(S)-00075710.)    This
information was provided by LBI personnel later the same day for both the OCC
and the futures exchanges. (*See* E-mail from F. Pearn to T. Stack et al., Sept. 21,
2008, 4:07 p.m. BCI-EX-(S)-00131273 (attaching OCC collateral reports); E-mail
from F. Pearn to T. Stack and L. McInerney, Sept. 21, 2008, 1:05 p.m., BCI-EX-
(S)-00138547-554 (attaching spreadsheet of futures exchange collateral, BCI-EX-
(S)-00138577 and 138555).)

81.    Barclays attempted to analyze the positions it held for LBI's
affiliates over the weekend of September 20-21 and to understand the potential
risks associated with assuming responsibility for those positions. Again, there
were no clear answers coming from LBI. Indeed it took Barclays, now assisted by
LBI operations personnel, several days after the closing to understand what the
affiliate positions were and in which accounts they were booked and carried, and
even longer to transfer the positions onto its own books and records. (*See, e.g.*,

**Contains Highly Confidential Information**

King Dep., at 260:21-263:25 (discussing information learned about LBI affiliate

holdings); E-mail from S. McKenna to S. King et al., Sept. 24, 2008, 9:43 a.m.,

BCI-EX-(S)-00079004 (discussing need to move and close out LBSF positions);

Clark Decl., ¶ 5 (noting LBSF options were valued at negative $801 million).)

Barclays had also become aware that many of LBI's affiliates had been placed in

receivership or equivalent proceedings in foreign jurisdictions.

82.    At the same time these discussions were taking place, the parties were

working to finalize the clarification letter that had been anticipated during the Friday Sale

Hearing and contemplated in the Sale Order.  The resulting Clarification Letter confirmed

that among the Purchased Assets Barclays was acquiring were the "exchange- traded

derivatives (and any property that may be held to secure obligations under such

derivatives)."  (*See* Clarification Letter, ¶ 1(a)(ii)(C).)

## V.    OPINIONS AND ANALYSIS.

### A.    Opinion #1.

Barclays contends in this litigation that, in the midst of the extreme and uncertain

circumstances surrounding its acquisition of the capital markets, brokerage, futures

commission merchant and other ETD businesses of LBI, Barclays entered into an

agreement with LBI whereby (i) Barclays would assume all of LBI's rights and

obligations in and to all exchange traded derivatives, including options and futures

(hereinafter collectively called "ETDs"), held for LBI's account as well as for the

accounts of LBI affiliates and LBI customers at clearing houses or clearing brokers in

connection with those businesses; and (ii) Barclays would receive all LBI's rights with

respect to the margin and related property (including clearing fund deposits) held by the

clearing houses or clearing brokers in relation to the ETDs (whether such property related

**Contains Highly Confidential Information**

to proprietary positions or customer positions) (hereinafter, the "posted collateral"). Not

only are the governing agreements entirely consistent with this position, but so too are the

record facts, all of which lead me to conclude, based on my experience and expertise in

the derivatives industry, that no rational purchaser would have agreed to acquire the

ETDs, or to assume the financial responsibility of a clearing broker with respect to such

ETDs, without also receiving LBI's rights with respect to the entirety of the posted

collateral. This conclusion is based on the following risks that Barclays faced, each of

which was particularly acute under the circumstances surrounding this acquisition: (i) the

market risk associated with the tens of thousands of unvetted positions in LBI's portfolio

of ETDs, particularly given the extremely volatile market conditions that existed at the

time of this transaction; (ii) the open-ended risk of funding the margin requirements (and

potentially increased clearing fund deposits) and the related capital commitment for the

ETDs under the circumstances in this case, particularly since the size of the requirement

was virtually impossible to determine and fluctuated substantially on a daily and even

hourly basis given the market volatility at the time; and (iii) the risk of default by LBI

affiliates in connection with their ETD positions and the inability to determine the size of

any potential losses Barclays might incur as a result of such defaults.

      **B.**      **Opinion #2.**

      83.      Based on my consideration of the facts described herein, it is also my

opinion that there was a substantial risk – readily apparent to anyone with experience in

this industry – that absent a transfer of LBI's ETDs to Barclays, and the assumption by

Barclays of LBI's responsibilities as a clearing broker, the ETD accounts would have

been liquidated by the respective clearing houses and any intermediary clearing brokers.

In view of the extremely volatile market conditions during the period the deal was being

**Contains Highly Confidential Information**

negotiated and the crisis in the credit markets, such a liquidation could have wiped out all

property held by the clearing houses or clearing brokers as margin.  LBI was well aware

of this risk because the Chicago Mercantile Exchange ("CME") had already liquidated

LBI's proprietary futures positions on its exchanges before the Barclays deal could be

completed and, in the process, all of the initial margin relating to those positions was

depleted.  It is equally apparent to me, as an expert in this industry, that in the event of

such a liquidation, LBI could have incurred additional losses beyond those that the posted

collateral would cover.  For each of these reasons, it was reasonable, in my opinion, for

LBI to conclude that it was in its best interest and the best interest of its customers to

effect a transfer of this business on the terms referenced in Paragraph 82 above.

     **C.**     **Analysis.**

          *1.*     *It Would Be Impossible, Given Only the Information Available to*
                 *Barclays During the Time Frame of the Negotiations, to Value and*
                 *Assess the Risk of the ETD Positions.*

     84.     During the period of negotiations regarding the APA, the Clarification

Letter, the TAA, and related agreements, Barclays continually sought detailed

information regarding the ETD positions it would be acquiring from LBI as a result of the

transaction.

     85.     The information that Barclays received prior to Closing was insufficient to

accurately value the LBI ETD positions or to accurately assess the risks associated with

taking on those positions. (*See* King Dep., at 216:22-217:5 ("So to estimate the list [of

open positions], we did have to speak to the exchanges . . . . Quite literally, we looked

that the margin went up when the market went down.  We used that to estimate that we

must be long.").)  These risks were of three types. The first was market risk due to market

fluctuations and related settlement risks, particularly in LBI's proprietary accounts, such

**Contains Highly Confidential Information**

fluctuations and related settlement risks, particularly in LBI's proprietary accounts, such as those associated with the requirement to cover every trade associated with the exercise or assignment of a short option, or those associated with the requirement to make daily variation margin payments on an open futures contract or to fund the close-out of any futures contract. The second risk category was funding risk; that is, the amount of collateral that Barclays would have to post as margin to avoid a liquidation when the responsibility for the underlying contracts were assumed. Barclays, whose U.S. derivatives positions at OCC were smaller than LBI's, also faced an increase in its clearing fund deposit. The third risk was customer[10] default risk; that is, the risk that a customer would be unable to perform its obligations to LBI. This included, with respect to customer short options, obligations to meet margin requirements and settlement obligations resulting from the exercise or assignment of short options. In the present case, Barclays realized that, for credit purposes, it "owned" the risk of LBSF's positions at OCC which were commingled in the proprietary account. (*See* Clark Decl., ¶ 5 (LBSF options worth negative $801 million as of September 24, 2008).) Similar risks were associated with the affiliates (LBIE, LBOTC and LBF) that had options and futures positions that were carried in LBI's OCC accounts. LBI was, and Barclays became, the *only* party responsible for performance of any obligations arising from ETD trading, regardless of whether the customer met its obligation to Barclays.

86.    Barclays' inability to assess the value and risk of the ETD positions was heightened by the extremely short window of time between the opening of negotiations between LBI and Barclays and the completion of the transaction. Even with perfect

---

[10] I use the term "customer" in its generic sense to include any party for whom LBI cleared options or futures, regardless of whether or not such party was a "customer" under the Federal Securities or Futures Laws or the laws of any other jurisdiction.

**Contains Highly Confidential Information**

information, analyzing the ETD aspect of the transaction would have been extremely

difficult if not impossible in the time available.

> 2.    *The Complexity of LBI's Business and the Short Time-frame*
> *Within Which the Parties Had To Negotiate This Deal Made it*
> *Even More Difficult Than It Otherwise Would Have Been To*
> *Assess the Risks Associated With this Component of the*
> *Transaction.*

87.    The Sale Transaction was not structured as an acquisition of all of the

stock of LBI, which would have been the most simple alternative conceptually, but rather

as an acquisition of LBI's core business through a purchase of assets and an assumption

of liabilities. (*See generally, APA*)

88.    Barclays was to acquire LBI's capital markets, brokerage and FCM

businesses, and to take over LBI's customer accounts.  These are both market and credit

intermediation businesses.  LBI was a major broker and dealer in a host of securities

traded in the fixed income, equities and derivatives markets.  It extended credit to its

customers and needed to finance a huge inventory[11] amounting before the collapse of

LBHI to hundreds of billions of dollars in aggregate.  (Hrg. Tr., Sept. 19, 2008, at 94:5-

12.)  It also provided a range of trade execution and clearing services to affiliates.  In

addition to the inventories acquired in connection with customer facilitation, LBI

conducted a proprietary trading business in which its traders engaged in various trading

strategies for its own account.

89.    In the course of these businesses, LBI traded for itself, for affiliates and

for customers in derivatives, including exchange traded options and futures.  The

proprietary derivatives trading was, in some business units, the core activity.  In other

---

[11] The term "inventory" is used here to include both long and short positions since, from a trader's
perspective, this is what counts. Both long and short positions essentially involved the use of LBI's credit.
Long inventory was effectively pledged to lenders and shorts were covered by cash deposits.

**Contains Highly Confidential Information**

cases, the derivatives were ancillary to trading in underlying securities. In normal circumstances, one broker dealer buying another wants to acquire the various "books" (or trading accounts) of business being conducted by the seller. In acquiring a trading operation, this requires making arrangements to keep the inventories of the various books intact, with trading to be carried on seamlessly by the buyer's own traders or by the seller's personnel retained to manage these "books."

90.    Based on my experience and expertise in the industry, structuring an acquisition of the businesses described in the APA as an asset purchase rather than as a change of control through a purchase of LBI's stock increased the complexity of the transaction enormously. In a normal transaction, the buyer would have come to a complete and accurate understanding of the details not only of the seller's assets and liabilities reflecting the seller's trading inventory, but also of the value of the various trading units. For example, LBI's assets were leveraged. Barclays would have had to plan how to take on the assets and refinance them. Short positions were covered by borrowing securities from numerous counterparties or customers. Barclays would have had to replace all of these arrangements if the short positions were to be maintained.

91.    Under normal conditions, Barclays would have taken the time to make its own assessment of the current value and risks of the ETD positions in light of the current market conditions. In this case, however, the risk evaluation team at Barclays did not have any information on individual ETD positions until the sale hearing had already begun on September 19, 2008 – two days after the APA (including the provision transferring the ETD positions) was signed. (*See* E-mail from C. Mincak to S. King, J. Yang, F. Pearn et al., Sept. 19, 2008, 4:45 p.m., BCI-EX-(S)-00055856 (attaching long options, BCI-EX-(S)-00055857); E-mail from C. Mincak to S. King, J. Yang, F. Pearn, et

**Contains Highly Confidential Information**

al., Sept. 19, 2008, 5:41 p.m., BCI-EX-(S)-00075257 (attaching long and short options, BCI-EX-(S)-00055863).) Moreover, Barclays had no clear understanding regarding the value of the positions. (*See* Deposition of R. Ricci, at 257:7-15 ("there was a lot of confusion and a lot of lack of information").)

92.    With respect to the ETD's, Barclays would, under normal conditions, have understood, and made an assessment of the value of, the various "books" in which proprietary positions were carried, and would have been acquiring those positions along with whatever long or short securities positions hedged (or were hedging) the options or futures. In this case, further complicating factors involved the fact that positions carried for LBSF and cleared through LBI's "proprietary" accounts would have had to be re-booked into customer accounts or transferred to other parties, and Barclays would have had to understand what (if any) margin had been posted to LBI to cover all the affiliate positions, since Barclays was not buying the affiliate businesses. (*See* Clark Decl., ¶¶ 6-8 (describing rebooking).) Accordingly, under normal conditions, Barclays would have had to collect margin from these affiliates if the affiliate margin was not being transferred from LBI. In the present case, Barclays assumed that LBI's affiliates would not be able to post margin and that it would have to assume any losses that might result from these positions, but it had little or no idea of what those losses might be until several days after the closing.

93.    Under normal conditions, Barclays would also have determined whether taking on the ETD positions would result in Barclays having to make arrangements with different clearing brokers. Where Barclays was a clearing member of clearing houses where LBI maintained its ETD positions, Barclays would have had to determine whether the addition of those positions in Barclays' accounts would require it to increase its

44

**Contains Highly Confidential Information**

clearing fund deposit. Clearing brokers for LBI were under no obligation to maintain the

accounts for Barclays, and any purchaser of these positions would have expected to be

able to use margin deposited by the seller to continue to carry the ETD positions whether

at LBI's brokers or Barclays own brokers.

94.    With respect to posted collateral, under normal circumstances a buyer and

seller would have reached an agreement about whether the transfer of ETDs would come

with or without the related collateral. The outcome would depend in part on how the

margin requirements were met (for example, cash collateral vs. letters of credit). But this

determination would be made in the context of accurate information about the related

inventory and positions being acquired and, to some extent, would depend on the

motivations of the parties with respect to the markets in which the ETDs traded. For

example, if ETD positions in a particular market were coming together with inventory to

be actively managed by the buyer, the buyer might be less insistent upon acquiring the

collateral posted and would be more willing to use its own resources. On the other hand,

if the buyer was uninterested in the ETD positions in a market, viewed them as

speculative, and saw that they were likely to liquidate to a loss, the buyer would be

expected to negotiate to obtain the posted collateral for those positions. None of the

conditions for assessing the values and risks of the ETDs were present here. In fact, there

was from the beginning of this transaction a high level of uncertainty about the values of

the businesses, inventory, and composition of the ETD positions. Nor was there any

ability to accurately asses and manage the market, funding and default risks referred to

earlier. In my opinion as an expert in the derivatives industry, a buyer would view the

acquisition of the ETD positions under these conditions solely as the assumption of risks

from which it would want to be protected. And conditioning the assumption of the ETD

**Contains Highly Confidential Information**

positions on the transfer of all property posted to cover the ETDs would be the only rational incentive to assume the risks. In this case, none of the conditions for a "normal" transaction existed, due primarily to the fact that, by necessity, the transaction was negotiated and closed, from start to finish, in a period of seven days.

95.    The parties were aware from the very beginning of the week of September 15, 2008, of the extreme limitations on the time they would have to analyze the nature of the exchange-traded derivatives business that Barclays was to acquire. The parties also became aware during the week of several facts suggesting that LBI's trading books were already in disarray due to significant market activity and seizures that took place in the preceding weeks and due to disruptions in the normal daily activities of LBI's traders. (*See* Ricci Dep., at 92:17-23 (discussing disarray and lack of information resulting from bankruptcy filing).)

96.    Since the parties were aware from the very start of their negotiations of the abnormality of this situation, they would always, in my opinion, have contemplated that Barclays would take over the ETD positions and all of the related collateral (along with all the other assets and liabilities of the capital markets business) except for specified exclusions. And I have seen evidence that Barclays in fact had this very understanding. (*See* Ricci Dep., at 160:17-161:13 ("You wouldn't take the positions and not take the collateral because you yourself have a collateral call the first day."); Deposition of P. Clackson, at 122:3-16; Deposition of M. Klein, 192:21-193:8; King Dep., at 234:11-24.)

97.    In my experience as an industry expert, major financial firms carefully monitor the amount of collateral posted to a clearing house or a clearing broker and seek to manage the collateral efficiently. Particularly for futures accounts, however, it is, in my experience, common practice for an FCM to maintain balances that both exceed the

**Contains Highly Confidential Information**

amount of initial margin required in a customer segregation account and for the purpose of meeting variation and intra-day variation margin calls. This is done to avoid the need to move cash or securities on a daily basis to meet changes in these requirements. Failure to have adequate margin on deposit could limit the ability of traders to increase their positions rapidly. Failure to have sufficient funds segregated for the benefit of customers would subject the FCM to regulatory sanction. The amount of such excess would ordinarily be determined on a case by case basis and would depend on the type of margin being used, the type and size of trading being conducted and the volatility in the market that might dramatically increase the requirement on any given day. Thus, it would be expected that LBI, given the nature and size of its business, would regularly maintain excess margin in its futures clearing accounts. During the extremely volatile conditions present during the time the Lehman-Barclays transaction was being finalized, management of the OCC margin (which fluctuated in some cases by $500 million from day to day) became difficult. Although it was LBI's practice to move cash into or out of the OCC account each day to reflect changes in the daily margin requirement, on September 19 the OCC, exercising its discretion on the morning of that day, refused to allow LBI to withdraw collateral. That action effectively increased LBI's margin requirement to 100% of the value of the assets on deposit.

98.    As the week of September 15, 2008, progressed, the "facts on the ground" changed in ways that rendered the ETDs component of the transaction a much riskier venture even than was contemplated at the beginning of the week.

99.    By September 19, as the Bankruptcy Court hearing was underway, operations and management personnel at both LBI and Barclays were scrambling to determine what exactly LBI had left in its inventory in light of the self help seizures of

47

**Contains Highly Confidential Information**

LBI assets used as collateral with creditors. It became even clearer during this time that it was impossible to approach the transaction in terms of acquiring coherent trading books. Instead, the parties were discussing what inventories remained and which could actually be acquired. The one thing that was virtually certain by this time was that the vast majority – and perhaps the entirety – of the exchange-traded derivatives were essentially naked exposures. That is, Barclays had no assurance that it was acquiring (and in most instances, knew that it was *not* acquiring) the "other side" to these positions. If the ETDs originally hedged (or were hedged by) existing stock positions, Barclays had to presume those hedges were gone, leaving naked exposure and substantially higher risk. And to the extent the ETDs included positions held on behalf of LBI affiliates, they would be completely unhedged by LBI, and Barclays would nevertheless come to "own" these positions, since the affiliates were also insolvent and unlikely to settle their ETD accounts with LBI – let alone with Barclays.

100.    In short, the circumstances as they existed by the end of the week of September 15 made it not just reasonable, but imperative that Barclays acquire all of the collateral held in respect of LBI's various ETD accounts.

> 3.    *The Uncertainty and the Risk Associated With the ETD Positions Was Further Exacerbated by the Highly Volatile Market Conditions Leading Up to the Closing.*

101.    The period during which the Asset Purchase Agreement and the Clarification Letter were negotiated can best be described as chaotic.

102.    Market conditions were extraordinarily volatile and in many ways unprecedented during the period of time during which the transaction was being negotiated and closed, particularly in the equity markets.

**Contains Highly Confidential Information**

103.    As a result, the exposure on the exchange-traded derivatives that were
included in the deal fluctuated substantially from day to day, and even from hour to hour.
These margin requirement fluctuations on OCC alone exceeded $500 million on some
days.

104.    Even if Barclays had sufficient information to value those positions and
assess both the market and funding risks associated with those positions prior to the
Closing, its estimates would have been highly fluid and uncertain in the prevailing market
conditions.

105.    By reason of the prevailing market volatility, anyone in the derivatives
industry would have been concerned that the amount of margin required in respect of the
ETD positions could substantially and rapidly increase, as could the exposure associated
with those positions, and that the margin required on any given day might be
substantially less than the losses that would ultimately be realized.

    *4.    Under the Circumstances, No Rational Acquirer Would Have
    Agreed To Complete this Transaction Without Receiving All of the
    Posted Collateral.*

106.    Because Barclays had to decide whether to close the transaction without
sufficient knowledge of the value and exposure of the ETD positions, it was taking a
blind risk with respect to those positions – something that no rational purchaser of ETDs
would be willing to do without the belief that it was receiving a cushion in the form of the
excess margin posted in the accounts and clearing fund deposits. (*See* King Dep., at
258:23-259:259 (explaining naked risk posed by OCC positions was equivalent of being
long by billions and could easily result in loss of all collateral in a declining market).)

**Contains Highly Confidential Information**

107.    It is particularly true that a rational purchaser would not be willing to assume such open-ended risks under extremely volatile market conditions without also obtaining whatever property was posted in relation to the ETDs.

108.    Thus, it would have been not only reasonable, but expected, for Barclays to refuse to acquire the ETD positions without all of the posted collateral.  The Trustee's representatives were fully aware of Barclays concerns about the potential liability associated with the ETD positions.  (*See* Kobak Dep., at 278:15-279:14.)

> 5.    *The Transaction Documents Are Entirely Consistent With Barclays' Claim That All Posted Collateral Was Included Among the Assets Purchased by Barclays.*

109.    The APA called for the transfer of both long and short ETD positions, as well as "all of the assets of Seller and its Subsidiaries used in connection with the Business." (APA, p. 6 (defining Purchased Assets).)

110.    The Clarification Letter makes explicit the understanding that "any property that may be held to secure obligations" under the ETDs was among the Purchased Assets.  (Clarification Letter, ¶ 1(a)(ii).)

111.    As an industry expert, I conclude that phrase in clause (C) of paragraph 1(a)(ii) of the Clarification Letter ("exchange traded derivatives (and any property that may be held to secure obligations under such derivatives)...") taken in conjunction with the introductory language in paragraph 1(a) ("Purchased Assets" means "all of the assets of Seller used primarily in the business *or necessary for the operation of the Business*"), (Clarification Letter, ¶ 1(a) (emphasis added)), is consistent with Barclays' claim – and would be understood in the industry to mean – that **all** of LBI's ETDs (whether long or short) were passing to Barclays together with any posted collateral, whether in the form

**Contains Highly Confidential Information**

of cash, securities and other property, that was associated with those positions and (ii)

clearing fund deposits.[12]

112.    The TAA, expressly negotiated and agreed to by the Trustee, provides that

LBI transferred all "rights, title, interests, powers, privileges, remedies, obligations, and

duties in, to, under, and in respect of the Account . . . including . . . all margin deposits

held by OCC with respect to the Account." (TAA, ¶ 1(a).)

113.    From the perspective of an expert in this industry, each of these

agreements reflects the same general understanding – that all margin and collateral

associated with the ETD positions was to be transferred to Barclays.

6.    *LBI Was Facing The Imminent Threat That Its Exchange-traded*
       *Derivatives Would Be Liquidated If It Did Not Consummate This*
       *Deal by Monday, September 22, 2008.*

114.    By the time of the September 19 sale hearing, the CME had already taken

the drastic step of auctioning all of LBI's proprietary futures.

115.    In the auctioning of LBI's CME futures contracts, the CME seized all of

LBI's initial margin, auctioned off all of the proprietary positions, and transferred the

positions and the initial margin to the entities who were willing to assume the futures

contracts.

116.    As a result of the CME liquidation, all of the initial margin associated with

the liquidated LBI futures was lost by LBI.

117.    The cost of this liquidation, from LBI's perspective, was $1.6 billion.

118.    The parties were plainly aware by Friday, September 19, 2008, that the

OCC was preparing to take a similar action. Indeed, on that Friday, the OCC drew down

---

[12] The Clarification Letter reflected the fact that the composition of LBI's assets and liabilities used in the business had changed dramatically during the week. This included the fact that its securities inventory (both long and short) was no longer part of the deal, except to the extent held in "clearance boxes" or included in the Barclays Repurchase Agreement (as defined in the Clarification Letter).

**Contains Highly Confidential Information**

on $80 million in letters of credit that were posted as margin in LBI's OCC accounts, and refused to release any of the purported excess margin that it had reported earlier that morning to LBI. If these actions were not plain enough indications of the OCC's concerns, the OCC took the further step of sending a representative to the sale hearing and presenting the parties with contractual language – both for inclusion in the sale order and for inclusion in two additional agreements involving the OCC, Barclays, and the Trustee – designed to protect the OCC's interests. Finally, on September 21, the OCC expressly threatened to liquidate all of LBI's ETD positions on the exchange, including customer positions, if the parties did not consummate this deal and execute the agreement the OCC had proposed by Monday, September 22, 2008. (*See* E-mail from J. McDaniel to E. Rosen, J. Giddens et al., Sept. 21, 2008, 4:04 p.m., BCI-CG00064703 ("If the transaction does not close tonight, OCC would need to immediately liquidate and close out the LBI accounts and is preparing to do so.").)

119.    If OCC had decided to liquidate the LBI positions, including customer positions, it was reasonable for LBI to fear that all or most of the margin posted with respect to those positions would have been depleted in the process, particularly in light of the results of the CME liquidation.[13]

120.    The margin losses would have been particularly severe in the context of a forced liquidation of the holdings of a major financial institution in the market conditions present at the time.

121.    There was a substantial risk that the other clearing corporations and exchanges would have also liquidated LBI's positions, and that such liquidations would

---

[13] In fact, having initiated the intra-day margin call equal to the margin posted, there was no "excess." The margin required at that time was all the margin posted.

**Contains Highly Confidential Information**

similarly result in a loss of all margin and collateral associated with the liquidated ETDs as well as the clearing fund deposits.

122.    It would not have served anyone's interest for the OCC or other clearing houses or brokers to liquidate the ETD positions as the CME had done.

123.    Under all of these circumstances, and in light of the CME example and the threatened OCC liquidation, LBI faced a substantial risk that, even if it had opted to retain the ETDs, it would not have been able to salvage any of the posted collateral.

124.    Moreover, if LBI had not transferred the ETDs to Barclays, not only would the OCC almost certainly have liquidated all of the positions, but it likely would have also drawn down on the remaining $252 million letter of credit issued on behalf of LBI by BNP Paribas, creating an additional debt for LBI's estate.

125.    Finally, in light of the extreme market volatility LBI was facing at the time (*see* paragraphs 55-58, *supra*), keeping the ETD positions would have left LBI exposed to even further losses, above and beyond those which would be covered by the margin already posted at the OCC. This risk was particularly acute given that LBI no longer had the benefit of many of the hedges that had originally offset the ETD equity positions.

126.    Based on all of the above facts, it is apparent to me that transferring both the margin and the ETDs was the best option for LBI and its customers under the circumstances.

## VI.    CONCLUSIONS

127.    Based on the language of the APA, the language of the Sale Order, the language of the Clarification Letter, and the language of the Transfer and Assumption Agreement (as it related to the ETDs carried for LBI at OCC), as well as the above-referenced facts and circumstances, it is clear to me, as an industry expert, that:

Contains Highly Confidential Information

- Being unsure of the scope of the market risks it was assuming in the ETD accounts, how much potential funding exposure it faced in taking on these positions, and unknown potential losses due to default by LBI affiliates for whose positions Barclays was now responsible, and being acutely aware of the market volatility at the relevant time, Barclays would not have been willing to take on this business without receiving all of the posted collateral (including any clearing fund deposits);

- Absent Barclays' assumption of LBI's obligations with respect to the exchange-traded derivatives, this business was in imminent danger of being unraveled by the relevant exchanges and clearing corporations through the medium of forced liquidation of the positions in LBI's ETD accounts;

- There was a substantial risk that such a liquidation could result in a loss of much if not all of the margin LBI had posted with the OCC and the other exchanges and clearing corporations and could have resulted in losses beyond those that the posted collateral (including clearing fund deposits) would cover and also result in losses to LBI's customers;

- For all of these reasons, it was in LBI's best interest to agree to transfer to Barclays the entirety of its exchange-traded derivatives business, including all posted collateral and the clearing fund deposits; and

- The governing agreements are entirely consistent, from the vantage point of an industry expert, with the view that the parties agreed to a transfer of the entirety of LBI's exchange-traded derivatives business, including all of the posted collateral and the clearing fund deposits.

Anthony J. Leitner

January 8, 2010

54

# *In re LEHMAN BROTHERS HOLDINGS INC., et al.,* Case No. 08-13555

### EXPERT REPORT OF ANTHONY J. LEITNER

### Schedule 1: Documents Reviewed

### TRANSACTION DOCUMENTS

Asset Purchase Agreement, dated as of September 16, 2008
Clarification Letter, dated as of September 20, 2008
Transfer and Assumption Agreement, dated as of September 20, 2008

### HEARING TRANSCRIPTS

September 17, 2008
September 19, 2008

### PLEADINGS

The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain
Limited Relief under Rule 60(b)

Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024,
Modifying the September 20, 2008 Sale Order and Granting Other Relief

Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc.,
et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024,
for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of
Bankruptcy Procedure 2002, 6004, and 6006 Authorizing and Approving (a) Sale of
Purchased Assets Free and Clear of Liens and Other Interests and (b) Assumption and
Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008
(and Related SIPA Sale Order) and Joinder in Debtor's and SIPA Trustee's Motions for
an Order Under Rule 60(b) to Modify Sale Order

The Trustee's First Rule 30(b)(6) Deposition Notice to Barclays on Issues Pertaining to
Barclays' Acquisition of LBI Assets and Assumption of LBI Liabilities

### COURT ORDERS

Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy
Procedure 2002, 6004, and 6006 Authorizing and Approving (a) Sale of Purchased Assets

Free and Clear of Liens and Other Interests and (b) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008.

Order Approving, and Incorporating by Reference for the Purposes of This Proceeding an Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman Brothers Holdings, Inc. Chapter 11 Proceeding, Dated September 20, 2008.

Order Commencing Liquidation, Dated September 19, 2008.


**DEPOSITIONS**

a.   Rich Ricci, 9/8/09
b.   Gary Romain, 9/10/09
c.   Jonathan Felder, 7/31/09
d.   Steven Berkenfeld, 08/6/09
e.   Alastair Blackwell, 8/7/09
f.   Mark Shapiro, 8/7/09
g.   Hugh McGee, 8/10/09
h.   John Coghlan, 8/13/09
i.   James Hraska, 8/14/09
j.   Paolo Tonucci, 8/14/09
k.   Robert Azerad, 8/17/09
l.   Martin Kelly, 8/18/09
m.   Gerard LaRocca, 8/19/09
n.   Ian Lowitt, 8/20/09
o.   John Rodefeld, 8/27/09
p.   Joseph Fleming, 8/28/09
q.   Mike Keegan, 8/28/09
r.   Alex Kirk, 8/31/09
s.   Jerry del Missier, 9/1/09
t.   Bart McDade, 9/2/09
u.   James Seery, 9/3/09
v.   John Varley, 9/3/09
w.   Patrick Clackson, 9/4/09
x.   Stephen King, 9/10/09
y.   Archibald Cox, 9/11/09
z.   Robert Edward Diamond Jr., 9/11/09
aa.   Michael Klein, 9/12/09
bb.   James Kobak, 12/07/09


**DEPOSITION EXHIBITS**

1
19

22
25
49
50
51
52
53
86B
87B
88B
95B
150A
151A
152A
153A
154A
155A
156A
157A
158A
159A
160A
161A
162A
163A
208
209
212
218
219
228
229
303B
304B
305B
306B
307B
308B
315B
361A
368A
369A
371A
377A
382
384

387
399
404A
405A

## WITNESS INTERVIEWS

Elizabeth James
Daniel Dziemian
Craig Jones
Sharon Blake
Eric Clark
Stephen King
Sean McKenna
Charles Utley
Lily McInerney
Hatim Banaja

## DECLARATIONS

Declaration of Daniel Dziemian, dated January, 8, 2010, and exhibits thereto
Declaration of Elizabeth James, dated January 8, 2010, and exhibits thereto
Declaration of Craig Jones, dated January 8, 2010, and exhibits thereto
Declaration of Sharon Blake, dated January 8, 2010, and exhibits thereto
Declaration of Eric Clark, dated January 8, 2010, and exhibits thereto

## EMAIL

J. Yang to J. Walker and S. King, Sept. 15, 2008, 10:58 AM
P. Tonucci to G. LaRocca et al., Sep. 16, 2008, 2:32 GMT
G. LaRocca to E Matrullo, Sep. 16, 2008, 2:40 GMT
L. Raben to A. Cox et al., Sep. 17, 20:47 GMT
S. Teague to C. Bernard et al., Sept. 18, 2008, 6:43 PM
C. Bernard to S. Teague et al., Sept. 18, 2008, 6:48 PM
S. Blake to C. Jones et al., Sept 19, 2008, 9: 31 AM
S. Blake to C. Jones et al., Sept. 19, 2008, 10:19 AM
J. McDaniel to S. Grosshandler et al., Sept. 19, 2009, 11:39 AM
J. McDaniel to R. Berkovich et al., Sept. 20, 2008, 12:44 PM
M. Washtell to S. Teague et al., Sept. 19, 2008, 12:59 PM
C.Mincak to S. King, J. Yang, F. Pearn et al., Sept. 19, 2008, 5:41 PM
J. McDaniel to E. Rosen et al., Sep. 19, 2008, 18:03 GMT
J. McDaniel to E. Rosen, J. Giddens et al., Sept. 21, 2008, 4:04 p.m.
J. Yang to C. Mincak et al., Sept. 19, 2008, 5:23 PM
C. Mincak to J. Yang et al., Sept. 19, 2008, 5:41 PM

4

J. Yang to A. DeCarolis et al., Sept. 19, 2008, 5:44 PM
A. Rovira to J. Kobak, E. Rosen et al., Sept. 20, 2009, 2:18 AM
S. Teague to M. Washtell et al., Sept. 20, 2008, 10:15 AM
J. McDaniel to R. Berkovich et al., Sept. 20, 2008, 12:44 PM
E. Rosen to J. McDaniel, R. Berkovich, J. Kobak, and K. Caputo, Sept. 20, 2008, 1:09 PM
J. McDaniel to E. Rosen and OCC personnel, Sept. 20, 2008, 1:18 PM
J. McDaniel to E. Rosen and OCC personnel, Sept. 20, 2008, 3:52 PM
J. McDaniel to E. Rosen, J. Giddens, J. Kobak, S. Harbeck, Sept. 21, 2008, 4:04 PM
S. Harbeck to J. McDaniel et al., Sept. 21, 2008, 4:15 PM
J. McDaniel to S. Harbeck and OCC representatives, Sept. 21, 2008, 4:37 PM
J. Yang to D. Regan et al., Sept. 23, 2008, 7:27 AM
S. King to L. McInerney et al., Sept. 21, 2008, 11:18 AM
F. Pearn to T. Stack and L. McInerney, Sept. 21, 2008, 1:05 PM
S. McKenna to S. King et al., Sept. 24, 2008, 9:43 a.m.
F. Pearn to T. Stack et al., Sept. 21, 2008, 4:07 PM
C.Mineak to S. King, J. Yang, F. Pearn et al., Sept. 19, 2008, 4:45 PM
G. Reilly to C. Mincak et al., Sept 21, 2008, 7:09 EDT
G. Reilly to C. Mincak et al., Sept 21, 2008, 7:10 EDT
S. King to G. Reilly et al., Sept. 21, 2008, 7:12 EDT
L. McInerney to S. King et al., Sept. 21, 2008, 9:09 EDT
S. King to L. McInerney et al., Sept. 21, 2008, 9:18 EDT
C. Mincak to S. King et al., Sept. 19, 2008, 4:45 PM
Mincak to S. King, J. Yang, F. Pearn, et al., Sept. 19, 2008, 5:41 PM
F. Pearn to J. Shi et al., Sept. 21, 15:21 GMT
F. Pearn to A. Stucchio et al., Sept. 21, 15:23 GMT
A. Stucchio to F. Pearn et al., Sept. 21, 15:24 GMT
S. King to F. Pearn et al., Sept 21, 15:26 GMT
P. Tennyson to A. Stucchio, Sept. 21, 2008, 15:29 GMT
F. Pearn to A. Stucchio, Sept. 21, 2008, 15:42 GMT
A. Stucchio to M. Kelly et al. Sept. 21, 2008, 15:50 GMT
F. Pearn to L. McInerney et al., Sept. 21, 2008, 15:53 GMT
F. Pearn to A. Stucchio, Sept. 21, 2008, 16:03 GMT
T. Stack to S. King et al., Sept. 21, 2008, 16: 04 GMT
P. Tennyson to A. Stucchio et al., Sept. 21, 2008, 16:09 GMT
G. Reilly to M. Kelly, Sept. 21, 2008, 16:16 GMT
G. Reilly to I. Lowitt, Sept. 21, 2008, 16:30 GMT
G. Reilly to I. Lowitt, Sept. 21, 2008, 16:57 GMT
F. Pearn to T. Stack, Sept. 21, 2008, 17:05 GMT
I. Lowitt to P. Tonucci, Sept. 21, 2008, 17:07 GMT
T. Stack to R. Konefal, Sept. 21, 2008, 17:10 GMT
T. Stack to F. Pearn et al., Sept. 21, 2008, 17:11 GMT
F. Pearn to P. Tenneyson et al., Sept. 21, 2008, 17:14 GMT
F. Pearn to T. Stack, Sept. 21, 2008, 17:14 GMT
P. Tenneyson to M. Neilson et al., Sept. 21, 2008, 17:18 GMT
M. Neilson to P. Tenneyson et al., Sept. 21, 2008, 17:43 GMT

T. Stack to F. Pearn, Sept. 21, 2008, 17:55 GMT
F. Pearn to T. Stack, Sept. 21, 2008, 17:56 GMT
J. Shi to F. Pearn, Sept. 21, 2008, 18: 18 GMT
C. Jones to F. Pearn, Sept. 21, 2008, 18:19 GMT
T. Stack to S. King, Sept. 21, 2008, 18:29 GMT
F. Pearn to J. Shi et al., Sept. 21, 2008, 18:30 GMT
J. Shi to F. Pearn et al., Sept. 21, 2008, 18:36 GMT
P. Tenneyson to C. Jones, Sept. 21, 2008, 18:37 GMT
C. Jones to P. Tenneyson, Sept. 21, 2008, 18: 38 GMT
F. Pearn to G. Reilly, Sept. 21, 2008, 18: 54 GMT
P. Tenneyson to C. Jones, Sept. 21, 2008, 18:56 GMT
C. Jones to J. Potenticano, Sept. 21, 2008, 19:09 GMT
J. Potentciano to C. Jones, Sept. 21, 2008, 19:24 GMT
T. Stack to F. Pearn, Sept. 21, 2008, 1939 GMT
F. Pearn to I. Lowitt, Sept. 21, 2008, 20:03 GMT
F. Pearn to T. Stack et al., Sept. 21, 2008, 20:07 GMT
T. Stack to N. Moriera et al., Sept. 21, 2008, 20:13 GMT
N. Leyhane to T. Stack et al., Sept. 21, 2008, 20:31 GMT
L. McInerney to T. Stack et al., Sept. 21, 2008, 20:32 GMT
N. Leyhane to T. Stack et al., Sept. 21, 2008, 20:51 GMT
T. Stack to N. Leyhane et al., Sept. 21, 2008, 20:56 GMT
N. Leyhane to T. Stack et al., Sept. 21, 2008, 20:59 GMT
T. Stack to N. Leyhane et al., Sept. 21, 2008, 21:05 GMT
D. Dziemian to T. Stack, Sept. 21, 2008, 2:57 GMT
D. Dziemian to T. Stack, Sept. 21, 2008, 2:58 GMT
M. Mazzuchi to J. McDaniel et al., Sept. 22, 2008, 7:51 AM EDT
E. Rosen to J. McDaniel et al., Sep. 29, 1008, 17:55 GMT
A. Rovira to E. Rosen, Sep. 20, 2008, 12:16 AM
A. Rovira to E. Rosen et al., Sep. 20, 2008, 1:50 AM
A. Rovira to J. McDaniel et al., Sep. 20, 2008, 2: 18 AM
J. McDaniel to R. Berkovich et al., Sep. 20, 2008, 11:44 AM
J. McDaniel to E. Rosen, Sep. 20, 2008, 12:52 PM
E. Rosen to A Rovira, Sep. 20, 2008, 12:28 PM
J. McDaniel to R. Berkovich, Sep. 20, 2008, 12:45 PM
E. Rosen to J. McDaniel et al., Sep 20, 2008, 1:09 PM
J. McDaniel to E. Rosen et al., Sep. 20, 2008, 1:15 PM
S. King to S. McKenna et al., Sep. 20, 2008, 20:53 GMTP. Clackson to J. Walker, Sep.
20, 2008, 18:46 GMT
M. Mazzuchi to A. Rovira et al., Sep. 20, 2008, 7:08 PM
M. Navin to E. Rosen et. al., Sep. 21, 2008, 11:06 AM
J. McDaniel to E. Rosen et al., Sep. 21, 2008, 11: 38 AM
E. Rosen to J. McDaniel et al., Sep. 21, 2008, 11:56 AM
J. McDaniel to E. Rosen et al., Sep 21, 2008, 4:04 PM
S. Harbeck to J. McDaniel et al., Sep 21, 2008, 4:15 PM
E. Rosen to J. McDaniel et al., Sep. 21, 2008, 4:31 PM
J. McDaniel to S. Harbeck et al., Sep. 21, 2008, 4:37 PM

6

S. King to S. McKenna et al., Sep. 22, 2008, 4:06 GMT
A. Blackwell to I. Lowitt et al., Sep. 22, 2008, 4:36 GMT
M. Mazzuchi to J. McDaniel et al., Sep. 22, 2008, 7:51 AM
J. Hraska to J. Rodefeld et al., Sep. 22, 2008, 15:35 GMT
M. Turner to J. Rodefeld et al., Sep. 22, 2008, 15:49 GMT
S. McKenna to J. Jennings et al., Sep. 22, 2008, 18:45 GMT
S. McKenna to Z. Vargas et al., Sep. 22, 2008, 18:47 GMT
S. King to T. Stack et al., Sep 22, 2008, 18:49 GMT
M. Turner to J. Rodefeld et al., Sep 22, 2008, 19:47 GMT
S. King to M. Schmanske et al., Sep. 22, 2008, 19:52 GMT
S. King to N. Leyhane, Sep. 22, 2008, 19:58 GMT
S. McKenna to S. King et al., Sep. 22, 2008 23:57 GMT
N. Moreira to S. King et al., Sep 23, 2008, 00:16 GMT
S. King to N. Moreira et al, Sep. 23, 2008, 00:23 GMT
N. Moreira to N. Leyhane et al., Sep. 23, 2008, 00:40 GMT
Moreira to S. McKenna et al., Sep. 23, 2008, 00:46 GMT
S. Garg to S. McKenna et al., Sep. 23, 2008, 1:24 GMT
S. McKenna to S. Garg et al., Sep. 23, 2008, 1:33 GMT
S. Garg to S. McKenna et al., Sep. 23, 2008, 1:35 GMT
S. McKenna to S. Garg et al., Sep. 23. 2008, 2:12 GMT
S. Garg to S. McKenna et al., Sep. 23, 2008, 3:10 GMT
S. McKenna to S. King, Sep. 23, 2008, 3:33 GMT
S. King to S. McKenna et al., Sep. 23, 2008, 11:04 GMT
T. Lucas to S. Garg et al., Sep. 23, 2008, 12:07 GMT
S. Garg to T. Lucas et al., Sep. 23, 2008, 12:12 GMT
G. Donini to S. Garg et al., Sep. 23, 2008, 13:07 GMT
R. Konefal to T. Lucas et al., Sep. 23, 2008, 13:53 GMT
S. McKenna to S. King et al., Sep. 23, 2008, 15:22 GMT
N. Moreira to S. King, Sep. 23, 2008, 20:17 GMT
S. McKenna to S. King, Sep. 24, 2008, 10:29 GMT
S. McKenna to S. King, Sep. 24, 2008, 11:51 GMT
S. McKenna to N. Moreira, Sep. 24, 2008, 13:51 GMT
M. Turner to G. LaRocca, Sep. 25, 2008, 15:50 GMT
S. McKenna to S. King, Sep. 28, 2008, 14:07 GMT
S. McKenna to J. Yang, Sep. 28, 2008, 17:46 GMT
D. Dziemian to S. Garg, Sep. 29, 2008, 18:36 GMT
S. McKenna to S. King, Sep. 30, 2008, 17:35 GMT
T. Lucas to S. King et al., Sep. 30, 2008, 21:24 GMT
S. King to T. Lucas et al., Sep. 30, 2008, 21:26 GMT
S. McKenna to S. King et al., Sep. 30, 2008, 23:12 GMT
C. Jones to L. Vecchio et al., Oct 1, 2008, 23:48 GMT
R. Mattesky to S. King, Sep. 11, 2008, 10:53 GMT
S. King to R. Mattesky, Sep. 11, 1008, 10:56 GMT
S. King to W. Robinson et al., Sep. 11, 2008, 11:49 GMT
Lehman to S. King, Sep. 12, 2008, 3:09 GMT
J. Yang to S. King et al., Sep. 12, 2008, 12:14 GMT

7

P. Bansal to S. King et al., Sep. 12, 2008, 13:01 GMT
V. Shilpiekandula to S. King et al., Sep. 12, 2008, 18:07 GMT
V. Shilpiekandula to S. King et al., Sep. 12, 2008, 18:30 GMT
P. Bansal to Y. Ali et al., Sep. 12, 2008, 21:47 GMT
V. Shilpiekandula to S. King, Sep. 12, 2008, 22:38 GMT
S. King to R. Babcock, Sep. 12, 2008, 22:57 GMT
E. Anderson to K. Marheineke et al., Sep.13, 2008, 00:25 GMT
J. Moynihan to S. King et al., Sep. 13, 2008, 00:48 GMT
J. Yang to S. King et al., Sep. 13, 2008, 2:57 GMT
C. Bernard to S. King, Sep. 13, 2008, 14:20 GMT
C. Bernard to S. King, Sep. 13, 2008, 15:05 GMT
J. Goodman to K. Agrawal, Sep. 13, 2008, 21:42 GMT
C. Bernard to S. King, Sep. 15, 2008, 22:25 GMT
C. Mincak to S. King, Sep. 15, 2008, 23:24 GMT
J. Yang to J. Walker et al., Sep. 17, 208, 14:58 GMT
S. King to P. Clackson et al., Sep. 17, 2008, 19:01 GMT
P. Clackson to S. King et al., Sep. 17, 2008, 19:04 GMT
S. King to P. Clackson et al., Sep. 17, 2008, 19:09 GMT
P. Clackson to S. King et al., Sep. 17, 2008, 19:14 GMT
J. Mahon to M. Keegan et al, Sep. 17, 2008, 20:49 GMT
J. Yang to S. King, Sep. 17, 2008, 21:25 GMT
C. Mincak to S. King et al., Sep. 17, 2008, 23:23 GMT
M. Duff to A. Guest et al., Sep. 18, 2008, 10:54 GMT
M. Duff to A. Guest et al., Sep. 18, 2008, 11:06 GMT
M. Duff to A. Guest et al., Sep. 18, 2008, 11:14 GMT
S. King to M. Duff et al., Sep. 18, 2008, 11:20 GMT
T. Stack to M. Duff et al., Sep. 18, 2008, 11:20 GMT
M. Duff to S. King et al., Sep. 18, 2008, 11:38 GMT
M. Duff to S. King et al., Sep. 18, 2008, 12:16 GMT
S. King to J. Yang, Sep. 18, 2008, 12:57 GMT
J. Yang to S. King, Sep. 18, 2008, 13:06 GMT
J. Yang to S. King, Sep. 18, 2008, 13:08 GMT
J. Yang to S. King, Sep. 18, 2008, 13:42 GMT
M. Schmanske to S. King, Sep. 18, 2008, 14:32 GMT
C. Bernard to J. Yang et al., Sep. 18, 2008, 15:10 GMT
C. Bernard to J. Walker et al., Sep. 18, 2008, 15:15 GMT
C. Bernard to J. Walker et al., Sep. 18, 2008, 15:15 GMT
S. King to D. Warren, Sep. 18, 2008, 23:08 GMT
S. King to D. Joshi et al., Sep. 18, 2008, 23:10 GMT
P. Clackson to S. King et al., Sep. 19, 2008, 00:38 GMT
P. Clackson to S. King et al.,Sep. 19, 2008, 00:57 GMT
G. Reilly to S. King et al., Sep. 19, 2008, 5:29 GMT
D. Martin to S. King et al., Sep. 19, 2008, 14:58 GMT
C. Mincak to S. King et al., Sep. 19, 2008, 20:45 GMT
J. Yang to C. Mincak et al., Sep. 19, 2008, 21:23 GMT
S. Garg to S. King, Sep. 19, 2008, 21:40 GMT

C. Mincak to J. Yang et al., Sep. 19, 2008, 21:41 GMT
S. King to R. Ricci, Sep. 21, 2008, 2:17 GMT
R. Ricci to S. King, Sep. 21, 2008, 2:56 GMT
J. Yang to S. King, Sep. 21, 2008, 12:19 GMT
S. King to J. Yang, Sep. 21, 2008, 12: 33 GMT
S. King to G. Reilly et al., Sep. 21, 2008, 13:12 GMT
M. Malloy to S. King et al., Sep. 21, 2008, 13:50 GMT
S. King to E. Yoss et al., Sep. 21, 2008, 15:03 GMT
S. King to L. McInerney et al., Sep. 21, 2008, 15:18 GMT
T. Stack to S. King, Sep. 21, 2008, 18:29 GMT
G. LaRocca to S. King, Sep. 21, 2008, 19:58 GMT
S. King to G. LaRocca, Sep. 21, 2008, 20:03 GMT
T. Stack to S. King et al., Sep. 21, 2008, 21:27 GMT
T. Stack to S. King et al., Sep. 21, 2008, 22:11 GMT
T. Stack to S. King et al., Sep. 21, 2008, 22:23 GMT
N. Moreira to S. King et al., Sep. 22, 2008, 00:16 GMT
S. King to G. Donini, Sep. 22, 2008, 1:15 GMT
S. King to S. McKenna et al., Sep. 22, 2008, 4:06 GMT
S. King to D. Warren, Sep. 18, 2008, 23:08 GMT
S. King to P. Clackson et al., Sep. 17, 2008, 19:09 GMT
P. Clackson to S. King et al., Sep. 17, 2008, 19: 14 GMT
J. Yang to S. King, Sep. 18, 2008, 13:08 GMT
J. Yang to S. King, Sep. 18, 2008, 13:06 GMT
S. King to J. Yang, Sep. 18, 2008, 12:57 GMT
S. King to D. Joshi et al., Sep. 18, 2008, 23:10 GMT
P. Clackson to S. King et al., Sep. 19, 2008, 00:38 GMT
S. King to R. Ricci, Sep. 21, 2008, 2:17 GMT
R. Ricci to S. King, Sep. 21, 2008, 2:56 GMT
C. Bernard to J. Walker et al., Sep. 18, 2008, 15:15 GMT
C. Bernard to S. King, Sep. 13, 2008, 15:05 GMT
D. Martin to S. King et. al., Sep. 19, 14:58 GMT
S. King to E. Yoss et al., Sep. 21. 2008, 15:03 GMT
J. Yang to S. King, Sep. 18, 2008, 13:08 GMT
S. King to M. Duff et al., Sep. 18, 2008, 15:23 GMT
J. Yang to M. Duff et al., Sep. 18, 2008, 16: 02 GMT
S. King to M. Duff et al., Sep. 18, 2008, 12:29 GMT
M. Duff to A. Guest et al., Sep. 18, 2008, 10:54 GMT
M. Duff to A. Guest et al., Sep. 18, 2008, 11: 06 GMT
S. King to M. Duff et al., Sep. 18, 2008, 11:20 GMT
C. Jones to F. Pearn et al., Sep. 21, 2008, 18:19 GMT
D. Murgio to K. Bryan et al., Sep. 21, 2008, 12:46 PM

9

**CORRESPONDENCE**

Hughes Hubbard Letter to Boies, Schiller & Flexner, Dated April 22, 2009
Barclays Letter to Trustee, James Giddens, Dated March 25, 2009
Barclays Letter to Trustee, James Giddens, Dated May 13, 2009
OCC Letter to Trustee, James Giddens, Dated October 15, 2008

**MISCELLANEOUS**

OCC Rules
OCC Bylaws

**MEDIA**

Wall Street Journal, Fate Spurs Emergency Session --- Wall Street Titans Seek Ways to
Stem Widening Crisis, September 13, 2008.
Wall Street Journal, Ultimatum By Paulson Sparked Frantic End, September 15, 2008.

## *In re LEHMAN BROTHERS HOLDINGS INC., et al.,* Case No. 08-13555

<u>EXPERT REPORT OF ANTHONY J. LEITNER</u>

### Schedule 2: Curriculum Vitae

**Anthony J. Leitner**
**36 Ridgewood Terrace**
**Maplewood, NJ 07040**

<u>**Employment history**</u>:

- May 2007 – present:
  Consultant on securities and futures regulation, NYSE-Euronext

- March 2004 – present:
  Attorney (admitted NY, 1970)
  Managing Member, A J Leitner & Associates LLC

- October, 1979 – November 2003:
  Legal Department of Goldman, Sachs & Co.
  1979 – 1999 – Vice President and Associate General Counsel
  1993 – 1998 – Coordinator, Derivatives Practice Group
  1999 – 2003 - Managing Director and General Counsel, Equities
  Division
- September 1969 – October 1979
  Curtis, Mallet-Prevost, Colt & Mosle
  Associate Attorney

<u>**Education**</u>:

- Columbia College AB 1965

- Northwestern University School of Law JD 1969

<u>**Publications**</u>:

- *"Trading Foreign Options: Rules of the Game"* (Futures Industry Magazine, Sept/Oct 2004).

- *"Recent Developments in Portfolio Margining and Cross-margining"* (Capital Markets Law Journal, Vol.2, no. 3, 2007).

- *"Clearing the Deck - Cross Margining Futures and Securities: a Fork in the Road Ahead"* (FI magazine, March/April 2007).

- *"Portfolio Margining – Can We Put Securities and Futures on a Level Playing Field"* (FI Outlook, 2006).

1

**Regulatory Advisory Committees**:

- Technology Advisory Committee, Commodity Futures Trading Commission (2000-2006)

- Market Transactions Advisory Committee, Securities & Exchange Commission (1989-1992)

- Co-Chair, Ad Hoc Regulation T Committee, Securities Industry Association (1987-1997)

- Derivative Products Committee, Securities Industry Association/Securities In (formation to present)

- Securities Futures Project (2002)

**Trade and Professional Associations**:

- Securities Industry Association Law & Compliance Division

- Futures Industry Association, Law & Compliance Division

- American Bar Association, Business Law Section, Committee on Futures and OTC Derivative Products

- New York State Bar Association, Futures Law Committee

**Professional Awards**:

- Securities Industry Association Distinguished Service Award (November, 2002)

# BCI EXHIBIT

# 341

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

# Expert Report of Professor Paul Pfleiderer

in the matter of

In Re:  Lehman Brothers Holdings Inc., *et al.*, Debtor

and

In Re:  Lehman Brothers Inc., Debtor

**January 8, 2010**

**Volume 1 of 2**

Contains Highly Confidential Information

TABLE OF CONTENTS

I.    Executive Summary ...................................................................................................1

    A.    Qualifications and Assignment ...........................................................................1

    B.    Summary of Opinions .........................................................................................2

    C.    Overview of the Remainder of This Report ........................................................4

II.    Alleged $5 Billion Discount in the Fed Replacement Repo ...........................................4

    A.    Overview of the Fed Replacement Repo .............................................................6

    B.    What Barclays Lent .............................................................................................9

    C.    What Barclays Received .....................................................................................10

        i.    Identifying transferred positions ...........................................................14

        ii.    Valuing transferred positions .................................................................16

        iii.    Lehman, JP Morgan Chase, and Bank of New York marks .....................22

        iv.    Barclays "exit price" marks ...................................................................29

        v.    Aggregate value of transferred positions ...............................................37

    D.    Ex Post Assessment of Profits from Trading Assets Acquired from LBI.............41

    E.    Conclusion ........................................................................................................45

III.    Alleged $5 Billion Discount at Inception ..................................................................45

    A.    Estimated Transaction Balance Sheet as of September 16, 2008 ........................47

    B.    Updated Transaction Balance Sheet as of September 17, 2008 ..........................51

    C.    Conclusion ........................................................................................................53

IV.    Risks Arising from the Acquisition ...........................................................................54

    A.    Information Risk ................................................................................................54

    B.    Market Risk .......................................................................................................56

    C.    Business and Strategic Risks ..............................................................................60

    D.    Conclusion ........................................................................................................62

V.    Barclays' Accounting Gain on the Acquisition .........................................................63

    A.    Key Documents Summarizing the Acquisition from an Accounting
        Perspective ........................................................................................................64

Contains Highly Confidential Information

B.    Recap of the Acquisition Based on Barclays' 2008 Results Announcement
Summary of the Acquisition...................................................................64

C.    Barclays' Accounting Gain on the Acquisition Does Not Indicate That
Barclays Obtained a Secret or Unfair Discount....................................70

VI.    **Benefits of the Acquisition**..............................................................................72

A.    Benefits for the LBHI and LBI Estates, Lehman Creditors, and Lehman
Customers...............................................................................................73

B.    Public Benefits.......................................................................................77

C.    Conclusion..............................................................................................77

**Appendix One:**     **Resume of Professor Paul Pfleiderer** ......................................79

**Appendix Two:**     **List of Documents and Other Materials Reviewed and
Considered** ................................................................................84

**Appendix Three:**     **Asset Types Transferred to Barclays**.....................................103

**Appendix Four:**     **Information on Selected Securities Transferred to Barclays**...........106

**Appendix Five:**     **Exhibits** ..................................................................................118

Exhibit 1:     Positions Comprising the Collateral Transferred to Barclays in the
Fed Replacement Repo...........................................................119

Exhibit 2:     Positions Included in "Trading Portfolio Assets" that Were Not
Transferred to Barclays in the Fed Replacement Repo ..........121

Exhibit 3:     Sample of "Short Names" of Securities in the Repo Collateral.............122

Exhibit 4:     "Stickiness" in GFS Marks for Level III Securities................125

Exhibit 5:     "Stickiness" in GFS Marks for Level II Securities ................127

Exhibit 6:     Comparison of Indicated Values Using BoNY Marks To Indicated
Valules Using Barclays Marks for Selected Individual Positions
and Groups of Similar Positions .............................................130

Exhibit 7:     Updated Transaction Balance Sheet (Assets Only) Based on
"LBI BS_917_V with Adjustment.xls" ...................................131

Exhibit 8:     Summary of Bank Acquisitions that Resulted in Negative Goodwill.....132

Contains Highly Confidential Information

# I.    Executive Summary

## A.    Qualifications and Assignment

1.    My name is Paul Pfleiderer.  I am the C.O.G. Miller Distinguished Professor of Finance at the Graduate School of Business at Stanford University.  I also am Professor of Law (by courtesy) at Stanford Law School, Stanford Graduate School of Business Trust Faculty Fellow for 2009-2010, and Co-Director of the Wealth Management Executive Program at Stanford.  Appendix One to this report is a copy of my current resume, which provides additional information about my training, employment history, teaching, research, publications, and prior testimonies.

2.    I have been retained by Boies, Schiller, and Flexner LLP, Counsel for Barclays Capital Inc. ("Barclays"), to analyze certain economic, financial, accounting, and valuation issues arising in this matter.[1]  The issues I analyzed and the opinions I express in this report all relate to a voluntary exchange (the "Acquisition" or "Transaction") between Barclays and Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), and LB 745 LLC ("LB 745" and, together with LBHI and LBI, "Lehman") as a result of which Barclays acquired the North American broker-dealer businesses of LBI (the "Businesses"), Lehman's world

---

[1] This matter involves three motions before the Court brought by three Movants:  (a) a Motion for an Order . . . Modifying the September 20, 2008 Sale Order and Granting Other Relief (the "Debtor's Motion") brought by the bankruptcy estate of LBHI (the "Debtor"); (b) a Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b) (the "Trustee's Motion") brought by James W. Giddens (the "Trustee") as trustee for the SIPA liquidation of LBI; and (c) a Motion . . . for Relief from Order . . . Authorizing and Approving . . . Sale of Purchased Assets Free and Clear of Liens and Other Interests . . . (the "Committee's Motion") brought by the Official Committee of Unsecured Creditors of LBHI (the "Creditors' Committee").

Contains Highly Confidential Information

headquarters building, and two data centers.[2]  I have been asked to analyze issues related to the

structure and pricing of the Acquisition, the risks associated with the Acquisition, the valuation

of certain assets and liabilities transferred to Barclays as part of the Acquisition, and the benefits

of the Acquisition for the LBHI and LBI estates, for Lehman's creditors and customers, and for

the general public.  I also was asked to analyze the accuracy and thoroughness of Barclays'

accounting for the Transaction, as set forth in its 2008 Results Announcement and further

detailed in work papers and files supporting the summary of the Transaction contained in that

Announcement.[3]

3.    I am being compensated for my work on this matter at my standard hourly rate,

which is $700 per hour.  I am being assisted by consultants at Finance Scholars Group, who are

working at my direction and are being compensated at their standard hourly rates.

B.    Summary of Opinions

4.    In this subsection, I provide a brief summary of the major opinions I hold

regarding the issues I examined.  My opinions are based on the facts of this case as I now

understand them and on the analyses described in the remainder of this report.  My work on this

case is continuing, and I reserve the right to revise or augment the findings and opinions set forth

here in the event that additional information relevant to the issues I examined becomes available,

in response to questions raised in my deposition, to take into account or reply to analyses

presented by experts retained by the Movants, or for other reasons.

---

[2] The terms of the Acquisition were negotiated in the days immediately following LBHI's filing for bankruptcy on September 15, 2008.  Following a hearing that began on Friday, September 19 (the "Sale Hearing"), the Transaction was approved by this Court the next day, and then closed on Monday, September 22, 2008.

[3] I am not a CPA and did not examine and do not opine as to whether Barclays' accounting for its acquisition of LBI's North American broker-dealer businesses complied with applicable accounting principles.  So far as I am aware, Movants have not asserted that Barclays failed to comply with these principles or that Barclays' auditor, PriceWaterhouseCoopers, failed to audit Barclays' acquisition accounting as required by generally accepted auditing standards, nor, to the best of my knowledge, is there any basis for doing so.

Contains Highly Confidential Information

5.       The following statements constitute a brief summary of my primary opinions as of

the date of this report:[4]

a.   *Alleged $5 billion discount in assets actually received in the Transaction*:  Most
     of the assets that Barclays received in the Transaction consisted of a large
     inventory of trading portfolio securities it acquired when it replaced the Federal
     Reserve Bank of New York as LBI's primary source of financing on Thursday,
     September 18, 2008 (the "Repo Collateral") and advanced LBI $45 billion in
     cash.  The Movants contend that the Repo Collateral that Barclays received was
     worth $50 billion or more and that the Fed Replacement Repo was in effect a sale
     to Barclays of the Repo Collateral at a secret $5 billion discount.  That contention
     is incorrect; the Repo Collateral was worth *at most* the approximately $45.5
     billion at which Barclays accounted for it in its 2008 Results Announcement
     summary of the Acquisition.  Thus, there was no $5 billion discount in the Fed
     Replacement Repo transaction.

b.   *Risks associated with the Acquisition*:   Barclays' acquisition of LBI's North
     American broker-dealer businesses entailed immense financial and business risks
     for Barclays.

c.   *Barclays' reported accounting gain on the Acquisition*:   Given the risks for
     Barclays, market conditions, and other relevant considerations, it was not unusual,
     unexpected, or unreasonable for Barclays to report an accounting gain on its
     acquisition of LBI's North American broker-dealer businesses.  To the contrary,
     two days before the Court's September 19, 2008, Sale Hearing, Barclays
     announced publicly that it expected the Transaction to generate day one negative
     goodwill of approximately $2 billion, post-tax.  The fact that Barclays reported an
     accounting gain on the Acquisition does not indicate that Barclays received a
     secret or unfair discount on the Repo Collateral, nor does it imply that Barclays
     earned an unexpected or unreasonable profit from the Transaction.

d.   *Benefits of the Acquisition*:   Barclays' acquisition of LBI's North American
     broker-dealer businesses was expected to benefit, and with high probability did
     benefit, the LBHI and LBI estates, Lehman's creditors, and Lehman's customers.
     The Acquisition also has generated significant public benefits.  Had Barclays not
     acquired the Businesses, whether because no agreement could be struck or
     because approval of the Transaction had been withheld by the Court, it is virtually
     certain that the LBHI and LBI estates, Lehman's creditors, Lehman's customers,
     and public financial markets all would have been worse off.

---

[4] These statements are a summary of my primary opinions only.  I set forth a number of related or subsidiary
opinions on a wide range of issues throughout this report, some of which may not be captured or reflected in this
summary.

Contains Highly Confidential Information

e. *Accounting for the Acquisition*:  Barclays' 2008 Results Announcement and supporting work papers and files (which I understand have been produced in this litigation in response to requests from the Movants) provide a thorough and accurate accounting for the Acquisition.[5]  These materials show what assets Barclays received (or expects to receive[6]) as a result of the Transaction, what liabilities Barclays assumed as a result of the Transaction, and the values Barclays assigned to these assets and liabilities for financial accounting purposes.  These materials also provide sufficient data and analytical support to establish that the values Barclays assigned to the acquired assets and assumed liabilities approximated their fair values at the time of the Acquisition with reasonable precision.

C.      **Overview of the Remainder of This Report**

6.      The remainder of this report is organized in six sections.  Sections II and III address two aspects of the alleged $5 billion discount, namely, whether Barclays received a $5 billion discount in the Repo Collateral, and whether Barclays negotiated or maneuvered for a secret $5 billion discount from inception of the Transaction.  Section IV examines risks to which Barclays was exposed when it entered into the Transaction.  Section V focuses on Barclays' accounting for the Acquisition, and Section VI discusses the benefits of the Transaction for the LBHI and LBI estates, for Lehman's creditors and customers, and for the general public.

II.     **Alleged $5 Billion Discount in the Fed Replacement Repo**

7.      The Movants assert that Barclays received a $5 billion "discount" on certain financial assets and a corresponding "windfall profit" as a result of its acquisition of LBI's North American broker-dealer businesses.  The Debtor, for example, asserts that the Transaction "was structured to give Barclays an immediate and enormous windfall profit [because c]ertain Lehman

---

[5] I use the phrase "accounting for the Acquisition" to mean a detailed description or characterization of the Transaction.  I do not examine and do not express an opinion as to whether this accounting complied with applicable accounting standards.

[6] As I explain below, Barclays contends that some assets that Barclays acquired in the Transaction have not yet been delivered to Barclays.

Contains Highly Confidential Information

executives agreed to give Barclays an undisclosed $5 billion discount . . . ."[7]  The Movants claim

further that the alleged secret discount was effected, ultimately, through a repurchase agreement

entered into by LBI and Barclays on Thursday, September 18, 2008 (the "Fed Replacement

Repo").[8]  Thus, according to the Debtor, "By mid-week, certain Lehman and Barclays executives

decided that . . . the better way to deliver the discount to Barclay's [sic] would be to terminate

the executory Repurchase Agreement . . . .  Changing the deal in this way orchestrated an

exchange of $50 billion in securities for a payment of only $45 billion, thus giving Barclay's

[sic] the agreed upon $5 billion undisclosed discount."[9]

8.      I disagree with the Movants' assertions and find their characterizations of the

Acquisition and its implementation both inaccurate and misleading.[10]  Based on the facts and

analyses set forth in this section, I conclude that Barclays did not receive a $5 billion discount,

secret or otherwise, through the Fed Replacement Repo.  Instead, and contrary to the Movants'

assertions, the Repo Collateral pledged to Barclays in the Fed Replacement Repo, including the

securities and cash ultimately received in Barclays' December settlement with JP Morgan Chase

and LBI, was worth at most approximately $45.5 billion, or about 1% more than the $45 billion

in cash that Barclays paid out as part of the Fed Replacement Repo.[11]

---

[7] Debtors Motion, page 3.

[8] Barclays agreed to enter into this repurchase transaction at the request of the Federal Reserve Bank of New York, which had provided funding to LBI for three days after LBHI's bankruptcy filing but was unwilling to provide funding for LBI on a longer term basis. *See* Leventhal Declaration at ¶¶ 6-7.

[9] Debtors Motion, pages 5-6.

[10] I also disagree with the Movants' claim that the alleged secret discount was an element of the contemplated transaction from inception. I examine and analyze facts related to this assertion in the next section.

[11] Importantly, Barclays did not acquire LBI's trading portfolio securities in a separate, stand-alone transaction, but instead acquired these assets as part of a bundle of assets and liabilities associated with LBI's North American broker-dealer businesses. Barclays' acquisition of LBI's trading portfolio securities was a major component of the larger Transaction, but did not constitute the *entirety* of the Transaction. To be clear, the facts and analyses set forth in this section and elsewhere in this report show not only that there was no $5 billion discount in the Fed Replacement Repo, but also that there was no $5 billion discount hidden *anywhere* in the Transaction. As discussed

Contains Highly Confidential Information

### A.   Overview of the Fed Replacement Repo

9.   I focus first and foremost on the transaction *as implemented* and on the Movants' claim that Barclays not only sought, but in fact received, $50 billion in securities for $45 billion in cash, through the mechanism of the Fed Replacement Repo. To assess the validity of this claim, I examined what Barclays paid to LBI in the Fed Replacement Repo and compared this to the value of what Barclays actually received back from LBI in the Fed Replacement Repo. I conclude that, by any reasonable standard, the value of the securities and cash Barclays received in the Fed Replacement Repo was not $50 billion, as the Movants assert, or even close to $50 billion. Instead, the fair value of the securities (and cash) Barclays received in the Fed Replacement Repo was, *at most*, approximately $500 million (or about one percent) more than $45 billion.[12]

10.   It is an important fact that Barclays did not acquire the Repo Collateral in a separate, standalone transaction, but instead acquired these assets as part of a larger bundle of assets and liabilities associated with LBI's North American broker-dealer businesses. This means, first, that there was no separate identifiable "price" paid by Barclays for the trading portfolio securities and, second and more specifically, that the $45 billion that Barclays lent to LBI in the Fed Replacement Repo should not be viewed as the "price" Barclays paid for the Repo Collateral. Nonetheless, the Movants frame their assertion that there was a $5 billion

---

below, for sound economic reasons, Barclays did earn and report an accounting gain on the overall Acquisition, but this gain was not secret, unusual, or unreasonable, and is not evidence of any secret discount or of an unreasonable or unusual profit in either the Transaction overall or in the Fed Replacement Repo component of the overall Transaction. See Section V for a further discussion of Barclays' accounting gain on the Acquisition.

[12] My conclusion as to the maximum value of the securities and cash Barclays received in the Fed Replacement Repo reflects the difficult market conditions that prevailed at the time of the Transaction, but does not take into account any "bulk purchase" adjustment and is not a "fire sale" valuation. Factoring in considerations related to the size of the Transaction and the special market conditions prevalent at the time would lead to a valuation of what Barclays actually received in the Fed Replacement Repo below the $45.5 billion value set forth here.

Contains Highly Confidential Information

secret discount in the Transaction primarily in terms of the Fed Replacement Repo, explicitly claiming that Barclays bought $50 billion of securities for a cash payment of only $45 billion. Because the Movants frame their claim in this way, I begin my analysis of the overall Transaction by examining the elements of the Fed Replacement Repo — i.e., what Barclays lent and what Barclays received — despite the risk that this narrow perspective distorts and mischaracterizes the overall Transaction.[13]

11.     Even viewed in isolation, as if it were a separate transaction rather than a component of a larger transaction, the Fed Replacement Repo was *not* a source of a $5 billion profit for Barclays.  Instead, it was a transaction that no other commercial entity would have entered into,[14] and a transaction that made sense only in the context of the broader Transaction, i.e., Barclays' acquisition of LBI's North American broker-dealer businesses, including not just

---

[13] An analogy may illustrate how the Movants' narrow focus on the Fed Replacement Repo distorts and mischaracterizes the Transaction.  Suppose an entrepreneur purchases a small retail business with an inventory worth an estimated $300,000.  Suppose further that the buyer acquires not only this inventory but also the business's established name, its extensive customer list, and the right to hire the store's experienced manager, all of which have an estimated value of $100,000.  Now suppose the buyer agrees to pay $280,000 in cash to be used to pay off a $280,000 bank loan to the business secured by the inventory and to pay the owner additional cash of $70,000 to complete the transaction.  All in, one could say that the buyer paid $350,000 for assets worth $400,000; alternatively, one could say that the buyer paid $70,000 for a business with net assets of $120,000.  (Either way, the buyer would report a gain on the acquisition of $50,000.)  But, based on these facts, one *cannot* say that the buyer paid $280,000 for the inventory, or that the buyer got a $20,000 discount on the inventory, or that the buyer paid less than "fair value" for the inventory.

[14] Mr. Marsal agrees that the Fed Replacement Repo appears on its face to be commercially untenable.  "I've never seen a secured lender on the eve of bankruptcy take out another secured lender with inadequate collateral which is what you're suggesting.  Unvalued collateral.  Difficult to value collateral.  That would be silly in sophisticated banking terms.  You wouldn't ever get there."  [Marsal, page 238.]  Oddly, Mr. Marsal concludes from this conundrum that the Repo Collateral must have been liquid and must have had excess value in it: "Barclays is a sophisticated — a very sophisticated, very savvy player . . .. Do I believe there was ever any issue with the value of that collateral with the securities against secured loan?  It never crossed my mind.  Because a savvy institution like that, there is no way you would ever do this transaction if that was an issue.  You would have gotten the CUSIPs — you would have gotten all the information you need before you're going to lend $45 billion.  Are you kidding me?  Anything that could have broken the bank are you telling me they did not have a pretty good handle on what was there in the way of value?  Inconceivable.  That's inconceivable.  So the issue in my mind was never the issue of the securities value.  I assumed that one would wash against the other.  I assume there was real value there."  Mr. Marsal appears to ignore the more reasonable explanations, namely, that (a) the positions that Barclays actually received on September 18 were materially different from (and only a portion of) the positions it expected to receive, and (b) Barclays entered into the Fed Replacement Repo only because the NYFRB required it do so in order to complete the larger Transaction.

---

Contains Highly Confidential Information

the Repo Collateral, but also other financial assets, employees, customers, intangible assets, and so on.[15]

12.    As I show below, in the Fed Replacement Repo, Barclays lent $45 billion of *riskless* assets (i.e., cash) to LBI, a troubled subsidiary of a bankrupt parent, in return for approximately $45 billion of *risky* assets (with no recourse to any other LBI or LBHI assets). Such a loan, in isolation, simply is not economically tenable. If the risky assets rise in value, the borrower will repay the loan (with interest). But if the assets fall in value the borrower can default on the loan and leave the lender with potentially massive losses.[16] This, of course, is why the "collateral value" of securities acceptable to the lender in a commercial repo transaction (i.e., the loan amount) is less than the value of the securities (or in other words, why the value of the securities pledged in a repo transaction are subject to a "haircut"). It also is why highly risky securities — which comprised a significant portion of the securities ultimately transferred to Barclays in the Fed Replacement Repo — typically are not acceptable or eligible collateral for a repo loan.

13.    The facts and analyses I summarize in the remainder of this section show that there was virtually no "haircut" in the Fed Replacement Repo, i.e., no significant difference between the amount of Barclays' loan ($45 billion) and the value of the assets pledged against the loan. So far as I am aware, there is no dispute that Barclays entered into the Fed

---

[15] Stephen King makes this point in his deposition, expressing the opinion that "under any normal circumstances, Barclays did not think that the lending of 45 billion dollars against this portfolio of securities was a transaction which it would have done absent the Lehman business acquisition." King Tr. at 120.

[16] Conceivably, although not practically, the interest rate on this highly unusual repo loan could have been set sufficiently high to induce Barclays to lend under these terms. But the interest rate on the Fed Replacement Repo was only 4% and, in any case, it is my understanding that Barclays chose to (or had to) write off even this interest (approximately $20 million). A spreadsheet in the PriceWaterhouseCoopers work papers identified in footnote 49 below recalculates interest on the Fed Replacement Repo transaction for four days at 4%, "without exception," but notes that the "interest receivable is not on the opening balance sheet [because] Barclays will not be getting paid for that receivable."

Contains Highly Confidential Information

Replacement Repo only because the Federal Reserve insisted that it do so as a condition of supporting the Transaction. The Fed Replacement Repo was a high risk transaction for Barclays; it is not surprising that it was not initiated by Barclays, but was instead a transaction that Barclays effectively was required to enter into to complete the Acquisition of the Businesses. Indeed, I doubt that Barclays or any other commercial lender would have willingly entered into a repo transaction on these terms and under these circumstances on a stand-alone basis.

14.    In the remainder of this section, I establish that there was no $5 billion discount, secret or otherwise, in the Fed Replacement Repo. To do so, I first report what Barclays paid in the Fed Replacement Repo. I then establish what Barclays received in the Fed Replacement Repo and the fair value of what Barclays received.

**B.    What Barclays Lent**

15.    One of the few numbers about which there is no dispute in this matter (so far as I am aware) is the amount of cash that Barclays transferred to LBI on September 18, 2008. As described by Shari Leventhal, Assistant General Counsel and Senior Vice President at the Federal Reserve Bank of New York ("FRBNY), "Beginning in the afternoon of September 18, Barclays initiated the process of transferring $45 billion in cash to LBI to fund LBI overnight. A series of funds transfers were made using the Fedwire Funds Service, which is operated by the Federal Reserve Banks. By early evening, the entire sum of $45 billion in cash had been transferred by Barclays to LBI."[17]

16.    Barclays wired a first payment of $5 billion to Bank of New York ("BoNY"), its custodian for the Fed Replacement Repo, on the morning of September 18. In return for this first payment, Barclays expected Lehman to deliver to BoNY securities with a marked value of

---

[17] Leventhal Declaration at ¶11.

Contains Highly Confidential Information

approximately $5 billion.[18]  This did not happen.  Instead, Lehman delivered securities that

everyone agrees (so far as I know) had an aggregate value well below $5 billion, perhaps as little

as $2 billion.[19]  Needless to say, this caused considerable, and understandable, consternation.

Nonetheless, Barclays fulfilled its side of the Fed Replacement Repo agreement and, before

receiving any additional securities, wired an additional $40 billion to BoNY for the benefit of

Lehman in a series of nearly simultaneous transfers.[20]

### C.    What Barclays Received

17.    What precisely Barclays received in return for its $45 billion in cash on

September 18, 2008, was, initially, a matter of great uncertainty, as was the value of what

Barclays received (i.e., the value of the Repo Collateral).  This uncertainty arose from multiple

sources.  First, on September 18, and for some time thereafter, there was considerable

uncertainty as to exactly what specific positions had been transferred to Barclays.[21]  Ultimately,

as discussed below, through a detailed reconciliation and accounting process, Barclays has

identified the exact positions (i.e., CUSIPs and quantities) that it received from the Fed

Replacement Repo.  But that process was not completed — indeed, by any reasonable

expectation, could not have been completed — on the day of the Fed Replacement Repo.

---

[18] Since Barclays was "replacing" emergency (collateralized repo) financing that the FRBNY had provided earlier in the week to prevent LBI's immediate collapse, the expectation was that securities held by JP Morgan Chase as custodian for the FRBNY's funding of LBI would be transferred to BoNY as collateral for Barclays' replacement repo funding.  In fact, only a portion of the Fed repo collateral was transferred to Barclays.  To fill this shortfall, additional LBI securities from outside the Fed repo collateral were pledged to Barclays (thus becoming part of the Repo Collateral), leaving a gap believed at the time to be about $7 billion.  I discuss the $7 billion "cash, but not ultimately cash" that filled this gap in some detail below.

[19] See, e.g., Deposition of James Hraska, In re: Lehman Brothers Holdings, Inc., et al., No. 08-13555 (JMP) (S.D.N.Y. Aug. 14, 2009), at 77:20 – 80:12.

[20] A set of "Payment Details" reports in the PriceWaterhouseCoopers work papers identified in footnote 49 below document six wire transfers on September 18, 2008, totaling $45.0 billion.

[21] For example, in the recollection of Stephen King, "By Friday we started to realize there are securities that we thought we were going to take delivery of that we haven't, and there were securities [being transferred to Barclays] that we have never seen before."  King Tr. at 91-92.

Contains Highly Confidential Information

Second, on September 18 and for some time thereafter, there also was considerable uncertainty as to the value of many of the specific positions that had been transferred to Barclays. Certainly, "marks" had been assigned to virtually all of the securities represented in the portfolio that had been transferred over to Barclays by one or more of the parties involved in the transfer (Lehman, JP Morgan Chase, Bank of New York, and/or Barclays), at least as of some date near the date of the Fed Replacement Repo.[22] However, the quality and timeliness of the marks for many of the securities comprising the Repo Collateral were highly questionable, for reasons I discuss below. Third, a major component of what Barclays anticipated receiving in return for its $45 billion[23] — namely, $7 billion of "cash" that Lehman supposedly put up to fill the undisputed gap between the securities that were supposed to be transferred to Barclays on September 18 and the securities Lehman actually was able to transfer on that date — turned out not to be cash, but instead was a "claim" for $7 billion, subject to legal dispute. The actual value of this claim became determinable only on or about December 22, 2008, more than three months after the initiation of the Fed Replacement Repo, upon consummation of the December settlement among Barclays, JP Morgan Chase, and LBI. What quickly became clear, however, was that this presented an additional source of transaction risk for Barclays, which should be weighed (without the benefit of hindsight) in any assessment of the Transaction.

---

[22] It is useful to distinguish between "marks," "quotes," and "prices." Economists generally use the word "price" to refer to amounts received or paid (per unit) in observed (or at least observable) transactions. A quote is an expressed willingness to buy or to sell at a *proposed* price. The price quotation in an expressed willingness to buy is a "bid" or "bid price," while the price quotation in an offer to sell is an "offer" or "offer price," also referred to as an "ask" or "ask price." A mark is a per-unit amount that is used to value a position. The mark used to value a specific security on a given day for a particular purpose may be based on or set equal to an observable price, if available, or based on or set equal to a bid price or an offer price or some point between the two, assuming quotes are available. Where reliable prices are not available and credible quotes are not forthcoming, a mark must be based on an estimate of value, generally derived from a model or some other analysis of value.

[23] To be clear, I am referring here to what Barclays anticipated receiving in the Fed Replacement Repo as the repo was being implemented and after learning that it would not be receiving all of the securities that had been pledged to the FRBNY.

Contains Highly Confidential Information

18.     A number of executives involved in the transfer of assets to Barclays pursuant to the Fed Replacement Repo have commented on the extreme uncertainty surrounding this transfer.  For example, Stephen King testified in his deposition as follows:[24]

". . . we obviously were extremely worried on the Friday [September 19].  We were very worried on Wednesday and Thursday.  We had a population of securities and we were very worried that those really might not be worth 45 billion dollars.

"We were even more worried over Thursday night and into Friday that now we just had a list of stuff that we had no idea whether it was worth what we just lent against it.  So there was lots of discussion of whether there was adequate collateral or how — actually, no one really talked about whether there was adequate collateral.  It was just how much the collateral was worth."

19.     Messages in emails (as distinct from the attachments to those emails, which I discuss next) among the participants on Thursday, September 18, and subsequent days contain a range of estimates of the aggregate value of the positions transferred to Barclays on that day.  In my view, none of these "email estimates" is a reliable indicator of the aggregate fair value of what Barclays received in the Fed Replacement Repo, for a variety of reasons.  In many cases, the source of or basis for an aggregate valuation in an email cannot be discerned from the email or from other sources, and one cannot identify with reasonable certainty which positions are being valued, which marks are being used to value the positions, or the quality and timeliness of those marks.  Moreover, even where the source of or basis for an aggregate valuation cited in an email can be determined, there virtually always remain important questions (discussed below) as to the quality and timeliness of the marks at which many of the securities at issue were valued.  Such estimates of value expressed in the body of an email message are not the kind of data on

---

[24] King Tr. at 181.

Expert Report of Professor Paul Pfleiderer                                         Page 12

Contains Highly Confidential Information

which economists and accountants rely in their professional work, and particularly not when there is better evidence of value available.

20.    As the participants worked to complete the Fed Replacement Repo transaction, many spreadsheets with lists of securities passed among the participants. I myself or staff working at my direction have reviewed and studied many of these spreadsheets generated on or shortly after September 18. Because of the size and complexity of the Fed Replacement Repo and the difficult conditions under which it was being implemented, none of these contemporaneous spreadsheets, in isolation, provides a definitive accounting of the population of positions that were transferred to Barclays in the Fed Replacement Repo, nor do they provide a reliable indicator of the aggregate value of the transferred positions. Instead, the specific positions reported on such lists are subject to further confirmation and reconciliation and the marks used to value reported positions are of dubious quality and timeliness. Consequently, none of the spreadsheet lists produced on or about September 18 provides a reliable basis for determining the aggregate value of the Repo Collateral.

21.    In addition to reviewing relevant email traffic and related attachments regarding the value of what Barclays received in the Fed Replacement Repo, I or others working at my direction have also read the deposition testimony of participants in the transaction who were questioned on this topic. Not surprisingly, the recollections of various participants as to the aggregate value of the positions transferred to Barclays in the Fed Replacement Repo are imprecise and sometimes at odds. Given the stressful conditions prevailing during the week of the Fed Replacement Repo and the passage of more than a year since the events at issue, it is probably to be expected that relevant deposition testimony, taken as a whole, does not provide a reliable indicator of the aggregate value of the transferred positions.

Contains Highly Confidential Information

22.    Given that neither participants' recollections nor contemporaneous emails, spreadsheets, and documents, answer the question at hand with clarity or reliability, I sought to find a way to establish the aggregate fair value of what Barclays received in the Fed Replacement Repo independent of these recollections and other sources. To do so, I had to resolve two major sets of questions. First, I had to determine, or identify, a reliable listing of the positions that in fact were transferred to Barclays as part of the Fed Replacement Repo. Related to this, I had to determine an appropriate way to characterize what Barclays received to fill the "$7 billion gap" that developed on September 18 — i.e., how to characterize a promise of cash that turned out not to be cash. Second, I had to determine, or identify, reliable marks for valuing the transferred positions. I now discuss these two important issues in turn.

i.    *Identifying transferred positions*

23.    As I indicated already, I myself and staff working at my direction reviewed and studied a large number of spreadsheet listings of positions from various times and sources, which we thought had the potential to shed light on what specific positions actually transferred to Barclays in the Fed Replacement Repo. I myself and staff working at my direction also interviewed a number of persons with knowledge of the transferred positions. Based on this investigative work, I believe that certain work papers and files developed by Barclays' finance function in the months following the Fed Replacement Repo are the best source for identifying the transferred positions with precision. As I discuss below, a major purpose of Barclays' efforts in constructing these work papers and files was to prepare an accounting summary of the Acquisition (i.e., an "Acquisition Balance Sheet") for inclusion in Barclays' financial reports, including its 2008 Results Announcement. Ultimately, Barclays' accounting summary of the Acquisition included an aggregate value for "trading portfolio assets" received in the

Contains Highly Confidential Information

Acquisition. In my opinion, the detailed lists of positions corresponding to this "trading portfolio assets" line item in Barclays' final Acquisition Balance Sheet provides an appropriate, comprehensive, and accurate *starting point* for identifying the positions transferred to Barclays pursuant to the Fed Replacement Repo. Importantly, these lists identify and include not only the positions Barclays received in September of 2008, which appear on the agreed "Schedule A" filed with the Court on September 30, 2008, but also positions Barclays received in its settlement with JP Morgan Chase in December of 2008.

24.    To avoid confusion, I note that one of Barclays' two detailed lists containing its valuations of the specific positions comprising the trading portfolio assets acquired in the overall Transaction (the one for "initial inventory") includes positions *not* received in connection with the Fed Replacement Repo. This is because this list includes certain positions (a relatively small portion of the total portfolio) that Barclays received not pursuant to the Fed Replacement Repo, but as part of the larger overall Acquisition. Specifically, the detailed lists enumerating the positions included in the "trading portfolio assets" line item in the Acquisition Balance Sheet include certain positions that were part of the so-called "unencumbered clearance box" or "Schedule B" assets received by Barclays as part of the overall Transaction, but not as part of the Fed Replacement Repo. These positions must be removed from the lists of positions comprising the full universe of acquired trading portfolio assets to produce a list of the positions Barclays received in the Fed Replacement Repo.

25.    After this adjustment, the set of remaining positions from the detailed lists constitutes an accurate and reliable accounting of the specific positions received by Barclays in return for its $45 million cash payment to LBI on September 18, 2008. Exhibit 1 (which is part

Contains Highly Confidential Information

of Appendix Five to this report)[25] is a listing of the securities (identified by unique CUSIPs and by abbreviated names) that comprise the Repo Collateral, presented in two parts.[26]  Part A of Exhibit 1 lists the positions comprising the "initial inventory" that was transferred to Barclays, as part of the Fed Replacement Repo, on or shortly after September 18.  Part B of Exhibit 1 lists the positions comprising the "JPM inventory," i.e., positions that were transferred to Barclays on December 22 as part of Barclays' settlement with JP Morgan Chase.  (For completeness, I report in Exhibit 2 those positions included on the lists of securities comprising the trading portfolio assets line item of Barclays' Acquisition Balance Sheet that were *not* part of the Repo Collateral.)  The positions in Part A of the Exhibit — representing 10,750 distinct CUSIPs (for positions with positive value based on Barclays' marks) — and in Part B of the Exhibit — representing 1,032 distinct CUSIPs (again for positions with positive value), with some overlap with Part A[27] — constitute, to the best of my understanding, the complete set of positions (CUSIPs, with quantities), other than cash, that Barclays received in return for its $45 billion payment in the Fed Replacement Repo.

           ii.      *Valuing transferred positions*

26.      I turn next to the issue of valuing the Repo Collateral, or equivalently, choosing marks to assign to the positions comprising this collateral portfolio.  As background for this discussion, it may be useful to stress the complexity involved in valuing all of the elements of a portfolio as large and diverse as the portfolio that was transferred to Barclays in the Fed Replacement Repo, especially under the difficult market conditions that prevailed in the days and

---

[25] All exhibits referenced in this report are presented together as Appendix Five at the end of the report.

[26] In most cases, only short and sometimes cryptic names like those in Exhibit 3 are reported in the available lists of securities.

[27] In a small number of instances, Barclays received batches of the same security in both the initial inventory and the JPM inventory, which results in a small overlap between these two lists.

Contains Highly Confidential Information

weeks surrounding LBHI's bankruptcy filing. Appendix Three provides a listing of generic asset types in the Repo Collateral, where the securities represented in the collateral portfolio are classified by type based on Bloomberg classifications. The transferred securities are spread across some 60 different Bloomberg security types, including common stock (2,686 CUSIPs), "US Government" (380 CUSIPs), "Private CMO Other" (394 CUSIPs), "REIT" (81 CUSIPs), "MBS Balloon" (5 CUSIPs), and "Closed-End Fund" (88 CUSIPs). Even at this high level of aggregation, it is clear that the positions transferred to Barclays in the Fed Replacement Repo constituted a very complex and heterogeneous portfolio of securities.

27.    Exhibit 3 is a sample of the abbreviated (and often cryptic) names assigned to the transferred securities at issue here. From even a cursory review of these names, it is clear that the Repo Collateral was made up of a wide range of different types of securities. These ranged from "on the run" Treasury securities, which typically trade in a deep and liquid market, to many different types of obscure and exotic positions, the markets for which are thin even in the best of times and for which there is no readily available pricing source. No doubt, some of the positions that transferred to Barclays were relatively easy to value, because reliable and timely prices and/or quotes were available for them even under the stressed market conditions of September 2008. However, many other transferred positions, including many large positions, were in securities that did not trade in liquid markets or, in many cases, were not trading at all in September and October of 2008.

28.    Market conditions in September 2008 were among the most challenging since the Great Depression. Importantly for the present discussion, this was a particularly difficult time for valuing securities. Trading in some secondary markets, such as the market for many kinds of

Contains Highly Confidential Information

auction rate securities, had ceased completely.[28]  There simply were no trades in these markets,

which meant that no actual transaction prices were being reported.  There often were no credible

bids, either, as potential buyers "sat on the sidelines."  Trading in many other markets was

infrequent and sporadic.  For a wide swath of securities, there were some, but relatively few,

actual trades and, consequently, relatively few reported transaction prices.[29]  This thin or

sporadic trading calls into question the quality of the price information or "signal" conveyed by

the price in any given reported trade:  If the reported trade price is a "one-off" price from a single

transaction, is that price a reliable indicator of value, or was it influenced by unusual and unique

circumstances?  In a thin market, it often is difficult to know the answer to this question.  Thus,

given the prevailing market conditions in September of 2008, and especially following LBHI's

bankruptcy filing, it simply was not possible at the time (and still is not possible today) to

establish accurate marks for a large portion of the securities listed in Exhibit 1 on the basis of

actual trades and observed prices, or even on the basis of credible quotes.

29.    As one indicator of the extent to which the positions in Exhibit 1 could be marked

based on observable prices, I searched Bloomberg for actual transaction prices on or shortly after

September 18, 2008.[30]  I found that Bloomberg reported an observed transaction price for

---

[28] I discuss some examples of auction rate securities that were included in the Repo Collateral, and Barclays' valuation of them, in Appendix Four.

[29] As I discuss later, this also meant that the spreads between bid and ask prices for many types of securities were unusually large during this time period.

[30] Bloomberg is widely recognized as the premier source of pricing data and other information about securities and trading activity in US and international financial markets. According to the product website, Bloomberg is "employed by over 300,000 professionals in central banks, investment institutions, commercial banks, government offices and agencies, law firms, corporations and news organizations around the world." They cover "over 5 million financial instruments" and provide "the most comprehensive and advanced set of financial data, real time market coverage, news, analytic tools, portfolio solutions, and research." Market data crosses "all asset classes, [including] Equities, Futures, Options, Fixed Income and Currency Markets and others" and provides "connectivity to more than 350 exchanges." *See* Bloomberg, "About Bloomberg: Product Data," *available at* http://about.bloomberg.com/product_data.html (visited Dec. 31, 2009) *AND* "About Bloomberg: Product Equities," *available at* http://about.bloomberg.com/product_equities.html (visited Dec. 31, 2009).

Expert Report of Professor Paul Pfleiderer                                                Page 18

Contains Highly Confidential Information

September 22, 2008, for only 5,719 of the 10,743 CUSIPs for the positions that transferred to Barclays in the "initial inventory" of trading portfolio assets acquired from LBI — or just over 53%.[31] Bloomberg "recognizes" most of the remaining CUSIPs — Bloomberg identifies only 288 of the remaining 5,024 CUSIPs as "invalid" — but does not capture or report any price for these CUSIPs on that day. The fact that actual prices were not available for so many CUSIPs might not be a major concern if these all were minor positions, accounting for relatively little of the overall value of the acquired trading portfolio assets. But this is not the case. Using Barclays' "exit price" marks (which I discuss below), I find that the CUSIPs/positions for which Bloomberg reports no observable prices for September 22, 2008, account for almost 40% of the aggregate value of the securities that transferred to Barclays in the "initial inventory of trading portfolio assets.[32]

30.    Bloomberg is widely recognized for the breadth of its pricing data. However, as a check on the analysis just reported, I performed the same analysis using a second price reporting service, Standard & Poor's Capital IQ. I found that Capital IQ reports a price for September 22, 2008, for only 3,783 of the 10,743 CUSIPs/positions that transferred to Barclays in the Fed Replacement Repo — or just over 35%. Using Barclays' "exit price" marks, as I did above, I find that the CUSIPs/positions for which Capital IQ reports no price account for almost 40% of the aggregate value of the securities that transferred to Barclays in the Fed Replacement Repo.

31.    Because some securities are "priced" by Capital IQ that are not "priced" by Bloomberg, combining these two sources expands the coverage somewhat. Between the two,

---

[31] Obviously, having a Bloomberg price is better than not having a Bloomberg price. But even where a Bloomberg price is available, if the market is "thin," that price may not accurately reflect the true value of the security in question.

[32] As indicated above, in a thin market with only sporadic trading, the reporting of an observable price for a given security in Bloomberg does not mean that that price is a good indicator of value. Thus, 60% is a cap on the portion of the Fed Replacement Repo Transferred Positions that can be valued reliably based on actual prices.

Contains Highly Confidential Information

Bloomberg and Capital IQ report observed prices (which may be from just one trade) for just under 60% of the CUSIPs represented in the Repo Collateral, which means that, for more than 40% of those CUSIPs, no reported price is available from these two sources for September 22, 2008. The value of positions for which no price is reported in either Bloomberg or Capital IQ for September 22, 2008, is more than 23% of the total fair value of the Repo Collateral (again using Barclays' exit price marks). This means that Repo Collateral positions with a value of between $9 billion and $10 billion cannot be marked on the basis of observed prices.[33]

32.    These results establish that determining appropriate marks for the securities transferred to Barclays was not and could not have been a simple mechanical process of pulling data from vendor price databases. Furthermore, given the absence or paucity of trading in many of the securities at issue, it is unlikely that gathering quotes from quotation systems would significantly contribute to the marking process. LBI's own books confirm that many of the securities in its inventory were, by nature, difficult to price. Among LBI's record-keeping systems is a system called the "Global Funding System" ("GFS"), which I understand served as a central warehouse for pricing and other data from multiple special purpose database systems also used by LBI.[34] Certain daily reports generated by GFS have been produced in this litigation, which I understand cover most of LBI's trading inventory. Among the fields in these reports is a field that identifies CUSIPs/positions by their "Fair Value Level."[35] These Levels correspond to a standard accounting categorization of securities according to the ease or difficulty with which

---

[33] Again, even where a reported price is available from a vendor, for a security traded in a thin market, this price may not be a good indicator of value. Thus, the total value of difficult-to-value positions in the Repo Collateral likely was considerably larger than $10 billion, especially given the near shut-down of markets for many different types of securities in the wake of LBHI's bankruptcy filing.

[34] There is some inconsistency within Lehman itself regarding the "GFS" acronym. While some deposition transcripts and documents produced in this matter indicate that the "GFS" refers to the "Global Funding System" of Lehman, other such sources indicate it refers to the "Global Finance System."

[35] A relatively small number of positions (or line items) have no indicator in this field.

Contains Highly Confidential Information

they can be valued. In this scheme, Level I represents assets that can be valued based upon "quoted prices"[36] for identical instruments traded in active markets; Level II represents assets for which quoted prices from deep markets are not available, but that can be valued based upon quoted prices for similar instruments traded in active markets, based upon quoted prices for similar or identical instruments in markets that are not active, or using model-based techniques for which all significant assumptions are observable in the market; and Level III represents assets that can be valued only by using model-based techniques that use at least one significant assumption not observable in the market.[37] Based on LBI's GFS report for September 12, 2008 (the last trading day before LBHI's bankruptcy filing), 4,072 of LBI's positions were categorized as Level I, 19,859 were categorized as Level II, and 2,128 were categorized as Level III.[38] Based on the aggregate values for these 26,059 positions (using LBI's marks as of September 12, 2008), I find that 20.9% of the total value of LBI's inventory was in Level I assets, 72.9% of total value was in Level II assets, and 6.2% of total value was in Level III assets.[39]

33.    The results of the analyses reported in this subsection lead to a number of important conclusions, especially in light of the volatile and rapidly deteriorating conditions in

---

[36] It is my understanding that this term, as used in the relevant accounting literature, refers to actual transaction prices reported by data providers such as Bloomberg, rather than to quotes, i.e., bid prices and offer prices.

[37] This system of classifying assets parallels that ordinarily used by the Financial Accounting Standards Board ("FASB"). *See* Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 157, "Fair Value Measurements" (Sept. 2006, as amended 2008), at FAS157-10 to FAS157-12; Judith Burns, "SEC Gives Firms More Leeway in Pricing Asset-Backed Issues," *Wall Street Journal* (Mar. 31, 2008), at C7.

[38] Collectively, the Level I, II, and III entries sum to 26,059 positions. However, there were also 535 entries on the September 12, 2008 GFS report for which no "Fair Value Level" was given. Adding these 535 "blank" entries to the number of Level I, II, and III positions yields 26,594, which is the total number of positions reflected in the GFS report detail. The percentages reported in the remainder of this discussion are based only on values for those 26,059 entries for which "Fair Value Level" information was available. *See* "BA: B-S Detailed Exposure Report (Cross System) – 12 Sep 2008," Bates No. BCI-EX 00185186.xls (Sept. 12, 2008) (hereinafter "Sept. 12, 2008 GFS Exposure Report").

[39] *See* Sept. 12, 2008 GFS Exposure Report. Valuation percentages are based on reported data for the "Long Inventory, TD @ MV" variable for the 26,059 positions identified as Level I, II, or III. Aggregate "Long Inventory, TD" market value for these positions totaled $51.01 billion. *Ibid.*

Contains Highly Confidential Information

financial markets in September of 2008.  First, valuing the individual positions in the Repo Collateral with reasonable precision was not a simple, mechanical process.  Rather, because of the nature of many of the positions and because of conditions in financial markets, valuing these positions necessarily was difficult, subjective, and time-consuming.  Second, valuing the Repo Collateral positions with reasonable precision required, in many cases, (a) a thorough understanding of very complex instruments, (b) an ability to model complex securities of many different types and structures, and (c) detailed information on the underlying collateral (e.g., default rates on the home equity loans packaged into a home equity line of credit ("HELOC") backed collateralized mortgage obligation, or "CMO") or other sources of value (e.g., the creditworthiness of the specific commercial borrowers whose loans had been packaged into a collateralized loan obligation, or "CLO") supporting a particular complex security.  Third, because financial market conditions were changing rapidly, the economic outlook was bleak and deteriorating, and the prices of most types of securities were unusually volatile, any valuation of the Repo Collateral positions as of one date, even if reasonably precise for that date, could become stale and highly inaccurate in a matter of hours.

34.    With these concerns in mind, I turn now to an assessment of three sets of marks that possibly might be used as a basis for determining the fair value of the Repo Collateral positions.

 iii.    *Lehman, JP Morgan Chase, and Bank of New York marks*

35.    Many factors made the accurate marking of any but the most liquid of securities extremely difficult in September of 2008.  To begin with, the nature of some of the securities included in the Repo Collateral and the circumstances surrounding the Fed Replacement Repo and the broader LBI-Barclays Transaction made marking the positions transferred to Barclays in

Contains Highly Confidential Information

the Fed Replacement Repo particularly difficult. Despite these difficulties, to assess the value of

the securities Barclays received in the Fed Replacement Repo (and evaluate the Movants'

assertion of a $5 billion discount), I needed to determine best estimates of what I will call "fair

value" marks for the securities that comprise the Repo Collateral.[40]   I began my efforts to

identify reasonable fair value marks by analyzing three sets of marks available in the record that

conceivably might be used to determine the fair value of the Fed Replacement Repo transferred

positions.

36.    Because broker-dealers are required to mark their assets daily for certain

regulatory purposes and also because custodians for repo agreements must assign marks to the

collateral they hold on behalf of the parties to repo agreements, there can be and often are

different marks available for a given set of collateral assets. In the case at hand, there are three

distinct sets of marks available in the record from dates within a few days of the date on which

the Transaction closed. These are as follows:[41]

- Marks from Lehman's Global Funding System, available in the record daily from
  September 12, 2008, though September 30, 2008;

- Marks assigned to various CUSIPs by JP Morgan Chase in its role as custodian
  for the FRBNY's loans to LBI on Monday, Tuesday, and Wednesday (September
  15-17, 2008); and

- Marks assigned to various CUSIPs by Bank of New York in its role as custodian
  for Barclays' Fed Replacement Repo loan to LBI.

---

[40] I use the term "fair value" because applicable accounting standards required Barclays to mark the assets it received to "fair value" as of acquisition for purposes of its acquisition accounting.  Because the applicable accounting standards do not permit recognition of some economically important factors such as the sheer size (and consequent illiquidity) of the positions, which in this case would have made the "fair value" of many positions difficult or impossible to realize in an actual sale, these "fair values" likely overstate the actual economic value of the acquired trading assets and should be viewed as stating an upper bound on the range of actual economic value.

[41] Also available in the record are marks developed and used by Barclays in the course of developing fair values for financial reporting purposes. I examine Barclays' marks in the next subsection.

Contains Highly Confidential Information

37.    I investigated and analyzed these alternative sets of marks from various perspectives to assess whether any of them provide a reliable basis for valuing the Repo Collateral positions.[42]  In this subsection I explain why I conclude that the Lehman marks, the JP Morgan Chase marks, and the BoNY marks, whether used separately or together, do not provide a reliable basis for valuing the Repo Collateral.[43]  In the next subsection, I compare the quality and timeliness of the marks developed by Barclays to the Lehman, JP Morgan Chase, and BoNY marks reviewed here.

38.    To assess the quality of the Lehman marks contained in the GFS system, I examined certain patterns through time in the prices contained in this system. I focused on Level II and Level III assets and attempted to ascertain to what extent these marks had been updated after Friday, September 12, 2008. Deposition testimony on this subject is ambiguous, with some deponents expressing the belief that Lehman's marks were not updated after September 12 and others asserting that Lehman's marks were, in fact, kept up to date after LBHI's bankruptcy filing and into the week of September 15, 2008.

39.    My analysis of the prices recorded in GFS revealed significant "stickiness" in the marks for Level II and Level III securities in the GFS reports going forward from September 12, 2008. Exhibit 4 reports LBI net long inventory positions in Level III securities with an indicated value greater than $20.0 million, as recorded in GFS as of September 12, 2008, for which there

---

[42] I also considered whether it would be feasible and informative to attempt to develop entirely new marks for the securities comprising the Fed Replacement Repo Transferred Positions and to re-value these positions *de novo*. For reasons I discuss later in this section, I believe this approach would not significantly improve our understanding of the Fed Replacement Repo.  However, I reserve the right to pursue this approach if future developments in this litigation cause me to change this assessment.

[43] In theory at least, the set of GFS marks should include marks (but of uncertain quality and timeliness) for all of the securities represented in the Repo Collateral.  The JP Morgan Chase marks and BoNY marks together also should cover all of these securities, but it is not necessarily the case that either the JP Morgan Chase marks or the BoNY marks on their own would provide full coverage of all of the Repo Collateral positions.

Contains Highly Confidential Information

was either no price adjustment after September 12, or at most one adjustment after September 12 (typically a single downward adjustment from the 12th to the 15th, with no subsequent adjustment). Exhibit 5 reports LBI inventory positions of Level II assets that met these same criteria, namely, positions with relatively large indicated values and at most one price adjustment after September 12. As Exhibits 4 and 5 demonstrate, the marks for significant portions of LBI's Level III securities, and even Level II securities, were not adjusted or updated after Friday, September 12; marks for even larger portions of LBI's Level III and Level II securities were not adjusted or updated after Monday, September 15. This observed level of "stickiness" — understandable under the circumstances and given the chaotic market conditions prevailing at the time — is inconsistent with the hypothesis that Lehman's marks were being reliably updated during the week of September 15.

40.    It has been widely reported and confirmed by deposition testimony that trading activity at LBI ground nearly to a halt the week of September 15, as did other normal business activities at Lehman. Many Lehman employees including traders were understandably more focused on their own personal situations than on their usual business tasks. This evidence, together with my analysis of stickiness in the marks in the GFS reports, confirms a reasonable inference regarding the marking process at Lehman Brothers after Friday, September 12, namely, that Lehman's marks were not reliably updated after that date. Given market conditions and the fact that the Fed Replacement Repo was not in place until Thursday, September 18, and that the Transaction did not close until Monday, September 22, I conclude that the Lehman marks do not provide useful information for determining the value of the Repo Collateral at acquisition.

41.    I next consider the marks assigned to various positions by JP Morgan Chase and BoNY in their roles as custodians for "tri-party" repurchase transactions during the week of

Contains Highly Confidential Information

September 15. Assigning marks is a necessary element of the services these banks provide as tri-party repo custodians. Both banks maintain procedures and pricing groups that enable them to provide this marking service quickly and with the level of accuracy required by their roles in tri-party repos, at least under normal conditions, for normal commercial tri-party repos, and for the types of securities that typically are eligible as collateral in tri-party repos. However, these were not normal times. The FRBNY's repo loans to LBI (earlier in the week) and Barclays' Fed Replacement Repo were not normal repurchase agreements, but instead were much larger and more complex, and a significant number of the securities in the Fed Replacement Repo transferred positions were not normally eligible to serve as collateral in commercial tri-party repos. All three of these factors significantly call into question any presumption that the JP Morgan Chase marks or the BoNY marks were accurate or necessarily provide the best, or even a sound basis, for assessing the value of the positions in the Repo Collateral.

42.    Having analyzed JP Morgan Chase's marks and the BoNY's marks for many of the esoteric and illiquid securities transferred in the Fed Replacement Repo, I conclude that many of them were in fact inaccurate, often significantly so.[44] This is not surprising, since many of these positions could not have been reliably marked in the brief time available to those institutions.

43.    Stephen King, as head of Barclays' Principal Mortgage Trading Group ("PMTG"), was responsible for managing the "on-boarding" of most or all of the Repo Collateral positions, for valuing at least some of the positions that were transferred to Barclays, and, ultimately, for hedging, to the extent possible, the risks associated with the on-boarded

---

[44] See the information on the marking of specific positions in the Repo Collateral in Appendix Four. As Appendix Four makes clear, I also have identified significant concerns about the quality of Lehman's own marks for some of these esoteric and illiquid securities, in addition to the concerns about their timeliness discussed above.

Expert Report of Professor Paul Pfleiderer                                          Page 26

Contains Highly Confidential Information

positions.  Mr. King characterized the "stuff" he and his group were directly responsible for valuing as follows:

> Mortgage backed [securities]. Unfortunately banks have a tendency of using mortgage and mortgage-backed securities to mean anything that isn't obviously something else. So it isn't just mortgages. It is CDOs, it is manufactured housing, it is franchise loans. It is a lot of stuff. Because you notice it doesn't obviously fit into any of those other categories, so it is stuff.
>
> Because it is stuff, some of it you would have no idea from the CUSIP or even the description whether it was a performing or nonperforming security, a senior obligation or a junior obligation. You would actually have to go to Bloomberg, or if in some cases it wasn't listed on Bloomberg, go to a trader and say what is this.[45]

Mr. King and his team were experienced, informed, and active participants in the relevant markets, such as they were, for mortgage backed securities and other "exotics," yet they had difficulty even identifying some of the securities in the Repo Collateral transferred positions. There is every reason to believe that JP Morgan Chase and BoNY, in their roles as custodians, had no better insight and were no better informed than (and more likely were not as well informed as) Mr. King and his team.  Thus, it is virtually certain that both JP Morgan Chase and Bank of New York encountered significant problems in characterizing, understanding, and marking at least some of the securities that comprised the Repo Collateral.  Given that JP Morgan Chase had just a few days to understand and mark at least the positions backing the FRBNY's loans to LBI earlier in the week, and that BoNY had just one day (at most) to understand and mark the positions backing the Barclay's Fed Replacement Repo loan to LBI on Thursday, it is highly likely that at least some of their marks were, at a minimum, imprecise.

---

[45] King Tr. at 48.

Expert Report of Professor Paul Pfleiderer                                                    Page 27

Contains Highly Confidential Information

44.    Mr. King addressed exactly this point in his deposition, commenting on JP Morgan Chase's marks for mortgage and mortgage-backed assets, which are the securities with which he is most familiar and knowledgeable:

> And some of those are very obvious mistakes as well. Because JP doesn't know any more than we do what some of the securities are. Sometimes it says, if I don't know what it is, mark it at par, but it may actually be worth zero, and that's the reason why that number comes out so wrong, because these are so complicated securities.[46]

45.    Testimony of key participants in Barclays' valuation process provides further insight into the nature of the marking process applied to Lehman's assets.  Stephen King, then a Barclays Managing Director and, as mentioned above, head of the Principal Mortgage Trading Group at Barclays, played a key role in developing the Barclays marks. According to Mr. King, all he cared about, as he developed marks for the Lehman assets was "what was a reasonable assessment for the value of the assets and ultimately what was the risk that we were going to have to manage." As stated in his deposition testimony:

> Q. Did you come to some conclusions about the accuracy of Lehman's marks when you were looking at all these asset groups?

> A. It is a peculiar way to describe it, did we come up with some assessment of the accuracy of Lehman's marks. In some respects I could say I didn't care about Lehman's marks.  I cared about what was a reasonable assessment for the value of the assets and ultimately what was the risk that we were going to have to manage.[47]

46.    I conclude from the above analyses that none of the three sets of marks discussed in this subsection — the marks in Lehman's GFS system; JP Morgan Chase's custodial marks; and BoNY's custodial marks — provides a reliable basis for valuing the positions comprising the Repo Collateral.

---

[46] King Tr. at 202.

[47] King Tr. at 26.

Contains Highly Confidential Information

iv.      *Barclays "exit price" marks*

47.     In this section, I report the results of my investigation into, and examination of, the marks developed by Barclays for valuing assets acquired in the Transaction for financial reporting purposes.   I first discuss the process by which these marks were developed and finalized by valuation professionals at Barclays over the course of several months.   Then I examine how and where Barclays' marks differ from BoNY marks, both at the aggregate level and for selected individual securities or sets of securities.

48.     I will refer to the set of marks I consider in this subsection as the Barclays "exit price" marks.  They are the marks, adjusted where appropriate to the equivalent of "bid" quotes, which, when multiplied by the quantities constituting the Repo Collateral positions, result in the value for "trading portfolio assets" reported on Barclays' 2008 Results Announcement summary of the Acquisition.   The key focus of my analysis is whether or not these marks provide an appropriate basis for determining the value of the securities Barclays received in the Fed Replacement Repo.[48]

49.     Efforts to anticipate what an acquisition balance sheet might look like began before the Transaction closed on Monday, September 22.  Part of Barclays' effort to develop a final Acquisition Balance Sheet was an effort to establish appropriate marks for determining the

---

[48] I have also examined Barclays' valuations of the "unencumbered clearance box" securities that it has received or to which it lays claim.  Few of these securities were liquid; most are highly illiquid and esoteric.  According to Alex Kirk, who was global head of Lehman's principal businesses at the time of the Transaction, "there was a reason why there was nobody financing those [unencumbered] assets and it was because they were the most illiquid and the hardest to value securities that Lehman Brothers owned on its balance sheet." Kirk Tr., page 106.  Barclays used the same methodology to value these securities as of acquisition that it used to value the Repo Collateral.  As discussed below, I find that methodology reasonable and appropriate and to have produced reliable "fair values" of the Repo Collateral.  As applied to these clearance box assets, I also find that methodology reasonable and appropriate and to have produced reliable "fair values."  Again, I emphasize that, due to applicable accounting rules, the "fair values" do not take into account some economically important factors such as the sheer size (and consequent illiquidity) of the positions, which in this case would have made the "fair value" of many positions difficult or impossible to realize in an actual sale.

Contains Highly Confidential Information

"fair value" of the assets (and also the liabilities) acquired by Barclays in the Transaction. This program of work led to the Barclays exit price marks that I analyze in this subsection.

50.    I have reviewed the deposition testimony of Gary Romain, chief technical accountant at Barclays, and of others who have been questioned about the development of Barclays' Acquisition Balance Sheet or the marks use to value assets recognized on that balance sheet. In addition, I and staff working at my direction interviewed Mr. Romain and several other participants in this program of work leading to the Acquisition Balance Sheet, to gain a thorough understanding of the process by which the Barclays exit price marks were developed. I and my support staff also have reviewed work papers developed by Barclays in the course of this work, as well as certain PriceWaterhouseCoopers work papers and files produced by Barclays in this litigation.[49]

51.    Based on this investigative work, I believe the following are key aspects of the process by which Barclays developed exit price marks:

1) Development of the Barclays exit price marks was the responsibility of the finance group, which drew on the expertise and gathered relevant information from trading desk personnel and product control group personnel.

2) The procedures and processes used to develop and test these exit price marks were the same as the procedures and processes that Barclays uses for similar purposes in the normal course of its business.

3) In the normal course of business, these "marking" procedures and processes are the subject of extensive review by numerous regulatory bodies. In addition, I have examined Barclays normal marking policies and procedures and find them to be reasonable, appropriate, and likely to produce reliable results.

---

[49] The work papers and files I refer to here were contained in Barclays document production in response to Document Request No. 3 of the Trustee's, Debtor's, and Creditors' Committee's First Set of Requests for Production, dated October 30, 2009 (BCI-EX-00247453 to BCI-EX-00295654).

Contains Highly Confidential Information

4) Employees in the finance group and employees in the product control group have no financial interest in the outcome of their work. The objective of their efforts is to identify accurate "fair value" marks; whether the marks they assign to positions are high or low has no impact on or relevance to these employees' performance reviews or compensation.

5) Trading desk (or "front office") marks were an input into the formation of the Barclays exit price marks, but traders otherwise had little or no involvement in the determination of the marks used to value the Repo Collateral positions for financial accounting purposes.

6) In addition to front office marks, the process of marking the Repo Collateral positions also drew on all other reasonably available and relevant data, including price data and quotes from multiple sources. Where possible and appropriate, actual reported prices were the basis for exit price marks. In other cases, bids were gathered from appropriate sources and formed the basis for exit price marks.

7) Where neither price data nor bid quotes of reasonable quality and credibility were available, vendor pricing models and various "bottom up" analyses were used to estimate fair value marks.

8) Where appropriate, but only where appropriate,[50] mid-point marks were adjusted to bid levels by applying "liquidity haircuts" to mid-point marks. These liquidity haircuts were intended to approximate the difference between mid-point prices and bid quotes, and were based on extensive analysis of bid quotes, ask quotes, and actual prices.

9) Adjustments of mid-point marks to bid-quote levels was intended to assure that the valuations used in Barclays' financial statements were computed at "exit prices" that reflected what Barclays likely would receive in an orderly sale of the assets in question, as I understand is required by applicable accounting standards.

10) Barclays' exit price marks were not further adjusted to reflect the size of the individual positions comprising the Repo Collateral or the size of the total portfolio of financial assets acquired by Barclays in the Transaction, nor were these marks adjusted to "fire sale" levels. It is my understanding that neither of these types of adjustment would have been permitted by applicable accounting standards. I note, however, that adjustments to reflect these factors would be appropriate when determining the actual economic — as distinct from accounting — value of these assets. Under the circumstances here, these factors would, as I discuss below, lead to the

---

[50] For example, where marks were based on bid quotes, no further adjustment was necessary (or made) to establish exit price marks.

Contains Highly Confidential Information

conclusion that the accounting valuation reported by Barclays overstates the actual, economic value of the assets that Barclays acquired in this transaction.

11) Whether Barclays' exit price marks were high or low had certain accounting and regulatory consequences, but for the most part did not affect the economic benefits of the Transaction. Relatively high marks would have the accounting effect of increasing the reported accounting gain on the Acquisition, but would lead to lower reported gains (or profits) when the positions were closed out. Relatively low marks, on the other hand, would have the accounting effect of reducing the reported accounting gain on the Acquisition, but would lead to higher reported gain (or profits) when the positions were closed out. Thus, so far as I have been able to determine, Barclays had no institutional incentive to set exit price marks high or low, although it is my understanding that a valuation low enough to make the transaction dilutive could have had adverse regulatory consequences.

12) PriceWaterhouseCoopers conducted an extensive audit of Barclays' final summary of the Acquisition, which included extensive investigation and testing of Barclays exit price marks.

52.     As mentioned above, analysts from Barclays' Product Control Group ("PCG") played a major role in the marking process described above. A key function of PCG is "price testing," i.e., ensuring the accuracy, integrity, and lack of bias with regard to the marks assigned to inventory positions in the normal course of business.[51] The price testing process at Barclays is described in detail in a series of internal statements summarizing the firm's "Price Testing Policy."

53.     To assess further the quality and timeliness of the Barclays exit price marks, I compared these marks to the BoNY custodial marks discussed above. I did this first for large aggregations of securities — i.e., all residential mortgage-backed securities, all corporate

---

[51] Assigning marks on a daily basis is the responsibility of front office traders. It is my understanding that PCG focuses on determining marks used for purposes of preparing monthly financial statements and also monitors traders' daily marking to assure the integrity of these marks.

Contains Highly Confidential Information

obligations, and so on.[52]  Table 1 reports the differences, for large aggregations of securities in
the Repo Collateral, between aggregate values based on the BoNY marks and aggregate values
based on Barclays exit price marks.

TABLE 1

DIFFERENCES BETWEEN INDICATED VALUES USING CUSTODIAL MARKS
AND INDICATED VALUES USING BARCLAYS EXIT PRICE MARKS, BY "DESK"
(INITIAL INVENTORY ONLY)

| | Indicated Value at Custodial Marks ($ billions) | Barclays Value Mid-Point Marks ($ billions) | Delta (percent) | Barclays Value at Exit Price Marks ($ billions) | Delta (percent) |
|---|---|---|---|---|---|
| RMBS | 13.906 | 13.077 | -5.96 | 12.620 | -9.24 |
| Corporate Bonds | 1.395 | 1.399 | +0.26 | 1.399 | +0.26 |
| Emerging Markets | 0.266 | 0.269 | +1.45 | 0.261 | -1.59 |
| Equities | 9.892 | 9.725 | -1.68 | 9.343 | -5.55 |
| Rates | 15.789 | 15.480 | -1.96 | 14.991 | -5.05 |
| PMTG | 3.789 | 2.628 | -30.65 | 2.075 | -45.23 |
| Total | 45.037 | 42.579 | -5.46 | 40.690 | -9.65 |

54.    The results in Table 1 provide important insight into the process used by Barclays
to develop exit price marks, and the results of that process.  First, I note that the differences
between values using BoNY (mid-point) marks and Barclays exit price marks are not uniform
across asset classes; Barclays did not simply write down the BoNY marks by a fixed percentage
across all securities in the Repo Collateral.  In fact, for both corporate bonds as a class and

---

[52] The grouping of assets in this table reflects the assignment of positions to different trading desks at Barclays for
evaluation.

Contains Highly Confidential Information

emerging markets as a class, positions in the Repo Collateral had a *higher* aggregate value using Barclays mid-point marks than those same positions had using BoNY mid-point marks, and for corporate bonds as a class the aggregate value at Barclays' exit price marks exceeded their aggregate value at BoNY mid-point marks. This, in my view, is evidence of the integrity of the process that generated Barclays exit price marks. Second, the overall pattern in the value differences in Table 1 seems eminently reasonable. The differences are larger for higher risk and less liquid asset classes, and lower for lower risk and more liquid asset classes. The largest differences arise from positions evaluated by PMTG; this is sensible and to be expected, since PMTG was tasked with evaluating unusual, unique, exotic, and difficult-to-characterize positions, which are, of course, the positions most difficult to mark accurately quickly, most affected by the difficult conditions in financial markets in September 2008, least likely to have been familiar to BoNY, and most likely to trade in thin markets or not to trade at all.[53]

55.    In addition to the asset-class level analysis summarized in Table 1, I also compared values determined by Barclays exit price marks to values determined by BoNY marks for selected individual positions and groups of similar positions. I focused this comparison on the marks associated with individual positions and groups of similar positions that give rise to large aggregate differences in indicated values. In other words, I examined positions and groups of similar positions that were major contributors to the overall gap between BoNY's marking of the Repo Collateral and Barclays' marking of the Repo Collateral. Exhibit 6 summarizes these differences for a selection of individual positions and groups of similar positions.

56.    The more granular data presented in Exhibit 6 support the conclusions I drew from the more aggregated results in Table 1 above: The differences between values using BoNY

---

[53] However, as my review of specific positions in Appendix Four shows, trading in thin or "frozen" markets was not limited to positions evaluated by PMTG.

Contains Highly Confidential Information

(mid-point) marks and Barclays exit price marks are not uniform across different assets or groups of assets; even among these mostly difficult-to-mark positions, Barclays did not simply write down the BoNY marks by a fixed percentage across all positions. Instead, the overall pattern in the value differences in Exhibit 6 is consistent with a discriminating and diligent effort to assess what values Barclays was likely to realize upon disposing of the acquired positions in an orderly sale in the difficult markets that prevailed in the fall of 2008.

57.    I next examined a number of the specific positions and groups of positions identified in Exhibit 6 in more detail, to assess whether the specific characteristics of the positions explained and supported Barclays exit price marks as opposed to BoNY marks. My work in this area is continuing, but I present some preliminary findings in Appendix Four: Information on Selected Positions Transferred to Barclays. Among the positions I examine in Appendix Four are certain high-risk varieties of collateralized mortgage obligations (namely, interest-only CMOs and inverse interest-only CMOs), Giants Stadium notes (which were auction rate securities), Pine CCS (a CDO collateralized by whole loans), certain insurance-related notes (also auction rate securities), and Lehman-issued warrants and equity-linked notes ("ELNs"). While my investigation of individual positions and groups of similar positions is on-going, I have formed three preliminary conclusions based on work completed to date. First, for many positions of significant indicated value in the Repo Collateral, there is no generally recognized pricing source available and, in fact, there is surprisingly little information available in the public domain (e.g., from the SEC, or from financial websites, or in the financial press) or even from proprietary (i.e., available for purchase) sources of financial information. Second, some of the specific securities included in the Repo Collateral (with significant indicated values) represent extremely complex claims on cash flows from bundles of underlying assets that themselves are

Contains Highly Confidential Information

complex, opaque, and hard to assess. Third and finally, based on my initial work, there appears to be strong support and justification for the differences between Barclays' exit price marks and BoNY's marks.

58.     This analysis leads me to conclude that the best available source for marks for valuing the assets Barclays received in the Fed Replacement Repo (and the Transaction as a whole) is the detailed worksheets prepared by Barclays to identify exit price marks. I discuss the market value of the assets Barclays received in the Fed Replacement Repo, using these marks, in the next subsection.

59.     Importantly, there are additional factors that may be relevant to understanding the economics of the Transaction that are not reflected in exit/bid prices developed by Barclays. These are not "fire sale" prices, nor are these "bulk" prices that take into account either the size of individual positions or the overall size of the transaction. (As I mentioned before, it is my understanding that applicable accounting rules do not allow these factors to be taken into account for purposes of developing "fair value" estimates of asset values of the type set forth in Barclays' acquisition accounting statement.) These factors, had they been taken into account, would have led to lower marks and to a lower assessment of the value of the trading assets acquired by Barclays. Importantly, these considerations would be relevant to an economic assessment of what Barclays received. Thus, the "fair value" valuation of the securities and assets Barclays received from Lehman in the Fed Replacement Repo at Barclays exit price marks is an upper bound on the reasonably estimated value of those assets.

60.     Before turning to the indicated value of the Repo Collateral, I should note that I also considered the feasibility of developing an entirely new set of marks, completely independent of any of the available sources. I determined that it is highly unlikely that such a

Contains Highly Confidential Information

procedure would lead to better marks than the marks developed by Barclays. Rather, such a procedure could in the end produce *less* reliable marks for several reasons. First, there is no reason to believe that better information is available today than was available in the fall and winter of 2008 (and into 2009) when the Barclays exit price marks were developed. To the contrary, few analysts today, if any, would have the data or the "feel for the market" that Barclays was able to tap a year ago as it developed its exit price marks. Second, as I indicated above, Barclays exit price marks were developed in the normal course of business, for financial accounting purposes only. In my experience, it is usually is preferable, where possible, to rely on "source" business data rather than data developed solely for litigation purposes. At a minimum, given the integrity of Barclays' marking process, discussed above, it seems appropriate to attach significant weight to Barclays exit price marks. Third and finally, the practical difficulties of developing an entirely new set of marks, independent of those available in the record, are immense. One of the main reasons there is controversy that gives rise to the present litigation is that many of the securities in the Repo Collateral had characteristics that made them extremely difficult to value given the market conditions prevailing as of and after the close of the Transaction. Any analyst attempting to develop entirely new marks for these positions would be confronted with precisely the difficulties that Barclays had to work through in developing exit price marks and preparing its Acquisition Balance Sheet in the fall of 2008.

### v.    *Aggregate value of transferred positions*

61.    The preceding discussion sets the stage for determining the aggregate value of the Repo Collateral. In this section, based on the analysis above, I report the indicated value of the Repo Collateral, using the list of transferred positions compiled by Barclays for financial

Contains Highly Confidential Information

reporting purposes and the "exit price" marks developed by Barclays to determine the fair value of those positions for financial reporting purposes.

62.    Table 2 below summarizes the aggregate indicated value of the transferred positions constituting the Repo Collateral. As reported in Table 2, the initial inventory of trading portfolio securities acquired by Barclays in September of 2008, including securities acquired in the Fed Replacement Repo and securities acquired as part of the larger Transaction, had a value, computed at clean mid-point marks, of $42,605.0 million. The additional inventory of trading portfolio securities that Barclays acquired as a result of its settlement with JP Morgan Chase in December of 2008 had a value, also computed at clean mid-point marks, of $3,917.9 million. Adding these two components together, adjusting the valuations from mid-point marks to exit-price marks, and adding interest accrued on the assets as of the Transaction date, the fair value of *all* of the trading portfolio assets acquired by Barclays in the overall Transaction was $44,781.4 million. Subtracting the value of the unencumbered clearance box (non-Repo) assets included in this total, along with the portion of accrued interest attributable to these assets, I conclude that the fair value of the trading portfolio securities acquired in the Fed Replacement Repo was $43,995.8 million. Finally, I add the $1,550.0 million of cash that Barclays received in the Fed Replacement Repo.[54] On this basis, I conclude that the aggregate "fair value" of all of the assets that Barclays received in the Fed Replacement Repo (including securities and cash, in September 2008 and December 2008) was, by this accounting, $45,545.8 million.

---

[54] This comprises the $1.25 billion in cash received in the JP Morgan settlement and $300 million that represented matured portions of the Fed Repo collateral.

Contains Highly Confidential Information

TABLE 2

AGGREGATE VALUE OF ASSETS RECEIVED FROM THE FED REPLACEMENT REPO

|  | Aggregate Value ($ millions) |
|---|---|
| Initial inventory at Barclays mid-price marks | 42,605.0 |
| JPMC inventory at Barclays mid-price marks | 3,917.9 |
| Adjustment to Barclays exit-price/bid marks | (2,086.5) |
| Accrued interest on trading portfolio assets | 345.0 |
| Subtotal: Fair value of all trading portfolio assets | 44,781.4 |
| Less: Schedule B assets included in the above (at Barclays exit-price/bid marks) | (778.9) |
| Less: Accrued interest on Schedule B assets included in the above | (6.7) |
| Subtotal: Fair value of transferred securities | 43,995.8 |
| Cash received with initial inventory | 300.0 |
| Cash received in JPMC settlement | 1,250.0 |
| Total: Fair value of all assets received | 45,545.8 |

63.    In closing this section, I note again that this "fair value" valuation of the assets Barclays acquired in the Fed Replacement Repo does not reflect several economically justified adjustments that likely would reduce the indicated economic value of the assets Barclays acquired in the Fed Replacement Repo well below $45,545.8 million. First, this "fair value" valuation of these assets does not reflect any discount for the size of the individual positions comprising the Repo Collateral,[55] some of which were massive, nor does the valuation reflect the

---

[55] Stephen King explains in his deposition why holding large positions of individual assets can reduce their economic value. He states "8 billion dollars worth of equities doesn't trade at where those marks are. A good example would be, we had cash equities where the amount of the cash equity that we owned represented 400 days of the historical trading volume. That means if we would have traded as much of that stock as trades every day for the last 400 days, we still couldn't get out of our position. But still, the last mark, last penny of stock that traded was

Contains Highly Confidential Information

size of the overall portfolio of trading assets acquired by Barclays. These considerations are relevant to an economic valuation; but it is my understanding that applicable accounting rules do not permit any "bulk discount" adjustment to fair value. Second, the $45,545.8 million "fair value" valuation does not apply any "fire sale" discount to any of the transferred positions. It is my understanding that Barclays did not want or intend to hold the Repo Collateral for the long term, but instead planned to dispose of the positions in a rapid, but orderly sale as market conditions permitted. Barclays almost certainly was particularly eager to sell off certain large, illiquid, and difficult-to-hedge positions; arguably for these positions, something closer to "fire sale" prices provides a better estimate of the economic value of the positions to Barclays than do unadjusted bid prices. Finally, this valuation makes no adjustment for the unusual risk characteristics of the $7.0 billion "cash, but ultimately not really cash" component of the assets Barclays actually held in the days and weeks immediately following the Fed Replacement Repo. While this claim ultimately was settled for cash and securities valued by Barclays at approximately $5.0 billion, it is likely that the "market value" of this claim in the final days of September 2008, if such a concept has any meaning at all for a claim for which there really was no market, was much less than $5.0 billion.[56]

64.      As explained above, in my judgment, the fair value of the assets Barclays actually received in its settlement with JP Morgan Chase is a reasonable proxy for the fair value of this

---

where we had to mark that position. It took us a year at that point to get out of those positions, and many of them therefore by construction every time we sold them took a loss every time. 300 million dollars of loss or whatever it was in the end, but every time we sold we were selling at a discount to the published mark. Easy to provide, put the published mark into that spreadsheet. The desk estimates were an attempt to then say, we have taken that, you know, where the exchange, such and such, and we assume it is going to cost us an additional 300 million dollars to bid side for us to be able to sell them." See Deposition of Stephen King, *In re: Lehman Brothers Holdings Inc., et al.*, Case No. 08-13555 (JMP) (SDNY Jan. 29, 2009), at 124:22-125:7.

[56] For this very reason, for financial accounting purposes, Barclays ultimately valued this claim based on the cash and securities actually received in December 2008.

Contains Highly Confidential Information

element of the Fed Replacement Repo assets. But this almost certainly is an upper limit on the fair value of this claim as of the date of the Transaction; there was no market for this claim, so far as I am aware, and it seems highly unlikely that any disinterested investor would have paid $5 billion to acquire it. For all of these reasons, in my opinion, the $45,545.8 million "fair value" valuation of the Repo Collateral is an upper limit on the true economic value of those positions.

### D.    Ex Post Assessment of Profits from Trading Assets Acquired from LBI

65.    Any assessment of the post-acquisition profitability of the Businesses that Barclays acquired from LBI on September 22, 2008, is necessarily a rough approximation. As Barclays stated in its 2008 Results Announcement, "The acquired business has been integrated into the corresponding existing business lines and there is no reliable basis for allocating post-acquisition results between the acquirer and the acquiree."[57]   Nonetheless, for purposes of this litigation, Barclays has prepared a memo summarizing available information as to the results of sales (or in some cases re-valuations) of trading portfolio securities. In this final subsection, I consider to what extent, if any, this ex post assessment sheds light on the issues discussed herein and more particularly on the Movants' claims that Barclays received a $5 billion secret discount when it acquired these trading portfolio securities from LBI.

66.    As a general matter, one must use ex post outcomes with considerable care. Consider, for example, the sale of a classic automobile in a private transaction for, say, $100,000. Suppose this same auto is put up for auction six months later and sells for $200,000. What, if anything, does this say about whether the buyer in the original transaction paid fair value for the car six months ago? On its own, this ex post outcome says little to nothing about that question. The car could have increased in value because of a general rise in the value of

---

[57]Barclays PLC 2008 Results Announcement, page 95.

Contains Highly Confidential Information

classic cars or because of a substantial and unforeseeable increase in the demand for the specific type of car that was purchased.

67.    Despite these concerns, I reviewed the ex post profitability assessment prepared by Barclays to determine the extent to which it illuminates important issues in this case. In my opinion, under the special circumstances here, this assessment does in fact convey useful information about important issues in this case.   What makes the ex post assessment of profitability useful in this case is that Barclays sought to hedge the serious market risk exposures arising from its acquisition of the trading portfolio securities almost immediately upon acquiring the portfolio.[58]  This put in place a workable mechanism, admittedly an imperfect mechanism, for distinguishing between ex post profits (or losses) attributable to market movements occurring after the close of the Transaction and ex post profits (or losses), if any, embedded in the positions because Barclays exit-price marks were systematically low (or high).

68.    As I have indicated above, Barclays moved to hedge the market risks inherent in the trading portfolio that it acquired from LBI immediately upon recognizing or confirming its exposure. It did so, initially at least, through broad "portfolio" hedges, as opposed to using one-on-one, position-by-position hedges.  For this and other reasons, hedging of these exposures by Barclays undoubtedly was incomplete and imperfect.  Still, to the extent that Barclays was able to hedge its exposures, this provides a means of separating out market movements from initial conditions.  Consider the implications of the Movants' assertion that Barclays exit price marks were discounted and artificially low, resulting in an aggregate value for the acquired trading portfolio securities some $5 billion less than their true value.  If there really were such a hidden discount in Barclays' acquisition-date valuation of the trading portfolio securities, then the

---

[58] *See* King Tr. at 89 ("Q.: The plan was to hedge the portion you needed to hedge and then sell the securities later? A.: Yeah.").

Contains Highly Confidential Information

eventual sales of these securities should have been extraordinarily profitable (in an amount approximating $5 billion). Moreover, the hedges that Barclays put in place should have locked in a substantial portion of those gains; if prices moved against Barclays' underlying acquired positions in the months following the Transaction, gains on the hedges would offset market losses on the underlying positions, allowing Barclays to reap the hidden $5 billion gain. On the other hand, if prices moved favorably for Barclays' underlying acquired positions, then market gains on the underlying positions would be offset by losses on the hedges, and Barclays again would reap just the hidden $5 billion gain allegedly embedded in the initial values of those positions.

69.    Because of this hedging, at least to the extent it was effective, Barclays' ex post assessment of its gains and losses on the acquired trading portfolio positions — including gains and losses on related hedges — can be viewed as a "test" of the Movants' claim that Barclays understated the value of the trading portfolio assets it acquired in the Transaction.

70.    At Barclays exit price marks, Barclays acquired approximately $44.4 billion of trading portfolio securities, including some positions that were not part of the Repo Collateral. Barclays' ex post analysis, which I summarize in Table 3 below, seeks to identify gains and losses on this portfolio of assets, including gains and losses on related hedges.

Contains Highly Confidential Information

TABLE 3
IDENTIFIED GAINS AND LOSSES ON ACQUIRED TRADING PORTFOLIO SECURITIES
(INCLUDING GAINS AND LOSSES ON HEDGES)

| | Assets ($ billions) | Gains / (Losses) ($ billions) |
|---|---|---|
| Assets Auctioned to Trading Desks | 7.2 | (0.160) |
| Agency Mortgages | 13.0 | 0.140 |
| Emerging Markets | 0.3 | - |
| Munis | 0.6 | 0.003 |
| Rates – Agencies | 9.8 | (0.034) |
| Rates – Treasuries | 5.8 | - |
| Equities – Convertibles | 0.5 | (0.059) |
| PTMG – Corporate Credit | 1.2 | 0.065 |
| PMTG – Illiquid Assets in LLCA | 0.7 | 0.204 |
| PMTG – Illiquid Assets in LiiL | 3.9 | (0.080) |
| PMTG – Cash and Other Equity Products | 1.4 | (0.028) |
| Total | 44.4 | 0.051 |

71.    By this ex post accounting, Barclays has had a gain on the acquired positions and related hedges of approximately $51 *million*.[59] This is just 1% of the gain that one would expect Barclays to have reaped if the Movants' assertion of a hidden $5 billion discount were true.[60] The results of this ex post accounting are consistent with my earlier findings and provide more evidence showing that Barclays exit price marks were, in the aggregate, accurate and can be used as an appropriate and reliable basis for valuing the Repo Collateral.

[59] Given the magnitude of the portfolio of trading assets Barclays acquired in the Transaction and the approximations involved in this calculation, a gain of $51 million is not meaningfully distinguishable from no gain at all.

[60] All else equal, one would expect Barclays to have realized a gain upon disposing of the acquired assets (and closing out related hedges) approximately equal to the alleged "hidden discount" of $5 billion were such a discount actually present.

Contains Highly Confidential Information

### E.    Conclusion

72.    I conclude that Barclays did not receive a $5 billion discount on the inventory of trading portfolio securities (the "Repo Collateral") it acquired when it replaced the Federal Reserve Bank of New York as LBI's primary source of financing on Thursday, September 18, 2008.

### III.    Alleged $5 Billion Discount at Inception

73.    The Movants claim that the alleged (but in fact non-existent) $5 billion secret discount in the Repo Collateral had its origins in the early stages of the negotiations.    They assert, in other words, that there was a secret $5 billion discount built into the Transaction from inception.    Since the facts show there was no $5 billion discount as the Transaction was implemented via the Thursday repurchase agreement, whether or not there was an agreed $5 billion discount at inception may be a moot point.    For completeness, however, I show in this section that the alleged discount at inception most likely did not exist.[61]

---

[61] I take the Movants' assertion seriously, and show analytically that there almost certainly was no $5 billion discount at inception.    But I also note that, in an important sense, the assertion just is not plausible on its face.    To see this, suppose that Barclays really did secretly and fraudulently understate the value of the financial assets it was acquiring from LBI by $5 billion.    If it had done so (and the evidence shows it did not), it was done in an extraordinarily forthright manner, in full public view.    First, even though there was no reason do to so, Barclays allowed to be included in the Asset Purchase Agreement a description and approximate valuation of the trading assets it would be acquiring: "government securities, commercial paper, corporate debt, corporate equities, exchange traded derivatives, and collateralized short term agreements with a book value as of the date hereof of approximately $70 billion."    Surely Barclays understood that Lehman would have to include, and in fact did include, a copy of the APA in a Form 8-K Report filed with the U.S. Securities and Exchange Commission immediately upon consummation of the Transaction.    Second, the third sentence in Barclays' press release announcing the Acquisition, dated September 17, 2008, stated that "Barclays will acquire trading assets with a current estimated value of . . . US$72 billion . . ." and this fact was repeated in Barclays' conference call with analysts later in the day.    If these publicly-disclosed values really were understated by $5 billion, Barclays had set itself up, in a very public way, for an extraordinary problem, namely, what to do with the $5 billion gain it would realize, mostly in the fourth quarter, as it sold off these assets.    How could Barclays not realize that a distortion of this magnitude, made in full public view, would come back to haunt it in a matter of months?    Viewed in this light, in my opinion, the Movants' assertion of a secret $5 billion discount from inception is implausible.

Contains Highly Confidential Information

74.    In analyzing this allegation, it is important to distinguish between two possible meanings of the term "discount," as applied to the "approximately $70 billion" in Long Positions in the definition of Purchased Assets in the APA.    When I review the pending motions, deposition testimony, and relevant documents, it often is unclear whether the term "discount" is intended to refer to (a) a reduction from a Lehman mark of a particular date *to market value* or (b) a negotiated reduction *below market value.*    But this is an important distinction.    There is a significant difference between (i) an agreement that "Long Positions" valued at $75 billion at Lehman's existing marks at the time of the negotiation actually were worth only approximately $70 billion and (b) an agreement that "Long Positions" actually worth $75 billion would be described as being worth only $70 billion.

75.    As I discuss below, there is reason to question whether, as of September 16, 2008, even Lehman's *marked values* for the Long Positions were actually $5 billion higher than the "approximately $70 billion" number stated in the APA.

76.    I am aware of no evidence supporting the contention that the *actual value* of the Long Positions was $5 billion higher than the $70 billion description in the APA.    That contention has been flatly denied by deponents, including Mr. McDade, Mr. Keegan, and Mr. King.    That contention is also inconsistent with internal documents circulated within Barclays showing that it intended to book the Long Positions at approximately $70 billion, and not at any higher valuation.[62]

---

[62] I note, in this connection, that the Movants cite to a September 16, 2008, presentation to the Barclays Board which states that there are $75 billion in assets in the transaction as support for their contention. [See "Board Deck" included in Exh. 342A.] The testimony suggests that the numbers in this document were preliminary. In any event, however, an examination of that presentation shows that the $75 billion number includes $6.5 billion in mortgage securities which are a category of securities not included in the APA's definition of the approximately $70 billion in Long Positions.

Contains Highly Confidential Information

### A.    Estimated Transaction Balance Sheet as of September 16, 2008

77.    A key element of the Movants' argument is that a one-page balance sheet referenced once in the APA (which I refer to hereafter as the "Estimated Transaction Balance Sheet"), but not attached to or incorporated into the APA, "materially understated the value of the assets" that the parties anticipated would be transferred over to Barclays in the Acquisition.[63] Elsewhere the Movants claim that the Estimated Transaction Balance Sheet "deliberately understated by $5 billion the amount shown on Lehman's books for the assets."[64]  In sum, according to the Movants, the "9/16/08 Financial Schedule [i.e., the Estimated Transaction Balance Sheet] — upon which the Sale Transaction was based and described to the Court — distorted the facts. It understated by at least $5 billion the consideration [i.e., assets] Barclays was receiving in the Sale Transaction . . . ."

78.    As support for this claim, the Movants quote bits of testimony about the Estimated Transaction Balance Sheet from the depositions of Steven Berkenfeld, Martin Kelly, and Ian Lowitt.  The testimony of these deponents regarding the origin, development, and meaning of the Estimated Transaction Balance Sheet is imprecise. Although I have my doubts about whether, taken as a whole and sensibly interpreted, this testimony supports the Movants' assertion, testing the validity of that assertion need not come down to how I or anyone else reads the testimony of these witnesses.  Instead, the assertion can be tested directly, by comparing the figures cited in the Estimated Transaction Balance Sheet to corresponding values reported on LBI's own books and records.

---

[63] The Estimated Transaction Balance Sheet appears as Exhibit 19 to the deposition of Steven Berkenfeld and is reproduced at page 30 of the Debtor's Motion. *See* Deposition of Steven Berkenfeld, *In re: Lehman Brothers Holdings, Inc., et al.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 6, 2009), at Exhibit 19; Debtor's Motion, page 30.

[64] Debtor's Motion, page 31.

Contains Highly Confidential Information

79.    I present just such a comparison in Table 4 below.  The list of assets and values on the left-hand-side ("LHS") is taken directly from the Estimated Transaction Balance Sheet, which the Movants assert is distorted and understates the values of LBI's assets.  The list of assets and values on the right-hand-side ("RHS") is, to the best of my knowledge, a statement of LBI's inventory of financial assets, as recorded on its books on September 12, 2008.[65]

TABLE 4
COMPARISON OF ESTIMATED TRANSACTION BALANCE SHEET (SEPTEMBER 16, 2008)
TO LBI BALANCE SHEET, BY GAAP ASSET TYPE (SEPTEMBER 12, 2008)

| Estimated Transaction Balance Sheet (Sept. 16, 2008) | | LBI Balance Sheet, by GAAP Asset Type (Sept. 12, 2008) | |
|---|---|---|---|
| Assets | ($ billions) | Net Long Inventory | ($ billions) |
| Governments and Agencies | 40.00 | Total Governments and Agencies | 39.17 |
| Commercial Paper | 1.10 | CDs and Other Money Market Instruments | 1.01 |
| Mortgages | 2.70 | Total Mortgages and Mortgage Backed | 6.56 |
| Total Corporate Debt | 4.90 | Total Corporate Obligations and Spot | 5.14 |
| Corporate Equity | 8.80 | Total Corporate Stocks and Options | 8.43 |
| Derivatives | 4.50 | Total Derivatives and Other Contr. | 4.84 |
| Cash | 0.70 | | - |
| Total | 62.70 | Total | 65.15 |

---

[65] The list of assets and values on the right-hand-side of Table 4 are from a spreadsheet workbook, which has been produced in this matter, entitled "2008-09-16_0723 – Here's the summary for the 12th.xls."  This workbook is composed of two worksheets (i.e., has two "tabs"), one named "LBI Summary" and the second named "Detail."  The "LBI Summary" worksheet has in its upper left hand corner the title, "Lehman Brothers, Inc.; Balance Sheet by GAAP Asset Type; 9/12/08"; it reports LBI's "net long inventory" in six categories, which I have reproduced on the right-hand-side of the table above.

Contains Highly Confidential Information

80.    While I cannot be certain that this particular spreadsheet was the direct source for the Estimated Transaction Balance Sheet, the spreadsheet does provide a means of testing the Movants' assertion that "the value of the classes of securities listed on the 9/16/08 Financial Schedule was understated on the schedule by $5 billion" and "deliberately understated by $5 billion the amount shown on Lehman's books for the assets." For three of the six categories for which we can make a direct comparison (the LBI Inventory does not report "cash"), the values included on the Estimated Transaction Balance Sheet (those on the LHS of Table 4) are *higher* than the corresponding values on the LBI Inventory as of September 12, 2008. Moreover, the only category for which the Estimated Transaction Balance Sheet value is significantly below the corresponding LBI Inventory value is "Mortgages" / "Total Mortgages and Mortgage Backed." But this difference almost certainly reflects the agreement, explicitly stated in the APA, before it was amended and clarified, that Barclays would accept only 50% of LBI's mortgage assets.

81.    One can further test the Movants' assertion that the value of the assets on the Estimated Transaction Balance Sheet were understated by comparing the aggregate value of the assets listed thereon to the aggregate value of the assets listed on the LBI Inventory for September 12, 2008, after two adjustments are made to compare "apples to apples." As a first adjustment, I replace the $6.36 billion of "mortgages and mortgage backed" assets by 50% of this value, or $3.18 billion; this reduces the aggregate value of assets listed on the LBI Inventory for September 12, 2008 $61.87 billion, which rounds, of course, to $61.9 billion. Next, I deduct the value of cash from the aggregate value of the assets shown on the Estimated Transaction Balance Sheet, since cash does not appear in the LBI Inventory values. This makes the aggregate value of the assets listed on the Estimated Transaction Balance Sheet $62.0 billion. Far from being distorted and understated by $5 billion, the aggregate asset value on the

Contains Highly Confidential Information

Estimated Transaction Balance Sheet is almost identical to the aggregate asset value recorded on Lehman's books at Lehman's marks.[66]

82.     As mentioned above, the Estimated Transaction Balance Sheet is referenced once in the Asset Purchase Agreement, but is not attached to or incorporated into the APA.  Instead, the APA refers to approximations to the "book value" of certain LBI assets ("long positions") and associated liabilities to be included in the Transaction, but without defining the term "book value."  Furthermore, to the best of my knowledge, "book value" does not have a definite meaning in this context, such that a financial professional would understand it, as the Movants apparently do, to be synonymous with the "marked" value of the assets and liabilities on Lehman's books as of any arbitrary date and without regard to the quality and timeliness of Lehman's marks on such date.  Rather, the interpretation of "book value" offered by Bart McDade, President of Lehman Brothers at the time of the Transaction, as the value of the assets and liabilities to which the parties mutually agreed in their negotiations, appears reasonable and appropriate.[67]

---

[66] To confirm that the LBI, Inventory by GAAP Asset Type discussed in this subsection accurately reflected the net long inventory balances on LBI's books as of September 12, 2008 staff working at my direction acquired from Barclays a GFS report which I understand captures all LBI positions as of that date.  From the detailed information in that report (a spreadsheet with more than 200,000 line items, approximately 59,000 of which have net balance sheet values of $100 or more), my support staff independently calculated the net inventory values for the asset classes listed in Table 4, and found values that closely approximated the values listed on the RHS of Table 4.  This again confirms that the values in the Estimated Transaction Balance Sheet did not distort or understate the asset values on Lehman's books.

[67] "Q.: So it's your view that Exhibit 19, that schedule, reflected the book value of the assets of Lehman that were to be transferred in the deal?  MR. HUME: Objection. Asked and answered.  Q. You can answer it.  A. I can answer?  Again, I'd repeat, maybe I don't understand the specifics of your question, the market -- the securities were last marked on Friday, the 12th, to the best of my knowledge.  The process, in terms of the bottoms-up between the two firms to recognize a value of assets to be purchased, was done over the course of the 15th and 16th, prices had changed dramatically in the marketplace.  So your specific question, using the term "book value," I would agree that the book value, if you're describing what our traders and the Barclays traders came up with, I would agree that that's one and the same, this is the book value." McDade Tr. at 69-70.

Contains Highly Confidential Information

### B.    Updated Transaction Balance Sheet as of September 17, 2008

83.    Further evidence and confirmation that the Estimated Transaction Balance Sheet was not distorted, and that there was no secret $5 billion discount applied to the values of the assets to be transferred to Barclays, comes from a series of emails and attachments related to an effort to construct a "post transaction" LBI balance sheet.[68] These emails, dated September 18, 2008, and their attachments show an *expected* transfer of certain categories of assets — specifically, the asset categories listed above, with the exception of mortgages, for which only 50% are expected to be transferred — to Barclays at Lehman's book values, without any discount whatsoever.

84.    The several attachments to these emails are slightly different versions of the same spreadsheet (with virtually identical numbers); one email describes its attachment as "a draft balance sheet for LBI both pre and post transaction" and another email describes its attachment as "a cut at the balance sheet that stays and [what] is transferred to Barclays." Several of the emails stress that the "numbers are still being finalized, so it is obviously subject to change."

85.    For simplicity, I will cite here only "LBI BS_917_V with adjustment.xls," the printed version of which bears the title, "Lehman Brothers, Inc.; Balance Sheet as of September 17, 2008; ($ in millions)." The asset side of this spreadsheet (the format of which has been slightly modified for ease of presentation) is reproduced as Exhibit 7 to this report. The first two columns of numbers on this spreadsheet, (A) and (B), report LBI's assets as of "08/31/08" and

---

[68] *See* Email from Brett Beldner, PWC, to Richard Krasnow, Weil Gotshal & Manges, re: "LBI Draft Balance Sheet," Bates No. LBHI 004083 (Sep. 19, 2008).

*See* Email from David Descoteau, Lazard, to Barry Ridings et al., Lazard NYC, re: "LBI_BS_917_V with adjustment.xls," Bates No. LAZ-C-00050306 (Sep. 19, 2008).

*See* Email from Martin Kelly, Lehman Brothers, to David J. Coles et al., re: "Consolidating Balance Sheet," Bates Nos. LBHI_SEC07940_92774-927779 (Sep. 19, 2008).

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

"09/17/08." These columns show not just the assets expected to be transferred to Barclays, but all of LBI's assets a (including those to be retained by LBI). There is no indication whatsoever that the numbers reported in these columns are anything other than LBI's "book" values for its assets, and no indication whatsoever that these asset values have been discounted in any way.

86.    To the right in Exhibit 7 there are two columns headed "Balance Sheet Transferred" and "Balance Sheet Remaining." Thus, as the emails themselves indicate, the analyst who prepared this worksheet is summarizing how the transaction is expected to be effected. He or she appears to be reporting, or estimating, what assets are expected to be transferred to Barclays and at what values as of September 17, 2008. In effect, the column headed "Balance Sheet Transferred" is an "Updated Transaction Balance Sheet," revised and updated to take into account changes in Lehman's positions and changes in Lehman's marks (to whatever extent those marks have been updated).

87.    The asset values shown for "Financial Instr. & Other Inventory Positions Owned" as of September 17, 2008, in column (B) of Exhibit 7, are slightly different from the asset values listed in the Estimated Transaction Balance Sheet discussed above, and on the LBI Inventory for September 12, 2008, also discussed above, but all three sources appear to represent the same categories of assets in LBI's inventory. As shown in column (B), the total value of LBI's Inventory Positions Owned on September 17 was $59.3 billion. Column (D) of Exhibit 7 shows the assets expected to be transferred to Barclays. After reducing the value of "mortgages and asset-backed securities" by 50% for comparability, the aggregate value of the six asset classes (other than cash) listed in Table 2 above, as of September 17, 2008, is $56.3 billion, compared to $60.0 billion for these same categories of assets on the Estimated Transaction Balance Sheet.

Contains Highly Confidential Information

While not conclusive, this result is not easily reconciled with the Movants' claim that the asset values on the Estimated Transaction Balance Sheet were significantly *understated*.

88.    Unlike the Estimated Transaction Balance Sheet referenced in the APA, which stands in isolation, here we can directly compare the values on the Re-Estimated Transaction Balance Sheet to the corresponding values on Lehman's books since both are reported in the same spreadsheet. What one sees in making this comparison is an exact match of the values on the Updated Transaction Balance Sheet with the values on Lehman's books as of September 17, 2008, with the exception of "mortgages and mortgage-backed sec," for which the value on the Updated Transaction Balance Sheet is exactly one-half of the value on Lehman's books.

89.    If there had been any secret $5 billion discount applied to the assets to be transferred to Barclays on the September 16 (a proposition inconsistent with the evidence discussed above), that discount was gone by September 17, at least according to this Updated Transaction Balance Sheet.

C.    **Conclusion**

90.    The evidence I have analyzed is inconsistent with the proposition that Barclays negotiated or otherwise arranged to acquire securities from LBI at a substantial, but undisclosed discount. Instead, the parties to the Transaction seem to have relied heavily on values drawn directly from LBI's own books and records as they sought to summarize a complex transaction.

91.    The facts and analyses in the previous section establish that there was no secret $5 billion discount in the Fed Replacement Repo. The facts and analyses discussed in this section are inconsistent with the proposition that there was a secret $5 billion discount in the Transaction from inception.

Contains Highly Confidential Information

IV.    **Risks Arising from the Acquisition**

92.    I turn next to a brief review of the risks that Barclays assumed when it acquired LBI's North American broker-dealer businesses. The acquisition of LBI's North American broker-dealer businesses entailed enormous risks for Barclays, which can be grouped into three broad categories: (a) information risk, (b) market and price risk, and (b) business and strategic risk. I discuss each of these categories of risk in the next three subsections.

A.    **Information Risk**

93.    I use the phrase "information risk" to refer to uncertainties arising from two sources. The first source of information risk is the unavoidable fact that information in a complex transaction like this is always imperfect. For example, it is virtually impossible for an investor to know with 100% accuracy the creditworthiness of every borrower behind every mortgage packaged into a given mortgage-backed security. The second source of information risk arises from information asymmetry, i.e., the fact that, in most transactions, the seller has more information about the item being sold than does the buyer. For the reasons set forth next, both of these sources of information risk were particularly important and problematic in Barclays' acquisition of LBI's North American broker-dealer businesses.

94.    The set of assets transferred from LBI to Barclays on September 22, 2008, was among the largest, most complex, and most difficult to understand set of assets ever transferred from one financial institution to another. This applies not only to the financial assets transferred to Barclays as part of the Transaction, but also to the non-financial assets transferred to Barclays. As noted above, the transferred financial assets included more than 10,000 different securities of virtually every type imaginable, thousands of which were traded thinly (if traded at all), largely unknown in the financial community, and opaque (in the sense that very little information about

Contains Highly Confidential Information

them was readily available to anyone other than their originator and their holder). There are reasons to doubt how well Lehman understood some of these securities, much less other investors and analysts (including Barclays prior to the Transaction). Similarly, with respect to the non-financial assets transferred to Barclays, there also were immense informational difficulties. For example, the value of LBI's customer base, given LBHI's failure and the extraordinarily difficult conditions in financial markets in September of 2008, was extremely uncertain. Similarly, the value of the "Lehman" name also was uncertain, as were the value of Lehman's headquarters building and Lehman's workforce.[69] For all of these reasons, there can be no doubt that both Lehman and Barclays were working with imperfect and incomplete information as they negotiated and effected the Transaction. This imperfect and incomplete information exposed both parties to risk.

95.    Obviously, though, the difficulties posed by imperfect and incomplete information were not symmetric, or of equal magnitude, for the two parties. Whatever the informational uncertainties from Lehman's point of view, they were orders of magnitude greater for Barclays. Indeed, through the summer of 2008 and until just days before the Transaction, Barclays had been trying to "size up" Lehman Brothers as a possible acquisition from publicly available information, e.g., analysts' reports, annual reports, SEC filings, and similar sources. As useful as these sources may be for certain purposes, they do not provide anywhere near the detailed and comprehensive information and data available to the senior executives of Lehman Brothers. When Barclays finally did get access to internal information and data from Lehman just prior to and while negotiating the terms of the Transaction, Lehman already was in a state of

---

[69] As I discuss in a later subsection, it is not hard to imagine scenarios in which the acquired Businesses simply dissipated into thin air.

Contains Highly Confidential Information

crisis. Consequently, due diligence that normally would take at least weeks and often months had to be completed in days.

96.    This meant that the information available to the two parties was massively asymmetric, with Lehman knowing much, much more about, for example, the financial positions likely to be transferred to Barclays upon consummation of the Transaction.[70] Economists have long recognized that whenever information is asymmetric, the party with less information is exposed to serious and difficult-to-manage risks. Of course, anyone who has considered buying a used car recognizes the same thing.

### B.    Market Risk

97.    I use the phrase "market risk" to refer to the panoply of financial risks to which Barclays was exposed as a result of the large long positions it took on as part of its acquisition of the Businesses. These financial risks included price risk, credit risk, liquidity risk, counterparty risk, and operational risk, among others.

98.    Price risk arises from volatility in the values of financial instruments and affects virtually all financial assets other than cash.[71] Price risk is observable in the case of instruments that trade in liquid markets, and can be seen in the daily fluctuations in reported transaction prices. But securities that trade in thin markets or do not trade at all also are subject to price risk, even though the risk is not readily observed in reported prices. In this subsection I provide one (conservative) measure of the price risk to which Barclays was exposed when it acquired LBI's inventory of trading securities.

---

[70] I do not mean to imply that Lehman was at all devious or uncooperative with regard to information transfer, but simply to recognize that the two parties were in very different positions.

[71] Among the lessons of the current financial crisis is that even near-cash assets like money market funds expose investors to price risk; this was demonstrated when the Reserve Fund, one of the largest and most well established money market funds "broke the buck" following (and apparently because of) LBHI's bankruptcy filing.

Expert Report of Professor Paul Pfleiderer                                        Page 56

Contains Highly Confidential Information

99.    The extraordinarily high level of volatility in the prices of financial assets in the wake of LBHI's bankruptcy filing is well known.  Given the size of the portfolio of financial assets Barclays acquired from LBI, it necessarily exposed itself to considerable price risk.  To quantify this risk by one very conservative measure, I began by identifying all of the CUSIPs/positions in the inventory of trading securities acquired by Barclays for which Bloomberg reported prices on each of the trading days between September 12, 2008, and September 22, 2008, inclusive.  I then computed the aggregate value of LBI's positions in these securities on September 12, 2008 and on each of the subsequent days, based on the Bloomberg prices.  From this, I was able to calculate daily percentage changes in the aggregate values of those positions for which Bloomberg reported prices, both in total and for groups of securities.[72]  These daily changes provide a conservative measure of the riskiness of the entire portfolio of trading assets acquired by Barclays in the Transaction, to the extent that the securities for which Bloomberg is less likely to report prices are less liquid and higher risk than the securities for which Bloomberg does report prices.  Had it been possible to include these securities in the analysis, the observed daily swings in asset prices likely would have been larger.

100.    Results of this analysis are summarized in Table 5 below.

---

[72] This analysis is based on reported prices only, and does not take into account additional changes in "exit price" values attributable to changing bid-ask spreads.  Using Bloomberg prices for this purpose obviously does not imply that Bloomberg prices are appropriate marks for other valuation purposes, and in particular does not imply that Bloomberg prices should be used to value the Repo Collateral.

Contains Highly Confidential Information

TABLE 5
PERCENTAGE CHANGE IN ASSET PRICES, SEPTEMBER 12 THROUGH 22, 2008
(BASED ON AVAILABLE BLOOMBERG REPORTED PRICES OF REPO COLLATERAL SECURITIES)

| | Percentage Change in Asset Prices | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| From Date: | 9/12 | 9/15 | 9/16 | 9/17 | 9/18 | 9/19 | 9/12 | 9/12 |
| To Date: | 9/15 | 9/16 | 9/17 | 9/18 | 9/19 | 9/22 | 9/17 | 9/22 |
| Corporation Obligations (111 CUSIPs) | -11.5 | -1.3 | -4.3 | -1.4 | 3.3 | -0.7 | -16.4 | -15.4 |
| Emerging Markets (35 CUSIPs) | -1.6 | -1.7 | -1.0 | 1.2 | 1.2 | -0.2 | -4.3 | -2.3 |
| Equities (2,347 CUSIPs) | -4.8 | 0.9 | -4.2 | 4.2 | 4.3 | -3.3 | -7.9 | -3.2 |
| PMTG (76 CUSIPs) | 0.1 | 0.0 | 0.1 | -0.3 | -0.1 | 0.3 | 0.2 | 0.0 |
| Rates (788 CUSIPs) | 1.9 | -0.6 | 0.2 | -0.7 | -1.6 | -0.3 | 1.5 | -1.0 |
| RMBS (2,043 CUSIPs) | 0.2 | -0.3 | 0.2 | -0.3 | -0.7 | 0.0 | 0.0 | -0.8 |
| All Desks (5,400 CUSIPs) | -1.2 | 0.0 | -1.4 | 1.1 | 0.8 | -1.3 | -2.6 | -2.0 |

Note:  Figures above are based on Bloomberg-reported prices of the Repo Collateral securities for which Bloomberg prices were available each day.

101.    These results provide some insight into the degree of (incremental) price risk to which Barclays was exposed as a result of the Transaction.   For all of the assets included in this analysis, the absolute value of the daily percentage change in their aggregate value was greater

Contains Highly Confidential Information

than 1.0% for four of these six days. On a portfolio of financial assets with a starting value of $45 billion, this implies a daily loss exposure of $500 million or more. Furthermore, over the six trading days starting on September 12, the cumulative percentage change in the aggregate value of these assets (using Bloomberg prices) was -2.6%, and over the three trading days starting on September 12, the percentage change was -2.0%. On a portfolio with a starting value of $45 billion, these percentage changes imply a multi-day exposure of approximately $1 billion or more.[73]

102.    Barclays could and in fact did try to hedge the market risks discussed above. However, hedging complex risks is difficult and imperfect even under normal conditions, and it was made more difficult by the prevailing market conditions here. First, operationally, Barclays had to assess the risks of the portfolio of securities it had received. For some of the securities it received, this was not unusually difficult, but many of the securities Barclays received were exotic and unfamiliar. In at least some cases, Barclays had to rely on personnel at LBI to gain even a rudimentary understanding of the risks of particular securities. This meant that whatever hedging Barclays was able to put in place involved significant "basis risk," i.e., risk that price on which a hedge was based would not move in close parallel to the price of the underlying asset. Second, many of the instruments and mechanisms that a financial institution would use to hedge complex market risks during normal times were simply not available to Barclays in the weeks and months following its acquisition of the Businesses. Third, because of a flight to quality in

---

[73] As noted above, both the Estimated Transaction Balance Sheet and Lehman's books indicated that LBI's net long inventory of trading assets (excluding short term agreement balances not captured in Lehman's GFS system) was approximately $60 billion as of September 12, 2008 at Lehman's marks. Taking into account a) the indicated declines in the average prices of relatively high-quality and liquid assets discussed here, b) the aggressiveness of Lehman's marks, as noted at least by some observers, and c) the relatively high weighting of LBI's portfolio in higher risk and less liquid assets and in assets directly or indirectly tied to Lehman's creditworthiness, it is not unreasonable to believe that LBI suffered a trading portfolio loss in the first few days following LBHI's bankruptcy filing in the range of $5 billion, compared to LBI's marks on September 12, 2008.

Contains Highly Confidential Information

the weeks after LBHI's bankruptcy, what hedging opportunities remained available to Barclays were extraordinarily expensive. Thus, I conclude that even after hedging, the Transaction likely exposed Barclays to a very significant level of price risk (or a combination of price risk and basis risk) in the weeks following the Transaction.

103.    Price risk is only one element of the overall market risk to which Barclays was exposed as a result of the Transaction. I do not try to quantify these additional market risks, but do note that Barclays was exposed to, for example, massive credit risk arising from the deteriorating financial strength of many of the credits underlying the complex structured products included in the trading assets portfolio it acquired from LBI, and extraordinary liquidity risk arising from deteriorating conditions in financial markets, including the "flight to safety," which sapped liquidity from the markets for all but the safest of financial assets. In sum, even with heroic efforts to shed or hedge the price risk Barclays was assuming with the securities taken on as part of the Acquisition, Barclays remained exposed to extraordinarily high levels of market risk for some period of time as a result of and following the closing of the Transaction.

## C.    Business and Strategic Risks

104.    The information risks and market risks associated with Barclays' acquisition of the Businesses were indeed substantial, but perhaps even more substantial were the business and strategic risks associated with the Acquisition. It is not hard to imagine a scenario, following the closing of the Transaction, in which (a) the Lehman customers whose accounts were transferred to Barclays migrated to other broker-dealers or simply cut back on their use for financial services, (b) the best of the thousands of Lehman employees who joined Barclays took jobs elsewhere (and took their customers and relationships with them), and (c) integrating two very different cultures proved contentious and unsuccessful. In other words, there was some

Contains Highly Confidential Information

possibility, difficult to quantify but certainly not negligible, that the LBI broker-dealer businesses acquired by Barclays would simply dissipate into thin air, leaving Barclays with an expensive but underemployed work force and an expensive but nearly empty headquarters building, not to mention a severely bruised reputation. Had this happened and had financial markets not started to stabilize in 2009, Barclays could have incurred massive losses from its acquisition of LBI's North American broker dealer operations, and could have found its strategy for joining the top ranks of global financial institutions in tatters.

105.    Barclays surely was keenly aware of the business and strategic risks of the Transaction. Indeed, just one year before the Transaction with LBI, Barclays had attempted, but failed, to acquire Dutch bank ABN AMRO, which in 2007 was one of the largest banks in Europe with operations in 63 countries. Barclays first announced its intention to acquire ABN AMRO in April 2007. After a consortium led by Royal Bank of Scotland ("RBS") submitted a higher competing bid, Barclays raised its offer in July 2007 to €67.5 billion. But Barclays' bid was still short of the RBS consortium's offer, and Barclays ultimately withdrew its bid for ABN AMRO in October 2007, clearing the way for the RBS-led consortium's bid to go through. The consortium then proceeded with its planned dismemberment of ABN AMRO, with Fortis acquiring ABN AMRO's Dutch and Belgian operations, Banco Santander acquiring ABN AMRO's banking operations in Brazil and Italy, and RBS acquiring ABN AMRO's wholesale division and all other operations, including those in Asia.

106.    Barclays "near miss" in the ABN AMRO bidding proved (ex post) to be fortunate and provided a vivid lesson in the business and strategic risk of a large acquisition in the financial services industry in perilous times. In April 2008 RBS announced the largest rights issue in British corporate history, aiming to raise £12billion in new capital in part to shore up its

Contains Highly Confidential Information

reserves following the purchase of ABN AMRO. In October 2008, in the turmoil following Lehman's collapse, the British government was forced to inject capital into RBS, acquiring 58% of the bank's common shares, and in January 2009 RBS announced a loss of £28 billion. Reportedly, £20 billion of this loss was due to ABN AMRO. Today, the British government owns 70% of the common shares of RBS.

107. Fortis fared no better than RBS. In July 2008, Fortis' Chief Executive Officer resigned after the ABN AMRO acquisition had depleted Fortis' capital. The total worth of Fortis, as reflected by its stock value, was at that time only one-third of what it had been before the ABN AMRO acquisition, and just under the value it had paid just months earlier for the Benelux operations of ABN AMRO. Like RBS, Fortis, too, lost its independence in the wake of the ABN AMRO acquisition. Today, all Fortis operations in the Netherlands, including those parts of ABN-AMRO that Fortis acquired, are controlled by the Dutch government.

**D.      Conclusion**

108. The Transaction posed significant risks to Barclays that extended far beyond the day one results. Recognition of these risks is important to any evaluation of the Transaction as is recognition of the potentially misleading effect of focusing only on the day one results of the Transaction. For example, given the impossibility of liquidating on day one or even over several days at anything but fire-sale prices, or perfectly hedging against market risk, the enormous volume of trading assets acquired in the Transaction means that any day-one gain on acquisition could have been wiped out or turned into a day-two loss.

Contains Highly Confidential Information

## V.    Barclays' Accounting Gain on the Acquisition

109.    I understand that part of the relief that the Creditors Committee seeks is an accounting of the Transaction.  In my view, there is no need for a further accounting, because Barclays' 2008 Results Announcement summary of the Acquisition and related work papers and files provide a thorough and detailed description of the Transaction. These materials show what assets Barclays received (or expects to receive[74]) as a result of the Transaction, what liabilities Barclays assumed as a result of the Transaction, and the values Barclays assigned to these assets and liabilities for financial accounting purposes.    Furthermore, these materials also provide sufficient data and analytical support to establish that the values Barclays assigned to the acquired assets and assumed liabilities approximated their "fair values" at the time of the Acquisition with reasonable precision.[75]

110.    My opinion is based on my examination, assisted by staff working at my direction, of the summary of the Acquisition contained in Barclays' 2008 Results Announcement and the work papers and files that support that summary.  I and staff working at my direction also have interviewed Gary Romain, head of technical accounting at Barclays Capital, to gain a better understanding the methods, procedures, and processes by which Barclays developed its accounting summary of the Acquisition.

---

[74] In total, Barclays' acquisition accounting reflects approximately $3 billion in assets recognized but not yet received.  In addition, my understanding is that assets with a value of approximately $765 million that have not yet been received were identified after the filing of Barclays' acquisition summary in February, 2009.  *See* Exh. 399A and related deposition testimony by Gary Romain at Romain Tr., pp 105-109 and 117-119.

[75] It is important again to emphasize that, because applicable accounting standards do not permit the "fair value" assigned to the assets acquired to reflect several factors that should be considered to determine the actual economic value of the trading assets — the lion's share of the total assets — that Barclays acquired, the acquisition accounting reflects an upper limit on the true economic value of what Barclays acquired in the Transaction.  *See* ¶ [69] *supra.*

Expert Report of Professor Paul Pfleiderer                                                     Page 63

Contains Highly Confidential Information

A.    **Key Documents Summarizing the Acquisition from an Accounting
Perspective**

111.    The overview of the transaction that I present below is based primarily on the

gross acquisition balance sheet ("GAB") underlying Barclays' reported transaction accounting,

which provides additional information useful to understand the financial structure of the

transaction.[76]  In addition, I have relied on additional work-product prepared by Barclays for this

litigation which differentiates — as the gross acquisition balance does not — between trading

assets received in connection with the Fed Replacement Repo and those received as clearance

box assets.[77]

B.    **Recap of the Acquisition Based on Barclays' 2008 Results Announcement
Summary of the Acquisition**

112.    In this section, I present a recap of the acquisition based on Barclays' 2008

Results Announcement summary of the Acquisition and the materials supporting that summary.

113.    The assets that Barclays acquired are most usefully considered as falling within

two broad categories:  (a) the non-financial and customer assets and (b) the trading assets.  The

non-financial and customer assets include real estate assets (GAB lines 32 and 33) and customer

assets (GAB lines 21 & 22) with offsetting liabilities (GAB lines 56, 57, and 43).  In addition,

about 49.5% of Barclays' declared $4.2 billion gain on acquisition is related to the combination

of the approximately $1.45 billion ledger entry for intangibles (GAB line 34), the approximately

$530 million ledger entry for fixtures, fittings, software, and the like (GAB line 36), and

miscellaneous assets totaling approximately $100 million (GAB lines 31 and 35).

---

[76] Exh. 377A, page 3, is a printed version of this gross acquisition balance sheet.

[77] This additional work product is contained in an Excel workbook entitled "Sched B LehOBS 5.xls."  I refer to this
work product elsewhere in this report as Barclays' "Schedule B breakout analysis."

Contains Highly Confidential Information

114.    The remainder of the assets shown on Barclays' acquisition accounting statement are trading assets consisting of the following:  The collateral (and cash) acquired in the Fed Replacement Repo transaction (including everything received in the December Settlement with J.P Morgan) was valued at acquisition at approximately $45.546 billion.  The clearance box assets delivered to Barclays to date (including accrued interest) were valued at acquisition at approximately $785.6 million.  Those two entries together are among the assets included in GAB lines 15 and 27 and are further broken out in Barclays' Schedule B Breakout Analysis.[78] Additional clearance box assets not yet received were valued at acquisition at approximately $707 million (GAB line 13).  The $769 million in securities not yet received but to be delivered pursuant to paragraph 8 of the Clarification Letter were valued at acquisition at approximately $769 million (GAB line 17).  The exchange-traded derivatives accounts were valued at acquisition at a net of approximately $2.4 billion, comprising gross assets of approximately $6.1 billion (GAB lines 16, 20, & 25) and offsetting liabilities of approximately $3.7 billion (GAB lines 42 & 44).[79]  It is my understanding that Barclays was unable to get reliable or complete information about the exchange-traded derivatives at the time of the transaction, and therefore made much more limited estimates at that time as to whether there may be any value included in the exchange-traded derivatives.   Because Barclays lacked reliable information about the exposure associated with the derivatives, it was taking a significant risk in agreeing to acquire both the assets and the liabilities associated with those derivatives — as it turned out, by taking that risk, Barclays ended up recording a net gain on those derivatives.  Taken together, the Repo Collateral, the clearance box assets, and the 15c3 asset add up to a total of approximately $47.8

---

[78] See fn 77.

[79] This $6.1 billion gross asset number includes certain margin collateral not yet received by Barclays.

Expert Report of Professor Paul Pfleiderer                                                      Page 65

Contains Highly Confidential Information

billion. If the net value of the exchange-traded derivatives and associated collateral is added to this (a net value about which Barclays lacked information at the time of the transaction and realized only by taking the risk when acquiring those assets with limited information), then the total value of the financial assets booked on the acquisition balance sheet is approximately $50.2 billion.

115.    On the liability side, Barclays paid $45 billion in cash in connection with the Fed Replacement Repo (GAB line 40); made compensation-related payments and commitments totaling approximately $2 billion (GAB lines 45 & 52); made cure payments of approximately $238 million (GAB line 41 shows $220 million; Mr. Romain testified that subsequent payments increased this amount); paid $250 million in cash to the DTC (GAB line 55); and paid the assessed value of the real estate, which was approximately $1.3 billion (GAB lines 56 & 57). Those liabilities total approximately $48.8 billion. Although, as I have discussed above, it is somewhat misleading to unpack what was a unitary transaction and attempt to match up particular sets of assets and liabilities, I have done so in order to address some of the points that the Movants appear to be trying to make.

116.    Specifically, the Movants appear to assert that the Transaction was supposed to be more or less a wash in the sense that the financial liabilities plus the estimated cure and compensation liabilities would roughly equal the value of the financial assets. Without agreeing that this fairly describes the agreed Transaction, I analyze how the final results stack up against that concept. Excluding the $1.3 billion cost of the buildings and the $250 million paid to the DTC (which the Movants appear to attribute to the non-financial assets purchased by Barclays) Barclays "paid" approximately $47.2 billion — comprising the $45 billion cash payment in connection with the Fed Replacement Repo, approximately $2 billion in compensation-related

Contains Highly Confidential Information

payments and commitments, and approximately $238 million in cure payments for the financial assets. In addition, Barclays assumed the liabilities associated with the LBI exchange-traded derivatives accounts, which I will initially treat separately below. In exchange, Barclays was to receive financial assets worth approximately $47.8 billion — comprising $45.546 billion worth of Fed Replacement Repo collateral, $1.492 billion worth of clearance box assets, and $769 million in other securities — plus exchange-traded derivatives accounts that as of the Sale Hearing (and, for that matter, as of the Closing) were of unascertainable value. Setting to one side, for the moment, the exchange-traded derivatives accounts, if one analyzes the financial assets and liabilities by characterizing the $47.2 billion that Barclays "paid" (summarized above) for the $47.8 billion worth of financial assets consisting of the Repo Collateral, Clearance Box Assets, and 15c3-03 Assets, then the difference between those assets and liabilities is only approximately 1.2% — which is very close to a mathematical wash. Given the extraordinary level of uncertainty which prevailed that week, that is closer to a "wash" than anyone could reasonably have expected at the time given the uncertainty on both the asset and liability sides of the transaction.

117.    In the previous paragraph, I set the exchange-traded derivatives accounts to one side because they represent a different kind of asset for at least two reasons. First, they were a Purchased Asset that included liabilities directly associated with them:  by acquiring the exchange-traded derivatives, Barclays acquired "out of the money" positions and settlement obligations, as well as any "in the money" positions and any margin collateral deposited in the accounts. Thus, if the value of the exchange-traded derivatives is to be included in the analysis, then the value of those liabilities and risks also must be included. Second, Barclays appears to have been unable to get any reliable information before the closing as to the potential liability

Contains Highly Confidential Information

and asset values associated with taking on the exchange-traded derivatives accounts. Barclays neither knew *nor could have known or even roughly estimated* the net value of these accounts as of the time of the Sale Hearing. As it turned out, the exchange-traded derivatives accounts had a net day-one value *to Barclays* of approximately $2.4 billion, and could thus be viewed to have contributed to that portion of Barclays' day-one gain not attributable to the non-financial assets. But that is an ex post measurement of value; ex ante, there was no way to tell what, if any, value they would have to Barclays or what, if any, effect they would have on Barclays' acquisition accounting.[80] In my opinion, given the uncertainty surrounding the value of these accounts at the time, and given the risks Barclays took on by assuming all the liabilities and settlement obligations associated with these accounts, it was reasonable for Barclays to receive the benefit of the unknown value associated with these accounts. Moreover, if LBI had not transferred the exchange-traded derivatives accounts to Barclays, there was a significant risk that some or all of the net value in those accounts would have been lost. As Lehman's counsel informed the Court at the Sale Hearing, the day before that hearing the Chicago Mercantile Exchange had closed out all of Lehman's positions on that exchange, resulting in a loss to Lehman of $1.6 billion.[81] And, on the night before the Closing, the OCC *warned that:* *"If the transaction does not close tonight, OCC would need to immediately liquidate and close out the LBI accounts and is preparing to do so."*[82] Had the OCC and the other exchanges, clearing corporations, or custodians liquidated and closed out LBI's accounts, it could reasonably have been expected to

---

[80] *See, e.g.,* Sept. 22, 2008 3:30 p.m. EST email chain from S. King to L. James, T. Stack, A. Kaplan, D. Joshi, S. McKenna, J. Hughes, and N. Moreira: "[i]t is clear that [Lehman] has absolutely no idea what its [OCC] risk position is. We know it is between 2bn short and 4bn long. They do not know what has been booked to what entity. We cannot see. We are now 4 days into making zero progress on this with them."

[81] Sept. 19, 2008 Hearing Tr., page 61.

[82] Sept. 21, 2008 4:03 p.m. email from McDaniel to Rosen.

Contains Highly Confidential Information

result in the loss of most or all of any net value in those accounts, or even in deficits that would have become claims against LBI.

118.    Finally, in addition to analyzing the exchange-traded derivatives accounts separately (as above), I have analyzed all of the financial assets and liabilities together. On the one hand (again, adopting for purposes of this analysis the Movants' concept that the $250 million in cash and the payments for the Buildings should be excluded from consideration), Barclays paid $45 billion in cash and assumed liabilities for cure and compensation obligations under the contract, *plus* the liabilities and settlement obligations associated with the exchange-traded derivatives.[83]    On the other hand, Barclays received assets that were of highly indeterminate value at the time of the transaction, but that were ultimately determined to have had a "fair value" of $50.2 billion. Under the uncertain and emergency circumstances of this transaction, and given the illiquid nature — and highly uncertain values — of huge portions of the inventory received, that difference between the assets and the liabilities reflects a reasonable gain on the acquisition. Stated differently, I do not believe that, absent the Transaction, it would have been reasonable at the time, or is reasonable now, to believe that Lehman would have received greater value in a liquidation of the assets purchased by Barclays. To the contrary, the contemporaneous conclusion that Lehman would not receive greater value for those assets in a liquidation was well founded and reasonable. Thus, as I discuss further below, given the substantial uncertainty about the value, and even the identity, of the assets and certain of the liabilities, Barclays' reported gain is reasonable, unsurprising, and fair to the Sellers.[84] It is also

---

[83] As I note above, this is a potentially misleading way to view the Transaction.

[84] Again, I note that, as discussed above, due to factors that the applicable accounting rules do not permit to be taken into account, the actual economic value of the Trading Portfolio Securities to Barclays was less than the reported accounting valuation.

Contains Highly Confidential Information

consistent even with the Movants' conception of the Transaction as roughly a "wash" in which the financial assets would roughly equal the financial liabilities plus cure and compensation.

### C. Barclays' Accounting Gain on the Acquisition Does Not Indicate That Barclays Obtained a Secret or Unfair Discount

119.    The Movants attempt to depict Barclays' announcement of an accounting gain on the Acquisition as something nefarious, and as confirmation that Barclays somehow benefited unfairly from the Acquisition.  For example, according to the Debtor's Motion, "Given what has now been revealed in discovery [e.g., the alleged undisclosed discount and the alleged significant and intentional inflation of the consideration Barclays was to pay], it is not particularly surprising that, in February 2009, Barclays announced it had enjoyed a gain of $4.2 billion 'on acquisition' of the Lehman assets.  This immediate gain . . . was attributable to *'[t]he excess of the fair value of net assets acquired over consideration paid . . . on acquisition.'"*  [Dramatic bold italics added by Debtors.]  In fact, given the risks for Barclays, market conditions, and other relevant considerations, it was not unreasonable nor should it have been unexpected for Barclays to report an accounting gain on its acquisition of LBI's North American broker-dealer businesses.[85]

120.    Barclays' acquisition of LBI's North American broker-dealer operations was not unique in generating negative goodwill and an accounting gain on acquisition for the buyer.  In fact, because of difficulties in valuing the assets held by financial institutions, because of the great uncertainty in financial markets, and because of the dire outlook for the financial institutions generally, negative goodwill and an accounting gain on acquisition were common features of transactions involving financial institutions in 2008 and early 2009.  Exhibit 8 shows

---

[85] In the footnote on acquisitions in its 2008 Results Announcement, Barclays summarized four different acquisitions it completed in 2008, including its LBI acquisition.  Barclays reported negative goodwill and an accounting gain on three of these four acquisitions.

Contains Highly Confidential Information

that similar results obtained in a number of transactions in the financial services industry in 2008 and 2009. Indeed, Barclays publicly announced two days before the September 19, 2008, Sale Hearing that it expected the transaction to result in a day-one accounting gain of $2 billion, post-tax.[86]

121.    Given the risks for Barclays, market conditions, and other relevant considerations, it was not unusual, unexpected, or unreasonable for Barclays to report an accounting gain on its acquisition of LBI's North American broker-dealer businesses.    Contrary to the Movants' assertions, Barclays' reported accounting gain on the Acquisition does not in any way imply that Barclays paid less than Lehman would have received in a liquidation of the financial assets acquired in the Transaction.    To the contrary, as explained above, it is unreasonable to believe that Lehman could have received more in a liquidation, and it would have been especially unreasonable to conclude this at the time of the transaction, given the uncertain and illiquid nature of a huge portion of the assets being transferred.    Moreover, the proposition that any rational bidder would have paid more under these circumstances — given the risk and uncertainty inherent in the Transaction — is in my view untenable and inconsistent with the observed fact that no other bidder offered to do so.

---

[86] The Movants have contended that the transaction described in the original APA — as distinct from the Transaction actually consummated — was intended to be a "wash" with the assets Barclays was to receive "basically equivalent" to the liabilities it would assume. Given the uncertainty as to the identity and the value of the financial assets and liabilities generally described in the original APA even as of September 16, absent a post-closing true-up mechanism, it would be impossible for anyone reasonably to conclude that the transaction outlined in the APA would with certainty, or even probably, be a "wash" three days later at the anticipated closing. Moreover, the transaction in its entirety as outlined in the APA cannot fairly be characterized as a "wash."

Contains Highly Confidential Information

## VI.    Benefits of the Acquisition

122.    The potential benefits of the Transaction, both private and public, were clear to many interested parties and informed observers. For example, the Federal Reserve Bank of New York supported the transaction, "[r]ecognizing that Barclays' offer provided an opportunity for an orderly transfer of thousands of customer accounts, as well as the possibility of preserving the jobs of thousands of LBI employees."[87] The SEC also supported the Transaction. According to SEC Chairman Christopher Cox, the announcement that Barclays intended to acquire the business and assets of Lehman Brothers, Inc., was "welcome news for every one of Lehman's customers. If approved by the court, customers will be able to look forward to an immediate transition of their accounts. Even before the transaction is completed, they will benefit because the broker-dealer and 10,000 Lehman employees will be able to continue their work with clarity about their future, and with greater funding resources for the broker-dealer's operations."[88] The U.S. Commodity Futures Trading Commission also was supportive; according to the Commission's acting chairman, Walt Lukken, "Today's purchase by Barclays provides for an orderly transfer of customer accounts — this is a strong and positive development for the customers of Lehman's futures business."[89]

123.    Throughout the sale approval process, the Sellers, their counsel, their bankers, their regulators, and other interested parties unequivocally represented to the Court that the Transaction with Barclays was the best alternative — better than no transaction and better than any alternative transaction — for Lehman, its employees, and its creditors. The analysis in this

---

[87] Leventhal Declaration at ¶7.

[88] "Statement on Proposed Acquisition of Lehman Brothers, Inc., by Barclays," SEC Press Release, September 17, 2008.

[89] "CFTC Statement Regarding Barclays Purchase of Lehman Futures Business," Commodity Futures Trading Commission Press Release No. 5552-08, September 20, 2008.

Expert Report of Professor Paul Pfleiderer                                                    Page 72

Contains Highly Confidential Information

section shows that these views were informed and reasonable and, with high probability, have proved accurate. In addition, Barclays' acquisition of the Businesses was reasonably considered likely to have, and almost certainly had and continues to have, significant public benefits, ranging from the preservation of jobs in New York City and elsewhere to freeing up resources at the Federal Reserve and Treasury at a time when both institutions were stretched extremely thin. In addition, and perhaps most important, the Transaction was reasonably believed likely to have, and likely had, a calming effect on global financial markets at a critical time of substantial threat to the viability of these markets. In hindsight, with financial markets now appearing to be stabilized and in an economy that appears to be recovering, it is easy to forget or minimize the risks in September 2008 of a total collapse of financial markets with extremely serious consequences including the possibility of a depression.

### A.    Benefits for the LBHI and LBI Estates, Lehman Creditors, and Lehman Customers

124.    To say that the days leading up to September 16, 2008, were stressful and difficult days for LBHI and LBI and for their creditors and customers is an understatement. Extensive reporting on the events of the weekend before indicates that LBHI had no reasonable alternative to filing for bankruptcy. Furthermore, since LBI's funding was integrated with LBHI, a filing by LBHI necessarily meant that LBI could continue to operate only with extraordinary support (which initially came from the NY Fed). By all accounts, the firm had no cash, and no ability to pay operating costs. Thus the outlook was for an immediate collapse of LBI and an immediate cessation of all activity by LBI as a broker-dealer.

125.    In essence, what the Transaction did was to prevent an immediate collapse of LBI and substitute an orderly transition of much of the firm into Barclays and allow for an orderly winding down of the rest. For obvious reasons, it is hard to assess with precision how this

Contains Highly Confidential Information

orderly transition would have compared to a free fall that, fortunately, did not occur. But it is certainly fair to conclude, as I do, that the contemporaneous belief that the Transaction would be beneficial in this regard was reasonable.

126.    Statements by Bryan Marsal, the restructuring professional appointed to serve as Lehman's Chief Restructuring Officer, confirm my assessment. So far as I know, Mr. Marsal has not addressed the additional costs that a "free fall" of LBI would have entailed. But he has assessed the additional costs arising from the "free fall" of LBHI, in part by contrasting the outcome of LBHI's "free fall" with the transition of Bear Stearns into JP Morgan Chase. Mr. Marsal states as follows:

> "After we did our due diligence, after we started to understand the assets, the inventory of assets and the realistic value of the assets, the structure, and we understood what the bankruptcy completions [sic] were, the question was raised by a reporter, you know, why does this situation contrast so much versus Bear Sterns [sic]; was this so much worse than Bear Sterns [?]"[90]

Mr. Marsal believes that the answer to this question is that LBHI was allowed to collapse, while Bear Stearns' was merged into JP Morgan Chase:

> "[T]he only reason this [LBHI's demise] is going to be so much worse than Bear Sterns [sic] was an orderly transfer to J.P. Morgan. This was a free-fall bankruptcy."[91]

Mr. Marsal then was asked the difference in cost between a "free fall" and an orderly transition into another firm:

> "And they said what's the cost of that difference in treatment? The answer was $50 to $75 billion, based on discussions that I had internally with my teammates, what do you think the answer to that question would be, $50 to $75 billion. That's the whole consensus of this."[92]

---

[90] Transcript of 341 Meeting of Creditors, *In re: Lehman Brothers Holdings Inc., et al.*, Case No. 08-13555 (JMP) (SDNY Jan. 29, 2009), pages 124-125.

[91] 341 Meeting of Creditors Tr., Jan. 29, 2009, page 125.

[92] 341 Meeting of Creditors Tr., Jan. 29, 2009, page125.

Contains Highly Confidential Information

Elsewhere Mr. Marsal makes clear that this was not just his personal opinion, but in fact reflected the informed views of his team of professionals:

> "[W]e went around the room and we wanted to get an assessment on what the loss was going to be, based on the loss had we had an orderly versus the free fall that we've experienced, and everyone around the table felt comfortable saying $50 to $75 billion based on what they knew about the portfolio was a comfortable if not low estimate of the cost."[93]

127.    Mr. Marsal also explained the consequences of a collapse on security prices and the sellers' proceeds from sales.    According to the *Wall Street Journal*, "Mr. Marsal also criticized the way Lehman sold off assets.    The unplanned bankruptcy pushed down prices for Lehman assets in an already depressed market."[94]    Barclays sold off the assets it acquired in the Transaction over several months, in a reasonable orderly process.    But for the Transaction it is highly likely that this sell off would have occurred in a more hectic setting, which means, as Mr. Marsal acknowledges and as common sense suggests, that proceeds from sales would likely have been considerably less than Barclays received.

128.    Indeed, given the market conditions, the significant uncertainty regarding asset values (and even asset identity), the reasonable perception that any transaction needed to be completed within days of the bankruptcy filing, the consequent inability to do more than minimal due diligence for a transaction of this size and complexity, and the risks inherent in investing tens of billions of dollars in securities and the financial services industry in the face of some of the worst economic conditions since the Great Depression, no rational purchaser would have paid more for the assets that Barclays purchased than Barclays did based on what was known and

---

[93] 341 Meeting of Creditors Tr., Jan. 29, 2009, page 110.

[94] Jeffrey McCracken, "Lehman's Chaotic Bankruptcy Filing Destroyed Billions in Value," *Wall Street Journal* (Dec. 29, 2008).

Contains Highly Confidential Information

knowable at the time. That no competing bidders offered to do so was unsurprising at the time, and it continues to be unsurprising now given all the factors discussed above.

129.    Furthermore, it is my view that it was reasonable to believe at the time, and is reasonable to conclude today, that the fire-sale which would have ensued absent the Transaction would have been worse for creditors and other interested parties.

130.    The benefits of the Transaction for LBI's customers have been acknowledged by the SIPA Trustee, who wrote: "The Account Transfers allowed former LBI account holders to access billions of dollars of assets held in hundreds of thousands of LBI accounts promptly following the largest broker-dealer liquidation filing in history."[95] According to the Trustee, the account transfers to Barclays benefitted approximately 85,000 individual account holders and involved the transfer of customer cash and securities valued at nearly $43.2 billion.[96]

131.    The transfer of accounts to Barclays (and others) was accomplished "with only minimal disruption," but was not entirely without problems, in part because some securities were not available for delivery due to assertion of liens by custodial banks or other causes. According to the Trustee, "to maintain market stability . . . Barclays sold or transferred, at [customers'] request, securities appearing on their Barclays statements, even though the Trustee had not yet transferred those securities to Barclays."[97] This accommodation by Barclays was a further benefit to LBI customers.

---

[95] Trustee's Second Interim Report for the Period May 30, 2009 through November 11, 2009, page 7. The Account Transfers to which the Trustee refers include the transfer of LBI Private Investment Management customer accounts to Barclays, the transfer of Private Asset Management (Neuberger Berman) customer accounts to a management group, and the transfer of prime brokerage accounts.

[96] Trustee's Second Interim Report, page 9.

[97] Trustee's Second Interim Report, page 9.

Contains Highly Confidential Information

132.    The Movants themselves either urged the Court to approve the Transaction or, in the case of the Creditors Committee, did not oppose it "based on the lack of a viable alternative."[98]

**B.    Public Benefits**

133.    At the conclusion of the Sale Hearing, Judge Peck approved the Transaction, stating that:[99]

> "I am completely satisfied that I am fulfilling my duty as a United States bankruptcy judge in approving this transaction and in finding that there is no better or alternative transaction for these assets, that the consequences of not approving a transaction could prove to be truly disastrous. And those adverse consequences are meaningful to me as I exercise this discretion. The harm to the debtor, its estates, the customers, creditors, generally, the national economy and global economy could prove to be incalculable.

> "Moreover, it's not just about avoiding harm. Approving the transaction secures whether for ninety days or for a lifelong career employment for 9,000 employees at Lehman, and holds together an operation the value of which is really embedded in the talent of the employees, their knowledge, their relationship, their expertise and their ability to create value to the economy."

134.    After analyzing this Transaction and the events that led up to it, reviewing the record compiled to date, and considering the Movants' claims and my own analysis of those claims, my opinion is that the Court's findings about the benefits of approving the Transaction were reasonable when made and have been borne out by events.

**C.    Conclusion**

135.    Barclays' acquisition of LBI's North American broker-dealer businesses was reasonably expected to benefit, and with high probability did benefit, the Estates, Lehman's creditors, and Lehman's customers. The Acquisition also was reasonably expected to generate,

---

[98] Sept. 19, 2008 Hearing Tr., page 67.

[99] Sept. 19, 2008 Hearing Tr., page 250.

Contains Highly Confidential Information

and has in fact generated, significant public benefits.  Had Barclays not acquired the Businesses, whether because no agreement could be struck or because approval of the Transaction had been withheld by the Court, it is virtually certain that the LBHI and LBI estates, Lehman's creditors, and Lehman's customer all would have been worse off.  And it was certainly reasonable to reach that conclusion at the time.

Paul Pfleiderer

Contains Highly Confidential Information

**APPENDIX ONE**

**RESUME OF PROFESSOR PAUL PFLEIDERER**

# PAUL PFLEIDERER, Ph.D.

## OFFICE

Graduate School of Business
Stanford University
Stanford, CA 94305-5015
(650) 723-4495
(650) 725-6152 (FAX)
pfleiderer_paul@gsb.stanford.edu (email)

## HOME

897 Newell Road
Palo Alto, CA 94303
(650) 323-2708

## UNDERGRADUATE STUDIES

Yale University, BA, Economics, 1976

## GRADUATE STUDIES

Yale University, Ph.D., Economics, 1982
Field of Concentration:
    Financial Economics
Other Fields:
    Economics of Information
    Econometrics
Thesis:
    "Private Information, Price Variability and Trading Volume," a consideration of the role heterogeneous private information plays in conditioning volume and price movements in a rational expectations model.
Thesis Committee:
    Stephen A. Ross
    Philip Dybvig
    Lawrence Weiss

## EXPERIENCE

2004–present    C. O. G. Miller Distinguished Professor of Finance, Graduate School of Business, Stanford University

1996–2004    William F. Sharpe Professor of Financial Economics, Graduate School of Business, Stanford University

1992–1995    Professor of Finance, Graduate School of Business, Stanford University

| 1986–1992 | Associate Professor of Finance, Graduate School of Business, Stanford University |
| 1981–1985 | Assistant Professor of Finance, Graduate School of Business, Stanford University |
| 1979–1981 | Research Assistant for Professor Stephen Ross, Yale University |
| 1977–1980 | Research Assistant for Professor John M. Quigley, Yale University |
| 1979 | Teaching Assistant, Yale University, Department of Economics, Graduate Level Microeconomics course |

## HONORS AND AWARDS

NSF grant, 1993–1995 (with Anat Admati).

Q-Group grant (with Anat Admati), 1989.

Prize for the best paper published in the first volume of the *Review of Financial Studies,* for "A Theory of Intraday Trading Patterns: Volume and Price Variability" (with Anat Admati), 1987.

Co-winner of NYSE Prize for the best paper in the RFS-WFA-NYSE Market Microstructure Symposium, 1990 for "Sunshine Trading and Financial Market Equilibrium" (with Anat Admati).

Robert M. and Anne T. Bass Fellowship, AY 1987–88 and 1989–90.

Recipient of Batterymarch Fellowship, Academic year 1988–89.

Graduated from Yale University Magna Cum Laude with distinction in major field of economics.

Phi Beta Kappa from Yale College.

## PUBLICATIONS AND RESEARCH PAPERS

"A Note on the Effect of Costs Changes on Prices" in the *Journal of Political Economy*, February 1983, pp. 182–185, with Jeremy Bulow.

"Interpreting the Factor Risk Premia in the Arbitrage Pricing Theory" in the *Journal of Economic Theory*, February 1985, pp. 191–195, with Anat Admati.

"Delegated Portfolio Management" in the *Journal of Economic Theory*, June 1985, pp. 1–25, with Sudipto Bhattacharya.

"A Monopolistic Market for Information" in the *Journal of Economic Theory*, July 1986, pp. 400–438, with Anat Admati.

"On Timing and Selectivity" in the *Journal of Finance*, July 1986, pp. 715–730, with Anat Admati, Sudipto Bhattacharya and Stephen A. Ross.

"Viable Allocations of Information in Financial Markets" in the *Journal of Economic Theory*, Vol. 43, October 1987, pp. 76–115, with Anat Admati.

"A Theory of Intraday Trading Patterns: Volume and Price Variability" in the *Review of Financial Studies*, Vol. 1, March 1988, pp. 3–40, with Anat Admati.

"Selling and Trading on Information in Financial Markets" in the *American Economic Review*, Papers and Proceeding, May 1988, pp. 96–103, with Anat Admati.

"Direct and Indirect Sale of Information" in *Econometrica*, Vol. 58, July 1990, pp. 901–928, with Anat Admati.

"Divide and Conquer: A Theory of Intraday and Day-of-the-Week Mean Effects" in the *Review of Financial Studies*, Vol. 2, 1989, pp 189–223, with Anat Admati.

"Sunshine Trading and Financial Market Equilibrium" in the *Review of Financial Studies*, Vol. 4, 1991, pp. 443–482, with Anat Admati.

"Underestimation of Portfolio Insurance and the Crash of October 1987" in the *Review of Financial Studies*, Spring, 1992, pp. 35–63, with Allan Kleidon and Charles Jacklin.

"Trading on Information in Financial Markets" in *The New Palgrave Dictionary of Money and Finance,* 1993, with Anat Admati.

"Trading Volume" in *The New Palgrave Dictionary of Money and Finance,* 1993, with Anat Admati.
"Robust Financial Contracting and the Role of Venture Capitalists," *Journal of Finance*, June, 1994, with Anat Admati.

"Large Shareholder Activism, Risk Sharing, and Financial Market Equilibrium," *Journal of Political Economy*, 1994, with Anat Admati and Josef Zechner.

"Should Firms Use Derivatives to Manage Risk?," in *Risk Management: Problems and Solutions*, McGraw Hill (William H. Beaver and George Parker, eds.1995), with David Fite.

"Does it All Add Up? Benchmarks, and the Compensation of Active Portfolio Managers," *Journal of Business*, 1997, with Anat Admati.

"Forcing Firms to Talk: Externalities and Financial Disclosure Regulation," *Review of Financial Studies,* 2000, with Anat Admati.

"Broadcasting Opinions with an Overconfident Sender," *International Economic Review*, 2004, with Anat Admati.

"The Wall Street Walk and Shareholder Activism: Exit as a Form of Voice" (with Anat Admati), Review of Financial Studies, 2009.

"The Volume of Trade and The Variability of Prices: A Framework for Analysis in Noisy Rational Expectations Equilibria," Working paper, 1984.

"The Role of Country and Industry Effects in Explaining Global Stock Returns," Working paper, 1997, with Terry Marsh.

"Why Nasdaq Market Makers Use Even-Eighths Quotes: A Model of Quote Clustering in Dealer Markets," Working paper, 1998, with Allan Kleidon.

"The 2008-2009 Financial Crisis: Risk Model Transparency and Incentives," Working paper, 2009, with Terry Marsh.

"Increased-Liability Equity: A Proposal to Improve Capital Regulation of Large Financial Institutions," Working paper, 2009, with Anat Admati.

## RESEARCH IN PROGRESS

"Governance with Diverse Shareholders and Hedging" (with Anat Admati and Chester Spatt)

"Disclosure by Informed Large Shareholders, Voting, and Corporate Decisions" (with Anat Admati)

"Misrepresentation and Penalties in Financial Disclosure" (with Anat Admati)

## PRIOR TESTIMONIES

*In re Broadcom Corp. Securities Litigation* (C. Dist. Cal.)

*Unsecured Creditors Committee of Iridium v. Motorola, Inc.* (Bankr.)

*In the Matter of the Arbitration Between Margo Piscevich, et al. v. Associated Securities Corp., et al.* (NASD Dispute Resolution)

*In re iXL Enterprises, Inc., Initial Public Offering Securities Litigation* (S.D.N.Y.)

Contains Highly Confidential Information

APPENDIX TWO

LIST OF DOCUMENTS AND OTHER MATERIALS REVIEWED AND CONSIDERED

**Bates Number Documents**

BCI-EX 00185186

HHR_00000194

HHR_00000195

HHR_00000196

HHR_00000491

HHR_00000492

HHR_00000493

HHR_00000685

HHR_00000686

HHR_00000687

HHR_00001774-HHR_00001775

HHR_00001776

HHR_00001777

HHR_00006310-HHR_00006312

HHR_00006313-HHR_00006480

LAZ-C-00050306

LBHI 004083

LBHI 004083

LBHI_SEC07940_92774-927779

MTHM0000139

MTHM0000140

BCI000002-BCI015744

BCI-EX-00185186

JPM-BARCAP0000001 – JPM- BARCAP0003898.TXT (with gaps)

JPM-60(b)00003982 - JPM-60(b)00005917.XLS (with gaps)

JPM-BARCAP0000001 – JPM- BARCAP0003898.TIF (with gaps)

JPM-BARCAP0000001 – JPM- BARCAP0003844.XLS (with gaps)

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

**Deposition Transcripts**

Deposition of Alastair Blackwell, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 7, 2009).

Deposition of Alex Kirk, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 31, 2009).

Deposition of Archibald Cox, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 11, 2009).

Deposition of Bart McDade, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 2, 2009).

Deposition of Bryan Marsal, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 22, 2009).

Deposition of Daniel Joseph Fleming, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 28, 2009).

Deposition of David Petrie, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 26, 2009).

Deposition of Eric Jonathan Felder, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Jul. 31, 2009).

Deposition of Gary Romain, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 10, 2009).

Deposition of Gerard LaRocca, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 19, 2009).

Deposition of Hugh McGee, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 10, 2009).

Deposition of Ian Lowitt, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 20, 2009).

Deposition of James B Kobak Jr., *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 7, 2009).

Deposition of James Hraska, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 14, 2009).

Deposition of James Seery, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 3, 2009).

Deposition of Jasen Yang, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 4, 2009).

Deposition of Jerry del Missier, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 1, 2009).

Contains Highly Confidential Information

Deposition of John Coghlan, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 13, 2009).

Deposition of John Rodefeld, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 27, 2009).

Deposition of John Varley, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 3, 2009).

Deposition of John Varley, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 11, 2009).

Deposition of Mark J. Shapiro, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 7, 2009).

Deposition of Martin Kelly, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 18, 2009).

Deposition of Martin Kelly, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Nov. 20, 2009).

Deposition of Michael Klein, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 12, 2009).

Deposition of Mike Keegan, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 28, 2009).

Deposition of Nancy Denig, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 21, 2009).

Deposition of Paolo Tonucci, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 14, 2009).

Deposition of Patrick Clackson, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 4, 2009).

Deposition of Paul Exall, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 27, 2009).

Deposition of Philip E. Kruse, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 17, 2009).

Deposition of Rich Ricci, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 8, 2009).

Deposition of Robert Azerad, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 17, 2009).

Deposition of Robert Edward Diamond Jr., *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 11, 2009).

Deposition of Saul Burian, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 17, 2009).

Contains Highly Confidential Information

Deposition of Stephen King, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 10, 2009).

Deposition of Steven Berkenfeld, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 6, 2009).

**Deposition Exhibits**

| | | | |
|---|---|---|---|
| Exhibit 1 | Exhibit 26 | Exhibit 51 | Exhibit 73B |
| Exhibit 2 | Exhibit 27 | Exhibit 52 | Exhibit 74B |
| Exhibit 3 | Exhibit 28 | Exhibit 53 | Exhibit 75B |
| Exhibit 4 | Exhibit 29 | Exhibit 54 | Exhibit 76B |
| Exhibit 5 | Exhibit 30 | Exhibit 55A | Exhibit 77B |
| Exhibit 6 | Exhibit 31 | Exhibit 55B | Exhibit 78B |
| Exhibit 7 | Exhibit 32 | Exhibit 56A | Exhibit 79B |
| Exhibit 8 | Exhibit 33 | Exhibit 56B | Exhibit 80B |
| Exhibit 9 | Exhibit 34 | Exhibit 57A | Exhibit 81B |
| Exhibit 10 | Exhibit 35 | Exhibit 57B | Exhibit 82 |
| Exhibit 11 | Exhibit 36 | Exhibit 58B | Exhibit 83B |
| Exhibit 12 | Exhibit 37 | Exhibit 59B | Exhibit 84B |
| Exhibit 13 | Exhibit 38 | Exhibit 60B | Exhibit 85B |
| Exhibit 14 | Exhibit 39 | Exhibit 61B | Exhibit 86B |
| Exhibit 15 | Exhibit 40 | Exhibit 62B | Exhibit 87B |
| Exhibit 16 | Exhibit 41 | Exhibit 63B | Exhibit 88B |
| Exhibit 17 | Exhibit 42 | Exhibit 64B | Exhibit 89B |
| Exhibit 18 | Exhibit 43 | Exhibit 65B | Exhibit 90B |
| Exhibit 19 | Exhibit 44 | Exhibit 66B | Exhibit 91B |
| Exhibit 20 | Exhibit 45 | Exhibit 67B | Exhibit 92B |
| Exhibit 21 | Exhibit 46 | Exhibit 68B | Exhibit 93B |
| Exhibit 22 | Exhibit 47 | Exhibit 69B | Exhibit 94B |
| Exhibit 23 | Exhibit 48 | Exhibit 70B | Exhibit 95B |
| Exhibit 24 | Exhibit 49 | Exhibit 71B | Exhibit 96B |
| Exhibit 25 | Exhibit 50 | Exhibit 72B | Exhibit 98 |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| | | | |
|---|---|---|---|
| Exhibit 99 | Exhibit 130 | Exhibit 148B | Exhibit 171A |
| Exhibit 100 | Exhibit 131 | Exhibit 149A | Exhibit 172A |
| Exhibit 101 | Exhibit 132 | Exhibit 149B | Exhibit 173A |
| Exhibit 102 | Exhibit 133 | Exhibit 150A | Exhibit 174 |
| Exhibit 103 | Exhibit 134 | Exhibit 150B | Exhibit 175 |
| Exhibit 104 | Exhibit 135 | Exhibit 151A | Exhibit 176 |
| Exhibit 105 | Exhibit 136A | Exhibit 151B | Exhibit 177 |
| Exhibit 106 | Exhibit 136B | Exhibit 152A | Exhibit 178 |
| Exhibit 107 | Exhibit 137A | Exhibit 152B | Exhibit 179 |
| Exhibit 108 | Exhibit 137B | Exhibit 153A | Exhibit 180 |
| Exhibit 109 | Exhibit 138A | Exhibit 153B | Exhibit 181 |
| Exhibit 110 | Exhibit 138B | Exhibit 154A | Exhibit 182 |
| Exhibit 111 | Exhibit 139A | Exhibit 154B | Exhibit 183 |
| Exhibit 112 | Exhibit 139B | Exhibit 155A | Exhibit 184 |
| Exhibit 113 | Exhibit 140A | Exhibit 155B | Exhibit 185 |
| Exhibit 114 | Exhibit 140B | Exhibit 156A | Exhibit 186 |
| Exhibit 115 | Exhibit 141A | Exhibit 156B | Exhibit 187 |
| Exhibit 116 | Exhibit 141B | Exhibit 157A | Exhibit 188 |
| Exhibit 117 | Exhibit 142A | Exhibit 158A | Exhibit 189 |
| Exhibit 118 | Exhibit 142B | Exhibit 159A | Exhibit 190 |
| Exhibit 119 | Exhibit 143A | Exhibit 160A | Exhibit 191 |
| Exhibit 120 | Exhibit 143B | Exhibit 161A | Exhibit 192 |
| Exhibit 121 | Exhibit 144A | Exhibit 162A | Exhibit 193 |
| Exhibit 122 | Exhibit 144B | Exhibit 163A | Exhibit 194 |
| Exhibit 123 | Exhibit 145A | Exhibit 164A | Exhibit 195 |
| Exhibit 124 | Exhibit 145B | Exhibit 165A | Exhibit 196 |
| Exhibit 125 | Exhibit 146A | Exhibit 166A | Exhibit 197 |
| Exhibit 126 | Exhibit 146B | Exhibit 167A | Exhibit 198 |
| Exhibit 127 | Exhibit 147A | Exhibit 168A | Exhibit 199 |
| Exhibit 128 | Exhibit 147B | Exhibit 169A | Exhibit 200 |
| Exhibit 129 | Exhibit 148A | Exhibit 170A | Exhibit 201 |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| | | | |
|---|---|---|---|
| Exhibit 202 | Exhibit 233 | Exhibit 264 | Exhibit 287A |
| Exhibit 203 | Exhibit 234 | Exhibit 265 | Exhibit 287B |
| Exhibit 204 | Exhibit 235 | Exhibit 266 | Exhibit 288B |
| Exhibit 205 | Exhibit 236 | Exhibit 267 | Exhibit 289B |
| Exhibit 206 | Exhibit 237 | Exhibit 268 | Exhibit 290B |
| Exhibit 207 | Exhibit 238 | Exhibit 269 | Exhibit 291B |
| Exhibit 208 | Exhibit 239 | Exhibit 270 | Exhibit 292B |
| Exhibit 209 | Exhibit 240 | Exhibit 271 | Exhibit 293B |
| Exhibit 210 | Exhibit 241 | Exhibit 272 | Exhibit 294A |
| Exhibit 211 | Exhibit 242 | Exhibit 273 | Exhibit 294B |
| Exhibit 212 | Exhibit 243 | Exhibit 274 | Exhibit 295A |
| Exhibit 213 | Exhibit 244 | Exhibit 275 | Exhibit 295B |
| Exhibit 214 | Exhibit 245 | Exhibit 276 | Exhibit 296A |
| Exhibit 215 | Exhibit 246 | Exhibit 277 | Exhibit 296B |
| Exhibit 216 | Exhibit 247 | Exhibit 278 | Exhibit 297A |
| Exhibit 217 | Exhibit 248 | Exhibit 279A | Exhibit 297B |
| Exhibit 218 | Exhibit 249 | Exhibit 279B | Exhibit 298A |
| Exhibit 219 | Exhibit 250 | Exhibit 280A | Exhibit 298B |
| Exhibit 220 | Exhibit 251 | Exhibit 280B | Exhibit 299A |
| Exhibit 221 | Exhibit 252 | Exhibit 281A | Exhibit 299B |
| Exhibit 222 | Exhibit 253 | Exhibit 281B | Exhibit 300A |
| Exhibit 223 | Exhibit 254 | Exhibit 282A | Exhibit 300B |
| Exhibit 224 | Exhibit 255 | Exhibit 282B | Exhibit 301A |
| Exhibit 225 | Exhibit 256 | Exhibit 283A | Exhibit 301B |
| Exhibit 226 | Exhibit 257 | Exhibit 283B | Exhibit 302A |
| Exhibit 227 | Exhibit 258 | Exhibit 284A | Exhibit 302B |
| Exhibit 228 | Exhibit 259 | Exhibit 284B | Exhibit 303A |
| Exhibit 229 | Exhibit 260 | Exhibit 285A | Exhibit 303B |
| Exhibit 230 | Exhibit 261 | Exhibit 285B | Exhibit 304A |
| Exhibit 231 | Exhibit 262 | Exhibit 286A | Exhibit 304B |
| Exhibit 232 | Exhibit 263 | Exhibit 286B | Exhibit 305A |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| | | | |
|---|---|---|---|
| Exhibit 305B | Exhibit 333 | Exhibit 358A | Exhibit 388B |
| Exhibit 306A | Exhibit 334 | Exhibit 359A | Exhibit 389A |
| Exhibit 306B | Exhibit 335 | Exhibit 360A | Exhibit 389B |
| Exhibit 307A | Exhibit 336 | Exhibit 361A | Exhibit 390A |
| Exhibit 307B | Exhibit 337A | Exhibit 362A | Exhibit 390B |
| Exhibit 308A | Exhibit 337B | Exhibit 363A | Exhibit 391A |
| Exhibit 308B | Exhibit 338A | Exhibit 364A | Exhibit 391B |
| Exhibit 309B | Exhibit 338B | Exhibit 365A | Exhibit 392A |
| Exhibit 310B | Exhibit 339A | Exhibit 366A | Exhibit 392B |
| Exhibit 311B | Exhibit 339B | Exhibit 367A | Exhibit 393A |
| Exhibit 312B | Exhibit 340A | Exhibit 368A | Exhibit 393B |
| Exhibit 313B | Exhibit 341A | Exhibit 369A | Exhibit 394A |
| Exhibit 314B | Exhibit 342A | Exhibit 370A | Exhibit 394B |
| Exhibit 315B | Exhibit 343A | Exhibit 371A | Exhibit 395A |
| Exhibit 316 | Exhibit 344A | Exhibit 372A | Exhibit 395B |
| Exhibit 317 | Exhibit 345A | Exhibit 373A | Exhibit 396A |
| Exhibit 318 | Exhibit 346A | Exhibit 374A | Exhibit 396B |
| Exhibit 319 | Exhibit 347A | Exhibit 375A | Exhibit 397A |
| Exhibit 320 | Exhibit 348A | Exhibit 376A | Exhibit 397B |
| Exhibit 321 | Exhibit 349B | Exhibit 377A | Exhibit 398A |
| Exhibit 322 | Exhibit 350B | Exhibit 378 | Exhibit 399A |
| Exhibit 323 | Exhibit 351A | Exhibit 379 | Exhibit 400A |
| Exhibit 324 | Exhibit 351B | Exhibit 380 | Exhibit 401A |
| Exhibit 325 | Exhibit 352A | Exhibit 381 | Exhibit 402A |
| Exhibit 326 | Exhibit 352B | Exhibit 382 | Exhibit 403A |
| Exhibit 327 | Exhibit 353A | Exhibit 383 | Exhibit 404A |
| Exhibit 328 | Exhibit 353B | Exhibit 384 | Exhibit 405A |
| Exhibit 329 | Exhibit 354A | Exhibit 385 | Exhibit 406A |
| Exhibit 330 | Exhibit 355A | Exhibit 386 | Exhibit 407A |
| Exhibit 331 | Exhibit 356A | Exhibit 387 | Exhibit 408A |
| Exhibit 332 | Exhibit 357A | Exhibit 388A | Exhibit 409A |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| | | | |
|---|---|---|---|
| Exhibit 410A | Exhibit 439 | Exhibit 463B | Exhibit 484 |
| Exhibit 411A | Exhibit 440 | Exhibit 464A | Exhibit 485 |
| Exhibit 412A | Exhibit 441 | Exhibit 464B | Exhibit 486 |
| Exhibit 412b | Exhibit 442 | Exhibit 465A | Exhibit 487 |
| Exhibit 413A | Exhibit 443 | Exhibit 465B | Exhibit 488 |
| Exhibit 413B | Exhibit 444 | Exhibit 466A | Exhibit 489 |
| Exhibit 414B | Exhibit 445 | Exhibit 466B | Exhibit 490 |
| Exhibit 415B | Exhibit 446 | Exhibit 467A | Exhibit 491 |
| Exhibit 416B | Exhibit 447 | Exhibit 467B | Exhibit 492 |
| Exhibit 417B | Exhibit 448 | Exhibit 468A | Exhibit 493 |
| Exhibit 418B | Exhibit 449 | Exhibit 468B | Exhibit 494 |
| Exhibit 419B | Exhibit 450 | Exhibit 469A | Exhibit 495 |
| Exhibit 420B | Exhibit 451 | Exhibit 469B (color) | Exhibit 496 |
| Exhibit 421B | Exhibit 452 | Exhibit 469B | Exhibit 497 |
| Exhibit 422B | Exhibit 453 | Exhibit 470A | |
| Exhibit 423B | Exhibit 454 | Exhibit 470B | |
| Exhibit 424 | Exhibit 455 | Exhibit 471B | |
| Exhibit 425 | Exhibit 456 | Exhibit 472B (color) | |
| Exhibit 426 | Exhibit 457A | Exhibit 472B | |
| Exhibit 427 | Exhibit 457B | Exhibit 473B | |
| Exhibit 428 | Exhibit 458A | Exhibit 474B | |
| Exhibit 429 | Exhibit 458B | Exhibit 475B | |
| Exhibit 430 | Exhibit 459A | Exhibit 476B | |
| Exhibit 431 | Exhibit 459B | Exhibit 477B | |
| Exhibit 432 | Exhibit 460A | Exhibit 478B | |
| Exhibit 433 | Exhibit 460B | Exhibit 479B | |
| Exhibit 434 | Exhibit 461A | Exhibit 480B | |
| Exhibit 435 | Exhibit 461B | Exhibit 481B | |
| Exhibit 436 | Exhibit 462A | Exhibit 482 | |
| Exhibit 437 | Exhibit 462B | Exhibit 483 | |
| Exhibit 438 | Exhibit 463A | | |

Contains Highly Confidential Information

**Legal Filings**

Affidavit of Daniel McIsaac, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Oct. 5, 2009).

Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 14, 2008).

Affidavit of Service, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 15, 2009).

Appendix to Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief: Volume I, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.).

Appendix to Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief: Volume II, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.).

Appendix to Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief: Volume III, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.).

Appendix to Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief: Volume IV, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.).

Appendix to Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief: Volume V, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.).

Appendix Volume I to Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a) Fed. R. Civ. P. 60(b) and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. § 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustees Motions for an Order Under Rule 60(b) to Modify Sale Order, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y.).

Appendix Volume II to Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a) Fed. R. Civ. P. 60(b) and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. § 105(a), 363, and 365 and Federal Rules

Contains Highly Confidential Information

of Bankruptcy Procedure 2002, 6004, and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustees Motions for an Order Under Rule 60(b) to Modify Sale Order, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y.).

Appendix Volume III to Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a) Fed. R. Civ. P. 60(b) and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. § 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustees Motions for an Order Under Rule 60(b) to Modify Sale Order, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y.).

Assumption and Assignment of Contracts Relating to the Purchased Assets, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 19, 2008).

Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 15, 2009).

Debtor's Reply in Further Support of its Motion for an Order, Pursuant to Fed.R.Bankr.P.2004, Authorizing Discovery from Barclays Capital, Inc., *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. June 23, 2009).

Debtors' First Rule 30(b)(6) Deposition Notice to Barclays on Issues Pertaining to Exchange-Traded Derivatives and Exchange Deposits Under the Asset Purchase Agreement, *In re: Lehman Brothers* Holdings Inc., et al., Debtors., Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 04, 2009).

Debtors' Motion to (A) Schedule A Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 17, 2008).

Debtors' Second Rule 30(b)(6) Deposition Notice to Barclays on Issues Relating to the Transfer of Assets, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug 4, 2009).

Debtors' Second Rule 30(b)(6) Deposition Notice to Barclays on Issues Relating to the Transfer of Assets, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug 4, 2009).

Contains Highly Confidential Information

Debtors' Third Rule 30(b)(6) Deposition Notice to Barclays on Issues Pertaining to Exchange-Traded Derivatives and Exchange Deposits, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 12, 2009).

Declaration of James B. Kobak Jr. in Support of The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively for Certain Limited Relief Under Rule 60(b), *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Sep. 15, 2009).

Declaration of Saul E. Burian in Support of Limited Objection of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. to SIPA Trustee's Motion Under 11 U.S.C. § § 105 and 363 and Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement , *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Dec. 19, 2008).

Declaration of Shari D. Leventhal in Support of Trustee's Motion for Entry of an Order Approving a Settlement Agreement, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.).

Declaration of William R. Maguire in Support of The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively for Certain Limited Relief Under Rule 60(b), *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Sep. 15, 2009).

Exhibits to Order, Pursuant to Fed. R. Bankr. P. 2004, Authorizing Discovery from Barclays Capital, Inc., *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. May 18, 2009).

Hearing Transcript (excerpt), *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 17, 2008).

Hearing Transcript, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 19, 2008).

Hearing Transcript, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Jun. 24, 2009).

JP Morgan Chase Subpoena in a Case Under the Bankruptcy Code, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Oct. 27, 2009).

Letter to Honorable James M. Peck, United States Bankruptcy Judge, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Sep. 15, 2009).

Motion of Debtor and Debtor in Possession for an Order Pursuant to Fed R. Bankr.P.2004, Authorizing Discovery From Barclays Capital, Inc., *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. May 18, 2009).

Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006 Authorizing and Approving (A) Sale of Purchased

Contains Highly Confidential Information

Assets Free and Clear of Liens and Other Interests and (B) Assumptions and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Sep. 15, 2009).

Motion Under 11 U.S.C. § § 105 and 363 and Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Dec. 5, 2008).

Notice of Hearing on the Trustee's Motion for Relief Pursuant to the Sale Order or Alternatively, for Certain Limited Relief Under Rule 60(b), *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Sep. 15, 2009).

Objection of Barclays Capital Inc. to Debtors' Motion for an Order Under Rule 2004 Authorizing Discovery of Barclays Capital Inc., *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. June 5, 2009).

Objection to Motion of the Debtors, Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3), for Establishment of the Deadline for Filing Proofs of Claim, Approval of the Form and Manner of Notice Thereof and Approval of the Proof of Claim Form, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. June 11, 2009).

Order Under 11 U.S.C. § § 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchase)) Assets Free An)) Clear of Liens and Other Interests An)) (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 19, 2009).

Order Under 11 U.S.C. § § 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 17, 2008).

Scheduling Order Concerning Certain Motions Filed by LBHI, SIPA Trustee and Creditors Committee, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Oct. 27, 2009).

The Trustee's Joinder in Debtors' Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sep. 15, 2009).

The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Sep. 15, 2009).

Contains Highly Confidential Information

The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively for Certain Limited Relief Under Rule 60(b), *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Sep. 15, 2009).

The Trustee's, Debtors' and Creditors' Committee's Second Set of Requests for Production of Documents and Things, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-13555 (JMP) and Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Dec. 23, 2009).

Trustee's First Interim Report for the Period September 19, 2008 through May 29, 2009, *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y.).

Trustee's Second Interim Report for the Period May 30, 2009 through November 11, 2009 *In re: Lehman Brothers Holdings Inc., et al., Debtors.*, Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y.).


**Publicly Available Documents**

Databases

Bloomberg LP

Capital IQ

Newspaper Articles, Business Commentary

"CFTC Statement Regarding Barclays Purchase of Lehman Futures Business," *Commodity Futures Trading Commission Press Release* (Sep. 20, 2008).

"North American Leisure Deal of the Year 2007 – Meadownlands Stadium: Split Decision," *Project Finance Magazine* (Feb. 2008).

"Statement on Proposed Acquisition of Lehman Brothers, Inc., by Barclays," *SEC Press Release* (Sep. 17, 2008).

Aaron Kuriloff and Michael McDonald, "NFL's Giants Redeeming $100 Million in Auction Debt (Update3)," *Bloomberg Online*, (April 15, 2008).

Jeffrey McCracken, "Lehman's Chaotic Bankruptcy Filing Destroyed Billions in Value," *Wall Street Journal* (Dec. 29, 2008).

Judith Burns, "SEC Gives Firms More Leeway in Pricing Asset-Backed Issues," *Wall Street Journal* (Mar. 31, 2008).

Liz Rappaport, "Firms Fight Banks Over Billions in Frozen Notes," *Wall Street Journal* (Jan. 2, 2010).

Contains Highly Confidential Information

<u>Publications by Organizations</u>

Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 157, *Fair Value Measurements* (Sept. 2006, as amended 2008), at FAS157-10 to FAS157-12.

Barclays PLC, *Results Announcement 2008* (Feb. 9, 2009).

Lehman Brothers, *Equity Linked Notes: An Introduction* (April 2001).

<u>Webpages</u>

Bloomberg, "About Bloomberg: Product Data," *available at* http://about.bloomberg.com/product_data.html (visited Dec. 31, 2009).

Bloomberg, "About Bloomberg: Product Equities," *available at* http://about.bloomberg.com/product_equities.html (visited Dec. 31, 2009).

**Other Miscellaneous Documents**

Barclays Capital, *Fixed Income Credit Products - Price Testing Policy* (Dec. 2008).

Barclays Capital, *Global Finance Credit Products - Price Testing Policy* (Aug. 2008).

Barclays Capital, *Product Control - Price Testing Policy V 1.2* (May 2009).

Gary Romain, Barclays Capital, "Lehman Acquisition Assets Summary – Post acquisition gains and losses for acquired inventory" (Jan. 2010).

PwC work papers contained in Barclays' document production in response to Document Request No. 3 of The Trustee's, Debtor's, and Creditors' Committee's First Set of Requests for Production of Documents and Things, dated October 30, 2009 (BCI-EX-00247453 – BCI-EX-00295654).

Document titled "Lehman OBS IPV Valuation Methodology_3.doc," *attached to* E-mail from Sean Teague to Tal Litvin et al., re: "Acquisition balance sheet" (Feb. 12, 2009).

E-mail from Duane McLaughlin to David Murgio et al., re: "Schedules A and B for Filing – FINAL" (Sep. 29, 2008) *with attached excel workbook.*

Email from James McDaniel to Edward Rosen, re: "Understandings relating to the transfer of LBI's accounts at OCC" (Sep. 21, 2008).

Email from Michael McGarvey to Francis Pearn and Gerard Reilly, re: "Here's the summary from the 12th" (Sep. 16, 2008 14:23 GMT) *attaching* LBI Balance Sheet by GAAP Asset Type workbook.

E-mail from Michael McGarvey to Gerard Reilly et al., re: "CUSIP Transferred to Barclays Master File" (Sep. 22, 2008 GMT 17:37) *with seven attached excel workbooks.*

Email from Stephen King to Liz James et al., re: "no subject" (Sep. 22, 2008).

Contains Highly Confidential Information

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 12 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt912.xls," (Sep. 12, 2008).

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 15 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt915.xls," (Sep. 15, 2008).

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 16 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt916.xls," (Sep. 16, 2008).

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 17 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt917.xls," (Sep. 17, 2008).

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 18 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt918.xls," (Sep. 18, 2008).

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 19 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt919.xls," (Sep. 19, 2008).

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 22 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt922.xls," (Sep. 22, 2008).

Lehman Brothers, "BA:B-S Detailed Exposure Report (CrossSystem) – 30 Sep 2008" *contained in* Spreadsheet titled "Detailed_Exposure_Rpt930.xls," (Sep. 30, 2008).

Spreadsheet titled "Acquisition Detail (PWC Day1) 09-22 Final Nu5.xls," *attached to* E-mail from Sean Teague to Tal Litvin et al., re: "Acquisition balance sheet" (Feb. 12, 2009).

Spreadsheet titled "Acquisition Detail (PWC Day1) 09-22 Final Nu5.xls," *attached to* E-mail from Sean Teague to Karen Hong, re: "Lehman P1 - (near) complete" (Feb. 5, 2009).

Spreadsheet titled "GR Long Island - Acquisition Balance Sheet 28.01.2009.xls," *attached to* Email from Andrew Daly to Gary Romain, re: "GR Long Island - Acquisition Balance Sheet 28.01.2009.xls" (Feb. 5, 2009).

Spreadsheet titled "LBI_BS_917_V with adjustment.xls," *attached to* Email from David Descoteau, Lazard, to Barry Ridings et al., Lazard NYC, re: "LBI_BS_917_V with adjustment.xls," Bates No. LAZ-C-00050306 (Sep. 19, 2008).

Spreadsheet titled "Lehman Asset P_3 12-22-2008_(JPM) Final 2.xls," *attached to* E-mail from Sean Teague to Tal Litvin et al., re: "Acquisition balance sheet" (Feb. 12, 2009).

Spreadsheet titled "New LBI Firm Asset List A 12312008 v2.xls," *attached to* E-mail from Sean Teague to Tal Litvin et al., re: "Acquisition balance sheet" (Feb. 12, 2009).

Spreadsheet titled "New LBI Firm Asset List B 12312008 (B.1) v6.xls," *attached to* E-mail from Sean Teague to Tal Litvin et al., re: "Acquisition balance sheet" (Feb. 12, 2009).

Email from Daniel Long to Jasen Yang et al., re: "Proj LI 9/19 collateral file" (Sep. 19, 2008) *attaching* "Master List_unique 6_44pm.xls."

Email from Daniel Long to Marty Malloy et al., re: "Master list of the DTC and Fed Wire from Lehman on 9-18" (Sep. 19, 2008) *attaching* "Master List.xls."

Email from David Petrie to Daniel Long et al., re: "Master List_unique_mod.xls" (Sep. 19, 2008) *attaching* "Master List_unique_mod.xls."

Contains Highly Confidential Information

Email from Duane McLaughlin to David Murgio et al., re: "Schedules A and B for Filing" (Sep. 29, 2008) *with attached "Schedule A" and "Schedule B" spreadsheets.*

Email from Edwin Lee to Doug Warren et al., re: "LBI Files" (Sep. 19, 2008) *attaching* "LBI Short and Long Inventory Detail (Corp Debt) excl Eq division Corp Debt.xls," "lbi-unknown-red-flag.xls," "lbi-converts.xls," "lbi-em.xls," "lbi-europe.xls," and "lbi-unknown."

Email from Gary Romain to James Walker et al., re: "Balance sheet" (Sep. 21, 2008) *attaching* "Long Island – Acquisition Summary.xls."

Email from Gary Romain to James Walker et al., re: "Draft acquisition balance sheet" (Sep. 25, 2008) *attaching* "Long Island – Acquisition Balance Sheet.xls."

Email from Gary Romain to Kim Cunningham et al., re: "Balance Sheet" (Nov. 10, 2008) *attaching* "Long Island – Acquisition Balance Sheet.xls."

Email from Gary Romain to Patrick Clackson et al., re: "OBS" (Jan. 27, 2009) *attaching* "Long Island – Acquisition Balance Sheet.xls."

Email from Gary Romain to TJ Gavenda et al., re: "LI balance sheet with uncertainties" (Oct. 25, 2008) *attaching* "Long Island – Acquisition Balance Sheet.xls."

Email from Gerard LaRocca to Mike Keegan, re: "Totals for the Fed Facility Collateral" (Sep. 19, 2008) *with attachment.*

Email from James Hraska to John Rodefeld et al., re: "Repo Trade" (Sep. 20, 2008) *attaching* "BarCap collateral-09.18.08.jh.xls."

Email from James Hraska to Nancy Denig et al., re: "Purchased & Excluded Mortgage Asset Files" (Sep. 18, 2008) *attaching* "Excluded Mortgage Assets 09-17-2008.xls."

Email from James Hraska to Robert Azerad et al., re: "Financing Facility Schedule" (Sep. 22, 2008) *attaching* "Tri09192008 (3).xls," "BarCap collateral-09.18.jh.xls," "barcap pldg 09 22 08 dtc-only.xls."

Email from Jasen Yang to Daniel Long and Hogan Chen, re: "Complete position of Lehman collateral" (Sep. 20, 2008) *attaching* "Lehm pos 9-19.xls."

Email from Jasen Yang to Daniel Long, re: "Urgent - Schedules" (Oct. 14, 2008) *with three untitled workbooks.*

Email from Jasen Yang to Eric Yoss et al., re: "Lb" (Sep. 21, 2008) *attaching* "Lehm Position 2008-09-19 (Thurs Close)(Sun 1030AM).xls."

Email from Jasen Yang to Gerard LaRocca et al., re: "Urgent - Schedules" (Sep. 26, 2008) *attaching* "Barclays Financing Collateral List (Barc Ops) 09-20-2008.xls", "Friday transfers BONY records agreed.xls", and "DTC 074 and 636 AVAILABLE COLL.xls."

Email from Jasen Yang to James Walker., re: "Lb" (Sep. 21, 2008) *attaching* "Lehm Position 2008-09-19 (Thurs Close) (Sun 1030AM).xls."

Email from Jasen Yang to John Haley et al., re: "Complete position of Lehman collateral" (Sep. 20, 2008) *attaching* "Copy of lehman9-18pos.xls," "Lehman Pledged Collateral.xls," "Residual

Contains Highly Confidential Information

N24 Box 13.5 Million.csv," "PDCF bzw689 11909+ Bill.csv." "Remaining MOP – 210 Mill.csv" and "BZW948-38854095571-85.csv."

Email from Jasen Yang to Nathaniel Hartley et al., re: "Master List_unique (2).xls" (Sep. 19, 2008) *attaching* "Master List_unique 2pm.xls."

Email from Jasen Yang to Robert Azerad et al., re: "Financing Facility Schedule" (Sep. 22, 2008) *attaching* "Barclays Financing Collateral.xls."

Email from Jason Yang to Eric Yoss et al., re: "Lb" (Sep. 21, 2008) *attaching* "Lehm Position 2008-09-19 (Thurs Close) (Sun 1030 AM).xls."

Email from Jason Yang to James Walker et al., FW: "Lb" (Sep. 21, 2008) *attaching* "Lehm Position 2008-09-19 (Thurs Close) (Sun 1030 AM).xls."

Email from John Diagostini to Jim Beckenhaupt et al., re: "PDCF" (Sep. 19, 2008) *attaching* "Market Value PDCF.xls."

Email from John Grenier to Chris O'Meara, re: "Final Balance Sheet" (Sep. 18, 2008) *attaching* "bs5.xls."

Email from John Grenier to Tim Sullivan, re: "Balance Sheet Iterations" (Sep. 18, 2008) *attaching* "Consolidated Balance Sheets.pdf."

Email from John Haley to Daniel Long, re: "Bony_Price 9-19 clean.xls" (Sep. 22, 2008) *attaching* "Bony_Price 9-19 clean.xls."

Email from John Rodefeld to Gerard LaRocca, re: "Purchase & Excluded Mortgage Asset Files" (Sep. 29, 2008) *attaching* "Excluded Mortgage Assets 09-17-2008.xls."

Email from Keith Kochie to John Haley et al., re: "Lehman Deal Collateral 9-19 EOD" (Sep. 20, 2008) *attaching* "LEHMAN PDCF BZW689 – 9-19.csv," "N24 LEHMAN Residual 9-19.csv," "MOP – LEHMAN Residual 9-19.csv," "Tri-Email:[OTBGZ_20080919.Z].

Email from Marie Stewart to Laura Faviano, re: "systems/process write ups for MTS, ITS, ADP and DBS" (Dec. 09, 2008) *attaching* "MTS Financing Narrative.doc," and "MTS Inventory Close Narrative.doc."

Email from Nathaniel Hartley to Jasen Yang, re: "Master List_unique (2).xls" (Sep. 19, 2008) *attaching* "Master List_unique (2).xls."

Email from Paolo Tonucci to David Petrie et al., re: "Box Positions" (Sep. 22, 2008) *attaching untitled spreadsheet.*

Email from Paolo Tonucci to Stephen King, re: "Non Actionable Box as of 0918.xls" (Sep. 19, 2008) *attaching* "Non Actionable Box as of 0918.xls."

Email from Ricky Policke to John Haley, re: "no subject" (Sep. 18, 2008) *attaching* "fed-091608.xls."

Email from Robert Azerad to Jasen Yang et al., re: "Financing Facility Schedule" (Sep. 22, 2008) *attaching* "Barclays Financing Collateral List (Barc Ops) 09-20-2008.xls."

Email from Ryan Babcock to Jasen Yang, re: "PMTG Haircut Summary (09-21-2008).xls" (Sep. 21, 2008) *attaching* "PMTG Haircut Summary (09-21-2008).xls."

Contains Highly Confidential Information

Email from Sean Teague to Andrew Pickett et al., re: "Pine CCS – memo and supporting pricing documentation-" (Jan. 14, 2009) *attaching* "PINE CCS LTD[1].-October 2008.pdf," "bfm239C.jpg," "Pine CCS BBF.gif," "Pine CCS BBG Rating History.gif," "PineII.xls," and "Pine CCS Valuation Memo (PCG)."

Email from Sean Teague to Jasen Yang et al., re: "Proj LI 9/19 collateral file" (Sep. 19, 2008) *attaching* "Master List_unique 2pm PT.xls."

Email from Sean Teague to Jeannie Chang et al., re: "Updated: Lehman at close audit – Price testing for rates" (Feb. 24, 2009).

Email from Sean Teague to Jonathan Shaw and Gary Romain, re: "Urgent Request" (Jan. 06, 2010) *attaching* "Sched B Inventory LehOBS 6.xls."

Email from Stephen King to Jason Yang, Fw: "Fed and DTC 9-18 (3).xls" (Sep. 18, 2008) *attaching* "Fed and DTC 9-18 (3).xls."

Email from to Ricky Policke to John Haley, (Sep. 18, 2008) *attaching* "fed-091608.xls."

Email from Usmanpatel Biradar to John Haley and Steven Rosenthal re: "Bony extract" (Sep. 22, 2008) *attaching* "market_val.zip."

Email from Victor I Lewkow to Gerard LaRocca et al., re: "Non Actionable Box" (Sep. 21, 2008) *attaching* "Non Actionable Box as of 0918.xls."

Excel Version of files attached to email from Mary Korycki to James Fogarty et al., (Sep. 29, 2008) *titled* "Exhibit A-1, A-2 – Barclays Financing Collateral List.xls", "Exhibit B-1, B-2, B-3 – DTC 074 and 636 AVAILABLE COLL," "Exhibit B-4 – Friday transfers BONY records agreed," "Exhibit B-5 – 636 Collateral," and "Exhibit B-6 – Schedule B Final."

Email from Duane Mclaughlin to David Murgio et al., re: "Schedules A and B for Filing" (Sep. 29, 2008) *with attached "Schedule A" and "Schedule B" spreadsheets.*

Workbook of Unpurchaseable securities titled "Book1.xls."

Workbook titled "(September 19th $1.035).xls."

Workbook titled "(September 29th - 636).xls."

Workbook titled "(September 30th 074).xls."

Workbook titled "(September 30th 074-equity).xls."

Workbook titled "6. 12-16-2008 JPM Settlement.xls."

Workbook titled "Copy of Lehman Schedule July 2009_2.xls."

Workbook titled "DocReq122809.xls."

Workbook titled "DTC Collateral Lehman Marks.xls."

Workbook titled "Fed and DTC 9-18 (3).xls."

Workbook titled "Fed cusips cob 9.16.xls."

Workbook titled "fed-091608.xls."

Workbook titled "Final  Lehman Position File v1.xls."

Contains Highly Confidential Information

Workbook titled "LBI Short and Long Inventory Detail (Corp Debt) excl Eq division Corp Debt.xls."

Workbook titled "lbi-converts.xls."

Workbook titled "lbi-em.xls."

Workbook titled "lbi-europe.xls."

Workbook titled "lbi-unknown.xls."

Workbook titled "lbi-unknown-red-flag.xls."

Workbook titled "LEH Collateral Rodefeld 5101 & 7256.xls."

Workbook titled "LEH Haircut File 9-22.xls."

Workbook titled "Lehman Intangible asset and amortization__Final.xls."

Workbook titled "Market Value PDCF.xls."

Workbook titled "Sched B LehOBS 5.xls."

Contains Highly Confidential Information

## APPENDIX THREE

### ASSET TYPES TRANSFERRED TO BARCLAYS

| Security Type (per Bloomberg) | Count | Market Value ($) [1] Sept. 22, 2008 |
|---|---|---|
| ABS Home | 27 | 29,653,767 |
| ABS Other | 138 | 386,292,283 |
| Adjustable, Convertible to Fixed | 1 | 14,100 |
| Adjustable | 105 | 237,237,043 |
| Adjustable, OID | 1 | 9,880,000 |
| ADR | 169 | 560,692,726 |
| Agency ABS Other | 2 | 651,399 |
| Agency CMO FLT | 38 | 427,677,557 |
| Agency CMO INV | 27 | 81,276,478 |
| Agency CMO IO | 347 | 768,931,696 |
| Agency CMO Other | 149 | 1,012,447,610 |
| Agency CMO PO | 214 | 1,638,712,495 |
| Agency CMO Z | 16 | 53,563,468 |
| Basket WRT | 1 | - |
| CF | 6 | 641,358,622 |
| Closed-End Fund | 88 | 38,489,382 |
| CMBS | 76 | 271,641,937 |
| Common Stock | 2,686 | 5,531,020,176 |
| CPI Linked | 1 | 38,000 |
| Domestic MTN | 175 | 411,691,381 |
| Equity WRT | 54 | 693,346 |
| ETP | 138 | 1,624,824,194 |
| Euro MTN | 4 | 20,948,213 |
| | | (continued on next page) |

Contains Highly Confidential Information

| Security Type (per Bloomberg) | Count | Market Value (\$) [1] Sept. 22, 2008 |
|---|---|---|
| Euro-Dollar | 22 | 25,023,677 |
| Fixed | 301 | 98,069,886 |
| Fixed, OID | 125 | 22,137,099 |
| Floating | 1 | 750 |
| GDR | 3 | 8,293 |
| Global | 329 | 1,821,841,389 |
| Inter. Appreciation, OID | 1 | 605,900 |
| Ltd Partnership | 68 | 558,599,690 |
| MBS 10yr | 48 | 34,126,078 |
| MBS 15yr | 659 | 1,959,125,312 |
| MBS 20yr | 166 | 415,067,033 |
| MBS 30yr | 1,832 | 4,527,357,468 |
| MBS ARM | 134 | 891,404,118 |
| MBS Balloon | 5 | 395,019 |
| MBS Other | 164 | 1,213,405,644 |
| Misc. | 7 | 3,555,664 |
| NY Registered Shares | 2 | 4,864,241 |
| Private Placement | 156 | 1,088,373,174 |
| Private | 11 | 11,729,655 |
| Private Comp. | 3 | - |
| Private CMO Floating | 183 | 476,504,578 |
| Private CMO Inverse | 1 | 3,099,649 |
| Private CMO Interest Only | 122 | 123,478,028 |
| | | (continued on next page) |

Contains Highly Confidential Information

| Security Type (per Bloomberg) | Count | Market Value ($) [1]<br>Sept. 22, 2008 |
|---|---|---|
| Private CMO Other | 394 | 463,063,281 |
| Private CMO Principal Only | 24 | 15,886,521 |
| Public | 174 | 127,044,377 |
| REIT | 81 | 120,649,228 |
| Right | 2 | - |
| Royalty Trust | 8 | 317,197 |
| Tracking Stock | 5 | 8,874,412 |
| Unit | 22 | 92,712,099 |
| U.S. Domestic | 504 | 3,577,436,771 |
| U.S. Government | 380 | 10,791,323,954 |
| Yankee | 26 | 69,454,201 |
| Zero Coupon | 2 | 4,269 |
| Zero Coupon, OID | 18 | 34,571,763 |
| N/A (Field Not Applicable) | 9 | 147,842 |
| N/A (Invalid Security) | 288 | 540,862,983 |
| **Grand Total** | **10,743** | **42,868,857,116** |

Sources:  Spreadsheet titled "Acquisition Detail (PWC Day1) 09-22 Final Nu5.xls," *attached to* E-mail from Sean Teague to Tal Litvin et al., re: "Acquisition balance sheet" (Feb. 12, 2009); Bloomberg.

Contains Highly Confidential Information

APPENDIX FOUR

INFORMATION ON SELECTED SECURITIES TRANSFERRED TO BARCLAYS

In this appendix, I briefly summarize available information about selected securities or groups of similar securities acquired by Barclays in the Transaction. The indicated values of most of these securities based on Barclays exit price marks for September 22, 2008, differ significantly from indicated values based on BoNY's marks for September 19, 2008. While my investigation of individual positions and groups of similar positions is on-going, I have formed three preliminary conclusions based on work completed to date:

- First, for many positions of significant indicated value in the Repo Collateral, there is no generally recognized pricing source available and, in fact, there is surprisingly little information available in the public domain (e.g., from the SEC, or from financial websites, or in the financial press) or even from proprietary (i.e., available for purchase) sources of financial information.

- Second, virtually all of the specific securities included in the Repo Collateral (with significant indicated values) for which there are significant differences between Barclays' exit price marks and BoNY's marks represent extremely complex claims on cash flows from bundles of underlying assets that themselves are complex, opaque, and hard to assess.

- Third, based on my initial work, there appears to be strong support and justification for the differences between Barclays' exit price marks and BoNY's marks.

Contains Highly Confidential Information

I begin this appendix by analyzing several sets of similar securities that Barclays sold shortly after closing the Transaction. These sales allow a direct comparison of BoNY's marks (and in some but not all cases, Barclays' marks) to actual results obtainable in the marketplace in late September of 2008. I then present information on a number of additional positions that contribute significantly to the overall difference between the indicated value of the Repo Collateral based on BoNY's marks and the indicated value of the Repo Collateral based on Barclays exit price marks.

## 1. Collateralized ALT-A mortgage obligations issued by Structured Adjustable Rate Mortgage Loan Trust

The initial inventory acquired by Barclays in the Transaction included positions in 125 different CMOs issued by the Structured Adjustable Rate Mortgage Loan Trust. All are identified in the detailed listing of initial inventory as "US Non-Agency CMOs" backed by ALT-A mortgages (of various vintages). Altogether, at BoNY marks, these positions had an aggregate indicated value of $237.7 million.

Because these positions were sold off quickly, Barclays did not finalize September 22 exit price marks for these positions, but instead valued them for financial accounting purposes at their actual sales value. However, before selling the positions, Barclays had estimated preliminary mid-point marks for these positions as of September 19; the indicated value of the positions at Barclays' preliminary mid-point marks was $197.1 million, which is a reduction of about 20% from the indicated value using BoNY marks.[100]

---

[100] Barclays typically reduced mid-point prices for ALT-A mortgage backed securities by 10% or 15% to adjust them to exit prices, with the size of the adjustment varying across different types of ALT-A products. Thus, had Barclays prepared September 22 exit price marks for these securities, they likely would have been at least 10% lower than these preliminary mid-point marks for September 19.

Contains Highly Confidential Information

Barclays sold all of these positions shortly after the close of the Transaction for total proceeds of $80.2 million, or only about one-third of their indicated value based on BoNY's marks.

## 2. Asset backed securities backed by ALT-A HELOCs issued by Lehman XS Trust

The initial inventory acquired by Barclays in the Fed Replacement Repo included positions in 65 different asset backed securities issued by the Lehman XS Trust. All are identified in the detailed listing of initial inventory as "US ABS Home Equity" backed by ALT-A home equity lines of credit (of various vintages). Altogether, at BoNY marks, these positions had an aggregate indicated value of $171.1 million.

Because these positions were sold off quickly, Barclays did not finalize September 22 exit price marks for these positions, but instead valued them for financial accounting purposes at their actual sales value. However, before selling the positions, Barclays had estimated preliminary mid-point marks for these positions as of September 19; the indicated value of the positions at Barclays' preliminary mid-point marks was $139.8 million, a reduction of about 20% from the indicated value using BoNY marks.

Barclays sold all of these positions shortly after the close of the Transaction for total proceeds of $86.9 million, or just over one-half of their indicated value based on BoNY's marks.

## 3. US Agency collateralized mortgage obligations (Sequentials, PACs, and VADMs)

The initial inventory acquired by Barclays in the Fed Replacement Repo included positions in 65 different CMOs issued by various agencies (Freddie Mac, Ginnie Mae, Federal Home Loan banks, and other) identified in the detailed listing of initial inventory as "US Agency

Contains Highly Confidential Information

CMO (Sequentials, PACs, and VADMs). Altogether, at BoNY marks, these positions had an aggregate indicated value of $856.1 million.

Although these positions were sold off quickly, Barclays had estimated preliminary mid-point marks for the positions as of either September 19 or September 22.[101] The indicated value of the positions at Barclays' preliminary mid-point marks was $810.8 million, a reduction of about 5% from the indicated value using BoNY marks. Barclays also developed September 22 exit price marks for these positions, by reducing mid-point marks to bid marks. The indicated value of these positions using Barclays' exit price marks was $729.8 million.

Barclays sold all of these positions shortly after the close of the Transaction for total proceeds of $798.1 million. Thus, this sale was completed for proceeds about 7% below the indicated value of the positions at BoNY marks, but approximately mid way between BoNY's marks and Barclays exit price marks. For financial accounting purposes, Barclays used the proceeds from the sale, rather than its lower preliminary estimate of value.

### 4. US Agency CMOs (Complex Floater, Interest Only and Inverse Interest Only)

In its complaint in a recent fraud action (unrelated to this matter), the SEC described some of the "myriad varieties [of CMOs], each with its own yield, price volatility, and risk characteristics." According to the SEC,

"Inverse floaters are variable rate securities with a coupon that is inversely related to a short-term interest rate index, typically the London Interbank Offered rate ("LIBOR"). As the index's interest rates rise, the Inverse Floater's interest payment falls, and vice versa. Inverse Floaters can have poor liquidity and erratic pricing. Inverse Floaters purchased for a premium (i.e., at a price over par) or sold before maturity present price risk to investors (i.e., the investor can lose their original investment).

---

[101] It is not possible to tell with certainty from the detailed support for the initial inventory whether these mid-point marks are for September 19 or September 22.

Contains Highly Confidential Information

"IOs are risky securities because they have no principal component and pay investors solely from the interest payments on the mortgage pool underlying a MBS. IOs are sensitive to market interest rate changes. When market rates fall, homeowners tend to prepay their loans, thereby reducing the number of mortgages available in the underlying pool to make interest payments. If enough mortgages underlying an IO prepay, the entire tranche may 'expire' early, resulting in a loss for investors who had not already recouped their initial investment through interest payments.

"Inverse IOs are a hybrid of Inverse Floaters and IOs. Like IOs, Inverse IOs have no principal component and investors are paid solely from the underlying MBS' interest payments. Like Inverse Floaters, the interest payment for Inverse IOs moves in the opposite direction of a specific short-term interest rate index. In all but limited interest rate environments . . . Inverse IOs display the negative characteristics of both Inverse Floaters and IOs; their price is sensitive to changes in the market interest rate and investors risk losing their investment."

The SEC characterized these types of CMOs as "among the riskiest available," "largely illiquid," and "only suitable for sophisticated investors with a high-risk investment profile." The initial inventory acquired by Barclays in the Fed Replacement Repo included positions in 350 different CMOs identified as "complex floater," "IO," or "Inverse IO," with an aggregate custodial value of $1.196 billion. Reflecting the risk and liquidity characteristics of these instruments, Barclays valued these positions using mid-point marks at $0.774 billion (35.29% below the indicated value at BoNY marks); and reduced this indicated value by another 10% (to $0.697 billion) to establish an indicated value at exit price marks. Given the relevant risks and liquidity issues, Barclays exit-price marks were reasonable and appropriate.

## 5. Lehman-issued warrants and Lehman-issued equity-linked notes

In the initial inventory acquired from LBI, Barclays acquired approximately $203 million of Lehman-issued warrants and Lehman-issued equity-linked notes, valued at custodial marks.

Contains Highly Confidential Information

Because the values of these instruments are closely related to Lehman's own creditworthiness, Barclays wrote off the entire value of these securities.

Lehman's global equity derivatives group produced an introduction to equity linked notes in April of 2001. According to this introduction, "An Equity Linked Note (ELN) is an instrument that provides investors fixed income like principal protection together with equity market upside exposure." An ELN is "structured by combining the economics of a long call option on equity with a long discount bond position"; it is "a debt instrument that differs from a standard fixed income security in that the coupon is based on the return of a single stock, basket of stocks or equity index (the 'underlying equity').

Lehman's introduction to ELNs emphasizes their "significant upside opportunity" and "principal protection feature" and asserts that ELNs "may be appropriate for conservative and risk-averse equity investors or fixed income investors with a long-term bullish view on the equity market." But the instruments are not without risk. Among the "additional considerations" cited in Lehman's introduction is "Creditworthiness of the Issuer. Investors should consider the ability of ELN issuers to repay the principal and interest, if any, at maturity. This will be based n the issuer's credit quality."

As indicated above, Barclays valued Lehman-issued warrants and equity-linked notes at zero for financial accounting purposes. To assess the reasonableness of this devaluation, I gathered daily data on the prices of other direct obligations of LBHI immediately preceding and following LBHI's bankruptcy filing. The prices of these instruments were surprisingly resilient through September 12, but typically lost somewhere between 80% and 90% of their value immediately following LBHI's filing. Given that Lehman-issued ELNs and warrants depend on the creditworthiness of LBHI (or related entities) in much the same way as these direct

Contains Highly Confidential Information

obligations, and given the lack of ready buyers for these securities following LBHI's bankruptcy, this write off of the BoNY-marks indicated value of Lehman-issued equity linked notes and warrants was reasonable and appropriate.

## 6. Giants Stadium Bonds

The initial inventory acquired by Barclays in the Transaction included positions in four related notes issued to provide funding for a new Meadowlands stadium, a joint venture between the New York Giants and the New York Jets. The stadium was financed by $1.3 billion of bond debt, which was shared equally by the two teams ($650 million each). The bonds issued by the Giants had maturity dates of 2029, 2037 and 2047,[102] and consisted of seven series of auction rate securities with interest rates to be set every month.[103] According to Barclays' position detail spreadsheets, Barclays valued the Giants auction rate securities it acquired, for accounting purposes, at their indicated values using BoNY's marks (which ranged from about $10 per $100 of face value to about $44 per $100 of face value), without further downward adjustment.

Markets for auction rate securities encountered severe difficulties beginning early in 2008, with increasing numbers of auctions "failing." These difficulties continued through 2008, and these markets have yet to revive. Since auctions had been the primary mechanism by which holders could reduce (or increase) their holdings, these auction failures made it difficult to for holders of auction rate securities to dispose of their positions.

Conditions in markets for auction rate securities made these securities particularly difficult to value. Some analysts argued that investors who could hold for the long term

---

[102] Project Finance Magazine, February 2008 Deals of the Year – North American Leisure Deal of the Year, Meadowlands Stadium: Split decision.

[103] Aaron Kuriloff and Michael McDonald, NFL's Giants Redeeming $100 Million in Auction Debt (Update3), www.bloomberg.com, last updated April 15, 2008 18:22 EDT.

Contains Highly Confidential Information

eventually would be paid in full; the crisis in auction rate markets was said to be an issue of lack of liquidity rather than deteriorating creditworthiness of the borrowers. But for Barclays purposes, the issue was not what the value of these securities might be in the long run assuming a return to normal conditions, but the value of the positions in an orderly sale under current conditions. Given conditions in the markets for auction rate securities, Barclays exit-price marks were reasonable and appropriate.

## 7. Insurance-related asset backed securities



Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information



Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information



Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information



## 8.  Pine CCS CLO



Contains Highly Confidential Information



Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

# APPENDIX FIVE

## EXHIBITS

Contains Highly Confidential Information

EXHIBIT 1

POSITIONS COMPRISING THE COLLATERAL TRANSFERRED TO BARCLAYS

IN THE FED REPLACEMENT REPO

PART A – INITIAL INVENTORY

**Exhibit 1, Part A is contained in**

**Volume 2: Trading Portfolio Assets - Position Detail**

Contains Highly Confidential Information

EXHIBIT 1

POSITIONS COMPRISING THE COLLATERAL TRANSFERRED TO BARCLAYS

IN THE FED REPLACEMENT REPO

PART B – JPM INVENTORY

**Exhibit 1, Part B is contained in**

**Volume 2: Trading Portfolio Assets - Position Detail**

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

EXHIBIT 2

POSITIONS INCLUDED IN "TRADING PORTFOLIO ASSETS" THAT WERE NOT TRANSFERRED

TO BARCLAYS IN THE FED REPLACEMENT REPO

**Exhibit 2 is contained in**

**Volume 2: Trading Portfolio Assets - Position Detail**

Contains Highly Confidential Information

EXHIBIT 3

SAMPLE OF "SHORT NAMES" OF SECURITIES IN THE REPO COLLATERAL



Contains Highly Confidential Information



Contains Highly Confidential Information



Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

EXHIBIT 4

"STICKINESS" IN GFS MARKS FOR LEVEL III SECURITIES

| Product | Product Name | Security Type | Gross Long Inventory ($) 9/12/08 | Clean Market Price | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 9/12/08 | 9/15/08 | 9/16/08 | 9/17/08 | 9/18/08 | 9/19/08 | 9/22/08 |
| | | Mortgage | 367,979,690 | 0.435 | 0.345 | 0.345 | 0.345 | 0.345 | 0.345 | 0.345 |
| | | Corpbond | 88,621,021 | 0.117 | 0.117 | 0.117 | 0.117 | 0.117 | 0.117 | 0.117 |
| | | Corpbond | 65,142,196 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| | | Corpbond | 53,192,905 | 0.914 | 0.914 | 0.914 | 0.914 | 0.914 | 0.914 | 0.914 |
| | | Mortgage | 47,812,500 | 0.900 | 0.830 | 0.830 | 0.830 | 0.830 | 0.830 | 0.830 |
| | | Corpbond | 47,570,104 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| | | Moneymkt | 41,982,577 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| | | Equity | 40,967,264 | 2.000 | 2.000 | 2.000 | 2.000 | 2.000 | 2.000 | 2.000 |
| | | Mortgage | 40,936,026 | 0.808 | 0.750 | 0.750 | 0.750 | 0.750 | 0.750 | 0.750 |
| | | Mortgage | 40,131,146 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 |
| | | Corpbond | 37,952,309 | 0.914 | 0.914 | 0.914 | 0.914 | 0.914 | 0.914 | 0.914 |
| | | Mortgage | 34,059,994 | 0.846 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 |
| | | Corpbond | 33,862,870 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| | | Corpbond | 27,570,097 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| | | Corpbond | 27,238,909 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| | | Mortgage | 27,027,811 | 0.938 | 0.790 | 0.790 | 0.790 | 0.790 | 0.790 | 0.790 |
| | | Mortgage | 25,946,674 | 0.925 | 0.925 | 0.925 | 0.925 | 0.925 | 0.925 | 0.925 |
| | | Mortgage | 24,503,196 | 0.740 | 0.740 | 0.740 | 0.740 | 0.740 | 0.740 | 0.740 |
| | | Mortgage | 23,729,342 | 0.626 | 0.626 | 0.626 | 0.626 | 0.626 | 0.626 | 0.626 |
| | | Mortgage | 23,596,848 | 0.300 | 0.300 | 0.300 | 0.300 | 0.300 | 0.300 | 0.300 |

(continued on next page)

Page 125

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| Product | Product Name | Security Type | Gross Long Inventory ($) 9/12/08 | 9/12/08 | 9/15/08 | 9/16/08 | 9/17/08 | 9/18/08 | 9/19/08 | 9/22/08 |
|---------|--------------|---------------|----------------------------------|---------|---------|---------|---------|---------|---------|---------|
| | | Corpbond | 23,089,160 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| | | Corpbond | 22,833,628 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| | | Corpbond | 22,608,905 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| | | Mortgage | 22,558,219 | 0.500 | 0.500 | 0.500 | 0.500 | 0.500 | 0.500 | 0.500 |
| | | Corpbond | 22,233,708 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 | 0.922 |
| | | Corpbond | 21,602,138 | 0.763 | 0.763 | 0.763 | 0.763 | 0.763 | 0.763 | 0.763 |
| | | Corpbond | 21,320,997 | 0.767 | 0.767 | 0.767 | 0.767 | 0.767 | 0.767 | 0.767 |

Clean Market Price

Page 126

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

EXHIBIT 5

"STICKINESS" IN GFS MARKS FOR LEVEL II SECURITIES

| Product | Product Name | Security Type | Gross Long Inventory ($) 9/12/08 | Clean Market Price | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 9/12/08 | 9/15/08 | 9/16/08 | 9/17/08 | 9/18/08 | 9/19/08 | 9/22/08 |
| | | Mortgage | 222,447,219 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| | | Mortgage | 134,333,333 | 0.680 | 0.600 | 0.600 | 0.600 | 0.600 | 0.600 | 0.600 |
| | | Corpbond | 123,375,040 | 0.995 | 0.995 | 0.995 | 0.995 | 0.995 | 0.995 | 0.995 |
| | | Munibond | 118,819,350 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Moneymkt | 118,526,977 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Moneymkt | 118,401,464 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Moneymkt | 118,400,956 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Munibond | 117,295,719 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Moneymkt | 113,450,513 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Equity | 106,826,030 | 0.650 | 0.550 | 0.550 | 0.550 | 0.550 | 0.550 | 0.550 |
| | | Mortgage | 86,044,000 | 0.980 | 0.980 | 0.980 | 0.980 | 0.980 | 0.980 | 0.980 |
| | | Mortgage | 76,033,997 | 0.842 | 0.720 | 0.720 | 0.720 | 0.720 | 0.720 | 0.720 |
| | | Moneymkt | 73,940,261 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| | | Munibond | 67,501,784 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Mortgage | 64,522,924 | 0.715 | 0.680 | 0.680 | 0.680 | 0.680 | 0.680 | 0.680 |
| | | Mortgage | 56,839,609 | 0.665 | 0.605 | 0.605 | 0.605 | 0.605 | 0.605 | 0.605 |

(continued on next page)

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| Product | Product Name | Security Type | Gross Long Inventory ($) 9/12/08 | Clean Market Price | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 9/12/08 | 9/15/08 | 9/16/08 | 9/17/08 | 9/18/08 | 9/19/08 | 9/22/08 |
| | | Mortgage | 56,316,854 | 0.480 | 0.400 | 0.400 | 0.400 | 0.400 | 0.400 | 0.400 |
| | | Mortgage | 56,074,350 | 0.810 | 0.810 | 0.810 | 0.810 | 0.810 | 0.810 | 0.810 |
| | | Mortgage | 53,090,844 | 0.883 | 0.883 | 0.883 | 0.883 | 0.883 | 0.883 | 0.883 |
| | | Moneymkt | 53,000,198 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Corpbond | 50,047,569 | 0.996 | 0.996 | 0.996 | 0.996 | 0.996 | 0.996 | 0.996 |
| | | Moneymkt | 49,905,400 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| | | Moneymkt | 46,000,191 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Munibond | 43,160,000 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Mortgage | 40,759,616 | 0.740 | 0.660 | 0.660 | 0.660 | 0.660 | 0.660 | 0.660 |
| | | Moneymkt | 37,951,202 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| | | Moneymkt | 36,751,178 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Equity | 36,432,000 | 0.990 | 0.990 | 0.990 | 0.990 | 0.990 | 0.990 | 0.990 |
| | | Corpbond | 34,757,538 | 69.50 | 69.50 | 69.50 | 69.50 | 69.50 | 69.50 | 69.50 |
| | | Moneymkt | 32,700,341 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Munibond | 32,000,686 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Moneymkt | 31,748,862 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| | | Mortgage | 31,344,000 | 0.750 | 0.750 | 0.750 | 0.750 | 0.750 | 0.750 | 0.750 |
| | | Mortgage | 30,108,083 | 1.002 | 1.002 | 1.002 | 1.002 | 1.002 | 1.002 | 1.002 |

(continued on next page)

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| Product | Product Name | Security Type | Gross Long Inventory ($) 9/12/08 | Clean Market Price | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 9/12/08 | 9/15/08 | 9/16/08 | 9/17/08 | 9/18/08 | 9/19/08 | 9/22/08 |
| | | Munibond | 30,000,213 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Mortgage | 28,121,866 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 |
| | | Moneymkt | 27,650,809 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Moneymkt | 27,251,559 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Moneymkt | 26,851,178 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Moneymkt | 24,900,181 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Equity | 23,862,000 | 0.970 | 0.970 | 0.970 | 0.970 | 0.970 | 0.970 | 0.970 |
| | | Moneymkt | 23,551,347 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Munibond | 22,375,574 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Mortgage | 22,276,710 | 0.920 | 0.920 | 0.920 | 0.920 | 0.920 | 0.920 | 0.920 |
| | | Munibond | 21,775,000 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Mortgage | 21,171,924 | 0.838 | 0.838 | 0.838 | 0.838 | 0.838 | 0.838 | 0.838 |
| | | Moneymkt | 21,050,540 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Mortgage | 21,021,114 | 0.953 | 0.953 | 0.953 | 0.953 | 0.953 | 0.953 | 0.953 |
| | | Munibond | 20,655,838 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Munibond | 20,551,510 | 95.21 | 95.21 | 95.21 | 95.21 | 95.21 | 95.21 | 95.21 |
| | | Munibond | 20,250,582 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | Corpbond | 20,090,294 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| | | Mortgage | 20,032,889 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| | | Mortgage | 20,003,734 | 0.570 | 0.570 | 0.570 | 0.570 | 0.570 | 0.570 | 0.570 |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

EXHIBIT 6

COMPARISON OF INDICATED VALUES USING CUSTODIAL MARKS TO INDICATED VALUES USING BARCLAYS MARKS
FOR SELECTED INDIVIDUAL POSITIONS AND GROUPS OF SIMILAR POSITIONS

| Asset or Asset Type | Number of CUSIPs | Indicated Value at Custodial Marks ($ million) | Indicated Value at Barclays Exit Price Marks ($ million) | Difference (%) |
|---|---|---|---|---|
| Agency Pools (FHLMC 30 yr) | 297 | 1,719.4 | 1,674.5 | -2.6 |
| Agency CMO (Interest Only) | 240 | 876.7 | 549.9 | -37.3 |
| Agency CMO (Inverse Interest Only) | 109 | 319.3 | 146.6 | -54.1 |
| FHA (SASC 07-3 2A2) | 1 | 20.2 | 18.2 | -10.0 |
| Agency (SASC 07-3 1A2) | 1 | 34.3 | 30.9 | -10.0 |
| Agencies - Tennessee Valley Authority | 11 | 1,046.5 | 959.8 | -8.3 |
| Treasuries – UDS  Ust Note | 8 | 4,454.1 | 4,363.9 | -2.0 |
| Agencies – USD FNMA | 88 | 1,921.3 | 1,784.7 | -7.1 |
| Agencies – USD FHLB | 113 | 2,107.6 | 1,989.4 | -5.6 |
| Munis – USD DISGEN | 6 | 60.3 | 51.5 | -14.6 |
| US Non-Agency CMO (SARM Loan Trust) | 125 | 237.7 | 80.2 | -66.2 |
| US ABS Home Equity – Lehman XS Trust | 67 | 171.1 | 86.9 | -49.2 |
| US Non-Agency CMO – Lehman XS Trust | 125 | 178.4 | 82.6 | -53.7 |
| CLO Mezz (Pine CCS) | 1 | 915.0 | 428.6 | -53.2 |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

EXHIBIT 7

UPDATED TRANSACTION BALANCE SHEET (ASSETS ONLY) BASED ON "LBI BS_917_V_WITH ADJUSTMENT.XLS"

Lehman Brothers, Inc.
Balance Sheet as of September 17, 2008
($ in millions)

| ASSETS | (A)<br>8/31/2008 | (B)<br>9/17/2008 | (C)<br>Adjustments | (D)<br>Balance Sheet<br>Transferred | (E)<br>Balance Sheet<br>Remaining | (F)<br>Purchase<br>Agreement |
|---|---|---|---|---|---|---|
| Cash & Cash Equivalents | $ 268 | $ 412 | $ - | $ 412 | $ - | $ 700 |
| Cash & Securities Segregated and on Deposit | 8,550 | 4,740 | - | - | 4,740 | - |
| Governments & Agencies | 30,225 | 37,214 | - | 37,214 | - | 40,000 |
| Total Commercial Paper & Other MMkt Instruments | 1,158 | 958 | - | 958 | - | 1,100 |
| Mortgages and Asset-Backed Securities | 6,499 | 5,972 | - | 2,986 | 2,986 | 2,700 |
| Total Corporate Debt & Other | 5,422 | 4,839 | - | 4,839 | - | 4,900 |
| Total Corporate Equities | 9,256 | 6,758 | - | 6,758 | - | 8,800 |
| Derivatives & Other Contract Agreements | 2,758 | 3,566 | - | 3,566 | - | 4,500 |
| Total Securities & Other Financial Instruments Owned | 55,318 | 59,307 | - | 56,321 | 2,986 | 62,000 |
| Collateralized Short-Term Agreements | 155,876 | 30,337 | - | 30,337 | - | 10,000 |
| Receivables and Other Assets | 14,746 | 30,237 | - | 76 | 30,161 | - |
| Investments in Consolidated Subsidiaries | 1,924 | 1,592 | - | - | 1,592 | - |
| Due from Subsidiaries | 65,634 | 56,176 | 1,383 | - | 57,559 | - |
| TOTAL ASSETS | $ 302,316 | $182,802 | $ 1,383 | $ 87,146 | $ 97,039 | $ 72,700 |

Expert Report of Professor Paul Pfleiderer

Page 131

Contains Highly Confidential Information

Exhibit 8

SUMMARY OF BANK ACQUISITIONS THAT RESULTED IN NEGATIVE GOODWILL

| Date of Acquisition | 09/25/2008 | 12/31/2008 | 01/16/2009 | 01/30/2009 | 02/06/2009 | 03/16/2008 | 10/06/2008 |
|---|---|---|---|---|---|---|---|
| Acquirer | JPMorgan | PNC Bank /2 | Lloyds Banking Group /3 | Community Bankers Trust | WestAmerica | JPMorgan /6 | BNP Paribas /7 |
| Target | WaMu | National City | HBOS | Suburban Federal Savings /4 | County Bank /5 | Bear Stearns | Fortis |
| | ($ millions) | ($ millions) | (£ millions) | ($ millions) | ($ millions) | ($ millions) | (€ millions) |
| Total Purchase Price | 1,938 | 6,133 | 7,787 | - | - | 1,373 | 14,500 |
| Book Value of Target's Net Assets | 30,916 | 10,536 | 22,936 | 45 | 59 | 11,352 | - |
| Adjustments | (20,343) | (4,402) | (3,976) | (24) | (10) | (1,008) | - |
| Fair Value of Net Assets Acquired | 10,573 | 6,133 | 18,960 | 21 | 49 | 10,344 | 15,315 |
| Negative Goodwill /1 | | | | | | | |
| Total | (8,635) | - | (11,173) | (21) | (49) | (8,971) | (815) |
| Allocated to Non-financial Assets | 8,054 | - | - | - | - | 605 | - |
| Remaining from the Transaction | (581) | - | (11,173) | (21) | (49) | (8,366) | (815) |

Notes:

/1 Accounting for acquisitions is governed by SFAS 141. In accordance with SFAS 141, "negative goodwill" is created when the fair value of the net assets acquired exceeds the purchase price. As prescribed by SFAS 141, nonfinancial assets acquired that are not held-for-sale are written down against that negative goodwill. The negative goodwill that remains after writing down nonfinancial assets is recognized as an extraordinary gain.

/2 PNC first reported this transaction in its 2008 10-K filing. Since the transaction occurred on Dec. 31, 2008, it had no effect on the annual financial statements. However, at the time initially reported, PNC's disclosures revealed that the adjustments to the assets to reflect fair value totaled $3,066 million, which initially resulted in negative goodwill of $1,337 million. In its1Q2009 10-Q filing, PNC disclosed that new information on the purchased assets and liabilities revealed the need for additional adjustments to reflect fair value. These adjustments totaled $1,337 million, so PNC did not report any negative goodwill on this transaction.

/3 Amounts in millions of British pounds sterling. "Adjustments" include £(3,917) for preferred shares and £(1,300) million for minority interests.

/4 Purchased from the FDIC acting as the Receiver of the Target bank. The Community Bankers Trust ("CBT") 10-Q form of May 11, 2009 does not provide the BV of the target's net assets. Bank of Essex, a wholly owned subsidiary of CBT, bid negative $45 million for the assets and liabilities assumed. For consistency in the table, this is presented as a positive $45 million book value. The $23.74 million adjustments to reflect FV of net assets acquired are presented as a reduction of the BV of the target's net assets, in order to conform with the disclosures in the CBT 10-Q filing (at pp. 2, 14-15).

/5 Purchased from the FDIC acting as the Receiver of the Target bank.

/6 Figures are according to the JPMorgan 8-K filing of April 16, 2008. In subsequent SEC filings, JPMorgan made adjustments to its original disclosure regarding the Bear Stearns transaction. In its 10-Q for the quarter ended June 30, 2009, JPMorgan adjusted the Total Purchase Price and Fair Value of net assets acquired to $1,496 and $611 million, respectively. As a result of these adjustments, JPMorgan recognized goodwill of $885 million instead of negative goodwill of $8,366 million as originally disclosed. The acquisition was apparently amended on March 24, 2008.

/7 Amounts in millions of Euros.

Expert Report of Professor Paul Pfleiderer

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

# Expert Report of Professor Paul Pfleiderer

**in the matter of**

**In Re:  Lehman Brothers Holdings Inc., *et al.*, Debtor**

**and**

**In Re:  Lehman Brothers Inc., Debtor**

**January 8, 2010**

**Volume 2 of 2**

**Trading Portfolio Assets – Position Detail**

Contains Highly Confidential Information

## TABLE OF CONTENTS

Exhibit 1, Part A:    Positions Comprising the Collateral Transferred to Barclays in the Fed Replacement Repo, Positions Received as part of the "Initial Inventory" ................................................................................................... 1

Exhibit 1, Part B:    Positions Comprising the Collateral Transferred to Barclays in the Fed Replacement Repo, Positions Received Pursuant to December 2008 Settlement Agreement.................................................................... 164

Exhibit 2:    Positions Included in "Trading Portfolio Assets" that Were Not Transferred to Barclays in the Fed Replacement .................................... 186

# Remainder of Exhibit
# Filed Under Seal