# BCI EXHIBIT

# 351

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (JMP) |
| Debtor. | (Jointly Administered) |

## DECLARATION OF ERIC CLARK

I, ERIC CLARK, declare:

1.    I am over the age of 18 and, if called to testify at trial, could competently testify to the following based on my personal knowledge.[1]

2.    Since April 1999, I have been employed as a Product Controller in the Finance Department at Barclays Capital ("Barclays"). From October 2006 to January 2009, I was on secondment in the New York office. My responsibilities included reporting the financial performance of certain trading portfolios within Barclays US operations. I am currently a director in the Product Control department in the London office.

3.    The Options Clearing Corporation (the "OCC") is a clearing house for futures and options contracts that are traded on domestic exchanges. Prior to September 22, 2008, it is my understanding that LBI was a clearing member at the OCC and held open options positions in proprietary and market-maker options accounts (the "074F Account" and the "074M Account," respectively) at the OCC (the "LBI Options"). (LBI held additional options and futures positions

---

[1] My understandings, as reflected in this declaration, are based in part on information provided to me by my colleagues in the price testing, equities trading, and product control departments.

that cleared through the OCC as well (in separate accounts), though these are not addressed in this declaration.)

4.  It is my understanding that on September 22, 2008 (the "Closing"), Barclays took over LBI's OCC Accounts, including the 074F and 074M Accounts.

5.  Certain of the LBI Options in the 074F and 074M Accounts were options that LBI had held, prior to the Closing, on behalf of a subordinated affiliate, Lehman Brothers Special Finance, S.A. (the "LBSF Options"). As of September 24, 2008, the LBSF Options had a net value, according to Barclays' price testing team, of negative $801,390,328.00. After the acquisition, Barclays treated the LBSF Options in the same manner it treated all other options held in the 074F and 074M Accounts.

6.  Prior to the Closing, Barclays was itself a clearing member at the OCC and had its own system in place for maintaining and processing its OCC positions. However, the LBI OCC Options were not immediately brought onto Barclays' systems, as those systems were not capable of incorporating the LBI OCC Options. The delay in moving these options onto Barclays' systems created difficulties for Barclays' risk management team in terms of their ability to manage the risk associated with these positions effectively during the interim period.

7.  Upon the Closing, the Lehman equity risk management systems were incorporated into the Barclays system architecture, which allowed the positions to be moved onto Barclays' risk management system on October 1.

8.  Then, on October 7, 2008, Barclays moved all of the LBI Options (and the long and short stock inventory positions arising from options assignments) to Barclays' equity books, at which point they ceased to be managed or tracked independently from Barclays' broader

2

trading portfolio and instead became part of Barclays' equity books. (The intervening period was required to manage the portfolio and parcel it out to the appropriate traders.)

9.    From the Closing through October 7, 2008, the LBI Options (and the long and short securities positions associated with the exercise or assignment of options pending or settled in the Options accounts as of the Closing) lost substantial value. Attached as Exhibit 1 is a statement of profits and losses, as provided by the Product Controllers of the trading books, arising from the activity of Barclays' equity options traders in managing the portfolio prior to the transfer of the positions on October 7. The total losses in value in this regard amounted to $730 million. *See* Exhibit 1.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th

day of January, 2010, at New York, New York.

_____
Eric Clark

**Exhibit 1:** *Profit/Loss on 074M and 074F Options Position from Acquisition through Trading*

**Comments**

| 074M and 074F Options PnL from acquisition through 10/1/08 | |
|---|---|
| | **PNL** |
| Options | (228,610,376) |
| Stock | (33,057,356) |
| **Total** | **(261,667,732)** |

PnL from acquisition to move date.

The date range used in this table to calculate the PnL for options held for LBI's own account was 9/19/08 – 10/1/08, and the date range used in this table to calculate the PnL for LBSF Options (as defined in the accompanying Eric Clark Declaration) was 9/25/08 – 10/1/08.

| 074M and 074F Options PnL from 10/2/08 through 10/6/08 | |
|---|---|
| | **PnL** |
| Option | (433,455,198) |
| Stock | (36,117,066) |
| **Total** | **(469,572,264)** |

PnL from move date to active trading date.

| Total 074M and 074 Options PnL from acquisition through 10/6/08 | |
|---|---|
| | **PNL** |
| Option | (662,065,574) |
| Stock | (69,174,422) |
| **Total** | **(731,239,996)** |

Total

Clark - Ex. 1

# BCI EXHIBIT

# 352

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re:

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

Debtor.

Chapter 11

Case No. 08-13555 (JMP)

(Jointly Administered)

---

## DECLARATION OF DANIEL DZIEMIAN

I, DANIEL DZIEMIAN, declare:

1.      I am over the age of 18 and, if called to testify at trial, could competently testify to the following based on my personal knowledge. I offer this declaration in support of Barclays motion, based on my personal knowledge, to the best of my recollection as supported by my review of corporate records.

2.      Prior to September 22, 2008, I was employed by Lehman Brothers, Inc. ("LBI") as a Senior Vice President. In that capacity, I had oversight responsibilities relating to LBI's exchange-traded options accounts (the "Acquired Options Accounts") at the Options Clearing Corporation (the "OCC").

3.      Since September 22, 2008, I have been employed at Barclays Capital Inc. ("Barclays") as a Director, Options Clearance. In that capacity, I have oversight responsibilities relating to the Acquired Options Accounts.

4.      It is my understanding that on September 22, 2008 (the "Closing"), Barclays assumed responsibility for the Acquired Options Accounts.

5.      The exercise or assignment of a physically-settled option cleared through OCC results in a contract to purchase or sell the underlying security which is cleared and

1

settled through DTC. When a cash-settled option cleared through OCC is exercised or

assigned, it results in a payment obligation from the writer of the option to the OCC and a

payment obligation from the OCC to the holder of the option. Barclays has satisfied all

settlement obligations to the DTC and OCC in respect of all exercises and assignments of

options held in the Acquired Options Accounts since the Closing.

6.    As of the Closing, the Acquired Options Accounts consisted of the

following: a market maker account (the "074M Account"), a firm account (the "074F

Account"), two customer accounts (the "074C Account" and the "273C Account,"

respectively), and a clearing fund account (the "074ZX Account").

7.    Options positions were held across the various Acquired Options

Accounts as follows: (1) options held for LBI's market-making business were cleared

through the 074M Account; (2) options held in connection with LBI's proprietary trading

business as well as certain options held on behalf of Lehman Brothers Special Finance,

S.A. (the "LBSF Options") were cleared through the 074F Account; (3) options held on

behalf of LBI's non-affiliated options customers (the "074C Customer Options"), options

held on behalf of LBI affiliated options customers, Lehman Brothers International Europe

and its customers (the "LBIE Options"), Lehman Brothers OTC Derivatives, Inc. (the

"LOTC Options"), Lehman Brothers Finance AG (the "LBF Options") and Lehman

Brothers Special Finance, S.A. (the "LBSF 074C Options") (collectively, the "074C

Affiliate Options"), were cleared through the 074C Account; and (4) options held on

behalf of clients of Neuberger Berman (the "273C Customer Options") were cleared

through the 273C Account.

8.      As of the Closing, the Acquired Options Accounts also contained margin
and/or clearing funds (the "OCC Options Margin").[1]  The OCC Options Margin was
dispersed across the 074M Account, the 074F Account, the 074C Account, the 273C
Account, and the 074ZX Account.  The OCC Options Margin was posted (at least in part)
in satisfaction of margin requirements that the OCC imposed on LBI in relation to the
options held in the Acquired Options Accounts as of the Closing.  It is my understanding
that those OCC requirements, which fluctuated daily, were entirely distinct from the
margin requirements that LBI imposed on its own customers pursuant to relevant
regulations and the firm's own policies.  As just one example, it is my understanding that
a customer who writes a "covered" call through a broker, i.e., who has the stock that it
will be required to deliver if the call is assigned  in the customer's account with the
broker, will be required to post little or no margin with the broker, but the broker will be
required to post margin to the OCC based on the call to the same extent as if it were not
covered.

9.      On or about September 25, 2008, Barclays opened a new set of accounts at
the OCC, which consisted of a market-making options account (the "255M Account"), a
proprietary options account (the "255F Account"), and a customer options account (the
"255C Account") (collectively, the "Barclays Options Accounts").

10.     On October 6, 2008, Barclays instructed the OCC to transfer the LBI and
LBSF market-making and proprietary options from the 074M and 074F Accounts to the
newly opened 255M and 255F Accounts, respectively.  Barclays also transferred the
positions from LBI's third-party processing systems to Barclays' third-party processing

---

[1] The Acquired Options Accounts also contained various escrow receipts and letters of guarantee deposited by certain of LBI's clients.

systems. Barclays has managed these options in its discretion and in accordance with its own proprietary trading strategy since the time of this transfer.

11.    Soon after the Closing, Barclays opened accounts on its books for applicable customers of LBI's Private Investment Management ("PIM") business (the "PIM Customer Accounts") and on September 26, 2008, Barclays transferred applicable options positions in PIM Customer Accounts (the "PIM Customer Options") from the 074C Account to the newly opened 255C Account for clearing purposes. From that point forward, the PIM Customer Options were administered and processed by Barclays in the 255C Account in the ordinary course of business.

12.    The remaining options in the 074C Account as of the Closing can be broken down into two categories: the 074C LBI Affiliate Options and the non-PIM 074C Customer Options.[2] While Barclays assumed clearing responsibility for these options, Barclays did not open customer accounts for the 074C LBI Affiliates or the non-PIM customers.[3] Instead, all non-PIM 074C Options and Affiliate Options remained in the 074C Account and were processed on LBI's processing systems.

13.    To facilitate the monitoring of, accounting for, and settlement of the options of parties whose positions were not transferred to Barclays customer accounts, Barclays established "bridge" accounts across Barclays' and LBI's processing systems to properly reflect all OCC customer options activity. The bridge accounts were necessary to account for the fact that the settlement bank and the settlement depository as of

---

[2] The 074C Customer Options consisted of options held on behalf of customers of LBI's Prime Services business and options held on behalf of institutional clients of LBI.

[3] Certain non-PIM Customers independently opened accounts at Barclays, which accounts were processed through the 255C Account.

approximately September 23, 2008, were switched to Barclays while the accounts of these customers and affiliates remained with LBI.

14.    On October 17, 2008, to mitigate risk and market exposure, Barclays began liquidating the remaining 074C LBI Affiliate Option positions.[4]  On that same date, Barclays also began liquidating (by the sale of long positions and the buy-in of short positions) all equity inventory then existing as a result of exercise or assignment of those options prior to that date.  The net effect of the close-out and liquidation of all positions and equities relating to the 074C LBI Affiliate Options on the LBI Bridge Account is a net receivable from LBI to Barclays in the amount of $80,285,927.09, broken down as follows: a net receivable in the amount of $112,750,802.28 in respect of close-out and liquidation of LBIE's positions and equities; a net receivable in the amount of $53,389,890.60 in respect of close-out and liquidation of LBF's positions and equities; a net payable of $63,777,275.79 in respect of close-out and liquidation of LOTC's positions and equities; and a net payable of $22,077,490.00 in respect of close-out and liquidation of LBSF's positions and equities.

15.    Barclays similarly made entries in the appropriate LBI bridge account for the non-PIM 074C Customer Options to reflect the cash and securities inventory (long and short) delivered and received in performance of its settlement obligations.[5]  Barclays has continued to work with the SIPC Trustee for the LBI liquidation (the "Trustee") and his consultants to settle up (through LBI) with these customers whenever possible.  There

---

[4] LBIE has one remaining option in the 074C Account that Barclays was not able to close out.  In particular, LBIE is short a put option in Sun Power Corporation, Class A (SPWRA).  The option expires January 16, 2010, and is currently out of the money.

[5] Of all the non-PIM 074C Customer Options held in the 074C Account as of the Effective Time of Closing. only three remain outstanding versus a single Prime Services account.

are currently unsettled entries relating to certain non-PIM Customer Options in the LBI bridge account.

16. The vast majority of the positions in the 273C Account as of the open of business on September 19, 2008 were transferred to Ridge Clearing before the Closing. Some others either expired or were exercised or assigned over the weekend prior to the Closing (which activity was processed in the normal course on LBI's processing systems). And all but one of the positions that remained in the 273C Account at the time of Closing expired worthless between the Closing and October 31, 2008. The single position that remained in the 273C Account on October 29, 2008 and was not imminently due to expire was a Neuberger Berman Prime Services Option position. That position was transferred from 273C to 074C on October 29, 2008, and was then treated in exactly the same way as the non-PIM 074C Customer Options: Barclays used one of its bridge accounts to reflect the cash and securities it had delivered and received in performance of its settlement obligations in relation to this position. There are currently unsettled entries relating to the settlement of this position, and Barclays continues to work with the Trustee to settle these entries.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of January, 2010,

at New York, New York.

Daniel Dziemian

6

# BCI EXHIBIT

# 353

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (JMP) |
| Debtor. | (Jointly Administered) |

## DECLARATION OF ELIZABETH JAMES

I, ELIZABETH JAMES declare:

1.    I am over the age of 21 and, if called to testify at trial, could competently testify to the following based on my personal knowledge.

2.    Since March 1, 2006, I have been employed as a Director in the Futures Sales department at Barclays Capital Inc. ("Barclays").

3.    On September 22, 2008 (the "Closing"), Barclays acquired (among other things) LBI's exchange-traded derivatives and LBI's then-existing business as a futures commission merchant.

4.    As of the Closing, LBI held open futures (including both futures and options on futures) that were traded on both domestic and foreign exchanges. The domestically traded futures were maintained in accounts with a number of U.S. brokers and clearing corporations, including LBI clearing accounts, non-affiliated clearing broker accounts, and accounts with a number of U.S. clearing corporations. The foreign-traded futures were maintained in accounts with a number of foreign affiliate and non-affiliated brokers and foreign clearing corporations.

1

5.     Some of the exchange-traded futures held by LBI as of the Closing were
held for LBI's own account (the "LBI Proprietary Futures"). Some were held for the
accounts of LBI affiliates (the "LBI Affiliate Proprietary Futures"). Some were held for
the accounts of LBI customers (the "LBI Customer Futures"). And some were held for
the accounts of LBI affiliates' customers (the "LBI Affiliate Customer Futures"). (The
LBI Customer Futures and LBI Affiliate Customer Futures are collectively referred to
herein as the "Customer Futures.")

6.     As of the Closing, LBI held open LBI Proprietary Futures in 9 different
accounts (the "LBI Proprietary Futures Accounts").

7.     As of the Closing, LBI maintained positive collateral balances in each of
the LBI Proprietary Futures Accounts (the "LBI Proprietary Futures Collateral").

8.     Over the course of the two weeks immediately following the Closing,
Barclays closed out all LBI Proprietary Futures that the domestic and foreign exchanges
would permit it to close out. As time went on, additional foreign exchanges permitted
Barclays to close out its LBI Proprietary Futures, and Barclays did so as and when it was
able. Barclays was not permitted to close out certain of the LBI Proprietary Futures prior
to their maturity dates but some of those were closed out by the exchanges and the
remainder have since matured and were cash-settled. Thus, at present, all of the LBI
Proprietary Futures have been closed out. The close-out of each LBI Proprietary Futures
position was settled against the then-existing balance in the respective LBI Proprietary
Futures Account. Upon completion of this close-out process, the value of the remaining
LBI Proprietary Futures Collateral, according to broker statements reflecting the balances

in these accounts after all positions were closed out, was approximately $457,205,950.14.
*See* Exhibit 1.[1]  None of this collateral has been released to Barclays.

9.      As of the Closing, LBI held open LBI Affiliate Futures in an account
numbered 084F at the OCC (the "OCC Affiliate Futures Account") and in other domestic
and foreign accounts with various clearing corporations, exchanges, or brokers ("the
Non-OCC Affiliate Futures Accounts") (collectively, the "LBI Affiliate Futures
Accounts").

10.     As of the open of business on September 22, 2008, LBI maintained a
positive collateral balance in the OCC Affiliate Futures Account of $46,406,394.00.  The
positions in this account have since been moved to the 084C customer account and were
then closed out at a net cost of $35,753,250.00.

11.     LBI also posted collateral for LBI Affiliate Futures contained in Non-OCC
Affiliate Futures Accounts, but that collateral was commingled with the Proprietary
Futures Collateral, discussed above.

12.     Approximately six weeks after the Closing, I learned of the existence of
the positions in the Non-OCC Affiliate Futures Accounts, which, by that time, had been
closed out by Barclays.  I understand that the close-out of those positions came at a net
cost of $517,045.56.

13.     As of the Closing, LBI maintained accounts for LBI customers and LBI
affiliates' customers (collectively, the "Futures Customers") with various affiliate or non-

---

[1] Exhibit 1 shows, for each broker (custodian), an account number, a description of whether the account
was in cash or government securities (e.g., TBills), the applicable currency, the currency balance in the
applicable currency according to the respective broker's statement as of a time after all positions had been
closed out, the applicable conversion rate applied, and the US dollar value of the currency balance.

3

affiliate brokers and with five different U.S. clearing corporations (the "LBI Customer Futures Accounts").

14.    The Futures Customers had deposited collateral including initial margin with LBI prior to the Closing to secure their futures trading activity. LBI maintained this collateral, along with additional collateral that constituted LBI's own property (collectively, the "Customer Futures Collateral"), in the LBI Customer Futures Accounts.

15.    Barclays took over LBI's liabilities to the LBI Futures Customers in the amount of any collateral those customers had posted prior to the Closing to secure their futures trading activity, and has since complied with its obligations to the LBI Futures Customers in this regard. Although, to my knowledge, Barclays was not aware of the total amount of these liabilities at the Closing, I understand that Barclays has since determined that the total amount of such liabilities as of that time was approximately $2 billion.

16.    On September 22, 2008, the LBI Customer Futures Accounts were re-named to reflect the fact that they had become Barclays accounts. Over the course of the next four weeks, the positions in those accounts were transferred into Barclays customer accounts (the "Barclays Customer Futures Accounts").[2] As detailed below, some of the collateral held in the LBI Customer Futures Accounts at the Effective Date of Closing was transferred in to the Barclays Customer Futures Accounts at the same time as the positions, some has been transferred since that time, and the remainder has still not been transferred.

---

[2] After the transfer of the Customer Futures (and some of the Customer Futures Collateral) from the LBI Customer Futures Accounts to the Barclays Customer Futures Accounts, certain Futures Customers requested that their business be transferred to other brokers, and Barclays complied with all such requests. The remainder of the Futures Customers kept their business with Barclays.

17.     As noted above, some of the Customer Futures Collateral has been transferred to the Barclays Customer Futures Accounts since the Closing. All such transfers were authorized by the SIPC Trustee for the LBI liquidation ("SIPC Trustee"). However, the SIPC Trustee has refused to authorize the release of a significant portion of the Customer Futures Collateral, and the release of still further Customer Futures Collateral was authorized by the SIPC Trustee but not effectuated by the relevant brokers. To date, Barclays had received Customer Futures Collateral totaling $2,201,072,209.51.[3] *See* Exhibit 2.[4] Barclays has yet to receive the remaining Customer Futures Collateral, totaling $ $488,648,614.96.[5] *See* Exhibit 3.[6]

18.     Despite the fact that Barclays did not receive and still has not received all of the Customer Futures Collateral, Barclays has had to satisfy, out of its own pocket in many instances, each of the following obligations as they came due since the Closing: (i) the obligation to maintain sufficient margin in the Customer Futures Accounts to satisfy the margin requirements associated with those accounts since the time of Closing, (ii) the settlement obligations in relation to the positions in the Customer Futures Accounts since the time of Closing, (iii) the obligation to return to the Futures Customers, upon their instruction, any collateral they had deposited with LBI prior to the Closing in excess of their then-existing margin requirements, and (iv) the obligation to return to the Futures

---

[3] This figures does not reflect whatever collateral Barclays may have received from the OCC 084C Account which, as of the open of business on September 23, 2009, had a balance of only $303,140.

[4] Exhibit 2 shows the break-out, by asset type and custodian, of the value of the Customer Futures Collateral received to date by Barclays (excepting any collateral held in the 084C Account), both in the relevant currency and in US dollars using the specified exchange rate.

[5] This figure does not reflect whatever collateral Barclays has yet to receive from the OCC 084C Account which, again, as of the open of business on September 23, 2009, had a balance of only $303,140.

[6] Exhibit 3 shows the break-out, by asset type and custodian, of the value of the Customer Futures Collateral (excepting any collateral held in the 084C Account) not yet received by Barclays, both in the relevant currency and in US dollars using the specified exchange rate.

Customers, upon close-out of their accounts, the full amount of any collateral they had

deposited with LBI prior to the Closing, net of any gains or losses realized upon close-out

of their positions. It is my understanding that Barclays would never have acted on what it

perceived to be its obligation to return or transfer Futures Customer Collateral to those

customers (or to other brokers) in that manner if it did not believe it was entitled under

the deal documents to receive that collateral.

19.    Many of the Proprietary and Customer Futures Accounts are held at

custodians that are not Lehman entities or affiliates and that are not restricted by any

ongoing bankruptcy proceeding. As a result, I expect that if LBI or the SIPC Trustee

authorizes the transfer of the net balances in those accounts, they can be transferred to

Barclays immediately upon such authorization (to the extent this has not been done

already). LBI has already accessed the remaining assets in some of those accounts, and

those assets should be transferred to Barclays immediately as well.[7] Finally, Barclays is

entitled to the transfer of the net balances in all other Futures Accounts immediately upon

the brokers' release of those assets.

---

[7] As one example, it is my understanding that the LBI Trustee recovered approximately $170 million in net balance amounts from Macquarie in Australia, one of the non-affiliated custodians for LBI Proprietary Futures Accounts. This amount should be available for immediate transfer to Barclays, but has not yet been transferred.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 8th

day of January, 2010, at New York, New York.

Elizabeth James

**Exhibit 1:** *Undelivered Margin from Proprietary Futures Accounts, Valued as of Account Closeout*

| Broker/custodian | Acct# | Type | CCY | CCY Bal. | FX | USD |
|---|---|---|---|---|---|---|
| Bank of Montreal | 75011 | T-bill | USD | 5,000,000.00 | 1 | 5,000,000.00 |
| Bank of Montreal | 75011 | Cash | CAD | 1,961,574.94 | 0.91268 | 1,790,290.22 |
| Kenanga | 046000 | Cash | MYR | 18,730,445.63 | 0.28 | 5,303,525.68 |
| Kenanga | 046000 | Cash | USD | 2,138,078.13 | 1.00 | 2,138,078.13 |
| Lehman JP (Osaka) | 2208025 | Cash | JPY | 714,140,489.00 | 0.01067 | 7,619,879.02 |
| Lehman JP (Osaka) | 2208025 | T-bill | USD | 40,000,000.00 | 1 | 40,000,000.00 |
| Lehman JP (TSE) | 2208021 | Cash | JPY | 411,252,097.00 | 0.01067 | 4,388,059.87 |
| Lehman JP (TSE) | 2208021 | T-bill | USD | 5,000,000.00 | 1 | 5,000,000.00 |
| Lehman Korea | 001-51-101466 | Cash | KRW | 17,085,602,627.00 | 0.000801 | 13,692,401.95 |
| Lehman SGP | 2208016 | Cash | JPY | 2,789,554,435.00 | 0.01067 | 29,764,545.82 |
| Lehman SGP | 2208016 | Cash | SGD | 2,112,228.83 | 0.69213 | 1,461,936.94 |
| Lehman SGP | 2208016 | Cash | USD | 45,956,172.36 | 1 | 45,956,172.36 |
| Lehman SGP | 2208016 | Tbills | USD | 10,000,000.00 | 1 | 10,000,000.00 |
| Lehman SGP | 2208016 | Tbills | USD | 80,000,000.00 | 1 | 80,000,000.00 |
| Macquarie | LEHH | Collateral | AUD | 52,144,738.04 | 0.83102 | 43,333,320.21 |
| Macquarie | LEHH | Cash | AUD | 2,041,602.07 | 0.83102 | 1,696,612.15 |
| Macquarie | LEHH | Cash | NZD | 597.92 | 0.68132 | 407.37 |
| Macquarie | LEHH | Cash | USD | 10,000,972.24 | 1 | 10,000,972.24 |
| Macquarie | LEH2 | Cash | USD | 150,000,000.00 | 1 | 150,000,000.00 |
| MF Global | 25010 | Cash | USD | 45,168.05 | 1 | 45,168.05 |
| Newedge | A FMTOK 7507610B | Cash | JPY | 1,366,460.00 | 0.01067 | 14,580.13 |
| | | | | | **Total** | **457,205,950.14** |

**Exhibit 2:** *Customer Collateral Delivered to Date, Valued as of September 19, 2008*

| Money Market Funds | CCY | Balance | FX | USD |
|---|---|---|---|---|
| BGI Prime MM | USD | 165,905,987.13 | 1 | $165,905,987.13 |
| Blackrock Temp Fund | USD | 20,788,214.29 | 1 | 20,788,214.29 |
| Dreyfus Cash Mgt. | USD | 20,522,297.78 | 1 | 20,522,297.78 |
| GS FSQ MMF | USD | 36,066,848.21 | 1 | 36,066,848.21 |
| JPM Chase Prime Fund 3605 | USD | 50,000,000.00 | 1 | 50,000,000.00 |
| Lehman Cash Mgmt Prime | USD | 106,500,000.00 | 1 | 106,500,000.00 |
| Lehman Money Market | USD | 18,270,056.93 | 1 | 18,270,056.93 |
| Lehman Prime (IN KIND) | USD | 591,191,503.56 | 1 | 591,191,503.56 |
| Lehman Prime Fund | USD | 3,408,614.86 | 1 | 3,408,614.86 |
| Reserve Primary Fund | USD | 50,867,186.52 | 1 | 50,867,186.52 |
| **Total MMF Received** | | | | **$1,063,520,709.28** |
| | | | | |
| **Cash** | | **871,564,537.93** | | **$871,564,537.93** |
| | | | | |
| Foreign Brokers | | | | |
| MF Global | USD | 33,403,527.52 | 1 | $33,403,527.52 |
| Bank of Montreal | CAD | 19,963,016.88 | 0.9497 | 18,958,877.13 |
| Bank of Montreal | USD | 80,000,000.00 | 1 | 80,000,000.00 |
| Macquarie | NZD | 470.93 | 0.580046404 | 273.16 |
| Macquarie | USD | 128,535,268.25 | 1 | 128,535,268.25 |
| Kenanga | USD | 680,831.28 | 1 | 680,831.28 |
| Kenanga | MYR | 15,126,275.30 | 0.291425673 | 4,408,184.95 |
| **Total Foreign Brokerage Received** | | | | **$265,986,962.30** |
| | | | | |
| **TOTAL Futures Customer Collateral Received** | | | | **$2,201,072,209.51** |

**Exhibit 3:** *Customer Futures Collateral Undelivered to Date, Valued as of September 19, 2008*

| Money Market Funds | CCY | Balance | | | |
|---|---|---|---|---|---|
| Reserve Primary Fund | USD | $5,108,924.50 | | | |
| **Total Not Received (MMF)** | | **$5,108,924.50** | | | |

| Foreign Brokers | CCY | Balance | FX | USD | Accounts |
|---|---|---|---|---|---|
| New Edge | JPY | 218,357,994.00 | 0.0110108 | $2,404,296.20 | A FMTOK 7507610A |
| Polaris | TWD | 123,612,173.98 | 0.0305118 | 3,771,629.93 | 1875286 |
| Polaris | USD | 89,283,688.12 | 1 | 89,283,688.12 | 01532-375, 01532-250, 01532-334, 01532-037, 01532-060, 01532-367 |
| Samsung | KRW | 4,852,095,082.00 | 0.0007915 | 3,840,433.26 | |
| **Total Not Received (Foreign Brokers)** | | | | **$99,300,047.51** | |

| Lehman Entities | CCY | Balance | US Treasury Bills | Accounts |
|---|---|---|---|---|
| Lehman Brothers Japan Inc | USD | $36,813,456.01 | $15,000,000.00 | 02208020, 02295615 |
| Lehman Brothers Futures Asia | USD | 5,955,828.87 | | 02208010, 02208011, 02295572, 02295573 |
| Lehman Brothers PTE | USD | 63,003,183.26 | 75,000,000.00 | 02208015, 02295612 |
| Lehman Brothers Japan Inc | USD | 24,402,193.31 | 5,000,000.00 | 02208024, 02295622 |
| Lehman Brothers Japan Inc | USD | 70,315.23 | | 02208027, 02295624 |
| Lehman Brothers SA | USD | 1,289,014.08 | | 02208047, 02295547 |
| Lehman Brothers International (Europe) | USD | 157,705,652.19 | | 02295670, 022958635 |
| **Total Not Received (LEH entities)** | Cash | **$289,239,642.95** | T-Bills **$95,000,000.00** | |

**TOTAL Undelivered Customer Futures Collateral** | **$488,648,614.96**

# BCI EXHIBIT

# 354

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (JMP) |
| Debtor. | (Jointly Administered) |

## DECLARATION OF CRAIG JONES

I, CRAIG JONES, declare:

1.      I am over the age of 18 and, if called to testify at trial, could competently testify

to the following based on my personal knowledge. This declaration reflects the best of my

understanding and recollection of the relevant events.

2.      Since September 22, 2008, I have been employed as a Director at Barclays

Capital Inc. ("Barclays"). Before joining Barclays, I was a Senior Vice President at Lehman

Brothers, Inc. ("LBI") in its Treasury Department. At both LBI and Barclays, my

responsibilities have included, among other things, managing the margin and clearing fund

deposits in respect of the accounts at the Options Clearing Corporation ("OCC").

3.      The OCC is a clearing house for futures and options contracts that are traded on

an open exchange. During my tenure with LBI's Cash Management team, LBI was a clearing

member at the OCC. It is my understanding that Barclays acquired LBI's accounts at the OCC

(collectively, the "LBI OCC Accounts") on or around September 22, 2008 (the "Closing").

4.      The OCC requires that each clearing member post, or have posted on its behalf,

collateral that will secure the obligations that may arise under the positions in that member's

OCC accounts. The collateral that the OCC requires a clearing member to post or have posted

on its behalf for each account is called margin for that account. The OCC also requires each clearing member to contribute a certain amount to its "clearing fund" to cover any losses suffered by the OCC in the event of the failure of any clearing member to discharge its obligations to the OCC. The OCC has its own proprietary methods for setting margin and clearing fund requirements. The OCC determines the margin requirements and communicates them to clearing members on at least a daily basis, and the OCC generally determines and communicates clearing fund requirements to its members on a monthly basis. The OCC reserves the right to make intra-day as well as daily changes to its margin requirements.

5.      The OCC permits a clearing member to post margin in cash, the deposit of money market funds and other specified marketable securities (subject to market value adjustments) and irrevocable letters of credit issued by approved banks. The assets that LBI deposited to meet the OCC's margin requirements were comprised of LBI's proprietary assets. In general, prior to September 2008, LBI posted collateral primarily in the form of treasury securities and letters of credit.

6.      I will refer in this declaration to the amount by which LBI's posted margin and clearing funds exceeded the OCC's margin and clearing fund requirements on any given day as "excess margin." One of my team's regular responsibilities was to minimize the amount of excess margin maintained by LBI at the OCC. Exhibit 1 hereto shows, for each day from September 15, 2008 through September 19, 2008, the total requirement at the open of business for each day across all of LBI's OCC accounts, the total value of collateral at the open of business for each day across all of LBI's OCC accounts, and the excess or deficit at the open of business on each day across all of LBI's

2

OCC accounts (although, as explained below, the excess reported by the OCC at the open

of business on September 19, 2008 became unavailable to LBI later that day).

7.    On September 15, 2008, LBI's clearing fund requirement at the OCC was

approximately $144.6 million.  To my understanding, the requirement was raised on

September 16, 2008 to $171 million.

8.    At about 9:32 a.m. EST on September 19, 2008, as part of the normal course of

monitoring the excess margin, I was informed that the value of the margin deposits at the OCC

(including the value of letters of credit) exceeded the requirements by just over $400 million.

*See* Exhibit 2 (Email from S. Blake to M. Chalco, B. O'Connor, T. Shafer, C. Jones, and R.

Golaszewski, Sept. 19, 2008, 13:31:47 GMT).  Later that same morning, I was informed by one

of my colleagues, Sharon Blake, that the OCC had refused to release any of the excess margin to

LBI, such that the entire approximately $400 million that had exceeded the requirement as of

9:32 a.m. was now effectively "required" margin according to the OCC.  *See* Exhibit 3 (Email

from S. Blake to C. Jones, T. Shafer, M. Chalco, C. Keith, B. O'Connor and R. Golaszewski,

Sept. 19, 2008, 14:19:43 GMT).

9.    Upon learning of this, I contacted at least one employee of the OCC by telephone

to confirm the information I had received from Ms. Blake and to inquire into the OCC's basis for

withholding the reported excess margin.  During that conversation, the person with whom I

spoke confirmed the accuracy of Ms. Blake's information—that LBI would not be permitted to

withdraw any of the margin excess that had been reported to LBI earlier that morning.  I was

advised during that telephone call that the OCC had full authority to take this measure, and I was

referred, in that regard, to the relevant OCC rules.

3

10.     As of the Closing, the LBI OCC Accounts included (among others) a market maker options account (the "074M Account") and a proprietary options account (the "074F Account").

11.     On or about September 25, 2008, Barclays opened a new set of accounts at the OCC, including a market-making account (the "255M Account") and a proprietary account (the "255F Account") and subsequently transferred the positions that had previously been held in the LBI 074M and 074F Accounts into those new accounts.  Barclays also opened a customer account (the "255C Account"), which it used for purposes of administering the customer positions that were converted from the 074C Account.

12.     As of the open of business on September 22, 2008, the combined margin and clearing fund requirements across the 074M, 074F, and 074ZX accounts totaled $1,192,058,455.75.  As of the open of business on October 7, 2008 (after the 074F and 074M options had been transferred into the 255F and 255M accounts, respectively), the OCC's combined margin and clearing fund requirements for the 255M, 255F, 074M, 074F, and 074ZX accounts totaled $1,808,778,900.75 – over $600 million higher than the September 22, 2008 requirement for the 074M, 074F, and 074ZX accounts.  Barclays has satisfied these requirements.

13.     The total margin and clearing fund requirements across all of LBI's OCC Accounts (074M, 074F, 074C, 074ZX, 084F, 084C, and 273C) as of open of business on September 22, 2008 totaled $1,571,059,337.75.  By October 16, 2008 (when the margin and clearing fund requirements reached their peak), the margin and clearing fund requirements that Barclays faced across all of the relevant accounts (255M, 255F, 255C, 074M, 074F, 074C, 074ZX, and 084C) totaled $3,527,630,925.75.

4

14.    As of open of business on September 22, 2008, the value of all margin and

clearing fund deposits in respect of the LBI OCC Accounts was over $2 billion. Of this amount,

approximately $1.1 billion constituted cash and approximately $926.8 million constituted

government-issued securities posted as margin by LBI to the OCC. LBI had also posted a $252

million letter of credit (issued by BNP Paribas) that remained as margin in the LBI OCC

Accounts as of the Closing. In the days following the Closing, Barclays secured a replacement

letter of credit from BNP Paribas in the same amount to take its place.

15.    Since the Closing, the cash portion of the excess margin in the LBI OCC

Accounts has been credited to Barclays, with one exception. The exception relates to certain

letter of credit proceeds (approximately $80 million worth) which Barclays is currently not

receiving credit for.

16.    In addition, the SIPC Trustee for LBI's liquidation (the "Trustee") consented to

the release to Barclays of a small portion of the OCC margin or clearing fund deposits

attributable to the government-issued securities. In particular, on or about October 1, 2008,

Barclays asked for the Trustee's consent for the release of $19 million in cash that resulted from

the maturation of a portion of the government-issued securities that were pledged to the OCC as

a clearing fund deposit. (*See* forwarded email chain from C. Jones to L. Vecchio (Oct. 1, 2008),

attached as Exhibit 4.) The Trustee consented, and the asset was released by the OCC to Chase,

which then paid Barclays' OCC cash settlement account. (*See* Trustee Authorization, attached as

Exhibit 5; *see also* Bank of New York Mellon Statement (Oct. 1-31, 2008), attached as Exhibit 6,

at p. 6.)

17.    However, the remainder of the margin and clearing fund deposits – held by LBI in

the form of government-issued securities as of the Closing – has yet to be released to Barclays,

5

and is no longer being credited against Barclays' OCC margin and clearing fund requirements.
Those assets had a value as of December 31, 2009 of $968,133,505.24.

18.    To my knowledge, the OCC has not drawn on any of the margin deposits that
were posted by LBI in respect of the LBI OCC Accounts in closing out or settling any of the
positions held as of the Closing in those accounts.


I declare under penalty of perjury that the foregoing is true and correct.  Executed this 8th
day of January, 2010, at New York, New York.

Craig Jones

6

**Exhibit 1**

| | Margin Requirement | Collateral Value Posted | Excess/(Deficit) |
|---|---|---|---|
| 9/15/2008 | (789,583,205) | 1,271,416,764 | 481,833,559 |
| 9/16/2008 | (1,359,001,075) | 1,471,206,735 | 112,205,660 |
| 9/17/2008 | (1,404,036,965) | 1,445,191,575 | 41,154,610 |
| 9/18/2008 | (2,068,829,847) | 1,730,732,024 | (338,097,823) |
| 9/19/2008 | (1,693,367,422) | 2,097,341,885 | 403,974,464 |

**From:**  Blake, Sharon F
**Sent:**  Fri, 19 Sep 2008 13:31:47 GMT
**To:**  Chalco, Maria; O'Connor, Brian (NY); Shafer, Tamir
**CC:**  Jones, Craig L; Golaszewski, Richard
**Subject:** Occ for today

---

All,

Please see today's requirements:

Customer:  Excess  66mm
Firm:              Excesst 335mm
Net:        Excess  401mm



The Current Available Letters of Credit for today



Please see LBI Securities which are currently pledged at OCC



In addition to the Treasuries, we also have the following Letters of Credit posted as of yesterday to meet our requirement of the previous business day



*Sharon Blake*
*Associate:Global Cash & Collateral Management*
*Email: Sblake@ Lehman.com*
*Voice (201) 499-6434*
*Fax: (201) 333-7199*

|           | Total Requirement | Today's excess/(deficit) |
|-----------|------------------:|-------------------------:|
| Customer  |     476,554,355.00 |            66,000,000.00 |
| Firm      |     606,817,181.00 |           335,000,000.00 |
| Net       |   1,083,371,536.00 |           401,000,000.00 |

### CUSTOMER ACCT

| Security  | Market Value | Collateral Value | Rate | Cusip | T-Bills Face Amount | Mat Date | Roll Date |
|-----------|-------------:|-----------------:|------|-------|--------------------:|----------|-----------|
| UST BOND  | $ 98,223,399.00 | $ 93,312,229.05 | 3.625 | 912810fd5 | $ 59,175,000.00 | 4/15/2028 | |
| UST BOND  | $ 143,480,917.35 | $ 136,306,871.48 | 2.375 | 912810fh4 | $ 119,445,000.00 | 1/15/2025 | |
| UST BOND  | $ 210,607,250.00 | $ 199,704,487.50 | 2.375 | 912810fh4 | $ 175,000,000.00 | 1/15/205 | |
| UST BOND  | $ 59,832,564.00 | $ 56,840,935.80 | 2 | 912810FS2 | $ 55,560,000.00 | 1/15/2026 | |
|           | $ 413,920,731.35 | $ 486,164,523.83 | | | | | |
|           |              |                  |      |       |                     |          |           |
| **FIRM ACCT** | | | | | | | |
| UST BOND  | $ 33,230,580.00 | $ 31,569,051.00 | 1.75 | 912810PV4 | $ 34,000,000.00 | 1/15/2028 | |
| UST NOTE  | $ 147,480,917.35 | $ 139,662,860.48 | 3.875 | 912810fn6 | $ 86,585,000.00 | 4/15/2029 | |
| Total     | $ 180,711,497.35 | $ 171,231,911.48 | | | | | |
|           |              |                  |      |       |                     |          |           |
| **MARKET MAKER ACCT** | | | | | | | |
| UST BOND  | $ 83,829,024.90 | $ 79,637,573.66 | 1.75 | 912810PV4 | $ 83,770,000.00 | 1/15/2028 | |
| UST BOND  | $ 31,544,299.80 | $ 29,967,084.81 | 2.375 | 912810fh4 | $ 26,260,000.00 | 01/15/205 | |
| Total     | $ 115,373,324.70 | $ 109,604,658.47 | | | | | |
|           |              |                  |      |       |                     |          |           |
|           |              | $ 767,001,093.78 | | | | | |



### Current Available LC's

$                36,600,000.00

| Firm Outstanding | Cust Outstanding | Total Outstanding |
|-----------------:|-----------------:|------------------:|
| $ 262,998,500.00 | $ 68,998,500.00 | $ 331,997,000.00 |

**From:**  Blake, Sharon F
**Sent:**  Fri, 19 Sep 2008 14:19:43 GMT
**To:**  Jones, Craig L; Shafer, Tamir
**CC:**  Chalco, Maria; Shafer, Tamir; Keith, Carol; O'Connor, Brian (NY); Golaszewski, Richard
**Subject:** FW: Occ for today/REVISED COPY.

---

All,

Please see today's requirements:

Customer:  Excess  0
Firm:          Excesst 0
Net:           Excess   0


Picture (Metafile)

*Sharon Blake*
*Associate:Global Cash & Collateral Management*
*Email: Sblake@Lehman.com*
*Voice (201) 499-6434*
*Fax: (201) 333-7199*

---

**From:**  Blake, Sharon F
**Sent:**  Friday, September 19, 2008 9:32 AM
**To:**  Chalco, Maria; O'Connor, Brian (NY); Shafer, Tamir
**Cc:**  Jones, Craig L; Golaszewski, Richard
**Subject:**  Occ for today

All,

Please see today's requirements:

Customer:  Excess  66mm
Firm:          Excesst 335mm
Net:           Excess   401mm



The Current Available Letters of Credit for today



Please see LBI Securities which are currently pledged at OCC



In addition to the Treasuries, we also have the following Letters of Credit posted as of yesterday to meet our requirement of the previous business day



*Sharon Blake*
*Associate:Global Cash & Collateral Management*
*Email: Sblake@.Lehman.com*
*Voice (201) 499-6434*
*Fax: (201) 333-7199*

|  | Total Requirement | Today's excess/(deficit) |
|---|---|---|
| Customer | 548,827,983.73 | 0.00 |
| Firm | 1,546,223,619.63 | 0.00 |
| **Net** | **2,095,051,603.36** | **0.00** |

|  | Total Requirement | Today's excess/(deficit) |
|---|---|---|
| Customer | 476,554,355.00 | 66,000,000.00 |
| Firm | 606,817,181.00 | 335,000,000.00 |
| **Net** | **1,083,371,536.00** | **401,000,000.00** |

### CUSTOMER ACCT

| Security | Market Value | Collateral Value | Rate | Cusip | Face Amount | Mat Date | Roll Date |
|---|---|---|---|---|---|---|---|
| UST BOND | $ 98,223,399.00 | $ 93,312,229.05 | 3.625 | 912810fd5 | $ 59,175,000.00 | 4/15/2028 | |
| UST BOND | $ 143,480,917.35 | $ 136,306,871.48 | 2.375 | 912810fh4 | $ 119,445,000.00 | 1/15/2025 | |
| UST BOND | $ 210,607,250.00 | $ 199,704,487.50 | 2.375 | 912810fh4 | $ 175,000,000.00 | 01/15/2025 | |
| UST BOND | $ 59,832,564.00 | $ 56,840,935.80 | 2 | 912810FS2 | $ 55,560,000.00 | 1/15/2026 | |
| | $ 413,920,731.35 | $ 486,164,523.83 | | | | | |

### FIRM ACCT

| Security | Market Value | Collateral Value | Rate | Cusip | Face Amount | Mat Date | Roll Date |
|---|---|---|---|---|---|---|---|
| UST BOND | $ 33,230,580.00 | $ 31,569,051.00 | 1.75 | 912810PV4 | $ 34,000,000.00 | 1/15/2028 | |
| UST NOTE | $ 147,480,917.35 | $ 139,662,860.48 | 3.875 | 912810fh4 | $ 86,585,000.00 | 4/15/2029 | |
| Total | $ 180,711,497.35 | $ 171,231,911.48 | | | | | |

### MARKET MAKER ACCT

| Security | Market Value | Collateral Value | Rate | Cusip | Face Amount | Mat Date | Roll Date |
|---|---|---|---|---|---|---|---|
| UST BOND | $ 83,829,024.90 | $ 79,637,573.66 | 1.75 | 912810PV4 | $ 85,770,000.00 | 1/15/2028 | |
| UST BOND | $ 31,544,299.80 | $ 29,967,084.81 | 2.375 | 912810fh4 | $ 26,260,000.00 | 01/15/2025 | |
| Total | $ 115,373,324.70 | $ 109,604,658.47 | | | | | |
| | | $ 767,001,093.78 | | | | | |

| Current Available LC's |
|---|
| $ 36,600,000.00 |

| Firm Outstanding | Cust Outstanding | Total Outstanding |
|---|---|---|
| $ 262,998,500.00 | $ 68,998,500.00 | $ 331,997,000.00 |

**From:**    Jones, Craig L
**Sent:**    Wed, 01 Oct 2008 23:48:17 GMT
**To:**    Vecchio, Laura M
**CC:**    Dziemian, Daniel; Ciaravino, Vincent: Markets (NYK); Maher, Michael R; Willoughby, Scott
**Subject:** OCC Treasury Redemption

---

Laura - tomorrow morning there is a Treasury redemption at the OCC. We would like SIPC to instruct the OCC to release the Treasuries back to Chase and then have SIPC advise Chase to pay the redemption proceeds to Barclays' account at BNY. The instructions should be as follows:

**OCC Instructions**
Bill Eineke (OCC) - please release the redeeming T-Bill cusip 912795G88 maturing on 10/02/08 and Face Value of $19,000,000 back from the LYE account at Chase to Chase's redemption account XRD.

**Chase Instructions:**
Mike Mego (Chase) - please take in from the OCC LYE account the redeeming T-Bill cusip 912795G88 maturing on 10/02/08 and Face Value of $19,000,000 and wire the proceeds from XRD to the Barclays OCC account at the Bank of New York. The wire instructions for the BNY account are as follows:

Pay: $19,000,000
Bank of New York
ABA 021000018
Barclays Capital LE OCC Account
Acct:890-0692-898

Let me know if you have any questions.
Thanks,
Craig

**To:**    Kiplok, Christopher[Kiplok@HughesHubbard.COM]; 'jane.buyers-russo@jpmorgan.com'[jane.buyers-russo@jpmorgan.com]; 'michael.a.mego@jpmorgan.com'[michael.a.mego@jpmorgan.com]; 'inaba_gail@jpmorgan.com'[inaba_gail@jpmorgan.com]; 'Robert.M.Macallister@chase.com'[Robert.M.Macallister@chase.com]; 'kevin.c.kelley@jpmorgan.com'[kevin.c.kelley@jpmorgan.com]; 'Enid.D.Jean-Claude@chase.com'[Enid.D.Jean-Claude@chase.com]; 'marcus.c.johnson@jpmchase.com'[marcus.c.johnson@jpmchase.com]
**Cc:**    'Vecchio, Laura M'[LVecchio@lehman.com]; Greene, Steven[greenes@HughesHubbard.com]; Friedenberg, Ellen[frieden@hugheshubbard.com]
**From:**    Frelinghuysen, Anson
**Sent on behalf of:**    Frelinghuysen, Anson
**Sent:**    Tue 10/7/2008 10:27:11 AM
**Importance:**    Low
**Sensitivity:**    None
**Subject:**    RE: LBI Trustee Authorization
**Categories:**

**Document.pdf**

Jane,

Our records indicate that the attached instruction has not yet been acted upon. Please let us know if you need further information or confirm completion.

As ever, you assistance is appreciated.

Thank you.

Anson

-----Original Message-----
From: Kiplok, Christopher
Sent: Thursday, October 02, 2008 3:18 PM
To: jane.buyers-russo@jpmorgan.com; 'michael.a.mego@jpmorgan.com'; inaba_gail@jpmorgan.com; 'Robert.M.Macallister@chase.com'; kevin.c.kelley@jpmorgan.com; 'Enid.D.Jean-Claude@chase.com'; 'marcus.c.johnson@jpmchase.com'
Cc: Vecchio, Laura M; Greene, Steven; Friedenberg, Ellen; Frelinghuysen, Anson; Kiplok, Christopher
Subject: LBI Trustee Authorization


Please see the attached, and thanks for your help.

Best regards,

Christopher K. Kiplok
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
(212) 837-6810
FAX (212) 422-4726

Confidential

James W. Giddens, as Trustee for the SIPA liquidation of Lehman Brothers, Inc., authorizes the transfer of cash identified below in accordance with the wire instructions below on an expedited, priority basis as part of the transfer of customer accounts to Barclays.

Instructions:

Please take in from the OCC LYE account the redeeming T-Bill cusip 912795G88 maturing on 10/02/08 and Face Value of $19,000,000 and wire the proceeds from XRD to the Barclays OCC account at the Bank of New York.  The wire instructions for the BNY account are as follows:

Pay: $19,000,000
Bank of New York
ABA 021000018
Barclays Capital LE OCC Account
Acct: 890-0692-898

October 2, 2008

Christopher K. Kiplok
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
(212) 837-6810
FAX (212) 422-4726

Counsel to the Trustee

Confidential



THE BANK OF NEW YORK MELLON

## FACSIMILE TRANSMITTAL SHEET

**DATE:    06/12/2009**

**TO:  Richard**

**COMPANY**

**ADDRESS:**

**FAX #646-822-7965**

**FROM:   Jenifer Eodumegwuhu**

**TELEPHONE NUMBER:    (800) 332-4550   (option 2)**

**FAX NUMBER:   201-909-6285**

**TOTAL NUMBER OF PAGES (INCLUDING COVER):**

**IF ALL PAGES RECEIVED ARE NOT COMPLETE AND FULLY LEGIBLE,
PLEASE LET SENDER KNOW AS SOON AS POSSIBLE.**

**MESSAGE:**

**PG:**

CONFIDENTIALITY: NOTE: THE INFORMATION IN THIS FACSIMILE MESSAGE AND ANY
ATTACHMENTS HEREIN ("FAX") MAY CONTAIN CONFIDENTIAL OR PROPRIETARY
INFORMATION FOR USE BY THE ADDRESSEE ONLY. IF THE READER OF THIS MESSAGE IS NOT
THE INTENDED RECIPIENT, YOU ARE NOTIFIED THAT RETENTION, DISSEMINATION,
DISTRIBUTION OR COPYING OF THIS FAX IS STRICTLY PROHIBITED. IF YOU RECEIVE THIS FAX
IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN IT TO THE SENDER
ABOVE. THANK YOU.

**BARCLAYS CAPITAL LE OCC A/C**

| Statement Number | CSM081031023914 | Account Number | 890-0692-898 |
| --- | --- | --- | --- |
| Statement Period | 2008-10-01 - 2008-10-31 | Opening Book Balance | 817,865.00 |
| Page | 1 of | Total Credits | 5,158,731,082.23 |
| | | Total Debits | 5,159,548,947.23 |
| | | Closing Book Balance | 0.00 |

| Our Transaction Reference / Your Reference Related Reference Our Description | Beneficiary Name (BN) / By Order of Party (BO) / Ordering Bank (OB) / Other Information | Value Date YYMMDD | Entry Date YYMMDD | F | Debits (U.S. Dollars) | Credits (U.S. Dollars) | Balance (U.S. Dollars) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| GSE061001859B700 | OPENING BOOK BALANCE | 081001 | | | | | 817,865.00 |
| FTK061001460700 | OPENING AVAILABLE BALANCE | 081001 | | | | | 817,865.00 |
| FTK061001460700 | B/O:B2W BARCLAYS AVENUE | 081001 | | | | | |
| FSB0810013013202 | O/B:THE BANK OF NEW YORK MELLON | 081001 | | | | | |
| FTK061001135B700 | O/B:ABI/CXCMEUS4C | 081001 | S | | | |
| FTK091001128200 | CASH-REG 081001 | 081001 | S | 96,462,147.50 | 167,269,447.03 | |
| FTK091001128300 | BEN:THE OPTIONS CLEARING CORPORATI | 081001 | S | 60,866,282.00 | 4,565,470.00 | |
| FTK091001128400 | CASH-REG 081001 | 081001 | S | 12,047,750.00 | 1,752,897.68 | |
| +++1001112B/VR | BEN:THE OPTIONS CLEARING CORPORATI | 081001 | S | 4,422,617.71 | | |
| FTT051001389407 | BEN:CHICAGO MERCANTILE EXCHANGE | 081001 | S | 2,459,372.50 | | |
| BRA081001000900 | BEN:CHICAGO MERCANTILE EXCHANGE | 081001 | S | 136,490.00 | | |
| | BEN: *NO NAME GIVEN* | 081001 | | | | |
| | CLOSING BOOK BALANCE | 081001 | | | | 0.0 |
| | CLOSING AVAILABLE BALANCE | 081001 | | | | 0.0 |
| FTK06100218B700 | O/B:THE BANK OF NEW YORK MELLON | 081002 | | 12,785,567.50 | | |
| FTK061002159B700 | O/B:THE BANK OF NEW YORK MELLON | 081002 | | 11,184,728.00 | | |
| NONREF | O/B:ABI/CXCMEUS4C | 081002 | S | 3,674,026.03 | | |
| FSB061002809000 | O/B:ABI/CXCMEUS4C | 081002 | S | 5,666,000.00 | | |
| FSB081002809808 | BEN: *NO NAME GIVEN* | 081002 | S | | 285,000.00 | |
| BRA081002002500 | O/B:THE BANK OF NEW YORK MELLON | 081002 | S | | 118,335.00 | |
| FTK061002170700 | O/B: *NO NAME GIVEN* | 081002 | S | | 59,140.00 | |
| BRA081002001200 | BEN:THE OPTIONS CLEARING CORPORATI | 081002 | S | | | |
| CASH-REG 081002 | BEN:BARCLAYS CAPITAL | 081002 | S | 16,560,582.25 | | |
| FUTURES/OCC NET | BEN:CHICAGO MERCANTILE EXCHANGE | 081002 | S | 5,490,282.28 | | |
| +++1002111B/VR | BEN:CHICAGO MERCANTILE EXCHANGE | 081002 | S | 4,401,756.00 | | |
| +++1001F180B/VR | BEN:CHICAGO MERCANTILE EXCHANGE | 081002 | S | 1,671,287.50 | | |
| CASH-REG 081002 | BEN:THE OPTIONS CLEARING CORPORATI | 081002 | S | 1,516,169.00 | | |
| FNDS TRFR 081002 | BEN: *NO NAME GIVEN* | 081002 | S | 105,100.00 | | |
| CASH-REG 081002 | BEN:THE OPTIONS CLEARING CORPORATI | 081002 | S | 57,774.50 | | |
| | CLOSING BOOK BALANCE | 081002 | | | | 0.0 |
| | CLOSING AVAILABLE BALANCE | 081002 | | | | 0.0 |
| FTJ081003015035S | DBT:BARCLAYS CAPITAL | 081003 | | 14,560,345.25 | | |
| NONREF | O/B:ABI/CXCMEUS4C | 081003 | S | 2,543,473.75 | | |
| FTK061003178B200 | O/B:THE BANK OF NEW YORK MELLON | 081003 | S | 1,240,425.00 | | |
| BRA081003000000600 | O/B:THE BANK OF NEW YORK MELLON | 081003 | S | 116,604.00 | | |
| NONREF | O/B: *NO NAME GIVEN* | 081003 | S | 96,170.00 | | |
| CASH-REG 081003 | O/B:ABI/CXCMEUS4C | 081003 | S | 31,950.00 | | |
| CASH-REG 081003 | BEN:THE OPTIONS CLEARING CORPORATI | 081003 | S | 7,136,016.00 | | |
| FTT061003176B000 | BEN:THE OPTIONS CLEARING CORPORATI | 081003 | S | 6,637,758.00 | | |
| FTT081003303506 | BEN:CHICAGO MERCANTILE EXCHANGE | 081003 | S | 3,750,000.00 | | |
| FTT061003393402 | BEN:CHICAGO MERCANTILE EXCHANGE | 081003 | S | 715,550.00 | | |
| | CLOSING BOOK BALANCE | 081003 | | | | 0.0 |
| | CLOSING AVAILABLE BALANCE | 081003 | | | | 0.0 |
| FTJ081006126055S | DBT:BARCLAYS CAPITAL | 081006 | | 117,406,167.57 | | |
| NONREF | O/B:ABI/CXCMEUS4C | 081006 | S | 7,309,550.00 | | |
| FTK061006982100 | O/B:THE BANK OF NEW YORK MELLON | 081006 | S | 6,595,778.00 | | |
| FTK081006681900 | O/B:THE BANK OF NEW YORK MELLON | 081006 | S | 2,936,424.00 | | |
| NONREF | O/B:ABI/CXCMEUS4C | 081006 | S | 2,116,597.00 | | |
| FTK081006982400 | O/B:THE BANK OF NEW YORK MELLON | 081006 | S | 1,040,392.50 | | |
| BRA081006002100 | BO:ICE CLEAR US INC NYC | 081006 | S | 275,000.00 | | |

Statement Number: CSM08181310023914
Statement Period: 2008-10-01 - 2008-10-31

Page 2 of 8

Account Number: 890-0692-898

| | U.S. Dollars |
|---|---|
| Opening Book Balance | 817,865.00 |
| 131  Total Credits | 5,158,731,082.23 |
| 160  Total Debits | 5,159,548,947.23 |
| Closing Book Balance | 0.00 |

| Our Transaction Reference | Your Reference / Related Reference / Our Description | Beneficiary name (Ben)/ By Order of Party (B/O)/ Ordering Bank (O/B)/Other Information | Value Date YYMMDD | Date MMDD | F | Debits (U.S. Dollars) | Credits (U.S. Dollars) | Balance (U.S. Dollars) |
|---|---|---|---|---|---|---|---|---|
| BRU08100500014000 | BRU08100500014000 | BO:ICE CLEAR US INC NYC | | 081006 | S | 113,022,747.57 | | |
| FTK081061000001400 | CASH-REG 081006 | BEN:THE OPTIONS CLEARING CORPORATI | | 081006 | S | 14,696,090.00 | | |
| FTT081001838AR | +++10061H8SBAR | BEN:CHICAGO MERCANTILE EXCHANGE | | 081006 | S | 7,954,434.00 | | |
| FTT08100240902002 | +++10062RH122BAR | OB:THE BANK OF NEW YORK MELLON | | 081006 | S | 2,078,927.90 | | |
| FTK081061946100 | CASH-REG 081006 | BEN:THE OPTIONS CLEARING CORPORATI | | 081006 | S | | | |
| | | CLOSING AVAILABLE BALANCE | | 081006 | | | 250,290.00 | |
| | | CLOSING BOOK BALANCE | | 081006 | | | | 0.0 |
| FTK081072128800 | FTK081072128800 | O/B:THE BANK OF NEW YORK MELLON | | 081007 | S | 497,371,966.42 | 456,013,906.49 | |
| FTK081072215100 | FTK081072215100 | O/B:THE BANK OF NEW YORK MELLON | | 081007 | S | 14,674,469.64 | 58,992,427.00 | |
| FTK081072129890 | FTK081072128900 | O/B:THE BANK OF NEW YORK MELLON | | 081007 | S | 5,975,000.00 | 8,367,376.00 | |
| F2S08100730802 | NONREF | OB:ABCX/XCMEUS4C | | 081007 | S | 4,508,371.00 | 2,972,029.00 | |
| BRU05102700022700 | BRM08100700002700 | BO:ICE CLEAR US INC NYC | | 081007 | S | 1,856,800.00 | 915,000.00 | |
| FTJ08100720192800 | OCC-FUT FUNDING | BEN:BARCLAYS CAPITAL | | 081007 | S | 1,012,560.50 | | |
| FTK081072122600 | CASH-REG 081007 | BEN:THE OPTIONS CLEARING CORPORATI | | 081007 | S | 587,519.40 | | |
| BRU08109700001500 | FNDS TRFR 081007 | BEN:ICE CLEAR US INC NYC | | 081007 | S | 343,383.00 | | |
| FTK081072122700 | CASH-REG 081007 | BEN:THE OPTIONS CLEARING CORPORATI | | 081007 | S | 336,872.78 | | |
| FTT081002413108 | FNDS TRFR 081007 | BEN:ICE CLEAR US INC NYC | | 081007 | S | 263,855.00 | | |
| FTT0810024131106 | +++10071RH88BAR | BO:BARCLAYS CAPITAL INGM | | 081007 | S | 212,287.10 | | |
| ACD08100775811112 | F2C835 | BEN:CME          DEBIT FIRM A | | 081007 | S | 62,995.50 | | |
| FTT081007247400002 | +++10071H12BAR | BEN:CHICAGO MERCANTILE EXCHANGE | | 081007 | S | 40,125.01 | | |
| FTK081072157800 | CASH-REG 081007 | BEN:THE OPTIONS CLEARING CORPORATI | | 081007 | S | 12,416.05 | | |
| ACD08100771744808 | F01835 | BEN:CME          DEBIT FIRM A | | 081007 | S | 1,113.24 | | |
| ACD08100771747468 | F07858 | BEN:NYMEX        DEBIT FIRM A | | 081007 | S | 1,108.55 | | |
| FTK081072159900 | CASH-REG 081007 | BEN:THE OPTIONS CLEARING CORPORATI | | 081007 | S | | | |
| F04858 | F04858 | BO:COMEX        DEBIT FIRM A | | 081007 | S | | | |
| ACD08100771744730 | ++++100771H74473 | BEN:COMEX       DEBIT FIRM A | | 081007 | S | | | |
| FTK081072159000 | CASH-REG 081007 | BEN:THE OPTIONS CLEARING CORPORATI | | 081007 | S | | | |
| FTK081072160000 | CASH-REG 081007 | BEN:THE OPTIONS CLEARING CORPORATI | | 081007 | S | | | |
| | | CLOSING BOOK BALANCE | | 081007 | | | | |
| FTK081082464000 | FTK081082464000 | O/B:THE BANK OF NEW YORK MELLON | | 081008 | S | 269,785,666.00 | 304,000,000.00 | |
| FTK081082463900 | FTK081082463900 | O/B:THE BANK OF NEW YORK MELLON | | 081008 | S | 169,400,818.00 | 148,202,570.00 | |
| F2S081008808606 | NONREF | OB:ABCX/XCMEUS4C | | 081008 | S | 114,416,698.00 | 115,625,570.00 | |
| F2S081008668708 | NONREF | OB:ABCX/XCMEUS4C | | 081008 | S | 77,418,259.00 | 55,327,200.00 | |
| BRU08100800001000 | BRU08100800001000 | BO:ICE CLEAR US INC NYC | | 081008 | S | 3,375,217.00 | 11,014,150.00 | |
| BRM08100800002800 | BRM08100800002800 | BO:ICE CLEAR US INC NYC | | 081008 | S | 593,000.00 | 4,164,220.00 | |
| FTT081008129297100 | +++10071RH128BAR | BEN:CHICAGO MERCANTILE EXCHANGE | | 081008 | S | 22,686.00 | 395,000.00 | |
| FTT081008341100 | +++1007RH122BAR | OB:ABCX/XCMEUS4C | | 081008 | S | | | |
| FTK081008228500 | CASH-REG 081008 | BEN:THE OPTIONS CLEARING CORPORATI | | 081008 | S | | | |
| FTK081008244600 | CASH-REG 081008 | BEN:THE OPTIONS CLEARING CORPORATI | | 081008 | S | | | |
| FTK081008234500 | CASH-REG 081008 | BEN:THE OPTIONS CLEARING CORPORATI | | 081008 | S | | | |
| BRM08100800418000 | FNDS TRFR 081008 | BEN:ICE CLEAR US INC NYC | | 081008 | S | | | |
| FTK081008239700 | CASH-REG 081008 | BEN:THE OPTIONS CLEARING CORPORATI | | 081008 | S | | | |
| | | CLOSING AVAILABLE BALANCE | | 081008 | | | | |
| | | CLOSING BOOK BALANCE | | 081008 | | | | |
| FTK081009257670000 | FTK081009257670000 | O/B:THE BANK OF NEW YORK MELLON | | 081009 | S | 50,000,000.00 | 50,000,000.00 | 0.0 |
| F2S081009314200 | NONREF | OB:ABCX/XCMEUS4C | | 081009 | S | 27,797,949.00 | 27,797,949.00 | 0.0 |

# BARCLAYS CAPITAL LE OCC A/C

| | | |
|---|---|---|
| Statement Number | CSM08131002591 4 | Account Number 890-0692-898 |
| Statement Period | 2008-10-01 - 2008-10-31 | Opening Book Balance 817,865.00 |
| | x | 131 Total Credits 5,158,731,082.23 |
| Page 3 of 8 | | 160 Total Debits 5,159,548,947.23 |
| | | Closing Book Balance 0.00 |

| Our Transaction Reference | Your Reference / Related Reference / Our Description | Beneficiary name /Bank/ By Order of Party (B/O)/ Ordering Bank (OEB)/Other Information | Value Date YY/MM/DD | Date MMDD | F | Debits (U.S. Dollars) | Credits (U.S. Dollars) | Balance (U.S. Dollars) |
|---|---|---|---|---|---|---|---|---|
| FZS0310093574302 | NONREF | O/B:ABICXCMEUS4C | 081009 | | S | | 21,147,250.00 | |
| FTK0810092576900 | FTK0810095276900 | O/B:THE BANK OF NEW YORK MELLON | 081009 | | S | | 10,000,000.00 | |
| BRM0810092576900 | BRM0810090201300 | O/B:THE BANK OF NEW YORK MELLON | 081009 | | S | | 8,498,486.62 | |
| BRM0810090201300 | BRM0810090001300 | B/O:ICE CLEAR US INC NYC | 081009 | | S | | 1,904,648.00 | |
| BRM0810090002400 | BRM0810090002400 | BEN:THE OPTIONS CLEARING CORPORATI | 081009 | | S | | 1,080,000.00 | |
| FTK0810092516200 | CASH-REG 081009 | BEN:BARCLAYS CAPITAL | 081009 | | S | 75,780,705.25 | | |
| FTU0810095234655 | OCC-FUT FUNDING | BEN:CHICAGO MERCANTILE EXCHANGE | 081009 | | S | 26,602,604.57 | | |
| FTT0810092425304 | +++1103R1134BVR | BEN:CHICAGO MERCANTILE EXCHANGE | 081009 | | S | 13,132,190.00 | | |
| FTT0810093048005 | +++1003103SBAR | BEN:ICE CLEAR US INC NYC | 081009 | | S | 3,829,000.00 | | |
| BRM0810090004200 | FNDS TRFR 081009 | BEN:THE OPTIONS CLEARING CORPORATI | 081009 | | S | 806,000.00 | | |
| FTK0810092516400 | CASH-REG 081009 | BEN:THE OPTIONS CLEARING CORPORATI | 081009 | | S | 277,827.80 | | |
| | | CLOSING BOOK BALANCE | 081009 | | | | | 0.0 |
| | | CLOSING AVAILABLE BALANCE | 081009 | | | | | 0.0 |
| FZS0310014254806 | NONREF | O/B:ABICXCMEUS4C | 081010 | | S | | 104,819,597.50 | |
| FZS0310016620605 | NONREF | O/B:ABICXCMEUS4C | 081010 | | S | | 61,710,000.00 | |
| BRM0810010001500 | BRM0810100001500 | B/O:ICE CLEAR US INC NYC | 081010 | | S | | 6,946,250.00 | |
| FTK0810010269700 | FTK0810100269700 | O/B:THE BANK OF NEW YORK MELLON | 081010 | | S | | 6,377,247.00 | |
| BRM0810010002200 | BRM0810100002200 | B/O:ICE CLEAR US INC NYC | 081010 | | S | | 3,588,400.00 | |
| FZS0810014249101 | NONREF | O/B:ABICXCMEUS4C | 081010 | | S | | 1,758,213.00 | |
| ACC0810100538969 | B1164 | 081009 CSCE     CRED BRKRS | 081010 | | S | | 1,511,515.25 | |
| ACC0810100538884 | BLBI5 | 081009 NYMEX     CRED BRKRS | 081010 | | S | | 51,602.25 | |
| BLBI5 | BLBI5 | BLBI5     CRED BRKRS | 081010 | | S | | 2,506.25 | |
| FTU0810100306555 | OCC-FUT FUNDING | BEN:BARCLAYS CAPITAL | 081010 | | S | 58,279,728.98 | | |
| FTK0810100326300 | CASH-REG 081010 | BEN:THE OPTIONS CLEARING CORPORATI | 081010 | | S | 59,767,368.34 | | |
| FTK0810010289400 | CASH-REG 081010 | BEN:THE OPTIONS CLEARING CORPORATI | 081010 | | S | 477,213,000.00 | | |
| FTT0810010243932 | +++1010411268AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081010 | | S | 14,077,421.33 | | |
| FTK0810100703400 | CASH-REG 081010 | BEN:THE OPTIONS CLEARING CORPORATI | 081010 | | S | 8,754,600.00 | | |
| FTK0810100289700 | CASH-REG 081010 | BEN:THE OPTIONS CLEARING CORPORATI | 081010 | | S | 1,516,468.90 | | |
| | | BEN:THE OPTIONS CLEARING CORPORATI | 081010 | | S | 778,788.00 | | |
| | | CLOSING BOOK BALANCE | 081010 | | | | | |
| | | CLOSING AVAILABLE BALANCE | 081010 | | | | | |
| FTK0810143057700 | FTK0810142893900 | O/B:THE BANK OF NEW YORK MELLON | 081014 | | S | | 120,000,000.00 | |
| FTK0810142893900 | FTK0810142893900 | O/B:THE BANK OF NEW YORK MELLON | 081014 | | S | | 63,568,036.00 | |
| FTK0810014005800 | FTK0810014005800 | O/B:THE BANK OF NEW YORK MELLON | 081014 | | S | | 50,000,000.00 | |
| FZS0810014222906 | NONREF | O/B:ABICXCMEUS4C | 081014 | | S | | 10,440,000.00 | |
| FZS0810014940702 | FTK08141 42893300 | O/B:THE BANK OF NEW YORK MELLON | 081014 | | S | | 10,277,650.00 | |
| FZS0810014288300 | NONREF | B/O:ICE CLEAR US INC NYC | 081014 | | S | | 4,772,979.54 | |
| FZS0810012683140 1 | NONREF | O/B:ABICXCMEUS4C | 081014 | | S | | 4,660,550.00 | |
| BRA0810140002900 | BRA0810140002900 | B/O:ICE CLEAR US INC NYC | 081014 | | S | | 2,115,160.00 | |
| FTT0810014348005 | +++1013R1835BAR | BEN:CHICAGO MERCANTILE EXCHANGE | 081014 | | S | 195,305,817.50 | | |
| FTK0810143494606 | +++1010R1103BAR | BEN:CHICAGO MERCANTILE EXCHANGE | 081014 | | S | 37,800,032.50 | | |
| BRM0810140001700 | FNDS TRFR 081014 | BEN:ICE CLEAR US INC NYC | 081014 | | S | 14,125,780.00 | | |
| BRM0810140001500 | FNDS TRFR 081014 | BEN:ICE CLEAR US INC NYC | 081014 | | S | 10,855,710.00 | | |
| BRM0810140002300 | FNDS TRFR 081014 | BEN:CHICAGO MERCANTILE EXCHANGE | 081014 | | S | 6,354,590.00 | | |
| FTT0810143443002 | +++10141112BAR | BEN:BARCLAYS CAPITAL | 081014 | | S | 1,020,848.04 | | |
| FTU0810140367650 | OCC-FUT FUNDING | BEN:BARCLAYS CAPITAL | 081014 | | S | 504,689.04 | | |
| FTK0810142891500 | CASH-REG 081014 | BEN:THE OPTIONS CLEARING CORPORATI | 081014 | | S | 289,036.50 | | |
| FTU0810140311344 | 05 | BEN:BARCLAYS CAPITAL | 081014 | | S | 8,250.00 | | |

| Statement Number | CSM08103100023914 | Account Number | 890-0692-898 |
|---|---|---|---|
| Statement Period | 2008-10-01 - 2008-10-31 | Opening Book Balance | 817,865.00 |
| | | X    131  Total Credits | 5,158,731,082.23 |
| Page | 4 of 8 | 160  Total Debits | 5,159,548,947.23 |
| | | Closing Book Balance | 0.00 |

| Our Transaction Reference | Your Reference / Related Reference / Our Description | Beneficiary / By Order of Party (B/O)/ Ordering Bank (O/B)/Other Information | Value Date YY/MM/DD | Entry Date MM/DD | F | Debits (U.S. Dollars) | Credits (U.S. Dollars) | Balance (U.S. Dollars) |
|---|---|---|---|---|---|---|---|---|
| | | CLOSING BOOK BALANCE | 081014 | | | | | 1,028,450. |
| FTK06101153327500 | FTK06101153327500 | CLOSING AVAILABLE BALANCE | 081014 | | | | | 1,028,450. |
| F2S08101153096905 | NONREF | O/B:THE BANK OF NEW YORK MELLON | 081015 | | S | | 165,000,000.00 | |
| F2S08101153096905 | NONREF | O/B:ABC/XO/XEUS/4C | 081015 | | S | | 54,591,600.00 | |
| FTK08101153328900 | FTK08101153328900 | O/B:ABC/XO/XEUS/4C | 081015 | | S | | 24,451,900.00 | |
| BRM08101160028601 | BRM08101160028601 | O/B:THE BANK OF NEW YORK MELLON NYC | 081015 | | S | | 17,385,096.00 | |
| FTK08101153057100 | NONREF | O/B:ABC/XO/XEUS/4C | 081015 | | S | | 7,993,900.00 | |
| FTK08101153328900 | FTK08101153328900 | O/B:THE BANK OF NEW YORK MELLON | 081015 | | S | | 6,485,600.00 | |
| BRA08101160010600 | BRM08101159001600 | B/O:CE CLEAR US INC NYC | 081015 | | S | | 6,000,000.00 | |
| FTK08101153226400 | CASH-REG 081015 | O/B:THE OPTIONS CLEARING CORPORATI | 081015 | | S | 164,746,982.99 | | |
| FTJ08101159144655 | OCC:FUT FUNDING | BEN:BARCLAYS CAPITAL | 081015 | | S | 80,025,920.07 | | |
| FTK08101153225900 | CASH-REG 081015 | BEN:THE OPTIONS CLEARING CORPORATI | 081015 | | S | 28,847,594.00 | | |
| FTK08101153349103 | +++1015III138AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081015 | | S | 25,481,460.00 | | |
| BRA08101160009500 | CASH-REG 081015 | BEN:THE OPTIONS CLEARING CORPORATI | 081015 | | S | 5,122,096.94 | | |
| FTJ08101159107544 | FNDS TRFR 081015 | BEN:CE CLEAR US INC NYC | 081015 | | S | 668,500.00 | | |
| | 11 | BEN:BARCLAYS CAPITAL | 081015 | | S | 1,010.00 | | |
| | | CLOSING BOOK BALANCE | 081015 | | | | | 0.4 |
| | | CLOSING AVAILABLE BALANCE | 081015 | | | | | 0.0 |
| F2S08101166630605 | NONREF | O/B:ABC/XO/XEUS/4C | 081016 | | S | | 97,426,367.50 | |
| FTJ08101163125165 | FTJ08101163125165 | DBT:BARCLAYS CAPITAL | 081016 | | S | | 53,827,354.43 | |
| F2S08101169208600 | NONREF | O/B:ABC/XO/XEUS/4C | 081016 | | S | | 32,559,850.00 | |
| BRM08101160800800 | BRM08101160800800 | B/O:CE CLEAR US INC NYC | 081016 | | S | | 10,317,900.00 | |
| F2S08101169209705 | NONREF | O/B:ABC/XO/XEUS/4C | 081016 | | S | | 4,436,000.00 | |
| FTK08101163476500 | CASH-REG 081016 | BEN:THE OPTIONS CLEARING CORPORATI | 081016 | | S | 120,526,575.43 | | |
| FTK08101163476500 | CASH-REG 081016 | BEN:THE OPTIONS CLEARING CORPORATI | 081016 | | S | 57,761,013.09 | | |
| BRA08101160002400 | FNDS TRFR 081016 | BEN:CE CLEAR US INC NYC | 081016 | | S | 8,667,930.00 | | |
| BRA08101160020400 | FNDS TRFR 081016 | BEN:CE CLEAR US INC NYC | 081016 | | S | 4,655,090.00 | | |
| FTK08101163432202 | +++1016III128AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081016 | | S | 4,139,300.00 | | |
| BRM08101160767200 | CASH-REG 081016 | BEN:THE OPTIONS CLEARING CORPORATI | 081016 | | S | 3,014,763.10 | | |
| FTJ08101163131744 | 10 | BEN:BARCLAYS CAPITAL | 081016 | | S | 100.00 | | |
| | | CLOSING BOOK BALANCE | 081016 | | | | | 100.0 |
| | | CLOSING AVAILABLE BALANCE | 081016 | | | | | 100.0 |
| FTK08101173766700 | FTK08101173766700 | O/B:THE BANK OF NEW YORK MELLON | 081017 | | S | | 200,000,000.00 | |
| FTK08101173894900 | FTK08101173894900 | O/B:THE BANK OF NEW YORK MELLON | 081017 | | S | | 95,618,198.50 | |
| FTK08101173995100 | FTK08101173995100 | O/B:THE BANK OF NEW YORK MELLON | 081017 | | S | | 8,566,090.26 | |
| P3S08101172248900 | NONREF | O/B:ABC/XO/XEUS/4C | 081017 | | S | | 941,650.00 | |
| FTJ08101174989155 | CCC:FUT FUNDING | BEN:BARCLAYS CAPITAL | 081017 | | S | 188,285,204.26 | | |
| FTT08101173455900 | +++1016RI158AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081017 | | S | 69,695,242.50 | | |
| FTT08101173455200 | +++1016RI118AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081017 | | S | 20,216,106.00 | | |
| FTT08101173469023 | FNDS TRFR 081017 | BEN:CE CLEAR US INC NYC | 081017 | | S | 10,976,850.00 | | |
| FTT08101173469023 | +++1017II1338AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081017 | | S | 9,906,000.00 | | |
| BRM08101170023900 | FNDS TRFR 081017 | BEN:CHICAGO MERCANTILE EXCHANGE | 081017 | | S | 3,799,562.00 | | |
| FTJ08101174168944 | FNDS TRFR 081017 | BEN:CE CLEAR US INC NYC | 081017 | | S | 2,855,000.00 | | |
| | 10 | BEN:BARCLAYS CAPITAL | 081017 | | S | 9,900.00 | | |
| | | CLOSING BOOK BALANCE | 081017 | | | | | 0.0 |
| | | CLOSING AVAILABLE BALANCE | 081020 | | | | | 0.0 |
| FTK08102038351700 | FTK08102038351700 | O/B:THE BANK OF NEW YORK MELLON | 081020 | | S | | 126,915,776.00 | |

# BARCLAYS CAPITAL LE OCC A/C

| | |
|---|---|
| Statement Number | CSM08103100023914 |
| Statement Period | 2008-10-01 - 2008-10-31 |
| Account Number | 890-0692-898 |
| Opening Book Balance | 817,865.00 |
| Total Credits | 131 — 5,158,731,082.23 |
| Total Debits | 160 — 5,159,548,947.23 |
| Closing Book Balance | 0.00 |

Page 5 of 8

| Your Transaction Reference | Your Reference / Related Reference / Our Description | By Order of Party (B/O) / Ordering Bank (O/B) / Other Information | Value Date (YYMMDD) | Entry Date | F | Debits (U.S. Dollars) | Credits (U.S. Dollars) | Balance (U.S. Dollars) |
|---|---|---|---|---|---|---|---|---|
| FTK081020393939400 | FTK081020393939400 | O/B:THE BANK OF NEW YORK MELLON | 081020 | | S | | 122,005,120.00 | 0.0 |
| F2S081010256010009 | NONREF | O/B:ABICXXCXEUS4C | 081020 | | S | | 19,337,579.00 | 0.0 |
| BRM081020200001600 | BRM081020200001600 | B/O:JCE CLEAR US INC NYC | 081020 | | S | | 8,452,450.00 | |
| F2S081020257016002 | NONREF | O/B:ABICXXCXEUS4C | 081020 | | S | | 5,696,900.00 | |
| FTJ081020205858655 | FTJ/OCC FUNDING | O/B:ABICXXCXEUS4C | 081020 | | S | | | |
| FTK081020385456005 | CASH-REG 081020 | BEN:BARCLAYS CAPITAL | 081020 | | S | 126,237,436.06 | | |
| FTT081020346700xx | ++1020111354AR | BEN:THE OPTIONS CLEARING CORPORATI | 081020 | | S | 82,360,145.62 | | |
| FTK081020385547005 | ++1017RH1148A | BEN:CHICAGO MERCANTILE EXCHANGE | 081020 | | S | 29,350,000.00 | | |
| FTT081018346204 | ++1017RH1148A/R | BEN:THE OPTIONS CLEARING CORPORATI | 081020 | | S | 18,839,374.32 | | |
| FTK081020200200200 | FNDS TRFR 081020 | BEN:CHICAGO MERCANTILE EXCHANGE | 081020 | | S | 16,175,274.00 | | |
| FTK081020386328100 | CASH-REG 051020 | BEN:JCE CLEAR US INC NYC | 081020 | | S | 4,655,000.00 | | |
| | | BEN:THE OPTIONS CLEARING CORPORATI | 081020 | | S | 2,997,565.00 | | |
| | | CLOSING BOOK BALANCE | 081020 | | | | | |
| | | CLOSING AVAILABLE BALANCE | 081020 | | | | | |
| FTK081021414560 | FTK081021414560 | O/B:THE BANK OF NEW YORK MELLON | 081021 | | S | | 147,602,013.00 | |
| F2S081021675... | NONREF | DBT:BARCLAYS CAPITAL | 081021 | | S | | 56,996,240.07 | |
| F2S081021657307 | NONREF | O/B:ABICXXCXEUS4C | 081021 | | S | | 10,837,000.00 | |
| BRM081021040900 | BRM081021040900 | B/O:JCE CLEAR US INC NYC | 081021 | | S | | 18,181,500.00 | |
| FTK081021408650 | FTK081021408650 | O/B:THE BANK OF NEW YORK MELLON | 081021 | | S | | 6,425,000.00 | |
| FTK081021409000 | CASH-REG 081021 | BEN:THE OPTIONS CLEARING CORPORATI | 081021 | | S | 151,625,636.00 | | |
| FTT081021346730 | ++1020A1359AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081021 | | S | 67,242,180.00 | | |
| FTK081021408980 | CASH-REG 081021 | BEN:THE OPTIONS CLEARING CORPORATI | 081021 | | S | 38,559,480.00 | | |
| FTK081021446902 | CASH-REG 081021 | BEN:CHICAGO MERCANTILE EXCHANGE | 081021 | | S | 25,212,092.00 | | |
| | FNDS TRFR 081021 | BEN:CHICAGO MERCANTILE EXCHANGE | 081021 | | S | 11,563,356.00 | 1,175,420.93 | |
| | ++1020111129AM | BEN:JCE CLEAR US INC NYC | 081021 | | S | 8,328,630.00 | | |
| | | CLOSING BOOK BALANCE | 081021 | | | | | 0.0 |
| | | CLOSING AVAILABLE BALANCE | 081021 | | | | | 0.0 |
| FTK081022439700 | FTK081022439700 | O/B:THE BANK OF NEW YORK MELLON | 081022 | | S | | 227,180,859.00 | |
| FTJ081022005744 | FTJ081020206716105 | DBT:BARCLAYS CAPITAL | 081022 | | S | | 213,479,285.79 | |
| F2S081022113105 | NONREF | OB:ABICXXCXEUS4C | 081022 | | S | | 10,480,106.00 | |
| BRM081022200002000 | BRM081022200002000 | B/O:JCE CLEAR US INC NYC | 081022 | | S | | 9,280,000.00 | |
| F2S081022335307 | NONREF | OB:ABICXXCXEUS4C | 081022 | | S | | 8,929,827.50 | |
| FTJ081022005744 | FTJ081022009945 | DBT:BARCLAYS CAPITAL | 081022 | | S | | 3,873,000.00 | |
| FTJ081022735744 | FTJ081022735744 | DBT:BARCLAYS CAPITAL | 081022 | | S | | | |
| FTJ081027935944 | FTJ081027935944 | BEN:THE OPTIONS CLEARING CORPORATI | 081022 | | S | 240,368,824.00 | | |
| FTK081022235000 | CASH-REG 081022 | BEN:THE OPTIONS CLEARING CORPORATI | 081022 | | S | 230,245,528.54 | | |
| FTK081022224700 | CASH-REG 081022 | BEN:THE OPTIONS CLEARING CORPORATI | 081022 | | S | 13,556,489.75 | | |
| FTT081022472801 | ++1021111129AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081022 | | S | 13,041,840.00 | 16,500.00 | |
| FTT081022472800 | ++1021111129AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081022 | | S | 3,873,000.00 | 11,000.00 | |
| BRJ081022200001000 | FNDS TRFR 081022 | BEN:JCE CLEAR US INC NYC | 081022 | | S | 1,773,000.00 | | |
| | | BEN:JCE CLEAR US INC NYC | 081022 | | S | 583,770.00 | | |
| | | CLOSING BOOK BALANCE | 081022 | | | | | 0.01 |
| | | CLOSING AVAILABLE BALANCE | 081022 | | | | | 0.01 |
| FTK081023453370 | FTK081023453370 | O/B:THE BANK OF NEW YORK MELLON | 081023 | | S | | 116,166,012.00 | |
| F2S081023276805 | NONREF | OB:ABICXXCXEUS4C | 081023 | | S | | 51,772,615.00 | |
| BRM081023000002000 | BRM081023000002000 | B/O:JCE CLEAR US INC NYC | 081023 | | S | | 13,305,400.00 | |
| FTK081023445400 | FTK081023445400 | O/B:THE BANK OF NEW YORK MELLON | 081023 | | S | | 6,495,942.73 | |

| Statement Number | CSM08103102023914 |
|---|---|
| Statement Period | 2008-10-01 - 2008-10-31 |
| Page | 6 of 8 |

| Account Number | 890-0692-898 |
|---|---|
| Opening Book Balance | 817,865.00 |
| X 131 Total Credits | 5,158,731,082.23 |
| 160 Total Debits | 5,159,548,947.23 |
| 8 Closing Book Balance | 0.00 |

| Your Transaction Reference | Your Reference / Related Reference / Our Description | By Order of Party (BO)/Ordering Bank (O/B)/Other Information | Value Date YYMMDD | Entry Date MMDD | F | Debits (U.S. Dollars) | Credits (U.S. Dollars) | Balance (U.S. Dollars) |
|---|---|---|---|---|---|---|---|---|
| BRN08I1023000101000 | BRX08I1023000101000 | BO/JCE CLEAR US INC NYC | 081023 | | S | | | |
| F2S08I0233455504 | NONREF | O/B/ABICXCXUEU54C | 081023 | | S | | 4,848,000.00 | |
| FTK08I0234348500 | CASH-REG 081023 | BEN/THE OPTIONS CLEARING CORPORATI | 081023 | | S | 125,394,061.00 | 972,400.00 | |
| FTU08I0233477002 | OCCFUT FUNDING | BEN/BARCLAYS CAPITAL | 081023 | | S | 22,589,365.05 | | |
| FTK08I0284451400 | +++I022RH12BAR | BEN/CHICAGO MERCANTILE EXCHANGE | 081023 | | S | 15,281,580.00 | | |
| FTT08I0233481200 | CASH-REG 081023 | BEN/THE OPTIONS CLEARING CORPORATI | 081023 | | S | 9,840,428.00 | | |
| ACD08I0283281350 | +++I023I1111BAR | BEN/CHICAGO MERCANTILE EXCHANGE | 081023 | | S | 358,798.00 | | |
| ACD08I0283207150 | F02084 | 08I022 CME DEBIT FRM | 081023 | | S | 159,911.00 | | |
| FTJ08I0281291444 | F02835 | 08I022 CME DEBIT FRM | 081023 | | S | 155,506.70 | | |
| | 07 | BEN/BARCLAYS CAPITAL | 081023 | | S | 29,500.00 | | 29,500.0 |
| | | CLOSING BOOK BALANCE | 081023 | | | | | 29,500.00 |
| | | CLOSING AVAILABLE BALANCE | 081024 | | | | | |
| F2S08I0248753465 | NONREF | O/B/ABICXCXUEU54C | 081024 | | S | | 50,448,000.00 | |
| FDF08I0240948200 | BO/CF 0810/24 | BO/JPMORGANCHASE2/08 DEF K NEW Y | 081024 | | S | | 19,000,000.00 | |
| F2S08I0248753200 | NONREF | O/B/ABICXCXUEU54C | 081024 | | S | | 8,580,500.00 | |
| BRN08I0240002100 | BRX08I1024000202100 | BEN/THE BANK OF NEW YORK MELLON | 081024 | | S | | 5,360,000.00 | |
| FTK08I0284484100 | FTK08I0244844100 | O/B/ABICXCXUEU54C | 081024 | | S | | 5,102,055.66 | |
| F2S08I0246284102 | NONREF | BEN/THE BANK OF NEW YORK MELLON | 081024 | | S | | 3,775,726.00 | |
| FTK08I0244844300 | FTK08I0244644900 | BEN/BARCLAYS CAPITAL | 081024 | | S | | 2,928,457.57 | |
| FTU08I0242452855 | OCCFUT FUNDING | BEN/CHICAGO MERCANTILE EXCHANGE | 081024 | | S | 68,235,593.73 | | |
| FTT08I0243482207 | +++I028RH27BAR | BEN/JCE CLEAR US INC NYC | 081024 | | S | 18,615,892.50 | | |
| BRN08I0240001100 | FNDS TRFR 081024 | BEN/THE OPTIONS CLEARING CORPORATI | 081024 | | S | 4,927,210.00 | | |
| FTK08I0246832200 | CASH-REG 081024 | BEN/BARCLAYS CAPITAL | 081024 | | S | 3,056,295.00 | | |
| BRN08I0240001200 | 12 | BEN/JCE CLEAR US INC NYC | 081024 | | S | 165,287.50 | | |
| | FNDS TRFR 081024 | | 081024 | | S | 99,000.00 | | |
| | | CLOSING BOOK BALANCE | 081024 | | | | | 165,287.5 |
| | | CLOSING AVAILABLE BALANCE | 081024 | | | | | 165,287.5 |
| FTJ08I0278340655 | FTJ08I0278340655 | DBT/BARCLAYS CAPITAL | 081027 | | S | | | |
| F2S08I0289334105 | NONREF | BO/JCE CLEAR US INC NYC | 081027 | | S | | 26,394,621.99 | |
| BRN08I0270001000 | BRX08I0270001000 | BEN/CHICAGO MERCANTILE EXCHANGE | 081027 | | S | | 23,830,542.50 | |
| FTK08I0274921100 | +++I027I1111BAR | BEN/THE OPTIONS CLEARING CORPORATI | 081027 | | S | | 7,075,550.00 | |
| FTK08I0274922500 | CASH-REG 081027 | BEN/THE OPTIONS CLEARING CORPORATI | 081027 | | S | 18,774,000.00 | | |
| FTT08I0283485702 | +++I024RH12BAR | BEN/CHICAGO MERCANTILE EXCHANGE | 081027 | | S | 11,807,571.00 | | |
| FTK08I0274822003 | CASH-REG 081027 | BEN/THE OPTIONS CLEARING CORPORATI | 081027 | | S | 8,046,846.50 | | |
| BRN08I0270001900 | FNDS TRFR 081027 | BEN/JCE CLEAR US INC NYC | 081027 | | S | 6,297,090.00 | | |
| FTT08I0274291900 | BRX08I0270001900 | BEN/CHICAGO MERCANTILE EXCHANGE | 081027 | | S | 5,026,079.49 | | |
| BRN08I0270101200 | +++I028I1111BAR | BEN/JCE CLEAR US INC NYC | 081027 | | S | 4,927,210.00 | | |
| | FNDS TRFR 081027 | | 081027 | | S | 3,350,000.00 | | |
| | | | 081027 | | S | 594,200.00 | | |
| | | | 081027 | | S | 10,500.00 | | |
| | | CLOSING BOOK BALANCE | 081028 | | | | | |
| | | CLOSING AVAILABLE BALANCE | 081028 | | | | | |
| F2S08I0282882506 | NONREF | O/B/ABICXCXUEU54C | 081028 | | S | | 64,864,817.50 | |
| FTK08I0285095800 | FTK08I0285095800 | O/B/THE BANK OF NEW YORK MELLON | 081028 | | S | | 44,545,561.00 | |
| BRN08I0280002900 | BRX08I0280025000 | BO/JCE CLEAR US INC NYC | 081028 | | S | | 13,657,270.00 | |
| FTK08I0285025000 | BRX08I0280025000 | O/B/THE BANK OF NEW YORK MELLON | 081028 | | S | | 4,536,512.74 | |
| ACC08I0283483574 | F01635 | 08I027 CME CREDIT FRM | 081028 | | S | | 432,029.91 | |
| FTJ08I0285057144 | FTJ08I0285057144 | DBT/BARCLAYS CAPITAL | 081028 | | S | | 165,287.50 | |
| FTT08I0283498605 | +++I028I1125BAR | BEN/CHICAGO MERCANTILE EXCHANGE | 081028 | | S | 38,924,060.00 | | 0.01 |
| | | | | | | | | 0.01 |

BARCLAYS CAPITAL LE OCC A/C

| | |
|---|---|
| Statement Number | CSM08I0310023914 |
| Statement Period | 2008-10-01 - 2008-10-31 |
| Account Number | 890-0692-898 |
| Opening Book Balance | 817,865.00 |
| Total Credits | 5,158,731,082.23 |
| Total Debits | 5,159,548,947.23 |
| Closing Book Balance | 0.00 |

Page    7    of    8

| Our Transaction Reference / Your Reference Related Reference Our Description | Beneficiary name Usety By Order of Party (B/O)/ Ordering Bank (O/B)/Other Information | Value Date YY/MM/DD | Entry Date MM/DD | F | Debits (U.S. Dollars) | Credits (U.S. Dollars) | Balance (U.S. Dollars) |
|---|---|---|---|---|---|---|---|
| FTJ0810295007755 / OCC/FUT FUNDING | BEN:BARCLAYS CAPITAL | 081028 | | S | 36,156,858.33 | | |
| FTK0810285017300 / CASH-REG 081028 | BEN:THE OPTIONS CLEARING CORPORATI | 081028 | | S | 36,459,441.00 | | |
| FTK0810285016408 / CASH-REG 081028 | BEN:THE OPTIONS CLEARING CORPORATI | 081028 | | S | 5,752,574.00 | | |
| FTU0810283493102 / +++0027R11128AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081028 | | S | 5,635,720.00 | | |
| BRM0810290020001800 / FNDS TRFR 081028 | BEN:ICE CLEAR US INC NYC | 081028 | | S | 4,570,000.00 | | |
| FTT0810234505702 / +++0138R11128AR | BEN:ICE CLEAR US INC NYC | 081028 | | S | 2,500,500.00 | | |
| FTK0810285017200 / CASH-REG 081028 | BEN:THE OPTIONS CLEARING CORPORATI | 081028 | | S | 259,117.82 | | |
| | CLOSING AVAILABLE BALANCE | 081028 | | | | | 165,287.5 |
| | CLOSING BOOK BALANCE | 081028 | | | | | 165,287.5 |
| FZS0810298582A206 / NONREF | O/B:ABC/XCMEUSAC | 081029 | | S | | 166,845,430.00 | |
| FTK0810296242800 / FTK0810296242800 | BEN:THE OPTIONS CLEARING CORPORATI | 081029 | | S | | 105,082,872.00 | |
| FZS0810298252R1455 / FTJ0810296251455 | BEN:THE OPTIONS CLEARING CORPORATI | 081029 | | S | | 100,934,247.10 | |
| FZS0810298582A2602 / NONREF0004432400 | O/B:ABC/XCMEUSAC | 081029 | | S | | 1,175,823.00 | |
| FTK0810295168400 / CASH-REG 081029 | BEN:THE OPTIONS CLEARING CORPORATI | 081029 | | S | 327,569,302.00 | | |
| BRM0810290020001100 / FNDS TRFR 081029 | BEN:CHICAGO MERCANTILE EXCHANGE | 081029 | | S | 17,318,119.90 | | |
| FTK0810295169500 / CASH-REG 081029 | BEN:THE OPTIONS CLEARING CORPORATI | 081029 | | S | 2,395,119.00 | | |
| BRM0810290020002000 / FNDS TRFR 081029 | BEN:ICE CLEAR US INC NYC | 081029 | | S | 2,380,400.00 | | |
| FTK0810295168300 / CASH-REG 081029 | BEN:THE OPTIONS CLEARING CORPORATI | 081029 | | S | 1,742,798.60 | | |
| BRM0810290020001200 / FNDS TRFR 081029 | BEN:ICE CLEAR US INC NYC | 081029 | | S | 447,000.00 | | |
| FTT0810293503300 / +++0291R11118AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081029 | | S | 370,800.00 | | |
| | CLOSING AVAILABLE BALANCE | 081029 | | | | | 0.0 |
| | CLOSING BOOK BALANCE | 081029 | | | | | 0.0 |
| FTJ0810307503855 / NONREF | DBT:BARCLAYS CAPITAL | 081030 | | S | | 103,121,229.08 | |
| FZS0810301569904 / NONREF | O/B:ABC/XCMEUSAC | 081030 | | S | | 10,318,400.00 | |
| FTK0810306361000 / FTK0810306361000 | BEN:THE BANK OF NEW YORK MELLON | 081030 | | S | | 5,352,977.95 | |
| BRM0810306001100 / BRM0810306001100 | BEN:THE BANK OF NEW YORK MELLON | 081030 | | S | | 1,585,710.00 | |
| FTK0810305420400 / FTK0810305420400 | BEN:THE BANK OF NEW YORK MELLON | 081030 | | S | | 1,105,536.00 | |
| FTK0810305581300 / FTK0810305581300 | BEN:THE BANK OF NEW YORK MELLON | 081030 | | S | | 1,031,228.99 | |
| FTK0810304592900 / +++0029R11126AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081030 | | S | 68,559,090.00 | | |
| FTT0810304105 / +++0029R11128AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081030 | | S | 23,550,890.00 | | |
| BRM0810300001900 / FNDS TRFR 081030 | BEN:ICE CLEAR US INC NYC | 081030 | | S | 14,408,739.00 | | |
| FTK0810303507100 / +++0301R11118AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081030 | | S | 7,950,400.00 | | |
| BRM0810300001200 / FNDS TRFR 081030 | BEN:ICE CLEAR US INC NYC | 081030 | | S | 4,585,965.00 | | |
| | | 081030 | | S | 3,640,400.00 | | |
| | CLOSING AVAILABLE BALANCE | 081030 | | | | | 0.00 |
| | CLOSING BOOK BALANCE | 081030 | | | | | 0.00 |
| FTJ0810311138255 / FTJ0810311138255 | DBT:BARCLAYS CAPITAL | 081031 | | S | | 211,559,859.34 | |
| FZS0810312105607 / NONREF | O/B:ABC/XCMEUSAC | 081031 | | S | | 48,205,575.00 | |
| FTK0810315509500 / FTK0810315509500 | BEN:THE BANK OF NEW YORK MELLON | 081031 | | S | | 1,580,701.00 | |
| CASH-REG 081031 / CASH-REG 081031 | BEN:THE OPTIONS CLEARING CORPORATI | 081031 | | S | 206,399,152.00 | | |
| FTT0810313507402 / +++0106R11128AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081031 | | S | 25,826,861.00 | | |
| FTK0810315537900 / CASH-REG 081031 | BEN:THE OPTIONS CLEARING CORPORATI | 081031 | | S | 12,722,679.00 | | |
| BRM0810310001800 / FNDS TRFR 081031 | BEN:ICE CLEAR US INC NYC | 081031 | | S | 5,760,000.00 | | |
| FTK0810315540000 / CASH-REG 081031 | BEN:ICE CLEAR US INC NYC | 081031 | | S | 1,547,675.34 | | |
| FTT0810315106303 / +++0031R11128AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081031 | | S | 1,590,076.00 | | |
| FTT0810315106606 / +++0131R11128AR | BEN:CHICAGO MERCANTILE EXCHANGE | 081031 | | S | 917,000.00 | | |
| | CLOSING BOOK BALANCE | 081031 | | | | | 0.0 |



Statement Number    CSM08103190023914
Statement Period    2008-10-01 - 2008-10-31

Account Number    890-0692-898
Opening Book Balance    817,865.00
X    131    Total Credits    5,158,731,082.23
160    Total Debits    5,159,548,947.23
Closing Book Balance    0.00

Page    8 of    8

| Our Transaction Reference | Your Reference Related Reference Our Description | Beneficiary Name (BEN) By Order of Party (B/O)/ Ordering Bank (O/B)/Other Information | Value Date YY/MM/DD | Entry Date MM/DD | F | Debits (U.S. Dollars) | Credits (U.S. Dollars) | Balance (U.S. Dollars) |
|---|---|---|---|---|---|---|---|---|
| | | CLOSING AVAILABLE BALANCE | 081031 | | | | | 0.00 |

# BCI EXHIBIT

# 355

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

Debtors.

Chapter 11 Case No.

08-13555 (JMP)

(Jointly Administered)

## DECLARATION OF ARCHIBALD COX

I, Archibald Cox, pursuant to 28 U.S.C. § 1746 declare as follows:

1.      I make this declaration on my personal knowledge.  If called to testify, I would testify competently as follows.

2.      In September 2008, I was Chairman of the Americas for Barclays.  In connection with the September 22, 2008 sale transaction between Lehman and Barclays, I was one of several Barclays representatives involved in the negotiations with Lehman.

3.      In my role in the negotiations, I was aware of Barclays' effort to immediately retain eight or nine of the top executives at Lehman.

4.      Barclays considered it urgent to retain these individuals for numerous reasons.  Barclays at that time had a relatively small presence in the United States in the types of business being acquired by Barclays.  The top individuals at Lehman had substantial institutional knowledge of those businesses and further were seen as influential to retention of Lehman's clients and subordinate employees.  In addition, during the negotiations, top executives at Lehman were already being approached by Barclays' competitors and recruited away.  Dissipation of clients, employees and institutional knowledge through loss of top executives to Barclays' competitors could

have been devastating to the business being acquired by Barclays.  It therefore was

critical to Barclays immediately to retain as many of the top executives as possible.

5.    Barclays did not make offers to or retain top executives in bad faith for the

purpose of influencing those individuals' actions during the negotiation process.

I declare under penalty of perjury that the foregoing is true and correct.  Executed

this 20th day of January, 2010, at New York, New York.

_____

Archibald Cox, Jr.

2

# BCI EXHIBIT

# 356

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF PAUL EXALL

I, Paul Exall, pursuant to 28 U.S.C. § 1746 declare as follows:

1.    I make this declaration on my personal knowledge.  If called to testify, I would testify competently as follows.

2.    I am currently Head of Compensation Analytics across Investment Banking and Investment Management at Barclays Capital.  My job, in 2008, entailed managing aspects of the compensation of former Lehman employees who transferred to Barclays as a result of the sale transaction between Lehman and Barclays in September 2008.

3.    Records available to me indicate that Robert Azerad's 2007 compensation from Lehman included ███████ base salary, ███████ cash bonus, and ███████ equity bonus.  Mr. Azerad's 2008 compensation from Barclays included ███████ annual salary and ███████ cash bonus.

4.    Records available to me indicate that Gerald Donini's 2007 compensation from Lehman included ███████ base salary, ███████ cash bonus, and ███████ equity bonus.  Mr. Donini became the head of U.S. Equities for LBI in 2008, succeeding

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

Bart McDade.  After Barclays' acquisition of LBI's U.S. broker dealer business, Mr.

Donini became Global Head of Equities at Barclays Capital.

5.    Records available to me indicate that Eric Felder's 2007 compensation

from Lehman included ███████ base salary, ████████ cash bonus, and ████████

equity bonus.  My records indicate that Mr. Felder received a 2008 guaranteed cash

bonus advance from Lehman of ████████ that I understand Mr. Felder subsequently

repaid to Lehman.  As a result, Barclays matched his 2008 compensation at Lehman by

offering him the same guaranteed cash bonus and annual salary.

6.    Records available to me indicate that Joseph Gatto's 2007 compensation

from Lehman included ███████ base salary, ████████ cash bonus, and ████████

equity bonus.

7.    Records available to me indicate that Michael Gelband's 2007

compensation from Lehman included ████████ base salary and no bonus.  I understand

that Mr. Gelband was terminated in 2007 and rehired on or about June 25, 2008, with a

salary of ████████, but no bonus agreement.  Mr. Gelband came to Barclays in 2008, but

did not sign an employment agreement, although the draft employment agreement for Mr.

Gelband included a 2008 bonus of ████████  Mr. Gelband left Barclays in October

2008 and was paid ████████ as part of his separation agreement.

8.    Records available to me indicate that Steven Hash's 2007 compensation

from Lehman included ███████ base salary, ████████ cash bonus, and ████████

equity bonus.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

9.    Records available to me indicate that Thomas Humphrey's 2007 compensation from Lehman included ▄▄▄▄ base salary, ▄▄▄▄ cash bonus, and ▄▄▄▄ equity bonus.

10.    Records available to me indicate that Alex Kirk's 2007 compensation from Lehman included ▄▄▄▄ base salary, ▄▄▄▄ cash bonus, and ▄▄▄▄ equity bonus. Mr. Kirk originally joined Barclays but did not sign an agreement. He left in November 2008 and was paid ▄▄▄▄ as part of his separation agreement.

11.    Records available to me indicate that Hyung Lee's 2007 compensation from Lehman included ▄▄▄▄ base salary, ▄▄▄▄ cash bonus, and ▄▄▄▄ equity bonus. Shortly after Mr. Lee signed his Barclays' employment agreement in 2008, Barclays made the decision to terminate Mr. Lee's employment. The employment agreement provided for Mr. Lee to receive a guaranteed bonus of ▄▄▄▄ and a two year Special Cash Award of ▄▄▄▄ Upon termination, a dispute arose regarding Barclays' obligations regarding the Special Cash Award. Mr. Lee pursued litigation, and in settlement, Barclays paid Mr. Lee ▄▄▄▄ Special Cash Award.

12.    Records available to me indicate that Ajay Nagpal's 2007 compensation from Lehman included ▄▄▄▄ base salary, ▄▄▄▄ cash bonus, and ▄▄▄▄ equity bonus.

13.    Records available to me indicate that Paul Parker's 2007 compensation from Lehman included ▄▄▄▄ base salary, ▄▄▄▄ cash bonus, and ▄▄▄▄ equity bonus.

3

## CONTAINS HIGHLY CONFIDENTIAL INFORMATION

14.    Records available to me indicate that James Seery's 2007 compensation from Lehman included ███████ base salary, ███████ cash bonus, and ███████ equity bonus.

15.    Records available to me indicate that Mark Shafir's 2007 compensation from Lehman included ███████ base salary, ███████ cash bonus, and ███████ equity bonus.

16.    Records available to me indicate that Mark Shapiro's 2007 compensation from Lehman included ███████ base salary, ███████ cash bonus, and ███████ equity bonus.

17.    Records available to me indicate that Ros Stephenson's 2007 compensation from Lehman included ███████ base salary, ███████ cash bonus, and ███████ stock bonus.

18.    Records available to me indicate that Jeffrey Weiss' 2007 compensation from Lehman included ███████ base salary, ███████ cash bonus, and ███████ equity bonus.

19.    Records available to me indicate that Larry Wieseneck's 2007 compensation from Lehman included was ███████ base salary, ███████ cash bonus, and ███████ equity bonus.

20.    Records available to me indicate that Daniel Fleming's 2007 compensation from Lehman included ███████ base salary, ███████ cash bonus, and ███████ equity bonus.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

21.    Records available to me indicate that John Coghlan's 2007 compensation
from Lehman included ████ base salary, ████ cash bonus, and ████
equity bonus.

22.    Records available to me indicate that James Hraska's 2007 compensation
from Lehman included ████ base salary, ████ cash bonus, and ████ equity
bonus.

23.    Records available to me indicate that Bart McDade joined Barclays, but
did not sign an employment agreement. He received base salary at a rate of ████ per
year, which was the same as his 2007 Lehman base salary. He did not receive a 2008
bonus payment.

24.    Records available to me indicate that when Paolo Tonucci joined
Barclays, his title was U.S. Treasurer. Mr. Tonucci was promoted to Head of Group
Balance Sheet at Barclays on or about February 2009.

I declare under penalty of perjury that the foregoing is true and correct. Executed
this 22d day of January, 2010, in London, England.

Paul Exall

5

# BCI EXHIBIT

# 357

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>                                        Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>                                        Debtor. | Case No. 08-01420 (JMP) |

## DECLARATION OF GARY ROMAIN

I, Gary Romain, declare as follows:

1.      I submit this affidavit in support of Barclays' Opposition to the Rule 60 motions filed by the Debtor, the SIPC Trustee, and the Official Committee of Unsecured Creditors ("the Committee").

2.      This affidavit explains the process of attempting to formulate the acquisition balance sheet for the Barclays acquisition of Lehman's North American broker-dealer business, and also explains the negative goodwill number ultimately reported by Barclays in the acquisition balance sheet reported in February 2009.

3.      During the week of September 15, 2008, I was in New York and involved in attempting to formulate estimates for the acquisition balance sheet for the Barclays acquisition of the Lehman North American broker-dealer and investment banking business.  I attempted to formulate these estimated balance sheets based upon information

provided to me by business representatives involved in the transaction, principally
Stephen King.

4.      The process of estimating the acquisition balance sheet was filled with
guesswork and approximations, and involved constantly changing inputs. Prior to the
closing, it was in my view never completely certain that the transaction necessarily would
generate negative goodwill, and certainly was never certain what the amount of such
negative goodwill might be. Indeed, it took several months after the closing to complete
a proper valuation and accounting for all of the assets acquired in the deal, and it was not
until that work was complete that we could arrive at a fair level of confidence as to what
the value of the acquired assets really was, and what the negative goodwill number really
was.

5.      It was never my understanding that we would account for assets using the
carrying values for those assets on the Lehman books. Rather, my understanding was
that we would recognise assets at fair value in accordance with our own accounting and
valuation methodologies. This would require the relevant business teams to perform a
valuation of the acquired financial assets, which is then verified by our Product Control
Group ("PCG"). This process ended up taking several months after the acquisition,
because many of the assets we acquired were illiquid assets, such as structured financial
products, which took significant time to value accurately.

6.      During the negotiations of the original Asset Purchase Agreement
("APA") over the days of September 15 and 16, I received information regarding the
assets that were expected at that point to be included in the transaction. The information
I received showed that our business teams believed the financial inventory was worth less

than the carrying value on the Lehman books. In formulating my initial estimates of the acquisition accounting and potential negative goodwill number, I used the fair value estimates of our risk managers, not the higher carrying value for those assets on the Lehman books. It was never my understanding or expectation that Barclays would "mark up" the assets to the carrying value on the Lehman books.

7.    This can be seen in an initial calculation I performed during the middle of the night between September 15 and 16, 2008, which was e mailed by me (using Tom McCosker's e mail account) to a number of Barclays finance professionals (in a document carrying Bates number BCI-EX-(S)-00023761). In that calculation, it was noted that there was approximately a $3.5 billion "valuation adjustment" from the "carrying amount" (which may have reflected the carrying amount as of some date on the Lehman books) for the financial inventory that was at that point understood be part of the acquisition – from approximately $64 billion to approximately $60.5 billion. As shown in that document, my calculations of the potential acquisition balance sheet and potential negative goodwill number therefore used $60.5 billion as the estimate for the value of this inventory on our balance sheet, not the higher "carrying amount".

8.    The difference between the "carrying amount" and the amount our business teams believed to be the fair value of the assets was not a "discount" from fair value. If there was any adjustment from the carrying amount, it is my understanding that reflected the fact that our business teams believed the carrying amounts were too high (either because the Lehman marks had not been updated or for any other reason, including legitimate differences of opinion regarding the value of certain illiquid assets included in the financial inventory).

9.    I do not recall any discussion in connection with the Barclays-Lehman acquisition of a $5 billion discount. I was never told that Barclays would be able to record negative goodwill in the transaction by virtue of our ability to recognise the financial inventory at $5 billion higher than the amount estimated to be the value of the assets in the negotiations with Lehman.

10.    I have reviewed the "Board discussion materials" entitled "Project Long Island," and dated as of September, 2008. I understand these materials were prepared for and presented to the board of directors of Barclays in order to obtain approval for the Lehman acquisition. The information included in these materials was later revised in a number of respects. For example, the numbers in the board materials refer to Barclays receiving $6.5 billion of mortgage assets. The APA's definition of Long Positions does not include any amount for mortgage securities, and therefore it is not an appropriate comparison to compare the APA's estimated value of $70 billion for the Long Positions with the $75 billion in the Barclays board deck. Indeed, for this comparison to make sense, it would seem necessary to extract out the mortgages from the board deck, which would result in a total asset value estimate of less than $70 billion. Thus, as with all of the other initial attempts to summarise the financial inventory being acquired in the sale, the "Board discussion materials" represented an initial estimate that was subsequently revised in significant respects.

11.    By Friday, September 19, 2008, I became aware that Barclays had engaged in a transaction to replace the "repo" loan of the Federal Reserve Bank of New York ("New York Fed"), and that under this transaction Barclays had advanced $45 billion in cash to Lehman, and had received securities as "repo collateral" in exchange.

At around the same time, I learned that the financial inventory being acquired in the deal was going to include the repo collateral as well as certain other assets that were to be documented in a letter agreement, and that the initial inventory that had been discussed and estimated at the beginning of the week was not available to transfer in the amounts originally discussed. During the weekend of September 20-22, 2008, I began to receive information regarding the estimated values of the repo collateral and other assets Barclays was acquiring in the transaction.

12.    The securities in the repo collateral included many assets that had not yet been reviewed by Barclays risk managers, and that carried "marks" from either Lehman or one of the custodian banks involved in the repo transaction – JP Morgan Chase ("JPM") or Bank of New York Mellon ("BNYM"). Many of these assets were illiquid and did not have readily obtainable trading values. Thus, in making initial estimates for the acquisition balance sheet at and around the time of the closing, I would provide the "marked" value of the inventory (as marked by the repo custodian banks), as well as an estimated "valuation adjustment" to show the rough estimate regarding the likely need to write down these assets. These were very preliminary estimates, however, and did not reflect the proper valuation work that would subsequently be performed by the business teams and verified by PCG.

13.    After the closing, the process of finalising this acquisition balance sheet was very time consuming and prolonged. The complexity of the transaction, the illiquid nature of many of the securities, and the fact that Barclays had poor information regarding many of the assets in the deal made it difficult to finalise the acquisition balance sheet for several months. For example, it took months for Barclays to determine

the identity and value of all of the assets associated with the exchange-traded derivatives

accounts it had acquired.  Similarly, it was not until December 2008 that Barclays

resolved its dispute with JP Morgan and LBI over the $7 billion shortfall in the repo

transaction.  In addition, throughout this time period, I received information and updates

from the business teams and PCG professionals who were involved in identifying and

valuing the various categories of assets acquired by Barclays in the transaction.

14.    On February 9, 2009, Barclays filed its SEC Form 6-K, and included in

that form a public filing of its acquisition balance sheet showing the assets and liabilities

recorded as part of the Lehman acquisition.  That acquisition balance sheet was published

in pounds sterling, but when converted into dollar terms (using the exchange rate in effect

as of that date), it lists total assets of $59.1 billion and total liabilities and consideration of

just over $54.7 billion, plus $300 million in equity-settled share schemes.  This published

acquisition balance sheet showed a total gain on the acquisition of just over £2.2 billion,

which corresponded to just over $4.1 billion.

15.    During the course of the Rule 2004 discovery that took place in July,

August and September of 2009, we produced back up financial data to help demonstrate

the component parts to the acquisition balance sheet.  This backup financial information

shows that the total assets on the acquisition balance sheet included approximately $1.93

billion of "PIM customer receivables" and "PIM deposit," which reflected amounts owed

to Barclays from PIM customers and from the LBI Trustee which offset liabilities owed

to customers that Barclays assumed in taking over the PIM accounts.  The offsetting

liabilities on the acquisition balance sheet are listed as a $1.93 billion amount of "PIM

customer payables" reflecting amounts owed to PIM customers.

16.    The acquisition balance sheet as originally published did not distinguish

between categories of assets in precisely the same manner as is reflected in the purchase

contract. Thus, in order to make clear the values Barclays ultimately arrived at for each

contractual category of assets Barclays was entitled to receive under the contract, I have

undertaken an effort, with the assistance of other colleagues in the finance department, to

break down the values by contractual category.

Repo Collateral: Schedule A and December Settlement

17.    Section 1(a)(ii)(A) and section 13 of the Clarification Letter provides that

the Purchased Assets to be transferred to Barclays in the sale include all of the assets in

the repo collateral. These assets consist of both (a) assets transferred to Barclays as part

of the repo transaction on September 18, 2008, which were subsequently listed on

Schedule A to the Clarification Letter, filed in Court on September 30, 2008, and (b)

assets received by Barclays in the December 22, 2008 settlement agreement with JP

Morgan and LBI (which was a settlement based upon the failure by JP Morgan to provide

Barclays with $7 billion in cash as promised at the time the purchase contract was

finalised).

18.    The Schedule A assets transferred to Barclays on September 18, 2008

were valued as of the open of business on September 22, 2008 – the closing date. After

considerable effort to value these assets (which took many weeks after the closing to

complete), Barclays determined a fair value for these assets of $40,554 million (which

consists of $39,916 million in securities at clean prices (i.e. excluding the value of

accrued interest), and approximately $638 million in accrued interest and principal for

matured securities within that portfolio). These numbers can be derived from documents

Barclays produced in discovery. In particular, Barclays produced a document showing its total valuation of all inventory actually transferred in September 2008, which includes both the Schedule A repo collateral securities as well as the Schedule B clearance box assets (Bates number BCI-EX-00099519). That document indicated that Barclays valued the total inventory of securities actually received in September 2008 at $40,690 million. The amount included in the acquisition balance sheet was $40,695m after adjusting for immaterial rounding items. From that number, my colleague Sean Teague extracted the values of all of the "Schedule B" clearance box assets (which are covered by section 1(a)(ii)(B) of the Clarification Letter), through a calculation that was prepared after the Rule 60 motions were filed. It is my understanding that document has been produced in this case. That calculation shows that Barclays valued all of the Schedule B assets actually transferred to Barclays in September 2008 to be $779 million. If that amount is subtracted from the total value of all inventory transferred to Barclays in September 2008, it yields the number of $39,916 million given above (the $40,695m included in the acquisition balance sheet reduced by the Schedule B assets of $779 million). Finally, the Gross Acquisition Balance Sheet produced by Barclays in the Rule 2004 discovery (Bates number BCI-EX-00115845) shows that Barclays received $300 million in "cash collateral" (reflecting matured securities within the repo collateral on Schedule A) and recognised $345 million of accrued interest on securities received in September 2008. Only $7 million of this interest amount related to Schedule B securities – the remainder reflects interest on Schedule A securities, and hence is included in the valuation of Schedule A assets.

19.    The assets transferred to Barclays in the December settlement with JP Morgan and LBI consisted of $1.25 billion in cash and securities that Barclays valued at $3,741 million measured as of the December 22, 2008 date of receipt. Thus, the total value of all assets received in the JP Morgan settlement was $4,991 million. (This calculation can be derived from the document produced in discovery showing the total cash received in the December settlement (line 27 of document bates-numbered BCI-EX-00115845), and the document produced in discovery showing the total Barclays valuation for the securities transferred in the December settlement (which carries Bates number BCI-EX-00108700)).

20.    Thus, based upon the foregoing, the total value of all assets Barclays received as "repo collateral," including all Schedule A assets and everything (both cash and securities) received in the December settlement with JP Morgan and LBI, equals $45,545 million (total Schedule A assets of $40,554 million plus securities in December settlement worth $3,741m plus cash received in December settlement of $1.25 billion).

Schedule B "Clearance Box" Assets

21.    Section 1(a)(ii)(B) of the Clarification Letter provides that one of the categories of Purchased Assets to be transferred to Barclays in the sale are LBI's clearance box assets as of the closing, which as of September 21 were to be reflected on a Schedule B to the Clarification Letter. As explained above, the portion of the securities actually transferred to Barclays in September 2008 that were identified as Schedule B "clearance box" securities were valued by Barclays as being worth a total of $779 million at clean prices. In addition, Barclays recognised accrued interest associated with these

securities of $7 million. Thus, the total value of all Schedule B clearance box assets actually received by Barclays was $786 million.

22.    In addition to the clearance box assets actually transferred to Barclays in September 2008, Barclays has identified other unencumbered LBI clearance box assets which have not yet been delivered. The total amount Barclays recognised on its opening day acquisition balance sheet for these undelivered clearance box assets is $707 million, as set forth in line 13 of the Gross Acquisition Balance Sheet. Barclays has identified additional unencumbered clearance box assets which have not yet been delivered, in the approximate amount of $148 million. However, these amounts have not yet been recognised in Barclays' accounts.

$769 Million in 15c3-3 Securities Or Their Equivalent

23.    Section 8 of the Clarification Letter provides that Barclays shall receive $769 million of securities either from LBI's Rule 15c3-3 account, or the equivalent type of assets in an equivalent amount. These assets have not yet been delivered to Barclays. Barclays has, however, recognised these assets in its acquisition balance sheet at the amount which Barclays is entitled to receive – i.e., $769 million. This is shown on line 17 of the Gross Acquisition Balance Sheet (Bates number BCI-EX-00115845).

Exchange-traded derivatives and property held to secure obligations under such derivatives

24.    Section 1(a)(ii)(C) of the Clarification Letter provides that one of the categories of Purchased Assets to be transferred to Barclays is the exchange-traded derivatives and "any property that may be held to secure obligations under such derivatives." It took Barclays a great deal of time after the closing to arrive at final valuations for all of these derivatives and the associated margin or collateral held to

secure such derivatives. As reflected on the Gross Acquisition Balance Sheet (Bates

number BCI-EX-00115845), these exchange-traded derivatives consist of both assets and

liabilities, and they are divided into options and futures separately. For options, the

proprietary and market maker positions were valued as being worth approximately a

negative $1.1 billion as of the date of closing (line 42 of the Gross Acquisition Balance

Sheet). (The value of the customer options was not included in the Acquisition Balance

Sheet because Barclays did not acquire beneficial ownership of those options.) The value

of the collateral that LBI had posted as margin to secure the OCC options was

approximately $2.29 billion (divided between lines 16 and 26 of the Gross Acquisition

Balance Sheet). The collateral for the options was listed on two different lines on the

Gross Acquisition Balance Sheet only because I learned about various categories of such

collateral at different times, and recorded them on different lines in the backup

spreadsheet. The names given to those two different lines do not bear any substantive

relationship to the categories of margin listed in each line item. For example, the fact that

one line item (line 26) refers to "OCC customer and clearing margin" does not mean that

the amounts listed in that line item were contained in the Lehman 074 Customer account.

25.    In addition to options, the exchange-traded derivatives acquired by

Barclays included futures. There are two line items on the Gross Acquisition Balance

Sheet: line 20 shows "Futures assets" of 3.78 billion, and line 44 shows "Futures

customer payables" of $2.6 billion. The "Futures customer payable" line is the value of

the liability Barclays had as of the closing to pay amounts to futures customers who were

transferred to Barclays as part of the overall sale transaction, coupled with the value of

the liability that Barclays had as of the closing to pay amounts to futures exchanges and

brokers relating to futures.  The "Futures assets" line item represents the sum of

receivables from futures customers, brokers and exchanges, the net value of open futures

positions and the value of all collateral held to secure the obligations under those futures.

26.    Finally, the acquisition balance sheet also includes significant entries for

intangible assets and other non-financial assets.  Specifically, relevant accounting

standards required Barclays to recognise $1.45 billion in intangible assets, reflecting

assets such as customer lists that are expected, but not certain, to yield future economic

value.  These amounts must be amortised against future earnings.  They are reflected on

line 34 of the Gross Acquisition Balance Sheet (Bates number BCI-EX-00115845).  In

addition, Barclays recognised $530 million for fixtures, fittings and software,

representing the physical and technical infrastructure acquired with the Lehman business.

We also recognised $70 million in respect of prepayments and deposits that were

acquired as part of the business.  These amounts are listed on lines 35 and 36 of the Gross

Acquisition Balance Sheet.

27.    Thus, just over $2 billion of the gain on acquisition reflected in the

acquisition balance sheet published in February 2009 is attributable to intangibles,

physical plant, equipment, prepayment deposits, and similar infrastructure assets

associated with the business -- i.e., something other than financial trading assets.

28.    All of the foregoing is derived from documents that have been produced in

discovery in this matter, and that I have made an effort to explain to the best of my ability

in response to questions asked during two different depositions I have given.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 26th day of January, 2010, in London, United Kingdom.

Gary Romain

# BCI EXHIBIT

# 358

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re:                                    :
                                          :
LEHMAN BROTHERS INC.,                     :         Case No.:  08-01420(JMP)SIPA
                                          :
            Debtor.                       :
-------------------------------------------------------------x

## DECLARATION OF ALAN KAPLAN

I, ALAN KAPLAN, declare:

1.      I am over the age of 21 and, if called to testify at trial, could competently testify

to the following based on my personal knowledge.

2.      Since 1984, I have been a member in good standing of the New York Bar.  I am

currently employed, and at all relevant times have been employed, by Barclays Capital as its

Deputy General Counsel, Americas.

3.      The repo transaction that Barclays entered into with Lehman Brothers at the

behest of the Federal Reserve ("the Fed Replacement Repo") was transacted using the parties'

standing Master Repurchase Agreement dated as of July 23, 1998, between LBI and Barclays

Capital Inc ("the Master Repo Agreement").

4.      On Friday, September 19, 2008, the Securities Investor Protection Corporation

(SIPC) sought and obtained an order putting Lehman Brothers Inc. (LBI) under the control of a

Trustee.  This triggered contractual termination rights for Barclays under eight master

agreements between various Barclays entities and LBI and launched a routine process within

Barclays that resulted in Barclays serving on LBI notices of termination or default under each of

those eight agreements.  Among the agreements with respect to which a Notice of Early

Termination was served was the Master Repo Agreement.  This notice should not have been

sent.  This error occurred because those individuals in the Legal Department at Barclays

involved in preparing and sending the termination notices were not familiar with the Fed

Replacement Repo.  Those individuals in the Legal Department at Barclays who were familiar

with the Fed Replacement Repo were not involved in preparing and sending the termination

notices because they were focusing on aspects of the sales transaction.  The parties corrected that

error in paragraph 13 of the Clarification Letter.  Paragraph 13 of the Clarification Letter

provides in pertinent part that "the Notice of Termination relating to the Barclays Repurchase

Agreement dated September 19, 2008 is hereby deemed rescinded and void *ab initio* in all

respects."

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 26 day of January, 2010, in New York, New York.

Alan B. Kaplan, Esq.

# BCI EXHIBIT

# 359

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 Case No. |
| Debtors. | 08-13555 (JMP) |
| | (Jointly Administered) |
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) |
| Debtor. | |

## DECLARATION OF JAMES HRASKA

I, James Hraska, declare as follows:

1.      I am currently Director of the Secured Financing Operations Group at Barclays

Capital Inc. ("Barclays").  Prior to the closing of the Barclays acquisition, I was employed by

Lehman Brothers.  I have personal knowledge of the matters set forth in this declaration and

could testify competently thereto at trial.

2.      Section 1(a)(ii)(B) of the Clarification Letter, which was filed with the Court on

September 22, 2008, states that the "Purchased Assets" include "such securities and other assets

held in LBI's 'clearance boxes' as of the time of Closing, which at the close of business on

September 21, 2008 were as specified on Schedule B [to the Clarification Letter]." I helped

prepare the lists of assets used to create Schedule B to the Clarification Letter, which was filed

with the Court on September 30, 2008, and which listed, as Schedule B itself says, "securities

believed to be held in LBI's 'clearance boxes' as of the time of the Closing." Schedule B further

notes that it was filed "without prejudice to the right of Barclays to receive other securities held in such clearance boxes but not listed on Schedule B . . . ." A copy of Schedule B as filed with the Court is attached as Exhibit 1. Depository Trust & Clearing Corporation ("DTCC") was LBI's main domestic clearing facility and, as such, housed the majority of the assets in its clearance boxes. For that reason, the vast majority of the clearance box assets listed on Schedule B were held at LBI's clearance boxes at the DTCC.

3.       Based upon a review of the assets that LBI has delivered to Barclays, LBI has delivered to Barclays certain of the assets listed on Schedule B, but not all of them. The delivered Schedule B assets had a "marked value" (as of the date of the pledge or transfer and based on the marks affixed by LBI or a custodial entity, which may not indicate what Barclays would determine to be the correct valuation, given the fact that many of the assets were illiquid and difficult to value) of $1.466 billion, and were delivered as follows: (a) $1.035 billion was pledged to Barclays on September 19, 2008; (b) $270 million was transferred on September 29, 2008; (c) $146 million was transferred on September 30, 2008; and (d) $15 million was transferred on September 30, 2008. All of those deliveries came from LBI's clearance boxes at the DTCC. The $1.035 billion pledged on September 19 did not actually leave Lehman's clearance box until after the Closing.

4.       Barclays has not received any further delivery of the remaining assets listed on Schedule B. The assets on Schedule B that Barclays has not received can be identified by specific "CUSIPS" (a "CUSIP" is a unique number assigned to a specific type of asset). There are approximately 800 different "CUSIPS" listed on Schedule B that Barclays has not received. A list of those CUSIPS is attached as Exhibit 2.

2

5.      I have also helped to prepare an independent analysis to identify any LBI assets held in clearance boxes that were available to be transferred to Barclays as of the closing, but which have not yet been delivered to Barclays.

6.      The data used for this analysis was taken from multiple financial systems, including, among others,  a system known as ADP and enabled us to look at the LBI stock record as of November 17, 2008, at which point many of the stock record "breaks" that had complicated the data used in compiling Schedule B had been resolved.  Because, apart from resolving the "breaks", there should have been little or no activity since the time of the Closing that would have affected the assets in LBI's clearance boxes, we believed that this data provides good insight into which undelivered assets were in Lehman's clearing boxes as of the closing.

7.      The population of clearance box assets identified in the course of this second analysis is listed on Exhibits 3, 4, and 5.

8.      These two analyses demonstrate that there is a population of clearance box assets not yet delivered to Barclays.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 27 day of January, 2010, in London, United Kingdom.

James Hraska

3

# Remainder of Exhibit
# Filed Under Seal

# BCI EXHIBIT

# 360

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>                                      Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>            LEHMAN BROTHERS INC.,<br><br>                                      Debtor. | Case No. 08-01420 (JMP) |

<u>**DECLARATION OF ERIC J. FELDER**</u>

I, Eric J. Felder, declare as follows:

1.      I make this declaration on my personal knowledge and to supplement my July 31, 2009 deposition testimony.  If called to testify, I would testify competently as follows.

2.      In June 2008, I became head of global credit products at Lehman and on September 8, 2008, I became co-head of fixed income products.  I am now head of global credit trading at Barclays Capital Inc. ("Barclays").

3.      I had a limited role in connection with the September 2008 transaction between Lehman and Barclays (the "Sale Transaction").  My involvement was limited to discussions with Barclays on September 15-16 concerning certain classes of securities about which Barclays personnel were asking.

23127812v1

4.      My best recollection of the September 15-16 discussions is that Barclays personnel were in a conference room at Lehman and, when questions were raised by those Barclay's personnel about Lehman's holdings in a particular asset class within the areas for which I was responsible, I would track down the Lehman person responsible for or most knowledgeable about that asset class and bring them to the room to speak with the Barclay's personnel. I believe I asked Kaushik Amin to address certain products, such as interest rate and foreign exchange products and commodities. I also asked Charlie Spero to address mortgage products. I personally answered questions about Lehman's holdings in high grade credit products (corporate bonds and preferred stock).

5.      The September 15-16 discussions in which I participated involved a good faith, arms' length discussion of Lehman's holdings in the various classes of financial assets. There was nothing secret or nefarious about the discussions. I did nothing to conceal those discussions from anyone at Lehman or Lehman's counsel or Lehman's advisors at Lazard.

6.      I had no role in negotiating or agreeing to any terms of the sale and had no decision making authority in connection with the sale negotiations.

7.      In my limited involvement in the Barclays transaction on September 15-16, I acted in Lehman's interests and at no time did I breach any duty to Lehman. The discussions I had with Barclay's personnel occurred at the direction of my supervisors. I had no reason to believe at the time that it was not in the interest of Lehman to complete the sale to Barclays. My September 15-16 statements to Barclays executives concerning various classes of financial assets were part of an honest effort to allow the Barclays executives to arrive at their own assessment of those securities.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27th day of January, 2010, at New York, New York.

Eric J. Felder

# BCI EXHIBIT

# 361

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (JMP) |

## DECLARATION OF MICHAEL KEEGAN

I, Michael Keegan, declare as follows:

1.      I make this declaration on my personal knowledge and to supplement my August 28, 2009 deposition testimony.  If called to testify, I would testify competently as follows.

2.      In September 2008, I was head of principal credit trading at Barclays Capital Inc. ("Barclays"), and I still hold that position.

3.      I had three primary responsibilities in connection with Barclays' September 22, 2008 Lehman acquisition (the "Sale Transaction").  First, I was involved in assessing and attempting to estimate the value of certain classes of securities that Lehman proposed to transfer and certain classes of securities that Lehman did transfer to Barclays.  I worked on this assessment with other executives from Barclays, primarily Stephen King and John Mahon.  While we each reviewed a variety of asset classes, my primary focus was on corporate debt and equities.  Stephen King focused primarily on

mortgages and asset-backed securities, as well as other asset categories, and John Mahon

focused primarily on understanding various structured products and interest rate products.

Second, I consulted with senior management of Barclays, Rich Ricci in particular,

concerning our assessments. Third, I assisted in assessing the collateral that Lehman

proposed to secure the debtor-in-possession financing that Barclays provided.

4.      Before LBHI filed for bankruptcy, in the period from Friday, September

12, 2008 through Sunday, September 14, 2008, I participated in attempting to assess

certain classes of securities in connection with an anticipated acquisition by Barclays of

Lehman globally.  At that time, we focused primarily on corporate debt, bank loans,

equities, commercial real estate and private equity investments.  That Sunday afternoon, I

learned that the global transaction was not going forward and I stopped my work.

5.      The next day, after the LBHI bankruptcy filing, I learned that Barclays

was considering purchasing certain assets and assuming certain liabilities of LBHI and

LBI in a bankruptcy sale.  As a result, I returned to the Lehman headquarters offices and

participated in Barclays' further assessment of certain classes of securities that Barclays

might acquire in the transaction.  My work on September 15-16 focused on the value and

categories of financial assets that Barclays would acquire.  Those September 15-16

efforts became largely irrelevant to the final transaction because the financial assets

ultimately transferred to Barclays in the final transaction changed dramatically.  The

financial assets transferred to Barclays were determined primarily by Barclays'

September 18 replacement of the Fed's financing of LBI.  As a result, Barclays ended up

receiving securities that it did not have an opportunity to assess in advance of the repo

replacement transaction.

<u>September 15-16</u>

6.      My colleague, Stephen King, head of the Principal Mortgage Trading

Group of Barclays, was involved in most of the review of financial asset classes on

September 15-16. At various times, he and I met different Lehman executives, including

Eric Felder, Gerald Donini, Kaushik Amin, and Charles Spero, to review the inventory

and to learn what assets Barclays would be acquiring as part of the overall acquisition of

the Lehman broker-dealer business. We wanted to know what the inventory was so that

we could estimate the realizable value of the assets. As Barclays' executives, we were

concerned primarily that Barclays not have to record a write down after acquiring the

inventory. We were also focused on what we would need to do to hedge the positions.

7.      Many of the securities Barclays reviewed that Monday and Tuesday were

very difficult to value accurately. We had some introduction to the inventory based on

our September 12-14 diligence, but had very little time on September 15-16 to undertake

this analysis in a detailed manner. We attempted to understand the underlying

obligations and instruments and made assessments by asset category primarily. Given

the volatility and uncertainty in the markets at that time, we recognized that there was

necessarily uncertainty concerning our rough valuations.

8.      Based on our review and analysis, we believed that Lehman had, in many

instances, been aggressive with its valuations and had overvalued certain financial assets.

In our view, many of the Lehman marks as of Friday, September 12, were not an accurate

reflection of actual market value as of September 15-16. Given market conditions on

September 15 and 16 — two of the worst days in Wall Street history — we believed that

overvaluation problem had become worse and would likely worsen even further before

negotiations were concluded and a final transaction closed. In addition to being aware of

the general disruption in the financial markets on September 15 and 16, I believed that many Lehman employees were not focusing on their regular responsibilities and were not concerned about making sure that positions were being marked correctly.

9.     The September 15-16 review focused on properly estimating the value of the various asset classes. We were reviewing a massive portfolio of securities and were concerned about the liquidity of the assets. Barclays made an assessment of reasonable value for each asset class based on our understanding of the asset class, taking into consideration what we understood about the market value of the asset class and what we assessed as the liquidity risk for that asset class. In some instances we requested cusip level detail to make our assessment and in other instances we referred to higher level aggregate information.

10.     We did not negotiate for a "$5 billion bulk discount" and I never understood that our work resulted in a "$5 billion discount from Lehman's marks." I certainly do not believe that the values we believed accurate and appropriate were $5 billion (or any other amount) less than the fair market value of those assets at that time. The values we believed accurate and appropriate were an *estimate* of fair market values.

11.     We made no effort to keep our review of financial assets secret. I was not aware of anything being kept secret from anyone. I also was not aware of any attempt to induce any Lehman executive to agree to reduced valuations for any of their assets in exchange for personal employment offers. The review I participated in was conducted in an arm's length and good faith manner. We had agreement on some asset classes and disagreements on other asset classes. Where we could not agree on a reasonable valuation of certain positions, we agreed that those positions would be excluded.

4

Fed Replacement Transaction

12.      In the late afternoon or early evening of Thursday, September 18, I was

informed that, at the request of the Federal Reserve Bank of New York (the "Fed"),

Barclays had entered into a reverse repurchase agreement transaction to replace the short

term financing that the Fed had been providing to LBI (the "Fed Replacement

Transaction" or the "reverse repo"). When I learned of the Fed Replacement

Transaction, I was concerned about the enormous risk created by the transaction — the

fact that Barclays had paid out $45 billion in cash for securities supposedly worth

approximately $50 billion, but which might be worth less, might be losing value, and

likely would be very difficult to liquidate.

13.      I also realized that, instead of the trade we had discussed on September

15-16, the Fed Replacement Transaction would effectively dictate the financial assets

Barclays would receive in connection with the Sale Transaction. As soon as Barclays

started to receive securities in the reverse repo, I began to review the securities that were

coming in. The securities Barclays was receiving on September 18 included, for

example, a number of credit linked notes (synthetic securities the value of which actually

depended on the creditworthiness of certain bankrupt or near-bankrupt Lehman entities).

I later learned, in addition, that a substantial number of the securities we were receiving

were different from the securities that had secured the Fed.

14.      After further reviewing the delivery of securities in the reverse repo, I

remained concerned that the repo collateral included securities that I felt were worth

substantially less than the marks provided by either Lehman or the custodian banks

involved in the repo (JP Morgan and Bank of New York Mellon). I understood at that

point in time that Barclays was essentially going to be buying the repo collateral it

received, assuming the sale was approved, and I was concerned that the collateral was

worth substantially less than the marks attributed to it. We were eventually told by

Lehman that the inventory that was coming through was all that Lehman had. We were

told that much of the inventory we reviewed and agreed to acquire on Monday was no

longer available for various reasons. In addition, we were told that securities pledged

previously to the Fed were being taken under standing business orders and were delivered

to contractual counterparties as they came into the LBI clearing account and the securities

coming through were all that was available. At some point Lehman executives indicated

that they understood my concern and suggested that Lehman could consider identifying

other miscellaneous categories of assets with value. They mentioned, for example,

unpledged securities "in the box." I recall at some point looking at a list of that

unpledged inventory, seeing that it consisted of things like restricted securities and other

securities that could not be used for financing.

15.    The purpose of a repo "haircut" (the value of purchased securities in

excess of the loan amount) is to protect against the risks associated with liquidation in the

event of a default. I was concerned that the haircut associated with the reverse repo

would be inadequate to cover Barclays' liquidation risk, particularly given the state of the

financial markets and the nature of the securities Barclays was receiving.

16.    To address Barclays' concerns, Lehman identified other assets in the

business — specifically, the unencumbered assets in its clearance boxes, which Lehman

apparently estimated to be worth approximately $1.9 billion, as well as certain assets

associated with its 15c3 account. On Friday morning, I was asked by Mr. Ricci whether

Barclays should agree to take the clearance box assets. As to those assets, I was able to

get some comfort regarding certain specific positions, but many of the assets were highly

illiquid and we could not get comfort on them.  I specifically recall focusing on certain

restricted stock positions and residuals of securitization deals that could not be pledged.

There were only a handful of positions (roughly five or six municipal securities) among

the "box" assets for which we could validate pricing based on a reliable source.  I

indicated to Mr. Ricci that I had no confidence that the clearance box assets would

actually be worth $1.9 billion in value.

    I declare under penalty of perjury that the foregoing is true and correct.  Executed

this _27th_ day of January, 2010, at New York, New York.

Michael Keegan

# BCI EXHIBIT

# 362

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF MARTIN B. KELLY

I, Martin B. Kelly, declare as follows:

1.       I make this declaration on my personal knowledge.  If called to testify, I would testify competently as follows.

2.       I am a Managing Director of Barclays Capital, Inc. ("Barclays") and the Chief Financial Officer of the Americas, which has offices at 745 Seventh Avenue, New York, New York 10019.

3.       I served as the Global Financial Controller of Lehman Brothers Holdings, Inc. ("LBHI") in September 2008.  I was employed by LBHI from approximately August 2000 through approximately May 2005, and then from January 2006 until September 2008.  Upon my return to the firm in January 2006, I joined the Global Finance Solutions group, which was part of the Investment Banking business.  During 2007, I transferred to the Hedge Fund group, which was also part of the Investment Banking business.  Effective December 1, 2007, I became Global Financial Controller and remained in that position until I became a Barclays employee.  In my role as Global Financial Controller, I was responsible for certain aspects of the firm's financial and regulatory reporting, both internally and externally.  In September 2008, I reported to Ian Lowitt, LBHI's Chief Financial Officer.

4.     I submit this declaration at the request of Barclays to respond to certain
allegations that I understand have been made by LBHI and others in this case. However, this
declaration does not respond to what I understand to be all of the allegations, and as such should
not be understood to imply any agreement with LBHI's allegations, many of which I dispute.

5.     On September 15, 2008, LBHI commenced a voluntary chapter 11 bankruptcy
case. On the same day, I learned that Lehman and Barclays began negotiations regarding a
transaction whereby Lehman would transfer certain assets and liabilities of LBHI, Lehman
Brothers 745 LLC ("LB 745 LLC"), and LBI to Barclays (the "Sale Transaction").

6.     As I understand it, the Sale Transaction was documented in an Asset Purchase
Agreement, dated as of September 16, 2008 ("Asset Purchase Agreement"), amended by a
Clarification Letter dated as of September 20, 2008. I was not involved in drafting any of the
Sale Transaction documents, including the Asset Purchase Agreement and the subsequent
Clarification Letter (the "Clarification Letter"). I understand that the United States Bankruptcy
Court for the Southern District of New York issued an order approving the Sale Transaction on
September 20, 2008 (the "Sale Order"). I did not testify at or attend any of the bankruptcy court
hearings regarding the Sale Transaction.

7.     In connection with the Sale Transaction, I was asked from time to time to
assemble information. I assembled and provided such information based on data available to me
and my team at the time, and endeavored to be accurate. I was not involved in negotiations
surrounding the Sale Transaction.

8.     I believe that at some point during the week of September 15, 2008, I was
approached by Alvarez & Marsal North America, LLC ("Alvarez"), the restructuring advisor
retained by the LBHI bankruptcy estate, regarding potential employment opportunities relating to

- 2 -

the estate. I believe that subsequent to this, I was approached about the possibility of employment at Barclays, either late in the week of September 15 or early in the week of September 22. In early October, I ultimately decided to accept the Barclays offer and signed an employment agreement dated October 10, 2008.

9.    I understand that in connection with its Rule 60(b) motion to modify the Sale Order, LBHI alleges that I acted with conflicted loyalties in performing my tasks related to the Sale Transaction so that I could secure employment with Barclays. This is wholly untrue. I was acting in the best interests of my employer at that time, Lehman. I believe that I performed my responsibilities for my employer diligently, in good faith, and without any divided loyalties. I never acted in any way to favor the interests of Barclays over the interests of Lehman.

10.    To the extent that I had conversations with anyone concerning the Sale Transaction, including the parties' advisors such as Alvarez and Debtors' counsel, Weil, Gotshal & Manges LLP, I sought to be responsive and accurate to the best of my abilities. Also, to be clear, I was not asked by anyone to act in any way that would conceal any aspect of the Sale Transaction, nor did I attempt to conceal any aspect of the Sale Transaction. I was not told to withhold information from any party or to keep secret any aspect of my responsibilities relating to the Sale Transaction.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

27 day of January, 2010, in New York, New York.

_____

Martin B. Kelly

# BCI EXHIBIT

# 363

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (JMP) |

## DECLARATION OF STEPHEN KING

I, Stephen King, declare as follows:

1.      I make this declaration on my personal knowledge and to supplement my September 10, 2009 deposition testimony.  If called to testify, I would testify competently as follows.

2.      At the time of the September 22, 2008 Lehman acquisition by Barclays Capital Inc. ("Barclays") (the "Sale Transaction"), I was a managing director of Barclays and head of the Principal Mortgage Trading Group, a trading and risk management group within Barclays.

3.      My primary responsibility in connection with the Sale Transaction was in assessing and attempting to estimate the value of and risk management issues associated with certain classes of securities that Lehman proposed to transfer and certain classes of securities that Lehman did transfer to Barclays.

4.      Before LBHI filed for bankruptcy, in the period from Friday, September 12, 2008 through Sunday, September 14, 2008, I participated in valuing and assessing certain classes of

securities in connection with an anticipated acquisition by Barclays of Lehman globally. That

global transaction was never completed. After the LBHI bankruptcy filing on September 15,

2008, Barclays then began considering the purchase out of bankruptcy of certain Lehman assets

and the assumption of certain liabilities. On September 15-16, in connection with that

anticipated bankruptcy sale, I participated in further assessment of certain classes of securities

that Barclays might acquire in the transaction.

September 15-16

5.      It is my understanding, based on statements by Lehman representatives, that

Lehman's counterparties, lenders and exchanges seized or closed out many of Lehman's long

and short positions in the period from September 15 to September 19. As a result, many of the

financial assets that I and others reviewed on September 15-16 were not included in the final

Sale Transaction. Despite that fundamental change in the securities in the final transaction, I

understand that the moving parties have nonetheless suggested that the earlier negotiations

involved an improper and "secret" negotiation of a "$5 billion discount." To the best of my

knowledge this assertion has no factual basis as I explain herein. Various discussions regarding

Lehman marks were open, not secret, and occurred in open conference rooms at Lehman's

headquarters.

6.      My review of Lehman financial assets on September 15-16 was a good faith effort

to arrive at an understanding of the approximate value of the securities Barclays would acquire

as part of the business. In a volatile and uncertain market, and with very little time available, I

made a good faith effort to estimate reasonable values. These included the value of certain

illiquid, complex mortgage securities based on the securitization of consumer credit.

2

7.      I also needed to understand how to hedge or dispose of certain long positions. At

the time, given the market turmoil, I had concerns that these long positions would be very

difficult to liquidate, and that the basis risk of hedges would be high.

8.      Many of the securities Barclays reviewed that Monday and Tuesday were highly

illiquid, were not traded on any exchange, and were very difficult to value accurately. We did

the best we could in the very short time available to us, but recognized that there was room for

doubt about the valuations, particularly given the extraordinary market conditions and limited

availability of securities related information under which we were operating.

9.      Contrary to the movants' suggestion that the parties negotiated a "secret

discount." I recall openly discussing certain mortgage-backed securities with Charlie Spero of

Lehman, including that it was appropriate for Barclays to make its own independent assessment.

I also recall a discussion with Bart McDade near the sofas in the open area outside the

conference rooms where various groups were meeting. While others listened or passed by, Mr.

McDade asked why I was estimating the value of certain asset classes below what Lehman had

them marked at. I explained openly that I was making estimates based on my team and other

relevant Barclay's employees' view of the value of those asset classes and taking into account

relevant information.

10.     On September 15-16, my focus was on making sure Barclays understood the

value of the positions it was acquiring and making sure we understood what would be necessary

to hedge the long positions.

11.     By September 17, my focus changed to the Fed repo that Barclays was asked to

assume.

3

Fed Replacement Transaction

12.    On Wednesday, September 17, I learned that the Federal Reserve Bank of New York (the "Fed") requested that Barclays enter into a reverse repurchase agreement transaction to replace the short term financing that the Fed had been providing to LBI (the "Fed Replacement Transaction" or the "reverse repo"). I was asked to determine if the portfolio of securities that were subject to the Fed repo (the "Fed Portfolio") would be sufficient to protect Barclays if Barclays provided $45 billion to LBI.

13.    I had only about two hours to review a list of Fed Portfolio securities and give an opinion. That was obviously not enough time to conduct a thorough analysis. I did that review on a high level, asset class basis, and concluded that this was not a trade I would ever recommend in normal circumstances. Nevertheless, I believed that while the Fed Portfolio securities were not worth what they had been marked at by the custodian (approximately $50 billion), they would probably be adequate (assuming a controlled liquidation) to secure a $45 billion advance in circumstances where Barclays was under considerable pressure to make the advance. The reverse repo securities included positions that we had previously concluded were extremely illiquid.

14.    The reverse repo transaction was executed on Thursday, September 18. By that time, I understood that the reverse repo transaction would become part of the purchase transaction, given LBI's inability to repay the $45 billion. Recognizing that this would be a transfer of a massive number of unhedged long positions, I began to plan a hedging and liquidation strategy to protect Barclays against that risk.

15.    By the morning of Friday, September 19, I learned that the securities Barclays actually received in the reverse repo were quite different from the Fed Portfolio securities I had previously reviewed. In addition, there was a shortfall in delivery of securities. Even assuming

4

the marks from the custodian banks were accurate (which we did not believe to be the case), the repo collateral actually transferred to Barclays on the evening of September 18 was approximately $7 billion less than the amount that was required to be transferred to Barclays under the applicable haircut schedule from the Master Repurchase Agreement.

16.    I understand that operations executives of Barclays reached an agreement with LBI and JPMorgan Chase to cover the delivery shortfall by a cash deposit of $7 billion to a Barclays tri-party account at JPMorgan Chase. We anticipated that if JPMorgan Chase and LBI eventually transferred securities in substitution of that deposit, the value of those securities would in fact be less than $7 billion.

17.    As of September 18-19, I and other Barclays executives were very concerned that the value in what was transferred and what remained to be transferred to Barclays in the repo transaction would not exceed $45 billion. Bank of New York Mellon ("BNYM"), Barclays' custodial agent, had marked the securities Barclays received on September 18 at roughly $43 billion. I believed at the time that the value of what Barclays had received in the reverse repo on September 18 had a value well below the BNYM marks.

18.    To the best of my knowledge at no time did Barclays ever reach a secret agreement with Lehman that the reverse repo would be used to transfer to Barclays an undisclosed $5 billion discount.

19.    I do not believe there was any other party who would have bid the securities portfolio from the Fed. Contrary to normal bidding practices, I do not think the valuations attributed to the securities portfolio by Barclays reflected the discount one would normally expect in situations where there were no bidders. If the portfolio had been liquidated pursuant to a normal liquidation of a Repo, I think the price realized would have been considerably less.

5

Exchange Traded Derivatives

20.    In the period from the signing of the original Asset Purchase Agreement to the

closing of the Sale Transaction, I had a consistent understanding that Barclays would not acquire

Lehman's over-the-counter derivatives business, but that Barclays would acquire Lehman's

exchange-traded derivatives business. I necessarily assumed that the exchange-traded

derivatives business included not only the derivatives positions but also the associated collateral

and margin posted with clearing corporations, exchanges or other intermediary custodians. I

understand that the moving parties now assert that they believed Barclays would acquire

exchange-traded derivatives positions without the associated collateral. Based on my

understanding of exchange-traded derivatives, that is illogical and I do not believe we would

have agreed to that. An exchange-traded derivative can only be exchange traded if there is

collateral posted with the exchange to secure the position. The position and the collateral are

necessarily connected and it was never my understanding that we would acquire the exchange-

traded derivative positions without also acquiring the associated collateral. It was my objective

to preserve the value of the collateral to protect against losses on the open risk position.

21.    Over the September 20-21 weekend and through Monday, September 22, I tried

repeatedly to gain an understanding from Lehman concerning the value of the assets and

liabilities in the exchange-traded derivatives accounts that Barclays was acquiring. Because

Barclays was taking over all positions as well as the settlement obligations associated with the

accounts, the exchange-traded derivatives represented a risk, with potential liabilities and losses.

LBI personnel were unable to provide any reliable information. As of several hours after

Closing, all I knew was that the exchange-traded derivatives had an estimated delta of anywhere

from $2 billion short to $4 billion long. Accordingly, as of the Closing, the value of the

6

exchange-traded derivatives Barclays had acquired was highly uncertain, and a significant source of concern.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27 day of January, 2010, at New York, New York.

Stephen King

# BCI EXHIBIT

# 364

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X
                              :

In re:
LEHMAN BROTHERS HOLDINGS INC, et al.,   :     Chapter 11
                                        Case No. 08-13555 (JMP)
           Debtor.         :     (Jointly Administered)

                              :

---------------------------------------------------------------- X
                              :

In re: LEHMAN BROTHERS INC.,        :     Case No. 08-01420 (JMP)
           Debtor.         :

                              :

---------------------------------------------------------------- X

## DECLARATION OF VICTOR I. LEWKOW

Pursuant to 28 U.S.C. § 1746, VICTOR I. LEWKOW hereby declares:

1.      I am a partner with the law firm of Cleary Gottlieb Steen & Hamilton LLP

("Cleary Gottlieb"). I was the senior mergers and acquisitions partner on the Cleary Gottlieb

team representing Barclays Capital Inc. ("Barclays") starting on Friday, September 12, 2008 in

connection with the potential acquisition of a substantial portion of the worldwide businesses and

assets of Lehman Brothers Holdings Inc. ("LBHI"). That project terminated mid-day on Sunday,

September 14. Following LBHI's filing for bankruptcy, on the morning of September 15, 2008

we were contacted to start work on the potential acquisition by Barclays of the North American

brokerage and investment banking business of Lehman Brothers Inc. ("LBI").

1

2.      I began working at Cleary Gottlieb as an associate in 1973 and have been a

partner since 1982. My practice focuses on public and private merger and acquisition

transactions. I also advise corporations and their boards regarding governance issues and the

fiduciary duties of directors.  I am the Co-Chair of Tulane's Corporate Law Institute, the leading

annual seminar for U.S. merger and acquisition lawyers, and a regular speaker at the Practicing

Law Institute's annual Contests for Corporate Control seminar.  I am also a member of the

Editorial Advisory Board of The M&A Lawyer, and have authored or co-authored a number of

publications on merger and acquisition, fiduciary duty and corporate governance topics,

including the Corporate and Securities Law chapter in the Manual of Foreign Investment in the

United States, Third Ed. 2004, "'Continuing Director' Change In Control Provisions After

Amylin," The M&A Lawyer, June 2009, "Director Liability in the Sale Process," New York Law

Journal, Nov. 17, 2008, "Left at the Altar: Creating Meaningful Remedies for Target

Companies," The M&A Lawyer, October 2007, "US Best-Price Rule - Return of the Tender

Offer," IFLR, January 2007, "Revlon Duties 'R' Us," The M&A Lawyer, September 2005, "The

Embattled Poison Pill," Insights, April 2005; and "Reflections on the Disney Decision," The

M&A Journal, 2005.    Additionally, I have taught mergers and acquisitions as an Adjunct

Professor at New York University School of Law.

3.      I base this Declaration on my personal knowledge, review of transaction

documents and, where indicated, the recollection of my partners who worked with me on this

engagement and with whom I have consulted in the preparation of this Declaration.  In preparing

this Declaration, I have neither relied on nor disclosed privileged communications.  Rather, I

have relied on my recollection and such consultations concerning non-privileged

communications between the parties to the transaction (and their advisors and counsel).

**Nature of the Transaction**

4.      In my discussions during the September 15-22, 2008 period with representatives

of the Debtor, some of which occurred in the presence of representatives of the Trustee and the

Creditors' Committee, and in the transaction documents, the transaction was always discussed

and documented as the purchase of all of the assets associated with the "Business," as defined in

such transaction documents, including specifically listed assets and the assumption of certain

identified liabilities and excluding specific assets.  The transaction was never discussed or

documented as what might be called a "balance sheet" transaction, which would have included

pre-closing and/or post-closing purchase price adjustment provisions relating to a valuation of

the transferred assets and liabilities.  Further, I do not recall anyone involved in the transaction

ever suggesting that the deal was supposed to be a "wash" with the value of assets acquired equal

to the value of liabilities assumed.

**Employment offers**

5.      Both during the negotiations of the Asset Purchase Agreement among LBHI, LBI

(collectively, "Lehman"), LB 745 LLC and Barclays Capital Inc. ("APA") and in the period

between the APA's execution and the Closing on September 22, 2008, the lawyers representing

Barclays (Cleary Gottlieb and Sullivan & Cromwell, LLP ("S&C")) and Lehman (Simpson

Thacher & Bartlett LLP ("Simpson") and Weil Gotshal & Manges LLP ("Weil")), were aware

that Barclays representatives were and would be meeting with senior Lehman executives to

discuss with them the possibility of their coming to work for Barclays were a sale transaction to

occur.  Those discussions were not secret.  Nor was any effort made to conceal them.

6.      More specifically, the lawyers directly involved in the negotiations from both

sides were aware that Barclays was in discussions with senior Lehman executives regarding

3

potential employment. Initially, Barclays sought a closing condition in the Asset Purchase

Agreement that eight senior officials agree to join Barclays in connection with the transaction. It

was noted in the discussions of such request that Barclays was already in discussions with some

of those eight, but the Debtor's representatives did not want the transaction subject to a condition

that an agreement be reached in the very short time frame prior to the anticipated Closing. Also,

from the beginning of negotiations of the Asset Purchase Agreement, Barclays sought a closing

condition tied to a high percentage of a broader group of top LBI personnel being willing to

continue employment with Barclays, which given the extraordinary timing of the transaction

would need to be satisfied within a matter of days. Following negotiations, the Asset Purchase

Agreement conditioned Barclays' obligation to close on at least 70% of the persons in the

targeted population of senior executives continuing to be employed and Lehman senior

management having determined in good faith that they would continue to be employed following

the Closing. A related provision required Barclays to make offers of continued employment to

each employee in that targeted population. APA §§ 9.1(a), 10.1(b).

**Execution of the Asset Purchase Agreement**

7.    The Asset Purchase Agreement was finalized late at night on Tuesday,

September 16, 2008 or shortly after midnight on Wednesday, and was executed in the early

hours of Wednesday, September 17.

8.    The APA, which was filed with the Court on September 17, bears hand-written

edits to the typed document. These hand-written edits were made, pursuant to joint instructions

by lawyers from Cleary Gottlieb on the one hand and Weil and Simpson on the other, at the last

stages of the negotiations on the night of September 16 (or possibly after midnight in the early

4

morning hours of September 17) in a large corner conference room on the executive conference

and dining floor at Lehman's headquarters at 745 Seventh Avenue.

**Valuation Issues**

9.    I understand that one of the Movants' contentions in these proceedings is that

Barclays sought out and bargained for a "secret discount" by marking down the financial assets

that Lehman was going to transfer to Barclays. I believe this allegation is a distortion of the fact

that there were discussions between Barclays representatives and Lehman representatives in

which Barclays representatives expressed the view that Lehman's marks for some of its assets

were outdated and higher than the Barclays' estimates for certain categories of trading assets.

While I was not present for the actual discussions between Barclays and Lehman traders or other

representatives as to the proper valuation of securities or categories of securities, I was present

for discussions between representatives of Lehman and Barclays on Monday and Tuesday

(September 16-17) at which Barclays representatives explained that, in the view of Barclays

traders, Lehman's existing valuation of several categories of securities were outdated and did not

accurately reflect the then current market value of those securities. This valuation concern was

heightened by the unprecedented market volatility and the severe illiquidity in the markets as a

result of which I understood that third-party price quotations for certain types of securities were

largely unavailable. One particular example I recall being mentioned in the discussions involved

a structured security. Lehman owned a junior tranche of the structured security, which it carried

on its balance sheet at par or at a smaller discount to par than the discount to par at which

Barclays carried a more senior tranche of the security, based on its traders' valuation of the more

senior security, unrelated to any proposed acquisition transaction. Lehman was thus

maintaining a higher mark on the *junior* tranche of the security (*i.e.*, either par or a smaller

5

discount to par) than Barclays' valuation of a senior security. I also was aware of media reports

published prior to the events of the week of September 15 to the effect that the book value of

certain securities held by Lehman had been overstated even prior to the market disruptions of the

prior few days.

**The Clarification Letter**

10.    I attended the Sale Hearing, which commenced on September 19, 2008. At the

hearing, lawyers from Weil Gotshal explained to the Court that there were "major changes" to

the transaction and "many moving parts," and explained that there was a letter agreement, which

they referred to as a "clarification letter," still being prepared. The Sale Order therefore

explicitly describes the Purchase Agreement it was approving to include the "clarification letter."

The Clarification Letter was ultimately finalized and executed at the Closing on the morning of

September 22, 2008.

11.    The initial drafts of the Clarification Letter had been prepared prior to the Sale

Hearing, and prior to the major changes that had been agreed to earlier on September 19, 2008.

Weil had circulated a revised draft of the Clarification Letter by email during the Sale Hearing.

Following the Sale Hearing, the parties turned to revising the existing draft to make the

necessary clarifications as well as to make amendments to reflect the agreed-upon changes. To

accomplish this and to continue other significant and critical discussions related to the

transaction that needed to be concluded by the Closing (such as the discussions with the

Depository Trust & Clearing Corporation ("DTCC"), the Options Clearing Corporation

("OCC"), and JP Morgan and discussions between Barclays and the Debtor concerning the

Transition Services Agreement), the parties convened at Weil's offices starting early Saturday

morning. These discussions continued until late Saturday night, resumed early Sunday morning

6

and did not conclude until the Closing at about 8 a.m. on Monday, September 22. The meetings

occurred in various conference rooms on two floors of Weil's offices. The LBI Trustee's

representatives were present at Weil, sat in the conference room where the Clarification Letter

was being discussed and revised by the two sides, and had access to drafts of that document and

to the closing room. Representatives of the Creditors' Committee were also present at Weil's

offices and, I believe, had access to these drafts and the closing room. The Clarification Letter

was finalized and executed at Weil's offices on the morning of Monday, September 22, 2008,

immediately prior to the Closing. As the Clarification Letter both clarified and amended

provisions of the original APA and made changes to the transaction, including revisions to the

definition of Purchased Assets in view of Lehman's inability to perform material terms of the

original APA, as the Bankruptcy Court had been advised in substance at the Sale Hearing, the

Clarification Letter recites that it "clarifies the intention of the parties with respect to certain

provisions of the [Asset Purchase] Agreement, supplements in certain respects the agreements of

the parties stated therein and amends the Agreement in certain respects. . . ." Clarification Letter

at 1.

      12.    Weil and Simpson represented the Debtor in these discussions. The Weil lawyers

were intimately involved in the preparation of the various drafts of the Clarification Letter

between September 19 and September 22, 2008, as they and Simpson, representing the Debtor,

and Cleary Gottlieb and S&C, representing Barclays, worked in good faith to finalize the

Clarification Letter in order to allow the Closing to take place before the opening of business on

September 22, 2008, on a basis consistent with the Sale Order and what had been described to

the Court.

13.    One of the provisions in the Clarification Letter provides that the Purchased

Assets being acquired by Barclays would include all of the assets in LBI's "clearance boxes" as

of the Closing. This provision was set forth in various iterations of the drafts of the Clarification

Letter as well as in the executed Clarification Letter. During this time, neither Weil nor any

representative of the Trustee nor the Creditors' Committee communicated to me or my

colleagues (or to my knowledge, any other representative of Barclays) any suggestion or view

that Barclays would not acquire the assets in LBI's "clearance boxes."

14.    I was also aware that there were concurrent discussions between Barclays and the

DTCC regarding the issue of whether Barclays would guarantee all of LBI's settlement

obligations at the DTCC (and its related family of clearing corporations) as requested by the

DTCC. This issue was ultimately resolved through a letter agreement (the "DTCC Letter") in

which Barclays agreed to deliver $250 million of the Cash Amount set forth in the APA to the

DTCC, rather than Lehman, as security for Lehman's obligations to DTCC, with any unused

portion to go to Lehman.    In connection with this provision, Section 1(d) of the Clarification

Letter was drafted to make clear that this $250 million of the Cash Amount was to be delivered

to the DTCC for deposit as collateral rather than being delivered to the Debtor as originally

provided in the APA. This was the only provision of the Clarification Letter that was necessary,

as far as anyone on behalf of Lehman ever indicated, to implement the DTCC Letter.

15.    The principal LBI "clearance boxes" were obviously those at the DTCC, and, at

no time before the Closing or for several months after the Closing, did anyone on behalf of

Lehman or the Trustee communicate to me or anyone else at Cleary (or, to my knowledge any

other representative of Barclays) that they believed that the DTCC Letter was somehow

amending the Clarification Letter being executed concurrently in order to remove the assets in

8

the DTCC clearance boxes from the Purchased Assets being acquired by Barclays in the transaction.

16.    Even prior to the Clarification Letter, the APA provided that the assets being acquired included those assets associated with LBI's business as a futures commission merchant, and that the exchange-traded derivatives were being acquired as part of the overall financial inventory.  APA § 1.1 (definitions of "Business" and "Purchased Assets").  One of the other provisions in the Clarification Letter confirmed that the Purchased Assets include the "exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives)."  Clarification Letter § 1(a)(ii)(C).

17.    During the weekend in which the Clarification Letter was finalized, no one suggested, in my presence (or, based on my conversations with my partners, in their presence), that any portion of the property held to secure Lehman's exchange-traded derivatives was not to be transferred to Barclays as part of the transaction.  To the contrary, the parties' communications (including emails to and from the OCC and its counsel) and the deal documents that were signed by the Trustee make clear that Barclays was to receive LBI's "exchange-traded derivatives" including "any property that may be held to secure obligations under such derivatives."  Neither I nor any of my partners involved in this transaction recall ever hearing a contrary view being expressed by anyone from the Lehman side.

18.    The Clarification Letter also contains a provision that Barclays would receive $769 million in securities held in LBI's Rule 15c3-3 account, "or securities of substantially the same nature and value."  I recall that we had been told prior to the hearing on Friday that there were assets in the 15c3-3 account that could be transferred by Lehman in connection with a sale, and that there was an email confirming that the SEC staff had agreed that this could be done.

9

Over the weekend while I was with a number of the Weil lawyers in the hallway, they showed

me for the first time (and said that they had also seen it for the first time that day), an internal

Lehman email which purported to show that the SEC staff had acquiesced to the transfer of $1

billion from the Rule 15c3-3 account.

19.    Following our review of that email, I participated in a continuation of the hallway

conversation with several Weil lawyers, including Harvey Miller, my partner Ed Rosen, Michael

Klein, and several other people.

20.    During that hallway conversation, Mr. Miller or one of his partners raised a

concern about whether the transfer of the Rule 15c3-3 account assets might be subject to legal or

regulatory constraints and that time would likely be necessary to resolve such concerns.  To

address that issue, I recall that my partner Ed Rosen suggested that the pertinent provision of the

Clarification Letter include a phrase such as "to the extent permitted by applicable law."  It is

also my recollection that, as part of the same conversation, Mr. Klein said, in substance, that if

the legal constraints prevented transfer of the Rule 15c3-3 account assets, Barclays should

receive substitute assets.  This was agreed to by representatives of Lehman as reflected in the

final version of the Clarification Letter, as executed by all the parties thereto.  In particular, the

phrase "or securities of substantially the same nature and value" was added to the relevant

paragraph of the Clarification Letter to make clear that to the extent the transfer of $769 million

in securities from the 15c3-3 account was not possible due to any legal or regulatory constraint,

Lehman would be obligated to deliver to Barclays securities of the same nature and value from

some other source (outside of the 15c3-3 reserve account).

10

21.     Prior to the execution of the Clarification Letter and for at least several months thereafter, no one on behalf of the Debtor or the Trustee or the Creditors' Committee ever communicated to me or my partners (or, to my knowledge, to any other representative of Barclays), any suggestion that they believed that the $769 million in securities promised in section 8 of the Clarification Letter would not be required to be transferred unless and until it was determined that there was enough estate property to satisfy the claims of all customers not transferred to Barclays.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on January 27, 2010.

_____
Victor I. Lewkow

# BCI EXHIBIT

# 365

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (JMP) |

## DECLARATION OF IAN LOWITT

I, Ian Lowitt, declare as follows:

1.      I make this declaration on my personal knowledge. If called to testify, I would testify competently as follows.

2.      I make this declaration at the request of Barclays to address certain allegations that I understand have been made in this case. This declaration does not address all of the claims made by the Debtor regarding my role in the Sale Transaction (as defined below) and related events. By not commenting on all of LBHI's allegations, my declaration should not be understood to reflect agreement with LBHI's allegations, many of which I dispute.

3.      I am currently a Managing Director of Barclays Capital, Inc. ("Barclays"), which has offices at 200 Park Avenue, New York, New York 10166, and the (1) Head of Global Business Assessment and Strategic Analytics in the Barclays Wealth Division, (2) Chief Operating Officer of Private Banking, and (3) Head of the Transition Services Agreement ("TSA") Organization. I joined Barclays in late September 2008 as a Managing Director in

1

Infrastructure Management and became Chief Operating Officer of Barclays Wealth, Americas in April 2009.

4.     From June 12, 2008 until September 22, 2008, I served as the Chief Financial Officer ("CFO") of Lehman Brothers Holdings Inc. ("LBHI"). From October 23, 2006 until September 22, 2008, I served as the co-Chief Administrative Officer ("CAO") of LBHI. Prior to those roles, I was the CAO of Lehman Brothers International (Europe) from July 2005 to October 2006 and Treasurer of LBHI and Global Head of Tax from 2000 to 2005. I joined LBHI in 1994 as the head of corporate development.

5.     On September 15, 2008, LBHI commenced a Chapter 11 bankruptcy filing. LBHI and Barclays engaged in negotiations regarding a transaction whereby LBHI would sell certain assets of LBHI, Lehman Brothers 745 LLC ("LB 745 LLC"), and Lehman Brothers Inc. ("LBI", and together with LB 745 LLC and LBHI, "Lehman") to Barclays (the "Sale Transaction").

6.     I did not negotiate the terms of the Sale Transaction. I did not attend any of the negotiation sessions among the parties and their legal counsel, financial advisors, or consultants. I did not attend any presentations to the Bankruptcy Court about the Sale Transaction. I did not perform the valuations of the assets or liabilities to be transferred in the Sale Transaction. Any knowledge I have of the terms of the Sale Transaction or of the discussions with Barclays that resulted in the Sale Transaction I learned from others.

7.     Following LBHI's filing for bankruptcy, I was involved with a number of different activities on behalf of LBHI, including helping to ensure that LBHI was able to continue to operate until the Sale Transaction was consummated. Thus, my job responsibilities included focusing on, among other things, Lehman's liquidity challenges, as well as the

2

operational and personnel issues created by Lehman's filing. The bankruptcy filing, and the

ensuing uncertainty at LBI, created a chaotic situation in which employees were distraught about

their futures and it was difficult to get employees to focus on the firm.

8.      I understand that in its Rule 60(b) motion to modify the order approving the Sale

Transaction, LBHI alleges that I acted with conflicted loyalties in performing my tasks related to

the Sale Transaction. I believe such allegations to be simply untrue.

9.      At all times, I believe that I acted in a fashion that comported with what I

understood my fiduciary duties to Lehman to be, including my duties of loyalty and care. During

my interactions with Barclays' personnel, I was never asked to act, nor did I act, in any manner

that I believe would have compromised Lehman's interests or what I understood to be my duties

to Lehman.

10.     On or about September 15, 2008, I had a conversation with Bart McDade,

Lehman's lead negotiator of the Sale Transaction and the President and Chief Operating Officer

of Lehman. Mr. McDade informed me that Barclays intended to extend job offers to me and

seven other Lehman employees that would commence after the close of the Sale Transaction. I

was also informed that Barclays considered my services and those of the seven others critical to

the integration of Lehman's and Barclays' businesses and thus to the transaction, and that one of

the conditions of the Sale Transaction at that time was that these eight individuals, myself

included, would enter into employment agreements with Barclays.

11.     I signed an employment agreement with Barclays (the "Employment Agreement")

dated September 18, 2008. None of the payments to which I am entitled under the Employment

Agreement is conditional on Barclays' performance. Under the terms of the Employment

Agreement, I received guaranteed compensation for 2008 equal to approximately 60 percent of

my 2007 compensation and an additional stock grant equal to almost 20 percent of my 2007

compensation to be awarded no later than March 15, 2009. The Employment Agreement also

entitled me to two special award payments, to be paid respectively at the first and second-year

anniversaries of my starting date, each equal to 25 percent of my total 2007 compensation. I

believe that the compensation I have received, and will receive, pursuant to the Employment

Agreement is commensurate with my prior compensation at Lehman, is consistent in structure

with what I understand to be the employment packages offered by Barclays to other former

Lehman employees, and is being received for ongoing and valuable services to Barclays.

12.    From September 2008 until January 2009, when the integration of the legacy

Lehman businesses into the Barclays' infrastructure was successfully completed, I was the

Director of Integration for the legacy Lehman businesses within Infrastructure Management. In

this position, I brought to bear the valuable experience I had with Lehman's infrastructure and

control environment, as well as my working relationships with key infrastructure personnel in

systems, operations, finance and other corporate areas, to assist Barclays in integrating Lehman's

former businesses. I also worked with senior Barclays managers in systems, operations, finance,

risk, and other corporate functions to create new leadership structures, decide who was best

placed to fill those positions, and create a fair process to identify individuals within the newly

combined organization to fill the remaining positions. As a result of the integration, almost all of

the Lehman businesses were successfully integrated into the Barclays control environment

before the close of 2009 and the legacy Lehman infrastructure groups were combined with their

Barclays counterparts to create single organizations.

13.    In November 2008, I was appointed the Head of the TSA Organization. In that

position, I was also able to use my knowledge of Lehman's control and operational environment

4

to assist Barclays in providing transitional services to the legacy Lehman estate (the "Estate").

The Estate has benefited from the quality of service provided by the TSA organization as this has

enabled it to realize value for its creditors.  I attach as Exhibit A an email sent to me by Bill

Gordon at Alvarez and Marsal thanking me and my team for what he described as a "great job"

on transitional services.

     I declare under penalty of perjury under the laws of the United States that the foregoing

is true and correct.  Executed this 27th day of January, 2010, at New York, New York.


_____

Ian Lowitt

# EXHIBIT A

**From:** Gordon, Bill [mailto:WGordon@alvarezandmarsal.com]
**Sent:** Thursday, December 24, 2009 6:39 AM
**To:** Lowitt, Ian T
**Subject:** 12 months

Ian,

I was just thinking how far we have come over the past twelve months. At this time last year I was putting the finishing touches in the infamous Christmas Eve letter to Jonathan Hughes. Since then, we seem to have put everything on the right track and look to have achieved 95% separation within eighteen months of the acquisition. Your team did a great job and, despite a few bumps in the road, it has been a pleasure working with you.

Have a wonderful holiday.
Bill

William B. Gordon
Managing Director
Alvarez & Marsal North America, LLC
600 Lexington Ave.
New York, NY 10022
Lehman Office (646) 285-9171
Cell: (914) 646-0422
Office: (212) 759-4433

# BCI EXHIBIT

# 366

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x
                                              :
In re                                         :      Chapter 11 Case No.
                                              :
LEHMAN BROTHERS HOLDINGS INC., et al.,        :      08-13555 (JMP)
                                              :
        Debtors.                              :      (Jointly Administered)
                                              :
--------------------------------------------------------------x

### DECLARATION OF HUGH (SKIP) MCGEE, III

I, Hugh McGee, III, declare as follows:

1.      I make this declaration on my personal knowledge. If called to testify, I would testify competently as follows.

2.      I am currently employed by Barclays Capital, a division of Barclays Bank PLC (together with Barclays's Capital, "Barclays") as a managing director and Head of Investment Banking. I have been in my current position since September 22, 2008.

3.      Before joining Barclays, I was employed by Lehman Brothers ("Lehman"). I first began working for Lehman in 1993 as a senior vice president in its Houston office. Over time, I became a managing director and ran Lehman's natural resources and power groups globally. I became global head of Investment Banking in December 2002 and remained in that position until I began to work for Barclays in late September 2008.

4.      I was involved in the negotiations between Lehman and Barclays regarding the Lehman Brothers North American broker-dealer business (the "Sales Transaction") that took place on September 15 and 16, 2008. I was not a primary negotiator for the Sales Transaction. Rather, my focus was on trying to preserve the human capital so there would be a business for Barclays to acquire when the transaction was finished. My work was focused on the provisions of the Asset Purchase Agreement (the "APA") that dealt with compensation issues, including

2

bonus and severance. This meant that I was involved in the discussions of the provisions of Section 9.1 of the APA, titled Employees and Employee Benefits, with those who were drafting that section. I was in and out of the room where other provisions of the APA were being discussed but was not directly involved in negotiating any of the other terms of the APA and played no role in assessing the value of the assets transferred to Barclays under the APA. I was not involved in any key parts of the Sales Transaction after September 16.

5.      As I testified at my August 10, 2009 deposition, at some point during the evening of September 15, 2008, I received a verbal offer of employment by Barclays. I was told by Barclays that my agreement to work for them was a condition for Barclays to close the Sales Transaction. On that same night I verbally agreed to work for Barclays after the Sales Transaction closed.

6.      I attended part of the meeting of the Lehman Boards of Directors that took place on the morning of September 16, 2008, along with several of my Lehman colleagues. During that meeting, the Boards were informed of the details of the Sales Transaction, including that one of the conditions of the Sales Transaction was that eight specific Lehman employees enter into employment contracts with Barclays, that I was one of those eight employees and that, therefore, interested employees were involved in negotiating the Sales Transaction. The Boards were also informed that a high percentage of the firm's top 200 employees must agree to transfer to Barclays as a condition to the Sales Transaction.

7.      From Wednesday, September 17, 2008 through Sunday, September 21, 2008, I was traveling outside of New York to meet with various Lehman employees about the Sales Transaction. I did not attend the bankruptcy court hearing to approve the Sales Transaction that

3

took place on Friday, September 19, 2008, but understand that the court approved the Sales

Transaction later that night or early the next morning.

8.       On or about September 22, 2008, I received a generic, group email notice from

Barclays (the "Email Offer") that stated that I was being offered employment at Barclays. This

email provided only minimal details regarding the terms of the offered employment but asked

that I promptly advise Barclays whether I intended to accept the offer.

9.       I understand that the Sales Transaction closed on Monday, September 22, 2008.

On that same day I sent a short email in reply to the Email Offer stating that I planned to accept

the offer. I did not receive a detailed offer prior to the Sales Transaction closing.

10.      On or about October 6, I received an official letter from Barclays that set forth in

detail the terms and conditions of the offer of employment (the "Employment Letter"). I signed

the Employment letter on October 7, 2008.

11.      Prior to the closing of the Sales Transaction on September 22, 2008, I considered

myself to be a Lehman employee and acted at all times in its best interest and did not seek to

advance the interests of any other party, including the interest of Barclays, over the interests of

Lehman. I consider any allegation that I breached my fiduciary duty to Lehman to be completely

unfounded and without merit.

        I declare that the foregoing is true and correct to the best of my knowledge,

information and belief.

Dated: January 27, 2010

Hugh (Skip) McGee, III

# BCI EXHIBIT

# 367

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (JMP) |

## DECLARATION OF KENNETH RAISLER

I, Kenneth Raisler, declare as follows:

1.      I am a partner with the law firm of Sullivan & Cromwell LLP ("S&C"). Following the commencement of the Chapter 11 case of Lehman Brothers Holdings Inc. on September 15, 2008, we were engaged to start work on the potential acquisition by Barclays of most of the assets of Lehman Brothers Inc. ("LBI").

2.      I base this Declaration on my personal knowledge and my review of transaction documents.  In preparing this Declaration, I have neither relied on nor disclosed privileged communications.  Rather, I have relied on my recollection of non-privileged communications between the parties to the transaction (and their advisors and counsel).

3.      Beginning on Monday, September 15, 2008, I was involved in meetings and discussions between LBI and Barclays personnel concerning a potential acquisition by Barclays of LBI's proprietary futures business as well as its business as a futures commission merchant,

1

i.e., its business handling futures transactions for customers (the "Futures Business"). I recall

that, during those meetings and telephone conferences, Barclays was unable to get detailed

information concerning LBI's Futures Business for a number of reasons, both technical and

practical. The obstacle to information-sharing that stands out most in my mind was that there

were problems with LBI's books and records that rendered it difficult for LBI to provide specific

details about the existence and nature of the positions and collateral held in connection with

LBI's Futures Business. My recollection is that, due to these and other issues, the discussions

during these meetings and calls were had at a very high level, all relating generally to LBI's

Futures Business, its proprietary positions and collateral, the customer segregated and secured

accounts through which LBI conducted that business, and the customer accounts that related to

that business. Although very little detailed information was provided during these meetings, it is

my recollection of these communications with LBI that the general understanding of all

participants seemed to be that the transfer of this business would be implemented on a date to be

determined by a direct transfer to Barclays of all of LBI's Futures Business including but not

limited to all LBI proprietary and customer futures accounts, and, to go with the accounts, all of

(1) LBI's settlement obligations to clearing corporations and brokers through whom LBI

conducted its Futures Business, (2) LBI's futures-related rights and obligations vis-à-vis its

futures proprietary and customer positions and (3) LBI's rights to the collateral contained in any

proprietary account or any customer segregated or secured account relating to LBI's Futures

Business.

4.    Also during the week of September 15, 2008, certain of the clearing corporations

and exchanges holding LBI's exchange-traded derivative accounts began exercising their self-

protection powers. For example, late on September 17, representatives of the Chicago

Mercantile Exchange ("CME") contacted me, as counsel to Barclays, the putative acquirer of the

LBI Futures Business, and requested that Barclays guarantee LBI's settlement obligations for all

proprietary futures positions that cleared through the CME.  I reported back in the early hours of

September 18th that Barclays could not agree to this request at that time because the anticipated

sale transaction with LBI had yet to receive Court approval.  I was told that without a guaranty

from Barclays, the CME would exercise its rights to take over the proprietary accounts.

Beginning on September 18th, the CME conducted auctions to sell LBI's proprietary futures

positions.  I understand that all or almost all of the collateral held in LBI's proprietary CME

account was transferred to the successful bidders in consideration for their taking over the

positions.  It is my understanding that this auctioning off of LBI's proprietary futures positions at

the CME led to a loss of approximately $1.6 billion in collateral that LBI had posted at the

CME.

      I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on January 27, 2010.

 

 

<u>                                                    </u>

                 Kenneth Raisler

# BCI EXHIBIT

# 368

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

                                :

In re:                                 :         Chapter 11
LEHMAN BROTHERS HOLDINGS INC, et al.,     :         Case No. 08-13555 (JMP)
                                  (Jointly Administered)
               Debtor.            :

                                  :

------------------------------------------------------------------ X

                                  :

In re: LEHMAN BROTHERS INC.,          :         Case No. 08-01420 (JMP)
               Debtor.            :

                                  :

------------------------------------------------------------------ X

## DECLARATION OF EDWARD J. ROSEN

Pursuant to 28 U.S.C. § 1746, EDWARD J. ROSEN hereby declares:

1.     I am a partner with the law firm of Cleary Gottlieb Steen & Hamilton LLP

("Cleary Gottlieb").  I was a member of the Cleary Gottlieb team representing Barclays Capital

Inc. ("Barclays") in connection with the potential acquisition by Barclays of the North American

brokerage and investment banking business of Lehman Brothers Inc. ("LBI").

2.     I began working at Cleary Gottlieb as an associate in 1982 and have been a

partner since 1991.  I specialize in derivatives and securities regulation and am co-coordinator of

the Firm's financial products and markets practice group.  I have served as counsel to the

Securities Industry and Financial Markets Association, the Securities Industry Association, the

Futures Industry Association, the International Swaps and Derivatives Association, and The

Bond Market Association.  I also currently serve on the Board of Directors of the Futures

Industry Association and the International Swaps and Derivatives Association Regulatory

Advisory Committee.  I am a co-author of the two-volume treatise, <u>U.S. Regulation of the</u>

<u>International Securities and Derivatives Markets</u>.

     3.     I base this Declaration on my personal knowledge, review of transaction

documents and, where indicated, the recollection of my partners who worked with me on this

engagement and with whom I have consulted in the preparation of this Declaration.  In preparing

this Declaration, I have neither relied on nor disclosed privileged communications.  Rather, I

have relied on my recollection and such consultations concerning non-privileged

communications between the parties to the transaction (and their advisors and counsel).

     4.     I understand from the Trustee's Rule 60 motion that the Trustee has taken the

position that the removal of certain language contained within section 1(d) of a draft of the

Clarification Letter circulated at 11:13 p.m. on September 20, 2008 reflects an agreement that

Barclays was not acquiring cash margin associated with LBI's exchange-traded derivatives

business.  That position is incorrect – there was, to my (or my partners') knowledge, never any

such agreement or discussion.

     5.     The draft language at issue was an attempt to accurately document the business

deal that had already been negotiated and agreed by clarifying, *inter alia*, that Barclays would

acquire the margin (including cash) associated with the exchange-traded derivatives positions

carried by LBI. The draft language accomplished this by making clear that the definition of

Excluded Assets did not include "any and all property [including cash] . . . maintained . . . by or

on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure

(whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any

other person in an account maintained by or on behalf of LBI for which [Barclays] shall become

responsible as of the Closing." Contrary to the Trustee's assertion, this carve-out for margin in

the form of cash was not removed. The carve-out was retained in section 1(a)(ii)(C) of the

execution version of the Clarification Letter, which clarifies that the definition of Purchased

Assets encompasses margin (in whatever form, including cash) for exchange-traded derivatives.

Clarification Letter § 1(a)(ii)(C) ("Purchased Assets shall include . . . exchange-traded

derivatives (and *any property* that may be held to secure obligations under such derivatives)")

(emphasis added). Because Excluded Assets is defined as assets "[e]xcept as otherwise specified

in the definition of 'Purchased Assets,'" Clarification Letter § 1(c), the inclusion of margin (in

whatever form) for exchange-traded derivatives in the definition of "Purchased Assets"

necessarily means that such margin is not encompassed within the definition of Excluded Assets

in section 1(c) of the Clarification Letter, which is consistent with the discussions of the lawyers

from both sides.

6.    At no time between 11:13 pm on September 20, 2008 and the Closing, or for

many months after the Closing, did anyone acting for the Trustee or the Debtor discuss with me

or anyone else at Cleary that the draft language in question should be removed because Barclays

was not supposed to acquire cash collateral pledged to secure obligations for the exchange-traded

derivatives that were part of the business Barclays was acquiring.

7.    As noted in the Declaration of Victor I. Lewkow, I participated in a hallway

conversation at Weil's offices in which Harvey Miller raised a concern about whether the

transfer of the Rule 15c3-3 account assets might be subject to legal or regulatory constraints. To

address that issue, I suggested that the pertinent provision of the Clarification Letter include a

phrase such as "to the extent permitted by applicable law." This was agreed to by

representatives of Lehman as reflected in the final version of the Clarification Letter, as executed by all the parties thereto.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on January 27, 2010.

                                 _____
                                      Edward J. Rosen

4

# BCI EXHIBIT

# 369

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re                                                          :        Chapter 11 Case No.

                                                               :

LEHMAN BROTHERS HOLDINGS INC., et al.,    :        08-13555 (JMP)

                                                               :

Debtors.                                                  :        (Jointly Administered)

                                                               :

-------------------------------------------------------------x

### DECLARATION OF PAOLO TONUCCI

I, Paolo Tonucci, declare as follows:

1.          I make this declaration on my personal knowledge.  If called to testify, I would testify competently as follows:

2.          I am currently employed by Barclays Bank PLC ("Barclays Bank") as Head of Group Balance Sheet within Group Treasury.  I have been in my current position since on or about February 2009.  From September 22, 2008 until on or about February 2009, I was employed by Barclays Capital (together with Barclays Bank, "Barclays") and my starting title with Barclays was U.S. Treasurer.

3.          From December 1996 through September 21, 2008, I was employed by Lehman Brothers ("Lehman").  I began working at Lehman as head of the fixed income derivatives product control team and my last job at Lehman was as Global Treasurer.

4.          I was aware that Lehman and Barclays were negotiating a sales transaction (the "Sales Transaction") on September 15 and 16, 2008.  I did not take part in these negotiations, but did have discussions with Lehman employees who themselves were providing information in connection with the negotiations.

5.      I did not attend the bankruptcy court hearing to approve the Sale Transaction, but understand that it commenced at approximately 4:30 p.m. on Friday, September 19, 2008 and that the Sales Transaction was approved later that night or early the next morning.  At some point during the evening of September 19, 2008, after the Lehman and Barclays teams had gone to the bankruptcy court, I was told informally by my Lehman colleague Ian Lowitt that I would be receiving an offer of employment from Barclays and the general economic terms.  Prior to that time, I had not discussed the possibility of working for Barclays with anyone.  I did not receive any written notice of the offer Mr. Lowitt referenced at that time and was not aware of what the specific terms of any such employment would be.

6.      On the morning of September 22, 2008, I received a notice from Barclays by email (the "Email Offer") that stated I was being offered employment at Barclays.  It was clearly a *pro forma*, group email and provided only minimal, general information regarding the terms of the offered employment.

7.      I understand that the Sales Transaction closed on Monday, September 22, 2008. On that same day, in order to comply with the Email Offer's directions, I responded to the acceptbarclaysoffer@lehman.com address with "I accept."

8.      On or about September 22, 2008, I also received a letter from Barclays that set forth in detail the terms and conditions of their offer of employment to me (the "Employment Letter").  I signed the Employment letter on September 26, 2008.

9.      Prior to the closing of the Sales Transaction on September 22, 2008, I considered myself to be a Lehman employee and acted at all times in its best interest and did not seek to advance the interests of any other party, including the interest of Barclays, over the interests of

Lehman.  I consider any allegation that I breached my fiduciary duty to Lehman to be completely unfounded and without merit.

   I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: January 27, 2010

         _____
         Paolo Tonucci

# BCI EXHIBIT

# 370

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF JAMES SEERY

I, James Seery, declare as follows:

1.      I make this declaration on my personal knowledge and to supplement my September 3, 2009 deposition testimony.  If called to testify, I would testify competently as follows.

2.      At the time of the September 22, 2008 Lehman acquisition by Barclays Capital Inc. ("Barclays") (the "Sale Transaction"), I was Lehman's Global Head of Loans, Fixed Income.

3.      I am also an experienced bankruptcy lawyer, having practiced bankruptcy law for roughly 10 years prior to joining Lehman in 1999.  As a result, I had an active role in the events and negotiations relating to the Sale Transaction.  I was familiar with changes in the transaction from September 16 through the September 19 approval hearing, which I attended.  I also participated in the discussions at Weil Gotshal over the weekend between the approval hearing and the September 22 closing.

4.      One of my roles was to brief representatives of the Creditors' Committee concerning the elements of the Sale Transaction.  I knew those advisors professionally and

personally as a result of many years of experience in bankruptcy matters. I felt that I was in a good position to communicate with them and to be direct about the terms of the transaction.

5.     I understand that one of the Committee representatives took notes of conversations that we had on the morning of Friday, September 19, 2008, the day of the approval hearing. I have reviewed those notes, which are attached as Exhibit 1. The notes refresh my recollection that I was very clear in explaining that there was a $5 billion difference between the marked value of the assets in the Fed repo (which I believed was $50.6 billion) and the amount advanced in the Fed repo to purchase those assets (which I believed was $45.5 billion).

6.     I understand that a Committee representative testified that he crossed out the notes reflecting the original information describing the repo because I told him the information and structure of the repo portion of the sale transaction had changed. My recollection is that the primary information that had changed was that Lehman's short positions had been closed out and that the estimated actual value of the Fed repo securities (as opposed to their marked value) had shrunk to approximately $45.5 billion. However, I consistently stressed to Committee representatives that the $5 billion difference between the advanced amount and the marked amount of the securities remained. That was the primary reason for my conversations with them at the time. I felt I needed to explain to them that this was a deal Lehman had to do, because it was the only available deal and the consequences of not selling the broker-deal would be disastrous for Lehman, its employees, customers, and the markets. Committee representatives indicated to me that they understood the sale might be a good deal for Barclays and, in fact, repeatedly discussed that point. They ultimately agreed that it was also the best alternative for Lehman.

2

7.    The notes also refreshed my recollection that Lehman traders independently assessed the value of the Fed Repo collateral under the stressed market circumstances at the time and the assets that went to Barclays when Barclays replaced the Fed repo.  We completed that exercise in connection with Barry Ridings' testimony and Barclays' challenge of the marked value of the assets.  The Lehman traders indicated that the market value of the Fed Repo collateral was closer to $45.5 billion than the marked value of $50.6 billion.  They also confirmed that Barclays had legitimate concerns, as Barclays expressed on September 18-19, that the value of the securities Barclays received and expected to receive in replacing the Fed repo might not provide excess value above the Barclays loan amount, as is customary in repo funding arrangements.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _28_ day of January, 2010, at _Alta_ , _UTAH_ .

_James P. Seery, Jr._
James P. Seery, Jr.

3

# Exhibit 1

10,200 employees ·· 9900 ·· 800 pm

Barclays will pay severance

Photog up Comp accrual.

Pension + 401k     } staying behind.
  → Fully Funded
Executive & Select Employee Plan  ‒ ‒

                                      3/21 - 9/15      14B

_IMD Div_

End of July, started selling majority stake ·· 55%
        16 - 17 plyrs
        15    NDAs
        11   1st Rnd ; Bids From 10 ; Selected 5
        5-6 staking ; 3 NDAs ‒ 1 revised intent
        Changed to 50/50 split ·· then final on Rnnd buyers.     6
        Last Friday ·· Bids from 4 (only sales from 3)
              Bain, HBF, S.Lauder, CVC

280B AUM                                          | TPE
     High Net Worth business ‒‒> huge at Clms PIM  | Capital Contracts
     Liquidity Business  ·· probably shut down.
     ~~Stock Equity~~
     Neuberger Berman  ·· equity/s
     ~~~~ CRATes  ‒ ~~told~~ told Labs Fds & consulting
          FCG
     LBAM ·  fixed assets

_Not included:_
~~Fixed~~ ~~product~~ sales + trading  ‒‒> Going to Barclays.
* heavily invested in Lease Pools ·· Xalom, Spruce

**Confidential**                                         HLHZ0038187

EXHIBIT
472B
12/17/09

1.5 b _of_ crippled Lehm contracts

NAV --
   LP - 2.3 B invested by Lehm (embedded Value 2+?)
      24 B _of_ associated mgt.
Crossroads -- _Fund of Funds_ in PE
   400 professionals ~ silo disi sual Fund.

New initiatives - Europe, Asia, Corn.

PIM
Asset Mgt - suspd redemptions
PE

Rest + sizing litigan
Comm't process
Timeline chts

Counsel PE
Pincus Trustees
Foregn Subs
Banks
Law Suits        - Koreans (Send copi)
                 - Dutch district
                 - JP Morgan (118 _of_ cross collatl)

Univ of returned Ldk = Senators

Eagle Energy          / Cour bk
Imperial Sugar

**Confidential**                                                    HLHZ0038188

Confidential

HLHZ0038189

#45.5 Log
All stats closed out (~~~~~)
Loan is @ 45.5
RE --- losing money
Comp & Seven
Losing the spreads in the portfolio
No Cash
350 PIM Broker

Prod    220      300
Creation  110      150
        330      450

20-30b closed out.
Repo -
Agen - 1+2%
Position  3 - 5%
Corp.   5-10%
Illiquid

Portion amount

47.8¢
45.5

2 c..d
2 Employ

DTC -- Trade closings now
FX & currency

* 250mm --BD
* Lehman None
* Contracts

No Residential Mortgages
59,000.

Confidential

HLHZ0038190

72 & A                                            47.4 B A
68 & L                                            45.5 & L
2.25 &              Corr                          2.25
2                   Early Comp Sim               2
250                 Cash on H                     250
950 - 1B            745 7th Ave                   950 - 1B
450                 NJ Data
Yes                 Profit Sharing               No
No                  DTC Settlmts                 Yes

              Purchased Assets
                    LB Canada Inc.
                    LB Short Financo  ⎫ PIM Buyers
                    LB Ongoing        ⎭
        2 year license for Lehman
        IMD purchal license
        No sharing of Residential Assets
        No purchase of Eagle Energy

        On-the-counter derivatives are not being taken

Confidential                                          HLHZ0038191