# BCI EXHIBIT

# 371

**From:**    Kelly, Martin
**Sent:**    Wed, 17 Sep 2008 21:57:51 GMT
**To:**    james.walker@barclayscapital.com
**Subject:**

---

James - please see org charts for key parts of finance attached

Regards - Martin


<<Finance Organizational Charts 2008 090408.ppt>>

<<Financial Control Organizational Chart - 09-17-08.ppt>>


<<Cap Markets and IBD 7.21.ppt>>

<<Global Treasury as of Sept. 3 2008 updated.ppt>>

<<Global Tax as of Aug 2008.ppt>>


Martin Kelly
Managing Director
Lehman Brothers Inc
Ph 212 526 3606



# Capital Markets & Investment Banking Controller
## Finance Division

**Gerry Reilly**
**Managing Director**
Capital Markets & Investment Banking CFO

**Janet Marrero**
Administrative Assistant

**Frank Pearn**
**Managing Director**
Equity Division CFO

**Jennifer Fitzgibbon**
Senior Vice President
Organizational Strategy, Capital Efficiency & Projects

**Clement Bernard**
**Managing Director**
Fixed Income Division CFO

**Gary Fox**
Senior Vice President
Investment Banking Division Controller

**Len Sciccutella**
**Managing Director**
Capital Markets Prime Services CFO & Capital Markets MIS & Sales

**Erik Addington**
Senior Vice President
Capital Markets Controller
*Asia*

**Tom O'Sullivan**
Senior Vice President
Mortgage Capital Division Controller

**Nick Slape**
**Managing Director**
Capital Markets Controller
*Europe*

**Legend**

MD & SVP
VP
Below VP
Non-Finance
Finance-Not Direct

LEHMAN BROTHERS

# Fixed Income Division
# Finance Division



LEHMAN BROTHERS

# FID Business Analysis
# Finance Division



Clement Bernard
Managing Director
FID CFO

Kevin Horan
Senior Vice President
BDS

Lucy Morris
VP
BPM

Sarah Pask
Associate

Vincent Mak
Analyst

Brian Daly
Associate
Revenue

Daniel Dias
Rotating Analyst

Mike McGarvey
VP
Capital

Brendan Davis
VP
Technology/Efficiency

Dirk Hasenuck
VP
Securitized Products
(Also reports to Product Controller)

Jomon Vallecillo
VP
Credit
(Also reports to Product Controller)

Paul Higham
VP
Real Estate
(Also reports to Product Controller)

Jeff Kimmelbaum
AVP
Munis

Kevin Citron
VP
Commodities

TBD
Rates

## Legend

MD & SVP
VP
Below VP
Non-Finance
Finance-Not Direct

LEHMAN BROTHERS



IRP
Finance Division

LEHMAN BROTHERS

# Commodities
# Finance Division



**Clement Bernard** — Managing Director

**Kevin Horan** — Senior Vice President

**Rafael Sanchez** — Vice President

**Kevin Citron** — Vice President

**Russell Schneider** — Senior Vice President

**Kirk Heineman**

**Natalie Lee**

**Greg Kaplanovich** — Assistant Vice President

**Jay Tedino** — Analyst

**Sheldon Tan** — Analyst

**TBD** — Associate/AVP

**Jason Fuchs** — Vice President

**Kristen O'Neill** — Associate

**Siddharth Kinghar** — Analyst

**Kevin McLean** — Analyst

**Legend**
MD & SVP
VP
Below VP
Non-Finance
Finance-Not Direct

LEHMAN BROTHERS



# Real Estate
# Finance Division

**LEHMAN BROTHERS**

# Credit Controller
# Finance Division



**Legend**

MD & SVP
VP
Below VP
Non-Finance
Finance–Not Direct

**Clement Bernard**
Managing Director
FID CFO

**Gilles Aublin**
Senior Vice President
Credit Controller

**Hicham Jaidi**
Vice President
CDO/HY

**Qwasi Gamor**
Vice President
Business Support

**Scott Goswami**
Vice President
Credit Valuation

**Brian Potasiewicz**
Vice President
Loans & Esoteric

**Katie Chan**
Vice President
High Grade/Munis

**TBD**
Vice President
High Grade

**Jeff Kirshenbaum**
Assistant Vice President
Municipals

**TBD**
Assistant Vice President

**TBD**
Vice President

**TBD**
Vice President

**TBD**
Associate

**Supama Ray**
Associate

**Amine Haqqaoui**
Associate

**Morenike Babarinde**
Associate

**Vivu Gogwana**
Associate

**Matthew Karp**
Rotating Analyst

**Thomas Boychuk**
Associate
Municipals

**Caitlin Coyne**
Rotating Analyst
Municipals

**Frank Triano**
Rotating Analyst

**Dual report to Neeraj Chopra

LEHMAN BROTHERS



# Emerging Markets
# Finance Division

**Gilles Aublin**
Senior Vice President
Emerging Markets CFO

**Sophia Lee**
Vice President

**Wendy Zhang**
Senior Associate

Legend

| MD & SVP |
| VP |
| Below VP |
| Non-Finance |
| Finance-Not Direct |

LEHMAN BROTHERS



# Securitized Products Finance Division

**LEHMAN BROTHERS**

Clement Bernard
**Managing Director**
FID CFO

James Guarino
**Senior Vice President**
Securitized Products

Joseph Sapia **
**Vice President**
Valuation Control

Dirk Haseruck
**Vice President**
Business Analysis

Gary Belitz
**Vice President**
PnL Analytics

Usman Babar
**Vice President**

Laura Kim
**Assistant Vice President**

Brian Lupo
**Assistant Vice President**

Jae Park
**Associate**

Ajeeth Sankaran
**Rotating Analyst**

Jason Siu
**Analyst**
Business Analysis

Keith Barth
**Associate**

Michael Elgort
**Associate**

Jim Oh
**Analyst**

Mike Williams
**Senior Associate**

Buffington Armand
**Associate**

Alex Merino
**Rotating Analyst**

Legend

| MD & SVP |
| VP |
| Below VP |
| Non-Finance |
| Finance-Not Direct |

** Dual report to Neeraj Chopra

# Valuation
## Finance Division



LEHMAN BROTHERS

# Equity OTC Products
# Finance Division



**LEHMAN BROTHERS**

# Capital Markets
# Risk, Valuation & Accounting Control Finance Division



**Legend**

| | |
|---|---|
| MD & SVP | |
| VP | |
| Below VP | |
| Non-Finance | |
| Finance-Not Direct | |

**Clement Bernard & Frank Peam**
Managing Directors
*Co-Head of Accounting & Valuation Control*

**Neeraj Chopra**
Senior Vice President
*Valuation Controller*

**Michael Bade**
Vice President
*Accounting Controller*

**TBD**
Assistant Vice President

**Muhammed Ali Jamal**
Assistant Vice President

**Kersi Harda**
Vice President

**TBD**
Assistant Vice President

**Pavan Makhija**
Associate

**William Lee**
Vice President

**Amit Shah**
Business Line
*Product Control Valuation*

**Scott Goswami**
Vice President
*Valuation*

**Alice Zhang**
Vice President

**Young Huang**
Vice President
*Energy Valuation*

**Qun Xu**
Senior Associate

**Sahil Kochar**
Associate

**Katey Chiu**
Analyst

**TBD**
Vice President
*Risk & Control*

**Anji Kothari**
Assistant Vice President

**TBD**
Assistant Vice President

**Gregory Faith**
Assistant Vice President

**Oksana Tevf**
Associate

**Michael Leung**
Associate

**TBD**
Associate

## LEHMAN BROTHERS

# Capital Markets MIS/Sales Finance Division



LEHMAN BROTHERS

# US - Investment Banking Finance
# Finance Division

**Gary Fox**
Senior Vice President
IBD Control

**Matt Foley**
Vice President
*Equities*

**John Correnti**
First Vice President
*Deal Closings/Pipeline*

**Priya Kothari**
Vice President
*NPE/Management Reporting*

**Steve McClatchey**
Senior Vice President
*Advisory/CFA Revenues/*
*Engagement Letters/Invoicing*

**Andy Lu**
Vice President
*Fixed Income*

**Cathy Bocchicchio**
Assistant Vice President
*ABS, MBS, Derivative,*
*FX*

**Kelly Chow**
Assistant Vice President
*Loans, Muni*

**Aik Pinellis**
Associate
*Municipals*

**Lyubov Lebedeva**
Assistant Vice President
*Debt Origination*

**James Choi**
Associate
*HY, PDF, RE*

**David Zilberman**
Rotating Analyst
*HG, FRN, L/T*

**Nicholas Locker**
Rotating Analyst
*2008 Finance Graduate Program*

**MaryAnn Zgaljardic**
Assistant Vice President
*IBD/NBM Control*

**Carolyn Berral**
Assistant Vice President

**Lilavatti (Mindy) Rammarian**
Associate

**Teri Volpe**
Shared AVP

**Martin Flaherty**
Rotating Analyst
*Syndicate*

**Joe Scamuffo**
Vice President
*Recoveries/Management*
*Reporting*

**Fran D'Amato**
Assistant Vice President
*Legal Busted Deals*

**Amanda Bago**
Associate
*Recoveries/Management*
*Reporting*

**Peter Del Mistro**
Assistant Vice President
*Revenue/Client Reporting*

**Andrey Ulyanenko**
Rotating Analyst
*Revenue/Client Reporting*

**Maagan McDermott**
Associate
*Expense Reporting*

Legend
MD & SVP
VP
Below VP
Non-Finance
Finance-Not Direct

LEHMAN BROTHERS

# Europe Capital Markets/Equity Volatility Product Control Finance Division

**Legend**

- MD & SVP
- VP
- Below VP
- Non-Finance
- Finance-Not Direct

Andrew Wright
MD - CFO

Nadeem Kiyani
SVP
Equity Product Control

James Rose
VP
Volatility Product Control

Ian Morris
VP
Volatility Product Control

Andrew Moore
Associate
Volatility Product Control Projects

JP Frechin (22 Oct)
Volatility Product Control
Valuations

Rob Iskin
Volatility Product Control
Flow & RnS

TBD
VP
Volatility Product Control
Converts / Funds / R&SK

Ayesha Qadir
Associate
Volatility Product Control
Converts / Funds / R&SK

James Campbell
Associate
Volatility Product Control
Converts / Funds / R&SK

Eric Kasper
Associate
Volatility Product Control
Valuations

Andy Chan
Associate
Volatility Product Control
Valuations

Naval Khaitij
Associate
Volatility Product Control
AXM Flow

TBD
AVP
Volatility Product Control
New Deal

TBD
Associate
Volatility Product Control
New Deal

Craig Van Eyk
AVP
Volatility Product Control
Converts / Funds / R&SK

Richard O'Neill
Volatility Product Control
Converts / Funds / R&SK

Nastya Krol
Associate
Volatility Product Control
Converts / Funds / R&SK

Eitan Cohlson
Associate
Volatility Product Control
Converts / Funds / R&SK

Ravi Aggarwal
Associate
Volatility Product Control
Converts / Funds / R&SK

Sarah Griffiths
Associate
Volatility Product Control
Converts / Funds / R&SK

Ameko Eslar
Associate
Volatility Product Control
Converts / Funds / R&SK

Brendan Ward
Industrial Placement
Volatility Product Control
Converts / Funds / R&SK

Steve Lerkman
Associate
Volatility Product Control
AXM Flow

Viviana Farrilas
Associate
Volatility Product Control
AXM Flow

Rob Cooper
Associate
Volatility Product Control
AXM Flow

Andrew Williams
Associate
Volatility Product Control
AXM Flow

Aliaa McElhany
Associate
Volatility Product Control
AXM Flow

Saba Ongoya
Associate
Volatility Product Control
AXM Flow

John Kelly
Associate
Volatility Product Control
AXM Flow

Caroline Mason
Associate
Volatility Product Control
AXM Flow

Dee Raftery
Associate
Volatility Product Control
Projects

Kelly McLain
AVP
Volatility Product Control
Balance Sheet

Surbjit Matta
Associate
Volatility Product Control
Balance Sheet

Natacha Choo Foo
Associate
Volatility Product Control
Balance Sheet

Sonra Aggar
Associate
Volatility Product Control
Balance Sheet

Open Rec

James Morris
Volatility Product Control
Exotics

Bhavuke Led
Volatility Product Control
Exotics

Petri Tarkainen
AVP
Volatility Product Control
Exotics

Hassan Kazmi
Associate
Volatility Product Control
Exotics

Anna Emery
Associate
Volatility Product Control
Exotics

Milan Emoh
Associate
Volatility Product Control
Exotics

Loredana Tevix
Associate
Volatility Product Control
Exotics

Blake Nakvas
Associate
Volatility Product Control
Exotics

Sandip Sobal
Associate
Volatility Product Control
Exotics

Lee Shimen
Associate
Volatility Product Control
Exotics

Shvive Javakski
Industrial Placement
Volatility Product Control
Exotics

Callins Chisenga
Volatility Product Control
Converts / Funds / R&SK

## LEHMAN BROTHERS

# Europe Capital Markets/Equity Product Control Finance Division



**LEHMAN BROTHERS**

# Europe Capital Markets/ FID Product Control (1)
## Finance Division



LEHMAN BROTHERS

# Europe Capital Markets/FID Product Control (2) Finance Division



LEHMAN BROTHERS

# Europe Capital Markets/Decision Support Finance Division



LEHMAN BROTHERS



# Asia – Capital Markets Product Control Finance Division

**Erik Addington**
Senior Vice President
Head of Capital Markets
Product Control, Asia

**Yuzuru Yano**
Senior Vice President
Head of Banking, Accounting and
Risk (CSE) Control, Asia

**Raymond Chan**
Senior Vice President
Head of FID Product Control
Asia

**Mark Wells**
Vice President
Head of Equities/CMPS Product Control
Asia

**Issac Davies**
Vice President
Head of Non-Japan Asia
Product Control, Asia

Legend

MD & SVP
VP
Below VP
Non-Finance
Finance-Not Direct

LEHMAN BROTHERS

# Asia – Capital Markets Accounting Control Finance Division



**Erik Addington**
Senior Vice President
Head of Capital Markets Product Control
Asia

**Yuzuru Yano**
Senior Vice President
Head of Banking, Accounting and
Risk (CSE) Control, Asia

TBD
Vice President
Capital Group

Jay Oh
Assistant Vice President

Katrin Dziergwa
Asssociate
CSE
Hong Kong

Nitin Kumar
Associate
CSE

Simon Reedman
Associate

Michelle Zeng
Analyst

TBD

Legend
MD & SVP
VP
Below VP
Non-Finance
Finance-Not Direct

**LEHMAN BROTHERS**

# Asia - FID Product Control Finance Division



LEHMAN BROTHERS

# Asia – Equity Product Control Finance Division



LEHMAN BROTHERS

Legend

MD & SVP
VP
Below VP
Non-Finance
Finance-No Direct

**Erik Addington**
Senior Vice President
Head of Capital Markets Product Control, Asia-Pacific

**Mark Wells**
Vice President
Head of Equities / CMPS Product Control
Asia-Pacific

**Nicole Lehmann**
Vice President
Capital Markets Prime Services

**Katherine Duncan**
Vice President
AES & GTS

**TBD**
Vice President
Head of Equity Volatility

TBD
Asst. Vice President

Sonoko Koike
Associate

Winnie Tan
Associate

Jason Gans
Analyst

Motoko Nozaki
Associate

Martin Tan
Asst. Vice President

Sandy Woo
Asst. Vice President

Joyce Choy
Associate

Jade Wong
Associate

Michael Sung
Asst. Vice President
AES

Aiko Kojima
Associate
AES

Ludovic Coll
Asst. Vice President
Structured Volatility

Manindra Kumar
Associate

Arion Ho
Associate

Shirley Yu
Associate

Christopher Arcoumanis
Associate

TBD

Kevin Lam
Asst. Vice President
Hong Kong

Mansigani Mahesh
Associate

Anne Chong
Associate

TBD

TBD
Vice President
Flow Volatility

Shirleen Quah
Asst. Vice President

Alvin Lam
Associate

Andrew Saunders
Associate

Elvira Nizaeba
Associate

Young Geun Ji
Associate
Korea

# Remainder of Attachments Omitted

# BCI EXHIBIT

# 372

**Administrator**

Sent: Friday, May 29, 2009 12:33 AM

| | |
|---|---|
| **From:** | Richard, Katia [krichard@lehman.com] |
| **Sent:** | Friday, September 19, 2008 3:56 AM (GMT) |
| **To:** | Dolan, John [jdolan1@lehman.com]; Bunyatov, Julia [jbunyato@lehman.com]; Failla, Nicholas [nicholas.failla@lehman.com]; McInerney, Lily [lily.mcinerney@lehman.com]; Neave, Jon [jon.neave@lehman.com]; Sorkin, Alan M [asorkin@lehman.com]; Butryn, Kirk [kbutryn@lehman.com]; Merveille, Jerome [jerome.merveille@lehman.com]; Martin, Lisa [lmartin1@lehman.com]; Blackwell, Alastair [ablackwe@lehman.com] |
| **Cc:** | Javed, Syma [syma.javed@lehman.com]; Bater, Thomas [thomas.bater@lehman.com]; Hanson, Guy C [guy.hanson@lehman.com]; Parchuri, Saritha [saritha.parchuri@lehman.com]; Urciuoli, Michael [mike@lehman.com]; Healy, Michael [michael.healy@lehman.com]; Cui, Brett [brett.cui@lehman.com]; Vemparala, Venkata S [venkata.vemparala@lehman.com]; Banaja, Hatim [hatim.banaja@lehman.com]; Fernandes, Peter [PFernand@lehman.com]; Lodato, Joseph [joseph.lodato@lehman.com]; Weitzer, John [jweitzer@lehman.com]; Evans, Michael (NY) [michael.evans@lehman.com] |
| **Subject:** | Re: FIRM ACCOUNT TRANSITION TO BARCLAYS - |

Trading agrees as of this evening all trades move over. No cherry picking

----- Original Message -----
From: Dolan, John
To: Bunyatov, Julia; Failla, Nicholas; McInerney, Lily; Neave, Jon; Sorkin, Alan M; Butryn, Kirk; Merveille, Jerome; Martin, Lisa; Blackwell, Alastair
Cc: Javed, Syma; Bater, Thomas; Hanson, Guy C; Parchuri, Saritha; Urciuoli, Michael; Healy, Michael; Cui, Brett; Vemparala, Venkata S; Richard, Katia; Banaja, Hatim; Fernandes, Peter; Lodato, Joseph; Weitzer, John; Evans, Michael (NY)
Sent: Thu Sep 18 23:29:33 2008
Subject: Re: FIRM ACCOUNT TRANSITION TO BARCLAYS -

All,

Let's be very clear here. There is no such thing as cherry picking. Per Berkenfeld and Lodato all positions will move. New accounts in NEWCO will be set up and the positions will be transferred as of Thursday's close. If something needs to be done, as in an account being set up to take the MTM
P+L between Thursday and Friday we need discuss in the AM.

All in all the mirror accounts in the 930 range will be set up to transfer the positons to and that will be processed somewhere around 6PM on Friday evening after compliance gives it the go ahead.

Compliance, please let me know if you disagree with the above approach.

Thnaks,

John


--------------------------------

----- Original Message -----
From: Bunyatov, Julia
To: Failla, Nicholas; McInerney, Lily; Neave, Jon; Sorkin, Alan M; Dolan, John; Butryn, Kirk; Merveille, Jerome; Martin, Lisa; Blackwell, Alastair

7/27/2009

Exhibit
65 B
2/K 8-7-09

10298087

Cc: Javed, Syma; Bater, Thomas; Hanson, Guy C; Parchuri, Saritha; Urciuoli, Michael; Healy, Michael; Cui, Brett; Vemparala, Venkata S; Richard, Katia; Banaja, Hatim; Fernandes, Peter
Sent: Thu Sep 18 23:13:15 2008
Subject: Re: FIRM ACCOUNT TRANSITION TO BARCLAYS -

Guys: are we cherry picking LBI positions or all LBI-TMS positions are being transferred?

Renaming accounts in FO risk management systems would cleraly not work if we are selecting positions.

Need a confirmation on the scope asap. Who owns that answer? The trader?

Lily/Kirk - please confirm.

If we are cherry picking positions in LBI - processing them via FO execution systems would probably make most sense to get them into COMPASS, AMM, etc.


----- Original Message -----
From: Failla, Nicholas
To: McInerney, Lily; Neave, Jon; Bunyatov, Julia; Sorkin, Alan M; Dolan, John; Butryn, Kirk; Merveille, Jerome; Martin, Lisa; Blackwell, Alastair
Cc: Javed, Syma; Bater, Thomas; Hanson, Guy C; Parchuri, Saritha; Urciuoli, Michael; Healy, Michael; Cui, Brett; Vemparala, Venkata S; Richard, Katia; Banaja, Hatim; Fernandes, Peter
Sent: Thu Sep 18 22:48:52 2008
Subject: Re: FIRM ACCOUNT TRANSITION TO BARCLAYS -

I thought if any positions stayed in lbi it would stay in the original lbi account it was in? It would then be managed out of that existing lbi account?

----- Original Message -----
From: McInerney, Lily
To: Neave, Jon; Bunyatov, Julia; Sorkin, Alan M; Dolan, John; Butryn, Kirk; Merveille, Jerome; Martin, Lisa; Failla, Nicholas; Blackwell, Alastair
Cc: Javed, Syma; Bater, Thomas; Hanson, Guy C; Parchuri, Saritha; Urciuoli, Michael; Healy, Michael; Parchuri, Saritha; Cui, Brett; Vemparala, Venkata S; Richard, Katia; Banaja, Hatim; Fernandes, Peter
Sent: Thu Sep 18 22:36:16 2008
Subject: RE: FIRM ACCOUNT TRANSITION TO BARCLAYS -

To point #3, if the accounts are just renamed with a new number who will adjust the positions for the quantity that may not be transferred.  That remaining amount needs to be reflected in an account under the existing LBI entity.

Either new books need to be created in old LBI to house positions left behind or new accounts for New Co. need to be created to reflect the transferred positions.

From:  Neave, Jon
Sent:  Thursday, September 18, 2008 7:57 PM
To:    Bunyatov, Julia; Sorkin, Alan M; Dolan, John; Butryn, Kirk; Merveille, Jerome; Martin, Lisa; Failla, Nicholas; Blackwell, Alastair
Cc:    McInerney, Lily; Javed, Syma; Bater, Thomas; Hanson, Guy C; Parchuri, Saritha; Urciuoli, Michael; Healy, Michael; Parchuri, Saritha; Cui, Brett; Vemparala, Venkata S; Richard, Katia
Subject:    RE: FIRM ACCOUNT TRANSITION TO BARCLAYS -


From:  Bunyatov, Julia
Sent:  Thursday, September 18, 2008 4:33 PM
To:    Neave, Jon; Sorkin, Alan M; Dolan, John; Butryn, Kirk; Merveille, Jerome; Martin, Lisa; Failla, Nicholas; Blackwell, Alastair
Cc:    McInerney, Lily; Javed, Syma; Bater, Thomas; Hanson, Guy C; Parchuri, Saritha; Urciuoli, Michael; Healy, Michael; Parchuri, Saritha; Cui, Brett; Vemparala, Venkata S; Richard, Katia
Subject:    RE: FIRM ACCOUNT TRANSITION TO BARCLAYS -
Importance:  High


7/27/2009

10298087

Three questions/confirmations:

1. Scope: All LBI positions - does this include Asia and Europe? The current account list from Nick includes Asia / Europe exposures.

<< Message: FW: Accounts Summary, as requested - Questions >>

I understand all positions are going, irrespective of where they were risk managed - does this constitute an issue in terms of who is assigned to trade them on Monday? If not, then we'll need to capture for p&l purposes.

2. The PNL clarification below (tomorrow's positions, today's EOD prices) - can you confirm this is actually the case/correct?

This would significantly affect how we transfer positions in FO Risk Management systems if we want to PNL to match front to back.

See attached - I have received no response to the contrary. We will be move unencumbered assets, excluding fails etc. I believe Alastair's organisation is pulling this together.

<< Message: Equity securities - transfer price and timing >>

3. Positions transfer:

Given the below confirmation - No trades will be processed by the Front Office Execution systems to facilitate position transfers to the new accounts.

Risk Management systems (COMPASS, EUCLID, AMM, SNM) are reviewing whether the existing accounts could be renamed to the new range.

Agreed - no trading permitted tomorrow

Thank you

---

From:  Neave, Jon
Sent:  Thursday, September 18, 2008 3:37 PM
To:    Bunyatov, Julia; Sorkin, Alan M; Dolan, John; Butryn, Kirk; Merveille, Jerome; Martin, Lisa; Failla, Nicholas; Blackwell, Alastair
Cc:    McInerney, Lily; Javed, Syma; Bater, Thomas; Hanson, Guy C
Subject:    RE: FIRM ACCOUNT TRANSITION TO BARCLAYS -

---

From:  Bunyatov, Julia
Sent:  Thursday, September 18, 2008 3:33 PM
To:    Neave, Jon; Sorkin, Alan M; Dolan, John; Butryn, Kirk; Merveille, Jerome; Martin, Lisa; Failla, Nicholas; Blackwell, Alastair
Cc:    McInerney, Lily; Javed, Syma; Bater, Thomas; Hanson, Guy C
Subject:    RE: FIRM ACCOUNT TRANSITION TO BARCLAYS -
Importance:    High

How are we transferring the positions?

1. Are we booking trades in Settlement systems?

TMS, RISC, ITS?

Yes - Kirk, John and co have created an approach to booking the trades. We don't think we have much to do on the front end. Their guys are defining some checks and balances to ensure the transfers went through correctly. Our working assumption is the positions will move tomorrow night based on tonight's prices.

I believe we are transferring positions plus open trades.

2. Are we transferring YTD PNL or starting fresh?

Start afresh - there will be p&l from the get go as we believe tonight's prices will be used.

7/27/2009

Thanks,
Julia

---

From: Neave, Jon
Sent: Thursday, September 18, 2008 2:58 PM
To: Bunyatov, Julia; Sorkin, Alan M; Dolan, John; Butryn, Kirk; Merveille, Jerome; Martin, Lisa
Cc: McInerney, Lily; Javed, Syma; Bater, Thomas; Hanson, Guy C
Subject: RE: FIRM ACCOUNT TRANSITION TO BARCLAYS

I agree with that Julia

I just spoke with Jerome about structure product issuance and agree we would look to defer any conversation around this until later next week to allow the dust to settle on our core migration.

I also heard FID was agitating to get up and running in terms of their OTC derivatives businesses, though I don't know how they would paper this. I haven't heard this on the Equities side so am going under the assumption that this is not a current priority for day-1.

Also, John Dolan indicated that potentially the listed option positions might not be coming across - I haven't heard this directly form the business so would be keen for clarity here if someone is aware.

J

---

From: Bunyatov, Julia
Sent: Thursday, September 18, 2008 1:34 PM
To: Neave, Jon
Cc: McInerney, Lily
Subject: FW: FIRM ACCOUNT TRANSITION TO BARCLAYS
Importance: High

Jon:

Please confirm the scope / priority for Monday - all of the below businesses have LBI portfolios:

Execution Services
Flow Vol
Equity Strategies
Convertibles
Structured Vol (DPL warrants and hedges)

Thanks,
Julia

---

From: Vassak, James J
Sent: Thursday, September 18, 2008 12:48 PM
To: Goddard - Directs; Kalyanswamy-Directs; Imperato Directs
Cc: Bunyatov, Julia; Execution Services BA Group; Crater, Jeffrey H; Peng, David L; Parchuri, Saritha; Jansen, Jeffrey; Failla, Nicholas; Richard, Katia
Subject: FIRM ACCOUNT TRANSITION TO BARCLAYS
Importance: High

All - Need to do a quick check on the systems that are in scope for change Monday. If we are missing anything, please let me know immediately!!!

Please review!!!

Thanks, Jim

7/27/2009

10298087

Scope of Systems in Analysis for Monday

Order Management/Execution Platforms
CTI
STOMP
Original BRASS
BRASS 2
LAURA
CBTS
LOTS
DPT GUI and tools (Cross Capture, Streetside Booker)
TIGER LATAM/Can
TIGER Listed Options
TIGER
Ex-trader (Futures)
Trade Pipe (Futures)
Raptor
Liquidpoint
FX Live
FX Maria
First
MacGregor
Royal Blue

Risk Management Systems
GPM
AMM
CBTS
SNM
EUCLID

7/27/2009

10298087

# BCI EXHIBIT

# 373

From:        Clackson, Patrick: Finance (LDN)
Sent:        Friday, September 19, 2008 3:06 PM
To:          Ricci, Rich: Barclays Capital
Subjec       FW: Negative goodwill

the official line fyi

Some of comp relates to deferred plans so is accounted for over the deferral period

Cure payments are optional and tho some will be incurred, most will be covered by our ongoing
supplier relationships and fall into monthly expenses

-----Original Message-----
From: Trevelyan, James:
Sent: 19 September 2008 15:29
To: Clackson, Patrick: Finance (LDN)
Subject: Negative goodwill

Patrick

As we talk to people we are still coming across quite some uncertainty around the negative
goodwill. I think it boils down to one point which seems to be not well understood.

We understand broadly that the negative goodwill arises because the 2.25 cure payment and 2.0
comp provision won't be valued at that amount but instead c.1.3, the difference (2.95) giving
rise to net assets for which we pay .25, leading to negative goodwill of 2.7.

What is not understood is why we are not recognising either the cure or the comp at their
full amount. It would be really valuable to get an understanding of how this works.

Regards

James
--------------------------
Sent using BlackBerry



1    .

# BCI EXHIBIT

# 374

# Filed Under Seal Pursuant To Protective Order

# BCI EXHIBIT

# 375

**To:**    'mwitkin@dtcc.com'[mwitkin@dtcc.com]; 'clambert@dtcc.com'[clambert@dtcc.com];
'dbrennan@dtcc.com'[dbrennan@dtcc.com]; 'imontal@dtcc.com'[imontal@dtcc.com];
'jcolangelo@dtcc.com'[jcolangelo@dtcc.com]; 'jkiechle@dtcc.com'[jkiechle@dtcc.com];
'lthompson@dtcc.com'[lthompson@dtcc.com]; "Susan Cossgrove'[scosgrove@dtcc.com];
'bkapogiannis@dtcc.com'[bkapogiannis@dtcc.com]
**Cc:**    'Neal.Ullman@lehman.com'[Neal.Ullman@lehman.com];
'wigallag@lehman.com'[wigallag@lehman.com]; 'lvecchio@lehman.com'[lvecchio@lehman.com]; Kobak,
James B.[kobak@hugheshubbard.com]; Kiplok, Christopher[Kiplok@HughesHubbard.COM]
**Bcc:**
    '004336.00002.east@nyimport01.firm.hugheshubbard.com'[004336.00002.east@nyimport01.firm
.hugheshubbard.com]

| | |
|---|---|
| **From:** | Frelinghuysen, Anson |
| **Sent on behalf of:** | Frelinghuysen, Anson |
| **Sent:** | Fri 9/26/2008 4:13:59 PM |
| **Importance:** | Low |
| **Sensitivity:** | None |
| **Subject:** | LBI Transfer Instructions / Trustee Authorization |
| **Categories:** | |

**Book1.xls**
**Document.pdf**


Please see the attached.

Thank you.

Anson

Anson B. Frelinghuysen
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
Tel: 212.837.6208
Fax: 212.299.6208
Cell: 646.404.3033

Confidential

DOCUMENT PRODUCED IN NATIVE FORMAT

Confidential

HHR_00019134

| S&P | MOODY | QUANTITY | LEHMAN MKT VAL |
|-----|-------|----------|----------------|
|  |  | 50,000.00 |  |
|  |  | 40,000.00 |  |
|  |  | 54,000.00 |  |
|  |  | 36,000.00 |  |
|  |  |  |  |
| AAA | AA2 | 21.00 | 21.00 |
| AAA | NR | 870,000.00 | 79,312.13 |
| CC | N/R | 19,650,000.00 | 13,830,002.95 |
| AAA | NR | 25,000.00 | 7,884.74 |
| NR | BAA2 | 4,750,000.00 | 3,697,152.58 |
| BB | NR | 25,000.00 | 16,104.19 |
| N/R | N/R | 4,450,000.00 | 107,912.50 |
| N/R | N/R | 25,000,000.00 | 8,046,904.29 |
| N/R | N/R | 11,027,410.00 | 3,588,954.88 |
| AAA | A3 | 198,973,015.00 | 1,941,753.56 |
| AAA | AAA | 165,000,000.00 | 33,995,782.65 |
| AAA | NR | 300,000.00 | 289,624.20 |
| AAA | AAA | 75,000.00 | 67,473.33 |
| AAA | NR | 7,889,000.00 | 7,581,145.36 |
| AAA | NR | 1,025,000.00 | 868,817.85 |
| AAA | AAA | 130,000.00 | 127,474.64 |
| AAA | N/R | 150,000.00 | 147,425.37 |
| AAA | NR | 60,000.00 | 54,104.71 |
| AAA | AAA | 120,000.00 | 110,597.45 |
| AAA | NR | 2,725,000.00 | 2,283,351.07 |
| N/R | N/R | 48,100,000.00 | 13,924,049.08 |
| AAA | AAA | 50,000.00 | 48,464.69 |
| AAA | AAA | 60,000,000.00 | 52,983,104.16 |
| NR | AAA | 25,208,000.00 | 21,125,853.24 |
| AAA | NR | 1,000.00 | 106.03 |
| AAA | AAA | 5,550,000.00 | 5,284,712.57 |
| BBB | BAA2 | 240,000.00 | 41,171.47 |
| AAA | AAA | 18,500,000.00 | 8,839,606.08 |
| AAA | AAA | 187,500.00 | 184,695.43 |
| AAA | NR | 30,000.00 | 27,480.11 |
| AAA | NR | 300,000.00 | 256,660.79 |
| N/R | AAA | 30,000.00 | 27,767.37 |
| AAA | AAA | 10,000,000.00 | 8,093,474.26 |
| AAA | AAA | 95,000,000.00 | 61,998,287.87 |
| CC | NR | 20,210,000.00 | 16,122,367.48 |
| NR | N/R | 5,000,000.00 | 1,971.46 |
| AAA | AAA | 4,858,411.00 | 238,722.24 |
| AAA | AAA | 189,391.00 | 27,587.16 |
| AAA | AAA | 150,000.00 | 145,258.43 |
| AAA | AAA | 4,000,000.00 | 3,759,550.07 |
| AAA | AAA | 30,000.00 | 27,986.49 |
|  |  |  | 269,921,342.80 |

James W. Giddens, as Trustee for the SIPA liquidation of Lehman Brothers, Inc.,
authorizes the transfer of collateral referenced in the enclosed spreadsheet in accordance
with the wire instructions below on an expedited, priority basis as part of the transfer of
customer accounts to Barclays.

Wire Instructions:
Please wire from DTC 636 to Barclays corporate DTC box 7256.  Please deliver on DTC
Code 30 for free.  Please reference 09.26.08 dtc 636 on the deliveries.


_____
Christopher K. Kiplok
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
(212) 837-6810
FAX (212) 422-4726

Counsel to the Trustee

Confidential

# BCI EXHIBIT

# 376

**From:** Hirshon, Sheldon
**Sent:** Tuesday, March 31, 2009 10:03 PM
**To:** 'Eric Kay'
**Cc:** James Tecce
**Subject:** RE: Lehman Brothers -- DTC

Eric - working from memory the gist of your request is for documents that record the deal between Lehman and Barclays. Neither DTCC nor any of its clearing agency subsidiaries (collectively, DTCC) was a party to that deal, participated in the negotiations or have any documents prepared by either side that demonstrate values, assets to be purchased, etc.

As for the resi securities, the original deal was for Barclays to secure DTCC's position with a $250mm guarantee and the pledge of one-half of the $6 bil of the resi's it was to receive in the deal, or $3 bil, as was mentioned at the Friday night hearing (at no time was the deal that DTCC would receive the entire $6 bil of resi's). However, about midnight on Sunday, the regulators arranged for the DTCC resi's to be given to Chase to break a deadlock with it, and these securities were never pledged to DTCC. DTCC never received, saw or evaluated these securities. It cannot provide any information regarding them.

I will explain in greater detail the role DTCC played in this deal when we speak. For now, suffice it so say that each trading day DTCC and its clearing agency subsidiaries clear and settle nearly all trades done on every exchange in the US; about 66 million sides a day (every trade has a buy side and a sell side). Its guarantees both sides; that is, it guarantees delivery of the securities sold and payment for the securities bought. If a broker/dealer fails to deliver the securities or the cash, DTCC completes the side and then seeks reimbursement from the failing b/d.

DTCC monitors its risk daily. In a b/d failure the DTCC standard procedure is for DTCC to "cease to act." It turns off the failing b/d's access to the market so that DTCC's risk is limited to the trades already in the pipeline. In the Lehman deal the regulators prevailed on DTCC to hold off on its usual procedures in order to facilitate the transfer of LBI's b/d business to Barclays by keeping LBI alive instead of shutting it down. The idea, as expressed at the hearing, was to deliver the b/d business intact and as a going business. The $250mm Barclays guarantee and the resi's were to be provided to protect DTCC from any losses it would incur as a result of not ceasing to act for LBI. As I said, the resi's were pulled from the deal leaving only the Barclays guarantee and, after an internal review of the situation, DTCC accepted the revised deal.

I hope this brief explanation will help you begin to understand DTCC's role in the deal and why I commented that DTCC probably will have few, if any, of the documents you seek. I will get back to you with a definitive response to your request after I have the chance to review it with DTCC.

Shelly


SHELDON I. HIRSHON | Proskauer Rose LLP
1585 Broadway | New York, NY 10036-8299
V: 212.969.3270 | F: 212.969.2900 | M: 917.693.5222
Email: shirshon@proskauer.com
www.proskauer.com


**From:** Eric Kay [mailto:erickay@quinnemanuel.com]
**Sent:** Tuesday, March 31, 2009 7:36 PM
**To:** Hirshon, Sheldon
**Cc:** James Tecce
**Subject:** RE: Lehman Brothers -- DTC

Sheldon,

Thanks for the response but given your colloquy with the Judge on the night of the sale hearing, we are a little surprised to

**CONFIDENTIAL**

DTCC 00540

hear that the DTCC would have little, if any, responsive documents.

As you recall, during the sale hearing, you explained to the Judge the role of the DTCC and its need for a pledge of $6 billion in residential mortgage securities to secure Lehman's obligations to DTCC. You further explained to the Judge the expectation that, assuming trades settled in the normal course, half of the value of the pledged securities (approximately $3 billion) would be returned to Lehman. Thus, at a minimum, the DTCC surely must have documents relating to the residential mortgage securities, their pledge to the DTCC, the obligations owing to the DTCC that the pledge sought to secure, and the ultimate disposition of the residential mortgage securities (i.e., are they still held by the DTCC, were they returned to Lehman, were they transferred to Barclays, etc.).

Thanks,

Eric

---

**From:** Hirshon, Sheldon [mailto:SHirshon@proskauer.com]
**Sent:** Tuesday, March 31, 2009 6:47 PM
**To:** Eric Kay
**Subject:** RE: Lehman Brothers -- DTC

Eric - I have been absorbed by an involuntary bk filing against a client and have just resurfaced. My review of your document request leads me to expect that DTCC has very little, if any, documents responsive to your request. I will talk with DTCC tomorrow and get back to you.

SHELDON I. HIRSHON | Proskauer Rose LLP
1585 Broadway | New York, NY 10036-8299
V: 212.969.3270 | F: 212.969.2900 | M: 917.693.5222
Email: shirshon@proskauer.com
www.proskauer.com

---

**From:** Eric Kay [mailto:erickay@quinnemanuel.com]
**Sent:** Friday, March 27, 2009 12:43 PM
**To:** Hirshon, Sheldon
**Cc:** James Tecce
**Subject:** RE: Lehman Brothers -- DTC

Shelly,

As a follow-up to your voicemail, attached is the letter that was sent to you on December 26th.

Thanks,

Eric

---

**From:** Eric Kay
**Sent:** Thursday, March 26, 2009 1:13 PM
**To:** shirshon@proskauer.com
**Cc:** James Tecce
**Subject:** Lehman Brothers -- DTC

Sheldon,

This email is a follow-up to my voice mail earlier this week regarding the documents that we (as counsel to the Official Creditors Committee) have requested from your client, the DTC, in connection with the September 2008 transaction between Lehman Brothers Holdings Inc., Lehman Brothers, Inc., LB 745 LLC and Barclays Capital, Inc. My voice mail

**CONFIDENTIAL**

DTCC 00541

message was a follow-up to an earlier letter and email sent to you requesting such documents. To date, we have not received any documents from the DTC or, in fact, any response from you on behalf of the DTC. As I explained in my voice mail, Barclays has recently produced documents relating to the transaction that we had previously requested from them. Barclays produced the documents in response to, among other things, the narrow requests we outlined in our December 26 letter addressed to both Barclays and the DTC (which we sent to you).

In order to continue our investigation into the transaction, we once again request that the DTC produce the documents that we have requested from it or, at a minimum, provide us with the courtesy of an explanation as to why DTC will not or can not produce the requested documents.

As I also indicated in my voice mail, the Committee is prepared to pursue this document request through a Rule 2004 request, if necessary . Still, we would prefer to avoid incurring that expense (and taxing the Court's time). To that end, the courtesy of your response is requested before Monday, March 30, 2009. Thank you.

Eric Kay
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Direct: (212) 849-7273
Main Phone: (212) 849-7000
Main Fax: (212) 849-7100
E-mail: erickay@quinnemanuel.com
Web: www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.



*******************************************************
To ensure compliance with requirements imposed by U.S.
Treasury Regulations, Proskauer Rose LLP informs you that
any U.S. tax advice contained in this communication
(including any attachments) was not intended or written to
be used, and cannot be used, for the purpose of (i)
avoiding penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any
transaction or matter addressed herein.

*****************************************************
This message and its attachments are sent from a law firm
 and may contain information that is confidential and
protected by privilege from disclosure. If you are not the
intended recipient, you are prohibited from printing,
copying, forwarding or saving them. Please delete the
message and attachments without printing, copying,
forwarding or saving them, and notify the sender
immediately.

CONFIDENTIAL

# BCI EXHIBIT

# 377

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                              :
In re                                         :    Chapter 11
                                              :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,      :    Case No. 08-13555 (JMP)
                                              :
        Debtors.                              :    (Jointly Administered)
                                              :
----------------------------------------------------------------x
                                              :
In re                                         :
                                              :
LEHMAN BROTHERS INC.                          :    Case No. 08-01420 (JMP) SIPA
                                              :
        Debtor.                               :
                                              :
----------------------------------------------------------------x

### STIPULATION AND AGREED ORDER WITH RESPECT TO NON-RELATED CONTRACTS POSTED FOR ASSUMPTION AND ASSIGNMENT IN CONNECTION WITH ASSET PURCHASE AGREEMENT

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors and debtors in possession (each a "Debtor," and collectively, the "Debtors"), Neuberger Berman Group LLC ("NB"), James W. Giddens (the "SIPA Trustee"), the appointed trustee under the Securities Investor Protection Act of 1970, as amended, for the administration of Lehman Brothers Inc. ("LBI"), and Barclays Capital Inc. ("Barclays" or the "Purchaser," and together with the Debtors, NB and the SIPA Trustee, the "Parties" and each a "Party"), by and through their respective attorneys, hereby enter into this Stipulation and Agreed Order and represent and agree as follows:

### RECITALS

A.        Commencing on September 15, 2008 and periodically thereafter, the Debtors (when referred to with their non-Debtor affiliates, "Lehman") commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

1

The Debtors are authorized to continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.       On September 16, 2008, LBHI, LB 745 LLC, LBI, and Barclays entered into an

asset purchase agreement for the purchase and sale of certain assets (as modified, clarified and/or

amended, the "Asset Purchase Agreement").  On September 17, 2008, the Debtors filed a motion

seeking, among other things, approval of the Asset Purchase Agreement.

C.       On September 19, 2008, a proceeding (the "SIPA Proceeding") was commenced

under the Securities Investor Protection Act of 1970, as amended ("SIPA"), 15 U.S.C. §§ 78aaa

et seq., with respect to LBI and James W. Giddens was appointed as Trustee under the SIPA to

administer LBI's estate.

D.       On September 20, 2008, the Court entered the sale order (the "Sale Order")

approving the Asset Purchase Agreement, as modified, clarified, and/or amended by the First

Amendment To Asset Purchase Agreement, dated September 19, 2008, and a letter agreement,

dated as of September 20, 2008, clarifying and supplementing the Asset Purchase Agreement.[1]

On September 20, 2008, the Court also entered a concurrent order approving the Sale Order in

the SIPA Proceeding.[2]

E.       The Asset Purchase Agreement provided that certain contracts related to the

assets purchased by Barclays (the "Related Contracts") could be designated by Purchaser as

Purchased Assets (as defined in the Asset Purchase Agreement).   On September 18, 2008, the

Debtors and the Purchaser identified Related Contracts for assumption and assignment to the

---

[1]       Case No. 08-13555 (JMP) [Docket No. 258].

[2]       Case No. 08-1420 (JMP) [Docket No. 3].

2

Purchaser as of September 22, 2008 (the "Closing Date") and listed those Related Contracts in

schedules (the "Closing Date Schedules") posted on http://chapter11.epiqsystems.com/lehman.

F.    Section 2.5 of the Asset Purchase Agreement provides, inter alia, that for a period

of sixty days (60) after the Closing Date, the Purchaser may designate additional Related

Contracts for assumption and assignment to the Purchaser. To facilitate the assumption and

assignment of Related Contracts subsequent to the Closing Date, on September 26, 2008, the

Debtors sought approval of procedures for the assumption and assignment or rejection of Related

Contracts.

G.    On October 3, 2008, the Court entered an order granting the Debtors' Motion,

inter alia, to establish procedures for the assumption and assignment or rejection of Related

Contracts (the "Procedures Order").[3] On October 6, 2008, the Court also entered an order

incorporating by reference the Procedures Order in the SIPA Proceeding.[4] Pursuant to the

Procedures Order, from time to time, the Purchaser filed notices of assignment (the "Assignment

Notices") on the docket in the Debtors' chapter 11 cases and the SIPA Proceeding and served

such Assignment Notices on the counterparties to the designated contracts.

H.    The Parties have conducted an independent review of the Closing Date Schedules

and the Assignment Notices and have agreed that certain contracts included therein are not

Related Contracts. Specifically, the Parties seek to clarify that the contracts identified on Exhibit

"A" hereto (i) were not intended to be assumed and assigned to the Purchaser, (ii) are unrelated

---

[3]    Case No. 08-13555 (JMP) [Docket No. 628].

[4]    Case No. 08-1420 (JMP) [Docket No. 69].

3

to the assets purchased by Barclays, and, as such, (iii) were not intended to be assumed and assigned by the Sale Order or the Procedures Order (collectively, the "Unrelated Contracts").

I.      NB, as the acquirer of Lehman's investment management business views certain of the Unrelated Contracts as necessary to the operation of Lehman's investment management business. NB's acquisition closed on May 4, 2009.

J.      Upon execution of this Stipulation and Agreed Order, the Debtors will provide notice of this Stipulation and Agreed Order to each of the counterparties (the "Counterparties") to the Unrelated Contracts.

**IT IS HEREBY STIPULATED, AGREED AND, UPON COURT APPROVAL HEREOF, IT SHALL BE ORDERED THAT:**

1.      Notwithstanding any prior order of this Court to the contrary, or any Closing Date Schedule or any Assignment Notice given by the Purchaser, the Debtors or the SIPA Trustee, the Unrelated Contracts (i) have not been assumed and assigned to the Purchaser, and (ii) were not purchased by the Purchaser.

2.      The Unrelated Contracts shall return to status quo ante between the Counterparty and the respective Lehman entity or LBI as if never having been listed on any Closing Date Schedule or Assignment Notice and all rights of the Counterparties and Lehman or LBI shall not be affected by the listing of an Unrelated Contract on a Closing Date Schedule or Assignment Notice. To the extent a Debtor or LBI is a party to the Unrelated Contracts, such Unrelated Contracts constitute property of the respective Debtor's or LBI's estate and all rights of the Debtors and the SIPA Trustee (and the Counterparties' rights) with respect thereto, including, but not limited to, under sections 362 and 365 of the Bankruptcy Code, are preserved.

4

3.      The inclusion of the Unrelated Contracts on the Closing Date Schedules and/or

any Assignment Notice shall not give rise to (i) any administrative expense claim or damage

claim against any of the Debtors, LBI or their respective estates, whether under 11 U.S.C. §

503(b) or otherwise, or (ii) any obligation or liability of Barclays, including without limitation,

for payment of cure amounts under section 365 of the Bankruptcy Code with respect to such

Unrelated Contracts.

4.      Within five (5) business days of entry of this Stipulation and Agreed Order by the

Court, NB shall pay to Barclays the cure amounts set forth in Exhibit "A," in accordance with

wire instructions provided by Barclays' counsel, on account of cure payments that have been

paid by Barclays with respect to the Unrelated Contracts.  Barclays agrees, solely with respect to

the Unrelated Contracts, not to seek payment or reimbursement of additional cure amounts from

NB, the SIPA Trustee, the Debtors, and their respective estates, other than those set forth on

Exhibit A.

5.      Barclays agrees to cooperate in good faith with, and upon request of, the Parties to

provide all documentation and records that may be reasonably necessary for evidence of any cure

payments expended by Barclays with respect to the Unrelated Contracts; provided however, for

the avoidance of doubt, that failure to provide any such documentation or records shall not

excuse compliance with the terms of this Stipulation and Agreed Order, including without

limitation those set forth in paragraph 4 above.

6.      Nothing in this Stipulation and Agreed Order shall bind, be collateral estoppel or

otherwise prejudice any Party's rights or position with regard to any Related Contracts.  Except

as expressly set forth herein, the Parties reserve all of their rights and defenses with respect to

any other claims each might have against the other.

5

7.      Each person who executes this Stipulation and Agreed Order on behalf of a Party hereto represents that he or she is duly authorized to execute this Stipulation and Agreed Order on behalf of such Party.

8.      This Stipulation and Agreed Order may be executed with counterparty signature pages in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. The Parties agree that this Stipulation and Agreed Order may be executed via facsimile or e-mail transmission and that this Stipulation and Agreed Order executed in such manner shall have full legal force.

9.      This Stipulation and Agreed Order can only be amended or otherwise modified only by a signed writing executed by the Parties.

10.     This Stipulation and Agreed Order shall be interpreted, construed and enforced exclusively in accordance with the laws of the State of New York, except to the extent that the Bankruptcy Code or SIPA applies.

11.    The Court shall retain jurisdiction to resolve any disputes or controversies arising from or related to this Stipulation and Agreed Order.

**AGREED TO:**

Dated: August 6, 2009
        New York, New York

/s/ Lori R. Fife
Lori R. Fife, Esq.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors and
Debtors in Possession*

/s/ Lindsee. P. Granfield
Lindsee. P. Granfield, Esq.
Lisa M. Schweitzer, Esq.

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for Barclays Capital, Inc.*

/s/ Jeffrey S. Margolin
James B. Kobak, Jr., Esq.
Jeffrey S. Margolin, Esq.

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*Attorneys for James W. Giddens, Trustee
for SIPA Liquidation of Lehman
Brothers Inc.*

/s/ Jeffrey W. Levitan
Jeffrey W. Levitan, Esq.

PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
Telephone: (212) 969-3000
Fascimile: (212) 969-2900

*Attorneys for Neuberger Berman Group
LLC*

**SO ORDERED:**

Dated: New York, New York
        August 25, 2009

s/ James M. Peck
UNITED STATES BANKRUPTCY JUDGE

7

**Exhibit A**
**(Schedule of Unrelated Contracts)**

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| Access Data Corp. | General Terms and Conditions: IT Products and Services, effective as of Sept. 18, 2006 (ID: CON-16340) | Master Agreement | Two Chatham Center 24th Floor Pittsburgh, PA 15219 | $153,850 | LBHI |
| Access Data Corp. | Application Service Provider Supplement, effective as of Sept. 18, 2006 (ID: CON-16341) | Additional terms and conditions applicable to ASP Products licensed and/or sublicensed to LBHI and related hosting / maintenance services | Two Chatham Center 24th Floor Pittsburgh, PA 15219 | | LBHI |
| Access Data Corp. | Application Service Provider Transaction Schedule, effective as of Mar. 12, 2008 (ID: CON-27119) | License of ASP Product - Access Data SalesVision CRM Synchronization, and related hosting and maintenance services | Two Chatham Center 11th Floor Pittsburgh, PA 15219 | | LBI |

---

1    This description is provided for informational purposes only. To the extent there is any inconsistency between this description and the agreement, the agreement governs. The inclusion of an agreement in this Exhibit is without prejudice to a determination of whether such agreement is an executory contract.

2    LBHI – Lehman Brothers Holdings Inc.
     LBI – Lehman Brothers Inc.
     LBCC – Lehman Brothers Commercial Corporation
     LCPI – Lehman Commercial Paper Inc.
     NB – Neuberger Berman LLC
     LBIMT – Lehman Brothers Investment Management Technology
     LB SAM – Lehman Brothers Software Asset Management

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| Access Data Corp. | Application Service Provider Transaction Schedule, effective as of September 18, 2005 (ID: CON-16342) | Transaction Schedule | Two Chatham Center 11th Floor Pittsburgh, PA 15219 | | NB |
| Access Data Corp. | Application Service Provider Transaction Schedule, effective as of Sept. 18, 2005 (ID: CON-16345) | Transaction Schedule | Two Chatham Center 11th Floor Pittsburgh, PA 15219 | | NB |
| Aspect Software, Inc. (a/k/a Aspect Communications) | End User Equipment / Software/ Services Agreement, dated as of June 15, 2007 | Contract for Purchase of Equipment and grant of license to use Aspect Software | 300 Apollo Drive Chelmsford, MA 01824 | | LBHI |
| Atlantic Information Services, LLC | Software License and Services Agreement, dated as of Nov. 28, 2005 (ID: CON-28590) | License of AIS CDO Sentry software package | Lee Farm Corporate Park 83 Wooster Heights Rd. Danbury, CT 06810 Attn: Scott Turley | | Lehman Brothers Asset Management |
| Atlantic Information Services, LLC | Product License Transaction Schedule, effective as of June 1, 2007 (ID: CON-20019) | Software License Schedule | Lee Farm Corporate Park 83 Wooster Heights Rd. Danbury, CT 06810 Attn: Scott Turley | | LBHI |
| Atlantic Information Services, LLC | Non-Disclosure Agreement, made as of Aug. 17, 2005 (ID: 004942-LEHNY-2005) | Confidentiality Agreement | Lee Farm Corporate Park 83 Wooster Heights Road Danbury, CT 06810 Attn: Scott Turley | | LBHI |
| Bank of New York | Stock Transfer Agency Agreement, dated as of November 9, 1998 (ID: CON-24059) | Bank of New York provides stock transfer agency services to LBHI | | | LBHI |

-2-

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| Bank of New York | Amendment No. 1 to Stock Transfer Agency Agreement (ID: CON-24060) | Amendment to November 9, 1998 agreement pursuant to which Bank of New York provides stock transfer agency services to LBHI | One Wall Street New York, NY 10286 | | LBHI |
| Bank of New York | Amendment No. 2 to Stock Transfer Agency Agreement, dated as of January 29, 2002 (ID: CON-24061) | Amendment to November 9, 1998 agreement pursuant to which Bank of New York provides stock transfer agency services to Lehman Brothers, including the Dividend Reinvestment Program. | One Wall Street New York, NY 10286 | | LBHI |
| Bank of New York | Administrative and Recordkeeping Services Agreement (U.S. Ordinaries), dated as of Dec. 23, 2002 (ID: CON-31129) | Bank of New York to provide ESPP administrative and record keeping services to LBHI. Firmwide usage. | 3 Manhattanville Road Purchase, NY 10577 Attn: Robert A. Goldstein | | LBHI |
| Barra, Inc. | Order Form for Asset Management, dated as of July 13, 2007 (ID: CON-20090) | Order for Barra Integrated Model – Developed Markets Bundle | 2100 Milvia Street Berkeley, CA 94704 | | LBI, on behalf of its Lehman Brothers Asset Management Business Unit |
| Barra, Inc. | Amendment No. 1 to the Assignment of Order Forms and License Agreement, effective as of July 13, 2007 (ID: CON-22455) | Products License | 2100 Milvia Street Berkeley, CA 94704 | | LBI and NB |
| Barra, Inc. | Order Form for Asset Management, dated as of Jan. 14, 2008 (ID: CON-27708) | Order for additional user license – Aegis Risk Manager | 2100 Milvia Street Berkeley, CA 94704 | | LBI, on behalf of NB |
| Barra, Inc. | License Agreement, effective as of Jan. 1, 2001 (ID: CON-5009A) | Nonexclusive license to use Barra Products | 2100 Milvia Street Berkeley, California 94704 | | NB |

-3-

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| Compass Group USA d/b/a Eurest Dining Services | Management Agreement, dated as of June 4, 2004 (ID: 005177-LEHNY-2004) | Agreement for management of food and beverage service at a site in Littleton, Colorado. | 11201 N. Tatum Blvd. Suite 160 Phoenix, AZ 85034 | | LBI |
| Compass Group USA, Inc. d/b/a Eurest Dining Services | Addendum to Management Agreement, dated as of October 25, 2004 (ID: 005351-LEHNY-2004) | Provides for food and beverages services at Aurora Loan Services' Inverness Facility. | 11201 N. Tatum Blvd. Suite 160 Phoenix, AZ 85034 | | LBI |
| Compass Group USA d/b/a Eurest Dining Services | Addendum to Management Agreement, effective as of June 4, 2004 (ID: CON-21193) | Provides for food and beverages service at Aurora Loan Services' Scottsbluff, Nebraska location. | 11201 N. Tatum Blvd. Suite 160 Phoenix, AZ 85034 | | LBI |
| deSABRAN LLC | General Terms and Conditions: IT Products and Services, effective as of May 11, 2007 (ID: CON-20521) | Terms and conditions governing purchase, license or lease of equipment and/or software from deSABRAN LLC. | 5082 E. Hampden Avenue, Suite 102 Denver, CO 80222 | | LBI |
| deSABRAN LLC | Product License Supplement, effective as of May 11, 2007 (ID: CON-21437) | Sets forth additional terms and conditions applicable to software products licensed to Aurora Loan Services. | 5082 E. Hampden Avenue, Suite 102 Denver, CO 80222 | | Aurora Loan Services LLC |
| deSABRAN LLC | Product Maintenance Supplement, effective as of May 11, 2007 (ID : CON-21438) | Sets forth additional terms and conditions applicable to the performance of maintenance services with respect to certain hardware or equipment. | 5082 E. Hampden Avenue, Suite 102 Denver, CO 80222 | | Aurora Loan Services LLC |

-4-

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| deSABRAN LLC | Amendment to Product License Transaction Schedule, dated as of July 15, 2008 (ID: CON-30186) | Identifies specific software being licensed – Aurora Secure File Upload application. | 5082 E. Hampden Avenue, Suite 102 Denver, CO 80222 | | Lehman Brothers Bank, FSB n/k/a Aurora Bank FSB |
| deSABRAN LLC | Product License Transaction Schedule for smartWebSuite 3.0, effective as of May 11, 2007 (ID: CON-23544) | Product License Transaction Schedule to CON-20521. | 5082 E. Hampden Avenue, Suite 102 Denver, CO 80222 | | Lehman Brothers Bank, FSB n/k/a Aurora Bank FSB |
| Fannie Mae Housing Finance Institute | Dedicated Network Solution Pricing Agreement between Fannie Mae and Aurora Loan Services Inc, dated as of Sept. 30, 2003. | Dedicated network solution pricing agreement | Rosemary Maieron Norwood Director, Business & Technology Consulting Eastern Business Center Fannie Mae 1935 Market Street Suite 2300 Philadelphia, PA 19103 | | Aurora Loan Services, LLC |
| FaxOne Systems LLC | Addendum to Vendor Agreement, dated as of Nov. 4, 2004 (ID: 005118-LEHNY-2004) | Addendum to End-User License Agreement | 63 Farmington Ridge Drive Farmington, CT 06032 | | NB |
| FaxOne Systems LLC | General Terms and Conditions: IT Products and Services, effective as of Jan. 8, 2008 (ID: CON-26418) | Master Agreement | 63 Farmington Ridge Drive Farmington, CT 06032 | | LBHI |
| FaxOne Systems LLC | Non-Disclosure Agreement, dated as of Jan. 4, 2008 (ID: CON-26481) | Confidentiality Agreement | 63 Farmington Ridge Drive Farmington, CT 06032 | | LBHI |

-5-

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| FaxOne Systems LLC | Professional Services Supplement, effective as of Jan. 8, 2008 (ID: CON-26419) | Additional terms and conditions applicable to services performed by FaxOne Systems. | 63 Farmington Ridge Drive Farmington, CT 06032 | | LBHI |
| FaxOne Systems LLC | Professional Services Transaction Schedule, effective as of Jan. 8, 2008 (ID: CON-26552) | FaxOne to add revenue reporting feature to ARMS data | 63 Farmington Ridge Drive Farmington, CT 06032 | | LBI |
| FX Alliance, LLC | FX Alliance User Agreement, dated as of Sept. 10, 2001 (ID: CON-31094) | Governs use of the System to access certain FXall Content | FX Alliance, LLC Attn: General Counsel or President 900 Third Ave., 3rd Floor New York, 10022 | | LBCC |
| FX Alliance, LLC, FX Alliance Limited, and FX Alliance International, LLC | FXall Accelor Direct Participant Agreement, dated as of January 17, 2008 (ID: CON-31096) | Governs the use of the System to submit Transaction Data | FX Alliance, LLC, FX Alliance Limited, and FX Alliance International, LLC Attn: General Counsel or President 900 Third Ave., 3rd Floor New York, 10022 | | LBCC |
| Hotspot FXi, L.L.C. | Participating Financial Institution Agreement between Lehman Brothers Commercial Corporation and Hotspot FXi, LLC dated as of July 21, 2005 | Hotspot provides an electronic platform through which Lehman and certain of its clients may enter into foreign currency transactions. | 1375 Plainfield Avenue Watchung, NJ 07069  With a copy to: Edward M. Zimmerman, Esq. Lowenstein Sandler PC 65 Livingston Avenue Roseland, NJ 07068 | | LBCC |
| Hotspot FXi, L.L.C. | ISDA Master Agreement | ISDA Master Agreement between Lehman Brothers Commercial Corporation and HotSpot FXi, LLC, dated as of May 8, 2007, and guarantee of the same by LBHI. | 1375 Plainfield Avenue Watchung, NJ 07069 | | LBCC |

-6-

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| Interactive Technologies, Inc. | Letter Agreement (ID: CON-26680) | Confidentiality Agreement | Mr. Bjarne F. Rostaing, Senior Vice President, Interactive Technologies Corporation 371 Springfield Avenue Summit, NJ 07901 | | LBI |
| Interactive Technologies, Inc. | Agreement for License and Installation of The Advantage LTD Fee Billing System, effective as of July 10, 2002 (ID: CON-23122, 006686A [duplicate]) | License Agreement | Mr. Bjarne F. Rostaing, Senior Vice President, Interactive Technologies Corporation 371 Springfield Avenue Summit, NJ 07901 | | LBI |
| Interactive Technologies, Inc. | Addendum to the Agreement for License and Installation of The Advantage LTD Fee Billing System, dated as of Jan. 3, 2008 (ID: CON-27212, CON-26461 [duplicate]) | Incorporates STP Batch Scheduler into the fee billing system | Mr. Bjarne F. Rostaing, Senior Vice President, Interactive Technologies Corporation 371 Springfield Avenue Summit, NJ 07901 | | LBI |
| Interactive Technologies, Inc. | Statement of Work (Final) for Lehman Brothers, Q1 Release 2008 (ID: CON-26460) | Advantage Fee System statement of work | 462 Springfield Avenue Summit, NJ 07901 | | LBI |
| Internet Securities, Inc. | Subscription Agreement between Internet Securities, Inc. and Lehman Brothers Inc. ("Vendor Agreement") and Addendum to Vendor Agreement (ID: CON-26807) | Subscription to Global Emerging Markets Information Service. | 225 Park Avenue South, 6th Floor New York, NY 10003 | | LBI |

-7-

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| KLD Research & Analytics, Inc. | Addendum and Modification to Subscription Agreement, dated as of Oct. 1, 2007 (ID: CON-24135) | Replaces the existing SOCRATES Product license with KLD Compliance | 250 Summer Street 4th Floor Boston, MA 02210 | | LBI, on behalf of NB |
| KLD Research & Analytics, Inc. | Addendum and Modification to Subscription Agreement, effective as of Jan. 1, 2006 (ID: CON-001031) | Expands license to include screening for non-US based ADRs and the KLD Sudan Compliance Project. | 250 Summer Street, 4th Floor Boston, MA 02210 | | LBI |
| KLD Research & Analytics, Inc. | Addendum and Modification to Subscription Agreement, dated as of Nov. 15, 2007 (ID: CON-25082) | Expands license to include the KLD Sudan Compliance Product | 250 Summer Street 4th Floor Boston, MA 02210 | | LBI, on behalf of NB |
| KLD Research & Analytics, Inc. | Addendum and Modification to Subscription Agreement, dated as of Feb. 1, 2006 (ID: CON-001121) | Expands license to include the KLD Sudan Compliance Project. | 250 Summer Street 4th Floor Boston, MA 02210 | | LBI |
| KLD Research & Analytics, Inc. | Addendum and Modification to Subscription Agreement, dated as of Mar. 15, 2008 (ID: CON-27687) | Expands license to include KLD Iran Compliance | 250 Summer Street 4th Floor Boston, MA 02210 | | LBI, on behalf of NB |
| KLD Research & Analytics, Inc. | Addendum and Modification to Subscription Agreement, dated as of Aug. 1, 2007 (ID: CON-22528) | Expands the existing license to include Global Socrates and Global Pork Compliance | 250 Summer Street 4th Floor Boston, MA 02210 | | LBI, on behalf of NB |
| KLD Research & Analytics, Inc. | Subscription Order Form, effective as of Aug. 1, 2005 (ID: CON-004541) | Grant of a nonexclusive, nontransferable license to use Products of KLD | 250 Summer Street 4th Floor Boston, MA 02210 | | NB |

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| KLD Research & Analytics, Inc. | Subscription Order Form [unexecuted] (ID: CON-004956) | Grant of a nonexclusive, nontransferable license to use Products of KLD | 250 Summer Street 4th Floor Boston, MA 02210 | | NB |
| KLD Research & Analytics, Inc. | Addendum and Modification to Subscription Agreement, dated as of June 1, 2008 (ID: CON-29330) | Expands license to include a monthly Compliance list of Factset based SIC codes | 250 Summer Street 4th Floor Boston, MA 02210 | | LBI, on behalf of NB |
| Mellon Bank, N.A., Trustees of the Lehman Brothers Holdings Inc. Retirement Plan | Trading Agency Agreement for Lehman Brothers Holdings Inc. Retirement Plan, dated as of Apr. 28, 2004 (ID: 004843-LEHNY-2004) | Appoints Mellon Bank, N.A. as Trading Agent with respect to the transition of certain Trust assets. | 595 Market Street, Suite 3000 San Francisco, CA 94105-2886 | | LBHI |
| Morgan Stanley Capital International Inc. | Schedule A to License Agreement, dated as of Nov. 7, 2007 (ID: CON-24822) | Schedule identifies service as Developed Markets Small Cap - Factset | Wall Street Plaza 88 Pine Street, 2nd Floor New York, NY 10005 1585 Broadway New York, NY 10036 | | LBI |
| Morgan Stanley Capital International Inc. | Schedule A to License Agreement, dated as of Apr. 1, 2008 (ID: CON-28279) | Product identified is EM Small Cap (Factset) | Wall Street Plaza 88 Pine Street, 2nd Floor New York, NY 10005 1585 Broadway New York, NY 10036 | | LBI |
| Morgan Stanley Capital International, Inc. | License Agreement, dated as of July 14, 1998 (ID: CON-24820) | Software License Agreement | Wall Street Plaza 88 Pine Street, 2nd Floor New York, NY 10005 1585 Broadway New York, NY 10036 | | NB |

-9-

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| MSCI Inc. (f/k/a Morgan Stanley Capital International Inc.) | Assignment of Schedule As and License Agreement, effective as of Nov. 12, 2007 (ID: CON-24821) | Assignment Agreement | Wall Street Plaza 88 Pine Street, 2nd Floor New York, NY 10005 1585 Broadway New York, NY 10036 | | NB (Assignor) LBI (Assignee) |
| MSTD, Inc. | Master Agreement for the Procurement of Services and the Licensing of Software, effective as of Oct. 30, 2001 (ID: MSTD27234) | Aurora Loans Services obtains license rights to access and use the software application owned and maintained by MSTD, Inc., known as BackInTheBlack (mortgage default loss mitigation application). | 210 E. Redwood Street Baltimore, MD 21202 Attn: Hans Rusli Attn: Mark H. Friedman | | Aurora Loans Services, LLC |
| MSTD, Inc. | Statement of Work, dated as of Nov. 2, 2007 (ID: MSTD23630) | Statement of Work issued pursuant to the Application Service Provider Agreement between MSTD, Inc. and Lehman Commercial Paper Inc., an Affiliate of Lehman Brothers Bank, dated February 1, 2005 | 210 E. Redwood Street Baltimore, MD 21202 Attn: Hans Rusli Attn: Mark H. Friedman | | Lehman Brothers Bank, FSB n/k/a Aurora Bank FSB |
| MSTD, Inc. | Statement of Work dated as of Nov. 2, 2007 (ID: MSTD25345) | | 210 E. Redwood Street, Suite 100 Baltimore, MD 21202 Attn: Hans Rusli Attn: Mark H. Friedman | | LCPI |

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| MSTD, Inc. | Amendment Number 1 to Statement of Work No: 11-02-07, amendment effective as of Feb. 11, 2008 (ID: MSTD29560) | Amendment to 11-02-07 Statement of Work | 210 E. Redwood Street, Suite 100 Baltimore, MD 21202 Attn: Hans Rusli Attn: Mark H. Friedman | | Lehman Brothers Bank, FSB |
| Omgeo LLC | Omgeo Central Trade Manager – Service Bureau STP Partner, Investment Manager Schedule and Rider to the CTM Agreement, dated as of Mar. 27, 2006 (ID: CON–15707) | Subscription to Omgeo Central Trade Manager service | 22 Thomson Place Boston, MA 02210 | | LBI |
| Open Solutions, Inc. | Data Processing Services Agreement, dated as of Jan. 22, 2008 (ID: No. 2099) | OSI agrees to provide Lehman with services connected to its conversion to the OSI data processing system. | 455 Winding Brook Drive Glastonbury, CT 06033 Attn: Chief Financial Officer | | Lehman Brothers Bank, FSB n/k/a Aurora Bank FSB |
| PerTrac Financial Solutions, LLC | Letter Agreement, dated in April 2007 executed as of May 24, 2007 (ID: CON–21142) | Letter Agreement in connection with PerTrac License Agreement related to the PerTrac Analytical Platform | 2611 South Mendenhall Road, Suite 200 Memphis TN 38115 | | Lehman Brothers Alternative Investment Management LLC |
| Portware, LLC | General Terms and Conditions: IT Products and Services, effective as of June 10, 2008 (ID: CON–27730) | Master Agreement | 233 Broadway 24th Floor New York, NY 10279 | | LBHI |
| Portware, LLC | Product License Supplement, effective as of June 10, 2008 (ID: CON–25081) | Additional terms and conditions | 233 Broadway 24th Floor New York, NY 10279 | | LBHI |

-11-

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| Portware, LLC | Product License Transaction Schedule, effective as of July 2, 2008 (ID: CON-27585) | Identifies specific product - Portware Enterprise On-Site Solution. | 233 Broadway 24th Floor New York, NY 10279 | | LBI |
| R.R. Donnelley & Sons Company | Letter agreement between R.R. Donnelly & Sons Company and Lehman Brothers Bank, FSB, dated as of April 18, 2008. | R.R. Donnelly to obtain access to Lehman's electronic mortgage loan servicing system necessary to enable it to provide certain printing and mailing services to Lehman. | 111 South Wacker Drive Chicago, IL 60606 | | Lehman Brothers Bank, FSB n/k/a Aurora Bank FSB |
| RIMES Technologies Corporation | Customer License Agreement, dated as of Aug. 19, 1998, and June 2002 Amendment to Customer License Agreement (ID: 004802-LEHNY-2005) | License Agreement | 134 Spring Street New York, NY 10012  84 Wooster Street New York, NY 10012 | | NB |
| Sociedad de Bolsas, S.A. | Contrato de Difusion de Informacion del Sistema de Interconexion Bursatil, dated as of March 1, 2007 (ID: CON-19610) | Provides for a data feed and stock exchange interconnection used in Debtors' London offices only. | Palacio de la Bolsa Plaza de la Lealtad, 1 28014 Madrid Spain | | LBHI |
| Standard & Poor's Corporation | Master Subscription Agreement, effective as of Oct. 12, 2001 (ID: 005563A) | License Agreement | Standard & Poor's (a division of The McGraw-Hill Companies, Inc.) 55 Water St. New York, NY 10041 Attn: Licensing & Contract Administration | | NB |
| Statpro Inc. | Addendum to End-User Software License and Support Agreement for Additional Sites, made part of and incorporated | Purchase of multi site Citrix License of StatPro Composites | 185 Madison Avenue 14th Floor New York, NY 10016 | | NB |

-12-

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| | into the End-User Software License and Support Agreement (ID: CON-23102) | | | | |
| Statpro Inc. | Addendum No. 2 to End-User Software License and Support Agreement, made part of and incorporated into the End-User Software License and Support Agreement dated Apr. 29, 1999 (ID: CON-23132, CON-20874 [duplicate]) | Schedule to Software License and Support Agreement Updates | 185 Madison Avenue 14th Floor New York, NY 10016 | | LBHI |
| Statpro Limited | End-User Software License and Support Agreement, dated as of Apr. 29, 1999 (ID: CON-5616A) | Master Agreement | 225 Magdalen Road, Earlsfield, London SW18 3PA | | NB |
| Strategic Financial Solutions, LLC | Letter in reference to PerTrac and HFR Hedge Fund Database Agreements, dated Dec. 20, 2002 (ID: CON-006036A) | Assignment Consent Agreement | 2611 South Mendenhall Road Suite 200 Memphis, TN 38115 | | LibertyView Capital Management, Inc. (Assignee: NB) |
| Strategic Financial Solutions, LLC | Consent to Assignment of PerTrac License and HFR Hedge Fund Database License, dated as of Aug. 19, 2003 (ID: CON-26325) | Assignment Consent Agreement | 2611 South Mendenhall Road, Suite 200 Memphis TN 38115 | | NB |

-13-

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| Strategic Financial Solutions, LLC d/b/a PerTrac Financial Solutions | Non-Disclosure Agreement, dated as of Mar. 26, 2008 (ID: CON-27020) | Confidentiality Agreement | 58 West 50th Street, 4th Floor New York, NY 10018 | | LBHI |
| Sungard Asset Management Systems, a division of Sungard Business Systems, LLC | Extension Addendum #2 to Addendum Number 4 Schedule C1 Services Schedule, executed as of March 10, 2008 (ID:CON-29085) | Extends term of engagement | One Memorial Drive Cambridge, MA 02142 Attn: Senior Vice President | | Lehman Brothers Trust Company, N.A. and Lehman Brothers Trust Company of Delaware |
| Sungard Asset Management Systems, a division of Sungard Business Systems, LLC | Extension Addendum to Addendum Number 4 Schedule C1 Services Schedule, executed as of Oct. 22, 2007 (ID: CON-25248) | Extends term of engagement | One Memorial Drive Cambridge, MA 02142 Attn: Senior Vice President | | Lehman Brothers Trust Company, N.A. and Lehman Brothers Trust Company of Delaware |
| Sungard Asset Management Systems, a division of Sungard Business Systems, LLC | Advantage Requirement Statement, agreed to as of Dec. 31, 2007 (ID:CON-25897) | Proposal Statement | One Memorial Drive Cambridge, MA 02142 Attn: Senior Vice President | | Lehman Brothers Trust Company, N.A. and Lehman Brothers Trust Company of Delaware |
| Sungard Asset Management Systems, a division of Sungard Business Systems, LLC | Advantage Requirement Statement, dated as of Oct. 3, 2007 (ID:CON-24653) | Requirement to develop custom SPL8 styles in landscape format for use with Personal Trust Accounts | One Memorial Drive Cambridge, MA 02142 Attn: Senior Vice President | | Lehman Brothers Trust Company, N.A. and Lehman Brothers Trust Company of Delaware |
| Sungard Asset Management Systems, a division of Sungard Business Systems, LLC | Extension Addendum #2 to Addendum Number 4 Schedule C1 Services Schedule, executed as of Mar. 10, 2008 (ID:CON-27918) | Extends term of engagement | One Memorial Drive Cambridge, MA 02142 Attn: Senior Vice President | | Lehman Brothers Trust Company, N.A. and Lehman Brothers Trust Company of Delaware |
| SunGard Asset Management Systems, a division of Sungard Business Systems, LLC | Software License Agreement, dated as of Mar. 18, 2005 (ID: 005062-LEHNY-2004) | AddVantage software license agreement | One Memorial Drive Cambridge, MA 02142 Attn: Senior Vice President | | Lehman Brothers Trust Company, N.A. and Lehman Brothers Trust Company of Delaware |

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| Sungard Asset Management Systems, a division of Sungard Business Systems, LLC | Schedule C2, executed as of June 23, 2008 (ID:CON-30378) | Services Schedule | One Memorial Drive Cambridge, MA 02142 Attn: Senior Vice President | | Lehman Brothers Trust Company, N.A. and Lehman Brothers Trust Company of Delaware |
| SunGard Asset Management Systems, a division of Sungard Business Systems LLC | Addendum Number 1 to Mar. 18, 2005 Software License Agreement (ID: 001024-LEHNY-2007) | Software license for PDF Converter (Red Titan) Software and (5) Reflections for the Web for Test Server #1 | One Memorial Drive Cambridge, MA 02142 Attn: Senior Vice President | | Lehman Brothers Trust Company, N.A. and Lehman Brothers Trust Company of Delaware |
| SunGard Asset Management Systems, a division of Sungard Business Systems LLC | Addendum Number 2, Schedule C1 to Software License Agreement, executed as of Aug. 21, 2006 (ID: 001027-LEHNY-2007) | Services schedule for AddVantage Cache, WebLink and IIS Webserver | One Memorial Drive Cambridge, MA 02142 Attn: Senior Vice President | | Lehman Brothers Trust Company, N.A. and Lehman Brothers Trust Company of Delaware |
| SunGard Asset Management Systems, a division of Sungard Business Systems LLC | Addendum Number 5, Schedule C to Software License Agreement, executed as of Mar. 5, 2007 (ID:CON-20098) | Services schedule | One Memorial Drive Cambridge, MA 02142 Attn: Senior Vice President | | Lehman Brothers Trust Company, N.A. and Lehman Brothers Trust Company of Delaware |
| SunGard Investment Systems LLC | Software License Agreement for the Investran Product Suite, dated as of Jan. 24, 2007 (ID: CON-23412, CON-19996) | Software license agreement | 11098 Biscayne Blvd. Suite 403 Miami, FL 33161 Attn: Jose Sinai | $17,466.89 | LBHI |
| SunGard Investment Systems LLC | Addendum No. 1 to Software License Agreement, dated as of Jan. 25, 2008 (ID: CON-27797) | Addendum to Software License Agreement | 11098 Biscayne Blvd. Suite 403 Miami, FL 33161 Attn: Jose Sinai | | LBI |

-15-

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| SunGard Investment Systems LLC | Non-Disclosure Agreement, dated as of Mar. 15, 2006 (ID: CON-12588) | Confidentiality Agreement | 11098 Biscayne Blvd. Suite 403 Miami, FL 33161 Attn: Jose Sinai | | LBHI |
| SunGard Investment Systems LLC | Supplemental Terms to Software License Agreement for the Investran Product Suite, dated as of Jan. 24, 2007 (ID: CON-19997, CON-23413) | Investran software license terms | 11098 Biscayne Blvd. Suite 403 Miami, FL 33161 Attn: Jose Sinai | | LBHI |
| SunGard Investment Systems LLC | Software Schedule #1 to Software License Agreement for the Investran Product Suite, dated as of Jan. 24, 2007 (ID: CON-19998, CON-23414) | Investran software schedule | 11098 Biscayne Blvd. Suite 403 Miami, FL 33161 Attn: Jose Sinai | | LBHI |
| The Courier L.L.C. | Master Agreement: Non-IT Services, effective as of Aug. 23, 2005 (ID: 004575-LEHNY-2005) | Provides terms and conditions governing transactions that may be entered into between LBHI and The Courier L.L.C. for the provision of services (courier/messenger services between buildings, post office pick ups and bank deliveries) | P.O. Box 11753 Denver, CO 80211 | | Aurora Loan Services LLC |
| The Courier L.L.C. | Professional Services Transaction Schedule 1, effective as of Aug. 23, 2005 (ID: 001171-LEHNY-2006) | Services schedule to Master Agreement. | P.O. Box 11753 Denver, CO 80211 | | LBHI |

-16-

| Counterparty | Title of Agreement (Contract ID) | Description[1] | Counterparty Address | Reimbursement Amount | Lehman/Neuberger Entity[2] |
|---|---|---|---|---|---|
| The MathWorks, Inc. | Master Agreement (ID: CON-04983) | Software License Agreement | 3 Apple Hill Drive Natick, MA 01760-2098 | | LBI |
| Thomson Financial LLC | Project Agreement, dated as of Mar. 20, 2008 (ID: CON-26555) | Agreement for PORTIA test conversion and production conversion | 195 Broadway New York, NY 10007 Attn: GSAM Attn: General Counsel | | LBI |
| Thomson Trading Services Incorporated | Software License Agreement, dated as of Sept. 6, 1995 (ID: CON-16440) | PORTIA License Agreement | 22 Pittsburgh Street Boston, MA 02210 | | Lincoln Capital Management Company |
| United Telephone Company of the West ("Embarq") | Individual Case Basis Agreement, dated as of Mar. 30, 2007 (ID:No.07BELD6YLKPP) | Sets forth the terms and conditions for Embarq's provision of certain services to LBHI (Embarq Ethernet). | 900 Springmill Road Mansfield, OH 44906 MS: OHMANJ0101 | | LBHI |

-17-

# BCI EXHIBIT

# 378

# BOIES, SCHILLER & FLEXNER LLP

575 LEXINGTON AVENUE • 7TH FLOOR • NEW YORK, NY 10022 • PH. 212.446.2300 • FAX 212.446.2350

December 10, 2009

BY HAND

Robert W. Gaffey, Esq.
Jennifer Del Medico, Esq.
George Spencer, Esq.
Jones Day
222 East 41st Street
New York, NY 10017

_In re Lehman Brothers Holdings Inc., et al.,_ Case No. 08-13555 (JMP)

Dear Bob:

Enclosed on 1 disc is correspondence attaching lists of securities (Bates-stamped BCI-EX- 00247338 through BCI-EX- 00247452).

Barclays is producing these documents pursuant to the Confidentiality Stipulation and Protective Order executed by LBHI, the Creditors' Committee, the Examiner, the LBI Trustee and Barclays on July 14, 2009, and so ordered by the Court on July 30, 2009. Barclays specifically reserves the right to demand and obtain the return of any privileged document inadvertently disclosed pursuant to Federal Rule of Evidence 502.

Sincerely,

_Christopher M. Green / CO._

Christopher M. Green

cc:    Counsel to the Creditors' Committee (By Hand, with Enclosure)
       Counsel to the LBI Trustee (By Hand, with Enclosure)
       Counsel to the Examiner (By Federal Express, w/o Enclosure)

# BCI EXHIBIT

# 379

William R. Maguire
Seth D. Rothman
Neil J. Oxford
**HUGHES HUBBARD & REED LLP**
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

John F. Wood
**HUGHES HUBBARD & REED LLP**
1775 I Street, N.W., Suite 600
Washington, D.C.  20006
(202) 721-4600 (telephone)
(202) 721-4646 (facsimile)
woodj@hugheshubbard.com

Attorneys for James W. Giddens, as
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| LEHMAN BROTHERS INC. | Case No. 08-01420 (JMP) |
| Debtor. | SIPA |
| In re: | |
| LEHMAN BROTHERS INC., ET AL. | Chapter 11 |
| Debtors. | Case No. 08-1355 (JMP) (Jointly Administered) |

## THE TRUSTEE'S OBJECTIONS AND RESPONSES TO
## BARCLAYS CAPITAL INC.'S SECOND SET OF INTERROGATORIES

James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of Lehman

Brothers Inc. ("LBI"), by his undersigned attorneys, hereby submits the following objections and

responses (the "Responses") to Barclays Capital Inc.'s ("Barclays") Second Set of

Interrogatories, dated November 20, 2009 (the "Interrogatories"), as follows:

## GENERAL OBJECTIONS

1.    The Trustee objects to the Interrogatories to the extent they seek information

that is not relevant to the issues in this litigation, or is not reasonably calculated to lead to the

discovery of relevant or admissible information.

2.    The Trustee objects to the Interrogatories to the extent they are vague,

ambiguous, overly broad, or unduly burdensome.

3.    The Trustee objects to the Interrogatories to the extent they call for legal

conclusions or legal theories.

4.    The Trustee objects to the Interrogatories to the extent they seek information

prepared in anticipation of litigation, subject to attorney-client privilege, or protected from

discovery under the work-product doctrine.

5.    The Trustee objects to the Interrogatories to the extent they purport to require

the production of information related to documents outside of the Trustee's possession, custody,

or control.

6.    The Trustee objects to the Interrogatories to the extent they seek discovery of

information already in the possession, custody, or control of Barclays or any of its present or

former employees, including but not limited to information that is contained in the Trustee's

Rule 60(b) motion papers.

7.    The Trustee objects to the Interrogatories to the extent they seek information

that is available through less burdensome or more appropriate means of discovery.

2

8.    By responding to the Interrogatories, the Trustee does not concede that the information requested or made available is relevant or admissible as evidence. The Trustee reserves any and all rights he may have to object to the admissibility of any information or document produced.

9.    The Trustee's objections and responses to the Interrogatories are based on information and documents now available to the Trustee. The Trustee has not yet completed discovery in this lawsuit nor prepared for trial and therefore reserves his right to amend, modify, or supplement his objections and responses if he obtains additional information during the course of discovery.

10.    The Trustee objects to the instructions and definitions set forth in the Interrogatories to the extent they seek to impose any obligation or responsibility on the Trustee other than or in addition to the obligations and responsibilities imposed by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, or the Local Rules of the Southern District of New York.

11.    In his responses to each of the Interrogatories, the Trustee incorporates as if fully stated therein each and every general objection made above.

## OBJECTIONS TO DEFINITIONS

1.    The Trustee objects to the definition of "15c3-3 Asset" to the extent it purports to define the term as assets from LBI's 15c3-3 account that LBI and Lehman Brothers Holdings, Inc. ("LBHI") agreed unconditionally to transfer to Barclays.

2.    The Trustee objects to the definition of "Acquired Financial Assets" to the extent it purports to include the "Clearance Box Assets," "15c3-3 Asset," and "Margin" among

3

those assets that Barclays has acquired or to which Barclays is entitled pursuant to the Sale

Transaction.

## OBJECTIONS TO INSTRUCTIONS

The Trustee objects to Instruction No. 7 to the extent that it calls for the home

telephone numbers and home addresses of any individuals identified in response to the

Interrogatories as irrelevant, unduly burdensome, and an unwarranted invasion of the privacy of

the identified individuals. The Trustee will provide the name, current or last known employer,

current or last known business address, current or last known business telephone number, and

current or last known business email address for each of the individuals identified in response to

any Interrogatory in which that information is requested.

## RESPONSES AND SPECIFIC OBJECTIONS

Interrogatory No. 1: "Identify each of the officers of either LBHI or LBI whom

You allege breached their fiduciary duty to either LBHI or LBI, as alleged in the Adversary

Complaint You filed against Barclays on or about November 16, 2009 in the United States

Bankruptcy Court for the Southern District of New York."

**Response to Interrogatory No. 1:** Subject to and without waiving his general

objections, the Trustee states that paragraphs 150 and 151 of his Adversary Complaint against

Barclays did not identify the specific officers of LBHI or LBI involved in the breaches of

fiduciary duty. The Trustee further states that his investigation into the breaches of fiduciary

duty is ongoing but includes senior executives involved in the relevant conduct and who obtained

substantial payments from Barclays, including but not limited to:

Ian Lowitt

Paolo Tonucci

4

Martin Kelly

Michael Gelband

Gerald Donini

Eric Felder

Alex Kirk

Hugh ("Skip") McGee

Gerald Reilly

Dated: New York, New York
         December 21, 2009

HUGHES HUBBARD & REED LLP

By:   /s/ William R. Maguire
                William R. Maguire

Seth D. Rothman
Neil J. Oxford
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

John F. Wood
1775 I Street, N.W., Suite 600
Washington, D.C.  20006
(202) 721-4600 (telephone)
(202) 721-4646 (facsimile)
woodj@hugheshubbard.com

*Attorneys for James W. Giddens*
*as Trustee for the SIPA Liquidation*
*of Lehman Brothers Inc.*

5

## AFFIRMATION OF SERVICE

I, Fara Tabatabai, an attorney admitted to practice in the courts of the State of New York, affirm under penalty that on December 21, 2009 I caused a true and correct copy of the foregoing to be served upon the parties listed on the attached Service List A by electronic mail and on the attached Service List B by first class mail.

Dated:  New York, New York
       December 21, 2009

                                Fara Tabatabai

## SERVICE LIST A

hhume@bsfllp.com
jschiller@bsfllp.com
jstern@bsfllp.com
jshaw@bsfllp.com
cgreen@bsfllp.com

rwgaffey@jonesday.com
jtambe@jonesday.com
wjhine@jonesday.com
tschaffer@jonesday.com

jamestecce@quinnemanuel.com
susheelkirpalani@quinnemanuel.com
ericataggart@quinnemanuel.com
tylerwhitmer@quinnemanuel.com
erickay@quinnemanuel.com

**SERVICE LIST B**

Jack G. Stern
Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022

Robert W. Gaffey
Jones Day
222 East 41st Street
New York, New York 10017

James C. Tecce
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

# BCI EXHIBIT

# 380

 JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Robert W. Gaffey
William J. Hine
Jayant W. Tambe

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
In re:                                                      :   Chapter 11
                                                            :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*    :   Case No. 08-13555
                                                            :
                            Debtors.               :   (Jointly Administered)
                                                            :
------------------------------------------------------------x

**DEBTOR'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR AN ORDER,**
**PURSUANT TO FED. R. BANKR. P. 2004, AUTHORIZING**
**DISCOVERY FROM BARCLAYS CAPITAL, INC.**

## PRELIMINARY STATEMENT

1.        Shortly after closing the Sale Transaction, Barclays declared a £2.262 billion

(approximately $4.2 billion[1]) gain on its acquisition of LBHI's assets, resulting from "the excess

of the fair market value of net assets acquired over [the] consideration paid" in the transaction.

(*See* Ex. 4, "Barclays Results Announcement: Figures 2008" at 95)  This windfall could be

explained by the answers to the very questions that prompted LBHI to seek discovery in this

case.  As shown in LBHI's moving papers, there appear to be significant discrepancies that raise

serious questions about the economics of the Sale Transaction, the adequacy of disclosures made

to the Court, and even whether former Lehman executives breached duties owed to Lehman in

agreeing to this and related transactions.  These discrepancies provide "good cause" for the

discovery the Debtor seeks.  As any responsible debtor can and must do, LBHI is examining the

potential for claims to determine whether there are assets that should be recovered by the Estate

for the benefit of creditors.  Contrary to Barclays' suggestions, this is not a "wholesale attack" on

the Sale Transaction.  LBHI has not formulated "potential claims" against Barclays.  Nor is it

seeking to retrade the deal.  Rather, LBHI is asking for discovery to find out exactly what

happened during the short, tumultuous, period of time at issue.

2.        In its opposition papers, Barclays sheds no light on the issues.  Barclays does not

say how much it has actually paid in Lehman-related compensation and contract cure liabilities.

Nor does Barclays address how or why it appears to have received a discount of approximately

$5 billion on its purchase of LBHI's assets, through the September 18 repurchase transaction.

Barclays does not explain how this ancillary transaction, which was hardly mentioned in Court

and was merely supposed to provide overnight financing in the days before the Sale Transaction

---

[1] Based on the approximate foreign exchange rate as of September 22, 2008.

closed, ended up providing Barclays all the funds it needed to buy Lehman's North American

businesses and then some.

3.       LBHI does not yet know if it has claims it should assert, but it has good cause to

seek answers.  The best way for Barclays to put these issues to rest is to provide full disclosure

about the issues raised in LBHI's motion.  Barclays has instead opted to fight or delay discovery.

## ARGUMENT

4.       Contrary to Barclays' suggestion, a Rule 2004 movant does not first have to

demonstrate that it has a claim.  (Opp. Br. at ¶ 14)  The purpose of Rule 2004 is to assist in

identifying potential claims.  *See, e.g.*, *In re the Bennet Funding Group*, 203 B.R. 24, 28 (Bankr.

N.D.N.Y. 1996) (Rule 2004 "is properly used as a pre-litigation device to determine whether

there are grounds to bring an action ...."); *In re Bakalis*, 199 B.R. 443, 447 (Bankr. E.D.N.Y.

1996) (Rule 2004 examinations are "typically implemented in the pre-litigation stage of a

bankruptcy case" and such "examinations may be used to prepare for initiation of litigation").[2]

Barclays' Opposition to Discovery About Compensation Payments
Misstates the Basis for the Requested Discovery

5.       When the Court was told at the hearings that, as part of the value given by

Barclays in the transaction, Barclays would assume (i) $2 billion in liabilities to pay

compensation and (ii) approximately $1.5 billion in contract cure costs, the Court relied on those

numbers, in full, in assessing the value of the Sale Transaction.  (*See, e.g.,* Ex. 17, 9/19/08

---

[2]  The cases cited by Barclays are not to the contrary.  *See, e.g., In re Metiam, Inc.*, 318 B.R. 263, 271 n.6 (S.D.N.Y. 2004) ("The purpose of a Rule 2004 examination is to assist a trustee in a bankruptcy proceeding to 'learn quickly about the debtor entity' so that he or she may 'maximize the realization of the debtor's estate'") (citation omitted); *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (E.D.N.Y. 1991) ("The scope of a Rule 2004 examination is very broad and can be in the nature of a fishing expedition."); *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 712, 708 (S.D.N.Y. 1991); *In re Silverman*, 36 B.R. 254, 258 (S.D.N.Y. 1984) (involving Rule 205 (predecessor to Rule 2004), "the broad latitude of which has been characterized as a 'fishing expedition'") (citation omitted).

2

Hearing Tr. at 100:22-25; *id.* at 101:1-4; Ex. 18, 9/17/08 Hearing Tr. at 23:5-24:8)  In fact, the

Court found that these assumptions of liabilities were "integral" to the deal.  (Sale Order at 10)

6.     Nevertheless, Barclays contends that LBHI should get no discovery about

compensation paid to former Lehman employees because: (1) "Barclays did not assume an

obligation to pay $2 billion in bonus payments" to Transferred Employees, and that figure was

purportedly only an "estimate of the potential exposure" Barclays agreed to assume (Opp. Br. at

¶ 24); (2) LBHI can get no purchase price adjustment (*id.* at ¶¶ 31-32); and (3) Barclays offers to

provide aggregate information about what it paid Transferred Employees (*id.* at ¶ 4).  Barclays is

wrong on all fronts.

7.     First, Barclays' assumed liability for compensation, an integral component of the

consideration it was required to pay, was, according to the Asset Purchase Agreement the Court

approved, a contractual obligation to pay a specified amount.  Article 9.1(c) of the APA states

that Barclays

> ***shall*** … pay each Transferred Employee an annual bonus (the "08
> Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the
> aggregate, are equal in amount to 100 percent of the bonus pool
> amounts accrued in respect of amounts payable for incentive
> compensation (but not base salary) and reflected on the financial
> schedule delivered to Purchaser on September 16, 2008 and
> initialed by an officer of each of Holdings and Purchaser (the
> "Accrued 08 FY Liability").  ***Such 08 Annual Bonuses shall be
> awarded … so that the aggregate amount awarded shall equal
> the Accrued 08 FY Liability***.

(APA § 9.1(c) (emphasis added))  And the financial schedule to which the APA refers shows the

Accrued '08 FY Liability to have been $2.0 billion.  (*See* Motion Ex. A)  There was nothing

optional or estimated about this obligation or amount.

8.     Second, LBHI is entitled to determine the source of that $2.0 billion number,

which emanates from the September 16, 2008 financial schedule about which the Estate has little

or no information. (Motion Ex. A)  The Court, and LBHI's board, was told that Barclays was

assuming real liabilities and otherwise giving equivalent value for the assets it was buying.  The

fact that Barclays has apparently paid much less than $2.0 billion in compensation suggests that

the number was not based on a valid calculation and could have been overstated simply to justify

a gratuitous transfer of property to Barclays.  Some documents that the Debtor has been able to

uncover indicate that this may be so.  In the early morning of September 16, 2008, Martin Kelly[3]

wrote an e-mail to Ian Lowitt and Paolo Tonucci saying:

> Well, it took all night and lots of back and forth but the deal is
> done and ready for the Board.  Final price did not change
> meaningfully—approximately a $5 bn all in economic loss versus
> our marks and $3.6 bn of resi assets left behind.  Assume we can
> fund this after everything else winds down but paolo you need to
> review this.  **Also, an extra $1 bn of comp beyond our accrual**
> and assumption of all trade payables in LBI and LBHI.  Took 745
> for $1b, and several data centers for $400 mm.  Bart [McDade]
> reviewed all of it before final agreement.

(Ex. 1, 9/16/09 E-mail from Kelly to Lowitt and Tonucci (emphasis added)) [4]

9.        Thus, LBHI needs discovery to determine whether the $2.0 billion assumed

liability for compensation was a properly calculated number, with a basis, or just an invented

number, or something in-between.  The assumption of this liability by Barclays was a critical

component of the Sale Transaction.  If the number was simply made up to cover for the transfer

of the Debtor's property to Barclays, or wrongly calculated, claims to recover assets for the

---

[3] Kelly was Lehman's Managing Director of Finance & Administration.  We believe he is now Barclays' CFO.

[4] The day before he wrote to Lowitt about "an extra 1 bn of comp beyond our accrual," Kelly himself said that a
bonus number of "$1.4B" did "not seem right" because "cash bonus for [the] entire firm is $1.9 b." (Ex. 2,
9/15/08 e-mail from Kelly to Edmond Coku).  Barclays, of course, did not purchase the "entire firm."  So if the
compensation accrual for all of Lehman Brothers was used, the stated assumption of liability was inflated and
the consideration the Court was told Barclays was giving was overstated.

Estate might well be viable.  Thus, even if the $2.0 billion began as an "estimate," LBHI should

be entitled to discovery to test whether it was arrived at in good faith and was reasonable.

        10.     Third, Barclays' assertion that LBHI could not secure a purchase price adjustment

because of paragraph 9 in the Clarification Letter (Opp. Br. at ¶ 31) is incorrect and irrelevant.

LBHI is investigating, among other things, whether former executives may have breached

fiduciary duties they owed to Lehman when they negotiated this deal and its post-approval

amendments.  If such misconduct occurred (and LBHI takes no position on that yet) the

surrender of a remedy that was put in place by the persons accused of such a breach of duty

would be unenforceable, both as a matter of tort law and public policy.  Besides, other remedies

could be available to LBHI if it has viable claims, including a review of the Sale Order.

        11.     Finally, Barclays' offer to provide unspecified "aggregate" compensation

information is not enough.[5]  Not only is LBHI entitled to examine whether Barclays fully

complied with Section 9.1(c) of the APA, it also must depose the former Lehman executives

(now working for Barclays) who were, directly or indirectly, involved in or affected by the

negotiations with Barclays.  Barclays' discussions with these individuals about their post-transfer

compensation, while the Sale Transaction was being negotiated, raises possible conflicts of

interest that require examination.  The limited documents in LBHI's possession indicate that

significant amounts of money, including "special cash awards," may have been promised by

Barclays to select former Lehman executives, including some from whom we seek discovery.

(*See* Ex. 3, Declaration of Rajesh Ankalkoti at ¶¶ 5-7)  Other information the Estate has been

able to develop suggests that e-mail communications about this post-transfer compensation may

---

[5]  (*See* Ex. 3, Declaration of Rajesh Ankalkoti, dated June 22, 2009)

have been deliberately avoided in favor of delivering sealed envelopes.  This provides "good

cause" for discovery on this issue.

<u>Barclays Should Provide Discovery About Cure Amounts</u>

12.    Barclays argues that LBHI should get no discovery about contract cure payments

because (1) LBHI allegedly can have no claim as to this issue (Opp. Br. at ¶ 35); (2) LBHI

allegedly has the most relevant information (*id.*); and (3) Barclays says it has agreed to provide

enough information.  (*Id.*)  These contentions miss the point.  Here, Barclays points to the text of

the APA in arguing that the $2.25 billion entry under "Cure pmt" in the financial schedule

attached to the APA was merely an estimate.  (Opp. Br. at ¶ 37)  But LBHI does not contend

that $2.25 billion was an amount Barclays was obligated under the APA to pay in full.  The issue

is just how far off the mark this purported "estimate" was, why that was so, and how that

affected the total consideration Barclays paid.  Against an "estimate" of, first, $2.25 billion (in

the 9/16/08 financial schedule) and then $1.5 billion (in Court the next day), Barclays wound up

paying only about $200 million for contract cures.  Again, the Court and the LBHI board were

told that equivalent value was being exchanged in the Sale Transaction.  The assumption of cure

liabilities estimated to be at least $1.5 billion was a critical component of this value.  If that

"estimate" for assumed cure liabilities was inflated, the value the Court was told Barclays would

give in the deal was inflated.  This issue, therefore, warrants examination.

13.    In addition to the fact that Barclays apparently ended up paying only a fraction of

these amounts after the transaction closed, another good reason discovery is necessary lies in the

fact that shortly after concluding the Sale Transaction, Barclays reported a £2.26 billion

(approximately $4.2 billion based on the September 22, 2008 exchange rate) gain on the

acquisition of Lehman's assets.  Barclays now contends that this enormous gain was earned

because the "acquired businesses have performed well." (Opp. Br. at ¶ 56) That assertion,
however, is belied by Barclays' own report, which stated that "[t]he excess of the fair value of
net assets acquired over consideration paid resulted in £2.262m in gains *on acquisition*." (*See*
Ex. 4, "Barclays Results Announcement: Figures 2008" at 95 (emphasis added); *see also id.*
(suggesting it would be impractical to disclose profits and losses from the acquired businesses at
the time of the report))

14.    Barclays' contention that LBHI already has the information it needs is not true.
LBHI has insufficient information as to how the numbers included in the Sale Transaction and
presented to the Court were derived because Lehman's key former employees now work for
Barclays. Nor does LBHI have information about what Barclays and these former Lehman
employees discussed (either before or after the closing) as to the contract cure issue. LBHI also
lacks information about Barclays' internal decisions as to which contracts to designate as
"Purchased Contracts" under the APA.

The Details of the Repurchase Transaction Were
Not Fully Disclosed and Require Further Examination

15.    Much of what occurred with regard to the repurchase transactions was not
disclosed to the Court before its approval of the Sale Transaction and LBHI does not have access
to the people who negotiated the agreements. Nonetheless, Barclays contends that information
should remain immune from discovery because: (1) public policy disfavors "unwarranted
hindsight attacks on such court-approved transactions" (Opp. Br. at ¶ 43); (2) Barclays allegedly
took an "enormous [] risk" in this deal (*id.* at ¶ 44); and (3) the Court approved these transactions
based on its "informed" assessment of the transaction. (*Id.* at ¶ 47) Again, Barclays' assertions
lack merit.

16.     First, the cases Barclays cites are inapplicable.  None addresses anything like the
unprecedented circumstances that gave rise to the Sale Transaction, and the expedited manner in
which it was negotiated and approved by the Court.  Indeed, while Barclays' cases point to a
policy generally favoring the finality of court-approved sales, they do not address the
countervailing policy of ensuring that expediency does not shield an otherwise unfair transaction
from scrutiny.[6]  Moreover, Barclays' arguments against revisiting the Court's Sale Order come
with ill grace from an entity that has *itself* filed two post-closing Rule 60 motions to re-examine
purported mistakes in the deal, and also has applied to approve a December 5, 2008 Settlement
Agreement whereby Barclays received additional money it claims mistakenly was not paid to it
under the original agreements.  If facts emerge to support it, the Debtor clearly has the same right
to revisit the Sale Order.

17.     Second, information uncovered to date calls into question Barclays' contentions
that it undertook "enormous" risks and that the Court was fully informed.  For example, e-mail
communications among senior Lehman executives indicate that the parties may have intended to
employ the September 18 repurchase transaction, in which Lehman posted some $50 billion in
collateral against Barclays' $45 billion in overnight financing, to effect a gratuitous transfer of
additional billions in securities to Barclays, essentially giving Barclays an undisclosed discount
on the Sale Transaction.[7]  Among other things, this effectively would negate Barclays'

---

[6]  Barclays' quotation from Judge Posner (Opp. Br. at ¶ 58) and its insinuation that sanctions may be appropriate are
way off base.  Not only has the Estate not filed any claims (so the case is inapplicable on its face), but LBHI is
engaging in a wholly appropriate investigation as to how Barclays acquired billions of dollars in assets, through
seemingly one-sided agreements, with limited creditor and judicial review.  That is what any reasonable debtor-
in-possession should be encouraged to do under these circumstances.

[7]  Nowhere in the APA or related documents is there mention of a discount, as acknowledged in e-mails between
Messrs. Reilly and Lowitt (both from Lehman) the night before the September 18 repurchase transaction.  (*See*
Ex. 5 [9/17 e-mail chain]) Reilly wrote:  "I went thru all docs and did not see reference to the price haircut.  If

assumption of a purported $4.25 billion in liabilities as the consideration the Court was told

Barclays would give in the Sale Transaction.[8]  This e-mail traffic suggests that Lehman and

Barclays planned for LBI to intentionally default on the repurchase transaction or otherwise

through the repurchase agreement to roll the pledged collateral into the Sale Transaction at a

discounted price.  Martin Kelly's description of the "final price" in the deal as including "a $5 bn

all in economic loss versus our marks" (Ex. 1) further supports the possibility that the $50 billion

in collateral in the repurchase agreement was given to Barclays for only $45 billion, thus giving

Barclays an undisclosed discount. The Court was never told about this.  Even the disclosures

noted in Barclays' opposition fail to mention it.  (Opp. Br. at ¶¶ 49-52)

18.    Again, there is some e-mail indicating good cause for further examination.  On

September 18 at 6:04 a.m. (before Barclays and LBI executed their repurchase transaction),

Gerard Reilly (Lehman) wrote to Ian Lowitt (Lehman's CFO) and Michael Gelband (another

senior Lehman executive):

> I need some help resolving these issues today …
>
> 3)  Not clear on the amount of block discount or how we make it
> happen.  **Defaulting on repo could be the best as discount could
> be taken from haircut.**  If not that then we need to give business
> an allocation of block discount so they can mark down the books
> tonight.  Does this create a problem as it could tip the broker early?
> Would we rather have that be in the sale price tomorrow?

(Ex. 9 (emphasis added))

---

(continued…)

we want conservative marks to reflect block nature we need to know how much and then can allocate to most
logical assets."  (*Id.*)  Lowitt replied:  "Since not in contract hard to see what to d[o]."  (*Id.*)

[8]  Documents prepared by Lehman employees purporting to draft "opening balance sheets" for Barclays' first day
of operations after the closing of the Sale Transaction indicate that the assets being transferred under the
September 18 repurchase transaction plus additional cash and securities were to be balanced against the $4.25
billion in liabilities Barclays was to assume, plus an unknown $3.38 billion "equity" component that was never
explained to the Court.  (*See* Exs. 6-8)

19.     In this regard, the make up of the collateral supporting the September 18 repurchase transaction also requires further investigation.  There are some indications that, rather than "step into the shoes" of the Federal Reserve repurchase agreement to provide overnight financing, Barclays cherry picked higher-quality collateral and used the repurchase agreement to take it out of the Estate.  On September 18, 2008, Eric Felder, a senior Lehman executive, wrote: "The barclays guys chose the assets we did not have anything to do with it."  (*Id.*)  Other e-mails suggest Barclays selected only the most liquid and non-risky securities to purchase under the APA and the September 18 repurchase transaction.  (*See, e.g.,* Ex. 10)  These indications that Barclays itself appears to have chosen the assets posted as collateral call into question Barclays' assertion that it simply "stepped into the shoes" of the Fed and assumed significant financial risk in the Sale Transaction, especially because Barclays appears to have been protected by $5 billion of the house's money.

20.     These questions are further complicated by modifications the parties made to the APA and the September 18 repurchase transaction after the Court approved the Sale Transaction. On September 22, 2008, the parties to the APA submitted a so-called Clarification Letter, which reflected substantial changes to the deal after it had been approved.  Among other things, the Clarification Letter fundamentally changed the APA definitions of Purchased Assets and Assumed Liabilities (allowing Barclays to receive for unknown reasons so-called "Schedule B" assets), and deleted from the APA a purchase price adjustment clause (*see* Clarif. Letter ¶ 9), which would have ensured that Barclays would not gain a windfall from post-closing price fluctuations in the securities it purchased, "including repos," subject to a ceiling of $750 million. (APA ¶ 3.3)

21.     The Clarification Letter also terminated the September 18 repurchase transaction
and stated that "Seller and Purchaser shall be deemed to have no further obligations to each other
under [that agreement] (including, without limitation, any payment or delivery obligations) …."
(Clarif. Letter at ¶ 13)  Notwithstanding this termination, Barclays later sought to enforce the
September 18 repurchase transaction, demanding that LBI transfer approximately $7 billion.
(*See* Ex. 11, Leventhal Decl. at ¶¶ 13-15)[9]  Under the December 5, 2008 settlement between the
trustee for the SIPA liquidation of LBI, Barclays and JPMorgan Chase, securities and cash with a
total value of over $6 billion appears to have been transferred to Barclays.  (*Id.* at ¶ 22)[10]

22.     These post-approval alterations to the Sale Transaction raise a number of
questions, including why the Clarification Letter or statements to the Court never mentioned the
parties' purported agreement for Lehman to pay additional billions in cash and collateral to
Barclays.  The complex machinations undertaken by the parties to transfer these assets to
Barclays are impossible to accurately retrace without discovery.  Nor is it possible without
discovery to know for certain whether Barclays received consideration to which it was not
entitled.  In fact, when it addressed the December 5, 2008 settlement, the Court itself noted that
future discovery might be necessary about this issue.  (*See* Ex. 14, Dec. 22, 2008 Hearing Tr. at
50:18-51:6)

The Requested Discovery Is Not Unduly Burdensome, Overbroad or Duplicative

23.     Barclays complains about the purported burden and overbreadth of the requested
discovery.  (*See* Opp. Br. at ¶¶ 16-17, 34, 39-40, 58)  The Debtor's request, however, covers a

---

[9]  It appears that by late afternoon or early evening on September 19, the parties may have known that the $7 billion
in question was not in Barclays' account at JPMC, and Bob Diamond, Barclays' chairman, contacted JPMC
regarding these funds.  (*See* Exs. 12-13)

[10]  LBHI is not a party to the December 5, 2008 settlement.

defined set of individuals and documents generated over only a few weeks. Compliance will not

disrupt Barclays' operations.[11] There should be little burden for Barclays, for example, in

isolating and reviewing the documents and e-mails of the relatively small number of its

employees involved in these short-lived negotiations. Likewise, the files of former Lehman

employees retained by Barclays (from September 22 onward) likely are not extensive.

24.     Furthermore, Barclays' repeated contentions that LBHI already has access to

sufficient information on these transactions are meritless. (Opp. Br. at ¶¶ 16, 19-21, 35, 39, 55)

As noted in LBHI's Motion, the Lehman executives involved in these negotiations went to work

for Barclays and therefore are not available to LBHI. And contrary to Barclays' assertion (*id.* at

¶ 19), personnel at Alvarez & Marsal are not a substitute; they did not participate in the

negotiations at issue. (*See* Ex. 15, Declaration of Bryan Marsal)

25.     Finally, Barclays' contention that the Debtor rushed into this motion is baseless.

The Debtor moved for an order under Rule 2004 only when it became evident that Barclays

intended to resist or delay cooperative discovery. (*See* Ex. 16, Declaration of Robert W. Gaffey)

## CONCLUSION

For the foregoing reasons and those set forth in the Motion, LBHI respectfully requests

that the Court issue an order allowing LBHI to take the requested document and deposition

discovery and granting such other relief as the Court deems just and proper.

---

[11] LBHI does not contemplate lengthy depositions involving multiple questioners. For the sake of efficiency and to reduce burden, LBHI opposes the recent attempts by third parties, WesternBank and Bank of New York, to piggyback on this Rule 2004 motion to secure discovery on unrelated matters. Indeed, the transactions about which they seek discovery involve separate repurchase agreements and potential claims.

Dated:  June 23, 2009
       New York, New York

Respectfully submitted,

  /s/ Robert W. Gaffey  
Robert W. Gaffey
William J. Hine
Jayant W. Tambe
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939

ATTORNEYS FOR DEBTOR AND DEBTOR
IN POSSESSION