WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | 08-13555(JMP) |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,: | | (Jointly Administered) |
| **DEBTORS.** | : | |
| | : | |

---------------------------------------------------------------x

**STIPULATION AND ORDER RESTRICTING USE OF ALLEGED
CASH COLLATERAL PURSUANT TO 11 U.S.C. §363(c)(2) AND (4) AND
BANKRUPTCY RULE 4001(d) BETWEEN LEHMAN BROTHERS SPECIAL
FINANCING INC. AND DR. MICHAEL C. FREGE IN HIS CAPACITY AS
INSOLVENCY ADMINISTRATOR (INSOLVENZVERWALTER) OVER THE
ASSETS OF LEHMAN BROTHERS BANKHAUS AKTIENGESELLSCHAFT I. INS.**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

This stipulation and order (the "Stipulation") is entered into by and between

Lehman Brothers Special Financing Inc. ("LBSF"), as debtor and debtor in possession and Dr.

Michael C. Frege in his capacity as Insolvency Administrator (Insolvenzverwalter) over the

assets of Lehman Brothers Bankhaus Aktiengesellschaft i. Ins. (the "LBB InsAdmin" and,

together with LBSF, the "Parties").

**RECITALS**

A. On September 15, 2008, Lehman Brothers Holdings Inc. ("LBHI") and

thereafter certain of its subsidiaries (collectively, the "Debtors") commenced voluntary cases

under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Court").

B.  On October 3, 2008 (the "Commencement Date"), LBSF, an affiliate of LBHI, commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") in the Court.

C.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On September 17, 2008, the United States Trustee for the Southern District of New York appointed the statutory committee of unsecured creditors (the "Creditors' Committee") pursuant to 1102 of the Bankruptcy Code.

D.  On November 12, 2008, the German banking regulator filed insolvency proceedings against Lehman Brothers Bankhaus Aktiengesellschaft ("Bankhaus") and on November 13, 2008, the local court (*Amtsgericht*) of Frankfurt am Main opened insolvency proceedings and appointed Dr. Michael C. Frege as insolvency administrator (*Insolvenzverwalter*).

E.  The LBB InsAdmin represents that Bankhaus was the sole holder of all of the original face value (i) Series 3 USD200,000,000 Floating Rate Secured Notes due 2008 (ISIN: XS0207405746; Common Code: 020740574) (the "Series 3 Notes") and (ii) Series 4 USD1,000,000,000 Floating Rate Secured Notes due 2013 (ISIN: XS0385832711; Common Code: 038583271) (the "Series 4 Notes," and together with the Series 3 Notes, the "Notes")

-2-

issued by 7th Avenue Inc., a Cayman Island company (the "Issuer") until the Notes were cancelled following the assignment referred to in Recital I hereto. The LBB InsAdmin asserts that the Series 3 Notes were issued as of December 8, 2004 and that the Series 4 Notes were issued as of August 28, 2008; both series of Notes were governed and secured by a Master Trust Deed, dated as of September 12, 2002 (the "Master Trust Deed"), between the Issuer and HSBC Trustee (C.I.) Limited, as trustee for the Series 3 Notes (in such capacity, the "Series 3 Deed Trustee"), and effective as of August 28, 2008, HSBC Corporate Trustee Company (UK) Limited, as trustee for the Series 4 Notes (in such capacity, the "Series 4 Deed Trustee," and together with the Series 3 Deed Trustee, the "Deed Trustees"); and that the Series 3 Notes and Series 4 Notes were also governed and secured, respectively, by (a) a Supplemental Trust Deed, dated as of December 8, 2004, between the Issuer and the Series 3 Deed Trustee (together with the Master Trust Deed, the "Series 3 Trust Deed") and (b) a Supplemental Trust Deed, dated as of August 28, 2008, between the Issuer and the Series 4 Deed Trustee (together with the Master Trust Deed, the "Series 4 Trust Deed," and collectively with the Series 3 Trust Deed, the "Trust Deeds").

    F. The LBB InsAdmin asserts that the primary security available to Bankhaus under the Trust Deeds (the "Trust Deeds Collateral") was (i) with respect to the Series 3 Notes, the Issuer's rights and interests in a Term Loan Agreement, dated as of December 8, 2004 (the "Series 3 Loan Agreement"), among the Issuer, as lender, LBSF, as borrower, and the Series 3 Deed Trustee, as trustee, and a related Security Agreement, dated December 8, 2004 (the "Series 3 Security Agreement"), among the Issuer, as secured party, LBSF, as debtor, and the Series 3 Deed Trustee, as trustee, and (ii) with respect to the Series 4 Notes, the Issuer's rights and interests in a Term Loan Agreement, dated as of August 28, 2008 (the "Series 4 Loan

Agreement," and together with the Series 3 Loan Agreement, the "Loan Agreements"), among the Issuer, as lender, LBSF, as borrower, and the Series 4 Deed Trustee, as trustee, and a related Security Agreement, dated August 28, 2008 (the "Series 4 Security Agreement," and together with the Series 3 Security Agreement, the "Security Agreements"), among the Issuer, as secured party, LBSF, as debtor, and the Series 4 Deed Trustee, as trustee.

G. The LBB InsAdmin asserts that (i) pursuant to the Security Agreements, LBSF's obligations under the Loan Agreements are secured by, among other things, liens on and security interests in (the "Alleged Security Interests") LBSF's rights, title and interest in, to and under certain ISDA Master Agreements (each a "Contract" and collectively the "Contracts"), the transactions thereunder and the proceeds thereof (collectively, the "Alleged Collateral"), (ii) the Alleged Security Interests in the Alleged Collateral have been properly perfected, and (iii) all cash and cash equivalent proceeds of the Alleged Collateral, including payments under the Contracts (the "Alleged Cash Collateral"), constitute its "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code.

H. The LBB InsAdmin asserts that pursuant to the Trust Deeds, the Issuer's rights, title and interest in the Alleged Collateral were pledged to, and exercisable by, the Deed Trustees for the benefit of Bankhaus as the sole beneficial owner of the Notes.

I. The LBB InsAdmin further asserts that pursuant to Deeds of Assignment dated as of October 29, 2009, among the Issuer, the Deed Trustees and the LBB InsAdmin (the "Deeds of Assignment"), all rights, title and interest of the Issuer and the Deed Trustees in and to the Alleged Collateral, including the Alleged Cash Collateral, have been assigned to the LBB InsAdmin, and following the effectiveness of such assignment, the Notes were cancelled.

J.  LBSF does not concede the validity or enforceability of the asserted liens or the Alleged Security Interests in the Alleged Collateral or that any existing or future proceeds thereof constitute "cash collateral" within the meaning of section 363 of the Bankruptcy Code.

K.  LBSF asserts that prior to the Commencement Date, JPMorgan Chase Bank N.A. exercised an asserted lien and right of setoff against all cash that was deposited in its accounts and that accordingly, as of the Commencement Date, there were no monies in its accounts that could be claimed by Bankhaus or the LBB InsAdmin as Alleged Cash Collateral.

L.  LBSF has advised the LBB InsAdmin that LBSF has undertaken a good faith review of its records to identify the Contracts and to determine whether or not any payments thereunder or in respect thereof (collectively, "Counterparty Payments") have been received by it since the Commencement Date.  As a result of such review, LBSF (i) has identified what it believes to be the Contracts, the Transactions (as defined in the Contracts) thereunder, each counterparty thereto and each credit support provider, if any, for such counterparty in respect of such Contract (each such counterparty and credit support provider a "Counterparty," and collectively, the "Counterparties"), and (ii) has determined that during the period from the Commencement Date until January 8, 2010, no Counterparty Payments have been received by LBSF in respect of any Alleged Collateral, except as set forth in the Contracts Schedule referred to below.  Concurrently herewith, LBSF will deliver a schedule (the "Contracts Schedule") to the LBB InsAdmin setting forth, to the best of LBSF's knowledge, (i) each Contract, each Transaction thereunder and each Counterparty (and credit support provider, if any) thereto; (ii) the status of such contract (i.e., whether or not a notice of an "Early Termination Date" has been delivered thereunder or such Contract or the transactions thereunder have otherwise been

terminated), and (iii) all payments, if any, made to LBSF under such Contract during the Initial Period.

M.   The LBB InsAdmin is unwilling at this time to consent to LBSF's use of the Alleged Cash Collateral.

N.   LBSF, while not conceding that either the LBB InsAdmin or Bankhaus have any rights in the Alleged Collateral or any Alleged Cash Collateral, is willing to restrict its use of payments received by it under the Contracts as provided in this Stipulation until the Parties either reach agreement as to the existence and enforceability of such rights or those issues are resolved by a binding and final order of the Court.

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED AND ORDERED** by and between the Parties, through their respective undersigned counsel, that:

1.   This Stipulation shall supersede all other prior agreements of the parties hereto with respect to the Alleged Cash Collateral and contains the entire agreement between the Parties relating to the subject matter thereof.

2.   As promptly as possible after the Court has approved this fully executed Stipulation, (the "<u>Effective Date</u>"), LBSF shall (i) identify to the LBB InsAdmin those Contracts as to which LBSF has received or delivered a notice of the occurrence of an Early Termination Date (as defined in the relevant Contract), (ii) specify to the LBB InsAdmin the amount stated by any Counterparty to a Contract or by LBSF, as the case may be, to be owing by such Counterparty to LBSF under such Contract, and (iii) specify to the LBB InsAdmin all payments, if any, that LBSF has been able to determine were received by LBSF in respect of each Contract (x) between September 15, 2008 and the Commencement Date and (y) subsequent to the Commencement Date through a date that is seven (7) business days prior to the Effective Date.

From time to time after the Effective Date, upon the reasonable request of the LBB InsAdmin, LBSF shall notify the LBB InsAdmin in writing of any payments that it has been able to determine were received by LBSF in respect of each Contract during each period for which no prior report has been requested.

3.  LBSF shall, as promptly as is reasonably possible, deliver to the LBB InsAdmin copies of (i) each notice received by LBSF from, or delivered by LBSF to, any Counterparty designating an "Early Termination Date" under any Contract, (ii) each notice received by LBSF from, or delivered by LBSF to, any Counterparty setting forth the payments, if any, required to be made by LBSF or the Counterparty under a Contract (a "Payment Notice") and (iii) all other correspondence or notices received by LBSF from or delivered by LBSF to a Counterparty after the delivery by the Counterparty to LBSF, or by LBSF to a Counterparty, of a notice designating an "Early Termination Date" under the Contract applicable to such Counterparty but only to the extent that such correspondence or notice relate to (x) said "Early Termination Date" notice and represent valuation notices or settlement proposals or (y) a Payment Notice.

4.  Nothing in this Stipulation shall be construed as or deemed to constitute the consent by the LBB InsAdmin to the use, sale, lease or other disposition by LBSF of the Alleged Collateral, including, without limitation, the Alleged Cash Collateral, or an authorization by the Court of any use, sale, lease or disposition of the Alleged Cash Collateral.

5.  As promptly as possible after LBSF determines any amount that it receives or has received constitutes a payment or recovery in respect of a Contract, including, without limitation, any amount LBSF recovers from a third party through an avoidance action or otherwise and all proceeds and recoveries from LBSF's novation or transfer of its rights in a

Contract to a third party, LBSF will segregate such amount and deposit it into an account with a bank (a "Segregated Account") containing only payments made under or traceable to the Contracts, and shall not commingle such amount with any other funds. LBSF shall promptly identify the Segregated Account (by name and location of the depository bank and by account number) to the LBB InsAdmin. LBSF shall not disburse or use such funds or any amounts in the Segregated Account for any purpose without the consent of the LBB InsAdmin or the prior approval of the Court upon due notice to the LBB InsAdmin.

6. LBSF shall not modify or amend the terms of the Contracts, settle any Counterparty's obligation under a Contract, or release any Counterparty from any of its obligations under a Contract unless either (a) Bankhaus shall consent thereto in writing (such consent not to be unreasonably withheld) or (b) the Court approves, upon due notice to Bankhaus, the terms of such modification, amendment, settlement, or release by a final, non-appealable order; provided, however, that Bankhaus shall be deemed to have consented to such modification, amendment, settlement, or release if it fails to object to the same, in writing, by email or facsimile, no later than three (3) business days from notification, which may be by email or by facsimile, from LBSF advising Bankhaus of the terms and conditions of such modification, amendment, settlement, or release.

7. The LBB InsAdmin represents and warrants that, pursuant to the Deeds of Assignment, all rights, title and interest of the Issuer and the Deed Trustees in and to the Alleged Collateral, including the Alleged Cash Collateral, have been assigned to Bankhaus and/or the LBB InsAdmin. The LBB InsAdmin further acknowledges that LBSF is entitled to rely on such representations and warranties and agrees to indemnify LBSF and hold it harmless from any and all losses, damages, costs or other expenses that it may suffer or incur as a result of the

inaccuracy of said representations and warranties.

8. LBSF accepts and agrees that this Stipulation and all transactions and measures contained herein, including those set forth in paragraph 7, do not give rise to any personal liability on the part of the LBB InsAdmin in his individual capacity. Unless otherwise provided by German mandatory law, any claim by LBSF against the LBB InsAdmin or Bankhaus arising under or relating to this Stipulation shall be satisfied out of the assets of the insolvency estate of Bankhaus.

9. LBSF shall maintain sole legal and beneficial ownership of the Alleged Collateral, subject to the Alleged Security Interests of the LBB InsAdmin therein.

10. LBSF shall not permit any Alleged Collateral to be subject to any lien (as defined by the Bankruptcy Code) arising or created after the Commencement Date which is senior to, or on a parity with, the Alleged Security Interests of the LBB InsAdmin in the Alleged Collateral.

11. Nothing in this Stipulation shall prohibit LBSF from using cash that it determines in good faith, using its reasonable best efforts, is not proceeds of the Contracts; provided, however, that if LBSF disburses or otherwise uses a sum of cash or cash equivalent that is later determined to have been the LBB InsAdmin's "cash collateral" within the meaning of section 363 of the Bankruptcy Code, the LBB InsAdmin shall have a claim in respect of such sum allowed under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The foregoing provision shall not constitute an authorization for LBSF to use any sum recovered by it that it knows or reasonably should know to be proceeds of the Contracts.

12. Nothing contained in this Stipulation may be deemed or construed as (i) an admission or concession by LBSF or any of its affiliates regarding the validity or enforceability

of the Alleged Security Interests, including any claim that any monies that were, are, or might be held by LBSF constituted, constitute or would constitute "cash collateral" (as that term is defined in section 363(a) of Bankruptcy Code) of the LBB InsAdmin or (ii) any waiver by the LBB InsAdmin of (x) any rights or remedies it or the Deed Trustees may have in respect of any cash collateral of theirs held or received by LBSF or (y) LBSF's obligations in respect of any such cash collateral under the Bankruptcy Code, the Loan Agreements or the Security Agreements.

13. Nothing contained in this Stipulation shall alter, amend, modify, waive or release, except as expressly set fourth herein, the rights of any party hereto as against any other party to this Stipulation or against any other person or entity, or any assets of any such other party, person or entity or otherwise, except that so long as LBSF is complying with all of its obligations under this Stipulation, the LBB InsAdmin waives his right to seek adequate protection with respect to its Alleged Cash Collateral.

14. The provisions of this Stipulation and any actions taken pursuant hereto shall survive entry of and shall not be modified by, any order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

15. Except as otherwise provided in paragraphs 11, 12, or 13 above, entry of this Stipulation shall be without prejudice to (a) any and all rights, remedies, claims and causes of action which the LBB InsAdmin may have against LBSF or any third parties, or in the Chapter 11 Case, or with respect to the Alleged Collateral (including without limitation the Alleged Cash Collateral), (b) to the rights of the LBB InsAdmin to seek relief from the automatic stay pursuant to section 362 of the Bankruptcy Code, or any other relief under the Bankruptcy Code or applicable non-bankruptcy law, and (c) the right, if any, of LBSF, under section 506(c) of the Bankruptcy Code to recover from the LBB InsAdmin, including as assignee of the Deed Trustees

and the Issuer, all the reasonable, necessary costs and expenses of preserving, collecting and disposing of the Alleged Collateral, inclusive of the Alleged Cash Collateral.  Furthermore, nothing contained herein shall be construed as altering or affecting the rights and obligations of the LBB InsAdmin, the Deed Trustees and the Issuer <u>inter se</u>.

16. LBSF shall have no obligations to the LBB InsAdmin under this Stipulation or otherwise with respect to that portion of the Alleged Collateral or the Alleged Cash Collateral, if any, that may be determined by an order of the Court is not subject to the Alleged Security Interests.

17. The LBB InsAdmin agrees that he shall not disclose any settlement proposals exchanged between LBSF and a Counterparty, any information or documents, in whatever format, that is provided to the LBB InsAdmin by or on behalf of LBSF in connection with its consideration of any settlement proposals as provided in this Stipulation and the terms of any settlement that LBSF may reach or enter into with a Counterparty, ("<u>Confidential Information</u>"), to any person other than to his employees, counsel, auditors and other advisors, and the officers and employees of Bankhaus (hereinafter, collectively, the "<u>Related Parties</u>"), in each case who need to know such information solely for the purpose of considering such settlement proposals (it being understood that such Related Parties will be informed in advance of the confidential nature of the Confidential Information and will be directed to treat such Confidential Information confidentially), except (i) as may be required by law, including but not limited to as may be required by United States federal securities or banking laws or regulations, (ii) in connection with the enforcement by the LBB InsAdmin of his rights under the Stipulation or his Alleged Security Interest in the Alleged Collateral (provided that the LBB InsAdmin shall (a) seek to seal any Confidential Information used or filed by him in connection with any such

enforcement action and (b) provide LBSF with notice of his intent to make such use of such Confidential Information (which notice may be by email) at least five (5) days in advance of such use (or such shorter period as shall be available to the LBB InsAdmin if such enforcement action is brought on an emergency basis)), (iii) any such information which becomes public (other than by reason of a breach by the LBB InsAdmin of his confidentiality obligations contained herein) or which is obtained by the LBB InsAdmin from a person (other than from or on behalf of LBSF) not known by the LBB InsAdmin to be violating any confidentiality obligations in furnishing such information to the LBB InsAdmin, and (iv) any such information in the possession of the LBB InsAdmin prior to his receipt from LBSF.  If the LBB InsAdmin becomes legally obligated (whether by court or regulatory order or otherwise), other than due to the LBB InsAdmin's compliance with United States federal securities or banking laws or regulations, to disclose any of the Confidential Information, the LBB InsAdmin will endeavor to provide LBSF, if permitted by law, with prompt notice so that LBSF may seek a protective order or other appropriate remedy.  If such a protective order or other protective remedy is not obtained, the LBB InsAdmin will furnish only that portion of the Confidential Information that is legally required, in the opinion of its own counsel, and the LBB InsAdmin will exercise its reasonable efforts to obtain reliable assurances that confidential treatment will be accorded the Confidential Information. The foregoing confidentiality obligations shall terminate, in respect of any item of Confidential Information, one year after the receipt of such item of Confidential Information by the LBB InsAdmin; provided that the LBB InsAdmin shall not at any time make any disclosure to the public at large of such Confidential Information by means of a press release or in a similar manner except to the extent otherwise permitted by clauses (i) through (iv) above.

18.     Upon approval of this fully executed Stipulation by the Court, the provisions hereof shall be immediately binding upon and inure to the benefit of the LBB InsAdmin and LBSF and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Case or in any superseding chapter 7 case as a legal representative of LBSF or LBSF's estate.

19.     No rights are intended to be created hereunder for the benefit of any third party or creditor or any direct or indirect incidental beneficiary except as specifically provided herein.

20.     No waiver, modification, or amendment of any of the provisions hereof shall be effective unless it is set forth in writing, signed by the parties hereto.

21.     The person who executed the Stipulation by or on behalf of each respective Party represents and warrants that he or she has been duly authorized and empowered to execute and deliver this Stipulation on behalf of such Party.

22.     This Stipulation may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument, and it shall constitute sufficient proof of this Stipulation to present any copy, copies, or facsimiles signed by the Parties here to be charged.  This Stipulation and the terms and conditions contained herein are subject to the approval of the Court and shall be of no force and effect unless and until approved by the Court.

23.     This Stipulation shall be governed by the laws of the State of New York, without regard to the application of New York's conflict of law principles.

24.     The Parties hereby agree that any dispute or controversy arising under or relating to this Stipulation shall be subject to the exclusive jurisdiction and venue of (a) the

Court, or (b) if the Court does not have or abstains from exercising jurisdiction, the United States District Court for the Southern District of New York, and each party hereby waives any and all objections to the assertion of such jurisdiction as provided hereunder and any right to a trial in a hearing by jury.

25. Notice hereunder to any party shall be delivered to such party at the address specified for it on Exhibit A hereto or to such other address as such Party shall specify by a prior notice in writing to the other Party. Notice shall be effective (i) upon receipt, if delivered by hand or courier or (ii) upon successful transmission, if delivered by email or facsimile transmission and received during business hours or on business day in the place of receipt (otherwise on the next succeeding business day).

Dated: January 12, 2010

| WEIL, GOTSHAL & MANGES, LLP | DEWEY & LEBOEUF LLP |
|---|---|
| By: /s/ Richard P. Krasnow<br>　　　Richard P. Krasnow | By: /s/ Irena Goldstein<br>　　　Irena Goldstein |
| 767 Fifth Avenue, Room 2745<br>New York, New York 10153<br>Phone: 212-310-8493 | 1301 Avenue of the Americas<br>New York, New York 10019<br>Telephone: (212) 259-8000 |
| ATTORNEYS FOR LEHMAN BROTHERS SPECIAL FINANCING INC. | ATTORNEYS FOR DR. MICHAEL C. FREGE IN HIS CAPACITY AS INSOLVENCY ADMINISTRATOR (INSOLVENZVERWALTER) OVER THE ASSETS OF LEHMAN BROTHERS BANKHAUS AKTIENGESELLSCHAFT I. INS. |

SO ORDERED this 29th day of January, 2010

　　　*s/ James M. Peck*
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

Addresses for Notice

<u>LBSF</u>:

    Lehman Brothers Special Financing, Inc.
    1271 Avenue of the Americas
    40th Floor
    New York, New York 10020
    Attention:    Michael Ferraro
    Tel. No.:    646-285-9672
    Fax No.:    646-758-4768
    Email:    michael.ferraro@lehmanholdings.com

    and

    Locke R. McMurray
    Tel. No.:    212-285-9700
    Fax No.:    212-285-9701
    Email:    locke.mcmurray@lehmanholdings.com

    with a copy to:

    Weil, Gotshal & Manges, LLP
    767 Fifth Avenue, Room 2745
    New York, New York 10153
    Attention:    Richard Krasnow, Esq.
    Tel. No.:    212-310-8493
    Tel. No.:    212-310-8934
    Email:    richard.krasnow@weil.com

<u>Bankhaus</u>:

    Lehman Brothers Bankhaus AG (in Ins.)
    c/o CMS Hasche Sigle
    Barckhausstraße 12 - 16
    60325 Frankfurt am Main
    Germany
    Attention:    Dr. Michael C. Frege, in his capacity as insolvency administrator
    Tel. No.:    +49 69 71701-0
    Fax No.:    +49 69 71701-40410
    email:    Michael.Frege@cms-hs.com

with a copy to:

Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, New York 10019
Attention: Irena Goldstein, Esq.
Tel. No.:      212-259-8000
Fax No.:      212-259-6333
Email:         igoldstein@dl.com