SALANS LLP
  Claude D. Montgomery
  Lee P. Whidden
  Michael Kauffman
Rockefeller Center
620 Fifth Avenue
New York, NY 10020-2457
Tel: (212) 632-5500
Fax: (212) 632-5555

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
: 
In re : 
: Chapter 11 Case No.
: 
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.* : 08-13555 (JMP)
: 
Debtors. : (Jointly Administered)
: 
: 
------------------------------------------------------------------x

**SWEDBANK'S OBJECTION TO DEBTORS' MOTION PURSUANT TO**
**SECTIONS 105(a) AND 362 OF THE BANKRUPTCY CODE FOR AN**
**ORDER ENFORCING THE AUTOMATIC STAY AGAINST AND**
**COMPELLING PAYMENT OF POST-PETITION FUNDS BY SWEDBANK AB**

      Swedbank AB (publ.) ("Swedbank") by and through its undersigned counsel, files this objection ("Objection") to the Motion of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors") Pursuant to Sections 105(a) and 362 of the Bankruptcy Code for an Order Enforcing the Automatic Stay Against and Compelling Payment of Post-Petition Funds by Swedbank AB ("Motion") and, in support hereof, respectfully states as follow:

**Preliminary Statement**

      1.    Debtors' Motion is premised on the erroneous assumption that the funds at issue are not governed by the Safe Harbor provisions of the Bankruptcy Code. Because Swedbank and LBHI have mutual obligations under various ISDA Master Agreements and

NewYork 1324232.7

guarantees as well as other agreements, setoff and netting is permitted without the need to seek stay relief.

2. Debtors' Section 362 analysis is inapplicable as Sections 362 and 553 do not apply to Safe Harbor transactions under the explicit provisions of section 561 of the Bankruptcy Code. In sum, Debtors' Motion ignores relevant facts, applies irrelevant law and must be denied.

**Background**

3. As of December 17, 1996, Swedbank and Lehman Brothers Commercial Corporation ("LBCC") entered into an ISDA Master Agreement ("LBCC Master Agreement") under which, on September 15, 2008, Swedbank was and is still owed 1,219,792 SEK plus all reasonable out of pocket expenses. Under the LBCC Master Agreement, LBHI is a Credit Support Provider and unconditional guarantor of LBCC's obligations under the LBCC Master Agreement. The LBCC Master Agreement provides for Automatic Early Termination. Declaration of Johan Stenberg, ¶ 6 (hereafter "Stenberg Decl.").

4. As of December 30, 1997, Swedbank and Lehman Brothers International (Europe), Inc ("LBIE") entered into an ISDA Master Agreement ("LBIE Master Agreement") under which, on September 15, 2008, Swedbank was and is still owed 43,296,206 SEK plus all reasonable out of pocket expenses. Under the LBIE Master Agreement, LBHI is a Credit Support Provider and unconditional guarantor of LBIE's obligations under the LBIE Master Agreement. The LBIE Master Agreement provides for Automatic Early Termination. Stenberg Decl. ¶ 7.

5. As of October 8, 2003, Swedbank and Lehman Brothers Finance, S.A. ("LBFSA") entered into an ISDA Master Agreement ("LBFSA Master Agreement") under which, on September 15, 2008, Swedbank was and is still owed 62,586,227 SEK plus all reasonable out of pocket expenses. Under the LBFSA Master Agreement, LBHI is a Credit

Support Provider and unconditional guarantor of LBFSA's obligations under the LBFSA Master Agreement. The LBFSA Master Agreement provides for Automatic Early Termination. Stenberg Decl. ¶ 8.

6. As of November 29, 2004, Swedbank and Lehman Brothers Special Financing, Inc. ("LBSFI") entered into an ISDA Master Agreement and Credit Support Annex ("LBSFI Master Agreement") under which, on September 15, 2008, Swedbank was and is still owed 12,129,635 SEK plus all reasonable out of pocket expenses. Under the LBSFI Master Agreement, LBHI is a Credit Support Provider and unconditional guarantor of LBSFI's obligations under the LBSFI Master Agreement. Stenberg Decl. ¶ 9.

7. Also as of November 29, 2004, Swedbank and LBHI, acting through its UK Branch, entered into an ISDA Master Agreement ("LBHI Master Agreement" and together with the LBCC Master Agreement, LBIE Master Agreement, LBFSA Master Agreement, and LBSFI Master Agreement, the "Master Agreements") under which, on September 15, 2008, Swedbank was owed 356,712 SEK ("LBHI Safe Harbor Obligation") plus all reasonable out of pocket expenses. Stenberg Decl. ¶ 10.

8. Each Master Agreement defines an Event of Default to include bankruptcy, whereby a "Party, any Credit Support Provider of such party … institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law of other similar law affecting creditors' rights." ISDA Master Agreements, (5)(a)(vii).

9. On September 15, 2008, LBHI filed a voluntary petition for bankruptcy in the Bankruptcy Court of the Southern District of New York ("LBHI Bankruptcy").

3

10. The LBHI Bankruptcy triggered Automatic Early Termination under the LBIE, LBCC and LBFSA Master Agreements. Stenberg Decl. ¶ 11.

11. On September 15, 2008, Swedbank notified LBSFI of an Event of Default under the LBSFI Master Agreement. Stenberg Decl. ¶ 12.

12. On September 17, 2008, Swedbank notified LBHI of an Event of Default under the LBHI Master Agreement. Stenberg Decl. ¶ 13.

13. Under the Master Agreements an Event of Default, properly notified or automatically terminating, triggers Early Termination. Early Termination gives rise to payment to the party in the money. ISDA Master Agreements, 6(e). "Set-off" is defined as "set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer." ISDA Master Agreements, 14, "Set-off" definition.

14. The Schedule to the LBHI Master Agreement provides, "In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office

of the obligation)" ("ISDA Contractual Setoff Right"). Schedule to the LBHI Master Agreement, Part 5 (b).

15. Under the LBHI Master Agreements, LBHI is indebted to Swedbank in the amount of SEK 119,588,572 plus all reasonable out of pocket expenses, either as a direct obligor, as a guarantor, or as an affiliate of LBCC, LBFSA, LBSFI, and LBIE ("Safe Harbor Obligations"). Stenberg Decl. ¶ 15.

16. LBHI, through its UK Branch, maintains an account at Swedbank, identified as No. 17608 ("Setoff Account"), with a balance of SEK 84,906,363.85, of which SEK 2,640,124.06 deposited pre-petition and SEK 82,266,239.79 deposited post-petition ("Safe Harbor Setoff Amount"). Stenberg Decl. ¶ 16.

17. By letter dated November 27, 2008, Swedbank notified LBHI that it would setoff the LBHI Safe Harbor Obligation against the Safe Harbor Setoff Amount in the Setoff Account, effective December 1, 2008. Stenberg Decl. ¶ 14. Swedbank reserves all rights with respect to any setoff, or partial setoff, already taken.

18. By letter dated January 30, 2009, Swedbank indicated that it had placed an administrative freeze on the Setoff Account. In their motion the Debtors cite irrelevant portions of the letter while ignoring the relevant portions. The Debtors note that Swedbank states in the letter that it "may request the court to lift the automatic stay to permit set offs against transactions which are *not [otherwise] protected by the safe harbor provisions of the US Bankruptcy Code*." (Emphasis added). What the Debtors failed to cite is the following additional language: "*Swedbank also reserve[s] and retain[s] the right to set off against the account any claims in relation to qualified financial transactions under the safe harbor*

5

*provisions or otherwise.*" Exhibit D of the Declaration of Adrian Teng in Support of Debtors Motion Enforcing the Automatic Stay Against Swedbank AB [dkt 6736].

19. Because the Safe Harbor Obligations and Safe Harbor Setoff Amount are covered by the Bankruptcy Code's Safe Harbor provisions, what the Debtors cite to is irrelevant. The relevant portion of the letter is Swedbank's reservation of rights regarding Safe Harbor setoff.

20. Under non-bankruptcy laws applicable to obligations under the ISDA Master Agreements, Swedbank has the contractual right to setoff Swedbank's SEK 119,588,572 against the SEK 84,906,363.85 LBHI owes Swedbank. As shown below, under the Bankruptcy Code, this contractual right remains wholly intact and unaffected by the automatic stay or restrictions of Section 553.

### Bankruptcy Code

21. Transactions under ISDA Master Agreements are "swap agreements" within the meaning of the Bankruptcy Code. *Thrifty Oil Co. v. Bank of America Nat. Trust and Sav. Ass'n*, 322 F.3d 1039 (9th Cir. 2003) (finding an ISDA swap transaction to be a swap agreement under the Bankruptcy Code). As such, the ISDA Master Agreements qualify as "swap agreements" under section 560 and 561 of the Bankruptcy Code, and as master netting agreements under section 561.

22. Subsection (a) of section 561 of Title 11 of the United States Code ("Bankruptcy Code") provides "the exercise of any contractual right, because of [an *ipso facto* clause] to cause the termination, liquidation, or acceleration of or to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more (or the termination, liquidation, or acceleration of one or more) … (5) swap agreements; or (6) master netting agreements, *shall not be stayed, avoided, or otherwise limited by operation of*

6

*any provision of this title or by any order of a court or administrative agency in any proceeding under this title.*"

23.     The contractual right to offset applies equally to pre-petition and post-petition obligations.  First, sections 560 and 561 do not contain any language which limits netting or set off of obligations relating to Safe Harbor transactions between pre- and post-petition obligations.  Were they to do so, it would eviscerate the very purpose of the Safe Harbor provisions.   By their own terms, sections 560 and 561 apply to "any" contractual right, whenever arising.  Second, and by way of contrast, where the Bankruptcy Code contemplates differentiating between pre- and post-petition obligations, it does so specifically.  For example, sections 362(a)(6) and 553, which cannot limit Safe Harbor transactions, explicitly differentiate between pre- and post-petition obligations.  Sections 362 and 553 demonstrate that, when Congress intends to differentiate pre- and post-petition obligations in the context of a setoff, it does so in plain terms.  Further, in 2005, Congress amended section 553 to explicitly exclude transactions or setoff subject to the provisions of Sections 555, 556, 559, 560 and 561 ("Safe Harbor Sections").  In leaving 553's pre- and post-petition distinction intact while leaving the Safe Harbor Sections without pre- and post-petition distinction Congress purposefully declined, again, to distinguish pre- and post-petition setoff obligations under Safe Harbor Sections. *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No.109-8, § 907(n), 119 Stat. 23, (2005).  Indeed, "Nothing in the Code places an explicit limit on a counterparty's post-petition rights [of] … setoff." Edward R. Morrison & Joerg Riegel, *Financial Contracts and the New Bankruptcy Code: Insulating Markets from Bankrupt Debtors and Bankruptcy Judges*, 13 AM. BANKR. INST. L. REV. 641, 658 (2005) ("Morrison").

NewYork 1324232.7

24. Subsection (b) of section 561 makes clear that so long as offset or netting is permitted by the applicable agreements, it cannot be restricted. That subsection provides the only limitation on set-off, and that limitation is contractual in nature: "A party may exercise a contractual right described in subsection (a) to terminate, liquidate, or accelerate only to the extent that such party could exercise such a right under section 555, 556, 559, or 560 for each individual contract covered by the master netting agreement in issue." Neither subsection (b) of Section 561 nor any other provision of the Bankruptcy Code restricts the contractual right "to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more … (5) swap agreements; or (6) master netting agreements." Indeed, there is no limit on the type of obligation against which a master netting agreement counterparty can set off against, including non-derivative obligations such as a debt, loan, promissory note, letter of credit—in fact, *any* type of obligation for which the master netting agreement provides a "contractual right." *See* Section 561.

25. The United States Supreme Court has been clear in its approach to interpreting the Bankruptcy Code. Where the meaning is clear, and does not yield an absurd result or frustrate the Bankruptcy Code's overarching policy, a court is compelled to follow the Bankruptcy Code's plain meaning. *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026 (1989) (Holding that, because the meaning of §506(b) of the Bankruptcy Code is clear and unambiguous, it shall be enforced as written; "The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters) (internal quotes omitted); *Perry v. Commerce Loan Co.*, 383 U.S. 392, 86 S.Ct. 852 (1966) ("There is, of course, no more

persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes").

26. The plain meaning of section 561 does not lead to absurd results and does not frustrate the Bankruptcy Code's policy. Indeed, it supports it. The purpose of the Safe Harbor provisions "will be to provide certainty for swap transactions and thereby stabilize domestic markets by *allowing the terms of the swap agreement to apply notwithstanding the bankruptcy filing.*" 136 Cong. Rec. S7535 (remarks of Sen. DeConcini) and quoted with approval in *Thrifty Oil Co.* at 1051.

27. Further, the congressional intent regarding Safe Harbor transactions was specifically to "prevent 'any inquiry' [by a court] into the economics of the transaction" and instead follow the plain meaning of the Bankruptcy Code. Morrison at 657.

28. In short, the statutory language is clear and unambiguous. Under the plain meaning of the Bankruptcy Code, as supported by policy and congressional intent, sections 560 and 561 allow the master netting agreement participants to realize any setoff or netting permitted under the terms of the master netting agreement to which they are parties.

29. Because the ISDA Master Agreement falls within the Bankruptcy Code's Safe Harbor, and the ISDA Contractual Setoff Right in each ISDA Master Agreement is an absolute right to be enforced without being "stayed, avoided, or otherwise limited," the automatic stay has no effect on Swedbank's ISDA Contractual Setoff Rights, which are fully enforceable as written.

### Section 553 Inapplicable

30. The Debtors fail to acknowledge Swedbank's ISDA Contractual Setoff Rights under section 561 and wrongly characterize the Safe Harbor Setoff Amount as subject to

9

section 553. Instead, a full review of the relevant facts and applicable law reveals Swedbank's right to setoff against the Safe Harbor Setoff Amount without recourse to this Court.

31. LBHI premises its Motion on section 553, even though this provision, by the mutually reinforcing terms of sections 553 and 651, is irrelevant to the determination of Swedbank's ISDA Contractual Offset Rights. Whatever the relevance of section 553 to setoff rights existing outside of Safe Harbor contractual rights, section 553 is wholly inapplicable here.

32. LBHI cites cases applicable to 553 transactions and wholly irrelevant to Safe Harbor transactions. *E.g.*, *In re Harris*, 260 B.R. 753 (Bankr. D. Md. 2001) (regards non safe harbor setoff). Confusingly, the only Debtors' case to mention "safe harbor," *Radcliffe v. Int'l Painters & Allied Trades Indus.*, 372 B.R. 401, 417 (Bankr. N.D. Ind. 2007), deals with an entirely different safe harbor. In *Radcliffe*, the issue was whether International Painters could avoid sanctions after having withheld funds before seeking, retroactively, relief from the automatic stay. Relying on *Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), which allowed such retroactive relief only if applied for "in very short order"—in *Strumpft*, 5 days—the court in *Radcliffe* concluded that International Painters did not qualify for this temporary "short order" safe harbor. This "short order" safe harbor is not at all the Safe Harbor regarding swap agreements and master netting agreements. *Radcliffe*, inapplicable to Safe Harbor transactions, is, likewise, inapplicable here.

33. In sum, the rights to net or offset under master netting agreements cannot be limited by operation of Section 553 or any other provision of the Bankruptcy Code.

## Relief Requested

34. Swedbank seeks a determination by this Court that (a) the ISDA Master Agreements are "master netting agreements" within the meaning of section 561, (b) ISDA Contractual Setoff Rights are contractual rights to setoff within the meaning of 561, (c) the ISDA

Contractual Setoff Rights contractually provide for setoff against any type of obligation, including a post-petition creditor obligation arising from debtor's bank account maintained with that creditor, (d) the Automatic Stay does not apply to the ISDA Contractual Setoff Rights, (e) section 553 does not apply to the ISDA Contractual Setoff Rights, (f) Swedbank has not, and is not, in violation of the Automatic Stay with respect to the ISDA Contractual Setoff Rights, and (g) that setoff of the LBHI Safe Harbor Obligation was proper and not in violation of any provision of the Bankruptcy Code ("Relief Requested").

WHEREFORE, Swedbank respectfully requests that the Court deny the Motion, and grant Swedbank the Relief Requested and such other and further relief as is just and proper.

Dated:  New York, New York
        February  3, 2010

SALANS LLP

By: /s/ Claude D. Montgomery
    Claude D. Montgomery, Esq.
    Lee P. Whidden, Esq.
    Michael Kauffman, Esq.
620 Fifth Avenue
New York, New York  10020
(212) 632-5500