(Multicurrency-Cross Border)



# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of December 17, 1996

**LEHMAN BROTHERS**     **AND**     **SWEDBANK (Sparbanken Sverige AB**
**COMMERCIAL CORPORATION**                        **(publ.))**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.    **Interpretation**

(a)    *Definitions.*  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)    *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)   promptly notify the other party ("Y") of such requirement;

        (2)   pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)   promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)   if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)   the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)   the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii) *Liability*. If:—

(1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2) X does not so deduct or withhold; and

(3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e) *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3. Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a) *Basic Representations.*

(i) *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii) *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii) *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)   *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)   *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)   *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)   *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)   *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.   Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)   *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

   (i)   any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

   (ii)   any other documents specified in the Schedule or any Confirmation; and

   (iii)   upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)   *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)   *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)   *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)   *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5. Events of Default and Termination Events

(a) *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i) *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii) *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default.*

(1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv) *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v) *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b) *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i) *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6.  Early Termination

(a)  *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)  *Right to Terminate Following Termination Event.*

   (i)  *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

   (ii)  *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

   If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

   Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

   (iii)  *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

   (iv)  *Right to Terminate.* If:—

      (1)  a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

      (2)  an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

   either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)     *Effect of Designation.*

(i) If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii) Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)     *Calculations.*

(i)     *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)     *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)     *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)     *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)     *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)     *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)     *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties:—

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

7. Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)     a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)     a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.     Contractual Currency

(a)     *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)     *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)     *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)     *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

9. Miscellaneous

(a) *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b) *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c) *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d) *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e) *Counterparts and Confirmations.*

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f) *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g) *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10. Offices; Multibranch Parties

(a) If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b) Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c) If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11. Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

12.    Notices

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)   if sent by telex, on the date the recipient's answerback is received;

(iii)  if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

13.    Governing Law and Jurisdiction

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)     *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)     in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)     in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)     in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

ISD... © 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)     the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)     such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means. subject to the Schedule, any obligation (whether present or future. contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means. subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction. cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date. that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS**
**COMMERCIAL CORPORATION**
(Name of Party)

By: ....................................
Name: ~~JONATHAN~~ D WILLIAMS
Title: SENIOR VICE PRESIDENT
Date: 6/27/97

**SWEDBANK (Sparbanken**
**Sverige AB (publ.))**
(Name of Party)

By: ....................................
Name:
Title:
Date:

*Johan Stenberg*
∪ P

*Clas Burénius*
Legal Adviser
June 18, 1997

(Multicurrency-Cross Border)

## SCHEDULE
### to the
### Master Agreement
dated as of December 17, 1996

between

### LEHMAN BROTHERS COMMERCIAL CORPORATION ("Party A")
a corporation organized under
the laws of Delaware

and

### SWEDBANK (Sparbanken Sverige AB (publ.)) ("Party B")
a bank organized under the laws of
the Kingdom of Sweden

## Part 1: Termination Provisions

In this Agreement:

(a)     "Specified Entity" means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b)     "Specified Transaction" will have the meaning specified in Section 14 of this
Agreement.

(c)     The "Cross Default" provisions of Section 5(a)(vi) will apply to Party A and Party B.

If such provisions apply:

"Specified Indebtedness" shall mean any obligation (whether present, future or
contingent, as principal or surety) in respect of borrowed moneys, other than deposits received, or
any guarantee, surety, or similar undertaking given, in the normal course of business.

"**Threshold Amount**" means, the lesser of (i) $40 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Holdings"), in the case of Party A and Holdings (or its equivalent in any other currency), and the lesser of (i) $40 million and (ii) two percent (2%) of the Stockholders" Equity of Party B, in the case of Party (or its equivalent in any other currency).

(d)     The "**Credit Event Upon Merger**" provisions of Section 5(b)(iv) will apply to Party A and Party B.

(e)     The "**Automatic Early Termination**" provision of Section 6(a) will apply to Party A and will apply to Party B.

(f)     "**Payments on Early Termination**"  For the purpose of Section 6(e) of this Agreement Market Quotation and the Second Method will apply.

(g)     "**Termination Currency**" means the currency selected by the party which is not the Defaulting Party or the Affected Party, as the case may be, or, if there are two Affected Parties, the currency selected by agreement between the parties or (failing such agreement) United States Dollars.  The Termination Currency shall be one of the currencies in which payments are required to be made in respect of the Terminated Transactions, if such currency is freely available, and otherwise United States Dollars.

(h)    **"Additional Termination Event"** will apply. The following shall constitute Additional Termination Events pursuant to Section 5(b) of this Agreement, and will be included under (a) of the definition of "Affected Transactions" in Section 14 of this Agreement.

    (i)    A Party ("X") shall not be deemed to be in breach of this Agreement or otherwise liable thereunder to the other Party ("Y") and no Event of Default shall be deemed to occur with respect to X, as a result of any delay in performance or any non-performance by X of any obligations to make a payment or delivery or to comply with any other material provisions under this Agreement (and the time for performance shall be extended accordingly) if and to the extent that the delay or non-performance is due to lockouts, strikes or other disputes (a "Labour Dispute Event"), in each case directly or indirectly affecting or instigated by X or its workforce.

    (ii)    If X cannot receive a payment from Y or Y cannot make a payment or delivery to X or comply with any other material provisions of this Agreement due to a Labour Dispute Event, then Y shall not be deemed to be in breach of this Agreement or otherwise liable to X, and no Event of Default shall be deemed to occur with respect to Y as a result of any delay in performance or any non-performance of any obligations under this Agreement resulting therefrom (and the time for performance shall be extended accordingly).

    (iii)    X shall promptly endeavor to notify Y of the nature and extent of the circumstances giving rise to a Labour Dispute Event.

    (iv)    If and so long as clause (i) applies, Y, and if and so long as clause (ii) applies, X may, on giving notice to the other party, withhold any payment and delivery due to that party under Transactions affected by the Labour Dispute Event.

    (v)    If, in accordance with this paragraph any payment hereunder is postponed following a Labour Dispute Event, interest shall accrue on the relevant amount(s) from the Scheduled Payment Dates(s) to the date of actual payment at a rate per annum equal to the cost to the party due to receive payment (as certified by it) if it were to fund or of funding such relevant amounts(s). However, in respect of a payment in Swedish Kronor interest shall accrue on the relevant amounts(s) from the Scheduled Payment Date to the date of actual payment, as set out above, at a rate of interest corresponding to "SEK-STIBOR-SIDE" for the relevant period if such interest rate is quoted.

    (vi)    If the delay in performance or non-performance due to the Labour Dispute Event in question, prevails for a continuous period in excess of ten (10) days, such event shall constitute an Additional Termination Event and each party shall be an Affected Party.

## Part 2: Tax Representations

(a) **Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) and 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b) **Payee Representations.** For the purpose of Section 3(f) of this Agreement, Party A and Party B make the representations specified below with respect to each Transaction between Party A and Party B acting through its London or Stockholm Office.

It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Interest" provision or the "Other Income" provision (if any) of the Specified Treaty with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the Specified Jurisdiction.

If such representation applies, then:

"**Specified Treaty**" means, with respect to Party A, the income tax convention between the United States of America and the Specified Jurisdiction of Party B.

"**Specified Jurisdiction**" means, with respect to Party A, the country in which the Office, through which Party B is acting for the purpose of the Transaction, is located.

"**Specified Treaty**" means, with respect to Party B, the income tax convention between the United States of America and Sweden.

"**Specified Jurisdiction**" means, with respect to Party B, the United States of America.

## Part 3: Agreement to Deliver Documents

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:-

(a) Tax forms, documents or certificates to be delivered are:-

| Party required to deliver document | Form/Document /Certificate | Date by which to be delivered |
|---|---|---|
| Party A and Party B | Forms and/or documents described in Section 4(a)(iii) of the Agreement. | Upon reasonable demand by the other party. |
| Party B | Form 1001, if the Office of Party B that is transacting such Transaction is located outside the United States of America | (A) The earliest of (i) the first scheduled Payment Date, or (ii) promptly upon reasonable demand by Party A; and (B) thereafter prior to the first scheduled Payment Date in each third calendar year during which any Transaction between Party A and such Office of Party B is in effect. |

(b)  Other documents to be delivered are:-

| Party required to **deliver** document | **Form/Document/ Certificate** | **Date by which to be Delivered** | Covered by **Section 3(d)** |
|---|---|---|---|
| Party A | An opinion of counsel to Party A substantially in the form of Exhibit B to this Schedule. | Promptly after execution of this Agreement | Yes |
| Party A | A guarantee of Holdings in the form of Exhibit A to this Schedule. | Upon execution of this Agreement. | Yes |
| Party A | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party A | A copy of the annual report of its Credit Support Provider containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting practices consistently applied. | Upon execution of this Agreement and thereafter upon request. | Yes |
| Party A | A copy of the unaudited financial statements of its Credit Support Provider for its most recent fiscal quarter and prepared in accordance with generally accepted accounting practices consistently applied. | Upon execution of this Agreement and thereafter upon request. | Yes |
| Party B | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |

| Party required to <u>deliver</u> document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | An opinion of counsel to Party B substantially in the form of Exhibit C to this Schedule. | Promptly after execution of this Agreement | Yes |
| Party B | A copy of the annual report of the party (and any Credit Support Provider) containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting practices consistently applied. | Upon execution of this Agreement and thereafter upon request. | Yes |
| Party B | A copy of the unaudited financial statements of the party (and any Credit Support Provider) for its most recent fiscal quarter and prepared in accordance with generally accepted accounting practices consistently applied. | Upon execution of this Agreement and thereafter upon request. | Yes |
| Party B | A certified copy of the resolution or resolutions (the "Authorizing Resolution") of the board of directors or loan committee of Party B, certified by a secretary, or an assistant secretary of Party B, pursuant to which Party B is authorized to enter into this Agreement and each Transaction entered into under this Agreement. | Upon execution of this Agreement (unless an Authorizing Resolution has previously been furnished by Party B to Party A) and, with respect to each Transaction not covered by a previously-furnished Authorizing Resolution, within five (5) Business Days of the Trade Date. | Yes |

## Part 4: Miscellaneous

(a)     **Addresses for Notices.** For the purposes of Section 12(a) of this Agreement:

Address for notices or communications to Party A:-

Address:     Derivative Finance Department
             3 World Financial Center, 12th Floor
             New York, New York 10285-1200 USA

             Attention:     Documentation Manager

             Telephone No.:     (212) 526-1877
             Facsimile No.:     (212) 528-7097

                        For all purposes.

Address for notices or communications to Party B:-

> Stockholm Head Office

Address:     Brunkebergstorg 8
             S-105 34 Stockholm

             Attention:     Backoffice Derivatives

             Telephone No.:     08-790 10 00
             Facsimile No.:     08-21 19 66
             Telex No.:         12356          Answerback: SWEDSET S

> London Branch

Address:     42 New Broad Street
             LONDON EC2M 1SB

             Attention:     Credit Control Department

             Telephone No.:     171-256 60 00
             Facsimile No.:     171-638 11 01
             Telex No.:         290315        Answerback: SWEDFX G

> New York Branch

Address:     12 East 49th Street, 20th Floor
             New York, NY 10017

             Attention:     Credit Manager

             Telephone No.:
             Facsimile No.:
             Telex No.:         496 06 814    Answerback: SWEDNYB

in each case only with respect to Transactions through the relevant Office. However, if
any notice is given pursuant to Section 5 or 6 of this Agreement, to an applicable or

affected Office of Party B that is not the Stockholm Head Office, it shall not be effective until the later of the First Local Business Day following receipt by Party B at such applicable or affected Office and receipt by Party B of a copy of such notice at the Stockholm Head Office.

For all purposes.

(b)     **Process Agent.**  For the purpose of <u>Section 13(c)</u>:-

Party A appoints as its Process Agent - Not applicable

Party B appoints as its Process Agent - SwedBank New York Branch with an office at:

> 12 East 49th Street
> New York, NY 10017

(c)     **Offices.**  The provisions of Section 10(a) will apply to this Agreement.

(d)     **Multibranch Party.**  For the purpose of Section 10(c) of this Agreement:

    (i)     Party A is not a Multibranch Party.

    (ii)    Party B is a Multibranch Party:  Stockholm, London and New York

(e)     **Calculation Agent.**  The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f)     **Credit Support Document.**  Details of any Credit Support Document, each of which is incorporated by reference in, constitutes part of, and is in connection with, this Agreement and each Confirmation (unless provided otherwise in a Confirmation) as if set forth in full in this Agreement or such Confirmation:-

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit B of this Schedule.

In the case of Party B,  Not applicable.

(g)     **Credit Support Provider.**  Credit Support Provider means in relation to Party A: Holdings.

Credit Support Provider means in relation to Party B: Not applicable.

(h)     **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)     **Jurisdiction.**  Section 13(b) is hereby amended by: (i) deleting in the second line of Subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.

(j)     **Netting of Payments.**  Subparagraph (ii) of Section 2(c) of this Agreement will not apply to all Transactions (in each case starting from the date of this Agreement.)

(k)     "**Affiliate**" will have the meaning specified in Section 14 of this Agreement.

## Part 5: Other Provisions

(a)     **Definitions.** This Agreement and each Transaction hereunder are subject to the 1991 interest Rate and Currency Exchange Definitions (the "Definitions") (as published by, as it is now called, the International Swaps and Derivatives Association, Inc. ("ISDA")), and will be governed in all relevant respects by the provisions set forth in the Definitions. The Definitions are incorporated by reference in, and shall be deemed part of, this Agreement and each Confirmation as if set forth in full in this Agreement and the relevant Confirmation. In the event of any conflict or inconsistency between the provisions of the Definitions and this Agreement or any Confirmation, this Agreement or, as the case maybe, the relevant Confirmation shall prevail.

(a)     **Set-off.** The following Section 6(f) shall be added to the Agreement:

"(f) Set-off. Any amount (the 'Early Termination Amount') payable to one party (the Payee) by the other party (the Payer) under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party in the case where a Termination Event under Section 5(b)(iv) has occurred, will, at the option of the party ('X') other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), be reduced by its set-off against any amount(s) (the 'Other Agreement Amount') payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer or instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off). X will give notice to the other party of any set-off effected under this Section 6(f).

    "For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

    "If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

    "Nothing in the Section 6(f) shall be effective to create a charge or other security interest. This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

(b)     **Deferral of Payments in Connection with Illegality.** If a party gives a notice of Illegality, the due date for any payment scheduled to be made by either party pursuant to

Section 2 in connection with any Affected Transaction at any time after that notice is effective shall be deferred to the earliest to occur of: (i) the date for settlement payments pursuant to Section 6(e) in connection with an Early Termination Date; (ii) the final Scheduled Payment Date for the Affected Transactions; and (iii) the date on which arrangements made pursuant to Section 6(b)(ii) to avoid the Illegality are effected. Any payments deferred pursuant to this provision shall be made on the deferred payment date together with interest accrued on each deferred amount from and including its originally scheduled due date to, but excluding the deferred due date (or, if an Early Termination Date is designated, to but excluding the day it is designated) at, the Non-default Rate.

(c) **Representations and Warranties.** Section 3(a) is amended by adding the following paragraphs (vi) and (vii):

    (vi) **No Agency.** It is entering into this Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

    (vii) **Eligible Swap Participant.** It is an "eligible swap participant" as that term is defined by the United States Commodity Futures Trading Commission in 17 C.F.R. § 35.1(b)(2)."

(d) **Waiver of Jury Trial.** Each Party hereby irrevocably waives any and all right to trial by jury in any suit, action or proceeding arising out of or relating to this Agreement or any Transaction and acknowledges that this waiver is a material inducement to the other Party's entering into this Agreement.

(e) **Confirmations.** In relation to Confirmations, unless either Party objects to the terms contained in any Confirmation within three (3) Business Days of receipt thereof, or such shorter time as may be appropriate given the Value Date of the FX Transaction, the terms of such Confirmation shall be deemed correct and accepted absent manifest error, unless a corrected Confirmation is sent by a Party within such three Business Days, or shorter period, as appropriate, in which case the Party receiving such corrected Confirmation shall have three (3) Business Days, or shorter period, as appropriate, after receipt thereof to object to the terms contained in such corrected Confirmation. In the event of any conflict between the terms of a Confirmation and this Master Agreement, the terms of this Master Agreement shall prevail, and the Confirmation shall not modify the terms of this Master Agreement.

In addition, where an FX Transaction or a Currency Option is confirmed by means of an electronic messaging system that the parties have elected to use to confirm such Transaction (i) such confirmation will constitute a "Confirmation" as referred to in this Agreement even where not so specified in the confirmation, (ii) such Confirmation will supplement, form part of, and be subject to this Agreement and all provisions in this Agreement will govern the Confirmation and (iii) the definitions and provisions contained in the FX Definitions will be incorporated into the Confirmation."

(f)    **Section 9** of this Agreement shall be amended by:

    (i) deleting from Section 9(b) of this Agreement the words "or electronic messages on an electronic messaging system", and

    (ii) the addition after Section 9(g), of the following new Section 9(h): **Amendments to the Agreement and Creation of Confirmations.**

"Notwithstanding the provisions of Sections 9(b) and 9(e)(i) and (ii), any amendments hereto confirmed, and each Confirmation created, by facsimile or exchange of telexes or (as concerns the creation of Confirmations only) by an exchange of electronic messages shall at the request of either party be further evidenced by an instrument in writing executed by the parties hereto but so that failure to execute such an instrument shall not prejudice the effectiveness of the exchange of telexes, facsimiles or (in the case of a Confirmation) the exchange of electronic messages."

(g)    **Section 12(a)(iii)** of this Agreement shall be amended by the addition of the following words before the final bracket:

"but shall be met by the recipient acknowledging the transmission by a telefax (which shall not be subject to the proviso to this Section 12(a)(iii)) or by other means in writing or by telephone conversation duly taperecorded by either party"

(h)    **Standard Terms and Scope of the Agreement.** This Agreement amends and restates: (1) the British Bankers' Association London Interbank Interest Rate Swaps Recommended Terms and Conditions ("BBAIRS Terms"), with respect to any swap transactions between Party A and Party B that are confirmed subject to such terms, (2) the British Bankers' Association London Interbank Forward Rate Agreements Recommended Terms and Conditions ("FRABBA Terms"), with respect to any forward rate agreements between Party A and Party B that are confirmed subject to such terms, (3) the British Bankers' Association 1993 International Foreign Exchange Master Agreement Terms ("IFEMA Terms"), with respect to any FX transaction between Party A and Party B that are confirmed subject to such terms, and (4) the British Bankers' Association International Currency Options Market Terms ("ICOM Terms") for any Currency Options between Party A and Party B that are confirmed subject to such terms (collectively, the "Standard Terms").

Notwithstanding any provision of Section 1(b) of this Agreement to the contrary, each confirmation (as defined in the Standard Terms) which forms a part of, or is stated to be governed by, the Standard Terms, shall constitute a Confirmation hereunder and each transaction evidenced by any such confirmation will remain in full force and effect and be governed hereby and by the 1991 ISDA Definitions, provided that the terms of this paragraph shall not modify the calculation of any payments due with respect to such transaction. However, notwithstanding the foregoing, the provisions of Section 5 and 6 of this Agreement shall in any event remain in full force and effect.

(i) **Consent to Recording.** The Parties agree that each may electronically record all telephonic conversations between them and that any such recordings may be submitted in evidence to any court or in any Proceedings for the purpose of establishing any matters pertinent to any Transaction.

(j) **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to specific Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(k) **Payment Instructions.** All payments to be made hereunder in respect of Transactions shall be made in accordance with standing payment instructions provided by the parties (or as otherwise specified in a Confirmation).

(l) **Reference Market-Makers.** The definition of "Reference Market-Makers" in Section 14 is hereby amended by: (i) deleting in the fourth line thereof after the word "Credit" the words "and (b) to the extent practicable, from among such dealers having an office in the same city"; and (ii) replacing such words with the words "or to enter into transactions similar in nature to the Transactions."

(m) **Relationship Between Parties.** The following additional Section 15 shall be added to the Agreement:

## Section 15.

**Relationship between Parties.** Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):-

(a) Non-Reliance. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

(b) Evaluation and Understanding. It is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the financial and other risks of that Transaction.

(c)   Status of Parties.  The other party is not acting as a fiduciary or advisor for it in respect of that Transaction.

(n)   "Stockholders' Equity" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

(o)   **Severability.**  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, such provisions shall be severed from this Agreement, and the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

(p)   **Cross Default.**  Section 5(a)(vi) of this Agreement shall be modified as follows:

> (i)    the word "or" shall be substituted for the comma after "default" in the second line and the words "or other similar event or condition (however described)" in the second and third lines shall be deleted;

> (ii)   the words ", or becoming capable at such time of being declared," in line seven shall be deleted; and

> (iii)  the following words shall be added at the end of the Section "Provided however, that notwithstanding the foregoing, an Event of Default shall not occur under either (1) or (2) above if the event or condition referred to in (1) or the failure to pay referred to in (2) is a failure to pay caused by an error or omission of an administrative or operational nature and funds were available to such party to enable it to make the relevant payment when due and such relevant payment is made within three Business Days following receipt of written notice from an interested party of such failure to pay."

(q)   **Absence of Litigation.**  Section 3(c) of this Agreement shall be amended by the insertion of the words "materially and adversely" after the word "likely" in the third line.

## Part 6: Additional Terms for FX Transactions and Currency Options

(a)   **Standard Terms and Conditions Applicable to FX Transactions and Currency Options**

> (i)    Incorporation of and Amendments to ISDA FX Definitions.  The 1992 FX and Currency Option Definitions (the "FX and Currency Option Definitions"), published by the International Swap and Derivatives Association, Inc., are hereby incorporated by reference with respect to any "Currency Options" and "FX Transactions" as defined by the FX and Currency Option Definitions, except as otherwise specifically provided herein and in the Confirmation.

The following amendments are made to the FX and Currency Option Definitions:

(1)    Section 1.2 of the FX and Currency Option Definitions is amended by the addition of the following definitions with respect to FX Transactions:

"Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(2)    Section 2.2 of the FX and Currency Option Definitions is amended by the addition of the following definitions with respect to Currency Options:

"Call". Call means a Currency Option entitling, but not obligating, the Buyer to purchase from the Seller at the Strike Price a specified quantity of the Call Currency;

"Put". Put means a Currency Option entitling, but not obligating, the Buyer to sell to the Seller at the Strike Price a specified quantity of the Put Currency;

(3)    Section 2.2(k) is hereby amended by deleting in its entirety the final sentence thereof and adding the following two sentences at the end thereof: "A Currency Option may be exercised in whole or in part. If a Currency Option is exercised in part, the unexercised portion shall not be extinguished thereby but shall remain a Currency Option to the extent of such unexercised portion until the earlier of: (i) the expiration of the Currency Option; or (ii) an exercise of the Currency Option that leaves no remaining unexercised portion thereof."

(4)    Section 2.4 is hereby amended by adding after the words "Section 2.4(b)" in the first sentence the text "or Section 2.4(c)," and by adding subsection (c) as follows:

(c)    **Potential Event of Default**. If an Event of Default or a Potential Event of Default has occurred and is continuing and an Early Termination Date has not been designated by the Non-Defaulting Party, the Non-Defaulting Party may, by written notice, specify that any or all Currency Options being settled while such Event of Default or Potential Event of Default is continuing shall be settled in accordance with Section 2.4(b) and upon such notice becoming effective, the parties shall be deemed to have elected to have the specified Currency Options settle at the In-the-Money Amount unless and until the Event of Default or Potential Event of Default is no longer continuing."

(5)    Section 2 is hereby amended by the addition of the following as a new Section 2.5:

"Section 2.5    **Terms Relating to Payment of Premium.**

(a)    Unless otherwise agreed in writing by the parties, the Premium related a Currency Option shall be paid on its Premium Payment Date in immediately available funds.

(b)   If a Premium is not received on the Premium Payment Date, the Seller may elect: (i) to accept a late payment of such Premium; (ii) to give written notice of such non-payment and, if such payment shall not be received within two (2) Local Business Days of such notice, treat the related Currency Option as void; or (iii) to give written notice of such non-payment and, if such payment shall not be received within two (2) Local Business Days of such notice, treat such non-payment as an Event of Default under Section 5(i). If the Seller elects to act under clause (i) of the preceding sentence, the Buyer shall pay interest on such Premium in the same currency as such Premium from the day such Premium was due until the day paid at the Default Rate; if the Seller elects to act under clause (ii) of the preceding sentence, the Buyer shall pay all out-of-pocket costs and actual damages incurred in connection with such unpaid or late Premium in the same currency as such Premium at the then prevailing market rate and any other costs or expenses incurred by the Seller in covering its obligations (including, without limitation, a delta hedge) with respect to such Currency Option."

(3)   Unless otherwise agreed, any Call Option or any Put Option written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call Option or a Put Option, respectively, written by the other party, such termination and discharge to occur automatically upon the payment in full of the last Premium payable in respect of such Currency Options; provided that such termination and discharge may only occur in respect of Currency Options:

(A)   each being with respect to the same Put Currency and the same Call Currency;

(B)   each having the same Expiration Date and Expiration Time;

(C)   each being of the same style, i.e., either both being American Style Options or both being European Style Options;

(D)   each having the same Strike Price;

(E)   neither of which shall have been exercised by delivery of a Notice of Exercise;

(F)   which are entered into by the same Offices of the parties; and

G)   which are otherwise identical in terms that are material for the purposes of offset and discharge;

and, upon the occurrence of such termination and discharge, neither party shall have any further obligation to the other party in respect of the relevant Currency Options or, as the case may be, parts thereof so terminated and discharged. In the case of a partial termination and discharge (i.e., where the relevant Currency Options are for different amounts of the Currency Pair), the remaining portion of the Currency Option which is partially discharged and terminated shall continue to be a Currency Option for all purposes of this Agreement.

(d)   **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall he deemed to include Currency Obligations.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS COMMERCIAL CORPORATION.

By: _____

Title: _____

SWEDBANK
Sparbanken Sverige AB (publ.)

By: _____

Title: _____

By: _____

Title: _____

## EXHIBIT A to the Schedule

### *GUARANTEE*

As an inducement to _____(hereinafter "Guaranteed Party") for, and in consideration of, its entering into various transactions with Lehman Brothers Commercial Corporation (hereinafter "Guaranteed Subsidiary") pursuant to which Guaranteed Subsidiary shall obligate itself to pay in accordance with such transactions (the "Obligations"), Lehman Brothers Holdings Inc. (hereafter "Guarantor") does hereby absolutely and unconditionally guarantee to Guaranteed Party, its successors, endorsees and assigns, the payment by Guaranteed Subsidiary of the Obligations to Guaranteed Party, its successors, endorsees and assigns, now existing or which hereafter may be contracted or existing, as the same shall respectively become due, whether at maturity, by declaration, demand, or otherwise, and Guarantor agrees to reimburse Guaranteed Party for all expenses, including reasonable attorneys' fees of enforcing or obtaining or endeavoring to enforce or obtain payment thereof. Guarantor consents that the time of payment of each Obligation may be extended or renewed and agreements with Guaranteed Subsidiary changed in any respect and any collateral for the Obligations released and defaults waived, all from time to time before or after any default, without notice to or further assent from Guarantor and Guarantor agrees that it will remain bound upon this Guarantee notwithstanding such action or inaction which might otherwise relieve a guarantor.

This Guarantee is absolute, unconditional and unlimited in amount. Guarantor shall have no right of subrogation with respect to any payments it makes under this Guarantee until all of the Obligations of Guaranteed Subsidiary to Guaranteed Party are paid in full.

This Guarantee is a guarantee of payment, not of collection, and Guaranteed Party may exercise its rights hereunder against Guarantor without first having to take any action against Guaranteed Subsidiary or any other guarantor. Guarantor agrees that in the event the Obligations which are guaranteed hereunder are paid, its liability as guarantor shall continue and remain in full force and effect in the event that all or any part of such payments is recovered from Guaranteed Party as a preference or fraudulent transfer under the Federal Bankruptcy Code, or any applicable state law.

Guarantor waives notice of any and all Obligations incurred by Guaranteed Subsidiary to Guaranteed Party, notice of acceptance of this Guarantee, notice of demand, and all other notices.

Guarantor agrees that all payments under this Guarantee shall be made in the same currency and manner as provided for the Obligations.

This Guarantee shall be binding upon Guarantor, its successors and assigns.

This Guarantee shall remain in full force and effect until such time as Guaranteed Party receives written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to Obligations incurred or arising out of transactions entered into prior to the termination hereof.

This Guarantee revokes any prior guarantee issued by Guarantor to Guaranteed Party of the Obligations of Guaranteed Subsidiary.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without reference to conflict of laws doctrine.

IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of November, 1996.

## LEHMAN BROTHERS HOLDINGS INC.

_____

NAME: Michael R. Milversted
TITLE: Treasurer, Managing Director

## EXHIBIT B to Schedule

[Form of Opinion of Counsel for
Lehman Brothers Commercial Corporation and
Lehman Brothers Holdings Inc.]

[date]

[counterparty]
[address]

[Attention:/Re:]

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Commercial Corporation, a Delaware corporation ("Party A"), and Lehman Brothers Holdings Inc., a Delaware corporation ("Guarantor"), and am familiar with matters pertaining to the execution and delivery of the Master Agreement (the "Master Agreement") dated as of [date of agreement] between Party A and [counterparty] ("Party B") and the guarantee of Guarantor (the "Guarantee") delivered in connection with the Master Agreement.

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of the Master Agreement and the Guarantee, certificates and statements of public officials and officers of Party A and Guarantor and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1. Each of Party A and Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

2. The execution, delivery and performance of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, are within its corporate power, have been duly authorized by all corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3. Each of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, has been duly executed and delivered and constitutes a legal, valid and binding obligation, enforceable against it in accordance with its terms.

4. To the best of my knowledge no consent, authorization, license or approval of or registration or declaration with, any federal or New York State governmental authority is required in connection with the execution, delivery and performance of the Master Agreement, in the case of Party A, or the Guarantee, in the case of Guarantor.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A. My opinion in paragraph 2 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B. I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C. My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D. This letter is rendered to you in connection with the Master Agreement and the Guarantee and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman Brothers Holdings Inc., except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Party A or Guarantor, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Master Agreement or the Guarantee.

E. I have assumed with your permission (i) the genuineness of all signatures by each party other than Party A or Guarantor, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Master Agreement by each party other than Party A.

Very truly yours,

EXHIBIT C to Schedule

[Form of Opinion of Counsel for Party B]

[Date]

Lehman Brothers
Commercial Corporation
3 World Financial Center
New York, New York 10285 USA

Gentlemen:

We have acted as counsel to «counterparty», a «entity_type» organized under the laws of «cp_jurisdiction» ("Party B") in connection with the execution and delivery of the Master Agreement ("the Master Agreement") dated as of «as_of_date», between Lehman Brothers Commercial Corporation ("Party A") and Party B.

In connection with this opinion, we have examined an executed copy of the Master Agreement and such corporate documents and records of Party B, certificates of public officials and officers of Party B and such other documents as we have deemed necessary or appropriate for the purposes of this opinion. In such opinion, I have assumed the genuineness of all the signatures, the authenticity of all documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as certified, conformed or photostatic copies.

Based upon the foregoing, we are of the opinion that:

1. Party B is a corporation duly organized, validly existing and in good standing under the laws of «cp_jurisdiction».

2. The execution, delivery and performance of the Master Agreement by Party B are within Party B's corporate power, have been duly authorized by all necessary corporate action and do not conflict with any provisions of Party B's articles of incorporation or by-laws.

3. The Master Agreement has been duly executed and delivered by Party B and constitutes a legally valid and binding obligation of Party B enforceable against Party B in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

4. To the best of our knowledge, no consent, authorization, license (including exchange control licenses) or approval of, or registration or declaration with, any United States of America federal, New York or «cp_jurisdiction» governmental authority is required in connection with the execution, delivery and performance of the Master Agreement by Party B.

5.      The choice of law provision in the Master Agreement is valid and binding under the laws of «cp_jurisdiction» or any political subdivision thereof and would be given effect by the courts of «cp_jurisdiction» or any political subdivision thereof.  The provision incorporated by reference in the Master Agreement whereby Party B irrevocably submits to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the County of New York (the "New York Courts") is valid and binding on Party B under the laws of «cp_jurisdiction» and any political subdivision thereof and if any final judgment of the New York Courts is rendered against Party B with respect to the Master Agreement, such judgment would be recognized and enforced by the courts of «cp_jurisdiction» and any political subdivision thereof without reexamination or relitigation on the merits of the subject matter thereof.

[6.      Party B is subject to civil and commercial law and to suit with respect to its obligations under the Master Agreement and neither Party B nor any of its properties and assets has any right to immunity from suit or attachment in aid of execution or other legal process on the ground of sovereignty or otherwise or, to the extent that Party B and any of its properties have any such right to immunity, Party B has effectively waived such right for the purpose of the Master Agreement and the party executing the Master Agreement on its behalf has the authority to waive such immunity.]*

The opinions expressed herein are limited to matters concerning the federal laws of the United States of America, the laws of the State of New York and the laws of «cp_jurisdiction».

Very truly yours,

Insert only if Party B is a sovereign (e.g. a governmental unit, ministry or other agency) or if Party B is a bank or business corporation which is sovereign-controlled