ORIGINAL

SUBMIT

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re : Chapter 11 Case No.
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*, : 08-13555 (JMP)
:
Debtors. : (Jointly Administered)

------------------------------------------------------------x

RECEIVED
FEB - 2 2010
U.S. BANKRUPTCY COURT
SO. DIST. OF NEW YORK

**WILLIAM KUNTZ III'S OBJECTION**

**1)RECENT PRESS REPORTS AS SEEN FROM NASSAU INCLUDING TELEVISED INTERVIEWS WITH FORMER TREASURY SECRETARY PAULSON INDICATE THAT THE DEBTOR IS LOADED WITH TOXIC ASSETS.**

**Exhibit 1 and 2 <bing and google search>**

**2)FURTHER, IT IS ALLEGED THAT BARCLAYS IS BACK AT THE TABLE SO TO SPEAK SEEKING TO RECOVER $ BILLIONS?**

NEW YORK POST

Updated: Sat., Jan. 30, 2010, 8:59 AM

# Barclays fires back at Lehman

By MARK DECAMBRE

*Last Updated:* 8:59 AM, January 30, 2010
*Posted:* 1:21 AM, January 30, 2010

More than three months after it was accused by the estate of Lehman Brothers of striking a sweetheart deal that generated billions in profit, UK bank Barclays fired back, claiming Lehman's math was flawed and requesting that the case be tossed.

In a 300-plus-page response filed in bankruptcy court early yesterday morning, Barclays argued that it never struck a special deal with ex-Lehman executives. Barclays bought Lehman's North American assets for $1.3 billion during the frenzied days following Lehman's bankruptcy filing on Sept. 15, 2008.

One of the issues at the heart of the fight is a $5 billion gain that Barclays realized when it marked up some Lehman assets.

Another bone of contention is that some former Lehman executives who helped facilitate the sale later got jobs at Barclays.

The Lehman estate has alleged that those execs knew about the sweetheart deal but said nothing in order to not jeopardize their employment arangements with Barclays.

"More than a year after the terms were agreed upon and contrary to well-established federal law, the [Lehman] creditors seek to change the terms of the sale," said Barclays spokesman Michael O'Looney.

A trial on the matter is set for April 26.

http://www.nypost.com/f/print/news/business/barclays_fires_back_at_lehman_07eiBM5NQPxGcJEjy8lhHN

NEW YORK POST is a registered trademark of NYP Holdings, Inc.
NYPOST.COM , NYPOSTONLINE.COM , and NEWYORKPOST.COM are trademarks of NYP Holdings, Inc.
Copyright 2009 NYP Holdings, Inc. All rights reserved. Privacy | Terms of Use

- BUSINESS
- JANUARY 30, 2010

**Barclays Responds to Lehman**

- **Article**

**By DAVID MCLAUGHLIN**

Barclays PLC is firing back in a court filing at accusations that the bank pocketed a secret windfall when it bought Lehman Brothers Holdings Inc.'s core U.S. operations days after it collapsed.

In its first detailed response to Lehman's allegations, London-based Barclays said the failed investment bank is making "a gross distortion" about the complex negotiations over the sale of Lehman's broker-dealer business. Barclays said Lehman and its creditors, which are fighting to claw back billions of dollars in assets, simply want to rewrite the terms of the deal because it was "too good for Barclays."

The filing is a response to claims by Lehman and its creditors that Barclays received possibly $12 billion in excess assets that were never disclosed. Lehman said the final details of the deal "bore little or no relation" to what was approved by the judge overseeing Lehman's bankruptcy case.

Barclays Capital agreed to buy the business a day after Lehman's bankruptcy filing in September 2008. After scrambling to put together the agreement, both sides continued to hammer out details while grappling with Lehman's deteriorating assets in the wake of its collapse, according to court documents.

At one point during those negotiations, as Barclays replaced the Federal Reserve's position in a repurchase agreement with Lehman, it received far less than the nearly $50 billion in securities it was supposed to get in exchange for $45 billion in cash it advanced to Lehman, Barclays said in the Friday court filing. The problem, which created "massive uncertainty and risk," wasn't rectified for months, it added.

Barclays also said it is still owed $3 billion in additional assets that it never received from the Lehman sale.

Lehman spokeswoman Kimberly Macleod said in a statement Friday that the deal at the time was described to Lehman's board and the court "as an equivalent exchange of value, with no embedded gain for Barclays."

"Because the court was never told, it never approved such a gain for Barclays," she said.

The court-appointed trustee, who is in charge of liquidating Lehman's broker-deal unit and who has joined Lehman's effort to recover assets, said in a statement that Barclays's argument is based on "strained interpretations of the sale agreements."

Lehman's lawyers have previously said that Lehman executives who negotiated the deal on behalf of the company "secretly structured" the agreement so that Barclays received a $5 billion discount on the value of securities it took when it replaced the Fed financing, plus billions of dollars in additional assets after the sale was approved.

But Barclays called this hidden discount "a fiction." Lehman, it said Friday, is relying on stale values for the securities that were delivered to Barclays under the repo. These assets were worth "little more" than the $45 billion in cash advanced to Lehman, it said.

The bank also argued in the filing that the extra assets added to the deal were disclosed to the court before the sale was approved and that the agreement never put a cap on the value of what they might be worth. It rejected Lehman's claim that the deal was structured as a "wash," with the assets equaling the liabilities it was assuming. Barclays made clear from the start, it said, that it expected to see an immediate accounting gain from the deal.

Barclays in February reported a gain of more than $4 billion from the sale, according to an earlier court filing by Lehman Brothers. In its court filing Friday, Barclays said that result was "far from guaranteed," given the turmoil rippling through global financial markets at the time, it said.

"One thing was certain, however: had the deal turned out differently, such that the plain text of the purchase agreement caused Barclays to incur a loss because the assets were worth even less than feared, Barclays would not have had the right to come back to court a full year later to ask for revised terms," Barclays said in its court filing.

Write to David McLaughlin at david.mclaughlin@dowjones.com

**http://online.wsj.com/article/SB10001424052748703389004575033414156402910.html#**

**3)WHILE OBJECTANT UNDERSTANDS THAT BANKRUPTCY CASES ARE OFTEN MIS-UNDERSTOOD, IT MUST FOLLOW THAT WHERE THERE IS SMOKE THERE MAY IN FACT BE FIRE.**

**4) THE COURT RECENTLY MUSED[1] THAT MUCH OF WHAT WAS GOING ON IN THE COURTROOM WAS NOTHING MORE THAN ELABORATE THEATRE. IF SUCH WERE A CRIME, I FOR ONE WOULD CONFESS. WEARING A PALM BEACH BILL BLASS PLAID COAT PURCHASED AT THE SALVATION ARMY**

[1] to weigh carefully in the mind; consider thoughtfully

**STORE WITH RED AND GREEN SUSPENDERS FROM BROOKS BROTHERS AND A RED SHIRT AND PURPLE SCARF AND SITTING IN THE SAME SEAT EVERY MONTH WHEN I HAD A CLOSET FULL OF SUITS CLEARLY IS A SEMI-STAGED APPEARANCE. THE COURT SHOULD ALSO RECALL THAT IT WAS WEIL, GOTSHAL'S MOTIONS THAT HAVE BROUGHT ME BACK FROM THE BAHAMAS TO COURT**

**HOWEVER, THE POINT MADE AMONG OTHERS IS THAT THE SMALL CREDITORS HAVE NO REPRESENTATION[2] AND IT SEEMS TO BE BUSINESS AS USUAL WITH WEIL, GOTSHAL ACTING AS IT HAS AN ALMOST PROPERITY INTEREST IN THE DEBTOR'S ESTATE.**

**5)**

6699 1/19/2010 Motion to Approve : Debtors Motion Pursuant to Sections 105(a) and 362 of the Bankruptcy Code fc Procedures Applicable to Transfers of the Debtors Securities filed by Shai Waisman on behalf of Lehman

---

## Official Committee of Unsecured Creditors

Pursuant to Docket #6217, the following creditors have been appointed to the Official Committee of Unsecured Creditors in these cases by the Office of the United States Trustee:

**Wilmington Trust Company, as Indenture Trustee**
520 Madison Avenue, 33rd Floor
New York, New York 10022
Phone: (212) 415-0522
Fax: (212) 415-0513
Attn: James J. McGinley, Managing Debtor

**The Bank of NY Mellon**
101 Barclay - 8 W
New York, New York 10286
Phone: (212) 815-5373
Attn: Gerard Facendola, Vice President Corporate Trust

**Mizuho Corporate Bank, Ltd. as Agent**
1251 Avenue of the Americas
New York, New York 10020-1104
Phone: (212) 282-3486
Fax: (212) 282-4490
Attn: Noel P. Purcell, Senior Vice President

**Metlife**
10 Park Avenue, P.O. Box 1902
Morristown, New Jersey 07962-1902
Phone: (973) 355-4581
Fax: (973) 355-4230
Attn: David Yu, Director

**The Vanguard Group Inc.**
P.O. Box 2600, V31
Valley Forge, Pennsylvania 19482
Phone: (800) 523-1036 x13346
Fax: (610) 407-2875
Attn: Stewart Hosansky, Principal/Senior Analyst

be held on 2/10/2010 at 10:00 AM at Courtroom 601 (JMP) Responses due by 2/3/2010, (Waisman, Sha
Debtor: Lehman Brothers Holdings Inc.

6)

6726 1/21/2010 Statement : Notice of Proposed Sale of De Minimis Assets Pursuant to De Minimis Asset Sale Proc document(s)[4021]) filed by Shai Waisman on behalf of Lehman Brothers Holdings Inc.. (Waisman, S
Debtor: Lehman Brothers Holdings Inc.
Related: 4021

6710 1/20/2010 Motion to Authorize : Motion of Lehman Brothers Holdings Inc. to Amend the Order Authorizi Establish Procedures to Sell or Abandon De Minimis Assets (related document(s)[4021]) filed by Sh behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 2/10/2010 at 10:00 AM at C (JMP) Responses due by 2/3/2010, (Waisman, Shai)
:

7)

6713 1/20/2010 Motion to Authorize : Debtors Motion Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Notes Issued by Variable Funding Trusts filed by Jacqueline Marcus on behalf of Lehman Brothers Hol 2/10/2010 at 10:00 AM at Courtroom 601 (JMP) Responses due by 2/3/2010,

8)

6714 1/20/2010 Motion to Authorize : Motion of Lehman Brothers Holdings Inc. Pursuant to Section 105(a) of the Bankruptcy Procedure 9019 for Authority to Compromise Certain Claims Pursuant to Deed in Lieu o Waisman on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 2/10/2010 at 10:00 due by 2/3/2010, (Waisman, Shai)

**AMOUNG OTHERS RETURNABLE ON THE 10TH OF FEB, 2010**

**9) I FOR ONE, DON'T KNOW HOW THE *DE MININIS* CONCEPT EVOLVED, BUT SELLING MILLIONS OF DOLLARS OF THE DEBTORS PROPERTY, BEFORE ANY PLAN IS EVEN OUTLINED, MUST LESS PROPOSED OR CONFIRMED BASED UPON SOME KIND OF 'TRUST US' ELOCUTIONS[3] FROM MR WAISMAN INSTILL'S NO CONFIDENCE IN THIS OBJECTANT Exhibit 3.**

**10) IT IS NEARLY IMPOSSIBLE TO DETERMINE JUST WHAT AND HOW THE DEBTOR INTENDS TO PUT FORWARD EACH MONTH AT THE ONIBUS**

---

[3] The art of public speaking in which gesture, vocal production, and delivery are emphasized.
A style or manner of speaking, especially in public.

HEARINGAS THEY ONLY PUBLISH THE PROPOSED CALENDER JUST HOURS BEFORE COURT AND EVEN THEN IT IS USUALLY AMENDED.

11) ACCORDINGLY AND IN LIGHT OF RECENT PUBLIC PRONOUNCEMENTS, AND THE TOTAL LACK OF REPRESENTATION BY ANY SMALL CREDITOR, IE HAVING A WORTH OF UNDER $100 BILLION AS THE CREDITORS COMMITTEE'S PRESENT MEMBESHIP IS SO SKEWED AS TO MAKE ANY NORMAL PERSON THINK THIS CASE IS BEING "FIXED" IN THE BEST OF TAMMANY HALL[4] STYLE THAT THIS COURT JUST PUT THE BRAKES ON.

12) THE COURT'S ATTENTIONS HAVE ALREADY BEEN NEEDLESSLY DIVERTED BY THE 'BAR DAR' BROUHAHA[5] WHICH COULD BE FIXED WITH A STROKE OF A PEN ON AN ORDER, NOT DRAFTED BY WEIL,GOTSHAL MOVING AND CREATING A NEW BAR DATE TO THURSDAY APRIL 1,2010. IT IS CREDITORS SUCH AS MYSELF WHOSE FINANCIAL INTERESTS WILL BE DILUTED BY ANY SUCH 'FLOOD' OF NEW CLAIMS. IT OF COURSE WILL WORK HARD ON THE EGO OF WEIL, GOTSHAL TO REMAKE THE DATE, BUT I THINK ON THE $100,000,000 IN FEE'S THEY HAVE SO FAR THAT THEY WILL BE ABLE TO ENDURE IT. AS THE COURT NOTED, THERE WOULD THEN BE A NEW BRIGHT LINE. NO CONFUSION. NO NEEDLESS DECISION AND ACCORDINGLY NO APPEALS WHICH WHILE DEPRIVING LAWYERS OF FEE'S WILL SERVE ALL INTERESTS IN A BETTER FASHION.

13) IT WOULD BE HOPED THAT THE COURT WOULD RECOGNIZE THAT THIS PARTY, AS AN UNDERSECURED CREDITOR HAS A DIAMETRICAL OPPOSITE INTEREST TO THE LAWYERS. THE LAWYERS ENJOY MONEY BY THE HOUR AND DESPITE THE PRETEXT OF REVIEW, THEY GET ALMOST

---

4 http://en.wikipedia.org/wiki/Tammany_Hall

5 Brouhaha, a general state of social agitation

**EVERY DIME ASKED FOR. THEY RIDE TO AND FROM COURT IN PRIVATE CARS AND ENJOY MEALS AT THE ESTATE'S EXPENSES.**

**INDIVIDUAL CREDITORS LIKE MYSELF, RIDE THE CHINESE DISCOUNT BUS AND TAKE THE SUBWAY, EATING POTATO KNISH'S AND ORANGES FROM VENDOR CARTS ON THE COURTHOUSE STEPS.**

**14) MY RECOVERY[6] IS BASED UPON THE % OF PAYOUT OF THE ESTATE. AT THIS POINT, WITH A CLAIM OF ABOUT $13,000,000 A 1% PAYOUT OF THE ESTATE WOULD YIELD ME $130,000. I AM ALREADY IN WHAT THE COURT WOULD CALL 'IN THE MONEY'. I SOLD MY LEHMAN STOCK, AS I RECALL IN THE $70 RANGE. THE SURPLUS WAS DEPOSITED BY LEHMAN IN ALBANY.**

| **Address:** | **Account #:** 033073395/027130763 |
|---|---|
| BOX 461, LAKE PLACID, NY 12946 | |
| **Reported By:** ***LEHMAN BROTHERS HOLDINGS INC*** | **Type of Property:** MUTUAL FUNDS/DIVIDEND REINVEST BOOK SHRS |

[6] ASSUMING IT WILL SURVIVE THE INEVITABLE CHALLENGE

**---------------------Continued due to computer glitch--------------------------------**

**14) FOR EXAMPLE, THE DEBTORS ARE ASKING THE COURT TO APPROVE THE PREPURCHASE OF CERTAIN VARIABLE FUNDING NOTES. PARAGRAPH #3 –BACKGROUND <DOCKET 6713> FAILS TO MENTION THAT THE MAIN BENEFACTOR OF THIS 'DEAL' IS MET LIFE WHO HAPPENS TO BE ON THE CREDITORS COMMITTEE. THE IDEA THAT YOU SPEND $400 MILLION CASH TO MAYBE MAKE $12 MILLION IS JUST PLAINLY ABSURD. TO BE CANDID, THE IDEA OF PUTTING CASH INTO A MORTGAGE TRUST IS ABOUT AS CLOSE TO PUTTING ONES HAND INTO A BAG FULL OF COBRA'S. THAT IS IF ONE WHO PAY'S ATTENTION TO NATIONAL NEWS AS ONE COULD FATHOM IT. IF THIS IS SUCH A HOT DEAL, LET WEIL, GOTSHAL INVEST ITS OWN RETIREMENT FUNDS.**

**THE <u>COURT SHOULD DENY</u> THIS AND WAIT AND SEE WHAT HAPPENS IN JUNE OF 2010.**

**15) THE DE MINIMUS MOTION, IT IS ALMOST LIKE THROWING CHUM[7] INTO THE WATER TO EVEN CONSIDER THAT 'LOW-VALUE' ASSETS DON'T REQUIRE COMPLETE ADMINISTRATION. THE COURT SHOULD SUSPEND <u>*IN TOTO*</u> THE OPERATION OF ANY DE MINIMUS SALES UNTIL AFTER A PLAN IS CONFIRMED. IF THE COURT AND THE DEBTOR IS SO CONCERNED THAT THE FEELINGS OF REALTORS MIGHT BE UPSET HAVING TO WAIT**

[7] cut or ground bait dumped into the water to attract fish to the area where one is fishing

**10 DAYS, THEN PERHAPS THE ENTIRE PORTFOLIO SHOULD BE TURNED OVER TO AUCTION.COM WHICH IS DOING A VERY GOOD JOB FOR BANK OF AMERICAN IN SELLING REO'S INSTEAD OF SUSPECT SWEETHEART DEALS.**

Since its beginnings in 1990, REDC has become the world leader and most successful real estate auction marketing firm, specializing in residential, commercial, multi-family and hospitality properties, land, as well as performing and non-performing notes and loan pools.

Real estate auctions have gained tremendous popularity among buyers who are seeking the true market value for properties in today's marketplace . Auctions play a major role in today's real estate marketplace as a greater number of home buyers, including not only real estate investors, but first-time and move up buyers choose to purchase at auction over the more conventional, time-consuming and expensive retail sales method.

By utilizing the auction marketing process pioneered and perfected by REDC we have sold more than $6 Billion of real estate assets for our clients, including a staggering $3.4 Billion and 32,800 homes in 2008 alone - an industry record!

REDC conducts auctions throughout the United States and in foreign countries including the United Kingdom which range from live ballroom mega-auctions to local on-site auctions, as well as online only auctions through the use of our proprietary and best in class online auction platform. Home buyers and investors alike have the opportunity to bid live, in real time, in our ballroom auctions as the auction progresses or participate in online only auctions through our state-of-the-art online bidding system at www.auction.com.

**16) THE STAMFORD CONN BUILDING. THE DEBTOR INDICATED THAT IT HAS ONLY AGREED IN PRINCIPLE. THEREFORE THERE IS REALLY NOTHING FOR THE COURT TO APPROVE.**

**OF COURSE THE COURT IS OPEN TO ANOTHER ROUND OF BEING BAMBOOZLED LIKE THE BARCLAYS[8] SALE, BUT ON A SMALLER SCALE, BUT UNTIL AND UNLESS THE PARTIES HAVE**

[8] THIS PARTY FOR ONE WOULD RESPECTFULLY SUBMIT THAT THE COURT RECUSE ITSELF FROM THE REHEARING OF THE BARCLAYS – LEHMAN UPCOMING RE-ENACTMENT. ANOTHER JUDGE WITHOUT ANY PREDISPOSITION TO DO ANYTHING SHOULD HEAR IT. AND PERHAPS THE COURT MIGHT CONSIDER GETTING A FEW MORE TALENTED LAW CLERKS WHO ARE LESS WILLING TO TAKE COUNSEL'S SUBMISSIONS ON FAITH AND THE PROSPECTS OF FUTURE EMPLOYMENT. IT IS WELL KNOWN THAT CLERKSHIP IS A CAREER PATH.

**AGREED TO ALL THE TERMS WITH A CLEAR UNDERSTANDING THE COURT SHOULD NOT APPROVE THIS IN ANY FASHION.**

***CONCLUSION***

**AS STATED BEFORE, IT IS SUBMITTED THAT THE COURT PUT THE BRAKES ON. IT WILL SOON BE 2 YEARS SINCE THE PETITION FOR CH 11 WAS FILED AND ALL THAT HAS BEEN PROMISED IS AN 'OUTLINE' OF A POSSIBLE PLAN.**

**AS THE COURT MAY RECALL, MR MILLER'S FIRM CAME INTO COURT AND THE COURT HAD TO DEAL WITH THE "EMERGENCY" OF SELLING TO BARCLAYS. NOW EVERYBODY IS PLAYING MONDAY MORNING QUARTERBACK.**

**THE FORMER TREASURY SECRETARY OF THE US, MR PAULSON HAS SAID THAT LEHMAN'S ASSETS WERE "TOO TOXIC" YET AT ALMOST EVERY TURN, UNDER THE SOOTHING WORDS OF BUSINESS JUDGEMENT, LEHMAN IS BUYING UP THESE ASSETS AND DEPLETING CASH.**

**RESPECTFULLY,**

**WILLIAM KUNTZ,III**

**INDIA ST PO BOX 1801**

**NANTUCKET ISLAND, MA 02554-1801**

**508-435-5858 <april>**

**FEB 1, 2010 NASSAU, BAHAMAS**

Web Images Translate Scholar Blogs Calendar Gmail more ▼ Search settings | Sign in

Google paulson and lehman Search Advanced Search

Search: ◉ the web ○ pages from The Bahamas

Web Show options... Results **1** - **10** of about **666,000** for **paulson and lehman**. (**0.33** seconds)

News results for **paulson and lehman**

Washington Post

**Paulson** Says He Was Prepared to Guarantee **Lehman** - 1 day ago
The UK government ultimately was responsible for forcing **Lehman** into bankruptcy, **Paulson** said. **Lehman** executives had reached a deal to sell the bank to ...
BusinessWeek - 197 related articles »

**Paulson's** Lament: **Lehman** Brothers Stole My Reputation
17 May 2009 ... Hank **Paulson**, former master of the universe, sits in a nondescript office in northwest Washington, DC He is trying to work on his memoirs, ...
www.huffingtonpost.com/.../**paulsons**-lament-**lehman**-br_n_204378.html - Cached - Similar

**Paulson** Defends Refusal To Bail Out **Lehman**
22 Oct 2008 ... It was the weekend of Sept. 13, and the moment Treasury Secretary Henry M. **Paulson** Jr. had feared for months was finally upon him: **Lehman** ...
www.huffingtonpost.com/.../**paulson**-defends-refusal-t_n_137075.html - Cached - Similar

**Paulson** Says He Was Prepared to Guarantee **Lehman** (Update1 ...
29 Jan 2010 ... Former US Treasury Secretary [bn:PRSN=1] Henry **Paulson** [] says in his memoir that he was prepared to support a government backstop to ...
www.bloomberg.com/apps/news?pid=20601088&sid=awcJZxKr_6TM

Video results for **paulson and lehman**

**Paulson** Says **Lehman** Bailout Was Never an Option
1 min 58 sec - 15 Sep 2008
www.youtube.com

10/6 Did **Paulsen** mislead **Lehman** right before ...
2 min 44 sec - 6 Oct 2008
www.youtube.com

Global Economic Crisis » **Lehman** Brothers One Year After Its Collapse
The calculation made by Bernanke and **Paulson** that **Lehman** Brothers was expendable, especially in light of the measures taken to save AIG, Merrill Lynch and ...
www.globaleconomiccrisis.com/blog/.../589 - United States - Cached - Similar

**Paulson** Says He Was Prepared to Guarantee **Lehman** - Yahoo! News
29 Jan 2010 ... Jan. 29 (Bloomberg) -- Former US Treasury Secretary Henry **Paulson** says in his memoir that he was prepared to support a government backstop ...
news.yahoo.com/s/bloomberg/20100129/pl.../agcqcqyvvlcw - Cached

No bailout: Hank **Paulson** lets **Lehman** Brothers fall | The Australian
No bailout: Hank **Paulson** lets **Lehman** Brothers fall. David Nason, New York correspondent; From: The Australian; September 16, 2008 12:00AM ...
www.theaustralian.com.au/...**paulson**...a.../story-e6frg8zx-1111117492581

Hank **Paulson** in Winter - Newsweek.com
**Lehman** Brothers disappeared with Hank **Paulson's** reputation. ... Hank Henry **Paulson** and Richard Dick Fuld for **Paulson** interview about **Lehman**, Bailout ...
www.newsweek.com/id/197810 - Cached - Similar



SUNDAY AFTERNOON **Paulson** tells **Lehman** where to go - Dec. 14, 2008
SUNDAY AFTERNOON **Paulson** tells **Lehman** where to go. ... **Paulson** not only told McDade and Lowitt that **Lehman** had no choice but to file for bankruptcy, ...
money.cnn.com/2008/12/12/magazines/...8.../index.htm - Cached - Similar

Why Hank **Paulson** will rescue China but not **Lehman** Brothers ...
My favourite friend of China, US Treasury Secretary Henry "Hank" **Paulson**, has decided not to rescue **Lehman** Brothers. What has his decision got to do with ...
blogs.telegraph.co.uk › News › World › Richard Spencer - Cached - Similar

Searches related to **paulson and lehman**

paulson and **goldman sachs** | **hank** paulson | paulson **hedge funds**

1 2 3 4 5 6 7 8 9 10 **Next**

paulson and lehman [Search]

Search within results - Language Tools - Search Help - Dissatisfied? Help us improve

Google Home - Advertising Programs - Privacy - About Google

Web Images Videos Shopping News Maps More | MSN | Hotmail

Sign in | United States | Preferences

Make Bing your decision engine

Bing

paulson and lehman

ALL RESULTS

Blogs for Paulson And Lehman

SEARCH HISTORY

Now you can go back further with search history. Learn More.

paulson and lehman

See all

Clear all | Turn off

ALL RESULTS

1-10 of 615,000 results · Advanced

**Paulson** Says He Was Prepared to Guarantee **Lehman**... 1 day ago
Former U.S. Treasury Secretary [bn:PRSN=1] Henry **Paulson** [] says in his memoir that he was prepared to support a government backstop to prevent the bankruptcy of **Lehman** Brothers ...
www.bloomberg.com/apps/news?pid=20601088&sid=awcJZxKr_6TM

**Lehman** Death Watch: Will **Paulson** Let **Lehman** Fail? « naked capitalism
Commentary on current economic and financial news. ... The short answer is yes, but we need to define fail And BTW, it's very frustrating to be stuck on a plane waiting for the ...
www.nakedcapitalism.com/2008/09/will-paulson-let-lehman-fail.html · Cached page

**Paulson**'s Lament: **Lehman** Brothers Stole My Reputation
Hank **Paulson**, former master of the universe, sits in a nondescript office in northwest Washington, D.C. He is trying to work on his memoirs, but he is struggling. He doesn't seem ...
www.huffingtonpost.com/2009/05/17/paulsons-lament-lehman-br_n_204378.html · Cached page

**Paulson** against **Lehman** bailout - thestar.com
Concern that **Lehman** Brothers Holdings Inc. may fail to find a buyer because the government is reluctant to provide financial backing sent the firm's shares down to a 14-year low ...
www.thestar.com/Business/article/498511 · Cached page

SUNDAY AFTERNOON **Paulson** tells **Lehman** where to go - Dec. 14, 2008
Friday Evening September 12 **Paulson** pulls the fire alarm; Late Friday Night Bank of America bows out; Saturday Morning **Lehman**'s books get scrubbed
money.cnn.com/2008/12/12/magazines/fortune/3days_8.fortune/index.htm · Cached page

**Paulson Lehman**
It was the weekend of Sept. 13, and the moment Treasury Secretary Henry M. **Paulson** Jr. had feared for months was finally upon him: **Lehman** Brothers wa...
www.huffingtonpost.com/tag/paulson-lehman · Cached page

**Paulson** Says He Was Prepared to Guarantee **Lehman**... 1 day ago
Former U.S. Treasury Secretary Henry **Paulson** says in his memoir that he was prepared to support a government backstop to prevent the bankruptcy of **Lehman** Brothers Holdings Inc ...
www.businessweek.com/news/2010-01-29/paulson-says-he-would-have-guaranteed-lehman-if-he... · Cached page

**Paulson** Says **Lehman** Bailout 'Never Once' Considered (Update2 ...
U.S. Treasury Secretary [bn:PRSN=1] Henry **Paulson** [] said he never considered bailing out [bn:WBTKR=LEH:US] **Lehman** Brothers Holdings Inc. [] and that a government loan to [bn:WBTKR ...
www.bloomberg.com/apps/news?pid=20601068&sid=aWlaTkDTcbXw&refer=economies

**Paulson** To **Lehman** (LEH): We're Not Saving Your Sorry Ass
We gave you SEVEN MONTHS to get your house in order, and you didn't do squat. So you're on your own.
www.businessinsider.com/2008/9/paulson-to-lehman-leh-sorry-we-re-not-saving-your-ass · Cached page

**Paulson** Defends Role in **Lehman** Collapse - DealBook Blog - NYTimes.com
Henry **Paulson** Jr., who was Treasury Secretary when **Lehman** Brothers fell into bankruptcy protection, told Newsweek that **Lehman** was a symptom, not a cause, of the financial crisis.
dealbook.blogs.nytimes.com/2009/05/18/paulson-defends-role-in-lehman-collapse · Cached page

Blogs for **paulson and lehman** »

**Paulson** Says He Would Have Guaranteed **Lehman** If He Could...
1 day ago
Jan. 29 (Bloomberg) -- Former U.S. Treasury Secretary Henry **Paulson** says in his new memoir that he was prepared to support a... · preciseBusiness

1 2 3 4 5 Next

paulson and lehman

© 2010 Microsoft | Privacy | Legal | Advertise | About our ads | Help | Tell us what you think



Web Images Translate Scholar Blogs Calendar Gmail more ▼ Search settings | Sign in

Google barclays and lehman Search Advanced Search

Search: ◉ the web ○ pages from The Bahamas

Web Show options... Results **1** - **10** of about **1,210,000** for **barclays and lehman**. (**0.21** seconds)

Tip: Save time by hitting the return key instead of clicking on "search"

News results for **barclays and lehman**

Telegraph.co.uk

**Barclays** Responds to **Lehman** - 8 hours ago
**Barclays** said **Lehman** and its creditors, which are fighting to claw back billions of dollars in assets, simply want to rewrite the terms of the deal because ...
Wall Street Journal - 83 related articles »
**Barclays** seeks dismissal of **Lehman** suit - St. Louis Post-Dispatch

**Barclays** Buys **Lehman** U.S. Units for $1.75 Billion (Update3 ...
17 Sep 2008 ... [bn:WBTKR=BARC:LN] **Barclays** Plc [], the UK's third- biggest bank, will acquire the North American investment-banking business of bankrupt ...
www.bloomberg.com/apps/news?pid=20601087&sid...refer=home

FT.com / Companies / Financial Services - **Barclays** Capital defends ...
29 Jan 2010 ... **Barclays** Capital has hit back at allegations that it bought **Lehman** Brothers on the cheap and demanded that the bankrupt bank pay **Barclays** ...
www.ft.com/.../52875556-0d1e-11df-a2dc-00144feabdc0.html - 18 hours ago

FT.com / Companies / Banks - **Lehman** seeks $10bn clawback in ...
17 Nov 2009 ... Complaint: **Lehman** v **Barclays** Capital - Nov-17. Lex: **Lehman / Barclays** - Sep-14 ... **Lehman** seeks probe into sale to **Barclays** - May-19 ...
www.ft.com/cms/s/0/40eac97a-d30f-11de-af63-00144feabdc0.html

Show more results from www.ft.com

Judge approves **Lehman, Barclays** pact | Reuters
20 Sep 2008 ... NEW YORK (Reuters) - A US bankruptcy judge approved a revised version of British bank **Barclays** Plc's deal to purchase the core US business ...
www.reuters.com/article/idUSN1932554220080920 - Cached

**Lehman** sues **Barclays** over windfall profits | Reuters
17 Nov 2009 ... (Reuters) - **Lehman** Brothers Holdings Inc has filed a lawsuit against **Barclays** Capital Inc alleging the British bank took control of excess ...
www.reuters.com/article/idUSTRE5AG0YB20091117 - Cached

Show more results from www.reuters.com

UPDATE 5-**Barclays** urges dismissal of **Lehman** 'windfall' suit ...
29 Jan 2010 ... NEW YORK/LAS VEGAS, Jan 29 (Reuters) - **Barclays** Plc urged a judge to throw out a lawsuit by **Lehman** Brothers Holdings Inc's bankruptcy estate ...
uk.finance.yahoo.com/.../update-5-**barclays**-urges-dismissal-of-**lehman**-windfall-suit-targetukfocus-7e5f2f5b1d9c.html - 19 hours ago

**Barclays** Says **Lehman** Owes It $3 Billion on Brokerage (Update1 ...

29 Jan 2010 ... **Barclays** Plc, sued for return of an alleged "secret" $5 billion profit on the purchase of **Lehman** Brothers Holdings Inc.'s brokerage, ...
www.businessweek.com/.../**barclays**-says-**lehman**-owes-it-3-billion-on-brokerage-deal.html

**Lehman** Sues **Barclays** to Recover Billions - WSJ.com
16 Nov 2009 ... **Lehman** Brothers sued **Barclays** Capital to recover billions of dollars of what **Lehman** says were excess assets improperly transferred to the ...
online.wsj.com/.../SB10001424052748704538404574540242955827828.html - Cached

Deep into the **Lehman-Barclays** Dispute
29 Jan 2010 ... Miller testifies several times that insiders felt **Lehman** was "aggressive" in marking its securities, meaning that **Barclays** believed **Lehman** ...
amlawdaily.typepad.com/.../deep-into-the-**lehmanbarclays**-dispute.html - 19 hours ago

**Lehman**
www.**lehman**.com/ - Similar

Searches related to **barclays and lehman**

barclays and lehman **brothers**
barclays **buy** lehman
barclays **purchase** lehman
barclays **investment banking**
**john varley** barclays
barclays **mutual funds**
barclays **financial crisis**
barclays **plc**

1 2 3 4 5 6 7 8 9 10 **Next**

barclays and lehman [Search]

Search within results - Language Tools - Search Help - Dissatisfied? Help us improve

Google Home - Advertising Programs - Privacy - About Google

**Exhibit A**

(Schedule of Assets Disposed of Pursuant to the *De Minimis* Sale Procedures)

| Description of the Asset | Location of the Asset | Purchaser | Relationship Between Purchaser and the Debtors | Lien or Encumbrance Holders | Terms and Conditions of the Noticed *De Minimis* Sale |
|---|---|---|---|---|---|
| Residential Real Property | 5730 Post Rd., Bronx Rd., NY | Kathy Solomon | none | none | $450,000 |
| Residential Real Property | 16463 Boatswain Circle, Woodbridge, VA | Bach Tran and Ha Dang | none | none | $418,500 |
| Residential Real Property | 257-06 Craft Ave., Rosedale, NY | Henry Usher | none | none | $399,900 |
| Residential Real Property | 249 Santa Rosa Ave., Sausalito, CA | Mitchell Weitzmann | none | none | $600,000 |
| Residential Real Property | 31 West Bellwood Dr., Holland, PA | Marina Ferdman | none | none | $480,000 |
| Residential Real Property | 9221 Dulene Dr., Lakeside, CA | Garry Cabading | none | none | $425,000 |
| Residential Real Property | 411 161st Avenue, Redington Beach, FL | Charles and Mary Schnurpal | none | none | $367,900 |





Pg 17 of 27

THE AMERICAN LAWYER **DECEMBER 2009**

CONTENTS

**A higher bar.** Not only did Judge Rakoff reject Bank of America's SEC settlement, he also spooked the corporate bar by asking why the



*Read excerpts from Judge Rakoff's hearing on BofA's settlement at* **americanlawyer.com/extra**

*Time and again, Judge Rakoff has made lawyers—not just their clients—*

**VERY NERVOUS.**

# Showstopper

**BY SUSAN BECK**

It was a tiny, inconsequential blip in the Bank of America Corporation legal saga. On October 13 the bank's lawyers at Cleary Gottlieb Steen & Hamilton and staff lawyers for the Securities and Exchange Commission asked for court approval of a protective order. The seven-page, single-spaced request, which related to the bank's decision to waive its attorney-client privilege, was drafted like the vast majority of legal documents. The prose meandered through mazes of clauses and subclauses until the gist of the matter was smothered. It was a mess, but as legal documents go, it was nothing unusual.

Still, Manhattan federal district court judge Jed Rakoff wasn't going to let this gobbledygook pass through his chambers without comment. In a written order the next day, he scolded the lawyers and took the opportunity to school them in advocacy: "Although the text of the proposed Protective Order is draped in legalese—with the complete first sentence extending over two-and-a-quarter single-spaced pages and featuring no fewer than nine recitations of the 'Whereas'—the thrust of the proposal is simple." He then neatly summarized their request in one sentence, and granted the protective order.

The lawyers should have known better than to dump their boilerplate on Rakoff. The 66-year-old, who has been on the bench since 1996, has made his mark by refusing to blindly accept the conventions of the status quo. If he thinks something isn't right—whether it's a landmark settlement, criminal sentencing guidelines, the death penalty, or the language of a routine discovery request—he says so, clearly and bluntly.

In the Bank of America case, the judge scoffed at the SEC's proposed $33 million settlement with the bank. The agency has accused the bank of lying to shareholders by failing to disclose an agreement to pay $5.8 billion in bonuses

**JUDGE RAKOFF** HAS A "FIRM SENSE THAT THERE IS REALLY JUSTICE TO BE HAD OUT THERE," SAYS HIS BROTHER, TODD.

PHOTOGRAPHS BY BRIAN SMITH

to Merrill Lynch & Co., Inc., executives before the two companies merged. Rakoff didn't just reject the adequacy of a proposed settlement—"it does not comport with the most elementary notions of justice and morality"—but he also insisted on knowing who was responsible for the disclosure decisions. If, as the SEC has contended, that trail leads to the companies' lawyers at Wachtell, Lipton, Rosen & Katz (for BofA) and Shearman & Sterling (for Merrill), why then, he asked, wasn't the SEC seeking penalties from the lawyers?

That question left the companies' lawyers staggering, and raised a cheer from a public tired of watching major corporations accused of wrongdoing insulate themselves from liability through clever lawyering. In the past, firms that facilitated unhealthy practices at companies like Enron Corp. and Global Crossing Ltd., and those that worked on the complex financial products that have decimated our financial system, have emerged largely unscathed. The Bank of America case may be no different in the end, either. Wachtell and Shearman maintain that they've done nothing wrong, and, in fact, insist that they were following industry norms in shaping the disclosure language.

But in Rakoff's world, just because something is commonly done doesn't make it right. This time, someone in authority was willing to stand up and say: What the hell is going on here?

Three weeks after that ruling, Rakoff gave a tour of his large office in the federal courthouse in downtown Manhattan. On the bench, Rakoff often appears formidable, his face a stern mask nearly hidden behind an expansive white beard and large glasses. In chambers he is cheerful, engaging, and garrulous. He introduces his three fresh-cheeked clerks, and points out some of the photographs that cover the walls of his office: his wife of 35 years and their three daughters, and judges he has known and admired, including Milton Pollack and Leonard Sand. An electronic keyboard sits under a window. He rocks back and forth on his new MBT shoes, which have curved rather than flat soles. Advertised as the "anti-shoe," they promise to be "muscle-toning, calorie-burning, and posture-improving." Rakoff has recently taken up ballroom dancing with his wife, and says he bought the shoes to address some dancing injuries.

Rakoff explained that he agreed to be interviewed because he believes that judges should be more accessible: "If you isolate yourself, the press and public will get notions about how courts operate that are totally at war with reality." He stressed, however, that he could not discuss cases that are pending, on appeal, or not otherwise closed.

Rakoff clearly relishes big cases. In addition to the SEC's suit against Bank of America, he has presided over the SEC's case against WorldCom (which produced a record $750 million penalty), the only civil Enron-related case to go to trial (which settled before verdict), and the criminal proceedings of disgraced lawyer Marc Dreier (who pled guilty to fraud charges). At press time he was handling the SEC's civil insider trading case against Galleon Group founder Raj Rajaratnam (who maintains that he is innocent) and 19 others.

*Next up for the iconoclastic judge: the SEC's insider trading case against* **GALLEON FOUNDER RAJ RAJARATNAM.**

With a front row seat to so much corporate malfeasance, Rakoff has had a close look at the role that lawyers have played in these events. In 2004 he published an article in the American Bar Association's journal, *Litigation*, titled "Is the Ethical Lawyer an Endangered Species?" In the piece, he maintained that most lawyers remain highly ethical, but noted that corporate scandals have shown "the willingness of respected law firms to provide a cover of legality to highly questionable transactions."

The judge spoke more bluntly during an ABA panel discussion in 2004. He discussed troublesome practices he had seen when he presided over a civil trial in 2002 in which JPMorgan Chase & Co. was accused of disguising loans to Enron as oil and gas contracts. During the trial, a Milbank, Tweed, Hadley & McCloy partner took the stand to testify about his drafting of these questionable "prepaid forward" contracts. (The case settled with the bank paying the plaintiffs' insurance companies $500 million before the verdict.) Said Rakoff: "It was something of an eye-opener for me to



see that so many singly responsible lawyers, from responsible law firms, with highly distinguished careers, could sign off on something that seemed so palpably a charade." Milbank did not respond to a request for comment.

That candor came back to hurt Rakoff in 2008, when lawyers from Simpson Thacher & Bartlett, representing JPMorgan, asked the judge to recuse himself from another Enron-related case, citing those statements. The judge wrote that he didn't think his recusal was necessary, but agreed to step aside to avoid "any hint of partiality."

In his chambers, Rakoff says he regrets those ABA comments. "I did say some strong things," he concedes. "But I was very disturbed by what I saw of the conduct of the lawyers." More generally, the judge avoids condemning the profession as a whole. Although he laments that too many lawyers have become narrowly focused and lose sight of the public good, he says he still sees many "wonderful lawyers" who stand up to clients and insist on doing what is right. "It's not like the profession has totally lost its soul," he says.

Even when Rakoff is dealing with lawyers whom he admires, he is exacting. Lawyers who displease him feel a sharp tug on their short leashes, no matter how eminent they are. Over the summer he conducted a trial that pitted American International Group, Inc., against its former chief executive officer Maurice Greenberg. The case was headlined by star trial lawyers David Boies for Greenberg, and Theodore Wells, Jr., representing AIG. The company accused an entity controlled by Greenberg of taking money from a trust created to benefit AIG employees; Greenberg countered that no legal trust existed.

*Rakoff has a history of questioning the status quo.*
**WORLDCOM, LED BY BERNIE EBBERS,**
*paid a $750 million fine, in a case overseen by the judge.*

During jury selection, Rakoff joked with a potential juror about the role he would play during the trial. "I'm basically going to be sitting there twiddling my thumbs," he said. "Occasionally, I will wake up and make a ruling." Not exactly. At one point in the trial, Rakoff criticized Wells, an esteemed partner at Paul, Weiss, Rifkind, Wharton & Garrison, for using a witness to make rhetorical statements—"That's not the way we proceed in my courtroom," he admonished—and took over the questioning of the witness himself. Later, he warned both Wells and Boies to stop crafting questions that were disguised arguments: "This is a very strict court, and we will play by the rules and strictly by the rules. Okay?"

Later when it was disclosed that Richard Beattie, the chairman of Simpson Thacher, had advised the AIG board on a key issue, but that neither side had questioned him, Rakoff decided on his own initiative to remedy that omission. "Well, that just adds to the fun," the judge told the lawyers. "So maybe we should get Mr. Beattie down here at 8:45 tomorrow morning, because he may have evidence that bears on this." Beattie, who was in Montana, testified several days later.

In the end, the jury sided with Boies's client, Greenberg, as did Rakoff, who found that no trust had been created, largely because there was no written document. (The jury decided certain issues, and the judge decided others.) Rakoff led off his written opinion with a snap. " 'Put it in writing' is the law's way of saying 'get serious,' " he wrote.

Rakoff is a lively writer who clearly enjoys crafting opinions. "He's the kind of judge who sees as his audience not just lawyers, but citizenry in general," says Rakoff's friend, Robert Katzmann, who sits on the U.S. Court of Appeals for the Second Circuit. "His prose is refreshing in this jargon-filled profession." In the Dreier case, Rakoff described the lawyer as a "doyen of dishonesty," and began an opinion in which he granted Dreier bail with this proclamation: "How glorious to be an American citizen."

Rakoff's exultation in his cleverness can rub some people the wrong way, especially if they're on the losing side of a cutting opinion. "From time to time, you will hear people say he's not as smart as he thinks he is," says one litigator at a major firm. "But I do think he's as smart as he thinks he is. He is wicked smart."

Rakoff is also famously hardworking. He regularly schedules evening oral arguments that can stretch for hours. (One clerk reveals, however, that Rakoff indulges in an occasional



in-chamber diversion: computer bridge.) The judge finds time to teach two courses a year at Columbia Law School, has written more than 100 articles, and is helping to revise the *Federal Judges' Manual on Scientific Evidence.* The grueling clip at which Rakoff runs his cases can exhaust seasoned litigators. "He is a real taskmaster," says Alan Levine, a partner at Cooley Godward Kronish, who was a prosecutor with Rakoff and has tried a case in his court. "He is probably the most expeditious trial judge that there is anywhere." Some think he's too demanding. "There are people who grouse about dealing with Rakoff," says one lawyer. "They sometimes feel his demands are unrealistic."

Rakoff professes to feel slightly concerned about being so tough on lawyers. "I would like to be more attentive to their needs, but there is a supervening policy," he says. "The single greatest weakness in the American legal system is the slow speed at which we operate. It's the oldest cliché: Justice delayed is justice denied. So I try to move cases with considerable speed."

Rakoff also handles cases with considerable decisiveness. In the SEC's accounting fraud case against WorldCom, he imposed his view of how a corporation should operate. When Rakoff took the case in 2002, the company consented to the appointment of a monitor, and the SEC recommended a monitor with limited powers. Instead, the judge appointed former SEC chairman Richard Breeden, and gave him expansive powers to clean up the company. Breeden recalls that Rakoff told him to monitor WorldCom "like a wet blanket." In particular, the judge wanted a halt to the company's exorbitant pay practices. "WorldCom had been the poster child for abusive compensation," Breeden says. In the early stages, Breeden and the judge talked up to six times a day about decisions that needed to be made at the company. When WorldCom was recruiting Michael Capellas to be its new CEO, Rakoff admonished the company for requesting approval of a compensation package that Breeden found to be "grossly excessive." The judge queried whether WorldCom's new management was "as committed to reform as the nature of this case requires."

Rakoff also pushed the SEC to impose an unprecedented fine. The agency suggested $500 million; Rakoff said that wasn't enough. WorldCom ended up paying $750 million, which was then 75 times higher than the next biggest fine ever levied by the SEC.

Todd Rakoff, Judge Rakoff's younger brother and a Harvard Law School professor, recalls his sibling as an energetic child. "After dinner every night we would chase each other around the house," he recalls. The Rakoffs lived in Philadelphia, where Rakoff's father was a gynecologist and his mother was an English teacher. "They were fantastic," says the judge about his parents. Rakoff attended Swarthmore College at the urging of his mother, in part because "it had a great social conscience," he says. There, he was president of the student council and editor in chief of the newspaper. He majored in English but also developed an interest in India. He headed to Oxford University to get a master's degree in Indian history, which led him to live in Delhi for six months. His master's thesis examined the organizational techniques of Mahatma Gandhi's first civil disobedience campaign.

**IN GRANTING MARC DREIER BAIL,**

*Rakoff wrote, "How glorious to be an American citizen."*

After graduating from Harvard Law School in 1969 and clerking for Abraham Freedman at the U.S. Court of Appeals for the Third Circuit, Rakoff worked at Debevoise & Plimpton for just over two years. In 1973 he became a prosecutor in the U.S. attorney's office in Manhattan, and rose to head the office's fraud unit. In 1980 Rakoff joined Mudge, Rose, Guthrie, Alexander & Ferdon as a partner, where he built a white-collar practice, and in 1990 moved to Fried, Frank, Harris, Shriver & Jacobson. His clients in private practice included former Kidder Peabody & Co. investment banker Martin Siegel, who pled guilty to an insider trading scheme with Ivan Boesky, and the Teamsters union, which was accused by the U.S. Department of Justice of running a RICO criminal enterprise due to its alleged affiliation with organized crime. That case settled on the eve of trial, much to Rakoff's disappointment.

Rakoff became a judge in 1996 as an appointee of President Bill Clinton. Federal judges make $169,300 annually (just a tad more than a first-year associate at the elite firms), and Rakoff jokes about his "gradual slide into penury." When he took the bench he reported assets in the $1 million range. "Now it's zilch," says Rakoff, whose reported assets have dropped to less than $10,000. Rakoff says all his savings went to his daughters' college funds, but it wasn't enough. He has a second mortgage on his house, and his daughters had to take out school loans. "I feel a little bad about that," he says. "But I'm not complaining," he insists. "The average American makes less than I do."

Rakoff's judicial approach is marked by a tendency to look at the bigger picture when analyzing an issue. He strives to find a result that is more than technically correct. "There is generally a firm sense with him that there is really justice to be had out there," says his brother, Todd. "There often is a right and a wrong, and it makes a difference to find it."

In two of his better-known rulings, Rakoff struck down the federal death penalty as unconstitutional in 2002 (he was reversed), and in 2006 he lambasted the government's application of the federal sentencing guidelines. In the death penalty case, he cited the growing number of DNA exonerations, and in the sentencing case he wrote that it was "patently absurd" for prosecutors to seek a life sentence for a company president who had participated in an accounting fraud devised by others. Robert Fiske, Jr., a Davis Polk & Wardwell partner who was Rakoff's boss as Manhattan's U.S. attorney, praises the judge's fearlessness: "He's shown a lot of courage in a lot of decisions. He doesn't hesitate to do what is right, whether it's in a death penalty case or Bank of America."

*Concerned about the advice* **BANK OF AMERICA CEO KEN LEWIS** *received from his lawyers, Rakoff refused to rubber-stamp the bank's settlement with the SEC.*

This determination to do what he believes is right can appear as stubbornness. "[Rakoff] will sometimes form a view of a case early on, and it's hard to move him from that," says one lawyer. "People get frustrated that he's glommed on to a particular view and can't get him off it." Rakoff says he's surprised that any lawyer would think that, especially since he holds oral arguments on "virtually every motion," and often changes his mind after arguments.

In the Galleon case, Rakoff has shown his determination to move the matter swiftly. In early November, he held a case management conference before 19 lawyers representing the five original defendants and three lawyers for the SEC. Rakoff cracked his whip a few times. He noted that the parties had proposed November 24 as a deadline for the first request for production of documents, and asked an SEC lawyer: "Why so long?" He moved the date up to November 16.

At one point, Theodore Altman of DLA Piper, who represents Mark Kurland, an executive of the hedge fund New Castle Partners, asked Rakoff to modify the schedule by pushing back some deadlines. "No," Rakoff shot back, without further discussion. Altman later raised the issue of whether the judge might stay the civil proceedings until the criminal case is resolved, as many judges do. Speaking slowly and carefully, Rakoff told the lawyer he could file a motion, but he shouldn't get his hopes up: "This is an important matter that should move forward expeditiously so that the parties and the public know what the truth is."

Rakoff believes in getting at the truth through the judicial process. A trial on the BofA deal would bring some clarity—at least for the public. At press time the case was set to begin March 1. BofA and its lawyers, which now include Paul, Weiss, must view the prospect of trying this case before Rakoff with horror. Still, it will be difficult to avoid a trial by crafting another settlement. Rakoff has made it clear that he's unlikely to accept a deal that doesn't pin responsibility on the individuals who made the disclosure decisions, whether they're lawyers or executives. If this conundrum cannot be resolved before March, seats in Judge Rakoff's courtroom will be the hottest ticket in town.

*E-mail: sbeck@alm.com.*

# Collapsed Lehman pays out big bonuses to prevent defections

By Jennifer Hughes
Published: December 22 2009 02:00 | Last updated: December 22 2009 02:00

Lehman Brothers, the collapsed Wall Street investment bank, is hiring bankers and paying generous bonuses in London to stop employees defecting.

Lehman's European business is recruiting middle and back office staff to help administrators PwC wade through the millions of transactions that must be reconciled with clients and trading partners to determine what is owed or can be claimed.

A judge overseeing Lehman's US bankruptcy in New York last week approved an extra $50m (£31m) in bonus pay-outs to some 230 derivatives traders working to unwind the dead bank's $10bn portfolio. The pay-outs come as bankers in the US and Europe face public anger over probable multi-million dollar bonuses at the end of this year and, in Britain and France, additional taxes on the pay-outs.

Steven Pearson, a partner at PwC and one of the four joint administrators for the dead bank's European arm, said the higher UK pay-outsreflected demand for the skills he needed and Lehman's unique situation.

"We've made our strategy and reasoning clear to our creditors," said Mr Pearson. "We need to keep up with the market and we have to bear in mind that staff here have much narrower career development options than at other banks."

Lehman Europe is the biggest and most complex part of the dead bank outside its US headquarters operations.

Mr Pearson said there were benefits in retaining staff with extensive knowledge of Lehman. Any bonuses, he said, were linked to the administrators' focus on maximising the money returned to creditors.

Administrators have considered paying bonuses to staff in claims against Lehman.But they have not taken the idea further because of technical problems in buying the claims.

Lehman's European operations employ about 440 people, up from the 360 PwC expected to need nine months ago.

When the bank collapsed in September 2008, its European business had 5,300 staff. Of those, about 2,800 were transferred to Japanese bank Nomura with its purchase of Lehman's equities unit. About 1,000 were laid off while another 1,000 found other work.

Those who remain are trying to untangle and value the millions of trades on Lehman's books, some of which are still technically "live" and potentially worth hundreds of millions of dollars to either side of the deal.

www.ft.com/lehman

# Judge OKs $50M Lehman bonuses

Lehman Brothers' plan to pay $50 million in bonuses to employees handling derivatives contracts was approved by a bankruptcy court judge, who said the payments provide essential incentives.

Lehman, which is liquidating in bankruptcy, asked Bankruptcy Judge James Peck last month for permission to pay incentives to about 230 full-time employees unwinding the contracts. Lehman told Peck in a Nov. 25 filing that the derivatives team had brought in more than $8 billion in cash and settled 17 percent of the contracts.

A bonus pool "designed to motivate and reward employees" in the group will help to maximize the value of the remaining contracts, it said.

Diana Adams, the US Trustee who oversees Lehman's bankruptcy, said in a filing on Dec. 11 that she was questioning why Lehman needs to pay bonuses to people for merely doing their job.

*Bloomberg*

New York Post, Thursday, December 17, 2009 nypost.com



# Bigger, Faster Cheaper

The recession's made business bankruptcies more sophisticated, urgent and subject to cost controls.

STEPHEN KAROTKIN

PHOTO BY RICK KOPSTEIN

BY LEIGH JONES

Along with a record-setting surge in the number of failed companies during the recession—and the enormous legal fees that some of those failures have generated—law firms are finding that it's not business bankruptcy as usual, and it likely never will be again.

The huge increase in business failures has made bankruptcy and restructuring practices the saving grace for law firms facing their own financial struggles. The collapse of Lehman Brothers Inc., General Motors Co., Chrysler LLC and other major companies has delivered millions in legal fees to the old-guard practices at the likes of Weil, Gotshal & Manges; Kirkland & Ellis; Jones Day; and Skadden, Arps, Slate, Meagher & Flom.

Smaller firms have benefited from the rest of the more than 30,000 business bankruptcies filed during 2009. Amid the erosion of public and investor confidence as big-board mainstays have proven they're not too big to fail, law firms are handling more sophisticated, quicker moving bankruptcies that nevertheless are subject to tighter cost controls.

The first change debtor attorneys can expect is stricter oversight of the fees they charge. Public scrutiny and the "notoriety" of hefty bankruptcy fees are making the use of fee auditors more common, said Stephen Karotkin, a partner at New York-based Weil Gotshal. "The process provides another set of eyes," Karotkin said. Weil Gotshal has billed about $99 million in fees thus far in the Lehman bankruptcy. Total legal fees for the failed investment bank have climbed to nearly $200 million, according to U.S. Securities and Exchange Commission records.

Lehman's September 2008 bankruptcy foreshadowed many more to come. During the first half of 2009, the latest data available from the Administrative Office of the U.S. Courts show, 30,333 businesses filed for bankruptcy, a 64.4% increase compared with the first six months of 2008. Of those business bankruptcies, Chapter 11 reorganizations shot up by 113% and Chapter 7 liquidations rose by 57%.

Total U.S. bankruptcies, including consumer bankruptcies, filed during the first six months of 2009 increased by 36% compared with the

7

same period in 2008. Total filings reached 711,550 between January and June of this year, compared with 522,205 last year. Samuel J. Gerdano, executive director of the American Bankruptcy Institute, said that he expects bankruptcy filings to top 1.4 million by the end of 2009.

Source: Administrative Office of the U.S. Courts

Karotkin is not keen on the fee-auditor concept. The Office of the U.S. Trustee and the bankruptcy judge presiding over a case are more than capable of determining whether professional fees are reasonable, he said.

"The system is already designed with adequate pages of time sheets looking for potentially excessive charges. Some fee auditors aren't familiar with complex Chapter 11 cases, Karotkin said, and may identify services as unreasonable when they are not.

He also worries that a fee auditor may consider that having more than one attorney involved on a matter is excessive, even when the level of staffing is necessary to move the case along economically and expeditiously.

## 'I'M SHOCKED'

John Marquess, president of Legal Cost Control in Haddonfield, N.J., knows that his role as the fee police is unpopular with bankruptcy attorneys.

"I'm shocked that law firms don't want to be involved with fee auditors," he said with sarcasm. "I don't want to be involved with the IRS, but that's life."

Legal Cost Control audited fees in the bankruptcies of Enron Corp., WorldCom Inc., Adelphia Communications Corp. and Delphi Corp. The company provides services using a project-based fee structure. In the case of Adelphia, it knocked off



Marquess agreed that public concern about the amount of money that law firms receive in bankruptcy cases has prompted increased use of fee auditors. But he worries that the public will grow complacent about big fees. "My concern is that people will become jaded. With TARP [the Troubled Asset Relief Program] money and other bailouts, what's a billion here and there?" he said.

Another result of the avalanche of bankruptcies has been an increase in the use of rapid asset sales, or 363 sales, named for the section of the U.S. Bankruptcy Code that governs the transactions. "There are more and more 363 sales where the process has been truncated and accelerated," said Scott Zuber, a partner in the Florham Park, N.J., office of Day Pitney.

SCOTT ZUBER

PHOTO BY RICK KOPSTEIN

There are more and more 363 cases where the process has been accelerated.

The bankruptcies of GM, Chrysler and the Chicago Cubs each included 363 sales, which enabled the distressed companies to sell their assets before entering into a reorganization plan.

Generally, the sale, which requires approval by the bankruptcy court, is a streamlined process that lets the debtor quickly collect payment for its assets. The process enables the asset buyer to negotiate the bidding procedures with the debtor, and the buyer secures those assets free of liens.

"It used to be used only in emergency cases," Zuber said, but debtors are relying on 363 sales more frequently to avoid the longer procedure of selling assets through a reorganization plan.

The quick sales can mean fewer billable hours for attorneys, but Zuber is not worried. "You're still going to have significant fees. You're still going to have a significant number of filings," he said.

Section 363 sales may move cases more rapidly through the system, but they can circumvent mechanisms designed to protect the creditors in a traditional restructuring plan, said David Skeel, a professor at University of Pennsylvania Law School whose scholarship focuses on bankruptcy.

"There's a point where you're pre-empting the protections that are put in place for a reason," Skeel said.

The rapid 363 sales in Chrysler and GM resulted in the secured creditors receiving less than they would have had the assets of the companies been handled through the reorganization process, Skeel said. "The protections were gutted," he said.

## 'EXPLOSION' OF CLAIMS TRADES

Bankruptcy lawyers also can expect to see an increase in claims trading, a transaction in which a creditor sells its claim against a debtor to a third party, often a hedge fund or bank. The claim seller, frequently a former vendor to the bankrupt company, receives cash in hand without waiting through the duration of the case for whatever may be left. The claim buyer hopes to end up with something of value, which may be stock in the reorganized debtor, worth more than the price it paid for the claim.

"There's been an explosion of available claims," said Tom Janover, a partner at Kramer Levin Naftalis & Frankel in New York. He represents major hedge funds that buy claims. The deals provide "tremendous efficiency" for creditors, he said. In September, Janover represented York Capital Management's purchase of Pequot Capital Management's $9.9 million claim against Lehman Brothers.

Claims trading has increased as the number of bankruptcy filings have risen, Janover said, but the amount of trading in individual filings has risen as well. The bankruptcies of Lehman, GM, Chrysler and dozens of other big companies have involved hundreds of claimants and provided a bounty of opportunities for claims trading, which are essentially unregulated transactions between the claim buyers and sellers.

The advantage in claims trading, which began increasing about 20 years ago, is that market forces determine the value of a creditor's claim, Skeel said. But there is a downside: Creditors, especially those that are not financially savvy, run the risk of selling their claims for too little, he said. A bankruptcy case can also devolve into fighting among sophisticated claim buyers and that can complicate resolving the case.

"It can lead to a lot more friction in the case," Skeel said, "and that friction may be destructive."

*Contact Leigh Jones at ljones@alm.com.*



# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of The Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported):
**January 14, 2010**

# LEHMAN BROTHERS HOLDINGS INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **1-9466** | **13-3216325** |
|---|---|---|
| (State or other jurisdiction Of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1271 Avenue of the Americas**
**New York, New York**
**10020**
(Address of Principal Executive Offices)
(Zip Code)

Registrant's telephone number, including area code:
**(646) 285-9000**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

