Hearing Date and Time:  **March 17, 2010 at 10:00 a.m.**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Jayant W. Tambe
Stephen Pearson
James K. Goldfarb
Benjamin Rosenblum

Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
In re:                                                       :    Chapter 11
                                                             :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :    Case No. 08-13555 (JMP)
                                                             :
                        Debtors.                        :    (Jointly Administered)
                                                             :
-------------------------------------------------------------x

**DEBTORS' REPLY IN SUPPORT OF MOTION TO**
**COMPEL PERFORMANCE BY NORTON GOLD FIELDS**
**LIMITED OF ITS OBLIGATIONS UNDER AN EXECUTORY**
**CONTRACT AND TO ENFORCE THE AUTOMATIC STAY**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Commercial Corporation ("LBCC"), as debtor and debtor in possession

(together with Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, the "Debtors"),

files this reply in response to the Objection of Norton Gold Fields Limited to Motion of the

Debtors and Debtors in Possession pursuant to Section 105(a), 362, and 365 of the Bankruptcy

Code to Compel Performance by Norton Gold Fields Limited of its Obligations under an

Executory Contract and to Enforce the Automatic Stay (the "Objection") and in support of such motion (the "Motion"), and respectfully states:[1]

## PRELIMINARY STATEMENT

1.     Norton and LBCC are parties to a gold price swap agreement, memorialized in an ISDA Master Agreement, along with the Schedule thereto, and various confirmations entered into thereunder (the "Agreement").  Norton suspended payment under the Agreement when LBCC and LBCC's parent and credit support provider, LBHI, filed for bankruptcy.  Norton claimed that the bankruptcy filings were events of default under Section 5(a)(vii)(4) of the ISDA Master Agreement and, therefore, Norton was entitled to suspend payment indefinitely under Section 2(a)(iii) of the Master Agreement.  Based on this infirm reasoning, Norton is withholding more than $24,211,689.46 from the estate[2] – money that Norton publicly admits it can afford to pay.[3]

2.     LBCC brought the Motion to compel Norton to pay the $24 million and continue honoring the Agreement, and to enforce the automatic stay.  In the Motion, LBCC demonstrated that Sections 2(a)(iii) and 5(a)(vii) of the Master Agreement are unenforceable *ipso facto* clauses under Section 365(e)(1) of the Bankruptcy Code.  LBCC also demonstrated that, under the Code, Norton may not refuse to terminate the Agreement and continue enjoying its benefits, while at the same time shirking its obligation to pay LBCC.

---

[1] Unless stated otherwise, capitalized terms used here have the definitions set forth in the Motion.

[2] In the Motion, LBCC cited a figure of $18.663 million.  (*See* Mot. ¶ 19).  Given the passage of time and the close of another quarterly settlement period under the Agreement, the amount of unpaid matured payments has risen to greater than $24 million.  LBCC sent a detailed invoice to Norton on December 31, 2009.  A copy of that invoice is Exhibit A to the Declaration of James K. Goldfarb, dated February 5, 2010 (the "Goldfarb Declaration").  The Goldfarb Declaration is being filed simultaneously with this reply.

[3] (*See* Goldfarb Decl. Ex. B [ASX/Media Announcement, *Statement of Norton Chairman, A. Anthony McLellan, at Norton's Annual General Meeting* (Nov. 30, 2009)] at 3 of 6 ("Do we have the cash to pay any such enforceable judgment [entered in respect of the Motion]?  Yes.").

3.      In its Objection, Norton does not contest those fundamental principles, nor does it deny owing substantial sums to the estate.  Instead, Norton offers an array of arguments as to why the prohibition on *ipso facto* clauses in Section 365(e)(1) has no application here or why Norton need not otherwise honor its contract.  But as its own cases show, Norton's arguments fail as a matter of law.

4.      First, Norton argues that the Agreement is not an executory contract and, therefore, it lies beyond the reach of Section 365(e)(1).  The argument is based on the assumption that the Agreement is not executory because it is indivisible from a suite of non-executory financing contracts.  But no court has held that when an executory contract is indivisible from a non-executory contract, the combined contract is non-executory.  In fact, courts have reached the exact opposite conclusion.  *See, e.g., Burley v. Am. Gas & Oil Investors*, 85 B.R. 274, 282-84 (Bankr. S.D.N.Y. 1988) (finding that promissory notes, which were non-executory contracts when standing alone, were executory contracts when read in conjunction with an executory agreement).  Norton's position is tantamount to holding that Norton may avoid its obligations under the executory Agreement simply because it owes money to third parties under the supposedly non-executory financing contracts.  The position finds no support in the law.  (*See* Point I, below).

5.      Second, Norton argues that it may suspend payment under the Agreement because of LBHI's bankruptcy filing.  Norton claims that this event of default does not trigger the protections of Section 365(e)(1) because it is not conditioned on *LBCC's* bankruptcy filing.  But the Court recently considered and rejected this very argument in *Lehman Brothers Special Financing Inc. v. BNY Corp. Trustee Services Ltd. (In re Lehman Brothers Holding Inc.)*, Adv. P.

No. 09-01242 (JMP), __ B.R. __, 2010 WL 271161, at *9-11 (Bankr. S.D.N.Y. Jan. 25, 2010).

(*See* Point II.A, below).

6.        Third, Norton argues that it may suspend payment because LBCC repudiated the

Agreement.  This argument is nothing more than Norton's attempt to avoid its payment

obligations under the Agreement based on a supposed pre-petition default – an argument that is

contrary to basic bankruptcy principles.  Even looking past that fatal flaw, the argument fails on

its merits.  The communications and conduct that supposedly evince LBCC's repudiation prove

no such thing.  Further, in the face of the supposed repudiation, Norton continued to perform

parts of the contract.  Under controlling English law, that "affirmation" of the Agreement

obligates Norton to perform the contract completely.  (*See* Point II.B, below).

7.        Fourth, Norton argues that other events of default *might* have occurred and would

provide it with a basis to withhold payment from LBCC.  The argument is pure speculation and

was rejected by the Court in *Metavante* for that very reason.  (*See* Point II.C, below).

8.        Fifth, relying on the English law doctrine of promissory estoppel, Norton argues

that LBCC cannot demand payment today because, in September 2008, it promised Norton it

would no longer demand payment.  But LBCC promised no such thing – let alone in clear and

unequivocal language, as would be required to trigger estoppel.  In any event, under English law,

estoppel does not trump the statutory right of a bankruptcy trustee to marshal the debtor's assets.

(*See* Point III, below).

9.        Sixth, Norton argues that, even if it must pay LBCC, it need not do so until LBCC

honors its agreement to settle the quarterly notional amounts through a series of intra-quarter

weekly trades.  But no such agreement exists, as is evidenced by the plain language of the very

documents on which Norton relies to advance this argument.  Norton does not deny that the

February 22, 2008 Confirmation sets forth all the terms necessary for the parties to settle their trades.  (*See* Point IV, below).

10.    Seventh, Norton argues that the Motion is procedurally flawed because LBCC was required to commence an Adversary Proceeding.  Even if technically correct, Norton's own cases hold that proceeding on motion is harmless error in circumstances like those here.  Norton has had ample notice of the claims against it and ample opportunity to be heard on those issues.  Further, if the Court were to construe in Norton's favor every issue of fact raised in the Objection, LBCC still wins as a matter of law.  In this light, Norton's request for discovery is nothing more than a delaying tactic.  (*See* Point V, below).

11.    Finally, Norton argues that it has not violated the automatic stay.  But this argument cannot be squared with clear cut law, including decisions of this Court in this very case. (*See* Point VI, below).

12.    For these reasons and those set forth below, the Court should grant the Motion.

## ARGUMENT

## I.    THE SWAP IS AN EXECUTORY CONTRACT PROTECTED BY THE PROHIBITION ON *IPSO FACTO* CLAUSES

13.    Swap contracts, such as the Agreement, are executory contracts.  *See Metavante* at 109:19 to 110:2 (interest rate swap); *In re Enron Corp.*, No. 01 B 16034 (AJG), 2005 WL 3874285, at *4 n.11 (Oct. 5, 2005) (natural gas price swap) ("[U]nder the swap agreement the parties had mutual performance obligations – each party was obligated to make a payment each month based on an agreed upon formula.  ENA was obligated to make payment based upon a fixed amount and Pennaco was obligated to make payment based on a floating amount.  As there were mutual obligations under the Swap Agreement, it was an executory contract.").

14.     Executory contracts are protected by the prohibition on *ipso facto* clauses set forth in Section 365(e)(1) of the Bankruptcy Code.  (*See* Mot. ¶¶ 27-31).  Norton does not deny this. Instead, it argues that the Agreement is not executory because it is indivisible from other contracts that provided financing to Norton and secured Norton's repayment obligations, and that such financing contracts are by definition non-executory.  (*See* Obj. ¶¶ 16, 70).  This argument fails as a matter of law, logic, and policy.[4]

15.     First, Norton conflates two distinct lines of authority to create a rule that no court has adopted.  Courts have held that related contracts should be treated as indivisible in certain circumstances.  (*See, e.g.*, Obj. ¶¶ 72-73 (citing cases)).  Courts also have held that loan agreements are non-executory.  (*See, e.g., id.* ¶ 80 (citing cases)).  But no court has concluded – as Norton urges – that when a loan agreement is indivisible from an executory contract, the executory contract somehow loses its executory nature and itself becomes non-executory.  To the contrary, courts have reached **the exact opposite conclusion**.  *See, e.g., Burley*, 85 B.R. at 282-84 (finding that promissory notes, which were non-executory contracts when standing alone, were executory contracts when read in conjunction with an executory agreement:  "Plaintiff's narrow focus of [sic] the notes without consideration of the Partnership Agreement and notes thereunder presents a distorted picture. . . .  AmGO has unperformed material duties [under the Partnership Agreement].  Similarly, Haefitz had a continuing duty to satisfy his obligations on the executed promissory notes.").

16.     The law, as expressed in *Burley*, makes sense in a way that demonstrates the poverty of Norton's position.  Logically, if the supposedly non-executory financing contracts are combined with the executory Agreement, the result is an executory contract; LBCC's (or

---

[4] Norton acknowledges that, if its argument fails, Section 365(e)(1) bars it from withholding payment due to LBCC's bankruptcy.  (*See* Obj. ¶ 87).

Norton's) remaining obligations under the Agreement provide the mutuality that supposedly is
lacking in the financing contracts. Norton never pauses to contemplate, let alone explain, why
the Court should reach the opposite conclusion and allow Norton to suspend payment under the
Agreement simply because the Agreement supposedly is indivisible from the supposedly non-
executory financing contracts. Stated differently, Norton fails to explain why the fact that it
owes money to third parties on account of the financing contracts excuses it from honoring the
Agreement with LBCC. No policy is promoted by Norton's theory, and Norton suggests none.

17.     Further, it would be a dramatic development if the Court were to conclude – as
Norton urges – that swaps used in conjunction with loans and other financing transactions are not
executory. Swaps frequently accompany these transactions. *See, e.g.*, *In re Lehman Brothers
Holding Inc.*, Case No. 08-13555 (JMP), Docket No. 3951 ¶ 2 (Bankr. S.D.N.Y. June 15, 2009)
(Objection of Metavante Corporation to Debtors' Motion Pursuant to Sections 105(a) and 365 of
the Bankruptcy Code) (interest rate swap at issue in *Metavante* was incident to a term loan
facility); *BNY*, 2010 WL 271161, at *3-4 (credit default swap agreement at issue in *BNY* was part
of a credit-linked notes transaction). Although the transactions themselves might appear
complex, the plain vanilla and routine swaps that accompany them are executory, like the swaps
in *Metavante* and *BNY*, and the swap here. *See Metavante* at 109:19 to 110:2; *BNY*, 2010 WL
271161, at *6-7.

## II.    NORTON CANNOT SUSPEND PAYMENT BASED
## ON SUPPOSED OTHER EVENTS OF DEFAULT

18.     In a further futile attempt to avoid the bar on *ipso facto* clauses, Norton contends
that its "payment obligations . . . are excused as a result of other Events of Default not predicated
upon LBCC's bankruptcy filing." (Obj. ¶ 84). But the contention falters because those other
Events of Default have not occurred. The exception is LBHI's bankruptcy. But that filing

triggers the protections of Section 365(e)(1), as the Court held two weeks ago in *Lehman Brothers Special Financing Inc. v. BNY Corp. Trustee Services Ltd. (In re Lehman Brothers Holding Inc.)*, Adv. P. No. 09-01242 (JMP), __ B.R. __, 2010 WL 271161, at *9-11 (Bankr. S.D.N.Y. Jan. 25, 2010).

A.    **Section 5(a)(vii)(4) of the Master Agreement, Providing for an Event of Default Based on LBHI's Bankruptcy, Is an Unenforceable *Ipso Facto* Clause**

19.    Norton contends that the bar on *ipso facto* clauses does not prevent it from suspending payment to LBCC based on **LBHI's** bankruptcy filing.  According to Norton, the *ipso facto* bar "has no application where . . . the Event of Default is the bankruptcy filing by a different entity who is not a party to the subject contract."  (Obj. ¶ 91).  The Court's decision in *BNY* defeats Norton's contention.

20.    In *BNY*, on facts analogous to those here, the Court held that the provisions of a derivatives transaction that modified the payment rights of Lehman Brothers Special Financing Inc. solely as a result of the Chapter 11 filing of LBHI were unenforceable *ipso facto* clauses under Section 365(e)(1), and that any attempt to enforce the provisions was a violation of the automatic stay under Section 362(a)(3).  *See BNY*, 2010 WL 271161, at *11.  In reaching this result, the Court directly refuted the assertion – advanced by BNY there and Norton here – that an event of default based on the bankruptcy filing of an entity other than the contracting party does not trigger the protections of Section 365(e)(1).

21.    The *BNY* decision was based on the plain language of Sections 365(e)(1)(B) and 541(c)(1)(B), which provide that the prohibition on *ipso facto* clauses is triggered by "the commencement of *a case* under this title."  *Id.* at *10 (quoting the statute) (emphasis added by the Court).  The Court found it significant that "the language used is not limited to the commencement of a case *by or against the debtor*."  *Id.* (emphasis added by the Court).

22.     The Court also found that the legislative history of Sections 365(e)(1)(B) and

541(c)(1)(B) reinforces the conclusion drawn from the plain statutory language.  The Court

observed that "an early version of what eventually became section 365(e)(1) referred to 'the

commencement of a case under this Act *by or against the debtor*.'"  *Id.* (citations omitted)

(emphasis added by the Court).  The Court also observed that "a draft of the language that

became section 541(c)(1) at one time referred to 'the commencement of a case under this title

*concerning the debtor*.'"  *Id.* (emphasis added by the Court).  Based on these observations, the

Court concluded that the "initial use and later rejection of limiting language demonstrates that

Congress considered, but ultimately rejected, drafting sections 365(e)(1) and 541(c)(1)(B) in a

manner that would have expressly restricted their application to the bankruptcy case of the debtor

counterparty."  *Id*.

23.     Recognizing that the prohibition on *ipso facto* clauses might sweep broadly if

triggered by the commencement of any debtor's case, the Court considered "under what

circumstances is the bankruptcy case of another debtor sufficiently related to rights of the parties

to such an executory contract that it is reasonable to trigger the *ipso facto* protections of these

sections."  *Id*.  The Court determined that the issue must be resolved on a case-by-case basis.

*See id*.

24.     In the Debtors' case, the Court found that LBHI and its various corporate

affiliates "comprise an 'integrated enterprise' and, as a general matter, 'the financial condition of

one affiliate affects the others.'"  *Id*. at *11 (quoting *JPMorgan Chase Bank, N.A. v. Charter

Communications Operating, LLC (In re Charter Communications)*, __ B.R. __, Bankr. LEXIS

3609, *67-69 (Bankr. S.D.N.Y. Nov. 17, 2009) (Peck, B.J.)).[5]  Accordingly, the Court held, the

---

[5] *Charter* is now reported at 419 B.R. 221.

bankruptcy filing of LBSF and its affiliates "is a singular event" for the purposes of interpreting

Section 365(e)(1):

> What happened on September 15, 2008 was a bankruptcy filing
> that precipitated subsequent related events.  LBHI commenced a
> case that entitled LBSF, consistent with the statutory language,
> fairly read, to claim the protections of the *ipso facto* provisions of
> the Bankruptcy Code because its ultimate corporate parent and
> credit support provider, at a time of extraordinary panic in the
> global markets, had filed a case under the Bankruptcy Code.

*Id.* at 20-21.  Because LBCC stands in the same shoes as LBSF in relation to LBHI, the

bankruptcy filing by LBHI entitled LBCC to claim the protections of the *ipso facto* provisions of

the Bankruptcy Code.  Consequently, the clause in the Master Agreement permitting Norton to

suspend payment based on LBHI's bankruptcy filing is unenforceable.

      25.      In addition to being firmly rooted in the Code's plain language and legislative

history, the *BNY* decision is sound as a matter of policy.  The decision addresses the facile

manner in which the Bankruptcy Code could be interpreted to permit parties to terminate or

modify a contract based on the bankruptcy filing or financial condition of a closely-related

affiliate.  As suggested in *BNY*, *Charter*, and elsewhere, the modern corporate structure often

consists of multiple layers of subsidiaries and affiliates with intricately woven financial

connections.  The bankruptcy of one potentially causes or compels the bankruptcy of the others.

If creditors were permitted to enforce a provision that terminated or modified a contract based on

the commencement of a bankruptcy case or the financial condition of a closely-related affiliate,

they could create *de facto ipso facto* provisions and contract around important bankruptcy

protections.  *See BNY*, 2010 WL 271161, at *11; *accord Charter*, 419 B.R. at 251 (holding that

an event of default based on the "insolvency or financial condition" of a corporate affiliate in an

"integrated enterprise" is no more than a thinly-veiled cross-default provision that is

unenforceable under Section 365(e)(1)).  In *BNY*, the counterparty was trying to skirt the

protections that Section 365(e)(1) afforded LBSF by leveraging the bankruptcy of LBSF's

corporate parent and guarantor, all to avoid paying money due LBSF.  Norton is trying to do no

less here.

> **B.**      **LBCC Did Not Repudiate the Agreement – But Even If It Did, Bankruptcy Law and English Law Prevent Norton from Withholding Payment**

26.      Norton claims that LBCC repudiated the Agreement pre-petition – an Event of

Default under Section 5(a)(ii) of the Master Agreement that would not trigger the protections of

Section 365(e)(1).  (*See* Obj. ¶ 94).  This argument goes nowhere because, as this Court has

noted on several occasions, a pre-petition default does not excuse a counterparty's failure to

perform its post-petition payment obligations.  Even if the Court were inclined to consider the

merits of Norton's repudiation claim, the communications, acts, and omissions that supposedly

prove it, in fact, do no such thing, particularly when the Court looks past Norton's self-serving

spin.  Moreover, Norton has never "accepted" LBCC's supposed repudiation.  As a result, under

controlling English law, Norton must perform completely.

> **1.**      ***Norton's Attempt to Avoid Its Post-Petition Obligations under the Agreement Based on a Supposed Pre-Petition Default Violates Sections 362, 365, and 541 of the Bankruptcy Code***

27.      Norton's repudiation argument does not even get off the starting block because it

tramples fundamental protections of the Bankruptcy Code.  Taking the facts as Norton claims

them to be, LBCC repudiated the contract pre-petition, but Norton did not accept the repudiation

or terminate the Agreement before LBCC filed for bankruptcy protection on October 5, 2008.

Consequently, the Agreement became property of the estate on the petition date (*see generally*

11 U.S.C. § 541(a)(1); *BNY*, 2010 WL 271161, at *9), and Norton may seek to suspend

performance under the Agreement, if at all, only after obtaining leave of court to lift the

automatic stay.[6]  *See* 11 U.S.C. § 362(d); *In re Pac. Gas & Elec. Co.*, No. C 02-3464 SI, 2004

U.S. Dist. LEXIS 22023, at *21 (N.D. Cal. Sept. 30, 2004) (during the gap period, non-debtors

"are not entitled to exercise extrajudicial remedies such as unilaterally withholding performance

without leave of court").  Of course, Norton has not sought such leave; it has unilaterally opted

to ignore its contractual obligations – a violation of the automatic stay.  *See Metavante* at 112:19

to 113:3 (citing *In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003)); *see also*

*Broadstripe, LLC v. Nat'l Cable Television Coop., Inc. (In re Broadstripe, LLC)*, 402 B.R. 646,

657 (Bankr. D. Del. 2009) ("As property of the estate, the debtor's interests in such contracts or

leases are protected against termination or other interference that would have the effect of

removing or hindering the debtor's rights in violation of section 362(a)(3).").

28.     Norton's actions also offend Section 365 of the Bankruptcy Code, which requires

Norton to perform its obligations under an executory contract during the gap period, regardless

of any supposed pre-petition default by LBCC.  *See Metavante* at 110:3-8 (citing *McLean Indus.,*

*Inc. v. Med. Lab. Automation, Inc. (In re McLean Indus., Inc.)*, 96 B.R. 440, 449 (Bankr.

S.D.N.Y. 1989)).  Norton does not deny this rule of law.  It simply argues, incorrectly, that its

performance is conditioned on LBCC's performance.  (*See* Obj. ¶¶ 131-136).  As explained

below, LBCC owes no such performance and, accordingly, Norton has no defense to payment.

(*See* Point IV, below).

## 2.     *LBCC Did Not Repudiate the Agreement*

29.     Norton's repudiation claim is based on a story that does not square with the facts

on which it is built.  According to Norton, it received a telephone call on September 19, 2008

from an unspecified "representative of Lehman" who advised that LBCC "(a) was no longer

---

[6] Of course, any motion for relief from the automatic stay would be futile because its only basis would be
the unenforceable *ipso facto* clause.

accepting any settlement payments under the ISDA Agreement, including the quarter-end pre-deliveries made under and pursuant to the Weekly Variation Pairs; and (b) that Norton Gold should cease payments under the terms of the ISDA Agreement until further notice." (Obj. ¶ 33; *see also id.* ¶¶ 96, 119).

30.     Norton's recollection of the telephone call is based on an internal Norton e-mail written three days after the call itself, and the description of the call in that e-mail cannot be squared with the confirmatory e-mail that Lehman sent to Norton immediately after the call:

| Lehman's Confirmatory E-mail | Norton's Recollection |
|---|---|
| As discussed Lehman Brother [sic] are unable to execute the gold predelivery today, for settlement Tuesday. (Brodie Decl. Ex. A).[7] | Got a phonecall [sic] from Keith Jones at Lehman Brothers on Friday evening stating that they were no longer accepting any settlement payments. This includes the weekly pre-deliveries we were doing into the hedge, but also the quarter end ones as well. (Brodie Decl. Ex. B). |

As the *full* text of Lehman's confirmatory e-mail makes clear, Lehman advised Norton only that it was unable to satisfy the current obligation on a specific date (September 19, 2008). Lehman's confirmatory e-mail does not bear out Norton's recollection that Lehman was "no longer accepting any settlement payments"; directing Norton to "cease payments" altogether (Obj. ¶ 33; *see also id.* ¶ 119); or repudiating the contract as a whole.[8] Even Norton's own recollection does not bear out its repudiation claims. According to Norton, it was advised to "cease payments . . . *until further notice.*" (Obj. ¶ 33 (emphasis added)).

---

[7] "Brodie Decl. Ex. __" refers to an exhibit to the Declaration of Simon Brodie, dated December 7, 2009, and filed simultaneously with the Objection.

[8] In a transparent bid to bootstrap its repudiation claim, Norton uses ellipses to give the impression that Lehman was repudiating the entire Agreement. (*See* Obj. ¶ 33 (claiming that the e-mail states: "Lehman Brothers [was] unable to execute the gold predelivery . . . for settlement.")). In fact, the Lehman e-mail states that Lehman Brothers was unable to execute the gold predelivery "***today***, for settlement ***Tuesday.***" (*See* Brodie Decl. Ex. A (emphasis added)).

31.     In addition to its spin on the September 19, 2008 communications, Norton places undue reliance on a letter that its outside counsel sent on September 23, 2008 demanding adequate assurances that LBCC would satisfy its forthcoming settlement obligations.  (*See* Brodie Decl. Ex. C at 2; Obj. ¶¶ 34, 96-97, 121).  Norton's reliance on that letter is misplaced for at least two reasons.

32.     First, the Agreement does not provide for (and, under controlling English law, LBCC was under no obligation to provide) adequate assurances.  Therefore, any failure by LBCC to respond is of no legal consequence.[9]  Beyond that, the absence of a response is not repudiation.  According to Norton's own case, a repudiation must be a clear refusal to perform; absent an express refusal to perform, the repudiatory act must be one that would lead a reasonable person to conclude that the counterparty has "an intention to abandon and altogether to refuse performance of the contract."  *Woodar Investment Dev. Ltd. v Wimpey Constr. UK Ltd.* [1980] 1 W.L.R. 277, 283, 294 (cited in Obj. ¶ 99) (quotation marks, citation omitted) (rejecting seller's contention that buyer repudiated a contract to buy land); *accord Butterworths Common Law Series: The Law of Contract* at 7.20 (3rd ed., 2007).[10]  Here, Norton not only fails to point to a clear refusal to perform, but no reasonable person would have inferred as much from the text of the September 19, 2008 confirmatory e-mail or the one unanswered letter.  Indeed, if one unanswered letter were repudiatory, most contracts would be repudiated regularly.  Such a rule (were it to exist) would completely undermine the sanctity of contracts.

---

[9] Additionally, it is unreasonable to fault LBCC for failing to respond to the letter in the eight days between September 23 (the date of the letter) and October 5 (the date of LBCC's bankruptcy filing).  Moreover, under the Bankruptcy Code, LBCC had no obligation to respond or provide adequate assurances after the petition date.  *See In re Pac. Gas & Elec. Co.*, No. C 02-3464 SI, 2004 U.S. Dist. LEXIS 22023, at *13 (N.D. Cal. Sept. 30, 2004) (reversing the bankruptcy court, which had permitted non-debtors to withhold performance post-petition until debtor provided adequate assurances in respect of pre-petition defaults).

[10] For the Court's ease of reference, the English authorities cited in this reply are attached as Exhibit F to the Goldfarb Declaration.

33.     In a last ditch attempt to demonstrate repudiation, Norton points to LBCC's supposed failure, after September 30, 2008, to execute weekly trades.  (*See* Obj. ¶ 97; *see also id.* ¶¶ 100, 121).  But Norton erroneously assumes that LBCC was obligated to enter into weekly trades for every settlement period under the Agreement.  That simply is not true (*see* Point IV, below), particularly post-petition.  (*See* ¶¶ 27-28, above).  Therefore, LBCC did not fail to satisfy its contractual obligations.

### 3.     *Even Assuming Repudiation, Norton Has Affirmed the Contract and Must Completely Perform Its Contractual Obligations*

34.     Norton's charge of repudiation is a red herring because, taking as true the facts set forth in the opposition papers, Norton never "accepted" LBCC's supposed repudiation.  Under English law, the non-repudiating party has only two options in the face of a repudiation.  It may either (i) "accept" the repudiation, terminate the contract, and seek its remedy, or (ii) "affirm" the contract and treat it as continuing.  There is no middle ground.  The non-repudiating party may not affirm the repudiation, then use it – as Norton seeks to do here – as an excuse to avoid its own performance while, at the same time, allowing the contract to continue.  *See Howard v Pickford Tool Co. Ld.* [1951] 1 K.B. 417, 420-21("[I]f the conduct of one party to a contract amounts to repudiation, and the other party does not accept it as such but goes on performing his part of the contract and affirms the contract, the alleged act of repudiation is wholly nugatory and ineffective in law."); *Chitty on Contracts* ¶ 24-010 (30th ed., 2008).[11]

35.     Norton has never accepted LBCC's supposed repudiation.  To the contrary, by its words and deeds, Norton has affirmed the Agreement.  Among other acts, it (i) sent the Joint Ore Reserve Committee Report to LBCC to avoid its own Event of Default (*see* Mot. ¶ 21);

---

[11] *Chitty on Contracts* is the leading treatise on English contract law.  *See McMahon v. Providence Capitol Enterprises, Inc. (In re McMahon)*, 236 B.R. 295, 305 (S.D.N.Y. 1999) (cited in Obj. ¶ 98 n.22).

(ii) advised shareholders that it continues to hold open forward positions under the terms of the Agreement and otherwise continues to meet its obligations in respect of the Agreement (*see id.*); and (iii) stated publicly that "termination is not in Norton's best interests [because] an early termination would require Norton to pay the accrued amount owing and additional amounts based on the mark to market value of the [Agreement], which could result in a significant termination payment to LBCC by Norton."  (*See id.* ¶ 16 & Mot. Ex. A at 2).  These actions – described in the Motion, but never addressed or denied by Norton in the Objection – are inconsistent with Norton's repudiation claim.

36.    More to the point, Norton's affirmation of the Agreement is dispositive of the Motion itself.  Under English law, when a non-repudiating party affirms the contract, the contract remains in full force and effect as to both parties, and the non-repudiating party must perform all its contractual obligations.  It may not, as Norton has done here, pick and choose which obligations to perform and which to ignore.  That would create a new contract.  *See Suisse Atlantique Société d'Armement Maritime S.A. v NV Rotterdamsche Kolen Centrale* [1967] 1 AC 361, 398 (Lord Reid) ("Where the contract has been affirmed by the innocent party, at first sight the position is simple. You must either affirm the whole contract or rescind the whole contract: you cannot approbate and reprobate by affirming part of it and disaffirming the rest – that would be making a new contract."); *accord Chitty on Contracts* ¶ 24-010.  Accordingly, Norton must pay LBCC the matured amounts under the Agreement and continue to make such payments as they come due.[12]

---

[12] Even if the Court were to look past Norton's affirmation of the contract to consider whether Norton accepted the repudiation, Norton did no such thing.  Under English law, acceptance must be clear and unequivocal. *See Chitty on Contracts* ¶ 24-003.  Norton first mentioned repudiation expressly ***seven*** months after LBCC's supposedly repudiatory actions.  Even then, Norton merely referred to the September 19 communications from Lehman Brothers and quoted the repudiation provision of the Master Agreement.  It certainly never signaled acceptance.  (*See* Mot. Ex. K [Letter from Simon Brodie to LBCC, dated April 30, 2009], at 2).

### C. Norton's "Other Events of Default" Argument is Based on Speculation

37.     Norton claims that "[it] is ***possible*** . . . that certain other Events of Default . . .

may have occurred (Obj. ¶ 109 (emphasis added); *see also id.* ¶ 40), and that those Events of

Default – if discovered – might provide Norton a basis to withhold payments from LBCC.  (*See*

Obj. ¶¶ 41-42, 109).  In *Metavante*, the Court addressed – and rejected – such rank speculation.

(*See Metavante* at 112:8-12 (rejecting argument that Lehman also may have defaulted under the

other specified indebtedness provision of the contract:  "[Metavante's] assertion that such default

may have occurred indicates that Metavante is not aware of any such default, and, therefore, did

not rely on that default in its refusal to perform under the Agreement or lacks knowledge of what

that default may be.").  Norton's speculation should fare no better than Metavante's.

38.     As an example of its speculative thinking, Norton claims that "it appears" the sale

of LBHI's and Lehman Brothers Inc.'s assets to Barclays Capital Inc. triggered an event of

default under Section 5(a)(viii) of the Master Agreement.  (Obj. ¶ 39).  That section provides for

an event of default only when a party or its credit support provider sells "*all or substantially all

its assets*" to another entity.  (See Master Agr. § 5(a)(viii) (emphasis added)).  In fact, the sale

here involved a mere seven percent of the assets.  (*Compare* Ex. A to LBHI's Voluntary Petition

(Docket No. 1), attached as Goldfarb Decl. Ex. C (stating that LBHI had total assets of $639

billion as of May 31, 2008), *with* Goldfarb Decl. Ex. D [Comments of Lori Fife, counsel for

LBHI, *In re Lehman Brothers Holding Inc.*, Case No. 08-13555, at 47 (Bankr. S.D.N.Y. Sept. 19,

2008) (Transcript)], at 47 (the sale was of $47.4 billion of assets)).

### D. Norton Cannot Claim Now that It Has Not
### Waived Any Supposed Events of Default

39.     Even assuming any of the Events of Default noted above were supportable,

legally or factually, Norton has waived its right to rely on these events to halt its performance.

Norton's reliance on Section 9(f) of the Master Agreement to claim otherwise (*see* Obj. ¶¶ 108-

109) is misplaced.  That section merely creates a rebuttable presumption of reliance (*see* Master

Agr. § 9(f) (stating in relevant part:  "a failure or delay . . . will not be presumed to operate as a

waiver")).  Given the length of time that has elapsed since the petition date, the presumption

clearly is rebutted in this case.

## III.   NORTON'S PROMISSORY ESTOPPEL ARGUMENT FAILS

40.     Norton cannot rely on the English doctrine of promissory estoppel to argue that

LBCC "waived Norton Gold's payment obligations."  (Obj. ¶ 115).  As an initial matter, even

assuming that LBCC promised in September 2008 not to enforce its right to payment, English

law permits LBCC to withdraw that promise and insist on its rights in certain circumstances,

including a subsequent bankruptcy.  *See Bateman v Williams* [2009] BPIR 748 ¶ 42 (holding that

estoppel cannot prevent a bankruptcy trustee from carrying out its statutory duties to marshal a

bankrupt's assets); *accord Smith v Lock (A Bankrupt)* [1998] BPIR 786.

41.     In any event, the doctrine of promissory estoppel would bar LBCC from insisting

on payment today only if (i) LBCC clearly or unequivocally represented in September 2008 that

it would not enforce its strict rights under the Agreement, and (ii) Norton relied on that

representation to its detriment.  *See McMahon v. Providence Capitol Enters., Inc. (In re

McMahon)*, 236 B.R. 295, 314-15 (S.D.N.Y. 1999) (cited in Obj. ¶ 98 n.22); *BP Exploration Co

(Libya) Ltd v Hunt (No. 2)* [1979] 1 W.L.R. 783, 810 (cited in Obj. ¶ 117).  Neither happened

here.

42.     LBCC never represented – in any fashion, let alone clearly or unequivocally – that

it would not enforce Norton's payment obligations.  (*See* Point II.B.2, above).  The very e-mail

on which Norton relies to prove its point compels this conclusion.  In that e-mail, Norton writes,

"[w]e are not to send Lehman Brothers any money ***until further notice***" and that Lehman

advises that "the administrator **may come back and ask for all the cash** from the gold hedge contracts that have closed." (Brodie Decl. Ex. B (emphasis added); *see also* Obj. ¶ 119). Thus, far from abandoning its rights to payment, LBCC preserved them.[13]

43.     Norton also struggles to show detrimental reliance. While it claims that LBCC's representations caused it to forego "opportunities for mergers and acquisitions" and "funding and growth opportunities" (Obj. ¶ 122), Norton never claims – let alone substantiates a claim – that passing on these vague and unspecified opportunities actually harmed it. Tellingly, Mr. Brodie's Declaration does not even address this issue.

44.     Norton also claims that it "has been forced to accrue and incur costs associated with the management of the trusts and Notes underlying the Financing Transaction". (Obj. ¶ 122). Putting aside the vagueness of this claim, Norton fails to show that it was induced to incur these costs by LBCC's supposed promise not to seek payment. In any event, Norton cannot deny that, as a result of LBCC's supposed promise, it suspended payments, preserved cash, and avoided what it concedes could be a "significant termination payment" (Mot. Ex. A [Norton press release, Apr. 29, 2009] at 2) – all steps that benefited, not harmed, Norton.

45.     Norton's own case – *BP Exploration* – seals the fate of its promissory estoppel argument. There, the court refused to apply the doctrine to prevent B.P. from pursuing a frustration of contract claim against E. Howard Hunt, B.P.'s partner in a failed Libyan oil venture. *See* 1 W.L.R. at 788-795, 814. Hunt based his promissory estoppel argument on,

---

[13] Because Norton's own e-mail is dispositive of the issue, the Court need not consider whether LBCC's supposed lack of a response to Norton's September 23 letter also proves estoppel, as Norton insists. (*See* Obj. ¶ 121; Brodie Decl. Ex. C). But even if the Court were to consider it, the absence of a response is not an unequivocal representation that would support estoppel under English law. *See Allied Marine Transport Ltd. v Vale do Rio Doce Navegaçao S.A. (The Leonidas D.)* [1985] 1 WLR 925, 937 (refusing to apply the promissory estoppel doctrine: "[I]t is difficult to imagine how silence and inaction can be anything but equivocal."). To the same effect is Norton's own case, *McMahon*. *See* 236 B.R. at 315 ("Although it must be clear or unequivocal, the promise or representation need not be express, but may be implied or made by conduct. 'Mere inactivity,' however, will not suffice.") (quoting *Chitty on Contracts* ¶¶ 3-068 to 3-069 (27th ed., 1994)).

among other acts, B.P.'s exercise of a *force majeure* clause after the Libyan government

expropriated B.P.'s assets. *See id.* at 812. But the court found B.P.'s actions to be "an

understandable immediate reaction to the [expropriation]" that "cannot possibly be construed as

any representation by B.P. that they would not enforce their strict legal rights against Mr. Hunt."

*Id.* The court also rejected Hunt's reliance claim. The court found that Hunt's actions,

supposedly taken in reliance, were no more than acts of "enlightened self-interest" "in the very

difficult situation which had arisen." *Id.* at 813, 814.

46.      *BP Exploration* is directly on point. Lehman's supposed representations in the

wake of its crisis were "an understandable immediate reaction to the situation" and were no more

a waiver of its right to payment than was B.P.'s exercise of the *force majeure* clause a waiver of

its right to claim frustration of contract. Additionally, Norton's refusal to pay and terminate –

steps undeniably taken in reliance on LBCC's supposed representations – were acts of

"enlightened self-interest", not detrimental acts, as Norton explained to its own shareholders.

(*See* Mot ¶ 16 & Mot. Ex. A at 2 ("[T]ermination is not in Norton's best interests [because] an

early termination would require Norton to pay the accrued amount owing and additional amounts

based on the mark to market value of the [Agreement], which could result in a significant

termination payment to LBCC by Norton."). Accordingly, LBCC is not estopped from seeking

and receiving payments under the Agreement.[14]

---

[14] Norton also argues that LBCC waived its right to demand payment under New York common law. (*See* Obj. ¶¶ 123-124). Putting aside the inapplicability of New York law to the issue of waiver under a contact controlled by English law (*see* Obj. ¶ 98 n.22), the argument fails. Waiver requires the voluntary and intentional abandonment of a known right. (*See* Obj. ¶ 123 (citing cases)). It must be based on "a clear manifestation of intent to relinquish a contractual protection" and "should not be lightly presumed." *Gilbert Frank Corp. v. Fed. Ins. Co.*, 520 N.E.2d 512, 514 (N.Y. 1988). But LBCC did not abandon the right to payment, let alone clearly manifest an intent to do so. (*See* ¶¶ 29-33, above). In any event, like promissory estoppel, a waiver may be withdrawn, as Norton acknowledges. (*See* Obj. ¶ 124).

IV.     **NORTON MAY NOT CONDITION ITS PAYMENT OBLIGATION
ON WEEKLY TRADES TO WHICH LBCC NEVER AGREED**

47.     In a final attempt to put off paying LBCC, Norton insists that LBCC must execute

new intra-quarter weekly trades pursuant to an arrangement the parties supposedly agreed to.

(*See* Obj. ¶¶ 125-129, 19-29).  In fact, the parties never agreed to execute weekly trades for the

life of the Agreement, and no document (including the Confirmations for the weekly trades) says

otherwise.  While LBCC is not obliged to engage in weekly trades during any of the post-petition

quarterly settlement periods, Norton is obliged to settle on each quarterly settlement date on the

terms set forth in the February 22, 2008 Confirmation.  (*See* Mot. ¶ 11 & Ex. F).  Norton does

not deny that it can pay under the terms set forth in that Confirmation.  Thus, the weekly trade

argument is simply a ruse adopted by Norton to excuse or delay payment.

A.     **The Parties Did Not Agree to Weekly Trades for Any Quarterly
Settlement Period other than the Period Ending September 30, 2008**

48.     Norton's argument that the parties agreed to the weekly trades for *every* quarterly

settlement period cannot be squared with the plain language of the Agreement.  First, the

February 22, 2008 Confirmation – the document that Norton acknowledges as setting forth the

terms of the parties' trades (*see* Obj. ¶¶ 22-23) – plainly provides for settlement on a quarterly,

not weekly, basis.  (*See* Mot. Ex. F at 1-2 (Settlement Dates is defined as the last Business Day

in each Pricing Month; Pricing Month is defined as March, June, September, and December from

March 2008 through June 2012)).

49.     Similarly, no pair of weekly Confirmations supports the argument that the parties

agreed to weekly trades for every quarterly settlement period.  Each pair memorializes a weekly

trade between May 28, 2008 and September 12, 2008 for a particular week only.  None

establishes weekly trades for every week within a given quarterly settlement period or for every

week within another quarterly settlement period.  In fact, no Confirmation even commits Norton

or LBCC to enter into a Confirmation the following week.[15]

50.    To avoid the conclusion compelled by the contract's plain language, Norton

claims that the parties orally agreed to weekly trades for the life of the Agreement in late May

2008.  (*See* Obj. ¶ 23).  But this claim suffers from at least two defects.  First, no writing proves

it.  (*See* ¶¶ 48-49, above).  Second, it contravenes the parties' agreement that, if they wanted to

vary the Agreement's terms – for example, to provide for weekly trades in respect of every

quarterly settlement period – they would do so only in writing.  (*See* Master Agr. § 9(b)

(providing that amendments and modification to the agreement "will only be effective if in

writing . . . and executed by each of the parties or confirmed by an exchange of telexes or by an

exchange of electronic messages on an electronic messaging system.")).

51.    To avoid the requirement of a writing, Norton relies on the English law of

variation and argues that the parties agreed to execute weekly trades for the life of the Agreement.

(*See* Obj. ¶¶ 130, 134).  But that argument is hopeless because Norton supplies no evidence,

written or otherwise, that the parties entered into such an agreement.  Further, Norton does not

argue – nor could it argue – that either party conducted itself as though it had agreed to engage in

weekly trades for the life of the Agreement.  Indeed, nothing about the parties' interaction

reflects a reasonable expectation on Norton's part that weekly trades would be the norm.  In

short, the variation, if any, was limited in scope.

---

[15] For the Court's ease of reference, a pair of weekly Confirmations are attached as Exhibit E to the Goldfarb Declaration.  The plain language of the Confirmations reinforces the conclusion that they are *sui generis*. For example, the introductory paragraph of the Confirmations for the Commodity Spot Trades states:  "The purpose of this communication . . . is to confirm the terms and conditions of the transaction . . . entered into . . . on the Trade Date specified below" (*see* Ex. E at 1), and the Trade Date always refers to a single date.  Further, the introductory sentence of the Economic Terms section states:  "The terms *of this particular Transaction* to which this Confirmation relates are as follows . . . ."  (*See id.* at 1 (emphasis added)).

52.     Next Norton argues that, under Section 9(e)(ii) of the Master Agreement, the parties were legally bound to enter into future Transactions on a weekly basis from the time they orally committed to do so.  (*See* Obj. ¶¶  23-24, 129).  That is a true statement of Section 9(e)(ii)'s effect, but it does not advance Norton's argument.  Section 9(e)(ii) provides for certainty of contract formation by clarifying that parties are bound to a transaction from the moment they agree to it.  Here, Norton admits that the transactions were agreed to each week during a telephone conversation to set the material terms of the weekly trade.  (*See* Obj. ¶¶ 28, 128).  Therefore, pursuant to Section 9(e)(ii), the parties were committed to the weekly trade on the terms agreed to during the weekly telephone call.  Nothing about Section 9(e)(ii) alters the Confirmations' plain language, and nothing in that language institutes weekly trades for the life of the Agreement.[16]

## B.    Norton Does Not Deny that It Can Perform the Contract under the Terms Set Forth in the February 22, 2008 Confirmation

53.     Stripped of its weekly trade argument, Norton has no choice but to honor its contractual obligations.  Norton does not – and cannot – deny that the February 22, 2008 Confirmation, in combination with the Master Agreement and Schedule, provides the material terms of the Agreement.  Nor does Norton deny that the parties can fully perform the Agreement by following the terms set forth in the February 22, 2008 Confirmation.

54.     Instead, Norton argues that LBCC's invoices "do not comply with the ISDA Agreement" (Obj. ¶ 29), and that it needs discovery to substantiate LBCC's calculations.  (*See id.*

---

[16] Norton also claims that, under New York law, the parties modified their agreements by course of conduct.  (*See* Obj. ¶ 134).  Of course, New York law does not control this dispute.  But even if it did, Section 9(b) of the Master Agreement expresses the parties' intention that amendment or modification occur by writing only.  New York permits parties to orally modify their agreement in limited circumstances.  Norton does not – and cannot – show that these circumstances exist here.  Further, Norton's own case (*Barsotti's, Inc. v. Consolidated Edison Co. of N.Y., Inc.*, 680 N.Y.S.2d 88 (N.Y. App. Div. 1st Dep't 1998)) did not involve an ISDA Master Agreement.  It involved a construction contract, a species of contract that is subject to its own set of oral change-order rules.  In contrast, we are aware of no decision modifying an ISDA Master Agreement based on the parties' course of conduct.

¶ 63). These arguments are pure make weight. Norton points to no provision of the Master Agreement, Schedule, or February 22, 2008 Confirmation that sets forth particular requirements for how the "in the money" party must request payment. Nor does Norton deny that the parties could confirm LBCC's calculations consensually. Indeed, the parties have a number of tools that would prove useful in this regard, including, if necessary, the ADR procedures established in the case. (*See generally* Docket No. 5207). At bottom, Norton must and can pay.

V.    **THE MOTION TO COMPEL IS NEITHER
      PROCEDURALLY IMPROPER NOR FLAWED**

55.    Norton asserts that LBCC should have sought relief in an adversary proceeding, that its due process rights have been trampled, and that it needs discovery to demonstrate the merits of its position. (*See* Obj. ¶¶ 50, 55). These are nothing more than feints to delay paying the estate and honoring contractual obligations.

56.    First, the relief LBCC seeks here is routinely sought by motion. Even if Norton were technically correct to insist on an adversary proceeding, numerous courts have held that when the use of an improper procedural vehicle is harmless error, they will not elevate form over substance but will allow the matter to proceed on the merits as originally filed. *See*, *e.g.*, *City Equities Anaheim, Ltd. v. Lincoln Plaza Dev. Co. (In re City Equities Anaheim, Ltd.)*, 22 F.3d 954, 958-59 (9th Cir. 1994); *In re Braniff Int'l Airlines, Inc.*, 164 B.R. 820, 831 (Bankr. E.D.N.Y. 1994), *aff'd*, 101 F.3d 686 (E.D.N.Y. 1996); *In re Command Servs. Corp.*, 102 B.R. 905, 908 (Bankr. N.D.N.Y. 1989).

57.    The practical approach reflected in those cases was adopted in *In re Stacy*, a case cited by Norton. (*See* Obj. ¶ 54). There, the district court held that it was harmless error under Bankruptcy Rule 9005 for the bankruptcy court to have granted a motion for specific performance in a real estate transaction, even though an adversary proceeding under Rule 7001

"was necessary to properly invoke the bankruptcy court's jurisdiction." 99 B.R. 142, 146-47 (D.

Mass. 1989). In language that directly undermines Norton's due process argument, the district

court held that the buyers "were not deprived of substantial justice by the bankruptcy judge's

failure to require an adversary proceeding" because the buyers' due process rights had been

protected in the motion proceedings:

> The buyers clearly had notice of the hearing, and an opportunity to
> prepare memoranda in support of their position. The materials
> submitted by the buyers reflect a clear awareness of the facts of the
> matter and an understanding of the issues involved and the relief
> requested. At the hearing itself . . . the buyers' counsel, presented
> evidence in the form of both testimony and exhibits.

*Id.* at 147. The court added, that because the motion focused on the "legal significance of

virtually undisputed facts" (*id.* at 148), it must reject the buyers' "bald assertion that discovery

would develop even more germane information." *Id.*

58.     Norton stands in the same shoes as the buyers in *Stacy*. It has had ample notice of

the matter, ample opportunity to present its case (evidenced by, among other things, its 67-page

objection), and all the procedural protections of a contested matter. Although Norton makes

much of its need for discovery, Norton's case fails as a matter of law even assuming the truth of

its assertions of fact. Therefore, as in *Stacy*, Norton can hardly complain that its fundamental

rights have been trounced or carp about the need for discovery. *See also I.R.S. v. Valley Nat'l*

*Bank (In re Decker)*, 199 B.R. 684, 689 (9th Cir. B.A.P. 1996) (finding no error with denial of

discovery request where moving party was entitled to judgment as a matter of law).[17]

59.     For the same reasons, the Court should deny Norton's request for an evidentiary

hearing under Rule 9014(d). (*See* Obj. ¶¶ 65-66). The Code provides for an evidentiary hearing

---

[17] Even if discovery were warranted, an adversary proceeding is unnecessary. Rule 9014 affords Norton
the same discovery rights and the same rights to present evidence in a contested matter as it would have in an
adversary proceeding. *See* Fed. R. Bankr. P. 9014(c)-(d).

only to resolve "disputed material factual issues." Fed. R. Bankr. P. 9014(d). Because LBCC

should prevail, even taking as true each fact posited by Norton in its Objection, no evidentiary

hearing is warranted. *Id.*; *accord City Equities Anaheim* 22 F.3d at 958-59 (finding there were

no disputed material facts and, therefore, rejecting argument that the hearing on motion to

enforce a settlement agreement was procedurally deficient because of the lack of oral testimony

or cross-examination); *Elmwood Dev. Co. v. Gen'l Elec. Pension Trust (Matter of Elmwood Dev.

Co.)*, 964 F.2d 508, 512 (5th Cir. 1992) ("A court may decline to conduct an evidentiary hearing

where the alleged facts, even if true, would not change the outcome.").

60.     Finally, allowing Norton not to perform while it takes needless and time-

consuming discovery would set a precedent that would make it difficult, if not impossible, for

the Debtors to enforce their rights under any derivatives contract.

## VI.     NORTON HAS VIOLATED THE AUTOMATIC STAY

61.     In the Motion, LBCC demonstrated that Norton's on-going refusal to honor its

contractual payment and performance obligations violates the automatic stay. (*See* Mot. ¶¶ 32-

34). Norton responds by advancing several arguments that run contrary to the plain language of

the Bankruptcy Code and lack any support in law or policy. (*See* Obj. ¶ 137).

62.     First, Norton asserts that the amounts owed to LBCC under the swap agreement

are not property of the bankruptcy estate. (*See* Obj. ¶ 138). This is incorrect. LBCC's estate

consists of all legal or equitable interests of the debtor as of the commencement date, wherever

located and by whomever held. *See* 11 U.S.C. § 541(a)(1). "The House and Senate Reports on

the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad" (*U.S. v. Whiting Pools, Inc.*, 462

U.S. 198, 204-05 (1983)) and gathers into the estate "all kinds of property, including tangible or

intangible property." H.R. REP. 595, 95th Cong., 1st Sess. 367 (1977). Executory contracts and

leases are plainly included within the scope of property of the estate. *See, e.g.*, *Computer

*Commc'ns, Inc. v. Codex Corp. (In re Computer Commc'ns, Inc.)*, 824 F.2d 725, 730 (9th Cir.

1987).  Moreover, "[c]ourts have consistently held that contract rights are property of the estate,

and that therefore those rights are protected by the automatic stay."  *In re Enron Corp.*, 300 B.R.

201, 212 (Bankr. S.D.N.Y. 2003) (quoting *Elder-Beerman Stores Corp. v. Thomasville Furniture*

*Indus. Inc. (In re Elder-Beerman Stores Corp.)*, 195 B.R. 1019, 1023 (Bankr. S.D. Ohio 1996)

(collecting cases)); *Alert Holdings, Inc. v. Interstate Protective Servs., Inc. (In re Alert Holdings,*

*Inc.)*, 148 B.R. 194, 202 (Bankr. S.D.N.Y. 1992); *Cohen v. Drexel Burnham Lambert Group, Inc.*

*(In re Drexel Burnham Lambert Group, Inc.)*, 138 B.R. 687, 701-702 (Bankr. S.D.N.Y. 1992).

This Court also has held that payments due under a swap agreement are property of the estate

that cannot be withheld.  *See Metavante* at 112:19 to 113:3 ("Metavante's attempts to control

LBSF's right to receive payment under the Agreement, constitute in effect, an attempt to control

property of the estate . . . . This is a violation of the automatic stay imposed by Code Section

362."); *see also Lehman Bros. Special Fin. Inc. v. BNY Corp. Trustee Servs. Ltd. (In re Lehman*

*Bros. Holding Inc.)*, Adv. P. No. 09-01242 (JMP), __ B.R. __, 2010 WL 271161, at *11 (Bankr.

S.D.N.Y. Jan. 25, 2010) (holding that it was a stay violation for trustee of a structured financial

product to enforce contractual provisions that deprived the estate of money due under the

product).  Consequently, the Agreement and LBCC's right to payment under the Agreement are

property of LBCC's estate, subject to the automatic stay.[18]

63.    Next, Norton contends that it may withhold estate funds because it disputes that it

has to pay pursuant to the Agreement, and the Agreement provides it with a right to suspend

---

[18] *Golden Distributors*, on which Norton relies, is not to the contrary and is readily distinguishable.  (*See*
Obj. ¶ 138 (citing *Golden Distribs. Ltd. v. Reiss (In re Golden Distribs., Ltd.)*, 128 B.R. 342 (Bankr. S.D.N.Y.
1991))).  That case did not involve withholding performance or payment under a contract.  Rather it involved former
employees of the debtor who went to work for a competitor and solicited the debtors' customers.  The Court found
that the former employees' services were not estate property and that they were not using estate property to solicit
the customers' debtors.  Therefore, the former employees were not violating the automatic stay.  *See* 128 B.R. at 345.

payment.  (*See* Obj. ¶¶ 139-145).  This contention fails for several reasons.  First, Norton has no right to withhold payment under the Agreement because there are no enforceable events of default in this case.  (*See* Point II, above).  Second, even if enforceable defaults did exist, Norton has no right to unilaterally act on such defaults.  The automatic stay routinely prevents parties with otherwise valid rights from exercising them without Court permission including, for example, exercising rights of setoff, withholding payment, foreclosing on assets, terminating the contract, or otherwise interfering with the debtors' property.  *See Broadstripe, LLC v. Nat'l Cable Television Coop., Inc. (In re Broadstripe, LLC)*, 402 B.R. 646, 657 (Bankr. D. Del. 2009) ("As property of the estate, the debtor's interests in such contracts or leases are protected against termination *or other interference* that would have the effect of removing or hindering the debtor's rights in violation of section 362(a)(3).") (emphasis added) (quoting 3 COLLIER ON BANKRUPTCY ¶ 362.03[5][a] (15th ed. rev.)); *Phillips v. Diecast Mktg. Innovations, L.L.C. (In re Collecting Concepts, Inc.)*, Nos. 99-60268-T, 2000 WL 1191026, *3 (Bankr. E.D. Va. Feb. 28, 2000) (the automatic stay prevents a debtor's interest in contracts from "termination or other interference").  Norton's attempt to exercise control over estate property – by withholding payment – are no exception to the sweep of the automatic stay.

64.    The difficulty of Norton's position is its misguided belief that it "is entitled to exercise its rights and remedies," including its rights and remedies under the Agreement, regardless of the bankruptcy filings.  (Obj. ¶ 83).  While there are limited safe harbor protections for swap agreements (*see* 11 U.S.C. § 560), they are unavailable to Norton (*see* Mot. ¶¶ 35-36) – a point Norton does not contest.  Consequently, the automatic stay is in full force and operates to

prevent Norton from exercising control over the Debtors' property based on erroneous assertions that there are enforceable defaults.[19]

## **CONCLUSION**

65.    For the foregoing reasons, the Court should grant the Motion.

Dated:    New York, New York           Respectfully submitted,
February 5, 2010

 /s/    James K. Goldfarb
Jayant W. Tambe
Stephen Pearson
James K. Goldfarb
Benjamin Rosenblum
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

---

[19] Norton claims to have made "extensive efforts to work with Alvarez and the Debtors to terminate the hedges and ISDA Agreement, settle the amounts thereunder and seek alternatives to maximize options for partially restructuring the transaction."  (Obj. ¶ 49).  Without delving into the factual support for this statement, suffice it to say that Norton's proposals did not promise sufficient value for the estate, but were based on an unflagging belief in the merits of Norton's legal position.  In any event, and perhaps due in some part to the recent shake-up in Norton's management, the parties are scheduled to discuss a consensual resolution in advance of the hearing now scheduled for February 10.