# EXHIBIT F

*Allied Marine Transport Ltd. v Vale de Rio Doce Navegacao S.A.(The Leonidas D.)*
[1985] 1 WLR 925

[HOUSE OF LORDS]

*REGINA . . . . . . . . . . RESPONDENT

AND

CALHAEM . . . . . . . . . . PETITIONER

1985 June 20 — Lord Fraser of Tullybelton, Lord Roskill and Lord Brandon of Oakbrook

PETITION by the appellant for leave to appeal to the House of Lords from the decision of the Court of Appeal [1985] 2 W.L.R. 826.

The Appeal Committee dismissed the petition.

C. T. B.

---

[COURT OF APPEAL]

*ALLIED MARINE TRANSPORT LTD. v. VALE DO RIO DOCE NAVEGACAO S.A.

1985 Feb. 20, 21; April 3 — Griffiths, Robert Goff and Stephen Brown L.JJ.

*Arbitration—Injunction to restrain—Delay in prosecuting claim—Appointment of arbitrators followed by prolonged inactivity of parties—Whether reference or claim discharged by abandonment*
*Ships' Names—Leonidas D*

In April 1975, the charterers chartered a vessel from the owners on an expanded version of the New York Produce Exchange form, which provided, inter alia, for the reference of disputes to three arbitrators in London. Disputes arose between the parties in January and April 1976 and by the end of April 1976, each party had appointed an arbitrator. No third arbitrator was ever appointed. Thereafter, the parties took no further steps to pursue the arbitration until August 1981, when the charterers' solicitors wrote to the owners' solicitors stating that unless the owners admitted liability in the sum claimed, the charterers would proceed with the arbitration. Having received no such admission by 20 November 1981, the charterers' solicitors served points of claim in the arbitration. On 4 December 1981, within six years of the disputes having arisen, the charterers appointed another arbitrator in respect of the same disputes, intending to institute a fresh arbitration should it be held that the original arbitration had been abandoned. The

owners sought, inter alia, an injunction restraining the charterers from taking any further steps in the arbitration. The judge held, granting the injunction, that the charterers' silence amounted to a tacit representation that they did not intend to pursue the claim or associated reference and the owners' inactivity amounted to an acceptance of that tacit offer and that by taking no steps in response to the charterers' silence, the owners had suffered a detriment sufficient to found an estoppel.

On appeal by the charterers:—

*Held*, allowing the appeal, (1) that in the absence of special circumstances, an offer to abandon the reference to arbitration and the acceptance of such an offer could not be inferred from the silence and inactivity of the parties so that there was no binding agreement between them whereby the charterers were obliged to treat the claim as having been abandoned (post, pp. 937B–D, 940C–H).

Dictum of Lord Brightman in *Paal Wilson & Co. A/S v. Partenreederi Hannah Blumenthal* [1983] 1 A.C. 854, 924, H.L.(E.) applied.

*Pearl Mill Co. Ltd. v. Ivy Tannery Co. Ltd.* [1919] 1 K.B. 78 and *Andre et Cie S.A. v. Marine Transocean Ltd. (The Splendid Sun)* [1981] Q.B. 694, C.A. considered.

(2) That silence and inactivity were of their very nature equivocal and could not therefore of themselves constitute an unequivocal representation for the purposes of invoking the principle of equitable estoppel; that moreover, there was no evidence that in failing to take steps to prepare their case, the owners had acted in reliance on any representation made by the charterers; and that, accordingly, the charterers were not estopped from pursuing their claim and the associated reference to arbitration (post, pp. 937D–E, 941A–D).

Decision of Mustill J. [1984] 1 W.L.R. 1; [1983] 3 All E.R. 737 reversed.

The following cases are referred to in the judgment of Robert Goff L.J.:

*André et Cie S.A. v. Marine Transocean Ltd. (The Splendid Sun)* [1981] Q.B. 694; [1981] 3 W.L.R. 43; [1981] 2 All E.R. 993, C.A.

*Bremer Vulkan Schiffbau und Maschinenfabrik v. South India Shipping Corporation Ltd.* [1981] A.C. 909; [1981] 2 W.L.R. 141; [1981] 1 All E.R. 289, H.L.(E.)

*Collin v. Duke of Westminster* [1985] 2 W.L.R. 553; [1985] 1 All E.R. 463, C.A.

*Forslind v. Bechely-Crundall*, 1922 S.C. (H.L.) 173, H.L.(Sc.)

*Freeth v. Burr* (1874) L.R. 9 C.P. 208

*Jones v. Gibbons* (1853) 8 Ex. 920

*Paal Wilson & Co. A/S v. Partenreederi Hannah Blumenthal* [1983] 1 A.C. 854; [1982] 3 W.L.R. 1149; [1983] 1 All E.R. 34, H.L.(E.)

*Pearl Mill Co. Ltd. v. Ivy Tannery Co. Ltd.* [1919] 1 K.B. 78

*Woodhouse A.C. Israel Cocoa Ltd. S.A. v. Nigerian Produce Marketing Co. Ltd.* [1972] A.C. 741; [1972] 2 W.L.R. 1090; [1972] 2 All E.R. 271, H.L.(E.)

The following additional cases were cited in argument:

*Birkett v. James* [1978] A.C. 297; [1977] 3 W.L.R. 38; [1977] 2 All E.R. 801, C.A. and H.L.(E.)

*Bond v. Walford* (1886) 32 Ch.D. 238

*Davis v. Bomford* (1860) 6 H. & N. 245

*Fisher (G.W.) Ltd. v. Eastwoods Ltd.* [1936] 1 All E.R. 421

*Tracomin S.A. v. Anton C. Nielsen A/S* [1984] 2 Lloyd's Rep. 195

APPEAL from Mustill J.

The charterers of the vessel *Leonidas D*, Vale do Rio Doce Navegacao S.A., appealed from an order of Mustill J. dated 13 May 1983 and perfected on 12 July 1983 whereby he determined that the arbitration commenced in April 1976 was at an end and that the claims advanced by the charterers as claimants in the arbitration had been mutually abandoned and accordingly that an injunction be granted to the owners of the vessel, Allied Marine Transport Ltd., restraining the charterers whether by themselves, their servants or agents or otherwise, from attempting to pursue the arbitration and that the charterers pay the owners the costs of the consolidated hearing. The charterers sought an order that the decision of Mustill J. be reversed and that the charterers have the costs of the appeal and of the hearing below.

The grounds of the appeal were, inter alia, that (1) the judge erred in law in holding that a claim which had become the subject matter of a reference to arbitration could be abandoned by mutual agreement between the parties in circumstances where (a) the only evidence of the alleged mutual agreement of abandonment was the silence and/or inactivity of both parties; and (b) it was alleged that the abandonment by mutual agreement by reason of such silence and/or inactivity had occurred prior to the end of the relevant period of limitation for the bringing of claims. (2) The judge erred in law in deciding that there could be a contract between the parties whereby one party agreed to abandon a claim which had become the subject matter of a reference to arbitration in circumstances where (a) the only evidence of the alleged agreement to abandon the claim on the part of the claimant charterers consisted of one or more "tacit" representations that they did not intend to pursue the claim or associated reference; (b) the only evidence of the alleged concurrence of the respondent owners to the claim was an annual agreement to renew a letter of credit which acted as security for the charterers' claim; (c) that evidence concerned matters that occurred prior to the end of the relevant limitation period. (3) The judge erred in holding upon the facts of the case that there had been a mutual agreement between the parties that the charterers' claim, the subject matter of the reference to arbitration in 1976, was abandoned. (4) The judge erred in holding that upon the facts of the case, the charterers were estopped from denying that they had abandoned their claim. (5) The decision of the judge was against the weight of the evidence.

By a respondent's notice the owners asked that the decision of Mustill J. be affirmed upon the following additional grounds other than those relied upon by the judge (1) that the conduct of the charterers was such as to lead Mr. Lloyd Nelson, on behalf of the owners consciously to believe that the charterers intended to treat the reference to arbitration made in April 1976 as ended, and the owners accordingly to alter their position in reliance upon that belief; and (2) that by reason of the facts found by the judge, the arbitration agreement made in the charterparty made between the parties on 24 April 1976 was at an end, having been repudiated by the charterers and treated as such by the owners, alternatively by the operation of the doctrine of frustration.

The owners also gave notice that they would contend on the appeal that the decision and order of the judge should be varied, in the event of its being determined that the charterers' cause of action survived

notwithstanding their abandonment of the reference, so as also to restrain the charterers from commencing their claims in any further or other proceedings whatsoever, upon the ground that the claims had become time barred by virtue of the clauses paramount incorporated in the charterparty and were time-barred by virtue thereof prior to the commencement of a second arbitration in December 1981.

The facts are stated in the judgment of the court.

*Kenneth Rokison Q.C.* and *Richard Aikens* for the charterers.
*Gordon Pollock Q.C.* and *Michael Collins* for the owners.

*Cur. adv. vult.*

3 April. The following judgment of the court was handed down.

ROBERT GOFF L.J. On this appeal we have to consider yet another case concerned with a long delay in proceeding with a reference to arbitration. It is well known that parties to arbitrations do in some cases, for very sensible, practical, reasons, allow them simply to go to sleep. Usually, they are never heard of again, but occasionally one party does, after the lapse of many years, seek to bring the reference back to life. So the question has arisen whether, in such circumstances, the other party can say that it is too late for the reference to be revived.

There is at present, under the laws of this country, no power in the court to dismiss a claim in an arbitration, as it can dismiss an action, for want of prosecution; nor do arbitrators in this country (unlike, as this case reveals, their counterparts in New York) have any equivalent power. So, having regard to the contractual basis of arbitration, successive attempts have been made to invoke contractual remedies.

As a matter of general principle, if parties to a contract simply allow it to go to sleep, an attempt by one party to bring it to life years later will be defeated, where there are reciprocal obligations outstanding under the contract, on the ground that he has himself committed a repudiatory breach and the other can for that reason excuse himself from further performance. In other cases, if a party seeks to enforce a right of action which has accrued long ago, his claim may be time barred; or, if he fails for a long time to exercise a contractual right in the nature of a power, his right may be held to have lapsed through effluxion of time.

The suggestion that a party to an arbitration might be taken, by his long delay, to have repudiated the reference to arbitration, though favoured by the lower courts, was rejected by a majority of the House of Lords in *Bremer Vulkan Schiffbau und Maschinenfabrik v. South India Shipping Corporation Ltd.* [1981] A.C. 909. Perhaps sadly, the argument in that case does not appear to have been presented to the House on the basis that each party's right to invite the arbitration tribunal to proceed to an award, and to make directions for that purpose, should be regarded as a contractual right in the nature of a power, which will lapse if not exercised within a reasonable time, though such an approach is not easy to reconcile with a passage in the speech of Lord Diplock, at p. 986. If solutions such as actual repudiatory breach, or lapse through effluxion of time, are not available, the result would

appear at first sight to be that either party to a reference which has gone to sleep is free to revive it even after many years of slumber.

However, efforts have been made to harness other contractual concepts to a task for which they are, perhaps, not well suited. It was first suggested that the solution to the problem might lie in holding that the arbitration agreement had been frustrated, but that solution was rejected by the House of Lords in *Paal Wilson & Co. A/S v. Partenreederi Hannah Blumenthal* [1983] 1 A.C. 854. Two other possibilities have since been proposed and each has now, in *The Hannah Blumenthal*, received some measure of approval in the House of Lords. The first is that it may be inferred from long delay that the parties have mutually agreed to abandon the reference to arbitration, thereby bringing the reference to an end; and the second is that, by the operation of the principle of equitable estoppel, one party or both may be precluded from enforcing his or their rights under the reference. In *Andre et Cie S.A. v. Marine Transocean Ltd.* (*The Splendid Sun*) [1981] Q.B. 694, this court had held that a reference to arbitration had been determined by mutual abandonment, reliance being placed in particular on a decision of a Divisional Court of the Queen's Bench Division in *Pearl Mill Co. Ltd. v. Ivy Tannery Co. Ltd.* [1919] 1 K.B. 78, a case concerned not with a reference to arbitration but with a contract for the sale of goods. The decision of the Court of Appeal in *The Splendid Sun* [1981] Q.B. 694, on the basis of mutual abandonment, received the approval of Lord Diplock and Lord Roskill in the House of Lords in *The Hannah Blumenthal* [1983] 1 A.C. 854; but in that case the House of Lords held that, on the particular facts of the case before it, neither mutual abandonment nor equitable estoppel could avail the party there seeking to establish that the reference to arbitration had been terminated by reason of long delay.

In the present case, which comes before us on appeal from a decision by Mustill J., the hearing took place against the backdrop of *The Hannah Blumenthal* [1983] 1 A.C. 854 proceeding through its successive stages before this court and the House of Lords. However, before the end of the hearing the speeches of the House of Lords in that case had been delivered and so were available as the basis upon which the final stage of the case was conducted, and upon which Mustill J. founded his judgment. He decided, having heard oral evidence and having considered the relevant documents, that the reference to arbitration had been mutually abandoned, and he therefore granted a declaration to that effect. He also expressed the opinion that, had it been necessary for them to do so, the plaintiffs could have successfully invoked the principle of equitable estoppel. It is against that decision that the unsuccessful defendants, who are seeking to proceed with the arbitration, now appeal to this court.

We must first set out, as briefly as we can, the relevant facts. The story begins nearly 10 years ago, in April 1975, when the respondents, Allied Marine Transport Ltd., who were the owners of the vessel *Leonidas D*, chartered her out to the appellants, Vale do Rio Doce Navegacao S.A., under a time charter in the New York Produce Exchange Form for a period of 18 to 24 months. The charterparty incorporated the United States, Canadian and Chamber of Shipping clauses paramount, and it also contained a London arbitration clause. It will, we think, be convenient if we refer to the appellants as the charterers, and to the respondents as the owners.

Disputes arose between the parties about the fitness of the vessel's holds to receive grain cargo. These arose on two occasions, the first in December 1975 when the vessel tendered for loading at the port of Beaumont, and the second in March 1976 when she tendered for loading at the port of Jacinto. On each occasion the charterers claimed that in consequence they incurred expense in paying specialised shore labour to make the holds fit and that time was lost while the work was being done. They claimed $26,303.15 for loss of time and $25,500 for cleaning costs at Beaumont, and $32,182.77 for loss of time and $23,500 for cleaning costs at Jacinto; so, in round figures, the total claim was approaching $110,000. Following the incident at Beaumont, the charterers deducted the sum claimed by them in respect of that incident from the hire. However, by the time when the next instalment of hire was due after the incident at Jacinto, an agreement had been reached between the parties which the judge summarised [1984] 1 W.L.R. 1, 10:

> "(i) the charterers would pay the amount of withheld hire, and would also pay the next instalment; (ii) the owners would not withdraw the vessel for non-payment of hire; (iii) the owners would give the charterers an irrevocable letter of credit in the amount of $51,878; (iv) the letter of credit would be considered null and void if the charterers failed to name an arbitrator before 30 April 1976."

By the end of April 1976 each party had appointed his arbitrator, the owners appointing Mr. Cedric Barclay on 26 April, and the charterers appointing Mr. Donald Davies on 30 April; but no third arbitrator (or umpire) has ever been appointed. On 19 May 1976, the owners caused a letter of credit to be opened by the Bank of Nova Scotia in New York in favour of the charterers in accordance with the agreement. Again, we take advantage of the judge's summary, at p. 10, to state the effect of that letter of credit:

> "(1) the charterers were authorised to draw up to $51,878 against (a) a certified copy of a final award of the arbitrators, or (b) a sworn statement by the parties or their agents that the parties had settled the dispute. (2) The letter of credit would be automatically renewed from year to year, unless the owners gave written notice that they elected not to renew it. (3) If such a notice was given, the charterers could draw upon the bank for the full amount of the credit, in which case the charterers were to state that the moneys drawn would be held by them in a special bank account until such time as there was either a judgment confirming an award, or the dispute had been settled. The statement was also to be accompanied by the charterers' undertaking to return to the owners any sums in excess of the award. (4) If the owners were to satisfy any award, or if the dispute was settled, the letter of credit would be cancelled."

The judge explained the practical effect of the issue of the letter of credit:

> "This ingenious document provided an acceptable commercial solution to the problem of keeping the vessel in service, on the reasonable hypothesis that the charterers would pursue their claim for $110,000, and that in due course there would be either an award or a settlement. The vessel did in fact continue to perform services under the charter until it expired in May 1977. Unfortunately, the

document took no account of the possibility that the charterers would do nothing at all, and this placed the owners in an unenviable position. The only way in which they could obtain the release of the letter of credit, in accordance with its terms, would be to obtain a favourable award. The arbitrators had no jurisdiction to make an award dismissing the claim for want of prosecution. The owners would therefore have to provoke the charterers to revive their claim, and fight it, solely for the purpose of having the claim dismissed. Similarly, if the owners instructed the bank not to renew the credit, the charterers would be entitled to call for payment; and the owners would then need to revive the arbitration in order to obtain the return of their money. Neither of these alternatives was attractive. The only other possibility was to go on renewing the credit from year to year until sufficient time had elapsed to justify the intervention of the court, always assuming that the court had jurisdiction to intervene. This is what the owners have in fact done, at the cost of a renewal fee amounting to $259.39 per annum."

We resume the narrative of events. Once the letter of credit had been opened, and the parties had appointed their arbitrators, the position was that, although the owners were formally the claimants, it was the charterers who were out of pocket and so in practical terms it was they who would be expected to take the initiative. On 29 June 1976 the owners' solicitors, Messrs. Ince & Co., wrote to the owners' operating agents, Orion and Global Chartering Co. Inc. in New York, suggesting the various steps which might be taken to collect evidence for the arbitration; but Mr. Nelson, the president of Orion, replied on 15 July that he could see no reason why the owners should take the initiative as claimants in the arbitration, bearing in mind that the letter of credit was a relatively inexpensive document, and Messrs. Ince & Co. replied on 19 July that they would take no action until they heard further from the charterers' solicitors. It was not until 3 August 1981, over five years later, that they in fact heard form the charterers' solicitors, Messrs. Richards Butler & Co., who then in effect gave notice of intention to proceed with the arbitration.

In the meanwhile, though no steps whatsoever had been taken in the arbitration, certain events had occurred. First of all, since the letter of credit ran until "18 May 1977 or any extended date," the question arose for the owners whether they should renew it. In fact (having presumably renewed it in May 1977) they renewed it for a period of one year in April 1978, April 1979, April 1980, and May 1981. On each occasion the Bank of Nova Scotia gave notice of the renewal to the charterers at the address of their New York agents. Evidence was given by Mr. Nelson in the form of an affidavit and, later, oral evidence as to the reasons why the letter of credit was renewed. In summary they were, as the judge held, that the owners were locked into the letter of credit, and paying a modest sum each year was simply a means of allowing the arbitration to stagnate.

Secondly, there was evidence from Mr. Nelson that on two occasions during 1978 the Bank of Nova Scotia telephoned Mr. Nelson and told him that a "Captain George" was at the bank requesting payment of the proceeds of the credit, and asking whether they should pay. Mr. Nelson told the bank that they should not pay and that they should tell Captain

George to direct any inquiries regarding the claim to him, Mr. Nelson. Captain George telephoned Mr. Nelson shortly afterwards and asked him about the arbitration, and in particular asked Mr. Nelson if he could give him the names of the charterers' solicitors in London. Mr. Nelson told him he could not, and the conversation was "abruptly terminated." As the judge put it, Captain George was briskly sent about his business. Nothing more was heard of him. Indeed, his visits to the bank and telephone call to Mr. Nelson were the only evidence of any activity whatsoever on behalf of the charterers between the appointment of their arbitrator in April 1976 and Messrs. Richards Butler's letter in August 1981.

Thirdly, the vessel continued loading under the charter between the owners and the charterers until 13 May 1977, the charter having been extended beyond its original period. During that time further grain cargoes were carried without complaint from the charterers. It appears that there were also other charters as between the owners and the charterers, though no details were provided. At no time did the charterers mention their claim, neither at the original expiry date of the charter and its extension, nor, more significantly, at the time of the drawing up of the final account on the expiry of the extension of the charter, nor at any time when they did other business with the owners.

Lastly, there was evidence of correspondence between Mr. Nelson and the owners' solicitors, Messrs. Ince & Co., regarding the arbitration. We have already recorded that in July 1976 they decided that they should take no action until they heard further from the charterers' solicitors. On 7 February 1978 they wrote to Mr. Nelson suggesting that, as they had heard nothing from the charterers' solicitors since April 1976, it seemed unlikely that the proceedings would be revived and so they suggested that they close their file and submit a note of their charges. Mr. Nelson replied, on 16 February, saying that he doubted seriously whether the matter would die a natural death and that, since the letter of credit expired on 18 May 1978, that would no doubt produce some action by the charterers. He proposed that, rather than close the file, they should submit a note of their charges. Messrs. Ince & Co., in reply, agreed to wait until May. In April Mr. Nelson again communicated with Messrs. Ince & Co. drawing attention to the fact that the owners were, in effect, locked into the credit and inquiring how long they had to go on renewing the credit. There is no record of any reply to that letter.

At all events, in April 1979 Messrs. Ince & Co. wrote again to Mr. Nelson, expressing the opinion that it was unlikely that the matter would proceed, and suggesting that they should send a note of their charges, while keeping the file open. Mr. Nelson replied, agreeing that they should send a note of their charges. This they did in July 1979 and they were then paid by the owners. Mr. Lux of Messrs. Ince & Co. stated, in an affidavit dated 31 March 1983:

> "In the case of *Leonidas D*, when the bill was paid by our clients, I believed that charterers' claim would not be pursued. Moreover, I anticipated that the ancillary matter of the letter of credit could be dealt with by the parties' agents and their attorneys in the United States, without our involvement. I should stress that it had been first negotiated and produced in the United States, without any intervention on our part. Accordingly, I consigned the file to the

vaults within one week of confirmation that our bill had been settled."

Thereafter, the letter of credit having been renewed in April 1980 and May 1981, with notice to the charterers, nothing at all happened until Messrs. Richards Butler's letter of August 1981.

It was against the background of those facts that the judge had to consider whether there had been a mutual abandonment of the reference to arbitration, or alternatively whether the owners could invoke the principle of equitable estoppel. In considering the first of those questions, he first of all drew attention to the fact that a distinction must be drawn between abandonment of the reference, with the claimant's cause of action, if any, remaining intact, and abandonment of both the reference and the cause of action. However, he rejected the possibility that the parties could in this case have agreed to abandon the reference alone, while leaving the claim intact, or that there was any representation to that effect. With this conclusion we agree. We recognise, of course, that there may be circumstances in which, for some special reason, parties may agree to abandon a reference while leaving the claim intact—for example, if they decide to bring an arbitration to an end so that the matter can be resumed before different arbitrators, or before the court. But if parties simply agree to bring a reference to arbitration to an end—to drop hands, so to speak—the ordinary inference must be that they intend that the relevant claim, or claims, should also go. There is nothing in the present case to suggest that there should be any departure from that ordinary inference.

Before this court, Mr. Rokison for the charterers sought to revive the point. His submission was that although, if the reference was abandoned, the requirements of the doctrine of consideration would be fulfilled by the mutual promises not to proceed with the arbitration, nevertheless there would be no consideration in the present case for the charterers' abandonment of their claim. We do not agree. The owners' abandonment of the reference, with all that this implies, including an abandonment of any right to obtain a declaratory award or to ask for an order for costs, would constitute good consideration for the abandonment of the charterers' claim as well as their abandonment of the reference.

The judge next considered whether there had been a mutual abandonment of the reference together with the claimant's claim, and whether the owners could invoke the principle of equitable estoppel. He set out a number of principles which he derived from the authorities. These included, at p. 7:

> "5. A consent to discharge the reference may be inferred from prolonged activity on both sides. 6. Discharge by consent inferred from inactivity may take place in two situations: (i) where each party conducts himself so as to evince to the other party an intention to treat the reference as ended; (ii) where the conduct of B is such as to lead A reasonably to believe that B intends to treat the reference as ended, and A alters his position in reliance on that belief. This second way of procuring a consensual discharge of the reference represents the important addition to the law brought about by the speeches in the House of Lords in *The Hannah Blumenthal* [1983] 1 A.C. 854, to which I have already referred. 7. In neither of these two situations is it material to examine the actual

08-13555-mg Doc 7013-2 Filed 02/05/10 Entered 02/05/10 18:36:11 Exhibit F (Part 1) Pg 12 of 66

subjective belief and intention of B. 8. In situation (i), since the test is objective, it is necessary to look only at the conduct of each party actually brought to the notice of the other. But in situation (ii) the court must investigate the state of A's mind at the relevant time. The oral evidence of A will be admissible on this question. So also will be evidence of his actions at the time, even if these were not brought to the attention of B."

He considered first the question of mutual abandonment and concluded that, having regard not merely to the inactivity of the charterers but also to the events which had occurred set against their background, there was a tacit representation by the charterers that they did not intend to pursue their claim, or the associated reference.

Turning to consider the conduct of the owners, as evinced to the charterers, he referred first to the fact that the owners renewed the letter of credit from year to year, and that the charterers were given notice of each renewal. He said [1984] 1 W.L.R. 1, 12:

"Essentially, the owners were locked into the credit, until either they or the charterers did something about the arbitration. Paying a modest sum was simply a means of allowing the arbitration to stagnate. And indeed, paradoxically, to refuse a renewal might have been less, rather than more, consistent with a belief that the arbitration had died, for it would be a recognition that the owners would have to press forward with the reference to obtain the release of the special account. It seems to me therefore that the dealings with the letter of credit were at the most neutral. Apart from this the owners' conduct, evinced to the charterers, consisted of a complete blank. It appears from the authorities which I have cited that this is sufficient to amount to an acceptance of a tacit offer to abandon the reference. This being so, I can see no reason why it should not also be sufficient to complete an accord and satisfaction of the claim."

Having so decided the question of mutual abandonment in the owners' favour, he dealt with the question of equitable estoppel briefly. He pointed out first the differences, as he saw them, between the two questions. He said, at p. 12:

"The starting point is the same—namely, a tacit representation by the charterers that they did not intend to pursue the claim—but the analysis of the owners' conduct takes an entirely different shape. Where an accord and satisfaction is in issue, what matters is how the owners acted towards the charterers, the investigation being of an entirely objective nature. The estoppel, by contrast, calls for an inquiry into the owners' subjective belief and intention, and into the steps which they took in reliance on that belief, irrespective of whether those steps were manifested to the charterers. Such an inquiry could not adequately be performed without discovery of documents and oral evidence on the owners' side, and these were duly made available for the last of the three hearings."

He then summarised the effect of the correspondence between Mr. Nelson and Messrs. Ince & Co. and he also considered the effect of Mr.

Nelson's oral evidence before him. His summary of Mr. Nelson's evidence, and his conclusion, are set out in the judgment, at p. 13:

> "The documentary evidence was expanded by oral testimony from Mr. Nelson. That I find this rather hard to follow is no reflection on Mr. Nelson, because the concept of tacit abandonment, which is difficult enough to grapple with even in a straightforward situation, was here entangled with the conundrum created by the letter of credit. It seems clear enough that Mr. Nelson did consciously address his mind to the problem of getting the letter of credit released, and I believe the gist of his evidence to be that he believed that the arbitration would technically remain alive until the six-year period expired in 1982, but that there ought to be some means of obtaining a default award. However, since the renewal fee was so small, he seems to have been content to let the matter run on, troublesome though it was. Whether Mr. Nelson ever consciously formed the opinion that the charterers had finally written off the claim, or indeed whether he ever asked himself the question after February 1978, is much less clear. I think it quite probable that he did not. Nevertheless this should not, in my view, be fatal to the plea of estoppel. Where the issue is whether there was reliance by A on B having done nothing, the reliance may take the shape of A also doing nothing, and there seems no reason why, for the purposes of an estoppel, A's response should have been the result of a conscious choice. Here, the owners did spontaneously react to the charterers' silence by taking none of the steps in the way of preparing their case which would have been appropriate if the claim was still active. By this omission—at least so far as relates to the period commencing about the middle of 1978—they suffered a real detriment which, if I have correctly understood the law, is sufficient to make good the argument based on an estoppel. Accordingly, for this reason also I consider that the owners' application is entitled to succeed."

Before this court it was submitted by Mr. Rokison, for the charterers, that the judge, in applying an objective test to the question whether there had come into existence a binding agreement to abandon the reference, had failed to give effect to the principles stated by Lord Diplock in *The Hannah Blumenthal* [1983] 1 A.C. 854, 915–916, because, on those principles, he should have had regard not merely to the question whether there had been an objective correspondence of offer and acceptance, but also to the question whether each party had in fact understood the other's communication, whether offer or acceptance, to be what it purported to be. Accordingly, submitted Mr. Rokison, the judge had been guilty of the very heresy which Lord Diplock had condemned; and, if he had correctly applied Lord Diplock's statement of principle, he would have been bound to hold that there was no binding agreement to abandon the reference, because of his finding of fact that Mr. Nelson had never addressed his mind to the question whether the charterers, by their action, were or were not intending to abandon the reference. In answer to this submission Mr. Pollock, for the owners, submitted that the judge was perfectly right to apply a purely objective test; and that, if there was a heretic, it was not Mustill J. but Lord Diplock in suggesting that a subjective, not an objective, test must be applied.

In order to consider these submissions, we turn for guidance to *The Hannah Blumenthal* [1983] 1 A.C. 854. In that case the main issue which arose on the appeal was whether a reference to arbitration could be frustrated by reason of delay in proceeding with the reference. The House of Lords held that it could not. However a subsidiary question arose on the cross-appeal, whether there had been, on the facts of the case, an implied mutual abandonment of the reference. The House of Lords again held that there had not. It is plain from the report that the point was very briefly argued. We can see that counsel for the appellants submitted that it was evident on the facts that neither party believed that the arbitration had been abandoned, and that in those circumstances it would be wrong to hold that there was any implied abandonment. Counsel for the respondents submitted that the correct approach was to see whether, on an objective appraisal of the facts, the parties were to be taken to have agreed to abandon, and the fact that neither party believed that the arbitration was at an end was not relevant. Counsel for the appellants was not called on to reply and it is evident that there was in argument no discussion of the underlying principles on this point. The House of Lords plainly considered that on the facts of the case there could be no question of implied abandonment.

Three distinct views were however expressed by their Lordships as to how an implied abandonment of a contract might come about. Lord Brandon, who delivered the leading speech, considered [1983] 1 A.C. 854, 914, that it could be established:

> "by showing that the conduct of each party, as evinced to the other party and acted on by him, leads necessarily to the inference of an implied agreement between them to abandon the contract."

Lord Diplock's formulation, at pp. 915–916, appears to us to involve the requirement that the actual intentions of both parties should in fact coincide. Lord Brightman, on the other hand, thought, at p. 924, that to enable one party ("the sellers") to rely on abandonment, it was enough for them to show:

> "that the buyers so conducted themselves as to entitle the sellers to assume, *and that the sellers did assume*, that the contract was agreed to be abandoned sub silentio."

It is apparent that these three approaches are not identical. However, if we have to choose between them, we would respectfully prefer to follow the approach of Lord Brightman. In his speech Lord Brightman was, as we understand it, asserting that if one party, O, so acts that his conduct, objectively considered, constitutes an offer, and the other party, A, believing that the conduct of O represents his actual intention, accepts O's offer, then a contract will come into existence, and on those facts it will make no difference if O did not in fact intend to make an offer, or if he misunderstood A's acceptance, so that O's state of mind is, in such circumstances, irrelevant. With that proposition we very respectfully agree and so, if it is necessary for us to choose, we would prefer to follow the reasoning of Lord Brightman in so far as it differs from the reasoning of Lord Brandon and Lord Diplock.

However, there is another more fundamental matter to which we wish to refer. We have here to consider an appeal from a decision that a binding agreement should be inferred from silence and inaction. Silence

and inaction by both parties are apparently here considered to be capable of giving rise to an offer by one, and to an acceptance by the other communicated in response to that offer. This is most surprising. We have all been brought up to believe it to be axiomatic that acceptance of an offer cannot be inferred from silence, save in the most exceptional circumstances: as to which see, for example, *Treitel, The Law of Contract,* 6th ed. (1983), p. 27. Yet it is here suggested that silence and inaction can give rise both to an offer and to an acceptance; and there do not appear to be any special circumstances, in the silent abandonment of this reference to arbitration, which could justify any departure from general principle. In the absence of special circumstances, silence and inaction by a party to a reference are, objectively considered, just as consistent with his having inadvertently forgotten about the matter; or with his simply hoping that the matter will die a natural death if he does not stir up the other party; or with his office staff, or his agents, or his insurers, or his solicitors, being appallingly slow. If so, there should, on ordinary principles, be no basis for the inference of an offer. Exactly the same comment can be made of the silence and inaction of the other party; for the same reasons, there appears to be no basis for drawing the inference of an acceptance in response to the supposed offer, still less of the communication of that acceptance to the offeror.

We should add that we see the same difficulty in invoking the principle of equitable estoppel in such circumstances. It is well settled that that principle requires that one party should have made an unequivocal representation that he does not intend to enforce his strict legal rights against the other; yet it is difficult to imagine how silence and inaction can be anything but equivocal.

We turn to the relevant authorities on implied abandonment, which are very few indeed. The only authorities of any conceivable relevance of which we are aware are those set out in *Chitty on Contracts*, 25th ed. (1983), p. 818, footnote 87. Of the seven cases there cited, only two can be read as providing any possible authority for the proposition that both parties to a contract can, by their silence and inaction, impliedly agree to abandon the contract: these are *Pearl Mill Co. Ltd. v. Ivy Tannery Co. Ltd.* [1919] 1 K.B. 78 and *Andre & Cie S.A. v. Marine Transocean Ltd. (The Splendid Sun)* [1981] Q.B. 694. The former of these authorities, a decision of a Divisional Court concerning a contract for the sale of goods, was applied by the Court of Appeal in *The Splendid Sun*, which was concerned with a reference to arbitration which had gone to sleep for many years.

It is of some interest to look at the *Pearl Mill* case [1919] 1 K.B. 78 in a little detail. The facts of the case, as set out at pp. 79–80, are:

> "On 26 September 1913, a contract in writing was entered into between the defendants by their representative one Mills and the plaintiffs for the sale by the defendants to the plaintiffs of 50 dozen red Welsh roller skins at 27s. per dozen, 'delivery as required.' Under the contract 20 dozen skins were delivered between 19 November 1913 and 29 September 1914 by the defendants to the plaintiffs at their request in 4 lots of 5 dozen each, viz., on 19 November 1913, 24 February 1914, 24 June 1914 and 29 September 1914, respectively, leaving 30 dozen skins undelivered. Mills called

on the plaintiffs about twice in 1914 and 1915, but from 29 September 1914 to 13 July 1917 no further deliveries were made by the defendants nor were any requested by the plaintiffs, the plaintiffs' manager having forgotten the existence of the contract and Mills having left the service of the defendants in June 1915. In July 1915, the plaintiffs gave Mills a personal order for 50 dozen skins of the same kind and at the same price as that specified in the contract of 26 September 1913, of which they took delivery. Between June 1915 and April 1916, one Moorhouse, who had succeeded Mills as the defendants' representative, called upon the plaintiffs and sent in his card to the plaintiffs' managing director with a message that he desired further orders. He however only saw the plaintiffs' lodge-keeper, and the reply sent by the plaintiffs' managing director was that there was nothing for him. On 15 November 1915, the defendants by letter offered the plaintiffs a small parcel of 20 to 30 dozen roller skins similar to those previously supplied and at the same price, but the plaintiffs replied that they had bought some time ago their requirements for the next year. On 13 July 1917, the plaintiffs wrote to the defendants requesting the delivery of the remaining 30 dozen skins under the contract. On 14 July 1917, the defendants replied saying that the plaintiffs had taken delivery at the rate of 5 dozen skins per quarter up to 29 September 1914 and that as there had been no deliveries since then, the contract expired in March, 1916. On 17 July 1917, the plaintiffs replied that the delay was caused by the change in representatives and insisting upon delivery. As the defendants in further correspondence still contended that the contract had expired, the plaintiffs brought the action to recover the £70 10s. damages for breach of the contract, being the difference between the price of 30 dozen skins under the contract and the market price on 14 July 1917. No evidence was given that the defendants had at any time requested the plaintiffs to take delivery of the remaining 30 dozen skins."

On these facts the report records that the county court judge found, at p. 80:

"that the plaintiffs had made up their minds to abandon the contract; and, whether his finding on that point was correct or not, that they behaved in such a way that the defendants reasonably believed that the plaintiffs considered the contract was at an end."

We only comment that the first of these findings is inconsistent with the statement of facts in the report, which records that the plaintiffs' manager had forgotten the existence of the contract.

The decision of the county court judge, and its affirmation by the Divisional Court, were made against the background of the decision of the Court of Exchequer in *Jones v. Gibbons* (1853) 8 Ex. 920. The judgment in the latter case consists of one sentence: "There must be judgment for the plaintiff," the plaintiff being the buyer. The reasoning behind the decision has to be inferred from the reporter's record of observations by members of the court in argument. From those it appears to have been held that, under a contract of sale of goods "delivery as required," the buyer is under an obligation to require

delivery within a reasonable time; but if he fails to do so, the seller cannot put an end to the contract unless he has in the first instance inquired of the buyer whether he means to have the goods. We express no opinion as to the correctness of the decision. McCardie J., in the *Pearl Mill* case [1919] 1 K.B. 78, referred to it as a well established and weighty authority. However, we have been unable to discover any reported case in which it was applied, or even cited, between 1853, when it was decided, and 1919, the date of the *Pearl Mill* case. It can be interpreted as deciding that the time for the performance of the buyers' obligation to require delivery within a reasonable time was not of the essence of the contract.

At all events, faced with that decision, the county court judge and the judges of the Divisional Court in the *Pearl Mill* case [1919] 1 K.B. 78 directed their attention to the question whether, having regard to the long delay, there had been a repudiatory breach by the buyer excusing the seller from further performance of his obligations under the contract. This they did, by reference to the well-known decision of the Court of Common Pleas in *Freeth v. Burr,* (1874) L.R. 9 C.P. 208, which is indeed an authority on repudiation; and, on the basis of that decision, both judges in the Divisional Court, Rowlatt J. and McCardie J., considered that there was material before the county court judge which justified his decision. Rowlatt J. described the county court judge's decision as being that the proper inference to be drawn from the facts was that each party was justified in assuming that the matter was off altogether. This was presumably on the basis that, on the principle in *Freeth v. Burr*, L.R. 9 C.P. 208 the buyer must be treated as having, by his conduct, wrongfully abandoned the contract; and that there was sufficient evidence, from the seller's conduct, to amount to an acceptance of that repudiation. It is not to be forgotten that, as the facts of the case reveal, the parties were not entirely inactive during the relevant period. At all events, we can see no trace in the judgments of any suggestion of an implied agreement to bring the contract to an end, on the basis of an offer by one party and an acceptance by the other, leading to an agreed termination of the contract by accord and satisfaction. There is a suggestion by McCardie J. that the sellers might have been able to invoke the principle of estoppel, but there is no evidence on the face of the report that the sellers in any way changed their position on the faith of an unequivocal representation by the buyers, and we doubt if much importance should be attached to that obiter dictum.

As we read it, therefore, the *Pearl Mill* case [1919] 1 K.B. 78 was simply a decision on repudiation, on somewhat unusual facts. We suspect that it owes its categorisation as a case on "implied abandonment" to its citation in a footnote in *Chitty on Contracts* under that heading, and that it is for that reason that it was cited by counsel to the Court of Appeal in *The Splendid Sun* [1981] Q.B. 694 as an authority on implied abandonment: see *per* Lord Denning M.R., at p. 700, and see also *per* Fox L.J. who, at p. 713, treated the case as one where, after a period of inactivity, the parties had impliedly agreed to put an end to the contract. We feel bound to say that we do not so read the *Pearl Mill* case [1919] 1 K.B. 78; and we find it striking that the authority upon which Eveleigh L.J. relied as justifying his decision, *Forslind v. Bechely-Crundall*, 1922 S.C. (H.L.) 173, was in fact a case concerned with repudiation.

08-13555-mg Doc 7013-2 Filed 02/05/10 Entered 02/05/10 18:36:11 Exhibit F (Part 1) Pg 18 of 66

We are of course bound by the decision of this court in *The Splendid Sun* [1981] Q.B. 694 but we must now read that decision in the light of the statement of the law by Lord Brightman in *The Hannah Blumenthal* [1983] 1 A.C. 854, 924, that, to entitle one party, A, to rely on abandonment, he must show that the other party, O, so conducted himself as to entitle A to assume, and that A did assume, that the contract was agreed to be abandoned sub silentio. As we interpret that statement of principle, it is not enough that O should appear to have given up pursuing his claim in the reference, and that A assumed that he had given up the pursuit of his claim, because there could be a number of reasons why O should not be pursuing it; for example, forgetfulness, or culpable delay by his solicitors. What has to be shown is that O appeared to be offering to agree that the reference should be abandoned and that A, having so understood O's offer, by his conduct accepted O's offer. As we read Lord Brightman's statement of principle, it is entirely consistent with the long accepted principles of offer and acceptance as creating a binding agreement.

So we ask ourselves, first, whether the evidence in the present case reveals the existence of an offer by the charterers to agree to abandon the reference. We have no hesitation in answering that question in the negative. Apart from the episode of Captain George's brief appearance, the charterers simply did and said nothing at all for over five years. This might have been (though it was not in fact) because they were content to let the reference die, though it could just as well have been because of incompetence or negligence on the part of the responsible person or persons in their organisation. In truth, the reason for their silence and inactivity was a matter of pure speculation as to which different persons, acting for the owners, could well have reached different conclusions. Cross-examination of the relevant person in the owners' organisation (Mr. Nelson) as to his state of mind could only reveal what happened to be his own speculative conclusion, if he ever thought about the matter, as to why the charterers were doing and saying nothing.

In these circumstances, we do not think that the charterers' conduct could possibly be read as an offer to agree to abandon the reference which, upon acceptance by the owners, would give rise to a binding contract to do so. Still less do we think that there was any acceptance by the owners. It is obvious from the evidence that Mr. Nelson was simply letting the reference to arbitration stagnate, in the confident expectation that it would quietly disappear, and in the meanwhile paying a small insurance premium in the form of the bank's fee for the letter of credit to make absolutely certain that the charterers would not be able to draw on it. But that he ever accepted an offer to abandon the reference is, we think, inconceivable. In truth, he did nothing in response to any "offer" by the charterers at all. At most, there was simply an apparent coincidence of contentment that the status quo should continue indefinitely, but that is not, we think, the same thing as a binding agreement that it should do so.

We add, for good measure, that it is in any event impossible to discover, even approximately, the point of time when any such "offer" was made, or, if any such "offer" was made, the point of time at which thereafter it was "accepted." For these simple reasons, we are unable to agree with the judge that there was an implied agreement to abandon the reference.

For very similar reasons we are unable to agree with him that the owners are able to invoke the principle of equitable estoppel. A party who invokes that principle has to establish that the other made, by words or conduct, an unequivocal representation that he did not intend to enforce his strict legal rights: see *Woodhouse A.C. Israel Cocoa Ltd. S.A. v. Nigerian Produce Marketing Co. Ltd.* [1972] A.C. 741, 755 *per* Lord Hailsham of St. Marylebone L.C. Here, all the owners can show is that (apart from the episode of Captain George) the charterers did nothing at all for over five years. But silence and inaction are of their nature equivocal, for the simple reason that there can be more than one reason why the person concerned has been silent and inactive. So, in our judgment, the owners fall at the first fence. But even if they had surmounted that fence, they would have fallen at the next, because there is no evidence that they acted in any way upon any such representation by the charterers. They decided, very sensibly, within a few months of the appointment of the arbitrators, to do nothing at all unless and until the charterers showed some sign of pursuing a claim which they, the owners, believed to have little substance. If the preparation of the owners' case is now difficult, that follows from that very early decision, made on practical grounds, and not from any conduct, or absence of conduct, on the part of the charterers.

We wish to add that, since preparing this judgment, the decision of this court in *Collin v. Duke of Westminster* [1985] 2 W.L.R. 553 has been reported. We are comforted to find that our approach to the problem in the present case is consistent, as we read it, with the approach of Oliver L.J., who delivered the leading judgment in that case.

For these reasons, the appeal will be allowed.

*Appeal allowed with costs.*
*Leave to appeal.*

*Solicitors: Richards Butler & Co.; Ince & Co.*

S. H.

*Bateman v Williams*
[2009] BPIR 748

Bankruptcy and Personal Insolvency Reports/2009/BATEMAN V WILLIAMS AND ANOTHER - [2009] BPIR 748

[2009] BPIR 748

# BATEMAN V WILLIAMS AND ANOTHER

**WREXHAM COUNTY COURT**

**HIS HONOUR JUDGE JARMAN QC**

**26 NOVEMBER 2008**

*Bankruptcy - Family home - Sale and possession - Exoneration - Insolvency Act 1986, s 323*

This was an application by the trustee in bankruptcy of Mr Richards to realise 50% of the property at Estorel, Middle Road, Coedpoeth, Wrexham (the property) now the home of Mr and Mrs **Williams.** Mrs **Williams** was formerly married to Mr Richards who was a builder. In 1986 a plot of land was purchased in his name for £7,000 and by May 1987 the house was completed at a cost of £25,000 - this was the property. By a conveyance dated 3 July 1987 Mr Richards conveyed the property to himself and his wife as beneficial joint tenants. By a mortgage of even date with that conveyance they charged the property to National Westminster Homes Ltd in the sum of £25,000. One month later there was a further charge to National Westminster Bank plc to secure the debts of Mr Richards. Both charges were discharged on a remortgage with Birmingham Midshires (the Building Society) dated 29 November 1989 in the sum of £74,591 odd. Mr Richards and his wife were divorced in 1990 and notice of severance was served. Mr Richards was also declared bankrupt with total unsecured liabilities of £150,000. In January 1991 the Building Society, who were then owed £83,000, obtained a suspended possession order - the property was at that time worth £87,500. Accordingly, steps were taken to transfer what had been Mr Richards' interest in the property to his former wife for £500 but this was never paid and the conveyance not executed. His former wife then married Mr Dean but was divorced from him some 10 years later. Improvements were made to the property during this period, including an extension, in respect of which Mrs **Williams** (as she ultimately became) indicated in her evidence that her parents had made some financial contribution. In 2001 Mr **Williams** moved into the property and they were married. Just after the marriage Mr **Williams** redeemed the mortgage in the sum of £65,424 and it was transferred to him. In May 2005 the present trustee in bankruptcy was appointed and because of the rise in property values sought to realise what had been Mr Richards' share.

**Held** - granting the application -

(1)    Mrs **Williams'** claim in respect of exoneration should be quantified as being one half of the sum advanced in 1989 - £37,295.

(2)    However, her claim in 1989 when the value of the property was low did not, as a result of s 323 of the Insolvency Act 1986, cause the trustee in bankruptcy's interest to be extinguished, as such an inchoate right of indemnity in respect of an accounting exercise which might have to be carried out if Mrs **Williams** had been called upon to pay the debts in question or if they were discharged out of the proceeds of sale of the property, did not amount to mutual dealings as envisaged by s 323.

(3)    Whilst, as a matter of principal, there was no estoppel preventing a trustee in bankruptcy from

performing his statutory duties, any statement by the applicant to the effect that there was then no equity in the property did not, in any event, amount to a clear representation that the applicant had no interest in the property or that Mrs **Williams** was entitled to the whole of the property beneficially. Moreover, even if an estoppel could otherwise arise, it could not be relied upon where it arose in the course of negotiation for the sale of the property which both parties knew was subject to completion.

(4) Any credit in favour of Mrs **Williams** in respect of interest payments made by her was cancelled by the occupation rent payable by her.

**Statutory provisions considered**

Bankruptcy Act 1869:s 39

Bankruptcy Act 1883:s 38

Bankruptcy Act 1914:s 31

Insolvency Act 1986:s 283

Insolvency Act 1986:s 305

Insolvency Act 1986:s 306

Insolvency Act 1986:s 322(1)

Insolvency Act 1986:s 322(2)

Insolvency Act 1986:s 323

Insolvency Rules 1986 (SI 1986/1925):r 6.115

Bankruptcy Act 1883, s 38

Bankruptcy Act 1869, s 39

Bankruptcy Act 1914, s 31

Insolvency Act 1986, ss 283, 305, 306, 322(1), (2), 323

Insolvency Rules 1986 (SI 1986/1925), r 6.115

**Cases referred to in judgment**

*Barcham, Re; sub nom French v Barcham* [2008] EWHC 1505 (Ch), [2009] 1 WLR 1124, [2008] BPIR 857, [2009] 1 All ER 145, ChD

*Boorer v Trustee in Bankruptcy of Boorer* [2002] BPIR 21, ChD

*Byford (Deceased), Re; Byford v Butler* [2003] EWHC 1267 (Ch), [2003] BPIR 1089, [2004] 1 FLR 56, [2004] 1 P&CR 159, ChD

*Cronmire, Re* [1901] 1 KB 480, CA

*Debtor (No 24 of 1971), Re A, ex parte Marley (J) v Trustee of the Property of the Debtor and Another* [1976] 1 WLR 952, [1976] 2 All ER 1010, ChD

*Gee v Liddell* [1913] 2 Ch 62, ChD

*Hall v Hall* [1911] 1 Ch 487, ChD

*Lewis v Mangle* (1752) Amb 150

*Pavlou (A Bankrupt), Re* [1993] 1 WLR 1046, [1993] 2 FLR 751, [1993] 3 All ER 955, ChD

*Pittortou (A bankrupt), Re, ex parte Trustee of the Property of the Bankrupt* [1985] 1 WLR 58, [1985] 1 All ER 285, ChD

*Smith v Lock (A Bankrupt) and Others* [1998] BPIR 786, ChD

*Stack v Dowden* [2007] UKHL 17, [2007] 2 AC 432, [2007] 2 WLR 831, [2007] BPIR 913, [2007] 1 FLR 1858, [2007] 2 All ER 929, HL

*Stein v Blake* [1996] 1 AC 243, [1995] 2 WLR 710, [1995] 2 All ER 961, [1995] 2 BCLC 94, HL

*Yeoman's Row Management Ltd v Cobbe* [2008] UKHL 55, [2008] 1 WLR 1752, [2008] 4 All ER 713, HL

*Hugh Sims for the applicant, Mr **Bateman,** the trustee in bankruptcy*

*Clive Jones (solicitor) for the respondents, Mr and Mrs **Williams***

**HIS HONOUR JUDGE JARMAN QC:**

**[1]** This is an application by the trustee in bankruptcy of Graham Richards for the realisation of a claimed 50% share in a dwelling-house known as Estorel, Middle Road, Coedpoeth, Wrexham, which I shall refer to as 'the property'. That is the home of Mr Derek and Mrs Sheila **Williams** and they resist the application.

**[2]** The essential facts of this matter are not in dispute and have been helpfully agreed by Mr Sims, who acts for the trustee, and Mr Jones who acts for Mr and Mrs **Williams.**

**[3]** Mrs **Williams** was formerly married to Mr Richards in 1969. They had two children. Mr Richards was a builder and traded under the name of R&R Builders. In 1986, a plot of land was purchased in his name for the sum of £7,000 on which to build a house for the family to live in. By May 1987, the house was finished at a cost of some £25,000. That is the property in question.

**[4]** By conveyance dated 3 July 1987, Mr Richards conveyed to himself and his then wife the property to hold as beneficial joint tenants. The conveyance was expressed to be by way of gift. By a mortgage of even date with that conveyance, the couple charged the property to National

*[2009] BPIR 748 at 750*

Westminster Homes Ltd in the sum of £25,000. Just over a month later they further charged the property to National Westminster Bank plc to secure the debts and liabilities of Mr Richards. Both those charges were discharged with £74,951 odd borrowed by the couple from Birmingham Midshires (I shall call that the building society), which in turn was charged against the property by a legal charge dated 29 November 1989.

**[5]** The following year was not a happy one for the couple. A decree nisi divorce was issued against Mr Richards by his then wife in June. In August, she gave notice severing the joint tenancy and then a day or so later he was declared bankrupt with total unsecured liabilities of over £150,000. In January 1991 the building society, who were then owed some £83,000, obtained a suspended possession order in respect of the property, which the trustee in bankruptcy's valuer then valued at some £87,500. Accordingly, steps were taken to convey Mr Richards' legal and beneficial interest in the property to his former wife for the sum of £500 but this sum was not in the end paid and the conveyance not executed.

**[6]** The former Mrs Richards remarried in 1990 and became Mrs Dean. That marriage lasted about 10 years, when a further decree was granted to her. Mr Derek **Williams** moved into the property in or about March 2001 to live with Sheila **Williams,** as she became when they married a year later. Just after that marriage, Mr **Williams** redeemed the building society's mortgage by paying £65,424 odd, and in June 2002 the mortgage was transferred to him.

**[7]** In May 2005 the present trustees were appointed in Mr Richards' bankruptcy and because of the rise in the value of the property now seek to realise his share. That claim is disputed, mainly on the grounds that by operation of the equity of exoneration and s 323 of the Insolvency Act 1986, the trustee has no interest. Alternatively, it is said he is now prevented from asserting such an interest on the basis of proprietary estoppel or unjust enrichment.

**[8]** Apart from the documentary evidence, which in several respects is limited, I have heard Mr and Mrs **Williams** give evidence. The issues canvassed in evidence focussed on the dealings of Mrs **Williams** with the property, firstly with Mr Richards, then later with his trustee and then finally with Mr **Williams.** I shall make findings of fact as to these issues before I turn to deal with the law.

**[9]** As to the former dealings, there is no documentary evidence as to how the £7,000 purchase price of the plot was raised. Mrs **Williams** could not recall why this was put into Mr Richards' name only. She accepted that she understood at the time that the business was for the benefit of the family. She said that the intention always was to have a home together which was jointly owned. There was some limited support for this in the form of a statement which Mr Richards made in the course of the bankruptcy proceedings when he said the plot was purchased jointly.

**[10]**    Mrs **Williams** further accepted that her take-home pay at the time was modest, in the region of about £8,000 to £9,000. She said that she was dealing with the architects and the bank at this stage, and again there is some support for this from contemporaneous correspondence addressed either to Mrs **Williams** or to the couple. She had her own bank account with National Westminster Bank and she said her income was necessary to be taken into

*[2009] BPIR 748 at 751*

account in order to pay the charges taken out in 1987. She understood this to be part of the same transaction required by the bank.

**[11]**    Mr Sims rightly points out that I should be slow to accept that evidence insofar as it is contradicted by the clear wording of the 1987 conveyance, signed by Mrs **Williams,** to the effect that her then husband was by that deed gifting her a beneficial joint tenancy. However, he also realistically accepted that I must look at the factual matrix in which the document was signed as best I can, having regard to the passage of time and the paucity of the evidence.

**[12]**    In my judgment, it is likely that the 1987 transactions were required by the bank because Mrs **Williams'** income was needed to serve, in part at least, the borrowing and to make her position clear in law. In my judgment, it is likely that the effect of the 1987 conveyance reflected the intentions already held by the couple when the plot was bought and the house built for the family. In this respect, therefore, I accept the evidence of Mrs **Williams** and find that beneficial interests of the property were held jointly by her and her then husband from the outset.

**[13]**    Again, there is little evidence as to how the moneys advanced by the building society in 1989 were dealt with. They were paid into an account at National Westminster Bank plc in Lord Street, here in Wrexham, in the name of Mr Richards trading as R&R Builders. No statements are available prior to January 1990, but the statement for that month shows that the account remained in overdraft at just under £22,000 until an unrelated payment of £18,500 odd was paid at the end of that month. Mrs **Williams'** evidence was that her husband told her that the mortgage was needed because the bank was pressing and he was awaiting payment from other debtors. I accept that evidence. She also accepted that he was buying other properties and she attempted to make a claim on these during the divorce. Again, I accept that evidence.

**[14]**    The next part of the oral evidence related to Mrs **Williams** dealing with the trustee. In evidence, she said that she did not pay the £500 in 1992 because she was obtaining conflicting advice as to whether she should pay that and then further costs and expenses were being asked for on top. In September 1994, the then trustee wrote to the Department of Trade and Industry saying that the property remained the only asset and was valued in October 1993 at £75,000, and further, that the mortgage on the property was in excess of £78,000 and there was also a charging order in favour of a Diners Club Ltd debt of just under £3,000. It is now not in dispute that that sum is statute barred.

**[15]**    Mrs **Williams** in evidence said that she was told by the trustee that there was no equity. She accepted, however, that she understood in 1992 that the process to transfer to her the trustee's interest would not be completed unless she paid these moneys and that she did not do so. In these respects, I accept her evidence. I find that she did understand in 1993 through to 1994 and beyond that although there may be no equity at any given time, the interest of the trustee in Mr Richards' share had not been transferred to her and was retained by him.

**[16]**    Next, both Mr and Mrs **Williams** were questioned about the time when he became involved in 2001. They both accept that they went to see a Mr Macloskey who was a solicitor, again here in Wrexham. There was

*[2009] BPIR 748 at 752*

initially some dispute as to whether his documents should be disclosed, it being claimed that they were privileged, but I ruled that because Mr **Williams** had referred to advice that he had been given in this context in his statement, then there had been a waiver of privilege. It appears that Mrs **Williams** attended on him in July 2001. There was a reference in the attendance note of that meeting that the trustee was claiming half the equity in the property. The advice given at that stage was to leave the Official Receiver until after the divorce (that is, the divorce from Mr Dean) as obviously the involvement of the trustee complicated the divorce and reduced the value of the matrimonial assets.

**[17]** On 1 August 2001, Mr Macloskey wrote to Mrs **Williams.** He said that what needed to be arranged first was for the property to be transferred into Mrs **Williams'** name and he enclosed a draft deed for her to sign, along with her former husband Mr Richards. Some days later, again Mrs **Williams** had a meeting with Mr Macloskey. She then had the papers which showed that she had had this opportunity to acquire Mr Richards' interest in the property. At that time Mr Macloskey advised that it was not appropriate for the mortgage to be paid off by Mr **Williams,** although it may be appropriate to pay something off the arrears, and there was a further attendance on the same day when Mrs **Williams** rang. She had spoken to Mr Richards and he had admitted that he had been made bankrupt again in the year 2000. Mr Macloskey said that there were problems about having the property transferred into Mrs **Williams'** sole name at that stage and it would be advisable to have the matters resolved with the Official Receiver.

**[18]** That advice was put into writing on 21 August 2001, addressed to Mrs **Williams,** or Mrs Dean as she still then was, at the property. He repeats his advice that it would be unwise for Mr **Williams** to clear all the borrowing with the building society, although that would effectively mean that he would become the mortgage lender. Mr **Williams** in evidence said that he was not impressed with the advice of Mr Macloskey and accordingly he took Mrs **Williams** to his former solicitor, Mr Jones. The couple were asked about letters which were written on their behalf by Mr Jones' firm.

**[19]** A letter was written on 4 July 2005 to Mrs **Williams** by the new trustee. He said that following a review of the files, he had been appointed as trustee and raised the issue of the trustee's interest in the property. Mr **Williams** accepted that he rang someone in the firm of KPMG LLP about that letter. The attendance note on 7 July 2005 records that Mr **Williams** stated that he had bought the property. On 12 September 2005, a letter written by Mr Jones to KPMG says this:

> 'We act on behalf of Mrs Sheila **Williams** and her husband, Mr Derek **Williams** ... Mr Richards no longer retains any interest in that property. His interest was bought from the Trustee David Milburn in 1992 for £500 ... Subsequently, Mr Derek **Williams** took a transfer off the Birmingham Midshires Building Society mortgage and has taken possession as mortgagee ...'

**[20]** A couple of months later, Mr Jones wrote to the solicitors for the trustee, saying that the dispute related to the existence or otherwise of a binding contract under which Mrs **Williams** purchased the bankrupt's estate

*[2009] BPIR 748 at 753*

from his trustee. When Mr and Mrs **Williams** were questioned about that line of correspondence, they both accepted that they did instruct Mr Jones, that they saw letters which he wrote on their behalf before they went out and that they approved them.

**[21]** Mrs **Williams** was somewhat hesitant about accepting that the assertion in that correspondence that Mr Richards' interest had been bought out in 1992 was not true, although she did accept that she had not paid that sum. It was similar with the assertion that Mr **Williams** took possession as a mortgagee. Both accepted that Mr **Williams** had moved in in March 2001 and that they lived together as husband and wife

since then and that nothing had changed. Both accepted that there was no expectation that Mrs **Williams** would make payments or owe moneys to Mr **Williams** after the mortgage was transferred to him. I accept that latter evidence.

**[22]** Mr **Williams** said that he had told Mr Halford in July 2005 that he had bought the property and he knew that that at the time was not accurate. He said he did this because he was incensed that the letter of 4 July had contained a reference to Mr Richards being deceased. Both deny the suggestion that these inaccurate claims were made knowingly in an attempt to dissuade the trustee from pursuing his claim. In my judgment, neither of them gave impressive evidence in respect of these answers. I find that they were aware of the true position in July to November 2005 and that they gave these instructions in an effort to put the trustee off.

**[23]** Having made those findings, I now turn to the law. Subject to a point taken by Mr Jones that the trustee's interest has been extinguished by Mrs **Williams'** right of exoneration, the effect of my findings of fact, in my judgment, are these.

**[24]** First, prior to being adjudicated bankrupt Mr Richards was the joint legal and beneficial owner of the property with Mrs **Williams.** When he became bankrupt, his half-share in the beneficial interest in the property became part of his bankruptcy estate under s 283 of the Insolvency Act 1986. That estate vested in the trustee on his appointment under s 306 of that Act and he, the trustee, thereby came under a duty to realise Mr Richards' estate in order to obtain the best possible return for the creditors, pursuant to s 305 of the Act.

**[25]** Mr Jones submits that as of the date of bankruptcy, Mrs **Williams** had a claim to be exonerated in respect of that part of the borrowing in 1989 which was referable to Mr Richards' debts. As there was no equity in the property at the time because of its low value, the result of s 323 of the Act is that the trustee's claim to beneficial interest is extinguished. This is disputed by the trustee, essentially on the basis that the respective positions of himself and Mrs **Williams** at the time of the bankruptcy related to shares in real property, subject to equities which might arise, including the equity of exoneration, if at some future time Mrs **Williams** were called upon to pay those debts as surety or if the property were sold and the debts were paid out of the proceeds. Neither eventuality has yet occurred.

**[26]** Both Mr Jones and Mr Sims accepted that none of the cases which deal with exoneration refers expressly to the insolvency legislation upon which Mr Jones relies. He says that in most if not all of the cases there would have been equity in the property at the time. This present case is an unusual situation where there was no equity at the time of the bankruptcy, but because

*[2009] BPIR 748 at 754*

of a net rise in property value since then the issue becomes relevant. The point is somewhat novel and so, seems to me, it is necessary to examine the legislative provisions and case-law in some detail.

**[27]** I start with s 322 of the 1986 Act. That provides as follows, under the heading of 'Proof of debts':

> '322(1) Subject to this section and the next, the proof of any bankruptcy debt by a secured or unsecured creditor of the bankrupt and the admission or rejection of any proof shall take place in accordance with the rules.
>
> (2) Where a bankruptcy debt bears interest, that interest is provable as part of the debt except insofar as it is payable in respect of any period after the commencement of the bankruptcy.
>
> (3) The trustee shall estimate the value of any bankruptcy debt which, by reason of its being subject to any contingency or contingencies or for any other reason, does not bear a certain value.'

And then s 323, under the heading of 'Mutual credit and set-off' provides as follows:

> '323(1) This section applies where before the commencement of the bankruptcy there have been mutual credits, mutual debts and set-off, or other mutual dealings between the bankrupt and any creditor of the bankrupt proving or claiming to prove for a bankruptcy debt.
>
> (2) An account shall be taken of what is due from each party to the other in respect of the mutual dealings and the sums due from one party shall be set off against the sums due from the other.
>
> (3) Sums due from the bankrupt to another party shall not be included in the account taken under subsection (2) if that other party had notice at the time they became due that a bankruptcy petition relating to the bankrupt was pending.
>
> (4) Only the balance (if any) of the account taken under subsection (2) is provable as a bankruptcy debt or, as the case may be, to be paid to the trustee as part of the bankrupt's estate.'

It appears that that section substantially re-enacts the provisions formerly contained in s 31 of the 1914 Act, which was itself a reproduction of s 38 of the 1883 Act, which in turn substantially re-enacted s 39 of the 1869 Act.

**[28]**    So far as the Rules are concerned, r 6.115 of the Insolvency Rules 1986, under the heading 'Value of security' says this:

> '(1) a secured creditor may, with the agreement of the trustee or the leave of the court, at any time alter the value which he has, in his proof of debt, put upon his security.
>
> (2) However, if the secured creditor--
>
> (a)    being the petitioner, has in the petition put a value on his security, or
>
> (b)    has voted in respect of the unsecured balance of his debt, he may re-value his security only with the leave of the court.'

*[2009] BPIR 748 at 755*

**[29]**    The principle of exoneration was referred to as long ago as 1752 by the then Lord Chancellor in the case of *Lewis v Mangle* reported in (1752) Amb 150. The Lord Chancellor is recorded as saying that the general rule where the husband borrows a sum of money for his own use and the wife joins in a mortgage of her joint ownership for repayment of it, is that her estate shall be a creditor on the husband for that sum; so it is where there is no settlement and the wife mortgages her estate of inheritance to raise money for the husband. That authority, amongst others, was considered by Warrington J in *Hall v Hall* [1911] 1 Ch 487. I need not go into the facts of that case. The learned judge, at 496, said this:

> 'When a husband and wife living together, when there are no circumstances indicating that expenditure is required for the exclusive benefit of the wife or that there is any exclusive debt of the wife incurred either before or subsequent to marriage required to be paid, why is one to draw any other inference from the raising of money by the two, and the payment of it to the husband, that it was required by the husband for some purposes of his own; purposes which may *incidentally* be for the benefit of the wife but which are nonetheless the purpose of the husband?' [Emphasis added]

**[30]**    And then further on in the judgment Warrington J said this:

> 'Thus, if a settlement is made by the husband on his wife at the time she charges her estate, he is regarded as

purchasing her assistance: and the inference that the parties intended that the wife's property should be exonerated by the husband does not arise (see *Lewis v Mangle*). *Clinton v Hooper* is the leading authority to show that the doctrine in question is based on an inference to be drawn in each case from all the facts of that particular case. It was long ago settled that although under the old law the husband became liable for the ante-nuptial debts of the wife, she had no right in equity to compel him to exonerate property of hers charged with those debts, even although he had expressly covenanted to pay them (see *Lewis v Mangle* and *Earl of Kinnoul v Money*).'

**[31]** Warrington J again revisited the issue in the case of *Gee v Liddell* [1913] 2 Ch 62, and at 72, said this:

'Has not the person who joins in mortgaging his own estate by virtue of that deed itself an interest in the estate of the person to whom the money is advanced? In my opinion he has, and I think that the nature of his interest is a charge upon the estate of the principle debtor by way of indemnity for the purpose of enforcing against that estate the right which he has, as between himself and the principle debtor, to have that estate resorted to first for the payment of the debt.'

**[32]** Coming now to more modern authorities, the issue was considered in the Chancery Division in the case *Re A Debtor ex parte Marley (J) v Trustee of the Property of the Debtor and Another* [1976] 2 All ER 1010. That

*[2009] BPIR 748 at 756*

involved a father providing his son with security so that he could get a loan from his bank. Foster J, who was one of the judges who gave judgment in that case, said this at 1013-1014:

'As between the bankrupt's father and the bankrupt, and bearing in mind that the bankrupt's father is admittedly only a surety, it should be implied that their intention was that the bankrupt's beneficial interest should bear the burden. If that is so, it seems to me that the bankrupt's interest vested in his trustee in bankruptcy, subject to an inchoate right of indemnity, if the surety were called on to pay, or the debt fell to be discharged, as it would have to be, out of the proceeds of sale of the property. Alternatively, I think that the bankrupt's father could be regarded as having an actual charge on the bankrupt's interest within the principle discussed by Warrington J in *Gee v Liddell.'*

...

'It is said that the present case can be distinguished from *Gee v Liddell* in the following ways. First, in *Gee v Liddell* the mortgagors expressly charged their separate beneficial interest. Counsel for the trustee says that in the present case the father and the bankrupt charged the entirety by way of legal mortgage, but it seems to me that the practical effect of that was to charge the beneficial interest of the bankrupt's father and of the bankrupt. Secondly, counsel for the trustee said that the bankrupt's father paid nothing to the bank. But Warrington J dealt with the position of a mere surety by covenant who had paid nothing.'

...

'But as I have said, I think that such a provision must be inferred. It follows that out of the proceeds of sale of the property the bank's indebtedness is, in my judgment, primarily payable out of the bankrupt's half-share, leaving little, if anything, for his trustee.'

**[33]** A more modern judgment was given in the case of *Re Pittortou (A Bankrupt) ex parte Trustee of the Property of the Bankrupt* [1985] 1 WLR 58 by Scott J, as he then was, in 1985. In that case a husband took over the running of a restaurant on his own account, which had previously been run by certain members of his family, and he and his wife executed a legal charge in favour of the bank charging the then matrimonial home to secure any indebtedness to the bank on a bank account which he intended, amongst other things, to use for the purpose of the restaurant. The judgment of Scott J is an important one and I refer to it at some length. At 61-63, the judge said this:

'It is, I think, clear that the effect of the equity of exoneration in a case such as this is indeed to enhance the proprietary interest of the surety/joint mortgagor and not simply to give the surety a personal right to an indemnity from the debtor who is the other joint mortgagor. *In Re Cronmire ex parte Cronmire* [1901] 1 KB 480 establishes the entitlement of a wife, whose property has been charged to secure her husband's debts, to prove in his bankruptcy in respect of the indemnity which he owes her. A subsequent case in *In Re A Debtor ex parte Marley v Trustee of the Property of the Debtor* [1976] 1 WLR 952,

*[2009] BPIR 748 at 757*

established that in addition to the right to claim an indemnity the surety [can claim an enhanced proprietary] interest.'

...

'However, the equity of exoneration is a principle of equity which depends upon the presumed intention of the parties. If the circumstances of a particular case do not justify the inference, or indeed if the circumstances negate the inference, that it was the joint intention of the joint mortgagors that the burden of the secured indebtedness should fall primarily on the share of one of them who was the debtor, then that consequence will not follow.'

...

'The guide that Victorian cases can provide to the inferences which should be drawn from the dealings with one another of husbands and wives today is often not very valuable.'

He then referred to the decision in *Hall v Hall* and went on to say this, at 62-63:

'I respectfully adopt that approach. The present is a case in which, as is plain from the evidence, the family, until the sad departure of the bankrupt in 1981, acted as a family unit in its family and business affairs. The second respondent worked in the restaurants, which the [Pittortou] family conducted, and which later the bankrupt on his own account conducted, for long hours and without pay. In that respect, her conduct was similar to the conduct of many wives assisting their husbands in the conduct of the business oo which the livelihood and support of the family depend. ...

On the other hand, save for payment made for the joint benefit of the household, it does not seem to me that the equity of exoneration has any less part to play now than it had in the early days when the [equitable] doctrine was being formulated. Accordingly, payments made by the husband purely for business purposes and, a fortiori, any payments made by the husband for the purposes of the second establishment it seems he was supporting, should as between the bankrupt and the second respondent be treated as a charge primarily on the bankrupt's half-share in the mortgage property....

... But to the extent that that indebtedness represents payments which can be shown to have been made by the bankrupt for the benefit of the household, the indebtedness should be discharged out of the proceeds of sale before division. There is no doubt that into that category will fall the building society instalments that were paid out of the National Westminster Bank account. Also, in my judgment, into that category would fall payments made for the purposes of the occupation of the property by the bankrupt and the second respondent and their daughter or otherwise for the benefit of the joint household. ...

If the second respondent is not able to make an offer to the trustee which properly reflects the value of the trustee's interest in the property, the property will have to be sold, and ought to be sold. Nevertheless, there ought not to be a sale until she is in a position to make such an

*[2009] BPIR 748 at 758*

offer. She will not be in that position until the extent of the respective beneficial interests have been ascertained.'

**[34]**    Then in *Re Pavlou* [1993] 1 WLR 1046 Millett J, as he then was, dealt with the issue. He said this, at 1048:

'The trustee in bankruptcy submits that there is no equitable accounting between beneficial joint tenants but only between tenants in common, on the ground that beneficial joint tenants own the entire property ... so that expenditure by one is expenditure on his or her own property, and cannot be described as laid out in part in the improvement of the share of the other co-owner. Accordingly, he submits, the wife is not entitled to be reimbursed for any expenditure by her before the date of the bankruptcy order.

In my judgment there is no distinction between a beneficial tenancy in common and a beneficial joint tenancy. In neither case could a co-owner formerly obtain contribution from his or her co-owner; any reimbursement had to wait a suit for partition or an order by the court for sale of the property. ... the guiding principle of the Court of Equity is that the proportions in which the entirety should be divided between former co-owners must have regard to any increase in its value which has been brought about by means of expenditure by one of them.'

**[35]** And then in slightly different context, the judge said this, at 1050:

'There remains the question of the interest element in the mortgage payments which the wife has paid. Once again, prime facia, she is entitled to reimbursement since the date on which the husband left the property in January 1983 and not merely since the [severance] in March 1987. In many cases the court has simply set off the interest element in the mortgage repayments against an occupation rent, but as Vinelott J pointed out in *In Re Gorman (a bankrupt)* [1990] 1 WLR 616, which, incidentally was a case of joint tenants:

"That practice is not, of course, a rule of law to be applied in all circumstances ..."'

**[36]** And then finally I come to a case relied upon heavily by Mr Jones, namely *Stein v Blake* [1995] 2 WLR 710, a decision of the House of Lords as to the meaning of the phrase 'mutual dealings' in s 323 of the 1986 Act. In the opinion of Lord Hoffmann, he said this at 713-716:

'Bankruptcy set-off therefore requires an account to be taken of liabilities which, at the time of bankruptcy, may be due but not yet payable or may be unascertained in amount or subject to contingency. Nevertheless, the law says that the account shall be deemed to have been taken and the sums due from one party set off against the other as at the date of the bankruptcy. This is in accordance with the general principle of bankruptcy law, which governs payment of interest, conversion of foreign currencies etc, that the debts of the bankrupt are treated as having been ascertained and his assets simultaneously

*[2009] BPIR 748 at 759*

distributed among his creditors on the bankruptcy date ... It is clear, therefore, that when section 323(2) speaks of taking an account of what is 'due' from each party, it does not mean that the sums in question must have been due and payable, whether at the bankruptcy date or even the date when the calculation falls to be made. The claims may have been contingent at the bankruptcy date and the creditor's claim against the bankrupt may remain contingent at the time of the calculation, but they are nevertheless included in the account. ...The law ... employs two techniques. The first is to take into account everything which has actually happened between the bankruptcy date and the moment when it becomes necessary to ascertain what, on that date, was the state of account between the creditor and the bankrupt. If by that time the contingency has occurred and the claim has been quantified, then that is the amount which is treated as having been due at the bankruptcy date...

[T]he law adopts a second technique, which is to make an estimation of the value of the claim ...

This enables the trustee to quantify a creditor's contingent or unascertained claim, for the purposes of set-off or proof, in a way which will enable the trustee safely to distribute the estate, even if subsequent events show that the claim was worth more...

Once one has eliminated any need for a proof in order to activate the operation of the section, it ceases to be linked to any step in the procedure of bankruptcy or litigation. This is a sharp contrast with legal set-off, which can be invoked only by the filing of a defence in an action. Section 323, on the other hand, operates at the time of bankruptcy without any step having to be taken by either of the parties. The 'account' in accordance with section 323(2) must be taken whenever it is necessary for any purpose to ascertain the effect which the section had...

> The principles so far discussed should provide an answer to the first of the issues in this appeal, namely, whether if A, against whom B has a cross-claim, becomes bankrupt, A's claim against B continues to exist as a chose in action so that A's trustee can assign it to a third party. In my judgment the conclusion must be that the original chose in action ceases to exist and is replaced by a claim to a net balance. If the set-off is mandatory and self-executing and results, as of the bankruptcy date, in only a net balance being owing, I find it impossible to understand how the cross-claims can, as choses in action, each continue to exist.'

**[37]** It seems to me that I should first decide what the potential right to exoneration is. Mr Jones accepts that the costs of building the house should be deducted. Beyond that, the evidence is scarce. In my judgment, there is no distinction between that debt and the debt in relation to the purchase of the plot, as I find there most likely was. Mrs **Williams** accepted that her salary was modest and necessary for the second charge. She accepts that to some extent she was relying upon the business. It is likely, in my view, that there would have been costs of decoration and the provision of furniture for the family home. On the other hand, it is not the sort of case where her involvement in the family business was such as occurred in *Re Pittortou*.

*[2009] BPIR 748 at 760*

There were other assets on which she made claim but none were family assets. Mrs **Williams'** evidence, which I accept, was that shortly after the 1989 loan was made, Mr Richards left the home and did not pay anything towards the building society borrowing for which she was still looking for him to support her. I accept that evidence.

**[38]** Doing the best I can, in my judgment, half of the sum advanced in 1989 was referable to Mr Richards' debts and that is a sum in respect of which the right to exoneration arises. In my judgment, this inchoate right of indemnity in respect of an accounting exercise which may have to be carried out if Mrs **Williams** is called upon to pay these debts or if they are discharged out of the proceeds of sale of the property, does not amount to mutual dealings envisaged by s 323.

**[39]** Mr Sims accepted that that phrase is to be construed widely and may include contingent sums, but to say that it includes an inchoate right in respect of a beneficial interest in real property in my judgment is a step too far. The language used by Lord Hoffmann in *Stein v Blake* and the language used in the section itself is not apt, in my judgment, to include such a right. It would be a startling proposition if a beneficial interest of a trustee in, for example, a former matrimonial home might be extinguished on the date of a bankruptcy on the basis of whether on that precise date there was equity in the property or not.

**[40]** Two further points were made by Mr Sims. First, he says the right of exoneration was extinguished by transfer of the mortgage in 2001 to Mr **Williams.** As I have indicated, both he and his wife accept that there was no intention that payments would be made or would be due from Mrs **Williams.** That may have been the position as between them whilst married, but Mrs **Williams** also said, which I accept, she expected her husband's money to be protected. In my judgment, there was no intention that that transaction should act as a release so as to prejudice her right of exoneration as against the trustees interest.

**[41]** Secondly, he says that in any event her claim is limited to a claim put in the bankruptcy in 2008 in the sum of £31,000 odd. In my judgment, there is nothing in that technical point. As Mr Sims accepted, this claim appears to have been made for a tactical reason when the issues were already clearly joined between the parties. If permission is needed to enlarge the claim, then in my judgment it should be given.

**[42]** I turn now to deal with the remaining issues of proprietary estoppel and unjust enrichment. Mr Jones made it clear that he did not abandon these arguments but he was content to rely upon his written submissions. I accept Mr Sims' submissions that as a matter of principle there is no estoppel preventing a trustee performing these statutory duties which I have described (see *Smith v Lock (A Bankrupt) and Others* [1998] BPIR 786 and *Re Boorer* [2002] BPIR 21). Moreover, even if it could be said that an estoppel could

arise, it cannot arise in the course of negotiations for the sale of real property which both sides know is subject to completion (see *Yeoman's Row Management Ltd v Cobbe* [2008] UKHL 55, [2008] 1 WLR 1752, [2008] 4 All ER 713). But, in my judgment, the main reasons that this defence is unfounded are the findings of fact which I have made. It may be that the trustee at some stage had indicated to Mrs **Williams** that there was then no equity in the property. That is not, in my judgment, a clear representation that

*[2009] BPIR 748 at 761*

he had no interest in the property or that she was entitled to the whole of the property beneficially, and for that reason I reject that defence.

**[43]** Turning to unjust enrichment, it appears to be submitted by Mr Jones that the creditors have benefited by Mrs **Williams** not completing the transfer in 1992, but that was a matter for her. It is also said that the trustee has benefited from the increase in values. That is so, but so too has Mrs **Williams** who has shared from the estate. Accordingly, in my judgment, there is nothing in the unjust enrichment point.

**[44]** There are just one or two remaining issues. The first is as to capital improvements. Mrs **Williams** accepted in evidence that these were paid for by her then husband Mr Dean, with some assistance from her parents, but the information as to that is scant. It seems to me that only to the extent that her parents made a contribution to those improvements should credit be given.

**[45]** Finally, I must have regard to the question of interest payments and the discharge of them by Mrs **Williams.** In *Re Byford (Deceased), Byford v Butler* [2003] EWHC 1267 (Ch), [2003] BPIR 1089, [2004] 1 FLR 56, the court accepted and applied the principle that a trustee is entitled to an occupation rent from a co-owner who continues in occupation of the property in respect of which the trustee has a joint interest. It also accepted that in most cases the occupation rent would equal and cancel out any credit which might be claimed in relation to the discharge of mortgage interest repayments. That decision is not affected by the House of Lords decision in *Stack v Dowden* [2007] UKHL 17, [2007] 2 AC 432, [2007] 2 WLR 831, [2007] BPIR 913 (see *Re Barcham, sub nom French v Barcham* [2008] EWHC 1505 (Ch), [2009] 1 WLR 1124, [2008] BPIR 857). I have not forgotten the passage in the judgment of Millett J in the case of *Re Pavlou*, which I have already quoted.

**[46]** Evidence has been obtained as to the rental value of the property. In my judgment, having regard to the findings which I made, it is appropriate in this case to adopt a broad approach similar to that adopted in *Re Byford* and *Re Barcham*, and that is the approach which in my judgment is appropriate in this case.

*Solicitors: Eversheds for the applicant, Mr **Bateman,** the trustee in bankruptcy*

*Gwilym Hughes & Partners for the respondents, Mr and Mrs **Williams***

(Part 1) Pg 34 of 66

*BP Exploration Co (Libya) Ltd v Hunt (No. 2)*
[1979] 1 W.L.R. 783

[QUEEN'S BENCH DIVISION]

# * B.P. EXPLORATION CO. (LIBYA) LTD. v. HUNT (No. 2)

[1975 B. No. 4490]

1977 Oct. 24–28, 31; Nov. 1–4, 7–11, 14–18, 21–24, 28–30; Dec. 1, 2, 5–9, 12–16, 19–21;

1978 Jan. 11–13, 16–20, 23–27, 30, 31; June 30; Sept. 13, 14; Oct. 6; Nov. 8; Dec. 7;

1979 March 16

Robert Goff J.

*Contract—Frustration—Remedy—Agreement to develop oil concession—Concession developed into oil field on stream —Agreement frustrated by Libyan Government expropriating one party's interest in field and excluding them from field—Resulting unjust enrichment of other party—Principles to be applied in awarding just sum—Currency of award—Whether interest payable on sum awarded—Law Reform (Miscellaneous Provisions) Act* 1934 (24 & 25 *Geo.* 5, *c.* 41), *s.* 3 [1]*—Law Reform (Frustrated Contracts) Act* 1943 (6 & 7 *Geo.* 6, *c.* 40), *ss.* 1 (3), 2 (3) [2]

The defendant was the owner of an oil concession in Libya. He entered into a "farm-in" agreement with the plaintiffs, under which the plaintiffs received a half-share in the concession and agreed in return (a) to transfer to the defendant certain "farm-in" contributions in cash and in oil, and (b) to undertake the exploration of the concession and, if oil was found, the development of and production of oil from the field. Under the agreement, the plaintiffs were to provide all necessary finance until the field came on stream; but once the field came on stream, the plaintiffs were to take and receive not only one-half of all oil produced from the field, but also "reimbursement oil" in the form of three-eighths of the defendant's share of the production until the plaintiffs had received in reimbursement 125 per cent. of their farm-in contributions and of one-half of the money expended by them in the exploration and development of the field before it came on stream. After the field came on stream, the cost of production and development of the field was to be borne equally by the two parties. By a later amending agreement, entered into after the field had come on stream, the reimbursement oil in respect of the plaintiffs' farm-in contributions and expenditure before the field came on stream was fixed at 50 million barrels of oil.

The agreement between the parties, which was contained in two documents (called the letter agreement and the operating agreement) provided, in clause 6 of the letter agreement, that "It is specifically understood and agreed that Hunt shall have no personal liability to repay the sums required in

[1] Law Reform (Miscellaneous Provisions) Act 1934, s. 3: see post, p. 835E.
[2] Law Reform (Frustrated Contracts) Act 1943, s. 1 (2) (3): see post, p. 797D–F. S. 2 (3): see post, p. 797H.

the operating agreement and this letter agreement to be advanced by BP for Hunt's account or paid to Hunt, but BP's right to recover any such sum which BP is required to pay or advance for Hunt's account shall be limited to recovery solely out of three-eighths of Hunt's half share of the production, and in the manner specified under section 9 of the operating agreement, if, as and when produced, saved and delivered at the Libyan sea terminal."

The plaintiffs discovered a giant oilfield in the concession. The exploration and development of the oilfield (on which the plaintiffs expended many millions of pounds) was completed by the end of 1966, and the field came on stream in January 1967. Thereafter substantial quantities of oil were produced from the field. In December 1971, the Libyan Government enacted a law purporting to expropriate the plaintiffs' interest in the concession, and thereafter excluded the plaintiffs from the concession and production facilities. Following the expropriation of the plaintiffs, the defendant continued to export some oil for his own account with the consent of the plaintiffs; but he did so under conditions of increasing difficulty, and in June 1973 the Libyan Government purported to expropriate the defendant's interest in the concession, and wholly excluded him from the concession.

By December 1971, when the plaintiff's interest was expropriated, they had received about one-third of the reimbursement oil to which they were entitled: after their expropriation, they received no further oil from the field.

Both the plaintiffs and the defendant in turn alleged that the expropriation of their interests by the Libyan Government was unlawful; but later, after the expropriation of the defendant, each party entered into a separate settlement with the Libyan Government under which the Libyan Government paid compensation based upon the book value of the facilities in Libya, but no compensation was paid for the loss of the concession itself.

The plaintiffs claimed a declaration that the contract had been frustrated, and the award of a just sum under section 1 (3) of the Law Reform (Frustrated Contracts) Act 1943. The defendant contended that the contract was not governed by English law, and had not been frustrated, so that the Act had no application: in the alternative, he denied that the plaintiffs were entitled to any award under the Act, and himself claimed such an award.

*Held*, (1) that the contract was governed by English law (post, p. 809A).

*B.P. Exploration Co. (Libya) Ltd.* v. *Hunt* [1976] 1 W.L.R. 788 followed.

(2) That the contract was frustrated in December 1971, and that the plaintiffs were not precluded (by estoppel, waiver or fresh agreement) from asserting that the contract had been frustrated (post, pp. 809B, 814E).

(3) That the prerequisites for the application of the Act were therefore fulfilled (post, p. 814F).

(4) That, in considering whether to make an award under section 1 (3) of the Act of 1943, the court has to apply the following principles: (a) The court has first to ascertain whether the defendant has, by reason of something done by the plaintiff in, or for the purpose of, the performance of the contract, obtained a valuable benefit (other than a payment of money) before the time of discharge. That benefit has to be identified, and valued; and forms the upper limit of any award. The benefit so identified should not be equated with the services rendered by the plaintiff, but may in an appropriate case be the end product of those services. The benefit is to be valued as at the date of frustration; but no allowance is to be made

for the "time value of money", i.e. the notional benefit derived from the fact that the defendant has had the use of the product of the plaintiff's contractual performance over a period of time before the frustrating event occurred. From the benefit as so valued, there has to be deducted the amount of any expenditure incurred by the defendant before the time of discharge in, or for the purpose of, the performance of the contract; and there has to be taken into account the effect, in relation to the benefit, of the circumstances giving rise to the frustration of the contract. (b) The court has next to assess a just sum to award to the plaintiff in respect of his performance. In considering the assessment of such sum, the court may have regard to the contract consideration as providing evidence of the appropriate level of remuneration; in many cases, it will be unjust to award more than the contract consideration, or a rateable part of it. (c) The amount to be awarded to the plaintiff will be the just sum, unless the benefit obtained by the defendant, valued on the principles stated above, is less, in which event the award will be limited to the amount of that benefit (post, pp. 799A—806E).

(5) That, applying the foregoing principles to the plaintiffs' claim (a) The defendant's benefit was the enhancement in the value of his share in the concession; but that benefit was greatly reduced by the effect of the circumstances giving rise to the frustration of the contract, and was thereby limited to the benefit of the oil obtained by him from the concession and the benefit of his settlement with the Libyan Government. Furthermore, only half of the benefit derived from the plaintiffs' contractual performance, the other half deriving from the defendant's ownership of the concession. On this basis, the defendant's benefit was valued at U.S. $84,951,000 (net of reimbursement oil) (post, pp. 814H—821E). (b) If the just sum to be awarded to the plaintiffs were to be assessed in U.S. dollars it would be assessed at U.S. $35,403,146. In assessing that sum regard was had to the contract between the parties as providing excellent evidence of the level of remuneration to be awarded; the terms of the amending agreement were disregarded as being too speculative to provide helpful guidance. In assessing the sum, the value of the reimbursement oil already taken and received by the plaintiffs was also brought into account (post, pp. 821F—828A). (c) On its true construction, clause 6 of the letter agreement was only applicable in its contractual context, and was not intended to apply in the event of frustration; it did not therefore have the effect, under section 2 (3) of the Act of 1943, of excluding an award to the plaintiffs (post, pp. 828C—833C). (d) That the just sum as so assessed being less than the benefit obtained by the defendant, the latter did not have the effect of reducing the award to the plaintiffs.

(6) That allegations by the defendant that the plaintiffs had broken their contract in a number of respects in the course of the development of the field were without foundation; and, even if proved, they would have had no bearing upon the just sum to be awarded to the plaintiffs under the Act (post, p. 828A–B).

(7) That, in selecting the currency of an award of restitution, attention should be concentrated on the defendant's benefit rather than the plaintiffs' expense; and the currency to be selected was the currency in which the defendant's benefit could most fairly and appropriately be valued (post, pp. 839D—841G).

*The Despina R* and *Services Europe Atlantique Sud (SEAS)* v. *Stockholm Rederiaktiebolag Svea* [1978] 3 W.L.R. 804, H.L.(E.) applied.

(8) That, having regard to all the circumstances (including

in particular the terms of the contract under which the plaintiffs' services were rendered, but disregarding the terms of the amending agreement) the just sum should, in so far as it related to the "farm-in" cash and oil, be assessed in U.S. dollars, and in so far as it related to the services rendered by the plaintiffs in exploration and development of, and production of oil from the field, be assessed in sterling; and the just sum to be awarded to the plaintiffs was U.S. $10,801,534 and £5,666,399 (post, pp. 841G—845D).

(9) That the defendant was liable to pay to the plaintiffs £127,465 in respect of various sums expended by the plaintiffs for the defendant's account after the expropriation of their interest (post, p. 835B).

(10) That a claim for an award under section 1 of the Act of 1943 was a claim for the recovery of a debt within the meaning of section 3 of the Law Reform (Miscellaneous) Provisions Act 1934 and therefore the court had power to award interest, from the date of accrual of the cause of action (viz. the date of frustration), on a just sum awarded under section 1 (3) of the Act of 1943 (post, pp. 835C—837C); that the court would in the exercise of its discretion grant interest on the award but, in the circumstances, interest would run from the date that the plaintiffs made clear to the defendant their intention to claim restitution, viz. June 14, 1974 (post, pp. 845D—849C).

(11) Dismissing the defendant's cross-claim, that the defendant had been fully recompensed for his contractual performance whereby the plaintiffs obtained their valuable benefit and accordingly the defendant was not entitled to any award under the Act (post, pp. 833C—834B).

The above headnote was drafted by Robert Goff J.

The following cases are referred to in the judgment:

*Aldora, The* [1975] Q.B. 748; [1975] 2 W.L.R. 791; [1975] 2 All E.R. 69.
*Bank Line Ltd.* v. *Arthur Capel & Co.* [1919] A.C. 435, H.L.(E.).
*Berwickshire, The* [1950] P. 204.
*Bowling* v. *Cox* [1926] A.C. 751, P.C.
*Business Computers Ltd.* v. *Anglo-African Leasing Ltd.* [1977] 1 W.L.R. 578; [1977] 2 All E.R. 741.
*Chandler* v. *Webster* [1904] 1 K.B. 493, C.A.
*Despina R, The* [1978] 3 W.L.R. 804; [1979] 1 All E.R. 421, H.L.(E.).
*Diplock, In re* [1948] Ch. 465; [1948] 2 All E.R. 318.
*Eugenia, The* [1964] 2 Q.B. 226; [1964] 2 W.L.R. 114; [1964] 1 All E.R. 161, C.A.
*Fibrosa Spolka Akcyjna* v. *Fairbairn Lawson Combe Barbour Ltd.*, [1943] A.C. 32; [1942] 2 All E.R. 122, H.L.(E.)
*General Tire & Rubber Co.* v. *Firestone Tyre & Rubber Co. Ltd.* [1975] 1 W.L.R. 819; [1975] 2 All E.R. 173, H.L.(E.).
*Heyman* v. *Darwins Ltd.* [1942] A.C. 356; [1942] 1 All E.R. 337, H.L.(E).
*Hirji Mulji* v. *Cheong Yue Steamship Co. Ltd.* [1926] A.C. 497, P.C.
*Hughes* v. *Metropolitan Railway Co.* (1877) 2 App.Cas. 439, H.L.(E.).
*Jefford* v. *Gee* [1970] 2 Q.B. 130; [1970] 2 W.L.R. 702; [1970] 1 All E.R. 1202, C.A.
*Liesbosch Dredger (Owners of)* v. *Owners of S.S. Edison* [1933] A.C. 449, H.L.(E.).
*Panchaud Frères S.A.* v. *Etablissements General Grain Co.* [1970] 1 Lloyd's Rep. 53, C.A.

*Pickett* v. *British Rail Engineering Ltd.* [1978] 3 W.L.R. 955; [1979] 1 All E.R. 774, H.L.(E.).

*Services Europe Atlantique Sud (SEAS)* v. *Stockholms Rederiaktiebolag Svea (The Folias)* [1978] 3 W.L.R. 804; [1979] 1 All E.R. 421, H.L.(E.).

*Société Franco Tunisienne D'Armement* v. *Sidermar S.P.A.* [1961] 2 Q.B. 278; [1960] 3 W.L.R. 701; [1960] 2 All E.R. 529.

*Way* v. *Latilla* [1937] 3 All E.R. 759, H.L.(E.).

*Woodhouse A.C. Israel Cocoa Ltd. S.A.* v. *Nigerian Produce Marketing Co. Ltd.* [1972] A.C. 741; [1972] 2 W.L.R. 1090; [1972] 2 All E.R. 271, H.L.(E.).

No additional cases were cited in argument.

ACTION

By a writ dated May 2, 1975, the plaintiffs, B.P. Exploration Co. (Libya) Ltd. ("B.P."), brought an action against the defendant, Nelson Bunker Hunt, claiming by their re-amended points of claim, inter alia, a declaration that a letter agreement and an operating agreement as well as all subsequent agreements supplementary thereto relating to Concession 65 were frustrated by the expropriation by the Libyan Government of the plaintiffs' activities and interests in Concession 65 on December 7, 1971, and/or by the consequences thereof, alternatively by the expropriation by the Libyan Government of the defendant's activities and interests in Concession 65 on June 11, 1973, and/or by the consequences thereof; such sums as the court considered just in respect of the valuable benefits obtained by the defendant pursuant to the Law Reform (Frustrated Contracts) Act 1943 alternatively such sums limited to the value of or, alternatively, to be satisfied by the delivery of 9,993,750 barrels of Libyan crude oil out of the quantity lifted by the defendant between December 8, 1971, and May 23, 1973, or out of the proceeds of the sale thereof, or by the delivery of a like quantity of oil of a like quality in lieu; damages for breach of contract; an account and an order for payment by the defendant of any sums found due thereunder; damages for conversion; and interest.

The defendant by his re-amended points of defence, inter alia, denied that the nationalisation of B.P.'s interest in Concession 65 frustrated the contractual agreements between the parties; that the purported nationalisation amounted to force majeure as provided for under clause 27 of the operating agreement; that B.P.'s settlement with the Libyan Government on November 20, 1974, was in breach and repudiation of the agreements between the parties; that B.P. could not rely on the Law Reform (Frustrated Contracts) Act 1943 as the contractual agreements were not governed by English law but by Texan law and the agreements had provisions which were intended to have effect in the event of circumstances arising which operated or would but for those provisions have operated to frustrate the contract; that all risks affecting production expenditure were assumed by B.P., and B.P.'s sole right to reimbursement was defined by clause 6 of the letter agreement, and clause 9 (e) of the operating agreement; and that the defendant had fulfilled his obligation to B.P. in respect of pre-production expenses.

By his counterclaim the defendant alleged that if the contractual agreements had been frustrated, B.P. had received valuable benefits and, by B.P.'s surrender of their interests to the Libyan Government, they were

in breach of contract. He claimed such sums as the court considered just under the Act of 1943, damages and interest.

The facts are stated in the judgment.

*Anthony Lloyd Q.C.*, *Kenneth Rokison Q.C.*, *I. A. Milligan* and *Richard Wood* for the plaintiff company.

*Robert Alexander Q.C.*, *Nicholas Lyell*, *Peregrin Simon* and *Stephen Ruttle* for the defendant.

*Cur. adv. vult.*

June 30, 1978. ROBERT GOFF J. read the following judgment. This case is concerned with a claim by the plaintiffs, B.P. Exploration Co. (Libya) Ltd., a wholly owned subsidiary within the B.P. group of companies, against the defendant, Mr. Hunt, a citizen of the United States. I shall refer to the plaintiffs simply as "B.P.", unless the context requires me to distinguish them from the companies in the B.P. group, then I shall refer to them as the "plaintiff company."

B.P.'s principal claim is for the award of a just sum under section 1 (3) of the Law Reform (Frustrated Contracts) Act 1943; there are however certain other claims by B.P. and certain cross-claims by Mr. Hunt including a cross-claim by him for an award under the Act of 1943. B.P.'s claim under the Act is advanced on the grounds that a contract between the parties, relating to the development of, and production of oil from, a concession in Libya, was frustrated when, on December 7, 1971, after the field had come on stream, B.P.'s interest in the concession was expropriated by the Libyan Government: and that, by reason of B.P.'s contractual performance before that date, Mr. Hunt had obtained a valuable benefit, on the basis of which the court should exercise its power under section 1 (3) of the Act to award a just sum to B.P.

The case has many remarkable features. It is, I have been told, the first case to be decided under the Act of 1943. So, although the Act was placed on the statute book 35 years ago, this is the first occasion on which the Act has been considered by a court. The construction of the Act has not proved an easy task, and the task has been made no easier by the fact that it is doubtful if the present case is one which the legislature had in mind when considering the form which the Act should take. But, in addition to difficult and novel questions of law, the case involves substantial questions of fact and of accounting procedure. The sums involved are enormous; B.P.'s claim was advanced in a number of alternative ways, the sum claimed varying from nearly $45,000,000 to nearly $230,000,000. Furthermore, allegations made by Mr. Hunt relating the manner in which B.P. developed the oilfield led to an investigation of almost the entire history of the exploration, appraisal, and development of the field, and the production of oil from the field. This investigation required a substantial body of evidence, much of it technical; and the documents before the court, which were very largely concerned with these allegations by Mr. Hunt, were very numerous—I was told that there were over 15,000 documents in court. Many of these were of a technical nature; and in any event they represented only the tip of the iceberg of documents disclosed on discovery. Only by reason of the good sense and restraint shown by counsel on both sides, and the efficiency of their instructing solicitors, was it possible for so substantial a piece of litigation to be kept under control and for the

hearing to take no longer than 57 days. The court wishes to record its gratitude to all concerned, and in particular to counsel on both sides for their assistance in elucidating the difficult questions of fact and law before the court.

The oilfield with which the action is concerned came to be known as the Sarir Field. It lies in the heart of the Libyan desert, about 500 kilometres to the south of Tobruk. The field lies within an area known as Concession 65. This is one of the many areas in which the Libyan Government granted rights to explore for and to extract oil. Concession 65 partially covered an area extending about 200 kilometres from east to west and about 75 kilometres from north to south. The concession was granted to Mr. Hunt on December 18, 1957. Other concessions were granted to B.P.; two of them, Concessions 80 and 81, adjoined Concession 65.

Now whereas B.P. is a major oil company with world-wide interests and a long and successful history of oil exploration, Mr. Hunt is a comparatively small independent producer whose interests, apart from this venture in Libya, were almost entirely restricted to the United States. Mr. Hunt lacked both the resources and the experience to explore Concession 65 or, if oil was found there, to develop it. Before entering into the contract with B.P., he carried out some preliminary reconnaissance in the concession. The terms of the concession however required him to start drilling for oil within three years from the date of the concession, namely, by December 18, 1960; and by the summer of 1960 he had carried out no exploration drilling. Time was running out for Mr. Hunt. On the other hand, B.P.'s concessions were not proving to be productive. Some oil was found in Concession 80, but even there the prospects were not good. However, their exploration in the two concessions adjoining Concession 65 led them to believe that the prospects of discovering oil in commercial quantities in that concession were rather more hopeful.

In the result, on June 24, 1960, B.P. and Mr. Hunt entered into an agreement for the exploration and development of Concession 65. The agreement was a so-called farm-in agreement. I shall have, later in this judgment, to set out the provisions of this agreement in some detail. It took the form of a document, called the letter agreement, to which were scheduled a draft assignment by Mr. Hunt to B.P. of a half-share in the concession, and a draft operating agreement; by the letter agreement, Mr. Hunt agreed to execute an assignment in the form of the draft (schedule A) immediately on the granting of approval of such assignment by the Libyan Petroleum Commission, and upon such grant of approval B.P. and Mr. Hunt agreed to execute an operating agreement in the form of the draft (schedule B). B.P. further undertook to transfer to Mr. Hunt certain farm-in contributions in cash and in oil, and undertook as operator the task of exploring the concession for oil and, if oil was found in commercial quantities, of developing the field and creating the necessary facilities to bring the field on stream. The agreement imposed on B.P. certain minimum obligations in their task of exploring the concession. Obviously the expenditure incurred in the exploration and development of an oilfield can be enormous. Under the agreement, however, up to the time when the field came on stream, all funds had to be advanced by B.P. Half such expenditure would be incurred for Mr. Hunt's account; but under the contract B.P. had no right of recoupment in respect of Mr. Hunt's share of the expenditure until the oil came

on stream. All oil produced from the field belonged to both B.P. and Mr. Hunt, and was to be shared equally between them, subject to the provision that B.P. was entitled to take and receive a proportion of Mr. Hunt's share of the oil, such proportion being called reimbursement oil, in order to recoup both the expenditure incurred by them for Mr. Hunt's account before the field came on stream, and their farm-in contributions, plus 25 per cent. Once the field came on stream, Mr. Hunt had to bear half the cost of production, and of further development of the field. It followed that the risk of finding oil in commercial quantities rested on B.P.; but if all went well they would recover, out of Mr. Hunt's share of the oil, 125 per cent. of their farm-in contributions and of half their initial investment in the field.

The agreement was entered into on June 24, 1960. Under the terms of his concession, Mr. Hunt's power of assignment was limited, and it was necessary to obtain the consent of the Libyan Petroleum Commission to the assignment of a half-share in the concession to B.P. That consent was obtained on September 11, 1960; and on November 10, 1960, Mr. Hunt executed as agreed an assignment to B.P. of an undivided half interest and title in and to the concession, subject to the rights and obligations contained in the concession. The assignment also contained terms which broadly reflected provisions of the operating agreement under which B.P. undertook the task of operator in the concession. At the same time the parties should have executed an operating agreement in the form of the draft in schedule B to the letter agreement; they did not in fact do so, but both parties treated themselves as bound by its terms, and it was undisputed that they were so bound.

The deadline under the concession for the commencement of drilling was December 18, 1960, only five or six weeks after the execution of the assignment. B.P. complied with that deadline by starting to drill the first exploration (or "wildcat") well (known as A1) on November 22. That well proved to be dry. A second wildcat well (B1) was drilled, starting in March 1961; that too proved to be dry. But the third well (C1) proved to be successful. Drilling started on that well in late August 1961 and was completed before the end of the year. There then followed the period of appraisement of the C Field, which I shall have to consider in more detail later in this judgment. By June 1963, when the eleventh well (C11) of the C Field had been drilled, there were sufficient prospects of oil to allow a decision to be made to go commercial, i.e. to build the necessary facilities in the field, the pipeline to the coast and the sea terminal for the storage and shipment of crude oil. A site had already been selected for the construction of a terminal near Tobruk, at a place called Marsa al Hariga. Apart from building gathering stations and related facilities in the field, a 34-inch pipeline had to be laid for a distance of over 500 kilometres across the Calanscio Sand Sea, in itself a major operation. However, before constructing the terminal at Marsa al Hariga, consent had to be obtained from the Libyan Government; and for various reasons, which I shall have to consider later in this judgment, that consent was not forthcoming until June 24, 1964.

The work was then put out to tender in five separate sections; the successful main contractor for the pipeline contract, which was the major section, was a firm called Price Neal Mothercat & Co. Consent for the main contractor for the pipeline contract was not forthcoming

from the Libyan Government until November 4, 1964 (due to a misapprehension on the part of the Libyan Government that Mr. Price was a Jew). The main contractor was then able to start work; and the pipeline was completed on November 14, 1966. The contract period for the building of the pipeline was 23 months; the pipeline was completed only six weeks late, and I was told, and I have no reason to doubt, that in the quite exceptionally difficult conditions this was a most creditable effort. Production started through the newly completed pipeline and terminal on January 11, 1967.

In the meanwhile, the appraisal of the field had continued. Many more wells had been drilled. In particular, another field (which came to be known as the L Field) had been discovered in 1960. This field lay approximately 25 kilometres to the north of the Main C Field. The oil produced from the C Field was valuable because it had a low sulphur content; but it was waxy, which created pumping problems, particularly in the winter months. The oil from the L Field was less waxy than the oil from the C Field, and the mixture of the former oil with the latter eased the problem of pumpability, particularly with a winter start-up in early 1967.

Production started at a rate of 100,000 barrels per day. Again, I shall have to consider later in more detail how this figure came to be chosen. Difficulties however arose under the terms of the contract between the parties, which militated against increasing the rate of production of the oil. These however were resolved by an amending agreement dated June 30, 1967, the detailed terms of which I shall set out in due course. One of the provisions of that agreement provided for an increase, as soon as practicable, in the rate of production from the field to 160,000 barrels per day (b.p.d.); another important provision fixed the amount of reimbursement oil due in respect of B.P.'s expenditure before the field came on stream, and their farm-in contributions in cash and oil, at 50 million barrels of oil, whereas reimbursement oil was recoverable by B.P. in respect of Mr. Hunt's share of expenses incurred after the date the field came on stream at the market price applicable at the date at which the oil was delivered. The oil deliverable to B.P. in respect of both these oil debts (which came to be known as the first and second oil debts respectively) was pegged at 18,750 b.p.d., or three-eighths of Mr. Hunt's share of the average daily production, whichever should be the less; in practice, 18,750 b.p.d. was always the less and so became thereafter the fixed rate of delivery of reimbursement oil.

That amending agreement was dated June 30, 1967. Earlier in that month there had occurred the Arab-Israeli War of 1967, the so-called June War, which led to the closure of the Suez Canal for a number of years. The result was to make Libyan oil much more valuable in the European market than oil from the Middle East, which thereafter had to be transported round the Cape of Good Hope; this fact provided a strong incentive to both parties to increase production from the Sarir Field. Furthermore, as the field was proved up it became apparent that it was a giant oilfield. By August 1967 production had increased to 250,000 b.p.d., and by January 1968 to 300,000 b.p.d. Further increases took place in late 1969 and again in late 1970; these increases in production brought the average rate in 1970 to over 400,000 b.p.d. By early 1971 the rate of production was approaching 450,000 b.p.d.

However on September 1, 1969, there had occurred an event which was later to have a profound effect upon the activities of the parties. That was the revolution which overthrew the Government of King Idris of Libya and substituted the Government of the Revolutionary Command Council (RCC) led by Colonel Gaddafi. In July 1970, the new Libyan Government started a campaign to increase posted prices. This it did by exerting pressure on the oil companies, one by one, by ordering them to cut back production. The campaign was successful, and led to a general increase in the posted prices; but it was one of the events which led to the oil companies joining together, in self-protection, in a secret agreement dated January 15, 1971, which became commonly known as the Safety Net Agreement. The effect of the agreement was, broadly speaking, that if any one party should have its production cut back by the Libyan Government, this lost production should be made up by the other parties to the agreement.

However a few months later a more catastrophic event occurred. On December 7, 1971, the Libyan Government expropriated B.P.'s assets in Concession 65. It appears that the decision of the Libyan Government to do so had no connection with B.P.'s activities in Libya. It arose out of the annexation by Iran of three small islands in the Persian Gulf. The Libyan Government appears to have regarded the annexation of these islands as contrary to Arab interests, and also to have regarded the British Government as bearing some responsibility because the islands were in some sense under British protection. The Libyan Government considered breaking off diplomatic relations with the British Government but in the end decided to expropriate B.P.'s assets in Concession 65.

Libyan Government forces then took over the field and occupied B.P.'s offices in Benghazi and Tripoli. B.P.'s employees were only allowed by the Libyan forces to enter their offices for very limited purposes, and were prevented altogether from exercising any control over the operations in Concession 65. Attempts were made by the Libyans to recruit B.P.'s expatriate personnel to their new national oil company, Arab Gulf Exploration Co. (A.G.E.C.), but these were unsuccessful; Mr. Hunt also attempted to recruit them, but his offers too were refused. By December 23, all B.P.'s expatriate personnel had left the country. The Libyan personnel were compelled to work for A.G.E.C. Mr. Hunt recruited, and brought to Libya, new staff to assist in the operation of the field and production facilities. There is no doubt whatsoever that, as from December 9, 1971, whatever might be the legality of the Libyan Government's action, B.P. were effectively excluded from their offices and from any control over the field and its related facilities. They were in consequence prevented from carrying out their obligations or exercising their rights under the letter agreement, the operating agreement and subsequent amending agreements. In particular, they could no longer exercise their rights and duties as operator. They could not operate the field, the production facilities or the sea terminal, or take any part in the further development of the field; and, as events turned out, it was in practice impossible for them to take delivery of any oil from the sea terminal, whether as reimbursement oil or otherwise. In other words, they were in practical terms completely excluded physically from the field and its related facilities, and prevented from drawing any oil from the field.

On December 9, 1971, B.P. served a force majeure notice on Mr.

Hunt pursuant to section 27 of the operating agreement. They announced publicly their refusal to recognise the Libyan Government's action as lawful; and they commenced arbitration proceedings against the Libyan Government under clause 28 of the concession. They also commenced what came to be known as "hot oil" suits—proceedings brought in various countries in which they claimed title to oil exported by the Libyan Government from the Sarir Field.

Meanwhile, Mr. Hunt found himself in a position of very considerable difficulty. On the one hand, the Libyan Government were urging him, with alternative use of carrot and stick, to co-operate with them in the exploitation of the field, and in particular in marketing oil for them; on the other hand, Mr. Hunt was a party to the Safety Net Agreement, and the international oil industry were backing B.P. in their stand against the Libyan Government. Indeed, although it created great difficulties for him, Mr. Hunt sympathised with B.P.'s position, and was later to adopt the same attitude when he in turn was expropriated by the Libyan Government. It appears that, almost immediately after the expropriation of B.P., the Libyan Government held production from the field to about 250,000 b.p.d. Mr. Hunt entered into negotiations with the Libyans, through Mr. Schuler, his representative in Libya. In these negotiations, intense pressure was brought to bear upon Mr. Hunt to co-operate in the marketing of oil for A.G.E.C. I have no doubt that throughout the ensuing period Mr. Hunt's prime consideration was to protect his own interests, and in particular to continue to export oil from the field for his own account. But in fact he was in a very difficult position. He was unable to submit to A.G.E.C.'s demands that he should market their oil, without running the obvious risk that B.P. would attach A.G.E.C.'s liftings from the field and without incurring the opprobrium of the whole oil industry. As a result his position steadily deteriorated. On January 4, 1972, he served a force majeure notice on B.P. On the same day, he entered into the first of three ad hoc agreements with B.P., under which B.P. agreed that he should be entitled to continue to produce oil from the field up to a certain rate during the first six months of 1972. The precise terms and effect of these agreements I shall have to consider later in this judgment; I should, however, record at this stage that in each case the figure agreed was expressed to include reimbursement oil at the rate of 18,750 b.p.d., but that Mr. Hunt never lifted from the field oil at a greater rate than the specified amount less the figure for reimbursement oil. On January 13, 1972, B.P. proposed to put in an Esso ship to lift reimbursement oil from the field from their account; Mr. Hunt declined to assist, fearing, with justification, the consequences to his own position in Libya. His fear was that, although the matter had never expressly been raised between him and the Libyans, the Libyans might nevertheless claim title to the reimbursement oil by virtue of the terms of their nationalisation decree; and it was therefore feared that, if the Libyans should discover that reimbursement oil had been lifted by B.P., with the assistance of Mr. Hunt, he and his personnel might incur the penalties specified in the decree in the event of its violation. Even so, during February and March three liftings were successfully made for B.P. by other companies under the Safety Net Agreement.

However, Mr. Hunt's refusal to assist A.G.E.C. in the marketing of their oil put him in an impossible position. The matter was summarised by Mr. Schuler in his evidence as follows:

"The nationalisation of B.P. created immediately, and surviving through until Mr. Hunt's expropriation, a situation where the operation of the concession was totally outside of anything Mr. Hunt could do to influence or control it, so long as he was unwilling to market the oil. It left him in a very vulnerable and exposed position. It was Libyan practice to prey upon the most vulnerable and exposed producer in Libya in order to extort whatever demands they were seeking; Mr. Hunt was left in such an exposed position by the nationalisation of B.P. and his refusal to co-operate with A.G.E.C. in marketing that oil."

Indeed, as early as January 1972 Mr. Hunt's own operatives were excluded from the field on the order of the Libyans, and returned to the United States. From then on, Mr. Hunt was only able to ship such oil from the sea terminal as the Libyans allowed him to take. In May or June 1972, the Libyans cut back production from the field to an even lower figure; the exact figure is not clear, but it was probably little more than 100,000 b.p.d. The purpose of this cutback may have been to provide the Libyans with an argument that oil which they were then shipping to the Russians and Rumanians came out of Mr. Hunt's share of the oil, and not out of B.P.'s share: but the effect was still further to reduce the amount of oil available to Mr. Hunt, whose ships took their place in the queue after the Russians and Rumanians. On June 29, B.P. and Mr. Hunt entered into a second ad hoc agreement, covering the second half of 1972. As a result of the cutbacks in May and June, Mr. Hunt himself started to receive oil under the Safety Net Agreement. In the course of the autumn of 1972, the Libyans stepped up their pressure on Mr. Hunt, imposing an increase in the posted price and demanding participation in his share of the concession, a demand which Mr. Hunt resisted. In December the Libyans cut back production from the field still further, to a little over 80,000 b.p.d. On December 27, 1972, B.P. and Mr. Hunt entered into the third of their ad hoc agreements, covering the first half of 1973. In that month, the Libyans were refusing to load some of Mr. Hunt's ships. In 1973, under conditions of increasing difficulty, Mr. Hunt continued to export some oil from the concession. The last ship he was able to load sailed in May 1973. The Libyans prevented the loading of the next two ships he put in; and on June 11, 1973, his interests in Concession 65 were expropriated by a law passed on that date.

On October 3, 1973, war broke out again in the Middle East, leading to a very substantial increase in the price of oil. On November 20, 1974, B.P. settled their differences with the Libyan Government, and in May 1975 Mr. Hunt, in his turn, entered into a settlement with that Government. I should record that by December 9, 1971, when their interests in Concession 65 were expropriated, B.P. had received in reimbursement oil 33,101,811 barrels—approximately, two-thirds of the first oil debt; after that date B.P. received no further oil from the concession, other than the three shipments of oil supplied to them by other companies under the Safety Net Agreement. I should also record that if the Libyan Law which purported to expropriate B.P.'s interest in Concession 65 was lawful (and in my judgment, having heard evidence from Libyan lawyers on the point, it was not), and if the Libyan law, had it been lawful, was effective to vest in A.G.E.C. any right to the balance of reimbursement oil (as to which there was a difference of opinion between

the Libyan lawyers who gave evidence), nevertheless A.G.E.C. made no attempt to enforce that right against Mr. Hunt, and the terms of the Libyan Government's settlement with Mr. Hunt were so wide as to preclude the Libyan Government or A.G.E.C. from thereafter enforcing any such right against him.

On May 2, 1975, B.P. commenced proceedings against Mr. Hunt by an action in this country. In that action they claimed a declaration that the letter agreement, the operating agreement and all other agreements supplementary thereto relating to Concession 65 were frustrated by the action of the Libyan Government in December 1971, and further claimed the award of a just sum pursuant to the Act of 1943. They also advanced certain other subsidiary claims. On May 1, Donaldson J. had given leave to B.P. to issue the writ and serve it on Mr. Hunt outside the jurisdiction, on the basis that the action affected a contract governed by English law. There followed various unsuccessful attempts by B.P. to serve the writ on Mr. Hunt personally. On June 10 Mr. Hunt started rival proceedings against B.P. in Texas, claiming a declaration that he was under no liability to them. On June 19 Donaldson J. made an order for substituted service of the English proceedings on Mr. Hunt, and the writ was served pursuant to that order. Mr. Hunt then applied for the writ in the English proceedings to be set aside. He relied upon a number of grounds, a principal submission being that the contract between him and B.P. was governed not by English law but by the law of Texas or alternatively the law of Libya. His application was heard by Kerr J. in October 1975 and, after a hearing lasting five days, Kerr J. rejected all Mr. Hunt's arguments and declined to set aside the writ: see [1976] 1 W.L.R. 788. Thereafter B.P. were free to proceed with their action in this country; and the matter finally came on for hearing before me on October 24, 1977.

Having set out the history of the matter in very brief outline I now propose to set out the more relevant provisions of the governing documents in the case. [His Lordship referred to the concession between the Libyan Petroleum Commission and Mr. Hunt; the letter agreement between the parties including clause 6 (see post, p. 828F–G); the assignment dated November 10, 1960, by which Mr. Hunt assigned to B.P. an undivided one-half interest in and title to the concession; the operating agreement including section 9 (e) (see post, p. 828H—829A); the memoranda of agreement dated June 30, 1967, and May 1, 1968; Libyan laws; the settlement between the Libyan Government and B.P. dated November 20, 1974; and the settlement between that Government and Mr. Hunt dated May 19, 1975. His Lordship continued:] The issue which dominated the factual aspect of the case was the one which became known as the due diligence issue. This arose out of paragraph 13 of the points of defence, served on May 26, 1976, in which a number of matters were pleaded by Mr. Hunt in support of his contention that, if the contract was frustrated, nevertheless it was not just that any sum should be paid by him to B.P. under the Act of 1943. Paragraph 13 (2) (g) was in the following terms:

> "B.P. did not diligently develop the said concession or produce save and deliver oil at the best possible rate or in accordance with the terms of the contractual arrangements and neither B.P. nor Mr. Hunt received as much oil as they would have received had B.P. done so."

By far the greater part of the huge quantity of documentary evidence before the court and most of the oral evidence was directed to this issue, which was concerned very largely with technical matters of considerable complexity. The issue does of course raise questions of law—not so much as to the nature of B.P.'s obligations to Mr. Hunt, because in this respect there was very little dispute between the parties, but as to the relevance of such allegations, if proved, to a claim under the Act of 1943. But the main dispute was on the facts; and I shall as a matter of convenience, make my findings of fact before I consider at a later stage, when I come to analyse the Act, the relevance (if any) in law of such allegations if proved. When I make my findings of fact on this issue, I shall review the evidence relevant to the issue as it came to be defined in the course of the hearing before me. In the same way, I shall refer to the evidence relevant to other factual matters when I come to deal with other issues in their proper order.

I shall consider the issues in this case in the following order. I shall first consider the due diligence issue. I shall deal with this matter first because it raises essentially factual questions and involves the most substantial review of the evidence. Next I shall consider the principles applicable to claims under the Act of 1943. Thirdly, I shall consider whether the prerequisites to a claim under the Act have been fulfilled in the present case. Fourthly, I shall consider B.P.'s claim against Mr. Hunt under the Act. Fifthly, I shall consider Mr. Hunt's cross-claim against B.P. under the Act. Sixthly, I shall consider the relationship between B.P.'s claim and Mr. Hunt's cross-claim under the Act. Seventhly, I shall consider a subsidiary claim by B.P. against Mr. Hunt, namely, that B.P. was beneficial owner of oil lifted by Mr. Hunt after December 2, 1971, to the extent of 18,750 b.p.d. Eighthly, I shall consider certain claims advanced by both parties in contract. Finally, I shall consider the question of interest on awards under the Act of 1943, and I shall briefly refer to the question of the appropriate currency for such an award.

*I. The due diligence issue*

[His Lordship considered the evidence, found that B.P. had acted with due diligence in the appraisal and development of the concession and in the production of oil from the field, and held that B.P. had committed no breach of contract.]

*II. The principles governing claims under the Act of* 1943

The Law Reform (Frustrated Contracts) Act 1943 is described as an Act to amend the law relating to the frustration of contracts. In fact, it is concerned not with frustration itself, but with the consequences of frustration; and it creates statutory remedies, enabling the court to award restitution in respect of benefits conferred under contracts thereafter frustrated.

Section 1 (1) of the Act sets out the circumstances in which the Act applies, namely, that a contract governed by English law has become impossible of performance or been otherwise frustrated, and the parties thereto have for that reason been discharged from the further performance of the contract. However, section 2 (5) excludes from the operation of the Act certain contracts, which are immaterial for the purposes of the present case; and section 2 (4) provides that, where part of a contract can properly be severed from the remainder, the

A severed part having before the time of discharge been either wholly performed or so performed except for payment of ascertained or ascertainable sums, the court shall treat the severed part as a separate contract which has not been frustrated, the Act being applicable only to the remainder.

The most important subsections are subsections (2) and (3) of section 1, which set out the statutory remedies, the former being concerned with B cases where the benefit conferred under the contract consists of money, and the latter with cases where the benefit does not consist of money. These subsections are of such importance that I shall set them out in full:

"(2) All sums paid or payable to any party in pursuance of the contract before the time when the parties were so discharged (in this C Act referred to as 'the time of discharge') shall, in the case of sums so paid, be recoverable from him as money received by him for the use of the party by whom the sums were paid, and, in the case of sums so payable, cease to be so payable: Provided that, if the party to whom the sums were so paid or payable incurred expenses before the time of discharge in, or for the purpose of, the performance of the contract, the court may, if it considers it just to do so D having regard to all the circumstances of the case, allow him to retain or, as the case may be, recover the whole or any part of the sums so paid or payable, not being an amount in excess of the expenses so incurred. (3) Where any party to the contract has, by reason of anything done by any other party thereto in, or for the purpose of, the performance of the contract, obtained a valuable E benefit (other than a payment of money to which the last foregoing subsection applies) before the time of discharge, there shall be recoverable from him by the said other party such sum (if any), not exceeding the value of the said benefit to the party obtaining it, as the court considers just, having regard to all the circumstances of the case and, in particular,—(*a*) the amount of any expenses F incurred before the time of discharge by the benefited party in, or for the purpose of, the performance of the contract, including any sums paid or payable by him to any other party in pursuance of the contract and retained or recoverable by that party under the last foregoing subsection, and (*b*) the effect, in relation to the said benefit, of the circumstances giving rise to the frustration of the contract."

G Of the remaining provisions of the Act, section 2 (1) and (2) are of no materiality to the present case, nor is section 1 (6). Section 1 (4) provides that, in estimating expenses incurred, sums may be included for overhead expenses, and for work or services performed personally. Section 2 (3) is, however, of considerable importance. I shall quote the subsection in full:

H "(3) Where any contract to which this Act applies contains any provision which, upon the true construction of the contract, is intended to have effect in the event of circumstances arising which operate, or would but for the said provision operate, to frustrate the contract, or is intended to have effect whether such circumstances arise or not, the court shall give effect to the said provision and shall only give effect to the foregoing section of this Act to such extent, if any, as appears to the court to be consistent with the said provision."

There remains section 1 (5), which is possibly related to section 2 (3). This subsection provides that the court is not to take into account any sums which have by reason of the circumstances giving rise to the frustration of the contract become payable under any contract of insurance, unless there was an obligation to insure imposed by an express term of the frustrated contract or by or under any enactment.

Such, in summary, is the Act. The historical background of the Act is well known. At one time, money paid under a contract thereafter frustrated was held to be irrecoverable. This was known as the rule in *Chandler* v. *Webster* [1904] 1 K.B. 493. The results of this rule were so obviously harsh that, following severe criticism, the rule was referred to the Law Revision Committee which, in its seventh interim report (Rule in *Chandler* v. *Webster*) (1939) (Cmd. 6009), recommended that (with exceptions relating to freight pro rata itineris and advance freight) money paid in pursuance of a contract thereafter frustrated (or, where a severable part of such a contract had been performed, money paid in pursuance of the remainder) should be recoverable, subject to a deduction of such sum as represented a fair allowance for expenditure incurred by the payee in the performance of or for the purpose of performing the contract. However in 1942, before this recommendation had been implemented, *Chandler* v. *Webster* was overruled by the House of Lords in *Fibrosa Spolka Akcyjna* v. *Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32. The effect of that decision was that money paid under a contract thereafter frustrated was recoverable, but only if the consideration for the payment had wholly failed. It was, however, considered by certain members of the House of Lords that, even with the rule in *Chandler* v. *Webster* [1904] 1 K.B. 493 out of the way, the common law remedy was imperfect; attention was drawn in particular to the fact that there could be no recovery if the consideration had only partially failed, and that no allowance could be made for expenses incurred by the payee: see pp. 49–50, *per* Viscount Simon; pp. 54–55, *per* Lord Atkin; and pp. 71–72 *per* Lord Wright. Furthermore, the *Fibrosa* case was, like the report of the Law Revision Committee, concerned only with the recovery of money. Neither touched upon the more difficult question of restitution where the benefit conferred under a contract was a benefit other than a payment of money: in such cases, the old strict common law doctrine of entire contracts provided a formidable obstacle to restitution. At all events, no doubt stimulated by the observations made in the *Fibrosa* case, in the following year the legislature enacted the Act of 1943.

It was suggested in argument that I might have regard to the report of the Law Revision Committee in construing the Act of 1943. I do not, however, consider that the report is of any assistance to me. Its terms of reference were limited to consideration of the rule in *Chandler* v. *Webster* [1904] 1 K.B. 493; that case was overruled by the House of Lords in the period between the date of the report and the passing of the Act, and the scope of the Act is considerably wider than that of the report.

I turn, therefore, to the construction of the Act itself. Much argument was directed towards the problem of construction, and in particular to the effect to be given to section 1 (2) and (3) and section 2 (3) of the Act. I shall now set out my conclusions on the effect to be given to these subsections.

(1) *The principle of recovery*

(*a*) The principle, which is common to both section 1 (2) and (3), and indeed is the fundamental principle underlying the Act itself, is prevention of the unjust enrichment of either party to the contract at the other's expense. It was submitted by Mr. Rokison, on behalf of B.P., that the principle common to both subsections was one of restitution for net benefits received, the net benefit being the benefit less an appropriate deduction for expenses incurred by the defendant. This is broadly correct so far as section 1 (2) is concerned; but under section 1 (3) the net benefit of the defendant simply provides an upper limit to the award—it does not measure the amount of the award to be made to the plaintiff. This is because in section 1 (3) a distinction is drawn between the plaintiff's performance under the contract, and the benefit which the defendant has obtained by reason of that performance—a distinction about which I shall have more to say later in this judgment; and the net benefit obtained by the defendant from the plaintiff's performance may be more than a just sum payable in respect of such performance, in which event a sum equal to the defendant's net benefit would not be an appropriate sum to award to the plaintiff. I therefore consider it better to state the principle underlying the Act as being the principle of unjust enrichment, which underlies the right of recovery in very many cases in English law, and indeed is the basic principle of the English law of restitution, of which the Act forms part.

(*b*) Although section 1 (2) and (3) is concerned with restitution in respect of different types of benefit, it is right to construe the two subsections as flowing from the same basic principle and therefore, so far as their different subject matters permit, to achieve consistency between them. Even so, it is always necessary to bear in mind the difference between awards of restitution in respect of money payments and awards where the benefit conferred by the plaintiff does not consist of a payment of money. Money has the peculiar character of a universal medium of exchange. By its receipt, the recipient is inevitably benefited; and (subject to problems arising from such matters as inflation, change of position and the time value of money) the loss suffered by the plaintiff is generally equal to the defendant's gain, so that no difficulty arises concerning the amount to be repaid. The same cannot be said of other benefits, such as goods or services. By their nature, services cannot be restored; nor in many cases can goods be restored, for example where they have been consumed or transferred to another. Furthermore the identity and value of the resulting benefit to the recipient may be debatable. From the very nature of things, therefore, the problem of restitution in respect of such benefits is more complex than in cases where the benefit takes the form of a money payment; and the solution of the problem has been made no easier by the form in which the legislature has chosen to draft section 1 (3) of the Act.

(*c*) The Act is *not* designed to do certain things: (i) It is not designed to apportion the loss between the parties. There is no general power under either section 1 (2) or section 1 (3) to make any allowance for expenses incurred by the plaintiff (except, under the proviso to section 1 (2), to enable him to enforce pro tanto payment of a sum payable but unpaid before frustration); and expenses incurred by the defendant are only relevant in so far as they go to reduce the net benefit obtained by him and thereby limit any award to the plaintiff. (ii) It is not con-

cerned to put the parties in the position in which they would have been if the contract had been performed. (iii) It is not concerned to restore the parties to the position they were in before the contract was made. A remedy designed to prevent unjust enrichment may not achieve that result; for expenditure may be incurred by either party under the contract which confers no benefit on the other, and in respect of which no remedy is available under the Act.

(*d*) An award under the Act may have the effect of rescuing the plaintiff from an unprofitable bargain. This may certainly be true under section 1 (2), if the plaintiff has paid the price in advance for an expected return which, if furnished, would have proved unprofitable; if the contract is frustrated before any part of that expected return is received, and before any expenditure is incurred by the defendant, the plaintiff is entitled to the return of the price he has paid, irrespective of the consideration he would have recovered had the contract been performed. Consistently with section 1 (2), there is nothing in section 1 (3) which necessarily limits an award to the contract consideration. But the contract consideration may nevertheless be highly relevant to the assessment of the just sum to be awarded under section 1 (3); this is a matter to which I will revert later in this judgment.

(2) *Claims under section* 1 (2)

Where an award is made under section 1 (2), it is, generally speaking, simply an award for the repayment of money which has been paid to to the defendant in pursuance of the contract, subject to an allowance in respect of expenses incurred by the defendant. It is not necessary that the consideration for the payment should have wholly failed: claims under section 1 (2) are not limited to cases of total failure of consideration, and cases of partial failure of consideration can be catered for by a cross-claim by the defendant under section 1 (2) or section 1 (3) or both. There is no discretion in the court in respect of a claim under section 1 (2), except in respect of the allowance for expenses; subject to such an allowance (and, of course, a cross-claim) the plaintiff is entitled to repayment of the money he has paid. The allowance for expenses is probably best rationalised as a statutory recognition of the defence of change of position. True, the expenses need not have been incurred by reason of the plaintiff's payment; but they must have been incurred in, or for the purpose of, the performance of the contract under which the plaintiff's payment has been made, and for that reason it is just that they should be brought into account. No provision is made in the subsection for any increase in the sum recoverable by the plaintiff, or in the amount of expenses to be allowed to the defendant, to allow for the time value of money. The money may have been paid, or the expenses incurred, many years before the date of frustration; but the cause of action accrues on that date, and the sum recoverable under the Act as at that date can be no greater than the sum actually paid, though the defendant may have had the use of the money over many years, and indeed may have profited from its use. Of course, the question whether the court may award interest from the date of the accrual of the cause of action is an entirely different matter, to which I shall refer later in this judgment.

(3) *Claims under section* 1 (3)

(*a*) *General.* In contract, where an award is made under section 1 (3), the process is more complicated. First, it has to be shown that the defendant has, by reason of something done by the plaintiff in, or for the purpose of, the performance of the contract, obtained a valuable benefit (other than a payment of money) before the time of discharge. That benefit has to be identified, and valued, and such value forms the upper limit of the award. Secondly, the court may award to the plaintiff such sum, not greater than the value of such benefit, as it considers just having regard to all the circumstances of the case, including in particular the matters specified in section 1 (3) (*a*) and (*b*). In the case of an award under section 1 (3) there are, therefore, two distinct stages—the identification and valuation of the benefit, and the award of the just sum. The amount to be awarded is the just sum, unless the defendant's benefit is less, in which event the award will be limited to the amount of that benefit. The distinction between the identification and valuation of the defendant's benefit, and the assessment of the just sum, is the most controversial part of the Act. It represents the solution adopted by the legislature of the problem of restitution in cases where the benefit does not consist of a payment of money; but the solution so adopted has been criticised by some commentators as productive of injustice, and it certainly gives rise to considerable problems, to which I shall refer in due course.

(*b*) *Identification of the defendant's benefit.* In the course of the argument before me, there was much dispute whether, in the case of services, the benefit should be identified as the services themselves, or as the end product of the services. One example canvassed (because it bore some relationship to the facts of the present case) was the example of prospecting for minerals. If minerals are discovered, should the benefit be regarded (as Mr. Alexander contended) simply as the services of prospecting, or (as Mr. Rokison contended) as the minerals themselves being the end product of the successful exercise? Now, I am satisfied that it was the intention of the legislature, to be derived from section 1 (3) as a matter of construction, that the benefit should in an appropriate case be identified as the end product of the services. This appears, in my judgment, not only from the fact that section 1 (3) distinguishes between the plaintiff's performance and the defendant's benefit, but also from section 1 (3) (*b*) which clearly relates to the product of the plaintiff's performance. Let me take the example of a building contract. Suppose that a contract for work on a building is frustrated by a fire which destroys the building and which, therefore, also destroys a substantial amount of work already done by the plaintiff. Although it might be thought just to award the plaintiff a sum assessed on a quantum meruit basis, probably a rateable part of the contract price, in respect of the work he has done, the effect of section 1 (3) (*b*) will be to reduce the award to nil, because of the effect, in relation to the defendant's benefit, of the circumstances giving rise to the frustration of the contract. It is quite plain that, in section 1 (3) (*b*), the word "benefit" is intended to refer, in the example I have given, to the actual improvement to the building, because that is what will be affected by the frustrating event; the subsection therefore contemplates that, in such a case, the benefit is the end product of the plaintiff's services, not the services themselves. This will not be so in every case, since in some cases the services will have no end product; for example, where the

services consist of doing such work as surveying, or transporting goods. In each case, it is necessary to ask the question: what benefit has the defendant obtained by reason of the plaintiff's contractual performance? But it must not be forgotten that in section 1 (3) the relevance of the value of the benefit is to fix a ceiling to the award. If, for example, in a building contract, the building is only partially completed, the value of the partially completed building (i.e. the product of the services) will fix a ceiling for the award; the stage of the work may be such that the uncompleted building may be worth less than the value of the work and materials that have gone into it, particularly as completion by another builder may cost more than completion by the original builder would have cost. In other cases, however, the actual benefit to the defendant may be considerably more than the appropriate or just sum to be awarded to the plaintiff, in which event the value of the benefit will not in fact determine the quantum of the award. I should add, however, that, in a case of prospecting, it would usually be wrong to identify the discovered mineral as the benefit. In such a case there is always (whether the prospecting is successful or not) the benefit of the prospecting itself, i.e. of knowing whether or not the land contains any deposit of the relevant minerals; if the prospecting is successful, the benefit may include also the enhanced value of the land by reason of the discovery; if the prospector's contractual task goes beyond discovery and includes development and production, the benefit will include the further enhancement of the land by reason of the installation of the facilities, and also the benefit of in part transforming a valuable mineral deposit into a marketable commodity.

I add by way of footnote that all these difficulties would have been avoided if the legislature had thought it right to treat the services themselves as the benefit. In the opinion of many commentators, it would be more just to do so; after all, the services in question have been requested by the defendant, who normally takes the risk that they may prove worthless, from whatever cause. In the example I have given of the building destroyed by fire, there is much to be said for the view that the builder should be paid for the work he has done, unless he has (for example by agreeing to insure the works) taken upon himself the risk of destruction by fire. But my task is to construe the Act as it stands. On the true construction of the Act, it is in my judgment clear that the defendant's benefit must, in an appropriate case, be identified as the end product of the plaintiff's services, despite the difficulties which this construction creates, difficulties which are met again when one comes to value the benefit.

(c) *Apportioning the benefit.* In all cases, the relevant benefit must have been obtained by the defendant by reason of something done by the plaintiff. Accordingly, where it is appropriate to identify the benefit with an end product and it appears that the defendant has obtained the benefit by reason of work done both by the plaintiff and by himself, the court will have to do its best to apportion that benefit, and to decide what proportion is attributable to the work done by the plaintiff. That proportion will then constitute the relevant benefit for the purposes of section 1 (3) of the Act.

(d) *Valuing the benefit.* Since the benefit may be identified with the product of the plaintiff's performance, great problems arise in the valuation of the benefit. First, how does one solve the problem which

arises from the fact that a small service may confer an enormous benefit, and conversely, a very substantial service may confer only a very small benefit? The answer presumably is that at the stage of valuation of the benefit (as opposed to assessment of the just sum) the task of the court is simply to assess the value of the benefit to the defendant. For example, if a prospector after some very simple prospecting discovers a large and unexpected deposit of a valuable mineral, the benefit to the defendant (namely, the enhancement in the value of the land) may be enormous; it must be valued as such, always bearing in mind that the assessment of a just sum may very well lead to a much smaller amount being awarded to the plaintiff. But conversely, the plaintiff may have undertaken building work for a substantial sum which is, objectively speaking, of little or no value—for example, he may commence the redecoration, to the defendant's execrable taste, of rooms which are in good decorative order. If the contract is frustrated before the work is complete, and the work is unaffected by the frustrating event, it can be argued that the defendant has obtained no benefit, because the defendant's property has been reduced in value by the plaintiff's work; but the partial work must be treated as a benefit to the defendant, since he requested it, and valued as such. Secondly, at what point in time is the benefit to be valued? If there is a lapse of time between the date of the receipt of the benefit, and the date of frustration, there may in the meanwhile be a substantial variation in the value of the benefit. If the benefit had simply been identified as the services rendered, this problem would not arise; the court would simply award a reasonable remuneration for the services rendered at the time when they were rendered, the defendant taking the risk of any subsequent depreciation and the benefit of any subsequent appreciation in value. But that is not what the Act provides: section 1 (3) (*b*) makes it plain that the plaintiff is to take the risk of depreciation or destruction by the frustrating event. If the effect of the frustrating event upon the value of the benefit is to be measured, it must surely be measured upon the benefit as at the date of frustration. For example, let it be supposed that a builder does work which doubles in value by the date of frustration, and is then so severely damaged by fire that the contract is frustrated; the valuation of the residue must surely be made on the basis of the value as at the date of frustration. However, does this mean that, for the purposes of section 1 (3), the benefit is always to be valued as at the date of frustration? For example, if goods are transferred and retained by the defendant till frustration when they have appreciated or depreciated in value, are they to be valued as at the date of frustration? The answer must, I think, generally speaking, be in the affirmative, for the sake of consistency. But this raises an acute problem in relation to the time value of money. Suppose that goods are supplied and sold, long before the date of frustration; does the principle that a benefit is to be valued as at the date of frustration require that allowance must be made for the use in the meanwhile of the money obtained by the disposal of the goods, in order to obtain a true valuation of the benefit as at the date of frustration? This was one of the most hotly debated matters before me, for the very good reason that in the present case it affects the valuation of the parties' respective benefits by many millions of dollars. It is very tempting to conclude that an allowance should be made for the time value of money, because it appears to lead to a more realistic valuation

of the benefit as at the date of frustration; and, as will appear hereafter, an appropriate method for making such an allowance is available in the form of the net discounted cash flow system of accounting. But I have come to the conclusion that, as a matter of construction, this course is not open to me. First, the subsection limits the award to the value of the benefit obtained by the defendant; and it does not follow that, because the defendant has had the money over a period of time, he has in fact derived any benefit from it. Secondly, if an allowance was to be made for the time value of the money obtained by the defendant, a comparable allowance should be made in respect of expenses incurred by the defendant, i.e. in respect of the period between the date of incurring the expenditure and the date of frustration, and section 1 (3) (*a*) only contemplates that the court, in making an allowance for expenses, shall have regard to the "amount of [the] expenses." Thirdly, as I have already indicated, no allowance for the time value of money can be made under section 1 (2); and it would be inconsistent to make such an allowance under section 1 (3) but not under section 1 (2).

Other problems can arise from the valuation of the defendant's benefit as the end product; I shall come to these later in the consideration of the facts of the present case. But there is a further problem which I should refer to, before leaving this topic. Section 1 (3) (*a*) requires the court to have regard to the amount of any expenditure incurred before the time of discharge by the benefited party in, or for the purpose of, the performance of the contract. The question arises—should this matter be taken into account at the stage of valuation of the benefit, or of assessment of the just sum? Take a simple example. Suppose that the defendant's benefit is valued at £150, and that a just sum is assessed at £100, but that there remain to be taken into account defendant's expenses of £75: is the award to be £75 or £25? The clue to this problem lies, in my judgment, in the fact that the allowance for expenses is a statutory recognition of the defence of change of position. Only to the extent that the position of the defendant has so changed that it would be unjust to award restitution, should the court make an allowance for expenses. Suppose that the plaintiff does work for the defendant which produces no valuable end product, or a benefit no greater in value than the just sum to be awarded in respect of the work; there is then no reason why the whole of the relevant expenses should not be set off against the just sum. But suppose that the defendant has reaped a large benefit from the plaintiff's work, far greater in value than the just sum to be awarded for the work. In such circumstances it would be quite wrong to set off the whole of the defendant's expenses against the just sum. The question whether the defendant has suffered a change of position has to be judged in the light of all the circumstances of the case. Accordingly, on the Act as it stands, under section 1 (3) the proper course is to deduct the expenses from the value of the benefit, with the effect that only in so far as they reduce the value of the benefit below the amount of the just sum which would otherwise be awarded will they have any practical bearing on the award.

Finally, I should record that the court is required to have regard to the effect, in relation to the defendant's benefit, of the circumstances giving rise to the frustration of the contract. I have already given an example of how this may be relevant, in the case of building contracts; and I have recorded the fact that this provision has been the subject of

criticism. There may, however, be circumstances where it would not be just to have regard to this factor—for example if, under a building contract, it was expressly agreed that the work in progress should be insured by the building-owner against risks which include the event which had the effect of frustrating the contract and damaging or destroying the work.

(e) *Assessment of the just sum.* The principle underlying the Act is prevention of the unjust enrichment of the defendant at the plaintiff's expense. Where, as in cases under section 1 (2), the benefit conferred on the defendant consists of payment of a sum of money, the plaintiff's expense and the defendant's enrichment are generally equal; and, subject to other relevant factors, the award of restitution will consist simply of an order for repayment of a like sum of money. But where the benefit does not consist of money, then the defendant's enrichment will rarely be equal to the plaintiff's expense. In such cases, where (as in the case of a benefit conferred under a contract thereafter frustrated) the benefit has been requested by the defendant, the basic measure of recovery in restitution is the reasonable value of the plaintiff's performance—in a case of services, a quantum meruit or reasonable remuneration, and in a case of goods, a quantum valebat or reasonable price. Such cases are to be contrasted with cases where such a benefit has not been requested by the defendant. In the latter class of case, recovery is rare in restitution; but if the sole basis of recovery was that the defendant had been incontrovertibly benefited, it might be legitimate to limit recovery to the defendant's actual benefit—a limit which has (perhaps inappropriately) been imported by the legislature into section 1 (3) of the Act. However, under section 1 (3) as it stands, if the defendant's actual benefit is less than the just or reasonable sum which would otherwise be awarded to the plaintiff, the award must be reduced to a sum equal to the amount of the defendant's benefit.

A crucial question, upon which the Act is surprisingly silent, is this: what bearing do the terms of the contract, under which the plaintiff has acted, have upon the assessment of the just sum? First, the terms upon which the work was done may serve to indicate the full scope of the work done, and so be relevant to the sum awarded in respect of such work. For example, if I do work under a contract under which I am to receive a substantial prize if successful, and nothing if I fail, and the contract is frustrated before the work is complete but not before a substantial benefit has been obtained by the defendant, the element of risk taken by the plaintiff may be held to have the effect of enhancing the amount of any sum to be awarded. Secondly, the contract consideration is always relevant as providing some evidence of what will be a reasonable sum to be awarded in respect of the plaintiff's work. Thus if a prospector, employed for a fee, discovers a gold mine before the contract under which he is employed is frustrated (for example, by illegality or by his illness or disablement) at a time when his work was incomplete, the court may think it just to make an award in the nature of a reasonable fee for what he has done (though of course the benefit obtained by the defendant will be far greater), and a rateable part of the contract fee may provide useful evidence of the level of sum to be awarded. If, however, the contract had provided that he was to receive a stake in the concession, then the just sum might be enhanced on the basis that, in all the circumstances, a reasonable sum should take account

of such a factor: cf. *Way* v. *Latilla* [1937] 3 All E.R. 759. Thirdly, however, the contract consideration, or a rateable part of it, may provide a limit to the sum to be awarded. To take a fairly extreme example, a poor householder or a small businessman may obtain a contract for building work to be done to his premises at considerably less than the market price, on the basis that he cannot afford to pay more. In such a case, the court may consider it just to limit the award to a rateable part of the contract price, on the ground that it was the understanding of the parties that in no circumstances (including the circumstances of the contract being frustrated) should the plaintiff recover more than the contract price or a rateable part of it. Such a limit may properly be said to arise by virtue of the operation of section 2 (3) of the Act. But it must not be forgotten that, unlike money, services can never be restored, nor usually can goods, since they are likely to have been either consumed or disposed of, or to have depreciated in value; and since, ex hypothesi, the defendant will only have been prepared to contract for the goods or services on the basis that he paid no more than the contract consideration, it may be unjust to compel him, by an award under the Act, to pay more than that consideration, or a rateable part of it, in respect of the services or goods he has received. It is unnecessary for me to decide whether this will always be so; but it is likely that in most cases this will impose an important limit upon the sum to be awarded—indeed it may well be the most relevant limit to an award under section 1 (3) of the Act. The legal basis of the limit may be section 2 (3) of the Act; but even if that subsection is inapplicable, it is open to the court, in an appropriate case, to give effect to such a limit in assessing the just sum to be awarded under section 1 (3), because in many cases it would be unjust to impose upon the defendant an obligation to make restitution under the subsection at higher than the contract rate.

(4) *The effect of section* 2 (3) *of the Act*

The court has always to bear in mind the provisions of section 2 (3) of the Act. It was submitted by Mr. Rokison that effect should only be given to this subsection where the relevant contractual provision was *clearly* intended to have effect in the event of the frustrating circumstances. I can see no good reason for so qualifying the express words of the subsection. In my judgment the effect of the subsection depends, as it expressly provides, simply upon applying the ordinary principles of construction. If the contract contains any provision which, upon the true construction of the contract, is intended to have effect in the circumstances specified in the subsection, then the court can only give effect to section 1 of the Act to such extent as is consistent with such provision.

Examples of such provisions may be terms which have the effect of precluding recovery of any award under the Act, or of limiting the amount of any such award, for example, by limiting the award to the contractual consideration or a rateable part thereof. Similarly, the parties may contract upon the terms that the plaintiff shall not be paid until the occurrence of an event, and by reason of the frustration of the contract that event does not or cannot occur; then, if upon a true construction of the contract the court concludes that the plaintiff has taken the risk of non-payment in the event of such frustration the court should make no award by virtue of section 2 (3) of the Act. Such may be the

conclusion if the contract contains an express term imposing upon the plaintiff an obligation to insure against the consequences of the frustrating event. Another example considered in argument was a loan of money advanced to a businessman on the terms that it was to be repaid out of the profits of his business. Such a term should not automatically preclude an award in the event of frustration, for example, if the businessman is incapacitated the day after the loan is made; but if the business consists, for example, of a ship, which strikes a reef and sinks, then it may be that the court, having regard to the terms of the contract and the risk taken thereunder by the lender, would make no award. But in such cases the court should only refuse to make an award if it is satisfied that the plaintiff has, by the contract, taken the risk of the consequences of the frustrating event. The principle is the same as in those cases where the contract consideration controls the amount or basis of the award under the Act—the court should not act inconsistently with the contractual intention of the parties applicable in the events which have occurred. But, such cases apart, the court is free to make an award which differs from the anticipated contractual performance of the defendant. I have already referred to the fact that, under section 1 (2) at least, the effect of an award under the Act may be to rescue the plaintiff from a bad bargain. Again, the contract may provide that the plaintiff is to receive goods or services; the court may nevertheless make an award in money. The contract may provide for the plaintiff to receive money at a certain place or in a certain currency; frustration may render that impossible (for example, in a case of supervening illegality), and the court may make an award for payment which takes effect at a different place or in a different currency. Most striking of all, in most frustrated contracts under which the claim is made in respect of a benefit other than money, the time for payment will not yet have come—the contract, or a severable part of it, will be "entire" in the old strict sense of that term; I do not, however, consider that such a provision should automatically preclude an award under section 1 (3). If it were intended to do so, there would be few awards under section 1 (3), and the matter would surely be the subject of an express provision if it was the intention that so fundamental a qualification was to be imposed upon the power of the court under this subsection. Certainly, no such qualification is imposed in section 1 (2), and no such result can be achieved in relation to an award under that subsection since, generally speaking, the plaintiff is entitled to the return of his money. In my judgment, only if upon a true construction of the contract the plaintiff has contracted on the terms that he is to receive no payment in the event which has occurred, will the fact that the contract is "entire" have the effect of precluding an award under the Act.

(5) *Cross-claims*

There may, in any particular case, be not merely a claim by the plaintiff against the defendant under the Act, but also a cross-claim by the defendant against the plaintiff. This may occur if each party has obtained a benefit by reason of the performance of the other, whether the benefit does or does not consist of a payment of money. The cross-claim may or may not be under the same subsection as the claim; indeed, claims, or cross-claims, or both, may be made under both subsections. Of course, where each party has conferred a benefit on the other, the effect may be that

the lesser claim is extinguished by the greater, in the sense that in the final result the party who has conferred the greater benefit may recover the balance; in particular, in a case under section 1 (3), the assessment of the just sum to be awarded to either party should take into account the receipt of any part of the contractual consideration from the other. Even so the court must take care, in making its award, that neither party gains an unjust benefit by taking advantage of the same item twice over. Section 1 (3) (*a*) of the Act recognises the existence of the problem of "double-counting" by providing that the defendant to a claim under section 1 (3) may bring into account, as expenses incurred by him, any sum paid or payable by him in pursuance of the contract and retained or recoverable by the payee under section 1 (2).

(6) *The relevance to a claim under the Act of a prior breach by the plaintiff*

If the plaintiff in an action in which he claims an award of restitution under the Act has committed a breach of the relevant contract prior to frustration, the only relevance of such breach is that, since the defendant will have an accrued right to damages, the defendant's claim to damages may be the subject of a set-off or counterclaim in the action. I cannot see that the breach of contract can have any other relevance. It certainly cannot otherwise affect a claim for repayment of money under section 1 (2), since the court has (subject to an allowance for expenses, or the effect of section 2 (3), or a cross-claim or set-off) no option but to order repayment in an appropriate case. Nor, in my judgment, can any such breach of contract have any other relevance to the award of a just sum under section 1 (3); the basis of such an award is that the defendant has been unjustly enriched at the plaintiff's expense, and the mere fact that the plaintiff has committed a prior breach of contract does not affect the question whether the defendant has been unjustly enriched, which depends upon the quite separate question whether he has received a benefit in respect of which he ought, in justice, to make restitution. The appropriate way of enforcing a claim for damages for breach of contract is by an action for damages, or (where appropriate) by a counterclaim or set-off; such proceedings are, of course, subject to the ordinary rules relating to limitation of actions. If a defendant allows such a claim to become time-barred, I cannot see why he should be able to revive his claim by the back-door by inviting a court to take it into account when assessing a just sum to be awarded to the other party under section 1 (3) of the Act. A fortiori, I cannot see any possible justification for the award of a just sum under section 1 (3) being reduced on the ground that the plaintiff, acting reasonably, might have acted in a manner more favourable to the defendant; quite apart from the fact that such action might have enhanced the benefit received by the defendant (and so have raised the limit to an award to the plaintiff), I cannot see how any such matter can have the slightest bearing on the question whether the defendant has, in the events which occurred, been unjustly enriched at the plaintiff's expense.

*III. Have the prerequisites to a claim under the Act of* 1943 *been established in the present case?*

Before a party can advance a claim to restitution under the Act of 1943, he has to establish two things—first, that the contract was governed

A by English law, and secondly, that the contract has become impossible of performance or been otherwise frustrated, and the parties thereto have for that reason been discharged from the further performance of the contract. [His Lordship referred to the judgment of Kerr J. [1976] 1 W.L.R. 788, stated that he was in complete agreement with Kerr J.'s conclusion that the contract was governed by English law and, having considered the question whether the contract was frustrated, B continued:] I hold that the contract between the parties was frustrated on December 7, 1971, and that, subject to one further point, the pre-requisites to the application of the Act of 1943 are fulfilled.

The further point I have to consider is this. It was alleged by Mr. Hunt that "B.P. waived any frustration of the agreement or any right to rely thereon or alternatively are estopped from relying thereon against C Hunt." The facts pleaded in support of this allegation were, in summary, as follows: (1) B.P.'s contention that the purported nationalisation of their interests amounted to force majeure within section 27 of the operating agreement, and Mr. Hunt's force majeure notice of January 4, 1972. (2) The so-called "hot oil" suits pursued by B.P., it being alleged by Mr. Hunt that he co-operated with B.P. in such litigation, and that in consequence his own position was jeopardised, his production cut D back, and finally he too was expropriated on June 11, 1973. (In response to a request for particulars of these allegations, Mr. Hunt alleged that he kept B.P. informed of all his shipments from Tobruk so that B.P. could identify those which were not his; that he refused demands from the Libyan Government that he should assist the Government in marketing B.P.'s share of the oil; and that he co-operated with B.P. E and other members of the Safety Net Agreement.) (3) B.P.'s agreement that, or acquiescence in the fact that, all reimbursement oil which would otherwise be available to B.P. should be left in the ground.

In support of these allegations, Mr. Alexander relied in particular upon *Panchaud Frères S.A.* v. *Etablissements General Grain Co.* [1970] 1 Lloyd's Rep. 53, although he also referred me to a number of other authorities. He was, of course, asked by the court to identify the F representation which he relied upon as founding his allegation of estoppel. His answer was that he relied not upon an express representation as such, but upon an implied representation by B.P. that they would not rely upon the frustration of the contract, arising from the fact that B.P., by their words and conduct, were impliedly representing that their relationship with the Libyan Government continued, that they were going to act G on that basis, and that they desired the support of Mr. Hunt in that course of action. More particularly, he submitted that B.P. expressly represented that their contractual rights, subject to force majeure, remained unaffected by the expropriation of their interests; and (I quote from Mr. Alexander's argument):

> "Implicit within that, one would have to find as a corollary that they H would not rely upon the nationalisation as a frustrating event . . . (or for the purposes of basing a claim under the Act) precisely because it is inconsistent with the express representation."

It is, I think, important to identify the legal principles upon which Mr. Alexander's submissions can legitimately be based. First, it is well established that, if a contract is frustrated, it is forthwith determined as a matter of law. It follows that, as a matter of law, the legal relationship between the parties under the contract so frustrated comes to an

end, apart from any provision of the contract which may, on its true construction, be held to continue to apply in the events which have occurred; although of course, following frustration, one or both of the parties may have the right to claim restitution under the Act of 1943. That being the case, it is somewhat difficult to talk in terms of one party in such circumstances "waiving frustration of the agreement or any right to rely thereon" or being "estopped from relying thereon" against the other party. Frustration is not a right; it is legal doctrine, the effect of which is to determine the rights and obligations arising under the contract which has been frustrated. Of course, following frustration, the parties may agree to enter into a fresh contract, possibly on the same terms as the old; and such new agreement may be either express or may be implied from the conduct of the parties. Again, in so far as there is a legal relationship surviving the frustration of the contract, and one party has any rights against the other arising under that legal relationship (for example, the right to claim restitution under the Act of 1943), he may preclude himself from enforcing those rights by virtue of the principle of equitable estoppel. But such circumstances apart, it is difficult to see how, in law, the doctrine of waiver or estoppel can be invoked by a party faced with a claim under the Act of 1943.

Furthermore, the reliance by Mr. Hunt upon the *Panchaud* case was, in my judgment, misplaced. The principle in that case must be carefully distinguished from the principle of equitable estoppel. The principle of equitable estoppel derives from the classic statement of Lord Cairns in *Hughes* v. *Metropolitan Railway Co.* (1877) 2 App.Cas. 439, 448, when he said:

> ". . . it is the first principle upon which all Courts of Equity proceed, that if parties who have entered into definite and distinct terms involving certain legal results—certain penalties or legal forfeiture—afterwards by their own act or with their own consent enter upon a course of negotiation which has the effect of leading one of the parties to suppose that the strict rights arising under the contract will not be enforced, or will be kept in suspense, or held in abeyance, the person who otherwise might have enforced those rights will not be allowed to enforce them where it would be inequitable having regard to the dealings which have thus taken place between the parties."

The principle, therefore, presupposes three things: (1) a legal relationship between the parties; (2) a representation, express or implied, by one party that he will not enforce his strict rights against the other; and (3) reliance by the representee (whether by action or by omission to act) on the representation, which renders it inequitable, in all the circumstances, for the representor to enforce his strict rights, or at least to do so until the representee is restored to his former position.

Now I do not understand *Panchaud Frères S.A.* v. *Etablissements General Grain Co.* [1970] 1 Lloyd's Rep. 53 to fall within that principle The case was concerned with a c.i.f. contract of sale of goods; and the question which arose for decision was whether the buyer, who had received a tender of documents including a bill of lading which inaccurately stated the goods to have been shipped within the contract period, and a certificate of quality which accurately stated that they had been shipped late, and who (having failed to observe the late date in the certificate of quality) took up the documents without question, could thereafter reject the goods on the ground that they were shipped late. The Court of

Appeal, reversing Roskill J., held that the buyer could not do so. Now it is well established in contracts for the sale of goods that, if a buyer accepts the goods (within the meaning of that expression as used in the Sale of Goods Act 1893), he cannot thereafter reject them: he has a choice, and if he chooses to accept the goods his decision in final. In a c.i.f. contract of sale, he has two opportunities of rejection—a right to reject the documents, and a right to reject the goods, if they are not in accordance with the contract. All that the *Panchaud* case decided was that if, in a c.i.f. contract, the documents show that the goods were shipped late, and the buyer nevertheless accepts the documents, then, even if he has failed to notice the late shipment date when he took up the documents, he will be precluded from thereafter rejecting the goods for that reason. The decision stems from the need for finality in commercial transactions, as does the doctrine of acceptance in contracts for the sale of goods—an analogy relied upon by Lord Denning M.R. in his judgment in the *Panchaud* case at p. 57. I do not read the *Panchaud* case as arising from the principle in *Hughes* v. *Metropolitan Railway Co.*, 2 App.Cas. 439 because the *Panchaud* case does not depend in any way upon the representee having relied upon any representation by the buyer—indeed, on the facts of the *Panchaud* case itself, the goods were (as is usually the case) on the high seas at the time when the documents were taken up by the buyer.

In a much-quoted passage in the *Panchaud* case, Winn L.J., having expressed the opinion that it was not possible to say that there was anything in the case which could be described as estoppel or quasi-estoppel, went on to say [1970] 1 Lloyds Rep. 53, 59, that he agreed with Lord Denning M.R. that

> "what one has here is something perhaps in our law not yet wholly developed as a separate doctrine—which is more in the nature of a requirement of fair conduct—a criterion of what is fair conduct between the parties. There may be an inchoate doctrine stemming from the manifest convenience of consistency in pragmatic affairs, negativing any liberty to blow hot and cold in commercial conduct."

This passage is frequently invoked by parties, often as an argument of last resort, when they find it difficult to bring their case within the established principles of estoppel, waiver,.or election. But, as I read the words of Winn L.J., he was not attempting to state any principle of general application: he was simply expressing the principle of finality which underlies the doctrine of acceptance in contracts of sale of goods. I certainly do not think it right to say that a party to a contract may not at times act inconsistently without affecting his legal rights. To give a simple example, which is perhaps apposite to the present case, an event may occur which may or may not prove, as events turn out, to have had the effect of frustrating a contract. Very often, the parties cannot tell at once whether this is so; and it may well be a natural precautionary measure for one or both of them to give a force majeure notice. But it does not follow that, if the contract was in fact frustrated, the giving of the force majeure notice should have the effect of precluding either of the parties from thereafter saying that the contract was frustrated, inconsistent though that may be with the force majeure notice which presupposes that the contract is still in existence. Only if the conduct of the parties is such that they are to be taken to have agreed that a new contract should come into existence on the terms

of the old, will either of them be precluded from saying that they are not bound by those terms. Ample authority for these propositions is to be found in *Hirji Mulji* v. *Cheong Yue Steamship Co. Ltd.* [1926] A.C. 497, in which an argument similar to that advanced by Mr. Hunt was "shortly disposed of" by Lord Sumner at pp. 500–501.

It follows, in my judgment, that *Panchaud Frères S.A.* v. *Etablissements General Grain Co.* [1970] 1 Lloyds Rep. 53 and other cases in which it has been followed, have no relevance to the present case. Mr. Alexander can only succeed in his argument if he can show a fresh agreement between the parties, or can establish that, on the principle in *Hughes* v. *Metropolitan Railway Co.*, 2 App.Cas. 439 B.P. are precluded from relying upon their rights under the Act of 1943.

I am satisfied that Mr. Alexander is quite unable to establish either of these things. I shall take first the possibility of equitable estoppel. It is well established that, to found such an estoppel, the representation must be unequivocal: see *Woodhouse A.C. Israel Cocoa Ltd. S.A.* v. *Nigerian Produce Marketing Co. Ltd.* [1972] A.C. 741. Furthermore, in considering whether B.P. did make any unequivocal representation that they did not intend to enforce their legal rights against Mr. Hunt, it is important to bear in mind that an assertion by B.P. of continuing rights against the Libyan Government did not necessarily involve an assertion of continuing rights against Mr. Hunt under the contract between them. Pursuant to that contract, Mr. Hunt had assigned to B.P. a half interest in the concession. That share had vested in B.P. before frustration: the transfer was unaffected by the subsequent frustration of the contract. It followed that for B.P. to assert, as against the Libyan Government, that they were still entitled to a half share in the concession, and that they were in consequence still joint owners, with Mr. Hunt, of all oil produced from the concession, was not inconsistent with the contract between B.P. and Mr. Hunt having been frustrated.

What, then, were the matters relied upon by Mr. Alexander as constituting a representation by B.P.? First, B.P.'s force majeure notice, which they gave on December 9, 1971 need not quote the terms of the notice: it contained a reference to section 27 of the operating agreement, and asserted that the action of the Libyan Government had given rise to a situation of force majeure. In my judgment, this was simply an understandable immediate reaction to the situation, and cannot possibly be construed as any representation by B.P. that they would not enforce their strict legal rights against Mr. Hunt, and in particular that they would not take advantage of any right to restitution in the event of the contract proving to have been frustrated. Second, Mr. Alexander relied upon the public announcement made by B.P. a few days later asserting that the Libyan Government's action was contrary to international law and to its contractual obligations, and concluding with the following words:

> "The company has protested to the Libyan Government against the enactment of the Law and, in accordance with the concession, has called for arbitration of the dispute arising from the Libyan Government's breaches. The company has also reminded the Libyan Government that the government's wrongful acts are under international law incapable of depriving the company of its rights under the agreement [i.e. the concession]. Accordingly, the attention of

A all those who may be concerned with these developments, whether as purchasers of oil or otherwise, is drawn to the continuance of the company's rights. It is the intention of the company to assert those rights wherever and whenever necessary against those who infringe them."

The announcement was therefore concerned with B.P.'s relationship B with the Libyan Government, and had no direct bearing upon B.P.'s legal relationship with Mr. Hunt. Third, Mr. Alexander relied upon a series of ad hoc agreements between B.P. and Mr. Hunt, under which B.P. authorised Mr. Hunt to continue to lift oil from the concession. Letters recording such agreements were written on January 4, 1972, June 29, 1972, and December 27, 1972, each referring to the ensuing six-months period. C By way of example, I quote the letter dated January 4, 1972:

"We wish to confirm our agreement that, notwithstanding that B.P. Exploration Co. (Libya) Ltd. is currently unable to lift its share of production, for the first six months of 1972 you may continue to produce from Concession 65 oil for export at a rate not exceeding 235,000 barrels per day, including reimbursement oil. This figure represents one half of the declared production rate for that period. D It was also agreed that you should provide the minimum number of persons necessary to operate the concession at a production level of 235,000 barrels per day.

"We would like to make clear that our agreement in these matters is given without prejudice to our legal rights and we reserve our right to resume those rights on due notice being given."

E I need only say of such letters that, quite apart from B.P.'s express reservation of rights, I do not read them as constituting any representation whatsoever by B.P. that they would not enforce their strict legal rights (whatever they might be) against Mr. Hunt, in the event of the contract proving to be frustrated. Finally, Mr. Alexander relied upon claims made by B.P. against Mr. Hunt to reimbursement oil. Such F claims were made only during the period shortly after the Libyan Government's action (the documents relied upon by Mr. Alexander all bore various dates in January 1972). I need not go into detail, since once again I cannot see that these claims involve, any more than did the force majeure notices, any representation by B.P. that they would not enforce their strict legal rights against Mr. Hunt, if the contract G should prove to have been frustrated. They were simply understandable immediate reactions in the circumstances which had arisen.

Furthermore, the suggestion that Mr. Hunt acted in any way in reliance upon B.P.'s alleged representation is, in my judgment, equally lacking in substance. First, reference was made to Mr. Hunt's own force majeure notice: but that was likewise only an understandable H reaction in the circumstances, and was made upon his own independent judgment, not in reliance upon any representation by B.P. Secondly, it was alleged that Mr. Hunt had co-operated with B.P. in the so-called "hot oil" suits, by giving B.P. information about Mr. Hunt's own liftings: that was done, however, to prevent B.P. from attempting to attach Mr. Hunt's liftings—it was an act of enlightened self-interest, rather than of disinterested co-operation. I quote from Mr. Rooney's letter, written on behalf of Mr. Hunt, to B.P. on December 29, 1971:

"This is just a brief letter to inform you that, in order to avoid attachment of liftings of my share of production from Concession 65 in Libya during the present dispute between B.P. and the Libyan Government, my London representative, Hunt International Petroleum Corporation, will be keeping you informed on an up to date basis of all those vessels which are programmed by my organisation to export crude oil from Libya from the Marsa al Hariga terminal at Tobruk for the account of Nelson Bunker Hunt."

I should add that there was no evidence that Mr. Hunt suffered any prejudice, vis à vis the Libyan Government, by reason of supplying such information to B.P.—indeed there was no evidence that the Libyans ever got to know of it. Thirdly, Mr. Alexander referred to Mr. Hunt's refusal to assist the Libyan Government to market the oil. It was, however, perfectly clear from Mr. Schuler's evidence that Mr. Hunt's refusal to do so in no way stemmed from any representation by B.P. The reasons for his refusal to do so were, in summary, as follows: (1) fear that B.P. might attach all cargoes leaving Tobruk, including Mr. Hunt's cargoes; (2) a legal obligation to the oil industry as a whole, arising from Mr. Hunt's membership of the Safety Net Agreement; and (3) a sense of moral commitment to B.P., coupled with a fear that, if that moral commitment was not honoured, Mr. Hunt might not be able to stay in the international oil business. In truth, Mr. Hunt did not act in any way differently by reason of any representation by B.P. regarding their contractual relationship with Mr. Hunt. What Mr. Hunt did was to look after his own interests as best he could, in the very difficult situation which had arisen. In so doing, he is open to no criticism; but he cannot begin to develop any effective submission that his actions were in any way the result of any representation by B.P. that they did not intend to enforce their legal rights against him.

I, therefore, conclude that Mr. Hunt's submissions on waiver and estoppel are without foundation. A fortiori, quite obviously there is no question of any fresh agreement having been entered into between B.P. and Mr. Hunt for the revival of the frustrated contract.

It follows that the prerequisites to the application of the Act of 1943 are fulfilled, and I turn next to B.P.'s claim to restitution under that Act.

*IV. B.P.'s claim under the Act of* 1943

I come now to the claim and cross-claim under the Act in the present case. I shall consider first B.P.'s claim against Mr. Hunt; and in respect of that claim I shall first consider the question of the valuable benefit obtained by Mr. Hunt.

*(a) Identifying Mr. Hunt's benefit*

B.P.'s pleaded contentions alleged that Mr. Hunt obtained the following valuable benefits as the result of work done and expenditure incurred by B.P.: (i) the farm-in payment of $2,000,000; (ii) the farm-in oil—5,567,873 barrels; (iii) £30,800,281 advanced and paid by B.P. for Mr. Hunt's account before the field came on stream on January 11, 1967; (iv) £440,026 advanced and paid or incurred by B.P. for Mr. Hunt's account after the field came on stream; (v) Mr. Hunt's share of the oil production—261,647,946 barrels of oil (net of reimbursement oil)