A between January 11, 1967, and December 7, 1971, and 74,003,211 barrels (which B.P. contend are inclusive of reimbursement oil) between December 7, 1971, and June 11, 1973; (vi) 50 per cent. share in all facilities, plant, equipment, etc., the book value of which at cost was 38,582,062 Libyan dinars at December 7, 1971, and 22,245,498 Libyan dinars at June 11, 1973. B.P. contended, further or alternatively, that (on the basis that the contract was frustrated on December 7, 1971) Mr.

B Hunt had obtained a positive net cash flow, the value of which as at December 7, 1971, was U.S. $147,639,942 and which, updated to December 7, 1977, B.P. valued at U.S. $214,078,000. These figures were, however, later the subject of recalculation.

So far as the question of benefit was concerned, Mr. Hunt admitted that he had obtained items (i) to (iv) above, as a result of work done

C and expenditure incurred by B.P. under the contract. He disputed item (v); the quantities admitted (though there was a dispute whether the 74,003,211 barrels were or were not inclusive of reimbursement oil), but Mr. Hunt's broad contentions were that it would be wrong to say that the oil, which was always his, was a benefit obtained by him as a result of anything done by B.P., and that in any event oil obtained by him after December 7, 1971, was irrelevant. So far as item (vi) was

D concerned, the figures were not disputed; but Mr. Hunt contended that it would be wrong to say that the 50 per cent. share in the facilities, etc., was a benefit obtained by him as a result of anything done by B.P. —the real benefit obtained by him from B.P. was, he contended, simply the deferred terms upon which B.P. were to be reimbursed. The alleged positive net cash flow was disputed on a number of grounds to which

E I shall have to refer later in this judgment.

In argument, B.P. developed their case as follows. First of all, as to what was done by B.P. in performance of the contract, by reason of which they said Mr. Hunt had obtained a valuable benefit, I cannot do better than quote Mr. Rokison's submission in his final speech:

F "We submit that B.P. provided experience, expertise and resources and they did a great deal of work. I am happy to add taking a risk as to whether or not the concession produced oil or perhaps I put it in a slightly different way, as to whether or not oil was found or found in sufficient quantities for them to be rewarded. Over and above the farm-in payments and advances of expenditure which my learned friend agrees were benefits, physically B.P. did a number of things. I have said they did work, but they explored, they drilled,

G they discovered the oil, they appraised and developed the field, they designed the facilities, they drew the specifications and the tender documents, they procured the building of the facilities and the pipeline as principal and they thus enabled oil to be produced and exported. After that they continued to act as operator, that is once the field had got on stream."

H That submission I entirely accept; and it is important to observe that the work done by B.P. extended beyond the mere expenditure of money— it involved as well (in addition to the farm-in payment and the farm-in oil) the exercise of very considerable experience and expertise, and the taking of a very substantial risk. Next, B.P. submitted that the benefit obtained by Mr. Hunt by reason of what had been done by B.P. (again in addition to the farm-in payment and the farm-in oil) was the develop-

**Robert Goff J.**    **B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)**    **[1979]**

ment of a bare concession of basically unknown potential into a conces-    A
sion containing a giant oilfield in production, in which Mr. Hunt held a
half share. This is not a case where a person was employed just to
prospect; on the contrary, B.P.'s task as operator went far beyond that,
and included the whole task, not only of exploration and appraisal, but
of developing the field, creating the necessary facilities, pipeline, terminal,
etc., bringing the field on production, and thereafter producing the oil
and further developing the field and facilities. This submission I also    B
accept. This is, in my judgment, a case in which the benefit obtained
by the defendant is to be identified as the product of the work: the
product here was the enhancement of the concession as I have described,
including of course a half share in the facilities, and subject always to
B.P.'s right to reimbursement in the form of reimbursement oil. Even
allowing for that right to reimbursement, and for the fact that Mr. Hunt    C
was only entitled to a half share in the oil produced from the concession
(net of reimbursement oil) the benefit so obtained by him was of
enormous, possibly incalculable, value. But that value is, B.P. submitted,
irrelevant, because of the effect in relation to the benefit of the circum-
stances giving rise to the frustration of the contract. The events which
occurred after the expropriation of B.P.'s interest on December 7, 1971,
I have already described. They are very largely undisputed; and it is    D
clear that the subsequent cutbacks in Mr. Hunt's production, the difficul-
ties with which he was faced, and even his own expropriation on June
11, 1973, flowed substantially from the expropriation of B.P. and the
repercussions from that event. B.P. conceded for present purposes that
all these matters should be regarded as the effect of the circumstances
giving rise to the frustration of the contract. From that concession,    E
which was in my judgment a reasonable concession to make, it followed
that the benefit obtained by Mr. Hunt was very greatly reduced: in
B.P.'s submission it should be limited to, in broad terms, the benefit
of the oil which he obtained from the concession and the benefit of his
settlement with the Libyan Government. In principle, in my judgment,
that submission was also well founded, assuming of course that his    F
benefit from the oil is calculated net of the reimbursement oil made
available to B.P. Furthermore, submitted B.P., of the sum so calculated
only half should be regarded as the benefit obtained by Mr. Hunt by
reason of what B.P. had done. That was because (disregarding the
farm-in payment and the farm-in oil) the oil so obtained by Mr. Hunt
derived in part from his own contribution to the joint enterprise (namely,    G
the concession itself), and in part from what B.P. had done. Under the
contract between them, the broad approach of the parties had been to
treat themselves as having equal shares in the oil produced by the field:
consistently with the approach in the contract B.P. proposed that only
one half of Mr. Hunt's benefit should be regarded as having been obtained
by reason of what B.P. had done, and for that purpose they proposed to    H
disregard the farm-in payment and the farm-in oil. Again, I accept this
submission; clearly, some apportionment has to be made, and B.P.'s
proposed solution is, in my judgment, certainly fair and probably
generous to Mr. Hunt.

There are certain features of the benefit as so identified, to which I
wish to draw attention. First, it should not be thought that, because the
reduced value of the benefit to Mr. Hunt includes the benefit to him of

1 W.L.R.          B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)          Robert Goff J.

A  all the oil he obtained from the concession, the benefit is, therefore, not
being restricted (as it should be) to the benefit obtained before the time
of discharge. On the contrary, the benefit as at the time of frustration,
and therefore of discharge, was the enhancement in the value of Mr.
Hunt's share of the concession; but the effect of the circumstances giving
rise to the frustration of the contract was to reduce that enhanced value
to a very much smaller amount, the best evidence of which is the
B  benefit of the oil actually obtained by Mr. Hunt before and after dis-
charge, and the benefit of his Libyan settlement—it being permissible
to look to the events which occurred after frustration in order to ascertain
the effect of the frustrating event upon the benefit, and to obtain evidence
of the value of the benefit, as so affected, at the time of discharge.
Secondly, in my judgment it makes no difference that it was, as Mr.
C  Alexander put it, Mr. Hunt's own oil which he obtained. Strictly
speaking, that is not correct. In fact, while in the ground the oil was
the property of the Libyan Government (see article 1 of the Libyan Pet-
roleum Law No. 25 of 1955); as soon as it was drawn from the ground,
all the oil became the property of B.P. and Mr. Hunt, as tenants in
common; and no oil became the separate property of B.P. or Mr. Hunt
until it was appropriated to one of them, e.g. by delivery from the shore-
D  line at the terminal into the pipeline of a tanker. But in any event, on
B.P.'s approach to the identification of the benefit, which I have
accepted, it is irrelevant that the oil obtained by Mr. Hunt was or was
not his property, because the only relevance of the value of the oil he
obtained is as evidence (in part) of the reduced value to him of the
enhancement of his share in the concession. Accordingly, I reject the
E  criticisms advanced in these respects by Mr. Alexander, on behalf of
Mr. Hunt. Thirdly, it is important that there should be no double
counting in respect of the facilities created by B.P. In their pleaded
case, B.P. pleaded the balance of Mr. Hunt's share of their expenditure
on the facilities as an element in the benefit obtained by Mr. Hunt. I
do not think that was right. Strictly speaking, B.P.'s expenditure in
this regard has to be treated as part of what had been done by B.P., by
F  reason of which Mr. Hunt obtained a benefit; his benefit—the enhance-
ment of his half share in the concession—included his half share in the
facilities. That element in the benefit was, however, affected by the
frustrating event, in so far as the expropriation of Mr. Hunt's own interest
flowed from it. The best evidence of the value of his share in the facilities
at the time of discharge was, therefore, the amount for which he was able
G  to dispose of them to the Libyan Government under his settlement with
that Government, the basis of which was the depreciated book value of
his share in the facilities. For this reason, in the calculation of his reduced
benefit it is right to bring in the benefit of that settlement, but to exclude
his share of B.P.'s expenditure. Of course, in assessing his benefit from
the oil he received, the oil must be taken net of the reimbursement oil.
Fourthly, however, no account need be taken of Mr. Hunt's half
H  share in the concession itself as an element in the benefit. This was
because the benefit to Mr. Hunt consisted of the *enhancement* to the
value of his share in the concession, and that enhancement is limited
in value in the manner I have described by reason of the effect of the
frustrating event: no part of Mr. Hunt's settlement with the Libyan
Government related to the concession itself, his compensation being
limited to the book value of the facilities. The concession of course is
relevant in other ways; it is relevant as part of the cause (roughly assessed

Robert Goff J.        B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)        [1979]

as half) of the benefit obtained by Mr. Hunt, and the half share   A
transferred by Mr. Hunt to B.P. is relevant as the basis of his cross-claim
against B.P. Fifthly, allowance must be made for expenses incurred
by Mr. Hunt. The relevance of such expenses, with regard to the
valuation of Mr. Hunt's benefit, is as part of the calculation by which
the net benefit to him of the oil from the concession is ascertained,
for the purpose of providing evidence of the reduced value of the
benefit of the enhanced value of the concession as at the date of discharge.   B

(b) *Valuing Mr. Hunt's benefit*

The method proposed by B.P. for the valuation of Mr. Hunt's
benefit was the discounted net cash flow method. The method is as
follows. Over the relevant period, you assess for each year the cash flow
of the party concerned, taking account of both income and expenditure;   C
of course, the figure produced may be either positive or negative. Having
produced the net cash flow figure for each year, you then apply a dis-
count to take account of the time value of money, i.e. to allow for the
fact that the net income was gained, or the net expenditure incurred, in
a given year at a different time from the date at which you wish to
assess the total figure. The date which B.P. selected for the assessment   D
of the total figure was the date of frustration, which they treated for
accounting purposes as being at the end of December 1971. To take
account of the time value of money, B.P. took (for the purpose of
valuing Mr. Hunt's benefit) the United States prime rates for each year
during the period in which he was incurring expenses and/or receiving
income from the date of the contract with B.P. onwards, i.e. 1958–1975.
For the year 1971, they applied a factor of 50 per cent. of the prime   E
rate for that year (on the basis that Mr. Hunt's net cash flow position
for that year was reached in the middle of the year, it being assumed
that his expenditure and income for the year were incurred and received
equally throughout the year); for the year 1970, they applied a factor
representing the prime rate for the whole of 1971 plus half the rate of
1970; and so on back to 1958, on a cumulative basis. For the years before   F
December 1971, therefore, the effect was to increase the negative or
positive cash flow for each year, so that the worth of the cash flow as at
December 1971 was treated as being greater than it was in the year when
it occurred. With regard to the years after 1971, the effect was the
opposite: because you are valuing future cash flow at an earlier date
than when it in fact took place, the application of the method has the
effect of producing reduced figures for the worth of the cash flow as at   G
December 1971. Since there is no dispute as to the prime rate
applicable to each year, I propose to set out B.P.'s calculations in a
simplified table of four columns. In the first column is set out the
applicable United States prime rate for the year (plus one); in the
second column the applicable factor for that year; in the third column
Mr. Hunt's positive or negative cash flow for each year (as assessed by   H
B.P.); and in the fourth column Mr. Hunt's positive or negative cash
flow for the year, as so assessed, valued as at 1971. The total of the
fourth column represents the total cash flow as at that date, taking
account therefore of the time value of money; on B.P.'s calculations
that figure is $180,667,000 and B.P.'s submission was that the value of
Mr. Hunt's benefit deriving from what B.P. had done in performance
of the contract is half of that figure, namely, $90,333,333.

The Weekly Law Reports, July 4, 1980

**1 W.L.R.**      B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)      Robert Goff J.

| | Rate + 1 | Applicable Factor | Positive (Negative) Cash Flow $ M. | Cash Flow Valued at December 1971 $ M. |
|---|---|---|---|---|
| 1958 | 1.038329 | 2.0324 | (0.668) | (1.358) |
| 1959 | 1.044795 | 1.9515 | (0.474) | (0.925) |
| 1960 | 1.048210 | 1.8648 | 1.571 | 2.930 |
| 1961 | 1.045000 | 1.7817 | 0.398 | 0.709 |
| 1962 | 1.045000 | 1.7050 | 4.243 | 7.234 |
| 1963 | 1.045000 | 1.6316 | 2.319 | 3.784 |
| 1964 | 1.045000 | 1.5614 | (0.876) | (1.368) |
| 1965 | 1.045356 | 1.4938 | (0.529) | (0.790) |
| 1966 | 1.056274 | 1.4218 | (0.529) | (0.752) |
| 1967 | 1.056315 | 1.3461 | 10.126 | 13.631 |
| 1968 | 1.063142 | 1.2703 | 19.351 | 24.582 |
| 1969 | 1.079568 | 1.1860 | 14.208 | 16.851 |
| 1970 | 1.079075 | 1.0989 | 15.687 | 17.238 |
| 1971 | 1.057062 | 1.0285 | 34.953 | 35.949 |
| 1972 | 1.051899 | 0.9747 | 24.672 | 24.048 |
| 1973 | 1.080041 | 0.9141 | 27.717 | 25.336 |
| 1974 | 1.107116 | 0.8355 | — | — |
| 1975 | 1.078110 | 0.7651 | 17.733 | 13.568 |
| | | | 169.902 | 180.667 |

B.P.'s case was therefore that, as at the date of frustration, the benefit obtained by Mr. Hunt by reason of B.P.'s performance should be valued at $90.3 million. On behalf of Mr. Hunt, Mr. Alexander advanced two criticisms of this valuation. The first, and by far the most important, of these submissions was that it was wrong in principle to take account of the time value of money; the second was that the figures were misleading in that they failed to take account of Mr. Hunt's domestic taxation in the United States. I have already recorded that Mr. Alexander also advanced certain other criticisms of B.P.'s calculations, namely, that no allowance was made for the depreciation of the concession, that the figures included income and expenditure after December 1971, and that they failed to take account of the fact that the oil which Mr. Hunt received was his own oil; but these criticisms went to the identification rather than the valuation of Mr. Hunt's benefit, and I have already rejected them when considering the question of identification of his benefit. Mr. Alexander also advanced certain further criticisms of the discounted net cash flow system of accounting in connection with the calculation of the benefit obtained by B.P. by reason of Mr. Hunt's performance; these I shall consider later when I come to deal with Mr. Hunt's cross-claim against B.P.

I turn, therefore, to the question whether the time value of money should be taken into account. In monetary terms this is a point of great importance so far as the question of benefit is concerned; because although on B.P.'s figures it made a difference, in relation to Mr. Hunt's benefit, of what was described in argument as "only" $10 million, the effect with regard to B.P.'s benefit was (as will appear hereafter) that taking into account the time value of money turned a positive figure of $55 million into a negative figure of $11 million. This was because B.P. incurred very substantial expenditure in the early years of the field's history, by reason of their farm-in contributions and more

Robert Goff J.    B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)    [1979]

A

particularly in the exploration and development of the field; the discounted net cash flow basis has the effect of enhancing their negative cash flow during those years and, therefore, of greatly reducing the amount of their net benefit valued as at December 1971.

It was submitted by Mr. Alexander, for Mr. Hunt, that the discounted net cash flow basis was not appropriate for an accounting of this kind. The method is adopted in business for the purpose of assessing the likely profitability of a project, and also (to a lesser extent) for assessing how far, in the event, the actual profitability of a project measured up to expectations. But it has never been used for a purpose such as the present. For the present purpose, Mr. Alexander submitted, the proper method was (as in the case of partnership accounts) to proceed on an ordinary accounts basis, which takes no account of the time value of money.

For B.P., on the other hand, Mr. Rokison submitted that it would be wholly unrealistic not to take account of the time value of money in valuing a benefit obtained under a contract of this kind, particularly as the parties themselves, to some extent at least, took account of the time value of money in the contract itself (see section 9 (e) of the operating agreement, in which provision is made for reimbursement of B.P.'s expenditure for Mr. Hunt's account and farm-in contributions in money and in oil, with an increment of 25 per cent.—no doubt to allow for the time value of money).

If it were open to me to take account of the time value of money for the purpose of assessing Mr. Hunt's benefit, I would have considered that the discounted net cash flow method of accounting provided an appropriate method for doing so. The fact that it has not been used for this purpose before is, of course, neither here nor there, particularly as this is the first known case under the Act; in fact, the exercise which would have to be done in the present case would be not dissimilar from the exercise, sometimes carried out in business, of assessing after the event the profitability of a project, for which the discounted net cash flow method is used. But attractive though I found Mr. Rokison's argument, and anxious though I am to act realistically, I have come to the conclusion that, on a true construction of the Act of 1943, it is not open to me to make an allowance for the time value of money. I need not repeat my reasons for reaching this conclusion, which I set out when considering the principles to be applied. But I shall add one footnote, which perhaps emphasises the kind of difficulty which can arise if the time value of money is taken into account. It was pointed out by Mr. Alexander, with some force, that no interest was in fact charged to B.P. by the B.P. group in respect of the very substantial sums of money advanced to B.P. which were employed in the Libyan operation. Now it is possible to adopt a broad approach, and look at the matter from the point of view of the B.P. group as a whole; in which event it can be said that the money was tied up in the Libyan operation, instead of being profitably employed elsewhere. But it is not easy to adopt this course when the legal entity which is making the claim in the present case is not the B.P. group but the plaintiff company, B.P., which does not appear in fact to have sustained any expense in obtaining the capital for this investment. I rely on this briefly as an illustration of the difficulty underlying the contention that the time value of money should be taken into account. The discounted net cash flow method is based on an *assumption* that money has a value in time, which can reasonably

B

C

D

E

F

G

H

A  be measured by reference to the appropriate interest rates. In fact, the money may not have proved to have such a value—as in the case of B.P.'s borrowing in the present case; and the Act of 1943 is, in my judgment, concerned (in relation to the defendant's benefit) with the benefit he has in fact obtained. Accordingly I decide, as a matter of construction of the Act, that it is not open to me to take account of the time value of money in valuing Mr. Hunt's benefit, or indeed
B  B.P.'s benefit, as contended by B.P.

I turn then to Mr. Alexander's second submission, which was that B.P.'s figures were defective in that no deduction was made in respect of the United States taxation which Mr. Hunt paid upon the receipts appearing in the discounted net cash flow statement. In my judgment, this criticism is not well founded. First, the relevance of the net cash
C  flow is to provide evidence of the reduced value of the enhancement to Mr. Hunt's share of the concession; I do not consider that such tax as he may have paid, no doubt by virtue of his general tax position (which may in any event be dependent to some extent upon his other activities), is of any relevance to the valuation of that benefit. Secondly, however, I was provided by Mr. Hunt with no material to enable me to make any allowance, had I thought fit to do so, in respect of his
D  domestic taxation. I therefore reject this criticism.

My conclusion is that the only criticism of B.P.'s calculation of Mr. Hunt's benefit which is justified is the fact that they took into account the time value of money. All other criticisms having been rejected, I accept the figure of $169,902,000 in B.P.'s calculations as an accurate figure for Mr. Hunt's positive cash flow, which takes into account all
E  material factors and excludes all immaterial factors, for the purpose of valuing Mr. Hunt's benefit. I therefore consider that the benefit obtained by Mr. Hunt before the time of discharge, by reason of B.P.'s performance of the contract, taking into account both Mr. Hunt's expenses and the effect of the circumstances giving rise to the frustration of the contract, is to be valued at half that figure, viz. $84,951,000.

F  (c) *The just sum (if any) to be awarded to B.P.*

Having identified and valued the benefit obtained by Mr. Hunt, I now come to the question of the just sum (if any) to be awarded to B.P. B.P. put their case in two ways. Their primary case was that Mr. Hunt should make full restitution in respect of half of the benefit obtained by him. Now this approach is, in my judgment, wrong in
G  principle. Under section 1 (3), the relevance of the defendant's benefit is to provide a ceiling for the sum to be awarded: it does not provide the measure of the just sum. The subsection is based on the premise (which, as I have already mentioned, I consider to be of doubtful validity) that the amount of the award should not exceed the benefit derived by the defendant from the plaintiff's performance taking into
H  account the effect of the frustrating event upon that benefit; but it by no means follows that the plaintiff is entitled to restitution in respect of the whole of the benefit—which could lead to the most extravagant awards. I have no hestitation, therefore, in rejecting B.P.'s primary submission.

The second submission of B.P. was that the just sum to be awarded was such sum as equalised the respective benefits obtained by B.P. and Mr. Hunt. This submission I find objectionable for precisely the same

reason. Their third submission was that the just sum should be assessed **A**
as the value of the outstanding reimbursement oil (namely, 16,898,189
barrels), on the basis that the just sum should prima facie be the benefit
obtained by Mr. Hunt, limited to the amount of the outstanding contract
consideration; or alternatively on the basis that the value of the
outstanding reimbursement oil provides a reasonable measure of recovery,
on a quantum meruit basis, in respect of the benefit obtained by Mr.
Hunt, taking into account the time value of money and the extent to **B**
which reimbursement oil had already been furnished. The first way in
which their third submission is advanced I am unable to accept, since
it assumes that prima facie B.P. are entitled to restitution in respect of
the benefit obtained by Mr. Hunt; the second way is, however, much
closer to the correct principles to be applied, which in my judgment are
as follows. **C**

I have already set out the nature of the services rendered by B.P.
These were of a most extensive kind—apart from B.P.'s farm-in con-
tributions in money and oil, they included not merely the expenditure
incurred by B.P. in the exploration, appraisal, and development of the
field, and in production from the field, but also the invaluable benefits
of their experience and expertise, and the risk they took that oil might
not be found in commercial quantities. The assessment of a just sum to **D**
be awarded for services such as these imposes a very difficult burden
on the court; and it is in just such a case as this that the court will
turn to the contract as providing valuable evidence in the form of the
value placed by the parties themselves upon such services and, therefore,
as evidence (though not conclusive evidence) of a just sum to be awarded
in respect of them. The consideration which B.P. were to receive under **E**
the contract was fundamentally twofold—first, a half share in the con-
cession, and, therefore, an equal share in all oil produced from the
field; and secondly, reimbursement oil (which was related to B.P.'s
expenditure for Mr. Hunt's account, and to B.P.'s farm-in contributions)
as set out in section 9 (e) of the operating agreement as varied by the
memorandum of agreement of 1967.

In my judgment, when the court is faced with a transaction of such **F**
an unusual nature as a farm-in agreement for the development of an
oil concession, the contract provides not merely evidence but really
by far the most useful evidence of a fair remuneration to be awarded
in respect of the services rendered. It is to be observed that the con-
sideration obviously takes into account all aspects of the services rendered
by B.P.—including the benefit of their experience and expertise, and the **G**
risk taken by them of not finding oil in commercial quantities. I under-
stand that the present agreement is not very different from other farm-
in agreements used in the oil industry, especially in the United States—
indeed there are signs that the present agreement derives from a form
which was adapted for use in the present case. The consideration, there-
fore, in all probability represents a market view of the fair consideration
to be furnished for services of this kind. I, therefore, think it right, in **H**
the present case, to take the contract consideration as my guide in the
assessment of the just sum.

Of course, in so far as the contractual consideration has already been
furnished by Mr. Hunt, that should in principle be taken into account
and deducted from the just sum to be awarded, for the obvious reason
that B.P. would otherwise be remunerated twice over for the same services.
So there must be brought into account the half share in the concession

A  which had already been transferred to B.P., carrying with it the right
to share equally with Mr. Hunt, as tenants in common, in all oil produced
from the concession. The fact that B.P. were, consequent upon the act
of the Libyan Government which frustrated the contract, deprived of
much of the benefit of their share of the concession, does not in my
judgment detract from the fact that the half share in the concession was
transferred by Mr. Hunt, and that therefore this element in the con-
B  tractual consideration was furnished by him to B.P. But Mr. Alexander,
on behalf of Mr. Hunt, sought to take this argument further. He
submitted that, by not only transferring the half share in the concession
but by also conferring on B.P., under section 9 (e) of the operating
agreement, the right to take and receive three eighths of his share of
production in reimbursement oil, Mr. Hunt had done all that was required
C  of him under the contract and that B.P. had therefore, in effect, received
their full contractual consideration and could no longer claim any
further sum in respect of their services. I am unable to accept this
argument. No doubt there are cases where the transfer of certain rights
constitutes a complete furnishing of the relevant consideration. But it
has to be remembered that in the present case the oil, once produced from
the ground (when it ceased to be the property of the Libyan state),
D  became the property of both B.P. and Mr. Hunt as tenants in common.
It only ceased to be such when it left the shoreline at the terminal, and
entered the pipeline of a tanker under the control of either B.P. or Mr.
Hunt. The direction of oil into any particular tanker was a matter of
administration, whereby delivery was regulated in accordance with the
parties' contractual arrangements. That delivery would, physically
E  speaking, be carried out by servants or agents of B.P., acting as operator;
but, as operator, B.P. would be acting as agents both for themselves and
for Mr. Hunt. When section 9 (e) provided that B.P. should be entitled
to take and receive certain reimbursement oil, it simply conferred upon
B.P., as operator, the authority so to regulate delivery to tankers at the
terminal in such a way that tankers owned or chartered by them would
receive, in addition to a half share in the oil, a quantity equal to three
F  eighths of Mr. Hunt's share, until all the so-called reimbursement oil had
been received by them, with the effect that, upon shipment, B.P. acquired
exclusive ownership in that oil. But no exclusive right of property
passed until that event took place. Section 9 (e) is essentially a con-
tractual provision, imposing contractual rights and obligations on both
parties which, if duly performed, would result in B.P. acquiring exclusive
G  property in the so-called reimbursement oil. There must, no doubt, be
an implied term of the contract as a whole that Mr. Hunt should do
everything on his part necessary to enable B.P. to exercise their rights
under the contract and under section 9 (e) in particular, and that he
should do nothing to prevent B.P. from doing so, thereby enabling B.P.
to acquire exclusive property in the so-called reimbursement oil. But
I do not think that the conferring of the contractual rights on B.P. under
H  section 9 (e) can of itself be equated to the transfer of the half share
of the concession and so be treated as the complete furnishing of part
of the contractual consideration. No doubt the part to be played by
Mr. Hunt (apart from the exceptional circumstance of himself acting as
operator) in ensuring that B.P. received their reimbursement oil, would
be minimal—though it is not to be overlooked that B.P. were acting as
agents for Mr. Hunt as well as for themselves in operating the production
facilities and the terminal; but in my judgment this element of the con-

Robert Goff J.        B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)        **[1979]**

tractual consideration was not furnished to B.P. until, with Mr. Hunt's    A
co-operation (in so far as it might be necessary), the property in the re-
imbursement oil vested exclusively in B.P. Until this occurred, there was
only a contractual right to take and receive such oil, and to receive all
co-operation necessary from Mr. Hunt for that purpose. I therefore reject
this argument.

Even so, in so far as B.P. had taken and received reimbursement oil,    B
this should be taken into account in assessing the just sum to be awarded.
If B.P. had received the whole of the reimbursement oil, as well as their
half share of the concession, then I am satisfied that no sum should
have been awarded to B.P. under the Act—given if Mr. Hunt had there-
after gone on receiving oil from the field to the exclusion of B.P. because
B.P. would have been fully remunerated for the services which they had
rendered. Of course, B.P. might have been able to assert a right of pro-    C
perty in the oil so taken by Mr. Hunt, by virtue of their right of joint
ownership; but that is quite a different matter. However, in point of fact
there remained a balance of 16,899,189 barrels of oil of the first oil debt,
and the equivalent in oil of £550,032 of the second oil debt (i.e. 125
per cent. × £420,026), outstanding by way of reimbursement oil at the
date of frustration. This of course represents the effect not of the original
contract between the parties, but of the contract as varied by the memo-    D
randum of 1967.

In advancing their case on the basis of a sum equal to the value of
the outstanding reimbursement oil, B.P. presented their claim in three
alternative ways: (a) the estimated market value of the oil on December
7, 1977 (treated as the date of the award); (b) the market value on the
date of frustration; and (c) the market value of the oil on the dates    E
when it would have been delivered. These figures, so far as (b) and
(c) were concerned, they updated to allow for the time value of money;
and the second oil debt they calculated on the basis of 125 per cent. of
Mr. Hunt's share of the expenses, in accordance with clause 2 (b) of
the memorandum of 1967. On this approach, they produce the following
figures:                                                                F

(1) *Balance of first oil debt*

(a) Market value on December 7, 1977, $228,135,051 (£124,428,
171)

(b) market value on date of frustration, updated to December 7,
1977, $67,385,081 (£26,941,000)

(c) market value on dates when reimbursement oil would have    G
been delivered, updated to December 7, 1977. $135,365,277
(£56,287,621)

(2) *Second oil debt* — 125 per cent. × £440,026=£550,032

(a) Actual value on December 7, 1977, £550,032

(b) Actual value on date of frustration, updated to December 7,
1977, $1,994,863 (£757,546)

(c) Actual value on dates when reimbursement oil would have    H
been delivered, updated to December 7, 1977 $1,808,887
(£755,591)

It will at once be seen that there are very marked differences in the
figures, depending on the date which is taken for the price of oil. This
is of course due to the very substantial increase in the price of oil,
especially following the Arab-Israeli conflict of 1973. It was generally

1 W.L.R.          B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)          Robert Goff J.

A  accepted in argument that, of the three dates proposed, if any one was to be accepted, the fairest would be alternative (c), based upon the dates on which the reimbursement oil would have been delivered.

In my judgment, however, there is a fundamental objection to all these calculations by B.P. I have to bear in mind that my task is to assess a just sum in respect of the services rendered by B.P.; and that in doing so I have to take into account the half share in the con-

B  cession which B.P. had received. Now it is quite clear that, under section 9 (e) of the operating agreement, the reimbursement oil was intended to represent three things—first, 125 per cent. of all costs and expenses advanced by B.P. for Mr. Hunt's account in exploration, development or any other work performed in or in connection with the concession; secondly, 125 per cent. of the farm-in payment of £2,000,000;

C  and thirdly, 125 per cent. of the farm-in oil. Had the original agreement been implemented, unamended from the memorandum of 1967, the reimbursement oil taken and received by B.P. pursuant to section 9 (e) would have been credited against three items, and when credited against the first two items it would have been credited on the basis of the value of the oil at the date of its receipt by B.P., as in the case of the second oil debt after the memorandum of 1967. All this was, however, changed

D  by the memorandum of 1967, under which the amount of the first oil debt (i.e. of all three items under section 9 (e)) was fixed on a compromise basis at 50,000,000 barrels of oil, it being agreed that this figure should not be varied to reflect any changes in costs, posted price, realised price or any other price. This proved in the outcome to be a very poor bargain for Mr. Hunt; the subsequent increase in oil prices meant that,

E  as the oil was delivered to B.P., they would receive substantially more than the expenses which, under this compromise, the 50,000,000 barrels of oil represented. Now, as I have said, my task is to assess a just sum in respect of the services rendered by B.P.; and I have decided that it would be right to have regard to the contract as evidence of the sum to be awarded in respect of those services. I am satisfied that the reimbursement oil must, so far as the first oil debt is concerned, be understood

F  to relate only to the three matters referred to in section 9 (e), all other services rendered by B.P. having been compensated for by the transfer to B.P. of a half share in the concession. In assessing a just sum in respect of these three matters it would, in my judgment, be quite wrong to apply contractual standards which, in the outcome, proved to be extraordinarily high. True, had the market gone the other way, B.P. might

G  have received under the contract recompense far less than the expenses they in fact incurred; by fixing the first oil debt as a fixed number of barrels of oil, both parties were taking a risk. If the market had gone down, it would have been a matter for the court to decide whether, in all the circumstances, the just sum should be limited to the value of the oil which B.P. would have received. But where, as in the present case, the market has risen, it would be wrong to make an award equal to

H  the value of the balance of the reimbursement oil, if that in fact exceeds a fair remuneration for the services which were rendered. The court's task is, after all, to award restitution, not to enforce a contract; the relevance of the contract is simply to provide evidence on which the court may proceed. This contract provides valuable evidence, in so far as the transfer of the half share of the concession is concerned; but the speculative, and in the outcome inflated, value of the reimbursement oil provides, in my judgment, no safe basis on which the court may proceed. In fact,

Robert Goff J.        B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)        [1979]

subject to one or two points, I consider the court's task to be relatively A
simple. The reimbursement oil was intended to represent only the
matters listed in section 9 (e) of the operating agreement, plus the
expense which was the subject of the second oil debt. The first two
items in section 9 (e) are purely monetary items, as is the expenditure
which is the subject of the second oil debt. There remains, however,
the farm-in oil, which is the third item under section 9 (e); and there
also remains the question whether any accretion should be allowed in B
respect of the time value of money, and in what way credit should be
given in respect of the reimbursement oil already taken and received by
B.P.

In my judgment, the proper way to approach these matters is as
follows. First, one should take the actual expenditure incurred by B.P.
under the first item under section 9 (e) of the operating agreement, C
which I understand to be agreed at £30,800,281. Secondly, one should
take the farm-in payment of $2,000,000. Thirdly, one should take the
value of the 5,567,873 barrels of farm-in oil, valued as at the date of
delivery to Mr. Hunt. Fourthly, one should take the sum of £440,026,
being the costs and expenses incurred by B.P. for Mr. Hunt's account
after January 11, 1967, when the field came on stream. These items con-
stitute together the expenditure incurred by B.P., at the dates when D
they were incurred; subject to any allowance for the time value of money
and to any deduction in respect of recompense already received (and
subject also, of course, to the question of risk, which I have yet to
consider), the total of these four sums should, in my judgment, constitute
the sum to be awarded under the act.

I have, therefore, to consider whether, in assessing the just sum to be E
awarded to B.P., any allowance should be made in the present case to
take account of the time value of money. Although the award is of
course being assessed by this court at the date when judgment is given,
B.P.'s cause of action, i.e. their right to ask the court to make an award
under the Act, accrued as at the date of frustration. That is the date
of the accrual of the cause of action, and that is the date as at which
the court should assess any just sum to be awarded, it being a matter F
for separate consideration whether, if any just sum should be awarded,
any award of interest should be made in respect of the period after that
date. Now in the present case the cause of action accrued on December
7, 1971. The services rendered by B.P., in respect of which the just
sum is now claimed, were rendered long before that date. The sub-
mission of B.P. is that, in the present case, an award would not, in all G
the circumstances of the case, constitute a just sum if no allowance were
made for the lapse of time between the rendering of the services and
the accrual of the cause of action, because, apart from the fact that the
lapse of time in the present case is very substantial, the case is concerned
with very substantial sums of money; the action is between parties who
are in business on a very large scale; and the contract itself (see section
9 (e) of the operating agreement) contemplated that an allowance should H
be made for the period between expenditure and reimbursement, which
was fixed on a rough basis at 25 per cent. Attractive though this
argument is, I do not think it would be right to accept it. I have already
held that it is not open to me to take account of the time value of money
in valuing the defendant's benefit; and it is for very similar reasons that
I conclude that I should not do so in assessing the award of a just sum
under section 1 (3). First, to do so would be inconsistent with section 1 (2).

1 W.L.R.        B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)        Robert Goff J.

A   Under that subsection, all the court can do is to order repayment of sums paid, however long a period of time may have elapsed between the date of payment and the date of frustration. True, the money is recoverable by the plaintiff as money received by the defendant for his use; but since the cause of action cannot arise until the date of frustration, I do not see how it can be said that the money has been received by the defendant for the use of the plaintiff before that date. This must even be so in a case where the money so paid constituted an advance which under the contract was to be repaid, at some time after the contract was in fact frustrated, with interest.

B   Secondly, as I read section 1 (3), the purpose is to award a just sum in the sense of reasonable remuneration for the contractual performance, whether such performance consists of (for example) goods or services, valued as at the date when the performance took place. And thirdly, it would, I consider, be inconsistent to exclude the time value of money from

C   the valuation of the benefit, while taking it into account in assessing the just sum, under section 1 (3). Suppose that, putting on one side the time value of money, the just sum and the defendant's benefit would be equal; if it were right to increase the just sum to allow for the time value of money, it would be very strange if this element was then promptly excluded because the just sum could not exceed the value of the defendant's

D   benefit, in which no allowance could be made for the time value of money. For these reasons I feel compelled to hold, as a matter of construction, that no allowance can be made for the time value of money, as between the date of performance and the date of frustration, in assessing a just sum under section 1 (3) of the act.

    There remains the fact that, before the date of frustration, B.P. had

E   received, pursuant to the contract as varied by the memorandum of 1967, a substantial quantity of reimbursement oil, namely, 33,100,811 barrels of oil. The value of this oil should be credited against the just sum to be awarded to B.P.; and this oil should, in my judgment, be valued at its market value as at the date of its receipt by B.P.

    It follows that (subject to the question of risk, which I have still to consider) the just sum to be awarded to B.P. under the Act is to be

F   calculated as follows. There have to be taken the following items: (a) £30,800,281, being the costs and expenses incurred by B.P. for Mr. Hunt's account before January 11, 1967; (b) $2,000,000, being B.P.'s farm-in payment; (c) the market value, as at the date of receipt by Mr. Hunt, of the 5,567,873 barrels of farm-in oil—on the figures in attachment D to schedule G to B.P.'s points of claim (which figures I understand to

G   be not in dispute) that value is $8,801,534; and (d) £440,026, being the costs and expenses incurred by B.P. for Mr. Hunt's account after January 11, 1967. From this aggregate figure there has to be deducted the market value, as at the date of receipt by B.P., of the 33,100,811 barrels of reimbursement oil already received by B.P., valued as at the date of receipt by them; B.P. valued such reimbursement oil, as at that date, at $62,702,000, and that figure I accept. Since £30,800,281 (con-

H   verted into dollars at the rates of exchange prevailing when the relevant work was done) equals $86,180,612, and £440,026 (converted at the prevailing exchange rates) equals $1,123,000 the total of the just sum to be awarded to B.P. (if calculated in dollars) is $98,105,146 less $62,702,000, viz. $35,403,146. That is considerably less than the benefit obtained by Mr. Hunt (which I have valued at $84,951,000); and so no reduction is required on the ground that Mr. Hunt's benefit was less than the just sum. It follows that (subject to the question of the appropriate

Robert Goff J.    B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)    [1979]

currency of the award, which I shall have to consider later) I assess the    A
just sum to be awarded to B.P. under the Act at that figure. Whether,
however, any sum is recoverable by B.P. depends on two further factors
—the question of risk, and Mr. Hunt's cross-claim.

It is right that I should record that, even if Mr. Hunt had established
(which he has not) any breach by B.P. of their obligations in respect of
the development of the concession, this would have had no bearing on
the assessment of the just sum to be awarded to B.P.; and a fortiori it    B
is entirely irrelevant to such assessment that another person, acting
reasonably, might have developed the concession more rapidly than B.P.
For the reasons I have already explained, when setting out the principles
of the Act, these matters are wholly irrelevant to any award to B.P.
under the Act.

C

(d) *The effect of section 2 (3) of the Act*

I now come to the question of risk. For Mr. Hunt, it was submitted
by Mr. Alexander that under the terms of the contract B.P. took the
risk of loss in the events which occurred. His submissions were as
follows. (i) It was not the intention of the legislature that an award
should be made where the agreement either expressly or impliedly had    D
the effect of providing that the plaintiff would bear the risk of loss or
that recovery should be limited to a particular manner or that in certain
events there should be no further recovery. (ii) The scheme of the
present agreement was very plain. Clause 6 of the letter agreement
survived frustration and was intended to take effect either in the event
of frustration or whether or not frustration occurred, and was, therefore,
a clause to which section 2 (3) of the Act applied; the clause clearly    E
indicated that Mr. Hunt was not to be under any personal liability, and
reinforced the provisions of section 9 (e) of the operating agreement
which provided that B.P.'s right of recovery was to be out of production.
Clause 6 clearly indicated that B.P's right of recovery was limited to
such recovery as they might get under section 9 (e); and it would, there-
fore, be inconsistent with clause 6 to make any award.    F

Before considering these submissions I propose first to set out once
again clause 6 of the letter agreement and section 9 (e) of the operating
agreement, which are of such crucial importance to this aspect of the
case:

" 6. It is specifically understood and agreed that Mr. Hunt shall
have no personal liability to repay the sums required in the opera-
ting agreement and this letter agreement to be advanced by B.P. for    G
Mr. Hunt's account or paid to Mr. Hunt, but B.P.'s right to recover
any such sums which B.P. is required to pay or advance for Mr.
Hunt's account shall be limited to recovery solely out of three-eighths
of Mr. Hunt's half of the production, and in the manner specified
under section 9 of the operating agreement, if, as and when pro-
duced, saved and delivered at the Libyan sea terminal."    H

" 9 (e) *Reimbursement of Payments*

" B.P. shall be entitled to take and receive as reimbursement
three-eighths of Mr. Hunt's share of the oil production from the
concession delivered f.o.b. Libyan seaboard until B.P. has received a
quantity of crude oil equal to the sum of the following: (1) A
quantity equal in value to 125 per cent. of all costs and expenses

1 W.L.R.          B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)          Robert Goff J.

A    advanced by B.P. for Mr. Hunt's account on exploration, develop-
ment or any other work performed in or in connection with the
concession, then (2) a quantity equal in value to U.S. $2,500,000,
and then (3) 5,000,000 barrels."

Now Mr. Alexander's first submission is, I am satisfied, too sweeping.
It entirely begs the question whether the provision of the contract is
B    intended to be applicable in the event of frustration.  If the submission
as stated was correct, it would follow that whenever there had been a
partial rendering of services under a contract for a money consideration,
there could never be any recovery under section 1 (3) of the Act, because
if the time for payment had come there would be a right to payment
under the contract, and if it had not, on Mr. Alexander's submission,
there would be no recovery under the Act.  I do not think that is right.
C    In such cases, as in many other instances, the crucial question will be:
was the contractual provision intended to exclude or limit recovery in
the events which have occurred?  Only if the answer is yes, will an
award of restitution under the Act be inconsistent with the contract,
and so be precluded (or limited) by virtue of section 2 (3) of the Act.

Mr. Alexander sought to meet this point by asserting that clause 6
D    was intended to " survive frustration " and to take effect either in the
event of frustration, or whether or not frustration occurred.  But this
assertion is not self-evident; it has to be proved, and its correctness
depends, as section 2 (3) of the Act clearly indicates, upon the true con-
struction of the contract as a whole.

Generally speaking, when a contract is determined by frustration, the
whole contract goes.  Of course some clauses may be held, upon a true
E    construction of the contract, to continue to bind in the changed circum-
stances; for example, an arbitration clause (see Heyman v. Darwins Ltd.
[1942] A.C. 356), or a clause the very subject matter of which relates
to the changed circumstances, such as a prohibition clause in a standard
G.A.F.T.A. form of contract.  But in other cases, where there is no
clear indication that the parties did intend the clause to be applicable
F    in the event of frustration, the court has to be very careful before it
draws the inference that the clause was intended to be applicable in
such radically changed circumstances; in this connection the well known
case of Bank Line Ltd. v. Arthur Capel & Co. [1919] A.C. 435 provides
an ample warning.  Certainly, as that case shows, it is wrong for the
court simply to assume that, because the words of the clause are so
widely drawn that they are capable of being read as applicable in the
G    event of frustration, they should necessarily be held to be so applicable.
Everything depends upon the construction of the contract as a whole.
Let me revert to an example I have already given.  Under a contract of
services, the contract may provide that payment shall not be made until
the services are completed—but such a clause should not necessarily
preclude an award of restitution under section 1 (3) of the Act in
H    respect of partially completed services, subject always (as required by
section 1 (3) to the ceiling of the defendant's benefit.  It must never
be forgotten that the policy of the Act is to prevent the unjust enrichment
of the defendant at the expense of the plaintiff; only if the contractual
provision is intended to have effect in the event of frustration (in which
expression I include, of course, any clause intended to apply whether the
contract is frustrated or not) and would in such circumstances be incon-
sistent with an award of restitution under the Act, will the exercise

Robert Goff J.        B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)        [1979]

of the court's statutory power to prevent the unjust enrichment of the  A
defendant be precluded or limited.

In considering the question of construction, there are certain argu-
ments of Mr. Alexander which I can at once put on one side. First, he
relied on the fact that there was some evidence that B.P. were aware of
the political instability of some regimes in the Middle East, and of the
possibility of nationalisation—at least in the sense of local nationals
being required to be employed by foreign companies. I imagine that  B
this was common knowledge in the industry at all material times; but
I cannot see that this knowledge has any bearing on the construction of
the contract—it does not appear to have been even mentioned during
the negotiations which led up to the making of the contract, and even
if it had been it would have been inadmissible as a matter of construc-
tion, forming no part of the contractual matrix and providing no clue  C
as to how the parties intended their respective rights to be regulated in
the event of expropriation of the interests of one or other or both of
them. The decision of Pearson J. in *Société Franco Tunisienne D'Arme-
ment* v. *Sidermar S.P.A.* [1961] 2 Q.B. 278 (later reversed on a different
point in *The Eugenia* [1964] 2 Q.B. 226) shows clearly that the mere
fact that frustration was a contemplated possibility at the time when the  D
contract was made should not of itself preclude an award of restitution
if frustration in fact occurs. Secondly, Mr. Alexander submitted that it
was part of the general scheme of the contract that Mr. Hunt was never
to put his hand in his pocket. However, quite apart from the fact that
such a proposition begs the question whether any such contractual scheme
has any bearing on the situation when the contract has ceased to bind,
the proposition itself is too sweeping to be accurate—as witness in particular  E
section 9 (d) of the operating agreement, clauses 14 and 15 of the letter
agreement, and section 3 of the operating agreement. Thirdly, Mr. Alex-
ander invoked certain other clauses as supporting his general thesis, namely,
sections 4, 18, 20, 22 and 27 of the operating agreement. I do not, how-
ever, consider that any of these provisions assists his argument. I do not
wish to burden this judgment with my detailed reasons for reaching this
conclusion. Briefly, however, my reasons are as follows. The con-  F
cluding words of section 18 (which exclude from the operator's lien
advances made by B.P. for Mr. Hunt's account under section 9) do not
take the matter any further, because the lien applies only to contractual
debts to the operator, and clause 6 of the letter agreement, whatever its
true extent, excludes any contractual debts by Mr. Hunt; section 20,
broadly speaking, provides that neither Mr. Hunt nor B.P. shall be  G
required to do anything which might subject either of them or his
income or property to any U.S. tax, but there was no evidence that an
award of restitution under the Act would have any such consequence;
section 22 forbids voluntary surrender of the concession without the
approval of both parties, but that appears to me to be irrelevant in the
event of frustration; section 27 is the force majeure clause, but again  H
that only applies during the subsistence of the contract—its effect is
only to suspend a party's obligations during the continuance of the force
majeure, and it makes no provision for what is to occur in the event
of frustration.

One of Mr. Alexander's principal submissions was that clause 6
of the letter agreement, and its sister provision section 9 (e) of the opera-
ting agreement, had been inserted in the contract for the purpose of

A    assisting Mr. Hunt's tax position in the United States. It was explained to me that under United States law there is a financing device commonly used in the oil industry called a " production payment." The effect of section 9 (e) was that the reimbursement oil made available to B.P. constituted a production payment and so was treated, for United States tax purposes, as B.P.'s income and not as Mr. Hunt's income, and so was not taxable in Mr. Hunt's hands. I do not consider that such
B    evidence is as such admissible as an aid to the construction of clause 6 of the letter agreement, in order to ascertain whether that clause was intended to have the effect, in the event of frustration, of excluding an award of restitution under the Act; but I do observe that clause 6 has no application to farm-in oil (which presumably could not be ignored as forming part of Mr. Hunt's income, or at least as a capital payment to
C    him) which leads me to infer that clause 6, although it may affect risk, was not exclusively concerned with risk but had some wider purpose— and the provision of section 20 of the operating agreement that neither party should do anything which might subject the other to United States tax is at least consistent with the conclusion that the principal purpose of clause 6 of the letter agreement may well have been to minimise Mr. Hunt's tax liability. But even if that is right, I cannot see how it would
D    be inconsistent with that purpose, as expressed in clause 6, for the law to impose an obligation upon Mr. Hunt to make restitution in the event of frustration. Certainly, the protection of Mr. Hunt's United States tax position could be adequately achieved by excluding any *contractual* obligation by Mr. Hunt to repay the money and by limiting B.P.'s *contractual* right of the recoupment to taking and receiving reimbursement oil
E    under section 9 (e)—and such a provision would clearly not affect B.P.'s statutory right to restitution in the event of frustration. In so far as the underlying purpose of clause 6 was to assist Mr. Hunt's United States tax position, such a purpose is not, in my judgment, inconsistent with B.P.'s argument that clause 6 was not intended to apply in the event of frustration, but was only intended to affect the parties' contractual rights and obligations under the contract.
F    Of course, even if the clause was not intended to survive frustration of the contract, and is concerned therefore only to define B.P.'s contractual right of recoupment, it clearly affects risk in the sense that, on this basis, it must follow that B.P. took the risk that it would not find any oil, or sufficient oil to make the field worth developing, or even sufficient oil that, if produced, there would be enough to enable B.P. to
G    obtain reimbursement in full in accordance with the provisions of section 9 (e). The taking of such a risk is a perfectly intelligible proposition in the context of a farm-in agreement under which B.P., in return for investing risk capital on a very substantial scale, received a half share in the concession and so the opportunity to share equally in the production of oil from the concession. It must often happen that a party
H    invests risk capital in an enterprise, and in return for an enhanced reward (often a share in the enterprise) takes the risk that the enterprise may not prove fruitful. But it by no means follows that he takes the risk of frustration, in the sense that the contractual term which provides for him to be repaid out of the fruits of the enterprise should preclude an award of restitution in the event of frustration. Suppose that A advances £100,000 to be invested in a business, the contract containing a clause that he is to be repaid only out of the profits of the

Robert Goff J.        **B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)**        **[1979]**

business. The day after the advance is made, the business premises are   A
destroyed by fire and the contract is frustrated. Alternatively, suppose
that A agrees to buy all the apples to be produced in a particular year
from a certain orchard, paying the agreed price in advance: the day
after he pays the price, the orchard is seized by the government and the
contract frustrated. In each case, it will be a question of construction
of the contract, applying the principles set out in section 2 (3) of the
Act, whether an award of restitution was precluded by the terms of   B
the contract; but the mere fact that the parties had agreed that the
plaintiff should receive his contractual consideration in a certain form
is unlikely to preclude an award of restitution in the event of frustration.
It is not to be forgotten that, in a case of services rendered, an award of
restitution under section 1 (3) of the Act is always subject to the ceiling
of the benefit obtained by the defendant, taking into account the effect   C
of frustration upon that benefit, a safeguard designed to prevent an
award of restitution bearing unfairly upon him.

    To turn to the present case, it might have happened that, on the day
after the field came on stream, B.P. were expropriated but not Mr. Hunt;
and Mr. Hunt might then have proceeded to draw many billions of
barrels, and an immense fortune, from the field over a period of years.   D
I find it difficult to believe that the contractual terms embodied in clause
6 of the letter agreement and section 9 (e) of the operating agreement
were intended to be effective, in such circumstances, to preclude an
award of restitution in respect of B.P.'s expenditure, measured in millions
of dollars, which enabled Mr. Hunt to reap his fortune from the field.
Of course, if Mr. Hunt had been expropriated at the same time as B.P.,
no award would have been made to B.P. under the Act; for Mr. Hunt's   E
benefit from B.P.'s contractual performance would have been reduced
to nil by the effect of the frustrating event.

    Even if, B.P. alone having been expropriated, B.P. were able to assert
a half interest in the oil obtained by Mr. Hunt, by virtue of their right
of property in the oil, I do not see why this should preclude them from
obtaining restitution in respect of their expenditure for Mr. Hunt's account   F
in the exploration and development of the field, which was not intended
to be compensated for by the transfer of the half interest in the concession
in the event of the field coming on stream. To my mind, the proper
construction of clause 6 of the letter agreement is to construe the clause
as applicable in its contractual context, taking effect in relation to the
parties' respective contractual rights; and I can see no good reason to
extend its application to the radically changed circumstances which   G
arose when the contract became frustrated by the expropriation of B.P.'s
interest. The clause makes sense when construed as applicable in its
contractual context, for example, as a clause intended to protect Mr.
Hunt's United States tax position, and having the effect that B.P. took
the risk of oil being found in commercial quantities, which explains why
Mr. Hunt should confer upon B.P. the benefit of a half share in the   H
concession. The sister provision of clause 6, section 9 (e) of the opera-
ting agreement, clearly ceased to apply in the event of frustration; and
it is logical that clause 6 of the letter agreement should likewise cease
to be so applicable. I can see nothing in clause 6 itself, or in the
remainder of the contract, from which I should infer that the clause
was intended to be applicable in the changed circumstances arising
when the contract ceased to bind; and to render it so applicable could

**1 W.L.R.**          **B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)**          **Robert Goff J.**

A lead to extravagant consequences, which, in my judgment, the parties are most unlikely to have intended. I should add, moreover, that some support for this conclusion is to be derived from section 21 of the operating agreement, which appears to contemplate that, if the joint venture foundered, B.P. would be entitled to recoup their expenditure for Mr. Hunt's account out of Mr. Hunt's share of the facilities—a conclusion which may perhaps also be derived from section 3 of the operating agree-

B ment. These clauses indicate at least that B.P. were not to be deprived of any remedy in respect of their expenditure for Mr. Hunt's account in the event of the enterprise foundering: and are also consistent with the conclusion that clause 6 of the letter agreement was only intended to operate within the contractual context, in all probability to protect Mr. Hunt's tax position, and was not intended to survive frustration.

C    I, therefore, conclude that the award of a just sum to B.P., on the lines I have already indicated, is not precluded by section 2 (3) of the Act.

*V. Mr. Hunt's cross-claim under the Act of 1943*

   I now come to Mr. Hunt's cross-claim under the Act. To this cross-claim, I shall of course apply exactly the same principles as I have

D applied to B.P.'s claim. [His Lordship considered the claim and continued: ]

   Applying the same principles to the assessment of the just sum in the case of Mr. Hunt's cross-claim as I have already applied in the case of B.P.'s claim, I have come to the conclusion that there is no ground for awarding any sum to Mr. Hunt under the Act. My reason is

E quite simply that Mr. Hunt has already been fully recompensed in respect of his contractual performance, whereby B.P. obtained their valuable benefit. Under the contract, Mr. Hunt had transferred to B.P. a half share in the concession, and made available to them a substantial quantity of reimbursement oil. The consideration to be furnished by B.P. under the contract was to supply the farm-in contributions in money and in oil, and to carry out such obligations as the contract placed upon them

F as operator in relation to the exploration, appraisal, and development of the field, the construction of the pipeline, terminal and other facilities, and bringing the field into production; in so doing, B.P. would be bringing their experience and expertise to bear upon the development of a concession in which Mr. Hunt held a half share, and taking the risk that they would not find oil in commercial quantities. Everything

G which was required of B.P. to be done, in return for the transfer of the half share in the concession and the availability of reimbursement oil, had been done by them; there only remained their continuing obligations as operator, in respect of which all costs and expense were to be borne by Mr. Hunt and B.P. in equal shares (in accordance with section 9 (d) of the operating agreement, as amended by clause 2 (b) of the memorandum of agreement of 1967). It follows that, in respect of all

H that Mr. Hunt had done under the contract in both transferring a half share in the concession and in making available reimbursement oil, he had already received the contract consideration in full, or to such an extent that I can see no basis for imposing upon B.P. any obligation to pay him any further remuneration. I wish to point out that, just as B.P.'s primary claim was advanced on the basis that Mr. Hunt should compensate them for the benefit he had received in the sense of the product of B.P.'s performance, so also was Mr. Hunt's cross-claim

advanced on the basis that B.P. should compensate him in respect of   A
the benefit in oil conferred upon B.P. by his assignment to them of a
half share in the concession. But in my judgment, this is not the proper
basis for the assessment of a just sum under the Act, the benefit (in
the sense of the product of the claimant's performance) being relevant
as a ceiling to any award, but not to the assessment of the just sum. In
a case such as the present, the just sum (if any) takes the form of a
fair remuneration for the contractual performance of the claimant; and if   B
the claimant has already been fully remunerated under the contract,
there is no room for any award. :

    I, therefore, decide that Mr. Hunt's cross-claim under the Act fails.

*VI. The relationship between B.P.'s claim and Mr. Hunt's cross-claim*
*under the Act*   C

    I have to draw attention to the fact that, under section 1 (3) in its
present form, a curious situation may arise in a case where there is both
a claim and a cross-claim. This is because, since the subsection pro-
ceeds on the basis that the defendant's benefit shall constitute a ceiling
to the plaintiff's claim, an element of double-counting may theoretically
arise in that expenses incurred by the defendant may operate, by   D
reducing the defendant's benefit, to reduce the plaintiff's claim and may
also operate, by constituting part of the defendant's contractual perform-
ance which has the effect of conferring a benefit on the plaintiff, to
found a cross-claim against the plaintiff. The converse may occur, in
the same case, in respect of expenses incurred by the plaintiff. This
is a point which could theoretically create problems of some complexity,
especially if in the same case the court has also to consider, in assessing   E
the just sum, the reduction of the award to either party by reason of
the consideration already furnished by the other having to be taken
into account and credited towards the just sum to be awarded. The
possibility of such problems arises, in my opinion, from the decision
of the legislature to limit recovery to the defendant's benefit, a provision
which (as I have already indicated) I consider to be contrary to principle   F
and capable of producing injustice. It is of course my duty to give effect
to the subsection as drafted; however, I am satisfied that, in respect of
both B.P.'s claim and Mr. Hunt's cross-claim in the present case, I
have properly assessed the sum (if any) to be awarded to each, taking
into account the other's contractual performance, and I have held that
the just sum to be awarded to B.P. does not exceed the benefit obtained by
Mr. Hunt by reason of B.P.'s performance. Although expenses incurred   G
by B.P. provide in part the basis of their claim against Mr. Hunt, and
also have the effect of limiting their own benefit, nevertheless, because
Mr. Hunt can recover nothing, since he has been fully remunerated for
his contractual performance, B.P.'s benefit has no effect whatsoever in
relation to his claim. Of course, the mere fact that one party should rely
on his contractual performance both to found a claim against the other,   H
and to resist a claim by the other on the basis that the other has
thereby already been pro tanto remunerated, is unobjectionable; because
where the performance of each goes to reduce the other's claim, there
will be a mutual cancelling-out and no element of double-counting will
arise. That is just what has happened in the present case, leaving B.P.
only with an award in respect of their performance which, under the
contract, was to have been paid for by reimbursement oil, but was in

A  the event only partially paid for in that way. It follows that no objection-
able element of double-counting arises in holding, as I do, that B.P.
succeed in their claim under the Act, to the extent I have already
indicated, and that Mr. Hunt fails in his cross-claim.

### VII and VIII

B  [His Lordship considered and rejected an alternative claim by B.P. to
their claim under the Act of 1943, namely, that B.P. were the beneficial
owners of the oil lifted by the defendant between December 8, 1971, and
May 1973, and, having also rejected various claims made by the parties in
contract (other than a claim by B.P. to £127,465 in respect of sums
expended by B.P. for Mr. Hunt's account after the expropriation of B.P.'s
interest), his Lordship continued:]

C

### IX. Interest

I now come to the question whether the court has power to award
interest upon any award made under the Act of 1943. For B.P. Mr.
Rokison submitted that the court had power to do so under section 3 of
the Law Reform (Miscellaneous Provisions) Act 1934, on the ground that
D  the proceedings under the Act of 1943 in the present case were proceedings
for the recovery of a debt. Mr. Alexander submitted that the court had no
such power, primarily on the ground that interest can only be awarded from
the time the sum in question becomes due, and in the case of a claim under
the Act no sum can be due until the court makes its award.

Section 3 (1) of the Act of 1934, upon which Mr. Rokison relied,
E  provides, subject to a proviso which is not relevant to the present case:

> "In any proceedings tried in any court of record for the recovery of
> any debt or damages, the court may, if it thinks fit, order that there
> shall be included in the sum for which judgment is given interest at
> such rate as it thinks fit on the whole or any part of the debt or
> damages for the whole or any part of the period between the date when
F  the cause of action arose and the date of the judgment: . . ."

The question, therefore, arises whether a claim to an award under the Act of
1943 is a claim for the recovery of a debt within the meaning of that word
as used in the Act of 1934. I have no doubt whatsoever that it is.

Let me take first claims under section 1 (2) of the Act of 1943. That
subsection provides that sums paid in pursuance of a contract thereafter
G  frustrated shall be recoverable from the payee as money received by him
for the use of the payer. It is clear that a claim under the subsection is a
statutory form of the old action for money had and received, though
nowadays it would be more appropriate to describe it as a statutory claim
in restitution. Now the action for money had and received is one of the old
indebitatus counts; and an indebitatus count only lay for the recovery of a
debt: see *Bullen & Leake's Precedents of Pleadings,* 3rd ed. (1868), p. 36.
H  One form of the old action for money had and received was the action to
recover money paid for a consideration which wholly failed: such an action
was certainly an action for the recovery of a debt, and I have no doubt
that in a case such as *Fibrosa Spolka Akcyjna* v. *Fairbairn Lawson Combe
Barbour Ltd.* [1943] A.C. 32 the court had power to award interest. (I
observe that the appeal to the House of Lords in that case was against an
order refusing to allow a claim for recovery of £1,000 with interest; but
although the appeal was allowed, it is not clear from the report whether the

order included an award of interest, although I should be very surprised if    A
it did not do so.) Mr. Alexander's submission leads indeed to the astonish-
ing conclusion that, in a case where money had been paid under a contract
thereafter frustrated, and the consideration for the payment had wholly
failed, the court would have had power to award interest before the Act,
but not after the Act. Plainly that cannot be right: and I am satisfied that,
when the court makes an order for the recovery of money under section 1 (2)
of the Act of 1943, it has the power to award interest under section 3 (1)    B
of the Act of 1934, because the proceedings are for the recovery of a debt.
The period in respect of which interest can be awarded is, of course, the
period between the date when the cause of action arose and the date of
judgment; and, as I have already held, the cause of action in respect of a
claim under the Act of 1943 arises at the date of frustration.

I turn next to claims under section 1 (3). Here the claim is for the    C
award of a just sum. I am satisfied, however, that the cause of action must,
as with claims under section 1 (2), arise at the date of frustration, though
the quantification of the award must await the decision of the court. The
closest analogy is a quantum valebat or quantum meruit claim; there, the
cause of action arises when the goods are sold and delivered, or the services
rendered, though the quantification of the recoverable sum may not be
known until the court gives judgment. Now the old quantum valebat    D
and quantum meruit counts were superseded by the indebitatus counts
(see *Bullen & Leake*, 3rd ed. p. 35); they too were actions for the
recovery of a debt—the amount of the debt being deemed to be certain, on
the ground that it was capable of being ascertained. I have no doubt that
in, for example, an action for the price of goods sold and delivered, where
the price has not been agreed but the reasonable price is fixed by the court,    E
the court has power to award interest under section 3 (1) of the Act of 1934,
since the action is an action for the recovery of a debt; and the same must
apply in the case of any quantum meruit claim. In my judgment, a claim
under section 1 (3) of the Act of 1943 is, in general terms, a statutory
quantum meruit claim. It is, therefore, an action for the recovery of a debt,
and the court has power under the Act of 1934 to award interest from the
date of the accrual of the cause of action, namely, from the date of frustra-    F
tion, to the date of judgment. It would certainly be a most surprising result
if the court had power to award interest when making an award under
section 1 (2), but no such power to do so when making an award under
section 1 (3). I note that in *Société Franco Tunisienne D'Armement* v.
*Sidermar S.P.A.* [1961] 2 Q.B. 278 (later reversed on a different point—see
*The Eugenia* [1964] 2 Q.B. 226), a case concerned with a frustrated con-    G
tract to which the Act of 1943 did not apply, the court, when awarding a
quantum meruit, did so with interest (see p. 314); once again, it would be
astonishing if in cases of frustration where the Act did not apply interest
was to be awarded upon a quantum meruit, whereas in the case of awards
under section 1 (3) of the Act the court had no power to award interest.

I am glad to be able to reach this conclusion; because I cannot overlook
the fact that the effect of Mr. Alexander's submission, if accepted, would be    H
to encourage defendants to delay indefinitely the hearing of proceedings in
respect of claims under the Act. I am, moreover, fortified in my conclusion
by the decision of Brandon J. in *The Aldora* [1975] Q.B. 748, in which he
held that the court had power, under the Act of 1934, to award interest in
proceedings for a salvage award. In so holding, Brandon J. observed, at p.
751, that the words " any debt " in section 3 (1) of the Act of 1934 should
be given a wide meaning. Certainly, when the claim in question is a claim to

1 W.L.R.        B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)        Robert Goff J.

A restitution, the courts have in the past placed a benevolently broad construction upon Acts of Parliament in order to make them applicable to such claims, when the legislature has failed to provide expressly for them. Thus in *In re Diplock* [1948] Ch. 465, 514, Lord Greene M.R. took the view that the words " actions founded on simple contract " in section 2 (1) (*a*) of the Limitation Act 1939 " must be taken to cover actions for money had and received . . . though the words used cannot be regarded as felicitous "; and B in *Bowling* v. *Cox* [1926] A.C. 751, a similar approach was adopted by the Privy Council to bring actions for money had and received within the ambit of a colonial ordinance equivalent to R.S.C., Ord. 11, r. 1. I therefore, agree with Brandon J. that a broad interpretation should be given to the words " any debt " in section 3 (1) of the Act of 1934, to accommodate claims in restitution, if this should be necessary; but I am satified that, in C the strict sense of the word, the claim in the present case for an award under the Act of 1943 is a proceeding for the recovery of a debt.

I accordingly decide that I have power under the Act of 1934 to award interest upon an award under section 1 (3) of the Act of 1934, from the date of frustration to the date of judgment. I shall, however, provide counsel with an opportunity to address me on the appropriate award of interest to be made in the present case.

D

### X. *Currency of an award under the Act of* 1943

Although counsel addressed me briefly, in the course of argument, on the question of the appropriate currency in which an award under the Act of 1943 might be made, their argument was to some extent hypothetical, since they did not know the exact form in which such an award might be E made in the present case. I, therefore, think it right to afford counsel an opportunity to address me further on this topic, now that they know the form which my award under the Act will take, especially as the choice of currency may affect very substantially the final sum to be awarded under the Act.

*Hearing adjourned.*

F

His Lordship heard submissions by counsel on the currency in which the award should be expressed and on the interest to be awarded.

*Kenneth Rokison Q.C.* and *I. A. Milligan* for B.P.
*Robert Alexander Q.C., Peter Curry Q.C.* and *Nicholas Lyell* for the defendant, Mr. Hunt.

G

*Cur. adv. vult.*

March 16, 1979. ROBERT GOFF J. read the following judgment. I gave judgment in this case on June 30, 1978. At that time I reserved for further argument two matters: the currency of the award, and interest. I had H hoped to be able to deal with those two matters before the end of July; but it was impossible for both leading counsel to be available to argue the points until September, and as the sums involved were so large, argument was postponed until September 13. Two days were set aside for the submissions on these two points; but the argument was not completed within the two days, and was resumed on the next available date, October 6. Further argument was addressed to me on November 8, 1978, following the decision of the House of Lords in *The Despina R* and *Services Europe Atlantique Sud*

Robert Goff J.    B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)    [1979]

(SEAS) v. Stockholms Rederiaktiebolag Svea (The Folias) [1978] 3 W.L.R.    A
804. By then, argument was complete except for one matter—the appropriate rate of interest on a dollar award. It was anticipated that the parties would be able to reach agreement on this point; unfortunately they were unable to do so, and they returned before me on December 7, 1978, when certain very helpful evidence was placed before me in affidavit form. The affidavit put in on behalf of Mr. Hunt had however only been sworn on December 5, and B.P. asked for and obtained leave to put in a further    B
affidavit in reply. That affidavit was not available to me until the end of January 1979, when I was on circuit; on March 14 I received yet another affidavit put in on behalf of Mr. Hunt. I am now able to give judgment on these two outstanding questions. Each of them, though ancillary to the main issue in the case, is of very considerable importance, since each affects the sum to be awarded by millions of pounds.    C

I take first the currency of the award. There are three currencies which might have been considered as possible candidates: pounds sterling, Libyan dinars and U.S. dollars. Neither party has espoused the cause of the Libyan dinar; and the argument developed into a battle between the pound and the dollar, Mr. Hunt arguing for an award in pounds, and B.P. for an award in dollars.

It is perhaps of interest to record the precise award for which each party    D
contended. The award for which B.P. contended was in accordance with the figures recorded in my judgment, in which (for convenience' sake) I provisionally assessed the award in dollars. The award totalled $35,403,146, made up as follows. I took (a) the sum of £30,800,281, being the costs and expenses incurred by B.P. for Mr. Hunt's account before January 11, 1967, which (converted into dollars at the rates of exchange prevailing when the    E
relevant work was done) equalled $86,180,612; (b) $2,000,000, being B.P.'s farm-in payment; (c) the market value, as at the date of receipt by Mr. Hunt, of the 5,567,873 barrels of farm-in oil, viz. $8,801,534; and (d) £440,026, being the costs and expenses incurred by B.P. for Mr. Hunt's account after January 11, 1967, which (converted into dollars at the agreed exchange rate) equalled $1,123,000. These sums totalled $98,105,146. From this figure I deducted the market value, as at the date of receipt by B.P., of the    F
33,100,811 barrels of reimbursement oil already received by B.P., viz. $62,702,000. The total award, if made in dollars, therefore amounts to $35,403,146. For the purposes of comparison, the present day sterling value of such an award would be in the region of £18,000,000.

The sterling award for which Mr. Alexander contended, on behalf of Mr. Hunt, was calculated as follows. He took (a) the sum of £30,800,281;    G
(b) the farm-in payment of $2,000,000 which converted into sterling @ £ = $2.80 amounted to £714,292; (c) the sterling value of the farm-in oil, namely £3,143,405, being $8,801,534 converted @ £ = $2.80; and (d) £440,026. These sums totalled £35,098,004. From that sum, he deducted a sum of £25,558,000 in respect of reimbursement oil, valued in sterling as at the date when it was received; the balance was £9,540,004 which (subject to one point to which I will refer in a moment) was the sterling sum which Mr.    H
Alexander said was the appropriate amount of the award.

It will at once be apparent that a dollar award would be almost twice as valuable as a sterling award. This reflects the fact that, over the period in question, the pound has weakened considerably against the dollar. There have effectively been two relevant devaluations of the pound as against the dollar—one a straightforward devaluation in November 1967, before the date of frustration and therefore before the date of accrual of the cause of

A    action, when the exchange rate was reduced from £ = \$2.80 to £ = \$2.40;
and the other, flowing from decisions taken in June 1972 and October
1977 (both of course after the date of accrual of the cause of action) as a
result of which the pound was allowed to float, leading through various
fluctuations to the present exchange rate of £ = about \$2.

I have said that the sterling sum for which Mr. Alexander contended
was £9,540,004, subject to one point. That point I will deal with at once.
B    It concerns the farm-in oil, which in my judgment I valued at £8,801,534.
Now Mr. Alexander complained of that figure that it includes an element of
profit to B.P.; he submitted that the profit element should be excluded, and
what should be taken is a figure net of that profit, viz. the cost to B.P. of
obtaining the oil from one of its own fields in the Middle East. In my
judgment, this submission is not well founded. I am concerned with award-
C    ing a just sum, in the nature of a quantum valebat, in respect of this par-
ticular benefit conferred by B.P. on Mr. Hunt under the contract. To assess
that sum, it is right that I should look not at the cost to B.P. of obtaining
that benefit, but at the market value of the benefit itself, i.e. of the farm-in
oil, as delivered to Mr. Hunt. The evidence moreover was that the figure
of \$8,801,534 was the market price charged to the plaintiff company within
the B.P. group for the supply of the oil to the plaintiff company; and I am
D    satisfied that, being based upon average realisations, it supplied the best
evidence before me of the market value of the oil. I therefore reject Mr.
Alexander's submission on this point.

I now turn to consider the currency of the award itself. Here I have
the guidance of the recent decision of the House of Lords in *The Despina
R* and *The Folias* [1978] 3 W.L.R. 804. Those two appeals, which were
E    heard together, were concerned respectively with claims in tort and in
contract where plaintiffs had suffered damage in a currency other than
sterling. Lord Wilberforce with whose speech three of their Lordships
agreed, stated, at p. 808, that in cases of tort damages should be calculated
in " the currency in which the loss was effectively felt or borne by the plain-
tiff, having regard to the currency in which he generally operates or with
which he has the closest connection," which he called " the plaintiff's cur-
F    rency "; in cases of contract, he stated, at p. 812, that, if the contract failed
to provide a decisive interpretation, " the damage should be calculated in
the currency in which the loss was felt by the plaintiff or ' which most truly
expresses his loss.' "

Both those cases were concerned with the choice of currency in which to
calculate damages to be awarded for a legal wrong; and, having regard to
G    the principles of restitutio in integrum and of reasonable foreseeability of
damage, attention was concentrated on the plaintiff's foreseeable loss, and
the chosen currency in each case was the currency in which the loss was felt
by the plaintiff. In the present case, however, I am concerned not with a
claim for damages for a legal wrong, but a claim for an award of restitution.
Such a claim, being founded on the principle of unjust enrichment, presup-
poses three things: (1) receipt by the defendant of a benefit, (2) at the plain-
H    tiff's expense, (3) in such circumstances that it would be unjust to allow the
defendant to retain the benefit. In such cases the law is concerned with
restitution in respect of the benefit obtained by the defendant. The award
is therefore related to that benefit. The plaintiff's expense is a prerequisite
of his claim; but it does not limit or control the award of restitution. In
assessing an award of restitution, it is the defendant's benefit which has to
be identified, in order that restitution may be ordered in respect of that
benefit. Accordingly, in selecting (where necessary) the currency for the

**Robert Goff J.    B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)    [1979]**

award, attention must be concentrated on the defendant's benefit rather  A
than on the plaintiff's expense.

Of course, when the benefit consists of money, there will usually be
little difficulty in identifying the benefit, or in selecting the appropriate cur-
rency for the award. Indeed, in such a case, the plaintiff's expense and the
defendant's benefit will generally be equal, subject to matters such as change
of circumstances on the part of the defendant. So far as currency is con-
cerned, the benefit will have taken the form of a payment of money in a  B
certain currency; and no doubt an award of restitution will generally take
the form of an award for repayment of a like sum in the same currency.

But, in the law of restitution, the benefit may take many forms; and
where it takes a form other than a payment of money no such easy solution
will be available. Let me take as my example a benefit in the form of
services, because that is the example most relevant to the present case. In  C
such a case, an award of restitution usually takes the form of a quantum
meruit, or award of reasonable remuneration, for the services rendered by
the plaintiff. Of course, in making such an award, it is the market value
of the services which is taken; the plaintiff's expenditure in rendering the
services may be greater or less than that market value but, as I have said,
in assessing an award of restitution it is the value of the defendant's benefit,
rather than the plaintiff's expense, which controls the award, though the  D
plaintiff's expense may sometimes be a relevant factor to be taken into
account in assessing the value of the defendant's benefit. Now, on what
principle is the court to select (where necessary) the currency in which such
an award is to be made? In my judgment, following the basic approach
adopted by the House of Lords in *The Despina R* and *The Folias*, the
general principle is that the award of restitution should be made in the  E
currency in which the defendant's benefit can be most fairly and appro-
priately valued. Such a principle is, of course, broad enough to embrace
all claims in restitution, including the comparatively simple case I have
already referred to where the benefit takes the form of a payment of money.

Reverting to the example of services, it must be borne in mind that very
often (though by no means always) the services will have been rendered
under a contract between the parties. If so, and the contract contains some  F
international element, it will frequently identify the currency in which the
services are to be valued and paid for if the contract is fulfilled in accordance
with its terms. In such a case, the currency so selected by the parties will
very often be the currency in which the benefit (i.e. the services) can be most
fairly and appropriately valued for the purpose of an award of restitution,
for the very reason that it is the currency which was chosen by the parties  G
for the purpose of making payment for the services, albeit under the
contract. I do not put it so strongly as saying that the contractual choice of
currency will be decisive; nor do I consider that it would be right to say that
there is a presumption that the contractual choice of currency should be
applicable to an award of restitution. It is simply a factor; but it will in
many cases be a factor of such overwhelming importance that it will in fact
be chosen as the currency in which the defendant's benefit can be most  H
fairly and appropriately valued for the purposes of making such an award.

Here I must introduce a refinement, because it is relevant to my decision
in the present case. A contract sometimes distinguishes between the
currency of account and the currency of payment. The currency of account
is the currency in which the indebtedness is to be measured; the currency
of payment is the currency in which the indebtedness, so measured, is to
be discharged. Frequently, the two currencies are the same; but occasion-

1 W.L.R.         B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)        Robert Goff J.

A   ally the contract may specify different currencies. Where they are the same, the practical effect is that the parties take the risk of fluctuation in the specified currency between the date of the contract and the date of payment, by which I mean fluctuation in that currency in relation to all other relevant currencies. If, however, they differ, the practical result is a little different. Strictly speaking, the parties are taking the risk of fluctuation in the currency of account, between the date of the contract and the date when the debt
B   falls due, in relation to the currency of payment; for it is on that date that the indebtedness crystallises and so falls to be converted from the currency of account to the currency of payment. Thereafter, the parties take the risk of fluctuation in the currency of payment; but if the debt is promptly paid, that has little practical effect on the risk taken by the parties, since the money once paid can be converted at the prevailing rate of exchange into
C   any other currency, including of course the currency of account. If however there is for any reason delay between the date when the debt falls due and the date of payment, then between those dates the parties will be taking the risk of fluctuation in the currency of payment in relation to all other relevant currencies. I have found it necessary to refer to this refinement because in the present case there has been some argument whether, where they differ, the currency of account or the currency of payment should be
D   preferred as the currency in which the defendant's benefit is to be valued for the purposes of making an award of restitution. It follows from what I have said that the currency of account is generally to be preferred to the currency of payment, unless the contract envisages an appreciable delay between the date when the debt falls due and the date of payment, in which event it may be desirable to make some different award.

E       In all cases, when making an award of restitution, it is essential to identify the benefit received by the defendant in respect of which the award is to be made. This is of course important for the purpose of valuing the benefit, but also (where necessary) for the purpose of selecting the currency in which that benefit can be most fairly and appropriately valued. I stress this in the context of the present case, because in the case of an award under section 1 (3) of the Law Reform (Frustrated Contracts) Act 1943, it is
F   necessary to bear in mind the ambiguity latent in the word " benefit." Because of the manner in which Parliament has chosen to draft the subsection the court is concerned with two benefits—the benefit to the defendant in the form of the end-product of the plaintiff's performance, the function of which is to act as a ceiling to any award under the subsection, and the benefit which is directly conferred upon the defendant by the plaintiff's
G   performance—in the case of services, the rendering of the services themselves. It is in respect of the latter benefit that the just sum is to be assessed; where the benefit consists of services, the just sum takes the form of a quantum meruit or reasonable remuneration for the services.

        I now turn to apply these principles to the present case. The benefit conferred by B.P. on Mr. Hunt consisted of (1) the farm-in payment of $2,000,000; (2) the farm-in oil; and (3) the services rendered by B.P. in the
H   exploration, appraisal and development of the field, and in the production of oil from the field. Under the contract, the consideration for B.P.'s contractual performance consisted or was to consist of the transfer of a half share in the concession (carrying with it a right to a half share in oil produced from the concession), which transfer had been effected, and reimbursement oil under clause 9 (e) of the operating agreement, which had only in part been received by B.P. I have already held that the just sum to be awarded to B.P. under section 1 (3) of the Act should be assessed by

Robert Goff J.        B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)            **[1979]**

reference to the total of (1) the farm-in payment, (2) the market value   A
of the farm-in oil, and (3) the expenditure incurred by B.P. for Mr.
Hunt's account in development, etc., of the field, less the value of the
reimbursement oil received by B.P., valued at the date of its receipt by
B.P. Now, under the contract, items (1), (2) and (3) were to be paid for
(with an increment) by means of reimbursement oil; and for this purpose,
the contract contained provision for the manner in which item (3)—B.P.'s   B
expenditure for Mr. Hunt's account—was to be assessed. Under clause 17
of the operating agreement, for the purpose of billing the " non-operator "
(Mr. Hunt) for expenses, the " operator " (B.P.) was to convert all foreign
currency expenses into sterling at the rate of exchange at the date of the
expenses in question; and although clause 17 does not itself expressly con-
template " payment " being made by Mr. Hunt by permitting B.P. to take
and receive reimbursement oil, nevertheless on a true construction of the   C
contract I am satisfied that the expenses incurred by B.P. for Mr. Hunt's
account, in respect of which B.P. were entitled to take and receive
reimbursement oil under clause 9 (e), were to be converted into sterling as
required by clause 17, and then the reimbursement oil was to be credited
against that sum by converting its dollar value into sterling at the date
when it was taken and received by B.P. It follows that, so far as those   D
expenses were concerned, sterling was the currency of account. Further-
more, both parties were taking the risk of fluctuation in sterling from the
date when the expenses were incurred until the date of payment, because
" payment " was to be made through the medium of reimbursement oil, and
the sterling currency of account was converted into oil (by reference to its
dollar value) on the date when the oil was taken and received, i.e. on the
date when " payment " was actually made. In other words, under the   E
operating agreement, although oil was the " currency," or more accurately
the medium, in which payment was made, the risk of fluctuation was only
in sterling; because as soon as the sterling debt was converted into oil, B.P.
could immediately realise the value of that oil in any currency they wished.

However, the accounting provisions in clause 17 had no application to
either the farm-in payment or the farm-in oil. There is no express provision   F
in the operating agreement as to how these items (with their increments)
were to be translated into reimbursement oil for the purposes of clause 9 (e);
presumably the reimbursement oil was simply to be credited, at its dollar
value at the date of receipt by B.P., against the dollar farm-in payment and
its increment, and against the dollar value of the farm-in oil (at the date of
its receipt by Mr. Hunt) and its increment. Sterling therefore had no relevance
to this part of the transaction.   G

The operating agreement did not remain unamended. In June 1967, a
few months after the field had come on stream, it was amended by the
memorandum of agreement of 1967, under which the quantity of reimburse-
ment oil deliverable under clause 9 (e) in respect of the farm-in payment,
the farm-in oil, and the expenses advanced by B.P. for Mr. Hunt's account
up to the date when the field came on stream, together with the contractual   H
increment on those items, was fixed at 50,000,000 barrels of oil (the first oil
debt). It must follow that, in so far as the expenses so incurred by B.P.
were concerned, sterling ceased to be the currency of account. For the
contractual consideration for these expenses, and for the farm-in payment
and the farm-in oil, the " currency " of account and the " currency " of
payment had become, quite simply, oil.

I have, of course, no power to make an award in oil. I can only make

1 W.L.R.          B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)       Robert Goff J.

A   an award in money. If, however, it was necessary for me to choose the currency which most closely represented oil, on the evidence before me that currency would be the U.S. dollar. Obviously it would not be correct to equate oil with dollars; but the U.S. dollar is the currency most closely linked to oil. The dollar is the currency of the international oil industry. The posted prices of oil are expressed in dollars; oil is, throughout the world, valued in dollars. Of course, from time to time the price of oil will vary
B   independently of the value of the dollar. We have seen in recent years dramatic increases in oil prices, quite independently of the value of the dollar, due to political or market pressures. But between changes in the price of oil, the price, being expressed in dollars, will be linked to the dollar; a fall in the value of the dollar may, as we have seen, lead to oil-producing countries increasing the price of oil. Of course, oil may
C   be bought and sold in currencies other than dollars; but even where that is done, the price may depend to some extent on the strength or weakness of the relevant currency vis à vis the dollar, and in any event oil is frequently traded in dollars. For all these reasons, if I were forced to choose the currency which most closely approximated to oil, I would choose the U.S. dollar.

D   Against this background, I turn to examine the submissions of the parties. For B.P., Mr. Rokison pressed strongly for the award to be made in dollars. He relied on the fact that the dollar was the currency which most closely approximated to oil; and he submitted that since, under the operating agreement as amended by the memorandum of agreement of 1967, which was the agreement in force between the parties at the date of frustration, the " currency " of account and " currency " of payment was oil, the dollar was
E   the most appropriate currency for valuing the benefit to Mr. Hunt in respect of the services rendered by B.P., which under the agreement were to be paid for through the exercise of B.P.'s right to take and receive reimbursement oil. Even before the memorandum of agreement of 1967, the " currency " of payment was oil; and this, submitted Mr. Rokison constituted a fairer yardstick than the currency of account. For Mr. Hunt, Mr. Alexander contended for an award in sterling. He relied on the fact that sterling was
F   the currency of account under the original operating agreement; the memorandum of agreement of 1967 should not, he submitted, be taken into account, because the agreement to fix the first oil debt at 50,000,000 barrels of oil had already been dismissed as too speculative to be taken into account as evidence of the appropriate measure of the just sum to be awarded to B.P., and should likewise be ignored for the purpose of selecting the currency
G   in which that just sum was to be assessed.

I approach the matter as follows. First, so far as the benefit conferred on Mr. Hunt is referable to the farm-in payment in dollars, and the farm-in oil, the just sum should be measured in dollars. There was never any question, even under the unamended operating agreement, of the reimbursement oil in respect of these items being measured by reference to a sterling sum. For these two items, sterling is wholly irrelevant; the dollar is the only
H   possible currency in which an award of restitution can fairly and appropriately be expressed.

But, when I turn to restitution in respect of Mr. Hunt's benefit from B.P.'s services in development, etc., of the field, I find the position to be very different. I first approach the problem on the hypothesis that the operating agreement had not been amended. On this basis, I am satisfied that the fair and appropriate currency in which to value Mr. Hunt's benefit would have been sterling. Under the agreement, the currency of account

Robert Goff J.        B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)                    [1979]

for measuring the contractual indebtedness was sterling: and, although that    A
indebtedness was to be discharged in oil, as I have already indicated the risk
taken by the parties under the contract was simply a risk in the fluctuation
of the value of sterling. This, of itself, must be a strong pointer to sterling
as the fair and appropriate currency to select for the purpose of valuing this
element of Mr. Hunt's benefit. If I look at the expenditure of B.P., there is
no evidence that it was in any substantial degree dollar expenditure. Looked
at as expenditure in the field, it was very largely expenditure in Libyan    B
dinars, and for much of the time during which the expenditure was incurred
the Libyan dinar was linked to sterling. The source of finance for their
expenditure came from London; there was no evidence as to the form this
took, but the probability is that it was in sterling—certainly there was no
evidence that it was in dollars. True, had the contract been performed in
full, B.P. would have taken and received further reimbursement oil, which    C
would have been more closely linked to the dollar than to sterling; but that
time did not come, and since under the contract the parties were (in this
connection) taking the risk of fluctuation in sterling but not in oil or in
dollars, I do not consider that the "currency" of payment under the con-
tract has any significant bearing on the valuation of this part of Mr. Hunt's
benefit for the purposes of an award of restitution. Delay in receipt of the
contractual benefit is, of course irrelevant, once the contract was frustrated;    D
any delay in receipt of the award of restitution can be compensated, so far
as appropriate, by interest.

But the operating agreement was, as I have recorded, amended. Should
this lead me to reach a different conclusion? So far as concerns the second
oil debt (in respect of expenditure incurred by B.P. for Mr. Hunt's account
after the field came on stream), clearly not. But what of the first oil debt?    E
I have come to the conclusion that the crystallisation of the first oil debt in
the memorandum of agreement of 1967 does not persuade me to depart
from my view that, so far as Mr. Hunt's benefit relates to B.P.'s services in
developing the field, etc., it should be valued in sterling. I have already
rejected the 5,000,000 barrels of oil as too speculative a consideration to
provide useful evidence of the value of Mr. Hunt's benefit. This should not
of itself be conclusive on the separate question of the choice of currency;    F
even so, I do not consider that it provides a useful guide for that purpose
either. I cannot overlook the fact that, at the time when the services in
question were rendered, the memorandum of agreement of 1967 had not
been entered into: they were all rendered before the field came on stream,
and therefore under the operating agreement in its unamended form. The
memorandum of agreement of 1967 was really a compromise agreement,    G
entered into to solve a number of problems which had arisen between the
parties. Thereafter, of course, sterling ceased to be of any relevance for
the purposes of the first oil debt; but looking at the matter in the context
of restitution, rather than contract, I do not consider that this compromise
agreement should displace sterling as the most fair and appropriate currency
in which to value the benefit of the services rendered by B.P. and received    H
by Mr. Hunt under the unamended operating agreement. In truth the mem-
orandum of agreement of 1967 was not seeking to revalue the services
rendered by B.P., but rather to crystallise the amount of reimbursement oil.
I have to look at the problem as a whole. In the whole body of evidence,
the memorandum of agreement of 1967 is only one element; and, given its
date and its somewhat special nature and purpose, I do not consider it to be
of sufficient weight to displace the choice of sterling.

A     I therefore hold that the award of a just sum to B.P. under section 1 (3) of the Act should be made partly in dollars, and partly in sterling, as follows:

(1) *Award in dollars*

| | |
|---|---|
| Farm-in payment | $2,000,000 |
| Farm-in oil | $8,801,534 |
| | $10,801,534 |

(2) *Award in sterling*

| | |
|---|---|
| Services rendered before the field came on stream | £30,800,281 |
| Less reimbursement oil—$62,702,000 converted at the rates of exchange applicable at the dates of delivery | £25,573,908 |
| | £ 5,226,373 |
| *Add* for services rendered after the field came on stream | £ 440,026 |
| | £ 5,666,399 |

D     I have credited the reimbursement oil, received by B.P. against B.P.'s expenditure for Mr. Hunt's accounts, because under clause 9 (e) of the operating agreement this was the first-named of the three items towards which the reimbursement oil was to be credited.

I now come to the question of interest. I have already held that I have power to award interest on my award, as from the date of accrual of the cause of action—which I have held to be the date of frustration, viz. December 7, 1971. What I now have to decide is whether, in the exercise of my discretion under section 3 (1) of the Law Reform (Miscellaneous Provisions) Act 1934, I should award any interest and, if so, for what period and at what rate. Since the sum to be awarded by way of interest may be very large, I think it right that I should state explicitly the principles upon which I have assessed interest, so that the exercise of my discretion should, if necessary, be open to review upon appeal.

Because of the size of the sum at stake, and the novelty of the form of the claim, there was considerable discussion before me concerning the principles upon which the court will exercise its discretion to award interest, particularly in commercial cases. In my judgment, those principles are reasonably clear. The fundamental principle is that interest is not awarded as a punishment, but simply because the plaintiff has been deprived of the use of the money which is due to him. A particularly clear statement of that principle is to be found in the speech of Lord Salmon in *General Tire & Rubber Co.* v. *Firestone Tyre & Rubber Co. Ltd.* [1975] 1 W.L.R. 819, 841 (a case concerned with a claim to damages for infringement of a patent):

"Interest is not awarded as punishment against a wrongdoer for withholding payments which he should have made. It is awarded because it is only just that the person who has been deprived of the use of the money due to him should be paid interest on that money for the period during which he was deprived of its enjoyment. No one suggests that the appellants acted dishonestly or unreasonably in withholding the money for five years; nor that they caused any of the delay

Robert Goff J.        B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)        **[1979]**

in the granting of the patent. This, however, in my view, has little    A
relevance. They enjoyed the use of the money during the whole of
this time and in law it is deemed to have been due to them from the
beginning of that period."

Now, it is true that Lord Salmon dissented in that case, but I do not under-
stand there to have been disagreement as to the basic principle on which
interest is awarded: the disagreement related to the question whether, on    B
the particular facts of the case, commercial practice required the principle
to be qualified. The leading speech of the majority of their Lordships was
delivered by Lord Wilberforce, and he, as I understand it, recognised the
same fundamental principle as Lord Salmon when he said, at p. 836:

" Where a wrongdoer has failed to pay money which he should have
paid, justice, in principle, requires that he should pay interest over the    C
period for which he has withheld the money."

It is for this reason that interest will generally run from the date of accrual
of the cause of action in respect of money then due or loss which then
accrues; and in respect of loss which accrues at a date between accrual of
the cause of action and judgment, from such date. For convenience, I shall
refer to these dates compendiously as the " date of loss," although I    D
recognise that the term is not altogether appropriate in a case of restitution.
This principle was, as I understand it, implicitly accepted in *Jefford* v. *Gee*
[1970] 2 Q.B. 130 (which was concerned, of course, with a personal injury
claim); thus it was held in that case that, in respect of special damages, in
principle the plaintiff should be awarded interest on the sum which represents
the loss as from the date it was incurred.

But the power to award interest is discretionary, and there is certainly    E
no rule that interest will invariably run from the date of loss. It is no part
of my task to attempt to define the circumstances in which the court will
depart from the fundamental principle; indeed, since the discretion to
award interest is unfettered, it would be improper to do so. There appear,
however, to be three main groups of cases in which, in the exercise of its
discretion, the court may depart from the fundamental principle.    F

The first group of cases concerns the position of the defendant. The
court may consider, in the light of all the circumstances, that his position
was such that it would not be just to make the defendant pay interest from
the date of loss. It may do so if, for example the circumstances were such
that the defendant neither knew, nor reasonably could have been expected
to know, that the plaintiff was likely to make a claim, and so was in no    G
position either to tender payment, or even to make provision for payment
if the money should be found due. In such a case, the court may in its
discretion only grant interest from the date of the plaintiff's claim, or even
from such a date as will allow reasonable investigation of the claim. Again,
to quote from Lord Wilberforce's speech in the *Firestone* case, at p. 836:

" In a commercial setting, it would be proper to take account of
the manner in which and the time at which persons acting honestly and    H
reasonably would pay."

On that principle, the majority of the House took account of a normal
commercial practice under which royalties in respect of use before grant of
a patent are not expected to be paid until grant, and so awarded interest
only from the date of the grant. There are no doubt other examples.

The second group of cases concerns the conduct of the plaintiff. If, for

**1 W.L.R.**        **B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)**        **Robert Goff J.**

A    example, the plaintiff has been guilty of unreasonable delay in prosecuting his claim, the court may decline to award interest for the full period from the date of loss. This may be to encourage plaintiffs to prosecute their claims with diligence, and also because such conduct may lull a defendant into a false sense of security, leading him to think that the claim will not be pursued against him. Again, there are no doubt other cases: for a recent example, see *Business Computers Ltd.* v. *Anglo-African Leasing Ltd.*
B    [1977] 1 W.L.R. 578.

The third group consists of other cases in which it would be unjust, in all the circumstances, to award interest from the date of loss. Into this group fall those cases on which an assessment of damages is made on such a basis that it would be just to award interest from a later date, as for example was held in *Jefford* v. *Gee,* in respect of interest on general
C    damages (on which see also *Pickett* v. *British Rail Engineering Ltd.* [1978] 3 W.L.R. 955).

The basic principle, is, however, that interest will be awarded from the date of loss. Furthermore, the mere fact that it is impossible for the defendant to quantify the sum due until judgment has been given will not generally preclude such an award. Thus, in Admiralty, in collision cases where the ship is totally lost, interest has been held to run from the date of
D    the loss (see e.g. *The Berwickshire* [1950] P. 204 and *Owners of Liesbosch Dredger* v. *Owners of S.S. Edison* [1933] A.C. 449, 468), and in the case of a salvage award, from the date of the rendering of the salvage services: see *The Aldora* [1975] Q.B. 748. There must have been many cases in the commercial court in which, although the quantum of damages was in doubt until the date of judgment, interest was
E    awarded from the date of loss. Similarly, the mere fact that it is doubtful whether the plaintiff's claim will succeed, and it is reasonable to contest his claim, will not generally require any departure from the general principle; nor generally will any doubt, however justified, as to the principles of law which will be applied. Another matter which is generally ignored is the financial situation of the plaintiff; it should generally make no difference even, if, for example, it could be shown that a plaintiff in a personal injury
F    action was a person who would simply have paid the damages, if received earlier, into his current account at the bank which was permanently in credit.

It is against the background of these principles that I consider the award of interest in the present case. First, I have to consider whether any award should be made at all. For Mr. Hunt, Mr. Alexander submitted that I should not make any award of interest. His submission was made on two
G    grounds: first, that the reimbursement oil which B.P. did not receive was oil they recouped from other sources of their own, so that they had not in fact been out of money which they would have had if they had received the reimbursement oil; secondly, that Mr. Hunt could not possibly know how much, if anything, he would be bound to pay until the court made its award. The first submission is, in my judgment, misconceived. The award to B.P. is not made because B.P. did not receive the reimbursement oil due under
H    the contract; it is an award of a just sum in respect of the benefit conferred under a contract thereafter frustrated. Furthermore, the fact that B.P. may have depleted other oil reserves to make good any deficiencies is, in my judgment, wholly irrelevant. As to Mr. Alexander's second submission, difficulty of quantification, however great, is in my judgment no good reason why I should decline to make an award of interest. I therefore reject the submission that no interest should be awarded.

Next, I have to consider the period for which it should be awarded. In

Robert Goff J.    B.P. Exploration Co. v. Hunt (No. 2) (Q.B.D.)    [1979]

cases of restitution, the date of loss is generally identical with the date of    A
accrual of the cause of action; because by that date the defendant will have
received the benefit in respect of which the plaintiff claims restitution. That
was certainly so in the present case. Mr. Alexander, however, submitted
that if interest should be awarded at all, it should only be awarded from the
date of the service of the writ (viz. May 1975), because until that date Mr.
Hunt had no knowledge that any claim was being made against him, and
could not therefore have paid any claim before that date. As to this, I am    B
satisfied, on the evidence before me, that at a meeting held on June 14,
1974, B.P. made clear to Mr. Hunt's representatives B.P.'s intention to
advance a claim against him. The claim was expressed as a claim for cash,
namely £17,000,000 in lieu of reimbursement oil, and there is no evidence
that it was spelled out as a claim under the Law Reform (Frustrated Con-
tracts) Act 1943, though it was stated to be a claim under English law and    C
I have no doubt, on the evidence, that it was intended to be a claim under
that Act. But this was, in my judgment, a clear indication that B.P. did
intend to pursue a claim against Mr. Hunt in respect of the services which
they had rendered, which would under the contract have been paid for by
reimbursement oil; and if interest is to date from the time when Mr. Hunt
was aware of B.P.'s claim, then it should date not from the date of the issue
of the writ, but from June 14, 1974.    D

This is not a case where the facts giving rise to the cause of action were
unknown to Mr. Hunt; on the contrary, he was well aware of all the relevant
facts. Even so, he did not know until June 1974 that B.P. were going to
make any claim upon him; and on the very unusual facts of the case Mr.
Hunt could not, in my judgment, have been reasonably expected to know
that B.P. were likely to make any claim upon him until they notified him of    E
their intention to do so. It appears that Mr. Hunt's lawyers expressed
surprise when B.P.'s representatives stated their intention at the meeting of
June 14, 1974; there is no reason to suppose that this surprise was simulated,
the circumstances being so unique and both parties' attention having been
concentrated upon their respective rights vis à vis the Libyan Government,
and upon their rights to the oil, rather than upon any claim in restitution.
It is in just such a case as this that a court may, in its discretion, decide    F
not to award interest before the claim is made. I am not however, prepared
to postpone the commencement of the period to allow time for the making
of investigations by Mr. Hunt, because the circumstances giving rise to the
claims were well known to him or to those in his employment.

I therefore decide that the period for which interest is to be awarded
runs from June 14, 1974, until the date of my order. It is right, however,    G
that I should record that I would not have been inclined to abridge the
period to June 14, 1974, on the separate ground that there had been any
reasonable delay by B.P. It is true that 2½ years elapsed between the date
of accrual of the cause of action, and the date of notification of the claim
to Mr. Hunt; and a further 10 months elapsed between that date and the
issue of the writ. Thereafter, there cannot be said to have been any
unreasonable delay by B.P.; on the contrary, having regard to the time    H
inevitably occupied by Mr. Hunt's unsuccessful attempt to set aside the
proceedings, which finally failed when Kerr J. gave judgment in October
1975, and having regard to the complexity of the case, it was a remarkable
achievement to bring the case on for trial as early as October 1977. I am,
however, concerned with the delay between December 1971 and June 1974.
In all the circumstances of the case, I would not have regarded that delay as
so unreasonable as to call for any reduction in the award of interest on that

A  ground. The situation which arose after December 1971 was one of extreme complexity. It was not unreasonable for B.P. to regard their prime objective as the need to bring pressure to bear on the Libyan Government, by all possible means including their "hot oil" suits, and thereafter to pursue their claim against the Libyan Government. It is quite understandable that time should elapse before B.P. decided finally to proceed with a claim against Mr. Hunt. In point of fact, B.P. did not finally settle their claims

B  against the Libyan Government until November 1974; by that date, they had already given Mr. Hunt notice of their intention to make a claim upon him, and the writ was issued about six months later, just before Mr. Hunt (whose interest had been expropriated in June 1973) himself settled his claim with the Libyan Government. Given the most unusual and complex situation which arose after the expropriation of B.P., I would not have

C  been prepared to conclude that the delay in making a claim against Mr. Hunt, or in commencing proceedings against him, was so unreasonable as to call of itself for any reduction in the period in respect of which interest should be awarded.

However, for the reason I have already given, I decided in the exercise of my discretion that interest should be awarded in respect of the period from June 14, 1974, until the date of my order.

D  Finally, I come to the rate. So far as the sterling part of the award is concerned I shall, in accordance with the usual practice in this court, award interest on the basis of bank rate or minimum lending rate plus 1 per cent. I can see no good reason for departing from this usual rule in the present case. The only evidence before me of interest at this rate consisted of a calculation on the basis that interest was awarded from the date of loss (i.e.

E  the date of accrual of the cause of action) until a judgment given in September 1978. I shall, of course, need assistance to calculate the figure for the award which I have decided to make.

I turn next to the interest on the dollar element of the award. On the evidence before me, a British company wishing to borrow U.S. dollars for purposes not specifically related to operations in the United States would probably have borrowed on the London Eurodollar market. On that

F  market the interest charged is made up of two parts—the London inter-bank offered rate, and the margin or banker's turn charged to the borrower. I had evidence before me that the appropriate London inter-bank offered rate to take was the six months rate; that the average London inter-bank six months bid rate for the period June 1974 to March 1979 was 8·115 per cent.; and that ⅛ per cent. should be added to convert the

G  bid rate into the offered rate, which would produce an average offered rate for that period of 8·24 per cent.

So far as margin is concerned, there was evidence before me that this would depend on the nature of the borrowing. One possibility is a medium term committed facility with a clause allowing early repayment without penalty and (I am assuming) a six months roll-over; the other possibility is an advised line of credit, which is similar to an overdraft. In the case of a

H  committed facility, it would be reasonable over the period 1973–78 to take a margin of between 0·75 per cent and 1·0 per cent. for the five year period; in addition a syndication or other comparable fee of 0·1 per cent. would be added for a very large borrowing. I assume that approximately the same figures would apply for the five year period 1974–79. In the case of an advised line of credit, it would be reasonable to take a margin of 0·75 per cent. over the period 1971–78; again I assume that the same would apply to the five year period 1974–79. These rates are quoted for a year of 360

days, and have to be slightly increased (by about 0·11 per cent.) to provide   A
the rate for a true year of 365 days. It is difficult to say whether a reason-
able borrower would have borrowed on the basis of a committed facility or
an advised line of credit; probably in the case of a very large sum of money
as in the present case, it is sensible to assume a combination of the two,
with perhaps an accent on the more advantageous committed facility. In
these circumstances, it is inevitable that the court should adopt a somewhat
rough and ready approach; and I shall award interest on the basis of the   B
London inter-bank six month offered rate plus 1 per cent. to allow for
margin and conversion of a 360 day year to a 365 day year. On the
evidence before me (which is based on the average rate up to March 1979)
the rate per annum would be 9·24 per cent.

I should add that it was submitted on behalf of Mr. Hunt that it was
unlikely that a major oil company such as B.P. would be a net borrower of   C
currency over a long period; and therefore that both the difference between
the bid and offered rate, and the margin, should be omitted from the
calculation. In my judgment, however, the question whether the plaintiff
is more likely to be a lender or a borrower over the period in question is
irrelevant; and having seen the rival submissions on the question whether
the plaintiff company is more likely to have been the one or the other in the
present case, I can fully understand why English law does not enter into   D
this inquiry.

It follows that interest on the dollar part of the award will be calculated
on the basis of the London inter-bank offered six month rate plus 1 per cent.
over the period June 14, 1974, to the date of my order. As with the interest
on the sterling figure, I shall be grateful for the assistance of counsel in the
final calculation of the sum to be awarded by way of interest on the dollar   E
part of the award.

Finally, I must mention the separate sum of £127,465 which I have
ordered that Mr. Hunt should pay to B.P. in respect of various sums
expended by B.P. for Mr. Hunt's account after the expropriation of their
interest. I do not think that counsel have yet addressed me on the interest
to be awarded on that sum; and I shall be glad to hear their submissions.   F

*Judgment for the plaintiffs in the sums
of $15,575,823 and £8,922,060, with
costs.*

Solicitors: *Linklaters & Paines; Franks, Charlesly & Co.*

  G

  H

*Butterworths Common Law Series: The Law of Contract*
7-20

BUTTERWORTHS COMMON LAW SERIES

# The Law of Contract

Third Edition

Series editor

**Andrew Grubb** MA (Cantab), LLD (Lond), FMedSci
*Senior Immigration Judge, Asylum and Immigration Tribunal; Visiting Professor of Law, Cardiff Law School, Cardiff University*

General editor

**Michael Furmston** TD, MA, BCL, LLM, Bencher of Gray's Inn
*Emeritus Professor and Senior Research Fellow, University of Bristol*

Contributors

**Roger Brownsword** LLB
*Professor of Law, King's College London, and Honorary Professor of Law, University of Sheffield*

**Robert Bradgate** MA (Cantab), Solicitor
*Professor of Commercial Law, University of Sheffield*

**Elizabeth Macdonald** LLB (Bristol), LLM (Cantab)
*Professor of Law, University of Swansea*

**Malcolm Clarke** MA, LLB, PhD
*Professor of Commercial Contract Law, University of Cambridge*

**Brenda Sufrin** LL.B. (Birmingham), Solicitor
*Professor of Law, University of Bristol*

**John N Adams** LL.B, Barrister
*Professor Emeritus, University of Sheffield; Adjunct Professor University of Notre Dame London Law Centre*

**GJ Tolhurst** LLM (Syd), Phd (NSW)
*Senior Lecturer in Law, University of Sydney*
*Consultant, Freehills*

**J W Carter** BA, LLB (Syd), PhD (Cantab)
*Professor of Commercial Law, University of Sydney*
*Consultant, Freehills*

**Roger Halson** LLB (Newcastle), M Litt (Oxon)
*Professor of Law, University of Leeds*

**LexisNexis**

7.18   *Termination*

doctrine is one of 'convenience'. In other words, the promisee is accorded the right to terminate as a means to an end, namely, to enable the promisee to make an alternative contract and to avoid expenditure which might be wasted[5].

## Express repudiation

7.19 The earliest cases of repudiation involved a promisor's express refusal to perform. Thus, in *Hochster v De la Tour*[1] the defendant agreed to employ the plaintiff for a specified period as a courier. Before the employment was due to commence the defendant repudiated his obligations by telling the plaintiff that his services were not required. The court held that the plaintiff was entitled to succeed in an action for damages for anticipatory breach of the employment contract. Again, in *Frost v Knight*[2], the plaintiff successfully sued for anticipatory breach of a promise to marry, even though the marriage was to take place on the death of the defendant's father and notwithstanding that the repudiation occurred and proceedings were commenced prior to the fulfilment of that contingency.

Today, the only examples of express refusals to perform which commonly come before the courts involve the wrongful termination of a contract[3]. If a promisor purports to 'cancel', 'end', 'terminate', 'rescind' or 'determine' the contract or its performance in circumstances in which there is no right to do so, the promisor's conduct may generally be treated by the promisee as a repudiation[4]. It makes no difference whether the wrongful termination takes place before or after the arrival of the time for performance by the promisor[5]. For example, the wrongful dismissal of an employee during the course of employment, as is a wrongful resignation[6]. However, it may be relevant to take into account whether the promisor has acted bona fide[7].

1  *Hochster v De La Tour* (1853) 2 E & B 678, at 688/118 ER 922, at 926. *Bradley v H Newsom Sons & Co* [1919] AC 16, at 53. But see Valid Withdrawal of Repudiation after Anticipatory Breach of Contract (1920s) 5 Texas L.R 9.
2  *Maredelanto Compania Naviera SA v Bergbau-Handel GmbH, The Mihalis Angelos* [1971] 1 QB 164. See also *Universal Cargo Carriers Corp v Citati* [1957] 2 QB 401 at 438; *Nissho Corp of Chile Ltd v Tunisia Compania de Navegacion SA, The Hermosa* [1980] 1 Lloyd's Rep 638 at 639 (and see also *Gibson Nitrate Sales Corp v Marine Transportation Co Ltd, The Hermosa* [1982] 1 Lloyd's Rep 570). For the origins of this basis see *Frost v Knight* (1872) LR 7 Exch 111 at 114.
3  See chapter 8.
4  [1980] 1 All ER 571; [1980] 1 WLR 277 at 296—?.
5  The suggested phases include that the repudiation is a present breach; the protection of the expectation interest; and the acceptance of an offer of termination. See generally Carter paras 717-723.

*Termination for Breach*   7.20

## Implied repudiation

7.20 By and large, the focus of the repudiation doctrine is objective[1]. Thus, if a reasonable person in the position of a promisee would conclude that the promisor has repudiated the contract this will be a repudiation even though there is no express refusal to perform and no actual intention to repudiate[2]. Lord Coleridge CJ formulated the test, in *Freeth v Burr*[3], as being whether the acts or conduct ... amount to an intimation of an intention to abandon and altogether to refuse performance of the contract. Such an intimation will be established if the words or conduct of the promisor make it 'quite plain' that the promisor will not (or cannot) perform, or will perform the contract in a manner which is substantially different from that required.

In *Ross T Smyth & Co Ltd v T D Bailey Son & Co*[4] Lord Wright said[5], 'repudiation of a contract is a serious matter, not to be lightly found or inferred'. Thus, in *Mersey Steel and Iron Co Ltd v Naylor Benzon & Co*[6] buyers of goods, who believed that the presentation of a petition to wind up the sellers precluded payment without the court's sanction, refused to pay for goods delivered until this was sanctioned by the court. Their belief was unsound. The buyers' refusal to perform was clearly contingent and the House of Lords held that the refusal did not constitute a repudiation. There was no absence of readiness or willingness to perform on the part of the buyers, albeit after some delay. On the other hand, in *Warinco AG v Samor SpA*[7], buyers under a contract for the sale of rapeseed oil of good, wholesome, merchantable quality rejected the first of the two instalments deliverable under the contract because it was not in accordance with the contract. In fact it was in accordance with the contract requirements and the sellers drew the inference, from communications with the buyers, that the second instalment would also be rejected[8]. They therefore continued in performance of the contract. The court held that the sellers were justified in terminating on the ground of repudiation because the refusal of the buyers related to all their outstanding obligations.

An erroneous construction of a contract, when acted upon by the promisor, will be a repudiation if it is clear that the promisor intends to perform in accordance with its (erroneous) construction, even though the promisor is not actually intending to repudiate[9]. In such cases the general principle stated by Lord Wright in *Ross T Smyth & Co Ltd v T D Bailey Son & Co*[10] applies, and it is not 'necessary to show that the party alleged to have repudiated should have an actual intention not to fulfil the contract'. Thus, an attempt to impose a requirement on the promisee which is not in fact provided for by the contract may be a repudiation[11]. However, it is in all cases relevant to take into account whether the erroneous construction is a bona fide construction. If it is, the promisee's allegations of repudiation may fail[12].

6  See *General Billposting Co Ltd v Atkinson* [1909] AC 118; *Hill v CA Parsons & Co Ltd* [1972] Ch 305; *Gunton v Richmond-upon-Thames London Borough Council* [1981] Ch 448.
7  See *Thomas Marshall (Exports) Ltd v Guinle* [1979] Ch 227.
8  See para 7.32.

## 7.20   Termination

1498

*Liability to perform*

**7.21** A repudiation may relate to the ability of a party to perform. Thus, the general principle, as stated by Devlin J in *Universal Cargo Carriers Corp v Citati*, is that 'a profession by words or conduct of inability is by itself enough to constitute renunciation'. Accordingly, if A, having agreed to sell land to B, covers title to C, this can be treated as a repudiation. More generally, therefore, any act which puts it out of the power of the promisor to perform may be treated as a repudiation. In this way, for example, the voluntary liquidation of a company may be a repudiation of an employment contract.

In terms of proof, the most difficult category of repudiation is 'factual inability', where the promisee relies solely on the promisor's position.

---

*Termination for Breach* 7.21

Lord Sumner said in *British & Beningtons Ltd v North Western Cachar Tea Co Ltd* that it must be established that the promisor was, at the time of the promisee's termination of the contract, 'wholly and finally disabled from performing the contract. The issue most commonly arises in cases where repudiation is based on delay. The leading case is *Universal Cargo Carriers Corp v Citati*, where Devlin J held that shipowners could succeed on the ground of 'factual inability' when the charterer under a voyage charterparty was so placed as to be unable to find and load a cargo of scrap iron for carriage from Basrah to Buenos Aires. When the vessel arrived at Basrah no cargo was ready, no shipper had been nominated and no loading berth had been provided. Before the lay days expired the shipowners terminated the contract and re-chartered the vessel. The slight risk of recover damages in arbitration proceedings. Although it was clear that the shipowners would be delayed, Devlin J held on a case stated in the arbitration that there had been no anticipatory breach because the loading term in a voyage charterparty was not a condition. However, Devlin J said: 'a party to a contract may not purchase indefinite delay by paying damages and a charterer may not keep a ship indefinitely on demurrage. In its view, 'frustrating' the commercial purpose of the charterparty could be treated as an anticipatory breach. This was Devlin J's conception of the 'wholly and finally disabled' criterion in the context of delay in the performance of a commercial contract. He took the view that this had been established'.

In *Universal Cargo Carriers Corp v Citati* Devlin J rejected an argument that termination for repudiation may be based simply on an inference by the promisee that the promisor cannot perform. Although such a principle operates in the context of frustration. Devlin J said that in the context of anticipatory breach it is not sufficient to show that a reasonable person in the promisee's position would draw the inference that the promisor is wholly and finally disabled from performing. In his view, inability in fact must be established. Devlin J's opinion was based on a concern that a promisee entitled to terminate on the ground of inferred inability might recover substantial damages even if it turned out that the promisor would have been able to perform. His concern stemmed from application of the inevitable breach basis for the doctrine of anticipatory breach. However, the better view, as explained in *The Mihalis Angelos*, is that the ability to anticipate an inevitable breach tells us only that the promisee is entitled to recover nominal damages. Recovery of substantial damages depends on proof of actual loss or damage. It remains to be seen whether this will lead to a reconsideration of Devlin J's decision.

1499

*Chitty on Contracts*
Select Paragraphs

THE COMMON LAW LIBRARY

OTHER VOLUMES IN THE COMMON LAW LIBRARY

Clerk & Lindsell on Torts

Chitty & Jacob's Queen's Bench Forms

Bullen & Leake & Jacob's Precedents of Pleadings

Charlesworth and Percy on Negligence

Bowstead and Reynolds on Agency

Gatley on Libel and Slander

McGregor on Damages

Phipson on Evidence

Benjamin's Sale of Goods

Jackson & Powell on Professional Negligence

Goff & Jones, The Law of Restitution

Arlidge, Eady & Smith on Contempt

# CHITTY
# ON
# CONTRACTS

## THIRTIETH EDITION

VOLUME I

### GENERAL PRINCIPLES

**SWEET & MAXWELL**     **THOMSON REUTERS**

and the contract as being "terminated" by the breach, it is clear that the contract is not rescinded ab initio[4] nor is it extinguished by the breach.[5] The innocent party, or, in some cases, both parties, are excused from further performance of their primary obligations under the contract; but there is then substituted for the primary obligations of the party in default a secondary obligation to pay monetary compensation for his non-performance.[6] Thirdly, the innocent party is not ordinarily[7] bound to treat himself as discharged: if the contract is still executory, he may elect instead to treat it as continuing.[8] He may also waive his right of discharge, accept the defective performance of the other party, and content himself with damages, which are his remedy in any event.[9]

24-002     **A middle ground.** An innocent party, faced by a repudiatory breach, is therefore given a choice: he can either treat the contract as continuing ("affirmation" of the contract) or he can bring it to an end ("acceptance of the repudiation"). He must "elect" or choose between these options. Further, it is sometimes said that there is no other option open to the innocent party; that is to say, there is no "middle way" or "third choice".[10] This is true in the sense that there is no:

---

" . . . third choice, as a sort of via media, to affirm the contract and yet be absolved from tendering further performance unless and until [the breaching party] gives reasonable notice that he is once again ready and willing to perform."[11]

But the proposition that there is no middle way can be over-stated. There is a sense in which there is a middle way open to the innocent party in that he is given a period of time in which to make up his mind whether he is going to affirm the contract or terminate. This point was well-expressed by Rix L.J. in *Stocznia Gdanska SA v Latvian Shipping Co (No.2)*[12] when he stated:

"In my judgment, there is of course a middle ground between acceptance of repudiation and affirmation of the contract, and that is the period when the innocent party is making up his mind what to do. If he does nothing for too long, there may come a time when the law will treat him as having affirmed. If he maintains the contract in being for the moment, while reserving his right to treat it as repudiated if his contract partner persists in his repudiation, then he has not yet elected. As long as the contract remains alive, the innocent party runs the risk that a merely anticipatory repudiatory breach, a thing 'writ in water' until acceptance, can be overtaken by another event which prejudices the innocent party's rights under the contract—such as frustration or even his own breach. He also runs the risk, if that is the right word, that the party in repudiation will resume performance of the contract and thus end any continuing right in the innocent party to elect to accept the former repudiation as terminating the contract."[13]

The length of the period given to the innocent party in order to make up his mind will very much depend upon the facts of the case. The period may not be a long one because a party who does nothing for too long may be held to have affirmed the contract.[14] The length of time will also depend upon the time at which the innocent party's obligations fall due for performance. A contract remains in force until it has been terminated for breach so that a contracting party who has not elected to terminate the contract remains bound to perform his obligations unless the effect of the other party's breach is to prevent performance of the innocent party's obligation becoming due.[15]

24-003     **Affirmation.** Where the innocent party, being entitled to choose whether to treat the contract as continuing or to accept the repudiation and treat himself as discharged, elects to treat the contract as continuing, he is usually said to have "affirmed" the contract.[16] He will not be held to have elected to affirm the

---

[4] *Heyman v Darwins Ltd* [1942] A.C. 356, 373, 399; *Johnson v Agnew* [1980] A.C. 367, 373; *Photo Production Ltd v Securicor Transport Ltd* [1980] A.C. 827, 844; *Bank of Boston Connecticut v European Grain and Shipping Ltd* [1989] A.C. 1056, 1098, 1099; *State Trading Corp of India Ltd v M. Golodetz Ltd* [1989] 2 Lloyd's Rep. 277, 286. See below, para.24-047.

[5] *Photo Production Ltd v Securicor Transport Ltd* [1980] A.C. 827 (overruling *Harbutt's "Plasticine" Ltd v Wayne Tank and Pump Co Ltd* [1970] 1 Q.B. 447). See above, para.14-022, below, para.24-047.

[6] *R. V. Ward Ltd v Bignall* [1967] 1 Q.B. 534, 548; *Moschi v Lep Air Services Ltd* [1973] A.C. 331, 345, 350, 351; *Hyundai Ltd v Pournaras* [1978] 2 Lloyd's Rep. 502, 507; *Photo Production Ltd v Securicor Transport Ltd* [1980] A.C. 827, 848, 851. See below, para.24-052.

[7] On the question of whether the wrongful dismissal of an employee from his contract of employment constitutes an exception to the rule, see Vol.II, para.39-185. See also *Thomas Marshall (Exports) Ltd v Guinle* [1979] Ch. 227 (repudiation by employee).

[8] *Avery v Bowden* (1855) 5 E. & B. 714; (1856) 6 E. & B. 953; *Frost v Knight* (1872) L.R. 7 Ex. 111, 112; *Johnstone v Milling* (1886) 16 QBD 460, 470; *Michael v Hart & Co* [1902] 1 K.B. 482, 492; *Tredegar Iron and Coal Co Ltd v Hawthorn Bros & Co* (1902) 18 T.L.R. 716; *Ham S.S. Co Ltd v Tate & Lyle Ltd* (1936) 41 Com. Cas. 350, 355, 363; *Heyman v Darwins Ltd* [1942] A.C. 356, 361; *Chandris v Isbrandtsen Moller Co Inc* [1951] 1 K.B. 240, 248; *Howard v Pickford Tool Co Inc* [1951] 1 K.B. 417, 421; *White & Carter (Councils) Ltd v McGregor* [1962] A.C. 413; *Cranleigh Precision Engineering Ltd v Bryant* [1965] 1 W.L.R. 1293; *Suisse Atlantique Société d'Armement Maritime SA v N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361, 398, 418; *Decro-Wall International SA v Practitioners in Marketing Ltd* [1971] 1 W.L.R. 361, 368, 375, 381; *Maclan Photographic Supplies Ltd v Baxter Hoare & Co Ltd* [1972] 1 Lloyd's Rep. 410, 417; *Lakshmijit v Sherani* [1974] A.C. 605; *Thomas Marshall (Exports) Ltd v Guinle* [1979] Ch. 227; *Tai Hing Cotton Mill Ltd v Kamsing Knitting Factory* [1979] A.C. 91; *Fercometal S.A.R.L. v Mediterranean Shipping Co SA* [1989] A.C. 788; *Vitol SA v Norelf* [1996] A.C. 800.

[9] *Bentsen v Taylor, Sons & Co* [1893] 2 Q.B. 274; *Wallis, Son and Wells v Pratt and Haynes* [1911] A.C. 394; *Ham S.S. Co Ltd v Tate & Lyle Ltd* (1936) 41 Com. Cas. 350; *Chandris v Isbrandtsen Moller Co Inc* [1951] 1 K.B. 240; *Suisse Atlantique Société d'Armement Maritime SA v N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361; Sale of Goods Act 1979 s.11(2). See also below, para.24-003 (affirmation).

[10] *Bentsen v Taylor* [1893] 2 Q.B. 274, 279; *Fercometal S.A.R.L. v Mediterranean Shipping Co SA* [1989] A.C. 788, 799-801; *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corp of India* [1990] 1 Lloyd's Rep. 391, 398-399.

[11] *Fercometal S.A.R.L. v Mediterranean Shipping Co SA* [1989] A.C. 788, 801.

[12] [2002] EWCA Civ 889; [2002] 2 Lloyd's Rep. 436; *Astra (UK) Ltd v Time Group Ltd* [2003] EWHC 725 (TCC); [2003] All E.R. (D) 212 (Apr).

[13] [2002] EWCA Civ 889 at [87].

[14] cf. *W.E. Cox Toner (International) Ltd v Crook* [1981] 1 R.L.R. 443, 446 ("he is not bound to elect within a reasonable time or any other time"). See also the line of cases in which it has been held that mere delay by itself does not constitute affirmation (fn.23 below).

[15] See Treitel, *The Law of Contract*, 12th edn (by Peel, 2007), paras 18-001—18-022 and also paras 24-036 and 24-037.

[16] *Suisse Atlantique Société d'Armement Maritime SA v N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361, 398; *Peyman v Lanjani* [1985] Ch. 457.

contract unless, first, he has knowledge of the facts giving rise to the breach,[17] and, secondly, he has knowledge of his legal right to choose between the alternatives open to him.[18] Affirmation may be express or implied. It will be implied if, with knowledge of the breach and of his right to choose, he does some unequivocal[19] act from which it may be inferred that he intends to go on with the contract regardless of the breach or from which it may be inferred that he will not exercise his right to treat the contract as repudiated.[20] Affirmation must be total: the innocent party cannot approbate and reprobate by affirming part of the contract and disaffirming the rest, for that would be to make a new contract.[21] Equally a party cannot affirm the contract for a limited period of time and then abrogate it on the expiry of that period of time.[22] Mere inactivity after breach does not of itself amount to affirmation,[23] nor (it seems) does the commencement of an action claiming damages for breach.[24] The mere fact that the innocent party

has called on the party in breach to change his mind, accept his obligations and perform the contract will not generally, of itself, amount to an affirmation:

" . . . the law does not require an injured party to snatch at a repudiation and he does not automatically lose his right to treat the contract as discharged merely by calling on the other to reconsider his position and recognize his obligation."[25]

But if the innocent party unreservedly[26] continues to press for performance or accepts performance by the other party after becoming aware of the breach and of his right to elect, he will be held to have affirmed the contract.

**Affirmation irrevocable.** Once the innocent party has elected to affirm the    **24-004** contract, and this has been communicated to the other party, then the choice becomes irrevocable.[27] There is no need to establish reliance or detriment by the party in default.[28] Thus the innocent party, having affirmed, cannot subsequently change his mind and rely on the breach to justify treating himself as discharged.[29] Nevertheless, in the case of a breach which is persisted in by the other party, the fact that the innocent party has continued to press for performance will not normally preclude him at a later stage from treating himself as discharged. In such a case the innocent party is not terminating on account of the original

---

[17] *Matthews v Smallwood* [1910] 1 Ch. 777, 786; *U.G.S. Finance Ltd v National Mortgage Bank of Greece* [1964] 1 Lloyd's Rep. 446, 450; *Suisse Atlantique Société d'Armement Maritime SA v N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361, 426; *Panchaud Frères SA v Etablissements General Grain Co* [1970] 1 Lloyd's Rep. 53, 57; *Kammins Ballrooms & Co Ltd v Zenith Investments (Torquay) Ltd* [1971] A.C. 850; *Peyman v Lanjani* [1985] Ch. 457; *Yukong Line Ltd of Korea v Rendsburg Investments Corp of Liberia* [1996] 2 Lloyd's Rep. 604, 607.

[18] *Kendall v Hamilton* (1879) 4 App. Cas. 504, 542; *Peyman v Lanjani* [1985] Ch. 457, cf. *Sea Calm Shipping Co SA v Chantiers Navals de L'Esterel* [1986] 2 Lloyd's Rep. 294; *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corp of India* [1990] 1 Lloyd's Rep. 391, 398, where the issue was noted but not resolved; *Yukong Line Ltd of Korea v Rendsberg Investments Corp of Liberia* [1996] 2 Lloyd's Rep. 604, 607.

[19] *China National Foreign Trade Transportation Corp v Evolgia Shipping Co SA of Panama* [1979] 1 W.L.R. 1018; *Peyman v Lanjani* [1985] Ch. 457; *State Securities Plc v Initial Industry Ltd* [2004] All E.R. (D) 317 (Jan) (acceptance of rental payment held not to have amounted to an election to continue with the contract).

[20] *Past v Dowie* (1863) 5 B. & S. 33; *Bentsen v Taylor, Sons & Co* [1893] 2 Q.B. 274; *Matthews v Smallwood* [1910] 1 Ch. 777; *Hain S.S. Co Ltd v Tate & Lyle Ltd* (1936) 41 Com. Cas. 350, 355, 363; *Temple S.S. Co v Sovfracht* (1945) 79 Ll. L. Rep. 1, 11; *Chandris v Isbrandtsen Moller Inc* [1951] 1 K.B. 240; *Denmark Productions Ltd v Boscobel Productions Ltd* [1969] 1 Q.B. 699, 731; *Suisse Atlantique Société d'Armement Maritime SA v N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361; *Sea Calm Shipping Co SA v Chantiers Navals de L'Esterel* [1986] 2 Lloyd's Rep. 294; *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corp of India* [1990] 1 Lloyd's Rep. 391, 398; *Lang Management Ltd v Aegon Insurance Co (UK) Ltd* (1998) 86 Build. L.R. 70, 108 (although the conclusion that the contract remained alive for the benefit of both parties does not sit easily with the fact that the plaintiffs had expressly relied upon an express power to terminate contained in the contract).

[21] *Suisse Atlantique Société d'Armement Maritime SA v N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361, 398. See also *Johnstone v Milling* (1886) 13 QBD 460.

[22] *Norwest Holst Ltd v Harrison* [1985] I.C.R. 668, 683; *Walkinshaw v Dunc* [2001] 1 Lloyd's Rep 632, 643.

[23] *Perry v Davis* (1858) 3 C.B.(N.S.) 769; *Cranleigh Precision Engineering Ltd v Bryant* [1965] 1 W.L.R. 1293; *Nichimen Corp v Gatoil Overseas Inc* [1987] 2 Lloyd's Rep. 46. See also *Clough v L.N.W. Ry* (1871) 7 Ex. 26; *Allen v Robles* [1969] 1 W.L.R. 193; *Cantor Fitzgerald International v Bird* [2002] I.R.L.R. 867. But see *Denmark Productions Ltd v Boscobel Productions Ltd* [1969] 1 Q.B. 699; *Scandinavian Trader Tanker Co AB v Flota Petrolea Ecuatoriana* [1981] 2 Lloyd's Rep. 425, 430; affirmed [1983] 2 A.C. 694.

[24] *General Billposting Co Ltd v Atkinson* [1909] A.C. 118; *Garnac Grain Co Ltd v H.M. Fauré & Fairclough Ltd* [1966] 1 Q.B. 650; affirmed [1968] A.C. 1130n. Equally, a decision not to pursue the remedy of specific performance does not commit the innocent party to accept a repudiatory or an anticipatory breach: *Bear Stearns Bank Plc v Forum Global Equity Ltd* [2007] EWHC 1576 (Comm) at [127].

[25] *Yukong Line Ltd of Korea v Rendsberg Investments Corp of Liberia* [1996] 2 Lloyd's Rep. 604, 608. Moore-Bick J. added that, in his view, the courts should generally be "slow" to accept that the innocent party has committed itself irrevocably to going on with the contract and then leave it to "the doctrine of estoppel" (below, para.24-006) to remedy any potential injustice which may arise in the case where the party in breach has relied upon a representation by the innocent party which suggests that the contract has been affirmed. See also *Internet Trading Clubs Ltd v Freeserve (Investments) Ltd Plc* Unreported June 19, 2001 QBD.

[26] *Bremer Handelsgesellschaft mbH v Deutsche Conti Handelsgesellschaft mbH* [1983] 2 Lloyd's Rep. 45; *Cobec Brazilian Trading & Warehousing Corp v Alfred C. Toepfer* [1983] 2 Lloyd's Rep. 386 (waiver).

[27] *Hain S.S. Co Ltd v Tate & Lyle Ltd* (1936) 41 Com. Cas. 350, 355; *Peyman v Lanjani* [1985] Ch. 457; *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corp of India* [1990] 1 Lloyd's Rep. 391; *Yukong Line Ltd of Korea v Rendsberg Investments Corp of Liberia* [1996] 2 Lloyd's Rep. 604, 607; *Lang Management Ltd v Aegon Insurance Co (UK) Ltd* (1998) 86 Build. L.R. 70, 108. However, affirmation may not be irrevocable in the case of an anticipatory breach of contract. In the case of an anticipatory breach, it has been argued that the innocent party ought to be entitled to go back upon his affirmation unless there has been some change of position by the party in breach in reliance upon the affirmation which would be prejudiced by the change of mind by the innocent party: see Treitel (1998) 114 L.Q.R. 22 and Treitel, *The Law of Contract*, 12th edn (by Peel, 2007), paras 17-089 et seq., a view which gains some support in principle from Thomas J. in *Stocznia Gdanska SA v Latvian Shipping Co* [2001] 1 Lloyd's Rep. 537, 566) and from Rix L.J. on appeal to the Court of Appeal, [2002] EWCA Civ 889, [2002] 2 Lloyd's Rep. 436 at [97]-[99].

[28] *Edm. J.M. Mertens & Co P.V.B.A. v Veevoeder Import Export Vimex BV* [1979] 2 Lloyd's Rep. 372, 384; *Telfair Shipping Corp v Athos Shipping Co SA* [1981] 2 Lloyd's Rep. 74, 87-88; affirmed [1983] 1 Lloyd's Rep. 127; *Peter Cremer v Granaria BV* [1981] 2 Lloyd's Rep. 583, 589; *Peyman v Lanjani* [1985] Ch. 457, 495, 500; *Sea Calm Shipping Co SA v Chantiers Navals de L'Esterel SA* [1986] 2 Lloyd's Rep. 294, 298; *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corp of India* [1990] 1 Lloyd's Rep. 391, 398; *Yukong Line Ltd of Korea v Rendsberg Investments Corp of Liberia* [1996] 2 Lloyd's Rep. 604, 607.

[29] *Bentsen v Taylor Sons & Co* [1893] 2 Q.B. 274.

[30] *Tai Hing Cotton Mill Ltd v Kamsing Knitting Factory* [1979] A.C. 91; *Johnson v Agnew* [1980] A.C. 367; *Stocznia Gdanska SA v Latvian Shipping Co* [2002] EWCA Civ 889, [2002] 2 Lloyd's Rep. 436 at [94]-[100].

election; once the election has been made it is final whether or not the party has acted in reliance upon the election having been made.[63] Waiver by estoppel is thus the "more flexible"[64] of the two doctrines.

**24-009**    **Other waivers.** Affirmation must be distinguished from a waiver by one party of a term of the contract inserted for his benefit,[65] or a "total" waiver by the innocent party of the breach itself by which he forgoes, not merely his right to treat himself as discharged by the breach, but also any claim for damages for the breach.[66]

**24-010**    **Effect of affirmation.** Where the innocent party, being entitled to treat himself as discharged by the other's breach, nevertheless elects to affirm the continued existence of the contract, he does not thereby necessarily relinquish his claim for damages for any loss sustained as a result of the breach.[67] Further, he may insist on holding the other party to the bargain and continue to tender due performance on his part.[68] In *White and Carter (Councils) Ltd v McGregor*,[69] the appellants, advertising contractors, agreed with the respondent, a garage proprietor, to display advertisements for his garage for three years. On the same day, the respondent repudiated the agreement and requested cancellation, but the appellants refused to cancel and performed their obligations under the contract. They then sued for the full contract price. The House of Lords, by a majority of three to two, upheld the claim. The appellants had elected to treat the contract as continuing and it remained in full effect. The decision in this case has not passed without criticism,[70] and one of the majority (Lord Reid) considered that the right to complete the contract and claim the price would not apply:

". . . if it can be shown that a person has no legitimate interest, financial or otherwise, in performing the contract rather than claiming damages."[71]

[63] *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corp of India* [1990] 1 Lloyd's Rep. 391, 399; *Yukong Line Ltd of Korea v Rendsburg Investments Corp of Liberia* [1996] 2 Lloyd's Rep. 604, 607.

[64] *Kosmar Villa Holidays Inc v Trustees of Syndicate 1243* [2008] EWCA Civ 147, [2008] All E.R. (D) 448 (Feb) at [38].

[65] See above, para.22-045.

[66] *Sale of Goods Act 1979* s.11(2); *Benjamin's Sale of Goods*, 7th edn (2006), paras 12-034—12-036. cf. *European Grain & Shipping Ltd v Peter Cremer* [1983] 1 Lloyd's Rep. 211.

[67] *Bentsen v Taylor, Sons & Co* [1893] 2 Q.B. 274; *Ham S.S. Co Ltd v Tate & Lyle Ltd* [1936] 41 Com. Cas. 350, 363; *Chandris v Isbrandtsen Moller Co Inc* [1951] 1 K.B. 240, 248; *Suisse Atlantique Société d'Armement Maritime SA v N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361, 395.

[68] *Heyman v Darwins Ltd* [1942] A.C. 356, 361.

[69] [1962] A.C. 413. See also *Tredegar Iron and Coal Co Ltd v Hawthorn Bros & Co* (1902) 18 T.L.R. 716; *International Correspondence Schools v Ayres* (1912) 106 L.T. 845; *Anglo-African Shipping Co of New York Inc v Mortner* [1962] 1 Lloyd's Rep. 81, 94; *Decro-Wall International SA v Practitioners in Marketing Ltd* [1971] 1 W.L.R. 373; *Gator Shipping Corp v Trans-Asiatic Oil Ltd SA* [1978] 2 Lloyd's Rep. 357; *Naameu Oil Ltd v Sea Oil and General Corp* (1979) 89 D.L.R. (3d) 1, 26.

[70] *Goodhart* (1962) 78 L.Q.R. 263; *Furmston* (1962) 25 M.L.R. 364; *Scott* [1962] Camb. L.J. 12, cf. *Nienaber* [1962] Camb. L.J. 213; *Treitel, The Law of Contract*, 12th edn (by Peel, 2007), paras 21-011—21-015.

[71] [1962] A.C. 413, 431. This dictum was applied in *Attica Sea Carriers Corp v Ferrostaal Poseidon Bulk Reederei GmbH* [1976] 1 Lloyd's Rep. 250, 255; *Gator Shipping Corp v Trans-Asiatic Oil Ltd SA* [1978] 2 Lloyd's Rep. 357, 372-374; *Clea Shipping Corp v Bulk Oil International Ltd* [1983] 2 Lloyd's Rep. 645; *Stocznia Gdanska SA v Latvian Shipping Co* [1995] 2

Further, if the innocent party is unable to complete the contract without the co-operation of the other party, his only remedy is to sue for damages and not for the contract sum.[72] So an employee who is wrongfully dismissed can ordinarily only sue for damages[73] and not for his wages or salary.[74] But the fact that the remedies of the innocent party are restricted to damages does not mean that a discharge occurs at the moment of breach[75]; he may (in the case of an anticipatory repudiation) refuse to accept the repudiation and await the time fixed for performance, keeping the contract alive during the interval. In such a case, the innocent party is not required to mitigate his loss before the time for performance arrives.[76]

**24-011**    **Effect if repudiation not accepted.** If the innocent party elects to treat the contract as continuing, then it remains in existence for the benefit of the wrongdoer as well as of himself.[77] The wrongdoer is entitled to complete the contract and to take advantage of any supervening circumstance which would excuse[78] him from or diminish[79] his liability. The question, however, arises whether the wrongdoer may raise as a defence to liability the fact that the innocent party has failed to perform or is unable to perform his own obligations in some fundamental respect at the time appointed for performance. The answer to this question turns on the difficult case of *Braithwaite v Foreign Hardwood Co Ltd*.[80] In that

Lloyd's Rep. 592, 600-602 (Clarke J.); [1996] 2 Lloyd's Rep. 132, 138-139 CA. (It was unnecessary for the House of Lords in *Stocznia Gdanska* to consider this point on appeal [1998] 1 W.L.R. 574, 581; *Ocean Marine Navigation Ltd v Koch Carbon Inc (The "Dynamic")* [2003] EWHC 1936 (Comm), [2003] 2 Lloyd's Rep. 693 at [23]; *Ministry of Sound (Ireland) Ltd v World Online Ltd* [2003] EWHC 2178 (Ch) at [64]-[66]); *Reichman v Beveridge* [2006] EWCA Civ 1659, [2007] Bus LR. 412 at [17].

[72] [1962] A.C. 413, 430, 432, 439; *Finelli v Dee* (1968) 67 D.L.R. (2d) 293; *Denmark Productions Ltd v Boscobel Productions Ltd* [1969] 1 Q.B. 699; *Hounslow LBC v Twickenham Garden Developments Ltd* [1971] Ch. 233, 251-254; *Attica Sea Carriers Corp v Ferrostaal Poseidon Bulk Reederei GmbH* [1976] 1 Lloyd's Rep. 250, 256; *Telephone Rentals v Burgess Salmon* [1987] 5 C.L. 52; *Ministry of Sound (Ireland) Ltd v World Online Ltd* [2003] EWHC 2178 (Ch) at [49]-[61].

[73] In the absence of special circumstances the liability of an employer in damages for wrongful dismissal does not extend beyond the notice period which the employer could lawfully have given under the contract: *Boyo v Lambeth LBC* [1994] I.C.R. 727.

[74] *Denmark Productions Ltd v Boscobel Productions Ltd* [1969] 1 Q.B. 699; cf. *Boyo v Lambeth LBC* [1994] I.C.R. 727, 747 where Staughton L.J. inclined to the view that the wrongfully dismissed employee should be able to sue for his wages. See Vol.II, paras 39-193—39-195.

[75] See (contracts of employment): Vol.II, para.39-185. See also *Heyman v Darwins Ltd* [1942] A.C. 356, 371.

[76] *Shindler v Northern Raincoat Co Ltd* [1960] 1 W.L.R. 1038, 1048. When the time for performance arrives the doctrine of mitigation does come into play. The inapplicability of the doctrine of mitigation in cases of anticipatory breach has been criticised: see Burrows, *Remedies for Torts and Breach of Contract*, 3rd edn (2004) p.128.

[77] *Frost v Knight* (1872) L.R. 7 Exch. 111, 112; *Suisse Atlantique Société d'Armement Maritime SA v N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361, 395, 419, 437-438; *Fercometal S.A.R.L. v Mediterranean Shipping Co SA* [1989] A.C. 788.

[78] *Frost v Knight* (1872) L.R. 7 Exch. 111, at 112; *Avery v Bowden* (1855) 5 E. & B. 714; (1856) 6 E. & B. 953 (below, para.24-024); *Heyman v Darwins Ltd* [1942] A.C. 356, 361; *Fercometal S.A.R.L. v Mediterranean Shipping Co SA* [1989] A.C. 788 (below, para.24-025).

[79] *Leigh v Paterson* (1818) 8 Taunt. 540; *Brown v Muller* (1872) L.R. 7 Ex. 319; *Tredegar Iron and Coal Co Ltd v Hawthorn Bros & Co* (1902) 18 T.L.R. 716; *Tai Hing Cotton Mill Ltd v Kamsing Knitting Factory* [1979] A.C. 91, 104.

[80] [1905] 2 K.B. 543. See *Dawson* (1980) 96 L.Q.R. 229; *Carter* [1989] L.M.C.L.Q. 81.

*Howard v Pickford Tool Co Ld.*
[1951] 1 K.B. 417

ICLR: King's/Queen's Bench Division/1951/Volume 1/HOWARD v. PICKFORD TOOL CO. LD.    [1950 H. 857.] -
[1951] 1 K.B. 417

[1951] 1 K.B. 417

**COURT OF APPEAL**

# HOWARD v. PICKFORD TOOL CO. LD.    [1950 H. 857.]

**1950 Nov. 27.**

**Evershed, M.R., Asquith and Singleton, L.JJ.**

*Procedure - Master and servant - Servant's claim to declaration that service agreement repudiated by master - Servant still in master's employment - R. S. C., Ord. 25, r. 5.*

By an agreement of May, 1950, the defendant company agreed to employ the plaintiff as joint managing director for a period of six years. He brought an action against them and by his statement of claim alleged that the defendants had shown by the conduct of their chairman that they no longer intended to be bound by the agreement. He claimed a declaration that the conduct of the defendants was such as to constitute a repudiation by them of their contract so that he was excused from further performance of his obligations under it. He had not ceased to carry out his duties under the contract. The defendants applied under R. S. C., Ord. 25, r. 4, to have the statement of claim struck out.

*Held,* that, while the jurisdiction conferred on the court by Ord. 25, r. 5, to make a declaratory order was most valuable in appropriate cases, it should not be used to answer academic questions as would be the case if a declaration were made here, for since the plaintiff was still performing his part of the contract, the alleged acts of the defendants were wholly nugatory and insufficient in law to constitute repudiation. A declaration that the plaintiff might at the time have accepted the acts of the defendant as a repudiation

*[1951] 1 K.B. 417 Page    418*

would not involve the result that he could nunc pro tunc rely on them as a repudiation and accept them as such. Moreover, if the plaintiff obtained the declaration sought, another action would be inevitable. The statement of claim should accordingly be struck out.

*Societe Maritime et Commerciale v. Venus Steam Shipping Co. Ld.* (1904) 9 Com. Cas. 289, and *Spettabile Consorzio Veneziano di Armamento e. Navigazione v. Northumberland Shipbuilding Co. Ld.* (1919) 121 L. T. 628, considered.

APPEAL from McNair, J., in chambers.

The plaintiff, Walter Howard, by his statement of claim in this action alleged that by an agreement dated May 31, 1950, made between himself of the one part and the defendants. Pickford Tool Co. Ld. of the other part, it was agreed that the defendants should employ the plaintiff as joint managing director of the defendant company for a period of six years from January 1, 1950. The plaintiff alleged in para. 3 that it was an implied term of the agreement that the powers, duties and directions given to him by the company should be reasonable and that he should be permitted without undue interference by the defendants to carry on his employment as joint managing director. By para. 4 he alleged that the defendants by the conduct of their chairman in

September, 1950, had not performed the implied terms and obligations of the contract, and particulars of the conduct of which the plaintiff complained were given.

The statement of claim then continued: "By reason of the conduct of the chairman as aforesaid it has become impossible for the plaintiff to perform his part of the said agreement although he has been and is willing and ready to do so and the plaintiff will say that such conduct on the part of the said chairman has shown that the defendants intend no longer to be bound by the said agreement or that, in the alternative, such conduct is in-compatible with its due performance". The plaintiff further alleged that the defendants were in breach of the agreement and claimed damages for the breach.

When the matter came before the master, it was shown by proper evidence that, notwithstanding the allega-tions of impossibility, the plaintiff was in fact still acting as managing director under the agreement; and it was plain from that fact that there could be no claim for damages. The master therefore directed that the statement of claim should be struck out. When the matter came before McNair, J., in chambers, counsel, who had not settled the statement of claim in its original form, asked leave to amend the claim or prayer at the end of the statement of claim by substituting for the claim for damages a claim for a declaration in the following terms: "The plaintiff therefore says that the defendants are in breach of the said agreement and

*[1951] 1 K.B. 417 Page   419*

claims a declaration that the conduct of the defendants set forth in para. 4 hereof is such as to constitute repu-diation by the defendants of the contract and that the plaintiff is excused further performance of his obliga-tions under the contract".

McNair, J., subject to that amendment being made, permitted the action to proceed. The defendants appealed.

**C. D. Aarvold** for the defendants. The defendants ask to have the plaintiff's statement of claim struck out either under Ord. 25, r. 4, or under the inherent jurisdiction of the court on the ground that, assuming that the defendants' conduct amounted to a repudiation of the contract, the plaintiff did not accept it as such but has gone on performing his part of the contract. Accordingly, he must be deemed to have affirmed the contract: *Heyman v. Darwins Ld.* (1). This is not a case where a declaration should be made under Ord. 25, r. 5(2). This case is distinguishable from *Societe Maritime et Commerciale v. Venus Steam Shipping Co. Ld.* (3), and *Spettabile Consorzio Veneziano di Armamento e. Navigazione v. Northumberland Shipbuilding Co. Ld.* (4). If a declaration is made, it will not settle the dispute between the parties: the plaintiff will have to bring another action. This statement of claim should be struck out.

**Cumming-Bruce** for the plaintiff. It is submitted that it is open to the plaintiff to come to the court and ask for a decla-ration as to his rights. The judge had jurisdiction to refuse to strike out this statement of claim, and, since he exercised his discretion in the matter, it is submitted that there are no grounds for interfering with the way in which he exercised it. It is important that, if a party is in doubt as to his rights under an agreement, it should be open to him to apply under Ord. 25, r. 5, for a declaration as to his rights, before he commits himself to any course of conduct which may prejudice him. Had the plaintiff refused to continue his service with the defendants pending the determination of this action, he might have been held to be in breach of his service agreement. There must be a middle road by which a plaintiff can obtain the directions of the court without losing his employment. A declaration under Ord. 25, r. 5, is a convenient procedure for a plaintiff who does not know his position. It is admitted that, if the plaintiff obtains the declaration he seeks, he will, should he want further

_____

(1)        [1942] A. C. 356, 361.


(2)        R. S. C., Ord. 25, r. 5: "No action or proceeding shall be open to objection, on the ground that a merely declaratory judgment or or-der is sought thereby, and the court may make binding declarations of right whether any consequential relief is or could be claimed, or not".

(3)    (1904) 9 Com. Cas. 289.

(4)    (1919) 121 L. T. 628.

relief, have to take other proceedings: see *Guaranty Trust Co. of New York v. Hannay & Co.* (5).

EVERSHED, M.R., stated the facts, and continued:- The question is a brief one, whether a claim for such a declaration as is sought, and in such circumstances as are found here, is within the intendment of Ord. 25, r. 5. The declaration sought is "a declaration that the conduct of the defendants set forth in para. 4 hereof is such as to constitute repudiation by the defendants of the contract and that the plaintiff is excused further performance of his obligations under the contract".

I wish to be cautious in what I say, because I do not doubt that Ord. 25, r. 5, confers upon the court most valuable jurisdiction to make declaratory judgments in appropriate cases. A good example of the utility of the Order is to be found in *Societe Maritime et Commerciale v. Venus Steam Shipping Co. Ld.* (6). There was in that case a written contract of an elaborate character. There had been an assignment by the original contractors of their rights under it, but the real question was whether as a result of certain acts and events the plaintiffs could properly refuse to load a ship which, if the contract were still binding on them, they were bound to do. They declined to load it, and, without waiting for action to be brought against them, brought the proceedings for a declaration that, in all the circumstances of the case, they were entitled so to refuse; and that very learned judge, Channell, J., held that they were so entitled. From that case and the reference to it in the later case to which we have also been referred of *Spettabile Consorzio Veneziano di Armamento e. Navigazione v. Northumberland Shipbuilding Co. Ld.* (7) in the Court of Appeal, it may be taken that where a party says that he is no longer bound by a contract he may, in certain circumstances, seek a declaration of the court to that effect; and if the declaration is against him, he will not be taken, by his having merely declined to do some particular thing, to have repudiated the contract.

It is to be observed that this case is fundamentally different in character from those, for this reason: the plaintiff is still performing (it is said) to the best of his ability, his contract; that is to say, at the moment he is still attending at his place of business. It is quite plain (and I refer, if it be necessary to quote authority, to the speech of Lord Simon, L.C., in *Heyman v. Darwins Ld.* (8), that if the conduct of one party to a contract amounts to a repudiation, and the other party does not accept it as such but goes on performing his part of the contract and

(5)    [1915] 2 K. B. 536.

(6)    9 Com. Cas 289.

(7)    121 L. T. 628.

(8)    [1942] A. C. 356, 361.

affirms the contract, the alleged act of repudiation is wholly nugatory and ineffective in law.

It is to be noted that the plaintiff has alleged that certain actions of the defendants' chairman at some period before the issue of the writ in September constituted a breach of this contract. If the action were to proceed, the court would be asked to say whether those actions in September then amounted to a repudiation which the plaintiff could then have accepted. He did not, however accept them as a repudiation, and a decision that they might have been accepted would not, so far as I can see, involve the result that they could now be relied upon as such repudiation and that the plaintiff could accept them now and say nunc pro tunc that the contract was at an end. Indeed, Mr. Cumming-Bruce virtually conceded that, if he obtained a favourable declaration, the result would almost inevitably be another action, if not a series of other actions.

Although Ord. 25, r. 5, is most useful in the jurisdiction which it confers, and I am not anxious to put unnecessary limitations upon it, it is plain that it could not, and should not, be used so as to require the court to answer academic questions. In effect that is what would happen here, for, if Mr. Cumming-Bruce is right, it would be possible for a person who alleged that he had been wronged to ask the court to declare in his favour that that was conduct which he could, if he had liked, have accepted as repudiation and which accordingly, if it were repeated, could then be so accepted.

I want to confine my observations strictly to the matter in hand, and I therefore prefer to say no more than that in this particular case, I am satisfied that the court ought not in the circumstances to entertain an action for a declaration of this nature. That is not to say that the plaintiff may not have some other cause of action which he may litigate - that will be for him; because the result of striking out the statement of claim in no sense bars him from any other claim he may rightfully have arising out of the same subject-matter. But this particular claim, with all respect to the judge who took a contrary view, is in my opinion beyond what I have called the intendment of the order, and I think that the action is one which the court could not properly entertain. I would therefore allow the appeal and order that the statement of claim be struck out.

ASQUITH, L.J. I agree. An unaccepted repudiation is a thing writ in water and of no value to anybody: it confers no legal rights of any sort or kind. Therefore a declaration that the defendants had repudiated their contract with the plaintiff would be entirely valueless to the plaintiff if it appeared at the same time, as it must appear in this case, that it was not accepted.

*[1951] 1 K.B. 417 Page    422*

The plaintiff's having stayed on and continued to perform the contract for something like two months and being still in the act of performing it, seems to me to be a sufficient reason for saying that the remedy asked for is an academic one such as cannot properly be sought under Ord. 25, r. 5. For that reason, with the others given by my Lord, I agree that the appeal ought to be allowed.

SINGLETON, L.J. I also agree, and I would add only this: Mr. Cumming-Bruce submitted to the court that to grant a declaration in the terms sought in this case would be a convenient way of dealing with the matter. I do not think that it would be so: I think that it would be rather inconvenient. At the most it would be making up the plaintiff's mind for him; but that is not the purpose of this procedure under Ord. 25, r. 5. I agree that the appeal should be allowed.

*Appeal allowed.*

Solicitors: *Biddle, Thorne, Welsford & Barnes, for Wake, Smith & Co., Sheffield; Bell, Brodrick & Gray, for Harry Glass, Sheffield.*

B. A. B.

*Smith v Lock*
[1998] BPIR 786

Bankruptcy and Personal Insolvency Reports/1998/SMITH V LOCK (A BANKRUPT) AND OTHERS - [1998] BPIR 786

**[1998] BPIR 786**

# SMITH V LOCK (A BANKRUPT) AND OTHERS

**CHANCERY DIVISION**

**HIS HONOUR JUDGE WEEKS QC; (SITTING AS AN ADDITIONAL JUDGE OF THE HIGH COURT)**

**27 NOVEMBER 1997**

*Bankruptcy - Old law of bankruptcy - Estoppel - Property vesting in trustee in bankruptcy - Second bankruptcy*

Ivan Lock was adjudged bankrupt on 10 August 1983 and obtained an automatic discharge on 10 August 1988. He was made bankrupt for a second time on 19 January 1994 and the official receiver became trustee in bankruptcy in respect of the second bankruptcy. The plaintiff was the trustee in bankruptcy under the first bankruptcy in succession to two previous trustees of that bankruptcy. On 2 November 1982 the bankrupt's mother-in-law, Mrs Fowler, made a settlement of property at Street Farm, Halstock, Dorset under which it was to be held for Mrs Fowler for life and then for the bankrupt and his children. Mrs Fowler died in 1991. Proceedings were commenced to realise the bankrupt's interest under the settlement. The bankrupt served a defence which pleaded that in or about 1987 the bankrupt met a Mr Milner who was an assistant of the first trustee in bankruptcy in the bankrupt's first bankruptcy and who told him that the trustee in bankruptcy was not interested in the bankrupt's interest in the trust. The bankrupt alleged that in reliance he did not seek to buy out the trustee in bankruptcy's share but continued to reside in the property. Furthermore, the bankrupt developed a trade in commercial vehicles and expended time and money in negotiating with developers concerning the property together with improving the same. The plaintiff applied to strike out the defence and the bankrupt applied to amend his defence to include a claim for misrepresentation and negligence.

**Held** - striking out the defence and refusing leave to amend -

(1) The bankrupt's expenditure on the property constituted an asset in his second bankruptcy and was not therefore available to the bankrupt.

(2) No estoppel would be available against a statute; where a person such as a trustee in bankruptcy had a statutory duty to realise assets no estoppel could prevail to prevent him from performing his duty.

(3) The proposed claim the subject of the proposed amended defence vested in the trustee in bankruptcy in the second bankruptcy and was not therefore available to the bankrupt.

### Cases referred to

Condon, Re, ex parte James (1874) 9 Ch App 609, [1874-80] All ER Rep 388

*Stephen Davies for the plaintiff; William Birtles for the first defendant; The second, third and fourth defendants appeared in person.*

*Bond Pearce for the plaintiff; Jeremy Wood & Co for the first defendant*

**27 November 1997**


**JUDGE WEEKS**


I have before me two applications. One is an application by the plaintiff - who, by substitution, is now Michael Peter Gerrard, the trustee in bankruptcy of Ivan William Lock - to strike out the defence that has been served in this matter as long ago as 4 April 1992 when there were only three defendants to the action, one of whom is still represented by solicitors; the other two are present here today. The fourth defendant has been joined subsequently and has not, as I understand it, served any defence yet. The second application is an application by the first defendant, Mr Ivan Lock, who is a bankrupt, to serve an amended defence and counterclaim.


The matter arises because Ivan Lock has been made bankrupt twice. He was made bankrupt first on 10 August 1983 and he obtained an automatic discharge 5 years later on 10 August 1988. The plaintiff is the trustee in that bankruptcy. Mr Ivan Lock was made bankrupt for the second time on 19 January 1994, and the official receiver is the trustee in that second bankruptcy.


In this action, the trustee in Ivan's first bankruptcy is claiming an interest in property that was settled by Ivan Lock's mother-in-law. On 2 November 1982 Mrs Fowler made a settlement on Ivan Lock (her son-in-law) and his three children, who are the three defendants - Mark, William and Christopher - of two cottages in Halstock Street Farm in Dorset. The settlement was on trust for Mrs Fowler for life and then for Ivan and his three sons in equal shares. Mrs Fowler died in 1991, so the settlement must have been made earlier than that date, and on that date Mr Ivan Lock's or, rather, his trustee in bankruptcy's, interest fell into possession and the trustee was entitled prima facie to a quarter-share of the property settlement, and this action is brought to enforce that interest and to obtain the removal of the trustees and an order for sale of the property so that the quarter-share can be realised for the benefit of the creditors in the first bankruptcy.


The defence served on 4 April 1992 admits large parts of the statement of claim and goes on to plead that in or about 1987 the bankrupt went to a hotel in Taunton to meet Mr Milner, who was an assistant of the previous trustee in bankruptcy, and Mr Milner said that the trustee in bankruptcy was not interested in the bankrupt's then contingent interest in the trust and that it was uneconomic to seek to liquidate it. The bankrupt and the defendants took the trustee at his word and, in reliance thereon, they did not seek to buy out any share that he may have had and continued to reside in the trust property and treat it as their home.


Furthermore, Ivan developed a trade in commercial vehicles from the trust property and expended considerable time and money negotiating with developers keen to develop parts of the said property for building purposes. In addition, Ivan also spent in the region of £ 13,500 in improving the property.


There are two problems, it seems to me, with that defence. If, indeed, Ivan did spend money improving the property in reliance on that, that may well have given him an increased interest in the property but that increased interest would, it seems to me, be an asset in his second bankruptcy and that interest can be asserted only by the trustee of the second bankruptcy. The other problem is that the general rule for estoppel is that no estoppel can prevail against a statute and where a person has statutory duties, as the trustee in bankruptcy does to realise the assets, then no estoppel can prevail to prevent him from exercising those duties.

There is a suggestion to the contrary in the standard work on insolvency, Muir Hunter, where it is said that:

'Although mere standing by by the trustee would not in principle deprive him of the right to intervene in such a claim, yet if he positively assents to the bankrupt's action being commenced and/or being continued in the bankrupt's name, and it is so commenced and/or continued, the trustee in the estate of the bankrupt and his successors in the trusteeship may become estopped from subsequently intervening in claiming the proceeds. Although the trustees' acts under this head require the sanction of the creditors' committee, it is submitted that even in the absence of such sanction the bankrupt might be able to rely on the rule in ex parte James to bind the estate in any event.'

This is a very tentative suggestion, and it seems to me that the author is relying rather on the rule in ex parte James, which has nothing to do with estoppel, to prevent the trustee from intervening to assert his right when he has led the bankrupt to believe that he can sue in his own name. There is no suggestion that the law has allowed the bankrupt to sue in his own name in the present case, and it seems to me to be out of line with settled law to allow the first defendant to plead an estoppel which would directly contravene the trustee's statutory duty to realise the assets in the bankruptcy for the benefit of the creditors.

Accordingly, I will strike out the defence which has been served by the first, second and third defendants, but I will allow them to serve another defence within a time, as to which I will hear argument.

I have before me an application by the first defendant, also, to serve an amended defence. This seems to me to be subject to the same objections in that it amplifies the estoppel defence and then it pleads a cause of action against the trustee in bankruptcy either for false representation or for negligence and claims that the first defendant has suffered damage as a result.

There is then a counterclaim, which seeks a declaration and damages. That seems to me to be a cause of action which, if it exists, cannot be asserted without at least the concurrence of the trustee in the second bankruptcy, and, accordingly, I will refuse leave to amend the defence and counterclaim and to make a counterclaim on behalf of the first defendant in the form at present before me.

The position, therefore, is that there will be no defence subsisting on behalf of any of the four defendants but I will give them leave to serve a defence within a specified time.

*Suisse Atlantique Societe d'Armement Maritime S.A. v NV Rotterdamsche Kolen Centrale*
[1967] 1 AC 361

ICLR: Appeal Cases/1967/Volume 1/SUISSE ATLANTIQUE SOCIÉTÉ D'ARMEMENT MARITIME S.A.
APPELLANTS AND N.V. ROTTERDAMSCHE KOLEN CENTRALE RESPONDENTS - [1967] 1 A.C. 361

[1967] 1 A.C. 361

[HOUSE OF LORDS]

## SUISSE ATLANTIQUE SOCIÉTÉ D'ARMEMENT MARITIME S.A. APPELLANTS AND N.V. ROTTERDAMSCHE KOLEN CENTRALE RESPONDENTS

**1965 Nov. 2, 3**

**VISCOUNT DILHORNE, LORD REID,**

**1966 Jan. 11, 12, 13, 17, 18, 19; Mar. 31**

**LORD HODSON, LORD UPJOHN and LORD WILBERFORCE.**

*Shipping - Charterparty - Demurrage - Damages, Limit of? - Americanised Welsh coal charter - Consecutive voyages - Delays by charterers in loading and discharging cargoes preventing vessel performing more voyages in charter time - Whether shipowners entitled to damages (less demurrage payments) for loss of further freights - Whether shipowners precluded from recovering further damages by reason of payments of demurrage.*

*Contract - Exceptions clause - Fundamental breach of contract - Breach of fundamental term - Difference between.*

*Ships' Names - General Guisan.*

On December 31, 1956, the respondents agreed to charter a vessel from the appellants for the carriage of coal from the United States (East Coast) to Europe, the vessel returning in ballast between each voyage. The charter was to remain in force "for a total of two years consecutive voyages." Fixed periods of laytime were provided within which the respondents were obliged respectively to load and discharge the vessel on each voyage and demurrage was payable, subject to certain exceptions, at the rate of 1,000 dollars a day. Between October 16, 1957, and the end of the charter the vessel made eight round voyages whereas the appellants alleged that a further six voyages could have been performed if the loading and discharging had been completed within the laytime or a further nine voyages if the respondents had loaded and discharged the vessel with reasonable despatch.

This claim went to arbitration and, at the request of the appellants, the arbitrators stated, inter alia, the following questions in the form of a consultative case: "whether ... (A) (i) the "appellants" are entitled to recover (subject to giving credit for the demurrage payments received by them) any damages suffered by them by reason of the respondents having failed to load and discharge the vessel within the laydays whereby the charterparty was (if so proved) rendered less profitable to the" appellants "by consequent loss of voyages or voyage time. (ii) Upon the assumption that such loss of profitability resulted from the respondents having deliberately (i.e., with the wilful intention of

limiting the number of contractual voyages) failed to load and/ or discharge the vessel (*a*) with such ordinary despatch as the circumstances permitted or (*b*) within the laydays the" appellants "are entitled to recover any damages suffered by the" appellants "through the charterparty having been rendered less profitable as aforesaid subject to giving credit for the demurrage payments received by them and for any such despatch money as would have been earned by the respondents."

Mocatta J. answered both (A) (i) and (ii) in the negative. The Court of Appeal affirmed that decision.

On appeal to the House of Lords, the appellants contended: (i) that the appellants had under the charterparty a contractual right to the number of voyages which would be performed if both parties complied with their obligations; (ii) that the appellants' claim for the loss of freight on the voyages which should have been performed was not limited to the demurrage payments; and (iii), that the breaches of contract which caused the delays complained of amounted to a fundamental breach or a breach going to the root of the contract thus entitling the appellants to repudiate the contract and that, accordingly, such breach prevented the respondents from relying on the demurrage clause as limiting their liability:-

*Held*, dismissing the appeal, (1) that no contractual right that not less than a certain number of voyages should be accomplished was to be implied either on the construction of the contract or by operation of law (post, pp. **389E**, **396B**, **407F**, **417A-G**, **429E**).

(2) That where delay was due to detention of the vessel and the demurrage provisions applied thereto the damages obtainable were limited to the demurrage payments (post, pp. **389G**, **396B**, **407F**, **417G-418A**, **429E**).

*Aktieselskabet Reidar v. Arcos Ltd.* [1927] 1 K.B. 352; 42 T.L.R. 737, C.A. considered.

(3) That the question whether an exceptions clause was applicable where there was a fundamental breach of contract was one of the true construction of the contract (post, pp. **392E**, **399C-D**, **405F-G**, **410A-F**, **425E - 426B**, **431G - 432E**).

Observations of Denning and Parker L.JJ. in *Karsales (Harrow) Ltd. v. Wallis* [1956] 1 W.L.R. 936, 940, 943; [1956] 2 All E.R. 866, C.A., disapproved.

Observations of Pearson L.J. in *U. G. S. Finance Ltd. v. National Mortgage Bank of Greece and National Bank of Greece, S.A.* [1964] 1 Lloyd's Rep. 446, 453, C.A., approved.

(4) That in the circumstances the appellants had not repudiated the contract; that in any event the demurrage clause was an agreed damages clause and not an exceptions clause and that, accordingly, on the true construction of the charterparty, the appellants were not entitled to claim that damages were at large (post, pp. **394G - 396A**, **406G - 407D**, **411D**, **413B-C**, **414A-D**, **419C-D**, **421B-D**, **435F - 436E**, **437D - 438A**).

*Per* Lord Upjohn. The phrases "fundamental breach" and

*[1967] 1 A.C. 361 Page  363*

"breach of a fundamental term" have been used interchangeably in some of the cases; but in fact they are quite different. There is no magic in the words "fundamental breach"; this expression is no more than a convenient shorthand expression for saying that a particular breach or breaches of contract by one party is or are such as to go to the root of the contract which entitles the other party to treat such breach or breaches

as a repudiation of the whole contract. Whether such breach or breaches do constitute a fundamental breach depends on the construction of the contract and on all the facts and circumstances of the case. The innocent party may accept that breach or those breaches as a repudiation and treat the whole contract at an end and sue for damages generally or he may at his option prefer to affirm the contract and treat it as continuing on foot in which case he can only sue for damages for breach or breaches of the particular stipulation or stipulations in the contract which has or have been broken. But the expression "fundamental term" has a different meaning. A fundamental term of a contract is a stipulation which the parties have agreed either expressly or by necessary implication, or which the general law regards as a condition which goes to the root of the contract so that *any* breach of that term may at once and without further reference to the facts and circumstances be regarded by the innocent party as a fundamental breach and thus is conferred on him the alternative remedies at his option that I have just mentioned (post, pp. **421F - 422D**).

Decision of the Court of Appeal [1965] 1 Lloyd's Rep. 533, C.A., affirmed.

APPEAL from the Court of Appeal.

This was an appeal from an order of the Court of Appeal (Sellers, Harman and Diplock L.JJ.) dated March 11, 1965, dismissing an appeal by the appellants, Suisse Atlantique Société d'Armement Maritime S.A., from an order of Mocatta J. dated January 11, 1965, made on the hearing of a consultative case stated under section 21 (1) (a) of the Arbitration Act, 1950, for the decision of the High Court by two arbitrators appointed pursuant to the terms of a charterparty.

On December 21, 1956, a charterparty was ostensibly concluded between the appellants as disponent owners and the respondents, N.V. Rotterdamsche Kolen Centrale, as *charterers of m.v. Silvretta*. The charterparty was in the Americanised Welsh Coal Charter form, with certain adaptations, and provided for the carriage of a cargo of coal from Hampton Roads, Baltimore or Philadelphia to a port in Belgium or Holland or to a German North Sea port. The following provisions of the charterparty were particularly relevant:

*[1967] 1 A.C. 361 Page  364*

"3. The cargo to be loaded into vessel at the average rate of 1,500 tons per running day ... if longer detained charterer to pay $1,000 U.S. currency per running day (or pro rata for part thereof) demurrage.

"8. The cargo to be taken from alongside by consignee at port of discharge, free of expense and risk to the vessel, at the average rate of (clause No. 22) tons per day ... if longer detained, consignee to pay vessel demurrage at the rate of $1,000 U.S. currency per running day (or pro rata for part thereof).

> "23. It is agreed that the *m.v. Silvretta* will perform under this charter until replaced, in June/July 1957 by owners new building No. 445, of 12,000 tons ten per cent. more or less, now under construction at Rijeka. ... This charter is to remain in force for a total of two years consecutive voyages with final cancelling date on last voyage March 10, 1959, vessel always returning in ballast between trips."

Clause 22 set out different discharging rates for Holland and Belgium and German North Sea.

Before the events with which this appeal was concerned, a dispute arose between the appellants and the respondents, as the respondents contended that the charterparty was concluded without

their authority and was not binding upon them. The details of that dispute were not material to the present appeal, for by an agreement dated October 8, 1957, between the appellants and the respondents it was agreed as follows:

> "(1)    Without prejudice to the dispute referred to in clause (3) hereof the parties hereto shall henceforward perform the charterparty of December 21, 1956, upon return of the *m.v. General Guisan* to Hampton Roads, notice of readiness being expected to be tendered by Suisse Atlantique on or about October 16, 1957."

It was pursuant to this agreement that the present dispute was referred to arbitration under the provisions in clause 3 of the charterparty.

By their points of claim in the arbitration the appellants alleged that it was an implied term of the charterparty, (1) that the respondents would co-operate and/or concur with the appellants and/or would do all things necessary to enable the appellants to perform the maximum possible number of voyages and to earn the maximum possible amount of freight under the charterparty; (2) that the respondents would do nothing to prevent the appellants from performing such voyages and earning such freight. Alternatively the appellants alleged that it was the duty of the respondents not wilfully to delay the loading or discharging of the vessel, but

*[1967] 1 A.C. 361 Page 365*

to load and discharge her with all reasonable speed so as to enable the maximum possible number of voyages to be performed and the maximum possible amount of freight to be earned. Alternatively, they alleged that the respondents were in breach of contract in respect of those occasions when the laytime had been exceeded, and that they were entitled to damages for the consequent diminution in the number of freight-earning voyages performed.

The appellants further alleged that the implied terms and the duty of the respondents as set out above had not been performed from about October 17, 1957, until March 7, 1959, as a result of which only eight voyages had been performed in that period, instead of 17 or alternatively 14 voyages. The appellants offered to give credit for $149,993.08 paid by the respondents as demurrage during this period, and claimed that their net loss thereafter was $772,866.92 or alternatively $476,490.92.

By their points of defence the respondents admitted the charterparty and the agreement dated October 8, 1957, but denied that any such terms were to be implied therein as the appellants alleged, or that they were under any duty not wilfully to delay the loading or discharging of the vessel. They admitted that the laydays had been exceeded, except on one occasion, on each of the eight voyages that the vessel performed. The respondents denied that they had thereby committed any breach of contract or duty. Alternatively they maintained that payment of demurrage totalling $154,554.15 and its receipt by the appellants constituted an accord and satisfaction of the appellants' claims.

The arbitrators on the appellants' application stated a consultative case for the opinion of the court on August 19, 1964, pursuant to section 21 (1) (a) of the Arbitration Act, 1950 The only fact found by the arbitrators in addition to the facts admitted by the respondents in their points of defence was that, by reason of the periods spent by the vessel at the loading and discharging ports during her eight voyages, she was able to perform fewer voyages during the period of the charterparty than would have been possible if loading and discharging had been completed within the laytime. This fact was admitted by the respondents before the arbitrators. No finding was made as to the alleged failure by the respondents to co-operate and concur in the performance of the maximum possible number of voyages, or as to the allegation that they wilfully delayed the vessel, or as to the loss

and damages alleged by the appellants. All these allegations were denied by the respondents.

Questions of law were stated by the arbitrators for the opinion of the court as follows:

"Whether upon the facts found and upon the true construction of the charterparty dated December 21, 1956, and the agreement dated October 8, 1957:

(A) (i)     The claimants [the appellants] are entitled to recover (subject to giving credit for the demurrage payments received by them) any damages suffered by them by reason of the respondents' having failed to load and discharge the vessel within the laydays whereby the charterparty was (if so proved) rendered less profitable to the claimants by consequent loss of voyages or voyage time.

(ii)     Upon the assumption that such loss of profitability resulted from the respondents having deliberately (i.e., with the wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel: (a) with such ordinary dispatch as the circumstances permitted, or (b) within the laydays, the claimants are entitled to recover any damages suffered by the claimants through the charterparty having been rendered less profitable as aforesaid subject to giving credit for the demurrage payments received by them and for any such despatch money as would have been earned by the respondents.

(B)     If the answer to any of the questions under ('A') be 'Yes,' the payment by the respondents and acceptance by the claimants of demurrage in respect of those periods when the laydays were exceeded preclude the claimants from recovering any damages otherwise recoverable by them in accordance with such answer or answers."

Before Mocatta J. it was agreed that the court should confine its decision to answering questions A (i) and (ii) and that the words "or voyage time" at the end of A (i) added nothing. The judge answered both these questions in the negative. On appeal, the Court of Appeal dismissed the appeal.

**R. A. MacCrindle, Q.C.** and **A. Evans** for the appellants. The questions are: (1) Under this class of contract, do the owners have a contractual right to the number of voyages which should be performed if both sides comply with their obligations? (2) Whether or not they have such a right, are they limited to demurrage for loss of freights on the voyages which should have been performed had the charterers complied with their obligations? Is demurrage meant to cover all delay?

When a businessman is operating as carrier a profit-earning charter, the longer the earning takes, the larger are his overheads and the smaller is his profit; so if the delay is long enough, the

owners of the ship will not only suffer loss from the overheads running, but will also suffer because their gross earnings will be diminished. Thus suppose that loading, the sea passage, discharging and returning in ballast take 48 days if the laytime is not exceeded; and that if the laytime is not exceeded the vessel would reach the loading port in due course in time to tender for loading 47 days before the cancelling date fixed for the last voyage she can perform only one more voyage. If by reason of the laytime being exceeded she is able to tender for loading only one day before the cancelling date she can still perform one more voyage. Hence for the delay the shipowner could only recover demurrage. But suppose the delay is so great that

instead of 20 voyages the ship can only do eight, demurrage is not, and is not intended to be, compensation to the owners for the loss of the cargoes and freights.

Demurrage is not compensation for deficiency in the quantity of the cargo loaded by the charterers: *Aktieselskabet Reidar v. Arcos Ltd.*1 Nor is it compensation for deficiency in the number of cargoes loaded by the charterers. Demurrage is concerned only with delay in loading and discharging that which is loaded. It is not concerned with a by-product of the delay, which renders it impossible to load what should have been loaded. The obligations are (1) to load within the laytimes and (2) to load on each voyage with that despatch which enables the owners to perform the contractual number of voyages. One cannot say at the outset of the charterparty how many voyages will be performed under it, because performance is subject to maritime perils. But the charterers at the outset could estimate what would be the minimum number possible provided the two parties performed their obligations with the speed which the contract requires.

One must distinguish between the case where freights are lost on a single voyage contract and on a consecutive voyage contract by a breach of the type of obligation here in question. As to the undertaking of reasonable dispatch, see *Anglo-Saxon Petroleum Co. Ltd. v. Admastos Shipping Co. Ltd.*2 and Scrutton on Charterparties, 17th ed. (1964), p. 93, n. (f).

Clause 23 of the present charterparty provides for consecutive voyages. There is, at the least, an express obligation on the charterers to allow a plurality of voyages. Hence if the charterers by delaying the ship at the first port prevent it from performing

1    [1927] 1 K.B. 352; 42 T.L.R. 737, C.A.

2    [1957] 2 Q.B. 233, 275; [1957] 2 W.L.R. 968; [1957] 2 All E.R. 311, C.A. (reversed on other grounds sub. nom. *Admastos Shipping Co. Ltd. v. Anglo Saxon Petroleum Co. Ltd.* [1959] A.C. 133); [1958] 2 W.L.R. 688; [1958] 1 All E.R. 725, H.L.

*[1967] 1 A.C. 361 Page  368*

more than one, there is a breach and the owners are entitled to sue for breach of an *express* term other than the laytime provisions. This demonstrates that in the present case the owners are not claiming for a breach of the laytime provisions simpliciter, but for breach of a separate obligation derived from the charterparty as a whole to permit the owners to load on the number of voyages performable given compliance with the laytime clauses. Since it is a breach of a separate obligation the demurrage clause is inapplicable so as to limit damages.

The substantial result of the decision in the court below is the same as if there had been, not a consecutive voyage charter, but a series of single voyage charters. But a consecutive voyage charter must be construed as a whole.

In the case of a single voyage charter the charterers promise a gross rate of remuneration to be earned over a period not exceeding the sea passage and the laytime. In the present case they promise a gross rate to be earned over as many consecutive voyages, each not exceeding the sea passage and the laytime, as prove to be performable in the period named. Of course, the sea passage and the laytime cannot be foreseen by the calendar; they may be affected by weather, strikes, riots and the like. In the case of both a single voyage

charter and a consecutive voyage charter demurrage represents damages for delay in the earning of the gross income but not for deprivation of part of that gross income. In the case of a single voyage charter the charterers promise not to detain the ship beyond the laytime, so that the owners may be free to seek the speculative benefit of such employment as they may be able to obtain when the performance without exceeding the laytime is over. In the case of a consecutive voyage charter the promise again is not to delay the ship beyond the laytime, but there the charterers have *contractual rights* (when performance of a voyage without exceeding the laytime is over) to compel the owners to carry further cargoes under the charterparty at the charterparty rates, and the owners have corresponding rights. The present claim is in respect of a breach of the obligation of the charterers to load those cargoes which should have been loaded, a failure to load the right amount of freight-earning cargo at all. The claim is consistent with what was said by Greer J. in the *Retdar case.*3 This claim is not in respect of mere detention but in respect of the diminution of contractual freights which, but for the detention, would have been earned.

3   [1926] 2 K.B. 83; 42 T.L.R. 520; [1927] 1 K.B. 352.

*[1967] 1 A.C. 361 Page  369*

Here the owners are complaining that they are entitled to damages because they have been deprived of their right to earn freights. The charterers delayed so long that the owners were unable to tender to earn the permissive freights. The fact that the inability to tender was brought about by the charterers' own fault debars the charterers from complaining of the failure to tender.

Demurrage is not a remedy for delays which go to the whole basis of the contract and frustrate it: see *Connolly Shaw Ltd. v. A/S Nordenfjeldske D/S*4 and Scrutton on Charterparties, 17th ed., p. 306, n. (f). If the breach is of a different calibre, the demurrage clause is irrelevant to damage flowing from "frustrating" delays.

As to the effect of a fundamental breach, see *Charterhouse Credit Co. Ltd. v. Tolley.*5 As to the effect of deviation, see *Hain Steamship Co. Ltd. v. Tate & Lyle Ltd.*6 In the House of Lords it was said that the deviation was similar to a repudiation of the contract and that, accordingly, the shipowners were not entitled to rely on the exceptions clause. If the party affected by the breach chooses to affirm the contract, his rights depend on the contractual terms. That case is consistent with the *Charterhouse case*7 because in neither of them was an innocent party held to be debarred from obtaining damages if the fundamental breach had caused the damage. In the present case the breach which went to the root of the contract did cause the damage. If the delays for which the respondents are responsible are such as to entitle the appellants to treat the charterparty as repudiated, the demurrage provisions do not apply and the appellants are entitled to recover the full loss they have suffered.

[VISCOUNT DILHORNE stated that their Lordships wished to hear the respondents on the question whether the appellants should be allowed to raise the question of fundamental breach.]

**J. F. Donaldson Q.C.** for the respondents. The appellants should not be allowed to take this point, which was not taken in the Court of Appeal and which raises a question far wider than any taken so far. The point of the consultative case was to have certain questions answered on the basis of certain facts found. Here the facts are not those which the appellants want and now

4    (1934) 49 Ll.L.R. 183, 190; 50 T.L.R. 418.

5    [1963] 2 Q.B. 683; [1963] 2 W.L.R. 1168; [1963] 2 All E.R. 432, C.A.

6    (1936) 155 L.T. 177, 179-180; 52 T.L.R. 617; [1936] 2 All E.R. 597, H.L.(E.).

7    [1963] 2 Q.B. 683.

*[1967] 1 A.C. 361 Page  370*

what they really want is to have the case sent back to the arbitrators. This was a matter for the judge of first instance and should not be brought in by a side-wind now.

**R. A. MacCrindle Q.C.** This point is in the appellants' printed case in paragraph 27. The case was consultative only. The point is open to the appellants on the claim or, if they go back to arbitration, they can ask for a special case upon it. The question whether a breach goes to the root of the contract is a matter of mixed fact and law. The only reasonable way of dealing with the question of substance is to allow argument on this question.

[VISCOUNT DILHORNE. The appellants will only be allowed to argue this point on condition that supplemental cases are filed. The hearing will be adjourned on their undertaking to pay all the costs involved.]

F.C.

**H. V. Brandon Q.C.**, **R. A. MacCrindle Q.C.** and **A. Evans** for the appellants. The appellants now wish to develop their contention that, if the appeal is not allowed for the reasons submitted at the earlier hearing of the appeal, nevertheless it should be allowed for the following reasons: (1) because, whether the clauses of the charterparty providing for the payments of demurrage by the respondents are exceptions clauses or clauses providing for the payment of liquidated damages, they do not govern the measure of damages recoverable by the appellants for detention of the vessel where the detention is such as to be a deviation from, or a repudiation or fundamental breach of, the charterparty. (2) Because the detention would be such as to be a deviation from, or a repudiation or fundamental breach of, the charterparty, if (as the appellants contend) it was in the aggregate so long as to frustrate the commercial purpose of the charterparty. (3) Because the detention would be such as to be a deviation from, or a repudiation or fundamental breach of, the charterparty, if (as the appellants further contend) it resulted from breaches which, in addition to causing serious delay, were deliberate or wilful.

As to (2), it is necessary to assume a finding that the delay was so long as to frustrate the commercial purpose of the charterparty.

For the purposes of (3), it is necessary to assume that the delay was serious and incurred deliberately or wilfully. On either of these assumptions the damage clause does not apply to the damage suffered because

on the true construction of the contract it was only intended to apply to non-fundamental breaches.

*[1967] 1 A.C. 361 Page 371*

Reliance is placed on the following propositions: (1) A breach of contract which goes to the root of the contract, or which conflicts with its main purpose, is a deviation from, or a repudiation or fundamental breach of, such contract. (2) Exceptions clauses, including clauses limiting the amount of a party's liability for breaches, do not normally apply to breaches which are deviations from, or repudiations or fundamental breaches of, the contract. (3) Provisions in a contract making liquidated damages payable for breaches similarly do not normally apply to breaches which are deviations from, or repudiations or fundamental breaches of, the contract. (4) Propositions (2) and (3) above are not affected by the question whether the party suffering the breach which is a deviation from, or a repudiation or fundamental breach of, the contract elects, with knowledge of the breach, to rescind or affirm the contract. (5) Where a breach of contract takes the form of delay, and time is not of the essence of the contract, the breach will be a deviation from, or a repudiation or fundamental breach of, the contract, if the delay is, or will be, so long as to frustrate the commercial purpose of the contract. (6) A breach causing delay will also be a deviation from, or a repudiation or fundamental breach of, the contract if such breach, in addition to causing serious delay, is deliberate or wilful. (7) Propositions (5) and (6) above apply to the particular case of detention of a vessel by a charterer under a charterparty by exceeding the lay days. They also apply to a number of breaches collectively as well as to a single breach. (8) The appellants contend on the facts, and it will be open to the arbitrators hereafter to determine, that the detention of the vessel caused by the respondents' breaches of charterparty was in the aggregate so long as to frustrate the commercial purpose of the charterparty. (9) The appellants further contend on the facts, and it will be open to the arbitrators hereafter to determine, that the respondents' breaches of charterparty, whereby the vessel was detained, in addition to causing serious delay, were deliberate or wilful. (10) The demurrage provisions of the charterparty are provisions which either limit or liquidate the damages payable by the respondents for detaining the vessel beyond her lay days. (11) In the event of its being hereafter determined either: (a) that the detention of the vessel caused by the respondents' breaches of charterparty was in the aggregate so long as to frustrate the commercial purpose of the charterparty; or (b) that the respondents' breaches of charterparty, whereby the vessel was detained, in addition to causing serious delay, were

*[1967] 1 A.C. 361 Page 372*

deliberate or wilful, then, whether the demurrage provisions are provisions limiting or liquidating the damages payable by the respondents for detaining the vessel beyond her lay days, such provisions will not apply to such breaches.

Fundamental breach is exactly equivalent to repudiation by breach. It is submitted that there is only one "animal," namely, a breach that goes to the root of the contract, whatever it may be termed. Thus, in commercial cases it is usually called "deviation," whilst in the more recent cases in the law of contract it is called "fundamental breach."

As to the authorities, the early cases were decided on a principle which may be termed that of constructive causation. Thus, in *Davis v. Garrett*8 there was an exceptions clause relating to usual perils of the sea. The case proceeded on the basis that there was a separate cause of action for deviation and that it was unnecessary for the plaintiff to show affirmatively that the loss there was occasioned by the tempest which arose on the deviated route but rather that it was for the defendant to show that the loss would still have occurred if the vessel had kept to the route contemplated by the charterparty: see also *Scaramanga v. Stamp*9; *Lilley v. Doubleday*10; *Leduc & Co. v. Ward*.11 By the time of the decision in *Balian & Sons v. Joly, Victoria & Co. Ltd.*12 however, there has been a shift in emphasis. The doctrine of constructive causation has gone and now it is stated that exceptions clauses do not apply to the different voyage; that is, once there has been a fundamental departure from the terms of the original contract, a different contract arises: *Mallett v. Great Eastern Railway Co.*13; *Joseph Thorley Ltd. v. Orchis Steamship Co. Ltd.*,14 deviation "goes to the root of the contract," *per* Collins, M.R.14; *International Guano en Superphosphaatwerken v. MacAndrew (Robert) & Co.*15; *Gunyon v. South Eastern and Chatham Railway Companies' Managing Committee.*16

*Morrison (James) & Co. v. Shaw, Savill and Albion Co. Ltd.*17 is the highwater mark of the view that a shipowner whose vessel has deviated has no protection at all. It is doubtful whether all the reasoning in that case17 is consistent with subsequent decisions

8    (1830) 6 Bing. 716.

9    (1880) 5 C.P.D. 295, C.A.

10    (1881) 7 Q.B.D. 510.

11    (1888) 20 Q.B.D. 475; 4 T.L.R. 313, C.A.

12    (1890) 6 T.L.R. 345, C.A.

13    [1899] 1 Q.B. 309; 15 T.L.R. 137, D.C.

14    [1907] 1 K.B. 660, 667; 23 T.L.R. 338, C.A.

15    [1909] 2 K.B. 360; 25 T.L.R. 529.

16    [1915] 2 K.B. 370; 31 T.L.R. 344, D.C.

17    [1916] 2 K.B. 783; 32 T.L.R. 712, C.A.

of this House. *The Cap Palos*18 is a very important decision in the development of the doctrine of fundamental breach. Particular attention is drawn to the judgment of Atkin L.J. in his observations on repudiation. In *London & North Western Railway Co. v. Neilson*19 this House considered the principle of fundamental breach to be one of construction and the observations of Scrutton L.J. in *Gibaud v. Great Eastern Railway Co.*20 on the way the principle proceeded originally were approved. The principle of fundamental breach was applied to a contract for the sale of goods in *Pollock & Co. v. Macrae*21 which shows that a whole series of defects may add up to something which amounts to the goods delivered being quite different from what was contracted for. Similarly a whole series of delays, as here, might lead to a

situation where what is performed over two years is not what was contracted for and, therefore, the demurrage clause does not apply at all to any of the delay.

*Hain Steamship Co. Ltd. v. Tate and Lyle Ltd.*22 is a landmark in the development of this branch of the law. In both the speeches of Lord Atkin and Lord Wright deviation is equated with fundamental breach. Further, Lord Wright equates both deviation and fundamental breach with repudiation. This brings the doctrine of deviation as previously established into line with the general law of contract and equates deviation with fundamental breach in any contract and with repudiation in any contract. The effect of the decision was thus stated by Devlin J. in *Alexander v. Railway Executive*23:

> "Where there has been a breach of a fundamental term of a contract giving the other party the right to rescind it, then, unless and until, with full knowledge of all the facts, he elects to affirm the contract and not to rescind it, the special terms of the contract go and cannot be relied upon by the contracting party."

As to the question of affirmation, this was not a live issue until the *Hain case,*24 where, on the peculiar facts of that case, there was a deviation at an early stage, for most of the earlier cases involved loss of the goods and therefore the substratum of the contract had gone and there was no contract to affirm. In any

18    [1921] P. 458; 37 T.L.R. 921, C.A.

19    [1922] 2 A.C. 263; 38 T.L.R. 653, H.L.

20    [1921] 2 K.B. 426, 435; 37 T.L.R. 422, C.A.

21    1922 S.C. (H.L.) 192, H.L.

22    (1936) 41 Com.Cas. 350; 52 T.L.R. 617; [1936] 2 All E.R. 597, H.L.

23    [1951] 2 K.B. 882, 889, 890; [1951] 2 T.L.R. 69; [1951] 2 All E.R. 442.

24    41 Com.Cas. 350.

*[1967] 1 A.C. 361 Page  374*

event, on the appellants' argument here affirmation as such is irrelevant.

*Karsales (Harrow) Ltd. v. Wallis*25 is the first of a series of cases where the doctrine of fundamental breach was applied to a hire-purchase agreement. If in that case25 Denning and Parker L.JJ. are stating that as a matter of law it is impossible to contract out of a fundamental breach, then the appellants cannot support it, but it is submitted that it is exceedingly difficult to contract out of a liability which amounts to a fundamental breach. *Sze Hai Tong Bank Ltd. v. Rambler Cycle Co. Ltd.*26 shows that a deliberate breach may well be a fundamental breach where if the same breach were not deliberate it would not. Deliberateness is material in determining the scope of an exceptions clause. *Hong-kong Fir Shipping Co. Ltd. v. Kawasaki Kisen Kaisha Ltd.*27 is most informative decision on the categorisation of different terms of a contract and different types of breach. The old distinction between conditions and warranties is no longer tenable. It is authority for the proposition that frustrating delay is repudiatory delay - unreasonable delay is not sufficient. The question there27 was whether accumulated breaches entitled a charterer to treat the contract as at an end. Here, it is submitted, there was a repudiation when the accumulated delay deprived the appellants of one complete voyage or, alternatively, when the accumulated delay deprived the appellants of a substantial number of contractual voyages.

In *Yeoman Credit Ltd. v. Apps*28 it was held that because there was a fundamental breach an exceptions clause did not apply and that the defendant was entitled to repudiate. It shows that although the approbation of the contract may prevent a plea that there was a total failure of consideration; it does not prevent a party from contending successfully that the loss in question was not covered by the exceptions clause. *Charterhouse Credit Co. Ltd. v. Tolly*29 expressly decided that affirmation did not affect the right of the injured party to sue for fundamental breach and that a general exemption clause did not prevent a claim for damages. Upjohn L.J. in *Astley Industrial Trust Ltd. v. Grimley*30 correctly

25    [1956] 1 W.L.R. 936; [1956] 2 All E.R. 866, C.A.

26    [1959] A.C. 576; [1959] 3 W.L.R. 214; [1959] 3 All E.R. 182, P.C.

27    [1962] 2 Q.B. 26; [1962] 2 W.L.R. 474; [1962] 1 All E.R. 474, C.A.

28    [1962] 2 Q.B. 508; [1961] 3 W.L.R. 94; [1961] 2 All E.R. 281, C.A.

29    [1963] 2 Q.B. 683; [1963] 2 W.L.R. 1168; [1963] 2 All E.R. 432, C.A.

30    [1963] 1 W.L.R. 584, 597, 598; [1963] 2 All E.R. 33, C.A.

states the effects of fundamental breach and reliance is placed on the second effect there stated. Reliance is also placed on the observations of Pearson L.J. in *U. G. S. Finance Ltd. v. National Bank of Greece and National Bank of Greece, S.A.*31 that whether an exceptions clause applies to a fundamental breach is a question of the true construction of the contract.

As to proposition (1), the main authority relied upon is the *Hain Steamship case*.32 As regards proposition (4), reliance is placed on the *Charterhouse Credit case*33; *Pollock & Co. v. Macrae*34; the *U. G. S. case*35; and *Wallis. Son & Wells v. Pratt & Haynes*.36

Breaches of contract fall into two categories: those that go to the root of the contract and those that do not. As to the latter, the only remedy is damages and general exceptions clauses will readily apply to them if the words in their ordinary meaning are wide enough to do so. As to the former class, two remedies are available: either to treat the contract as at an end or to treat it as remaining and to sue for damages, and as regards exceptions clauses, they will not apply as a normal rule to breaches of this character. Thus each class has to be looked at from two standpoints: (1) the remedies available; (2) the applicability to them of exceptions clauses in general terms. As to breaches going to the root of the contract, the following statement from Cheshire and Fifoot on Contract, 6th ed. (1964), p. 502, is adopted:

> "Breach, no matter what form it may take, always entitles the innocent party to maintain an action for damages, but it does not always discharge the contract. The distinction is important, for two results follow from a breach which is sufficiently serious to amount to a discharge: First, the party not in default, in addition to suing for damages, may refuse to perform the obligations that he has undertaken. Secondly, the party at fault cannot rely on any term which has been inserted in the contract for the purpose of protecting him against liability."

As to proposition (3), the demurrage clause allowing 1,000 dollars a day for delay is on its true construction a clause limiting the liability of the charterers and is not a clause liquidating damages: see *Cellulose Acetate Silk Co. v. Widnes Foundry (1925) Ltd.*37 All the circumstances have to be looked at, including that

31    [1964] 1 Lloyd's Rep. 446, 453, C.A.

32    41 Com.Cas. 350.

33    [1963] 2 Q.B. 683.

34    1922 S.C. (H.L.) 192.

35    [1964] 1 Lloyd's Rep. 446.

36    [1911] A.C. 394; 27 T.L.R. 431, H.L.

37    [1933] A.C. 20; 48 T.L.R. 595, H.L.

of the intention of the parties, before calling a clause a liquidated damages clause. Thus, where in a charterparty there is a clause which puts damages much lower than the parties must know the actual damage would be, then it is a limitation of liability clause and not a liquidated damages clause. In any event, insofar as *Inverkip Steamship Co. Ltd. v. Bunge & Co.*38 and *Chandris v. Isbrandtsen-Moller Co. Inc.*39 suggest that liquidated damages clauses, and in particular demurrage clauses, do not apply to breaches which are deviations from, or repudiations or fundamental breaches of, the contract, they were wrongly decided. Further, *Ethel Radcliffe Steamship Co. Ltd. v. W. & R. Barnett Ltd.*40 should be overruled on the questions of repudiatory delay and deliberateness.

To the question whether there is any limit to the delay for which charterers can excuse themselves at the cost of paying demurrage only, the answer is that there are two limits: (1) frustrating delay whether deliberate or not; (2) deliberate delay whether frustrating or not. Both limits are questions of construction.

As to (1), frustrating delay, it is necessary to construe the expressions "if longer detained" in clauses 3 and 8 of the charter to ascertain whether it includes detention of the vessel for so long as to frustrate the charterparty. This has to be considered on two hypotheses: (a) that the demurrage provisions are limitations of liability provisions; (b) that they are liquidated damages provisions. So far as ending the contract is concerned, the effect of frustrating delay is well established. If neither party is at fault it determines the contract automatically. Neither has an option. If one party is at fault, the other has an option to treat the contract as at an end or as still subsisting and to sue for damages. The reason is because such delay makes the contract into something different from what was originally contemplated. If frustrating delay occurs ex hypothesi a demurrage clause cannot apply to it, for this is a clause dealing with damages for delay as contemplated by the parties.

There is in principle no valid ground for differentiating between exceptions clauses, including clauses limiting liability, on the one hand, and clauses providing for payment of liquidated damages on the other. As to limiting liability clauses, all the authorities support the appellants' argument: see especially *Brandt v. Liverpool,*

38    [1917] 2 K.B. 193, C.A.

39    [1951] 1 K.B. 240; 66 T.L.R. (Pt. 1) 971; [1950] 1 All E.R. 768.

40    (1926) 31 Com.Cas. 222; 42 T.L.R. 385; 24 Ll.L.R. 277, C.A.

Brazil and River Plate Steam Navigation Co.41 on fundamental breach by delay.

As to the expression "if longer detained," if the respondents are relying on this phrase in clauses 3 and 8 in respect of both repudiatory and non-repudiatory delay, then it is for them to show that it applies on the contra preferentem doctrine.

(2) As regards deliberate delay and the question whether on the true construction of the charterparty the expression "if longer detained" in clauses 3 and 8 includes detention resulting from a deliberate breach by the charterers themselves of the demurrage provisions, on the footing that they are provisions limiting liability there is weighty authority that they would not apply to a deliberate breach: see *Sze Hai Tong Bank Ltd. v. Rambler Cycle Co. Ltd.*42 Where general words are used an exception will not be construed as covering deliberate acts. The reason for that is based on the presumed intention of the parties.

If the demurrage clause is to be considered a liquidated damages provision the position is more difficult, mainly because of the dearth of authority on the question. On principle it is difficult to see any distinction between liquidated damages clauses and exceptions clauses. The only authority is the *Ethel Radcliffe Steamship case.*43 The point is clearly raised in the argument of Mr. Dunlop but it is submitted that it was dealt with in a wholly unsatisfactory way by the Court of Appeal. If it be held that that decision43 runs contrary to the appellants' argument, the House is invited to hold that it was wrongly decided. It is a salutary principle that parties are not to be deemed to be excluding their liability for deliberate breaches of contract without stating so in the clearest possible terms. Where general words have to be construed they should be construed in a manner consonant with the true nature and purpose of the contract.

Effect can be given to the appellants' contention by the House giving a qualified answer to questions (A) (i) and (ii) of the consultative case, such as "yes, if the detention of the vessel was a deviation from, or a repudiation or fundamental breach of, the charterparty. Otherwise, no." It will then be for the arbitrators to find the facts material to the question whether the detention was of such a character or not, and to determine such question.

[Reference was also made to United States Shipping Board and Bunge y Born44; Un*ited States Shipping Board v. Bunge y*

41    [1924] 1 K.B. 575, C.A.

42    [1959] A.C. 576.

43    31 Com.Cas. 222.

44    (1924) 18 Ll.L.R. 422.

*Born*45; *Cunard Steamship Co. v. Buerger*46; *Stag Line Ltd. v. Foscolo, Mango & Co.*47; *Bontex Knitting Works Ltd. v. St. John's Garage*48; *Swan Hunter and Wigham Richardson Ltd. v. France Fenwick Tyne & Wear Co. Ltd., The Albion*49; *Smeaton Hans-comb & Co. v. Sassoon I. Setty, Son & Co. (No. 1)*50; *Glynn v. Margetson & Co.*51; *Hollins v. J. Davy Ltd.*52; *John Carter (Fine Worsteds) Ltd. v. Hanson Haulage (Leeds) Ltd.*53; *Jackson v. Union Marine Insurance Co.*54; *Taubman v. Pacific Steam Navigation Co.*55]

***J. F. Donaldson Q.C.*** and ***C. S. Staughton*** for the respondents. The law of England permits parties to a contract to provide what the measure of damages shall be in the event of breach of contract: *Dunlop Pneumatic Tyre Co. Ltd. v. New Garage Co.*,56 *per* Lord Parker of Waddington and Lord Parmoor. The law of England also permits parties to limit their liability for breach of contract with certain statutory exceptions, for example, the Carriage of Goods by Sea Act, 1924. These two types of agreement are essentially different. Under an agreed measure of damages provision all that the plaintiff need prove is a breach, but in the case of a limited measure of damage provision the plaintiff must prove every penny of his damage to the limit. If the parties agree damages which in the circumstances turn out to be too low, that does not make the clause a limitation of damage provision, for that would be to change the nature of the clause retrospectively. The clause must be construed as at the date of the contract.

It may be asked: (a) what is covered by the term "remuneration" which a shipowner receives under a single or consecutive voyages charterparty? (b) what loss is suffered by a shipowner if his ship is detained during loading or discharging?

As to (a), it covers four matters: (i) The ballast voyage to the loading port. (ii) The permitted period in port for loading - the loading lay time. (iii) The laden voyage. (iv) The allowed period in port for discharging - the discharging lay time.

45    (1924) 20 Ll.L.R. 73, C.A.; (1925) 31 Com.Cas. 118; 42 T.L.R. 174; 23 Ll.L.R. 257, H.L.

46    [1927] A.C. 1; 42 T.L.R. 653, H.L.

47    [1932] A.C. 328; 48 T.L.R. 127, H.L.

48    (1943) 60 T.L.R. 44, 253, C.A.

49    [1953] 1 W.L.R. 1026; [1953] 2 All E.R. 679, C.A.

50    [1953] 1 W.L.R. 1468; [1953] 2 All E.R. 1471.

51    [1893] A.C. 351; 9 T.L.R. 437, H.L.

52    [1963] 1 Q.B. 844; [1963] 2 W.L.R. 201; [1963] 1 All E.R. 570.

53    [1965] 2 Q.B. 495; [1965] 2 W.L.R. 553; [1965] 1 All E.R. 113, C.A.


54    (1874) L.R. 10 C.P. 125.


55    (1872) 26 L.T. 704.


56    [1915] A.C. 79, 97, 100; 30 T.L.R. 625, H.L.


*[1967] 1 A.C. 361 Page  379*

As regards (b), the shipowner (i) is deprived of the opportunity of using the ship to earn a profit under the next engagement, which may be another charterparty or another voyage under the same charterparty, and (ii) he incurs expenditure on port dues, the crew's wages and on fuel bills during the period of detention. It is difficult for either party to estimate such loss, although it is easier to do so on a consecutive voyages charterparty.

On looking at the matter as a whole in the light of the above, what the parties have done here is a classic example of the adoption of a liquidated damages clause. That is what a demurrage clause is considered in law to be; it is not a limiting of liability clause: see Scrutton on Charterparties, 17th ed., p. 305. This was the view not only of Scrutton L.J. himself but also of subsequent editors, Lord Porter, McKinnon L.J., McNair J. and Mocatta J. It is thus very late in the day to challenge the nature of a demurrage clause. The above view also has the authority of Devlin J. in *Chandris v. Isbrandtsen-Moller Co. Inc.*57

The appellants' argument can be summarised as follows: (1) there were here two contractual obligations, only one of which was covered by the demurrage provisions. (2) There was only one obligation but two types of damage, only one of which was covered. (3) The demurrage provisions of the charterparty have no application to delay which is serious and deliberate or to delay which constitutes a fundamental breach.

(1)    Were the charterers in breach of two obligations? It is common ground that the cargo was to be loaded and discharged at agreed rates. But was there a further independent obligation on the charterers so to act as to enable the owners to perform X voyages within a period of two years? X is the number of voyages which the owners could perform if the charterers complied with clauses 3, 8 and 22. The incalculability of X becomes apparent when it is realised that if on the first voyage, after delay, there is a fast passage the vessel might well arrive at the other side of the Atlantic at the same time as if there had been no delay in port but the vessel had been slowed down by storms.

By the express terms of this charterparty there is a clear obligation on the charterers to load and discharge at a particular rate and there is also a clear obligation on the owners to perform their part of the contract. Even if the charterparty is construed so as to give rise to the above additional obligation, the appellants


57    [1951] 1 K.B. 240, 249.

are still only entitled to the demurrage rate: see *Inverkip Steamship Co. Ltd. v. Bunge & Co.*,58 *per* Scrutton L.J.; Scrutton on Charierparties, 17th ed., p. 306.


As regards an implied obligation, this will only be presumed when it is necessary in order to give business efficacy to the contract: see *The Moorcock*,59 *per* Bowen L.J. In the present case there are four reasons for rejecting an implied term to give effect to the appellants' contention: (a) There is no business necessity for implying such a term. If the demurrage rate is correctly calculated it will cover the situation. (b) The parties could have provided that the number of days on demurrage should be limited but they did not choose so to do. (c) Alternatively, the parties could have made the charterers' obligation to be to employ the vessel for two years for X consecutive voyages but they did not do so. (d) The odd consequences which result from the implied term. Mocatta J. listed two of them: in the first place, it would be extremely difficult for charterers to know when they were in breach of it. Secondly, the provisions as to demurrage in clauses 3 and 8, which by reason of clause 23 must be read as applying to any exceeding of the fixed times for loading and discharging on each voyage during the charter period, would have an unusually restricted and almost capricious application. A third consequence might well be that if the delay exceeded one voyage and the demurrage rate was high, the charterers would be endeavouring to get back the demurrage and claiming damages for detention. It is impossible to formulate the term with accuracy and simplicity.


(2)    It is said that there were here two types of damage. This contention is based on *Aktieselskabet Reidar v. Arcos Ltd.*60 The vessel failed to load within the lay days. She could not earn freight whilst detained and she incurred expenses whilst she was lying in port. When the detention ended, the vessel was damaged in her freight carrying capacity, for when she sailed she could only load in order to comply with the law down to her winter marks. It was as though she was notionally deprived of one of her holds. In the present case, however, the damage is entirely different. If it be right that Bankes L.J. in *Reidar v. Arcos*61 thought that there was only one obligation giving rise to two heads of damage, it was not a point apparently taken by counsel.61 It is submitted that


58    [1917] 2 K.B. 193, 203.


59    (1889) 14 P.D. 64, 68, C.A.


60    [1927] 1 K.B. 352; 42 T.L.R. 737, C.A.


61    (1926) 25 Ll.L.R. 30, 31, 513, 514.

Bankes L.J. was wrong. The true view is that there these were two independent obligations.

(3)    The appellants' additional submission. The steps in this argument are: (i) exceptions clauses do not apply to fundamental breach-proposition (2). (ii) Clauses agreeing damages are exceptions clauses or akin thereto - proposition (3). (iii) Delay will constitute a fundamental breach of contract, if (a) it frustrates the commercial purpose of the contract, or (b) it is serious but not frustrating and is deliberate or wilful and in such event the demurrage clause will not apply - propositions (5) and (6). (iv) In ascertaining whether there has been a fundamental or serious breach of contract by reason of delay it is permissible to add together separate periods of delay - proposition (8). (v) Whether or not the contract has been affirmed is irrelevant - proposition (4). (vi) It will be open to the arbitrators to find that the delays were serious or frustrating - proposition (8). (vii) It is open to the House to answer questions of law which are not stated by the arbitrators in the case, namely, whether on facts not found or pleaded the respondents are liable in damages to the appellants.

As regards (1), the "new equity," the appellants have resiled from the position that there is a rule of law to this effect: but see *Bontex Knitting Works Ltd. v. St. John's Garage*,62 *per* Lewis J.; *Smeaton Hans-comb & Co. v. Sassoon I. Setty, Son & Co. (No. 1)*,63 *per* Devlin J.; *Karsales (Harrow) Ltd. v. Wallis*,64 *per* Denning and Parker L.JJ.; *Sze Hai Tong Bank Ltd. v. Rambler Cycle Co. Ltd.*,65 where the same idea was expressed, although there it was tied up with deliberateness; *Yeoman Credit Ltd. v. Apps*,66 *per* Harman L.J.; *Charterhouse Credit Ltd. v. Tolly*,67 *per* Donovan, Upjohn and Ormerod L.JJ.; *Astley Industrial Trust Ltd. v. Grimley*68; *U. G. S. Finance Ltd. v. National Mortgage Bank of Greece and National Bank of Greece, S.A.*,69 *per* Lord Denning M.R. and Harman L.J., contrast the observations of Pearson L.J.70; *Philip Boshali v. Allied Commercial Exporters Ltd.*71

The concession made by the appellants was rightly made in view of *Cunard Steamship Co. Ltd. v. Buerger*,72 where Lord Pamloor clearly contemplated that there could be a properly

62    [1943] 2 All E.R. 690, 695.

63    [1953] 1 W.L.R. 1468, 1470.

64    [1956] 1 W.L.R. 936, 940, 943.

65    [1959] A.C. 576, 588.

66    [1962] 2 Q.B. 508, 523.

67    [1963] 2 Q.B. 683, 703, 709, 715.

68    [1963] 1 W.L.R. 584, 598.

69    [1964] 1 Lloyd's Rep. 446, 450, 457.


70    Ibid. 453.


71    Unreported, 1961, November 14, P.C.


72    [1927] A.C. 1, 13.

*[1967] 1 A.C. 361 Page  382*

drafted clause which covered what the appellants term "fundamental breach": see also *per* Atkin L.J. in *The Cap Palos.*73 Accordingly, it is now said that there is a rule of construction that normally an exceptions clause should be construed as not applying to a fundamental breach.


There is no category of breach of contract known as "fundamental breach" in English law. In determining the rights of parties the courts must apply certain rules of construction and certain rules of law and all the cases are merely applications of these rules.


The primary rule of construction is that words are to be given their normal and natural meaning. In case of doubt, conflict or ambiguity the following sub-rules are invoked: (i) The main purpose rule. This derives its name from the speech of Lord Halsbury in *Glynn v. Margetson & Co.*74

"looking at the whole of the instrument, and seeing what one must regard... as its main purpose, one must reject words, indeed whole provisions, if they are inconsistent with what one assumes to be the main purpose of the contract."


It is to be observed: (a) it is a rule of construction; (b) it is to be applied principally (if not invariably) when there is a conflict between the printed provisions of a standard form of contract and the written or typed words inserted therein; (c) it is a rule which must operate, if at all, when the contract is made. At that moment the conflict must be apparent, and it must be determined which words or whole provisions are to be struck out and which are to remain. (ii) The four corners rule. If under a contract of carriage or bailment the carrier or bailee departs from the agreed route or uses a place other than that agreed on for storing the goods, or otherwise exposes the goods to risks quite different from those contemplated by the contract, he cannot rely on clauses in the contract designed to protect him against liability arising within the four corners of the contract. This rule has never been applied to a bailor. (iii) The exceptions clauses rule. Exceptions to liability under a contract are construed strictly and therefore if a word is capable of two meanings the narrow meaning is preferred: see *per* Devlin J. in *Alexander v. Railway Executive.*75 (iv) The contra preferentem rule. An instrument is construed more forcibly against the party putting forward the document. This has no application here.


Two other relevant rules of law are the repudiation rule and

73    [1921] P. 458, 471, 472.


74    [1893] A.C. 351, 357.


75    [1951] 2 K.B. 882, 893.

*[1967] 1 A.C. 361 Page  383*

the renunciation rule. These are quite different and must be kept distinct. The repudiation rule: (i) If one party to a contract commits an actual as opposed to an anticipatory breach of contract of a sufficiently serious character, the other party acquires a right either to disaffirm the contract or to affirm it. If the alleged contract breaker is protected by an exceptions clause, there is no breach. (ii) This right arises irrespective of whether the innocent party suffers damage. (iii) If the innocent party suffers damage he can recover damages however he elects. (iv) If he disaffirms the contract the contract is at an end and any further contractual relations with the other party depend on another contract express or implied. (v) If he affirms the contract he is bound by all its terms. (vi) Affirmation may be express or implied and the sole peculiarity of the marine deviation cases is that lapse of time does not usually give rise to an inference of affirmation because of the lack of knowledge. (vii) Affirmation may be accompanied by implied variation.


*Hain Steamship Co. Ltd. v. Tate and Lyle Ltd.*76 It is true that Lord Atkin, Lord Wright and Lord Maughan, who delivered the opinions in that case, all refer to "fundamental breach" but if the case is read as a whole it is plain that the purport of the decision was that the breaches complained of were sufficiently serious to give rise to a right to repudiate and not that the circumstances gave rise to some special category of breach which had its own rules.


The renunciation rule. If one party to a contract so conducts himself as to evince an intention not to be bound by, or, the inability to perform the contract thereafter, the other party then acquires an option either to ignore this conduct or to treat it as a repudiatory breach. If he ignores it, he is entitled to continue to insist on performance, for "an unaccepted repudiation is a thing writ in water": *Howard v. Pickford Tool Co. Ltd.*,77 *per* Asquith L.J., and see also *Heyman v. Darwins Ltd.*,78 *per* Viscount Simon. If he treats it as a repudiatory breach, the contract is at an end and he can sue for its breach. Devlin J. in *Universal Cargo Carriers Corporation v. Citati*79 added the rider that the forecast breach must be of such a character that if it occurred it *would be* a repudiatory breach.


It has been said that deliberateness is a relevant factor. It


76    41 Com.Cas. 350, 357, 362, 371.


77    [1951] 1 K.B. 417, 421, C.A.

78    [1942] A.C. 356, 361; 58 T.L.R. 169; [1942] 1 All E.R. 337, H.L.

79    [1957] 2 Q.B. 401; [1957] 2 W.L.R. 713; [1957] 2 All E.R. 70.

*[1967] 1 A.C. 361 Page  384*

is submitted that it may give to a minor actual breach the character of a renunciation. If that happens the innocent party may treat the contract as at an end, but if he does not the minor actual breach remains and no amount of deliberateness will change its character. But in the construction of an exceptions clause one can have words which except an accidental but not a deliberate breach: see *Alexander v. Railway Executive*80 and *Hollins v. J. Davy Ltd.*81

All the cases which have been cited, apart from the "new equity" cases, are applications of the above two rules of law, and the "new equity" cases can also be justified on the basis that they are of a repudiatory nature.

As to the rule of construction, none of the sub-rules are applicable here.

There is nothing in the decision in *Cellulose Acetate Silk Co. v. Widnes Foundry (1925) Ltd.*82 that in any way establishes that an agreed measure of damages provision is at all akin to an exceptions clause or a clause limiting liability.

Applying the above rules to the present charterparty, if what occurred here was a repudiatory breach, then the respondents concede that the appellants had the option of sailing away and if they had done so of suing for damages at common law. If, however, the breach was not accepted as putting an end to the charterparty, then the demurrage clause applies: *Ethel Radcliffe Steamship Co. Ltd. v. W. & R. Barnett Ltd.*,83 *per* Bankes and Warrington L.JJ. *Inverkip Steamship Co. Ltd. v. Bunge & Co.*84 is authority for the proposition that a demurrage clause applies to repudiatory delay and in *Chandris v. Isbrandtsen-Moller Co. Inc.*85 Devlin J. found on the facts there that there was a repudiatory breach and held expressly that the demurrage clause applied. The principle laid down in the *Inverkip Steamship case*86 and the *Ethel Radcliffe Steamship case*87 must have been applied to thousands of charterparties. The principles laid down in commercial cases should not be disturbed unless it is shown that they are plainly wrong: *Atlantic Shipping and Trading Co. v. Dreyfus (L.) & Co.*,88 *per* Lord Dunedin.

As to delay which is serious and deliberately caused, the respondents have conceded that deliberateness is relevant in relation to renunciation, but a renunciatory breach is nothing unless

80    [1951] 2 K.B. 882, 893.

81    [1963] 1 Q.B. 844, 854.

82    [1933] A.C. 20.

83    31 Com.Cas. 222, 230, 233.

84    [1917] 2 K.B. 193.

85    [1951] 1 K.B. 240.

86    [1917] 2 K.B. 193.

87    31 Com.Cas. 222.

88    [1922] 2 A.C. 250, 257.

*[1967] 1 A.C. 361 Page  385*

it is accepted, and here there was no acceptance and, therefore, even if the delay was deliberate, it is irrelevant to the issues to be determined.

As to the aggregation of separate periods of delay, this cannot be done here, for each period of loading and discharging is special to each particular voyage. *Pollock & Co. v. MacCrae*89 was relied on but that case is plainly distinguishable, for there there were *concurrent* breaches all operating contemporaneously.

As to whether it is open to the arbitrators to find that the delays were serious or frustrating, it is possible for the arbitrators to find that the delays were serious but not to find that they were frustrating, bearing in mind that the total demurrage days were 154 out of a total of 511. This is, in effect, a time charter for present purposes and a two-year time charter has never hitherto been held to have been frustrated by a one-third delay of the total time of the charter.

Finally, it is submitted that it is not open to this House to answer the arbitrators' question (A) (i) as the appellants now contend, for so to do would necessitate the redrafting of the question. Similarly, question (A) (ii) cannot be answered on the ground that the delay was serious, for that matter is not raised by the question.

[Reference was also made to *Davis Contractors Ltd. v. Fareham Urban District Council.*90]

*C. S. Staughton* following. In *Western Steamship Co. v. Amaral Sutherland & Co.*91 counsel for the plaintiffs in reply to a question by Bray J. contended, as do the appellants here, that a demurrage clause does not apply to a repudiatory breach and this argument was rejected by Bray J. in his judgment. It is plain authority for the contentions of the respondents here. Further, that decision91 was approved by all three members of the Court of Appeal in *Inverkip Steamship Co. Ltd. v. Bunge & Co.*92

**H. V. Brandon Q.C.** in reply. It is implicit in the case for the respondents that they were entitled to detain the ship for an unlimited period under this charterparty upon payment of demurrage and that if they had done so that the appellants would not have been entitled either to bring the contract to an end or to claim damages apart from demurrage. If that view be rejected, as the

89    1922 S.C. (H.L.) 192.

90    [1956] A.C. 696; [1956] 3 W.L.R. 37; [1956] 2 All E.R. 145, H.L.

91    [1913] 3 K.B. 366, 368; 29 T.L.R. 660.

92    [1917] 2 K.B. 193.

*[1967] 1 A.C. 361 Page  386*

appellants submit it should be, then it is necessary to determine the limit and the juridical basis of it.

To prevent an absurd situation developing in a business transaction it is necessary to imply a term that there will not be deliberate delay. It is said that such a term could have been expressed but that argument could be used against every clause that the courts have ever implied.

As to the concept of two types of damage, *Aktieselskabet Reidar v. Arcos Ltd.*93 is a clear example of a case where two types of damage flowed from the same act, one of which was covered by the demurrage clause and the other was not, although both were the result of the detention of the vessel. In the present case it was as if the ship had been deprived of the use of two of her holds.

As to fundamental breach, the following questions arise: (i) could any breach of the lay day provisions be repudiatory? (ii) If so, what breaches? (iii) Assuming that there could be repudiatory breaches, would the demurrage provisions apply to them? (iv) On the same assumption, is it open to the arbitrators to find that the alleged breaches were repudiatory?

As to (i), it is impossible to contend that the ship could have been detained in port for the whole two years on mere payment of $1,000 a day, because, for example, the charterers had obtained another vessel at a lower rate of freight. The answer is therefore in the affirmative. As to (ii), the answer is, those that go to the root of the contract. That includes (a) breaches of the lay day provisions such as delay of so prolonged a character as to alter the nature of the contract, which would as a matter of law be held to go to the root of the contract. In this connection it is permissible to aggregate successive separate periods of delay: see *Hongkong Fir Shipping Co. Ltd. v. Kawasaki Kisen Kaisha Ltd.*,94 *per* Upjohn L.J. It also includes (b) deliberate breaches which produce serious delay. Motivation is one element, together with the length of the delay and the effect thereof on the other party in determining whether the breach is repudiatory. If there is no deliberateness, then the delay has to be frustrating to be repudiatory. The answer to (iii) is in the negative. As to (iv), there is nothing to prevent the arbitrators from finding that the alleged breaches were repudiatory.

As to the contention that as a *matter of law* a demurrage clause is a liquidated damages clause, that does not follow; it is always a question of construction. In a charterparty a demurrage clause

93   [1927] 1 K.B. 352.

94   [1962] 2 Q.B. 26, 64, 65.

*[1967] 1 A.C. 361 Page 387*

is prima facie a liquidated damages clause, but a particular demurrage clause has to be construed in relation to the particular circumstances of the particular case.

The *Western Steamship Co. case*95 is of little assistance, for it was decided when the criterion was reasonable delay, but that yardstick has now gone.

It is to be observed that no case has been cited where a court (i) has found as a fact that there has been frustrating delay and therefore a repudiatory breach and then (ii) has found as a matter of law that a demurrage clause applies after that frustrating delay has occurred.

As to *Chandris v. Isbrandtsen-Moller Co. Inc.,*96 which was much relied on, it is submitted that it was wrongly decided, alternatively that it is distinguishable on the grounds that it was not a case of repudiatory delay; the period of delay was not abnormal, although large. It was in fact a case of a non-repudiatory delay caused by a repudiatory delay at an earlier stage. If it be held that the decision is not so distinguishable, then it is submitted that the reasoning of Devlin J. can only be affirmed by holding that *Charterhouse Credit Co. Ltd. v. Tolly*97 was wrongly decided.

As to the reliance on the doctrine of stare decisis, this is not applicable, for the principle advocated by the respondents has not found favour over the years. This is exemplified by the fact that, if it had, note (*f*) on p. 306 of Scrutton on Charterparties, 17th ed., would be unnecessary. [Reference was also made to *Davis Contractors Ltd. v. Fare-ham Urban District Council*98; *Hardwick Game Farm v. Suffolk Agricultural Poultry Producers Association*99; *Empresa Maritime de Transportes S.A. Plaintiff v. A. T. Massey Coal Company et al. Defendants.*100]

Their Lordships took time for consideration.

March 31, 1966. VISCOUNT DILHORNE. My Lords, this appeal is from a decision of the Court of Appeal (Sellers, Harman and Diplock L.JJ.) dismissing an appeal by the appellants from a decision by Mocatta J. on a consultative case in relation to a dispute between the parties which has arisen in connection with the charter of a vessel from the appellants.

On December 21, 1956, the respondents agreed to charter a

95    [1913] 3 K.B. 366.

96    [1951] 1 K.B. 240.

97    [1963] 2 Q.B. 683.

98    [1956] A.C. 696.

99    [1966] 1 W.L.R. 287; [1966] 1 All E.R. 309, C.A.

100    1965 A.M.C. 517 (U.S.A.).

*[1967] 1 A.C. 361 Page  388*

vessel from the appellants for the carriage of coal from the United States to Europe. That charter was to remain in force "for a total of two years consecutive voyages" (clause 23 of the charterparty). The vessel had "with all possible dispatch" to "sail and proceed" to a port in the United States and there load on each voyage a cargo of coal "and being so loaded, shall therewith proceed with all possible dispatch" to a port in Europe (clause 1). She had to be loaded at a specified rate per running day and, if she was detained beyond the loading time, the charterers were to pay $1,000 a day demurrage. In computing the loading time, detention of the vessel in consequence of the happening of certain events was to be disregarded (clause 3). Similarly if she was detained longer than was required to unload her at the stipulated rate per day and that was not due to strikes, etc., or other causes beyond the control of the charterers, the charterers who were to discharge the cargo were to pay demurrage at the rate of $1,000 a day.

On September 16, 1957, the appellants regarded themselves as entitled to treat the charterparty as repudiated by reason of the respondents' delays in loading and discharging the vessel. This was not accepted by the respondents and on October 8, 1957, it was agreed, without prejudice to this dispute, that from thenceforward the charterparty would be carried out.

Between October 16, 1957, and the end of the charter the vessel made eight round voyages. The appellants contended that she ought reasonably to have completed each round voyage in 30 or 37 days including loading and unloading. On this basis eight voyages would have taken 240 or 296 days. In fact they took 511 and the difference, the appellants alleged, was due to delays in loading and unloading for which the respondents were responsible. The result was, so the appellants alleged, that the vessel did not make as many voyages as she should have done with the result that they were deprived of the freights they would have earned on 9 or alternatively 6 voyages. On this basis, after giving credit for the demurrage payments received by them, they claimed $772,866.92 and alternatively $476,490.92 from the respondents.

This claim went to arbitration and, at the request of the appellants, the arbitrators stated the following questions in the form of a consultative case: