"(A) (i)    The claimants are entitled to recover (subject to giving credit for the demurrage payments received by them) any damages suffered by them by reason of the respondents having failed to load and discharge the vessel within the

*[1967] 1 A.C. 361 Page  389*

laydays whereby the charterparty was (if so proved) rendered less profitable to the claimants by consequent loss of voyages or voyage time.

"(ii)    Upon the assumption that such loss of profitability resulted from the respondents having deliberately (i.e., with the wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel: (a) With such ordinary dispatch as the circumstances permitted, or (b) within the laydays, the claimants are entitled to recover any damages suffered by the claimants through the charterparty having been rendered less profitable as aforesaid subject to giving credit for the demurrage payments received by them and for any such despatch money as would have been earned by the respondents.

"(B)    If the answer to any of the questions under ('A') be 'Yes,' the payment by the respondents and acceptance by the claimants of demurrage in respect of those periods when the laydays were exceeded preclude the claimants from recovering any damages otherwise recoverable by them in accordance with such answer or answers."

Before Mocatta J. it was agreed that he should confine his decision to answering questions A (i) and (ii) and that The words "or voyage time" at the end of A (i) added nothing.

Mr. MacCrindle for the appellants submitted to your Lordships, as he had in the courts below, that the appellants had under the charterparty a contractual right to the number of voyages which would be performed if both parties complied with their obligations, and, secondly, that the appellants' claim for the loss of freight on the voyages which should have been performed was not limited to the demurrage payments.

In my opinion, no such contractual right is to be implied either on the construction of the charterparty or by operation of law. The charterparty might have provided that not less than a certain number of voyages should be accomplished. It did not do so.

In support of their second contention the appellants relied on *Aktieselskabet Reidar v. Arcos Ltd.*1 and, in particular, on the judgment of Bankes L.J. Although he came to the same conclusion as Atkin L.J. and Sargant L.J. he did so on somewhat different grounds. I do not consider that this decision affords any basis for the contention that, where demurrage provisions apply, it is possible to obtain more than the demurrage payments for the detention of a vessel.

On these issues I agree with, and do not think that it is necessary to add to, the judgments of the Court of Appeal and Mocatta J.

If in this case the appellants had been able to establish a breach

*[1967] 1 A.C. 361 Page  390*

of the charterparty other than by the detention of the vessel, then *Aktieselskabet Reidar v. Arcos Ltd.*1 is authority for saying that the damages obtainable would not be limited to the demurrage payments. In my opinion, they have not done so.

Towards the conclusion of his argument, Mr. MacCrindle sought to put forward a new argument, not advanced in the courts below nor in the appellants' case, to the effect that if the delays for which the respondents were responsible were such as to entitle the appellants to treat the charterparty as repudiated, the demurrage provisions did not apply and they were entitled to recover the full loss they had suffered.

While ordinarily this would not be permitted, as the result of refusing to allow it in the present case might be that the question would come before the courts on another consultative case, involving delay and expense, their Lordships decided to allow the argument to be advanced on condition that supplemental cases should be filed, the hearing adjourned and on the appellants undertaking to pay the costs involved.

At the resumed hearing Mr. Brandon sought to sustain this contention. He cited a large number of cases in which it had been held that where there had been deviation of a vessel, the owners of the ship were not entitled to rely on provisions in a charterparty or bill of lading protecting them from liability or limiting their liability for the loss of the kind that had occurred. It is not, I think, necessary to refer to all the cases cited. The principle is well established.

In *Hain Steamship Co. Ltd. v. Tate and Lyle Ltd.*2 Lord Atkin. with whose opinions Lord Thankerton and Lord Macmillan agree. said3:

> "the effect of a deviation upon a contract of carriage by sea has been stated in a variety of cases but not in uniform language... Occasionally language has been used which suggests that the occurrence of a deviation automatically displaces the contract, as by the now accepted doctrine does an event which 'frustrates' a contract. In other cases where the effect of deviation upon the exceptions in the contract had to be considered language is used which... shows that the sole effect is, as it were, to expunge the exceptions clause, as no longer applying to a voyage which from the beginning of the deviation has ceased to be the contract voyage. I venture to think that the true view is that departure from the voyage

1    [1927] 1 K.B. 352; 42 T.L.R. 737, C.A.

2    (1936) 41 Com.Cas. 350; 52 T.L.R. 617; [1936] 2 All E.R. 597, H.L.

3    41 Com.Cas. 350, 354.

*[1967] 1 A.C. 361 Page  391*

> contracted to be made is a breach by the shipowner of his contract, a breach of such a serious character that, however slight the deviation, the other party to the contract is entitled to treat it as going to the root of the contract, and to declare himself as no longer bound by the contract terms."

He also said4:

> "If this view be correct, then the breach by deviation does not automatically cancel the express contract, otherwise the shipowner by his own wrong can get rid of his own contract. Nor does it affect merely the exceptions clauses. This would make those clauses alone subject to a condition of no deviation, a construction for which I can find no justification. It is quite inconsistent with the cases which have treated deviation as precluding enforcement of demurrage provisions. The event falls within the ordinary law of contract. The party who is affected by the breach has the right to say, 'I am not now bound by the contract whether it is expressed in charterparty, bill of lading, or otherwise.'... I am satisfied that once he elects to treat the contract as at an end he is not bound by the promise to pay the agreed freight any more than by his other promises. But, on the other hand, as he can elect to treat the contract as ended, so he can elect to treat the contract as subsisting; and if he does this with knowledge of his rights he must in accordance with the general law of contract be held bound."

Lord Wright M.R. in the same case said5:

> "An unjustified deviation is a fundamental breach of a contract of affreightment."

and later6:

> "But, however fundamental is the condition, it may still be waived by the goods owner. For this purpose the case is like any other breach of a fundamental condition, which constitutes the repudiation of a contract by one party; the other party may elect not to treat the repudiation as being final, but to treat the contract as subsisting, and to that extent may waive the breach, any right to damages being reserved."

See also *Chandris v. Isbrandtsen-Moller Co. Inc.*,7 per Devlin J.

This House thus treated the deviation cases as coming within the ordinary law of contract.

Mr. Brandon also cited *Mallett v. Great Eastern Railway Co.*8 where goods were sent by a different route from that contracted for and a clause relieving the company of liability was consequently

4    41 Com.Cas. 350, 355.

5    Ibid. 362.

6    Ibid. 363.

7    [1951] 1 K.B. 240, 248, 249; 66 T.L.R. (Pt. I) 971; [1950] 1 All E.R. 768.

8    [1899] 1 Q.B. 309; 15 T.L.R. 137, D.C.

*[1967] 1 A.C. 361 Page  392*

held not to apply; *Gunyon v. South Eastern and Chatham Railway Companies' Managing Committee*9 where fruit was carried by goods train when the contract was for it to go by passenger train and so an exemption clause was held not to apply, and *Lilley v. Doubleday*10 where goods were destroyed by fire in a warehouse other than that contracted for and an exemption clause was held not to apply.

These are all cases which illustrate the principle that where there has been a fundamental breach - and deviation is a fundamental breach - or a breach of a fundamental term, the party guilty of the breach cannot successfully rely on provisions in the contract designed for his protection in the performance of the contract.

In a number of cases (e.g., *Smeaton Hanscomb & Co. v. Sassoon I. Setty, Son & Co., (No. 1)*11; *Karsales (Harrow) Ltd. v. Wallis*12; *Yeoman Credit Ltd. v. Apps*13; *Astley Industrial Trust Ltd. v. Grimley*14; *Charterhouse Credit Co. Ltd. v. Tolly*15; and *U.G.S. Finance Ltd. v. National Mortgage Bank of Greece and National Bank of Greece, S.A.*FN16) there are judicial observations to the effect that exempting clauses, no matter how widely they are drawn, only avail a party when he is carrying out the contract in its essential respects. In my view, it is not right to say that the law prohibits and nullifies a clause exempting or limiting liability for a fundamental breach or breach of a fundamental term. Such a rule of law would involve a restriction on freedom of contract and in the older cases I can find no trace of it.

In each case not only have the terms and scope of the exempting clause to be considered but also the contract as a whole. In the cases I have cited above, I think that, on construction of the contract as a whole, it is apparent that the exempting clauses were not intended to give exemption from the consequences of the fundamental breach. Any provision that does so must be expressed in clear and unambiguous terms (see *Cunard Steamship Co. v. Buerger,*FN17 *per* Lord Parmoor and *London & North Western Railway Co. v. Neilson,*FN18 *per* Lord Dunedin). It must be apparent

9    [1915] 2 K.B. 370; 31 T.L.R. 344, D.C.

10   (1881) 7 Q.B.D. 510.

11   [l953] 1 W.L.R. 1468; [1953] 2 All E.R. 1471.

12   [1956] 1 W.L.R. 936, [1956] 2 All E.R. 866, C.A.

13   [1962] 2 Q.B. 508; [1961] 3 W.L.R. 94; [1961] 2 All E.R. 281, C.A.

14   [1963] 1 W.L.R. 584; [1963] 2 All E.R. 33, C.A.

15   [1963] 2 Q.B. 683; [1963] 2 W.L.R. 1168; [1963] 2 All E.R. 432, C.A.

16   [1964] 1 Lloyd's Rep. 446, C.A.

17   [1927] A.C. 1, 13; 42 T.L.R. 653, H.L.

18    [1922] 2 A.C. 263, 272; 38 T.L.R. 653, H.L.

that such is its purpose and intention. In *Glynn v. Margetson & Co.*FN19 the contract was for the carriage of oranges from Malaga to Liverpool and the charterparty contained a provision giving the vessel liberty to go to any port not on the route from Malaga to Liverpool. As a result of the vessel going to a port not on the route from Malaga to Liverpool the oranges were damaged. In that caseFN19 Lord Herschell L.C. saidFN20 that the main object and intent of the charterparty was the voyage so agreed on and "it would be to defeat what is the manifest object and intention of such a contract to hold that it was entered into with a power to the shipowner to proceed anywhere."

I think that the legal position was most clearly and accurately stated by Pearson L.J. in *U.G.S. Finance Ltd.*FN21 He said:

> "As to the question of 'fundamental breach,' I think there is a rule of construction that normally an exception or exclusion clause or similar provision in a contract should be construed as not applying to a situation created by a fundamental breach of contract. This is not an independent rule of law imposed by the court on the parties willy-nilly in disregard of their contractual intention. On the contrary it is a rule of construction based on the presumed intention of the contracting parties. It involves the implication of a term to give to the contract that business efficacy which the parties as reasonable men must have intended it to have. This rule of construction is not new in principle but it has become prominent in recent years in consequence of the tendency to have standard forms of contract containing exceptions clauses drawn in extravagantly wide terms, which would produce absurd results if applied literally."

Although the terms are sometimes used as if their meaning was the same, a fundamental breach differs from a breach of a fundamental term. In *Smeaton Hanscomb v. Sassoon I. Setty, Son & Co. (No. 1),*FN22 Devlin J. said that he thought a fundamental term was "something which underlies the whole contract so that, if it is not complied with, the performance becomes something totally different from that which the contract contemplates."

In relation to a fundamental breach, one has to have regard to the character of the breach and determine whether in consequence of it the performance of the contract becomes something totally different from that which the contract contemplates.

The provisions as to demurrage in the charterparty indicate that

19    [1893] A.C. 351; 9 T.L.R. 437, H.L.

20    [1893] A.C. 351, 355.

21    [1964] 1 Lloyd's Rep. 446, 453.

22    [1953] 1 W.L.R. 1468, 1470.

*[1967] 1 A.C. 361 Page  394*

it was appreciated that the respondents might be in breach of the charterparty by detaining the vessel beyond the laydays and yet carry out the charterparty. I do not think that breach of the charterparty by detention beyond the laydays can be regarded as a breach of a fundamental term.

Delay in the performance of a charterparty may amount to deviation and so to a fundamental breach. In *The Cap Palos* FN23 where the contract was for the towage of a vessel, Atkin L.J. said:

> "The" (towage) "figures appear to me to indicate such delay as to make the purported performance something quite different from that contracted for, a form of deviation quite familiar in marine adventures."

In *Brandt v. Liverpool, Brazil and River Plate Steam Navigation Co.* FN24 delay by the owners of a vessel in dealing with bags of zinc was held by Scrutton L.J. FN25 and Atkin L.J. FN26 to amount to a deviation.

Breach of a charterparty by the detention of the vessel beyond the laydays by the charterers may, in my view, take on the character of a fundamental breach. If, for instance, there was a delay of many weeks in the loading of the vessel the consequence would be that the voyages, though in fact consecutive, would be totally different from those contemplated by the contract. Further, if it was established that a breach, though of itself not of sufficient duration as to lead to the conclusion that the performance of the contract became totally different from that contemplated, was committed deliberately and wilfully with the object of reducing the number of voyages accomplished, the breach might, in my opinion, take on the character of a fundamental breach. It is only in this connection, in determining whether there has been repudiatory conduct, that, in my opinion, the wilfulness of the breach has any relevance.

In this case the appellants contend that the totality of the delays in loading and unloading constituted a fundamental breach entitling them to treat the contract as repudiated and the demurrage provisions as not applying. They do not suggest that at any particular time between October 16, 1957, and the end of the charter the delays were such as to constitute a fundamental breach.

If there was a time after October 16, 1957, and before the end of the charterparty when they could have said that it had been

23    [1921] P. 458, 470; 37 T.L.R. 921, C.A.

24    [1924] 1 K.B. 575, C.A.

25    Ibid. 597.

26    Ibid. 601.

repudiated by the respondents, they did not do so. They had full knowledge of the delays as they occurred, and if there was a time when they could have elected to treat the charterparty as at an end they must, in my view, be taken to have elected to waive the repudiation and to have affirmed the charterparty. If they affirmed the charterparty, then they were bound by its provisions in respect of events occurring after the affirmation, but waiver of the breach does not mean waiver of the right to damages for that breach *(Hain Steamship Co. Ltd. v. Tate and Lyle Ltd.*FN27; *Chandris v. Isbrandt-sen-Moller Co. Inc.,*FN28 *per* Devlin J.). In this connection there are, I think, certain passages in *Charterhouse Credit Co. Ltd. v. Tolly*FN29 which require reconsideration.

If the appellants were entitled to treat the charterparty as repudiated, the demurrage provisions could only be held not to apply if they were provisions limiting the respondents' liability and, on construction of the contract as a whole, they were held not to apply in relation to the fundamental breach.

In my view, the demurrage provisions are not to be regarded as limiting the respondents' liability. In the circumstances of this case it may be that the amount of the demurrage payments bears little relation to the loss the appellants claim to have suffered. In *Chandris v. Isbrandtsen-Moller Co. Inc.*FN30 Devlin J. said that the sum produced by demurrage "is generally less than damages for detention" and that a demurrage clause is merely a clause providing for liquidated damages for a certain type of breach. While it may be that a demurrage clause in a particular case is so drawn that on its proper construction it is to be treated as imposing a limitation on liability, in this case the demurrage provisions are, in my opinion, clearly provisions for the payment of agreed damages. If the clauses imposed a limit on liability, then the appellants would have to prove the actual loss they sustained and if it was less than the amount stated they would only recover the loss they proved. Here the parties agreed that demurrage at a daily rate should be paid in respect of the detention of the vessel and, on proof of breach of the charterparty by detention, the appellants are entitled to the demurrage payments without having to prove the loss they suffered in consequence.

In my view, the appellants cannot avoid the operation of these provisions and cannot recover more than the agreed damages for

27    41 Com.Cas. 350.

28    [1951] 1 K.B. 240, 248.

29    [1963] 2 Q.B. 683.

30    [1951] 1 K.B. 240, 249.

the detention of their vessel. (See *Cellulose Acetate Silk Co. v. Widnes Foundry* (1925) Ltd.FN31)

For these reasons the further contention advanced by the appellants in my view fails and, in my opinion, this appeal should be dismissed.

LORD REID. My Lords, I am satisfied that for the reasons given by your Lordships this appeal could not succeed on any of the grounds submitted to the Court of Appeal and to your Lordships at the first hearing of this appeal. But at the end of his opening address counsel for the appellant put forward a new contention based on there having been a fundamental breach of contract by the respondents. Normally this House would not permit a new question of that character to be argued. But this is a consultative case stated by arbitrators and the appellants could still raise such a new question before the arbitrators. So in order to avoid delay and expense your Lordships adjourned the hearing on terms as to costs and ordered the parties to lodge supplementary cases dealing with this new contention. I only intend to deal with the new question argued at the second hearing.

The case arises out of a charterparty for two years' consecutive voyages made on December 21, 1956, between the appellants, the owners, and the respondents, the charterers. After a dispute the parties made a further agreement on October 8, 1957, to perform the charterparty for the remainder of the two-year period. The purpose of the charterparty was that on each voyage the vessel should proceed in ballast to an Atlantic port in the United States and there load coal to be carried to a port in the Netherlands. During this remaining part of the two years the vessel only made eight voyages and she spent some 380 days in ports of loading or discharge. There was provision for payment of demurrage with wide exceptions of causes of delay beyond the-control of the charterer. But the respondents have admitted liability to pay demurrage for some 150 days. The complaint of the appellants is that by reason of the failure of the respondents to perform their contractual obligations to load and discharge within the laydays the appellants have been deprived of the freight which would have been earned on the additional voyages which would have been performed had there not been this delay for which the respondents are responsible. They claim that six or nine more voyages would

31    [1933] A.C. 20; 48 T.L.R. 595, H.L.

have been performed within the period if the respondents had fulfilled their obligations and they estimate their loss from that cause at $875,000 or alternatively $580,000. The respondents' answer is that the appellants are only entitled to demurrage at the agreed rate of $1,000 per day and they have paid some $150,000 as demurrage.

The new contention submitted by the appellants is that the breaches of contract which caused these delays amounted to fundamental breach or breach going to the root of the contract so that at some time during the currency of the agreement the appellants would have been entitled to treat the breaches as a repudiation, to terminate or rescind the contract and to claim damages at common law. It is, I think, clear that if they did have that right they must be held to have elected not to treat the breaches as repudiatory. But they argue that nevertheless the fact that there was a fundamental breach prevents the respondents from relying on the demurrage clause as limiting their responsibility.

So the first question must be whether these delays can be regarded as involving fundamental breach. If so, it is for the arbitrators, at least in the first instance, to decide whether there was fundamental breach. The respondents deny that these breaches are capable of being regarded as amounting to fundamental breach. General use of the term "fundamental breach" is of recent origin and I can find nothing to indicate that it means either more or less than the well known type of breach which entitles the innocent party to treat it as repudiatory and to rescind the contract. The appellants allege that the respondents caused these delays deliberately (i.e., with the wilful intention of limiting the number of contractual voyages). They do not allege fraud or bad faith. This allegation would appear to cover a case where the charterers decided that it would pay them better to delay loading and discharge and pay the resulting demurrage at the relatively low agreed rate, rather than load and discharge more speedily and then have to buy more coal and pay the relatively high agreed freight on the additional voyages which would then be possible. If facts of that kind could be proved I think that it would be open to the arbitrators to find that the respondents had committed a fundamental or repudiatory breach. One way of looking at the matter would be to ask whether the party in breach has by his breach produced a situation fundamentally different from anything which the parties could as reasonable men have contemplated when the

*[1967] 1 A.C. 361 Page  398*

contract was made. Then one would have to ask not only what had already happened but also what was likely to happen in future. And there the fact that the breach was deliberate might be of great importance.

If fundamental breach is established the next question is what effect, if any, that has on the applicability of other terms of the contract. This question has often arisen with regard to clauses excluding liability, in whole or in part, of the party in breach. I do not think that there is generally much difficulty where the innocent party has elected to treat the breach as a repudiation, bring the contract to an end and sue for damages. Then the whole contract has ceased to exist including the exclusion clause, and I do not see how that clause can then be used to exclude an action for loss which will be suffered by the innocent party after it has ceased to exist, such as loss of the profit which would have accrued if the contract had run its full term. But that is not the situation in the present case, where in my view the appellants elected that the contract should continue in force.

Where the contract has been affirmed by the innocent party, at first sight the position is simple. You must either affirm the whole contract or rescind the whole contract: you cannot approbate and reprobate by affirming part of it and disaffirming the rest - that would be making a new contract. So the clause excluding liability must continue to apply. But that is too simple and there is authority for two quite different ways of holding that, in spite of affirmation of the contract as a whole by the innocent party, the guilty party may not be entitled to rely on a clause in it. One way depends on construction of the clause. The other way depends on the existence of a rule of substantive law.

As a matter of construction it may appear that the terms of the exclusion clause are not wide enough to cover the kind of breach which has been committed. Such clauses must be construed strictly and if ambiguous the narrower meaning will be taken. Or it may appear that the terms of the clause are so wide that they cannot be applied literally: that may be because this would lead to an absurdity or because it would defeat the main object of the contract or perhaps for other reasons. And where some limit must be read into the clause it is generally reasonable to draw the line at fundamental breaches. There is no reason why a contract should not make a provision for events which the parties do not have in contemplation or even which are unforeseeable, if sufficiently

*[1967] 1 A.C. 361 Page  399*

clear words are used. But if some limitation has to be read in it seems reasonable to suppose that neither party had in contemplation a breach which goes to the root of the contract. Then the true analysis seems to me to be that the whole contract, including the clause excluding liability, does survive after election to affirm it, but that that does not avail the party in breach. The exclusion clause does not change its meaning: as a matter of construction it never did apply and does not after election apply to this type of breach, and

therefore is no answer to an action brought in respect of this type of breach.

But applying a strict construction to these clauses is not sufficient to exclude them in all cases of fundamental breach. It cannot be said as a matter of law that the resources of the English language are so limited that it is impossible to devise an exclusion clause which will apply to at least some cases of fundamental breach without being so widely drawn that it can be cut down on any ground by applying ordinary principles of construction. So, if there is to be a universal rule that, no matter how the exclusion clause is expressed, it will not apply to protect a party in fundamental breach, any such rule must be a substantive rule of law nullifying any agreement to the contrary and to that extent restricting the general principle of English law that parties are free to contract as they may see fit.

There is recent authority for the existence of such a rule of law but I cannot find support for it in the older authorities. Most of them arose out of deviation from the contractual voyage or similar breaches of contracts of carriage by land. Any deviation has always been regarded as a breach going to the root of the contract, and it was held in these earlier cases that, if the consignor's goods were lost after there had been a deviation, the shipowner could not rely on clauses excluding or limiting his liability. The reasons given for this varied but I do not think that it is useful now to examine them in detail because it was made clear in the speeches in this House in *Hain Steamship Co. Ltd. v. Tate & Lyle Ltd.*FN32 that there is no special rule applicable to deviation cases: the ordinary principles of the law of contract must be applied. The special feature of these cases is that the consignor's goods were lost before he knew of the deviation and therefore before he had any opportunity to elect whether or not to treat it as bringing the contract to an end. When he learns of the deviation and of the

32    41 Com.Cas. 350; 55 Ll.L.Rep. 159.

subsequent loss of his goods there is hardly room for any election, but the fact that he sues for their value could be treated as an election to terminate the contract by reason of and immediately after the deviation.

Among the reasons given in the earlier cases I do not find any reliance on any rule of law that a party guilty of a breach going to the root of the contract can never rely on clauses excluding his liability. And I do not think that the decision in *Tate & Lyle's case*FN32 assists us. There the owners of the goods had known of the deviation and had elected to waive it before the goods were lost. The breach was not a continuing breach and it did not cause the loss of the goods. In this case the breach, if it was a fundamental breach, was a continuing breach and it did cause the loss of which the appellants complain.

I think that *Smeaton Hanscomb v. Sassoon I. Setty, Son & Co. (No. 1)*FN33 can be regarded as the first of the series of recent cases dealing with fundamental breach. There the question was whether a claim by the buyer was barred by a clause in the contract "any claim must be made within 14 days from the final discharge of the goods." Devlin J. saidFN34:

"It is no doubt a principle of construction that exceptions are to be construed as not being applicable for the protection of those for whose benefit they are inserted if the beneficiary has committed a breach of a fundamental term of the

> contract; and that a clause requiring the claim to be brought within a specified period is to be regarded as an exception for this purpose... I do not think that what is a fundamental term has ever been closely defined. It must be something, I think, narrower than a condition of the contract, for it would be limiting the exceptions too much to say that they applied only to breaches of warranty. It is, I think, something which underlies the whole contract so that, if it is not complied with, the performance becomes something totally different from that which the contract contemplates."

It is true that Lord Devlin says that he is applying a principle of construction but I think' that he is really applying a substantive rule of law. He does not reach his conclusion by construing the clause in its context: there is no statement of any reason why the apparently general terms of this particular clause must be cut down or limited so as to make it only applicable to claims in respect of breaches which do not go to the root of the contract or which are not breaches of fundamental terms. And it does not appear to me

33    [1953] 1 W.L.R. 1468.

34    Ibid. 1470.

*[1967] 1 A.C. 361 Page 401*

to be obvious that some canon of construction would require a limitation of the apparently general terms of this clause.

The next case is *Karsales (Harrow) Ltd. v. Wallis.*FN35 There the contract provided that - "No condition or warranty that the vehicle is roadworthy," or "as to its age, condition or fitness for any purpose is given by the owner or implied herein." Lord Denning saidFN36:

> "Notwithstanding earlier cases which might suggest the contrary, it is now settled that exempting clauses of this kind, no matter how widely they are expressed, only avail the party when he is carrying out his contract in its essential respects. He is not allowed to use them as a cover for misconduct or indifference or to enable him to turn a blind eye to his obligations. They do not avail him when he is guilty of a breach which goes to the root of the contract."

And Parker L.J. saidFN37:

> "But, in my judgment, however extensive the exception clause may be, it has no application if there has been a breach of a fundamental term."

This is a clear statement of a rule of law. If it is right, it would be irrelevant that on its true construction an exempting clause must be held to be intended to apply to the breach in question, and that it is not so wide in its terms that as a matter of construction in, its context its applicability must be limited. It must mean that the law does not permit contracting out of common law liability for a fundamental breach. I think that I should go on to examine the rest of the series of recent cases, but, under the present practice of the Court of Appeal with regard to the binding character of any of its own decisions, it was hardly to be expected that this

statement of the law would not be followed. I should add that I cannot deduce from the authorities cited in *Karsales*FN38 that the proposition stated in the judgments could be regarded as in any way settled law.

In *Sze Hai Tong Bank Ltd. v. Rambler Cycle Co. Ltd.*FN39 I think that the ground of decision was that "The clause must therefore be limited and modified to the extent necessary to enable effect to be given to the main object and intent of the contract,"FN40

35    [1956] 1 W.L.R. 936.

36    Ibid. 940.

37    Ibid. 943.

38    [1956] 1 W.L.R. 936.

39    [1959] A.C. 576; [1959] 3 W.L.R. 214; [1959] 3 All E.R. 182, P.C.

40    [1959] A.C. 576, 587.

*[1967] 1 A.C. 361 Page  402*

applying *Glynn v. Margetson & Co.*FN41 But in delivering the judgment of the Board Lord Denning made some observations about deliberate breach. He saidFN42:

"And they deliberately disregarded one of the prime obligations of the contract. No court can allow so fundamental a breach to pass unnoticed under the cloak of a general exemption clause"

and laterFN43:

"The self-same distinction runs through all the cases where a fundamental breach has disentitled a party from relying on an exemption clause. In each of them there will be found a breach which evinces a deliberate disregard of his bounden obligations."

Then he cited *Bontex Knitting Works Ltd. v. St. John's Garage*FN44; *Alexander v. Railway Executive*FN45

and *Karsales (Harrow) Ltd. v. Wallis*FN46 and addedFN47:

> "In each of those cases it could reasonably be inferred that the servant or agent deliberately disregarded one of the prime obligations of the contract. He was entrusted by the principal with the performance of the contract on his behalf: and his action could properly be treated as the action of his principal. In each case it was held that the principal could not take advantage of the exemption clause. It might have been different if the servant or agent had been merely negligent or inadvertent."

In this connection I may refer to *The Cap Palos*FN48 where Atkin L.J. referred to the importance of a breach being deliberate.

*Yeoman Credit Ltd. v. Apps*FN49 was another case of hire-pur-chase of a car with an exemption clause similar to that in *Karsales.*FN50 Holroyd Pearce L.J.FN51 quoted the passages from the judgments in *Karsales*FN52 to which I have referred, and later on in his judgmentFN53 he referred to:

> "such a non-performance or repudiation or breach going to the root of the contract as disentitles the owners to take refuge behind an exception clause intended only to give protection to those breaches which are not inconsistent with and not destructive of the whole essence of the contract."

*Charterhouse Credit Ltd. v. Tolly*FN54 was a similar case but with

41    [1893] A.C. 351; 9 T.L.R. 437, H.L.

42    [1959] A.C. 576, 587, 588.

43    [1959] A.C. 576, 588.

44    (1943) 60 T.L.R. 44, 253, C.A.

45    [1951] 2 K.B. 882; [1951] 2 T.L.R. 69; [1951] 2 All E.R. 442.

46    [1956] 1 W.L.R. 936.

47    [1959] A.C. 576, 588, 589.

48    [1921] P. 458.

49    [1962] 2 Q.B. 508.

50    [1956] 1 W.L.R. 936.

51    [1962] 2 Q.B. 508, 517.

52    [1956] 1 W.L.R. 936.

53    [1962] 2 Q.B. 508, 520.

54    [1963] 2 Q.B. 683.

more complicated facts. It had been argued that the exemption clause was not sufficiently clear to be given effect. Donovan L.J. saidFN55:

> "I do not find it necessary to determine the true construction of this clause, for even if it bears the construction contended for by the finance company, I am of the opinion that it is of no avail to it in this case. As has been often said in recent years, a fundamental breach of contract, that is, one which goes to its very root, disentitles the party in breach from relying on the provisions of an exempting clause."

and he gives *Karsales*FN56 as his authority.

There was a finding that the hirer had elected to treat the contract as still on foot and it was argued that therefore he must be as much bound by the exemption clause as by any other clause. On this matter Donovan L.J. saidFN57:

> "The point is, apparently, free from direct authority, but, on principle, the election by the hirer of one remedy for the fundamental breach, instead of another remedy, ought, as I see it, to make no difference to the ineffectiveness of an exempting clause in face of such a breach. However this may be, two decisions of the House of Lords exist where one party to a contract elected to treat it as still subsisting despite a fundamental breach by the other, and succeeded in obtaining damages for such breach despite the existence in the contract of an exempting clause similar to clause 5 here. One is *Pollock & Co. v. Macrae*FN58 and the other *Wallis, Son & Wells v. Pratt & Haynes.*FN59 The contention I am now considering was not specifically raised in either case, but it is impossible to think that, if valid, it would have been overlooked not only by the parties sued, but by all the courts before which the two case came."

Upjohn L.J. said 60:

> "The authorities establish that where there is a breach of a fundamental term the person in breach cannot rely on clauses of exclusion to protect him as against the other party. But the company said with some force that that is so, no doubt, when the innocent party treats the contract as repudiated, but that if he elects to affirm the contract, then he must take the benefit of the contract subject to all its provisions, including a clause of exclusion, and he can no longer plead that the finance company, though in breach of a fundamental term, cannot rely on a clause of exclusion. That is not, I think, an easy question, and there appears to be no

55    [1963] 2 Q.B. 683, 703, 704.

56    [1956] 1 W.L.R. 936.

57    [1963] 2 Q.B. 683, 704.

58    1922 S.C.(H.L.) 192, H.L.

59    [1911] A.C. 394; 27 T.L.R. 431, H.L.

60    [1963] 2 Q.B. 683, 709, 710.

*[1967] 1 A.C. 361 Page  404*

> authority where the matter has been expressly decided. If I am right in the analysis of this fundamental term, that it really stems from the fact that the finance company must lend that which it contracts to lend and not something which is essentially different, it seems to me that the principle must apply whether it is a case of repudiation accepted by the hirer or whether he affirms the contract and sues for damages."

This was substantially repealed by him in *Astley Industrial Trust Ltd. v. Grimley.*FN61 My noble and learned friend gave the example of a contract for delivery of a tractor and delivery instead of Suffolk Punch horses. I would be inclined to think that that was not delivery under the contract at all, but that it was an offer of a new contract on terms to be implied.

I do not think that either of the two cases to which Lord Donovan referred is of assistance in this connection. In each it was held that on a true construction the exempting clause was not wide enough to apply to the breach. In *Pollock & Co. v. Macrae*FN62 Lord Dunedin said:

> "Such conditions to be effectual must be most clearly and unambiguously expressed, as is always necessary in cases where a well-known common law liability is sought to be avoided."

Then he referred to *London & North Western Railway Co. v. Neilson*FN63 and continuedFN64:

> "Reading the clauses in this light, I am of opinion that, although they excuse from damage flowing from the insufficiency of a part or parts of the machinery, they have no application to damage arising when there has been total breach of contract by failing to supply the article truly contracted for."

In *Wallis, Son & Wells v. Pratt & Haynes*FN65 an inferior variety of seed was delivered but the buyer did not discover this until it was too late to reject the goods: so he sued for damages. The contract included the clause "sellers give no warranty express or implied" but it was held that this was not wide enough in its terms to apply to breach of a condition. In neither case was there any question of cutting down or limiting the application of a clause apparently wide enough to apply to the breach. Both really turned on pure construction.

61    [1963] 1 W.L.R. 584, 598; [1963] 2 All E.R. 33, C.A.

62    1922 S.C.(H.L.) 192, 199.

63    [1922] 2 A.C. 263.

64    1922 S.C.(H.L.) 192, 199.

65    [1911] A.C. 394.

*[1967] 1 A.C. 361 Page 405*

In *U.G.S. Finance Ltd. v. National Mortgage Bank of Greece and National Bank of Greece, S.A.*FN66 the question related to a condition to the effect that interest coupons were forfeited if not presented within six years. Lord DenningFN67 repeated in substance what he had said in *Karsales*FN68 and addedFN69:

> "The doctrine does not depend on the customer electing to disaffirm the contract. Usually he has no option open to him. The contract has been broken irretrievably before he gets to know of it, and the only course for him is to sue for the breach. So the point does not very often arise. But even if he does get to know of it, in time to affirm or disaffirm, he can still treat the contract as in being, and sue for the breach (without being defeated by the exemption clause) provided always that the breach itself is continuing to operate and cause damage to him."

A different view was expressed by Pearson L.J.FN70:

> "As to the question of 'fundamental breach', I think there is a rule of construction that normally an exception or exclusion clause or similar provision in a contract should be construed as not applying to a situation created by a fundamental breach of the contract. This is not an independent rule of law imposed by the court on the parties willy-nilly in disregard of their contractual intention. On the contrary it is a rule of construction based on the presumed intention of the contracting parties. It involves the implication of a term to give to the contract that business efficacy which the parties as reasonable men must have intended it to have. This rule of construction is not new in principle but it has become prominent in recent years in consequence of the tendency to have standard forms of contract containing exceptions clauses drawn in extravagantly wide terms, which would produce absurd results if applied literally."

If this new rule of law is to be adopted, how far does it go? In its simplest form it would be that a party is not permitted to contract out of common law liability for a fundamental breach. If that were right then a demurrage clause could not stand as limiting liability for loss resulting from a fundamental breach: and the same would apply to any clause providing for liquidated damages. I do not suppose that anyone has intended that this rule should go quite so far as that. But I would find it difficult to say just where the line would have to be drawn.

In my view no such rule of law ought to be adopted. I do not

66   [1964] 1 Lloyd's Rep. 446.

67   Ibid. 450.

68   [1956] 1 W.L.R. 936.

69   [1964] 1 Lloyd's Rep. 446, 450.

70   Ibid. 453.

*[1967] 1 A.C. 361 Page  406*

take that view merely because any such rule is new or because it goes beyond what can be done by developing or adapting existing principles. Courts have often introduced new rules when, in their view, they were required by public policy. In former times when Parliament seldom amended the common law, that could hardly have been avoided. And there are recent examples although, for reasons which I gave in *Shaw v. Director of Public Prosecutions*,FN71 I think that this power ought now to be used sparingly. But my main reason is that this rule would not be a satisfactory solution of the problem which undoubtedly exists.

Exemption clauses differ greatly in many respects. Probably the most objectionable are found in the complex standard conditions which are now so common. In the ordinary way the customer has no time to read them, and if he did read them he would probably not understand them. And if he did understand and object to any of them, he would generally be told he could take it or leave it. And if he then went to another supplier the result would be the same. Freedom to contract must surely imply some choice or room for bargaining.

At the other extreme is the case where parties are bargaining on terms of equality and a stringent exemption clause is accepted for a quid pro quo or other good reason. But this rule appears to treat all cases alike. There is no indication in the recent cases that the courts are to consider whether the exemption is fair in all the circumstances or is harsh and unconscionable or whether it was freely agreed by the customer. And it does not seem to me to be satisfactory that the decision must always go one way if, e.g., defects in a car or other goods are just sufficient to make the breach of contract a fundamental breach, but must always go the other way if the defects fall just short of that. This is a complex problem which intimately affects millions of people and it appears to me that its solution should be left to Parliament. If your Lordships reject this new rule there will certainly be a need for urgent legislative action but that is not beyond reasonable expectation.

I have no doubt that exemption clauses should be construed strictly and I think that this case must be decided by considering whether there is any ground for adopting any but the natural meaning of the demurrage clause. Having provided for the calculation of the laydays and for extension of the laydays when delays

71    [1962] A.C. 220; [1961] 2 W.L.R. 897; [1961] 2 All E.R. 446, H.L.

*[1967] 1 A.C. 361 Page  407*

are caused by various events for which the charterer is not responsible, clause 3 of the charterparty continues:

> "If longer delayed charterer to pay $1,000 U.S. currency payable in the same manner as the freight per running day (or pro rata for part thereof) demurrage, if sooner dispatched vessel to pay charterer or his agents $500 U.S. currency per day (or pro rata for part thereof) dispatch money for lay time saved."

It is impossible to hold that these words are not wide enough to apply to the circumstances of the present case, whether or not there was fundamental breach. So the only question is whether there is any reason for limiting their scope. The authorities are against the appellants, but, even putting them aside, I can find no such reason. The appellants chose to agree to what they now say was an inadequate sum for demurrage, but that does not appear to me to affect the construction of this clause. Even if one assumes that the $1,000 per day was inadequate and was known to both parties to be inadequate when the contract was made, I do not think that it can be said that giving to the clause its natural meaning could lead to an absurdity or could defeat the main object of the contract or could for any other reason justify cutting down its scope. If there was a fundamental breach the appellants elected that the contract should continue and they did so in the knowledge that this clause would continue. On the whole matter I am of opinion that this appeal fails and that the questions should be answered as my noble and learned friend proposes.

LORD HODSON. My Lords, I agree with the judgments given already in the Court of Appeal and at first instance that this contract cannot be held to contain an implied obligation involving payment for the greatest number of voyages which could have been made if no delays had been experienced. Further, I do not find that the appellants can find support from the decision of the Court of Appeal in the case of *Aktieselskabet Reidar v. Arcos Ltd.*FN72 The trial judge, Greer J., and two of the Lords Justices, Atkin L.J. and Warrington, were agreed that damages were payable as for dead freight beyond the sum due for demurrage. There a chartered vessel had been sent to Archangel, a White Sea port, to load a cargo of timber. She went there in plenty of time within the laydays to load a full and complete cargo according to the summer marks and summer carrying capacity of the vessel. Delay took place in

72    [1927] 1 K.B. 352.

*[1967] 1 A.C. 361 Page 408*

loading and the number of laydays was exceeded in order to load the quantity which was loaded. She sailed with 306 standards short of the 850 standards of timber which she could have loaded because by the time the vessel sailed she could only load in order to comply with the law down to her winter marks. There was a breach separate from although arising from the same circumstances as the delay, and it was in these circumstances that damages were awarded.

The charterparty now under consideration provided for the carriage of coal from the United States (East Coast) to Europe and to return in ballast between each trip and remained in force "for a total of 2 years' consecutive voyages" (clause 23). Fixed periods of laytime were provided within which the respondents were obliged respectively to load and discharge the vessel on each voyage. During the relevant part of the two-year period the vessel performed eight voyages whereas the appellants contend that a further six voyages could have been performed if the loading and discharging had been completed within the laytime or a further nine voyages if the respondents had loaded and discharged the vessel with reasonable dispatch.

The detention beyond the agreed laytime is admittedly a breach of the charterparty, and the only question is whether in circumstances such as those which have arisen here the appellants are entitled to any further sum from the respondents over and above their demurrage for which the appellants give credit in their claim.

The matter for your Lordships to decide arises on a consultative case stated by arbitrators. The only relevant question is

"(A)    Whether upon the facts found and upon the true construction of the charterparty dated December 21, 1956, and the agreement dated October 8, 1957:

(i)    The claimants are entitled to recover (subject to giving credit for the demurrage payments received by them) any damages suffered by them by reason of the respondents having failed to load and discharge the vessel within the laydays whereby the charterparty was (if so proved) rendered less profitable to the claimants by consequent loss of voyages or voyage time.

(ii)    Upon the assumption that such loss of profitability resulted from the respondents having deliberately (i.e., with the

wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel: (a) with such ordinary dispatch as the circumstances permitted, or, (b) within the laydays, the claimants are entitled to recover any damages suffered by the claimants through the charterparty

*[1967] 1 A.C. 361 Page  409*

having been rendered less profitable as aforesaid subject to giving credit for the demurrage payments received by them and for any such despatch money as would have been earned by the respondents."

It is emphasised on behalf of the appellants that since their obligation throughout was to perform all parts of the agreed voyages "with all possible dispatch" subject only to the operation of expected perils, the respondents as charterers should likewise as a matter of construction of the clauses of the charterparty be held to be bound to load and discharge the vessel on a specific number of voyages only ascertainable and then with some difficulty at the end of the two-year period.

This argument was I think rightly rejected, but before your Lordships the argument was carried further in that it was said that although the demurrage rate here would be the measure of compensation in the ordinary case for delay of the vessel yet where the detention is so long as to frustrate the contract the words of the charterparty "if longer detained," whether or not the detention is deliberate, i.e., with the wilful intention of limiting the number of contractual voyages, no longer govern the measure of compensation payable to the owners. Detention cannot, it is said, cover delay by the charterers of such a kind as to amount to repudiatory breach of the contract. Often expressions have been used in various cases such as fundamental breach or breach going to the root of a contract to describe those situations which may be brought about through the fault of one party which have a frustrating effect and make the contract in its original form at any rate impossible of performance. Sometimes it is said that to hold the parties to the original contract after the breach would be to make a new contract for them not to insist on performance of the old. The argument is quite general in its scope and not confined to cases involving the carriage of goods by sea or by land. Before considering the argument further it is pertinent to remember that your Lordships are not concerned with a case where the appellants have accepted a repudiation of the contract or purported to do so and sailed away. The appellants continued to perform the contract and seek damages for delay over and above the demurrage rate. Thus, if they were to succeed in this appeal they would be faced with the difficulty of establishing when if at all the accumulated delay was such as would entitle them to sue for damages at large for the loss they have suffered.

As has been recognised at the Bar on both sides, the expression

*[1967] 1 A.C. 361 Page  410*

"fundamental breach" is of comparatively recent origin and has seemed to have attained some mystical meaning in the law of contract For my part, I doubt whether anything is to be gained by analysing the various expressions which have been used to describe breaches of contract so serious as to justify the injured party in throwing up the contract if he so chooses. Sometimes it has been declared that where a fundamental breach of contract had occurred an exceptions clause could not as a matter of law be relied upon, but the better view on the authorities, and that accepted by both sides before your Lordships, is that as a matter of construction normally an exception or exclusive clause or similar provision in a contract should be construed as not applying to a situation created by a fundamental breach of contract.

I have here quoted the language used by Pearson L.J. in *U.G.S. Finance v. National Mortgage Bank of Greece and National Bank of Greece, S.A.*FN73 which is contained in the passage cited by my noble and learned friend, Lord Reid - see also the judgment of Diplock L.J. in *Hardwick Game Farm v. Suffolk Agricultural Poultry Producers Association*FN74 in which judgment was delivered on December 20, 1965 - a recent example of the acceptance of the opinion of Pearson L.J.

So long as one remembers that one is construing a document and not applying some rule of law superimposed upon the law of contract so as to limit the freedom of the parties to enter into any agreement they like within the limits which the law prescribes one can apply one's mind to each contract as it comes up for consideration. I would adopt the language of Atkin L.J. in *The Cap Palos*,FN75

> "I am far from saying that a contractor may not make a valid contract that he is not to be liable for any failure to perform his contract, including even wilful default; but he must use very clear words to express that purpose..."

This passage has the support of Lord Parmoor in *Cunard Steamship Co. Ltd. v. Buerger*.FN76 I think it is unnecessary to refer in detail to those cases where the doctrine of fundamental breach has been stated as if it went further than a matter to be dealt with on construction. By way of example, in an unreported case, *Philip Boshali v. Allied Commercial Exporters Ltd.*,FN77 Privy Council Appeal, No. 51 of 1959, the Board stated unequivocally that a

73    [1964] 1 Lloyd's Rep. 446.

74    [1966] 1 W.L.R. 287; [1966] 1 All E.R. 309, C.A.

75    [1921] P. 458, 471, 472.

76    [1927] A.C. 1, 13.

77    Unreported, 1961, November 14.

*[1967] 1 A.C. 361 Page 411*

breach which goes to the root of a contract disentitles a party from relying on an exemption clause *(Karsales (Harrow) Ltd. v. Wallis*,FN78 *per* Denning L.J.). It is to be noticed, however, that Lord Denning himself delivering a judgment of the Board in the year 1959 in *Sze Hai Tong Bank Ltd. v. Rambler Cycle Co. Ltd.*FN79 treated the same matter as one of construction. As in this case counsel there conceded that finally the question was one of construction, and in the judgment of the Board this phrase appearsFN80: "... as a matter of construction, their Lordships decline to attribute to it [viz., the clause] the unreasonable effect contended for."

Thus, even if the accumulated delays of the chartered ship were such as to justify the finding that the respondents are guilty of a fundamental breach of contract, nevertheless it would not follow as a matter of law that the demurrage clause entitling the amount of compensation for detention would not apply.

Even if one were to describe the demurrage clause as an exemption or exclusive clause, which I do not think it is, this result would not follow, for the contract must still be construed. Moreover, if one drives the argument that "fundamental breach" of contract introduces a rule of law that exemption clauses cannot be relied on far enough it would no doubt be sufficient to destroy the effect of a clause by which "demurrage" (that is agreed damages for detention) should be calculated. No case has ever gone so far.

It is convenient to remember that a great number of marine cases have been heard over the years in which "deviation" has been in question, and deviation has always been regarded as a serious matter. As Lord Atkin said in *Hain Steamship Co. Ltd. v. Tate & Lyle Ltd.*FN81:

> "I venture to think that the true view is that the departure from the voyage contracted to be made is a breach by the shipowner of his contract, a breach of such a serious character that, however slight the deviation, the other party to the contract is entitled to treat it as going to the root of the contract, and to declare himself as no longer bound by any of the contract terms."

Later he saidFN81:

> "No doubt the extreme gravity attached to a deviation in contracts of carriage is justified by the fact that the insured cargo owner when the ship has deviated has become uninsured."

78    [1956] 1 W.L.R. 936, 940.

79    [1959] A.C. 576.

80    Ibid. 587.

81    41 Com.Cas. 350, 354.

*[1967] 1 A.C. 361 Page  412*

Deviation cases are convenient examples for consideration because they involve breaches of a fundamental term of the contract and there is usually no difficulty in ascertaining whether that term has been breached. If it has been the breach will be fundamental. The case is more difficult as a rule where, as here, the term involved can hardly be described as fundamental yet breaches of it may be said in the aggregate to be fundamental. I doubt whether it is helpful to analyse or to sub-divide the cases which are concerned with these serious breaches or to try to give special names to individual clauses of such cases. The leading case of *Glynn v. Margetson & Co.*FN82 is a striking example of a breach of a deviation clause in a contract which has been described as an application of the "main purpose" rule. This was a case of deviation where the

main purpose of the contract was the delivery of oranges from Malaga to Liverpool. The ship made in the opposite direction videlicet to Burriana, going further away from Liverpool than she was at Malaga and the oranges were damaged owing to the delay on the voyage. The shipowner relied on a clause which gave him liberty to proceed to and stay at any port or ports within wide limits staying there as long as he liked for any purpose. Both Lord Herschell L.C. and Lord Halsbury, with whom the other members of the House agreed, treated the matter as one of construction of the contract and on that basis limited the liberty to ports in the course of the voyage.

Other expressions have been used, e.g., "the four corners rule." Thus, under a contract of carriage or bailment if the carrier or bailee uses a place other than that agreed on for storing the goods, or otherwise exposes the goods to risks quite different from those contemplated by the contract, he cannot rely on clauses in the contract designed to protect him against liability within the four corners of the contract, and has only such protection as is afforded by the common law. *Lilley v. Doubleday* FN83 and *Gibaud v. Great Eastern Railway Co.* FN84 are examples of such cases all of which depend on the construction of the contract.

Sometimes a position of absurdity is reached by the tacking on to formal words in a printed contract designed for a variety of purposes a specific bargain which cannot be performed if the printed words are to apply. Such a case was *Glynn v. Margetson & Co.* FN85 Lord Herschell L.C. said FN86:

82    [1893] A.C. 351.

83    7 Q.B.D. 510.

84    [1921] 2 K.B. 426; 37 T.L.R. 422, C.A.

85    [1893] A.C. 351.

86    Ibid. 355.

*[1967] 1 A.C. 361 Page  413*

"Where general words are used in a printed form which are obviously intended to apply, so far as they are applicable, to the circumstances of a particular contract, which particular contract is to be embodied in or introduced into that printed form, I think you are justified in looking at the main object and intent of the contract and in limiting the general words used, having in view that object and intent."

Treating the matter as one of construction the case is not affected by the affirmation of the contract. In this

case the appellants, the owners of the ship, did not sail away; they continued to perform the contract to the bitter end and accordingly are bound by such of the terms of the contract as are applicable notwithstanding the breach of contract by the respondents, the charterers. I see no reason why the agreement as to the demurrage rate should not apply so long as the contract is being performed, whether the breach is treated as fundamental or not.

I think the decision of this House in *Pollock & Co. v. Macrae*FN87 is of some assistance. There a contract for the building and installation of a set of motor marine engines which bound the builders to replace any parts faulty through bad material or workmanship contained a clause providing that all goods were supplied on the condition that the builders should not be liable for direct or consequential damages arising from the defective material or workmanship. It was held that this clause, while it protects the builders where a part or parts of the engines were defective, was of no avail where there had been a complete breach of contract owing to a series of defects in the engines which rendered them practically unserviceable. The buyer then had ineffectively elected to reject the goods and treat the contract as repudiated but was allowed to fall back on his alternative remedy for damages. Lord Dunedin saidFN88:

> "Now, when there is such a congeries of defects as to des troy the workable character of the machine, I think this amounts to a total breach of contract, and that each defect cannot be taken by itself separately so as to apply the provisions of the conditions of guarantee and make it impossible to claim damages."

The case turned on pure construction but it was decided on the basis that the whole of the contract had to be construed. I think the same applies to the case of *Wallis, Son & Wells v. Pratt &*

87    1922 S.C. (H.L.) 192.


88    Ibid. 200.


*[1967] 1 A.C. 361 Page 414*

*Haynes,*FN89 another case of breach of contract of a repudiatory quality followed by affirmation.

On the construction of this contract I am of opinion that the parties have agreed to limit the damages payable for detention at the agreed demurrage rate and that there is no reason for not so limiting them whether or not there was an intention on the part of the respondents wilfully to limit the number of voyages. As has been stated in Scrutton on Charterparties and as Mocatta J. pointed out: demurrage in its strict meaning is a sum agreed by the charterer to be paid as liquidated damages for delay beyond a stipulated or reasonable time for loading or unloading. As a rule some deliberate or negligent conduct on the part of the charterer is involved for he is protected by a number of exceptions against any risks outside his control. No English authority was cited which assists the appellants. The researches of counsel only discovered one case which raises the point of deliberate delay consisting of detention so long as it suits the charterers' convenience. This was *Ethel Radcliffe Steamship Co. Ltd. v. W. & R. Barnett Ltd.*FN90 Damages at large at common law were awarded by an arbitrator but the award was varied by Rowlatt J., and the Court of Appeal rejected the submission which had at first succeeded.

There the clause to be construed was as follows "orders as to port of discharge are to be given to the master within 24 hours after receipt by consignees of master's telegraphic report to consignees ... of his arrival at the port of call; and for any detention waiting for orders, after the aforesaid 24 hours, the charterers or their agents shall pay to the steamer 30*s*. sterling per hour**....**"

The court treated the 24 hours as equivalent to laydays and the 30*s*. per hour as demurrage and applied to the situation the passage at p. 348 of the 12th edition of Scrutton on Charterparties, article 128:

"Stipulations for demurrage may be

(1)    *Exhaustive*: as '10 days for loading and demurrage at £20 per diem afterwards,' which covers all delay. On such a provision the shipowner cannot say that the provision for £20 a day demurrage only applies to a reasonable time, after the lapse of which he can claim damages for detention. After the lapse of a reasonable time he may take his ship away, but if he allows her to stay on he can only claim the agreed rate of demurrage."

89    [1911] A.C. 394.

90    (1926) 31 Com.Cas 222; 42 T.L.R. 385; 24 Ll.L.Rep. 277, C.A.

*[1967] 1 A.C. 361 Page  415*

In the current (17th) edition of this work, p. 306, the last sentence has been rewritten so as to read: "If the contract be not repudiated or frustrated, he can only claim the agreed rate of demurrage." Thus, the question of a frustrating delay is left open but the general proposition stated in the paragraph is supported by *Inverkip Steamship Co. Ltd. v. Bunge & Co.*,FN91 as Atkin L.J. pointed out.FN92

An American case which was relied upon by the appellants should be noticed as the language of the judgment lends some support to their submission. This was *Empresa Maritime de Transportes S.A. Plaintiff v. A. T. Massey Coal Company et al. Defendants*FN93 tried in the United States District Court, Eastern District of Virginia, Norfolk Division, in 1963. In that case damages were claimed for wrongful detention of the m.v. *Blue Star* within the laydays, the allegation being that the defendant coal supplier conspired with the charterer of the vessel intentionally to delay the *Blue Star* at loading by arranging that the coal would not be loaded on the vessel until laytime was about to expire so as to diminish the number of consecutive voyages the vessel could perform under a two-year consecutive voyage time charter agreement. The charter was also written on an Americanised Welsh Coal Charter form.

The claim succeeded on the construction of the charterparty but the facts were special and in any case, as the editors of the report point out in a note, there is authority in the courts of this country for the proposition that when a charterparty prescribes a fixed time to load there is no basis for implying an obligation on the

part of the voyage charterer to load within a lesser time. See *Margaronis Navigation Agency Ltd. v. Henry W. Peabody & Co. of London Ltd.*FN94

For myself, I see no reason to hold that attributing to the respondents a wilful intention of limiting the number of contractual voyages affects the sums otherwise payable by way of demurrage so as to open the way to a claim for damages at large. I would accordingly agree with the learned judge that the question A in the consultative case be answered in the negative and dismiss the appeal.

91    [1917] 2 K.B. 193, C.A.

92    31 Com.Cas. 222, 236, 237.

93    1965 A.M.C. 517 (U.S.A.).

94    [1965] 1 Q.B. 300; [1964] 3 W.L.R. 111; [1964] 2 All E.R. 296; [1964] 1 Lloyd's Rep. 173; [1965] 2 Q.B. 430; [1964] 3 W.L.R. 873; [1964] 3 All E.R. 333; [1964] 2 Lloyd's Rep. 153, C.A.

*[1967] 1 A.C. 361 Page 416*

LORD UPJOHN. My Lords, in this appeal your Lordships are concerned with the rights and obligations of the contracting parties to a consecutive voyage charterparty dated December 21, 1956, made between the appellants, owners of the ship, and the respondents, the charterers. It provided for the carriage of coal for two years' consecutive voyages terminating in March, 1959, between Hampton Roads, Baltimore or Philadelphia on one side of the Atlantic and one safe port, Belgium, Holland or Germany on the other side, returning in ballast to the U.S.A. for a further cargo. Clause 3 of the charterparty provided for loading at an agreed rate with a widely drawn provision excluding from loading time (or laydays as they are usually called) time lost from a variety of events and causes immaterial to the matters in issue before your Lordships. The clause provided "If longer detained charterer to pay $1,000 U.S. currency per running day (or pro rata for part thereof) demurrage." There was a similar provision for demurrage if the time for the agreed rate of discharge was exceeded.

Whether because of the fall in freight rates after the re-opening of the Suez Canal in April of 1957 or for some other reason the ship greatly exceeded the permitted lay time in port and your Lordships were told that at one time the owners sailed the ship away treating the contract as repudiated by the charterers and accepting that repudiation. This led to an arbitration between the parties, not yet determined, and without prejudice to that arbitration the parties on October 8, 1957, agreed to perform the charterparty for the remainder of the stipulated term. Thereafter, save for the first voyage, the ship always greatly exceeded the laydays in port, both loading and unloading, and in fact during the term of the charterparty the ship performed only eight voyages. The charterers do not dispute their liability to pay demurrage for these lost days which amounts to the substantial sum of approximately $150,000. The owners, however, allege that but for the

days lost in port the ship could have performed some six to nine additional profitable voyages during that time and upon that footing they claim large additional damages for loss of profit which the ship could have earned by reason of these additional voyages.

This dispute was referred to arbitration and has reached this House upon a consultative case by the arbitrators.

When the matter first came before your Lordships it was opened, as in the courts below, upon the footing that though the delays (beyond the laydays) in port were considerable, such delays

*[1967] 1 A.C. 361 Page  417*

did not amount to repudiatory conduct on the part of the charterers.

It is not in doubt that every time the charterers exceeded the laydays in port they committed a breach of contract; a breach, however, for which the parties have agreed damages at the rate of $1,000 a day. But the owners argue that as this is not a single voyage charter but one contract for the performance of a number of consecutive voyages, damages are not to be determined solely by the length of detention of the ship in excess of the laydays in port as it was admitted they would have been in a single voyage charter, but that there was a further obligation upon the charterers to load and discharge within the lay time provided by the charterparty so that the ship might perform such a number of consecutive voyages each of a duration not exceeding the sea passage plus the permitted lay times in port, as proved to be capable of performance within the term of the charter. In other words, in a consecutive voyage charter there is a larger obligation upon the charterers to load and discharge the cargo within the laydays so that the owners may benefit from the profitable employment of their ship contemplated by the charterparty for the period of the charter. This obligation was said to arise either as a matter of construction of the charterparty regarded as a whole or from an implied term that the charterers would co-operate or concur in doing all things necessary to enable the owners to perform the maximum possible number of voyages and to earn the maximum possible amount of freight, which could in the ordinary course of events be performed or earned during the term of the charter.

My Lords, the charterparty in my opinion does not bear this construction. It is clear that the charterers have broken no express clause of the charterparty except the provision for detention in the ports of loading or discharge in excess of the laydays. The voyages have been in fact consecutive and I, for my part, can find nothing in the contract which imposes upon the charterers as a matter of construction or as a matter of necessary implication an obligation to undertake any additional requirement of loading within the laydays for breach of which they will be liable in damages beyond the rate of demurrage specified in the contract for exceeding those days. As both Mocatta J. and the Court of Appeal held, there was only one breach by the charterers, namely, a breach of the obligation to load and discharge at an agreed rate and the detention of the ship in a port beyond that date was a breach of contract for

*[1967] 1 A.C. 361 Page  418*

which the parties had agreed damages. The owners, however, placed much reliance upon the case of *Aktieselskabet Reidar v. Arcos Ltd.*FN95 but with all respect to the argument that was a very different case. In the view of Greer J. at first instance and the majority of the Court of Appeal there were in that case breaches of two quite independent obligations; one was demurrage for detention (as here) the other was a failure to load a full and complete cargo, which had become impossible owing to the onset of winter conditions and, therefore, entirely different considerations applied to that case. It is true that Bankes L.J. reached the same result by a different route on the particular facts of that case, but as Mocatta J. and the Court of Appeal, with whose judgments I am in full agreement, pointed out his ratio decidendi does not assist the owners in this quite different case. Accordingly, in my opinion, that case does not help your Lordships.

My Lords, I have dwelt upon this case at a little length because in the end I believe that the considerations which I have already mentioned are very material in deciding this appeal.

At the conclusion of his main argument counsel for the owners endeavoured to take a new point not raised in the courts below, namely, that the charterers had committed a fundamental breach of the contract which amounted to a repudiation and upon that footing it was urged that the owners were entitled to general damages for lack of profitability and were not confined to demurrage.

Your Lordships, in the special circumstances of this case, permitted the appeal to be re-argued de novo after supplemental cases had been lodged by each side. The owners' basic argument on this new case is that after the first voyage there were such delays beyond the laydays each time that the ship entered port for loading or discharge that the delays, each admittedly a breach of the charterparty, amounted cumulatively to a repudiation of the contract which entitled the respondents at their option to accept and to treat the contract as at an end and sail away. This appeal comes before your Lordships on a consultative case by the arbitrators and the relevant facts have not yet been found on this point so for the purposes of this point it is necessary to make the double assumption in favour of the owners, first, that it is open to the arbitrators on the facts to find that there has been a breach of contract by the charterers which goes to its root and entitled the owners to treat the contract as at an end and, secondly, that in fact

95    [1927] 1 K.B. 352.

they will so find. It was submitted by the charterers that upon the facts of this case, as a matter of law it was not open to the arbitrators to find in favour of the owners for it was said that out of 511 days which was the term of the charter after the agreement of October, 1957, only 154 days were demurrage days. I cannot agree with this submission. It is a proper matter of fact for the arbitrators to consider. Accordingly, for the purpose solely of dealing with the argument I am prepared to make the assumptions desired by the owners.

But what seems to me quite clear, making these assumptions, is that there has been no acceptance by the owners of the repudiation which brought the contract to an end. On the contrary, it seems to me clear that by their conduct the owners expressly affirmed the contract. The relevant facts were known at all material times to them for they must have been made currently aware of the excessive delays in port; they had already sailed away once - I say nothing about that for it is still sub judice - but it was for the owners, knowing of the delays, to make up their minds whether to sail away again. They did not do so and with full knowledge of all the facts elected to treat the contract as on foot until the expiry of the charterparty by effluxion of time. It is this feature which gives rise to the whole difficulty in this interesting case. For it is common ground that had the owners accepted the assumed repudiation and sailed away, thereby terminating the contract, none of its terms survived, and damages for breach of contract would have been at large including damages for loss of profitable employment of the ship for the term of the charterparty.

In general it cannot be disputed that where a party having an option to treat a contract at an end nevertheless affirms it, that contract and all its terms must remain in full force and effect for the benefit of both parties during the remainder of the period of performance, for it is not possible even for the innocent party to make a new contract between the parties without the concurrence of the other. As Lord Atkin in *Hain Steamship Co. Ltd. v. Tate and Lyle Ltd.*FN96 said:

"he can elect to treat the contract as subsisting; and if he does this with knowledge of his rights he must in accordance
with the general law of contract be held bound."

and as Lord Wright said even more clearlyFN97:

In the present case the charterers elected to waive the breach,

96    41 Com.Cas. 350, 355.

97    Ibid. 363.

*[1967] 1 A.C. 361 Page 420*

with the result that the charterparty was not abrogated, but remained in force. The appellants were thus
entitled to the benefit of the contract conditions, and in particular to rely on the exception of perils of the
sea..."

and see *Chandris v. Isbrandtsen-Moller Co. Inc.*,FN98 *per* Devlin J. That is this case. Now it is, in my
opinion, quite clear that as a matter of construction of the charterparty the demurrage clause both as to
loading and discharging is expressed without limitation of time and therefore applies throughout the term of
the contract. If authority be wanted for this self-evident proposition it is to be found in *Western Steamship Co.
v. Amaral Sutherland & Co.*,FN99 *Inverkip Steamship Co. Ltd. v. Bunge & Co.*,100 *Ethel Radcliffe Steamship
Co. Ltd. v. W. & R. Barnett Ltd.*101 Therefore, to succeed in this appeal the owner must displace the
demurrage clause. He seeks to do so in reliance on the well-known doctrine that in certain circumstances a
party to a contract cannot rely on an exception or limitation clause inserted solely for his benefit. But before
examining this doctrine the first question which logically must be asked is, surely, whether this demurrage
clause is a clause of exception or limitation. Whatever the ultimate ambit of the doctrine may be found to be it
is, in my opinion, confined to clauses which are truly clauses of exception or limitation, that is to say clauses
essentially inserted for the purpose only of protecting one contracting party from the legal consequences of
other express terms of the contract or from terms which would otherwise be implied by law or from the terms
of the contract regarded as a whole; just as a party may waive a clause which is inserted for solely his own
benefit (see *Hawksley v. Outram*102) So per contra there are occasions when a party cannot be permitted to
rely on such a clause. But if the clause is inserted for the benefit of both I know of no authority - and none
has been cited - which entitles one party unilaterally to disregard its provisions. In my opinion, the demurrage
clause with which we are concerned is a clause providing for agreed damages and is different from a clause
excluding or limiting liability for damage by breach of contract by one party. An agreed damage clause is for
the benefit of both; the party establishing breach by the other need prove no damage in fact, the other must
pay that, no less but no more. But where liability for damage is limited by a clause then the person seeking

98    [1951] 1 K.B. 240, 248.

99    [1913] 3 K.B. 366; 29 T.L.R. 660.

100    [1917] 2 K.B. 193.

101    31 Com.Cas. 222

102    [1892] 3 Ch. 359, C.A.

to claim damages must prove them at least up to the limit laid down by the clause; the other party, whatever may be the damage in fact, can refuse to pay more if he can rely on the clause. As Greer J. said in relation to a demurrage clause in *Aktieselskabet Reidar v. Arcos Ltd.*103: "this clause was put in for my benefit as well as yours; it measures the damages I have to pay. ..." Counsel for the owners sought to say that the agreed damages of $1,000 a day were much too low to be an estimate of damage and that it might be open to the arbitrators to hold that in truth this was in the nature of a penalty clause or a limitation clause limiting liability. I do not think it is open now to the owners to make this submission. It is quite clear on the authorities that the parties need not agree on a true estimate of damage. They are perfectly entitled to agree on a low rate. See *Cellulose Acetate Silk Co. Ltd. v. Widnes Foundry (1925) Ltd.*104 and the *Chandris case.*105

Accordingly, in my opinion the demurrage clause is a clause which, the contract being affirmed, remains an agreed damages clause for the benefit of both parties and it is not a clause of exception or limitation inserted for the benefit of one party only to which the doctrine under consideration can properly be applied. That is sufficient to dispose of this appeal.

But in view of the arguments that have been addressed to your Lordships I think it is right that I should express my views thereon upon the footing that the demurrage clause in this case is indeed a clause of exception or limitation of liability inserted solely for the benefit of the charterer, and that it is therefore a clause to which in certain circumstances the doctrine relied upon by the appellants applies. That the doctrine exists is not in doubt, but it is necessary to examine the authorities to understand the principle upon which it is based.

There was much discussion during the argument upon the phrases "fundamental breach" and "breach of a fundamental term" and I think it is true that in some of the cases these terms have been used interchangeably; but in fact they are quite different. I believe that all of your Lordships are agreed and, indeed, it has not seriously been disputed before us that there is no magic in the words "fundamental breach", this expression is no more than a convenient shorthand expression for saying that a particular breach or breaches of contract by one party is or are such as

103    [1926] 2 K.B. 83, 86.

104    [1933] A.C. 20.

105    [1951] 1 K.B. 240, 249.

*[1967] 1 A.C. 361 Page  422*

to go to the root of the contract which entitles the other party to treat such breach or breaches as a repudiation of the whole contract. Whether such breach or breaches do constitute a fundamental breach depends on the construction of the contract and on all the facts and circumstances of the case. The innocent party may accept that breach or those breaches as a repudiation and treat the whole contract at an end and sue for damages generally or he may at his option prefer to affirm the contract and treat it as continuing on foot in which case he can sue only for damages for breach or breaches of the particular stipulation or stipulations in the contract which has or have been broken.

But the expression "fundamental term" has a different meaning. A fundamental term of a contract is a stipulation which the parties have agreed either expressly or by necessary implication or which the general law regards as a condition which goes to the root of the contract so that *any* breach of that term may at once and without further reference to the facts and circumstances be regarded by the innocent party as a fundamental breach and thus is conferred on him the alternative remedies at his option that I have just mentioned. I discussed this matter in the Court of Appeal in *Hongkong Fir Shipping Co. Ltd. v. Kawasaki Kisen Kaisha Ltd.*106

With these preliminary observations I must now examine some of the cases that were cited to your Lordships as examples of the principle that in some circumstances a party to the contract cannot rely on clauses inserted for his benefit. The earlier cases were nearly all cases of carriage of goods by sea or by land or concerned with the warehousing of goods. The principles on which these cases, mainly in the last century, were decided were not expressed by the judges to be related to repudiatory conduct on the part of one party thereto nor to any principle of frustration, for these conceptions were not so fully developed as they are now. Thus, in cases of carriage of goods by sea, an unreasonable deviation from the usual and customary course is and has always been considered as precluding the shipowner from relying on any clauses inserted for his protection - see for example *Davis v. Garrett*107 and *Scaramanga v. Stamp.*108 So strict is this rule that although the deviation has not been the cause of any loss to the plaintiff's

106    [1962] 2 Q.B. 26, 63; [1962] 2 W.L.R. 474; [1962] 1 All E.R. 478, C.A.

107    (1830) 6 Bing. 716.

108    (1880) 5 C.P.D. 295, C.A.

*[1967] 1 A.C. 361 Page 423*

goods and was, so to speak, a mere incident in the voyage, nevertheless having taken place the owner is no longer entitled to rely on clauses of exception contained in the relevant contract, unless it can be shown that the loss would have happened in any event (see *United States Shipping Board v. Bunge y Born*109; *Morrison (James) & Co. v. Shaw, Savill, and Albion Co. Ltd.*110). It was not, however, until this century that deviation was finally established as a fundamental breach. This was first suggested, rather tentatively, by Lord Esher M.R. in *Balian & Sons v. Joly, Victoria & Co. Ltd.*111 but was accepted as the basis of his decision by the Court of Appeal in *Joseph Thorley Ltd. v. Orchis Steamship Co. Ltd.*112 Collins M.R. pointed out that the deviation goes to the root of the contract and its performance is a condition precedent to the right of a shipowner to put the bill of lading in suit.

Finally, this House in *Hain Steamship Co. Ltd. v. Tate & Lyle Ltd.*113 established the proposition in relation to carriage of goods by sea in the words of Lord Atkin114 (with which the other Lords agreed):

> "I venture to think that the true view is that the departure from the voyage contracted to be made is a breach by the shipowner of his contract, a breach of such a serious character that, however slight the deviation, the other party to the contract is entitled to treat it as going to the root of the contract, and to declare himself as no longer bound by any of the contract terms."

So the law is now quite clearly established that unless the parties otherwise agree the usual and customary course on any voyage described in a charterparty is a fundamental term and therefore *any* breach of it (however for practical purposes irrelevant) is a fundamental breach. See this stated explicitly by Lord Wright in the *Tate & Lyle case.*115 Moreover, Lord Atkin made it clear that the rule that the owner cannot rely on an exception clause in such a case is not because of anything special about such a clause but it is the result of the application of the ordinary law of contract. He said116:

> "If this view is correct, then the breach by deviation does not automatically cancel the express contract, otherwise the shipowner by his own wrong can get rid of his own contract.

109    (1925) 31 Com.Cas. 118; 42 T.L.R. 174; 23 Ll.L.Rep. 257, H.L.

110    [1916] 2 K.B. 783; 32 T.L.R. 712, C.A.

111    (1890) 6 T.L.R. 345, C.A.

112    [1907] 1 K.B. 660; 23 T.L.R. 338, C.A.


113    41 Com.Cas. 350.


114    Ibid 354.


115    Ibid. 362, 363.


116    Ibid. 355.


*[1967] 1 A.C. 361 Page 424*

Nor does it affect merely the exceptions clauses. This would make those clauses alone subject to a condition of no deviation, a construction for which I can find no justification. It is quite inconsistent with the cases which have treated deviation as precluding enforcement of demurrage provisions. The event falls within the ordinary law of contract. The party who is affected by the breach has the right to say, 'I am not now bound by the contract whether it is expressed in charterparty, bill of lading, or otherwise.'"

Lord Atkin then went on to point out that equally the innocent party electing to treat the contract as at an end is not bound by his promise to pay the agreed freight any more than by his other promises.

The warehouse cases and cases of carriage by land have developed on parallel lines. The principle on which these cases proceeded originally is well stated by Scrutton L.J. in *Gibaud v. Great Eastern Railway Co.*117 where he said:

> "The principle is well known, and perhaps *Lilley v. Doubleday*118 is the best illustration, that if you undertake to do a thing in a certain way, or to keep a thing in a certain place, with certain conditions protecting it, and have broken the contract by not doing the thing contracted for in the way contracted for, or not keeping the article in the place in which you have contracted to keep it, you cannot rely on the conditions which were only intended to protect you if you carried out the contract in the way in which you had contracted to do it."

These observations have subsequently been approved in your Lordships' House in *London & North Western Railway Co. v. Neilson.*119 Thus, to give one or two examples from the cases to illustrate the general proposition, in *Lilley v. Doubleday*120 itself the warehouseman contracted to store his goods at A but in fact he stored them at B. It was held that he could not rely on a clause of exception excusing him from loss without negligence though he could have relied on the clause if they had been warehoused at A. Again, in *Mallett v. Great Eastern Railway Co.*,121 a consignment of fish contracted to be sent to Jersey by the Weymouth route was sent by the consignor by mistake via the Southampton route and although the steamers were due to arrive at Jersey at about the same time the Southampton steamer, being on a longer sea route, was delayed by bad weather and it was held that the consignor

117    [1921] 2 K.B. 426, 435.

118    7 Q.B.D. 510.

119    [1922] 2 A.C. 263.

120    7 Q.B.D. 510.

121    [1899] 1 Q.B. 309.

*[1967] 1 A.C. 361 Page  425*

could not rely on a clause of exception for he had done something wholly at variance with the contract. So, too, in *Gunyon v. South Eastern and Chatham Railway Companies' Managing Committee,*122 the goods were by mistake transferred from a passenger train by which means the consignor had contracted to send them on to a goods train, and it was held that the consignor could not rely on a clause of exception against liability for loss.

Just as in the case of deviation in sea voyages, it is a fundamental term of the relevant contract that ships shall proceed by the ordinary and customary route and that any deviation changes the adventure and is at once a fundamental breach, regardless of the consequences so in the other cases to which Scrutton L.J. referred in *Gibaud's case*123 the true ratio decidendi in my view is that the law treats the stipulation that the goods shall be housed in a particular place or that they shall be consigned by a particular route or on a particular type of train as a fundamental term, breach of which at once entitles the other side to accept, if he so desires, as a fundamental breach. In forming this view I am fortified by the observations of Lord Dunedin in *London & North Western Railway Co. v. Neilson*124 where he treats these observations of Scrutton L.J. as being illustrative of or comparable to a deviation in a shipping contract. I can see no justification for applying some special rule to those classes of case any more than in the deviation cases. Both are governed by and *only* by the general law relating to contracts.

If I am right in drawing this conclusion then the necessary result, in my opinion, is that the principle upon which one party to a contract cannot rely on the clauses of exception or limitation of liability inserted for his sole protection, is not because they are regarded as subject to any special rule of law applicable to such clauses as being in general opposed to the policy of the law or for some other reason but, just as in the deviation cases, it is the consequence of the application of the ordinary rules applicable to all contracts, that if there is a fundamental breach accepted by the innocent party the contract is at an end, the guilty party cannot rely on any special terms in the contract. If not so accepted the clauses of exception or limitation remain in force like all the other clauses of the contract.

Thus, for my part if in *Karsales (Harrow) Ltd. v. Wallis*125

122    [1915] 2 K.B. 370

123    [1921] 2 K.B. 426, 435.

124    [1922] 2 A.C. 263, 272.

125    [1956] 1 W.L.R. 936.

*[1967] 1 A.C. 361 Page  426*

Denning L.J.126 or Parker L.J.,127 in passages which have already been quoted in the speech of Lord
Reid128 and which, therefore, I shall not repeat, were intending to lay down some special rule of law
applicable to exclusion or limitation clauses, I find myself unable to agree. I prefer the view of Pearson L.J. in
*U.G.S. Finance Ltd. v. National Mortgage Bank of Greece and National Bank of Greece, S.A.*129 that the
matter is one of the true construction of the contract. But before considering this question of construction one
matter remains to be stated. In very many of the cases which were cited to your Lordships there was no
question of any election by the innocent party either to affirm or disaffirm the contract when the other party
had committed a fundamental breach. This is because in so many cases, as Lord Denning pointed out in the
*U.G.S. case,*130 the voyage or journey or warehousing contract has been completed before the innocent
party gets to know of any breaches of it, and the only course open to him is to sue for breach, and he does
so upon the footing that he is entitled to treat the whole contract as at an end, for the law is clear that where
there has been a fundamental breach he can only be taken to affirm the contract if he knows his full rights.
Thus, in the *Bunge y Born case*131 the whole argument in your Lordships' House turned upon the question
whether there had been a deviation or not, and it was assumed that if deviation was proved the charterer
could thereupon at the conclusion of the voyage sue as for a fundamental breach.

Therefore, my Lords, as in my opinion the owners have expressly affirmed the contract they cannot escape
from the consequences of the demurrage clause, unless as a matter of construction of that clause they can
show that it has no application to the events of this case, this they cannot do for the reasons I have already
given. Accordingly, upon the footing that the demurrage clause is a clause of exclusion or limitation, this
does not avail the owners in this case.

But, my Lords, again having regard to the arguments addressed to your Lordships, I think I ought to make
one or two observations upon the question of construction of exclusion or limitation clauses.

It cannot be doubted that even while the contract continues in force (that is there has been no fundamental
breach but only some lesser breach) exclusion clauses are strictly construed. Why this

126    [1956] 1 W.L.R. 936, 940.

127    Ibid. 943.

128    Ante, p. 401B-C.

129    [1964] 1 Lloyd's Rep. 446, 453.

130    Ibid. 450.

131    31 Com.Cas. 118.

*[1967] 1 A.C. 361 Page  427*

should be so is largely a matter of history and I think probably stems from the fact that in so many cases exceptions clauses are to be found in rather small print sometimes on the back of the main terms of the contract and that the doctrine of "contra proferentes" has been applied. But whatever the reason, that they are strictly construed against the contracting party seeking protection even during the currency of the contract cannot be doubted.

I refer only to two examples: the first is to be found in the judgment of Lord Sterndale M.R. in *The Cap Palos*,132 where he expressly put his decision upon a strict construction of the exclusion clause relied on, and treated the contract as continuing. With all respect to the judgment of Atkin L.J. in that case,133 I think the reasoning of Lord Sterndale is to be preferred. A second example is to be found in the observations of Lord Sumner in *London & North Western Railway Co. v. Neilson*134 where he (in contrast to the other Lords) expressly put his decision upon the footing that the contract remained on foot, but he gave a very strict construction to the words "in transit" and held that it did not apply to goods not actually in transit which had wrongly been delivered to a railway cloakroom.

But where there is a breach of a fundamental term the law has taken an even firmer line for there is a strong, though rebuttable, presumption that in inserting a clause of exclusion or limitation in their contract the parties are not contemplating breaches of fundamental terms and such clauses do not apply to relieve a party from the consequences of such a breach even where the contract continues in force. This result has been achieved by a robust use of a well-known canon of construction, that wide words which taken in isolation would bear one meaning must be so construed as to give business efficacy to the contract and the presumed intention of the parties, upon the footing that both parties are intending to carry out the contract fundamentally. Thus, in *Leduc & Co. v. Ward*135 where the charterparty was for a voyage from Fiume to

Dunkirk "with liberty to call at any ports in any order," it was construed by Lord Esher M.R.136 to mean any ports which would be substantially ports which in the course of the voyage would be passed on the named voyage, so that a call at Glasgow was held to be a deviation and, therefore, a breach of the fundamental term, notwithstanding the wide words of the exception. Again, in your

132    [1921] P. 458, 465.

133    Ibid. 468.

134    [1922] 2 A.C. 263, 278.

135    (1888) 20 Q.B.D. 475; 4 T.L.R. 313, C.A.

136    20 Q.B.D. 475, 482.

*[1967] 1 A.C. 361 Page  428*

Lordships' House in *Glynn v. Margetson & Co.*137: under a bill of lading the ship was to carry oranges from Malaga to Liverpool, but the words of exclusion permitted the ship to visit almost any ports in Europe or Africa. The voyage from Malaga to Liverpool was treated by Lord Herschell L.C.138 as the main object and intent of the contract (that is, parenthetically, a fundamental term) and the wide words permitting calls at almost any port must be cut down so as not to defeat that object and intent. Lord Halsbury said139:

"Looking at the whole of the instrument, and seeing what one must regard, for the reason which I will give in a moment, as its main purpose, one must reject words, indeed whole provisions, if they are inconsistent with what one assumes to be the main purpose of the contract."

The cases of *Cunard Steamship Co. Ltd. v. Buerger*140 and the *Neilson case*141 support the same view. In the former case142 Lord Parmoor said of an exception clause:

"[They] do not apply when... loss or damage has occurred outside the route or voyage contemplated by the parties when they entered into the contract of carriage, unless the intention that such limitations should apply is expressed in clear and unambiguous language."

In the latter case143 Lord Dunedin said:

"It is a broad principle of great importance in all contracts of carriage that when a carrier protects himself by exceptions, *unless they are very clearly worded*, they only apply to his carrying out of the contract and do not apply if he is doing

something which he has not contracted to do." [The italics are mine.]

Both noble Lords were dealing with what we now call fundamental terms and illustrate both the presumption and its rebuttable character.

The appellants relied strongly on the case of *Charterhouse Credit Co. Ltd. v. Tolly.*144 That case affords no help to them for it was dealing with breach of a fundamental term and there is no suggestion of such a breach in this case. That case is open to review by your Lordships and having had the advantage of much fuller argument than was afforded to us in the Court of Appeal in that case it is possible that the true justification of that decision

137    [1893] A.C. 351.

138    Ibid. 355.

139    Ibid. 357.

140    [1927] A.C. 1.

141    [1922] 2 A.C. 263.

142    [1927] A.C. 1, 13.

143    [1922] 2 A.C. 263, 272.

144    [1963] 2 Q.B. 683.

*[1967] 1 A.C. 361 Page  429*

lies in the application of the presumption I have mentioned to the relevant clause of exclusion in that case.

My Lords, in view of the introduction in the questions posed by the arbitrator of the impact of a presumed

wilful default, for my part I think it is only necessary to say that it seems to me as a matter of general principle that wilful default in connection with the matters we are now considering is relevant and relevant only to one matter, that is to say, whether in fact the owners can establish a fundamental breach. In cases such as this, where there has been no breach of any fundamental term, the question as to whether there has been a fundamental breach must be a question of fact and degree in all the circumstances of the case, but one of the elements in reaching a conclusion upon that matter is necessarily the question as to whether there has been a wilful breach, for as a practical matter it cannot be doubted that it is easier to find as a fact, for such it primarily is, that the charterers are evincing an intention no longer to be bound by the terms of the contract and are therefore guilty of repudiatory conduct if it can be established that the breaches have been wilful and not innocent. I say no more upon that.

My Lords, I would dismiss this appeal.

LORD WILBERFORCE. My Lords, I agree that the present appeal, in so far as it is based upon the reasons advanced in the original case lodged by the appellants, must fail and I do not find it necessary to add to the reasons for so finding given by Mocatta J. and the Court of Appeal. It is only upon the submissions contained in the appellants' supplementary case that I desire to add some observations, since these involve some issues of general importance in the law of contract.

The nature of the appellants' contentions can most conveniently be seen from the answer which they suggest should be given to the questions stated in the consultative case. To the first question (which is whether the owners can recover damages suffered by reason of the respondents having failed to load and discharge the vessels within laydays, whereby the charterparty was rendered less profitable to the owners by consequent loss of voyages or voyage time) the appellants suggest the qualified answer "Yes, if the detention of the vessel was a deviation from, or a repudiation or fundamental breach of, the charterparty. Otherwise, no." And they suggest that the same answer should be given to the second question which is based upon the assumption that such loss of

*[1967] 1 A.C. 361 Page  430*

profitability resulted from the respondents having deliberately (i.e., with the wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel within the laydays.

In amplification of this, the appellants submit that the qualification appearing In the suggested answer would apply, first, if the detention of the vessel caused by the respondents' breaches of contract was in the aggregate so long as to frustrate the commercial purpose of the charterparty, or, secondly, if that detention was deliberate, in the special sense used in the consultative case. Whether either of these situations existed would be for the arbitrators to find. I am prepared to deal with the submissions of law so made upon the assumption that it is open to the arbitrators so to find that they might do so.

The appellants' main argument in law is formulated as follows: First, they say that a breach of contract which goes to the root of the contract or which conflicts with its main purpose is a deviation from or a repudiation or fundamental breach of such contract. Secondly, they contend that exceptions clauses do not apply to breaches which are deviations from or repudiations or fundamental breaches of the contract. These propositions contain in themselves implicitly or explicitly several distinct lines of argument. It is necessary to separate the strands before attempting to examine them.

It is convenient first to segregate the reference to what is sometimes (and conveniently) described as the main purpose rule. This is a rule of construction, a classic statement of which is found in Lord Halsbury's speech in *Glynn v. Margetson & Co.*145: it can be summed up in his words146:

"Looking at the whole of the instrument, and seeing what one must regard, as its main purpose, one must reject words indeed whole provisions, if they are inconsistent with what one assumes to be the main purpose of the contract."

The decision in that case was that printed words in a document intended to be used in a variety of contracts of affreightment between a variety of ports ought to be restricted so as to be consistent with the purpose of the particular charterparty which was for a voyage from Malaga to Liverpool. There is no difficulty as to this, and I shall consider in due course whether it has any application to the relevant clause (i.e., the demurrage clause) in the contract.

145    [1893] A.C. 351.

146    Ibid. 357.

*[1967] 1 A.C. 361 Page 431*

Next for consideration is the argument based on "fundamental breach" or, which is presumably the same thing, a breach going "to the root of the contract." These expressions are used in the cases to denote two quite different things, namely, (i) a performance totally different from that which the contract contemplates, (ii) a breach of contract more serious than one which would entitle the other party merely to damages and which (at least) would entitle him to refuse performance or further performance under the contract.

Both of these situations have long been familiar in the English law of contract; and it will have to be considered whether the conception of "fundamental breach" extends beyond them. What is certain is that to use the expression without distinguishing to which of these, or to what other, situations it refers is to invite confusion.

The importance of the difference between these meanings lies in this, that they relate to two separate questions which may arise in relation to any contract. These are (as to (i)) whether an "exceptions" clause contained in the contract applies as regards a particular breach and (as to (ii)) whether one party is entitled to elect to refuse further performance.

The appellants, in their submission that exceptions clauses do not apply to "fundamental breaches" or "repudiations" confuse these two questions. There is in fact no necessary coincidence between the two kinds of (so-called fundamental) breach. For, though it may be true generally, if the contract contains a wide exceptions clause, that a breach sufficiently serious to take the case outside that clause, will also give the other party the right to refuse further performance, it is not the case, necessarily, that a breach of the latter character has the former consequence. An act which, apart from the exceptions clause, might be a breach sufficiently serious to justify refusal of further performance, may be reduced in effect, or made not a breach at all, by the terms of the clause.

The present case is concerned with the application of what may be said (with what justice will be later considered) to be an exceptions clause to a possible type of "fundamental breach." I treat the words

"exceptions clause" as covering broadly such clauses in a contract as profess to exclude or limit, either quantitatively or as to the time within which action must be taken, the right of the injured party to bring an action for damages. Such a clause must, ex hypothesi, reflect the contemplation of the parties that a

*[1967] 1 A.C. 361 Page 432*

breach of contract, or what apart from the clause would be a breach of contract, may be committed, otherwise the clause would not be there; but the question remains open in any case whether there is a limit to the type of breach which they have in mind. One may safely say that the parties cannot, in a contract, have contemplated that the clause should have so wide an ambit as in effect to deprive one party's stipulations of all contractual force: to do so would be to reduce the contract to a mere declaration of intent. To this extent it may be correct to say that there is a rule of law against the application of an exceptions clause to a particular type of breach. But short of this it must be a question of contractual intention whether a particular breach is covered or not and the courts are entitled to insist, as they do, that the more radical the breach the clearer must the language be if it is to be covered. As Lord Parmoor said in *Cunard Steamship Co. Ltd. v. Buerger*147 in relation to exception clauses:

> "[they] do not apply when... loss or damage has occurred outside the route or voyage contemplated by the parties when they entered the contract of carriage, unless the intention that such limitations should apply is expressed in clear and unambiguous language."

And in *The Cap Palos*148 Atkin L.J. similarly said:

> "I am far from saying that a contractor may not make a valid contract that he is not to be liable for any failure to perform his contract, including even wilful default, but he must use very clear words to express that purpose...

In application to more radical breaches of contract, the courts have sometimes stated the principle as being that a "total breach of the contract" disentitles a party to rely on exceptions clauses. This formulation has its use so long as one understands it to mean that the clause cannot be taken to refer to such a breach but it is not a universal solvent: for it leaves to be decided what is meant by a "total" breach for this purpose - a departure from the contract? but how great a departure?; a delivery of something or a performance different from that promised? but how different? No formula will solve this type of question and one must look individually at the nature of the contract, the character of the breach and its effect upon future performance and expectation and make a judicial estimation of the final result.

A few illustrations from three groups of decided cases may explain how the courts have dealt with this problem.

147    [1927] A.C. 1, 13.

148    [1921] P. 458, 471, 472.

*[1967] 1 A.C. 361 Page  433*

(i)    Supply of a different article: As long ago as 1838, where the contract provided for the supply of peas, but beans were delivered, Lord Abinger C.B. explained the difference between this case and a breach of "condition": "The contract is to sell peas, and if he sends him anything else in their stead, it is a nonperformance of it." *(Chanter v. Hopkins*149). This was followed (after the Sale of Goods Act, 1893), in *Pinnock Brothers v. Lewis & Peat Ltd.*150 (copra cake) and Pearson L.J. accepted the principle, while modernising the illustration (chalk for cheese) in *U.G.S. Finance Ltd. v. National Mortgage Bank of Greece and National Bank of Greece, S.A.*151 Since the contracting parties could hardly have been supposed to contemplate such a mis-performance, or to have provided against it without destroying the whole contractual substratum, there is no difficulty here in holding exception clauses to be inapplicable.

(ii)    Hire purchase cases: In several recent decisions, the courts have been able to hold wide exception clauses inapplicable by finding, that what was delivered was totally different from that promised. Such are *Karsales (Harrow) Ltd. v. Wallis*152 and *Charterhouse Credit Co. Ltd. v. Tolly.*153 These cases, and others, follow the judgment of Devlin J. in *Smeaton Hanscomb & Co. v. Sassoon I. Setty & Co. (No. 1)*154 where he expressed the test as being whether there was a performance totally different from that contemplated by the contract. In some of these cases difficult questions of fact have arisen in deciding whether there is the total difference, or merely a serious breach of contract, as can be seen by comparing the *Karsales case*155 with *Astley Industrial Trust Ltd. v. Grimley*156 and some doubt may be felt whether the right result on the facts was reached in *Charterhouse Credit Co. Ltd. v. Tolly*157 but the principle is well in line with that of the cases mentioned under (i).

(iii)    Marine cases relating to deviation: There is a long line of authority the commencement of which is usually taken from the judgment of Tindal C.J. in *Davis v. Garrett*,158 which shows that a shipowner who deviates from an agreed voyage, steps out of the contract, so that clauses in the contract (such as exceptions or limitation clauses) which are designed to apply to the contracted

149    (1838) 4 M. & W. 399, 404.

150    [1923] 1 K.B. 690; 39 T.L.R. 212.

151    [1964] 1 Lloyd's Rep. 446, 453.

152    [1956] 1 W.L.R. 936.

153    [1963] 2 Q.B. 683.

154    [1953] 1 W.L.R. 1468.

155    [1956] 1 W.L.R. 936.

156    [1963] 1 W.L.R. 584.

157    [1963] 2 Q.B. 683.

158    6 Bing. 716.

*[1967] 1 A.C. 361 Page  434*

voyage are held to have no application to the deviating voyage. The basis for the rule was explained in *Stag Line Ltd. v. Foscolo, Mango & Co.*159 by Lord Russell of Killowen in these terms:

> "it was well settled before the Act [of 1924] that an unjustifiable deviation deprived a ship of the protection of exceptions. They only applied to the contract voyage."

In *The Cap Palos*160 Atkin L.J. had applied this principle to contracts generally, adopting for this purpose the formulation of Scrutton L.J. in *Gibaud v. Great Eastern Railway Company*161:

The principle is well-known, and perhaps *Lilley v. Doubleday*,162 is the best illustration, that if you undertake to do a thing in a certain way, or to keep a thing in a certain place, with certain conditions protecting it, and have broken the contract by not doing the thing contracted for in the way contracted for, or not keeping the article in the place in which you have contracted to keep it, you cannot rely on the conditions which were only intended to protect you if you carried out the contract in the way which you had contracted to do it."

The words "intended to protect you" show quite clearly that the rule is based on contractual intention.

The conception, therefore, of "fundamental breach" as one which, through ascertainment of the parties' contractual intention, falls outside an exceptions clause is well recognised and comprehensible. Is there any need, or authority, in relation to exceptions clauses, for extension of it beyond this? In my opinion there is not. The principle that the contractual intention is to be ascertained - not just grammatically from words used, but by consideration of those words in relation to commercial purpose (or other purpose according to the type of contract) - is surely flexible enough, and though it may be the case that adhesion contracts give rise to particular difficulties in ascertaining or attributing a contractual intent, which may require a special solution, those difficulties need not be imported into the general law of contract nor be permitted to deform it.

The only new category of "fundamental breach" which in this context I understand to have been suggested is one of "deliberate" breaches. This most clearly appears in the Privy Council case of *Sze Hai Tong Bank Ltd. v. Rambler Cycle Co. Ltd.*163 The decision itself presents no difficulty and seems to have been based on construction: it was that an exceptions clause referring to

159    [1932] A.C. 328, 347; 48 T.L.R. 127, H.L.

160    [1921] P. 458, 471.

161    [1921] 2 K.B. 426, 435.

162    7 Q.B.D. 510.

163    [1959] A.C. 576.

*[1967] 1 A.C. 361 Page  435*

"discharge" of the goods did not apply to a discharge wholly outside the contract, a case I would have thought well within the principle of the "deviation" cases. But the appellants rely on one passage in the judgment of the Board which seems to suggest that "deliberate" breaches may, of themselves, form a separate category, citing three previous English decisions. Two of them *Alexander v. Railway Executive*164 and *Karsales (Harrow) Ltd. v. Wallis*165 (on which I have already commented) are straightforward cases of "total departure" from what is contractually contemplated and present no difficulty. The third *Bontex Knitting Works Ltd. v. St. John's Garage*166 does not appear to be based on the deliberate character of the breach. The decision may be justified on the basis that there was a breach of contract equivalent to a deviation, but if it goes beyond this I would regard it as of doubtful validity. The "deliberate" character of a breach cannot, in my opinion, of itself give to a breach of contract a "fundamental" character, in either sense of that word. Some deliberate breaches there may be of a minor character which can appropriately be sanctioned by damages: some may be, on construction, within an exceptions clause (for example, a deliberate delay for one day in loading). This is not to say that "deliberateness" may not be a relevant factor: depending on what the party in breach "deliberately" intended to do, it may be possible to say that the parties never contemplated that such a breach would be excused or limited: and a deliberate breach may give rise to a right for the innocent party to refuse further performance because it indicates the other party's attitude towards future performance. All these arguments fit without difficulty into the general principle: to create a special rule for deliberate acts is unnecessary and may lead astray.

I now come to the facts of the present case. First, it is necessary to decide what is the legal nature of the demurrage clause: is it a clause by which damages for breach of the contract are agreed in advance, a liquidated damages clause as such provisions are commonly called, or is it, as the appellants submit, a clause limiting damages? If it is the latter, the appellants are evidently a step nearer the point when they can

invoke cases in which clauses of exception, or exemption, do not apply to particular breaches of contract. The appellants' strongest argument here rests upon the discrepancy which they assert to exist between the demurrage rate of $1,000 per diem and the freight rate for which the

164    [1951] 2 K.B. 882.

165    [1956] 1 W.L.R. 936.

166    60 T.L.R. 44.

*[1967] 1 A.C. 361 Page  436*

charterparty provides. The extent of the discrepancy is said to be shown by the difference between the appellants' claim for lost freight (which is of the order of $900,000 on one calculation and $600,000 on another) and the amount which they would receive under the demurrage provision, which is approximately $150,000. So, the argument runs, the $1,000 per diem cannot be a pre-estimate of damage: it must be a limit in the charterer's favour.

I am unable to accept this. Leaving aside that the figures quoted for lost freight represent merely the owners' claim, it must be borne in mind that the $1,000-a-day figure has to cover a number of possible events. There might have been delay for one day or a few days beyond the laytime, in which case the owners might, and probably would, lose nothing in the way of freight and only suffer through increased overheads in port. Even if a case were to arise where freight was lost, over a period of two years circumstances might well change which would affect adversely the owners' anticipated rate of profit. So I am far from satisfied that any such discrepancy has been shown between the agreed figure and reality as requires the conclusion that the clause is not what on its face it purports to be - particularly when one bears in mind that each side derives an advantage from having the figure fixed and so being assured of payment without the expense and difficulty of proof.

The form of the clause is, of course, not decisive, nor is there any rule of law which requires that demurrage clauses should be construed as clauses of liquidated damages; but it is the fact that the clause is expressed as one agreeing a figure, and not as imposing a limit: and as a matter of commercial opinion and practice demurrage clauses are normally regarded as liquidated damage clauses. (This has the authority of Scrutton on Charterparties, 10th and following editions, and see *Chandris v. Isbrandtsen-Moller Co. Inc.*167 *per* Devlin J.)

The clause being, then, one which fixes, by mutual agreement, the amount of damages to be paid to the owners of the vessel if "longer detained" than is permitted by the contract, is there any reason why it should not apply in the present case in either of the assumed alternatives, i.e., either that the aggregated delays add up to a "frustrating" breach of contract, or that the delays were "deliberate" in the special sense? In answering these questions it is necessary to have in mind what happened. It appears that there was an initial dispute between the owners and the charterers

167    [1951] 1 K.B. 240, 249.

in which the owners claimed that they were entitled to treat the charterers as having repudiated the charterparty. This dispute was resolved by an agreement on October 8, 1957, under which the charterers agreed to pay an agreed sum as demurrage, leaving it to arbitration to decide whether the owners' claim was correct and, if so, what damages they should recover. It was further agreed that the charterparty should be performed for the remainder of the agreed two-year period. The manner in which it was performed is set out in a schedule to the consultative case. There were eight voyages in all, the last terminating on March 7, 1959, three days before the termination date. It is as regards these eight voyages that it is claimed that the delays in question occurred. During the whole of the period, although the periods spent in port on either side of the Atlantic (in fact at Rotterdam and, in every case but the first, Newport News) must have been known to the owners, who must also have been in a position to ascertain the availability of cargo and of loading and discharging facilities, the owners took no steps which would indicate that they regarded the charterparty as repudiated: they did not sail their vessel away but allowed it to continue with further voyages and took demurrage at the agreed rate for the delays. So there is no question here of any termination of the contract having taken place. Is there, then, any basis upon which the owners can escape from their bargain as regards detention of the vessel? In my opinion there is not. The arbitrators can (on the assumptions required) only find that the breach of contract falls within one, or other, or both of the two stated categories, namely, that they "frustrate the commercial purpose of the charterparty," or that the delays were "deliberate" (in the special sense). In either case, why should not the agreed clause operate? Or what reason is there for limiting its application to such delays as fall short of such as "frustrate the commercial purpose" or such as are not "deliberate"? I can see no such reason for limiting a plain contractual provision, nor is there here any such conflict between the demurrage clause and the main purpose of the contract as to bring into play the doctrine of *Glynn v. Margetson & Co.*168 On a consideration of the nature of this clause, together with the events which took place, and in particular the fact that the owners did not during its currency put an end to the contract, I reach the conclusion that the owners are clearly

168    [1893] A.C. 351.

bound by it and can recover no more than the appropriate amount demurrage.

I find support for this conclusion in two decisions of the Court of Appeal. In *Inverkip Steamship Co. Ltd. v. Bunge & Co.*169 there was a detention of the ship beyond (as was held) a reasonable time for keeping it on demurrage. The demurrage clause was in a similar form to that in the present case: "If detained longer than five days," and was held to be applicable to the whole period of delay. The Court of Appeal did not decide the question whether the delay was such as to amount to a "repudiatory breach," so that the master could have

sailed away, but the implication at least of the judgment of Warrington L.J. is that the same result would have followed if this had been so. Then in *Ethel Radcliffe Steamship Co. Ltd. v. W. & R. Barnett Ltd.*,170 there was a deliberate detention. The arbitrators' actual finding (which it is relevant to compare with the possible finding here) was that "the respondents neglected and refused to give such order under August 29, 1924, and did so deliberately as it suited their business arrangements to keep the steamer at St. Vincent." It was argued that the charterer had repudiated the contract and that the demurrage clause did not cover wilful detention, but the Court of Appeal held to the contrary. Counsel for the appellants submitted that these cases were wrongly decided but they seem to me to be entirely in accordance with principle, and I respectfully agree with them.

On the whole case, I would dismiss the appeal.

*Appeal dismissed.*

Solicitors: *Richards, Butler & Co.; William A. Crump & Son.*

J. A. G.

169    [1917] 2 K.B. 193.

170    31 Com.Cas. 222.

*Woodar Investment Dev. Ltd. v Wimpey Constr. UK Ltd.*
[1980] 1 W.L.R. 277

1 W.L.R.          Co-op. Retail Ltd. v. Environment Sec. (C.A.)          Brandon L.J.

A    shown on the evidence before us to have been contrary to justice. There-
fore, the court has no power to interfere with that decision.

I should like to make some observations about *Chalgray Ltd.* v.
*Secretary of State for the Environment,* 33 P. & C.R. 10, which was
relied on by Mr. Ground for the applicants. In the headnote of that
case, the second part of the decision is stated in this way:

B        " . . . That the words in section 242 (3) (*b*) ' any decision of the Secre-
tary of State on an appeal under section 36 of the Act ' were not
necessarily limited to the decision or orders or final result specified in
section 36 (3); and that the Secretary of State's declining to consider
the appeal was a decision on an appeal under section 36."

Even if that decision made by Slynn J. is correct, it does not assist the
C    applicants on the facts of this case because there has not been any refusal
to consider the appeal. I am bound to say, however, that I have doubts
about the correctness of that decision on the law by Slynn J. It seems
to me very arguable that the expression " any decision of the Secretary
of State on an appeal under section 36," as used in section 242 (3) (*b*),
is limited to decisions or orders or final results arrived at under section
36 (3). I further think that, where there is a refusal to consider an appeal,
D    the case might well come within section 242 (4) of the Act. It is not,
however, necessary to decide that question in this case. I only wish to
express my doubts about this because the case has been relied on and I
would not like it thought that I regard it as necessarily correct.

*Appeal dismissed with costs.*
*Leave to appeal refused.*
E

Solicitors: *Bower, Cotton & Bower for Bury & Walkers, Barnsley;*
*Treasury Solicitor; Last Suddards & Co.*

[Reported by MISS HENRIETTA STEINBERG, Barrister-at-Law]

F                              ———————

[HOUSE OF LORDS]

* WOODAR INVESTMENT
DEVELOPMENT LTD. .     .     .     .     .   RESPONDENTS
G                              AND

WIMPEY CONSTRUCTION U.K. LTD.   .     .     .   APPELLANTS

1979 Nov. 19, 20, 21, 22;              Lord Wilberforce, Lord Salmon,
1980 Feb. 14                           Lord Russell of Killowen
                                       Lord Keith of Kinkel and
                                       Lord Scarman
H

*Contract — Repudiation — Right to rescind reserved — Purported*
*exercise—Held bad in law—Whether contract repudiated*
*Damages—Contract—Breach—Condition for payment to third party*
*—Whether sum recoverable in action by party to contract*

On February 21, 1973, the purchasers, W.C. Ltd. entered
into a contract to buy certain land from the vendors, W.I.D.
Ltd. The purchase price was £850,000 of which £150,000 was
to be paid on completion to T.T. Ltd. There was a prospect
VOL. 1                                                          15

The Weekly Law Reports, March 14, 1980

**Woodar Ltd. v. Wimpey Ltd. (H.L.(E.))**    **[1980]**

of planning permission for development being granted. By a    A
special condition E (a) (iii) the purchasers reserved the right
to rescind

> " if prior to the date of completion . . . (iii) any authority
> having a statutory power of compulsory purchase shall
> have commenced to negotiate for the acquisition by agree-
> ment or shall have commenced the procedure required by
> law for the compulsory acquisition of the property or
> any part thereof."    B

On March 20, 1973, the purchasers sent the vendors a notice
purporting to rescind the contract under that provision on
the ground that the Secretary of State for the Environment
had commenced the procedure for compulsory acquisition of
part of the land.

At the date of the contract both parties knew that in 1970
the minister had given the then owner notice of a draft com-
pulsory purchase order. On November 8, 1973, a compulsory    C
purchase order was made.

The vendors brought an action against the purchasers for
a declaration that the condition gave them no right to rescind.
By their defence the purchasers contended that on the true
construction of the condition the notice of rescision was
valid. In a second action the vendors claimed damages for
breach of contract by the purchasers in serving the notice
and delivering their defence.    D

Fox J. held that the purchasers were not entitled to invoke
the condition and by doing so had wrongfully repudiated the
contract and that they were accordingly liable for damages
including £150,000 for the use and benefit of T.T. Ltd. The
Court of Appeal affirmed his decision but varied the amount
of the damages.

On appeal by the vendors: —

*Held,* allowing the appeal (Lord Salmon and Lord Russell    E
of Killowen dissenting), that a party who took action relying
simply on the terms of the contract in question and not
manifesting by his conduct an ulterior intention to abandon
it was not to be treated as repudiating it; that the whole
circumstances must be looked at and, since it had been
assumed in those proceedings that both sides would abide by
the decision of the court, the evidence of the purchasers'
conduct was insufficient to support a case for repudiation    F
(post, pp. 280F–G, 282C–D, 283A, D–E, 296E, 297A–C, 298A–C,
299D–F).

*Federal Commerce & Navigation Co. Ltd.* v. *Molena Alpha
Inc.* [1979] A.C. 757, H.L.(E.) considered.

*Per curiam.* If vendors made a contract that a sum of
money was to be paid to a third party they could not, without
showing that they had themselves suffered loss or were agents
or trustees for the third party sue for damages for non payment    G
of that sum (post, pp. 284A–B, 291B–D, 293E, 297D–F, 300D–E).

*Jackson* v. *Horizon Holidays Ltd.* [1975] 1 W.L.R. 1468,
C.A. disapproved.

Decision of the Court of Appeal reversed.

The following cases are referred to in their Lordships' opinions:

*Beswick* v. *Beswick* [1968] A.C. 58; [1967] 3 W.L.R. 932; [1967] 2    H
All E.R. 1197, H.L.(E.).

*Bradley* v. *H. Newsom, Sons & Co.* [1919] A.C. 16, H.L.(E.).

*Federal Commerce & Navigation Co. Ltd.* v. *Molena Alpha Inc.* [1978]
Q.B. 927; [1978] 3 W.L.R. 309; [1978] 3 All E.R. 1066, C.A.; [1979]
A.C. 757; [1978] 3 W.L.R. 991; [1979] 1 All E.R. 307, H.L.(E.).

*Freeth* v. *Burr* (1874) L.R. 9 C.P. 208, D.C.

*Frost* v. *Knight* (1872) L.R. 7 Ex. 111.

*Heyman* v. *Darwin's Ltd.* [1942] A.C. 356, H.L.(E.).

A  *Jackson* v. *Horizon Holidays Ltd.* [1975] 1 W.L.R. 1468; [1975] 3 All
E.R. 92, C.A.
*Johnstone* v. *Milling* (1886) 16 Q.B.D. 460, C.A.
*Lloyd's* v. *Harper* (1880) 16 Ch.D. 290, C.A.
*Mersey Steel and Iron Co. Ltd.* v. *Naylor, Benzon & Co.* (1884) 9
App.Cas. 434, H.L.(E.).
*New Zealand Shipping Co. Ltd.* v. *A. M. Satterthwaite & Co. Ltd.*
B  [1975] A.C. 154; [1974] 2 W.L.R. 865; [1974] 1 All E.R. 1015,
P.C.
*Radford* v. *De Froberville* [1977] 1 W.L.R. 1262; [1978] 1 All E.R. 33.
*Shaffer (James) Ltd.* v. *Findlay Durham & Brodie* [1953] 1 W.L.R. 106,
C.A.
*Smyth (Ross T.) and Co. Ltd.* v. *T. D. Bailey, and Son and Co.* (1940)
164 L.T. 102; [1940] 3 All E.R. 60, H.L.(E.).
C  *Spettabile Consorzio Veneziano di Armamento e Navigazione* v. *North-
umberland Shipbuilding Co. Ltd.* (1919) 121 L.T. 628, C.A.
*Sweet & Maxwell Ltd.* v. *Universal News Services Ltd.* [1964] 2 Q.B.
699; [1964] 3 W.L.R. 356; [1964] 3 All E.R. 30, C.A.
*Tweddle* v. *Atkinson* (1861) 1 B. & S. 393.

The following additional cases were referred to in argument:

D  *Coulls* v. *Bagot's Executor and Trustee Co. Ltd.* (1967) 40 A.L.J.R. 471.
*General Billposting Co. Ltd.* v. *Atkinson* [1909] A.C. 118, H.L.(E.).
*Viles* v. *Viles* [1939] S.A.S.R. 164.
*West* v. *Houghton* (1879) 4 C.P.D. 197.

APPEAL from the Court of Appeal.
This was an appeal by the defendants, Wimpey Construction U.K.
E  Ltd., formerly George Wimpey & Co. Ltd. (the appellants), by leave of
the Court of Appeal, from an order of the Court of Appeal (Buckley,
Lawton and Goff L.JJ.) made on October 26, 1978, varying an order
made by Fox J. on December 21, 1976. By his order Fox J. awarded
the plaintiffs, Woodar Investment Development Ltd. (the respondents),
damages for breach of contract in the sum of £462,000 with interest, that
sum being expressed by the order to include the sum of £150,000 for the
F  use and benefit of Transworld Trade Ltd. By its order the Court of
Appeal (Buckley L.J. dissenting on the issue of liability) reduced those
damages to the sum of £272,943 with interest, including therein the
sum of £135,000 for the use and benefit of Transworld.

The facts are stated in their Lordships' opinions.

G  *Jonathan Parker Q.C.* and *Stephen Acton* for the appellant company.
*A. Leolin Price Q.C.* and *Nicholas Stewart* for the respondent
company.

Their Lordships took time for consideration.

H  February 14, 1980. LORD WILBERFORCE. My Lords, the appellants
(" Wimpey ") are defendants in this action brought by the respondents
(" Woodar ") upon a contract of sale dated February 21, 1973. This
contract related to 14·41 acres of land of Cobham, Surrey, near to the site
later occupied by the Esher by-pass. There was the prospect of planning
permission being granted for development. The purchase price was
£850,000 and there was a special condition (condition I) that upon
completion the purchasers should pay £150,000 to a company called

Lord Wilberforce        Woodar Ltd. v. Wimpey Ltd. (H.L.(E.))                    [1980]

Transworld Trade Ltd.  Completion was fixed for the earliest of three    A
dates namely (i) two months from the granting of outline planning
permission for the development of the property, (ii) February 21, 1980,
(iii) such date as the purchaser should specify by not less than 14 days'
notice in writing.

The contract contained a special condition E under which there was
reserved to the purchasers power to rescind the contract in either of
three events.  The first related to failure to obtain outline planning    B
permission, the second to failure to obtain an easement giving access
to the property, the third (E (a) (iii) ) was in the following terms:

"... if prior to the date of completion ... (iii) Any authority
having a statutory power of compulsory acquisition shall have com-
menced to negotiate for the acquisition by agreement or shall have
commenced the procedure required by law for the compulsory    C
acquisition of the property or any part thereof."

On March 20, 1974, the appellants sent to the respondents a notice
in writing purporting to rescind the contract under this provision.  The
notice stated that the ground relied on was that the Secretary of State
for the Environment had commenced the procedure required by law
for the compulsory acquisition of 2·3 acres of the property.    D

It was in fact known to both parties at the date of the contract that
certain steps had already been taken in relation to these 2·3 acres.  In
1970 the Minister had given notice to the then owner of a draft com-
pulsory purchase order, and this fact had been published in the local
press.  Notice had been given of the appointment of an inspector to
hold a public inquiry, and this was held.  A compulsory purchase order    E
was made on November 8, 1973.  On these facts, the respondents
contended that special condition E (a) (iii) could not be invoked by the
appellants because the relevant procedure for compulsory purchase had
started before the date of the contract, and so did not come within the
words "shall have commenced."  This contention was upheld by Fox J.
at the trial and was not the subject of appeal, so that the appellants'
claim to invoke the condition has failed.    F

This gives rise to the first issue in this appeal: whether, by invoking
special condition E (a) (iii), and in the circumstances, the appellants
are to be taken as having repudiated the contract.  The respondents so
claim, and assert that they have accepted the repudiation and are entitled
to sue the appellants for damages.

My Lords, I have used the words "in the circumstances" to indicate,    G
as I think both sides accept, that in considering whether there has been
a repudiation by one party, it is necessary to look at his conduct as
a whole.  Does this indicate an intention to abandon and to refuse
performance of the contract?  In the present case, without taking the
appellants' conduct generally into account, the respondents' contention,
that the appellants had repudiated, would be a difficult one.  So far
from repudiating the contract, the appellants were relying on it and    H
invoking one of its provisions, to which both parties had given their
consent.  And unless the invocation of that provision were totally abusive,
or lacking in good faith, (neither of which is contended for), the fact
that it has proved to be wrong in law cannot turn it into a repudiation.
At the lowest, the notice of rescission was a neutral document consistent
either with an intention to preserve or with an intention to abandon
the contract, and I will deal with it on this basis—more favourable to

A  the respondents.  In order to decide which is correct the appellants' conduct has to be examined.

One point can, in my opinion, be disposed of at once.  The respondents, in March 1974 started proceedings against the appellants: this is one of the actions consolidated in the litigation before us.  They claimed a declaration that the appellants' notice of rescission was not valid, and

B  the appellants, by their defence, asserted the contrary and they counterclaimed for a declaration to that effect.  The respondents now contend that if the original notice did not amount to a repudiation, the defence and counterclaim did.  I regard this contention as hopeless.  The appellants' pleading carried the matter no further: it simply rested the matter on the contract.  It showed no intention to abandon the contract whatever the result of the action might be.  If the action were to

C  succeed (i.e. if the appellants lost) there was no indication that the appellants would not abide by the result and implement the contract.

The facts indicative of the appellants' intention must now be summarised.  It is clear in the first place that, subjectively, the appellants, in 1974, wanted to get out of the contract.  Land prices had fallen, and they thought that if the contract were dissolved, they could probably

D  acquire it at a much lower price.  But subjective intention is not decisive: it supplied the motive for serving the notice of rescission: there remains the question whether, objectively regarded, their conduct showed an intention to abandon the contract.

In early 1974, there was a possibility that some planning permission might be granted.  If it were, and unless the purchasers could take valid objection to it, completion would (under the conditions) have to follow

E  in two months.  Therefore, if a notice of rescission were to be given, it had to be served without delay, i.e. before the planning permission arrived.  In this situation, the appellants' advisers arranged a meeting with a Mr. Cornwell, who was acting for the vendors, or as an intermediary with power to commit the vendors, to discuss the matter.  This took place on March 7, 1974, and is recorded as a disclosed aide mémoire

F  dated the next day.  This document was prepared by the appellants, and we have not the benefit of Mr. Cornwell's evidence upon it: he had died before the trial.  But the rest of the correspondence is fully in line with it and I see no reason to doubt its general accuracy.  After recording each side's statement of position, the document contained (inter alia) these passages:

G        "He [Mr. Cornwell] stated that if we attempted to rescind the contract, then he would take us to court and let the judge decide whether the contract could be rescinded on the point we were making."

This "point" was undoubtedly that relating to the compulsory purchase of the 2·5 acres.

H        "I told him that our legal department would be serving the notice to rescind the contract within a short while—this would ensure that the company was fully protected and was prudent.  He assured me that he would accept it on that basis and not regard it as a hostile act."

The notice was then served on March 20, 1974.  On March 22 the respondents' solicitors wrote that they did not accept its validity.  On

Lord Wilberforce    Woodar Ltd. v. Wimpey Ltd. (H.L.(E.))    **[1980]**

May 30, 1974, Mr. Cornwell wrote a long letter to Sir Godfrey Mitchell,  A
president of Wimpey.  I refer to one passage:

> " . . . within a few days of the original meeting, a notice of rescission
> was served upon the vendor company by your organisation that the
> contract was to be rescinded.  Simultaneously with that notice or
> rescission, proceedings were instituted and there the matter remains
> so far as the legal situation is concerned and both parties, from the  B
> legal point of view, must now await the decision of the court as to
> the validity of the claim made by Messrs. George Wimpey & Co.
> Ltd. that they are entitled to rescind this contract upon the grounds
> which they have so stated."

On June 4, 1974, Mr. Cornwell wrote again:

> " . . . all I need say now is that we will retire to our battle stations  C
> and it goes without saying I am sure that you will abide by the
> result as I will."

My Lords, I cannot find anything which carries the matter one inch
beyond, on Wimpey's part, an expressed reliance on the contract (con-
dition E (a) (iii)), on Woodar's side an intention to take the issue of the
validity of the notice (nothing else) to the courts, and an assumption, not  D
disputed by Wimpey, that both sides would abide by the decision of the
court.  This is quite insufficient to support the case for repudiation.  There
is only one other matter relied on.  At the date of the contract (February
21, 1973) there were arrangements made for a loan of £165,000 to be
made to the respondents by the National Westminster Bank.  The
appellants guaranteed—subject to three months' notice of termination—  E
the respondents' indebtedness to the bank up to £165,000 and agreed
with the bank to meet interest and other charges.  As between the
appellants and the respondents it was agreed that the appellants should
indemnify the respondents against all interest on the loan for seven
years or until the contract should be " fulfilled or discharged."  These
arrangements did not form part of the contract of sale but were collateral
to it.  F

When the notice of rescission was served on March 20, 1974, it was
accompanied by a covering letter, of the same date, referring to the
loan arrangements.  It stated:

> " The undertaking was limited to seven years from the date of
> exchange or until the contract was fulfilled or discharged.  As the
> contract is now discharged by the enclosed notice, [Woodar] will  G
> now be liable for the charges incurred in respect of this loan."

The appellants also gave three months' notice to the bank terminating
the guarantee.  Again, in my opinion, this carried the matter no further.
It simply drew the attention of Woodar to the consequences which
would follow from rescission of the contract, nothing more.  Woodar,
in fact understood it as such, for they wrote to the bank on April 8,  H
1974, stating that proceedings had been instituted against Wimpey for
a declaration " which, if successful, will reinstate the arrangements which
you now give notice you intend to bring to an end."

My Lords, in my opinion, it follows, as a clear conclusion of fact,
that the appellants manifested no intention to abandon, or to refuse
future performance of or to repudiate the contract.  And the issue being
one of fact, citation of other decided cases on the other facts is hardly

A necessary. I shall simply state that the proposition that a party who takes action relying simply on the terms of the contract, and not manifesting by his conduct an ulterior intention to abandon it, is not to be treated as repudiating it is supported by *James Shaffer Ltd.* v. *Findlay Durham & Brodie* [1953] 1 W.L.R. 106 and *Sweet & Maxwell Ltd.* v. *Universal News Services Ltd.* [1964] 2 Q.B. 699.

B    In contrast to these is the case in this House of *Federal Commerce & Navigation Co. Ltd.* v. *Molena Alpha Inc.* [1979] A.C. 757 which fell on the other side of the line. Of that I said at p. 780:

"The two cases relied on by the appellants (*James Shaffer Ltd.* v. *Findlay Durham & Brodie* [1953] 1 W.L.R. 106 and *Sweet & Maxwell Ltd.* v. *Universal News Services Ltd.* [1964] 2 Q.B. 699) . . . would only be relevant here if the owners' action had been confined to assert-

C    ing their own view—possibly erroneous—as to the effect of the contract. They went, in fact, far beyond this when they threatened a breach of the contract with serious consequences."

The case of *Spettabile Consorzio Veneziano di Armamento e Navigazione* v. *Northumberland Shipbuilding Co. Ltd.* (1919) 121 L.T. 628 though in some factual respects distinguishable from the present, is nevertheless, in

D    my opinion, clear support for the appellants.

In my opinion therefore the appellants are entitled to succeed on the repudiation issue, and I would only add that it would be a regrettable development of the law of contract to hold that a party who bona fide relies upon an express stipulation in a contract in order to rescind or terminate a contract should, by that fact alone, be treated as having

E    repudiated his contractual obligations if he turns out to be mistaken as to his rights. Repudiation is a drastic conclusion which should only be held to arise in clear cases of a refusal, in a matter going to the root of the contract, to perform contractual obligations. To uphold the respondents' contentions in this case would represent an undesirable extension of the doctrine.

The second issue in this appeal is one of damages. Both courts below

F    have allowed Woodar to recover substantial damages in respect of condition I under which £150,000 was payable by Wimpey to Transworld Trade Ltd. on completion. On the view which I take of the repudiation issue, this question does not require decision, but in view of the unsatisfactory state in which the law would be if the Court of Appeal's decision were to stand I must add three observations:

G    1. The majority of the Court of Appeal followed, in the case of Goff L.J. with expressed reluctance, its previous decision in *Jackson* v. *Horizon Holidays Ltd.* [1975] 1 W.L.R. 1468. I am not prepared to dissent from the actual decision in that case. It may be supported either as a broad decision on the measure of damages (per James L.J.) or possibly as an example of a type of contract—examples of which are persons contracting for family holidays, ordering meals in restaurants

H    for a party, hiring a taxi for a group—calling for special treatment. As I suggested in *New Zealand Shipping Co. Ltd.* v. *A. M. Satterthwaite & Co. Ltd.* [1975] A.C. 154, 167, there are many situations of daily life which do not fit neatly into conceptual analysis, but which require some flexibility in the law of contract. *Jackson's* case may well be one.

I cannot however agree with the basis on which Lord Denning M.R. put his decision in that case. The extract on which he relied from the judgment of Lush L.J. in *Lloyd's* v. *Harper* (1880) 16 Ch.D. 290, 321

Lord Wilberforce        Woodar Ltd. v. Wimpey Ltd. (H.L.(E.))            **[1980]**

was part of a passage in which the Lord Justice was stating as an    A
" established rule of law " that an agent (sc. an insurance broker) may
sue on a contract made by him on behalf of the principal (sc. the assured)
*if the contract gives him such a right, and is no authority for the proposition
required in Jackson's case,* still less for the proposition, required here,
that, if Woodar made a contract for a sum of money to be paid to Trans-
world, Woodar can, without showing that it has itself suffered loss or that
Woodar was agent or trustee for Transworld, sue for damages for non-    B
payment of that sum. That would certainly not be an established rule of
law, nor was it quoted as such authority by Lord Pearce in *Beswick* v.
*Beswick* [1968] A.C. 58.

2. Assuming that *Jackson's* case was correctly decided (as above), it
does not carry the present case, where the factual situation is quite
different. I respectfully think therefore that the Court of Appeal need    C
not, and should not have followed it.

3. Whether in a situation such as the present—viz. where it is not
shown that Woodar was agent or trustee for Transworld, or that Woodar
itself sustained any loss, Woodar can recover any damages at all, or any
but nominal damages, against Wimpey, and on what principle, is, in my
opinion, a question of great doubt and difficulty—no doubt open in this
House—but one on which I prefer to reserve my opinion.    D

I would allow the appeal.


LORD SALMON. My Lords, this case raises a point of law of con-
siderable importance in relation to the repudiation of contracts.

Between July 1969 and February 1973 prolonged negotiations took
place between Mr. Ronald Cornwell and the appellants (Wimpey) for the    E
purchase by Wimpey of 14·41 acres of freehold land known as Mizen's
Nurseries at Cobham. In January 1973 Wimpey learnt from Mr. Cornwell
that the vendors were to be the respondents (Woodar). By February
1973 the purchase price had been agreed at £1m. In that month Mr.
Cornwell proposed that part of the purchase price should be paid to
him as European agent for the Transworld Trade Ltd. (Transworld),    F
and a few days later it was agreed that that part of the purchase price
should amount to £150,000 and be paid to Transworld direct.

It was also arranged that the contract should provide for a loan of
£165,000, secured by a charge on the land (the subject matter of the
contract) to be made to Woodar by Wimpey through their bank and
that Wimpey should be responsible for servicing the loan. Wimpey
were, however, advised that the loan should be treated separately from    G
the contract, otherwise the contract might be void as constituting a clog
on the equity of redemption under the charge. Accordingly, on February
21, 1973, Wimpey's bank lent Woodar £165,000 and Woodar executed a
legal charge on the land in respect of the loan. Wimpey gave a written
undertaking to the bank to meet all interest and other charges in respect
of the loan until February 21, 1980, " or until the contract should be    H
fulfilled or discharged." (The underlining is mine.) The facts which
I have related are all taken out of Wimpey's printed case.

The written contract for the purchase of the land by Wimpey from
Woodar was also executed on February 21, 1973. It specified the
purchase price as £850,000 and laid down at the end of the contract in
special condition I that upon the completion of the purchase of the whole
or any part of this land, Wimpey should pay Transworld £150,000.

1 W.L.R.          Woodar Ltd. v. Wimpey Ltd. (H.L.(E.))          Lord Salmon

A          I will now turn to the material clauses in the contract.  Special con-
ditions E (a) so far as relevant reads:

> " This contract shall be absolutely binding on both parties . . . for a
> period of seven years from the date hereof but there shall be reserved
> to the purchaser only the power to rescind this contract if prior to
> the date of completion:  . . . (iii) any authority having a statutory
B          power of compulsory acquisition shall have commenced to negotiate
> for the acquisition by agreement or shall have commenced the
> procedure required by law for the compulsory acquisition of the
> property or any part thereof."

This clause, quite obviously, refers only to any such negotiation or
procedure commenced after the execution of the contract and prior to
C completion but not to any negotiation or procedure which had com-
menced and of which both parties were well aware before they executed
the contract.

Special condition E (c), so far as relevant, reads:

> " The power to rescind reserved to the purchaser by subclause
> (a) . . . shall be exerciseable by the service of a notice in writing to
D          that effect upon the vendor . . . and the purchaser's liability under
> . . . this contract shall from the date of service of such notice cease."

Special condition E (g) provides that completion shall take place on the
earliest of the three dates it mentions, namely, (i) two months after the date
on which outline planning permission for the development of the property
is granted; (ii) February 21, 1980, (iii) such date as the purchaser shall
E specify but not by less than 14 days' written notice.

Returning to special condition E (a) (iii) of the contract, it is common
ground that Wimpey and Woodar both knew, well before the contract
between them was executed, (1) that in 1970 the Minister of Transport
had given notice of a draft compulsory purchase order in respect of
2·3 acres of the 14·41 acres covered by the contract, (2) that this fact
had been published in the local press, and (3) that notice had also been
F given of the appointment of an inspector to hold a public inquiry which
he had duly held.

Indeed, there is a provision in the contract under special condition G,
which, so far as relevant, reads:

> " It is hereby agreed that the vendor shall not require the purchaser
> to include in the transfer to the purchaser any part . . . of the land
G          hereby agreed to be sold which shall be required by the Surrey
> County Council . . . or any statutory authority . . . and the purchase
> price shall be abated at the rate of £70,000 per acre . . . for any
> part . . . of the land hereby agreed to be sold which shall not be
> included in the transfer to the purchaser."

H It is to be observed that if the land is priced in the contract at £70,000
an acre, the 14·41 acres sold under the contract would, in fact, be priced
at about £1m.

By March of 1974 there had been a very alarming slump in the value
of land.  It is quite clear from one of Wimpey's internal memoranda,
written at the beginning of that month, that Wimpey had no intention
of honouring their contract by paying the agreed price of £70,000 an
acre for the land: that they intended to repudiate the contract but would

gladly enter into a new contract with Woodar to buy the land at £48,000    A
an acre, on otherwise the same terms as those of the existing contract.
The relevant part of the memorandum reads as follows:

> " Revised broadsheets have been prepared taking account of the
> reduced selling price of houses and increased building costs and
> these indicate that currently to show 20% profit we can offer
> £48,000 per acre, to show 15% profit £53,000 per acre.  The indi-    B
> cations are that this piece of land could obtain outline planning
> permission within the next four months, in which case we as a com-
> pany would be obliged to perform in accordance with the obligations
> of our contract to purchase subject to the various conditions.  We
> propose arranging a meeting with Mr. Cornwell to discuss formally
> with him: (a) Our intention to rescind the contract so that he is
> obliged to pay the interest on the loan thereafter from that date.    C
> (b) To make him a proposal that we are prepared to proceed with
> the purchase of the land at the reduced figure of £48,000 per develop-
> able acre subject, of course, to the same terms and conditions."

On March 20, 1974, a notice was sent to Woodar by Wimpey in the
following terms:

> " Pursuant to clause E (c) of a contract dated February 21, 1973,    D
> and made between Woodar Investment Development Ltd. of the
> one part and George Wimpey & Co. Ltd. of the other part the
> said George Wimpey & Co. Ltd. hereby rescinds the said contract
> on the ground that within the meaning of clause E (a) (iii) of the
> said contract the Secretary of State for the Environment has com-
> menced the procedure required by law for the compulsory acquisition    E
> of part of the property (a compulsory purchase order relating to the
> land edged red on the plan annexed hereto having been made)."

I am afraid that I am entirely unable to agree with the proposition
that this notice of rescission was a neutral averment consistent either
with the intention to preserve or with an intention to abandon the
contract.  To my mind it was served with the clearly expressed intention    F
of bringing the contract to an end.  This notice was accompanied by a
letter of the same date, the last paragraph of which reads as follows:

> " When contracts for the sale and purchase of the above land were
> exchanged, an undertaking was given by the company indemnifying
> Woodar Investment Development Ltd. against all interest charges
> payable to the National Westminster Bank Ltd. as a result of a    G
> loan by them to you of a sum of £165,000.  The undertaking was
> limited to seven years from the date of exchange or until the
> contract was fulfilled or discharged.  As the contract is now dis-
> charged by the enclosed notice, Woodar Investment Development
> Ltd. will now be liable for the charges incurred in respect of this
> loan."  (The underlining is mine.)    H

My Lords, it was conceded in this House on behalf of Wimpey that
they had no right to rescind, discharge or repudiate the contract.  In
my respectful opinion, Wimpey had made it crystal clear by their notice
and letter of March 20 that they purported to bring their liability under
the contract to an end by rescinding and discharging it; and that they
had no intention of paying the contract price for the land in question.
If this does not go to the root of the contract and evince an unequivocal

A  intention no longer to be bound by it, and therefore amounts to a repudiation of the contract, I confess that I cannot imagine what would.

In the court of first instance, Wimpey sought to justify their notice and letter of March 20, 1974, on the ground that prior to the execution of the contract of February 21, 1973, steps had been taken for the compulsory acquisition of 2·3 acres out of the 14·41 acres the subject

B  matter of the contract. I have already described these steps and I shall not repeat them. It is common ground that all these steps were well known both to Wimpey and to Woodar at the time they were taken. The point was nevertheless argued on behalf of Wimpey before the trial judge that because of these steps having been taken when they were, Wimpey were entitled under special condition E (a) (iii) of the contract to rescind the contract and refuse to perform it. The learned trial

C  judge made short work of that point and decided that it was untenable. The point was so obviously bad that it was wisely decided by counsel on behalf of Wimpey not to be worth taking in the Court of Appeal. It was however accepted by Woodar that on March 20, 1974, Wimpey honestly believed in the point which they later abandoned. I do not understand how Wimpey's honest belief in a bad point of law can in any way avail them. In *Federal Commerce & Navigation Co. Ltd.* v.

D  *Molena Alpha Inc.* [1978] Q.B. 927, 979, Lord Denning M.R. said:

> " I have yet to learn that a party who breaks a contract can excuse himself by saying that he did it on the advice of his lawyers: or that he was under an honest misapprehension. Nor can he excuse himself on those grounds from the consequences of a repudiation."

E  I gratefully adopt that passage which seems to me to be particularly apt in the present case. It certainly was never questioned in your Lordships' House when the appeal from the decision of the Court of Appeal in the *Federal Commerce* case [1979] A.C. 757 was dismissed.

In *Freeth* v. *Burr* (1874) L.R. 9 C.P. 208, 213 Lord Coleridge C.J. said:

F  
> " . . . where the question is whether the one party is set free by the action of the other, the real matter for consideration is whether the acts or conduct of the one do or do not amount to an intimation of an intention to abandon and altogether to refuse performance of the contract."

In *Mersey Steel and Iron Co. Ltd.* v. *Naylor, Benzon & Co.* (1884)

G  9 App.Cas 434 Lord Selborne L.C., after approving of what Lord Coleridge said in *Freeth* v. *Burr* went on to say, at p. 439 :

> " . . . you must examine what that conduct is, so as to see whether it amounts to a renunciation, to an absolute refusal to perform the contract, such as would amount to a rescission if he had the power to rescind, and whether the other party may accept it as a reason for not performing his part; "

H  In the *Spettabile* case, 121 L.T. 628, 634–635 Atkin L.J. said :

> " A repudiation has been defined in different terms—by Lord Selborne as an absolute refusal to perform a contract; by Lord Esher as a total refusal to perform it; by Bowen L.J. in *Johnston* v. *Milling* (1886) 16 Q.B.D. 460 as a declaration of an intention not to carry out a contract when the time arrives, and by Lord Haldane in *Bradley* v. *H. Newsom Sons & Co.* [1919] A.C. 16 as an inten-

tion to treat the obligation as altogether at an end. They all come A
to the same thing, and they all amount at any rate to this, that it
must be shown that the party to the contract made quite plain his
own intention not to perform the contract."

In *Heyman* v. *Darwins Ltd.* [1942] A.C. 356, 378–379, Lord Wright
said:

> " There is, however, a form of repudiation where the party who B
> repudiates does not deny that a contract was intended between the
> parties, but claims that it is not binding because of the failure of
> some condition or the infringement of some duty fundamental to
> the enforceability of the contract, it being expressly provided by
> the contract that the failure of condition or the breach of duty
> should invalidate the contract . . . But perhaps the commonest
> application of the word ' repudiation' is to what is often called C
> the anticipatory breach of a contract where the party by words or
> conduct evinces an intention no longer to be bound and the other
> party accepts the repudiation and rescinds the contract. In such a
> case, if the repudiation is wrongful and the rescission is rightful,
> the contract is ended by the rescission but only as far as concerns
> future performance. It remains alive for the awarding of damages D
> . . . for the breach which constitutes the repudiation."

In my opinion, the repudiation in the present case exactly fits the
repudiation which Lord Wright explains in the passages which I have
just cited.

I do not recall that any of these definitions of a repudiation of a
contract have ever until now, been questioned. The fact that a party E
to a contract mistakenly believes that he has the right to refuse to
perform it cannot avail him. Nor is there any authority for the proposi-
tion that if a party to a contract totally refuses to perform it, this refusal
is any the less a repudiation of the contract because he honestly but
mistakenly believes that he is entitled by a condition of the contract
to refuse to perform it.

It would indeed be unfortunate if the law were otherwise. A mistake F
in the construction of a contractual condition, even such a glaringly
obvious mistake as the present can apparently easily be made especially
perhaps when the market price has fallen far below the contract price.
It is acknowledged in this case that the mistake was an honest one. If,
however, a case arose in which a mistake of this kind was alleged to be an
honest mistake, but not acknowledged to be so, it would be extremely G
difficult, if not impossible to prove the contrary.

*James Shaffer Ltd.* v. *Findlay Durham & Brodie* [1953] 1 W.L.R.
106 and *Sweet & Maxwell Ltd.* v. *Universal News Services Ltd.* [1964]
2 Q.B. 699 were strongly relied upon on behalf of Wimpey. Those two
cases were very different from each other and even more different from
the present case; in my opinion they certainly lend no more support to
Wimpey than they did to the appellants in the *Federal Commerce* case H
[1979] A.C. 757. Indeed, if anything, they are of some help to Woodar.
In the former case, Singleton L.J. said at p. 121: " . . . is it possible
to say that the defendants . . . showed an intention to abandon and
altogether to refuse the performance of the contract? . . . I think not."
Morris L.J. said at p. 124: " I have no doubt that [the defendants]
wanted to go on with the contract." In the latter case [1964] 2 Q.B.
699, 729 Harman L.J. said:

1 W.L.R.          Woodar Ltd. v. Wimpey Ltd. (H.L.(E.))          Lord Salmon

A
" . . . repudiation really is not in the picture here at all, because if
the defendants were not wholly justified in the attitude they took
up, [on the construction of the agreement] the plaintiffs were not
wholly justified in their attitude either, and they could only treat
the defendants' refusal to comply with their demands as repudiation
if their demands were wholly right. Therefore . . . repudiation does
not really arise: but as it was the ground of the judgment of the
B
judge below I think I ought to say something about it . . . there
was not that absolute refusal to go on which is necessary . . . to
arrive at a conclusion that an agreement . . . has been entirely
repudiated."

Pearson L.J. said much the same.
C
The present case is, however, quite different from the *James Shaffer*
case [1953] 1 W.L.R. 106 and the *Sweet & Maxwell* case [1964] 2
Q.B. 699 because Wimpey made it very plain by their notice and letter
of March 20, 1974, that they had no intention to go on with the contract
and buy the land at the contract price.
*Spettabile Consorzio Veneziano di Armamento e Navigazione* v.
*Northumberland Shipbuilding Co. Ltd.*, 121 L.T. 628 was also strongly
D
relied upon on behalf of Wimpey. The facts of that case were very
strange and clearly distinguishable from the present. Goff L.J. made a
long and masterly analysis of that case with which I agree and gratefully
adopt. I do not consider that that case is, in reality, of any help to
Wimpey.
I cannot accept that the majority of the Court of Appeal concen-
trated too much attention on Wimpey's rescission notice of March 20,
E
1974, and not enough upon its surrounding circumstances. In any event,
it seems to me that those surrounding circumstances supported Woodar's
case rather than Wimpey's. I think that it is obvious from the surround-
ing circumstances that Wimpey had made up their mind at the beginning
of March 1974 (and never changed it) that, in no circumstances would
they comply with their contractual obligation to buy the land in question
F
at the price of £70,000 per acre. This is made clear by the language
of their memorandum which I have already cited and which appears to
have been written a day or two before Wimpey's aide mémoire of
March 8, 1974, upon which Wimpey rely. I do not understand how
that document can be evidence against Woodar, even if Mr. Cornwell
were still alive. Nor do I think that even if the document were admissible
in evidence it could be accepted as being accurate in every detail.
G
Looking at the document as a whole, however, it seems to support
Woodar's case rather than Wimpey's. It indicates (1) that Wimpey
made plain to Mr. Cornwell what was recorded in the memorandum
which I have cited; (2) that Mr. Cornwell was anxious to effect a
compromise and suggested that "the money could be paid to him over
a period of up to say five years, or that the price could be lowered or
H
a combination of both"; (3) that Wimpey replied "the mere extension
of five years would not be attractive to us, but that if the land value
was vastly reduced we would still like to remain with the deal"; (4) that
Mr. Cornwell then said "that he would go away and consider the lowest
price that he could afford to sell it to us and that below that price he
would fight us through the courts." (The underlining is mine).
On March 22, 1974, two days after the notice of rescission was
served by Wimpey, Woodar's solicitor wrote that they did not accept

Lord Salmon        Woodar Ltd. v. Wimpey Ltd. (H.L.(E.))            [1980]

its validity. By a writ of summons endorsed with a statement of claim  A
served on March 29, 1974, Woodar, amongst other things, claimed against
Wimpey a declaration that their notice of March 20, 1974, did not
rescind the contract. It may well be that Woodar considered that once
they commenced legal proceedings, Wimpey would throw in their hand.
If so, they were mistaken, for Wimpey served a defence and counter-
claim on May 18, 1974, alleging that the notice of rescission of March
20, 1974, was valid and counterclaimed a declaration that the contract  B
had been rescinded by that notice.

Mr. Cornwell, who seems to have done all the negotiations on behalf
of Woodar, was obviously anxious if possible to settle rather than embark
on lengthy and expensive litigation. He was no doubt disappointed when
Wimpey made it clear by their defence and counterclaim that they
intended to fight. He probably, I think, wrote his lengthy letter of  C
May 30, 1974, in one last effort to effect a settlement. Wimpey have
sought to make much of this letter which in my view helps Woodar
rather than Wimpey. It seems to make it very plain that Mr. Cornwell
had consulted counsel on the notice of rescission and had been advised
that it constituted a wrongful repudiation of the contract. I cite one
brief passage from it: ". . . unless some compromise is reached and
quickly, then I shall feel obliged to sell immediately in the best possible  D
circumstances with a certain knowledge, so far as counsel's advice is
concerned, that we have a complete redress against " Wimpey. Of
course there was nothing to stop the parties waiting and doing nothing
until the litigation constituted by the first action was over as Mr. Cornwell
said earlier in his letter. But there was nothing to prevent Woodar
from selling immediately and bringing another action claiming damages,  E
once they had accepted the repudiation to which I have already referred.

At the time when Mr. Cornwell's letter of June 4, 1974, was written,
upon which my noble and learned friend, Lord Scarman, places con-
siderable reliance, Woodar had not accepted the repudiation: and a
repudiation, however wrongful is nugatory until accepted by the other
contracting party.                                                      F

The result of the first action must have been in Woodar's favour.
They could have waited until completion was due under the contract,
which could not have been later than February 21, 1980. Wimpey might
then perhaps have completed the contract or they might have failed to
complete it, in which event they would have had no defence to an action
for specific performance or damages. There was, however, nothing to
compel Woodar to confine themselves to the first action. They had a  G
free choice to do so or to accept the wrongful repudiation which would
enable Woodar to bring the second action claiming damages for an
anticipatory breach of the contract.

I entirely agree with my noble and learned friend, Lord Wilberforce,
that Wimpey's counterclaim in the first action did not amount to a
repudiation of the contract. For the reasons I have given, however, their  H
repudiation of the contract had, in my view, been effected by the notice
of rescission dated March 20, 1974, and supported by the letter of the
same date.

Although I cannot agree with Buckley L.J. that the contract was not
wrongfully repudiated, I do agree with his view that if Wimpey's notice
of the March 20, 1974, did constitute a wrongful repudiation of the
contract of February 21, 1973, the proceedings launched by Woodar

A  against Wimpey on March 29, 1974, could not preclude them from
accepting that repudiation and bringing another action against Wimpey
claiming damages for an anticipatory breach of contract.  And this is
what Woodar did.  On July 10, 1974, through their solicitors, they
accepted the wrongful repudiation of March 20, 1974, and then launched
their action for damages for an anticipatory breach of contract.  The
two actions were consolidated and duly tried by Fox J. who found that
B  Wimpey had wrongfully repudiated the contract of February 21, 1973,
and gave judgment in favour of Woodar for, in all, £462,000 damages.

The Court of Appeal by a majority affirmed Fox J's decision on
liability but reduced the damages to £272,943.

My Lords, for the reasons I have stated, I would dismiss the appeal
on the issue of liability.  Since, as I understand, the majority of your
C  Lordships are for allowing the appeal on liability, the interesting question
in relation to damages in respect of the claim for £150,000 does not
now arise.  I do, however, agree with what my noble and learned friend,
Lord Wilberforce, has said about the finding of the majority of the Court
of Appeal (Goff L.J. with reluctance) on this topic.  I would add that,
in my opinion, the law as it stands at present in relation to damages of
this kind is most unsatisfactory; and I can only hope that your Lordships'
D  House will soon have an opportunity of reconsidering it unless in the
meantime it is altered by statute.

LORD RUSSELL OF KILLOWEN.  My Lords, the contention advanced
by the purchaser (" Wimpey ") was that it was entitled to rescind the
contract by notice of rescission under special condition E (a) (iii) of
E  the contract, because the relevant authority had " commenced the
procedure " required by law for compulsory acquisition not earlier than
the making of the compulsory purchase order on November 8, 1973,
subsequent to the contract.  Fox J. held that this was incorrect; and
that even if it were a correct construction of the contract there should
be rectification to make it clear that steps taken by authority in that
connection prior to the contract constituted commencement of the
F  relevant procedure and were not intended to afford a ground for rescission
under the special condition.  From that holding there was and is no
appeal.

Consequently there was no justification in law for the notice of
rescission, and the first question in this appeal is whether the notice
of rescission was capable of being accepted by Woodar as a renunciation
G  or repudiation of the contract by Wimpey.  An affirmative answer to
that question was assumed, or not disputed, before Fox J., and was given
by the majority in the Court of Appeal (Buckley L.J. dissenting).

The difference of opinion on this point in the Court of Appeal and
in your Lordships' House turns upon a question which can be shortly
stated.  If a party to a contract has a power thereunder totally to rescind
H  and renounce all liability to perform any part of its obligations under a
contract, and in terms purports absolutely so to rescind and renounce
on grounds that in law are not justified, can there ever be circumstances
which enable the rescinder to dispute the renunciatory and repudiatory
quality of his action?

My Lords, in my opinion the answer to that question is in the negative.
I do not of course dispute that a mistaken concept of the rights of
a party under the contract, and action (or inaction) on the basis of

Lord Russell
of Killowen                 Woodar Ltd. v. Wimpey Ltd. (H.L.(E.))                 **[1980]**

that mistaken concept, need not constitute such a renunciation of the    A
contract as to be capable of being accepted as repudiation of the
contract. Nor do I dispute that repudiation is a serious matter not
lightly to be found. Nor do I dispute that in most cases repudiation or
non-repudiation falls to be decided having regard to all the circumstances
of a case. But I deny that a clear case of the purported exercise of a
power of rescission, a total renunciation of all future obligation to perform    B
any part of the contract, such as now concerns your Lordships, can by
any circumstances be watered down or deprived of its repudiatory quality.
I further assert that it is fallacious to deny that totally renunciatory and
repudiatory quality on the ground that because the action is purportedly
taken under a clause in the contract it is somehow affirming rather
than repudiating the contract. The notice of rescission given in this
case by Wimpey was wholly unequivocal, in effect saying that Wimpey    C
would not in any circumstances fulfil the contract: and that flat state-
ment is not to be regarded as otherwise than renunciatory of the contract
because Wimpey genuinely thought that it was entitled in law to take
that attitude.

It is of course true that in previous discussion with Mr. Cornwell
(for Woodar) it was indicated that Wimpey's right to rescind on the    D
ground suggested would be challenged by Woodar in proceedings. But
I see no ground in that for watering down the absolute nature (or colour)
of the notice of rescission as being somehow conditional upon the
rectitude in law of Wimpey's stance. Indeed I do not accept a view
that the notice of rescission could have been (a) expressed to be con-
ditional upon its justification in law but (b) then operative to terminate
all liability of Wimpey under the contract, as it was manifestly intended    E
to be because it was feared that shortly a planning permission would be
forthcoming (though it did not) which would trap Wimpey irrevocably
into an unprofitable bargain.

I can, my Lords, envisage a situation in which a party in the position
of Woodar might state unequivocally in advance that if Wimpey were to
serve the notice which it did serve, Woodar would not, when it was    F
shown in proceedings that the notice was unjustified, treat it as repudi-
atory. But that would achieve a position in which Woodar would be
debarred from asserting repudiation, rather than constitute a circumstance
qualifying the fundamental renunciatory character of the purported
exercise by Wimpey of the power. But it cannot be said that such a
position was achieved by anything said by Cornwell in this case.

I am, my Lords, not led to a contrary view by the circumstances of    G
the *Spettabile* case, 121 L.T. 628 at first instance. There was the view
taken that if originally a communication would have indicated a repudi-
atory attitude, subsequent approach to the court by the " repudiator "
for a decision upon the rights of the case should be taken as withdrawal
of the original repudiation. That is not this case. The resort to the
court was not by Wimpey, and Wimpey never withdrew its notice of    H
rescission to abide the outcome of the litigation.

It was suggested that the proceedings by Woodar for a declaration
and/or rectification somehow constituted an election not to accept the
rescission as a repudiation, so that Woodar's later purported acceptance
of it as such was ineffective. In common with, I believe, all your
Lordships I cannot accept that. Woodar was obliged to take steps that

1 W.L.R.                Woodar Ltd. v. Wimpey Ltd. (H.L.(E.))              Lord Russell
of Killowen

A    it did in order to establish that the notice was unjustified in law and
therefore an unjustified repudiation.

Accordingly in my opinion Wimpey wrongfully repudiated the contract
by its notice of rescission, and Woodar accepted that repudiation so as
to entitle it to damages for total breach.

In arriving at my conclusion I do not rely upon the reference to interest
payments in the covering letter enclosing the rescission notice: nor upon
B    the defence or counterclaim of Wimpey. These seem to me to add
nothing to the repudiatory nature of the notice itself.

In conclusion upon this point I cannot agree that, if my opinion were
correct, it would be an unfortunate step in the law. If a party takes such a
bold step he risks disaster. If he plunges in without first testing the
temperature by a construction summons asking whether the rescission
C    remedy is available to him he runs the risk of catching a severe cold.

There is no question on this appeal as to quantum of damage save
under the heading of damages for breach of special condition I, under
which Wimpey agreed on completion of the sale to pay £150,000 to Trans-
world, a Hong Kong company. Transworld was in some way connected
with Mr. Cornwell, who died before action. No evidence connects Trans-
D    world with Woodar, the party to the contract. No evidence suggests that
Woodar could suffer any damage from a failure by Wimpey to pay
£150,000 to Transworld. It is clear on the authority of *Beswick* v.
*Beswick* [1968] A.C. 58, that Woodar on completion could have secured
an order for specific peformance of the agreement to pay £150,000 to
Transworld, which the latter could have enforced. That would not have
been an order for payment to Woodar, nor (contrary to the form of
E    order below) to Woodar for the use and benefit of Transworld. There
was no suggestion of trust or agency of Woodar for Transworld. If it
were necessary to decide the point, which in the light of the views of the
majority of your Lordships on the first point it is not, I would have con-
cluded that no more than nominal damages had been established by Woodar
as a consequence of the refusal by Wimpey to pay Transworld in the
F    light of the law of England as it now stands. I would not have thought
that the reasoning of Oliver J. in *Radford* v. *De Froberville* [1977] 1
W.L.R. 1262 supported Woodar's case for substantial damages. Nor do I
think that on this point the Court of Appeal was correct in thinking it
was constrained by *Jackson* v. *Horizon Holidays Ltd.* [1975] 1 W.L.R.
1468 to award substantial damages. I do not criticize the outcome of that
case: the plaintiff had bought and paid for a high class family holiday:
G    he did not get it, and therefore he was entitled to substantial damages
for the failure to supply him with one. It is to be observed that the order
of the Court of Appeal as drawn up did not suggest that any part of the
damages awarded to him were " for the use and benefit of " any member
of his family. It was a special case quite different from the instant case
on the Transworld point.
H    I would not, my Lords, wish to leave the *Jackson* case without adverting
with respectful disapproval to the reliance there placed by Lord Denning
M.R.—not for the first time—on an extract taken from the judgment of
Lush L.J. in *Lloyd's* v. *Harper*, 16 Ch.D. 290. That case was plainly
a case in which a trustee or agent was enforcing the rights of a beneficiary
or principal, there being therefore a fiduciary relationship. Lord Denning
in *Jackson's* case said, at p. 1473:

"The case comes within the principle stated by Lush L.J. in *Lloyd's*    A
*v. Harper* (1880) 16 Ch.D. 290, 321: 'I consider it to be an established
rule of law that where a contract is made with *A.* for the benefit of
*B., A.* can sue on the contract for the benefit of *B.* and recover all
that *B.* could have recovered if the contract had been made with *B.*
himself'."

Lord Denning continued: "It has been suggested that Lush L.J. was    B
thinking of a contract in which A was trustee for B. But I do not think
so. He was a common lawyer speaking of common law." I have already
indicated that in all the other judgments the matter proceeded upon a
fiduciary relationship between A and B: and Lush L.J. in the same
passage makes it plain that he does also; for he says:

> "It is true that the person [B] who employed him [the broker A]    C
> has a right, if he pleases, to take action himself and sue upon the
> contract made by the broker for him, for he [B] is a principal party
> to the contract."

To ignore that passage is to divorce the passage quoted by Lord Denning
from the fiduciary context in which it was uttered, the context of principal
and agent, a field with which it may be assumed Lush L.J. was familiar.    D
I venture to suggest that the brief quotation should not be used again as
support for a proposition which Lush L.J. cannot have intended to
advance.

In summary therefore, in disagreement with the majority of your
Lordships, I would have dismissed this appeal on repudiation. Had I
been correct I would, as at present advised, have allowed the appeal on
the Transworld point, and awarded only nominal damages on that point to    E
Woodar, and not substantial damages to be paid to Woodar "for the use
and benefit of" Transworld, a form of order which I cannot see was
justified.

LORD KEITH OF KINKEL. My Lords. In deciding the issue of repudia-
tion which arises in this appeal, the guiding principle is that enunciated    F
by Lord Coleridge, C.J. in *Freeth v. Burr*, L.R. 9 C.P. 208, 213:

> "... in cases of this sort, where the question is whether the one
> party is set free by the action of the other, the real matter for con-
> sideration is whether the acts or conduct of the one do or do not
> amount to an intimation of an intention to abandon and altogether
> to refuse performance of the contract."    G

The matter is to be considered objectively:

> "The claim being for wrongful repudiation of the contract it was
> necessary that the plaintiff's language should amount to a declaration
> of intention not to carry out the contract, or that it should be such that
> the defendant was justified in inferring from it such intention. We
> must construe the language used by the light of the contract and the    H
> circumstances of the case in order to see whether there was in this
> case any such renunciation of the contract." (*Johnstone v. Milling*
> (1886) L.R. 16 Q.B.D. 460, 474, *per* Bowen L.J.).

The importance of looking at the whole circumstances of the case was
emphasised by Lord Selborne L.C. in *Mersey Steel and Iron Co. Ltd. v.
Naylor, Benzon & Co.*, 9 App.Cas. 434, and by Singleton L.J. in *James
Shaffer Ltd.* v. *Findlay Durham & Brodie* [1953] 1 W.L.R. 106, 116.

A    There is a tract of authority which vouches the proposition that the assertion by one party to the other of a genuinely held but erroneous view as to the validity or effect of a contract does not constitute repudiation. In the *Spettabile* case, 121 L.T. 628, the plaintiffs sent to the defendants a letter claiming that certain contracts were no longer binding upon them and followed it up with a service of a writ seeking declarations to that effect. The Court of Appeal held that the plaintiffs' conduct did not amount to repudiation of the contracts. Warrington L.J. said at p. 633, with reference to the letter:

B

> " It seems to me that that is not telling the defendants that whatever happens, whatever is the true state of the case, whether the contracts are binding on the plaintiffs or not, they will not perform them: but that they have instructed their solicitors to take proceedings with the object of having it determined that the contracts are not binding upon the plaintiffs and are at an end; . . .''

C

And with reference to the writ:

> " . . . I think that it is desirable to say this, that in my opinion where one party to a contract conceives that he is no longer bound by the contract or has a right to have it rescinded or declared null and void, and issues a writ for the purpose of obtaining that which he believes to be his right, he does not by that mean to repudiate the performance of the contract in any event. It seems to me that he submits to perform it if the court, as the result of the action, comes to the conclusion that he is bound to perform it, and it cannot be taken to be an absolute repudiation."

D

E

Lord Atkin, at p. 635, after observing that it must be shown that the party to the contract made quite plain his own intention not to be bound by it, said:

> " . . . the substance of [the writ] appears to me to be this: that the plaintiffs in the action are asking the court to declare whether or not they are any longer bound by the contracts. It appears to me that that is an entirely different state of facts altogether from an intimation by the plaintiffs, apart from the courts of law, that they in any event are not going to perform the contracts. It is something quite different from a repudiation. So far from expressing the intention of the parties not to perform the contracts, it appears to me to leave it to the court to say whether or not the contract is to be performed, and if the court says it is, then it impliedly states that it will be performed. I think, therefore, there was no repudiation of the contract.'

F

G

In two other cases it was held by the Court of Appeal that the expression by one party to a contract of a genuine but erroneous view as to the obligations which on a proper construction of it were thereby imposed did not infer an intention to repudiate the contract. These cases are *James Shaffer Ltd.* v. *Findlay Durham & Brodie* [1953] 1 W.L.R. 106 and *Sweet & Maxwell Ltd.* v. *Universal News Services Ltd.* [1964] 2 Q.B. 699. Finally, it is worth observing that in *Ross T. Smyth and Co. Ltd.* v. *T. D. Bailey, and Son and Co.* (1940) 164 L.T. 102, 107, Lord Wright said: " . . . a mere honest misapprehension, especially if open to correction, will not justify a charge of repudiation."

H

So in the present case the question comes to be whether, having    A
regard to all the circumstances, the conduct of the appellants in relation to
their invocation of special condition E (a) (iii) of the contract was such
that a reasonable person in the position of the respondents would properly
infer an intention " in any event," to use the expression employed by
Warrington and Atkin L.JJ. in the *Spettabile* case, 121 L.T. 628, to refuse
to perform the contract when the time came for performance.

The terms of special condition E (a) (iii) have been quoted by my noble    B
and learned friend Lord Wilberforce.  It conferred upon the appellants
the right lawfully to rescind the contract in the event there described.  The
appellants had come to find the contract burdensome in view of the
dramatic collapse of the property market.  They accordingly desired to be
relieved of it and took legal advice as to whether there existed grounds
upon which they might lawfully do so.  The advice received was to the    C
effect that special condition E (a) (iii) provided such a ground.

The appellants did not, however, at once give notice of rescission
under the clause.  They sought an interview with Mr. Cornwell, as
representing the respondents, which took place on March 7, 1974, and
proceeded on the lines described in the aide mémoire which is in evidence.
The appellants informed Mr. Cornwell of their position as regards the
application of special condition E (a) (iii) and proposed a renegotiation of    D
the contract, failing which they stated their intention to serve notice of rescis-
sion in terms of the clause.  Mr. Cornwell contested the correctness of their
position, and expressed the intention, if the appellants served notice of res-
cission, of taking the matter to court and obtaining a decision upon their
right to do so.  The appellants served their notice of rescission about two
weeks later, clearly in the expectation, which was duly and promptly    E
realised, that the respondents would initiate legal proceedings in order to
test its validity.  In my opinion there was nothing in the appellants' con-
duct up to this point, there being no dispute about the genuineness of their
belief that they were entitled to terminate the contract upon the stated
ground, which might reasonably be treated as inferring that it was their
intention to refuse performance in the event of a judicial determination
that that belief was erroneous.  The letters written by Mr. Cornwell to    F
Sir Godfrey Mitchell on May 30, and June 6, 1974, the material parts of
which have been quoted by my noble and learned friend, clearly indicate
that he himself did not draw any such inference.  I am unable to regard
the appellants' conduct as evincing an intention " altogether to refuse per-
formance of the contract " as Lord Coleridge put it in *Freeth* v. *Burr*,
L.R. 9 C.P. 208, 213 or as constituting an absolute " repudiation " in the    G
sense in which Atkin L.J. used that expression in the *Spettabile* case,
121 L.T. 628.

I would accept without hesitation the statement of Lord Denning M.R.
in *Federal Commerce & Navigation Co. Ltd.* v. *Molena Alpha Inc.* [1978]
1 Q.B. 927, 979 that a party who breaks a contract cannot excuse himself
by saying that he did it on the advice of his lawyers, or that he was under
an honest misapprehension.  If in the present case the time for performance    H
had passed while the appellants were still maintaining their position based
on the erroneous interpretation of special condition E (a) (iii), they would
have been in breach of contract and liable in damages accordingly.  Lord
Denning goes on to say: " Nor can he excuse himself on those grounds
from the consequences of a repudiation."  That may be so, but it is first
necessary to determine whether or not there has been a repudiation.

The doctrine of repudiatory breach is largely founded upon considera-

A  tions of convenience and the opportunities which it affords for mitigating loss, as observed by Cockburn C.J. in *Frost* v. *Knight* (1872) L.R. 7 Ex. 111, 114. It enables one party to a contract, when faced with a clear indication by the other that he does not intend to perform his obligations under it when the time for performance arrives, to treat the contract, if he so chooses, as there and then at an end and to claim damages as for actual breach. Where one party, honestly but erroneously, intimates to the other

B  reliance upon a term of the contract which, if properly applicable, would entitle him lawfully to rescind the contract, in circumstances which do not and are not reasonably understood to infer that he will refuse to perform his obligations even if it should be established that he is not so entitled, legal proceedings to decide that issue being in contemplation, I do not consider it in accordance with ordinary concepts of justice that the other

C  party should be allowed to treat such conduct as a repudiation. Nor, in my opinion, are there any considerations of convenience which favour that course.

   I would add that in my view the lodging by the appellants of their defence and counterclaim in answer to the respondents' first writ did not constitute further conduct on their part which can itself be regarded as having a repudiatory character. They thereby demonstrated nothing

D  more than an adherence to their position as they had earlier expressed it. Further, the action taken by the appellants in relation to the guarantee arrangements with the National Westminster Bank appear to me to have been no more than a natural consequence of the view taken by the appellants as to their right to terminate the contract.

   In the circumstances the issue regarding the respondents' right to

E  damages in respect of alleged breach of the appellants' obligation under the contract to pay £150,000 to Transworld does not arise for decision. It is desirable, however, that I should express my agreement with my noble and learned friend, Lord Wilberforce, that the decision in favour of the respondents upon this issue, arrived at by the majority of the Court of Appeal, was not capable of being supported by *Jackson* v.

F  *Horizon Holidays Ltd.* [1975] 1 W.L.R. 1468. That case is capable of being regarded as rightly decided upon a reasonable view of the measure of damages due to the plaintiff as the original contracting party, and not as laying down any rule of law regarding the recovery of damages for the benefit of third parties. There may be a certain class of cases where third parties stand to gain indirectly by virtue of a contract, and

G  where their deprivation of that gain can properly be regarded as no more than a consequence of the loss suffered by one of the contracting parties. In that situation there may be no question of the third parties having any claim to damages in their own right, but yet it may be proper to take into account in assessing the damages recoverable by the contracting party an element in respect of expense incurred by him in

H  replacing by other means benefits of which the third parties have been deprived or in mitigating the consequences of that deprivation. The decision in *Jackson* v. *Horizon Holidays Ltd.* is not, however, in my opinion, capable of being supported upon the basis of the true ratio decidendi in *Lloyd's* v. *Harper,* 16 Ch.D. 290, which rested entirely on the principles of agency.

   I would also associate myself with the observations of my noble and learned friend, Lord Scarman, as to the desirability of this House having

an opportunity of reviewing, in some appropriate future case, the general    A
attitude of English law towards the topic of jus quaesitum tertio.

My Lords, I would allow the appeal.

LORD SCARMAN. My Lords.  For the reasons given by my noble and
learned friend, Lord Wilberforce, I would allow the defendants' appeal.
In my judgment the defendants did not commit, or threaten to commit,
a repudiatory breach of contract.  The principle of the modern law is now    B
" perspicuous," as my noble and learned friend observed in *Federal Com-
merce & Navigation Co. Ltd.* v. *Molena Alpha Inc.* [1979] A.C. 757, 778.
To be repudiatory, the breach, or threatened breach, must go to the root of
the contract.  If an anticipatory breach is relied on, the renunciation
must be " an intimation of an intention to abandon and altogether to
refuse performance of the contract "; or, put in other but equally    C
clear words, " the true question is whether the acts and conduct of the
party evince an intention no longer to be bound by the contract ": Lord
Coleridge C.J. in *Freeth* v. *Burr,* L.R. 9 C.P. 208, 213.  The emphasis
upon communication of the party's intention by his acts and conduct
is a recurring theme in the abundant case law.  Two well-known cases
illustrative of the emphasis are *Mersey Steel and Iron Co. Ltd.* v. *Naylor,*    D
*Benzon & Co.,* 9 App.Cas. 434 and *Bradley* v. *H. Newsom, Sons &
Co.* [1919] A.C. 16 (see in particular the speech of Lord Wrenbury).

Difficulty, however, does arise in the application of the principle to
particular facts—as the difference in judicial opinion in the present case
shows.  The dividing line between what is repudiatory and what is not
emerges from three very persuasive dicta to be found in the case law.
When the *Federal Commerce* case [1979] A.C. 757 was in the Court of    E
Appeal, Lord Denning M.R. said [1978] Q.B. 927, 979 :

> " I have yet to learn that a party who breaks a contract can excuse
> himself by saying that he did it on the advice of his lawyers: or
> that he was under an honest misapprehension . . . I would go by
> the principle . . . that if the party's conduct " " contract " must be a
> misprint "—objectively considered in its impact on the other party—    F
> is such as to evince an intention no longer to be bound by his
> contractual obligations, then it is open to the other party to accept
> his repudiation and treat the contract as discharged from that time
> onwards."

In the *Spettabile* case, 121 L.T. 628, 634–635, Atkin L.J. said of the
various definitions of repudiations :                    G

> " They all come to the same thing, and they all amount at any rate
> to this, that it must be shown that the party to the contract made
> quite plain [emphasis supplied] his own intention not to perform
> the contract."

In *James Shaffer Ltd.* v. *Findlay Durham & Brodie* [1953] 1 W.L.R.    H
106 the Court of Appeal had under consideration a breach of a long-term
supply contract where the defendant, who had undertaken to pass on
orders of not less than a specified value each year, failed to do so.
He honestly believed his failure was not a breach of contract: but the
Court of Appeal held that it was, his construction of the contract being
erroneous in law.  The court held, however, that the breach did not
evince an intention not to be bound by the contract.  Singleton L.J., who

A    referred to *Freeth* v. *Burr*, L.R. 9 C.P. 208 and the *Spettabile* case, 121 L.T. 628 made this comment, at p. 120:

> " Streatfield J. said that this was a very difficult case and near the line. I think that that is a true description. Sometimes when a case is put in one particular way it has great appeal, and, when it is put in the other way, it has an almost equal appeal. I do not think
> B    that it is right to look at the interview of May 18 alone; as I understand the law, it is our duty to have regard to the circumstances."

Morris L.J. (bottom of p. 124) and Upjohn J. (p. 127) said the same thing.

My Lords, as I see it, the error of the majority of the Court of Appeal in the instant case was, notwithstanding some dicta to the contrary, to concentrate attention on one act, i.e. the notice of rescission
C    with its accompanying letter. They failed to give the consideration which the law requires of all the acts and conduct of the defendants in their dealings with Mr. Cornwell—the " alter ego " of the plaintiff company. The law requires that there be assessed not only the party's conduct but also, " objectively considered," its impact on the other party. The error is neatly exposed in Goff L.J.'s terse conclusion: " In my judgment
D    rescission is repudiation, and if it cannot be justified by the terms of the contract it is wrongful and a breach." The learned Lord Justice was, with respect, concentrating too much attention on one act isolated from its surrounding circumstances and failing to pay proper regard to the impact of the party's conduct upon the other party.

In this case the contract provided for the possibility of rescission by the defendants. But the notice of rescission, which the defendants gave,
E    was not, in the circumstances which existed when it was given, one which the defendants had any contractual right to give. But they honestly believed the contract did give them the right. When one examines the totality of their conduct and its impact upon Mr. Cornwell it is plain, as shown by my noble and learned friend's analysis of the facts, that the defendants, though claiming mistakenly to exercise a power given them
F    by the contract to bring it to an end, were not evincing an intention not to be bound by the contract. On the contrary, they believed they were acting pursuant to the contract. And Mr. Cornwell well understood the situation. As he put it in his final letter to Sir Godfrey Mitchell, the president of the defendants,

> " . . . all I need say now it that we will retire to our battle stations
> G    and it goes without saying I am sure that you will abide by the result as I will."

It never occurred to Mr. Cornwell that the defendants, if held not to have been entitled to give notice of rescission, would refuse to perform the contract. In fact, it would seem that he believed exactly the contrary. Such was the impact upon him of the defendants' conduct.
H    It being the view of the majority of the House that there was no repudiation, the appeal must be allowed, with the result that there is no need to consider the other issues raised. But, because of its importance, I propose to say a few words on the question of damages.

The plaintiff company agreed to sell the land to the defendants for £850,000. They also required the defendants to pay £150,000 to a third party. The covenant for this payment was in the following terms:

"I.  Upon completion of the purchase of the whole or any part    A
of the land the purchaser shall pay to Transworld Trade Ltd. of
25 Jermyn Street, London, S.W.1 a sum of £150,000."

No relationship of trust or agency was proved to exist between the
plaintiff company and Transworld Trade Ltd.  No doubt, it suited Mr.
Cornwell to split up the moneys payable under the contract between
the two companies: but it is not known, let alone established by evidence    B
(though an intelligent guess is possible) why he did so, or why the
plaintiffs desired this money to be paid to Transworld Trade.  It is simply
a case of B agreeing with A to pay a sum of money to C.

B, in breach of his contract with A, has failed to pay C.  C, it is said,
has no remedy, because the English law of contract recognises no " jus
quaesitum tertio ": *Tweddle* v. *Atkinson* (1861) 1 B. & S. 393.  No
doubt, it was for this reason that Transworld Trade is not a party to the    C
suit.  A, it is acknowledged, could in certain circumstances obtain specific
performance of the promise to pay C: *Beswick* v. *Beswick* [1968] A.C.
58.  But, since the contract in the present case is admitted (for reasons
which do not fall to be considered by the House) to be no longer in
existence, specific performance is not available.  A's remedy lies only in
an award of damages to himself.  It is submitted that, in the absence of    D
any evidence that A has suffered loss by reason of B's failure to pay C,
A is only entitled to nominal damages.

I wish to add nothing to what your Lordships have already said about
the authorities which the Court of Appeal cited as leading to the
conclusion that the plaintiff company is entitled to substantial damages
for the defendants' failure to pay Transworld Trade.  I agree that they    E
do not support the conclusion.  But I regret that this House has not yet
found the opportunity to reconsider the two rules which effectually
prevent A or C recovering that which B, for value, has agreed to provide.

First, the " jus quaesitum tertio."  I respectfully agree with Lord Reid
that the denial by English law of a " jus quaesitum tertio " calls for
reconsideration.  In *Beswick* v. *Beswick* [1968] A.C. 58, 72 Lord Reid,
after referring to the Law Revision Committee's recommendation in    F
1937 (Cmnd. 5449) p. 31 that the third party should be able to enforce
a contractual promise taken by another for his benefit, observed:

"And, if one had to contemplate a further long period of Parlia-
mentary procrastination, this House might find it necessary to deal
with this matter."

The committee reported in 1937: *Beswick* v. *Beswick* was decided in    G
1967.  It is now 1979: but nothing has been done.  If the opportunity
arises, I hope the House will reconsider *Tweddle* v. *Atkinson,* 1 B. & S. 393
and the other cases which stand guard over this unjust rule.

Likewise, I believe it open to the House to declare that, in the absence
of evidence to show that he has suffered no loss, A, who has contracted
for a payment to be made to C, may rely on the fact that he required    H
the payment to be made as prima facie evidence that the promise for
which he contracted was a benefit to him and that the measure of his
loss in the event of non-payment is the benefit which he intended for C
but which has not been received.  Whatever the reason, he must have
desired the payment to be made to C and he must have been relying on B
to make it.  If B fails to make the payment, A must find the money from
other funds if he is to confer the benefit which he sought by his contract

A    to confer upon C. Without expressing a final opinion on a question which is clearly difficult, I think the point is one which does require consideration by your Lordships' House.

Certainly the crude proposition for which the defendants contend, namely that the state of English law is such that neither C for whom the benefit was intended nor A who contracted for it can recover it, if the contract is terminated by B's refusal to perform, calls for review: and now, not forty years on.

B

*Appeal allowed.*

Solicitors: *P. J. Ward; Sharpe, Pritchard & Co.*

F .C.

C

───────

[FAMILY DIVISION]

* PRACTICE DIRECTION (CHILD: JOINT CUSTODY ORDER)

*Husband and Wife—Divorce—Children—Practice—Joint custody*
D    *order—Procedure to secure uniformity of practice in making*
    *order—Matrimonial Causes Act 1973 (c. 18), s. 41*

It sometimes happens that the judge who is considering the arrangements for the children under section 41 of the Matrimonial Causes Act 1973 is invited by one or both parties to make a joint custody order. Such orders are being sought more often now than formerly and
E    variations of practice have been noticed in different parts of the country. With a view to securing uniformity of approach it is hereby directed as follows:

1. Where a petitioner and a respondent have reached an agreement as to which of them should have care and control of the child, or children, and are further agreed that legal custody should be vested in the two
F    of them jointly and only one of them appears on the appointment, the court ought not on that appointment to make an order which is inconsistent with the agreement. If the court is unwilling to make the agreed order, it should adjourn the matter to give each party the opportunity to be heard.

2. Where a petition contains a prayer for custody and the respondent has indicated in writing (in the acknowledgment of service or otherwise)
G    that he (or she) wishes to apply for custody to be vested in the two of them jointly, the court should proceed on the basis that the question of custody is in issue, and should not make an order for custody, or joint custody, except with the agreement of both parties or after giving each of them the opportunity to be heard.

This direction is issued with the concurrence of the Lord Chancellor.

H
                                        SIR JOHN ARNOLD P.

*February* 18, 1980.

───────