*original* *AV*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
:
In re : Chapter 11 Case No.
:
LEHMAN BROTHERS HOLDINGS INC., et al., 08-13555 (JMP)
:
Debtors. : (Jointly Administered)
:
-----------------------------------------------------------x

*Submit*

## STAMFORD CONN BUILDING BAILOUT PROJECT
### 695 EAST MAIN ST

HAVING RETURNED TO THE UNITED STATES WITH REGARDS TO THE HEARING SET

DOWN FOR THE 10TH AND HAVING FILED A TIMELY OBJECTION TO THE

STAMFORD BUILDING BAILOUT, IT OCCURED TO OBJECTANT IN THE VERY EARLY

MORNING OF THE 9TH UPON READING PART OF SUNDAY'S NY TIMES REAL

ESTATE SECTION SHOWING A LARGE MAP OF CONNECTICUT

HTTP://WWW.HALSTEAD.COM ON PAGE MBRE 20 THAT A SEARCH OF

THE SUBJECT PROPERTY MIGHT BE USEFUL.

IT APPEARS THAT THE DEBTOR IS JUST TRYING TO DUPE THE COURT INTO

JUST ANOTHER SWEETHEART DEAL. ANY BASIC UNDERSTANDING OF

COMMERICAL REAL ESTATE INCLUDING THE CONCEPT OF MITIGATION, IE

IF YOU HAVE A BUILDING THAT IS GOING TO BE EMPTY, YOU TRY AND GET

OUT IN-FRONT AND GET IT RENTED AND OR SOLD

A SEARCH REVEALS THE FOLLOWING IN THE RANGE OF BUILDINGS BETWEEN

400,000 AND 600,000 SQ FT IN STAMFORD, CONN

2010 FEB -9 A 11:01
S.D. OF N.Y.
FILED
US BANKRUPTCY COURT

Stamford, CT Office Properties For Lease — *No Results Found*
http://www.loopnet.com/xNet/MainSite/Listing/Search/SearchResults.aspx?SCSN=SSCXml#rr

NOR IS ANY BUILDING THAT SIZE FOR SALE

STAMFORD, CT Commercial Real Estate For Sale — *No Results Found*

http://www.loopnet.com/xNet/MainSite/Listing/Search/SearchResults.aspx?linkcode=13880&SCSN=SSCXml#rr

ACCORDINGLY AND RESPECTFULLY, THIS APPEARS TO BE JUST ANOTHER

ATTEMPT TO DUPE THE COURT AND PARK CASH WITH GOOD BUDDIES WHILE

LOADING UP THE DEBTOR WITH WORTHLESS ESTATE.

IF THIS IS SUCH A HOT DEAL, THEN PERHAPS THE DEBTOR AND IT'S LAWYERS

MIGHT MOVE LOCK STOCK AND BARREL OUT THERE SO AT LEAST THE ESTATE

MIGHT GET SOME VALUE FOR AN PROPERTY THAT WILL REMAIN EMPTY FOR THE

LONG TERM FUTURE. I CAN ONLY WONDER JUST HOW MUCH OF THE EXORBITANT

FEE'S THAT THE ESTATE HAS SUFFERED TO BE PAID OUT HAS JUST GONE OVER

TO WELL HEELED REAL ESTATE OWNERS OF BUILDING LIKE THE GM BUILDING

WHERE WEIL GOTSHAL HAS IT'S LAVISH OFFICE.

THE IDEA THAT PAYING $11 MILLION LATE THIS SUMMER

< The first debt service payment of $11,343,142 is due on or before August 1, 2010.debtors motion @ page 3>

IS SOME KIND OF BURDEN TO THE ESTATE BUT IT IS OK

TO PAY OVER $400+ MILLION MORE TO MET LIFE WHO IS ON THE CREDITORS

COMMITTEE OR $1 BILLION+ OVER TO THE GERMANS FOR GOD ONLY KNOWS

WHAT KIND OF JUNK IS JUST THE MOST DANGEROUS KIND OF ADVENTURING IN A

WORLD SINKING INTO FINANCIAL DISARAY.

### JP Morgan involved in shady Greek bonds | EnerPub - Energy Publisher
The structured **bonds** were sold in February to state pension funds. They had been underwritten by JPMorgan on behalf of the **Greek** government and sold to North Asset Management in February for 92.95 percent of their nominal value.
www.energypublisher.com/article.asp?id=10849

### Dr Doom's medicine is bad for Greece

...on spending cuts" as a remedy for the current situation in Greece. We have heard this prescription for "harsh medicine" before...the countries in south-eastern Europe (among them Bulgaria, Greece's northern neighbour) to recover from the shock. The therapy...

IT IS JUST THIS KIND OF RECKLESS CONDUCT THAT GOT LEHMAN INTO

BANKRUPTCY COURT AND THE IDEA THAT THE CASH IS SOME KIND OF HONEY-

POT TO BE RAIDED WITH EVERY HAIRBRAINED SCHEME THAT IS BEING

ADVANCED MUST BE ENDED.

THE CASH IN HAND BELONGS TO THE CREDITORS AND IS NOT SOME KIND OF

MAGIC CREDIT CARD FOR THE VISITING MANAGEMENT AND LONG TIME LAWYERS

OF LEHMAN TO GO ON A SPENDING SPREE.

I WOULD NOT BE AT ALL SHOCKED TO SEE THE NEXT PROPOSAL FOR THE

DEBTOR TO LOAD UP ON GREEK GOVT BONDS. AFTER ALL, THEY ARE PAYING

ALMOST 6% AFTER ALL AND I AM SURE MR WAISMAN CAN FIND SOME

EMBELLISHING WORDS TO MAKE IT SOUND LIKE A CLEVER IDEA.

The yield on two-year Greek notes rose for a fourth straight day, increasing 48 basis points to 5.70 percent as of 4:58 p.m. in London.

HOWEVER

" If you fear a Greek crisis then you should not only avoid government bonds but corporates as well," Gisdakis said.

Philip Gisdakis, head of credit strategy at UniCredit SpA in Munich.

http://www.bloomberg.com/apps/news?pid=20601087&sid=aHQ7FXn9F6do

"The market is telling you that there's concern at the implementation of the plans," said Steven Major, global head of fixed-income research at HSBC Holdings Plc in London.

http://www.businessweek.com/globalbiz/content/dec2009/gb20091217_642114.htm

FURTHER THERE IS NO QUESTION IN MY MIND THAT WHAT GOES ON IN THIS

COURT IS HAVING A MAJOR IMPACT NOT ONLY TO THE ESTATE AND THE

EVENTUAL PAYOUT, IF ANY, TO UNDERSECURED CREDITORS BUT OTHERS.

## Lehman ruling creates new doubts for CDOs

By Aline van Duyn and Nicole Bullock
Published: February 8 2010 19:27 | Last updated: February 8 2010 19:27
Collateralised debt obligations, the complex debt securities linked to pools of risky mortgages and derivatives, have caused astronomical losses across the global financial system.
Many of the macroeconomic assumptions about house prices – and the likely default rates on mortgages – have turned out to be so wrong that the resulting losses for banks and insurance companies turned a financial crisis into a global

**Massive defaults for housing bubble deals**
Default rate of asset-backed securities collateralised debt obligations (%)
100

economic disaster which continues to be felt to this day.

A look at defaults on CDOs backed by asset-backed securities (see chart) highlights how wrong the beliefs underpinning deals struck at the height of the US housing bubble were: nearly 90 per cent of $186bn of such CDOs issued in 2007 have been defaulted on, compared with a 3 per cent default rate on deals backed by mortgages from 2001.

Much of that is due to the poor mortgage underwriting which prevailed at that time. In other words, these CDOs proved to be among the most toxic of toxic assets.

So much for the past. Now a new uncertainty looms, and it is linked to the assets and money that might be available to investors as these distressed securities are unwound.

This follows a US court ruling last month in the Lehman Brothers bankruptcy which may turn the conventional wisdom which has driven many of these deals on its head.

Structured deals such as CDOs are composed of many different tranches of securities, each representing different levels of risk. When these deals are liquidated, the legal structure of the deals determines which investors are repaid first.

It had long been assumed that investors in structured deals – the ones owning the notes – will get paid before swap counterparties do.

## EDITOR'S CHOICE

**Culture gap let toxic instruments thrive - Nov-25**

**CLOs under pressure from defaults - Mar-11**

**CLOs face Moody's ratings threat - Mar-04**

**S&P sees new systemic risk in CLO defaults - Feb-16**

**Defaults poised for record high - Feb-10**

**Half of all CDOs of ABS failed - Feb-10**

Often swap counterparties have only a small stake in a CDO, providing a hedge on interest rates, for example. But in some of the Lehman deals being contested, swap counterparties had a huge stake. This is particularly true for so-called synthetic CDOs, a shadowy market the scale of which is still hard to pin down, and which surged once banks ran out of mortgages to repackage into CDOs. Instead, credit derivatives linked to these mortgages were repackaged – creating the synthetic CDOs – and at the centre were credit default swaps written by dealers like Lehman's.

Now, Lehman's lawyers are seeking to get paid before other investors do. This position has now been backed by US courts but not by English ones.

"If not overturned, this decision could result in [Lehman Brothers] receiving billions of dollars from various CDOs that would otherwise be distributed to noteholders," said lawyers at Cleary Gottlieb in a note to clients.

Lawyers say they have received requests for advice from investors who have been paid on synthetic CDOs deals after Lehman's default triggered the unwinding of deals. They fear they may be forced to repay money already received, which could add up to $8bn, according to Cleary Gottlieb.

"The problems around CDOs, particularly synthetic CDOs, are really highlighting just how deficient and insufficient many of the assumptions underlying this huge market were," said a lawyer working for a hedge fund which has been paid money on a CDO.

The next step in the Lehman case will come at a hearing in New York on February 10.

Regardless of the outcome, another question mark has been added to the future of structured finance. Even though new deals are not expected to be structured in the same way or linked to mortgage-backed securities, the could be affected by the turmoil around CDOs.

The Lehman rulings, for example, could affect whether or not structured finance deals can be rated higher than the ratings of the swap counterparties backing parts of the deal.

If there are divergent decisions in England and the US, one answer may be to just use non-US swap counterparties. However, it highlights the risks that courts may rule in a way which is different to the way

lawyers thought they would.
Other issues which have come to the fore are uncertainty about how holders of different slices of the CDOs stand when there are defaults, as well as numerous uncertainties relating to the valuation of these securities when investors are seeking to settle or sell.
Such valuation issues have been particularly in the spotlight since the collapse of AIG, brought down by the weight of CDS insurance sold on hundreds of billions of dollars of CDOs. The pay-outs made by the Federal Reserve Bank of New York when it took over the insurer in 2008 to AIG counterparties like Goldman Sachs and Société Générale – the terms of which appear to have allowed the banks to determine the value of the CDOs when asking for collateral payments – continue to be a source of political scrutiny.
"The provisions in these CDS contracts, with hindsight, do not work well when you have hard-to-value, illiquid financial instruments," said Paul Forrester, partner at Mayer Brown.
"This is just one of the assumptions underpinning structured finance markets that is being re-examined. The status of swap counterparties is another one. All of these outcomes will need to be taken into account when future financial innovations are developed and designed.," Mr Forrester went on.
Copyright The Financial Times Limited 2010. You may share using our article tools. Please don't cut articles from FT.com and redistribute by email or post to the web.

Respectfully,

William Kuntz,III
kuntzwm1@yahoo.com
India St
PO Box 1801
Nantucket Island, Massachusetts 02554-1801 USofA
508-435-5858