**Exhibit "A"**

## MEZZANINE LOAN AGREEMENT

Dated as of June 6, 2007

Between

### FONTAINEBLEAU LAS VEGAS RETAIL MEZZANINE, LLC,
as Borrower

### FONTAINEBLEAU LAS VEGAS RETAIL PARENT, LLC
Mezzanine Pledgor

and

### LEHMAN BROTHERS HOLDINGS INC.
individually and as Agent for one or more Co-Lenders,
as Lender

I. DEFINITIONS; PRINCIPLES OF CONSTRUCTION............................................................ 1

    Section 1.1  Definitions............................................................................................. 1

    Section 1.2  Principles of Construction.................................................................... 35

II. GENERAL TERMS .......................................................................................................... 36

    Section 2.1  Loan Commitment; Disbursement to Borrower. ................................. 36

    Section 2.2  Interest; Loan Payments; Late Payment Charge.................................. 36

    Section 2.3  Prepayments........................................................................................ 44

    Section 2.4  Interest Rate Cap Agreement. ............................................................. 46

    Section 2.5  Release on Payment in Full................................................................. 49

III. CLOSING CONDITIONS................................................................................................ 49

    Section 3.1  Closing Conditions and Conditions to Initial Advance. ...................... 49

IV. REPRESENTATIONS AND WARRANTIES ................................................................. 52

    Section 4.1  Pledgor Representations....................................................................... 52

    Section 4.2  Survival of Representations. ................................................................ 70

V. BORROWER COVENANTS............................................................................................ 70

    Section 5.1  Affirmative Covenants.......................................................................... 70

    Section 5.2  Negative Covenants. ............................................................................ 98

VI. INSURANCE; CASUALTY; CONDEMNATION ......................................................... 107

    Section 6.1  Insurance. ............................................................................................ 107

    Section 6.2  Casualty............................................................................................... 108

    Section 6.3  Condemnation. ..................................................................................... 108

    Section 6.4  Restoration. .......................................................................................... 108

    Section 6.5  Rights of Lender. ................................................................................. 109

VII. RESERVE FUNDS ........................................................................................................ 109

    Section 7.1  Reserved............................................................................................... 109

    Section 7.2  Tax and Insurance Escrow Fund.......................................................... 109

    Section 7.3  Reserve Funds, Generally. ................................................................... 109

    Section 7.4  Transfer of Reserve Funds under Mortgage Loan. .............................. 110

VIII. DEFAULTS ................................................................................................................... 111

    Section 8.1  Event of Default................................................................................... 111

    Section 8.2  Remedies.............................................................................................. 116

    Section 8.3  Right to Cure Defaults. ........................................................................ 118

    Section 8.4  Remedies Cumulative; Waivers........................................................... 119

Section 8.5  Power of Attorney...................................................................... 119

IX. SPECIAL PROVISIONS............................................................................. 119

Section 9.1  Sale of Notes and Securitization. ............................................... 119

Section 9.2  Securitization Indemnification. .................................................. 122

Section 9.3  Servicer. ..................................................................................... 124

Section 9.4  Exculpation. ............................................................................... 125

Section 9.5  Intentionally Omitted. ................................................................ 126

Section 9.6  Intentionally Omitted. ................................................................ 127

Section 9.7  Syndication ................................................................................ 127

Section 9.8  Reallocation of Loan Amounts. ................................................. 134

Section 9.9  Certain Additional Rights of Lender.......................................... 135

Section 9.10  Mortgage Loan Defaults. ......................................................... 135

Section 9.11  Intercreditor Agreement........................................................... 137

Section 9.12  Discussions with Mortgage Lender. ......................................... 137

Section 9.13  Independent Approval Rights. .................................................. 137

X. CASH MANAGEMENT .............................................................................. 138

Section 10.1  Property Account. ..................................................................... 138

Section 10.2  Lockbox Account...................................................................... 138

Section 10.3  Mortgage Borrower Distributions............................................. 139

XI. MISCELLANEOUS ................................................................................... 139

Section 11.1  Survival. ................................................................................... 139

Section 11.2  Lender's Discretion................................................................... 139

Section 11.3  Governing Law. ........................................................................ 140

Section 11.4  Modification, Waiver in Writing. ............................................. 140

Section 11.5  Delay Not a Waiver. ................................................................. 140

Section 11.6  Notices. ..................................................................................... 141

Section 11.7  Trial by Jury.............................................................................. 142

Section 11.8  Headings. .................................................................................. 142

Section 11.9  Severability. .............................................................................. 143

Section 11.10  Preferences.............................................................................. 143

Section 11.11  Waiver of Notice..................................................................... 143

Section 11.12  Remedies of Borrower. ........................................................... 143

Section 11.13  Expenses; Indemnity............................................................... 143

ii

Section 11.14  Schedules and Exhibits Incorporated. .................................................... 145

Section 11.15  Offsets, Counterclaims and Defenses. .................................................. 145

Section 11.16  No Joint Venture or Partnership; No Third Party Beneficiaries. ........... 145

Section 11.17  Publicity. ............................................................................................... 146

Section 11.18  Waiver of Marshalling of Assets. .......................................................... 146

Section 11.19  Waiver of Counterclaim. ........................................................................ 146

Section 11.20  Conflict; Construction of Documents; Reliance. ................................... 146

Section 11.21  Brokers and Financial Advisors. ............................................................ 147

Section 11.22  Nature of Inspection and Approvals. ..................................................... 147

Section 11.23  Prior Agreements. .................................................................................. 148

Exhibits

Exhibit A – Form Assignment of Interest Rate Cap Agreement
Exhibit B - Form Subordination of Development Agreement
Exhibit C - Form Subordination of Management Agreement
Exhibit D - Form of Affiliate Lease
Exhibit E - Form of Tenant Lease
Exhibit F - Form of Management Agreement
Exhibit G - Form of Statement Re: Non-Bank Status

Schedules

Schedule I - Organizational Chart of Borrower
Schedule II – Litigation
Schedule III – Construction Budget
Schedule IV – Mortgage Loan Documents

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of June 6, 2007 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), between **LEHMAN BROTHERS HOLDINGS INC.,** a Delaware corporation, having an address at 399 Park Avenue, 8th Floor, New York, New York 10022, individually as lender and as Agent for one or more Co-Lenders ("Lender") and **FONTAINEBLEAU LAS VEGAS RETAIL MEZZANINE, LLC,** a Delaware limited liability company, having its principal place of business at 2827 Paradise Road, Las Vegas, Nevada 89109 ("Borrower") and **FONTAINEBLEAU LAS VEGAS RETAIL PARENT, LLC,** a Delaware limited liability company having it principal place of business at 2827 Paradise Road, Las Vegas, Nevada 89109, ("Mezzanine Pledgor"; together with the Borrower, hereinafter referred to as "Pledgor").

### W I T N E S S E T H:

WHEREAS, Borrower desires to obtain the Loan (as hereinafter defined) from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## I.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1**    Definitions.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"Acceptable Counterparty" shall mean any Counterparty to any Interest Rate Cap Agreement that has and shall maintain, until the expiration of such Interest Rate Cap Agreement, a long-term unsecured debt rating of not less than "Aa3" by Moody's and not less than "A+" by S&P (or in each case, the equivalent by any other Rating Agency); provided, however, Lehman Brothers Holdings Inc. or any Affiliate thereof shall be deemed to be an Acceptable Counterparty for so long as it maintains a long-term unsecured debt rating of not less than "A" by S&P and "A1" from Moody's.

"Account Collateral" shall mean: (i) the Accounts, and all Cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts from time to time; (ii) any and all amounts invested in Permitted Investments; (iii) all interest, dividends, Cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and (iv) to the extent not covered by clauses (i) - (iii) above, all "proceeds" (as defined under the UCC as in effect in the State in which the Accounts are located) of any or all of the foregoing.

"Accounts" shall mean the Tax Account, the Insurance Premium Account, the Debt Service Account, any escrow accounts or reserve accounts established by the Loan Documents (other than those accounts established under the Master Disbursement Agreement with respect to which the Resort Lender is the pledgee).

"Acquired Property" shall have the meaning set forth in Section 5.1.10(h)(i) hereof.

"Acquired Property Statements" shall have the meaning set forth in Section 5.1.10(h)(i) hereof.

"Additional Construction Consultant" shall mean any additional construction consultant engaged by Lender at Borrower's expense to perform various services on behalf of Lender including: examination of the Plans and Specifications and changes thereto, the Construction Budget change orders, and Advance Requests; periodic inspections on Lender's behalf and advising and rendering periodic reports to Lender concerning the same; and approving requests for Future Advances.

"Additional Indemnified Liabilities" shall have the meaning set forth in Section 11.13(b) hereof.

"Adjusted Prime Rate" shall mean an interest rate per annum equal to the Prime Rate in effect from time to time plus the Adjusted Prime Rate Spread.

"Adjusted Prime Rate Spread" shall mean the difference (expressed as the number of basis points) between (a) the Eurodollar Rate on the date LIBOR was last applicable to the Loan and (b) the Prime Rate on the date that LIBOR was last applicable to the Loan; provided, however, that if such difference is a negative number then the Adjusted Prime Rate Spread shall be equal to zero.

"Advance Request" shall (i) with respect to Project Future Advances, have the meaning set forth in the Master Disbursement Agreement and (ii) with respect to Debt Service Advances, have the meaning set forth in Section 2.1.2(d) hereof.

"Affected Co-Lender" shall have the meaning set forth in Section 9.7.2(k) hereof.

"Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person or of an Affiliate of such Person. Such term shall include the Guarantor unless otherwise specified or if the context may otherwise require.

"Affiliate Agreements" shall have the meaning set forth in Section 5.2.9 hereof.

"Affiliate Deferred Payments Agreement" shall mean the Affiliate Deferred Payments Agreement, dated as of the date hereof, among Turnberry Residential Limited Partner, L.P., Sponsor, Jeffrey Soffer and Mortgage Borrower.

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

"Affiliate Lease" shall mean the lease to be entered into between Mortgage Borrower and Fontainebleau Las Vegas, LLC in the form attached (with such de minimis changes agreed to by Borrower) as Exhibit D hereto.

"Affiliated Loans" shall have the meaning set forth in Section 5.1.10(m) hereof.

"Affiliated Manager" shall mean any property manager which is an Affiliate of, or in which Pledgor, Mortgage Borrower or any Guarantor has, directly or indirectly, any legal, beneficial or economic interest.

"Agent" shall have the meaning set forth in Section 9.7.2(d) hereof.

"Air Rights Lease" shall mean that certain Master Lease Agreement dated as of the date hereof, by and among Resort Borrower and Mortgage Borrower, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Air Rights Rent" shall mean "Rent" as defined in the Air Rights Lease and any other rent or amounts payable under the Air Rights Lease.

"ALTA" shall mean American Land Title Association, or any successor thereto.

"Annual Budget" shall mean the operating budget, including all planned Capital Expenditures, for the Property prepared by Mortgage Borrower for the applicable Fiscal Year or other period.

"Applicable Laws" shall mean all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations and court orders.

"Applicable Interest Rate" shall mean  (A) from and including the date of this Agreement through June 8, 2007, an interest rate per annum equal to 15.32%; and (B) from and including the June 9, 2007, and for each successive Interest Period through and including the date on which the Debt is paid in full, an interest rate per annum equal to (I) the Eurodollar Rate or (II) the Adjusted Prime Rate, for so long as the Loan bears interest at the Adjusted Prime Rate in accordance with the provisions of Section 2.2.3 hereof.

"Appraisal" shall mean an appraisal prepared in accordance with the requirements of FIRREA and USPAP, prepared by an independent third party appraiser holding an MAI designation, who is licensed or certified to the extent required under the laws of the State of Nevada, who meets the requirements of FIRREA and USPAP and who is otherwise satisfactory to Lender.

"Approved Accountant" shall mean a "Big Four" accounting firm or other independent certified public accountant reasonably acceptable to Lender.

"Approved Affiliate Agreements" shall mean the Master Disbursement Agreement, the Affiliate Lease, the License Agreement, the Master REA, the Air Rights Lease, the Affiliate Deferred Payments Agreement, the Credit Enhancement Fee Agreement, the Reimbursement Agreement, the Approved Leasing Agreement and the Approved Management Agreement, and

- 3 -

in each case any replacement of any such agreement entered into from time to time in accordance with the terms hereof.

"Approved Annual Budget" shall have the meaning set forth in Section 5.1.10(d) hereof.

"Approved Leasing Agreement" shall mean that certain Leasing Agreement, dated as of the date hereof, between and Mortgage Borrower and TB Realty, Inc., a Nevada corporation.

"Approved Management Agreement" shall mean that certain Property Management Agreement, dated as of the date hereof, between Mortgage Borrower and TB Realty, Inc., a Nevada corporation.

"Architect" means, in the event Mortgage Borrower (rather than the applicable subtenants) constructs any of the Future Improvements, an architect selected by Mortgage Borrower and approved by Lender, such approval not to be unreasonably withheld, conditioned or delayed.

"Architect's Contract" means any contract entered into after the date hereof relating to the design and construction of the Future Improvements, if any, being constructed by Mortgage Borrower and approved by Lender, such approval not to be unreasonably withheld, conditioned or delayed.

"Assignment and Assumption" shall have the meaning set forth in Section 9.7.2 hereof.

"Assignment of Interest Rate Cap Agreement" shall mean that certain Collateral Assignment of Interest Rate Cap Agreement to be entered into by Borrower in favor of Lender in the form attached hereto as Exhibit A (or such other form reasonably acceptable to Lender) as security for the Loan, consented to by the Counterparty, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Leases" shall mean that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Mortgage Borrower, as assignor, to Mortgage Lender, as assignee, assigning to Mortgage Lender all of Mortgage Borrower's interest in and to the Leases and Rents of the Property as security for the Mortgage Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assumed Note Rate" shall mean an interest rate equal to the sum of 1% plus LIBOR as determined on the preceding LIBOR Determination Date plus the Eurodollar Rate Margin.

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"Bankruptcy Code" shall mean Title 11 U.S.C. § 101 *et seq.*, and the regulations adopted and promulgated pursuant thereto (as the same may be amended from time to time).

"Basic Carrying Costs" shall mean the sum of the following costs associated with the Property for the relevant Fiscal Year or payment period: (i) Taxes and (ii) Insurance Premiums

- 4 -

and (iii) so long as the Air Rights Lease is in effect, any Air Rights Rent payable during such Fiscal Year or payment period.

"Borrower" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"Breakage Costs" shall have the meaning set forth in Section 2.2.3(d) hereof.

"Building" shall mean the building being constructed (in accordance with the Project Plans and Specifications and the Plans and Specifications, respectively) on the construction site for the Project.

"Business Day" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"Business Party" shall have the meaning set forth in Section 4.1.35(aa)) hereof.

"Capital Expenditures" shall mean, for any period, the amount expended with respect to the Property for items capitalized under GAAP (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"Cash" shall mean coin or currency of the United States of America or immediately available federal funds, including such fund delivered by wire transfer.

"Casualty" shall mean the occurrence of any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"Certificate of Sources and Uses" shall mean Exhibit D to that certain escrow letter agreement dated the date hereof and entered into in connection with the Loan.

"Closing Date" shall mean the date of the funding of the Loan.

"Code" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and all applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Co-Lender" shall have the meaning set forth in Section 9.7.2 hereof.

"Co-Lending Agreement" shall mean the co-lending agreement entered into between Lender, individually as a Co-Lender and as Agent and the other Co-Lenders in the event of a Syndication, as the same may be further supplemented modified, amended or restated.

"Collateral" shall mean (i) the Collateral as defined in the Pledge Agreement, and (ii) all other collateral for the Loan granted in the Loan Documents.

"Completion Date" shall mean March 31, 2010 or, if such construction is delayed by a Force Majeure cause, on or before October 31, 2010.

"Completion Guaranty" shall mean that certain Completion Guaranty, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Condemnation" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"Construction Budget" shall mean that certain budget attached hereto as Schedule III, as changed from time to time in accordance with the terms of this Agreement.

"Construction Consultant" shall mean, individually and collectively as the context may require, the Additional Construction Consultant (if any) and the Project Construction Consultant.

"Construction Contract" means any contract entered into between Mortgage Borrower and any General Contractor after the date hereof, approved by Lender in its reasonable discretion, and all amendments, supplements, appendices and addenda to each thereof, which each relate to the construction of the Future Improvements to be constructed by Mortgage Borrower.

"Construction Documents" shall mean the Architect's Contract, the Construction Contract, the Engineer's Contract, the Plans and Specifications and all other contracts, plans or documents concerning the construction, design, or engineering of the Future Improvements to be constructed by Mortgage Borrower, if any.

"Contract Rate" shall mean, at the time of any calculation, an interest rate per annum equal to the greater of (a) the Applicable Interest Rate then in effect and (b) 8.5%.

"Control" (and the correlative terms "controlled by" and "controlling") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of the business and affairs of the entity in question by reason of the ownership of beneficial interests, by contract or otherwise.

"Counterparty" shall mean, at any time, the Person which is the issuer of the Interest Rate Cap Agreement at such time.

"Credit Enhancement Fee Agreement" shall mean the Credit Enhancement Fee Agreement, dated as of the date hereof, among Turnberry Residential Limited Partner, L.P., Sponsor, Jeffrey Soffer and Mortgage Borrower.

"Creditors Rights Laws" shall mean with respect to any Person, any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

[TPW: NYLEGAL:674139.7] 16248-00758 06/06/2007 12:54 AM

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon, the Exit Fee and all other sums due to Lender in respect of the Loan under the Note, this Agreement, the Pledge Agreement or any other Loan Document, including, without limitation but without duplication, all Reserve Fund Deposits.

"Debt Service" shall mean, with respect to any particular period of time, interest payments due under the Note for such period.

"Debt Service Advance" shall have the meaning set forth in Section 2.1.2(d) hereof.

"Debt Service Account" shall have the meaning set forth in Section 10.1 hereof.

"Debt Service Coverage Ratio" shall mean a ratio in which:

(a)    the numerator is the Net Operating Income for the 6 full calendar month (or such other period as specifically stated herein)(such amount to be annualized) period preceding the date of calculation as set forth in the financial statements required hereunder, without deduction for (i) actual management fees incurred in connection with the operation of the Property, or (ii) amounts paid to the Mortgage Reserve Funds, less (A) management fees equal to the greater of (1) assumed management fees of three percent (3%) of Gross Income from Operations or (2) the actual management fees incurred, and (B) assumed replacement reserve fund contributions equal to $0.15 per square foot of gross leaseable area at the Property; and (C) Lease Termination Payments; and

(b)    the denominator is the aggregate amount of Debt Service and Mortgage Debt Service which would be due and payable for such 6 full calendar month period (or such other period as specifically stated herein)(such amount to be annualized), calculated at an interest rate equal to the Contract Rate and Mortgage Contract Rate respectively.

"Default" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would constitute an Event of Default.

"Default Rate" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (a) the Maximum Legal Rate, or (b) four percent (4%) above the Applicable Interest Rate.

"Defaulting Lender" shall mean at any time, (i) any Lender or Co-Lender with respect to which a Lender Default is in effect, (ii) any Lender or Co-Lender that as a result of any voluntary action is the subject (as a debtor) of any action or proceeding (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, (iii) any Lender or Co-Lender that shall make a general assignment for the benefit of its creditors or (iv) any Lender or Co-Lender that shall

- 7 -

generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due.

"Deferred Interest Balance" shall mean the sum of each Monthly Deferred Interest Amount then accrued but unpaid, together with all interest accruing thereon pursuant to the terms hereof.

"Designated Servicing Matters" shall consist of each of the following actions taken by Servicer as they relate to the Loan: (i) the review of Leases or any request for Lender's consent pursuant to Section 5.1.17 hereof, (ii) any Property inspections, (iii) any actions in connection with a Casualty or Condemnation and (iv) any actions in connection with a Default or Event of Default.

"Developer" shall mean a Qualified Developer who is developing the Property in accordance with the terms and provisions of this Agreement.

"Development Agreement" shall mean, with respect to the Property, any development agreement entered into by and between Mortgage Borrower and Developer, pursuant to which the Developer is to provide development and other services with respect to the Property, or, if the context requires, the Replacement Development Agreement executed in accordance with the terms and provisions of this Agreement.

"Disclosure Document" shall have the meaning set forth in Section 9.2(a) hereof.

"Distributions" shall have the meaning set forth in Section 5.2.12 hereof.

"Eligible Account" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts maintained with a federal or State chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with a federal or State chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a State chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R.§9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and State authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"Eligible Institution" shall mean a depository institution or trust company, insured by the Federal Deposit Insurance Corporation, (a) the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by S&P, P-1 by Moody's and F-1 by Fitch in the case of accounts in which funds are held for thirty (30) days or less, or (b) the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's in the case of accounts in which funds are held for more than thirty (30) days.

"Embargoed Person" shall have the meaning set forth in Section 4.1.43 hereof.

- 8 -

"Engineer" means any engineer or consultant who has a contract in the future directly with Mortgage Borrower in connection with the Future Improvements, if any, that are to be constructed by Borrower.

"Engineer's Contract" means the collective reference to all contracts and agreements entered into after the date hereof between Mortgage Borrower and Engineer, related to the construction of the Future Improvements, if any, being constructed by Mortgage Borrower, and site planning therefor, and in each case approved by Lender, which approval shall not be unreasonably withheld, conditioned or delayed.

"Environmental Indemnity" shall mean that certain Environmental Indemnity Agreement executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Environmental Law" shall mean any federal, State and local laws, statutes, ordinances, rules, regulations, standards, policies and other government directives or requirements, as well as common law, that, at any time, apply to Borrower and Guarantor or the Property and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act and the Resource Conservation and Recovery Act.

"Environmental Liens" shall have the meaning set forth in Section 5.1.19(a) hereof.

"Environmental Reports" shall have the meaning set forth in Section 4.1.39 hereof.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"Eurodollar Rate" shall mean, with respect to any Interest Period, an interest rate per annum equal to LIBOR plus the Eurodollar Rate Margin.

"Eurodollar Rate Margin" shall mean 10%.

"Event of Default" shall have the meaning set forth in Section 8.1(a) hereof.

"Exchange Act" shall have the meaning set forth in Section 9.2(a) hereof.

"Exchange Act Filing" shall have the meaning set forth in Section 9.2(a) hereof.

"Exit Fee" shall mean an amount equal to $1,250,000.00.

"Extended Maturity Date: shall have the meaning set forth in Section 2.2.1(c) hereof.

"Extension Fee" shall mean 0.125% of the Maximum Loan Amount.

"Extension Option" shall have the meaning set forth in Section 2.2.1(c) hereof.

"Extension Period" shall have the meaning set forth in Section 2.2.1(c) hereof.

[TPW: NYLEGAL:674139.7] 16248-00758 06/06/2007 12:54 AM

"Fee Estate" shall mean, with respect to the Property, the fee interest of the lessor under the Air Rights Lease in the Property and the Improvements demised under the Air Rights Lease.

"Fee Owner" shall mean, with respect to the Property, the owner of the lessor's interest in the Air Rights Lease and the related Fee Estate prior to the Fee Transfer.

"Fee Transfer" shall occur at such time as Mortgage Borrower has received fee simple title to the New Estate.

"Fee Transfer Conditions" shall mean each of the following:

(i)    [intentionally omitted];

(ii)    Lender shall have received a copy of the Owner's Title Policy (or (A) a marked, signed and redated commitment to issue such Owner's Title Policy or (B) an endorsement to the existing Owner's Title Policy as would be reasonably satisfactory to a prudent institutional mezzanine lender) insuring the fee simple ownership interest of Mortgage Borrower in the Property, issued by the title company that issued the initial Owner's Title Policy insuring the Mortgage Borrower's ownership interest and dated as of the date of the acquisition by Borrower, with reinsurance and direct access agreements that replace such agreements (or satisfactory endorsements or amendments to the existing agreements) issued in connection with the Owner's Title Policy insuring the Mortgage Borrower's ownership interest prior to the Fee Transfer. Such new Owner's Title Policy (or the existing Owner's Title Policy as modified by such endorsement, as applicable) issued shall (1) provide coverage in an amount equal to no less than $400,000,000, (2) insure Mortgage Borrower owns fee simple title to the New Estate (together with the remainder of the Property), free and clear of all exceptions from coverage other than Permitted Encumbrances and standard exceptions and exclusions from coverage (as modified by the terms of any endorsements), (3) contain such endorsements and affirmative coverages as are then available and are contained in the existing Owner's Title Policy (to the extent applicable), and such other endorsements or affirmative coverage (if any) that a prudent institutional mezzanine lender would require solely as a result of a change in collateral from a leasehold estate to a fee estate, and (4) name Mortgage Borrower as the insured. Lender also shall have received copies of paid receipts or other evidence showing that all premiums, if any, in respect of the Owner's Title Policy (or endorsement) has been paid;

(iii)    Borrower shall have paid or reimbursed Lender for all costs and expenses incurred by Lender (including, without limitation, reasonable attorneys' fees and disbursements) in connection with the Fee Transfer (and Borrower's satisfaction of the Fee Transfer Conditions) and Borrower shall have paid (or caused to be paid) all recording charges, filing fees, taxes or other expenses (including, without limitation, mortgage and intangibles taxes and documentary stamp taxes) payable in connection with the Fee Transfer. Borrower shall have paid all costs and expenses of the Rating Agencies incurred in connection with the substitution;

(iv)    Borrower shall have delivered evidence to Lender that all Leases then in effect shall not be terminated or otherwise adversely affected as a result of the Fee Transfer;

(v)    Lender shall have received reasonably satisfactory evidence that all necessary actions have been taken, including, but not limited to, the filing of all appropriate documents

- 10 -

with the municipality, to insure that the New Estate will be assessed as one or more wholly independent tax lot or lots;

     (vi)    no Event of Default exists; and

     (vii)    Pledgor shall deliver an Officers Certificate certifying that each of the Fee Transfer Conditions hereunder and under the Mortgage Loan Documents have been satisfied.

"Fee Transfer Event" shall occur at such time as each of the following events have taken place: (i) a Fee Transfer and (ii) each of the Fee Transfer Conditions have been satisfied in Lender's reasonable discretion.

"FIRREA" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as the same may be amended from time to time.

"Fiscal Year" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

"Fitch" shall mean Fitch, Inc., and any successor by merger, consolidation or acquisition of all of its assets so long as the same remains a nationally recognized rating agency.

"Force Majeure" "shall mean the failure of Borrower to perform (or cause to be performed) any obligation hereunder by reason of any act of God, enemy or hostile government action, terrorist attacks, civil commotion, insurrection, sabotage, strikes or lockouts or any other reason due to cause or causes beyond the reasonable control of Borrower or any Affiliate of Borrower; provided, however, that Borrower shall notify Lender in writing within ten (10) days after each such occurrence, and no Force Majeure event shall suspend or abate any obligation of Borrower or any Guarantor or any other person to pay any money.

"Future Improvements" means any and all improvements to be made to the Property to be constructed by Mortgage Borrower (in which case the same shall be depicted in the Plans and Specifications) and Mortgage Borrower's subtenants, as the case may be, in order to complete the retail component of the Project in accordance with the terms of the Master REA and the Loan Documents.

"GAAP" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"General Contractor" means any general contractor, approved by Lender in all respects, which consent will not be unreasonably withheld, conditioned or delayed, that will have a Construction Contract with Mortgage Borrower in connection with the Future Improvements being constructed by Mortgage Borrower, if any, except to the extent all Construction Contracts with such general contractor, taken as a whole, are not material to the retail component of the Project.

"Governmental Authority" shall mean any court, board, agency, commission, office, central bank or other authority of any nature whatsoever for any governmental unit (federal,

[TPW: NYLEGAL:674139.7] 16248-00758 06/06/2007 12:54 AM

State, county, district, municipal, city, country or otherwise) or quasi-governmental unit whether now or hereafter in existence.

"Gross Income from Operations" shall mean all income, computed in accordance with GAAP, derived from the ownership and operation of the Property from whatever source, including, but not limited to, the Rents, utility charges, escalations, service fees or charges, license fees, parking fees, rent concessions or credits, and other required pass-throughs, but excluding sales, use and occupancy or other taxes on receipts required to be accounted for by Mortgage Borrower to any Governmental Authority, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, Insurance Proceeds (other than business interruption or other loss of income insurance), Awards, security deposits, interest on credit accounts, utility and other similar deposits, payments received by Mortgage Borrower or Borrower, as applicable, under the Mortgage Interest Rate Cap Agreement or the Interest Rate Cap Agreement, as applicable, interest on credit accounts, interest on the Reserve Funds, and any disbursements to Mortgage Borrower from the Mortgage Reserve Funds. Gross income shall not be diminished as a result of the Security Instrument or the creation of any intervening estate or interest in the Property or any part thereof.

"Guarantor" shall mean Jeffrey Soffer, Fontainebleau Resorts, LLC, a Delaware limited liability company and any other entity substituted as a guarantor under any Guaranty in accordance with the terms thereof.

"Guaranty" shall mean, individually or collectively, as the context may require, the Guaranty of Payment, Guaranty of Recourse Obligations and the Completion Guaranty.

"Guaranty of Payment" shall mean that certain Guaranty of Payment, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Guaranty of Recourse Obligations" shall mean that certain Guaranty of Recourse Obligations of Borrower, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Hazardous Materials" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; toxic mold; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Property is prohibited by any federal, State or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import within the meaning of any Environmental Law.

"Improvements" shall have the meaning set forth in Article 1 of the Security Instrument.

"Indemnified Liabilities" shall have the meaning set forth in Section 9.7.4(c) hereof.

"Indemnified Parties" shall mean Lender, any Affiliate of Lender who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by the Pledge Agreement is or will have been recorded, Persons who may hold or acquire or will have held a full or partial interest in the Loan, the holders of any Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

"Indemnified Taxes" shall mean any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by the United States or any political subdivision or taxing authority thereof or therein..

"Indemnitee" shall have the meaning set forth in Section 9.7.4(c) hereof.

"Independent Manager" shall have the meaning set forth in Section 4.1.35(aa) hereof.

"Information" shall have the meaning set forth in Section 9.7.3(b) hereof.

"Insolvency Opinion" shall mean, that certain bankruptcy non-consolidation opinion letter delivered by counsel for Borrower in connection with the Loan and reasonably approved by Lender or the Rating Agencies, as the case may be.

"Insurance Premium Account" shall have the meaning set forth in the Mortgage Loan Agreement.

"Insurance Premiums" shall have the meaning set forth in the Mortgage Loan Agreement.

"Insurance Proceeds" shall have the meaning set forth in the Mortgage Loan Agreement.

"Intercreditor Agreement" shall have the meaning set forth in Section 9.10 hereof.

"Interest Period" shall mean, in connection with the calculation of interest accrued with respect to any specified Payment Date, the period from and including the ninth (9th) day of the prior calendar month to and including the eighth (8th) day of the calendar month in which the applicable Payment Date occurs; provided, however, that with respect to the Payment Date occurring on June 9, 2007, the Interest Period shall be the period commencing on the Closing Date to and including June 8, 2007. Each Interest Period, except for the Interest Period ending June 8, 2007, shall be a full month and shall not be shortened by reason of any payment of the Loan prior to the expiration of such Interest Period.

- 13 -

"Interest Rate Cap Agreement" shall mean each Interest Rate Cap Agreement (together with the confirmation and schedules relating thereto), entered into from time to time, between a Counterparty and Borrower obtained by Borrower. The Interest Rate Cap Agreement shall be written on the then current standard ISDA documentation, and shall provide for interest periods and calculations consistent with the payment terms of this Agreement. After delivery of a Replacement Interest Rate Cap Agreement to Lender, the term "Interest Rate Cap Agreement" shall be deemed to mean such Replacement Interest Rate Cap Agreement.

"Interest Shortfall" shall have the meaning set forth in Section 2.3.1(b) hereof.

"Issuing Bank" shall have the meaning set forth in the definition of Letter of Credit.

"Investor" shall have the meaning set forth in Section 5.1.10(g) hereof.

"Lease Termination Payments" shall mean all payments made to Mortgage Borrower or Borrower in connection with any termination, cancellation, surrender, sale or other disposition of any Lease.

"Leased Property" shall have the meaning set forth in the Air Rights Lease.

"Leases" shall have the meaning set forth in Article 1 of the Security Instrument.

"Leasing Agreement" shall mean, with respect to the Property, the leasing agreement entered into by and between Mortgage Borrower and Leasing Agent, pursuant to which the Leasing Agent is to provide leasing and other services as described therein with respect to the Property, or, if the context requires, the Replacement Leasing Agreement executed in accordance with the terms and provisions of this Agreement.

"Leasing Agent" shall mean the leasing agent under any Leasing Agreement or, if the context requires, a Qualified Leasing Agent who is leasing the Property in accordance with the terms and provisions of this Agreement.

"Leasing Plan" shall have the meaning set forth in Section 5.1.10(d) hereof.

"Legal Requirements" shall mean, with respect to the Property, all federal, State, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower, the Collateral, Mortgage Borrower or the Property or any part thereof, or the zoning, construction, use, alteration, occupancy or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"Lehman" shall have the meaning set forth in Section 9.2(b) hereof.

- 14 -

"Lehman Group" shall have the meaning set forth in Section 9.2(b) hereof.

"Lender" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"Lender Default" shall mean the failure or refusal (which has not been retracted in writing) of a Lender or Co-Lender to make available its portion of any Loan when required to be made by it hereunder.

"Letter of Credit" shall mean a transferable, clean, irrevocable, unconditional, standby letter of credit in form, substance and amount reasonably satisfactory to Lender in its reasonable discretion, issued or confirmed by a commercial bank with a long term debt obligation rating of AA or better (or a comparable long term debt obligation rating) as assigned by the Rating Agencies and otherwise satisfactory to Lender in its reasonable discretion (the "Issuing Bank"). The Letter of Credit shall be payable upon presentation of a sight draft only to the order of Lender at a New York City bank. The Letter of Credit shall have an initial expiration date of not less than one (1) year (or through the Maturity Date, if less) and shall be automatically renewed for successive twelve (12) month periods for the term of the Loan (unless such Letter of Credit provides that the Issuing Bank may elect not to renew the Letter of Credit upon written notice to the beneficiary at least thirty (30) days prior to its expiration date) and shall provide for multiple draws. The Letter of Credit shall be transferable by Lender and its successors and assigns at a New York City bank.

"Liabilities" shall have the meaning set forth in Section 9.2(b) hereof.

"LIBOR" shall mean, for the first Interest Period 5.32% per annum. For each Interest Period thereafter LIBOR shall mean the quoted offered rate for one-month United States dollar deposits with leading banks in the London interbank market that appears as of 11:00 a.m. (London time) on the related LIBOR Determination Date on the display page designated as Telerate Page 3750 (or such other page as may replace Telerate Page 3750 for the purpose of displaying London interbank offered rates of major banks for United States dollar deposits).

If, as of such time on any LIBOR Determination Date, no quotation is given on Telerate Page 3750 (or such other page as may replace Telerate Page 3750 for the purpose of displaying London interbank offered rates of major banks for United States dollar deposits), then the Lender shall establish LIBOR on such LIBOR Determination Date by requesting four Reference Banks meeting the criteria set forth herein to provide the quotation offered by its principal London office for making one-month United States dollar deposits with leading banks in the London interbank market as of 11:00 a.m., London time, on such LIBOR Determination Date.

(i)    If two or more Reference Banks provide such offered quotations, then LIBOR for the next Interest Period shall be the arithmetic mean of such offered quotations (rounded upward if necessary to the nearest whole multiple of 1/1,000%).

(ii)    If only one or none of the Reference Banks provides such offered quotations, then LIBOR for the next Interest Period shall be the Reserve Rate.

[TPW: NYLEGAL:674139.7] 16248-00758 06/06/2007 12:54 AM

(iii)    If on any LIBOR Determination Date, Lender is required but is unable to determine the LIBOR in the manner provided in paragraphs (i) and (ii) above, LIBOR for the next Interest Period shall be LIBOR as determined on the preceding LIBOR Determination Date.

The establishment of LIBOR on each LIBOR Determination Date by the Lender shall be final and binding absent manifest error.

"LIBOR Business Day" shall mean a day upon which (i) United States dollar deposits may be dealt in on the London interbank markets and (ii) commercial banks and foreign exchange markets are open in London, England and in New York, New York, USA.

"LIBOR Determination Date" shall mean, with respect to any Interest Period, the date that is two (2) LIBOR Business Days prior to the fifteenth (15th) calendar day of the month in which such Interest Period commenced.

"License Agreement" shall mean the License Agreement, dated as of the date hereof, between Fontainebleau Resort Properties II, LLC and Mortgage Borrower, with respect to the use of the "Fontainebleau" name.

"Licenses" shall have the meaning set forth in Section 4.1.21 hereof.

"Lien" shall mean, with respect to the Property, any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, Mortgage Borrower, the Collateral the Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"Liquidation Event" shall have the meaning set forth in Section 2.3.2 hereof.

"Liquidity" means Cash, Cash equivalents and unencumbered, marketable securities and other investments approved by Lender in its sole discretion.

"LLC Agreement" shall have the meaning set forth in Section 4.1.35(cc) hereof.

Loan" shall mean the loan made by Lender to Borrower pursuant to this Agreement and the other Loan Documents as the same may be amended or split pursuant to the terms hereof.

"Loan Documents" shall mean, collectively, this Agreement, the Note, the Pledge Agreement, the Environmental Indemnity, the Guaranty of Payment, Guaranty of Recourse Obligations, the Subordination of Leasing Agreement, Completion Guaranty, the Subordination of Management Agreement, the Certificate of Sources and Uses, the Assignment of Interest Rate Cap Agreement and all other documents executed and/or delivered in connection with the Loan.

"Loan Party" shall mean individually and collectively, as the context requires, Pledgor or Mortgage Borrower.

- 16 -

"Lockbox Account" shall have the meaning set forth in Section 10.1(b) hereof.

"Lockbox Bank" shall mean any Eligible Institution selected by Lender.

"Lockout Period" shall have the meaning set forth in Section 2.3.1 hereof.

"Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages (but not special or punitive damages), losses (other than diminution in value), costs, expenses, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense).

"Major Lease" shall mean (i) any Lease (A) which together with all other Leases to the same tenant and to all Affiliates of such tenant, covers 10,000 square feet or more of the total space at the Property, in the aggregate or (B) is with an Affiliate of Borrower and (ii) any instrument guaranteeing or providing credit support for any Major Lease.

"Management Agreement" shall mean, with respect to the Property, any management agreement executed by Mortgage Borrower in the future pursuant to the terms hereof, or, if the context requires, the Replacement Management Agreement executed in accordance with the terms and provisions of this Agreement.

"Manager" shall mean the manager under any Management Agreement or, if the context requires, a Qualified Manager who is managing the Property in accordance with the terms and provisions of this Agreement.

"Master Disbursement Agreement" shall mean that certain Master Disbursement Agreement, dated as of the date hereof, among Mortgage Borrower, Lender, Resort Borrower, Resort Lender, Bank of America, N.A., as disbursement agent and each other party from time to time thereto, as amended, restated, supplemented or otherwise modified from time to time.

"Master REA" shall mean that certain Construction, Operation and Reciprocal Easement Agreement dated as of the date hereof, by and among Fontainebleau Las Vegas, LLC, Fontainebleau Las Vegas II, LLC and Fontainebleau Las Vegas Retail, LLC, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Material Adverse Effect" means a material adverse effect on one or more of the following: (i) the business, operations or condition (financial or otherwise) of Pledgor or Mortgage Borrower; (ii) the ability of Pledgor or Guarantor to perform its obligations under any Loan Document; (iii) the ability of Mortgage Borrower or Guarantor to perform its obligations under any Mortgage Loan Document (iv) the material rights or remedies of Lender under any Loan Document or Mortgage Lender under any Mortgage Loan Document, as applicable; (iv) the legality, validity, binding effect or enforceability against Pledgor of any material provision of a Loan Document, (v) the legality, validity, binding effect or enforceability against Mortgage Borrower of any material provision of a Mortgage Loan Document or (vi) the value or condition of the Property or the Collateral.

- 17 -

"Material Agreement" means all agreements, other than the Approved Affiliate Agreements and the Leases, entered into by any Loan Party affecting or relating to the Property, the Collateral or any other direct or indirect ownership interest of a Loan Party requiring the payment of more than $500,000 in the aggregate in payments or liability in any annual period or which is not cancelable without penalty or premium on no more than thirty (30) days notice.

"Maturity Date" shall mean October 9, 2010, as such date may be extended pursuant to the terms hereof, or, if such day is not a Business Day, the immediately preceding Business Day, or such other date on which the final payment of the principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"Maximum Legal Rate" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or in the other Loan Documents, under the laws of such State or States whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"Maximum Other Retail Cost Advance Amount" shall mean $62,000,000.

"Mezzanine Loan Account" shall have the meaning set forth in the Mortgage Loan Agreement.

"Mezzanine Pledgor" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"Minimum L/C" shall have the meaning set forth in the definition of Letter of Credit.

"Monthly Debt Service Payment Amount" shall mean the amount of interest due and payable on each Payment Date, pursuant to the Note and Section 2.2 hereof.

"Monthly Deferred Interest Amount" shall have the meaning set forth in Section 2.2.1 hereof.

"Monthly Deferred Interest Payment" shall mean, with respect to each Payment Date, the payment of an amount equal to (a) the Positive Cash Flow Amount, less (b) the Required Monthly Interest Payment, not to exceed the Deferred Interest Balance; provided, however, that if such difference is a negative number then the Monthly Deferred Interest Payment shall be equal to zero.

"Monthly Insurance Premium Deposit" shall have the meaning set forth in Section 7.2 hereof.

"Monthly Tax Deposit" shall have the meaning set forth in Section 7.2 hereof.

"Moody's" shall mean Moody's Investors Service, Inc., and any successor by merger, consolidation or acquisition of all of its assets so long as the same remains a nationally recognized rating agency.

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

"Mortgage Borrower" shall mean Fontainebleau Las Vegas Retail, LLC, a Delaware limited liability company, together with its successors and permitted assigns.

"Mortgage Borrower Operating Agreement" shall the Amended and Restated Operating Agreement of Mortgage Borrower.

"Mortgage Contract Rate" shall mean at the time of any calculation, an interest rate per annum equal to the greater of (a) the Mortgage Loan Applicable Interest Rate then in effect and (b) 8.5%.

"Mortgage Interest Rate Cap Agreement" shall mean the "Interest Rate Cap Agreement" under and as defined in the Mortgage Loan Agreement.

"Mortgage Lender" shall mean Lehman Brothers Holdings Inc., together with its successors and assigns.

"Mortgage Loan" shall mean that certain loan made by Mortgage Lender to Mortgage Borrower in the principal amount of THREE HUNDRED FIFTEEN MILLION AND 00/100 DOLLARS ($315,000,000).

"Mortgage Loan Agreement" shall mean that certain Loan Agreement between Mortgage Borrower and Mortgage Lender in connection with the Mortgage Loan, dated as of the date hereof, as amended, restated, supplemented or otherwise modified from time to time.

"Mortgage Loan Applicable Interest Rate" has the meaning assigned to the term "Applicable Interest Rate" in the Mortgage Loan Agreement.

"Mortgage Loan Documents" shall mean, collectively, the Mortgage Note, the Mortgage Loan Agreement, the Security Instrument, and any and all other documents defined as "Loan Documents" in the Mortgage Loan Agreement, as amended, restated, replaced, supplemented or otherwise modified from time to time.

"Mortgage Loan Event of Default" shall mean an "Event of Default" under and as defined in the Mortgage Loan Agreement.

"Mortgage Loan Extension Option" shall have the meaning ascribed to the term "Extension Option" in the Mortgage Loan Agreement.

"Mortgage Note" shall mean that certain promissory note of even date herewith in the original principal amount of THREE HUNDRED FIFTEEN MILLION AND 00/100 DOLLARS ($315,000,000), made by Mortgage Borrower in favor of Mortgage Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"Mortgage Reserve Funds" shall mean the "Reserve Funds" as defined in the Mortgage Loan Agreement.

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

"Mortgage Securities" shall mean the "Securities" as defined in the Mortgage Loan Agreement.

"Mortgage Servicing Fee" shall mean the "Servicing Fee" under and as defined in the Mortgage Loan Agreement.

"Net Cash Flow" for any period shall mean the amount obtained by subtracting Operating Expenses and Capital Expenditures for such period from Gross Income from Operations for such period.

"Net Cash Flow After Debt Service" for any period shall mean the amount obtained by subtracting Debt Service for such period from Net Cash Flow for such period.

"Net Cash Flow Schedule" shall have the meaning set forth in Section 5.1.10(b) hereof.

"Net Liquidation Proceeds After Debt Service" shall mean, with respect to any Liquidation Event, all amounts paid to or received by or on behalf of Mortgage Borrower in connection with such Liquidation Event, including, without limitation, proceeds of any sale, refinancing or other disposition or liquidation, less (i) in the event of a Liquidation Event consisting of a Casualty or Condemnation, Lender's and/or Mortgage Lender's reasonable costs incurred in connection with the recovery thereof, (ii) in the event of a Liquidation Event consisting of a Casualty or Condemnation, the costs incurred by Mortgage Borrower in connection with a restoration of all or any portion of the Property made in accordance with the Mortgage Loan Documents, (iii) in the event of a Liquidation Event consisting of a Casualty or Condemnation or a Transfer, amounts required or permitted to be deducted therefrom and amounts paid pursuant to the Mortgage Loan Documents to Mortgage Lender, (iv) in the event of a Liquidation Event consisting of a Casualty or Condemnation, those proceeds paid to Mortgage Borrower pursuant to Section 6.4.1 or 6.4.2 of the Mortgage Loan Agreement, (v) in the case of a foreclosure sale, disposition or transfer of the Property in connection with realization thereon following an Event of Default under the Mortgage Loan, such reasonable and customary costs and expenses of sale or other disposition (including attorneys' fees and brokerage commissions), (vi) in the case of a foreclosure sale, such costs and expenses incurred by Mortgage Lender under the Mortgage Loan Documents as Mortgage Lender shall be entitled to receive reimbursement for under the terms of the Mortgage Loan Documents and (vii) in the case of a refinancing of the Mortgage Loan, such costs and expenses (including attorneys' fees) of such refinancing, and (viii) the amount of any prepayments or other payments required pursuant to the Mortgage Loan Documents (including the Master Disbursement Agreement) or the Master REA in connection with any such Liquidation Event.

"Net Operating Income" shall mean the amount obtained by subtracting Operating Expenses from Gross Income from Operations, excluding any payments received by Mortgage Borrower or Borrower, as applicable, under the Mortgage Interest Rate Cap Agreement and the Interest Rate Cap Agreement, as applicable.

"Net Proceeds" shall have the meaning set forth in the Mortgage Loan Agreement.

"Net Worth" shall mean, as of a given date, a Person's equity calculated in conformance with GAAP by subtracting total liabilities from total tangible assets.

"New Estate" shall mean the fee estate in the Leased Property.

"Non-U.S. Entity" shall mean the Lender or any Co-Lender or any successor and/or assignee of Lender or any Co-Lender that is not, for United States federal income tax purposes, (i) a citizen or resident of the United States, (ii) a corporation or entity treated as a corporation created or organized in or under the laws of the United States, or any political subdivision thereof, (iii) an estate whose income is subject to United States federal income taxation regardless of its source or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States persons have the authority to control all substantial decisions of such trust..

"Note" shall mean that certain promissory note of even date herewith in the principal amount of EIGHTY-FIVE MILLION AND 00/100 DOLLARS ($85,000,000), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"Obligations" shall mean Borrower's obligation to pay the Debt and perform its obligations under the Note, this Agreement and the other Loan Documents.

"Offering Document Date" shall have the meaning set forth in Section 5.1.10(h)(iv) hereof.

"Officer's Certificate" shall mean a certificate delivered to Lender by Borrower which is signed by a Responsible Officer of Borrower.

"Opening Date" shall mean the date on which all material amenities of the Project are open for business to gaming and lodging customers, provided that only 70% of the tenant improvements with respect to the retail space within the Project (determined on the basis of square footage) need be completed on the Opening Date.

"Operating Expenses" shall mean the total of all expenditures, computed in accordance with GAAP, of whatever kind relating to the operation, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance premiums, license fees, property taxes and assessments, advertising and marketing expenses, franchise fees, development fees, management fees, payroll and related taxes, computer processing charges, operational equipment or other lease payments as approved by Lender, and other similar costs, but excluding depreciation, Debt Service, Capital Expenditures and contributions to the Reserve Funds or the Mortgage Reserve Funds.

"Organizational Documents" shall mean (i) with respect to a corporation, such Person's certificate of incorporation and by laws, and any shareholder agreement, voting trust or similar arrangement applicable to any of such Person's authorized shares of capital stock, (ii) with respect to a partnership, such Person's certificate of limited partnership, partnership agreement, voting trusts or similar arrangements applicable to any of its partnership interests, (iii) with respect to a limited liability company, such Person's certificate of formation, limited liability company agreement or other document affecting the rights of holders of limited liability company interests, and (iv) any and all agreements between any constituent member, partner or

- 21 -

shareholder of the Person in question, including any contribution agreement or indemnification agreements.    In each case, "Organizational Documents" shall include any indemnity, contribution, shareholders or other agreement among any of the owners of the entity in question.

"Other Charges" shall mean all Air Rights Rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"Owner's Title Policy" shall mean that certain ALTA extended coverage owner's policy of title insurance issued in connection with the closing of the Mortgage Loan insuring the Mortgage Borrower as the owner of the Real Property.

"Ownership Interest" means (i) any interest in the Property or (ii) in the case of any Loan Party, any ownership interest in such Loan Party, direct or indirect, contingent or fixed, at any level or any tier, of any nature whatsoever, whether in the form of a partnership interest, stock interest, membership interest, equitable interest, beneficial interests, profit interest, loss interest, voting rights, control rights, management rights or otherwise.

"Participant" shall have the meaning set forth in Section 9.7.2(i) hereof.

"Payment Date" shall mean the ninth (9th ) day of each calendar month during the term of the Loan or, if such day is not a Business Day, the immediately preceding Business Day.

"Permitted Encumbrances" shall mean, collectively:

(a)      Liens and security interests created by the Mortgage Loan Documents;

(b)      subject to Borrower's right to contest under Section 5.1.2, Liens, if any, for Taxes imposed by any Governmental Authority not yet delinquent;

(c)      carrier's, warehousemen's, repairmen's, mechanics', materialmen's or similar Liens, in each case only if such Liens either (i) are not overdue for more than thirty (30) days or (ii) are being contested in good faith and by appropriate proceedings (in the same manner in which Taxes are contested pursuant to Section 5.1.2);

(d)      the Master REA and other easements, covenants, rights-of-way, restrictions, encroachments and other similar encumbrances and other minor defects and irregularities in title to which like properties are commonly subject, in each case incurred in the ordinary course of business and which do not materially (i) interfere with the benefits to be provided by the Security Instrument encumbering the Property or the Pledge Agreement encumbering the Collateral, (ii) materially and adversely affect the operation, use, value, enjoyment or marketability of the Property, (iii) materially and adversely affect Borrower's ability to repay the Loan in full or the Mortgage Borrower ability to pay the Mortgage Loan in full, (iv) have any effect on any rights or remedies Mortgage Lender may have under the Title Insurance Policy with respect to items described in this clause (d) which are not excluded from coverage under the Title Insurance Policy and (v) otherwise result in a Material Adverse Effect;

- 22 -

(e)    any attachment or judgment Lien with respect to any judgments or decrees entered against Mortgage Borrower (i) resulting in a liability that has been paid (and for which Mortgage Borrower is diligently trying to remove) or is satisfactorily covered by insurance (as determined by Lender in its reasonable discretion) as to which the relevant insurance company has acknowledged coverage or (ii) has been outstanding less than thirty (30) days;

(f)    Liens, encumbrances and other matters disclosed in the Title Insurance Policy relating to the Property or any part thereof; and

(g)    rights of tenants, as tenants only, under Leases and subleases entered into in accordance with the terms of this Agreement.

"Permitted Investments" shall mean any one or more of the following obligations or securities acquired at a purchase price of not greater than par, including those issued by Servicer, the trustee under any Securitization or any of their respective Affiliates, payable on demand or having a maturity date not later than the Business Day immediately prior to the first Payment Date following the date of acquiring such investment and meeting one of the appropriate standards set forth below:

(i)    obligations of, or obligations fully guaranteed as to payment of principal and interest by, the United States or any agency or instrumentality thereof provided such obligations are backed by the full faith and credit of the United States of America including, without limitation, obligations of: the U.S. Treasury (all direct or fully guaranteed obligations), the Farmers Home Administration (certificates of beneficial ownership), the General Services Administration (participation certificates), the U.S. Maritime Administration (guaranteed Title XI financing), the Small Business Administration (guaranteed participation certificates and guaranteed pool certificates), the U.S. Department of Housing and Urban Development (local authority bonds) and the Washington Metropolitan Area Transit Authority (guaranteed transit bonds); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(ii)    Federal Housing Administration debentures;

(iii)    obligations of the following United States government sponsored agencies: Federal Home Loan Mortgage Corp. (debt obligations), the Farm Credit System (consolidated systemwide bonds and notes), the Federal Home Loan Banks (consolidated debt obligations), the Federal National Mortgage Association (debt obligations), the Financing Corp. (debt obligations), and the Resolution Funding Corp. (debt obligations); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single

- 23 -

interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(iii)    federal funds, unsecured certificates of deposit, time deposits, bankers' acceptances and repurchase agreements with maturities of not more than 365 days of any bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term rating category and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(iv)    fully Federal Deposit Insurance Corporation-insured demand and time deposits in, or certificates of deposit of, or bankers' acceptances with maturities of not more than 365 days and issued by, any bank or trust company, savings and loan association or savings bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term rating category and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(v)    debt obligations with maturities of not more than 365 days and at all times rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities) in its highest long-term unsecured rating category; provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

(vi)    commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than one year after the date of issuance thereof) with maturities of not more than 365 days and that at all times is rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities) in its highest short-term unsecured debt rating; provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(vii)    units of taxable money market funds, with maturities of not more than 365 days and which funds are regulated investment companies, seek to maintain a constant net asset value per share and invest solely in obligations backed by the full faith and credit of the United States, which funds have the highest rating available from each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities) for money market funds; and

(viii)    any other security, obligation or investment which has been approved as a Permitted Investment in writing by (a) Lender and (b) each Rating Agency, as evidenced by a written confirmation that the designation of such security, obligation or investment as a Permitted Investment will not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities by such Rating Agency;

provided, however, that no obligation or security shall be a Permitted Investment if (A) such obligation or security evidences a right to receive only interest payments or (B) the right to receive principal and interest payments on such obligation or security are derived from an underlying investment that provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment.

"Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Personal Property" shall have the meaning set forth in Article 1 of the Security Instrument with respect to the Property.

[TPW: NYLEGAL:674139.7] 16248-00758 06/06/2007 12:54 AM

"Plan" shall mean an employee benefit plan (as defined in section 3(3) of ERISA) whether or not subject to ERISA or a plan or other arrangement within the meaning of section 4975 of the Code.

"Plan Assets" shall mean assets of a Plan within the meaning of section 29 C.F.R. section 2510.3-101 or similar law.

"Plans and Specifications" means the plans and specifications for the construction of the portion of the Future Improvements being constructed by Mortgage Borrower, if any, approved by Lender in consultation 'with the Construction Consultant, which approval shall not be unreasonably withheld, conditioned or delayed, with such amendments thereto as may from time to time be made by Mortgage Borrower and, to the extent such amendments constitute material changes to the Plans and Specifications, as approved by Lender in consultation with the Construction Consultant such approval not to be unreasonably withheld, conditioned or delayed.

"Pledge Agreement" shall mean that certain Pledge and Security Agreement dated as of the date hereof, executed and delivered by Pledgor to Lender as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Pledged Member Interests" shall mean all membership and manager interests in (a) with respect to Borrower, Mortgage Borrower and (b) with respect to Mezzanine Pledgor, Borrower.

"Pledgor" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"Policies" shall have the meaning set forth in the Mortgage Loan Agreement.

"Positive Cash Flow Amount" shall mean an amount equal to (i) all sums on deposit (on the applicable Payment Date) in the Mezzanine Loan Account, less (ii) those sums on deposit for the payment of Net Liquidation Proceeds After Debt Service.

"Prepayment Date" shall have the meaning set forth in Section 2.3.1 hereof.

"Prepayment Notice" shall have the meaning set forth in Section 2.3.1(a) hereof.

"Prepayment Premium" shall mean an amount equal to 1.0% of the principal amount so prepaid.

"Prime Rate" shall mean, on a particular date, a rate per annum equal to the rate of interest published in The Wall Street Journal as the "prime rate", as in effect on such day, with any change in the prime rate resulting from a change in said prime rate to be effective as of the date of the relevant change in said prime rate; provided, however, that if more than one prime rate is published in The Wall Street Journal for a day, the average of the prime rates shall be used; provided, further, however, that the Prime Rate (or the average of the prime rates) will be rounded to the nearest 1/100 of 1% or, if there is no nearest 1/100 of 1%, to the next higher 1/100 of 1%. In the event that The Wall Street Journal should cease or temporarily interrupt publication, then the Prime Rate shall mean the daily average prime rate published in another

[TPW: NYLEGAL:674139.7] 16248-00758 06/06/2007 12:54 AM

business newspaper, or business section of a newspaper, of national standing chosen by Lender. If The Wall Street Journal resumes publication, the substitute index will immediately be replaced by the prime rate published in The Wall Street Journal. In the event that a prime rate is no longer generally published or is limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a comparable interest rate index which is readily available to Borrower and verifiable by Borrower but is beyond the control of Lender. Lender shall give Borrower prompt written notice of its choice of a substitute index and when the change became effective. Such substitute index will also be rounded to the nearest 1/100 of 1% or, if there is no nearest 1/100 of 1%, to the next higher 1/100 of 1%. The determination of the Prime Rate by Lender shall be conclusive and binding absent manifest error.

"Prohibited Person" shall mean any Person:

(a)    listed in the Annex to, or otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order");

(b)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(c)    with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)    that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov.ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; or

(f)    who is an Affiliate of or affiliated with a Person listed above.

"Project" shall mean the construction of the Fontainebleau Resort and Casino (including, but not limited to, construction of the Project Future Improvements and the Future Improvements, in accordance with the Project Plans and Specifications and the Plans and Specifications, respectively).

"Project Architect" shall mean Bergman, Walls & Associates or any successor architect appointed in accordance with the provisions of the Master REA.

"Project Architect's Contract" shall mean that certain contract between Fontainebleau Las Vegas, LLC and Project Architect, dated as of April 2, 2007, relating to the design and construction of the Project Future Improvements.

- 27 -

"Project Construction Budget" shall mean the detailed trade breakdown of the cost of constructing the Project Future Improvements and an itemization of non-construction and land costs.

"Project Construction Consultant" shall have the meaning ascribed to the term "Construction Consultant" in the Master Disbursement Agreement

"Project Construction Contract" shall mean the guaranteed maximum price contract to be entered into between Resort Borrower and Project General Contractor, to be approved by Lender, and all amendments, supplements, appendices and addenda to each thereof, which each relate to the construction of the Project Future Improvements.

"Project Construction Documents" shall mean the Project Architect's Contract, the Project Construction Contract, the Project Engineer's Contract, the Project Plans and Specifications and all other contracts, plans or documents concerning the construction, design, or engineering of the Project Future Improvements.

"Project Engineer's Contract" shall mean the collective reference to all contracts and agreements between Resort Borrower and Project Engineer, related to the construction of the Project Future Improvements and site planning therefor.

"Project Engineer" shall mean JBA Consulting Engineers or any successor engineer appointed in accordance with the provisions of the Master REA.

"Project Future Improvements" shall mean any and all improvements to be made to the Resort Property and the Property (including, without limitation, the shell of the Building and any shared improvements with respect to the Property) depicted in the Project Plans and Specifications and to be constructed by Resort Borrower.

"Project General Contractor" shall mean Turnberry West Construction Inc. or any successor project general contractor appointed in accordance with the provisions of the Master REA.

"Project Plans and Specifications" shall mean the plans and specifications for the construction of the Project Future Improvements, prepared by the Project Architect and previously approved by Lender, as more particularly identified on Exhibit U to the Master Disbursement Agreement, with such amendments thereto as may from time to time be made and approved by Lender in consultation with the Construction Consultant if and to the extent such approval is required pursuant to Section 5.1.30.

"Projections" shall have the meaning set forth in Section 9.7.3(b) hereof.

"Property" shall mean, the Leased Property, the Improvements thereon, all Personal Property and any other real property owned by the Mortgage Borrower and encumbered by the Security Instrument, together with all of Mortgage Borrower's rights pertaining to the Property and Improvements, as more particularly described in Article 1 of the Security Instrument and referred to therein as the "Property". Notwithstanding the foregoing, upon the occurrence of a

- 28 -

Fee Transfer, the term "Property", as used herein, shall also include the New Estate, whereupon the Leased Property shall no longer be deemed a part of the Property.

"Property Account" shall have the meaning set forth in the Mortgage Loan Agreement.

"Property Account Agreement" shall have the meaning set forth in the Mortgage Loan Agreement.

"Property Account Bank" shall mean Bank of America, N.A., provided that it remains an Eligible Institution, and any successor Eligible Institution or other Eligible Institution selected by Borrower, subject to Lender's approval.

"Provided Information" shall have the meaning set forth in Section 9.1(a) hereof.

"Qualified Developer" shall mean (i) Fontainebleau Las Vegas, LLC, a Delaware limited liability company or (ii) such other reputable and experienced professional development organization (a) which has developed, together with its Affiliates, ten (10) properties of a type and quality similar to the Property, totaling in the aggregate no less than 5,000,000 square feet and (b) prior to whose employment as developer of the Property (i) prior to the occurrence of a Securitization, such employment shall have been approved by Lender, and (ii) after the occurrence of a Securitization, Lender shall have received written confirmation from the Rating Agencies that the employment of such manager will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current ratings of the Securities.

"Qualified Insurer" shall have the meaning set forth in Section 6.1(b) hereof.

"Qualified Leasing Agent" shall mean (i) TB Realty, Inc., a Nevada corporation, (ii) any Affiliate of Shopping Center Management, a Florida general partnership, d/b/a Turnberry Associates or (iii) such other reputable and experienced professional leasing organization (a) which leases, together with its Affiliates, ten (10) properties of a type and quality similar to the Property, totaling in the aggregate no less than 3,500,000 square feet and (b) prior to whose employment as leasing agent of the Property (i) prior to the occurrence of a Securitization, such employment shall have been approved by Lender, and (ii) after the occurrence of a Securitization, Lender shall have received written confirmation from the Rating Agencies that the employment of such leasing agent will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current ratings of the Securities.

"Qualified Manager" shall mean (i) TB Realty, Inc., a Nevada corporation, or (ii) any Affiliate of Shopping Center Management, a Florida general partnership, d/b/a Turnberry Associates or (iii) such other reputable and experienced professional management organization (a) which manages, together with its Affiliates, ten (10) properties of a type and quality similar to the Property, totaling in the aggregate no less than 3,500,000 square feet and (b) prior to whose employment as manager of the Property (i) prior to the occurrence of a Securitization, such employment shall have been approved by Lender, and (ii) after the occurrence of a Securitization, Lender shall have received written confirmation from the Rating Agencies that the employment of such manager will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current ratings of the Securities.

- 29 -

"Rating Agencies" shall mean each of S&P, Moody's, and Fitch, and any other nationally-recognized statistical rating agency which has been approved by Lender and has rated the Securities.

"REA" shall mean any construction, operation and reciprocal easement agreement or similar agreement (including any separate agreement or other agreement between one or more other parties to an REA with respect to such REA) affecting the Property in any material respect or any portion thereof in any material respect including, without limitation, the Master REA.

"Real Property" shall mean all Property of Mortgage Borrower other than the Personal Property.

"Reference Bank" shall mean a leading bank engaged in transactions in Eurodollar deposits in the international Eurocurrency market that has an established place of business in London. If any such Reference Bank should be removed from the Telerate Page 3750 (or such other page as may replace Telerate Page 3750 for the purpose of displaying London interbank offered rates of major banks for United States dollar deposits) or in any other way fail to meet the qualifications of a Reference Bank, Lender may designate alternative Reference Banks meeting the criteria specified above.

"Register" shall have the meaning set forth in Section 9.7.2(h) hereof.

"Registration Statement" shall have the meaning set forth in Section 9.2(b) hereof.

"Reimbursement Agreement" shall mean the Reimbursement Agreement, dated as of the date hereof, between Sponsor and Mortgage Borrower.

"Release" of any Hazardous Materials shall mean any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials.

"REMIC Trust" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note.

"Renewal Lease" shall have the meaning set forth in Section 5.1.17(a) hereof.

"Rents" shall have the meaning set forth in Article 1 of the Security Instrument.

"Replacement Co-Lender" shall have the meaning set forth in Section 9.7.2(k) hereof.

"Replacement Development Agreement" shall mean, collectively, (a) a development agreement with a Qualified Developer which development agreement shall be acceptable to Lender in form and substance, provided, Lender, at its option, may require that Borrower obtain confirmation from the applicable Rating Agencies that such development agreement will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current rating of the Securities or any class thereof; and (b) a conditional assignment of development agreement substantially in the form of the Assignment of Development Agreement (or such other form reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such

- 30 -

Qualified Developer at Borrower's expense and (c) if such replacement developer is an Affiliate of Borrower, Borrower shall have delivered, or cause to be delivered, to Lender, an updated Insolvency Opinion reasonably acceptable to Lender with respect to such Affiliate.

"Replacement Interest Rate Cap Agreement" shall mean an interest rate cap agreement from an Acceptable Counterparty with terms that (i) comply with Section 2.4 of this Agreement and the definition of Interest Rate Cap Agreement and (ii) are otherwise consistent with the Interest Rate Cap Agreement then in effect.

"Replacement Leasing Agreement" shall mean, collectively, (a) a leasing agreement with a Qualified Leasing Agent, which leasing agreement shall be acceptable to Lender in form and substance, provided, Lender, at its option, may require that Borrower obtain confirmation from the applicable Rating Agencies that such leasing agreement will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current rating of the Securities or any class thereof; and (b) a conditional assignment of leasing agreement substantially in the form of the Assignment of Leasing Agreement (or such other form reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Leasing Agent at Borrower's expense and (c) if such replacement leasing agent is an Affiliate of Borrower, Borrower shall have delivered, or caused to be delivered, to Lender, an updated Insolvency Opinion reasonably acceptable to Lender with respect to such Affiliate.

"Replacement Management Agreement" shall mean, collectively, (a) a management agreement with a Qualified Manager, which management agreement shall be acceptable to Lender in form and substance, provided, Lender, at its option, may require that Borrower obtain confirmation from the applicable Rating Agencies that such management agreement will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current rating of the Securities, the Mortgage Securities or any class thereof; and (b) a subordination of management agreement substantially in the form of the Assignment of Management Agreement (or such other form reasonably acceptable to Lender), executed and delivered to Lender by Borrower, Mortgage Borrower and such Qualified Manager at Borrower's expense and (c) if such replacement manager is an Affiliated Manager, Borrower shall have delivered, or cause to be delivered, to Lender, an updated Insolvency Opinion reasonably acceptable to Lender with respect to such Affiliated Manager.

"Required Monthly Interest Payment" shall have the meaning set forth in Section 2.2.1 hereof.

"Reserve Fund Deposits" shall mean the amounts to be deposited into the Reserve Funds for any given month or at any other time as provided in this Agreement or in the other Loan Documents.

"Reserve Funds" shall mean the Tax and Insurance Escrow Fund or any other escrow or reserve fund established by or on behalf of Borrower under the Loan Documents.

"Reserve Rate" shall mean the rate per annum which Lender determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 1/1,000%) of the one-month United States dollar lending rates that at least three major New York City banks

- 31 -

selected by Lender are quoting, at 11:00 a.m. (New York time) on the relevant LIBOR Determination Date, to the principal London offices of at least two of the Reference Banks, or (ii) in the event that at least two such rates are not obtained, the lowest one-month United States dollar lending rate which New York City banks selected by Lender are quoting as of 11:00 a.m. (New York time) on such LIBOR Determination Date to leading European banks.

"Resort Borrower" shall mean, collectively, Fontainebleau Las Vegas, LLC, a Nevada limited liability company and Fontainebleau Las Vegas II, LLC, a Florida limited liability company.

"Resort Lender" shall mean Bank of America, N.A., as administrative agent and individually as a lender under the Resort Loan Agreement.

"Resort Loan" shall mean the loans and other extensions of credit made to Resort Borrower under the Resort Loan Agreement.

"Resort Loan Event of Default" shall mean an "Event of Default" under and as defined in the Resort Loan Agreement.

"Resort Loan Agreement" shall mean that certain Credit Agreement among Resort Borrower, Resort Lender and the other parties thereto in connection with the Resort Loan, dated as of the date hereof, as amended, restated, supplemented or otherwise modified from time to time.

"Resort Loan Documents" shall mean all documents executed and/or delivered in connection with the Resort Loan, including, but not limited to, the Resort Loan Agreement and the Master Disbursement Agreement.

"Resort Property" shall mean have the meaning given to the term "Tower Parcel" in the Master REA.

"Responsible Officer" shall mean with respect to a Person, the chairman of the board, president, chief operating officer, chief financial officer, treasurer or vice president-finance of such Person.

"Restoration" shall have the meaning set forth in the Mortgage Loan Agreement.

"Restricted Party" shall mean Mortgage Borrower, Borrower, Mezzanine Pledgor, any Guarantor, any Affiliated Manager or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of, Mortgage Borrower, Borrower, Mezzanine Pledgor, any Guarantor, or any non-member manager, other than any public shareholders of a Restricted Party whose issued and outstanding shares of stock are listed on the New York Stock Exchange or such other nationally recognized stock exchange.

"Retail Intercreditor Agreement" shall mean that certain Intercreditor Agreement (Retail) dated as of the date hereof, by and among Resort Lender, Wells Fargo Bank, N.A., as trustee, Lender and Mortgage Borrower.

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

"S&P" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc, and any successor by merger, consolidation or acquisition of all of its assets so long as the same remains a nationally recognized rating agency.

"Sale or Pledge" shall mean a voluntary or involuntary sale, conveyance, transfer or pledge of a direct or indirect legal or beneficial interest.

"Satisfactory DSCR Date" shall mean such date that the Debt Service Coverage Ratio shall be greater than 1.10 to 1.0.

"Securities" shall have the meaning set forth in Section 9.1 hereof.

"Securitization" shall have the meaning set forth in Section 9.1 hereof.

"Securities Act" shall have the meaning set forth in Section 9.2(a) hereof.

"Security Deposits" shall have the meaning set forth in Section 5.1.17(e) hereof.

"Security Instrument" shall mean that certain Mortgage (or Deed of Trust or Deed to Secure Debt, as applicable) and Security Agreement, executed and delivered by Mortgage Borrower as security for the Mortgage Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Separate Tax Lot Event" shall mean such time that Mortgage Borrower has obtained one or more separate tax lot or parcel designations for the Property.

"Servicer" shall have the meaning set forth in Section 9.3 hereof.

"Servicing Agreement" shall have the meaning set forth in Section 9.3 hereof.

"Servicing Fee" shall have the meaning set forth in Section 9.3 hereof.

"Severed Loan Documents" shall have the meaning set forth in Section 8.2(c) hereof.

"Shortfall" shall have the meaning set forth in Section 2.1.2(d)hereof.

"Special Member" shall have the meaning set forth in Section 4.1.35(cc) hereof.

"Sponsor" shall mean Fontainebleau Resorts, LLC, a Delaware limited liability company.

"Sponsor Parent" shall mean any entity that is a direct parent of Sponsor. As of the Closing Date, Fontainebleau Equity Holdings, Voteco, LLC, a Delaware limited liability company and Fontainebleau Equity Holdings, LLC, a Delaware limited liability company would both be deemed to be (and would be the only entities that would be deemed to be) Sponsor Parents for the purpose of this definition.

"Spread Maintenance Premium" shall mean, with respect to any repayment of the outstanding principal amount of the Loan prior to the end of the Lockout Period, a payment to Lender in an amount equal to the sum of the present value of each future installment of interest

- 33 -

that would be payable under the Note on the outstanding principal amount of the Loan from the date of such prepayment through, but excluding, the end of the Lockout Period assuming an interest rate equal to the Eurodollar Rate Margin, discounted at an interest rate per annum equal to the Treasury Constant Maturity Yield Index published during the second full week preceding the date on which such premium is payable for instruments having a maturity coterminous with the end of the Lockout Period.

"Standard Statement" shall have the meaning set forth in Section 5.1.10(h)(i) hereof.

"State" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"Strike Rate" shall mean 6.0%.

"Subordination of Development Agreement" shall mean a Subordination of Development Agreement in the form (with such de minimis changes agreed to by Mortgage Borrower) attached hereto as Exhibit B (or such other form reasonably acceptable to Lender).

"Subordination of Leasing Agreement" shall mean that certain Subordination of Leasing Agreement dated as of the date hereof, among Lender, Mortgage Borrower, and Leasing Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Subordination of Management Agreement" shall mean a Subordination of Management Agreement in the form (other than de minimus changes) attached hereto as Exhibit C (or such other form reasonably acceptable to Lender).

"Survey" shall mean a survey prepared by a surveyor licensed in the State where the Property is located and satisfactory to Lender and the company or companies issuing the Title Insurance Policies, and containing a certification of such surveyor satisfactory to Lender.

"Syndication" shall have the meaning set forth in Section 9.7.2(a) hereof.

"Tax Account" shall have the meaning set forth in Section 10.1 hereof.

"Tax and Insurance Escrow Fund" shall have the meaning set forth in the Mortgage Loan Agreement.

"Taxes" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against (i) the Property or part thereof and (ii) until such time as Mortgage Borrower has obtained one or more separate tax lot or parcel designations for the Property, the Resort Property.

"Telerate Page 3750" shall mean the display designated as page 3750 on the Dow Jones Telerate Service (or such other page as may replace page 3750 on that service or such other service as may be nominated by the British Bankers-Association as the information vendor for the purposes of displaying British Bankers-Association Interest Settlement Rates for U.S. dollar deposits).

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

"Tenant Construction Deliverables" shall, with respect to any tenant or subtenant under the Lease, mean any contracts, plans or documents concerning the construction, design, or engineering of the Future Improvements to be constructed by such tenant or subtenant.

"Terrorism Insurance" shall have the meaning set forth in Section 6.1(b) of the Mortgage Loan Agreement.

"Terrorism Insurance Cap" shall have the meaning set forth in Section 6.1(b) of the Mortgage Loan Agreement.

"Title Company" shall mean Lawyers Title Insurance Corporation.

"Title Insurance Policy" shall have the meaning set forth in the Mortgage Loan Agreement.

"Transfer" shall have the meaning set forth in Section 5.2.10(a) hereof.

"Treasury Constant Maturity Yield Index" shall mean the average yield for "treasury constant maturities" published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) ("FRB Release"), for the second full week preceding the date of the applicable date of prepayment for instruments having a maturity co-terminous with the end of the Lockout Period. If the FRB Release is no longer published, Lender shall select a comparable publication to determine the Treasury Constant Maturity Yield Index. If there is no Treasury Constant Maturity Yield Index for instruments having a maturity co-terminous with the end of the Lockout Period, then the weighted average yield to the end of the Lockout Period of the Treasury Constant Maturity Yield Indices with maturities next longer and shorter than such remaining average life to maturity shall be used, calculated by averaging (and rounding upward to the nearest whole multiple of 1/100,000 of 1% per annum, if the average is not such a multiple) the yields of the relevant Treasury Constant Maturity Yield Indices (rounded, if necessary, to the nearest 1/100,000 of 1% with any figure of 1/100,000 of 1% or above rounded upward).

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the state of New York.

"UCC Financing Statements" shall mean the UCC financing statement executed in connection with the Pledge Agreement and the other Loan Documents and filed in the applicable filing offices.

"UCC Title Insurance Policy" shall mean, with respect to the Collateral, a UCC title insurance policy in the form acceptable to Lender issued with respect to the Collateral and insuring the lien of the Pledge Agreement encumbering such Collateral.

"Underwriter Group" shall have the meaning set forth in Section 9.2(b) hereof.

"USPAP" shall mean the Uniform Standard of Professional Appraisal Practice.

**Section 1.2**    Principles of Construction.

- 35 -

(a)    All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. With respect to terms defined by cross-reference to the Mortgage Loan Documents, such defined terms shall have the definitions set forth in the Mortgage Loan Documents as of the date hereof, and no modifications to the Mortgage Loan Documents shall have the effect of changing such definitions for the purpose of this Agreement unless Lender expressly agrees that such definitions as used in this Agreement have been revised or Lender consents to the modification documents. With respect to any provisions incorporated by reference herein from the Mortgage Loan Agreement, such provisions shall be deemed a part of this Agreement notwithstanding the fact that the Mortgage Loan shall no longer be effective for any reason.

(b)    All covenants, representations, terms and conditions contained in this Agreement applicable to Pledgor shall be deemed to apply to each of Borrower and Mezzanine Pledgor, as applicable, individually. It shall constitute an Event of Default if any covenant, representation, term or condition contained in this Agreement is breached (beyond any applicable notice and cure periods) with respect to either Pledgor.

## II.    GENERAL TERMS

**Section 2.1**    Loan Commitment; Disbursement to Borrower.

2.1.1    Agreement to Lend and Borrow.

Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan as a single borrowing in an amount equal to $85,000,000 on the Closing Date, on the terms and conditions set forth herein. Any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

2.1.2    Intentionally Omitted.

2.1.3    The Note, Pledge Agreement and Loan Documents.

The Loan shall be evidenced by the Note and secured by the Pledge Agreement and the other Loan Documents.

2.1.4    Use of Proceeds.

Borrower shall use the proceeds of the Loan solely for the purposes set forth in the Certificate of Sources and Uses.

**Section 2.2**    Interest; Loan Payments; Late Payment Charge.

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

2.2.1   <u>Payments</u>.

(a)    <u>Interest</u>.  Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date to the end of the Interest Period in which the Maturity Date occurs at the Applicable Interest Rate.  Monthly installments of interest only in an amount equal to (the "Required Monthly Interest Payment") the lesser of (x) the amount of interest that has accrued during the immediately preceding Interest Period and (y) Positive Cash Flow Amount, shall be paid on each Payment Date commencing on July 9, 2007 and on each subsequent Payment Date thereafter up to and including the Maturity Date.  Except as provided below and to the extent permitted by law, on each Payment Date (i) all interest that accrued during the immediately preceding Interest Period which is not payable by Borrower on such Payment Date pursuant to the preceding sentence (the "Monthly Deferred Interest Amount") shall be deferred, (ii) the Monthly Deferred Interest Amount shall be added to the outstanding principal balance of the Loan and (iii) the Monthly Deferred Interest Amount, as so capitalized per clause (ii) above, shall thereafter earn interest at the Applicable Interest Rate.  Notwithstanding anything to the contrary contained herein all payments made under the Interest Rate Cap Agreement shall be applied to the payment of all accrued and unpaid interest on the Loan.  Interest on the outstanding principal amount of the Loan from and including the Closing Date through June 8, 2007 shall be paid by Borrower on the Closing Date.  The outstanding principal balance of the Loan together (including the Deferred Interest Balance) with all accrued and unpaid interest thereon and the Exit Fee shall be due and payable on the Maturity Date.

(b)    <u>Monthly Deferred Interest Payments</u>.  On each Payment Date, Borrower shall also pay to Lender the Monthly Deferred Interest Payment.  Each Monthly Deferred Interest Payment shall be applied to reduce the Deferred Interest Balance.

(c)    <u>Extension of the Maturity Date</u>.  Borrower shall have the option to extend the term of the Loan beyond the initial Maturity Date for two (2) successive terms (each, an "Extension Option") of ten months each (each, an "Extension Period") to (x) the Payment Date occurring in August, 2011, and (y) the Payment Date occurring in June, 2012 (each such date, the "Extended Maturity Date"), respectively, and, as to each Extension Option, upon satisfaction of the following terms and conditions:

(i)    no Event of Default shall have occurred and be continuing at the time the applicable Extension Option is exercised and on the date that the applicable Extension Period is commenced;

(ii)    Borrower shall notify Lender of its irrevocable election to extend the Maturity Date as aforesaid not earlier than one hundred twenty (120) days and no later than thirty (30) days prior to the then applicable Maturity Date;

(iii)    Borrower shall obtain and deliver to Lender prior to exercise of such Extension Option, one or more Replacement Interest Rate Cap Agreements, which Replacement Interest Rate Cap Agreements shall be effective commencing

- 37 -

on the first day of such Extension Option and shall have a maturity date not earlier than the next succeeding Extended Maturity Date;

(iv)    in connection with each Extension Option, Borrower shall have delivered to Lender together with its notice pursuant to subsection (c)(ii) of this Section 2.2.1 and as of the commencement of the applicable Extension Option, an Officer's Certificate in form reasonably acceptable to the Lender certifying that each of the representations and warranties of Borrower contained in the Loan Documents is true, complete and correct in all material respects as of the date of such Officer's Certificate except to the extent such representations and warranties are matters which by their nature can no longer be true and correct as a result of the passage of time and/or except to the extent the failure of such representation or warranty to be true and correct would not result in a Material Adverse Effect;

(v)    in connection with the exercise of each Extension Option, Borrower shall have paid to Lender the Extension Fee; and

(vi)    the Mortgage Loan Extension Option corresponding to the applicable Extension Period shall have been exercised in accordance with the terms of the Mortgage Loan Agreement.

(d)    All references in this Agreement and in the other Loan Documents to the Maturity Date shall mean the applicable Extended Maturity Date in the event the applicable Extension Option is exercised.

(e)    All payments and other amounts due under the Note, this Agreement and the other Loan Documents shall be made without any setoff, defense or irrespective of, and without deduction for, counterclaims.

2.2.2    Interest Calculation.

Interest on the outstanding principal balance of the Loan (including the Deferred Interest Balance) shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate equal to the Applicable Interest Rate divided by three hundred sixty (360) by (c) the outstanding principal balance (including the Deferred Interest Balance).

2.2.3    Eurodollar Rate Unascertainable; Illegality; Increased Costs.

(a)    (i) In the event that Lender shall have determined (which determination shall be conclusive and binding upon Borrower absent manifest error) that by reason of circumstances affecting the interbank eurodollar market, adequate and reasonable means do not exist for ascertaining LIBOR, then Lender shall forthwith give notice by telephone of such determination, to Borrower at least one (1) Business Day prior to the last day of the related Interest Period, with a written confirmation of such determination promptly thereafter. If such notice is given, the Loan shall bear interest at the Adjusted Prime Rate beginning on the first day of the next succeeding Interest Period. (ii) If, pursuant to the terms of this Section 2.2.3(a), the Loan is bearing interest at the Adjusted Prime Rate and

- 38 -

Lender shall determine (which determination shall be conclusive and binding upon Borrower absent manifest error) that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable, Lender shall give notice thereof to Borrower by telephone of such determination, confirmed in writing, to Borrower as soon as reasonably practical, but in no event later than one (1) Business Day prior to the last day of the then current Interest Period. If such notice is given, the Loan shall bear interest at the Eurodollar Rate beginning on the first day of the next succeeding Interest Period. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to elect to have the Loan bear interest at either the Eurodollar Rate or the Adjusted Prime Rate.

(b)    If any requirement of law or any change therein or in the interpretation or application thereof, shall hereafter make it unlawful for Lender or any Co-Lender in good faith to make or maintain the portion of the Loan bearing interest at the Eurodollar Rate and such requirement or change is generally applicable to all similarly situated lenders, (I) the obligation of Lender or such Co-Lender hereunder to make the Loan bearing interest at the Eurodollar Rate shall be canceled forthwith and (II) the Loan shall automatically bear interest at the Adjusted Prime Rate on the first day of the immediately succeeding Interest Period or within such earlier period as required by Applicable Law. Borrower hereby agrees promptly to pay Lender or any Co-Lender (within ten (10) days of Lender's or any Co-Lender's written demand therefor), any additional amounts necessary to compensate Lender or any Co-Lender for any reasonable costs incurred by Lender or such Co-Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender or such Co-Lender to lenders of funds obtained by it in order to make or maintain the Loan hereunder. Upon written demand from Borrower, Lender or the applicable Co-Lender shall demonstrate in reasonable detail the circumstances giving rise to Lender's or such Co-Lender's determination and the calculation substantiating the Adjusted Prime Rate and any additional costs incurred by Lender or such Co-Lender in making the conversion. Lender's or Co-Lender's written notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

(c)    In the event that any change in any requirement of any Applicable Law or in the interpretation or application thereof, or compliance in good faith by Lender or any Co-Lender with any request or directive (whether or not having the force of law) hereafter issued from any Governmental Authority which is generally applicable to all Lenders subject to such Governmental Authority's jurisdiction:

(i)    shall hereafter impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender or any Co-Lender which is not otherwise included in the determination of LIBOR hereunder;

(ii)    shall, if the Loan is then bearing interest at the Eurodollar Rate, hereafter have the effect of reducing the rate of return on Lender's or any Co-

- 39 -

Lender's capital as a consequence of its obligations hereunder to a level below that which Lender or any Co-Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's or any Co-Lender's policies with respect to capital adequacy) by any amount deemed by Lender or any Co-Lender to be material; or

(iii)   shall, if the Loan is then bearing interest at the Eurodollar Rate, hereafter impose on Lender or any Co-Lender any other condition, the result of which is to increase the cost to Lender or such Co-Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender or such Co-Lender (within ten (10) days of Lender's or such Co-Lender's written demand therefor), any additional amounts necessary to compensate Lender or such Co-Lender for such additional cost or reduced amount receivable which Lender or such Co-Lender deems to be material. If Lender or any Co-Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.3(c), Lender and such Co-Lender shall provide Borrower with written notice specifying in reasonable detail the event or circumstance by reason of which it has become so entitled and the additional amount required to fully compensate Lender and such Co-Lender for such additional cost or reduced amount. A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender or such Co-Lender to Borrower shall be conclusive absent manifest error. This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under the Note, this Agreement and the other Loan Documents.

(d)   Borrower agrees to indemnify Lender and the Co-Lenders and to hold Lender and the Co-Lenders harmless from any loss or expense which Lender or any Co-Lender actually sustains or incurs as a consequence of (I) any default by Borrower in payment of the principal of or interest on the Loan beyond applicable notice and cure periods (if any) while bearing interest at the Eurodollar Rate, including, without limitation, any such loss or expense arising from interest or fees payable by Lender or any Co-Lenders to lenders of funds obtained by it in order to maintain the Eurodollar Rate, (II) any prepayment (whether voluntary or mandatory) of the Loan on a day that is not the day immediately following the last day of an Interest Period with respect thereto and (III) the conversion (for any reason whatsoever, whether voluntary or involuntary) of the Applicable Interest Rate from the Eurodollar Rate to the Adjusted Prime Rate with respect to any portion of the outstanding principal amount of the Loan then bearing interest at the Eurodollar Rate on a date other than the Payment Date immediately following the last day of an Interest Period, including, without limitation, such loss or expenses arising from interest or fees payable by Lender or any Co-Lender to lenders of funds obtained by it in order to maintain the Eurodollar Rate hereunder (the amounts referred to in clauses (I), (II) and (III) are herein referred to collectively as the "Breakage Costs"). This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents. Anything to the contrary contained herein notwithstanding, Borrower shall not be obligated to pay any Breakage Costs in connection with a prepayment resulting from casualty or condemnation.

- 40 -

2.2.4    Payment on Maturity Date.

Borrower shall pay to Lender on the Maturity Date the outstanding principal balance (including the Deferred Interest Balance), all accrued and unpaid interest thereon, the Exit Fee and all other amounts due hereunder and under the Note, the Pledge Agreement and the other Loan Documents, including, without limitation, all interest that would accrue on the outstanding principal balance (including the Deferred Interest Balance) of the Loan through and including the Maturity Date.

2.2.5    Payments after Default.

Upon the occurrence and during the continuance of an Event of Default, (a) interest on the outstanding principal balance of the Loan (including the Deferred Interest Balance) and, to the extent permitted by Applicable Law, overdue interest and other amounts due in respect of the Loan, shall accrue at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein and (b) Lender shall be entitled to receive and Borrower shall pay to Lender on each Payment Date an amount equal to the Net Cash Flow After Debt Service for the prior month, such amount to be applied by Lender to the payment of the Debt in such order as Lender shall determine in its sole discretion, including, without limitation, alternating applications thereof between interest and principal. Interest at the Default Rate and Net Cash Flow After Debt Service shall both be computed from the occurrence of the default until the actual receipt and collection of the Debt (or that portion thereof that is then due). To the extent permitted by Applicable Law, interest at the Default Rate shall be added to the Debt, shall itself accrue interest at the same rate as the Loan and shall be secured by the Pledge Agreement. This paragraph shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default; the acceptance of any payment of Net Cash Flow After Debt Service shall not be deemed to cure or constitute a waiver of any Event of Default; and Lender retains its rights under the Note to accelerate and to continue to demand payment of the Debt upon the happening of any Event of Default, despite any payment of Net Cash Flow After Debt Service.

2.2.6    Late Payment Charge.

If any principal, interest or any other sums due under the Loan Documents (other than the payment of principal due on the Maturity Date) is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of four percent (4%) of such unpaid sum or the maximum amount permitted by Applicable Law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Pledge Agreement and the other Loan Documents to the extent permitted by Applicable Law.

2.2.7    Usury Savings.

This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan (including

- 41 -

the Deferred Interest Balance) at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance (including the Deferred Interest Balance) due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder, provided, however, that in no event shall any Spread Maintenance Premium or Breakage Costs be due with respect to any such deemed prepayment of principal. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

2.2.8    Indemnified Taxes.

(a)    All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, Indemnified Taxes, excluding (i) Indemnified Taxes measured by Lender's or any Co-Lender's net income, and franchise taxes imposed on it, by the jurisdiction under the laws of which Lender or any Co-Lender is resident or organized, or any political subdivision thereof, (ii) taxes measured by Lender's or any Co-Lender's net income, and franchise taxes imposed on it, by the jurisdiction of Lender's or such Co-Lender's applicable lending office or any political subdivision thereof or in which Lender or such Co-Lender is resident or engaged in business, and (iii) withholding taxes imposed by the United States of America, any state, commonwealth, protectorate territory or any political subdivision or taxing authority thereof or therein as a result of the failure of Lender or any Co-Lender which is a Non-U.S. Entity to comply with the terms of paragraph (b) below (if applicable). If any non-excluded Indemnified Taxes are required to be withheld from any amounts payable to Lender or any Co-Lender hereunder, the amounts so payable to Lender or such Co-Lender shall be increased to the extent necessary to yield to Lender or such Co-Lender (after payment of all non-excluded Indemnified Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder. Whenever any non-excluded Indemnified Tax is required to be withheld from amounts payable to Lender or any Co-Lender hereunder and is payable pursuant to Applicable Law by Borrower, Borrower shall send to Lender or the applicable Co-Lender an original official receipt or certified copy thereof showing payment of such non-excluded Indemnified Tax or other evidence of payment reasonably satisfactory to Lender or the applicable Co-Lender. Borrower hereby agrees to indemnify Lender and each Co-Lender for any incremental taxes, interest or penalties that may become payable by Lender or any Co-Lender which may result from any failure by Borrower to pay any such non-excluded Indemnified Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender or any Co-Lender the required receipts or other required documentary evidence, except to the extent due to Lender's or any Co-Lender's, as applicable, failure to forward an invoice for such non-excluded Indemnified Tax. For the avoidance of doubt,

- 42 -

Borrower shall not be obligated to pay any additional amounts or indemnification amounts under this paragraph (a) except to the extent such amounts are payable solely due to a change in applicable treaty, law or regulation effective after the date on which the applicable Non-U.S. Entity became a party to this Agreement.

(b)     In the event that Lender or any Co-Lender or any successor and/or assign of Lender or any Co-Lender is a Non-U.S. Entity, each such Non-U.S. Entity agrees that, prior to the first date on which any payment is due such entity hereunder, it will deliver to Borrower two duly completed copies of United States Internal Revenue Service Form W-8BEN and/or Form W-8IMY or successor applicable form, as applicable (claiming complete exemption from deduction or withholding of any United States federal income taxes under an applicable treaty), or Form W-8ECI or successor applicable form, certifying that such entity is entitled to receive payments under the Note, without deduction or withholding of any United States federal income taxes, or, in the case of a Non-U.S. Entity claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," a statement substantially in the form of Exhibit G and a Form W8-BEN or successor applicable form. Each entity required to deliver to Borrower a Form W-8BEN or W-8ECI pursuant to the preceding sentence further undertakes to deliver to Borrower two further copies of such forms, or successor applicable forms, or other manner of certification, as the case may be, on or before the date that any such form expires (which, in the case of the Form W-8ECI, is the last day of each U.S. taxable year of the Non-U.S. Entity) or becomes obsolete or after the occurrence of any event requiring a change in the most recent form previously delivered by it to Borrower, and such other extensions or renewals thereof as may reasonably be requested by Borrower, certifying in the case of a Form W-8BEN, W-8IMY or W-8ECI that such entity is entitled to receive payments under the Note without deduction or withholding of any United States federal income taxes, unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required which renders all such forms inapplicable or which would prevent such entity from duly completing and delivering any such form with respect to it and such entity advises Borrower that it is not capable of receiving payments without any deduction or withholding of United States federal income tax.

(c)     In the event that Lender or any Co-Lender or any successor and/or assign of Lender or any Co-Lender is not a Non-U.S. Entity, each such Lender or Co-Lender agrees that, prior to the first date on which any payment is due such entity hereunder, it will deliver to Borrower two duly completed copies of United States Internal Revenue Service Form W-9 or successor applicable form establishing that such Lender or Co-Lender is not subject to United States backup withholding tax.

(d)     The Lender and each Co-Lender shall use reasonable efforts (including reasonable efforts to change its applicable lending office) to avoid the imposition of any non-excluded Indemnified Taxes for which Borrower is required to pay additional amounts pursuant to paragraph (a) above; provided, however, that such efforts shall not require the Lender or such Co-Lender to incur additional costs or legal or regulatory

- 43 -

burdens that the Lender or such Co-Lender considers in its good faith reasonable judgment to be material.

**Section 2.3**    Prepayments.

2.3.1    Voluntary Prepayments.

Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part prior to June 9, 2008 (the "Lockout Period"). On any Payment Date occurring after the expiration of the Lockout Period, Borrower may, at its option, prepay the Loan in whole but not in part, upon satisfaction of the following conditions:

(a)    Borrower shall provide prior written notice (the "Prepayment Notice") to Lender (which notice shall be irrevocable) specifying the date (the "Prepayment Date") upon which the prepayment is to be made, which notice shall be delivered to Lender not less than fifteen (15) Business Days prior to such payment; provided, however, Borrower shall have the one-time right to send a written notice to Lender revoking its notice of prepayment at least five (5) Business Days prior to the Payment Date occurring in the calendar month of the proposed prepayment date set forth in the original prepayment notice, provided Borrower pays to Lender at the time of its notice of revocation, all costs and expenses (including, but not limited to, any Breakage Costs) incurred by Lender in anticipation of the repayment including, but not limited to, reasonable attorney's fees and expenses and any fees and expenses of any servicer;

(b)    Borrower shall pay to Lender, simultaneously with such prepayment, (i) all accrued and unpaid interest calculated at the Applicable Interest Rate on the amount of principal (including the Deferred Interest Balance) being prepaid through and including the Prepayment Date, (ii) in addition to the payments required in clause (i) above, if such prepayment is not made on a Payment Date, all interest on the principal amount being prepaid which would have accrued from the date of prepayment through and including the immediately succeeding Payment Date, calculated at (1) the Applicable Interest Rate if such prepayment occurs on or after the LIBOR Determination Date for the Interest Period in which such prepayment occurs or (2) the Assumed Note Rate if such prepayment occurs before the LIBOR Determination Date for the Interest Period in which the prepayment occurs (the "Interest Shortfall"), (iii) Breakage Costs, if any, without duplication of any sums paid pursuant to the preceding clauses (i) and (ii); (iv) the Exit Fee and (v) all other sums then due under this Agreement, the Note or the other Loan Documents;

(c)    each prepayment shall be in an aggregate principal amount of $1,000,000.00 or any integral multiple of $100,000.00 in excess thereof (or the entire principal amount of the Loan outstanding); and

(d)    Mortgage Borrower shall have simultaneously with such prepayment prepaid the Mortgage Loan in whole.

(e)    Such prepayment shall not be prohibited pursuant to the Mortgage Loan Documents.

If the Interest Shortfall was calculated based upon the Assumed Note Rate, upon determination of LIBOR on the LIBOR Determination Date for the Interest Period in which such prepayment occurs, (i) if the Applicable Interest Rate for such Interest Period is less than the Assumed Note Rate, Lender shall promptly refund to Borrower the amount of the Interest Shortfall paid, calculated at a rate equal to the difference between the Assumed Note Rate and the Applicable Interest Rate, or (ii) if the Applicable Interest Rate is greater than the Assumed Note Rate, Borrower shall promptly (and in no event later than the ninth (9th) day of the following month) pay Lender the amount of such additional Interest Shortfall calculated at a rate equal to the excess of the Applicable Interest Rate over the Assumed Note Rate.

If a notice of prepayment is given by Borrower to Lender pursuant to this Section 2.3.1, the amount designated for prepayment and all other sums required under this Section 2.3.1 shall be due and payable on the Prepayment Date unless the applicable Prepayment Notice has been revoked in accordance with Section 2.3.1(a) above.

2.3.2    Liquidation Events.

(a)    In the event of (i) any Casualty to all or any portion of the Property, (ii) any Condemnation of all or any portion of the Property, (iii) a Transfer of the Property in connection with realization thereon by the Mortgage Lender following an Event of Default under the Mortgage Loan, including without limitation a foreclosure sale, or (iv) any refinancing of the Property or the Mortgage Loan (each, a "Liquidation Event"), Borrower shall cause the related Net Liquidation Proceeds After Debt Service to be deposited directly into an account designated by Lender. On each date on which Lender actually receives a distribution of Net Liquidation Proceeds After Debt Service, if such date is a Payment Date, such Net Liquidation Proceeds After Debt Service shall be applied to the outstanding principal balance of the Note (including the Deferred Interest Balance) in an amount equal to one hundred percent (100%) of such Net Liquidation Proceeds After Debt Service, together with interest that would have accrued on such amount through the next Payment Date and all other sums then due. In the event Lender receives a distribution of Net Liquidation Proceeds After Debt Service on a date other than a Payment Date, such amounts shall be held by Lender as collateral security for the Loan in an interest bearing account, with such interest accruing to the benefit of Borrower, and shall be applied by Lender on the next Payment Date.

(b)    Borrower shall immediately notify Lender of any Liquidation Event once Borrower has knowledge of such event. Borrower shall be deemed to have knowledge of (i) a sale (other than a foreclosure sale) of the Property on the date on which a contract of sale for such sale is entered into, and a foreclosure sale, on the date notice of such foreclosure sale is given, and (ii) a refinancing of the Property, on the date that is five (5) Business Days after the date on which a commitment for such refinancing is entered into. The provisions of this Section 2.3.2 shall not be construed to contravene in any manner the restrictions and other provisions regarding refinancing of the Mortgage Loan or Transfer of the Property set forth in this Agreement and the other Loan Documents.

2.3.3    Prepayments After Default.

- 45 -

If, following an Event of Default, Borrower tenders payment of all or any part of the Debt, or if all or any portion of the Debt is recovered by Lender after such Event of Default (including, without limitation, through application of any Net Liquidation Proceeds After Debt Service) such tender or recovery shall be deemed a voluntary prepayment by Borrower in violation of the prohibition against prepayment of the Loan prior to the expiration of the Lockout Period and Borrower shall pay, in addition to the debt, (i) all accrued and unpaid interest calculated at the Applicable Interest Rate on the amount of principal being prepaid through and including the Prepayment Date together with an amount equal to the interest that would have accrued at the Applicable Interest Rate on the amount of principal being prepaid through the end of the Interest Period in which such prepayment occurs, notwithstanding that such Interest Period extends beyond the date of prepayment, (ii) the Interest Shortfall, if applicable, with respect to the amount prepaid, (iii) Breakage Costs, if any, without duplication of any sums paid pursuant to the preceding clause (ii); (iv) if such payment occurs prior to the expiration of the Lockout Period, an amount equal to the greater of the Prepayment Premium or the applicable Spread Maintenance Premium, (v) the Exit Fee and (vi) all other sums due under this Agreement, the Note or the other Loan Documents in connection with a partial or total prepayment.

2.3.4    <u>Making of Payments</u>.

Each payment by Borrower hereunder or under the Note shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 12:00 p.m., New York City time, on or prior to the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower. Whenever any payment hereunder or under the Note shall be stated to be due on a day which is not a Business Day, such payment shall be made on the first Business Day succeeding such scheduled due date.

2.3.5    <u>Application of Prepayments</u>.

All prepayments received pursuant to this Section 2.3 and Section 2.5 shall be applied first, to interest on the outstanding principal balance (including the Deferred Interest Balance) being prepaid that accrued through and including the Prepayment Date, second, to interest on the outstanding principal balance being (including the Deferred Interest Balance) prepaid that would have accrued through the end of the Interest Period in which the prepayment occurred, third, to the Deferred Interest Balance and fourth, to the payments of principal (exclusive of the Deferred Interest Balance) due under the Loan.

**Section 2.4**    <u>Interest Rate Cap Agreement</u>.

(a)    Upon the earlier to occur of (i) thirty (30) days after the Closing Date and (ii) five (5) Business Days notice from Lender that the same is required in connection with a Securitization or Syndication, Borrower shall obtain, or cause to be obtained, and shall thereafter maintain in effect, an Interest Rate Cap Agreement with an Acceptable Counterparty, which shall be coterminous with the Loan and the Mortgage Loan and have a notional amount which shall not at any time be less than the outstanding principal balance of the Loan (including the Deferred Interest Balance) and which shall at all times have a strike rate equal to (or at Borrower's election, less than) the Strike Rate. The

- 46 -

Counterparty shall be obligated under the Interest Rate Cap Agreement to make monthly payments equal to the excess of one (1) month LIBOR over the Strike Rate, calculated on the notional amount. The notional amount of the Interest Rate Cap Agreement may be reduced from time to time in amounts equal to any prepayment of the principal of the Loan in accordance with Section 2.3 hereof.

(b)    Simultaneously with entering into an Interest Rate Cap Agreement, Borrower shall collaterally assign to Lender pursuant to an Assignment of Interest Rate Cap Agreement substantially in the form annexed hereto as Exhibit A, all of its right, title and interest to receive any and all payments under the Interest Rate Cap Agreement (and any related guarantee, if any) and shall deliver to Lender an executed counterpart of such Interest Rate Cap Agreement and notify the Counterparty of such collateral assignment (either in such Interest Rate Cap Agreement or by separate instrument).    The Counterparty shall agree in writing to make all payments it is required to make under the Interest Rate Cap Agreement into the Mezzanine Loan Account or if the Mezzanine Loan Account is not then required to be in effect, into such account as specified by Lender in writing (with a copy if such notice to Borrower within a reasonable period of time thereafter).    At such time as the Loan is repaid in full, all of Lender's right, title and interest in the Interest Rate Cap Agreement shall terminate and Lender shall promptly execute and deliver at Borrower's sole cost and expense, such documents as may be required to evidence Lender's release of the Interest Rate Cap Agreement and to notify the Counterparty of such release.

(c)    Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement.    All amounts paid by the Counterparty under the Interest Rate Cap Agreement shall be deposited immediately into the Mezzanine Loan Account or if the Mezzanine Loan Account is not then required to be in effect, into such account as specified by Lender in writing (with a copy of such notice to Borrower within a reasonable period of time thereafter).    Borrower shall take all actions reasonably requested by Lender to enforce Lender's rights under the Interest Rate Cap Agreement in the event of a default by the Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder.

(d)    In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below "A+" (or the equivalent) by the Rating Agencies, Borrower shall replace the Interest Rate Cap Agreement with a Replacement Interest Rate Cap Agreement with an Acceptable Counterparty not later than ten (10) Business Days following receipt of notice from Lender or Servicer of such downgrade, withdrawal or qualification. Notwithstanding the foregoing, in the event Lehman Brothers Holdings Inc. or any Affiliate thereof is the Counterparty, any reference in this subsection to a rating of "A+" shall be deemed to refer to a rating of "A".

(e)    In the event that Borrower fails to purchase and deliver to Lender the Interest Rate Cap Agreement or any Replacement Interest Rate Cap Agreement as and when required hereunder, Lender may purchase such Interest Rate Cap Agreement and the cost incurred by Lender in purchasing such Interest Rate Cap Agreement shall be paid

- 47 -

by Borrower to Lender with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is paid by Borrower to Lender.

(f)     Each Interest Rate Cap Agreement shall contain the following language or its equivalent: "In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below "Aa3" by Moody's or "A+" by S&P (or in each case, the equivalent by any other Rating Agency), the Counterparty must, within 30 days, either (x) post collateral on terms acceptable to each Rating Agency or (y) find a replacement Acceptable Counterparty, at the Counterparty's sole cost and expense, acceptable to each Rating Agency (notwithstanding the foregoing, if the Counterparty's rating is downgraded to "A" or lower, only the option described in clause (y) will be acceptable); provided that, notwithstanding such a downgrade, withdrawal or qualification, unless and until the Counterparty transfers the Interest Rate Cap Agreement to a replacement Acceptable Counterparty pursuant to the foregoing clause (y), the Counterparty will continue to perform its obligations under the Interest Rate Cap Agreement. Failure to satisfy the foregoing shall constitute an Additional Termination Event as defined by Section 5(b)(v) of the ISDA Master Agreement, with the Counterparty as the Affected Party." Notwithstanding the foregoing, in the event Lehman Brothers Holdings Inc. or any Affiliate thereof is the Counterparty, any reference in this subsection to a rating of "A+" shall be deemed to refer to a rating of "A".

(g)     In connection with an Interest Rate Cap Agreement, Borrower shall obtain and deliver to Lender an opinion of counsel from counsel for the Counterparty (upon which Lender and its successors and assigns may rely) which shall provide, in relevant part, that:

(1)     the Counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement;

(2)     the execution and delivery of the Interest Rate Cap Agreement by the Counterparty, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent Organizational Documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(3)     all consents, authorizations and approvals required for the execution and delivery by the Counterparty of the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

- 48 -

(4)      the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the Counterparty and constitutes the legal, valid and binding obligation of the Counterparty, enforceable against the Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

Such opinion shall be subject to customary assumptions and qualifications for interest rate cap opinions delivered in connection with loans of this type.

**Section 2.5**    Release on Payment in Full.

Lender shall, upon the written request and at the expense of Borrower, upon payment in full of all principal and interest on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Note and this Loan Agreement, release the Lien of the Pledge Agreement and any other Collateral not theretofore released.

## III.    CLOSING CONDITIONS

**Section 3.1**    Closing Conditions and Conditions to Initial Advance.

The obligation of Lender to close is subject to the accuracy and validity of all representations, warranties and covenants set forth in Articles 4 and 5 hereof, and to the satisfaction of the following conditions:

(a)      Master Disbursement Agreement. Mortgage Borrower, Mortgage Lender and the other parties thereto shall have entered into the Master Disbursement Agreement, satisfactory in all respects to Lender, and Lender shall have received a fully executed copy of the Master Disbursement Agreement.  All conditions precedent (without duplication of those contained in this Section 3.1) set forth in Section 3.1 of the Master Disbursement Agreement shall have been satisfied or waived in accordance with the terms thereof.

(b)      Opinion of Counsel.  Borrower shall have delivered to Lender an opinion letter, in form and substance reasonably acceptable to Lender, from an attorney who is licensed to practice in the State of New York and is otherwise acceptable to Lender.  In addition Borrower shall have delivered to Lender a non-consolidation opinion in form and substance satisfactory to Lender.

(c)      No Defaults.  Borrower and each Guarantor shall be in compliance with all the material terms and provisions set forth herein (including all representations and warranties set forth herein), in the other Loan Documents on its or their part to be observed or performed, and with all requirements (including all construction and plan approval schedules) on its or their part to be observed or performed, and no Event of Default or Default shall have occurred and be continuing.

- 49 -

(d)    Mortgage Loan Conditions Precedent.  All conditions precedent (without duplication of those contained in this Section 3.1) set forth in Section 3.1 of the Mortgage Loan Agreement shall have been satisfied or waived in accordance with the terms thereof.

(e)    Compliance with Laws.  Borrower shall have delivered to Lender reasonably acceptable evidence that the Property, the Project and the intended uses thereof are in compliance with all applicable encumbrances and restrictions (whether of record or otherwise) and all Applicable Laws, including the Americans with Disabilities Act of 1990, as amended (42 U.S.C. § 12-101, et seq.), the Federal Architectural Barriers Act, as amended (42 U.S.C. § 4151, et seq.), the Fair Housing Amendments Act of 1988, as amended (42 U.S.C. § 3601, et seq.), the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794, et seq.) and all state laws addressing the same subject matter.  Such evidence may include letters, licenses, permits, certificates and other correspondence from the appropriate Governmental Authorities, opinions of the Borrower's counsel or other counsel, and opinions or certifications from Architect, Engineer or General Contractor.  The evidence submitted as to zoning should include the zoning designation for the Property and Future Improvements, the permitted uses of the Property and Future Improvements under such zoning designation and zoning requirements as to parking, lot size, ingress, egress and building setbacks.  Further, for those actions or proceedings disclosed to Lender in writing for which the failure to secure a favorable ruling would have a material adverse effect on the Property or the Project) there shall be no actions or proceedings pending before any Governmental Authority relating to the Loan, the Property, the Project or Borrower's use or proposed use of the Property, and all appeal periods for any such prior proceedings must have expired without any appeal having been filed.

(f)    Taxes.  Borrower shall have delivered to Lender evidence that all taxes due and payable in connection with the Property and the Project have been paid.  Lender shall also be satisfied that all periodic escrow payments for real property taxes and assessments required to be made under the Loan Documents have been properly funded.

(g)    Concrete, Soil and Other Tests.  To the extent required by Lender, Borrower shall have delivered to Lender a report as to soil borings made at the Property by a soil testing firm which is reasonably satisfactory to Lender, Construction Consultant, Engineer and Architect.  Said testing firm shall not be associated with, or selected by, General Contractor.  The number and location of such borings shall be in accordance with the recommendations of the soil testing firm and must also be satisfactory to Lender, Construction Consultant, Engineer and Architect.  The report shall address the ability of the soil to support the Project, and shall include the recommendations of the soil testing firm as to the preparation of the soil and the type and design of the foundation needed in order to adequately support the Future Improvements.

(h)    Leases.  If any Leases are then in existence, Borrower shall have delivered to Lender reasonably satisfactory evidence as to the status of all executed Leases.

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

(i)    <u>Tenant Estoppel Certificates/Subordination Agreements.</u>    If any Leases are then in existence, Borrower shall have delivered to Lender estoppel certificates and/or nondisturbance, subordination and attornment agreements, in form and substance reasonably satisfactory to Lender, from such Lease tenants as Lender may require.

(j)    <u>Taxpayer Identification Number.</u>    Borrower shall have delivered to Lender the Borrower's and each Guarantor's federal taxpayer identification number of Borrower and each Guarantor that is not a natural person.

(k)    <u>Intellectual Property and Trademarks.</u>    Borrower shall have delivered to Lender an assignment of Borrower's license to use the name "Fontainebleau" and any related trademarks and other intellectual property of (or licensed to) Borrower in connection with the Property which assignment shall be acknowledged by any applicable licensor and otherwise in form and substance reasonably satisfactory to Lender.

(l)    <u>Appraisals.</u>    To the extent not delivered to and approved by Lender prior to the date hereof, Lender shall have obtained a current written appraisal of the Property prepared at Borrower's expense by a qualified appraiser designated by, engaged or contracted by and satisfactory to Lender.  Such appraisal must be satisfactory in form and substance to Lender and shall contain an "as-is" appraised value of the Property (based upon the present value of the "as-stabilized" appraised value) in amount of not less than $454,000,000.

(m)    <u>UCC Letter.</u>    Borrower shall have delivered to Lender a UCC search letter (or other evidence satisfactory to Lender) showing no prior security interests in any part of the Project.

(n)    <u>No Flood Hazard Area.</u>    Borrower shall have delivered evidence, satisfactory to Lender, that the Property is not situated in a special flood hazard area as designated by federal Governmental Authorities.

(o)    <u>Damage, Condemnation or Similar Proceedings.</u>    Lender shall be satisfied that since the date of the last inspection of the Property or the Project by Lender, no portion thereof has been damaged and not repaired to Lender's satisfaction, or has been taken in condemnation or other similar proceedings (and no such proceedings shall be pending).

(p)    <u>Resort Loan Documents.</u>  Lender shall have received fully executed copies of the Resort Loan Agreement, and the Guarantee and Collateral Agreement, the Guarantees, the Completion Guarantees and the Deed of Trust (in each case as defined in the Resort Loan Agreement) and such other documents requested by Lender.

(q)    <u>Net Worth and Liquidity of Guarantor.</u>    Borrower shall have delivered to Lender evidence that Guarantor has (1) a Net Worth (exclusive of any direct or indirect interest in the Property) at least equal to $400,000,000 and (2) Liquidity (exclusive of any direct or indirect interest in the Property) at least equal to $100,000,000.

- 51 -

     (r)     <u>Retail Intercreditor Agreement</u>.  Lender shall have received a fully executed copy of the Retail Intercreditor Agreement.

     (s)     <u>Reserved</u>.

     (t)     <u>Loan-to-Cost</u>.  Borrower shall have delivered to Lender evidence that the total of budgeted construction costs (including, soft costs, hard cost, interest expense, etc.) plus allocable air rights acquisition value plus the value of any rights conferred by the Master REA for the Property, shall be no less than $454,000,000

     (u)     <u>Air Rights Lease</u>.  Borrower shall have delivered to Lender a fully executed copy of the Air Rights Lease.

     (v)     <u>Intercreditor Agreement</u>.  Lender shall have entered into the Intercreditor Agreement, satisfactory in all respects to Lender.  Lender shall have received a fully executed copy of the Intercreditor Agreement.

     (w)     <u>Miscellaneous</u>.  Borrower shall have delivered to Lender all other documents and items, in form and substance satisfactory to Lender, that are reasonably requested by Lender or are otherwise customarily provided in loan transactions similar to the Loan.

For purposes of determining compliance with the conditions specified in this Section 3.1, Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lenders if Lender has made the Loan hereunder.

## IV.    **REPRESENTATIONS AND WARRANTIES**

**Section 4.1**    <u>Pledgor Representations</u>.

Pledgor represents and warrants as of the Closing Date that:

4.1.1    <u>Organization</u>.

     (a)     Pledgor is duly organized and is validly existing and in good standing in the jurisdiction in which it is organized, with requisite power and authority to own its assets and to transact the businesses in which it is now engaged. Pledgor is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its assets, its businesses and operations. Pledgor possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its assets and to transact the businesses in which it is now engaged. Attached hereto as Schedule I is an organizational chart of Pledgor.  Pledgor has delivered to Lender true and correct copies of the Mortgage Borrower Operating Agreement and all other Organizational Documents for the Mortgage Borrower, Pledgor and Principal, all of which are in full force and effect.

- 52 -

(b)    Pledgor has the power and authority and the requisite Ownership Interests to control the actions of Mortgage Borrower, and, upon the foreclosure or other such realization upon the Collateral under the Pledge Agreement, Lender or any other party succeeding to the Pledgor's interest in the Collateral described in the Pledge Agreement would have such control.  Without limiting the foregoing, Pledgor has sufficient control over Mortgage Borrower to cause Mortgage Borrower to (i) take any action on Mortgage Borrower's part required by the Loan Documents and (ii) refrain from taking any action prohibited by the Loan Documents.

### 4.1.2   Proceedings.

Pledgor has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents.  This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Pledgor and constitute legal, valid and binding obligations of Pledgor enforceable against Pledgor in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

### 4.1.3   No Conflicts.

The execution, delivery and performance of this Agreement and the other Loan Documents by Pledgor will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Pledgor pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement, or other agreement or instrument to which Pledgor is a party or by which any of Pledgor's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over Pledgor or any of the Collateral or any of Pledgor's property or other assets, or any license or other approval required to own and manage its property, and any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Pledgor of this Agreement or any other Loan Documents have been obtained and is in full force and effect.

### 4.1.4   Litigation.

To Pledgor's knowledge after due inquiry, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or threatened against or affecting Pledgor, Mortgage Borrower, the Collateral or the Property, which actions, suits or proceedings, if determined against Pledgor, Mortgage Borrower, the Collateral or the Property, could reasonably be expected to materially adversely affect the condition (financial or otherwise) or business of Pledgor, Mortgage Borrower, the Collateral or the condition or ownership of the Property, except as disclosed on Schedule II hereto.

- 53 -

4.1.5   Agreements.

Pledgor is not a party to any agreement or instrument or subject to any restriction which would be reasonably expected to materially and adversely affect Pledgor, Mortgage Borrower, the Collateral or the Property, or Pledgor's or Mortgage Borrower's business, properties or assets, operations or condition, financial or otherwise. Neither Pledgor nor Mortgage Borrower is in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Pledgor, Mortgage Borrower, the Collateral or the Property are bound. Neither Pledgor nor Mortgage Borrower has any material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Pledgor or Mortgage Borrower is a party or by which Pledgor, Mortgage Borrower, the Collateral or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the business relating to Pledgor's ownership and operation of the Collateral, (b) obligations incurred in the ordinary course of the business relating to Mortgage Borrower's ownership and operation of the Property; (c) obligations under the Loan Documents and the Mortgage Loan Documents, as applicable, and (d) obligations under the Approved Affiliate Agreements.

4.1.6   Title.

(a)     Each Pledgor purporting to grant a Lien on any Collateral is the record and beneficial owner of, and has good and marketable title to, the Collateral, free and clear of all Liens whatsoever. The Pledge Agreement, together with the UCC Financing Statements relating to the Collateral when properly filed in the appropriate records, will create a valid, perfected first priority security interests in and to the Collateral, all in accordance with the terms thereof for which a Lien can be perfected by filing a UCC Financing Statement. For so long as the Lien of the Pledge Agreement is outstanding, Pledgor shall forever warrant, defend and preserve such title and the validity and priority of the Lien of the Pledge Agreement and shall forever warrant and defend such title, validity and priority to Lender against the claims of all persons whomsoever.

(b)     Mortgage Borrower has good title to the Property and Mortgage Borrower possesses a leasehold interest in the Property pursuant to the Air Rights Lease and owns and/or leases, as applicable, the Property free and clear of all liens, encumbrances and charges whatsoever except for the Permitted Encumbrances. Other than Mortgage Lender, no Person other than Mortgage Borrower owns any interest in any payments due under any Leases with respect to which Mortgage Borrower is the landlord. Pledgor shall cause Mortgage Borrower to forever warrant, defend and preserve the title to the Property and to forever warrant and defend the same to Lender against the claims of all persons whomsoever, subject to Permitted Encumbrances.

4.1.7   Solvency.

Pledgor (a) has not entered into the transaction or executed the Note, this Agreement or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan

- 54 -

Documents.  Giving effect to the Loan, the fair saleable value of Pledgor's assets exceeds and will, immediately following the making of the Loan, exceed Pledgor's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities.  The fair saleable value of Pledgor's assets is and will, immediately following the making of the Loan, be greater than Pledgor's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured.  Pledgor's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Pledgor does not intend to incur debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Pledgor and the amounts to be payable on or in respect of obligations of Pledgor).  No petition under the Bankruptcy Code or similar state bankruptcy or insolvency law has been filed against Pledgor, Mortgage Borrower or any constituent Person in the last seven (7) years, and neither Pledgor nor any constituent Person in the last seven (7) years has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors.  Neither Pledgor nor any of its constituent Persons are contemplating either the filing of a petition by it under the Bankruptcy Code or similar state bankruptcy or insolvency law or the liquidation of all or a major portion of Pledgor's assets or property, and Pledgor has no knowledge of any Person contemplating the filing of any such petition against it or such constituent Persons.

       4.1.8   Full and Accurate Disclosure.

No statement of fact made by Pledgor in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.  There is no fact presently known to Pledgor which has not been disclosed to Lender which materially and adversely affects, or could reasonably be expected to materially and adversely affect, the Collateral, the Property or the business, operations or condition (financial or otherwise) of Pledgor or Mortgage Borrower.

       4.1.9   No Plan Assets.

No Loan Party is a Plan and none of the assets of any Loan Party constitute or will constitute, by virtue of the application of 29 C.F.R. §2510.3-101(f) as modified by section 3(42) of ERISA, "Plan Assets" of one or more Plans.  In addition, (a) no Loan Party is a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) transactions by or with any Loan Party are not subject to State statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Agreement.

       4.1.10  Compliance.

Pledgor, Mortgage Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, all Environmental Laws, building and zoning ordinances and codes.  Neither Pledgor nor Mortgage Borrower is in

- 55 -

default or violation of any order, writ, injunction, decree or demand of any Governmental Authority. There has not been committed by Pledgor, Mortgage Borrower, or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Pledgor's obligations under any of the Loan Documents.

4.1.11  Financial Information.

All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Pledgor, Mortgage Borrower, the Collateral and the Property in respect of prior periods (i) are true, complete and correct in all material respects, (ii) accurately represent, in all material respects, the financial condition of Pledgor, Mortgage Borrower, the Collateral and the Property, as applicable, as of the date of such reports, and (iii) have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein. Except for Permitted Encumbrances, Pledgor does not have any contingent liabilities, liabilities for taxes, unusual forward or long term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Pledgor and reasonably likely to have a materially adverse effect on the Collateral or the Property or the operation thereof as retail shopping centers except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Pledgor or Mortgage Borrower from that set forth in said financial statements.

4.1.12  Condemnation.

No Condemnation or other similar proceeding has been commenced or, to the best of Pledgor's knowledge, is threatened or contemplated with respect to all or any portion of the Real Property or for the relocation of roadways providing access to the Real Property.

4.1.13  Federal Reserve Regulations.

No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

4.1.14  Public Access.

The Real Property has rights of access to public ways.

4.1.15  Not a Foreign Person.

Pledgor is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

4.1.16  Assessments.

- 56 -

The Real Property, together with the Resort Property, is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property, other than the Resort Property. To Pledgor's knowledge after due inquiry, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Real Property, nor are there any contemplated improvements to the Real Property that may result in such special or other assessments.

4.1.17 <u>Enforceability</u>.

The Loan Documents are not subject to any right of rescission, set off, counterclaim or defense by Pledgor, including the defense of usury, and Pledgor has not asserted any right of rescission, set off, counterclaim or defense with respect thereto.

4.1.18 <u>No Prior Assignment</u>.

As of the Closing Date, other than under the Mortgage Loan Documents, there are no prior assignments of the Leases or any portion of the Rents due and payable or to become due and payable which are presently outstanding. As of the Closing Date, there are no prior assignments of the Collateral which are presently outstanding except in accordance with the Loan Documents.

4.1.19 <u>Insurance</u>.

Mortgage Borrower has obtained and Pledgor has delivered to Lender certificates of insurance policies reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No Person, including Pledgor, has done, by act or omission, anything which would impair the coverage of any such policy. Within ninety (90) days of the date hereof, Pledgor shall deliver to Lender copies of all insurance policies reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.

4.1.20 <u>Use of Property</u>.

The Property is intended, upon completion of the Future Improvements, to be used for retail and ancillary purposes (including, but not limited to, the operation of restaurants).

4.1.21 <u>Licenses; Permits</u>.

All certificates, permits, licenses and other authorizations of Governmental Authorities which are necessary for the continued use and operation of the Future Improvements to be constructed by Mortgage Borrower in accordance with the terms and provisions of the Loan Documents (collectively, the "Licenses"), have been or will have been duly obtained by or on behalf of Borrower prior to when needed and shall at all times thereafter remain in full force and effect.

4.1.22 <u>Flood Zone</u>.

None of the Improvements on the Real Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards and, if so

- 57 -

located, the flood insurance required pursuant to Section 6.1(a)(vii) of the Mortgage Loan Agreement is in full force and effect.

### 4.1.23 Construction Documents.

As of the Closing Date, neither the Pledgor nor the Mortgage Borrower are a party to any Construction Contract, Architect's Contract, Engineer's Contract or other material contract (other than the Master REA) concerning the construction, design or engineering of the Future Improvements or the Project Future Improvements.

### 4.1.24 Boundaries.

Other than Permitted Encumbrances, no improvements on adjoining properties encroach upon the Real Property, and no easements or other encumbrances upon the Real Property encroach upon any of the Improvements.

### 4.1.25 Leases.

The Property is not subject to any Leases other than the Air Rights Lease, the Affiliate Lease and, after Closing Date, Leases entered into from time to time in accordance with Section 5.1.17 of the Mortgage Loan Agreement.

### 4.1.26 Survey.

To Pledgor's knowledge, the Survey for the Property delivered to Lender in connection with this Agreement does not fail to reflect any material matter affecting the Real Property or the title thereto.

### 4.1.27 Loan to Value.

As of the Closing Date, the maximum principal amount of the Loan does not exceed one hundred twenty-five percent (125%) of the aggregate fair market value of the Property.

### 4.1.28 Filing and Recording Taxes.

As of the Closing Date, all transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes, if any, required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Collateral to Pledgor, the making of the Mortgage Loan, the Loan or the other transactions contemplated by this Agreement have been paid or will be paid simultaneously with the closing of the Loan or funds therefor will be provided in escrow to the Title Company with instructions for timely application. As of the Closing Date, all recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Pledge Agreement, have been paid or will be paid simultaneously with the closing of the Loan.

### 4.1.29 Development Agreement.

- 58 -

Neither the Pledgor nor the Mortgage Borrower is a party to any Development Agreement. Property is being developed by Fontainebleau Las Vegas, LLC, an Affiliate of Borrower. No Development Agreement exists and no party is (and shall be for so long as such Property is being developed by an Affiliate of Pledgor or Mortgage Borrower) entitled to receive any development fees.

4.1.30  Management Agreement.

As of the Closing Date, a fully executed, true and complete copy of the Approved Management Agreement, which shall be in full force and effect, shall have been delivered to Lender.

4.1.31  Illegal Activity.

No portion of the Property or the Collateral has been or will be purchased with proceeds of any illegal activity and to the best of Pledgor's knowledge, there are no illegal activities or activities relating to any controlled substances at the Property.

4.1.32  No Change in Facts or Circumstances; Disclosure.

All information submitted by Pledgor to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Pledgor in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the use, operation or value of the Property or the business operations or the financial condition of Pledgor or Mortgage Borrower. Pledgor has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any information described in this Section 4.1.32 or any representation or warranty made herein to be materially misleading.

4.1.33  Investment Company Act.

Pledgor is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) to the best of its knowledge, subject to any other federal or State law or regulation which purports to restrict or regulate its ability to borrow money, in contravention of this Agreement or any other Loan Document.

4.1.34  Principal Place of Business; State of Organization.

Pledgor's principal place of business as of the date hereof is the address set forth in the introductory paragraph of this Agreement. Borrower is organized under the laws of the State of Delaware and its organizational identification number is 4338955. Mezzanine Pledgor is

organized under the laws of the state of Delaware and its organizational identification number is 4338950.

4.1.35 <u>Single Purpose Entity</u>.

Pledgor represents and warrants that it has not, and covenants and agrees that its Organizational Documents shall provide that it shall not:

(a)    engage in any business or activity other than the acquisition, ownership, and managing of the Collateral, and entering into the Loan, and activities incidental thereto;

(b)    acquire or own any material assets other than (i) the Collateral, and (ii) such incidental personal property as may be necessary for the ownership of the Collateral;

(c)    merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(d)    (i) fail to observe its organizational formalities or preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, and qualification to do business in the State where the Property is located, if applicable, or (ii) without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of its LLC Agreement, Articles of Organization or similar Organizational Documents;

(e)    own any subsidiary or make any investment in, any Person (other than (i) with respect to Mezzanine Pledgor, Borrower and (ii) with respect to Borrower, Mortgage Borrower) without the prior written consent of Lender;

(f)    commingle its assets with the assets of any of its members, general partners, Affiliates, principals or of any other Person or entity, participate in a cash management system with any other entity or Person or fail to use its own separate stationery, telephone number, invoices and checks;

(g)    (i) with respect to Borrower, incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Debt, except for liabilities incurred in the ordinary course of business relating to the ownership of the Collateral and the routine administration of Borrower, in amounts not to exceed $25,000 which liabilities are not more than sixty (60) days past due and are not evidenced by a note, and (ii) with respect to Mezzanine Pledgor, incur any debt secured or unsecured, direct or contingent (including guaranteeing any obligations), except for liabilities incurred in the ordinary course of business relating to the ownership of its interest in Borrower and the routine administration of Mezzanine Pledgor, in amounts not to exceed $25,000 which liabilities are not more than sixty (60) days past due and are not evidenced by a note;

- 60 -

(h)    become insolvent and fail to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due;

(i)    (i) fail to maintain its records (including financial statements), books of account and bank accounts separate and apart from its Affiliates and any other Person, (ii) permit its assets or liabilities to be listed as assets or liabilities on the financial statement of any other Person; provided, however, that Pledgor's assets may be included in a consolidated financial statement of an Affiliate of Pledgor, provided that (1) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Pledgor from such Affiliate and to indicate that Pledgor's assets and credit are not available to satisfy the debts and other obligations of such Affiliate or any other Person and (2) such assets shall also be listed on Pledgor's own separate balance sheet, or (iii) include the assets or liabilities of any other Person on its financial statements;

(j)    , enter into any contract or agreement with any member, general partner, principal or Affiliate of Pledgor, Guarantor, or any member, general partner, principal or Affiliate thereof (other than a business management services agreement with an Affiliate of Pledgor, provided that (i) such agreement is reasonably acceptable to Lender, (ii) the manager, or equivalent thereof, under such agreement holds itself out as an agent of Pledgor and (iii) the agreement meets the standards set forth in this subsection (j) following this parenthetical), except upon terms and conditions that are commercially reasonable, intrinsically fair and substantially similar to those that would be available on an arms length basis with third parties other than any member, general partner, principal or Affiliate of Pledgor, Guarantor, or any member, general partner, principal or Affiliate thereof;

(k)    seek the dissolution or winding up in whole, or in part, of Pledgor;

(l)    fail to correct any known misunderstandings regarding the separate identity of Pledgor or any member, general partner, principal or Affiliate thereof or any other Person;

(m)    guarantee or become obligated for the debts of any other Person or hold itself out to be responsible for the debts of another Person;

(n)    make any loans or advances to any third party, including any member, general partner, principal or Affiliate of Pledgor, or any member, general partner, principal or Affiliate thereof, and shall not acquire obligations or securities of any member, general partner, principal or Affiliate of Pledgor, or any member, general partner, or Affiliate thereof;

(o)    fail to file its own tax returns or be included on the tax returns of any other Person except as required by Applicable Law;

(p)    fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or a name

- 61 -

franchised or licensed to it by an entity other than an Affiliate of Pledgor, and not as a division or part of any other entity in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that Pledgor is responsible for the debts of any third party (including any member, general partner, principal or Affiliate of Pledgor, or any member, general partner, principal or Affiliate thereof);

(q)     fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(r)     share any common logo with or hold itself out as or be considered as a department or division of (i) any general partner, principal, member or Affiliate of Pledgor, (ii) any Affiliate of a general partner, principal or member of Pledgor, or (iii) any other Person;

(s)     fail to allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate;

(t)     pledge its assets for the benefit of any other Person other than with respect to the Loan;

(u)     fail to maintain a sufficient number of employees in light of its contemplated business operations;

(v)     fail to provide in its LLC Agreement, Articles of Organization or similar Organizational Documents, that for so long as the Loan is outstanding pursuant to the Note, this Agreement and the other Loan Documents, it shall not file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors without the affirmative vote of each Independent Manager and of all other general partners/managing members/directors;

(w)     fail to hold its assets in its own name;

(x)     if Pledgor is a corporation, fail to consider the interests of its creditors in connection with all corporate actions to the extent permitted by Applicable Law;

(y)     have any of its obligations guaranteed by an Affiliate except the Guarantor in connection with the Loan;

(z)     violate or cause to be violated the assumptions made with respect to Pledgor in the Insolvency Opinion;

(aa)     fail at any time to have at least one independent director or manager (or, at the request of Lender, two independent directors or managers, within thirty (30) days of such request) (each an "Independent Manager") that is not and has not been for at least

- 62 -

five (5) years: (a) a stockholder, director, officer, employee, partner, member, attorney or counsel of Pledgor, Mortgage Borrower or any Affiliate of either of them; (b) a customer, supplier or other Person who derives its purchases or revenues (other than any fee paid to such director or manager as compensation for such director or manager to serve as an Independent Manager) from its activities with Mortgage Borrower, Pledgor or any Affiliate of either of them (a "Business Party"); (c) a Person or controlling or under common control with any such stockholder, partner, member, director, officer, attorney, counsel or Business Party; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, attorney, counsel or Business Party. Notwithstanding the foregoing, no Independent Manager shall also serve as an Independent Manager (as such term is defined in the Mortgage Loan Agreement) for Mortgage Borrower, the other Pledgor or any Principal (as such term is defined in the Mortgage Loan Agreement) of Mortgage Borrower; or

(bb)    permit its board of directors to take any action which, under the terms of any certificate of incorporation, by-laws, voting trust agreement with respect to any common stock or other applicable Organizational Documents, requires the unanimous vote of one hundred percent (100%) of the members of the board without the vote of each Independent Manager.

(cc)    fail to have the limited liability company agreement of Pledgor (the "LLC Agreement") provide that (A) upon the occurrence of any event that causes the last remaining member (or sole member to the extent Borrower only has one member) of Pledgor ("Member") to cease to be the member of Pledgor (other than (1) upon an assignment by Member of all of its limited liability company interest in Pledgor and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (2) the resignation of Member and the admission of an additional member of Pledgor in accordance with the terms of the Loan Documents and the LLC Agreement), any Person acting as Independent Manager of Pledgor shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Pledgor, automatically be admitted to Pledgor ("Special Member") and shall continue Pledgor without dissolution and (B) Special Member may not resign from Pledgor or transfer its rights as Special Member unless (1) a successor Special Member has been admitted to Pledgor as Special Member in accordance with requirements of Delaware law and (2) such successor Special Member has also accepted its appointment as an Independent Manager. The LLC Agreement shall further provide that (v) Special Member shall automatically cease to be a member of Pledgor upon the admission to Pledgor of a substitute Member, (w) Special Member shall be a member of Pledgor that has no interest in the profits, losses and capital of Pledgor and has no right to receive any distributions of Pledgor assets, (x) pursuant to Section 18-301 of the Delaware Limited Liability Company Act, Special Member shall not be required to make any capital contributions to Pledgor and shall not receive a limited liability company interest in Pledgor, (y) Special Member, in its capacity as Special Member, may not bind Pledgor and (z) except as required by any mandatory provision of the Delaware Limited Liability Company Act, Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Pledgor, including, without limitation, the merger, consolidation or conversion of Pledgor;

- 63 -

provided, however, such prohibition shall not limit the obligations of Special Member, in its capacity as Independent Manager, to vote on such matters required by the LLC Agreement. In order to implement the admission to Pledgor of Special Member, Special Member shall execute a counterpart to the LLC Agreement. Prior to its admission to Pledgor as Special Member, Special Member shall not be a member of Pledgor.

Upon the occurrence of any event that causes Member to cease to be a member of Pledgor, to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Pledgor, agree in writing (A) to continue Pledgor and (B) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Pledgor, effective as of the occurrence of the event that terminated the continued membership of Member of Pledgor in Pledgor. Any action initiated by or brought against Member or Special Member under any Creditors Rights Laws shall not cause Member or Special Member to cease to be a member of Pledgor and upon the occurrence of such an event, the business of Pledgor shall continue without dissolution. The LLC Agreement shall provide that each of Member and Special Member waives any right it might have to agree in writing to dissolve Pledgor upon the occurrence of any action initiated by or brought against Member or Special Member under any Creditors Rights Laws, or the occurrence of an event that causes Member or Special Member to cease to be a member of Pledgor.

Mortgage Borrower is in compliance with, and shall continue to comply with, the provisions of Section 4.1.35 of the Mortgage Loan Agreement.

4.1.36  <u>Business Purposes</u>.

The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

4.1.37  <u>Taxes</u>.

Pledgor has filed all federal, State, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it, except to the extent being contested by Borrower in good faith in accordance with the terms of Section 5.1.2 of this Agreement. Pledgor knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

4.1.38  <u>Forfeiture</u>.

Neither Pledgor nor any other Person in occupancy of or involved with the operation or use of the Property has committed any act or omission affording the federal government or any State or local government the right of forfeiture as against any of the Collateral, the Property or any part thereof or any monies paid in performance of Pledgor's obligations under the Note, this Agreement or the other Loan Documents. Pledgor hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

4.1.39  <u>Environmental Representations and Warranties</u>.

- 64 -

Pledgor represents and warrants, to the best of its knowledge after due inquiry, except as disclosed in the written reports resulting from the environmental site assessments of the Property delivered to and approved by Lender prior to the Closing Date (the "Environmental Report") and information that Pledgor knows, that: (a) there are no Hazardous Materials or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with current Environmental Laws and with permits issued pursuant thereto (if such permits are required), and (ii) either (A) in amounts not in excess of that necessary to operate, clean, repair and maintain the Property or each tenant's respective business at the Real Property as set forth in their respective Leases, or (B) held by a tenant for sale to the public in its ordinary course of business; (b) there are no past, present or threatened Releases of Hazardous Materials in violation of any Environmental Law and which would require remediation by a Governmental Authority in, on, under or from the Property; (c) there is no threat of any Release of Hazardous Materials migrating to the Property; (d) there is no past or present non-compliance with current Environmental Laws, or with permits issued pursuant thereto, in connection with the Property except as described in the Environmental Reports; (e) Pledgor does not know of, and has not received and Mortgage Borrower has not received, any written or oral notice or other communication from any Person (including but not limited to a Governmental Authority) relating to a Release of Hazardous Materials in, on, under or from the Property; and (f) Pledgor has truthfully and fully provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property actually known to Pledgor or Mortgage Borrower or contained in Pledgor's or Mortgage Borrower's files and records, including but not limited to any reports relating to a Release of Hazardous Materials in, on, under or migrating to or from the Property and/or to the environmental condition of the Property.

4.1.40  Taxpayer Identification Number.

Borrower's United States taxpayer identification number is 20-8979458.

4.1.41  OFAC.

Pledgor represents and warrants that neither Pledgor, Mortgage Borrower, Guarantor, or any of their respective Affiliates is a Prohibited Person, and Pledgor, Mortgage Borrower, Guarantor, and their respective Affiliates are in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

4.1.42  Air Rights Lease Representations.

(a)     (i) The Air Rights Lease, a true and complete copy of which has been delivered to Lender, is in full force and effect and has not been modified or amended in any manner whatsoever, (ii) there are no defaults under the Air Rights Lease by Mortgage Borrower, or, to the best of Pledgor's knowledge, Fee Owner as landlord thereunder, and, to the best of Pledgor's knowledge, no event has occurred which but for the passage of time, or notice, or both would constitute a default under the Air Rights Lease, (iii) all Air Rights Rent have been paid in full, (iv) neither Mortgage Borrower nor the landlord under the Air Rights Lease has commenced any action or given or received any notice for the purpose of terminating the Air Rights Lease other than by taking

- 65 -

measures to create the New Estate which shall take effect upon satisfaction of the Fee Transfer Conditions, (v) neither Fee Owner, as debtor in possession, nor a trustee for such Fee Owner, has given any notice of,  and Borrower has not consented to, any attempt to transfer the Fee Estate free and clear of the Air Rights Lease under section 363(f) of the Bankruptcy Code, and (vi) Fee Owner is not subject to any voluntary or involuntary bankruptcy, reorganization or insolvency proceeding and the Fee Estate is not an asset in any   voluntary or involuntary bankruptcy, reorganization or insolvency proceeding.

(b)    All existing and future mortgages are subordinate to the Air Rights Lease and the Lien of the Security Instrument;

(c)    The Air Rights Lease or a memorandum thereof has been duly recorded, the Air Rights Lease does not prohibit the interest of the Pledgor in the lessee thereunder to be encumbered by the Pledge Agreement, and there has not been any change in the terms of the Air Rights Lease since its recordation;

(d)    Other than Permitted Encumbrances, Mortgage Borrower's interest in the Air Rights Lease is not subject to any Liens superior to, or of equal priority with, the Security Instrument;

(e)    The Air Rights Lease does not prohibit (i) the assignment of Borrower's interest in the Mortgage Borrower to Lender and (ii) in the event that it is so assigned, the further assignment by Lender;

(f)    The Air Rights Lease requires the lessor thereunder to give notice of any default by Mortgage Borrower to Lender and the Air Rights Lease further provides that notice of termination given under the Air Rights Lease is not effective against Lender unless a copy of the notice has been delivered to Lender in the manner described in the Air Rights Lease;

(g)    Lender is permitted an opportunity (including, where necessary, time to gain possession of the interest of Borrower in the Mortgage Borrower) to cure any default under the Air Rights Lease, which is curable after the receipt of notice of any default before the lessor thereunder may terminate the Air Rights Lease;

(h)    The Air Rights Lease has a term which extends not less than twenty (20) years beyond the Maturity Date;

(i)    The Air Rights Lease requires the lessor to enter into a new lease upon termination of the Air Rights Lease to the extent specified therein, including as a result of the rejection of the Air Rights Lease in a bankruptcy proceeding;

(j)    Under the terms of the Air Rights Lease, the Master REA and the Loan Documents, taken together, any Net Proceeds will be applied either to the Restoration of all or part of the Property, with Mortgage Lender or a trustee appointed (or previously approved) by Mortgage Lender having the right to hold and disburse such Net Proceeds as the Restoration progresses, or to the payment of the outstanding principal balance of

- 66 -

the Loan (including the Deferred Interest Balance) together with any accrued interest thereon;

(k)    The mortgagee on the related fee interest in the Property has agreed that such lender's mortgage (and the related Lien upon such fee interest) shall terminate and be removed of record upon the occurrence of a Fee Transfer;

(l)    The Air Rights Lease does not impose restrictions on subletting except that subleases must be in accordance with the Master REA; and

(m)    Pursuant to such Air Rights Lease, (i) Resort Borrower and Mortgage Borrower acknowledged that, immediately prior to entering into the Air Rights Lease, the membership interests in Mortgage Borrower were owned by Resort Borrower, (ii) Resort Borrower agreed to contribute certain interests in the Air Rights Parcel (as defined in the Air Rights Lease) to the capital of Mortgage Borrower (as described in the Air Rights Lease), (iii) for business and practical reasons, Resort Borrower and Mortgage Borrower intend that the transfer of the ownership of the Air Rights Parcel shall be effected by the Air Rights Lease by providing a term of 99 years at a nominal rent, with an obligation for Resort Borrower to convey fee title to Mortgage Borrower upon the satisfaction of certain specified events (all as set forth in the Air Rights Lease), (iv) Resort Borrower and Mortgage Borrower intend, immediately following the execution and delivery of the Air Rights Lease, that the membership interests in Mortgage Borrower will be distributed as a return of capital by Resort Borrower through Resort Borrower's upstream intermediate parent entities to Fontainebleau Resort Holdings, LLC, which thereafter will contribute the membership interests in Mortgage Borrower downstream through Mezzanine Pledgor to the capital of Borrower and, as a result of those transfers, Mortgage Borrower will constitute a wholly owned subsidiary of Borrower and (v) Resort Borrower and Mortgage Borrower acknowledge that the foregoing transfers will be recorded and accounted for as so described.

4.1.43  <u>Embargoed Person</u>.

As of the date hereof and at all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Pledgor, Mortgage Borrower and Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Pledgor, Mortgage Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of law ("Embargoed Person"); (b) no Embargoed Person has any interest of any nature whatsoever in Pledgor, Mortgage Borrower or Guarantor, as applicable, with the result that the investment in Pledgor, Mortgage Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Pledgor, Mortgage Borrower or Guarantor, as applicable, have been derived from any unlawful activity

- 67 -

with the result that the investment in Pledgor, Mortgage Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

4.1.44  <u>Labor and Material</u>.

Pledgor shall advise (and cause Mortgage Borrower to advise) Lender in writing immediately if Pledgor or Mortgage Borrower, as applicable, receives any notice, written or oral, from any laborer, contractor, subcontractor or material furnisher to the effect that said laborer, contractor, subcontractor or material furnisher has not been paid for any labor or materials furnished to or in the Real Property, and Pledgor shall (or shall cause Mortgage Borrower to) deliver to Lender on demand, any contracts, bills of sale, statements, receipted vouchers or agreements, under which Mortgage Borrower claims title to any materials, fixtures or articles used in the construction of the Future Improvements.

4.1.45  <u>Master Disbursement Agreement Representations</u>.

Pledgor has reviewed the representations and warranties made by, and covenants of, the Project Entities (as defined in the Master Disbursement Agreement) contained in the Master Disbursement Agreement and such representations and warranties are true, correct and complete.

4.1.46  <u>Reciprocal Easement Agreements</u>.

(a)  To the best of Pledgor's knowledge, neither Mortgage Borrower, nor any other party is currently in default (nor has any notice been given or except as previously disclosed to Lender in writing, received with respect to an alleged or current default) in any material respect under any of the terms and conditions of the REA, and the REA remains unmodified and in full force and effect.

(b)  To the best of Pledgor's knowledge, all sums due and owing by Mortgage Borrower to the other parties to the REA (or by the other parties to the REA to the Mortgage Borrower) pursuant to the terms of the REA, including without limitation, all sums, charges, fees, assessments, costs, and expenses in connection with any taxes, site preparation and construction, non-shareholder contributions, and common area and other property management activities have been paid, are current, and no lien has attached on the Property (or threat thereof been made) for failure to pay any of the foregoing.

(c)  The terms, conditions, covenants, uses and restrictions contained in the REA do not conflict in any material respect with any terms, conditions, covenants, uses and restrictions contained in any Lease or in any agreement between Mortgage Borrower and occupant of any peripheral parcel, including without limitation, conditions and restrictions with respect to kiosk placement, tenant restrictions (type, location or exclusivity), sale of certain goods or services, and/or other use restrictions.

(d)  The terms, conditions, covenants, uses and restrictions contained in any Lease do not conflict in any material respect with any terms, conditions, covenants, uses and restrictions contained in the REA, any other Lease or in any agreement between Mortgage Borrower and occupant of any peripheral parcel, including without limitation,

- 68 -

conditions and restrictions with respect to kiosk placement, tenant restrictions (type, location or exclusivity), sale of certain goods or services, and/or other use restrictions.

4.1.47 <u>Deposit Accounts</u>.

(a)    Upon establishment of the same in accordance with the terms of the Mortgage Loan Agreement, the Property Account will be and shall be maintained as a "deposit account" (as such term is defined in Section 9-102(a)(29) of the UCC), and each of the other Accounts other than the Property Account will be and shall be maintained as a "securities account" (as such term is defined in Section 8-501(a) of the UCC);

(b)    Except as expressly provided in the Mortgage Loan Agreement, upon establishment of the same in accordance with the terms of the Mortgage Loan Agreement, Mortgage Borrower shall own and have good and marketable title to the Property Account and the Lockbox Account free and clear of any Lien or claim of any Person;

(c)    Upon establishment of the same in accordance with the terms of the Mortgage Loan Agreement, Pledgor shall deliver to Lender a fully executed agreement pursuant to which the bank maintaining the Property Account shall have agreed to comply with all instructions originated by Mortgage Lender directing disposition of the funds in such accounts without further consent by Mortgage Borrower;

(d)    Other than the security interest granted to Lender pursuant to the Mortgage Loan Agreement and the Property Account Agreement, Mortgage Borrower has not pledged, assigned, or sold, granted a security interest in, or otherwise conveyed any of the Property Account or the Lockbox Account; and

(e)    Upon establishment of the same in accordance with the terms of the Mortgage Loan Agreement, the Property Account and the Lockbox Account shall not be in the name of any Person other than Mortgage Borrower or Mortgage Lender. Upon establishment of the same in accordance with the terms of the Mortgage Loan Agreement, Mortgage Borrower shall not consent to the banks maintaining the Lockbox Account to comply with instructions of any Person other than Mortgage Lender.

4.1.48 <u>Affiliates</u>.

Pledgor does not own any equity interests in any other Person other than the applicable related Pledged Member Interests.

4.1.49 <u>Mortgage Borrower Representations</u>.

Pledgor has reviewed the representations and warranties made by, and covenants of, Mortgage Borrower to and for the benefit of Mortgage Lender contained in the Mortgage Loan Documents and such representations and warranties are true, correct and complete.

4.1.50 <u>List of Mortgage Loan Documents</u>.

- 69 -

As of the Closing Date, there are no Mortgage Loan Documents other than those set forth on Schedule IV attached hereto. Pledgor has or has caused to be delivered to Lender true, complete and correct copies of all Mortgage Loan Documents, and none of the Mortgage Loan Documents has been amended or modified as of the date hereof.

4.1.51 <u>Mortgage Loan Event of Default</u>.

No Mortgage Loan Event of Default or an event or circumstance has occurred which with the giving of notice or the passage of time, or both, would constitute a Mortgage Loan Event of Default exists as of the date hereof.

**Section 4.2**    <u>Survival of Representations</u>.

Pledgor agrees that all of the representations and warranties of Pledgor set forth in Section 4.1 and elsewhere in this Agreement and in the other Loan Documents shall survive (but shall not be deemed to be remade unless expressly stated elsewhere in the Loan Documents) for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Pledgor. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Pledgor shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## V.    **BORROWER COVENANTS**

**Section 5.1**    <u>Affirmative Covenants</u>.

From the date hereof and until payment and performance in full of all obligations of Pledgor under the Loan Documents or the earlier release in full of Lender's Liens encumbering the Collateral (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Pledgor hereby covenants and agrees with Lender that:

5.1.1 <u>Existence; Compliance with Legal Requirements</u>.

(a)    Pledgor shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises, and comply, or cause Mortgage Borrower to comply, in all material respects, with all Legal Requirements applicable to it, the Collateral, Plans and Specifications and the Property, except to the extent any failure with respect to the foregoing could not be reasonably expected to have a Material Adverse Effect. There shall never be committed by Pledgor, and Pledgor shall not permit or cause Mortgage Borrower or any Affiliate to knowingly permit any other Person in occupancy of or involved with the operation or use of the Real Property any act or omission affording the federal government or any State or local government the right of forfeiture against the Real Property or any part thereof or any monies paid in performance of Pledgor's obligations under any of the Loan Documents. Pledgor hereby covenants and agrees not to permit or cause Mortgage Borrower to commit, permit or suffer to exist any act or omission affording such right of forfeiture. Pledgor shall at all times cause Mortgage Borrower to use commercially reasonable efforts to maintain, preserve and protect all franchises and trade names and

- 70 -

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

preserve all the remainder of its property used or useful in the conduct of its business and shall keep the Real Property in reasonably good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Loan Documents. Pledgor shall keep, or shall cause Mortgage Borrower to keep, the Real Property insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement.

(b)    After prior written notice to Lender, Pledgor, at its own expense, may, or cause Mortgage Borrower to, contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Pledgor, Mortgage Borrower or the Property or any alleged violation of any Legal Requirement, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Pledgor is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Applicable Laws; (iii) neither the Property nor the Collateral, nor any part thereof or interest therein will have a reasonable likelihood of being sold, forfeited, terminated, cancelled or lost as a result of such contest; (iv) Pledgor shall, and shall cause Mortgage Borrower to, promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (v) such proceeding shall suspend the enforcement of the contested Legal Requirement against Pledgor, Mortgage Borrower, the Collateral or the Property; and (vi) Pledgor shall furnish or cause Mortgage Borrower to furnish such security as may be required in the proceeding (or if no such security is required by the proceeding, such security, or as may be requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security or part thereof, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property or the Collateral (or any part thereof or interest therein) shall be in imminent danger of being sold, forfeited, terminated, cancelled or lost.

5.1.2    <u>Taxes and Other Charges</u>.

(a)    Subject to Section 7.2 hereof, Pledgor shall pay (or cause to be paid) all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable. Pledgor shall furnish, or cause to be furnished, to Lender receipts, or other evidence for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Pledgor is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Mortgage Lender pursuant to Section 7.2 of the Mortgage Loan Agreement). Pledgor shall not suffer and shall not permit Mortgage Borrower to suffer and shall promptly cause Mortgage Borrower to promptly pay and discharge any Lien or charge whatsoever which may be or become a

- 71 -

Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property. Notwithstanding the foregoing or any other provision of any Loan Document, after prior written notice to Lender, Pledgor, at its own expense, may, or cause Mortgage Borrower to, contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Pledgor and Mortgage Borrower are subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Applicable Laws; (iii) neither the Collateral nor the Property nor any part thereof or interest therein will have a reasonable likelihood of being sold, forfeited, terminated, cancelled or lost as a result of such contest; (iv) Pledgor shall, or shall cause Mortgage Borrower to, promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) to the extent Pledgor has not paid (or cause to be paid) such Taxes or Other Charges, such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (vi) Pledgor shall furnish such security as may be required in the proceeding, (or if no such security is required by the proceeding, such security or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Lender may apply such security or part thereof held by Lender at any time when, in the reasonable judgment of Lender, the validity or applicability of such Taxes or Other Charges are established or the Property or any asset of Pledgor (or part thereof or interest therein) shall be in imminent danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of any Security Instrument or the Pledge Agreement being primed by any related Lien.

(b)    Until such time as a separate tax lot or parcel has been obtained for the Real Property which does not include any portion of the Resort Property, unless the Resort Lender is currently budgeting loan proceeds for (and Lender has no reasonable belief that Resort Lender will not be able to timely pay or cause to be paid with such budgeted proceeds) Taxes for both the Resort Property and the Real Property, Mortgage Borrower shall be required to escrow Taxes with respect to the Resort Property with Mortgage Lender.

5.1.3    Litigation.

Pledgor shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened against Pledgor or Mortgage Borrower which could reasonably be expected to materially adversely affect Pledgor's or Mortgage Borrower's condition (financial or otherwise) or business or the Property.

5.1.4    Access to the Property.

- 72 -

Pledgor shall cause Mortgage Borrower to permit agents, representatives and employees of Lender and the Construction Consultant to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice.

### 5.1.5    Notice of Default.

Pledgor shall promptly advise Lender of any material adverse change in Pledgor's or Mortgage Borrower's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Pledgor has knowledge.

### 5.1.6    Cooperate in Legal Proceedings.

Pledgor shall cooperate, and shall cause each Loan Party to cooperate, fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way adversely affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

### 5.1.7    Award and Insurance Benefits.

Pledgor shall cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by Pledgor of the expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Award or Insurance Proceeds.

### 5.1.8    Further Assurances.

Pledgor shall and shall cause Mortgage Borrower, at Pledgor's sole cost and expense:

(a)    furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Pledgor or Mortgage Borrower pursuant to the terms of the Loan Documents or reasonably requested by Lender in connection therewith;

(b)    execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Pledgor under the Loan Documents, as Lender may reasonably require including, without limitation, the authorization of Lender to execute and/or the execution by Pledgor of UCC financing statements; and

(c)    do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

reasonably require from time to time, provided that the same does not unreasonably increase the obligations of or restrictions imposed upon the Pledgor or any Guarantor under this Agreement or any other Loan Document.

5.1.9    Mortgage and Intangible Taxes.

Pledgor shall pay and shall cause Mortgage Borrower to pay all State, county and municipal recording, intangible, and all other taxes imposed upon the execution and recordation of the UCC Financing Statements and/or upon the execution and delivery of the Note.

5.1.10    Financial Reporting.

(a)    Pledgor and Guarantor will keep and maintain on a Fiscal Year basis, in accordance with GAAP (or such other accounting basis acceptable to Lender), proper and accurate books, records and accounts reflecting all of the financial affairs of Pledgor and all items of income and expense with respect to the Collateral.  Pledgor will cause Mortgage Borrower to keep and maintain on a Fiscal Year basis, in accordance with GAAP (or such other accounting basis acceptable to Lender), proper and accurate books, records and accounts reflecting all of the financial affairs of Mortgage Borrower and all items of income and expense in connection with the operation on an individual basis of the Property.  Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Pledgor, Mortgage Borrower or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire.  After the occurrence of an Event of Default, Pledgor shall pay any costs and expenses incurred by Lender to examine Pledgor's accounting records with respect to the Collateral, the Property or any Loan Party, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)    Pledgor will furnish, and cause to be furnished, to Lender annually, within one hundred twenty (120) days following the end of each Fiscal Year, a complete copy of Pledgor's annual financial statements audited by an Approved Accountant and prepared in accordance with GAAP (or such other accounting basis acceptable to Lender) covering the Collateral owned by Pledgor for such Fiscal Year and containing statements of profit and loss for Pledgor and the balance sheet for Pledgor.

(c)    Pledgor will furnish, or cause Mortgage Borrower to furnish, to Lender a copy of the financial statements and all other materials Mortgage Borrower is required to provide Mortgage Lender under Section 5.1.10 of the Mortgage Loan Agreement within the time periods required under such Section.

(d)    For the partial year period commencing on the date hereof, and for each Fiscal Year thereafter, Pledgor shall cause (i) Mortgage Borrower to submit to Lender a commercially reasonable leasing plan appropriate for a property of the type and character of the Property, including a marketing plan and projections for rollovers, vacancies, leasing commission costs, tenant improvement cost and other capital costs (a "Leasing Plan") and Borrower to lease the Property in accordance with the Leasing Plan and (ii)

- 74 -

cause Mortgage Borrower to submit to Lender an Annual Budget for the Property not later than sixty (60) days prior to the Opening Date (as defined in the Master Disbursement Agreement) and the commencement of Fiscal Year thereafter in form reasonably satisfactory to Lender, and shall be subject to Lender's written approval (each such Annual Budget after it has been approved in writing by Lender shall be hereinafter referred to as an "Approved Annual Budget"). In the event that Lender objects to a proposed Annual Budget submitted by Pledgor, Lender shall advise Pledgor of such objections within fifteen (15) days after receipt thereof (and deliver to Pledgor a reasonably detailed description of such objections) and Pledgor shall cause Mortgage Borrower to promptly revise such Annual Budget and resubmit the same to Lender. Lender shall advise Pledgor of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Pledgor a reasonably detailed description of such objections) and Pledgor shall cause Mortgage Borrower to promptly revise the same in accordance with the process described in this subsection until Lender approves the Annual Budget. Until such time that Lender approves a proposed Annual Budget, the most recently Approved Annual Budget shall apply; provided that, such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and utilities expenses.

(e)     Pledgor shall furnish or cause Mortgage Borrower to furnish to Lender, within ten (10) Business Days after request such further detailed information with respect to the operation of the Property and the financial affairs of Pledgor or Mortgage Borrower as may be reasonably requested by Lender, including, without limitation, an annual operating budget for the Property.

(f)     Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form, (ii) on a diskette, and (iii) if requested by Lender and within the capabilities of Pledgor's or Mortgage Borrower's, as applicable, data systems without change or modification thereto, in electronic form and prepared using a Microsoft Word for Windows or WordPerfect for Windows files (which files may be prepared using a spreadsheet program and saved as word processing files).

(g)     Pledgor agrees that Lender may forward to each purchaser, transferee, assignee, servicer, participant, Co-Lender or investor in all or any portion of the Loan or any Securities (collectively, the "Investor") or any Rating Agency rating such participations and/or Securities and each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Pledgor, Mortgage Borrower, any Guarantor, the Collateral and the Property, whether furnished by Pledgor, Mortgage Borrower, any Guarantor, or otherwise, as Lender determines necessary or desirable. Pledgor irrevocably waives any and all rights it may have under any Applicable Laws to prohibit such disclosure, including, but not limited, to any right of privacy.

(h)     If requested by Lender, Pledgor shall provide or cause Mortgage Borrower to provide Lender, promptly upon request or within the time periods set forth in this subsection (h), with the following financial statements if, at the time a Disclosure

- 75 -