Document is being prepared for a Securitization, it is expected that the principal amount of the Loan together with any Affiliated Loans at the time of Securitization may, equal or exceed 20% of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization:

(i)    A balance sheet with respect to the Property for the two most recent fiscal years, meeting the requirements of Section 210.3-01 of Regulation S-X of the Securities Act and statements of income and statements of cash flows with respect to the Property for the three most recent fiscal years, meeting the requirements of Section 210.3-02 of Regulation S-X, and, for any interim period between the last audited balance sheet and the date of the most recent interim financial statements, interim financial statements of the Property meeting the requirements of Section 210.3-01 and 210.3-02 of Regulation S-X (all of such financial statements, collectively, the "Standard Statements"); provided, however, that with respect to the Property (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) that has been acquired by Mortgage Borrower from an unaffiliated third party (such Property, "Acquired Property"), as to which the other conditions set forth in Section 210.3-14 of Regulation S-X for provision of financial statements in accordance with such Section have been met, in lieu of the Standard Statements otherwise required by this section, Pledgor shall instead provide the financial statements required by such Section 210.3-14 of Regulation S-X ("Acquired Property Statements").

(ii)    Not later than 30 days after the end of each fiscal quarter following the date hereof, a balance sheet of the Property as of the end of such fiscal quarter, meeting the requirements of Section 210.3-01 of Regulation S-X, and statements of income and statements of cash flows of the Property for the period commencing following the last day of the most recent fiscal year and ending on the date of such balance sheet and for the corresponding period of the most recent fiscal year, meeting the requirements of Section 210.3-02 of Regulation S-X (provided, that if for such corresponding period of the most recent fiscal year Acquired Property Statements were permitted to be provided hereunder pursuant to subsection (i) above, Pledgor shall instead provide Acquired Property Statements for such corresponding period).

(iii)    Not later than 75 days after the end of each fiscal year following the date hereof, a balance sheet of the Property as of the end of such fiscal year, meeting the requirements of Section 210.3-01 of Regulation S-X, and statements of income and statements of cash flows of the Property for such fiscal year, meeting the requirements of Section 210.3-02 of Regulation S-X.

(iv)    Within ten business days after notice from the Lender in connection with the Securitization of this Loan, such additional financial statements, such that, as of the date (each an "Offering Document Date") of each Disclosure Document, Pledgor shall have provided Lender with all financial statements as described in subsection (h)(i) above; provided that the fiscal year

- 76 -

and interim periods for which such financial statements shall be provided shall be determined as of such Offering Document Date.

(i)      If requested by Lender, Pledgor shall provide or cause Mortgage Borrower to provide Lender, promptly upon request (but in no event later than the time periods set forth in Section 5.1.10(h) hereof), with "selected financial data" regarding the net operating income for Mortgage Borrower and the Property for the most recent fiscal year and interim period (or such longer period as may be required by Regulation S-K if the Loan is not treated as a non-recourse loan under Instruction 3 for Item 1101(k) of Regulation AB) meeting the requirements and covering the time periods specified in Section 301 of Regulation S-K and Item 1112 of Regulation AB of the Securities Act if, at the time a Disclosure Document is being prepared for a Securitization, it is expected that the principal amount of the Loan and any Affiliated Loans at the time of Securitization may, equal or exceed 10% (but is less than 20%) of the aggregate principal amount of all mortgage loans expected to be included in a Securitization.

(j)      All financial statements provided or caused to be provided by Pledgor hereunder pursuant to Section 5.1.10(h) and (i) hereof shall be prepared in accordance with GAAP, and shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB and other applicable legal requirements.  All financial statements referred to in Subsections 5.1.10(h)(i) and 5.1.10(h)(iii) above shall be audited by independent Approved Accountants of Borrower or Mortgage Borrower, as applicable, acceptable to Lender in accordance with Regulation S-K or Regulation S-X, as applicable, Regulation AB and all other applicable legal requirements, shall be accompanied by the manually executed report of the independent Approved Accountants thereon, which report shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB and all other applicable legal requirements, and shall be further accompanied by a manually executed written consent of the independent Approved Accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such independent Approved Accountants and the reference to such independent Approved Accountants as "experts" in any Disclosure Document and Exchange Act Filing, all of which shall be provided at the same time as the related financial statements are required to be provided.  All financial statements (audited or unaudited) provided by Pledgor under this Section 5.1.10 shall be certified by the chief financial officer or administrative member of Pledgor or Mortgage Borrower, as applicable, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this Section 5.1.10(j).

(k)      If requested by Lender, Pledgor shall provide or cause to be provided to Lender, promptly upon request, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall determine to be required pursuant to Regulation S-K or Regulation S-X, as applicable, Regulation AB or any amendment, modification or replacement thereto or other legal requirements in connection with any Disclosure Document or any Exchange Act filing in connection with or relating to a Securitization or as shall otherwise be reasonably requested by the Lender.

- 77 -

(l)     In the event Lender determines, in connection with a Securitization, that the financial statements required in order to comply with Regulation S-K or Regulation S-X, as applicable, Regulation AB or other legal requirements are other than as provided herein, then notwithstanding the provisions of Sections 5.1.10(h), (i) and (j) hereof, Lender may request, and Pledgor shall promptly deliver or cause to be promptly delivered, such combination of Acquired Property Statement and/or Standard Statements or such other financial statements as Lender determines to be necessary or appropriate for such compliance.

(m)     The term "Affiliated Loans" shall mean a loan made by Lender to a parent, subsidiary or such other entity affiliated with Pledgor or any Guarantor and any other loan that is cross-collateralized with the Loan

(n)     If requested by Lender, Borrower shall provide Lender, promptly upon request, a list of tenants (including all affiliates of such tenants) that in the aggregate (1) occupy 10% or more (but less than 20%) of the total floor area of the improvements or represent 10% or more (but less than 20%) of aggregate base rent, and (2) occupy 20% or more of the total floor area of the improvements or represent 20% or more of aggregate base rent.

(o)     In addition, if requested by Lender, Borrower shall provide Lender, promptly upon request, with financial information regarding any of the tenants identified in the list prepared pursuant to the preceding sentence in form and substance sufficient to satisfy the requirements of Item 1112 of Regulation AB.

5.1.11  Business and Operations.

Pledgor will cause Mortgage Borrower to continue to be engaged in the businesses presently conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property.  Pledgor will and shall cause Mortgage Borrower to remain in good standing under the laws of each jurisdiction the extent required for the ownership, maintenance, management and operation of the Property.  The Property shall be used only for a retail center and any ancillary uses relating thereto (including the operation of one or more restaurants), and for no other uses without the prior written consent of Lender, which consent shall not be unreasonably withheld.

5.1.12  Costs of Enforcement.

In the event (a) that Lender exercises any of its rights or remedies under the Pledge Agreement or any other Loan Document as and when permitted thereby, or (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Pledgor or any of its constituent Persons or an assignment by Pledgor or any of its constituent Persons for the benefit of its creditors or (c) Lender incurs any costs or expenses in connection with any refinancing or restructuring of the Loan in the nature of a workout, Pledgor, its successors or assigns, shall be chargeable with and agrees to pay all costs of collection and defense and all other expenses, including attorneys' fees and costs, incurred by Lender or Pledgor in connection

- 78 -

therewith and in connection with any appellate proceeding or post judgment action involved therein, together with all required service or use taxes.

5.1.13   Estoppel Statement.

(a)   After request by Lender, Pledgor shall within ten (10) days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Applicable Interest Rate of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, and (vi) that the Note, this Agreement, the Pledge Agreement and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

(b)   Pledgor shall use commercially reasonable efforts to deliver to Lender upon request (but not more than once in any calendar year unless (i) an Event of Default then exists or (ii) in connection with a Securitization or Syndication), tenant estoppel certificates from each commercial tenant leasing space at the Property in form and substance reasonably satisfactory to Lender.

(c)   Pledgor shall, promptly upon request of Lender, cause Mortgage Borrower to deliver an estoppel certificate from Fee Owner stating that (i) the Air Rights Lease is in full force and effect and has not been modified, amended or assigned, (ii) neither Fee Owner nor Mortgage Borrower is in default under any of the terms, covenants or provisions of the Air Rights Lease and the Air Rights Lessor know of no event which, but for the passage of time or the giving of notice or both, would constitute an event of default under the Air Rights Lease, (iii) neither the Fee Owner nor Mortgage Borrower has commenced any action or given or received any notice for the purpose of terminating the Air Rights Lease and (iv) all sums due and payable to Fee Owner under the Air Rights Lease have been paid in full.

(d)   Pledgor shall cause Mortgage Borrower to deliver to Lender upon request (but not more than once in any calendar year unless (i) an Event of Default then exists or (ii) in connection with a Securitization or syndication) an estoppel certificate from each party to the Master REA (and shall use commercially reasonable efforts with respect to any other material REA, as determined by Lender in its reasonable discretion) in form and substance reasonably satisfactory to Lender.

(e)   After request by Borrower, Lender shall (but not more than once in any calendar year and provided no Event of Default then exists) within ten (10) days, furnish Borrower with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Applicable Interest Rate of the Note (iv) the date installments of interest and/or principal were last paid and (v) that the Note, this Agreement, the Pledge Agreement and the other Loan Documents have not been modified or if modified, giving particulars of such modification.

- 79 -

5.1.14  Loan Proceeds.

Borrower shall use the proceeds of the Loan received by it on the Closing Date only for the purposes set forth in Section 2.1.4. hereof.

5.1.15  Performance by Pledgor.

(a)    Pledgor shall in a timely manner (and subject to any applicable notice and grade periods expressly provided for in the Loan Documents) observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Pledgor, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Pledgor without the prior written consent of Lender.  Notwithstanding anything to the contrary contained herein or in the other Loan Documents, in no event shall Pledgor be required to follow any express instruction from Lender in connection with the Loan that would directly result in a Mortgage Loan Event of Default by Mortgage Borrower under the Mortgage Loan; provided, however, in no event shall the foregoing (i) impact the terms set forth in Section 9.13, or (ii) limit any consent or approval rights of Lender.

(b)    Pledgor shall not cause or permit Mortgage Borrower to enter into or otherwise suffer or permit any amendment, waiver (except to the extent the same is immaterial), supplement, termination or other modification of any Mortgage Loan Document executed and delivered by, or applicable to, Mortgage Borrower as of the date hereof without the prior written consent of Lender.  Pledgor shall cause Mortgage Borrower to provide Lender with a copy of any amendment, waiver, consent, supplement, termination or other modification to the Mortgage Loan Documents within five (5) days after the execution thereof.  Pledgor shall not, and shall not permit any Loan Party not to, amend or modify the Organizational Documents of Mortgage Borrower in any respect, without Lender's prior written consent, which would (i) limit distributions to be made to Pledgor, (ii) limit cure rights of Pledgor, (iii) modify the special purpose entity requirements set forth therein or (iv) would in any other respect have any adverse effect on Lender.

5.1.16  Confirmation of Representations.

Pledgor shall deliver, in connection with any Securitization or Syndication, (a) one or more Officer's Certificates certifying as to the accuracy of all representations made by Pledgor in the Loan Documents as of the date of the closing of such Securitization or Syndication in all relevant jurisdictions (or, to the extent such representations are not then true, indicating the exceptions thereto), and (b) certificates of the relevant Governmental Authorities in all relevant jurisdictions indicating the good standing and qualification of Pledgor as of the date of the closing of such Securitization or Syndication.

5.1.17  Leasing Matters.

(a)    Pledgor may cause Mortgage Borrower to enter into a proposed Lease (including the renewal or extension of an existing Lease (a "Renewal Lease")) without

- 80 -

the prior written consent of Lender, provided such proposed Lease or Renewal Lease (i) provides for rental rates and terms comparable to existing local market rates and terms (taking into account the type and quality of the tenant) as of the date such Lease is executed by Mortgage Borrower (unless, in the case of a Renewal Lease, the rent payable during such renewal, or a formula or other method to compute such rent, is provided for in the original Lease), (ii) is an arms-length transaction with a bona fide, independent third party tenant, (iii) does not have a material adverse effect on the value or quality of the Property, (iv) is subject and subordinate to the Security Instrument and the lessee thereunder agrees to attorn to Lender, (v) is in the form of Exhibit E attached hereto approved by Lender (other than factual information with respect to the tenant and other commercially reasonable modifications not material to the Property taken as a whole and that could not be reasonably expected to result in a Material Adverse Effect, as determined by Mortgage Borrower in its good faith reasonable business judgement, provided in all events that any such proposed Lease shall be subordinate to the Security Instrument and the other Loan Documents), and (vi) is not a Major Lease. All proposed Leases which do not satisfy the requirements set forth in this Section 5.1.17(a) shall be subject to the prior approval of Lender, which approval shall not be unreasonably withheld, conditioned or delayed. At Lender's request, Pledgor shall cause Mortgage Borrower to promptly deliver to Lender copies of all Leases which are entered into pursuant to this Subsection together with Pledgor's certification that it has satisfied or caused Mortgage Borrower to have satisfied all of the conditions of this Section.

(b)    Pledgor shall cause Mortgage Borrower (i) to observe and perform all the material obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to materially impair the value of any of the Leases as security for the Debt; (ii) to promptly send copies to Lender of all notices of default or other material matters which Mortgage Borrower shall send or receive with respect to the Leases; (iii) to enforce all of the material terms, covenants and conditions contained in the Leases upon the part of the tenant thereunder to be observed or performed (except for termination of a Major Lease which shall require Lender's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed); (iv) to not collect any of the Rents more than one (1) month in advance (except Security Deposits shall not be deemed Rents collected in advance); (v) to, immediately upon receipt, deposit all Lease Termination Payments into such account as directed by Lender, (vi) not to execute any other assignment of the lessor's interest in any of the Leases or the Rents (except as contemplated by the Mortgage Loan Documents); and (vii) not to consent to any assignment of or subletting under any Leases not in accordance with their terms, without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    Pledgor may, without the consent of Lender, cause Mortgage Borrower to amend, modify or waive the provisions of any Lease or terminate, reduce rents under, accept a surrender of space under, or shorten the term of, any Lease (including any guaranty, letter of credit or other credit support with respect thereto) provided that such Lease is not a Major Lease and that such action (taking into account, in the case of a termination, reduction in rent, surrender of space or shortening of term, the planned alternative use of the affected space) does not have a material adverse effect on the value

- 81 -

of the Property taken as a whole, and provided that such Lease, as amended, modified or waived, is otherwise in compliance with the requirements of this Agreement and any lease subordination agreement binding upon Lender with respect to such Lease.    A termination of a Lease (other than a Major Lease) with a tenant who is in default beyond applicable notice and grace periods shall not be considered an action which has a material adverse effect on the value of the Property taken as a whole.    Any amendment, modification, waiver, termination, rent reduction, space surrender or term shortening which does not satisfy the requirements set forth in this Subsection shall, at Pledgor's expense, be subject to the prior written approval of Lender and its counsel, which approval shall not be unreasonably withheld, conditioned or delayed.    At Lender's request, Pledgor shall cause Mortgage Borrower to promptly deliver to Lender copies of all Leases, amendments, modifications and waivers which are entered into pursuant to this Section 5.1.17(b) together with Pledgor's certification that it has satisfied or caused to be satisfied all of the conditions of this Section 5.1.17(b).

(d)    Notwithstanding anything contained herein to the contrary, Pledgor shall cause Mortgage Borrower not to, without the prior written consent of Lender, enter into, renew, extend, amend (unless such amendment is not material to the Property, taken as whole and could not be reasonably expected result in a Material Adverse Effect), modify (unless such modification is not material to the Property, taken as a whole and could not be reasonably expected to result in a Material Adverse Effect), waive any provisions of (unless such waiver is not material to the Property, taken as a whole and could not be reasonably expected to result in a Material Adverse Effect), terminate, reduce rents under, accept a surrender of space under, or shorten the term of, any Major Lease or any instrument guaranteeing or providing credit support for any Major Lease.

(e)    In connection with any restaurant Lease to an Affiliate of Mortgage Borrower which a "celebrity" (as determined by Lender in its reasonable discretion) chef (a "Celebrity Chef") has agreed to associate his/her name with the Property, Borrower shall cause Mortgage Borrower to use commercially reasonable efforts to deliver, or cause to be delivered, an agreement from such Celebrity Chef stating that if there is a foreclosure of the Security Instrument or Pledge Agreement, as applicable, or similar enforcement action resulting in the transfer of title to the Property or Collateral, as applicable, or if Mortgage Borrower or Pledgor becomes insolvent, such Celebrity Chef shall, at the election of Lender, complete its obligations under any relevant Lease or contract (or other arrangement) previously entered into with Mortgage Borrower for the benefit of and with no additional charge or expense to Lender, its nominee or wholly owned subsidiary.

Notwithstanding the provisions of this Section 5.1.17 to the contrary, to the extent that Lender's prior written approval is required pursuant to this Section 5.1.17 with respect to new Leases and modifications and amendments of existing Leases, such request for approval shall be deemed approved if (i) Lender shall have failed to notify Borrower of its approval or disapproval within seven (7) Business Days (the "Approval Period") following Lender's receipt of Borrower's written request together with any and all information and documentation relating thereto reasonably requested by Lender to reach a decision, (ii) Borrower shall have delivered to Lender a written notice of Lender's failure to respond to Borrower's request within the Approval

Period (the "Failure to Respond Notice"), which Failure to Respond Notice is marked in bold lettering (of no less than fourteen point type and underlined) with the following: "IMMEDIATE RESPONSE REQUIRED, FAILURE TO RESPOND TO THIS APPROVAL REQUEST WITHIN SEVEN (7) BUSINESS DAYS FROM RECEIPT SHALL BE DEEMED TO BE LENDER'S APPROVAL", and (iii) Lender shall have failed to notify Borrower of its approval or disapproval within seven (7) Business Days following Lender's receipt of the Failure to Respond Notice.  Upon Lender's request, Borrower shall be required to provide Lender with such information and documentation as may be reasonably required by Lender, in its reasonable discretion, including without limitation, lease comparables and other market information as reasonably required by Lender.

    5.1.18  <u>Management Agreement</u>.

        (a)    Borrower shall not permit Mortgage Borrower to enter into a Management Agreement for the Property without Lender's prior written consent (provided that Lender's consent shall not be required with respect to the Approved Management Agreement or any other Management Agreement in the form attached (with such de minimis changes agreed to by Borrower) hereto as Exhibit F, with a Qualified Manager and otherwise in accordance with Section 5.1.18(b) below).

        (b)    In no event shall the management fees under any Management Agreement exceed three percent (3%) of the gross revenue derived from the Property.  Pledgor shall cause Mortgage Borrower to (i) diligently perform and observe all of the terms, covenants and conditions of any Management Agreement, on the part of Mortgage Borrower to be performed and observed to the end that all things shall be done which are necessary to keep unimpaired the rights of Mortgage Borrower under any Management Agreement and (ii) promptly notify Lender of the giving of any notice by any Manager to Mortgage Borrower of any default by Mortgage Borrower in the performance or observance of any of the terms, covenants or conditions of any Management Agreement on the part of Mortgage Borrower to be performed and observed and deliver to Lender a true copy of each such notice.  Pledgor shall cause Mortgage Borrower not to surrender any Management Agreement, consent to the assignment by any Manager of its interest under any Management Agreement, or terminate or cancel any Management Agreement, or modify, change, supplement, alter or amend any Management Agreement, in any material respect, either orally or in writing.  Notwithstanding the foregoing, Borrower shall have the right to cause Mortgage Borrower to terminate the Management Agreement without Lender's prior written consent upon satisfaction of the following conditions: (i) Borrower delivers to Lender written notice of its intention to terminate the Management Agreement at least ten (10) Business Days prior to such termination; (ii) Borrower causes Mortgage Borrower to replace the Manager within thirty (30) days after the termination of the Management Agreement with a Qualified Manager pursuant to a Replacement Management Agreement; and (iii) such Qualified Manager delivers to Lender an Subordination of Management Agreement which is also executed by the Borrower.  Subject to the rights of Mortgage Lender, if Mortgage Borrower shall default in the performance or observance of any material term, covenant or condition of any Management Agreement on the part of Mortgage Borrower to be performed or observed, then, without limiting the generality of the other provisions of this Agreement, and

- 83 -

without waiving or releasing Pledgor from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of any Management Agreement on the part of Mortgage Borrower to be performed or observed to be promptly performed or observed on behalf of Mortgage Borrower, to the end that the rights of Mortgage Borrower in, to and under any Management Agreement shall be kept unimpaired and free from default. Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time for the purpose of taking any such action. If any Manager shall deliver to Lender a copy of any notice sent to Pledgor or Mortgage Borrower of default under any Management Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon. Pledgor shall cause Mortgage Borrower not to, and shall not permit any Manager to, sub-contract any or all of its management responsibilities under any Management Agreement to a third-party without the prior written consent of Lender, which consent shall not be unreasonably withheld. Pledgor shall, from time to time, obtain from any Manager such certificates of estoppel with respect to compliance by Mortgage Borrower with the terms of any Management Agreement as may be requested by Lender (which request may be made no more often than once per calendar year unless (i) in connection with a Syndication or Securitization or (ii) an Event of Default then exists). During the continuance of an Event of Default, Pledgor shall cause Mortgage Borrower to exercise each individual option, if any, to extend or renew the term of any Management Agreement upon demand by Lender made at any time within one (1) year of the last day upon which any such option may be exercised. Any sums expended by Lender pursuant to this paragraph (i) shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, (ii) shall be deemed to constitute a portion of the Debt, (iii) shall be secured by the lien of the Pledge Agreement and the other Loan Documents and (iv) shall be immediately due and payable upon demand by Lender therefor.

(c)    Without limitation of the foregoing, Pledgor, upon the request of Lender, shall cause Mortgage Borrower to terminate any Management Agreement and replace any Manager, without penalty or fee, if at any time during the Loan: (a) any Manager shall become insolvent or a debtor in any bankruptcy or insolvency proceeding, (b) there exists an Event of Default or (c) there exists a default by Manager under any Management Agreement beyond any applicable notice and cure periods. Within thirty (30) days after any such removal, a Qualified Manager shall assume management of the Property pursuant to a Replacement Management Agreement.

5.1.19  Environmental Covenants.

(a)    Pledgor covenants and agrees that so long as the Loan is outstanding (i) Pledgor shall cause Mortgage Borrower to, and shall cause Mortgage Borrower to use commercially reasonable efforts to ensure that all other Persons (including, but not limited to, all tenants and subtenants) cause all uses and operations on or of the Real Property, whether by Mortgage Borrower or any other Person, to be in compliance in all material respects with all Environmental Laws and permits issued pursuant thereto; (ii)

- 84 -

there shall be no Releases of Hazardous Materials by Mortgage Borrower in, on, under or from any of the Real Property and Pledgor shall cause Mortgage Borrower to use commercially reasonable efforts to insure that there shall be no Releases of Hazardous Materials by any other Person in, on, under or from any of the Real Property; (iii) there shall be no Hazardous Materials in, on, or under the Real Property, except those that are both (A) in compliance with all Environmental Laws and with permits issued pursuant thereto, if and to the extent required, and (B) (1) in amounts not in excess of that necessary to operate the Real Property or (2) fully disclosed to and approved by Lender in writing; (iv) Pledgor shall cause Mortgage Borrower to keep the Real Property free and clear of all liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Pledgor or any other Person (the "Environmental Liens"); (v) Pledgor shall, at its sole cost and expense, cause Mortgage Borrower to fully and expeditiously cooperate in all activities pursuant to paragraph (b) below, including but not limited to providing all relevant information and making knowledgeable persons available for interviews; (vi) Pledgor shall, at its sole cost and expense, cause Mortgage Borrower to perform any environmental site assessment or other investigation of environmental conditions in connection with the Real Property, pursuant to any reasonable written request of Lender, upon Lender's reasonable belief that the Real Property is not in compliance with all Environmental Laws in any material respect (other than such lack of compliance as has been previously disclosed to, and approved of in writing by, Lenders), and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties shall be entitled to rely on such reports and other results thereof; (vii) Pledgor shall, at its sole cost and expense, cause Mortgage Borrower to comply with all reasonable written requests of Lender to (A) reasonably effectuate remediation of any Hazardous Materials in, on, under or from the Real Property; and (B) comply with any Environmental Law; (viii) Pledgor shall not permit Mortgage Borrower to knowingly allow any tenant or other user of any of the Real Property to violate any Environmental Law; and (ix) Pledgor shall immediately notify Lender in writing after it has become aware of (A) any presence or Release or threatened Releases of Hazardous Materials in, on, under, from or migrating towards the Real Property; (B) any non-compliance with any Environmental Laws related in any way to the Real Property; (C) any actual or potential Environmental Lien; (D) any required or proposed remediation of environmental conditions relating to any of the Real Property; and (E) any written or oral notice or other communication of which Pledgor becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials in, on or under the Property in violation of any Environmental Law.

(b)     Lender and any other Person designated by Lender, including but not limited to any representative of a Governmental Authority, and any environmental consultant on behalf of Lender or such other Person, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Real Property at all reasonable times to assess any and all aspects of the environmental condition of the Real Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lender's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive

- 85 -

testing at Lender's sole cost and expense except to the extent Pledgor or Mortgage Borrower is responsible for payment of the same under Section 5.1.19(a). Pledgor shall cause Mortgage Borrower to cooperate with and provide access to Lender and any such Person designated by Lender.

5.1.20 <u>Alterations</u>.

Pledgor shall obtain Lender's prior written consent to any additions or alterations of the Property and any Improvements thereon (unless such additions or alterations are being performed pursuant to the terms of a Lease satisfying the leasing requirements set forth in Section 5.1.17) to the extent the cost of such addition or alteration exceeds $2,000,000, which approval shall not be unreasonably withheld, conditioned or delayed. If the total unpaid amounts with respect to such alterations to the Improvements at the Property (other than such amounts to be paid or reimbursed by tenants under the Leases or for which unadvanced sums are allocated for the payment of the same) shall at any time exceed Two Million and 00/100 Dollars ($2,000,000.00) (the "Threshold Amount"), Pledgor shall promptly deliver or cause to be delivered to Lender as security for the payment of such amounts and as additional security for Pledgor's obligations under the Loan Documents any of the following: (A) Cash, (B) U.S. Obligations, (C) other securities having a rating acceptable to Lender and that the applicable Rating Agencies have confirmed in writing will not, in and of itself, result in a downgrade, withdrawal or qualification of the initial, or, if higher, then current ratings assigned in connection with any Securitization, or (D) a completion bond or letter of credit issued by a financial institution having a rating by S&P of not less than A-1+ if the term of such bond or letter of credit is no longer than three (3) months or, if such term is in excess of three (3) months, issued by a financial institution having a rating that is acceptable to Lender and that the applicable Rating Agencies have confirmed in writing will not, in and of itself, result in a downgrade, withdrawal or qualification of the initial, or, if higher, then current ratings assigned in connection with any Securitization. Such security shall be in an amount equal to the excess of the total unpaid amounts with respect to alterations to the Improvements on the Property (other than such amounts to be paid or reimbursed by tenants under the Leases) over the Threshold Amount and applied from time to time at the option of Lender to pay for such alterations or to terminate any of the alterations and restore the Property to the extent necessary to prevent any material adverse effect on the value of the Property.

Notwithstanding the foregoing, (i) Pledgor shall be relieved of its obligation to deposit the security for certain alterations described above provided Mortgage Borrower is required to and does deliver such security to Mortgage Lender in accordance with the Mortgage Loan Documents and Lender received evidence acceptable to Lender of the delivery of such security, (ii) in the event that Lender fails to respond within seven (7) Business Days of any request for consent required under this Section 5.1.20, such failure shall be deemed to be the consent and approval of the such proposed request for consent by Lender if (I) Pledgor has delivered to Lender all required documents and information necessary to adequately and completely evaluate the proposed request for consent (including, but not limited to, any material information or documentation reasonably requested by Lender), (II) Pledgor has resubmitted the proposed request for consent with the notation "IMMEDIATE RESPONSE REQUIRED, FAILURE TO RESPOND TO THIS APPROVAL REQUEST WITHIN SEVEN (7) BUSINESS DAYS FROM RECEIPT SHALL BE DEEMED TO BE LENDER'S APPROVAL " prominently displayed in

[TPW: NYLEGAL:674139.7] 16248-00758 06/06/2007 12:54 AM

bold, all caps and fourteen (14) point or larger font at the top of the first page of the proposed request for consent and the envelope containing such proposed request for consent and (III) Lender does not approve or reject the proposed request for consent within seven (7) Business Days from the date Lender receives the resubmitted request.

5.1.21  Reciprocal Easement Agreements.

Pledgor shall not permit Mortgage Borrower to enter into, terminate or modify any REA in any material respect without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed other than modifications, with respect to the Master REA, solely to give effect to changes in the legal descriptions attached thereto, so long as, after giving effect to such changes, (i) the Retail Parcel (as defined in the Master REA) shall be no less than 283,000 square feet, (ii) there shall be no adverse impact on the access and egress to the Property, taken as a whole and (iii) the Property is not otherwise materially and adversely impacted. Prior to the substantial completion of the retail component of the Project, Pledgor shall have the right, without Lender's prior written consent, to permit Mortgage Borrower to enter into any modification contemplated by the Master REA (on the date hereof) which has the sole effect of reducing the total square footage of the Property so long as such reduction does not (i) result in the total square footage of the Property falling below 283,000 square feet and (ii) otherwise materially and adversely impact the Property. Pledgor shall enforce, comply with, and cause each of the parties to the REA to comply with all of the material economic terms and conditions contained in the REA. Borrower shall not consent to any (i) changes to the Plans and Specifications (for the purposes of this Section 5.1.21 only, as defined in the Master REA) pursuant to Article 3 of the Master REA or (ii) unless permitted pursuant to Section 5.1.20, alterations pursuant to Section 8.3 of the Master REA, in either case, without obtaining the prior written consent of Lender (which consent shall not be unreasonably withheld, conditioned or delayed).

5.1.22  Leasing Agreement.

(a)    Other than the Approved Leasing Agreement in effect on the Closing Date, Pledgor shall not permit Mortgage Borrower to enter into a Leasing Agreement for the Property without Lender's prior written consent.

(b)    All leasing fees under any Leasing Agreement shall be market and customary. Pledgor shall cause Mortgage Borrower to (i) diligently perform and observe all of the terms, covenants and conditions of any Leasing Agreement, on the part of Borrower to be performed and observed to the end that all things shall be done which are necessary to keep unimpaired the rights of Mortgage Borrower under any Leasing Agreement and (ii) promptly notify Lender of the giving of any notice by any Leasing Agent to Mortgage Borrower of any default by Mortgage Borrower in the performance or observance of any of the terms, covenants or conditions of any Leasing Agreement on the part of Mortgage Borrower to be performed and observed and deliver to Lender a true copy of each such notice. Pledgor shall not permit Mortgage to not surrender any Leasing Agreement, consent to the assignment by any Leasing Agent of its interest under any Leasing Agreement, or terminate or cancel any Leasing Agreement, or modify, change, supplement, alter or amend any Leasing Agreement, in any material respect,

- 87 -

either orally or in writing. Notwithstanding the foregoing, Borrower shall have the right to cause Mortgage Borrower to terminate the Leasing Agreement without Lender's prior written consent upon satisfaction of the following conditions: (i) Borrower delivers to Lender written notice of its intention to terminate the Leasing Agreement at ten (10) Business Days prior to such termination; (ii) Borrower shall cause Mortgage Borrower to replace the Leasing Agent within thirty (30) days after the termination of the Leasing Agreement with a Qualified Leasing Agent pursuant to a Replacement Leasing Agreement; and (iii) such Qualified Leasing delivers to Lender an Assignment of Leasing Agreement which is also executed by the Borrower. Subject to the rights of Mortgage Lender, if Mortgage Borrower shall default in the performance or observance of any material term, covenant or condition of any Leasing Agreement on the part of Mortgage Borrower to be performed or observed, then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Pledgor from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of any Leasing Agreement on the part of Mortgage Borrower to be performed or observed to be promptly performed or observed on behalf of Mortgage Borrower, to the end that the rights of Mortgage Borrower in, to and under any Leasing Agreement shall be kept unimpaired and free from default. Pledgor shall cause Lender and any Person designated by Lender to have, the right to enter upon the Property at any time and from time to time for the purpose of taking any such action. If any Leasing Agent shall deliver to Lender a copy of any notice sent to Pledgor and Mortgage Borrower of default under any Leasing Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon. Pledgor shall not and Pledgor shall cause Mortgage Borrower not to permit any Leasing Agent to, sub-contract any or all of its leasing responsibilities under any Leasing Agreement to a third-party without the prior written consent of Lender, which consent shall not be unreasonably withheld. Pledgor shall cause Mortgage Borrower to, from time to time, obtain from any Leasing Agent such certificates of estoppel with respect to compliance by Mortgage Borrower with the terms of any Leasing Agreement as may be requested by Lender (which request may be made no more often than once per calendar year unless (i) in connection with a Syndication or Securitization or (ii) an Event of Default then exists). During the continuance of an Event of Default, Pledgor shall cause Mortgage Borrower to exercise each individual option, if any, to extend or renew the term of any Leasing Agreement upon demand by Lender made at any time within one (1) year of the last day upon which any such option may be exercised, and Pledgor hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Pledgor, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest. Any sums expended by Lender pursuant to this paragraph (i) shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, (ii) shall be deemed to constitute a portion of the Debt, (iii) shall be secured by the lien of the Pledge Agreement and the other Loan Documents and (iv) shall be immediately due and payable upon demand by Lender therefor.

(c)    Without limitation of the foregoing, Pledgor, upon the request of Lender, shall cause Mortgage Borrower to terminate any Leasing Agreement (whether in writing

- 88 -

or verbal) and replace any Leasing Agent, without penalty or fee, if at any time during the Loan: (a) any Leasing Agent shall become insolvent or a debtor in any bankruptcy or insolvency proceeding, (b) there exists an Event of Default or (c) there exists a default by Leasing Agent under any Leasing Agreement beyond any applicable notice and cure periods. Within thirty (30) days after any such removal, a Qualified Leasing Agent shall assume leasing duties of the Property pursuant to a Replacement Leasing Agreement.

(d)     Notwithstanding anything to the contrary contained in this Agreement, Mortgage Borrower shall not be required to maintain the Leasing Agreement and Pledgor shall have the right to cause Mortgage Borrower to terminate the Leasing Agreement without Lender's consent in the event that the Management Agreement or Replacement Management Agreement shall provide for leasing services (in addition to management services) at the Property in a manner reasonably satisfactory to Lender.

5.1.23  [Reserved].

5.1.24  The Air Rights Lease.

With respect to the Air Rights Lease,

(a)     Borrower shall cause Mortgage Borrower to (i) pay all Air Rights Rent required to be paid by Mortgage Borrower, as tenant under and pursuant to the provisions of the Air Rights Lease, (ii) diligently perform and observe all of the material terms, covenants and conditions of the Air Rights Lease on the part of Mortgage Borrower, as tenant thereunder, (iii) promptly notify Lender of the giving of any notice by the Fee Owner under the Air Rights Lease to Mortgage Borrower of any default by Mortgage Borrower, as tenant thereunder, and deliver to Lender a true copy of each such notice within seven (7) Business Days of receipt and (iv) promptly notify Lender of any bankruptcy, reorganization or insolvency of the Fee Owner under the Air Rights Lease or of any notice thereof, and deliver to Lender a true copy of such notice within five (5) Business Days of Mortgage Borrower's or Borrower's receipt, together with copies of all notices, pleadings, schedules and similar matters received by Mortgage Borrower in connection with such bankruptcy, reorganization or insolvency within five (5) Business Days after receipt. Borrower shall not permit or cause Mortgage Borrower to, without the prior consent of Lender, surrender the leasehold estate created by the Air Rights Lease or terminate or cancel the Air Rights Lease or modify, change, supplement, alter or amend the Air Rights Lease, either orally or in writing, or (y) consent to, acquiesce in, or fail to object to, any attempt by the Fee Owner, as debtor in possession or by a trustee for such Fee Owner, to sell or transfer the Fee Estate free and clear of the Air Rights Lease under section 363(f) of the Bankruptcy Code or otherwise. Borrower shall cause Mortgage Borrower to object to any such attempt by the Fee Owner, as debtor in possession or by a trustee for the Fee Owner, to sell or transfer the Fee Estate free and clear of the Air Rights Lease under section 363(f) of the Bankruptcy Code or otherwise, and in such event shall affirmatively assert and pursue its right to adequate protection under section 363(e) of the Bankruptcy Code. Subject to the rights of Mortgage Lender under the Mortgage Loan Agreement, Pledgor hereby assigns to Lender all of its rights under Section 363 of the Bankruptcy Code to consent or object to any sale or transfer of

- 89 -

the Fee Estate free and clear of the Air Rights Lease, and grants to Lender the right to object to any such sale or transfer on behalf of Pledgor, and Pledgor shall not contest any pleadings, motions documents or other actions filed or taken on Lender's or Pledgor's behalf by Lender in the event that any Person, as debtor in possession or by a trustee for the Fee Owner, attempts to sell or transfer the Fee Estate free and clear of the Air Rights Lease under section 363(f) of the Bankruptcy Code or otherwise.

(b)    If Borrower shall default in the performance or observance of any term, covenant or condition of the Air Rights Lease on the part of Mortgage Borrower, as tenant thereunder, and shall fail to cure the same prior to the expiration of any applicable cure period provided thereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all of the terms, covenants and conditions of the Air Rights Lease on the part of Mortgage Borrower to be performed or observed on behalf of Pledgor, to the end that the rights of Borrower in, to and under the Air Rights Lease shall be kept unimpaired and free from default. If the landlord under the Air Rights Lease shall deliver to Lender a copy of any notice of default under the Air Rights Lease, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon. Pledgor shall cause Mortgage Borrower shall exercise each individual option, if any, to extend or renew the term of the Air Rights Lease upon demand by Lender made at any time within one (1) year prior to the last day upon which any such option may be exercised.

(c)    Subleases. Notwithstanding anything contained in the Air Rights Lease to the contrary, Pledgor shall cause Mortgage Borrower to not further sublet any portion of the Property (other than as permitted pursuant to Section 5.1.17 hereof) without prior written consent of Lender. Each sublease hereafter made shall provide that, (a) in the event of the termination of the Air Rights Lease, the sublease shall not terminate or be terminable by the lessee thereunder; (b) in the event of any action for the foreclosure of the Security Instrument, the sublease shall not terminate or be terminable by the lessee thereunder by reason of the termination of the Air Rights Lease unless such lessee is specifically named and joined in any such action and unless a judgment is obtained therein against such lessee; and (c) in the event that the Air Rights Lease is terminated as aforesaid, the lessee under the sublease shall attorn to the lessor under the Air Rights Lease or to the purchaser at the sale of the Property on such foreclosure, as the case may be. In the event that any portion of the Property shall be sublet pursuant to the terms of this subsection, such sublease shall be deemed to be included in the Property.

(d)    Termination of Air Rights Lease.    Notwithstanding anything to the contrary contained herein, provided no Event of Default exists, Pledgor shall have the right to cause Mortgage Borrower to terminate the Air Rights Lease concurrently with a Fee Transfer Event.

(e)    Separate Tax Lot.  Within sixty days following a Fee Transfer Event, Pledgor shall cause title company to deliver an endorsement to the Owner's Title Policy that the New Estate (together with the remainder of the Property) constitutes one or more separate tax lots or, if such an endorsement is not available in the State, a letter from the

- 90 -

title insurance company issuing such Owner's Title Policy stating that the New Estate (together with the remainder of the Property) constitutes one or more separate tax lots.

5.1.25  OFAC.

At all times throughout the term of the Loan, Pledgor, Mortgage Borrower, Guarantor and their respective Affiliates shall be in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

5.1.26  Use of Mortgage Proceeds.

Pledgor shall cause all of the Mortgage Loan proceeds advanced from time to time to Mortgage Borrower to be used solely in accordance with the Mortgage Loan Documents.

5.1.27  Construction Responsibilities.

Mortgage Borrower is solely responsible for the selection of its own contractor or contractors, all materials, supplies and equipment to be used in construction of the Future Improvements being constructed by Mortgage Borrower (and not by any subtenant) and Lender assumes no responsibility for adequacy or sufficiency of materials, or design or engineering, or for the completion of the Future Improvements according to the Plans and Specifications and Applicable Laws.

5.1.28  Construction Budget.

Pledgor shall not permit Mortgage Borrower to make any changes to the Construction Budget without the prior written approval of Lender, which consent shall not be unreasonably withheld.

5.1.29  Construction Schedule.

Pledgor shall cause Mortgage Borrower to cause the Opening Date to occur prior to the Completion Date.

5.1.30  Preservation/Document Assignment.

Pledgor shall not permit Mortgage Borrower to terminate, cancel, materially modify or amend the Plans and Specifications (except as provided in the immediately following Section hereof), the Architect's Contract, the Engineer's Contract or the Construction Contract without the prior written approval of Lender, which approval shall not be unreasonably withheld or delayed. Pledgor shall cause Mortgage Borrower to notify Lender of any contractors, architects or engineers contracted with by Mortgage Borrower as substitutes for Architect, Engineer or General Contractor or as additional general contractors, architects, engineers or project coordinators, and Lender shall have the right to approve or disapprove such substitution or addition (Lender agreeing not to unreasonably withhold or delay the approval of any such proposed substitution other than a proposed substitution for the General Contractor), and to require the submission of any additional Loan documentation (reasonably requested by Lender)

- 91 -

regarding such substitutions or additions. In connection with entering into any Construction Documents, Borrower shall cause Mortgage Borrower to (i) assign the same to Mortgage Lender and (ii) use commercially reasonable efforts to deliver to Lender letters from any Architect, Engineer or General Contractor in form substantially similar to those certain Consent and Agreement letters delivered on the Closing Date by the Project Architect and Project General Contractor (revised to reflect, among other applicable changes, the applicable Construction Agreement, the applicable parties and with the material benefits of such letters running to Lender) or such other form reasonably approved by Lender. Incident to any assignment of the Architect's Contract, Engineer's Contract, the Construction Contract and the Plans and Specifications, as such assignment is set forth in the applicable assignment documentation, Pledgor shall cause Mortgage Borrower to fulfill the material obligations of Mortgage Borrower thereunder, diligently enforce the performance thereof and all material rights and remedies set forth therein, and give immediate notice to Lender of any material default by Architect, Engineer or General Contractor thereunder. Pledgor represents and warrants that the copy of the Construction Contract and any other Construction Document furnished or to be furnished to Lender is and shall be a true and complete copy thereof, that the copies of the Plans and Specifications delivered to Lender are and shall be true and complete copies of the Plans and Specifications, that there have been no modifications of any such Construction Documents which are not fully set forth in the copies delivered, and that Mortgage Borrower's interest therein is not subject to any claim, setoff, or encumbrance. Upon the request of Lender, Pledgor shall cause Mortgage Borrower to promptly deliver to Lender and its Construction Consultant copies of any Tenant Construction Deliverables previously received by Mortgage Borrower. Furthermore, in no event shall Borrower permit Resort Borrower to terminate, cancel, modify or amend the Project Plans and Specifications, the Project Architect's Contract, the Project Construction Budget, the Project Engineer's Contract or the Project Construction Contract if such event would result in a Material Adverse Effect, without the prior written approval of Lender in consultation with the Construction Consultant), which approval shall not be unreasonably withheld or delayed.

5.1.31  <u>Change Orders.</u>

Subject to Section 5.1.28 and Section 5.1.29 hereof, Pledgor shall not permit Mortgage Borrower to change, alter or amend either the Plans and Specifications or the construction of the Future Improvements in any material respect without the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed), and shall not permit any material deviations by any contractor from the Plans and Specifications. Copies of all material change orders and evidence of any necessary approvals thereof shall be promptly delivered to Lender.

5.1.32  <u>Construction Quality.</u>

Pledgor shall cause Mortgage Borrower to construct (or cause the construction of) the Future Improvements entirely on the Property such that the same (a) will not encroach upon or overhang any easement or right of way, nor upon the land of others (except as permitted pursuant to the Master REA), (b) shall be wholly within the building restriction lines, however established, (c) will not violate applicable use or other restrictions contained in applicable prior conveyances or applicable protective covenants or restrictions, and (d) shall comply in all material respects with the Plans and Specifications and all Applicable Laws.

- 92 -

5.1.33  Correction of Deficient Work.

If Lender reasonably determines that any portion of the Future Improvements to be constructed by Mortgage Borrower is not being constructed in accordance with the Plans and Specifications in any material respect in a workmanlike manner, Lender may require Pledgor to cause Mortgage Borrower to cause the work to be stopped and may withhold disbursements from any Reserve Fund until the material deficiencies are corrected.  Borrower agrees that it will correct (or cause to be correct) any materially deficient work performed and replace any materials that do not comply with the Plans and Specifications (unless the materials actually applied are the same or better quality, as determined by Lender in its reasonable discretion), Applicable Laws, or accepted standards of quality and workmanship.  The correction of deficient work or materials shall be at Borrower's expense unless Lender (in consultation with its Construction Consultant) determines that there are adequate funds remaining in the applicable line items of the Construction Budget or in any "Contingency" line item of the Construction Budget to correct such deficient work or materials, in which case such corrections may be funded from such line items in accordance with the procedures set forth herein for requesting advances so long as the making of any such advance will not result in insufficient funds in the applicable Construction Budget category to pay for all reasonably foreseeable items to be funded from such Construction Budget category.

5.1.34  Rebalancing

(a)    TI/LC.  If Lender at any time determines, in the exercise of its reasonable discretion, that (a) the unadvanced portion of the Maximum Other Retail Cost Advance Amount is less than (b) the then current estimated cost of completing all Future Improvements to be completed or funded by Borrower (in accordance with the terms of the Loan Documents, the Mortgage Loan Documents and the Master REA) and the leasing thereof anticipated to be completed from and after the time of such calculation (i) prior to the date that 65% of the Real Property (determined on the basis of square footage) has been leased to tenants pursuant to Leases entered into in accordance with Section 5.1.17, by more than 5% of the total estimated cost of completion and leasing for the Real Property, and (ii) thereafter, by any amount, Lender shall have the option of requiring Pledgor to deposit with Lender additional funds in amounts sufficient to cover the resulting deficit (the "Additional TI/LC Deposit").  Pledgor shall make any required Additional TI/LC Deposit within ten (10) days of written notice to Pledgor from Lender of such requirement, provided that (x) no such Additional TI/LC Deposit shall be required prior to the date that is the earlier to occur of (1) ninety (90) days prior to the Completion Date and (2) the initial advance by Mortgage Lender for Other Retail Costs (as defined in the Master Disbursement Agreement) pursuant to the terms of the Master Disbursement Agreement, and (y) unless otherwise approved by Lender in its sole discretion, any Additional TI/LC Deposit shall be funded and disbursed in accordance with this Agreement and the Master Disbursement Agreement before (except in the event Borrower has elected to deposit a Letter of Credit pursuant to Section 5.1.34(b) below) any additional Loan proceeds are disbursed.    Notwithstanding the foregoing, Pledgor shall be relieved of its obligation to deposit the Additional TI/LC Deposit described above provided Mortgage Borrower is required to and does deliver such Additional TI/LC Deposit to Mortgage Lender in accordance with the Mortgage Loan Documents

- 93 -

and Lender received evidence acceptable to Lender of the delivery of such Additional TI/LC Deposit.

(b)    Letter of Credit Option.  In lieu of depositing funds with Lender in connection with an Additional TI/LC Deposit, Borrower shall have the option of delivering to Lender a Letter of Credit in the applicable amount.

(c)    Collateral. The Additional TI/LC Deposit (whether in Cash or in the form of a Letter of Credit) is hereby pledged by Pledgor as additional collateral for the Debt, and Pledgor hereby grants and conveys to Lender a security interest in all funds so deposited with Lender as additional collateral for the Loan.  Any interest earned on the Additional TI/LC Deposit (in the form of Cash) shall be credited to the account of Pledgor but shall be subject to the foregoing security interest and shall be disbursed in accordance with this Agreement and the Master Disbursement Agreement before any additional Loan proceeds are disbursed.

(d)    Provisions Regarding Letters of Credit.

(i)    Lender shall be the beneficiary of any Letter of Credit and Pledgor shall not be entitled to draw down any such Letter of Credit for any reason whatsoever.  Each Letter of Credit delivered under this Agreement shall be additional security for the payment of the Debt.  Upon the occurrence and during the continuation of an Event of Default, Lender shall have the right, at its option, to draw on any Letter of Credit and to apply all or any part thereof to the payment of the items for which such Letter of Credit was established or to apply such Letter of Credit to payment of the Debt in such order, proportion or priority as Lender may determine.  Any such application to the Debt shall be subject to the Prepayment Premium, if applicable.  On the Maturity Date, if the Debt is not paid in full, any such Letter of Credit may be applied to reduce the Debt.  Pledgor shall pay to Lender all of Lender's reasonable out-of-pocket costs and expenses in connection with any Letter of Credit.

(ii)    In addition to any other right Lender may have to draw upon a Letter of Credit pursuant to the terms and conditions of this Agreement, Lender shall have the additional rights to draw in full on any Letter of Credit:  (i) if Lender has received a notice from the Issuing Bank that such Letter of Credit will not be renewed and either (y) a substitute Letter of Credit or (z) cash in the amount of the Letter of Credit is not provided at least twenty (20) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (ii) upon receipt of notice from the Issuing Bank that the Letter of Credit will be terminated (except if the termination of such Letter of Credit is permitted pursuant to the terms and conditions of this Agreement or a substitute Letter of Credit is provided); or (iii) if Lender has received notice that the Issuing Bank shall cease to meet the Minimum L/C Rating and Pledgor has failed to deliver to Lender either (y) a substitute Letter of Credit or (z) cash in the amount of the Letter of Credit. Notwithstanding anything to the contrary contained in the above, Lender shall not be obligated to draw down on any Letter of Credit upon the happening of an event specified in clause (i), (ii) or (iii) above and shall not be liable for any losses sustained by Pledgor due to the insolvency of the Issuing Bank if Lender has not drawn the Letter of Credit,

- 94 -

and in the event of the insolvency of the Issuing Bank or if the Issuing Bank ceases to meet the Minimum L/C Rating, Pledgor shall promptly provide to Lender either (y) a substitute Letter of Credit or (z) cash in the amount of the Letter of Credit.

5.1.35  Reappraisals.

After the date hereof and only to the extent that Mortgage Borrower has not been required by Mortgage Lender (pursuant to Section 5.1.35 of the Mortgage Loan Agreement) to deliver a new appraisal of the Project at Mortgage Borrower's sole cost and expense in the immediately preceding six month period, Borrower shall permit Lender (and Borrower hereby authorizes Lender) to commission, at Borrower's sole cost and expense not more once in any twelve month period, one new appraisal of the Project, prepared in accordance with Lender's then current appraisal requirements.  Pledgor shall cause Mortgage Borrower to cooperate with any additional appraisals commissioned by Lender at Lender's expense.

5.1.36  Intentionally Omitted.

5.1.37  Net Worth Covenant.

Until the Loan is paid in full, Guarantor shall maintain at all times an aggregate Net Worth (exclusive of any direct or indirect interest in the Property) at least equal to $350,000,000, and, within ten (10) Business Days of Lender's request, Pledgor shall demonstrate in writing and to Lender's reasonable satisfaction, compliance with this Section.

5.1.38  Liquidity Covenant.

Until the Loan is paid in full, Guarantor shall maintain at all times an aggregate Liquidity (exclusive of any direct or indirect interest in the Property or the Collateral) at least equal to $75,000,000,  and, within ten (10) Business Days of Lender's request, Pledgor shall demonstrate in writing and to Lender's reasonable satisfaction, compliance with this Section.  Lender shall be entitled to receive demonstration of compliance with this Section no more than twice in every twelve (12) month period unless (A) in connection with a Securitization or Syndication, (B) an Event of Default has occurred and is continuing or (C) Lender has a reasonable belief that such Liquidity covenant is not being satisfied; provided, however, the foregoing shall not affect any financial reporting requirements set forth in Section 5.1.10 hereof.

5.1.39  Intentionally Omitted.

5.1.40  Additional Notices.

Pledgor shall give notice, or cause notice to be given, to Lender promptly upon the occurrence of any Resort Loan Event of Default.

5.1.41  Mortgage Borrower Covenants Under Master Disbursement Agreement.

Pledgor shall cause Mortgage Borrower to comply with all obligations with which Mortgage Borrower has covenanted to comply under the Master Disbursement Agreement.

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

5.1.42  Intentionally Omitted.

5.1.43  Development Agreement.

(a)     The Property shall at all times be developed by a Qualified Developer; provided, however, Pledgor shall not permit Mortgage Borrower to enter into any Development Agreement for the Property without Lender's prior written consent.

(b)     In no event shall the development fees under any Development Agreement exceed the greater of (i) the amount that is market and customary and (ii) three percent (3%) of the gross income derived from the Property.  Pledgor shall cause Mortgage Borrower to shall (i) diligently perform and observe all of the terms, covenants and conditions of any Development Agreement, on the part of Mortgage Borrower to be performed and observed to the end that all things shall be done which are necessary to keep unimpaired the rights of Borrower under any Development Agreement and (ii) promptly notify Lender of the giving of any notice by the Developer to Mortgage Borrower of any default by Mortgage Borrower in the performance or observance of any of the terms, covenants or conditions of any Development Agreement on the part of Mortgage Borrower to be performed and observed and deliver to Lender a true copy of each such notice.  Pledgor shall not permit Mortgage Borrower to surrender any Development Agreement, consent to the assignment by the Developer of its interest under any Development Agreement, or terminate or cancel any Development Agreement, or modify, change, supplement, alter or amend any Development Agreement, in any material respect, either orally or in writing.  Notwithstanding the foregoing, Borrower shall have the right to cause Mortgage Borrower to terminate the Development Agreement without Lender's prior written consent upon satisfaction of the following conditions:  (i) Borrower delivers to Lender written notice of its intention to terminate the Development Agreement at ten (10) Business Days prior to such termination; (ii) Borrower shall cause Mortgage Borrower to replace the Developer within thirty (30) days after the termination of the Development Agreement with a Qualified Developer pursuant to a Replacement Development Agreement; and (iii) such Qualified Development delivers to Lender an Assignment of Development Agreement which is also executed by the Borrower.  If Mortgage Borrower shall default in the performance or observance of any material term, covenant or condition of any Development Agreement on the part of Mortgage Borrower to be performed or observed, then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Mortgage Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of any Development Agreement on the part of Mortgage Borrower to be performed or observed to be promptly performed or observed on behalf of Mortgage Borrower, to the end that the rights of Borrower in, to and under any Development Agreement shall be kept unimpaired and free from default.  Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time for the purpose of taking any such action. If the Developer shall deliver to Lender a copy of any notice sent to Mortgage Borrower of default under any Development Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be

taken by Lender in good faith, in reliance thereon. Pledgor shall not permit Mortgage Borrower to, and shall not permit Mortgage Borrower to permit the Developer to, sub-contract any or all of its development responsibilities under any Development Agreement to a third-party without the prior written consent of Lender, which consent shall not be unreasonably withheld. Pledgor shall cause Mortgage Borrower to, from time to time, obtain from the Developer such certificates of estoppel with respect to compliance by Mortgage Borrower with the terms of any Development Agreement as may be requested by Lender (provided that Lender shall not exercise such rights except during the continuance of an Event of Default or as otherwise expressly permitted under the Loan Documents). During the continuance of an Event of Default, Pledgor shall cause Mortgage Borrower to exercise each individual option, if any, to extend or renew the term of any Development Agreement upon demand by Lender made at any time within one (1) year of the last day upon which any such option may be exercised, and Pledgor hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Pledgor, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest. Any sums expended by Lender pursuant to this paragraph (i) shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, (ii) shall be deemed to constitute a portion of the Debt, (iii) shall be secured by the lien of the Security Instrument and the other Loan Documents and (iv) shall be immediately due and payable upon demand by Lender therefor.

(c)    Without limitation of the foregoing, Pledgor shall cause Mortgage Borrower to, upon the request of Lender, shall terminate any Development Agreement (whether in writing or verbal) and replace the Developer, without penalty or fee, if at any time during the Loan: (a) the Developer shall become insolvent or a debtor in any bankruptcy or insolvency proceeding, (b) there exists an Event of Default, or (c) there exists a default by Developer under any Development Agreement beyond any notice and cure periods. Within thirty (30) days after any such removal, a Qualified Developer shall assume development of the Property pursuant to a Replacement Development Agreement.

5.1.44  <u>Mortgage Loan Reserve Funds</u>.

Pledgor shall cause Mortgage Borrower to deposit and maintain each of the Mortgage Loan Reserve Funds as more particularly set forth in Article VII of the Mortgage Loan Agreement and to perform and comply with all the terms and provisions relating thereto.

5.1.45  <u>Notices</u>.

Pledgor shall give notice, or cause notice to be given, to Lender promptly upon the occurrence of any Mortgage Loan Event of Default.

5.1.46  <u>Special Distributions</u>.

On each date on which amounts are required to be disbursed to Lender pursuant to Article 10 of the Mortgage Loan Agreement, Pledgor shall exercise its rights under the

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

Organizational Documents of Mortgage Borrower to cause Mortgage Borrower to make to Pledgor a distribution in an aggregate amount such that Lender shall receive the amount required to be disbursed pursuant to Article 10 of the Mortgage Loan Agreement.

### 5.1.47 Mortgage Borrower Covenants.

Pledgor shall cause Mortgage Borrower to comply with all obligations with which Mortgage Borrower has covenanted to comply under the Mortgage Loan Agreement and all other Mortgage Loan Documents (including, without limitation, those certain covenants regarding the maintenance of the Mortgage Interest Rate Cap Agreement and affirmative and negative covenants set forth in the Mortgage Loan Agreement) whether the Mortgage Loan has been repaid, unless otherwise consented to in writing by Lender. Pledgor shall cause Mortgage Borrower to promptly notify Lender of all notices received by Mortgage Borrower under or in connection with the Mortgage Loan, including, without limitation, any notice by the Mortgage Lender to Mortgage Borrower of any default by Mortgage Borrower in the performance or observance of any of the terms, covenants or conditions of the Mortgage Loan Documents on the part of Mortgage Borrower to be performed or observed, and deliver to Lender a true copy of each such notice, together with any other consents, notices, requests or other written correspondence between Mortgage Borrower and Mortgage Lender.

### 5.1.48 Mortgage Loan Estoppels.

Pledgor shall, or shall cause Mortgage Borrower to, use commercially reasonable efforts from time to time, to obtain from the Mortgage Lender such certificates of estoppel with respect to compliance by Mortgage Borrower with the terms of the Mortgage Loan Documents as may be requested by Lender. In the event or to the extent that Mortgage Lender is not legally obligated to deliver such certificates of estoppel and is unwilling to deliver the same, or is legally obligated to deliver such certificates of estoppel but breaches such obligation, then Pledgor shall not be in breach of this provision so long as Pledgor furnishes to Lender an estoppel executed by Pledgor and Mortgage Borrower and expressly representing to Lender the information requested by Lender regarding compliance by Mortgage Borrower with the terms of the Mortgage Loan Documents. Pledgor hereby indemnifies Lender from and against all out-of-pocket liabilities, obligations, losses, damages, penalties, assessments, actions, or causes of action, judgments, suits, claims, demands, costs, expenses (including, without limitation, reasonable attorneys' and other professional fees, whether or not suit is brought and settlement costs) and disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against Lender based in whole or in part upon any fact, event, condition, or circumstances relating to the Mortgage Loan which was misrepresented in, or which warrants disclosure and was omitted from such estoppel executed by Pledgor and Mortgage Borrower.

### **Section 5.2**    Negative Covenants.

From the date hereof until payment and performance in full of all obligations of Pledgor under the Loan Documents or the earlier release of the Lien on the Collateral in accordance with the terms of this Agreement and the other Loan Documents, Pledgor covenants and agrees with Lender that it will not do, directly or indirectly, any of the following:

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

### 5.2.1   Liens.

Pledgor shall not permit or cause Mortgage Borrower to create, incur, assume or suffer to exist any Lien on any portion of the Property or permit any such action to be taken, except (i) Permitted Encumbrances and (ii) Liens created by or permitted pursuant to the Mortgage Loan Documents.  Pledgor shall not create, incur, assume or suffer to exist any Lien on any portion of the Collateral or permit any such action to be taken.

### 5.2.2   Dissolution.

Pledgor shall not (a) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (b) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the Property or assets of Pledgor except to the extent expressly permitted by the Loan Documents, (c) except as expressly permitted under the Loan Documents, modify, amend, waive or terminate its Organizational Documents or its qualification and good standing in any jurisdiction or (d) cause the Mortgage Borrower to (i) dissolve, wind up or liquidate or take any action, or omit to take an action, as a result of which the Mortgage Borrower would be dissolved, wound up or liquidated in whole or in part, or (ii) except as expressly permitted under the Loan Documents, including Section 5.1.15(b), amend, modify, waive or terminate the certificate of incorporation, bylaws or similar Organizational Documents of Mortgage Borrower, in each case, without obtaining the prior written consent of Lender.  Nothing contained in this Section 5.2.2 is intended to expand the rights of Pledgor contained in Section 5.2.10 hereof.

### 5.2.3   Change In Business.

(a)      Pledgor shall not enter into any line of business other than the ownership of the Collateral, or make any material change in the scope or nature of its business purposes, or undertake or participate in activities other than the continuance of its present business.

(b)      Pledgor shall not cause Mortgage Borrower to enter into any line of business other than the ownership, acquisition, development, leasing and management of the Property (including providing services in connection therewith), or make any material change in the scope or nature of its business objectives, purposes or operations.

### 5.2.4   Debt Cancellation.

Pledgor shall not cancel or otherwise forgive or release any material claim or debt (other than termination of Leases in accordance herewith) owed to Pledgor by any Person, except for adequate consideration and in the ordinary course of Pledgor's business.  In addition, Pledgor shall not permit or cause Mortgage Borrower to cancel or otherwise forgive or release any material claim or debt (other than termination of Leases in accordance with the Mortgage Loan Agreement) owed to Mortgage Borrower by any Person, except for adequate consideration and in the ordinary course of Mortgage Borrower's business.

### 5.2.5   Zoning.

- 99 -

Pledgor shall not cause Mortgage Borrower to initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Real Property in any manner that could result in such use becoming a non conforming use under any zoning ordinance or any other Applicable Law, without the prior written consent of Lender.

### 5.2.6    No Joint Assessment.

Except with respect to the existence of the Real Property constituting one or more tax lots together with the Resort Property from the date hereof until such time as a Separate Tax Lot Event has occurred, Pledgor shall cause Mortgage Borrower not to suffer, permit or initiate the joint assessment of the Real Property with (a) any other real property constituting a tax lot separate from the Real Property, or (b) any portion of the Real Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Real Property.

### 5.2.7    Name, Identity, Structure, or Principal Place of Business.

Pledgor shall not, and shall not permit any Loan Party to, change its name, identity (including its trade name or names), or principal place of business set forth in the introductory paragraph of this Agreement, without, in each case, first giving Lender thirty (30) days prior written notice. Pledgor shall not change its corporate, partnership or other structure, or the place of its organization as set forth in Section 4.1.34, without, in each case, the consent of Lender. Upon Lender's request, Pledgor shall execute and deliver additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or place of organization.

### 5.2.8    ERISA.

(a)    During the term of the Loan or of any obligation or right hereunder, no Loan Party shall be a Plan and none of the assets of Pledgor or any other Loan Party shall constitute Plan Assets.

(b)    Pledgor further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its reasonable sole discretion, and represents and covenants that (A) no Loan Party is, and no Loan Party maintains an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title IV of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (B) no Loan Party is subject to State statutes regulating investments and fiduciary obligations with respect to governmental plans; and (C) one or more of the following circumstances is true:

(i)    Equity interests in such Loan Party are publicly offered securities, within the meaning of 29 C.F.R. §2510.3 101(b)(2);

(ii)    None of the assets of any Loan Party are, by virtue of the application of 29 C.F.R. §2510.3 101(f) as modified by section 3(42) of ERISA, regarded as assets of any Plan; or

(iii)    Such Loan Party qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3 101(c) or (e).

5.2.9    Affiliate Transactions.

(a)    Pledgor shall not enter into, or be a party to, any transaction with an Affiliate of Pledgor, or any of the partners of Pledgor except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Pledgor or such Affiliate than would be obtained in a comparable arm's length transaction with an unrelated third party.

(b)    Except in connection with payments made in accordance with the Approved Affiliate Agreements and in accordance with the Loan Documents (including, without limitation, any subordination agreements), no Loan Party shall pay, or permit the payment of, development fees, management fees, brokerage or leasing fees or commissions or any other compensation of any form whatsoever to any Loan Party or any direct or indirect partner, member, shareholder or Affiliate thereof, or request disbursement of funds from Lender or Mortgage Lender for such purpose, without the prior written consent of Lender. Any contracts or agreements relating to the Property in any manner between or among any Loan Party and any other Loan Party or their respective direct or indirect partners, members, shareholders or Affiliates, including the Management Agreement and any other agreement specifically related to the Property, the Collateral or any Loan Party (collectively, the "Affiliate Agreements") shall be made on an arm's-length basis or shall be subject to the prior written approval of Lender (Lender acknowledging that the Approved Affiliate Agreements in existence as of the Closing Date were approved at in connection with the closing of the Loan); and the parties to each Affiliate Agreement shall acknowledge and agree that (subject to the terms of any subordination agreement entered into by Lender and the applicable counterparty with respect to such Affiliate Agreement) such agreement is terminable by Mortgage Borrower or Lender immediately upon notice, without the payment of any fee, penalty, premium or liability for future or accrued liabilities or obligations, if an Event of Default shall have occurred and be continuing. Following an Event of Default, if requested by Lender in writing, Pledgor shall, or shall cause the applicable Loan Party to, terminate any existing Affiliate Agreement specified by Lender within five (5) days after delivery of Lender's request without payment of any penalty, premium, termination fee or any other amount which might be due and payable under such Affiliate Agreement (subject to the terms of any subordination agreement entered into by Lender and the applicable counterparty with respect to such Affiliate Agreement). If such Affiliate Agreement is not terminated in accordance with the immediately preceding sentence, Lender shall have the right, and Pledgor hereby irrevocably authorizes Lender and irrevocably appoints Lender as Pledgor's attorney-in-fact coupled with an interest, at Lender's sole option, to terminate such Affiliate Agreement on behalf of and in the name of the applicable Loan

- 101 -

Party, and Pledgor hereby releases and waives any claims against Lender arising out of Lender's exercise of such authority.

5.2.10 <u>Transfers</u>.

(a)    Pledgor shall not (and shall not permit Mortgage Borrower to, as applicable) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) (other than the disposal of Personal Property in the ordinary course of business) the Property, the Collateral or any part thereof or any legal or beneficial interest therein or permit a Sale or Pledge of an interest in any Restricted Party (collectively, a "Transfer"), other than in connection with a Permitted Encumbrance or pursuant to Leases of space in the Improvements to tenants in accordance with the provisions of Section 5.1.17 hereof, without (i) the prior written consent of Lender and (ii) if a Securitization has occurred, delivery to Lender of written confirmation from the Rating Agencies that the Transfer will not result in the downgrade, withdrawal or qualification of the then current ratings assigned to any Securities or the proposed rating of any Securities.

(b)    A Transfer shall include, but not be limited to: (i) an installment sales agreement wherein Pledgor (or Mortgage Borrower, as applicable) agrees to sell the Property, the Collateral or any part thereof for a price to be paid in installments; (ii) an agreement by Mortgage Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Mortgage Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interests or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non managing membership interests or the creation or issuance of new non managing membership interests; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (vii) the removal or the resignation of the Manager (including, without limitation, an Affiliated Manager) other than in accordance with the Mortgage Loan Agreement and Section 5.1.18 hereof, or (viii) any deed-in-lieu or consensual foreclosure relating to the Property with or for the benefit of Mortgage Lender or any Affiliate thereof.

- 102 -

(c)       Notwithstanding the provisions of Sections 5.2.10(a) and (b), the following transfers shall not be deemed to be a Transfer: (i) a transfer by devise or descent or by operation of law upon the death of a member, partner or shareholder of a Restricted Party (other than Mortgage Borrower or Pledgor) or a Restricted Party (other than Mortgage Borrower or Pledgor) itself; (ii) the Sale or Pledge, in one or a series of transactions, of not more than forty-nine percent (49%) of the stock in a Restricted Party (other than Mortgage Borrower or Pledgor); provided, however, no such transfers shall result in the change of voting control in the Restricted Party, and as a condition to each such transfer, Lender shall receive not less than thirty (30) days prior written notice of such proposed transfer, (iii) the Sale or Pledge, in one or a series of transactions, of not more than forty-nine percent (49%) of the limited partnership interests or non-managing membership interests (as the case may be) in a Restricted Party (other than Mortgage Borrower or Pledgor); provided, however, no such transfers shall result in the change of voting control in the Restricted Party, and as a condition to each such transfer, Lender shall receive not less than thirty (30) days prior written notice of such proposed transfer, (iv) the sale, transfer or issuance of shares of stock in a Restricted Party (other than Mortgage Borrower or Pledgor) (the "Traded Entity") provided such shares of stock are listed on the New York Stock Exchange or such other nationally or internationally recognized stock exchange (including the Australian Stock Exchange) and provided the Traded Entity complies with the provisions of Section 5.3 hereof, (v) a Fee Transfer Event, (vi) any change in any member of the board of managers or board of directors of Sponsor, any Sponsor Parent or any of their direct or indirect beneficial owners, (vii) any direct or indirect Transfer (including any change in any board of managers, board of directors, general partner, managing member or manager) of any interest in any Sponsor Parent or any of its direct or indirect beneficial owners; provided, however, as a condition to each such transfer of any interest to any Person, in one or a series of transactions, which is greater than or equal to ten percent of the interests in Sponsor, Pledgor or Borrower, Lender shall receive not less than ten (10) Business Days prior written notice of such proposed transfer; (viii) any direct or indirect Transfer of any interest in any Sponsor Parent held by Publishing and Broadcasting Limited (or its Affiliates) to (1) Publishing and Broadcasting Limited or any of its Affiliates, (2) any Traded Entity or (3) any other Person which is not an Affiliate of Publishing and Broadcasting Limited; provided that (A) following any such transfer in (viii)(1) or (viii)(2), Lender shall receive notice of such transfer within five (5) Business Days following such transfer, (B) following any such transfer in (viii)(3) which is less than forty-nine (49%) of the ownership interests, Lender shall receive notice of such transfer within five (5) Business Days following such transfer and (C) following any such transfer in (viii)(3) to any Person, in one or a series of transactions, which is greater than forty-nine (49%) of the ownership interests in the aggregate, Lender shall receive notice of such transfer within ten (10) Business Days prior to such transfer and (ix) any direct or indirect Transfer of Sponsor's PIK preferred units.       Additionally, Lender acknowledges that Section 5.2.10(e)(b) shall not apply to any of the transactions set forth in Sections 5.2.10(c)(vii), (viii) and (ix); provided, however, Lender reserves the right to request the information set forth in Section 5.2.10(e)(b) at any time after such transfer.

(d)       Notwithstanding anything to the contrary contained in this Section 5.2.10, Jeffrey Soffer must continue to control Mortgage Borrower, Pledgor and Sponsor and

[TPW: NYLEGAL:674139.7] 16248-00758 06/06/2007 12:54 AM

own, directly or indirectly, at least a 20% interest in Mortgage Borrower, Pledgor and in each Sponsor.

(e)    Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer in violation of this Section 5.2.10. This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer. Notwithstanding anything to the contrary contained in this Section 5.2.10, (a) no transfer (whether or not such transfer shall constitute a Transfer) shall be made to any Prohibited Person, (b) in the event Pledgor becomes aware of (or should have been aware of) any transfer (whether or not such transfer shall constitute a Transfer), results in (or will result in) any Person and its Affiliates owning in excess of ten percent (10%) of the ownership interest in a Restricted Party, Borrower shall provide to Lender, not less than thirty (30) days prior to such transfer, the name and identity of each proposed transferee, together with the names of its controlling principals, the social security number or employee identification number of such transferee and controlling principals, and such transferee's and controlling principal's home address or principal place of business, and home or business telephone number, and (c) in the event any transfer (whether or not such transfer shall constitute a Transfer) results in any Person and its Affiliates owning in excess of forty-nine percent (49%) of the ownership interest in a Sponsor Parent, Sponsor, Mortgage Borrower or Pledgor, Pledgor shall, prior to such transfer, deliver an updated Insolvency Opinion to Lender, which opinion shall be in form, scope and substance reasonably acceptable in all respects to Lender and the Rating Agencies. Within ten (10) days after request, Pledgor shall deliver to Lender an updated organizational chart in the form of the organizational chart attached hereto as Schedule I.

(f)    Death or Incapacity of Guarantor.

Within thirty (30) days after the death or incapacity of any Guarantor who is an individual, Borrower shall cause a substitute Guarantor approved by Lender in accordance with this Section 5.2.10(f) to deliver to Lender a substitute Guaranty and Environmental Indemnity in form and substance identical to the Guaranty and Environmental Indemnity delivered on the Closing Date and a legal opinion with respect to the enforceability of such Guaranty and Environmental Indemnity in form and substance similar to the enforceability opinion delivered on the Closing Date and otherwise satisfactory to Lender. Lender's approval of a substitute Guarantor shall not be unreasonably withheld provided such substitute Guarantor has a comparable net worth and experience to the Guarantor. Lender's approval hereunder may be subject in Lender's discretion to the receipt of (i) after a Securitization, written confirmation that such substitution would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities, (ii) satisfactory credit report and credit check and (iii) other due diligence with respect to the substitute Guarantor.

5.2.11  Limitation on Securities Issuances.

Pledgor shall not issue any limited liability membership interests or other securities other than those that have been issued as of the date hereof.

- 104 -

5.2.12 <u>Distributions</u>.

(a)    Any and all dividends, including capital dividends, stock or liquidating dividends, distributions of property, redemptions or other distributions made by Mortgage Borrower on or in respect of any interests in Mortgage Borrower, and any and all cash and other property received in payment of the principal of or in redemption of or in exchange for any such interests (collectively, the "Distributions"), shall become part of the Collateral. Notwithstanding the foregoing, Lender expressly agrees that Pledgor shall be permitted to distribute to its members any Distributions Pledgor receives only upon the express condition that no Event of Default has occurred and is continuing under the Loan.

(b)    If any Distributions shall be received by Pledgor or any Affiliate of Pledgor after the occurrence and during the continuance of an Event of Default, Pledgor shall hold, or shall cause the same to be held, in trust for the benefit of Lender. Any and all revenue derived from the Property paid directly by tenants, subtenants or occupants of the Property shall be held and applied in accordance with the terms and provisions of the Mortgage Loan Agreement.

5.2.13 <u>Refinancing or Prepayment of the Mortgage Loan</u>.

Neither Pledgor nor Mortgage Borrower shall be required to obtain the consent of Lender to refinance the Mortgage Loan, provided that the Loan shall have (or shall simultaneously be) been paid in full in accordance with the terms of this Agreement (including any prepayment premiums and other amounts due and payable to Lender under the Loan Documents). Pledgor shall cause Mortgage Borrower to obtain the prior written consent of Lender to enter into any other refinancing of the Mortgage Loan.

5.2.14 <u>Acquisition of the Mortgage Loan</u>.

(a)    No Loan Party, Guarantor, or any Affiliate of any of them or any Person acting at any such Person's request or direction, shall acquire or agree to acquire the Mortgage Lender's interest in the Mortgage Loan, or any portion thereof or any interest therein, or any direct or indirect ownership interest in the holder of the Mortgage Loan, via purchase, transfer, exchange or otherwise, and any breach or attempted breach of this provision shall constitute an Event of Default hereunder. If, solely by operation of applicable subrogation law, Pledgor shall have failed to comply with the foregoing, then Pledgor: (i) shall immediately notify Lender of such failure; (ii) shall cause any and all such prohibited parties acquiring any interest in the Mortgage Loan Documents: (A) not to enforce the Mortgage Loan Documents; and (B) upon the request of Lender, to the extent any of such prohibited parties has or have the power or authority to do so, to promptly: (1) cancel the promissory note evidencing the Mortgage Loan, (2) reconvey and release the Lien securing the Mortgage Loan and any other collateral under the Mortgage Loan Documents, and (3) discontinue and terminate any enforcement proceeding(s) under the Mortgage Loan Documents.

- 105 -

(b)    Lender shall have the right at any time to acquire all or any portion of the Mortgage Loan or any interest in any holder of, or participant in, the Mortgage Loan without notice or consent of Pledgor or any other Loan Party, in which event Lender shall have and may exercise all rights of Mortgage Lender thereunder (to the extent of its interest), including the right (i) to declare that the Mortgage Loan is in default and (ii) to accelerate the Mortgage Loan indebtedness, in accordance with the terms thereof and (iii) to pursue all remedies against any obligor under the Mortgage Loan Documents.  In addition, Pledgor hereby expressly agrees that any claims, counterclaims, defenses, offsets, deductions or reductions of any kind which Mortgage Borrower or any other Person may have against Mortgage Lender relating to or arising out of the Mortgage Loan shall be the personal obligation of Mortgage Lender, and in no event shall Mortgage Borrower be entitled to bring, pursue or raise any such claims, counterclaims, defenses, offsets, deductions or reductions against Lender or any Affiliate of Lender or any other Person as the successor holder of the Mortgage Loan or any interest therein, provided that Mortgage Borrower may seek specific performance of its contractual rights under the Mortgage Loan Documents.

5.2.15  <u>Material Agreements</u>.

(a)    Pledgor shall not, and shall not permit any Loan Party to, enter into any Material Agreement without the consent of Lender not to be unreasonably withheld or delayed.  Lender may condition its consent upon Mortgage Borrower also obtaining the consent of the Mortgage Lender, if applicable.  Upon the request of Lender with respect to Material Agreements, Pledgor shall use commercially reasonable efforts to obtain and deliver, or shall cause the applicable Loan Party to use commercially reasonable efforts to obtain and deliver, to Lender a recognition agreement from such service or material provider, among other things, providing for such Person's continued performance should Lender become the owner of the Collateral.  Each such Material Agreement and each recognition agreement relating thereto, shall be in form and substance reasonably acceptable to Lender in all respects, including the amount of the costs and fees thereunder.

(b)    Except as specifically set forth herein, Pledgor will not, and will not permit or cause any Loan Party to, amend, modify, supplement, rescind or terminate any Material Agreement in any material respect, without Lender's approval, including the identity of the party to perform services under such agreement.  If a material or service provider under a Material Agreement is in default in its obligations thereunder to the extent entitling the applicable Loan Party to rescind or terminate that agreement, then if Lender so requires (but not otherwise), Pledgor will, or will cause the applicable Loan Party to, promptly use commercially reasonable efforts to terminate that agreement and appoint a new party in its place, with such identity and terms of appointment approved by Lender.

(c)    Pledgor shall and shall cause each Loan Party, as applicable, to observe and perform each and every term to be observed or performed by such Loan Party under the Material Agreements the non-performance of which would cause a Material Adverse Effect.

- 106 -

**Section 5.3**    Traded Shares.

The Traded Entity shall cause its issued and outstanding shares of stock to be listed for trading on the New York Stock Exchange or such other nationally or internationally recognized stock exchange (including the Australian Stock Exchange) throughout the term of the Loan.

## VI.    INSURANCE; CASUALTY; CONDEMNATION

**Section 6.1**    Insurance.

(a)    Pledgor shall cause Mortgage Borrower to maintain at all times during the term of the Loan the insurance required under Section 6.1 of the Mortgage Loan Agreement, including, without limitation, meeting all insurer requirements thereunder. In addition, Pledgor shall cause Lender to be named as an additional named insured under each of the insurance policies described in Section 6.1 (a)(ii), (iii), (v), (ix), (xi) and (xii) of the Mortgage Loan Agreement. In addition, Pledgor shall cause Lender to be named as a named insured together with Mortgage Lender, as their interest may appear, under the insurance policies required under Section 6.1 (a)(i), (iv), (vi), (vii), (viii) and (x) of the Mortgage Loan Agreement. Pledgor shall also cause all insurance policies required under this Section 6.1 to provide for at least thirty (30) days prior notice to Lender in the event of policy cancellation or material changes. Not less than thirty (30) days prior to the expiration dates of the Policies (as such term is defined in the Security Instruments) theretofor furnished to Lender pursuant to the terms hereof, certified copies of the Policies marked "premium paid" or accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder shall be delivered by Pledgor to Lender; provided, however, that in the case of renewal Policies, Pledgor may furnish Lender with binders therefor to be followed by the original Policies when issued.

(b)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Pledgor, to take such action as Lender deems necessary to protect its interest in the Collateral, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Pledgor to Lender upon demand and until paid shall be secured by the Pledge Agreement and shall bear interest at the Default Rate.

(c)    For purposes of this Agreement, Lender shall have the same approval rights over the insurance referred to above (including, without limitation, the insurers, deductibles and coverages thereunder, as well as the right to require other reasonable insurance pursuant to Section 6.1(a)(xii)) as are provided in favor of the Mortgage Lender in the Mortgage Loan Agreement. All liability insurance provided for in the Mortgage Loan Agreement shall provide insurance with respect to the liabilities of both the Mortgage Borrower and the Pledgor. The insurance policies delivered pursuant to the Mortgage Loan Agreement shall include endorsements of the type described in Section 6.1(e) thereof, but pursuant to which Lender shall have the same rights as the Mortgage Lender as referred to in such Section 6.1(e).

- 107 -

(d)    In the event that the Mortgage Loan has been paid in full, except upon the occurrence and continuance of an Event of Default, Pledgor shall permit Mortgage Borrower to settle any insurance or condemnation claims with respect to the insurance proceeds or condemnation awards which in the aggregate are less than or equal to the $2,500,000. Lender shall have the right to participate in and reasonably approve any settlement for insurance or condemnation claims with respect to the insurance proceeds or condemnation awards which in the aggregate are equal to or greater than $2,500,000. If an Event of Default shall have occurred and be continuing, Pledgor hereby irrevocably empowers Lender, in the name of Mortgage Borrower as its true and lawful attorney-in-fact, to file and prosecute such claim and to collect and to make receipt for any such payment, subject to any rights Mortgage Lender may have under the Mortgage Loan Documents in such respect.

**Section 6.2**    Casualty.

If the Property shall sustain a Casualty, Pledgor shall cause Mortgage Borrower to give prompt notice of such Casualty to Lender and shall cause Mortgage Borrower to promptly commence and diligently prosecute to completion the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty (except in the event that such Restoration is physically not capable of being done for reason that Resort Borrower is not restoring the base of the Building or to the extent that the insurance proceeds relating to such Casualty have not been made available to Borrower for application to such Restoration; provided, however, regardless of whether Mortgage Lender has made the Net Proceeds available to Mortgage Borrower for Restoration, Borrower shall cause Mortgage Borrower to promptly commence and diligently prosecute the removal and disposal of any debris, refuse or hazards resulting from the Casualty and insure that the Property is in a safe condition and otherwise in accordance with the Mortgage Loan Agreement), with such alterations as may be reasonably approved by Lender, as are required pursuant to the Master REA and the Master Disbursement Agreement (for so long as the same remain in full force and effect) and otherwise in accordance with Section 6.4 of the Mortgage Loan Agreement.

**Section 6.3**    Condemnation.

Pledgor shall cause Mortgage Borrower to give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of all or any part of the Property and shall cause Mortgage Borrower to deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Pledgor shall from time to time cause Mortgage Borrower to deliver to Lender all instruments requested by Lender to permit such participation. Pledgor shall, at its expense, cause Mortgage Borrower to diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation, or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Pledgor shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.

**Section 6.4**    Restoration.

- 108 -

(a)    Pledgor shall, or shall cause Mortgage Borrower to, deliver to Lender all reports, plans, specifications, documents and other materials that are delivered to Mortgage Lender under Section 6.4 of the Mortgage Loan Agreement in connection with a restoration of the Property after a Casualty or Condemnation. If any insurance proceeds or condemnation awards are to be disbursed by Mortgage Lender for restoration, Pledgor shall deliver or cause to be delivered to Lender copies of all written correspondence delivered to and received from Mortgage Lender that relates to the restoration and release of the insurance proceeds or condemnation awards.

(b)    Notwithstanding any provision in this Agreement to the contrary, all insurance proceeds and condemnation award will be made available to Mortgage Borrower in accordance with the Mortgage Loan Agreement. In the event the Mortgage Loan has been paid in full and Lender receives any insurance proceeds or condemnation award, Lender shall either apply such proceeds to the Debt or for the restoration of the Property in accordance with the same terms and conditions contained in Article 6 of the Mortgage Loan Agreement.

**Section 6.5**    Rights of Lender.

For purposes of this Article 6, Pledgor shall obtain the approval of Lender for each matter requiring the approval of Mortgage Lender under the provisions of Sections 6.4 of the Mortgage Loan Agreement, with each reference in any such provisions to the "Loan" to include the Mortgage Loan and the Loan, and the reference in any such provisions to the "Maturity Date" to mean the Maturity Date, as defined herein. If the Mortgage Lender does not require the deposit by the Mortgage Borrower of the "Net Proceeds Deficiency" pursuant to Section 6.4.3(e) of the Mortgage Loan Agreement, Lender shall have the right to demand that Pledgor make a deposit of said "Net Proceeds Deficiency" in accordance with the terms of such Section (as if each reference therein to "Pledgor" and "Lender" referred to Pledgor and Lender, respectively).

**VII.**    RESERVE FUNDS

**Section 7.1**    Reserved

**Section 7.2**    Tax and Insurance Escrow Fund.

(a)    Pledgor shall, or shall cause Mortgage Borrower to, comply with all of the terms and conditions set forth in Section 7.2 of the Mortgage Loan Agreement.

(b)    In the event (i) Mortgage Lender waives the requirement of Mortgage Borrower to maintain a Tax and Insurance Escrow Fund (or to make deposits therein) pursuant to the terms of Section 7.2 of the Mortgage Loan Agreement or (ii) the Mortgage Loan has been repaid in full, Lender shall have the right to require Borrower to establish and maintain (or, at Borrower's option, cause Mortgage Borrower to establish and maintain) an escrow that would operate in the same way as the Tax and Insurance Escrow Fund described in Section 7.2 of the Mortgage Loan Agreement.

**Section 7.3**    Reserve Funds, Generally.

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

(a)      Pledgor grants to Lender a first priority perfected security interest in each of the Reserve Funds and the related Accounts and any and all monies now or hereafter deposited in each Reserve Fund and related Account as additional security for payment of the Debt.  Until expended or applied in accordance herewith, the Reserve Funds and the related Accounts shall constitute additional security for the Debt.

(b)      Upon the occurrence and during the continuance of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserve Funds to the payment of the Debt in any order in its sole discretion.

(c)      The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Lender.

(d)      The Reserve Funds shall be held in interest bearing accounts and all earnings or interest on a Reserve Fund shall be added to and become a part of such Reserve Fund and shall be disbursed in the same manner as other monies deposited in such Reserve Fund, except that earnings or interest on the Tax and Insurance Escrow Fund shall not be added to or become a part thereof and shall be the sole property of and shall be paid to Lender, and Borrower shall not be responsible for taxes on such earnings or interest on the Tax and Insurance Escrow.

(e)      Pledgor shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Reserve Fund or related Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC 1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

(f)      Pledgor shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, damages (but not special, consequential or punitive damages), losses (other than diminution in value), obligations and costs and expenses (including litigation costs and reasonable attorneys fees and expenses) arising from or in any way connected with the Reserve Funds or the related Accounts or the performance of the obligations for which the Reserve Funds or the related Accounts were established, except to the extent arising from the gross negligence or willful misconduct of Lender, its agents or employees.  Pledgor shall assign to Lender all rights and claims Pledgor may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds or the related Accounts; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

**Section 7.4**      Transfer of Reserve Funds under Mortgage Loan.

If Pledgor is required to deposit with Lender reserves pursuant to this Article VII, Pledgor shall enter into a cash management and lockbox agreement for the benefit of Lender for the purpose of covering deposits to the required reserve accounts substantially similar to the requirements of Article 10 of the Mortgage Loan Agreement.

- 110 -

## VIII.  **DEFAULTS**

**Section 8.1**    Event of Default.

(a)    Each of the following events shall constitute an event of default hereunder (an "Event of Default"):

(i)    if any portion of the Debt is not paid on or before the date which is five (5) Business Days after the same is due and payable;

(ii)    subject to Pledgor's right to contest in accordance with the terms of Section 5.1.2 hereof, if any of the Taxes or Other Charges are not paid on or before the date when the same are due and payable; provided, however, Borrower shall not be in default for failure to pay any Taxes so long as there is sufficient money in the Tax Account for payment of amounts then due and payable and Lender's access to such money has not been constrained or restricted in any manner due to any circumstance or event which is caused by or otherwise relates to any actions or omissions of Pledgor or its Affiliates (including, without limitation, as a result of (x) any proceeding brought under any Creditors Rights Law concerning or relating to Pledgor or any of its Affiliates or (y) any other litigation or proceeding concerning or relating to Pledgor or any of its Affiliates);

(iii)    if the Policies are not kept in full force and effect or if certified copies of the Policies are not delivered to Lender on request; provided, however, Borrower shall not be in default for failure to pay any insurance premiums so long as there is sufficient money in the Insurance Premium Account (allocable to the payment of insurance premiums) for payment of all insurance premiums then due and payable and Lender's access to such money has not been constrained or restricted in any manner due to any circumstance or event which is caused by or otherwise relates to any actions or omissions of Borrower or its Affiliates (including, without limitation, as a result of (x) any proceeding brought under any Creditors Rights Law concerning or relating to Borrower or any of its Affiliates or (y) any other litigation or proceeding concerning or relating to Borrower or any of its Affiliates);

(iv)    if Pledgor transfers or encumbers any portion of any of the Collateral in violation of the provisions hereof or the Pledge Agreement or if any other Transfer prohibited under of Section 5.2.10 occurs;

(v)    if any representation or warranty made by Pledgor or Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made;

(vi)    if Pledgor, Mortgage Borrower, Guarantor or any other guarantor under any guaranty issued in connection with the Loan shall make an assignment for the benefit of creditors;

- 111 -

(vii)    if a receiver, liquidator or trustee shall be appointed for Pledgor, Mortgage Borrower, Guarantor or any other guarantor under any guarantee issued in connection with the Loan or if Pledgor, Mortgage Borrower, Guarantor or such other guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to the Bankruptcy Code, or any similar federal or State law, shall be filed by or against, consented to, or acquiesced in by, Pledgor, Mortgage Borrower, Guarantor or such other guarantor, or if any proceeding for the dissolution or liquidation of Pledgor, Mortgage Borrower, Guarantor or such other guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Pledgor, Mortgage Borrower, Guarantor or such other guarantor, upon the same not being discharged, stayed or dismissed within ninety (90) days;

(viii)    if Pledgor attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(ix)    if Pledgor breaches any of its respective negative covenants contained in Section 5.2;

(x)    if Pledgor violates or does not comply with any of the provisions dealing with Major Leases in Section 5.1.17 hereof;

(xi)    subject to the terms of Section 5.1.22, if the Property is not at any time managed by a Qualified Leasing Agent pursuant to the Leasing Agreement or a Replacement Leasing Agreement;

(xii)    if Pledgor violates or does not comply with any of the provisions of Section 4.1.35 hereof provided, however, that such violation or failure to comply shall not constitute an Event of Default if (A) such violation or failure to comply was inadvertent, immaterial and non-recurring, (B) such violation or failure to comply is curable and Pledgor shall promptly cure such violation or failure to comply within thirty (30) calendar days Pledgor's obtaining actual knowledge of such failure and (C) within thirty (30) calendar days of the request by Lender, Pledgor causes its legal counsel to deliver (1) an Insolvency Opinion stating that such violation or failure would not result in a substantive consolidation of the assets and liabilities of Pledgor with those of any other Person in a bankruptcy proceeding under the United States Bankruptcy Code (11 U.S.C. § 101, et seq.) or (2) if an Insolvency Opinion had previously been delivered to Lender, a revised or updated Insolvency Opinion to the effect that such violation or failure to comply shall not impair, negate or amend the opinions rendered in the Insolvency Opinion delivered in connection with the closing of the Loan, which opinion shall be acceptable to Lender in its reasonable discretion;

(xiii)    subject to Pledgor's right to contest set forth in Section 5.1.2 and Section 5.2.1 hereof, if the Property becomes subject to any mechanic's,

- 112 -

materialman's or other Lien other than a Lien for local real estate taxes and assessments not then due and payable and the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days;

(xiv)    subject to Pledgor's right to contest set forth in Section 5.1.2 and Section 5.2.1 hereof, if any federal tax Lien or state or local income tax Lien is filed against Pledgor, Mortgage Borrower, any Guarantor, the Collateral, or the Property and same is not discharged of record within thirty (30) days after same is filed;

(xv)    if (A) Pledgor fails to timely provide Lender with the written certification and evidence referred to in Section 5.2.8 hereof, (B) Pledgor is a Plan or its assets constitute Plan Assets; or (C) Pledgor consummates a transaction which would cause the Pledge Agreement or Lender's exercise of its rights under the Pledge Agreement, the Note, this Agreement or the other Loan Documents to constitute a nonexempt prohibited transaction under ERISA or result in a violation of a State statute regulating governmental plans, subjecting Lender to liability for a violation of ERISA, the Code, a State statute or other similar law;

(xvi)    if Pledgor shall fail to deliver to Lender, within ten (10) days after request by Lender, the estoppel certificates required pursuant to the terms of Section 5.1.13(a) hereof;

(xvii)    if any default occurs under any guaranty or indemnity executed in connection herewith (including, without limitation, the Guaranty and the Environmental Indemnity) and such default continues after the expiration of applicable grace periods, if any;

(xviii)    if Pledgor shall be in default beyond applicable notice and grace periods under the Pledge Agreement or other security agreement covering any part of the Collateral whether it be superior or junior in lien to the Pledge Agreement;

(xix)    if (i) the Interest Rate Cap Agreement is not executed and delivered when required hereunder or is terminated for any reason by Pledgor or the Counterparty, or (ii) the Counterparty defaults in the performance of its monetary obligations under the Interest Rate Cap Agreement or (iii) the rating of the Counterparty is subject to any downgrade, withdrawal or qualification by a Rating Agency, and in any such case Pledgor does not within ten (10) days (A) replace the Interest Rate Cap Agreement with a Replacement Interest Rate Cap Agreement in accordance with Section 2.4 hereof, and (B) deliver to Lender, in form and substance reasonably satisfactory to Lender (x) an Assignment of Interest Rate Cap Agreement (y) a recognition letter from the Counterparty thereto acknowledging the assignment of the Replacement Interest Rate Cap Agreement and (z) any other opinions or documents required pursuant to Section 2.4 hereof;

- 113 -

(xx)    with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Pledgor shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xxi)    if Pledgor shall cause Mortgage Borrower to fail to pay the Air Rights Rent or any additional rent or other charge mentioned in or made payable by the Air Rights Lease when said rent or other charge is due and payable;

(xxii)    if there shall occur any default by Mortgage Borrower, as tenant under the Air Rights Lease, in the observance or performance of any term, covenant or condition of the Air Rights Lease on the part of Mortgage Borrower to be observed or performed and said default is not cured following the expiration of any applicable grace and notice periods therein provided, or if the leasehold estate created by the Air Rights Lease shall be surrendered or if the Air Rights Lease shall cease to be in full force and effect or the Air Rights Lease shall be terminated or canceled for any reason or under any circumstances whatsoever (other than in connection with a Fee Transfer Event), or if any of the terms, covenants or conditions of the Air Rights Lease shall in any manner be modified, changed, supplemented, altered, or amended without the consent of Lender;

(xxiii)    if any of the assumptions contained in the Insolvency Opinion, or in any other "non-consolidation" opinion delivered to Lender in connection with the Loan, or in any other "non-consolidation" delivered subsequent to the closing of the Loan, is or shall become untrue in any material respect; provided, however, that any such violation shall not result in an Event of Default if (A) such violation was inadvertent, does not result in a reasonable likelihood that a substantive consolidation of the assets and liabilities of Pledgor with those of any other Person in a bankruptcy proceeding under the Bankruptcy Code would occur, and is promptly corrected upon Pledgor's obtaining knowledge of such failure (unless such failure to correct would not result in a future reasonable likelihood of substantive consolidation and the opinion required in the following clause (B) opines to the same) and (B) within fifteen (15) days of Lender's request, Pledgor delivers to Lender an opinion of counsel to the effect that such breach shall not negate or impair the substance of the Insolvency Opinion delivered to Lender in connection with the closing of the Loan;"

(xxiv)    if any Guarantor who is an individual dies or is incapacitated and Borrower fails to provide a substitute Guarantor satisfactory to Lender in accordance with Section 5.2.10(f) within thirty (30) days of such an event;

(xxv)    subject to the terms of Section 5.1.18, if the Property is not at any time managed by a Qualified Manager pursuant to the Management Agreement or a Replacement Management Agreement;

- 114 -

(xxvi) prior to the date that both the Satisfactory DSCR Date and Completion Date (as defined in the Master Disbursement Agreement) have been achieved, upon the occurrence of a Resort Loan Event of Default;

(xxvii) upon the occurrence of an Event of Default under the Master Disbursement Agreement (except to the extent the same has been owed or waived in accordance with the terms of the Master Disbursement Agreement);

(xxviii) subject to the terms of Section 5.1.22, if the leasing duties with respect to Property is not at any time being handled by a Qualified Leasing Agent pursuant to the Leasing Agreement or a Replacement Leasing Agreement;

(xxix) prior to the Completion Date (as defined in the Master Disbursement Agreement), without the prior written consent of Lender, if Jeffrey Soffer fails to control Resort Borrower and own, directly or indirectly, at least a 20% interest in Resort Borrower;

(xxx) if any Letter of Credit is not renewed, replaced or substituted in accordance with the terms hereof twenty (20) days prior to the expiration date of such Letter of Credit (unless such expiration date shall occur at least two (2) Business Days after the Maturity Date);

(xxxi) in the event that the long term credit rating of the Issuing Bank falls below the Minimum L/C Rating and Borrower fails to deliver to Lender within ten (10) days thereof a Letter of Credit in an amount equal to the amount of the Letter of Credit being replaced from an Issuing Bank having a credit rating of no less than the Minimum L/C Rating, unless such Letter of Credit is replaced with cash in accordance with the terms hereof within such ten (10) day period;

(xxxii) if Pledgor shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xxxi) above, for ten (10) days after notice to Pledgor from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Pledgor shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Pledgor in the exercise of due diligence to cure such Default, such additional period not to exceed ninety (90) days;

(xxxiii) if there shall be a default under the Pledge Agreement or any of the other Loan Documents beyond any applicable notice and cure periods contained in such documents, whether as to Pledgor or the Collateral, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is

- 115 -

to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt;

(xxxiv) the Liens created pursuant to any Loan Document shall cease to be a fully enforceable first priority security interest; or

(xxxv)  a Mortgage Loan Event of Default shall occur, and shall not have been waived or settled by Mortgage Lender or cured by Mortgage Borrower, or if Mortgage Borrower enters into or otherwise suffers or permits any amendment, waiver (except to the extent the same is immaterial), supplement, termination, extension, renewal, replacement or other modification of any Mortgage Loan Document without the prior written consent of Lender.

(b)    Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vi) or (vii) above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Pledgor and in and to the Collateral, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents and any or all of the Collateral and may exercise all the rights and remedies of a secured party under the Uniform Commercial Code against Pledgor and the Collateral, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi) or (vii) above, the Debt and all other obligations of Pledgor hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Pledgor hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

**Section 8.2**    <u>Remedies</u>.

(a)    Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Pledgor under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Pledgor or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Collateral.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by Applicable Law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by Applicable Law, equity or contract or as set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, to the extent permitted by Applicable Law, Pledgor agrees that if an Event of Default is

- 116 -

continuing (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Collateral and the Collateral has been foreclosed upon, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(b)      With respect to Pledgor and the Collateral, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Collateral for the satisfaction of any of the Debt in preference or priority to any other Collateral, and Lender may seek satisfaction out of the Collateral or any part thereof, in its absolute discretion in respect of the Debt.  In addition, Lender shall have the right from time to time to partially foreclose the upon the Collateral in any manner and for any amounts secured by the Pledge Agreement then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances: (i) in the event Pledgor defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose upon the Collateral to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose upon the Collateral to recover so much of the principal balance of the Loan (including the Deferred Interest Balance) as Lender may accelerate and such other sums secured by the Pledge Agreement as Lender may elect.  Notwithstanding one or more partial foreclosures, the Collateral shall remain subject to the Pledge Agreement to secure payment of sums secured by the Pledge Agreement and not previously recovered.

(c)      Lender shall have the right, from time to time, to sever the Note and the other Loan Documents into one or more separate notes, pledges and other security documents (the "Severed Loan Documents") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Pledgor shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Pledgor hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Pledgor ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Pledgor by Lender of Lender's intent to exercise its rights under such power.  The Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Pledgor only as of the Closing Date.

(d)      <u>Additional Construction Related Remedies</u>. Subject to the rights of Mortgage Lender under the Mortgage Loan Agreement, upon the occurrence and during the continuance of an Event of Default, Lender may, at its election, but without any

obligation to do so, without notice of any kind to Pledgor, do any one or more of the following:

> (i)    terminate its commitment to lend and any obligation to make any further disbursements of the Loan;

> (ii)    set-off and apply, to the extent thereof and to the maximum extent permitted by law, any and all deposits, funds or assets at any time held and any and all indebtedness at any time owing by Lender to or for the credit or account of Pledgor against any Debt;

> (iii)    exercise any and all rights and remedies afforded by the Guaranty, this Agreement or the other Loan Documents, at law, in equity or otherwise;

> (iv)    in its own name or in the name of Mortgage Borrower, enter into possession of the Property, perform all work necessary to complete the construction of the Future Improvements (to the extent that the construction is being performed by Mortgage Borrower or Mortgage Borrower otherwise has the right to take such actions) substantially in accordance with the Plans and Specifications and Specifications (as modified as deemed necessary by Lender), Loan Documents and Applicable Laws, and continue to employ Architect, Engineer, General Contractor, and any contractor pursuant to the applicable contracts or otherwise; and

> (v)    after first having given written notice to Architect, Engineer or General Contractor that Mortgage Borrower has no further rights with respect to the Construction Documents, Mortgage Borrower's rights in and to any Construction Documents having been extinguished under the terms and conditions of the Loan Documents, to enjoy and enforce all of the rights of Mortgage Borrower under the Architect's Contract, the Engineer's Contract, the Construction Contract, the Plans and Specifications or the Construction Documents (but in such event Lender does not assume responsibility to pay any amounts due by Mortgage Borrower or Pledgor whether or not Lender takes possession of the Project).

> (e)    Any amounts recovered from the Collateral after an Event of Default may be applied by Lender toward the payment of any interest and/or principal of the Loan and/or any other amounts due under the Loan Documents in such order, priority and proportions as Lender in its sole discretion shall determine.

**Section 8.3**    <u>Right to Cure Defaults.</u>

Upon the occurrence and during the continuance of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Pledgor and without releasing Pledgor from any obligation hereunder, make any payment or do any act required of Pledgor hereunder in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property for such

- 118 -

purposes, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 8.3, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by the liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefor. Notwithstanding any other provision of this Agreement, any right of Lender to enter upon the Property shall be subject to the rights of any tenant under its applicable Lease and the rights of Mortgage Lender under the Mortgage Loan Documents.

**Section 8.4**    Remedies Cumulative; Waivers.

The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Pledgor pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one or more Defaults or Events of Default with respect to Pledgor shall not be construed to be a waiver of any subsequent Default or Event of Default by Pledgor or to impair any remedy, right or power consequent thereon.

**Section 8.5**    Power of Attorney.

For the purpose of carrying out the provisions and exercising the rights, powers and privileges granted in this Section 8, Pledgor hereby irrevocably appoints the Lender as its true and lawful attorney-in-fact to execute, acknowledge and deliver any instruments and do and perform any acts such as are referred to in this subsection in the name and on behalf of Pledgor. It is further understood and agreed that this power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.

## IX.    SPECIAL PROVISIONS

**Section 9.1**    Sale of Notes and Securitization.

Lender may, at any time, sell, transfer, pledge or assign the Note, this Agreement, the Pledge Agreement and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass-through certificates or other securities (the "Securities") evidencing a beneficial interest in a rated or unrated public offering or private placement (a "Securitization"). Notwithstanding the foregoing, Lehman agrees to provide Borrower with no less than three (3) months prior written notice prior to any

- 119 -

Securitization by Lehman pursuant to this Section 9.1. At the request of the holder of the Note and, to the extent not already required to be provided by Pledgor under this Agreement, Pledgor, and Sponsor at Pledgor's and Sponsor's expense, shall satisfy the market standards to which the holder of the Note customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with a Securitization or the sale of the Note or the participations or Securities, including, without limitation, to:

(a)     within fifteen (15) days after written request, (i) provide such financial and other information with respect to the Collateral, the Property, Pledgor, Mortgage Borrower, Sponsor, Guarantor and Manager (if any), (ii) provide budgets relating to the Property and (iii) to perform or permit or cause to be performed or permitted such site inspection, appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), engineering reports and other due diligence investigations of the Property, as may be reasonably requested by the holder of the Note or the Rating Agencies or as may be necessary or appropriate in connection with the Securitization (the "Provided Information"), together, if customary, with appropriate verification and/or consents of the Provided Information through letters of auditors or opinions of counsel of independent attorneys reasonably acceptable to Lender and the Rating Agencies;

(b)     if required by the Rating Agencies, deliver (i) a revised Insolvency Opinion, (ii) revised opinions of counsel as to due execution and enforceability with respect to the Property, Collateral, Pledgor, Guarantor and their respective Affiliates and the Loan Documents, and (iii) revised Organizational Documents for Pledgor, Guarantor and their respective Affiliates (including, without limitation, such revisions as are necessary to comply with the provisions of Section 4.1.35 hereof), which counsel, opinions and Organizational Documents shall be reasonably satisfactory to Lender and the Rating Agencies;

(c)     if required by the Rating Agencies, deliver such additional tenant estoppel letters, subordination agreements or other agreements from parties to agreements that affect the Property, which estoppel letters, subordination agreements or other agreements shall be reasonably satisfactory to Lender and the Rating Agencies;

(d)     execute such amendments to the Loan Documents and Organizational Documents as may be reasonably requested by the holder of the Note or the Rating Agencies or otherwise to effect the Securitization; provided, however, that Pledgor shall not be required to modify or amend any Loan Document if such modification or amendment would (except for modifications and amendments required to be made pursuant to Section (e) and (f) below,) (i) change the interest rate, the stated maturity or the amortization of principal set forth in the Note, (ii) modify or amend any other material economic term of the Loan or (iii) materially lessen the rights of or materially increase the obligations or liabilities of Pledgor or any Guarantor;

(e)     if Lender elects, in its sole discretion, prior to or upon a Securitization, to split the Loan into two or more parts, or the Note into multiple component notes or tranches which may have different interest rates, amortization payments, principal amounts and payment priorities, Pledgor and Sponsor agree to cooperate with Lender in

- 120 -

connection with the foregoing and to execute the required modifications and amendments to the Note, this Agreement and the Loan Documents and to provide opinions necessary to effectuate the same. Such Notes or components may be assigned different interest rate spreads, so long as the initial weighted average of such interest rates does not exceed the Applicable Interest Rate and the Maturity Date and other material economic terms remain unchanged; provided, however, that nothing in this subsection (e) shall limit Lender's right to apply (i) mandatory or involuntary prepayments to the Debt in such order as Lender determines in its sole discretion and (ii) payments to the Debt in such order as Lender determines in its sole discretion during the continuance of an Event of Default, it being agreed that the weighted average interest rate spreads described above may subsequently change only as a result of a payment or application of principal made (x) in connection with a mandatory or involuntary prepayment and/or (y) during the continuance of an Event of Default. Notwithstanding anything to the contrary contained in this subsection (e), provided no Event of Default exists, all voluntary prepayments made pursuant to Section 2.3.1 above shall be applied pro rata among each component;

(f)     execute modifications to the Loan Documents changing the interest rate and/or the amortization payments (if any) for the Loan provided that the initial weighted average of the interest rate spreads for the Loan and the Mortgage Loan after such modification shall not exceed the weighted average of the interest rate spreads for the Loan and the Mortgage Loan immediately prior to such modification; provided, however, that nothing in this subsection (f) shall limit Lender's right to apply (i) mandatory or involuntary prepayments to the Debt in such order as Lender determines in its sole discretion and (ii) payments to the Debt in such order as Lender determines in its sole discretion during the continuance of an Event of Default, it being agreed that the weighted average interest rate spreads described above may subsequently change only as a result of a payment or application of principal made (x) in connection with a mandatory or involuntary prepayment and/or (y) during the continuance of an Event of Default. The Borrower and Sponsor shall also provide opinions and title insurance reasonably necessary to effectuate the same; Notwithstanding anything to the contrary contained in this subsection (f), all voluntary prepayments under the Loan shall require a corresponding pro rata voluntary prepayment under the Mortgage Loan;

(g)     make such representations and warranties as of the closing date of the Securitization with respect to the Collateral, the Property, Pledgor, Mortgage Borrower, Sponsor and the Loan Documents as are customarily provided in securitization transactions and as may be reasonably requested by the holder of the Note or the Rating Agencies and consistent with the facts covered by such representations and warranties as they exist on the date thereof, including the representations and warranties made in the Loan Documents (or, to the extent such representations are not then true, indicating the exceptions thereto); and

(h)     supply to Lender such documentation, financial statements and reports in form and substance required for Lender to comply with Regulations S-X and AB of the federal securities law, if applicable.

- 121 -

All reasonable third party costs and expenses incurred by Lender or Borrower or Sponsor in connection with Pledgor's or Sponsor's complying with requests made under this Section 9.1 shall be paid by Pledgor and Sponsor. Notwithstanding anything to the contrary contained herein, the Pledgor's obligation with respect to the payment of Securitization costs of Borrower, Sponsor and their Affiliates under this Section 9.1 (excluding any in-house counsel fees, internal costs (copies, distributions and the like) and costs incurred in connection with the addition of any Independent Manager) shall not exceed $50,000.00 in the aggregate.

**Section 9.2**    Securitization Indemnification.

(a)    Pledgor and Sponsor understand that certain of the Provided Information may be included in disclosure documents in connection with the Securitization, including, without limitation, a prospectus supplement, private placement memorandum, offering circular or other offering document (each a "Disclosure Document") and may also be included in filings (an "Exchange Act Filing") with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "Securities Act"), or the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), or provided or made available to Investors or prospective Investors in the Securities, the Rating Agencies, and service providers relating to the Securitization. In the event that the Disclosure Document is required to be revised prior to the sale of all Securities, Pledgor and Sponsor will cooperate with the holder of the Note in updating the Disclosure Document by providing (to the extent not in the possession of and readily accessible to Lender) all current information necessary to keep the Disclosure Document accurate and complete in all material respects.

(b)    Pledgor and Sponsor agree to provide in connection with each of (i) a preliminary and a final private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an indemnification certificate (A) certifying that Pledgor has carefully examined such memorandum or prospectus or term sheets, as applicable, including, without limitation, the sections entitled "Special Considerations," "Description of the Mortgages," ""Description of the Mortgage Loans and Mortgaged Property," "The Manager", "The Developer", "The Pledgor" and "Certain Legal Aspects of the Mortgage Loan," and such sections (and any other sections reasonably requested) do not, to Pledgor's knowledge after reasonably inquiry, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender (and for purposes of this Section 9.2, Lender hereunder shall include its officers and directors), the Affiliate of Lehman Brothers Inc. ("Lehman") that has filed the registration statement relating to the Securitization (the "Registration Statement"), each of its directors, each of its officers who have signed the Registration Statement and each Person who controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "Lehman Group"), and Lehman, each of its directors and each Person who controls Lehman within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "Underwriter Group") for any claims, damages (but not special, consequential or punitive damages), losses (other than diminution in value) or liabilities (collectively, the "Liabilities") to which Lender, the Lehman Group or

- 122 -

the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such sections described in clause (A) above insofar as they relate to the Pledgor, its Affiliates, the Property, the Collateral or the Manager, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections or in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender, the Lehman Group and the Underwriter Group for any legal or other expenses reasonably incurred by Lender the Lehman Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that Pledgor will be liable in any such case under clauses (B) or (C) above only to the extent that any such Liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with the Provided Information, information contained in such portions of the Disclosure Document examined and approved by Pledgor or information otherwise furnished to Lender by or on behalf of Pledgor in connection with the preparation of the memorandum or prospectus. This indemnification will be in addition to any liability which Pledgor may otherwise have. Moreover, the indemnification provided for in clauses (B) and (C) above shall be effective whether or not an indemnification certificate described in (A) above is provided and shall be applicable based on information previously provided by Pledgor or its Affiliates if Pledgor does not provide the indemnification certificate.

(c)     In connection with filings under the Exchange Act, Pledgor and Sponsor agree to indemnify (i) Lender, the Lehman Group and the Underwriter Group for Liabilities to which Lender, the Lehman Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the omission or alleged omission to state in the Provided Information a material fact required to be stated in the Provided Information in order to make the statements in the Provided Information, in light of the circumstances under which they were made not misleading and (ii) reimburse Lender, the Lehman Group or the Underwriter Group for any reasonable legal or other expenses actually incurred by Lender, the Lehman Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(d)     Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party. After notice from the indemnifying party to such indemnified party under this Section 9.2 the indemnifying party shall not be responsible

- 123 -

for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party to parties.  The indemnifying party shall not be liable for the expenses of more than one such separate counsel unless an indemnified party shall have reasonably concluded that there are any legal defenses available to it that are different from or additional to those available to another indemnified party.

(e)     In order to provide for just and equitable contribution in circumstances in which the indemnifications provided for in Section 9.2(b) or (c) is or are for any reason held to be unenforceable by an indemnified party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Liabilities (or action in respect thereof) to the extent permitted by Applicable Law; provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) Lehman's and Pledgor's relative knowledge and access to information concerning the matter with respect to which claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances.  Lender, Pledgor, and Sponsor hereby agree that it would not be equitable if the amount of such contribution were determined solely by pro rata or per capita allocation.

(f)     The liabilities and obligations of both Pledgor, Sponsor and Lender under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

**Section 9.3**    Servicer.

At the option of Lender or Agent, the Loan may be serviced by a servicer/trustee (the "Servicer") selected by Lender or Agent and Lender or Agent may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "Servicing Agreement") between Lender or Agent and Servicer. Pledgor shall be responsible for payment of (i) any reasonable set-up fees or any other initial costs relating to or arising under the Servicing Agreement, (ii) all reasonable out-of-pocket costs and expenses of Servicer in connection with Designated Servicing Matters and (iii) an annual servicing fee (the "Servicing Fee") in an amount up to (as required by Lender) $25,000; provided, however, Lender reserves the right upon agreement with the Mortgage Lender (in accordance with the terms of the Intercreditor Agreement) to change the amount of the Servicing

[TPW: NYLEGAL:674139.7] 16248-00758 06/06/2007 12:54 AM

Fee provided that in no event shall the Servicing Fee, together with the Mortgage Servicing Fee, exceed $125,000.

**Section 9.4**    Exculpation.

(a)    Except as otherwise provided herein, in the Pledge Agreement or in the other Loan Documents, Lender shall not enforce the liability and obligation of Pledgor to perform and observe the obligations contained in this Agreement, the Note or the Pledge Agreement by any action or proceeding wherein a money judgment shall be sought against Pledgor, except that Lender may bring a foreclosure action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon this Agreement, the Note, the Pledge Agreement, the other Loan Documents, and the Collateral, and any other collateral given to Lender created by this Agreement, the Note, the Pledge Agreement and the other Loan Documents; provided, however, that any judgment in any such action or proceeding shall be enforceable against Pledgor only to the extent of Pledgor's interest in the Collateral and in any other collateral given to Lender. Lender, by accepting this Agreement, the Note and the Pledge Agreement, agrees that it shall not, except as otherwise provided herein or in the Pledge Agreement, sue for, seek or demand any deficiency judgment against Pledgor in any such action or proceeding, under or by reason of or under or in connection with this Agreement, the Note, the Pledge Agreement or the other Loan Documents.   The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Agreement, the Note, the Pledge Agreement or the other Loan Documents; (ii) impair the right of Lender to name Pledgor as a party defendant in any action or suit for judicial foreclosure and sale under the Pledge Agreement; (iii) affect the validity or enforceability of any indemnity (including, without limitation, the Environmental Indemnity), guaranty (including, without limitation, the Guaranty), master lease or similar instrument made in connection with this Agreement, the Note, the Pledge Agreement, or the other Loan Documents; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) reserved; (vi) impair the right of Lender to enforce the provisions of Sections 4.1.8, 4.1.28, 5.1.9 and 5.2.8 hereof; or (vii) impair the right of Lender to obtain a deficiency judgment or other judgment on the Note against Pledgor if necessary to (A) preserve or enforce its rights and remedies against the Collateral or (B) obtain any Insurance Proceeds or Awards to which Lender would otherwise be entitled under the terms of this Agreement or the Pledge Agreement; provided however, Lender shall only enforce such judgment to the extent of such Insurance Proceeds and/or Awards.

(b)    Notwithstanding the provisions of this Section 9.4 to the contrary, Pledgor shall be personally liable to Lender for the Losses it actually incurs due to: (i) fraud or intentional misrepresentation in connection with the execution and the delivery of this Agreement, the Note, the Pledge Agreement, the other Loan Documents or any Mortgage Loan Document;   (ii)   Pledgor's   or   Mortgage   Borrower's   misapplication   or misappropriation of Rents received by Pledgor or Mortgage Borrower after the occurrence of a Default or Event of Default; (iii) Pledgor's or Mortgage Borrower's misapplication or misappropriation of Security Deposits or Rents collected more than thirty (30) days in advance; (iv) Pledgor's or Mortgage Borrower's misapplication or the

- 125 -

misappropriation of Insurance Proceeds or Awards; (v) Pledgor's or Mortgage Borrower's misapplication or the misappropriation of Net Liquidation Proceeds After Debt Service or any distributions or other payments made in respect of any part of the Property or the Collateral; (vi) Pledgor's making a distribution to its equity owners after the occurrence and during the continuance of an Event of Default; (vii) Mortgage Borrower's failure to pay Taxes, Other Charges (except to the extent that sums sufficient to pay such amounts have been deposited in escrow with Mortgage Lender pursuant to the terms of Section 7.2 of the Mortgage Loan Agreement, charges for labor or materials or other charges that can create Liens on the Property; (viii) Pledgor's failure to return or to reimburse Lender for all Personal Property taken from the Property by or on behalf of Mortgage Borrower and not replaced with Personal Property of the same utility and of the same or greater value other than Personal Property disposed of in the ordinary course of business; (ix) any act of intentional waste or arson with respect to the Property (or Collateral) (other than the disposal of Personal Property in the ordinary course of business) by Pledgor or Mortgage Borrower or any Affiliate or thereof or by Guarantor or any other Person providing an indemnity; (x) any fees or commissions paid by Pledgor or any Affiliate of Pledgor, or Guarantor in violation of the terms of this Agreement, the Note, the Pledge Agreement or the other Loan Documents; (xi) Pledgor's failure to comply with the provisions of Sections 4.1.39, 5.1.10 and 5.1.19 of this Agreement, (xii) any indemnity provided by Lender under any Control Agreements (as defined in the Master Disbursement Agreement or (xiii) the litigation described on Schedule II hereto.

(c)    Notwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in Subsection (a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect (i) in the event of Pledgor's default under Sections 4.1.35 (subject to the limitations set forth in Section 8.1(a)(xii)) or 5.2.10 hereof or (ii) if the Property, the Collateral or any part thereof shall become an asset in (A) a voluntary bankruptcy or insolvency proceeding or (B) an involuntary bankruptcy or insolvency proceeding commenced by any Person (other than Lender) and Pledgor or Mortgage Borrower, as applicable, fails to use its best efforts to obtain a dismissal of such proceedings.

(d)    Nothing herein shall be deemed to be a waiver of any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provision of the Bankruptcy Code to file a claim for the full amount of the indebtedness secured by the Pledge Agreement or to require that all collateral shall continue to secure all of the indebtedness owing to Lender in accordance with this Agreement, the Note, the Pledge Agreement and the other Loan Documents.

(e)    Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, damages (but not special, consequential or punitive damages), losses (other than diminution in value), obligations and costs and expenses (including litigation costs and reasonable attorneys fees and expenses) arising from or in any way connected with any indemnity provided by Lender under any Control Agreements (as defined in the Master Disbursement Agreement).

**Section 9.5**    <u>Intentionally Omitted.</u>

**Section 9.6**    Intentionally Omitted.

**Section 9.7**    Syndication

9.7.1    Syndication.

The provisions of this Section 9.7 shall only apply in the event that the Loan is syndicated in accordance with the provisions of this Section 9.7 set forth below.

9.7.2    Sale of Loan, Co-Lenders, Participations and Servicing.

(a)    Lender and any Co-Lender may, at their option, without Pledgor's consent (but with written notice to Pledgor), sell with novation all or any part of their right, title and interest in, and to, and under the Loan (the "Syndication"), to one or more additional lenders (each a "Co-Lender"). Each additional Co-Lender shall enter into an assignment and assumption agreement (the "Assignment and Assumption") assigning a portion of Lender's or Co-Lender's rights and obligations under the Loan, and pursuant to which the additional Co-Lender accepts such assignment and assumes the assigned obligations. From and after the effective date specified in the Assignment and Assumption (i) each Co-Lender shall be a party hereto to the extent of the applicable percentage or percentages set forth in the Assignment and Assumption and, except as specified otherwise herein, shall succeed to the rights and obligations of Lender and the Co-Lenders hereunder and under each other Loan Document in respect of the Loan, and (ii) Lender, as lender and each Co-Lender, as applicable, shall, to the extent such rights and obligations have been assigned by it pursuant to such Assignment and Assumption, relinquish its rights and be released from its obligations hereunder and under the Loan Documents, except as specifically otherwise provided herein.

(b)    The liabilities of Lender and each of the Co-Lenders shall be several and not joint, and Lender's and each Co-Lender's obligations to Pledgor under this Agreement shall be reduced by the amount of each such Assignment and Assumption. Neither Lender nor any Co-Lender shall be responsible for the obligations of any other Co-Lender. Lender and each Co-Lender shall be liable to Pledgor only for their respective proportionate shares of the Loan. If for any reason any of the Co-Lenders shall fail or refuse to abide by their obligations under this Agreement, Lender and the other Co-Lenders shall not be relieved of their obligations, if any, hereunder, including their obligations to make their pro rata share of any advance; notwithstanding the foregoing, Lender and the Co-Lenders shall have the right, but not the obligation, at their sole option, to make the defaulting Co- Lender's pro rata share of such advance pursuant to the Co-Lending Agreement.

(c)    Pledgor agrees that it shall, in connection with any sale of all or any portion of the Loan, whether in whole or to an additional Co-Lender or Participant, within ten (10) Business Days after requested by Agent, furnish Agent with the certificates required under Sections 5.1.10 and 5.1.13 hereof and such other information as reasonably requested by any additional Co-Lender or Participant in performing its due diligence in connection with its purchase of an interest in the Loan.

- 127 -

(d)    Lender (or an Affiliate of Lender) shall act as administrative agent for itself and the Co-Lenders (together with any successor administrative agent, the "Agent") pursuant to this Section 9.7. Pledgor acknowledges that Lender, as Agent, shall have the sole and exclusive authority to execute and perform this Agreement and each Loan Document on behalf of itself, as Lender and as agent for itself and the Co-Lenders subject to the terms of the Co-Lending Agreement. Lender acknowledges that Lender, as Agent, shall retain the exclusive right to grant approvals and give consents with respect to the operating budgets required to be delivered hereunder and with respect to matters concerning the establishment and administration of any Accounts. Except as otherwise provided herein, Pledgor shall have no obligation to recognize or deal directly with any Co-Lender, and no Co-Lender shall have any right to deal directly with Pledgor with respect to the rights, benefits and obligations of Pledgor under this Agreement, the Loan Documents or any one or more documents or instruments in respect thereof. Pledgor may rely conclusively on the actions of Lender as Agent to bind Lender and the Co-Lenders, notwithstanding that the particular action in question may, pursuant to this Agreement or the Co-Lending Agreement be subject to the consent or direction of some or all of the Co-Lenders. Lender may resign as Agent of the Co-Lenders, in its sole discretion or if required to by the Co-Lenders in accordance with the term of the Co-Lending Agreement, in each case without the consent of Pledgor. Upon any such resignation, a successor Agent shall be determined pursuant to the terms of the Co-Lending Agreement. The term Agent shall mean any successor Agent.

(e)    Notwithstanding any provision to the contrary in this Agreement, the Agent shall not have any duties or responsibilities except those expressly set forth herein (and in any other Loan Document and the Co-Lending Agreement) and no covenants, functions, responsibilities, duties, obligations or liabilities of Agent shall be implied by or inferred from this Agreement, the Co-Lending Agreement, or any other Loan Document, or otherwise exist against Agent.

(f)    Except to the extent its obligations hereunder and its interest in the Loan have been assigned pursuant to one or more Assignments and Assumption, Lender, as Agent, shall have the same rights and powers under this Agreement as any other Co-Lender and may exercise the same as though it were not Agent, respectively. The term "Co-Lender" or "Co-Lenders" shall, unless otherwise expressly indicated, include Lender in its individual capacity. Lender and the other Co-Lenders and their respective Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, Pledgor, or any Affiliate of Pledgor and any Person who may do business with or own securities of Pledgor or any Affiliate of Pledgor, all as if they were not serving in such capacities hereunder and without any duty to account therefor to each other.

(g)    If required by any Co-Lender, each Pledgor hereby agrees to execute supplemental notes in the principal amount of such Co-Lender's pro rata share of the Loan substantially in the form of the Note, and such supplemental note shall (i) be payable to order of such Co-Lender, (ii) be dated as of the Closing Date (or, if requested by Lender, dated the date of assignment to such Co-Lender of such pro rata share), and (iii) mature on the Maturity Date. Such supplemental note shall provide that it evidences

- 128 -

a portion of the existing Debt hereunder and under the Note and not any new or additional Debt of Pledgor. In connection with any such supplemental note, Lender and each Co-Lender agree, at the request of Pledgor, to surrender any previously delivered notes, provided that Pledgor delivers replacement notes totaling the Maximum Loan Amount (less any prepayments of principal made prior to such date in accordance with the terms of this Agreement). The term "Note" as used in this Agreement and in all the other Loan Documents shall include all such supplemental notes.

(h)    Lender, as Agent, shall maintain at its domestic lending office or at such other location as Lender, as Agent, shall designate in writing to each Co-Lender and Pledgor a copy of each Assignment and Assumption delivered to and accepted by it and a register for the recordation of the names and addresses of the Co-Lenders, the amount of each Co-Lender's proportionate share of the Loan and the name and address of each Co-Lender's agent for service of process (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and Pledgor, Lender, as Agent, and the Co-Lenders may treat each Person whose name is recorded in the Register as a Co-Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection and copying by Pledgor or any Co-Lender during normal business hours upon reasonable prior notice to the Agent. A Co-Lender may change its address and its agent for service of process upon written notice to Lender, as Agent, which notice shall only be effective upon actual receipt by Lender, as Agent, which receipt will be acknowledged by Lender, as Agent, upon request.

(i)    Notwithstanding anything herein to the contrary, any financial institution or other entity may be sold a participation interest in the Loan by Lender or any Co-Lender without Pledgor's consent (such financial institution or entity, a "Participant") (x) if such sale is without novation and (y) if the other conditions set forth in this paragraph are met. No Participant shall be considered a Co-Lender hereunder or under the Note or the Loan Documents. No Participant shall have any rights under this Agreement, the Note or any of the Loan Documents and the Participant's rights in respect of such participation shall be solely against Lender or Co-Lender, as the case may be, as set forth in the participation agreement executed by and between Lender or Co-Lender, as the case may be, and such Participant. No participation shall relieve Lender or Co-Lender, as the case may be, from its obligations hereunder or under the Note or the Loan Documents and Lender or Co-Lender, as the case may be, shall remain solely responsible for the performance of its obligations hereunder.

(j)    Notwithstanding any other provision set forth in this Agreement, Lender or any Co-Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, amounts owing to it in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System), provided that no such security interest or the exercise by the secured party of any of its rights thereunder shall release Lender or Co-Lender from its funding obligations hereunder.

(k)    Notwithstanding any other provision of this Agreement, provided that no Event of Default has occurred and is continuing, Borrower shall have the right to require

- 129 -

(a) any Co-Lender that is entitled to and has demanded compensation or other amounts pursuant to Sections 2.2.3(b), 2.2.3(c) or 2.2.8 hereof or (b) any Co-Lender that is a Defaulting Lender provided such Defaulting Lender has failed to cure the default as a result of which it has become a Defaulting Lender (and to the extent such default was a Lender Default, none of the other Co-Lenders have exercised their right to make the Defaulting Co-Lender's pro rata share of such advance pursuant to the Co-Lending Agreement) within ten (10) Business Days after Borrower's request that it cure such default (such Co-Lender under (a) or (b), an "Affected Co-Lender"), to assign in full its rights and obligations under this Agreement to one or more additional Co-Lenders designated by Borrower which (i) are reasonably acceptable to Lender and the other Co-Lenders, and (ii) which agree to assume all of such rights and obligations arising as of and after the date of the assumption (a "Replacement Co-Lender"), provided that (A) such assignment and assumption is otherwise in compliance with this Section 9.7, (B) Borrower pays any fees payable in connection with such assignment and (C) such Affected Co-Lender receives payment in full of the principal amount of the Loan owing to such Affected Co-Lender, together with accrued and unpaid interest thereon to the date of such payment of principal and all other amounts payable to such Affected Co-Lender under this Agreement. Any rights of a Affected Co-Lender to indemnification hereunder shall survive as to such Affected Co-Lender.

9.7.3    Cooperation in Syndication.

(a)    Pledgor and Sponsor agree to assist Lender in completing a Syndication satisfactory to Lender. Such assistance shall include (i) direct contact between senior management and advisors of Pledgor and the proposed Co-Lenders, (ii) assistance in the preparation of a confidential information memorandum and other marketing materials to be used in connection with the Syndication, (iii) the hosting, with Lender, of one or more meetings of prospective Co-Lenders or with the Rating Agencies, (iv) the delivery of appraisals reasonably satisfactory to Lender if required, and (v) working with Lender to procure a rating for the Loan by the Rating Agencies.

(b)    Lender shall manage all aspects of the Syndication of the Loan, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocations of the commitments among the Co-Lenders and the amount and distribution of fees among the Co-Lenders. To assist Lender in its Syndication efforts, Pledgor and Sponsor agree promptly to prepare and provide to Lender all information with respect to Pledgor, Manager (if any), Developer (if any), Sponsor, Guarantor and the Property contemplated hereby, including all financial information and projections (the "Projections"), as Lender may reasonably request in connection with the Syndication of the Loan. Pledgor hereby represents and covenants that (i) all information other than the Projections (the "Information") that has been or will be made available to Lender by Pledgor or any of their representatives is or will be, when furnished, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made

- 130 -

available to Lender by Pledgor or any of their representatives have been or will be prepared in good faith based upon reasonable assumptions. Pledgor understands that in arranging and syndicating the Loan, Lender, the Co-Lenders and, if applicable, the Rating Agencies, may use and rely on the Information and Projections without independent verification thereof.

(c)    If required in connection with the Syndication, Pledgor and Sponsor hereby agree to:

(i)    amend the Loan Documents to give Lender the right, at Pledgor's sole cost and expense, to have the Property reappraised on an annual basis;

(ii)    deliver updated financial and operating statements and other information reasonably required by Lender to facilitate the Syndication;

(iii)    deliver reliance letters reasonably satisfactory to Lender with respect to the environmental assessments and reports delivered to Lender prior to the Closing Date, which will run to Lender and its successors and assigns; and

(iv)    execute modifications to the Loan Documents reasonably required by the Co- Lenders, provided that such modification will not (except as set forth in (v) and (vi) below) change any material or economic terms of the Loan Documents, or otherwise materially increase the obligations or materially decrease the rights of Borrower pursuant to the Loan Documents;

(v)    if Lender elects, in its sole discretion, prior to or upon a Syndication, to split the Loan into two or more parts, or the Note into multiple component notes or tranches which may have different interest rates, principal amounts and payment priorities, Borrower agrees to cooperate with Lender in connection with the foregoing and to execute the required modifications and amendments to the Note, this Agreement and the Loan Documents and to provide opinions necessary to effectuate the same. Such Notes or components may be assigned different interest rates, so long as the initial weighted average spread of such interest rates does not exceed the Applicable Interest Rate; provided, however, that nothing in this subsection (v) shall limit Lender's right to apply (A) mandatory or involuntary prepayments to the Debt in such order as Lender determines in its sole discretion and (B) payments to the Debt in such order as Lender determines in its sole discretion during the continuance of an Event of Default, it being agreed that the weighted average interest rate spreads described above may subsequently change only as a result of a payment or application of principal made (x) in connection with a mandatory or involuntary prepayment and/or (y) during the continuance of an Event of Default. Notwithstanding anything to the contrary contained in this subsection (v), provided no Event of Default exists, all voluntary prepayments made pursuant to Section 2.3.1 above shall be applied pro rata among each component; and

- 131 -

(vi)    execute modifications to the Loan Documents changing the interest rate for the Loan, provided that the initial weighted average of the interest rate spreads for the Loan and the Mortgage Loan after such modification shall not exceed the weighted average of the interest rate spreads for the Loan and the Mortgage Loan immediately prior to such modification; provided, however, that nothing in this subsection (vi) shall limit Lender's right to apply (A) mandatory or involuntary prepayments to the Debt in such order as Lender determines in its sole discretion and (B) payments to the Debt in such order as Lender determines in its sole discretion during the continuance of an Event of Default, it being agreed that the weighted average interest rate spreads described above may subsequently change only as a result of a payment or application of principal made (x) in connection with a mandatory or involuntary prepayment and/or (y) during the continuance of an Event of Default. The Borrower shall also provide opinions reasonably necessary to effectuate the same. Notwithstanding anything to the contrary contained in this subsection (vi), all voluntary prepayments under the Loan shall require a corresponding pro rata voluntary prepayment under the Mortgage Loan.

All reasonable third party costs and expenses incurred by Lender or Borrower or Sponsor in connection with Borrower's or Sponsor's complying with requests made under this Section 9.7.3 shall be paid by Borrower and Sponsor.

9.7.4    Payment of Agent's, and Co-Lender's Expenses, Indemnity, etc.

Pledgor and Sponsor shall:

(a)    whether or not the transactions contemplated in this Section 9.7 are consummated, pay all reasonable out-of-pocket costs and expenses (A) of Agent's counsel fees and expenses relating to the negotiation, preparation, execution and delivery of the Note, this Agreement, the Pledge Agreement, and the other Loan Documents and the documents and instruments referred to therein, the creation, perfection or protection of Lender's and Co-Lender's liens on the Property (including, without limitation, fees and expenses for title insurance, property inspections, appraisals, if required for Syndication, surveys, lien searches, filing and recording fees, and escrow fees and expenses), and any amendment, waiver or consent relating to any of the Loan Documents including releases (but the Co-Lenders shall pay their own respective counsel fees) and (B) of Agent and Co-Lenders in connection with the preservation of rights under, any amendment, waiver or consent relating to, and enforcement of, the Loan Documents and the documents and instruments referred to therein or in connection with any restructuring or rescheduling of the Obligations (including, without limitation, the reasonable fees and disbursements of counsel for Agent)(but the Co-Lenders shall pay their own respective counsel fees);

(b)    pay, and hold Agent and each Co-Lender harmless from and against, any and all present and future stamp, excise and other similar taxes with respect to the foregoing matters and hold Agent and each Co-Lender harmless from and against any

- 132 -

and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to Agent or such Co-Lender) to pay such taxes; and

        (c)     indemnify Agent, (in its capacity as Lender and as Agent), and each Co-Lender, its officers, directors, employees, representatives and agents and any persons or entities owned or Controlled by, owning or Controlling, or under common Control or Affiliated with Agent, Agent, or each Co-Lender (each an "Indemnitee") from, and hold each of them harmless against, any and all liabilities, claims, damages (but not special, consequential or punitive damages), losses (other than diminution in value), expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitee in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnitee shall be designated a party thereto) that may at any time (including, without limitation, at any time following the payment of the Obligations) be imposed on, asserted against or incurred by any Indemnitee as a result of, or arising in any manner out of, or in any way related to or by reason of, (i) the execution, delivery or performance of any Loan Document by Pledgor, (ii) the breach of any of Pledgor's representations and warranties or of any of Pledgor's Obligations, (iii) a default under Section 5.2.8 hereof, including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA, the Code, any State statute or other similar law that may be required, and (iv) the exercise by Agent and the Co-Lenders of their rights and remedies (including, without limitation, foreclosure) under any Loan Documents, but excluding, as to any Indemnitee, any such losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements to the extent incurred by reason of the gross negligence or willful misconduct of such Indemnitee as finally determined by a court of competent jurisdiction (collectively, "Indemnified Liabilities"). Pledgor and Sponsor further agree that, without Agent's or the Co-Lenders' prior written consent, it will not enter into any settlement of a lawsuit, claim or other proceeding arising or relating to any Indemnified Liability unless such settlement includes an explicit and unconditional release from the party bringing such lawsuit, claim or other proceeding of each Indemnitee. Pledgor's and Sponsor's obligations under this Section shall survive the termination of this Agreement and the payment of the Obligations. Pledgor and Sponsor shall have the right to undertake, conduct and control through counsel of its own choosing (which counsel shall be acceptable to the Indemnitee acting reasonably), the conduct and settlement of the Indemnified Liabilities, and the Indemnitee shall cooperate with Pledgor and Sponsor in connection therewith; provided that Pledgor and Sponsor shall permit the Indemnitee to participate in such conduct and settlement through counsel chosen by the Indemnitee, but reasonable fees and expenses of such counsel shall be borne by the Indemnitee. Notwithstanding the foregoing, the Indemnitee shall have the right to employ its own counsel, and the reasonable fees and expenses of such counsel shall be at Pledgor's and Sponsor's cost and expense if the Indemnitee reasonably determines that (i) Pledgor's and Sponsor's counsel is not adequately defending any claim or proceeding in a manner reasonably acceptable to Indemnitee or (ii) the interests of Pledgor and the Indemnitee have become adverse in any such claim or course of

- 133 -

action; provided, however Pledgor, in such event, shall only be liable for the reasonable legal expenses of one counsel for all such Indemnitees. None of Pledgor, Sponsor nor any Indemnitee shall be liable for any settlement of any Indemnified Liability effected without its prior written consent, such consent not to be unreasonably withheld. No Indemnitee shall be liable for any indirect damages, consequential damages, punitive damages or damages based on diminution in value or lost revenues, in connection with its activities related to the Loan, the Securitization or the Syndication.

### 9.7.5    Limitation of Liability.

No claim may be made by Pledgor, or any other Person against Agent, or any Co-Lenders or the Affiliates, directors, officers, employees, attorneys or agent of any of such Persons for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection therewith; and Pledgor hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

### 9.7.6    No Joint Venture.

Notwithstanding anything to the contrary herein contained, neither Agent, nor any Co-Lender by entering into this Agreement or by taking any action pursuant hereto, will be deemed a partner or joint venturer with Pledgor.

### 9.7.7    Voting Rights of Co-Lenders.

Pledgor acknowledges that the Co-Lending Agreement may contain provisions which require that amendments, waivers, extensions, modifications, and other decisions with respect to the Loan Documents shall require the approval of all or a number of the Co-Lenders holding in the aggregate a specified percentage of the Loan or any one or more Co-Lenders that are specifically affected by such amendment, waiver, extension, modification or other decision.

**Section 9.8**    Reallocation of Loan Amounts.

In the event Mortgage Lender exercises its right to reallocate the amount of the Loan and the Mortgage Loan pursuant to Section 9.8 of the Mortgage Loan Agreement, Pledgor agrees to cooperate to facilitate such reallocation provided that (i) the aggregate principal amount of the Loan and the Mortgage Loan immediately following such reallocation shall equal the outstanding principal balance of the Loan (including the Deferred Interest Balance) and the Mortgage Loan immediately prior to such reallocation, (ii) Lender has agreed to the allocation as required by the Mortgage Lender and (iii) the initial weighted average interest rate of the Note and the Mortgage Note immediately following such reallocation shall equal the weighted average interest rate which was applicable to the Note and the Mortgage Note immediately prior to such reallocation; provided, however, that nothing in this Section 9.8 shall limit Lender's right to apply (A) mandatory or involuntary prepayments to the Debt in such order as Lender determines in its sole discretion and (B) payments to the Debt in such order as Lender determines in its sole discretion during the continuance of an Event of Default, it being agreed that the weighted average interest rate spreads described above may subsequently change only as a result of a

- 134 -

payment or application of principal made (x) in connection with a mandatory or involuntary prepayment and/or (y) during the continuance of an Event of Default. Pledgor shall cooperate with all reasonable requests of Lender in order to reallocate the amount of the Loan and the Mortgage Loan and shall execute and deliver such documents as shall reasonably be required by Lender in connection therewith, including, without limitation, amendments to the Loan Documents and the Mortgage Loan Documents, and endorsements to the Title Policy and the UCC title insurance policy, all in form and substance reasonably satisfactory to Lender, and Borrower shall pay all costs and expenses in connection such reallocation pursuant to this Section, including, without limitation, any additional title insurance and UCC insurance premiums and any additional mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any amendments of the Loan Documents or the Mortgage Loan Documents in connection with the reallocation, provided that such costs and expenses shall not exceed $50,000.00 in the aggregate.

### Section 9.9    Certain Additional Rights of Lender.

Notwithstanding anything to the contrary which may be contained in this Agreement, Lender shall have the right from time to time upon Lender's request to consult with and advise Pledgor's management regarding the significant business activities and business and financial developments of Pledgor, provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of hazardous substances. Routine consultation meetings may occur no more frequently than quarterly, with Lender having the right to call special meetings at any reasonable time (but not more frequently than once per quarter). Pledgor shall have no obligation to adhere to any advice proposed by Lender, except where otherwise specifically required elsewhere in the Loan Documents.

The rights described above may be exercised by any entity which owns and controls, directly or indirectly, substantially all of the interests in Lender.

### Section 9.10    Mortgage Loan Defaults.

(a)    Without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Pledgor from any of its obligations hereunder, if there shall occur any Event of Default under the Mortgage Loan Documents or if Mortgage Lender asserts that a Mortgage Loan Event of Default has occurred, Pledgor hereby expressly agrees that Lender shall have the immediate right (and Lender shall use commercially reasonable efforts to provide Borrower with notice of such cure, provided that any failure to deliver such notice shall in no way affect any of Lender's rights hereunder or give rise to any liability to Lender), but shall be under no obligation: (i) to pay all or any part of the Mortgage Loan, and any other sums, that are then due and payable and to perform any act or take any action on behalf of Mortgage Borrower, as may be appropriate, to cause all of the terms, covenants and conditions of the Mortgage Loan Documents on the part of Mortgage Borrower to be performed or observed thereunder to be promptly performed or observed; and (ii) to pay any other amounts and take any other action as Lender, in its sole and absolute discretion, shall deem advisable

- 135 -

to protect or preserve the rights and interests of Lender in the Loan and/or the Collateral. Lender shall have no obligation to complete any cure or attempted cure undertaken or commenced by Lender. All sums so paid and the costs and expenses incurred by Lender in exercising rights under this Section (including, without limitation, reasonable attorneys' and other professional fees), with interest at the Default Rate, for the period from the date of demand by Lender to Pledgor for such payments to the date of payment to Lender, shall constitute a portion of the Debt, shall be secured by the Pledge Agreement and shall be due and payable to Lender within two Business Days following demand therefor.

(b)    Subject to the rights of tenants and Mortgage Lender, Pledgor hereby grants, and shall cause Mortgage Borrower to grant, Lender and any Person designated by Lender the right to enter upon the Property at any time for the purpose of carrying out the rights granted to Lender under this Section 9.9. Pledgor shall not, and shall not cause or permit Mortgage Borrower or any other Person to impede, interfere with, hinder or delay, any effort or action on the part of Lender to cure any default or asserted default under the Mortgage Loan, or to otherwise protect or preserve Lender's interests in the Loan and the Collateral, including the Property in accordance with the provisions of this Agreement and the other Loan Documents.

(c)    Pledgor hereby indemnifies Lender from and against all out-of-pocket liabilities, obligations, losses, damages, penalties, assessments, actions, or causes of action, judgments, suits, claims, demands, costs, expenses (including, without limitation, reasonable attorneys' and other professional fees, whether or not suit is brought, and settlement costs), and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Lender as a result of the foregoing actions described in Section 9.10(a); provided, however, that Pledgor shall not have any obligation to Lender hereunder to the extent that such Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Lender. Lender shall have no obligation to Pledgor, Mortgage Borrower or any other party to make any such payment or performance. Pledgor shall not impede, interfere with, hinder or delay, and shall cause Mortgage Borrower to not impede, interfere with, hinder or delay, any effort or action on the part of Lender to cure any default or asserted default under the Mortgage Loan, or to otherwise protect or preserve Lender's interests in the Loan and the Collateral following a default or asserted default under the Mortgage Loan.

(d)    If Lender shall receive a copy of any notice of default under the Mortgage Loan Documents sent by Mortgage Lender to Mortgage Borrower, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon. As a material inducement to Lender's making the Loan, Pledgor hereby absolutely and unconditionally release and waive all claims against Lender arising out of Lender's exercise of its rights and remedies provided in this Section other than claims arising out of the fraud, illegal acts, gross negligence or willful misconduct of Lender. In the event that Lender makes any payment in respect of the Mortgage Loan, Lender shall be subrogated to all of the rights of Mortgage Lender under the Mortgage Loan Documents against the Property, in addition to all other rights it may have under the Loan Documents.

(e)      Any default under the Mortgage Loan which is cured by Lender, whether or not such cure is prior to the expiration of any applicable grace, notice or cure period under the Mortgage Loan Documents, shall constitute an immediate Event of Default under this Agreement without any notice, grace or cure period otherwise applicable under this Agreement.

(f)      In the event that Lender makes any payment in respect of the Mortgage Loan, Lender shall be subrogated to all of the rights of Mortgage Lender under the Mortgage Loan Documents against the Property and Mortgage Borrower in addition to all other rights Lender may have under the Loan Documents or applicable law.

**Section 9.11**   Intercreditor Agreement.

(a)      Lender and Mortgage Lender are parties to a certain intercreditor agreement dated as of the date hereof (the "Intercreditor Agreement") memorializing their relative rights and obligations with respect to the Mortgage Loan, the Loan, Mortgage Borrower, Pledgor and the Property.  Pledgor and Mortgage Borrower hereby acknowledge and agree that (i) such Intercreditor Agreement is intended solely for the benefit of Lender and Mortgage Lender and (ii) Pledgor and Mortgagor are not intended third-party beneficiaries of any of the provisions therein and shall not be entitled to rely on any of the provisions contained therein.  Lender and Mortgage Lender shall have no obligation to disclose to Pledgor the contents of the Intercreditor Agreement.  Pledgor's obligations hereunder are independent of such Intercreditor Agreement and remain unmodified by the terms and provisions thereof.

(b)      In the event the Lender is required pursuant to the terms of the Intercreditor Agreement to pay over any payment or distribution of assets for reason that the Lender's rights to payment of the Loan are subordinate to the Mortgage Lender's rights to payment by Mortgage Borrower, whether in cash, property or securities which is applied to the Debt, including, without limitation, any proceeds of the Property previously received by Lender on account of the Loan to the Mortgage Lender, then Pledgor agrees to indemnify Lender for any amounts so paid, and any amount so paid shall continue to be owing pursuant to the Loan Documents as part of the Debt notwithstanding the prior receipt of such payment by Lender.

**Section 9.12**   Discussions with Mortgage Lender.

In connection with the exercise of its rights set forth in the Loan Documents, Lender shall have the right at any time to discuss the Property, the Mortgage Loan, the Loan or any other matter directly with Mortgage Lender or Mortgage Lender's consultants, agents or representatives without notice to or permission from Pledgor or any other Loan Party, nor shall Lender have any obligation to disclose such discussions or the contents thereof with Pledgor or any other Loan Party.

**Section 9.13**   Independent Approval Rights.

If any action, proposed action or other decision is consented to or approved by Mortgage Lender, such consent or approval shall not be binding or controlling on Lender.  Pledgor hereby

- 137 -

acknowledges and agrees that (i) the risks of Mortgage Lender in making the Mortgage Loan are different from the risks of Lender in making the Loan, (ii) in determining whether to grant, deny, withhold or condition any requested consent or approval Mortgage Lender and Lender may reasonably reach different conclusions, and (iii) Lender has an absolute independent right to grant, deny, withhold or condition any requested consent or approval based on its own point of view. Further, the denial by Lender of a requested consent or approval shall not create any liability or other obligation of Lender if the denial of such consent or approval results directly or indirectly in a default under the Mortgage Loan, and Pledgor hereby waives any claim of liability against Lender arising from any such denial.

## X.    CASH MANAGEMENT

**Section 10.1**    Property Account.

(a)    Not less than ten (10) Business Days prior to Mortgage Borrower's receipt of any Rents or other Gross Income from Operations in the form of Cash, Pledgor shall cause Mortgage Borrower to establish and maintain (during the remaining term of the Loan) an account (the "Property Account") with Property Account Bank in trust for the benefit of Mortgage Lender, which Property Account shall be under the sole dominion and control of Mortgage Lender to the extent required under the Mortgage Loan Agreement.    Mortgage Lender and its servicer shall have the sole right to make withdrawals from the Property Account and all costs and expenses for establishing and maintaining the Property Account shall be paid by Mortgage Borrower.

(b)    Pledgor shall cause Mortgage Borrower to deliver irrevocable written instructions to all tenants under Leases to deliver all Rents payable thereunder directly to the Property Account.    Borrower shall cause Mortgage Borrower to deposit all amounts received by Mortgage Borrower or Manager constituting Rents into the Property Account in accordance with the terms of the Mortgage Loan Agreement.

(c)    Pledgor shall cause Mortgage Borrower to obtain from Property Account Bank its agreement to transfer to the Lockbox Account in immediately available funds by federal wire transfer all amounts on deposit in the Property Account once every Business Day throughout the term of the Loan.

(d)    The Property Account shall be an Eligible Account and the funds on deposit therein shall not be commingled with other monies held by Mortgage Borrower or Property Account Bank.

(e)    Pledgor shall not permit or cause Mortgage Borrower to further pledge, assign or grant any security interest in the Property Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Mortgage Lender as the secured party, to be filed with respect thereto and to the extent permitted under Section 10.1(f) of the Mortgage Loan Agreement.

**Section 10.2**    Lockbox Account.

- 138 -

Pursuant to the terms of Section 10.1(b) of the Mortgage Loan Agreement, Mortgage Lender shall establish and maintain (during the remaining term of the Loan) a segregated Eligible Account (the "Lockbox Account"), which Lockbox Account shall be under the sole dominion and control of Mortgage Lender. Pledgor will not cause or permit Mortgage Borrower in any way to alter or modify the Lockbox Account and will notify Lender of the account number thereof. Mortgage Lender and its servicer shall have the sole right to make withdrawals from the Lockbox Account and all costs and expenses for establishing and maintaining the Lockbox Account shall be paid by Mortgage Borrower. Pledgor shall direct or cause Mortgage Borrower to direct that all cash distributions from the Lockbox Account to be paid to Lender in accordance with the Mortgage Loan Agreement (including the Net Liquidation Proceeds After Debt Service) be deposited into an account specified by Lender. In the event Mortgage Lender waives the requirement of Mortgage Borrower to maintain the Lockbox Account or the Mortgage Loan has been repaid in full, Lender shall have the right to require Pledgor to establish and maintain a cash management account that would operate in the same way as the Lockbox Account, provided that Lender has obtained written consent from the Mortgage Lender in the event the Mortgage Loan is still outstanding.

**Section 10.3**    Mortgage Borrower Distributions.

All transfers of Mortgage Borrower's funds from the Lockbox Account or other sources to or for the benefit of Lender or the Borrower pursuant to this Agreement, the Mortgage Loan Documents or any of the other Loan Documents, are intended by Borrower and the Mortgage Borrower to constitute and shall constitute distributions from the Mortgage Borrower to the Borrower, and must comply with the requirements as to distributions of the Delaware Limited Liability Company Act. No provision of the Loan Documents shall create a debtor-creditor relationship between Mortgage Borrower and the Lender.

## XI.    MISCELLANEOUS

**Section 11.1**    Survival.

This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Pledgor, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 11.2**    Lender's Discretion.

Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not

- 139 -

satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

**Section 11.3**   Governing Law.

(a)    THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT ENTERED INTO PURSUANT TO THE LAWS OF THE STATE OF NEW YORK AND SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS), PROVIDED HOWEVER, THAT WITH RESPECT TO THE CREATION, PERFECTION, PRIORITY AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED BY THIS AGREEMENT, THE PLEDGE AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND THE DETERMINATION OF DEFICIENCY JUDGMENTS, THE LAWS OF THE STATE WHERE THE PROPERTY IS LOCATED SHALL APPLY.

(b)    WITH RESPECT TO ANY CLAIM OR ACTION ARISING HEREUNDER OR UNDER THIS AGREEMENT, THE NOTE, OR THE OTHER LOAN DOCUMENTS, EACH PARTY HERETO (A) IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK, NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF, AND (B) IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING ON VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS BROUGHT IN ANY SUCH COURT, IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING IN THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS INSTRUMENT WILL BE DEEMED TO PRECLUDE LENDER FROM BRINGING AN ACTION OR PROCEEDING WITH RESPECT HERETO IN ANY OTHER JURISDICTION.

**Section 11.4**   Modification, Waiver in Writing.

No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Note, or of any other Loan Document, nor consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Pledgor, shall entitle Pledgor to any other or future notice or demand in the same, similar or other circumstances.

**Section 11.5**   Delay Not a Waiver.

- 140 -

Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 11.6**  Notices.

All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person or by facsimile transmission with receipt acknowledged by the recipient thereof and confirmed by telephone by sender, (ii) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U. S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Pledgor: | Fontainebleau Las Vegas Retail Mezzanine, LLC<br>Fontainebleau Las Vegas Retail Parent, LLC<br>2827 Paradise Rd.<br>Las Vegas, NV 89109<br>Attention: Jim Freeman<br>Phone: (702) 495-8220<br>Fax: (702) 495-8011 |
| With a copy to: | Fontainebleau Las Vegas Retail Mezzanine, LLC<br>Fontainebleau Las Vegas Retail Parent, LLC<br>19950 West Country Club Drive<br>Aventura, FL  33180<br>Attn:  Eric Salzinger<br>Phone: (305) 682-4204<br>Fax: (305) 682-4205 |
| With an additional copy to: | Fontainebleau Las Vegas Retail Mezzanine, LLC<br>Fontainebleau Las Vegas Retail Parent, LLC<br>Las Vegas, NV 89109<br>Attn:  General Counsel<br>Phone: (702) 495-8108<br>Fax: (702) 495-8112 |
| If to Lender / Agent: | Lehman Brothers Holdings Inc. |

- 141 -

c/o Lehman Brothers Holdings
399 Park Avenue
New York, New York 10022
Attention: Josh Freedman
Facsimile No.: (212) 713-1278

With a copy to:

Lehman Brothers Holdings Inc.
c/o Lehman Brothers Holdings
399 Park Avenue
New York, New York 10022
Attention: Gary Taylor
Facsimile No.: (646) 758-2256

and

Thacher Proffitt & Wood
Two World Financial Center
New York, New York  10281
Attention: Mitchell G. Williams, Esq.
Facsimile No.: (212) 912-7751

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

**Section 11.7**    Trial by Jury.

EACH PARTY HERETO HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTY.

**Section 11.8**    Headings.

The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

[TPW: NYLEGAL:674139.7] 16248-00758  06/06/2007 12:54 AM

**Section 11.9**    Severability.

Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 11.10**    Preferences.

Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Pledgor to any portion of the obligations of Pledgor hereunder.  To the extent Pledgor makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, State or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 11.11**    Waiver of Notice.

Pledgor shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Pledgor and except with respect to matters for which Pledgor is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Pledgor hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Pledgor.

**Section 11.12**    Remedies of Borrower.

In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Pledgor agrees that neither Lender nor its agents shall be liable for any monetary damages, and Pledgor's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

**Section 11.13**    Expenses; Indemnity.

(a)    Pledgor covenants and agrees to pay or, if Pledgor fails to pay, to reimburse, Lender within five (5) Business Days of receipt of written notice from Lender for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the

- 143 -

consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Pledgor (including without limitation any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property); (ii) Pledgor's ongoing performance of and compliance with Pledgor's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date (after the expiration of all applicable notice, grace and cure periods, if any,) including, without limitation, confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Borrower; (iv) securing Pledgor's compliance with any requests made pursuant to the provisions of this Agreement (after the expiration of all applicable notice, grace and cure periods, if any); (v) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (vi) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Pledgor, this Agreement, the other Loan Documents, the Collateral, or any other security given for the Loan to the extent Lender is entitled to do so hereunder; and (vii) enforcing any obligations of or collecting any payments due from Pledgor under this Agreement, the other Loan Documents or with respect to the Collateral (after the expiration of all applicable notice, grace and cure periods, if any) or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; provided, however, that Pledgor shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender.  Any cost and expenses due and payable to Lender (after the expiration of all applicable notice, grace and cure periods, if any) may be paid from any amounts in the Lockbox Account.

(b)    Pledgor shall indemnify, defend and hold harmless Lender from and against any and all other liabilities, obligations, damages (but not special, consequential or punitive damages), losses (other than diminution in value), penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Lender in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto), that are imposed on, incurred by, or asserted against Lender in any manner relating to or arising out of (i) any breach by Pledgor of its obligations under, or any material misrepresentation by Pledgor contained in, this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "Additional Indemnified Liabilities"); provided, however, that Pledgor shall not have any obligation to Lender hereunder to the extent that such Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Lender.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence

- 144 -

may be unenforceable because it violates any law or public policy, Pledgor shall pay the maximum portion that it is permitted to pay and satisfy under Applicable Law to the payment and satisfaction of all Additional Indemnified Liabilities incurred by Lender.

(c)    Pledgor shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless Lender and the Indemnified Parties from and against any and all losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA, the Code, any State statute or other similar law that may be reasonably required) that Lender may incur, directly or indirectly, as a result of a default under Sections 4.1.8 or 5.2.8 hereof.

(d)    Pledgor covenants and agrees to pay for or, if Pledgor fails to pay, to reimburse Lender for, (i) any fees and expenses incurred by any Rating Agency in connection with any Rating Agency review of the Loan, the Loan Documents or any transaction contemplated thereby or (ii) any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of this Agreement or any other Loan Document and Lender shall be entitled to require payment of such fees and expenses as a condition precedent to the obtaining of any such consent, approval, waiver or confirmation.

**Section 11.14** Schedules and Exhibits Incorporated.

The Schedules and Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 11.15** Offsets, Counterclaims and Defenses.

Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Pledgor may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Pledgor in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Pledgor.

**Section 11.16** No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)    Pledgor and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Pledgor and Lender.

(b)    This Agreement and the other Loan Documents are solely for the benefit of Lender and Pledgor and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Pledgor any right to insist upon or to enforce the performance or observance of any of the obligations

- 145 -

contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

**Section 11.17** Publicity.

All news releases, publicity or advertising by Pledgor or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender, Lehman, or any of their Affiliates shall be subject to the prior written approval of Lender, which shall not be unreasonably withheld. Notwithstanding the foregoing, disclosure required by any federal or State securities laws, rules or regulations, as determined by Pledgor's counsel, shall not be subject to the prior written approval of Lender.

**Section 11.18** Waiver of Marshalling of Assets.

To the fullest extent permitted by Applicable Law, Pledgor, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Pledgor, Pledgor's partners and others with interests in Pledgor, and of the Collateral, or to a sale in inverse order of alienation in the event of foreclosure of all or part of the Pledge Agreement, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Collateral for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Collateral in preference to every other claimant whatsoever.

**Section 11.19** Waiver of Counterclaim.

Pledgor hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

**Section 11.20** Conflict; Construction of Documents; Reliance.

In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents (including, but not limited to, the Master Disbursement Agreement), the provisions of this Agreement shall control unless otherwise expressly provided herein. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Pledgor acknowledges that, with respect to the Loan, Pledgor shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate

- 146 -

of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Pledgor, and Pledgor hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.    Pledgor acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Pledgor or its Affiliates.

### Section 11.21  Brokers and Financial Advisors.

Pledgor hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.  Pledgor hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Pledgor or Lender in connection with the transactions contemplated herein.    The provisions of this Section 11.21 shall survive the expiration and termination of this Agreement and the payment of the Debt.

### Section 11.22  Nature of Inspection and Approvals.

Upon reasonable prior notice, Lender shall at its option have the right (and Pledgor shall cause Mortgage Borrower to permit Lender) to make inspection of the Project, and to approve, among other things the Plans and Specifications, the Survey, and the Construction Documents. No right of inspection or approval contained herein shall be deemed to impose upon Lender any duty or obligation whatsoever to undertake any inspection or to make any approval.    No inspection made or approval given by Lender shall be deemed to impose upon Lender any duty or obligation whatsoever to correct any defects in the Future Improvements or to notify any person with respect thereto, and provided further that no liability shall be imposed upon Lender, and no warranties construed to arise by reason of any inspection of the Project or approval by Lender, its agents, employees or representatives, any such inspections and approvals being made solely for the benefit of Lender.  All conditions precedent to the obligation of Lender to make any disbursement are imposed hereby solely for the benefit of Lender, and no other party may require satisfaction of any such condition precedent or be entitled to assume that Lender will refuse to make any disbursement in the absence of strict compliance with such conditions precedent.  Any requirement of this Agreement obligating Borrower or any of its Affiliates may be waived, in whole or in part, in a specific written waiver intended for the purpose and signed by Lender.  Lender shall have the right (and Pledgor shall cause Mortgage Borrower to permit Lender) to approve and verify the periodic progress, costs incurred by Mortgage Borrower, and the estimated costs remaining to be incurred, after consultation with the Construction Consultant. No disbursement shall constitute an approval or acceptance by Lender of any construction work, a waiver of any condition precedent to any further disbursement, or preclude Lender from thereafter declaring the failure of Pledgor or Mortgage Borrower to satisfy such condition precedent to be an Event of Default.  No waiver by Lender of any condition precedent or

- 147 -

obligation to funding a disbursement of the Loan proceeds shall preclude Lender from requiring such condition or obligation to be met prior to making any future disbursement.

**Section 11.23** Prior Agreements.

This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, between Pledgor and/or its Affiliates and Lender are superseded by the terms of this Agreement and the other Loan Documents.

[NO FURTHER TEXT ON THIS PAGE]

- 148 -

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

FONTAINEBLEAU    LAS    VEGAS    RETAIL MEZZANINE, LLC, a Delaware limited liability company

By:    Fontainebleau Las Vegas Retail Parent, LLC, a Delaware limited liability company, its managing member

By:    Fontainebleau Resort Holdings, LLC, a Delaware limited liability company, its managing member

By:    Fontainebleau Resorts, LLC, a Delaware limited liability company, its managing member

By:    _____
Name: Jeffrey Soffer
Title:  Exec. Chairman

FONTAINEBLEAU LAS VEGAS RETAIL
PARENT, LLC, a Delaware limited liability
company

By:    Fontainebleau Resort Holdings, LLC, a
Delaware limited liability company, its
managing member

    By:    Fontainebleau Resorts, LLC, its
managing member

       By:    _____
Name:  *Jeffrey Soffer*
*Exec. Chairman*

WITH RESPECT TO SECTIONS 9.1, 9.2, 9.7.3 AND 9.7.4 AND 9.9 ONLY

FONTAINEBLEAU RESORTS, LLC, a Delaware limited liability company

By: _____

Name: Jeffrey Soffer

Title: Exec. Chairman

MEZZANINE LOAN AGREEMENT

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, individually as a Co-Lender and as Agent for one or more Co-Lenders

By: _____

Name: Charlene Thomas
Title: Authorized Signatory

# FIRST AMENDMENT TO MEZZANINE LOAN AGREEMENT AND OTHER LOAN DOCUMENTS

Dated as of September 9, 2007

Between

## FONTAINEBLEAU LAS VEGAS RETAIL MEZZANINE, LLC
as Borrower

and

## LEHMAN BROTHERS HOLDINGS INC.
individually and as Agent for one or more Co-Lenders,
as Lender

## FIRST AMENDMENT TO MEZZANINE LOAN AGREEMENT AND OTHER LOAN DOCUMENTS

THIS FIRST AMENDMENT TO MEZZANINE LOAN AGREEMENT AND OTHER LOAN DOCUMENTS (this "**Amendment**"), dated as of September 9, 2007, between **FONTAINEBLEAU LAS VEGAS RETAIL MEZZANINE, LLC,** a Delaware limited liability company, having its principal place of business at 2827 Paradise Road, Las Vegas, Nevada 89109 ("**Borrower**") and **LEHMAN BROTHERS HOLDINGS INC.,** a Delaware corporation, having an address at 399 Park Avenue, 8th Floor, New York, New York 10022, individually as lender and as Agent for one or more Co-Lenders (together with its successors and assigns, "**Lender**").

## W I T N E S S E T H:

**WHEREAS**, Lender made a mezzanine loan in the original principal amount of $85,000,000 (the "**Loan**") to Borrower pursuant to the terms and conditions of that certain Mezzanine Loan Agreement, dated as of June 6, 2007 (as heretofore and hereafter amended, modified or extended, collectively, the "**Loan Agreement**").

**WHEREAS**, pursuant to the terms of the Loan Agreement, Lender now wishes to amend the Loan Agreement and other Loan Documents (as defined in the Loan Agreement), and Borrower consents to such amendment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties hereto hereby covenant, agree, represent and warrant that the Loan Agreement is hereby amended as follows:

### I.    LOAN AGREEMENT

**1.1** Revised Definitions.  The following term set forth in the Loan Agreement is hereby deleted in its entirety and shall have the meaning set forth below:

"Completion Guaranty" shall mean that certain Mezzanine Completion Guaranty, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Environmental Indemnity" shall mean that certain Mezzanine Environmental Indemnity Agreement executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Eurodollar Rate Margin" shall mean 12.7794% per annum.

"Guaranty of Payment" shall mean that certain Mezzanine Guaranty of Payment, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

[TPW: NYLEGAL:699578.5] 16248-00758 09/14/2007 03:13 PM

"Guaranty of Recourse Obligations" shall mean that certain Mezzanine Guaranty of Recourse Obligations of Borrower, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"LIBOR Determination Date" shall mean, with respect to any Interest Period, the date that is two (2) LIBOR Business Days prior to the ninth (9th) calendar day of the month in which such Interest Period commenced.

## II.    ENVIRONMENTAL INDEMNITY

**2.1**    The text ", Borrower" is hereby inserted after the text "("**Fontainebleau**"; Soffer," and before the words "and Fontainebleau" in the opening paragraph of the Environmental Indemnity.

## III.    COMPLETION GUARANTY

**3.1**    The text ", jointly and severally," is hereby inserted after the text "hereby absolutely and unconditionally" in the opening paragraph of the Completion Guaranty.

## IV.    GUARANTY OF RECOURSE OBLIGATIONS OF BORROWER

**4.1**    The text ", jointly and severally," is hereby inserted after the text "hereby absolutely and unconditionally" in the opening paragraph of the Guaranty of Recourse Obligations.

## V.    GUARANTY OF PAYMENT

**5.1**    The text ", jointly and severally," is hereby inserted after the text "hereby absolutely and unconditionally" in the opening paragraph of the Guaranty of Payment.

## VI.    MISCELLANEOUS

**6.1**    Except as specifically modified and amended herein, all other terms, conditions and covenants contained in the Loan Agreement and the other Loan Documents shall remain in full force and effect.

**6.2**    All references in any of the Loan Documents to any of the Loan Documents modified herein shall mean the applicable Loan Document as hereby modified and amended.

**6.3**    All references in any of the Loan Documents to the "Loan Agreement" shall be deemed to refer to the Loan Agreement as defined in the recitals hereto.

**6.4**    Unless otherwise defined in this Amendment, terms used but not defined herein shall have the meaning set forth in the Loan Agreement.

**6.5**    This Amendment may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All such counterparts shall be

2

construed together and shall constitute one instrument, but in making proof hereof it shall only be necessary to produce one such counterpart.

6.6    This Amendment shall be binding upon and inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

6.7    This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to principles of conflict laws, and any applicable law of the United States of America.

**[NO FURTHER TEXT ON THIS PAGE]**

[TPW: NYLEGAL:699578.5] 16248-00758  09/14/2007 03:13 PM

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be duly executed by their duly authorized representatives, all as of the day and year first above written.

FONTAINEBLEAU LAS VEGAS RETAIL MEZZANINE, LLC, a Delaware limited liability company

By: Fontainebleau Las Vegas Retail Parent, LLC, a Delaware limited liability company, its managing member

By: Fontainebleau Resort Holdings, LLC, a Delaware limited liability company, its managing member

By: Fontainebleau Resorts, LLC, a Delaware limited liability company, its managing member

By: _____
Name: James Freeman
Title: Senior Vice President and Chief Financial Officer

LENDER:

LEHMAN BROTHERS HOLDINGS INC.,
a Delaware corporation, individually as a Co-
Lender and as Agent for one or more Co-
Lenders


By: _____

Name:
Title:          Catherine Harnett
                Authorized Signatory

CONSENTED    TO    BY    MORTGAGE
LENDER:

LEHMAN BROTHERS HOLDINGS INC.,
a Delaware corporation, individually as a Co-
Lender and as Agent for one or more Co-
Lenders


By: _____

Name:
Title:          Catherine Harnett
                Authorized Signatory

First Amendment to Mezzanine Loan Agreement

Guarantor hereby acknowledges the modifications to the Loan Agreement and other Loan Documents made herein and hereby ratifies and confirms to Lender, as of the date hereof, that all of the terms, covenants, indemnifications and provisions of the Guaranty are and shall remain in full force and effect without change except as otherwise amended herein.

FONTAINEBLEAU   RESORTS,   LLC,   a
Delaware limited liability company

By: _____
Name: James Freeman
Title: Senior Vice President and
Chief Financial Officer

_____
Jeffrey Soffer, an Individual

3