Exhibit "A"

# LOAN AGREEMENT

Dated as of June 6, 2007

Between

## FONTAINEBLEAU LAS VEGAS RETAIL, LLC
as Borrower

And

## LEHMAN BROTHERS HOLDINGS INC.
individually and as Agent for one or more Co-Lenders,
as Lender

I. DEFINITIONS; PRINCIPLES OF CONSTRUCTION...........................................................1
    Section 1.1  Definitions..........................................................................................1
    Section 1.2  Principles of Construction..................................................................34
II. GENERAL TERMS .............................................................................................................34
    Section 2.1  Loan Commitment; Disbursement to Borrower. .................................34
    Section 2.2  Interest; Loan Payments; Late Payment Charge...................................37
    Section 2.3  Prepayments........................................................................................44
    Section 2.4  Interest Rate Cap Agreement. .............................................................47
    Section 2.5  Release on Payment in Full.................................................................49
III. CONSTRUCTION LOAN ADMINISTRATION ............................................................49
    Section 3.1  Closing Conditions and Conditions to Initial Advance. ......................49
IV. REPRESENTATIONS AND WARRANTIES ..................................................................52
    Section 4.1  Borrower Representations....................................................................52
    Section 4.2  Survival of Representations. ................................................................68
V. BORROWER COVENANTS.................................................................................................68
    Section 5.1  Affirmative Covenants.........................................................................68
    Section 5.2  Negative Covenants. ............................................................................96
VI. INSURANCE; CASUALTY; CONDEMNATION .........................................................101
    Section 6.1  Insurance. ..........................................................................................101
    Section 6.2  Casualty.............................................................................................105
    Section 6.3  Condemnation. ...................................................................................106
    Section 6.4  Restoration. .......................................................................................106
VII. RESERVE FUNDS ..........................................................................................................112
    Section 7.1  Reserved.............................................................................................112
    Section 7.2  Tax and Insurance Escrow Fund.........................................................112
    Section 7.3  Reserve Funds, Generally. .................................................................113
VIII. DEFAULTS .....................................................................................................................114
    Section 8.1  Event of Default.................................................................................114
    Section 8.2  Remedies............................................................................................119
    Section 8.3  Remedies Cumulative; Waivers..........................................................121
    Section 8.4  Power of Attorney ..............................................................................121
IX. SPECIAL PROVISIONS....................................................................................................122
    Section 9.1  Sale of Notes and Securitization. .......................................................122

Section 9.2  Securitization Indemnification. ................................................................ 124

Section 9.3  Servicer. ..................................................................................................... 127

Section 9.4  Exculpation. ............................................................................................... 127

Section 9.5  Intentionally Omitted. ............................................................................... 129

Section 9.6  Intentionally Omitted. ............................................................................... 129

Section 9.7          Syndication ...................................................................................... 129

Section 9.8  Reallocation of Loan Amounts. ............................................................... 137

Section 9.9  Intentionally Omitted. ............................................................................... 138

Section 9.10  Intercreditor Agreement. ......................................................................... 138

X. CASH MANAGEMENT ........................................................................................... 138

Section 10.1  Establishment of Accounts. .................................................................... 138

Section 10.2  Deposits into Lockbox Account ............................................................... 139

Section 10.3  Account Name. ......................................................................................... 139

Section 10.4  Eligible Accounts ..................................................................................... 140

Section 10.5  Permitted Investments. ............................................................................ 140

Section 10.6  The Initial Deposits. ................................................................................ 140

Section 10.7  Transfer To and Disbursements from the Lockbox Account .................. 140

Section 10.8  Withdrawals From the Tax Account and the Insurance Premium
              Account. ................................................................................................ 141

Section 10.9  Withdrawals from the Debt Service Account. ......................................... 141

Section 10.10  Withdrawals from the Mezzanine Account. .......................................... 141

Section 10.11  Sole Dominion and Control. .................................................................. 142

Section 10.12  Security Interest. .................................................................................... 142

Section 10.13  Rights on Default. .................................................................................. 142

Section 10.14  Financing Statement; Further Assurances. ........................................... 142

Section 10.15  Borrower's Obligation Not Affected. .................................................... 143

Section 10.16  Payments Received Under this Agreement ............................................ 143

Section 10.17  Deposit Accounts. .................................................................................. 143

Section 10.18  Intentionally Omitted. ............................................................................ 144

Section 10.19  Lender Reliance. ..................................................................................... 144

Section 10.20  Borrower Distributions. ......................................................................... 144

XI. MISCELLANEOUS .................................................................................................. 145

Section 11.1  Survival. ................................................................................................... 145

[TPW: NYLEGAL:618631.13] 16248-00758  06/06/2007 12:51 AM

Section 11.2  Lender's Discretion.................................................................... 145

Section 11.3  Governing Law. ........................................................................ 145

Section 11.4  Modification, Waiver in Writing. ............................................. 146

Section 11.5  Delay Not a Waiver. ................................................................. 146

Section 11.6  Notices. ..................................................................................... 146

Section 11.7  Trial by Jury. ............................................................................ 147

Section 11.8  Headings. .................................................................................. 148

Section 11.9  Severability. .............................................................................. 148

Section 11.10  Preferences................................................................................ 148

Section 11.11  Waiver of Notice....................................................................... 148

Section 11.12  Remedies of Borrower. ............................................................. 148

Section 11.13  Expenses; Indemnity................................................................. 149

Section 11.14  Schedules and Exhibits Incorporated........................................ 150

Section 11.15  Offsets, Counterclaims and Defenses. ...................................... 150

Section 11.16  No Joint Venture or Partnership; No Third Party Beneficiaries. ........... 151

Section 11.17  Publicity. ................................................................................... 151

Section 11.18  Waiver of Marshalling of Assets. ............................................. 151

Section 11.19  Waiver of Counterclaim............................................................ 152

Section 11.20  Conflict; Construction of Documents; Reliance. ...................... 152

Section 11.21  Brokers and Financial Advisors................................................ 152

Section 11.22  Nature of Inspection and Approvals. ........................................ 152

Section 11.23  Prior Agreements. ..................................................................... 153

Exhibits

Exhibit A - Form of Advance Request
Exhibit B - Form Assignment of Interest Rate Cap Agreement
Exhibit C - Form Assignment of Development Agreement
Exhibit D - Form Assignment of Management Agreement
Exhibit E - Form of SNDA
Exhibit F – Form of Notice to Tenants
Exhibit G - Form of Affiliate Lease
Exhibit H - Form of Tenant Lease
Exhibit I -  Reserved
Exhibit J - Form of Management Agreement
Exhibit K – Form of Statement Re: Non-Bank Status

Schedules

[TPW: NYLEGAL:618631.13] 16248-00758  06/06/2007 12:51 AM

Schedule I - Organizational Chart of Borrower
Schedule II – Litigation
Schedule III – Construction Budget

[TPW: NYLEGAL:618631.13] 16248-00758  06/06/2007 12:51 AM

# LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of June 6, 2007 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), between **LEHMAN BROTHERS HOLDINGS INC.,** a Delaware corporation, having an address at 399 Park Avenue, 8th Floor, New York, New York 10022, individually as lender and as Agent for one or more Co-Lenders ("Lender") and **FONTAINEBLEAU LAS VEGAS RETAIL, LLC,** a Delaware limited liability company, having its principal place of business at 2827 Paradise Road, Las Vegas, Nevada 89109 ("Borrower").

## W I T N E S S E T H:

WHEREAS, Borrower desires to obtain the Loan (as hereinafter defined) from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## I.     DEFINITIONS; PRINCIPLES OF CONSTRUCTION

### Section 1.1     Definitions.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"Acceptable Counterparty" shall mean any Counterparty to any Interest Rate Cap Agreement that has and shall maintain, until the expiration of such Interest Rate Cap Agreement, a long-term unsecured debt rating of not less than "Aa3" by Moody's and not less than "A+" by S&P (or in each case, the equivalent by any other Rating Agency); provided, however, Lehman Brothers Holdings Inc. or any Affiliate thereof shall be deemed to be an Acceptable Counterparty for so long as it maintains a long-term unsecured debt rating of not less than "A" by S&P and "A1" from Moody's.

"Account Collateral" shall mean: (i) the Accounts, and all Cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts from time to time; (ii) any and all amounts invested in Permitted Investments; (iii) all interest, dividends, Cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and (iv) to the extent not covered by clauses (i) - (iii) above, all "proceeds" (as defined under the UCC as in effect in the State in which the Accounts are located) of any or all of the foregoing.

"Accounts" shall mean the Tax Account, the Insurance Premium Account, the Debt Service Account, the Debt Service Reserve Account, any escrow accounts or reserve accounts

established by the Loan Documents (other than those accounts established under the Master Disbursement Agreement with respect to which the Resort Lender is the pledgee).

"Acquired Property" shall have the meaning set forth in Section 5.1.10(h)(i) hereof.

"Acquired Property Statements" shall have the meaning set forth in Section 5.1.10(h)(i) hereof.

"Additional Construction Consultant" shall mean any additional construction consultant engaged by Lender at Borrower's expense to perform various services on behalf of Lender including: examination of the Plans and Specifications and changes thereto, the Construction Budget change orders, and Advance Requests; periodic inspections on Lender's behalf and advising and rendering periodic reports to Lender concerning the same; and approving requests for Future Advances.

"Additional Indemnified Liabilities" shall have the meaning set forth in Section 11.13(b) hereof.

"Adjusted Prime Rate" shall mean an interest rate per annum equal to the Prime Rate in effect from time to time plus the Adjusted Prime Rate Spread.

"Adjusted Prime Rate Spread" shall mean the difference (expressed as the number of basis points) between (a) the Eurodollar Rate on the date LIBOR was last applicable to the Loan and (b) the Prime Rate on the date that LIBOR was last applicable to the Loan; provided, however, that if such difference is a negative number then the Adjusted Prime Rate Spread shall be equal to zero.

"Advance Request" shall (i) with respect to Project Future Advances, have the meaning set forth in the Master Disbursement Agreement and (ii) with respect to Debt Service Advances, have the meaning set forth in Section 2.1.2(d) hereof.

"Affected Co-Lender" shall have the meaning set forth in Section 9.7.2(k) hereof.

"Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person or of an Affiliate of such Person. Such term shall include the Guarantor unless otherwise specified or if the context may otherwise require.

"Affiliate Deferred Payments Agreement" shall mean the Affiliate Deferred Payments Agreement, dated as of the date hereof, among Turnberry Residential Limited Partner, L.P., Sponsor, Jeffrey Soffer and Borrower.

"Affiliate Lease" shall mean the lease to be entered into between Borrower and Fontainebleau Las Vegas, LLC in the form attached (with such de minimis changes agreed to by Borrower) as Exhibit G hereto.

"Affiliated Loans" shall have the meaning set forth in Section 5.1.10(m) hereof.

- 2 -

"Affiliated Manager" shall mean any property manager which is an Affiliate of, or in which Borrower or any Guarantor has, directly or indirectly, any legal, beneficial or economic interest.

"Agent" shall have the meaning set forth in Section 9.7.2(d) hereof.

"Air Rights Lease" shall mean that certain Master Lease Agreement dated as of the date hereof, by and among Resort Borrower and Borrower, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Air Rights Rent" shall mean "Rent" as defined in the Air Rights Lease and any other rent or amounts payable under the Air Rights Lease.

"ALTA" shall mean American Land Title Association, or any successor thereto.

"Annual Budget" shall mean the operating budget, including all planned Capital Expenditures, for the Property prepared by Borrower for the applicable Fiscal Year or other period.

"Applicable Laws" shall mean all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations and court orders.

"Applicable Interest Rate" shall mean  (A) from and including the date of this Agreement through June 8, 2007, an interest rate per annum equal to 8.07%; and (B) from and including the June 9, 2007, and for each successive Interest Period through and including the date on which the Debt is paid in full, an interest rate per annum equal to (I) the Eurodollar Rate or (II) the Adjusted Prime Rate, for so long as the Loan bears interest at the Adjusted Prime Rate in accordance with the provisions of Section 2.2.3 hereof.

"Appraisal" shall mean an appraisal prepared in accordance with the requirements of FIRREA and USPAP, prepared by an independent third party appraiser holding an MAI designation, who is licensed or certified to the extent required under the laws of the State of Nevada, who meets the requirements of FIRREA and USPAP and who is otherwise satisfactory to Lender.

"Approved Accountant" shall mean a "Big Four" accounting firm or other independent certified public accountant reasonably acceptable to Lender.

"Approved Affiliate Agreements" shall mean the Master Disbursement Agreement, the Affiliate Lease, the License Agreement, the Master REA, the Air Rights Lease, the Affiliate Deferred Payments Agreement, the Credit Enhancement Fee Agreement, the Reimbursement Agreement, the Approved Leasing Agreement and the Approved Management Agreement, and in each case any replacement of any such agreement entered into from time to time in accordance with the terms hereof.

"Approved Annual Budget" shall have the meaning set forth in Section 5.1.10(d) hereof.

- 3 -

"Approved Leasing Agreement" shall mean that certain Leasing Agreement, dated as of the date hereof, between and Borrower and TB Realty, Inc., a Nevada corporation.

"Approved Management Agreement" shall mean that certain Property Management Agreement, dated as of the date hereof, between Borrower and TB Realty, Inc., a Nevada corporation.

"Architect" means, in the event Borrower (rather than the applicable subtenants) constructs any of the Future Improvements, an architect selected by Borrower and approved by Lender, such approval not to be unreasonably withheld, conditioned or delayed.

"Architect's Contract" means any contract entered into after the date hereof relating to the design and construction of the Future Improvements, if any, being constructed by Borrower and approved by Lender, such approval not to be unreasonably withheld, conditioned or delayed.

"Assignment and Assumption" shall have the meaning set forth in Section 9.7.2 hereof.

"Assignment of Development Agreement" shall mean a Conditional Assignment of Development Agreement in the form (with such de minimis changes agreed to by Borrower) attached hereto as Exhibit C (or such other form reasonably acceptable to Lender).

"Assignment of Interest Rate Cap Agreement" shall mean that certain Collateral Assignment of Interest Rate Cap Agreement to be entered into by Borrower in favor of Lender in the form attached hereto as Exhibit B (or such other form reasonably acceptable to Lender) as security for the Loan, consented to by the Counterparty, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Leases" shall mean that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender all of Borrower's interest in and to the Leases and Rents of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Leasing Agreement" shall mean that certain Conditional Assignment of Leasing Agreement dated as of the date hereof, among Lender, Borrower, and Leasing Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Management Agreement" shall mean a Conditional Assignment of Management Agreement in the form (other than de minimus changes) attached hereto as Exhibit D (or such other form reasonably acceptable to Lender).

"Assumed Note Rate" shall mean an interest rate equal to the sum of 1% plus LIBOR as determined on the preceding LIBOR Determination Date plus the Eurodollar Rate Margin.

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

[TPW: NYLEGAL:618631.13] 16248-00758  06/06/2007 12:51 AM

"Bankruptcy Code" shall mean Title 11 U.S.C. § 101 *et seq.*, and the regulations adopted and promulgated pursuant thereto (as the same may be amended from time to time).

"Basic Carrying Costs" shall mean the sum of the following costs associated with the Property for the relevant Fiscal Year or payment period: (i) Taxes and (ii) Insurance Premiums and (iii) so long as the Air Rights Lease is in effect, any Air Rights Rent payable during such Fiscal Year or payment period.

"Borrower" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"Breakage Costs" shall have the meaning set forth in Section 2.2.3(d) hereof.

"Building" shall mean the building being constructed (in accordance with the Project Plans and Specifications and the Plans and Specifications, respectively) on the construction site for the Project.

"Business Day" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"Business Party" shall have the meaning set forth in Section 4.1.35(aa)) hereof.

"Capital Expenditures" shall mean, for any period, the amount expended with respect to the Property for items capitalized under GAAP (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"Cash" shall mean coin or currency of the United States of America or immediately available federal funds, including such fund delivered by wire transfer.

"Casualty" shall have the meaning set forth in Section 6.2 hereof.

"Casualty Consultant" shall have the meaning set forth in Section 6.4.3(b) hereof.

"Casualty Retainage" shall have the meaning set forth in Section 6.4.3(b) hereof.

"Closing Date" shall mean the date of the funding of the Loan.

"Code" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and all applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Co-Lender" shall have the meaning set forth in Section 9.7.2 hereof.

"Co-Lending Agreement" shall mean the co-lending agreement entered into between Lender, individually as a Co-Lender and as Agent and the other Co-Lenders in the event of a Syndication, as the same may be further supplemented modified, amended or restated.

"Collateral" shall mean the Property, the Accounts, the Reserve Funds, the Guaranty, the Personal Property, the Rents, the Account Collateral, and all other real or personal property of

- 5 -

Borrower or any Guarantor that is at any time pledged, mortgaged or otherwise given as security to Lender for the payment of the Debt under the Security Instrument, this Agreement or any other Loan Document.

"Completion Date" shall mean March 31, 2010 or, if such construction is delayed by a Force Majeure cause, on or before October 31, 2010.

"Completion Guaranty" shall mean that certain Completion Guaranty, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Condemnation" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"Condemnation Proceeds" shall have the meaning set forth in Section 6.4.2(b) hereof.

"Construction Budget" shall mean the budget attached hereto as Schedule III, as changed from time to time in accordance with the terms of this Agreement.

\\jcnas01\reis
\Lehman Docs
\Fontainebleau-583
99.0003

"Construction Consultant" shall mean, individually and collectively as the context may require, the Additional Construction Consultant and/or the Project Construction Consultant.

"Construction Contract" means any contract entered into between Borrower and any General Contractor after the date hereof, approved by Lender in its reasonable discretion, and all amendments, supplements, appendices and addenda to each thereof, which each relate to the construction of the Future Improvements to be constructed by Borrower.

"Construction Documents" shall mean the Architect's Contract, the Construction Contract, the Engineer's Contract, the Plans and Specifications and all other contracts, plans or documents concerning the construction, design, or engineering of the Future Improvements to be constructed by Borrower, if any.

"Contract Rate" shall mean, at the time of any calculation, an interest rate per annum equal to the greater of (a) the Applicable Interest Rate then in effect and (b) 8.5%.

"Control" (and the correlative terms "controlled by" and "controlling") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of the business and affairs of the entity in question by reason of the ownership of beneficial interests, by contract or otherwise.

"Counterparty" shall mean, at any time, the Person which is the issuer of the Interest Rate Cap Agreement at such time.

"Credit Enhancement Fee Agreement" shall mean the Credit Enhancement Fee Agreement, dated as of the date hereof, among Turnberry Residential Limited Partner, L.P., Sponsor, Jeffrey Soffer and Borrower.

"Creditors Rights Laws" shall mean with respect to any Person, any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement, the Security Instrument or any other Loan Document, including, without limitation but without duplication, all Reserve Fund Deposits.

"Debt Service" shall mean, with respect to any particular period of time, interest payments due under the Note for such period.

"Debt Service Advance" shall have the meaning set forth in Section 2.1.2(d) hereof.

"Debt Service Account" shall have the meaning set forth in Section 10.1 hereof.

"Debt Service Coverage Ratio" shall mean a ratio in which:

(a)    the numerator is the Net Operating Income for the 6 full calendar month (or such other period as specifically stated herein)(such amount to be annualized) period preceding the date of calculation as set forth in the financial statements required hereunder, without deduction for (i) actual management fees incurred in connection with the operation of the Property, or (ii) amounts paid to the Reserve Funds, less (A) management fees equal to the greater of (1) assumed management fees of three percent (3%) of Gross Income from Operations or (2) the actual management fees incurred, and (B) assumed replacement reserve fund contributions equal to $0.15 per square foot of gross leaseable area at the Property; and (C) Lease Termination Payments; and

(b)    the denominator is the aggregate amount of Debt Service and Mezzanine Debt Service which would be due and payable for such 6 full calendar month period (or such other period as specifically stated herein)(such amount to be annualized), calculated at an interest rate equal to the Contract Rate and Mezzanine Contract Rate respectively.

"Debt Service Reserve Account" shall have the meaning set forth in Section 2.2.1(c) hereof.

"Default" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would constitute an Event of Default.

"Default Rate" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (a) the Maximum Legal Rate, or (b) four percent (4%) above the Applicable Interest Rate.

[TPW: NYLEGAL:618631.13] 16248-00758 06/06/2007 12:51 AM

"Defaulting Lender" shall mean at any time, (i) any Lender or Co-Lender with respect to which a Lender Default is in effect, (ii) any Lender or Co-Lender that as a result of any voluntary action is the subject (as a debtor) of any action or proceeding (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, (iii) any Lender or Co-Lender that shall make a general assignment for the benefit of its creditors or (iv) any Lender or Co-Lender that shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due.

"Designated Servicing Matters" shall consist of each of the following actions taken by Servicer as they relate to the Loan: (i) the review of Leases or any request for Lender's consent pursuant to Section 5.1.17 hereof, (ii) any Property inspections, (iii) any actions in connection with a Casualty or Condemnation and (iv) any actions in connection with a Default or Event of Default.

"Developer" shall mean a Qualified Developer who is developing the Property in accordance with the terms and provisions of this Agreement.

"Development Agreement" shall mean, with respect to the Property, any development agreement entered into by and between Borrower and Developer, pursuant to which the Developer is to provide development and other services with respect to the Property, or, if the context requires, the Replacement Development Agreement executed in accordance with the terms and provisions of this Agreement.

"Disclosure Document" shall have the meaning set forth in Section 9.2(a) hereof.

"Eligible Account" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts maintained with a federal or State chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with a federal or State chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a State chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R.§9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and State authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"Eligible Institution" shall mean a depository institution or trust company, insured by the Federal Deposit Insurance Corporation, (a) the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by S&P, P-1 by Moody's and F-1 by Fitch in the case of accounts in which funds are held for thirty (30) days or less, or (b) the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's in the case of accounts in which funds are held for more than thirty (30) days.

- 8 -

"Embargoed Person" shall have the meaning set forth in Section 4.1.43 hereof.

"Engineer" means any engineer or consultant who has a contract in the future directly with Borrower in connection with the Future Improvements, if any, that are to be constructed by Borrower.

"Engineer's Contract" means the collective reference to all contracts and agreements entered into after the date hereof between Borrower and Engineer, related to the construction of the Future Improvements, if any, being constructed by Borrower, and site planning therefor, and in each case approved by Lender, which approval shall not be unreasonably withheld, conditioned or delayed.

"Environmental Indemnity" shall mean that certain Environmental Indemnity Agreement executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Environmental Law" shall mean any federal, State and local laws, statutes, ordinances, rules, regulations, standards, policies and other government directives or requirements, as well as common law, that, at any time, apply to Borrower and Guarantor or the Property and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act and the Resource Conservation and Recovery Act.

"Environmental Liens" shall have the meaning set forth in Section 5.1.19(a) hereof.

"Environmental Reports" shall have the meaning set forth in Section 4.1.39 hereof.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"Eurodollar Rate" shall mean, with respect to any Interest Period, an interest rate per annum equal to LIBOR plus the Eurodollar Rate Margin.

"Eurodollar Rate Margin" shall mean 2.75%.

"Event of Default" shall have the meaning set forth in Section 8.1(a) hereof.

"Exchange Act" shall have the meaning set forth in Section 9.2(a) hereof.

"Exchange Act Filing" shall have the meaning set forth in Section 9.2(a) hereof.

"Extended Maturity Date: shall have the meaning set forth in Section 2.2.1(c) hereof.

"Extension Fee" shall mean 0.125% of the Maximum Loan Amount.

"Extension Option" shall have the meaning set forth in Section 2.2.1(c) hereof.

"Extension Period" shall have the meaning set forth in Section 2.2.1(c) hereof.

"Fee Estate" shall mean, with respect to the Property, the fee interest of the lessor under the Air Rights Lease in the Property and the Improvements demised under the Air Rights Lease.

"Fee Owner" shall mean, with respect to the Property, the owner of the lessor's interest in the Air Rights Lease and the related Fee Estate prior to the Fee Transfer.

"Fee Transfer" shall occur at such time as Borrower has received fee simple title to the New Estate.

"Fee Transfer Conditions" shall mean each of the following:

(i)    to the extent reasonably required by Lender in order to preserve and/or protect the new fee simple collateral securing or intended to secure the obligations of Borrower under the Loan Documents, Borrower shall have executed, acknowledged and delivered to Lender (i) a new Security Instrument and two new UCC-1 financing statements with respect to the Property (or in each case, satisfactory amendments to the existing Security Instrument and UCC-1 financing statements), together with a letter from Borrower countersigned by a title insurance company acknowledging receipt of such Security Instrument and UCC-1 financing statements and agreeing to record or file, as applicable, such Security Instrument and one of the UCC-1 financing statements in the real estate records for the county in which the Property is located and to file one of the UCC-1 financing statements in the office of the Secretary of State (or other central filing office) of the State in which the Property is located, so as to effectively create upon such recording and filing valid and enforceable first priority Liens upon the New Estate (together with the remainder of the Property), in favor of Lender (or such other trustee as may be desired under local law), subject only to the Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents;

(ii)    Lender shall have received a Title Insurance Policy (or (A) a marked, signed and redated commitment to issue such Title Insurance Policy or (B) an endorsement to the existing Title Insurance Policy as would be reasonably satisfactory to a prudent institutional mortgage lender) insuring the Lien of the Security Instrument encumbering the fee simple interest in the Property, issued by the title company that issued the initial Title Insurance Policy insuring the Lien of the Security Instrument and dated as of the date of the acquisition by Borrower, with reinsurance and direct access agreements that replace such agreements (or satisfactory endorsements or amendments to the existing agreements) issued in connection with the Title Insurance Policy insuring the Lien of the Security Instrument encumbering the Property prior to the Fee Transfer. Such new Title Insurance Policy (or the existing Title Policy as modified by such endorsement, as applicable) issued shall (1) provide coverage in an amount equal to the Maximum Loan Amount, (2) insure Lender that the relevant Security Instrument (as amended, if applicable) creates a valid first lien on the New Estate (together with the remainder of the Property) encumbered thereby, free and clear of all exceptions from coverage other than Permitted Encumbrances and standard exceptions and exclusions from coverage (as modified by the terms of any endorsements), (3) contain such endorsements and affirmative coverages as are then available and are contained in the existing Title Insurance Policy (to the extent applicable), and such other endorsements or affirmative coverage (if any) that a prudent institutional mortgage lender would require solely as a result of a change in collateral from a leasehold estate to a fee estate, and (4) name Lender as the insured. Lender also shall have received copies of

- 10 -

paid receipts or other evidence showing that all premiums, if any, in respect of the Title Insurance Policy (or endorsement) has been paid;

(iii)    Lender shall have received, if the Loan is part of a Securitization, an opinion of counsel acceptable to the Rating Agencies that the Fee Transfer does not constitute a "significant modification" of the Loan under Section 1001 of the Code or otherwise cause a tax to be imposed on a "prohibited transaction" by any REMIC Trust;

(iv)    Borrower shall have paid or reimbursed Lender for all costs and expenses incurred by Lender (including, without limitation, reasonable attorneys' fees and disbursements) in connection with the Fee Transfer (and Borrower's satisfaction of the Fee Transfer Conditions) and Borrower shall have paid all recording charges, filing fees, taxes or other expenses (including, without limitation, mortgage and intangibles taxes and documentary stamp taxes) payable in connection with the Fee Transfer. Borrower shall have paid all costs and expenses of the Rating Agencies incurred in connection with the substitution;

(v)    Borrower shall have delivered evidence to Lender that all Leases then in effect shall not be terminated or otherwise adversely affected as a result of the Fee Transfer;

(vi)    Lender shall have received new subordination agreements in the form approved by Lender in connection with the origination of the Loan (or such other form or modifications to existing subordination agreements, each as approved by Lender, which approval shall not be unreasonably withheld) with respect to tenants under all Leases at the Property to the extent such Leases for such tenants are not automatically subordinate (in lien and in terms) pursuant to the terms of the applicable Leases or any subordination, non-disturbance and attornment agreements previously executed;

(vii)    Lender shall have received reasonably satisfactory evidence that all necessary actions have been taken, including, but not limited to, the filing of all appropriate documents with the municipality, to insure that the New Estate will be reasonably assessed as one or more wholly independent tax lot or lots;

(viii)    no Event of Default exists; and

(ix)    Borrower shall deliver an Officers Certificate certifying that each of the Fee Transfer Conditions have been satisfied.

"Fee Transfer Event" shall occur at such time as each of the following events have taken place:  (i) a Fee Transfer and (ii) each of the Fee Transfer Conditions have been satisfied in Lender's reasonable discretion.

"FIRREA" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as the same may be amended from time to time.

"Fiscal Year" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

[TPW: NYLEGAL:618631.13] 16248-00758  06/06/2007 12:51 AM

"Fitch" shall mean Fitch, Inc., and any successor by merger, consolidation or acquisition of all of its assets so long as the same remains a nationally recognized rating agency.

"Flood Insurance Act" shall have the meaning set forth in Section 6.1(a)(vii) hereof.

"Force Majeure" "shall mean the failure of Borrower to perform any obligation hereunder by reason of any act of God, enemy or hostile government action, terrorist attacks, civil commotion, insurrection, sabotage, strikes or lockouts or any other reason due to cause or causes beyond the reasonable control of Borrower or any Affiliate of Borrower; provided, however, that Borrower shall notify Lender in writing within ten (10) days after each such occurrence, and no Force Majeure event shall suspend or abate any obligation of Borrower or any Guarantor or any other person to pay any money.

"Future Advance" shall mean, individually and collectively, as the context may require, a Debt Service Advance or a Project Future Advance.

"Future Improvements" means any and all improvements to be made to the Property to be constructed by Borrower (in which case the same shall be depicted in the Plans and Specifications) and Borrower's subtenants, as the case may be, in order to complete the retail component of the Project in accordance with the terms of the Master REA and the Loan Documents.

"GAAP" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"General Contractor" means any general contractor, approved by Lender in all respects, which consent will not be unreasonably withheld, conditioned or delayed, that will have a Construction Contract with Borrower in connection with the Future Improvements being constructed by Borrower, if any, except to the extent all Construction Contracts with such general contractor, taken as a whole, are not material to the retail component of the Project.

"Governmental Authority" shall mean any court, board, agency, commission, office, central bank or other authority of any nature whatsoever for any governmental unit (federal, State, county, district, municipal, city, country or otherwise) or quasi-governmental unit whether now or hereafter in existence.

"Gross Income from Operations" shall mean all income, computed in accordance with GAAP, derived from the ownership and operation of the Property from whatever source, including, but not limited to, the Rents, utility charges, escalations, service fees or charges, license fees, parking fees, rent concessions or credits, and other required pass-throughs, but excluding sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, Insurance Proceeds (other than business interruption or other loss of income insurance), Awards, security deposits, interest on credit accounts, utility and other similar deposits, payments received under the Interest Rate Cap Agreement, interest on credit accounts, interest on the Reserve Funds, and any disbursements to Borrower from the Reserve Funds. Gross income shall not be diminished as a result of the Security Instrument or the creation of any intervening estate or interest in the Property or any part thereof.

- 12 -

"Guarantor" shall mean Jeffrey Soffer, Fontainebleau Resorts, LLC, a Delaware limited liability company, and any other entity substituted as a guarantor under any Guaranty in accordance with the terms thereof.

"Guaranty" shall mean, individually or collectively, as the context may require, the Guaranty of Payment, Guaranty of Recourse Obligations and the Completion Guaranty.

"Guaranty of Payment" shall mean that certain Guaranty of Payment, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Guaranty of Recourse Obligations" shall mean that certain Guaranty of Recourse Obligations of Borrower, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Hazardous Materials" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; toxic mold; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Property is prohibited by any federal, State or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import within the meaning of any Environmental Law.

"Improvements" shall have the meaning set forth in Article 1 of the Security Instrument.

"Indemnified Liabilities" shall have the meaning set forth in Section 9.7.4(c) hereof.

"Indemnified Parties" shall mean Lender, any Affiliate of Lender who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by the Security Instrument is or will have been recorded, Persons who may hold or acquire or will have held a full or partial interest in the Loan, the holders of any Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

"Indemnified Taxes" shall mean any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by the United States or any political subdivision or taxing authority thereof or therein.

- 13 -

"Indemnitee" shall have the meaning set forth in Section 9.7.4(c) hereof.

"Independent Manager" shall have the meaning set forth in Section 4.1.35(aa) hereof.

"Information" shall have the meaning set forth in Section 9.7.3(b) hereof.

"Initial Advance" shall have the meaning set forth in Section 2.1.2(b) hereof.

"Insolvency Opinion" shall mean, that certain bankruptcy non-consolidation opinion letter delivered by counsel for Borrower in connection with the Loan and reasonably approved by Lender or the Rating Agencies, as the case may be.

"Issuing Bank" shall have the meaning set forth in the definition of Letter of Credit.

"Insurance Premium Account" shall have the meaning set forth in Section 10.1 hereof.

"Insurance Premiums" shall have the meaning set forth in Section 6.1(b) hereof.

"Insurance Proceeds" shall have the meaning set forth in Section 6.4.2(b) hereof.

"Intercreditor Agreement" shall have the meaning set forth in Section 9.10 hereof.

"Interest Period" shall mean, in connection with the calculation of interest accrued with respect to any specified Payment Date, the period from and including the ninth (9th) day of the prior calendar month to and including the eighth (8th) day of the calendar month in which the applicable Payment Date occurs; provided, however, that with respect to the Payment Date occurring on June 9, 2007, the Interest Period shall be the period commencing on the Closing Date to and including June 8, 2007. Each Interest Period, except for the Interest Period ending June 8, 2007, shall be a full month and shall not be shortened by reason of any payment of the Loan prior to the expiration of such Interest Period.

"Interest Rate Cap Agreement" shall mean each Interest Rate Cap Agreement (together with the confirmation and schedules relating thereto) entered into from time to time, between a Counterparty and Borrower obtained by Borrower. The Interest Rate Cap Agreement shall be written on the then current standard ISDA documentation, and shall provide for interest periods and calculations consistent with the payment terms of this Agreement. After delivery of a Replacement Interest Rate Cap Agreement to Lender, the term "Interest Rate Cap Agreement" shall be deemed to mean such Replacement Interest Rate Cap Agreement.

"Interest Shortfall" shall have the meaning set forth in Section 2.3.1(b) hereof.

"Investor" shall have the meaning set forth in Section 5.1.10(g) hereof.

"Lease Termination Payments" shall mean all payments made to Borrower in connection with any termination, cancellation, surrender, sale or other disposition of any Lease.

"Leased Property" shall have the meaning set forth in the Air Rights Lease.

"Leases" shall have the meaning set forth in Article 1 of the Security Instrument.

[TPW: NYLEGAL:618631.13] 16248-00758 06/06/2007 12:51 AM

"Leasing Agent" shall mean the leasing agent under any Leasing Agreement or, if the context requires, a Qualified Leasing Agent who is leasing the Property in accordance with the terms and provisions of this Agreement.

"Leasing Agreement" shall mean, with respect to the Property, the leasing agreement entered into by and between Borrower and Leasing Agent, pursuant to which the Leasing Agent is to provide leasing and other services as described therein with respect to the Property, or, if the context requires, the Replacement Leasing Agreement executed in accordance with the terms and provisions of this Agreement.

"Leasing Plan" shall have the meaning set forth in Section 5.1.10(d) hereof.

"Legal Requirements" shall mean, with respect to the Property, all federal, State, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof, or the zoning, construction, use, alteration, occupancy or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"Lehman" shall have the meaning set forth in Section 9.2(b) hereof.

"Lehman Group" shall have the meaning set forth in Section 9.2(b) hereof.

"Lender" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"Lender Default" shall mean the failure or refusal (which has not been retracted in writing) of a Lender or Co-Lender to make available its portion of any Loan when required to be made by it hereunder.

"Letter of Credit" shall mean a transferable, clean, irrevocable, unconditional, standby letter of credit in form, substance and amount reasonably satisfactory to Lender in its reasonable discretion, issued or confirmed by a commercial bank with a long term debt obligation rating of AA or better (or a comparable long term debt obligation rating) as assigned by the Rating Agencies (the "Minimum L/C Rating") and otherwise satisfactory to Lender in its reasonable discretion (the "Issuing Bank"). The Letter of Credit shall be payable upon presentation of a sight draft only to the order of Lender at a New York City bank. The Letter of Credit shall have an initial expiration date of not less than one (1) year (or through the Maturity Date, if less) and shall be automatically renewed for successive twelve (12) month periods for the term of the Loan (unless such Letter of Credit provides that the Issuing Bank may elect not to renew the Letter of Credit upon written notice to the beneficiary at least thirty (30) days prior to its expiration date) and shall provide for multiple draws. The Letter of Credit shall be transferable by Lender and its successors and assigns at a New York City bank.

- 15 -

"Liabilities" shall have the meaning set forth in Section 9.2(b) hereof.

"LIBOR" shall mean, for the first Interest Period 5.32% per annum. For each Interest Period thereafter LIBOR shall mean the quoted offered rate for one-month United States dollar deposits with leading banks in the London interbank market that appears as of 11:00 a.m. (London time) on the related LIBOR Determination Date on the display page designated as Telerate Page 3750 (or such other page as may replace Telerate Page 3750 for the purpose of displaying London interbank offered rates of major banks for United States dollar deposits).

If, as of such time on any LIBOR Determination Date, no quotation is given on Telerate Page 3750 (or such other page as may replace Telerate Page 3750 for the purpose of displaying London interbank offered rates of major banks for United States dollar deposits), then the Lender shall establish LIBOR on such LIBOR Determination Date by requesting four Reference Banks meeting the criteria set forth herein to provide the quotation offered by its principal London office for making one-month United States dollar deposits with leading banks in the London interbank market as of 11:00 a.m., London time, on such LIBOR Determination Date.

(i)      If two or more Reference Banks provide such offered quotations, then LIBOR for the next Interest Period shall be the arithmetic mean of such offered quotations (rounded upward if necessary to the nearest whole multiple of 1/1,000%).

(ii)      If only one or none of the Reference Banks provides such offered quotations, then LIBOR for the next Interest Period shall be the Reserve Rate.

(iii)      If on any LIBOR Determination Date, Lender is required but is unable to determine the LIBOR in the manner provided in paragraphs (i) and (ii) above, LIBOR for the next Interest Period shall be LIBOR as determined on the preceding LIBOR Determination Date.

The establishment of LIBOR on each LIBOR Determination Date by the Lender shall be final and binding absent manifest error.

"LIBOR Business Day" shall mean a day upon which (i) United States dollar deposits may be dealt in on the London interbank markets and (ii) commercial banks and foreign exchange markets are open in London, England and in New York, New York, USA.

"LIBOR Determination Date" shall mean, with respect to any Interest Period, the date that is two (2) LIBOR Business Days prior to the fifteenth (15th) calendar day of the month in which such Interest Period commenced.

"License Agreement"  shall mean the License Agreement, dated as of the date hereof, between Fontainebleau Resort Properties II, LLC and Borrower, with respect to the use of the "Fontainebleau" name.

"Licenses" shall have the meaning set forth in Section 4.1.21 hereof.

- 16 -

"Lien" shall mean, with respect to the Property, any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"Liquidity" means Cash, Cash equivalents and unencumbered, marketable securities and other investments approved by Lender in its sole discretion.

"LLC Agreement" shall have the meaning set forth in Section 4.1.35(cc) hereof.

"Loan" shall mean the loan made by Lender to Borrower pursuant to this Agreement and the other Loan Documents as the same may be amended or split pursuant to the terms hereof.

"Loan Documents" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases, the Environmental Indemnity, the Guaranty of Payment, Guaranty of Recourse Obligations, the Assignment of Leasing Agreement, Completion Guaranty, the Assignment of Interest Rate Cap Agreement, the Master Disbursement Agreement and all other documents executed and/or delivered in connection with the Loan.

"Lockbox Account" shall have the meaning set forth in Section 10.1(b) hereof.

"Lockbox Bank" shall mean any Eligible Institution selected by Lender.

"Lockout Period" shall have the meaning set forth in Section 2.3.1 hereof.

"Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages (but not special or punitive damages), losses (other than diminution in value), costs, expenses, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense).

"Major Lease" shall mean (i) any Lease (A) which together with all other Leases to the same tenant and to all Affiliates of such tenant, covers 10,000 square feet or more of the total space at the Property, in the aggregate or (B) is with an Affiliate of Borrower and (ii) any instrument guaranteeing or providing credit support for any Major Lease.

"Management Agreement" shall mean, with respect to the Property, any management agreement executed by Borrower in the future pursuant to the terms hereof, or, if the context requires, the Replacement Management Agreement executed in accordance with the terms and provisions of this Agreement.

"Manager" shall mean the manager under any Management Agreement or, if the context requires, a Qualified Manager who is managing the Property in accordance with the terms and provisions of this Agreement.

- 17 -

"Master Disbursement Agreement" shall mean that certain Master Disbursement Agreement, dated as of the date hereof, among Borrower, Lender, Resort Borrower, Resort Lender, Bank of America, N.A., as disbursement agent and each other party from time to time thereto, as amended, restated, supplemented or otherwise modified from time to time.

"Master REA" shall mean that certain Construction, Operation and Reciprocal Easement Agreement dated as of the date hereof, by and among Fontainebleau Las Vegas, LLC, Fontainebleau Las Vegas II, LLC and Fontainebleau Las Vegas Retail, LLC, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Material Adverse Effect" means a material adverse effect on one or more of the following: (i) the business, operations or condition (financial or otherwise) of Borrower; (ii) the ability of Borrower or Guarantor to perform its obligations under any Loan Document; (iii) the material rights or remedies of Lender under any Loan Document; (iv) the legality, validity, binding effect or enforceability against Borrower of any material provision of a Loan Document, or (v) the value or condition of the Property.

"Maturity Date" shall mean October 9, 2010, as such date may be extended pursuant to the terms hereof, or, if such day is not a Business Day, the immediately preceding Business Day, or such other date on which the final payment of the principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"Maximum Debt Service Advance Amount" shall have the meaning set forth in Section 2.1.2(d) hereof.

"Maximum Legal Rate" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or in the other Loan Documents, under the laws of such State or States whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"Maximum Loan Amount" shall mean the maximum principal amount of $315,000,000.00, in lawful money of the United States of America, to be advanced to Borrower pursuant to this Loan Agreement. Reference in the Loan Agreement to "Maximum Loan Amount" shall mean the maximum principal amount, irrespective of actual principal amount outstanding or actually advanced to Borrower during the term of the Loan.

"Maximum Other Retail Cost Advance Amount" shall mean $62,000,000.

"Maximum Project Future Advance Amount" shall have the meaning set forth in Section 2.1.2(c) hereof.

"Member" shall have the meaning set forth in Section 4.1.35(cc) hereof.

"Mezzanine Borrower" shall mean Fontainebleau Las Vegas Retail Mezzanine, LLC, a Delaware limited liability company.

[TPW: NYLEGAL:618631.13] 16248-00758  06/06/2007 12:51 AM

"Mezzanine Debt Service" shall mean, with respect to any particular period of time, interest payments, due under the Mezzanine Note for such period.

"Mezzanine Default" shall have the meaning ascribed to the term "Event of Default" in the Mezzanine Loan Agreement.

"Mezzanine Extension Option" shall have the meaning ascribed to the term "Extension Option" in the Mezzanine Loan Agreement.

"Mezzanine Lender" shall mean the owner and holder of the Mezzanine Loan.

"Mezzanine Loan" shall mean that certain loan made by Mezzanine Lender to Mezzanine Borrower on the date hereof pursuant to the Mezzanine Loan Agreement, as the same may be amended or split pursuant to the terms of the Mezzanine Loan Documents.

"Mezzanine Loan Account" shall have the meaning set forth in Section 10.1(b) hereof.

"Mezzanine Loan Agreement" shall mean that certain Loan Agreement (Mezzanine Loan) dated as of the date hereof between Mezzanine Borrower and Mezzanine Lender.

"Mezzanine Loan Documents" shall mean all documents or instruments evidencing, securing or guaranteeing the Mezzanine Loan, including without limitation, the Mezzanine Loan Agreement.

"Mezzanine Note" shall mean that certain Secured Promissory Note dated as of the date hereof given by Mezzanine Borrower to Mezzanine Lender in the principal amount of $85,000,000.

"Mezzanine Servicing Fee" shall mean the "Servicing Fee" under and as defined in the Mezzanine Loan Agreement.

"Minimum L/C" shall have the meaning set forth in the definition of Letter of Credit.

"Monthly Debt Service Payment Amount" shall mean the amount of interest due and payable on each Payment Date, pursuant to the Note and Section 2.2 hereof.

"Monthly Insurance Premium Deposit" shall have the meaning set forth in Section 7.2 hereof.

"Monthly Mezzanine Debt Service Payment Amount" shall mean the monthly amount of interest due and payable pursuant to the Mezzanine Loan Agreement and the Mezzanine Note.

"Monthly Tax Deposit" shall have the meaning set forth in Section 7.2 hereof.

"Moody's" shall mean Moody's Investors Service, Inc., and any successor by merger, consolidation or acquisition of all of its assets so long as the same remains a nationally recognized rating agency

[TPW: NYLEGAL:618631.13] 16248-00758 06/06/2007 12:51 AM

"Net Cash Flow" for any period shall mean the amount obtained by subtracting Operating Expenses and Capital Expenditures for such period from Gross Income from Operations for such period.

"Net Cash Flow After Debt Service" for any period shall mean the amount obtained by subtracting Debt Service for such period from Net Cash Flow for such period.

"Net Cash Flow Schedule" shall have the meaning set forth in Section 5.1.10(b) hereof.

"Net Liquidation Proceeds After Debt Service" shall have the meaning set forth in the Mezzanine Loan Agreement.

"Net Operating Income" shall mean the amount obtained by subtracting Operating Expenses from Gross Income from Operations, excluding any payments received under any Interest Rate Cap Agreement.

"Net Proceeds" shall have the meaning set forth in Section 6.4.2(b) hereof.

"Net Proceeds Deficiency" shall have the meaning set forth in Section 6.4.2(b)(vi) hereof.

"Net Worth" shall mean, as of a given date, a Person's equity calculated in conformance with GAAP by subtracting total liabilities from total tangible assets.

"New Estate" shall mean the fee estate in the Leased Property.

"Non-U.S. Entity" shall mean the Lender or any Co-Lender or any successor and/or assignee of Lender or any Co-Lender that is not, for United States federal income tax purposes, (i) a citizen or resident of the United States, (ii) a corporation or entity treated as a corporation created or organized in or under the laws of the United States, or any political subdivision thereof, (iii) an estate whose income is subject to United States federal income taxation regardless of its source or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States persons have the authority to control all substantial decisions of such trust.

"Note" shall mean that certain promissory note of even date herewith in the principal amount of THREE HUNDRED FIFTEEN MILLION AND 00/100 DOLLARS ($315,000,000), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"Obligations" shall mean Borrower's obligation to pay the Debt and perform its obligations under the Note, this Agreement and the other Loan Documents.

"Offering Document Date" shall have the meaning set forth in Section 5.1.10(h)(iv) hereof.

"Officer's Certificate" shall mean a certificate delivered to Lender by Borrower which is signed by a Responsible Officer of Borrower.

"Opening Date" means the date on which all material amenities of the Project are open for business to gaming and lodging customers, provided that only 70% of the tenant improvements with respect to the retail space within the Project (determined on the basis of square footage) need be completed on the Opening Date.

"Operating Expenses" shall mean the total of all expenditures, computed in accordance with GAAP, of whatever kind relating to the operation, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance premiums, license fees, property taxes and assessments, advertising and marketing expenses, franchise fees, management fees, payroll and related taxes, computer processing charges, operational equipment or other lease payments as approved by Lender, and other similar costs, but excluding depreciation, Debt Service, Capital Expenditures and contributions to the Reserve Funds.

"Other Charges" shall mean all Air Rights Rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"Participant" shall have the meaning set forth in Section 9.7.2(i) hereof.

"Payment Date" shall mean the ninth $(9^{th})$ day of each calendar month during the term of the Loan or, if such day is not a Business Day, the immediately preceding Business Day.

"Permitted Encumbrances" shall mean, collectively:

(a)     Liens and security interests created by the Loan Documents;

(b)     subject to Borrower's right to contest under Section 5.1.2, Liens, if any, for Taxes imposed by any Governmental Authority not yet delinquent;

(c)     carrier's, warehousemen's, repairmen's, mechanics', materialmen's or similar Liens, in each case only if such Liens either (i) are not overdue for more than thirty (30) days or (ii) are being contested in good faith and by appropriate proceedings (in the same manner in which Taxes are contested pursuant to Section 5.1.2);

(d)     the Master REA and other easements, covenants, rights-of-way, restrictions, encroachments and other similar encumbrances and other minor defects and irregularities in title to which like properties are commonly subject, in each case incurred in the ordinary course of business and which do not (i) materially interfere with the benefits to be provided by the Security Instrument encumbering the Property, (ii) materially and adversely affect the operation, use, value, enjoyment or marketability of the Property, (iii) materially adversely affect Borrower's ability to repay the Loan in full and (iv) otherwise result in a Material Adverse Effect;

(e)     any attachment or judgment Lien with respect to any judgments or decrees entered against Borrower (i) resulting in a liability that has been paid (and for which Borrower is diligently trying to remove) or is satisfactorily covered by insurance (as determined by Lender in

- 21 -

its reasonable discretion) as to which the relevant insurance company has acknowledged coverage or (ii) has been outstanding less than thirty (30) days;

(f)    Liens, encumbrances and other matters disclosed in the Title Insurance Policy relating to the Property or any part thereof; and

(g)    rights of tenants, as tenants only, under Leases and subleases entered into in accordance with the terms of this Agreement.

"Permitted Investments" shall mean any one or more of the following obligations or securities acquired at a purchase price of not greater than par, including those issued by Servicer, the trustee under any Securitization or any of their respective Affiliates, payable on demand or having a maturity date not later than the Business Day immediately prior to the first Payment Date following the date of acquiring such investment and meeting one of the appropriate standards set forth below:

(i)    obligations of, or obligations fully guaranteed as to payment of principal and interest by, the United States or any agency or instrumentality thereof provided such obligations are backed by the full faith and credit of the United States of America including, without limitation, obligations of: the U.S. Treasury (all direct or fully guaranteed obligations), the Farmers Home Administration (certificates of beneficial ownership), the General Services Administration (participation certificates), the U.S. Maritime Administration (guaranteed Title XI financing), the Small Business Administration (guaranteed participation certificates and guaranteed pool certificates), the U.S. Department of Housing and Urban Development (local authority bonds) and the Washington Metropolitan Area Transit Authority (guaranteed transit bonds); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(ii)    Federal Housing Administration debentures;

(iii)    obligations of the following United States government sponsored agencies: Federal Home Loan Mortgage Corp. (debt obligations), the Farm Credit System (consolidated systemwide bonds and notes), the Federal Home Loan Banks (consolidated debt obligations), the Federal National Mortgage Association (debt obligations), the Financing Corp. (debt obligations), and the Resolution Funding Corp. (debt obligations); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

- 22 -

(iii)    federal funds, unsecured certificates of deposit, time deposits, bankers' acceptances and repurchase agreements with maturities of not more than 365 days of any bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term rating category and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(iv)    fully Federal Deposit Insurance Corporation-insured demand and time deposits in, or certificates of deposit of, or bankers' acceptances with maturities of not more than 365 days and issued by, any bank or trust company, savings and loan association or savings bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term rating category and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(v)    debt obligations with maturities of not more than 365 days and at all times rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities) in its highest long-term unsecured rating category; provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(vi)    commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than one year after the date of issuance thereof) with maturities of not more than

- 23 -

365 days and that at all times is rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities) in its highest short-term unsecured debt rating; provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(vii)    units of taxable money market funds, with maturities of not more than 365 days and which funds are regulated investment companies, seek to maintain a constant net asset value per share and invest solely in obligations backed by the full faith and credit of the United States, which funds have the highest rating available from each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities) for money market funds; and

(viii)   any other security, obligation or investment which has been approved as a Permitted Investment in writing by (a) Lender and (b) each Rating Agency, as evidenced by a written confirmation that the designation of such security, obligation or investment as a Permitted Investment will not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities by such Rating Agency;

provided, however, that no obligation or security shall be a Permitted Investment if (A) such obligation or security evidences a right to receive only interest payments or (B) the right to receive principal and interest payments on such obligation or security are derived from an underlying investment that provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment.

"Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Personal Property" shall have the meaning set forth in Article 1 of the Security Instrument with respect to the Property.

"Plan" shall mean an employee benefit plan (as defined in section 3(3) of ERISA) whether or not subject to ERISA or a plan or other arrangement within the meaning of section 4975 of the Code.

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

"Plan Assets" shall mean assets of a Plan within the meaning of section 29 C.F.R. section 2510.3-101 or similar law.

"Plans and Specifications" means the plans and specifications for the construction of the portion of the Future Improvements being constructed by Borrower, if any, approved by Lender in consultation with the Construction Consultant, which approval shall not be unreasonably withheld, conditioned or delayed, with such amendments thereto as may from time to time be made by Borrower and, to the extent such amendments constitute material changes to the Plans and Specifications, as approved by Lender in consultation with the Construction Consultant such approval not to be unreasonably withheld, conditioned or delayed.

"Pledgor" shall have the meaning set forth in the Mezzanine Loan Agreement.

"Policies" shall have the meaning set forth in Section 6.1(b) hereof.

"Prepayment Date" shall have the meaning set forth in Section 2.3.1 hereof.

"Prepayment Notice" shall have the meaning set forth in Section 2.3.1(a) hereof.

"Prepayment Premium" shall mean an amount equal to 1.0% of the principal amount so prepaid.

"Prime Rate" shall mean, on a particular date, a rate per annum equal to the rate of interest published in The Wall Street Journal as the "prime rate", as in effect on such day, with any change in the prime rate resulting from a change in said prime rate to be effective as of the date of the relevant change in said prime rate; provided, however, that if more than one prime rate is published in The Wall Street Journal for a day, the average of the prime rates shall be used; provided, further, however, that the Prime Rate (or the average of the prime rates) will be rounded to the nearest 1/100 of 1% or, if there is no nearest 1/100 of 1%, to the next higher 1/100 of 1%.   In the event that The Wall Street Journal should cease or temporarily interrupt publication, then the Prime Rate shall mean the daily average prime rate published in another business newspaper, or business section of a newspaper, of national standing chosen by Lender. If The Wall Street Journal resumes publication, the substitute index will immediately be replaced by the prime rate published in The Wall Street Journal.  In the event that a prime rate is no longer generally published or is limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a comparable interest rate index which is readily available to Borrower and verifiable by Borrower but is beyond the control of Lender.  Lender shall give Borrower prompt written notice of its choice of a substitute index and when the change became effective.  Such substitute index will also be rounded to the nearest 1/100 of 1% or, if there is no nearest 1/100 of 1%, to the next higher 1/100 of 1%.  The determination of the Prime Rate by Lender shall be conclusive and binding absent manifest error.

"Prohibited Person" shall mean any Person:

(a)    listed in the Annex to, or otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order");

- 25 -

(b)      that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(c)      with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)      who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)      that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov.ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; or

(f)      who is an Affiliate of or affiliated with a Person listed above.

"Project" shall mean the construction of the Fontainebleau Resort and Casino (including, but not limited to, construction of the Project Future Improvements and the Future Improvements, in accordance with the Project Plans and Specifications and the Plans and Specifications, respectively).

"Project Architect" shall mean Bergman, Walls & Associates or any successor architect appointed in accordance with the provisions of the Master REA.

"Project Architect's Contract" shall mean that certain contract between Fontainebleau Las Vegas, LLC and Project Architect, dated as of April 2, 2007, relating to the design and construction of the Project Future Improvements.

"Project Construction Budget" shall mean the detailed trade breakdown of the cost of constructing the Project Future Improvements and an itemization of non-construction and land costs.

"Project Construction Consultant" shall have the meaning ascribed to the term "Construction Consultant" in the Master Disbursement Agreement.

"Project Construction Contract" shall mean the guaranteed maximum price contract to be entered into between Resort Borrower and Project General Contractor, to be approved by Lender, and all amendments, supplements, appendices and addenda to each thereof, which each relate to the construction of the Project Future Improvements.

"Project Construction Documents" shall mean the Project Architect's Contract, the Project Construction Contract, the Project Engineer's Contract, the Project Plans and Specifications and all other contracts, plans or documents concerning the construction, design, or engineering of the Project Future Improvements.

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

"Project Engineer's Contract" shall mean the collective reference to all contracts and agreements between Resort Borrower and Project Engineer, related to the construction of the Project Future Improvements and site planning therefor.

"Project Engineer" shall mean JBA Consulting Engineers or any successor engineer appointed in accordance with the provisions of the Master REA.

"Project Future Advance" shall have the meaning set forth in Section 2.1.2(c) hereof.

"Project Future Improvements" shall mean any and all improvements to be made to the Resort Property and the Property (including, without limitation, the shell of the Building and any shared improvements with respect to the Property) depicted in the Project Plans and Specifications and to be constructed by Resort Borrower.

"Project General Contractor" shall mean Turnberry West Construction Inc. or any successor project general contractor appointed in accordance with the provisions of the Master REA.

"Project Plans and Specifications" shall mean the plans and specifications for the construction of the Project Future Improvements, prepared by the Project Architect and previously approved by Lender, as more particularly identified on Exhibit U to the Master Disbursement Agreement, with such amendments thereto as may from time to time be made and approved by Lender in consultation with the Construction Consultant if and to the extent such approval is required pursuant to Section 5.1.30.

"Projections" shall have the meaning set forth in Section 9.7.3(b) hereof.

"Property" shall mean, the Leased Property, the Improvements thereon, all Personal Property and any other real property owned by Borrower and encumbered by the Security Instrument, together with all of Borrower's rights pertaining to the Property and Improvements, as more particularly described in Article 1 of the Security Instrument and referred to therein as the "Property". Notwithstanding the foregoing, upon the occurrence of a Fee Transfer, the term "Property", as used herein, shall also include the New Estate, whereupon the Leased Property shall no longer be deemed a part of the Property.

"Property Account" shall have the meaning set forth in Section 10.1(a) hereof.

"Property Account Agreement" shall have the meaning set forth in Section 10.1(a) hereof.

"Property Account Bank" shall mean Bank of America, N.A., provided that it remains an Eligible Institution, and any successor Eligible Institution or other Eligible Institution selected by Borrower, subject to Lender's approval.

"Provided Information" shall have the meaning set forth in Section 9.1(a) hereof.

"Qualified Developer" shall mean (i) Fontainebleau Las Vegas, LLC, a Delaware limited liability company or (ii) such other reputable and experienced professional development

- 27 -

organization (a) which has developed, together with its Affiliates, ten (10) properties of a type and quality similar to the Property, totaling in the aggregate no less than 5,000,000 square feet and (b) prior to whose employment as developer of the Property (i) prior to the occurrence of a Securitization, such employment shall have been approved by Lender, and (ii) after the occurrence of a Securitization, Lender shall have received written confirmation from the Rating Agencies that the employment of such manager will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current ratings of the Securities.

"Qualified Insurer" shall have the meaning set forth in Section 6.1(b) hereof.

"Qualified Leasing Agent" shall mean (i) TB Realty, Inc., a Nevada corporation, (ii) any Affiliate of Shopping Center Management, a Florida general partnership, d/b/a Turnberry Associates or (iii) such other reputable and experienced professional leasing organization (a) which leases, together with its Affiliates, ten (10) properties of a type and quality similar to the Property, totaling in the aggregate no less than 3,500,000 square feet and (b) prior to whose employment as leasing agent of the Property (i) prior to the occurrence of a Securitization, such employment shall have been approved by Lender, and (ii) after the occurrence of a Securitization, Lender shall have received written confirmation from the Rating Agencies that the employment of such leasing agent will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current ratings of the Securities.

"Qualified Manager" shall mean (i) TB Realty, Inc., a Nevada corporation, an Affiliate of Shopping Center Management, a Florida general partnership, d/b/a Turnberry Associates or (iii) such other reputable and experienced professional management organization (a) which manages, together with its Affiliates, ten (10) properties of a type and quality similar to the Property, totaling in the aggregate no less than 3,500,000 square feet and (b) prior to whose employment as manager of the Property (i) prior to the occurrence of a Securitization, such employment shall have been approved by Lender, and (ii) after the occurrence of a Securitization, Lender shall have received written confirmation from the Rating Agencies that the employment of such manager will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current ratings of the Securities.

"Rating Agencies" shall mean each of S&P, Moody's, and Fitch, and any other nationally-recognized statistical rating agency which has been approved by Lender and has rated the Securities.

"REA" shall mean any construction, operation and reciprocal easement agreement or similar agreement (including any separate agreement or other agreement between one or more other parties to an REA with respect to such REA) affecting the Property in any material respect or any portion thereof in any material respect including, without limitation, the Master REA.

"Real Property" shall mean all Property of Borrower other than Personal Property.

"Reference Bank" shall mean a leading bank engaged in transactions in Eurodollar deposits in the international Eurocurrency market that has an established place of business in London. If any such Reference Bank should be removed from the Telerate Page 3750 (or such other page as may replace Telerate Page 3750 for the purpose of displaying London interbank

- 28 -

   mg    Doc 7076-1    Filed 02/11/10    Entered 02/11/10 13:21:36    Exhibit A
Pg 35 of 173

offered rates of major banks for United States dollar deposits) or in any other way fail to meet the qualifications of a Reference Bank, Lender may designate alternative Reference Banks meeting the criteria specified above.

"Register" shall have the meaning set forth in Section 9.7.2(h) hereof.

"Registration Statement" shall have the meaning set forth in Section 9.2(b) hereof.

"Reimbursement Agreement" shall mean the Reimbursement Agreement, dated as of the date hereof, between Sponsor and Borrower.

"Release" of any Hazardous Materials shall mean any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials.

"REMIC Trust" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note.

"Renewal Lease" shall have the meaning set forth in Section 5.1.17(a) hereof.

"Rents" shall have the meaning set forth in Article 1 of the Security Instrument.

"Replacement Co-Lender" shall have the meaning set forth in Section 9.7.2(k) hereof.

"Replacement Development Agreement" shall mean, collectively, (a) a development agreement with a Qualified Developer which development agreement shall be acceptable to Lender in form and substance, provided, Lender, at its option, may require that Borrower obtain confirmation from the applicable Rating Agencies that such development agreement will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current rating of the Securities or any class thereof; and (b) a conditional assignment of development agreement substantially in the form of the Assignment of Development Agreement (or such other form reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Developer at Borrower's expense and (c) if such replacement developer is an Affiliate of Borrower, Borrower shall have delivered, or cause to be delivered, to Lender, an updated Insolvency Opinion reasonably acceptable to Lender with respect to such Affiliate.

"Replacement Interest Rate Cap Agreement" shall mean an interest rate cap agreement from an Acceptable Counterparty with terms that (i) comply with Section 2.4 of this Agreement and the definition of Interest Rate Cap Agreement and (ii) are otherwise consistent with the Interest Rate Cap Agreement then in effect.

"Replacement Leasing Agreement" shall mean, collectively, (a) a leasing agreement with a Qualified Leasing Agent, which leasing agreement shall be acceptable to Lender in form and substance, provided, Lender, at its option, may require that Borrower obtain confirmation from the applicable Rating Agencies that such leasing agreement will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current rating of the Securities or any class thereof; and (b) a conditional assignment of leasing agreement substantially in the form of the Assignment of Leasing Agreement (or such other form reasonably acceptable to Lender),

- 29 -

executed and delivered to Lender by Borrower and such Qualified Leasing Agent at Borrower's expense and (c) if such replacement leasing agent is an Affiliate of Borrower, Borrower shall have delivered, or caused to be delivered, to Lender, an updated Insolvency Opinion reasonably acceptable to Lender with respect to such Affiliate.

"Replacement Management Agreement" shall mean, collectively, (a) a management agreement with a Qualified Manager, which management agreement shall be acceptable to Lender in form and substance, provided, Lender, at its option, may require that Borrower obtain confirmation from the applicable Rating Agencies that such management agreement will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current rating of the Securities or any class thereof; and (b) a conditional assignment of management agreement substantially in the form of the Assignment of Management Agreement (or such other form reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Manager at Borrower's expense and (c) if such replacement manager is an Affiliated Manager, Borrower shall have delivered, or cause to be delivered, to Lender, an updated Insolvency Opinion reasonably acceptable to Lender with respect to such Affiliated Manager.

"Reserve Fund Deposits" shall mean the amounts to be deposited into the Reserve Funds for any given month or at any other time as provided in this Agreement or in the other Loan Documents.

"Reserve Funds" shall mean the Tax and Insurance Escrow Fund or any other escrow or reserve fund established by the Loan Documents.

"Reserve Rate" shall mean the rate per annum which Lender determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 1/1,000%) of the one-month United States dollar lending rates that at least three major New York City banks selected by Lender are quoting, at 11:00 a.m. (New York time) on the relevant LIBOR Determination Date, to the principal London offices of at least two of the Reference Banks, or (ii) in the event that at least two such rates are not obtained, the lowest one-month United States dollar lending rate which New York City banks selected by Lender are quoting as of 11:00 a.m. (New York time) on such LIBOR Determination Date to leading European banks.

"Resort Borrower" shall mean, collectively, Fontainebleau Las Vegas, LLC, a Nevada limited liability company, and Fontainebleau Las Vegas II, LLC, a Florida limited liability company.

"Resort Lender" shall mean Bank of America, N.A., as administrative agent and individually as a lender under the Resort Loan Agreement.

"Resort Loan" shall mean the loans and other extensions of credit made to Resort Borrower under the Resort Loan Agreement.

"Resort Loan Event of Default" shall mean an "Event of Default" under and as defined in the Resort Loan Agreement.

"Resort Loan Agreement" shall mean that certain Credit Agreement among Resort Borrower, Resort Lender and the other parties thereto in connection with the Resort Loan, dated

- 30 -

as of the date hereof, as amended, restated, supplemented or otherwise modified from time to time.

"Resort Loan Documents" shall mean all documents executed and/or delivered in connection with the Resort Loan, including, but not limited to, the Resort Loan Agreement and the Master Disbursement Agreement.

"Resort Property" shall mean have the meaning given to the term "Tower Parcel" in the Master REA.

"Responsible Officer" shall mean with respect to a Person, the chairman of the board, president, chief operating officer, chief financial officer, treasurer or vice president-finance of such Person.

"Restoration" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be approved by Lender, such approval not to be unreasonably withheld, conditioned or delayed.

"Restricted Party" shall mean Borrower, Mezzanine Borrower, any Guarantor, any Affiliated Manager or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of, Borrower, Mezzanine Borrower, any Guarantor, or any non-member manager, other than any public shareholders of a Restricted Party whose issued and outstanding shares of stock are listed on the New York Stock Exchange or such other nationally recognized stock exchange.

"Retail Intercreditor Agreement" shall mean that certain Intercreditor Agreement (Retail) dated as of the date hereof, by and among Resort Lender, Wells Fargo Bank, N.A., as trustee, Lender and Borrower.

"S&P" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc, and any successor by merger, consolidation or acquisition of all of its assets so long as the same remains a nationally recognized rating agency.

"Sale or Pledge" shall mean a voluntary or involuntary sale, conveyance, transfer or pledge of a direct or indirect legal or beneficial interest.

Satisfactory DSCR Date" shall mean such date that the Debt Service Coverage Ratio shall be greater than 1.10 to 1.0.

"Securities" shall have the meaning set forth in Section 9.1 hereof.

"Securitization" shall have the meaning set forth in Section 9.1 hereof.

"Securities Act" shall have the meaning set forth in Section 9.2(a) hereof.

"Security Deposits" shall have the meaning set forth in Section 5.1.17(e) hereof.

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

"Security Instrument" shall mean that certain Mortgage (or Deed of Trust or Deed to Secure Debt, as applicable) and Security Agreement, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Separate Tax Lot Event" shall mean such time that Borrower has obtained one or more separate tax lot or parcel designations for the Property.

"Servicer" shall have the meaning set forth in Section 9.3 hereof.

"Servicing Agreement" shall have the meaning set forth in Section 9.3 hereof.

"Servicing Fee" shall have the meaning set forth in Section 9.3 hereof.

"Severed Loan Documents" shall have the meaning set forth in Section 8.2(c) hereof.

"Shared Costs" shall have the meaning set forth in the Master Disbursement Agreement.

"Shortfall" shall have the meaning set forth in Section 2.1.2(d)hereof.

"Special Member" shall have the meaning set forth in Section 4.1.35(cc) hereof.

"Sponsor" shall mean Fontainebleau Resorts, LLC, a Delaware limited liability company.

"Sponsor Parent" shall mean any entity that is a direct parent of Sponsor. As of the Closing Date, Fontainebleau Equity Holdings, Voteco, LLC, a Delaware limited liability company and Fontainebleau Equity Holdings, LLC, a Delaware limited liability company would both be deemed to be (and would be the only entities that would be deemed to be) Sponsor Parents for the purpose of this definition.

"Spread Maintenance Premium" shall mean, with respect to any repayment of the outstanding principal amount of the Loan prior to the end of the Lockout Period, a payment to Lender in an amount equal to the sum of the present value of each future installment of interest that would be payable under the Note on the outstanding principal amount of the Loan from the date of such prepayment through, but excluding, the end of the Lockout Period assuming an interest rate equal to the Eurodollar Rate Margin, discounted at an interest rate per annum equal to the Treasury Constant Maturity Yield Index published during the second full week preceding the date on which such premium is payable for instruments having a maturity coterminous with the end of the Lockout Period.

"Standard Statement" shall have the meaning set forth in Section 5.1.10(h)(i) hereof.

"State" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"Strike Rate" shall mean 6.0%.

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

"Survey" shall mean a survey prepared by a surveyor licensed in the State where the Property is located and satisfactory to Lender and the company or companies issuing the Title Insurance Policies, and containing a certification of such surveyor satisfactory to Lender.

"Syndication" shall have the meaning set forth in Section 9.7.2(a) hereof.

"Tax Account" shall have the meaning set forth in Section 10.1 hereof.

"Tax and Insurance Escrow Fund" shall have the meaning set forth in Section 7.2 hereof.

"Taxes" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against (i) the Property or part thereof and (ii) until such time as Borrower has obtained one or more separate tax lot or parcel designations for the Property, the Resort Property.

"Telerate Page 3750" shall mean the display designated as page 3750 on the Dow Jones Telerate Service (or such other page as may replace page 3750 on that service or such other service as may be nominated by the British Bankers-Association as the information vendor for the purposes of displaying British Bankers-Association Interest Settlement Rates for U.S. dollar deposits).

"Tenant Construction Deliverables" shall, with respect to any tenant or subtenant under the Lease, mean any contracts, plans or documents concerning the construction, design, or engineering of the Future Improvements to be constructed by such tenant or subtenant.

"Terrorism Insurance" shall have the meaning set forth in Section 6.1(b) hereof.

"Terrorism Insurance Cap" shall have the meaning set forth in Section 6.1(b) hereof.

"Title Company" shall mean Lawyers Title Insurance Corporation.

"Title Insurance Policy" shall mean an ALTA mortgagee title insurance policy in a form acceptable to Lender (or, if the Property is located in a State which does not permit the issuance of such ALTA policy, such form as shall be permitted in such State and acceptable to Lender) issued with respect to the Property and insuring the lien of the Security Instrument encumbering the Property.

"Transfer" shall have the meaning set forth in Section 5.2.10(a) hereof.

"Treasury Constant Maturity Yield Index" shall mean the average yield for "treasury constant maturities" published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) ("FRB Release"), for the second full week preceding the date of the applicable date of prepayment for instruments having a maturity co-terminus with the end of the Lockout Period. If the FRB Release is no longer published, Lender shall select a comparable publication to determine the Treasury Constant Maturity Yield Index. If there is no Treasury Constant Maturity Yield Index for instruments having a maturity co-terminus with the end of the Lockout Period, then the weighted average yield to the end of the Lockout Period of the Treasury Constant Maturity Yield Indices with maturities next longer and shorter than such

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

remaining average life to maturity shall be used, calculated by averaging (and rounding upward to the nearest whole multiple of 1/100,000 of 1% per annum, if the average is not such a multiple) the yields of the relevant Treasury Constant Maturity Yield Indices (rounded, if necessary, to the nearest 1/100,000 of 1% with any figure of 1/100,000 of 1% or above rounded upward).

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the State in which the Property is located.

"Underwriter Group" shall have the meaning set forth in Section 9.2(b) hereof.

"USPAP" shall mean the Uniform Standard of Professional Appraisal Practice.

**Section 1.2**    Principles of Construction.

All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## II.    **GENERAL TERMS**

**Section 2.1**    Loan Commitment; Disbursement to Borrower.

2.1.1    Agreement to Lend and Borrow.

Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the terms and conditions set forth herein.

2.1.2    Initial Advance; Future Advances.

(a)    Borrowing.  The Loan shall be funded in one or more advances and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

(b)    Initial Advance.  Lender shall make an initial advance of the Loan in the amount of $125,400,000 (the "Initial Advance") on the Closing Date.

(c)    Project Future Advances.  $145,000,000 of the Loan (the "Maximum Project Future Advance Amount") will not be disbursed as of the Closing Date, but thereafter shall, subject to the conditions set forth in this Section 2.1.2(c) and 2.1.2(e), be advanced by Lender from time to time prior to the Maturity Date (each a "Project Future Advance").  Each Project Future Advance shall be considered an advance of the Loan, shall be added to the unpaid principal balance of the Loan as of the day such Project Future Advance is made for purposes of Borrower's payment obligations under this Loan

- 34 -

Agreement, and repayment thereof, together with interest thereon at the Applicable Interest Rate and shall be secured by the Security Instrument and other Collateral given for the Loan.  Lender will make Project Future Advances to Borrower in accordance with the procedures, terms and conditions set forth in the Master Disbursement Agreement.  In the event that the Master Disbursement Agreement is terminated during the term of the Loan, Lender shall continue to make Project Future Advances in accordance with the same procedures, terms and conditions contained in the Master Disbursement Agreement.

(d)     Debt Service Advance.

(i)     Debt Service Advance Amount and Use.  $44,600,000 of the Loan (the "Maximum Debt Service Advance Amount") will not be disbursed as of the Closing Date, but thereafter shall, subject to the conditions set forth in this Section 2.1.2(d) and Article 3 hereof, be advanced by Lender from time to time prior to the Maturity Date (each, a "Debt Service Advance") for the purpose of the payment of Monthly Debt Service Payment Amounts in the event of a shortfall between revenue and expenses at the Property for a specific month (a "Shortfall").  Each Debt Service Advance shall be considered an advance of the Loan, shall be added to the unpaid principal balance of the Loan as of the day such Debt Service Advance is made for purposes of Borrower's payment obligations under this Agreement, and repayment thereof, together with interest thereon at the Applicable Interest Rate and shall be secured by the Security Instrument and other Collateral given for the Loan.

(ii)     Debt Service Advance on Payment Date.  Lender shall, provided Lender receives written request in the form of Exhibit A (an "Advance Request") from Borrower (together with such evidence of compliance of this Section 2.1.2(d) and 2.1.2(e) hereof as Lender may reasonably request) delivered not later than five (5) Business Days prior to the pending Payment Date, make a Debt Service Advance to Borrower on such Payment Date in the amount requested by Borrower, not exceeding the actual shortfall in revenues generated by the Property in such month, for Borrower to pay, in full, the Monthly Debt Service Payment Amount due from Borrower under the Loan on such Payment Date in accordance with this Agreement.  Borrower hereby authorizes Lender to, and Lender agrees that it shall (unless prohibited by applicable laws, rules or regulations) apply any and all Debt Service Advances made by Lender on the applicable Payment Date towards the payment of the Monthly Debt Service Payment Amount then due from Borrower. Lender's failure to make a Debt Service Advance shall not relieve Borrower of its obligation to pay all amounts due Lender in accordance with this Agreement on any Payment Date.   Notwithstanding the foregoing, Lender acknowledges that so long as (A) Borrower has timely requested a Debt Service Advance in an amount sufficient to pay the applicable Monthly Debt Service Payment Amount due from Borrower, (B) the terms and conditions set forth in this Section 2.1.2(d) and Section 2.1.2(e) have been satisfied and (C) Borrower is otherwise entitled to the requested Debt Service Advance, it shall not be a default or an Event of Default (and no late charge or default interest shall be due in connection therewith) in the event Lender fails to make such a Debt Service

- 35 -

Advance or to apply the same as required pursuant to this Section 2.1.2(d). Borrower acknowledges that Lender has no obligation to advance more than the remaining balance of the Maximum Debt Service Advance Amount if such amount is less than the full payment due or requested.

(iii)    <u>Reconciliation of Debt Service Advances</u>.  To evidence the Debt Service Advances made by Lender and the application thereof to Monthly Debt Service Payment Amounts due from Borrower on a Payment Date, Lender shall make appropriate entries on Lender's books and records.

(iv)    <u>Debt Service Advances</u>. Provided no Event of Default shall exist on the date of the request for the Debt Service Advance or on the date the disbursement is actually made and subject to the additional conditions set forth in Section 2.1.2(e), Lender shall, upon written request made in accordance with Section 2.1.2(d)(ii), make Debt Service Advances upon the satisfaction by Borrower of the following conditions:

(A)    <u>Absence of Liens</u>.  With respect to each Debt Service Advance, Borrower shall deliver to Lender CLTA 122 endorsement to the Title Insurance Policy in form and substance reasonably acceptable to Lender insuring the priority of the lien of the Security Instrument (subject only to Permitted Encumbrances) in the amount of the then outstanding principal balance of the Loan (after giving effect to the funding of the applicable Debt Service Advance).

(B)    <u>Responsible Officer Certificate</u>.  Borrower shall deliver an Officer's Certificate certifying that:

(1)    the requirements of this Section 2.1.2(d) have been satisfied; and

(2)    all information stated in the Advance Request is true and correct in all material respects, each attachment to the Advance Request is correct and complete, and if the attachment is a copy of the original, that it is a true and an accurate reproduction of the original.

(C)    Borrower shall not submit a request for, and Lender shall not be required to make, (x) more than one (1) Debt Service Advance during any calendar month and (y) any Debt Service Advance for less than $250,000.

(e)    <u>Additional Conditions with Respect to Future Advances</u>

(i)    If the date of any Future Advance is a day other than a Payment Date, Borrower shall make a payment to Lender on the next succeeding Payment Date in an amount equal to the sum of (A) the interest accruing on the Future Advance from and after the date of the making of the Future Advance through and

- 36 -

including the end of the Interest Period in which the Future Advance is made and (B) the monthly payment of interest that would have been due on such next succeeding Payment Date had the Future Advance not been made. If the date of the Future Advance is a Payment Date, Borrower shall make a payment to Lender on the next succeeding Payment Date in an amount equal to the interest accruing on the outstanding principal balance of the Loan (after giving effect to the Future Advance) from and after the date of the making of the Future Advance through and including the end of the Interest Period in which the Future Advance is made.

(ii)    Lender's obligations to perform in accordance with this Section 2.1.2 and to make any Future Advance in accordance with the terms and provisions of this Agreement or the Master Disbursement Agreement are an independent contract made by Lender to Borrower separate and apart from any other obligation of Lender to Borrower under the other provisions of this Agreement and the other Loan Documents. The obligations of Borrower under this Agreement and the other Loan Documents shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower, or any other party, against Lender by reason of Lender's failure to perform its obligations under this Section 2.1.2.

(iii)    Subject to the terms of Section 3.5.1 of the Master Disbursement Agreement with respect to Future Advances for Shared Costs, Lender shall have no obligation to advance any Future Advance at any time during which an Event of Default exists. The making of any advance by Lender at the time when a default or Event of Default has occurred and is then continuing shall not be deemed a waiver or cure by Lender of that default or Event of Default, nor shall Lender's rights and remedies by prejudiced in any manner thereby.

2.1.3    The Note, Security Instrument and Loan Documents.

The Loan shall be evidenced by the Note and secured by the Security Instrument, the Assignment of Leases and the other Loan Documents.

2.1.4    Use of Proceeds.

Borrower shall use the proceeds of the Initial Advance to (a) repay and discharge any existing loans relating to the Property (if any), (b) pay all past-due Basic Carrying Costs, if any, with respect to the Property, (c) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, or (d) fund any working capital requirements of the Property, including with respect to Basic Carrying Costs and (e) fund any Shared Costs or costs incurred with respect to tenant improvement work or leasing commissions and (f) fund any required equity contributions. The balance of the Initial Advance, if any, shall be distributed to Borrower. Borrower shall use the proceeds of each Future Advance in accordance with the terms of this Agreement.

**Section 2.2**    Interest; Loan Payments; Late Payment Charge.

2.2.1    Payments.

- 37 -

(a)    Interest.  Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date to the end of the Interest Period in which the Maturity Date occurs at the Applicable Interest Rate.  Monthly installments of interest only shall be paid on each Payment Date commencing on July 9, 2007 and on each subsequent Payment Date thereafter up to and including the Maturity Date.  Interest on the outstanding principal amount of the Loan from and including the Closing Date through June 8, 2007 shall be paid by Borrower on the Closing Date.  The outstanding principal balance of the Loan together with all accrued and unpaid interest thereon shall be due and payable on the Maturity Date.

(b)    Reserved.

(c)    Extension of the Maturity Date.  Borrower shall have the option to extend the term of the Loan beyond the initial Maturity Date for two (2) successive terms (each, an "Extension Option") of ten months each (each, an "Extension Period") to (x) the Payment Date occurring in August, 2011, and (y) the Payment Date occurring in June, 2012 (each such date, the "Extended Maturity Date"), respectively, and, as to each Extension Option, upon satisfaction of the following terms and conditions:

(i)    no Event of Default shall have occurred and be continuing at the time the applicable Extension Option is exercised and on the date that the applicable Extension Period is commenced;

(ii)    Borrower shall notify Lender of its irrevocable election to extend the Maturity Date as aforesaid not earlier than one hundred twenty (120) days and no later than thirty (30) days prior to the then applicable Maturity Date;

(iii)    Borrower shall obtain and deliver to Lender prior to exercise of such Extension Option, one or more Replacement Interest Rate Cap Agreements, which Replacement Interest Rate Cap Agreements shall be effective commencing on the first day of such Extension Option and shall have a maturity date not earlier than the next succeeding Extended Maturity Date;

(iv)    in connection with each Extension Option, Borrower shall have delivered to Lender together with its notice pursuant to subsection (c)(ii) of this Section 2.2.1 and as of the commencement of the applicable Extension Option, an Officer's Certificate in form reasonably acceptable to the Lender certifying that each of the representations and warranties of Borrower contained in the Loan Documents is true, complete and correct in all material respects as of the date of such Officer's Certificate except to the extent such representations and warranties are matters which by their nature can no longer be true and correct as a result of the passage of time and/or except to the extent the failure of such representation or warranty to be true and correct would not result in a Material Adverse Effect;

(v)    in connection with the exercise of each Extension Option, Borrower shall have paid to Lender the Extension Fee; and

- 38 -

(vi)    the Mezzanine Extension Option corresponding to the applicable Extension Period shall have been exercised in accordance with the terms of the Mezzanine Loan Agreement; and

(vii)    Borrower shall deposit into an account with Lender (the "Debt Service Reserve Account") such amount (after giving credit to (A) income determined by Lender to be derived, during the applicable Extension Period, from Leases that were executed in accordance with the terms of this Agreement or which were otherwise approved by Lender, in each case, prior to the applicable Extension Period and (B) any excess amounts that will exist in such Debt Service Reserve Account, if any, on the date immediately preceding the commencement of the applicable Extension Period) that Lender reasonably estimates (using an interest rate equal to the Strike Rate plus the Eurodollar Rate Margin) will be required to pay all Monthly Debt Service Payment Amounts ensuing over the applicable Extension Period.

(d)    All references in this Agreement and in the other Loan Documents to the Maturity Date shall mean the applicable Extended Maturity Date in the event the applicable Extension Option is exercised.

(e)    All payments and other amounts due under the Note, this Agreement and the other Loan Documents shall be made without any setoff, defense or irrespective of, and without deduction for, counterclaims.

2.2.2    <u>Interest Calculation</u>.

Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate equal to the Applicable Interest Rate divided by three hundred sixty (360) by (c) the outstanding principal balance.

2.2.3    <u>Eurodollar Rate Unascertainable; Illegality; Increased Costs</u>.

(a)    (i)  In the event that Lender shall have determined (which determination shall be conclusive and binding upon Borrower absent manifest error) that by reason of circumstances affecting the interbank eurodollar market, adequate and reasonable means do not exist for ascertaining LIBOR, then Lender shall forthwith give notice by telephone of such determination, to Borrower at least one (1) Business Day prior to the last day of the related Interest Period, with a written confirmation of such determination promptly thereafter.  If such notice is given, the Loan shall bear interest at the Adjusted Prime Rate beginning on the first day of the next succeeding Interest Period. (ii) If, pursuant to the terms of this Section 2.2.3(a),  the Loan is bearing interest at the Adjusted Prime Rate and Lender shall determine (which determination shall be conclusive and binding upon Borrower absent manifest error) that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable, Lender shall give notice thereof to Borrower by telephone of such determination, confirmed in writing, to Borrower as soon as reasonably practical, but in no event later than one (1) Business Day prior to the last

- 39 -

day of the then current Interest Period. If such notice is given, the Loan shall bear interest at the Eurodollar Rate beginning on the first day of the next succeeding Interest Period. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to elect to have the Loan bear interest at either the Eurodollar Rate or the Adjusted Prime Rate.

(b)    If any requirement of law or any change therein or in the interpretation or application thereof, shall hereafter make it unlawful for Lender or any Co-Lender in good faith to make or maintain the portion of the Loan bearing interest at the Eurodollar Rate and such requirement or change is generally applicable to all similarly situated lenders, (I) the obligation of Lender or such Co-Lender hereunder to make the Loan bearing interest at the Eurodollar Rate shall be canceled forthwith and (II) the Loan shall automatically bear interest at the Adjusted Prime Rate on the first day of the immediately succeeding Interest Period or within such earlier period as required by Applicable Law. Borrower hereby agrees promptly to pay Lender or any Co-Lender (within ten (10) days of Lender's or any Co-Lender's written demand therefor), any additional amounts necessary to compensate Lender or any Co-Lender for any reasonable costs incurred by Lender or such Co-Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender or such Co-Lender to lenders of funds obtained by it in order to make or maintain the Loan hereunder. Upon written demand from Borrower, Lender or the applicable Co-Lender shall demonstrate in reasonable detail the circumstances giving rise to Lender's or such Co-Lender's determination and the calculation substantiating the Adjusted Prime Rate and any additional costs incurred by Lender or such Co-Lender in making the conversion. Lender's or Co-Lender's written notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

(c)    In the event that any change in any requirement of any Applicable Law or in the interpretation or application thereof, or compliance in good faith by Lender or any Co-Lender with any request or directive (whether or not having the force of law) hereafter issued from any Governmental Authority which is generally applicable to all Lenders subject to such Governmental Authority's jurisdiction:

(i)    shall hereafter impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender or any Co-Lender which is not otherwise included in the determination of LIBOR hereunder;

(ii)    shall, if the Loan is then bearing interest at the Eurodollar Rate, hereafter have the effect of reducing the rate of return on Lender's or any Co-Lender's capital as a consequence of its obligations hereunder to a level below that which Lender or any Co-Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's or any Co-Lender's policies with respect to capital adequacy) by any amount deemed by Lender or any Co-Lender to be material; or

- 40 -

(iii)    shall, if the Loan is then bearing interest at the Eurodollar Rate, hereafter impose on Lender or any Co-Lender any other condition, the result of which is to increase the cost to Lender or such Co-Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender or such Co-Lender (within ten (10) days of Lender's or such Co-Lender's written demand therefor), any additional amounts necessary to compensate Lender or such Co-Lender for such additional cost or reduced amount receivable which Lender or such Co-Lender deems to be material.  If Lender or any Co-Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.3(c), Lender and such Co-Lender shall provide Borrower with written notice specifying in reasonable detail the event or circumstance by reason of which it has become so entitled and the additional amount required to fully compensate Lender and such Co-Lender for such additional cost or reduced amount.  A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender or such Co-Lender to Borrower shall be conclusive absent manifest error.  This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under the Note, this Agreement and the other Loan Documents.

(d)    Borrower agrees to indemnify Lender and the Co-Lenders and to hold Lender and the Co-Lenders harmless from any loss or expense which Lender or any Co-Lender actually sustains or incurs as a consequence of (I) any default by Borrower in payment of the principal of or interest on the Loan beyond applicable notice and cure periods (if any) while bearing interest at the Eurodollar Rate, including, without limitation, any such loss or expense arising from interest or fees payable by Lender or any Co-Lenders to lenders of funds obtained by it in order to maintain the Eurodollar Rate, (II) any prepayment (whether voluntary or mandatory) of the Loan on a day that is not the day immediately following the last day of an Interest Period with respect thereto and (III) the conversion (for any reason whatsoever, whether voluntary or involuntary) of the Applicable Interest Rate from the Eurodollar Rate to the Adjusted Prime Rate with respect to any portion of the outstanding principal amount of the Loan then bearing interest at the Eurodollar Rate on a date other than the Payment Date immediately following the last day of an Interest Period, including, without limitation, such loss or expenses arising from interest or fees payable by Lender or any Co-Lender to lenders of funds obtained by it in order to maintain the Eurodollar Rate  hereunder (the amounts referred to in clauses (I), (II) and (III) are herein referred to collectively as the "Breakage Costs").  This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.  Anything to the contrary contained herein notwithstanding, Borrower shall not be obligated to pay any Breakage Costs in connection with a prepayment resulting from casualty or condemnation.

2.2.4    <u>Payment on Maturity Date</u>.

Borrower shall pay to Lender on the Maturity Date the outstanding principal balance, all accrued and unpaid interest thereon and all other amounts due hereunder and under the Note, the Security Instruments and the other Loan Documents, including, without limitation, all interest

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

that would accrue on the outstanding principal balance of the Loan through and including the Maturity Date.

2.2.5    <u>Payments after Default</u>.

Upon the occurrence and during the continuance of an Event of Default, (a) interest on the outstanding principal balance of the Loan and, to the extent permitted by Applicable Law, overdue interest and other amounts due in respect of the Loan, shall accrue at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein and (b) Lender shall be entitled to receive and Borrower shall pay to Lender on each Payment Date an amount equal to the Net Cash Flow After Debt Service for the prior month, such amount to be applied by Lender to the payment of the Debt in such order as Lender shall determine in its sole discretion, including, without limitation, alternating applications thereof between interest and principal.    Interest at the Default Rate and Net Cash Flow After Debt Service shall both be computed from the occurrence of the default until the actual receipt and collection of the Debt (or that portion thereof that is then due).    To the extent permitted by Applicable Law, interest at the Default Rate shall be added to the Debt, shall itself accrue interest at the same rate as the Loan and shall be secured by the Security Instrument.    This paragraph shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default; the acceptance of any payment of Net Cash Flow After Debt Service shall not be deemed to cure or constitute a waiver of any Event of Default; and Lender retains its rights under the Note to accelerate and to continue to demand payment of the Debt upon the happening of any Event of Default, despite any payment of Net Cash Flow After Debt Service.

2.2.6    <u>Late Payment Charge</u>.

If any principal, interest or any other sums due under the Loan Documents (other than the payment of principal due on the Maturity Date) is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of four percent (4%) of such unpaid sum or the maximum amount permitted by Applicable Law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.    Any such amount shall be secured by the Security Instrument and the other Loan Documents to the extent permitted by Applicable Law.

2.2.7    <u>Usury Savings</u>.

This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.    If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder,

- 42 -

provided, however, that in no event shall any Spread Maintenance Premium or Breakage Costs be due with respect to any such deemed prepayment of principal. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

2.2.8   Indemnified Taxes.

(a)     All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, Indemnified Taxes, excluding (i) Indemnified Taxes measured by Lender's or any Co-Lender's net income, and franchise taxes imposed on it, by the jurisdiction under the laws of which Lender or any Co-Lender is resident or organized, or any political subdivision thereof, (ii) taxes measured by Lender's or any Co-Lender's net income, and franchise taxes imposed on it, by the jurisdiction of Lender's or such Co-Lender's applicable lending office or any political subdivision thereof or in which Lender or such Co-Lender is resident or engaged in business, and (iii) withholding taxes imposed by the United States of America, any state, commonwealth, protectorate territory or any political subdivision or taxing authority thereof or therein as a result of the failure of Lender or any Co-Lender which is a Non-U.S. Entity to comply with the terms of paragraph (b) below (if applicable). If any non-excluded Indemnified Taxes are required to be withheld from any amounts payable to Lender or any Co-Lender hereunder, the amounts so payable to Lender or such Co-Lender shall be increased to the extent necessary to yield to Lender or such Co-Lender (after payment of all non-excluded Indemnified Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder. Whenever any non-excluded Indemnified Tax is required to be withheld from amounts payable to Lender or any Co-Lender hereunder and is payable pursuant to Applicable Law by Borrower, Borrower shall send to Lender or the applicable Co-Lender an original official receipt or certified copy thereof showing payment of such non-excluded Indemnified Tax or other evidence of payment reasonably satisfactory to Lender or the applicable Co-Lender. Borrower hereby agrees to indemnify Lender and each Co-Lender for any incremental taxes, interest or penalties that may become payable by Lender or any Co-Lender which may result from any failure by Borrower to pay any such non-excluded Indemnified Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender or any Co-Lender the required receipts or other required documentary evidence, except to the extent due to Lender's or any Co-Lender's, as applicable, failure to forward an invoice for such non-excluded Indemnified Tax. For the avoidance of doubt, Borrower shall not be obligated to pay any additional amounts or indemnification amounts under this paragraph (a) except to the extent such amounts are payable solely due to a change in applicable treaty, law or regulation effective after the date on which the applicable Non-U.S. Entity became a party to this Agreement.

(b)     In the event that Lender or any Co-Lender or any successor and/or assign of Lender or any Co-Lender is a Non-U.S. Entity, each such Non-U.S. Entity agrees that, prior to the first date on which any payment is due such entity hereunder, it will deliver to

- 43 -

Borrower two duly completed copies of United States Internal Revenue Service Form W-8BEN and/or Form W-8IMY or successor applicable form, as applicable (claiming complete exemption from deduction or withholding of any United States federal income taxes under an applicable treaty), or Form W-8ECI or successor applicable form, certifying that such entity is entitled to receive payments under the Note, without deduction or withholding of any United States federal income taxes, or, in the case of a Non-U.S. Entity claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," a statement substantially in the form of Exhibit K and a Form W8-BEN or successor applicable form. Each entity required to deliver to Borrower a Form W-8BEN or W-8ECI pursuant to the preceding sentence further undertakes to deliver to Borrower two further copies of such forms, or successor applicable forms, or other manner of certification, as the case may be, on or before the date that any such form expires (which, in the case of the Form W-8ECI, is the last day of each U.S. taxable year of the Non-U.S. Entity) or becomes obsolete or after the occurrence of any event requiring a change in the most recent form previously delivered by it to Borrower, and such other extensions or renewals thereof as may reasonably be requested by Borrower, certifying in the case of a Form W-8BEN, W-8IMY or W-8ECI that such entity is entitled to receive payments under the Note without deduction or withholding of any United States federal income taxes, unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required which renders all such forms inapplicable or which would prevent such entity from duly completing and delivering any such form with respect to it and such entity advises Borrower that it is not capable of receiving payments without any deduction or withholding of United States federal income tax.

(c)    In the event that Lender or any Co-Lender or any successor and/or assign of Lender or any Co-Lender is not a Non-U.S. Entity, each such Lender or Co-Lender agrees that, prior to the first date on which any payment is due such entity hereunder, it will deliver to Borrower two duly completed copies of United States Internal Revenue Service Form W-9 or successor applicable form establishing that such Lender or Co-Lender is not subject to United States backup withholding tax.

(d)    The Lender and each Co-Lender shall use reasonable efforts (including reasonable efforts to change its applicable lending office) to avoid the imposition of any non-excluded Indemnified Taxes for which Borrower is required to pay additional amounts pursuant to paragraph (a) above; provided, however, that such efforts shall not require the Lender or such Co-Lender to incur additional costs or legal or regulatory burdens that the Lender or such Co-Lender considers in its good faith reasonable judgment to be material.

**Section 2.3**    Prepayments.

2.3.1    Voluntary Prepayments.

Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part prior to June 9, 2008 (the "Lockout Period"). On any Payment Date

- 44 -

occurring after the expiration of the Lockout Period, Borrower may, at its option, prepay the Loan in whole but not in part, upon satisfaction of the following conditions:

(a)      Borrower shall provide prior written notice (the "Prepayment Notice") to Lender (which notice shall be irrevocable) specifying the date (the "Prepayment Date") upon which the prepayment is to be made, which notice shall be delivered to Lender not less than fifteen (15) Business Days prior to such payment; provided, however, Borrower shall have the one-time right to send a written notice to Lender revoking its notice of prepayment at least five (5) Business Days prior to the Payment Date occurring in the calendar month of the proposed prepayment date set forth in the original prepayment notice, provided Borrower pays to Lender at the time of its notice of revocation, all costs and expenses (including, but not limited to, any Breakage Costs) incurred by Lender in anticipation of the repayment including, but not limited to, reasonable attorney's fees and expenses and any fees and expenses of any servicer;

(b)      Borrower shall pay to Lender, simultaneously with such prepayment, (i) all accrued and unpaid interest calculated at the Applicable Interest Rate on the amount of principal being prepaid through and including the Prepayment Date, (ii) in addition to the payments required in clause (i) above, if such prepayment is not made on a Payment Date, all interest on the principal amount being prepaid which would have accrued from the date of prepayment through and including the immediately succeeding Payment Date, calculated at (1) the Applicable Interest Rate if such prepayment occurs on or after the LIBOR Determination Date for the Interest Period in which such prepayment occurs or (2) the Assumed Note Rate if such prepayment occurs before the LIBOR Determination Date for the Interest Period in which the prepayment occurs (the "Interest Shortfall"), (iii) Breakage Costs, if any, without duplication of any sums paid pursuant to the preceding clauses (i) and (ii); (iv) [intentionally omitted] and (v) all other sums then due under this Agreement, the Note or the other Loan Documents;

(c)      each prepayment shall be in an aggregate principal amount of $1,000,000.00 or any integral multiple of $100,000.00 in excess thereof (or the entire principal amount of the Loan outstanding); and

(d)      Mezzanine Borrower shall have simultaneously with such prepayment prepaid the Mezzanine Loan in whole.

If the Interest Shortfall was calculated based upon the Assumed Note Rate, upon determination of LIBOR on the LIBOR Determination Date for the Interest Period in which such prepayment occurs, (i) if the Applicable Interest Rate for such Interest Period is less than the Assumed Note Rate, Lender shall promptly refund to Borrower the amount of the Interest Shortfall paid, calculated at a rate equal to the difference between the Assumed Note Rate and the Applicable Interest Rate, or (ii) if the Applicable Interest Rate is greater than the Assumed Note Rate, Borrower shall promptly (and in no event later than the ninth (9th) day of the following month) pay Lender the amount of such additional Interest Shortfall calculated at a rate equal to the excess of the Applicable Interest Rate over the Assumed Note Rate.

If a notice of prepayment is given by Borrower to Lender pursuant to this Section 2.3.1, the amount designated for prepayment and all other sums required under this Section 2.3.1 shall be due and payable on the Prepayment Date unless the applicable Prepayment Notice has been revoked in accordance with Section 2.3.1(a) above.

2.3.2   <u>Mandatory Prepayments</u>.

On the next occurring Payment Date following the date on which Borrower actually receives any Net Proceeds, if and to the extent Lender is not obligated to make such Net Proceeds available to Borrower for the Restoration of the Property (or, pursuant to the Master Disbursement Agreement or Master REA, for Restoration of the shell of the Building), Borrower shall prepay (without any Prepayment Premium, Spread Maintenance Premium or Breakage Costs) the outstanding principal balance of the Note in an amount equal to one hundred percent (100%) of such Net Proceeds.  Such prepayment shall be applied, first, to interest on the outstanding principal balance of the Loan that would have accrued at the Applicable Interest Rate on the amount prepaid through the end of the Interest Period in which such prepayment occurs, notwithstanding that such Interest Period extends beyond the date of prepayment, and then to all other amounts then due to Lender under this Agreement or any of the other Loan Documents and then to the outstanding principal balance of the Loan.

2.3.3   <u>Prepayments After Default</u>.

If, following an Event of Default, Borrower tenders payment of all or any part of the Debt, or if all or any portion of the Debt is recovered by Lender after such Event of Default such tender or recovery shall be deemed a voluntary prepayment by Borrower in violation of the prohibition against prepayment of the Loan prior to the expiration of the Lockout Period and Borrower shall pay, in addition to the debt, (i) all accrued and unpaid interest calculated at the Applicable Interest Rate on the amount of principal being prepaid through and including the Prepayment Date together with an amount equal to the interest that would have accrued at the Applicable Interest Rate on the amount of principal being prepaid through the end of the Interest Period in which such prepayment occurs, notwithstanding that such Interest Period extends beyond the date of prepayment, (ii) the Interest Shortfall, if applicable, with respect to the amount prepaid, (iii) Breakage Costs, if any, without duplication of any sums paid pursuant to the preceding clause (ii); (iv) if such payment occurs prior to the expiration of the Lockout Period, an amount equal to the greater of the Prepayment Premium or the applicable Spread Maintenance Premium, (v) [intentionally omitted] and (vi) all other sums due under this Agreement, the Note or the other Loan Documents in connection with a partial or total prepayment.

2.3.4   <u>Making of Payments</u>.

Each payment by Borrower hereunder or under the Note shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 12:00 p.m., New York City time, on or prior to the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower.  Whenever any payment hereunder or under the Note shall be stated to be due on a

- 46 -

day which is not a Business Day, such payment shall be made on the first Business Day succeeding such scheduled due date.

    2.3.5    Application of Prepayments.

    All prepayments received pursuant to this Section 2.3 and Section 2.5 shall be applied first, to interest on the outstanding principal balance being prepaid that accrued through and including the Prepayment Date, second, to interest on the outstanding principal balance being prepaid that would have accrued through the end of the Interest Period in which the prepayment occurred and third, to the payments of principal due under the Loan.

**Section 2.4**    Interest Rate Cap Agreement.

    (a)    Upon the earlier to occur of (i) thirty (30) days after the Closing Date and (ii) five (5) Business Days notice from Lender that the same is required in connection with a Securitization or Syndication, Borrower shall obtain, or cause to be obtained, and shall thereafter maintain in effect, an Interest Rate Cap Agreement with an Acceptable Counterparty, which shall be coterminous with the Loan and have a notional amount which shall not at any time be less than the outstanding principal balance of the Loan and which shall at all times have a strike rate equal to (or at Borrower's election, less than) the Strike Rate.  The Counterparty shall be obligated under the Interest Rate Cap Agreement to make monthly payments equal to the excess of one (1) month LIBOR over the Strike Rate, calculated on the notional amount.  The notional amount of the Interest Rate Cap Agreement may be reduced from time to time in amounts equal to any prepayment of the principal of the Loan in accordance with Section 2.3 hereof.

    (b)    Simultaneously with entering into an Interest Rate Cap Agreement, Borrower shall collaterally assign to Lender pursuant to an Assignment of Interest Rate Cap Agreement substantially in the form annexed hereto as Exhibit B, all of its right, title and interest to receive any and all payments under the Interest Rate Cap Agreement (and any related guarantee, if any) and shall deliver to Lender an executed counterpart of such Interest Rate Cap Agreement and notify the Counterparty of such collateral assignment (either in such Interest Rate Cap Agreement or by separate instrument).  The Counterparty shall agree in writing to make all payments it is required to make under the Interest Rate Cap Agreement into the Lockbox Account or if the Lockbox Account is not then required to be in effect, into such account as specified by Lender in writing (with a copy of such notice to Borrower within a reasonable period of time thereafter).  At such time as the Loan is repaid in full, all of Lender's right, title and interest in the Interest Rate Cap Agreement shall terminate and Lender shall promptly execute and deliver at Borrower's sole cost and expense, such documents as may be required to evidence Lender's release of the Interest Rate Cap Agreement and to notify the Counterparty of such release.

    (c)    Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement.  All amounts paid by the Counterparty under the Interest Rate Cap Agreement shall be deposited immediately into the Lockbox Account or if the Lockbox Account is not then required to be in effect, into such account

- 47 -

as specified by Lender in writing (with a copy of such notice to Borrower within a reasonable period of time thereafter).   Borrower shall take all actions reasonably requested by Lender to enforce Lender's rights under the Interest Rate Cap Agreement in the event of a default by the Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder.

(d)    In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below "A+" (or the equivalent) by the Rating Agencies, Borrower shall replace the Interest Rate Cap Agreement with a Replacement Interest Rate Cap Agreement with an Acceptable Counterparty not later than ten (10) Business Days following receipt of notice from Lender or Servicer of such downgrade, withdrawal or qualification.  Notwithstanding the foregoing, in the event Lehman Brothers Holdings Inc. or any Affiliate thereof is the Counterparty, any reference in this subsection to a rating of "A+" shall be deemed to refer to a rating of "A".

(e)    In the event that Borrower fails to purchase and deliver to Lender the Interest Rate Cap Agreement or any Replacement Interest Rate Cap Agreement as and when required hereunder, Lender may purchase such Interest Rate Cap Agreement and the cost incurred by Lender in purchasing such Interest Rate Cap Agreement shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is paid by Borrower to Lender.

(f)    Each Interest Rate Cap Agreement shall contain the following language or its equivalent: "In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below "Aa3" by Moody's or "A+" by S&P (or in each case, the equivalent by any other Rating Agency), the Counterparty must, within 30 days, either (x) post collateral on terms acceptable to each Rating Agency or (y) find a replacement Acceptable Counterparty, at the Counterparty's sole cost and expense, acceptable to each Rating Agency (notwithstanding the foregoing, if the Counterparty's rating is downgraded to "A" or lower, only the option described in clause (y) will be acceptable); provided that, notwithstanding such a downgrade, withdrawal or qualification, unless and until the Counterparty transfers the Interest Rate Cap Agreement to a replacement Acceptable Counterparty pursuant to the foregoing clause (y), the Counterparty will continue to perform its obligations under the Interest Rate Cap Agreement.  Failure to satisfy the foregoing shall constitute an Additional Termination Event as defined by Section 5(b)(v) of the ISDA Master Agreement, with the Counterparty as the Affected Party."  Notwithstanding the foregoing, in the event Lehman Brothers Holdings Inc. or any Affiliate thereof is the Counterparty, any reference in this subsection to a rating of "A+" shall be deemed to refer to a rating of "A".

(g)    In connection with an Interest Rate Cap Agreement, Borrower shall obtain and deliver to Lender an opinion of counsel from counsel for the Counterparty (upon which Lender and its successors and assigns may rely) which shall provide, in relevant part, that:

(1)    the Counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the

- 48 -

organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement;

(2)    the execution and delivery of the Interest Rate Cap Agreement by the Counterparty, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(3)    all consents, authorizations and approvals required for the execution and delivery by the Counterparty of the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(4)    the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the Counterparty and constitutes the legal, valid and binding obligation of the Counterparty, enforceable against the Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

Such opinion shall be subject to customary assumptions and qualifications for interest rate cap opinions delivered in connection with loans of this type.

**Section 2.5**    Release on Payment in Full.

Lender shall, upon the written request and at the expense of Borrower, upon payment in full of all principal and interest on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Note and this Loan Agreement, release the Lien of the Security Instrument on the Property and remit any remaining Reserve Funds to Mezzanine Lender if the Mezzanine Loan is still outstanding or Borrower if the Mezzanine Loan has been paid in full.

## III.    CONSTRUCTION LOAN ADMINISTRATION

**Section 3.1**    Closing Conditions and Conditions to Initial Advance.

The obligation of Lender to close and make the Initial Advance is subject to the accuracy and validity of all representations, warranties and covenants set forth in Articles 4 and 5 hereof, and to the satisfaction of the following conditions:

- 49 -

(a)    <u>Master Disbursement Agreement</u>.    Borrower, Lender and the other parties thereto shall have entered into the Master Disbursement Agreement, satisfactory in all respects to Lender, and Lender shall have received a fully executed copy of the Master Disbursement Agreement.    All conditions precedent (without duplication of those contained in this Section 3.1) set forth in Section 3.1 of the Master Disbursement Agreement shall have been satisfied or waived in accordance with the terms thereof.

(b)    <u>Opinion of Counsel</u>.    Borrower shall have delivered to Lender an opinion letter, in form and substance reasonably acceptable to Lender, from (i) an attorney who is licensed to practice in the State of Nevada and is otherwise acceptable to Lender and (ii) an attorney who is licensed to practice in the State of New York and is otherwise acceptable to Lender.    In addition Borrower shall have delivered to Lender a non-consolidation opinion in form and substance satisfactory to Lender.

(c)    <u>No Defaults</u>.    Borrower and each Guarantor shall be in compliance with all the material terms and provisions set forth herein (including all representations and warranties set forth herein), in the other Loan Documents on its or their part to be observed or performed, and with all requirements (including all construction and plan approval schedules) on its or their part to be observed or performed, and no Event of Default or Default shall have occurred and be continuing.

(d)    <u>Intentionally Omitted</u>.

(e)    <u>Compliance with Laws</u>.    Borrower shall have delivered to Lender reasonably acceptable evidence that the Property, the Project and the intended uses thereof are in compliance with all applicable encumbrances and restrictions (whether of record or otherwise) and all Applicable Laws, including the Americans with Disabilities Act of 1990, as amended (42 U.S.C. § 12-101, et seq.), the Federal Architectural Barriers Act, as amended (42 U.S.C. § 4151, et seq.), the Fair Housing Amendments Act of 1988, as amended (42 U.S.C. § 3601, et seq.), the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794, et seq.) and all state laws addressing the same subject matter.    Such evidence may include letters, licenses, permits, certificates and other correspondence from the appropriate Governmental Authorities, opinions of the Borrower's counsel or other counsel, and opinions or certifications from Architect, Engineer or General Contractor.    The evidence submitted as to zoning should include the zoning designation for the Property and Future Improvements, the permitted uses of the Property and Future Improvements under such zoning designation and zoning requirements as to parking, lot size, ingress, egress and building setbacks.    Further, for those actions or proceedings disclosed to Lender in writing for which the failure to secure a favorable ruling would have a material adverse effect on the Property or the Project, there shall be no actions or proceedings pending before any Governmental Authority relating to the Loan, the Property, the Project or Borrower's use or proposed use of the Property, and all appeal periods for any such prior proceedings must have expired without any appeal having been filed.

(f)    <u>Taxes</u>.    Borrower shall have delivered to Lender evidence that all taxes due and payable in connection with the Property and the Project have been paid.    Lender

- 50 -

shall also be satisfied that all periodic escrow payments for real property taxes and assessments required to be made under the Loan Documents have been properly funded.

(g)     <u>Concrete, Soil and Other Tests</u>.   To the extent required by Lender, Borrower shall have delivered to Lender a report as to soil borings made at the Property by a soil testing firm which is reasonably satisfactory to Lender, Construction Consultant, Engineer and Architect.  Said testing firm shall not be associated with, or selected by, General Contractor.  The number and location of such borings shall be in accordance with the recommendations of the soil testing firm and must also be satisfactory to Lender, Construction Consultant, Engineer and Architect.  The report shall address the ability of the soil to support the Project, and shall include the recommendations of the soil testing firm as to the preparation of the soil and the type and design of the foundation needed in order to adequately support the Future Improvements.

(h)     <u>Leases</u>.  If any Leases are then in existence, Borrower shall have delivered to Lender reasonably satisfactory evidence as to the status of all executed Leases.

(i)     <u>Tenant Estoppel Certificates/Subordination Agreements</u>.    If any Leases are then in existence, Borrower shall have delivered to Lender estoppel certificates and/or nondisturbance, subordination and attornment agreements, in form and substance reasonably satisfactory to Lender, from such Lease tenants as Lender may require.

(j)     <u>Taxpayer Identification Number</u>.  Borrower shall have delivered to Lender the Borrower's and each Guarantor's federal taxpayer identification number of Borrower and each Guarantor that is not a natural person.

(k)     <u>Intellectual Property and Trademarks.</u>  Borrower shall have delivered to Lender an assignment of Borrower's license to use the name "Fontainebleau" and any related trademarks and other intellectual property of (or licensed to) Borrower in connection with the Property which assignment shall be acknowledged by any applicable licensor and otherwise in form and substance reasonably satisfactory to Lender.

(l)     <u>Appraisals</u>.  To the extent not delivered to and approved by Lender prior to the date hereof, Lender shall have obtained a current written appraisal of the Property prepared at Borrower's expense by a qualified appraiser designated by, engaged or contracted by and satisfactory to Lender.  Such appraisal must be satisfactory in form and substance to Lender and shall contain an "as-is" appraised value of the Property (based upon the present value of the "as-stabilized" appraised value) in amount of not less than $454,000,000.

(m)     <u>UCC Letter</u>.  Borrower shall have delivered to Lender a UCC search letter (or other evidence satisfactory to Lender) showing no prior security interests in any part of the Project.

(n)     <u>No Flood Hazard Area</u>.    Borrower shall have delivered evidence, satisfactory to Lender, that the Property is not situated in a special flood hazard area as designated by federal Governmental Authorities.

- 51 -

(o)    <u>Damage, Condemnation or Similar Proceedings</u>.  Lender shall be satisfied that since the date of the last inspection of the Property or the Project by Lender, no portion thereof has been damaged and not repaired to Lender's satisfaction, or has been taken in condemnation or other similar proceedings (and no such proceedings shall be pending).

(p)    <u>Resort Loan Documents</u>. Lender shall have received fully executed copies of the Resort Loan Agreement, and the Guarantee and Collateral Agreement, the Guarantees, the Completion Guarantees and the Deed of Trust (in each case as defined in the Resort Loan Agreement) and such other documents requested by Lender.

(q)    <u>Net Worth and Liquidity of Guarantor</u>.  Borrower shall have delivered to Lender evidence that Guarantor has (1) a Net Worth (exclusive of any direct or indirect interest in the Property) at least equal to $400,000,000 and (2) Liquidity (exclusive of any direct or indirect interest in the Property) at least equal to $100,000,000.

(r)    <u>Retail Intercreditor Agreement</u>.  Lender shall have entered into the Retail Intercreditor Agreement, which shall be satisfactory in all respects to Lender.  Lender shall have received a fully executed copy of the Retail Intercreditor Agreement.

(s)    <u>Reserved</u>.

(t)    <u>Loan-to-Cost</u>.  Borrower shall have delivered to Lender evidence that the total of budgeted construction costs (including, soft costs, hard cost, interest expense, etc.) plus allocable air rights acquisition value plus the value of any rights conferred by the Master REA for the Property, shall be no less than $454,000,000

(u)    <u>Air Rights Lease</u>.  Borrower shall have delivered to Lender a fully executed copy of the Air Rights Lease.

(v)    <u>Intercreditor Agreement</u>.  Lender shall have entered into the Intercreditor Agreement, satisfactory in all respects to Lender.  Lender shall have received a fully executed copy of the Intercreditor Agreement.

(w)    <u>Miscellaneous</u>.  Borrower shall have delivered to Lender all other documents and items, in form and substance satisfactory to Lender, that are reasonably requested by Lender or are otherwise customarily provided in loan transactions similar to the Loan.

For purposes of determining compliance with the conditions specified in this Section 3.1, Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lenders if Lender has made the requested Initial Advance hereunder.

## IV.    <u>REPRESENTATIONS AND WARRANTIES</u>

**Section 4.1**    <u>Borrower Representations</u>.

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

Borrower represents and warrants as of the Closing Date that:

4.1.1    <u>Organization</u>.

Borrower is duly organized and is validly existing and in good standing in the jurisdiction in which it is organized, with requisite power and authority to own and lease the Property, as applicable, and to transact the businesses in which it is now engaged.  Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with the Property, its businesses and operations.  Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own and lease the Property, as applicable, and to transact the businesses in which it is now engaged. Attached hereto as Schedule I is an organizational chart of Borrower.

4.1.2    <u>Proceedings</u>.

Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents.  This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

4.1.3    <u>No Conflicts</u>.

The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement, or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over Borrower or any of the Property or any of Borrower's other assets, or any license or other approval required to operate the Property, and any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of this Agreement or any other Loan Documents have been obtained and is in full force and effect.

4.1.4    <u>Litigation</u>.

To Borrower's knowledge after due inquiry, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or threatened against or affecting Borrower or the Property, which actions, suits or proceedings, if determined against Borrower or the Property, could reasonably be expected to materially

- 53 -

adversely affect the condition (financial or otherwise) or business of Borrower or the condition or ownership of the Property, except as disclosed on Schedule II hereto.

4.1.5    <u>Agreements</u>.

Borrower is not a party to any agreement or instrument or subject to any restriction which would be reasonably expected to materially and adversely affect Borrower or the Property, or Borrower's business, properties or assets, operations or condition, financial or otherwise. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property is bound. Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property; (b) obligations under the Loan Documents, and (c) obligations under the Approved Affiliate Agreements.

4.1.6    <u>Solvency</u>.

Borrower (a) has not entered into the transaction or executed the Note, this Agreement or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to incur debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower). No petition under the Bankruptcy Code or similar state bankruptcy or insolvency law has been filed against Borrower or any constituent Person in the last seven (7) years, and neither Borrower nor any constituent Person in the last seven (7) years has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. Neither Borrower nor any of its constituent Persons are contemplating either the filing of a petition by it under the Bankruptcy Code or similar state bankruptcy or insolvency law or the liquidation of all or a major portion of Borrower's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against it or such constituent Persons.

4.1.7    <u>Full and Accurate Disclosure</u>.

No statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact

- 54 -

necessary to make statements contained herein or therein not misleading.  There is no fact presently known to Borrower which has not been disclosed to Lender which materially and adversely affects, or could reasonably be expected to materially and adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower.

4.1.8    No Plan Assets.

Borrower is not a Plan and none of the assets of Borrower constitute or will constitute, by virtue of the application of 29 C.F.R. §2510.3-101(f) as modified by section 3(42) of ERISA, "Plan Assets" of one or more Plans.  In addition, (a) Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) transactions by or with Borrower are not subject to State statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Agreement.

4.1.9    Compliance.

Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, all Environmental Laws, building and zoning ordinances and codes.  Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority.  There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

4.1.10    Financial Information.

All financial data, including, without limitation, any statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower and the Property in respect of prior periods (i) are true, complete and correct in all material respects, (ii) accurately represent, in all material respects, the financial condition of Borrower and the Property, as applicable, as of the date of such reports, and (iii) have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein.  Except for Permitted Encumbrances, Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on the Property or the operation thereof as retail shopping centers except as referred to or reflected in said financial statements.  Since the date of any such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower from that set forth in said financial statements.

4.1.11    Condemnation.

No Condemnation or other similar proceeding has been commenced or, to the best of Borrower's knowledge, is threatened or contemplated with respect to all or any portion of the Real Property or for the relocation of roadways providing access to the Real Property.

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

4.1.12  <u>Federal Reserve Regulations</u>.

No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

4.1.13  <u>Public Access</u>.

The Real Property has rights of access to public ways.

4.1.14  <u>Not a Foreign Person</u>.

Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

4.1.15  <u>Intentionally Omitted.</u>

4.1.16  <u>Assessments</u>.

The Real Property, together with the Resort Property, is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property, other than the Resort Property.  To Borrower's knowledge after due inquiry, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Real Property, nor are there any contemplated improvements to the Real Property that may result in such special or other assessments.

4.1.17  <u>Enforceability</u>.

The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, including the defense of usury, and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

4.1.18  <u>No Prior Assignment</u>.

As of the Closing Date, there are no prior assignments of the Leases or any portion of the Rents due and payable or to become due and payable which are presently outstanding.

4.1.19  <u>Insurance</u>.

Borrower has obtained and has delivered to Lender certificates of insurance reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.  No Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any such policy.  Within ninety (90) days of the date hereof, Borrower shall deliver to Lender copies of all insurance policies reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

4.1.20  Use of Property.

The Property is intended, upon completion of the Future Improvements, to be used for retail and ancillary purposes (including, but not limited to, the operation of restaurants).

4.1.21  Licenses; Permits.

All certificates, permits, licenses and other authorizations of Governmental Authorities which are necessary for the continued use and operation of the Future Improvements to be constructed by Borrower in accordance with the terms and provisions of the Loan Documents (collectively, the "Licenses"), have been or will have been duly obtained by or on behalf of Borrower prior to when needed and shall at all times thereafter remain in full force and effect.

4.1.22  Flood Zone.

None of the Improvements on the Real Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards and, if so located, the flood insurance required pursuant to Section 6.1(a)(vii) is in full force and effect.

4.1.23  Construction Documents.

As of the Closing Date, the Borrower is not a party to any Construction Contract, Architect's Contract, Engineer's Contract or other material contract (other than the Master REA, the Master Disbursement Agreement and the Affiliate Lease) concerning the construction, design or engineering of the Future Improvements or the Project Future Improvements.

4.1.24  Boundaries.

Other than Permitted Encumbrances, no improvements on adjoining properties encroach upon the Real Property, and no easements or other encumbrances upon the Real Property encroach upon any of the Improvements.

4.1.25  Leases.

The Property is not subject to any Leases other than the Air Rights Lease, the Affiliate Lease and, after Closing Date, Leases entered into from time to time in accordance with Section 5.1.17.

4.1.26  Survey.

To Borrower's knowledge, the Survey for the Property delivered to Lender in connection with this Agreement does not fail to reflect any material matter affecting the Real Property or the title thereto.

4.1.27  Loan to Value.

As of the Closing Date, the maximum principal amount of the Loan does not exceed one hundred twenty-five percent (125%) of the aggregate fair market value of the Property.

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

4.1.28  <u>Filing and Recording Taxes</u>.

As of the Closing Date, all transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes, if any, required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid or will be paid simultaneously with the closing of the Loan or funds therefor will be provided in escrow to the Title Company with instructions for timely application.  As of the Closing Date, all mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instrument, have been paid or will be paid simultaneously with the closing of the Loan or funds therefor will be provided in escrow to the Title Company with instructions for timely application.

4.1.29  <u>Development Agreement</u>.  The Borrower is not a party to any Development Agreement.  The Property is being developed by Fontainebleau Las Vegas, LLC, an Affiliate of Borrower.  No Development Agreement exists and no party is (and shall be for so long as such Property is being developed by an Affiliate) entitled to receive any development fees.

4.1.30  <u>Management Agreement</u>.

As of the Closing Date, a fully executed, true and complete copy of the Approved Management Agreement, which shall be in full force and effect, shall have been delivered to Lender.

4.1.31  <u>Illegal Activity</u>.

No portion of the Property has been or will be purchased with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to any controlled substances at the Property.

4.1.32  <u>No Change in Facts or Circumstances; Disclosure</u>.

All information submitted by Borrower to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects.  There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the use, operation or value of the Property or the business operations or the financial condition of Borrower.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any information described in this Section 4.1.32 or any representation or warranty made herein to be materially misleading.

4.1.33  <u>Investment Company Act</u>.

- 58 -

Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) to the best of its knowledge, subject to any other federal or State law or regulation which purports to restrict or regulate its ability to borrow money, in contravention of this Agreement or any other Loan Document.

4.1.34  Principal Place of Business; State of Organization.

Borrower's principal place of business as of the date hereof is the address set forth in the introductory paragraph of this Agreement.  Borrower is organized under the laws of the State of Delaware and its organizational identification number is DE 4338959.

4.1.35  Single Purpose Entity.

Borrower represents and warrants that it has not, and covenants and agrees that its organizational documents shall provide that it shall not:

(a)     engage in any business or activity other than the acquisition, development, ownership, operation, leasing, managing and maintenance of the Property, and entering into the Loan, and activities incidental thereto;

(b)     acquire or own any material assets other than (i) the Real Property, and (ii) such incidental Personal Property as may be necessary for the operation of the Real Property;

(c)     merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(d)     (i) fail to observe its organizational formalities or preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, and qualification to do business in the State where the Property is located, if applicable, or (ii) without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of its LLC Agreement, Articles of Organization or similar organizational documents;

(e)     own any subsidiary or make any investment in (provided that, for the avoidance of doubt, Lender acknowledges that the payment by Borrower of Shared Costs does not constitute an investment in the Resort Borrower), any Person without the prior written consent of Lender;

(f)     commingle its assets with the assets of any of its members, general partners, Affiliates, principals or of any other Person (provided that, for the avoidance of doubt, Lender acknowledges that the payment by Borrower of Shared Costs does not constitute a commingling of assets with the Resort Borrower), participate in a cash

- 59 -

management system with any other Person or fail to use its own separate stationery, telephone number, invoices and checks;

(g)      incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Debt, except for trade payables in the ordinary course of its business of owning and operating the Property, provided that such debt (i) is not evidenced by a note, (ii) is paid within sixty (60) days of the date incurred, (iii) does not exceed, in the aggregate, three percent (3%) of the outstanding principal balance of the Note and (iv) is payable to trade creditors and in amounts as are normal and reasonable under the circumstances;

(h)      become insolvent and fail to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due;

(i)      (i) fail to maintain its records (including financial statements), books of account and bank accounts separate and apart from its Affiliates and any other Person, (ii) permit its assets or liabilities to be listed as assets or liabilities on the financial statement of any other Person; provided, however, that Borrower's assets may be included in a consolidated financial statement of an Affiliate of Borrower, provided that (1) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower from such Affiliate and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliate or any other Person and (2) such assets shall also be listed on Borrower's own separate balance sheet, or (iii) include the assets or liabilities of any other Person on its financial statements;

(j)      other than the Approved Affiliate Agreements, enter into any contract or agreement with any member, general partner, principal or Affiliate of Borrower, Guarantor or any member, general partner, principal or Affiliate thereof (other than a business management services agreement with an Affiliate of Borrower, provided that (i) such agreement is reasonably acceptable to Lender, (ii) the manager, or equivalent thereof, under such agreement holds itself out as an agent of Borrower and (iii) the agreement meets the standards set forth in this subsection (j) following this parenthetical), except upon terms and conditions that are commercially reasonable, intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any member, general partner, principal or Affiliate of Borrower, Guarantor, or any member, general partner, principal or Affiliate thereof;

(k)      seek the dissolution or winding up in whole, or in part, of Borrower;

(l)      fail to correct any known misunderstandings regarding the separate identity of Borrower or any member, general partner, principal or Affiliate thereof or any other Person;

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

(m)     guarantee or become obligated for the debts of any other Person or hold itself out to be responsible for the debts of another Person;

(n)     make any loans or advances to any third party, including any member, general partner, principal or Affiliate of Borrower, or any member, general partner, principal or Affiliate thereof, and shall not acquire obligations or securities of any member, general partner, principal or Affiliate of Borrower, or any member, general partner, or Affiliate thereof (provided that, for the avoidance of doubt, Lender acknowledges that the payment by Borrower of Shared Costs does not constitute a loan or advance);

(o)     fail to file its own tax returns or be included on the tax returns of any other Person except as required by Applicable Law;

(p)     fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or a name franchised or licensed to it by an entity other than an Affiliate of Borrower (provided that Lender acknowledges that the foregoing shall not preclude Borrower from using the "Fontainebleau" name in connection with the name of the retail center at the Property), and not as a division or part of any other entity in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that Borrower is responsible for the debts of any third party (including any member, general partner, principal or Affiliate of Borrower, or any member, general partner, principal or Affiliate thereof);

(q)     fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(r)     share any common logo with (provided that Lender acknowledges that the foregoing shall not preclude Borrower from using the "Fontainebleau" logo in connection with the operations of the Property) or hold itself out as or be considered as a department or division of (i) any general partner, principal, member or Affiliate of Borrower, (ii) any Affiliate of a general partner, principal or member of Borrower, or (iii) any other Person;

(s)     fail to allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate;

(t)     pledge its assets for the benefit of any other Person other than with respect to the Loan;

(u)     fail to maintain a sufficient number of employees in light of its contemplated business operations;

(v)     fail to provide in its LLC Agreement, Articles of Organization or similar organizational documents, that for so long as the Loan is outstanding pursuant to the Note, this Agreement and the other Loan Documents, it shall not file or consent to the

- 61 -

filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors without the affirmative vote of each Independent Manager and of all other general partners/managing members/directors;

(w)    fail to hold its assets in its own name;

(x)    if Borrower is a corporation, fail to consider the interests of its creditors in connection with all corporate actions to the extent permitted by Applicable Law;

(y)    have any of its obligations guaranteed by an Affiliate except the Guarantor in connection with the Loan;

(z)    violate or cause to be violated the assumptions made with respect to Borrower in the Insolvency Opinion;

(aa)    fail at any time to have at least one independent director or manager (or, at the request of Lender, two independent directors or managers, within thirty (30) days of such request) (each an "Independent Manager") that is not and has not been for at least five (5) years: (a) a stockholder, director, officer, employee, partner, member, attorney or counsel of Borrower or any Affiliate of either of them; (b) a customer, supplier or other Person who derives its purchases or revenues (other than any fee paid to such director or manager as compensation for such director or manager to serve as an Independent Manager) from its activities with Borrower or any Affiliate of Borrower (a "Business Party"); (c) a Person or controlling or under common control with any such stockholder, partner, member, director, officer, attorney, counsel or Business Party; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, attorney, counsel or Business Party; or

(bb)    permit its board of directors to take any action which, under the terms of any certificate of incorporation, by-laws, voting trust agreement with respect to any common stock or other applicable organizational documents, requires the unanimous vote of one hundred percent (100%) of the members of the board without the vote of each Independent Manager.

(cc)    Fail to have the limited liability company agreement of Borrower (the "LLC Agreement") provide that (A) upon the occurrence of any event that causes the last remaining member (or sole member to the extent Borrower only has one member) of Borrower ("Member") to cease to be the member of Borrower (other than (1) upon an assignment by Member of all of its limited liability company interest in Borrower and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (2) the resignation of Member and the admission of an additional member of Borrower in accordance with the terms of the Loan Documents and the LLC Agreement), any Person acting as Independent Manager of Borrower shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Borrower, automatically be admitted to Borrower ("Special Member") and shall continue Borrower without dissolution and (B) Special Member may not resign

- 62 -

from Borrower or transfer its rights as Special Member unless (1) a successor Special Member has been admitted to Borrower as Special Member in accordance with requirements of Delaware law and (2) such successor Special Member has also accepted its appointment as an Independent Manager.  The LLC Agreement shall further provide that (v) Special Member shall automatically cease to be a member of Borrower upon the admission to Borrower of a substitute Member, (w) Special Member shall be a member of Borrower that has no interest in the profits, losses and capital of Borrower and has no right to receive any distributions of Borrower assets, (x) pursuant to Section 18-301 of the Delaware Limited Liability Company Act, Special Member shall not be required to make any capital contributions to Borrower and shall not receive a limited liability company interest in Borrower, (y) Special Member, in its capacity as Special Member, may not bind Borrower and (z) except as required by any mandatory provision of the Delaware Limited Liability Company Act, Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Borrower, including, without limitation, the merger, consolidation or conversion of Borrower; provided, however, such prohibition shall not limit the obligations of Special Member, in its capacity as Independent Manager, to vote on such matters required by the LLC Agreement.  In order to implement the admission to Borrower of Special Member, Special Member shall execute a counterpart to the LLC Agreement.  Prior to its admission to Borrower as Special Member, Special Member shall not be a member of Borrower.

Upon the occurrence of any event that causes Member to cease to be a member of Borrower, to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Borrower, agree in writing (A) to continue Borrower and (B) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of Member of Borrower in Borrower.  Any action initiated by or brought against Member or Special Member under any Creditors Rights Laws shall not cause Member or Special Member to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without dissolution.  The LLC Agreement shall provide that each of Member and Special Member waives any right it might have to agree in writing to dissolve Borrower upon the occurrence of any action initiated by or brought against Member or Special Member under any Creditors Rights Laws, or the occurrence of an event that causes Member or Special Member to cease to be a member of Borrower.

4.1.36  Business Purposes.

The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

4.1.37  Taxes.

Borrower has filed all federal, State, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it, except to the

- 63 -

extent being contested by Borrower in good faith in accordance with the terms of Section 5.1.2 of this Agreement.  Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

4.1.38  Forfeiture.

Neither Borrower nor any other Person in occupancy of or involved with the operation or use of the Real Property has committed any act or omission affording the federal government or any State or local government the right of forfeiture as against the Real Property or any part thereof or any monies paid in performance of Borrower's obligations under the Note, this Agreement or the other Loan Documents.  Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

4.1.39  Environmental Representations and Warranties.

Borrower represents and warrants, to the best of its knowledge after due inquiry, except as disclosed in the written reports resulting from the environmental site assessments of the Property delivered to and approved by Lender prior to the Closing Date (the "Environmental Report") and information that Borrower knows, that: (a) there are no Hazardous Materials or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with current Environmental Laws and with permits issued pursuant thereto (if such permits are required), and (ii) either (A) in amounts not in excess of that necessary to operate, clean, repair and maintain the Property or each tenant's respective business at the Real Property as set forth in their respective Leases, or (B) held by a tenant for sale to the public in its ordinary course of business; (b) there are no past, present or threatened Releases of Hazardous Materials in violation of any Environmental Law and which would require remediation by a Governmental Authority in, on, under or from the Property; (c) there is no threat of any Release of Hazardous Materials migrating to the Property; (d) there is no past or present non-compliance with current Environmental Laws, or with permits issued pursuant thereto, in connection with the Property except as described in the Environmental Reports; (e) Borrower does not know of, and has not received, any written or oral notice or other communication from any Person (including but not limited to a Governmental Authority) relating to a Release of Hazardous Materials in, on, under or from the Property; and (f) Borrower has truthfully and fully provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property actually known to Borrower or contained in Borrower's files and records, including but not limited to any reports relating to a Release of Hazardous Materials in, on, under or migrating to or from the Property and/or to the environmental condition of the Property.

4.1.40  Taxpayer Identification Number.

Borrower's United States taxpayer identification number is 20-8901045.

4.1.41  OFAC.

Borrower represents and warrants that neither Borrower, Guarantor, or any of their respective Affiliates is a Prohibited Person, and Borrower, Guarantor, and their respective Affiliates are in full compliance with all applicable orders, rules, regulations and

- 64 -

recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

4.1.42   Air Rights Lease Representations.

(a)   (i) The Air Rights Lease, a true and complete copy of which has been delivered to Lender, is in full force and effect and has not been modified or amended in any manner whatsoever, (ii) there are no defaults under the Air Rights Lease by Borrower, or, to the best of Borrower's knowledge, Fee Owner as landlord thereunder, and, to the best of Borrower's knowledge, no event has occurred which but for the passage of time, or notice, or both would constitute a default under the Air Rights Lease, (iii) all Air Rights Rent have been paid in full, (iv) neither Borrower nor the landlord under the Air Rights Lease has commenced any action or given or received any notice for the purpose of terminating the Air Rights Lease other than by taking measures to create the New Estate which shall take effect upon satisfaction of the Fee Transfer Conditions, (v) neither Fee Owner, as debtor in possession, nor a trustee for such Fee Owner, has given any notice of,  and Borrower has not consented to, any attempt to transfer the Fee Estate free and clear of the Air Rights Lease under section 363(f) of the Bankruptcy Code, and (vi) Fee Owner is not subject to any voluntary or involuntary bankruptcy, reorganization or insolvency proceeding and the Fee Estate is not an asset in any voluntary or involuntary bankruptcy, reorganization or insolvency proceeding.

(b)   All existing and future mortgages on the Property and on the Fee Estate are or shall be subordinate to the Air Rights Lease and the Lien of the Security Instrument;

(c)   The Air Rights Lease or a memorandum thereof has been duly recorded, the Air Rights Lease permits the interest of the lessee thereunder to be encumbered by the Security Instrument, and there has not been any change in the terms of the Air Rights Lease since its recordation;

(d)   Other than Permitted Encumbrances, Borrower's interest in the Air Rights Lease is not subject to any Liens superior to, or of equal priority with, the Security Instrument;

(e)   Borrower's interest in the Air Rights Lease is assignable to Lender upon notice to, but without the consent of, the lessor thereunder and, in the event that it is so assigned, it is further assignable upon notice to, but without the need to obtain the consent of, such lessor;

(f)   The Air Rights Lease requires the lessor thereunder to give notice of any default by Borrower to Lender and the Air Rights Lease further provides that notice of termination given under the Air Rights Lease is not effective against Lender unless a copy of the notice has been delivered to Lender in the manner described in the Air Rights Lease;

(g)   Lender is permitted an opportunity (including, where necessary, time to gain possession of the interest of Borrower under the Air Rights Lease) to cure any

- 65 -

default under the Air Rights Lease, which is curable after the receipt of notice of any default before the lessor thereunder may terminate the Air Rights Lease;

(h)     The Air Rights Lease has a term which extends not less than twenty (20) years beyond the Maturity Date;

(i)     The Air Rights Lease requires the lessor to enter into a new lease upon termination of the Air Rights Lease to the extent specified therein, including as a result of the rejection of the Air Rights Lease in a bankruptcy proceeding;

(j)     Under the terms of the Air Rights Lease, the Master REA and the Loan Documents, taken together, any Net Proceeds will be applied either to the Restoration of all or part of the Property, with Lender or a trustee appointed (or previously approved) by Lender having the right to hold and disburse such Net Proceeds as the Restoration progresses, or to the payment of the outstanding principal balance of the Loan together with any accrued interest thereon;

(k)     The mortgagee on the related fee interest in the Property has agreed that such lender's mortgage (and the related Lien upon such fee interest) shall terminate and be removed of record upon the occurrence of a Fee Transfer;

(l)     The Air Rights Lease does not impose restrictions on subletting except that subleases must be in accordance with the Master REA; and

(m)     Pursuant to the Air Rights Lease, (i) Resort Borrower and Borrower acknowledged that, immediately prior to entering into the Air Rights Lease, the membership interests in Borrower were owned by Resort Borrower, (ii) Resort Borrower agreed to contribute certain interests in the Air Rights Parcel (as defined in the Air Rights Lease) to the capital of Borrower (described in the Air Rights Lease), (iii) for business and practical reasons, Resort Borrower and Borrower intend that the transfer of the ownership of the Air Rights Parcel shall be effected by the Air Rights Lease by providing a term of 99 years at a nominal rent, with an obligation for Resort Borrower to convey fee title to Borrower upon the satisfaction of certain specified events (all as set forth in the Air Rights Lease), (iv) Resort Borrower and Borrower intend, immediately following the execution and delivery of the Air Rights Lease, that the membership interests in Borrower will be distributed as a return of capital by Resort Borrower through Resort Borrower's upstream intermediate parent entities to Fontainebleau Resort Holdings, LLC, which thereafter will contribute the membership interests in Borrower downstream through Fontainebleau Las Vegas Retail Parent, LLC to the capital of Mezzanine Borrower and, as a result of those transfers, Borrower will constitute a wholly owned subsidiary of Mezzanine Borrower and (v) Resort Borrower and Borrower acknowledge that the foregoing transfers will be recorded and accounted for as so described.

4.1.43   Embargoed Person.

As of the date hereof and at all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower and Guarantor constitute property of, or are beneficially owned,

directly or indirectly, by any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of law ("Embargoed Person"); (b) no Embargoed Person has any interest of any nature whatsoever in Borrower or Guarantor, as applicable, with the result that the investment in Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower or Guarantor, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

4.1.44  <u>Labor and Material</u>.

Borrower shall advise Lender in writing immediately if Borrower receives any notice, written or oral, from any laborer, contractor, subcontractor or material furnisher to the effect that said laborer, contractor, subcontractor or material furnisher has not been paid for any labor or materials furnished to or in the Real Property, and Borrower shall deliver to Lender on demand, any contracts, bills of sale, statements, receipted vouchers or agreements, under which Borrower claims title to any materials, fixtures or articles used in the construction of the Future Improvements.

4.1.45  <u>Master Disbursement Agreement Representations</u>.  Borrower has reviewed the representations and warranties made by, and covenants of, the Project Entities (as defined in the Master Disbursement Agreement) contained in the Master Disbursement Agreement and such representations and warranties are true, correct and complete.

4.1.46  <u>Reciprocal Easement Agreements</u>.

(a)    To the best of Borrower's knowledge, neither Borrower, nor any other party is currently in default (nor has any notice been given or except as previously disclosed to Lender in writing, received with respect to an alleged or current default) in any material respect under any of the terms and conditions of the REA, and the REA remains unmodified and in full force and effect.

(b)    To the best of Borrower's knowledge, all sums due and owing by Borrower to the other parties to the REA (or by the other parties to the REA to the Borrower) pursuant to the terms of the REA, including without limitation, all sums, charges, fees, assessments, costs, and expenses in connection with any taxes, site preparation and construction, non-shareholder contributions, and common area and other property management activities have been paid, are current, and no lien has attached on the Property (or threat thereof been made) for failure to pay any of the foregoing.

(c)    The terms, conditions, covenants, uses and restrictions contained in the REA do not conflict in any material respect with any terms, conditions, covenants, uses and restrictions contained in any Lease or in any agreement between Borrower and

occupant of any peripheral parcel, including without limitation, conditions and restrictions with respect to kiosk placement, tenant restrictions (type, location or exclusivity), sale of certain goods or services, and/or other use restrictions.

(d)    The terms, conditions, covenants, uses and restrictions contained in any Lease do not conflict in any material respect with any terms, conditions, covenants, uses and restrictions contained in the REA, any other Lease or in any agreement between Borrower and occupant of any peripheral parcel, including without limitation, conditions and restrictions with respect to kiosk placement, tenant restrictions (type, location or exclusivity), sale of certain goods or services, and/or other use restrictions.

**Section 4.2**    <u>Survival of Representations</u>.

Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 and elsewhere in this Agreement and in the other Loan Documents shall survive (but shall not be deemed to be remade unless expressly stated elsewhere in the Loan Documents) for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower.  All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## V.    **BORROWER COVENANTS**

**Section 5.1**    <u>Affirmative Covenants</u>.

From the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Security Instrument encumbering the Property (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

5.1.1    <u>Existence; Compliance with Legal Requirements</u>.

(a)    Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises, and comply with all Legal Requirements applicable to it, the Plans and Specifications and the Property, except to the extent any failure with respect to the foregoing could not be reasonably expected to have a Material Adverse Effect.  There shall never be committed by Borrower or any Affiliate, nor shall Borrower knowingly permit any other Person in occupancy of or involved with the operation or use of the Real Property, any act or omission affording the federal government or any State or local government the right of forfeiture against the Real Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.  Borrower shall at all times use commercially reasonable efforts to maintain, preserve and protect all franchises and trade names and preserve all the remainder of its property used or useful in the conduct of its business and

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

shall keep the Real Property in reasonably good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Security Instrument. Borrower shall keep the Real Property insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement.

(b)     After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of any Legal Requirement, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Applicable Laws; (iii) neither the Property nor any part thereof or interest therein will have a reasonable likelihood of being sold, forfeited, terminated, cancelled or lost as a result of such contest; (iv) Borrower shall promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (v) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower or the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding (or if no such security is required by the proceeding, such security as may be requested by Lender) to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security or part thereof, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in imminent danger of being sold, forfeited, terminated, cancelled or lost.

5.1.2   Taxes and Other Charges.

(a)     Subject to Section 7.2 hereof, Borrower shall pay (or cause to be paid) all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable. Borrower shall furnish to Lender receipts, or other evidence for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to Section 7.2 hereof). Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever which may be or become a Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property. Notwithstanding the foregoing or any other provision of any Loan Document, after prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted

- 69 -

under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Applicable Laws; (iii) neither the Property nor any part thereof or interest therein will have a reasonable likelihood of being sold, forfeited, terminated, cancelled or lost as a result of such contest; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) to the extent Borrower has not paid such Taxes or Other Charges, such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding (or if no such security is required by the proceeding, such security as may be requested by Lender) to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon.  Lender may apply such security or part thereof held by Lender at any time when, in the reasonable judgment of Lender, the validity or applicability of such Taxes or Other Charges are established or the Property (or part thereof or interest therein) shall be in imminent danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien.

(b)        Until such time as a separate tax lot or parcel has been obtained for the Real Property which does not include any portion of the Resort Property, unless the Resort Lender is currently budgeting loan proceeds for (and Lender has no reasonable belief that Resort Lender will not be able to timely pay or cause to be paid with such budgeted proceeds) Taxes for both the Resort Property and the Real Property, Borrower shall be required to escrow Taxes with respect to the Resort Property with Lender.

5.1.3    Litigation.

Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened against Borrower which could reasonably be expected to materially adversely affect Borrower's condition (financial or otherwise) or business or the Property.

5.1.4    Access to the Property.

Borrower shall permit agents, representatives and employees of Lender and the Construction Consultant to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice.

5.1.5    Notice of Default.

Borrower shall promptly advise Lender of any material adverse change in Borrower's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

5.1.6    Cooperate in Legal Proceedings.

Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way adversely affect the rights

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

5.1.7    Award and Insurance Benefits.

Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Award or Insurance Proceeds.

5.1.8    Further Assurances.

Borrower shall, at Borrower's sole cost and expense:

(a)    furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents or reasonably requested by Lender in connection therewith;

(b)    execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require including, without limitation, the authorization of Lender to execute and/or the execution by Borrower of UCC financing statements; and

(c)    do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time, provided that the same does not unreasonably increase the obligations of or restrictions imposed upon the Borrower or any Guarantor under this Agreement or any other Loan Document.

5.1.9    Mortgage and Intangible Taxes.

Borrower shall pay all State, county and municipal recording, mortgage, and intangible, and all other taxes imposed upon the execution and recordation of the Security Instrument and/or upon the execution and delivery of the Note.

5.1.10    Financial Reporting.

(a)    Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with GAAP (or such other accounting basis acceptable to Lender), proper and accurate books, records and accounts reflecting all of

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

the financial affairs of Borrower and all items of income and expense in connection with the operation on an individual basis of the Property.  Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire.  After the occurrence of an Event of Default, Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)    Borrower will furnish to Lender annually, within one hundred twenty (120) days following the end of each Fiscal Year, a complete copy of Borrower's annual financial statements audited by an Approved Accountant in accordance with GAAP (or such other accounting basis acceptable to Lender) covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower.  Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing Operating Expenses, and, following Borrower's initial receipt of any Rents or other Gross Income from Operations, amounts representing annual Net Cash Flow and Gross Income from Operations.  Borrower's annual financial statements shall be accompanied by (i) a comparison of the budgeted income and expenses and the actual income and expenses for the prior Fiscal Year, (ii) a certificate executed by a Responsible Officer or other appropriate officer of Borrower, stating that each such annual financial statement presents fairly the financial condition and the results of operations of Borrower and the Property being reported upon and has been prepared in accordance with GAAP, (iii) a certificate executed by a Responsible Officer or other appropriate officer of Borrower, certifying as to the Net Operating Income,  (iv) an unqualified opinion of an Approved Accountant, (v) a list of tenants, if any, occupying more than twenty (20%) percent of the total floor area of the Improvements and (vi) a schedule prepared and certified to by a Responsible Officer of Borrower Net Operating Income to Net Cash Flow (the "Net Cash Flow Schedule"), which shall itemize all adjustments made to Net Operating Income to arrive at Net Cash Flow deemed material by such Responsible Officer.  Together with Borrower's annual financial statements, Borrower shall furnish to Lender an Officer's Certificate certifying as of the date thereof whether there exists an event or circumstance which constitutes a Default or Event of Default under the Loan Documents executed and delivered by, or applicable to, Borrower, and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(c)    Borrower will furnish, or cause to be furnished, to Lender on or before thirty (30) days after the end of each calendar month the following items (which items are not required to be audited by an Approved Accountant unless expressly stated otherwise), accompanied by a certificate of a Responsible Officer or other appropriate officer of Borrower, stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments): (i) commencing upon the execution of the first Lease by Borrower, a rent roll for the subject month accompanied by an Officer's

- 72 -

Certificate with respect thereto; (ii) commencing upon Borrower's initial receipt of any Rents or other Gross Income from Operations, monthly and year-to-date operating statements prepared for each calendar month, noting Net Operating Income, Gross Income from Operations, Operating Expenses, Capital Expenditures and other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar month, and containing a comparison of budgeted income and expenses and the actual income and expenses together with a detailed explanation of any variances of five percent (5%) or more between budgeted and actual amounts for such periods, all in form satisfactory to Lender; (iii) commencing upon Borrower's initial receipt of any Rents or other Gross Income from Operations, a calculation reflecting the annual Debt Service Coverage Ratio for the immediately preceding twelve (12) month period (or such shorter period commencing upon the date of Borrower's initial receipt of any such Rents or other Gross Income from Operations) as of the last day of such month accompanied by an Officer's Certificate with respect thereto; (iv) an update as to Borrower's Leasing Plan (showing the number of inquiries made and/or rental applications received from tenants or prospective tenants, letters of intent in existence and deposits received from tenants and any other information requested by Lender), (v) an update as to the actual costs spent to date (at the time such update is given) in connection with the completion of the Future Improvements to be constructed (or paid for) by Borrower as well as the projected costs of completion for such Future Improvements in accordance with the Plans and Specifications and Applicable Laws, (vi) an update as to the actual costs spent to date (at the time such update is given) by Borrower and its Affiliates in connection with the completion of the Project Future Improvements as well as the projected costs for Borrower and its Affiliates of completion for such Project Future Improvements in accordance with the Project Plans and Specifications and Applicable Laws and (vii) a Net Cash Flow Schedule.  In addition, such certificate shall also be accompanied by a certificate of a Responsible Officer or other appropriate officer of Borrower stating that the representations and warranties of Borrower set forth in Section 4.1.35 are true and correct as of the date of such certificate and that there are no trade payables outstanding for more than sixty (60) days unless the same are being contested in good faith and such amounts are immaterial (in which case such certificate shall certify as to the same).  Borrower will furnish, or cause to be furnished, to Lender on or before twenty (20) days after the end of each calendar quarter a calculation reflecting the Debt Service Coverage Ratio for such calendar quarter accompanied by an Officer's Certificate with respect thereto.

(d)      (i) For the partial year period commencing on the date hereof, and for each Fiscal Year thereafter, Borrower shall submit to Lender a commercially reasonable leasing plan appropriate for a property of the type and character of the Property, including a marketing plan and projections for rollovers, vacancies, leasing commission costs, tenant improvement costs and other capital costs (a "Leasing Plan") and Borrower will lease the Property in accordance with the Leasing Plan and (ii) Borrower shall submit to Lender an Annual Budget for the Property not later than sixty (60) days prior to the Opening Date (as defined in the Master Disbursement Agreement) and the commencement of each Fiscal Year thereafter in form reasonably satisfactory to Lender, and shall be subject to Lender's written approval (each such Annual Budget, after it has been approved in writing by Lender shall be hereinafter referred to as an "Approved

- 73 -

Annual Budget"). In the event that Lender objects to a proposed Annual Budget submitted by Borrower, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender. Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves the Annual Budget. Until such time that Lender approves a proposed Annual Budget, the most recently Approved Annual Budget shall apply; provided that, such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and utilities expenses.

(e)     Borrower shall furnish to Lender, within ten (10) Business Days after request such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender, including, without limitation, an annual operating budget for the Property.

(f)     Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form, (ii) on a diskette, and (iii) if requested by Lender and within the capabilities of Borrower's data systems without change or modification thereto, in electronic form and prepared using a Microsoft Word for Windows or WordPerfect for Windows files (which files may be prepared using a spreadsheet program and saved as word processing files).

(g)     Borrower agrees that Lender may forward to each purchaser, transferee, assignee, servicer, participant, Co-Lender or investor in all or any portion of the Loan or any Securities (collectively, the "Investor") or any Rating Agency rating such participations and/or Securities and each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor, and the Property, whether furnished by Borrower, any Guarantor, or otherwise, as Lender determines necessary or desirable. Borrower irrevocably waives any and all rights it may have under any Applicable Laws to prohibit such disclosure, including, but not limited, to any right of privacy.

(h)     If requested by Lender, Borrower shall provide Lender, promptly upon request or within the time periods set forth in this subsection (h), with the following financial statements if, at the time a Disclosure Document is being prepared for a Securitization, it is expected that the principal amount of the Loan together with any Affiliated Loans at the time of Securitization may equal or exceed 20% of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization:

(i)     A balance sheet with respect to the Property for the two most recent fiscal years, meeting the requirements of Section 210.3-01 of Regulation S-X of the Securities Act and statements of income and statements of cash flows

- 74 -

with respect to the Property for the three most recent fiscal years, meeting the requirements of Section 210.3-02 of Regulation S-X, and, for any interim period between the last audited balance sheet and the date of the most recent interim financial statements, interim financial statements of the Property meeting the requirements of Section 210.3-01 and 210.3-02 of Regulation S-X (all of such financial statements, collectively, the "Standard Statements"); provided, however, that with respect to a Property (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) that has been acquired by Borrower from an unaffiliated third party (such Property, "Acquired Property"), as to which the other conditions set forth in Section 210.3-14 of Regulation S-X for provision of financial statements in accordance with such Section have been met, in lieu of the Standard Statements otherwise required by this section, Borrower shall instead provide the financial statements required by such Section 210.3-14 of Regulation S-X ("Acquired Property Statements").

(ii)    Not later than 30 days after the end of each fiscal quarter following the date hereof, a balance sheet of the Property as of the end of such fiscal quarter, meeting the requirements of Section 210.3-01 of Regulation S-X, and statements of income and statements of cash flows of the Property for the period commencing following the last day of the most recent fiscal year and ending on the date of such balance sheet and for the corresponding period of the most recent fiscal year, meeting the requirements of Section 210.3-02 of Regulation S-X (provided, that if for such corresponding period of the most recent fiscal year Acquired Property Statements were permitted to be provided hereunder pursuant to subsection (i) above, Borrower shall instead provide Acquired Property Statements for such corresponding period).

(iii)    Not later than 75 days after the end of each fiscal year following the date hereof, a balance sheet of the Property as of the end of such fiscal year, meeting the requirements of Section 210.3-01 of Regulation S-X, and statements of income and statements of cash flows of the Property for such fiscal year, meeting the requirements of Section 210.3-02 of Regulation S-X.

(iv)    Within ten business days after notice from the Lender in connection with the Securitization of this Loan, such additional financial statements, such that, as of the date (each an "Offering Document Date") of each Disclosure Document, Borrower shall have provided Lender with all financial statements as described in subsection (h)(i) above; provided that the fiscal year and interim periods for which such financial statements shall be provided shall be determined as of such Offering Document Date.

(i)    If requested by Lender, Borrower shall provide Lender, promptly upon request (but in no event later than the time periods set forth in Section 5.1.10(h) hereof), with "selected financial data" regarding the net operating income for the Borrower and the Property for the most recent fiscal year and interim period (or such longer period as may be required by Regulation S-K if the Loan is not treated as a non-recourse loan

- 75 -

under Instruction 3 for Item 1101(k) of Regulation AB) meeting the requirements and covering the time periods specified in Section 301 of Regulation S-K and Item 1112 of Regulation AB of the Securities Act if, at the time a Disclosure Document is being prepared for a Securitization, it is expected that the principal amount of the Loan and any Affiliated Loans at the time of Securitization may equal or exceed 10% (but is less than 20%) of the aggregate principal amount of all mortgage loans expected to be included in a Securitization.

(j)     All financial statements provided by Borrower hereunder pursuant to Section 5.1.10(h) and (i) hereof shall be prepared in accordance with GAAP, and shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB and other applicable legal requirements.  All financial statements referred to in Subsections 5.1.10(h)(i) and 5.1.10(h)(iii) above shall be audited by independent Approved Accountants of Borrower acceptable to Lender in accordance with Regulation S-K or Regulation S-X, as applicable, Regulation AB and all other applicable legal requirements, shall be accompanied by the manually executed report of the independent Approved Accountants thereon, which report shall meet the requirements of Regulation S-K or of Regulation S-X, as applicable, Regulation AB and all other applicable legal requirements, and shall be further accompanied by a manually executed written consent of the independent Approved Accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such independent Approved Accountants and the reference to such independent Approved Accountants as "experts" in any Disclosure Document and Exchange Act Filing, all of which shall be provided at the same time as the related financial statements are required to be provided.  All financial statements (audited or unaudited) provided by Borrower under this Section 5.1.10 shall be certified by the chief financial officer or administrative member of Borrower, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this Section 5.1.10(j).

(k)     If requested by Lender, Borrower shall provide Lender, promptly upon request, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall determine to be required pursuant to Regulation S-K or Regulation S-X, as applicable, Regulation AB or any amendment, modification or replacement thereto or other legal requirements in connection with any Disclosure Document or any Exchange Act filing in connection with or relating to a Securitization or as shall otherwise be reasonably requested by the Lender.

(l)     In the event Lender determines, in connection with a Securitization, that the financial statements required in order to comply with Regulation S-K or Regulation S-X, as applicable, Regulation AB or other legal requirements are other than as provided herein, then notwithstanding the provisions of Sections 5.1.10(h), (i) and (j) hereof, Lender may request, and Borrower shall promptly provide, such combination of Acquired Property Statement and/or Standard Statements or such other financial statements as Lender determines to be necessary or appropriate for such compliance.

(m)    The term "Affiliated Loans" shall mean a loan made by Lender to a parent, subsidiary or such other entity affiliated with Borrower, any Guarantor and any other loan that is cross-collateralized with the Loan.

(n)    If requested by Lender, Borrower shall provide Lender, promptly upon request, a list of tenants (including all affiliates of such tenants) that in the aggregate (1) occupy 10% or more (but less than 20%) of the total floor area of the improvements or represent 10% or more (but less than 20%) of aggregate base rent, and (2) occupy 20% or more of the total floor area of the improvements or represent 20% or more of aggregate base rent.

In addition, if requested by Lender, Borrower shall provide Lender, promptly upon request, with financial information regarding any of the tenants identified in the list prepared pursuant to the preceding sentence in form and substance sufficient to satisfy the requirements of Item 1112 of Regulation AB.

5.1.11   Business and Operations.

Borrower will continue to engage in the businesses presently conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property.  The Property shall be used only for a retail center and any ancillary uses relating thereto (including the operation of one or more restaurants), and for no other uses without the prior written consent of Lender, which consent shall not be unreasonably withheld.  Borrower will remain in good standing under the laws of each jurisdiction the extent required for the ownership, maintenance, management and operation of the Property.

5.1.12   Costs of Enforcement.

In the event (a) that the Security Instrument encumbering the Property is foreclosed in whole or in part or that the Security Instrument is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any mortgage prior to or subsequent to the Security Instrument encumbering the Property which proceeding Lender is made a party, or (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors, Borrower, its successors or assigns, shall be chargeable with and agrees to pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

5.1.13   Estoppel Statement.

(a)    After request by Lender, Borrower shall within ten (10) days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Applicable Interest Rate of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, and (vi) that the Note, this Agreement, the Security Instrument and the other Loan Documents are

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

(b)     Borrower shall use commercially reasonable efforts to deliver to Lender upon request (but not more than once in any calendar year unless (i) an Event of Default then exists or (ii) in connection with a Securitization or Syndication), tenant estoppel certificates from each commercial tenant leasing space at the Property in form and substance reasonably satisfactory to Lender.

(c)     Borrower shall, promptly upon request of Lender, deliver an estoppel certificate from Fee Owner stating that (i) the Air Rights Lease is in full force and effect and has not been modified, amended or assigned, (ii) neither Fee Owner nor Borrower is in default under any of the terms, covenants or provisions of the Air Rights Lease and the Air Rights Lessor know of no event which, but for the passage of time or the giving of notice or both, would constitute an event of default under the Air Rights Lease, (iii) neither the Fee Owner nor Borrower has commenced any action or given or received any notice for the purpose of terminating the Air Rights Lease and (iv) all sums due and payable to Fee Owner under the Air Rights Lease have been paid in full.

(d)     Borrower shall deliver to Lender upon request (but not more than once in any calendar year unless (i) an Event of Default then exists or (ii) in connection with a Securitization or syndication) an estoppel certificate from each party to the Master REA (and shall use commercially reasonable efforts with respect to any other material REA, as determined by Lender in its reasonable discretion) in form and substance reasonably satisfactory to Lender.

(e)     After request by Borrower, Lender shall (but not more than once in any calendar year and provided no Event of Default then exists) within ten (10) days, furnish Borrower with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Applicable Interest Rate of the Note (iv) the date installments of interest and/or principal were last paid and (v) that the Note, this Agreement, the Security Instrument and the other Loan Documents have not been modified or if modified, giving particulars of such modification.

5.1.14  <u>Loan Proceeds</u>.

Borrower shall use the proceeds of the Loan received by it on the Closing Date only for the purposes set forth in Section 2.1.4. hereof.

5.1.15  <u>Performance by Borrower</u>.

Borrower shall in a timely manner (and subject to any applicable notice and grade periods expressly provided for in the Loan Documents) observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior written consent of Lender.

- 78 -

5.1.16  <u>Confirmation of Representations</u>.

Borrower shall deliver, in connection with any Securitization or Syndication, (a) one or more Officer's Certificates certifying as to the accuracy of all representations made by Borrower in the Loan Documents as of the date of the closing of such Securitization or Syndication in all relevant jurisdictions (or, to the extent such representations are not then true, indicating the exceptions thereto), and (b) certificates of the relevant Governmental Authorities in all relevant jurisdictions indicating the good standing and qualification of Borrower as of the date of the closing of such Securitization or Syndication.

5.1.17  <u>Leasing Matters</u>.

(a)    Borrower may enter into a proposed Lease (including the renewal or extension of an existing Lease (a "Renewal Lease")) without the prior written consent of Lender, provided such proposed Lease or Renewal Lease (i) provides for rental rates and terms comparable to existing local market rates and terms (taking into account the type and quality of the tenant) as of the date such Lease is executed by Borrower (unless, in the case of a Renewal Lease, the rent payable during such renewal, or a formula or other method to compute such rent, is provided for in the original Lease), (ii) is an arms-length transaction with a bona fide, independent third party tenant, (iii) does not have a material adverse effect on the value or quality of the Property, (iv) is subject and subordinate to the Security Instrument and the lessee thereunder agrees to attorn to Lender, (v) is in the form of Exhibit H attached hereto approved by Lender (other than factual information with respect to the tenant and other commercially reasonable modifications not material to the Property taken as a whole and that could not be reasonably expected to result in a Material Adverse Effect, as determined by Borrower in its good faith reasonable business judgement, provided in all events that any such proposed Lease shall be subordinate to the Security Instrument and the other Loan Documents), and (vi) is not a Major Lease. All proposed Leases which do not satisfy the requirements set forth in this Section 5.1.17(a) shall be subject to the prior approval of Lender, which approval shall not be unreasonably withheld, conditioned or delayed.  At Lender's request, Borrower shall promptly deliver to Lender copies of all Leases which are entered into pursuant to this Subsection together with Borrower's certification that it has satisfied all of the conditions of this Section.

(b)    Borrower (i) shall observe and perform all the material obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to materially impair the value of any of the Leases as security for the Debt; (ii) shall promptly send copies to Lender of all notices of default or other material matters which Borrower shall send or receive with respect to the Leases; (iii) shall enforce all of the material terms, covenants and conditions contained in the Leases upon the part of the tenant thereunder to be observed or performed (except for termination of a Major Lease which shall require Lender's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed); (iv) shall not collect any of the Rents more than one (1) month in advance (except Security Deposits shall not be deemed Rents collected in advance); (v) shall, immediately upon receipt, deposit all Lease Termination Payments into such account as directed by Lender, (vi) shall not execute any other

- 79 -

assignment of the lessor's interest in any of the Leases or the Rents; and (vii) shall not consent to any assignment of or subletting under any Leases not in accordance with their terms, without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    Borrower may, without the consent of Lender, amend, modify or waive the provisions of any Lease or terminate, reduce rents under, accept a surrender of space under, or shorten the term of, any Lease (including any guaranty, letter of credit or other credit support with respect thereto) provided that such Lease is not a Major Lease and that such action (taking into account, in the case of a termination, reduction in rent, surrender of space or shortening of term, the planned alternative use of the affected space) does not have a material adverse effect on the value of the Property taken as a whole, and provided that such Lease, as amended, modified or waived, is otherwise in compliance with the requirements of this Agreement and any lease subordination agreement binding upon Lender with respect to such Lease.  A termination of a Lease (other than a Major Lease) with a tenant who is in default beyond applicable notice and grace periods shall not be considered an action which has a material adverse effect on the value of the Property taken as a whole.  Any amendment, modification, waiver, termination, rent reduction, space surrender or term shortening which does not satisfy the requirements set forth in this Subsection shall, at Borrower's expense, be subject to the prior written approval of Lender and its counsel, which approval shall not be unreasonably withheld, conditioned or delayed.  At Lender's request, Borrower shall promptly deliver to Lender copies of all Leases, amendments, modifications and waivers which are entered into pursuant to this Section 5.1.17(b) together with Borrower's certification that it has satisfied all of the conditions of this Section 5.1.17(b).

(d)    Notwithstanding anything contained herein to the contrary, Borrower shall not, without the prior written consent of Lender, enter into, renew, extend, amend (unless such amendment is not material to the Property, taken as whole and could not be reasonably expected result in a Material Adverse Effect), modify (unless such modification is not material to the Property, taken as whole and could not be reasonably expected result in a Material Adverse Effect), waive any provisions of (unless such waiver is not material to the Property, taken as a whole and could not be reasonably expected to result in a Material Adverse Effect), terminate, reduce rents under, accept a surrender of space under, or shorten the term of, any Major Lease or any instrument guaranteeing or providing credit support for any Major Lease.

(e)    Lender shall hold any and all monies representing security deposits under the Leases (the "Security Deposits") received by Lender, in accordance with the terms of the respective Lease, and shall only release the Security Deposits in order to return a tenant's Security Deposit to such tenant if such tenant is entitled to the return of the Security Deposit under the terms of the Lease.

(f)    In connection with any restaurant Lease to an Affiliate of Borrower which a "celebrity" (as determined by Lender in its reasonable discretion) chef (a "Celebrity Chef") has agreed to associate his/her name with the Property, Borrower shall use commercially reasonable efforts to deliver, or cause to be delivered, an agreement from

- 80 -

such Celebrity Chef stating that if there is a foreclosure of the Security Instrument or similar enforcement action resulting in the transfer of title to the Property, or if Borrower becomes insolvent, such Celebrity Chef shall, at the election of Lender, complete its obligations under any relevant Lease or contract (or other arrangement) previously entered into with Borrower for the benefit of and with no additional charge or expense to Lender, its nominee or wholly owned subsidiary.

(g)    Lender agrees, from time to time upon Borrower's request, to enter into a subordination, nondisturbance and attornment agreement with any tenant under a Lease, which agreement shall be substantially in the form attached as Exhibit E, in each case with such changes as may be mutually acceptable to Lender and such tenant.

Notwithstanding the provisions of this Section 5.1.17 to the contrary, to the extent that Lender's prior written approval is required pursuant to this Section 5.1.17 with respect to new Leases and modifications and amendments of, or waivers with respect to, existing Leases, such request for approval shall be deemed approved if (i) Lender shall have failed to notify Borrower of its approval or disapproval within seven (7) Business Days (the "Approval Period") following Lender's receipt of Borrower's written request together with any and all information and documentation relating thereto reasonably requested by Lender to reach a decision, (ii) Borrower shall have delivered to Lender a written notice of Lender's failure to respond to Borrower's request within the Approval Period (the "Failure to Respond Notice"), which Failure to Respond Notice is marked in bold lettering (of no less than fourteen point type and underlined) with the following: "IMMEDIATE RESPONSE REQUIRED, FAILURE TO RESPOND TO THIS APPROVAL REQUEST WITHIN SEVEN (7) BUSINESS DAYS FROM RECEIPT SHALL BE DEEMED TO BE LENDER'S APPROVAL", and (iii) Lender shall have failed to notify Borrower of its approval or disapproval within seven (7) Business Days following Lender's receipt of the Failure to Respond Notice.  Upon Lender's request, Borrower shall be required to provide Lender with such information and documentation as may be reasonably required by Lender, in its reasonable discretion, including without limitation, lease comparables and other market information as reasonably required by Lender

5.1.18  <u>Management Agreement</u>.

(a)    Borrower shall not enter into a Management Agreement for the Property without Lender's prior written consent (provided that Lender's consent shall not be required with respect to the Approved Management Agreement or any other Management Agreement in the form attached (with such de minimis changes agreed to by Borrower) hereto as Exhibit J, with a Qualified Manager and otherwise in accordance with Section 5.1.18(b) below).

(b)    In no event shall the management fees under any Management Agreement exceed three percent (3%) of the gross revenue derived from the Property.  Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of any Management Agreement, on the part of Borrower to be performed and observed to the end that all things shall be done which are necessary to keep unimpaired the rights of Borrower under any Management Agreement and (ii) promptly notify Lender of the giving of any notice by any Manager to Borrower of any default by Borrower in the

- 81 -

performance or observance of any of the terms, covenants or conditions of any Management Agreement on the part of Borrower to be performed and observed and deliver to Lender a true copy of each such notice. Borrower shall not surrender any Management Agreement, consent to the assignment by any Manager of its interest under any Management Agreement, or terminate or cancel any Management Agreement, or modify, change, supplement, alter or amend any Management Agreement, in any material respect, either orally or in writing. Borrower hereby assigns to Lender as further security for the payment of the Debt and for the performance and observance of the terms, covenants and conditions of this Agreement, all the rights, privileges and prerogatives of Borrower to surrender any Management Agreement, or to terminate, cancel, modify, change, supplement, alter or amend any Management Agreement, in any respect (provided that Lender shall not exercise such rights except during the continuance of an Event of Default or as otherwise expressly permitted under the Loan Documents), and any such surrender of any Management Agreement, or termination, cancellation, modification, change, supplement, alteration or amendment of any Management Agreement in any material respect, without the prior consent of Lender shall be void and of no force and effect. Notwithstanding the foregoing, Borrower shall have the right to terminate the Management Agreement without Lender's prior written consent upon satisfaction of the following conditions: (i) Borrower delivers to Lender written notice of its intention to terminate the Management Agreement at least ten (10) Business Days prior to such termination; (ii) Borrower replaces the Manager within thirty (30) days after the termination of the Management Agreement with a Qualified Manager pursuant to a Replacement Management Agreement; and (iii) such Qualified Manager delivers to Lender an Assignment of Management Agreement which is also executed by the Borrower. If Borrower shall default in the performance or observance of any material term, covenant or condition of any Management Agreement on the part of Borrower to be performed or observed, then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of any Management Agreement on the part of Borrower to be performed or observed to be promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under any Management Agreement shall be kept unimpaired and free from default. Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time for the purpose of taking any such action. If any Manager shall deliver to Lender a copy of any notice sent to Borrower of default under any Management Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon. Borrower shall not, and shall not permit any Manager to, sub-contract any or all of its management responsibilities under any Management Agreement to a third-party without the prior written consent of Lender, which consent shall not be unreasonably withheld. Borrower shall, from time to time, obtain from any Manager such certificates of estoppel with respect to compliance by Borrower with the terms of any Management Agreement as may be requested by Lender (which request may be made no more often than once per calendar year unless (i) in connection with a Syndication or Securitization or (ii) an Event

- 82 -

of Default then exists).  During the continuance of an Event of Default, Borrower shall exercise each individual option, if any, to extend or renew the term of any Management Agreement upon demand by Lender made at any time within one (1) year of the last day upon which any such option may be exercised, and Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.  Any sums expended by Lender pursuant to this paragraph (i) shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, (ii) shall be deemed to constitute a portion of the Debt, (iii) shall be secured by the lien of the Security Instrument and the other Loan Documents and (iv) shall be immediately due and payable upon demand by Lender therefor.

(c)    Without limitation of the foregoing, Borrower, upon the request of Lender, shall terminate any Management Agreement and replace any Manager, without penalty or fee, if at any time during the Loan: (a) any Manager shall become insolvent or a debtor in any bankruptcy or insolvency proceeding, (b) there exists an Event of Default or (c) there exists a default by Manager under any Management Agreement beyond any applicable notice and cure periods.  Within thirty (30) days after any such removal, a Qualified Manager shall assume management of the Property pursuant to a Replacement Management Agreement.

5.1.19  Environmental Covenants.

(a)    Borrower covenants and agrees that so long as the Loan is outstanding (i) Borrower shall, and shall use commercially reasonable efforts to ensure that all other Persons (including, but not limited to, all tenants and subtenants) shall, cause all uses and operations on or of the Real Property to be in compliance in all material respects with all Environmental Laws and permits issued pursuant thereto; (ii) there shall be no Releases of Hazardous Materials by Borrower in, on, under or from any of the Real Property and Borrower shall use commercially reasonable efforts to insure that there shall be no Releases of Hazardous Materials by any other Person in, on, under or from any of the Real Property; (iii) there shall be no Hazardous Materials in, on, or under the Real Property, except those that are both (A) in compliance with all Environmental Laws and with permits issued pursuant thereto, if and to the extent required, and (B) (1) in amounts not in excess of that necessary to operate the Real Property or (2) fully disclosed to and approved by Lender in writing; (iv) Borrower shall keep the Real Property free and clear of all liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other Person (the "Environmental Liens"); (v) Borrower shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to paragraph (b) below, including but not limited to providing all relevant information and making knowledgeable persons available for interviews; (vi) Borrower shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Real Property, pursuant to any reasonable written request of Lender, upon Lender's reasonable belief that the Real Property is not in compliance with all Environmental Laws in any material respect (other than such lack of compliance as has been previously disclosed to, and approved of in writing by, Lenders), and share with Lender the reports

- 83 -

and other results thereof, and Lender and other Indemnified Parties shall be entitled to rely on such reports and other results thereof; (vii) Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to (A) reasonably effectuate remediation of any Hazardous Materials in, on, under or from the Real Property; and (B) comply with any Environmental Law; (viii) Borrower shall not knowingly allow any tenant or other user of any of the Real Property to violate any Environmental Law; and (ix) Borrower shall immediately notify Lender in writing after it has become aware of (A) any presence or Release or threatened Releases of Hazardous Materials in, on, under, from or migrating towards the Real Property; (B) any non-compliance with any Environmental Laws related in any way to the Real Property; (C) any actual or potential Environmental Lien; (D) any required or proposed remediation of environmental conditions relating to the Real Property; and (E) any written or oral notice or other communication of which Borrower becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials in, on or under the Property in violation of any Environmental Law.

(b)    Lender and any other Person designated by Lender, including but not limited to any representative of a Governmental Authority, and any environmental consultant on behalf of Lender or such other Person, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Real Property at all reasonable times to assess any and all aspects of the environmental condition of the Real Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lender's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing at Lender's sole cost and expense except to the extent Borrower is responsible for payment of the same under Section 5.1.19(a).  Borrower shall cooperate with and provide access to Lender and any such Person designated by Lender.

5.1.20  <u>Alterations</u>.

Borrower shall obtain Lender's prior written consent to any additions or alterations of the Property and any Improvements thereon (unless such additions or alterations are being performed pursuant to the terms of a Lease satisfying the leasing requirements set forth in Section 5.1.17) to the extent the cost of such addition or alteration exceeds $2,000,000, which approval shall not be unreasonably withheld, conditioned or delayed.  If the total unpaid amounts with respect to alterations to the Improvements at the Property (other than such amounts to be paid or reimbursed by tenants under the Leases or for which unadvanced sums are allocated for the payment of the same) shall at any time exceed Two Million And 00/100 Dollars ($2,000,000.00) (the "Threshold Amount"), Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following: (A) Cash, (B) U.S. Obligations, (C) other securities having a rating acceptable to Lender and that the applicable Rating Agencies have confirmed in writing will not, in and of itself, result in a downgrade, withdrawal or qualification of the initial, or, if higher, then current ratings assigned in connection with any Securitization, or (D) a completion bond or letter of credit issued by a financial institution having a rating by S&P

- 84 -

of not less than A-1+ if the term of such bond or letter of credit is no longer than three (3) months or, if such term is in excess of three (3) months, issued by a financial institution having a rating that is acceptable to Lender and that the applicable Rating Agencies have confirmed in writing will not, in and of itself, result in a downgrade, withdrawal or qualification of the initial, or, if higher, then current ratings assigned in connection with any Securitization.  Such security shall be in an amount equal to the excess of the total unpaid amounts with respect to alterations to the Improvements on the Property (other than such amounts to be paid or reimbursed by tenants under the Leases) over the Threshold Amount and applied from time to time at the option of Lender to pay for such alterations or to terminate any of the alterations and restore the Property to the extent necessary to prevent any material adverse effect on the value of the Property.

Notwithstanding the foregoing, in the event that Lender fails to respond within seven (7) Business Days of any request for consent required under this Section 5.1.20, such failure shall be deemed to be the consent and approval of the such proposed request for consent by Lender if (I) Borrower has delivered to Lender all required documents and information necessary to adequately and completely evaluate the proposed request for consent (including, but not limited to, any material information or documentation reasonably requested by Lender), (II) Borrower has resubmitted the proposed request for consent with the notation "IMMEDIATE RESPONSE REQUIRED, FAILURE TO RESPOND TO THIS APPROVAL REQUEST WITHIN SEVEN (7) BUSINESS DAYS FROM RECEIPT SHALL BE DEEMED TO BE LENDER'S APPROVAL " prominently displayed in bold, all caps and fourteen (14) point or larger font at the top of the first page of the proposed request for consent and the envelope containing such proposed request for consent and (III) Lender does not approve or reject the proposed request for consent within seven (7)  Business Days from the date Lender receives the resubmitted request.

5.1.21  <u>Reciprocal Easement Agreements</u>.

Borrower shall not enter into, terminate or modify any REA in any material respect without Lender's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed) other than modifications, with respect to the Master REA, solely to give effect to changes in the legal descriptions attached thereto, so long as, after giving effect to such changes, (i) the Retail Parcel (as defined in the Master REA) shall be no less than 283,000 square feet, (ii) there shall be no adverse impact on the access and egress to the Property, taken as a whole and (iii) the Property is not otherwise materially and adversely impacted.  Borrower shall enforce, comply with, and cause each of the parties to the REA to comply with all of the material economic terms and conditions contained in the REA.  Borrower shall not consent to any (i) changes to the Plans and Specifications (for the purposes of this Section 5.1.21 only, as defined in the Master REA) pursuant to Article 3 of the Master REA or (ii) unless permitted pursuant to Section 5.1.20, alterations pursuant to Section 8.3 of the Master REA, in either case, without obtaining the prior written consent of Lender (which consent shall not be unreasonably withheld, conditioned or delayed).

5.1.22  <u>Leasing Agreement</u>.

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

(a)     Other than the Approved Leasing Agreement in effect on the Closing Date, Borrower shall not enter into a Leasing Agreement for the Property without Lender's prior written consent.

(b)     All leasing fees under any Leasing Agreement shall be market and customary.  Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of any Leasing Agreement, on the part of Borrower to be performed and observed to the end that all things shall be done which are necessary to keep unimpaired the rights of Borrower under any Leasing Agreement and (ii) promptly notify Lender of the giving of any notice by any Leasing Agent to Borrower of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of any Leasing Agreement on the part of Borrower to be performed and observed and deliver to Lender a true copy of each such notice.  Borrower shall not surrender any Leasing Agreement, consent to the assignment by any Leasing Agent of its interest under any Leasing Agreement, or terminate or cancel any Leasing Agreement, or modify, change, supplement, alter or amend any Leasing Agreement, in any material respect, either orally or in writing.  Borrower hereby assigns to Lender as further security for the payment of the Debt and for the performance and observance of the terms, covenants and conditions of this Agreement, all the rights, privileges and prerogatives of Borrower to surrender any Leasing Agreement, or to terminate, cancel, modify, change, supplement, alter or amend any Leasing Agreement, in any respect (provided that Lender shall not exercise such rights except during the continuance of an Event of Default or as otherwise expressly permitted under the Loan Documents), and any such surrender of any Leasing Agreement, or termination, cancellation, modification, change, supplement, alteration or amendment of any Leasing Agreement in any material respect, without the prior consent of Lender shall be void and of no force and effect.  Notwithstanding the foregoing, Borrower shall have the right to terminate the Leasing Agreement without Lender's prior written consent upon satisfaction of the following conditions:  (i) Borrower delivers to Lender written notice of its intention to terminate the Leasing Agreement at ten (10) Business Days prior to such termination; (ii) Borrower replaces the Leasing Agent within thirty (30) days after the termination of the Leasing Agreement with a Qualified Leasing Agent pursuant to a Replacement Leasing Agreement; and (iii) such Qualified Leasing delivers to Lender an Assignment of Leasing Agreement which is also executed by the Borrower.  If Borrower shall default in the performance or observance of any material term, covenant or condition of any Leasing Agreement on the part of Borrower to be performed or observed, then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of any Leasing Agreement on the part of Borrower to be performed or observed to be promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under any Leasing Agreement shall be kept unimpaired and free from default.  Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time for the purpose of taking any such action.  If any Leasing Agent shall deliver to Lender a copy of any notice sent to Borrower of default under any Leasing Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

taken by Lender in good faith, in reliance thereon.  Borrower shall not, and shall not permit any Leasing Agent to, sub-contract any or all of its leasing responsibilities under any Leasing Agreement to a third-party without the prior written consent of Lender, which consent shall not be unreasonably withheld.  Borrower shall, from time to time, obtain from any Leasing Agent such certificates of estoppel with respect to compliance by Borrower with the terms of any Leasing Agreement as may be requested by Lender (which request may be made no more often than once per calendar year unless (i) in connection with a Syndication or Securitization or (ii) an Event of Default then exists). During the continuance of an Event of Default, Borrower shall exercise each individual option, if any, to extend or renew the term of any Leasing Agreement upon demand by Lender made at any time within one (1) year of the last day upon which any such option may be exercised, and Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.  Any sums expended by Lender pursuant to this paragraph (i) shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, (ii) shall be deemed to constitute a portion of the Debt, (iii) shall be secured by the lien of the Security Instrument and the other Loan Documents and (iv) shall be immediately due and payable upon demand by Lender therefor.

(c)      Without limitation of the foregoing, Borrower, upon the request of Lender, shall terminate any Leasing Agreement (whether in writing or verbal) and replace any Leasing Agent, without penalty or fee, if at any time during the Loan: (a) any Leasing Agent shall become insolvent or a debtor in any bankruptcy or insolvency proceeding, (b) there exists an Event of Default or (c) there exists a default by Leasing Agent under any Leasing Agreement beyond any applicable notice and cure periods.  Within thirty (30) days after any such removal, a Qualified Leasing Agent shall assume leasing duties of the Property pursuant to a Replacement Leasing Agreement.

(d)      Notwithstanding anything to the contrary contained in this Agreement, Borrower shall not be required to maintain the Leasing Agreement and Borrower shall have the right to terminate the Leasing Agreement without Lender's consent in the event that the Management Agreement or Replacement Management Agreement shall provide for leasing services (in addition to management services) at the Property in a manner reasonably satisfactory to Lender.

5.1.23    [Reserved].

5.1.24    <u>The Air Rights Lease</u>.

With respect to the Air Rights Lease,

(a)      Borrower shall (i) pay all Air Rights Rent required to be paid by Borrower, as tenant under and pursuant to the provisions of the Air Rights Lease, (ii) diligently perform and observe all of the material terms, covenants and conditions of the Air Rights Lease on the part of Borrower, as tenant thereunder, (iii) promptly notify Lender of the giving of any notice by the Fee Owner under the Air Rights Lease to

- 87 -

Borrower of any default by Borrower, as tenant thereunder, and deliver to Lender a true copy of each such notice within seven (7) Business Days of receipt and (iv) promptly notify Lender of any bankruptcy, reorganization or insolvency of the Fee Owner under the Air Rights Lease or of any notice thereof, and deliver to Lender a true copy of such notice within five (5) Business Days of Borrower's receipt, together with copies of all notices, pleadings, schedules and similar matters received by Borrower in connection with such bankruptcy, reorganization or insolvency within five (5) Business Days after receipt.  Borrower shall not, without the prior consent of Lender, surrender the leasehold estate created by the Air Rights Lease or terminate or cancel the Air Rights Lease or modify, change, supplement, alter or amend the Air Rights Lease, either orally or in writing, or (y) consent to, acquiesce in, or fail to object to, any attempt by the Fee Owner, as debtor in possession or by a trustee for such Fee Owner,  to sell or transfer the Fee Estate free and clear of the Air Rights Lease under section 363(f) of the Bankruptcy Code or otherwise.  Borrower shall object to any such attempt by the Fee Owner, as debtor in possession or by a trustee for the Fee Owner, to sell or transfer the Fee Estate free and clear of the Air Rights Lease under section 363(f) of the Bankruptcy Code or otherwise, and in such event shall affirmatively assert and pursue its right to adequate protection under section 363(e) of the Bankruptcy Code.  Borrower hereby assigns to Lender all of its rights under Section 363 of the Bankruptcy Code to consent or object to any sale or transfer of the Fee Estate free and clear of the Air Rights Lease, and grants to Lender the right to object to any such sale or transfer on behalf of Borrower, and Borrower shall not contest any pleadings, motions documents or other actions filed or taken on Lender's or Borrower's behalf by Lender in the event that any Person, as debtor in possession or by a trustee for the Fee Owner, attempts to sell or transfer the Fee Estate free and clear of the Air Rights Lease under section 363(f) of the Bankruptcy Code or otherwise.

(b)      If Borrower shall default in the performance or observance of any term, covenant or condition of the Air Rights Lease on the part of Borrower, as tenant thereunder, and shall fail to cure the same prior to the expiration of any applicable cure period provided thereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all of the terms, covenants and conditions of the Air Rights Lease on the part of Borrower to be performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under the Air Rights Lease shall be kept unimpaired and free from default.  If the landlord under the Air Rights Lease shall deliver to Lender a copy of any notice of default under the Air Rights Lease, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon.  Borrower shall exercise each individual option, if any, to extend or renew the term of the Air Rights Lease upon demand by Lender made at any time within one (1) year prior to the last day upon which any such option may be exercised, and Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.

(c)      Subleases.  Notwithstanding anything contained in the Air Rights Lease to the contrary, Borrower shall not further sublet any portion of the Property (other than as permitted pursuant to Section 5.1.17 hereof) without prior written consent of Lender.

- 88 -

Each sublease hereafter made shall provide that, (a) in the event of the termination of the Air Rights Lease, the sublease shall not terminate or be terminable by the lessee thereunder; (b) in the event of any action for the foreclosure of the Security Instrument, the sublease shall not terminate or be terminable by the lessee thereunder by reason of the termination of the Air Rights Lease unless such lessee is specifically named and joined in any such action and unless a judgment is obtained therein against such lessee; and (c) in the event that the Air Rights Lease is terminated as aforesaid, the lessee under the sublease shall attorn to the lessor under the Air Rights Lease or to the purchaser at the sale of the Property on such foreclosure, as the case may be.  In the event that any portion of the Property shall be sublet pursuant to the terms of this subsection, such sublease shall be deemed to be included in the Property.

(d)    Termination of Air Rights Lease.    Notwithstanding anything to the contrary contained herein, provided no Event of Default exists, Borrower shall have the right to terminate the Air Rights Lease concurrently with a Fee Transfer Event.

(e)    Separate Tax Lot.    Within sixty days following a Fee Transfer Event, Borrower shall cause title company to deliver an endorsement to the Title Insurance Policy that the New Estate (together with the remainder of the Property) constitutes one or more separate tax lots or, if such an endorsement is not available in the State, a letter from the title insurance company issuing such Title Insurance Policy stating that the New Estate (together with the remainder of the Property) constitutes one or more separate tax lots.

5.1.25  OFAC.

At all times throughout the term of the Loan, Borrower, Guarantor and their respective Affiliates shall be in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

5.1.26  [Reserved.]

5.1.27  Construction Responsibilities.

Borrower is solely responsible for the selection of its own contractor or contractors, all materials, supplies and equipment to be used in construction of the Future Improvements being constructed by Borrower (and not by any subtenant) and Lender assumes no responsibility for adequacy or sufficiency of materials, or design or engineering, or for the completion of the Future Improvements according to the Plans and Specifications and Applicable Laws.

5.1.28  Construction Budget.

Borrower shall not make any changes to the Construction Budget without the prior written approval of Lender, which consent shall not be unreasonably withheld.

5.1.29  Construction Schedule.

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

Borrower shall cause the Opening Date to occur prior to the Completion Date.

5.1.30    <u>Preservation/Document Assignment.</u>

Borrower shall not terminate, cancel, materially modify or amend the Plans and Specifications (except as provided in the immediately following Section hereof), the Architect's Contract, the Engineer's Contract or the Construction Contract without the prior written approval of Lender, which approval shall not be unreasonably withheld or delayed.  Borrower shall notify Lender of any contractors, architects or engineers contracted with by Borrower as substitutes for Architect, Engineer or General Contractor or as additional general contractors, architects, engineers or project coordinators, and Lender shall have the right to approve or disapprove such substitution or addition (Lender agreeing not to unreasonably withhold or delay the approval of any such proposed substitution other than a proposed substitution for the General Contractor), and to require the submission of any additional Loan documentation (reasonably requested by Lender) regarding such substitutions or additions.    In connection with entering into any Construction Documents, Borrower shall (i) assign the same to Lender and (ii) use commercially reasonable efforts to deliver to Lender letters from any Architect, Engineer or General Contractor in form substantially similar to those certain Consent and Agreement letters delivered on the Closing Date by the Project Architect and Project General Contractor (revised to reflect, among other applicable changes, the applicable Construction Agreement, the applicable parties and with the material benefits of such letters running to Lender) or such other form reasonably approved by Lender. Incident to any assignment of the Architect's Contract, Engineer's Contract, the Construction Contract and the Plans and Specifications, as such assignment is set forth in the applicable assignment documentation, Borrower shall fulfill the material obligations of Borrower thereunder, diligently enforce the performance thereof and all material rights and remedies set forth therein, and give immediate notice to Lender of any material default by Architect, Engineer or General Contractor thereunder.  Borrower represents and warrants that the copy of the Construction Contract and any other Construction Document furnished or to be furnished to Lender is and shall be a true and complete copy thereof, that the copies of the Plans and Specifications delivered to Lender are and shall be true and complete copies of the Plans and Specifications, that there have been no modifications of any such Construction Documents which are not fully set forth in the copies delivered, and that Borrower's interest therein is not subject to any claim, setoff, or encumbrance. Upon the request of Lender, Borrower shall promptly deliver to Lender and its Construction Consultant copies of any Tenant Construction Deliverables previously received by Borrower.    Furthermore, in no event shall Borrower permit Resort Borrower to terminate, cancel, modify or amend the Project Plans and Specifications, the Project Architect's Contract, the Project Construction Budget, the Project Engineer's Contract or the Project Construction Contract if such event would result in a Material Adverse Effect, without the prior written approval of Lender (in consultation with the Construction Consultant), which approval shall not be unreasonably withheld or delayed.

5.1.31    <u>Change Orders.</u>

Subject to Section 5.1.28 and Section 5.1.29 hereof, Borrower shall not change, alter or amend either the Plans and Specifications or the construction of the Future Improvements in any material respect without the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed), and shall not permit any material deviations by any

- 90 -

contractor from the Plans and Specifications. Copies of all material change orders and evidence of any necessary approvals thereof shall be promptly delivered to Lender.

5.1.32  Construction Quality.

Borrower shall construct (or cause the construction of) the Future Improvements entirely on the Property such that the same (a) will not encroach upon or overhang any easement or right of way, nor upon the land of others (except as permitted pursuant to the Master REA), (b) shall be wholly within the building restriction lines, however established, (c) will not violate applicable use or other restrictions contained in applicable prior conveyances or applicable protective covenants or restrictions, and (d) shall comply in all material respects with the Plans and Specifications and all Applicable Laws.

5.1.33  Correction of Deficient Work.

If Lender reasonably determines that any portion of the Future Improvements to be constructed by Borrower is not being constructed in accordance with the Plans and Specifications in any material respect in a workmanlike manner, Lender may require work to be stopped and may withhold Loan disbursements until the material deficiencies are corrected. Borrower agrees that it will correct (or cause to be correct) any materially deficient work performed and replace any materials that do not comply with the Plans and Specifications (unless the materials actually applied are the same or better quality, as determined by Lender in its reasonable discretion), Applicable Laws, or accepted standards of quality and workmanship. The correction of deficient work or materials shall be at Borrower's expense unless Lender (in consultation with its Construction Consultant) determines that there adequate funds remaining in the applicable line items of the Construction Budget or in any "Contingency" line item of the Construction Budget to correct such deficient work or materials, in which case such corrections may be funded from such line items in accordance with the procedures set forth herein for requesting advances so long as the making of any such advance will not result insufficient funds in the applicable Construction Budget category to pay for all reasonably foreseeable items to be funded from such Construction Budget category.

5.1.34  Rebalancing

(a)  Debt Service.  If Lender at any time determines, in the exercise of its reasonable discretion, that (a) the sum of (i) the unadvanced portion of the Maximum Debt Service Advance Amount plus (ii) any amounts contained in the Debt Service Reserve Account (together with any interest expected to accrue thereon) is less than (b) all Debt Service arising under the Loan Documents from and after the time of such calculation (i) prior to the date that 65% of "Retail Lenders Shared Cost Commitment" (as defined in the Master Disbursement Agreement) has been funded by Lender in accordance with the terms of the Master Disbursement Agreement, by more than 5% of the amount of such Debt Service and (ii), thereafter, by any amount, Lender shall have the option of requiring Borrower to deposit with Lender additional funds in amounts sufficient to cover the resulting deficit (the "Additional Debt Service Deposit"). Borrower shall make any required Additional Debt Service Deposit within  ten (10) days of written notice to Borrower from Lender of such requirement and any Additional Debt

- 91 -

Service Deposit shall be funded and disbursed in accordance with this Agreement before (except in the event Borrower has elected to deposit a Letter of Credit pursuant to Section 5.1.34(c) below) any additional Loan proceeds are disbursed.

(b)     TI/LC.  If Lender at any time determines, in the exercise of its reasonable discretion, that (a) the unadvanced portion of the Maximum Other Retail Cost Advance Amount is less than (b) the then current estimated cost of completing all Future Improvements to be completed or funded by Borrower (in accordance with the terms of the Loan Documents and the Master REA) and the leasing thereof anticipated to be completed from and after the time of such calculation (i) prior to the date that 65% of the Real Property (determined on the basis of square footage) has been leased to tenants pursuant to Leases entered into in accordance with Section 5.1.17, by more than 5% of the total estimated cost of completion and leasing for the Real Property, and (ii) thereafter, by any amount, Lender shall have the option of requiring Borrower to deposit with Lender additional funds in amounts sufficient to cover the resulting deficit (the "Additional TI/LC Deposit").  Borrower shall make any required Additional TI/LC Deposit within ten (10) days of written notice to Borrower from Lender of such requirement, provided that (x) no such Additional TI/LC Deposit shall be required prior to the date that is the earlier to occur of (1) ninety (90) days prior to the Completion Date and (2) the initial advance by Lender for Other Retail Costs (as defined in the Master Disbursement Agreement) pursuant to the terms of the Master Disbursement Agreement, and (y) unless otherwise approved by Lender in its sole discretion, any Additional TI/LC Deposit shall be funded and disbursed in accordance with this Agreement and the Master Disbursement Agreement before (except in the event Borrower has elected to deposit a Letter of Credit pursuant to Section 5.1.34(c) below) any additional Loan proceeds are disbursed.

(c)     Letter of Credit Option.  In lieu of depositing funds with Lender in connection with an Additional Debt Service Deposit and/or an Additional TI/LC Deposit, Borrower shall have the option of delivering to Lender a Letter of Credit in the applicable amount.

(d)     Collateral.  Each of the Additional Debt Service Deposit and the Additional TI/LC Deposit (whether in Cash or in the form of a Letter of Credit) is hereby pledged by Borrower as additional collateral for the Debt, and Borrower hereby grants and conveys to Lender a security interest in all funds so deposited with Lender as additional collateral for the Loan.  Any interest earned on the Additional Debt Service Deposit and the Additional TI/LC Deposit (in the form of Cash) shall be credited to the account of Borrower but shall be subject to the foregoing security interest and shall be disbursed in accordance with this Agreement and the Master Disbursement Agreement before any additional Loan proceeds are disbursed.

(e)     Provisions Regarding Letters of Credit.

(i)     Lender shall be the beneficiary of any Letter of Credit and Borrower shall not be entitled to draw down any such Letter of Credit for any reason whatsoever.  Each Letter of Credit delivered under this Agreement shall be additional security for the

- 92 -

payment of the Debt.  Upon the occurrence and during the continuation of an Event of Default, Lender shall have the right, at its option, to draw on any Letter of Credit and to apply all or any part thereof to the payment of the items for which such Letter of Credit was established or to apply such Letter of Credit to payment of the Debt in such order, proportion or priority as Lender may determine.  Any such application to the Debt shall be subject to the Prepayment Premium, if applicable.  On the Maturity Date, if the Debt is not paid in full, any such Letter of Credit may be applied to reduce the Debt.  Borrower shall pay to Lender all of Lender's reasonable out-of-pocket costs and expenses in connection with any Letter of Credit.

(ii)    In addition to any other right Lender may have to draw upon a Letter of Credit pursuant to the terms and conditions of this Agreement, Lender shall have the additional rights to draw in full on any Letter of Credit:  (i) if Lender has received a notice from the Issuing Bank that such Letter of Credit will not be renewed and either (y) a substitute Letter of Credit or (z) cash in the amount of the Letter of Credit is not provided at least twenty (20) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (ii) upon receipt of notice from the Issuing Bank that the Letter of Credit will be terminated (except if the termination of such Letter of Credit is permitted pursuant to the terms and conditions of this Agreement or a substitute Letter of Credit is provided); or (iii) if Lender has received notice that the Issuing Bank shall cease to meet the Minimum L/C Rating and Borrower has failed to deliver to Lender either (y) a substitute Letter of Credit or (z) cash in the amount of the Letter of Credit. Notwithstanding anything to the contrary contained in the above, Lender shall not be obligated to draw down on any Letter of Credit upon the happening of an event specified in clause (i), (ii) or (iii) above and shall not be liable for any losses sustained by Borrower due to the insolvency of the Issuing Bank if Lender has not drawn the Letter of Credit, and in the event of the insolvency of the Issuing Bank or if the Issuing Bank ceases to meet the Minimum L/C Rating, Borrower shall promptly provide to Lender either (y) a substitute Letter of Credit or (z) cash in the amount of the Letter of Credit.

5.1.35  Reappraisals.

After the date hereof, Borrower shall permit Lender (and Borrower hereby authorizes Lender) to commission, at Borrower's sole cost and expense not more once in any twelve month period, one new appraisal of the Project, prepared in accordance with Lender's then current appraisal requirements.  Borrower shall cooperate with any additional appraisals commissioned by Lender at Lender's expense.

5.1.36  Consent to Assignment.

Upon Lender's request, Borrower shall obtain a consent to assignment from each party to each material contract assigned to Lender under the Loan Documents, including specifically the assigned material Construction Documents, in form and substance acceptable to Lender, evidencing such party's consent to the assignment of the contract and agreeing that Lender shall have the right and to enforce all rights of Borrower under such contract.

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

5.1.37  <u>Net Worth Covenant</u>.  Until the Loan is paid in full, Guarantor shall maintain at all times an aggregate Net Worth (exclusive of any direct or indirect interest in the Property) at least equal to $350,000,000, and, within ten (10) Business Days of Lender's request, Borrower shall demonstrate in writing and to Lender's reasonable satisfaction, compliance with this Section.

5.1.38  <u>Liquidity Covenant</u>.  Until the Loan is paid in full, Guarantor shall maintain at all times an aggregate Liquidity (exclusive of any direct or indirect interest in the Property) at least equal to $75,000,000,  and, within ten (10) Business Days of Lender's request, Borrower shall demonstrate in writing and to Lender's reasonable satisfaction, compliance with this Section. Lender shall be entitled to receive demonstration of compliance with this Section no more than twice in every twelve (12) month period unless (A) in connection with a Securitization or Syndication, (B) an Event of Default has occurred and is continuing or (C) Lender has a reasonable belief that such Liquidity covenant is not being satisfied; provided, however, the foregoing shall not affect any financial reporting requirements set forth in Section 5.1.10 hereof.

5.1.39  <u>Intentionally Omitted</u>.

5.1.40  <u>Additional Notices.</u>  Borrower shall give notice, or cause notice to be given, to Lender promptly upon the occurrence of any Resort Loan Event of Default.

5.1.41  <u>Borrower Covenants Under Master Disbursement Agreement</u>.  Borrower shall comply with all obligations with which Borrower has covenanted to comply under the Master Disbursement Agreement.

5.1.42  <u>Intentionally Omitted</u>.

5.1.43  <u>Development Agreement</u>.

(a)    The Property shall at all times be developed by a Qualified Developer; provided, however, the Borrower shall not enter into any Development Agreement for the Property without Lender's prior written consent.

(b)    In no event shall the development fees under any Development Agreement exceed the greater of (i) the amount that is market and customary and (ii) three percent (3%) of the gross income derived from the Property.  Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of any Development Agreement, on the part of Borrower to be performed and observed to the end that all things shall be done which are necessary to keep unimpaired the rights of Borrower under any Development Agreement and (ii) promptly notify Lender of the giving of any notice by the Developer to Borrower or any default by Borrower in the performance or observance of any of the terms, covenants or conditions of any Development Agreement on the part of Borrower to be performed and observed and deliver to Lender a true copy of each such notice.  Borrower shall not surrender any Development Agreement, consent to the assignment by the Developer of its interest under any Development Agreement, or terminate or cancel any Development Agreement, or modify, change, supplement, alter or amend any Development Agreement, in any material respect, either orally or in writing. Borrower hereby assigns to Lender as further security for the payment of the Debt and for

- 94 -

the performance and observance of the terms, covenants and conditions of this Agreement, all the rights, privileges and prerogatives of Borrower (if any) to surrender any Development Agreement, or to terminate, cancel, modify, change, supplement, alter or amend any Development Agreement, in any respect, (provided that Lender shall not exercise such rights except during the continuance of an Event of Default or as otherwise expressly permitted under the Loan Documents), and any such surrender of any Development Agreement, or termination, cancellation, modification, change, supplement, alteration or amendment of any Development Agreement, without the prior consent of Lender shall be void and of no force and effect.   Notwithstanding the foregoing, Borrower shall have the right to terminate the Development Agreement without Lender's prior written consent upon satisfaction of the following conditions:  (i) Borrower delivers to Lender written notice of its intention to terminate the Development Agreement at least ten (10) Business Days prior to such termination; (ii) Borrower replaces the Developer within thirty (30) days of the termination of the Development Agreement with a Qualified Developer pursuant to a Replacement Development Agreement; and (iii) such Qualified Developer delivers to Lender an Assignment of Development Agreement which is also executed by the Borrower.  If Borrower shall default in the performance or observance of any material term, covenant or condition of any Development Agreement on the part of Borrower to be performed or observed, then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of any Development Agreement on the part of Borrower to be performed or observed to be promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under any Development Agreement shall be kept unimpaired and free from default. Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time for the purpose of taking any such action.   If the Developer shall deliver to Lender a copy of any notice sent to Borrower of default under any Development Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon.  Borrower shall not, and shall not permit the Developer to, sub-contract any or all of its development responsibilities under any Development Agreement to a third-party without the prior written consent of Lender, which consent shall not be unreasonably withheld.  Borrower shall, from time to time, obtain from the Developer such certificates of estoppel with respect to compliance by Borrower with the terms of any Development Agreement as may be requested by Lender (provided that Lender shall not exercise such rights except during the continuance of an Event of Default or as otherwise expressly permitted under the Loan Documents).  During the continuance of an Event of Default, Borrower shall exercise each individual option, if any, to extend or renew the term of any Development Agreement upon demand by Lender made at any time within one (1) year of the last day upon which any such option may be exercised, and Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.  Any sums expended by Lender pursuant to this paragraph (i) shall bear interest at the Default

- 95 -

Rate from the date such cost is incurred to the date of payment to Lender, (ii) shall be deemed to constitute a portion of the Debt, (iii) shall be secured by the lien of the Security Instrument and the other Loan Documents and (iv) shall be immediately due and payable upon demand by Lender therefor.

(c)     Without limitation of the foregoing, Borrower, upon the request of Lender, shall terminate any Development Agreement (whether in writing or verbal) and replace the Developer, without penalty or fee, if at any time during the Loan: (a) the Developer shall become insolvent or a debtor in any bankruptcy or insolvency proceeding, (b) there exists an Event of Default, or (c) there exists a default by Developer under any Development Agreement beyond any notice and cure periods. Within thirty (30) days after any such removal, a Qualified Developer shall assume development of the Property pursuant to a Replacement Development Agreement.

**Section 5.2**   <u>Negative Covenants</u>.

From the date hereof until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Security Instrument in accordance with the terms of this Agreement and the other Loan Documents, Borrower covenants and agrees with Lender that it will not do, directly or indirectly, any of the following:

5.2.1   <u>Liens</u>.

Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property or permit any such action to be taken, except for Permitted Encumbrances.

5.2.2   <u>Dissolution</u>.

Borrower shall not (a) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (b) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the Property or assets of Borrower except to the extent expressly permitted by the Loan Documents, (c) except as expressly permitted under the Loan Documents, modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction in each case, without obtaining the prior written consent of Lender.

5.2.3   <u>Change In Business</u>.

Borrower shall not enter into any line of business other than the ownership, acquisition, development, operation, leasing and management of the Property (including providing services in connection therewith), or make any material change in the scope or nature of its business objectives, purposes or operations.

5.2.4   <u>Debt Cancellation</u>.

Borrower shall not cancel or otherwise forgive or release any material claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

5.2.5    Zoning.

Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Real Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other Applicable Law, without the prior written consent of Lender.

5.2.6    No Joint Assessment.

Except with respect to the existence of the Real Property constituting one or more tax lots together with the Resort Property from the date hereof until such time as a Separate Tax Lot Event has occurred, Borrower shall not suffer, permit or initiate the joint assessment of the Real Property with (a) any other real property constituting a tax lot separate from the Real Property, or (b) any portion of the Real Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Real Property.

5.2.7    Name, Identity, Structure, or Principal Place of Business.

Borrower shall not change its name, identity (including its trade name or names), or principal place of business set forth in the introductory paragraph of this Agreement, without, in each case, first giving Lender thirty (30) days prior written notice.  Borrower shall not change its corporate, partnership or other structure, or the place of its organization as set forth in Section 4.1.34, without, in each case, the consent of Lender.  Upon Lender's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or place of organization.

5.2.8    ERISA.

(a)    During the term of the Loan or of any obligation or right hereunder, Borrower shall not be a Plan and none of the assets of Borrower shall constitute Plan Assets.

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its reasonable discretion and represents and covenants that (A) Borrower is not and does not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title IV of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (B) Borrower is not subject to State statutes regulating investments and fiduciary obligations with respect to governmental plans; and (C) one or more of the following circumstances is true:

(i)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3 101(b)(2);

- 97 -

(ii)     None of the assets of Borrower are, by virtue of the application of 29 C.F.R. §2510.3 101(f) as modified by section 3(42) of ERISA, regarded as assets of any Plan; or

(iii)     Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3 101(c) or (e).

5.2.9    <u>Affiliate Transactions</u>.

Other than the Approved Affiliate Agreements, Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower or any of the members of Borrower except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

5.2.10   <u>Transfers</u>.

(a)     Borrower shall not sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record)(other than the disposal of Personal Property in the ordinary course of business) the Property or any part thereof or any legal or beneficial interest therein or permit a Sale or Pledge of an interest in any Restricted Party (collectively, a "Transfer"), other than in connection with a Permitted Encumbrance or pursuant to Leases of space in the Improvements to tenants in accordance with the provisions of Section 5.1.17 hereof, without (i) the prior written consent of Lender and (ii) if a Securitization has occurred, delivery to Lender of written confirmation from the Rating Agencies that the Transfer will not result in the downgrade, withdrawal or qualification of the then current ratings assigned to any Securities or the proposed rating of any Securities.

(b)     A Transfer shall include, but not be limited to: (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interests or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge

- 98 -

of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; or (vii) the removal or the resignation of the Manager (including, without limitation, an Affiliated Manager) other than in accordance with Section 5.1.18 hereof.

(c)      Notwithstanding the provisions of Sections 5.2.10(a) and (b), the following transfers shall not be deemed to be a Transfer: (i) a transfer by devise or descent or by operation of law upon the death of a member, partner or shareholder of a Restricted Party or a Restricted Party itself; (ii) the Sale or Pledge, in one or a series of transactions, of not more than forty nine percent (49%) of the stock in a Restricted Party (other than Borrower or Pledgor); provided, however, no such transfers shall result in the change of voting control in the Restricted Party, and as a condition to each such transfer, Lender shall receive not less than thirty (30) days prior written notice of such proposed transfer, (iii) the Sale or Pledge, in one or a series of transactions, of not more than forty nine percent (49%) of the limited partnership interests or non managing membership interests (as the case may be) in a Restricted Party (other than Borrower or Pledgor); provided, however, no such transfers shall result in the change of voting control in the Restricted Party, and as a condition to each such transfer, Lender shall receive not less than thirty (30) days prior written notice of such proposed transfer, (iv) the pledge of any interest in Borrower in connection with the Mezzanine Loan and the exercise of any rights or remedies Mezzanine Lender may have under the Mezzanine Loan Documents in accordance with and subject to the terms of the Intercreditor Agreement, as applicable, (v) the sale, transfer or issuance of shares of stock in a Restricted Party (other than Borrower or Pledgor) (the "Traded Entity") provided such shares of stock are listed on the New York Stock Exchange or such other nationally or internationally recognized stock exchange (including the Australian Stock Exchange)  and provided the Traded Entity complies with the provisions of Section 5.3 hereof, (vi) a Fee Transfer Event, (vii) any change in any member of the board of managers or board of directors of Sponsor, any Sponsor Parent or any of their direct or indirect beneficial owners, (viii) any direct or indirect Transfer (including any change in any board of managers, board of directors, general partner, managing member or manager) of any interest in any Sponsor Parent or any of its direct or indirect beneficial owners; provided, however, as a condition to each such transfer of any interest to any Person, in one or a series of transactions, which is greater than or equal to ten percent of the interests in Sponsor, Pledgor or Borrower, Lender shall receive not less than ten (10) Business Days prior written notice of such proposed transfer; (ix) any direct or indirect Transfer of any interest in any Sponsor Parent held by Publishing and Broadcasting Limited (or its Affiliates) to (1) Publishing and Broadcasting Limited or any of its Affiliates, (2) any Traded Entity or (3) any other Person which is not an Affiliate of Publishing and Broadcasting Limited; provided that (A) following any such transfer in (ix)(1) or (ix)(2), Lender shall receive notice of such transfer within five (5) Business Days following such transfer, (B) following any such transfer in (ix)(3) which is less than forty-nine (49%) of the ownership interests, Lender shall receive notice of such transfer within five (5) Business Days following such transfer

- 99 -

and (C) following any such transfer in (ix)(3) to any Person, in one or a series of transactions, which is greater than forty-nine (49%) of the ownership interests in the aggregate, Lender shall receive notice of such transfer within ten (10) Business Days prior to such transfer and (x) any direct or indirect Transfer of Sponsor's PIK preferred units. Additionally, Lender acknowledges that Section 5.2.10(e)(b) shall not apply to any of the transactions set forth in Sections 5.2.10(c)(viii), (ix) and (x); provided, however, Lender reserves the right to request the information set forth in Section 5.2.10(e)(b) at any time after such transfer.

(d)    Notwithstanding anything to the contrary contained in this Section 5.2.10, Jeffrey Soffer must continue to control Borrower and Sponsor and own, directly or indirectly, at least a 20% interest in Borrower and in Sponsor.

(e)    Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer in violation of this Section 5.2.10. This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer. Notwithstanding anything to the contrary contained in this Section 5.2.10, (a) no transfer (whether or not such transfer shall constitute a Transfer) shall be made to any Prohibited Person, (b) in the event Borrower becomes aware of (or should have been aware of) any transfer (whether or not such transfer shall constitute a Transfer), results in (or will result in) any Person and its Affiliates owning in excess of ten percent (10%) of the ownership interest in a Restricted Party, Borrower shall provide to Lender, not less than thirty (30) days prior to such transfer, the name and identity of each proposed transferee, together with the names of its controlling principals, the social security number or employee identification number of such transferee and controlling principals, and such transferee's and controlling principal's home address or principal place of business, and home or business telephone number, and (c) in the event any transfer (whether or not such transfer shall constitute a Transfer) results in any Person and its Affiliates owning in excess of forty-nine percent (49%) of the ownership interest in a Sponsor Parent, Sponsor, Borrower or Pledgor, Borrower shall, prior to such transfer, deliver an updated Insolvency Opinion to Lender, which opinion shall be in form, scope and substance reasonably acceptable in all respects to Lender and the Rating Agencies. Within ten (10) days after request, Borrower shall deliver to Lender an updated organizational chart in the form of the organizational chart attached hereto as Schedule I.

(f)    <u>Death or Incapacity of Guarantor.</u>

Within thirty (30) days after the death or incapacity of any Guarantor who is an individual, Borrower shall cause a substitute Guarantor approved by Lender in accordance with this Section 5.2.10(f) to deliver to Lender a substitute Guaranty and Environmental Indemnity in form and substance identical to the Guaranty and Environmental Indemnity delivered on the Closing Date and a legal opinion with respect to the enforceability of such Guaranty and Environmental Indemnity in form and substance similar to the enforceability opinion delivered on the Closing Date and otherwise satisfactory to Lender. Lender's approval of a substitute Guarantor shall not be unreasonably withheld provided such substitute Guarantor has a

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

comparable net worth and experience to the Guarantor. Lender's approval hereunder may be subject in Lender's discretion to the receipt of (i) after a Securitization, written confirmation that such substitution would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities, (ii) satisfactory credit report and credit check and (iii) other due diligence with respect to the substitute Guarantor.

5.3    Traded Shares.

The Traded Entity shall cause its issued and outstanding shares of stock to be listed for trading on the New York Stock Exchange or such other nationally or internationally recognized stock exchange (including the Australian Stock Exchange) throughout the term of the Loan.

## VI.    INSURANCE; CASUALTY; CONDEMNATION

**Section 6.1**    Insurance.

(a)    Borrower shall obtain and maintain, or cause to be maintained, Policies for Borrower and the Property providing at least the following coverages:

(i)    comprehensive all risk insurance, including the peril of wind (named storms) on the Improvements and the Personal Property, in each case, (A) in an amount equal to 100% of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation, (B) containing an agreed amount endorsement with respect to the Improvements and Personal Property waiving all co-insurance provisions; (C) providing for no deductible in excess of $10,000; and (D) providing coverage for contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements together with an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses. The Full Replacement Cost shall be redetermined from time to time (but not more frequently than once in any twenty-four (24) calendar months) at the request of Lender by an appraiser or contractor designated and paid by Borrower and approved by Lender, or by an engineer or appraiser in the regular employ of the insurer. After the first appraisal, additional appraisals may be based on construction cost indices customarily employed in the trade. No omission on the part of Lender to request any such ascertainment shall relieve Borrower of any of its obligations under this Subsection;

(ii)    commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined single limit of not less than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the

- 101 -

following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all written and oral contracts; and (5) contractual liability covering the indemnities contained in Article 10 of the Security Instrument to the extent the same is available;

(iii)    business interruption/loss of rents insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in Section 6.1(a)(i); (C) in an amount equal to 100% of the projected gross income from the Property (on an actual loss sustained basis) for a period continuing until the Restoration of the Property is completed; the amount of such business interruption/loss of rents insurance shall be determined prior to the Closing Date and at least once each year thereafter based on the greatest of: (x) Borrower's reasonable estimate of the gross income from the Property and (y) the highest gross income received during the term of the Note for any full calendar year prior to the date the amount of such insurance is being determined, in each case for the succeeding eighteen (18) month period and (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and the Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of eighteen (18) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; All insurance proceeds payable to Lender pursuant to this Section 6.1(a)(iii) shall be held by Lender and shall be applied to the obligations secured hereunder from time to time due and payable hereunder and under the Note and this Agreement; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured hereunder on the respective dates of payment provided for in the Note and this Agreement except to the extent such amounts are actually paid out of the proceeds of such business interruption/loss of rents insurance.

(iv)    at all times during which structural construction, repairs or alterations are being made with respect to the Improvements (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the insurance provided for in Section 6.1(c)(ii); and (B) the insurance provided for in Section 6.1(a)(i) shall be written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to Section 6.1(a)(i), (3) shall include permission to occupy the Property, and (4) shall contain an agreed amount endorsement waiving co-insurance provisions;

(v)    to the extent Borrower has any employees, workers' compensation, subject to the statutory limits of the State in which the Property is located, and employer's liability insurance with a limit of at least $2,000,000.00 per accident and per disease per employee, and $2,000,000.00 for disease aggregate in respect

- 102 -

of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable);

(vi)    comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under Section 6.1(a)(i);

(vii)    if any portion of the Improvements is at any time located in an area identified by the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, or any successor law (the "Flood Insurance Acts"), flood hazard insurance of the following types and in the following amounts (A) coverage under Policies issued pursuant to the Flood Insurance Acts (the "Flood Insurance Policies") in an amount equal to the maximum limit of coverage available for the Property under the Flood Insurance Acts, subject only to customary deductibles under such Policies and (B) coverage under supplemental private Policies in an amount, which when added to the coverage provided under the Flood Act Policies, is not less than the Loan amount;

(viii)    earthquake, and, if required by Lender sinkhole and mine subsidence insurance in amounts equal to one times (1x) the probable maximum loss of the Property as determined by Lender in its sole discretion and in form and substance satisfactory to Lender, provided that the insurance pursuant to this Section 6.1(a)(viii) hereof shall be on terms consistent with the all risk insurance policy required under Section 6.1(a)(i) hereof;

(ix)    umbrella liability insurance in an amount not less than One Hundred Million  And 00/100 Dollars ($100,000,000.00) per occurrence on terms consistent with the commercial general liability insurance policy required under Section 6.1(a)(ii) hereof;

(x)    [Intentionally Omitted]

(xi)    [Intentionally Omitted]

(xii)    such other insurance and in such amounts or as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b)    All insurance provided for in Section 6.1(a) hereof shall be obtained under valid and enforceable policies (the "Policies" or in the singular, the "Policy"), in such forms and, from time to time after the date hereof, in such amounts as may be satisfactory to Lender, issued by financially sound and responsible insurance companies authorized to do business in the State in which the Property is located and approved by Lender.  The insurance companies must have a claims paying ability/financial strength rating of "A" (or its equivalent) or better by at least two (2) Rating Agencies (one of which will be

- 103 -

S&P if they are rating the Securities and one of which shall be Moody's if they are rating the Securities), or if only one Rating Agency is rating the Securities, then only by such Rating Agency (each such insurer shall be referred to below as a "Qualified Insurer"). Borrower will be required to maintain, at all times, insurance against terrorism, terrorist acts or similar acts of sabotage ("Terrorism Insurance") with amounts, terms and coverage consistent with those required under Sections 6.1(a)(i) and (iii) hereof (the "Terrorism Insurance Required Amount").  Notwithstanding the foregoing sentence, Borrower shall not be obligated to expend more than $750,000 in any fiscal year on Insurance Premiums for Terrorism Insurance (the "Terrorism Insurance Cap") and if the cost of the Terrorism Insurance Required Amount exceeds the Terrorism Insurance Cap, Borrower shall purchase the maximum amount of Terrorism Insurance available with funds equal to the Terrorism Insurance Cap; provided, however, in the event such Terrorism Insurance is customarily maintained by owners of similar properties in the United States as part of the all risk coverage required pursuant to Section 6.1(a)(i) hereof, Borrower shall maintain such Terrorism Insurance as a part thereof, regardless of the cost of the related Insurance Premiums.  Not less than thirty (30) days prior to the expiration dates of the Policies theretofore furnished to Lender pursuant to Section 6.1(a), Borrower shall deliver certified copies of the Policies marked "premium paid" or accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "Insurance Premiums").

(c)    Borrower shall not obtain (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Lender and Lender's interest is included therein as provided in this Agreement and such Policy is issued by a Qualified Insurer, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Section 6.1(a) to be furnished by, or which may be reasonably required to be furnished by, Borrower.  In the event Borrower obtains separate insurance or an umbrella or a blanket policy, Borrower shall notify Lender of the same and shall cause certified copies of each Policy to be delivered as required in Section 6.1(a).  Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 6.1(a).  Notwithstanding Lender's approval of any umbrella or blanket liability or casualty Policy hereunder, Lender reserves the right, in its sole discretion, to require Borrower to obtain a separate Policy in compliance with this Section 6.1.

(d)    All Policies provided for or contemplated by Section 6.1(a) hereof, except for the Policy referenced in Section 6.1(a)(v), shall name Lender and Borrower as the insured or additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, and flood insurance, shall contain a customary non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(e)    All Policies provided for in Section 6.1(a) hereof shall contain clauses or endorsements to the effect that:

- 104 -

(i)    no act or negligence of Borrower, or anyone acting for Borrower, or failure to comply with the provisions of any Policy which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)    the Policy shall not be materially changed (other than to increase the coverage provided thereby) or cancelled without at least 30 days' written notice to Lender and any other party named therein as an insured;

(iii)    each Policy shall provide that the issuers thereof shall give written notice to Lender if the Policy has not been renewed thirty (30) days prior to its expiration; and

(iv)    Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect and Lender has any reason to believe any insurance is not in full force and effect, then Lender shall have the right, without notice to Borrower to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Security Instrument and shall bear interest at the Default Rate.

(g)    In the event of a foreclosure of the Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt all right, title and interest of Borrower in and to the Policies then in force and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

(h)    Borrower shall furnish to Lender, on or before thirty (30) days after the close of each of Borrower's fiscal years, a statement certified by Borrower or a Responsible Officer of Borrower of the amounts of insurance maintained in compliance herewith, of the risks covered by such insurance and of the insurance company or companies which carry such insurance and, if requested by Lender, verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender.

**Section 6.2**    <u>Casualty</u>.

If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "Casualty"), Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the completion of the Restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty (except in the event that such Restoration is physically not capable of being done for reason that Resort Borrower is not restoring the base of the Building or to the extent that the insurance

- 105 -

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

proceeds relating to such Casualty have not been made available to Borrower for application to such Restoration; provided, however, regardless of whether Lender has made the Net Proceeds available to Borrower for Restoration, Borrower shall promptly commence and diligently prosecute the removal and disposal of any debris, refuse or hazards resulting from the Casualty and insure that the Property is in a safe condition and otherwise in accordance with this Loan Agreement), with such alterations as may be reasonably approved by Lender, as are required pursuant to the Master REA and the Master Disbursement Agreement (for so long as the same remain in full force and effect) and otherwise in accordance with Section 6.4 hereof.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance.  Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower.  No Prepayment Premium, Spread Maintenance Premium or Breakage Costs shall be payable in connection with any mandatory prepayment under Section 2.3.2 resulting from a Casualty.

**Section 6.3**    Condemnation.

Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of all or any part of the Property and shall deliver to Lender copies of any and all papers served in connection with such proceedings.  Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation.  Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings.  Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt.  Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note.  If the Property or any portion thereof is taken by a condemning authority, Borrower shall, promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 6.4 hereof.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.  No Prepayment Premium, Spread Maintenance Premium or Breakage Costs shall be payable in connection with any mandatory prepayment under Section 2.3.2 resulting from a Condemnation.

**Section 6.4**    Restoration.

6.4.1    Restoration Pre-Completion of Future Improvements.

All Net Proceeds received prior to the termination of the Master Disbursement Agreement pursuant to Section 11.18 thereof, regardless of amount, shall be deposited in the Retail Loss Proceeds Account (as established pursuant to and defined in the Master Disbursement Agreement) and shall be made available for Restoration, in accordance

- 106 -

with the terms of the Master Disbursement Agreement, provided that each of the following conditions are met:

(A)    the applicable conditions precedent set forth in Section 3.5 of the Master Disbursement Agreement have been satisfied;

(B)    the Future Improvements can still be built in accordance with the Plans and Specifications in compliance with all Applicable Laws;

(C)    Lender shall have been satisfied that the Opening Date will be achieved on or before the Completion Date;

(D)    the Net Proceeds, together with any Cash or Cash Equivalent deposited by Borrower with Lender and any unfunded Future Advances, are sufficient in Lender's discretion to cover the cost of the construction of the Future Improvements and Restoration each to completion; and

(E)    the Resort Lender is making all proceeds under the Resort Loan available for restoration of the Resort Property and such amounts, together with any unfunded future advances under the Resort Loan, are sufficient in Lender's discretion to cover the cost of the construction of the Project Future Improvements to completion.

6.4.2    <u>Restoration Post-Completion of Future Improvements</u>.    Subject to the terms of the Master REA for so long as the same is in full force and effect, the following provisions shall apply in connection with the Restoration of the Property occurring after the termination of the Master Disbursement Agreement pursuant to Section 11.18 thereof (or at such other time when the Master Disbursement Agreement is no longer in full force and effect):

(a)    If the Net Proceeds shall be less than Two Million Five Hundred Thousand  And 00/100 Dollars ($2,500,000.00) and the costs of completing the Restoration shall be less than Two Million Five Hundred  Thousand  And 00/100 Dollars ($2,500,000.00), the Net Proceeds will be disbursed by Lender to Borrower upon receipt, provided that no Event of Default exists and Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(b)    If the Net Proceeds are equal to or greater than Two Million Five Hundred Thousand  And 00/100 Dollars ($2,500,000.00) or the costs of completing the Restoration is equal to or greater than Two Million Five Hundred  Thousand  And 00/100 Dollars ($2,500,000.00), Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 6.4.2.  The term "Net Proceeds" shall mean:  (i) the net amount of all insurance proceeds received by Lender pursuant to Section 6.1(a)(i), (iv), (vi), (vii), (viii) and (ix) as a result of such damage or destruction, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("Insurance Proceeds"), or (ii) the net amount of the Award, after deduction of its reasonable costs and expenses

- 107 -

(including, but not limited to, reasonable counsel fees), if any, in collecting same ("Condemnation Proceeds"), whichever the case may be.

        (i)      The Net Proceeds shall be made available to Borrower for Restoration provided that each of the following conditions is met:

        (A)      no Event of Default shall have occurred and be continuing;

        (B)      (1) in the event the Net Proceeds are Insurance Proceeds, less than forty percent (40%) of the total floor area of the Improvements on the Property has been damaged, destroyed or rendered unusable as a result of such Casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, less than ten percent (10%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is located on such land;

        (C)      Leases demising in the aggregate a percentage amount equal to or greater than sixty-five percent (65%) of the total rentable space in the Property which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such Casualty or Condemnation, whichever the case may be, shall remain in full force and effect during and after the completion of the Restoration, notwithstanding the occurrence of any such Casualty or Condemnation, whichever the case may be, and Borrower furnishes to Lender evidence satisfactory to Lender that all tenants under Major Leases shall continue to operate their respective space at the Property after the completion of the Restoration;

        (D)      Borrower shall commence the Restoration as soon as reasonably practicable and shall diligently pursue the same to satisfactory completion in compliance with all Applicable Laws, including, without limitation, all applicable Environmental Laws;

        (E)      Lender shall be satisfied that any operating deficits, including all scheduled payments of principal and interest under the Note, which will be incurred with respect to the Property as a result of the occurrence of any such Casualty or Condemnation, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Section 6.1(a)(iii), if applicable, or (3) other funds of Borrower;

        (F)      Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Maturity Date, (2) twelve (12) months after the occurrence of such Casualty or Condemnation, or (3) the expiration of the insurance coverage referred to in Section 6.1(a)(iii);

- 108 -

(G)     the Property and the use thereof after the Restoration will be in compliance with and permitted under all Applicable Laws;

(H)     Lender shall be satisfied that the Debt Service Coverage Ratio after the completion of the Restoration shall be equal to or greater than 1.05 to 1;

(I)     such Casualty or Condemnation, as applicable, does not result in the total and permanent loss of access to the Real Property or the Improvements;

(J)     Borrower shall deliver, or cause to be delivered, to Lender a signed detailed budget approved in writing by Borrower's architect or engineer stating the entire cost of completing the Restoration, which budget shall be reasonably acceptable to Lender;

(K)     the Net Proceeds together with any Cash or Cash equivalent deposited by Borrower with Lender are sufficient in Lender's discretion to cover the cost of the Restoration;

(L)     Reserved;

(M)     any Management Agreement in effect as of the date of the occurrence of such Casualty or Condemnation, whichever the case may be, shall (1) remain in full force and effect during the Restoration and shall not otherwise terminate as a result of the Casualty or Condemnation or the Restoration or (2) if terminated, shall have been replaced with a Replacement Management Agreement with a Qualified Manager, prior to the opening or reopening of the Property or any portion thereof for business with the public.

(N)     the Resort Lender is making all proceeds under the Resort Loan available for restoration of the Resort Property and such amounts, together with any unfunded future advances under the Resort Loan and any Cash or Cash equivalent deposited by the Resort Borrower with the Resort Lender, are sufficient in Lender's reasonable discretion to cover the cost of the construction of the Resort Property to completion.

6.4.3   General Restoration Provisions.

(a)     The Net Proceeds shall be held by Lender (unless otherwise required by the Master REA or Master Disbursement Agreement for so long as the same remain in full force and effect) in an interest-bearing account and, until disbursed in accordance with the provisions of this Section 6.4.3, shall constitute additional security for the Debt and other obligations under the Loan Documents. Subject to the terms of the Master REA and the Master Disbursement Agreement for so long as the same remain in full force and effect the Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of

- 109 -

evidence reasonably satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement or are not yet payable) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Real Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(b)     All plans and specifications required in connection with the Restoration, the cost of which is greater than $1,000,000.00, shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "Casualty Consultant") and reasonably acceptable to Borrower.  Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration.  The identity of the contractors, subcontractors and materialmen engaged in the Restoration the cost of which is greater than $1,000,000.00, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant.  All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(c)     Unless otherwise required by the Master REA or the Master Disbursement Agreement (for so long as the same remain in full force and effect) In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage.  The term "Casualty Retainage" shall mean an amount equal to (i) ten percent (10%), of the costs actually incurred for work in place as part of the Restoration until fifty percent (50%) of the Restoration has been completed and (ii) five percent (5%) of the costs actually incurred for work in place as part of the Restoration after fifty percent (50%) of the Restoration has been completed until the Restoration has been completed, in each case as certified by the Casualty Consultant to Lender, until the Restoration has been completed.  The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 6.4, be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration.  The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 6.4 and that all approvals necessary for the re-occupancy and use of the Real Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence reasonably satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company issuing the Title Insurance Policy for the Property, and Lender receives an endorsement to such Title Insurance Policy insuring the continued priority of the Lien of the Security Instrument and evidence of payment of any premium payable for such endorsement. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(d)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month unless otherwise required under the Master Disbursement Agreement (while in effect) or the Master REA.

(e)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, if any, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 6.4 shall constitute additional security for the Debt and other obligations under the Loan Documents.

(f)     The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 6.4, and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under the Note, this Agreement or any of the other Loan Documents.

(g)     All Net Proceeds not required (i) to be made available for the Restoration by Section 6.4.1 or 6.4.2 or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Section 6.4.2 may be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its sole discretion shall deem proper, or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall approve, in its discretion. If Lender shall receive and retain Net Proceeds, the Lien of the Security Instrument shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

## VII.    RESERVE FUNDS

**Section 7.1**    Reserved

**Section 7.2**    Tax and Insurance Escrow Fund.

Borrower shall pay to Lender on each Payment Date (a) if (1) a Separate Tax Lot Event has occurred or (2) the Property is not one or more separate tax lots and the Resort Lender is not budgeting loan proceeds for Taxes for both the Resort Property and the Property (or if Resort Lender is budgeting for the same, if Lender has a reasonable belief that Resort Lender has not paid or will not timely be able to pay or cause to be paid such Taxes with such budgeted proceeds), one-twelfth of the Taxes (the "Monthly Tax Deposit") that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates; and (b) at the option of Lender, if the liability or casualty Policy maintained by Borrower covering the Property shall not constitute an approved blanket or umbrella Policy pursuant to Section 6.1(c) hereof, or Lender shall require Borrower to obtain a separate Policy pursuant to Section 6.1(c) hereof, one-twelfth of the Insurance Premiums (the "Monthly Insurance Premium Deposit") that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (said amounts in (a) and (b) above hereinafter called the "Tax and Insurance Escrow Fund"). In the event Lender shall elect to collect payments in escrow for Insurance Premiums pursuant to clause (b) above, Borrower shall pay to Lender an initial deposit to be determined by Lender, in its sole discretion, to increase the amounts in the Tax and Insurance Escrow Fund to an amount which, together with anticipated Monthly Insurance Premium Deposits, shall be sufficient to pay all Insurance Premiums as they become due. The Tax and Insurance Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note and this Agreement, shall be added together and shall be paid as an aggregate sum by Borrower to Lender. Lender will apply the Tax and Insurance Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Sections 5.1.2 and 6.1, respectively, hereof. In making any payment relating to the Tax and Insurance Escrow Fund, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If the amount of the Tax and Insurance Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 5.1.2 and 6.1, respectively, hereof. Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Escrow Fund. In allocating such excess, Lender may deal with the Person shown on the records of Lender to be the owner of the Property. Any amount remaining in the Tax and Insurance Escrow Fund after the Debt has been paid in full shall be returned to Borrower. If at any time Lender reasonably determines that the Tax and Insurance Escrow Fund is not or will not be sufficient to pay Taxes and Insurance Premiums by the dates set forth in (a) and (b) above, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes and/or thirty (30) days prior to expiration of the Policies, as the case

[TPW: NYLEGAL:618631.13] 16248-00758  06/05/2007 11:46 PM

may be.  Notwithstanding anything to the contrary contained in this Section 7.2, for so long as (i) the insurance required to be maintained under Section 6.1 is covered by a blanket Policy approved by Lender covering both the Resort Property and the Property and naming the Lender as an additional insured and (ii) Resort Lender is currently escrowing Insurance Premiums for such Policy covering both the Resort Property and the Property, Borrower shall not be required to make the Monthly Insurance Premium Deposits.

**Section 7.3**   Reserve Funds, Generally.

(a)   Borrower grants to Lender a first priority perfected security interest in each of the Reserve Funds and the related Accounts and any and all monies now or hereafter deposited in each Reserve Fund and related Account as additional security for payment of the Debt.  Until expended or applied in accordance herewith, the Reserve Funds and the related Accounts shall constitute additional security for the Debt.

(b)   Upon the occurrence and during the continuance of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserve Funds to the payment of the Debt in any order in its sole discretion.

(c)   The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Lender.

(d)   The Reserve Funds shall be held in interest bearing accounts and all earnings or interest on a Reserve Fund shall be added to and become a part of such Reserve Fund and shall be disbursed in the same manner as other monies deposited in such Reserve Fund, except that earnings or interest on the Tax and Insurance Escrow Fund shall not be added to or become a part thereof and shall be the sole property of and shall be paid to Lender, and Borrower shall not be responsible for taxes on such earnings or interest on the Tax and Insurance Escrow.

(e)   Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Reserve Fund or related Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC 1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

(f)   Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, damages (but not special, consequential or punitive damages), losses (other than diminution in value), obligations and costs and expenses (including litigation costs and reasonable attorneys fees and expenses) arising from or in any way connected with the Reserve Funds or the related Accounts or the performance of the obligations for which the Reserve Funds or the related Accounts were established, except to the extent arising from the gross negligence or willful misconduct of Lender, its agents or employees.  Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds or

- 113 -

the related Accounts; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

## VIII.  **DEFAULTS**

**Section 8.1**      Event of Default.

    (a)      Each of the following events shall constitute an event of default hereunder (an "Event of Default"):

    (i)      if any portion of the Debt is not paid on or before the date which is five (5) Business Days after the same is due and payable;

    (ii)      subject to Borrower's right to contest in accordance with the terms of Section 5.1.2 hereof, if any of the Taxes or Other Charges are not paid on or before the date when the same are due and payable; provided, however, Borrower shall not be in default for failure to pay any Taxes so long as there is sufficient money in the Tax Account for payment of amounts then due and payable and Lender's access to such money has not been constrained or restricted in any manner due to any circumstance or event which is caused by or otherwise relates to any actions or omissions of Borrower or its Affiliates (including, without limitation, as a result of (x) any proceeding brought under any Creditors Rights Law concerning or relating to Borrower or any of its Affiliates or (y) any other litigation or proceeding concerning or relating to Borrower or any of its Affiliates);

    (iii)      if the Policies are not kept in full force and effect or if certified copies of the Policies are not delivered to Lender on request; provided, however, Borrower shall not be in default for failure to pay any insurance premiums so long as there is sufficient money in the Insurance Premium Account (allocable to the payment of insurance premiums) for payment of all insurance premiums then due and payable and Lender's access to such money has not been constrained or restricted in any manner due to any circumstance or event which is caused by or otherwise relates to any actions or omissions of Borrower or its Affiliates (including, without limitation, as a result of (x) any proceeding brought under any Creditors Rights Law concerning or relating to Borrower or any of its Affiliates or (y) any other litigation or proceeding concerning or relating to Borrower or any of its Affiliates);

    (iv)      if Borrower transfers or encumbers any portion of the Property in violation of the provisions of Section 5.2.10 hereof or Article 7 of the Security Instrument;

    (v)      if any representation or warranty made by Borrower or Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made;

- 114 -

(vi)     if Borrower, Guarantor or any other guarantor under any guaranty issued in connection with the Loan shall make an assignment for the benefit of creditors;

(vii)     if a receiver, liquidator or trustee shall be appointed for Borrower, Guarantor or any other guarantor under any guarantee issued in connection with the Loan or if Borrower, Guarantor or such other guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to the Bankruptcy Code, or any similar federal or State law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Guarantor or such other guarantor, or if any proceeding for the dissolution or liquidation of Borrower, Guarantor or such other guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Guarantor or such other guarantor, upon the same not being discharged, stayed or dismissed within ninety (90) days;

(viii)     if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(ix)     if Borrower breaches any of its negative covenants contained in Section 5.2;

(x)     if Borrower violates or does not comply with any of the provisions dealing with Major Leases in Section 5.1.17 hereof;

(xi)     subject to the terms of Section 5.1.22, if the Property is not at any time managed by a Qualified Leasing Agent pursuant to the Leasing Agreement or a Replacement Leasing Agreement;

(xii)     if Borrower violates or does not comply with any of the provisions of Section 4.1.35 hereof provided, however, that such violation or failure to comply shall not constitute an Event of Default if (A) such violation or failure to comply was inadvertent, immaterial and non-recurring, (B) such violation or failure to comply is curable and Borrower shall promptly cure such violation or failure to comply within thirty (30) calendar days Borrower's obtaining actual knowledge of such failure and (C) within thirty (30) calendar days of the request by Lender, Borrower causes its legal counsel to deliver (1) an Insolvency Opinion stating that such violation or failure would not result in a substantive consolidation of the assets and liabilities of Borrower and/or Principal with those of any other Person in a bankruptcy proceeding under the United States Bankruptcy Code (11 U.S.C. § 101, et seq.) or (2) if an Insolvency Opinion had previously been delivered to Lender, a revised or updated Insolvency Opinion to the effect that such violation or failure to comply shall not impair, negate or amend the opinions rendered in the Insolvency Opinion delivered in connection with the closing of the Loan, which opinion shall be acceptable to Lender in its reasonable discretion;

- 115 -

(xiii)    subject to Borrower's right to contest set forth in Section 5.1.2 and Section 5.2.1 hereof, if the Property becomes subject to any mechanic's, materialman's or other Lien other than a Lien for local real estate taxes and assessments not then due and payable and the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days;

(xiv)    subject to Borrower's right to contest set forth in Section 5.1.2 and Section 5.2.1 hereof, if any federal tax Lien or state or local income tax Lien is filed against Borrower, any Guarantor, or the Property and same is not discharged of record within thirty (30) days after same is filed;

(xv)    if (A) Borrower fails to timely provide Lender with the written certification and evidence referred to in Section 5.2.8 hereof, (B) Borrower is a Plan or its assets constitute Plan Assets; or (C) Borrower consummates a transaction which would cause the Security Instrument or Lender's exercise of its rights under the Security Instrument, the Note, this Agreement or the other Loan Documents to constitute a nonexempt prohibited transaction under ERISA or result in a violation of a State statute regulating governmental plans, subjecting Lender to liability for a violation of ERISA, the Code, a State statute or other similar law;

(xvi)    if Borrower shall fail to deliver to Lender, within ten (10) days after request by Lender, the estoppel certificates required pursuant to the terms of Section 5.1.13(a) hereof;

(xvii)    if any default occurs under any guaranty or indemnity executed in connection herewith (including, without limitation, the Guaranty and the Environmental Indemnity) and such default continues after the expiration of applicable grace periods, if any;

(xviii)    if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to the Security Instrument;

(xix)    if (i) the Interest Rate Cap Agreement is not executed and delivered when required hereunder or is terminated for any reason by Borrower or the Counterparty, or (ii) the Counterparty defaults in the performance of its monetary obligations under the Interest Rate Cap Agreement or (iii) the rating of the Counterparty is subject to any downgrade, withdrawal or qualification by a Rating Agency, and in any such case Borrower does not within ten (10) days (A) replace the Interest Rate Cap Agreement with a Replacement Interest Rate Cap Agreement in accordance with Section 2.4 hereof, and (B) deliver to Lender, in form and substance reasonably satisfactory to Lender (x) an Assignment of Interest Rate Cap Agreement (y) a recognition letter from the Counterparty thereto acknowledging the assignment of the Replacement Interest Rate Cap

- 116 -

Agreement and (z) any other opinions or documents required pursuant to Section 2.4 hereof;

(xx)    with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xxi)    if Borrower shall fail to pay the Air Rights Rent or any additional rent or other charge mentioned in or made payable by the Air Rights Lease when said rent or other charge is due and payable;

(xxii)    if there shall occur any default by Borrower, as tenant under the Air Rights Lease, in the observance or performance of any term, covenant or condition of the Air Rights Lease on the part of Borrower to be observed or performed and said default is not cured following the expiration of any applicable grace and notice periods therein provided, or if the leasehold estate created by the Air Rights Lease shall be surrendered or if the Air Rights Lease shall cease to be in full force and effect or the Air Rights Lease shall be terminated or canceled for any reason or under any circumstances whatsoever (other than in connection with a Fee Transfer Event), or if any of the terms, covenants or conditions of the Air Rights Lease shall in any manner be modified, changed, supplemented, altered, or amended without the consent of Lender;

(xxiii)    if any of the assumptions contained in the Insolvency Opinion, or in any other "non-consolidation" opinion delivered to Lender in connection with the Loan, or in any other "non-consolidation" delivered subsequent to the closing of the Loan, is or shall become untrue in any material respect; provided, however, that any such violation shall not result in an Event of Default if (A) such violation was inadvertent, does not result in a reasonable likelihood that a substantive consolidation of the assets and liabilities of Borrower with those of any other Person in a bankruptcy proceeding under the Bankruptcy Code would occur, and is promptly corrected upon Borrower's obtaining knowledge of such failure (unless such failure to correct would not result in a future reasonable likelihood of substantive consolidation and the opinion required in the following clause (B) opines to the same) and (B) within fifteen (15) days of Lender's request, Borrower delivers to Lender an opinion of counsel to the effect that such breach shall not negate or impair the substance of the Insolvency Opinion delivered to Lender in connection with the closing of the Loan;"

(xxiv)    if any Guarantor who is an individual dies or is incapacitated and Borrower fails to provide a substitute Guarantor satisfactory to Lender in accordance with Section 5.2.10(f) within thirty (30) days of such an event;

(xxv)    subject to the terms of Section 5.1.18, if the Property is not at any time managed by a Qualified Manager pursuant to the Management Agreement or a Replacement Management Agreement;

- 117 -

(xxvi) prior to the date that both the Satisfactory DSCR Date and Completion Date (as defined in the Master Disbursement Agreement) have been achieved, upon the occurrence of a Resort Loan Event of Default;

(xxvii) upon the occurrence of an Event of Default under the Master Disbursement Agreement (except to the extent the same has been cured or waived in accordance with the terms of the Master Disbursement Agreement);

(xxviii) subject to the terms of Section 5.1.22, if the leasing duties with respect to Property is not at any time being handled by a Qualified Leasing Agent pursuant to the Leasing Agreement or a Replacement Leasing Agreement;

(xxix) prior to the Completion Date (as defined in the Master Disbursement Agreement), without the prior written consent of Lender, if Jeffrey Soffer fails to control Resort Borrower and own, directly or indirectly, at least a 20% interest in Resort Borrower;

(xxx) if any Letter of Credit is not renewed, replaced or substituted in accordance with the terms hereof twenty (20) days prior to the expiration date of such Letter of Credit (unless such expiration date shall occur at least two (2) Business Days after the Maturity Date);

(xxxi) in the event that the long term credit rating of the Issuing Bank falls below the Minimum L/C Rating and Borrower fails to deliver to Lender within ten (10) days thereof a Letter of Credit in an amount equal to the amount of the Letter of Credit being replaced from an Issuing Bank having a credit rating of no less than the Minimum L/C Rating, unless such Letter of Credit is replaced with cash in accordance with the terms hereof within such ten (10) day period;

(xxxii) if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xxxi) above, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed ninety (90) days; or

(xxxiii) if there shall be a default under the Security Instrument or any of the other Loan Documents beyond any applicable notice and cure periods contained in such documents, whether as to Borrower or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or

- 118 -

condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt.

(b)    Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vi) or (vii) above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and or any part of the Property, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi) or (vii) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

**Section 8.2**    Remedies.

(a)    Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Property or any other Collateral. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by Applicable Law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by Applicable Law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, to the extent permitted by Applicable Law, Borrower agrees that if an Event of Default is continuing (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the other Collateral and the Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(b)    With respect to Borrower and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property or Collateral for the satisfaction of any of the Debt in preference or priority to any other Collateral, and Lender may seek satisfaction out of the Property or all of the Collateral or any part thereof, in its absolute discretion in respect of the Debt. In addition, Lender

[TPW: NYLEGAL:618631.13] 16248-00758  06/06/2007 12:51 AM

shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Security Instrument to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of sums secured by the Security Instrument and not previously recovered.

(c)  Lender shall have the right, from time to time, to sever the Note and the other Loan Documents into one or more separate notes, Security Instruments, Mortgages and other security documents (the "Severed Loan Documents") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power. The Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

(d)  Additional Construction Related Remedies. Upon the occurrence and during the continuance of an Event of Default, Lender may, at its election, but without any obligation to do so, without notice of any kind to Borrower, do any one or more of the following:

(i)  terminate its commitment to lend and any obligation to make any further disbursements of the Loan;

(ii)  set-off and apply, to the extent thereof and to the maximum extent permitted by law, any and all deposits, funds or assets at any time held and any and all indebtedness at any time owing by Lender to or for the credit or account of Borrower against any Debt;

(iii)  exercise any and all rights and remedies afforded by the Guaranty, this Agreement or the other Loan Documents, at law, in equity or otherwise;

- 120 -

(iv)    in its own name or in the name of Borrower, enter into possession of the Property, perform all work necessary to complete the construction of the Future Improvements (to the extent that the construction is being performed by Borrower or Borrower otherwise has the right to take such actions) substantially in accordance with the Plans and Specifications and Specifications (as modified as deemed necessary by Lender), Loan Documents and Applicable Laws, and continue to employ Architect, Engineer, General Contractor, and any contractor pursuant to the applicable contracts or otherwise; and

(v)    after first having given written notice to Architect, Engineer or General Contractor that Borrower has no further rights with respect to the Construction Documents, Borrower's rights in and to any Construction Documents having been extinguished under the terms and conditions of the Loan Documents, to enjoy and enforce all of the rights of Borrower under the Architect's Contract, the Engineer's Contract, the Construction Contract, the Plans and Specifications or the Construction Documents (but in such event Lender does not assume responsibility to pay any amounts due by Borrower whether or not Lender takes possession of the Project).

**Section 8.3**    Remedies Cumulative; Waivers.

The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one or more Defaults or Events of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

**Section 8.4**    Power of Attorney.  Borrower hereby constitutes and appoints Lender its true and lawful attorney-in-fact, with full power of substitution during the continuance of an Event of Default, to complete the Future Improvements in the name of Borrower (to the extent that the construction is being performed by Borrower or Borrower otherwise has the right to complete the same).  Borrower hereby empowers said attorney as follows:

(a)    to use any funds of Borrower, including any Loan proceeds which may remain undisbursed hereunder, for the purpose of completing the Future Improvements in the manner called for by the Plans and Specifications;

(b)    to make such additions, changes, and corrections in the Plans and Specifications as shall be necessary or desirable to complete the Future Improvements (to the extent that the construction is being performed by Borrower or Borrower otherwise has the right to take such actions);

(c)     to employ such contractors, subcontractors, agents, architects and inspectors as shall be required for said purposes;

(d)     to pay, settle, or compromise all existing bills and claims which may be liens against the Future Improvements, or as may be necessary or desirable to Lender for the completion of the Future Improvements or for clearance of title;

(e)     to take over and use all or any part of the labor, materials, supplies and equipment contracted for, owned by, or under the control of Borrower, whether or not previously incorporated into the Future Improvements;

(f)     to execute all applications and certificates in the name of Borrower which may be required by any of the contract documents;

(g)     to prosecute and defend all actions or proceedings in connection with the Property, the Project or the construction of the Future Improvements and take such action and require such performance as Lender shall deem necessary under any performance or payment bond;

(h)     to do any and every act with respect to construction or completion of the Future Improvements (to the extent that the construction of the same is being performed by Borrower or Borrower otherwise has the right to take such action) or the closing of any permanent financing which Borrower might do in its own behalf including execution, acknowledgment, and delivery of all instruments, documents, and papers in the name of Borrower as may be necessary or desirable to Lender; and

(i)     to enforce all rights of Borrower under any contract or with respect to the Plans and Specifications.

(j)     It is further understood and agreed that this power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.

## IX.    SPECIAL PROVISIONS

**Section 9.1**    Sale of Notes and Securitization.

Lender may, at any time, sell, transfer or assign the Note, this Agreement, the Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass-through certificates or other securities (the "Securities") evidencing a beneficial interest in a rated or unrated public offering or private placement (a "Securitization").    Notwithstanding the foregoing, Lehman agrees to provide Borrower with no less than three (3) months prior written notice prior to any Securitization by Lehman pursuant to this Section 9.1. At the request of the holder of the Note and, to the extent not already required to be provided by Borrower under this Agreement, Borrower, and Sponsor at Borrower's and Sponsor's expense, shall satisfy the market standards to which the holder of the Note customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with a Securitization or the sale of the Note or the participations or Securities, including, without limitation, to:

- 122 -

(a)    within fifteen (15) days after written request, (i) provide such financial and other information with respect to the Property, Borrower, Sponsor, Guarantor and Manager (if any), (ii) provide budgets relating to the Property and (iii) to perform or permit or cause to be performed or permitted such site inspection, appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), engineering reports and other due diligence investigations of the Property, as may be reasonably requested by the holder of the Note or the Rating Agencies or as may be necessary or appropriate in connection with the Securitization (the "Provided Information"), together, if customary, with appropriate verification and/or consents of the Provided Information through letters of auditors or opinions of counsel of independent attorneys reasonably acceptable to Lender and the Rating Agencies;

(b)    if required by the Rating Agencies, deliver (i) a revised Insolvency Opinion, (ii) revised opinions of counsel as to due execution and enforceability with respect to the Property, Borrower, Guarantor and their respective Affiliates and the Loan Documents, and (iii) revised organizational documents for Borrower, Guarantor and their respective Affiliates (including, without limitation, such revisions as are necessary to comply with the provisions of Section 4.1.35 hereof), which counsel, opinions and organizational documents shall be reasonably satisfactory to Lender and the Rating Agencies;

(c)    if required by the Rating Agencies, deliver such additional tenant estoppel letters, subordination agreements or other agreements from parties to agreements that affect the Property, which estoppel letters, subordination agreements or other agreements shall be reasonably satisfactory to Lender and the Rating Agencies;

(d)    execute such amendments to the Loan Documents and organizational documents as may be reasonably requested by the holder of the Note or the Rating Agencies or otherwise to effect the Securitization; provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (except for modifications and amendments required to be made pursuant to Section (e) and (f) below,) (i) change the interest rate, the stated maturity or the amortization of principal set forth in the Note, (ii) modify or amend any other material economic term of the Loan or (iii) materially lessen the rights of or materially increase the obligations or liabilities of Borrower or any Guarantor;

(e)    if Lender elects, in its sole discretion, prior to or upon a Securitization, to split the Loan into two or more parts, or the Note into multiple component notes or tranches which may have different interest rates, amortization payments, principal amounts and payment priorities, Borrower and Sponsor agree to cooperate with Lender in connection with the foregoing and to execute the required modifications and amendments to the Note, this Agreement and the Loan Documents and to provide opinions necessary to effectuate the same. Such Notes or components may be assigned different interest rate spreads, so long as the initial weighted average of such interest rate spreads does not exceed the Applicable Interest Rate and the Maturity Date and other material economic terms remain unchanged; provided, however, that nothing in this subsection (e) shall limit Lender's right to apply (i) mandatory or involuntary prepayments to the Debt in such

- 123 -

order as Lender determines in its sole discretion and (ii) payments to the Debt in such order as Lender determines in its sole discretion during the continuance of an Event of Default, it being agreed that the weighted average interest rate spreads described above may subsequently change only as a result of a payment or application of principal made (x) in connection with a mandatory or involuntary prepayment and/or (y) during the continuance of an Event of Default. Notwithstanding anything to the contrary contained in this subsection (e), provided no Event of Default exists, all voluntary prepayments made pursuant to Section 2.3.1 above shall be applied pro rata among each component;

(f)      execute modifications to the Loan Documents changing the interest rate and/or the amortization payments (if any) for the Loan, provided that the initial weighted average of the interest rate spreads for the Loan and the Mezzanine Loan after such modification shall not exceed the weighted average of the interest rate spreads for the Loan and the Mezzanine Loan immediately prior to such modification; provided, however, that nothing in this subsection (f) shall limit Lender's right to apply (i) mandatory or involuntary prepayments to the Debt in such order as Lender determines in its sole discretion and (ii) payments to the Debt in such order as Lender determines in its sole discretion during the continuance of an Event of Default, it being agreed that the weighted average interest rate spreads described above may subsequently change only as a result of a payment or application of principal made (x) in connection with a mandatory or involuntary prepayment and/or (y) during the continuance of an Event of Default. The Borrower and Sponsor shall also provide opinions and title insurance reasonably necessary to effectuate the same. Notwithstanding anything to the contrary contained in this subsection (f), all voluntary prepayments under the Loan shall require a corresponding pro rata voluntary prepayment under the Mezzanine Loan;

(g)      make such representations and warranties as of the closing date of the Securitization with respect to the Property, Borrower, Sponsor and the Loan Documents as are customarily provided in securitization transactions and as may be reasonably requested by the holder of the Note or the Rating Agencies and consistent with the facts covered by such representations and warranties as they exist on the date thereof, including the representations and warranties made in the Loan Documents (or, to the extent such representations are not then true, indicating the exceptions thereto); and

(h)      supply to Lender such documentation, financial statements and reports in form and substance required for Lender to comply with Regulations S-X and AB of the federal securities law, if applicable.

All reasonable third party costs and expenses incurred by Lender or Borrower or Sponsor in connection with Borrower's or Sponsor's complying with requests made under this Section 9.1 shall be paid by Borrower and Sponsor. Notwithstanding anything to the contrary contained herein, the Borrower's obligation with respect to the payment of Securitization costs to be paid by Borrower, Sponsor and their Affiliates under this Section 9.1 (excluding any in-house counsel fees, internal costs (copies, distributions and the like) and costs incurred in connection with the addition of any Independent Manager) shall not exceed $50,000.00 in the aggregate.

**Section 9.2**      Securitization Indemnification.

- 124 -

(a)     Borrower and Sponsor understand that certain of the Provided Information may be included in disclosure documents in connection with the Securitization, including, without limitation, a prospectus supplement, private placement memorandum, offering circular or other offering document (each a "Disclosure Document") and may also be included in filings (an "Exchange Act Filing") with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "Securities Act"), or the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), or provided or made available to Investors or prospective Investors in the Securities, the Rating Agencies, and service providers relating to the Securitization.  In the event that the Disclosure Document is required to be revised prior to the sale of all Securities, Borrower and Sponsor will cooperate with the holder of the Note in updating the Disclosure Document by providing (to the extent not in the possession of and readily accessible to Lender) all current information necessary to keep the Disclosure Document accurate and complete in all material respects.

(b)     Borrower and Sponsor agree to provide in connection with each of (i) a preliminary and a final private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an indemnification certificate (A) certifying that Borrower has carefully examined such memorandum or prospectus or term sheets, as applicable, including without limitation, the sections entitled "Special Considerations," "Description of the Mortgages," ""Description of the Mortgage Loans and Mortgaged Property," "The Manager", "The Developer", "The Borrower" and "Certain Legal Aspects of the Mortgage Loan," and such sections (and any other sections reasonably requested) do not, to Borrower's knowledge after reasonably inquiry, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender (and for purposes of this Section 9.2, Lender hereunder shall include its officers and directors), the Affiliate of Lehman Brothers Inc. ("Lehman") that has filed the registration statement relating to the Securitization (the "Registration Statement"), each of its directors, each of its officers who have signed the Registration Statement and each Person who controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "Lehman Group"), and Lehman, each of its directors and each Person who controls Lehman within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "Underwriter Group") for any claims, damages (but not special, consequential or punitive damages), losses (other than diminution in value) or liabilities (collectively, the "Liabilities") to which Lender, the Lehman Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such sections described in clause (A) above insofar as they relate to the Borrower, its Affiliates, the Property or the Manager, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections or in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender, the Lehman Group and the Underwriter Group for any legal or other expenses reasonably incurred by Lender the Lehman Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that

- 125 -

Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such Liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with the Provided Information, information contained in such portions of the Disclosure Document examined and approved by Borrower or information otherwise furnished to Lender by or on behalf of Borrower in connection with the preparation of the memorandum or prospectus. This indemnification will be in addition to any liability which Borrower may otherwise have. Moreover, the indemnification provided for in clauses (B) and (C) above shall be effective whether or not an indemnification certificate described in (A) above is provided and shall be applicable based on information previously provided by Borrower or its Affiliates if Borrower does not provide the indemnification certificate.

(c)    In connection with filings under the Exchange Act, Borrower and Sponsor agree to indemnify (i) Lender, the Lehman Group and the Underwriter Group for Liabilities to which Lender, the Lehman Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the omission or alleged omission to state in the Provided Information a material fact required to be stated in the Provided Information in order to make the statements in the Provided Information, in light of the circumstances under which they were made not misleading and (ii) reimburse Lender, the Lehman Group or the Underwriter Group for any reasonable legal or other expenses actually incurred by Lender, the Lehman Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(d)    Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party. After notice from the indemnifying party to such indemnified party under this Section 9.2 the indemnifying party shall not be responsible for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party to parties. The indemnifying party shall not be liable for the expenses of more than one such separate counsel unless an indemnified party shall have reasonably

- 126 -

concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

(e)      In order to provide for just and equitable contribution in circumstances in which the indemnifications provided for in Section 9.2(b) or (c) is or are for any reason held to be unenforceable by an indemnified party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Liabilities (or action in respect thereof) to the extent permitted by Applicable Law; provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) Lehman's and Borrower's relative knowledge and access to information concerning the matter with respect to which claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. Lender, Borrower, and Sponsor hereby agree that it would not be equitable if the amount of such contribution were determined solely by pro rata or per capita allocation.

(f)      The liabilities and obligations of both Borrower, Sponsor and Lender under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

**Section 9.3**    Servicer.

At the option of Lender or Agent, the Loan may be serviced by a servicer/trustee (the "Servicer") selected by Lender or Agent and Lender or Agent may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "Servicing Agreement") between Lender or Agent and Servicer. Borrower shall be responsible for payment of (i) any reasonable set-up fees or any other initial costs relating to or arising under the Servicing Agreement, (ii) all reasonable out-of-pocket costs and expenses of Servicer in connection with Designated Servicing Matters and (iii) an annual servicing fee (the "Servicing Fee") in an amount up to (as required by Lender) $100,000 ; provided, however, Lender reserves the right upon agreement with the Mezzanine Lender (in accordance with the terms of the Intercreditor Agreement) to change the amount of the Servicing Fee provided that in no event shall the Servicing Fee, together with the Mezzanine Servicing Fee, exceed $125,000.

**Section 9.4**    Exculpation.

(a)      Except as otherwise provided herein, in the Security Instrument or in the other Loan Documents, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Agreement, the Note or the Security Instrument by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, action for

- 127 -

specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon this Agreement, the Note, the Security Instrument, the other Loan Documents, and the interest in the Property, the Rents and any other collateral given to Lender created by this Agreement, the Note, the Security Instrument and the other Loan Documents; provided, however, that any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender. Lender, by accepting this Agreement, the Note and the Security Instrument, agrees that it shall not, except as otherwise provided herein or in the Security Instrument, sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding, under or by reason of or under or in connection with this Agreement, the Note, the Security Instrument or the other Loan Documents.  The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Agreement, the Note, the Security Instrument or the other Loan Documents; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instrument; (iii) affect the validity or enforceability of any indemnity (including, without limitation, the Environmental Indemnity), guaranty (including, without limitation, the Guaranty), master lease or similar instrument made in connection with this Agreement, the Note, the Security Instrument, or the other Loan Documents; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) impair the right of Lender to enforce the provisions of Sections 9.9 and 10.2 of the Security Instrument or Sections 4.1.8, 4.1.28, 5.1.9 and 5.2.8 hereof; or (vii) impair the right of Lender to obtain a deficiency judgment or other judgment on the Note against Borrower if necessary to (A) preserve or enforce its rights and remedies against the Property or (B) obtain any Insurance Proceeds or Awards to which Lender would otherwise be entitled under the terms of this Agreement or the Security Instrument; provided however, Lender shall only enforce such judgment to the extent of the Insurance Proceeds and/or Awards.

(b)    Notwithstanding the provisions of this Section 9.4 to the contrary, Borrower shall be personally liable to Lender for the Losses it actually incurs due to: (i) fraud or intentional misrepresentation in connection with the execution and the delivery of this Agreement, the Note, the Security Instrument, or the other Loan Documents; (ii) Borrower's misapplication or misappropriation of Rents received by Borrower after the occurrence of a Default or Event of Default; (iii) Borrower's misapplication or misappropriation of Security Deposits or Rents collected more than thirty (30) days in advance; (iv) Borrower's misapplication or the misappropriation of Insurance Proceeds or Awards; (v) Borrower's failure to pay Taxes or Other Charges (except to the extent that sums sufficient to pay such amounts have been deposited into a satisfactory escrow arrangement with Lender), charges for labor or materials or other charges that can create Liens on the Property; (vi) Borrower's failure to return or to reimburse Lender for all Personal Property taken from the Property by or on behalf of Borrower and not replaced with Personal Property of the same utility and of the same or greater value; (vii) any act of intentional waste or arson with respect to the Property (other than the disposal of Personal Property in the ordinary course of business) by Borrower or any Affiliate or thereof or by any Guarantor or Person providing an indemnity; (viii) any fees or

- 128 -

commissions paid by Borrower to any Affiliate of Borrower, or Guarantor in violation of the terms of this Agreement, the Note, the Security Instrument or the other Loan Documents; (ix) Borrower's failure to comply with the provisions of Sections 4.1.39, 5.1.10 and 5.1.19 of this Agreement, (x) any indemnity provided by Lender under any Control Agreements (as defined in the Master Disbursement Agreement) or (xi) the litigation described on Schedule II hereto.

(c)     Notwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in Subsection (a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect (i) in the event of Borrower's default under Sections 4.1.35 (subject to the limitations set forth in Section 8.1(a)(xii)) or 5.2.10 hereof or Article 7 of the Security Instrument or (ii) if the Property or any part thereof shall become an asset in (A) a voluntary bankruptcy or insolvency proceeding or (B) an involuntary bankruptcy or insolvency proceeding commenced by any Person (other than Lender) and Borrower fails to use its best efforts to obtain a dismissal of such proceedings.

(d)     Nothing herein shall be deemed to be a waiver of any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provision of the Bankruptcy Code to file a claim for the full amount of the indebtedness secured by the Security Instrument or to require that all collateral shall continue to secure all of the indebtedness owing to Lender in accordance with this Agreement, the Note, the Security Instrument and the other Loan Documents.

(e)     Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, damages (but not special, consequential or punitive damages), losses (other than diminution in value), obligations and costs and expenses (including litigation costs and reasonable attorneys fees and expenses) arising from or in any way connected with any indemnity provided by Lender under any Control Agreements (as defined in the Master Disbursement Agreement).

**Section 9.5**    Intentionally Omitted.

**Section 9.6**    Intentionally Omitted.

**Section 9.7**    Syndication

9.7.1   Syndication.

The provisions of this Section 9.7 shall only apply in the event that the Loan is syndicated in accordance with the provisions of this Section 9.7 set forth below.

9.7.2   Sale of Loan, Co-Lenders, Participations and Servicing.

(a)     Lender and any Co-Lender may, at their option, without Borrower's consent (but with written notice to Borrower), sell with novation all or any part of their right, title and interest in, and to, and under the Loan (the "Syndication"), to one or more additional lenders (each a "Co-Lender").  Each additional Co-Lender shall enter into an

- 129 -

assignment and assumption agreement (the "Assignment and Assumption") assigning a portion of Lender's or Co-Lender's rights and obligations under the Loan, and pursuant to which the additional Co-Lender accepts such assignment and assumes the assigned obligations. From and after the effective date specified in the Assignment and Assumption (i) each Co-Lender shall be a party hereto to the extent of the applicable percentage or percentages set forth in the Assignment and Assumption and, except as specified otherwise herein, shall succeed to the rights and obligations of Lender and the Co-Lenders hereunder and under each other Loan Document in respect of the Loan, and (ii) Lender, as lender and each Co-Lender, as applicable, shall, to the extent such rights and obligations have been assigned by it pursuant to such Assignment and Assumption, relinquish its rights and be released from its obligations hereunder and under the Loan Documents, except as specifically otherwise provided herein.

(b)    The liabilities of Lender and each of the Co-Lenders shall be several and not joint, and Lender's and each Co-Lender's obligations to Borrower under this Agreement shall be reduced by the amount of each such Assignment and Assumption. Neither Lender nor any Co-Lender shall be responsible for the obligations of any other Co-Lender. Lender and each Co-Lender shall be liable to Borrower only for their respective proportionate shares of the Loan. If for any reason any of the Co-Lenders shall fail or refuse to abide by their obligations under this Agreement, Lender and the other Co-Lenders shall not be relieved of their obligations, if any, hereunder, including their obligations to make their pro rata share of any advance; notwithstanding the foregoing, Lender and the Co-Lenders shall have the right, but not the obligation, at their sole option, to make the defaulting Co- Lender's pro rata share of such advance pursuant to the Co-Lending Agreement.

(c)    Borrower agrees that it shall, in connection with any sale of all or any portion of the Loan, whether in whole or to an additional Co-Lender or Participant, within ten (10) Business Days after requested by Agent, furnish Agent with the certificates required under Sections 5.1.10 and 5.1.13 hereof and such other information as reasonably requested by any additional Co-Lender or Participant in performing its due diligence in connection with its purchase of an interest in the Loan.

(d)    Lender (or an Affiliate of Lender) shall act as administrative agent for itself and the Co-Lenders (together with any successor administrative agent, the "Agent") pursuant to this Section 9.7. Borrower acknowledges that Lender, as Agent, shall have the sole and exclusive authority to execute and perform this Agreement and each Loan Document on behalf of itself, as Lender and as agent for itself and the Co-Lenders subject to the terms of the Co-Lending Agreement. Lender acknowledges that Lender, as Agent, shall retain the exclusive right to grant approvals and give consents with respect to the operating budgets required to be delivered hereunder and with respect to matters concerning the establishment and administration of any Accounts. Except as otherwise provided herein, Borrower shall have no obligation to recognize or deal directly with any Co-Lender, and no Co-Lender shall have any right to deal directly with Borrower with respect to the rights, benefits and obligations of Borrower under this Agreement, the Loan Documents or any one or more documents or instruments in respect thereof. Borrower may rely conclusively on the actions of Lender as Agent to bind Lender and the

- 130 -

Co-Lenders, notwithstanding that the particular action in question may, pursuant to this Agreement or the Co-Lending Agreement be subject to the consent or direction of some or all of the Co-Lenders. Lender may resign as Agent of the Co-Lenders, in its sole discretion or if required to by the Co-Lenders in accordance with the term of the Co-Lending Agreement, in each case without the consent of Borrower. Upon any such resignation, a successor Agent shall be determined pursuant to the terms of the Co-Lending Agreement. The term Agent shall mean any successor Agent.

(e)    Notwithstanding any provision to the contrary in this Agreement, the Agent shall not have any duties or responsibilities except those expressly set forth herein (and in any other Loan Document and the Co-Lending Agreement) and no covenants, functions, responsibilities, duties, obligations or liabilities of Agent shall be implied by or inferred from this Agreement, the Co-Lending Agreement, or any other Loan Document, or otherwise exist against Agent.

(f)    Except to the extent its obligations hereunder and its interest in the Loan have been assigned pursuant to one or more Assignments and Assumption, Lender, as Agent, shall have the same rights and powers under this Agreement as any other Co-Lender and may exercise the same as though it were not Agent, respectively. The term "Co-Lender" or "Co-Lenders" shall, unless otherwise expressly indicated, include Lender in its individual capacity. Lender and the other Co-Lenders and their respective Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, Borrower, or any Affiliate of Borrower and any Person who may do business with or own securities of Borrower or any Affiliate of Borrower, all as if they were not serving in such capacities hereunder and without any duty to account therefor to each other.

(g)    If required by any Co-Lender, each Borrower hereby agrees to execute supplemental notes in the principal amount of such Co-Lender's pro rata share of the Loan substantially in the form of the Note, and such supplemental note shall (i) be payable to order of such Co-Lender, (ii) be dated as of the Closing Date (or, if requested by Lender, dated the date of assignment to such Co-Lender of such pro rata share), and (iii) mature on the Maturity Date. Such supplemental note shall provide that it evidences a portion of the existing Debt hereunder and under the Note and not any new or additional Debt of Borrower. In connection with any such supplemental note, Lender and each Co-Lender agree, at the request of Borrower, to surrender any previously delivered notes, provided that Borrower delivers replacement notes totaling the Maximum Loan Amount (less any prepayments of principal made prior to such date in accordance with the terms of this Agreement). The term "Note" as used in this Agreement and in all the other Loan Documents shall include all such supplemental notes.

(h)    Lender, as Agent, shall maintain at its domestic lending office or at such other location as Lender, as Agent, shall designate in writing to each Co-Lender and Borrower a copy of each Assignment and Assumption delivered to and accepted by it and a register for the recordation of the names and addresses of the Co-Lenders, the amount of each Co-Lender's proportionate share of the Loan and the name and address of each Co-Lender's agent for service of process (the "Register"). The entries in the Register

- 131 -

shall be conclusive and binding for all purposes, absent manifest error, and Borrower, Lender, as Agent, and the Co-Lenders may treat each Person whose name is recorded in the Register as a Co-Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection and copying by Borrower or any Co-Lender during normal business hours upon reasonable prior notice to the Agent. A Co-Lender may change its address and its agent for service of process upon written notice to Lender, as Agent, which notice shall only be effective upon actual receipt by Lender, as Agent, which receipt will be acknowledged by Lender, as Agent, upon request.

(i)     Notwithstanding anything herein to the contrary, any financial institution or other entity may be sold a participation interest in the Loan by Lender or any Co-Lender without Borrower's consent (such financial institution or entity, a "Participant") (x) if such sale is without novation and (y) if the other conditions set forth in this paragraph are met. No Participant shall be considered a Co-Lender hereunder or under the Note or the Loan Documents. No Participant shall have any rights under this Agreement, the Note or any of the Loan Documents and the Participant's rights in respect of such participation shall be solely against Lender or Co-Lender, as the case may be, as set forth in the participation agreement executed by and between Lender or Co-Lender, as the case may be, and such Participant. No participation shall relieve Lender or Co-Lender, as the case may be, from its obligations hereunder or under the Note or the Loan Documents and Lender or Co-Lender, as the case may be, shall remain solely responsible for the performance of its obligations hereunder.

(j)     Notwithstanding any other provision set forth in this Agreement, Lender or any Co-Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, amounts owing to it in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System), provided that no such security interest or the exercise by the secured party of any of its rights thereunder shall release Lender or Co-Lender from its funding obligations hereunder.

(k)     Notwithstanding any other provision of this Agreement, provided that no Event of Default has occurred and is continuing, Borrower shall have the right to require (a) any Co-Lender that is entitled to and has demanded compensation or other amounts pursuant to Sections 2.2.3(b), 2.2.3(c) or 2.2.8 hereof or (b) any Co-Lender that is a Defaulting Lender provided such Defaulting Lender has failed to cure the default as a result of which it has become a Defaulting Lender (and to the extent such default was a Lender Default, none of the other Co-Lenders have exercised their right to make the Defaulting Co-Lender's pro rata share of such advance pursuant to the Co-Lending Agreement) within ten (10) Business Days after Borrower's request that it cure such default (such Co-Lender under (a) or (b), an "Affected Co-Lender"), to assign in full its rights and obligations under this Agreement to one or more additional Co-Lenders designated by Borrower which (i) are reasonably acceptable to Lender and the other Co-Lenders, and (ii) which agree to assume all of such rights and obligations arising as of and after the date of the assumption (a "Replacement Co-Lender"), provided that (A) such assignment and assumption is otherwise in compliance with this Section 9.7, (B) Borrower pays any fees payable in connection with such assignment and (C) such

- 132 -

Affected Co-Lender receives payment in full of the principal amount of the Loan owing to such Affected Co-Lender, together with accrued and unpaid interest thereon to the date of such payment of principal and all other amounts payable to such Affected Co-Lender under this Agreement. Any rights of a Affected Co-Lender to indemnification hereunder shall survive as to such Affected Co-Lender.

9.7.3   <u>Cooperation in Syndication</u>.

(a)      Borrower and Sponsor agree to assist Lender in completing a Syndication satisfactory to Lender. Such assistance shall include (i) direct contact between senior management and advisors of Borrower and the proposed Co-Lenders, (ii) assistance in the preparation of a confidential information memorandum and other marketing materials to be used in connection with the Syndication, (iii) the hosting, with Lender, of one or more meetings of prospective Co-Lenders or with the Rating Agencies, (iv) the delivery of appraisals reasonably satisfactory to Lender if required, and (v) working with Lender to procure a rating for the Loan by the Rating Agencies.

(b)      Lender shall manage all aspects of the Syndication of the Loan, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocations of the commitments among the Co-Lenders and the amount and distribution of fees among the Co-Lenders. To assist Lender in its Syndication efforts, Borrower and Sponsor agree promptly to prepare and provide to Lender all information with respect to Borrower, Manager (if any), Developer (if any), Sponsor, Guarantor and the Property contemplated hereby, including all financial information and projections (the "Projections"), as Lender may reasonably request in connection with the Syndication of the Loan. Borrower hereby represents and covenants that (i) all information other than the Projections (the "Information") that has been or will be made available to Lender by Borrower or any of their representatives is or will be, when furnished, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available to Lender by Borrower or any of their representatives have been or will be prepared in good faith based upon reasonable assumptions. Borrower understands that in arranging and syndicating the Loan, Lender, the Co-Lenders and, if applicable, the Rating Agencies, may use and rely on the Information and Projections without independent verification thereof.

(c)      If required in connection with the Syndication, Borrower and Sponsor hereby agree to:

(i)      amend the Loan Documents to give Lender the right, at Borrower's sole cost and expense, to have the Property reappraised on an annual basis;

(ii)      deliver updated financial and operating statements and other information reasonably required by Lender to facilitate the Syndication;

- 133 -

(iii)    deliver reliance letters reasonably satisfactory to Lender with respect to the environmental assessments and reports delivered to Lender prior to the Closing Date, which will run to Lender and its successors and assigns; and

(iv)    execute modifications to the Loan Documents reasonably required by the Co- Lenders, provided that such modification will not (except as set forth in (v) and (vi) below) change any material or economic terms of the Loan Documents, or otherwise materially increase the obligations or materially decrease the rights of Borrower pursuant to the Loan Documents;

(v)    if Lender elects, in its sole discretion, prior to or upon a Syndication, to split the Loan into two or more parts, or the Note into multiple component notes or tranches which may have different interest rates, principal amounts and payment priorities, Borrower agrees to cooperate with Lender in connection with the foregoing and to execute the required modifications and amendments to the Note, this Agreement and the Loan Documents and to provide opinions necessary to effectuate the same. Such Notes or components may be assigned different interest rates, so long as the initial weighted average spread of such interest rates does not exceed the Applicable Interest Rate; provided, however, that nothing in this subsection (v) shall limit Lender's right to apply (A) mandatory or involuntary prepayments to the Debt in such order as Lender determines in its sole discretion and (B) payments to the Debt in such order as Lender determines in its sole discretion during the continuance of an Event of Default, it being agreed that the weighted average interest rate spreads described above may subsequently change only as a result of a payment or application of principal made (x) in connection with a mandatory or involuntary prepayment and/or (y) during the continuance of an Event of Default. Notwithstanding anything to the contrary contained in this subsection (v), provided no Event of Default exists, all voluntary prepayments made pursuant to Section 2.3.1 above shall be applied pro rata among each component; and

(vi)    execute modifications to the Loan Documents changing the interest rate for the Loan, provided that the initial weighted average of the interest rate spreads for the Loan and the Mezzanine Loan after such modification shall not exceed the weighted average of the interest rate spreads for the Loan and the Mezzanine Loan immediately prior to such modification; provided, however, that nothing in this subsection (vi) shall limit Lender's right to apply (A) mandatory or involuntary prepayments to the Debt in such order as Lender determines in its sole discretion and (B) payments to the Debt in such order as Lender determines in its sole discretion during the continuance of an Event of Default, it being agreed that the weighted average interest rate spreads described above may subsequently change only as a result of a payment or application of principal made (x) in connection with a mandatory or involuntary prepayment and/or (y) during the continuance of an Event of Default. The Borrower shall also provide opinions reasonably necessary to effectuate the same. Notwithstanding anything to the contrary contained in this subsection (vi), all voluntary prepayments under

[TPW: NYLEGAL:618631.13] 16248-00758 06/06/2007 12:51 AM

the Loan shall require a corresponding pro rata voluntary prepayment under the Mezzanine Loan.

All reasonable third party costs and expenses incurred by Lender or Borrower or Sponsor in connection with Borrower's or Sponsor's complying with requests made under this Section 9.7.3 shall be paid by Borrower and Sponsor.

9.7.4    Payment of Agent's, and Co-Lender's Expenses, Indemnity, etc.

Borrower and Sponsor shall:

(a)    whether or not the transactions contemplated in this Section 9.7 are consummated, pay all reasonable out-of-pocket costs and expenses (A) of Agent's counsel fees and expenses relating to the negotiation, preparation, execution and delivery of the Note, this Agreement, the Security Instrument, and the other Loan Documents and the documents and instruments referred to therein, the creation, perfection or protection of Lender's and Co-Lender's liens on the Property (including, without limitation, fees and expenses for title insurance, property inspections, appraisals, if required for Syndication, surveys, lien searches, filing and recording fees, and escrow fees and expenses), and any amendment, waiver or consent relating to any of the Loan Documents including releases (but the Co-Lenders shall pay their own respective counsel fees) and (B) of Agent and Co-Lenders in connection with the preservation of rights under, any amendment, waiver or consent relating to, and enforcement of, the Loan Documents and the documents and instruments referred to therein or in connection with any restructuring or rescheduling of the Obligations (including, without limitation, the reasonable fees and disbursements of counsel for Agent)(but the Co-Lenders shall pay their own respective counsel fees);

(b)    pay, and hold Agent and each Co-Lender harmless from and against, any and all present and future stamp, excise and other similar taxes with respect to the foregoing matters and hold Agent and each Co-Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to Agent or such Co-Lender) to pay such taxes; and

(c)    indemnify Agent, (in its capacity as Lender and as Agent), and each Co-Lender, its officers, directors, employees, representatives and agents and any persons or entities owned or Controlled by, owning or Controlling, or under common Control or Affiliated with Agent, Agent, or each Co-Lender (each an "Indemnitee") from, and hold each of them harmless against, any and all liabilities, claims, damages (but not special, consequential or punitive damages), losses (other than diminution in value), expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitee in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnitee shall be designated a party thereto) that may at any time (including, without limitation, at any time following the payment of the Obligations) be imposed on, asserted against or incurred by any Indemnitee as a result of, or arising in any manner out of, or in any way

- 135 -

related to or by reason of, (i) the execution, delivery or performance of any Loan Document by Borrower, (ii) the breach of any of Borrower's representations and warranties or of any of Borrower's Obligations, (iii) a default under Section 5.2.8 hereof, including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA, the Code, any State statute or other similar law that may be required, and (iv) the exercise by Agent and the Co-Lenders of their rights and remedies (including, without limitation, foreclosure) under any Loan Documents, but excluding, as to any Indemnitee, any such losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements to the extent incurred by reason of the gross negligence or willful misconduct of such Indemnitee as finally determined by a court of competent jurisdiction (collectively, "Indemnified Liabilities"). Borrower and Sponsor further agree that, without Agent's or the Co-Lenders' prior written consent, it will not enter into any settlement of a lawsuit, claim or other proceeding arising or relating to any Indemnified Liability unless such settlement includes an explicit and unconditional release from the party bringing such lawsuit, claim or other proceeding of each Indemnitee. Borrower's and Sponsor's obligations under this Section shall survive the termination of this Agreement and the payment of the Obligations. Borrower and Sponsor shall have the right to undertake, conduct and control through counsel of its own choosing (which counsel shall be acceptable to the Indemnitee acting reasonably), the conduct and settlement of the Indemnified Liabilities, and the Indemnitee shall cooperate with Borrower and Sponsor in connection therewith; provided that Borrower and Sponsor shall permit the Indemnitee to participate in such conduct and settlement through counsel chosen by the Indemnitee, but reasonable fees and expenses of such counsel shall be borne by the Indemnitee. Notwithstanding the foregoing, the Indemnitee shall have the right to employ its own counsel, and the reasonable fees and expenses of such counsel shall be at Borrower's and Sponsor's cost and expense if the Indemnitee reasonably determines that (i) Borrower's and Sponsor's counsel is not adequately defending any claim or proceeding in a manner reasonably acceptable to Indemnitee or (ii) the interests of Borrower and the Indemnitee have become adverse in any such claim or course of action; provided, however Borrower, in such event, shall only be liable for the reasonable legal expenses of one counsel for all such Indemnitees. None of Borrower, Sponsor nor any Indemnitee shall be liable for any settlement of any Indemnified Liability effected without its prior written consent, such consent not to be unreasonably withheld. No Indemnitee shall be liable for any indirect damages, consequential damages, punitive damages or damages based on diminution in value or lost revenues, in connection with its activities related to the Loan, the Securitization or the Syndication.

9.7.5    Limitation of Liability.

No claim may be made by Borrower, or any other Person against Agent, or any Co-Lenders or the Affiliates, directors, officers, employees, attorneys or agent of any of such Persons for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection therewith;

- 136 -

and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

### 9.7.6   No Joint Venture.

Notwithstanding anything to the contrary herein contained, neither Agent, nor any Co-Lender by entering into this Agreement or by taking any action pursuant hereto, will be deemed a partner or joint venturer with Borrower.

### 9.7.7   Voting Rights of Co-Lenders.

Borrower acknowledges that the Co-Lending Agreement may contain provisions which require that amendments, waivers, extensions, modifications, and other decisions with respect to the Loan Documents shall require the approval of all or a number of the Co-Lenders holding in the aggregate a specified percentage of the Loan or any one or more Co-Lenders that are specifically affected by such amendment, waiver, extension, modification or other decision.

### Section 9.8   Reallocation of Loan Amounts.

Lender, without in any way limiting its other rights hereunder, in its sole and absolute discretion, shall have the right, at any time prior to a Securitization or a Syndication, to reallocate the amount of the Loan and the Mezzanine Loan and/or adjust the interest rate rates thereon provided that (i) the aggregate principal amount of the Loan and the Mezzanine Loan immediately following such reallocation shall equal the outstanding principal balance of the Loan and the Mezzanine Loan immediately prior to such reallocation, (ii) the initial weighted average interest rate of the Note and the Mezzanine Note immediately following such reallocation shall equal the weighted average interest rate which was applicable to the Note and the Mezzanine Note immediately prior to such reallocation and (iii) Mezzanine Lender has agreed to the allocation as required by Lender; provided, however, that nothing in this subsection shall limit Lender's right to apply (i) mandatory or involuntary prepayments to the Debt in such order as Lender determines in its sole discretion and (ii) payments to the Debt in such order as Lender determines in its sole discretion during the continuance of an Event of Default, it being agreed that the weighted average interest rate spreads described above may subsequently change only as a result of a payment or application of principal made (x) in connection with a mandatory or involuntary prepayment and/or (y) during the continuance of an Event of Default. Borrower shall cooperate with all reasonable requests of Lender in order to reallocate the amount of the Loan and the Mezzanine Loan and shall execute and deliver such documents as shall reasonably be required by Lender in connection therewith, including, without limitation, amendments to the Loan Documents and the Mezzanine Loan Documents, and endorsements to the Title Policy and the UCC title insurance policy, all in form and substance reasonably satisfactory to Lender, and Borrower shall pay all costs and expenses in connection such reallocation pursuant to this Section, including, without limitation, any additional title insurance and UCC insurance premiums and any additional mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any amendments of the Loan Documents or the Mezzanine Loan Documents in

- 137 -

connection with the reallocation, provided that such costs and expenses shall not exceed $50,000.00 in the aggregate.

**Section 9.9**    Intentionally Omitted.

**Section 9.10**    Intercreditor Agreement.

Lender and Mezzanine Lender are parties to a certain intercreditor agreement dated as of the date hereof (the "Intercreditor Agreement") memorializing their relative rights and obligations with respect to the Loan, the Mezzanine Loan, Borrower, the Mezzanine Borrower and the Property. Borrower and each Mezzanine Borrower hereby acknowledge and agree that (i) such Intercreditor Agreement is intended solely for the benefit of Lender and Mezzanine Lender and (ii) Borrower and Mezzanine Borrower are not intended third-party beneficiaries of any of the provisions therein and shall not be entitled to rely on any of the provisions contained therein. Lender and Mezzanine Lender shall have no obligation to disclose to Borrower the contents of the Intercreditor Agreement. Borrower's obligations hereunder are independent of such Intercreditor Agreement and remain unmodified by the terms and provisions thereof.

## X.    CASH MANAGEMENT

**Section 10.1**    Establishment of Accounts.

(a)    Not less than ten (10) Business Days prior to Borrower's receipt of any Rents or other Gross Income from Operations in the form of Cash, (i) establish, and hereby covenants to maintain, an account (the "Property Account") with Property Account Bank into which Borrower shall deposit, or cause to be deposited, all Gross Income from Operations and forfeited Security Deposits, and (ii) execute an agreement with Lender and the Property Account Bank providing for the control of the Property Account by Lender in form and substance reasonably acceptable to Lender (the "Property Account Agreement").

(b)    In connection with the establishment of the Property Account, Lender shall establish an account with the Lockbox Account Bank (the "Lockbox Account") into which Borrower shall deposit or cause to be deposited all sums or deposits in the Property Account in accordance with Section 10.2 hereof and Lender shall cause the Lockbox Bank to establish the following Accounts (which may be book entry sub-accounts) into which amounts in the Property Account shall be deposited or allocated:

(i)    An account with Lockbox Bank into which Borrower shall deposit, or cause to be deposited, the Monthly Tax Deposit (the "Tax Account");

(ii)    An account with Lockbox Bank into which Borrower shall deposit, or cause to be deposited, the Monthly Insurance Premium Deposit (the "Insurance Premium Account");

(iii)    An account with Lockbox Bank into which Borrower shall deposit, or cause to be deposited, the Monthly Debt Service Payment Amount (the "Debt Service Account");

- 138 -

(iv)    Reserved;

(v)    An account with Lockbox Bank into which Borrower shall deposit, or cause to be deposited, the Monthly Mezzanine Debt Service Payment Amount (the "Mezzanine Loan Account").

(c)    In the event Lender waives the requirement for Borrower to maintain the Property Account and the Lockbox Account, Lender hereby consents to the Mezzanine Borrower establishing and maintaining a Property Account and Lockbox Account with Mezzanine Lender that would operate as provided in this Article 10.

### Section 10.2    Deposits into Lockbox Account.

(a)    Borrower represents, warrants and covenants that (i) Borrower shall, or shall cause any Manager to, immediately deposit all Gross Income from Operations and forfeited Security Deposits into the Property Account, (ii) Borrower shall send a notice, substantially in the form of Exhibit F, to all tenants now (if any) or hereafter occupying space at the Property directing them to pay all Rents (including, without limitation, all Lease Termination Payments) and other sums due under the Lease to which they are a party into the Property Account, (iii) other than the Accounts, there shall be no other accounts maintained by Borrower or any other Person into which revenues from the ownership and operation of the Property is deposited, and (iv) neither Borrower nor any other Person shall open any other such account with respect to the deposit of income in connection with the Property.  Until deposited into the Property Account, any Gross Income from Operations from the Property and forfeited Security Deposits held by Borrower shall be deemed to be Collateral and shall be held in trust by it for the benefit, and as the property, of Lender and shall not be commingled with any other funds or property of Borrower.

(b)    Borrower, or Lender on behalf of Borrower, shall direct the Property Account Bank to transfer, on each Business Day, all funds on deposit in the Property Account to the Lockbox Account.

(c)    Borrower warrants and covenants that it shall not rescind, withdraw or change any notices or instructions required to be sent by it pursuant to this Section 10.2 without Lender's prior written consent.

### Section 10.3    Account Name.

(a)    Subject to subsection (b) below, the Accounts (other than the Property Account) shall each be in the name of Lender.

(b)    In the event Lender transfers or assigns the Loan, Borrower acknowledges that the Property Account Bank and Lockbox Bank, at Lender's request, shall change the name of each Account to the name of the transferee or assignee.  In the event Lender retains a servicer to service the Loan, Borrower acknowledges that the Property Account Bank and Lockbox Bank, at Lender's request, shall change the name of each account to the name of the servicer, as agent for Lender.

- 139 -

**Section 10.4    Eligible Accounts**.

Each Account shall at all times be maintained as an Eligible Account.

**Section 10.5    Permitted Investments**.

Sums on deposit in any Account other than the Property Account may be invested in Permitted Investments provided (i) such investments are then regularly offered by Lockbox Bank for accounts of this size, category and type, (ii) such investments are permitted by Applicable Law, (iii) the maturity date of the Permitted Investment is not later than the date on which sums in the applicable Account are anticipated by Lender to be required for payment of an obligation for which such Account was created, and (iv) no Event of Default shall have occurred and be continuing. Except as may be provided otherwise in Article 7 hereof, all income earned from Permitted Investments shall be the property of Borrower. Borrower hereby irrevocably authorizes and directs Lockbox Bank, to hold any income earned from Permitted Investments as part of the Accounts. Borrower shall be responsible for payment of any federal, State or local income or other tax applicable to income earned from Permitted Investments. No other investments of the sums on deposit in the Accounts shall be permitted except as set forth in this Section 10.5. Lender shall not be liable for any loss sustained on the investment of any funds constituting the Reserve Funds or of any funds deposited in the related Accounts.

**Section 10.6    The Initial Deposits**.

Lender shall determine, in its reasonable discretion, the initial deposit amounts (the "Initial Deposits"), if any, required to be deposited in each of the Tax Account and the Insurance Premium Account, and Borrower shall cause to be deposited the respective Initial Deposits into each such Account.

**Section 10.7    Transfer To and Disbursements from the Lockbox Account**.

(a)    Bank shall withdraw all funds on deposit in the Lockbox Account on the date immediately preceding each Payment Date (and if such day is not a Business Day then the preceding day which is a Business Day),

(b)    Lockbox Bank shall disburse the funds in the Lockbox Account in the following order of priority:

(i)    Intentionally omitted;

(ii)    First, funds sufficient to pay the Monthly Tax Deposit shall be deposited in the Tax Account;

(iii)    Second, funds sufficient to pay the Monthly Insurance Premium Deposit shall be deposited in the Insurance Premium Account;

(iv)    Third, funds sufficient to pay the Monthly Debt Service Payment Amount shall be deposited into the Debt Service Account to be applied to the payment of accrued and unpaid interest computed at the Applicable Interest Rate;

- 140 -

(v)    Fourth, funds sufficient to pay any interest accruing at the Default Rate, and late payment charges, if any, shall be deposited in the Debt Service Account;

(vi)    Fifth, to the payment of Lockbox Bank for fees and expenses incurred in connection with this Agreement and the accounts established hereunder;

(vii)    Sixth, to the payment of the Servicing Fee (if such Servicing Fee is due); and

(viii)    Seventh, to the extent available, funds sufficient to pay (A) the Monthly Mezzanine Debt Service Payment Amount and (B) any Net Liquidation Proceeds After Debt Service, shall be deposited into the Mezzanine Loan Account to be applied in accordance with the Mezzanine Loan Agreement; and

(ix)    Eighth, provided no Event of Default shall exist under the Loan Documents, all amounts remaining in the Lockbox Account after deposits for items (i) through (viii) for the current month and all prior months shall be disbursed (A) if Lender has received written notice from Mezzanine Lender that a Mezzanine Default has occurred and is continuing, to an account designated by Mezzanine Lender or (B) to Borrower.

**Section 10.8**    Withdrawals From the Tax Account and the Insurance Premium Account.

So long as no Event of Default then exists and further provided (except during any period of time in which Lender in good faith has reason to believe that the Borrower or the Property may be involved in a bankruptcy, insolvency or similar proceeding affecting creditors' rights) Lender and/or Lockbox Bank is not prohibited from doing so by applicable laws, rules or regulations, Lender or Lockbox Bank shall withdraw funds from time to time (i) from the Tax Account to pay Taxes on or before the date such Taxes are due and payable and (ii) from the Insurance Premium Account from time to time to pay Insurance Premiums on or before the date Insurance Premiums are due and payable. Lockbox Bank shall disburse funds from the Tax Account and the Insurance Premium Account in accordance with Lender's written request therefor on the Business Day following Lockbox Bank's receipt of such written request.

**Section 10.9**    Withdrawals from the Debt Service Account.

Lender shall have the right to withdraw funds from the Debt Service Account to pay the Monthly Debt Service Payment Amount on or after the date when due, together with any late payment charges or interest accruing at the Default Rate; provided, however, provided the Debt Service Account contains sufficient funds and provided Lender is not prohibited from doing so by applicable laws, rules or regulations, it shall not be an Event of Default (and no late charge or default interest shall be due in connection therewith) in the event Lender fails to withdraw such funds on or prior to the date any Monthly Debt Service Payment Amount is due.

**Section 10.10**    Withdrawals from the Mezzanine Account.

- 141 -

Lender shall withdraw funds from the Mezzanine Loan Account to pay the Monthly Mezzanine Debt Service Payment Amount by the date and time when due, together with any late payment charges or interest accruing pursuant to the Mezzanine Loan Documents.

**Section 10.11** Sole Dominion and Control.

Borrower acknowledges and agrees that the Accounts are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, including Property Account Bank and Lockbox Bank, subject to the terms hereof; and Borrower shall have no right of withdrawal with respect to any Account except with the prior written consent of Lender or as otherwise provided herein.

**Section 10.12** Security Interest.

Borrower hereby grants to Lender a first priority security interest in each of the Accounts and the Account Collateral as additional security for the Debt.

**Section 10.13** Rights on Default.

Notwithstanding anything to the contrary in this Article 10, upon the occurrence and during the continuance of an Event of Default, Lender shall promptly notify Property Account Bank and Lockbox Bank in writing of such Event of Default and, without notice from Property Account Bank, Lockbox Bank or Lender, (a) Borrower shall have no further right (to the extent Borrower had such right under the Loan Documents) to instruct Lockbox Bank and/or Property Account Bank to make any transfer from, make any decisions with respect to or otherwise exercise any control of) the Accounts during the continuance of such Event of Default(s), (b) Lender may direct Lockbox Account to liquidate and transfer any amounts then invested in Permitted Investments to the Accounts or reinvest such amounts in other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or pursuant to the other Loan Documents or to enable Lockbox Bank, as agent for Lender, or Lender to exercise and enforce Lender's rights and remedies hereunder or under any other Loan Document with respect to any Account or any Account Collateral, and (c) Lender shall have all rights and remedies with respect to the Accounts and the amounts on deposit therein and the Account Collateral as described in this Agreement and in the Security Instrument, in addition to all of the rights and remedies available to a secured party under the UCC, and, notwithstanding anything to the contrary contained in this Agreement or in the Security Instrument, Lender may apply the amounts of such Accounts as Lender determines in its sole discretion including, but not limited to, payment of the Debt.

**Section 10.14** Financing Statement; Further Assurances.

Borrower hereby authorizes Lender to file, and upon Lender's request, shall deliver to Lender for filing, a financing statement or statements under the UCC in connection with any of the Accounts and the Account Collateral with respect thereto in the form required to properly perfect Lender's security interest therein. Borrower agrees that at any time and from time to time, at the reasonable expense of Borrower, Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Lender may request, in order to perfect and protect any security interest granted

- 142 -

or purported to be granted hereby (including, without limitation, any security interest in and to any Permitted Investments) or to enable Lockbox Bank or Lender to exercise and enforce its rights and remedies hereunder with respect to any Account or Account Collateral.

**Section 10.15** Borrower's Obligation Not Affected.

The insufficiency of funds on deposit in the Accounts shall not absolve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

**Section 10.16** Payments Received Under this Agreement.

Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, and provided no Event of Default has occurred and is continuing, Borrower's obligations with respect to the monthly payment of Debt Service and amounts due for the Tax and Insurance Escrow Fund and any other payment reserves established pursuant to this Agreement or any other Loan Document shall (provided Lender is not prohibited from withdrawing or applying any funds in the Accounts by Applicable Law or otherwise) be deemed satisfied to the extent sufficient amounts are deposited in the Lockbox Account established pursuant to this Agreement to satisfy such obligations on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.

**Section 10.17** Deposit Accounts.

(a)    This Agreement and the Property Account Agreement when executed would create valid and continuing security interests (as defined in the UCC) in the Property Account and the Lockbox Account in favor of Lender, which security interests would be prior to all other Liens and are enforceable as such against creditors of and purchasers from Borrower;

(b)    Borrower and Lender agree that the Property Account is and shall be maintained (i) as a "deposit account" (as such term is defined in Section 9-102(a)(29) of the UCC), (ii) in such a manner that Lender shall have control (within the meaning of Section 9-104(a)(2) of the UCC) over the Property Account and (iii) such that neither Borrower nor any Manager shall have any right of withdrawal from the Property Account and no Account Collateral shall be released to Borrower or any Manager from the Property Account.   Without limiting Borrower's obligations under the immediately preceding sentence, Borrower shall only establish and maintain the Property Account with a financial institution that has executed an agreement substantially in the form of the Property Account Agreement or in such other form reasonably acceptable to Lender.

(c)    Borrower and Lender agree that each Account other than the Property Account is and shall be maintained (i) as a "securities account" (as such term is defined in Section 8-501(a) of the UCC), (ii) in such a manner that Lender shall have control (within the meaning of Section 8-106(d)(2) of the UCC) over each such Account, (iii) such that neither Borrower nor any Manager shall have any right of withdrawal from such Accounts and, except as provided herein, no Account Collateral shall be released to

- 143 -

Borrower from such Accounts, (iv) in such a manner that the Lockbox Bank shall agree to treat all property credited to such Account as "financial assets" and (v) such that all securities or other property underlying any financial assets credited to such Accounts shall be registered in the name of Lockbox Bank, indorsed to Lockbox Bank or in blank or credited to another securities account maintained in the name of Lockbox Bank and in no case will any financial asset credited to any such Accounts be registered in the name of Borrower, payable to the order of Borrower or specially indorsed to Borrower except to the extent the foregoing have been specially indorsed to Lockbox Bank or in blank;

(d)    Borrower owns and has good and marketable title to the Property Account and the Lockbox Account free and clear of any Lien or claim of any Person except the Lien and claims of Lender created under the Loan Documents, the Property Account Agreement and the agreements described in clause (e) below in connection with the Loan;

(e)    Borrower has delivered to Lender fully executed agreements pursuant to which the banks maintaining the Property Account and the Lockbox Account have agreed to comply with all instructions originated by Lender directing disposition of the funds in such accounts without further consent by Borrower;

(f)    Other than the security interest granted to Lender pursuant to this Agreement, the other Loan Documents, the Property Account Agreement and the agreements described in clause (e) above, Borrower has not pledged, assigned, or sold, granted a security interest in, or otherwise conveyed any of the Property Account or the Lockbox Account; and

(g)    The Property Account and the Lockbox Account are not in the name of any Person other than Borrower or Lender.  Borrower has not consented to the banks maintaining the Lockbox Account or the Property Account, to comply with instructions of any Person other than Lender.

**Section 10.18** Intentionally Omitted.

**Section 10.19** Lender Reliance.

Lender shall have no duty to confirm, inquire or determine whether a Mezzanine Default has occurred.  Lender may rely on any notice it believes in good faith to be genuine and given by Mezzanine Lender.

**Section 10.20** Borrower Distributions.

All transfers of Borrower's funds from the Lockbox Account or other sources to or for the benefit of the Mezzanine Lender pursuant to this Agreement or any of the other Loan Documents are intended by Borrower to constitute and shall constitute distributions from the Borrower to the Mezzanine Borrower, and must comply with the requirements as to distributions of the Delaware Limited Liability Company Act.  No provision of the Loan Documents shall create a debtor-creditor relationship between the Borrower and the Mezzanine Lender.

## XI.    MISCELLANEOUS

### Section 11.1    Survival.

This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

### Section 11.2    Lender's Discretion.

Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

### Section 11.3    Governing Law.

(a)    THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT ENTERED INTO PURSUANT TO THE LAWS OF THE STATE OF NEW YORK AND SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS), PROVIDED HOWEVER, THAT WITH RESPECT TO THE CREATION, PERFECTION, PRIORITY AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED BY THIS AGREEMENT, THE SECURITY INSTRUMENT AND THE OTHER LOAN DOCUMENTS, AND THE DETERMINATION OF DEFICIENCY JUDGMENTS, THE LAWS OF THE STATE WHERE THE PROPERTY IS LOCATED SHALL APPLY.

(b)    WITH RESPECT TO ANY CLAIM OR ACTION ARISING HEREUNDER OR UNDER THIS AGREEMENT, THE NOTE, OR THE OTHER LOAN DOCUMENTS, EACH PARTY HERETO (A) IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK, NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF, AND (B) IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING ON VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS BROUGHT IN ANY SUCH COURT, IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH

- 145 -

SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING IN THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS INSTRUMENT WILL BE DEEMED TO PRECLUDE LENDER FROM BRINGING AN ACTION OR PROCEEDING WITH RESPECT HERETO IN ANY OTHER JURISDICTION.

**Section 11.4**    Modification, Waiver in Writing.

No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 11.5**    Delay Not a Waiver.

Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 11.6**    Notices.

All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person or by facsimile transmission with receipt acknowledged by the recipient thereof and confirmed by telephone by sender, (ii) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U. S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Borrower: | Fontainebleau Las Vegas Retail, LLC |
| | 2827 Paradise Rd. |
| | Las Vegas, NV 89109 |
| | Attention: Jim Freeman |
| | Phone: (702) 495-8220 |
| | Fax: (702) 495-8011 |

- 146 -

With a copy to:     Fontainebleau Las Vegas Retail, LLC
19950 West Country Club Drive
Aventura, FL  33180
Attn:  Eric Salzinger
Phone: (305) 682-4204
Fax: (305) 682-4205


With an additional copy to:  Fontainebleau Las Vegas Retail, LLC
2827 Paradise Rd.
Las Vegas, NV 89109
Attn:  General Counsel
Phone: (702) 495-8108
Fax: (702) 495-8112

If to Lender / Agent:   Lehman Brothers Holdings Inc.
c/o Lehman Brothers Holdings
399 Park Avenue
New York, New York 10022
Attention:  Josh Freedman
Facsimile No.:  (212) 713-1278


With a copy to:     Lehman Brothers Holdings Inc.
c/o Lehman Brothers Holdings
399 Park Avenue
New York, New York 10022
Attention:  Gary Taylor
Facsimile No.:  (646) 758-2256


         and

        Thacher Proffitt & Wood
Two World Financial Center
New York, New York  10281
Attention:  Mitchell G. Williams, Esq.
Facsimile No.:  (212) 912-7751

or addressed as such party may from time to time designate by written notice to the other parties.

   Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

   **Section 11.7** Trial by Jury.

   EACH PARTY HERETO HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR

[TPW: NYLEGAL:618631.13] 16248-00758  06/06/2007 12:51 AM

HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTY.

**Section 11.8**   Headings.

The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 11.9**   Severability.

Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 11.10** Preferences.

Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder.  To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, State or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 11.11** Waiver of Notice.

Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 11.12** Remedies of Borrower.

- 148 -

In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

**Section 11.13** Expenses; Indemnity.

(a)    Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Lender within five (5) Business Days of receipt of written notice from Lender for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property); (ii) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date (after the expiration of all applicable notice, grace and cure periods, if any,) including, without limitation, confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Borrower; (iv) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement (after the expiration of all applicable notice, grace and cure periods, if any); (v) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (vi) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan to the extent Lender is entitled to do so hereunder; and (vii) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property (after the expiration of all applicable notice, grace and cure periods, if any) or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender. Any cost and expenses due and payable to Lender (after the expiration of all applicable notice, grace and cure periods, if any) may be paid from any amounts in the Lockbox Account.

- 149 -

(b)    Borrower shall indemnify, defend and hold harmless Lender from and against any and all other liabilities, obligations, damages (but not special, consequential or punitive damages), losses (other than diminution in value), penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Lender in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto), that are imposed on, incurred by, or asserted against Lender in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "Additional Indemnified Liabilities"); provided, however, that Borrower shall not have any obligation to Lender hereunder to the extent that such Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Lender.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under Applicable Law to the payment and satisfaction of all Additional Indemnified Liabilities incurred by Lender.

(c)    Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless Lender and the Indemnified Parties from and against any and all losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA, the Code, any State statute or other similar law that may be reasonably required) that Lender may incur, directly or indirectly, as a result of a default under Sections 4.1.8 or 5.2.8 hereof.

(d)    Borrower covenants and agrees to pay for or, if Borrower fails to pay, to reimburse Lender for, (i) any fees and expenses incurred by any Rating Agency in connection with any Rating Agency review of the Loan, the Loan Documents or any transaction contemplated thereby or (ii) any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of this Agreement or any other Loan Document and Lender shall be entitled to require payment of such fees and expenses as a condition precedent to the obtaining of any such consent, approval, waiver or confirmation.

**Section 11.14** Schedules and Exhibits Incorporated.

The Schedules and Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 11.15** Offsets, Counterclaims and Defenses.

Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such

- 150 -

documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 11.16** No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)    Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)    This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

**Section 11.17** Publicity.

All news releases, publicity or advertising by Borrower or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender, Lehman, or any of their Affiliates shall be subject to the prior written approval of Lender, which shall not be unreasonably withheld. Notwithstanding the foregoing, disclosure required by any federal or State securities laws, rules or regulations, as determined by Borrower's counsel, shall not be subject to the prior written approval of Lender.

**Section 11.18** Waiver of Marshalling of Assets.

To the fullest extent permitted by Applicable Law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, or to a sale in inverse order of alienation in the event of foreclosure of all or part of the Security Instrument, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or

[TPW: NYLEGAL:618631.13] 16248-00758 06/06/2007 12:51 AM

of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

### Section 11.19  Waiver of Counterclaim.

Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

### Section 11.20  Conflict; Construction of Documents; Reliance.

In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents (including, but not limited to, the Master Disbursement Agreement), the provisions of this Agreement shall control unless otherwise expressly provided herein.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

### Section 11.21  Brokers and Financial Advisors.

Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.  Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein.  The provisions of this Section 11.21 shall survive the expiration and termination of this Agreement and the payment of the Debt.

### Section 11.22  Nature of Inspection and Approvals.

Upon reasonable prior notice, Lender shall at its option have the right to make inspection of the Project, and to approve, among other things the Plans and Specifications, the Survey, and the Construction Documents.  No right of inspection or approval contained herein shall be deemed to impose upon Lender any duty or obligation whatsoever to undertake any inspection or to make any approval.  No inspection made or approval given by Lender shall be deemed to impose upon Lender any duty or obligation whatsoever to correct any defects in the Future

Improvements or to notify any person with respect thereto, and provided further that no liability shall be imposed upon Lender, and no warranties construed to arise by reason of any inspection of the Project or approval by Lender, its agents, employees or representatives, any such inspections and approvals being made solely for the benefit of Lender.  All conditions precedent to the obligation of Lender to make any disbursement are imposed hereby solely for the benefit of Lender, and no other party may require satisfaction of any such condition precedent or be entitled to assume that Lender will refuse to make any disbursement in the absence of strict compliance with such conditions precedent.  Any requirement of this Agreement obligating Borrower or any of its Affiliates may be waived, in whole or in part, in a specific written waiver intended for the purpose and signed by Lender.  Lender shall have the right to approve and verify the periodic progress, costs incurred by Borrower, and the estimated costs remaining to be incurred, after consultation with the Construction Consultant.  No disbursement shall constitute an approval or acceptance by Lender of any construction work, a waiver of any condition precedent to any further disbursement, or preclude Lender from thereafter declaring the failure of Borrower to satisfy such condition precedent to be an Event of Default.  No waiver by Lender of any condition precedent or obligation to funding a disbursement of the Loan proceeds shall preclude Lender from requiring such condition or obligation to be met prior to making any future disbursement.

**Section 11.23** Prior Agreements.

This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, between Borrower and/or its Affiliates and Lender are superseded by the terms of this Agreement and the other Loan Documents.

[NO FURTHER TEXT ON THIS PAGE]

[TPW: NYLEGAL:618631.13] 16248-00758 06/06/2007 12:51 AM

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

FOUNTAINEBLEAU LAS VEGAS RETAIL, LLC, a Delaware limited liability company

By:    Fontainebleau Las Vegas Retail Mezzanine, LLC, a Delaware limited liability company, its managing member

    By:    Fontainebleau Las Vegas Retail Parent, LLC, a Delaware limited liability company, its managing member

        By:    Fontainebleau Resort Holdings, LLC, a Delaware limited liability company, its managing member

            By:    Fontainebleau Resorts, LLC, a Delaware limited liability company, its managing member

            By: _____
Name: Jeffrey Soffer
Title: Executive Chairman

LOAN AGREEMENT

WITH RESPECT TO SECTIONS 9.1, 9.2, 9.7.3 and 9.7.4 and 9.9 ONLY

FONTAINEBLEAU RESORTS, LLC, a Delaware limited liability company

By: _____

Name: *Jeffrey Soffer*

Title: *Executive Chairman*

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, individually as a Co-Lender and as Agent for one or more Co-Lenders

By: _____

Name:  Charlene Thomas
Title:  Authorized Signatory

# FIRST AMENDMENT TO LOAN AGREEMENT AND OTHER LOAN DOCUMENTS

Dated as of September 9, 2007

Between

## FONTAINEBLEAU LAS VEGAS RETAIL, LLC
as Borrower

and

## LEHMAN BROTHERS HOLDINGS INC.
individually and as Agent for one or more Co-Lenders,
as Lender

[TPW: NYLEGAL:699566.7] 16248-00758 09/14/2007 03:15 PM

## FIRST AMENDMENT TO LOAN AGREEMENT AND OTHER LOAN DOCUMENTS

THIS FIRST AMENDMENT TO LOAN AGREEMENT AND OTHER LOAN DOCUMENTS (this "**Amendment**"), dated as of September 9, 2007 between **FONTAINEBLEAU LAS VEGAS RETAIL, LLC.**, a Delaware limited liability company, having its principal place of business at 2827 Paradise Road, Las Vegas, Nevada 89109 ("**Borrower**") and **LEHMAN BROTHERS HOLDINGS INC.,** a Delaware corporation, having an address at 399 Park Avenue, 8th Floor, New York, New York 10022, individually as lender and as Agent for one or more Co-Lenders (together with its successors and assigns, "**Lender**").

## W I T N E S S E T H:

**WHEREAS**, Lender made a loan in the maximum principal amount of $315,000,000 (the "**Loan**") to Borrower pursuant to the terms and conditions of that certain Loan Agreement, dated as of June 6, 2007 (as heretofore and hereafter amended, modified or extended, collectively, the "**Loan Agreement**") and evidenced by that certain Promissory Note, dated June 6, 2007, made by Borrower in favor of Lender (such Promissory Note, together with all extensions, renewals, replacements, restatements or modifications thereof being hereinafter referred to collectively as the "Original Note").

**WHEREAS**, Borrower and Lender have agreed in the manner hereinafter set forth to modify certain terms and provisions of the Loan Agreement in order to, among other things, sever the Original Note into eight notes, one of which is hereinafter referred to as "Note A-1", in the principal amount of $80,000,000.00, one of which is hereinafter referred to as "Note A-2", in the principal amount of $60,000,000.00, "Note A-3", in the principal amount of $20,000,000.00, one of which is hereinafter referred to as "Note A-4", in the principal amount of $20,000,000.00 "Note A-5", in the principal amount of $20,000,000.00, one of which is hereinafter referred to as "Note A-6", in the principal amount of $25,000,000.00 "Note A-7", in the principal amount of $10,000,000.00, and one of which is hereinafter referred to as "Note A-8", in the principal amount of $80,000,000.00, as more specifically set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties hereto hereby covenant, agree, represent and warrant that the Loan Agreement and other Loan Documents (as defined in the Loan Agreement) are hereby amended as follows:

## I.   LOAN AGREEMENT

**1.1** <u>Revised Definitions</u>. The following terms set forth in the Loan Agreement are hereby deleted in their entirety and shall have the respective meanings set forth below:

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8 together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8, this Agreement, the Security Instrument or any other Loan Document, including, without limitation but without duplication, all Reserve Fund Deposits.

"Eurodollar Rate Margin" shall mean 2.0% per annum.

[TPW: NYLEGAL:699566.7] 16248-00758 09/14/2007 03:15 PM

"Mezzanine Note" shall mean that certain Mezzanine Promissory Note dated as of the date hereof given by Mezzanine Borrower to Mezzanine Lender in the principal amount of $85,000,000.

"Monthly Debt Service Payment Amount" shall mean the amount of interest due and payable on each Payment Date, pursuant to Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8 and Section 2.2 hereof.

"LIBOR Determination Date" shall mean, with respect to any Interest Period, the date that is two (2) LIBOR Business Days prior to the ninth (9th) calendar day of the month in which such Interest Period commenced.

"Note" shall mean, individually and collectively as the context may require, Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

**1.2** Additional Definitions.  The following terms which are not set forth and defined in the Loan Agreement are hereby added as defined terms in the Loan Agreement and shall have the meanings set forth below:

"Note A-1" shall mean that certain Replacement Promissory Note (Note A-1) dated as of the date of this Amendment in the principal amount of Eighty Million and 00/100 Dollars ($80,000,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"Note A-2" shall mean that certain Replacement Promissory Note (Note A-2) dated as of the date of this Amendment in the principal amount of Sixty Million and 00/100 Dollars ($60,000,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"Note A-3" shall mean that certain Replacement Promissory Note (Note A-3) dated as of the date of this Amendment in the principal amount of Twenty Million and 00/100 Dollars ($20,000,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"Note A-4" shall mean that certain Replacement Promissory Note (Note A-4) dated as of the date of this Amendment in the principal amount of Twenty Million and 00/100 Dollars ($20,000,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"Note A-5" shall mean that certain Replacement Promissory Note (Note A-5) dated as of the date of this Amendment in the principal amount of Twenty Million and 00/100 Dollars ($20,000,000.00), made by Borrower in favor of Lender, as the same may be amended, restated,

2

replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"Note A-6" shall mean that certain Replacement Promissory Note (Note A-6) dated as of the date of this Amendment in the principal amount of Twenty-five Million and 00/100 Dollars ($25,000,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"Note A-7" shall mean that certain Replacement Promissory Note (Note A-7) dated as of the date of this Amendment in the principal amount of Ten Million and 00/100 Dollars ($10,000,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"Note A-8" shall mean that certain Replacement Promissory Note (Note A-8) dated as of the date of this Amendment in the principal amount of Eighty Million and 00/100 Dollars ($80,000,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

**1.3** Modification of Loan Agreement. The Loan Agreement is hereby modified such that:

(a) The second sentence of Section 2.1.2(c) of the Loan Agreement is hereby deleted in its entirety and the following sentence is substituted therefor:

> Each Project Future Advance shall be made pro-rata under Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8 and shall be considered an advance of the Loan, shall be added to the unpaid principal balance of Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8, as applicable, as of the day such Project Future Advance is made for purposes of Borrower's payment obligations under this Loan Agreement, and repayment thereof, together with interest thereon at the Applicable Interest Rate and shall be secured by the Security Instrument and other Collateral given for the Loan.

(b) The second sentence of Section 2.1.2(d)(i) of the Loan Agreement is hereby deleted in its entirety and the following sentence is substituted therefor:

> Each Debt Service Advance shall be made pro-rata under Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8 and shall be considered an advance of the Loan, shall be added to the unpaid principal balance of Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8, as applicable, as of the day such Debt Service Advance is made for purposes of Borrower's payment obligations under this Loan Agreement, and repayment thereof, together

3

with interest thereon at the Applicable Interest Rate and shall be secured
by the Security Instrument and other Collateral given for the Loan.

(c) Section 2.2.1(a) of the Loan Agreement is hereby deleted in its entirety and
the following is substituted therefor:

Interest on the outstanding principal balance of Note A-1 shall accrue
from the Closing Date to but excluding the Maturity Date at the
Applicable Interest Rate. Interest on the outstanding principal balance of
Note A-2 shall accrue from the Closing Date to but excluding the Maturity
Date at the Applicable Interest Rate. Interest on the outstanding principal
balance of Note A-3 shall accrue from the Closing Date to but excluding
the Maturity Date at the Applicable Interest Rate. Interest on the
outstanding principal balance of Note A-4 shall accrue from the Closing
Date to but excluding the Maturity Date at the Applicable Interest Rate.
Interest on the outstanding principal balance of Note A-5 shall accrue
from the Closing Date to but excluding the Maturity Date at the
Applicable Interest Rate. Interest on the outstanding principal balance of
Note A-6 shall accrue from the Closing Date to but excluding the Maturity
Date at the Applicable Interest Rate. Interest on the outstanding principal
balance of Note A-7 shall accrue from the Closing Date to but excluding
the Maturity Date at the Applicable Interest Rate. Interest on the
outstanding principal balance of Note A-8 shall accrue from the Closing
Date to but excluding the Maturity Date at the Applicable Interest Rate.
Monthly installments of interest only shall be paid to Lender on each
Payment Date up to and including the Maturity Date.

(d) Section 2.2.2 of the Loan Agreement is hereby deleted in its entirety and the
following is substituted therefor:

Interest on the outstanding principal balance of Note A-1 shall be
calculated by multiplying (a) the actual number of days elapsed in the
period for which the calculation is being made by (b) a daily rate equal to
the Applicable Interest Rate divided by three hundred sixty (360) by (c)
the outstanding principal balance of Note A-1. Interest on the outstanding
principal balance of Note A-2 shall be calculated by multiplying (a) the
actual number of days elapsed in the period for which the calculation is
being made by (b) a daily rate equal to the Applicable Interest Rate
divided by three hundred sixty (360) by (c) the outstanding principal
balance of Note A-2. Interest on the outstanding principal balance of Note
A-3 shall be calculated by multiplying (a) the actual number of days
elapsed in the period for which the calculation is being made by (b) a daily
rate equal to the Applicable Interest Rate divided by three hundred sixty
(360) by (c) the outstanding principal balance of Note A-3. Interest on the
outstanding principal balance of Note A-4 shall be calculated by
multiplying (a) the actual number of days elapsed in the period for which
the calculation is being made by (b) a daily rate equal to the Applicable

4

Interest Rate divided by three hundred sixty (360) by (c) the outstanding principal balance of Note A-4. Interest on the outstanding principal balance of Note A-5 shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate equal to the Applicable Interest Rate divided by three hundred sixty (360) by (c) the outstanding principal balance of Note A-5. Interest on the outstanding principal balance of Note A-6 shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate equal to the Applicable Interest Rate divided by three hundred sixty (360) by (c) the outstanding principal balance of Note A-6. Interest on the outstanding principal balance of Note A-7 shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate equal to the Applicable Interest Rate divided by three hundred sixty (360) by (c) the outstanding principal balance of Note A-7. Interest on the outstanding principal balance of Note A-8 shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate equal to the Applicable Interest Rate divided by three hundred sixty (360) by (c) the outstanding principal balance of Note A-8.

(e) The following sentence is hereby added to the end of Section 2.2.6 of the Loan Agreement:

Any late payment charges received pursuant to this Section 2.2.6 shall be applied pro rata to late payment charges due under Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 or Note A-8.

(f) The following sentence is hereby added to the end of Section 2.3.1 of the Loan Agreement:

Notwithstanding anything to the contrary contained in this Section 2.3.1, Borrower shall not be permitted to prepay the principal balance of Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 or Note A-8, in whole unless, in connection with (i) a prepayment in whole of Note A-1, Borrower simultaneously tenders a prepayment in whole of Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8, (ii) a prepayment in whole of Note A-2, Borrower simultaneously tenders a prepayment in whole of Note A-1, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8, (iii) a prepayment in whole of Note A-3, Borrower simultaneously tenders a prepayment in whole of Note A-1, Note A-2, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8, (iv) a prepayment in whole of Note A-4, Borrower simultaneously tenders a prepayment in whole of Note A-1, Note A-2, Note A-3, Note A-5, Note A-6, Note A-7 and Note A-8, (v) a prepayment in whole of Note A-5, Borrower simultaneously tenders a prepayment in whole of Note A-1, Note A-2, Note A-3, Note A-4, Note A-6, Note A-7 and Note A-8, (vi) a

5

prepayment in whole of Note A-6, Borrower simultaneously tenders a prepayment in whole of Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-7 and Note A-8, (vii) a prepayment in whole of Note A-7, Borrower simultaneously tenders a prepayment in whole of Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6 and Note A-8 and (viii) a prepayment in whole of Note A-8, Borrower simultaneously tenders a prepayment in whole of Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6 and Note A-7.

(g) The text ", such prepayment to be applied pro rata to sums due under Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8" is hereby added following the text "(100%) of such Net Proceeds" at the end of the first sentence of Section 2.3.2 of the Loan Agreement.

(h) The following sentence is hereby added to the end of Section 2.3.3 of the Loan Agreement:

All sums received pursuant to this Section 2.3.3 shall be applied pro rata to sums due under Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8.

(i) The following sentence is hereby added to the end of Section 2.3.5 of the Loan Agreement:

(j) Notwithstanding the foregoing, all such prepayments shall be applied pro rata to sums due under Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8.

## II.    ENVIRONMENTAL INDEMNITY

**2.1** The text ", Borrower" is hereby inserted after the text "(**"Fontainebleau"**; Soffer," and before the words "and Fontainebleau" in the opening paragraph of the Environmental Indemnity.

## III.    COMPLETION GUARANTY

**3.1** The text ", jointly and severally," is hereby inserted after the text "hereby absolutely and unconditionally" in the opening paragraph of the Completion Guaranty.

## IV.    GUARANTY OF RECOURSE OBLIGATIONS OF BORROWER

**4.1** The text ", jointly and severally," is hereby inserted after the text "hereby absolutely and unconditionally" in the opening paragraph of the Guaranty of Recourse Obligations.

## V.    GUARANTY OF PAYMENT

**5.1** The text ", jointly and severally," is hereby inserted after the text "hereby absolutely and unconditionally" in the opening paragraph of the Guaranty of Payment.

[TPW: NYLEGAL:699566.7] 16248-00758  09/14/2007 03:15 PM

## VI.    OTHER LOAN DOCUMENTS

**6.1** Any reference in any other Loan Document to "Note" shall mean the Note as modified by the terms of this Amendment.

## VII.    MISCELLANEOUS

**7.1** Except as specifically modified and amended herein, all other terms, conditions and covenants contained in the Loan Agreement and the other Loan Documents shall remain in full force and effect.

**7.2** All references in any of the Loan Documents to any of the Loan Documents modified herein shall mean the applicable Loan Document as hereby modified and amended.

**7.3** All references in any of the Loan Documents to the "Loan Agreement" shall be deemed to refer to the Loan Agreement as defined in the recitals hereto.

**7.4** Unless otherwise defined in this Amendment, terms used but not defined herein shall have the meaning set forth in the Loan Agreement.

**7.5** This Amendment may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document.  All such counterparts shall be construed together and shall constitute one instrument, but in making proof hereof it shall only be necessary to produce one such counterpart.

**7.6** This Amendment shall be binding upon and inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

**7.7** This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to principles of conflict laws, and any applicable law of the United States of America.

### [NO FURTHER TEXT ON THIS PAGE]

7

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be duly executed by their duly authorized representatives, all as of the day and year first above written.

FOUNTAINEBLEAU LAS VEGAS RETAIL, LLC, a Delaware limited liability company

By:    Fontainebleau Las Vegas Retail Mezzanine, LLC, a Delaware limited liability company, its managing member

By:    Fontainebleau Las Vegas Retail Parent, LLC, a Delaware limited liability company, its managing member

By:    Fontainebleau Resort Holdings, LLC, a Delaware limited liability company, its managing member

By:    Fontainebleau Resorts, LLC, a Delaware limited liability company, its managing member

By: _____

Name: James Freeman
Title: Senior Vice President and Chief Financial Officer

LENDER:

LEHMAN BROTHERS HOLDINGS INC.,
a Delaware corporation, individually as a Co-
Lender and as Agent for one or more Co-
Lenders

By: _____

Name:

Title:

                             Catherine Harnett
                            Authorized Signatory

CONSENTED    TO    BY    MEZZANINE
LENDER:

LEHMAN BROTHERS HOLDINGS INC.,
a Delaware corporation, individually as a Co-
Lender and as Agent for one or more Co-
Lenders

By: _____

Name:

Title:

                             Catherine Harnett
                            Authorized Signatory

First Amendment to Mortgage Loan Agreement

Guarantor hereby acknowledges the modifications to the Loan Agreement and other Loan Documents made herein and hereby ratifies and confirms to Lender, as of the date hereof, that all of the terms, covenants, indemnifications and provisions of the Guaranty are and shall remain in full force and effect without change except as otherwise amended herein.

FONTAINEBLEAU    RESORTS,    LLC,    a
Delaware limited liability company


By: _____
Name: James Freeman
Title: Senior Vice President and
Chief Financial Officer


_____
Jeffrey Soffer, an Individual