# Exhibit "B"

CO-LENDING AGREEMENT

for

LOAN AGREEMENT
DATED AS OF June 6, 2007
MAXIMUM LOAN AMOUNT OF $315,000,000

between

LEHMAN BROTHERS HOLDINGS INC.
as the Agent and a Split Note Holder

-and-

The parties listed on Exhibit A attached hereto
each individually, as a Split Note Holder

Dated:  September 24, 2007

## CO-LENDING AGREEMENT

THIS CO-LENDING AGREEMENT (this "**Agreement**") is dated as of September 24, 2007, by and among **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an address at 399 Park Avenue, 8th Floor, New York, New York 10022 (in its capacity as the Agent hereunder, the "**Agent**"), **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an address at 399 Park Avenue, 8th Floor (the "**Note A-1 Holder**"), **THE UNION LABOR LIFE INSURANCE COMPANY (ULLICO)**, a Maryland corporation, on Behalf of Separate Account J, having an address at 1625 Eye Street, NW, Washington, DC 20006 (the "**Note A-2 Holder**"), **NATIONAL CITY BANK**, a national banking association, having an address at 1900 East Ninth Street, Cleveland, Ohio 44114 (the "**Note A-3 Holder**"), **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an address at 399 Park Avenue, 8th Floor (the "**Note A-4 Holder**"), **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an address at 399 Park Avenue, 8th Floor, New York, New York 10022 (the "**Note A-5 Holder**"), **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an address at 399 Park Avenue, 8th Floor, New York, New York 10022 (the "**Note A-6 Holder**"), **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an address at 399 Park Avenue, 8th Floor, New York, New York 10022 (the "**Note A-7 Holder**"), and **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an address at 399 Park Avenue, 8th Floor, New York, New York 10022 (the "**Note A-8 Holder**"). The Note A-1 Holder, Note A-2 Holder, Note A-3 Holder, Note A-4 Holder, Note A-5 Holder, Note A-6 Holder, Note A-7 Holder and Note A-8 Holder, in their capacity as co-lenders pursuant to this Agreement, are sometimes collectively referred to herein as the "**Split Note Holders**" or "**Lenders**". All terms as used in this Agreement shall, unless otherwise defined in the main body of this Agreement, have the meanings given to such terms in the section herein titled "**Definitions**".

## RECITALS

Pursuant to that certain Loan Agreement dated as of June 6, 2007 (the "**Original Mortgage Loan Agreement**"), between Fontainebleau Las Vegas Retail, LLC, a Delaware limited liability company ("**Mortgage Borrower**"), and Lehman Brothers Holdings Inc., a Delaware corporation, individually as lender and as Agent for one or more Co-Lenders ("**LBHI**"), LBHI made a loan in the maximum principal amount of $315,000,000 (the "**Mortgage Loan**") to the Mortgage Borrower.

The Mortgage Loan is evidenced by that certain Promissory Note dated June 6, 2007 (the "**Original Mortgage Note**") made by the Mortgage Borrower in favor of LBHI.

The Original Mortgage Note, and the obligations thereunder, are secured and/or evidenced by that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of June 6, 2007 (the "**Original Mortgage**"), made by Mortgage Borrower in favor of LBHI and encumbering Mortgage Borrower's leasehold interest in the retail portion (the "**Mortgaged Property**") of the

1

property to be known as "Fontainebleau Las Vegas" in Las Vegas, Nevada, as more particularly described in the Original Mortgage, (2) that certain Assignment of Leases and Rents, dated as of June 6, 2007 (the "**Original Assignment of Leases and Rents**"), executed by Mortgage Borrower in favor of LBHI, (3) that certain Guaranty of Recourse Obligations of Borrower, dated as of June 6, 2007 (the "**Guaranty of Recourse Obligations**"), made by Jeffrey Soffer ("**Soffer**") and Fontainebleau Resorts, LLC, a Delaware limited liability company ("**Fontainebleau Resorts**", and together with Soffer, collectively known as the "**Guarantor**") in favor of LBHI, (4) that certain Completion Guaranty, dated as of June 6, 2007 (the "**Completion Guaranty**"), made by Guarantor in favor of LBHI, (5) that certain Payment Guaranty, dated as of June 6, 2007 (the "**Payment Guaranty**"), made by Guarantor in favor of LBHI, (6) that certain Environmental Indemnity Agreement, dated as of June 6, 2007 (the "**Environmental Indemnity Agreement**"), made by Mortgage Borrower and Guarantor in favor of LBHI, (7) that certain Assignment of Permits and Contracts, dated as of June 6, 2007 (the "**Assignment of Permits and Contracts**"), executed by Mortgage Borrower in favor of LBHI, (8) that certain Conditional Assignment of Leasing Agreement, dated as of June 6, 2007 (the "**Conditional Assignment of Leasing Agreement**"), executed by Mortgage Borrower in favor of LBHI, (9) that certain Conditional Assignment of Management Agreement, dated as of June 6, 2007 (the "**Conditional Assignment of Management Agreement**"), executed by Mortgage Borrower in favor of LBHI, and (10) that certain Intellectual Property Security Agreement, dated as of June 6, 2007, executed by Mortgage Borrower in favor of LBHI (the "**Intellectual Property Security Agreement**" and, together with the Conditional Assignment of Management Agreement, the Conditional Assignment of Leasing Agreement, the Assignment of Permits and Contracts, the Environmental Indemnity Agreement, the Guaranty of Recourse Obligations, the Completion Guaranty, the Payment Guaranty, the Original Assignment of Leases and Rents, the Original Mortgage Loan Agreement, the Original Mortgage, the Original Mortgage Note and all other documents which evidence and/or secure the Mortgage Loan, the "**Original Mortgage Loan Documents**").

The Original Mortgage Note has been split and severed into eight (8) separate notes known as (i) Replacement Promissory Note (Note A-1) in the principal amount of $80,000,000 (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes or otherwise modified from time to time, "**Note A-1**"), (ii) Replacement Promissory Note (Note A-2) in the principal amount of $60,000,000 (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes or otherwise modified from time to time, "**Note A-2**"), (iii) Replacement Promissory Note (Note A-3) in the principal amount of $20,000,000 (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes or otherwise modified from time to time, "**Note A-3**"), (iv) Replacement Promissory Note (Note A-4) in the principal amount of $20,000,000 (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes or otherwise modified from time to time, "**Note A-4**"), (v) Replacement Promissory Note (Note A-5) in the principal amount of $20,000,000 (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes or otherwise modified from time to time, "**Note A-5**"), (vi) Replacement Promissory Note (Note A-6) in the principal amount of $25,000,000 (as the same may be amended, restated, replaced, supplemented,

2

severed into one or more separate notes or otherwise modified from time to time, "**Note A-6**"), (vii) Replacement Promissory Note (Note A-7) in the principal amount of $10,000,000 (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes or otherwise modified from time to time, "**Note A-7**") and (viii) Replacement Promissory Note (Note A-8) in the principal amount of $80,000,000 (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes or otherwise modified from time to time, "**Note A-8**") (each dated as of September 9, 2007 and executed by the Mortgage Borrower in favor of LBHI). Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8 shall be collectively referred to herein as the "**Split Notes**". The Split Notes and the obligations of the Mortgage Borrower contained therein are and shall continue to remain secured by the Original Mortgage.

Pursuant to certain Allonges dated the date hereof, Note A-2 has been assigned by LBHI in favor of the Note A-2 Holder and Note A-3 has been assigned by LBHI in favor of the Note A-3 Holder.

On the date hereof, an undivided interest in the Original Mortgage and the other Original Mortgage Loan Documents equal to the respective Pro Rata Interests (as defined herein) has been assigned by LBHI to the Split Note Holders of Note A-2 and Note A-3 pursuant to Assignment and Assumption Agreements.

In addition, (i) as of September 9, 2007, the Original Loan Documents were modified by that certain First Amendment to Mortgage Loan Agreement (the "**First Amendment to Loan Agreement**"); the Original Mortgage Loan Agreement, as modified by the First Amendment to Loan Agreement is hereinafter referred to as the "**Mortgage Loan Agreement**". The Original Mortgage Loan Documents, as modified by the First Amendment to Loan Agreement, are referred to herein as the "**Mortgage Loan Documents**", in each case, to reflect the splitting of the Original Mortgage Note and other modifications set forth therein.

It is the intention and desire of the Split Note Holders to enter into this Agreement in order to set forth the rights, benefits, priorities, and obligations of the Split Note Holders under the Split Notes and the other mutual understandings of the Split Note Holders. The parties hereto intend that the transactions contemplated hereby constitute a "true sale" in accordance with generally accepted accounting principles.

**NOW, THEREFORE**, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto hereby agree, with respect to the Mortgage Loan, as follows:

## DEFINITIONS

Capitalized terms and phrases not otherwise defined in this Agreement shall have the meanings ascribed to them in the Mortgage Loan Agreement.

The following terms as used herein shall have the following meanings:

3

"**A Notes(s)**" shall mean, individually and collectively, Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8.

"**Agent**" shall mean Lehman Brothers Holdings Inc. and its successors and assigns. Except to the extent expressly set forth otherwise in this Agreement, references to the Agent shall refer to the Agent solely in its capacity as "agent" and not in the Agent's capacity as a Split Note Holder.

"**Assignment and Assumption**" shall mean any assignment and assumption agreement pursuant to which a Split Note Holder acquires its Pro Rata Interest, in the form attached hereto as Exhibit F.

"**Bankruptcy Action**" shall mean any bankruptcy, insolvency or similar proceeding relating to any Mortgage Borrower, any Mortgaged Property or any Mortgage Loan Party.

"**Cause**" shall mean (a) fraud, gross negligence or willful misconduct by the Agent, (b) the commencement of any bankruptcy, insolvency or similar proceeding with respect to the Agent, (c) any material breach or default by the Agent under this Agreement which continues for 15 days after written notice to the Agent or (d) the Agent is a Defaulting Split Note Holder.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policy and/or policies of a Person, whether through ownership of voting securities or other ownership interests, by contract or otherwise; the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"**Current Split Note Holder**" shall mean each of the Split Note Holders which is not a Defaulting Split Note Holder.

"**Default**" shall mean the occurrence of any event under the Mortgage Loan Documents which, but for the giving of notice or the passage of time, or both, would be an Event of Default.

"**Default Loans**" shall have the meaning set forth in Section 5.01(d) hereof.

"**Default Rate**" shall have the meaning set forth in the Mortgage Loan Agreement and the respective Notes.

"**Defaulting Split Note Holder**" shall have the meaning set forth in Section 5.01(a) hereof.

"**Eligibility Requirements**" means, with respect to any Person, that such Person (i) has total assets (in name or under management) in excess of $600,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $250,000,000 and (ii) is regularly engaged in the

business of making or owning commercial real estate loans (or interests in commercial real estate loans) or operating commercial mortgaged properties.

"**Enforcement Action**" means any judicial or non-judicial foreclosure proceeding, the exercise of any power of sale, the sale by advertisement, the taking of a deed or assignment in lieu of foreclosure, the obtaining of a receiver, the pursuit of any deficiency judgment, acquisition of any Mortgaged Property, any sale of any Mortgaged Property (other than the sale of condominium units in the ordinary course of business), or the taking of any other enforcement action against any Mortgaged Property.

"**Event of Default**" shall have the meaning set forth in the Mortgage Loan Documents.

"**Guarantor**" shall have the meaning set forth in the Recitals.

"**Indebtedness**" shall mean the sum of principal of and interest due on the Mortgage Loan, and all other obligations and sums due and payable by the Mortgage Borrower or any other Mortgage Loan Party to the Split Note Holders and the Agent and incurred pursuant to or evidenced or secured by any of the Mortgage Loan Documents.

"**Intercreditor Agreement**" shall mean that certain Intercreditor Agreement dated as of even date herewith entered into between the holder of the Mezzanine Loan and the holder of the Mortgage Loan.

"**Loan Default**" shall mean an Event of Default as defined in the Mortgage Loan Agreement.

"**Loan Fees**" shall have the meaning set forth in Section 1.08 hereof.

"**Mezzanine Loan**" shall mean that certain mezzanine loan in the original principal amount of $85,000,000 to Fontainebleau Las Vegas Retail Mezzanine, LLC, a Delaware limited liability company ("**Mezzanine Borrower**"), pursuant to that certain Loan Agreement (Mezzanine Loan), dated as of June 6, 2007 (the "**Mezzanine Agreement**"), between the Mezzanine Borrower and LBHI (in such capacity, the "**Mezzanine Lender**"), as amended by that certain First Amendment to Mezzanine Loan Agreement, dated as of September 9, 2007.

"**Mortgage Borrower**" shall have the meaning provided in the Recitals.

"**Mortgage Loan**" shall have the meaning provided in the Recitals.

"**Mortgage Loan Agreement**" shall have the meaning provided in the Recitals.

"**Mortgage Loan Documents**" shall have the meaning provided in the Recitals.

5

"**Mortgage Loan Party**" shall mean the Mortgage Borrower, any Guarantor, indemnitor or surety of any of the Obligations and any other Person (other than LBHI) that is a party to any of the Mortgage Loan Documents, other than any Property Manager that is not an Affiliate of a Mortgage Borrower.

"**Mortgage Note**" shall mean the collective reference to the A Notes.

"**Mortgaged Property**" shall have the meaning provided in the Recitals.

"**Note**" shall mean any of Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7 and Note A-8.

"**Note A-1**" shall have the meaning provided in the Recitals.

"**Note A-2**" shall have the meaning provided in the Recitals.

"**Note A-3**" shall have the meaning provided in the Recitals.

"**Note A-4**" shall have the meaning provided in the Recitals.

"**Note A-5**" shall have the meaning provided in the Recitals.

"**Note A-6**" shall have the meaning provided in the Recitals.

"**Note A-7**" shall have the meaning provided in the Recitals.

"**Note A-8**" shall have the meaning provided in the Recitals.

"**Note A Interest Rate**" shall mean the applicable interest rate in effect from time to time on the A Notes or any A Note, as the context may require (but excluding interest at the Default Rate).

"**Note A Principal Balance**" shall mean, at any time of determination, the outstanding principal balance of the A Notes or any A Note, as the context may require.

"**Original Mortgage**" shall have the meaning provided in the Recitals.

"**Original Mortgage Note**" shall have the meaning provided in the Recitals.

"**Patriot Act**" means the United States of America Patriot Act, Pub. L. No. 107-56.

"**Permitted Fund Manager**" means any Person that on the date of determination is (i) one of the entities listed on Exhibit C or any other nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate, (ii) investing through a fund with committed capital of at least $250,000,000 and (iii) not subject to any bankruptcy, insolvency or similar proceeding.

"**Person**" shall mean (i) any individual, corporation, partnership, joint venture, limited liability company, estate, trust or unincorporated association, or (ii) any federal, state, county or municipal government or any bureau, department or agency thereof and, in the case of any person or entity set forth in clause (i) or (ii) above, any fiduciary acting in such capacity on behalf of any of such person or entity.

"**Prime Rate**" shall mean, for any day, the "prime rate" which is normally published in the "Money Rates" section of The Wall Street Journal for such day or, in the event such rate shall not be so published, in such other nationally recognized publication as the Agent may, from time to time, specify.

"**Prohibited Person**" shall mean any Person:

(i)    listed in the annex to, or who is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "**Executive Order**");

(ii)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions, of the Executive Order;

(iii)    with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(iv)    who commits, threatens or conspires to commit or supports "**terrorism**" as defined in the Executive Order;

(v)    that is named as a "**specially designated national and blocked person**" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or

(vi)    who is an Affiliate of a Person listed in clauses (i) – (v) above.

"**Pro Rata Interest**", with respect to any individual Split Note Holder, or "**Pro Rata Interests**", with respect to each of the Split Note Holders, as the case may be, shall mean the applicable percentage or percentages of the Mortgage Loan, as set forth on Exhibit A hereof, as the same may be supplemented or amended from time to time, held by such Split Note Holder.

"**Protective Advance**" means all sums expended as reasonably determined by the Agent to be necessary (a) to protect the priority, validity and enforceability of the Lien of the Original Mortgage and the other instruments evidencing or securing the Indebtedness and (b) to protect the value or the security of the Mortgaged

7

Property, including any amounts expended in accordance with Section 4.03 of this Agreement.

"**Qualified Servicer**" means any nationally recognized commercial mortgage loan servicer that is reasonably satisfactory to the Required Split Note Holders.

"**Qualified Transferee**" means a Person that is not a Prohibited Person for purposes of the Patriot Act and that is (i) Lehman Brothers Holdings Inc., The Union Labor Life Insurance Company (ULLICO), National City Bank, or any affiliate under the Control of such Persons, or (ii) one or more of the following:

(A)    a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (A) satisfies the Eligibility Requirements;

(B)    an investment company, money management firm or "**qualified institutional buyer**" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "**accredited investor**" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (B) satisfies the Eligibility Requirements;

(C)    an institution substantially similar to any of the foregoing entities described in clauses (ii)(A) or (ii)(B) that satisfies the Eligibility Requirements;

(D)    any entity Controlled by or under common Control with one or more of any of the entities described in clause (i) or clauses (ii)(A) or (ii)(C);

(E)    a Qualified Trustee in connection with a securitization of, the creation of collateralized debt obligations (including, without limitation, collateralized loan obligations) ("**CDO**") secured by or financing through an "**owner trust**" of, the Mortgage Loan (collectively, "**Securitization Vehicles**"), so long as (A) the special servicer or manager of such Securitization Vehicle has the Required Special Servicer Rating and (B) the entire "**controlling class**" of such Securitization Vehicle, other than with respect to a CDO Securitization Vehicle, is held by one or more entities that are otherwise Qualified Transferees under clauses (ii)(A), (B), (C) or (D) of this definition; provided that the operative documents of the related Securitization Vehicle required that (1) in the case of a CDO Securitization Vehicle, the "**equity interest**" in such Securitization Vehicle is owned by one or more entities that are Qualified Transferees under clauses (ii)(A), (B), (C) or (D) of this definition and (2) if any of the relevant trustee, special servicer, manager fails to meet the requirements of this clause (E), such Person must be replaced by a Person meeting the requirements of this clause (E) within thirty (30) days;

(F)    an investment fund, limited liability company, limited partnership or general partnership where a Permitted Fund Manager or an entity that is otherwise a Qualified Transferee under clauses (ii)(A), (B), (C) or (D) of this definition acts as the

8

general partner, managing member or fund manager and at least 50% of the equity interests in such investment vehicle are owned, directly or indirectly, by one or more entities that are otherwise Qualified Transferees under clauses (ii)(A), (B), (C) or (D) of this definition;

      (G)    any entity listed on Exhibit C attached hereto;

      (H)    any entity listed on Exhibit D attached hereto; or

      (I)    any Affiliate of a Person described in subparagraphs (A) – (H).

"**Qualified Trustee**" means (i) a corporation, national bank, national banking association or a trust company, organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers and to accept the trust conferred, having a combined capital and surplus of at least $100,000,000 and subject to supervision or examination by federal or state authority, (ii) an institution insured by the Federal Deposit Insurance Corporation or (iii) an institution whose long-term senior unsecured debt is rated in either of the then current two highest rating categories of each of the Rating Agencies.

"**Rating Agencies**" shall mean each of S&P, Moody's Investors Service, Inc., and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been designated by the Agent.

"**Register**" shall have the meaning set forth in Section 2.01(b) hereof.

"**Required Special Servicer Rating**" means with respect to any particular special servicer (i) that it has a rating of "CSS1" in the case of Fitch, (ii) that it is listed on S&P's list of approved special servicers in the case of S&P and (iii) in the case of Moody's, that it is acting as special servicer in a commercial mortgage loan securitization that was rated by Moody's within the twelve (12) -month period prior to the date of determination, and Moody's has not downgraded or withdrawn its then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities.

"**Required Split Note Holders**" means Split Note Holders holding Pro Rata Interests in the Split Notes aggregating more than sixty six and two-thirds percent (66⅔%) of the unpaid principal balance of the Notes.

"**Servicing Standard**" shall mean the servicing and administration of the Mortgage Loan or the management of the Mortgaged Property, as applicable, by the Agent for the benefit of the Split Note Holders and in accordance with applicable law, the terms of the Mortgage Loan Documents and this Agreement and in the same manner in which, and with the same care, skill, prudence and diligence with which it administers mortgage loans for its own account or other third parties (whichever servicing is of a higher standard), giving due consideration to customary and usual standards of practice of prudent institutional commercial lenders servicing their own loans, and with a view

towards the best interests of the Split Note Holders as a collective whole and the maximization of the net present value of the Mortgage Loan (subject to the relative priority rights of the Split Note Holders as set forth in this Agreement), but without regard to (i) any relationship that the Agent, or any Affiliate of the Agent, may have with the Mortgage Borrower or any Affiliate of the Mortgage Borrower or any other parties to this Agreement or the Mortgage Loan Documents; (ii) the existence of any subordinate or mezzanine loan (including, without limitation, the Mezzanine Loan) that the Agent, or any Affiliate of the Agent, may service, hold or have an interest in; (iii) the ownership of the Mortgage Note or any interest or participation therein, or any equity interest in the Mortgaged Property, as applicable, by the Agent or any Affiliate of the Agent, as applicable; and (iv) the sufficiency of any compensation for its services hereunder and/or the Agent's obligation to make any Protective Advances or incur any expenses.

"**Split Note Holders**" shall have the meaning set forth in the opening paragraph of this Agreement and shall also mean each and every Person that holds an interest in all or any portion of the Mortgage Loan pursuant to an assignment of any of the Notes.

"**Unconditional Unanimous Consent Modification**" shall have the meaning set forth in Section 2.03(a) hereof.

## SECTION 1.  PURCHASE, ASSIGNMENT, ASSUMPTION AND AGENT

1.01.  Purchase of Notes.  On the date hereof, (i) Note A-1 Holder has purchased Note A-1 from LBHI and is now the lawful owner of Note A-1, (ii) Note A-2 Holder has purchased Note A-2 from LBHI and is now the lawful owner of Note A-2, (iii) Note A-3 Holder has purchased Note A-3 from LBHI and is now the lawful owner of Note A-3, (iv) Note A-4 Holder has purchased Note A-4 from LBHI and is now the lawful owner of Note A-4, (v) Note A-5 Holder has purchased Note A-5 from LBHI and is now the lawful owner of Note A-5, (vi) Note A-6 Holder has purchased Note A-6 from LBHI and now the lawful owner of Note A-6, (vii) Note A-7 Holder has purchased Note A-7 and is now the lawful owner of Note A-7, and (viii) Note A-8 Holder has purchased Note A-8 and is now the lawful owner of Note A-8.

1.02.  Assignment of Mortgage Loan Documents.  From and after the date hereof, the Note A-1 Holder, the Note A-2 Holder, the Note A-3 Holder, the Note A-4 Holder, the Note A-5 Holder, the Note A-6 Holder, the Note A-7 Holder and the Note A-8 Holder shall hold their respective Pro Rata Interest in the Original Mortgage and the Mortgage Loan Documents and the Intercreditor Agreement.

1.03.  Assumption of Mortgage Loan Documents.

(a)    Each of the Split Note Holders hereby assumes and undertakes to perform, pay or discharge, in accordance with the terms and conditions thereof and in accordance with its Pro Rata Interest, all obligations of LBHI under the Mortgage Loan Documents and the Intercreditor Agreement, to the extent such obligations are to be performed, paid or discharged after the date hereof, including, without limitation, the obligation to make

required future advances under the Mortgage Loan Agreement based upon its Pro Rata Interest. In the event that the Servicer receives a request from the Mortgage Borrower for a future advance of proceeds of the Mortgage Loan, the Servicer shall deliver a copy of such request to each Split Note Holder at least four (4) Business Days prior to the date upon which each such Split Note Holder is required to fund its Pro Rata Interest of such future advance in order to allow each Split Note Holder to determine whether Mortgage Borrower is entitled to such future advance pursuant to the Mortgage Loan Documents. Alternatively, the Servicer may deliver a certificate to each Split Note Holder stating that the conditions set forth in Section 2.1.2 of the Mortgage Loan Agreement to such future advance have been satisfied and Mortgage Borrower is entitled to such future advance pursuant to the Mortgage Loan Documents at least four (4) Business Days prior to the date on which such future advance is to be funded to the Mortgage Borrower and in such event each Split Note Holder shall fund its Pro Rata Interest of such future advance on the requested date.

(b)    Each of the Split Note Holders hereby assumes and undertakes to make, in accordance with the terms and conditions set forth in the Mortgage Loan Agreement and the Master Disbursement Agreement (as such term is defined in the Mortgage Loan Agreement) and in accordance with its Pro Rata Interest, the Project Future Advances and the Debt Service Advance (as such terms are defined in the Mortgage Loan Agreement).

(c)    Each of the Split Note Holders agrees to execute and deliver all such further assurances as may reasonably be requested by LBHI in order to effect the assumption by such Split Note Holder of the obligations contemplated herein.

1.04.    <u>Rights of Split Note Holders</u>. The A Notes and the rights of the Split Note Holders thereunder, including their respective rights to receive payments of interest, principal and any and all other amounts due thereunder, shall be pari passu, equal and without priority or preference as among all of the Split Note Holders, except as specifically provided herein.

1.05.    <u>Appointment</u>.

(a)    Each Split Note Holder hereby confirms the appointment of the Agent, as agent, to administer the Mortgage Loan and to take actions or cause such actions to be taken on its behalf with respect to the Mortgage Loan Documents under the provisions of this Agreement, the Mortgage Loan Agreement, the other Mortgage Loan Documents and the Servicing Standard. The Agent hereby confirms its acceptance of such appointment. The Agent shall carry out its administrative duties to the Split Note Holders in accordance with the applicable terms of the Mortgage Loan Agreement, the other Mortgage Loan Documents, this Agreement and the Servicing Standard. The relationship between the Agent and each Split Note Holder is a contractual relationship only, and the Agent shall not have any duties or responsibilities (except those expressly set forth in the Mortgage Loan Agreement, the other Mortgage Loan Documents or this Agreement or as required by the Servicing Standard) or any fiduciary duty to any Split Note Holder, and no implied covenants, functions, responsibilities, obligations or liabilities or duties on the part of the Agent shall be read into this Agreement.

11

(b)    Subject to Section 2.01, the Agent may execute any of its duties under this Agreement, the Mortgage Loan Agreement or the other Mortgage Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel (including internal counsel) concerning all matters pertaining to such duties; provided, however, that the execution of any of the Agent's duties by or through agents or attorneys-in-fact shall not relieve the Agent of any of its obligations under this Agreement, the Mortgage Loan Agreement or the other Mortgage Loan Documents. The Agent shall not be responsible for the negligence or misconduct of any agents or attorneys in fact selected by it in good faith in accordance with the Servicing standard and exercising reasonable judgment.

(c)    Subject to Section 2.01, at the option of the Agent, the Mortgage Loan may be serviced by a Qualified Servicer ("Servicer") selected by the Agent and the Agent may delegate all or any portion of its responsibilities under this Agreement, the Mortgage Note, the Mortgage Loan Agreement and the other Mortgage Loan Documents to said Servicer; provided, however, no such delegation of responsibilities shall relieve the Agent from its responsibilities and obligations hereunder, which shall be direct and primary responsibilities of the Agent. Each Split Note Holder acknowledges that as of the date hereof, TriMont Real Estate Advisors, Inc., a Georgia corporation is acting as Servicer and shall be entitled to all servicing fees payable under the Mortgage Loan Documents.

1.06.    <u>Ownership and Possession of Mortgage Loan Documents and Funds</u>. Each of the Split Note Holders shall own an undivided interest in the Mortgage Loan and the Mortgage Loan Documents equal to its Pro Rata Interest. The Agent shall hold in its possession, as collateral agent, at its office at 399 Park Avenue, New York, New York 10022, or at such other location as the Agent shall designate in writing to the Split Note Holders, the Mortgage Loan Documents for the pro rata benefit of the Agent as one of the Split Note Holders and each of the other Split Note Holders, except that each Split Note Holder shall have the right to hold its Note. The parties hereto further agree that LaSalle Bank, N.A. may hold such Mortgage Loan Documents, on behalf of the Agent, at its office at 135 South LaSalle Street, Suite 1625, Chicago, Illinois 60674 without further notice being provided. The Agent shall keep and maintain complete and accurate files and records of all matters pertaining to the Mortgage Loan. Upon reasonable prior notice to the Agent by the Split Note Holders, the Agent will make available to the Split Note Holders and their representatives and agents, the files and records relating to the Mortgage Loan for inspection and copying during normal business hours. The Agent hereby agrees to hold all payments and other funds received from the Mortgage Borrower, the Guarantor or any other Person with respect to the repayment of the Mortgage Loan and/or pursuant to the enforcement of the rights of Lender under the Mortgage Loan Documents in a segregated account and shall not commingle such funds with any other funds.

1.07.    <u>Successor Agent</u>.

(a)    The Agent may resign, in its sole discretion, without the consent of the Split Note Holders or the Mortgage Borrower by giving thirty (30) days' prior written notice of such resignation to the Split Note Holders and the Mortgage Borrower unless

12

applicable law requires a shorter notice period. Upon any such resignation, the retiring Agent shall, on behalf of the Split Note Holders, appoint a successor Agent, which shall be subject to the approval of the Required Split Note Holders, such approval not to be unreasonably withheld or delayed; provided, however, that the retiring Agent shall first offer such appointment as successor Agent to each of the Split Note Holders in order of their respective Pro Rata Interests (with the Split Note Holder having the largest Pro Rata Interest being given the first offer). If all Split Note Holders decline to serve as the Agent, the Required Split Note Holders may appoint a successor the Agent, provided that any proposed successor Agent shall (i) have demonstrated its capacity, ability and expertise to service commercial mortgage loans with principal balances of at least $50,000,000 each and at least $1,000,000,000 in the aggregate, and (ii) have accepted such appointment within ten (10) days of the offer of appointment.

(b)    The Required Split Note Holders shall have the right to remove the Agent if Cause occurs, provided that for this purpose if any Split Note Holder is the Agent or is an Affiliate of the Agent, such Split Note Holder's Pro Rata Interest shall be excluded in determining which Split Note Holders constitute the Required Split Note Holders.

(c)    The resignation or termination of the Agent hereunder shall not be effective until the acceptance of the appointment as the Agent hereunder by a successor Agent (meeting the criteria set forth in Section 1.07(a) and approved by the Required Split Note Holders pursuant to Section 1.07(a)) as evidenced by such successor Agent's execution and delivery to each Split Note Holder of an agreement, which contains an assumption by such successor Agent of the due and punctual performance of all terms and conditions thereafter to be performed by an Agent under this Agreement and the Mortgage Loan Documents, and such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from any duties and obligations under this Agreement thereafter arising, provided, however, that the retiring Agent shall transfer and deliver to the successor Agent the Register, all of the Mortgage Loan Documents and any other documents or instruments, including all books and records relating to the Mortgage Loan in its possession. The retiring Agent shall execute and deliver all instruments and documents reasonably requested to effectuate the transfer of the administration of the Mortgage Loan. After any retiring Agent's resignation as the Agent, the provisions of this Agreement shall inure to its benefit and shall bind it as to any actions taken or omitted to be taken by it while it was the Agent under this Agreement.

1.08.    Other Loan Fees.    The Agent shall retain for its own account all reasonable incidental servicing and other loan fees, other than loan extension fees and the Exit Fee, referred to in the Mortgage Loan Agreement or the Mortgage Loan Documents, if any, payable after the date hereof ("Loan Fees"). Any extension fees received by the Agent from the Mortgage Borrower shall be distributed to the Split Note Holders in accordance with their respective Pro Rata Interests. The Exit Fee payable under the Mortgage Loan shall be retained by LBHI.

1.09.    Agent as Split Note Holder.    Except to the extent its interest in the Mortgage Loan has been or shall be assigned pursuant to one or more Assignment and

13

Assumption agreements, the term "Split Note Holder" or "Split Note Holders" shall, unless the context otherwise expressly indicates, include the Agent in its individual capacities as holder of a Pro Rata Interest, and the Agent may exercise the rights and powers and shall be bound by the obligations of a Split Note Holder without regard to its rights and obligations as the Agent hereunder.

SECTION 2.  ADMINISTRATION OF THE MORTGAGE LOAN

2.01.  Administration.

(a)    The Agent shall administer the Mortgage Loan Agreement and the other Mortgage Loan Documents and service the Mortgage Loan in accordance with the terms and conditions of this Agreement and the Mortgage Loan Documents and in accordance with the terms of the Servicing Standard; provided, however, that neither the Agent nor any of its directors, officers, agents or employees shall be liable for any error in judgment or for any action taken or omitted to be taken by it or them in good faith and in accordance with the Servicing Standard and this Agreement, except the Agent (but not any of its directors, officers, agents or employees) shall be liable for its own gross negligence or willful misconduct and the gross negligence or willful misconduct of its officers, directors, agents or employees.  Notwithstanding anything in this Agreement to the contrary, the Agent shall also represent the Split Note Holders in connection with the exercise of their rights and obligations as senior lenders pursuant to the terms of the Intercreditor Agreement, acting in accordance with the terms of the Servicing Standard. Without limitation of the generality of the foregoing, neither the Agent, as agent nor any Split Note Holder (i)  shall be responsible in any manner to any Split Note Holder for any recitals, statements, representations or warranties made by the Mortgage Borrower or other Mortgage Loan Party contained in the Mortgage Loan Agreement or any other Mortgage Loan Document or by the Mortgage Borrower or any other Mortgage Loan Party in any certificate, report, statement or other document referred to or provided for in, or received under or in connection with the Mortgage Loan Agreement or any other Mortgage Loan Document or for the value, validity, effectiveness, genuineness (as long as the Agent complied with the Servicing Standard), enforceability or sufficiency of this Agreement, the Mortgage Loan Agreement or any other Mortgage Loan Document or any such certificate, report, statement or other document, or of any Mortgaged Property; (ii) shall be responsible for, or inquire as to, the performance or observance by the Mortgage Borrower or any other Mortgage Loan Party of any of the terms, covenants or conditions of the Mortgage Loan Documents; (iii) shall have any duty to inspect the Mortgaged Property (including the books and records of the Mortgage Borrower or any other Mortgage Loan Party, except as may be specifically provided herein); and (iv) shall incur any liability under or with respect to the Mortgage Loan or under the Mortgage Loan Documents or with respect to any Mortgaged Property by acting in good faith upon any notice, resolution, affidavit, letter, statement, consent, certificate or other instrument or writing (which may be by telegram, telecopy, cable or telex) or conversation (including by telephone) believed by it to be genuine (as long as the Agent complied with the Servicing Standard) and signed or sent by the proper party or parties or by acting in good faith upon any representation or warranty of the Mortgage Borrower or any Mortgage Loan Party made or deemed to be made under any Mortgage Loan Document.

14

No successor Agent shall be liable for any act or omission of any prior Agent which occurred prior to the date such successor Agent assumed the role of successor Agent.

(b)    The Agent shall maintain a register for the recordation of the names and addresses of the Split Note Holders, the amount of each Split Note Holder's Pro Rata Interest and the name and address of each Split Note Holder's agent for service of process (the "**Register**"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Agent and the Split Note Holders may treat each person or entity whose name is recorded in the Register as a Split Note Holder hereunder for all purposes of this Agreement. The Register shall be available for inspection and copying by any Split Note Holder during normal business hours upon reasonable prior notice to the Agent. The Agent shall also maintain a copy of each Assignment and Assumption agreement delivered to the Agent.

2.02.    <u>Powers of the Agent</u>. Except as otherwise expressly provided for in the Mortgage Loan Documents or this Agreement, including Section 2.03 hereof, the Agent shall have the right, in its commercially reasonable discretion, in each instance subject to the Servicing Standard, (i) to grant or withhold approvals under the Mortgage Loan Documents; (ii) to agree to the modification or waiver of any of the terms or provisions of the Mortgage Loan Documents; (iii) to consent to any action or failure to act by the Mortgage Borrower or any other Mortgage Loan Party; and (iv) to exercise or refrain from exercising any rights which the Agent or the Split Note Holders may have with respect to the Mortgage Loan, the Mortgage Loan Documents or the Mortgaged Property, including, without limitation, the right to:

(a)    receive, review and process all documents, certificates, opinions, insurance policies, reports, requisitions and other materials of every nature and description submitted by, or on behalf of, the Mortgage Borrower and pursuant to this Agreement, the Mortgage Loan Agreement, the Mortgage or the other Mortgage Loan Documents, and to determine whether or not the Mortgage Borrower or any other Mortgage Loan Party is in compliance with the requirements of the Mortgage Note, the Mortgage, the Mortgage Loan Agreement and the other Mortgage Loan Documents;

(b)    make Protective Advances in accordance with the provisions of this Agreement and the Mortgage Loan Documents;

(c)    receive all payments of principal, interest, fees and other charges paid by or on behalf of the Mortgage Borrower and distribute all such funds to the Split Note Holders as provided for in this Agreement;

(d)    enforce or refrain from enforcing all of the rights, remedies and privileges afforded or available to the respective Split Note Holders under the terms of the Mortgage Loan Agreement, the Mortgage Note and the other Mortgage Loan Documents, any opinion, certificates, warranties, representations or insurance policies furnished by or on behalf of the Mortgage Borrower or any other Mortgage Loan Party;

15

(e)    in connection with any Enforcement Action, subject to Section 2.03, (1) bring such Enforcement Action in the Agent's name, as the Agent for all of the Split Note Holders collectively, (2) retain and direct counsel to prosecute such Enforcement Action on behalf of the Agent for all of the Split Note Holders, (3) make all decisions concerning the appointment of a receiver, the conduct of such Enforcement Action, the collection of any judgment, the settlement of such Enforcement Action, the acceptance of a deed-in-lieu of foreclosure, the bid on behalf of the Split Note Holders at any foreclosure sale, and the commencement and conduct of any deficiency judgment proceeding, (4) subject to Section 4.03 hereof, determine the manner of taking and holding title to the Mortgaged Property, and the sale of the Mortgaged Property after foreclosure, and (5) otherwise act on behalf of (and act at the direction of in accordance with Section 2.03 hereof) the Split Note Holders in connection with such Enforcement Action;

(f)    in connection with any Bankruptcy Action, (1) the Agent shall submit or file a proof of claim on behalf of any Split Note Holder, as agent for same, if and to the extent that such Split Note Holder has failed to file its own proof of claim on or prior to the tenth (10th) day immediately preceding the expiration of the time period for filing claims, (2) vote on behalf of the Split Note Holders pursuant to their direction in accordance with Section 2.03 below, and (3) otherwise act on behalf of (and, in accordance with Section 2.03 below, act at the direction of) the Split Note Holders in connection with such Bankruptcy Action; and

(g)    do or refrain from doing all such other acts as may be reasonably necessary or incident to the administration and servicing of the Mortgage Loan and the enforcement of the rights and remedies of the Split Note Holders.

2.03.    Limitations on the Agent.  The provisions of this Section 2.03 shall, as among the Agent and the Split Note Holders, govern and control any other inconsistent provision of this Agreement, including, without limitation, Section 2.02 hereof.  The Agent shall not (i) agree to the modification or waiver of any of the terms of the Mortgage Loan Agreement, the Mortgage Note, the Mortgage or the other Mortgage Loan Documents, (ii) consent to any act or omission by the Mortgage Borrower or any other Mortgage Loan Party or (iii) exercise or waive any rights which the Agent or the Split Note Holders may have with respect to the Mortgage Loan, the Mortgage Loan Agreement, the Mortgage Note, the Mortgage or the other Mortgage Loan Documents if any such agreement, consent or exercise would:

(a)    unless in each case unanimously approved by all of the Split Note Holders:

(i)    change or modify the interest rate provisions set forth in the Mortgage Loan Documents;

(ii)    increase or decrease the principal amount of the Mortgage Loan, except as permitted under the Mortgage Loan Documents or in connection with the making of Protective Advances;

16

(iii)    alter the Pro Rata Interest of any Split Note Holder;

(iv)    extend the Maturity Date of the Mortgage Loan;

(v)    forgive the payment of principal of, or interest on (other than interest at the Default Rate), the Mortgage Loan or the payment of any other sum or fee due under the Mortgage Loan Documents to which the Split Note Holders are entitled; provided, however, if any Split Note Holder is entitled to any additional amounts described in the Mortgage Loan Agreement, any such Split Note Holder may forgive the payment of any such sums due only to such Split Note Holder without requiring the consent of any other Split Note Holder;

(vi)    amend or modify in any material respect the terms and provisions of this Agreement;

(vii)    release all or any portion of the Mortgaged Property or Mortgage Loan Documents (including guaranties, pledges, required equity contributions and recourse obligations) for the Mortgage Loan except as expressly permitted without the Agent's consent pursuant to this Agreement or as expressly permitted by the Mortgage Loan Agreement or other Mortgage Loan Documents or modify any terms with respect to the conditions of release of the Mortgaged Property or Mortgage Loan Documents (including guaranties, pledges, required equity contributions and recourse obligations) in any respect or release Mortgage Borrower, Guarantor or any other credit support party or any other Persons liable under any of the Mortgage Loan Documents from any obligation under the Mortgage Loan Documents;

(viii)    postpone any date for payment of principal of, or interest on (other than interest at the Default Rate), the Mortgage Loan or the payment of any other sum or fee due under the Mortgage Loan Documents to which the Split Note Holders are entitled; provided, however, if any Split Note Holder is entitled to any additional amounts described in the Mortgage Loan Agreement, any such Split Note Holder may agree to the postponement of payment of any such sums due only to such Split Note Holder without requiring the consent of any other Split Note Holder;

(ix)    amend or modify in any material respect the terms and provisions of the Intercreditor Agreement;

(x)    enter into or modify any agreement subordinating any of the Split Notes to any indebtedness;

(xi)    permit or consent to any Transfer (other than a Transfer permitted pursuant to the terms of the Intercreditor Agreement) or voluntary or involuntary sale or transfer of all or any portion of the Mortgaged Property or permit any subordinate financing (other than the Mezzanine Loan) or additional financing of all or any portion of the Mortgaged Property except as expressly permitted

17

without the Agent's consent by this Agreement or except to the extent any of the same is expressly permitted by the Mortgage Loan Agreement;

Each of the foregoing modifications and other actions set forth in this Section 2.03(a) shall be referred to as an "**Unconditional Unanimous Consent Modification.**"

(b)    unless in each case consented to or directed by the Required Split Note Holders:

(i)    deliver a written waiver of any material obligation under the Mortgage Loan Documents or a claim against Mortgage Borrower (other than any waiver described in subsection (a) above, for which the unanimous approval of all Split Note Holders shall be required);

(ii)    make arrangements for or agree to the distribution of any insurance or condemnation proceeds in a manner not contemplated by the Mortgage Loan Documents;

(iii)    consent to an appraisal to determine the full insurable value of the Improvements; or

(iv)    consent to any material change in the use of the Mortgaged Property

Notwithstanding anything to the contrary herein, (i) each Split Note Holder shall have the sole right to waive any provisions of the Mortgage Loan Documents relating to the payment of interest at the Default Rate on any amounts due and owing with respect to the Note held by such Split Note Holder and (ii) to the extent that any of the modifications and/or other actions set forth in this Section 2.03(b) shall cause to occur or otherwise result in any Unconditional Unanimous Consent Modification, the unanimous consent of all of the Split Note Holders shall be required as provided under Section 2.03(a) hereof.

As to any matters which are subject to the consent or direction of all Split Note Holders or the Required Split Note Holders, the Agent shall not be permitted or required to exercise any discretion or take any action except upon the instructions of all the Split Note Holders or the Required Split Note Holders, as the case may be, which instructions shall be binding upon all Split Note Holders. The Agent and its directors, officers, agents and employees shall be fully protected in acting or in refraining from action upon such instructions or direction. In no event shall the Agent be required to take any action which exposes the directors, officers, agents or employees of the Agent to personal liability or which is contrary to the Mortgage Loan Documents or applicable law. As to any matters not expressly provided for by the Mortgage Loan Documents or this Agreement, the Agent shall not be required to exercise any discretion or take any action, unless such inaction on the part of the Agent exposes the Agent or its directors, officers, agents or employees to personal liability or is contrary to applicable law or violates the Servicing Standard. In acting hereunder as the Agent, the Agent shall be acting for its own account as one of the Split Note Holders, and for the account of the

18

other Split Note Holders, to the extent of their respective Pro Rata Interests in the Mortgage Loan.

2.04.    Approval of Split Note Holders.    All communications from the Agent to the Split Note Holders requesting the Split Note Holders' determination, consent, approval or disapproval (i) shall be given in the form of a written notice to each of the Split Note Holders, (ii) shall be accompanied by a description of the matter or thing as to which such determination, approval, consent or disapproval is requested, and shall advise each of the Split Note Holders where such matter or thing may be inspected, or shall otherwise adequately describe the matter or issue to be resolved, (iii) shall include, to the extent not previously provided to the Split Note Holders, all written materials (to the extent necessary to make an informed decision) and a description of all oral information (to the extent necessary to make an informed decision) provided to the Agent in respect of the matter or issue to be resolved and (iv) shall include the Agent's recommended course of action or determination in respect thereof. The Split Note Holders shall reply within seven (7) Business Days after receipt of such notice or such shorter period as may be required under the Mortgage Loan Documents and as specifically identified to the Split Note Holders by the Agent so as to not prejudice the Agent's or any Split Note Holder's position under the Mortgage Loan Documents, provided, however, that if any Split Note Holder has not replied to the Agent with such seven (7)-Business Day period, the Agent shall send such Split Note Holder a second notice of such request, which second notice shall inform such Split Note Holder that its response to such request is required within an additional three (3) Business Days. Such second notice shall include a bold-faced, conspicuous legend at the top of the first page thereof stating that "IF YOU FAIL TO RESPOND TO, OR EXPRESSLY DENY, THIS REQUEST IN WRITING WITHIN THREE BUSINESS DAYS YOUR APPROVAL SHALL BE DEEMED GIVEN." Failure of a Split Note Holder to respond to the second notice within such additional three (3)-Business Day time frame shall be deemed to be an approval of such recommendation or determination.

2.05.    Enforcement Actions; Bankruptcy Actions; Protective Advances.    Each of the Split Note Holders acknowledges and agrees that no individual Split Note Holder may (i) separately enforce or exercise any of the provisions of any of the Mortgage Loan Documents (including, without limitation, the Notes) other than through the Agent, or (ii) separately appear, submit or file any claim, vote, or take any other action in any Bankruptcy Action other than through the Agent, except that each Split Note Holder shall have the right to file its own proof of claim in any Bankruptcy Action. The Agent shall advise the Split Note Holders of all material actions which the Agent takes in accordance with the provisions of this Section 2.05. No Split Note Holder shall make a Protective Advance without the consent of the Required Split Note Holders except the Agent may make such an advance in the event of any emergency or any other expense if the consequences of failure to prevent or cure could have an adverse affect on the value of the Mortgaged Property or the Mortgage Loan. Any such Protective Advances made by the Agent shall accrue interest at the Prime Rate from the date advanced until repaid to the Agent as provided hereunder. If at any time a holder of any interest in the Mezzanine Loan is also a Split Note Holder, then such Split Note Holder shall have no right to authorize, approve, vote on or consent to a Protective Advance.

19

2.06.  Notice to Split Note Holders.  The Servicer shall promptly provide each Split Note Holder with copies of all financial statements delivered by the Mortgage Borrower or any other Mortgage Loan Party to the Servicer pursuant to the Mortgage Loan Agreement.  Each Split Note Holder agrees to keep such financial statements confidential to the same extent that the Lender is obligated to the Mortgage Borrower to keep such statements confidential as provided in the Mortgage Loan Agreement.  The Servicer shall promptly deliver to the Split Note Holders all material information regarding the Mortgaged Property (including without limitation, quarterly and annual officer's certificates, comfort letters, operating statements, sales reports and management and operating reports delivered pursuant to the Mortgage Loan Agreement), the Mortgage Borrower or any Mortgage Loan Party, and any other holder of any of the ownership interests of the Mortgage Borrower or any Mortgage Loan Party furnished to or obtained by the Servicer, as the Servicer or as one of the Split Note Holders, with respect to the Mortgage Loan.  The Servicer shall also promptly deliver to the Split Note Holders copies of all notices (including, without limitation, notices of Default) and other communications of a material nature relating to the Mortgage Loan and all notices received under the Intercreditor Agreement which are sent or received by the Servicer. The Servicer shall promptly notify the Split Note Holders of any notice of prepayment received from the Mortgage Borrower.

2.07.  Hazard Insurance and Condemnation Award.  If any Split Note Holder becomes aware of any damage to any Mortgaged Property, or of any actual or potential condemnation affecting any Mortgaged Property or the security for the Mortgage Loan, it shall promptly notify the Agent of the occurrence and nature thereof.  The Agent shall promptly notify each of the Split Note Holders of, and, upon prior written consent of the Required Split Note Holders, shall have the authority to adjust, compromise or settle hazard insurance or condemnation claims in accordance with the provisions of the Mortgage Loan Documents.  The net proceeds of any insurance or condemnation award, after payment of fees, expenses and costs of collection, shall be made available to the Mortgage Borrower to restore or replace the Mortgaged Property or be applied to the principal amount of the Mortgage Loan in accordance with the provisions of the Mortgage Loan Documents and in accordance with the provisions of applicable law.  To the extent permitted by applicable law and not otherwise provided for in the Mortgage Loan Documents, the proceeds of any insurance recovery or condemnation award received by the Agent and not immediately disbursed or immediately applied to the Indebtedness or not otherwise distributed by the Agent in accordance with the Mortgage Loan Documents or this Agreement, shall be deposited in an interest-bearing account for the benefit of the Split Note Holders, which account shall provide for interest at then prevailing market rates, provided that nothing herein shall require that interest be earned at the highest prevailing rates.  The income, if any, received by the Agent from such account and not payable to others shall be shared by the Split Note Holders in accordance with their respective Pro Rata Interests.

2.08.  Inspection.  The Agent, upon the written request of any Split Note Holder, shall make, or cause to be made, reasonable inspections of the Mortgaged Property and shall provide the Split Note Holders with reasonable information with respect to the condition of the Mortgaged Property.  Provided no Event of Default exists, such

inspections shall be made not more frequently than semi-annually. In the event that the Agent inspects the Mortgaged Property in accordance with the foregoing, the Agent shall notify each Split Note Holder of such inspection at least 24 hours prior to such inspection and each Split Note Holder or its representative shall have the right to accompany the Agent on such inspection.

2.09.    Business Activities of Each Split Note Holder.  Each Split Note Holder acknowledges that the other Split Note Holders and their respective Affiliates may make loans or otherwise extend credit to and generally engage in any kind of business with any Affiliate of the Mortgage Borrower ("**Mortgage Borrower Related Parties**"), and receive payments on such other loans or extensions of credit to Mortgage Borrower Related Parties and otherwise act with respect thereto freely and without accountability in the same manner as if this Agreement and the transactions contemplated hereby were not in effect.  No Split Note Holder shall assign its Note to the Mortgage Borrower, any Mortgage Borrower Related Parties or the Mezzanine Borrower.

2.10.    Mortgage Loan Documents.  To the extent of any conflict between Article IX of the Mortgage Loan Agreement and this Agreement, the terms and conditions of this Agreement shall prevail and control.  To the extent not addressed in this Agreement, the terms and conditions of Article IX of the Mortgage Loan Agreement shall govern and control, and such terms and conditions set forth in Article IX of the Mortgage Loan Agreement are incorporated herein by this reference.

SECTION 3.  PAYMENTS, INCREASED COSTS, PERMITTED TRANSACTIONS

3.01.    Method of Payment.  Upon receipt of any payments of principal of, interest on and other amounts due with respect to the Mortgage Loan, the Servicer shall promptly, but in no event later than 12:00 noon, New York City time, on the Business Day which is two (2) Business days following the collection in immediately available funds of any such payment by the Agent or the Servicer on behalf of the Agent distribute, in immediately available funds, to each Split Note Holder entitled to payment in accordance with this Agreement, the amount to which such Split Note Holder is entitled. The distribution to each Split Note Holder hereunder shall be to the account specified in Exhibit B unless otherwise specified in writing to the Agent.  Each payment to the Agent or the Servicer on behalf of the Agent under this Section 3.01 shall constitute a payment by the Mortgage Borrower to the Split Note Holders in the amount of such payment, and any portion of the Mortgage Loan paid by any such payment to the Agent or the Servicer on behalf of the Agent by or on behalf of the Mortgage Borrower shall not be considered outstanding for any purpose after the date of its receipt by the Agent or the Servicer on behalf of the Agent.

3.02.    Payments.  All amounts tendered by or collected from the Mortgage Borrower or any other Person or otherwise available for payment of the Mortgage Loan (including amounts received by any Servicer), whether received in the form of monthly payments, spread maintenance payments, foreclosure proceeds, funds received as a result of the taking of any Enforcement Action by the Agent, proceeds from the sale of the Mortgaged Property, proceeds under title, hazard or other insurance policies or awards or

settlements in respect of condemnation proceedings or similar exercise of the power of eminent domain (other than (i) proceeds, awards or settlements which are required to be applied to the restoration or repair of the Mortgaged Property or released to the Mortgage Borrower in accordance with the Mortgage Loan Documents, notwithstanding the occurrence of a Loan Default, and (ii) amounts collected on the Mortgage Loan that are then due and payable to the Servicer under the Mortgage Loan and any interest accrued thereon incurred in connection with the Mortgage Loan) shall be applied in the following order of priority:

(a)    first, to the Split Note Holders to reimburse the amount of any Protective Advances made by the Split Note Holders in accordance with this agreement in the same order in which such Protective Advances were made by the Split Note Holders; and

(b)    second, to the Split Note Holders pro rata in proportion to their respective Pro Rata Interests and pari passu in an amount equal to all amounts due under the A Notes to satisfy the A Notes in full.

3.03.    Increased Cost of the Mortgage Loan. If any Split Note Holder is entitled to, and decides to require payment of, any additional amounts described in the Mortgage Loan Agreement, such Split Note Holder shall: (a) give written notice thereof to the Agent, who shall notify the Mortgage Borrower, and such sums shall be payable to such Split Note Holder at the rate and place indicated in such notice subject to the terms of this Agreement and the Mortgage Loan Documents; and (b) simultaneously with the giving of such notice, furnish to the Agent (who may, but is not obligated to, furnish to the Mortgage Borrower) at least ten (10) Business Days prior to each date on which such additional amounts are payable, a certificate of an officer of such Split Note Holder setting forth the amount to which such Split Note Holder is then entitled pursuant to the Mortgage Loan Documents. Such Split Note Holder's certificate shall be consistent with such Split Note Holder's good faith determination of the costs incurred, directly or indirectly, by it with respect to the related amounts and shall be accompanied by such other supporting documentation and evidence as the Agent or the Mortgage Borrower shall reasonably require. The Agent shall remit to such Split Note Holder the Split Note Holder's interest in such additional amounts to the extent collected and in accordance with the terms and conditions of Section 3.01 hereof.

3.04.    Taxes. All taxes due and payable on any payments to be made to a Split Note Holder in respect of the Mortgage Loan or under the Mortgage Loan Agreement shall be such Split Note Holder's sole responsibility. All payments payable to the Split Note Holders hereunder or with respect to the Mortgage Loan shall be made to the Split Note Holders without deduction for any taxes, charges, levies or withholdings except to the extent, if any, that such amounts are required to be withheld by the Agent under the laws, rules and regulations of the United States of America and any other applicable taxing authority. If a Split Note Holder is organized or is existing under the laws of another jurisdiction outside the United States, such Split Note Holder shall provide to the Agent upon the execution of this Agreement and, from time to time thereafter, completed and signed copies of any form that may be required by the United States Internal Revenue Service in order to certify such Split Note Holder's exemptions from United

States withholding taxes with respect to payments to be made to such Split Note Holder in respect of the Mortgage Loan or under the Mortgage Loan Agreement or such other documents as are necessary to indicate that all such payments are exempt from withholding taxes or subject to such taxes at a rate reduced by an applicable tax treaty.

3.05.    Excess Payments.  If any Split Note Holder or the Agent in its capacity as a Split Note Holder shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off or otherwise) on account of its interest in the Mortgage Loan in excess of the amount to which it is entitled pursuant to this Agreement, such excess shall be shared among all Split Note Holders in accordance with their respective Pro Rata Interests.  However, if all or any portion of such excess payment is thereafter recovered by the Mortgage Borrower or other party entitled thereto through legal action or otherwise, each Split Note Holder shall reimburse the party required to refund such payment to the Mortgage Borrower or any other party entitled thereto in an amount equal to the amount such Split Note Holder so received.  Within three (3) Business Days of obtaining any excess payment, each Split Note Holder agrees to notify the Agent of such excess payment.

3.06.    Recaptured Payments.  If the Agent or any Servicer holding or having distributed any amount received or collected in respect of the Notes determines, or a court of competent jurisdiction orders, at any time that any amount received or collected in respect of the Notes must, pursuant to any insolvency, bankruptcy, fraudulent conveyance, preference or similar law, be returned to the Mortgage Borrower or paid to any Split Note Holder, the Agent or any Servicer or paid to any other Person, then, notwithstanding any other provision of this Agreement, neither the Agent nor any Servicer shall be required to distribute any portion thereof to any Split Note Holder, and each Split Note Holder shall promptly repay on demand a portion of the amount to be returned to the Mortgage Borrower based on each Split Note Holder's Pro Rata Interest in the Mortgage Loan, together with interest thereon at such rate, if any, as shall have been required to be paid to the Mortgage Borrower, any Split Note Holder, the Servicer or such other Person with respect thereto.  The return of any funds pursuant to the foregoing sentence shall be allocated among the Split Note Holders so that any losses are allocated to the Split Note Holders based on their respective Pro Rata Interests. Each of the Split Note Holders agrees that if at any time it shall receive from any sources whatsoever any payment on account of the Mortgage Loan in excess of its distributable share thereof, it shall promptly remit such excess to the Agent and the Agent shall hold such payment in trust for the other Split Note Holders.  The Agent shall have the right to offset any amounts due hereunder from any of the Split Note Holders with respect to the Mortgage Loan against any future payments due to any Split Note Holder, as applicable, under the Mortgage Loan, provided, that the obligations of each of the Split Note Holders under this Section 3.06 are separate and distinct obligations from one another and in no event shall the Agent or the Servicer enforce the obligations of any Split Note Holder against the other Split Note Holders.  The obligations of the Split Note Holders under this Section 3.06 constitute absolute, unconditional and continuing obligations and the Agent and the Servicer shall be deemed a third party beneficiary of these provisions.

3.07.  Return of Payments.  If, for any reason, the Servicer makes any payment to any Split Note Holder before the Servicer has received or applied that corresponding payment on the Mortgage Loan (it being understood that the Servicer is under no obligation to do so), and, thereafter, the Servicer does not receive the corresponding payment within five (5) Business Days of the date the Servicer made such payment to such Split Note Holder, such Split Note Holder shall, at the Servicer's request, return that payment to the Servicer within three (3) Business Days following such request.  In addition, such Split Note Holder shall simultaneously remit interest on that payment at the overnight rate for federal funds transactions between member banks of the Federal Reserve System, as published by the Federal Reserve Bank of New York, for each day from the making of that payment to such Split Note Holder until its return to the Servicer. If the Servicer has received or applied any payment in respect of the Mortgage Loan and has paid any Split Note Holder on account of such payment and, thereafter, that payment or application is rescinded or must otherwise be returned or paid over by the Servicer under applicable law, whether or not required pursuant to any bankruptcy or insolvency law, the sharing of payments clause of any Mortgage Loan Document or otherwise, such Split Note Holder shall, at the Servicer's request, return the amount so received to the Servicer within three (3) Business Days following such request.  In addition, such Split Note Holder shall simultaneously remit any interest or other amount required to be paid by the Servicer with respect to that payment or application.  All requests pursuant to this Section 3.07 shall be promptly confirmed in writing, and such confirmation shall include an explanation of the circumstances giving rise to such request.

3.08.  Permitted Transactions with Mortgage Borrower or Any Other Mortgage Loan Party.  The Agent,  the Split Note Holders and their Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with the Mortgage Borrower or any Mortgage Loan Party, any principal or partner of the Mortgage Borrower or any Mortgage Loan Party, and any person or entity who may do business with or own securities of the Mortgage Borrower or any Mortgage Loan Party or of any principal or partner of the Mortgage Borrower or any Mortgage Loan Party, all as if the Agent, and the Split Note Holders were not acting as lenders, and the Agent was not acting as the Agent in respect of the Mortgage Loan, and without any duty to account therefor, but subject to the Servicing Standard.  Notwithstanding the preceding sentence, the Agent and the Split Note Holders each agree in their respective capacities hereunder to act fairly and without discrimination with respect to the Mortgage Loan notwithstanding any other transactions or business each may have with the Mortgage Borrower or any Mortgage Loan Party, any principal or partner of the Mortgage Borrower or any Mortgage Loan Party, and any person or entity who may do business with or own securities of the Mortgage Borrower or any Mortgage Loan Party or of any principal or partner of the Mortgage Borrower or any Mortgage Loan Party; however, the foregoing shall not limit the rights of either the Split Note Holders or the Agent to enforce any remedies with respect to such other transactions.  If any property is taken by the Agent or the Split Note Holders as collateral for any other loans or extensions of credit made by the Agent, or the Split Note Holders to or for the Mortgage Borrower or any Mortgage Loan Party, or any property is in the Agent's, or any Split Note Holder's possession or control, or any deposit is held or other indebtedness is owing by the Agent, or any Split Note Holder, and that property, deposit or indebtedness, or the

24

proceeds thereof, may be or become collateral for or otherwise available for payment in connection with the Mortgage Loan by reason of the general description of secured obligations contained in any security agreement or other agreement or instrument held by the Agent or any Split Note Holder or by reason of a right of set-off, counterclaim or otherwise, the other Split Note Holders shall have no interest in that property, deposit or indebtedness, or the proceeds thereof, except that if the property, deposit or indebtedness, or the proceeds thereof, shall be applied in reduction of amounts outstanding in connection with the Mortgage Loan, then, subject to Section 3.07 hereof, the other Split Note Holders shall be entitled to the amount provided in this Agreement with respect to such payment.

3.09  <u>First Interest Payment Pro Ration</u>.  Notwithstanding anything to the contrary contained herein, the parties hereto hereby acknowledge and agree that the payment of interest due on October 9, 2007, under the Split Notes shall be prorated and disbursed as follows:

(a)    pari passu to the Split Note Holders accordance with their Pro Rata Interests in an amount equal to the accrued and unpaid interest on the Mortgage Loan, for the period commencing on the September 9, 2007 through and including October 8, 2007 at the rates per annum specified in the Split Notes; and

(b)    all accrued and unpaid interest on the Split Notes for the period from September 9, 2007 through and including the date immediately preceding the date of this Agreement shall be paid by each Assignee to Assignor on the Settlement Date (as such terms are defined in the Assignment and Assumption Agreement).

## SECTION 4.  DEFAULT BY MORTGAGE BORROWER

4.01.  <u>Acceleration</u>.  Upon the occurrence of a Loan Default, the Split Note Holders hereby agree to consult with each other during the fifteen (15)-day period immediately following such occurrence with respect to the exercise of any rights and remedies the Split Note Holders may have under the Mortgage Loan Documents or the commencement of any Enforcement Action against the Mortgaged Property.  The Agent shall promptly notify all of the Split Note Holders of the decision made or direction given by the Required Split Note Holders.    During such fifteen (15)-day period, no Enforcement Action shall be taken unless directed by the Required Split Note Holders.  If at the end of such fifteen (15)-day period, (a) the Loan Default has not been cured or waived in accordance with the terms of this Agreement, or (b) the Required Split Note Holders have not affirmatively directed the Agent to either take an Enforcement Action or to take no action, the Agent shall declare the outstanding principal balance of the Notes, all interest thereon and all other amounts payable under the Mortgage Loan Documents to be immediately due and payable and commence an Enforcement Action, including, without limitation, the commencement of a foreclosure action or similar action against the Mortgaged Property, provided that (A) such action is not stayed by any bankruptcy or insolvency proceeding or any other injunction or court order, (B) the Agent believes in good faith that such action shall not expose the Agent to any liability from any

party, including without limitation, Mortgage Borrower or any Split Note Holder and (C) such Loan Default shall constitute a material Loan Default. If after commencing such Enforcement Action, the Agent is directed to cease such Enforcement Action or to take another course of action by the Required Split Note Holders under the terms of this Agreement, the Agent shall follow such direction.

    4.02.  <u>Enforcement of Remedies</u>. Subject to the provisions of Sections 2.05 and 4.01 hereof, the Required Split Note Holders shall determine whether and in what manner and to what extent, any and all rights under the Mortgage Loan Documents shall be exercised by the Agent in respect of a Loan Default (including, without limitation, during the pendency of any Bankruptcy Action), including, but not limited to, whether all or any portion of the Mortgaged Property should be acquired or realized upon and, if it is determined that an acquisition should be made, whether such acquisition should be made by the acceptance of a deed in lieu of foreclosure or by purchase at foreclosure sale or otherwise. The Agent shall thereupon take such action as is approved or directed by the Required Split Note Holders.

    4.03.  <u>Title to Mortgaged Property</u>. In the event that all or any portion of the Mortgaged Property is acquired by the Agent as the result of a foreclosure or the acceptance of a deed or assignment in lieu of foreclosure, or is retained in satisfaction of all or any part of Mortgage Borrower's obligations, title to any such Mortgaged Property or any portion thereof shall be held in the name of the Agent or a nominee or subsidiary of the Agent, in any case as agent, for the ratable benefit of the Split Note Holders. The Agent shall promptly after the taking of title prepare a recommended course of action for such Mortgaged Property (the "**Post-Foreclosure Plan**"), which shall be subject to the approval of the Required Split Note Holders in accordance with the procedure set forth in Section 2.04 hereof. The Agent shall manage, operate, repair, administer, complete, construct, restore or otherwise deal with the Mortgaged Property so acquired in accordance with the Servicing Standard and the Post-Foreclosure Plan and administer all transactions relating thereto, including, without limitation, employing a managing agent and other agents, contractors and employees, including agents for the sale of such Mortgaged Property, or any portion thereof, and the collecting of rent and other sums from such Mortgaged Property, and paying expenses of such Mortgaged Property. The Agent shall render, or cause to be rendered by the managing agent, to each of the Split Note Holders, monthly, an income and expense statement for the Mortgaged Property. Each of the Split Note Holders shall contribute its Pro Rata Interest of any operating loss for such Mortgaged Property, and such other expenses and operating reserves as the Agent shall deem reasonably necessary within five (5) Business Days following notice thereof. To the extent there is net operating income from such Mortgaged Property, the Agent shall determine the amount and timing of distributions to the Split Note Holders. All such distributions shall be made to the Split Note Holders in accordance with Section 3.02 of this Agreement. The Agent shall undertake to sell such Mortgaged Property, at such price or prices and upon such terms and conditions as may be approved pursuant to Section 2.03. Any sales proceeds from any portion of the Mortgaged Property remaining after each Split Note Holder receives all amounts to which it is entitled pursuant to Section 3.02 shall be distributed to the Split Note Holders in accordance with their Pro Rata Interests.

## SECTION 5.  DEFAULT BY AGENT OR SPLIT NOTE HOLDER

5.01.  Defaults.

(a)    If, for any reason, the Agent, as a Split Note Holder but not as an the Agent, or any of the Split Note Holders shall fail or refuse to abide by its obligations under the Mortgage Loan Agreement, this Agreement or the other Mortgage Loan Documents and such failure continues five days after written notice from the Agent (or if the Agent, as a Split Note Holder, is the one refusing or failing to abide by its obligations, from any other Split Note Holder) of such failure (provided that no such written notice and opportunity to cure shall be applicable to the extent that it may, in any way, prejudice or adversely affect the rights or remedies of Lender under the Mortgage Loan Agreement or any of the other Mortgage Loan Documents) (each a "**Defaulting Split Note Holder**"), then, in addition to the rights and remedies that may be available to the Agent and the other Split Note Holders at law and in equity, such Defaulting Split Note Holder's right to participate in the administration of the Mortgage Loan and the Mortgage Loan Documents, including without limitation, any rights to consent to or direct any action or inaction of the Agent shall be suspended during the pendency of such failure or refusal.

(b)    If, for any reason, the Defaulting Split Note Holder fails to make timely payment of any amount required to be paid by it hereunder or under the Mortgage Loan Documents, in addition to other rights and remedies which the Agent, on behalf of all Split Note Holders, may have under Section 5.01(a) hereof or otherwise, the Agent, on behalf of all Split Note Holders, shall be entitled (i) to collect interest from the Defaulting Split Note Holder for the period from (and including) the date on which the payment was due until (but excluding) the date on which the payment is made at the Prime Rate, (ii) pursuant to Section 5.01(d) hereof, to withhold or set off, and to apply to the payment of the defaulted amount and any related interest, any amounts to be paid to the Defaulting Split Note Holder under this Agreement, and (iii) to bring an action or suit against the Defaulting Split Note Holder in a court of competent jurisdiction to recover the defaulted amount and any related interest.

(c)    If the Agent is a Defaulting Split Note Holder, the Current Split Note Holders holding at least sixty six and two thirds percent (66 ⅔%) of the outstanding principal balance of the Notes shall have the immediate right to terminate the Agent as the Agent and appoint a successor Agent pursuant to Section 1.07 hereof (provided that for this purpose if any Split Note Holder is a Defaulting Split Note Holder, such Split Note Holder's Pro Rata Interest shall be excluded in determining which Split Note Holders constitute at least sixty six and two thirds percent (66 ⅔%) of the outstanding principal balance of the Notes).  Until such time as such successor Agent has accepted such appointment, the Agent shall take no action other than upon the consent or direction of the Required Split Note Holders or, if such action requires the consent or direction of all of the Split Note Holders, upon the consent or direction of all of the Split Note Holders other than the Agent.

27

(d)    If any Defaulting Split Note Holder shall fail to make any advance required under the Mortgage Loan Documents or this Agreement, the Current Split Note Holders shall have the right to fund such advance on behalf of the Defaulting Split Note Holder (and if more than one Current Split Note Holder desires to fund such advance, then the funding shall be made in accordance with their respective Pro Rata Interests recalculated for the purposes hereof to exclude the Defaulting Split Note Holder). All Obligations owing to a Defaulting Split Note Holder and to be applied or distributed hereunder shall be subordinated in right of payment, as provided in the following sentence, to the prior payment in full of all principal of, interest on and fees relating to the advances funded by the Current Split Note Holders in connection with any such advances in which the Defaulting Split Note Holder has not funded its Pro Rata Interest (or has otherwise failed or refused to abide by its obligations under the Mortgage Loan Agreement, this Agreement or the other Mortgage Loan Documents and such failure or refusal has a material adverse affect on the Split Note Holders, the Mortgage Loan or the Mortgage Borrower) (such principal, interest and fees being referred to as "**Default Loans**" for the purposes of this Section 5.01(d)). Each Default Loan shall accrue interest at the Prime Rate. All amounts paid by the Mortgage Borrower and otherwise due to be applied to the Obligations owing to such Defaulting Split Note Holder pursuant to the terms hereof shall be distributed by the Agent to the Current Split Note Holders holding Default Loans in accordance with the respective balances of the outstanding Default Loans until all Default Loans have been paid in full. Upon such payment in full of all Default Loans, the Defaulting Split Note Holder shall no longer be deemed a Defaulting Split Note Holder. This provision governs only the relationship among the Agent, each Defaulting Split Note Holder and the Current Split Note Holders; nothing hereunder shall limit the obligation of Mortgage Borrower to repay all Mortgage Loans in accordance with the terms of the Mortgage Loan Documents. The provisions of this section shall apply and be effective regardless of whether a Loan Default occurs, and notwithstanding (i) any other provision of this Agreement to the contrary, (ii) any instruction of the Mortgage Borrower as to its desired application of payments or (iii) the suspension of such Defaulting Split Note Holder's rights to vote on matters which are subject to the consent or approval of the Split Note Holders or all of the Split Note Holders.

5.02.    Advances.    Each of the Agent, solely in its capacity as a Current Split Note Holder, and any one or more of the other Current Split Note Holders may, at their respective option, pay to the Agent all costs, expenses or disbursements incurred or made by the Agent pursuant to the terms of this Agreement not theretofore paid by a Defaulting Split Note Holder and the amounts so paid shall constitute Default Loans to such Defaulting Split Note Holder.

## SECTION 6.  INDEMNIFICATION

6.01.    Indemnification of the Agent.    Each Split Note Holder agrees to indemnify, defend, reimburse and hold the Agent harmless (to the extent not reimbursed by the Mortgage Borrower or any other Mortgage Loan Party), in accordance with its Pro Rata Interest, for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, reasonable costs, expenses or disbursements which may be imposed on, incurred by, or asserted against the Agent, as agent in any way relating to or arising out

28

of the Mortgage Loan, or any action taken or omitted by the Agent under this Agreement or the Mortgage Loan Documents and shall make payment with respect thereto within ten (10) Business Days of a request therefor, provided that the Split Note Holders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from, related to or arising from the breach of the Servicing Standard or this Agreement or from the gross negligence or willful misconduct of the Agent, as the case may be, as determined by a final judgment of a court of competent jurisdiction. Each Split Note Holder agrees to reimburse the Agent promptly upon demand for its Pro Rata Interest in all Protective Advances made by the Agent in accordance with the terms of this Agreement. The Agent shall be entitled to deduct from any payments to be made to the Split Note Holders under this Agreement, and to retain, amounts due the Agent as reimbursement hereunder provided that the Agent shall have first delivered to the Split Note Holders thirty (30) days prior written notice of such amounts and the circumstances giving rise thereto, and the Split Note Holders have not paid such amounts. The Agent shall make reasonable attempts to collect such amounts from the Mortgage Borrower and the other Mortgage Loan Parties. If the Agent receives payment of any amount referred to in this Section 6.01 from the Mortgage Borrower or any third party after a Split Note Holder has reimbursed the Agent for such amount, the Agent shall promptly return the amount of the reimbursement to such Split Note Holder. Any loss, cost, liability or expense occasioned solely by the conduct of any one of the Split Note Holders shall be borne solely by the party causing such loss, cost, liability or expense and such party shall indemnify, defend and hold the other Split Note Holders harmless against any and all such losses, costs and liabilities and expenses (including, but not limited to, reasonable attorneys' fees) sustained or incurred by the other Split Note Holders as a result thereof.

6.02. <u>Indemnification on Default</u>. Each Defaulting Split Note Holder shall indemnify, defend and hold the Agent and each of the other Split Note Holders harmless from and against any and all losses, damages, liabilities or expenses (including, but not limited to, reasonable attorneys' fees and interest at the Default Rate) which they may sustain or incur by reason of or as a consequence of the Defaulting Split Note Holder's failure or refusal to abide by its obligations under the Mortgage Loan Documents or this Agreement. The Agent shall set-off against principal, interest or other payments due to the Defaulting Split Note Holders for losses actually incurred by the Agent and the other Split Note Holders as a result of such Defaulting Split Note Holder's failure or refusal to abide by its obligations under the Mortgage Loan Documents or this Agreement. The exercise of the above remedies shall not reduce, diminish or liquidate the Defaulting Split Note Holder's Pro Rata Interest or the obligations for the sharing of losses and reimbursement for costs, liabilities and expenses under the Mortgage Loan Agreement and this Agreement

## SECTION 7. REPRESENTATION, WARRANTIES AND ACKNOWLEDGMENTS

7.01. <u>Split Note Holder's Representations and Warranties</u>. Each Split Note Holder hereby represents and warrants to the other parties to this Agreement, as of the date hereof:

29

(a)    The Split Note Holder has all necessary corporate power and authority to own its Pro Rata Interest in the Mortgage Loan, and has all necessary corporate power and authority to perform all its obligations with respect to this Agreement, the related Assignment and Assumption, the Mortgage Loan Agreement and the Mortgage Loan Documents;

(b)    The execution and delivery of this Agreement, the related Assignment and Assumption, the Mortgage Loan Agreement and all other instruments and documents executed in connection therewith have been duly authorized by all requisite corporate action of the Split Note Holder;

(c)    Neither the execution and delivery of this Agreement, the related Assignment and Assumption or the Mortgage Loan Agreement nor performance by the Split Note Holder thereunder will conflict with or result in a breach of any of the provisions of, or constitute a default under the organizational documents of the Split Note Holder, as amended, or any agreement, mortgage, indenture or other instrument to which the Split Note Holder is a party, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Split Note Holder is subject;

(d)    There is no litigation or governmental proceeding pending or, to the best of the Split Note Holder's knowledge, threatened which, if determined adversely to the Split Note Holder, would materially adversely affect the enforceability of this Agreement, the related Assignment and Assumption, the Mortgage Loan Agreement or any other document or instrument executed in connection herewith;

(e)    No approval, authorization, order, license or consent of, or registration or filing with, any governmental authority or other person is required in connection with this Agreement, the related Assignment and Assumption or the Mortgage Loan Agreement; and

(f)    It is, and upon its execution and delivery of this Agreement and the related Assignment and Assumption and its performance thereunder, shall continue to be (1) in compliance with any and all applicable licensing requirements of the state where the Mortgaged Property is located, if any such requirements are applicable to the Split Note Holder, and (2) (i) organized under the laws of such state or (ii) qualified to do business in such state or (iii) to the best of its knowledge, not required to qualify to do business in such state.

7.02.    <u>ERISA Representations</u>.  The Split Note Holders represent and warrant to the other parties of this Agreement that neither the execution nor delivery of this Agreement, the Mortgage Loan Agreement or the Mortgage Loan Documents or any subsequent Assignment and Assumption nor the exercise of any remedy or enforcement of any right with respect thereto will constitute a prohibited transaction within the meaning of section 406 of the Employee Retirement Income Security Act of 1974, as amended, or section 4975 of the Internal Revenue Code of 1986, as amended, for which an exemption is not available, and if such execution, delivery, purchase, exercise or enforcement constitutes such a prohibited transaction, the Split Note Holders will

cooperate with the Department of Labor, Internal Revenue Service and other affected parties in obtaining an exemption therefor. The Split Note Holders will not sell, assign, transfer, participate or otherwise dispose of its interest in the Mortgage Loan Agreement and the Mortgage Loan Documents to any entity other than the Agent unless the prospective purchaser, assignee, participant or transferee provides the Agent with a certification or opinion of counsel reasonably satisfactory to the Agent that such sale, assignment, transfer or other disposition will not constitute, and will not cause the exercise of any remedy or enforcement of any right with respect to this Agreement or the Mortgage Loan Documents to be, such a prohibited transaction.

7.03. <u>Agent's Representations and Warranties</u>. The Agent hereby represents and warrants to the other parties hereto, as of the date hereof:

(a)    The Agent has all necessary corporate power and authority to own its Pro Rata Interest in the Mortgage Loan, and has all necessary corporate power and authority to perform all its obligations with respect to this Agreement, the related Assignment and Assumption, the Intercreditor Agreement, the Mortgage Loan Agreement and the other Mortgage Loan Documents;

(b)    The execution and delivery of this Agreement, the related Assignment and Assumption and the Intercreditor Agreement and all other instruments and documents executed in connection therewith have been duly authorized by all requisite corporate action of the Agent;

(c)    Neither the execution and delivery of this Agreement, the Intercreditor Agreement, the related Assignment and Assumption, nor performance by the Agent thereunder will conflict with or result in a breach of any of the provisions of, or constitute a default under the organizational documents of the Agent, as amended, or any agreement, mortgage, indenture or other instrument to which the Agent is a party, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Agent is subject;

(d)    There is no litigation or governmental proceeding pending, or to the best of the Agent's knowledge, threatened which, if determined adversely to the Agent, would adversely affect the enforceability of this Agreement, the Intercreditor Agreement, the related Assignment and Assumption, or any other document or instrument executed in connection herewith; and

(e)    It is (1) in compliance with any and all applicable licensing requirements of the state where the Mortgaged Property is located, if any such requirements are applicable to the Agent, and (2) (i) organized under the laws of such state, or (ii) qualified to do business in such state or (iii) to the best of its knowledge, not required to qualify to do business in such state.

(f)    There are no documents evidencing or securing the Mortgage Loan other than the Mortgage Loan Documents, true and correct copies of which have been provided to each of the Split Note Holders. There are no documents between the Agent and the

holder of the Mezzanine Loan regarding the relationship between the Mortgage Loan and the Mezzanine Loan other than the Intercreditor Agreement, true and correct copies of which have been provided to each of the Split Note Holders. None of the Mortgage Loan Documents or the Intercreditor Agreement has been superseded, amended, modified, cancelled, extended or otherwise changed except as described in the recitals to this Agreement.

      7.04.   Examination of Mortgage Loan.

      (a)    Each Split Note Holder hereby acknowledges that LBHI has furnished it with copies of the Mortgage Loan Documents and financial statements, certificates, instruments, documents, affidavits, resolutions and agreements as such Split Note Holder deemed necessary to make its own credit analysis and decision in respect of the Mortgage Loan. Each Split Note Holder acknowledges that it has, independently and, except as set forth herein, in the Mortgage Loan Documents or in the Assignment and Assumption, without reliance upon the Agent or any other Split Note Holder and based on such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and to extend credit to the Mortgage Borrower. Each Split Note Holder also acknowledges to the Agent and the other Split Note Holders that it will, independently and without reliance upon the Agent or any other Split Note Holder and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action in respect of the Mortgage Loan and to make such investigation as it deems necessary to inform itself as to the business, operations, property, prospects, financial and other conditions of creditworthiness of the Mortgage Borrower and the other Mortgage Loan Parties.

      (b)    Each Split Note Holder hereby acknowledges that, except as specifically set forth herein or in the Mortgage Loan Agreement or in the Assignment and Assumption, neither the Agent nor any Split Note Holder makes any warranty or representation to the Split Note Holders and neither the Agent nor any Split Note Holder shall be responsible to any Split Note Holder for (i) any statements, warranties or representations (written or otherwise) made in or in connection with the Mortgage Loan or the Mortgage Loan Documents or for the financial condition of the Mortgage Borrower or any Mortgage Loan Party or for the title or the value of the Mortgaged Property nor (ii) the due execution, legality, validity, enforceability, genuineness, sufficiency or collectibility of any of the Mortgage Loan Documents or any other instrument or document furnished pursuant thereto or in connection with the Mortgage Loan or the legality, validity, enforceability, genuineness, sufficiency, perfection or priority of any rights in the Mortgaged Property.

## SECTION 8.  ASSIGNMENTS AND PARTICIPATIONS

      8.01.   Assignments and Participations.

      (a)    Each Split Note Holder may transfer or assign its interest in the Mortgage Loan by assignment in accordance with and subject to the terms and conditions of this

Agreement, provided that any transfer by assignment to a Split Note Holder of less than a Split Note Holder's entire interest in the Mortgage Loan shall be in a minimum amount of $10,000,000 and provided further, that with respect to each Split Note Holder, any such transfer to any Person that is not an Affiliate of an existing Split Note Holder shall be either (a) to a Qualified Transferee or (b) subject to prior written approval of the Required Split Note Holders, which approval shall not be unreasonably withheld, conditioned or delayed.

(b)      The assigning Split Note Holder will give notice of such assignment to the Agent, and the Agent will give notice of such assignment to the other Split Note Holders. Upon the effectiveness of any such assignment (and after notice to, and (to the extent required pursuant to the terms hereof), with the consent of, the Required Split Note Holders, if applicable) the assignee shall become a "**Lender**" or "**Split Note Holder**" for all purposes of this Agreement and the Mortgage Loan Documents and, to the extent of such assignment, the assigning Split Note Holder shall be relieved of its obligations hereunder to the extent of the Note being assigned, and in connection therewith, the Agent shall be authorized to amend <u>Exhibit A</u> of this Agreement to reflect Pro Rata Interests of each of the Split Note Holders taking into account such assignment. In connection with such assignment, the Agent agrees upon notice of such assignment and the surrender of the appropriate Note to the Agent by the assigning Split Note Holder, it will promptly cause the Mortgage Borrower to provide to the assigning Lender and to the assignee separate promissory notes in the amount of their respective interests substantially in the form of the original Note being assigned (but with notation thereon that it is given in substitution for and replacement of the original Note or any replacement notes thereof). By executing and delivering an assignment agreement in accordance with this Section 8.01(b), the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim; (ii) except as set forth in clause (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, any of the Mortgage Loan Documents or any other instrument or document furnished pursuant hereto or thereto, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any of the Mortgage Loan Documents or any other instrument or document furnished pursuant hereto or thereto or the financial condition of the Mortgage Borrower or the performance or observance by the Mortgage Borrower of any of its obligations under the Mortgage Loan Documents or any other instrument or document furnished pursuant hereto or thereto; (iii) such assignee represents and warrants that it is legally authorized to enter into such assignment agreement; (iv) such assignee confirms that it has received a copy of this Agreement, the Mortgage Loan Documents and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such assignment agreement; (v) such assignee will independently and without reliance upon the Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the Mortgage Loan Documents; (vi) such assignee appoints and authorizes the Agent to take

33

such action on its behalf and to exercise such powers under this Agreement or the Mortgage Loan Documents as are delegated to the Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees in writing that it shall perform in accordance with their terms all the obligations which by the terms of this Agreement and the Mortgage Loan Documents are required to be performed by it as a Lender or Split Note Holder.

(i)    The Agent shall maintain a copy of each Assignment and Assumption Agreement delivered to and accepted by it and shall record in its records the names and address of each Split Note Holder and its Pro Rata Interest.

(ii)    Upon receipt of an Assignment and Assumption Agreement executed by an assigning Lender and an assignee, the Agent shall, if such Assignment and Assumption Agreement has been properly completed and consented to if required herein, accept such Assignment and Assumption Agreement, and record the information contained therein in its records.

(c)    Each Split Note Holder may grant a participation interest in its Split Note and in and to its rights and obligations under the Mortgage Loan Documents in accordance with and subject to the terms and conditions of this Agreement without the consent of the Agent or any other Split Note Holder; provided, however, that (i) such Split Note Holder provides written notice of any such participation to the Agent, (ii) such Split Note Holder shall remain solely responsible to the other parties hereto for the performance of its obligations under this Agreement, (iii) the Agent and the other Split Note Holders shall continue to deal solely and directly with such Split Note Holder in connection with such Split Note Holder's rights and obligations under this Agreement and with regard to any and all payments to be made under this Agreement, and (iv) the holder of any such participation shall not be entitled to voting rights under this Agreement.

(d)    Notwithstanding anything to the contrary contained in this Section 8.01. each Split Note Holder shall be permitted to transfer or assign its interest in the Mortgage Loan to a trustee (a "**Treuhander**") as part of a pool of mortgages securing Pfandbriefe issued by such Split Note Holder under German law allowing the issuance of Pfandbriefe.

8.02.    Not a Security.    The Split Notes shall not be deemed to be securities within the meaning of the Securities Act of 1933 or the Securities Exchange Act of 1934. Each of the Split Note Holders acknowledges that it is (i) (a) a substantial, sophisticated investor having such knowledge and experience in financial and business matters, and, in particular, in such matters related to instruments similar to the Split Notes, such that it is capable of evaluating the merits and risks of investment in the Split Notes, (b) able to bear the economic risks of such an investment and (c) an "accredited investor" within the meaning of Rule 501(a) promulgated pursuant to Securities Act of 1933; or (ii) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act of 1933.

## SECTION 9.  FINANCING

9.01.   Financing.   Each Split Note Holder (in such capacity, a "Loan Pledgor") shall have the right to pledge (such pledge, a "Pledge") such Split Note Holder's Split Note to any Person which has extended a credit facility, including, without limitation, credit in the form of a repurchase agreement facility, to such Loan Pledgor and would otherwise satisfy the requirements of a Qualified Transferee (such Person, a "Loan Pledgee"), on the terms and conditions set forth in this Section 9.01.  Upon written notice by the Loan Pledgor to the Agent that the Pledge has been effected and delivery to the Agent of the address for notice purposes of the Loan Pledgee, the Agent agrees to acknowledge receipt of such notice and thereafter agrees:  (i) to give the Loan Pledgee written notice of any default by the Loan Pledgor under this Agreement of which default the Agent has actual knowledge; (ii) to allow the Loan Pledgee (who shall not be obligated to cure and such default) to cure such default within the same period afforded to the Split Note Holder; and (iii) that no amendment or modification of this Agreement that adversely affects the rights or obligations of the Loan Pledgor, and no waiver or termination of the Loan Pledgor's rights under this Agreement, shall be effective against the Loan Pledgee without the written consent of the Loan Pledgee, which consent shall not be unreasonably withheld; provided, however, the consent of the Loan Pledgee shall not be required unless the Loan Pledgor's consent was required pursuant to the terms of this Agreement to effect such modification, waiver or termination; and (iv) that, upon written notice (a "Redirection Notice") to the Agent by the Loan Pledgee that the Loan Pledgor is in default beyond applicable cure periods under its obligations to the Loan Pledgee pursuant to the applicable credit agreement between the Loan Pledgor and the Loan Pledgee (which notice need not be joined in or confirmed by the Loan Pledgor), and until such Redirection Notice is withdrawn or rescinded by the Loan Pledgee, the Agent shall remit to the Loan Pledgee and not to the Loan Pledgor, any payments that the Agent would otherwise be obligated to pay to the Loan Pledgor from time to time pursuant to this Agreement, any Mortgage Loan Document or any other agreement among the Split Note Holders that related to the Mortgage Loan or Loan Pledgor.  Each Split Note Holder hereby unconditionally and absolutely releases the Agent from any liability to such Split Note Holder on account of the Agent's compliance with any Redirection Notice believed by the Agent to have been delivered by such Split Note Holder's Loan Pledgee.  The Loan Pledgee shall be permitted to fully exercise its rights and remedies against the Loan Pledgor, and realize on all collateral granted by the Loan Pledgor to the Loan Pledgee (and accept an assignment in lieu of foreclosure as to such collateral), in accordance with applicable law.  In such event, and upon receipt of an Assignment and Assumption signed by the Loan Pledgee, the Agent shall recognize the Loan Pledgee (and any transferee which is also a Qualified Transferee at any foreclosure or similar sale held by the Loan Pledgee or any transfer in lieu of such foreclosure), and its successors and assigns, as the successor to the Loan Pledgor's rights, remedies and obligations under this Agreement, and any such Loan Pledgee or Qualified Transferee shall assume in the writing the obligations of the Loan Pledgor hereunder accruing from and after such Transfer and agrees to be bound by the terms and provisions hereof.  The Loan Pledgee agrees to be bound by the terms and conditions of the Intercreditor Agreement.  The rights of Loan Pledgee under this Section 9.01 shall remain effective unless and until Loan Pledgee shall

35

have notified the Agent in writing that its interest in the applicable Split Note and this Agreement has terminated.

## SECTION 10.  MISCELLANEOUS

10.01. Further Assurances.   The Agent and each Split Note Holder shall cooperate fully with each other in order to carry out promptly and fully the terms and provisions of this Agreement.  Each party hereto shall from time to time execute and deliver such other agreements, documents or instruments and take such other actions as may be reasonably necessary or desirable to effectuate the terms of this Agreement.  The Agent and the Split Note Holders shall each be solely responsible for all costs and expenses (including their respective attorneys' fees and disbursements) incurred by them in connection with the execution and delivery of this Agreement and otherwise incurred by them in entering into the transactions contemplated herein.

10.02. No Waiver, etc.  No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

10.03. Notice.  Except as otherwise expressly provided herein, all notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile or email), and shall be deemed to have been duly given or made when delivered by hand, or five (5) days after being deposited in the United States or German (Deutsche Post) mail, certified or registered, postage prepaid, or, in the case of facsimile notice, when sent, answerback received, or in the case of email notice, on the next Business Day after transmittal, or in the case of a nationally recognized overnight courier service, one (1) Business Day after delivery to such courier service, or, in the case of a courier service for an international delivery, two (2) Business Days after delivery to such courier service, addressed, in the case of each Split Note Holder and the Agent at the addresses specified on Exhibit E attached hereto, or to such other addresses as may be designated by any party in a written notice to the other parties hereto, provided that notices and communications shall not be effective until received by the party to whom they are addressed.

10.04. Conflict With Other Agreements.   This Agreement contains additional terms and conditions relating to the administration of the Mortgage Loan.  In the event of any conflict between the provisions of this Agreement and the provisions of the Mortgage Loan Agreement or any of the other Mortgage Loan Documents in respect of the administration of the Mortgage Loan, the provisions of this Agreement shall control as between the Agent and the Split Note Holders.  Notwithstanding the foregoing, the Agent shall not be required to take any action or refrain from any action in violation of the terms of the Mortgage Loan Documents except, if in conflict herewith, Article IX of the Mortgage Loan Agreement.

10.05. <u>No Third Party Beneficiaries</u>.  No person, other than the parties hereto and their permitted successors and assigns pursuant to the Mortgage Loan Agreement shall have any rights under this Agreement.

10.06. <u>Counterparts</u>.    This Agreement may be executed in two or more counterparts each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

10.07. <u>No Amendments</u>.  No amendment, supplement or modification of this Agreement shall be effective against a party against whom the enforcement of such amendment, supplement or other modification would be asserted, unless such amendment, supplement or modification was made in a writing signed by such party.

10.08. <u>Severability</u>.  In case any one or more of the provisions contained in this Agreement, or any application thereof, shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein, and any other application thereof, shall not in any way be affected or impaired thereby.

10.09. <u>Governing Law</u>.  This Agreement shall be construed in accordance with and governed by the laws of the State of New York, excluding its rules of conflict of laws.

10.10. <u>Headings, etc</u>.  The headings and captions of various paragraphs of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

10.11. <u>No Partnership or Joint Venture</u>.  Neither the execution of this Agreement nor the purchase of an interest in the Mortgage Loan or in the Mortgage Loan Documents, or any agreement to share in profits or losses arising out of this transaction, is intended to be, nor shall it be construed to be, the formation of a partnership or joint venture among the Split Note Holders and the Agent, and neither the Agent nor any Split Note Holder shall be liable to any other person or entity for the liability in tort or contract of the Agent or any other Split Note Holder arising in connection with the Mortgage Loan or any transaction connected herewith or therewith nor shall the Agent have any fiduciary obligations to any Split Note Holder nor shall any Split Note Holder have any fiduciary duty to the Agent or any other Split Note Holder.  The Agent shall have and may exercise such powers as are specifically delegated to the Agent under this Agreement.

10.12. <u>True Sale</u>.  This Agreement is intended to effectuate a "true sale" of the Split Note contemplated hereby.  In no event shall the transactions contemplated hereby be deemed a financing or other extension of credit.  The parties hereto shall in all respects account for the transactions contemplated hereby in a manner consistent with the preceding sentence.

10.13. <u>Submission to Jurisdiction</u>.  With respect to any claim arising out of this Agreement, the Mortgage Loan Agreement or any other Mortgage Loan Documents, each

party hereto irrevocably submits to the nonexclusive jurisdiction of the courts of the State of New York and the United States District Court located in the City of New York, and each party hereto (i) irrevocably waives any objection which it may have at any time to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement, the Mortgage Loan Agreement or any other Mortgage Loan Documents brought in any such court, (ii) irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum and further (iii) irrevocably waives the right to object, with respect to such claim, suit, action or proceeding brought in any such court, that such court does not have jurisdiction over such party. Nothing in this Agreement will be deemed to preclude the Agent or the Split Note Holders from bringing an action or proceeding in respect of this Agreement in any other jurisdiction.

10.14. <u>WAIVER OF JURY TRIAL</u>. THE SPLIT NOTE HOLDERS HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY FOREVER WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THIS AGREEMENT OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY OR THE EXERCISE BY ANY PARTY OF ITS RIGHTS UNDER THIS AGREEMENT IN ANY WAY ARISING OUT OF OR RELATED IN ANY MANNER WITH THE SUBJECT MATTER HEREOF OR THEREOF.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SPLIT NOTE HOLDERS:

NOTE A-1 HOLDER:

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, individually as a Co-Lender and as Agent for one or more Co-Lenders

By: _____

Name: _____

Title: _____

Catherine Harnett
Authorized Signatory

Co-Lending Agreement

NOTE A-2 HOLDER:

THE UNION LABOR LIFE INSURANCE
COMPANY (ULLICO), a Maryland
corporation, on Behalf of Separate Account J

By:  *Herbert A Kolben*
     Name:     Herbert A. Kolben
     Title:      Senior Vice President

NOTE A-3 HOLDER:

NATIONAL CITY BANK, a National
Banking Association

By: _____
Name: Joel Dalson
Title: Vice President

NOTE A-4 HOLDER:

LEHMAN BROTHERS HOLDINGS INC., a
Delaware corporation, individually as a Co-
Lender and as Agent for one or more Co-
Lenders


By: _____

Name:
Title:            Catherine Harnett
                  Authorized Signatory

NOTE A-5 HOLDER:

LEHMAN BROTHERS HOLDINGS INC., a
Delaware corporation, individually as a Co-
Lender and as Agent for one or more Co-
Lenders

By:   _____

Name:        Catherine Harnett

Title:        Authorized Signatory

NOTE A-6 HOLDER:

LEHMAN BROTHERS HOLDINGS INC., a
Delaware corporation, individually as a Co-
Lender and as Agent for one or more Co-
Lenders

By: _____

    Name:

    Title:       Catherine Harnett
                Authorized Signatory

Co-Lending Agreement

NOTE A-7 HOLDER:

LEHMAN BROTHERS HOLDINGS INC., a
Delaware corporation, individually as a Co-
Lender and as Agent for one or more Co-
Lenders

By:    _____

Name:              Catherine Harnett
Title:             Authorized Signatory

Co-Lending Agreement

NOTE A-8 HOLDER:

LEHMAN BROTHERS HOLDINGS INC., a
Delaware corporation, individually as a Co-
Lender and as Agent for one or more Co-
Lenders

By: _____

Name:      Catherine Harnett
Title:       Authorized Signatory

Co-Lending Agreement

**AGENT:**

LEHMAN BROTHERS HOLDINGS INC., a
Delaware corporation, individually as a Co-
Lender and as Agent for one or more Co-
Lenders

By: _____

Name:

Title:          Catherine Harnett
                Authorized Signatory

EXHIBIT A

PRO RATA INTERESTS

| Split Note Holder | Pro Rata Interest |
|---|---|
| Note A-1 | 25.397% |
| Note A-2 | 19.048% |
| Note A-3 | 6.349% |
| Note A-4 | 6.349% |
| Note A-5 | 6.349% |
| Note A-6 | 7.937% |
| Note A-7 | 3.175% |
| Note A-8 | 25.397% |

<u>EXHIBIT B</u>

ACCOUNT INFORMATION - SPLIT NOTE HOLDER PAYMENT

| **ASSIGNEE** | | **WIRING INSTRUCTIONS** |
|---|---|---|
| Note A-1 Holder:<br>Lehman Brothers Holdings Inc. | Bank:<br>ABA No.:<br>Acct. Name:<br>Acct. No:<br>Ref.<br>Contact: | Citibank, N.A.<br>021-000-089<br>Lehman Brothers Holdings Inc.<br>40615501<br>Fontainebleau Retail Sr. Loan<br>Edwin Mejia (212-320-0175) |
| Note A-2 Holder:<br>The Union Labor Life Insurance Company<br>(ULLICO) on Behalf of Separate Account J | Bank:<br>Acct. Name:<br>Acct. No:<br>ABA No:<br>Ref. | Mellon Bank<br>The Union Labor Life – General<br>2182582<br>031000037<br>Fontainebleau Sal Vegas Retail |
| Note A-3 Holder:<br>National City Bank | Bank:<br>ABA No:<br>Acct. Name:<br>Acct. No:<br>Ref. | National City Bank<br>041 000 124<br><br>151804/0004710<br>Fontainebleau Las Vegas Retail |
| Note A-4 Holder:<br>Lehman Brothers Holdings Inc. | Bank:<br>ABA No:<br>Acct. Name:<br>Acct. No:<br>Ref.<br>Contact: | Citibank, N.A.<br>021-000-089<br>Lehman Brothers Holdings Inc.<br>40615501<br>Fontainebleau Retail Sr. Loan<br>Edwin Mejia (212-320-0175) |
| Note A-5 Holder:<br>Lehman Brothers Holdings Inc. | Bank:<br>ABA No:<br>Acct. Name:<br>Acct. No:<br>Ref.<br>Contact: | Citibank, N.A.<br>021-000-089<br>Lehman Brothers Holdings Inc.<br>40615501<br>Fontainebleau Retail Sr. Loan<br>Edwin Mejia (212-320-0175) |
| Note A-6 Holder:<br>Lehman Brothers Holdings Inc. | Bank: | Citibank, N.A. |

| **ASSIGNEE** | **WIRING INSTRUCTIONS** | |
|---|---|---|
| | ABA No: | 021-000-089 |
| | Acct. Name: | Lehman Brothers Holdings Inc. |
| | Acct. No: | 40615501 |
| | Ref. | Fontainebleau Retail Sr. Loan |
| | Contact: | Edwin Mejia (212-320-0175) |
| Note A-7 Holder: | | |
| Lehman Brothers Holdings Inc. | Bank: | Citibank, N.A. |
| | ABA No: | 021-000-089 |
| | Acct. Name: | Lehman Brothers Holdings Inc. |
| | Acct. No: | 40615501 |
| | Ref. | Fontainebleau Retail Sr. Loan |
| | Contact: | Edwin Mejia (212-320-0175) |
| Note A-8 Holder: | | |
| Lehman Brothers Holdings Inc. | Bank: | Citibank, N.A. |
| | ABA No: | 021-000-089 |
| | Acct. Name: | Lehman Brothers Holdings Inc. |
| | Acct. No: | 40615501 |
| | Ref. | Fontainebleau Retail Sr. Loan |
| | Contact: | Edwin Mejia (212-320-0175) |

EXHIBIT C

PERMITTED FUND MANAGERS

Apollo Real Estate Advisors
Archon Capital, L.P.
BlackRock, Inc.
Clarion Partners
CW Capital
Fortress Investment Group, LLC
H/2 Credit Partners Master Fund Ltd.
iStar Financial Inc.
J.E. Roberts Companies
Starwood Financial Trust
The Blackstone Group International Ltd.
Walton Street Capital, LLC

EXHIBIT D

QUALIFIED TRANSFEREE

AEW Capital Management
Angelo Gordon & Company
Arbor Financial
Apollo Real Estate Advisors
ARCap
Arden Realty
Barrow Street Capital
Blackacre Capital Group, L.P.
Boston Properties
Capital Trust
Carlyle Group
CarrAmerica Realty Corporation
Crescent Real Estate
CW Capital
Emmes & Company
Fleet National Bank and its Tri-Sail Funds
Grammercy Capital
H/2 Credit Partners Master Fund Ltd.
Hartford Life Insurance Company (and
  affiliated insurance companies)
Heitman Financial
IStar Financial
JE Roberts Cos.
Legg Mason Real Estate
Lupert Adler Partners
Mack Cali Realty
MassMutual (DL Babson and affiliated
  funds)
Meadowbrook Real Estate Fund
Metropolitan Life
Mony Realty Capital
New York Life (and affiliated funds)
Northstar Capital Investment Corp.
Oaktree Capital Management
Olympus Real Estate Fund (Hicks Muse)

Pacific Life
Prentiss Properties
Reckson Associates/Reckson Operating
  Partnership
RREEF
Rockport Group
Starwood Opportunity Fund (Starwood
  Capital)
Sterling Equities
TrizecHahn Corp
Vornado Realty
Wells Fargo
Westbrook Real Estate Fund

EXHIBIT E

(NOTICE ADDRESSES)

**If to the Agent:**                    Lehman Brothers Holdings Inc.
                                        c/o Lehman Brothers Holdings
                                        399 Park Avenue
                                        New York, New York 10022
                                        Attention:  Benjamin Herman
                                        Facsimile No.:  (212) 713-1278

With a copy to:                         Lehman Brothers Holdings Inc.
                                        c/o Lehman Brothers Holdings
                                        399 Park Avenue
                                        New York, New York 10022
                                        Attention:  Gary Taylor
                                        Facsimile No.:  (646) 758-2256

                                        and

                                        Thacher Proffitt & Wood
                                        Two World Financial Center
                                        New York, New York  10281
                                        Attention:  Mitchell G. Williams, Esq.
                                        Facsimile No.:  (212) 912-7751

**If to Note A-1 Holder:**              Lehman Brothers Holdings Inc.
                                        c/o Lehman Brothers Holdings
                                        399 Park Avenue
                                        New York, New York 10022
                                        Attention: Benjamin Herman
                                        Facsimile No.: (646) 758-2256

With a copy to:                         Lehman Brothers Holdings Inc.
                                        c/o Lehman Brothers Holdings
                                        399 Park Avenue
                                        New York, New York 10022
                                        Attention: Gary Taylor
                                        Facsimile No.: (646) 758-2256

                                        and

                                        Thacher Proffitt & Wood
                                        Two World Financial Center
                                        New York, New York  10281
                                        Attention:  Mitchell G. Williams, Esq.
                                        Facsimile No.:  (212) 912-7751

**If to Note A-2 Holder:**

The Union Labor Life Insurance Company
1625 Eye Street, NW
Washington, DC 20006
Attention: Donita Johnson
Facsimile No.: (202) 354-8091

With a copy to:

Meyer, Unkovic & Scott LLP
1300 Oliver Building
Pittsburgh, Pennsylvania 15222
Attention: Matthew D. Whitworth
Facsimile No.: (412) 456-3286

**If to Note A-3 Holder:**

National City Bank
2000 Auburn Drive, Suite 400
Beachwood, Ohio 44122
Attention: Elissa Hricik
            Assistant Vice President
Facsimile No.: (216) 488-3160

With a copy to:

**If to Note A-4 Holder:**

Lehman Brothers Holdings Inc.
c/o Lehman Brothers Holdings
399 Park Avenue
New York, New York 10022
Attention: Benjamin Herman
Facsimile No.: (212) 713-1278

With a copy to:

Lehman Brothers Holdings Inc.
c/o Lehman Brothers Holdings
399 Park Avenue
New York, New York 10022
Attention: Gary Taylor
Facsimile No.: (646) 758-2256

and

Thacher Proffitt & Wood
Two World Financial Center
New York, New York 10281
Attention: Mitchell G. Williams, Esq.
Facsimile No.: (212) 912-7751

**If to Note A-5 Holder:**                Lehman Brothers Holdings Inc.
                                          c/o Lehman Brothers Holdings
                                          399 Park Avenue
                                          New York, New York 10022
                                          Attention: Benjamin Herman
                                          Facsimile No.: (212) 713-1278

With a copy to:                           Lehman Brothers Holdings Inc.
                                          c/o Lehman Brothers Holdings
                                          399 Park Avenue
                                          New York, New York 10022
                                          Attention: Gary Taylor
                                          Facsimile No.: (646) 758-2256

                                          and

                                          Thacher Proffitt & Wood
                                          Two World Financial Center
                                          New York, New York 10281
                                          Attention: Mitchell G. Williams, Esq.
                                          Facsimile No.: (212) 912-7751

**If to Note A-6 Holder:**                Lehman Brothers Holdings Inc.
                                          c/o Lehman Brothers Holdings
                                          399 Park Avenue
                                          New York, New York 10022
                                          Attention: Benjamin Herman
                                          Facsimile No.: (212) 713-1278

With a copy to:                           Lehman Brothers Holdings Inc.
                                          c/o Lehman Brothers Holdings
                                          399 Park Avenue
                                          New York, New York 10022
                                          Attention: Gary Taylor
                                          Facsimile No.: (646) 758-2256

                                          and

                                          Thacher Proffitt & Wood
                                          Two World Financial Center
                                          New York, New York 10281
                                          Attention: Mitchell G. Williams, Esq.
                                          Facsimile No.: (212) 912-7751

**If to Note A-7 Holder:**                Lehman Brothers Holdings Inc.

                                        c/o Lehman Brothers Holdings
                                        399 Park Avenue
                                        New York, New York 10022
                                        Attention: Benjamin Herman
                                        Facsimile No.: (212) 713-1278

With a copy to:                         Lehman Brothers Holdings Inc.
                                        c/o Lehman Brothers Holdings
                                        399 Park Avenue
                                        New York, New York 10022
                                        Attention: Gary Taylor
                                        Facsimile No.: (646) 758-2256

                                        and

                                        Thacher Proffitt & Wood
                                        Two World Financial Center
                                        New York, New York 10281
                                        Attention: Mitchell G. Williams, Esq.
                                        Facsimile No.: (212) 912-7751

**If to Note A-8 Holder:**               Lehman Brothers Holdings Inc.
                                        c/o Lehman Brothers Holdings
                                        399 Park Avenue
                                        New York, New York 10022
                                        Attention: Benjamin Herman
                                        Facsimile No.: (212) 713-1278

With a copy to:                         Lehman Brothers Holdings Inc.
                                        c/o Lehman Brothers Holdings
                                        399 Park Avenue
                                        New York, New York 10022
                                        Attention: Gary Taylor
                                        Facsimile No.: (646) 758-2256

                                        and

                                        Thacher Proffitt & Wood
                                        Two World Financial Center
                                        New York, New York 10281
                                        Attention: Mitchell G. Williams, Esq.
                                        Facsimile No.: (212) 912-7751

EXHIBIT F

(FORM OF ASSIGNMENT AND ASSUMPTION)

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Assignment and Assumption (the "Assignment Agreement") is made as of September ____, 2007 (the "Settlement Date"), between LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, having an address at 399 Park Avenue, New York, New York 10022 ("Assignor") and [_____], a [_____] ("Assignee").

RECITALS:

WHEREAS, reference is hereby made to (i) that certain Loan Agreement, dated as of June 6, 2007, as amended by that certain First Amendment to Mortgage Loan Agreement, dated as of September 9, 2007, made between Fontainebleau Las Vegas Retail, LLC, a Delaware limited liability company ("Borrower") and Assignor (as the same may hereafter be further amended, modified or supplemented from time to time, the "Mortgage Loan Agreement"), (ii) that certain Replacement Promissory Note (Note A-1) of even date herewith in the principal amount of $80,000,000 or so much thereof as may be advanced thereunder (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes otherwise modified from time to time, "Note A-1"), (iii) that certain Replacement Promissory Note (Note A-2) of even date herewith in the principal amount of $60,000,000 or so much thereof as may be advanced thereunder (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes otherwise modified from time to time, "Note A-2"), (iv) that certain Replacement Promissory Note (Note A-3) of even date herewith in the principal amount of $20,000,000 or so much thereof as may be advanced thereunder (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes otherwise modified from time to time, "Note A-3"), (v) that certain Replacement Promissory Note (Note A-4) of even date herewith in the principal amount of $20,000,000 or so much thereof as may be advanced thereunder (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes otherwise modified from time to time, "Note A-4"), (vi) that certain Replacement Promissory Note (Note A-5) of even date herewith in the principal amount of $20,000,000 or so much thereof as may be advanced thereunder (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes otherwise modified from time to time, "Note A-5"), (vii) that certain Replacement Promissory Note (Note A-6) of even date herewith in the principal amount of $25,000,000 or so much thereof as may be advanced thereunder (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes otherwise modified from time to time, "Note A-6"), (viii) that certain Replacement Promissory Note (Note A-7) of even date herewith in the principal amount of $10,000,000 or so much thereof as may be advanced thereunder (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes otherwise modified from time to time, "Note A-7") and (ix) that certain Replacement Promissory Note (Note A-8) of even date herewith in the principal amount of $80,000,000 or so much thereof as may be advanced thereunder (as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes otherwise modified from time to time, "Note A-8").

Unless defined herein or in any Annex attached hereto, terms defined in the Mortgage Loan Agreement are used herein as therein defined.

NOW, THEREFORE, in consideration of the covenants, agreements, representations and/or warranties of Assignor and Assignee set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of Assignor and Assignee do hereby agree as follows:

1.      The Assignor hereby sells and assigns to the Assignee without recourse and without representation or warranty (other than as expressly provided herein), and the Assignee hereby purchases and assumes from the Assignor, Note A-___ and a Pro Rata Interest in the Loan Documents (other than Note A-__, Note A-__, Note A-___, Note A-___, Note A-___ and Note A-___). Assignee hereby assumes and undertakes to perform, pay or discharge, in accordance with the terms and conditions thereof, and in accordance with its Pro Rata Interest, all obligations of Assignor under the Loan Documents (other than Note A-__, Note A-___, Note A-___, Note A-___, Note A-___, Note A-___ and Note A-___), to the extent such obligations are to be performed, paid or discharged after the date hereof.

2.      The Assignor (i) represents and warrants that it is duly authorized to enter into and perform the terms of this Assignment Agreement; (ii) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any liens or security interests; (iii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Mortgage Loan Agreement, the other Loan Documents, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Mortgage Loan Agreement, the other Loan Documents, or any other instrument or document furnished pursuant thereto; and (iv) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or any of its Affiliates or the performance or observance by the Borrower of any of its obligations under the Mortgage Loan Agreement, the other Loan Documents, or any other instrument or document furnished pursuant thereto except as expressly set forth herein. Attached hereto as Annex II is a true, correct and complete list of all of the Loan Documents as of the date hereof. To Assignor's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute an Event of Default under the Loan Documents.

3.      The Assignee (i) represents and warrants that it is duly authorized to enter into and perform the terms of this Assignment Agreement; (ii) confirms that it has received a copy of the Mortgage Loan Agreement and the other Loan Documents listed on Annex II hereto, together with copies of the financial statements referred to therein and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement, and has not relied on any statements or representations made by Assignor in connection with its decision to purchase the Pro Rata Interest pursuant to this Assignment Agreement; (iii) agrees that it will, independently and without reliance upon the Assignor and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Mortgage Loan Agreement; (iv) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Mortgage Loan Agreement are required to be performed by it as a

Lender holding its Pro Rata Interest; and (v) agrees that the interest being assigned hereunder is being acquired by it for its own account, for investment purposes only and not with a view to the public distribution thereof and without any present intention of its resale in either case that would be in violation of applicable securities laws.

4.     As of the Settlement Date, (i) the Assignee shall be a party to the Mortgage Loan Agreement and, to the extent provided in this Assignment Agreement, have the rights and obligations of a Lender under the Mortgage Loan Agreement and the other Loan Documents (other than Note A-__, Note A-__, Note A-__, Note A-___, Note A-___, Note A-____ and Note A-___.), and (ii) the Assignor shall, with respect to that portion of its interest assigned hereby relinquish its rights and be released from its future obligations under the Loan Documents.

5.     Assignee hereby acknowledges and agrees that, as of the date hereof, Assignor shall serve as the Agent under the  Mortgage loan documents, pursuant to that certain Co-Lending Agreement dated the date hereof between Assignor, Assignee and the other Split Note Holders.

6.     It is agreed that as of the Settlement Date, the Assignee shall be entitled to all interest on the disbursed amount of the Pro Rata Interest of the Loan at the rates specified in the Mortgage Loan Agreement and Note A-__.  Upon the Settlement Date, the Assignee shall pay to the Assignor an amount specified by the Assignor in writing which represents the Pro Rata Interest of the principal amount of the Loan made by the Assignor pursuant to the Mortgage Loan Agreement which is outstanding on the Settlement Date and which is being assigned hereunder.  The Assignor and the Assignee shall make all appropriate adjustments in payments under the Mortgage Loan Agreement for periods prior to the Settlement Date directly between themselves on the Settlement Date.

7.     This Assignment Agreement may be executed in any number of counterparts which, when taken together, shall be deemed to constitute one and the same instrument.

8.     Assignor will, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, assignments, notices of assignments, transfers and assurances as Assignee shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto Assignee the property and rights hereby given, granted, bargained, sold, conveyed, and/or assigned or intended now or hereafter.  Assignor and Assignee will, do, execute, acknowledge and deliver all and every such further acts as are reasonably required for carrying out the intention or facilitating the performance of the terms of this Assignment.

9.     THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGE]**

IN WITNESS WHEREOF, the parties hereto have caused this Assignment Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

ASSIGNOR:

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation (individually and as lead arranger and Agent for itself and certain Split Note Holders)

By: _____
    Name:
    Title:

ASSIGNEE:

[_____],     a
[_____]

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**ANNEX FOR ASSIGNMENT AND ASSUMPTION AGREEMENT**

ANNEX I

1.    Pro Rata Interest:

2.    Amounts as of Settlement Date:

|  | **General Commitment** | **Amount Disbursed as of Assignment Date** | **Undisbursed Commitment** |
|---|---|---|---|
| a. Aggregate Amount for all Lenders | $315,000,000.00 | $[_____.00] | $[_____.00] |
| b. Pro Rata Interest of Loan | [_____]% | | |
| c. Amount of Pro Rata Interest of Loan | $[_____.00] | $[_____.00] | $[_____.00] |

3.    Assignee Notice Instructions:

4.    Assignee Wire Instructions:

ANNEX FOR ASSIGNMENT AND ASSUMPTION AGREEMENT

ANNEX II

List of Loan Documents

Promissory Note dated as of June 6, 2007 in the principal amount of $315,000,000 made by Borrower in favor of Assignor, as replaced by:

      I      Replacement Promissory Note A-1 dated as of September 9, 2007 made by Borrower in favor of Assignor in the principal amount of $80,000,000.00;

      II      Replacement Promissory Note A-2 dated as of September 9, 2007 made by Borrower in favor of Assignor in the principal amount of $60,000,000.00, with respective Allonge made to THE UNION LABOR LIFE INSURANCE COMPANY (ULLICO), a Maryland corporation, on Behalf of Separate Account J;

      III      Replacement Promissory Note A-3 dated as of September 9, 2007 made by Borrower in favor of Assignor in the principal amount of $20,000,000, with respective Allonge made to NATIONAL CITY BANK, a national banking association;

      IV      Replacement Promissory Note A-4 dated as of September 9, 2007 made by Borrower in favor of Assignor in the principal amount of $20,000,000.00;

      V      Replacement Note A-5 dated as of September 9, 2007 made by Borrower in favor of Assignor in the principal amount of $20,000,000.00;

      VI      Replacement Note A-6 dated as of September 9, 2007 made by Borrower in favor of Assignor in the principal amount of $25,000,000.00;

      VII      Replacement Note A-7 dated as of September 9, 2007 made by Borrower in favor of Assignor in the principal amount of $10,000,000.00; and

      VIII      Replacement Note A-8 dated as of September 9, 2007 made by Borrower in favor of Assignor in the principal amount of $80,000,000.00;

Loan Agreement, dated as of June 6, 2007 between Assignor and Borrower, as modified by that certain First Amendment to Mortgage Loan Agreement and Other Loan Documents, dated as of September 9, 2007 between Borrower and Assignor.

Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of June 6, 2007 executed and delivered by Borrower to Assignor.

Assignment of Leases and Rents dated as of June 6, 2007 between Borrower and Assignor.

Borrower's Certification dated as of June 6, 2007 made by Assignor to Borrower.

Environmental Indemnity Agreement dated as of June 6, 2007 executed by Borrower and JEFFREY SOFFER, an individual, and FONTAINEBLEAU RESORTS, LLC, a Delaware limited liability company, for the benefit of Assignor.

Completion Guaranty, dated as of June 6, 2007 from JEFFREY SOFFER, an individual, and FONTAINEBLEAU RESORTS, LLC, a Delaware limited liability company, (collectively or individually, as the context requires, "Guarantor"), to Assignor.

Guaranty of Payment, dated as of June 6, 2007 from Guarantor to Assignor.

Guaranty of Recourse Obligations of Borrower, dated as of June 6, 2007 from Guarantor to Assignor.

Conditional Assignment of Management Agreement dated as of June 6, 2007 made by Borrower to Assignor and acknowledged and consented to by TB REALTY, INC., a Nevada corporation.

Conditional Assignment of Leasing Agreement dated as of June 6, 2007 among Assignor, Borrower, and TB REALTY INC., a Nevada corporation.

Assignment of Permits and Contracts dated as of June 6, 2007 between Borrower and Assignor.

Intellectual Property and Security Agreement dated as of June 6, 2007 made by Borrower in favor of Assignor.

Subordination of Affiliate Deferred Payments Agreement dated as of June 6, 2007 made by Borrower to Assignor and acknowledged and consented to by JEFFREY SOFFER, an individual, FONTAINEBLEAU RESORTS, LLC, a Delaware limited liability company ("Parent"), and TURNBERRY RESIDENTIAL LIMITED PARTNER, L.P., a Delaware limited partnership.

Subordination of Credit Enhancement Fee Agreement dated as of June 6, 2007 made by Borrower to Assignor and acknowledged and consented to by JEFFREY SOFFER, an individual, Parent, and TURNBERRY RESIDENTIAL LIMITED PARTNER, L.P., a Delaware limited partnership.

Subordination of Reimbursement Agreement dated as of June 6, 2007 made by Borrower to Assignor and acknowledged and consented to by FONTAINEBLEAU RESORTS, LLC, a Delaware limited liability company.

Consent and Agreement dated as of June 6, 2007 executed by TURNBERRY WEST CONSTRUCTION, INC., a Nevada corporation and FONTAINEBLEAU LAS VEGAS, LLC, a Delaware limited liability company for the benefit of (i) BANK OF AMERICA, N.A., in its capacity as the administrative agent (the "Bank Agent") (ii) WELLS FARGO BANK, NATIONAL ASSOCIATION, in its capacity as the trustee (the "Trustee") and (iii) LEHMAN BROTHERS HOLDINGS INC. D/B/A LEHMAN CAPITAL, A DIVISION OF LEHMAN BROTHERS HOLDINGS, INC., a Delaware corporation, in its capacity as agent.

Consent and Agreement dated as of June 6, 2007 executed by BERGMAN, WALLS & ASSOCIATES, LTD., a Nevada corporation and FONTAINEBLEAU LAS VEGAS, LLC, a Delaware limited liability company for the benefit of (i) BANK OF AMERICA, N.A., in its capacity as the administrative agent (the "Bank Agent") (ii) WELLS FARGO BANK,

NATIONAL ASSOCIATION, in its capacity as the trustee (the "Trustee") and (iii) LEHMAN BROTHERS HOLDINGS INC. D/B/A LEHMAN CAPITAL, A DIVISION OF LEHMAN BROTHERS HOLDINGS, INC., a Delaware corporation, in its capacity as agent.

Master Disbursement Agreement among FONTAINEBLEAU LAS VEGAS HOLDINGS, LLC, FONTAINEBLEAU LAS VEGAS CAPITAL CORP., Borrower, FONTAINEBLEAU LAS VEGAS, LLC, and FONTAINEBLEAU LAS VEGAS II, LLC, BANK OF AMERICA, N.A., as the Bank Agent, WELLS FARGO BANK, N.A., as the Trustee, LEHMAN BROTHERS HOLDINGS INC., as the Retail Agent, and BANK OF AMERICA, N.A., as the Disbursement Agent.

Retail Intercreditor dated as of June 6, 2006 by and among Bank of America, N.A., Wells Fargo Bank, National Association, Lehman Brothers Holdings Inc., and Borrower.

Intercreditor Agreement dated as of June 6, 2007 by and between Assignor and LEHMAN BROTHERS HOLDINGS INC., individually and as Agent for one or more Co-Lenders as Mezzanine Lender.

UCC-1 Financing Statement between Borrower as Debtor and Assignor as Secured Party filed in the Clark County Clerk's Office, Nevada.

UCC-1 Financing Statement between Borrower as Debtor and Assignor as Secured Party filed with the Secretary of State of Delaware.

Co-Lending Agreement dated as of September 24, 2007 between LEHMAN BROTHERS HOLDINGS INC. as the Agent and a Split Note Holder and "), LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, "Note A-1 Holder", THE UNION LABOR LIFE INSURANCE COMPANY (ULLICO), a Maryland corporation, on Behalf of Separate Account J, "Note A-2 Holder", "), NATIONAL CITY BANK, a national banking association, "Note A-3 Holder", LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, "Note A-4 Holder", LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, "Note A-5 Holder", LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, "Note A-6 Holder", LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, "Note A-7 Holder", LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, "Note A-8 Holder".

Assignment and Assumption Agreement dated as of September 24, 2007 between Assignor and THE UNION LABOR LIFE INSURANCE COMPANY (ULLICO), a Maryland corporation, on Behalf of Separate Account J, as Asignee.

Assignment and Assumption Agreement dated as of September 24, 2007 between Assignor and NATIONAL CITY BANK, a national banking association, as Assignee.