**Hearing Date:  October 24, 2013 at 10:00 a.m. (prevailing Eastern Time)**
**Response Deadline: September 12, 2013 at 4:00 p.m. (prevailing Eastern Time)**

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726

*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>　　　LEHMAN BROTHERS INC.,<br><br>　　　　　　　　　　　　Debtor. | Case No.:  08-01420 (JMP) SIPA |

### NOTICE OF HEARING ON THE TRUSTEE'S OBJECTION TO THE GENERAL CREDITOR CLAIM OF LAWRENCE FOGARAZZO, ET AL. (CLAIM NO. 5837)

   **PLEASE TAKE NOTICE** that on August 22, 2013, James W. Giddens (the "Trustee"), as trustee for the liquidation of the business of Lehman Brothers Inc. (the "Debtor" or "LBI"), under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), by and through his undersigned counsel, filed an objection (the "Objection") for entry of an order (the "Order") disallowing and expunging the general creditor claim filed by Lawrence Fogarazzo, Carolyn Fogarazzo, Stephen L. Hopkins, and Don Engel (the "Claimant" or "Claimants"), represented by claim number 5837, with prejudice.

   **PLEASE TAKE FURTHER NOTICE** that a hearing on the Objection will be held, if necessary, before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **October 24, 2013 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Objection must:  (i) be in writing; (ii) state the name and address of the responding party and nature of the claim or interest of such party; (iii) state with particularity the legal and factual bases of such response; (iv) conform to the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules; (v) be filed with the Bankruptcy Court, together with proof of service, electronically, in accordance with General Order M-399 by registered users of the Court's Electronic Case Filing system, and by all other parties in interest, on a 3.5 inch disk, compact disk, or flash drive, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format no later than **September 12, 2013 at 4:00 p.m. (Prevailing Eastern Time)** (the "Response Deadline"); and (vi) served on (a) Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, New York 10004, Attn: Robert B. Funkhouser, Esq.; (b) the Securities Investor Protection Corporation, 805 Fifteenth Street, N.W., Suite 800, Washington, DC 20005, Attn: Kenneth J. Caputo, Esq.; (c) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Maurice Horwitz, Esq. and Lori R. Fife, Esq., with a courtesy copy to the chambers of the Honorable James M. Peck, Courtroom 601, One Bowling Green, New York, New York, 10004.

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and served with respect to the Objection, the Trustee may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Objection, which may be entered with no further notice or opportunity to be heard offered to any party.

Dated:  New York, New York
        August 22, 2013

                                        HUGHES HUBBARD & REED LLP


                                        By:  /s/ James B. Kobak, Jr.
                                            James B. Kobak, Jr.
                                            Christopher K. Kiplok
                                            Robert B. Funkhouser
                                            Meaghan C. Gragg
                                        One Battery Park Plaza
                                        New York, New York 10004
                                        Telephone:(212) 837-6000
                                        Facsimile: (212) 422-4726
                                        E-Mail: kobak@hugheshubbard.com

                                        Attorneys for James W. Giddens,
                                        *Trustee for the SIPA Liquidation of
                                        Lehman Brothers Inc.*

**Hearing Date: October 24, 2013 at 10:00 a.m. (prevailing Eastern Time)**
**Response Deadline: September 12, 2013 at 4:00 p.m. (prevailing Eastern Time)**

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726

Attorneys for James W. Giddens,
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) SIPA |
| Debtor. | |

## THE TRUSTEE'S OBJECTION TO THE GENERAL CREDITOR CLAIM
## OF LAWRENCE FOGARAZZO, ET AL. (CLAIM NO. 5837)

# TABLE OF CONTENTS

Page

RELIEF REQUESTED ................................................................................................... 1

JURISDICTION AND VENUE ...................................................................................... 3

BACKGROUND ............................................................................................................. 3

    The Fogarazzo Action and Claim ........................................................................ 4

    The Efforts By Fogarazzo To Pursue LBHI Insurance Coverage and The
        Representations In Open Court By Fogarazzo's Counsel That He Would
        Dismiss The Claims Against LBI ................................................................... 5

ARGUMENT .................................................................................................................. 8

I.    REPRESENTATIONS BY FOGARAZZO'S COUNSEL TO THE COURT
      THAT THE FOGARAZZO CLAIM WOULD BE DISMISSED SHOULD BE
      ENFORCED ...................................................................................................... 8

    A.    To Obtain Access To The Settlement and Termination Agreement For
          LBHI Insurance Policies, Counsel Represented That He Would Dismiss
          The Fogarazzo Claim Against LBI ...................................................... 8

    B.    The Doctrine of Judicial Estoppel Bars The Fogarazzo Claim That
          Counsel Represented Would Be Dismissed. ....................................... 9

II.    THE FOGARAZZO PROOF OF CLAIM IS DEFICIENT ON THE MERITS ............... 10

    A.    The Fogarazzo Claim Fails Because Loss Causation Cannot Be
          Established. ......................................................................................... 10

    B.    The Fogarazzo Claim Provides No Basis for Recovering Damages Against
          LBI. ..................................................................................................... 13

III.    THE PUTATIVE CLASS CLAIMS SHOULD BE DISMISSED BECAUSE
      FOGARAZZO FAILS TO SATISFY THE DISCRETIONARY THRESHOLD
      FOR CLASS TREATMENT UNDER BANKRUPTCY RULE 7023 ............................ 14

RESERVATION OF RIGHTS ...................................................................................... 19

NOTICE ....................................................................................................................... 19

NO PRIOR RELIEF REQUESTED ............................................................................. 19

CONCLUSION ............................................................................................................. 19

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

James W. Giddens (the "Trustee"), as trustee for the liquidation of the business of

Lehman Brothers Inc. (the "Debtor" or "LBI") under the Securities Investor Protection Act of

1970, as amended, 15 U.S.C. §§ 78aaa and *et seq*. ("SIPA"),[1] by and through his undersigned

counsel, respectfully represents as follows:

## **RELIEF REQUESTED**

1.      The Trustee files this Objection (the "Objection") pursuant to section

502(b) of title 11 of the United States Code (the "Bankruptcy Code"), as made applicable to this

proceeding pursuant to sections 78fff(b) and 78fff-1(a) of SIPA, Rule 3007(d) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking disallowance and

expungement of the general creditor claim filed by Lawrence Fogarazzo and three others as

"Lead Plaintiffs" on behalf of a putative class (the "Claimant" or "Fogarazzo"), represented by

claim number 5837 annexed hereto as Exhibit A (the "Fogarazzo Claim").  The Trustee's

proposed order (the "Proposed Order") is annexed hereto as Exhibit C.

2.      The Fogarazzo Claim, asserted in the amount of $393.6 million, purports

to be on behalf of a class of investors in securities of RSL Communications, Inc. ("RSL").  In

summary, the Claimant alleges:  "Lehman Brothers, Inc., along with two other investment banks,

Goldman Sachs & Co., and Morgan Stanley & Co., Inc. fraudulently manipulated the price of

RSL stock by issuing materially misleading analyst reports." (Ex. A at App. B.)  As support, the

Fogarazzo Claim attaches the Amended Federal Securities Class Action Complaint, filed in

*Fogarazzo v. Lehman Brothers, Inc.*, 03 Civ. 5194 (SAS) (S.D.N.Y. Nov. 14, 2003) (the

"Fogarazzo Action").  (Ex. A at App. B.)

---

1.   For convenience, subsequent references to SIPA may omit "15 U.S.C."

3.      The Trustee has determined that there is no legal or factual justification for the Fogarazzo Claim.  First, in his motion to lift the stay in the Lehman Brothers Holdings Inc. ("LBHI") bankruptcy proceeding, Fogarazzo's counsel represented in open court that the Fogarazzo Claim would be withdrawn if he were provided with documentation showing insurance coverage was not available. Based on this representation, the Court denied the motion to lift the stay but ordered that the requested documents be provided, which they were, nearly two years ago.  Under the doctrine of judicial estoppel, the representation should be enforced and the Fogarazzo Claim should be deemed withdrawn.

4.      Second, on the merits, the Fogarazzo Claim should be disallowed because Fogarazzo cannot establish loss causation against LBI. Nor can Fogarazzo show separate damages attributable to LBI.  Fogarazzo previously settled the Fogarazzo Action against the other two defendants and the Fogarazzo Claim provides no basis for damages against LBI distinguishable from what has been released by the settlement.  Accordingly, the Trustee requests that the Court enter an order disallowing and expunging the Fogarazzo Claim in its entirety

5.      Finally, the Fogarazzo Claim fails to meet the threshold requirements for class treatment under the Federal Rules of Bankruptcy Procedure.  Under the applicable discretionary standard, the Court should deny class treatment at this stage of the proceedings when, among other things, Fogarazzo has not to date sought to certify a class (but has instead represented that the Fogarazzo Claim would be withdrawn).  Accordingly, if the Fogarazzo Claim is not disallowed entirely, the Court should permit it to proceed only as to the four individuals who filed the Fogarazzo Claim.

## JURISDICTION AND VENUE

6.     Following removal to this Court for all purposes as required for SIPA

cases by section 78eee(b)(4) of SIPA, this Court has "all of the jurisdiction, powers, and duties

conferred by [SIPA] upon the court to which the application for the issuance of the protective

decree was made."  SIPA § 78eee(b)(4).

7.     Venue is proper in this Court pursuant to SIPA section 78eee(a)(3) and

section 78aa of title 15 of the United States Code.

## BACKGROUND

8.     On September 19, 2008 (the "Filing Date"), the Honorable Gerard E.

Lynch, United States District Court, Southern District of New York, entered the Order

Commencing Liquidation of LBI (the "LBI Liquidation Order," ECF No. 1) pursuant to the

provisions of SIPA in the case captioned *Securities Investor Protection Corporation v. Lehman

Brothers Inc.*, Case No. 08-CIV-8119 (GEL).  The LBI Liquidation Order, *inter alia*, (i)

appointed the Trustee for the liquidation of the business of LBI pursuant to section 78eee(b)(3)

of SIPA; and (ii) removed the case to this Court for all purposes as required in SIPA cases

pursuant to section 78eee(b)(4) of SIPA, in the case captioned *In re Lehman Brothers Inc.,* Case

No. 08-01420 (JMP) (the "SIPA Proceeding").

9.     On November 7, 2008, the Court entered the Order Approving Form and

Manner of Publication and Mailing of Notice of Commencement; Specifying Procedures and

Forms for Filing, Determination, and Adjudication of Claims; Fixing a Meeting of Customers

and Other Creditors; and Fixing Interim Reporting Pursuant to SIPA (the "Customer Claims

Process Order," ECF No. 241).  Beginning on December 1, 2008, consistent with SIPA section

78fff-2(a)(1), the Trustee mailed more than 905,000 claims packages with filing information to

former LBI customers and other potential claimants (the "Claims Process Notice") and posted

claims filing information on the Trustee's website (www.lehmantrustee.com) and SIPC's website

(www.sipc.org). The Trustee also published notice of the claims process in *The New York*

*Times*, *The Wall Street Journal*, and *The Financial Times*.

10.      Pursuant to SIPA section 78fff-2(a)(3) and the Customer Claims Process

Order, customer claims seeking maximum protection under SIPA must have been received by

the Trustee on or before January 30, 2009.

11.      All customer claims and general creditor claims must have been received

by the Trustee by June 1, 2009. A copy of the LBI Customer Claims Process Order was made

publically available at www.lehmantrustee.com. The Trustee's website allowed claimants filing

electronically to upload documents as part of their claims submission and thereby comply with

the instructions to include supporting documentation set forth in the proof of claim.

**The Fogarazzo Action and Claim**

12.      Curtis Trinko, as purported "class counsel," filed a general creditor proof

of claim against the LBI estate on behalf of Lawrence Fogarazzo, Carolyn Fogarazzo, Stephen

Hopkins, and Don Engel. (Ex. A at 1.) Appendix A to the Fogarazzo Claim also refers to "a

class of all others similarly situated," and Appendix B references and attaches the amended

complaint from November 2003. The Fogarazzo Action was stayed as to LBI after

commencement of the SIPA liquidation proceeding.

13.      In the Fogarazzo Action, a class had been certified on July 27, 2005, but

was vacated by the Second Circuit in January 2007. (Ex. A at App. B.) A renewed motion to

certify the class against the two other defendants (but not LBI) was pending—but had not been

granted—when the Fogarazzo Claim was filed on June 1, 2009. *Id.* Thus, no class was certified

on the LBI Filing Date or when the Fogarazzo Claim was filed.

14.    Although stayed as to LBI, the Fogarazzo Action proceeded with discovery and a renewed class certification only as to the other two defendants, Goldman Sachs & Co. and Morgan Stanley & Co.  Prior to any summary judgment briefing, these defendants settled for an aggregate payment of $6.75 million.  *See* Final Judgment and Order of Dismissal With Prejudice With Regard to Settling Defendants, No. 03 Civ. 5194 (SAS) (Feb. 23, 2011), ECF No. 107 (the "Final Judgment"), included as Ex. 1 to the Declaration of Nicholas D. Millman ("Millman Decl.") annexed hereto as Exhibit B.  Plaintiffs released the settling defendants and the Final Judgment barred contribution claims against them.  (Ex. B at ¶¶ 7, 10.) Lead counsel was awarded more than a third of the award, $2,250,000 for fees and $211,596.69 expenses, and Lead Plaintiffs received $32,000.  (Ex. B at ¶¶ 17-18.)

**The Efforts By Fogarazzo To Pursue LBHI Insurance Coverage and The Representations In Open Court By Fogarazzo's Counsel That He Would Dismiss The Claims Against LBI**

15.    On July 19, 2010, Fogarazzo filed a motion in the consolidated bankruptcy proceeding for LBHI and its affiliates for relief from the automatic stay to allow Fogarazzo to "proceed against any and all insurance policies that may provide coverage to [LBHI] and/or its subsidiary, Lehman Brothers, Inc."  Motion of Lawrence Fogarazzo, et al., Pursuant to Section 362 of the Bankruptcy Code For Relief From Automatic Stay To Allow Advancement Under Insurance Policy By Lloyd's of London at ¶ 2, *In re* Lehman Bros. Holdings Inc., No. 08-13555 (July 10, 2010), ECF No. 10279.

16.    Lloyd's of London and LBHI opposed the motion, noting that the two policies that potentially would have provided coverage had been terminated years before, and arguing that the motion therefore was futile, as well as deficient in showing no basis for lifting the stay under the Second Circuit's multi-factor test.  *See* Lehman Bros. Holdings Inc.'s Response to Motion of Lawrence Fogarazzo, et al. at ¶¶ 5-8, *In re* Lehman Bros. Holdings Inc.,

No. 08-13555 (Nov. 10, 2010), ECF No. 12660; Certain Underwriters at Lloyd's' and

Companies' Response to Motion of Lawrence Fogarazzo, et al. at ¶¶ 34, 39, *In re* Lehman Bros.

Holdings Inc., No. 08-13555 (Nov. 10, 2010), ECF No. 12651.

      17.     In his reply, Fogarazzo acknowledged having been advised of the

termination of the policies but complained that no documentation had been provided. *See* Reply

Memorandum of Law of Lawrence Fogarazzo, et al. at 8, *In re* Lehman Bros. Holdings Inc., No.

08-13555 (Nov. 15, 2010), ECF No. 12737.

      18.     At a hearing on November 17, 2010, Fogarazzo's counsel directly and

repeatedly stated that if he were provided the documentation showing termination of the

insurance policies, he would dismiss the claims against LBI:

> THE COURT:     Let me ask you a question. If you were
> satisfied based upon a review subject to any appropriate confidentiality
> restrictions that might be requested of documents demonstrating that the
> policy as to which you seek to obtain potential recovery in fact was
> terminated some number of years ago and that releases were exchanged in
> connection with a transaction that's not subject to credible challenge, do you
> go away?
>
> MR. TRINKO:     If those documents were produced to us and
> with the caveat that it was an appropriate corporate transaction at the time, it
> was not for some personal benefit but it was for the benefit of LBI, and we
> reviewed those documents in confidence, **I would be willing to stipulate to
> a dismissal of our proceeding of that event.**
>
> THE COURT:     When you say a dismissal of your proceeding,
> are you talking about the litigation against LBI which has not been settled
> currently pending before Judge Scheindlin?
>
> MR. TRINKO:     **All the way through, Your Honor, yes.**

Hr'g Tr. 35:11-36:4, Nov. 17, 2010 (emphasis added) (Ex. 2 to Millman Decl.)

> THE COURT:     I presume that Mr. Trinko will be reasonable
> upon reviewing such documents. I'm assuming that there are narrow credible
> challenges to be made to such documentation that he'll be able to assure
> himself and, ultimately, his client class that pursuing claims in the litigation

in order to get insurance proceeds would be a waste of time.  If he has a difference point of view, he's obviously free to assert that.

MR. TRINKO:      Your Honor, I certainly think that's a reasonable suggestion.  I would just be somewhat concerned, though, about the level of redaction that would be undertaken.  If we have a confidentiality stipulation, there's virtually no need for redaction.  I have looked at –

*Id*. at 42:18-43:5.

THE COURT:      If it becomes a problem, I suppose that's something that you can discuss with counsel.  I'll tell you, however, that discovery disputes relating to redaction are unlikely to get my attention.

*Id*. at 43:11-14.

19.     The Court accordingly denied Fogarazzo's motion to lift the stay but granted the following affirmative relief:

ORDERED that, LBHI and/or Lloyd's shall provide redacted copies of the relevant termination and settlement agreements in respect of LBHI's Primary Combined Financial Institutions Comprehensive Crime and Professional Indemnity Policy (Policy No. 509/QA529399) and Excess Combined Financial Institutions Comprehensive Crime and Professional Indemnity Policy (Policy No. 509/QA529499) to counsel for the Movants, subject to the parties' entry into a confidentiality agreement acceptable to LBHI and Lloyd's.

Order Denying Motion of Lawrence Fogarazzo, *et. al.,* Pursuant To Section 362 of the

Bankruptcy Code, For Relief From The Automatic Stay To Allow Advancement Under

Insurance Policies By Lloyd's Of London, *In re* Lehman Bros. Holdings Inc., No. 08-13555

(Dec. 1, 2010), ECF No. 13136 (attached as Ex. 3 to Millman Decl.).

20.     The termination agreements, redacted as provided for in the Court's order,

were provided to Fogarazzo's counsel on August 19, 2011.  (Declaration of Edward C. Kirk ¶ 4,

attached as Ex. 4 to Millman Decl.)

21.     In March 2013, the Trustee's counsel contacted Fogarazzo's counsel by

email and telephone, and requested that the Fogarazzo Claim be withdrawn in light of the

foregoing.  Although acknowledging the above statements and that he had received the redacted

termination agreements,  Fogarazzo's counsel declined to withdraw the Fogarazzo Claim.

## ARGUMENT

I.    **REPRESENTATIONS BY FOGARAZZO'S COUNSEL TO THE COURT THAT
      THE FOGARAZZO CLAIM WOULD BE DISMISSED SHOULD BE ENFORCED**

   A.    **To Obtain Access To The Settlement and Termination Agreement For LBHI
         Insurance Policies, Counsel Represented That He Would Dismiss The
         Fogarazzo Claim Against LBI.**

         22.    Mr. Trinko represented to the Court that if he were provided access to the

LBHI settlement of its insurance policy, and the settlement documents confirmed the insurers'

and LBHI's representations that no coverage remained, he would dismiss the action against LBI.

The Court confirmed this in open court:

> THE COURT:        When you say dismissal of your proceeding, are you
> talking about the litigation against LBI which has not been settled currently pending
> before Judge Scheindlin?

> MR. TRINKO:        All the way through, Your Honor, yes.

Hr'g Tr. at 35:25-36:4, Millman Decl. Ex. 2.

         23.    While denying without prejudice the motion to lift the stay, the Court

ordered the redacted settlement documents to be produced.  Lloyd's of London complied on

August 19, 2011.  *See* Kirk Decl. ¶ 4, Millman Decl. Ex. 4.  No further word from Mr. Trinko

was heard until March 2013 when counsel for the SIPA Trustee contacted him to fulfill his

promise to withdraw the putative class claim against LBI.  Mr. Trinko now refuses to withdraw

the Fogarazzo Claim, despite never having objected or otherwise responded to the redacted

documents he received pursuant to the Court's order.

**B.      The Doctrine of Judicial Estoppel Bars The Fogarazzo Claim That Counsel Represented Would Be Dismissed.**

24.      The doctrine of judicial estoppel bars a party from taking a position that is inconsistent with one that it took in a prior proceeding and that the court has adopted in some way. *Intellivision v. Microsoft Corp.*, 784 F. Supp. 2d 356, 363 (S.D.N.Y. 2011).  The doctrine is intended "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment" and "prevent[ing] parties from playing fast and loose with the courts." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal quotation marks omitted) (citations omitted).  "In determining whether judicial estoppel will apply, courts consider if: '1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel.'" *Raizberg v. JV CJSC Gulfstream Sec. Sys.*, No. 11 Civ. 8498 KMW, 2013 WL 1245545, at *3 (S.D.N.Y. Mar. 26, 2013) (granting motion to dismiss based on judicial estoppel) (quoting *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010).

25.      The doctrine of judicial estoppel bars Fogarazzo from now maintaining that he will not withdraw the Fogarazzo Claim against LBI.  First, his earlier position that he would dismiss the Fogarazzo Action against LBI if given access to the redacted documents is "clearly inconsistent" with his refusal now to withdraw the Fogarazzo Claim, despite having received the settlement documents upon which such promise was made nearly two years ago.

26.      Second, Fogarazzo's representation was adopted by the Court in its subsequent order, wherein the Court required that the parties provide Fogarazzo with "redacted copies of the relevant termination and settlement agreements." (Millman Decl. Ex. 3.)  In

9

ordering this production, the Court directly relied upon Fogarazzo's representations that he

would dismiss proceedings against LBI.  (Tr. at 35-36, Millman Decl. Ex. 2.)

27.    Third, "absent a finding of judicial estoppel, judicial integrity would be

undermined." *See Raizberg*, 2013 WL 1245545, at *5 (finding that the integrity of the judicial

system would be undermined if a party were allowed to assert a position contrary to the one

relied upon by the court in a prior proceeding).  Fogarazzo obtained the insurance discovery

despite the automatic stay by representing he would withdraw the Fogarazzo Action against LBI

if the documents verified the representations by LBI and Lloyds that no insurance coverage was

available.

28.    By now refusing to withdraw the Fogarazzo Claim, Fogarazzo attempts to

play "fast and loose" with the court, simply because it conveniences him "according to the

exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. at 749-50. At odds with

underlying principle of judicial estoppel, he put the integrity of the judicial process at risk by

objectively taking a position in the short term knowing that he may be on the verge of taking an

inconsistent future action. *Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia

Recovery Trust)*, 634 F.3d 678, 696 (2d Cir. 2011) ("[T]he proper focus is on the objective

conduct of a party or its counsel.").  The representation by Fogarazzo's counsel should be

enforced and the Fogarazzo Claim deemed withdrawn.

## II.    THE FOGARAZZO PROOF OF CLAIM IS DEFICIENT ON THE MERITS

### A.    <u>The Fogarazzo Claim Fails Because Loss Causation Cannot Be Established.</u>

29.    A filed proof of claim is "deemed allowed, unless a party in

interest . . . objects." 11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's

essential allegations is asserted, the claimant has the burden to demonstrate the validity of the

claim. *See In re Oneida Ltd.,* 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia*

*Commc'ns Corp.*, No. 02-41729 (REG), 2007 WL 601452, at *5 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.,* 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

30.     Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).

31.     Even if Fogarazzo's Claim were not barred by judicial estoppel, it is deficient on the merits because he cannot prove loss causation, a fundamental prerequisite in a securities fraud claim.

32.     The Private Securities Litigation Reform Act ("PSLRA") requires plaintiffs to plead and prove, as to each defendant from which plaintiffs seek to recover, "that the act or omission of the defendant alleged to violate this chapter *caused* the loss for which the plaintiff[s] seek[] to recover damages." 15 U.S.C. § 78u-4(b)(4) (emphasis added); *see also, Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342, 346 (2005) ("The statute . . . makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss.").  In order to prove the requisite causation, the putative class bears the burden of showing that disclosure of the falsity of LBI's analyst reports caused RSL stock to decline in value, injuring the putative class members (*i.e.*, loss causation).  *See Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 173, 175 (2d Cir. 2005) (affirming grant of motion to dismiss for investors' failure to state loss causation for allegedly false research reports); *60223 Trust v. Goldman, Sachs & Co.*, 540 F. Supp. 2d 449, 459 (S.D.N.Y. 2007) (granting defendants' motion to dismiss for plaintiffs' failure to plead loss causation related to allegedly false research reports).

11

33.     The Supreme Court also has expressly required plaintiffs to prove a direct

causal link between the alleged misrepresentation and the loss for which plaintiffs seek to

recover.  *See Dura Pharm.*, 544 U.S. at 345-46.  In the years since *Lentell* and *Dura*, the Second

Circuit has enforced the loss causation requirement.  *See, e.g.*, *New Orleans Emps.' Ret. Sys. v.*

*Omnicom Grp., Inc. (In re Omnicom Grp., Inc. Sec. Litig.)*, 597 F.3d 501, 513-14 (2d Cir. 2010)

(affirming summary judgment for defendants due to plaintiff's failure to show specific

misrepresentations caused drop in stock price); *ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*,

493 F.3d 87, 106-07 (2d Cir. 2007) (ruling in favor of defendants on loss causation issue because

concealed information, when revealed, did not cause plaintiff's stock price to drop); *Lattanzio v.*

*Deloitte & Touche LLP*, 476 F.3d 147, 150 (2d Cir. 2007) (affirming defendants' motion to

dismiss for failing to adequately allege loss causation).

34.     Fogarazzo and the other claimants cannot demonstrate loss causation

because they are unable to show that that any revelation concerning the truth or falsity of LBI's

research reports caused RSL's stock price to decline.  In *Lentell*, the Second Circuit ruled that in

order to prove loss causation, the alleged loss must be "foreseeable *and* that the loss be caused by

the materialization of the concealed risk." 396 F.3d at 173.  The alleged fraudulent misstatement

or omission must have "concealed something from the market that, *when disclosed*, negatively

affected the value of the security."  *Id.* (emphasis added).  In affirming defendants' motion to

dismiss, the court stated that "it is not enough to allege that a defendant's misrepresentations and

omissions induced a purchase-time value disparity between the price paid for a security and its

true investment quality."  *Id.* at 174 (internal quotation marks omitted).

35.     For Fogarazzo to prove loss causation, he must show that the loss in value

of the RSL stock occurred at the time of the disclosure of the conflict of interest allegedly

affecting the research analyst reports. *See 60223 Trust*, 540 F. Supp. 2d at 460 ("Did the loss in

value of the . . . stock occur at the time of the disclosure of the allegedly concealed facts . . . ?")

The Amended Complaint alleges that RSL stock was artificially inflated in the period from April

30, 1999 to December 29, 2000.   (Ex. A at App. B ¶ 1)  Claimants further allege that the

disclosure of LBI's purported misconduct related to analyst reports did not occur until April of

2003, when the Securities and Exchange Commission filed its complaint against LBI and others.

But nearly two years prior to the SEC disclosures, RSL stock had already plummeted to near

zero; accordingly, the corrective disclosure could not have caused the loss claimed in the

Fogarazzo Action.

   36. Accordingly, because Claimants cannot demonstrate loss causation, the

Fogarazzo Claim should be disallowed.[2]

  **B.** **The Fogarazzo Claim Provides No Basis for Recovering Damages Against**
    **LBI.**

   37. To recover damages, Fogarazzo must establish "actual damages . . . on

account of the act complained of."  15 U.S.C. § 78bb(a).  This requires eliminating losses caused

by others, including RSL and the two defendants with whom Fogarazzo has settled.  *See In re*

*Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1025 (S.D.N.Y. 1997) (excluding damages

---

[2] Prior to the *Dura* and *Lentell* decisions, Judge Scheindlen denied defendants' motions to dismiss on loss causation and other grounds.  *See Fogarazzo v. Lehman Bros., Inc.,* 341 F. Supp. 2d 274, 291-92 (S.D.N.Y. 2004). Subsequently, however, in another case, Judge Scheindlin dismissed very similar securities fraud claims based on research analyst reports on the grounds that the plaintiffs "fail[ed] to allege a corrective disclosure of the falsity of [the research analysts'] opinions*." Liu* v. *Credit Suisse First Boston (In re Initial Pub. Offering Sec. Litig.),* 399 F. Supp. 2d 298, 308 (S.D.N.Y. 2005) *aff'd sub nom. Tenney v. Credit Suisse First Boston Corp., Inc.*, No. 05-3430-CV, 2006 WL 1423785 (2d Cir. May 19, 2006).   And Judge Sweet, in granting a motion to dismiss in *Joffee* v. *Lehman Bros., Inc.,* 410 F. Supp. 2d 187, 193 (S.D.N.Y. 2006), held that the plaintiffs' reliance on the *Fogarazzo* decision was "misplaced because that decision . . . pre-dates *Dura* and the Second Circuit's extensive treatment of the loss causation requirement as applied to research analyst cases in *Lentell*," and further noted that "Judge Scheindlin has herself revisited the loss causation requirement" in *Liu. See id.*

expert as unreliable because his methodology failed to eliminate the portion of the price decline that was the result of forces unrelated to the wrong).

38.     In the Fogarazzo Action, the Claimants alleged loss from inflated values for RSL stock arising from the defendants' reports.  But Claimants provide no basis for establishing damages caused specifically by LBI apart from what Claimants have already obtained from the settling defendants, Goldman Sachs and Morgan Stanley.  As Fogarazzo's own counsel acknowledged in supporting the joint settlement with Goldman Sachs and Morgan Stanley for $6.7 million, establishing proportionate liability would be very difficult.  *See* Declaration of Curtis V. Trinko at ¶ 8 (Ex. 5 of Millman Decl.).

39.     Even if Fogarazzo were able to show loss causation, he must specifically apportion actual damages to LBI in order to collect a monetary award.  *See Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 235 (4th Cir. 2004) (affirming award of zero damages because plaintiff failed to show amount of loss solely caused by defendant's fraud); *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 891, 894-95 (3d Cir. 1975) ("Although the law does not command mathematical preciseness from the evidence in finding damages, sufficient facts must be introduced so that a court can arrive at an intelligent estimate without speculation or conjecture.").  As the Fogarazzo Claim provides no basis for attributing damages to LBI apart from what has been recovered from others, no damages may be recovered.

## III.   THE PUTATIVE CLASS CLAIMS SHOULD BE DISMISSED BECAUSE FOGARAZZO FAILS TO SATISFY THE DISCRETIONARY THRESHOLD FOR CLASS TREATMENT UNDER BANKRUPTCY RULE 7023

40.     Bankruptcy Rule 7023 does not automatically apply to contested matters in bankruptcy "and the decision to extend its application is committed to the Court's discretion." *In re Musicland Holding Corp.*, 362 B.R. 644, 650 (Bankr. S.D.N.Y. 2007).  As explained in *In re WorldCom Inc.*, "Bankruptcy Rule 7023 adopt[s] Federal Rule of Civil Procedure 23 in

adversary proceedings, but not for contested matters. The provisions of Bankruptcy Rule 9014

apply certain rules from the Code to contested matters, but do not include Rule 7023. Therefore,

this Court has discretion to apply Rule 7023 to a contested matter." *In re WorldCom, Inc.*, No.

02-13533 (AJG), 2005 WL 3832063, at *2 (Bankr. S.D.N.Y. May 11, 2005); *accord In re

Motors Liquidation Co.*, 447 B.R. 150, 157 (Bankr. S.D.N.Y. 2011) ("The decision to extend

Civil Rule 23's application is committed to the Court's discretion."); *see also* 10 *Collier on

Bankruptcy* ¶ 7023.01 (16th ed. 2013) (Rule 9014 "gives the court discretion to apply Rule 7023

to a contested matter in bankruptcy.").[3]

41.     A "bankruptcy significantly changes the balance of factors to be

considered in determining whether to allow a class action and . . . class certification may be 'less

desirable in bankruptcy than in ordinary civil litigation.'" *In re Ephedra Prods. Liab. Litig.*, 329

B.R. 1, 5 (S.D.N.Y. 2005) (quoting *In re Am. Reserve Corp.*, 840 F.2d 487, 493 (7th Cir. 1988)).

"Class action status is sparingly used in a bankruptcy case." *In re Nw. Airlines Corp.*, No. 05-

17930 (ALG), 2007 WL 2815917, at *3 (Bankr. S.D.N.Y. Sept. 26, 2007).

42.     Under the framework adopted by this Court, for a class action claim to

proceed in bankruptcy, three requirements must be fulfilled:  "(1) the bankruptcy court must

direct Rule 23 to apply [by choosing to apply Bankruptcy Rule 7023 via Bankruptcy Rule

9014(c)], (2) the claim must satisfy the requirements of Rule 23, and (3) the benefits that

generally support class certification in civil litigation must be realizable in the bankruptcy case."

*WorldCom*, 2005 WL 3832063, at *2; *accord In re Woodward & Lothrop Holdings, Inc.*, 205

---

3.   The Second Circuit has not addressed the circumstances when class proofs of claim are valid in bankruptcy.
     Some U.S. Courts of Appeal have rejected class proofs of claim. *See, e.g., Sheftelman v. Standard Metals Corp.
     (In re Standard Metals Corp.)*, 817 F.2d 625, 630 (10th Cir. 1987) ("We conclude that class proofs of claim
     violate the statutory scheme of the Act and the Rules.") *rev'd on reh'g and decided on other grounds,
     Sheftelman v. Standard Metals Corp.*, 839 F.2d 1383 (10th Cir. 1987).

B.R. 365, 369 (Bankr. S.D.N.Y. 1997).  Applying this three-pronged analysis demonstrates that
the Fogarazzo Claim should not proceed as a class claim.

43.     On the first prong, in determining whether to apply Bankruptcy Rule
7023, courts consider whether the putative class was certified pre-petition. *Musicland Holding
Corp.*, 362 B.R. 654. As described in the Proof of Claim, in the Fogarazzo Action the class was
decertified in 2006, and thus no class was certified as of the Filing Date or as of the date the
Fogarazzo Claim was filed.  (*See* Ex. A at App. B.)  Accordingly, "the putative class members
did not have a reasonable expectation that a class claim would be filed that would protect their
rights, or that they did not have to comply with the bar date."  *Musicland*, 362 B.R. at 656.

44.     Although the Bankruptcy Code and Rules do not provide "express
guidance" regarding the Court's exercise of its discretion, "a pervasive theme is avoiding undue
delay in the administration of the case" and "a court sitting in bankruptcy may decline to apply
Rule 23 if doing so would . . . 'gum up the works' of distributing the estate." *Ephedra*, 329 B.R.
at 5 (quoting *Woodward*, 205 B.R. at 376) (denying class certification where claimant failed to
seek class certification expeditiously and bankruptcy-related considerations weighed against
allowing claimants to proceed as a class).  Additionally, the "effect of a class claim on other
creditors is an important factor in a court's decision whether to exercise its discretion and grant
Rule 23 certification." *Nw. Airlines*, 2007 WL 2815917, at *3, 5 (expunging claim where
"Debtors might have to reserve shares to satisfy up to $300 million for years, while Plaintiffs
tried their cases . . . and then engaged in further appellate practice" and finding that "[s]uch a
possible course of action provides strong support for denial of class certification").

45.     The onus is on the claimant to move promptly for the application of
Bankruptcy Rule 7023. *In re Thomson McKinnon Sec., Inc.*, 133 B.R. 39, 41 (Bankr. S.D.N.Y.

1991) (expunging class proof of claim where the claimant "disregarded compliance with the
Bankruptcy procedures regulating the filing of class proofs of claim in a bankruptcy case" in that
he "never filed a Rule 9014 motion requesting that Rule 7023 apply" and where the debtor was
"no longer in business and the creditors are anxiously awaiting distribution with respect to their
allowed claims") *aff'd*, 141 B.R. 31 (S.D.N.Y. 1992); *Motors*, 447 B.R. at 164 (holding that
"[g]iven the substantial impact that these claims could have on the" estate, claimants "should
have sought class certification far sooner than they did" where claimants moved for class
treatment 12 months after proceedings commenced and 8 months after bar date.

46.    Fogarazzo failed to move affirmatively and promptly under Bankruptcy
Rule 9014 for class certification.  On the contrary, as described above, Fogarazzo's counsel
represented to this Court that the Fogarazzo Claim would be withdrawn.  More than four years
after filing the Fogarazzo Claim, Fogarazzo still has not moved for class certification as to LBI.

47.    These discretionary factors are sufficient for the Court to determine not to
consider application of Bankruptcy Rule 7023 to the Fogarazzo Claim.  Even if the Court were to
consider the second prong, class status is not appropriate.   Even where a class has been certified
pre-petition, the certified class's proof of claim may still be disallowed in bankruptcy.  *See In re
Tronox Inc.*, No. 09-10156 (ALG), 2010 WL 1849394, at *2 (Bankr. S.D.N.Y. May 6, 2010)
("There simply is no overlap between an appointment as lead plaintiff in securities litigation and
the right of a party to file and prosecute a class proof of claim . . . .  Recognition of class status in
securities litigation does not guaranty [sic] recognition of class status in a bankruptcy case."); *In
re Zenith Labs., Inc.*, 104 B.R. 659, 664 (D.N.J. 1989) (affirming denial of class certification in a
bankruptcy proceeding by a court which had previously certified the same shareholder class in a

prior proceeding).  Here, the Fogarazzo Claim, which had been decertified prior to the Filing

Date is particularly unsuitable for class treatment.

48.     If the Court were to reach the Bankruptcy Rule 7023 prerequisites for

class treatment, each of the criteria—numerosity, commonality, typicality, and adequate

representation—should be evaluated against the alternative of an individual proof of claim.  It is

clear that Fogarazzo cannot meet his burden of showing that class treatment is superior.

49.     With respect to the third prong, the benefits of class actions in civil

litigation simply to not apply to the Fogarazzo Claim in this proceeding.  Generally, class actions

are heralded for reducing costs, increasing efficiency, and deterring "future wrongdoing."

*Woodward*, 205 B.R. at 376.  These advantages "vanish[]," however, in a bankruptcy

proceeding.  *Ephedra*, 329 B.R at 9-10 (explaining that class certification "would unreasonably

waste" the estate and "[t]he only real beneficiaries of applying Rule 23 would be the lawyers

representing the class"); *see Am. Reserve*, 840 F.2d at 489 (discussing diminishment of class

action advantages in bankruptcy).

50.     A court "has discretion under Rule 9014 to find that the likely total benefit

to class members would not justify the cost to the estate of defending a class action."  *Ephedra*,

329 B.R. at 10.  Litigating a class action prolongs the bankruptcy process, making it more

expensive.  *Bally*, 402 B.R. at 621 ("[C]lass certification . . . adversely affect[s] the

administration of these cases adding layers of procedural and factual complexity that accompany

class-based claims, siphoning the Debtors' resources and interfering with the orderly progression

of the reorganization."); *Am. Reserve*, 840 F.2d at 490 ("The systemic costs of class litigation

should not be borne lightly.").  Class certification would force debtors "to incur substantial legal

fees defending a class action" and a certified class could seek attorneys' fees, "necessarily

diminishing the already limited distributions available to other creditors." *Bally*, 402 B.R. at 621

n.4.

51.     The applicable discretionary factors here all weigh heavily against class

treatment of the Fogarazzo Claim and the Court should decline to permit it to proceed as a class

claim.

## RESERVATION OF RIGHTS

52.     The Fogarazzo Claim appears objectionable on a number of additional

grounds and discovery may reveal still more grounds for objection.  The Trustee reserves all

rights to object on any other basis to the Fogarazzo Claim or any portion of the Fogarazzo Claim

for which the Court does not grant the relief requested herein.

## NOTICE

53.     Notice of this Objection has been provided to (i) the Claimant via

overnight mail; and (ii) the list of parties requesting notice of pleadings in accordance with the

Court's Amended Order Pursuant to Section 150(a) of the Bankruptcy Code and Bankruptcy

Rules 1015(a) and 9007 Implementing Certain Notice and Case Management Procedures and

Related Relief entered by the Court on July 13, 2010 (ECF No. 3466), and will be immediately

available for inspection upon filing with the Court  at the Trustee's website,

www.lehmantrustee.com.  The Trustee submits that other or further notice need not be provided.

## NO PRIOR RELIEF REQUESTED

54.     No previous request for the relief requested herein has been made by the

Trustee to this or any other Court.

## CONCLUSION

55.     For the reasons stated herein, the Trustee respectfully requests entry of an

order granting the relief requested herein and such other and further relief as is just.

Dated:  New York, New York
        August 22, 2013

                                    HUGHES HUBBARD & REED LLP


                                    By: /s/ James B. Kobak, Jr.
                                        James B. Kobak, Jr.
                                        Christopher K. Kiplok
                                        Robert B. Funkhouser
                                        Meaghan C. Gragg
                                    One Battery Park Plaza
                                    New York, New York 10004
                                    Telephone: (212) 837-6000
                                    Facsimile: (212) 422-4726
                                    E-Mail: kobak@hugheshubbard.com

                                    *Attorneys for James W. Giddens,
                                    Trustee for the SIPA Liquidation of
                                    Lehman Brothers Inc.*

**EXHIBIT A**

**Filed: USBC - Southern District of New York
SIPC v. Lehman Brothers Inc.
08-01420 (JMP)**

RECEIVED

JUN 0 1 2009

LEGAL SERVICES

**Bankruptcy Claim #**

||||||| |||| ||||||| |||

**000005837**

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT | Southern District of New York | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor:<br>Lehman Brothers, Inc. | Case Number:<br>08-01420 (JMP) SIPA |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>**Lawrence Fogarazzo, Carolyn Fogarazzo, Stephen L. Hopkins and Don Engel**<br>Name and address where notices should be sent:<br><br>Please see Appendix A<br><br>Telephone number: | ☐ Check this box to indicate that this claim amends a previously filed claim.<br><br>**Court Claim Number:**_____<br>*(If known)*<br><br>Filed on:_____ |
|---|---|

| Name and address where payment should be sent (if different from above):<br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |
|---|---|

| **1.** Amount of Claim as of Date Case Filed:    $ 393.6 Million estimated<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5.** Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.<br><br>Specify the priority of the claim.<br><br>☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
|---|---|

| **2.** Basis for Claim:  Please see Appendix B<br>(See instruction #2 on reverse side.) | |
|---|---|

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

**3.** Last four digits of any number by which creditor identifies debtor: _____

    **3a.** Debtor may have scheduled account as: _____
        (See instruction #3a on reverse side.)

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

**4.** Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe:

Value of Property:$_____ Annual Interest Rate____%

Amount of arrearage and other charges as of time case filed included in secured claim,

if any: $_____    Basis for perfection: _____

Amount of Secured Claim: $_____    Amount Unsecured: $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

| **6.** Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.<br><br>**7.** Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See definition of "redacted" on reverse side.)<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).<br><br>**Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |
|---|---|

| Date: 5/29/09    Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>*Curtis V. Trinko*    Curtis V. Trinko, Class Counsel | FOR COURT USE ONLY |
|---|---|

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

B 10 (Official Form 10) (12/07) – Cont.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there be exceptions to these general rules.*

### Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien

documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

### _____DEFINITIONS_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

### _____INFORMATION_____

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the bankruptcy court or the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## Appendix A

Lawrence Fogarazzo, Carolyn Fogarazzo, Stephen L. Hopkins, and Don Engel, and a class of all others similarly situated.

c/o Curtis V. Trinko, Esq.
Wai K. Chan, Esq.
16 West 46 Street, 7th Floor
New York, New York 10036
Phone: (212) 490-9550
Fax: (212) 986-0158
email: ctrinko@trinko.com

## Appendix B

The basis for this claim is set forth in the Amended Federal Securities Class Action

Complaint (Complaint annexed hereto as Exhibit A), dated November 14, 2003, filed in the

action entitled, *Fogarazzo, et al. v. Lehman Brothers, Inc., et al.*, 03 Civ. 5194 (SAS), U.S.

District Court for the Southern District of New York. On May 21, 2004, The plaintiffs in the

pending action are a class of investors who bought shares of RSL Communications, Inc.

("RSL"). Lehman Brothers, Inc., along with two other investment banks, Goldman Sachs & Co.,

and Morgan Stanley & Co., Inc. fraudulently manipulated the price of RSL stock by issuing

materially misleading analyst reports. On May 21, 2004, the U.S. District Court for the Southern

District of New York denied the defendants' motions to dismiss plaintiffs claims. *Fogarazzo v.*

*Lehman Bros., Inc.* 341 F. Supp.2d 274 (S.D.N.Y. 2004). On July 27, 2005, the court granted the

plaintiffs' motion for class certification. Subsequently, the Second Circuit Court of appeals

vacated the class certification order and remanded the action for reconsideration of the motion

for class certification pursuant to new standards of proof articulated by the Second Circuit in *In*

*re Public Offering Securities Litigation*, 471 F.3d 24 (2d Cir. 2006). Currently, the renewed

motion for class certification has been filed and is proceeding against the other two named

defendants in the U.S. District Court for the Southern District of New York. To recover the

damages plaintiffs suffered as a result of Lehman Brothers, Inc.'s fraudulent actions, the

plaintiffs now file this proof of claim in the United States Bankruptcy Court for the Southern

District of New York.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LAWRENCE FOGARAZZO and CAROLYN FOGARAZZO, Joint Tenants With Rights of Survivorship, STEPHEN L. HOPKINS, AND DON ENGEL on behalf of themselves, and all others similarly situated, | Civ Action No. 03 Civ. 5194 (SAS) |
| Plaintiffs, | AMENDED FEDERAL SECURITIES CLASS ACTION COMPLAINT |
| -against - | |
| LEHMAN BROTHERS, INC., GOLDMAN SACHS & CO., and MORGAN STANLEY & CO., INC. | JURY TRIAL DEMANDED |
| Defendants, | |

Plaintiffs, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint, allege upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters, based upon the investigation made by and through their attorneys, which investigation included a review of analyst reports published and disseminated to the investing public by Defendants Lehman Brothers Inc. ("Lehman"), Goldman, Sachs& Co. ("Goldman Sachs"), and Morgan Stanley & Co., Inc. ("Morgan Stanley") on RSL Communications, Inc. ("RSL" or the "Company"), and recent public filings and related documents from the United States Securities and Exchange Commission ("SEC") and the States of New York, Alabama, and Utah, attacking the independence and accuracy of research reports issued by Defendants, as well as additional publicly available information:

-1-

## NATURE OF ACTION

1.     This is a securities class action brought on behalf of public investors who purchased the common stock of RSL during the period from April 30, 1999 through and including December 29, 2000 (the "Class Period"). Defendants are each charged with violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.     During the Class Period, Defendants issued to the investing public false and misleading analyst reports on RSL as part of their bids to win or maintain lucrative banking and financial advisory work from the Company.

3.     As a result of Defendants' false and misleading statements, the market price of RSL common stock was artificially inflated throughout the Class Period, to the injury of Plaintiffs and the other Class members who purchased RSL stock at that time, relying upon the integrity of the market price of the stock.

4.     On or about April 28, 2003, in connection with the settlement of charges filed against Defendants, the SEC and the Attorneys General of various states, including New York, Alabama, and Utah (who were litigation task force leaders), found that Defendants each had failed, during the Class Period, to adopt sufficient procedures and processes to ensure that the interaction between their research analysts and investment bankers and/or covered companies did not expose analysts to economic pressures or influences from the affected investment banking personnel or covered companies, and had violated several rules of the NASD and NYSE by issuing false and misleading analyst reports on numerous companies, including RSL, as a result of analysts having had conflicts of interest. The SEC complaints charged Defendants with violating numerous rules of conduct of the NASD and NYSE, by issuing false and misleading

-2-

analyst reports on numerous companies, including RSL. The complaint describes the influence

and control exerted by Defendants' investment bankers on its supposedly independent research

analysts in order to obtain lucrative investment banking opportunities from covered companies,

including RSL, details how positive ratings and research reports on RSL and numerous other

companies issued by Defendants to the public were contrary to the Defendants' more negative

assessments of the true value and prospects of such companies, and asserts that such ratings and

reports contributed to the inflation of the stock prices of such companies, including RSL, during

the Class Period.

### JURISDICTION AND VENUE

5.      The claims asserted below arise under §§10(b) and 20(a) of the Exchange Act,

15U.S.C. §§78j(b), and Rule 10b-5 promulgated thereunder by the United States Securities and

Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5.

6.      Jurisdiction is conferred upon this Court by §27 of the Exchange Act, 15 U.S.C.

§78aa, and 28 U.S.C. §§1331 and 1337.

7.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28

U.S.C. § 1391(b) since Defendants have their principal place of business located in this District,

and many of the acts alleged herein, including the dissemination of the misleading statements to

the investing public, occurred in substantial part in this District.

8.      In connection with the acts, conduct and other wrongs alleged herein, Defendants,

directly and indirectly, used the means and instrumentalities of interstate commerce, including

the United States mails, interstate telephonic communications and the facilities of the national

securities exchanges.

## THE PARTIES

**Plaintiffs**

9.       Plaintiffs, Lawrence and Carolyn Fogarazzo, Stephen L. Hopkins, and Don Engel

all purchased shares of RSL common stock during the Class Period as set forth in the

accompanying certifications, and have been damaged as a result of Defendants' misconduct as

described herein.

**Defendants**

10.       Defendant Lehman is, and was during the class period, a global investment bank

serving institutional, corporate, government and individual clients.  Lehman is also a broker-

dealer registered with the SEC and is a member of all principal securities and commodities

exchanges, including the NYSE and NASD.  Lehman's businesses include securities

underwriting, sales and trading, investment banking, private equity, financial advisory services,

investment research, venture capital, correspondent brokerage services, and asset management.

Lehman maintains its corporate headquarters at 745 Seventh Avenue, New York, New York.

11.       Goldman Sachs is, and was during the Class Period, an international financial

services firm that provides investment banking and broker dealer services to business, engaged

in retail and institutional sales to its customers, and publishes research reports and ratings on

stocks.  Goldman Sachs is also a broker-dealer registered with the SEC and is a member of all

principal securities and commodities exchanges, including the NYSE and NASD.  Goldman

Sachs maintains its corporate headquarters at 85 Broad Street, New York, New York

12.       Morgan Stanley is, and was during the Class Period, an international financial

services firm that provides investment banking services to business, engaged in retail and

institutional sales to its customers, and publishes research reports and ratings on stocks.  Morgan

Stanley is also a broker-dealer registered with the SEC and is a member of all principal securities and commodities exchanges, including the NYSE and NASD. Morgan Stanley's principal place of business is located at 1585 Broadway, New York, New York.

## CLASS ACTION ALLEGATIONS

13.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired shares of RSL equities during the period from April 30, 1999 through December 29, 2000, both dates inclusive (the "Class"). Excluded from the Class are Defendants, members of Defendants' employees' immediate family, as well as their officers, directors, subsidiaries or affiliates, and any entity in which any excluded person has a controlling interest, and legal representatives, heirs, successors or assigns of any of the foregoing.

14.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, thousands of members of the Class who purchased RSL common stock during the Class Period.

15.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

- whether Defendants engaged in acts or conduct in violation of the federal securities laws as alleged herein;

- whether Defendants participated in and pursued the common course of conduct complained of herein;

- whether Defendants issued false and misleading statements during the Class Period;

- whether the market prices of the Company's common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

16.    Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiffs and the other members of the Class sustained damages arising out of Defendants's wrongful conduct in violation of federal law as complained herein.

17.    Plaintiffs will fairly and adequately protect the interests of members of the Class, and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

18.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

19.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- the common stock of the Company traded on the NASDAQ National
  Market System, an efficient market;

- the market reacted to public information disseminated by Defendants;

- the misrepresentations and omissions alleged would tend to induce a
  reasonable investor to misjudge the value of the Company's securities; and,

- Plaintiffs and the other members of the Class purchased their Company
  stock between the time the Defendants failed to disclose or misrepresented
  material facts and the time the true facts were disclosed, without
  knowledge of the omitted or misrepresented facts.

20.    Based upon the foregoing, Plaintiffs and the other members of the Class are
entitled to a presumption of reliance upon the integrity of the market.

## SUBSTANTIVE ALLEGATIONS

### LEHMAN'S FRAUDULENT SCHEME

#### Background

21.    Lehman is a global investment bank providing financial advisory, capital markets
and underwriting services, among other services, to its clients.  During the Class Period, Lehman's
investment banking department ("Investment Banking"), among other activities, engaged in
securities offerings, including initial public offerings ("IPOs"), secondary offerings and debt
financings, and provided merger and acquisition and other advisory services for its clients.

#### The Investment Banking Function at Lehman

22.    During the Class Period, Lehman competed vigorously with other investment
banks to be selected as the lead manager, underwriter and/or placement agent for securities

-7-

offerings, because of the financial rewards associated with those roles. In addition, Lehman

hoped to gain ongoing transactional and advisory work from existing and potential clients,

including secondary offerings and financial advisory arrangements. In 2001, Lehman served as

lead manager, underwriter, and/or placement agent for sixty-six equity deals, and earned

approximately $ 1.3 billion from underwriting services.

### Lehman's Global Equity Research and Public Dissemination of Reports

23.     During the Class Period, Lehman's Equity Research Department ("Research")

employed up to 600 employees, including approximately 100 senior research analysts and 200

junior research analysts. Additionally, during 2001, Research covered approximately 80

industries and approximately 900 U.S. companies. Senior research analysts in the United States

reported to the Director of U.S. Equity Research, who reported to the Managing Director of

Global Equity Research.

24.     Research analysts collect financial and other information about a company and its

industry, analyze that information, and develop recommendations and ratings regarding a

company's securities. In addition, research analysts also examine the financial condition of

selected publicly traded companies that are believed to be of potential investment value.

Lehman claims that its analysts make evaluations of companies' anticipated earnings, revenue

and cash flow, operating and financial strengths and weaknesses, and long term viability and

dividend potential. During the Class Period, Lehman analysts produced and compiled written

research materials including research reports and First Call notes regarding companies and

industry sectors.

25.     Lehman's research was distributed to both institutional clients and retail

investors. Lehman distributed its research product directly to its own client base, consisting of

-8-

institutional investors and high net worth individual retail investors. In June 1999, Lehman

entered into a "strategic alliance" with Fidelity Investments. Among other things, the "strategic

alliance" provided Fidelity's retail customers with access to Lehman research. Lehman also sold

its research products to other broker-dealers that in turn provided the research to their retail

costumers. Lehman also made its research available to the public through services such as

Thomson Financial/First Call and Multex.com, Inc. Ratings of Lehman's analysts were freely

and publicly available through a number of print and electronic media outlets. Lehman analysts

appeared regularly in the financial press, and the substance of their reports were widely reported

in the media.

        26.    Appearing at the top of its research reports that were devoted to specific stocks,

Lehman assigned a "rank" according to a 5-point scale reflecting how the analyst believed the

stock would perform relative to the market generally. During the Class Period, Research used

the following ratings: 1- Buy (expected to outperforms the market by 15 or more percentage

points), 2 - Outperform (expected to outperform the market by 5-15 percentage points), 3 -

Neutral (expected to perform in line with the market, plus or minus 5 percentage points), 4 -

Underperform (expected to underperform the market by 15 or more percentages points), and 5 -

Sell. The definitions for the ratings were provided to Lehman clients on a monthly basis.

        27.    Although Lehman purported to rank stocks according to a 5-point scale, in fact,

during the Class Period, Lehman analysts never assigned a 5- Sell rating to a domestic company

and almost never assigned a 4-Underperform rating to a stock.

        28.    Lehman's research reports also assigned to the stock a price target designed to

reflect the price at which the analyst believed the stock would trade within a time period that was

identified in some reports and unidentified in others.

29.     Lehman held out its research analysts as providing independent recommendations and analyses of companies and stocks upon which investors could rely to reach investment decisions. Lehman promoted its research for the "quality and timeliness of its investment recommendations."

30.     In fact, Lehman's research analysts were subjected to conflicts of interest arising from the close relationship between Research and Investment Banking. Such conflicts of interest adversely impacted the independence of Lehman's public stock recommendations.

31.     Analysts worked closely with members of Investment Banking and other departments to generate business for Lehman. Analysts often worked with Investment Banking to identify and win corporate finance business for Lehman, including secondary offerings or debt finances. To this end, analysts were expected to have target and alignment meetings with their Investment Banking counterparts on a periodic basis.

32.     Lehman aligned its analysts with an Investment Banking team. Analysts' responsibilities included providing research to their Investment Banking counterparts so that the bankers could leverage the research product order to create and/or maintain investment banking business relationships with a company.

33.     Recognizing the strategic importance of this alignment, on August 5, 1999, Lehman's Managing Director of Global Equity Research circulated a memorandum to Global Research Directors (the "August 5 Memorandum"), which detailed key areas of "strategic importance." The memorandum concluded that in order for Lehman to be more profitable, Investment Banking and Research should work together to increase Lehman's number of equity originations, stating:

-10-

> Investment Banking Partnership- This is a key challenge for not
> only research but the entire global equities businesses. Increasing
> our equity origination will be one of the most important
> accomplishments of the firm. One of the most significant ways we
> will increase the equity division's total revenue to more than S 2
> billion is by substantially increasing origination.

34.    The August 5 Memorandum also set forth the "paradigm" for Lehman's

investment banking relationships:

> the analyst is THE key driver of the firm relationship with its
> corporate client base. Analysts need to accept responsibility and
> use it to expand the franchise and DRIVE PROFITABILITY
> EVERY DAY BUT IN A WAY THAT IS CONSISTENT WITH
> BUILDING A LONG TERM FRANCHISE (Emphases in
> original.)

35.    The August 5 Memorandum emphasized the research analyst's role in identifying

potential banking business for Lehman, stating: "global research must drive the banking

targeting efforts, consistent with the new paradigm." The August 5 memorandum stated further:

"to ensure we have proper recognition of analysts' impact on banking, we have to closely track

every dollar of IBD revenue (equity, M&A, debt ) by analyst."

36.    On September 14, 1999, the Managing Director of Global Equity Research again

emphasized the importance of the Investment Banking/Research partnership in a memo directed

to Coverage Analysts. Coverage Analysts were provided with an attachment, dated September

13, 1999, entitled "1 + 1= $" (the September 13 Attachment), that emphasized that the successful

partnership of Research and Investment Banking was key to Lehman's growth as a firm.

37.    The September 13 Attachment explained numerous ways in which Lehman's

Research and Investment Banking divisions could benefit each other, and stated that "seamless

Banking/Research coverage" was critical to all Investment Banking products. The attachment

also contained a chart, entitled "Secret to Success– Lehman Wins Business When Banking And

-11-

Research are Aligned." The September 13 Attachment explained that the Research /Investment

Banking partnership at Lehman would be institutionalized through executive committee support,

targeting and alignment, full partnership accountability between bankers and research analysts,

and reinforced through compensation.

38.     The September 13 Attachment also revealed that Lehman's investment bankers

and research analysts would be required to complete performance reviews of each other.

Bankers would evaluate research analysts on, among other things "the extent to which the

analysts places origination as [a] priority," and "adds value in building banking business," and

the analyst's "effectiveness in the pitching process."

39.     Finally, the September 13 Attachment revealed that Lehman reinforced the

partnership of Research and Banking through compensation. Analyst compensation would be

"impacted by contribution to banking" and "reviewed with appropriate banking group heads."

The primary criterion in evaluating analyst compensation was the analysts' contribution to

Lehman's investment banking revenue.

40.     As part of the relationship between Investment Banking and Research, analysts

met or communicated with their Investment Banking counterparts several times a week , or even

daily. These communications included analysts identifying banking opportunities for Lehman.

For example, on July 7, 2000, one senior analyst sent the following email to Investment Bankers:

> FYI, I have recently come across several great companies in the
> wireless data services industry, an incredible sector for most
> technology inventors.... In my view, we as a firm (tech & telecom)
> should get all over this sector ... I think we should be very
> coordinated in attacking this banking windfall.

41.     Investment bankers pressured analysts to issue positive research coverage on a

company to help Lehman win banking business. Lehman's investment bankers understood that

if Lehman's research department would cover a potential banking client, Lehman's chances to

obtain banking business from that client would be greatly strengthened. For example, on

October 4, 2000, a banker sent the following email to an analyst :

> Spoke with [a Worlstor employee] over at Worlstor. Here's the
> scoop and what we need to do. They are meeting with other
> bankers over the next 4 days... They like [Salomon] because of
> their research report. Action plan for us includes ... We need to
> say [Lehman's analyst] is publishing a big storage ssp report and
> we would like to make Worlstor the feature of the report like Solly
> did MSI and Storagenetworks...
>
> [Analyst] you need to call (the CEO) and the CFO at least 3 times
> between now and the Board meeting ... The message is we luv you
> and have been waiting for you. [Analyst] your call and enthusiasm
> is key. (Emphasis added).

42.    Another banker wrote the following email to investment bankers and analysts on

June 29, 2000:

> Our competition on the CPQ debt deal is likely the following...
> Given their stock price action after today's downgrade by [SSB],
> we are the highest equity recommendation. The bottom line is that
> they need a very strong story around their credit and we, with
> [analyst] are in the best position to deliver."

43.    Investment bankers also routinely reviewed drafts of analysts' research reports

before publication in order to insure that the reports were aimed at generating investment

banking revenue from the company.

### Lehman Gave Its Analysts Financial Incentives To
### Use Research To Generate Investment Banking Revenue

44.    Lehman tied the compensation of senior research analysts to the amount of

Investment Banking revenue the analyst helped to generate. Typically, Lehman analysts

received relatively small base salaries and considerably larger bonuses. Bonuses were

determined by, in large part, the amount of investment banking revenue generated by companies

-13-

the analysts covered. The bonuses Lehman paid to analysts dwarfed their base salaries and gave

the analysts a strong personal financial incentive to obtain investment banking business, which

created conflicts of interest for the analysts.

### Analyst Employment Contracts Tied
### Bonuses Directly To Investment Banking Revenue

45.     Some of Lehman's approximately 100 senior research analysts had employment

contracts that linked their bonuses directly to the amount of investment banking revenue they

generated. Depending on the contract, the analyst's entire bonus or an additional Investment

Banking Department ("IBD") bonus was paid based on the aggregate IBD net revenues and fees

generated by companies covered by the analyst, or by companies where the analyst significantly

contributed to the investment banking business.

46.     For example, one analyst contract provided for an annual salary of $200,000, and

a minimum bonus of $ 4.8 million. The minimum bonus could increase in $1 million

increments, based on the Aggregate IBD Net Revenues and Fees for the performance year, as

follows:

| Minimum Bonus | Aggregate IBD Net Revenues and Fees |
|---|---|
| $ 4.8 Million | Less than $50 million |
| $ 5.8 million | At least $ 50 million but less than $75 million |
| $ 6.8 million | At least $75 million but less than $100 million |
| $ 7.8 million | At least $ 100 million but less than $125 million |
| $ 8.8 million | $125 million or more |

Aggregate IBD Net Revenues and Fees were defined as revenues and fees booked or received by Lehman from companies covered by the analyst or from companies whose award of business to Lehman was attributed to the analyst's "significant contribution."

47.    Another analyst's contract provided for the payment of a yearly salary of $200,000, a minimum bonus of $3.3 million, and an additional bonus equal to 5% of Investment Banking revenues and fees generated by companies covered by the analyst or companies where the analyst substantially contributed to the award of investment banking business.

### Lehman Compensated Other Analysts Based On Their Contribution To Investment Banking Revenue

48.    Analysts who did not have specific clauses in their contracts related to investment banking revenue were nevertheless compensated financially if companies they covered generated Investment Banking revenue.

49.    As an example of these interrelationships, a Lehman analyst had described that he had arranged a meeting between Lehman analysts, Lehman investment bankers, and a large blue chip company. The analyst explained that his relationship with the company resulted in Investment Banking receiving ten potential projects for the company. The Director of U.S. Equity Research congratulated the analyst, stating: "well done, we need senior bankers to see who (the analysts) have the real relationships with the big companies. This is how we justify big comp. packages." (emphasis added).

50.    Also, Lehman monitored the investment banking revenue that analysts generated. For example, Lehman's "Performance Reviews" kept track of the investment banking and trading revenue attributable to each senior analyst. Senior analysts were shown Performance Reviews during their compensation evaluations.

-15-

51.     For each analyst, Investment Banking also generated a spreadsheet known as a "Project Review" that identified Investment Banking projects with revenue booked for the year and projects expected to generate revenue in the next year. The Director of U.S. Equity Research used the Project Reviews in conducting both mid-year and year-end evaluations for senior analysts.

52.     Senior analysts also frequently provided lists of the Investment Banking deals they had worked on during the year to the Director of U.S. Equity Research, in connection with the consideration of their year-end bonuses. For example, in December 1999, one senior analyst (who did not have an Investment Banking revenue clause in his contract) wrote in an email to the Director of U.S. Equity Research that his research accomplishments and banking revenue were relevant to his compensation. In describing his research accomplishments, the analyst noted that he had written frequently on a company, and that the company had raised $430 million in equity and high yield financing through Lehman. The analyst noted that he had written frequently about another company and, as a result, Lehman had a "good shot" at leading an upcoming equity deal. With respect to banking revenue from RSL, the analyst wrote:

> I believe the revenues generated by my universe generated at least as much as other research universes, excluding the Delta Three IPO (which RSL's CEO will tell I (sic) was a key part of why LB won the books [Delta Three was covered by another analyst] and for which I believe I should get credit.

53.     One Senior analyst sent an email, on February 9, 2000, to Lehman's Managing Director of Global Research and the Director of U.S. Equity Research, requesting a promotion to vice president. In support of his request, the analyst emphasized that his estimated investment banking revenue for the year 2000 was greater than $5 million, and added that "1999 Banking Revenue [of] $1.2M solely [was]due to research relationship."

-16-

54.     In addition, senior analysts were required to complete "business plans" each year.
The business plans included an entire section devoted to banking and required analysts to
identify their banking initiatives for the coming year.  The business plans required senior
analysts to report:

- their plan to add stocks to coverage for either sales and trading and/or banking;

- whether Research/Banking targets and alignment discussions were reflected in the
business plan; and

- whether analysts had completed the selection of "franchise and super league
clients" with their bankers.

55.     Investment Bankers participated in analyst evaluations by providing written
comments on a form titled "Year End Performance Review for Analysts (to be completed by
Bankers)" to the heads of Research.  Bankers were asked to evaluate:

- Whether the analyst places origination as a priority;

- The analyst's contribution toward building relationships with clients in the sector;

- The analyst's effectiveness in the pitching process;

- The quality of the analyst's reputation with banking clients; and

- The analyst's level of initiative in providing the banker with value-added ideas for
banking clients.

56.     One senior analyst's review stated that the analyst "cares a great deal about
competing for business and winning."  Another senior analyst's review stated "strong
originator/rainmaker," "strong pitchman" and "very supportive of banking effort; coordinate
with banking team on targeting major clients."

-17-

57.    Analysts were criticized if they failed to work closely with Investment Banking. For example, in one instance, a senior analyst was criticized for not having had more frequent contact with her Investment Banking counterpart.

58.    One analyst sent a memorandum, dated December 22, 1999, to the Managing Director of Global Equity Research and the Director of U.S. Equity Research, stating that he was "surprised" by the review he received from an investment banker (the "December 22 Memorandum"). As a result, Lehman required the analyst to meet with the investment banker in order to receive "feedback" and "improve the relationship between research and investment banking".

59.    The analyst described this meeting with the banker, in the December 22 Memorandum, stating:

> [banker] has concluded, after seeing me for 2-3 months (based on two pitches and other feedback) that I may not have the capabilities to be a "banking analyst", i.e., telling companies what they want to hear and not what I think!"...

60.    The analyst also commented that the bankers told him "that the analysts need to be available at extremely short notice to assist in pitch meetings." The analyst defended himself, in part, by commenting that he spent an "inordinate" amount of time on banking prospects.

**Lehman Used The Promise Of Future Research Coverage
To Obtain Investment Banking Business From Companies**

61.    Lehman's marketing efforts aimed at companies included assurances that its research would be favorable and, thus, raise the price of the company's stock.

62.    Lehman competed with other investment banks for selection as lead underwriter for securities offerings, including IPOs, as well as secondary and debt offerings. As part of this competition, Lehman met with companies to present its qualifications. Research analysts

attended these meetings, referred to as "pitch" meetings, with members of Investment Banking in

an effort to win investment banking business for Lehman.  At these meetings, Lehman research

analysts typically advised companies how best to position and market the company's "story" to

investors.

63.     At such meetings, Lehman often presented companies with marketing materials

known as pitchbooks that touted Lehman's underwriting qualifications.  The pitchbooks

typically featured the Lehman analyst who would be covering the company after a banking

transaction, and stated that the analyst would issue research on the company as soon as the "quiet

period" (a period of time after an offering during which the underwriting firms cannot publish

research) ended.  The pitchbooks often provided examples of favorable research reports by an

analyst, and how such favorable reports resulted in a company's stock price being raised.

64.     The pitchbooks often featured the role that the analyst would play in marketing

the offering.  Some pitchbooks listed research as a key part of Lehman's underwriting services

and, in one case, stated that the "[analyst] will lead a powerful marketing campaign."  Other

pitchbooks described the analyst as the "axe" in the industry, and provided numerous examples

of how the analyst's positive coverage had positively impacted a company's stock price.

65.     Lehman's initiation of research coverage of a company was often tied to

Investment Banking fees from the covered company.  For example, in February 2000, Lehman

bankers questioned a delay in initiating Lehman's coverage of Curagen Corporation, following

Lehman's participation in a convertible bond offering by Curagen.  The analyst had explained he

needed more time and more meetings with the company before issuing a report.  The bankers

then questioned the delay in an email to the Director of U.S. Equity Research, who responded

that the analyst was doing a great job given his many responsibilities, and asked the bankers:

-19-

> [W]hen did we decide to promise equity research for a small
> convertible bond deal.  What were the economics & how much did
> we make.

One of the bankers responded to the question, stating:

> We made $1.5m in banking and Lehman made $12m as of last
> Thursday.  The real question is could we just put a note out that
> would satisfy the company and get us in the next deal.

66.    On another occasion, the Director of U.S. Equity Research received inquiries

from Lehman employees on behalf of officers of public companies seeking to have Lehman

initiate research coverage of their company.  The Director of U.S. Equity Research responded by

directing such inquiries to Investment Banking.  For example, in February 2000, the Director of

U.S. Equity Research advised a Lehman employee in an email:

> The proper process is to introduce the principals to someone in
> investment banking.  If we have the resources and there appears to
> be significant revenue potential, banking will request research.

67.    Similarly, in October 1999, the Director of U.S. Equity Research advised another

Lehman employee in an email:

> doing business is not enough, we need to do a lot of business to
> commit resources.  Finally, you should find a contact in banking to
> channel these requests as well.

68.    In another email in March 2000, an analyst explained to his product manager his

reason for initiating coverage on a stock listed only in Mexico that will be of "little interest to

our US institutional salesforce."  The analyst wrote:

> The reason for coverage is there is a potential banking deal (big
> $$$) we're trying to get later this year.  The bankers just want the
> report out.  They don't care about promoting the stock and realize
> it is of little interest to my client base.

-20-

**Conflicts of Interest Resulted in the Publication
of Exaggerated or Unwarranted Research.**

69.     The relationship between Investment Banking and Research as alleged herein

created conflicts of interest for Lehman's research analysts. The financial incentives and

pressure exerted on analysts to assist in obtaining investment banking deals and to maintain

banking relationships adversely affected the integrity of the analysts' ratings, price targets, and

research reports. These conflicts of interest caused Lehman analysts to issue more positive

research reports or ratings than were warranted by the financial data, and to avoid downgrades or

negative reports regarding companies that were Lehman investment banking clients, such as

RSL.

70.     In doing so, Lehman analysts were driven not by their assessment of the inherent

value of companies, including RSL, but rather the opportunity for Lehman to earn lucrative

investment banking fees. As noted in a recently filed complaint by the SEC:

> Lehman used research to obtain investment banking business from
> covered companies. Specifically, Lehman tied the financial
> compensation of analysts directly and indirectly to the analyst's
> success in generating investment banking revenue from covered
> companies. In addition, Lehman also used the promise of future
> research coverage to obtain valuable underwriting business and
> marketed to companies the ability of Lehman analysts to move the
> market for a stock. Lehman analysts were subject to conflicts of
> interest that, at times, adversely impacted the independence of
> Lehman's research product.
>
> In certain instances, the financial incentives and pressure on
> analysts to assist in obtaining investment banking deals and to
> maintain banking relationships adversely affected the integrity of
> the analysts' ratings, price targets, and research reports, and caused
> analysts to issue more positive reports or ratings, and to avoid
> downgrades or negative reports regarding companies that were
> investment banking clients.

## Lehman's Banking Business with RSL

71.  ·  Lehman had substantial Investment Banking relationships with RSL. Lehman was lead or joint-lead underwriter or placement agent in the Company's various public offerings from 1997 through 2000 (which yielded in excess of $64 million in total investment banking fees), including but not limited to: (a) the RSL IPO, in late 1997; (b) a high yield note placement by RSL, in December 1998; (c) RSL's deltathree.com, Inc. ("Delta 3") spin-off IPO, dated September 3, 1999, for which Lehman was lead underwriter and received approximately $5 million in fees, commissions, and other compensation; (d) the February 2000 issuance of $200 million in 12 7/8% Senior Notes due 2010 (aggregate commissions amounting to approximately $5.0 million shared by three placement agents, including Lehman), for which Lehman was lead or co-lead placement agent; (e) the February 2000 issuance of $115 million aggregate liquidation preference of 7 ½% Series A preferred shares (aggregate commissions amounting to approximately $4.0 million shared by three placement agents), for which Lehman was lead or co-lead placement agent and Lehman exercised its over-allotment option with respect to an additional $15 million aggregate liquidation preference of Series A preferred shares; and (f) RSL's Consent Solicitation Statement, dated on or about September 13, 1999, to certain of RSL's note holders, for which Lehman served as Solicitation Agent and received $750,000 in compensation. On at least three occasions during 1999-2000, the Lehman analysts covering RSL upgraded or were "held off" from downgrading analyses of RSL for "banking reasons, " including the investment banking business mentioned above.

**Lehman's False and Misleading Statements During the Class Period**

72.     On May 3, 1999, RSL announced its plans to spin-off its Delta 3 subsidiary and offer Delta 3 common stock to the public in an IPO. On September 3, 1999, RSL filed its registration statement for the Delta 3 IPO.

73.     On April 30, 1999, Lehman analysts had issued a Strong Buy rating (its then highest rating) for RSL shares, citing the importance of the Delta 3 IPO to the valuation of RSL shares. In response to this report, RSL stock rose approximately $1 per share.

74.     On May 21, 1999, Lehman analysts reiterated the Strong Buy rating for RSL, emphasizing that RSL shares were "real cheap." In response to this report, the price of RSL's shares rose approximately $3 per share.

75.     After having met with RSL's management, Lehman analysts, on July 9, 1999, issued yet another bullish report on RSL containing a 1-Buy rating (its then highest rating) for RSL shares. In response to this report, the price of RSL's shares rose approximately $2 per share.

76.     On September 3, 1999, RSL filed a registration statement with the SEC for the Delta 3 IPO, for which Lehman was appointed lead underwriter and received approximately $5 million in fees, commissions, and other compensation.

77.     The analyst ratings and reports concerning RSL referred to in paragraphs 73, 74, and 75 herein were false and misleading because Lehman knew or recklessly disregarded and failed to disclose that:

　　　　　1.     it regularly used analyst research to obtain and/or maintain lucrative investment banking business from companies it covered, including RSL;

-23-

2.    it caused the analyst covering RSL to upgrade or not downgrade his research reports and/or ratings of RSL for "banking reasons, " including but not limited to the fact that Lehman: (a) sought and won the lead underwriter position for RSL's IPOs, including the lucrative Delta 3 IPO spin-off; (b) sought and won the lucrative lead placement agent position for RSL's issuance of Senior Notes and Series A preferred shares and exercised its over-allotment options for the preferred shares; and (c) sought and won the lucrative solicitation agent position, in connection with RSL's Consent Solicitation Statement;

3.    its analysts were subject to financial conflicts of interest that adversely impacted the independence of Lehman's research product, including analyst ratings, reports, and price targets concerning RSL;

4.    it failed to adequately supervise its analysts and protect the objectivity of its published research;

5.    as a result of the foregoing, its analysts issued more positive reports and ratings than were justified, and avoided downgrades or negative reports regarding investment banking clients, including RSL, and thus caused the stock price of RSL to be artificially inflated throughout the Class Period.

78.    On September 7, 1999, with RSL trading at $20 3/16 per share, Lehman analysts resumed its 1-Buy rating (its then highest stock rating) for RSL shares and evaluated RSL's break-up value as exceeding $40 per share. Additionally, the analyst cited RSL's Delta 3 IPO as "pure upside to our valuation" of RSL. Documents reveal that RSL, based on conversations with analysts, in fact, thought little about Delta 3's long-term prospects after the IPO had been

successfully sold to investors. On November 1, 1999, Lehman analysts reiterated their 1-Buy

rating with a price target of $40 per share for RSL shares and, as a result, RSL shares rose

approximately $3 per share.

79.     The analyst ratings and reports concerning RSL referred to in the preceding

paragraph herein were false and misleading because Lehman knew or recklessly disregarded and

failed to disclose that:

1.     it regularly used analyst research to obtain and/or maintain lucrative

investment banking business from companies it covered, including RSL;

2.     it caused the analyst covering RSL to upgrade or not downgrade his

research reports and/or ratings of RSL for "banking reasons, " including

but not limited to the fact that Lehman: (a) sought and won the lead

underwriter position for RSL's IPOs, including the lucrative Delta 3 IPO

spin-off; (b) sought and won the lucrative lead placement agent position for

RSL's issuance of Senior Notes and Series A preferred shares and

exercised its over-allotment options for the preferred shares; and (c) sought

and won the lucrative solicitation agent position, in connection with RSL's

Consent Solicitation Statement;

3.     its analysts were subject to financial conflicts of interest that adversely

impacted the independence of Lehman's research product, including

analyst ratings, reports, and price targets concerning RSL;

4.     it failed to adequately supervise its analysts and protect the objectivity of

its published research;

-25-

5.     as a result of the foregoing, its analysts issued more positive reports and

ratings than were justified, and avoided downgrades or negative reports

regarding investment banking clients, including RSL, and thus caused the

stock price of RSL to be artificially inflated throughout the Class Period.

80.     In February 2000, with RSL trading at $17 per share, the Lehman analyst drafted

but did not a issue a new report on RSL in which he lowered his revenue projections for RSL but,

nonetheless, maintained a bullish price target of $35 per share. The first sentence of the text of

the draft report read: "we are revising our Revenue and EBITDA estimates for RSL to reflect

declining revenue from U.S. prepaid and wholesale and more moderate ramp in European retail

revenue." Based on his prior experience, the analyst knew that his attempt to express his more

negative view of RSL would be resisted by Lehman's Investment Banking division. On February

24, 2000, the analyst sent an email to his supervisor, captioned "RSL Note - Bankers are going to

resist," in which he enclosed his draft report, and stated:

> Below is a draft of a note lowering our numbers on RSL
> (maintaining our 1 rating) Recall we were a co. in their recent
> convert deal. I've wanted to lower numbers for several months
> now, but have held back as 1) we led the DeltaThree IPO (was
> owned by RSL) and more recently were on the cover of the
> convert .... I've given our coverage banker the courtesy of seeing
> this and preparing the company. I know they are going to resist.
> I've been quiet on this too long, and I plan on going ahead anyway.
> [emphasis in original].

81.     The Lehman investment banker dealing with RSL prevailed on the analyst not to

issue the report and instead to meet with RSL management, and to reconsider his analysis. As a

result, on March 2, 2000, the analyst issued a report that maintained the 1-Buy rating and $40

price target for RSL shares. The first sentence of the text of the report touted that "RSL's

European unit posted strong sequential revenue growth in Q4..." On March 9 and 10, 2002, the

-26-

analyst issued additional reports on RSL in which he raised the price target to $50 per share. Despite negative news about the Company, including lowered earnings expectations, on March 10, 2000, RSL stock had shot up to $32 per share.

82.    The analyst ratings and reports concerning RSL referred to in the preceding paragraph herein were false and misleading because Lehman knew or recklessly disregarded and failed to disclose that:

    1.      it regularly used analyst research to obtain and/or maintain lucrative investment banking business from companies it covered, including RSL;

    2.      it caused the analyst covering RSL to upgrade or not downgrade his research reports and/or ratings of RSL for "banking reasons, " including but not limited to the fact that Lehman: (a) sought and won the lead underwriter position for RSL's IPOs, including the lucrative Delta 3 spin-off IPO; (b) sought and won the lucrative lead placement agent position for RSL's issuance of Senior Notes and Series A preferred shares, and exercised its over-allotment options for the preferred shares; and (c) sought and won the lucrative solicitation agent position, in connection with RSL's Consent Solicitation Statement;

    3.      its analysts were subject to financial conflicts of interest that adversely impacted the independence of Lehman's research product, including analyst ratings, reports, and price targets concerning RSL;

    4.      it failed to adequately supervise its analysts or impose adequate controls in order to protect the objectivity of its published research; and,

-27-

5.    as a result of the foregoing, its analysts issued more positive reports and

ratings than were justified, and avoided downgrades or negative reports

regarding investment banking clients, including RSL, and thus caused

RSL's stock price to be artificially inflated throughout the Class Period.

83.    On March 16, 2000, the investment banker for RSL sent an email to the analyst's

supervisor praising the analyst's "open-mindedness" and crediting the analyst with raising RSL's

stock price:

> I just wanted to drop you a note to let you know of [analyst's]
> recent helpfulness in a touchy situation with RSL
> Communications. RSL is a telecom company... and is the parent
> company of Delta 3 for which we recently led an IPO. Following
> RSL's recent convertible notes issue (for which we were a co),
> [analyst] was inclined negatively toward the Company's prospects;
> however, he agreed to hold off on a downgrade (which would have
> harmed an important banking relationship) at the request of
> banking until he could hear out management. [Analyst] met with
> the Company's CEO and was convinced positively, **he issued a
> positive report and was the axe behind significant positive
> momentum to the stock**. The CEO praised [analyst's] open-
> mindedness and has indicated we will be included in the
> underwritings of their coming spinoffs. Thus, [analyst] has helped
> our banking relationship with the client significantly. (emphasis
> added).

The supervisor forwarded the email to the analyst and wrote "good job & congratulations."

84.    On or about May 5, 2000, the Lehman analyst issued another report, reiterating

the 1-Buy rating on the stock and the $50 price target, despite the fact that the stock price had

declined to $15.50 per share and the Company had missed its revenue estimates by a substantial

amount.

-28-

85.    The analyst rating and report concerning RSL referred to in the preceding

paragraph was false and/or misleading because Lehman knew, or recklessly disregarded and/or

failed to disclose that:

1.    it regularly used analyst research to obtain and/or maintain lucrative

investment banking business from companies it covered, including RSL;

2.    it caused the analyst covering RSL to upgrade or not downgrade his

research reports and/or ratings of RSL for "banking reasons, " including

but not limited to the fact that Lehman: (a) sought and won the lead

underwriter position for RSL's IPOs, including the lucrative Delta 3spin-

off IPO; (b) sought and won the lucrative lead placement agent position

for RSL's issuance of Senior Notes and Series A preferred shares, and

exercised its over-allotment options for the preferred shares; and (c)

sought and won the lucrative solicitation agent position, in connection

with RSL's Consent Solicitation Statement;

3.    its analysts were subject to financial conflicts of interest that adversely

impacted the independence of Lehman's research product, including

analyst ratings, reports, and price targets concerning RSL;

4.    it failed to adequately manage its analyst and protect the objectivity of its

published research;

5.    as a result of the foregoing, its analysts issued more positive reports and

ratings than were justified, and avoided downgrades or negative reports

regarding investment banking clients, including RSL, and thus caused the

stock price of RSL to be artificially inflated throughout the Class Period.

-29-

86.     By August 14, 2000 RSL's stock price had declined to approximately $4 per share. In an August 14, 2000 email, the analyst candidly complained to his supervisor about the influence Investment Banking had continued to exert over his research:

> Enough is enough. It's hard enough to be right about stocks, it's even harder to build customer relationships when all your companies blow up, you knew they were going to, and you couldn't say anything. Every single one of my companies has blown up in some fashion (or will - GBLX) and with the exception of PGEX, I haven't been able to speak my mind. I think I've been a team player, and I believe it is now imperative for the franchise that I be able to take action on bad situations.

87.     The analyst voiced particular concerns about RSL, stating "for the record, I have attempted to downgrade RSLC THREE times over the last year, but have been held off for banking reasons each time." (Emphasis in original.)

88.     Even after his complaint, the analyst did not downgrade RSL but rather simply was permitted to drop coverage of RSL in September 2000, devoting a few short sentences to the Company in a "Sector Report."

89.     The Sector report concerning RSL, referred to in the preceding paragraph herein, was false and/or misleading because Lehman knew, or recklessly disregarded and/or failed to disclose that:

1.      it regularly used analyst research to obtain and/or maintain lucrative investment banking business from companies it covered, including RSL;

2.      it caused the analyst covering RSL to upgrade or not downgrade his research reports and/or ratings of RSL for "banking reasons, " including but not limited to the fact that Lehman: (a) had sought and won the lead underwriter position for RSL's lucrative Delta 3spin-off IPO; (b) had

-30-

sought and won the lucrative lead placement agent position for RSL's

issuance of Senior Notes and Preferred shares and exercised its over-

allotment options for the Preferred shares; and (c) sought and won the

lucrative solicitation agent position, in connection with RSL's Consent

Solicitation Statement;

3.    its analysts were subject to financial conflicts of interest that adversely

impacted the independence of Lehman's research product, including

analyst ratings, reports, and price targets concerning RSL;

4.    it failed to adequately manage its analyst and protect the objectivity of its

published research;

5.    as a result of the foregoing, its analysts issued more positive reports and

ratings than were justified, and avoided downgrades or negative reports

regarding investment banking clients, including RSL, and thus caused the

stock price of RSL to be artificially inflated throughout the Class Period.

90.    On December 29, 2000, RSL was trading at $0.20 per share and was de-listed

from the NASDAQ stock exchange.

## GOLDMAN SACHS'S FRAUDULENT SCHEME

### Background

91.    Goldman Sachs is a leading global investment banking and securities firm that,

offers underwriting services to companies seeking to sell their securities to the public. In

addition to its prominent investment banking operations, Goldman Sachs also offers extensive

services to its institutional investor clients and its private wealth management clients (principally

high net worth individuals), has an active securities sales and trading business, and maintains a separate division to perform research on equity securities.

92.     For the companies for which Goldman Sachs provided equity research coverage, including RSL, Goldman Sachs analysts issued periodic reports and made investment recommendations.  During the Class Period, Goldman Sachs' equity research ratings included four investment ratings:

> **Recommended List** - expected to provide price gains of at least 10 percentage points greater than the market over the next 6-18 months;

> **Market Outperformer**- expected to provide price gains of at least 5-10 percentage points greater than the market over the next 6-18 months;

> **Market Performer**- expected to provide price gains similar to the market over the next 6-18 months;

> **Market Underperformer**- expected to provide price gains of at least 5 percentage points less than the market over the next 6-18 months;

93.     In addition to ratings, the research reports generally contained Goldman Sachs's analysis of the covered company's financial prospects.

### Investment Banking Division's Relationship to and Influence on Research Division

94.     Goldman Sachs held itself out as generating and providing research reports that were the product of objective research and the honest and independent opinions of the firm's research analysts.  The research reports and ratings of companies covered by Goldman Sachs analysts as well as Goldman Sachs's list of recommended stocks were made available to Goldman Sachs's institutional investor clients and its private wealth management clients,

-32-

principally high net worth individuals. Additionally, the substance of Goldman Sachs's research reports was often reported in the U.S. and world financial press.

95.    Goldman Sachs's research, or the content of its research, was disseminated by various means, including: mail, facsimile, distributions at client meetings, e-mail, Goldman Sachs's research website, telephone conversations involving analysts and salespersons, and as part of analysts' appearances in the financial news media, as well as seminars and industry conferences.

96.    Research coverage by Goldman Sachs analysts was a critical factor many issuers took into account in awarding its investment banking business. Goldman Sachs's research analysts' reputations for working in tandem with investment bankers and evaluating and marketing investment banking business was a big incentive for issuers.

97.    In connection with its marketing and coverage decisions, Goldman Sachs implemented a Research Alignment process whereby the Investment Banking , Equities, and Research Divisions would "work collaboratively to insure a strategic alignment of [Goldman Sachs's] business - that the biggest opportunities for investment banking and equities were being covered , that [Goldman Sachs] had the right Research resources in the right places, and that [Goldman Sachs's] Research reputation for independent and thoughtful analysis was sustained if not enhanced." The alliance of Goldman Sachs's Investment Banking and Research Divisions "insur[ed] that companies of strategic and/or commercial importance to both IBD and Research are covered by an analyst and a banking team... [I]deal candidates for coverage are those that are franchise defining, and/or those that offer a meaningful opportunity for significant revenue in the relatively near term."

-33-

98.    Sector captains were appointed within Investment Banking to "coordinate all banker requests for Research coverage; work with IBD teams and ECM [Equity Capital Markets] to establish priority rankings within the sector and reach consensus with Research counterparts."

99.    At Goldman Sachs research retreats, analysts were instructed that Investment Banking sector captains were to "[w]ork directly with Research counterparts to agree on names and timing" of companies to be covered to "[d]etermine IBD priority ranking of each company needing Research, including rationale and timing."

100.    Representatives of Investment Banking and Research met periodically to review companies that were candidates for research coverage. In May 2000, the head of Research reported: "Of the 63 companies highlighted which offered equity opportunities over the next 12 months or which were SuperLeague targets, 40 are now considered no longer active, 9 have been picked up by Research, and 14 still need coverage, based on the recent banker input ..."

101.    The Research Alignment process was designed to ensure that the various interested areas of the firm (including Investment Banking and Equities) had effective input into critical decisions concerning the initiation of analyst coverage.

### Goldman Sachs's Compensation Structure and Analyst Performance Review

102.    Analyst compensation at Goldman Sachs was based largely on performance reviews, which often made reference to analysts' contributions to investment banking revenue. Comments in analysts' evaluations indicated that analysts were involved in many aspects of investment banking-related activities and reflected analysts' beliefs that participating or assisting in investment banking activities was a factor in determining analyst performance and compensation.

-34-

103.    Goldman Sachs introduced a new program, in June 2000, to strengthen "firmwide

marketing... including how we leverage our brand, advertise, and in particular, cross sell ...."

Strengthening cross-selling efforts was defined as a "top strategic priority for 2000." A

$50,000.00 award was created to recognize individuals across all divisions of the firm who

"cross-sell or help deliver a significant mandate to another business unit or division."

104.    Analysts were evaluated as part of the firmwide "360 degree" review process.

Analysts were evaluated not only by supervisors, peers, and subordinates in the Research

division, but also by employees in other divisions and departments of the firm with whom the

analyst had worked , including Investment Banking, Equity Sales, and Trading.

105.    Some analyst evaluations referred to investment banking revenues for

transactions in which the analyst had a role, as well as to the fact that analysts were involved in

many aspects of investment banking. For example:

a.    In one evaluation, an analyst was referred to as: "Very hard working,

focused and eager to do a good job and win business." Moreover, the analyst was: "Becoming

much more proactive about sharing info with banking.  Well focused on banking issues and GS

[Goldman Sachs] business overall." Another evaluation of the same analyst commented that:

"He is a great help to the Banking franchise."

b.    An evaluation of another analyst stated: "She did a super job with the IB

client as well as investors ... She became more comfortable over time that IB- fee paying

potential should be a consideration in her list [of companies to cover].  I strongly suggest that she

use the resources that IB offers as she works evaluating companies (e.g. when changing her

[financial] model, please inform/ consult the IB team).

-35-

    c.     A comment about another analyst stated: "Hard to say how much of poor investment decisions have been because banking drove the outcome."

    d.     An evaluation of RSL analyst Frank Governali stated: "Frank is swamped and needs help. The demands placed upon him by his banking duties threatens the very franchise that has allowed him to become such a powerful banking asset."

    e.     An evaluation of another analyst stated "There are still times when [analyst] does not think commercially about a client. There have been times when [analyst] is going to see an important CEO target and no one from banking is even aware that he has the meeting."

### Analyst Business Plans

106.    Goldman Sachs analysts were required to develop business plans. One critical area covered in business plans was how analysts planned to assist the firm's investment banking efforts. Goldman Sachs created and distributed business plan forms to analysts, in order to find out from analysts:

    a.     "How much of your time will be devoted to IBD?"

    b.     "Are you using/managing IBD effectively? How can you work more effectively with IBD to exploit the opportunities available to the firm? What specific opportunities do you see? Do you have alignment - do you have counterparts in IBD you work with to approach business in an integrated fashion? How can IBD help you in conferences, client meetings, etc?"

    c.     "What stocks do you plan to add at current team size?... Have you discussed this coverage with relevant IBD, Equities and other users?"

d.     "With which corporates do you have a better relationship with senior

management than IBD does?  How will you use that to enhance GS

business opportunities?

107.    Analysts' responses included:

a.     In response to the question "what are the three most important goals for

you in 2000?" -- one analyst replied: "1. Get more investment banking

revenue." 2. Get more investment banking revenue. 3. Get more

investment banking  revenue."

b.     Another analyst commented: "My two most important company specific

research reports in 2000 will likely be the initiation of coverage reports of

the two Latin American e-Finance companies that we may IPO this year."

c.     An analyst expressed the view : "flexible/opportunities" for  research can

be a "big business driver for GS."

d.     In response to a question that asked analysts to identify the research firms

that do a better job than Goldman Sachs, one analyst remarked about the

firm Sanford Bernstein: "Bernstein also gives us a run because they have

equivalent manpower to what we have, but they cover only about a half as

many stocks and don['t] have any banking business.  We just have an

incredibly difficult time beating the thought leadership these guys are able

to put back on the table as a result of that focus."

108.    Analysts assisted investment banking by using their industry knowledge to

identify potential investment banking opportunities.

-37-

109.    An analyst wrote to an investment banker that he wanted to "harmonize with you strategically," in order to pursue an investment banking opportunity.

110.    In October 1999, an analyst sent an e-mail thanking equity salespeople and private wealth management representatives at Goldman Sachs for arranging an investor road show at a certain company. The day after the road show was completed, the company awarded Goldman Sachs a mandate to repurchase 5% of the company's outstanding stock. The analyst stated: "your efforts have already borne positive fruit" because "Goldman Sachs received the mandate for [this share repurchase] as a direct reward for the work you all did."

111.    In an April 2000 e-mail, a Goldman Sachs investment banker advised two Goldman Sachs analysts that, for an investment banking pitch to a potential issuer, they "come prepared to SELL." The banker proposed that the "pitch" include a draft research report on the potential issuer so that Goldman Sachs could demonstrate to the issuer that "we are so excited about the story that we have already begun writing the report." The analyst predicted to the investment bankers: "WE WILL WIN THIS MANDATE!!!!"

112.    RSL analyst Frank Governali received credit from a Goldman Sachs banker for being the determining factor in winning an early 2000 IPO: "Frank was fully involved in pitching this and thanks to him, we received a sole-book mandate with the Joint lead of [another investment bank]." Moreover, the banker reminded analysts that their "input will be critical to the success of this IPO."

### Assistance in Explaining and Marketing IPOs to Institutional Investor Clients

113.    Goldman Sachs analysts often assisted in marketing IPO securities. One issuer's "Lead Banker Selection Criteria" stated: "Need to understand commitment of senior analysts that

-38-

they will be the 'lead' research analyst on the deal and in the aftermarket." This commitment was understood to include the following with respect to analysts:

    a.    "Spending time personally with the CFO to refine model and define appropriate IPO and ongoing business metrics."

    b.    "They personally will pro-actively market [the issuer] to the institutional community and be available on a regular basis to respond to institutional investor questions."

114.    An analyst commented about an issuer's stock offering: " I have been out aggressively telling the story, and the volume has picked up noticeably."

115.    Responding to complaints by a potential issuer about a downgrade of the sector, an analyst told the potential issuer: "Again, I want to stress that both [analyst] and I remain committed to the short and long-term success of [potential issuer]."

116.    In self-reported time estimates for 2000, one analyst estimated he spent 40% of his time in investment-banking related activities, while another analyst estimated his investment banking-related activities consumed 55% of his time.

117.    In 1999, analysts estimated they spent up to 75% of their non-Research time on Investment Banking matters.

**Research alignment effectiveness.**

118.    Goldman Sachs commented on its year 2000 "Global Investment Research IBD Alignment Process, " as follows: "US Investment Research appears to be on the right track with our IBD alignment initiative." Specific comments included:

    a.    "[R]esearch analysts, on 429 different occasions, solicited 328 transactions in the first 5 ½ months of this fiscal year."

-39-

b.  "Research was involved in 82% of all 'won business' solicitations."

c.  "Research was involved in 49% of 'lost business' solicitations."

d.  Only 4.3% of all IBD 'lost business' was attributed to lack of research coverage."

e.  "IR [Investment Research] was involved in 31 mergers amounting to $56 billion."

f.  "IR was involved in 209 financing transactions not reported in Market View amounting to $83 billion."

g.  "In addition to financings, US IR was involved in a significant number of merger advisories, solicitations, and other transactions which have either not yet closed or were not captured [in the] database."

**Influence of Investment Banking Personnel on**
**Research and the Timing of Research Coverage**

119.   Analysts sent drafts of research reports to investment bankers before publicizing them.  In one case, an advance copy of changes to a research report was sent to investment bankers for their comments, in order to "to speed up the approval process."

120.   One analyst revealed: "Since our banking ties are so close to each one of the companies mentioned above along with the fact that these companies are direct competitors with each other, it is incredibly difficult to voice strong opinions in these sectors."

121.   In early 2000, a Goldman Sachs investment banking client complained that Goldman Sachs had yet to initiate research coverage on his company.  The client emailed a Goldman Sachs investment banker, informing her that its stock was "dropping like a rock," and stated: "Our hopes were that a buy coverage from our lead banker might help stabilize the

-40-

stock." In response, Goldman Sachs investment bankers complained to analysts, who asserted that "[w]ith research commitment committee approval and an improvement in the market, research coverage is imminent."

### Goldman Sachs's Investment Banking Division Had
### Input into the Hiring of Goldman Sachs's Analysts.

122.    Recruitment and hiring of analysts involved significant input from Goldman Sachs's investment bankers.

123.    In January 2000, an investment banker had complained that Goldman Sachs's research resources were inadequate and, therefore, additional analysts were needed to be hired in order to prevent loss of substantial revenue business.

124.    In March 2000, Goldman Sachs was considering hiring an analyst from a competing firm. The candidate's first interview was with a Goldman Sachs investment banker. The investment banker was later asked to comment on her "comfort level" with the prospective analyst.

### Discussion of Research Capabilities in Goldman Sachs Pitchbooks

125.    Some Goldman Sachs investment banking pitches included discussions of benefits issuers would receive from Goldman Sachs, including obtaining research ratings from Goldman Sachs analysts.

126.    An October 2000 pitchbook explained the "[r]ole of investment research analyst" as "creating the story . . . marketing the story . . . [and] following the story." Another pitchbook included a list of the various ratings provided by the analyst on the companies he covered and cited to "[g]lobal sales effort led by analysts," and contained a diagram highlighting the crucial role Goldman Sachs analysts play in an initial public offering.

-41-

127.    Another pitchbook said: "[Goldman Sachs analyst] has sold more stock than any research analyst in the sector."

**Goldman Sachs's Investment Bankers Had Input into Research Coverage**

128.    Investment Banking and Equities personnel had input into decisions regarding the initiation and termination of research coverage.

129.    For example, after having received numerous bullish reports from Goldman Sachs analysts, RSL stock had finally dropped below $1.50 per share on October 11, 2000. On the same day, an analyst sent an e-mail to Frank Governali asking when Goldman Sachs could finally drop coverage of RSL. Governali responded: "Good que[s]tion. I'll call the bankers soon and ask their view."

130.    An investment banker informed an analyst in 2000 that the head of Research had approved dropping coverage of various companies he covered.

131.    In September 30, 1999, an investment banker sent an e-mail to Goldman Sachs analyst Robert Pomeroy, who, along with Frank Governali, covered RSL, stating: "Our list for you to publish on from the IBD front is (in order): . . ." The banker listed five issuers, four of which were described as investment banking prospects.

132.    A 360 degree review of one analyst stated: "Initiated coverage of . . . [two examples cited] promptly after being co-manager on the initial public offering. NOT picking up coverage of [another company] as the company stiff-armed IBD when selecting underwriters."

133.    In another 360 degree review of an analyst, an investment banker stated: "we have probably pushed her into research on companies where maybe she shouldn't have been or we did not have the client firmly commit[ed] enough on business before she covered them."

-42-

**Analyst Discussions About Research**

134.    In August 2000, James Golob, the co-head of Goldman Sachs's global telecommunications services, wrote to RSL analyst Governali, the other co-head, about the "anomalous situation where our sector has been tanking for 3-4 months and we globally still have a majority of stocks as R[ecommended] L[ist]s as that is all the salesmen and clients care about". Golob suggested that Governali at least consider the approach he had taken: "In Europe, we have found that honour is preserved if we have a stock as an M[arket] O[utperformer] and the companies can't complain because [it's] better than an M[arket] P[erformer]." Governali responded that he had planned "to re-state most of the CLECs, which is where the problem is most egregious. The ratings were a residual from [a departed analyst], and I never changed them, not wanting to disrupt things too much. But, its ridiculous. I've already met with the bankers, and plan to move most of the companies down to M[arket] O[utperformer], from R[ecommended] L[ist] before [another analyst] takes over completely in September . . . I don't think I would end up leaving only 7.5% as R[ecommended] L[ist], but the present 68% is ridiculous."

135.    In August 2000, an analyst complained that Goldman Sachs's investment bankers had maligned him "for lowering the [price] target from stupid heights to the merely absurd."

136.    One analyst's self-evaluation contained the admission that he : "[h]as subordinated personal preferences on recommendations [citing two examples] for 'commercial' reasons."

**Research Ratings.**

137.    The percentage of companies that received Goldman Sachs's top two investment ratings (Recommended List or Market Outperformers) reached 72%, in the first quarter of 1999,

-43-

and fell to 50% in the last quarter of 2001. The percentage of companies that received Goldman

Sachs's worst rating, Market Underperformer, never rose above 1.1% during this time.

138.    The number of companies for which Goldman Sachs ceased providing research

coverage increased from 1, in early 1999, to 280, at the end of 2001. Some of these companies

may have declared bankruptcy or ceased to exist during this period. In some cases, Goldman

Sachs ceased covering bankrupt companies without first having downgraded their ratings. A

Goldman Sachs analyst questioned whether this was the "proper protocol with respect to a

bankrupt company."

139.    A comment made about one analyst stated: "... he communicates what he really

thinks to a select few, his public ratings have been an embarrassment to the firm."

### Draft Research Reports and Expected Research Ratings Were
### Shared with Issuers and Goldman Sachs's Investment Bankers.

140.    Goldman Sachs permitted covered companies to review its draft research reports.

141.    Goldman Sachs further permitted analysts to give investment bankers and covered

companies a "heads up" on the rating to be assigned to a company after the

market closed, the day before a report was to be issued.

142.    For example, an investment banker had suggested that the Research Division get

input from certain issuers "BEFORE this piece is published." To this suggestion, RSL analyst

Frank Governali responded: "we wouldn't think of publishing this without direct input from the

company and their review of the report."

143.    In September 2000, following news of a possible merger between two large

telecommunications providers, Governali wrote a research report on one of the companies.

Because Goldman Sachs was providing advisory services to the company, Governali asserted
that he "had to talk to our bankers and l[a]wyers before it went out."

144.   Additionally, an analyst wrote to Governali that she had changed the content of
her report in order to satisfy a company/issuer, as follows: "included [the issuer's]
extensive comments . . . I also said we had slightly smoothed the negative edge (emphasis
section up front and text) from when they saw the report." Moreover, the analyst said she
"promised them I'd re-email the final report tonight so they could see our changes." Despite the
analyst's efforts, the issuer's officers complained to Governali that the research report was not
sufficiently favorable. In response, Governali promised the company that "such an important
industry report which is going to have profound implications will be to their liking."

### Other Comments Made by Frank Governali

145.   In an email, dated January 19, 2000, Governali wrote that he was not available to
discuss stock valuations on a certain stock because he was fearful such discussions would "taint
our ability to do the IPO," and that, in any event, he was involved "in a banking pitch right
now."

146.   In an email, dated sometime in January 2000, Governali e-mailed a friend at
another investment bank that: "It's been a good first month, and its [sic] been very busy. There
has not been a day when we're not involved with some deal..."

147.   In an email, dated February 29, 2000, Governali revealed to a Goldman Sachs
research associate that he was "inundated with deals" and, thus, could not return her calls.

148.   In an email, dated March 23, 2000, Governali revealed the extent of his
preoccupation with deal making. Since he had "four deals in the market simultaneously," he had
in fact spent the entirety of his vacation time on the phone "dialing for dollars."

149.   In an email, dated June 26, 2000, Governali revealed that slides used in an emerging telecom companies conference had been manipulated by "banking." ·

150.   In an email, dated, July 20, 2000, Governali requested the attendance of his analyst colleagues at a meeting with Goldman Sachs bankers in order to discuss "gameplans and priorities."

151.   In an email, dated July 20, 2000, Governali discussed RSL management's complaints concerning a research note drafted by another Goldman Sachs analyst, Robert Pomeroy, who had worked closely with and was supervised by Governali, with respect to RSL coverage, in Goldman Sachs's Portland, Maine office.  In an email sent to Pomeroy that same day, Governali asked: "what happened with RSL - I thought the company...knew in advance everything you were doing with the notes?"

152.   In an earlier email to a Goldman Sachs investment Banker and Governali, dated October 2, 1999, Pomeroy had complained that RSL "think[s] the investment rating is purchased and are shocked when the analyst wants to do some work."

153.   Sometime in August 2000, Pomeroy "resigned" from Goldman Sachs.

**Goldman Sachs's Banking Business with RSL**

154.   Goldman Sachs had substantial Investment Banking relationships with RSL. Goldman Sachs was lead or joint-lead underwriter/placement agent in various of the Company's public offerings (which yielded in excess of $64 million in total investment banking fees), including, but not limited to: (a) the RSL IPO in late 1997; (b) RSL's Delta 3 spin-off IPO, for which Goldman Sachs received substantial fees, commissions, and other compensation; (c) the February 2000 issuance of $200 million in 12 7/8% Senior Notes due 2010 (aggregate commissions amounting to approximately $5.0 million to three placement agents, including

-46-

Goldman Sachs); (d) RSL's issuance of $115 million aggregate liquidation preference of 7 ½% Series A preferred shares (aggregate commissions amounting to approximately $4.0 million to three placement agents, including Goldman Sachs), and for which, in March 2000, Goldman Sachs exercised its over-allotment option with respect to an additional $15 million aggregate liquidation preference of Series A preferred shares; (e) the May 1999 offering of 9 7/8% Senior notes due 2009, for which Goldman Sachs was appointed lead placement agent and received commissions of approximately $1.1 million.

### Goldman Sachs's False and Misleading Ratings and Reports on RSL

155.   After having issued numerous reports on RSL since 1998, on or about September 21, 1999, Goldman Sachs analysts issued new research reports on RSL that added RSL to its Recommended List (RL), Goldman Sachs's highest stock rating, and issued a price target of $42 per share, notwithstanding the Company's serious earnings problems and devastating restructuring charges. On September 3, 1999, RSL had filed a registration statement for the Delta 3 spin-off IPO. In May 1999, RSL issued 9 7/8% Senior notes due 2009, for which Goldman Sachs was appointed lead placement agent and received commissions of approximately $1.1 million.

156.   On or about February 1, 2000, Goldman Sachs conducted a road show for RSL. The road show featured Goldman Sachs's analysts' upbeat, bullish research reports concerning RSL. Such bullish reports had continued unabated, since, at least, September 1999.

157.   The road show showcased the Company's $115 million in Series A preferred shares and $200 million in high yield Senior Note offerings, for which Goldman Sachs had won the lucrative positions of co-lead placement agent.

158.    In March 2000, Goldman Sachs maintained its bullish reports on RSL stock, which had shot up to $32 per share, despite increasing concerns about RSL's prospective earnings which were significantly lowered. In March 2000, as well, Goldman Sachs exercised its over-allotment option with respect to an additional $15 million aggregate liquidation preference of Series A preferred shares and, consequently, earned millions of dollars in fees, commissions, and other revenue.

159.    On July 18, 2000, pursuant to a prospectus, Form S-3/A, filed with the SEC, Goldman Sachs had gained the rights to sell 282,998 RSL converted Series A preferred shares to the public. Despite a massive $48 million write-down to RSL's 2Q00 earnings which resulted in a huge loss of equity value, on or about this same date, Goldman Sachs published a report stating that RSL shares would outperform the overall market (from RL to MO rating). Also on that day, the CNBC financial news network reported that RSL's share price had fallen due to "comments by Goldman Sachs," relating to the MO rating that Goldman Sachs had issued. RSL shares would have fallen further, but for Goldman Sachs's policy of changing RL ratings to MO, in order to retain "honour" and to keep the many companies with which it conducted investment banking business, such as RSL, placated.

160.    The analyst ratings, reports, and price targets referred to in paragraphs 155, 156, 158, and 159 herein were false and/or misleading because Goldman Sachs knew or recklessly disregarded and failed to disclose, that Goldman Sachs:

1.    regularly used analyst research to obtain and maintain lucrative investment banking business from companies it covered, including RSL;

2.    caused the analysts covering RSL to assign and maintain bullish ratings for RSL stock, in order to pursue and win and/or maintain investment

-48-

banking business from RSL, including but not limited to: (a) appointment
as underwriter for RSL's lucrative Delta 3 spin-off IPO; (b) the lucrative
lead placement agent positions for RSL's May 1999 and February 2000
issuance of its Senior Notes, as well as Series A preferred shares,
including rights to exercise over-allotment options and sell RSL's
converted Series A shares to the public;

3.    analysts were subject to financial conflicts of interest that adversely
impacted the independence of its research product, including analyst
ratings, reports, and price targets, concerning RSL;

4.    failed to adequately manage and supervise its analysts or impose adequate
controls in order to protect the objectivity of its published research,
including allowing companies, including RSL, to review and approve
analyst reports prior to being published;

5.    as a result of the foregoing, its analysts issued more positive reports and
ratings, and avoided downgrades or negative reports regarding investment
banking clients, including RSL, and thus caused the stock price of RSL to
be artificially inflated, throughout the Class Period.

161.    On December 29, 2000, RSL was trading at $0.20 per share and was de-listed
from the NASDAQ stock exchange.

## MORGAN STANLEY'S FRAUDULENT SCHEME

### Background

### The Investment Banking Function at Morgan Stanley

162.    Morgan Stanley frequently served as the lead underwriter in IPOs as well as follow-on offerings of securities, including those of RSL.

163.    Investment banking was an important source of revenues and profits for Morgan Stanley. In 2000, investment banking revenues exceeded $4.8 billion, or approximately twenty-four percent of Morgan Stanley's total new revenues.

### The Role of Research Analysts at Morgan Stanley

164.    Research analysts at Morgan Stanley covered a broad range of industry sectors and published periodic reports on companies within those sectors. Through 2001, Morgan Stanley's equity research department had a system for rating covered companies, from most to least positive, as "Strong Buy," "Outperform", "Neutral", or "Underperform." Analyst reports were disseminated to Morgan Stanley clients by mail and facsimile and by financial advisors. Research reports were also made available to retail clients on Morgan Stanley's web site. In addition, certain industry reports were also available on Morgan Stanley's publicly-accessed web site. Certain institutional clients of Morgan Stanley could also access research reports through the First Call/Multex subscription service. The financial news media often reported Morgan Stanley analysts' ratings, and analysts often appeared in print and electronic media.

165.    Morgan Stanley analysts also played an important role in assessing potential investment banking transactions, particularly IPOs. Morgan Stanley's stated objective was, as lead underwriter, to take companies public and to have its research analysts serve as gatekeepers to the IPO process. Research analysts who endorsed an IPO candidate participated in the

-50-

competition to obtain the investment banking business and, if Morgan Stanley was selected as

lead underwriter, helped market the IPO to institutional investors and explain the IPO to the

firm's institutional and retail sales forces, and then issued research on the company.

166.    During the Class period, senior analysts at Morgan Stanley published individual

research reports without pre-publication review by research department supervisors.  While

reports were minimally reviewed for grammatical errors and compliance with certain legal

requirements, there was no system in place for reviewing the recommendations for price targets

included in the reports of senior analysts prior to their publication.

### The Relationship Between Investment Banking and Research Created Conflicts of Interest for Morgan Stanley Research Analysts

167.    Morgan Stanley created and maintained conflicts of interest for the firm's

research analysts with respect to investment banking considerations.  These conflicts arose due

to the analysts' involvement in helping to win investment banking business for Morgan Stanley.

Reports from analysts, if negative, could prevent the firm from winning the banking business

from both prospective and actual clients.

168.    Morgan Stanley typically competed with other investment banks for selection as

the lead underwriter, or "bookrunner," for securities offerings, including IPO and follow-on

offerings.  Significant rewards were at stake in these competitions.  Sole or joint bookrunners

generally received the largest portion of underwriting fees, which were typically divided among

participating investment banks.  The bookrunner also established the allocation of shares in an

offering, and typically retained the greatest number of shares for itself.  The typical IPO,

including the RSL IPO, generated millions of dollars in investment banking fees for Morgan

Stanley.

169.     As part of the package of services it offered to issuers to win investment banking

business, Morgan Stanley would offer the initiation or continuance of research coverage.  If

Morgan Stanley won the banking competition, research coverage would, in fact, be initiated or

continued.  Thus, Morgan Stanley used its analysts as a marketing tool to help secure banking

business.  The promise of future research coverage was often a critical selling point that enabled

Morgan Stanley to obtain millions of dollars in investment banking fees.  Research coverage was

a critical part of a package of services for which Morgan Stanley was compensated in those

investment banking deals.

170.     Analysts also played an important role in Morgan Stanley's pitches for banking

business.  Along with the investment bankers, analysts were typically presented as part of the

Morgan Stanley "team that would consummate the transaction." The pitchbooks typically

dedicated several pages to analysts' experience, credentials, and specific roles in the completed

transaction.  Analysts drafted portions of the pitchbooks and almost always attended the

presentations for IPO business.  The pitchbooks favorably compared Morgan Stanley analysts to

their counterparts at competing firms, citing their rankings in analyst polls and other measures.

Morgan Stanley typically identified its analysts as a critical factor that issuers should consider in

selecting Morgan Stanley for their investment banking business needs.

171.     In its pitches to obtain investment banking business, Morgan Stanley typically

promised future research coverage.  For example, in pitchbooks provided to iBean Broadcasting

Corp., Morgan Stanley promised to "provide ongoing research coverage and aftermarket

trading" and, in another instance, committed that "coverage would be initiated immediately after

the quiet period.  Additional research reports will follow on a regular basis thereafter."  Morgan

Stanley won the iBeam IPO business and received investment banking fees of approximately

$3.8 million. Morgan Stanley made comparable commitments to other prospective banking clients, including RSL. Additionally, Morgan Stanley pitchbooks often identified the specific number of reports its analyst published on other companies, giving implicit guidance on how many reports issuers could expect to receive if they selected Morgan Stanley as their lead banker.

172.    In other instances, Morgan Stanley pitchbooks identified a particular analyst's history of issuing Strong Buy and Outperform ratings on other companies. Moreover, some pitchbooks identified instances in which other stocks covered by a Morgan Stanley analyst increased in price following their IPOs. For example, Morgan Stanley provided pitchbooks to Transmeta Corp. in July 2000, emphasizing how one analyst's "support" of IPOs since 1997 had "resulted in unparalleled performance in the public market," and included a line graph showing a dramatic increase in the stock's price from 1998 through March 2000.

173.    In addition to pitchbooks, Morgan Stanley occasionally provided draft or "mock" research reports to issuers to provide examples of how analysts might describe the issuer to investors. The draft or mock reports always described the issuers in favorable terms.

174.    Morgan Stanley's commitments to provide research coverage were not limited to pitches for IPO business. Morgan Stanley frequently obtained investment banking business for follow-on offerings of companies that its analysts did not cover, by promising to initiate future coverage.

175.    Morgan Stanley consistently honored its commitments to provide, initiate, or maintain coverage after it won investment banking business.

176.    In Morgan Stanley's annual performance evaluation process, some analysts and bankers noted their success in obtaining banking fees by promising future research coverage.

-53-

For example, in a November 3, 1999 e-mail, an investment banker specified several banking transactions that Morgan Stanley had won because it committed a highly-rated analyst to initiate research coverage. Specifically, the banker wrote that Morgan Stanley had won two transactions totaling $13.4 million in fees "just for promising that [the senior analyst] would pick up coverage after the deals." The banker observed that "enraged" competing firms complained that it was "unprecedented" to give an underwriter with no previous research coverage such a high share of the fees, and added: "The response from the CEO to those firms - 'you don't have [the senior analyst].'" Analyst evaluations, as well as internal Morgan Stanley documents, identified additional instances whereby Morgan Stanley won investment banking business simply by making commitments to initiate coverage.

### Investment Banking Concerns Influenced Morgan Stanley's Decisions on Whether to Initiate or Continue Research Coverage

177.    Morgan Stanley's decisions on whether to initiate or continue research coverage was determined by the companies' decisions to award Morgan Stanley investment banking business.

178.    Morgan Stanley analysts declined to cover some companies that refused to award investment banking business to Morgan Stanley. One senior analyst wrote in a year 2000 self-evaluation that he had declined one company's request for research coverage for four years, and added that he had "insisted that we first be mandated on a large investment banking transaction." When the company provided Morgan Stanley with banking business in connection with a spin-off, the analyst initiated coverage with a bullish Outperform rating.

-54-

179.    In a senior analyst's self-evaluation for year 2000, the analyst stated that "when we miss a winning IPO, we should work like crazy (with tons of ideas) to secure a spot as M&A advisor (USWeb/CKS) or book running manager on follow-on offerings (eBay)."

### Morgan Stanley Research Analysts Performed Investment Banking Functions

180.    Morgan Stanley research analysts performed a number of investment banking-related functions, including identifying potential IPO and merger and acquisition transaction candidates for the investment banking department, participating in soliciting investment banking business for the firm, and participating in road shows and other efforts to sell Morgan Stanley-underwritten IPOs and secondary offerings to institutional investors. Analysts also discussed business strategy with investment banking clients; one senior analyst was described as a "relationship manager" with investment banking clients.

181.    Morgan Stanley kept records of each analyst's contribution to investment banking revenues. Each year, a "Revenue Share Analysis" was prepared, specifying every investment banking transaction in which each analyst had participated, the revenues secured from each transaction, ratings on a scale of 1 to 5 (5 being "critical" to the deal) of the analyst's contribution to the transaction, and a calculation of the analyst's "share" of the credit for the revenues secured from the transaction. The Revenue Share Analysis also recorded investment gains on Morgan Stanley investments in companies covered by the analyst.

182.    One senior analyst's involvement in investment banking activities was so pervasive that investment bankers at the firm considered the analyst to be an investment banker. One banker wrote that the analyst was the most committed and focused banker with whom he had ever worked. Another banker wrote that the analyst was a "commercial animal." The analyst's supervisor wrote, in 1999, that the analyst's focus was primarily on banking and that,

-55-

notwithstanding the growing demand for the analyst's time on investment banking matters, the

analyst needed to devote more attention to institutional investors and the firm's institutional sales

force.

183.    The same analyst's self-evaluation prominently highlighted his assistance to

investment banking in selecting and generating investment banking business and large fees,

stating: "Bottom line, my highest and best use is to help MSDW win the best Internet IPO

mandates (and to ensure that we have the appropriate analysts and bankers to serve the

companies well). . ." The analyst also prominently listed the deals and revenues from her

investment banking-connected efforts, as follows:

> **Internet Investment Banking, a Record Year with $205MM+
> YTD Revenue, [20+] Pending Financings, Co-Coverage
> (Leverage) in 85% of Cases, 6 of 6 Tech IBD Revenue
> Generating Clients, Internet Category was #1 Revenue
> Generator in Tech IBD ($505MM YTD Tech Revenue) . . .**
> (Emphasis in original.)
>
> Ok, the numbers (see Attachment A): Forty investment banking
> transactions ($143MM in fees) . . .
> It's notable that 96% of the $205MM in revenue was derived from
> clients new to the firm since 1995! Exceptions were America
> Online, Compaq, Hearst and Sotheby's.  **And, I have been very
> involved in this business**.  (Emphasis added.)

### Research Analyst's Compensation

184.    Participation in investment banking activities was the determining factor in

awarding compensation to Morgan Stanley research analysts.  Thus, analysts faced conflicts of

interest between helping win investment banking business for Morgan Stanley and publishing

honest and accurate research that, if negative, could prevent Morgan Stanley from winning

banking business.

185.    The annual salaries paid to senior Morgan Stanley analysts typically were comparatively small components of their total annual compensation. The majority of their total annual compensation was paid in the form of a bonus. In 2000, one senior analyst received a year-end bonus that was 90 times greater than her base salary.

186.    The total compensation paid to analysts was based on the investment banking fees that Morgan Stanley received. Thus, the success or failure of the investment banking division determined the amount of funds available for analyst compensation.

### Analysts Rated Their Contributions to Investment Banking

187.    The level of analysts' contribution to investment banking was an important factor in the annual evaluations of Morgan Stanley's analysts and, consequently, their compensation.

188.    As part of the annual performance evaluation process, analysts were required to submit self-evaluations that, among other things, discussed their contributions to Morgan Stanley's investment banking business. Analysts' self-evaluations often included discussions of analysts' involvement in investment banking, including descriptions of specific transactions, the fees generated, and roles the analysts played in deals. For example, the 1999 self-evaluation of one analyst identified forty transactions in which he was involved that year which generated a total of $143 million in fees for Morgan Stanley.

189.    As part of the evaluation process, analysts rated their contributions to specific banking transactions. Analysts were instructed to complete a Transaction Summary Worksheet ("TSW") in which they graded their roles in specific deals on a scale of 1-5. Instructions provided to each analyst described the rating system as follows:

>       5 = critical to deal
>
>       4 = important to development and execution

-57-

3 = solid contribution

2 = limited contribution

1 = contribution limed to provided research coverage

190.    Analysts were instructed to reveal whether the "promise of coverage was critical

to winning" a given investment banking mandate.  Analysts were also instructed that supplying

this information was an "important part" of the evaluation process.

### Investment Bankers Evaluated Analysts' Performance

191.    Moreover, Morgan Stanley also solicited and received investment bankers'

assessments of analysts' performance.  Morgan Stanley's liaison between the research and

investment banking divisions compiled and summarized the bankers' evaluations of the analysts'

role in each deal, and then prepared a final TSW listing for each transaction that provided a joint

evaluation of the analysts' contributions to each deal.

192.    Finally, as part of Morgan Stanley's "360 degree" review process, in which

employees confidentially reviewed one another, investment bankers submitted written opinions

of analysts with whom they worked.

193.    Investment bankers thus played a major role in the annual evaluation of research

analysts by providing substantive information that was considered in the year-end evaluation

process and in the determination of the analysts' compensation for that year.  The investment

bankers' role in the evaluation process created a conflict of interest for the analysts, who wanted

positive evaluations from investment bankers.  By issuing honest and objective research reports,

if negative, analysts would jeopardize Morgan Stanley's ability to win future investment banking

business from the covered companies and, consequently, would jeopardize their compensation

level.

**Investment Banking Was the Factor Accorded the Greatest**
**Weight by Management in Reviewing Analysts' Compensation**

194.    In 1999 and 2000, analyst compensation was set primarily by a managing director

in the equity research division.  The managing director made an initial determination of proposed

compensation for all analysts and ranked the analysts based on that determination.  The

managing director then ranked the analysts based on their composite scores in nine separate

categories.  The managing director then compared the two rankings before forwarding the final

compensation recommendations to his/her superiors at Morgan Stanley.

195.    The nine categories used to rank the analysts included the amount of investment

banking revenues attributed to each analyst based on their involvement in transactions (relative

weight of 33%) and eight other categories related to core research activities, including: (1) poll

rankings from the *Institutional Investor* and other sources (19%); (2) poll ranking from

institutional equity division sales (12%); (3) firm activities and ability to be a team player (11%);

(4) the "hit ratio" in vote gathering from institutional clients (7%); (5) rank in vote gathering

from institutional clients (7%); (6) stock picking (active portfolio vs. passive portfolio) (6%); (7)

stock picking (active portfolio vs. index portfolio) (3%); and (8) poll ranking from retail sales

(2%).  Thus, the managing director assigned a one-third weight to the amount of investment

banking revenues - the highest weight given to any single category.

196.    The impact that analysts' contributions to investment banking revenues could

have on the determination of their compensation is demonstrated by the compensation of one

Morgan Stanley senior analyst.  In 1999, this analyst ranked only 11th overall, but ranked first in

investment banking revenues and, thereafter, received the highest compensation of all Morgan

Stanley research analysts.

197.   In 2000, the same analyst continued to rank first in investment banking revenues: the total investment banking revenues that this analyst helped Morgan Stanley to obtain more than doubled from 1999. In most other categories, however, the analyst's performance declined after 1999, and the analyst's composite score dropped to 19th overall. In 2000, the analyst ranked only 70th out of 111 analysts in stock picking and the analyst's self-evaluation conceded that 2000 had been the analyst's worst stock-picking year in fifteen years. Nevertheless, this analyst's total salary bonus for 2000 increased by approximately $8.7 million compared to 1999, again ranking first among all Morgan Stanley analysts.

**Morgan Stanley Had No System in Place for
Reviewing the Ratings Issued By Its Senior Analysts**

198.   Morgan Stanley required only non-officer-level analysts to submit their initial ratings and proposed changes in ratings for review by the Stock Selection Committee. Senior analysts, principals, and managing directors were not subject to this requirement. During the Class Period, Morgan Stanley had no effective system in place for reviewing the ratings of its senior analysts.

199.   Not until late 2001, after numerous complaints from Institutional Sales personnel, did management tell analysts: "Don't let your ratings get stale; change them ahead of expected price action."

**Morgan Stanley's Analysts Virtually Never Used
the Lowest Rating in the Firm's Stock Rating System**

200.   From 1995 to March 2002, Morgan Stanley publicly stated that it had a four-category rating system: Strong Buy, Outperform; Neutral; and Underperform. "Underperform" was defined, as follows: "Given the current price, these securities are not expected to perform as well as other stocks in the universe covered by the analyst."

201.   Although Morgan Stanley stated that it had a four-category system, its analysts virtually never used the "Underperform" rating and, in effect, used a three-category system. During the Class Period, Morgan Stanley published research on approximately 1,000 North American company stocks. No more than three of the 1,033 stocks covered by Morgan Stanley over the course of year 1999 were given an Underperform rating; no more than five of the 1,058 stocks covered by Morgan Stanley over the course of year 2000 received that rating; and no more than six of the 1030 stocks covered by Morgan Stan over the course of year 2001 were rated Underperform.

202.   Morgan Stanley management was aware that analysts were not using the "Underperform" ratings, but did not correct the problem until March 2002, when a new rating system was instituted.

### Morgan Stanley's Banking Business with RSL

203.   Morgan Stanley had substantial Investment Banking relationships with RSL. Morgan Stanley was lead or joint-lead underwriter/placement agent in the Company's various public offerings (which yielded in excess of $64 million in total investment banking fees), from 1997 through 2000), including, but not limited to: the RSL IPO, in late 1997; and the February 2000 issuance of $200 million in 12 7/8% Senior Notes due 2010 (total aggregate commissions amounting to approximately $5.0 million shared by three firms), as well as RSL's issuance of $115 million aggregate liquidation preference of 7 ½% Series A preferred shares (total aggregate commissions amounting to approximately $4.0 million shared by three firms) -- in both cases, Morgan Stanley was appointed lead or co-lead placement agent and earned millions of dollars of fees, commissions, and other substantial compensation. Moreover, in March 2000, Morgan

Stanley exercised its over-allotment options with respect to an additional $15 million aggregate

liquidation preference of Series A preferred shares.

### Morgan Stanley's False and Misleading Statements

204.    On May 3, 1999, RSL announced its plans to spin-off its Delta 3 subsidiary and

offer Delta 3 common stock to the public in an IPO.

205.    On April 30, 1999, Morgan Stanley analysts had issued a Strong Buy rating (its

then highest rating) for RSL shares. On the same day, RSL stock rose approximately $1 per

share.

206.    On May 21, 1999, Morgan Stanley analysts reiterated the Strong Buy rating for

RSL, emphasizing that, notwithstanding price declines, RSL shares constituted a "buying

opportunity." On the same day, the price of RSL's shares rose approximately $3 per share.

207.    On or about August 10, 1999, the price of RSL shares had fallen to $14 1/4 per

share, a then 52-week low. On or about that same date, Morgan Stanley issued a report which

included a "strong buy" recommendation for the RSL. Within one week of the issuance of this

report, the share price of RSL shares had risen approximately $2.

208.    By October 15, 1999, RSL stock price had increased to $20.63 per share. On the

same day, Morgan Stanley had issued an Equity Research and Briefing Note in which it

reiterated its Strong Buy rating and a $38.00 per share price target for RSL, even though, on

October 12, 1999, RSL announced that it had taken a massive $32 million restructuring charge.

Incredibly, in the same October 15 report, Morgan Stanley characterized the $32 million charge

to earnings as "a positive for RSL."

-62-

209.   A few weeks later, on November 4, 1999, RSL stock price had increased to $21.63 per share. On the same date, Morgan Stanley had issued an Equity Research and Briefing Note in which it maintained its Strong Buy rating and target price of $38 per share for RSL, notwithstanding the fact that RSL's quarterly earnings per share came in considerably below estimates, due to, among other things, RSL's higher than expected non-cash compensation expenses. After the November 4, 1999 report had been published, Morgan Stanley temporarily dropped coverage of RSL. Morgan Stanley had not been chosen to underwrite the Delta 3 spin-off IPO, which yielded millions of dollars of fees, commissions, and other substantial compensation to its competitors.

210.   The analyst ratings and price targets contained in the research reports on RSL referred to in the five (5) preceding paragraphs herein were false and/or misleading because Morgan Stanley knew or recklessly disregarded and failed to disclose, that:

1.   it regularly used analyst research to obtain lucrative investment banking business from companies it covered, including RSL;

2.   it caused the analysts covering RSL to upgrade or otherwise not downgrade their analysis of RSL due to investment banking reasons, including, but not limited to, the prospect of underwriting and/or managing RSL's public offerings, including, but not limited to, the Delta 3 spin-off IPO;

3.   its analysts were subject to financial conflicts of interest that adversely impacted the independence and accuracy of its research product, including analyst ratings, reports, and price targets concerning RSL;

-63-

4.    it failed to adequately manage and supervise its analysts or impose
      adequate controls in order to protect the objectivity of its published
      research;

5.    as a result of the foregoing, its analysts issued more positive reports and
      ratings than were justified, and avoided downgrades or negative reports
      regarding investment banking clients, including RSL, and thus caused the
      stock price of RSL to be artificially inflated during the Class Period.

211.    By February 18, 2000, RSL stock had dropped to $15.00 per share. On the same
date, Morgan Stanley issued a Equity Research report in which it resumed coverage for RSL and
reaffirmed its Strong Buy rating and $38 per share price target for the stock. In this same time
period, RSL was involved in road shows that touted RSL's offerings of $115 million in preferred
shares and $200 million in high yield notes, which presented highly lucrative investment banking
opportunities for Morgan Stanley. RSL chose Morgan Stanley to be co-lead placement agent for
both offerings, for which Morgan Stanley earned millions of dollars in commissions, fees, and
other substantial compensation.

212.    By March 3, 2000, RSL stock shot up to more than $26.00 per share. On the
same date, Morgan Stanley had issued a Sales/Earnings Analysis report in which it maintained
its Strong Buy rating and $38 per share price target for RSL, despite the perceived weakness of
its convertible preferred stock offerings. A few days later, RSL stock had skyrocketing to
$32.00 per share. Sometime in March, 2000, Morgan Stanley exercised its over-allotment option
with respect to the RSL Series A preferred shares.

-64-

213.   The analyst ratings and price targets contained in the research report of RSL referred to in the preceding two (2) paragraphs, herein, were false and/or misleading because Morgan Stanley knew or recklessly disregarded and failed to disclose, that:

1.   it regularly used analyst research to obtain lucrative investment banking business from companies it covered, including RSL;

2.   it caused the analysts covering RSL to upgrade or otherwise not downgrade their analysis of RSL due to investment banking business with RSL, including but not limited to RSL's Senior Notes and Series A preferred shares offerings, including rights to exercise over-allotment options, for which Morgan Stanley was chosen lead or co-lead placement agent and earned millions of dollars in fees, commissions, and other substantial compensation;

3.   its analysts were subject to financial conflicts of interest that adversely impacted the independence and accuracy of its research product, including analyst ratings, reports, and price targets concerning RSL;

4.   it failed to adequately manage and supervise its analysts or impose adequate controls in order to protect the objectivity of its published research;

5.   as a result of the foregoing, its analysts issued more positive reports and ratings than were justified, and avoided downgrades or negative reports regarding investment banking clients, including RSL, and thus caused the stock price of RSL to be artificially inflated during the class period.

214.    On March 28, 2000, RSL stock was trading in the $27.00 per share range. On the same day, Morgan Stanley had issued an Equity Research report which it maintained a Strong Buy rating and increased its price target to $50 per share for RSL stock. The bullish report emphasized that RSL shares are "extremely attractive," even though RSL had a need for additional capital and was increasingly viewed as having an obsolete Internet/data business strategy.

215.    The analyst ratings and price targets contained in the research reports of RSL referred to in the preceding paragraph herein were false and/or misleading because Morgan Stanley knew or recklessly disregarded and failed to disclose, that:

1.    it regularly used analyst research to obtain lucrative investment banking business from companies it covered, including RSL;

2.    it caused the analysts covering RSL to upgrade or otherwise not downgrade their analysis of RSL due to investment banking business with RSL, including but not limited to RSL's Senior Notes and Series A preferred shares offerings, including rights to exercise over-allotment options, for which Morgan Stanley was chosen lead or co-lead placement agent and earned millions of dollars in fees, commissions and other substantial compensation;

3.    its analysts were subject to financial conflicts of interest that adversely impacted the independence of its research product, including analyst ratings, reports, and price targets concerning RSL;

4.    it failed to adequately manage and supervise its analysts or impose

adequate controls in order to protect the objectivity of its published

research;

5.    as a result of the foregoing, its analysts issued more positive reports and

ratings than were justified, and avoided downgrades or negative reports

regarding investment banking clients, including RSL, and thus caused the

stock price of RSL to be artificially inflated during the class period.

216.    On April 4, 2000, RSL stock traded as high $22 5/16 per share. On the same date,

Morgan Stanley issued an Equity Research report in which it affirmed its Strong Buy rating and

$50 per share price target for RSL stock, despite a sharp reduction in RSL's revenue estimates.

217.    The analyst ratings and price targets contained in the research reports on RSL

referred to in the preceding paragraph herein were false and/or misleading because Morgan

Stanley knew or recklessly disregarded and failed to disclose, that:

1.    it regularly used analyst research to obtain lucrative investment banking

business from companies it covered, including RSL;

2.    it caused the analysts covering RSL to upgrade or otherwise not

downgrade their analysis of RSL due to investment banking business with

RSL, including, but not limited to, RSL's Senior Notes and Series A

preferred shares offerings, including rights to exercise over-allotment

options, for which Morgan Stanley was chosen lead or co-lead placement

agent and received millions of dollars in fees, commissions, and/or other

substantial compensation;

-67-

3.    its analysts were subject to financial conflicts of interest that adversely
      impacted the independence and accuracy of its research product, including
      analyst ratings, reports, and price targets concerning RSL;

4.    it failed to adequately manage and supervise its analysts or impose
      adequate controls in order to protect the objectivity of its published
      research;

5.    as a result of the foregoing, its analysts issued more positive reports and
      ratings than were justified, and avoided downgrades or negative reports
      regarding investment banking clients, including RSL, and thus caused the
      stock price of RSL to be artificially inflated during the class period.

218.    By May 26, 2000, RSL's stock price had dropped to approximately $10 per share.
On the same date, despite the significant stock price drop and a radical reduction in RSL's
revenue estimates, Morgan Stanley issued an Equity Research report in which it affirmed its
Strong Buy rating and $50 per share price target for RSL shares.  Within two days of the
issuance of this report, RSL's stock price rose approximately $2 per share, or 20%.

219.    The analyst ratings and price targets contained in the research reports of RSL
referred to in the preceding paragraph were false and/or misleading because Morgan Stanley
knew or recklessly disregarded and failed to disclose, that:

1.    it regularly used analyst research to obtain lucrative investment banking
      business from companies it covered, including RSL;

2.    it caused the analysts covering RSL to upgrade or otherwise not
      downgrade their analysis of RSL in order to pursue and maintain
      investment banking business with RSL, including, but not limited to,

-68-

RSL's Senior Notes and Series A preferred shares offerings, including

rights to exercise over-allotment options, for which Morgan Stanley was

chosen lead or co-lead placement agent and received millions of dollars in

fees, commissions, and/or other substantial compensation;

3.      its analysts were subject to financial conflicts of interest that adversely

impacted the independence and accuracy of its research product, including

analyst ratings, reports, and price targets, concerning RSL;

4.      it failed to adequately manage and supervise its analysts or impose

adequate controls in order to protect the objectivity of its published

research;

5.      as a result of the foregoing, its analysts issued more positive reports and

ratings than were justified, and avoided downgrades or negative reports

regarding investment banking clients, including RSL, and thus caused the

stock price of RSL to be artificially inflated during the class period.

220.    By July 18, 2000, RSL's stock price had dropped to $7.30 per share. Despite a

massive $48 million write-down applicable to RSL's 2Q00 earnings, which resulted in a huge

loss of equity value, on the same date, Morgan Stanley issued an Equity Research report in

which it reiterated its Strong Buy rating for RSL's shares and, further stated that RSL's valuation

was "compelling." On or about this same date, other brokerage firms, including Lehman and

Goldman Sachs had marginally downgraded RSL shares to the still bullish ratings of

"outperform."

221.   The analyst ratings contained in the research reports of RSL referred to in the preceding paragraph herein were false and misleading because Morgan Stanley knew or recklessly disregarded and failed to disclose, that:

1.   it regularly used analyst research to obtain and maintain lucrative investment banking business from companies it covered, including RSL;

2.   it caused the analysts covering RSL to not meaningfully downgrade their analysis of RSL due to investment banking business with RSL, including, but not limited to, RSL's Senior Notes and Series A preferred shares offerings, including rights to exercise over-allotment options, for which Morgan Stanley was chosen lead or co-lead placement agent and earned millions of dollars in fees, commissions and/or other substantial compensation;

3.   its analysts were subject to financial conflicts of interest that adversely impacted the independence and accuracy of its research product, including analyst ratings, reports, and price targets, concerning RSL;

4.   it failed to adequately manage and supervise its analysts or impose adequate controls in order to protect the objectivity of its published research;

5.   as a result of the foregoing, its analysts issued more positive reports and ratings than were justified, and avoided downgrades or negative reports regarding investment banking clients, including RSL, and thus caused the stock price of RSL to be artificially inflated or stabilized during the Class Period.

-70-

222.    On August 7, 2000, the High Yield Report announced that Moody's Investment
Service had downgraded RSL's bond rating from B2 to B3, citing RSL's inability to achieve
cash flow growth. At this time, RSL's stock had dropped to approximately $1 per share. In
response to this news, a Morgan Stanley analyst stated: "This company is selling dirt cheap, I
don't think it should be trading at these levels."

223.    The analyst comments referred to in the preceding paragraph herein were false and /
or misleading because Morgan Stanley knew or recklessly disregarded and failed to disclose, that:

1.    it regularly used analyst research reports to obtain and maintain lucrative
investment banking business from companies it covered, including RSL;

2.    it caused the analysts covering RSL to upgrade or otherwise not downgrade
their analysis of RSL due to investment banking business with RSL,
including, but not limited to, RSL's Senior Notes and Series A preferred
shares offerings, including rights to exercise over-allotment options, for
which Morgan Stanley was chosen lead or co-lead placement agent and
earned millions of dollars in fees, commissions and/or other substantial
compensation;

3.    its analysts were subject to financial conflicts of interest that adversely
impacted the independence and accuracy of its research product, including
analyst ratings, reports, and price targets, concerning RSL;

4.    it failed to adequately manage and supervise its analysts or impose adequate
controls in order to protect the objectivity of its published research;

5.    as a result of the foregoing, its analysts issued more positive reports and
ratings than were justified, and avoided downgrades or negative reports

-71-

regarding investment banking clients, including RSL, and thus caused the

stock price of RSL to be artificially inflated and/or stabilized during the

Class Period.

224.    On December 29, 2000, RSL was trading at $0.20 per share and was de-listed

from the NASDAQ stock exchange.

### Defendants' Misconduct Revealed

225.    On or about April 28, 2003, a settlement was reached in connection with charges

filed against Defendants by the SEC and the Attorneys General of various states, including New

York, Alabama, and Utah (who were task force leaders). Pursuant to settlement memoranda,

which includes numerous findings of fact that relate to Plaintiffs' complaint, the substance of

which is particularized herein, the SEC and the aforementioned state Attorneys General found

that Defendants each had systematically failed to adopt sufficient procedures and processes to

ensure that the interaction between its research analysts and investment bankers or covered

companies did not expose its analysts to undue pressures or influences from investment banking

personnel and/or covered companies. Moreover, the afore-stated charges allege that Defendants

had violated several rules of the NASD and NYSE by issuing false and misleading analyst

reports on numerous companies which served to artificially inflate the prices of numerous

companies, including RSL.

226.    Additionally, the SEC and various states' settlement memoranda sets forth

specific e-mails and internal communications described above, which establish that Defendants

each had violated federal securities laws in connection with their published research and ratings

on many companies its analysts had covered, including RSL.

-72-

227.    Moreover, the findings of fact in the aforesaid settlement memoranda reveal that while the purported role of Defendants' research analysts was to produce objective research, Defendants systematically encouraged their analysts to participate in investment banking-related activities. Additionally, analysts' compensation was directly tied to investment banking revenue. As a result of their participation in investment banking-related activities and the financial pressures arising from linkage of their compensation to investment banking revenue, analysts issued numerous misleading and false research reports which served to bolster the Defendants' investment banking revenues and, consequently, artificially inflated the stock prices of numerous companies, including RSL. Defendants each knew or should have known of these undue pressures or influences, and yet failed to adequately manage them and, thus, failed to protect the objectivity and accuracy of their published research concerning many companies they covered, including RSL.

228.    Lehman settled these charges for the payment of $50 million, in addition to accepting other remedial obligations.

229.    Goldman Sachs settled these charges for the payment of $110 million, in addition to accepting other remedial obligations.

230.    Morgan Stanley settled these charges for the payment of $125 million, in addition to accepting other remedial obligations.

**The Market for RSL Shares**

231.    The market for RSL common stock was open, well-developed and efficient at all relevant times herein. As a result of the materially false and misleading statements and failures to disclose outlined herein, RSL's common stock price had been artificially inflated or otherwise stabilized during the Class Period. The suppression of the truth concerning such artificial

inflation and/or stabilization of RSL's stock price continued until the time Defendants each admitted to the SEC and/or relevant state authorities that their reports and ratings concerning RSL were, in fact, false and misleading and caused injury to investors, including the members of the Class.

232.    Defendants each had communicated false and misleading statements to the investment community, and such communications had been absorbed by the securities markets, leading to the artificial inflation of the stock price of RSL shares. Plaintiffs and the other members of the Class purchased or otherwise acquired RSL common stock in reliance upon the integrity of the market concerning RSL, and have been damaged thereby.

233.    During the Class Period, Defendants each materially misled the investing public, thereby inflating the price of RSL common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make its statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Defendants' analysts' conflicts of interests.

234.    At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and the other members of the Class. As described herein, during the Class Period, each Defendant made or caused to be made a series of materially false or misleading statements about RSL. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of RSL, thus causing the price of the Company's common stock to be overvalued at all relevant times herein. As the following chart shows, Defendants' false and misleading reports, ratings and/or statements were

-74-

repeatedly issued while RSL's stock price was plummeting and had the effect of temporarily

halting the downward trend and driving the price back up. These specific points can be viewed

graphically in the following chart where the arrows indicate the timing of Defendants statements:



# RSL Communications
## stock price history for April 1, 1999 - Sept. 29, 2000

Class Period: April 30, 1999 - Dec. 29, 2000
May 1999: RSL issued $175 million of unregistered Senior Notes. GS was the placement agent.
Sept - Nov 1999: SEC filings for IPO of deltathree.com wherein RSL sold 6.9 million shares at
$15 per share for $103.5 million. LB was lead underwriter and GS a participating underwriter.
Feb 2000: RSL issued $115 million of Series A Covertible Preferred Shares (2.3 million);
$100 million of Senior Notes; and 100 million Euros of Senior Notes. GS, LB and MS were
co-lead placement agents.

Each Defendant's materially false and misleading statements during the Class Period resulted in

Plaintiffs and the other members of the Class purchasing the Company's common stock at

artificially inflated prices, thus causing the damages complained of herein.

-75-

235.    Defendants each regularly issued analyst research reports which were reported in the financial press, made readily available through Defendants' web sites and public activities, including road shows, and made available through third-party investment report subscriber services, among other outlets. Consequently, the Defendants' reports were publicly available and entered and influenced the public marketplace concerning the price of RSL shares.

236.    As a result, the markets digested all information with respect to RSL from all publicly-available sources and reflected such information in RSL's stock price. Under these circumstances, all purchasers of RSL's common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

## STATUTORY SAFE HARBOR

237.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Further, none of the statements pleaded herein which were forward-looking statements were identified as "forward-looking statements" when made. Nor was it stated that actual results "could differ materially from those projected." Nor were the forward-looking statements pleaded accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Defendants each are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and/or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Defendants who knew that those statements were false when made.

-76-

## CLAIMS FOR RELIEF

## COUNT I

### (Against Lehman For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

238.    Plaintiffs repeat and reallege each and every allegation set forth above.

239.    During the Class Period, Defendant Lehman made untrue statements of material

fact and omitted to disclose material facts, that were intended to and did: (i) deceive the

investing public, including Plaintiffs and the other members of the Class, as alleged herein; (ii)

artificially inflated and maintained the market price of RSL common stock; and (iii) caused

Plaintiffs and the other members of the Class to purchase or otherwise acquire RSL stock at

artificially inflated prices.

240.    The Defendant made untrue statements of material fact and/or omitted to state

material facts necessary to make the statements made, in light of the circumstances under which

they were made, not misleading, all in violation of section 10(b) of the Exchange Act and Rule

10b-5. Defendant's material misrepresentations and omissions concerned, inter alia: (i) the fact

their ratings did not reflect the analysts' true opinions of RSL; (ii) that Lehman had an

undisclosed internal policy to never issue "underperform" or "sell" recommendations on Internet

companies, including RSL, thereby converting a published five-point rating scale into a de-facto

three-point system; (iii) that the challenged ratings and reports on RSL failed to disclose that

Lehman's ratings were tarnished by an undisclosed conflict of interest in that the research

analysts were acting as quasi-investment bankers for RSL and the companies at issue, often

initiating , continuing, and/or manipulating research coverage for the purpose of attracting and

keeping investing banking business with RSL and other covered clients, thereby producing

-77-

misleading ratings that were neither objective nor independent, as they purported to be; and (iv)

Defendant's failure to comply with the rules and regulations of the SEC, NASD and other

regulatory authorities regarding communications to the investing public.

241.   Defendant's material misrepresentations and/or omissions were done knowingly

or recklessly and for the purpose and effect of obtaining lucrative investment banking business

from RSL. Specifically, the analysts' reports were represented to be both positive and objective,

while internal Lehman e-mails have shown that the ratings and recommendations in the reports

were both artificially inflated and given merely in the hopes of obtaining future banking

business.

242.   Defendant Lehman, however, knew or recklessly disregarded that their statements

concerning the integrity and objectivity of their securities research and ratings system were false

at the time they made these statements, because those statements were flatly contradicted by the

Defendant's unlawful plan, scheme and course of conduct alleged herein.

243.   Defendant was required to comply with all relevant SEC and NASD regulations.

In addition, said Defendant had a duty to fully disclose the truth concerning their business

practices alleged herein by virtue of their issuance of research reports to investors, as a result of

Defendant Lehman's status as a registered U.S. broker/dealer and its wrongful activities in such

capacity alleged herein, and as a result of the integrated disclosure provisions of the SEC as

embodied in SEC Regulations S-X, [17 C.F.R.; § 210.0, et seq.], S-K [ 17 C.F.R.; § 299.10, et

seq.], and other SEC regulations.

244.   Throughout the Class Period, Defendant's material misrepresentations and

omissions induced a disparity between the market price and the true "investment quality" of

RSL securities. As a result of the dissemination of the materially false and misleading

-78-

information and failure to disclose material facts, as set forth above, the market price of RSL securities were artificially inflated during the Class Period, and Plaintiffs and the Class were deceived as to the true investment quality of RSL securities. In ignorance of the fact that the market price of RSL securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendant Lehman, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendant but not disclosed in public statements by Defendant during the Class Period, Plaintiffs and the other members of the Class acquired RSL securities during the Class period at artificially inflated prices and were damaged thereby.

245.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class known of the omitted material facts, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired RSL securities, or if they had acquired RSL securities, they would not have done so at the artificially inflated prices.

246.    Plaintiffs and the other members of the Class were injured because the risks that materialized were risks of which they were unaware as a result of Defendant's material misrepresentations and omissions. Absent Defendant's wrongful conduct, Plaintiffs and the other members of the Class would not have been injured.

247.    By virtue of the foregoing, Defendant Lehman violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

248.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of RSL securities in an amount to be proved at trial.

## COUNT II

### (Against Goldman Sachs For Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5 Promulgated Thereunder

249.    Plaintiffs repeat and reallege paragraphs 1 through 237, set forth above.

250.    During the Class Period, Defendant Goldman Sachs made untrue statements of

material fact and omitted to disclose material facts, that were intended to and did: (i) deceive the

investing public, including Plaintiffs and the other Class members, as alleged herein; (ii)

artificially inflated and maintained the market price of RSL common stock; and (iii) caused

Plaintiffs and the other members of the Class to purchase or otherwise acquire RSL stock at

artificially inflated prices.

251.    The Defendant made untrue statements of material fact and/or omitted to state

material facts necessary to make the statements made, in light of the circumstances under which

they were made, not misleading, all in violation of section 10(b) of the Exchange Act and Rule

10b-5. Defendant's material misrepresentations and omissions concerned, inter alia: (i) the fact

that the ratings did not reflect the analysts' true opinions of RSL; (ii) that Goldman Sachs

maintained an undisclosed internal policy to never issue "sell" recommendations on Internet

companies, including RSL; (iii) that the challenged ratings and reports on RSL failed to disclose

that Goldman Sachs's ratings were tarnished by an undisclosed conflict of interest in that the

research analysts were acting as quasi-investment bankers for RSL and the companies at issue,

often initiating , continuing, and/or manipulating research coverage for the purpose of attracting

and keeping investing banking business with RSL and the other covered clients, thereby

producing misleading ratings that were neither objective nor independent, as they purported to

-80-

be; and (iv) Goldman Sachs's failure to comply with the rules and regulations of the SEC, NASD and other regulatory authorities regarding communications to the investing public.

252.    Defendant's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of obtaining lucrative investment banking business from RSL. Specifically, the analysts' reports were represented to be both positive and objective, while internal Goldman Sachs e-mails and other documents have shown that the ratings and recommendations in the reports were both artificially inflated and given merely in the hopes of obtaining future banking business.

253.    Defendant Goldman Sachs, however, knew or recklessly disregarded that their statements concerning the integrity and objectivity of their securities research and ratings system were false at the time they made these statements, because those statements were flatly contradicted by the Defendant's unlawful plan, scheme and course of conduct alleged herein.

254.    Defendant Goldman Sachs was required to comply with all relevant SEC and NASD regulations. In addition, said Defendant had a duty to fully disclose the truth concerning their business practices alleged herein by virtue of their issuance of research reports to investors, as a result of Defendant Goldman Sachs's status as a registered U.S. broker/dealer and its wrongful activities in such capacity alleged herein, and as a result of the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X, [17 C.F.R.; § 210.0, et seq.], S-K [ 17 C.F.R.; § 299.10, et seq.], and other SEC regulations.

255.    Throughout the Class Period, Defendant's material misrepresentations and omissions induced a disparity between the market price and the true "investment quality" of RSL securities. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of RSL securities were

artificially inflated during the Class Period, and Plaintiffs and the Class were deceived as to the true investment quality of RSL securities. In ignorance of the fact that the market price of RSL securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendant , or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendant but not disclosed in public statements by Defendant during the Class Period, Plaintiffs and the other members of the Class acquired RSL securities during the Class period at artificially inflated prices and were damaged thereby.

256.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class known of the omitted material facts, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired RSL securities, or if they had acquired RSL securities, they would have not done so at the artificially inflated prices.

257.    Plaintiffs and the other members of the Class were injured because the risks that materialized were risks of which they were unaware as a result of Defendant's material misrepresentations and omissions. Absent Defendant's wrongful conduct, Plaintiffs and the other members of the Class would not have been injured.

258.    By virtue of the foregoing, Defendant Goldman Sachs violated section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

259.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of RSL securities in an amount to be proved at trial.

-82-

## COUNT III

### (Against Morgan Stanley For Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5 Promulgated Thereunder

260.     Plaintiffs repeat and reallege paragraphs 1 through 237, set forth above.

261.     During the Class Period, Defendant Morgan Stanley made untrue statements of

material fact and omitted to disclose material facts, that were intended to and did: (i) deceive the

investing public, including Plaintiffs and the other members of the Class, as alleged herein; (ii)

artificially inflated and maintained the market price of RSL common stock; and (iii) caused

Plaintiffs and the other members of the Class to purchase or otherwise acquire RSL stock at

artificially inflated prices.

262.     The Defendant Morgan Stanley made untrue statements of material fact and/or

omitted to state material facts necessary to make the statements made, in light of the

circumstances under which they were made, not misleading, all in violation of section 10(b) of

the Exchange Act and Rule 10b-5, promulgated thereunder. Defendant's material

misrepresentations and omissions concerned, inter alia: (i) the fact the ratings did not reflect the

analysts' true opinions of RSL; (ii) that Morgan Stanley had an undisclosed internal policy to

never issue "sell" recommendations on companies, including RSL; (iii) that the challenged

ratings and reports on RSL failed to disclose that Morgan Stanley's ratings were tarnished by an

undisclosed conflict of interest in that the research analysts were acting as quasi-investment

bankers for RSL and the other companies at issue, often initiating, continuing, and/or

manipulating research coverage for the purpose of attracting and keeping investing banking

business with RSL and other covered clients, thereby producing misleading ratings that were

neither objective nor independent, as they purported to be; and (iv) Defendant's failure to

-83-

comply with the rules and regulations of the SEC, NASD and other regulatory authorities regarding communications to the investing public.

263.   Defendant's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of obtaining lucrative investment banking business from RSL. Specifically, the analysts' reports were represented to be both positive and objective, while internal Morgan Stanley documents have shown that the ratings and recommendations in the reports were both artificially inflated and given merely in the hopes of obtaining future banking business.

264.   Defendant Morgan Stanley, however, knew or recklessly disregarded that their statements concerning the integrity and objectivity of their securities research and ratings system were false at the time they made these statements, because those statements were flatly contradicted by the Defendant's unlawful plan, scheme and course of conduct alleged herein.

265.   Defendant Morgan Stanley was required to comply with all relevant SEC and NASD regulations. In addition, said Defendant had a duty to fully disclose the truth concerning their business practices alleged herein by virtue of their issuance of research reports to investors, as a result of Defendant Morgan Stanley's status as a registered U.S. broker/dealer and its wrongful activities in such capacity alleged herein, and as a result of the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X, [17 C.F.R.; § 210.0, et seq.], S-K [17 C.F.R.; § 299.10, et seq.], and other SEC regulations.

266.   Throughout the Class Period, Defendant's material misrepresentations and omissions induced a disparity between the market price and the true "investment quality" of RSL securities. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of RSL securities were

-84-

artificially inflated during the Class Period, and Plaintiffs and the Class were deceived as to the true investment quality of RSL securities. In ignorance of the fact that the market price of RSL securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendant Morgan Stanley, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendant but not disclosed in public statements by Defendant during the Class Period, Plaintiffs and the other members of the Class acquired RSL securities during the Class period at artificially inflated prices and were damaged thereby.

267.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class known of the omitted material facts Plaintiffs and the other members of the Class would not have purchased or otherwise acquired RSL securities, or if they had acquired RSL securities, they would not have done so at the artificially inflated prices.

268.    Plaintiffs and the other members of the Class were injured because the risks that materialized were risks of which they were unaware as a result of Defendant's material misrepresentations and omissions. Absent Defendant's wrongful conduct, Plaintiffs and the other members of the Class would not have been injured.

269.    By virtue of the foregoing, Defendant Morgan Stanley violated section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

270.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of RSL securities in an amount to be proved at trial.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

i)      Determining that this action is a proper class action, designating Plaintiffs as Lead

Plaintiffs and Plaintiffs' counsel as Lead Counsel, and thereafter certifying Plaintiffs as

authorized class representatives under Rule 23 of the Federal Rules of Civil Procedure;

ii)     Awarding compensatory damages in favor of Plaintiffs and the other Class

members against the Defendants for all damages sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

iii)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

iv)     Such other and further relief as the Court may deem just and proper

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: November 14, 2003

LAW OFFICES OF CURTIS V. TRINKO, LLP

By: _____
      Curtis V. Trinko (CT-1838)
      Jeffrey B. Silverstein (JS-4818)
16 West 46th Street
7th Floor
New York, New York 10036
Tel: (212) 490-9550
Fax: (212) 986-0158

Attorneys for Plaintiffs

-86-

## CERTIFICATION OF NAMED PLAINTIFFS
## PURSUANT TO FEDERAL SECURITIES LAWS

WE, **LAWRENCE FOGARAZZO** and **CAROLYN FOGARAZZO**, hereby certify as

follows:

1.      We have reviewed the complaint prepared for us concerning RSL

Communications, Inc., brought under the federal securities laws, and have authorized the filing

of such an action .

2.      Plaintiffs did not purchase, or otherwise acquire, the securities of RSL

Communications, Inc. that are the subject of this action, at the direction of plaintiffs' counsel, or

in order to participate in any action arising under the federal securities laws.

3.      We are willing to serve as representative parties on behalf of the class and will

provide testimony at a deposition and/or at trial, if necessary.

4.      Plaintiffs' transactions in the securities that are the subject of this litigation during

the class period set forth in the complaint are, as follows:

        a.      Plaintiffs purchased 1,000 shares of RSL Communications, Inc. common

                stock on March 6, 2000 at $22.85064 per share;

        b.      Plaintiffs purchased 200 shares of RSL Communications, Inc. common

                stock on May 10, 2000 at $14.38315 per share;

        c.      Plaintiffs purchased 500 shares of RSL Communications, Inc. common

                stock on May 15, 2000 at $13.56616 per share; and

        d.      Plaintiffs still hold 1,700 shares of RSL Communications, Inc. common

                stock.

5.      During the three years prior to the date hereof, plaintiffs have not filed an action in which they have sought to serve, or have served, as representative parties for a class in any action filed under the federal securities laws.

6.      Plaintiffs will not accept any payment for serving as representative parties on behalf of the class beyond their pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge and belief. Executed this __9__ day of July, 2003 at Manchester Center, Vermont.

LAWRENCE FOGARAZZO

CAROLYN FOGARAZZO

2

## CERTIFICATION OF NAMED PLAINTIFFS
## PURSUANT TO FEDERAL SECURITIES LAWS

**I, DONALD ENGEL,** hereby certify as follows:

1.      I have reviewed the complaint prepared for Plaintiffs Lawrence and Carolyn Fogarazzo against Lehman Brothers, Inc. concerning RSL Communications, Inc., brought under the federal securities laws, and have authorized the filing of such an action.

2.      I did not purchase, or otherwise acquire, the securities of RSL Communications, Inc. that are the subject of this action at the direction of plaintiffs' counsel or in order to participate in any action arising under the federal securities laws.

3.      I am willing to serve, along with the other plaintiffs named in this action, as representative parties on behalf of the class and will provide testimony at a deposition and/or at trial, if necessary.

4.      My transactions in RSL Communications, Inc. common stock, which are the subject of this litigation, made during the class period set forth in the complaint, are as follows:

| Date | Transaction | Volume | Amount Paid |
|------|-------------|--------|-------------|
| 09/21/1999 | Buy | 2,500 | $42,025.00 |
| 09/21/1999 | Buy | 2,500 | $42,181.25 |
| 09/21/1999 | Buy | 100 | $1,693.50 |
| 09/21/1999 | Buy | 4,900 | $83,293.10 |
| 10/11/1999 | Buy | 4,000 | $82,995.35 |
| 10/11/1999 | Buy | 1,000 | $20,560.00 |
| 03/08/2000 | Buy | 5,000 | $131,550.00 |
| 03/08/2000 | Buy | 2,000 | $52,120.00 |
| 03/08/2000 | Buy | 3,000 | $77,992.50 |
| 03/27/2000 | Buy | 6,000 | $141,735.00 |
| 03/27/2000 | Buy | 14,000 | $329,842.35 |

| | | | |
|---|---|---|---|
| 03/28/2000 | Buy | 10,000 | $258,725.00 |
| 04/04/2000 | Buy | 4,500 | $87,457.50 |
| 04/04/2000 | Buy | 500 | $9,030.00 |
| 04/04/2000 | Buy | 4,000 | $72,240.00 |
| 04/04/2000 | Buy | 2,500 | $49,212.50 |
| 04/04/2000 | Buy | 2,000 | $38,370.00 |
| 04/04/2000 | Buy | 500 | $8,842.50 |
| 04/04/2000 | Buy | 500 | $8,842.50 |
| 04/04/2000 | Buy | 500 | $9,873.75 |
| 05/04/2000 | Sell | 5,000 | $78,872.36 |
| 05/04/2000 | Sell | 2,000 | $31,548.94 |
| 05/04/2000 | Sell | 3,000 | $47,323.42 |
| 05/04/2000 | Sell | 10,000 | $157,744.72 |
| 05/04/2000 | Sell | 4,500 | $70,985.12 |
| 05/04/2000 | Sell | 500 | $7,887.24 |
| 09/20/2000 | Sell | 4,000 | $13,398.34 |
| 09/20/2000 | Sell | 2,500 | $8,373.97 |
| 09/20/2000 | Sell | 2,00 | $6,699.17 |
| 09/20/2000 | Sell | 500 | $1,674.79 |
| 09/20/2000 | Sell | 500 | $1,674.79 |
| 09/20/2000 | Sell | 500 | $1,674.79 |
| 09/20/2000 | Sell | 2,500 | $8,373.97 |
| 09/20/2000 | Sell | 2,500 | $8,373.97 |
| 09/20/2000 | Sell | 100 | $334.96 |
| 09/20/2000 | Sell | 4,000 | $16,412.97 |
| 09/20/2000 | Sell | 4,000 | $13,398.34 |
| 09/20/2000 | Sell | 1,000 | $3,349.59 |
| 09/20/2000 | Sell | 6,000 | $20,087.52 |
| 09/20/2000 | Sell | 14,000 | $46.894.21 |

2

5.      During the three years prior to the date hereof, I have not filed an action in which I have sought to serve, or have served, as a representative party for a class in any action filed under the federal securities laws.

6.      I will not accept any payment for serving as a representative party on behalf of the class beyond a pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this __20__ day of August, 2003, at New York, New York.

**DONALD ENGEL**

3

08/21/2003  15:02    512-467-9645    IASB PROGRAM-ADMIN    PAGE  02/04
08/21/03  15:05 FAX 212 988    38    CURTIS V. TRINKO    @002

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

**I, STEPHEN LOUIS HOPKINS,** hereby certify as follows:

1.    I have reviewed the complaint prepared for Plaintiffs Lawrence and Carolyn Fogarazzo against Lehman Brothers, Inc. concerning RSL Communications, Inc., brought under the federal securities laws, and have authorized the filing of such an action .

2.    I did not purchase, or otherwise acquire, the securities of RSL Communications, Inc. that are the subject of this action at the direction of plaintiffs' counsel or in order to participate in any action arising under the federal securities laws.

3.    I am willing to serve, along with the other plaintiffs named in this action, as representative parties on behalf of the class and will provide testimony at a deposition and/or at trial, if necessary.

4.    My transactions in RSL Communications, Inc. common stock, which are the subject of this litigation, made during the class period set forth in the complaint, are as follows:

        a.    I purchased 200 shares of RSL Communications, Inc. common stock on October 12, 1999 at $19.6875 per share;

        b.    I sold 200 shares of RSL Communications, Inc. common stock on October 18, 1999 at $20.00 per share;

        c.    I purchased 300 shares of RSL Communications, Inc. common stock on December 14, 1999 at $18.50 per share; and

        d.    I purchased 400 shares of RSL Communications, Inc. common stock on December 20, 1999 at $17.00 per share.

        e.    I purchased 200 shares of RSL Communications, Inc. common stock on December 31, 1999 at $15.75 per share;

        f.    I purchased 100 shares of RSL Communications, Inc. common stock on December 31, 1999 at $15.75 per share;

08/21/2003  15:02   512-467-3645                    TASB PROGRAM-ADMIN                        PAGE  03/04
08/21/03  15:05 FAX 212 988   38          CURTIS V. TRINKO                              ☑003

g.    I sold 1000 shares of RSL Communications, Inc. common stock on February 4, 2000 at $22.625 per share;

h.    I purchased 500 shares of RSL Communications, Inc. common stock on April 19, 2000 at $16.125 per share;

i.    I purchased 500 shares of RSL Communications, Inc. common stock on April 26, 2000 at $13.875 per share; and

j.    I purchased 300 shares of RSL Communications, Inc. common stock on June 1, 2000 at $12.1875 per share.

k.    I purchased 400 shares of RSL Communications, Inc. common stock on June 5, 2000 at $11.75 per share.

l.    I purchased 300 shares of RSL Communications, Inc. common stock on June 16, 2000 at $11.625 per share.

m.    I purchased 1000 shares of RSL Communications, Inc. common stock on July 17, 2000 at $7.3125 per share.

n.    I purchased 900 shares of RSL Communications, Inc. common stock on July 24, 2000 at $5.875 per share.

o.    I purchased 100 shares of RSL Communications, Inc. common stock on June 24, 2000 at $5.875 per share.

p.    I purchased 300 shares of RSL Communications, Inc. common stock on August 16, 2000 at $3.1875 per share.

q.    I purchased 700 shares of RSL Communications, Inc. common stock on August 16, 2000 at $3.1875 per share.

3.    During the three years prior to the date hereof, I have not filed an action in which I have sought to serve, or have served, as a representative party for a class in any action filed under the federal securities laws.

4.    I will not accept any payment for serving as a representative party on behalf of the class beyond a pro rata share of any recovery, or as ordered or approved by the Court,

2

08/21/2003  15:02    512-467-3645              IASB PROGRAM-ADMIN                              PAGE  04/04
08/21/03  15:05 FAX 212 885    38          CURTIS V. TRINKO                              Ø004

including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this ___21___ day of August, 2003 at Highland Haven, Texas.

STEPHEN LOUIS HOPKINS

3

**Extremely Urgent**

UPS Next Day Air®
UPS Worldwide Express™
UPS 2nd Day Air®

Call 1-800-PICK-UPS® (1-800-742-5877) or visit UPS.com®

◄ Insert shipping docum
under window from th

- For UPS Next Day Air services, there is no weight limit for envelopes containing correspondence, urgent documents, and electronic media. When a UPS Next Day Air service is selected, UPS Express Envelopes containing items other than those listed above are subject to the corresponding rates for the applicable weight.

- For UPS Worldwide Express, the documents of no commercial va pages you can enclose.

Do not use this envelope for:

UPS Ground

10300 SW ALLEN BLVD
BEAVERTON OR 97005-4833

P: **YELLOW** S: 300
**323-1465**   X   I: **5D**

1Z289Y09221000 3674

Window Env

Use this envelope with ship
or inkjet printer on plain pa

**UPS Next Day Air**
**UPS Worldwide Express**℠

S h i p p i n g   D o c u m e n t

| WEIGHT | DIMENSIONAL WEIGHT | LARGE PACKAGE | SHIPPER RELEASE |
|---|---|---|---|
| WEIGHT | | ☐ | ☐ |

☐ EXPRESS (INTL)
☐ DOCUMENTS ONLY

SATURDAY DELIVERY   ☐

1Z 289 Y09 22 1000 3674

1Z 289 Y09 22 1000 3674

SHIPMENT FROM

UPS ACCOUNT NO.   **289Y09**

REFERENCE NUMBER
RSL

TELEPHONE
**212-490-9550**

**TRINKO**

**16 W 46TH STREET 7TH FLOOR**

**NEW YORK**            NY 10036-4503

DELIVERY TO

Lehman Brothers Inc. (Chapis processing)
Epiq Bankruptcy Solutions LLC
10300 SW Allen Blvd
Beaverton OR          97005

TELEPHONE

**UPS Next Day Air**          1

1Z 289 Y09 22 1000 3674

1Z 289 Y09 22 1000 3674

DATE OF SHIPMENT
5/29/09

| SHIPMENT ID NUMBER | 289Y 0979 XV4 |
|---|---|

0101811202809 1/07 S        United Parcel Service, Louisville, KY

International Shipping Notice - Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.

100% Recycled fiber
80% Post-Consumer

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) SIPA |
| Debtor. | |

**DECLARATION OF NICHOLAS D. MILLMAN IN SUPPORT OF**
**THE TRUSTEE'S OBJECTION TO THE GENERAL CREDITOR CLAIM OF**
**LAWRENCE FOGARAZZO, ET AL. (CLAIM NO. 5837)**

Pursuant to 28 U.S.C. § 1746, I, Nicholas D. Millman, hereby declare as follows:

1.      I am an attorney duly admitted to practice in this Court and an associate at the law firm of Hughes Hubbard & Reed LLP, attorneys for James W. Giddens, Trustee for the SIPA Liquidation of Lehman Brothers Inc.  I submit this declaration in support of the Trustee's objection to the general creditor claim of Lawrence Fogarazzo, et al. (Claim No. 5837).

2.      Attached as Exhibit 1 is a true and correct copy of the Final Judgment and Order of Dismissal With Prejudice With Regard to Settling Defendants, Docket Item 107 in *Fogarazzo v. Lehman Brothers Inc.,* No. 03 Civ. 5194 (SAS) (Feb. 23, 2011) (the "Fogarazzo Action").

3.      Attached as Exhibit 2 is a true and correct copy of the transcript of the November 17, 2010 Hearing re Motion of Carolyn Fogarazzo, et al. for Relief from the Automatic Stay, Docket Item 12934 in *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (JMP) (the "LBHI Proceeding").

4.      Attached as Exhibit 3 is a true and correct copy of the Order Denying Motion of Lawrence Fogarazzo, *et. al.,* Pursuant To Section 362 of the Bankruptcy Code, For Relief From The Automatic Stay To Allow Advancement Under Insurance Policies By Lloyd's Of London, Docket Item 13136 in the LBHI Proceeding.

5.      Attached as <u>Exhibit 4</u> is a true and correct copy of the Declaration of Edward J.

Kirk, executed on August 21, 2013.

6.      Attached as <u>Exhibit 5</u> is a true and correct copy of the December 28, 2010

Declaration of Curtis V. Trinko in Support of Final Approval of Settlement, Plan of Allocation,

Lead Counsels' Application for an Award of Attorneys Fees and Expenses, and Lead Plaintiffs'

Application for Incentive Awards, Docket Item 99 in the Fogarazzo Action (the "<u>Trinko</u>

<u>Declaration</u>").  The Trinko Declaration is attached without exhibits.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on August 22, 2013

By: /s/ Nicholas D. Millman
Nicholas D. Millman
Associate, Hughes Hubbard & Reed LLP

**EXHIBIT 1**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LAWRENCE FOGARAZZO and CAROLYN FOGARAZZO, Joint Tenants With Rights of Survivorship, STEPHEN L. HOPKINS, and DON ENGEL on behalf of themselves, and all others similarly situated, | |
| Plaintiffs, | Civil Action No. 03 Civ. 5194 (SAS) |
| v. | |
| LEHMAN BROTHERS, INC., GOLDMAN, SACHS & CO., and MORGAN STANLEY & CO., INC., | |
| Defendants. | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/23/11

## FINAL JUDGMENT AND ORDER OF DISMISSAL WITH PREJUDICE WITH REGARD TO SETTLING DEFENDANTS

### EXHIBIT B

This matter came before the Court for hearing pursuant to an Order of this Court, dated September 27, 2010, on the application of the Settling Parties for approval of the Settlement set forth in the Settlement Agreement and Release dated as of August 23, 2010 (the "Settlement Agreement"). Due and adequate notice having been given of the Settlement as required in said Order, and the Court having considered all papers filed and proceedings held herein and otherwise being fully informed in the premises and good cause appearing therefore, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1. This Judgment incorporates by reference the definitions in the Settlement Agreement, and all terms used herein shall have the same meanings set forth in the Settlement Agreement.

2. This Court has jurisdiction over the subject matter of the Action and over all Parties to the Action, including all Members of the Class who did not timely file a request for exclusion

from the Class by the January 10, 2011 deadline pursuant to the Court's Order dated September 27, 2010.

3.      The Court reiterates its prior Order of August 4, 2009 certifying this action as a class action and finds that the prerequisites for a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure have been satisfied in that: (a) the number of Class Members is so numerous that joinder of all members thereof is impracticable; (b) there are questions of law and fact common to the Class; (c) the claims of the Court-appointed Class Representatives, Lawrence Fogarazzo, Carolyn Fogarazzo, Stephen L. Hopkins, and Don Engel, are typical of the claims of the Class they represent; (d) the Class Representatives have and will continue to fairly and adequately represent the interests of the Class; (e) the questions of law and fact common to the Members of the Class predominate over any questions affecting only individual Members of the Class; and (f) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby finally certifies this action as a class action on behalf of all persons or entities who purchased or otherwise acquired shares of RSL Communications, Inc. common stock between April 30, 1999 and December 29, 2000.  Excluded from the Class are Lehman Brothers Inc. ("Lehman Brothers"), Goldman, Sachs & Co., and Morgan Stanley & Co. Incorporated, and their officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.  Also excluded from the Class are persons and entities who submitted valid and timely requests for exclusion in accordance with the Notice, who are listed in Exhibit 1 hereto.

4.      The distribution of the Notice and the publication of the Summary Notice, as provided for in the Preliminary Approval Order, constituted the best notice practicable under the

- 2 -

circumstances, including individual notice to all Members of the Class who could be identified through reasonable effort. Said notices provided the best notice practicable under the circumstances of those proceedings and of the matters set forth therein, including the proposed Settlement set forth in the Settlement Agreement, to all Persons entitled to such notices, and said notices fully satisfied the requirements of Federal Rule of Civil Procedure 23, Section 21D(a)(7) of the Securities and Exchange Act of 1934, the requirements of Due Process, and any other applicable law.

5.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby approves the Settlement set forth in the Settlement Agreement and finds that said Settlement is, in all respects, fair, reasonable and adequate to, and is in the best interests of, the Lead Plaintiffs, the Class and each of the Class Members. This Court further finds the Settlement set forth in the Settlement Agreement is the result of arm's-length negotiations between experienced counsel representing the interests of the Lead Plaintiffs, Class Members, Goldman, Sachs & Co. and Morgan Stanley & Co. Incorporated (the "Settling Defendants"). Accordingly, the Settlement embodied in the Settlement Agreement is hereby approved in all respects and shall be consummated in accordance with its terms and provisions. The Settling Parties are hereby directed to perform the terms of the Settlement Agreement.

6.      Except as to any individual claim of those Persons (identified in Exhibit 1 attached hereto) who timely requested exclusion from the Class before the January 10, 2011 deadline, the Action and all claims contained therein, including all of the Released Claims, are dismissed with prejudice as to the Lead Plaintiffs and the other Members of the Class, and as against each and all of the Released Persons. The Settling Parties are to bear their own costs, except as otherwise provided in the Settlement Agreement.

- 3 -

7.    Upon the Effective Date, the Lead Plaintiffs and each of the Class Members (other than those Persons or entities listed on Exhibit 1 who have timely and validly requested exclusion from the Class) shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished and discharged all Released Claims against the Released Persons, whether or not such Class Member executes and delivers a Proof of Claim and Release form.

8.    Upon the Effective Date hereof, each of the Released Persons shall be deemed to have, and by operation of this Judgment shall have, fully, finally, and forever released, relinquished and discharged the Lead Plaintiffs, each and all of the Class Members and Lead Counsel from all claims (including Unknown Claims), arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement or resolution of the Action or the Released Claims.

9.    Any Person or entity, including but not limited to any Person or entity later named as a defendant or third-party in the Action, is hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting any claim for contribution against the Released Persons (or any other claim against the Released Persons where the injury consists of actual or threatened liability to the Lead Plaintiffs, the Class or any Class Member(s), including but not limited to any amounts paid in settlement of such actual or threatened liability, and any other costs or expenses, including attorneys' fees) based upon the Released Claims and/or the Action, whether as claims, cross-claims, counterclaims, third-party claims or otherwise, whether or not asserted in the Complaint, and whether asserted in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other tribunal or forum in the United States or elsewhere.

10.    The Released Persons are hereby permanently barred, enjoined and restrained from commencing, prosecuting or asserting against any Person or entity, including but not limited to any

- 4 -

Person or entity later named as a defendant or third-party in the Action, any claim for contribution (or any other claim where the injury to such Released Person(s) is any Person's or entity's actual or threatened liability to the Lead Plaintiffs, the Class or any Class Member(s), including but not limited to any amounts paid in Settlement of such actual or threatened liability, and any other costs or expenses, including attorneys' fees) based upon the Released Claims and/or the Action, whether as claims, cross-claims, counterclaims, third-party claims or otherwise, whether or not asserted in the Complaint, and whether asserted in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other tribunal or forum in the United States or elsewhere.

11.     The Court shall reduce a future verdict or judgment entered against any Person or entity with respect to the Action for any claims as to which the rights of that Person or entity have been extinguished by virtue of the bar order contained in ¶ 9 of this Order by such amount determined by the Court under applicable law.

12.     Any further orders or proceedings solely regarding the Plan of Allocation shall in no way disturb or affect this Judgment and shall be separate and apart from this Judgment.

13.     Neither the Settlement Agreement nor the Settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Settlement Agreement or the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claim, or of any wrongdoing or liability of the Settling Defendants; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Released Persons in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. The Released Persons may file the Settlement Agreement and/or the Judgment in any other action that may be brought against them in order to support a

- 5 -

defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

14. Without affecting the finality of this Judgment in any way with regard to the Settling Defendants, this Court hereby retains continuing jurisdiction over: (a) implementation of this Settlement and any award or distribution of the Settlement Fund, including interest earned thereon; (b) disposition of the Settlement Fund; (c) hearing and determining applications for attorneys' fees and expenses in the Action; and (d) all Settling Parties hereto for the purpose of construing, enforcing and administering the Settlement Agreement.

15. The Court finds that during the course of the Action, the Settling Parties and their respective counsel at all times complied with the requirements of Federal Rule of Civil Procedure 11.

16. In the event that the Settlement does not become effective in accordance with the terms of the Settlement Agreement or the Effective Date does not occur, or in the event that the Settlement Fund, or any portion thereof, is returned to either or both of the Settling Defendants, then this Judgment shall be rendered null and void to the extent provided by and in accordance with the Settlement Agreement and shall be vacated to such extent and, in such event, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Settlement Agreement.

17. The Court hereby GRANTS Lead Counsel attorneys' fees of __33 1/3__ % of the ($ 2, 250,000. 00) Settlement Fund and expenses in an amount of $ __211 596.__ 69/100, together with the interest earned thereon for the same time period and at the same rate as that earned on the Settlement Fund until paid. The Court finds that the amount of fees awarded is fair and reasonable in light of the time and

- 6 -

labor required, the novelty and difficulty of the case, the skill required to prosecute the case, the experience and ability of the attorneys, awards in similar cases, the contingent nature of the representation and the result obtained for the Class.

18.     The Court hereby **GRANTS** Lead Plaintiffs reimbursement of their reasonable costs and expenses (including lost wages) directly related to their representation of the Class in the amount of $ 32,000.⁰⁰/₀₀     See attached Rider

19.     The awarded attorneys' fees and expenses, and interest earned thereon, shall be paid to Lead Counsel from the Settlement Fund immediately after the date this Order is executed subject to the terms, conditions, and obligations of the Settlement Agreement and in particular ¶ 6.2 thereof, which terms, conditions, and obligations are incorporated herein.

20.     The awarded reasonable costs and expenses shall be paid to Lead Plaintiffs from the Settlement Fund immediately after the date this Order is executed subject to the terms, conditions, and obligations of the Settlement Agreement and in particular ¶ 6.2 thereof, which terms, conditions, and obligations are incorporated herein.

21.     Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court finds that there is no just reason to delay entry of judgment. The Clerk of the Court is directed to enter a final judgment dismissing the claims against the Settling Defendants.

DATED: 2/23/11

_____
The Honorable Shira A. Scheindlin
United States District Judge

- 7 -

**EXHIBIT 1**

**List of Persons and Entities Excluded from the Class in**
*Fogarazzo, et al. v. Lehman Brothers, Inc., et al.*
Civil Action No. 03-Civ. 05194 (SAS)

The following persons and entities, and only the following persons and entities, properly excluded themselves from the Class by the ___Jan. 10___, 2010 deadline pursuant to the Court's Order dated ___Sept 27___, 2010:

| IN RESPONSE TO THE NOTICE OF PENDENCY OF CLASS ACTION |
| --- |
| They were no "opt-outs". |
| |
| |
| |
| |
| |
| |
| |

- 8 -

**RIDER** to the
FINAL JUDGMENT AND ORDER OF DISMISSAL
<u>WITH PREJUDICE REGARD TO SETTLING DEFENDANTS</u>

The amount referenced in paragraph eighteen (18) will be distributed as follows:

| | |
|---|---|
| Dan Engler | $10,000.00 |
| Stephen Hopkins | $10,000.00 |
| Lawrence Fogarazzo | $ 8,000.00 |
| Carolyn Fogarazzo | <u>$ 4,000.00</u> |
| | $ 32,000.00 |

**EXHIBIT 2**

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5   - - - - - - - - - - - - - - - - - - - - -x

6   In the Matters of:

7

8   LEHMAN BROTHERS HOLDINGS INC., et al.

9

10              Debtors.

11  - - - - - - - - - - - - - - - - - - - - -x

12  LEHMAN BROTHERS INC.,

13

14              Debtor.

15  - - - - - - - - - - - - - - - - - - - - -x

16              United States Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              November 17, 2010

21              10:05 AM

22

23  B E F O R E:

24  HON. JAMES M. PECK

25  U.S. BANKRUPTCY JUDGE

Page 2

1

2    HEARING re Debtors' Motion for Authorization to Modify Certain

3    Terms of the Restructuring of the Archstone Credit Facilities

4

5    HEARING re Debtors' Presentment of Stipulation, Agreement and

6    Order Granting State Street Bank and Trust Co. Limited Relief

7    from the Automatic Stay

8

9    HEARING re Motion of Carolyn Fogarazzo, et al. for Relief from

10   the Automatic Stay

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

Page 3

1

2   A P P E A R A N C E S :

3   WEIL, GOTSHAL & MANGES LLP

4          Attorneys for Debtors and Debtors-in-Possession

5          767 Fifth Avenue

6          New York, NY 10153

7

8   BY:   JACQUELINE MARCUS, ESQ.

9          DAMON P. MEYER, ESQ.

10         SUNNY SINGH, ESQ.

11         BRENNAN HACKETT, ESQ.

12

13  STUTMAN, TREISTER & BLATT

14         Attorneys for Lehman Brothers Holdings, Inc.

15         1901 Avenue of the Stars

16         12th Floor

17         Los Angeles, CA 90067

18

19  BY:   JEFFREY H. DAVIDSON, ESQ.

20         MICHAEL NEUMEISTER, ESQ.

21         MARINA FINEMAN, ESQ.

22         (TELEPHONICALLY)

23

24

25

Page 4

1

2    HUGHES HUBBARD & REED LLP

3         Attorneys for the SIPA Trustee

4         One Battery Park Plaza

5         New York, NY 10004

6

7    BY:   JEFFREY S. MARGOLIN, ESQ.

8         SARAH L. CAVE, ESQ.

9

10   MILBANK, TWEED, HADLEY & MCCLOY LLP

11        Attorneys for the Official Committee of Unsecured

12         Creditors

13        One Chase Manhattan Plaza

14        New York, NY 10005

15

16   BY:   DENNIS C. O'DONNELL, JR.

17        MATTHEW KANTOR, ESQ.

18

19   U.S. DEPARTMENT OF JUSTICE

20        Office of the United States Trustee

21        33 Whitehall Street

22        21st Floor

23        New York, NY 10004

24

25   BY:   ELISABETTA G. GASPARINI, TRIAL ATTORNEY

Page 5

1

2    MARK L. LUBELSKY AND ASSOCIATES

3         Attorneys for LH 1440 L.L.C.

4         123 West 18th Street

5         Eighth Floor

6         New York, NY 10011

7

8    BY:   MARK L. LUBELSKY, ESQ.

9

10   BINGHAM MCCUTCHEN LLP

11        Attorneys for State Street Bank & Trust Co.

12        One Federal Street

13        Boston, MA 02110

14

15   BY:   ANDREW C. PHELAN, ESQ.

16

17   LAW OFFICES OF CURTIS V. TRINKO, LLP

18        Attorneys for the Fogarazzo Plaintiffs

19        16 West 46th Street

20        7th Floor

21        New York, NY 10036

22

23   BY:   CURTIS V. TRINKO, ESQ.

24

25

Page 6

```
 1

 2    CLYDE & CO US LLP

 3          Attorneys for Certain Underwriters at Lloyd's, London &

 4           Companies

 5          405 Lexington Avenue

 6          New York, NY 10174

 7

 8    BY:   EDWARD J. KIRK, ESQ.

 9

10    BROWN RUDNICK LLP

11          Attorneys for the Ad Hoc Group of Creditors

12          One Financial Center

13          Boston, MA 02111

14

15    BY:   ANGELO THALASSINOS, ESQ.

16          (TELEPHONICALLY)

17

18    CHAPMAN & CUTLER LLP

19          Attorneys for US Bank

20          111 West Monroe Street

21          Chicago, IL 60603

22

23    BY:   FRANKLIN H. TOP III, ESQ.

24          JAMES HEISER, ESQ.

25          (TELEPHONICALLY)
```

Page 7

1                    P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Be seated, please.  Good morning.

4          MS. MARCUS:  Good morning, Your Honor.  Jacqueline

5    Marcus, Weil Gotshal & Manges, on behalf of Lehman Brothers

6    Holdings Inc. and its affiliated debtors.  The first item on

7    the agenda this morning, Your Honor, is the debtors' motion for

8    authorization to modify certain terms of the restructuring of

9    the Archstone credit facilities, docket number 12475.

10          Your Honor, as you're probably aware, this is our

11   third time before you with respect to the Archstone

12   restructuring.  We were here in January 2009 when we got what

13   we have described as the initial modification order which

14   permitted LCPI and the co-sponsors to provide an additional 485

15   million in priority financing to Archstone and to extend

16   certain maturity dates.

17          We were before you again in May 2009 when we sought

18   approval of the comprehensive restructuring which provided for

19   a conversion of approximately 2.5 billion of LCPI debt to

20   preferred equity interest, the conversion of the 485 million in

21   priority financing to a new revolving credit facility and the

22   extension of certain maturity dates.

23          At the time we got approval of the comprehensive

24   restructuring, we did not yet have agreement on the final terms

25   of the deal and at the hearing, the Court expressed some

Page 8

1    discomfort with that fact and directed us to err on the side of

2    caution if there were further changes to the terms of the

3    restructuring.  It is in large part due to the Court's

4    admonition that we are here before you again today seeking

5    approval of further modifications to the terms that we laid out

6    for the Court and other parties in interest in May.  We have

7    made a substantial amount of progress in the negotiations since

8    May and we are close to finalizing the terms of the Archstone

9    restructuring.

10          The changes to the terms of the restructuring are

11    summarized in the motion and are as follows:  first and most

12    importantly, the amount of indebtedness that will be converted

13    to preferred equity interest will be increased by 237 million

14    dollars, sixty-five million of which is attributable to LCPI.

15    The other changes are less significant.  The post-conversion

16    revolver will be a single tranche or a multi-tranche facility

17    in the discretion of the co-sponsors instead of a two=tranche

18    originally contemplated.  And the third change is that there is

19    increased flexibility regarding which entity will be the

20    managing member of Archstone Property Holdings LLC.  It is

21    currently contemplating that Archstone Enterprise LP or one of

22    its affiliates, as agreed by the co-sponsors, will be the

23    managing member.  And the managing member will be subject to

24    removal by the co-sponsors.

25          The debtors have filed a declaration of Jeffrey Fitts

Page 9

```
 1    in support of the motion.  Mr. Fitz, who is present in court
 2    today, is a managing director of Alvarez & Marsal and is the
 3    co-head of Lehman's real estate group.  As set forth in his
 4    declaration, Mr. Fitts believes that the modifications to the
 5    restructuring are in the debtors' best interest and provide the
 6    best framework for protecting and maximizing the value of the
 7    debtors' interests -- investments in Archstone.  The changes
 8    provide for further de-leveraging of Archstone and, in Mr.
 9    Fitts' opinion, are immaterial in the context of the overall
10    restructuring.
11          Although, as indicated, we may have made substantial
12    progress since May 25th in finalizing the terms of the
13    restructuring, the parties have not yet completed all of the
14    documentation related to the restructuring.  In order to avoid
15    having to burden this Court again with further motions
16    regarding this matter, the proposed order approving the motion
17    provides, and I quote, "notwithstanding the provisions of the
18    Restructuring Order or this Order, the Transaction Documents
19    may be further modified, amended or supplemented by the parties
20    thereto in accordance with the terms thereof without further
21    order of the Court, provided that, in each case, the Debtors
22    determine, with consent from the Creditors' Committee, that
23    such modification, amendment or supplement has no materially
24    negative effect on the Debtors' claims or interests with
25    respect to Archstone as modified by this Order and the
```

Page 10

1   Restructuring."

2         As indicated in the certificate of no objection we

3   filed with respect to the motion, no objections to the motion

4   have been filed.  And the creditors' committee has filed a

5   statement in support of the motion.  Accordingly, based on the

6   motion and the evidentiary support provided by the Fitts

7   declaration, the debtors request that unless the Court has any

8   questions, the Court enter the proposed order.

9         THE COURT:  I have a couple of questions.

10        MS. MARCUS:  Sure.

11        THE COURT:  One relates to how close we really are to

12  the finish line and what kinds of changes are contemplated or

13  foreseeable.  And another has to do with why we're here on an

14  interim step as opposed to coming in to court when everything

15  is absolutely done and you can have one last opportunity for

16  all parties in interest to understand the terms of the

17  transaction and for the Court to have a full and adequate

18  opportunity to review the transaction.

19        MS. MARCUS:  Sure.

20        THE COURT:  Two questions.

21        MS. MARCUS:  Sure.  I'll take them in the order that

22  you presented them, Your Honor.  First, in terms of how close

23  we are to the finish line, I've been advised that we are very

24  close, that the parties currently contemplate a closing by the

25  current drop dead date which is December 6th, so a little past

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 11

1    the November 30th date we had indicated earlier, and that the

2    nature of things that remain open are in the nature of, and I'm

3    quoting here, "nits".  Mr. Fitts has advised me that he doesn't

4    expect that the transaction will be final until we're actually

5    at the table signing documents but that all of the substantive

6    terms have been agreed to.

7            As to your second question, the reason that we're her

8    is because the parties had originally set a drop dead date of

9    November 30 and I believe that both Lehman and the other

10   sponsors believe that because of interest rate concerns, it's

11   especially essential that this deal close as soon as possible,

12   and definitely, definitely by December 31.

13           THE COURT:  I'd like to hear from the creditors'

14   committee on this.

15           MS. MARCUS:  Your Honor, before you do that, just one

16   more thing.  We did make a couple of changes to the proposed

17   order after we filed it with the court partly in response to

18   the creditors' committee's comments.  And if it's okay with

19   you, I'd like to hand it up to you.

20           THE COURT:  Please do.  Thank you.

21           MR. O'DONNELL:  Good morning, Your Honor.  Dennis

22   O'Donnell, Milbank, Tweed, Hadley & McCloy on behalf of the

23   official creditors' committee.  Your Honor, on the Archstone

24   transaction and the overall restructuring itself is we

25   indicated back in May the committee has spent a long time

Page 12

1    looking at and evaluating the original restructuring and

2    looking again at the proposed modifications here which, from

3    our perspective, were always in the mix, something that wasn't

4    agreed to back in May but we knew it might come to this and we

5    had already looked at the possibility of these loans being

6    included in the mix.  So we think that the addition of the

7    additional loans in terms of the cutoff loans being also

8    converted is immaterial from our perspective.

9         THE COURT:  When you say you're in the mix, are you --

10   you're in the mix as an observer?

11        MR. O'DONNELL:  We're in the mix as an observer but

12   with full -- I mean, we have a team from FTI that has weekly

13   meetings with the debtors to discuss all real estate issues and

14   this issue in particular.  Archstone, in particular, was the

15   subject of perhaps four or five different meetings between the

16   FAs and -- between A&M and FTI and four or five different

17   subcommittee meetings to discuss the various aspects.  There

18   was a lot of back and forth on the overall concept of the

19   conversion here and whether it could be done in a way that was

20   effective and whether the benefits offset any detriment here.

21   That goes back to May.

22        In terms of revisiting it with respect to the most

23   recent modifications, again, that was an issue that was fully

24   discussed with the FAs in both the initially and weekly

25   meetings and thereafter and other meetings.  And they conduct

Page 13

1   their own independent analysis of all aspects of this

2   transaction including the most recent modification.

3          I'm not sure in terms of if the question is are we at

4   the negotiating table, the answer is no.  But we're getting

5   real time updates from the negotiating table.  There are

6   different levels of cooperation and interaction in this case

7   amongst A&M and the committee's professionals.  On the real

8   estate side and particularly with respect to this transaction,

9   I would term the level of cooperation to be extraordinary.  And

10  nothing has gotten done without our full buy-in.  They've made

11  both A&M and Lehman professionals available to us to answer any

12  of the questions that we had and based on that have gotten

13  comfortable with the transaction as presented.

14         THE COURT:  Okay.  Thank you.  Let me just take a

15  moment to look at the blackline unless you would like to

16  emphasize changes for the record.

17         MS. MARCUS:  I think the most important one is on page

18  4.  The other ones were really immaterial.  One had to do with

19  who was provided with notice and the other was a typographical

20  error.  But on page 4 is the one that we made in response to

21  the committee's comments which changes "consultation with the

22  creditors' committee" to "consent from the creditors'

23  committee".  It's page 4 of the blackline, the first full

24  paragraph.

25         THE COURT:  I see it.  Thank you.

Page 14

1        This is an uncontested matter and so, in a sense, this

2    should be as much of a layup as the matters that were removed

3    from the calendar because no objections were lodged.  I would

4    note that some of those matters are actually matters that

5    appear to be of great public interest because they involve the

6    advancement of proceeds under officers and directors liability

7    policy, something that the financial press seems to take a

8    great interest in.  But incredibly, not a single party in

9    interest cared to object so that's been removed from the

10   calendar.

11       This item involving Archstone is similarly a highly

12   visible issue of great public interest and it's, in part, for

13   that reason and because the record is clear from hearing to

14   hearing that this is a moving target that I took the position

15   last time that there would be no changes to this restructuring

16   without a further opportunity for notice and hearing.

17       I accept the representation that somebody used the

18   term "nits" -- I'm not sure who that was -- to describe the

19   nature of the remaining issues that have to be resolved before

20   this restructuring transaction can be finalized.  I accept that

21   representation with this admonition.  I leave it to the

22   professionals, including the creditors' committee, to decide

23   whether or not it's not just a nit but an infestation of nits.

24   And if that occurs -- and in the aggregate, we're talking about

25   changes that are worthy of public attention.  In that instance,

Page 15

1    you should be guided by the same caution that brought you here

2    today and should be renoticing, perhaps on an expedited

3    schedule, for approval the changes to the transaction that have

4    occurred from today to the date of closing.

5              I also note that this is all happening, I understand,

6    with the utmost of good faith and with the extraordinary

7    cooperation mostly between financial advisors for the debtors'

8    estates and for the creditors' committee which is not the same

9    as a public airing of these issues.  I recognize that

10   negotiations cannot be conducted effectively in a fishbowl but

11   the results of those negotiations deserve disclosure.  For that

12   reason, regardless of whether or not a hearing is required, I

13   believe that some form of public notice should occur prior to

14   or immediately after closing that would give parties who are

15   following this case an opportunity to understand how, if at

16   all, the transaction has changed from today to the date of

17   closing.

18             MS. MARCUS:  Do you have any suggestions, Your Honor,

19   for what form that public notice should take?

20             THE COURT:  No.  I assume that a notice filed on the

21   ECF system which seems to work for notices of hearings and

22   other notices in the case or notices on your website would

23   suffice.

24             MS. MARCUS:  Okay.  Thank you, Your Honor.

25             THE COURT:  I'm not suggesting streaming video.

Page 16

1          MS. MARCUS:  Would you like us to revise the proposed

2     order to request your request or is the transcript sufficient?

3          THE COURT:  The transcript is sufficient.  I'll simply

4     so order this part of the transcript.

5          MS. MARCUS:  Thank you, Your Honor.  The next item on

6     the agenda will be handled by my colleague, Damon Meyer.

7          THE COURT:  Okay.

8          MR. MEYER:  Good morning, Your Honor.  For the record,

9     Damon Meyer from Weil Gotshal on behalf of the debtors.  Your

10    Honor, on October 25th, we filed a -- on notice of presentment

11    a stipulation.  It's docket number 12281.  It's between Lehman

12    Brothers Holdings Inc. and Lehman Commercial Paper Inc., on the

13    one hand, and State Street Bank and Trust Company, on the other

14    hand.  The stipulation is for the -- to modify the automatic

15    stay for the limited purpose of allowing State Street to

16    exercise remedies with respect to a senior secured loan.  There

17    was one objection received to the stipulation.  It was from the

18    equity holders for the underlying property.  It's LH 1440

19    L.L.C.  Your Honor, I can address the merits of the stipulation

20    or if you would like to hear from the objecting parties first,

21    we can proceed that way.

22         THE COURT:  Why don't you address the merits of the

23    stipulation?  I'll then hear the objection and I'll hear from

24    State Street.

25         MR. MEYER:  Certainly, Your Honor.  We believe the

Page 17

1   stipulation is in the best interest of the estate.  This Court

2   has found that Lehman's interest in the property is a junior

3   secured interest to State Street's senior secured interest.

4   The stipulation is for the limited purpose of modifying the

5   stay to allow State Street to exercise remedies with respect to

6   its senior interests.  The stipulation will allow Lehman to

7   avoid having to spend the time and resources dealing with this

8   junior interest while, at the same time, any funds that are

9   recovered by State Street on account of its senior interest in

10  excess to the senior interest and the cost of the recovery

11  would be remitted to Lehman on account of their junior

12  interest.

13          THE COURT:  Does the automatic stay apply here at all?

14          MR. MEYER:  Your Honor, I guess that's questionable.

15  Right now, it's an issue as to the underlying property holders

16  have appealed the decisions to who owns the underlying junior

17  loans.  I suppose, Your Honor, if the underlying junior loans

18  are owned by Lehman, which we believe they are, State Street

19  believes they are and I believe this Court has found, then it's

20  -- I believe the automatic stay would apply because State

21  Street would be exercising remedies that could affect property

22  of the estate.

23          THE COURT:  But not as to the acquisition loan.

24          MR. MEYER:  But not as to the acquisition loan, that's

25  correct, Your Honor.

Page 18

1          THE COURT:  And no one takes the position that the

2     automatic stay applies as to the acquisition loan?

3          MR. MEYER:  Solely as it relates to the acquisition

4     loan, that's correct, Your Honor.

5          THE COURT:  All right.  Thank you.  I'll hear the

6     objection.

7          MR. LUBELSKY:  Thank you, Your Honor.  Good morning.

8     Mark Lubelsky for LH 1440.  As an initial matter, in what

9     manner is the stipulation in the best interest of Lehman?

10    State Street's own reply makes it clear that Lehman receives

11    absolutely nothing from this stipulation.  I believe State

12    Street's reply puts the value of the acquisition loan currently

13    at sixteen million dollars.  And State Street's reply makes it

14    clear than any expected recovery is substantially less than

15    that.  I believe State Street values the underlying asset

16    somewhere between five and six million dollars.  LH 1440 values

17    it substantially lower.  This -- if this is in Lehman's best

18    interest because of some potential access recovery, that's,

19    according to State Street's own papers, completely illusory.

20    There is no --

21         THE COURT:  Can you ask you a question unrelated to

22    your argument but related to something that you presented to me

23    informally in correspondence earlier this year?  You advised

24    that under the terms of the financing arrangements, the

25    individual investors in LH 1440 were exposed to recourse

Page 19

1    liability if action were taken to contest efforts by the

2    holders of the loan to exercise remedies or to deal with the

3    property at maturity of the loan facility.  You're here

4    objecting to a stipulation which is designed to, among other

5    things, facilitate State Street as holder of the acquisition

6    loan's efforts to seek remedies at state law coupled with a

7    spillover of value to the debtors' estates to the extent there

8    is any value that may spill over.  If you're able to comment on

9    this, to what extent is your present activity in derogation of

10   limitations within the underlying loan documents?  And to what

11   extent, if at all, does it expose investors to potential

12   personal liability?

13        (Pause)

14        MR. LUBELSKY:  I'd be hesitant to comment upon that on

15   the record but it's certainly in our interpretation that this

16   act does not trigger recourse liability, that here, we are

17   merely objecting to a lifting of the automatic stay and not

18   contesting the foreclosure in any manner.  If the automatic

19   stay is lifted, the overwhelming odds are we would not even put

20   in an answer put in an answer to the foreclosure proceeding for

21   fear of triggering recourse liability.

22        There is, however, the appeal to the district court.

23   Certainly, if it went well for LH 1440 would reset the parties'

24   relationship such that State Street couldn't actually foreclose

25   because there would be a tryable issue of fact as to whether or

Page 20

```
 1    not State Street was the prior breaching party and whether or

 2    not State Street had substantial liability to LH 1440.  So this

 3    act, we certainly believe, does not trigger recourse but

 4    certainly, just about anything beyond this act, I would be

 5    scared of.

 6             THE COURT:  All right.  So whether you're right or

 7    not, you think you're at the threshold and you haven't crossed

 8    it?

 9             MR. LUBELSKY:  That would be a fair way to put it,

10    Your Honor.

11             THE COURT:  All right.  As I read your objection, it

12    seemed to be mostly about priority of the acquisition loan

13    relative to the other two loans.

14             MR. LUBELSKY:  Your Honor, that was amended and we

15    withdrew that portion of the objection.

16             THE COURT:  Oh.  Okay.  Then what's your objection

17    really about now?

18             MR. LUBELSKY:  It's really -- having read the reply

19    papers, one is this provides absolutely no benefit to Lehman

20    whatsoever under, really, any interpretation of events.  And

21    two would be, just the appeal has been fully briefed before

22    Judge Swain.  The State Street's rights and responsibilities

23    would potentially be substantially different if that appeal was

24    successful with regard to LH 1440 than as they are today.  And

25    since LH 1440 really has no ability to contest a foreclosure
```

08-13555-mg   Doc   Filed 08/22/13   Entered 08/22/13 08:29:59   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 161 of 217

Page 21

1   proceeding whatsoever because of the Bad Boy Act's clauses, not

2   necessarily because of the facts, lifting the stay at this time

3   would really leave Lighthouse without any practical remedy even

4   if they did later prevail upon the appeal.

5           THE COURT:  Okay.

6           MR. LUBELSKY:  Thank you, Your Honor.

7           THE COURT:  I'll hear from State Street.

8           MR. PHELAN:  Good morning, Your Honor.  Andy Phelan on

9   behalf of State Street.  What the borrower's response to the

10  Court's question has revealed is they're trying to do

11  indirectly what they cannot do directly and seek through a stay

12  here or a nonlifting of the stay here to enjoin the foreclosure

13  proceeding that State Street is considering.  We should get

14  back to the basics of the Court's first question to Lehman's

15  counsel which is should the -- is there even an automatic stay

16  here.  And really, as to the acquisition loan, there is not.

17  The only Lehman interest, which is the purpose of the stay to

18  begin with, is if there is some recovery for Lehman in the

19  foreclosure proceedings.  The stipulation addresses that

20  concern to Lehman's satisfaction and clearly, and it states

21  that in the enforcement proceedings if there is any recovery

22  beyond what is owed to State Street, it will be remitted to

23  Lehman.  So the basis -- the foundation for there to be a stay

24  does not exist to begin with.  And to the extent that there is

25  a tangential or indirect effect on Lehman property, it is

Page 22

1   addressed.

2          The appeal that 1440 Story has taken -- and the Court

3   is very familiar having twice gone through a complaint, an

4   amended complaint, motion to dismiss and then a renewed motion

5   to dismiss.  The effort there is to make State Street

6   responsible for two loans that it never acquired.  The appeal

7   is irrelevant to the lifting of the stay for two reasons

8   because it doesn't matter really which way the appeal turns

9   out.  If 1440 Story loses the appeal then there should not have

10  been a stay to begin with but there's no bar to lifting the

11  stay.  Even if 1440 Story were to prevail on the appeal, which

12  is to establish that there is a disputed issue of fact as to

13  whether Lehman sold to State Street both the building loan and

14  the project loan, that would come back to this Court on remand.

15  And I want the Court to assume that even if that was within the

16  jurisdiction of this Court to hear that State Street borrower

17  dispute, even if the Court were to find that those loans were

18  acquired by State Street then LH 1440 Story has proven too

19  much.  It has proven that there should not have been a stay to

20  begin with as to that property.  So the appeal itself, the

21  pendency of the appeal, is irrelevant to the issue as to

22  whether the Court should lift the stay or not.

23          The fact that it is fully briefed also is irrelevant.

24  It is pending before Judge Swain.  We don't have a hearing

25  date.  We don't know for sure whether there will be a hearing.

Page 23

1    But State Street has now held this loan for over two years.

2            THE COURT:  What's happening on December 3rd before

3    Judge Swain?

4            MR. PHELAN:  On December 3rd is a status conference, a

5    scheduling conference.  And counsel contacted chambers about

6    that through Mr. Lubelsky.  And Mr. Lubelsky indicated in a

7    communication to us, and he can correct me if I have this

8    wrong, but that is not being transformed into a hearing and the

9    Court may not even have a hearing on the appeal.

10           THE COURT:  Okay.

11           MR. PHELAN:  So we're still waiting to see what

12   happens there.  But irregardless of the result of that, it

13   should not affect the lifting of the stay.  And the Court

14   should also keep in mind that while that may be -- even

15   assuming that there was a hearing on the appeal, on December

16   3rd, we still have the issue of an appeal, potential appeal,

17   for the Second Circuit which would delay things even farther

18   when there shouldn't have been a stay to begin with.  And we

19   have the fact that State Street now is exercising its rights in

20   protecting the property, is paying for taxes, for example, on

21   the property while this appeal is pending.  There is no basis

22   for an automatic stay.  Lehman's property interest is

23   protected.  When 1440 Story lost on the motion to dismiss, it

24   did not move for a stay pending appeal.  It did not post a

25   bond.  So it is not entitled to the relief that it is seeking

Page 24

1   even assuming that the Court had jurisdiction over the

2   acquisition loan.

3           So for all these reasons, the Court should grant the

4   stipulation and reject the objection that 1440 Story has

5   raised.

6           THE COURT:  Okay.  Anything more from the debtor?

7           MR. MEYER:  Your Honor, the one thing I would like to

8   address is 1440's assertion that there was no benefit to the

9   estate from the stipulation.  Your Honor, just because we have

10  a junior interest, there are costs and time and professional

11  fees associated with dealing with every aspect of this estate.

12  And to the extent that we can limit those, that is one of the

13  benefits to the estates.  And as Mr. Phelan said, of course,

14  our rights are protected through the stipulation.  To the

15  extent value does reach down to Lehman's interest.

16          THE COURT:  Okay.  Thanks.  As the parties have noted,

17  the Court is very familiar with this dispute.  There was a

18  certain irony in comments made by counsel for LH 1440 in

19  response to my question concerning the recourse liability

20  associated with the so-called "Bad Boy" guaranty associated

21  with this property.  In effect, once State Street proceeds with

22  foreclosure remedies in connection with the acquisition loan,

23  this will turn out to be an uncontested foreclosure because it

24  would be economic suicide for the investors to contest.  That's

25  not really before me.  That's just economic reality.  So the

Page 25

1    objection lodged by LH 1440 to the current stipulation granting

2    limited relief from the automatic stay is, in effect, the best

3    means by which LH 1440 can protect the property without, at the

4    same time, exposing individual investors to personal liability.

5          When a stipulation is examined for what it says and

6    does, it's a really benign instrument.  All it's really doing

7    is saying that to the extent the stay applies, State Street can

8    proceed in respect of the acquisition loan and benefit the

9    estate in connection with the other loans that are junior to

10   the acquisition loan.  The objection by LH 1440, which has

11   changed form a little bit during the course of today's

12   argument, is that there's really no benefit to the estate and

13   that, in any event, we should give the district court an

14   opportunity to pay appropriate attention to the pending appeal.

15   As to the no benefit to the estate contention, debtors' counsel

16   has persuasively argued that there is some benefit even in

17   avoiding the costs and expenses of having to deal with this

18   anymore plus the possible contingency, although I think it's

19   highly remote, of economics that may flow to the junior holders

20   following foreclosure.  The statements, which I don't take as

21   evidence but simply as random indications of value, would

22   suggest that the property is worth substantially less than the

23   loan and so I doubt very much than anything is going to flow to

24   the debtors' estate as a junior holder of the other loans.  But

25   notwithstanding that, there is a statement made of benefit to

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 26

1    the estate which I accept.

2            As to the pendency of the appeal of my order from this

3    past summer granting State Street's motion to dismiss the

4    amended complaint, I would be loathe to do anything here that

5    would undermine or collaterally attack in any fashion the

6    district court's ability to effectively grant relief in

7    connection with the appeal.  But based upon my understanding of

8    the procedural record and upon review of State Street's reply

9    papers that were submitted very recently, it appears that

10   there's nothing about the pending stipulation that will

11   materially impact or perhaps impact at all the proceedings

12   before Judge Swain.  Either Judge Swain will affirm my

13   dismissal of the amended complaint or she will find fault with

14   what I did and either do that in a manner that doesn't lead to

15   remand or do that in a manner that does lead to remand.  But

16   regardless of that outcome, that then becomes an active

17   litigation not against the debtors' estates but against State

18   Street in connection with claim liability relating to the

19   overall loan transaction.

20           For that reason, I'm unable to see any reason not to

21   approve the stipulation and agree that, to some extent at

22   least, what LH 1440 is seeking to do here is to cantilever the

23   automatic stay out in its direction and for its benefit.  The

24   stay is not intended to benefit LH 1440.  It benefits solely

25   the debtor.  And the debtor has concluded that to the extent

Page 27

```
 1    the stay applies at all, and that's a debatable proposition,

 2    that they're consenting to limited relief.  For that reason,

 3    the objection is overruled and the stipulation will be

 4    approved.

 5            MR. MEYER:  Thank you, Your Honor.  The next matter on

 6    the agenda is going to be handled by my colleague, Sunny Singh.

 7            MR. SINGH:  Good morning, Your Honor.  Sunny Singh,

 8    Weil Gotshal & Manges on behalf of the debtors.  Your Honor,

 9    the next item on the agenda is the motion for relief from the

10    automatic stay by the Fogarazzo plaintiffs.  And I'll turn the

11    podium over to the movants first to present their motion.

12        (Pause)

13            MR. TRINKO:  I'm coming, Your Honor.

14        (Pause)

15            MR. TRINKO:  Your Honor, I'm Curtis Trinko.  I'm

16    counsel for the movants who have made a motion for advancement

17    against an insurance policy by modifying the automatic stay.

18    With regard to the underlying claims, they're from a lawsuit

19    pending before Judge Scheindlin in the Southern District of New

20    York.  It's a securities fraud matter that was brought against

21    three investment banks, Morgan Stanley, Goldman Sachs and

22    Lehman Brothers, in 2003.

23            We have just recently reached a partial settlement

24    with Morgan Stanley and with Goldman Sachs.  We are seeking to

25    proceed against insurance policies that were designated by
```

Page 28

 1   Lehman Brothers Inc. as covering the claims in the underlying

 2   lawsuit.  They were part of initial disclosure that was filed

 3   in August of 2004.  Also, we know that timely notice of the

 4   claims were made to the insurance company.  Based upon that, we

 5   believe that we have the status as third party beneficiary in

 6   this suit.

 7          As you probably noted from our motion papers, we took

 8   pains to describe our entitlement to relief against Lehman

 9   Brothers in the underlying lawsuit in terms of the document

10   production that was made before the automatic stay was imposed.

11   There was full document discovery.  After the stay was imposed,

12   we proceeded against Goldman Sachs and Morgan Stanley with

13   regard to depositions.  We had fifteen merits depositions.  We

14   also took the experts that they proffered in preparation for a

15   motion for summary judgment.  And we also had our expert

16   deposed.

17          We seek this relief because this is the only

18   alternative that we have at this point is to go against these

19   liability policies and to seek a recovery.  In the

20   underlying -- is it possible I can get some water?

21          THE COURT:  You want to drink the Court's water?

22          MR. TRINKO:  Absolutely, Your Honor.

23          THE COURT:  Sure.  We can get you a glass of water.

24   Just stay there.

25          MR. TRINKO:  Thank you.

```
 1            In 2002, Your Honor --

 2            THE COURT:  That's the first time incidentally that

 3    request has ever been made.

 4            MR. TRINKO:  Really?

 5            THE COURT:  Yes.  You're the first person to ever ask

 6    to drink our water.

 7        (Pause)

 8            MR. TRINKO:  Thank you.  In 2002, Your Honor, there

 9    were proceedings brought against the various investment banks

10    one of them being Lehman Brothers Inc.

11            THE COURT:  I read the papers --

12            MR. TRINKO:  Okay.

13            THE COURT:  -- and I'm generally familiar with the --

14            MR. TRINKO:  The analyst proceeding.

15            THE COURT:  No.  I understand that this relates to

16    RSL.  I understand that you had lots of discovery.  I read your

17    papers and that you have a partial settlement.  I'm not

18    understanding why you're spending the time to do this here now.

19    And it's also not entirely clear to me why, if, in fact, this

20    underlying policy was terminated and releases exchanged, you

21    consider it to be worth your time to be seeking stay relief.

22    Or, if it's true, how you could be entitled to stay relief.

23    That's one question.

24            Another question is the cart before the horse

25    question.  You're seeking relief from the automatic stay in the
```

Page 30

```
 1    LBHI bankruptcy case as it relates to claims that were

 2    presented many years ago in district court against Lehman

 3    Brothers Inc.  Lehman Brothers Inc. is a party to a SIPA

 4    liquidation proceeding which is actually part of my regular

 5    omnibus docket.  But no motion for relief from stay has been

 6    brought in the SIPA case.  Instead, you're seeking relief from

 7    stay in what I view as a highly questionable manner in this

 8    case.  So I'd like to give you an opportunity not to talk about

 9    what a good case you might have but why you're entitled to stay

10    relief here.

11            MR. TRINKO:  Yes, Your Honor.  We had discussions with

12    both Weil Gotshal and Hughes Hubbard with regard to where the

13    motion should have been brought.  Since the insurance policies

14    were issued to Holdings and covering their subsidiaries, it was

15    believed that this would be the most appropriate forum rather

16    than the liquidation proceedings regarding LBI.  I don't

17    profess to be a bankruptcy expert on that issue, Your Honor,

18    but we did raise it and it was decided among counsel that this

19    would be most appropriate.  So that's why we chose the Holdings

20    proceeding to go in.  We certainly can also file it in the

21    liquidation proceeding if Your Honor would feel that's more

22    appropriate.

23            THE COURT:  Well, I have no idea what the right

24    approach is and I don't practice law anymore.  So you'd have to

25    do that on your own.
```

08-13555-mg   Doc   Filed 08/22/13   Entered 08/22/13 08:29:59   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 171 of 217

Page 31

 1              MR. TRINKO:  Yes.

 2              THE COURT:  But it seems to me that in the ordinary

 3       course of relief from stay litigation, having the rights to

 4       pursue claims against an insurance policy is not even halfway

 5       there because the rights as to the insurance policy are

 6       derivative whatever rights you have against the insured.

 7              MR. TRINKO:  Well, Your Honor, I thought long and hard

 8       about that.  Obviously, if it were so that one had to get a

 9       judgment against the party before one could proceed against the

10       insurance company, all litigation in America would grind to a

11       halt.

12              THE COURT:  I don't think that's true.  I think you

13       just stated too much.  All litigation would not grind to a

14       halt.  Maybe plaintiffs' litigation would.

15              MR. TRINKO:  Plaintiffs' litigation, okay, Your Honor.

16              THE COURT:  The issue is how you pursue a claim

17       against insurance proceeds as to a policy that, at least it has

18       been represented to the Court, is no longer in full force and

19       effect; and, secondly, how you're able to deal with that policy

20       without going at least through LBI.

21              MR. TRINKO:  Your Honor, as to the first issue, there

22       were representations made that was -- the first time we heard

23       these representations were in August of this year, Your Honor,

24       that the policies had been terminated and releases issued in

25       the year 2004.  As I indicated, in August of 2004, initial

Page 32

1  disclosures were served by Paul Weiss on behalf of LBI and

2  indicated there that the insurance policy was the appropriate

3  avenue of recovery if we obtained relief against LBI.

4        We have requested on numerous occasions for

5  documentation or some backup to these assertions that there

6  were policy terminations and releases.  We have received

7  nothing.  We haven't even received the excess policy which we

8  requested because we were only given the primary policy.  And

9  so that, we're not even sure if these terminations and releases

10  in fact exist or if, in fact, are possessed by Weil Gotshal

11  and/or Hughes Hubbard.

12        It also, Your Honor -- in thirty-five years

13  experience, I've never seen an investment bank do this with

14  regard to its coverage and go naked.  There is no reason that

15  would be done other than some kind of transaction that

16  benefited individuals rather than the institution.  And that

17  may be a reason why documents are not forthcoming.  But the

18  fact is, Your Honor, that there could be no termination made

19  with regard to terminations or releases on these policies

20  without some form of evidence being presented that they, in

21  fact, exist and, in fact, are appropriate and viable and, if

22  not, then procured by fraud or something else.

23        We have third party beneficiary rights.  The insurance

24  company was on notice of that.  And regardless of that fact,

25  they supposedly went forward and terminated the policy with

Page 33

1    existing proceeds still available.

2         THE COURT:  I believe it is disputed that you have

3    third part beneficiary rights if I read correctly what Lloyds

4    said in their papers.

5         MR. TRINKO:  I acknowledge that, Your Honor.

6         THE COURT:  Okay.

7         MR. TRINKO:  I'm giving my side of the story.

8         THE COURT:  You're welcome to do -- that's why you're

9    here.  We believe that we do have third party beneficiary

10   rights and that it's appropriate for us to advance against the

11   policy.  We have no other option with regard to claims against

12   LBI.

13        We did file -- and there was a mistake in the

14   unofficial -- or the official creditors' committee's

15   submission.  We did file proofs of claim in a timely manner

16   both against Holdings and LBI.  But as Your Honor knows,

17   shareholders are the lowest priority.  And after doing this

18   dozens of times, we've never recovered in a bankruptcy

19   proceeding through a proof of claim.  But we did file them,

20   Your Honor.

21        THE COURT:  Wait.  You're not pursuing this on behalf

22   of shareholders of LBI or shareholders of --

23        MR. TRINKO:  No, we're not, Your Honor.

24        THE COURT:  -- LBHI.  You're pursuing this on behalf

25   of investors in RSL, isn't that right?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 34

1          MR. TRINKO:  Yes, Your Honor.

2          THE COURT:  Okay.  And you're saying that on behalf of

3    investors in RSL, the class represented by Lawrence --

4          MR. TRINKO:  Lawrence Fogarazzo --

5          THE COURT:  Fogarazzo --

6          MR. TRINKO:  -- Carolyn Fogarazzo --

7          THE COURT:  -- and others that you have filed proofs

8    of claim in both the LBI and in the LBHI cases?

9          MR. TRINKO:  Yes, I have, Your Honor.

10         THE COURT:  All right.

11         MR. TRINKO:  Now, with regard to these insurance

12   policies, we believe they cover these types of claims.  They

13   were procured by Lehman for their protection against claims,

14   such as securities fraud, to cover employees of Lehman.

15         THE COURT:  Okay.  I --

16         MR. TRINKO:  It's not a directors and officers

17   liability policy.

18         THE COURT:  I don't -- I understand the word crime is

19   in the policy name.  The focus here has to be why you're

20   entitled to stay relief under the Sonnax standard, something

21   that you belatedly address in your reply papers.  You've

22   already said you're not a bankruptcy practitioner.  The focus

23   here, however, has to be Sonnax not whether or not you are

24   sympathetic as a plaintiffs' lawyer.

25         MR. TRINKO:  They focused on three of the Sonnax

Page 35

1    factors, Your Honor.  We felt that in our reply papers we

2    adequately responded to those by showing that there's no

3    judicial economy to be garnered from a denial of our relief

4    because we're seeking to go solely against the insurance

5    policy.  We're not meaning to involve LBI or Holdings in this

6    process.  And that, at this point, perhaps we would ask for

7    documents with regard to these terminations of releases.  But

8    there really are few depositions that need to be taken.  They

9    know who the people are because we made deposition notices in

10   the underlying proceeding before they went into bankruptcy.

11         THE COURT:  Let me ask you a question.  If you were

12   satisfied based upon a review subject to any appropriate

13   confidentiality restrictions that might be requested of

14   documents demonstrating that the policy as to which you seek to

15   obtain potential recovery in fact was terminated some number of

16   years ago and that releases were exchanged in connection with a

17   transaction that's not subject to credible challenge, do you go

18   away?

19         MR. TRINKO:  If those documents were produced to us

20   and with the caveat that it was an appropriate corporate

21   transaction at the time, it was not for some personal benefit

22   but it was for the benefit of LBI, and we reviewed those

23   documents in confidence, I would be willing to stipulate to a

24   dismissal of our proceeding of that event.

25         THE COURT:  When you say a dismissal of your

Page 36

1    proceeding, are you talking about the litigation against LBI

2    which has not been settled currently pending before Judge

3    Scheindlin?

4         MR. TRINKO:  All the way through, Your Honor, yes.

5         THE COURT:  All right.  Let me find out from counsel

6    for the underwriters whether or not this can be resolved with

7    some targeted cooperative discovery.

8         MR. KIRK:  Good morning, Your Honor.  Edward Kirk from

9    Clyde & Co. for Underwriters at Lloyds & Companies.  Your

10   Honor, these policies -- I think you understand the issues

11   quite well.  These policies were issued in 1999 to Lehman

12   Brothers Holdings Inc. and its subsidiaries and certain

13   employees and officers of the company with respect to claims

14   for coverage related to professional liability acts, et cetera.

15   But the important thing with regard to the policies is that

16   they're indemnity policies.  And there's nothing in the

17   policies that indicate at all that any third party would be a

18   beneficiary under the policies.  In fact, the policies would

19   indemnify Lehman Brother and those identified as insureds for

20   certain losses and defense costs.  But there's no obligation by

21   Underwriters to make any payment directed to plaintiffs or

22   anything in that nature.  And certainly, the Fogarazzo

23   plaintiffs and any other third party plaintiffs are not

24   identified in the policies and there's no indication at all

25   that these are anything other than indemnity policies.  So they

Page 37

 1    do not have standing as third party beneficiaries.

 2           The other important point to take away, and it's quite

 3    simple, is that even if they were third party beneficiaries,

 4    they have absolutely no further rights under the policies than

 5    the insureds would.  And here, it's not disputed by the

 6    insureds themselves that the policies were, in fact, terminated

 7    and a full release was provided to Underwriters in 2004.  This

 8    was six years ago.  Now the plaintiffs have come forward two

 9    years after Lehman Brothers went into bankruptcy and the stay

10    was put in place.  And they're now asking for the Court to lift

11    the stay so that they can determine whether or not they can get

12    further proceeds with respect to Lehman Brothers.  But what

13    they're trying to do is essentially get around a release -- a

14    settlement agreement and release entered into between two

15    parties relating to that they have no affiliation relating to

16    policies that they're not parties to.

17           So they have absolutely no standing at all under the

18    policies and have absolutely no right to lift the stay.  And

19    any lifting of the stay here would be futile and academic as

20    Lehman Brothers just pointed out.

21           THE COURT:  Okay.  But about this discovery that I

22    mentioned before you stood up, I recognize your legal position

23    which is that these plaintiffs have no direct standing as third

24    party beneficiaries to be seeking anything from you.

25           MR. KIRK:  That's correct.

Page 38

1          THE COURT:  But I also recognize that there is the

2     potential for litigation to proliferate here.  It could go

3     away, too, for that matter, but it could also proliferate in

4     the sense of a motion for stay relief in the LBI case, an

5     appeal from an adverse determination of this Court concerning

6     the request for stay relief.  And this can become vexatious.

7     My question to you is whether, as a means to allow this to go

8     away quietly, Underwriters would provide information to

9     plaintiffs' counsel that would prove the point made in the

10    papers filed in connection with this pending contested matter,

11    namely, that there's no insurance in effect any longer and that

12    there hasn't been insurance in effect for six years.

13         MR. KIRK:  Your Honor, just to explain, the settlement

14    of the policies related to other claims involving other

15    parties.  We also have a confidentiality provision in those

16    agreements and there is some concern that providing those

17    releases to the plaintiffs --

18         THE COURT:  That's what redacting is for.

19         MR. KIRK:  Okay.  I think we might be able to agree to

20    it if we could redact certain portions of it.  And I think we

21    would be willing to show them the release which would confirm

22    that, in fact, we did get a full release and that the release

23    was specific to the Fogarazzo action among others.

24         THE COURT:  Okay.

25         MR. KIRK:  We could agree to that.

Page 39

```
 1           THE COURT:  So it's --

 2           MR. KIRK:  -- although I have to note that I am

 3   somewhat concerned that providing those releases to the

 4   plaintiffs would actually encourage them to continue on with

 5   their proliferation of litigation and result in more

 6   unnecessary motion practice.  He's already indicated that he

 7   may go away but only if he considers the settlement to be a

 8   proper corporate transaction.  So I see a real risk there, Your

 9   Honor.

10           THE COURT:  Well, at some point, if it isn't

11   productive, lawyers tend to go away.  I suggest that the --

12   first of all, I want to hear from counsel for LBI on this, too.

13   I recognize that LBI did not file any papers; at least I didn't

14   see any.  But I'd be interested in knowing whether the trustee

15   in the LBI SIPA proceeding has any position whatsoever to

16   express in connection with the pending motion for stay relief.

17           MS. CAVE:  Good morning, Your Honor.  Sarah Cave from

18   Hughes Hubbard on behalf of the SIPA trustee.  And as far as

19   our position on the motion, I think we have -- our interests

20   are aligned with the LBHI debtors in terms of wanting to

21   resolve this as efficiently as possible.  If the Underwriters

22   and the LBHI debtors are amenable to the proposal that Your

23   Honor had regarding providing the limited amount of discovery

24   regarding the redacted releases, we would have no objection to

25   that.  As Mr. Trinko said, he has filed on behalf of the
```

Page 40

1    plaintiffs whom he represents.  He's filed a claim in the LBI

2    proceeding.  And to the extent that he is entitled to any

3    recovery on that with respect to those claims, it will be dealt

4    in the course of our claims process.

5         The stay is in effect as to the litigation in front of

6    Judge Scheindlin.  We have no -- we don't contemplate any --

7    seeking to litigate that proceeding at any time soon.  And I

8    would just also note that we've been dealing with Mr. Trinko

9    for a number of months.  He initially tried to re -- in our

10   view, sort of get around the stay by refiling his securities

11   complaint as an adversary proceeding --

12        THE COURT:  Can I stop you for one second?  I'm

13   talking now to the people who are on CourtCall.  I don't know

14   who you are but please mute your phones.  You're coming through

15   on our loudspeakers.  I'm sorry.

16        MS. CAVE:  That's okay.  So Mr. Trinko had refiled his

17   complaint as a purported adversary proceeding and we

18   immediately dealt with Mr. Trinko in terms of pointing out to

19   him how that was not a proper adversary proceeding.  And

20   ultimately, after a number of months, Mr. Trinko did withdraw

21   that adversary complaint.  But it's our view that certainly Mr.

22   Trinko has been tenacious as far as attempting to recover on

23   behalf of his clients.  But the fact is that LBI is in

24   bankruptcy and he has filed a proof of claim in our proceeding

25   and it will be dealt with in due course in that regard.

Page 41

1          THE COURT:  To the extent that what we're dealing with

2     here is an indemnity policy and accepting for a moment the

3     assertion made by Underwriter's counsel that there are no third

4     party beneficiary rights to pursue, what would the trustee's

5     position be in the event that Mr. Trinko, on behalf of his

6     class, were to seek relief from the automatic stay in the LBI

7     case to pursue litigation before Judge Scheindlin solely in

8     respect of available insurance policy proceeds, if any?

9          MS. CAVE:  Well, I would need to discuss that with my

10    colleagues.  As Your Honor is aware from other situations in

11    this case, we have agreed to limited lifting of the stay.  To

12    the extent that the only relief that's being sought is as to

13    the policies, to the extent that the insurers are the ones who

14    are covering the defense costs of that, so with the caveat that

15    assuming that it would proceed along the lines with which we

16    have done this in similar situations, as long as there is not

17    going to be any additional imposition on the LBI estate from

18    such relief, I think we would consider that in all

19    reasonableness.

20         THE COURT:  Okay.  Thank you.  I think this is

21    probably more complicated than it needs to be and that while I

22    recognize that it is possible that Mr. Trinko, who has been

23    described as tenacious -- you might as well accept that as a

24    compliment.  I'm not sure that it's intended as such --

25         MR. TRINKO:  I will, Your Honor.

Page 42

1        THE COURT:  Okay.  That he may or may not go away as a

2    thorn in the side of the parties in this proceeding.  But it

3    seems to me that it is reasonable for him to at least be in a

4    position to exercise duties owed to his client class to assure

5    himself that what has been represented in the papers filed to

6    date in fact is true.  That's not to say that anybody would say

7    anything in papers filed that wouldn't be true.  But I think

8    the saying is trust but verify.  And I believe that it makes

9    some sense for Mr. Trinko to gain access within an appropriate

10   setting of confidentiality to those documents that would

11   support the contention of Underwriters that the applicable

12   insurance policy, in fact, has been terminated and that

13   releases have been exchanged.

14        So I'm going to deny the pending motion for stay

15   relief without prejudice with the understanding that the

16   parties will work cooperatively with one another to provide Mr.

17   Trinko with such documentation as he might reasonably need in

18   order to determine that coverage no longer exists.  I presume

19   that Mr. Trinko will be reasonable upon reviewing such

20   documents.  I'm assuming that there are narrow credible

21   challenges to be made to such documentation that he'll be able

22   to assure himself and, ultimately, his client class that

23   pursuing claims in the litigation in order to get insurance

24   proceeds would be a waste of time.  If he has a different point

25   of view, he's obviously free to assert that.

Page 43

1          MR. TRINKO:  Your Honor, I certainly think that's a

2     reasonable suggestion.  I would just be somewhat concerned,

3     though, about the level of redaction that would be undertaken.

4     If we have a confidentiality stipulation, there's virtually no

5     need for redaction.  I have looked at --

6          THE COURT:  Well, I'm not getting into that level of

7     detail.  We're now talking about something that's entirely

8     unrelated to your motion.  And you're anticipating a problem

9     that may never exist.

10         MR. TRINKO:  Okay.

11         THE COURT:  If it becomes a problem, I suppose that's

12    something that you can discuss with counsel.  I'll tell you,

13    however, that discovery disputes relating to redaction are

14    unlikely to get my attention.

15         MR. TRINKO:  Okay.  But I really appreciate the

16    Court's suggestion as far as a way of resolving this matter.

17    And we will cooperate in good faith with counsel to provide a

18    process for documents to be provided to us for our review --

19         THE COURT:  Okay.

20         MR. TRINKO:  -- on this issue.

21         THE COURT:  Fine.  Very good.

22         MR. TRINKO:  Thank you, Your Honor.

23         THE COURT:  And I would ask that debtors' counsel

24    submit an order in reference to this particular motion for stay

25    relief that reflects the statements made on the record today.

08-13555-mg   Doc   Filed 08/22/13   Entered 08/22/13 08:29:59   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 184 of 217

Page 44

1          MR. MEYER:  Yes, Your Honor.

2          MS. MARCUS:  Your Honor, that brings us to the end of

3    the LBHI part of the calendar.  There's nothing else.

4          THE COURT:  Before we move on, I just wanted to

5    express a preference of the Court for the next omnibus hearing

6    or perhaps the one after the next omnibus hearing depending

7    upon what makes the most sense.  And that has to do with the

8    plan process.  Today's omnibus hearing is noticeably lacking in

9    any matters that provide any illumination at all as to how this

10   case is progressing on an overall basis.  We're approaching the

11   end of the year.  And I am mindful of the statements made by

12   Mr. Marsal at the state of the estate report on September 22 in

13   which he suggested, aspirationally, no doubt, that a plan might

14   be forthcoming to be confirmed before the end of the first

15   quarter of 2011.  I'd like to know what progress is being made,

16   what problems, if any, exist with respect to the successful

17   formulation of a consensual plan and what, if any, protocols of

18   communication among and between creditor constituencies that

19   are not presently in place may be necessary or appropriate to

20   facilitate the plan process.  I'm not saying that needs to

21   happen in December.  And I'm not trying to ruin anybody's

22   holidays.  But I do think that some progress report of a public

23   nature is appropriate.

24          MS. MARCUS:  That's fine, Your Honor.  And I'll

25   consult with my colleagues as to whether the December hearing

Page 45

1    is the right time or we should do it in the hearing after that.

2              THE COURT:  Fine.  Thank you.

3              MS. MARCUS:  Thank you, Your Honor.  I think that

4    concludes our hearing for today.

5              THE COURT:  Is there anything on the LBI case?

6              MR. MARGOLIN:  No, Your Honor.  We filed a --

7              THE COURT:  Certificate of no objection?

8              MR. MARGOLIN:  -- certificate of no objection.

9              THE COURT:  Okay.  We're adjourned then until 2:00 for

10   the adversary docket.

11        (Whereupon these proceedings were concluded at 11:14 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 46

```
 1
 2                       I N D E X
 3
 4                   R U L I N G S
 5   DESCRIPTION                                    PAGE      LINE
 6   Debtors' motion for authorization to modify     14        2
 7   certain terms of the restructuring of the
 8   Archstone credit facilities granted as
 9   Uncontested; transcript so ordered as to        16        4
10   Court's direction to parties to provide
11   public notice of changes to transaction between
12   date of hearing and closing
13   Stipulation between LHBI and State Street Bank   27        4
14   and Trust Co. granting State Street relief
15   from the automatic stay approved and objection
16   of LH 1440 L.L.C. overruled
17   Motion by Fogarazzo plaintiffs' for relief      42       14
18   from the automatic stay denied without
19   prejudice
20
21
22
23
24
25
```

Page 47

1

2                        C E R T I F I C A T I O N

3

4     I, Lisa Bar-Leib, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6

7     _____

8     LISA BAR-LEIB

9     AAERT Certified Electronic Transcriber (CET**D-486)

10

11

12    Veritext

13    200 Old Country Road

14    Suite 580

15    Mineola, NY 11501

16

17    Date:  November 18, 2010

18

19

20

21

22

23

24

25

**EXHIBIT 3**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                    :

In re                               :          **Chapter 11 Case No.**

                                      :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,    :          **08-13555 (JMP)**

                                      :

               **Debtors.**         :          **(Jointly Administered)**

                                      :

                                      :
---------------------------------------------------------------x

**ORDER DENYING MOTION OF LAWRENCE FOGARAZZO,** *ET. AL.*,
**PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE,
FOR RELIEF FROM THE AUTOMATIC STAY TO ALLOW
<u>ADVANCEMENT UNDER INSURANCE POLICIES BY LLOYD'S OF LONDON</u>**

Upon the motion, dated July 19, 2010 (the "<u>Motion</u>") [Docket No. 10279], of

Lawrence Fogarazzo, *et. al*. ("<u>Movants</u>"), pursuant to section 362 of title 11 of the United States

Code, for relief from the automatic stay to allow advance under insurance policy by Lloyd's of

London; and upon the responses to the Motion filed by Lehman Brothers Holdings Inc.

("<u>LBHI</u>") [Docket No. 12660] and Certain Underwriters at Lloyd's and Companies ("<u>Lloyd's</u>")

[Docket No. 12651]; and upon the joinder to LBHI's response filed by the Official Committee of

Unsecured Creditors [Docket No. 12732]; and upon the reply in support of the Motion filed by

the Movants [Docket No. 12737]; and the Court having jurisdiction to consider the Motion and

the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing

Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided, and it appearing that no other or further notice

need be provided; and the Court having considered all of the pleadings filed in respect of the

Motion; and a hearing having been held to consider the relief requested in the Motion on

November 17, 2010 (the "Hearing"); and after due deliberation, it is hereby

ORDERED that, for the reasons set forth by the Court on the record of the

Hearing, the Motion is denied without prejudice; and it is further

ORDERED that, LBHI and/or Lloyd's shall provide redacted copies of the

relevant termination and settlement agreements in respect of LBHI's Primary Combined

Financial Institutions Comprehensive Crime and Professional Indemnity Policy (Policy No.

509/QA529399) and Excess Combined Financial Institutions Comprehensive Crime and

Professional Indemnity Policy (Policy No. 509/QA529499) to counsel for the Movants, subject

to the parties' entry into a confidentiality agreement acceptable to LBHI and Lloyd's; and it is

further

ORDERED that this Court retains jurisdiction with respect to all matters arising

from or related to the implementation of this Order.

Dated:  New York, New York
         December 1, 2010

                        s/ James M. Peck
                        UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 4**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re:

LEHMAN BROTHERS INC.,                                    Case No. 08-01420 (JMP) SIPA


                    Debtor.

---

## DECLARATION OF EDWARD J. KIRK

Pursuant to 28 U.S.C. § 1746, Edward J. Kirk, declares as follows:

1.      I am an attorney duly admitted to this Court and a partner in the New York offices
of Clyde & Co. US LLP.

2.      I appeared on behalf of Certain Underwriters at Lloyd's and Companies
("Lloyd's") to oppose the Motion of Lawrence Fogarazzo, et al., For Relief From The Automatic
Stay To Allow Advancement Under Insurance Policies By Lloyds's of London, *In re Lehman
Brothers Holdings Inc.*, Case No. 08-13555 [Docket No. 10279].

3.      In the Court's December 1, 2010 Order denying the Motion, the Court directed
that "LBHI and/or Lloyd's shall provide redacted copies of the relevant termination and
settlement agreements in respect of LBHI's Primary Combined Financial Institutions
Comprehensive Crime and Professional Indemnity Policy (Policy No. 509/QA529399) and
Excess Combined Financial Institutions Comprehensive Crime and Professional Indemnity
Policy (Policy No. 509/QA529499) to counsel for the Movants, subject to the parties' entry into
a confidentiality agreement acceptable to LBHI and Lloyd's."

4.      On August 19, 2011, I provided copies of the relevant termination and settlement
agreements for these policies to Curtis Trinko, counsel for Fogarazzo.  The termination and

62406567_1

settlement agreements were redacted to omit references to litigation or claims other than the

Fogarazzo action and confidential trust and escrow account information.

5.      After providing the agreements, neither Mr. Trinko, nor any other attorney from

his offices have requested that we provide further information regarding the agreements or

advised of any objections to the agreements provided.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on 21st August 2013

Edward J. Kirk

**EXHIBIT 5**

199

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAWRENCE FOGARAZZO and CAROLYN FOGARAZZO, Joint Tenants With Rights of Survivorship, STEPHEN L. HOPKINS, and DON ENGEL on behalf of themselves, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LEHMAN BROTHERS, INC., GOLDMAN, SACHS & CO., and MORGAN STANLEY & CO., INC.,<br><br>Defendants. | Civil Action No. 03 Civ. 5194 (SAS) |

## DECLARATION OF CURTIS V. TRINKO IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, LEAD COUNSELS' APPLICATION FOR AN AWARD OF ATTORNEYS FEES AND EXPENSES, AND LEAD PLAINTIFFS' APPLICATION FOR INCENTIVE AWARDS

CURTIS V. TRINKO, ESQ., an attorney duly admitted to practice before this Court, hereby declares pursuant to 28 U.S.C. §1746, that the following is true and correct.

1.     I am the principal attorney with the firm entitled Law Offices of Curtis V. Trinko, LLP, Lead Counsel for Lead Plaintiffs and the Class in the above-captioned matter. I submit this Declaration in support of Lead Plaintiffs' Application For the Court's final approval of the Proposed Partial Settlement ("the Proposed Partial Settlement") entered into with Settling Defendants, Goldman, Sachs & Co. ("Goldman Sachs") and Morgan Stanley & Co., Inc. ("Morgan Stanley", collectively, the "Settling Defendants"), the Plan of Allocation of the Net Settlement Fund, Lead Counsel's Application for an Award of Attorneys Fees and Expenses, and

Lead Plaintiffs' Application for Incentive Awards. My firm has directly participated in and overseen all aspects of this litigation, and I am fully familiar with the facts and circumstances related herein, and I support the [Proposed] Partial Settlement, as being fair, reasonable and adequate to the Class.

2.       This securities class action was brought in the U.S. District Court, Southern District of New York pursuant the federal securities laws (specifically, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder) against Lehman Brothers, Inc. ("Lehman Brothers"), Goldman, Sachs & Co. ("Goldman Sachs"), and Morgan Stanley & Co. Incorporated ("Morgan Stanley," collectively, "Defendants"). It was instituted on behalf of all persons or entities who purchased or otherwise acquired shares of RSL Communications, Inc. (hereinafter "RSL") common stock between April 30, 1999 and December 29, 2000 (the "Class Period"), inclusive (the "Class").

3.       Pursuant to the Proposed Partial Settlement, Settling Defendants Goldman Sachs, and Morgan Stanley have agreed to a cash settlement of Six Million Seven Hundred and Fifty Thousand Dollars ($6,750,000), half of which is being paid by Goldman Sachs and half of which is being paid by Morgan Stanley. In exchange, the Class will release their claims against the Settling Defendants as described in the Settlement Agreement and Release ("Settlement Agreement"), dated August 23, 2010, previously submitted to the Court in support of the Preliminary Approval Order.

4.       The Settlement disposes of all aspects of this action brought against the Settling Defendants. Plaintiffs are still pursuing claims involving the Defendant Lehman Brothers.

5.    -  By Its Order Preliminarily Approving Settlement, dated September 27, 2010 (the "Preliminary Approval Order"), this Court preliminarily approved the Proposed Partial

-2-

Settlement. The Preliminary Approval Order is annexed hereto as Exhibit A. The Proposed Order of Final Judgment is annexed hereto as Exhibit B.

6.    Plaintiffs have timely provided, as ordered by the Court in the Preliminary Approval Order, comprehensive mailed and published notices to Class Members describing the Proposed Partial Settlement in detail, the claims procedures, the opt-out and objection procedures, how the net settlement funds will be allocated among Class Members, Lead Counsels' application for attorneys' fees and the reimbursement of litigation expenses, and Lead Plaintiffs' application for incentive awards. Thus far, Lead Plaintiffs and Lead Counsel have not received any objections made by any Class Member to any aspect of the Proposed Partial Settlement.

7.    In settling with Goldman Sachs and Morgan Stanley, Lead Plaintiffs and the Class avoid the substantial risks (and expense) of a trial proceeding against these two defendants who had advanced very strong oppositions to Lead Plaintiffs' claims from the inception of the litigation.

8.    For example, defendants such as Goldman Sachs and Morgan Stanley are protected from false "statement of opinion claims" under § 10(b), and a prosecuting plaintiff must show, with particularity, provable facts to demonstrate that the actionable statement of opinion is both objectively and subjectively false; it is not sufficient to show that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between opinions publicly expressed and opinions truly held. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b). This is an extremely difficult standard to meet, since there is a somewhat limited amount of existing evidence on the part of the Settling Defendants of their

participation in the fraud at issue, while plaintiffs have continuously asserted that there exists

significant direct evidence of culpability on the part of Defendant Lehman Brothers. Even if

plaintiffs were to prove that defendants Goldman Sachs and/or Morgan Stanley are liable

because of their reckless conduct in disseminating analyst reports concerning RSL – a lesser

scienter standard but still a high hurdle to meet for the plaintiffs suing Goldman Sachs and

Morgan Stanley – this Court must instruct the jury to determine the proportionate responsibility

of each of the reckless analysts. It is inconceivable that in this case, that the jury could find that

the subject analysts were responsible for the entirety of the damages being sought.

9.      Lead Plaintiffs also submit that the Proposed Partial Settlement is fair given that

the recovery ($6.75 million) represents more than 9% of the *maximum* damages that could have

been recoverable at trial against all of the Defendants. This damages assessment, as well as the

substantial risks of prevailing on the claims by continuing through trial, were taken into account

by experienced counsel, in consultation with Lead Plaintiffs, in deciding whether to enter into the

Proposed Partial Settlement.

10.      In addition to final approval of the Proposed Partial Settlement, Lead Counsel

seek attorneys' fees in the amount of 33 1/3% of the $6.75 million Gross Settlement Fund, or

$2,250,000. Lead Counsel respectfully submits that this fee is reasonable given that (1) Lead

Counsel has worked on this case for over seven years without compensation; (2) Lead Counsel

devoted thousands of hours to this case, including but not limited to filing, briefing, and

completing discovery with regard to two motions to dismiss made by Defendant Lehman

Brothers and the Settling Defendants, filing, briefing, and completing discovery two motions for

class certification, reviewing approximately 600,000 pages of documents produced by the

Defendants, as well as conducting 15 merits depositions, the depositions of two Defendant

witnesses, defending Plaintiffs' Loss Causation expert on two separate occasions, and defending the four Lead Plaintiffs at their depositions as part of discovery; (3) the $6.75 million Gross Settlement Fund is an excellent result in light of the substantial challenges Lead Counsel overcame; and (4) the lodestar of Lead Counsel amounts to $4,362,899.50, and thus Lead Counsel would be paid for approximately 51.6 % of the time it devoted to this action. Courts throughout the country have approved equivalent fee applications in similar situations.

11.    Lead Counsel also seek reimbursement of their costs and expenses, accrued by payment or contractual obligation in the amount of $211,646.69, as well as incentive awards to the Lead Plaintiffs for the value of the time spent on behalf of the Class in the aggregate amount of $32,000. The Notice of Pendency of Class Action, Proposed Partial Settlement, Motion for Attorney's Fees and Expenses, Lead Plaintiffs' Costs and Expenses and Settlement Hearing (the "Notice") informed the Class that Lead Counsel would seek costs and expenses in an amount not to exceed $300,000, and that Lead Plaintiffs would seek an aggregate award of up to $40,000. No Class member has objected to any of these requests.

12.    For all of the reasons explained in this Declaration and in the accompanying Memoranda of Law, I respectfully request that the Court approve the Proposed Partial Settlement, approve the proposed Plan of Allocation, approve the request for attorneys' fees and reimbursement of expenses, and approve Lead Plaintiffs' request for incentive awards.

## I.    THE TERMS OF THE PROPOSED PARTIAL SETTLEMENT

13.    In settlement of all claims made herein against Settling Defendants Goldman Sachs and Morgan Stanley, the Settling Defendants have agreed to pay in cash, the aggregate sum of Six Million Seven Hundred and Fifty Thousand Dollars ($6,750,000) in equal amounts (*i.e.*, Three Million Three Hundred and Seventy-Five Thousand Dollars ($3,375,000) each).

Such payments shall be several, and not joint, obligations of Goldman Sachs and Morgan Stanley.

## II.    THE BACKGROUND OF THE LITIGATION

14.    On July 15, 2003, the initial class action complaint against solely Defendant Lehman Brothers was filed in the U.S. District Court for the Southern District of New York (the "Court") on behalf of a class consisting of all persons or entities who purchased or otherwise acquired shares of RSL common stock between April 30, 1999 and December 29, 2000 (the "Class Period"), inclusive (the "Class"). Plaintiffs alleged claims under the federal securities laws (specifically, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder) against the Defendants.

15.    Next was the filing of an Amended Class Action Complaint on November 18, 2003 against Settling Defendants Goldman Sachs and Morgan Stanley and original Defendant Lehman Brothers.

16.    This lawsuit alleges that, during the specified Class Period, the price of RSL's common stock was artificially inflated as a result of untrue or materially misleading statements made by Defendants in their equity research reports released with regard to RSL. Plaintiffs further contend that Defendants made these statements knowing them to be false or misleading, or recklessly disregarding their false or misleading nature, and that investors in RSL common stock suffered injury as a result of the alleged inflation.

17.    By Order dated September 29, 2003, the Court appointed Lawrence Fogarazzo, Carolyn Fogarazzo, Stephen L. Hopkins, and Don Engel as Lead Plaintiffs pursuant to § 21D(a)(3)(B) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the

-6-

Private Securities Litigation Reform Act of 1995 ("PSLRA"). The Court also approved Lead Plaintiffs' selection of The Law Offices of Curtis V. Trinko LLP as Lead Counsel.

18.     Between August 22, 2003 and May 25, 2007, there were many telephonic communications, email communications, letters and meetings with the outside counsel for the Defendants regarding all aspects of Lead Plaintiffs' prosecution of claims against the Defendants These communications ended when that defendant filed for bankruptcy and there was an automatic stay of the litigation against Lehman Brothers.

19.     On November 18, 2003, Lead Plaintiffs filed the Amended Federal Securities Class Action Complaint ("Complaint"), which added Goldman Sachs and Morgan Stanley as Defendants.

20.     On January 13, 2004, Lehman Brothers filed a motion to dismiss the Complaint, and Goldman Sachs and Morgan Stanley filed a joint motion to dismiss the Complaint. Following full briefing and oral argument on these motions to dismiss the Complaint, by Order dated May 21, 2004, the Court denied the motions to dismiss the Complaint in their entirety.

21.     Between January 5, 2004 and June 29, 2010, I participated in a multitude of telephonic communications, email communications, letters and meetings with counsel for Goldman Sachs, Sullivan & Cromwell, and counsel for Morgan Stanley, Kirkland & Ellis, regarding the scheduling of both attorney-only and Court conferences, motions, discovery proceedings, pleadings, and settlement discussions, which, led to the third mediation session that ended in a proposed partial settlement, which is now the subject of this Declaration and the accompanying papers seeking the Court's final approval of the partial settlement.

22.     On November 9, 2004, Lead Plaintiffs moved for certification of the Class. Following full briefing, discovery and oral argument, the Court granted Lead Plaintiffs' motion for class certification by Order dated July 29, 2005.

23.     On August 15, 2005, Defendants filed a petition with the United States Court of Appeals for the Second Circuit, pursuant to Federal Rule of Civil Procedure 23(f), for leave to appeal the Court's July 29, 2005 Order granting Lead Plaintiffs' motion for class certification. Following full briefing, on January 26, 2007, the United States Court of Appeals granted Defendants' 23(f) petition and vacated and remanded the Court's July 29, 2005 Order.

24.     On October 8, 2008, Defendant Lehman Brothers filed a Notice of Order Commencing Liquidation. Accordingly, the Action was thereafter stayed against Lehman Brothers.

25.     On April 30, 2009, Lead Plaintiffs renewed their motion to certify the Class. Following full briefing, discovery and oral argument, the Court granted Lead Plaintiffs' renewed motion for certification of the Class by means of an Order dated August 4, 2009.

26.     On August 18, 2009, the Settling Defendants filed a petition with the United States Court of Appeals for the Second Circuit, pursuant to Federal Rule of Civil Procedure 23(f), for leave to appeal the Court's August 4, 2009 Order granting Lead Plaintiffs' motion for class certification. Following full briefing, on January 25, 2010, the United States Court of Appeals denied the Settling Defendants' Rule 23(f) petition.

27.     I participated in over four settlement discussions with Counsel for the Settling Defendants and it also took four mediation between Counsel for the Settling Defendants and Lead Counsel for all parties hereto to come to a partial settlement.

## III.    THE PLAN OF ALLOCATION

-8-

28.     The Plan of Allocation of the Net Settlement Fund was devised by Plaintiffs'

Lead Counsel, with the assistance of a damages consultant. Plaintiffs' Lead Counsel, based upon

its extensive experience in securities class action litigation, believes the Plan of Allocation fairly

allocates the net settlement fund among various members of the Class.    Attached hereto as

Exhibit E is The Law Office of Curtis V. Trinko, LLP's Resume.    See Exhibit C hereto.  The

Plan of Allocation is not part of the Settling Defendants' Settlement Agreement and the Settling

Defendants have no responsibility or liability with respect thereto.  Thus far, no Class Member

has objected to the Plan of Allocation.

29.     In formulating the Plan of Allocation, Plaintiffs' Lead Counsel, and their damages

consultant, took into account all decisions made by this Court with regard to the motions to

dismiss and class certification, all relevant law concerning loss causation, including Dura

Pharmaceuticals v. Broudo, 544 U.S. 336 (2005), other relevant Second Circuit law, and the facts

of this case.

30.     The Plan of Allocation reflects the allegations that the price of RSL's common

stock was artificially inflated as a result of untrue or materially misleading statements made by

Defendants in their equity research reports on RSL.   Plaintiffs further contend that Defendants

made these statements knowing them to be false or misleading, or recklessly disregarding their

false or misleading nature, and that investors in RSL common stock suffered injury as a result of

the alleged inflation.   In order to have recoverable damages (a "Recognized Claim"), a class

member must have purchased RSL common stock during the Class Period, and have held it at

least to the date of the initial public disclosure partially revealing the substance of the alleged

fraud at issue.  The amount of recovery is based upon the date the shares were purchased and the

date the shares were sold, by applying a measure of artificial inflation determined by the

damages consultant. Each Authorized Claimant will be allocated a *pro rata* share of the Net

Settlement Fund based on her, his, or its Recognized Claim as compared to the total Recognized

Claims of all Authorized Claimants.

31.    The Plan of Allocation recognizes the following Groups of Class Members:

a.    For each share of RSL common stock purchased between April 30, 1999 and

July11, 2000, inclusive and:

i.    Sold prior to the close of trading on July 11, 2000, the Recognized

Loss is $0.00.

ii.    Sold at a loss between July 12, 2000 and July 16, 2000, the

Recognized Loss shall be the lesser of: a) $1.56 per share; or b)the

difference between the purchase price per share and the sales price per

share.

iii.    Sold at a loss between July 17, 2000 and October 5, 2000, the

Recognized Loss shall be the lesser of: a) $2.83 per share; or b) the

difference between the purchase price per share and the sales price per

share.

iv.    Sold at a loss between October 6, 2000 and December 25, 2000, the

Recognized Loss shall be the lesser of: a) $3.31 per share; or b) the

difference between the purchase price per share and the sales price per

share.

v.    Sold at a loss between December 26, 2000 and March 26, 2001, the

Recognized Loss shall be the lesser of: a) $3.40 per share; or b)

thedifference between the purchase price per share and the mean

trading price per share beginning December 26, 2000 through the date of sale.

 vi. Held as of the close of trading on March 26, 2001, the Recognized Loss shall be the lesser of: a) $3.40 per share; or b) the difference between the purchase price and $0.22 per share, if greater than zero.[1]

b. For each share of RSL common stock purchased between July 12, 2000 and July 16, 2000, inclusive and:

 i. Sold prior to the close of trading on July 16, 2000, the Recognized Loss is $0.00.

 ii. Sold at a loss between July 17, 2000 and October 5, 2000, the Recognized Loss shall be the lesser of: a) $1.27 per share; or b) the difference between the purchase price per share and the sales price per share.

 iii. Sold at a loss between October 6, 2000 and December 25, 2000, the Recognized Loss shall be the lesser of: a) $1.75 per share; or b) the difference between the purchase price per share and the sales price per share.

 iv. Sold at a loss between December 26, 2000 and March 26, 2001, the Recognized Loss shall be the lesser of: a) $1.84 per share; or b) the

---

[1] Pursuant to Section 21(D)(e)(1) of the Private Securities Litigation Reform Act of 1995, "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated." The mean closing price of RSL common stock during the 90-day period beginning on December 26, 2000 and ending on March 26, 2001 was $0.22.

difference between the purchase price per share and the mean trading price per share beginning December 26, 2000 through the date of sale.

    v. Held as of the close of trading on March 26, 2001, the Recognized Loss shall be the lesser of: a) $1.84 per share; or b) the difference between the purchase price and $0.22 per share, if greater than zero.

c. For each share of RSL common stock purchased between July 17, 2000 and October 5, 2000, inclusive and:

    i. Sold prior to the close of trading on October 5, 2000, the Recognized Loss is $0.00.

    ii. Sold at a loss between October 6, 2000 and December 25, 2000, the Recognized Loss shall be the lesser of: a) $0.48 per share; or b) the difference between the purchase price per share and the sales price per share.

    iii. Sold at a loss between December 26, 2000 and March 26, 2001, the Recognized Loss shall be the lesser of: a) $0.57 per share; or b) the difference between the purchase price per share and the mean trading price per share beginning December 26, 2000 through the date of sale.

    iv. Held as of the close of trading on March 26, 2001, the Recognized Loss shall be the lesser of: a) $0.57 per share; or b) the difference between the purchase price and $0.22 per share, if greater than zero.

d. For each share of RSL common stock purchased between October 6, 2000 and December 25, 2000, inclusive and:

-12-

    i. Sold prior to the close of trading on December 25, 2000, the Recognized Loss is $0.00.

    ii. Sold at a loss between December 26, 2000 and March 26, 2001, the Recognized Loss shall be the lesser of: a) $0.09 per share; or b) the difference between the purchase price per share and the mean trading price per share beginning December 26, 2000 through the date of sale.

    iii. Held as of the close of trading on March 26, 2001, the Recognized Loss shall be the lesser of: a) $0.09 per share; or b) the difference between the purchase price and $0.22 per share, if greater than zero.

e. For each share of RSL common stock purchased between December 26, 2000 and December 29, 2000, inclusive and:

    i. Sold prior to the close of trading on December 29, 2000, the Recognized Loss is $0.00.

    ii. Sold at a loss between December 29, 2000 and March 26, 2001, the Recognized Loss shall be: the difference between the purchase price per share and the sales price per share, if greater than zero.

    iii. Held as of the close of trading on March 26, 2001, the Recognized Loss shall be the: the difference between the purchase price and $0.22 per share, if greater than zero.

## IV. THE PROPOSED PARTIAL SETTLEMENT WARRANTS FINAL APPROVAL

32.    Lead Plaintiffs respectfully submit that the Proposed Partial Settlement is fair, reasonable, and adequate, and readily meets the criteria applicable for final settlement approval.

-13-

This Proposed Partial Settlement was the result of arm's-length negotiations among experienced

counsel for the various parties, and provide a substantial and immediate benefit to the Class.

## V.    THE PROPOSED PARTIAL SETTLEMENT IS PROCEDURALLY FAIR

33.    The negotiations for the Partial Settlement took place among experienced counsel

representing Plaintiffs, and the Settling Defendants Goldman Sachs, and Morgan Stanley. There

is no special damages consideration being given to the Lead Plaintiffs, nor is any group within

the Settlement Class obtaining any special benefit.

34.    In addition, there is no suggestion that the integrity of the negotiating process

might have been compromised by any expectation of excessive compensation being paid to Lead

Counsel. To the contrary, the fee Lead Counsel is applying for is only a fraction of Plaintiffs'

Counsel's accrued lodestar for this case. In sum, nothing in the course of the negotiations or in

the substance of the Settlement indicates that the Settlement is outside the range of possible

approval.

## VI.    THE PROPOSED PARTIAL SETTLEMENT IS FAIR REASONABLE, AND ADEQUATE

35.    Plaintiffs respectfully submit that the Proposed Partial Settlement is fair,

reasonable, and adequate in accordance with Second Circuit precedent.

### a.    The Complexity, Expense and Likely Duration of the Litigation

36.    A trial of this case would be complex and expensive. The Complaint alleges that

the Settling Defendants issued to the investing public false and misleading analyst reports on

RSL as part of their bids to win or maintain lucrative banking and financial advisory work from

RSL. In order to prove this claim, Lead Plaintiffs would be required to employ financial and

economic testifying experts at a substantial cost (in addition to the myriad of other costs of a

trial). Moreover, in order to prove loss causation (an essential element of a securities fraud claim which was in dispute throughout the litigation), Lead Plaintiffs would be required to employ additional damages experts at substantial cost.

37.    The likely duration of this case, already seven and one-half years old, in the event of a trial, would have continued for many additional months if not years. Plaintiffs would have faced summary judgment motions made by the Settling Defendants, which would have further delayed a trial date, and the anticipated post-verdict motion practice and appeals would have gone on for several additional years.

b.    **No Class Member Has Objected to the Proposed Partial Settlement**

38.    Pursuant to Paragraph 7(a) of the Amended Preliminary Approval Order, notices have been mailed to over 23,000 potential Class members, and a summary notice was published in Investor's Business Daily and on a different day, on the PR Newswire. See Affidavit of Michael Rosenbaum. The deadline for objections to or exclusions from the Proposed Partial Settlement and Plan of Allocation is imminent, and to date no Class member has objected to or excluded himself, herself, or itself. The favorable actions of the Class further supports final approval of the Proposed Partial Settlement.

c.    **The Stage of the Proceedings and the Amount of Discovery Completed Support Final Approval of the Proposed Partial Settlement**

39.    Over seven and one-half years of active litigation, the parties herein have engaged in motions to dismiss, two hotly contested class certification motions, and substantial discovery more than sufficient to enable an intelligent appraisal of the Proposed Partial Settlement. Lead Counsel obtained and reviewed over 600,000 pages of documents from the Defendants. Plaintiffs' Counsel conducted an intensive deposition schedule. From December 2009 through

March 2010, Plaintiffs' Counsel deposed 15 current or former Goldman Sachs and Morgan

Stanley employees who were employed by the Settling Defendants during the Class Period. In

addition, in or about March 2005, the Lead Plaintiffs were deposed concerning the motions for

class certification, the depositions of two expert witnesses for the Defendants were taken in early

2010, and the Loss Causation Expert for the Lead Plaintiffs was deposed twice du5ring the

litigation. Lead Counsel thoroughly reviewed all of the documents produced by the Defendants,

as well as the testimony elicited at the depositions before entering into the Proposed Partial

Settlement on behalf of the Class.

### d.    **The Risks of Establishing Liability**

40.    Here, the Lead Plaintiffs faced multiple risks. First, the Class faced the risk that

Goldman Sachs' and Morgan Stanley's arguments concerning loss causation, an essential

element of a securities fraud claim, would succeed on a motion for summary judgment (and if

unsuccessful at summary judgment, then at trial).

41.    Second, Lead Plaintiffs faced risks in proving scienter. Here, the Settling

Defendants likely would have argued that they were unaware of any untrue or materially

misleading statements in their analyst reports, and the possibility exists that a jury would find

against Lead Plaintiffs and the Class on this claim.

### e.    **The Risks of Proving Damages**

42.    Even if a jury rejected the Settling Defendants' loss causation argument, and

determined that Class Members had suffered the maximum damages for which proof will be

offered, it is very unlikely that the jury would find that Settling Defendants Goldman Sachs and

Morgan Stanley were responsible for that maximum amount. Defendants like Goldman Sachs

and Morgan Stanley are protected from the false statement of opinion claims under § 10(b) since

-16-

plaintiffs must demonstrate with particularity that the statement of opinion is both objectively and subjectively false; it is not sufficient to show that the opinion was unreasonable, irrational, excessively optimistic, and/or not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between an opinion publicly expressed and an opinion truly held. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b).

43.    This is an extremely difficult standard to meet in this case since there exists limited demonstrable evidence of active participation in the fraud by the Settling Defendants. Even if plaintiffs would prove that Settling Defendants Goldman Sachs and/or Morgan Stanley are liable because of their reckless conduct, as reflected in the preparation of their analyst reports concerning RSL – a lesser standard but still a high hurdle for the lead plaintiffs suing Goldman Sachs and Morgan Stanley herein – this Court must then instruct the jury to determine the proportionate responsibility of each reckless analyst. It is inconceivable that in this case the jury could find that the Settling Defendants' equity analysts, no matter how reckless, were responsible for 100% of the damages accrued by the Lead Plaintiffs and other Class Members in this Action.

f.    **The Risks of Maintaining the Class Action Through Trial**

44.    In this case, the risks of not being able to prevail as a class action through trial is indeed high. The Lead Plaintiffs in this case were, in fact, compelled to pursue motions for class certification on two separate occasions. There was no certainty that the Court would determine that a certified class action was appropriate, especially when analyzing the different types of damage computation methodologies being utilized. The Proposed Partial Settlement eliminates

this risk with respect to Lead Plaintiffs' claims against Settling Defendants Goldman Sachs and

Morgan Stanley in this Action.

g.    **The Ability of the Settling Defendants to Withstand a Greater Judgment**

45.    Lead Plaintiffs do not know the current financial condition of Settling Defendants

Goldman Sachs and/or Morgan Stanley, and are unable to determine whether Goldman Sachs

and/or Morgan Stanley could have withstood a greater amount of judgment than the amounts

being proffered by the settlement. However, based upon information gleaned from the financial

media, each of the Settling Defendants possibly could withstand a greater amount of judgment.

However, this factor did not arise during settlement discussions, and the competing perceptions

of liability risk were of much greater importance in the negotiations between Lead Plaintiffs , the

Settling Defendants, and their counsel.

h.    **The Range of Reasonableness of the Settlement Fund in Light of the Best
    Possible Recovery**

46.    The Settlement Fund for the Proposed Partial Settlements is $6.75 million, plus

accrued interest. This is over 9% of the estimated maximum recovery in a trial against all of the

Defendants, in and upon the most recent estimate of Lead Plaintiffs' economic consultant. See

Affidavit of Candace Preston, annexed as Exhibit C hereto.

**VII.    LEAD COUNSEL ARE ENTITLED TO A FEE FROM THE COMMON
    FUND THEY CREATED**

47.    Lead Counsel requests attorneys' fees in the amount of 33 1/3% of the Gross

Settlement Fund. Plaintiffs' Counsel prosecuted this action on a wholly contingent basis, and by

doing so, they have shouldered the risk of an unfavorable result and have worked without

compensation in excess of seven years. As a result of the Proposed Settlement (if approved),

Plaintiffs' Counsel will have conferred a substantial benefit on the Class in the face of significant

-18-

risks. Plaintiffs' Lead Counsel obtained a $6,750,000 settlement with the Settling Defendants, and have now avoided the risks inherent in continued motion practice and/or trial.

48.    Moreover, the lodestar "cross check" confirms the reasonableness of Lead Counsel's fee request. Lead Counsel devoted a combined total of 10,989.6 hours to this case. Annexed as Exhibit A to Affidavit of Curtis V. Trinko. Based on Lead Counsel's hourly rates, the lodestar for Lead Counsel has a value of $4,362,899.50. Thus, Lead Counsel will only be paid for approximately 51.6% of the work they did on this case if the Court awards the fees being sought by Lead Counsel.

## VIII. THE COSTS AND EXPENSES OF LEAD COUNSEL SHOULD BE REIMBURSED

49.    Lead Counsel seek reimbursement of expenses paid out-of-pocket and/or to which the firm is contractually obligated totaling $211,646.69. These expenses are based on the attached Affidavit of Curtis V. Trinko In Support Of Motion For An Award Of Attorneys Fees and Expenses.

50.    The Notice informed Class members that Lead Counsel would apply for up to $300,000 in expenses and no Class member has objected. These expenses were reasonable and necessarily incurred in the presentation of Lead Plaintiffs' claims, and warrant the Court's approval.

## IX. LEAD PLAINTIFFS' REASONABLY INCURRED LOST VALUE OF TIME, COSTS AND EXPENSES SHOULD BE REIMBURSED

51.    Pursuant to 15 U.S.C. §78u-4(a)(4), Lead Plaintiffs Don Engel and Stephen L. Hopkins seek court awards of $10,000 each for the value of their time and expenses incurred on behalf of the Class. Lead Plaintiff Lawrence Fogarazzo seeks a court award of $8,000 for the value of his time and expenses incurred on behalf of the Class, and Lead Plaintiff Carolyn

Fogarazzo seeks an award of $4,000 for the value of her time and expenses incurred on behalf of the Class.

52.    Here, the time devoted to the prosecution of the action by Lead Plaintiffs resulted in missed work and lost business opportunities for those individuals, as detailed in the declarations they have each submitted. These declarations are Exhibits D1, D2, D3 and D4 to this declaration.

## X.    CONCLUSION

53.    For the reasons set forth above and in the accompanying memoranda of law, Plaintiffs respectfully submit that: the Proposed Partial Settlement and the Proposed Plan of Allocation are fair, reasonable, and adequate and should be approved; that the application for an award of attorneys' fees and reimbursement of expenses is also fair and reasonable, and should be granted; and that the applications by Lead Plaintiffs for incentive awards are likewise fair and reasonable and should be granted.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 28, 2010.

_____
Curtis V. Trinko

**EXHIBIT C**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re

     LEHMAN BROTHERS INC.,

                     Debtor.

Case No. 08-01420 (JMP) SIPA

---

### [PROPOSED] ORDER DISALLOWING AND EXPUNGING THE PROOF OF CLAIM OF LAWRENCE FOGARAZZO, ET AL. (CLAIM NO. 5837)

Upon the objection dated August 22, 2013 (the "Objection"),[1] of James W. Giddens (the "Trustee"), as trustee for the liquidation of Lehman Brothers Inc. (the "Debtor" or "LBI") under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), seeking entry of an order disallowing and expunging the general creditor claim represented by claim number 5837 (the "Claim") filed by Lawrence Fogarazzo, Carolyn Fogarazzo, Stephen L. Hopkins, and Don Engel, as more fully described in the Objection; and the Court having jurisdiction to consider the Objection and the relief requested therein in accordance with SIPA § 78eee(b)(4); and venue being proper before this Court pursuant to SIPA § 78eee(a)(3) and 15 U.S.C. § 78aa; and due and proper notice of the Objection having been provided, and it appearing that no other or further notice need be provided, and the Court having found and determined that the relief sought in the Objection is appropriate and in the best interests of LBI, its estate, its customers, its creditors, and all parties in interest; and sufficient cause appearing therefor, it is

     **ORDERED** that the relief requested in the Objection is granted; and it is further

---

1.   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

**ORDERED** that, pursuant to section 502(b) of the Bankruptcy Code, the Claim is

disallowed and expunged in its entirety with prejudice; and it is further

**ORDERED** that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated:  New York, New York
            October __, 2013

_____

HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE