# EXHIBIT "A"

# EXHIBIT A-1

inspiring business decisions

# factiva™
Dow Jones & Reuters

---

**Factiva subscription agreement**

---

**THIS AGREEMENT**, which includes the terms and conditions and any schedules attached (the "**Agreement**"), is between **Factiva**, whose registered office is at 85 Fleet Street, London EC4P 4AJ, and the **Subscriber**, the details of which are set out below.

### Description of the Agreement

This Agreement governs the terms and conditions under which the Services, as set out below, are to be supplied to the Subscriber and the Subscriber is to pay for the Services.

### Details of the Parties

| Party | Subscriber | Factiva |
|---|---|---|
| Legal Name | Lehman Brothers (International) Europe | Dow Jones Reuters Business Interactive Limited |
| Principal contact | Mark Jewell | Stephen Carter |
| Contact Address | 1 Broadgate London EC2M 7HA | 85 Fleet St London EC4P 7AJ |
| Telephone | 0207 260 2008 | 0207 542 4262 |
| Facsimile | 0207 260 2717 | 0207 542 4006 |
| E-mail | mjewell@lehman.com | Stephen.carter@factiva.com |

### Fees and Services

| Services | Permitted Users | Fees per month (US$) | | |
|---|---|---|---|---|
| | | information fee | service fee | Total |
| Factiva.com | 500 | $34,136 | $6,509 | $40,645 |

| | integration services only | | |
|---|---|---|---|
| Folders (articles) | Ancillary Fees | | |
| | initial year | each successive year | |
| N/A | N/A | N/A | N/A |

| Billing Start Date | 1 October 2002 | VAT no. (if any) | | Account number | 9LLH00360 |
|---|---|---|---|---|---|

**We hereby agree to be bound by and comply with the terms and conditions of this Agreement**

Signed for and on behalf of the Subscriber:

Signed for and on behalf of **Factiva**:

By (name): _MARK JEWELL_

By (name): _E.J. WRIGHT_

Title : _Director_

Title : _Director of Sales_

Date : _29 October 2002_

Date : _11th November 2002_

**AGREED TERMS:**

1.  **Definitions**

    In this Agreement:

    "**Ancillary Fees**" means the ancillary fees specific to any Service set out on the first page of this Agreement;

    "**Billing Start Date**" means the date as set out on the first page of this Agreement, or if undated, the date of first availability of the Services for use by the Subscriber;

    "**Factiva Group**" means Dow Jones Reuters Business Interactive LLC and its Subsidiaries (of which Factiva is one);

    "**Fees**" means the fees as set out on the first page of this Agreement (excluding any Ancillary Fees), being the aggregate of the fees for the Information and fees for the Services, payable by the Subscriber to Factiva;

    "**Information**" means information, in whatever form, contained in a Service;

    "**Permitted User**" means:
    (a) an individual employee of the Subscriber or any of its Subsidiaries, who is authorised by the Subscriber to access a Service and use the Information; and
    (b) an individual performing the functions of an employee on a temporary basis, independent contractor or consultant who is performing work for the Subscriber and is authorised by the Subscriber to access a Service and use the Information, for so long as:
      (1) such user remains authorised by the Subscriber to perform work for the Subscriber; and
      (2) the Subscriber assumes responsibility for any acts or omissions by such user which would constitute a breach or default under this Agreement if done by an employee;

    "**Service**" means any of Factiva's global news and business information services through which the Information is supplied to the Subscriber by Factiva;

    "**Subsidiary**" shall mean any corporate entity in which another corporate entity owns or controls, directly or indirectly, the majority of the issued share capital of that corporate entity and over which it exercises effective control; and

    "**User Statement**" means a statement to be provided by the Subscriber to Factiva setting out the number of Permitted Users of each Service (in total and per country) and confirming that neither the Services nor the Information have been used by any party other than the Permitted Users.

2.  **Services**

2.1 Factiva will supply the Information and the Services to the Subscriber and grants to the Subscriber a non-exclusive, non-transferable, non-sublicensable, non-assignable license to use the Information and the Services pursuant to the terms of this Agreement. The rights granted under this Agreement are limited to use by Permitted Users who are normally located within Europe (including United Kingdom, France, Spain, Italy, Netherlands and Israel).

2.2 Factiva retains control and ownership of the form and content of the Services. Neither the Subscriber nor the Permitted Users will acquire any ownership rights in the Services or the Information, and the Subscriber shall not alter the form or content of the Services without the written permission of Factiva.

2.3 Factiva may alter the form and content of the Services from time to time. The Information is either licensed from third party information providers or is proprietary to Factiva. Should any license agreement with an information provider be terminated or suspended for any reason then the Information supplied by that information provider may be withdrawn from the Services. Should Factiva's alteration of the form and/or content of the Service be of such a material nature that the Services can not reasonably be of use to the Subscriber, the Subscriber may terminate this Agreement without penalty, on 60 days' prior written notice.

2.4 The Subscriber acknowledges that the indexing codes (including Factiva indexing codes, RICs and DJ tickers) used for retrieving Information from the Services are owned by either Factiva or a third party, and that such

indexing codes are protected by copyrights, database rights, trade marks and/or patents owned by the relevant party. The Subscriber may use the indexing codes solely to access Information from the Services and may not otherwise copy, publish, re-distribute or otherwise use such codes.

3.     **Use of the Services**

3.1     The Permitted Users may:

    (a)     review and download Information from a Service for their own use; and

    (b)     include in internal reports and/or reports to customers, on an occasional and infrequent basis, individual articles from the Information, provided that such articles (or portions of articles) are attributed to the relevant author or provider of such article.

3.2     The Subscriber, and each Permitted User, shall not:

    (a)     reproduce, distribute, display, sell, publish, broadcast or circulate the Information to any third party, including (other than as authorised in clause 3.1(b)) other individuals in the Subscriber's or its Subsidiary's organisations, nor make the Information available for any such use;

    (b)     remove, conceal or alter any copyright notices contained in the Services or the Information, or change the meaning of any article of Information;

    (c)     create or store in electronic form any shared library or archive of Information which could be used as a research application; or

    (d)     use the authority granted in clause 3.1(b) as a substitute for authorising additional users to use the Services, and for the avoidance of doubt, Permitted Users may not on a regular basis, or an irregular but frequent basis, distribute more than a few articles to any individuals (employees of the Subscriber, its Subsidiaries or otherwise) who are not Permitted Users.

3.3     The Subscriber shall:

    (a)     use its best efforts to ensure that each Permitted User is aware of and complies with the conditions of use of the Services and/or the Information contained in this Agreement;

    (b)     use its best efforts to ensure that each Permitted User complies with any additional restrictions notified by means of any on-screen notices contained within an article of Information to which the additional restriction relates;

    (c)     on 30 days' prior written notice from Factiva, provide a User Statement to Factiva, save that Factiva may not make such request more frequently than twice annually;

    (d)     maintain reasonable internal control procedures to verify each User Statement; and

    (e)     provide Factiva with reasonable assistance in complying with Factiva's obligations under privacy laws relating to information in respect of individual Permitted Users.

4.     **Fees**

4.1     The Subscriber agrees to pay the Fees and any Ancillary Fees to Factiva within 30 days of receipt of the corresponding valid invoice from Factiva. Factiva shall invoice the Subscriber quarterly in advance. In addition to the relevant Fees and any Ancillary Fees, the Subscriber shall be responsible for all applicable sales, value-added and other such taxes or duties payable in respect of this Agreement. Should the Subscriber fail to make any of the payments under this clause by the relevant due date then Factiva may require the Subscriber to pay interest to Factiva at a rate of 1.5% per month, accruing daily, on undisputed amounts .

4.2     Factiva's standard rate of Fees may increase from time to time. Other than pursuant to clause 4.3 below, no change in the Fees payable by the Subscriber shall be effective unless agreed in writing between the parties.

4.3     Factiva may, following not less than 30 days' prior written notice to the Subscriber, increase the rate of the Fees and/or any applicable Ancillary Fees, save that no such increase may be made during the 12 month period following the Billing Start Date, and only once in any consecutive 12 month period thereafter. If the rate of

such increase is greater than the then current rate of Underlying inflation (RPIX) for the United Kingdom, as quoted by the HM Treasury, as at the date of Factiva's notice or 5% (whichever is the greater), then the Subscriber may, within 15 days of receipt of such notice, terminate this Agreement by written notice to Factiva. If the Subscriber gives notice pursuant to this clause 4.3 then such termination shall be effective on the date on which the Fees and/or any applicable Ancillary Fees would have increased.

4.4    Factiva may on reasonable notice (which shall not be less than 2 business days) and during reasonable business hours conduct an audit to verify any User Statement. If such audit reveals that the number of Permitted Users is over or under stated the Fees shall be recalculated accordingly. In the event that any audit shows a User Statement to be understated by 15% or more, the Subscriber shall pay to Factiva the Fees due in relation to such understatement in respect of the previous 6 month period and Factiva's reasonable fees incurred in respect of such audit, and Factiva may suspend the Service or terminate this Agreement immediately if such understatement is in excess of 25%.

## 5.    Warranty, liability and indemnity

5.1    Factiva shall make reasonable efforts to ensure: the accuracy and reliability of the Services; the timeliness of the Information; and that the Services do not contain any computer virus. Except as specified in this Agreement, all express or implied representations, warranties, conditions and undertakings are excluded. This Agreement gives neither the Subscriber nor the Permitted Users any rights against third party information providers with respect to use of Information by the Subscriber and/or any Permitted User.

5.2    Factiva accepts liability only for: death or personal injury caused by its negligence; direct physical loss or damage to the Subscriber's site caused by its negligence; or any other direct loss or damage caused by its negligence or willful misconduct. Neither Factiva, nor any other member of the Factiva Group, will be held liable in relation to the accuracy or timeliness of the Information or for any loss or damage of any type in connection with the provision of or failure to provide the Services, except as set out in this clause 5. The total liability of Factiva under this Agreement shall, to the extent permitted by law, under no circumstances exceed the Fees paid by the Subscriber in the twelve months preceding such claim except in the case of tangible property loss or damage in which case Factiva's liability shall not exceed £1 million per event or series of connected events.

5.3    Factiva shall indemnify the Subscriber against any direct loss or damage suffered by the Subscriber arising out of any third party claim or action that the Information infringes the copyright of such third party, except for any claim or action arising out of a breach of this Agreement by the Subscriber or the Permitted Users. The Subscriber agrees that if any such claim is made by a third party then the Subscriber will promptly notify and co-operate with Factiva, and Factiva shall at its request be given control of such action. Other than in respect of information proprietary to Factiva, the indemnity in this clause 5.3 shall be limited to the extent that Factiva may recover from its information providers.

5.4    The Subscriber shall indemnify Factiva and, where relevant, any third party information provider or supplier, for any loss or damage suffered arising out of any use of the Information beyond the rights expressly granted to the Subscriber and/or the Permitted Users under this Agreement.

## 6.    Term and termination

6.1    The term of this Agreement shall commence on the date of first availability of the Services for use by the Subscriber and shall continue save that either party may cancel any or all of the Services on giving to the other 3 months prior written notice. To be valid, any cancellation notice from the Subscriber to Factiva must comply with clause 8.2.

6.2    Without prejudice to any rights of either party, this Agreement may be terminated:

(a)    in the event of a party committing any breach of this Agreement which is remediable and not remedied within 21 days of written notice from the other party requiring such remedy;

(b)    immediately on written notice being given by a party if the other party commits any irremediable breach of this Agreement or repeats any breach as has previously been the subject of a notice under paragraph (a) above;

(c)    immediately on a party giving written notice to the other party if:

(i)     an order is made or an effective resolution is passed for the liquidation or winding up of the other party;

(ii)    the other party enters into any composition with its creditors;

(iii)   the other party has a receiver, manager, administrative receiver or administrator appointed in respect of it or substantially all of its assets; or

(iv)    the other party is affected in any jurisdiction other than the United Kingdom by any matter of substantially similar effect to any of the matters referred to in paragraphs (i) to (iii) above.

6.3     On termination of this Agreement for any reason the Subscriber shall pay to Factiva any Fees payable until the effective date of such termination.

6.4     If the Subscriber commits a material breach of this Agreement, Factiva may suspend any Service without notice or penalty until such breach is remedied. Factiva shall as soon as reasonably practicable give the Subscriber notice of the details of such material breach.

**7.      Confidentiality**

7.1     The parties acknowledge and confirm that during the term of this Agreement and following its termination the parties shall treat as confidential and shall not (other than in the proper provision of the Services or as required by any applicable law) use or disclose to any person, firm or company, the terms of this Agreement and any confidential information relating to the business of and belonging to the other party, nor permit its use or disclosure. This obligation of confidentiality shall not apply to information which is publicly known (through no fault of the non-disclosing party) or not of commercial value to such other party.

7.2     No public announcement, press release or circular (other than required by law or regulation) concerning this Agreement will be made by either party without the prior consent of the other party, which shall not be unreasonably withheld or delayed.

7.3     The obligations of confidentiality as contained herein shall survive termination of this Agreement for a period of 3 years.

7.4     Factiva shall not use the name or marks, refer to or identify "Lehman Brothers" or any Lehman entity in publicity releases, promotional or marketing materials, announcements, customer listings, testimonials or advertising.

**8.      Notices**

8.1     <u>General.</u> Other than as set out below, all notices shall be in writing, and delivered by courier or registered mail, or by either facsimile or electronic mail with confirmation, to the addresses specified on the signature page of this document, or other address stipulated in writing by one party to the other. Notice shall be deemed received on the date 3 business days after being sent, if by courier or registered mail, or on the date actually received, if by fax or electronic mail.

8.2     <u>Cancellation notices.</u> Any notice from the Subscriber to Factiva in relation to either termination of this Agreement or cancellation of a Service (or part of Service) must be sent to Factiva either using the web form located at https://www.factiva.com/customerservice/xaccount/or by electronic mail (including the Subscriber's account number and contract details) to the relevant electronic mail address. If such notice is sent by any other means it will not be valid notice under the terms of this Agreement. The relevant electronic mail address is dependent on the Subscriber's location (set out on the front page of this Agreement), if the Subscriber is located:

(a)     in Europe, the Middle East or Africa, the address is xaccount.emea@factiva.com;

(b)     in Asia and Australasia, the address is xaccount.asiapacific@factiva.com; or

(c)     in Central or South America, the address is xaccount.americas@factiva.com.

## 9.    General

9.1    The terms and conditions set out in this Agreement represent the entire agreement between both parties relating to the Services and supersede all prior agreements and representations. It is however acknowledged that separate divisions or business units of the Subscriber, or entities forming part of the Subscriber's group of companies, may independently subscribe for Services from Factiva. Such independent subscriptions under separate contracts do not supersede and are not superseded by this Agreement.

9.2    No failure or delay by any party in exercising any right, power or remedy under this Agreement shall operate as a waiver of any such right, power and/or remedy. Neither party will be liable for any loss or failure to perform an obligation due to circumstances beyond its reasonable control, save that if a material lack of performance persists for a period of 60 days then the other party may terminate this Agreement on written notice with immediate effect

9.3    The Services subscribed for under this Agreement, the level of the Fees and Ancillary Fees, the number of Permitted Users, and other relevant details of such Services may be amended by written notice signed by both parties confirming the relevant amendment and the inclusion of any additional schedule.

9.4    In the event of conflict between these agreed terms and any schedule, the terms in the relevant schedule shall prevail in relation to the provision of that Service.

9.5    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

9.6    Neither party may assign this Agreement without the prior written consent of the other party.

9.7    A person or entity who is not a Party to this Agreement shall have no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement..

9.8    The official language of this Agreement shall be the English language and no translation into any other language may be used in its interpretation.

9.9    This Agreement will not be governed by the United Nations Convention on Contracts for the International Sale of Goods.

9.10   This Agreement shall be governed by, construed and take effect in accordance with the laws of the England and Wales and subject to the exclusive jurisdiction of the English courts.

## Factiva.com (standard flat fee) schedule

These additional terms and conditions apply to the Factiva.com service ("Factiva.com") which shall be included as one of the Services as defined in the Factiva Subscription Agreement to which this schedule is appended.

1. **Additional Definitions**

   "Flat Fee" means the Fee set out on the front page of this Agreement payable in respect of Factiva.com, as may be amended pursuant to this schedule;

   "Initial Period" means the 3 month period following the Billing Start Date;

   "Password" means an individual password provided by Factiva to Subscriber pursuant to which a Permitted User is enabled to access a Service;

   "Period" means the then-current period, being either the Initial Period or a Renewal Period;

   "Renewal Period" means the 3 month period following the Initial Period (or any subsequent Renewal Period as the case may be);

   "Usage Value" means the value (according to the then-current Factiva standard price list) of the usage of Factiva.com by the Permitted Users; and

   "Web Content" means publicly available content which may be accessed through Factiva.com via links to third party sites on the internet, and which is identified within Factiva.com as being from the internet.

2. **Additional Rights/Restrictions**

   2.1   Factiva grants to the Subscriber and its Permitted Users the right to access and use Factiva.com pursuant to the terms and conditions of the Agreement except that, the restriction on internal redistribution contained in section 3.1(b) of the main terms of the Agreement shall not apply where any Permitted User is replying to a specific adhoc query on behalf of an individual employee within the Subscriber's organisation, who in such cases will be considered Permitted Users for the purpose of this Agreement

   2.2   Factiva will issue the Subscriber with one Password for each Permitted User, each such Password may only be used by one Permitted User. The Subscriber should notify Factiva if it learns or suspects that any Password(s) is either being used by any person not authorised by the Subscriber to use the Services or is being used by more than one Permitted User. Factiva will then cancel the relevant Password(s) and assign a new Password(s) to the Subscriber. Factiva may in its reasonable discretion attach conditions to the assignment of such new Password(s).

   2.3   For the purposes of this schedule and the Subscriber's use of Factiva.com, "Permitted Users" shall be restricted to those users who have direct access to Factiva.com via an individual password assigned to such user.

3.    **Web Content**

   3.1   Factiva chooses the internet sites through which the Web Content is made available and uses reasonable care in doing so. However, the Web Content is not made available through any licensing agreement with any third party, and accordingly Factiva does not and cannot license the use of such Web Content. The Subscriber and Permitted Users are solely responsible for determining the extent to which they may use Web Content.

   3.2   The Web Content is not included as Information for the purposes of this Agreement and Factiva does not accept any liability in relation to the Web Content.

4.    **Flat Fee**

   4.1   The Flat Fee payable during the Initial Period shall be based on Factiva's projection of Usage Value based on the number of Permitted Users, the nature of the Subscriber's business, and the Subscriber's prior usage of RBB and DJI. Except as expressly provided in this schedule, and unless the Subscriber requests an increase in the number of Permitted Users, the Flat Fee shall not increase during the Period.

4.2   Factiva shall, subject to clause 4.4 below, 30 days prior to the end of the Period, give the Subscriber written notice of:

(a)   the average Usage Value per month during the Period (based on the details of usage available at the time of recalculation); and

(b)   the Flat Fee, amended pursuant to clause 4.3 or 4.4 below, to be applicable for the following Renewal Period.

4.3   In respect of the first Renewal Period, the Flat Fee shall be calculated according to a comparison of the then-current Flat Fee to Usage Value during that Period. The monthly Flat Fee payable in respect of the following Renewal Period shall be increased according to the percentage calculated from the table below:

| Usage Value* | % Decrease/Increase |
|---|---|
| $0 - $16,257 | -20 |
| $16,258 - $29,321 | -15 |
| $20,322 - $27,096 | -10 |
| $27,097 - $40,644 | -5 |
| $40,645 - $60,967 | 5 |
| $60,968 - $81,290 | 10 |
| $81,291 - $101,612 | 15 |
| $101,613 – Unlimited | 20 |

* Usage Value calculated per Factiva's standard published pricing schedule minus a corporate discount of 14%.

4.4   In respect of each Renewal Period (other than the first Renewal Period), the Flat Fee shall be calculated according to a comparison of the then-current Usage Value to the Usage Value during the previous period. The monthly Flat Fee payable in respect of the following Renewal Period shall be increased according to the following calculation:

New monthly flat fee = $\dfrac{\text{average monthly Usage Value for then-current Period}}{\text{average monthly Usage Value for the previous Period}}$ x Monthly flat fee during the then-current period

5.   **Additional Right of Termination**

5.1   In addition to the rights of termination set out in the main terms and conditions within the Agreement, the Subscriber may, within 15 days of receiving any notice from Factiva pursuant to clause 4.2 above, give Factiva notice of termination of Factiva.com (such notice must be given in accordance with the clause 8.2 of the main terms and conditions). Such notice of termination shall be effective 3 months after the end of the then-current Period, and the Fees payable during that 3 month period shall be equal to the level of Fees payable in respect of the previous Period.



**FSA Amendment -change to existing service**

The terms set out on this page and in any schedule attached (the **"Amendment"**) shall, with effect from the Effective Date of Amendment (set out below), amend the subscription agreement made between Dow Jones Reuters Business Interactive Limited, which trades as **Factiva**, whose registered office is at 6th Floor, Commodity Quay, East Smithfield, London, E1W 1AZ, and the **Subscriber** (the **"Subscription Agreement"**), further details of which are set out below. In the event of any inconsistency between the Subscription Agreement and this Amendment the terms of this Amendment shall prevail.

**Description of the Agreement** - The Agreement, being the Subscription Agreement as amended by this Amendment, governs the terms and conditions under which the Services are to be supplied to the Subscriber and the Subscriber is to pay for the Services.

**Details of the Parties**

| Party | Subscriber | Factiva |
|---|---|---|
| Legal Name | Lehman Brothers (International) Europe | Dow Jones Reuters Business Interactive Limited |
| Principal Contact | Mark Jewell | Martin Cade |
| Contact Address | 25 Bank Street London E14 5LE | Commodity Quay, East Smithfield London E1W 1AZ |
| Telephone | 0207 260 2008 | 0207 542 3015 |
| Facsimile | 0207 260 2717 | 0207 542 4006 |
| E-mail | mjewell@lehman.com | Martin.cade@factiva.com |

| Account Number | 9LEH000300 |
|---|---|

**Fees and Services - as amended**

| Services | Permitted Users (up to) | Fees per month (USD) | | | Additional information | | |
|---|---|---|---|---|---|---|---|
| | | Information fee | Service fee | Total | Folders (articles) | Ancillary Fees (USD) | |
| | | | | | | Initial year | Each successive year |
| Factiva.com | 550 | | | | - | - | - |
| Factiva SalesWorks or Factiva Company & Executives | 550 | 67,701 | 12,896 | 80,597 | Regional coverage= Global | | |
| Factiva Developer's Kit through Alacra | 10 | | | | | | |

| Effective Date of Amendment | 1st January 2006 | Description of amendment | Change to the Factiva.com schedule and addition of Factiva SalesWorks and/or Factiva Companies & Executives |
|---|---|---|---|

We hereby agree to be bound by and comply with the terms and conditions of the Agreement (as amended by this document):

Signed for and on behalf of the *Subscriber*.

By
(name):  M.L SULLIVAN
Title:  NON REAL TIME DATA MANAGER

Signed for and on behalf of *Factiva*:

By
(name):  D LEWIS
Title:
Date:

## Amendment to the Subscription Agreement

These additional terms and conditions are an amendment to the terms of the Subscription Agreement (as defined on the front page of the Amendment to which this schedule is appended).

1.    **Amendment to the Subscription Agreement**

1.1    The Subscription Agreement shall be amended, with effect from the Effective Date of Amendment, as follows:

(a)    by the deletion of clause 6.1 of the main terms and replacing with the clause copied below:

"6.1    The term of this Agreement shall commence on the date of first availability of the Services for use by the Subscriber and shall continue for 12 months from the Effective Date of Amendment (as defined on the front page of this Agreement). Thereafter the term shall renew for successive 12 month periods. Either party may cancel any or all of the Services on written notice to the other no less than 3 months before the end of the then-current 12 month period. To be valid, any cancellation notice from the Subscriber to Factiva must comply with clause 8.2."

(b)    by the deletion of the "Factiva.com (standard flat fee) schedule", which shall be replaced with the Factiva.com schedule attached to this Agreement;

(c)    by the addition of the "Pricing schedule" attached to this Agreement; and

(d)    by the addition of the "Factiva Companies and Executives and Factiva SalesWorks schedule" attached to this Agreement.

2.    **Text Mining**

The license granted under this Agreement does not permit the Subscriber, without Factiva's express written consent, to use the Information or the attached codes in conjunction with any data mining or text mining software, or automated trend analysis application.

## Pricing Schedule

These additional terms and conditions apply to the pricing in respect of all of the Services subscribed for pursuant to the Factiva Subscription Agreement to which this schedule is appended.

1.    **Additional Definitions**

"**Fee**" means the Fee set out on the front page of this Agreement payable in respect of the Subscriber's use of the Services, as may be amended pursuant to this schedule;

"**Initial Period**" means the 3 month period following the Effective Date of Amendment;

"**Period**" means the then-current period, being either the Initial Period or a Renewal Period;

"**Renewal Period**" means the 3 month period following the Initial Period (or any subsequent Renewal Period as the case may be); and

"**Usage Value**" means the value (according to the then-current Factiva standard price list) of the usage of Factiva.com by the Permitted Users; and

2.    **Fees**

2.1    The Fees set out on the front page are in respect of the Subscriber's use of the Services during the Initial Period. The Fee payable during the Initial Period shall be based on Factiva's historic pattern of Usage Value and the nature of the Subscriber's business. Except as expressly provided in this schedule, and unless the Subscriber requests an increase in the number of Permitted Users, the Fee shall not increase during the Period.

2.2    If the Subscriber has subscribed for multiple Services, the Fees are discounted as a consequence of the Subscriber's overall spend with Factiva and so shall not be available at the Fees related to each Service on a stand-alone basis or as part of a reduced overall offering. The Fees are set for the Subscriber as at signature and may not be available to the Subscriber if the Subscriber or one of its Subsidiaries acquires, merges or otherwise undergoes a corporate change which results in what was, prior to the Effective Date of Amendment, another legal entity or business becoming part of the Subscriber or one of its Subsidiaries.

2.3    The Subscriber may request an increase to the number of Permitted Users authorised to access Factiva *SalesWorks* or Factiva *Companies and Executives* (as further described in the attached schedule) and the Fees shall be adjusted on the next invoice sent by Factiva to the Subscriber on a pro rata basis based on the following calculation: for each block of additional 50 Permitted Users of Factiva *SalesWorks* or Factiva *Companies & Executives* above the initial allowance of 550 Permitted Users and up to 1,000 Permitted Users of either Factiva *SalesWorks* or Factiva *Companies and Executives*, the Fees shall increase by $1,000 per month (i.e. $20 per user per month). In the event the Subscriber requests for more than 1,000 Permitted Users to be given access to either Factiva *SalesWorks* or Factiva *Companies and Executives*, then both parties shall negotiate in good faith the Fees to be payable in respect of such additional Permitted Users. In no event can the number of Permitted Users of either Factiva *SalesWorks* or Factiva *Companies and Executives* be inferior to 550 Permitted Users.

2.4    Factiva shall, 30 days prior to the end of the Period, give the Subscriber written notice of:

(a)    the average Usage Value per month during the Period (based on the details of usage available at the time of recalculation);

(b)    the number of Permitted Users authorised to access Factiva SalesWorks or Factiva Companies & Executives at the end of the Period if it is greater than 550; and

(c)    the Fee, amended pursuant to clause 2.5 below, to be applicable for the following Renewal Period.

2.5    In respect of each Renewal Period, the Fees shall be calculated according to a comparison of the then-current Usage Value to the Usage Value during the previous Period and the number of Permitted Users authorised to access Factiva SalesWorks or Factiva Companies and Executives at the end of the current Period. The monthly Fee payable in respect of the following Renewal Period shall be increased according to the following

| New monthly Fee = | $\dfrac{\text{average monthly Usage Value for then-current Period}}{\text{average monthly Usage Value for the previous Period}}$ | x | Monthly Fee during the then-current Period | + | Average additional fees payable in respect of additional Permitted Users authorised to access Factiva SalesWorks or Factiva Companies and Executives during the then-current Period calculated pursuant to clause 2.3 |
|---|---|---|---|---|---|

save that the Fees shall not decrease by more than 15% over each Period or by more than 30% over the first 12-month period following the Effective Date of Commencement.

### Factiva.com schedule

These additional terms and conditions apply to the Factiva.com service ("Factiva.com") which shall be included as one of the Services as defined in the Factiva Subscription Agreement to which this schedule is appended.

**1.    Additional Definitions**

"**Password**" means an individual password provided by Factiva to Subscriber pursuant to which a Permitted User is enabled to access a Service; and

"**Web Content**" means publicly available content which may be accessed through Factiva.com via links to third party sites on the internet, and which is identified within Factiva.com as being from the internet.

**2.    Additional Rights/Restrictions**

2.1    Factiva grants to the Subscriber and its Permitted Users the right to access and use Factiva.com pursuant to the terms and conditions of the Agreement except that, the restriction on internal redistribution contained in section 3.1(b) of the main terms of the Agreement shall not apply where any Permitted User is replying to a specific adhoc query on behalf of an individual employee within the Subscriber's organisation, who in such cases will be considered Permitted Users for the purpose of this Agreement.

2.2    Factiva will issue the Subscriber with one Password for each Permitted User, each such Password may only be used by one Permitted User. The Subscriber should notify Factiva if it learns or suspects that any Password(s) is either being used by any person not authorised by the Subscriber to use the Services or is being used by more than one Permitted User. Factiva will then cancel the relevant Password(s) and assign a new Password(s) to the Subscriber. Factiva may in its reasonable discretion attach conditions to the assignment of such new Password(s).

2.3    For the purposes of this schedule and the Subscriber's use of Factiva.com, "Permitted Users" shall be restricted to those users who have direct access to Factiva.com via an individual password assigned to such user.

**3    Web Content**

3.1    Factiva chooses the internet sites through which the Web Content is made available and uses reasonable care in doing so. However, the Web Content is not made available through any licensing agreement with any third party, and accordingly Factiva does not and cannot license the use of such Web Content. The Subscriber and Permitted Users are solely responsible for determining the extent to which they may use Web Content.

3.2    The Web Content is not included as Information for the purposes of this Agreement and Factiva does not accept any liability in relation to the Web Content.

### Factiva Companies and Executives and Factiva SalesWorks Schedule

These additional terms and conditions apply to Factiva SalesWorks ("FSW") and Factiva Companies and Executives ("FCE"), each of which shall be considered as one of the Services, as that term is defined in the Factiva Subscription Agreement to which this schedule is appended. The Subscriber's election for FCE and FSW and the regional coverage and depth of Information that is subscribed for, is set out below.

1.    **Additional Definitions**

*"Password"* means an individual password provided by Factiva to Subscriber pursuant to which a Permitted User is enabled to access the Service; and

*"Web Content"* means publicly available content that is viewed at third party internet sites and accessed through a Service via links to such sites. Web Content is identified within the Service as being from the internet.

2.    **Additional Rights/Restrictions**

2.1    Factiva grants the Subscriber and its Permitted Users the right to use the applicable Service pursuant to the terms and conditions of this Agreement.

2.2    Factiva will issue the Subscriber with one Password for each Permitted User. Each such Password may only be used by one Permitted User. The Subscriber should notify Factiva if it learns or suspects that any Password(s) is either being used by any person not authorised by the Subscriber to use the Services or is being used by more than one Permitted User. Factiva will then cancel the relevant Password(s) and assign a new Password(s) to the Subscriber. Factiva may attach reasonable conditions to the assignment of such new Password(s).

2.3    The storage of any shared archive or database of the Information on any server controlled by the Subscriber is not permitted.

2.4    Factiva and its third party information suppliers provide no warranty as to the timeliness or accuracy of the Information contained in the Service. Factiva, and such information suppliers, shall not be liable for any loss or damage, of any type, in connection with the use of such Information or the provision of or failure to provide the Information in the Service.

2.5    Factiva chooses the internet sites through which the Web Content is made available and uses reasonable care in doing so. However, the Web Content is not made available through any licensing agreement with any third party, and accordingly Factiva does not and cannot license the use of such Web Content. The Subscriber and Permitted Users are solely responsible for determining the extent to which they may use Web Content. The Web Content is not included as Information for the purposes of this Agreement and Factiva does not accept any liability or offer an indemnity in relation to the Web Content.

## FSA Amendment - change to existing service

The terms set out on this page and in any schedule attached (this "**Amendment**") shall, with effect from the Effective Date of Amendment (set out below), amend the subscription agreement made between Factiva Limited (previously known as Dow Jones Reuters Business Interactive Limited), which trades as **Factiva**, whose registered office and principal place of business is at 6th Floor, Commodity Quay, East Smithfield, London E1W 1AZ, and the **Subscriber** (the "**Subscription Agreement**"), further details of which are set out below. In the event of any inconsistency between the Subscription Agreement and this Amendment the terms of this Amendment shall prevail.

**Description of the Agreement** - The Agreement, being the Subscription Agreement as amended by this Amendment, governs the terms and conditions under which the Services are to be supplied to the Subscriber and the Subscriber is to pay for the Services.

### Details of the Parties

| Party | Subscriber | Factiva |
|---|---|---|
| Legal Name | Lehman Brothers Holdings Inc | Factiva Limited |
| Principal Contact | Daniel Williams | Stephen Slattery |
| Contact Address | 25 Bank Street London E14 5LE | Commodity Quay, 6th Floor East Smithfield London E1W 1AZ |
| Telephone | 020 7102 1594 | 0207 542 4164 |
| Facsimile | 020 7067 9747 | 0207 542 4006 |
| E-mail | daniwill@lehman.com | Stephen.slattery@dowjones.com |

| Account Number | 9LEH000300 & 9LEH001200 |
|---|---|

### Fees and Services - as amended

| Services | Permitted Users (up to) | Fees per year (USD) | | | Folders (articles) | Ancillary Fees (USD) | |
|---|---|---|---|---|---|---|---|
| | | Information fee | Service fee | Total | | Initial year | Each successive year |
| Factiva.com | 26,000 | | | | - | - | - |
| Dow Jones Company & Executives | 22 | 110,00.00 | 27,500 | 1,280,088* | Regional coverage= Global | | |
| Factiva Developer's Kit through Alacra | Enterprise | | | | - | - | - |

Additional information

* The Fees set out above shall be increased by 5% to $1,344,092 in Year Two (being the 12 month period from 1 January 2009) and in Year Three to $1,536,198 (being the 12 month period from 1 January 2010)

| Effective Date of Amendment | 1 January 2008 | Description of amendment | Fixed Enterprise fee. No usage review. |
|---|---|---|---|

**We hereby agree to be bound by and comply with the terms and conditions of the Agreement (as amended by this document):**

Signed for and on behalf of the *Subscriber*:

By
(name):
Title:
Date:

Signed for and on behalf of *Factiva*:

By
(name): _____
Title: _____
Date: _____

## Amendment to the Subscription Agreement

These additional terms and conditions are an amendment to the terms of the Subscription Agreement (as defined on the front page of the Amendment to which this schedule is appended).

**1.      Amendment to the Subscription Agreement**

1.1      The Subscription Agreement shall be amended, with effect from the Effective Date of Amendment, as follows:

(a)      by the deletion of clause 6.1 of the main terms and replacing with the clause copied below:

"6.1      The term of this Agreement shall continue for 24 months from the Effective Date of Amendment (the "**First Renewal Term**"). Thereafter the term shall renew for successive 12 month periods. Either party may cancel any or all of the Services on written notice to the other of no less than 30 days to expire at the end of the First Renewal Term or the then-current 12 month period. To be valid, any cancellation notice from the Subscriber to Factiva must comply with clause 8.2."

and

(b)      by the deletion of the "Pricing schedule" to the Agreement.

**2.      Assignment**

Neither party may assign this Agreement without the prior written consent of the other party, provided however that Factiva may transfer any of its rights and obligations to Dow Jones & Company Inc. or any Subsidiary thereof.

**EXHIBIT A-2**

CONTRACT NO. *2006 - US-1500*



**factiva.**

Dow Jones & Reuters

---

### FSA Amendment -change to existing service

The terms set out on this page and in any schedule attached (the "**Amendment**") shall, with effect from the Effective Date of Amendment (set out below), amend the subscription agreement made between Dow Jones Reuters Business Interactive LLC, which does business as **Factiva**, whose principal place of business is at Route 1 at Ridge Road, South Brunswick, NJ 08852, and the Subscriber (the "**Subscription Agreement**"), further details of which are set out below. In the event of any inconsistency between the Subscription Agreement and this Amendment the terms of this Amendment shall prevail.

**Description of the Agreement** - The Agreement, being the Subscription Agreement as amended by this Amendment, governs the terms and conditions under which the Service set out below is to be supplied to the Subscriber and the Subscriber is to pay for the Services.

**Details of the Parties**

| Party | Subscriber | Factiva |
|---|---|---|
| Legal Name | Lehman Brothers Holdings Inc. | Dow Jones Reuters Business Interactive LLC |
| Principal Contact | Patrick Kidney | Eddie Kim |
| Contact Address | 1301 6ᵗʰ Avenue, New York, NY 10019 | PO Box 300 Princeton, NJ 08543 |
| Telephone | (212)526-0646 | 212-277-9727 |
| Facsimile | (212)520-0687 | 212-277-9702 |
| E-mail | pkidney@lehman.com | eddie.kim@factiva.com |

Account Number *4LEN001600*

**Additional Fees and Services**

| Services | Term | Permitted Use | Fees per Term (USD) |
|---|---|---|---|
| Public Figures & Associates | June 30, 2006-July 31, 2007 | Enterprise | $125,000 |

| Effective Date of Amendment | June 30, 2006 | Description of amendment | Adding Public Figures and Associates (aka PFA) to existing contract |
|---|---|---|---|

We hereby agree to be bound by and comply with the terms and conditions of the Agreement (as amended by this document):

Signed for and on behalf of the *Subscriber*:

By (name): PATRICK COSTOS

Title: AUTHORIZED SIGNATORY

Date: 6/30/2006

Signed for and on behalf of *Factiva*:

By (name): ARTHUR RASSIAS

Title: DIRECTOR

Date: 7/25/2006

## Amendment to the Agreement

These additional terms and conditions are an amendment to the terms of the Agreement (as defined on the front page of the Amendment to which this schedule is appended).

1. **Interpretation**

1.1    The Services set out in this Agreement are in addition to the Fees and Services described in the Subscription Agreement.    Except as varied below, the terms and conditions of the Subscription Agreement shall apply to use of the Services and the Information contained therein.

1.2    Except as they may be varied by this Agreement, all capitalized terms shall have the same meaning when set out in this Agreement as defined in the Subscription Agreement.

1.3    The terms applying to the existing Services already being subscribed to under the Subscription Agreement are *unaffected by this Amendment.*

2.    **Term for the PFA Service**

(a)    The term of this Amendment shall commence on the Effective Date of Amendment and shall continue for thirteen months from that date (the "**Initial Term**"). Following the Initial Term, the term shall automatically renew for successive 12 month periods (each a "Renewal Term"). Either party may cancel any or all of the Services on written notice to the other no less than 1 month before the end of the then-current term (being the Initial Term or a Renewal Term). If the Subscriber is not able to sign a service agreement with Equifax by July 31, 2006, the Subscriber may, at its option, terminate this agreement, with written notice effective July 31, 2006. The Subscriber will owe $9,615.38 for the month of July, 2006. A pro-rata refund of any unused subscription fee will be refunded to the Subscriber.

Any notices under this section from Subscriber to Factiva must be sent by email or certified mail to the Factiva contact person set out on the front page of this Amendment. For the avoidance of doubt, the term of the Subscription Agreement is unaffected by this provision which shall only apply to the Services known as Public Figures and Associates.

# EXHIBIT A-3

## Dow Jones Indexes[SM]
### Enterprise Distribution Agreement

**THIS DOW JONES INDEXES[SM] ENTERPRISE DISTRIBUTION AGREEMENT** (the "**Agreement**"), dated as of October 30 2001 (the "Effective Date"), sets forth the terms and conditions under which Dow Jones & Company, Inc. ("**Dow Jones**") grants to the undersigned party ("**Vendor**") a non-exclusive license to receive and distribute the Indexes (as defined below) from components determined by Dow Jones from time to time.

  1.    **Definitions.** As used in this Agreement, the following terms shall have the following meanings when used in initial capital letters:

"**Affiliates**" shall mean any of Lehman Brothers Holdings Inc.'s subsidiaries which it holds, directly or indirectly, an ownership interest of more than 50%.

"**Averages**" shall mean The Dow Jones Averages[SM] currently consisting of the Dow Jones Industrial Average[SM], the Dow Jones Transportation Average[SM], the Dow Jones Utility Average[SM] and the Dow Jones Composite Average[SM], including Constituent Information, as compiled and distributed by Dow Jones from time to time; "**CBOT**" shall mean The Board of Trade of the City of Chicago;

"**Constituent Information**" shall mean company names, symbols and weightings of the components of the Indexes and divisors of the Indexes;

"**Delayed Data**" shall mean any data from the Indexes for which fifteen (15) minutes or more have elapsed from the time such data was received by Vendor and/or its Affiliates to the time such data was distributed by Vendor and/or its Affiliates;

"**Dow Jones Marks**" shall mean the names Dow Jones[SM], The Dow Jones Indexes[SM], The Dow Jones Averages[SM], Dow Jones Industrial Average[SM], DJIA[SM], Dow Jones Transportation Average[SM], DJTA[SM], Dow Jones Utility Average[SM], DJUA[SM], Dow Jones Composite Average[SM], The Dow Jones Global Indexes[SM], DJGI[SM] and the names of the component indexes of the Global Indexes;

"**End-of-Day Data**" shall mean any data from the Indexes distributed thirty (30) minutes or more after the close of trading on the underlying stock exchange corresponding to such data;

"**Global Indexes**" shall mean those Dow Jones Global Indexes[SM] (a) for which Real-Time Data is distributed as determined by Dow Jones, (b) displayed on Dow Jones' public web site or (c) included in Dow Jones Indexes' FTP site, including Constituent Information, as compiled and distributed by Dow Jones from time to time; "**Indexes**" shall mean the Averages and the Global Indexes;

"**Intellectual Property**" shall mean patents, copyrights, trade names, trademarks, service marks (including the Dow Jones Marks), trade secrets, formulas, methods, methodologies, and other property rights;

"**Real-Time Data**" shall mean any data from the Indexes for which less than fifteen (15) minutes have elapsed from the time such data was received by Vendor and/or its Affiliates to the time such data was distributed by Vendor and/or its Affiliates;

"**Sources**" shall mean third parties who provide any information or data included in the data elements or necessary for the calculation or maintenance of the Indexes;

"**Subscriber Agreement**" shall mean a written agreement between Vendor and a Subscriber governing such Subscriber's receipt and use of the Indexes, as required in Section 7;

"**Subscribers**" shall mean end users that receive any of the Indexes (including, without limitation, Constituent Information) from Vendor or its Affiliates;

"**Subvendors**" shall mean other data distributors that receive any of the Indexes from Vendor or its Affiliates;

"**Vendor Fees**" shall mean fees charged to Vendor pursuant to Section 4(a); and

"**Vendor Products**" shall mean the URLs of Vendor or its Affiliates listed on Exhibit A hereto (which list may be amended to add additional URLs of Vendor or its Affiliates, by written request to Dow Jones and subject to Dow Jones' prior written consent, which shall not be unreasonably withheld).

2.    **Grant of License.**

(a)    Subject to the terms and conditions hereof, Dow Jones hereby grants to Vendor and its Affiliates, under the term set forth below, a non-exclusive, non-transferable, worldwide license to (i) receive and distribute the Indexes in connection with the Vendor Products to Subscribers and/or Subvendors and (ii) use the Dow Jones Marks in connection with the Vendor Products as prescribed in Section 6. No other use of the Indexes or the Dow Jones Marks is permitted by Vendor and its Affiliates without the express written permission of Dow Jones. Vendor and its Affiliates understand and agree that it shall not (A) store data from the Indexes to create historical databases or for any purpose other than to facilitate the distribution of the Indexes in the Vendor Products; (B) distribute the Indexes in any formats other than End-of-Day Data and Delayed Data (i.e., this Agreement does <u>not</u> include the right to distribute the Real-Time Data); and (C) except as set forth in Exhibit A, use the Indexes or data from the Indexes as the basis of financial instruments or investment products without a separate written agreement with Dow Jones for such purpose. Notwithstanding the preceding sentence, Vendor and/or its Affiliates may, without additional express permission from Dow Jones, calculate the Indexes on a back-up basis only (<u>i.e.</u>, calculate the Indexes and use such calculation only in the event and to the extent that such calculation is not provided to Vendor and/or its Affiliates as set forth in Section 3 hereof). Lehman Brothers Holdings, Inc. will be responsible for any breach of the terms and conditions of this Agreement by its Affiliates.

(b)    Vendor shall have no right to disseminate or otherwise distribute the Real-Time Data or other real-time data of Dow Jones to Subscribers over the internet unless, in addition to the other requirements of this Agreement, Vendor's distribution system has sufficient controls to prevent unauthorized receipt and redistribution of the Indexes and, in particular, Vendor shall require that its Subscribers gain access to the Indexes by means of identification codes that are designed to block, and are effective at blocking, unauthorized access to the Indexes. Further, for the avoidance of doubt, Vendor shall not disseminate or display the Indexes, or cause the Indexes to be displayed or disseminated, in any format on any URL that is not identified on Exhibit A hereto or otherwise permitted by Dow Jones.

3.    **Receipt of the Indexes; Changes in Indexes or Distribution.**

(a)    Vendor shall receive the Real-Time Data via one or more data feeds supplied by: The Board of Trade of the City of Chicago, Attention: Vendor Technical Liaison, Market Data Services, 141 West Jackson Boulevard, Chicago, Illinois 60604, Tel.: (312) 341-7024, or by another authorized redistributor as determined by Dow Jones. Vendor acknowledges and agrees that Dow Jones distributes Real-Time Data only with respect to certain Global Indexes, which indexes are subject to Dow Jones' sole discretion. Vendor shall be responsible for changing the format of the data (i.e., from Real-Time

- 2 -

Data to Delayed Data) so that Vendor complies with the limited license granted pursuant to Section 2(a). Vendor shall bear all costs and expenses related to receiving transmission of the Indexes and changing the format as set forth in the preceding sentence as applicable.

(b)    Vendor acknowledges that Dow Jones, in its sole discretion, may choose to: (i) cease or suspend compiling, calculating, publishing or distributing values of any or all of the Indexes (including, without limitation, Constituent Information); (ii) compile, calculate, publish or distribute the Indexes in a different form; (iii) modify the Constituent Information (including, without limitaion, the components of the Indexes) or (iv) discontinue distributing the Indexes, in whole or in part, via CBOT or discontinue using existing communications facilities or modify such facilities' interface, speed, signal characteristics, or operational requirements. Dow Jones agrees to give Vendor (A) at least ninety (90) days notice prior to making any material changes in the speed, signal characteristics, or operational requirements, unless a malfunction in the system requires changes on an accelerated basis or an emergency situation precludes advance notice and (B) reasonable practicable notice prior to making any other change that materially affects the distribution of the Indexes to Vendor and/or its Affiliates. Vendor shall bear the responsibility and expense of making any changes to its service necessitated by Dow Jones' actions pursuant to this Section 3(b).

4.    **Vendor Fees.**    In consideration of the licenses granted herein, Vendor shall pay Dow Jones the undisputed Vendor Fees in the amounts and at the times set forth on Schedule 1 hereto. Vendor shall bear the responsibility of collecting all fees and charges, if any, that it chooses to impose on its Subscribers; provided, however, that Vendor shall be liable to Dow Jones for all undisputed Vendor Fees specified in Schedule 1 hereto irrespective of what fees and charges Vendor imposes on its Subscribers. As of one (1) year from the Effective Date of this Agreement, Dow Jones shall have the right to institute increases in Vendor Fees but no more than once annually at its sole discretion. Any such annual increase in Vendor Fees shall be made only upon at least ninety (90) days prior written notice to Vendor. No such annual increase with respect to the Delayed-Data shall exceed five percent (5%) of the Vendor Fees during the immediately preceding one-year period. Vendor shall remit payment to Dow Jones within thirty (30) days of receipt of invoice either (a) at the remittance address set forth below via check payable in United States dollars or (b) by wire transfer to Dow Jones' bank account in New York pursuant to transfer instructions set forth on Exhibit B hereto.

5.    **Inspections and Audits; Information.**    No more than once per year, Dow Jones shall have the right, at its expense, upon reasonable notice, during Vendor's normal business hours to inspect and audit Vendor's compliance with the terms of this Agreement. At Dow Jones' request, Vendor shall provide to Dow Jones, within thirty (30) days following each calendar year end, a written report setting forth the number of devices to which Vendor was distributing Indexes as of such year end, except that Vendor shall have no obligation to advise Dow Jones of the number of computer devices that receive the Indexes from Vendor via web site distribution only.

6.    **Intellectual Property.**

(a)    Vendor acknowledges and agrees that the Dow Jones Marks are famous, well-known and internationally recognized trade names, trademarks and service marks owned by Dow Jones. Vendor has no rights to such marks except for those rights set forth herein. Vendor recognizes the great value of the reputation and goodwill associated with the Dow Jones Marks and agrees that all goodwill associated with the Dow Jones Marks from the Vendor Products shall belong exclusively to Dow Jones. Vendor further acknowledges and agrees that (i) the Indexes, and the divisors, formulas and methods used to compute the Indexes, are the exclusive property of Dow Jones not within the public domain and are protected by copyright and (ii) but for this Agreement or any other written agreements between Vendor and Dow Jones, Vendor shall not have any rights with respect to, or rights to receive, any of the Indexes. Vendor will not contest the ownership or validity of any rights of Dow Jones in the Indexes or such

- 3 -

Intellectual Property relating thereto.

(b)    Vendor shall consistently provide clear attribution to Dow Jones in connection with any use of the Indexes hereunder in a form reasonably acceptable to Dow Jones.

(c)    Vendor shall not redistribute or otherwise commercially exploit the Indexes except as otherwise expressly provided herein. Vendor shall distribute the Indexes described herein only under the corresponding Dow Jones Marks.

(d)    If at any time Dow Jones is of the opinion that Vendor is improperly using the Indexes or any Intellectual Property of Dow Jones in connection with Vendor Products under the terms of this Agreement, Dow Jones shall give Vendor notice to that effect. Upon receipt of such notice, Vendor shall forthwith cease distributing any non-conforming Vendor Products, or any advertising and marketing material related thereto, and correct the defects to achieve compliance with all standards required by Dow Jones.

(e)    **CUSIP DATA.** Vendor agrees and acknowledges that it has been informed that the CUSIP Service, or any portion thereof that may be included in the Indexes being provided to Vendor in connection herewith, is and shall remain valuable intellectual property owned by, or licensed to, CUSIP Service Bureau, Standard & Poor's ("CSB") and the America Bankers Association ("ABA"), and that no proprietary rights are being transferred to Vendor in such materials or in any of the information contained therein. Vendor agrees that Vendor shall not publish or distribute in any medium the CUSIP Service or any information contained therein, or any portion thereof that may be included in the Indexes being provided to Vendor in connection herewith unless Vendor has entered into a separate agreement with CSB and/or the ABA allowing Vendor to do so. NEITHER CSB, ABA NOR ANY OF THEIR AFFILIATES MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY OF THE INFORMATION CONTAINED IN THE CUSIP SERVICE OR THE CUSIP DATABASE, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE. IN NO EVENT SHALL THE CSB, ABA OR ANY OF THEIR AFFILIATES PURSUANT TO ANY CAUSE OF ACTION HAVE ANY LIABILITY FOR ANY ERRORS OR OMISSIONS IN THE CUSIP DATABASE NOR SHALL THEY BE LIABLE FOR ANY DAMAGES, WHETHER DIRECT OR INDIRECT, SPECIAL OR CONSEQUENTIAL RESULTING THEREFROM. Vendor acknowledges and agrees that it may be required to obtain a license from CSB prior to receipt of the Indexes hereunder.

7.    **Subvendors and Subscribers.**

(a)    **Distribution to Subvendors.** Vendor shall not distribute any part of the Indexes to any Subvendor unless such Subvendor has entered into an agreement with Dow Jones and Vendor receives written approval from Dow Jones to commence such distribution.

(b)    **Subscriber Agreements.**

(i)    Except as otherwise provided in Section 7(b)(ii), before distributing the Indexes to any Subscriber, Vendor shall have entered into a Subscriber Agreement with such subscriber. Such Subscriber Agreement must contain provisions necessary (A) to effect the terms and limitations respecting Subscribers set forth in this Agreement (including, without limitation, in Sections 7(c) and 8), (B) for Subscriber to agree and acknowledge for itself the provisions agreed and acknowledged by Vendor for itself in Section 6(a), and (C) for Subscriber to agree that it will not copy, download, store, reproduce or further transmit or distribute the Indexes for commercial purposes in any type of format or by any means, including but not limited to the Internet, Intranet or other type of network. Upon request by Dow Jones, Vendor shall make available to Dow Jones copies of its Subscriber Agreements; provided,

- 4 -

however, that Vendor shall have no obligation to divulge any confidential or proprietary information. Vendor agrees to make all reasonable efforts to ensure that its Subscribers are not engaged in conduct inconsistent with the Subscriber Agreement, and Vendor shall promptly notify Dow Jones of the identity of any Subscriber who is not in compliance with the terms set forth in its Subscriber Agreement.

(ii)    Vendor shall not be required to put in place the Subscriber Agreement described in Section 7(b)(i) with Subscribers who receive only Delayed Data or End-of-Day Data via a web site so long as Vendor's terms and conditions of use set forth on Exhibit C hereto are posted on Vendor's web site (via hyperlink or otherwise) hereto.

(c)    **Right to Terminate Distribution.**  Dow Jones retains the right to direct Vendor to terminate distribution of the Indexes to any Subvendor or Subscriber effective upon thirty (30) days written notice for reasonable cause, unless such cause is cured within a 30-day period. The Subscriber Agreement, if applicable, shall contain a provision giving Dow Jones such right to terminate. Accordingly, upon written notice from Dow Jones, Vendor shall cease distributing the Indexes to such Subvendor or Subscriber as soon as practicable.

(d)    **Cooperation of Vendor.**  Vendor shall reasonably cooperate with Dow Jones to ensure that Subscribers are complying with the Vendor's Subscriber Agreement as it relates to the Indexes.

8.    **Limitation of Liability; Disclaimer of Warranties.**

(a)    EXCEPT IN CONNECTION WITH THE INDEMNIFICTION OBLIGATIONS OR DUE TO LOSS OR DAMAGE CAUSED BY WILFUL MISCONDUCT, NEITHER DOW JONES AND ITS AFFILIATES, ITS SOURCES, THE CBOT (OR OTHER DISTRIBUTION AGENT) AND ITS AFFILIATES, AND EACH OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES, AGENTS AND REPRESENTATIVES ("THE DOW JONES PARTIES") NOR VENDOR, SUBVENDOR AND SUBSCRIBER, AND EACH OF THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES, AGENTS AND REPRESENTATIVES ("THE VENDOR PARTIES") SHALL BE LIABLE TO THE OTHER PARTY FOR ANY LOSS OR DAMAGE, DIRECT, INDIRECT OR CONSEQUENTIAL, ARISING FROM (i) ANY INACCURACY OR INCOMPLETENESS IN, OR DELAYS, INTERRUPTIONS, ERRORS OR OMISSIONS IN THE DELIVERY OF, THE INDEXES OR ANY OTHER INFORMATION SUPPLIED TO VENDOR, SUBVENDORS OR SUBSCRIBERS ("THE INDEX DATA"), OR (ii) ANY DECISION MADE OR ACTION TAKEN BY VENDOR OR ANY SUBVENDOR OR SUBSCRIBER IN RELIANCE UPON THE INDEX DATA. EXCEPT FOR ANY INDEMNIFICATION OBLIGATIONS OR LOSS OR DAMAGE CAUSED BY WILLFUL MISCONDUCT, NEITHER THE VENDOR PARTIES NOR THE DOW JONES PARTIES SHALL BE LIABLE TO EACH OTHER FOR LOSS OF BUSINESS REVENUES, LOST PROFITS OR ANY PUNITIVE, INDIRECT, CONSEQUENTIAL, SPECIAL OR SIMILAR DAMAGES WHATSOEVER, WHETHER IN CONTRACT, TORT OR OTHERWISE, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  EXCEPT FOR INDEMNIFICATION OBLIGATIONS OR LOSS OR DAMAGE CAUSED BY WILLFUL MISCONDUCT, IN NO EVENT SHALL THE CUMULATIVE LIABILITY OF EITHER THE VENDOR PARTIES OR THE DOW JONES PARTIES ARISING OUT OF ANY LEGAL CLAIM IN ANY WAY CONNECTED TO THE INDEX DATA EXCEED THE VENDOR FEES PAID BY VENDOR HEREUNDER DURING THE TWELVE (12) MONTHS PRIOR TO THE INCIDENT GIVING RISE TO SUCH CLAIM.

(b)    VENDOR EXPRESSLY ACKNOWLEDGES THAT (OTHER THAN AS EXPRESSED IN SECTION 11 BELOW) THE DOW JONES PARTIES DO NOT MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, TO VENDOR OR ANY SUBVENDORS OR

- 5 -

SUBSCRIBERS WITH RESPECT TO THE INDEX DATA, INCLUDING, WITHOUT LIMITATION:
(i) ANY WARRANTIES WITH RESPECT TO THE TIMELINESS, SEQUENCE, ACCURACY,
COMPLETENESS, CURRENTNESS, MERCHANTABILITY, QUALITY OR FITNESS FOR A
PARTICULAR PURPOSE OF THE INDEX DATA OR (ii) ANY WARRANTIES AS TO THE
RESULTS TO BE OBTAINED BY VENDOR, ANY SUBVENDOR OR SUBSCRIBER, OR ANY
OTHER PERSON OR ENTITY IN CONNECTION WITH THE USE OF THE INDEX DATA.

(c)     Each Subscriber Agreement shall include the provisions of Sections 8(a) and 8(b).

**9.     Term; Termination.**  The term of this Agreement shall commence as of the Effective Date hereof and shall continue until terminated by either party upon not less than ninety (90) days prior written notice; provided, however, that, if either party violates any provision of this Agreement, the other party may terminate this Agreement, effective upon thirty (30) days written notice if such violation is not cured within such 30-day period; and provided, further, that, if Dow Jones exercises its right to increase the Vendor Fees pursuant to Section 4, Vendor may terminate this Agreement as of the effective date of such price increase by giving Dow Jones written notice of its desire to terminate the Agreement within thirty (30) days after its receipt of the notice from Dow Jones regarding the increase in the Vendor Fees.

**10.     Indemnification.**

(a)     Vendor shall defend, indemnify and hold harmless the Dow Jones Parties (as defined in Section 8(a)) from and against any and all judgments, damages, expenses, settlements, liabilities, costs, losses and other liabilities of any kind (including reasonable attorneys' and experts' fees and disbursements) that arises as a result of Vendor's breach of this Agreement or that directly relates to any Vendor Products, except insofar as such liability relates to a breach of this Agreement by Dow Jones or Dow Jones' willful misconduct.

(b)     Dow Jones shall defend, indemnify and hold harmless the Vendor Parties from and against any and all judgments, damages, expenses, settlements, liabilities, costs, losses and other liabilities of any kind (including reasonable attorneys' and experts' fees and disbursements) as a result of any claim, suit, action, litigation or proceeding by any third party that alleges that the Vendor Parties' use of the Dow Jones Marks or the Indexes in accordance with the terms and conditions of this Agreements violates, infringes, or otherwise misappropriates any third-party copyright, patent, trademark, service mark, trade secret or other proprietary right.

(c)     Any party seeking indemnification under this Section 10 shall promptly notify the indemnifying party in writing of any claim, action, suit, litigation or proceeding (but the failure to do so shall not relieve a the indemnifying party of any liability hereunder except to the extent such party has been materially prejudiced therefrom) and shall reasonably cooperate in the defense of such claim, action, suit, litigation or proceeding at the indemnifying party's expense.

(d)     In no event, however, may either party agree to any settlement of any claim or action for which it has agreed to provide indemnification under this Agreement that imposes any liability or obligation on the other party without that other party's prior written consent.

**11.     Right to Furnish.**  Dow Jones represents and warrants to Vendor that: (a) the license furnished by Dow Jones does not and will not violate, infringe or misappropriate any patent, published patent application, copyright, trade mark, service mark, trade secret or other intellectual property or industrial property rights of any third party or the laws or regulations of any governmental or judicial authority; (b) the Vendor Parties shall be entitled to use, possess and enjoy the benefit of the license covered hereunder subject to, and in accordance with, the terms of this Agreement; and (c) the Vendor

- 6 -

Parties' use, possession and enjoyment of the license in accordance with the terms of this Agreement shall not be adversely affected, interrupted or disturbed by Dow Jones or any entity asserting a claim under or through Dow Jones subject to, and in accordance with, the terms of this Agreement.

12.    **Force Majeure.** Each party's performance hereunder shall be excused without liability in the event of any event or contingency beyond the other party's reasonable control, including but not limited to: foreign or domestic embargoes; acts of God; the adoption or enactment of any law, ordinance, regulation, ruling, or order directly interfering with performance hereunder; fires; floods; explosions; strikes; or technological failures directly caused by one of the above force majeure events.

13.    **Headings.** The headings used herein are for convenience only and shall not be deemed to constitute a part hereof or to limit, characterize, or in any way affect the provisions of this Agreement.

14.    **Notices.** All notices and other communications under this Agreement shall be: (a) in writing; (b) delivered by hand (with receipt confirmed in writing), by registered or certified mail (return receipt requested), or by facsimile transmission (with receipt confirmed in writing), to the address or facsimile number set forth below the parties' signatures herein or to such other address or facsimile number as either party shall specify by a written notice to the other; and (c) deemed given upon receipt.

15.    **Severability.** If any court having competent jurisdiction shall determine that one or more of the provisions contained in this Agreement shall be unenforceable in any respect, then such provision shall be deemed limited and restricted to the extent that such court shall deem it to be enforceable, and as so limited or restricted shall remain in full force and effect. If any such provision or provisions shall be deemed wholly unenforceable, the remaining provisions of this Agreement shall remain in full force and effect.

16.    **Assignment.** This Agreement may not be assigned by either party without the prior written consent of the other party, which shall not be unreasonably withheld. Notwithstanding the foregoing, Vendor may assign this Agreement and any of its rights and/or obligations hereunder upon written notice to Vendor, to any of its Affiliates so long as Vendor remains liable to Dow Jones for its obligations and liabilities incurred hereunder or to an entity with or into which it is merged or consolidated or to which it sells all or substantially all its capital stock or assets, without the consent of Vendor. This Agreement shall be binding upon the parties' respective successors and assigns.

17.    **Survival.** This Section, Sections 6(a), 8, 9, 10, 11, 16, 17, 19, 20, 21 and 22, and those sections that by their nature are intended to survive, shall survive termination of this Agreement.

18.    **Entire Agreement; Waiver.** This Agreement represents the entire agreement between the parties with respect to the subject matter hereof, and supersedes any previous agreement or understanding between the parties, and no amendment hereof shall be effective unless in writing and signed by the parties hereto. No term or provision hereof shall be deemed waived and no breach consented to or excused, unless such waiver, consent or excuse shall be in writing and signed by the waiving party. Should either party consent, waive or excuse a breach by the other party, such shall not constitute a consent to, waiver of, or excuse of any other different or subsequent breach, whether or not of the same kind as the original breach.

19.    **Governing Law; Jurisdiction and Venue.** This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, USA, applicable to contracts made and performed in New York. Vendor and Dow Jones hereby agree and consent to the personal and exclusive jurisdiction and venue of the New York state courts and the United States District Court for the Southern District of New York.

- 7 -

**20.    Confidentiality.** Each party shall treat as confidential and shall not disclose or transmit to any third party (a) any non-public information obtained by a party as a result of this Agreement which relates to the past, present or future business activities of the providing party, its subsidiaries and affiliates or their respective employees, customers or third party contractors, including any information relating to the plans, pricing, methods, methodologies, processes, financial data, lists, customer information, apparatus, statistics, programs, research, development, information technology or related information, and (b) the terms and conditions of this Agreement (collectively, "Confidential Information"). Confidential Information shall not include (i) any information that is available to the public or to the receiving party hereunder from sources other than the providing party (provided that such source is not subject to a confidentiality agreement with regard to such information) or (ii) any information that is independently developed by the receiving party without use of or reference to information from the providing party. Notwithstanding the foregoing, either party may reveal Confidential Information to any regulatory agency or court of competent jurisdiction if such information to be disclosed is (A) approved in writing by the providing party for disclosure or (B) required by law, regulatory agency or court order to be disclosed by the receiving party, provided, if permitted by law, that prior written notice of such required disclosure is given to the providing party and provided further that the receiving party shall cooperate with the providing party to limit the extent of such disclosure.

**21.    No Publicity.** Dow Jones shall not use the name or marks, refer to, or identify "Lehman Brothers" or any Vendor entity in advertising or publicity releases, promotional or marketing materials, announcements, customer listings, testimonials, or advertising.

**22.    Employment Representation.** Dow Jones agrees and represents that it is an independent contractor and its personnel are not Vendor's agents or employees for federal, state and local tax purposes or any other purposes whatsoever, and are not entitled to any Vendor employee benefits. Dow Jones, and not Vendor, is solely responsible for the compensation of personnel assigned to perform services pursuant to this Agreement, and payment of workers' compensation, disability and other similar benefits, unemployment and other similar insurance, for withholding income and payroll taxes and for verifying the work eligibility of each person performing services hereunder, including the completion and maintenance of Form I-9, if applicable. Dow Jones will comply with all applicable requirements of Executive Order 11246, the Vietnam Veterans' Readjustment Assistance Act of 1974, as amended, the Rehabilitation Act of 1973, as amended, and the applicable implementing regulations and reporting requirements under each of the foregoing, each of which are incorporated herein by reference.

- 8 -

**IN WITNESS WHEREOF**, the signatory for each party has duly executed this Agreement on the date hereof and certifies that he/she has the authority to bind the party on behalf of whom he/she has signed.

**LEHMAN BROTHERS HOLDINGS INC.**
      (Vendor)

By: _____
      Name:    O Budd
      Title:    V. P.

**Vendor's Address:**
3 World Financial Center
New York, New York 10285


Attn:    Paula Hardy
Telephone:  (201) 524-4307
Fax:       (201) 528-4833
Email:  phardy@lehman.com
With a copy to:
          Global Purchasing Manager
          and General Counsel


**Billing Address:**

Expense Control Division
101 Hudson, 29th Floor
Jersey City, NJ 07302

**DOW JONES & COMPANY, INC.**

By: _Michael Petronella_
      Michael A. Petronella
      Managing Director
      Dow Jones Indexes

**VENDOR FEE AND REPORT
REMITTANCE ADDRESS:**
Dow Jones & Company, Inc.
Dow Jones Indexes
P.O. Box 300
Princeton, New Jersey 08543-0300
Attn: Donald A. Williams
Telephone:  (609) 520-7233
Fax:  (609) 520-7030
Email: don.williams@dowjones.com


**Ship to: (for FedEx, DHL, etc.)**

U.S. No. 1 at Ridge Road
Monmouth Junction, NJ 08852

- 9 -

enterprsedeod2
05-30-00

**Schedule 1**

**Vendor Fees**

   Pursuant to Section 4 of the Agreement, Vendor shall pay Dow Jones Vendor Fees of (i) U.S. $6,000 per year for receipt by the Vendor Parties of the Delayed Data and (ii) U.S.$0 per year for receipt by the Vendor Parties of the End-of-Day Data, which fees shall be payable quarterly in advance, but no earlier than the Effective Date.

- 10 -

## Exhibit A

## Description of Vendor Products

- lehman.com - Vendor's public web site
- lehmanlive.com - Vendor's extranet portal and employee intranet for use by professionals and non-professionals
- live.lehman.com - Vendor's extranet portal and employee intranet for use by professionals and non-professionals
- client.lehman.com - Vendor's extranet portal and employee intranet for use by professionals and non-professionals
- my.lehman.com – Vendor's employee intranet
- lehmanbank.com – Affiliates' retail mortgage and banking web site for use by professionals and non-professionals

Portfolio WebBench, Vendor's web-based application for portfolio analysis, will be on Vendor's password protected web site(s) as designated by Vendor.

- 11 -

## Exhibit B

### Dow Jones Wire Instructions

| | |
|---|---|
| ACCOUNT NAME: | Dow Jones & Company<br>Princeton, New Jersey |
| ACCOUNT NUMBER: | 140801942 |
| BANK NAME AND ADDRESS: | Chase Manhattan Bank<br>New York, NY  10004 |
| ACCOUNT NUMBER:<br>*(for domestic transfers)* | Fedwire ABA Number<br>021000021 |
| CHIPS UID NUMBER:<br>*(for international transfers)* | Swift Address<br>CHASUS33 |
| CHIPS PARTICIPANT: | 002 |

- 12 -

## Exhibit C

### Terms and Conditions of Vendor Products

- 13 -



Dow Jones Indexes
P.O. Box 300
Princeton, NJ 08543-0300

## VENDOR FEE NOTICE

July 17, 2008

Mr. Daniel Williams
Lehman Brothers Holdings Inc.
3 World Financial Center
New York, NY 10285

RE: Enterprise Distribution Agreement dated November 30, 2001
     Account Number: 00555-41N00432

Dear Mr. Williams,

I am writing to notify Lehman Brothers Holdings Inc. ("Lehman") of a fee increase pursuant to
Section 4 of the above-mentioned Agreement.

According to the Agreement, Lehman has rights to display Delayed Data and End-of-Day Data
on the following sites:

- www.lehman.com – Vendor's public web site
- www.lehmanlive.com, www.live.lehman.com, www.client.lehman.com
  www.my.lehamn.com and www.lehmanbank.com – Vendor's extranet portal and
  employee intranet sites

Pursuant to the conversations between Victoria James and Daniel Williams and Clair Barnes, we
understand that Lehman currently only requires rights to display Delayed Data on the following
two sites:

- www.lehman.com – Vendor's public web site
- www.lehmanstructuredinvestments.co.uk – Vendor's public web site

Therefore, the rights granted under the agreement and the Vendor Fees shall be according to the
attached Replacement Exhibit A "Description of Vendor Products" and Replacement Schedule I
"Vendor Fees" beginning November 1, 2008.  Please confirm Lehman's agreement with these
changes by having a duly authorized Lehman representative countersign this letter where
indicated below and return the original countersigned copy to my attention at Dow Jones Indexes.

These price changes are being implemented across the full range of our index services to support
the next phases in index development.

The years ahead offer terrific opportunities to develop new ways for investors to access the
markets and allocate risk.  As a real-time feed customer, you'll be among the very first to benefit
and profit from the new kinds of indexes we develop.  We appreciate your business and look
forward to our continued partnership in the years ahead.

As always, please contact me with any questions you have or to let us know how we may be of service.

Kind regards,

Erica L. Day
Dow Jones Indexes

Understood and Accepted:

Lehman Brothers Holdings Inc.

By:

Name:

Title:

Replacement Exhibit A

Description of Vendor Products

Vendor may display Delayed Data on publicly accessible (i.e., non-password protected) pages, in a chart or market box, on Vendor's site www.lehman.com, and on Vendor's site www.lehmanstructuredinvestments.co.uk., so long as neither site is a URL related to: (i) a financial institution that makes any of the Indexes available to a user (i.e., an individual person) to whom a password has been issued to access any of the Indexes, (ii) a broker dealer, (iii) an Internet brokerage firm, (iv) a securities exchange, or (v) an electronic communications network (ECN). .

Vendor is not required to implement Subscriber Agreements with respect to users receiving only Delayed Data through one of the Vendor sites listed above, so long as the Delayed Data is displayed to such users only in a publicly accessible area of such sites, and each page displaying the Delayed Data contains a clear hyperlink to Vendor's web site terms of use.

Replacement Schedule 1

Vendor Fees

With respect to the display of the Delayed Data on Vendor's sites listed on Replacement Exhibit A, Vendor Fees shall be: $4,500.00 per site per year, paid quarterly in advance.  To be clear, the Vendor Fees for the two sites listed in Exhibit A shall be $9,000 per year.

- All dollar amounts are stated in U.S. dollars (at the applicable exchange rate prevailing at the time payment is due, as published in The Wall Street Journal).  All amounts are stated net of any withholding taxes (i.e., the amount stated is the amount to be received by Dow Jones after payment of any withholding taxes).  All amounts shall be non-refundable.

Vendor shall not be required to report with respect to the usage of the Indexes described in Replacement Exhibit A.