# COSCAN

*0248-0300-2.1*
*Master File - Owner Contr*
*Gables Marquis*
*(Right side)*
*11-6-05*

November 16, 2005

VIA FACSIMILE
(561) 368-0775

Dan Kaskel
Daniel A. Kaskel, P.A.
7284 W Palmetto Park Road, Suite 108
Boca Raton, Florida 33433

Re:  Lehman Bros. Consent of Contractor
     Marquis Gables

Dear Dan,

Attached please find a copy of the executed Consent of Contractor in connection with the above-referenced matter. I understand from your email to Mike Utley that you are going to substitute the first two pages with identical pages with the dollar amount of the loans filled in when you know them. I further understand from your email that the amounts of the loans are approximately $44.1 Million and $9.0 Million, respectively.

Sincerely,

Michael R. Neal, President
Coscan Construction, LLC

## CONSENT AND AGREEMENT OF GENERAL CONTRACTOR

THIS CONSENT AND AGREEMENT OF GENERAL CONTRACTOR (this "**Agreement**") is made as of the 14th day of November, 2005, by GABLES MARQUIS, L.L.C., a Florida limited liability company, having its principal place of business at 7284 West Palmetto Park Road, Suite 106, Boca Raton, Florida 33433 ("**Borrower**"), to LEHMAN BROTHERS HOLDINGS INC., doing business as Lehman Capital, a division of Lehman Brothers Holdings Inc., a Delaware corporation, having an office at 399 Park Avenue, 8th Floor, New York, New York 10022 ("**Lender**"), and is acknowledged and consented to by COSCAN CONSTRUCTION, LLC, a **Florida limited liability Company**, having its principal place of business at 5555 Anglers Avenue, Suite 1A, Fort Lauderdale, Florida 33312 (the "**General Contractor**").

## RECITALS:

The Borrower represents and warrants the truth of the following recitals:

A. **GABLES MARQUIS, L.L.C.**, a Florida limited liability company ("**Owner**"), is the owner of a fee simple interest in that certain parcel of real property located at 3232 Coral Way in the City of Miami, State of Florida, and more particularly described in Exhibit A attached hereto (said real property being herein collectively referred to as the "**Land**"; the Land, together with all structures, buildings and improvements now or hereafter located on the Land, being collectively referred to as the "**Property**").

B. GABLES MARQUIS I, L.L.C., a Delaware limited liability company ("Mezzanine Borrower"), is the sole member of, and holds 100% of the membership interests in, the Owner.

C. GABLES MARQUIS II, L.L.C., a Delaware limited liability company is a Member of, and holds 100% of the membership interests in, Mezzanine Borrower.

D. ELIE BERDUGO a/k/a Elie Berdougo, is the sole member of, and holds 100% of the membership interests in, Member.

E. Lender is prepared to make a loan (the "**Loan**") to Borrower in the principal amount of [$_____], pursuant to that certain loan agreement (the "**Loan Agreement**") of even date herewith between Borrower and Lender to be evidenced by that certain secured promissory note of even date herewith in the principal amount of [$_____] made by Borrower to Lender (the "**Note**") and secured by, *inter alia*, a certain Amended and Restated Mortgage, Assignment of Leases and Rents, Security Agreement, Fixture Filing and Notice of Future Advance, dated as of the date hereof, as more particularly described on Schedule 1 attached hereto and made a part hereof, granted by Owner in favor of the Lender ("**Security Instrument**"; the Security Instrument, together with any and all other documents which evidence and secure the Loan, are collectively referred to herein as the "**Loan**

{10328234:1}SL

Documents") on the Owner's interest in the Property and such other real and personal property covered by such Security Instrument.

F. **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an address at 399 Park Avenue, 8th Floor, New York, New York 10022, as administrative agent (including, any of its successors and assigns, "Agent") for itself and other Lenders signatory hereto (collectively, together with any such other co-lenders as may exist from time to time, the "**Mezzanine Lender**") has simultaneously herewith made, or intends to make, a loan of up to [$_____] to Mezzanine Borrower (the "**Mezzanine Loan**") which loan is evidenced by that certain Secured Promissory Note dated as of the date hereof (the "**Mezzanine Note**") and secured by, among other things, those certain Membership Pledge and Security Agreements of even date herewith given by each Pledgor (as defined in pursuant to that certain loan agreement (the "**Mezzanine Loan Agreement**") of even date herewith between Mezzanine Borrower and Mezzanine Lender) in favor of Mezzanine Lender (the "**Pledge Agreements**").

G. Pursuant to that certain Standard Form of Agreement Between Owner and Contractor made as of April 11, 2005, between Owner and General Contractor (the "**Construction Contract**"), a true and correct copy of which is attached hereto as Exhibit B, including all Change Orders executed to date, but not including Change Orders in process which shall, never the less, be part of the Construction Contract when added. Owner employed General Contractor exclusively to render certain construction and construction management services in connection with the Project (as defined herein) and General Contractor is entitled to certain fees (the "**General Contractor Fees**") thereunder.

H. Lender requires as a condition to the making of the Loan that Borrower and General Contractor enter into this Agreement.

## AGREEMENT:

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Definitions**. All capitalized terms used herein but not otherwise defined herein shall have the meaning ascribed to such terms in the Loan Agreement. As used in this Agreement, the following terms shall have the following meanings:

The term "**Project**" means the construction of "Gables Marquis Condominium", a mixed-use luxury residential condominium complex consisting of two (2) buildings, the first building containing eight (8) residential units and the second building, (being a twenty (20) story building including three stories of parking) containing one hundred sixty-nine (169) Residential Units and up to five (5) retail units, with approximately 332 parking spaces, all in accordance with and as more particularly set forth in the Plans and Specifications.

The term "**Plans and Specifications**" means, collectively, (i) the sets of design plans and specifications for the Project prepared by **COHEN, FREEDMAN, ENCINOSA & ASSOC. ARCHITECTS P.A.** (including any successor architect thereto, the "**Architect**") and

its consultants and completed as of the date hereof, to the extent such plans and specifications have been reviewed and approved by Lender and are described in Exhibit E to the Loan Agreement (the "**Existing Plans and Specifications**"), but which may have been further defined in accordance with supplements issued on the Project after the date of the documents which constitute the Existing Plans and Specifications and (ii) the sets of design plans and specifications to be completed by (a) the Architect and its consultants and (b) any subcontractor, pursuant to a design-build subcontract for the mechanical, plumbing, electrical and fire protection systems for the Project (the plans and specifications referred to in (b) above are referred to herein as "**Design-Build Plans and Specifications**"), for the remainder of the Project not covered by the Existing Plans and Specifications as reviewed and approved by Lender in accordance with the terms of the Loan Agreement. The term also includes any material modification of any of those plans, maps, sketches, diagrams, surveys, drawings, specifications or lists of materials if the modification is in writing and is initialed by Lender and Borrower or Architect.

The term "**New Improvements**" means all structures, buildings and improvements located on the Property, as same shall exist upon the completion of the Project in accordance with the Plans and Specifications.

The term "**Business Day**" means any weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York, New York, are authorized by law to be closed.

2. **Estoppel**. Each of General Contractor and Borrower represents and warrants for itself that (a) the Construction Contract is in full force and effect and has not been assigned, (b) neither General Contractor, Owner nor Borrower is in default under any of the terms, covenants or provisions of the Construction Contract and General Contractor knows of no event which, but for the passage of time or the giving of notice or both, would constitute an event of default under the Construction Contract, (c) neither General Contractor, Owner nor Borrower has commenced any action or given or received any notice for the purpose of terminating the Construction Contract and (d) all fees and other sums currently due to General Contractor under the Construction Contract have been paid in full.

3. **Borrower's Covenants**. Borrower hereby covenants with Lender that until such time as all outstanding amounts due under the Loan are paid in full: (a) Borrower shall not, and shall not permit Owner to, transfer the responsibility for construction services, and the management thereof, to be rendered pursuant to the Construction Contract from General Contractor to any other person or entity without prior written notification to Lender and the prior written consent of Lender, which consent shall not be unreasonably withheld by Lender; (b) Borrower shall not, and shall not permit Owner to, terminate or amend any of the terms or provisions of the Construction Contract without the prior written consent of Lender, which consent shall not be unreasonably withheld by Lender; and (c) Borrower shall, and shall cause Owner to, in the manner provided for in this Agreement, give notice to Lender of any notice or information that Borrower or Owner receives which indicates that General Contractor is terminating the Construction Contract or that General Contractor is otherwise discontinuing its construction and/or construction management services. Owner executes this Agreement in order to consent to the performance of the terms of this Agreement by General Contractor.

4. **Agreement by Borrower and General Contractor**.

(a) Borrower and General Contractor hereby agree that upon the occurrence of an Event of Default (as defined in the Loan Agreement) under any of the Loan Documents, and at the option of Lender, exercised by written notice to Borrower and General Contractor within five (5) days of such notice of Event of Default Lender may exercise its rights under this Agreement and may immediately terminate, or direct Borrower to immediately terminate, the Construction Contract. In the event the Construction Contract shall be terminated as aforesaid, General Contractor shall not look to Lender, nor shall Lender be liable for payment of any termination fee or penalty, or for payment of General Contractor Fees for the period prior to such termination unless Lender has specifically agreed in writing to pay such General Contractor Fees.

(b) Upon written request by Lender, General Contractor shall deliver within ten (10) Business Days of delivery of such request, a complete set of the Design-Build Plans and Specifications to Lender, at the cost of Lender, but such cost shall be limited to the actual cost of duplicating such Design-Build Plans and Specifications. However, Lender shall defend, indemnify and hold harmless, General Contractor, its employees, agents, subcontractors, directors, and managers from and against any and all claims, causes of action, damages or costs (including attorneys' fees, court costs, expert witness fees, and appellate fees and costs of all levels) from any use of any Design-Build Plans and Specifications which are provided by the General Contractor in accordance with the foregoing sentence.

5. **Lender's Right to Replace General Contractor**. In addition to the foregoing, in the event that General Contractor becomes insolvent, Lender may exercise its rights under this Agreement and direct Borrower to cause Owner to terminate the Construction Contract in accordance with the terms of the Construction Contract and to replace General Contractor with a general contractor or construction manager acceptable to Lender in Lender's sole and absolute discretion.

6. **Receipt of General Contractor Fees**. Borrower and General Contractor hereby agree that General Contractor shall not collect, nor be entitled to receive, from Lender any General Contractor Fees or other fee payable to General Contractor under the Construction Contract and General Contractor shall not be obligated to continue performance under the Construction Contract for and during any period of time after General Contractor has been notified by Lender that any Event of Default has occurred and is continuing; provided, however, that (i) General Contractor shall not be obligated to return or refund to Lender any General Contractor Fee or other fee already received by General Contractor prior to the occurrence of the Event of Default, and to which General Contractor was entitled under this Agreement; and (ii) upon receipt of written notice from Lender that an Event of Default has occurred under any of the Loan Documents, but subject to the terms of Section 7(b)(ii) hereof, General Contractor shall be entitled to immediately suspend all work.

7. **Consent and Agreements of General Contractor**.

(a) General Contractor hereby acknowledges and consents to this Agreement and agrees that General Contractor will act in conformity with the provisions of this Agreement and Lender's rights hereunder or otherwise related to the Construction Contract.

General Contractor acknowledges that Lender is obligated only to the Borrower and to no other person or entity, unless otherwise provided by law. General Contractor is executing this Agreement to induce Lender to advance funds under the Loan Agreement, and General Contractor understands that Lender would not do so but for the execution and delivery of this Agreement by General Contractor.

(b)   General Contractor hereby covenants and agrees as follows:

(i)   During the Project as contemplated by the Loan Agreement, upon the request of Lender and at Lender's costs, the General Contractor will make available to Lender copies of all correspondence to or from Borrower, Owner or the subcontractors, and all other documentation and written instruments and reports, including all Design-Build Plans and Specifications, prepared for or by General Contractor with respect to the Project.

(ii)   Upon receipt of written notice from Lender that an Event of Default has occurred under any of the Loan Documents and Lender's agreement to continue with the construction of the Project by General Contractor, and provided that Lender has not exercised its termination rights as provided for under Section 4 of this Agreement, General Contractor shall continue performance on the Lender's behalf under the Construction Contract in accordance with the terms thereof, provided that General Contractor shall be reimbursed in accordance with the Construction Contract for all work, labor and material by General Contractor in accordance with the terms of the Construction Contract, whether arising before or after such notification by the Lender.

(iii)   In the event Owner defaults in making any payment or in performing any other obligation under the Construction Contract, General Contractor shall not, subject to subparagraph (B) herein, exercise any right under the Construction Contract which entitles General Contractor to terminate the Construction Contract, or otherwise discontinue rendering construction or construction management services pursuant to the Construction Contract and, if General Contractor claims such an Owner default, General Contractor shall give Lender written notice of such default claim in the manner provided for in this Agreement within five (5) Business Days of General Contractor making such default claim ("**Notice of Default**"). After Notice of Default is given, Lender, at its option, may require the General Contractor to continue its performance on Lender's behalf under the Construction Contract in accordance with the terms thereof by giving General Contractor written notice ("**Notice to Continue**") as provided herein, provided that:

(A)   General Contractor shall be reimbursed in accordance with the Construction Contract, for all work, labor, and material provided, whether before or after said notice. In the event that Lender gives notice of its intention to have the General Contractor continue performance under the Construction Contract, Lender shall be bound to the General Contractor to the extent that the Borrower was formerly bound to General Contractor and General Contractor shall be bound to Lender as General Contractor was formerly bound to the Borrower.

(B)   If General Contractor does not receive such Notice to Continue within two (2) Business Days after Notice of Default is given by

SL{10328234:1}                                    5

General Contractor, General Contractor shall have no further obligation to Lender under this Agreement.

(C) General Contractor shall not perform work under any prospective change order involving an adjustment to the Construction Contract of more than $200,000 or thirty (30) days adjustment to the Construction Contract Completion date without first securing Lender's written consent to such change order. Lender shall promptly give General Contractor written notice of approval or rejection thereof..

8. **Governing Law**. This Agreement shall be governed, construed, applied and enforced in accordance with the laws of the State of Florida and the applicable laws of the United States of America Venue in any dispute arising out of this Agreement shall be in Miami, Dade County Florida.

9. **Notices**. All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery or refusal of delivery, if delivered in person, (ii) one (1) Business Day (hereinafter defined) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Borrower:   Gables Marquis, L.L.C.
                  c/o E.B. Developers, Inc.
                  7284 West Palmetto Park Road, Suite 106
                  Boca Raton, Florida 33433
                  Attention: Mr. Richard Schuerger

with a copy to:   Greenberg Traurig, P.A.
                  1221 Brickell Avenue
                  Miami, Florida 33131
                  Attention: Ralph B. Bekkevold, Esq.

with a copy to:   Daniel Kaskel, Esq.
                  7284 West Palmetto Park Road
                  Suite 108
                  Boca Raton, Florida 33433

with a copy to:   Kodsi Law Firm
                  701 West Cypress Creek Road
                  Suite 303
                  Fort Lauderdale, Florida 33309
                  Attention: Steven Amster, Esq.

If to Lender:     Lehman Brothers Holdings Inc.
                  399 Park Avenue, 8th Floor

SL{10328234:1}                          6

|  |  |
|---|---|
|  | New York, New York  10022<br>Attention: Mr. Michael J. Zito<br>MTS No.: VZ94<br>Asset No.: 1122901 |
| With a copy to: | Windels Marx Lane & Mittendorf, LLP<br>156 West 56th Street<br>New York, New York  10019<br>Attention: James J. Thomas, Esq. |
| With an additional copy to Servicer: | TriMont Real Estate Advisors, Inc.<br>3424 Peachtree Road, N.E. – Suite 2200<br>Atlanta, Georgia 30326<br>Attention: Mr. J. Gregory Winchester<br>MTS No.: VZ94<br>Asset No.: 1122901 |
| If to General Contractor: | Coscan, Construction, LLC<br>5555 Anglers Avenue, Suite 1A<br>Fort Lauderdale, Florida 33312<br>Attention: Michael R. Neal, President |
| with a copy to: | Michael E. Utley, P.C.<br>2101 Rexford Road, Suite 200E<br>Charlotte, North Carolina 28211 |

or addressed as such party may from time to time designate by written notice to the other parties. Any party by notice to the other parties may designate additional or different addresses for subsequent notices or communications.

10. **No Oral Change**. This Agreement, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower, Lender or General Contractor, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

11. **Liability**. If Borrower or General Contractor consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Borrower, Lender and General Contractor and their respective successors and assigns forever.

12. **Inapplicable Provisions**. If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

SL{10328234:1}                                                                7

13. **Headings, Etc.** The headings and captions of various paragraphs of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

14. **Duplicate Originals; Counterparts**. This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

15. **Number and Gender**. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

16. **Miscellaneous**. (a) Wherever pursuant to this Agreement (i) Lender exercises any right given to it to approve or disapprove, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

(b) Wherever pursuant to this Agreement it is provided that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, legal fees and disbursements of Lender, whether retained firms, the reimbursement for the expenses of in-house staff or otherwise.

(c) This Agreement and the other Loan Documents and the Obligations may, at the option of Lender, at any time until the same shall be fully paid and satisfied, be split or divided into two or more agreements; provided Borrower will only be obligated to make payments to a single servicer no matter how many note holders exist. To that end, Borrower and the General Contractor, upon written request of Lender, shall execute and deliver to Lender and/or its designee or designees (i) substitute agreements containing terms, provisions and clauses substantially similar to those contained herein and (ii) such other documents and instruments as may be required by Lender, provided Borrower's payment and other obligations under the Loan Documents, and the General Contractor's obligations under this Agreement, are not affected, except to a de minimis extent, and Borrower is not required to make payments to more than a single loan servicer.

(d) Borrower and General Contractor each acknowledges that Lender may securitize the Note or any replacement notes, or otherwise sell, assign, transfer or convey, by pledge or otherwise, the Note or any replacement notes and all or any portion of the Lender's interest therein, or in the Loan evidenced by the Loan Documents, to third parties. In such event, in order to maximize the proceeds of such securitization or other sale, assignment, transfer or conveyance, Borrower and General Contractor shall fully cooperate with Lender, provided same does not change any material or economic terms of this Agreement or the other Loan

Pg 10 of 15

Documents, or otherwise materially increase the obligations, or materially decrease the rights, of Borrower and General Contractor pursuant to this Agreement and the other Loan Documents.

(e)     All third-party costs and expenses incurred by Lender in connection with a transaction contemplated by subparagraphs (c) and (d), shall be paid by Lender except that Lender shall have no obligation to pay any costs and expenses which Borrower would be otherwise obligated to pay pursuant to the Loan Agreement and the other Loan Documents had such transactions not occurred.

**[Remainder of Page Intentionally Left Blank;
Signature Page to Follow]**

**(Signature Page to Consent and Agreement of General Contractor)**

**IN WITNESS WHEREOF** the undersigned have executed this Agreement as of the date and year first written above.

**BORROWER:**

**GABLES MARQUIS, L.L.C.,**
a Florida limited liability company

By: _____
    Name: Elie Berdugo, a/k/a Elie Berdougo
    Title: President

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,**
a Delaware corporation

By: _____
    Name:
    Title:    Authorized Signatory

**GENERAL CONTRACTOR:**

**COSCAN CONSTRUCTION, LLC,**
a _Florida_ limited liability company

By: _/s/_ _____
    Name: Michael R. Neal
    Title: President

**(Signatures continue on following page)**

{10328234:1}SL

**(Signature Page to Consent and Agreement of General Contractor, continued)**

## OWNER:

**GABLES MARQUIS, L.L.C.,**
a Florida limited liability company

By: _____
    Name:  Elie Berdugo, a/k/a Elie Berdougo
    Title:  President

## **EXHIBIT A**

[Legal Description of Property Attached.]

A portion of Lots 4, 5, 6, 35, 36, 37, 38, 39, and 40, Block 4, AMENDED PLAT OF MIAMI SUBURBAN ACRES, according to the plat thereof, as recorded in Plat Book 4, at Page 73 of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Begin at the Southeast corner of said Lot 39, Block 4; thence North 90 degrees 00 minutes 00 seconds West along the South line of said Lots 38 and 39 for 100.03 feet to the Southwest corner of said Lot 38, also being the Southeast corner of said Lot 37; thence North 00 degrees 02 minutes 47 seconds East along the West line of said Lot 38, also being the East line of said Lot 37 for 10.00 feet; thence North 90 degrees 00 minutes 00 seconds West along a line parallel with and 10.00 feet North of the South line of said Lots 35, 36, and 37 for 150.04 feet to a point on the West line of said Lot 35; thence North 00 degrees 02 minutes 05 seconds East along said West line of Lot 35, and the West line of said Lot 6 for 254.97 feet to a point on a line that is 35.00 feet South of the North line of said Lot 6; thence South 89 degrees 59 minutes 48 seconds East along said line that is 35.00 feet South of the North line of Lot 6 for 50.03 feet to a point on the East line of said Lot 6, also being the West line of said Lot 5; thence North 00 degrees 02 minutes 05 seconds East along said East line of Lot 6 and said West line of Lot 5 for 1.32 feet to a point on a line that is 50.00 feet South of and parallel with the North line of the Northwest 1/4 of Section 16, Township 54 South, Range 41 East for 100.06 feet to a point on the East line of said Lot 4; thence South 00 degrees 02 minutes 47 seconds West along said East line of Lot 4 for 116.34 feet to the Southeast corner of said Lot 4; thence South 89 degrees 59 minutes 54 seconds East along the North line of said Lots 38 and 39, for 100.05 feet to the Northeast corner of said Lot 39, also being the Northwest corner of said Lot 40; thence South 00 degrees 03 minutes 16 seconds West along said West line of said Lot 40, also being said East line of Lot 39 for 50.00 feet; thence South 89 degrees 59 minutes 54 seconds East along a line 50.00 feet South of and parallel with the North line of said Lot 40 for 46.89 feet; thence South 00 degrees 04 minutes 10 seconds East along said line that is 35.00 feet West of and parallel with the East line of the Northwest 1/4 of Section 16, Township 54 South, Range 41 East for 49.98 feet; thence North 90 degrees 00 minutes 00 seconds West along a line 50.00 feet North of and parallel with the South line of said Lot 40 for 47.00 feet to a point on said West line of Lot 40 and said East line of Lot 39; thence South 00 degrees 03 minutes 16 seconds West along said West line of Lot 40 and said East line of said Lot 39 for 50.00 feet to the Point of Beginning.

## **EXHIBIT B**

**GENERAL CONTRACTOR'S CONSTRUCTION CONTRACT**

[Attached.]

{10328234:1}                                B-1

From: Origin ID: (954)620-1000
julie Hynds
COSCAN HOMES
5555 ANGLERS AVE., SUITE 1

FORT LAUDERDALE, FL 33312



Ship Date: 16NOV05
ActWgt: 1 LB
System#: 2252699/INET2300
Account#: S ********

REF: Gables Marquis

Delivery Address Bar Code

SHIP TO: (212)237-1039    BILL SENDER
**David Bass**
**Windels Marx Land Mittendorf, LLP**
**156 West 56th Street**

**New York, NY 10019**

**PRIORITY OVERNIGHT**                    **THU**
                                          Deliver By:
TRK#  7902 2413 0750   FORM 0201          17NOV05
                                   EWR    A1

10019   -NY-US
                        **Z2 QNYA**



Shipping Label: Your shipment is complete
1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.