IN THE CIRCUIT COURT FOR THE ELEVENTH JUDICIAL CIRCUIT OF FLORIDA
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

LEHMAN BROTHERS HOLDINGS INC., )
a Delaware corporation, )
                                   )
               Plaintiff, )
v. )     **08-21804 CA 05**
                                     )
GABLES MARQUIS, L.L.C., a Florida limited liability )  CASE NO.
company, URBANISM-CORAL WAY, L.L.C., a )  DIVISION
Florida limited liability company, COSCAN )
CONSTRUCTION, LLC, a Florida limited liability )
company, G & E FLORIDA CONTRACTORS, INC., a )
Florida corporation, TECHCRETE ARCHITECTURAL )    **THE ORIGINAL FILED**
PRECAST, INC., a Florida corporation, CAYMAN )
NATIONAL MANUFACTURING AND )    **ON**  APR 17 2003
INSTALLATION, INC., a Florida corporation, )    **IN THE OFFICE OF**
AMERICAN CUTTING AND DRILLING )    CIRCUIT COURT DADE CO.
COMPANY, a Florida corporation, MIAMI WALL )    CIVIL DIVISION
SYSTEMS, INC., a Florida corporation, DILLON )
POOLS, INC., a Florida corporation, PROFESSIONAL )
PLUMBING CORP., a Florida corporation, EASTERN )
WASTE SYSTEMS, INC., a Florida corporation, )
FORTIN, LEAVY, SKILES, INC., a Florida )
corporation, MERIT FLOORS, INC., a Florida )
corporation, ARC ONE, LLC, a Delaware limited )
liability company, TARMAC AMERICA LLC, a )
Delaware limited liability company, PARADISE )
AWNINGS CORPORATION, a Florida corporation, )
CENTRAL FLORIDA EQUIPMENT RENTALS INC., )
a Florida corporation, PERMACO, INC., a Florida )
corporation d/b/a Perla Lichi Design, )
THYSSENKRUPP ELEVATOR CORPORATION, a )
Delaware corporation, and IBA CONSULTANTS, INC., )
a Florida corporation, )
                                     )
               Defendants. )
_____/ )

## COMPLAINT

    Plaintiff, LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation

("Lehman"), by and through its undersigned counsel, sues Defendants, GABLES MARQUIS,

L.L.C. ("Borrower"), URBANISM - CORAL WAY, L.L.C. ("Urbanism"), COSCAN
CONSTRUCTION, LLC ("Coscan"), G & E FLORIDA CONTRACTORS, INC. ("GEFC"),
TECHCRETE ARCHITECTURAL PRECAST, INC. ("Techcrete"), CAYMAN NATIONAL
MANUFACTURING AND INSTALLATION, INC. ("Cayman"), AMERICAN CUTTING
AND DRILLING COMPANY ("American Cutting"), MIAMI WALL SYSTEMS, INC.
("Miami Wall"), DILLON POOLS, INC. ("Dillon Pools"), PROFESSIONAL PLUMBING
CORP. ("Professional Plumbing"), a EASTERN WASTE SYSTEMS, INC. ("EWS"), FORTIN,
LEAVY, SKILES, INC. ("Fortin Leavy"), MERIT FLOORS, INC. ("Merit Floors"), ARC ONE,
LLC ("Arc One"), TARMAC AMERICA LLC ("Tarmac"), PARADISE AWNINGS
CORPORATION ("Paradise Awnings"), CENTRAL FLORIDA EQUIPMENT RENTALS INC.
("Central Florida Equipment"), PERMACO, INC. ("Permaco"), THYSSENKRUPP
ELEVATOR CORPORATION ("Thyssenkrupp"), and IBA CONSULTANTS, INC. ("IBA")
and alleges:

## NATURE OF CLAIM

1.      This is an action (a) to foreclose certain liens and security interests in real and
personal property located in Miami-Dade County, Florida (the "Mortgaged Property"), and
(b) for damages under the promissory note secured by such liens and security interests.

## GENERAL ALLEGATIONS

2.      Lehman is a corporation organized under the laws of the State of Delaware.

3.      Borrower is a Florida limited liability company.

4.      Urbanism is a Florida limited liability company.

5.    Coscan is a Florida limited liability company.

6.    GEFC is a Florida corporation.

7.    Techcrete is a Florida corporation.

8.    Cayman is a Florida corporation.

9.    American Cutting is a Florida corporation.

10.    Miami Wall is a Florida corporation.

11.    Dillon Pools is a Florida corporation.

12.    Professional Plumbing is a Florida corporation.

13.    EWS is a Florida corporation.

14.    Fortin Leavy is a Florida corporation.

15.    Merit Floors is a Florida corporation.

16.    Arc One is a Delaware limited liability company.

17.    Tarmac is a Delaware limited liability company.

18.    Paradise Awnings is a Florida corporation.

19.    Central Florida Equipment is a Florida corporation.

20.    Permaco is a Florida corporation.

21.    Thyssenkrupp is a Delaware corporation.

22.    IBA is a Florida corporation.

23.    On or about November 17, 2005, Lehman and Borrower entered into a Construction Loan Agreement (the "Loan Agreement"), wherein Lehman agreed to make a loan to Borrower in the principal amount of $46,842,839.49 (the "Loan"). A true and complete copy of the Loan Agreement is attached hereto as **Exhibit "A."**

24.    On or about November 17, 2005, Borrower, executed and delivered to Lehman a Promissory Note in the principal amount of $46,842,839.49 (the "Note"). A true and complete copy of the Note is attached hereto as **Exhibit "B."**

25.    On or about November 17, 2005, as a part of the same transaction evidenced by the Loan Agreement and Note, and as a requirement of Lehman in making the Loan, Borrower executed and delivered to Lehman a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement (the "Mortgage"), securing payment of the Loan and mortgaging and pledging as security the real and personal property described therein, which (i) was then owned by and in the possession of Borrower, and (ii) constitutes a part of the Mortgaged Property. The Mortgage, a true and complete copy of which is attached hereto as **Exhibit "C,"** was recorded in O.R. Book 23994 at page 3108 of the Public Records of Miami-Dade County, Florida (the "Records").

26.    On or about November 17, 2005, as a part of the same transaction evidenced by the Loan Agreement and Note, and as a requirement of Lehman in making the Loan, Borrower executed and delivered to Lehman an Assignment of Leases and Rents ("Assignment"), further securing payment of the Loan and pledging as security the property rights described therein, which (i) were then vested in Borrower, and (ii) constitute a part of the Mortgaged Property. The

Assignment, a true and complete copy of which is attached hereto as **Exhibit "D,"** was recorded in O.R. Book 23994 at page 3143 of the Records.

27.    As a part of the same transaction evidenced by the Loan Agreement and Note, and as a requirement of Lehman in making the Loan:

(a)    Lehman caused a UCC-1 Financing Statement (the "Fixture Financing Statement"), a true and complete copy of which is attached hereto as **Exhibit "E,"** to be filed in O.R. Book 23994 at page 3157 of the Records; and

(b)    Lehman caused a UCC-1 Financing Statement (the "Central Financing Statement"), a true and complete copy of which is attached hereto as **Exhibit "F,"** to be filed with the Florida Secured Transaction Registry under File No. 200602787635.

Hereinafter, the Loan Agreement, the Note, the Mortgage, the Assignment, the Fixture Financing Statement, the Central Financing Statement, and all other documents evidencing or securing the Loan are hereinafter collectively called the "Loan Documents."

28.    Lehman owns and holds the Note, the Mortgage, and the other Loan Documents.

29.    The real property described in the Mortgage and the Assignment includes all of the condominium units in Gables Marquis, a Condominium (the "Original Units"). Some of the Original Units have been released by Plaintiff from the lien of the Mortgage and the Assignment. The Original Units that have not been so released (the "Encumbered Units") are (i) encumbered by the Mortgage and the Assignment, and (ii) owned by and in the possession of Borrower.

30.     The personal property described in the Mortgage and the Assignment is owned by Borrower, and is either in its possession or under its control.

31.     Borrower defaulted on the Loan by, among other things, failing to pay the Loan in full on or before its scheduled maturity date of December 9, 2007. As a result, the entire outstanding indebtedness of the Loan is now due and payable in full.

32.     Pursuant to Section 697.07, Florida Statutes, and the Loan Documents, Lehman is entitled to collect all rents of or from the real property encumbered by the Mortgage that accrue or are paid from the date of default.

33.     Borrower owes Lehman:

   (a)     $10,345,180.73 that is due on principal on the Note, plus accrued and unpaid interest and late charges thereon;

   (b)     all costs and expenses incurred or to be incurred by Lehman in collecting the amounts due to Lehman under the Note or the other Loan Documents, and in protecting its security in the property encumbered by the Security Documents; and

   (c)     various other amounts that are or may become due under the terms of the Loan Documents.

34.     By reason of the aforementioned defaults, Lehman (i) has been required to secure the services of the undersigned attorneys to endeavor to collect the sums due Lehman under the Loan Documents and to conduct these proceedings, and has agreed to pay said attorneys a reasonable fee for their services and to reimburse them for the costs they incur in connection

therewith, and (ii) has been and will be compelled to incur expenses for title information in connection with these proceedings. All fees, costs and expenses so paid or incurred by Lehman constitute additional indebtedness of Borrower to Lehman, the payment of which is secured by the Mortgage and the other Security Documents.

35.    Defendant Urbanism may claim some interest in one or more of the Encumbered Units by virtue of a certain unrecorded "Commercial Condominium Sale and Purchase Agreement - Gables Marquis, A Condominium" dated September 8, 2003, between Borrower and Urbanism (the "Urbanism Purchase Agreement"), a true and complete copy of which is attached hereto as **Exhibit "G"**; however, pursuant to Section 30(d) of the Urbanism Purchase Agreement, any such interest is subordinate, inferior and subject to the lien and security interest evidenced by the Mortgage and the Assignment.

36.    Defendant Coscan Construction, LLC may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 25845 at page 1893 of the Records, as amended by amendment of lien recorded in O.R. Book 25893 at page 612 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

37.    Defendant G & E Florida Contractors, Inc. may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 25678 at page 1443 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

38.     Defendant Techcrete Architectural Precast, Inc. may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 25925 at page 4236 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

39.     Defendant Cayman National Manufacturing and Installation, Inc. may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 25887 at page 4391 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

40.     Defendant American Cutting and Drilling Company may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 25959 at page 2218 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

41.     Defendant Miami Wall Systems, Inc. may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 25939 at page 4527 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

42.     Defendant Dillon Pools, Inc. may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 25936 at page

461 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

43.   Defendant Professional Plumbing Corp. may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 25977 at page 3521 of the Records, as modified by two partial releases recorded in (i) O.R. Book 26119 at page 3150 of the Records, and (ii) O.R. Book 26318 at page 3668 of the Records, respectively; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

44.   Defendant Eastern Waste Systems, Inc. may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 26119 at page 3736 of the Records, as amended by amended claim of lien recorded in O.R. Book 26179 at page 1540 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

45.   Defendant Fortin, Leavy, Skiles, Inc. may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 26037 at page 3754 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

46.   Defendant Merit Floors, Inc. may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 26022 at page 3020 of the Records as amended by amended claim of lien recorded in O.R. Book 26108 at page

3910 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

47.     Defendant Arc One, LLC may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 26131 at page 4146 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

48.     Defendant Tarmac America LLC may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 26133 at page 4955 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

49.     Defendant Paradise Awnings Corporation may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 25831 at page 4763 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

50.     Defendant Central Florida Equipment Rentals, Inc. may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of two claims of lien recorded in (i) O.R. Book 26186 at page 4350 of the Records and (ii) O.R. Book 26291 at page 1382 of the Records, respectively; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

51.    Defendant Permaco, Inc. may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 26219 at page 2695 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

52.    Defendant Thyssenkrupp Elevator Corporation may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 26282 at page 3770 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

53.    Defendant IBA Consultants, Inc., may claim an interest in property encumbered by the Mortgage and the Assignment by virtue of a claim of lien recorded in O.R. Book 26319 at page 2915 of the Records; however, any such interest is for all purposes subordinate, inferior and subject to the lien and security interests evidenced by the Mortgage and the Assignment.

54.    All conditions precedent to the institution and maintenance of these proceedings and to the relief sought herein have been performed or have occurred.

## COUNT I - ACTION ON PROMISSORY NOTE

Plaintiff, Lehman Brothers Holdings Inc., sues defendant Gables Marquis, L.L.C., and alleges:

55.    This is an action for damages in excess of $15,000.00, exclusive of interest and attorneys' fees.

56.    Lehman reavers the allegations contained in paragraphs 1 through 3, 23 through 34, and 54 above as if fully set forth herein.

WHEREFORE, Plaintiff demands judgment for damages against said defendant for all sums due to Lehman under the Note and the other Loan Documents and for such other and further relief as the Court may deem appropriate.

## COUNT II - ACTION TO FORECLOSE MORTGAGE

Plaintiff, Lehman Brothers Holdings Inc., sues defendants, Gables Marquis, L.L.C., Urbanism - Coral Way, L.L.C., Coscan Construction, LLC, G & E Florida Contractors, Inc., Techcrete Architectural Precast, Inc., Cayman National Manufacturing and Installation, Inc., American Cutting and Drilling Company, Miami Wall Systems, Inc., Dillon Pools, Inc., Professional Plumbing Corp., Eastern Waste Systems, Inc., Fortin, Leavy, Skiles, Inc., Merit Floors, Inc., Arc One, LLC, Tarmac America LLC, Paradise Awnings Corporation, Central Florida Equipment Rentals Inc., Permaco, Inc., Thyssenkrupp Elevator Corporation, and IBA Consultants, Inc., and alleges:

57.    This is an action to foreclose a mortgage on real property located in Miami-Dade County, Florida.

58.    Lehman reavers the allegations contained in paragraphs 1 through 29 and 31 through 54 above as if fully set forth herein.

WHEREFORE, Plaintiff prays that this Court:

(a)    take jurisdiction of this action and the parties hereto;

(b)     enter a judgment determining Lehman's priority position in the real property encumbered by the Mortgage;

(c)     make an accounting of the sums due to Lehman under the Note and the other Loan Documents, including all amounts that have been or may be advanced or incurred by Lehman in collecting the sums due to it under the Note and the other Loan Documents and in protecting its security in the real property encumbered by the Mortgage and the Assignment, including court costs and reasonable attorneys' fees;

(d)     order that if said sums are not paid within the time set by the Court, that the real property be sold and the proceeds of such sale be applied toward satisfaction of Lehman's claim; and that the estate and all right, title, and interest of defendants, Gables Marquis, L.L.C., and Urbanism - Coral Way, L.L.C., Coscan Construction, LLC, G & E Florida Contractors, Inc., Techcrete Architectural Precast, Inc., Cayman National Manufacturing and Installation, Inc., American Cutting and Drilling Company, Miami Wall Systems, Inc., Dillon Pools, Inc., Professional Plumbing Corp., Eastern Waste Systems, Inc., Fortin, Leavy, Skiles, Inc., Merit Floors, Inc., Arc One, LLC, Tarmac America LLC, Paradise Awnings Corporation, Central Florida Equipment Rentals Inc., Permaco, Inc., Thyssenkrupp Elevator Corporation, and IBA Consultants, Inc., and all persons claiming by, through, under or against said defendants since the filing of the Notice of Lis Pendens herein, be forever barred and foreclosed;

(e)     appoint a receiver of the real property and of the rents, issues, income and profits thereof, with such rights, powers and duties as may be necessary or appropriate for the preservation of the property and the protection of Plaintiff's interests therein during

the pendency of these proceedings, including the right, power and duty to market and sell Encumbered Units;

(f)      order that, pending the appointment of a receiver, Borrower be required to deposit all rents of and from the real property into the registry of the Court pursuant to §697.07 Florida Statutes; and,

(g)      retain jurisdiction of this cause and parties hereto to grant such other and further relief as is just and equitable under the circumstances.

## COUNT III - ACTION TO FORECLOSE SECURITY INTERESTS

Plaintiff, Lehman Brothers Holdings Inc., sues defendants, Gables Marquis, L.L.C., and Urbanism - Coral Way, L.L.C., and alleges:

59.      This is an action to foreclose certain security interests in personal property.

60.      Plaintiff reavers the allegations contained in paragraphs 1 through 4, 23 through 35, and 54 above as if fully set forth herein.

**WHEREFORE**, Plaintiff prays that this Court:

(a)      take jurisdiction of this action and the parties hereto;

(b)      enter a judgment determining Lehman's priority position in the personal property encumbered by the Security Documents;

(c)      make an accounting of the sums due to Lehman under the Note and the other Loan Documents, including all amounts that have been or may be advanced or incurred by Lehman in collecting the sums due to it under the Note and the other Loan

Documents and in protecting its security in the personal property encumbered by the Security Documents, including court costs and reasonable attorneys' fees;

(d)     order that if said sums are not paid within the time set by the Court, that the personal property be sold and the proceeds of such sale be applied toward satisfaction of Lehman's claim; and that the estate and all right, title, and interest of defendants, Gables Marquis, L.L.C., and Urbanism-Coral Way, L.L.C., and all persons claiming by, through, under or against said defendants since the filing of the Notice of Lis Pendens herein, be forever barred and foreclosed;

(e)     appoint a receiver of the personal property, with such rights, powers and duties as may be necessary or appropriate for the preservation of the property and the protection of Plaintiff's interests therein during the pendency of these proceedings; and

(f)     retain jurisdiction of this cause and parties hereto to grant such other and further relief as is just and equitable under the circumstances.

Respectfully submitted,

_____
ROBERTA A. COLTON
Florida Bar No. 0371289
J. ALAN ASENDORF
Florida Bar No. 0585947
TRENAM, KEMKER, SCHARF, BARKIN,
FRYE, O'NEILL & MULLIS, P.A.
101 East Kennedy Boulevard, Suite 2700
Tampa, Florida 33602
Telephone: (813) 223-7474
Fax: (813) 229-6553
Attorneys for Lehman Brothers Holdings Inc.

Dated: April 16, 2008.

-15-

# EXHIBIT "A"

# CONSTRUCTION LOAN AGREEMENT

Dated as of November 17, 2005

Between

## GABLES MARQUIS, L.L.C.,
as Borrower

and

## LEHMAN BROTHERS HOLDINGS INC.,
as Administrative Agent

and

## THE LENDERS NAMED HEREIN,
as Lenders

# TABLE OF CONTENTS

Page

I.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION ...................................................... 1

Section 1.1    Definitions .......................................................................... 1
Section 1.2    Principles of Construction ........................................................ 26

II.    THE LOAN ........................................................................................ 26

Section 2.1    The Loan and Advances ............................................................. 26
               2.1.1    Agreement to Lend and Borrow ..................................... 26
               2.1.2    No Reborrowings ................................................... 27
               2.1.3    The Note .......................................................... 27
               2.1.4    Use of Proceeds ................................................... 27
               2.1.5    Loan Term and Extension Options ................................... 27
               2.1.6    Preliminary Project Report and Budget ............................. 28
               2.1.7    Budget Reallocations .............................................. 28
               2.1.8    Advances .......................................................... 29
               2.1.9    Stored Materials .................................................. 29
               2.1.10   Amount of Advances ................................................ 30
               2.1.11   Loan Balancing .................................................... 30
               2.1.12   Quality of Work ................................................... 31
               2.1.13   Required Equity ................................................... 31
Section 2.2    Interest Rate ..................................................................... 31
               2.2.1    Interest .......................................................... 31
               2.2.2    Intentionally Omitted ............................................. 32
               2.2.3    Certain Notices ................................................... 32
               2.2.4    Additional Costs .................................................. 32
               2.2.5    LIBOR Rate ........................................................ 34
               2.2.6    Illegality ........................................................ 35
               2.2.7    Breakage Costs .................................................... 35
               2.2.8    Withholding Taxes ................................................. 36
Section 2.3    Usury Savings ..................................................................... 36
Section 2.4    Loan Payments ..................................................................... 37
               2.4.1    Payment Before Maturity Date ...................................... 37
               2.4.2    Payment on Maturity Date .......................................... 37
               2.4.3    Late Payment Charge ............................................... 37
               2.4.4    Interest Rate and Payment After Default ........................... 37
               2.4.5    Method and Place of Payment ....................................... 37
Section 2.5    Prepayment ........................................................................ 38
               2.5.1    Voluntary Prepayments ............................................. 38
               2.5.2    Mandatory Prepayments ............................................. 38
               2.5.3    Default Prepayment ................................................ 38
               2.5.4    Prepayment Waivers ................................................ 38
               2.5.5    Miscellaneous ..................................................... 38

Section 2.6    Payments Not Conditional. ............................................................39
Section 2.7    Conditions Precedent. ...................................................................39
Section 2.8    Interest and Fee Advances. ...........................................................39
Section 2.9    Conditions of Advances. ...............................................................39
    2.9.1    Conditions of Initial Advance .................................................39
    2.9.2    Conditions of Subsequent Advances ......................................44
    2.9.3    Conditions of Final Construction Advance...........................46
    2.9.4    Intentionally Omitted ...............................................................48
    2.9.5    Intentionally Omitted ...............................................................48
    2.9.6    Intentionally Omitted. ..............................................................48
    2.9.7    No Reliance................................................................................48
Section 2.10    Borrowing Procedures. ................................................................48
    2.10.1    Draw Requests ........................................................................48
    2.10.2    One Advance Per Month........................................................49
    2.10.3    Advances to Pay Interest, Fees and Expenses ......................49
    2.10.4    Procedure of Advances ...........................................................49
    2.10.5    Funds Advanced.......................................................................51
    2.10.6    Direct Advances to Third Parties...........................................52
    2.10.7    Advances After Completion Date...........................................52
    2.10.8    Advances Do Not Constitute a Waiver...................................53
    2.10.9    Intentionally Omitted. ............................................................53
    2.10.10    Interest Reserve......................................................................53
    2.10.11    Intentionally Omitted. ..........................................................53
    2.10.12    Advances and Disbursements Under Completion Guaranty ...............53

III.    REPRESENTATIONS AND WARRANTIES.................................................53

Section 3.1    Borrower Representations..............................................................53
    3.1.1    Organization.............................................................................53
    3.1.2    Proceedings ..............................................................................53
    3.1.3    No Conflicts ..............................................................................54
    3.1.4    Litigation...................................................................................54
    3.1.5    Governmental Orders ..............................................................54
    3.1.6    Consents....................................................................................54
    3.1.7    Title...........................................................................................54
    3.1.8    No Plan Assets .........................................................................55
    3.1.9    Compliance ...............................................................................55
    3.1.10    Financial and Other Information............................................55
    3.1.11    Condemnation ........................................................................56
    3.1.12    Utilities and Public Access ....................................................56
    3.1.13    Separate Lots...........................................................................56
    3.1.14    Assessments ............................................................................56
    3.1.15    Enforceability..........................................................................56
    3.1.16    Assignment of Leases .............................................................56
    3.1.17    Insurance ................................................................................57
    3.1.18    Affiliate Fees...........................................................................57
    3.1.19    Flood Zone ..............................................................................57

|  |  |  |  |
|---|---|---|---|
| 3.1.20 | Physical Condition | | 57 |
| 3.1.21 | Boundaries | | 57 |
| 3.1.22 | Leases | | 57 |
| 3.1.23 | Filing and Recording Taxes | | 57 |
| 3.1.24 | Single Purpose | | 57 |
| 3.1.25 | Tax Filings | | 60 |
| 3.1.26 | Solvency | | 60 |
| 3.1.27 | Federal Reserve Regulations | | 61 |
| 3.1.28 | Affiliate Debt | | 61 |
| 3.1.29 | Offices; Location of Books and Records | | 61 |
| 3.1.30 | Intentionally Omitted. | | 61 |
| 3.1.31 | General Contractor's Agreement | | 61 |
| 3.1.32 | Access | | 62 |
| 3.1.33 | No Default | | 62 |
| 3.1.34 | Architect | | 62 |
| 3.1.35 | Plans and Specifications | | 62 |
| 3.1.36 | Zoning | | 62 |
| 3.1.37 | Budget | | 62 |
| 3.1.38 | Feasibility | | 62 |
| 3.1.39 | Intentionally Omitted. | | 62 |
| 3.1.40 | Lien Waivers | | 62 |
| 3.1.41 | Condominium Documents | | 63 |
| 3.1.42 | Unit Contracts | | 63 |
| 3.1.43 | Intentionally Omitted. | | 63 |
| 3.1.44 | Full and Accurate Disclosure | | 63 |
| 3.1.45 | Foreign Person | | 63 |
| 3.1.46 | Investment Company Act | | 63 |
| 3.1.47 | Organizational Structure | | 64 |
| 3.1.48 | Management Agreement | | 64 |
| 3.1.49 | Indebtedness | | 64 |
| 3.1.50 | Broker's Agreement | | 64 |
| 3.1.51 | Intentionally Omitted. | | 64 |
| Section 3.2 | Continuing Effectiveness and Survival of Representations | | 64 |
| IV. | BORROWER COVENANTS | | 65 |
| Section 4.1 | Borrower Affirmative Covenants. | | 65 |
| 4.1.1 | Existence; Compliance with Legal Requirements | | 65 |
| 4.1.2 | Taxes and Other Charges | | 65 |
| 4.1.3 | Litigation | | 66 |
| 4.1.4 | Access to Property | | 66 |
| 4.1.5 | Further Assurances; Supplemental Mortgage Affidavits | | 66 |
| 4.1.6 | Financial Reporting | | 66 |
| 4.1.7 | Title to the Property | | 68 |
| 4.1.8 | Estoppel Statement | | 68 |
| 4.1.9 | Leases | | 68 |
| 4.1.10 | Alterations | | 68 |

| | | | |
|---|---|---|---|
| 4.1.11 | Intentionally Omitted. | | 68 |
| 4.1.12 | Updated Appraisal | | 68 |
| 4.1.13 | Up-Front Fee and Servicing Fee | | 69 |
| 4.1.14 | Interest Rate Protection Agreement | | 69 |
| 4.1.15 | General Contractor's Agreement | | 72 |
| 4.1.16 | Architect's Contract | | 72 |
| 4.1.17 | Insurance | | 72 |
| 4.1.18 | Application of Loan Proceeds | | 73 |
| 4.1.19 | Costs | | 73 |
| 4.1.20 | Fees and Expenses | | 73 |
| 4.1.21 | Completion of Construction | | 73 |
| 4.1.22 | Inspection of Property | | 74 |
| 4.1.23 | Construction Consultant | | 74 |
| 4.1.24 | Construction Consultant/Duties and Access | | 74 |
| 4.1.25 | Correction of Defects | | 75 |
| 4.1.26 | Books and Records | | 75 |
| 4.1.27 | Indebtedness | | 75 |
| 4.1.28 | Maintain Existence | | 76 |
| 4.1.29 | Bonds | | 76 |
| 4.1.30 | Intentionally Omitted. | | 76 |
| 4.1.31 | Easements and Restrictions; Zoning | | 76 |
| 4.1.32 | Laborers, Subcontractors and Materialmen | | 76 |
| 4.1.33 | Ownership of Personalty | | 77 |
| 4.1.34 | Comply with Other Loan Documents | | 77 |
| 4.1.35 | Purchase of Material Under Conditional Sale Contract | | 77 |
| 4.1.36 | Further Assurance of Title | | 77 |
| 4.1.37 | Intentionally Deleted | | 77 |
| 4.1.38 | Intentionally Deleted | | 77 |
| 4.1.39 | Condominium | | 77 |
| Section 4.2 | Borrower Negative Covenants | | 83 |
| 4.2.1 | Due on Sale and Encumbrance; Transfers of Interests | | 83 |
| 4.2.2 | Liens | | 83 |
| 4.2.3 | Dissolution | | 83 |
| 4.2.4 | Change in Business | | 84 |
| 4.2.5 | Debt Cancellation | | 84 |
| 4.2.6 | Affiliate Transactions | | 84 |
| 4.2.7 | Zoning | | 84 |
| 4.2.8 | Assets | | 84 |
| 4.2.9 | No Joint Assessment | | 84 |
| 4.2.10 | Principal Place of Business | | 84 |
| 4.2.11 | ERISA | | 84 |
| 4.2.12 | No Distributions | | 85 |
| 4.2.13 | Change Orders | | 85 |
| 4.2.14 | Indebtedness | | 86 |
| 4.2.15 | Organizational Documents | | 86 |
| 4.2.16 | Condominium Documents | | 86 |

V.    INSURANCE, CASUALTY AND CONDEMNATION ................................................86

Section 5.1     Insurance. ....................................................................................................86
                5.1.1     Insurance Policies ....................................................................86
                5.1.2     Insurance Company ...................................................................90
Section 5.2     Casualty and Condemnation. ......................................................................90
                5.2.1     Casualty.....................................................................................90
                5.2.2     Condemnation ...........................................................................90
Section 5.3     Delivery of Net Proceeds. ...........................................................................91
                5.3.1     Minor Casualty or Condemnation.............................................91
                5.3.2     Major Casualty or Condemnation.............................................92
                5.3.3     Application of Net Proceeds .....................................................95

VI.    FUNDS ..................................................................................................................95

Section 6.1     Security Interest in Funds. ..........................................................................95
                6.1.1     Grant of Security Interest.........................................................95
                6.1.2     Prohibition Against Further Encumbrance ...............................95
                6.1.3     Application of Funds.................................................................95
Section 6.2     Cash Management..........................................................................................96
                6.2.1     Permitted Investments..............................................................96
                6.2.2     Earnings on Fund Collateral ....................................................96
                6.2.3     Income Taxes............................................................................96
Section 6.3     Letters of Credit. ..........................................................................................96
                6.3.1     Delivery of Letters of Credit....................................................96
                6.3.2     Security for Debt.......................................................................96
                6.3.3     Additional Rights of Agent ......................................................97

VII.    PROPERTY MANAGEMENT ..............................................................................97

Section 7.1     The Management Agreement.........................................................................97
Section 7.2     Prohibition Against Termination or Modification. ......................................98
Section 7.3     Replacement of Manager. .............................................................................98

VIII.    TRANSFERS........................................................................................................98

Section 8.1     Agent's and Lenders' Reliance. ...................................................................98
Section 8.2     No Transfers...................................................................................................98
Section 8.3     Permitted Transfers.......................................................................................98

IX.    DEFAULTS .............................................................................................................99

Section 9.1     Events of Default. .........................................................................................99
Section 9.2     Rights and Remedies of Agent and Lenders.................................................103
Section 9.3     Power of Attorney.........................................................................................106
Section 9.4     Remedies Cumulative. ..................................................................................106
Section 9.5     Annulment of Defaults..................................................................................106
Section 9.6     Waivers. ........................................................................................................106

Section 9.7    Course of Dealing, Etc. ..................................................................107
Section 9.8    Remedies Cumulative. .....................................................................107

X.    MISCELLANEOUS .............................................................................108

Section 10.1    Successors and Assigns......................................................................108
Section 10.2    Agent's and Lenders' Discretion. .....................................................108
Section 10.3    Consent to Service. ...........................................................................108
Section 10.4    Submission to Jurisdiction. ...............................................................109
Section 10.5    Jurisdiction Not Exclusive. ...............................................................108
Section 10.6    Waiver of Jury Trial ........................................................................1108
Section 10.7    Choice of Law. ..............................................................................11208
Section 10.8    Provisions Subject to Applicable Law ...............................................109
Section 10.9    Modification Waiver in Writing .......................................................109
Section 10.10    Delay Not a Waiver .........................................................................109
Section 10.11    Notices. ............................................................................................109
Section 10.12    Intentionally Deleted.........................................................................111
Section 10.13    Headings. ..........................................................................................111
Section 10.14    Severability. .....................................................................................111
Section 10.15    Preferences. ......................................................................................112
Section 10.16    Waiver of Notice. ...........................................................................112
Section 10.17    Remedies of Borrower .....................................................................112
Section 10.18    Expenses, Indemnity ........................................................................112
Section 10.19    Schedules and Exhibits Incorporated. ...............................................115
Section 10.20    Offsets, Counterclaims and Defenses. ..............................................115
Section 10.21    No Joint Venture or Partnership; No Third Party Beneficiaries ..........115
Section 10.22    Publicity. ..........................................................................................116
Section 10.23    Approvals and Consents. ..................................................................116
Section 10.24    Waiver of Offsets/Defenses/Counterclaims........................................116
Section 10.25    Conflict; Construction of Documents; Reliance. ................................116
Section 10.26    Brokers and Financial Advisors.........................................................117
Section 10.27    Exculpation. .....................................................................................117
Section 10.28    Prior Agreements. ............................................................................119
Section 10.29    Intentionally Omitted.........................................................................119
Section 10.30    Joint and Several Liability. ...............................................................119
Section 10.31    Assignments. .....................................................................................120
Section 10.32    Adjustments; Set-Off. .......................................................................122
Section 10.33    Cooperation in Syndication................................................................122
Section 10.34    Counterparts. ....................................................................................124

XI.    AGENT ...............................................................................................125

Section 11.1    Performance by Agent. .....................................................................125
Section 11.2    Actions. ............................................................................................125
Section 11.3    Nonliability of Agent and Lenders. ...................................................125
Section 11.4    Authorization and Action...................................................................126
Section 11.5    Agent's Reliance, Etc........................................................................127

Section 11.6    Agent as a Lender. .................................................................................128
Section 11.7    Distribution of Payments by Agent to Lenders...................................................128
Section 11.8    Indemnification of Agent by Lenders. ..............................................................128
Section 11.9    Assignment Upon Payment..............................................................................129
Section 11.10  Servicer. .........................................................................................................129
Section 11.11  Loan Components and Creation of Subordinate Debt .......................................130

## SCHEDULES

| | | |
|---|---|---|
| SCHEDULE I | - | Lenders' Ratable Share |
| SCHEDULE II | - | Form of Borrower's Requisition Letter (Construction Loan) |
| SCHEDULE III | - | Intentionally Omitted |
| SCHEDULE IV | - | Intentionally Omitted |
| SCHEDULE V | - | Intentionally Omitted |
| SCHEDULE VI | - | Form of Application and Certificate for Payment (AIA Document G702) |
| SCHEDULE VII | - | Form of Architect's Certificate |
| SCHEDULE VIII | - | Form of Borrowing Certificate |
| SCHEDULE IX | - | Form of Payment Receipt |
| SCHEDULE X | - | Form of Anticipated Cost Report |
| SCHEDULE XI | - | Form of Final Unconditional Lien Waiver and Release and Payment Receipt |
| SCHEDULE XII | - | Form of Unconditional Lien Waiver and Release and Payment Receipt |
| SCHEDULE XIII | - | Funding Statement |
| SCHEDULE XIV | - | Form of General Contractor's Certificate |
| SCHEDULE XV | - | Intentionally Omitted |
| SCHEDULE XVI | - | Form of Major Trade Contractor's Performance Letter |
| SCHEDULE XVII | - | Forms of Architect's Certification and Consent Agreement |
| SCHEDULE XVIII | - | Intentionally Omitted |
| SCHEDULE XIX | - | Form of Requisition Authorization Statement |
| SCHEDULE XX | - | Borrower's Chief Executive Office Address, Jurisdiction of Organization and Federal Employer's Identification Number |
| SCHEDULE XXI | - | Form of Dual Obligee and Modification Rider to Bonds |
| SCHEDULE XXII | - | Schedule of PreSold Units |
| SCHEDULE XXIII | - | List of Affiliate Contracts |
| SCHEDULE XXIV | - | Affiliate Fees |

| | |
|---|---|
| EXHIBIT A | The Land |
| EXHIBIT B | Borrower's Organizational Chart |
| EXHIBIT C | Form of Assignment of Interest Rate Protection Agreement |
| EXHIBIT D | Form of Assignment and Acceptance |
| EXHIBIT E | Form of Promissory Note |
| EXHIBIT F | Minimum Sales and Minimum Release Prices |
| EXHIBIT G | Form of Amendment to Guaranty |
| EXHIBIT H | Intentionally Omitted |

## CONSTRUCTION LOAN AGREEMENT

THIS CONSTRUCTION LOAN AGREEMENT, dated as of November 17, 2005 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**" and sometimes also referred to as the "**Loan Agreement**"), between **GABLES MARQUIS, L.L.C.**, a Florida limited liability company, having its principal place of business at 7284 West Palmetto Park Road, Boca Raton, Florida 33433("**Borrower**"), and **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an address at 399 Park Avenue, New York, New York 10022, as administrative agent (including any of its successors and assigns, "**Agent**") for itself and the other Lenders signatory hereto (collectively, together with such other co-lenders as may exist from time to time, "**Lenders**").

All capitalized terms used herein shall have the respective meanings set forth in Article I hereof.

### W I T N E S S E T H:

WHEREAS, Borrower desires to obtain the Loan from Lenders; and

WHEREAS, each Lender is severally willing to make the Loan to Borrower, subject to and in accordance with the conditions and terms of this Agreement and the other Loan Documents.

NOW, THEREFORE, in consideration of the covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree, represent and warrant as follows:

## I.   DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1      Definitions.**

For all purposes of this Agreement, except as otherwise expressly provided:

"**ADA**" shall mean the Americans with Disabilities Act of 1992, as amended from time to time.

"**Additional Costs**" shall have the meaning as set forth in Section 2.2.4(a).

"**Additional Interest**" shall mean any and all amounts which may become due and payable by Borrower pursuant to Section 2.2.4, Section 2.2.7 or Section 2.2.8.

"**Additional Third Party Reports**" shall have the meaning set forth in Section 10.28.

"**Advance**" or "**Advances**" shall mean any disbursement of the proceeds of the Loan by Lenders pursuant to the terms of this Agreement.

{10327732:6}SL

"**Affiliate**" When used with reference to any particular Person (the "**Reference Person**") (a) each Person that, directly or indirectly, controls, is controlled by or is under common control with, the Reference Person referred to, (b) each Person which beneficially owns or holds, directly or indirectly, five percent (5%) or more of any class of voting stock of the Reference Person referred to (or if the Reference Person referred to is not a corporation, five percent (5%) or more of the equity interest therein), (c) each Person, five percent (5%) or more of the voting stock (or if such Person is not a corporation, five percent (5%) or more of the equity interest therein) of which is beneficially owned or held, directly or indirectly, by the Reference Person referred to, and (d) each of such Reference Person's officers, directors, joint ventures and partners. The term "**control**" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Person in question.

"**Affiliate Contracts**" shall mean those contracts listed on SCHEDULE XXIII, as the same may be amended from time to time with the consent of Agent.

"**Affiliate Fees**" shall have the meaning as set forth in Section 3.1.18.

"**Agent**" shall mean Lehman Brothers Holdings Inc., together with its successors and assigns, acting in its capacity as administrative agent to the Lenders hereunder and under the other Loan Documents.

"**Agent's Register**" shall have the meaning as set forth in Section 10.26(f).

"**Agreement Regarding Instructions Given by Telephone or Facsimile**" shall mean the Agreement Regarding Instructions Given by Telephone or Facsimile, dated the date hereof, which shall be in the form attached hereto as SCHEDULE XVIII and shall be executed and delivered by Borrower to Agent contemporaneously herewith.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alteration Threshold**" shall mean $250,000.00.

"**Anticipated Cost Report**" shall mean each anticipated cost report submitted to Agent in connection with an Advance pursuant to Section 2.9.2(b).

"**Applicable Interest Rate**" shall mean either (i) the LIBOR Rate plus the LIBOR Margin with respect to any period when the Loan (or the applicable portion thereof) is a LIBOR Loan, or (ii) the Substitute Rate plus the Substitute Rate Margin with respect to any period when the Loan (or the applicable portion thereof) is a Substitute Rate Loan.

"**Applicable Lending Office**" shall mean the related "Lending Office" of each Lender (or of an Affiliate of such Lender) designated for such Lender on the signature page hereof or such other Office of Lender (or of an Affiliate of Lender) as each Lender may from time to time specify to Borrower as the office by which the Loan is to be made and/or maintained by such Lender.

"**Applicable Spread**" shall mean (i) the LIBOR Margin with respect to the LIBOR Rate, or (ii) the Substitute Rate Margin with respect to the Substitute Rate.

"**Approval**", "**Approved**", "**approval**" or "**approved**" shall mean, as the context so determines, an approval in writing given to the party seeking approval after full disclosure to the party giving approval of all material facts necessary in order to determine whether approval should be granted.

"**Approved Accountant**" shall mean Goldstein Lewis & Co., or any independent certified public accounting firm of recognized standing approved by Agent.

"**Architect's Certificate**" shall have the meaning as set forth in Section 2.9.1(d)(x).

"**Architect's Contract**" shall mean that certain Standard Form Agreement for Architectural Services with Standard Form of Architect Services, dated as of April 19, 2002 between Borrower and Borrower's Architect, or any successor architect's contract which may be approved by Lender or its agent in its reasonable discretion.

"**Assignment and Acceptance**" shall have the meaning as set forth in Section 10.31.

"**Assignment of Contracts**" shall mean that certain Assignment of Contracts, Licenses and Permits dated as of the date hereof from Borrower, as assignor, to Agent, as assignee.

"**Assignment of Interest Rate Protection Agreement**" shall mean that certain Assignment of Interest Rate Protection Agreement among Borrower, Agent and the related Counterparty to the related Interest Rate Protection Agreement to be entered into pursuant to Section 4.1.14(c).

"**Assignment of Leases**" shall mean that certain Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Agent, as assignee.

"**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement and Subordination of Management Fees dated as of the date hereof among Borrower, Manager and Agent, and any assignment of management agreement and subordination of management fees hereafter entered into by Borrower pursuant to Section 7.2.

"**Authorized Representatives**" shall mean those Persons authorized pursuant to the Requisition Authorization Statement to execute and deliver on behalf of Borrower Borrower's Requisition.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "**Bankruptcy**", as amended from time to time, and any successor statute or statutes and all rules

and regulations from time to time promulgated thereunder, and any comparable state laws relating to bankruptcy, insolvency or creditors' rights.

"**Basle Accord**" shall have the meaning as set forth in Section 2.2.4.

"**Benefited Lender**" shall have the meaning as set forth in Section 10.27(a).

"**Borrower**" shall mean Gables Marquis, L.L.C., a Florida limited liability company, together with its permitted successors and permitted assigns.

"**Borrower's Architect**" shall mean Cohen Friedman Encinosa & Associates, P.A.

"**Borrower's Designated Account**" shall mean the bank account designated by Borrower pursuant to Borrower's Requisition Letter as the deposit account at BBT Bank, into which Advances shall be wired.

"**Borrower's Requisition**" shall have the meaning as set forth in Section 2.10.1.

"**Borrowing Date**" shall have the meaning as set forth in Section 2.10.1.

"**Broker**" shall mean E.B. Management Company, a Florida corporation, with an office at 7284 West Palmetto Park Road, Suite 106, Boca Raton, Florida 33433 or other broker approved by Agent.

"**Broker's Agreement**" shall mean that certain Broker's Agreement dated as of November 17, 2005 between Borrower and Broker.

"**Budget Line**" shall have the meaning as set forth in Section 2.1.6.

"**Business Day**" shall mean any day other than a Saturday or Sunday or any other day on which national banks in New York, New York are not open for business.

"**Casualty**" shall mean the occurrence of any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"**Casualty Consultant**" shall have the meaning as set forth in Section 5.3.2(c).

"**Casualty Retainage**" shall have the meaning as set forth in Section 5.3.2(d).

"**Claim**" shall have the meaning as set forth in Section 10.13(c).

"**Closing Date**" shall mean the date of funding the initial Advance of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Completion Date**" shall mean May 31, 2007; provided, however, that the Completion Date may be extended by the aggregate number of days that Completion of the Improvements is delayed by Force Majeure Events; provided, further, that the Completion Date shall not be delayed more than ninety (90) days in the aggregate after giving effect to all such extensions.

"**Completion of the Improvements**" shall mean completion of the construction of the Improvements substantially in accordance with all Plans and Specifications, all Legal Requirements, all Permitted Encumbrances, the Condominium Documents and the Loan Agreement, such compliance to be evidenced to the reasonable satisfaction of Agent and the Construction Consultant; together with the delivery to Agent of a permanent or temporary certificate of occupancy (if subject to any conditions, such conditions being acceptable to Agent) for the Improvements and evidence that all other Governmental Approvals have been issued and all other Legal Requirements have been satisfied so as to allow the use and occupancy of the Improvements in accordance with the definition of "Improvements" set forth in this Agreement.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Conditional Assignment of Condominium Documents**" shall have the meaning as set forth in Section 4.1.37(h)(iii).

"**Condominium**" shall mean the condominium created with respect to the Property (or any portion thereof or interest therein) pursuant to the Condominium Documents.

"**Condominium Act**" shall mean Chapter 718, Florida Statutes, of the State of Florida and all modifications, supplements and replacements thereof and all regulations with respect thereto, now or hereafter enacted or promulgated.

"**Condominium Documents**" shall mean with respect to the Condominium, the following: any plat of Condominium, the declaration of condominium of the Condominium, all plans, schedules and other details defining the condominium units and the general common elements and the limited common elements, the bylaws of the condominium unit owner's association for the Condominium (the "Association") or the board of managers for the Condominium, the rules and regulations, the management agreement between the Association or board of managers and the firm that will be managing the property which is included in the Condominium, the sales agency agreement, the form of purchase agreement(s) to be used for the sale of condominium units and all sales and promotional materials to be used in connection with the sale of condominium units; each executed Qualifying Contract; together with any amendments, exhibits or attachments to any of the foregoing.

"**Construction Consultant**" shall mean Construction Management & Development, Inc., with an office at 5805 Ipswich Road, Bethesda, MD 20814 or such other Person as Agent may designate and engage as a replacement to inspect the Improvements and the

Property as construction progresses and consult with and to provide advice to and to render reports to Agent, which Person may be, at Agent's option upon notice to Borrower, either an officer or employee of Agent or consulting architects, engineers or inspectors appointed by Agent.

"**Construction Period**" shall mean the applicable period of time ending on the Completion Date.

"**Construction Schedule**" shall mean the schedule, broken down by trade, of the estimated dates of commencement and completion of the Improvements certified by Borrower to Agent dated as of even date herewith and approved by the Construction Consultant prior to the date of this Agreement.

"**Costs**" shall mean all costs and expenses of constructing and developing the Improvements (including Hard Costs and Soft Costs).

"**Counterparty**" shall mean each counterparty to, or issuer of, any Interest Rate Protection Agreement other than Borrower or an Affiliate of Borrower.

"**Counterparty Opinion**" shall have the meaning as set forth in Section 4.1.14(f).

"**Debt**" shall mean the outstanding principal amount of the Loan together with all interest accrued and unpaid thereon and all other sums (including, without limitation, any amounts payable to Lenders pursuant to Section 2.2) due to Lenders in respect of the Loan under the Note, the Loan Agreement, the Mortgage, the Environmental Indemnity or any other Loan Document.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Prepayment**" shall mean a prepayment of the principal amount of the Loan made after the occurrence of any Event of Default or an acceleration of the Maturity Date under any circumstances, including, without limitation, a prepayment occurring in connection with reinstatement of the Mortgage provided by statute under foreclosure proceedings or exercise of a power of sale, any statutory right of redemption exercised by Borrower or any other party having a statutory right of redemption exercised by Borrower or any other party having a statutory right to redeem or prevent foreclosure, any sale in foreclosure or under exercise of a power of sale or otherwise.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (i) the Applicable Interest Rate plus three percent (3%) or (ii) the Maximum Legal Rate, whichever is lower

"**Defaulting Lender**" shall have the meaning as set forth in Section 2.10.4(c).

"**Deficiency**" or "**Deficiencies**" shall have the meaning as set forth in Section 2.10.4(c).

"**Determination Date**" shall mean with respect to any Interest Period, the date that is two (2) LIBOR Business Days prior to the ninth (9th) calendar day of the month in which such Interest Period commenced provided, however, the Determination Date for the first Interest Period of any LIBOR Loan (if such first Interest Period does not commence on the ninth (9th) day of a calendar month) shall be the first (1st) day of such first Interest Period.

"**Disbursement Schedule**" shall mean the schedule of the amounts of Advances anticipated to be requisitioned by Borrower each month during the term of the Loan, dated as of the date hereof.

"**Division**" shall mean the Division of Florida Land Sales, Condominiums and Mobile Homes.

"**Dollars**" or "**$**" shall mean lawful money of the United States of America.

"**Draw Request**" shall mean, with respect to each Advance, Borrower's request for such Advance, and documents required by this Agreement to be furnished to Agent as a condition to such Advance. Each draw request shall contain the written warning required by Section 713.3471, Florida Statutes (which requires lenders, when making disbursements directly to owners, to give written warning to such owners that to protect themselves from double payments, lien releases from each lienor should be required from the contractor), and shall be supported by such information and documentation (such as paid receipts, invoices, statements of accounts, lien releases, etc.) as Lender may require to assure that amounts requested are to be used to reimburse Borrower for costs previously paid by Borrower or to pay costs incurred by Borrower that are to be paid from proceeds of the Loan, as set forth in the Budget.

"**Electing Lender**" shall have the meaning as set forth in Section 2.10.4(c).

"**Eligible Assignee**" means (a)(i) a commercial bank or financial institution organized under the laws of the United States or any state thereof; (ii) a savings and loan association or savings bank organized under the laws of the United States or any state thereof; (iii) a commercial bank organized under the laws of any other country or a political subdivision thereof; (provided, however, that (A) such bank or financial institution is acting through a branch or agency located in the United States or (B) such bank or financial institution is organized under the laws of a country that is a member of the Organization for Economic Cooperation and Development or a political subdivision of such country) and (iv) any other entity which is an "accredited investor" (as defined in Regulation D under the Securities Act) which extends credit or buys loans as one of its principal businesses including, but not limited to, insurance companies, mutual funds and lease financing companies, in each case (under clauses (i) through (iv) above) that is reasonably acceptable to Agent; and (b) any Lender and any Affiliate of any Lender; provided, further, however, that each Eligible Assignee under clauses (a)(i) through (a)(iv) above shall have Tier 1 capital (as defined in the regulations of its primary banking regulator) of not less than $100,000,000.

"**Eligible Institution**" shall mean a depository institution or trust company insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by S&P, P-1 by Moody's, and F-1+ by Fitch,

Inc. in the case of accounts in which funds are held for thirty (30) days or less or, in the case of Letters of Credit or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "A-" by Fitch and S&P and "A3" by Moody's.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantor, for the benefit of Agent and Lenders.

"**Equipment**" shall have the meaning as set forth in the granting clause of the Mortgage.

"**ERISA**" shall have the meaning as set forth in Section 4.2.11.

"**Escrow Agent**" shall mean Kodsi Law Firm, P.A., in its capacity as "Escrow Agent" under and pursuant to the Escrow Agreement.

"**Escrow Agreement**" shall mean that certain Escrow Agreement dated May 11, 2004 between Borrower and Escrow Agent.

"**Eurocurrency Liabilities**" shall have the meaning specified in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time and including any successor regulation thereto.

"**Event of Default**" shall have the meaning as set forth in Section 9.1.

"**Excluded Taxes**" means, with respect to Agent, each Lender or any other recipient of any payment to be made by or on account of any obligation of Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of such Lender, in which its Applicable Lending Office is located, and (b) any branch profits taxes imposed by the United States of America or any similar law imposed by any other jurisdiction in which Borrower is located.

"**Exit Fee**" shall mean one percent (1.0%) of the principal amount of the Loan being prepaid or repaid, as applicable, which fee shall be due and payable in connection with any prepayment of the Loan (including, without limitation, the prorata portion of the Exit Fee due in connection with a release of a Unit) and /or any repayment of the Loan upon or after the Maturity Date.

"**Extension Notice**" shall have the meaning as set forth in Section 2.1.5(b).

"**Extended Maturity Date**" shall mean June 9, 2008 or such earlier date on which the final payment of principal of the Building Loan Note becomes due and payable as therein or herein provided whether at such stated extended maturity date, by declaration of acceleration or otherwise.

"**Extension Period**" shall mean a period of six (6) consecutive months following the Initial Maturity Date.

"**Extension Fee**" shall mean 0.25% of the outstanding principal amount of the Loan on the Initial Maturity Date (plus the amount, if any, of the undisbursed proceeds of the Loan that Borrower would be entitled to continue to have advanced to Borrower (assuming for this purpose only that Borrower satisfied all conditions precedent thereto) under the Loan Agreement and the other Loan Documents, payable in connection with Borrower's option, subject to and in accordance with the terms of this Agreement, to extend the term of the Loan for the Extension Period.

"**Final Completion**" shall mean that, in addition to the Completion of the Improvements, all Punch List Items shall have been completed substantially in accordance with the Plans and Specifications, all Legal Requirements and this Agreement, and that a permanent certificate of occupancy shall have been issued (if subject to any conditions, such conditions being acceptable to Agent) for the Improvements and evidence that all other Governmental Approvals have been issued and all other Legal Requirements have been satisfied so as to allow the Improvements to be used and operated in accordance with the Loan Documents.

"**FIRREA**" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Force Majeure Event**" shall mean any event or condition beyond the control of Borrower, including, without limitation, strikes, labor disputes, acts of God, the elements, governmental restrictions, regulations or controls, enemy action, civil commotion, fire, casualty, accidents, mechanical breakdowns or shortages of, or inability to obtain, labor, utilities or materials, which causes delay; provided, however, that any lack of funds shall not be deemed to be a condition beyond the control of Borrower and provided further that any extension therefor shall not exceed ninety (90) days.

"**Funding Statement**" shall mean that certain funding statement to be executed and delivered by Borrower in connection with the closing of the Loan in the form attached hereto as SCHEDULE XIII.

"**Funds**" shall have the meaning as set forth in Section 6.1.1.

"**GAAP**" shall mean generally accepted accounting principles as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession, or in accordance with other methods acceptable to Lender in its sole discretion, consistently applied.

"**General Contractor**" means Coscan Construction, LLC, a Florida limited liability company, having its principal place of business at 5555 Anglers Avenue, Suite 1A, Fort Lauderdale, Florida 33312 or other general contractor approved by Agent.

"**General Contractor's Agreement**" shall mean that certain Standard Form of Agreement Between Owner and General Contractor made as of April 11, 2005.

"**General Contractor's Certificate**" shall have the meaning set forth in Section 2.9.1(d)(xi).

"**Governmental Approvals**" shall mean all approvals, consents, waivers, orders, acknowledgments, authorizations, permits and licenses required under applicable Legal Requirements to be obtained from any Governmental Authority for the construction of the Improvements and/or the use, occupancy and operation following completion of construction, as the context requires, including, without limitation, all land use, building, subdivision, condominium, zoning and similar ordinances and regulations promulgated by any Governmental Authority.

"**Governmental Authority**" shall mean any court, board, agency, commission, office, authority, department, bureau or instrumentality of any nature whatsoever or any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Gross Sales Proceeds**" shall mean as to any Unit, the gross proceeds from the sale of such Unit (including, without limitation, any fees, expenses or transfer taxes of Borrower paid by the purchaser of such Unit and any mortgage recording tax reimbursement paid by such purchaser, and including any customary closing prorations paid by such purchaser such as real estate taxes and common area charges in respect of accrual periods from and after the closing).

"**Guarantor**" shall mean Elie Berdugo, a/k/a Elie Berdougo, an individual.

"**Guaranty**" shall mean, collectively, the Guaranty of Completion and the Guaranty of Payment.

"**Guaranty of Completion**" shall mean that certain Guaranty of Completion from Guarantor in favor of Agent dated as of the date hereof.

"**Guaranty of Payment**" shall mean that certain Guaranty of Payment from Guarantor in favor of Agent dated as of the date hereof.

"**Hard Costs**" shall mean those Costs which are for labor, materials, equipment and fixtures.

"**Hazardous Substances**" shall have the meaning as set forth in the Environmental Indemnity.

"**Improvements**" shall mean the construction of a mixed-use luxury residential condominium complex consisting of two (2) buildings, the first building containing eight (8)

Residential Units and the second building, being a twenty (20) story building (including six (6) levels of parking), containing one hundred sixty-nine (169) Residential Units up to five (5) Retail Units (consisting of approximately 4,100 square feet of total retail space), seventy-five (75) storage units located within the parking levels, and approximately three hundred thirty-one (331) parking spaces ("Spaces") of which nine (9) Spaces are dedicated to handicapped use in accordance with the American With Disabilities Act, sixteen (16) Spaces are dedicated to the Retail Units, seventeen (17) Spaces are dedicated to guest parking, one hundred twenty-four (124) Spaces are for sale to Residential and Retail Unit owners of the building, and the remaining one hundred and sixty-five (165) Spaces are dedicated to the Residential Units, all in accordance with and as more particularly set forth in the Plans and Specifications.

"**Indebtedness**" shall mean, for any Person, without duplication:    (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all indebtedness guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, and (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"**Indemnified Liabilities**" shall have the meaning as set forth in Section 10.13(b).

"**Indemnified Party**" shall have the meaning as set forth in Section 10.13(b).

"**Independent Director**" shall have the meaning as set forth in Section 3.1.24(s).

"**Information**" shall have the meaning set forth in Section 10.28.

"**Initial Advance**" shall have the meaning as set forth in Section 2.9.1.

"**Initial Maturity Date**" shall mean December 9, 2007 or such earlier date on which the final payment of principal of the Building Loan Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Initial Offering Plan**" shall have the meaning as set forth in Section 4.1.39.

"**Institution**" shall mean (a) a commercial bank organized under the laws of the United States, or any State thereof, or a commercial bank organized under the laws of another country and acting through a branch or agency located in the United States, in any case having total assets of not less than ten billion Dollars, any holding company thereof and any affiliate having total assets of not less than ten billion Dollars of any such holding company; (b) a savings and loan association or savings bank organized under the laws of the United States, or any State

thereof and having total assets of not less than ten billion Dollars, any holding company thereof and any affiliate having total assets of not less than ten billion Dollars of any such holding company; and (c) any insurance company, pension fund or investment fund having total assets of not less than ten billion Dollars.

"**Insurance Consultant**" shall mean Trimont Real Estate Advisors, Inc. or such other insurance consultant as Agent may engage in connection with the Loan.

"**Insurance Premiums**" shall have the meaning as set forth in Section 5.1.1(b).

"**Interest Period**" shall mean, with respect to any LIBOR Loan:

(a)    initially, the period commencing on the borrowing date with respect to such LIBOR Loan and, if such borrowing date occurs before the ninth (9th) day of a calendar month, ending on (and including) the eighth (8th) day of the calendar month in which such borrowing date occurs, or if such borrowing date occurs on or after the ninth (9th) day of a calendar month, the period commencing on such borrowing date and ending on (and including) the eighth (8th) day of the following calendar month; and

(b)    thereafter, each period commencing on the last day of the then expiring Interest Period applicable to such LIBOR Loan (i.e., on the ninth (9th) day of the applicable calendar month) and ending on (and including) the eighth (8th) day of the following calendar month; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)    if any Interest Period pertaining to a LIBOR Loan would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day; and

(ii)    Each Interest Period as set forth in clause (b) above shall be a full month and shall not be shortened by reason of any payment of the Loan prior to the expiration of such Interest Period.

"**Interest Rate Protection Agreement**" shall mean one or more interest rate caps (together with the schedules relating thereto) in form and substance reasonably satisfactory to Lender, with a confirmation from the Counterparty thereto, which shall be in the form attached to the Loan Agreement as EXHIBIT C, between Borrower and, subject to Section 4.1.11 of this Agreement, a Counterparty reasonably acceptable to Agent with a Minimum Counterparty Rating, and all amendments, restatements, replacements, supplements and modifications thereto.

"**Interest Reserve**" shall have the meaning as set forth in Section 2.10.10.

"**Land**" shall mean the land more particularly described on EXHIBIT A and includes all rights appurtenant thereto, including, without limitation, all development rights, if any, acquired by Borrower pursuant to any air rights agreements pertaining thereto, and any and all beneficial easements or use agreements for the use of or rights to common facilities or amenities.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, treaties, rules, orders, regulations, ordinances, judgments, decrees, injunctions, permits or requirements of Governmental Authorities affecting Borrower or the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the ADA, the Prescribed Laws, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof, or (ii) in any way limit the use and enjoyment thereof.

"**Lender's Notice**" shall have the meaning set forth in Section 2.2.1(c).

"**Letter of Credit**" shall mean an irrevocable, unconditional, transferable, clean sight draft letter of credit acceptable to Agent (either an evergreen letter of credit or one which does not expire until at least thirty (30) Business Days after the Maturity Date) in favor of Agent for the ratable benefit of the Lenders and entitling Agent to draw thereon in New York, New York, issued by a domestic Eligible Institution or the U.S. agency or branch of a foreign Eligible Institution. If at any time the bank issuing any such Letter of Credit shall cease to be an Eligible Institution, Agent shall have the right upon ten (10) days' prior notice to Borrower to draw down the same in full and hold the proceeds of such draw in accordance with the applicable provisions hereof unless within such ten (10) day period Borrower has delivered a replacement Letter of Credit meeting the requirements set forth herein issued by an Eligible Institution.

"**LIBOR Base Rate**" shall mean for each Interest Period, the quoted offered rate for one-month United States dollar deposits with leading banks in the London interbank market that appears as of 11:00 a.m. (London time) on the related Determination Date on Telerate Page 3750.

If, as of such time on any Determination Date, no quotation is given on Telerate Page 3750, then Lender shall establish the LIBOR Base Rate on such Determination Date by requesting four Reference Banks meeting the criteria set forth herein to provide the quotation offered by its principal London office for making one-month United States dollar deposits with leading banks in the London interbank market as of 11:00 a.m., London time, on such Determination Date.

    (a)    If two or more Reference Banks provide such offered quotations, then the LIBOR Base Rate for the next Interest Period shall be the arithmetic mean of such offered quotations (rounded upward if necessary to the nearest whole multiple of 1/1,000%).

    (b)    If only one or none of the Reference Banks provides such offered quotations, then the LIBOR Base Rate for the next Interest Period shall be the Reserve Rate.

(c)    If on any Determination Date, Lender is required but is unable to determine the LIBOR Base Rate in the manner provided in paragraphs (i) and (ii) above, the LIBOR Base Rate for the next Interest Period shall be the LIBOR Base Rate as determined on the preceding Determination Date.

The establishment of the LIBOR Base Rate on each Determination Date by Lender shall be final and binding absent manifest error.

"**LIBOR Business Day**" means a day upon which United States dollar deposits may be dealt in on the London and the New York City interbank markets and commercial banks and foreign exchange markets are open in London and the New York.

"**LIBOR Loan(s)**" shall mean the Loan or any portion thereof at any time in which the Applicable Interest Rate for the Loan or such portion thereof is calculated with reference to the LIBOR Rate in accordance with the provisions of Article II.

"**LIBOR Margin**" shall mean 300 basis points.

"**LIBOR Rate**" shall mean with respect to each Interest Period the quotient of (i) the LIBOR Base Rate applicable to the Interest Period divided by (ii) a percentage equal to 100% minus the Reserve Requirement applicable to the Interest Period.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Property, or any portion thereof, or Borrower, or any interest in Borrower, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances against the Property or any portion thereof or Borrower or any interest in Borrower.

"**Lien Law**" shall mean the Florida Construction Lien Law, Chapter 713, Florida Statutes.

"**Line Items**" shall have the meaning as set forth in Section 2.1.6.

"**Loan**" shall mean the Loan, made by Lender to Borrower pursuant to this Agreement and the other Loan Documents.

"**Loan Amount**" shall mean $46,842,839.49.

"**Loan Budget**" shall mean the budget (which may be set forth by way of a separate column on an overall project budget) for total estimated Loan Costs, dated the date hereof, prepared by Borrower and approved by the Agent and the Construction Consultant and all amendments and modifications thereto approved by Agent in accordance with this Agreement.

"**Loan Contingency**" shall mean the Loan Contingency (Hard Costs) and the Loan Contingency (Soft Costs).

"**Loan Contingency (Hard Costs)**" shall mean the amount allocated as contingency reserve in the Loan Budget for "Hard Costs" of construction.

"**Loan Contingency (Soft Costs)**" shall mean the amount allocated as contingency reserve in the Loan Budget for "Soft Costs" of construction.

"**Loan Costs**" shall mean those Costs that are to be funded from proceeds of the Loan, subject to availability and satisfaction of all applicable conditions to Advances hereunder.

"**Loan Documents**" shall mean, collectively, the Loan Agreement, the Note, the Mortgage, the Assignment of Leases, the Assignment of Contracts, the Environmental Indemnity, the Assignment of Management Agreement, the Loan Fee Letter, the Requisition Authorization Statement, the Funding Statement, the Agreement Regarding Instructions by Telephone or Facsimile, the Guaranty of Completion, the Guaranty of Payment, the Assignment of Interest Rate Protection Agreement, as well as all other documents now or hereafter executed and/or delivered by Borrower or a Guarantor with respect to the Loan.

"**Loan Fee Letter**" shall mean that certain letter agreement dated as of the date hereof between Agent and Borrower pertaining to the fees payable by Borrower to Agent and/or Lenders.

"**Loan Parties**" shall mean, collectively, Borrower and Guarantor.

"**Losses**" shall have the meaning as set forth in Section 10.13(b).

"**Major Trade Contract**" shall mean any Trade Contract with a Trade Contractor (i) in which the aggregate contract price is equal to or greater than $250,000.00, whether pursuant to one contract or agreement or multiple contracts or agreements, after taking into account all change orders, or (ii) which relates to the following major project components: steel, concrete, HVAC systems, windows, doors and other similar items mechanical, electrical and plumbing.

"**Major Trade Contractor**" shall mean the contractor or vendor under a Major Trade Contract.

"**Management Agreement**" shall mean that certain Consultant Agreement dated as of December 30, 2002, by and between Borrower and the Manager (or any other management agreement entered into by Borrower in accordance with Section 7.1 with a manager approved by Agent in its sole discretion), pursuant to which such Manager is to provide management and other services with respect to the Property.

"**Manager**" shall mean Continental Association Management, Inc., or any other manager, if any, as shall have been approved by Agent in its sole discretion, in accordance with Section 7.1.

"**Material Adverse Effect**" shall mean a material adverse effect on (a) the ability of Borrower to perform its payment obligations under the Loan Documents to which it is a party, or to perform its obligations thereunder in respect of the construction of the Improvements,

maintenance of the Property or the maintenance of insurance or the payment of Taxes and Other Charges in respect of the Property, (b) the validity or enforceability of any of the Loan Documents, the lien of the Mortgage or the rights and remedies of Agent and/or Lenders under any of the Loan Documents (except to the extent caused solely by an act or omission of Agent or the Lenders, respectively), (c) the ability of either Guarantor to perform its obligations under the respective Guaranties or (d) the Property or any other collateral for the Loan.

"**Maturity Date**" shall mean the earlier to occur of the Initial Maturity Date or such earlier date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise; provided however that if Borrower exercises its right to extend the term of the Loan for the Extension Period and, in accordance with the terms of this Agreement, the term of the Loan is so extended, from and after such extension of the term of the Loan "Maturity Date" shall mean the Extended Maturity Date or such earlier date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Commitment**" shall mean, as to any Lender, the obligation of such Lender to fund Advances of the Loan to Borrower pursuant to Section 2.1 in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on SCHEDULE I or in an Assignment and Acceptance, as such amount may be reduced from time to time in accordance with the provisions of this Agreement.

"**Maximum Legal Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Member**" shall mean, Gables Marquis II, L.L.C., a Delaware limited liability company.

"**Mezzanine Borrower**" shall mean, Gables Marquis I, L.L.C., a Delaware limited liability company.

"**Mezzanine Lender**" shall mean, Lehman Brothers Holdings Inc., a Delaware Corporation, together with its successors and permitted assigns.

"**Mezzanine Loan**" shall mean that certain loan made as of the date hereof by Mezzanine Lender to Mezzanine Borrower in the original principal amount of $7,985,709.87.

"**Mezzanine Loan Default**" shall mean "Event of Default" under the Mezzanine Loan Documents.

"**Mezzanine Loan Documents**" shall mean all documents evidencing the Mezzanine Loan and all documents executed and/or delivered in connection therewith.

"**Minimum Counterparty Rating**" shall mean an unqualified credit rating from S&P and Fitch of at least "AA" and from Moody's of at least "AA".

"**Minimum Release Price**" shall mean, as to any Unit, parking space or Storage Unit, the minimum release price required to be paid to Agent for the ratable benefit of Lenders for the release of such Unit, parking space or Storage Unit, as the case may be (prior to the inclusion of any condominium upgrades) as provided on SCHEDULE XXIX hereto.

"**Mortgage**" shall mean that certain first priority Mortgage, Assignment of Leases and Rents, Security Agreement and Financing Statement dated as of the date hereof, executed and delivered by Borrower to Agent as security for the Loan and encumbering the Property.

"**Net Proceeds**" shall mean all Proceeds payable as a result of a Casualty or a Condemnation to the Property or any portion thereof, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such Proceeds.

"**Net Proceeds Deficiency**" shall have the meaning as set forth in Section 5.3.2(f).

"**Net Sales Proceeds**" shall mean as to any unit, the Gross Sale Proceeds of such Unit minus customary and reasonable closing costs and expenses paid to third parties which do not exceed in the aggregate five percent (5%) of the Gross Sales Proceeds for such Unit, including, without limitation, broker fees, marketing agent fees and legal fees actually incurred by Borrower (excluding transfer taxes paid by Borrower) and reasonably approved by Agent in connection with the sale of such Unit.

"**Note**" shall have the meaning as set forth in Section 2.1.3.

"**Notice**" shall have the meaning as set forth in Section 10.6.

"**Obligations**" shall mean the unpaid principal amount of, and interest (including, without limitation, interest accruing after the maturity of the Loan and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) on the Loan, and all other obligations and liabilities of the Loan Parties to Agent and the Lenders, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, or out of or in connection with this Agreement, the Note, the Guaranties and any other Loan Documents and any other document made, delivered or given in connection therewith or herewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees and disbursements of counsel to Agent or to the Lenders that are required to be paid by a Loan Party pursuant to the terms of the Loan Documents) or otherwise.

"**Offering Plan**" shall mean the Initial Offering Plan or Prospectus as the same is or may be amended in accordance with the provisions of Section 4.1.39.

"**Officer's Certificate**" shall mean a certificate delivered to Agent by Borrower which is signed by an authorized senior officer of Borrower.

"**Organizational Documents**" shall mean, as to any Person, its certificate of formation and operating agreement, its partnership agreement and certificate of limited partnership or doing business certificate, as applicable, its articles or certificate of incorporation and by-laws, and/or the other organizational or governing documents of such Person. Organizational Documents of a Person shall include, to the extent applicable, incumbency certificates, resolutions, certificates of good standing and consents of members, partners or shareholders, as applicable.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Payment and Performance Bonds**" shall mean unconditional dual-obligee payment and performance bonds relating to the General Contractor and all Major Trade Contractors, issued by a surety company or companies authorized to do business in the State, and in form and content reasonably acceptable to Agent, in each case in an amount not less than the full contract price; together with a dual obligee and modification rider in the form attached hereto as SCHEDULE XXI which shall be attached thereto.

"**Payment Date**" shall mean the ninth (9th) calendar day of each calendar month during the term of the Loan, and if such day is not a Business Day, then the Business Day immediately preceding such day, commencing on December 9, 2005 and continuing to and including the Maturity Date.

"**Permitted Encumbrances**" shall mean, collectively, (i) the Liens and security interests created by the Loan Documents or otherwise permitted by the Loan Documents, (ii) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy, (iii) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (iv) such other title and survey exceptions as Agent has approved or may approve in writing in Agent's sole discretion.

"**Permitted Investments**" shall mean any one or more of the following obligations or securities acquired at a purchase price of not greater than par, including those issued by Servicer, the trustee under any Securitization or any of their respective Affiliates, payable on demand or having a maturity date not later than the Business Day immediately prior to the first monthly Payment Date following the date of acquiring such investment and meeting one of the appropriate standards set forth below:

(a)     obligations of, or obligations fully guaranteed as to payment of principal and interest by, the United States or any agency or instrumentality thereof provided such obligations are backed by the full faith and credit of the United States of America including, without limitation, obligations of: the U.S. Treasury (all direct or fully guaranteed obligations), the Farmers Home Administration (certificates of beneficial

ownership), the General Services Administration (participation certificates), the U.S. Maritime Administration (guaranteed Title XI financing), the Small Business Administration (guaranteed participation certificates and guaranteed pool certificates), the U.S. Department of Housing and Urban Development (local authority bonds) and the Washington Metropolitan Area Transit Authority (guaranteed transit bonds); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(b)    Federal Housing Administration debentures;

(c)    obligations of the following United States government sponsored agencies: Federal Home Loan Mortgage Corp. (debt obligations), the Farm Credit System (consolidated systemwide bonds and notes), the Federal Home Loan Banks (consolidated debt obligations), the Federal National Mortgage Association (debt obligations), the Financing Corp. (debt obligations), and the Resolution Funding Corp. (debt obligations); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(d)    federal funds, unsecured certificates of deposit, time deposits, bankers' acceptances and repurchase agreements with maturities of not more than 365 days of any bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term rating category and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(e)    fully Federal Deposit Insurance Corporation-insured demand and time deposits in, or certificates of deposit of, or bankers' acceptances issued by, any bank or trust company, savings and loan association or savings bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in

the highest short term rating category and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(f)    debt obligations with maturities of not more than 365 days and at all times rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities) in its highest long-term unsecured rating category; provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(g)    commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than one year after the date of issuance thereof) with maturities of not more than 365 days and that at all times is rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities) in its highest short-term unsecured debt rating; provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(h)    units of taxable money market funds or mutual funds, which funds are regulated investment companies, seek to maintain a constant net asset value per share and invest solely in obligations backed by the full faith and credit of the United States, which funds have the highest rating available from each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities) for money market funds or mutual funds; and

(i)    any other security; obligation or investment which has been approved as a Permitted Investment in writing by (a) Lender and (b) each Rating Agency, as evidenced by a written confirmation that the designation of such security, obligation or investment as a Permitted Investment will not, in and of itself, result in a downgrade, qualification or withdrawal of the initial, or, if higher, then current ratings assigned to the Securities by such Rating Agency;

provided, however, that no obligation or security shall be a Permitted Investment if (A) such obligation or security evidences a right to receive only interest payments or (B) the right to receive principal and interest payments on such obligation or security are derived from an underlying investment that provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment.

"**Permitted Transfers**" shall have the meaning set forth in Section 8.3.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall mean materials, furnishings, fixtures, machinery, equipment and all items of tangible and intangible personal property now or hereafter owned by Borrower, wherever located, and either (i) to be incorporated into the Improvements, (ii) used in connection with the construction of the Improvements or (iii) to be used in connection with the operation of the Property.

"**Physical Conditions Report**" shall mean a report prepared by a company satisfactory to Agent regarding the physical condition of the Property, satisfactory in form and substance to Agent, which report shall, among other things, confirm that the Property and its use comply, in all material respects, with all applicable Legal Requirements (including, without limitation, zoning, subdivision and building laws) and with the ADA.

"**Plans and Specifications**" shall mean the plans and specifications for the Improvements prepared by Borrower's Architect more particularly identified on EXHIBIT F, as the same may be amended and supplemented from time to time in accordance with the terms of this Agreement.

"**Pledges**" shall collectively mean that certain Pledge and Security Agreement dated as of the date hereof by Mezzanine Borrower, of its 100% membership interest in Borrower, in favor of Lender; that certain Pledge and Security Agreement dated as of the date hereof by Member, of its 100% membership interest in Mezzanine Borrower, in favor of Lender; and the certain Pledge and Security Agreement by Elie Berdugo, a/k/a Elie Berdougo, dated the date hereof, of his 100% membership interest in Member, in favor of Lender.

"**Policies**" shall have the meaning as set forth in Section 5.1.1(b).

"**Preliminary Project Report**" shall have the meaning as set forth in Section 2.1.6.

"**Prepayment Date**" shall have the meaning as set forth in Section 2.5.1.

"**Prepayment Notice**" shall have the meaning as set forth in Section 2.5.1.

"**Prescribed Laws**" shall mean, collectively, (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (The USA PATRIOT Act), (b) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (c) the International Emergency Economic Power Act, 50 U.S.C. §1701 et. seq. and (d) all other Legal Requirements relating to money laundering or terrorism.

"**Proceeds**" shall mean: (i) the amount of all insurance proceeds payable as a result of a Casualty to the Property or any portion thereof, or (ii) the amount of the Award payable as a result of a Condemnation to the Property or any portion thereof.

"**Project**" shall mean the development and construction of the Improvements at the Property in accordance with the Plans and Specifications and all Legal Requirements.

"**Project Cost Budget**" shall have the meaning as set forth in Section 2.1.6.

"**Projections**" shall have the meaning specified in Section 10.28.

"**Property**" shall mean the Land, the Improvements now or hereafter erected thereon and all personal property owned by Borrower and encumbered by the Mortgage, together with all rights pertaining to such property and Improvements, as more particularly described in the granting clauses of the Mortgage.

"**Punch List Items**" shall mean, collectively, minor or insubstantial details of construction, decoration, mechanical adjustment or installation, which do not hinder or impede the use, operation, or maintenance of the Property or the ability to obtain a permanent certificate of occupancy with respect thereto.

"**Qualifying Contract**" shall mean a contract for the sale of any Unit that satisfies the requirements of Section 4.1.39(g)(iii).

"**Ratable Share**" or "**ratably**" shall mean, with respect to any Lender, the percentage that such Lender's Maximum Commitment then constitutes of the Loan Amount. The Ratable Share of each Lender on the date of this Agreement is set forth on SCHEDULE I.

"**Rating Agencies**" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("**S&P**"), Moody's Investors Service, Inc. ("**Moody's**"), and Fitch, Inc. ("**Fitch**"), and any other nationally-recognized statistical rating agency which has been designated by Agent.

"**Reference Bank**" means a leading bank engaged in transactions in Eurodollar deposits in the international Eurocurrency market that has an established place of business in London. If any such Reference Bank should be removed from the Telerate Page 3750 or in any

other way fail to meet the qualifications of a Reference Bank, Lender may designate alternative Reference Banks meeting the criteria specified above.

**"Regulation D"** shall mean Regulation D of the Board of Governors of the Federal Reserve System from time to time in effect, including any successor or other Regulation or official interpretation of said Board of Governors relating to reserve requirements applicable to member banks of the Federal Reserve System.

**"Regulatory Change"** shall mean any change after the date of this Agreement in Federal, state or foreign law or regulations (including, without limitation, Regulation D of the Board of Governors of the Federal Reserve System) applying to a class of banks including any Lenders or the adoption or making after such date of any interpretation, directive or request applying to a class of banks including any Lenders of or under any Federal, state or foreign law or regulations (whether or not having the force of law and whether or not failure to comply therewith would be unlawful) by any court or government or monetary authority charged with the interpretation or administration thereof.

**"Rents"** shall mean all rents, moneys payable as damages or in lieu of rent, revenues, deposits that are not the property of Tenants but including Borrower's rights in such property (if any) (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property.

**"Reporting Failure"** shall have the meaning as set forth in Section 4.1.6(k).

**"Required Equity"** shall mean the sum of (x) $3,725,000.00 in cash equity invested by Borrower in the Property plus (y) an imputed land value of $2,740,000.00 as of or prior to the date hereof, which investment shall be maintained throughout the term of the Loan.

**"Required Financial Item"** shall have the meaning as set forth in Section 4.1.6(k).

**"Required Release Price"** has the meaning as set forth in Section 4.1.39(i)(A)(VIII).

**"Requisition Authorization Statement"** shall mean the Requisition Authorization Statement dated as of the date hereof, which shall be in the form attached hereto as SCHEDULE XIX and shall be executed and delivered by Borrower to Agent contemporaneously herewith.

**"Reserve Rate"** shall mean the rate per annum which Lender determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 1/1,000%) of the one-month United States dollar lending rates that at least three major New York City banks selected by Lender are quoting, at 11:00 a.m. (New York time) on the relevant Determination Date, to the principal London offices of at least two of the Reference Banks, or (ii) in the event that at least two such rates are not obtained, the lowest one-month United States

dollar lending rate which New York City banks selected by Lender are quoting as of 11:00 a.m. (New York time) on such Determination Date to leading European banks.

"**Reserve Requirements**" shall mean, for any day as applied to a LIBOR Loan, the aggregate (without duplication) of the rates (expressed as a decimal fraction) of reserve requirements in effect on such day, if any, (including, without limitation, any supplemental, marginal, supplemental and emergency reserves) under any regulations of the Board of Governors of the Federal Reserve System or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "**Eurocurrency liabilities**" in Regulation D) required to be maintained by the applicable Lender or its Loan participants, if any. Without limiting the effect of the foregoing, the Reserve Requirement shall reflect any other reserves required to be maintained by any Lender or any Lender's respective Loan participants, if any, by reason of any Regulatory Change against (i) any category of liabilities that includes deposits by reference to which the LIBOR Base Rate is to be determined as provided in this Agreement" or (ii) any category of extensions of credit or other assets that includes the loans the interest rate on which is determined on the basis of rates used in determining the LIBOR Rate.

"**Residential Unit**" or "**Residential Units**" shall mean any Unit or Units designated for residential use in the Offering Plan.

"**Restoration**" shall have the meaning as set forth in Section 5.2.1.

"**Restoration Threshold**" shall mean $250,000.00.

"**Retainage**" shall mean, for each construction contract and subcontract, the greater of (a) ten percent (10%) of all costs funded to the contractor or subcontractor under the contract or subcontract and (b) the actual retainage required under such contract or subcontract.

"**Retail Unit**" or "**Retail Units**" shall mean any Unit or Units designed for retail use in the Offering Plan.

"**Servicer**" shall have the meaning set forth in Section 11.10.

"**Servicing Agreement**" shall have the meaning set forth in Section 11.10.

"**Servicing Fee**" shall mean the "Servicing Fee" under (and as defined in) the Loan Fee Letter.

"**Severed Loan Documents**" shall have the meaning as set forth in Section 9.2.1(c).

"**Shell Completion**" shall mean, with respect to the Project, the construction in accordance with the Plans and Specifications of the exterior building walls and the enclosure thereof with the roof, so as to create a structural unit that is "weather-tight."

"**Shell Completion Date**" shall mean September 29, 2006, provided, however, that the Shell Completion Date may be extended by the aggregate number of days that the Shell

Completion is delayed by Force Majeure Events; provided, further, that the Shell Completion Date shall not be delayed more than ninety (90) days in the aggregate after giving effect to all such extensions.

"**Shortfall**" shall have the meaning as set forth in <u>Section 2.1.11</u>.

"**Soft Costs**" shall mean those Costs which are not Hard Costs, including but not limited to, architect's, engineer's and construction manager's fees, interest on the Loan, recording taxes and title charges in respect of the Mortgage, Taxes and Other Charges and Insurance Premiums.

"**SPC Party**" shall have the meaning as set forth in <u>Section 3.1.24(r)(i)</u>.

"**Spreadsheet**" shall have the meaning as set forth in <u>Section 2.9.1(d)(xiii)</u>.

"**State**" shall mean the State of Florida.

"**Storage Units**" shall mean the Units designated for storage use in the Offering Plan, if any.

"**Stored Materials**" shall have the meaning as set forth in <u>Section 2.1.9</u>.

"**Subordinate Loan**" shall have the meaning set forth in <u>Section 11.11</u>.

"**Substitute Rate**" shall have the meaning set forth in <u>Section 2.2.1(c)</u>.

"**Substitute Rate Margin**" shall have the meaning set forth in <u>Section 2.2.1(c)</u>.

"**Substitute Rate Loan**" shall mean the Loan or any portion thereof at any time in which the Applicable Interest Rate for the Loan or such portion thereof is calculated with reference to the Substitute Rate in accordance with the provisions of Article II.

"**Survey**" shall mean an ALTA survey of the Property prepared by a surveyor licensed in the State and satisfactory to Agent and the Title Company issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Agent and the Title Company issuing the Title Insurance Policy.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof, together with all interest and penalties thereon.

"**Title Company**" shall mean Commonwealth Land Title Insurance Company which is insuring the Lien of the Mortgage.

"**Title Insurance Policy**" shall mean an ALTA mortgagee title insurance policy issued by the Title Company in the form (acceptable to Agent) issued with respect to the Property and insuring the Lien of the Mortgage.

"**Total Debt**" shall mean collectively, the Debt and Other Debt.

"**Total Project-Related Costs**" shall mean all direct and indirect costs and expenses of constructing and developing the Improvements (including Hard Costs and Soft Costs) and operating the same through the Completion Date.

"**Trade Contract**" shall mean any agreement (other than the Architect's Agreement and the General Contractor's Agreement) entered into by the Borrower or by the General Contractor, in which the Trade Contractor thereunder agrees to provide labor and/or materials in connection with the construction of the Improvements.

"**Trade Contractor**" shall mean the contractor or vendor under any Trade Contract.

"**Transfer**" shall have the meaning as set forth in the Mortgage.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State from time to time.

"**Unit**" or "**Units**" shall mean each individual condominium unit (including any residential or retail unit and any appurtenant interest in the common elements) in the Land and the Improvements created by the submission of the Property to the provisions of the Condominium Act in accordance with the Condominium Documents.

"**Up-Front Fee**" shall mean the "Up-Front Fee" under (and as defined in) the Loan Fee Letter.

"**U.S. Obligations**" shall mean direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption.

**Section 1.2    Principles of Construction.**

All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any Loan Document shall be deemed to include references to such documents as the same may hereafter be amended, modified, supplemented, extended, replaced and/or restated from time to time (and, in the case of any note or other instrument, to any instrument issued in substitution therefor). Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## II.    THE LOAN

**Section 2.1    The Loan and Advances.**

**2.1.1    Agreement to Lend and Borrow.** (a) Subject to and upon the terms and conditions set forth herein, Lenders severally and not jointly agree to make Advances of the Loan to Borrower from time to time, in accordance with the provisions hereof, during the period

from the date hereof to the Maturity Date, and Borrower shall accept the Advances of the Loan from Lenders, in an aggregate principal amount of up to the Loan Amount. No Lender is obligated to fund amounts in excess of the amount of its Maximum Commitment as set forth on SCHEDULE I, but if the aggregate amount of all Lenders' Maximum Commitments is increased or Agent makes funds available in excess of the total Maximum Commitment amount, each Lender shall have the right to elect at its own discretion whether to provide funds to Agent to fund amounts in excess of its Maximum Commitment. If and to the extent any Lender shall fund amounts in excess of its Maximum Commitment for any purpose, such Lender's Ratable Share of the Loan shall be adjusted from time to time based on the total amounts advanced by all of Lenders from time to time in respect of the Loan.

2.1.2    **No Reborrowings**. Any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

2.1.3    **The Note**. The Loan shall be evidenced by one or more promissory notes in the form of Exhibit E attached hereto, made by Borrower to each Lender in the respective principal amounts of the related Lender's Ratable Share of the Loan, and all of which notes shall collectively be in the aggregate principal amount of the Loan Amount (collectively, as the same may be amended, supplemented, restated, increased, extended and consolidated, substituted or replaced from time to time, the **"Note"**) and shall be repaid in accordance with the terms of this Agreement and the Note.

2.1.4    **Use of Proceeds**. Borrower shall use proceeds of the Loan to pay or reimburse itself for Loan Costs actually incurred in connection with the construction of the Improvement if and to the extent that such Loan Costs are reflected in the Loan Budget, subject to reallocation pursuant to Sections 2.1.7 [Budget Reallocations] and 4.2.13 [Change Orders] (or other reallocations approved by Agent in its sole discretion).

2.1.5    **Loan Term and Extension Options**. (a) The term of the Loan shall commence on the Closing Date and shall end on the Initial Maturity Date unless otherwise extended in accordance with subparagraph (b) below.

(b)    Notwithstanding the foregoing, Borrower shall have an option to extend the term of the Loan until the Extended Maturity Date, subject to satisfaction of the following conditions: (a) Borrower shall have given Agent written notice (the **"Extension Notice"**) of such extension by no earlier than sixty (60) days prior to the Initial Maturity Date and no more than ninety (90) days prior to the Initial Maturity Date; (b) there shall have been no material adverse change in the financial condition of the Loan Parties or in the value of the Project as determined by Agent in its reasonable discretion; (c) Borrower shall have paid or caused to be paid to Administrative Agent the non-refundable Extension Fee; (d) no Default or Event of Default shall have occurred and be continuing at the time of, or any time after, the delivery of the Extension Notice; (e) Agent shall have received a title report updating the status of title from the date of the policy, and increase the amount of the existing policy, at a premium amount equal to the difference between the original insured amount and the increased amount but the effective date will not be updated; (f) Borrower shall have paid all costs and expenses actually incurred by Agent in connection with such extension, including underwriting, title and reasonable legal fees and costs; (g) completion of the Improvements shall have occurred and temporary or permanent

certificates of occupancy for the Improvements have been issued; (h) Borrower shall have obtained an Interest Rate Cap Agreement for the Extension Period; (i) on or prior to the Initial Maturity Date, Borrower shall have established with Agent such reserves for the Payment of Taxes, Insurance Premiums, Debt Service and other expenses reasonably anticipated by Agent to be incurred by Borrower during the Extension Period pursuant to this Agreement and; (j) Guarantor executes a reaffirmation of the Guaranty and Environmental Indemnity.

      **2.1.6    Preliminary Project Report and Budget**. A budget, which details the direct and indirect costs estimated to be incurred by Borrower until the Property achieves stabilized occupancy (the "**Project Cost Budget**"), shall be prepared by Borrower and delivered to Agent and to the Construction Consultant. Agent shall cause the Construction Consultant to prepare, at Borrower's cost and expense, a report for Agent which documents the Construction Consultant's review conclusions (the "**Preliminary Project Report**") after reviewing the Project Cost Budget, Plans and Specifications, General Contractor's Agreement, Trade Contracts, Construction Schedule, Disbursement Schedule, tests and all other reports required by the Construction Consultant. After reviewing the Preliminary Project Report, Agent shall approve a Loan Budget. Each category of direct and indirect cost (the "**Line Items**" or "**Budget Line**") shall be delineated in the Project Cost Budget and in the Loan Budget with those that are approved as Loan Costs to be disbursed out of Loan proceeds subject to availability and satisfaction of all applicable conditions to Advances hereunder, being so indicated.

      **2.1.7    Budget Reallocations**. (a) Subject to the prior approval of Agent, which shall not be unreasonably withheld, the Borrower may revise the Loan Budget from time to time to move amounts available under the Hard Costs Budget Line denominated "Contingency" to other Hard Costs Budget Lines, and/or to move amounts available under the Soft Costs Budget Line denominated "Contingency" to other Soft Costs Budget Lines.

      (b)    Notwithstanding anything in Section 2.1.7(a) to the contrary, if there is a savings in a particular Budget Line, and if such savings is substantiated by evidence reasonably satisfactory to Agent, the Borrower shall have the right, upon prior approval of Agent, which approval shall not be unreasonably withheld or delayed, to reallocate such savings to another Budget Line with respect to which additional costs have been or may be incurred; provided, however that, the Borrower shall in no event or under any circumstances have the right (i) to reallocate any portion of the Interest Reserve or the Fees Budget Line(s) prior to Completion of the Improvements, or (ii) reallocate any savings in a Hard Costs Budget Line to other than another Hard Costs Budget Line, without in each instance obtaining the prior approval of Agent, which approval may be withheld in the sole and absolute discretion of Agent, or to cause a reallocation to occur that in the opinion of the Agent, its counsel or the Title Company will be in contravention of the Lien Law, or that in the opinion of the Agent, its counsel or the Title Company will adversely affect or impair in any manner whatsoever the lien or the priority of lien of the Mortgage.

      (c)    If Borrower becomes aware of any change in Costs which will increase a Line Item of Costs reflected on the Project Costs Budget, Borrower shall immediately notify Agent in writing and promptly submit to Agent for its approval a revised Project Costs Budget. Any reallocation of any Line Item in the Loan Budget in connection with cost overruns shall be subject to Agent's approval in Agent's sole discretion except as set forth in Section 2.1.7(a) and

(b) above and Section 4.2.13. Lenders shall have no obligation to make any further Advances unless and until the revised Project Cost Budget and Loan Budget so submitted by Borrower is approved by Agent, and Agent reserves the right to approve or disapprove any revised Loan Budget in its sole and absolute discretion (except with respect to reallocations in accordance with Section 2.1.7(a) and (b) above and Section 4.2.13).

(d)     Notwithstanding anything to the contrary contained herein, if Agent is requested by Borrower to make reallocation of a hard cost item which would require contractor and lienor notices under Chapter 713, Florida Statutes, written notice from the owner to the applicable contractor and all required lienors, in compliance with the Lien Law, and countersigned by the applicable contractor and any lienors who have provided notices to owner, shall be given prior to any such reallocation.

2.1.8     **Advances**.  The Loan Budget reflects, by category and line item, the purposes and the amounts for which funds to be advanced by Lenders under this Agreement are to be used. Lenders shall not be required to disburse for any category or line item more than the amount specified therefor in the Loan Budget, subject to Sections 2.1.7 and 4.2.13 (or other reallocations approved by Agent in its sole discretion). No Lender is obligated to fund amounts in excess of its Ratable Share of the Loan Amount, but if the Loan Amount is increased or Agent makes funds available in excess of the total Loan Amount, each Lender shall have the right to elect at its own discretion whether to provide funds to Agent to fund amounts in excess of the Loan Amount. If and to the extent any Lender shall fund amounts in excess of the Loan Amount for any purpose, such Lender's Ratable Share of the Loan shall be adjusted from time to time based on the total amounts advanced by all of Lenders from time to time in respect of the Loan.

2.1.9     **Stored Materials**.  Lenders shall not be required to disburse any funds for any materials, machinery or other Personal Property not yet incorporated into the Improvements (the **"Stored Materials"**), unless the following conditions are satisfied:

(a)     Borrower shall deliver to Agent bills of sale or other evidence reasonably satisfactory to Agent of the cost of, and, subject to the payment therefor, Borrower's title in and to such Stored Materials;

(b)     The Stored Materials are identified to the Property and Borrower, are segregated so as to adequately give notice to all third parties of Borrower's title in and to such materials, and are components in substantially final form ready for incorporation into the Improvements;

(c)     The Stored Materials are stored at the Property or at such other third-party owned and operated site as Agent shall reasonably approve, and are protected against theft and damage in a manner satisfactory to Agent, including, if requested by Agent, storage in a bonded warehouse in the County in which the Property is located;

(d)     The Stored Materials will be paid for in full with the funds to be disbursed, and all lien rights or claims of the supplier will be released upon full payment;

(e)     Agent for the benefit of Lenders has or will have upon payment with disbursed funds a perfected, first priority security interest in the Stored Materials;

(f)    The Stored Materials are insured for an amount equal to their replacement costs in accordance with Section 5.1 of this Agreement;

(g)    The aggregate cost of Stored Materials stored at the Property is approved by the Construction Consultant and, if required by Agent, the Construction Consultant shall certify that it has inspected such Stored Materials and they are in good condition and suitable for use in connection with the Project; and

(h)    The cost of Stored Materials not stored at the Property, in the aggregate at any time, is not more than $500,000.00 and the aggregate cost of Stored Materials stored off and on the Property at any one time shall not exceed $1,000,000.00.

**2.1.10    Amount of Advances.**  (a) In no event shall any Advance exceed the full amount of Loan Costs theretofore paid or to be paid with the proceeds of such Advance minus, with respect to any such Loan Costs that are Hard Costs of construction, the applicable Retainage for each contract and subcontract.   It is further understood that the Retainage described above is intended to provide a contingency fund protecting Lenders against failure of Borrower or Guarantor to fulfill any Obligations under the Loan Documents, and that Lenders may charge amounts against such Retainage in the event Lenders are required or elect to expend funds to cure any Default or Event of Default.

(b)    The Retainage shall be advanced upon Completion of the Improvements, provided, however that Retainage shall be advanced on a contract-by-contract basis prior to Completion of the Improvements but after final completion of all construction work provided for under all Trade Contracts with respect to any individual trade or component of the construction of the Improvements, subject to approval thereof by the Construction Consultant and receipt by Agent of final lien waiver(s) for said contract.

(c)    No Advance of the Loan by the Lenders shall be deemed to be an approval or acceptance by the Lenders of any work performed thereon or the materials furnished with respect thereto.

**2.1.11    Loan Balancing.**  At any time and from time to time during the term of the Loan, Agent shall have the right (but not the obligation) to notify Borrower that, in Agent's sole but reasonable judgment, (a) the cost of all Total Project-Related Costs that remain unpaid at the time in question exceeds the undisbursed proceeds of the Loan plus any sums deposited with Agent pursuant to this Section 2.1.11 and not previously disbursed, or (b) the cost of completing any Line Item in the Loan Budget exceeds the remaining undisbursed portion of the Loan allocated to such Line Item in the Loan Budget plus any sums deposited with Agent pursuant to this Section 2.1.11 to pay for such deficiency and not previously disbursed (the amount of any such deficiency under clauses (a) or (b) being herein referred to as the "**Shortfall**").  If Agent at any time shall so notify Borrower, Borrower shall, at its option, either individually or in combination (i) within five (5) days of Agent's notification as aforesaid, deposit with Agent an amount equal to such Shortfall, which Agent may from time to time apply, or allow Borrower to apply, to such costs; (ii) pay for such costs, as incurred, in the amount of such Shortfall so that the amount of the Loan which remains to be disbursed shall be sufficient to pay all of the remaining Total Project-Related Costs, and Borrower shall furnish Agent with such evidence

thereof as Agent shall require; (iii) post an irrevocable standby Letter of Credit in the amount of such deficiency, in favor of the Agent and the Lenders; (iv) with respect to any Shortfall arising pursuant to clause (b) above, to the extent permitted under Section 2.1.7(a) and Section 2.1.8, allocate the Loan Contingency to the Shortfall, and (v) with respect to any Shortfall arising pursuant to clause (b) above, to the extent permitted under Section 2.1.7(b), reallocate cost savings from the Loan Budget (or other reallocations which are approved by Agent, in its sole discretion) in accordance with the terms of this Agreement. Borrower hereby agrees that Agent shall have a lien on and security interest in, for the benefit of Lenders, any sums deposited pursuant to clause (i) above and that Borrower shall have no right to withdraw any such sums except for the payment of the aforesaid costs as approved by Agent. Agent and Lenders shall have no obligation to make any further advances of proceeds of the Loan until the sums required to be deposited pursuant to clause (i) above have been exhausted, Borrower has actually paid such Total Project-Related Costs pursuant to clause (ii) above, or until Borrower has posted an irrevocable standby Letter of Credit pursuant to clause (iii) above, as the case may be, and, in any such case, the Loan is back "in balance". Any such sums not used as provided in said clause (i) shall be released to Borrower when and to the extent that Agent reasonably determines that the amount thereof is more than the excess, if any, of the remaining Total Project-Related Costs over the undisbursed balance of the Loan, provided, however, that should an Event of Default occur, Agent shall apply such amounts either to the remaining Total Project-Related Costs or to the immediate reduction of outstanding principal and/or interest under the Notes.

**2.1.12   Quality of Work**.   No Advance or any portion thereof shall be made with respect to defective work or to any contractor that has performed work that is defective and that has not been cured, as confirmed by the report of the Construction Consultant, but Lenders may disburse all or part of any Advance before the sum shall become due if Agent believes it advisable to do so, and all such Advances or parts thereof shall be deemed to have been made pursuant to this Agreement.

**2.1.13   Required Equity**.   All Required Equity shall be contributed (i.e., expended by Borrower and invested in the Property for costs set forth on the approved Project Cost Budget) before any Advances of the Loan shall be made.

**Section 2.2     Interest Rate.**

**2.2.1   Interest**.

(a)     Applicable Interest Rate.   Except as herein provided with respect to interest accruing at the Default Rate or the Substitute Rate, interest on the principal balance of the Loan outstanding from time to time shall accrue from the date advanced up to and including the Maturity Date (including, without limitation, all interest that would accrue on the outstanding principal balance of the Loan through the end of the Interest Period during which the Maturity Date occurs (even if such period extends beyond the Maturity Date)) at the Applicable Interest Rate. Interest on the outstanding principal balance of the Loan existing on the commencement of an Interest Period shall accrue for the entire Interest Period and shall be owed by Borrower for the entire Interest Period regardless of whether any principal portion of the Loan is repaid prior to the expiration of such Interest Period.

(b)    <u>Computation of Interest and Fees</u>.    Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Applicable Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the outstanding principal balance. Notwithstanding the foregoing, interest payable at the Default Rate following an Event of Default shall be payable from time to time on demand of Agent and in any event, upon the payment or prepayment of any principal of any portion of the Loan, accrued, unpaid interest on the principal amount so paid or prepaid shall be due and payable through the next Payment Date. In any event, upon the payment or prepayment of any principal of any portion of the Loan, accrued, unpaid interest on the principal amount so paid or prepaid through the next Payment Date shall be due and payable.

(c)    <u>Substitute Rate</u>.    In the event that Lender shall have determined (which determination shall be conclusive and binding upon Borrower absent manifest error) that by reason of circumstances affecting the interbank eurodollar market, adequate and reasonable means do not exist for ascertaining the LIBOR Base Rate, then Lender shall, by notice to Borrower (**"Lender's Notice"**), which notice shall set forth in reasonable detail such circumstances, establish the Applicable Interest Rate at Lender's then customary spread (the **"Substitute Rate Margin"**), taking into account the size of the Loan and the creditworthiness of Borrower, above a published index used for variable rate loans as reasonably determined by Lender (the **"Substitute Rate"**).    If permitted by law, any change pursuant to this Section 2.2.1 shall not become effective until the expiration of the then current Interest Period. If, pursuant to the terms of this Agreement, the Loan has been converted to a Substitute Rate Loan and Lender shall determine (which determination shall be conclusive and binding upon Borrower absent manifest error) that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable, Lender shall give notice thereof to Borrower, and the Substitute Rate Loan shall automatically convert to a LIBOR Loan on the effective date set forth in such notice. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to elect to convert a LIBOR Loan to a Substitute Rate Loan.

### 2.2.2    <u>Intentionally Omitted</u>.

2.2.3    **Certain Notices**.    Notices by Borrower to Agent of borrowings hereunder shall be irrevocable and shall be effective only if received by Agent in writing or telephonically not later than 11:00 a.m. New York time (and if telephonically, also confirmed in writing by 5:00 p.m. New York time) on the number of LIBOR Business Days or days prior to the date of the relevant occurrence specified below:

| Notice | Prior Notice Requirements |
|---|---|
| Borrowing | 3 LIBOR Business Days |

2.2.4    **Additional Costs**.    (a) Borrower shall pay to Agent from time to time, within ten (10) days after demand therefor by Agent, such amounts as each Lender may

reasonably determine to be sufficient to compensate such Lender for any costs that such Lender reasonably determines are attributable to its making or maintaining of any portion of the Loan as a LIBOR Loan or its obligation to make any portion of the Loan as a LIBOR Loan hereunder, or any reduction in any amount receivable by such Lender hereunder in respect of a LIBOR Loan or such obligation (such increases in costs and reductions in amounts receivable being herein called "Additional Costs"), in each case resulting from and limited to the amounts necessary to compensate each Lender for any Regulatory Change (I) which affects similarly situated banks or financial institutions generally and is not applicable to such Lender primarily by reason of such Lender's particular conduct or condition and (II) which:

(i)     changes the basis of taxation of any amounts payable to such Lender under this Agreement or the Note (other than Excluded Taxes); or

(ii)     imposes or modifies any reserve, special deposit or similar requirements (other than the Reserve Requirement utilized in the determination of the LIBOR Rate) relating to any extensions of credit or other assets of, or any deposits with or other liabilities of, such Lender (including, without limitation, any such deposits referred to in the definition of "LIBOR Base Rate"), or any commitment of such Lender (including, without limitation, the commitment of such Lender hereunder); or

(iii)     imposes any other condition affecting this Agreement or the Note (or any of such extensions of credit or liabilities referred to in subdivision (ii) above).

Notwithstanding anything to the contrary contained in this Section 2.2.4, Additional Costs may be imposed on Borrower by Agent on behalf of each Lender only if such Additional Costs are generally being imposed by such Lender on similarly situated borrowers (as reasonably determined by such Lender).

(b)     Without limiting the effect of the provisions of clause (a) of this Section 2.2.4 (but without duplication), in the event that, by reason of any Regulatory Change which affects similarly situated banks or financial institutions generally and is not applicable to a Lender primarily by reason of such Lender's particular conduct or condition, any Lender incurs Additional Costs based on or measured by the excess above a specified level of the amount of a category of deposits or other liabilities of such Lender that includes deposits by reference to which the LIBOR Rate is determined as provided in this Agreement or a category of extensions of credit or other assets of such Lender that includes the portion of the Loan evidenced by such Lender's Note, then, if such Lender so elects by notice to Agent and Borrower, the obligation of such Lender to make or continue such portion of the Loan based on the LIBOR Rate hereunder shall be suspended effective on the last day of the then current Interest Period, until such Regulatory Change ceases to be in effect and the portion of the Loan evidenced by such Lender's Note shall, during such suspension, bear interest at the Substitute Rate plus the Substitute Rate Margin.

(c)     Without limiting the effect of the foregoing provisions of this Section 2.2.4 (but without duplication), Borrower shall pay to each Lender from time to time on request such amounts as such Lender may reasonably determine to be necessary to compensate such Lender (or, without duplication, the bank or bank holding company of which such Lender is

a subsidiary) for any costs that it determines are attributable to the maintenance by such Lender (or any Applicable Lending Office or such parent bank or bank holding company of such Lender), pursuant to any law or regulation or any interpretation, directive or request (whether or not having the force of law) of any Governmental Authority (i) following any Regulatory Change or (ii) implementing any risk-based capital guideline or other requirement (whether or not having the force of law) applying to a class of banks including such Lender, hereafter issued by any government or governmental or supervisory authority implementing at the national level the Basle Accord (including, without limitation, the Final Risk-Based Capital Guidelines of the Board of Governors of the Federal Reserve System (12 C.F.R. Part 208, Appendix A; 12 C.F.R. Part 225, Appendix A) and the Final Risk-Based Capital Guidelines of the office of the Comptroller of the Currency (12 C.F.R. Part 3, Appendix A)), of capital in respect of the commitment to lend or the Ratable Share of the Loan of such Lender (such compensation to include, without limitation, an amount equal to any reduction of the rate of return on assets or equity of such Lender (or any Applicable Lending Office or such parent bank or bank holding company of such Lender) to a level below that which such Lender (or any Applicable Lending Office or such parent bank or bank holding company of such Lender) could have achieved but for such law, regulation, interpretation, directive or request).    For purposes of this Section 2.2.4(c), "**Basle Accord**" shall mean the proposals for risk-based capital framework described by the Basle Committee on Banking Regulations and Supervisory Practices in its paper entitled "International Convergence of Capital Measurement and Capital Standards" dated July 1988, as amended, modified and supplemented and in effect from time to time or any replacement thereof.

(d)    Each Lender shall notify Agent and Borrower of any event occurring after the date of this Agreement entitling Lender to compensation under clause (a) or (c) of this Section 2.2.4 as promptly as practicable, and shall designate a different Applicable Lending Office for the Loan if such designation will avoid the need for, or reduce the amount of, such compensation and will not, in the reasonable opinion of such Lender, be materially disadvantageous to such Lender.  Such Lender shall furnish to Borrower a certificate setting forth the basis and amount of each request by such Lender for compensation under clause (a) or (c) of this Section 2.2.4.  Determinations and allocations by each Lender for purposes of this Section 2.2.4 of the effect of any Regulatory Change pursuant to clause (a) or (b) of this Section 2.2.4, or of the effect of capital maintained pursuant to clause (c) of this Section 2.2.4, on its costs or rate of return of maintaining its Ratable Share of the Loan or its obligation to make such Loan, or on amounts receivable by it in respect of the Loan, and of the amounts required to compensate each Lender under this Section 2.2.4, shall constitute prima facie evidence thereof. Each Lender shall confirm to Borrower at the time it makes any claim under this Section 2.2.4 that the methods of determination and allocation used by it in determining the amount of such claim are reasonably consistent with such Lender's treatment of customers similar to Borrower (as reasonably determined by such Lender).  In the event any Lender makes a request for compensation under clause (a) or (c) of this Section 2.2.4, Borrower shall, upon payment of the amount of compensation so requested, have the right to prepay the Loan in full on the last day of any then current Interest Period with respect to which such compensation has been requested.

2.2.5    **LIBOR Rate**. Anything herein to the contrary notwithstanding, if, on or prior to the determination of any LIBOR Base Rate for any Interest Period,

(a)     any Lender reasonably determines that quotations of interest rates for the relevant deposits referred to in the definition of "LIBOR Base Rate" are not being provided in the relevant amounts or for the relevant maturities for purposes of determining rates of interest for any LIBOR Loan as provided herein; or

(b)     any Lender determines that by reason of circumstances affecting the London interbank market the relevant rates of interest referred to in the definition of "LIBOR Base Rate" upon the basis of which the rate of interest for the LIBOR Loan for such Interest Period is to be determined are not likely adequately to cover the cost to such Lender of making or maintaining a LIBOR Loan for such Interest Period;

then such Lender shall give Borrower and Agent prompt notice thereof and, so long as such condition remains in effect, such Lender shall be under no obligation to make its Ratable Share of any such LIBOR Loan but shall remain obligated to make its Ratable Share of a Base Rate Loan for a corresponding amount, or if any portion of the Loan is already outstanding as a LIBOR Loan, such portion shall, commencing immediately after the end of the then current Interest Period, bear interest at the Substitute Rate plus the Substitute Rate Margin. Each such Lender shall promptly notify Borrower and Agent upon the cessation of any facts and circumstances which resulted in suspension under this Section 2.2.5, whereupon Borrower's right to cause the Loan or any portion thereof to be a LIBOR Loan shall be reinstated.

2.2.6     **Illegality.**  Notwithstanding any other provision of this Agreement, in the event that it becomes unlawful for any Lender or its Applicable Lending Office to honor its obligation to make or maintain its Ratable Share of the Loan, then such Lender shall promptly notify Borrower and Agent thereof and such Lender's obligation to make its Ratable Share of the Loan shall be suspended (provided that such Lender's Ratable Share of the Loan shall automatically be converted to a Substitute Rate Loan if doing so would enable such Lender to lawfully honor its obligation to make or maintain its Ratable Share of the Loan) until such time as such Lender may again make its Ratable Share of the Loan and Borrower shall, if required by applicable law, upon the request of such Lender, prepay a portion of the Loan equal to the Ratable Share of such Lender together with accrued interest thereon, but without compensation to such Lender pursuant to Section 2.2.7. Notwithstanding the foregoing, such Lender shall, as promptly as practicable, designate a different Applicable Lending Office for the Loan if doing so would enable it to lawfully honor its obligation to make or maintain its Ratable Share of the Loan.

2.2.7     **Breakage Costs.**  (a) Borrower agrees to compensate each Lender for any loss, cost or expense incurred by it as a result of (a) a default by Borrower in making a borrowing of, conversion into or continuation of a LIBOR Loan after such Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) a default by Borrower in making any prepayment after such Borrower has given a notice thereof in accordance with the provisions of this Agreement, (c) the making of a prepayment (mandatory or optional) of a LIBOR Loan for any reason (including, without limitation, the acceleration of the maturity of the Loan pursuant to Section 9.2 or a prepayment of the Loan in connection with a release of a Unit pursuant to Section 4.1.39) on a day that is not the last day of an Interest Period with respect thereto, (d) the failure to prepay the loan on any Prepayment Date set forth in a Prepayment Notice or (e) the early termination of any swap or other interest rate hedging

arrangements, including without limitation, any such loss, cost or expense arising from the reemployment of funds obtained by it, from fees payable to terminate the deposits from which such funds were obtained or from reversing any swap or other interest rate hedging arrangements.

(b)    Each such Lender will furnish to Borrower a certificate setting forth the basis and amount of each request by Lender for compensation under this Section 2.2.7, which certificate shall provide reasonable detail as to the calculation of such loss, cost or expense. Such certificate shall constitute prima facie evidence of the amount of such loss, cost or expense, which shall be calculated by such Lender on a reasonable and customary basis, consistent with the basis on which such calculations are then being made by similarly situated banks or financial institutions generally.

2.2.8    **Withholding Taxes**.  Borrower agrees to pay to each Lender such additional amounts as are necessary in order that the net payment of any amount due hereunder or under any of the other Loan Documents to such Lender, after deduction for or withholding of any present or future tax imposed by the United States (subject, in either case, to the provisions of this Section 2.2.8), excluding Excluded Taxes of such Lender, will be the amount that would be required to be paid hereunder or thereunder in the absence of such deduction or withholding. Each Lender shall provide Borrower with a form prescribed by the United States Internal Revenue Service (currently, Form W-8ECI or Form W-8BEN) certifying such Lender's exemption from United States withholding taxes with respect to all payments to be made to such Lender under this Agreement and any other Loan Document at the date of such certificate, and if any Lender fails to provide Borrower with the prescribed form referred to in the preceding sentence, indicating that such payments are not subject to United States withholding tax or are subject to such tax at a rate reduced to zero by an applicable tax treaty, Borrower may withhold taxes from payments to or for the account of such Lender at the applicable statutory rate and shall not be obligated to pay any additional amounts described in the first sentence of this Section 2.2.8; provided, that this sentence shall be inapplicable to such Lender in the event that such Lender is not able to make the certification set forth in such prescribed form as a result of a change in tax law, regulation or judicial or administrative interpretation occurring after the date hereof, or of an amendment, modification or revocation of an applicable tax treaty or a change in official position regarding the application or interpretation thereof, in each case, occurring after the date hereof.  In the event that Borrower is obligated to pay any additional amounts described in the first sentence of this section in respect of the Loan, Lender shall make commercially reasonable efforts to change the jurisdiction of its Applicable Lending Office if, in the reasonable judgment of such Lender, doing so would eliminate or reduce Borrower's obligation to pay such additional amounts and would not be disadvantageous to such Lender.

**Section 2.3**    **Usury Savings.**

This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required to pay interest on the principal balance of the Loan at a rate which could subject Lenders to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the

Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Agent or Lenders for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

### Section 2.4    Loan Payments.

**2.4.1    Payment Before Maturity Date**. Borrower shall make a payment to Agent of interest only at the Applicable Interest Rate on the Payment Date occurring on January 9, 2006 and on each Payment Date thereafter to and including the Maturity Date; each payment to be calculated in the manner set forth in Section 2.2.1. Notwithstanding the foregoing, the amount of stub interest on the outstanding principal balance of the Loan to be paid by Borrower on the date hereof shall be an amount calculated from the date hereof through December 14, 2005.

**2.4.2    Payment on Maturity Date**. Borrower shall pay to Agent the outstanding principal balance of the Loan, all accrued and unpaid interest, the balance of the Exit Fee and all other amounts due hereunder and under the Note, the Mortgage and the other Loan Documents on the Maturity Date.

**2.4.3    Late Payment Charge**. If any principal, interest or any other sum due under the Loan Documents is not paid by Borrower on the date on which it is due, regardless of whether such failure shall constitute an Event of Default, Borrower shall pay to Agent upon demand an amount equal to the lesser of four percent (4%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Agent in handling and processing such delinquent payment and to compensate Lenders for the loss of the use of such delinquent payment. Any such amount shall be secured by the Mortgage and the other Loan Documents.

**2.4.4    Interest Rate and Payment After Default**. In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan shall accrue interest at the Default Rate, calculated from the date the Default occurred which led to such an Event of Default without regard to any grace or cure periods contained herein.

**2.4.5    Method and Place of Payment**. (a) Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Agent not later than 3:00 p.m., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Agent's office, and any funds received by Agent after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(b)    Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day that is not a Business Day, the due date thereof shall be the preceding Business Day.

### Section 2.5    Prepayment.

**2.5.1    Voluntary Prepayments.** Except (a) with respect to the sale of Units as permitted under this Agreement, or (b) with respect to the application of Insurance or Condemnation Proceeds pursuant to the terms and conditions set forth in Article V herein, Borrower shall not be permitted to prepay the Loan, in whole or in part until the Maturity Date.

**2.5.2    Mandatory Prepayments.** (a) On each date on which Agent actually receives a distribution of Net Proceeds and if Agent is not required to make such Net Proceeds available to Borrower for the Restoration of the Property pursuant to Section 5.3, Agent may, in its sole and absolute discretion, elect to either make the Net Proceeds available for Restoration pursuant to Section 5.3 or use the Net Proceeds to prepay, without premium or penalty, the outstanding principal balance of the Note in an amount equal to one hundred percent (100%) of such Net Proceeds. Any prepayment received by Agent pursuant to this Section 2.5.2 on a date other than a Payment Date shall be held by Agent as collateral security for the Loan in an interest bearing account, with such interest accruing to the benefit of Borrower, and shall be applied by Agent on the next Payment Date.

(b)    In addition, Borrower shall, at Agent's option, prepay without premium or penalty the principal balance of the Note in an amount equal to the amount required by Agent due to changes in tax and debt credit pursuant to Section 5.3 of the Mortgage.

(c)    In each instance of prepayment under this Section 2.5.2, Borrower shall be required to pay all other sums due hereunder (including under Sections 2.2.7 and 2.4.3), and no principal amount repaid may be reborrowed.

**2.5.3    Default Prepayment.** If a Default Prepayment occurs, Borrower shall pay to Agent for the ratable benefit of Lenders, the entire Debt, including, without limitation, an amount equal to one percent (1%) of the Default Prepayment.

**2.5.4    Prepayment Waivers.** Borrower acknowledges that the inclusion of the waiver of prepayment rights and agreement to pay the Default Prepayment and the Exit Fees was separately negotiated with Agent, that the economic value of the various elements of this waiver and agreement were discussed and that the consideration given by Borrower for the Loan was adjusted to reflect the specific waiver and agreement negotiated between Borrower, Agent and Lenders and contained herein.

**2.5.5    Miscellaneous.** The making of an Advance by Agent and/or Lenders shall not constitute Agent's and/or Lenders' approval or acceptance of the construction theretofore completed. Agent's inspection and approval of the Plans and Specifications, the construction of the Improvements, or the workmanship and materials used therein, shall impose no liability of any kind on Agent or Lenders, the sole obligation of Agent and Lenders as the

result of such inspection and approval being to make the Advances if and to the extent, required by this Agreement.

### Section 2.6       Payments Not Conditional.

All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

### Section 2.7       Conditions Precedent.

The Agent shall not be obligated to make any disbursement of the Loan unless the Agent is reasonably satisfied that the conditions precedent to the making of such disbursement, as set forth in this Agreement, have been satisfied by the Borrower.

### Section 2.8       Interest and Fee Advances.

Notwithstanding the provisions of <u>Section 2.9.1</u>, provided that the conditions set forth in <u>Sections 2.9.2(c)</u> and <u>2.10.3</u> are satisfied, Advances for the payment of interest, if any, due under the Note, the fees of Agent and/or Lenders and/or Servicer, if any, due under the Loan Fee Letter or hereunder (including, without limitation, the Servicing Fee) and the fees of the Construction Consultant shall be made in accordance with <u>Section 2.10.3</u>. In accordance with the procedures of <u>Section 2.10.3</u>, each Lender shall make such Advances to Agent (i) for Advances to the Construction Consultant for payment of its fees, (ii) for Advances to Servicer for payment of the Servicing Fee and any servicing fees and (iii) for Advances for the payment of interest on the Note.

### Section 2.9       Conditions of Advances.

**2.9.1       Conditions of Initial Advance.**   Agent and Lenders shall not be obligated to make the first Advance of the Loan (the **"Initial Advance"**) until all of the conditions precedent set forth in this Section have been satisfied:

(a)       <u>Payment of Fees and Delivery of Loan Fee Letter</u>. Payment by Borrower of all fees and expenses required by this Agreement or the Loan Fee Letter, to the extent due and payable, including, without limitation, Agent's reasonable attorneys' fees and expenses, all origination fees, and brokerage commissions and delivery to Agent of an original counterpart of the Loan Fee Letter, duly executed by Borrower.

(b)       <u>Required Equity</u>. Borrower shall furnish Agent with evidence in form and content satisfactory to Agent that Borrower has contributed the Required Equity.

(c)       <u>Loan Documents</u>. The Loan Documents, in form and substance satisfactory to Agent and Lenders, shall have been duly executed and delivered by the parties thereto and shall be in full force and effect, and Agent shall have received the originals or fully executed counterparts thereof.

(d)     <u>Pre-Sales</u>. As of the date hereof, Lender shall have received copies of 79% of the total Qualifying Contracts with sales prices that in the aggregate are at least $45,654,707.00, less an amount equal to the Minimum Release Prices paid to Lender. If at any time any of the foregoing requirements is not satisfied, such failure shall constitute an Event of Default hereunder unless the Borrower provides to Lender substitute Qualifying Contract of equal or greater purchase prices within thirty (30) days of the occurrence of such failure. All Units sold by the Borrower must be to creditworthy bona fide purchasers that are not Affiliates of any Loan Party. No Condominium Documents shall be recorded against the title to the Land and no Units shall be released from the lien of the Security Instrument until: (i) the Borrower has presented such evidence, (ii) the Declaration of Condominium is filed with the Division, and (iii) Borrower has complied with the requirements set forth in Section 4.1 herein. Schedule 22 attached hereto evidences those Units that are subject to such Qualifying Contracts as of the date of this Agreement.

(e)     <u>Construction Documents</u>.

(i)     <u>General Contractor</u>. Borrower shall deliver to Agent a fully executed copy of the General Contractor's Agreement, which agreement shall be approved by Agent in its reasonable discretion. General Contractor shall have executed and delivered to Agent an original certificate, consenting to the assignment of the General Contractor's Agreement, substantially in the form of SCHEDULE XIV.

(ii)     <u>Trade Contracts/Major Trade Contracts</u>. Borrower shall have delivered to Agent, and Agent shall have approved, a list, certified by Borrower, of all Major Trade Contractors who have been or, to the extent identified by Borrower, will be supplying labor or materials for the Property. In addition, Borrower shall deliver to Agent and the Construction Consultant correct and complete copies of: (i) all executed Trade Contracts, each such Trade Contract (other than Major Trade Contracts) may be entered into without the prior consent of the Agent and the Construction Consultant; and (ii) all executed Major Trade Contracts, each such Major Trade Contract shall be approved by Agent and the Construction Consultant in their reasonable discretion.

(iii)     <u>Architect and Other Design Professional(s)</u>. Borrower shall deliver to Agent fully executed copies of the Architect's Agreement, which agreement shall be approved by Agent in its reasonable discretion for the design of the Project. Borrower's Architect shall have executed and delivered to Agent an original certificate, consenting to the assignment of the Architect's Agreement, substantially in the form of SCHEDULE XVII.

(iv)     <u>Standard Form of Trade Contract</u>. Borrower shall deliver to Agent a copy of the standard form of contract and/or subcontract to be used by General Contractor, which standard form shall be approved by Agent in its reasonable discretion, which approval shall not be unreasonably withheld.

(v)     <u>Intentionally Omitted</u>.

(vi)    Construction Consultant Certificate.  Each draw request relating to Hard Costs shall be accompanied by a certificate or report of the Construction Consultant to the Agent based upon a site observation of the Improvements made by the Construction Consultant not more than thirty (30) days prior to the date of such draw, in which the Construction Consultant shall in substance:  (i) for the Initial Advance only, indicate its review and acceptance of the Plans and Specifications; (ii) verify that the portion of the Improvements completed as of the date of such site observation has been completed substantially in accordance with the Plans and Specifications; and (iii) state its estimate of (1) the percentages of the construction of the Improvements completed as of the date of such site observation on the basis of work in place as part of the Improvements and the Budget, (2) the Hard Costs actually incurred for work in place as part of the Improvements as of the date of such site observation, (3) the sum necessary to complete construction of the Improvements in accordance with the Plans and Specifications; and (4) the amount of time from the date of such inspection that will be required to achieve Completion of the Improvements.

(vii)    Payment and Performance Bonds.  The Borrower shall cause Payment and Performance Bonds, in form and substance satisfactory to the Agent and issued by sureties satisfactory to the Agent, to be maintained with respect to the obligations of the General Contractor and each Major Trade Contractor.  The Payment and Performance Bonds shall be in an amount not less than the full contract price for the General Contractor's Agreement.  The Payment and Performance Bonds shall have attached thereto a dual obligee and modification rider in the form attached hereto as SCHEDULE XXI.  A copy of the Payment and Performance Bonds shall be attached to and recorded with the Notice of Commencement as required by the Lien Law.

(viii)    Plans and Specifications.  Borrower shall deliver to the Construction Consultant a complete set of the Plans and Specifications and any and all modifications and amendments made thereto.  Borrower shall deliver to the Agent a list identifying the Plans and Specifications and any and all modifications and amendments made thereto.

(ix)    Draw Request.  Borrower shall submit a Draw Request in accordance with the provisions of this Agreement.

(x)    Architect's Certificates.  Borrower shall cause to be delivered to Agent certificates from the Borrower's Architect (the "Architect's Certificate") substantially in the form attached hereto as SCHEDULE VII (unless Borrower's Architect signs the Application of Payment (AIA Form G702) for such Advance).

(xi)    Intentionally Omitted.

(xii)    Preliminary Project Report.  The Preliminary Project Report shall have been delivered to Agent by the Construction Consultant.

(xiii)    Intentionally Omitted.

(xiv)    Lien Waivers.  Borrower shall deliver duly executed affidavits providing notice to Borrower as required under the Lien Law and duly executed lien waivers in the

form set forth in SCHEDULE XI or SCHEDULE XII, as applicable, from all Trade Contractors for all work performed, and all labor or material supplied for which payment thereof has been made prior to the date of the Initial Advance.

(f)     Title Insurance Policy.  Borrower shall cause to be delivered to Agent a paid Title Insurance Policy or report in all respects satisfactory to Agent and its counsel, dated the date of the recording of the Mortgage and showing the Mortgage as a prior and paramount lien on the Property in the amount of the Loan, together with all endorsements as required by Agent and subject only to (i) the Permitted Encumbrances and the lien of any other Loan Documents and (ii) any other liens or encumbrances consented to in writing by Agent, along with co-insurance or reinsurance in such forms and amounts as may be required by Agent.  The reinsurance agreements shall provide for direct access with the other title insurance companies satisfactory to Agent.

(g)     Other Insurance.  Borrower shall cause to be delivered to Agent Policies of all insurance (or certificates thereof) required by Section 5.1 of this Agreement or any other Loan Document, and the same shall be in form and substance satisfactory to Agent.

(h)     Evidence of Sufficiency of Funds.  Agent shall have received evidence satisfactory to Agent that the proceeds of the Loan plus the Required Equity will be sufficient to cover all Total Project-Related Costs reasonably anticipated to be incurred, to satisfy the Obligations of Borrower to Agent and under this Agreement.

(i)     Environmental Report.  Borrower shall cause to be delivered to Agent an environmental assessment report or reports of one or more qualified environmental engineering or similar inspection firms approved by Agent in form, scope and substance satisfactory to Agent, which report or reports shall indicate a condition of the Property in all respects satisfactory to Agent in its sole discretion and upon which report or reports Lenders are expressly entitled to rely.

(j)     Site Plan and Survey.  Borrower shall deliver to Agent a site plan depicting the placement of the Improvements verifying that all of the Improvements will be within the lot lines of the Property and in compliance with all set-back requirements and a Survey prepared in accordance with Agent's survey requirements, certified by a land surveyor registered as such in the State, which Survey shall be in form and substance satisfactory to Agent.

(k)     Government Approvals and Legal Requirements.  Borrower shall deliver to Agent evidence, in the form of a legal opinion satisfactory to Lender, that, except for certificates of occupancy or temporary certificates of occupancy, all Government Approvals necessary for the construction of the Improvements as contemplated by the Plans and Specifications, have been obtained, including, without limitation, a building permit, and that Borrower shall have complied in all material respects with all Legal Requirements, including all land use, building, subdivision, zoning and similar ordinances and regulations promulgated by any Governmental Authority and applicable to the commencement of the construction of the Improvements and to permit the construction to continue to progress to the stage of completion at which work in then proceeding at the Project and in order to achieve Completion of the

Improvements by not later than the Completion Date (including punch-list items) and Shell Completion shall be completed by the Shell Completion Date.

(l)    Intentionally Omitted.

(m)    Intentionally Omitted.

(n)    Organizational Documents. Borrower shall deliver to Agent certified copies of Borrower's and Guarantor's Organizational Documents, and the same shall be acceptable to Agent in all respects.

(o)    Evidence of Utilities. Borrower shall cause to be delivered to Agent letters from those local utility companies whose services are necessary to complete the Improvements in accordance with the Plans and Specifications and to operate the Improvements thereafter or the appropriate local Governmental Authority stating that sufficient electric, steam, gas, storm and sanitary sewer, telephone, cable and water facilities will be available to the Property upon the completion of the Improvements.

(p)    Legal Opinions. Agent shall have received opinions in form, substance and scope satisfactory to Agent and Agent's counsel from counsel reasonably satisfactory to Agent as to such matters (including, without limitation, land use and zoning matters and nonconsolidation matters) as Agent shall reasonably request. Notwithstanding the foregoing, Agent shall not require a non-consolidation opinion until such time as there is a syndication or securitization of the Loan, and shall be provided at Borrower's cost and expense.

(q)    Searches Regarding Personal Property. Agent shall have received a certification from the Title Company or other service satisfactory to Agent or counsel satisfactory to Agent (which shall be updated from time to time at Borrower's expense upon request by Agent in connection with future Advances) that a search of the public records disclosed no judgment, UCC or tax liens affecting Borrower or any Guarantor, the Property or the Personal Property, and no conditional sales contracts, chattel mortgages, leases of personalty, financing statements or title retention agreements which affect the Personal Property.

(r)    Notices. All notices required by any Governmental Authority or by any applicable Legal Requirement to be filed prior to commencement of construction of the Improvements shall have been filed, including, but not limited to the Notice of Commencement as required by the Lien Law.

(s)    Appraisal. Agent shall have received a FIRREA appraisal of the Property, commissioned by Agent at Borrower's cost and expense, that is satisfactory to Agent in its sole discretion. At Agent's discretion, Agent shall have the option of commissioning an updated FIRREA appraisal of the Property subsequent to the Closing, at Borrower's cost and expense that is satisfactory to Agent in its reasonable discretion.

(t)    Performance; No Default. Borrower shall have performed and complied with all terms and conditions herein required to be performed or complied with by it at or prior to the date of the Initial Advance, and on the date of the Initial Advance, there shall exist no Default or Event of Default.

(u)    Representations and Warranties. The representations and warranties made by Borrower and Guarantor in the Loan Documents or otherwise made by or on behalf of Borrower or Guarantor in connection therewith or after the date thereof shall have been true and correct in all material respects on the date on which made and shall continue to be true and correct in all material respects on the date of the Initial Advance.

(v)    Other Documents. Borrower shall have delivered such other documents and certificates as Agent or its counsel may reasonably require.

(w)    Proceedings and Documents. All proceedings in connection with the transactions contemplated by this Agreement and the other Loan Documents shall be satisfactory to Agent and Agent's counsel in form and substance, and Agent shall have received all information and such counterpart originals or certified copies of such documents and such other certificates, opinions or documents as Agent and Agent's counsel may reasonably require.

(x)    Offering Plan. Borrower shall cause to be delivered to Agent copies of the Offering Plan and all other Condominium Documents, each certified by Borrower and the Offering Plan shall have been approved by Agent and accepted for filing by the Division.

2.9.2    **Conditions of Subsequent Advances**. The obligation of the Agent and the Lenders to make any Advance after the Initial Advance shall be subject to the following conditions precedent:

(a)    Prior Conditions Satisfied. All conditions precedent to the Initial Advance set forth in Section 2.9.1 (in the same manner in which they were satisfied for the Initial Advance and without reimposing any one-time requirement) shall continue to be satisfied as of the date of such subsequent Advance.

(b)    Anticipated Cost Report. The Borrower shall submit to the Agent an Anticipated Cost Report in the form set forth in SCHEDULE X provided by the General Contractor, which indicates the costs anticipated to complete the construction of the Improvements, after giving effect to costs incurred during the previous month and projected costs.

(c)    Satisfactory Title; Survey Update. The Mortgage shall constitute a valid first lien on the Property for the full amount of the Loan advanced to and including the date of the applicable Advance, free and clear of all liens except for Permitted Encumbrances. Agent shall have been furnished with a notice of title continuation or an endorsement to the Title Insurance Policy issued to Agent and Lenders in connection with the Initial Advance of the Loan, which continuation or endorsement shall increase the coverage of the Title Insurance Policy by the amount of the Advance through the pending disbursement clause (but not the overall policy amount which shall be for the full amount of the Loan), amend the effective date of the Title Insurance Policy to the date of such Advance, continue to insure the lien of the Mortgage subject to no liens or encumbrances other than the Permitted Encumbrances and which shall state that since the last disbursement of the Loan there have been no changes in the state of title to the Property (other than Permitted Encumbrances) and that there are no additional survey exceptions not previously approved by Agent. Borrower shall also cause to be delivered to

Agent a boundary line Survey (if not previously delivered in connection with the Initial Advance) and inspection report of the Property dated within thirty (30) days after the foundations to the Improvements are set and prior to the date of the first advance of the Loan proceeds after the foundations are set, prepared in accordance with Agent's survey requirements, certified by a land surveyor registered as such in the State in which the Property is located, which Survey shall be in form and substance satisfactory to Agent

(d)     No Other Security Interests.   Except as otherwise permitted herein, all materials and fixtures incorporated in the construction of the Improvements shall have been purchased so that their absolute ownership shall have vested in Borrower immediately upon delivery to the Land and Borrower shall have produced and furnished, if required by Agent, the contracts, bills of sale or other agreements under which title to such materials and fixtures is claimed.

(e)     Performance; No Default.   Borrower shall have performed and complied with all terms and conditions herein required to be performed or complied with by it at or prior to the date of such Advance, and on the date of such Advance there shall exist no Default or Event of Default.

(f)     Representations and Warranties.   The representations and warranties made by Borrower and Guarantor in the Loan Documents or otherwise made by or on behalf of Borrower or Guarantor in connection therewith after the date thereof shall have been true and correct in all material respects on the date on which made and shall also be true and correct in all material respects on the date of such Advance.

(g)     No Damage.   The Improvements shall not have been injured or damaged by fire, explosion, accident, flood or other casualty, unless Agent shall have received insurance proceeds or other monies sufficient in the judgment of Agent to effect the satisfactory restoration of the Improvements and to permit the Completion of the Improvements prior to the Completion Date.

(h)     Subcontracts.   No Advance shall be made by Lenders with regard to work done by or on behalf of any Trade Contractor unless Borrower shall have delivered to Agent the following documents as to such Trade Contractor:

(i)     A copy of a fully executed contract, which if a Major Trade Contract is reasonably acceptable to Agent;

(ii)     in the case of a Major Trade Contract, Payment and Performance Bonds with dual obligee riders naming Agent (to the extent required under the definition of "**Payment and Performance Bonds**"), each in form and substance reasonably satisfactory to Agent; and

(iii)     if requested by Agent, a Performance Letter from each Major Trade Contractor substantially in the form attached hereto as SCHEDULE XVI.

(i)     Government Approvals and Legal Requirements.   No Advance shall be made by Lenders with respect to any Hard Costs, unless Borrower shall have delivered to Agent

evidence reasonably satisfactory to Agent and the Construction Consultant that all Government Approvals necessary for the construction of the Improvements for which such Hard Costs Advance is sought, if any, as contemplated by the Plans and Specifications have been obtained including, without limitation, a building permit, and that Borrower shall have complied with all Legal Requirements, including all land use, building, subdivision, zoning and similar ordinances and regulations promulgated by any Governmental Authority and applicable to the construction of such Improvements, if any, and to permit construction to continue to progress to the stage of completion at which work is then proceeding at the Project and to permit the Completion of the Improvements prior to the Completion Date.

(j)    Construction Consultant Approval. Agent has received advice from the Construction Consultant, satisfactory to Agent, as to Construction Consultant's determination based on on-site inspections of the Improvements and the data submitted to and reviewed by it as part of Borrower's Requisition of the value of the labor and materials in place, that the construction of the Improvements is proceeding satisfactorily, in conformity with Legal Requirements and in accordance with the Construction Schedule and that the Improvements have commenced to the same percentage of completion that the General Contractor has requested payment for and that the work on account of which the Advance is sought has been completed in a good and workmanlike manner to such Consultant's satisfaction within cost estimates approved by Agent and substantially in accordance with the Plans and Specifications.

(k)    No Material Adverse Effect. No event shall have occurred which has had or would be reasonably likely to have a Material Adverse Effect.

(l)    Other Documents. Agent shall have received such other documents and certificates as Agent or its counsel may reasonably require.

(m)    Lien Waivers. To the extent not previously delivered, Borrower shall deliver duly executed lien waivers in the form set forth in SCHEDULE XI or SCHEDULE XII, as applicable or in form otherwise sufficient to constitute a lien waiver under Florida law, or lien releases from all Trade Contractors for all work performed, and all labor or material supplied for which payment thereof has been made through the current pay period.

(n)    Draw Request. Borrower shall submit a Draw Request in accordance with the provisions of this Agreement.

(o)    Architect's Certificates. Borrower shall cause to be delivered to Agent certificates from the Borrower's Architect (the "**Architect's Certificate**") substantially in the form attached hereto as SCHEDULE VII (unless Borrower's Architect signs the Application for Payment (AIA Form G702) for the applicable Advance).

(p)    Payment and Performance Bonds. Borrower shall cause Payment and Performance Bonds to be maintained with respect to the obligations of each new Major Trade Contractor.

**2.9.3    Conditions of Final Construction Advance.** In addition to the conditions set forth in Section 2.9.2, the Agent and Lenders' obligation to make the final

Advance of proceeds of the Loan pursuant to this Agreement shall be subject to the following conditions precedent:

(a)    Completion of Improvements.    Agent shall have received evidence satisfactory to Agent of the Completion of the Improvements.

(b)    Approval by Construction Consultant.    Agent shall have received notification from the Construction Consultant that Completion of the Improvements has occurred and that all utilities necessary to service the Property have been connected and are in operation.

(c)    Certificates.  Borrower shall have furnished to Agent certificates of the General Contractor substantially in the form attached hereto as SCHEDULE XIV and of Borrower's Architect substantially in the form attached hereto as SCHEDULE VII (unless Borrower's Architect signs the Application for Payment (AIA G702) for such Advance).

(d)    Final Unconditional Lien Waivers and Release/Payment Receipts. Borrower shall have furnished to Agent duly executed affidavits providing notice to Borrower in accordance with the Lien Law and duly executed Final Unconditional Lien Waivers and Release/Payment Receipts substantially in the form attached hereto as SCHEDULE XI from the General Contractor and all Trade Contractors who have performed work in connection with the Project, for the work so performed, and/or who have supplied labor and/or materials in connection with the Project, for the labor and/or materials so supplied.

(e)    Final Survey.  Borrower shall have furnished to Agent a final survey acceptable to Agent and the Title Company showing the as-built location of the completed Improvements (all of which shall be within lot lines of the Land and in compliance with all set-back requirements) and all easements appurtenant thereto.

(f)    Intentionally Omitted.

(g)    Payment of Costs.  Agent shall have received evidence satisfactory to Agent that all sums due in connection with the construction of the Improvements have been paid in full (or will be paid out of the funds requested to be advanced) and that no party claims or has a right to claim any statutory or common law lien arising out of the construction of the Improvements or the supplying of labor, material, and/or services in connection therewith.

(h)    Intentionally Omitted.

(i)    Condominium. Agent shall have received evidence satisfactory to Agent that the requirements set forth under Section 4.1.39(a) through (l) have been fully satisfied.

(j)    Construction Consultant Approval. Agent shall have received advice from the Construction Consultant, satisfactory to Agent, as to Construction Consultant's determination based on on-site inspections of the Improvements and the data submitted to and reviewed by it as part of Borrower's Requisition of the value of the labor and materials in place, that the construction of the Improvements is proceeding satisfactorily and in conformity with all Legal Requirements, in accordance with the Completion Schedule and that the Improvements have commenced to the same percentage of completion that the General Contractor has requested

payment for and that the work on account of which the Advance is sought has been completed in a good and workmanlike manner to such Consultant's satisfaction within cost estimates approved by Agent and substantially in accordance with the Plans and Specifications.

(k)    "As-Built" Plans and Specifications. Borrower shall furnish to Agent a full and complete set of "as built" Plans and Specifications certified to by Borrower's Architect and General Contractor.

(l)    Intentionally Omitted.

(m)    Other Documents. Agent shall have received such documents, letters, lien releases through the current pay period, affidavits of notice to Borrower from Trade Contractors in accordance with the Lien Law, other affidavits, reports and assurances, as Agent, Agent's counsel and the Construction Consultant may reasonably require, including, without limitation, completed AIA Form G704 (Certificate of Substantial Completion), completed AIA Form G707 (Consent of Surety to Final Payments) and a final contractor's affidavit that complies with the requirements of the Lien Law.

2.9.4    **Intentionally Omitted**.

2.9.5    **Intentionally Omitted**.

2.9.6    **Intentionally Omitted**.

2.9.7    **No Reliance**. All conditions and requirements of this Agreement are for the sole benefit of Agent and Lenders and no other Person (including, without limitation, the Construction Consultant, General Contractor and Trade Contractors engaged in the construction of the Improvements) shall have the right to rely on the satisfaction of such conditions and requirements by Borrower. Agent shall have the right, in its sole and absolute discretion, to waive any such condition or requirement.

*Section 2.10    Borrowing Procedures.*

2.10.1    **Draw Requests**. Borrower shall submit to Agent and the Construction Consultant a Draw Request (substantially in the forms attached hereto as SCHEDULES II through IX, as applicable) ("**Borrower's Requisition**") not less than ten (10) Business Days prior to the date upon which a disbursement of the Loan is requested (the "**Borrowing Date**") and no more frequently than once in each calendar month. As part of each Draw Request, the Borrower shall submit, as irrevocable notice of its intention to borrow funds, a Borrower's Requisition Letter in the form set forth in SCHEDULE II, which shall be executed by one of the Authorized Representatives. Each Borrower's Requisition Letter shall be accompanied by: (i) duly executed affidavits from Trade Contractors providing notice to Borrower as required under the Lien Law and duly executed lien waivers in the form *set forth in* SCHEDULE XI or SCHEDULE XII, as applicable, from all Trade Contractors for all work performed, and all labor or material supplied for which payment thereof has been made prior to the date of the Initial Advance; (ii) a completed Application and Certificate for Payment (AIA Document G702) attached hereto as SCHEDULE VI that is executed by the General Contractor and Architect, provided that the Architect may, in lieu of executing such Application and Certificate for

Payment, execute an Architect's Certificate with respect to the related Advance in the form attached as SCHEDULE VII; (iii) a Borrowing Certificate in the form set forth in SCHEDULE VIII; (iv) Payment Receipts in the form set forth in SCHEDULE IX or in form otherwise required by Florida law, from General Contractor and all Trade Contractors evidencing that they have been paid in full for all work performed and/or materials supplied to the date of the current pay period, except for retainage provided for in this Agreement; (v) at the request of Agent, current requisitions for payment from Trade Contractors and/or any of their subcontractors allocable to the Project; (vi) such other information and documents as may be reasonably requested or required by Agent or the Construction Consultant with respect to the Hard Costs covered by such Draw Request; and (vii) invoices, statements or such other information and documentation as Agent shall reasonably request or require with respect to any Soft Costs covered by such Draw Request. All such requests and requisitions for payment shall have been approved by the Borrower and, with respect to Hard Costs, recommended for payment by the Construction Consultant.

**2.10.2   One Advance Per Month.** The Agent and Lenders shall have no obligation to make advances of the Loan more often than once in each calendar month except that Agent, in its sole discretion, shall have the right but not the obligation, to make and to require the Lenders to make additional advances per month for interest, fees and expenses due under the Loan Documents.

**2.10.3   Advances to Pay Interest, Fees and Expenses.** Borrower hereby requests that Agent and Lenders make an advance on each (a) Payment Date to pay interest and Additional Interest due at such time; (b) Payment Date to pay fees under the Loan Documents that are then due to Agent, Lenders and/or Construction Consultant, as applicable; and (c) Borrowing Date to pay expenses and other reimbursables under the Loan Documents that are then due and payable. Notwithstanding anything to the contrary contained in this Agreement, (i) the amounts otherwise to be funded by Lenders pursuant to this Section 2.10.3 for interest on the Loan shall be reduced by any payments received under the Interest Rate Protection Agreement and (ii) Lenders shall have no obligation to make any such disbursement for interest or fees unless the conditions set forth in Section 2.9.2(c) are satisfied and no Default or Event of Default shall have occurred and be continuing. Neither the provisions of this Section 2.10.3 nor the provisions of Section 2.8 are intended to limit or derogate from Borrower's and Guarantor's absolute and unconditional obligation to pay such interest and fees regardless of whether Loan proceeds are available or advanced therefor to the extent (if any) provided in the applicable Guaranty.

**2.10.4   Procedure of Advances.** (a) Each Draw Request shall be submitted to Agent, each Lender and the Construction Consultant at least ten (10) Business Days prior to the Borrowing Date for the requested Advance, and no more frequently than monthly. Not less than three (3) LIBOR Business Days prior to the Borrowing Date, Agent shall deliver written notice to each Lender at the address specified by each Lender from time to time which notice shall include the Borrowing Date and such Lender's Ratable Share of such Advance. Agent shall include with such notice a copy of the Draw Request, to the extent not previously delivered and to the extent in Agent's possession, and Agent shall promptly deliver to each Lender all items in respect of such Advance received by Agent after the date of such notice. Lenders shall make the requested Advance on the Borrowing Date so long as all conditions to such Advance are satisfied

or waived. Unless otherwise notified by Agent, each Lender may assume that all conditions to such Advance are satisfied or waived on the Borrowing Date.

(b)     Not later than 11:00 a.m. New York City time, on the Borrowing Date, each Lender shall make available for the account of Agent at its address referred to in Section 10.6, in same day funds, such Lender's ratable portion of such Advance. After Agent's receipt of such funds and upon fulfillment of the applicable conditions in Article II, Agent will make such funds available to Borrower in accordance with the terms of this Section 2.10.

(c)     Unless Agent shall have received notice from a Lender prior to the Borrowing Date that such Lender will not make available to Agent such Lender's ratable portion of such Advance, Agent may assume that such Lender has made such portion available to Agent on the Borrowing Date in accordance with Section 2.10.4(b), and Agent may, in reliance upon such assumption, make available to Borrower on the Borrowing Date a corresponding amount. If and to the extent that any of Lenders (the "**Defaulting Lender**") shall not have so made such ratable portion available to Agent (individually, a "**Deficiency**", and collectively, "**Deficiencies**"), and Agent has advanced such amount to Borrower, such Defaulting Lender and Borrower agrees to repay to Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to Borrower until the date such amount is repaid to Agent at the Default Rate. If such Defaulting Lender shall repay to Agent such corresponding amount, such amount (excluding interest) so repaid shall constitute such Defaulting Lender's ratable portion of the Advance. Each of the Lenders agrees that Borrower or any of the other Lenders shall have the right to proceed directly against any Defaulting Lender in respect of any right or claim arising out of the default of such Defaulting Lender hereunder. If there shall be a Deficiency in respect of any Lender, the other Lenders, or any of them, shall have the right, but not the obligation, to elect to advance all or any part of the ratable portion of an Advance that should have been made by the Defaulting Lender, and the Defaulting Lender agrees to repay upon demand to each of the Lenders (each, an "**Electing Lender**") who has advanced a portion of the Deficiency the amount advanced on behalf of the Defaulting Lender, together with interest thereon at the Default Rate. If more than one Lender elects to advance a portion of the Deficiency such Lenders' advances shall be made based on the relative Ratable Shares of the Loan of each Electing Lender or as otherwise agreed to by such Lenders. In the event the Defaulting Lender fails to advance or repay the Deficiency (with interest at the Default Rate, if applicable) on or prior to the date of the next succeeding Advance, the entire interest of said Defaulting Lender in the Loan shall be subordinate to the interests of the other Lenders and all payments otherwise payable to the Defaulting Lender shall be used to advance or repay the Deficiency, as applicable, until such time such Defaulting Lender advances or repays all Deficiencies (including interest at the Default Rate, if applicable) and Agent shall have the right (but not the obligation) to require such Defaulting Lender to assign its interest in the Loan to an Eligible Assignee or other assignee satisfactory to Agent in its sole discretion.

(d)     The failure of any Lender to pay any Deficiency shall not relieve any other Lender of its obligation, if any, hereunder to make its ratable portion of the Advance on the Borrowing Date, but no Lender shall be responsible for the failure of any Lender to make its ratable portion of the Advance to be made by such other Lender on the Borrowing Date; provided, however, that if no Lender shall become an Electing Lender pursuant to Section 2.10.4(c), all of the non-Defaulting Lenders shall fund the Defaulting Lender's

Deficiency pro rata among the non-Defaulting Lender in the proportion that the amount of each such non-Defaulting Lender's Maximum Commitment bears to the total Maximum Commitments of all non-Defaulting Lenders within three (3) Business Days after notice by Agent to Lenders that no Lender has become an Electing Lender provided further that (i) no Lender shall be required in any event to fund an aggregate amount of the Loan funds greater than the amount of its Maximum Commitment, (ii) no Lender shall be responsible for the failure of any other Lender to advance or to perform any of its other obligations in connection with the Loan and the Loan Documents; (iii) the obligation to fund an Defaulting Lender's Deficiency shall terminate on the sixtieth (60th) day next following the giving of the initial Borrowing Date for which a Deficiency first occurred as a result of a Defaulting Lender's failure to advance its share of the Advance in question; (iv) if the Defaulting Lender's default has not been cured, or Borrower and Agent, after using commercially reasonable efforts (but without increasing the Maximum Commitment of Lehman Brothers Holdings Inc., or any of its affiliates as a Lender) to obtain an Eligible Assignee to replace Defaulting Lender as a Lender hereunder, has not replaced the Defaulting Lender within said sixty (60) day period, Borrower shall upon demand from the Agent deposit with Agent an amount equal to the aggregate amount of the Deficiencies funded by the non-Defaulting Lenders. The amount so deposited by Borrower shall be advanced by Agent in lieu of an Advance by the non-Defaulting Lenders until such time as the aggregate Loan Costs to be paid no longer exceed the non-Defaulting Lenders unfunded Maximum Commitments and, thereafter, Borrower shall continue to deposit with Agent each month an amount equal to that which would have been funded by the Defaulting Lender. Borrower agrees that Agent for the ratable benefit of Lenders shall have a lien on and security interest in any sums deposited by Borrower pursuant to this paragraph. If Borrower shall fail to make the deposits required to be made by it pursuant to this paragraph, Lenders, in the sole discretion of Agent, shall have the right to make no further Advances under the Loan and the Loan Amount shall be permanently reduced by any and all Deficiencies unless and until a substitute lender that is an Eligible Assignee, reasonably acceptable to Lenders other than the Defaulting Lender(s), pays such Deficiency(ies) (including those funded by the other Lenders and/or Borrower) to the Agent who shall distribute same pro rata to the Persons who funded such Deficiency(ies) (including, if applicable and after the Lenders (other than the Defaulting Lender) have been fully reimbursed for the respective amounts of such Deficiency(ies) funded by them, to Borrower) and assumes the obligations of the Defaulting Lender to fund its Ratable Share of the balance of the Loan subject to and in accordance with this Agreement and the other Loan Documents. Defaulting Lender shall be required to execute an Assignment and Acceptance in favor of such substitute lender provided such substitute lender executes the same as well. If pursuant to this Section, Lenders are not obligated to make an Advance, Agent may (subject to subsection (e) below) nonetheless make a determination that Lenders shall make such Advances and all Lenders shall be bound by such determination.

(e)    Notwithstanding the foregoing, any decision by Agent to make Advances hereunder when Borrower is not entitled to receive such an Advance because an Event of Default has occurred and is continuing and any decision by Agent to refuse to make any Advance hereunder because an Event of Default has occurred and is continuing shall be a Major Decision requiring the consent of the Required Lenders.

2.10.5    **Funds Advanced**. Each Advance shall be made by Agent by wire transfer to Borrower's Designated Account or as provided in Section 2.10.6. All proceeds of all

Advances shall be used by Borrower only for the purposes for which such Advances were made. Borrower shall not commingle such funds with other funds of Borrower. Without limiting the generality of the foregoing, Borrower shall cause all payments to the General Contractor and Trade Contractors in privity with Borrower to be made in accordance with the requirements of the General Contractor's Agreement or applicable Trade Contracts, as the case may be, and the Lien Law and shall cause all payments to Trade Contractors not in privity with Borrower to be made as "proper payments" in compliance with the requirements of Section 713.06 of the Lien Law.

2.10.6    **Direct Advances to Third Parties**.    At Agent's option, Agent may direct Lenders to make any or all Advances directly or through the Title Company to (i) General Contractor or any Trade Contractor for construction expenses which shall theretofore have been approved by Agent and for which Borrower shall have failed to make payment, (ii) Borrower's Architect to pay its fees to the extent funds are allocated thereto in the Loan Budget, (iii) the Construction Consultant to pay its fees, (iv) Agent's counsel to pay its fees, (v) each Lender to pay (x) any installment of interest due under the Note, (y) any expenses incurred by such Lender which are reimbursable by Borrower under the Loan Documents (including, without limiting the generality of the foregoing, reasonable attorneys' fees and expenses and other fees and expenses incurred by such Lender), provided that Borrower shall theretofore have received notice from Agent or such Lender that such expenses have been incurred and Borrower shall have failed to reimburse such Lender for said expenses beyond any grace periods provided for said reimbursement under the Note, this Agreement or any of the other Loan Documents, or (z) following an Event of Default, any other sums due to any Lender under the Note, this Agreement or any of the other Loan Documents, all to the extent that the same are not paid by the respective due dates thereof, and in each case subject to the approval of Agent, (vi) Servicer to pay any monthly servicing fees and (vii) any other Person to whom Agent in good faith determines payment is due and any portion of the Loan so disbursed by Lenders shall be deemed disbursed as of the date on which the Person to whom payment is made receives the same. Agent shall give each Lender not less than three (3) LIBOR Business Days' Notice of the amount of interest due each Lender on each interest due date, which notice shall include the Interest Period(s), and the portion of the Loan which relates thereto and the Applicable Interest Rate for each Interest Period. The execution of this Agreement by Borrower shall, and hereby does, constitute an irrevocable authorization so to advance the proceeds of the Loan directly or through the Title Company to such Persons in accordance with this Section 2.10.6 as amounts become due and payable to them hereunder and any portion of the Loan so disbursed by Lenders shall be deemed disbursed as of the date on which the Person to whom payment is made receives the same. No further authorization from Borrower shall be necessary to warrant such direct Advances to such relevant Person, and all such Advances shall satisfy pro tanto the obligations of Lenders hereunder and shall be secured by the Mortgage and the other Loan Documents as fully as if made directly to Borrower.

2.10.7    **Advances After Completion Date**.    Notwithstanding anything contained herein to the contrary, Lenders shall have no obligation to make any Advance after the Completion Date (except for Retainage not yet disbursed, other Loan Costs associated with usual and customary Punch List Items and Soft Costs if funds allocated in the Loan Budget remain available to be advanced under this Agreement for such purposes, interest, insurance and taxes to

be advanced during the Extension Period if such amounts are provided for in the Loan Budget and subject to all the conditions to Advances therefor).

      **2.10.8**   **Advances Do Not Constitute a Waiver**. No Advance shall constitute a waiver of any of the conditions of Lenders' obligation to make further Advances nor, in the event Borrower is unable to satisfy any such condition, shall any Advance have the effect of precluding Agent from thereafter declaring such inability to be an Event of Default hereunder.

      **2.10.9**   **Intentionally Omitted**.

      **2.10.10**   **Interest Reserve**. A portion of the Loan specified in the Loan Budget (the "Interest Reserve") has been reserved for payments of interest as it accrues and becomes due and payable on the Loan. The Interest Reserve shall not be disbursed for any purpose other than the payment of interest on the Loan unless otherwise agreed to by Agent in its sole and absolute discretion. Agent shall advance portions of the Interest Reserve directly to Lenders to satisfy obligations for the payment of interest under the Note from time to time as the same become due and payable.

      **2.10.11**   **Intentionally Omitted**.

      **2.10.12**   **Advances and Disbursements Under Completion Guaranty**. Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, Borrower hereby irrevocably and unconditionally authorizes Agent and Lenders to make any disbursements of proceeds of the Loan or of any Funds held by Agent to Guarantor, but Agent and Lenders shall have no obligation to do so.

## III.    REPRESENTATIONS AND WARRANTIES

**Section 3.1**    **Borrower Representations.**

Borrower represents and warrants that:

      **3.1.1**   **Organization**. Borrower is duly organized, validly existing and in good standing with full power and authority to own its assets and conduct its business and is duly qualified in all jurisdictions in which the ownership or lease of its property or the conduct of its business requires such qualification. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents by it, and has the power and authority to execute, deliver and perform under this Agreement, the other Loan Documents and all the transactions contemplated hereby.

      **3.1.2**   **Proceedings**. This Agreement and the other Loan Documents have been duly authorized, executed and delivered by Borrower and constitute a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**3.1.3    No Conflicts**. The execution and delivery of this Agreement and the other Loan Documents by Borrower and the performance of its Obligations hereunder and thereunder will not conflict with any provision of any law or regulation to which Borrower is subject, or conflict with, result in a breach of, or constitute a default under, any of the terms, conditions or provisions of any of Borrower's organizational documents or any agreement or instrument to which Borrower is a party or by which it is bound, or any order or decree applicable to Borrower, or result in the creation or imposition of any lien on any of Borrower's assets or property (other than pursuant to the Loan Documents).

**3.1.4    Litigation**. There is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against Borrower and/or Guarantor in any court or by or before any other Governmental Authority, or labor controversy affecting Borrower, Guarantor or any of their respective properties, businesses, assets or revenues, individually or in the aggregate,) that would be reasonably likely to have a Material Adverse Effect.

**3.1.5    Governmental Orders**. Borrower is not in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, which default might have consequences that would materially and adversely affect the condition (financial or other) or operations of Borrower or its properties or might have consequences that would materially and adversely affect its performance hereunder.

**3.1.6    Consents**. No consent, approval, authorization or order of any court or Governmental Authority or other Person is required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, this Agreement or the other Loan Documents or the consummation of the transactions contemplated hereby and thereby, other than those which have been obtained by Borrower.

**3.1.7    Title**. Borrower has good, marketable and insurable fee simple title to the real property comprising part of the Property and good title to the balance of the Property, free and clear of all Liens whatsoever except the Permitted Encumbrances. The Mortgage, when properly recorded in the appropriate records together with this Agreement when properly filed in the appropriate records and any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (i) a valid, first priority, perfected lien on the Property, subject only to Permitted Encumbrances and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases) in which a security interest can be perfected by the filing of Uniform Commercial Code financing statements, and any Leases, all in accordance with the terms thereof, in each case subject only to any Permitted Encumbrances. There are no mechanics', materialmen's or other similar liens or claims which have been filed for work, labor or materials affecting the Property which are or may be liens prior to, or equal or coordinate with, the lien of the Mortgage. None of the Permitted Encumbrances, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Mortgage, this Agreement and the other Loan Documents, materially and adversely affect the value of the Property, impair the use or operations of the Property or impair Borrower's ability to perform its Obligations under the Loan Documents in a timely manner.

3.1.8    **No Plan Assets**. As of the date hereof and throughout the term of the Loan (a) Borrower is not and will not be an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, (b) none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, (c) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA and (d) transactions by or with Borrower are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans.

3.1.9    **Compliance**. Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, the Lien Law and building and zoning ordinances and codes. Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower. Borrower has not committed any act which may give any Governmental Authority the right to cause Borrower to forfeit the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. All necessary action has been taken to permit construction of the Improvements according to the Plans and Specifications and full use of the Improvements for their intended purpose under applicable Legal Requirements, except, with respect to use of the Improvements, for the absence of a certificate of occupancy prior to the completion of the Improvements.    All applicable Condominium Documents have been filed with and accepted and approved by the Division and the Department of Housing and Urban Development. Borrower has all necessary certificates, licenses, authorizations, registrations, permits and/or approvals necessary for the construction of the Improvements or any part thereof in substantial accordance with the Plans and Specifications or the commencement or continuance of construction thereon, as the case may be, including but not limited to, where appropriate, all required environmental permits, all of which as of the date of the signing hereof are in full force and effect and not, to the knowledge of Borrower, subject to any revocation, amendment, release, suspension, forfeiture or the like. Borrower has obtained all Governmental Approvals from, and has given all such notices to, and has taken all such other actions with respect to such Governmental Authority as may be required under applicable Legal Requirements for the construction of the Improvements. Borrower has no knowledge of any violations or notices of violations of any Legal Requirements relating to Borrower, Guarantor and/or the Property.

3.1.10    **Financial and Other Information**. All financial data, including, without limitation, the statements of cash flow and income and operating expense, if any, that have been delivered to Agent and/or Lenders in respect of the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of the Property as of the date of such reports, and (iii) have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein. Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on the Property or the operation thereof, except as referred to or reflected in said financial statements. Since the date of the financial statements, there has been no material adverse change in any condition, fact, circumstance or event that would make the financial statements, reports, certificates or other documents

submitted in connection with the Loan inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely, or is reasonably likely to materially and adversely affect, the Property, Borrower or its business, operations or condition (financial or otherwise). All documents furnished to Agent by or on behalf of Borrower, as part of or in support of the Loan application or pursuant to this Agreement or any of the other Loan Documents, are true, correct, complete in all material respects and accurately represent the matters to which they pertain as of the dates made and there have been no materially adverse changes with respect to such matters since the respective dates thereof. In addition, there is no fact or circumstance presently known to Borrower which has not been disclosed to Agent and which materially adversely affects, or is reasonably likely to materially adversely affect, the Property, Borrower or its business, operations or condition (financial or otherwise).

   **3.1.11**  **Condemnation**.  No Condemnation or other similar proceeding has been commenced or, to Borrower's best knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

   **3.1.12**  **Utilities and Public Access**. The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate for the construction, development and operation of the Property for its intended uses. All roads and streets necessary for the construction and full utilization of the Improvements for their intended purpose have been completed and with respect to all roads and streets, the necessary rights of way therefor have either been acquired by the appropriate Governmental Authority or have been dedicated to public use and accepted by said Governmental Authority allowing for the construction, use and operation of, and access to the Improvements.

   **3.1.13**  **Separate Lots**. The Property is comprised of one (1) or more parcels that constitute separate tax lots and do not constitute a portion of any other tax lot not a part of the Property.

   **3.1.14**  **Assessments**. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

   **3.1.15**  **Enforceability**. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

   **3.1.16**  **Assignment of Leases**. : The Assignment of Leases creates a valid assignment of, or a valid security interest in, certain rights under the related Leases, to the extent that any Leases exist, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under such Leases, including the right to operate the Property. No Person other than Agent (on behalf of Lenders) has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder.

**3.1.17    Insurance**. Borrower has obtained and has delivered to Agent original or certified copies of all of the Policies (or Accord 27 certificates satisfactory to Agent evidencing the existence of the same), with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No claims have been made under any of the Policies, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

**3.1.18    Affiliate Fees**. Borrower is not and will not be a party to any Affiliate Contracts and does not and will not owe any fees or other sums to any Affiliate.

**3.1.19    Flood Zone**. None of the Improvements on the Property are located in an area identified by the Federal Emergency Management Agency as a special flood hazard area.

**3.1.20    Physical Condition**. Neither the Property nor any portion thereof is now damaged or injured as result of any fire, explosion, accident, flood or other casualty. There are no proceedings pending, or, to the best of Borrower's knowledge, threatened, to acquire by power of condemnation or eminent domain, the Property, or any interest therein, or to enjoin or similarly prevent the construction or use of the Improvements. Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

**3.1.21    Boundaries**. All of the Improvements which are located on the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the improvements, so as to affect the value or marketability of the Property except those which are insured against by title insurance.

**3.1.22    Leases**. As of the Closing Date there are no Leases in existence with respect to the Property or any portion thereof.

**3.1.23    Filing and Recording Taxes**. All transfer taxes, deed stamps, intangible taxes, personal property taxes or other amounts in the nature of transfer or debt taxes required to be paid under applicable Legal Requirements in connection with the transfer of or debt on the Property to Borrower have been paid. All mortgage, mortgage recording, stamp, intangible, personal property or other similar taxes required to be paid under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Mortgage, have been paid or are being paid simultaneously herewith. All taxes and governmental assessments due and owing in respect of the Property have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established hereunder or are insured against by the Title Insurance Policy to be issued in connection with the Mortgage.

**3.1.24    Single Purpose**. Borrower hereby represents and warrants to, and covenants that as of the date hereof and until such time as the Debt shall be paid in full:

(a)     Borrower does not own and will not own any asset or property other than (i) the Property, and (ii) incidental personal property necessary for the ownership or operation of the Property.

(b)     Borrower does not and will not engage in any business other than the ownership, construction, management and operation of the Property and Borrower will conduct and operate its business as presently conducted and operated.

(c)     Borrower has not and will not enter into any contract or agreement with any Affiliate of Borrower, any constituent party of Borrower or any Affiliate of any constituent party, except upon terms and conditions that are comparable to those that would be available on an arm's length basis with third parties other than any such party.

(d)     Borrower has not incurred and will not incur any Indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation) other than (i) the Debt, (ii) except in connection with the completion of the Improvements, unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding $100,000.00 at any one time, and (iii) except in connection with the completion of the Improvements, Indebtedness incurred in the financing of equipment and other personal property used on the Property with annual payments not exceeding $100,000.00 in the aggregate; provided that any Indebtedness incurred pursuant to subclauses (ii) and (iii) shall be (x) not more than sixty (60) days past due and (y) incurred in the ordinary course of business. No Indebtedness other than the Debt may be secured (subordinate, pari passu or otherwise) by the Property.

(e)     Borrower has not made and will not make any loans or advances to any third party (including any Affiliate or constituent party), and shall not acquire obligations or securities of its Affiliates.

(f)     Borrower is and will remain solvent and Borrower will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

(g)     Borrower has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Borrower will not, nor will Borrower permit any constituent party to, amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents of Borrower or such constituent party without the prior consent of Agent in any manner that (i) violates the single purpose covenants set forth in this Section 3.1.24 or (ii) amends, modifies or otherwise changes any provision thereof that by its terms cannot be modified at any time when the Loan is outstanding or by its terms cannot be modified without Agent or Lenders' consent.

(h)     Borrower will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any constituent party. Borrower's assets will not be listed as assets on the financial statement of any other Person, provided, however, that Borrower's assets may be included in a consolidated financial statement of its Affiliates provided

that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on Borrower's own separate balance sheet. Borrower will file its own tax returns (to the extent that Borrower is required to file any such tax returns) and will not file a consolidated federal income tax return with any other Person. Borrower shall maintain its books, records, resolutions and agreements as official records.

(i)    Borrower will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of Borrower or any constituent party of Borrower), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its Affiliates as a division or part of the other and shall maintain and utilize a separate telephone number and separate stationery, invoices and checks bearing its own name.

(j)    Intentionally Omitted;

(k)    Neither Borrower nor any constituent party will seek or effect the liquidation, dissolution, winding up, liquidation, consolidation or merger, in whole or in part, of Borrower.

(l)    Borrower will not commingle the funds and other assets of Borrower with those of any Affiliate or constituent party or any other Person, and will hold all of its assets in its own name.

(m)    Borrower has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person.

(n)    Borrower will not guarantee or become obligated for the debts of any other Person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

(o)    Borrower will not permit any Affiliate or constituent party independent access to its bank accounts.

(p)    Borrower will pay the salaries of its own employees (if any) from its own funds and maintain a sufficient number of employees (if any) in light of its contemplated business operations.

(q)    Borrower will compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred.

(r)    (i) If Borrower is a limited partnership or a limited liability company, (other than a single member limited liability company), each general partner or managing member (each, an "**SPC Party**") shall be a corporation whose sole asset is its interest in Borrower and each such SPC Party will at all times comply, and will cause Borrower to comply, with each of the representations, warranties, and covenants contained in this Section 3.1.24 as if

such representation, warranty or covenant was made directly by such SPC Party. Upon the withdrawal or the disassociation of an SPC Party from Borrower, Borrower shall immediately appoint a new SPC Party whose articles of incorporation are substantially similar to those of such SPC Party and deliver a new non-consolidation opinion to the Rating Agency or Rating Agencies, as applicable, with respect to the new SPC Party and its equity owners.

(ii)    If Borrower is a single member limited liability company, Borrower shall have at least one springing member, which, upon the dissolution of such sole member or the withdrawal or the disassociation of the sole member from Borrower, shall immediately become the sole member of Borrower.

(s)    Borrower shall at all times cause there to be at least one duly appointed member of the board of directors (or similarly appointed governing body) who is provided by a nationally recognized company that provides professional independent directors (an "Independent Director") of each SPC Party and Borrower reasonably satisfactory to Lender who shall not have been at the time of such individual's appointment or at any time while serving as a director of such SPC Party and Borrower, and may not have been at any time during the preceding five years (i) a stockholder, director (other than as an Independent Director), officer, employee, partner, attorney or counsel of such SPC Party, Borrower or any Affiliate of either of them, (ii) a customer, supplier or other Person who derives any of its purchases or revenues from its activities with such SPC Party, Borrower or any Affiliate of either of them, (iii) a Person or other entity controlling or under common control with any such stockholder, partner, customer, supplier or other Person, or (iv) a member of the immediate family of any such stockholder, director, officer, employee, partner, customer, supplier or other Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

Borrower shall not cause or permit the board of directors of any SPC Party and Borrower to take any action which, under the terms of any certificate of incorporation, by-laws or any voting trust agreement with respect to any common stock or under any organizational document of Borrower or SPC Party, requires a vote of the board of directors (or similar governing body) of each SPC Party and Borrower unless at the time of such action there shall be at least one member of the board of directors of each SPC Party and Borrower who is an Independent Member.

**3.1.25    Tax Filings**. Borrower has filed (or has obtained effective extensions for filing) all federal, state and local tax returns (if any) required to be filed and has paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower. Borrower believes that its tax returns (if any) properly reflect the income and taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

**3.1.26    Solvency**. Borrower (a) has not entered into the transaction or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for its Obligations under the Loan Documents. Giving effect to the advances made under the Loan, the fair saleable value of Borrower's assets exceeds

and will, immediately following the making of such advances, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the making of such advances, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur Indebtedness and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Indebtedness and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).

   3.1.27    **Federal Reserve Regulations**.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

   3.1.28    **Affiliate Debt**.  There is no Affiliate Debt owed or outstanding.

   3.1.29    **Offices; Location of Books and Records**.  The chief executive office or chief place of business and the jurisdiction of organization (as such terms are used in Revised Article 9 of the UCC as in effect in the State of New York from time to time) of Borrower is set forth on SCHEDULE XX or as otherwise described in a notice from Borrower to Agent, together with the organization number assigned to Borrower in such jurisdiction and Borrower's federal employer identification number.  Borrower's books of accounts and records are located at its chief executive office or the chief place of business.

   3.1.30    **Intentionally Omitted**.

   3.1.31    **General Contractor's Agreement**.    (i) The General Contractor's Agreement is in full force and effect; (ii) Borrower and General Contractor, as applicable, are in full compliance with their respective obligations under the General Contractor's Agreement; (iii) the work to be performed by General Contractor under the General Contractor's Agreement is the work called for by the Plans and Specifications and shall be performed in compliance with all applicable legal requirements; and (iv) all work on the Improvements shall be completed in substantial accordance with the Plans and Specifications in a good and workmanlike manner, within the time frames set forth in the Construction Schedule and shall be free of any material defects and shall be performed in compliance with all applicable Legal Requirements. Borrower shall from time to time, upon request by Agent, use reasonable efforts to cause General Contractor to provide Agent with reports in regard to the status of construction of the Improvements, in such form and detail as reasonably requested by Agent.

3.1.32    **Access**.  All curb cuts and driveway permits shown on the Plans and Specifications or otherwise necessary for access to the Property are existing or have been fully approved by the appropriate Governmental Authority.

3.1.33    **No Default**. No Default or Event of Default exists.

3.1.34    **Architect**.  The work to be performed by the Architect under the General Contractor's Agreement is the architectural services required to design the Improvements to be built in substantial accordance with the Plans and Specifications, within the time frames set forth in the Construction Schedule and all architectural services required to complete the Improvements in accordance with the Plans and Specifications is provided for under the General Contractor's Agreement and shall be performed in compliance with all applicable legal requirements.  Borrower shall from time to time, upon request by Agent, cause Borrower's Architect to provide Agent with reports in regard to the status of construction of the Improvements, in such form and detail as reasonably requested by Agent.

3.1.35    **Plans and Specifications**.  Borrower has furnished Agent true and complete sets of the Plans and Specifications which comply with all applicable Legal Requirements, all Governmental Approvals, and all restrictions, covenants and easements affecting the Property, and which have been approved by Agent, General Contractor, Guarantor, Borrower's Architect and by each such Governmental Authority as is required for construction of the Improvements.

3.1.36    **Zoning**.  (a) The land use and zoning regulations which are in effect for the Land permit the construction of the Improvements thereon on an as-of-right basis and no variance, conditional use permit, special use permit or other similar approval is required for such construction or (subject to obtaining a certificate of occupancy for the Improvements) the use of the Improvements as currently used and as described in the definition of "Improvements" and contemplated by the Plans and Specifications.

(b)    All easements, restrictions, covenants or operating agreements which benefit or burden the Property are in full force and effect, and to the best of Borrower's knowledge there are no defaults thereunder by any party thereto.

3.1.37    **Budget**.  The Project Costs Budget accurately reflects all Costs and the Loan Budget accurately reflects all Loan Costs.  Upon the making of the Advances requested in Borrower's Requisition in the manner set forth therein, all materials and labor theretofore supplied or performed in connection with the Property will have been paid for in full (subject to the Retainage).

3.1.38    **Feasibility**.  Each of the Construction Schedule and the Disbursement Schedule is accurate to date.

3.1.39    **Intentionally Omitted**.

3.1.40    **Lien Waivers**.  To the extent permitted by law, every contract or agreement providing for services, goods or materials entered into between Borrower and a third party in connection with the construction of the Improvements, contains a provision waiving and

releasing any and all liens or rights of liens which may arise in any manner on the Property or any part thereof, and a provision which subordinates any liens or any rights of lien of such third party to the lien of the Mortgage and the rights of Agent under the Mortgage.

**3.1.41    Condominium Documents**. All Condominium Documents shall comply with all applicable State statutes (including, without limitation, condominium statutes), Federal and State Securities Laws, Federal and State Truth in Lending Statutes, HUD filings re: interstate sales (if applicable), and the requirements of any Governmental Authority having jurisdiction. Moreover, (i) the condominium created pursuant to the filing of the Declaration of Condominium is a valid and conforming condominium under the laws of the State and (ii) the filing of the Declaration of Condominium will result in a valid and conforming condominium under the laws of the State.

**3.1.42    Unit Contracts**. The Contracts submitted to Agent by Borrower and all future contracts relating to individual Units, assuming the existence and, if applicable, the competence, of the purchaser and the delivery of the Contract to the Borrower by the purchaser, are and will be, subject to the terms and conditions therein contained, the valid and binding obligations of the purchaser and not rescindable by the purchaser thereunder for any reason except failure to complete construction of the Improvements and are Qualifying Contracts as provided for herein.

**3.1.43    Intentionally Omitted**.

**3.1.44    Full and Accurate Disclosure**. To the best of Borrower's knowledge, no information contained in this Agreement, the other Loan Documents, or any written statement furnished by or on behalf of Borrower or Guarantor pursuant to the terms of this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. To the best of Borrower's knowledge, there has been no material adverse change in any condition, fact, circumstance or event that would make the financial statements, rent rolls, reports, certificates or other documents submitted in connection with the Loan inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely, or is reasonably likely to materially and adversely affect, the Property, Borrower or Guarantor or their respective business, operations or condition (financial or otherwise). In addition, there is no fact or circumstance presently known to Borrower which has not been disclosed to Agent and which materially adversely affects, or is reasonably likely to materially adversely affect, the Property, Borrower or Guarantor or their respective business, operations or condition (financial or otherwise).

**3.1.45    Foreign Person**. Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code.

**3.1.46    Investment Company Act**. Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a

"subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended.

**3.1.47   Organizational Structure.**   Borrower's organizational structure is accurately reflected on its organizational chart, which is annexed hereto as EXHIBIT B.

**3.1.48   Management Agreement.**   (i) The Management Agreement is in full force and effect; (ii) both Borrower and Manager are in compliance in all material respects with their respective obligations under the Management Agreement; and (iii) the work performed by the Manager under the Management Agreement consists of construction management services required to oversee the construction of the Improvements and the general development of the Project in accordance with the Plans and Specifications. Borrower shall from time to time, upon request by Agent, cause Manager to provide Agent with reports in regard to the status of construction of the Improvements and the general development of the Project, in such form and detail as reasonably requested by Agent.

**3.1.49   Indebtedness.**   Borrower has not incurred any Indebtedness, other than Indebtedness permitted pursuant to Section 4.2.14.

**3.1.50   Broker's Agreement.**  . (i) The Broker's Agreement is in full force and effect; (ii) both Borrower and Broker are in compliance in all material respects with their respective obligations under the Broker's Agreement; and (iii) the work performed by the Broker under the Broker's Agreement consists of selling Residential Units in the Building.

**3.1.51   Intentionally Omitted.**

**Section 3.2   Continuing Effectiveness and Survival of Representations**

**3.2.1**   All representations and warranties contained in any documents furnished to Agent and/or Lenders by or on behalf of Borrower or Guarantor as part of or in support of the Loan application or pursuant to this Agreement or any of the other Loan Documents shall be deemed continuing and in effect at all times while Borrower remains indebted to Lenders and shall be deemed to be incorporated by reference in each requisition for an Advance by Borrower and each Draw Request submitted to Agent as provided in Section 2.10.1 shall constitute an affirmation that the representations and warranties contained in Article III of this Agreement and in the other Loan Documents remain true and correct as of the date of such Draw Request unless Borrower specifically notifies Agent of any change therein; and unless Agent is notified to the contrary, in writing, prior to the disbursement of the requested Advance or any portion thereof; shall constitute an affirmation that the same remain true and correct in all material respects on the date of such disbursement unless Borrower specifically notifies Agent of any change therein. The representations and warranties set forth in Section 3.1 shall survive, and any covenants contained in Section 3.1 shall continue, for so long as any amount remains payable to Agent and/or Lenders under this Agreement or any of the other Loan Documents.

## IV.   BORROWER COVENANTS

### Section 4.1   Borrower Affirmative Covenants.

Borrower hereby covenants and agrees that:

**4.1.1   Existence; Compliance with Legal Requirements.** Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply with all Legal Requirements applicable to it and the Property, including, without limitation, Prescribed Laws.

### 4.1.2   Taxes and Other Charges.

(a)   Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable even if Borrower is contesting in good faith. Borrower shall furnish to Agent receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent. Borrower shall not permit or suffer and shall promptly discharge any Lien (other than Permitted Encumbrances) against the Property, by payment, bonding or otherwise. After prior notice to Agent, Borrower, at its own expense, may contest by appropriate legal proceeding, conducted in good faith and with due diligence, the amount or validity of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable statutes, laws and ordinances; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of Taxes or Other Charges from the Property; and (vi) unless as a condition to maintaining such proceeding Borrower is required to pay the amount of any such Taxes or Other Charges, Borrower shall deposit with Agent cash, or other security as may be approved by Agent, in an amount equal to one hundred twenty-five percent (125%) of the contested amount, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Agent may pay over any such cash or other security held by Agent to the claimant entitled thereto at any time when, in the judgment of Agent, the entitlement of such claimant is established.

(b)   Borrower shall pay, or cause to be paid any and all taxes, charges, filing, registration and recording fees, documentary stamps, intangible taxes, excises and levies imposed upon the Borrower by reason of its ownership of the Note, the Security Instrument or the Assignment of Leases, any security instrument with respect to the equipment used in connection with the Project, or the Borrower or with respect to Borrower's interest therein and any instrument of further assurance, other than income, franchise and doing business taxes, and shall pay or cause to be paid all stamp taxes and other taxes required to be paid on the Note, the Security Instrument or the Assignment of Leases. In the event Borrower fails to make such payments or fails to cause such payments to be made within five (5) days after written notice thereof from Lenders, or the then current mortgagee under the Security Instrument, Lenders or the then current mortgagee under the Security Instrument shall have the right, but not the

obligation, to pay the amounts due, and Borrower shall, on demand, reimburse Lenders or the then current mortgagee under the Security Instrument for said amounts, together with interest thereon at the Default Rate from the date said amounts are so advanced until the same are paid to the Lenders or the then current mortgagee under the Security Instrument.

**4.1.3    Litigation**. Borrower shall give prompt notice to Agent of any litigation or governmental proceedings pending or threatened against Borrower which might cause a Material Adversely Effect to the Property, or Borrower's ability to perform its Obligations hereunder or under the other Loan Documents.

**4.1.4    Access to Property**. Borrower shall permit agents, representatives and employees of Agent to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice.

**4.1.5    Further Assurances; Supplemental Mortgage Affidavits**. Borrower shall, at Borrower's sole cost and expense:

(a)    execute and deliver to Agent such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Obligations of Borrower under the Loan Documents, as Agent may reasonably require, provided that the same shall be subject to Section 10.22;

(b)    do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Agent shall reasonably require from time to time; and

(c)    furnish to Agent all instruments, documents, certificates, plans and specifications, appraisals, title and other insurance, reports and agreements and each and every other document and instrument required to be furnished by the terms of this Agreement or the other Loan Documents, all at Borrower's reasonable expense.

**4.1.6    Financial Reporting**. (a) Borrower shall keep and maintain or will cause to be kept and maintained proper and accurate books and records, in accordance with GAAP, reflecting the financial affairs of Borrower. Agent shall have the right from time to time during normal business hours upon reasonable notice to Borrower to examine such books and records at the office of Borrower or other Person maintaining such books and records and to make such copies or extracts thereof as Agent shall desire.

(b)    Borrower shall furnish Agent annually, within sixty (60) days following the end of each Fiscal Year, a complete copy of Borrower's and Guarantor's annual financial statements audited by the Approved Accountant or other independent certified public accountant acceptable to Agent prepared in accordance with GAAP, including, without limitation, statements of (i) assets and liabilities and net worth, (ii) income and expense and (iii) prior to completion, a project cost report for Borrower and the Property, and after completion, a cash flow statement for Borrower and the Property.

(c)     Borrower will furnish Agent on or before the thirtieth (30th) day after the end of each fiscal quarter (based on Borrower's Fiscal Year), the following items:

(i)     quarterly and year-to-date statements of (i) assets and liabilities and net worth, (ii) income and expense and (iii) cash flow prepared for such quarter with respect to the Property, with a balance sheet for such quarter for Borrower and Guarantor;

(ii)     intentionally omitted;

(iii)     a comparison of the budgeted income and expenses and the actual income and expenses for such month and year to date for the Property, together with a detailed explanation of any material variances between budgeted and actual amounts for such period and year to date;

(d)     Borrower will furnish to Agent within thirty (30) days following the end of each calendar month, the following items, each of which shall be certified as true and correct by an authorized senior officer of Borrower or, if applicable, its managing member or general partner:

(i)     an income and expense report for the preceding month; and

(ii)     weekly Unit sales report for the Property pursuant to Section 4.1.1;

(e)     Borrowers' financial statements delivered pursuant to Section 4.1.6 (b) and (c) shall be accompanied by an Officer's Certificate for the Property for the period in question (y) stating that such financial statements present fairly the financial condition and the results of operations of Borrower and (z) certifying as of the date thereof whether to the best of such Borrower's knowledge there exists an event or circumstance which constitutes a Default or Event of Default by Borrower under the Loan Documents and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(f)     Intentionally Omitted.

(g)     Borrower shall submit the Annual Budget to Agent not later than the commencement of each Fiscal Year following the Completion Date and not later than thirty (30) days after the Completion Date for the Fiscal Year in which the Completion Date occurs.

(h)     Intentionally Omitted.

(i)     Borrower shall furnish to Agent a complete copy of Borrower's and each Guarantor's federal income tax returns within thirty (30) days after the filing of the same.

(j)     Borrower shall furnish to Agent, within five (5) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Agent.

(k)      Borrower acknowledges the importance to Agent and Lenders of the timely delivery of each of the items required by this Section 4.1.6 (each, a "**Required Financial Item**" and collectively, the "**Required Financial Items**"). In the event Borrower fails to deliver to Agent any of the Required Financial Items within the time frame specified herein (each such event, a "**Reporting Failure**"), in addition to constituting an Event of Default hereunder and without limiting Agent's other rights and remedies with respect to the occurrence of such an Event of Default, Borrower shall pay to Agent upon written demand the sum of $1,000.00 per occurrence for each Reporting Failure. Notwithstanding the foregoing, such payment shall not be owed to Agent until after the second occurrence of a Reporting Failure. It shall constitute a further Event of Default hereunder if any such payment is not received by Agent within thirty (30) days of the date on which such payment is demanded, and Agent shall be entitled to the exercise of all of its rights and remedies provided hereunder.

**4.1.7    Title to the Property**. Borrower will warrant and defend the validity and priority of the Liens of the Mortgage and the Assignment of Leases on the Property and the Liens created pursuant to Section 6.1 against the claims of all Persons whomsoever, subject with respect to the Property only to Permitted Encumbrances.

**4.1.8    Estoppel Statement**. After request by Agent, Borrower shall within ten (10) Business Days furnish Agent with a statement, duly acknowledged and certified, stating (i) the unpaid principal amount of the Note, (ii) the Applicable Interest Rate of the Note, (iii) the date installments of interest and/or principal were last paid on the Note, (iv) any offsets or defenses to the payment of the Debt, if any, and (v) that this Agreement and the other Loan Documents have not been modified or if modified, giving particulars of such modification.

**4.1.9    Leases**. The Property shall not be leased without Agent's prior consent in its sole discretion.

**4.1.10    Alterations**. Upon completion of the Improvements, Agent's prior approval shall be required in connection with any alterations to any Improvements that may (a) have a Material Adverse Effect, (b) result in a reduction of the square footage of the Improvements or (c) adversely affect the use of operation of the Improvements and/or (d) require an amendment to the Offering Plan or the Declaration of Condominium. If the total unpaid amounts incurred and to be incurred with respect to any alterations to the Improvements shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Agent as security for the payment of such amounts and as additional security for Borrower's Obligations under the Loan Documents any of the following: (i) cash, (ii) U.S. Obligations or (iii) other securities acceptable in all respects to Agent. Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to alterations to the Improvements over the Alteration Threshold. The provisions of this Section 4.1.10 shall not pertain to a Restoration for which the provisions of Article V are intended to govern.

**4.1.11    Intentionally Omitted**.

**4.1.12    Updated Appraisal**. Upon the written request of Agent, Borrower shall promptly reimburse Agent for the cost of an updated FIRREA appraisal of the Property as Agent may require, in form and substance and conducted by an appraiser satisfactory to Agent and its

internal appraisal staff in all respects; provided, however, that Borrower shall not be required to reimburse Agent for an updated FIRREA standard appraisal of the Property more frequently than once every year except if such updated FIRREA appraisal is obtained by Agent in connection with an Event of Default or in connection with the election of Borrower to extend the term of the Loan for the Extension Period.

        **4.1.13**   **Up-Front Fee and Servicing Fee**.   Borrower shall pay to Agent the Up-Front Fee and pay Servicer the Servicing Fee in accordance with the Loan Fee Letter.

        **4.1.14**   **Interest Rate Protection Agreement**.   (a)Prior to or contemporaneously with the Closing Date, Borrower shall have entered into one or more Interest Rate Protection Agreements with an acceptable Counterparty, which, if the Loan is then not fully funded, are based on an increasing notional amount, such schedule of increases to be based on the draw schedule for the Loan (with the intent that, to the extent reasonably practicable, the notional amount applicable from time to time shall equal the outstanding principal balance of the Loan and that if it does not, Borrower shall, upon request by Agent, amend the Interest Rate Protection Agreement to change the notional amounts accordingly), which shall effectively hedge the LIBOR Rate on the entire outstanding principal balance of the Loan until the Maturity Date at a rate less than or equal to five percent (5%) per annum, calculated on an annual basis. The obligations of Borrower under any Interest Rate Protection Agreements shall not be secured by or encumber any of the collateral securing Borrower's obligations under the Loan Documents. Promptly upon obtaining any Interest Rate Protection Agreement, Borrower shall deliver the same to Agent.

        (b)   Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Protection Agreement. Borrower shall take all action reasonably requested by Agent to enforce Agent's rights under the Interest Rate Protection Agreements in the event of a default by Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder. Borrower shall not (a) without the prior written consent of Agent, modify, amend or supplement the terms of the Interest Rate Protection Agreement, (b) without the prior written consent of Agent, cause the termination of the Interest Rate Protection Agreement prior to its stated maturity date, (c) without the prior written consent of Agent, waive or release any obligation of the Counterparty (or any successor or substitute party to the Interest Rate Protection Agreement) under the Interest Rate Protection Agreement, (d) without the prior written consent of Agent, consent or agree to any act or omission to act on the part of the Counterparty (or any successor or substitute party to the Interest Rate Protection Agreement) which, without such consent or agreement, would constitute a default under the Interest Rate Protection Agreement, (e) fail to exercise promptly and diligently each and every material right which it may have under the Interest Rate Protection Agreement, (f) take or omit to take any action or suffer or permit any action to be omitted or taken, the taking or omission of which would result in any right of offset against sums payable under the Interest Rate Protection Agreement or any defense by the Counterparty (or any successor or substitute party to the Interest Rate Protection Agreement) to payment or (g) fail to give prompt notice to Agent of any notice of default given by or to Borrower under or with respect to the Interest Rate Protection Agreement, together with a complete copy of such notice.

(c)     Borrower shall collaterally assign to Agent, pursuant to an Assignment of Interest Rate Protection Agreement substantially in the form attached hereto as EXHIBIT C, all of its right, title and interest to receive any and all payments under the Interest Rate Protection Agreement (and any related guarantee, if any) and shall deliver to Agent an executed counterpart of such Interest Rate Protection Agreements, notify the Counterparty of such collateral assignment and obtain the agreement (either in such Interest Rate Protection Agreement or by separate instrument) of such Counterparty to make any payments to become payable under or pursuant to the Agreement directly to Agent until such time as the Assignment of Interest Rate Protection Agreement is terminated or otherwise canceled. At such time as the Loan is repaid in full, all of Agent's right, title and interest in the Interest Rate Protection Agreement shall terminate and Agent shall execute and deliver at Borrower's sole cost and expense, such documents as may be required to evidence Agent's release of the Interest Rate Protection Agreements and to notify the Counterparty of such release. If Agent receives any payments under the Interest Rate Protection Agreement (other than a payment by reason of a termination event or any other payment during the existence of an Event of Default), Agent shall deliver the same to Borrower by depositing the same into Borrower's Designated Account. If Agent receives any payments under the Interest Rate Protection Agreement during the existence of an Event of Default or by reason of a termination event under the Interest Rate Protection Agreement, Agent shall have the right to hold the same, to deposit the same in a cash collateral account as additional security for the Loan or to apply same to any portion of the Debt in any order it desires or, if the Interest Rate Protection Agreement has been partially or wholly terminated, to apply same to the cost of acquiring another interest rate protection agreement in form and substance, and from a counterparty, satisfactory to Agent in all respects.

(d)     If for any reason the Counterparty's rating shall fall below the Minimum Counterparty Rating, Borrower shall within ten (10) Business Days following receipt of notice thereof from Agent or any other Person, procure a new interest rate protection product from a counterparty having a rating from S&P and Fitch of at least "A" and from Moody's of at least "A" in the form of the Interest Rate Protection Agreement and shall pledge same to Agent pursuant to an assignment of interest rate protection agreement in the form of the Assignment of Interest Rate Protection Agreement or such other assignment form as is then generally utilized by Agent and accompanied by an opinion letter from counsel to such new Counterparty in form and substance reasonably satisfactory to Agent.

(e)     In the event that Borrower fails to purchase and deliver to Agent the Interest Rate Protection Agreement as and when required hereunder, Agent may purchase the Interest Rate Protection Agreements and the cost incurred by Agent in purchasing the Interest Rate Protection Agreements shall be paid by Borrower to Agent with interest thereon at the Default Rate from the date such cost was incurred by Agent until such cost is paid to Agent.

(f)     In connection with an Interest Rate Protection Agreement, unless Agent is the Counterparty thereunder, Borrower shall obtain and deliver to Agent an opinion of counsel from counsel for the Counterparty thereunder (upon which Agent and Lenders and their respective successors and assigns may rely) (the **"Counterparty Opinion"**), under New York law and, if the Counterparty is a non-U.S. entity, the applicable foreign law, substantially in compliance with the requirements set forth below:

(i)     The Counterparty Opinion shall be addressed to Agent, for itself and Lenders, and their respective successors and assigns and shall state that it may be relied upon by (A) successor Agent, (B) any assignee of any Lender's interest in the Loan, (C) any participant of any Lender's interest in the Loan, and (D) any servicer of the Loan,

(ii)     The Counterparty Opinion shall be in form and substance reasonably acceptable to Lender and shall contain the following opinions:

(A)     the Counterparty under the Interest Rate Protection Agreement is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Protection Agreement;

(B)     the execution and delivery of the Interest Rate Protection Agreement by the Counterparty thereunder, and any other agreement (including, without limitation, the Assignment of Interest Rate Protection Agreement) which such Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(C)     all consents, authorizations and approvals required for the execution and delivery by the Counterparty of the Interest Rate Protection Agreement, and any other agreement (including, without limitation, the Assignment of Interest Rate Protection Agreement) which such Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(D)     the Interest Rate Protection Agreement, and any other agreement (including, without limitation, the Assignment of Interest Rate Protection Agreement) which the Counterparty thereunder has executed and delivered pursuant thereto, has been duly executed and delivered by such Counterparty and constitutes the legal, valid and binding obligation of such Counterparty, enforceable against such Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law) and subject to other reasonable usual and customary assumptions and qualifications.

(iii)     Depending on the nature of the transaction, the Counterparty Opinion shall contain such additional opinions on such other matters relating to the Interest Rate

Protection Agreement and/or and any other agreement (including, without limitation, the Assignment of Interest Rate Protection Agreement) which the Counterparty thereunder has executed and delivered pursuant thereto, as Agent shall reasonably require, including, without limitation, the following additional opinions if the Counterparty is a foreign entity:

      (A)    Jurisdiction where Counterparty is located will respect and give effect to the choice of law provisions of the Interest Rate Protection Agreement and any other agreement (including, without limitation, the Assignment of Interest Rate Protection Agreement) which the Counterparty thereunder has executed and delivered pursuant thereto.

      (B)    A judgment obtained in the courts of the State of New York is enforceable in the jurisdiction where Counterparty is located.

    (g)    Borrower's failure to comply with any or all of the foregoing covenants set forth in this Section 4.1.14 within fifteen (15) days after Agent's notice to Borrower of such failure shall constitute an Event of Default hereunder.

    **4.1.15**    **General Contractor's Agreement**.  Borrower shall (i) enforce the General Contractor's Agreement in accordance with all applicable Legal Requirements and in the best interests of Borrower consistent with the construction of the Improvements using sound business judgment, (ii) enforce the General Contractor's Agreement so as to require the construction of the Improvements to be completed within the time frames set forth in the Construction Schedule, (iii) waive none of the material obligations of any of the parties thereunder, (iv) do no act which would relieve General Contractor of its material obligations to construct the Improvements according to the Plans and Specifications and (v) make no amendments to or change orders under the General Contractor's Agreement, except as permitted under Section 4.2.13, without the prior approval of Agent. Borrower shall, from time to time, upon request by Agent, cause General Contractor to provide Agent with reports in regard to the status of construction of the Improvements, in such form and detail as reasonably requested by Agent.

    **4.1.16**    **Architect's Contract**. Borrower shall (i) enforce the Architect's Contract in the best interests of Borrower consistent with the construction of the Improvements using sound business judgment, (ii) waive none of the material obligations of Borrower's Architect thereunder, (iii) do no act which would relieve Borrower's Architect from its material obligations under the Architect's Contract and (iv) make no amendments to the Architect's Contract without the prior approval of Agent. Borrower shall, from time to time, upon request by Agent, cause Borrower's Architect to provide Agent with reports in regard to the status of construction of the Improvements, in such form and detail as reasonably requested by Agent.

    **4.1.17**    **Insurance**.  Borrower shall maintain in effect at all times while Borrower is indebted to Lenders the insurance policies required by this Agreement. The proceeds of any insurance shall be applied in accordance with the terms of Section 5.3. Borrower shall also furnish Agent with evidence or certificates from insurance companies indicating that the Persons responsible for the design or construction of the Improvements

(including the General Contractor, the Borrower's Architect or if applicable, any Major Trade Contractor) are covered by professional liability insurance or other liability insurance, as applicable, as required by the applicable contract approved by Agent; such evidence or certificates to be delivered to Agent (i) on or before the date of this Agreement, with respect to any such Persons whose contracts are then in effect and (ii) within thirty (30) days after execution, with respect to any Major Trade Contracts executed after the date of this Agreement.

     **4.1.18   Application of Loan Proceeds.**  Borrower shall comply with the Lien Law, including without limitation Chapter 713.3471 Florida Statutes, and shall use the proceeds of the Loan solely and exclusively for the purposes of constructing the Improvements in accordance herewith and in accordance with the Loan Budget, which shall be subject to no change except as permitted hereby.  Borrower will receive the Advances to be made hereunder and will hold the right to receive the same as a trust fund for the purpose of paying the Costs of the Improvement and it will apply the same first to such payment before using any part thereof for any other purpose.

     **4.1.19   Costs.**  Borrower shall promptly pay when due all Costs.

     **4.1.20   Fees and Expenses.**  Borrower shall pay when due the fees of the Construction Consultant, all reasonable costs and expenses, including, without limitation, appraisal fees (only if required by law after the initial appraisal or in connection with any extension of the Loan), recording fees and charges, abstract fees, title policy fees, escrow fees, reasonable attorneys' fees, fees of inspecting architects and engineers to the extent provided hereunder in connection with Advances, environmental consultants to the extent provided in the Mortgage, monthly servicing fees of the Servicer and all reasonable out-of-pocket costs and expenses incurred by the Servicer and the Construction Consultant, and all other reasonable costs and expenses of every character which have been incurred or which may hereafter be incurred by Agent in connection with the preparation and execution of the Loan Documents, including any extension, amendment or modification thereof; the funding of the Loan, the administration and enforcement of the Mortgage, the Note, and the other Loan Documents, including, without limitation, all reasonable out of pocket costs and expenses related to the inspection of the Property and reasonable attorneys' fees in any action for the foreclosure of the Mortgage and the collection of the Loan, and all such fees incurred in connection with any bankruptcy or insolvency proceeding; and Borrower will, within thirty (30) days after demand by Agent (together with reasonable evidence of incurrence of such expenses), reimburse Agent for all such reasonable expenses which have been incurred.  All amounts incurred or paid by Agent under this Section 4.1.20, together with interest thereon at the Default Rate from the due date until paid by Borrower, shall be added to the Debt and shall be secured by the lien of the Mortgage.

     **4.1.21   Completion of Construction.**  Borrower shall diligently pursue and complete construction of the Shell Completion on or prior to the Shell Completion Date. Borrower shall diligently pursue construction of the entire Improvements to completion and obtain a temporary or permanent certificate of occupancy (and to the extent the same are conditional or require performance by Borrower, satisfied all conditions to the issuance of and/or performed all obligations required for the continued validity of the same) for on or prior to the Completion Date in substantial accordance with the Plans and Specifications (except for changes in accordance with Section 4.2.13) and in substantial compliance with all restrictions, covenants

and easements affecting the Property, material compliance with all applicable Legal Requirements, and all Governmental Approvals, and with all terms and conditions of the Loan Documents; to pay all sums and to perform such duties as may be necessary to complete such construction of the Improvements substantially in accordance with the Plans and Specifications (except for changes in accordance with Section 4.1.13) and in substantial compliance with all restrictions, covenants and easements affecting the Property, material compliance with all Legal Requirements and all Governmental Approvals, and with all terms and conditions of the Loan Documents, all of which shall be accomplished on or before the Completion Date, free from any liens, claims or assessments (actual or contingent) asserted against the Property for any material, labor or other items furnished in connection therewith. Evidence of satisfactory compliance with the foregoing shall be furnished by Borrower to Agent on or before the Completion Date. In addition, if such certificate of occupancy or other Governmental Approvals are temporary in nature, Borrower shall diligently pursue procuring final Governmental Approvals. In addition, Borrower shall diligently pursue construction of the entire Improvements to Final Completion after the Completion Date.

**4.1.22   Inspection of Property**. Borrower shall permit Agent, the Construction Consultant and their respective representatives, to enter upon the Property, inspect the Improvements and all materials to be used in the construction thereof and to examine the Plans and Specifications which are or may be kept at the construction site at all reasonable times and with reasonable advance notice and will cooperate, and use reasonable efforts to cause the General Contractor and the Trade Contractors to cooperate with the Construction Consultant to enable him or her to perform his or her functions hereunder.

**4.1.23   Construction Consultant**. Borrower acknowledges that (i) the Construction Consultant has been retained by Agent to act as a consultant and only as a consultant to Agent in connection with the construction of the Improvements and has no duty to Borrower, (ii) the Construction Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon Lenders or Borrower, (iii) Agent reserves the right to make any and all decisions required to be made by Agent under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Agent under this Agreement and to accept or not accept any matter or thing required to be accepted by Agent under this Agreement, and without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by the Construction Consultant with respect thereto, (iv) Agent reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Agent or any other person or party, and (v) Agent reserves the right to replace the Construction Consultant, at no cost or expense to Borrower, with another construction consultant at any time and without prior notice to or approval by Borrower.

**4.1.24   Construction Consultant/Duties and Access**. Borrower shall permit Agent to retain the Construction Consultant at the reasonable cost of Borrower to perform the following services on behalf of Agent:

(a)    To review and advise Agent whether, in the opinion of the Construction Consultant, the Plans and Specifications are satisfactory;

(b)    To review Draw Requests and change orders; and

(c)    To make periodic inspections (approximately at the date of each Draw Request) for the purpose of assuring that construction of the Improvements to date is in substantial accordance with the Plans and Specifications and to approve Borrower's then current Draw Request as being consistent with Borrower's obligations under this Agreement, including inter alia, an opinion as to Borrower's continued compliance with the provisions of Section 2.9.1(g), the issuance of the certificate pursuant to Section 2.9.1(d)(vi) and the approvals pursuant to Section 2.9.2(j) and Section 2.9.3(j) and otherwise perform its responsibilities to the Agent and Lenders.

The fees of the Construction Consultant shall be paid by Borrower within thirty (30) days after billing therefor and expenses incurred by Agent on account thereof shall be reimbursed to Agent within thirty (30) days after request therefor, but neither Agent nor the Construction Consultant shall have any liability to Borrower on account of (i) the services performed by the Construction Consultant, (ii) any neglect or failure on the part of the Construction Consultant to properly perform its services or (iii) any approval by the Construction Consultant of construction of the Improvements. Neither Agent nor the Construction Consultant assumes any obligation to Borrower or any other Person concerning the quality of construction of the Improvements or the absence therefrom of defects.

**4.1.25    Correction of Defects**. Borrower shall promptly correct all defects in the Improvements or any substantial departure from the Plans and Specifications not previously approved by Agent to the extent required hereunder. Borrower agrees that the advance of any proceeds of the Loan whether before or after such defects or substantial departures from the Plans and Specifications are discovered by, or brought to the attention of, Agent shall not constitute a waiver of Agent's right to require compliance with this covenant.

**4.1.26    Books and Records**. Borrower shall keep and maintain detailed, complete and accurate books, records and accounts reflecting all items of income and expense of Borrower in connection with the Property and the construction of the Improvements and the results of the operation thereof; and, upon the request of Agent, to make such books, records and accounts available to Agent for inspection or independent audit at reasonable times upon reasonable advance notice to Borrower. Any independent audit conducted hereunder shall be at Agent's expense unless such audit shall uncover a material error in statements previously delivered to Agent, in which case Borrower shall pay all reasonable costs related thereto. Agent hereby agrees to keep, and to use reasonable efforts to cause its agents, employees and consultants to keep, any information acquired hereby confidential unless already known to the general public or as required by law.

**4.1.27    Indebtedness**. Borrower shall duly and promptly pay all Borrower's indebtedness to Lenders according to the terms of this Agreement, the Note and the other Loan Documents, and shall incur no other Indebtedness in any form, whether direct, indirect, primary, secondary, or contingent, without Agent's prior written consent, other than such Indebtedness

contemplated hereunder and the Indebtedness (if any) permitted pursuant to Section 4.2.14, which other Indebtedness in each case is paid on a timely basis.

**4.1.28    Maintain Existence**.  Borrower shall maintain its existence in good standing and make no changes in its organization, except to the extent permitted under Article VIII; shall not convey, transfer, or lease any substantial part of its property, assets, or business to any other person or entity except as provided under Article VIII; shall not engage in any business enterprise other than as provided in this Agreement; shall not merge or consolidate with or into any other firm or corporation or enter into any partnership or joint venture with any other person or entity; and shall not make any loans or advances to any other person or entity, except extensions of credit in the normal course of business.

**4.1.29    Bonds**.  Borrower shall furnish to Agent and maintain such Payment and Performance Bonds with respect to the obligations of the General Contractor and each Major Trade Contractor to the extent required hereunder.  In the event that any payments under any such Payment and Performance Bonds are issued jointly to Borrower and Agent or Lenders, Borrower shall endorse any such jointly issued payments to the order of Agent promptly upon Agent's demand.

**4.1.30    Intentionally Omitted**.

**4.1.31    Easements and Restrictions; Zoning**.  Borrower shall submit to Agent for Agent's approval prior to the execution thereof by Borrower all proposed easements, restrictions, covenants, permits, licenses, and other similar instruments which would affect the title to the Property, accompanied by a Survey showing the exact proposed location thereof and such other information as Agent shall reasonably require.  Except as permitted under Article VIII, Borrower shall not subject the Property or any part thereof to any easement, restriction or covenant (including any restriction or exclusive use provision in any lease or other occupancy agreement) without the prior approval of Agent (not to be unreasonably withheld or delayed in the case of utility easements only).  With respect to any and all existing easements, restrictions, covenants or operating agreements which benefit or burden the Property and any easement, restriction or covenant to which the Property may hereafter be subjected in accordance with the provisions hereof, Borrower shall:  (a) observe and perform the obligations imposed upon the Borrower or the Property; (b) not alter, modify or change the same without the prior approval of Agent; (c) enforce its rights thereunder in a commercially reasonable manner so as to preserve for the benefit of the Property the full benefits of the same; and (d) deliver to Agent a copy of any notice of default or other material notice received by Borrower in respect of the same promptly after Borrower's receipt of such notice.

**4.1.32    Laborers, Subcontractors and Materialmen**.  Borrower shall notify Agent immediately, and in writing, if Borrower receives any default notice, notice of lien or demand for past due payment, written or oral, from any laborer, subcontractor or materialmen.  Borrower will also furnish to Agent at any time and from time to time upon reasonable demand by Agent, lien waivers in form reasonably satisfactory to Agent bearing a then current date from each Major Trade Contractor covering work performed through the current pay period.

**4.1.33    Ownership of Personalty**. Borrower shall furnish to Agent, if Agent so requests, photocopies of the fully executed contracts, bills of sale, receipted vouchers and agreements, or any of them, under which Borrower claims title to the materials, articles, fixtures and other personal property used or to be used in the construction or operation of the Improvements.

**4.1.34    Comply with Other Loan Documents**. Borrower shall perform all of Borrower's Obligations under the Note and the other Loan Documents.

**4.1.35    Purchase of Material Under Conditional Sale Contract**. Borrower shall not permit any materials, equipment, fixtures or any other part of the Improvements to be purchased or installed under any security agreement or other arrangements wherein the seller reserves or purports to reserve the right to remove or to repossess any such items or to consider them personal property after their incorporation in the Improvements, unless authorized by Agent in writing and in advance.

**4.1.36    Further Assurance of Title**. Borrower shall further assure title as follows: If at any time Agent has reason to believe in its reasonable opinion that any Advance is not secured or will or may not be secured by the Mortgage as a first priority lien or security interest on the Improvements (subject only to the Permitted Encumbrances), then Borrower shall, within ten (10) days after written notice from Agent, do all things and matters necessary (including execution and delivery to Agent of all further documents and performance of all other acts which Agent reasonably deems necessary or appropriate) to assure to the satisfaction of Agent that any Advance previously made hereunder or to be made hereunder is secured or will be secured by the Mortgage as a first priority lien or security interest with respect to the Improvements (subject only to the Permitted Encumbrances). Lenders, at Agent's option, may decline to make further Advances hereunder until Agent has received such assurance.

**4.1.37    Intentionally Deleted**.

**4.1.38    Intentionally Deleted**.

**4.1.39    Condominium**. The provisions of this Section 4.1.39 shall apply with respect to the conversion of the Property to a condominium regime of ownership:

(a)    Borrower shall have submitted to Agent the offering plan or prospectus, and all documents contained therein shall be subject to Agent's approval (the "Initial Offering Plan"), for the establishment of the Condominium and the initial Offering Plan shall be acceptable to Agent in its reasonable discretion; Borrower shall, subject to Agent's prior approval (which approval or non approval Agent shall deliver to Borrower within fifteen (15) Business Days after request therefor), promptly submit all amendments and supplements to such Offering Plan required by Legal Requirements to the Division. Borrower promptly shall obtain acceptance for filing of the Offering Plan, as so amended or supplemented, by the Division. If Agent disapproves an amendment, it shall furnish Borrower with a written statement setting forth the reasons for disapproval. Agent's consent shall be required for price change amendments that increase or decrease Minimum Release Prices.

(b)    The form of contract of sale for the Residential Units and Retail Units, as

the case may be, (each, a "Qualifying Contract" as defined herein) shall be subject to the approval of Agent.

(c)     Borrower shall cause the Condominium Documents to comply with all applicable Legal Requirements.

(d)     Borrower shall comply with all Legal Requirements in connection with the offering and sale of Units.

(e)     Borrower shall hold or shall cause to be held any deposits in connection with any Qualifying Contract in an account maintained with the escrow agent designated in the Offering Plan, or another escrow agent reasonably acceptable to Agent, to hold any deposits in connection with any Qualifying Contract, and shall not withdraw such deposits for any purpose except as expressly provided in the applicable Qualifying Contract, or in accordance with Legal Requirements or the Condominium Documents. Except as otherwise provided, Borrower shall not permit the proceeds of any such deposits to be used to pay for construction or other costs related to the Improvements. Borrower shall assign its rights therein to Agent pursuant to a form reasonably acceptable to Agent. If requested by Agent and permitted under applicable law, Borrower shall require that such escrow agent hold such deposits in an account maintained with Agent or an affiliate of Agent or shall designate Agent as escrow agent with respect to holding such deposits. Otherwise, Borrower shall require that such escrow agent hold such deposits in an account at an Eligible Institution unless otherwise required by applicable law.

(f)     Notwithstanding the provisions of subparagraph (e) above, the Borrower may use any portion of the deposits (exclusive of upgrade deposits, if any) in excess of ten percent (10%) of the purchase price that is given to Borrower pursuant to Qualifying Contracts and legally available under the Condominium Statute, for use to pay for Hard Costs of Construction of the Improvements in lieu of the funding of the Loan proceeds to pay Hard Costs. Notwithstanding anything to the contrary contained herein, to the extent that deposits are used to fund Construction of the Improvements, the amount of the Loan originally allocated for such shall remain in the applicable line item of the approved Project Budget and will not be subject to reallocation pursuant to Section 9.20 of the Loan Agreement. Additionally, such set aside amount shall not considered a portion of the undisbursed balance of the Loan. If Borrower is required to refund any deposit(s) that were used to pay for Hard Costs, the amount will be drawn by funding on the specified line item for which such deposits were originally used, provided that no Default shall then exist and the Loan will remain "in balance" after such funding, as determined by Lender.

(g)     All Upgrade or Unit customization costs shall be subject to Lender's reasonable approval, if the Upgrade or customization item is unusual or such costs for any Unit aggregate in excess of Twenty Thousand and 00/100 Dollars ($20,000.00) over the Minimum Release Price for such Unit (prior to any upgrades).

(h)     If the purchaser under any Contract shall default in performance of its obligations thereunder beyond all applicable grace, notice and cure periods and Borrower shall retain the deposit thereunder as liquidated damages, Borrower shall give prompt notice to Agent of such retention and shall prepay the Loan in an amount equal to such deposit (net of collection

expenses), without imposition of a prepayment premium or penalty (but subject to Sections 2.2.7 and 2.4.3).

(i)     Without the prior written consent of Agent (which consent or non consent Agent shall deliver to Borrower within fifteen (15) Business Days of request therefor), Borrower shall not:

(i)     amend, modify, supplement or terminate any of the Condominium Documents other than an amendment, modification or supplement which merely increases the price of any Unit, but, in any case, Agent shall be given notice of any such amendment, modification or supplement;

(ii)     sell or offer for sale any Units except in compliance with the Condominium Documents and all applicable Legal Requirements;

(iii)·     enter into any Contract unless (A) the same is a bona fide, unconditional contract in the form included in the Offering Plan, (B) the same is expressly inferior and subordinate to the lien of any mortgage or deed of trust now or hereafter existing which encumbers the Project, (C) the purchaser thereunder is an unaffiliated third party, (D) the sale price is greater than or equal to 125% of the Minimum Release Price (exclusive of any upgrades and the prorata portion of the Exit Fee), (E) the sale price is payable in full by bank or certified check or wire transfer of immediately available funds at closing, (F) the sale price includes all Unit upgrades selected by the purchaser and the price to be paid by the purchaser for such upgrade, (G) the Offering Plan has been accepted for filing with the Division, (H) such Contract shall require the purchaser to deposit with the escrow agent under the Offering Plan a cash amount equal to not less than ten percent (10%) of the purchase price and shall provide that such amount shall not be refundable to the purchaser, (I) such Contract shall be subject to no conditions (other than completion of construction of the Improvements) upon the purchaser's obligation (except for customary title conditions and rights of rescission required by law), (J) such Contract shall not be assignable by the purchaser thereunder, (K) such Contract shall not be for more than one Unit in the Building, except that, it may be for not more than two (2) contiguous Units (either on the same floor or up and down), and the purchaser thereunder shall not have entered into any other Contracts for the purchase of other Units in the Building, (L) no more than ten (10) Units may be purchased by purchasers of multiple Units (i.e. no more than five (5) multiple Unit purchasers and the purchasers must be purchasing contiguous Units (either up or down or side by side), and (M) moreover, a bona fide third party purchaser shall not include the Borrower, any member or manager of the Borrower, any stockholder, director, officer, partner, member or manager of any member or manager of Borrower, or any partner, member manager, stockholder, director or officer of any constituent party of any member or manager of the Borrower, or any member of the immediate family or affiliate (as defined in Rule 405 of the Securities Act of 1933) of any of the foregoing parties, (all of the foregoing a "**Qualifying Contract**");

(iv)     For purposes of this Agreement, the "**Minimum Release Price**" for a parking space at the Property shall be the greater of (a) 100% of the Net Sales

Proceeds for such parking space or (b) $9,000.00 (Borrower shall pay such Release Price upon the assignment by Borrower of any parking space, whether such parking space is sold together with a Unit or sold separately), The "**Minimum Release Price**" for a storage unit at the Property shall be the greater of (a) 100% of the Net Sales Proceeds for such storage unit or (b) $4,000.00 (Borrower shall pay such Release Price upon the assignment by Borrower of any storage unit, whether such storage unit is sold together with a Unit or sold separately), and the "**Release Price**" for any Retail space in excess of 4,080 square feet, shall be $150.00 per square foot.

(v)    (A) amend, modify or supplement any Qualifying Contract in any material manner or in any manner which would materially adversely affect Borrower, Agent, Lenders or the Property, or terminate any Qualifying Contract (except for default on the part of a purchaser thereto but with prompt notice to Agent), or permit any of the foregoing actions to be taken or (B) release any deposit under any Qualifying Contract, except in each case, in accordance with the terms of such Contract and this Agreement; or

(vi)    abandon or materially change its plan for submission of the Property to the condominium form of ownership.

(j)    Agent shall, on Borrower's written request, contemporaneously with Agent's release of the first Unit from the liens of the Mortgage, subordinate the lien of the Mortgage to the Declaration of Condominium for the Land and Improvements and shall execute the appropriate instruments (reasonably satisfactory in all respects to Agent and the Title Company) in recordable form to effect such subordination, upon the satisfaction of the conditions enumerated below.

(i)    Agent shall have received and approved in all respects the Condominium Documents (to the extent not previously approved in writing by Agent) which shall be in proper form for recording or filing, as necessary, in the appropriate offices;

(ii)    the title policy or policies insuring the Mortgage shall have been endorsed to provide affirmative insurance in the form of SCHEDULE XXXI attached hereto, to the effect that the Property constitutes a condominium validly created under the Condominium Act and Agent shall have received such endorsement from the Title Company;

(iii)    Borrower shall have duly executed and delivered, or caused to be duly executed and delivered, to Agent (a) a conditional assignment of Borrower's or the declarant's (if the declarant under the applicable Condominium Documents is other than Borrower) rights under the Condominium Documents ("**Conditional Assignment of Condominium Documents**") in the form of SCHEDULE XXXII, (b) conditional resignations of the officers and members of the board of directors of the applicable condominium association who have been appointed or elected by Borrower or any Affiliate of Borrower in the form of SCHEDULE XXXIII hereto and (c) a letter from the Person (if other than Agent) who, pursuant to the Offering Plan, shall hold the deposits

under any Contract in the form of SCHEDULE XXXIV;

(iv)    Agent shall have received an opinion (upon which Agent and Lenders and their respective successors and assigns may rely) from counsel reasonably satisfactory to Agent to the effect that (A) the Condominium Documents satisfy all applicable requirements of Governmental Authorities and Legal Requirements and have been duly executed, (B) all requirements of any applicable statute, rule or ordinance relating to the formation of the condominium have been duly satisfied and, assuming the recording of the Declaration of Condominium and the subordination of the Mortgage to the Declaration of Condominium, the condominium has been duly and validly created and is existing in full force and effect and no filing, registration or other compliance with any federal or state securities law or other Legal Requirement will be required in connection with the sale of Units in the State of Florida, or if such filing is necessary, that the applicable Legal Requirement governing the same has been fully complied with and (C) the assignment, resignations and agreements referred to in clause (iii) of this subsection have each been duly authorized, executed and delivered by the respective parties thereto and are enforceable against said parties in accordance with their respective terms;

(v)    the Offering Plan for the condominium pursuant to the Initial Offering Plan (A) shall have been approved by all Governmental Authorities whose approval is required under any Legal Requirements, (B) has been accepted for filing by the Division and (C) upon the recordation of the Declaration of Condominium, shall become effective; and

(vi)    the condominium association pursuant to the Condominium Documents shall have been created and Agent shall have been furnished, at no cost or expense to Agent, a blanket fire insurance policy with extended coverage naming Agent, said condominium association, and purchasers of each Unit, as their respective interests may appear, as the insureds, covering all of the Improvements for the full replacement value (other than foundations); said fire insurance shall at all times be an amount equal to 100% of the insurable value of the Improvements (other than foundations) and shall otherwise comply with the applicable conditions contained in Article V of this Agreement and the other Building Loan Documents.

(k)    (A) Provided that no Default or Event of Default exists under this Agreement, Agent shall release one or more Residential Units, Retail Units, parking spaces and/or Storage Units from the lien of the Mortgage and all other Loan Documents securing the indebtedness evidenced by the Note (and from any UCC 1 financing statements executed by Borrower in favor of Agent covering such Units) and deliver to Borrower a duly executed release(s) in recordable form, a UCC 3 release of security interest and other such documents as may be reasonably required to release the Residential Unit(s) from the lien and/or security interest of the Loan Documents upon satisfaction of each of the following conditions:

(I)    Borrower shall have fully complied with the provisions of subsections (a) through (d) of this Section 4.1.39;

(II)     Borrower shall have entered into Qualifying contracts (under which any and all financing contingencies have expired) for the sale of not less than 80% of the Units of the Project;

(III)     Borrower shall have given to Lender a written request for the release of the Residential Unit and related parking space(s) and, if applicable, Storage Unit(s) accompanied by all evidence, information and other items required by Lender, including, but not limited to, a copy of the Contract, not less than five (5) Business Days prior to the desired unit release date; and

(IV)     Borrower shall have delivered to Lender a copy of the closing statement for the sale of the Residential Unit or Retail Units, as the case may be, and related parking space(s) and, if applicable, Storage Unit(s) Unit certified by Borrower as true and correct not less than one (1) Business Day prior to the desired Unit release date;

(V)     contemporaneously with such release there shall be a sale of such Residential Unit or Retail Unit(s), as the case may be, pursuant to a Qualifying contract entered into in accordance with the terms of this Agreement;

(VI)     the Unit to be released will constitute one or more tax lots separate and distinct from the tax lot or lots applicable to the remaining portion of the Property encumbered by the lien of the Mortgage;

(VII)    neither the release from the lien of the Mortgage, nor the conveyance to the transferee of such Residential Unit or Retail Unit(s), as the case may be, will violate any applicable zoning or subdivision laws;

(VIII) Agent shall have received in cash or by wire transfer of immediately available funds or by certified or bank check payable to Agent the greatest of (y) the Minimum Release Price for such Unit, or (z) the Net Sales Proceeds (the amount described in clause (y) or (z), as applicable, in respect of each Residential Unit being, the "**Required Release Price**"); and

(IX)     Agent shall have received such other documents, certificates, instruments, opinions or assurances as Agent may reasonably request.

(B)     Required Release Prices received by Agent under this Section 4.1.39 other than on a Payment Date may be held by Agent as additional collateral for the Loan (and shall earn interest equal to the interest earned by Agent on such deposits at the rate offered from time to time by Agent on time deposits equal to the interest earned by Agent or such deposits until the next succeeding Payment Date at which time such amounts held by Agent (plus any interest earned thereon) shall be applied in accordance with subsection (C) below and shall not be deemed

a payment until such time. Agent shall have the right to apply the Required Release Prices to the Loan on a more frequent basis in its sole discretion.

(C)    Amounts received by Agent under this subsection shall be applied to the payment of principal (without penalty other than Additional Costs) outstanding under the Loan Documents.

(l)    Borrower shall not submit for recording or filing the Declaration of Condominium or By-laws until as close in time as reasonably practicable to the first sale of a Unit at the Property.

(m)    Borrower shall comply with all of the terms, covenants and conditions of the Condominium Documents and any rules and regulations that may be adopted for the Condominium, as the same shall be in force and effect from time to time

(n)    Borrower shall pay, or cause to be paid, all assessments for common charges and expenses made against the Unit(s) owned by Borrower pursuant to the Condominium Documents as the same shall become due and payable.

(o)    The Borrower shall deliver to Agent, commencing on the Tuesday of the first week after the closing of the Loan and thereafter on or before the Tuesday of each ensuring week, a report on Unit sales contracts, reservation agreements, any selected upgrades, the price paid by the proposed buyer for such upgrades, the costs to Borrower to provide such upgrades, during the preceding week and containing such other information about the Property which Lender may request from time to time. The report shall include a copy of each sales contract (to the extent not previously delivered to Lender) and shall set forth the sale price, deposit amounts and deposit application for each new contract and reflect any additional deposits received by the Borrower under all previously reported sales contracts.

(p)    A schedule of units that have been contracted for as of the Closing Date is attached hereto as Schedule XXII.

### Section 4.2    Borrower Negative Covenants.

Borrower covenants and agrees that:

**4.2.1    Due on Sale and Encumbrance; Transfers of Interests**.  Borrower shall not permit or suffer any Transfer, other than Permitted Transfers, without the prior written consent of Agent.

**4.2.2    Liens**.  Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property except for Permitted Encumbrances.

**4.2.3    Dissolution**.  Borrower shall not engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, or transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly permitted by the Loan Documents.

**4.2.4    Change in Business**. Borrower shall not enter into any line of business other than the ownership, construction, management, development and operation of the Property.

**4.2.5    Debt Cancellation**. Borrower shall not cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

**4.2.6    Affiliate Transactions**. Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower or any of the constituent members of Borrower except in the ordinary course of business and on terms which are fully disclosed to Agent in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party. Borrower shall not amend or permit the amendment of any Affiliate Contracts without the prior consent of Agent.

**4.2.7    Zoning**. Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner. Borrower will promptly notify Agent of any anticipated or proposed change in the zoning for the Property or any portion thereof or any other property with respect to which a change in zoning would affect the zoning or Borrower's use and enjoyment of the Property, or any part thereof, promptly upon its learning of any such anticipated or proposed change. Agent shall have the right to participate (at Borrower's sole cost and expense) in any and all proceedings, judicial, administrative or otherwise, with respect to or in any way affecting the Property, including, without limitation, zoning, environmental and other matters using counsel of Agent's choosing.

**4.2.8    Assets**. Borrower shall not purchase or own any property other than (i) the Property and (ii) incidental personal property necessary for the ownership or operation of the Property.

**4.2.9    No Joint Assessment**. Borrower shall not suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, and (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**4.2.10    Principal Place of Business**. Borrower shall not change its chief executive office or chief place of business or its jurisdiction of organization as set forth on SCHEDULE XX without first giving Agent thirty (30) days' prior notice.

**4.2.11    ERISA**. (a) Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Agent of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**").

(b)    Borrower shall deliver to Agent such certifications or other evidence from time to time throughout the term of the Loan, as requested by Agent in its sole discretion, that (A) Borrower is not and does not maintain an "employee benefit plan" as defined in Section 3(3)

of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (B) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (C) one or more of the following circumstances is true:

(i)      Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

(ii)     Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2); or

(iii)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e).

**4.2.12    No Distributions.** Borrower will not make any distributions or other disbursements to its shareholders, partners or members or Persons owned by or related to any of its shareholders, partners or members until the Loan has been repaid in full except for payments made pursuant to the Affiliate Contracts. Borrower will use any and all Rents collected from the Property to pay operating expenses (including, without limitation, real property taxes, insurance premiums, debt service and ground rent (if any) of the Property.

**4.2.13    Change Orders.** (a) Borrower shall not directly or indirectly, without the prior written consent of Agent and all Governmental Authorities (to the extent required by law):

(i)      modify or supplement the Plans and Specifications (except as provided in paragraph (iii) below) or any permits granted to construct the Improvements in any respect;

(ii)     amend, supplement or otherwise modify the General Contractor's Agreement or any Major Trade Contract, except as provided in paragraph (iii) below, (1) to increase the amount payable by Borrower thereunder, (2) to lengthen the time for performance of any party thereto other than Borrower or (3) in any other way that could adversely affect Agent and the Lenders; or

(iii)    except as approved pursuant to Section 2.9.4 hereof, direct or permit the performance of any work pursuant to any revision (of whatever nature or form) of the Plans and Specifications, or any change order or change bulletin or other instrument or understanding relating to the construction of the Improvements unless:

(A)     such change order will not materially change the gross square feet or the net rentable square feet of commercial space to be contained in the Improvements or the net rentable or saleable square feet of residential space to be contained in the Improvements, or the basic layout of the Improvements, or involve the use of materials, furniture, fixtures and equipment that will not be at least equal in quality to the materials, furniture, fixtures and equipment originally specified in or required by the approved Plans and Specifications; and

(B)    such change order shall, in a single instance, result in an increase or decrease in the cost of Improvements of less than $50,000.00; however, if the aggregate cost of all such change orders (not previously approved by Agent and Construction Consultant) at any given time, result in an increase or decrease in the cost of the Improvements of more than $150,000.00 then any and all subsequent change orders, regardless of amount, must be previously approved by Agent and Construction Consultant.

(b)    Borrower shall submit to Agent and Construction Consultant copies of all change orders entered into with respect to the Improvements within fifteen (15) days after the same are entered into, irrespective of whether the same require the prior approval of Agent and Construction Consultant pursuant to this Agreement.

**4.2.14    Indebtedness**.  Borrower will not incur any Indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation) other than (i) the Debt, (ii) except in connection with the completion of the Improvements, unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding $250,000.00 at any one time and (iii) except in connection with the completion of the Improvements, Indebtedness incurred in the financing of equipment and other personal property used on the Property with annual payments not exceeding $250,000 in the aggregate; provided that any Indebtedness incurred pursuant to subclauses (ii) and (iii) shall be (x) not more than sixty (60) days past due and (y) incurred in the ordinary course of business. No Indebtedness other than the Debt may be secured (subordinate or pari passu) by the Property.

**4.2.15    Organizational Documents**.  Borrower will not amend, modify or otherwise change its Organizational Documents without the prior consent of Agent in any manner that (i) violates the single purpose covenants set forth in this Section 3.1.24, or (ii) amends, modifies or otherwise changes any provision thereof that by its terms cannot be modified at any time when the Loan is outstanding or by its terms cannot be modified without Agent or the Lenders' consent.

**4.2.16    Condominium Documents**.  Borrower will not amend, modify or otherwise change the Condominium Documents without the prior consent of Agent, except as may be otherwise expressly permitted herein.

## V.    INSURANCE, CASUALTY AND CONDEMNATION

**Section 5.1    Insurance.**

**5.1.1    Insurance Policies**.  (a) Borrower, at its sole cost and expense, shall obtain and maintain, or cause to be maintained, the following insurance Policies:

(i)    Builder's Risk.  Insurance against loss to the Property which during construction shall be on a "Special Perils" "Builders' Risk", nonreporting "Completed Value" form (with no "provisional limit of liability" clause or any other limitation that is applicable if the amount of such insurance is less than the insured value of the Improvements), and after Completion of construction shall be on a "Special Perils" policy form, in each case covering insurance risks no less broad than those covered under

a Standard Multi-Peril (SMP) policy form, which contains a Commercial ISO "Causes of Loss - Special Form" or comparable form acceptable to Lender, including theft, and insurance against such other risks as Lender may reasonably require, including, but not limited to, insurance covering the cost of demolition of undamaged portions of any portion of the Property when required by Applicable Law and the increased cost of reconstruction to conform with current code or ordinance requirements and the cost of debris removal. During construction of the Project, Borrower may fulfill this requirement by causing the Construction Contractor to obtain such insurance provided that Borrower and Lender are added as additional insureds and the policies otherwise comply with the provisions of this Agreement. In addition, during construction such Policies shall cover the following: real estate property taxes; architect, engineering, development and consulting fees; legal and accounting fees (including, but not limited to, the reasonable cost of in-house attorneys and paralegals); advertising and promotion expenses; interest on money borrowed; additional commissions incurred upon renegotiating leases and any and all other expenses which may be incurred as a result of any property loss or destruction by an insured. Such Policies shall be in amounts equal to the full replacement cost of the Property (other than the Land) on an As-Built Basis, including all fixtures, equipment, construction materials and Personal Property on-site and off-site, but in no event less than the aggregate amount of the Loan and the Mezzanine Loan (assuming full disbursement thereof). Such Policies shall also contain a 100% co-insurance clause with an agreed amount endorsement (with such amount to include the replacement cost of the foundation and any underground pipes), a permission to occupy endorsement (if such endorsement is applicable because such coverage would otherwise be excluded) and deductibles which are in amounts acceptable to Lender.

(ii)     Delayed Opening. Until Completion, "Delayed Opening" insurance in an amount of not less than estimated annual gross income/rents for the Property. Such Policy shall include the standard "Soft Costs" endorsement if not already included within the property section of the Builder's Risk form.

(iii)     Boiler and Machinery. Upon Completion, broad form boiler and machinery insurance including business interruption/extra expense and rent and rental value insurance, on all equipment and objects customarily covered by such insurance and/or involved in the heating, cooling, electrical and mechanical systems of any portion of the Property (if any are located thereat), providing for full repair and replacement cost coverage, and other insurance of the types and in amounts as Lender may require, but in no event less than that customarily carried by persons owning or operating like properties.

(iv)     Workers' Compensation. During the construction of (or making of any alterations or improvements to) the Property and, to the extent not covered by Section 8.4(b) and otherwise applicable (i) insurance covering claims based on the owner's or employer's contingent liability not covered by the insurance provided in Section 8.4(b) and (ii) workers' compensation insurance covering all Persons engaged in such alterations or improvements to the extent required by law.

(v)     Flood. If applicable, insurance against loss or damage by flood or mud

slide in compliance with the Flood Disaster Protection Act of 1973, as amended from time to time, if the Property is now, or at any time while the Loan remains outstanding shall be, situated in any area which an appropriate Governmental Authority designates as a special flood hazard area, Zone A or Zone V, in an amount not less than full replacement cost coverage for each occurrence and in the aggregate. If the Property is located outside of a special flood hazard area, Zone A or Zone V, Borrower shall obtain flood insurance with such limits as Lender may reasonably require, but in no event less than $1,000,000.00.

(vi)   Public Liability.   Comprehensive liability insurance against death, bodily injury and property damage arising in connection with the Project. Such Policy shall be written on a Standard ISO occurrence basis form or comparable form approved by the Lender, shall list Borrower as the named insured, shall designate thereon the location of the Property, and have such limits as Lender may reasonably require, but in no event less than $1,000,000.00 per occurrence. Borrower shall also obtain excess liability insurance with such limits as Lender may reasonably require, but in no event less than Twenty-Five Million and No/100 Dollars ($25,000,000.00) after substantial completion of the Project.

(vii)   Wind and Hail.   Borrower shall carry full wind and hail coverage for the Property at all times.

(viii)   Other Insurance.   Such other insurance relating to the construction of the Project and use of the Property as Lender may, from time to time, reasonably require, including dramshop liability insurance.

(b)   Contractor's Insurance.   Prior to Completion, Borrower shall furnish to Lender insurance certificates and insurance policies from the insurance carrier for the General Contractor evidencing workers' compensation, employers' liability, commercial auto liability, excess umbrella liability coverage and commercial general liability insurance (including contractual liability and completed operations coverage) written on a standard "ISO" occurrence form or comparable form approved by Lender, with general liability insurance limits as Lender may reasonably require, but in no event less than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate with a $50,000,00.000 umbrella policy. Lender shall be named as an additional insured under all such Policies. Borrower shall cause General Contractor to cause each subcontractor to maintain commercial general liability, commercial automobile liability, workers' compensation, employers' liability, excess umbrella liability coverage and any other insurance required by the provisions of the General Contractor's Agreement. Notwithstanding the foregoing, the requirements of this subsection (b) shall not be required in the event Owner purchases and maintains a so-called "Wrap Policy" in an amount no less than $25,000,000.00 which insures the Owner and General Contractor under such policy at all times during the construction of the Project.

(c)   Policy Requirements.

(i)   All insurance shall: (i) be carried by companies with a Best's rating of A/X or better, or otherwise acceptable to Lender; (ii) be in form and content acceptable to Lender; (iii) provide for thirty (30) days' advance written notice to Lender before any

cancellation, adverse material modification or notice of non-renewal; and (iv) to the extent not otherwise specified herein, contain deductibles and limits which are in amounts acceptable to Lender.

(ii)    All physical damage Policies and renewals (including those required to be maintained under any of the Project Documents) shall contain (i) a standard mortgage clause naming Lender and Mezzanine Lender (as their interests may appear), which clause shall expressly state that any breach of any condition or warranty by any Loan Party or any other Person shall not prejudice the rights of Lender or Mezzanine Lender under such insurance and shall further waive any rights of subrogation against Lender and Mezzanine Lender, and (ii) a loss payable clause in favor of Lender and Mezzanine Lender (as their interests may appear) for personal property, contents, inventory, equipment, loss of rents and business interruption. All liability Policies and renewals (including those required to be maintained under any of the Project Documents) shall name Lender as an additional insured (excepting worker's compensation and employer's liability policies). No Person (other than Lender and Mezzanine Lender) shall appear in the mortgagee or loss payable clause without Lender's prior written consent.

(d)    Delivery of Policies. The insurance shall be evidenced by the original Policy or a true and certified copy of the original Policy. Borrower shall (A) deliver to Lender a binder (accompanied by an insurance certificate) or originals or certified copies of all Policies and renewals marked "paid" or other evidence satisfactory to Lender of the continuing coverage at least fifteen (15) days before the expiration of existing Policies and (B) in any event deliver originals or certified copies of such Policies to Lender no later than thirty (30) days after the expiration of existing Policies. If Lender has not received the items specified in (A) and (B) of the immediately preceding sentence within the time frames therein specified (even if advised verbally or in writing that such Policies have been renewed or otherwise obtained), Lender shall have the right, but not the obligation, to purchase such insurance. Any amounts so disbursed by Lender in so doing shall be deemed to be Protective Advances, but nothing contained in this Section shall require Lender to incur any expense or take any action hereunder, and any failure by the Lender to purchase any insurance, or any other inaction by Lender, shall never be considered a waiver of any right accruing to Lender on account of this Section, and shall not give rise to any liability of the Lender to any Loan Party or any other Person.

(e)    Separate Insurance. Borrower shall not carry (and shall not allow any other Loan Party to carry) any separate insurance on the Property concurrent in kind or form with any insurance required hereunder or contributing in the event of loss without Lender's prior written consent, and any such Policy shall otherwise meet all other requirements set forth herein.

(f)    Insurance Review. At Lender's option, Lender may (i) require Borrower to certify to Lender on a quarterly basis that insurance required by this Section 5.1 is in place and (ii) not more often than annually obtain, at Borrower's expense, a report from Lender's Insurance Consultant, certifying that insurance required by this Section 5.1 is in place.

(g)    Other Compliance. Without limiting the requirements of this Section 5.1, Borrower shall comply with all insurance requirements of the Loan Documents, Condominium Documents, the Leases, if any, and the other Project Documents.

{10327732:6}SL                                    -89-

(h)    <u>Waiver of Subrogation; Non-Imputation</u>.  Each Policy shall contain such endorsements thereto in form and content acceptable to Lender to the effect if Lender acquires any ownership interest in any Loan Party, such insurer (i) waives the right to assert any claim, by way or subrogation or otherwise, against any such Loan Party in connection with any claim made under such Policy and (ii) will not deny any claim made by any such Loan Party or raise any defense to coverage under any Policy by reason of any event or circumstances involving such Loan Party and occurring prior to the time Lender acquired its ownership interest in such Loan Party.

(i)    <u>Event of Default</u>.  Any default, breach or violation of this <u>Section 5.1</u> shall be an automatic Event of Default if not cured within seven (7) days after notice to Borrower of such default, breach or violation.

**5.1.2    Insurance Company**.  The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the state in which the Property is located and having a claims paying ability rating of "A" or better by S&P and Fitch and "A2" by Moody's or otherwise approved by Agent.

**Section 5.2    Casualty and Condemnation.**

**5.2.1    Casualty**.  If the Property shall sustain a Casualty, Borrower shall give prompt notice of such Casualty to Agent and shall promptly commence and diligently prosecute to completion the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty (a "**Restoration**") and otherwise in accordance with <u>Section 5.3</u>.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance.  Agent may, but shall not be obligated to, make proof of loss if not made promptly by Borrower.

**5.2.2    Condemnation**.  Borrower shall give Agent prompt notice of any actual or threatened Condemnation by any Governmental Authority of all or any part of the Property and shall deliver to Agent a copy of any and all papers served in connection with such proceedings.  Agent may participate in any such proceedings, and Borrower shall from time to time deliver to Agent all instruments requested by Agent to permit such participation.  Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Agent, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings.  Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and this Agreement.  Lenders shall not be limited to the interest paid on the Award by any Governmental Authority but shall be entitled to receive out of the Award interest and additional interest (if any) at the rate or rates provided in this Agreement or in the Note.  If the Property or any portion thereof is taken by any Governmental Authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of <u>Section 5.3</u>.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Agent of the Award, Agent shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

## Section 5.3    Delivery of Net Proceeds.

**5.3.1    Minor Casualty or Condemnation.** If a Casualty or Condemnation has occurred to the Property, Borrower's right, title and interest in and to all Proceeds are, except as otherwise herein provided, hereby assigned by Borrower to Agent and all Net Proceeds shall, except as otherwise herein provided, be paid to Agent. Borrower shall, in good faith and in a commercially reasonable manner, file and prosecute the adjustment, compromise or settlement of any claim for Proceeds and, subject to Borrower's right to receive the direct payment of any Net Proceeds as herein provided, will cause the same to be paid directly to Agent to be held and applied in accordance with the provisions of this Agreement. Except upon the occurrence and during the continuance of an Event of Default, Borrower may settle any insurance claim with respect to Net Proceeds which do not exceed the Restoration Threshold. Whether or not an Event of Default shall have occurred and be continuing, Agent shall have the right to approve, such approval not to be unreasonably withheld, any settlement which would in Agent's reasonable judgment result in Net Proceeds which exceed the Restoration Threshold and Borrower shall deliver or cause to be delivered to Agent all instruments reasonably requested by Agent to permit such approval. Borrower shall pay all reasonable out-of-pocket costs, fees and expenses incurred by Agent on behalf of Lenders (including all reasonable attorneys' fees and expenses, the reasonable fees of insurance experts and adjusters and reasonable costs incurred in any litigation or arbitration), and interest thereon at the Default Rate to the extent not paid within fifteen (15) days after delivery of a request for reimbursement by Agent, accompanied by reasonable back-up documentation, in connection with the settlement of any claim for Proceeds and the seeking and obtaining of any payment on account thereof in accordance with the foregoing provisions. If any Proceeds are received by Borrower and may be retained by Borrower pursuant to this Section 5.3.1, such Proceeds shall, until the completion of the related work, be held in trust for Agent for the ratable benefit of Lenders and shall be segregated from other funds of Borrower to be used to pay for the cost of the Restoration in accordance with the terms hereof, and to the extent such Proceeds exceed the Restoration Threshold, such Proceeds shall be forthwith paid directly to and held by Agent to be applied or disbursed in accordance with this Article V. If an Event of Default shall have occurred and be continuing, or if Borrower fails to file any insurance claim for a period of fifteen (15) Business Days, or to prosecute same with commercially reasonable diligence following Borrower's receipt of written notice to do so from Agent, Borrower hereby irrevocably empowers Agent, in the name of Borrower as its true and lawful attorney-in-fact, to file and prosecute such claim (including settlement thereof) with counsel satisfactory to Agent and to collect and to make receipt for any such payment, all at Borrower's expense (including payment of interest at the Default Rate for any amounts advanced by Agent pursuant to this sentence). Notwithstanding anything to the contrary set forth in this Agreement, but excluding all situations requiring prepayment of the Note, to the extent any Proceeds (either singly or when aggregated with all other then unapplied Proceeds with respect to the Property) do not exceed the Restoration Threshold, such Proceeds are to be paid directly to Borrower to be applied to restoration of the Property in accordance with the terms hereof. If a Casualty or Condemnation has occurred to the Property and the Net Proceeds shall be less than the Restoration Threshold and the costs of completing the Restoration shall be less than the Restoration Threshold, and provided no Event of Default shall have occurred and remain uncured, the Net Proceeds will be disbursed by Agent to Borrower. As soon as reasonably practicable after receipt of the Net Proceeds (but in no event later than sixty (60) days after such Casualty or Condemnation, whichever the case may be, occurs) Borrower shall commence and

satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

**5.3.2   Major Casualty or Condemnation.** (a) If a Casualty or Condemnation has occurred to the Property, Borrower shall commence and satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement, provided that, if required to pursuant to the terms of this Agreement, Agent shall have made the Net Proceeds available to Borrower in accordance with the provisions of this Agreement. If the Net Proceeds are equal to or greater than the Restoration Threshold or the costs of completing the Restoration are equal to or greater than the Restoration Threshold, Agent shall make the Net Proceeds available for the Restoration, provided that each of the following conditions are met:

(i)     no Event of Default shall have occurred and be continuing;

(ii)     (A) in the event the Net Proceeds are insurance proceeds, the related Casualty shall have occurred prior to the Completion of the Improvements or is less than twenty-five percent (25%) of the total floor area of the Improvements at the Property shall have been damaged, destroyed or rendered unusable as a result of such Casualty or (B) in the event the Net Proceeds are an Award, less than ten percent (10%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is the subject of the Condemnation;

(iii)     intentionally omitted;

(iv)     Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than sixty (60) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion;

(v)     Agent shall be satisfied that (A) the undisbursed amount of the Net Proceeds shall be sufficient to pay for the costs of completing the Restoration or Borrower has deposited sufficient funds with Agent to pay for any such deficiency, (B) any operating deficits and all payments of principal and interest under the Note will be paid during the period required for Restoration from (I) the Net Proceeds or (II) other funds of Borrower;

(vi)     If the Casualty or Condemnation occurs before the Completion of the Improvements, Agent shall be satisfied that the Restoration will be completed and that the Completion of the Improvements will be achieved, on or before the earliest to occur of (A) the Completion Date, (B) the date that is sixty (60) days prior to the Maturity Date, (C) such time as may be required under applicable Legal Requirements in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or to as nearly as possible the condition it was in immediately prior to such Condemnation, as applicable or (D) the expiration of the rent loss and/or business interruption insurance coverage, and if the Casualty or Condemnation occurs after the completion of the

Improvements, the Restoration will be completed on or before the earliest to occur of (B), (C) or (D) above;

(vii)    the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements;

(viii)    the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements; and

(ix)    such Casualty or Condemnation, as applicable, does not result in the loss of access to the Property or the related Improvements.

(b)    If the Net Proceeds shall be less than the applicable Restoration Threshold, the same shall be paid directly to Borrower and applied by Borrower toward the Restoration. If the Net Proceeds shall be equal to or greater than the applicable Restoration Threshold, the Net Proceeds shall paid directly to Agent and held by Agent in an interest-bearing account and, until disbursed in accordance with the provisions of this Section 5.3.2, shall constitute additional security for the Debt. If delivered to Agent pursuant to the terms of this Section 5.3.2(b), the Net Proceeds shall be disbursed by Agent to, or as directed by, Borrower from time to time during the course of the Restoration, promptly after receipt of evidence satisfactory to Agent that (A) all requirements set forth in Section 5.3.2(a) have been satisfied and (B) all relevant conditions to the making of Advances of the Loan shall have been satisfied with respect to disbursements of Net Proceeds for Restoration as though such disbursements were of Loan Proceeds rather than Net Proceeds, it being understood however that disbursements of Net Proceeds shall not be deemed to be advances of the Loan.

(c)    All plans and specifications required in connection with the Restoration shall be subject to prior approval by Agent and by an independent architect selected by Agent (which shall be the Construction Consultant if the Casualty or Condemnation occurs prior to the Completion of the Improvements) (the "**Casualty Consultant**"). The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to approval by Agent and the Casualty Consultant. All costs and expenses incurred by Agent in connection with recovering, holding and advancing the Net Proceeds for the Restoration including, without limitation, reasonable attorneys' fees and disbursements and the Casualty Consultant's fees and disbursements, shall be paid by Borrower.

(d)    In no event shall Agent be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, less the Casualty Retainage. The term "**Casualty Retainage**" shall mean, as to each contractor, subcontractor or materialman engaged in the Restoration, an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 5.3.2(d), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty

Consultant certifies to Agent that the Restoration has been completed in accordance with the provisions of this Section 5.3.2(d) and all applicable Legal Requirements and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Agent receives evidence satisfactory to Agent that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Agent will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Agent that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Agent or by the title company issuing the Title Insurance Policy, and Agent receives an endorsement to the Title Insurance Policy insuring the continued priority of the lien of the Mortgage and evidence of payment of any premium payable for such endorsement. If required by Agent, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(e)     Agent shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(f)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Agent in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the **"Net Proceeds Deficiency"**) with Agent before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Agent shall be held by Agent and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 5.3.2 shall constitute additional security for the Debt.

(g)     The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Agent shall, after the Casualty Consultant certifies to Agent that the Restoration has been completed in accordance with the provisions of this Section 5.3.2, and the receipt by Agent of evidence satisfactory to Agent that all costs incurred in connection with the Restoration have been paid in full, be remitted by Agent to Borrower, provided no Event of Default shall have occurred and shall be continuing and provided, however, that with respect to an Award, no amounts shall be remitted to Borrower in excess of the Net Proceeds Deficiency deposited with Agent.

(h)     All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Section 5.3.2(g) may be retained and applied by Agent toward the payment of the Debt, without prepayment premium or penalty (but subject to Sections 2.2.7 and 2.4.3), whether or not then due and payable in such order, priority and proportions as Agent in its sole discretion shall deem proper, or, at the

discretion of Agent, the same may be paid, either in whole or in part, to Borrower for such purposes as Agent shall designate.

5.3.3 **Application of Net Proceeds**. Upon the occurrence of an Event of Default, Agent, at its option, may withdraw all the Net Proceeds or the undisbursed balance thereof and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Agent and may apply such Net Proceeds and Net Proceeds Deficiency either to the payment of Restoration or to payment of the Debt (without premium or penalty, but subject to Section 2.2.7) in such order, proportion and priority as Agent may determine in its sole discretion. Agent's right to withdraw and/or direct the withdrawal of the Tax Funds and apply such Net Proceeds and Net Proceeds Deficiency shall be in addition to all other rights and remedies provided to Agent under the Loan Documents. Upon payment in full of the Total Debt, if the Mezzanine Loan is then outstanding, Borrower hereby instructs and directs Lender to pay such excess to Mezzanine Lender.

Notwithstanding the foregoing, Lender's rights and obligations with respect to this Section 5.3.3 shall be subject to the terms of the Declaration of Condominium from and after the sale by Borrower and release of the first Residential Unit at the Property in accordance with the terms hereof.

## VI. FUNDS

### Section 6.1 Security Interest in Funds.

6.1.1 **Grant of Security Interest**. Borrower shall be the owner of the Net Proceeds Deficiency, if any, deposited with Agent after a Casualty or Condemnation and the payments received by Agent from the Counterparty under and pursuant to any Assignment of Interest Rate Protection Agreement and amounts deposited by Borrower pursuant to Section 2.1.11 and any Required Release Prices paid to Agent on other than a Payment Date (collectively, the "**Funds**"). Borrower hereby pledges, assigns and grants a security interest to Agent for the benefit of Agent and Lenders, as security for payment of the Debt and the performance of all other terms, conditions and covenants of the Loan Documents on Borrower's part to be paid and performed, in all of Borrower's right, title and interest in and to the Funds. The Funds shall be under the sole dominion and control of Agent.

6.1.2 **Prohibition Against Further Encumbrance**. Borrower shall not, without the prior consent of Agent, further pledge, assign or grant any security interest in the Funds or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Agent as the secured party, to be filed with respect thereto.

6.1.3 **Application of Funds**. Upon the occurrence of an Event of Default, Agent, at its option, may withdraw the Funds and apply the Funds to payment of the Debt in such order, proportion and priority as Lender may determine in its sole discretion. Agent's right to withdraw and apply the Funds shall be in addition to all other rights and remedies provided to Agent or Lenders under the Loan Documents. Notwithstanding anything to the contrary contained herein, any amounts remaining in the Reserve Funds after the Total Debt has been paid

in full shall be deposited into the Mezzanine Collection Account (as defined in the Mezzanine Loan Documents) to be disbursed in accordance with the terms of the Mezzanine Loan Documents and if the Mezzanine Loan has been satisfied in full, with Borrower.

**Section 6.2      Cash Management.**

**6.2.1      Permitted Investments**. Agent shall invest any balances of the Funds in such Permitted Investments as Agent shall determine in its sole discretion is appropriate given the length of time that such Funds are to be invested, which Permitted Investments shall be held in the name of and be under the sole dominion and control of Agent and subject at all times to the terms hereof. No investment shall be made unless Agent shall have and continue to have a perfected first priority lien in such investment securing the Obligations of Borrower hereunder and under the other Loan Documents and all filings and other actions necessary to ensure the validity, perfection, and first priority of such lien shall have been taken. Agent shall have no liability for any loss of such funds that are invested in investments and no such loss shall affect Borrower's obligations to deposit Funds if required under Section 2.1.11.

**6.2.2      Earnings on Fund Collateral**. All interest or other income (whether by virtue of Permitted Investments or otherwise) accruing on such funds shall, in each case, be held as if a part of the funds so invested. All risk of loss in respect of the investments shall be borne by Borrower.

**6.2.3      Income Taxes**. Borrower shall report on its federal, state and local income tax reports all interest or income accrued on such funds.

**Section 6.3      Letters of Credit.**

**6.3.1      Delivery of Letters of Credit**. (a) In lieu of making the payments of the Funds pursuant to Section 2.1.11, Borrower may deliver to Agent a Letter of Credit in accordance with the provisions of this Section 6.3. The aggregate amount of any Letter of Credit and cash on deposit with respect to the Funds shall at all times be at least equal to the aggregate amount which Borrower is required to have on deposit in such Fund pursuant to this Agreement.

(b)      Borrower shall give Agent no less than thirty (30) days' notice of Borrower's election to deliver a Letter of Credit and Borrower shall pay to Agent all of Agent's reasonable out-of-pocket costs and expenses in connection therewith. Borrower shall not be entitled to draw from any such Letter of Credit. Upon thirty (30) days' notice to Agent, Borrower may replace a Letter of Credit with a cash deposit if a Letter of Credit has been outstanding for more than six (6) months. Prior to the return of a Letter of Credit, Borrower shall deposit an amount equal to the amount that would have accumulated and not been disbursed in accordance with this Agreement if such Letter of Credit had not been delivered.

**6.3.2      Security for Debt**. Each Letter of Credit delivered under this Agreement shall be additional security for the payment of the Debt. Upon the occurrence of an Event of Default, Agent shall have the right, at its option, to draw on any Letter of Credit and to apply all or any part thereof to the payment of the items for which such Letter of Credit was established or to apply each such Letter of Credit to payment of the Debt in such order, proportion or priority as Agent may determine.

**6.3.3    Additional Rights of Agent**.  In addition to any other right Agent may have to draw upon a Letter of Credit pursuant to the terms and conditions of this Agreement, Agent shall have the additional rights to draw in full any Letter of Credit: (a) with respect to any evergreen Letter of Credit, if Agent has received a notice from the issuing bank that the Letter of Credit will not be renewed and a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (b) with respect to any Letter of Credit with a stated expiration date, if Agent has not received a notice from the issuing bank that it has renewed the Letter of Credit at least thirty (30) days prior to the date on which such Letter of Credit is scheduled to expire and a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (c) upon receipt of notice from the issuing bank that the Letter of Credit will be terminated (except if the termination of such Letter of Credit is permitted pursuant to the terms and conditions of this Agreement or a substitute Letter of Credit is provided); or (d) if Agent has received notice that the bank issuing the Letter of Credit shall cease to be an Eligible Institution and within ten (10) days after Agent notifies Borrower in writing of such circumstance, Borrower shall fail to deliver to Agent a substitute Letter of Credit issued by an Eligible Institution.  Notwithstanding anything to the contrary contained in the above, Agent is not obligated to draw any Letter of Credit upon the happening of an event specified in (a), (b), (c) or (d) above and shall not be liable for any losses sustained by Borrower due to the insolvency of the bank issuing the Letter of Credit if Agent has not drawn the Letter of Credit.

## VII.    PROPERTY MANAGEMENT

### Section 7.1        The Management Agreement.

Borrower shall not enter into any agreement relating to the management or operation of the Property without the express consent of Agent, which consent shall not be unreasonably withheld, provided that such consent may be conditioned upon the manager under such agreement and Borrower executing an assignment of management agreement and subordination of management fees in the form then used by Agent.  The Management Agreement shall be in compliance with all Legal Requirements and the Condominium Documents.  From and after such time as Borrower shall have entered into a Management Agreement, Borrower shall cause Manager to manage the Property in accordance with the Management Agreement.  Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed, (ii) promptly notify Agent of any notice to Borrower of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of the Management Agreement on the part of Borrower to be performed and observed and (iii) promptly notify Agent of any default by Manager in the performance or observance of any of the terms, covenants or conditions of the Management Agreement on the part of Manager to be performed and observed.  If Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Agent's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder or under the Management Agreement, Agent shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed.

**Section 7.2        Prohibition Against Termination or Modification.**

Borrower shall not surrender, terminate, cancel, modify, renew or extend the Management Agreement, if one exists, or enter into any other agreement relating to the management or operation of the Property with Manager or any other Person, or consent to the assignment by the Manager of its interest under the Management Agreement, in each case without the express consent of Agent, which consent shall not be unreasonably withheld; provided, however, with respect to a new manager such consent may be conditioned upon such new manager and Borrower executing an assignment of management agreement and subordination of management fees in the form then used by Agent.

**Section 7.3        Replacement of Manager.**

If there is a Management Agreement at any time during the term of the Loan, Agent shall have the right to require Borrower to replace the Manager with a Person chosen by Borrower and approved by Agent, or at Agent's option, selected by Agent in its sole discretion, upon the occurrence of any one or more of the following events: (i) at any time during the existence of an Event of Default and/or (ii) at any time that the Manager has engaged in (x) gross negligence, (y) fraud or (z) willful misconduct.

**VIII.   TRANSFERS**

**Section 8.1        Agent's and Lenders' Reliance.**

Borrower acknowledges that Agent and Lenders have examined and relied on the experience of Borrower and its general partners, members, principals and (if Borrower is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to enter into this Agreement and make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Borrower's Obligations under the Loan Documents. Borrower acknowledges that Agent and Lenders have a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Borrower's Obligations under the Loan Documents, Agent and Lenders can recover the Debt by a sale of the Property.

**Section 8.2        No Transfers.**

Borrower shall not Transfer the Property or any part thereof or permit or suffer the Property or any part thereof to be Transferred or permit any other Transfer to occur, unless Agent shall consent thereto in writing, in Agent's sole and absolute discretion.

**Section 8.3        Permitted Transfers.**

The restrictions on Transfers set forth in Section 8.2 shall not apply to the following Transfers ("**Permitted Transfers**"):

(a)     the conversion of the Property to a condominium form of ownership, subject the provisions of Section 4.1.39.

(b)    transfers of Units pursuant to Qualifying Contracts in conjunction with a release of such Units from the liens of the Mortgage pursuant to Section 4.1.39(i);

(c)    easements affecting the Property that are granted with the approval of Agent (not to be unreasonably withheld) in accordance with the terms of this Agreement and the Mortgage;

(d)    any Liens that are Permitted Encumbrances;

## IX.    DEFAULTS

### Section 9.1    Events of Default.

(a)    Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(i)    if any portion of the Debt is not paid on or before the fifth (5th) day after the same is due or if the entire Debt is not paid on or before the Maturity Date;

(ii)    if any of the Taxes or Other Charges is not paid when the same is due and payable and within five (5) Business Days after notice of failure to make such payment is given to Borrower, except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Agreement;

(iii)    if the Policies are not kept in full force and effect, or if for more than five (5) Business Days after notice from Lender, the Policies are not delivered to Lender upon request or Borrower has not delivered evidence of the renewal of the Policies thirty (30) days prior to their expiration as provided in Section 5.5.1(d);

(iv)    if Borrower breaches or permits or suffers a breach of Article 6 of the Mortgage;

(v)    if Borrower is in breach of any of the covenants set forth in Article 4;

(vi)    if any representation or warranty made by Borrower or any Guarantor in this Agreement or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Agent and/or Lenders shall have been false or shall have omitted a material fact so as to make the same not misleading in any material respect as of the date the representation or warranty was made (or deemed remade);

(vii)    if Borrower or any Guarantor shall make an assignment for the benefit of creditors;

(viii)    if a receiver, liquidator or trustee shall be appointed for Borrower or any Guarantor or if Borrower or any Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal

bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower or any Guarantor, or if any proceeding for the dissolution or liquidation of Borrower or any Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower or such Guarantor, upon the same not being discharged, stayed or dismissed within ninety (90) days;

(ix)    if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(x)    if any material easements, restrictions, covenants or operating agreements benefiting the Property shall no longer be in full force and effect and the same has a Material Adverse Effect on the Property;

(xi)    if Borrower breaches any representation, warranty or covenant contained in Article 3;

(xii)    if Borrower fails to comply with the covenants as to Prescribed Laws set forth in Sections 4.1.1;

(xiii)    if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not specified in subsections (i) to (xii) above or in subsections (xv) to (xxii) below, for ten (10) days after notice to Borrower from Agent, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Agent in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such 30-day period and provided further that Borrower shall have commenced to cure such Default within such 30-day period and thereafter diligently and expeditiously proceeds to cure the same, such 30-day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed ninety (90) days;

(xiv)    or if any other event shall occur or condition shall exist if the effect of such event or condition under any Loan Document is to accelerate the maturity of any portion of the Debt or to permit Agent to accelerate the maturity of all or any portion of the Debt;

(xv)    if the Shell Completion is not completed in accordance with Section 4.1.21 on or prior to the Shell Completion Date.

(xvi)    if the Improvements are not completed in accordance with Section 4.1.21 on or prior to the Completion Date;

(xvii)    if any voucher or invoice is fraudulently submitted by Borrower in connection with any Advance for services performed or for materials used in or furnished for the Property;

(xviii) if there is any cessation at any time in construction of the Improvements for more than twenty (20) consecutive Business Days except if due to a Force Majeure Event;

(xix)   if Borrower requests a termination of the Loan or confesses inability to continue or complete construction of the Improvements in accordance with this Agreement;

(xx)   if Agent, the Construction Consultant or their representatives are not permitted at all reasonable times upon not less than two (2) Business Days' notice to enter upon the Property, inspect the Improvements and the construction thereof and all materials, fixtures and articles used or to be used in the construction and to examine all the Plans and Specifications, or if Borrower shall fail to furnish to Agent or its authorized representative, when requested upon not less than two (2) Business Days' notice, copies of the Plans and Specifications;

(xxi)   if a material adverse change in Borrower's and/or any Guarantor's financial condition shall occur which would, in Agent's reasonable determination, materially and adversely affect Borrower's and/or such Guarantor's ability to perform its Obligations under this Agreement or any other document evidencing or securing the Loan beyond any applicable notice and grace periods expressly set forth in the Loan Documents;

(xxii)   if one or more judgments or decrees shall be entered against Borrower involving in the aggregate a liability in excess of $250,000.00 and shall not have been vacated or bonded and stayed within thirty (30) days or if one or more judgments or decrees shall be entered against Guarantor involving in the aggregate a liability in excess of $250,000.00 and shall not have been vacated or bonded and stayed within thirty (30) days;

(xxiii) if Guarantor shall be in breach of any of its obligations set forth in the Guaranty of Payment or the Guaranty of Completion;

(xxiv) if Borrower shall be in default beyond any applicable notice and cure period under the Condominium Documents, or if Borrower shall fail to pay the common area charges on the condominium unit covered by the Mortgage within the applicable grace or cure period provided in the by laws of the condominium;

(xxv)  if the Property becomes subject to any mechanic's lien, materialman's or other lien other than (x) a lien for local real estate taxes and assessments not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days;

(xxvi) if any federal tax lien is filed against the Property, Borrower or any Guarantor, and same is not discharged of record within thirty (30) days after same is filed;

(xxvii) if any survey inspection required or requested by Lender pursuant to the

provisions of this Agreement shows any condition not approved by Lender, and such condition is not remediated to Lender's satisfaction within sixty (60) days after notice thereof by Lender to Borrower;

(xxviii) if Owner or Borrower executes any chattel mortgage or other security agreement in favor of any party other than the Lender with respect to any materials, equipment, furniture or fixtures used in connection with the Project or with respect to any articles of personal property constituting part of the Property, or if any such materials, equipment, furniture, fixtures or articles of personal property are not substantially in accordance with the Plans and Specifications or are leased or purchased pursuant to any conditional sales contract or other security agreement or otherwise so that the ownership thereof will not vest unconditionally in Borrower free from encumbrances (except those in favor of Lender) upon being made a part of the Property, and Borrower fails to cure such default within twenty (20) days following notice from Lender, or if Borrower does not furnish to Lender on request and after reasonable notice to Borrower the contracts, bills of sale, statements, receipted vouchers or other agreements, under which Borrower claims title to such materials, equipment, furniture, fixtures or articles of personal property;

(xxix) if there shall occur any event of default under any Project Documents beyond any applicable grace, notice or cure period (in each case, without regard to whether Lender or any other Person cures same; and

(xxx) if Borrower, Guarantor, or any principal or Affiliate of any thereof, commits gross negligence (which continues after notice from Lender that such activity is occurring) or intentional, willful misconduct with respect to the management and operation of the Property or any Borrower's financial affairs.

(xxxi) If Indemnitor shall be in breach of any of its obligations set forth in the Environmental Indemnity;

(b)    Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vii), (viii) or (ix) above) and at any time thereafter Agent may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Agent deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Agent may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vii), (viii) or (ix) above, the Debt and all other Obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding and Agent and Lenders shall further be entitled to all rights and remedies available under the Guaranty and Environmental Indemnity.

## Section 9.2     Rights and Remedies of Agent and Lenders.

(a)     Upon the occurrence and continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Agent against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Agent at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Agent shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Property. Any such actions taken by Agent shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Agent may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Agent permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Agent is not subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Agent shall remain in full force and effect until Agent has exhausted all of its remedies against the Property and the Mortgage has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(b)     Agent shall have the right from time to time following the occurrence and continuance of an Event of Default to partially foreclose the Mortgage in any manner and for any amounts secured by the Mortgage then due and payable as determined by Agent in its sole discretion including, without limitation, the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Agent may foreclose the Mortgage to recover such delinquent payments, or (ii) in the event Agent elects to accelerate less than the entire outstanding principal balance of the Loan, Agent may foreclose the Mortgage to recover so much of the principal balance of the Loan as Agent may accelerate and such other sums secured by the Mortgage as Agent may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Mortgage to secure payment of sums secured by the Mortgage and not previously recovered.

(c)     Agent shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "**Severed Loan Documents**") in such denominations as Agent shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Agent from time to time, promptly after the request of Agent, a severance agreement and such other documents as Agent shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Agent, provided that the same shall contain provisions substantially the same as are set forth in Section 10.22. Borrower hereby absolutely and irrevocably appoints Agent as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, that the power of attorney provided for in this Subsection may only be exercised if Borrower has failed to take any action reasonably

required of it within ten (10) days of Agent's notice and demand therefor. Borrower shall not be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents, and the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date or the date of the last Advance made hereunder, whichever is later.

(d)    Upon the occurrence and continuance of an Event of Default, Agent may declare Lenders' obligations to make Advances hereunder to be terminated, whereupon the same shall terminate, and/or declare all unpaid principal of and accrued interest on the Note, together with all other sums payable under the Loan Documents, to be immediately due and payable, whereupon same shall become and be immediately due and payable, anything in the Loan Documents to the contrary notwithstanding, and without presentation, protest or further demand or notice of any kind, all of which are expressly hereby waived by Borrower; provided, however, that Lenders may make Advances or parts of Advances thereafter without thereby waiving the right to demand payment of the Note, without becoming liable to make any other or further Advances, and without affecting the validity of or enforceability of the Loan Documents. Notwithstanding and without limiting the generality of the foregoing or anything else to the contrary contained in this Agreement, upon the occurrence of an Event of Default, Lenders' obligations to make Advances hereunder shall automatically terminate and upon the occurrence and during the continuance of a Default, Lenders shall not be obligated to make any further Advance until such time as the same is remedied.

(e)    Upon the occurrence and continuance of an Event of Default, Agent may cause the Improvements to be completed and may enter upon the Property and construct, equip and complete the Improvements in accordance with the Plans and Specifications, with such changes therein as Agent may, from time to time, and in its sole discretion, deem appropriate. In connection with any construction of the improvements undertaken by Agent pursuant to the provisions of this subsection, Agent may:

(A)    use any funds of Borrower, including any balance which may be held by Agent as security or in escrow, and any funds remaining unadvanced under the Loan;

(B)    employ existing contractors, subcontractors, including Trade Contractors, agents, architects, engineers, and the like, or terminate the same and employ others;

(C)    employ security watchmen to protect the Property;

(D)    make such additions, changes and corrections in the Plans and Specifications as shall, in the judgment of Agent, be necessary or desirable;

(E)    take over and use any and all Personal Property contracted for or purchased by Borrower, if appropriate, or dispose of the same as Agent sees fit;

(F)    execute all applications and certificates on behalf of Borrower which may be required by any Governmental Authority or Law or Regulation or contract documents or agreements;

(G)    pay, settle or compromise all existing or future bills and claims which are or may be liens against the Property, or may be necessary for the Completion of the Improvements or the clearance of title to the Property, including, without limitation, all taxes and assessments;

(H)    complete the marketing and sale of Units as Agent shall deem to be necessary or desirable;

(I)    prosecute and defend all actions and proceedings in connection with the construction of the Improvements or in any other way affecting the Property, the Improvements and take such action and require such performance as Agent deems necessary under the Payment and Performance Bonds; and

(J)    take such other action hereunder, or refrain from acting hereunder, as Agent may, in its sole and absolute discretion, from time to time determine, and without any limitation whatsoever, to carry out the intent of this Section 9.2.1:

Borrower shall be liable to Agent for all costs paid or incurred for the construction, completion and equipping of the Improvements, whether the same shall be paid or incurred pursuant to the provisions of this Section or otherwise, and all payments made or liabilities incurred by Agent hereunder of any kind whatsoever shall be deemed advances made to Borrower under this Agreement and shall be secured by the Mortgage and the other Loan Documents.

To the extent that any costs so paid or incurred by Agent, together with all other Advances made by Lenders hereunder, exceed the Loan Amount, such excess costs shall be paid by Borrower to Agent on demand, with interest thereon at the Default Rate until paid; and Borrower shall execute such notes or amendments to the Note as may be requested by Agent to evidence Borrower's obligation to pay such excess costs and until such notes or amendments are so executed by Borrower, Borrower's obligation to pay such excess costs shall be deemed to be evidenced by this Agreement. In the event Agent takes possession of the Property and assumes control of such construction as aforesaid, Agent shall not be obligated to continue such construction longer than Agent shall see fit and may thereafter, at any time, change any course of action undertaken by it or abandon such construction and decline to make further payments for the account of Borrower whether or not the Property shall have been completed. For the purpose of this Section, the construction, equipping and completion of the Property shall be deemed to include any action necessary to cure any Event of Default by Borrower under any of the terms and provisions of any of the Loan Documents.

(f)    Upon the occurrence and continuance of an Event of Default, Agent may appoint or seek appointment of a receiver, without notice and without regard to the solvency of Borrower or the adequacy of the security, for the purpose of preserving the Property, preventing waste, and to protect all rights accruing to Agent and/or Lenders by virtue of this Agreement and

the other Loan Documents, and expressly to do any further acts as Agent may determine to be necessary to complete the development and construction of the Improvements. All expenses incurred in connection with the appointment of such receiver, or in protecting, preserving, or improving the Property, shall be charged against Borrower and shall be secured by the Mortgage and enforced as a lien against the Property.

(g)   Upon the occurrence and continuance of an Event of Default, Agent may accelerate maturity of the Note and any other indebtedness of Borrower to Lenders, and demand payment of the principal sum due thereunder, with interest, advances, costs and reasonable attorneys' fees and expenses (including those for appellate proceedings), and enforce collection of such payment by foreclosure of the Mortgage or the enforcement of any other collateral, or other appropriate action.

### Section 9.3    Power of Attorney.

For the purposes of carrying out the provisions and exercising the rights, powers and privileges granted by or referred to in this Agreement, Borrower hereby irrevocably constitutes and appoints Agent its true and lawful attorney-in-fact, with full power of substitution, to execute, acknowledge and deliver any instruments and do and perform any acts which are referred to in this Agreement, in the name and on behalf of Borrower. The power vested in such attorney-in-fact is, and shall be deemed to be, coupled with an interest and irrevocable. Notwithstanding the foregoing, the power of attorney provided for in this Section 9.3 may only be exercised if Borrower has failed to take any action reasonably required of it within ten (10) days of Agent's notice and demand therefor.

### Section 9.4    Remedies Cumulative.

Upon the occurrence of any Event of Default, the rights, powers and privileges provided in this Article IX and all other remedies available to Agent and Lenders under this Agreement or under any of the other Loan Documents or at law or in equity may be exercised by Agent and Lenders at any time and from time to time and shall not constitute a waiver of Agent's or any of Lenders' other rights or remedies thereunder, whether or not the Loan shall be due and payable, and whether or not Agent shall have instituted any foreclosure proceedings or other action for the enforcement of its rights under the Loan Documents.

### Section 9.5    Annulment of Defaults.

An Event of Default shall not be deemed to be in existence for any purpose of this Agreement or any Loan Document if Agent shall have waived such Event of Default in writing or stated that the same has been cured to its reasonable satisfaction, but no such waiver shall extend to or affect any subsequent Event of Default or impair any of the rights of Lenders upon the occurrence thereof.

### Section 9.6    Waivers.

Borrower hereby waives to the extent not prohibited by applicable law (a) all presentments, demands for payment or performance, notices of nonperformance (except to the extent required by the provisions hereof or of any other Loan Documents), protests and notices

of dishonor, (b) any requirement of diligence or promptness on Agent's or Lenders' part in the enforcement of its rights (but not fulfillment of its obligations) under the provisions of this Agreement or any other Loan Document, and (c) any and all notices of every kind and description which may be required to be given by any statute or rule of law, to the fullest extent permitted by applicable law.

### Section 9.7    Course of Dealing, Etc.

No course of dealing and no delay or omission by Agent, Lenders or Borrower in exercising any right or remedy hereunder shall operate as a waiver thereof or of any other right or remedy and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. No waiver or consent shall be binding upon Lenders unless it is in writing and signed by Agent. Agent's exercise of Agent's right to remedy any default by Borrower to Lenders or any other person, firm or corporation shall not constitute a waiver of the default remedied, a waiver of any other prior or subsequent default by Borrower or a waiver of the right to be reimbursed for any and all of its expenses in so remedying such default. The making of an Advance hereunder during the existence of an Event of Default shall not constitute a waiver thereof. All rights and remedies of Lenders hereunder are cumulative. No Advance of Loan proceeds hereunder, no increase or decrease in the amount of any Advance, and no making of all or any part of an Advance prior to the due date thereof shall constitute an approval or acceptance by Lenders of the work theretofore done or a waiver of any of the conditions of Lenders' obligation to make further Advances, nor in the event Borrower is unable to satisfy any such condition, shall any such failure to insist upon strict compliance have the effect of precluding Lenders from thereafter refusing to make an Advance and/or declaring such inability to be an Event of Default as hereinabove provided. All Advances shall be deemed to have been made pursuant hereto and not in contravention of the terms of this Agreement.

### Section 9.8    Remedies Cumulative.

The rights, powers and remedies of Agent under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Agent may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Agent's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Agent may determine in Agent's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

## X.    MISCELLANEOUS

### Section 10.1    Successors and Assigns.

All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the respective legal representatives, successors and assigns of Agent and Lenders.

### Section 10.2    Agent's and Lenders' Discretion.

Whenever, pursuant to this Agreement, Agent and/or a Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Agent and/or any Lender, the decision of Agent and/or such Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Agent and/or such Lender, as applicable, and shall be final and conclusive.

### Section 10.3    Consent to Service.

(a)    Borrower will maintain a place of business or an agent for service of process in New York, New York, and give prompt notice to Lender of the address of such place of business and of the name and address of any new agent appointed by Borrower, as appropriate. Borrower further agrees that the failure of its agent for service of process to give it notice of any service of process will not impair or affect the validity of such service or of any judgment based thereon. Borrower also irrevocably consents to service of process by registered or certified mail, postage prepaid, to it either at its address given in Section 10.3 of this Agreement or its address specified in the preamble of this Agreement.

(b)    Borrower initially and irrevocably designates CT CORP SYSTEM, with offices on the date hereof at 111 EIGHTH AVENUE, NEW YORK, NEW YORK 10011, to receive for and on behalf of Borrower service of process in New York, New York with respect to this Agreement.

### Section 10.4    Submission to Jurisdiction.

With respect to any claim or action arising hereunder or under the Note or any of the other Loan Documents, Borrower (a) irrevocably submits to the nonexclusive jurisdiction of the courts of the State of New York and the state where the Property is located and the United States District Court located in the Borough of Manhattan in New York, New York and the county in which the Property is located, and appellate courts from any thereof, and (b) irrevocably waives any objection which Borrower may have at any time based on the venue of any suit, action or proceeding, arising out of or relating to this Agreement or any of the other Loan Documents, brought in any such court, and (c) irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. This choice of forum is made pursuant to New York General Obligations Law Section 5-1402.

### Section 10.5    Jurisdiction Not Exclusive.

Nothing in this Agreement will be deemed to preclude Lender from bringing an action or proceeding with respect hereto in any other jurisdiction.

### Section 10.6    Waiver of Jury Trial.

Borrower, Guarantor, and Indemnitor, and Lender, each hereby waives its respective right to a jury trial with respect to any action or claim arising out of any dispute in connection with this Agreement, the Note or any of the other Loan Documents, any rights or obligations hereunder or thereunder or the performance of such rights and obligations. Borrower, Indemnitor and Guarantor, each (a) certifies that no representative, agent or attorney of Lender has represented, expressly or otherwise, that Lender would not, in the event of litigation, seek to enforce the foregoing waivers and (b) acknowledges that Lender has been induced to enter into this Agreement and the other Loan Documents to which it is a party by, among other things, the waivers and certifications contained in this Article X. Borrower, Indemnitor and Guarantor, each acknowledges that it has had an opportunity to review this Article X with its legal counsel and that each of them agrees to the foregoing as its free, knowing and voluntary act.

### Section 10.7    Choice of Law.

This Agreement shall be governed, construed, applied and enforced in accordance with the laws of the state in which the Property is located with respect to the creation and enforcement of any liens within the jurisdiction of the state in which the Property is located relating to matters of real property law, foreclosure rights and obligations, but otherwise in accordance with the laws of the State of New York and the applicable laws of the United States of America. This choice of law is made pursuant to New York General Obligations Law Section 5-1401.

### Section 10.8    Provisions Subject to Applicable Law.

All rights, powers and remedies provided in this Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Agreement

invalid or unenforceable. If any term of this Agreement or any application thereof shall be invalid or unenforceable, the remainder of this Agreement and any other application of the term shall not be affected thereby.

### Section 10.9     Modification, Waiver in Writing.

No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

### Section 10.10    Delay Not a Waiver.

Neither any failure nor any delay on the part of Agent and/or Lenders in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement or any other Loan Document, neither Agent nor Lenders shall be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

### Section 10.11    Notices.

All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "**Notice**") required, permitted, or desired to be given hereunder or under any other Loan Document (other than the Guaranties, which shall be governed by the respective provisions thereof concerning notices) shall be in writing sent by telefax (with answer back acknowledged) or by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this Section 10.11. Any Notice to Borrower shall be effective if rendered in accordance with this Section 10.11 to Borrower solely. Agent shall use commercially reasonable efforts to provide copies of notices rendered to Borrower to the additional parties specified below, but the failure to effect any such Notice to such additional party shall not affect the validity and full force and effect of such Notice upon Borrower. Any Notice shall be deemed to have been received: (a) three (3) days after the date such Notice is mailed, (b) on the date of sending by telefax if sent during business hours on a Business Day (otherwise on the next Business Day), (c) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day), and (d) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

| | |
|---|---|
| If to Borrower: | c/o E.B. Developers, Inc.<br>7284 West Palmetto Park Road, Suite 106<br>Boca Raton, Florida 33433<br>Attention: Mr. Richard Schuerger<br>Facsimile: (561) 395-6868 |
| with a copy to: | Greenberg Traurig, P.A.<br>1221 Brickell Avenue<br>Miami, Florida 33131<br>Attention: Ralph B. Bekkevold, Esq.<br>Facsimile: (305) 961-5625 |
| with a copy to: | Daniel Kaskel, Esq.<br>7284 West Palmetto Park Road<br>Suite 108<br>Boca Raton, Florida 33433<br>Facsimile: (561) 368-0775 |
| with a copy to: | Kodsi Law Firm<br>701 West Cypress Creek Road<br>Suite 303<br>Fort Lauderdale, Florida 33309<br>Attention: Steven Amster, Esq.<br>Facsimile: (561) 368-0775 |
| If to Agent: | Lehman Brothers Holdings Inc.<br>399 Park Avenue<br>8th Floor<br>New York, NY 10022<br>Attention: Mr. Michael J. Zito<br>Facsimile: (646) 758-3101<br>MTS No.: VZ94<br>Asset No.: 1122901 |
| with a copy to: | Lehman Brothers Holdings Inc.<br>399 Park Avenue<br>8th Floor<br>New York, NY 10022<br>Attention: David S. Broderick, Esq.<br>Facsimile: (646) 758-5311<br>MTS No.: VZ94<br>Asset No.: 1122901 |
| If to Lenders: | at their respective Applicable Lending Offices<br>Set forth opposite their signatures hereto. |

with a copy to:     Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, New York 10019
Attention: James J. Thomas, Esq.
Facsimile: (212) 262-1215

and an additional
copy to (Servicer):    TriMont Real Estate Advisors, Inc.
Monarch Tower
3424 Peachtree Road NE
Suite 2200
Atlanta, Georgia  30326
Attention:  J. Gregory Winchester
Facsimile:  (404) 582-8760
MTS No.: VZ94
Asset No.: 1122901

Either party by notice to the other may designate different addresses (or additional addresses not exceeding in the aggregate four addresses per party) for subsequent notices or communications.

**Section 10.12    Intentionally Deleted.**

**Section 10.13    Headings.**

The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 10.14    Severability.**

Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 10.15    Preferences.**

Each Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Obligations of Borrower hereunder.  To the extent Borrower makes a payment or payments to Agent or any Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations hereunder or part thereof intended to be

satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Agent or such Lender.

### Section 10.16 Waiver of Notice.

Borrower shall not be entitled to any notices of any nature whatsoever from Agent or Lenders except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Agent and/or Lenders to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Agent and/or any Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Agent and/or such Lender to Borrower.

### Section 10.17 Remedies of Borrower.

In the event that a claim or adjudication is made that Agent or any Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where, by law or under this Agreement or the other Loan Documents, Agent or such Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, neither Agent nor such Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedy shall be limited to commencing an action seeking injunctive relief or declaratory judgment. Any action or proceeding to determine whether Agent or a Lender has acted reasonably shall be determined by an action seeking declaratory judgment. Any expedited procedure legally available with such a declaratory judgment action or action for injunctive relief may be utilized to the extent possible.

### Section 10.18 Expenses; Indemnity.

(a) Borrower shall pay or, if Borrower fails to pay, shall reimburse Agent upon receipt of notice and demand from Agent, for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Agent in connection with (i) Borrower's and/or Guarantor's ongoing performance of and compliance with Borrower's and/or Guarantor's agreements and covenants contained in this Agreement and the other Loan Documents or the Condominium Documents on their respective parts to be performed or complied with after the date of this Agreement, including, without limitation, confirming compliance with environmental and insurance requirements; (ii) Agent's ongoing performance of and compliance with all agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the date of this Agreement, including without limitation in connection with the making of any Advances after the date of this Agreement; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Borrower and/or Guarantor; (iv) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Agent all required legal opinions, and other similar expenses incurred, in creating and perfecting the Liens in favor of Agent pursuant to this Agreement and the other Loan Documents; (v) enforcing or preserving any rights, whether at trial or not, including appeals therefrom, in response to third party claims or the prosecuting or defending of

any action or proceeding, mediation, arbitration or other litigation or administrative proceeding, in each case against, under or affecting Borrower, Guarantor, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; and (vi) enforcing any Obligations of or collecting any payments due from Borrower and/or Guarantor under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to Agent to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Agent.

(b)    Borrower shall indemnify, defend and hold harmless Agent and each Lender, each participant in the Loan, and their respective officers, directors, partners, employees and agents (each, an **"Indemnified Party"**) from and against, and shall reimburse the affected Indemnified Party for, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and expenses of counsel for Agent in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Agent shall be designated a party thereto) (collectively, **"Losses"**), that may be imposed on, incurred by, or asserted against such Indemnified Party in any manner relating to or arising out of (i) any breach by Borrower of its Obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, (ii) the use or intended use of the proceeds of the Loan or (iii) any other matter arising from this Agreement or the Loan (collectively, the **"Indemnified Liabilities"**); provided, however, that Borrower shall not have any obligation to such Indemnified Party hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by such Indemnified Party.

(c)    In case any such claim, action or proceeding (a **"Claim"**) is brought against an Indemnified Party in respect of which indemnification may be sought by such Indemnified Party pursuant hereto, Agent shall give prompt written notice thereof to Borrower, which notice shall include all documents and information in the possession of or under the control of Agent and such Indemnified Party relating to such Claim and shall specifically state that indemnification for such Claim is being sought under this Section 10.18; provided, however, that the failure of Agent to so notify Borrower shall not limit or affect such Indemnified Party's rights to be indemnified pursuant to this Section 10.18 except to the extent Borrower is materially prejudiced by such failure. Upon receipt of such notice of Claim (together with such documents and information from Agent and such Indemnified Party), Borrower shall, at its sole cost and expense, in good faith defend any such Claim with counsel reasonably satisfactory to Agent and such Indemnified Party (it being understood that counsel selected by Borrower's insurance carrier shall be deemed to be acceptable to Agent and such Indemnified Party, provided such insurer is an acceptable insurer under the Loan Documents or otherwise was accepted by Agent as an insurer), which counsel may, without limiting the rights of Agent and

such Indemnified Party pursuant to the next succeeding sentence of this Section 10.18, also represent Borrower in such investigation, action or proceeding. In the alternative, such Indemnified Party may elect to conduct its own defense through counsel of its own choosing and at the reasonable expense of Borrower, if (A) such Indemnified Party reasonably determines that the conduct of its defense by Borrower could be materially prejudicial to its interests, (B) Borrower refuses to defend, or (C) Borrower shall have failed, in such Indemnified Party's reasonable judgment, to defend the Claim in good faith (unless such Claim is being defended by Borrower's insurance carrier, provided such insurer is an acceptable insurer under the Loan Documents or otherwise was accepted by Agent as an insurer). Borrower may settle any Claim against such Indemnified Party without such Indemnified Party's consent, provided (i) such settlement is without any liability, cost or expense whatsoever to such Indemnified Party, (ii) the settlement does not include or require any admission of liability or culpability by such Indemnified Party under any federal, state or local statute or regulation, whether criminal or civil in nature and (iii) Borrower obtains an effective written release of liability for such Indemnified Party from the party to the Claim with whom such settlement is being made, which release must be reasonably acceptable to such Indemnified Party, and a dismissal with prejudice with respect to all claims made by the party against such Indemnified Party in connection with such Claim. Agent and such Indemnified Party shall reasonably cooperate with Borrower, at Borrower's sole cost and expense, in connection with the defense or settlement of any Claim in accordance with the terms hereof. If Borrower refuses to defend any Claim or fails to defend such Claim in good faith (other than a Claim that is being defended by Borrower's carrier, provided such insurer is an acceptable insurer under the Loan Documents or otherwise was accepted by Agent as an insurer) and such Indemnified Party elects to defend such Claim by counsel of its own choosing Borrower shall be responsible for any good faith settlement of such Claim entered into by such Indemnified Party. If such Indemnified Party reasonably determines that the conduct of its defense by Borrower could be materially prejudicial to its interests and elects to defend such Claim by counsel of its own choosing, Borrower shall be responsible for any reasonable settlement of such Claim entered into by such Indemnified Party. Except as provided in the preceding two (2) sentences, no Indemnified Party may pay or settle any Claim and seek reimbursement therefor under this Section 10.18. Nothing contained herein shall be construed as requiring Agent or any Indemnified Party to expend funds or incur costs to defend any Claim in connection with the matters for which Agent or any Indemnified Party is entitled to indemnification pursuant to this Section 10.18. The Obligations of Borrower hereunder shall specifically include the obligation to expend its own funds, to incur costs in its own name and to perform all actions as may be necessary to protect Agent or any other Indemnified Party from the necessity of expending its own funds, incurring cost or performing any actions in connection with the matters for which Agent or such other Indemnified Party is entitled to indemnification hereunder.

### Section 10.19   Schedules and Exhibits Incorporated.

The Schedules and Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

### Section 10.20    Offsets, Counterclaims and Defenses.

Any assignee of Agent's or any Lender's interest in and to this Agreement and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

### Section 10.21    No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)    Borrower, Agent and Lenders intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Agent or Lenders nor to grant Agent or Lenders any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)    This Agreement and the other Loan Documents are solely for the benefit of Agent and Lenders and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Agent and Lenders any right to insist upon or to enforce the performance or observance of any of the Obligations contained herein or therein. All conditions to the obligations of Lenders to make Advances of the Loan hereunder are imposed solely and exclusively for the benefit of Agent and Lenders and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Agent or Lenders will refuse to make Advances of the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Agent on behalf of Lenders if, in Agent's sole discretion, Agent deems it advisable or desirable to do so. In addition, no Lender is the agent or representative of Borrower and this Agreement shall not make any Lender liable to any Trade Contractor or any other Person for goods delivered to or services performed by them upon the Property, or for debts or claims accruing to such parties against Borrower and there is no contractual relationship, either express or implied, between any Lender and any Trade Contractor or any other Person supplying any work, labor or materials for the Improvements.

### Section 10.22    Publicity.

(a)    Borrower shall not, and shall not permit, suffer or allow any of its Affiliates to, issue any news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public that refers to the Loan Documents or the financing evidenced by the Loan Documents.

(b)    Lender shall not, and shall not permit, suffer or allow any of its Affiliates to, issue any news releases, publicity or advertising by Agent or its Affiliates or through any media intended to reach the general public that refers to the Loan Documents or the financing

evidenced by the Loan Documents. The foregoing shall not apply to a Syndication or a Securitization.

### Section 10.23    Approvals and Consents.

Wherever the consent or approval of Agent is required under this Agreement or any other Loan Document, such consent or approval may be granted or withheld in the sole discretion of Agent unless the specific provision states that the consent or approval shall be reasonable or shall not be unreasonably withheld, in which case, such consent or approval shall be granted or withheld in the Agent's discretion exercising its reasonable business judgment and shall not be unreasonably withheld, conditioned or delayed.

### Section 10.24    Waiver of Offsets/Defenses/Counterclaims.

Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Agent or Lenders or their agents or otherwise to offset any obligations to make the payments required by the Loan Documents. No failure by Agent or Lenders to perform any of its obligations hereunder shall be a valid defense to, or result in any offset against, any payments which Borrower is obligated to make under any of the Loan Documents.

### Section 10.25    Conflict; Construction of Documents; Reliance.

In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Agent or any Lender or any parent, subsidiary or affiliate of Agent or such Lender. Neither Agent nor any Lender shall be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or affiliate of Agent or such Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Agent's and/or Lenders' exercise of any such rights or remedies. Borrower acknowledges that Agent and each Lender engages in the business of real estate financings and other real estate transactions and investments that may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

### Section 10.26    Brokers and Financial Advisors.

Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement. Borrower shall indemnify, defend and hold each Indemnified Party and its officers and directors harmless from and against any Losses in any way relating to

or arising from a Claim by any Person that such Person acted on behalf of Borrower or Agent or any Lender in connection with the transactions contemplated herein. The provisions of this Section 10.26 shall survive the expiration and termination of this Agreement and the payment of the Debt.

### Section 10.27   Exculpation.

This Loan shall be fully recourse to the Borrower and Guarantor, except as otherwise set forth in the Guaranty and Environmental Indemnity. Subsequent to the Completion Date and subject to the Guaranty and Environmental Indemnity and the qualifications below, neither Agent nor Lenders shall enforce the liability and obligation of Borrower to perform and observe the Obligations contained in the Note, this Agreement, the Mortgage, or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Agent may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Agent to enforce and realize upon its interest under the Note, this Agreement, the Mortgage and the other Loan Documents, or in the Property, or any other collateral given to Agent and/or Lenders pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, and in any other collateral given to Agent and/or Lenders, and Lenders, by accepting the Note, this Agreement, the Mortgage and the other Loan Documents, shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement, the Mortgage or the other Loan Documents. The provisions of this Section shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Agent or Lenders to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (c) affect the validity or enforceability of any guaranty or indemnification agreement made in connection with the Loan or any of the rights and remedies of Agent or Lenders thereunder; (d) impair the right of Agent or Lenders to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases; (f) constitute a prohibition against Agent or Lenders to seek a deficiency judgment against Borrower in order to fully realize on any security given by Borrower in connection with the Loan or to commence any other appropriate action or proceeding in order for Agent or Lenders to exercise its remedies against such security; or (g) constitute a waiver of the right of Agent or Lenders to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Agent or Lenders (including reasonable attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

(i)     fraud or intentional misrepresentation by Borrower or any guarantor in connection with the Loan;

(ii)    the gross negligence or willful misconduct of Borrower;

(iii)   the intentional breach of any representation, warranty, covenant or indemnification provision in the Environmental Indemnity or in the Mortgage concerning

environmental laws, hazardous substances and asbestos and any indemnification of Agent and Lenders with respect thereto in either document;

      (iv)    intentional waste or the removal or disposal of any portion of the Property;

      (v)    the misapplication, misuse or conversion by Borrower of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Property, (B) any Awards or other amounts received in connection with the Condemnation of all or a portion of the Property, or (C) any Loan proceeds;

      (vi)    failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Property;

      (vii)    any security deposits, advance deposits or any other deposits collected with respect to the Property which are not delivered to Agent or held by an escrow agent for Agent's benefits upon a foreclosure of the Property or action in lieu thereof;

      (viii)    intentional failure to permit on-site inspections of the Property or to provide financial information, as required by, and in accordance with the terms and provisions of this Agreement and the Mortgage;

      (ix)    intentional failure to appoint a new property manager upon the request of Agent after an Event of Default, as required by, and in accordance with the terms and provisions of this Agreement and the Mortgage; and

      (x)    intentional failure to purchase and deliver to Agent the Interest Rate Protection Agreement as and when required under Section 4.1.14 of this Agreement, including, without limitation, any cost incurred by Agent in purchasing the Interest Rate Protection Agreement together with interest thereon at the Default Rate from the date such cost was incurred by Agent until such cost is paid to Agent.

      Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents, (A) neither Agent nor Lenders shall be deemed to have waived any right which Agent and/or Lenders may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lenders in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower in the event that: (i) Borrower fails to maintain its status as a single purpose entity as set forth in Section 3.1.24 of this Agreement; (ii) Borrower fails to obtain Agent's prior consent to any subordinate financing or other voluntary Lien encumbering the Property; (iii) Borrower fails to obtain Agent's prior consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Mortgage or this Agreement; (iv) Borrower files a voluntary petition under the Bankruptcy code or any other Federal or state bankruptcy or insolvency law; (v) an Affiliate, officer, director, or representative which controls, directly or indirectly, Borrower files, or joins in the filing of, an involuntary petition against Borrower under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any person; (vi) Borrower files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed

against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or solicits or causes to be solicited petitioning creditors for any involuntary petition from any Person; (vii) any Affiliate, officer, director, or representative which controls Borrower consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Property; or (viii) Borrower makes an assignment for the benefit of creditors, or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

### Section 10.28    Prior Agreements.

This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

### Section 10.29    Intentionally Omitted.

### Section 10.30    Joint and Several Liability.

If Borrower is comprised of more than one Person, all representations, warranties, covenants (both affirmative and negative) and all other Obligations hereunder shall be the joint and several obligation of each entity making up Borrower and a Default or Event of Default by any such Person shall be deemed a Default or Event of Default by all such entities and Borrower. The representations, covenants and warranties contained herein or in any other Loan Document shall be read to apply to the individual entities comprising Borrower when the context so requires but a breach of any such representation, covenant or warranty or a breach of any obligation under the Loan Documents shall be deemed a breach by all such entities and Borrower, entitling Agent and/or Lenders, as applicable, to exercise all of their rights and remedies under all the Loan Documents and under applicable law. Notwithstanding anything to the contrary herein contained, except as provided in any Guaranty or in the Environmental Indemnity, no principal, director, officer or employee or direct or indirect partner or member of Borrower, nor any principal, director, officer or employee of any such partner or member, shall have any personal liability under the Loan Documents.

### Section 10.31    Assignments.

(a)      Borrower may not assign this Agreement or any of its rights or obligations hereunder without the prior approval of Agent.

(b)      No Lender shall assign, transfer, sell, pledge or hypothecate all or any portion of its rights in and to the Loans to any other Person (a Person to which any such assignment, transfer or sale is made in accordance with this Article X being an "**Assignee**"):

(i)      without the prior written consent of Agent, which consent shall not be unreasonably withheld and shall not be required if the Assignee is an Affiliate of such Lender and provided that such Lender shall not be released from its continuing obligations hereunder after such assignment to its Affiliate;

(ii)    so long as no Event of Default shall exist, without the prior written consent of Borrower for so long as Lenders continue to have any further funding obligations hereunder, which consent shall not be unreasonably withheld and shall not be required if the Assignee is (A) an Affiliate of the assigning Lender and provided that such Lender shall not be released from its continuing obligations hereunder after such assignment to its Affiliate or (B) an Eligible Assignee;

(iii)    unless such transaction shall be an assignment of a constant and not a varying, ratable percentage of such Lender's interest in the Loan;

(iv)    unless the aggregate principal amount of the Loan which is the subject of such transaction is Five Million Dollars ($5,000,000.00) or more;

(v)    unless, after giving effect to such transaction, such Lender's aggregate unassigned interest in the Loan shall be in a principal amount of at least Five Million Dollars ($5,000,000.00) unless such transaction encompasses all of such Lender's rights in and to the Loan in which case such Lender shall have assigned all of its rights in and to the Loan; and

(vi)    in the case of an assignment, the parties to each such assignment shall execute and deliver to Agent, for its acceptance and recording in the Agent's Register, Agent's form of assignment and acceptance agreement attached hereto as EXHIBIT D, with appropriate completions (each, an "**Assignment and Acceptance**"), together with a processing and registration fee of $2,500.00, which fee shall cover Agent's cost in connection with the assignments under this Agreement.

(c)    If an Event of Default has occurred and is continuing, subject to Section 11.4(f), Borrower's consent to any assignment or participation to any party whatsoever shall not be required and all parties hereto agree to promptly execute and file an amendment to this Agreement reflecting any such assignment. Furthermore, if within five (5) Business Days after receiving a request pursuant to subparagraph (b) above for its consent to any assignment or participation by any Lender, Borrower shall not have either consented or withheld its consent (specifying the reasons therefor), then such consent shall be deemed to have been given.

(d)    Borrower agrees to execute, or cause Guarantor to execute, within ten (10) days after request therefor is made by Agent, any documents and/or estoppel certificates reasonably requested by Agent in connection with such participation or assignment, without charge; provided that such documents and/or estoppel certificates do not expand the liability or Obligations of Borrower or Guarantor or reduce assignee's or participant's obligations.

(e)    Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (x) the assignee thereunder shall be a party thereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (y) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an

Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party thereto).

(f)     Agent shall maintain a register (the "**Agent's Register**") showing the identity of the Lenders from time to time.  The entries in the Agent's Register shall be conclusive, in the absence of manifest error, and Borrower, Agent and the Lenders may (and, in the case of any portion of the Loan or other obligation hereunder not evidenced by a Note, shall) treat each Person whose name is recorded in the Register as the owner of such portion of the Loan or other obligation hereunder as the owner thereof for all purposes of this Agreement and the other Loan Documents, notwithstanding any notice to the contrary.  Any assignment of any portion of the Loan or other obligation hereunder not evidenced by a Note shall be effective only upon appropriate entries with respect thereto being made in the Register.  The Register shall be available for inspection by the Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(g)     Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an Assignee (and, in the case of an Assignee that is not then a Lender or an affiliate thereof, by Borrower and Agent) together with payment to Agent of a registration and processing fee of $2,500.00, Agent shall (i) promptly accept such Assignment and Acceptance and (ii) on the effective date determined pursuant thereto record the information contained therein in the Agent's Register and give notice of such acceptance and recordation to the Lenders and the Borrower.

(h)     Borrower authorizes each Lender to disclose to any participant or Assignee of such Lender (each, a "**Transferee**") and any prospective Transferee any and all financial information in such Lender's possession concerning the Borrower and its Affiliates which has been delivered to such Lender by or on behalf of the Borrower pursuant to this Agreement or which has been delivered to such Lender by or on behalf of the Borrower in connection with such Lender's credit evaluation of the Borrower and its Affiliates prior to becoming a party to this Agreement.

(i)     For avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this Section concerning assignments relate only to absolute assignments and that such provisions do not prohibit assignments creating security interests, including, without limitation, any pledge or assignment by a Lender of any Loan or Note to any Federal Reserve Bank in accordance with applicable law.

(j)     Borrower agrees that after the effective date under such Assignment and Acceptance, upon the request to Agent by any Lender, Borrower shall execute and deliver to such Lender one or more substitute notes of the Borrower evidencing such Lender's Ratable Share of the Loan in substantially the same form as the Note, with appropriate insertions as to payee and principal amount.  Each such substitute note shall be dated as of the Closing Date.

### Section 10.32    Adjustments; Set-Off.

(a)     If any Lender (a "**Benefited Lender**") shall at any time receive any payment of all or part of its Ratable Share of the Loan, or interest thereon, or receive any

collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in <u>Section 9.1(a)(viii)</u>, or otherwise including pursuant to <u>subsection (b)</u> below), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Ratable Share of the Loan, or interest thereon, such benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Loan, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; <u>provided, however</u>, that if all or any portion of such excess payment or benefits is thereafter recovered from such benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. Borrower agrees that each Lender so purchasing a portion of another Lender's Ratable Share of the Loan may exercise all rights of payment (including, without limitation, rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

(b)    In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower. Each Lender agrees promptly to notify Borrower and Agent after any such set-off and application made by such Lender, <u>provided</u> that the failure to give such notice shall not affect the validity of such set-off and application.

**Section 10.33    Cooperation in Syndication.**

(a)    Borrower agrees to use commercially reasonable efforts to assist Agent in completing a Syndication satisfactory to Agent. Such assistance shall include (i) direct contact between senior management and advisors of Borrower and the proposed Co-Lenders, (ii) assistance in the preparation of a confidential information memorandum and other marketing materials to be used in connection with the Syndication, (iii) the hosting, with Agent, of one or more meetings of prospective participants and/or co-lenders, and (iv) the delivery of appraisals satisfactory to Agent if required at no expense to Borrower.

(b)    Agent shall manage all aspects of the Syndication of the Loan, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocations of the commitments among the prospective Transferee and the amount and distribution of fees among the prospective co-lenders and/or participants. To assist Agent in its Syndication efforts, Borrower agrees promptly to prepare and provide to Agent all information with respect to Borrower, and the Properties contemplated hereby, including all financial information, projections and business plans (the "**Projections**"), as Agent may reasonably request in

connection with the Syndication of the Loan. Borrower hereby represents and covenants that (i) all information other than the Projections (the "**Information**") that has been or will be made available to Agent by Borrower or any of their representatives is or will be, to the best of Borrower's knowledge, when furnished, complete and correct in all material respects and does not or will not, to the best of Borrower's knowledge, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available to Agent by Borrower or any of their representatives have been or will be prepared in good faith based upon reasonable assumptions. Borrower understands that in arranging and syndicating the Loan, Agent and Lenders may use and rely on the Information and Projections without independent verification thereof.

(c)    If required in connection with the Syndication, Borrower hereby agrees to:

(i)    deliver updated financial and operating statements and other information reasonably required by Agent to facilitate the Syndication;

(ii)    deliver a non-consolidation opinion by a law firm reasonably acceptable to Lender;

(iii)    deliver reliance letters reasonably satisfactory to Lender with respect to the environmental assessments and reports and engineering assessments and reports delivered to Agent prior to the Closing Date, which will run to Agent and Lenders and their respective successors and assigns, or provide access to the Property to enable third party inspection for additional assessments and reports if required by any prospective participant and/or co-lender (any such additional assessments and reports the "**Additional Third Party Reports**"); and

(iv)    execute modifications to the Loan Documents required by the participants and/or co-lenders; provided that subject to Section 9.4 hereof, such modification will not change any material or economic terms of the Loan Documents, or otherwise increase the obligations or decrease the rights of Borrower pursuant to the Loan Documents.

(v)    All of Borrower's third party costs and expenses incurred by Agent in connection with a Syndication (other than the servicing fee required to be paid pursuant to Section 11.10) and all out-of-pocket costs and expenses incurred by Borrower in connection with Borrower's complying with requests made under this Section 10.33 shall be paid by Borrower. Notwithstanding the foregoing, Borrower shall not be liable for any such costs exceeding $25,000.00.

**Section 10.34    Counterparts.**

This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which shall constitute together but one and the same agreement.

## XI.    AGENT

### Section 11.1    Performance by Agent.

If an Event of Default shall have occurred and be continuing, Agent shall have the right, but not the duty, without limitation, upon any of Agent's rights pursuant hereto, to perform the Obligations of Borrower which are the subject of the Event of Default, in which event Agent shall endeavor to give notice to Borrower of Agent's performance, and Borrower agrees to pay to Agent, within ten (10) days of demand therefor, all actual costs and expenses incurred by Agent in connection therewith, including without limitation reasonable attorneys' fees, together with interest from the date of expenditure at the Default Rate, if an Event of Default shall have given rise to such expenditure. Upon demand by Agent each of the Lenders shall promptly advance to Agent in immediately available funds its ratable portion of the funds expended by Agent in curing such Event of Default together with interest thereon at the Applicable Interest Rate from the date of Agent's payment through the date prior to the date on which such advance is received by Agent.

### Section 11.2    Actions.

If Agent shall have reasonable cause to believe that any action or proceeding related to the Property could, if adversely determined, have a material adverse effect upon the rights or interests of Agent and/or Lenders under this Agreement or any of the other Loan Documents, Agent shall have the right to commence, appear in and defend such action or proceeding, and in connection therewith Agent may pay necessary expenses, employ counsel, and pay reasonable attorneys' fees. Borrower agrees to pay to Agent, within ten (10) days after demand therefor by Agent, all actual and reasonable costs and expenses incurred by Agent in connection therewith, including without limitation reasonable attorneys' fees, together with interest from the date of expenditure at the Default Rate, if an Event of Default shall have given rise to such action or proceeding. Borrower's Obligations to repay such expenses shall be secured by the Loan Documents.

### Section 11.3    Nonliability of Agent and Lenders.

Borrower acknowledges and agrees that:

(a)    any inspections of the construction of the Improvements made by or through Agent or Lenders are for purposes of administration of the Loan only and Borrower is not entitled to rely upon the same with respect to the quality, adequacy or suitability of materials or workmanship, conformity to the Plans and Specifications, state of completion or otherwise; Borrower shall make its own inspections of such construction to determine that the quality of the Improvements and all other requirements of such construction are being performed in a manner satisfactory to Borrower and in conformity with the Plans and Specifications and all other requirements; and Borrower shall immediately notify Agent, in writing, should the same not be in conformity with the Plans and Specifications and all other requirements;

(b)    by accepting or approving anything required to be observed, performed, fulfilled or given to Agent or Lenders pursuant to the Loan Documents, including any certificate, statement of profit and loss or other financial statement, survey, appraisal, lease or insurance

policy, neither Agent nor Lenders shall be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof and such acceptance or approval thereof shall not constitute a warranty or representation to anyone with respect thereto by Agent;

(c)    neither Agent nor Lenders undertake nor assume any responsibility or duty to Borrower to select, review, inspect, supervise, pass judgment upon or inform Borrower of any matter in connection with the Property, including, without limitation, matters relating to the quality, adequacy or suitability of: (i) the Plans and Specifications, (ii) architects, contractors, subcontractors and materialmen employed or utilized in connection with the construction of the Improvements, or the workmanship of or the materials used by any of them, or (iii) the progress or course of construction and its conformity or nonconformity with the Plans and Specifications; and Borrower shall rely entirely upon its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information to Borrower by Agent or Lenders in connection with such matters is for the protection of Agent and/or Lenders only and neither Borrower nor any third party is entitled to rely thereon;.

(d)    neither Agent nor Lenders owe any duty of care to protect Borrower against negligent, faulty, inadequate or defective building or construction; and

(e)    neither Agent nor any Lender shall be directly or indirectly liable or responsible for any loss, claim, cause of action, liability, indebtedness, damage or injury of any kind or character to any person or property arising from any construction on, or occupancy or use of, any of the Property, including without limitation any loss, claim, cause of action, liability, indebtedness, damage or injury caused by, or arising from: (i) any defect in any building, structure, grading, fill, landscaping or other improvements. thereon or in any on-site or off-site improvement or other facility therein or thereon; (ii) any act or omission of Borrower, the parties comprising Borrower or any of Borrower's agents, employees, independent contractors, licensees or invitees; (iii) any accident in or on the Land and Improvements or any fire, flood or other casualty or hazard thereon; (iv) the failure of Borrower, any of Borrower's licensees, employees, invitees, agents, independent contractors or other representatives to maintain the Property in a safe condition; and (v) any nuisance made or suffered on any part of the Property.

**Section 11.4    Authorization and Action.**

(a)    Each Lender hereby appoints and authorizes Agent to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to Agent by the terms hereof, together with such powers as are reasonably incidental thereto. Any and all actions relating to construction of the Improvements, including without limitation, approval of changes to the Budget, Plans and Specifications, contracts and subcontracts and Bonds, shall be deemed to have been delegated to Agent exclusively.

(b)    By their execution of this Agreement, all of the Lenders hereby authorize and direct Agent to act on their behalf in all respects in connection with the Loan Documents and the making of the Loan (but subject to paragraph (e) below) and agree with Borrower that Borrower shall only be required to and shall only deal with Agent and each of the Lenders shall be bound by any acts of Agent.

(c)    Intentionally Omitted.

(d)    Intentionally Omitted.

(e)    Except as otherwise provided in this Agreement, any provision of this Agreement or the other Loan Documents may be modified or supplemented only by an instrument in writing signed by Borrower and Agent and any provisions of this Agreement or the other Loan Documents may be waived by Agent  The provisions of this subsection are solely for the benefit of the Lenders and Agent and shall not create any rights in Borrower. Notwithstanding the foregoing, Borrower acknowledges that the Lenders may enter into a co-lending agreement that may contain provisions which require that amendments, waivers, extensions, modifications, and other decisions with respect to the Loan Documents shall require the approval of all or a number of the Lenders holding in the aggregate a specified percentage of the Loan or any one or more Lenders that are specifically affected by such amendment, waiver, extension, modification or other decision.

(f)    If Agent shall resign as Agent (which Agent may do upon thirty (30) days written notice to Borrower and each Lender), the successor Agent shall assume such obligations in writing and from and after Borrower's receipt of a copy of notice of such replacement and receipt of a copy of such assumption the successor Agent shall be the sole Agent hereunder and the term "Agent" shall thereafter refer to such successor.

### Section 11.5    Agent's Reliance, Etc.

Agent shall administer this Agreement and the other Loan Documents and service the Loan in accordance with the terms and conditions of this Agreement and with the same degree of care as the Agent would use in servicing a loan of similar size and type held for its own account; provided, however, that none of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement, except for its or their own gross negligence or willful misconduct. Without limiting the generality of the foregoing, Agent: (i) may consult with legal counsel (including counsel for Borrower), independent public accountants and other experts selected and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (ii) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with this Agreement; (iii) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement on the part of Borrower or to inspect the Property (including the books and records) of Borrower; (iv) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other instrument or document furnished pursuant hereto; and (v) shall incur no liability under or in respect of this Agreement by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopier, telegram, cable or telex) believed by it to be genuine and signed or sent by the proper party or parties.

### Section 11.6    Agent as a Lender.

With respect to Agent's ownership interest in the Loan and the Loan Documents as a Lender, Agent in its capacity as a Lender shall have the rights and powers of a Lender under this Agreement and the other Loan Documents as set forth herein and therein and may exercise the same as though it were not Agent. Agent in its capacity as a Lender and its affiliates may accept deposits from, lend money to, act as trustee under indentures of accept investment banking engagements from and generally engage in any kind of business with, Borrower, any of its affiliates and/or subsidiaries and any Person who may do business with or own securities of Borrower, any of its affiliates and/or subsidiaries, all as if such Lender were not the Agent and without any duty to account therefor to the other Lenders.

### Section 11.7    Distribution of Payments by Agent to Lenders.

Agent shall promptly distribute to each Lender its Ratable Share of any payment on account of principal or interest or any extension fee received by Agent by credit to an account of such Lender at Agent or by wire transfer to an account of such Lender in accordance with written wiring instructions received by Agent from such Lender, or to such other Person or in such other manner as such Lender may designate, provided any other designated account is maintained at a commercial bank located in the United States of America. If any payments are received by Agent after 11:00 a.m. (New York time), then provided Agent shall not be able to distribute to each Lender its Ratable Share of any such payment on the same day as such payment is received by Agent, Agent shall hold such payment to the extent not so distributed for the benefit of the respective Lenders ratably, shall invest any such Lender's Ratable Share not so distributed in overnight federal funds for the benefit of such Lender and such Lender shall be entitled to receive its Ratable Share of such payment together with interest earned thereon on the following Business Day. The provisions of this Section 11.7 are subject to the terms and conditions set forth in Section 2.10.4(c) as to any Defaulting Lender.

### Section 11.8    Indemnification of Agent by Lenders.

Each Lender severally agrees to indemnify the Agent (to the extent not promptly reimbursed by Borrower) from and against such Lender's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by the Agent under the Loan Documents; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross negligence or willful misconduct. Without limitation of the foregoing, each Lender agrees to reimburse the Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by Borrower hereunder or under any Loan Document, to the extent that the Agent is not promptly reimbursed for such costs and expenses by Borrower. The failure of any Lender to reimburse the Agent promptly upon demand for its ratable share of any amount required to be paid by the Lender to the Agent as provided herein shall not relieve any other Lender of its obligation hereunder to reimburse the Agent for its ratable share of such amount, but no Lender shall be responsible for

the failure of any other Lender to reimburse the Agent for such other Lender's ratable share of such amount. Without prejudice to the survival of any other agreement of any Lender hereunder, the agreement and obligations of each Lender contained in this Section 11.8 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

### Section 11.9      Assignment Upon Payment.

Upon repayment or prepayment of the Loan in full by Borrower in accordance with the terms of this Agreement and the other Loan Documents, Lenders shall, on a one-time basis, assign the Note and Agent shall assign the Mortgage, each without recourse, covenant or warranty of any nature, express or implied, (except if any Lender is not delivering the original Note, in which case such Lender shall execute and deliver a "lost note affidavit" in its customary form with respect to the copy of its Note) to such new mortgagee designated by Borrower (other than Borrower or a nominee of Borrower); provided that Borrower (i) has caused to be paid the reasonable out-of-pocket expenses of Agent and Lenders incurred in connection therewith and Agent's and Lenders' reasonable attorneys' fees for the preparation, delivery and performance of such an assignment and (ii) has provided such other information and documents which a prudent mortgagee would reasonably require to effectuate such assignment. Borrower shall be responsible for all mortgage recording taxes, recording fees and other charges payable in connection with any such assignment.

### Section 11.10      Servicer.

(a)     At the option of Agent, the Loan may be serviced by a servicer/trustee (the "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "**Servicing Agreement**") between Lender and Servicer. As of the date hereof, Servicer shall mean TriMont Real Estate Advisors, Inc., or any replacement servicer chosen by Lender in its sole discretion. Borrower shall be responsible for (i) any reasonable set-up fees or any other initial costs relating to or arising under the Servicing Agreement, (ii) reasonable monthly servicing fees due to the Servicer under the Servicing Agreement, (ii) reimbursement to Servicer of reasonable costs and expenses as and to the same extent (but without duplication) as Agent is entitled thereto under the applicable provisions of this Agreement and the other Loan Documents.

(b)     Upon notice thereof from Agent, Servicer shall have the right to exercise all rights of Lender and enforce all obligations of Borrower pursuant to the provisions of this Agreement, the Note and the other Loan Documents.

(c)     Provided Borrower shall have been given notice of Servicer's address by Lender, Borrower shall deliver to Servicer duplicate originals of all notices and other instruments which Borrower may or shall be required to deliver to Lender pursuant to this Agreement, the Note and the other Loan Documents (and no deliver of such notices or other instruments by Borrower shall be of any force or effect unless delivered to Lender and Servicer as provided above).

**Section 11.11   Loan Components and Creation of Subordinate Debt.**  Agent shall have the right, at Lender's sole cost and expense, at any time to convert a portion thereof into subordinate financing, including, but not limited to, mezzanine debt, subordinate debt or participations in the Loan (collectively, the "**Subordinate Loan**"), provided that (i) the aggregate principal amount of the Loan and the Subordinate Loan on the date of such adjustment shall equal the aggregate outstanding principal balance of the Loan immediately prior to such adjustment, (ii) the Loan and the Subordinate Loan (assuming both are fully funded) shall have an initial weighted average interest rate equal to the weighted average interest rate immediately prior to such adjustment (assuming full funding), (iii) the other terms and provisions of the Loan and the Subordinate Loan shall substantially remain unchanged, except for changes which are customary with respect to Subordinate Loan financing and (iv) the then current limited partners of Borrower and shareholders of Borrower's general partner shall convey their interests in Borrower to a subordinate loan borrower (the "**Subordinate Borrower**") that shall be a single-purpose, single-asset bankruptcy remote entity reasonably acceptable to Lender in exchange for substantially equivalent equity interests in the Subordinate Borrower.  Borrower shall cooperate with all reasonable requests of Lender in connection with any such adjustment of the Loan and shall execute and deliver such documents as shall reasonably be required by Lender in connection therewith.   All reasonable third party costs and expenses incurred by Lender in connection with this Section 11.11 and all reasonable out-of-pocket costs and expenses incurred by Borrower in connection with Borrower's complying with requests made under this Section 11.11 (excluding Borrower's out-of-pocket legal expenses exceeding $25,000.00) shall be paid by Lender; provided, however, that the foregoing shall not require Lender to pay or reimburse Borrower for any costs and expenses that Borrower would otherwise be required to pay or reimburse Lender under any other provision of this Agreement in the event that Agent had not converted a portion of the Loan to a Subordinate Loan.

**[NO FURTHER TEXT ON THIS PAGE]**

**[Signature Page to Construction Loan Agreement]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**GABLES MARQUIS, L.L.C.,**
a Florida limited liability company

By: _____
Name: Elie Berdugo, a/k/a Elie Berdougo
Title:  President

**[SIGNATURES CONTINUED ON NEXT PAGE]**

SL

[Signature Page to Construction Loan Agreement, continued]

AGENT:

**LEHMAN BROTHERS HOLDINGS INC., a
Delaware corporation**

By: _____

Name:   F. ROBERT BRUSCO

Title:

LENDER(S):

**LEHMAN BROTHERS HOLDINGS INC., a
Delaware corporation**

By: _____

Name:   F. ROBERT BRUSCO

Title:

Lending Office:
399 Park Avenue
New York, New York  10022

SL

## ACKNOWLEDGMENT

STATE OF FLORIDA        )
                        )
COUNTY OF *Palm Beach* )


The foregoing instrument was acknowledged before me this 14 day of November, 2005, by
Elie Berdugo, a/k/a Elie Berdougo, who is personally known to me or has produced a _____
_____ as identification.

Print Name: _____

Notary Public, State of Florida

Commission No.: _____

(if any)

Marlene M. Burns
Commission #DD279145
Expires: Jan 06, 2008
Bonded Thru
Atlantic Bonding Co., Inc.

My Commission Expires:

SL

STATE OF NEW YORK      )
                       : ss.:
COUNTY OF NEW YORK  )

On the _i 6_ day of November in the year 2005, before me, the undersigned, personally appeared _Robert Bruce_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

PERLA PRICE
NOTARY PUBLIC, State of New York
No. 01PR6086303
Qualified in New York County
Commission Expires January 21, 2007

Signature and Office of individual taking
acknowledgment

SL

## SCHEDULE I

### LENDERS' RATABLE SHARE

| Lender's Name | Ratable Loan Amount | Percentage/Ratable Share |
|---|---|---|
| **LEHMAN BROTHERS HOLDINGS INC.** | | **100%** |

{10327732:6}

## SCHEDULE II

**FORM OF BORROWER'S REQUISITION LETTER**
**Requisition No.**
**[Form - Construction Loans]**

| AGENT FOR LENDERS:<br>Lehman Brothers Holdings Inc. | BORROWER:<br>Gables Marquis, L.L.C. |
|---|---|
| DATE: | PREMISES: |
| PERIOD COVERED: _____ to | |

Pursuant to the Building Loan Agreement for the subject Loan, Borrower hereby authorizes and requests an advance, which is calculated as follows (below amounts obtained from Borrower's Requisition Spreadsheet):

| | | | |
|---|---|---|---|
| (1) | Amount Requisitioned for the Period Covered:[1] | | $_____ |
| (2) | Less interest/fees already capitalized for the Period Covered: | (_____) | |
| (3) | Amount of new loan proceeds (1-2): | | $_____ |
| (4) | Less Lender holdbacks for Reimbursements: | (_____) | |
| (5) | Net Amount of Wire (3-4): | | $_____ |

Borrower requests that the funds be wired on _____ [DATE] in accordance with the following wire instructions:

Amount:
Bank:
ABA #:
Account Name:
Account #:

---

[1]    The Amount Requisitioned for the Period Covered equals: Hard Costs net of retainage for the Period Covered plus Soft Costs for the Period Covered.

Attention:

In connection with and in order to induce Lender to advance the amount requested on the previous page, Borrower hereby represents, warrants and stipulates as follows:

1.     The amounts and percentages set forth on Borrower's Requisition Spreadsheet attached hereto are true and correct to the best of Borrower's knowledge.

2.     All sums previously requisitioned have been applied to the payment of the Hard and Soft Costs heretofore incurred.

3.     Names, addresses, contract dates and amounts for the Trade Contractors responsible for performing each item of Hard Costs listed on the Borrower's Requisition Spreadsheet have been heretofore or are herewith submitted to Lender and the Construction Consultant and copies of any Trade Contracts not previously delivered to Lender or the Construction Consultant are enclosed herewith.

4.     All change orders have been submitted to Lender and the Construction Consultant and all change orders for which an advance is requested hereby have been approved by Lender for funding to the extent required by the Building Loan Agreement.

5.     All "Payment Receipts" due as of the end of the period covered have been submitted to the Construction Consultant.

6.     Borrower acknowledges receipt of the following warning from Lender:

WARNING!

**YOUR LENDER IS MAKING A LOAN DISBURSEMENT DIRECTLY TO YOU AS THE BORROWER, OR JOINTLY TO YOU AND ANOTHER PARTY. TO PROTECT YOURSELF FROM HAVING TO PAY TWICE FOR THE SAME LABOR, SERVICES, OR MATERIALS USED IN MAKING THE IMPROVEMENTS TO YOUR PROPERTY, BE SURE THAT YOU REQUIRE YOUR CONTRACTOR TO GIVE YOU LIEN RELEASES FROM EACH LIENOR WHO HAS SENT YOU A NOTICE TO OWNER EACH TIME YOU MAKE A PAYMENT TO YOUR CONTRACTOR.**

Very truly yours,


Subscribed and sworn to
before me on _____, 20__.

_____
Notary Public


[Stamp and Seal]

GABLES MARQUIS, L.L.C.,
a Florida limited liability company


By: _____
|         |                                    |
| Name:   | Elie Berdugo, a/k/a Elie Berdougo   |
| Title:  | President                            |
| [Seal]  |                                     |

## SCHEDULE III

## INTENTIONALLY OMITTED

{10327732:6}

## SCHEDULE IV.

### INTENTIONALLY OMITTED

{10327732:6}

## SCHEDULE V

## INTENTIONALLY OMITTED

{10327732:6}

## SCHEDULE VI

## FORM OF APPLICATION AND CERTIFICATE FOR PAYMENT
(AIA DOCUMENT G702)

## APPLICATION AND CERTIFICATE FOR PAYMENT AIA DOCUMENT G702 (instructions on reverse side) PAGE ONE OF     PAGES

TO OWNER:                    PROJECT:                    APPLICATION NO.:                    Distribution to:
                                                         PERIOD TO:                              OWNER
                                                         PROJECT NOS.:                           ARCHITECT
                                                                                                 CONTRACTOR
FROM CONTRACTOR:             VIA ARCHITECT:             CONTRACT DATE:
CONTRACT FOR:

### CONTRACTOR'S APPLICATION FOR PAYMENT
Application is made for payment, as shown below, in connection with the Contract. Continuation Sheet, AIA Document G703 is attached.

1. ORIGINAL CONTRACT SUM . . . . . . . . . . . . . . . . .   $
2. Net change by Change Orders . . . . . . . . . . . . . .   $
3. CONTRACT SUM TO DATE (Line 1 ± 2) . . . . . . . . .   $
4. TOTAL COMPLETED & STORED TO DATE . . . . . . .   $
   (Column G on G703)
5. RETAINAGE:
   a. _____ % of Completed Work          $
      (Columns D + E on G703)
   b. _____ % of Stored Material         $
      (Column F on G703)
   Total Retainage (Line 5a + 5b or
   Total in Column I of G703) . . . . . . . . . . . . . . . .   $
6. TOTAL EARNED LESS RETAINAGE . . . . . . . . . . .   $
   (Line 4 less Line 5 total)
7. LESS PREVIOUS CERTIFICATES FOR PAYMENT . . . . . . . . . . . . .   $
   (Line 6 from prior Certificate)
8. CURRENT PAYMENT DUE . . . . . . . . . . . . . . . . .   | $ |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:

By: _____          Date: _____

State of:
County of:
Subscribed and sworn to before
me this              day of

Notary Public:
My Commission expires:

### ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

S-VI-1

{10327132;6}

**9. BALANCE TO FINISH, INCLUDING RETAINAGE**

(Line 3 less Line 6)    $

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | | |
| Total approved this Month | | |
| TOTALS | | |
| NET CHANGES by Change Order | | |

**AMOUNT CERTIFIED** ............ $

(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this Application and on the Continuation Sheet that are changed to conform to the amount certified.)

ARCHITECT:

By: _____ Date: _____

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

**G702-1992**

AIA DOCUMENT G702 • APPLICATION AND CERTIFICATE FOR PAYMENT • 1992 EDITION • AIA® • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

S-VIII-2

[10327732;6]

## SCHEDULE VII

## FORM OF ARCHITECT'S CERTIFICATE

### [Architect's Letterhead]

Gables Marquis, L.L.C.
7284 West Palmetto Park Road, Suite 106
Boca Raton, Florida 33433

Lehman Brothers Holdings Inc., as Agent
399 Park Avenue
New York, New York 10022

      Re:    Project:

      Location:  Miami, Florida

In connection with Draw No. __, the undersigned ("Architect") visited the site of the above referenced project on _____ (Insert Date).

The Architect hereby certifies that to the best of his knowledge, information and belief, work performed on site has progressed in accordance with the requirements of the contract documents and is in conformance with all applicable codes, regulations and laws. The Architect further certifies that he has no reason to believe that the project, upon completion, will not be able to receive all required permits to operate as its intended purpose pursuant to the contract documents.

Very truly yours,

Architect of Record, AIA

Stamp

{10327732:6}

## SCHEDULE VIII

## FORM OF BORROWING CERTIFICATE

Pursuant to subsection __ of the Construction Loan Agreement (the "Loan Agreement") dated _____, 2005, between Lehman Brothers Holdings Inc., as agent for itself and other co-lenders (collectively, "Lender"), Lender and Gables Marquis, L.L.C., (the "Borrower"), the undersigned [_____]of the Borrower hereby certifies as follows:

1.    The representations and warranties of the Borrower set forth in the Loan Agreement, or in any of the Loan Documents, any certificate, document or financial or any other statement furnished pursuant to or in connection with the Loan Agreement are true and correct on and as of the date hereof with the same effect as if made on the date hereof;

2.    Immediately prior to and immediately after the making of the Loan advance requested to be made pursuant to the current Loan Advance date, no Default or Event of Default shall have occurred and be continuing under the Loan Agreement;

3.    No part of the Collateral has been materially injured or damaged by any casualty or condemned or threatened with condemnation;

4.    No event has occurred which is likely to adversely and materially affect the ability of the Borrower to construct or to cause the construction of the Project in accordance with the terms and conditions of the Loan Agreement;

5.    The undersigned is a _____ of the Borrower, and the signature set forth on the signature line above such officer's name below is such officer's true and genuine signature;

6.    There are no liquidation or dissolution proceedings pending or to the knowledge of the undersigned threatened against the Borrower, nor has any other event occurred affecting or threatening the existence of the Borrower;

7.    The Borrower is a limited liability company duly organized and validly existing under the laws of the State of Florida and is duly qualified to do business in the State of Florida; and

8.    The Loan Documents have been duly executed and delivered by the Borrower and constitute the legal, valid and binding obligations of the Borrower, enforceable against it in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

{10327732:6}

All terms used in this Certificate that are defined in the Loan Agreement shall have the meanings given to them therein.

Date: _____

**BORROWER:**

GABLES MARQUIS, L.L.C.,
a Florida limited liability company,

By: _____
       Name:    Elie Berdugo, a/k/a Elie Berdougo
       Title:    President

## SCHEDULE IX

### FORM OF PAYMENT RECEIPT

TO:   The Borrower and General Contractor named below and Lehman Brothers Holdings Inc.,
as Agent

Period Ending ("Date") _____, 200 __

Re:   Borrower: Gables Marquis, L.L.C.
Lender: Lehman Brothers Holdings Inc.
Premises:
General Contractor:
Contract Work:
Contract Date:
Original Contract Amount: $
Change Order Amounts: $
Adjusted Contract Amount: $
Amount of Work Done to Date: $
Retainage Amount Not Yet Due: $
Net Amount Due to Date: $
Total Payments Received to Date: $

The undersigned contractor, subcontractor or supplier hereby acknowledges receipt of $_____ (in cash only and not in equivalents or other agreements) and aggregate payments equal to the Total Payments Received to Date stated above. These amounts represent payment in full for all amounts due for the Contract Work as of the Date of this Payment Receipt under our contract with the General Contractor or the Borrower identified above as increased or decreased by the Change Order Amounts also specified above excluding Retainage.

The undersigned hereby certifies that the amounts set forth are true and correct and acknowledges that there are no additional costs or claims for any extras or additions for labor and material on the above described Project other than those included in the Contract Amount and any Change Order Amounts set forth above.

Duly authorized, executed and delivered by the undersigned this ___ day of _____, 20__.

WITNESSED OR NOTARIZED BY:                    _____
                                              (Contractor, Subcontractor or Supplier)

(1) _____           By: _____

{10327732:6}

(2) _____

NOTE:  Fill Out Form Completely or it Will Not be Accepted.

## SCHEDULE X

## FORM OF ANTICIPATED COST REPORT

(See Attached.)

S-X-1

GABLES MARQUIS    .D & SOFT COST BUDGET

| Borrower: | Gables Marquis LLC | | | |
|---|---|---|---|---|
| Project: | Gables Marquis LLC | | | |
| Item No. | Item Description | BUDGETED AMOUNT | FUNDED AT OR PRIOR TO CLOSING | REMAINING TO BE FUNDED |
| **USES** | **Soft Costs:** | | | |
| | Land | 5,225,000.00 | 5,225,000.00 | 0.00 |
| | Land Appreciation | 2,740,000.00 | 2,740,000.00 | 0.00 |
| | | | | |
| | Architect and Consultants | 854,287.72 | 854,287.72 | 0.00 |
| | Architecture-Const Admin | 75,000.00 | 64,463.32 | 10,536.68 |
| | Wind Tunnel Study | 45,000.00 | 45,000.00 | 0.00 |
| | Builder's Risk | 375,000.00 | 99,400.88 | 275,599.12 |
| | Threshold Inspections | 120,000.00 | 76,000.00 | 44,000.00 |
| | Land Loan Interest | 455,265.38 | 455,265.38 | 0.00 |
| | Window and Roof Inspections | 60,000.00 | 0.00 | 60,000.00 |
| | Testing & Inspections | 50,000.00 | 5,340.00 | 44,660.00 |
| | Sales Trailer Design | 85,809.75 | 85,809.75 | 0.00 |
| | Rendering | 29,039.37 | 29,039.37 | 0.00 |
| | Market Study | 5,000.00 | 5,000.00 | 0.00 |
| | Economic Study | 10,000.00 | 10,000.00 | 0.00 |
| | Traffic Study | 17,515.00 | 17,515.00 | 0.00 |
| | Miscellaneous | 10,968.82 | 10,968.82 | 0.00 |
| | Survey, Soils & Envir Report | 47,281.60 | 47,281.60 | 0.00 |
| | Insurance | 858,720.00 | 337,773.35 | 520,946.65 |
| | Impact Fees | 1,105,963.28 | 1,105,963.28 | 0.00 |
| | Mezz Fee | 0.00 | | |
| | FAR Bonus Costs | 292,357.00 | 292,357.00 | 0.00 |
| | Interior Design | 74,961.02 | 74,961.02 | 0.00 |
| | Scale Model | 56,822.00 | 56,822.00 | 0.00 |
| | Doc Stamps | 152,250.00 | 152,250.00 | 0.00 |
| | Intangible Tax | 87,000.00 | 87,000.00 | 0.00 |
| | Title Insurance | 93,325.00 | 93,325.00 | 0.00 |
| | Sales and Marketing | 2,079,907.21 | 2,079,907.21 | 0.00 |
| | Future Commissions | 967,797.00 | 0.00 | 967,797.00 |
| | Title Closing Legal | 310,000.00 | 310,000.00 | 0.00 |
| | Loan Service Fees | 0.00 | 0.00 | 0.00 |
| | RE Taxes -2004- 2005 | 171,721.60 | 171,721.60 | 0.00 |
| | RE Taxes - 2006 | 100,000.00 | 0.00 | 100,000.00 |
| | Appraisal & Review | 9,550.00 | 9,550.00 | 0.00 |
| | Construction Loan Fees-Key | 0.00 | | |
| | Construction Loan Fee | 468,492.96 | 468,428.39 | 64.57 |
| | Interest Reserve-Mezz | 0.00 | | |
| | Construction Period Interest | 4,000,000.00 | 119,821.90 | 3,880,178.10 |
| | Plan & Cost/Inspections | 49,150.00 | 0.00 | 49,150.00 |
| | Interest Rate Cap | 242,400.00 | 0.00 | 242,400.00 |
| | Construction Consultant | 84,000.00 | 0.00 | 84,000.00 |
| | Broker's Fee | 532,539.65 | 532,339.05 | 200.60 |
| | Soft Cost Contingency | 400,000.00 | 99,999.24 | 300,000.76 |
| | **SUBTOTAL** | 22,342,124.37 | 15,862,590.88 | 6,479,533.48 |
| | **Hard Costs:** | | | |
| | Site Improvements | | | |
| | Building Costs | 39,481,791.00 | 4,049,216.53 | 35,432,574.47 |
| | Pending Insurance Change Order | -775,726.00 | 0.00 | -775,726.00 |
| | Owners Electric | 0.00 | 0.00 | 0.00 |
| | Owners Plumbing | 0.00 | 0.00 | 0.00 |
| | Owners Structural Wiring | 0.00 | 0.00 | 0.00 |
| | Owners Lobby Finishes | 0.00 | 0.00 | 0.00 |
| | Landscaping | 0.00 | 0.00 | 0.00 |
| | Awnings | 0.00 | 0.00 | 0.00 |
| | Signage | 0.00 | 0.00 | 0.00 |
| | Fountains | 0.00 | 0.00 | 0.00 |
| | Hard Cost Contingency | 1,245,360.00 | 0.00 | 1,245,360.00 |
| | **SUBTOTAL** | 39,951,425.00 | 4,049,216.53 | 35,902,208.47 |
| | **TOTAL USES** | 62,293,549.37 | 19,911,807.41 | 42,381,741.95 |

| **SOURCES** | Senior Loan | 46,842,839.49 | 75.20% | 4,461,097.54 | 42,381,741.95 |
|---|---|---|---|---|---|
| | Mezzanine Loan | 7,985,709.87 | 12.82% | 7,985,709.87 | 0.00 |
| | Imputed Land Value | 2,740,000.00 | 4.40% | 2,740,000.00 | 0.00 |
| | Borrower's Equity | 3,725,000.00 | 5.98% | 3,725,000.00 | 0.00 |
| | Sale of Retail | 1,000,000.00 | 1.61% | 1,000,000.00 | 0.00 |
| | **TOTAL SOURCES** | 62,293,549.37 | 100% | 19,911,807.42 | 42,381,741.95 |

## SCHEDULE XI

## FORM OF FINAL UNCONDITIONAL LIEN WAIVER AND RELEASE AND PAYMENT RECEIPT

TO:    The Borrower and Contractor named below and Lehman Brothers Holdings Inc., as Agent

Period Ending ("Date") _____, 20__

Re:    Borrower:  Gables Marquis, L.L.C.
       Lender:  Lehman Brothers Holdings Inc.
       Premises:
       General Contractor:
       Contract Work:
       Contract Date:
       Original Contract Amount:  $
       Change Order Amounts:  $
       Adjusted Contract Amount:  $
       Total Payments Received to Date:  $

The undersigned contractor, subcontractor or supplier hereby acknowledges receipt equal to the Total Payments Received to Date (in cash only and not in equivalents or other agreements) stated above and that this amount represents payment in full for all amounts due for the Contract Work under our contract with the General Contractor or the Borrower identified above as increased or decreased by the Change Order Amounts also above.

The undersigned hereby certifies that the amounts set forth are true and correct and acknowledges that there are no additional costs or claims for any extras or additions for labor and material on the above described Project.

The undersigned has been paid in full for all labor, services, supplies, equipment and materials furnished under the Contract Work. The undersigned, for itself, its successors and assigns and anyone else acting or claiming by or through it, hereby releases and waives entirely any mechanic's lien or other lien, stop notice, or any right against any labor or material bond, or claim to mechanic's lien or other lien, which the undersigned may now or hereafter have for all labor, materials, equipment, services and supplies furnished for use in or performed upon the above described Premises.

Duly authorized, executed and delivered by the undersigned this ____ day of _____, 20__.

WITNESSED OR NOTARIZED BY:

_____
(Contractor, Subcontractor or Supplier)

(1) _____    By:    _____

(2) _____

NOTE:  Fill Out Form Completely Or It Will Not Be Accepted.

## SCHEDULE XII

### FORM OF UNCONDITIONAL LIEN WAIVER
### AND RELEASE AND PAYMENT RECEIPT

TO:    The Borrower and Contractor named below and Lehman Brothers Holdings Inc., as
Agent

Period Ending ("Date") _____, 20__.

Re:    Borrower: Gables Marquis, L.L.C.
Lender: Lehman Brothers Holdings Inc.
Premises:
General Contractor:
Contract Work:
Contract Date:
Original Contract Amount: $
Change Order Amounts: $
Adjusted Contract Amount: $
Total Payments Received to Date: $
Final Payment Due: $

The undersigned contractor, subcontractor or supplier hereby acknowledges that upon receipt of the Final Payment Due (in cash only and not equivalents or other agreements), which will be added to the Total Payments Received to Date stated above, the total due under the contract and any and all change orders and/or claims will be paid in full. These amounts represent payment in full for all amounts due for the Contract Work under our contract for the Borrower and/or General Contractor/Construction Manger identified above as increased or decreased by the Change Order Amounts also specified above. A Final Unconditional Waiver of Lien and Release and Payment Receipt will be given upon delivery of the Final Payment Due stated above.

The undersigned hereby certifies that the amounts set forth are true and correct and acknowledges that there are no additional costs or claims for any extras or additions for labor and material on the above described Project other than those included in the Contract Amount and any Change Order Amounts set forth above.

The undersigned, upon receipt of the Final Payment Due, has been paid in full for all labor, services, supplies, equipment and materials furnished under the Contract Work. The undersigned, for itself, its successors and assigns and anyone else acting or claiming by or through it, hereby releases and waives entirely any mechanic's lien or other lien, stop notice, or any right against any labor or material bond, or claim to mechanic's lien or other lien, which the undersigned may now or hereafter have for all labor, materials, equipment, services and supplies furnished for use in or performed upon the above described Premises.

Duly authorized, executed and delivered by the undersigned this ___ day of _____, 20__.

WITNESSED OR NOTARIZED BY:

_____
(Contractor, Subcontractor or Supplier)

(1) _____     By: _____

(2) _____

# SCHEDULE XIII

## FUNDING STATEMENT

(See Attached.)

**Gables Marquis**
**Funding Reconciliation Sheet**
**November 17, 2005**

| | | |
|---|---|---|
| **Senior Loan Proceeds** | | |
| Senior Loan Amount | | 46,842,839.49 |
| **Senior Loan Holdbacks** | | |
| Interest Holdback | | 3,880,178.10 |
| Working Capital Holdback | | 38,501,563.85 |
| **Senior Loan Total Funds Available** | | 4,461,097.54 |
| | | |
| **Deductions:** | | |
| Origination Fee (Senior Loan) | 1.0% | 468,428.39 |
| Stub Interest (Senior Loan) | | 24,841.21 |
| **Subtotal Deductions** | | 493,269.60 |

**TOTAL WIRE FROM LEHMAN BROTHERS SENIOR LOAN**

| | |
|---|---|
| **Junior Mezzanine Loan Proceeds** | |
| Junior Mezzanine Loan Amount | 7,985,709.87 |
| Return of Deposit Less Expenses | 46,955.49 |

**TOTAL WIRE FROM LEHMAN BROTHERS MEZZANINE LOAN**

**TOTAL WIRES FROM LEHMAN BROTHERS TO TITLE**    12,000,493.31

## CAPITALIZATION

| | | |
|---|---|---|
| Senior Loan | 46,842,839.49 | 75.20% |
| Junior Mezzanine | 7,985,709.87 | 12.82% |
| Imputed Equity | 2,740,000.00 | 4.40% |
| Cash Equity | 3,725,000.00 | 5.98% |
| Sale of Retail | 1,000,000.00 | 1.61% |
| **Total** | 62,293,549.37 | 100.00% |

## HOLDBACKS

| | |
|---|---|
| Interest Holdback | 3,880,178.10 |
| Construction Holdback | 38,501,563.85 |

## INTEREST CALCULATION

| | |
|---|---|
| Index | 4.15938% |
| Spread | 3.00000% |
| Rate | 7.15938% |
| | |
| Senior Principal | 4,461,097.54 |
| Days | 28 |
| Interest Due | 24,841.21 |

## DEPOSIT RETURN

| | |
|---|---|
| Return of Deposit | 50,000.00 |
| LB T&E | (3,044.51) |
| Net Deposit to Title | 46,955.49 |
| | |
| CM&D | (22,214.40) |
| EMG Phase 1 | (2,300.00) |
| Paid from Title | (24,514.40) |
| | |
| Balance to Borrower | 22,441.09 |

## SCHEDULE XIV

## CONSENT AND AGREEMENT OF GENERAL CONTRACTOR

THIS CONSENT AND AGREEMENT OF GENERAL CONTRACTOR (this "**Agreement**") is made as of the ___ day of November, 2005, by **GABLES MARQUIS, L.L.C.,** a Florida limited liability company, having its principal place of business at 7284 West Palmetto Park Road, Suite 106, Boca Raton, Florida 33433 ("**Borrower**"), to **LEHMAN BROTHERS HOLDINGS INC.,** doing business as Lehman Capital, a division of Lehman Brothers Holdings Inc., a Delaware corporation, having an office at 399 Park Avenue, 8th Floor, New York, New York 10022 ("**Lender**"), and is acknowledged and consented to by **COSCAN CONSTRUCTION, LLC,** a _____, having its principal place of business at 5555 Anglers Avenue, Suite 1A, Fort Lauderdale, Florida 33312 (the "**General Contractor**").

## R E C I T A L S :

The Borrower represents and warrants the truth of the following recitals:

A.      **GABLES MARQUIS, L.L.C.,** a Florida limited liability company ("**Owner**"), is the owner of a fee simple interest in that certain parcel of real property located at 3232 Coral Way in the City of Miami, State of Florida, and more particularly described in Exhibit A attached hereto (said real property being herein collectively referred to as the "**Land**"; the Land, together with all structures, buildings and improvements now or hereafter located on the Land, being collectively referred to as the "**Property**").

B.      **GABLES MARQUIS I, L.L.C.,** a Delaware limited liability company ("**Mezzanine Borrower**"), is the sole member of, and holds 100% of the membership interests in, the Owner.

C.      **GABLES MARQUIS II, L.L.C.,** a Delaware limited liability company is a Member of, and holds 100% of the membership interests in, Mezzanine Borrower.

D.      **ELIE BERDUGO** a/k/a Elie Berdougo, is the sole member of, and holds 100% of the membership interests in, Member.

E.      Lender is prepared to make a loan (the "**Loan**") to Borrower in the principal amount of FORTY SIX MILLION EIGHT HUNDRED FORTY TWO THOUSAND EIGHT HUNDRED THIRTY NINE AND 49/100 ($46,842,839.49) Dollars, pursuant to that certain loan agreement (the "**Loan Agreement**") of even date herewith between Borrower and Lender to be evidenced by that certain secured promissory note of even date herewith in the principal amount of $46,842,839.49 made by Borrower to Lender (the "**Note**") and secured by, *inter alia,* a certain Mortgage, Assignment of Leases and Rents, Security Agreement, Fixture Filing and Notice of Future Advance, dated as of the date hereof, as more particularly described on Schedule 1 attached hereto and made a part hereof, granted by Owner in favor of the Lender ("**Security Instrument**"; the Security Instrument, together with any and all other documents

which evidence and secure the Loan, are collectively referred to herein as the "**Loan Documents**") on the Owner's interest in the Property and such other real and personal property covered by such Security Instrument.

F.    **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an address at 399 Park Avenue, 8th Floor, New York, New York 10022, as administrative agent (including, any of its successors and assigns, "**Agent**") for itself and other Lenders signatory hereto (collectively, together with any such other co-lenders as may exist from time to time, the "**Mezzanine Lender**") has simultaneously herewith made, or intends to make, a loan of up to SEVEN MILLION NINE HUNDRED EIGHTY FIVE THOUSAND SEVEN HUNDRED AND NINE AND 87/100 DOLLARS ($7,985,709.87) to Mezzanine Borrower (the "**Mezzanine Loan**") which loan is evidenced by that certain Secured Promissory Note dated as of the date hereof (the "**Mezzanine Note**") and secured by, among other things, those certain Membership Pledge and Security Agreements of even date herewith given by each Pledgor (as defined in pursuant to that certain loan agreement (the "**Mezzanine Loan Agreement**") of even date herewith between Mezzanine Borrower and Mezzanine Lender) in favor of Mezzanine Lender (the "**Pledge Agreements**").

G.    Pursuant to that certain Standard Form of Agreement Between Owner and Contractor made as of April 11, 2005, between Owner and General Contractor (the "**Construction Contract**"), a true and correct copy of which is attached hereto as Exhibit B, Owner employed General Contractor exclusively to render certain construction and construction management services in connection with the Project (as defined herein) and General Contractor is entitled to certain fees (the "**General Contractor Fees**") thereunder.

H.    Lender requires as a condition to the making of the Loan that Borrower and General Contractor enter into this Agreement.

## A G R E E M E N T :

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Definitions**. All capitalized terms used herein but not otherwise defined herein shall have the meaning ascribed to such terms in the Loan Agreement. As used in this Agreement, the following terms shall have the following meanings:

The term "**Project**" means the construction of "Gables Marquis Condominium", a mixed-use luxury residential condominium complex consisting of two (2) buildings, the first building containing eight (8) residential units and the second building, (being a twenty (20) story building including three stories of parking) containing one hundred sixty-nine (169) Residential Units and up to five (5) retail units, with approximately 332 parking spaces, all in accordance with and as more particularly set forth in the Plans and Specifications.

The term "**Plans and Specifications**" means, collectively, (i) the sets of design plans and specifications for the Project prepared by **COHEN, FREEDMAN, ENCINOSA & ASSOC. ARCHITECTS P.A.** (including any successor architect thereto, the "**Architect**") and its consultants and completed as of the date hereof, to the extent such plans and specifications have been reviewed and approved by Lender and are described in Exhibit E to the Loan Agreement (the "**Existing Plans and Specifications**"), and (ii) the sets of design plans and specifications to be completed by (a) the Architect and its consultants and (b) any subcontractor, pursuant to a design-build subcontract for the mechanical, plumbing, electrical and fire protection systems for the Project (the plans and specifications referred to in (b) above are referred to herein as "**Design-Build Plans and Specifications**"), for the remainder of the Project not covered by the Existing Plans and Specifications as reviewed and approved by Lender in accordance with the terms of the Loan Agreement. The term also includes any material modification of any of those plans, maps, sketches, diagrams, surveys, drawings, specifications or lists of materials if the modification is in writing and is initialed by Lender and Borrower or Architect.

The term "**New Improvements**" means all structures, buildings and improvements located on the Property, as same shall exist upon the completion of the Project in accordance with the Plans and Specifications.

The term "**Business Day**" means any weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York, New York, are authorized by law to be closed.

2.     **Estoppel**.  Each of General Contractor and Borrower represents and warrants for itself that (a) the Construction Contract is in full force and effect and has not been modified, amended or assigned, (b) neither General Contractor, Owner nor Borrower is in default under any of the terms, covenants or provisions of the Construction Contract and General Contractor knows of no event which, but for the passage of time or the giving of notice or both, would constitute an event of default under the Construction Contract, (c) neither General Contractor, Owner nor Borrower has commenced any action or given or received any notice for the purpose of terminating the Construction Contract and (d) all fees and other sums currently due to General Contractor under the Construction Contract have been paid in full.

3.     **Borrower's Covenants**.  Borrower hereby covenants with Lender that until such time as all outstanding amounts due under the Loan are paid in full: (a) Borrower shall not, and shall not permit Owner to, transfer the responsibility for construction services, and the management thereof, to be rendered pursuant to the Construction Contract from General Contractor to any other person or entity without prior written notification to Lender and the prior written consent of Lender, which consent shall not be unreasonably withheld by Lender; (b) Borrower shall not, and shall not permit Owner to, terminate or amend any of the terms or provisions of the Construction Contract without the prior written consent of Lender, which consent shall not be unreasonably withheld by Lender; and (c) Borrower shall, and shall cause Owner to, in the manner provided for in this Agreement, give notice to Lender of any notice or information that Borrower or Owner receives which indicates that General Contractor is terminating the Construction Contract or that General Contractor is otherwise discontinuing its construction and/or construction management services.  Owner executes this Agreement in order to consent to the performance of the terms of this Agreement by General Contractor.

4.     **Agreement by Borrower and General Contractor**.

(a)     Borrower and General Contractor hereby agree that upon the occurrence of an Event of Default (as defined in the Loan Agreement) under any of the Loan Documents, and at the option of Lender, exercised by written notice to Borrower and General Contractor: (i) General Contractor shall not collect, nor be entitled to receive, from Lender any General Contractor Fees or other fee due under the Construction Contract which is earned after the date of any notice delivered to General Contractor from Lender in accordance with Section 7(b)(ii) of this Agreement, unless Lender agrees in writing to pay such fees; and (ii) Lender may exercise its rights under this Agreement and may immediately terminate, or direct Borrower to immediately terminate, the Construction Contract.  In the event the Construction Contract shall be terminated as aforesaid, General Contractor shall not look to Lender, nor shall Lender be liable for payment of any termination fee or penalty, or for payment of General Contractor Fees for the period prior to such termination unless Lender has specifically agreed in writing to pay such General Contractor Fees.

(b)     Upon written request by Lender, General Contractor shall deliver within ten (10) Business Days of delivery of such request, a complete set of the Design-Build Plans and Specifications to Lender, at the cost of Lender, but such cost shall be limited to the actual cost of duplicating such Design-Build Plans and Specifications.

5.     **Lender's Right to Replace General Contractor**.  In addition to the foregoing, in the event that General Contractor becomes insolvent, Lender may exercise its rights

under this Agreement and direct Borrower to cause Owner to terminate the Construction Contract and to replace General Contractor with a general contractor or construction manager acceptable to Lender in Lender's sole and absolute discretion.

      6.    **Receipt of General Contractor Fees**. Borrower and General Contractor hereby agree that General Contractor shall not collect, nor be entitled to receive, from Lender any General Contractor Fees or other fee payable to General Contractor under the Construction Contract for and during any period of time after General Contractor has been notified by Lender that any Event of Default has occurred and is continuing; provided, however, that (i) General Contractor shall not be obligated to return or refund to Lender any General Contractor Fee or other fee already received by General Contractor prior to the occurrence of the Event of Default, and to which General Contractor was entitled under this Agreement; and (ii) upon receipt of written notice from Lender that an Event of Default has occurred under any of the Loan Documents, but subject to the terms of Section 7(b)(ii) hereof, General Contractor shall be entitled to immediately suspend all work.

      7.    **Consent and Agreements of General Contractor**.

      (a)    General Contractor hereby acknowledges and consents to this Agreement and agrees that General Contractor will act in conformity with the provisions of this Agreement and Lender's rights hereunder or otherwise related to the Construction Contract. General Contractor acknowledges that Lender is obligated under the Loan Agreement only to the Borrower and to no other person or entity. General Contractor is executing this Agreement to induce Lender to advance funds under the Loan Agreement, and General Contractor understands that Lender would not do so but for the execution and delivery of this Agreement by General Contractor.

      (b)    General Contractor hereby covenants and agrees as follows:

      (i)    During the Project as contemplated by the Loan Agreement, upon the request of Lender and at Lender's costs, the General Contractor will make available to Lender copies of all correspondence to or from Borrower, Owner or the subcontractors, and all other documentation and written instruments and reports, including all Design-Build Plans and Specifications, prepared for or by General Contractor with respect to the Project.

      (ii)    Upon receipt of written notice from Lender that an Event of Default has occurred under any of the Loan Documents, and provided that Lender has not exercised its termination rights as provided for under Section 4 of this Agreement, General Contractor shall continue performance on the Lender's behalf under the Construction Contract in accordance with the terms thereof, provided that General Contractor shall be reimbursed in accordance with the Construction Contract for all work, labor and material rendered on Lender's behalf by General Contractor following such notice.

      (iii)    In the event Owner defaults in making any payment or in performing any other obligation under the Construction Contract, General Contractor shall not, subject to subparagraph (B) herein, exercise any right under the Construction

Contract which entitles General Contractor to terminate the Construction Contract, or otherwise discontinue rendering construction and/or construction management services pursuant to the Construction Contract and, if General Contractor claims such an Owner default, General Contractor shall give Lender written notice of such default claim in the manner provided for in this Agreement within five (5) Business Days of General Contractor making such default claim ("**Notice of Default**"). After Notice of Default is given, Lender, at its option, may require the General Contractor to continue its performance on Lender's behalf under the Construction Contract in accordance with the terms thereof by giving General Contractor written notice ("**Notice to Continue**") as provided herein, provided that:

(A)   General Contractor shall be reimbursed in accordance with the Construction Contract, for all work, labor, and material rendered on the Lender's behalf following such Notice to Continue.

(B)   If General Contractor does not receive such Notice to Continue within ten (10) Business Days after Notice of Default is given by General Contractor, General Contractor shall have no further obligation to Lender under this Agreement.

(C)   General Contractor shall not perform work under any prospective material change order without first securing Lender's written consent to such change order.

(iv)   General Contractor shall not contest or impede the exercise by Lender of any right it has under or in connection with this Agreement.

8.   **Governing Law**. This Agreement shall be governed, construed, applied and enforced in accordance with the laws of the State of New York and the applicable laws of the United States of America.

9.   **Notices**. All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery or refusal of delivery, if delivered in person, (ii) one (1) Business Day (hereinafter defined) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Borrower:   Gables Marquis, L.L.C.
c/o E.B. Developers, Inc.
7284 West Palmetto Park Road, Suite 106
Boca Raton, Florida 33433
Attention: Mr. Richard Schuerger

with a copy to:   Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, Florida 33131

Attention: Ralph B. Bekkevold, Esq.

with a copy to:      Daniel Kaskel, Esq.
7284 West Palmetto Park Road
Suite 108
Boca Raton, Florida 33433

with a copy to:      Kodsi Law Firm
701 West Cypress Creek Road
Suite 303
Fort Lauderdale, Florida 33309
Attention: Steven Amster, Esq.

If to Lender:        Lehman Brothers Holdings Inc.
399 Park Avenue, 8th Floor
New York, New York  10022
Attention:  Mr. Michael J. Zito
MTS No.: VZ94
Asset No.: 1122901

With a copy to:      Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, New York  10019
Attention:  James J. Thomas, Esq.

With an additional
copy to Servicer:    TriMont Real Estate Advisors, Inc.
3424 Peachtree Road, N.E. – Suite 2200
Atlanta, Georgia 30326
Attention: Mr. J. Gregory Winchester
MTS No.: VZ94
Asset No.: 1122901

If to General
Contractor:          Coscan, Construction, LLC
5555 Anglers Avenue, Suite 1A
Fort Lauderdale, Florida 33312
Attention:

or addressed as such party may from time to time designate by written notice to the other parties.
Any party by notice to the other parties may designate additional or different addresses for
subsequent notices or communications.

10.    **No Oral Change**. This Agreement, and any provisions hereof, may not
be modified, amended, waived, extended, changed, discharged or terminated orally or by any act
or failure to act on the part of Borrower, Lender or General Contractor, but only by an agreement

in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

11. **Liability**. If Borrower or General Contractor consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Borrower, Lender and General Contractor and their respective successors and assigns forever.

12. **Inapplicable Provisions**. If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

13. **Headings, *Etc.*** The headings and captions of various paragraphs of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

14. **Duplicate Originals; Counterparts**. This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

15. **Number and Gender**. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

16. **Miscellaneous**. (a) Wherever pursuant to this Agreement (i) Lender exercises any right given to it to approve or disapprove, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

(b) Wherever pursuant to this Agreement it is provided that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, legal fees and disbursements of Lender, whether retained firms, the reimbursement for the expenses of in-house staff or otherwise.

(c) This Agreement and the other Loan Documents and the Obligations may, at the option of Lender, at any time until the same shall be fully paid and satisfied, be split or divided into two or more agreements; provided Borrower will only be obligated to make payments to a single servicer no matter how many note holders exist. To that end, Borrower and the General Contractor, upon written request of Lender, shall execute and deliver to Lender and/or its designee or designees (i) substitute agreements containing terms, provisions and clauses substantially similar to those contained herein and (ii) such other documents and instruments as may be required by Lender, provided Borrower's payment and

other obligations under the Loan Documents, and the General Contractor's obligations under this Agreement, are not affected, except to a de minimis extent, and Borrower is not required to make payments to more than a single loan servicer.

        (d)    Borrower and General Contractor each acknowledges that Lender may securitize the Note or any replacement notes, or otherwise sell, assign, transfer or convey, by pledge or otherwise, the Note or any replacement notes and all or any portion of the Lender's interest therein, or in the Loan evidenced by the Loan Documents, to third parties. In such event, in order to maximize the proceeds of such securitization or other sale, assignment, transfer or conveyance, Borrower and General Contractor shall fully cooperate with Lender, provided same does not change any material or economic terms of this Agreement or the other Loan Documents, or otherwise materially increase the obligations, or materially decrease the rights, of Borrower and General Contractor pursuant to this Agreement and the other Loan Documents.

        (e)    All third-party costs and expenses incurred by Lender in connection with a transaction contemplated by subparagraphs (c) and (d), shall be paid by Lender except that Lender shall have no obligation to pay any costs and expenses which Borrower would be otherwise obligated to pay pursuant to the Loan Agreement and the other Loan Documents had such transactions not occurred.

**[Remainder of Page Intentionally Left Blank;
Signature Page to Follow]**

**(Signature Page to Consent and Agreement of General Contractor)**

**IN WITNESS WHEREOF** the undersigned have executed this Agreement as of the date and year first written above.

**BORROWER:**

**GABLES MARQUIS, L.L.C.,**
a Florida limited liability company

By: _____
    Name:  Elie Berdugo, a/k/a Elie Berdougo
    Title:  President

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,**
a Delaware corporation

By:_____
    Name:
    Title:    Authorized Signatory

**GENERAL CONTRACTOR:**

**COSCAN CONSTRUCTION, LLC,**
a _____ limited liability company

By:_____
    Name: Michael R. Neal
    Title: President

**(Signatures continue on following page)**

**(Signature Page to Consent and Agreement of General Contractor, continued)**

**OWNER:**

**GABLES MARQUIS, L.L.C.,**
a Florida limited liability company


By: _____
      Name:  Elie Berdugo, a/k/a Elie Berdougo
      Title:  President

## EXHIBIT A

[Legal Description of Property Attached.]

A portion of Lots 4, 5, 6, 35, 36, 37, 38, 39, and 40, Block 4, AMENDED PLAT OF MIAMI
SUBURBAN ACRES, according to the plat thereof, as recorded in Plat Book 4, at Page 73 of the
Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Begin at the Southeast corner of said Lot 39, Block 4; thence North 90 degrees 00 minutes 00
seconds West along the South line of said Lots 38 and 39 for 100.03 feet to the Southwest corner
of said Lot 38, also being the Southeast corner of said Lot 37; thence North 00 degrees 02
minutes 47 seconds East along the West line of said Lot 38, also being the East line of said Lot
37 for 10.00 feet; thence North 90 degrees 00 minutes 00 seconds West along a line parallel with
and 10.00 feet North of the South line of said Lots 35, 36, and 37 for 150.04 feet to a point on the
West line of said Lot 35; thence North 00 degrees 02 minutes 05 seconds East along said West
line of Lot 35, and the West line of said Lot 6 for 254.97 feet to a point on a line that is 35.00
feet South of the North line of said Lot 6; thence South 89 degrees 59 minutes 48 seconds East
along said line that is 35.00 feet South of the North line of Lot 6 for 50.03 feet to a point on the
East line of said Lot 6, also being the West line of said Lot 5; thence North 00 degrees 02
minutes 05 seconds East along said East line of Lot 6 and said West line of Lot 5 for 1.32 feet to
a point on a line that is 50.00 feet South of and parallel with the North line of the Northwest 1/4
of Section 16, Township 54 South, Range 41 East for 100.06 feet to a point on the East line of
said Lot 4; thence South 00 degrees 02 minutes 47 seconds West along said East line of Lot 4 for
116.34 feet to the Southeast corner of said Lot 4; thence South 89 degrees 59 minutes 54 seconds
East along the North line of said Lots 38 and 39, for 100.05 feet to the Northeast corner of said
Lot 39, also being the Northwest corner of said Lot 40; thence South 00 degrees 03 minutes 16
seconds West along said West line of said Lot 40, also being said East line of Lot 39 for 50.00
feet; thence South 89 degrees 59 minutes 54 seconds East along a line 50.00 feet South of and
parallel with the North line of said Lot 40 for 46.89 feet; thence South 00 degrees 04 minutes 10
seconds East along said line that is 35.00 feet South of and parallel with the East line of the
Northwest 1/4 of Section 16, Township 54 South, Range 41 East for 49.98 feet; thence North 90
degrees 00 minutes 00 seconds West along a line 50.00 feet North of and parallel with the South
line of said Lot 40 for 47.00 feet to a point on said West line of Lot 40 and said East line of Lot
39; thence South 00 degrees 03 minutes 16 seconds West along said West line of Lot 40 and said
East line of said Lot 39 for 50.00 feet to the Point of Beginning.

## EXHIBIT B

### GENERAL CONTRACTOR'S CONSTRUCTION CONTRACT

[Attached.]

## SCHEDULE XV

## INTENTIONALLY OMITTED

## SCHEDULE XVI

### INTENTIONALLY OMITTED

<u>SCHEDULE XVII</u>

**CONSENT AND AGREEMENT OF ARCHITECT**

**THIS CONSENT AND AGREEMENT OF ARCHITECT** (this "**Agreement**") is made as of the 14th day of November, 2005, by **GABLES MARQUIS, L.L.C.**, a Florida limited liability company, having its principal place of business at 7284 West Palmetto Park Road, Suite 106, Boca Raton, Florida 33433 ("**Borrower**"), to **LEHMAN BROTHERS HOLDINGS INC.**, doing business as Lehman Capital, a division of Lehman Brothers Holdings Inc., a Delaware corporation, having an office at 399 Park Avenue, 8th Floor, New York, New York 10022 ("**Lender**"), and is acknowledged and consented to by COHEN, FREEDMAN, ENCINOSA & ASSOC. ARCHITECTS P.A., a _____, having its principal place of business at 8085 N.W. 155th Street, Miami, Florida 33016 ("**Architect**").

**R E C I T A L S :**

A.    **GABLES MARQUIS, L.L.C.**, a Florida limited liability company ("**Owner**"), is the owner of a fee simple interest in that certain parcel of real property located at 3232 Coral Way in the City of Miami, State of Florida, and more particularly described in Exhibit A attached hereto (said real property being herein collectively referred to as the "**Land**"; the Land, together with all structures, buildings and improvements now or hereafter located on the Land, being collectively referred to as the "**Property**").

B.    **GABLES MARQUIS I, L.L.C.**, a Delaware limited liability company ("**Mezzanine Borrower**"), is the sole member of, and holds 100% of the membership interests in, the Owner.

C.    **GABLES MARQUIS II, L.L.C.**, a Delaware limited liability company ("**Member**"), is a member of, and holds 100% of the membership interests in, Mezzanine Borrower.

D.    **ELIE BERDUGO** a/k/a Elie Berdougo ("**Berdugo**") is the sole member of, and holds 100% of the membership interests in, Member.

E.    Lender is prepared to make a loan (the "**Loan**") to Borrower in the principal amount of [$_____], pursuant to that certain loan agreement (the "**Loan Agreement**") of even date herewith between Borrower and Lender to be evidenced by that certain secured promissory note of even date herewith in the principal amount of [$_____] made by Borrower to Lender (the "**Note**") and secured by, inter alia, a certain Mortgage, Assignment of Leases and Rents, Security Agreement, Fixture Filing and Notice of Future Advance, dated as of the date hereof, as more particularly described on Schedule 1 attached hereto and made a part hereof, granted by Owner in favor of the Lender ("**Security Instrument**"; the Security Instrument, together with any and all other documents which evidence and secure the Loan, are collectively referred to herein as the "**Loan Documents**") on *the Owner's interest* in the Property and such other real and personal property covered by such Security Instrument.

F.    **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an address at 399 Park Avenue, 8th Floor, New York, New York 10022, as administrative agent (including, any of its successors and assigns, "**Agent**") for itself and other Lenders signatory hereto (collectively, together with any such other co-lenders as may exist from time to time, the "**Mezzanine Lender**") has simultaneously herewith made, or intends to make, a loan of up to [$_____] to Mezzanine Borrower (the "**Mezzanine Loan**") which loan is evidenced by that certain Secured Promissory Note dated as of the date hereof (the "**Mezzanine Note**") and secured by, among other things, those certain Membership Pledge and Security Agreements of even date herewith given by each Pledgor (as defined in pursuant to that certain loan agreement (the "**Mezzanine Loan Agreement**") of even date herewith between Mezzanine Borrower and Mezzanine Lender) in favor of Mezzanine Lender (the "**Pledge Agreements**").

G.    Pursuant to that certain Standard Form of Agreement Between Owner and Architect with Standard Form of Architect Services made as of the 19th of April 2002, between Owner and Architect (the "**Architect's Agreement**"), a true and correct copy of which is attached hereto as Exhibit B, Owner employed Architect to render certain architectural and engineering services, all as more specifically set forth in the Architect's Agreement, in connection with the Project (as defined herein), and Architect is entitled to certain fees and expenses (the "**Architect Fees**") thereunder.

H.    Lender requires as a condition to the making of the Loan that Borrower enter into, and Architect consent to, this Agreement.

## A G R E E M E N T:

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Definitions**. All capitalized terms used herein but not otherwise defined herein shall have the meaning ascribed to such terms in the Loan Agreement. As used in this Agreement, the following terms shall have the following meanings:

The term "**Project**" shall mean the construction of a mixed-use luxury residential condominium complex consisting of two (2) buildings, the first building containing eight (8) Residential Units and the second building, being a twenty (20) story building (including six (6) levels of parking), containing one hundred sixty-nine (169) Residential Units up to five (5) Retail Units (consisting of approximately 4,100 square feet of total retail space), seventy-five (75) storage units located within the parking levels, and approximately three hundred thirty-one (331) parking spaces ("**Spaces**") of which nine (9) Spaces are dedicated to handicapped use in accordance with the American With Disabilities Act, sixteen (16) Spaces are dedicated to the Retail Units, seventeen (17) Spaces are dedicated to guest parking, one hundred twenty-four (124) Spaces are for sale to Residential and Retail Unit owners of the building, and the remaining one hundred and sixty-five (165) Spaces are dedicated to the Residential Units, all in accordance with and as more particularly set forth in the Plans and Specifications.

{10327732:6}                                         S-XVII-2

The term "**Plans and Specifications**" means, collectively, (i) the sets of design plans and specifications for the Project prepared by Architect and its consultants, and completed as of the date hereof, to the extent such plans and specifications have been reviewed and approved by Lender and are described in Exhibit E to the Loan Agreement (the "**Existing Plans and Specifications**"), and (ii) the set of design plans and specifications to be completed by the Architect and its consultants in accordance with the terms of the Architect's Agreement for the remainder of the Project not covered by the Existing Plans and Specifications, as reviewed and approved by Lender in accordance with the terms of the Loan Agreement. The term also includes any material modification of any of those plans and specifications, if the modification is in writing and is initialed by Lender and Borrower or Architect.

The term "**New Improvements**" means all structures, buildings and improvements located on the Property, as same shall exist upon the completion of the Project in accordance with the Plans and Specifications.

The term "**Business Day**" means any weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York, New York, are authorized by law to be closed.

2.     **Estoppel.** Each of Architect and Borrower represents for itself that (a) the Architect's Agreement is in full force and effect and has not been modified, amended or assigned, (b) neither Architect, Owner nor Borrower is in default under any of the terms, covenants or provisions of the Architect's Agreement and Architect knows of no event which, but for the passage of time or the giving of notice or both, would constitute an event of default under the Architect's Agreement, (c) neither Architect, Owner nor Borrower has commenced any action or given or received any notice for the purpose of terminating the Architect's Agreement and (d) the Architect Fees and all other sums currently due and payable to the Architect under the Architect's Agreement have been paid in full.

3.     **Borrower's Covenants.** Borrower hereby covenants with Lender that until such time as all outstanding amounts due under the Loan are paid in full: (a) Borrower shall not, and shall not permit Owner to, transfer the responsibility for the architectural services to be rendered pursuant to the Architect's Agreement from Architect to any other person or entity without prior written notification to Lender and the prior written consent of Lender, which consent may be withheld by Lender in Lender's sole discretion; (b) Borrower shall not, and shall not permit Owner to, terminate or amend any of the terms or provisions of the Architect's Agreement without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed; and (c) Borrower shall, and shall cause Owner to, in the manner provided for in this Agreement, give notice to Lender of any notice or information that Borrower or Owner receives which indicates that Architect is terminating the Architect's Agreement or that Architect is otherwise discontinuing its architectural services as provided for in the Architect's Agreement. Owner executes this Agreement in order to consent to the performance of the terms of this Agreement by the Architect.

4.     **Agreement by Borrower and Architect.**

(a)     Borrower and Architect hereby agree that upon the occurrence of an Event of Default (as defined in the Loan Agreement) under any of the Loan Documents, and at the option of Lender, exercised by written notice to Borrower and Architect, (i) Architect shall

not collect nor be entitled to receive any Architect Fees or other fee due under the Architect's Agreement from Lender unless Lender agrees in writing to pay such fees; and (ii) Lender may exercise its rights under this Agreement and may immediately terminate, or direct Borrower to cause Owner to immediately terminate, the Architect's Agreement and require Architect to transfer its responsibility for the furnishing of its professional services to an architect selected by Lender in Lender's sole and absolute discretion. In the event the Architect's Agreement shall be terminated as aforesaid, Architect shall not look to Lender, nor shall Lender be liable for payment of any termination fee or penalty, or for payment of any Architect Fees for the period prior to such termination unless Lender has specifically agreed in writing to pay such Architect Fees.

(b)     In addition, in the event Lender, at any time following the occurrence of an Event of Default, elects to pay all Architect Fees due to the Architect for architectural and engineering services rendered by the Architect in accordance with the terms of the Architect's Agreement, upon such payment, Lender shall have full ownership of the Plans and Specifications and shall be entitled to exclusive use thereof. In such a case, and upon written request by Lender, Architect shall deliver, within ten (10) Business Days of delivery of such request, a complete set of Plans and Specifications to Lender, at the cost of Lender, but such cost shall be limited to the actual cost of duplicating such Plans and Specifications.

5.      **Lender's Right to Replace Architect**. In addition to the foregoing, in the event that Architect becomes insolvent, Lender may exercise its rights under this Agreement and direct Borrower to cause Owner to terminate the Architect's Agreement and to replace Architect with an architect acceptable to Lender in Lender's sole and absolute discretion.

6.      **Receipt of Architect Fees**. Borrower and Architect hereby agree that Architect shall not collect nor be entitled to receive any Architect Fees or other fee payable to Architect under the Architect's Agreement for and during any period of time after Architect has been notified by Lender that any Event of Default has occurred and is continuing; provided, however, that (i) Architect shall not be obligated to return or refund to Lender any Architect Fee or other fee already received by Architect prior to the occurrence of the Event of Default, and to which Architect was entitled under this Agreement; and (ii) upon receipt of written notice from Lender that an Event of Default has occurred under any of the Loan Documents, but subject to the terms of Section 7(c)(ii) hereof, Architect shall be entitled to immediately suspend all work.

7.      **Consent, Representations and Agreements of Architect**.

(a)     Architect hereby acknowledges and consents to this Agreement and agrees that Architect will act in conformity with the provisions of this Agreement and Lender's rights hereunder or otherwise related to the Architect's Agreement. Architect acknowledges that Lender is obligated under the Loan Agreement only to the Borrower and to no other person or entity. Architect is executing this Agreement to induce Lender to advance funds ' under the Loan Agreement, and Architect understands that Lender would not do so but for Architect's execution and delivery of this Agreement.

(b)     Architect hereby represents to Lender as follows:

(i)    Architect prepared the Plans and Specifications or such Plans and Specifications were prepared by its consultants, and Architect is responsible for such Plans and Specifications.

(ii)    Based upon Architect's knowledge, information and belief, after due inquiry, the New Improvements, if constructed in accordance with the Plans and Specifications, and upon issuance of all necessary temporary or permanent certificates of occupancy, will comply with all laws applicable to the design of the Project including, without limitation, applicable provisions of the zoning and building codes of the City of Boston, State of Massachusetts.

(iii)    Based upon Architect's knowledge, information and belief, after due inquiry, all on-site and off-site infrastructures, including but not limited to water, required sewage systems and all other utilities, which are necessary for the Project can and will be completed and will be available for the operation of the New Improvements.

(iv)    Notwithstanding any other written or oral agreement or understanding between Architect and Owner or any other party to the contrary, the professional services for which the Architect has been engaged by Owner are fully embodied in and evidenced by the Architect's Agreement, and such professional services do not include any construction services.

(c)    Architect hereby covenants and agrees as follows:

(i)    During the Project, upon the request of Lender, the Architect will make available to Lender copies of all correspondence to or from Borrower, Owner, the general contractor for the Project, and all other documentation and written instruments and reports prepared by Architect with respect to the design and construction of the Project.

(ii)    Upon receipt of written notice from Lender that an Event of Default has occurred under any of the Loan Documents, and provided that Lender has not exercised its termination rights as provided for under Section 4 of this Agreement, Architect shall continue performance on the Lender's behalf under the Architect's Agreement in accordance with the terms thereof, provided that (a) Architect shall be reimbursed in accordance with the Architect's Agreement for all architectural and engineering services rendered by Architect pursuant to the terms of the Architect's Agreement on Lender's behalf following such notice, and (b) any Architect Fees which are due and payable pursuant to the Architect's Agreement, but remain unpaid as of the date of such notice, shall have been paid to Architect.

(iii)    In the event Owner defaults in making any payment or in performing any other obligation under the Architect's Agreement, Architect shall not, subject to subparagraph (B) herein, exercise any right under the Architect's Agreement which entitles Architect to terminate the Architect's Agreement or otherwise discontinue rendering architectural and engineering services pursuant to the Architect's Agreement unless (i) Architect has delivered written notice of such default (which notice shall describe the default in reasonable detail) to Lender in the manner provided for in this

Agreement within ten (10) Business Days of Architect becoming aware of such default ("**Notice of Default**"), and (ii) a period of ten (10) Business Days from the date of Lender's receipt of such Notice of Default within which Lender would have the opportunity (but not the obligation) to cure such default (the "**Cure Period**") shall have expired. The Cure Period shall be extended for a reasonable period of time not to exceed thirty (30) days if Lender shall have commenced steps to cure such default with such Cure Period but the default is of a nature which cannot be cured within such Cure Period. After Notice of Default is given, Lender, at its option, may require the Architect to continue its performance on Lender's behalf under the Architect's Agreement in accordance with the terms thereof by giving Architect written notice as provided herein, provided that:

(A)     Architect shall be (1) reimbursed in accordance with the Architect's Agreement for all architectural and engineering services rendered by Architect pursuant to the terms of the Architect's Agreement on Lender's behalf following such notice, and (2) any Architect Fees which are due and payable pursuant to the Architect's Agreement, but remain unpaid as of the date of such notice, shall have been paid to Architect.

(B)     If Architect does not receive such written notice within ten (10) Business Days after Notice of Default is given by Architect, Architect shall have no further obligation to Lender under this Agreement.

(C)     Architect shall not agree to any change in services to be rendered by the Architect pursuant to the Architect's Agreement or perform any work under the Agreement based upon a Change Order (as defined in the Architect's Agreement) or a Construction Change Directive (as defined in the Architect's Agreement) which shall result in a material increase in Architect Fees payable to Architect pursuant to the terms of the Architect's Agreement without, in each case, first securing Lender's written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(iv)     In the event that the responsibility for the architectural services at the Property is transferred from Architect in accordance with the provisions hereof, Architect shall, and hereby agrees to, fully cooperate in transferring its responsibility to a new architect and effectuate such transfer no later than thirty (30) days from the date the Architect's Agreement is terminated.

(v)     Architect shall not contest or impede the exercise by Lender of any right it has under or in connection with this Agreement.

8.     **Governing Law.** This Agreement shall be governed, construed, applied and enforced in accordance with the laws of the State of New York and the applicable laws of the United States of America.

9.     **Notices.** All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) *Business Day (hereinafter defined)* after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited

in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Borrower: | Gables Marquis, L.L.C.<br>c/o E.B. Developers, Inc.<br>7284 West Palmetto Park Road, Suite 106<br>Boca Raton, Florida 33433<br>Attention: Mr. Richard Schuerger |
| with a copy to: | Greenberg Traurig, P.A.<br>1221 Brickell Avenue<br>Miami, Florida 33131<br>Attention: Ralph B. Bekkevold, Esq. |
| with a copy to: | Daniel Kaskel, Esq.<br>7284 West Palmetto Park Road<br>Suite 108<br>Boca Raton, Florida 33433 |
| with a copy to: | Kodsi Law Firm<br>701 West Cypress Creek Road<br>Suite 303<br>Fort Lauderdale, Florida 33309<br>Attention: Steven Amster, Esq. |
| If to Lender: | Lehman Brothers Holdings Inc.<br>399 Park Avenue, 8th Floor<br>New York, New York 10022<br>Attention: Mr. Michael J. Zito<br>MTS No.: VZ94<br>Asset No.: 1122901 |
| With a copy to: | Windels Marx Lane & Mittendorf, LLP<br>156 West 56th Street<br>New York, New York 10019<br>Attention: James J. Thomas, Esq. |
| With an additional copy to Servicer: | TriMont Real Estate Advisors, Inc.<br>3424 Peachtree Road, N.E. – Suite 2200<br>Atlanta, Georgia 30326<br>Attention: Mr. J. Gregory Winchester<br>MTS No.: VZ94<br>Asset No.: 1122901 |

If to Architect:    Cohen, Freedman, Encinosa & Assoc. Architects
P.A.
8085 N.W 155th Street
Miami, Florida 33016
Attention:

or addressed as such party may from time to time designate by written notice to the other parties. Any party by notice to the other parties may designate additional or different addresses for subsequent notices or communications.

10.    **No Oral Change**.  This Agreement, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower, Lender or Architect, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

11.    **Liability**.  If Borrower or Architect consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several.  This Agreement shall be binding upon and inure to the benefit of Borrower, Lender and Architect and their respective successors and assigns forever.

12.    **Inapplicable Provisions**.  If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

13.    **Headings, *Etc*.**  The headings and captions of various paragraphs of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

14.    **Duplicate Originals; Counterparts**.  This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement.  The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

15.    **Number and Gender**.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

16.    **Miscellaneous**.  (a) Wherever pursuant to this Agreement (i) Lender exercises any right given to it to approve or disapprove, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

(b)     Wherever pursuant to this Agreement it is provided that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, legal fees and disbursements of Lender, whether retained firms, the reimbursement for the expenses of in-house staff or otherwise.

(c)     This Agreement and the other Loan Documents and the Obligations may, at the option of Lender, at any time until the same shall be fully paid and satisfied, be split or divided into two or more agreements; provided Borrower will only be obligated to make payments to a single servicer no matter how many note holders exist. To that end, Borrower and the Architect, upon written request of Lender, shall execute and deliver to Lender and/or its designee or designees (i) substitute agreements containing terms, provisions and clauses substantially similar to those contained herein and (ii) such other documents and instruments as may be required by Lender, provided Borrower's payment and other obligations under the Loan Documents, and the Architect's obligations under this Agreement, are not affected, except to a de minimis extent, and Borrower is not required to make payments to more than a single loan servicer.

(d)     Borrower and Architect each acknowledges that Lender may securitize the Note or any replacement notes, or otherwise sell, assign, transfer or convey, by pledge or otherwise, the Note or any replacement notes and all or any portion of the Lender's interest therein, or in the Loan evidenced by the Loan Documents, to third parties. In such event, in order to maximize the proceeds of such securitization or other sale, assignment, transfer or conveyance, Borrower and Architect shall fully cooperate with Lender, provided same does not change any material or economic terms of this Agreement or the other Loan Documents, or otherwise materially increase the obligations, or materially decrease the rights, of Borrower and Architect pursuant to this Agreement and the other Loan Documents.

(e)     All third-party costs and expenses incurred by Lender in connection with a transaction contemplated by subparagraphs (c) and (d), shall be paid by Lender except that Lender shall have no obligation to pay any costs and expenses which Borrower would be otherwise obligated to pay pursuant to the Loan Agreement and the other Loan Documents had such transactions not occurred.

**[Remainder of Page Intentionally Left Blank;
Signature Page to Follow]**

**(Signature Page to Consent and Agreement of Architect)**

IN WITNESS WHEREOF the undersigned have executed this Agreement as of the date and year first written above.

**BORROWER:**

**GABLES MARQUIS, L.L.C.,**
a Florida limited liability company

By: _____
    Name:  Elie Berdugo, a/k/a Elie Berdougo
    Title:  President

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,**
a Delaware corporation

By:_____
    Name:
    Title:      Authorized Signatory

**ARCHITECT:**

**COHEN, FREEDMAN, ENCINOSA & ASSOC.
ARCHITECTS P.A., a _____**

By:_____
    Name:
    Title:

**(Signatures continue on following page)**

**(Signature Page to Consent and Agreement of Architect, continued)**

**OWNER:**

**GABLES MARQUIS, L.L.C.,**
a Florida limited liability company

By: _____
    Name:  Elie Berdugo, a/k/a Elie Berdougo
    Title:  President

## EXHIBIT A

[Legal Description of Property Attached.]

A portion of Lots 4, 5, 6, 35, 36, 37, 38, 39, and 40, Block 4, AMENDED PLAT OF MIAMI
SUBURBAN ACRES, according to the plat thereof, as recorded in Plat Book 4, at Page 73 of the
Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Begin at the Southeast corner of said Lot 39, Block 4; thence North 90 degrees 00 minutes 00
seconds West along the South line of said Lots 38 and 39 for 100.03 feet to the Southwest corner
of said Lot 38, also being the Southeast corner of said Lot 37; thence North 00 degrees 02
minutes 47 seconds East along the West line of said Lot 38, also being the East line of said Lot
37 for 10.00 feet; thence North 90 degrees 00 minutes 00 seconds West along a line parallel with
and 10.00 feet North of the South line of said Lots 35, 36, and 37 for 150.04 feet to a point on the
West line of said Lot 35; thence North 00 degrees 02 minutes 05 seconds East along said West
line of Lot 35, and the West line of said Lot 6 for 254.97 feet to a point on a line that is 35.00
feet South of the North line of said Lot 6; thence South 89 degrees 59 minutes 48 seconds East
along said line that is 35.00 feet South of the North line of Lot 6 for 50.03 feet to a point on the
East line of said Lot 6, also being the West line of said Lot 5; thence North 00 degrees 02
minutes 05 seconds East along said East line of Lot 6 and said West line of Lot 5 for 1.32 feet to
a point on a line that is 50.00 feet South of and parallel with the North line of the Northwest 1/4
of Section 16, Township 54 South, Range 41 East for 100.06 feet to a point on the East line of
said Lot 4; thence South 00 degrees 02 minutes 47 seconds West along said East line of Lot 4 for
116.34 feet to the Southeast corner of said Lot 4; thence South 89 degrees 59 minutes 54 seconds
East along the North line of said Lots 38 and 39, for 100.05 feet to the Northeast corner of said
Lot 39, also being the Northwest corner of said Lot 40; thence South 00 degrees 03 minutes 16
seconds West along said West line of said Lot 40, also being said East line of Lot 39 for 50.00
feet; thence South 89 degrees 59 minutes 54 seconds East along a line 50.00 feet South of and
parallel with the North line of said Lot 40 for 46.89 feet; thence South 00 degrees 04 minutes 10
seconds East along said line that is 35.00 feet West of and parallel with the East line of the
Northwest 1/4 of Section 16, Township 54 South, Range 41 East for 49.98 feet; thence North 90
degrees 00 minutes 00 seconds West along a line 50.00 feet North of and parallel with the South
line of said Lot 40 for 47.00 feet to a point on said West line of Lot 40 and said East line of Lot
39; thence South 00 degrees 03 minutes 16 seconds West along said West line of Lot 40 and said
East line of said Lot 39 for 50.00 feet to the Point of Beginning.

# EXHIBIT B

## ARCHITECT'S AGREEMENT

[Attached.]

## SCHEDULE XVIII

### INTENTIONALLY OMITTED

{10327732:6}

## SCHEDULE XIX

## FORM OF REQUISITION AUTHORIZATION STATEMENT

Date:  As of [DATE]

Re:    Building Loan Agreement (the "Agreement"), of even date herewith
among Lehman Brothers Holdings Inc., ("Agent"), the Lenders signatory
thereto ("Lenders") and Gables Marquis, L.L.C. ("Borrower").

The undersigned Borrower hereby unconditionally authorizes any one of the persons whose
names and signatures appear below to execute and submit Requests for Disbursement of
[DESCRIPTION OF DISBURSEMENT] to Agent for the benefit of the Lenders under the
Agreement with the identical force and effect in all respects as if executed and submitted by
Borrower. No revocation or modification of the foregoing authorization shall be effective until
written notice thereof from Borrower shall have been actually received by
[_____], Vice President, of Lehman Brothers Holdings Inc., at 399 Park
Avenue, New York, New York 10022.


_____          _____
[Name]                               [Signature]


_____          _____
[Name]                               [Signature]


_____          _____
[Name]                               [Signature]


_____          _____
[Name]                               [Signature]

**BORROWER:**


**GABLES MARQUIS, L.L.C.,**
A Florida limited liability company


By: _____
                Name:    Elie Berdugo, a/k/a Elie Berdougo
                Title:     President


      This is to certify that this Requisition Authorization Statement was executed in my presence on the date hereof (a) by the parties whose signatures appear above in the capacities indicated on behalf of the above-named Borrower and (b) by the other parties whose signatures appear above.


_____
Notary Public


My Commission Expires:

_____

## SCHEDULE XX

### BORROWER'S CHIEF EXECUTIVE OFFICE ADDRESS, JURISDICTION OF ORGANIZATION AND FEDERAL EMPLOYER'S IDENTIFICATION NUMBER

Chief Executive Office:            7284 West Palmetto Park Road, Suite 106, Boca Raton, FL 34433

Jurisdiction of Organization:      Florida

Employer's Identification Number:  54-2071438

## SCHEDULE XXI

**FORM OF DUAL OBLIGEE AND MODIFICATION RIDER TO BONDS**

(See Attached.)

## LENDER'S DUAL OBLIGEE RIDER TO
## [PERFORMANCE] [LABOR AND MATERIAL PAYMENT] BOND

WHEREAS, on or about the _____ day of _____, 2005, _____, as Contractor, and [_____], as Owner entered into a written agreement for the construction of Gables Marquis Condominium according to the plans and specifications of _____, Architect, herein referred to as the Contract, and

WHEREAS, Contractor and _____, as Surety, made, executed and delivered to Owner their joint and several [Performance] [Labor and Material Payment] Bond, herein referred to as the Bond and

WHEREAS, Owner has arranged for a loan for the payment and performance of the Contract and, in connection therewith, has requested that Contractor and Surety join with Owner in the execution and delivery of this Rider to the Bond, and Contractor and Surety are willing to do so on the terms and conditions contained herein,

NOW, THEREFORE, in consideration of One Dollar and other good and valuable considerations, receipt of which is hereby acknowledged, the undersigned hereby agree that the Bond shall be and is hereby amended as follows:

Lehman Brothers Holdings Inc., as agent for itself and other co-lenders as may exist from time to time, as mortgagee, as Lender, shall be added to the Bond as a named Obligee.

Notwithstanding anything contained herein to the contrary, there shall be no liability on the part of the Contractor or Surety under the Bond to the Owner or Lender, unless the Owner or Lender shall make payments to the Contractor, or to the Surety in case it arranges for completion of the Contract upon default of the Contractor, in accordance with the terms of said Contract as to payments, and shall perform all the other obligations required to be performed under said Contract at the time and in the manner therein set forth.

The aggregate liability of Surety under the Bond to Owner and Lender, as their interests may appear, is limited to the penal sum of said Bond. The Surety shall make any payments under said Bond by check issued jointly to Owner and Lender, provided any payments made after Lender makes any payment to Contractor or Surety shall be made by check issued solely to Lender.

Surety further agrees that in the event of any default by Owner in the performance of Owner's obligations to Contractor under the Contract, Contractor or Surety shall cause written notice of such default to be given to Lender and Owner specifying said default in detail, and Lender and Owner shall have thirty (30) days after receipt of such notice within which to cure such default, or such additional period of time as may be reasonably required if the nature of such default is such that it cannot be cured within thirty (30) days. Performance by Lender shall be deemed to be performance by Owner. Notice of default shall be sent by certified or registered U.S. mail, return receipt requested, first class postage prepaid, to Lender and to Owner.

As herein modified, said Bond shall be and remain in full force and effect.

SIGNED, SEALED AND DATED this ___ day of _____, 2005.

SURETY:                                    CONTRACTOR:

_____          _____

Countersigned by:                          OWNER:

_____          _____

AGENT FOR LENDERS:

LEHMAN BROTHERS HOLDINGS INC.

By:_____
    Name:
    Title:

## SCHEDULE XXII

### SCHEDULE OF PRESOLD UNITS

(See attached.)

{10327732:6}

## SCHEDULE XXIII

### LIST OF AFFILIATE CONTRACTS

Broker's Agreement dated November 17, 2005, between E.B. Management Company, as Broker, and Borrower, as Project Owner.

Architect's Agreement, as amended, dated April 19, 2002, between Cohen, Freedman, Encinosa & Assoc. Architects P.A., as Architect and EB Developers, Inc., as Owner.

General Contractor's Agreement dated April 11, 2005, between Coscan Construction, LLC, as Contractor, and Borrower, as Owner.

Consultant's Agreement dated June 6, 2005, between IBA Consultants, Inc., as Provider, and Borrower.

Management Agreement dated December 30, 2002, between Continental Association Management, Inc., as Consultant, and E.B. Developers, as Owner.

## SCHEDULE XXIV

**AFFILIATE FEES**

See Broker's Agreement.

## EXHIBIT A

### THE LAND

A portion of Lots 4, 5, 6, 35, 36, 37, 38, 39, and 40, Block 4, AMENDED PLAT OF MIAMI SUBURBAN ACRES, according to the plat thereof, as recorded in Plat Book 4, at Page 73 of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Begin at the Southeast corner of said Lot 39, Block 4; thence North 90 degrees 00 minutes 00 seconds West along the South line of said Lots 38 and 39 for 100.03 feet to the Southwest corner of said Lot 38, also being the Southeast corner of said Lot 37; thence North 00 degrees 02 minutes 47 seconds East along the West line of said Lot 38, also being the East line of said Lot 37 for 10.00 feet; thence North 90 degrees 00 minutes 00 seconds West along a line parallel with and 10.00 feet North of the South line of said Lots 35, 36, and 37 for 150.04 feet to a point on the West line of said Lot 35; thence North 00 degrees 02 minutes 05 seconds East along said West line of Lot 35, and the West line of said Lot 6 for 254.97 feet to a point on a line that is 35.00 feet South of the North line of said Lot 6; thence South 89 degrees 59 minutes 48 seconds East along said line that is 35.00 feet South of the North line of Lot 6 for 50.03 feet to a point on the East line of said Lot 6, also being the West line of said Lot 5; thence North 00 degrees 02 minutes 05 seconds East along said East line of Lot 6 and said West line of Lot 5 for 1.32 feet to a point on a line that is 50.00 feet South of and parallel with the North line of the Northwest 1/4 of Section 16, Township 54 South, Range 41 East for 100.06 feet to a point on the East line of said Lot 4; thence South 00 degrees 02 minutes 47 seconds West along said East line of Lot 4 for 116.34 feet to the Southeast corner of said Lot 4; thence South 89 degrees 59 minutes 54 seconds East along the North line of said Lots 38 and 39, for 100.05 feet to the Northeast corner of said Lot 39, also being the Northwest corner of said Lot 40; thence South 00 degrees 03 minutes 16 seconds West along said West line of said Lot 40, also being said East line of Lot 39 for 50.00 feet; thence South 89 degrees 59 minutes 54 seconds East along a line 50.00 feet South of and parallel with the North line of said Lot 40 for 46.89 feet; thence South 00 degrees 04 minutes 10 seconds East along said line that is 35.00 feet West of and parallel with the East line of the Northwest 1/4 of Section 16, Township 54 South, Range 41 East for 49.98 feet; thence North 90 degrees 00 minutes 00 seconds West along a line 50.00 feet North of and parallel with the South line of said Lot 40 for 47.00 feet to a point on said West line of Lot 40 and said East line of Lot 39; thence South 00 degrees 03 minutes 16 seconds West along said West line of Lot 40 and said East line of said Lot 39 for 50.00 feet to the Point of Beginning.

## EXHIBIT B

### BORROWER'S ORGANIZATIONAL CHART

(See Attached.)

## ORGANIZATIONAL STRUCTURE CHART FOR GABLES MARQUIS, L.L.C.



**GABLES MARQUIS, L.L.C.**
(Project Owner/Senior Loan Borrower)
(FL)

**GABLES MARQUIS I, L.L.C.**
(Mezzanine Borrower)
(DE)

**GABLES MARQUIS II, L.L.C.**
(Member)
(DE)

**ELIE BERDUGO**
(an individual, sole member of Member)
(Florida)

## EXHIBIT C

### FORM OF ASSIGNMENT OF INTEREST RATE PROTECTION AGREEMENT

(See Attached.)

## ASSIGNMENT OF INTEREST RATE PROTECTION AGREEMENT

**THIS ASSIGNMENT OF INTEREST RATE PROTECTION AGREEMENT,** dated as of November ___, 2005 (this "**Assignment**") is made by **GABLES MARQUIS, L.L.C.**, a Florida limited liability company, having its principal place of business at 7284 West Palmetto Park Road, Suite 106 Boca Raton, Florida 33433 ("**Assignor**") in favor of **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation ("**Lehman**"), having an address at 399 Park Avenue, New York, New York 10022, as agent (including any of its successors and assigns, "**Agent**"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned such terms in that certain Construction Loan Agreement dated as of the date hereof (as amended, modified or supplemented and in effect from time to time, the "**Loan Agreement**") by and among Assignor, Agent and the lenders signatory thereto (collectively, "**Lenders**").

1. Assignor hereby collaterally assigns and transfers to Agent for the benefit of the Lenders and their respective successors and assigns (collectively, "**Assignee**"), as collateral, all of its interest, whether now owned or hereafter acquired, now existing or hereafter arising, wherever located, in, to and under each of those certain interest rate protection agreements identified on **Schedule I** annexed hereto with the counterparty identified on said **Schedule I** ("**Counterparty**"), as supplemented by the related confirmation, as amended from time to time ("**Interest Rate Protection Agreement**"), and Assignor hereby grants to Assignee a security interest in and to the Interest Rate Protection Agreement and all proceeds (as defined in Section 9-315(1) of the Uniform Commercial Code adopted in the State of New York (the "**UCC**")) thereof, to have and to hold the same, unto Assignee. This Assignment constitutes additional security for the obligations (collectively, the "**Obligations**") of Assignor arising pursuant to the Loan Agreement and the other Loan Documents. Notwithstanding anything to the contrary herein contained, Agent shall have no obligation to make any payments under the Interest Rate Protection Agreement.

2. The Counterparty to the Interest Rate Protection Agreement, by its execution of this Assignment, hereby consents to the above collateral assignment and the other terms hereof (including, without limitation, the second sentence of Paragraph 4 hereof), and Assignor and Counterparty agree that, so long as any Obligations remain unsatisfied, the Counterparty will make any payments to become payable under or pursuant to the Interest Rate Protection Agreement directly to Assignee until such time as this Assignment is terminated or otherwise canceled, at which time the Counterparty will be instructed to make payments to or on behalf of Assignor. Notwithstanding the foregoing, upon the occurrence and during the continuance of any Event of Default, Assignor shall be entitled to receive any payments under the Interest Rate Protection Agreement (other than a payment by reason of a Termination Event under (and as defined in) the Interest Rate Protection Agreement), and the Counterparty shall continue to make such payments directly to Assignor until such time as the Counterparty shall have been given notice by Assignee that an Event of Default shall have occurred and such Event of Default is continuing. All amounts paid to Assignee pursuant to the terms hereof arising out of the assignment of the Interest Rate Protection Agreement shall be deposited into an

account designated by the Agent and distributed in accordance with the provisions of the Loan Agreement.

3. Notwithstanding the last sentence of paragraph 2 hereof, upon the occurrence of an Event of Default and for so long as such Event of Default is continuing, Assignee shall be entitled to exercise all remedies in respect of the collateral hereby assigned provided in the UCC.

4. Assignor hereby covenants and agrees that Assignor shall not, without first obtaining Assignee's written consent, convey, assign, sell, mortgage, encumber, pledge, hypothecate, grant a security interest in, grant an option or options with respect to, or otherwise dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration) any Interest Rate Protection Agreement except to the extent expressly permitted under the Loan Agreement. Assignor and Counterparty hereby covenant and agree that until such time as this Assignment is terminated pursuant to paragraph 6 hereof, Assignor and Counterparty shall not, without first obtaining Assignee's written consent, amend or modify in any material respect or, cancel or terminate the Interest Rate Protection Agreement or such portion thereof as remains subject to this Assignment.

5. If Assignee receives any payments under the Interest Rate Protection Agreement (other than a payment by reason of a Termination Event under (and as defined in) the Interest Rate Protection Agreement) and no Event of Default exists under the Loan Agreement, Assignee shall promptly deposit same in a cash collateral account pursuant to the Loan Agreement and apply the same on an Interest Payment Date against accrued and unpaid interest on the Loan. If Assignee receives any payments under the Agreement during the existence of an Event of Default under the Loan Agreement or by reason of a Termination Event under the Agreement, Assignee shall have the right to hold same, to deposit same in such cash collateral account or to apply same to any portion of the Debt (as defined in the Loan Agreement) in any order it desires or, if the Agreement has been partially or wholly terminated, to apply same to the cost of acquiring another interest rate protection agreement in form and substance, and from a counterparty, satisfactory to Assignee in all respects.

6. This Assignment shall terminate upon the payment and performance in full of the Obligations, and upon such termination Assignee shall release this Assignment.

7. This Assignment shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine.

8. This Assignment shall be binding upon and shall inure to the benefit of Assignor, its successors and permitted assigns and Assignee. Agent may transfer its rights under this Assignment to any successor Agent under the Loan Agreement.

9. This Assignment may be amended or modified only by a written instrument signed by the parties hereto.

10. This Assignment may be executed in any number of counterparts, each of which shall be an original but all of which shall constitute one instrument.

11. This Assignment is a Loan Document executed pursuant to the Loan Agreement and shall (unless otherwise expressly indicated herein) be construed, administered and applied in accordance with the terms and provisions thereof.

12. Wherever possible each provision of this Assignment shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Assignment shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Assignment.

13. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute a single assignment.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**[Signature Page to Assignment of Interest Rate Protection Agreement]**

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the day and year first above written.

**ASSIGNOR:**

**GABLES MARQUIS, L.L.C.,**
a Florida limited liability company

By: _____
      Name:   Elie Berdugo, a/k/a Elie Burdougo
      Title:    President

**ASSIGNEE:**

**LEHMAN BROTHERS HOLDINGS INC.,**
a Delaware corporation, as Agent

By: _____
      Name:
      Title:

**[COUNTERPARTY SIGNATURE CONTINUED ON NEXT PAGE.]**

**Counterparty**:

The provisions of this Assignment are
hereby acknowledged:

_____

By:_____
    Name:
    Title:

## SCHEDULE I

## INTEREST RATE PROTECTION AGREEMENT(S)

## EXHIBIT D

## FORM OF ASSIGNMENT AND ACCEPTANCE

Reference is made to that certain: Construction Loan Agreement, dated as of [_____, 2005] (as same may be amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), which are between Gables Marquis, L.L.C., a Florida limited liability company ("Borrower"), and Lehman Brothers Holdings Inc., a Delaware corporation, individually and as agent ("Agent") for the lenders to the Loan Agreement from time to time (collectively with Agent, "Lender") and that certain Promissory Note, dated as of [_____, 2005], (the "Note") by Borrower in favor of Lender. Capitalized terms not defined herein shall have the meanings ascribed to them in the Loan Agreement.

The "Assignor" and the "Assignee" referred to on Schedule 1 attached hereto agree as follows:

1.    The Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, an interest in and to the Assignor's rights and obligations under the Loan Agreement, the Note and the Mortgage (but if Assignor is Agent, such assignment shall not include any of Agent's rights or obligations as agent) as of [_____] equal to the percentage interest specified on Schedule 1 attached hereto of all rights and obligations under the Loan Agreement, Mortgage and Note with respect to such interest. After giving effect to such sale and assignment, the amount of the Loan and the Note owing to the Assignee will be as set forth on Schedule 2 attached hereto. Such sales and assignment is without recourse to Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by the Assignor.

2.    The Assignor (i) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, the Loan Documents or any other instrument or document furnished pursuant thereto, and (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrower or Guarantor or the performance or observance by Borrower or Guarantor of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; and (iv) attaches the Note or Notes held by the Assignor and requests that Agent cause Borrower to exchange such Note or Notes for a new Note or Note payable to the order of the Assignee in an amount equal to the principal amount of the Loan assumed by the Assignee pursuant hereto or new Note payable to the order of the Assignee in an amount equal to the principal amount of the Loan assumed by the Assignee pursuant hereto and the Assignor in an amount equal to the principal amount of the Loan retained by the Assignor under the Loan Agreement, respectively, as specified on **Schedule 1** hereto.

3.     The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Lender under the Loan Agreement; (b) if it is a foreign Lender, attached to this Assignment and Acceptance is any documentation required to be delivered by it pursuant to the terms of the Loan Agreement, duly completed and executed by the Assignee; (c) confirms that it has received a copy of the Loan Agreement, Mortgage and Note, together with such financial statements and other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (d) agrees that it will, independently and without reliance upon Lender or the Assignor based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Mortgage or the Note; (e) appoints and authorizes Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are given to Agent by the terms thereof, together with such powers and discretion as are reasonably incidental thereto; and (f) agrees that it will perform in accordance with their terms all of the obligations from by the terms of the Mortgage and the Note are required to be performed by it as an assignee of an interest therein.

4.     Following the execution of this Assignment and Acceptance, it will be delivered to Agent for acceptance and recording by Agent.   The effective date for this Assignment and Acceptance (the "Effective Date") shall be the date of acceptance hereof by the Agent, unless otherwise specified on Schedule 1 attached hereto.

5.     Upon such acceptance and recording by Agent, as of the Effective Date, (i) the Assignee shall be a party to the Loan Agreement, and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of an assignee thereof and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Loan Agreement arising after the Effective Date other than, if Assignor is also Agent, its agency obligations thereunder and under the other Loan Documents.

6.     Upon such acceptance and recording by Agent, from and after the Effective Date, Agent shall make all payments under the Loan Agreement and Note or Notes in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest and other amounts with respect thereto) to the Assignee whether such amounts have accrued prior to after the Effective Date.   The Assignor and the Assignee shall make all appropriate adjustments in payments under the Loan Agreement, Mortgage and Note, or notes for periods prior to the Effective Date directly between themselves.

7.     This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York.

8.     This Assignment and Acceptance may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of **Schedule 1** to this Assignment

and Acceptance by telecopier shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.

       9.    This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.

       IN WITNESS WHEREOF, the Assignor and the Assignee have caused Schedule 1 to this Assignment and Acceptance to be executed by their officers thereunto duly authorized as of the date specified thereon.

*   *

### SCHEDULE 1
#### to
### ASSIGNMENT AND ACCEPTANCE

As to the Loan in respect of which an interest is being assigned:

Percentage interest assigned: _____%

Assignee's Commitment $_____

Aggregate outstanding principal amount of the Loan assigned: $_____

Principal amount of Note payable to Assignee: $_____

Principal amount of Note payable to Assignor: $_____

Effective Date (if other than date of acceptance by Agent):
* _____ __, 200__

**ASSIGNOR:**

**[NAME OF ASSIGNOR]**, as Assignor

By:_____ _____
    Name:
    Title:

Dated: _____ __, 200_

**ASSIGNEE:**

**[NAME OF ASSIGNEE]**, as Assignee

By: _____
    Name:
    Title:

Dated: _____ __, 200_

---

\* This date should be no earlier than five Business Days after the delivery of this Assignment and Acceptance to the Lender.

Accepted this _____ day of _____, 200_

**AGENT:**

Lehman Brothers Holdings Inc., as Agent

By: _____
    Name:
    Title:

## SCHEDULE 2

### RATABLE PORTIONS OF LOAN
### AFTER GIVING AFFECT TO ASSIGNMENT AND ACCEPTANCE

| Lender's Name | Ratable Loan Amount | Percentage/Ratable Share |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS INC. | $[_____] | 100% |
| | $[_____] | [__]% |
| | $[_____] | [__]% |

## **EXHIBIT F**

### **INTENTIONALLY OMITTED**

## EXHIBIT G

## FORM OF AMENDMENT TO GUARANTY

## N/A

## EXHIBIT H

**FEES OF CONSTRUCTION CONSULTANT**

**N/A**