**Hearing Date and Time: March 17, 2010 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: March 12, 2010 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                                    :
**In re**                                                           :        **Chapter 11 Case No.**
                                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :        **08-13555 (JMP)**
                                                                    :
                                   **Debtors.**                     :        **(Jointly Administered)**
                                                                    :
-------------------------------------------------------------------x

**NOTICE OF DEBTORS' MOTION PURSUANT**
**TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE FOR**
**AUTHORIZATION TO ENGAGE OMNIUM LLC AS BUSINESS PROCESS OUTSOURCER**

**PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "Motion") of Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases (together, the "Debtors"), pursuant to sections 105(a) and 363(b) of title 11 of the United States Code, for authorization to engage Omnium LLC as business process outsourcer, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York, 10004 (the "Bankruptcy Court"), on **March 17, 2010 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Richard P. Krasnow, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the

Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis; Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the official committee of unsecured creditors appointed in these cases; and (v) Omnium LLC, 131 South Dearborn Street, Chicago, IL 60603, Attn: Michael R. Weiner, Esq., General Counsel, so as to be so filed and received by no later than **March 12, 2010 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: February 23, 2010
      New York, New York

                              /s/ Richard P. Krasnow
                              Richard P. Krasnow

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007

                              Attorneys for Debtors
                              and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                                                              :
**In re**                                                     :     **Chapter 11 Case No.**
                                                              :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,                  :     **08-13555 (JMP)**
                                                              :
                                        **Debtors.**          :     **(Jointly Administered)**
                                                              :
-----------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO**
**SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE FOR**
**AUTHORIZATION TO ENGAGE OMNIUM LLC AS FUND ADMINISTRATOR**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

              Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors in possession (together with LBHI, the

"Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this Motion and

respectfully represent:

**Preliminary Statement**

              1.     Prior to the Commencement Date, Lehman operated its businesses under a

unified information technology infrastructure that made available equipment, software, and data

to perform multiple front-office tasks, such as valuations and investment management decisions

for various asset classes, including loans, derivatives and commodities, as well as middle- and

back-office tasks, such as maintaining records of asset-based transactions and providing office

management support.  The infrastructure was utilized by Lehman personnel with expertise and

intimate familiarity with the relevant technology and software to provide internal support to

Lehman's businesses and to manage asset portfolios of, and provide related services to, Lehman's

clients, including institutional portfolios, mutual funds, alternative investments and private

accounts.

2.      On September 20, 2008, the Court entered an order approving an asset

purchase agreement dated September 16, 2008 (the "Purchase Agreement"), as amended and

clarified from time to time, between certain of the Debtors, Lehman Brothers Inc. and Barclays

Capital Inc. ("BarCap") and the various transactions contemplated therein [Docket No. 258].  In

connection with the Purchase Agreement, Lehman's information technology infrastructure was

sold to BarCap, and the key Lehman personnel dedicated to the maintenance and administration

of Lehman's information technology infrastructure transferred to BarCap.  The Debtors,

however, continue to require access to the infrastructure to administer their estates and manage

and service the assets of their businesses.  As a result, the Debtors currently depend on BarCap's

obligations under a Transition Services Agreement, dated September 22, 2008 (the "TSA"),

between BarCap and the Debtors for such services.  With certain exceptions, the TSA expires on

March 22, 2010.

3.      The Debtors will require access to data processing and workflow

automation support services (the "Services") beyond the expiration of the TSA, and believe that

it would be cost-effective and less time consuming to outsource their requirements to a third-

party service provider.  According to the Debtors' projections, such outsourcing can save the

Debtors' estates an average of approximately $13,500,000 annually through 2011, while

providing the Debtors with a more efficient platform than what is currently available under the TSA.

4.        In light of these potential savings, the Debtors determined that it is necessary to transition the Services to a third party vendor as expeditiously as possible. Accordingly, the Debtors filed a motion with this court to approve an interim consulting agreement (the "Interim Agreement") with Omnium LLC ("Omnium"), formerly known as Citadel Solutions LLC, that was intended to allow the Debtors to begin the transition process while they solicited long term bids for the services from Omnium and other third party service providers.  This Court approved the Interim Agreement on August 5, 2009.  [Docket No. 4717]. The Debtors have now concluded that process and have determined that Omnium is the best party with whom to have such a long term relationship.  The Debtors, therefore, seek approval of an agreement with Omnium that will establish that relationship.

**Background**

5.        Commencing on September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.        On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed a statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

7.       Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to these chapter 11 filings is contained in the Affidavit

of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District

of New York in Support of First-Day Motions and Applications, filed on September 15, 2008

[Docket No. 2].

## Jurisdiction

8.       This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Relief Requested

9.       Following negotiations with Omnium and others, the Debtors, subject to

court approval, entered into that certain Master Services Agreement (the "MSA") with Omnium

on February 12, 2010.  The Debtors now seek authorization and approval of their entry into the

MSA pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule

6004(h), on the terms and conditions described therein.  A copy of the MSA is attached hereto as

Exhibit A.  Although the Debtors believe that their engagement of Omnium is ordinary course

under section 363(c)(1) of the Bankruptcy Code, they are seeking this relief out of an abundance

of caution.  The Debtors further request that, pursuant to Bankruptcy Rule 6004(h), any order

granting the requested relief be effective immediately upon entry.

## The Debtors' Data Processing and Workflow Automation Requirements

10.       As indicated above, the Debtors currently require, and will continue to

require, access to data processing and workflow automation services to administer their estates,

in particular, their loan, derivative, real estate, principal investments and commodities books.

Subsequent to the transfer of the information technology and expert Lehman personnel to

BarCap, the Debtors considered operating their businesses independent of the BarCap-controlled

Lehman legacy infrastructure, but determined that it would be more costly and time consuming to recreate the infrastructure and retain personnel with expertise in providing such services. As a result, the Debtors have relied on BarCap's obligations under the TSA to provide the technology and personnel necessary to operate their businesses.

11.    The Debtors and their restructuring advisors, Alvarez and Marsal North America, LLC ("A&M"), have determined that outsourcing their data processing and workflow automation needs would reduce the costs of administering their estates. Accordingly, the Debtors undertook an extensive analysis to identify the optimal company to provide the requisite support services. Together with their relevant business teams, they defined applicable requirements and identified a set of ten (10) third-party providers of data processing and workflow automation services for further consideration. Upon consideration of information submitted by each provider, the Debtors narrowed the field to four parties. The Debtors engaged in information-sharing sessions, observed solution demonstrations, and conducted multiple site visits with each of the four providers. The Debtors and their business teams evaluated the reliability, scalability, extensibility and financial charges of each administrator's services and offerings as well as the financial stability of the administrators.

12.    Omnium emerged as the leading candidate to replace BarCap as a long-term provider of data processing and workflow automation support. Its platform is well adapted to be readily deployed for the administration of all classes of assets held by Lehman; it is already providing certain functionalities, such as the support and pricing of commodity assets that other providers would have had to develop over time; and it has exceeded the Debtors expectations with respect to transitioning the Debtors' asset portfolios onto its platform pursuant to the Interim Agreement.

13.     The MSA includes Omnium's agreement to provide technology to

support, among other things, trade capture, affirmation, confirmation, settlement and

reconciliation, tracking of corporate actions, over-the-counter derivative processing, fund

accounting and reporting.  In connection therewith, Omnium will host a database to act as the

definitive reference for information regarding certain classes of assets held in the Debtors'

estates. For other classes of assets, Omnium will maintain an environment hosted at a third party

data center solely for the Debtors.

14.     The MSA provides that the engagement of Omnium will be subject to

fees calculated on a time and materials basis.  Omnium's hourly rate will be benchmarked

against the average cost for the type of services provided by other administrators and service

providers in this industry and range from $225 an hour for staff members to $750 for managing

directors during the implementation phase of Omnium's services and from $175 to $500 after the

initial transition to the Omnium-provided environment.  In addition, Omnium and its employees

and agents will be reimbursed for all reasonable out-of-pocket travel, meal and lodging expenses.

The Debtors believe that the engagement of Omnium pursuant to the MSA is appropriate and

necessary to enable the Debtors to operate their businesses, minimize the costs of administration

of their estates, and execute faithfully their duties as debtors and debtors in possession.  Omnium

is well qualified and able to provide the requested services.

### Basis for Relief Requested

15.     The Debtors seek authorization to engage and compensate Omnium

pursuant to section 363(b) of the Bankruptcy Code, which provides in relevant part that "[t]he

trustee, after notice and a hearing, may use…, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  Bankruptcy Code section 105(a) further provides

that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

16.      Under applicable case law in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved.  *See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring an "articulated business justification"); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, the court defers to the trustee's judgment so long as there is a "legitimate business justification"); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).

17.      It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is a strong presumption that "'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

18.      Sound business reasons support the Debtors' engagement of Omnium.  As set forth above, prior to the Debtors' engagement of Omnium under the Interim Agreement, they

were compelled to rely on the TSA with BarCap for day-to-day operational and business

continuity infrastructure, which is necessary to administer their estates and Lehman's remaining

client portfolios, at a greater cost than that which is available through Omnium. Accordingly, to

minimize the cost of administration of their estates, the Debtors' engagement of Omnium is

appropriate. In addition, the TSA is set to expire in the near future and will therefore not meet

the Debtors' long-term requirements.

19.      Further, the Debtors have determined that outsourcing data processing and

workflow automation support to Omnium will result in annual savings to the Debtors of

approximately $13,500,000 annually through 2011 and be more efficient on a going-forward

basis.

20.      A debtor is required to obtain bankruptcy court approval before it is

permitted to hire professionals and compensate them with funds from property of the estate.

However, as explained below, Omnium is not a "professional" as that term is used in the

Bankruptcy Code. Thus, Omnium should not be held to the requirements under section 327(a) of

the Bankruptcy Code, and Omnium should not be required to submit fee applications pursuant to

sections 330 and 331 of the Bankruptcy Code.

21.      Section 327(a) of the Bankruptcy Code provides, in relevant part, that a

debtor

> … with the court's approval, may employ one or more attorneys, accountants,
> appraisers, auctioneers, or other professional persons, that do not hold or represent
> an interest adverse to the estate, and that are disinterested persons, to represent or
> assist the [debtor] in carrying out the [debtor]'s duties under [the Bankruptcy
> Code].

11 U.S.C. § 327(a). The United States Bankruptcy Court for the Southern District of New York

has previously held that the term "professional" as it used under section 327(a) is a term of art

reserved for those who play a "an intimate role in the reorganization of the debtor's estate."

*John-Manville*, 60 B.R. at 619-20.  While fund administrators are members of a profession, they are not subject to section 327(a) if their work is not connected to the administration of the debtor's bankruptcy proceeding.  *In re Seatrains Lines, Inc.*, 13 B.R. 980, 981 (Bankr. S.D.N.Y. 1981) (holding maritime engineers sought to be retained as consultants to the debtor were not "professional persons" for purposes of section 327(a) because they were merely involved in the mechanics of the debtor's business operations and did not affect the administration of the debtor's reorganization); *see also In re Lexington Precision, et al.*, Case No. 08-11153 (MG) (Bankr. S.D.N.Y. July 14, 2008) [Docket No. 249] (authorizing employment of consultant advising on management and production efficiencies for debtors' business operations).

22.    In these chapter 11 cases, this Court has previously approved the retention of Natixis Capital Markets Inc. as strategic advisor to the Debtors, Kelly Wright as art consultant, and Omnium (on an interim basis) to provide the services described herein, which the Debtors also sought out of an abundance of caution pursuant to sections 105(a) and 363 of the Bankruptcy Code.  *See* Docket Nos. 2308, 2678 and 4988.  Similarly, bankruptcy courts in this District have authorized a debtor's engagement of a broad range of specialists pursuant to section 363 including lobbyists, executive search consultants, crisis managers, and attorneys.  *See, e.g., In re Johns-Manville Corp.*, 60 B.R. 612, 621 (Bankr. S.D.N.Y. 1986) (holding that lobbyists performing functions external to the reorganization as they had pre-petition for the debtor were not "professional persons"); *In re PRC, LLC,* Case No. 08-10239 (MG) (Bankr. S.D.N.Y. May 28, 2008) [Docket No. 434] (authorizing retention of executive search consultants pursuant to section 363 of the Bankruptcy Code); *In re Bally Total Fitness of Greater N.Y., Inc*., Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) [Docket No. 283] (authorizing retention of crisis managers pursuant to section 363 of the Bankruptcy Code); *In re Enron Corp.*, 335 B.R. 22

(Bankr. S.D.N.Y. 2005) (finding employment of law firm to represent employees in relation to a governmental investigation appropriate under Bankruptcy Code section 363).

23.    While the Services to be provided by Omnium might aid in the facilitation of the administration of the Debtors' chapter 11 cases, they are substantially the same services the Debtors used prior to the Commencement Date and the same services they would have required in the ordinary course of their businesses outside the chapter 11 context.  Omnium will play no role in formulating or negotiating the Debtors' proposed chapter 11 plans.  Moreover, Omnium will not control or manage the day-to-day business decisions of Debtors' estates, nor will it have any authority to execute trades, determine how transactions should be structured, move cash or otherwise control the Debtors' assets, except when complying with Debtors' instructions in connection therewith.  Rather, Omnium's engagement will be limited to data processing and workflow automation, and such other related services as the Debtors' may require and request.  Accordingly, Omnium is not a "professional person" of the kind contemplated by section 327(a) of the Bankruptcy Code.

## Notice

24.    No trustee has been appointed in these chapter 11 cases.  The Debtors, in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837], have served notice of this Motion on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) Omnium.  The Debtors submit that no other or further notice need be provided.

25.    Other than with respect to the Interim Agreement, no previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated: February 23, 2010
       New York, New York

                                   /s/ Richard P. Krasnow
                                   Richard P. Krasnow

                                   WEIL, GOTSHAL & MANGES LLP
                                   767 Fifth Avenue
                                   New York, New York 10153
                                   Telephone: (212) 310-8000
                                   Facsimile: (212) 310-8007

                                   Attorneys for Debtors
                                   and Debtors in Possession

## **Exhibit A**

**(Master Services Agreement)**

EXECUTION COPY

**MASTER SERVICES AGREEMENT**


**Between**


**Lehman Brothers Holdings Inc.**


**And**


**Omnium LLC**


Dated as of February 12, 2010

**TABLE OF SCHEDULES**

| | |
|---|---|
| **Schedule 1.2(b)(ii)** | **Form of Statement of Work** |
| **Schedule 1.2(c)** | **Form of Service Level Schedule** |
| **Schedule 2.3(d)** | **Valuation Guidelines** |
| **Schedule 6.1** | **Governance** |
| **Schedule 8.3** | **Form of Monthly Scorecard** |
| **Schedule 9.1** | **Productivity Methodology** |
| **Schedule 10.3(c)** | **Additional License Grants** |
| **Schedule 10.4(b)** | **Third Party Licenses** |
| **Schedule 12.3(a)** | **Benchmarking** |
| **Schedule 14.1** | **Termination Assistance** |
| **Schedule 15.1(e)** | **Business Continuity Plan** |
| **Schedule 15.4(h)(i)** | **Supplier Rate Card for LBHI-Specific Changes** |
| **Schedule 15.4(h)(ii)** | **Supplier Rate Card for Generally Applicable Changes** |
| **Schedule 15.3(a)(i)** | **Code of Conduct** |
| **Schedule 15.3(a)(ii)** | **Employment Data Protection Standards** |
| **Schedule 16.5** | **Compliance Certifications** |
| **Schedule 18.1** | **Form of Weekly Executive Summary Status Report** |
| **Schedule 18.2** | **Form of Quarterly Letter of Financial Condition** |
| **Schedule 22.1** | **Insurance** |

EXECUTION COPY

**MASTER SERVICES AGREEMENT**

This Master Services Agreement (this "Agreement"), is made and entered into on this 12 day of February, 2010 ("Effective Date") by and between **Lehman Brother Holdings Inc.**, a company incorporated under the Laws of the State of Delaware with a principal office located at 1271 Avenue of the Americas, New York, NY 10020 ("LBHI"), on behalf of itself and any LBHI Affiliates (as defined herein), and **Omnium, LLC**, a company incorporated under the Laws of the State of Delaware, with a principal office located at 131 South Dearborn Street, Chicago, IL 60603 ("Supplier").  This Agreement consists of the general terms and conditions below and all Exhibits and Schedules attached hereto.

NOW, THEREFORE, for and in consideration of the Parties' agreements set forth below and intending to be legally bound, the Parties hereby agree as follows:

## 1.      BACKGROUND AND STRUCTURE

### 1.1      Background and Purpose

(a)      LBHI commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 08-13555) (the "Bankruptcy Case").  LBHI is authorized to operate its businesses and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

(b)      LBHI has been performing internally certain investment administration functions that LBHI has determined, through its establishment and evaluation of an outsourcing business case, could be better performed for a certain period of time by a company that specializes in the performance of such functions for others.

(c)      Supplier is a provider of investment administration services as further described herein and in Statements of Work.

(d)      The purpose of this Agreement is to establish the general terms and conditions applicable to Supplier's provision of certain investment administration services to the LBHI Recipients.

(e)      Contemporaneous with the execution of this Agreement:  Supplier and LBHI and/or their Affiliates have entered into the initial Statement of Work (the "First Statement of Work") to govern the provision of certain Services with respect to LBHI's and other LBHI Recipients' operations, as more particularly described therein.

### 1.2      Structure of Agreement

(a)      Master Services Agreement.  This Agreement is a master agreement governing the rights, obligations, and relationship of the Parties solely with regard to Supplier's provision of Services (and products relating thereto) to LBHI and any other LBHI

Recipient(s). This Agreement does not govern any other products or services of Supplier.

(b) <u>Statements of Work</u>.

    (i)    Each Statement of Work will be in writing and signed by a duly authorized representative of each of Supplier and each relevant LBHI Recipient prior to the commencement of any Services under such Statement of Work. If, during the term of this Agreement, LBHI requests that Supplier provide additional Services not yet being provided to LBHI or any LBHI Recipient under this Agreement (including any Statements of Work), the parties shall mutually agree upon and execute a new Statement of Work in accordance with the terms and conditions set forth herein. Any LBHI Affiliate that desires to receive Services under an existing Statement of Work will become a party to this Agreement (if not otherwise a party hereto) and such Statement of Work upon written notice from LBHI to Supplier and approval by Supplier, not to be unreasonably delayed, conditioned or withheld, it being understood that all entities that are LBHI Affiliates as of the Effective Date as well as LAMCO, LLC are hereby approved by Supplier.

    (ii)    Each Statement of Work will be numbered consecutively and dated. Each Statement of Work will (i) be substantially in the form set forth in <u>Schedule 1.2(b)(ii)</u> (the "<u>Form of Statement of Work</u>") for use by the Parties; and (ii) include the following:

        (A)    a detailed description of the Services to be performed and the Deliverables (if any) to be provided thereunder;

        (B)    any terms and conditions specific to such Services or Deliverables (if any) including, as applicable, any terms and conditions necessary to satisfy applicable legal, business or regulatory requirements in the relevant jurisdiction or with respect to any relevant LBHI Recipient;

        (C)    a Fee Schedule (inclusive of any applicable termination fees, implementation fees, and pricing methodologies specific to such Services and Deliverables (if any));

        (D)    if applicable, a Service Level Schedule specific to such Services in accordance with <u>Section 1.2(c)</u>;

        (E)    the term of such Statement of Work, including any renewal options; and

        (F)    any other terms relevant to such Statement of Work.

    (iii)    Subject to <u>Section 13.1(c)</u>, and except as otherwise expressly set forth in an applicable Statement of Work:

(A)     each Statement of Work will be deemed to be incorporated by reference herein, and will in turn incorporate by reference therein the terms and conditions of this Agreement; and

(B)     each Statement of Work will not incorporate any terms or conditions of any other Statement of Work.

(iv)    The Parties to each Statement of Work will modify any provisions of this Agreement to the extent necessary to comply with the local Laws of the jurisdiction in which such Statement of Work is executed or the local Laws of the jurisdiction(s) where the Services are rendered thereunder while reflecting, to the maximum extent possible, the intent of the Parties reflected herein.

(c)     <u>Service Level Schedules</u>.  Each Statement of Work shall have an associated Service Level Schedule, if applicable, attached as a schedule thereto.  For the avoidance of doubt, any reference regarding compliance with and satisfaction under the terms of any Statement of Work shall incorporate by reference the terms of any Service Level Schedule attached thereto as though set fully set forth therein.  Each Service Level Schedule shall include applicable Critical Service Levels and other Service Levels for the Services substantially in the form set forth in <u>Schedule 1.2(c)</u> (the "<u>Form of Service Level Schedule</u>").

(d)     <u>Migration Plans</u>.  Each Statement of Work shall have an associated Migration Plan.  Supplier agrees to provide all Services needed to transition each LBHI Recipient to the Services described in the Statements of Work, including any applicable Deliverables, in accordance with the terms and conditions set forth in the Migration Plans and, subject to those applicable penalties associated with milestones dates and Service Levels set forth in the Migration Plan.  For the avoidance of doubt, any reference regarding compliance with and satisfaction under the terms of any Statement of Work shall incorporate by reference the terms of any applicable Migration Plan thereto as though set fully set forth in such Statement of Work.

**1.3    Definitions**

Defined terms used in this Agreement have the meanings referenced in <u>Article 27</u> unless otherwise defined.  Capitalized terms that are used but not defined in any Exhibit or Schedule to this Agreement or in any Statement of Work will have the respective meanings assigned to them in this Agreement (unless otherwise noted in such other documents).

**2.     SERVICES; LOCATIONS; SUBCONTRACTORS**

**2.1    Services**

(a)     Supplier will provide the Services, including Deliverables, to all relevant LBHI Recipient(s) during the term of this Agreement in accordance with the terms and conditions of (i) this Agreement and (ii) all Statements of Work.

(b)     Commencing on the Effective Date and continuing throughout the term of this Agreement, Supplier shall be responsible for providing the following Services to LBHI and each relevant LBHI Recipient:

(i)     the Services described in this Agreement or any Statement of Work, except those services, functions, business processes and responsibilities which are expressly identified as the responsibility of an LBHI Recipient or a third party (other than a Delegate); and

(ii)     any inherent functions, tasks, or subtasks that are not specifically described in this Agreement (including any Statements of Work), but that form a part of or are inherent, necessary or customary for the proper performance of the Services in accordance with this Agreement, which functions, tasks, or subtasks shall be deemed to be implied by, and included within the scope of the Services, as applicable, to the same extent and in the same manner as if specifically described in this Agreement, but excluding any functions, tasks or subtasks that are specified as to be performed by LBHI, its Designees or its agents (other than Supplier).

(iii)     No implied duties (fiduciary or otherwise) are assumed by, or may be asserted against either Party other than those of good faith and fair dealing.  Neither Supplier nor any of its Affiliates are fiduciaries or trustees of any LBHI Recipient.

(c)     In no event will Supplier assume any responsibility or liability in relation to any investment activity undertaken by any LBHI Recipient.  Notwithstanding the foregoing, Supplier maintains responsibility for the performance of the Services.

(d)     Notwithstanding anything to the contrary in this Agreement or any Statement of Work, in no event shall either Party be responsible for any delay or failure to perform in accordance with the requirements of this Agreement or any Statement of Work to the extent that such delay or failure is caused by (i) delay of any necessary court order; or (ii) the delay or failure to perform by the other Party (or its Delegates, suppliers, or providers, as applicable) of its obligations under this Agreement or the applicable Statement of Work provided that party has used reasonable efforts to mitigate the effects of the delay.  Subject to Section 15.2 in all respects, Supplier is not required or expected to conduct any inquiry as to the truth, accuracy or completeness of any information, data, records or representations of LBHI, its Designees or agents.

(e)     Either Party's failure to perform its responsibilities under this Agreement or to meet the Service Levels shall be excused and any applicable Service Level Credits will be abated if and solely to the extent that such non-performance is directly caused by such Party's compliance with the other party's instructions, compliance directives, policies or procedures; the improper functioning or unavailability of any Technology of the other Party, or the failure of any Representative agents or contractors of the other Party to perform any of its obligations under this Agreement or an applicable Statement of Work.  If Party believes that adjustments to the Service Levels are applicable under the terms of this Section 2.1(e), it shall (i) use commercially reasonable efforts to mitigate

EXECUTION COPY

the effects of the other Party's failure to perform and (ii) promptly notify the other Party of such intent and the reasons therefor.

**2.2    Generally Available Services**

Upon request from an LBHI Recipient, Supplier will make available and offer to such LBHI Recipient any service that Supplier makes generally available to its other unaffiliated customers in any Supplier Service Jurisdictions subject to such request, subject to mutual agreement on terms (including pricing) applicable thereto, which the Parties shall negotiate in good faith.

**2.3    No Exclusivity**

Supplier will not be the exclusive provider of the Services to the LBHI Recipients with respect to Serviced Assets.  Nothing in this Agreement will preclude or otherwise limit in any way any LBHI Recipient's or LBHI Affiliate's right to outsource to a third party any services of any kind or nature whatsoever.

(a)    The Services provided by the Supplier are not exclusive to LBHI or LBHI Affiliates.

(b)    The Supplier or any Affiliate of the Supplier may contract with, or enter into any custodial, financing, banking, brokerage, trading, asset purchase or sale, advisory or other arrangement or transaction as either principal or agent, with LBHI, Investors, Creditors, a competitor of LBHI, or any entity for which securities are held by or for the account of LBHI, or otherwise, and may charge, receive and retain any spread, commission, discount, profit or other remuneration that the Affiliate of the Supplier may negotiate in connection with such arrangement;

(c)    Any Affiliate of the Supplier or any client of any Affiliate of the Supplier may purchase any investment from, or sell any investment to, LBHI and may acquire, dispose of or otherwise deal with interests in LBHI (whether the Affiliate of the Supplier or such client is acting as principal or as agent for any other person) and the Affiliate of the Supplier may charge, receive and retain any spread, commissions, discounts, profits or other remuneration arising out of such transactions;

(d)    The Supplier will rely on valuations of Investments provided by or on behalf of LBHI or the Valuation Guidelines that are either set forth in Schedule 2.3(d) or as mutually agreed upon with respect to a Statement of Work(s), even though such valuations may vary (whether significantly or not) from those used by (i) other clients of the Supplier, (ii) Affiliates of the Supplier in connection with principal or agency business they conduct, or (iii) available pricing vendors.  While the Supplier may, in its own discretion, inform LBHI of such valuation variances, the Supplier is under no duty to ensure that LBHI discloses any such valuation or valuation variance to any party, including Investors.

(e)    Nothing herein shall prohibit any affiliate of the Supplier from pursuing or disposing of any claims it may have against the LBHI bankruptcy estate

**2.4    Subcontracting to Delegates**

EXECUTION COPY

Supplier may subcontract the performance of Services to be provided under Agreement and under any Statement of Work only in accordance with the following:

(a)    <u>Appointment of Delegates</u>.  Subject to the provisions of this <u>Section 2.4</u>, and except as prohibited by applicable Law:

    (i)    Supplier will obtain the prior written approval (which approval shall not be unreasonably withheld) from a designated individual with authority to approve on behalf of the relevant LBHI Recipient(s) (the "<u>Authorized Approver</u>") for all Delegates performing any Services on behalf of Supplier under this Agreement or a particular Statement of Work with Citadel Investment Group LLC and Sapient Corporation ("<u>Sapient</u>") hereby approved by LBHI, *provided, however*, that the approval of any Delegate may be reasonably withdrawn by any relevant LBHI Recipient at any time subject to reasonable potential expenses associated with such withdrawal.

    (ii)    Supplier will provide the Authorized Approver with at least thirty (30) days' prior written notice of any subcontracting of the Services to a Delegate and upon the request of the Authorized Approver, will provide the methodologies by which Supplier intends to monitor the internal controls and procedures employed by any such Delegate, and such other information (other than pricing) reasonably requested by such Authorized Approver.

(b)    <u>Material Services</u>.  Supplier may not appoint a Delegate to perform a material Service (or a Service directly relating to a material business activity of the relevant LBHI Recipient(s)) hereunder, unless and until Supplier has executed a written agreement with such Delegate in a form reasonably acceptable to the relevant LBHI Recipient(s), including with respect to the following terms:

    (i)    the date upon which the appointment commences;

    (ii)    the termination of the appointment (including provisions which allow the appointment to be terminated by Supplier in the same circumstances, on the same notice and upon the same basis as which this Agreement (including any Statements of Work) may be terminated by the relevant LBHI Recipient);

    (iii)    the consequences of a default or breach of the terms of appointment;

    (iv)    provisions relating to security, confidentiality, data protection, compliance with Laws, and dispute resolution consistent with the requirements set forth herein;

    (v)    the liability of the Delegate, including an indemnity by the Delegate for losses, damages, charges and expenses arising from a breach of the terms of appointment; and

    (vi)    audit, monitoring, and assessment of the agent, delegate, or person consistent with applicable Laws and the requirements herein.

Supplier may redact the pricing, fee and payment structure from the copy provided to the relevant LBHI Recipient(s) of any such agreement(s) with Delegates.

(c)    Responsibility for Delegates.  Supplier will remain fully responsible under this Agreement and any Statement of Work for the performance of all Delegates of the Services to the same extent as if performed by Supplier itself.  All performance by Delegates of the Services will be deemed to constitute performance of the Services by Supplier, and will be subject to the same terms and conditions that apply to Supplier's performance of the Services under this Agreement and any Statements of Work, including those provisions relating to Standard of Care, Service Levels, compliance with Laws, security, confidentiality, and data protection.  Supplier will be the LBHI Recipients' sole point of contact for enforcing the terms of this Agreement (including any Statements of Work) with respect to Delegates.

(d)    Confidentiality.  Supplier will not disclose (or provide access to) LBHI's Confidential Information or Intellectual Property Rights to a Delegate (including an Affiliate of Supplier) until such Delegate (and any individual personnel of such Delegate who will receive or access such information) has executed a written agreement that contains limits on the use and disclosure of Confidential Information and Intellectual Property Rights of the LBHI Recipients that are consistent in all material respects with the limitations applicable to Supplier under this Agreement (including any Statements of Work).  Supplier will fully enforce its rights under its agreement(s) with any Delegate to the extent that such Delegate uses or discloses the Confidential Information or Intellectual Property Rights of the LBHI Recipients other than as permitted under such agreement or this Agreement.

## 3.    MIGRATION TO SUPPLIER SOLUTION

**3.1    Migration - Generally**.  Each of Supplier and the LBHI Recipients will perform, and cause its respective third-party providers to perform, the Services necessary to transition any applicable LBHI Recipient(s) to the Services set forth in the applicable Statement of Work and to accomplish the migration of the performance of the Services described in the applicable Statement of Work from the operating environment of the LBHI Recipients or other current suppliers to Supplier Solution (the "Migration") pursuant to the terms and conditions of the applicable Migration Plan.

**3.2    Migration Plans**

(a)    Migration Plans.  Within five (5) days after the Effective Date, the Parties will meet to discuss the Migration Plans and develop detailed work plans that describe the tasks, methods, procedures, and anticipated timing of the steps necessary to effect the Migrations based on and consistent with the Migration Plans which will elaborate on the overall migration and implementation process during the period that the Migrations are being performed ("Migration Period").  The LBHI Recipients will deliver their business requirements within ten (10) business days following the Effective Date.  Within five (5) business days receipt of all such business requirements, Supplier will deliver to the Executive Committee for its review, comment, and approval, draft work plans, including:

(i)    the Parties' overall approach;

       (ii)      the specific implementation activities to be performed;

       (iii)     interdependencies between the LBHI Recipients (including tasks to be performed by the LBHI Recipients or their third-party providers) and Supplier and assumptions upon which the Migration Plan's activities and timelines are based;

       (iv)     Supplier's description of the Migration of the in-scope Services, including descriptions of milestone events and Deliverables; and

       (v)      any other information relating to the Migration that the LBHI Recipients reasonably request.

The Executive Committee will use commercially reasonable efforts to agree upon the final form of such detailed work plans within twenty-five (25) business days after the Effective Date. Such detailed work plans, once approved by the Executive Committee, will become a part of the Migration Plans and be incorporated therein, as such Migration Plans may be further amended from time to time by mutual written agreement of the Parties. From and after approval by the Executive Committee of such detailed work plans the Parties will work to further delineate the detailed work plans to the extent necessary to carry out and complete the Migration.

    (b)    <u>Interfaces and Reporting</u>. For each Migration Plan, the Parties shall:

       (i)      use commercially reasonable efforts to specify all interfaces and reporting between the Systems of the LBHI Recipients and Supplier's Systems of records and input data, *provided, however*, that the Parties may supplement such list from time to time upon the identification of any additional relevant interfaces and reporting; and

       (ii)     allocate responsibilities between the Parties with respect to such interfaces and reporting.

**3.3**    **Conduct of the Migrations**. Supplier will use reasonable efforts to perform its tasks described in the Migration Plans in a manner that will not unreasonably disrupt in any material respect the business or operations of any LBHI Recipient (other than as may be expressly contemplated by the Migration Plans or mutually agreed by the Parties), and not degrade in any material respect the Services then being received by any LBHI Recipient.

    (a)    <u>Cooperation</u>. Each Party will provide the cooperation and assistance required or reasonably requested by the other Party in order to perform their respective obligations under the Migration Plans. Supplier will identify any problems that may impede or delay the timely completion of each milestone in the Migration Plan as Supplier becomes aware of the same and each Party will assist the other with the resolution of any problems that may impede or delay the timely completion of each milestone in the Migration Plans.

    (b)    <u>Notice</u>. If either Party reasonably determines that it will not or may not be able to perform its responsibilities or meet the timetable set forth in the Migration Plans, it will

as soon as reasonably practicable disclose such information to the other Party and will identify specific measures to address such delay and mitigate the risks associated therewith.

(c)     <u>Right to Modify Migration Plans</u>.  For legitimate business reasons, the LBHI Recipients may request to:

(i)     extend or re-schedule any part of a Migration Plan (and to the extent such extension or re-scheduling impacts a Migration milestone, such milestone will also be extended or re-scheduled) upon notice to Supplier.  Upon any such request, Supplier will provide the LBHI Recipients with an estimate of the costs that Supplier would incur in relation to such request and the LBHI Recipients will either elect to:

(A)     proceed with such extension and reimburse Supplier for such costs within thirty (30) days after receipt of invoice therefor; or

(B)     forego such extension; or

(ii)     request changes to the Migration Plans, which change requests (including any requests that would increase or decrease the number of interfaces that Supplier will be required to develop in connection with the Migrations or otherwise alter Supplier's obligations with respect to the Migrations) (the "<u>Migration Changes</u>") shall be handled through the Change Management Procedure.

(d)     <u>Migration Meetings and Reports</u>.  The Executive Committee will use reasonable efforts to meet at least once every week during the Migration Period to discuss the Parties' progress in performing their respective responsibilities and meeting the timetable set forth in the Migration Plans (including any associated Deliverables and milestones). Upon the request of the relevant LBHI Recipient(s), Supplier will report in writing to the LBHI Recipients on:

(i)     Supplier's progress in performing its responsibilities and meeting the timetable set forth in the Migration Plans;

(ii)     failures by the LBHI Recipients to perform any of their obligations in the Migration Plans within the timetable set forth in the Migration Plans;

(iii)     actual and anticipated problem areas with respect to Supplier's Migration tasks and any actions taken or proposed by Supplier in order to minimize the impact of such problems; and

(iv)     a reasonable estimate of the timeframe for remedying any such problems.

**3.4**    **Remedies**

If either:

(a)    the Executive Committee determines unanimously, provided that at least one representative from each Party is present, that the Migration should be permanently abandoned; or

(b)    a Migration is incomplete (*i.e.,* the Services do not perform effectively or are not in production) as of the applicable date set forth in the applicable Migration Plan, as each such date may be extended due to delays caused in whole or in part by:

    (i)    the LBHI Recipients or their third-party providers;

    (ii)    Migration Changes requested by the LBHI Recipients and agreed upon by the Parties;

    (iii)    extensions of the Migrations as contemplated under Section 3.3(c); or

    (iv)    Force Majeure Events;

then in either such case the LBHI Recipients may terminate the relevant Statement of Work, which termination will not be considered a termination for convenience, and the LBHI Recipients will not be required to pay any termination charges, but will be subject to Section 14.1(c).

**3.5**    **Knowledge Transfer**.  During the time periods specified in each applicable Migration Plan:

(a)    The applicable LBHI Recipient(s) will, upon Supplier's reasonable request, make available to Supplier employees of the LBHI Recipients who can provide reasonable and relevant assistance to Supplier in connection with the applicable Migration and the delivery of Services under the Migration Plans; and

(b)    Supplier may ask a reasonable number of questions to such employees of the LBHI Recipients by telephone during regular business hours relating to the functions performed that are within the scope of Services.

**3.6**    **Migrations; Service Level Review**

(a)    Migration(s).  Following the completion of each Service or version of a Service going into production, a new Baseline Service Level Period will commence with respect to any such Service Level.  All data compiled during such Baseline Service Level Period(s) will be added to all other data compiled pursuant to this Section 3.6(a) and Supplier and the LBHI Recipients will establish in good faith adjustments to such Service Level metrics.

(b)    Executive Committee Meetings.  During each regularly scheduled meeting, the Executive Committee may review, among other things, performance data related to each of the Service Levels for which the Baseline Service Level Period has expired since the last meeting of the Executive Committee.  Such data will include any data compiled by the

relevant LBHI Recipients during their performance of the relevant Services for themselves, as applicable, and all data compiled by Supplier during the Baseline Service Level Period.  Supplier and the relevant LBHI Recipients will use such data to establish in good faith appropriate adjustments to the relevant Service Level metrics and such Service Level metrics, as modified, will apply thereafter.

(c)    <u>Annual Review</u>.  At least annually, the Executive Committee will review Service Levels to determine whether adjustments to them would be appropriate to reflect improved performance capabilities associated with advances in technology and methods used to perform the Services.  The Parties expect improvements in the Critical Service Levels once Migration is completed.

**4.    CHANGES TO SERVICES**

**4.1    Change Management Procedure**

(a)    <u>Generally</u>.  From time to time, the Parties may wish to make a Change.  All Changes shall be requested pursuant to and handled in accordance with the change management procedure set forth in <u>Section 4.1(b)</u> (the "<u>Change Management Procedure</u>").   No proposed Changes will become effective or binding upon the Parties until agreed upon by Supplier and any relevant LBHI Recipient via the Change Management Procedure and pursuant to an addendum to such Statement of Work executed by the Parties.

(b)    <u>Change Management Procedure</u>.

(i)    <u>Change Requests</u>.  Either Party may request a Change by submitting a written request to the other Party that sets forth:

(A)    the nature and scope of the Change in reasonable detail in relation to the size and complexity of the Change;

(B)    the desired (or mandated, in the case of a Mandatory Change) implementation date;

(C)    the priority of the Change in relation to other pending Changes and initiatives;

(D)    the proposed allocation of costs (if any) to the relevant LBHI Recipients;

(E)    any desire by such LBHI Recipients to use the resulting Work Product exclusively for a period of time, or to own such Work Product; and

(F)    any desire by such LBHI Recipients to use the resulting Work Product after the term of the relevant Statement of Work (each such request, a "<u>Change Request</u>").

(ii)    <u>Initial Assessment</u>.  Upon the delivery of a Change Request, Supplier shall promptly conduct an initial assessment of the requested Change and the

proposed implementation date.  In making such assessment, Supplier shall consider, *inter alia*:

(A)    the cost and resources necessary to effect the Change;

(B)    the feasibility of the requested implementation date;

(C)    market charges for comparable services inclusive of the Change;

(D)    the financial return, risk and liability to Supplier in providing the Services following implementation of the Change;

(E)    the priority of the Change in relation to other pending Changes and initiatives;

(F)    the terms and conditions, if any, for the relevant LBHI Recipients to use the resulting Work Product on an exclusive basis, or to own such Work Product.  The Supplier is under no obligation to provide Work Product on an exclusive basis or to provide Work Product to be owned by other than Supplier or Affiliates of Supplier;

(G)    the terms and conditions, if any, for the relevant LBHI Recipients to use the resulting Work Product beyond the term of the applicable Statement of Work; and

(H)    as applicable, the necessity of any Transition Services Changes.

The weighting of the foregoing factors shall be in the sole discretion of the Supplier.  Supplier shall be obligated to act in good faith and in a commercially reasonable manner in carrying out any such assessment, but may not be required to disclose its business opportunities or business plans to LBHI. Supplier recognizes that certain Changes may be more urgent than others at an LBHI Recipient's discretion, and will use reasonable efforts to accommodate and react accordingly.  If LBHI Recipient determines that Supplier's response  to a particular Change Request provides for an unreasonably long implementation timeframe in light of the priority indicated in such Change Request, the applicable LBHI Recipients may escalate such matter *via* the Governance Process.

(iii)    Modifications.  If, upon completion of an initial assessment, Supplier determines that it would be commercially impractical to implement a Change Request relating to a Change (other than a Mandatory Change)(a "Discretionary Change"), Supplier shall promptly notify the relevant LBHI Recipients of its determination and the Parties shall discuss possible modifications to the Change Request such that the Change could be practically implemented on terms more mutually satisfactory to the Parties.  If, after such good faith discussion, Supplier determines, in its reasonable discretion, that the Discretionary Change remains commercially impractical, Supplier shall be entitled to decline the Change

EXECUTION COPY

Request, provided that the Parties have exhausted the escalation procedures described in the Agreement.

(iv)    <u>Mandatory Changes; Removal of Services</u>.  Supplier shall be obligated to implement Mandatory Changes, subject to the terms and conditions set forth in this <u>Section 4.2(b)</u>, including any applicable time and materials charges.

(A)    The LBHI Recipients will be responsible for development and implementation costs relating to the modification or enhancement of any Out-of-Scope Technology or the development or implementation of any new Out-of-Scope Technology in connection with a Mandatory Change, including the cost of developing interface components required to allow such modified, enhanced or new Out-of-Scope Technology to transmit data to the Supplier Technology.

(B)    Supplier may not decline a Change Request relating to the removal of any of the Services although removal of a Service may be subject to a transition period during which fees will continue to apply.  Any such removal shall be effected in accordance with a process developed and agreed upon by Supplier and the relevant LBHI Recipients.  The Parties acknowledge and agree that Supplier shall not be entitled to any early termination fees except as to the extent set forth in <u>Section 14.1(c)</u>.  Upon the effectiveness of such removal, the applicable LBHI Recipients shall no longer be responsible for the prospective fees set forth in the applicable Fee Schedule with respect thereto.  If the applicable Fee Schedule does not describe fees specifically applicable to such Services, the Parties shall negotiate in good faith an equitable adjustment to the applicable Fee Schedule.

(v)    <u>Change Plan</u>.  In the event of a Mandatory Change or if Supplier agrees to proceed with any other Change, Supplier shall, within forty-five (45) days, prepare and deliver to the relevant LBHI Recipients:

(A)    a preliminary Change Plan; and

(B)    proposed revisions to the terms of the applicable Statement of Work, Service Level Schedule(s), and the applicable Fee Schedule, in each case to the extent necessitated by implementation of the Change.

(C)    If an LBHI Recipient wishes to proceed on the basis of the preliminary Change Plan (or on amended terms) it shall so notify Supplier and the Parties shall thereafter negotiate final terms of such Change Plan as soon as practicable.

(vi)    <u>Change Funding; Transition Services Change Funding</u>.  The Parties acknowledge and agree that not all Changes will involve the imposition of additional charges or the reduction of existing charges and that the Parties will negotiate in good faith to reach agreement on a commercially reasonable allocation of the initial and on-going costs in respect of a Change that reflects the underlying economic

EXECUTION COPY

arrangement between the Parties.  In each instance, the Parties shall assess, *inter alia*:

(A)     the materiality of the Change;

(B)     the degree to which the Change Request involves substantially similar functions, duties and/or workloads as then performed by Supplier as part of the Services;

(C)     the cost of developing and implementing the Change and projected third party charges (including, without limitation, the providers of Supplier or Third-Party Technology), as applicable;

(D)     the timing of the Change in relation to then-current resource levels and other pending Changes and Supplier initiatives;

(E)     the resource and cost profile of providing the Services after implementation of the Change;

(F)     whether up front costs can be recouped within a commercially reasonable time frame;

(G)     such other considerations as the Parties deem relevant under the circumstances.

In no event shall Supplier charge an LBHI Recipient for Changes that it has generally provided at no charge to other customers or suppliers that receive services substantially similar to the Services, *provided, however*, that if an LBHI Recipient expressly requests a Change prior to Supplier generally providing such Change at no charge to other customers or suppliers, then Supplier may charge the LBHI Recipient for such Change.  Supplier will bear the risk of and have financial responsibility for any change in Laws that are applicable to Supplier generally or the fund administration industry generally as well as any change in Laws that are generally applicable to administrators of distressed assets. The Supplier may charge each LBHI Recipient receiving Services under such Statement of Work an equitable share (*i.e.,* allocated equitably among all of Supplier's LBHI Recipients that receive services affected by such change) of Supplier's costs incurred to comply with any other Laws.

(vii)    <u>Change Completion</u>.  Upon agreement on the terms and conditions of the Change Plan, Supplier shall promptly implement the Change in accordance with the terms thereof and the Parties shall provide each other with such cooperation and assistance as may be reasonably necessary to effect the Change, as applicable, in accordance with the agreed terms.

(c)    <u>Change and Escalation</u>.

(i)    Supplier shall keep the Change Log current and provide copies to LBHI's Relationship Manager and at each regular meeting of the Executive Committee.

The Executive Committee shall review the status of all Changes at their regular meetings and reprioritize Changes, as appropriate or desired.

(ii)   Each Party's Relationship Manager(s) shall be empowered to make all the decisions required under this Change Management Procedure. If such Parties' representatives are not able to reach agreement with respect to a particular matter, such matter shall be escalated in the manner described in <u>Article 25</u>. If the Parties are not able to reach agreement through such escalation procedures, neither Party shall be required to implement the applicable Change (exclusive of Mandatory Changes, which the Parties acknowledge must be implemented).

(d)   <u>Exceptions</u>. The Parties' respective rights and obligations with respect to the following will not be subject to the Change Management Procedure:

(i)   any Upgrades initiated by Supplier or one of Supplier's vendors; or

(ii)   any change in the quantity of Serviced Assets, except to the extent that the provision of Services in respect of such Serviced Assets would:

(A)   require a Change to the scope, manner or delivery of the Services under such Statement of Work or additional Supplier Personnel;

(B)   require the establishment of a new Service Location; or

(C)   subject Supplier to different legal or regulatory requirements.

**4.2   Divestitures**

(a)   Except to the extent prohibited by applicable Laws, if, after the Effective Date, any LBHI Recipient relinquishes Control of all or part of a business unit, or a particular function or facility of any LBHI Recipient (each, a "<u>Divested Business</u>"), then at such LBHI Recipient's request, Supplier will continue to provide the Services, including Termination Assistance, to such business after the date it becomes a Divested Business for a period not to extend beyond eighteen (18) months after commencement of such Services to the Divested Business (the "<u>Divestiture Period</u>") at Supplier's time and materials rates or at such other pricing as the Parties may mutually agree, *provided, however*, that such LBHI Recipient will have the option to extend the Divestiture Period for no more than six (6) months by providing Supplier written notice of its intent to exercise this option no later than one hundred twenty (120) days prior to the end of the Divestiture Period, unless the provision of such Services to a Divested Business requires additional services, for example entity specific reports and services that are over and above what was provided when such entity was part of the previous LBHI Recipient.

(b)   Fees charged for the addition of any Serviced Assets due to a Divested Business will be in accordance with the applicable Fee Schedule or as otherwise mutually agreed upon by the parties in writing, except with respect to any Changes that are required, which will be handled in the manner contemplated by the Change Management Procedure.

EXECUTION COPY

(c)    The Parties acknowledge and agree that notwithstanding any other provision of this Agreement, LBHI may elect to have any Divested Business receive a partial assignment of this Agreement and any relevant Statement(s) of Work pursuant to <u>Section 26.2(a)</u> for the remainder of the term of this Agreement and without limitation to the Divestiture Period.

**4.3    Support of New Business**

(a)    <u>New Business</u>.  Upon the request of any LBHI Recipient, Supplier will, at applicable time and materials rates, reasonably cooperate and provide reasonable assistance with such LBHI Recipient's operational assessment and integration planning (*e.g.,* initial planning with respect to potential integration into Supplier's operating model), and will help such LBHI Recipient identify whether any Acquired Business, potential Acquired Business or new business generated organically (each, and collectively, "<u>New Business</u>") could receive Services under any then-existing Statement of Work without any Change and, if not, any Changes that would be required under any existing Statement of Work (including estimates of the anticipated costs relating thereto).  Any reasonable travel expenses incurred by Supplier in providing such cooperation and assistance will be reimbursed by the relevant LBHI Recipient, provided that such expenses are approved for reimbursement in advance by such LBHI Recipient.

(b)    Fees charged for the addition of any Serviced Assets due to a New Business will be in accordance with the applicable Fee Schedule, or as otherwise mutually agreed upon by the parties in writing, except with respect to any:

(i)    Changes that are required, which will be handled in the manner contemplated by the Change Management Procedure; or

(ii)    development or enhancement of Supplier Technology that is required in order to facilitate the provision of the Services in respect of such New Business, which will be subject to a fee (the "<u>Implementation Fee</u>") at the Supplier Hourly Rates set forth in the Fee Schedule to the relevant Statement of Work(s).  The LBHI Recipients shall have reasonable discretion as to the allocation of Supplier resources, including Supplier Personnel, associated with the New Business versus the existing businesses with the understanding changes in allocation may affect Service Levels.

(c)    Subject to <u>Section 2.1(d)</u>, the LBHI Recipients may appoint and outsource to any providers other than Supplier any services with respect to any New Business.

**4.4    Out-of-Scope Services**

To the extent any LBHI Recipient performs any Services for itself or services that are outside of the scope of the Services but that nevertheless relate to the Services (the "<u>Out-of-Scope Services</u>"), or retains any third party to do so, upon the request of such LBHI Recipient, Supplier will, at applicable time and materials rates, reasonably cooperate and coordinate with such LBHI Recipient or third party to identify and implement the most orderly and efficient provision of Services and Out-of-Scope Services to such LBHI Recipient, including by: (i) meeting and discussing such matters with such LBHI Recipient or third party; and (ii) providing information

relating to the Services as reasonably requested by such LBHI Recipient or third party, provided, however, that Supplier will not be obligated to disclose its Confidential Information to a third party.  Any reasonable travel expenses incurred by Supplier in providing such cooperation or coordination will be reimbursed by the relevant LBHI Recipient, provided that such expenses are approved for reimbursement in advance by such LBHI Recipient.  Travel expenses that are, in the aggregate, less than two-thousand dollars ($2000.00) per individual per trip shall be deemed to be automatically approved by the relevant LBHI Recipient.

**5.      ACCEPTANCE AND TESTING OF DELIVERABLES**

5.1      **Supplier Testing of Deliverables**. Unless as otherwise agreed to in writing by the parties in a Statement of Work, Supplier will verify that each Deliverable conforms to the applicable Statement of Work and the applicable Service Level Schedule by delivering testing results or sufficient data as reasonably requested by the relevant LBHI Recipient(s).  Supplier will promptly provide written notice to the relevant LBHI Recipient(s) upon the completion of a Deliverable under an Statement of Work, and will promptly deliver such Deliverable to such LBHI Recipient(s).  To the extent possible, Supplier will deliver electronic versions of Deliverables to the relevant LBHI Recipient(s).

5.2      **Acceptance Process**

(a)      <u>Acceptance or Rejection</u>.  Supplier will deliver complete Deliverables as set forth in the applicable Statement of Work.  Upon receipt of a Deliverable, the relevant LBHI Recipient will review it and may, in its reasonable discretion, (i) elect to accept such Deliverable, (ii) reject it due to a failure of such Deliverable to comply materially with the applicable specifications and acceptance criteria specified in the applicable Statement of Work, or (iii) request additional Information, documents or materials from Supplier should further testing and review be required in order to determine whether such Deliverable is acceptable to such LBHI Recipient.  If the LBHI Recipient fails to provide to Supplier written notice of any of the foregoing within the time period for acceptance set forth in the applicable Statement of Work (or if no time period for rejection is set forth in the applicable Statement of Work, within twenty-five (25) Business Days of the date such Deliverable was received by the LBHI Recipient (the "<u>Acceptance Period</u>")), then such Deliverable shall be deemed accepted by such LBHI Recipient.  The Parties will use reasonable efforts to communicate regarding the status of each Deliverable prior to its completion and delivery in order to minimize the risk of rejection by LBHI.

(b)      <u>Correction</u>.  If the relevant LBHI Recipient rejects a Deliverable, it will provide a written notice of rejection to Supplier setting forth the reasons (which must reasonably justify the rejection) for such failure.  Supplier will materially correct any such failure and provide such LBHI Recipient with a revised Deliverable as soon as practicable but, unless otherwise agreed in writing, no later than five (5) Business Days (or such longer period as mutually agreed by the Parties) after its receipt of the notice of rejection from such LBHI Recipient.  Such LBHI Recipient will have the right to accept or reject the corrected Deliverable in accordance with this <u>Article 5</u>.  If such LBHI Recipient determines that Supplier has not corrected any such failure, such LBHI Recipient may at its discretion:

EXECUTION COPY

(i)      reiterate its request that Supplier correct such failure and extend the time for correction of the Deliverable for an additional thirty (30) days or such other time as mutually agreed by the Parties; or

(ii)     return or reject the Deliverable to Supplier (or terminate the applicable Statement of Work) and (except in the case of the build of the Lehman dedicated computing environment as set forth in the Statement of Work detailing the infrastructure relating thereto (the "Infrastructure Statement of Work")) receive a refund of those amounts paid specifically for the production of that Deliverable.

**5.3**    **Effect on Warranties**.  The Parties compliance with this Article 5 will not relieve Supplier of any of its representations, warranties and obligations contained herein or in any Statement of Work. If Supplier receives a request for further Information from the relevant LBHI Recipient, Supplier will evaluate such request and determine the best approach for providing the requested Information and produce such within a reasonable time period agreed upon between the Parties.

**5.4**    **Integrated Deliverables.**  In the event that more than one Deliverable is to be used together by the relevant LBHI Recipient, after such LBHI Recipient's acceptance of such Deliverables individually, Supplier shall perform applicable testing as set forth in Section 5.1 reasonably defined by LBHI and agreed to by Supplier and in such a manner to ensure that isolated and integrated functionality is achieved as contemplated by the applicable Statement of Work.  Such LBHI Recipient will have the right to accept or Reject such Deliverable(s) based upon the complete and accurate performance of the Deliverable(s) when operating in an integrated manner.

**6.**      **GOVERNANCE; PERSONNEL; SERVICE LOCATIONS; FACILITIES**

**6.1**    **Governance, Meetings and Reports**

(a)     Generally.  The Parties will organize their relationship with respect to the provision and receipt of Services hereunder in accordance with this Agreement and the governance committees, processes and procedures set forth in Schedule 6.1 (collectively, the "Governance Process").

(b)     Composition.  Supplier and the LBHI Recipients will consult with one another with respect to the appointment of persons to the positions contemplated by the Governance Process. Each of Supplier and the LBHI Recipients, in its sole discretion, will make the final determination with respect to persons appointed on its behalf.

(c)     LBHI-Supplier Director.  At such time as an independent Board of Directors is established by Supplier (which Supplier covenants shall occur no later than March 31, 2010) and so long as annual revenues to Supplier from LBHI (i) exceed $5,000,000.00 for the first year of the term of this Agreement, and (ii) exceed such other minimal threshold that will be mutually agreed by the parties on an annual basis thereafter, LBHI shall have the right to designate an individual to serve as a member of the board of directors of Supplier (such individual, the "LBHI-Supplier Director").  Prior to the establishment of the independent Board of Directors, Supplier shall provide to LBHI all reports and information that

Supplier would otherwise provide to its Board of Directors had it been established as of the date of this Agreement.

**6.2    Executive Committee**

(a)    Supplier and LBHI will establish an executive committee (the "<u>Executive Committee</u>") to perform the functions set forth in this Agreement.  The Executive Committee will consist of four (4) Representatives of Supplier and eight (8) Representatives of LBHI.  Any action of the Executive Committee shall require the affirmation of both (i) a majority of the Representatives of Supplier in attendance at the meeting where such action is discussed; and (ii) a majority of the Representatives of LBHI in attendance at the meeting where such action is discussed.   The Executive Committee will meet on a quarterly basis during the twelve months following the Effective Date and on a semi-annual basis or as agreed, either in person or via teleconference thereafter.

(b)    In addition to any other obligations set forth under this Agreement (including any Statements of Work), the Executive Committee may:

(i)    review and approve milestones, objectives and other procedures and the performance of all obligations under this Agreement, the Statements of Work and the Service Level Schedules;

(ii)    attempt to resolve disputes and discuss any significant business or operational issues raised by either Party under this Agreement (including any Statements of Work) in accordance with <u>Section 25</u> (Dispute Resolution);

(iii)    discuss planned Upgrades by Supplier to the Supplier Technology or changes to the Services in order to offer its customers more efficient or improved services or functionality;

(iv)    evaluate the Services for competitiveness, including evaluating any new products or services that Supplier intends to make available as part of its services offerings (including but not limited to any ASP solution), any trends and directions of which Supplier is aware in relation to the Services that may be relevant to the LBHI Recipients' business, and any services or functionality relating to the Services which are offered by leading providers of services similar to the Services but are not included in the Services;

(v)    estimates of any prices at which Supplier intends to offer to customers for services comparable to any of the Services;

(vi)    discuss and determine the strategic direction of the LBHI Recipients including anticipated increases in volumes as the result of an Acquired Business or other mergers and acquisitions or divestitures;

(vii)    evaluate any planned Upgrades by an LBHI Recipient to its legacy system(s) during the Migration, as applicable;

EXECUTION COPY

(viii)   support and facilitate the transition of Services to Supplier's Services pursuant to the Migration;

(ix)   discuss and evaluate any concerns that any LBHI Recipient may have with respect to Turnover and the plan(s) of Supplier to remedy excessive Turnover;

(x)   subject to Article 9, at least once each year assess Supplier's compliance with the Productivity commitments in this Agreement and the Statements of Work, the Productivity gains in Supplier's performance of the Services, the Services being provided to the LBHI Recipients under all Statements of Work, the Critical Service Levels under all Service Level Schedules, and Supplier's compliance with such Critical Service Levels; and

(xi)   perform such other duties and responsibilities as the Executive Committee deems necessary or appropriate.

(c)   Notwithstanding anything to the contrary in this Agreement, the Executive Committee will have no authority to independently amend or modify this Agreement (including any Statements of Work).

## 7.   SUPPLIER PERSONNEL

### 7.1   Supplier Personnel

(a)   Supplier Personnel.  Supplier will provide sufficient personnel of suitable training and skills to perform the Services as set forth in the applicable Statements of Work.  For each Statement of Work, Supplier will only assign competent personnel who meet the requirements of such Statement of Work to provide the applicable Services thereunder. All Supplier Personnel will have the experience, qualifications and training necessary to satisfactorily discharge their obligations in connection with the Services.  Any LBHI Recipient may request, and Supplier will furnish a staffing plan regarding Supplier Personnel who are primarily dedicated to the performance of the Services at any time during the term of this Agreement.

(b)   Compliance.  Notwithstanding any other provision of this Agreement, Supplier will at all times during the term of this Agreement cause (and will cause each Delegate to cause) all Supplier Personnel comply with all policies and procedures of any LBHI Recipient(s) applicable to performance of the services that relate to legal or regulatory compliance and will use reasonable efforts to comply with all other applicable policies and procedures of any LBHI Recipient(s) applicable to the performance of Services to the extent that such compliance would not be unduly burdensome on Supplier or its Delegates.  By or before the Effective Date, Supplier shall provide to LBHI a statement acknowledging that Supplier has read and agreed to the applicable policies and procedures.  To the extent Supplier wishes to exclude certain requirements thereunder for the reasons set forth in this Section 7.1(b), Supplier shall provide an explanation therefor in such statement.  Each LBHI Recipient shall provide Supplier with written notice of such policies and procedures upon commencement of Services and upon implementation of any Change (if applicable).

EXECUTION COPY

(c)     <u>Background Checks</u>.  Supplier will maintain (and will ensure that each Delegate maintains) as part of its standard hiring practices a requirement to perform background checks with respect to Supplier Personnel.  Supplier will conduct (and will ensure that each Delegate conducts) adequate background screenings based on NASD guidelines or any other applicable Laws on all Supplier Personnel who provide Services relating to any LBHI Recipient's business.

(d)     <u>Replacement</u>.  In the event that LBHI or any LBHI Recipient notifies Supplier that any Supplier Personnel is deemed to be, in the sole reasonable opinion of LBHI or such LBHI Recipient, unsatisfactory and requests that Supplier reassign such personnel, Supplier will consider in good faith such request, *provided, however* that, subject to <u>Section 7.2(c)</u>, the final decision to reassign any such Supplier Personnel from the LBHI Recipient's account will be within the control of Supplier.

(e)     <u>Former LBHI Employees</u>.  In the event that, following the Effective Date hereof, any employee of any LBHI Recipient who (i) has institutional knowledge regarding such LBHI Recipient, and (ii) accepts an offer of employment from or secondment by Supplier (or any of its Affiliates) to primarily assist in the provision of the Services ("<u>Former LBHI Employee</u>"), such Former LBHI Employee shall be primarily dedicated to the provision of the Services and Supplier may not reassign such Former LBHI Employee except upon written consent of the relevant LBHI Recipient in its sole discretion.

**7.2    Key Supplier Positions**

(a)     <u>Key Supplier Positions</u>.  Each Statement of Work will identify certain Supplier Personnel that the parties thereto have designated as being in key positions (the "<u>Key Supplier Positions</u>").  With respect to each of the individuals assigned to Key Supplier Positions in a Statement of Work, each such individual will, except as otherwise provided in this Agreement or a Statement of Work, be primarily dedicated to the provision of the Services from the time of assignment to such position.  The LBHI Recipients may require different or additional Key Supplier Positions during the term of this Agreement.

(b)     <u>Limitations Replacement/Reassignment</u>.  Supplier may not replace or reassign an individual assigned to a Key Supplier Position, except:

    (i)     upon written consent of the relevant LBHI Recipient, which consent will not be unreasonably withheld;

    (ii)    upon such individual's voluntary resignation from Supplier;

    (iii)   upon the dismissal of such individual by Supplier for misconduct or unsatisfactory performance as determined in the reasonable judgment of Supplier; or

    (iv)    upon the inability of such individual to work due to sickness, death or disability.

(c)     <u>Requests for Replacement/Reassignment</u>.  In the event that LBHI or any LBHI Recipient notifies Supplier that any individual assigned to a Key Supplier Position is deemed to be, in the sole reasonable opinion of LBHI or such LBHI Recipient, unsatisfactory and

provides a written explanation for such determination, Supplier will promptly replace such individual and not reassign such individual to any Services without the prior written consent of LBHI or such LBHI Recipient.

**7.3    Non-Solicitation of Employees**

(a)    From the Effective Date until twelve (12) months after completion of Supplier's on-going performance obligations under this Agreement, neither Supplier nor any LBHI Recipient will solicit or seek to procure the employment of any of the following individuals, either directly or indirectly (other than by general advertising), without the prior written consent of Supplier or the LBHI Recipients, as applicable, except as otherwise permitted under this Agreement:

   (i)    in the case of the LBHI Recipients, the Supplier and the Supplier's Affiliates' Personnel with whom employees of the LBHI Recipients interact on a regular basis in the course of providing or receiving the Services, as applicable; and

   (ii)    in the case of Supplier, employees of the LBHI Recipients with whom Supplier Personnel interact on a regular basis in the course of providing the Services.

During the Restricted Migration Period, the LBHI Recipients will not hire any Supplier Personnel who occupy Key Supplier Positions.  Notwithstanding the foregoing, if LBHI terminates this Agreement for any reason other than a termination for convenience, Supplier will waive the non-solicitation restrictions under this Section 7.3 with respect to the Supplier Personnel who are primarily dedicated to the performance of Services, provided that any LBHI Recipients' hiring of such Supplier Personnel will not materially impede Supplier's ability to provide Services hereunder and provided that the effective date of any such hiring will not precede the completion of the term of this Agreement (unless otherwise agreed by the Parties).  The foregoing restrictions shall not apply to any Personnel who (i) has been involuntary terminated by the Supplier or its Affiliates or the LBHI Recipient, as applicable, prior to the initial employment, (ii) responds to a general solicitation through the media, or (iii) is referred by an employment agency, so long as its search was not directed at or focused on such person.

**7.4    Proper Instructions**

(a)    Authorized Persons.  Each LBHI Recipient will provide Supplier with a list of the names, powers and (if applicable) signatures, of all Authorized Persons of such LBHI Recipient. Supplier may rely upon the identity and authority of such persons until it receives written notice from any such LBHI Recipient to the contrary and has been afforded a reasonable opportunity to act thereon.

(b)    Authentication Procedures.  Supplier will follow such authentication procedures as may be agreed upon with each LBHI Recipient from time to time for purposes of verifying that purported proper instructions have been originated by an Authorized Person.

EXECUTION COPY

**7.5    Service Locations and Facilities.**

(a)    <u>Supplier Service Jurisdictions</u>.  Supplier may provide Services from the Supplier's (or, with the prior written approval of the relevant LBHI Recipient, any Delegate's) facilities located in any Supplier Service Jurisdiction.

(b)    <u>Relocations – Within the Supplier Service Jurisdictions</u>.  Supplier may change, relocate or add to the facilities from which the Services are provided (each a "<u>Service Location</u>") within any Supplier Service Jurisdictions subject to the prior written consent of the relevant LBHI Recipient(s), which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    <u>Relocations – Outside of the Supplier Service Jurisdictions</u>.  Supplier may relocate the Service Locations to outside of the Supplier Service Jurisdictions, *provided that* Supplier complies with the following:

(i)    <u>Relevant LBHI Recipient Inspection</u>.  Prior to relocating any Service Location to outside of the Supplier Service Jurisdictions, Supplier will:

(A)    fully examine and evaluate the effects of any contemplated relocation on the Services and its performance under this Agreement, including a review of:

(1)    the compliance of any the proposed Service Location with Supplier's physical and information security obligations and requirements hereunder; and

(2)    physical safeguards used at any such Service Location;

(B)    discuss with the LBHI Relationship Manager in good faith the effects and ramifications of such potential relocation and any concerns that the any relevant LBHI Recipient(s) may have; and

(C)    provide the relevant LBHI Recipients with an opportunity to inspect the proposed Service Location, subject to applicable reasonable restrictions in accordance with Supplier's policies and procedures or restrictions imposed by its agreements with its Delegates, as applicable.

(ii)    <u>Final Notification</u>.  Supplier shall inform the relevant LBHI Recipient(s) in writing promptly after Supplier's final determination to relocate the provision of any of the Services to any country outside of the Supplier Service Jurisdictions.

(iii)    <u>LBHI Objections</u>.  Notwithstanding anything in <u>Sections 7.5(c)(i)</u> or <u>7.5(c)(ii)</u> to the contrary, if any LBHI Recipient reasonably objects to the relocation of a Service Location to a country outside of the Supplier Service Jurisdictions, Supplier will not proceed with the relocation and shall continue to provide the Services from within the country from which such Services are then performed (or from within any other Supplier Service Jurisdiction).

EXECUTION COPY

(d)     <u>Relocation - Responsibilities</u>.

    (i)     Except as otherwise expressly set forth herein, the LBHI Recipients will have no financial responsibility whatsoever for any costs, taxes and other expenses arising from or related to any Supplier-initiated change, relocation or addition of a Service Location.

    (ii)     Notwithstanding any other provision of this Agreement, Supplier shall comply with, and be solely responsible for compliance with:

        (A)     all Laws applicable to Supplier and to its Delegates in any Service Location; and

        (B)     all export laws and import Laws of the United States and any Supplier Service Jurisdictions.

(e)     <u>LBHI Locations</u>.  For the avoidance of doubt, any LBHI Recipient may change, relocate or add to the LBHI Locations at will at any time and for any reason, provided that such LBHI Recipient provide written notice thereof to Supplier and LBHI bears any costs associated with the provision of Services to such new location.

(f)     <u>Facilities and Premises</u>.

    (i)     <u>Manner of Use</u>.  Each Party may only use the other Party's facilities or premises for the sole and exclusive purpose of providing or receiving the Services (as applicable) or exercising its audit rights subject to and in accordance with the terms of this Agreement (including any Statements of Work).  Any other uses are subject to the prior approval of the other Party, to be granted or withheld in its sole discretion.  The limited rights granted under this <u>Section 7.5(f)</u> will not constitute a leasehold or other property interest in favor of the other Party nor any right whatsoever of the other Party to occupy or use said facilities or premises nor shall it transfer any right, title or interest therein or thereto to the other party.

    (ii)     <u>Compliance</u>.  The personnel of each Party will at all times be subject to the other Party's written employee and on-site safety and security policies when on the premises of the other Party.

    (iii)     <u>Liability for Damages</u>.  Each Party will be responsible for property damage to the other Party's locations, personal injury, or death if caused by the personnel of such party (or their respective Delegates or guests), including such personnel's intentional misconduct, abuse, misuse, neglect, or gross negligence or failure to comply with its other obligations respecting the other Party's location.

EXECUTION COPY

**8.      PERFORMANCE STANDARDS; SERVICE LEVELS**

**8.1      Generally**

(a)      Subject to the terms and conditions of this Agreement, Supplier (and each Delegate) will perform its obligations under this Agreement and the Statements of Work in accordance with the Service Level Schedules and in a manner that is consistent with the Standard of Care.  The Standard of Care is not intended to relieve Supplier of its obligations under the Statements of Work.

(b)      Each Party hereby agrees that in the event that an employee of such Party repeatedly and persistently acts in a manner grossly inconsistent with the standards of civilized society in its communications and interactions with the other Party, upon receipt of notice from the other Party specifying the nature, substance, and frequency of such employee's acts, the employing Party shall, to the extent reasonably practicable, attempt to correct such behavior or, upon the reasonable request of the other Party, reassign such employee to avoid further confrontation.

**8.2      Service Levels**

(a)      <u>Critical Service Levels</u>.

(i)      <u>Designation</u>.  With respect to new Services, Supplier and the relevant LBHI Recipients will mutually determine whether any associated Service Levels will be designated as Critical Service Levels.

(ii)      <u>Replacement</u>.

(A)      The LBHI Recipients (through their Representatives at a duly held meeting of the Executive Committee where at least one representative from each Party is present) may, from time to time, replace Critical Service Levels, provided (i) the Executive Committee agrees unanimously to the replacement at the relevant Executive Committee meeting and (ii) the relevant LBHI Recipient(s) give Supplier written notice of such change within thirty (30) days after the relevant Executive Committee meeting (the "<u>Critical Service Level Replacement Notice</u>").

(B)      The replacement of any Critical Service Level with another Service Level under this <u>Section 8.2(a)</u> shall become effective commencing on the first day of the calendar month following thirty (30) days after the dates upon which the LBHI Recipients provide the Critical Service Level Replacement Notice, as applicable.

(b)      <u>Measurement</u>.  For all purposes of this Agreement and the Statements of Work (including, without limitation, remedies available in connection with Service Level breaches), Service Levels will be measured:

    (i)      under each Statement of Work and not aggregated with other Statements of Work; and

    (ii)     for the LBHI Recipients in the aggregate under each such Statement of Work, rather than with respect to each such LBHI Recipient under a particular Statement of Work.

**8.3     Performance Measurement; Monthly Scorecard**

(a)     <u>Monthly Scorecard</u>.  Beginning after the first full calendar month of the term of this Agreement, on a monthly basis, no later than two (2) Business Days after the completion of client reporting (as set forth in the applicable Statement of Work), Supplier will deliver to the LBHI Recipients a balanced scorecard ("<u>Monthly Scorecard</u>") for review by the Executive Committee on a quarterly basis, containing (at a minimum):

    (i)      Critical Service Levels and such other Service Levels that the Parties may mutually agree from time to time, including Service Level failures, *provided, however,* that until the Migration is complete, Supplier will report on Critical Service Levels and such other Service Levels that the Parties may mutually agree only if the technology provided by LBHI under <u>Article 10</u> is capable of generating such reports or Supplier is capable of generating such reports without incurring material incremental costs.

    (ii)     volume metrics (*e.g.*, volumes, number of accounts, etc.) and such other statistical information that the Executive Committee may determine from time to time;

    (iii)    the turnover rate for Supplier Personnel who are primarily dedicated to the provision of the Services for the prior month ("<u>Turnover</u>");

    (iv)    timeliness and budget status, as applicable, for Changes and the Migration; and

    (v)     such other information as Supplier and the LBHI Recipients will mutually agree upon from time to time.

The Monthly Scorecard shall be substantially in a form of that will be mutually agreed upon by the Parties and appended hereto as <u>Schedule 8.3</u> or such other form as the Parties shall mutually determine.

(b)     <u>Remedial Plans</u>.  Supplier will deliver with each Monthly Scorecard a draft action plan to address any material failure of Supplier with respect to the matters set forth in <u>Sections 8.2(a)(i)</u> or <u>8.2(a)(ii)</u> and results of any previously implemented plans.

**8.4     Notice of Performance Issues.**

(a)     <u>Supplier Non Performance</u>.  If Supplier becomes aware of a situation where it (or a Delegate) has failed (or intends to fail) to comply with any Service Levels, or otherwise with its obligations under this Agreement (including any Statements of Work) in any material respect, Supplier will promptly inform the relevant LBHI Recipient(s) in writing

EXECUTION COPY

of such situation, the situation's impact or expected impact on Supplier's ability to perform the Services and Supplier's action plan to minimize, eliminate or remediate such impact and the projected actual completion (or delivery) time.  In particular, Supplier will promptly notify the relevant LBHI Recipients upon becoming aware of any circumstances that may reasonably be expected to jeopardize the timely and successful completion or delivery of any Service, Deliverable or Change.  Supplier will inform the relevant LBHI Recipients of the steps Supplier is taking or will take to minimize, eliminate or remediate such impact, and the projected actual completion (or delivery) time. Any such report will not be construed as admission of breach hereof, but is only intended to facilitate the provision of Services.

(b)     <u>LBHI Non Performance</u>.  To the extent that a Service Level Schedule requires performance by an LBHI Recipient(s) and such LBHI Recipient(s) becomes aware of a situation where it has failed to comply therewith, or otherwise with its obligations under this Agreement (including any Statements of Work), in any material respect, such LBHI Recipient(s) will promptly inform Supplier in writing of such situation.

**8.5     Resource Reprioritization**

Supplier and the LBHI Recipients will discuss any requests by the LBHI Recipients to reprioritize or reset the schedule for the Services or Changes.  Upon the request of any LBHI Recipient, Supplier will use commercially reasonable efforts to reprioritize or reset the schedule for the Services or Changes, except to the extent that Supplier reasonably believes in good faith that such requested reprioritization will cause Supplier to fail to provide the Services in accordance with the Service Levels or Fee Schedules or otherwise fail to meet its obligations under any applicable Statement of Work.  In such event Supplier will discuss with such LBHI Recipient or other potentially affected LBHI Recipients the anticipated impact of such LBHI Recipient's request and such LBHI Recipient may either:

(a)     forego or delay such reprioritization; or

(b)     temporarily adjust Supplier's obligations to be performed, the schedules associated therewith, the Service Levels or the Fee Schedules, as applicable, to permit Supplier's performance of the Services or Changes that LBHI desires to be given higher priority.

To the extent any reprioritization requested by an LBHI Recipient causes Supplier to fail to meet its obligations with respect to any matter that such LBHI Recipient designated as a lower priority matter, Supplier will be excused for such failure.   Notwithstanding anything in this <u>Section 8.5</u> to the contrary, any requested reprioritizations to the Services or Changes that Supplier is implementing on behalf of any such LBHI Recipient and other Supplier customers, will be subject to the approval of  the Executive Committee.

**8.6     Service Level Methodology and Remedies**

(a)     The LBHI Recipients may receive Service Level Credits and Supplier may receive Service Level Incentives in accordance with the Service Level Schedules, as applicable.  Any Service Level Credits issued with respect to any failure to meet Service Levels will be credited against any damages payable with regard to such failure.

(b)     LBHI Recipients shall be entitled to the remedies hereunder in the event of any failures by Supplier to meet any Service Level, including the Service Level Credits, as applicable. A failure by Supplier to meet any Service Level during any Baseline Service Level Period will not constitute a breach or violation of this Agreement (including any Statements of Work) giving rise to financial penalties, damages, termination rights, or contractual or other remedies.

## 9.    PRODUCTIVITY

9.1    <u>Productivity Sharing</u>.  The Parties agree to optimize the effectiveness and efficiency of all outsourced processes through increased Productivity.  Supplier will provide the LBHI Recipients with Fee adjustments in accordance with the terms and conditions set forth in the applicable Statements of Work.  Productivity shall be calculated in accordance with the methodology to be mutually agreed upon by the Parties and set forth in <u>Schedule 9.1</u> hereto.  For the avoidance of doubt, Productivity shall be mutually agreed upon by the Parties in writing in the applicable Statements of Work.  During the six (6) month period following the execution of each Statement of Work and any amendment or modification thereto, the Parties will discuss in good faith whether to amend such Statement of Work to provide for commitments by Supplier to increase Productivity in connection therewith.

9.2    <u>Guaranteed Productivity Minimums</u>.  Guaranteed Productivity minimums, if any, shall be agreed to in writing by the parties in the applicable Statements of Work.

## 10.    TECHNOLOGY AND INTELLECTUAL PROPERTY RIGHTS

10.1    **Independent Work**

(a)     <u>Ownership, Generally</u>.  Except as otherwise provided in this Agreement (including any Statement of Work):

(i)     as between the Parties, each Party will have and retain all right (including Intellectual Property Rights), title and interest in and to its Independent Work and will be entitled to seek Intellectual Property Rights protection for its Independent Work as it deems appropriate;

(ii)     a Party will not submit patent applications or otherwise seek to file for or obtain Intellectual Property Right protection with respect to or based upon the other Party's Independent Work without the other Party's prior written consent, which may be withheld at the other Party's sole discretion;

(iii)     a Party will not be permitted to use the other Party's Independent Work (except to the extent that either Party is permitted pursuant to the terms hereunder to use elements of the other Party's Technology which elements are Independent Works); and

(iv)     ANY RIGHTS OF USE OF A PARTY'S INDEPENDENT WORK GRANTED BY THIS AGREEMENT ARE GRANTED ON AN "AS-IS, WHERE-IS" BASIS WITHOUT WARRANTIES OF ANY KIND.

EXECUTION COPY

**10.2    Work Product and Commissioned Work Product**

(a)    As between LBHI and Supplier, all right, title and interest in and to Commissioned Work Product will be owned by LBHI, including any Intellectual Property Rights therein. Supplier hereby irrevocably assigns, transfers and conveys, and will cause its personnel to assign, transfer, and convey, to LBHI without further consideration all right, title and interest in and to the Commissioned Work Product.  Supplier acknowledges, and will cause the Supplier Personnel to acknowledge, that LBHI and its successors and assigns will have the right to obtain and hold in their own names any and all Intellectual Property Rights in and to the Commissioned Work Product.  To the extent applicable, the Commissioned Work Product will be deemed a "work made for hire" under the United States Copyright Law (17 U.S.C. § 101 *et seq.*) (or any equivalent foreign Laws). Any and all such assignments include all rights, however denominated, of paternity, integrity, disclosure, attribution and withdrawal and any other rights, present or future, of any country, including rights that may be known as or referred to as "moral rights" or "unfair competition rights" (collectively, "Moral Rights").  To the extent such Moral Rights cannot be assigned under applicable law and to the extent allowed by the laws in the various countries where Moral Rights exist, Supplier hereby waives such Moral Rights and consents to any action of LBHI and its licensees that would violate such Moral Rights in the absence of such consent.

(b)    As between LBHI and Supplier, all right, title and interest in and to Work Product will be owned by Supplier, including any Intellectual Property Rights therein.  Notwithstanding the foregoing, to the extent that any Work Product is either licensed by Supplier to third parties and/or Used by Supplier in connection with Supplier's provision of services to any other customers of Supplier, the Parties may agree in the relevant Statement of Work to enter into a separate revenue-sharing agreement with respect to such Work Product pursuant to which Supplier may pay to LBHI a percentage of the revenues paid to Supplier by such other customers attributable to the enhanced functionality arising from such license or Use of the Work Product.

(c)    Additional Acts.  Each Party agrees to execute, and cause its Delegates (if applicable) and employees to execute, at no additional charge, any documents and take any other actions as may be reasonably necessary, or as may be requested by the other Party, to perfect each Party's ownership rights as set forth herein and to register, maintain and enforce the Commissioned Work Product and/or Work Product (and any Intellectual Property Rights therein or arising therefrom).

**10.3    License Rights**

(a)    Supplier Grants.  Subject to the terms and conditions of this Agreement, Supplier hereby grants (and will cause each Delegate to grant) to each LBHI Recipient and its Authorized Designee(s)

(i)     a royalty-free, limited, perpetual, non-exclusive, non-transferable, worldwide and irrevocable right and license, with the unrestricted right to sublicense to Representatives under the Supplier Technology (including Work Product), to the extent that such Supplier Technology (or Work Product) is embedded or

EXECUTION COPY

incorporated in any Commissioned Work Product (including any non-Software Deliverables provided by Supplier to any LBHI Recipient(s) under the Statements of Work, regardless of whether such Deliverables are owned by or licensed to such LBHI Recipient(s)), to Use such Supplier Technology (including any Intellectual Property Rights therein or arising therefrom) solely in connection with the use of such Commissioned Work Product (and not for purposes of reverse-engineering any of Supplier's or its Affiliates' Intellectual Property Rights); and

(ii)     a royalty-free (unless otherwise expressly provided in the applicable Statement of Work), limited, non-exclusive, non-transferable, worldwide right and license, with the unrestricted right to sublicense to Representatives, under Supplier Technology to the extent that Supplier Technology is made available by Supplier from time to time for purposes of providing electronic access to data and information generated or maintained by Supplier as part of the Services (the "<u>Data Access Services</u>"), and to Use such Supplier Technology (including any Intellectual Property Rights therein or arising therefrom) solely in connection with the use of such Data Access Services during the term of this Agreement.

For the purposes of this <u>Article 10</u>, each LBHI Recipient will be responsible for the acts and omissions of its Authorized Designees in relation to their use of the Supplier Technology as if such LBHI Recipient had committed such acts and omissions itself.  For the avoidance of doubt, <u>Section 10.3(a)(i)</u> does not grant to any LBHI Recipient(s) or Authorized Designee a license to Use such Supplier Technology on a stand-alone basis.  No Technology or Intellectual Property Rights of a third party will be incorporated into Deliverables without the prior written consent of the applicable LBHI Recipient(s).

(b)     <u>LBHI Recipient Grant</u>.  Subject to the terms and conditions of this Agreement, each LBHI Recipient hereby grants to Supplier and Delegates a limited, non-exclusive, non-transferable, worldwide and revocable right and license to Use LBHI Technology (including any Intellectual Property Rights therein or arising therefrom) solely to the extent necessary to perform the Services and fulfill its obligations hereunder and for no other purpose.  Supplier may sublicense such right and license to its Delegates upon the prior written approval of LBHI, with Citadel Investment Group LLC and Sapient hereby approved by LBHI, provided that Supplier will be responsible for the acts and omissions of Delegates in relation to their use of the LBHI Technology as if such Supplier had committed such acts and omissions itself.

(c)     <u>Additional License Grants</u>.  Upon the execution of this Agreement, the Parties shall (and shall cause their relevant Affiliates, as applicable) to execute a license agreement in the form set forth in <u>Schedule 10.3(c)</u>.  The Parties acknowledge and agree that such license agreement will be deemed to be incorporated by reference herein, and will in turn incorporate by reference therein the terms and conditions of this Agreement.

**10.4     Limitations.**

(a)     <u>No Other Rights Granted</u>.  Except for the rights granted in this <u>Article 10</u>, in no event will a Party acquire or retain any other license or right of use or otherwise acquire or retain

EXECUTION COPY

any right, title or interest in or to the Technology of the other Party, whether in the form of Intellectual Property Rights or other ownership rights or interests as a result of this Agreement.

(b)     <u>Third-Party Restrictions</u>.  Any and all rights granted hereunder are limited by and subject to the restrictions imposed under any license or other agreement between the party granting the license and any supplier of:

(i)      Supplier Third-Party Technology or LBHI Third-Party Technology, as applicable;

(ii)     data feeds; or

(iii)    other information or technology services;

and each Party receiving such a license agrees to abide by any such restrictions following receipt of notice thereof from the licensor and a reasonable opportunity to act thereon, <u>provided, however</u>, that with respect to any Supplier Third-Party Technology that Supplier uses solely for providing Services to the LBHI Recipients (and not for any other customer(s) of Supplier) Supplier agrees and covenants that, on a prospective basis, it shall use reasonable efforts, with LBHI's cooperation, to include identical or substantially similar terms and conditions to those set forth in <u>Schedule 10.4</u> in all license agreements pursuant to which such Supplier Third-Party Technology is licensed.

(c)     <u>No Right to Modify</u>.  The Party granted a license hereunder, on its behalf and any Delegate or Authorized Designee, as applicable, agrees not to and shall have no right to modify the Technology of the Party granting such license in any way, enhance or otherwise create derivative works based upon the licensed Technology or reverse engineer, decompile or otherwise attempt to secure the Source Code for all or any part of the licensed Technology.  Notwithstanding the foregoing, this <u>Section 10.4(c)</u> will not restrict either Party's rights to develop technology similar to or competitive with the licensed Technology pursuant to a clean room development in a way that does not infringe the rights of the other party or third party rights; *provided, however,* that in doing so they do not misappropriate or infringe the Intellectual Property Rights or Intellectual Property Rights of the other Party, its Affiliates, or third parties who have licensed or provided materials to the other Party or its Affiliates.

(d)     <u>Improvements</u>.  All right, title and interest in and to any improvements, modifications, corrections, compilations, derivative works, derivations, or other revisions ("<u>Improvements</u>") of the licensed Technology provided to any Party receiving a license by the party granting such license or developed by any Party receiving such license (and all Intellectual Property Rights therein or arising therefrom) will be owned by the licensing Party and shall be deemed to be included in the definition of "<u>Supplier Technology</u>" or "<u>LBHI Technology</u>," as applicable, and subject to the provisions of <u>Sections 10.1</u> and <u>10.2</u>, as applicable.

(e)     <u>Residuals</u>. During the course of performing or receiving the Services, Supplier and the LBHI Recipient(s) (including Delegates and Authorized Designees, respectively) may further develop their knowledge, skills, and experience in its personnel's unaided memory.  The mere subsequent use by any such party of such knowledge, skills and

EXECUTION COPY

experience will not constitute a breach of this Agreement or any Statement of Work, so long as such use is consistent with the confidentiality obligations under this Agreement and the applicable Statement of Work(s).

(f)     Rights under the Bankruptcy Code.  All licenses and rights of use granted by Citadel Licensors with respect to Technology or Intellectual Property Rights under or pursuant to this Agreement will be deemed to be, for the purposes of the Bankruptcy Code, licenses to rights in "intellectual property" as defined under 11 U.S.C. § 101 (35A). Accordingly, the licensee of such rights will retain and may fully exercise all of its rights and elections under the Bankruptcy Code.  Upon the commencement of bankruptcy proceedings by or against any Citadel Licensor under the Bankruptcy Code, the LBHI Recipients will be entitled to retain all of their license rights and use rights granted under the Agreement.

**10.5    LBHI Data Format**.  Supplier represents, warrants and covenants that all LBHI Data shall be, at all times during and after the term of this Agreement, maintained in a format that allows for and facilitates ready extraction and conversion to another format of LBHI's choosing.  Supplier hereby grants to LBHI a non-exclusive, royalty-free, irrevocable and perpetual license to use whatever Intellectual Property Rights or Technology of Supplier or its Affiliates or the other licensors under Schedule 10.3 are necessary for the extraction and conversion of the LBHI Data solely for the purpose of extracting and converting the LBHI Data.  By or before the applicable Services are provided, Supplier shall deliver to LBHI documentation that describes the database schema for such format in such detail as to allow a reasonably skilled engineer to understand the format and fully utilize data stored therein without undue experimentation.

**11.     LBHI RECIPIENT RESPONSIBILITIES**

**11.1    LBHI Recipient Obligations**

(a)     Dependencies.  The LBHI Recipients will use reasonable efforts to, in a timely manner in order to allow Supplier to meet its obligations hereunder:

(i)      give Supplier all customary instructions and such other instructions as Supplier reasonably requests to enable Supplier to fulfill its duties and obligations under this Agreement (including any Statements of Work);

(ii)     use commercially reasonable review and control procedures that are designed to ensure that all trade instructions delivered to Supplier are duly authorized and comply with applicable Laws, internal compliance procedures and policies and investment restrictions applicable to such LBHI Recipients;

(iii)    provide, and cause third-party providers to make available, information and data to Supplier as reasonably required for Supplier to be able to perform its obligations under this Agreement (including any Statements of Work);

(iv)    use commercially reasonable review and control procedures that are designed to ensure that such information and data is accurate and will make corrections to such information and data as problems are identified by either Party; and

EXECUTION COPY

    (v)    perform its other obligations, and cause third-party providers to perform their obligations, under this Agreement and the Statements of Work to enable Supplier to perform its obligations under this Agreement and the Statements of Work in accordance with the Service Levels, as applicable.

(b)    <u>Costs of Operations, Market Data</u>.  The LBHI Recipients will bear all expenses incurred by such LBHI Recipients' operation of their retained businesses that are not specifically assumed by Supplier under any Statement of Work, including, without limitation, all costs and expenses necessary for or relating to the receipt of the Services, as set forth herein.  In addition, the LBHI Recipients will bear the cost of and secure all necessary rights to market data necessary to provide the Services unless and until such times as Supplier and the LBHI Recipients otherwise agree in writing.

## 11.2    Limitation of Remedies

In no event will a failure by any LBHI Recipient to satisfy its responsibilities hereunder, except for its obligations regarding intellectual property as set forth in <u>Article 10</u> and confidentiality as set forth in <u>Article 20</u> hereafter, under a Statement of Work, a Change Plan, or the Migration Plan give rise to:

(a)    any termination rights other than the termination rights expressly set forth in this Agreement (including any Statements of Work); or

(b)    any claim by Supplier against the LBHI Recipients for any damages (other than those arising from (i) LBHI's indemnification obligations pursuant to <u>Article 23</u>; (ii) LBHI's failure to pay any amounts due under this Agreement or any Statements of Work (other than amounts disputed in good faith); and (iii) the gross negligence or willful misconduct of LBHI).

## 12.    CHARGES, INVOICING AND PAYMENT

## 12.1    Charges

Each Statement of Work will contain a Fee Schedule that sets forth the charges payable to Supplier for the performance of Services under such Statement of Work.  The LBHI Recipients will not be required to pay Supplier any amounts for or in connection with performing the Services and fulfilling Supplier's obligations under this Agreement (including any Statements of Work) other than the charges and any amounts that Supplier is expressly permitted to charge under the terms of this Agreement or any such Statement of Work, or as otherwise agreed in writing by LBHI or an LBHI Recipient.

## 12.2    Expenses

Supplier acknowledges and agrees that expenses that it incurs in performing the Services (including document reproduction and shipping, and long-distance telephone) are included in the Fee Schedule set forth in any Statement of Work.  Accordingly, no such expenses will be separately reimbursable by the LBHI Recipients, except as otherwise indicated hereunder.

## 12.3    Benchmarking; Pricing Assumptions

(a)     <u>Benchmarking</u>.  The LBHI Recipients will have the right during the term of this Agreement to benchmark the charges payable under the Statements of Work and the performance of Services in accordance with the provisions to be mutually agreed by the Parties and attached hereto as <u>Schedule 12.3(a)</u>.

(b)     <u>Pricing Assumptions</u>.

   (i)     Any and all of Supplier's prices, terms and conditions for Services governed by this Agreement will at all times be equal, lower or more favorable to LBHI than those offered by Supplier to any other similarly situated recipient or user of Supplier's services that are materially consistent in scope to the Services. Without limiting the foregoing, if the pricing for any service or feature identified on any Statement of Work is offered by Supplier to any other similarly situated party at a lower price, Supplier shall immediately notify LBHI in writing of such lower price and the Fee Schedule for such Statement of Work shall be deemed to be automatically amended by such notice to reflect the lower price.  LBHI shall have the right to audit Supplier to verify that Supplier is not in breach of this Section.  If LBHI's audit shows that Supplier is in breach of this Section, Supplier will refund to LBHI the overcharged amounts plus ten percent (10%). No remedy afforded LBHI in this Section shall serve to limit LBHI's other rights and remedies under this Agreement, at equity, or at law.  This provision will not apply to any fees relating to the licensing of any Intellectual Property Rights of Supplier or its Affiliates.

   (ii)     If, at any time during the twelve (12) month period following the Statement of Work Effective Date, such data provided by the LBHI Recipients proves to be erroneous, and forms the foundation for any such assumptions, and Supplier incurs material costs as a result thereof without a corresponding increase in fees, Supplier shall have the right to reimbursement for such material costs, to the extent of the impact of such erroneous data on the revenue and cost models of Supplier, provided that Supplier substantiates in a reasonable manner such material costs and a lack of corresponding increase in fees.

**12.4    Taxes**

"<u>Taxes</u>" means all taxes, levies or other like assessments, charges or fees, including, without limitation, income, gross receipts, excise, ad valorem, property, goods and services, value added ("<u>VAT</u>"), import, export, sales, use, license, payroll, franchise, utility and privilege taxes or other taxes, fees, duties, charges, levies, regulatory fees, surcharges or assessments of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax or additional amounts, imposed by the United States, or any state, county, local or foreign government or subdivision or agency thereof.

(a)     <u>Taxes in the Dedicated Environment</u>.

   (i)     The LBHI Recipients shall reimburse Supplier for state and local sales, use, gross receipts, or similar taxes which are imposed on the Supplier and may be charged to the LBHI Recipient on an invoice, for tangible personal property or services

EXECUTION COPY

purchased by Supplier solely for use in, the environment described in Statement of Work No. _____ (the "Dedicated Environment").

(ii)    The LBHI Recipients shall reimburse Supplier for all real property, personal property, or similar *ad valorem* taxes imposed on Supplier with respect to any item of property that Supplier owns or leases solely for use in the Dedicated Environment.

(iii)    Each LBHI Recipient shall pay any sales, use, gross receipts or other tax which is directly imposed on the LBHI Recipient and may be charged to the LBHI Recipient on an invoice for tangible personal property or services that it receives from Supplier under the Agreement.

(b)    <u>Taxes Outside of the Dedicated Environment</u>.

(i)    For all services provided to any LBHI Recipient outside of the Dedicated Environment, Supplier shall be responsible for any and all taxes on tangible personal property or services purchased or used by Supplier to provide services to any LBHI Recipient.

(ii)    Each LBHI Recipient shall pay any sales, use, gross receipts or other tax which is imposed on the LBHI Recipient and may be charged to the LBHI Recipient on an invoice for any tangible personal property or services that it receives from Supplier under the Agreement.

(c)    <u>Withholding Taxes</u>.  Any and all payments made by any LBHI Recipient under a Statement of Work will be made free and clear of and without deduction or withholding for any and all taxes; provided, however, that if a LBHI Recipient is required by Law to deduct any taxes from such payments, then:

(i)    such LBHI Recipient will make such deductions or withholdings; and

(ii)    such LBHI Recipient will pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable Law.

Any such LBHI Recipient will provide Supplier with the appropriate certificate(s) from the relevant tax authorities (to the extent available, or, if not, other relevant documentation) confirming the amount of the taxes withheld and paid over by such LBHI Recipient in accordance with this Section.  The Parties further agree to complete and, if required, submit to the relevant tax authorities within a reasonable period of time such forms, certifications or other documents as may be required to reduce or establish an exemption from the requirement to withhold taxes on the payments by any such LBHI Recipient to Supplier hereunder.  Supplier's responsibility under the preceding sentence will arise only upon such requests.  Supplier will respond to reasonable requests by any LBHI Recipient to complete and submit such forms, certifications or other documents as may be required to reduce or establish an exemption from the requirement to withhold taxes on the payments.  In the event that a LBHI Recipient makes an increase in payment on account of Taxes pursuant to <u>Section 12.4</u> to Supplier and Supplier receives in connection therewith a credit against its Tax liabilities in or with

EXECUTION COPY

respect to the taxable year in which the additional amount is paid, Supplier will pay to the affected LBHI Recipient an amount that is equal to the net benefit, after tax, which was obtained by Supplier in such year as a result of such credit.

(d)    Cooperation and Notification.

(i)    The Parties agree to cooperate in good faith to determine the applicability of state and local sales, and use taxes that may be imposed on the sale, license, lease or other use of tangible personal property or provision of services to the LBHI Recipients or state and local sales and use taxes passed through to the LBHI Recipients under this agreement.  If the Parties disagree on the applicability of sales or use tax on a particular transaction, Supplier may invoice the LBHI Recipient for the tax, however, Supplier agrees to provide reasonable cooperation to the LBHI Recipient supporting its position on the determination of the applicability of the tax.

(ii)    Supplier  agrees to use its best efforts to invoice taxable charges separately from non-taxable charges, and to apply Taxes to these charges appropriately. Each Party will provide and make available to the other any exemption certificates, resale certificates, information regarding out-of-state or out-of-country sales or use of equipment, materials or Services, and other information reasonably requested by the other Party.  To the extent that any Tax authority asserts that any of Supplier's products or Services are subject to Tax for which the LBHI Recipients are responsible under this Agreement, Supplier agrees to provide the LBHI Recipients with information from its books and records to support the tax treatment of such product or Service, or to minimize the amount of Tax to which the product or Service is subject.  Each Party will notify the other in writing, within 30 days of being contacted by a government authority with regard to any tax for which the other party may be liable.  The parties shall coordinate the response to and settlement of any claim for taxes asserted by any government authority for which such other Party is responsible hereunder.

## 12.5    Invoicing and Payment Due

This Section 12.5 sets forth the invoicing and payment terms and procedures associated with the charges payable to Supplier for performance of the Services.  LBHI will pay to Supplier all amounts owed to Supplier hereunder or under any Statement of Work (other than amounts disputed in good faith) within forty-five (45) days after the date that LBHI receives the corresponding invoice.  Late payments shall accrue interest at a rate of LIBOR plus five percent (5%).  Supplier will include the calculations used to establish the charges and will include separate line items on each invoice for applicable Taxes.

(a)    Currency.  Supplier will invoice the LBHI Recipient receiving the Services in the currency mutually agreed upon and set forth in the Fee Schedule to each Statement of Work.

(b)    Supporting Documentation.  Supplier will maintain complete and accurate records of, and supporting documentation for, the amounts billable to and payments made by LBHI under this Agreement (including any Statements of Work).  Supplier will provide LBHI

EXECUTION COPY

with documentation and other information with respect to each invoice rendered by it sufficient for LBHI to verify the accuracy and compliance of invoices with the provisions of this Agreement and the Statements of Work.

(c)    <u>Disputed Charges</u>.  If LBHI in good faith disputes the accuracy of an invoice submitted by Supplier (or portions thereof) within forty five (45) days of receipt by LBHI of such invoice, LBHI may withhold payment of any amount in dispute.  The Parties agree to resolve in good faith on an expedited basis any such disputes.

## 13.    TERM AND TERMINATION

### 13.1    Term, Extension and Renewal

(a)    <u>Agreement Initial Term</u>.  The term of this Agreement will commence on the Effective Date and will continue until the third (3rd) anniversary thereof, unless terminated earlier or extended or renewed in accordance with this Agreement (the "<u>Agreement Initial Term</u>").

(b)    <u>Renewal</u>.  This Agreement will automatically renew for consecutive annual periods following expiration of the Agreement Initial Term.  Either Party may elect not to renew the Agreement upon at least one (1) year's notice prior to the then-current expiration date.

(c)    <u>Term of Statements of Work</u>.  Each Statement of Work will set forth its Statement of Work Effective Date and its term, as well as any renewals, if applicable.  Each Statement of Work will terminate upon expiration or termination of this Agreement unless earlier terminated in accordance with the terms hereof or thereof.

### 13.2    Termination, Generally

This Agreement may only be terminated as provided in this <u>Article 13</u>.  Unless this Agreement expressly provides otherwise, termination by a Party will be without prejudice to and with full reservation of any other rights and remedies available to the Party.  Without prejudice to the rights of Supplier and any Supplier Affiliate under applicable Laws, the LBHI Recipients will not be obliged to pay any termination charges or wind-down fees in connection with the termination of any Statement of Work, except as expressly provided in this Agreement or such Statement of Work (i.e., costs associated with build out of the Data Center referenced in the Infrastructure Statement of Work).

### 13.3    Termination of this Agreement

(a)    <u>By LBHI</u>.

(i)    <u>For Cause</u>.

(A)    A Material Disruption is classified as a situation either (x) where Supplier's acts or omissions demonstrate, in LBHI's reasonable discretion, a lack of integrity and/or moral turpitude such that it would not be reasonable to expect the LBHI Recipients to continue with their

EXECUTION COPY

relationship with Supplier (including any cases where Supplier Personnel is engaged in fraudulent or criminal activity potentially affecting the LBHI Recipients); or (y) where, in each case set forth below, Supplier has failed to provide assurances, reasonably satisfactory to LBHI, that it will continue to provide the Services to LBHI in material compliance with the terms and conditions set forth herein and any applicable Statement of Work for a reasonable transition period not to exceed one year:

(1)     Supplier materially breaches this Agreement, which breach is not cured within thirty (30) days after LBHI notifies Supplier of such breach, or if such breach is not capable of cure within such thirty (30) day period, within an additional thirty (30) day period (for a total of sixty (60) days following such notice), provided that Supplier commences to cure such breach within such initial thirty (30) day period and diligently pursues the cure of such breach to completion; *provided, however,* that no such cure period will apply where Supplier has committed a breach that is incapable of cure.

(2)     Supplier commits a Persistent Breach or Pervasive Breach of this Agreement and LBHI has notified Supplier by written notice that a Persistent Breach or Pervasive Breach of such Statement of Work has occurred, and:

   i.     with respect to a Persistent Breach, Supplier has failed to cure the cause of such Persistent Breach within thirty (30) days after receipt of such notice; or

   ii.    with respect to a Pervasive Breach, Supplier has failed to cure a sufficient number of the underlying breaches that comprise the Pervasive Breach within thirty (30) days of receipt of such notice such that any underlying breaches that remain uncured do not in the aggregated constitute a Pervasive Breach.

(3)     Supplier is unable to pay its debts as they fall due or in the event of any of the following as they relate to Supplier (i) the presentation of a petition for winding up of Supplier, a petition in bankruptcy or similar proceeding seeking its reorganization or liquidation, which petition is not dismissed within thirty (30) days (or such longer period as the law of the jurisdiction concerned may provide); (ii) being the subject of an order, or an effective resolution is passed for winding up of Supplier, or Supplier going into liquidation; (iii) the application for an order or application for the appointment of a receiver (including an administrative receiver), administrator, trustee, liquidator or similar officer in respect of Supplier, which application is not dismissed within thirty (30) days (or such longer period as the

law of the jurisdiction concerned may provide); (iv) an execution creditor, receiver (including an administrative receiver) or other similar officer taking possessions of the whole or any substantial part of Supplier's property or assets; (v) Supplier making a composition with its creditors generally or making a general assignment for the benefit of its creditors; (vi) the filing by Supplier of a voluntary petition in bankruptcy or similar proceeding seeking liquidation or the filing of a written admission of its inability to pays its debts as they become due; (vi) Supplier's or such Supplier Affiliate's auditors issue an opinion expressing doubt as to whether Supplier can maintain itself as a "going concern" or (viii) filing by Supplier of a petition or answer seeking reorganization or an arrangement with creditors or seeking protection under any bankruptcy or insolvency law (any such event shall be referred to as an "<u>Insolvency Event</u>"); or

(4)     Supplier suffers a Force Majeure event, as set forth in <u>Section 24.3</u> resulting in an inability to provide Services to LBHI for ten (10) business days or more according to the terms and conditions herein; or

(5)     Supplier ceases operations without notice to LBHI.

(B)     In the event of a Material Disruption:

(1)     Upon LBHI's request, Supplier shall deliver to LBHI all LBHI Data in its most current and updated form, in a format pre-approved by LBHI and which is accessible and usable by third parties without any further conversion efforts.

(2)     Supplier's Affiliates may offer to, *inter alia*, assume Supplier's rights and obligations under this Agreement or to continue to provide the Software used to support the Services, in object code/runtime form, for a commercially reasonable license fee

    i.      for the remainder of the term of the Agreement, or

    ii.     for the duration of a reasonable transition period (not to exceed twelve (12) months) to allow LBHI to transition its portfolio to an alternative services provider (the "<u>Transition Period</u>").

Such offer by Supplier's Affiliates may be accepted or rejected by LBHI in its sole discretion.

(C)     If LBHI has not accepted an offer by Supplier's Affiliates pursuant to <u>Section 13.3(a)(i)(B)(2)</u> within ten (10) days after the commencement of a Material Disruption, the LBHI Recipients shall have the right to

EXECUTION COPY

terminate this Agreement and any or all Statements of Work hereunder and to use the Software used to support the Services in object code or runtime form only and hardware to continue the Services itself for the Transition Period. In furtherance of this right:

(1)     LBHI shall be able to exercise its rights under the license from the Citadel Licensors under Section 10.3 if necessary to effect a transition of its portfolio to an alternative services provider.

(2)     Supplier's Affiliates and its Affiliates as applicable shall make available to LBHI at licensing rate equal to the excess, if any, of the current market licensing rates over the amount of damages to which LBHI is entitled due to the Material Disruption, an exact replica of the Software used to support the Services in object code/runtime form, which Software shall be subject to the license set forth in Exhibit 10.3.

(3)     Notwithstanding Section 7.3 hereto, LBHI shall have the right to demand that any Supplier or Delegate employees or agents that LBHI reasonably believes will assist in continuing to provide the Services be seconded to LBHI (on a full-time or part-time basis at LBHI's cost and sole discretion) for up to one (1) year in order to assist in conducting an efficient and effective transition away from Supplier, and Supplier and each Delegate shall use good faith efforts to compel such employees, or employees of comparable skills and knowledge and comparable experience working with Supplier, LBHI, the LBHI dedicated environment and providing the Services, to be so seconded, *provided, however*, that if any such individuals cease to be employees of Supplier or any Delegate, then LBHI shall have the right to engage such individuals as consultants for up to one (1) year in order to assist in conducting an efficient and effective transition away from Supplier, and, in either case, Supplier and each Delegate release any claims they may have against LBHI or the employees or agents arising from such secondment or engagement including, but not limited to, claims of breach of contract or misappropriation of trade secrets (in connection with their use of such trade secrets consistent with the applicable license).

(4)     LBHI may engage a third party service provider, including Sapient, to continue to provide the Services.  Such third party shall have access to the Citadel Licensors' Software in object code/runtime form as necessary and at licensing rate equal to the excess, if any, of the current market licensing rates over the amount of damages to which LBHI is entitled due to the Material Disruption , which Software shall be subject to the license set forth in Exhibit 10.3, to maintain and continue to

EXECUTION COPY

provide the Services as provided by Supplier if necessary to effect a transition away from Supplier and/or to an alternative services provider, *provided, however*, that in the event that access to the Citadel Licensors' Software in source code form is necessary to effect a transition away from Supplier and/or to an alternative services provider, (a) upon LBHI's request, subject to the execution of new confidentiality undertakings by any Engaged Consultants, any Seconded Employees and Engaged Consultants shall have access to a copy of those portions of the source code necessary to effect such transition in accordance with Supplier's reasonable source code access policies and procedures.  Furthermore, any Software used in connection with the Services  and hosted in the LBHI data center shall continue to be hosted in the LBHI data center.

(D)     For the avoidance of doubt, and subject to <u>Section 24</u> hereof, none of the remedies set forth in this <u>Section 13</u>, shall in any way restrict, limit or offset LBHI's remedies at law against Supplier for any claims, damages, expenses or losses suffered by LBHI as a result of Supplier's failure to perform its obligations under this Agreement.

(ii)     <u>Material Uncured Breach</u>.  LBHI may terminate this Agreement, in whole or in part, by written notice to Supplier with immediate effect if Supplier materially breaches this Agreement, which breach is not cured within thirty (30) days after LBHI notifies Supplier of such breach, or if such breach is not capable of cure within such thirty (30) day period, within an additional thirty (30) day period (for a total of sixty (60) days following such notice), *provided that* Supplier commences to cure such breach within such initial thirty (30) day period and diligently pursues the cure of such breach to completion; *provided, however,* that no such cure period will apply where Supplier has committed a breach that is incapable of cure.

(iii)     <u>Persistent or Pervasive Breach</u>.  LBHI may terminate this Agreement, in whole or in part, by written notice to Supplier with immediate effect if Supplier commits a Persistent Breach or Pervasive Breach of this Agreement and LBHI has notified Supplier by written notice that a Persistent Breach or Pervasive Breach of such Statement of Work has occurred, and:

(A)     with respect to a Persistent Breach, Supplier has failed to cure the cause of such Persistent Breach within thirty (30) days after receipt of such notice; or

(B)     with respect to a Pervasive Breach, Supplier has failed to cure a sufficient number of the underlying breaches that comprise the Pervasive Breach within thirty (30) days of receipt of such notice such that any underlying breaches that remain uncured do not in the aggregated constitute a Pervasive Breach.

(iv)    <u>Upon Order to Terminate by Governmental Authority or Non-Governmental Authority</u>.  LBHI may terminate this Agreement by written notice to Supplier with immediate effect upon receipt by LBHI of any order, letter, directive or similar communication from a governmental authority with jurisdiction over LBHI directing LBHI to terminate, cease or otherwise withdraw from all or any material part of this Agreement.

(v)    <u>For Regulatory Breach</u>.  LBHI may terminate this Agreement, in whole or in part (including any Statement of Work(s) hereunder), by written notice to Supplier with immediate effect if the portion of Supplier's business that offers the Services has committed a material violation of its regulatory obligations, if any, with regard to the Services.  Where such termination relates to a violation of regulatory obligations applicable to the Services, LBHI will not be liable for any Termination for Convenience Fees.

(vi)    <u>For Convenience</u>.  Subject to <u>Section 14.1(c)</u>, after the first twelve (12) months of the Agreement Initial Term, LBHI may terminate this Agreement, in whole or in part (including any Statement of Work(s) hereunder), for convenience and without cause by giving Supplier at least six (6) months' prior written notice designating the termination date, with no liability for Termination for Convenience Fees (except those costs associated with the build out of the LBHI Data Center as set forth in the Infrastructure Statement of Work or as otherwise set forth in a Statement of Work).

(vii)    <u>For Change of Control in Supplier</u>.  Subject to <u>Section 14.1(c)</u>, LBHI may terminate this Agreement in the event of a Change of Control, provided that LBHI provides Supplier written notice of its intent to terminate under this <u>Section 13.3(a)(vii)</u> no later than ninety (90) days after the closing of the applicable transaction that results in the Change of Control.  Such termination will be deemed effective upon Supplier's receipt of such notice thereof, and LBHI will not be liable for any Termination for Convenience Fees.

(b)    <u>By Supplier</u>.

(i)    Supplier may, by giving written notice to the LBHI Recipients, terminate this Agreement with immediate effect, subject to <u>Article 14</u>, if an LBHI Recipient fails to pay Supplier any charges or other amounts owed hereunder (including any amounts owed pursuant to any applicable indemnity) when due under this Agreement (other than amounts that are disputed to the extent permitted herein) and fails to cure such failure within sixty (60) days after written notice thereof from Supplier.

(ii)    Subject to <u>Section 4.2</u> and except with respect to LAMCO, LLC, Supplier may terminate this Agreement solely with respect to a Divested Business for convenience and without cause by giving the owner of the Divested Business at least six (6) month's prior written notice designating the termination date, with no liability for Termination for Convenience Fees.

(iii)     Subject to <u>Section 4.2</u> and except with respect to LAMCO, LLC, Supplier may terminate this Agreement solely with respect to a Divested Business by written notice to the owner of such Divested Business with immediate effect in the event that said owner and/or such Divested Business materially breaches this Agreement, which breach is not cured within thirty (30) days after Supplier notifies said owner and/or such Divested Business of such breach, or if such breach is not capable of cure within such thirty (30) day period, within an additional thirty (30) day period (for a total of sixty (60) days following such notice), provided that said owner and/or such Divested Business commences to cure such breach within such initial thirty (30) day period and diligently pursues the cure of such breach to completion; *provided, however,* that no such cure period will apply where said owner and/or such Divested Business has committed a breach that is incapable of cure.

(c)    <u>By Either Party</u>.  Either Party may terminate this Agreement immediately in the event

(i)     The other Party's representations set forth in <u>Sections 21.2(a)</u>, <u>21.2(b)</u> or <u>21.2(c)</u> hereof were false as of the Effective Date;

(ii)    The other Party or any of its Delegates or Authorized Designees, as applicable, or any of their employees or representatives breach the obligations relating to confidentiality or use of Intellectual Property Rights under this Agreement or any Statement of Work and such Party does not cure such breach within thirty (30) days after receipt of notice thereof; or

(iii)    The other Party or any of its Delegates or Authorized Designees, as applicable, or any of their employees or representatives engage in fraud, criminal conduct or breaches such Party's obligations under <u>Section 8.1(b)</u>.

## 14.    TERMINATION/EXPIRATION RESOURCES; EFFECT OF TERMINATION

### 14.1    Termination Assistance

Supplier will perform the required services, functions and responsibilities in connection with the cessation of any Service, or the expiration or earlier termination (for any reason) of a Statement of Work, to facilitate the orderly wind-down of the Services being ceased, terminated or expiring, or facilitate migration of such Services from Supplier's operating environment(s) to the replacement operating environment(s) of the LBHI Recipients or their designee (either or both such entities, the "<u>Successor</u>"), as and to the extent such services, functions and responsibilities are described in this <u>Article 14</u> or are mutually agreed upon by the Parties and set forth in <u>Schedule 14.1</u> hereto (the "<u>Termination Assistance</u>").  Supplier will perform Termination Assistance, when applicable, as set forth in such Statement of Work(s), unless Termination Assistance is not addressed therein, in which case Supplier will perform Termination Assistance with respect to such Statement of Work as set forth hereunder.

(a)    <u>Time Period</u>.  Supplier will provide Termination Assistance upon the earlier of either a delivery of a termination notice or a failure of the Parties to reach agreement on acceptable terms for renewal as of the Renewal Decision Date, and continuing for twenty-four (24) months (the "<u>Termination Assistance Period</u>").  The Termination

EXECUTION COPY

Assistance Period and any Emergency Termination Assistance Period (as applicable) may extend beyond the expiration or termination of the term of this Agreement.  The Parties will develop and agree on a plan for Supplier's provision of Termination Assistance that will include, among other things, staffing levels and additional Supplier Personnel as mutually agreed to by the Parties in their discretion.

(b)     <u>Fees</u>.  Any Termination Assistance is subject to prompt payment by LBHI of all amounts owed to Supplier hereunder or under any Statement of Work (other than amounts disputed in good faith) and will be billed at standard time and material rates.

(c)     <u>Stranded Costs</u>.   Should LBHI terminate this Agreement and such termination is effective prior to the expiration of the Agreement Initial Term, LBHI shall reimburse Supplier for Supplier's actual, out-of-pocket stranded costs associated with equipment purchased or leased, software licensed, and service commitments and lease obligations made at the request of LBHI and approved in writing by LBHI.  For purposes of this provision, costs will be considered "stranded" to the extent Supplier is unable to mitigate the costs by exercising rights of termination, selling or leasing the relevant equipment, or making a good faith effort to make productive use of the equipment, software or services for other purposes in place of expenses it otherwise would have incurred, or the like.  Supplier will use good faith efforts to mitigate stranded costs, but under no circumstances will a failure to make productive use of any stranded assets be deemed to be not in good faith.

(i)     <u>Right of First Offer</u>:  Prior to mitigation, Supplier shall notify LBHI and LBHI shall have the right to purchase any such equipment and/or receive an assignment of any such services by paying Supplier's cost therefor.

(ii)     <u>Right of Last Offer</u>:  If Supplier procures a prospective buyer for any such equipment or services or intends to offset other expenses through use of such equipment or services, in each case which will yield receipts or offset costs lower than Supplier's cost therefor (such that LBHI would need to reimburse stranded costs for such equipment or services), Supplier shall so notify LBHI and LBHI shall, as its sole and exclusive remedy, instead have the option to purchase the equipment or services itself by paying Supplier's costs therefor.  LBHI understands that this right of last offer may impact Supplier's ability to find buyers for stranded assets.

If LBHI elects to purchase any of such equipment or accept assignment of any services contracts or equipment leases, then Supplier or its Affiliate shall, at LBHI's election, promptly convey title to such equipment or assign the agreement for services (as applicable) to LBHI and, in the case of equipment, make such equipment available for LBHI's disposition at LBHI's expense and risk.  For purposes of calculating stranded costs hereunder, costs shall be aggregated across all equipment purchased and service commitments made at the request of LBHI and approved in writing by LBHI (such that profit with respect to some items may be offset against shortfall with respect to other items).

**14.2     Other Items and Works**

EXECUTION COPY

(a)     During the Termination Assistance Period and subject to applicable Laws, at the request of the LBHI Recipients, Supplier will identify for the LBHI Recipients the works or other Intellectual Property Rights that Supplier has licensed, leased or otherwise obtained from unaffiliated third parties, not otherwise covered by the other provisions of this Article 14 and are used primarily to provide the Services being ceased, terminated or expiring, subject to any confidentiality restrictions with the owners of such Intellectual Property Rights.

(b)     At the request of the LBHI Recipients, Supplier will return to the relevant LBHI Recipient all of the documents and materials of the LBHI Recipients.

## 15.     DATA PROTECTION; POLICIES; SECURITY

### 15.1     LBHI Data

(a)     LBHI Data.  Supplier will store all applicable Information received or produced under this Agreement on LBHI-designated or controlled Systems except for items specifically excluded by LBHI and Information owned and controlled by Supplier.  All LBHI Data received or produced during the performance of the Services hereunder and stored on Supplier Technology (including Supplier's Systems) will be contained in a database or maintained through other suitable computer storage process sufficient to conform to all applicable Laws and will, upon LBHI's request, be delivered to LBHI within a reasonable period of time in the format specified by LBHI.

(b)     Use Restrictions.

(i)     Except as provided in Section 15.1 or otherwise permitted under Section 20.2(b), without approval of the relevant LBHI Recipient (in its sole discretion), Supplier covenants that the LBHI Data will not be:

(A)     used by Supplier or its Delegates other than is strictly necessary for the performance of the Services under this Agreement;

(B)     disclosed, sold, assigned, leased or otherwise provided by or within Supplier or its Delegates (including within or to any other business line of Supplier that provides investment advisory services) other than as is strictly necessary for the performance of the Services, *provided, however*, that in the event that Supplier's databases become corrupted such that Supplier's provision of Services would be materially limited or impeded, Supplier may, upon LBHI's prior approval (in LBHI's sole discretion), allow a third party to have access to such corrupted database for the sole purpose of remediation of such database, and *provided further*, that such third party is bound to a confidentiality or non-disclosure agreement at least as protective as this Agreement; or

(C)     commercially exploited by or on behalf of Supplier or its Delegates.

(ii)     Supplier and its Delegates will not possess or assert liens or other rights in or to LBHI Data and Supplier shall use commercially reasonable efforts to remove any

EXECUTION COPY

such lien or other rights that have been granted by or through Supplier or its Delegates.

(iii)    Except as provided in <u>Section 15.1</u>, Supplier hereby agrees to irrevocably and perpetually assign, transfer and convey to the relevant LBHI Recipient without further consideration all of its and their right, title and interest, if any, in and to LBHI Data.

(c)    <u>Return of Data/Record Retention</u>.  At the request of any LBHI Recipient at any time during the term of this Agreement, Supplier will  promptly return to such LBHI Recipient, in a useable, machine readable format, all or any part of LBHI Data and/or erase or destroy all or any part of LBHI Data in Supplier's possession.  Any destruction or disposal of LBHI Data by Supplier hereunder will be in accordance with Laws applicable to Supplier and/or in accordance with Laws applicable to the relevant LBHI Recipient. Solely during the term of this Agreement, Supplier may maintain a copy of any LBHI Data in accordance with its internal document retention policies.

(d)    <u>Data Archiving and Storage</u>.  In the event any or all LBHI Data stored on Supplier Technology is destroyed, altered or damaged in any way, Supplier will, at its cost, promptly use commercially reasonable efforts to restore full use within forty-eight (48) hours of loss of service and such additional efforts specified in the BCP described in <u>Section 15.1(e)</u>, to restore such LBHI Data.  Supplier will take all necessary precautions to prevent the loss of or alteration of LBHI Data in Supplier's possession.  Supplier will perform regular archiving of all electronic LBHI Data that is maintained on Supplier Technology and shall archive such LBHI Data in two (2) sites (1 principal and 1 backup) that are located in different cities.

(e)    <u>Business Continuity Plan</u>.  At no additional cost to LBHI or any LBHI Recipient(s), Supplier will (i) prepare, maintain and comply with a disaster recovery, crisis management and business continuity plan and procedures (the "<u>BCP</u>") designed to help ensure that it can continue to provide the Services in accordance with this Agreement and the applicable Statements of Work in the event of a disaster or other significant event that might otherwise impact its operations.  Supplier's BCPs will include, at a minimum, those items contained in <u>Schedule 15.1(e)</u>.  Such BCPs will also address all operations identified by LBHI as "mission critical," will meet the substantive requirements specified by LBHI, and will be agreed upon by LBHI and Supplier.  Supplier will regularly update, and, when necessary, activate, the BCPs such that all Services provided to the LBHI Recipient(s) will be restored to full use in accordance with the mutually agreed to BCP.  The BCPs and all updates thereto will be approved or rejected by LBHI within twenty-five (25) Business Days of receipt thereof.  Supplier will provide a copy of the BCPs to LBHI at any time upon request.  Supplier will permit LBHI to participate in testing and assessment of the BCPs.

## 15.2    Data Accuracy

(a)    Supplier will notify the relevant LBHI Recipient if it discovers any material inaccuracies in the Historical Records and will assist such LBHI Recipient to mitigate any possible damages arising from such inaccuracies, to the extent reasonably practicable.  Supplier

will provide all reasonable assistance to such LBHI Recipient (at the request and expense of such LBHI Recipient) to reconcile any outstanding items and process any necessary adjustments.

(b)    Supplier will perform certain reconciliations, variance or tolerance checks or other specific forms of data review as specified in a Statement of Work.  Supplier will promptly notify the relevant LBHI Recipient if it becomes aware that any information received by it is incomplete, inaccurate or insufficient in a material respect or in the event of a failure or delay by any person to provide information required by Supplier to discharge its duties under this Agreement (including any Statements of Work).

## 15.3    LBHI Policies

(a)    Supplier acknowledges that it has received a copy of, and has caused its Representatives on the Executive Committee and Relationship Managers (and will cause any replacements thereof) to become familiar with, the following LBHI policies, all of which are attached to this Agreement ("LBHI Policies"):

(i)    the Code of Conduct attached hereto as Schedule 15.3(a)(i) ("Code of Conduct");

(ii)    the Employment Data Protection Standards and Data Security Policies attached hereto as Schedule 15.3(a)(ii) subject to the exclusions set forth on the Supplement to Schedule 15.3(a)(ii), *provided, however*, that (A) at the request of LBHI, the parties shall perform an in-depth, structured audit to test the effectiveness of Supplier's controls, and (B) following such structured audit, Supplier shall make all commercially reasonable changes that LBHI requests in order to cause Supplier to be in compliance with the Employment Data Protection Standards and Data Security Policies attached hereto as Schedule 15.3(a)(ii), and the cost of implementing such changes shall be billed to LBHI according to the rates set forth in Schedule 15.4(h)(i) subject to the recurring, non-cumulative, annual credit of one-hundred thousand dollars ($100,000) set forth in Section 15.4(h), *provided, further*, that for purposes of this Section 15.3(a)(ii), "commercially reasonable changes" means changes that would not create significant operational issues for Supplier or its Affiliates.

(iii)    the Information Security Policy of the LBHI Recipients, and the respective standards set forth therein; and

(iv)    any other policies identified by LBHI during the term of this Agreement, provided that if Supplier's compliance with any such additional policies requires Supplier to incur additional expenses or to provide additional Services, the addition of such policy shall be considered a Change and shall be subject to the Change Management Procedure described in Section 4.1.

(b)    Supplier shall comply with, and will cause its Delegates to comply with, all LBHI Policies, and to report to LBHI suspected material violations of such policies (whether such violations are by Supplier or otherwise).  Supplier further agrees that it will provide copies of the LBHI Policies to all Supplier Personnel, instruct all Supplier Personnel to

EXECUTION COPY

review the LBHI Policies, and shall require all Supplier Personnel to certify that they have read and reviewed the LBHI Policies.

**15.4    Security Standards**

(a)    <u>Information Security Policies</u>.  Each Party will (i) comply with the Systems access operating standards and procedures, user identification and password control requirements, and other security procedures implemented by the other Party in accordance with its Information Security Policy to the extent the other Party provides prior notification thereof; (ii) inform the other Party, reasonably in advance of the implementation thereof, of any revisions to its Information Security Policy that would impact the other Party's ability to access the Systems; and (iii) advise the other Party immediately if it learns or has reason to believe that any person to whom it has granted access to the Technology or Systems of the other Party has violated or intends to violate the terms of this Agreement and will cooperate with the other Party in seeking injunctive or other equitable relief.

(b)    <u>Physical Security Standards</u>.  Supplier will limit access to routers, servers, and network devices used in providing the Services.  Supplier will provide for monitored environments of such routers, servers, and network devices, such as air conditioning, clean and uninterrupted power source, and fire suppression.

(c)    <u>Access to Supplier Network</u>.  Supplier will have firewall technology in place to protect Supplier from unauthorized outside access to Supplier's network.   Supplier's Internet/web server(s) must be protected by a firewall.  Supplier's server hosting LBHI Confidential Information may not have Internet access unless LBHI consents.  Supplier will protect all LBHI Confidential Information from unauthorized outside network access in a manner no less secure than the manner by which Provider protects its own comparable information.

(d)    <u>Internet Security</u>.  Supplier will encrypt all LBHI Data transmitted through the Internet. Documents, business records and other data made available via the Internet will be available only to authorized users and will be protected by Supplier from improper use in accordance with generally accepted Internet security practices used in the information technology industry.  Only authorized Supplier Personnel will have access to access codes and electronic identification codes.

(e)    <u>Other Security Standards</u>.  Subject to <u>Article 4</u> and <u>Section 15.4(h)</u>, LBHI and Supplier will jointly agree in good faith to other security requirements that may be necessary to make LBHI's and Supplier's network and Internet environments secure.

(f)    <u>Notice of Breach or Intrusion</u>.  If there is any security breach and/or any unauthorized intrusion into any of the Supplier Systems from which LBHI Data is accessible or on which LBHI Data is hosted , Supplier will immediately inform LBHI of the nature, scope, circumstances, and anticipated impact (if any) of such breach.

(g)    <u>Evolution of Security Standards</u>.  Supplier agrees to improve security standards in response to the evolving sophistication of security threats, consistent with the best practices in international information system standards.

EXECUTION COPY

(h)     <u>Changes to Policies and Security Standards</u>.  Supplier will implement all changes to the LBHI Policies and LBHI's security guidelines reasonably requested by LBHI, *provided that* (i) to the extent such changes are solely relevant to the Services provided to the LBHI Recipient(s) hereunder (and therefore inapplicable to Supplier's business, services, and/or other customers), the cost of implementing such changes shall be billed to LBHI according to the rates set forth in <u>Schedule 15.4(h)(i)</u> and (ii) to the extent such changes can be used in and are applicable to Supplier's business, services, and/or other customers, the cost of implementing such changes shall be billed to LBHI according to the rates set forth in <u>Schedule 15.4(h)(ii)</u>.  To the extent the Parties cannot reach a good faith agreement as to whether <u>Section 15.4(h)(i)</u> or <u>Section 15.4(h)(ii)</u> hereof is applicable with respect to a specific change, such change will be billed according to the rate-card set forth in <u>Schedule 15.4(h)(i)</u>.  Notwithstanding the foregoing, Supplier shall grant to LBHI a recurring, non-cumulative, annual credit of one-hundred thousand dollars ($100,000) for (A) all differences between the costs billed to LBHI pursuant to <u>Section 15.4(h)(i)</u> which LBHI believes should have been billed under <u>Section 15.4(h) (ii)</u>; (B) the costs of any changes made by Supplier pursuant to <u>Section 15.3(a)(ii)</u>.

## 15.5    Upgrades; Virus Detection Software; Malicious Code

(a)     <u>Acceptance Testing</u>.  Each Party will subject new Software, or any revision, update, improvement, modification, correction, release, replacement or enhancement thereof ("<u>Upgrade</u>") to an acceptance test prior to implementation to the extent the implementation of any such new Software or Upgrade could reasonably be expected to have a material downstream impact to the Systems of the other Party.  Each Party will use commercially reasonable efforts to minimize any costs or disruptions to the other Party as a result of new Software or an Upgrade.

(b)     <u>Supplier Releases</u>.  Supplier will make available to the LBHI Recipients all corrections, Upgrades and all subsequent releases and versions of the Supplier Technology that it puts into production for other customers receiving services from Supplier that are comparable to any of the Services generally from time to time, all within a reasonable time after Supplier generally puts the same into production for its customers receiving services from Supplier comparable to any of the Services generally, such supply to be at no additional charge (other than in connection with any implementation assistance that the LBHI Recipients may request of Supplier) to the LBHI Recipients (provided such Upgrade is offered without charge to other customers of Supplier receiving services from the Supplier comparable to any of the Services generally) and all such corrections and Upgrades and all subsequent releases and versions to be deemed to form part of Supplier Technology and to be, as applicable, licensed pursuant to and in accordance with <u>Article 10</u>.  In no event will any corrections, Upgrades or releases be withheld from LBHI Recipients following the date upon which Supplier generally makes such releases available to any other customer of Supplier receiving services from the Supplier comparable to any of the Services without charge.  For the sake of clarity, provided that Supplier has used commercially reasonable efforts to consult with LBHI prior to making available any mandatory corrections, Upgrades or releases, the LBHI Recipients shall not have the right to reject the implementation of any Upgrades and subsequent releases and versions of the Supplier Technology made available by Supplier unless such Upgrade would materially negatively impact the quality or increase the cost of the Services.

EXECUTION COPY

(c)    <u>Virus Detection Software</u>.  Each Party will exercise commercially reasonable efforts (including employing a current version of one of the leading commercially available virus detection Software programs to evaluate Software for the presence of any Malicious Code) to prevent the introduction and proliferation of any Malicious Code into its Systems or the other Party's Systems.

(d)    <u>Malicious Code</u>.  Without limiting either Party's other obligations under this Agreement (including any Statements of Work), each Party covenants that if any Malicious Code is found to have been introduced into any Systems used by such Party to provide or receive the Services, such Party will:

(i)    remove such Malicious Code at its expense;

(ii)    exercise commercially reasonable efforts to eliminate, and reduce the effects of, the Malicious Code; and

(iii)    if the Malicious Code causes a material loss of operational efficiency or loss of data, use reasonable efforts to mitigate such losses and restore such data.

If an LBHI Recipient requests additional assistance from Supplier to eliminate or reduce the effects of any Malicious Code introduced by or through LBHI, an LBHI Recipient or a third party under the control of an LBHI Recipient, Supplier will provide reasonable assistance at the LBHI Recipient's expense at the Supplier Hourly Rates under an applicable Statement of Work.

**15.6    Notice and Resolution of Security Breach**

Without limiting the Parties' obligations under <u>Article 20</u>, if either Party discovers or is notified of a known Security Breach Incident, such Party will unless otherwise instructed by legal or regulatory authorities:

(a)    promptly notify the Relationship Manager of the other Party by telephone and e-mail, and by a confirmatory written notice as soon as practicable (but in any event within two (2) Business Days) of such Security Breach Incident;

(b)    provide appropriate status reports to the other Party regarding the resolution of the Security Breach Incident and prevention of future Security Breach Incidents, including investigating and remediating the effects of the Security Breach Incident; and

(c)    discuss with the other Party any other appropriate action to be taken to limit any adverse effects to such other Party as a result of the Security Breach Incident.

**16.    COMPLIANCE WITH LAWS**

**16.1    Compliance with Laws**

(a)    Each Party will perform its obligations under this Agreement (including any Statements of Work) in a manner that complies with all Laws applicable to such Party.

EXECUTION COPY

(b)     Supplier covenants, represents and warranties that (i) it has the legal right to provide the Services from all Supplier Service Jurisdictions, and (ii) the Supplier and the Services and Deliverables provided by the Supplier are in compliance with all applicable Laws, including privacy and data protection Laws.

(c)     To the extent either Party becomes aware of any changes in Law that would require a Change to this Agreement or any Statement of Work, such Party will notify the other Party of such change in Law.  To the extent such Laws require Supplier to provide training to Supplier Personnel, Supplier will, upon reasonable request therefor, certify to the relevant LBHI Recipient that it has done so in a form mutually agreed upon by the Parties.  Such training will be conducted at LBHI's cost solely to the extent that such training is required by a change in Law applicable solely to LBHI and not otherwise applicable to Supplier or the fund administration industry generally.

**16.2    Obligations of Supplier.**  Supplier agrees that:

(a)     If an LBHI Recipient notifies Supplier of any restrictions or conditions imposed by applicable Laws or Governmental Entities applicable to the delegation of the Services (or any part thereof) to Supplier, Supplier will comply with any such restrictions or conditions.  Such compliance may constitute a Mandatory Change for purposes of this Agreement and be subject to the Change Management Procedure and any additional fees resulting therefrom.

(b)     Supplier (and all of its Delegates):  (i) will use no forced, indentured or prison labor, or labor which violates any applicable minimum working age, working condition, wage or overtime Laws in the performance of this Agreement and the Statements of Work; (ii) will comply with the tax, immigration, and employment Laws of all jurisdictions in which its employees perform work under this Agreement and the Statements of Work; (iii) will comply with all Laws and regulations governing environmental protection, and the health and safety of its employees; and (iv) will comply with all applicable privacy or data protection Laws of any country where work relating to this Agreement and the Statements of Work is performed.

(c)     Supplier will be solely responsible for procuring and maintaining all necessary permits and licenses required in connection with Supplier's performance of the Services, including, where applicable, processing and procuring all necessary visas, work permits, and passport documents for its employees in advance of their assignment in connection with provision of any Services.  Supplier will use commercially reasonable efforts to obtain all such permits, licenses and visas in a timely manner to avoid any unnecessary delay.  Supplier will ensure that all Supplier Personnel are in compliance with all visas, passports, and work permits being used by them.

(d)     Supplier will provide all data, documents, reports and Information as reasonably requested by any LBHI Recipient(s) from time to time, as evidence of Supplier's compliance with Law.

**16.3    Export Controls**

EXECUTION COPY

Each Party acknowledges that certain software and technical data to be provided hereunder and certain transactions hereunder may be subject to export controls under the Laws of one or more jurisdictions.  Neither Party nor any of their respective Authorized Designees or Delegates, as applicable, will export or re-export any such items or any direct product thereof or undertake any transaction in violation of any such Laws.  Each Party will be responsible for, and will coordinate and oversee, compliance with such export Laws in respect of such items exported or imported hereunder by such Party.  Upon request therefor by a Party, the other Party will identify the classification of its Technology for the purpose of helping the other Party understand export controls related risks.

**16.4    Notification**

If a Party discovers a breach of its obligations under applicable Law (including a breach of its regulatory obligations) that relates to the Services and that may have a material adverse effect on its ability to perform its obligations under this Agreement (including any Statements of Work), such Party will promptly notify the other Party's Relationship Manager of such breach (provided that such notification will not relieve either Party of any other notification rights or obligations hereunder).  Such breach will be referred to the Executive Committee, which will meet with each Party's Relationship Manager in attendance as soon as practicable and in any event within two (2) Business Days after receipt of such notice.  The Executive Committee will use reasonable efforts to agree upon the most appropriate course of action to be taken in respect of any such breach, including, where appropriate, an agreed form of explanation or disclosure to be given to the relevant regulators or to be announced publicly, provided that nothing in this <u>Section 16.4</u> will interfere with any Party's obligation to deal with its regulator in an open and co-operative manner and in accordance with its obligations under applicable Laws.

**16.5    Compliance Certifications**

At the written request of the other Party, each Party will provide the other Party with certifications substantially in the form attached as <u>Schedule 16.5</u> hereto or such other form and at such times as the Parties shall mutually determine.

**16.6    Cooperation**

Each Party will cooperate with, and fully comply with, the other Party's efforts to comply with applicable Laws, including instructions and orders given from regulators, to the extent such instructions and orders relate to the Services.  If compliance with this <u>Section 16.6</u> would cause either Party to violate applicable Laws, the Parties will escalate via the Governance Procedures.

EXECUTION COPY

**17.    PERSONAL DATA PROCESSING AND PROTECTION**

**17.1    Personal Data Processing**

In performance of this Agreement and the Statements of Work, Supplier and its Delegates may have access to, or otherwise Process, LBHI Personal Data on LBHI's behalf.  LBHI Personal Data will be accessed and otherwise Processed by Supplier and it Delegates only to the extent strictly necessary to perform Supplier's obligations under this Agreement and the Statements of Work, or upon LBHI's written instructions (and in strict compliance thereof).

**17.2    Protection**

(a)    <u>Confidentiality</u>.  Notwithstanding anything in <u>Article 20</u> to the contrary, Supplier agrees to keep the LBHI Personal Data confidential, and agrees to not disclose the LBHI Personal Data to third parties without having first received express written approval from LBHI.  Supplier Personnel will Process LBHI Personal Data only on a need-to-know basis solely to the extent strictly necessary to perform Supplier's obligations under this Agreement and the Statements of Work.

(b)    <u>Security</u>.  Supplier will implement technical and organizational measures to ensure the security and confidentiality of LBHI Personal Data and in order to prevent, among other things: (i) accidental, unauthorized or unlawful destruction, alteration, modification or loss of LBHI Personal Data, (ii) accidental, unauthorized or unlawful disclosure or access to LBHI Personal Data, and/or (iii) unlawful forms of Processing.  The security measures taken by Supplier will be in compliance with all applicable Data Protection Laws and will be commensurate with the risks represented by the Processing and the nature of the LBHI Personal Data to be Processed, taking into consideration the generally accepted security measures available to protect such data and the implementation costs of such measures.  Supplier will immediately inform the applicable LBHI Recipient(s) of any breach of its obligations under this <u>Article 17</u>.

(c)    <u>Compliance with Data Protection Laws</u>.  Without limiting the Parties' obligations under <u>Article 16</u>, the Parties will comply with their respective obligations under the following Laws (collectively, "<u>Data Protection Laws</u>"), as applicable:

(i)    Title V of the Gramm-Leach-Bliley Act of 1999 or any successor federal statute to the Gramm-Leach-Bliley Act of 1999, and the rules and regulations thereunder, all as may be amended or supplemented from time to time;

(ii)    the applicable Laws, *e.g.*, European Commission Data Protection Directive (95/46/EC), the European Commission Data Protection in the Electronic Communications Sector Directive (2002/58/EC) or Data Protection Act 1998 or any implementing or related legislation of any member state in the European Economic Area; and

(iii)    any other data protection or privacy Laws relevant to the applicable Statement of Work.

EXECUTION COPY

(d)     Supplier and its employees shall, and Supplier shall ensure that its Delegates shall, on LBHI's request, reasonably assist LBHI and the LBHI Recipients with their efforts to demonstrate their compliance with any legislative or regulatory responsibilities or liabilities under any relevant data protection legislation or Data Protection Laws in relation to the performance of the Services and that cannot be delegated by the LBHI recipients to Supplier for discharge or fulfillment by Supplier in the proper performance of its obligations under this Agreement and/or any Statement of Work.

(e)     If any change in Laws prevents Supplier from fulfilling its obligations under this Article 17:

     (i)     the LBHI Recipients shall be able to suspend the transfer of data to Supplier unless and until a suitable workaround or other Change has been implemented and Supplier shall be excused from the performance of any Service that requires the use of such data and relieved from liability on account thereof; and

     (ii)     and if within a reasonable time after Supplier is so prevented (in light of the compliance obligations of the LBHI Recipients) a workaround or other Change that permits Supplier to fulfill such obligations in compliance with such change in Law has not been implemented, the LBHI Recipients shall be entitled in its sole discretion, to terminate the relevant Statement of Work upon written notice to Supplier.

(f)     Supplier will, and will cause its Delegates to, implement all measures reasonably necessary to ensure compliance by Supplier Personnel with the obligations relating to LBHI Personal Data, and will require Supplier Personnel, a condition of having access to LBHI Personal Data, to sign individual confidentiality agreements in which they each agree individually to comply with the obligations of this Article 17.  LBHI may also require Supplier Personnel, as a condition of participating in specific assignments, to sign individual confidentiality agreements that are tailored for such specific assignments.

(g)     LBHI reserves the right to conduct at any time during business hours, subject to prior written notice, an on-site verification of Supplier's compliance with obligations relating to LBHI Personal Data, even after the expiration or termination of this Agreement. Supplier will provide access to all concerned facilities, equipment and records in order to conduct such verification.

(h)     Upon the expiration or termination of this Agreement for whatever reason, Provider will stop any Processing of LBHI Personal Data and will return to LBHI all copies of LBHI Personal Data along with all notes, analyses, compilations, forecasts, data, translations, studies, memoranda, copies, extracts, reproductions or other documents that contain such LBHI Personal Data.

(i)     Failure by Provider to comply with the obligations set forth in this Agreement relating to Personal Data will be considered a material breach of this Agreement.  Supplier will immediately inform LBHI of any material breach of Supplier's obligations under this Article 17.

18.     **REPORTS**

Supplier will provide the following reports, and such other periodic reports as the Parties may mutually agree from time to time that relate to the Services or are required to permit the LBHI Recipients to discharge their obligations under applicable Law:   (a) weekly executive summary status reports describing, by business, any key risks, issues, and decisions, applicable workstreams, tracking and milestones, which report shall be substantially in the form attached hereto as Schedule 18.1; and (b) quarterly letter of financial condition, which shall be substantially in the form attached hereto as Schedule 18.2.  The LBHI-Supplier Director shall have access to all such reports.  To the extent that any such reports would reasonably be expected to cause concern to LBHI, the LBHI-Supplier Director may disclose such reports, and any Information disclosed therein to LBHI.

19.     **AUDIT; REGULATORS**

19.1    **Audits of the other Party**

(a)     LBHI Audit Rights.

(i)      Unless prohibited by applicable Laws, and subject to Section 19.1(b) below, each LBHI Recipient, its compliance personnel, auditors (internal and/or external) as well as regulators and other public authorities in each case with jurisdiction over the LBHI Recipients (collectively, the "LBHI Auditors"), may perform audits, inspections and examinations, including the right to photocopy documents, at such LBHI Recipient's expense, of any location or facility or portion thereof at or from which Supplier Personnel are providing the Services, and any data, books, logs (including logs from devices used to measure and monitor Service Level achievement), records, performance records and other documentation in any media relating to the Services ("Books") for the following purposes:

(A)     to examine Supplier's (or its Delegates') performance of its obligations under this Agreement (including any Statements of Work), including the achievement of the required Service Levels, the establishment and implementation by Supplier of business continuity arrangements and Supplier's compliance with Laws (including orders and instructions from the regulator of an LBHI Recipient), regulations, and Supplier's compliance with restrictions on its use of LBHI Technology;

(B)     to ask questions and review documentation regarding the internal controls of Supplier; and

(C)     to discuss Supplier's information security program with Supplier's information security officers and/or other personnel of Supplier in relation to the Confidential Information and the LBHI Recipients, *provided, however*, that neither Supplier nor any of its Affiliates will be obligated to disclose any information to any LBHI Recipient that could, in its reasonable discretion, impair or endanger the security of Supplier's or its Affiliates' computer networks except in connection with a structured audit.

Supplier will make available to LBHI and the LBHI Recipients any materials that Supplier generally makes available to its customers concerning compliance with applicable Laws, or that may assist LBHI or the LBHI Recipients in relation to the Services for the purpose of assisting such customers to comply with Laws applicable to them.

(ii)     Supplier will use Commercially Reasonable Efforts to ensure that its internal and external auditors provide reasonable cooperation with respect to the provision of information that Supplier is required to provide under this Agreement (including any Statements of Work) in connection with the exercise of the audit rights granted to the LBHI Auditors under this Agreement (including any Statements of Work).

(b)     <u>Notice and Cooperation</u>.  Supplier will:

(i)     assist and cooperate fully with the audits performed by LBHI in accordance with the terms of this Agreement; and

(ii)     provide such assistance as reasonably required to carry out the audits, including providing use of Supplier's locations, facilities and resources as reasonably necessary.

(c)     <u>Audit Follow-Up and Remedial Action</u>.

(i)     <u>Audit Follow-Up</u>.  At the conclusion of an audit or examination and prior to issuing the final audit report, LBHI will conduct, or request that the LBHI Auditors (other than regulatory authorities), as applicable, conduct an exit conference with Supplier to obtain factual concurrence with issues identified in the review.  Supplier and the relevant LBHI Recipients will meet to review each final audit report promptly after the issuance thereof.

(ii)     <u>Compliance Corrections</u>.  If an audit performed by LBHI pursuant to <u>Section 19.1</u> reveals any breach by Supplier with any of its material obligations under this Agreement (including any Statements of Work), LBHI will identify such breach to Supplier and Supplier will promptly use Commercially Reasonable Efforts to cure such breach, provided such breach is capable of cure.

(d)     <u>Supplier Information</u>.  Supplier will provide to the LBHI Recipients and the LBHI Auditors with sufficient information regarding itself, its Delegates or their respective operations thereof so as to permit the LBHI Recipients to comply with their regulatory and legal obligations.  LBHI shall reimburse Supplier for any reasonable expenses incurred as a result of its compliance and cooperation with such regulatory inquiries.

**19.2     Type II SAS 70 Audits**

(a)     <u>By Supplier</u>.  Commencing by no later than twelve (12) months following the Migration Period and in each subsequent twelve (12) month period, Supplier will engage an external auditor to conduct a SAS 70 Type II audit of Supplier's controls in place, including an audit of internal controls and procedures used by Supplier with a scope

EXECUTION COPY

substantially in conformance with that set forth in the report attached as <u>Schedule 19.2</u>. In the event the LBHI Recipients request a service level or scope of report different than that currently provided to Supplier's customers generally, then the relevant services/scope may be beyond the coverage of the SAS 70 report in which case, at LBHI's request and expense (as provided in <u>Section 19.2(c)</u>), Supplier shall commission and provide to LBHI a SAS 70 Type II audit with the requested scope.  The Executive Committee shall periodically discuss developments in the industry with respect to the frequency with which SAS 70 audits are conducted in relation to Services that are the same are substantially similar to the Services.

(b)   <u>Reports</u>.

(i)   <u>Generally</u>.  As soon as reasonably practicable following Supplier's receipt of the SAS 70 Type II audit report required of it hereunder, Supplier will provide LBHI and, upon request, its external auditors with a copy of such report.

(ii)   <u>Delegates</u>.  Upon request thereof, but not more frequently than semi-annually, Supplier will provide the LBHI Recipients with copies of any SAS 70 reports of its Delegates that it receives in relation to the Services performed by such Delegates and that Supplier is permitted to make available to the LBHI Recipients.

(c)   <u>Fees</u>.  Supplier will be solely responsible for the fees and expenses charged by its external auditor to conduct the SAS 70 Type II audits required of it hereunder.  If Supplier's auditor determines that a separate SAS 70 Type II report is necessary to cover the Services, then LBHI will bear the costs of such report.  In the event the scope of the current SAS 70 report changes due to LBHI's request , LBHI will bear the incremental costs of such changes.

(d)   <u>Deficiencies</u>.  If any such SAS 70 Type II audit identifies any deficiencies in Supplier's provision of the Services and results in a qualified opinion, Supplier will promptly investigate and conduct an assessment of such deficiency.  At a meeting of the Executive Committee, Supplier will discuss the manner in which it intends to remediate such deficiencies.  To the extent that LBHI is required to demonstrate to its external auditors and regulators that any such deficiency has been corrected, Supplier will permit such Party to review the processes and controls that relate to such deficiency.

**19.3   Record Maintenance and Retention**

(a)   <u>Record Maintenance</u>.  In support of the LBHI Recipients' rights and Supplier's obligations under <u>Article 15</u>, Supplier will maintain all records of all Data and Information of LBHI Recipients that it maintains as part of the Services throughout the term of this Agreement or until such Data and Information is transferred to the LBHI dispute analysis and forensics facility.  Upon termination or expiration of this Agreement, Supplier shall transfer all such records to LBHI in accordance with the terms and conditions of this Agreement.

(b)   <u>Record Retention</u>.  Unless prohibited by applicable Laws and subject to <u>Section 20.4</u>, Supplier will maintain and provide access upon request to the records, documents and

EXECUTION COPY

other Information that it maintains as part of the Services for the periods prescribed by applicable Laws to which the relevant LBHI Recipient is subject, and of which such LBHI Recipient has notified Supplier in writing reasonably in advance of the time by which compliance therewith is required. Any legally required Changes will constitute a Mandatory Change, subject to the Change Management Procedure.

**19.4    Communication with Regulators**

If either Party receives any inquiry from any regulator regarding the other Party or Customers in relation to the Services, then such Party will, to the extent reasonably practicable and legally permissible, consult the other Party before responding to such inquiry and comply with such Party's reasonable requests regarding the content or timing of such response; *provided, however,* that the foregoing shall not limit or restrict such Party in any manner from complying with its regulatory obligations in a manner that, in its sole discretion, it determines to be compliant with Law or necessary for the maintenance of its ongoing relationships with its regulatory authorities.

**20.    CONFIDENTIALITY**

**20.1    Confidential Information.**  In connection with this Agreement and the Statements of Work, Supplier (and its Delegates) and the LBHI Recipients will each have access to certain Confidential Information of the other (the "<u>Information Owner</u>").  The term "<u>Information Owner</u>" includes the directors, officers, employees, and agents of the Information Owner.

**20.2    Exclusions.**

(a)    Notwithstanding any other provision of this Agreement, Confidential Information does not include any information that the Accessing Party can demonstrate:

(i)    was, at the time of disclosure to it, in the public domain (other than as a result of a non-permitted disclosure or other wrongful act directly or indirectly by the Accessing Party or its Representatives);

(ii)    after disclosure to it, is published or otherwise becomes part of the public domain through no action or fault of the Accessing Party;

(iii)    was in the possession of the Accessing Party at the time of disclosure to it and was not the subject of a pre-existing confidentiality obligation at the time of the initial disclosure;

(iv)    was received after disclosure to it from a third party who had a lawful right to disclose such information to it; or

(v)    was independently developed by the Accessing Party without use of the Confidential Information of the Information Owner as reasonably demonstrated through contemporaneous written documentation.

For the avoidance of doubt, any exclusion from the definition of Confidential Information contained in this Agreement will not apply to Personal Information.

(b)     Notwithstanding any other provision of this Agreement, the confidentiality obligations in this <u>Article 20</u> (Confidentiality) will not apply to any Confidential Information which:

(i)     is required (by oral question, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to be disclosed by any Governmental Entity or pursuant to applicable Law, provided, however, that the Accessing Party (i) uses all reasonable efforts to provide the Information Owner with written notice of such request or demand as promptly as practicable under the circumstances so that the Information Owner will have an opportunity to seek an appropriate protective order or other appropriate remedy, or waive compliance with the provisions of this Agreement, (ii) furnishes only that portion of the Confidential Information which is, in the opinion of Accessing Party's counsel, legally required and (iii) takes, and causes its Representatives to take, all other reasonable steps necessary to obtain confidential treatment for any such Confidential Information required to be furnished; or

(ii)    is reasonably required to be disclosed by any LBHI Recipient to their third-party providers in connection with any Termination Assistance to be provided by Supplier, *provided, however*, that (A) any disclosure pursuant to this <u>Section 20.2(b)(ii)</u> shall be pursuant to confidentiality or non-disclosure obligations at least as protective as this Agreement and shall not include any Information that contains pricing, and (B) LBHI shall be responsible for any breaches of such confidentiality or non-disclosure obligations.

**20.3    Confidentiality Obligations**

(a)     <u>Confidentiality Obligations</u>.

(i)     The Accessing Party (or its Delegate, as applicable) will use the Confidential Information of the Information Owner solely for the purposes of performing its obligations or enforcing its rights under this Agreement (including the Statements of Work) or for the purpose for which it was disclosed, and not for any other purpose, including the purpose of competing with the Information Owner.  The Accessing Party will keep such Confidential Information confidential and will not disclose any Confidential Information to any third party without the prior written consent of the Information Owner.  The Accessing Party will exercise at least the same degree of care to safeguard the confidentiality of such Confidential Information as it does to safeguard its own proprietary confidential information of equal importance, but not less than a reasonable degree of care.

(ii)    The Accessing Party will disclose Confidential Information of the Information Owner only to such of the Accessing Party's Representatives who have a need to know the Confidential Information for the purpose of performing its obligations or enforcing its rights under this Agreement (including any Statements of Work). The Accessing Party will ensure, by instruction, contract, or otherwise with its Representatives that such Representatives comply with the provisions of this

Article 20.  Subject to the limitations set forth in Article 23, the Supplier will indemnify and hold harmless the Information Owner in the event of any breach by the Accessing Party's Representatives of such agreements.

(iii)    The Accessing Party will promptly notify the Information Owner in the event that the Accessing Party or its Representatives learn of any unauthorized use or disclosure of such Confidential Information, and will promptly take all actions necessary to correct and prevent such use or disclosure, including cooperating with the Information Owner in any litigation and investigation against third parties deemed reasonably necessary by such Party to protect its proprietary rights.  The Accessing Party will, if required, establish "Chinese walls" to ensure that individuals working on other matters do not have access to the Information Owner's Confidential Information.

**20.4    Return or Destruction**

(a)    During Agreement Term.  As requested by LBHI during the term of this Agreement, the Supplier will return or provide LBHI with a copy of any designated LBHI Confidential Information.

(b)    Expiration or Termination.  Except to the extent this Agreement requires or provides for the Supplier to continue to use or retain items that constitute or contain the LBHI's Confidential Information after the term of this Agreement, Supplier for no additional charge will return, or at LBHI's option, destroy all copies of materials containing LBHI's Confidential Information upon Supplier's cessation of work, completion of its obligations associated with such information under this Agreement (including any Statements of Work), as applicable, or upon any earlier termination of this Agreement or any such Statement of Work, as applicable, for any reason whatsoever. For the sake of clarity, following any such destruction or return, Supplier will no longer have any obligations to provide Services with respect to such Confidential Information.

(c)    Certification.  At LBHI's request, Supplier will certify in writing that it has returned or destroyed all copies of LBHI's Confidential Information in the possession or control of Supplier's or any of its Affiliates, Delegates or contractors to the extent required hereunder.

**20.5    Duration of Confidentiality Obligations**

The Accessing Party's obligations under this Article 20 apply to Confidential Information of the Information Owner disclosed to the Accessing Party before or after the Effective Date and will continue during the term of this Agreement and survive the expiration or termination of this Agreement as follows:

(a)    the Accessing Party's obligations under Section 20.4 will continue in effect until fully performed;

(b)    as to any portion of the Information Owner's Confidential Information that constitutes a trade secret under applicable Law, the obligations will continue indefinitely; and

EXECUTION COPY

(c)    as to all other Confidential Information of the Information Owner, the obligations will survive ten (10) years following termination or expiration of this Agreement, unless otherwise required by Laws, regulations or applicable third-party agreements.

**20.6**    <u>No Implied Rights</u>.  Each Party's Confidential Information will remain the property of that Party. Nothing contained in this <u>Article 20</u> will be construed as obligating a Party to disclose its Confidential Information to the other Party, or as granting to or conferring on a Party, expressly or by implication, any rights or license to the Confidential Information of the other Party.  Any such obligation or grant will only be as provided by other provisions of this Agreement (including any Statements of Work).

**21.**    **REPRESENTATIONS, WARRANTIES, AND COVENANTS**

**21.1**    **By Supplier**

Supplier represents, warrants and covenants to the LBHI Recipients that:

(a)    During the term of this Agreement, subject to <u>Section 2.1(d)</u>, it shall render the Services with promptness and diligence and shall execute them in a professional and workmanlike manner, in accordance with generally accepted industry standards of best practices used in the provision of services similar to the Services, using adequate numbers of qualified personnel with suitable training, education, experience and skill to perform the Services in accordance with the Service Levels (which shall take into consideration Supplier's technological capabilities);

(b)    During the term of this Agreement, it shall perform its responsibilities under this Agreement in a manner that does not infringe, or constitute an infringement, misappropriation or other violation of any third party Intellectual Property Rights, and no Services or Deliverables or Commissioned Work Product provided to LBHI Recipients by or on behalf of Supplier, nor their use by LBHI Recipients, will infringe or constitute an infringement, misappropriation or other violation of any third party Intellectual Property Rights;

(c)    During the term of this Agreement, the Supplier Technology required to support the Services provided by Supplier hereunder are capable of supporting all local currencies required by LBHI Recipients, as additional currencies or main currencies, but is not multi-currency functional;

(d)    During the term of this Agreement, Supplier will provide the Services using proven, current Technology that will enable Supplier to reasonably take advantage of technological advancements in its industry.  Supplier will notify LBHI of any of Supplier's new developments or services that could reasonably be expected to have a favorable impact on the Services but that Supplier does not use in the provision of the Services;

(e)    Supplier will be able to pay its debts as they become due and shall have adequate financial resources to provide the Services during the Agreement Initial Term. No obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Supplier; and

(f)       Supplier will provide promptly following the Effective Date, a copy of an executed agreement by and between Supplier and Sapient, pursuant to which Sapient acknowledges Supplier's rights to offer employment to any of Sapient's employees, upon the occurrence of a Sapient-related Insolvency Event, as defined in <u>Section 13.3(a)(i)(A)(2)</u>.

**21.2   Mutual Representations and Warranties**

Each Party represents, warrants and covenants to the other that:

(a)       <u>Good Standing</u>.  As of the Effective Date, it is a corporation duly organized, validly existing and in good standing under the Laws of Delaware.

(b)       <u>Power and Authority</u>.  As of the Effective Date, it has all requisite corporate power and authority to enter into, and to carry out the transactions contemplated by this Agreement, including the Statements of Work.

(c)       <u>Duly Authorized and No Material Default</u>.  As of the Effective Date, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement (i) have been duly authorized by the requisite corporate action on the part of such Party and (ii) will not conflict with or constitute a violation of any of the terms, conditions, or provisions of any contract, judgment, order or decree.

(d)       <u>Adequate Rights</u>.

(i)        As of the Effective Date, it has obtained and will retain, at its sole expense, any and all necessary rights, licenses, consents and approvals from Governmental Entities and third parties to perform its obligations under this Agreement and to enter into this Agreement, including the right to grant the other Party the rights granted to it under this Agreement; and

(ii)       As of the Effective Date, it is fully authorized and has all rights necessary to grant or make available to the other Party such rights (including Intellectual Property Rights) and license rights granted or made available, as applicable, to the other Party pursuant to this Agreement.

(e)       <u>No Pending Proceedings; Litigation</u>.  As of the Effective Date, there is no claim, litigation, proceeding, arbitration, investigation or material controversy pending or, to the knowledge of such Party, threatened that challenges or may have a material adverse affect on its ability to perform its obligations under this Agreement.

(f)       <u>Enforcement</u>.  During the term of this Agreement, this Agreement and the Statements of Work will be enforceable by each Party and its successors and assigns against the other Party and its successors and assigns.

(g)       <u>Intrusion</u>.  During the term of this Agreement, it shall comply with all general accepted industry standards for its Technology, Software, Systems, Data, Deliverables and Commissioned Work Product to not contain any elements which are designed to,

capable of, or permit (A) unauthorized access to or intrusion upon, (B) disabling of, (C) erasure of, or (D) interference with, any hardware, Software, data or peripheral equipment, including any "computer viruses," "worms" or "time bombs" as those terms are commonly understood within the technology industry;

(h)     <u>Compliance</u>.  During the term of this Agreement, it shall be in compliance with all applicable federal, state, local, international and foreign Laws applicable to it in connection with its obligations under this Agreement and any applicable Statements of Work.

(i)     <u>Destructive Elements</u>.

(i)     With respect to Supplier:

(A)     Supplier's Systems and the Deliverables do not, with the knowledge of Supplier or its Delegates, after taking reasonable precautions, contain any Destructive Elements, provided that if Supplier breaches the representation set forth in this <u>Section 21.2(i)(i)(A)</u>, Supplier agrees to use commercially reasonable efforts to immediately eliminate any and all Destructive Elements and reverse their adverse effects; and

(B)     Supplier has tested, or has caused its Delegates to test (as applicable), each element of its Systems and used reasonable efforts to test the Deliverables utilizing the most recent version and the most recent data file of a reputable, commercially available anti-virus-checking software program to determine that both are free of Destructive Elements.

(ii)    With respect to LBHI:

(A)     The Misys Software and the LBHI Data do not, with the knowledge of LBHI, after taking reasonable precautions, contain any Destructive Elements, provided that if Supplier breaches the representation set forth in this <u>Section 21.2(i)(ii)(A)</u>, LBHI agrees to use commercially reasonable efforts to immediately eliminate any and all Destructive Elements and reverse their adverse effects; and

(B)     LBHI has tested, or has caused Misys to test (as applicable), each element of the Misys Software and used reasonable efforts to test the LBHI Data installed on Supplier's Systems utilizing the most recent version and the most recent data file of a reputable, commercially available anti-virus-checking software program to determine that both are free of Destructive Elements.

**21.3    DISCLAIMER**

OTHER THAN AS EXPRESSLY PROVIDED IN THIS AGREEMENT OR ANY STATEMENTS OF WORK, NEITHER PARTY MAKE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

22.    **INSURANCE AND RISK OF LOSS**

22.1    **Required Insurance Coverages**

Supplier will at all times during the term of this Agreement, and for one (1) year following expiration or termination of this Agreement, maintain in full force and effect and maintain at its sole cost and expense the policies of insurance specified in Schedule 22.1.

22.2    **Approved Companies**

All such insurance will be procured with reputable insurance companies admitted to do business in the United States.  Each insurance policy will be maintained with an insurer having a rating of at least an "A-" in the most currently available Best's Insurance Reports and will provide for at least thirty (30) days prior written notice to LBHI in the event of any modification or cancellation.

22.3    **Jurisdictions**

Each Party will ensure that the insurance required of it permits payment in the jurisdictions in respect of which Services are provided or received, as applicable.

22.4    **Certificates**

Supplier will, upon request therefor, provide the LBHI Recipients with certificates of insurance evidencing compliance with this Article 22 (including evidence of renewal of insurance) signed by authorized representatives of the respective carriers for each year that this Agreement is in effect.

23.    **INDEMNIFICATION**

23.1    **Mutual**

Each Party (the "Indemnitor") will indemnify, defend and hold harmless the other Party (the "Indemnitee") and such Indemnitee's respective officers, directors, employees, agents (including Misys IQ LLC, in the case of LBHI as Indemnitee), customers, permitted successors and assigns from any and all third party suits, actions, legal or administrative proceedings, losses, costs, expenses (including interest, court costs, reasonable fees and expenses of attorneys, accountants and other experts or other reasonable fees and expenses of litigation or other proceedings or of any claim, default or assessment), damages, claims (including any judgments and any amount paid in settlement of a claim in accordance with the terms of this Agreement), demands or other third party liabilities ("Losses") to the extent such Losses arise from or in connection with any of the following, except in each case to the extent such Losses arise from the Indemnitee's (or its Delegates', Designees', or agents', as applicable) negligence, gross negligence, willful misconduct or failure to perform its obligations under this Agreement:

(a)    the Indemnitor's (or its Delegates', Designees', or agents', as applicable) default in the performance of its obligations under this Agreement or any Statement(s) of Work;

EXECUTION COPY

(b)     the infringement or misappropriation of any Intellectual Property Right alleged to have occurred because of Technology, Independent Work of Indemnitor, Commissioned Work Product, or third-party Intellectual Property Rights provided by or on behalf of the Indemnitor (the "Indemnitor Infringement Items"), except to the extent that such infringement or misappropriation relates to or results from:

　　(i)     changes to the Indemnitor Infringement Items made by or at the direction of the Indemnitee, or precluded by the express instructions of any Indemnitee;

　　(ii)    any Indemnitee's combination of the Indemnitor Infringement Items with products or services not provided or approved in writing by Indemnitor, except to the extent such combination arises out of any Indemnitee's use of the Indemnitor Infringement Items in a manner contemplated in this Agreement;

　　(iii)   designs provided by or at the direction of any Indemnitee (except in the event of a knowing infringement by Indemnitor);

　　(iv)    specifications or other information provided by or at the direction of any Indemnitee (except in the event of a knowing infringement by Indemnitor); or

　　(v)     use by any Indemnitee of any of the Indemnitor Infringement Items in a manner not permitted under this Agreement; or

(c)     the death or bodily injury of an agent, employee, customer, business invitee or business visitor or other person caused by the tortious or criminal conduct of the Indemnitor (or its Delegates', Designees', and agents', as applicable);

(d)     the damage, loss or destruction of real or tangible personal property caused by the tortious or criminal conduct of the Indemnitor (or its Delegates', Designees', and agents', as applicable);

(e)     the breach of any of Indemnitor's (or its Delegates', Designees', and agents', as applicable) confidentiality obligations, as set forth in Article 20; or

(f)     the loss, costs, expenses or damages caused any violation of Law committed by the Indemnitor (or its Delegates', Designees', and agents', as applicable).

**23.2    Infringement Remedy**

(a)     If any item or process embedded in Intellectual Property Rights that Supplier makes available to the LBHI Recipients as part of the Services becomes, or in its reasonable opinion is likely to become, the subject of an infringement or misappropriation claim or proceeding by a third party, Supplier will use Commercially Reasonable Efforts to take any of the following actions at no additional charge to the LBHI Recipients:

　　(i)     secure the right to continue using such item or process; or

EXECUTION COPY

(ii)   replace or modify such item or process to make it non-infringing, provided that the replacement or modification will not degrade performance or quality in any material respect.

(b)   Supplier's obligations in this Section will not exclude the right of the LBHI Recipients to enforce the obligations of Supplier under Section 23.1(a).

**23.3   Destructive Elements Indemnity**

(a)   Supplier will indemnify, defend and hold harmless LBHI, the LBHI Recipient(s) and their Affiliates, officers, directors, employees, agents (including Misys), customers, permitted successors and assigns (collectively, the "LBHI DE Indemnitees") from any claim related to any damages to the LBHI DE Indemnitees arising from any Destructive Elements known to Supplier after reasonable testing, that are contained in Supplier's Systems and/or the Deliverables.  Supplier further agrees to indemnify, defend and hold harmless the LBHI DE Indemnitees from and against any Losses arising from any breach by Supplier of its warranties set forth Section 21.2(i)(i).

(b)   LBHI will indemnify, defend and hold harmless Supplier its respective officers, directors, employees, agents, customers, permitted successors and assigns (collectively, the "Supplier DE Indemnitees") from any claim related to any damages to the Supplier DE Indemnitees arising from any Destructive Elements known to LBHI after reasonable testing, that are contained in the Misys Software and the LBHI Data.  LBHI further agrees to indemnify, defend and hold harmless the Supplier DE Indemnitees from and against any Losses arising from any breach by LBHI of its warranties set forth Section 21.2(i)(ii).

**23.4   Indemnification Procedures**

(a)   Third-Party Claims.  Subject to Section 24 below, if any third-party claim, demand or other action is commenced against an Indemnitee (which term  will include any Party that is entitled to be indemnified under this Agreement), notice thereof will be given to the Indemnitor promptly after the Indemnitee receives notice of the claim or liability being asserted.

(i)   If, after such notice, the Indemnitor acknowledges and agrees that this Agreement's terms apply to such claim, then the Indemnitor may, in a notice promptly delivered to the Indemnitee, but in no event less than thirty (30) days prior to the date on which a response to such claim is due, immediately take control of the defense and investigation of such claim and employ and engage attorneys reasonably acceptable to the Indemnitee to handle and defend the same, at the Indemnitor's sole cost and expense, subject to the following:

(A)   Indemnitee's right to control the defense and investigation pursuant to Section 23.4(c) below.

(B)   the Indemnitor will assign separate counsel to itself and the Indemnitee if the Indemnitee reasonably considers there to be a conflict between the interests of the Parties.

(C)     no settlement of a claim that involves a remedy other than the payment of money by the Indemnitor (which includes as an unconditional term thereof the giving by each claimant or plaintiff to such Indemnitee of a release from all liability with respect to such claim) will be entered into without the prior written consent of the Indemnitee, which will not be unreasonably withheld.

(D)     after notice by the Indemnitor to the Indemnitee of its election to assume full control of the defense of any such claim, the Indemnitor will not be liable to the Indemnitee for any legal expenses incurred thereafter by such Indemnitee in connection with the defense of that claim.

(ii)     The Indemnitee will cooperate, at the cost of the Indemnitor, in all reasonable respects with the Indemnitor and its attorneys in the investigation, trial and defense of such claim and any appeal arising therefrom; *provided, however*, that the Indemnitee may, at its own cost and expense (except as otherwise would be the responsibility of the Indemnitor hereunder), participate, through its attorneys or otherwise, in such investigation, trial and defense of such claim and any appeal arising therefrom.

(iii)     Each Party will use Commercially Reasonable Efforts to mitigate liability, damages and other Losses suffered in connection with this Agreement (including any Statements of Work).

(b)     <u>Ancillary Claims</u>.  If any third-party claim, demand or other action is commenced for which a Party is primarily required to indemnify hereunder ("<u>Lead Party</u>") and in which the other Party's acts or omissions are incidental to the subject matter of the claim ("<u>Incidental Party</u>"), notice thereof will be given to the Lead Party promptly after the Incidental Party receives notice of the claim or liability being asserted.

(i)     If, after such notice, the Lead Party takes control of the defense and investigation of such claim, the Lead Party will employ and engage attorneys to handle and defend the same, at the Lead Party's sole cost and expense, subject to the following:

(A)     the Lead Party will assign separate counsel to itself and the Incidental Party if Lead Party's counsel considers there to be a conflict between the interests of the Parties.

(B)     no settlement of a claim that involves a remedy other than the payment of money by the Lead Party (which includes as an unconditional term thereof the giving by each claimant or plaintiff to such Incidental Party of a release from all liability with respect to such claim) will be entered into without the prior written consent of the Incidental Party, which will not be unreasonably withheld.

(C)     after election by the Lead Party to assume full control of the defense of any such claim, the Lead Party will not be liable to the Incidental Party

EXECUTION COPY

for any legal expenses incurred thereafter by such Incidental Party in connection with the defense of that claim.

(ii)    The Incidental Party will cooperate, at the cost of the Lead Party in all reasonable respects with the Lead Party and its attorneys in the investigation, trial and defense of such claim and any appeal arising therefrom.

(iii)    Each Party will use Commercially Reasonable Efforts to mitigate liability, damages and other Losses suffered in connection with this Agreement (including any Statements of Work).

(c)    <u>Retained Control by Indemnitee</u>.  If the Indemnitor does not take control of the defense pursuant to <u>Section 23.4(a)</u>, the Indemnitee may retain control of the defense and investigation of such claim and employ and engage attorneys reasonably acceptable to the Indemnitor to handle and defend the same, at the Indemnitor's sole cost and expense, provided that the Indemnitor may participate in such defense at its sole cost and expense.  If the Indemnitee retains control of the defense of any claim subject to indemnification hereunder:

(i)    to the extent that any settlement involves the payment of money by the Indemnitor, such settlement will be limited to a reasonable amount; and

(ii)    to the extent any settlement involves a remedy other than the payment of money by the Indemnitor, such settlement will be subject to a waiver of Indemnitee's rights to further indemnification and prior written approval of the Indemnitor, which approval will not be unreasonably withheld.

## 23.5    Enforcement

If the Indemnitee is required to bring a claim against the Indemnitor to enforce the Indemnitee's rights under this <u>Article 23</u>, and the Indemnitee prevails (to the extent so determined by the finder of fact) in such claim, then the Indemnitor will indemnify and reimburse the Indemnitee for and from any costs and expenses (including reasonable legal fees) incurred in connection with the enforcement of this Article.

## 23.6    Subrogation

If an Indemnitor will be obligated to indemnify an Indemnitee, the Indemnitor will, upon fulfillment of its obligations with respect to indemnification, including payment in full of all amounts due pursuant to its indemnification obligations, be subrogated to the rights of the Indemnitee with respect to the claims to which such indemnification relates.

## 23.7    Other Remedies

The availability of the indemnifications provided in this <u>Article 20</u> are not intended to preclude a Party from pursuing any other remedies available to such Party at law, in equity, by contract or otherwise.

## 24.    LIABILITY LIMITATIONS

**24.1**    **Limits and Disclaimers**

(a)    <u>Limits on Liability Amount</u>.  Each Party's total liability for damages for claims (including all claims made by third-party beneficiaries pursuant to <u>Section 26.11</u>) or Losses hereunder and under all Statements of Work in the aggregate over any rolling twelve (12) month period, whether in contract, in tort (including breach of warranty, negligence, strict liability in tort and enforcement of any indemnification obligation) or otherwise, will not exceed the amount equal to the charges paid to Supplier hereunder for the twelve (12) month period immediately preceding the date the relevant claim first arises.  If the most recent event giving rise to liability occurs during the first twelve (12) months after the Effective Date, liability will be limited to an amount equal to the product of twelve (12) times the result obtained by dividing the charges payable from the Effective Date through the date on which such event occurred by the number of months from the Effective Date through such date (based on a thirty (30) day month).  Following exhaustion of the foregoing limitation of liability at any point in time through payment of damages by Supplier, such limitation shall renew with respect to additional claims as charges are paid to Supplier hereunder but in no event to exceed twelve (12) months of charges trailing from the date such claim first arises.  For the avoidance of doubt, the limits of liability set forth in this <u>Section 24.1(a)</u> shall apply to all claims in the aggregate asserted by LBHI, an LBHI Recipient, or a third party beneficiary (as the case may be) on the one hand, and Supplier, on the other hand.

(b)    <u>Limits on Liability Type</u>.  EXCEPT AS SET FORTH IN <u>SECTION 24.1(c)(ii)</u>, IN NO EVENT, WHETHER IN CONTRACT, IN TORT (INCLUDING BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY IN TORT AND ENFORCEMENT OF ANY INDEMNIFICATION OBLIGATION), OR ANY OTHER LEGAL OR EQUITABLE GROUNDS WILL EITHER PARTY BE LIABLE FOR SPECULATIVE, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE OR OTHERWISE MIGHT OR SHOULD HAVE ANTICIPATED THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES.  THE LIMITATIONS SET FORTH IN THIS <u>SECTION 24.1(b)</u> WILL SURVIVE FAILURE OF AN EXCLUSIVE REMEDY.

(c)    <u>Exception to Liability Limitations</u>.

(i)    The limitations set forth in <u>Section 24.1(a)</u> shall not apply to damages that:

(A)    result from violations of a Party's obligations with respect to Confidential Information or Personal Data of the other Party in its care (including personal data of clients of the LBHI Recipients in Supplier's care or in the care of its Delegates) and including Supplier's obligations under <u>Sections 15.1(a)-(c)</u> (collectively, "<u>Confidentiality Obligations</u>");

(B)    result from a Party's (or its Delegates', Designees', and agents', as applicable) fraud, gross negligence, or willful misconduct (which, in the case of Supplier, shall include any intentional abandonment of the Services);

(C)    result from a Party's willful or grossly negligent violation of Laws;

(D)    result from a Party's (or its Delegates' or agents', as applicable) breach of Sections 21.2(i)(i) or 21.2(i)(ii), as applicable; or

(E)    are the subject of indemnity obligations under Section 23.3.

(ii)    The limitations set forth in Section 24.1(b) shall not apply to damages that:

(A)    are the subject of indemnity obligations hereunder with regard to claims asserted by third parties that are not Affiliated with the Indemnitee and with whom the Indemnitee did not have a reasonable opportunity to limit such damages contractually;

(B)    result from a Party's (or its Delegates' or agents', as applicable) breach of Section 21.2(i)(i) or 21.2(i)(i)(A); or

(C)    are the subject of indemnity obligations under Section 23.3.

(iii)    In the event that (x) any LBHI Recipient has assigned this Agreement or any Statement of Work pursuant to Section 26.2 (Assignment) to LAMCO or a similar or comparable entity carrying on an ongoing business, and (y) new Serviced Assets of third parties who are not current or former Affiliates of LBHI (collectively, which shall be referred to as the "New Serviced Assets") are added by such assignee as a result of, or subsequent to, such assignment, then:

(A)    The exclusions to the cap of liability set forth in Section 24.1(c)(i)(A) do not apply with respect to the New Serviced Assets; rather, only the exclusions set forth below in Sections 24.1(c)(iii)(B) and 24.1(c)(iii)(C) shall apply;

(B)    the limitations set forth in Section 24.1(a) shall not apply to damages that result from violations of a Party's Confidentiality Obligations arising solely with respect to the New Serviced Assets where such violations result from a Party's (or its Delegates', Designees', and agents', as applicable) fraud, gross negligence, willful misconduct, or bad faith; and

(C)    the limitations set forth in Section 24.1(a) shall not apply to damages that result from all other violations of a Party's Confidentiality Obligations arising solely with respect to the New Serviced Assets, and instead each Party's total liability for damages for claims for such violations hereunder and under all Statements of Work in the aggregate over any rolling twelve (12) month period, whether in contract, in tort (including breach of warranty, negligence, strict liability in tort and enforcement of any indemnification obligation) or otherwise, will not exceed the greater of twenty million dollars ($20,000,000) and the amount equal to two (2) times the charges paid to Supplier hereunder for such twelve (12) month period. If the most recent event giving rise to liability occurs during the first twelve (12) months after the Effective Date, liability will be limited to the greater of (i) twenty million dollars ($20,000,000), and (ii) an amount equal to the product of twenty four

EXECUTION COPY

(24) times the result obtained by dividing the charges payable from the Effective Date through the date on which such event occurred by the number of months from the Effective Date through such date (based on a thirty (30) day month).  Following exhaustion of the foregoing limitation of liability at any point in time through payment of damages by Supplier, such limitation shall renew as charges are paid to Supplier hereunder but in no event to exceed the greater of twenty million dollars ($20,000,000) and two (2) times twelve (12) months of trailing charges.   For the avoidance of doubt, the limits of liability set forth in this Section  24.1(c)(iii)(C) shall apply to all claims in the aggregate asserted by LBHI, an LBHI Recipient or a third party beneficiary (as the case may be) on the one hand, and Supplier, on the other hand.  Any liability for damages subject to the limits set forth in this Section 24.1(c)(iii)(C) shall count toward the limit in Section 24.1(a) and any liability for damages subject to the limits set forth in Section 24.1(a) shall count toward the limit in Section 24.1(c)(iii)(C), but in each case only up to the limit set forth in Section 24.1(a), and any liability for damages subject to the limits set forth in this Section 24.1(c)(iii)(C) that is in excess of the limit set forth in Section 24.1(a) shall be deemed, by virtue of this Section 24.1(c)(iii)(C), not to count toward the limit in Section 24.1(a).

(d)    Service Level Credits.  Service Level Credits will not be considered damages subject to the foregoing liability cap and will not count against or reduce the amounts available under it.

(e)    LBHI and Supplier each agree that Supplier and LBHI, respectively, is its sole counterparty under this Agreement and in entering into this Agreement it is relying solely on the credit and assets of the Supplier and LBHI, respectively.

(f)    In the event a Party is requested or authorized by any representative of the other Party or required by governmental regulation, subpoena or legal process to produce its working papers or its personnel as witnesses with respect to any Services performed hereunder, the requesting Party will reimburse all time expended at applicable hourly rates for the relevant personnel then in effect.

## 24.2    Liability Under Statements of Work

The liability limitations in this Article 24 are global limitations and all damages arising under or in connection with all Statements of Work will be subject to and apply against such limitations.

## 24.3    Force Majeure

(a)    Neither Party will be liable for any default or delay in the performance of its obligations under this Agreement (including any Statements of Work), if and to the extent such default or delay is caused, directly or indirectly, by fire, flood, earthquake, elements of nature or acts of God, wars, riots, rebellions or revolutions, acts of terrorism, pandemics, strikes, lockouts or labor disputes (except disputes solely between a party (or the Affiliates of the party) and its own personnel) or any other similar cause beyond

EXECUTION COPY

the reasonable control of such Party (a "<u>Force Majeure Event</u>"), except to the extent such default or delay could have reasonably been avoided by the non-performing Party through the use of alternate sources, workaround plans or other means (or in the case of Supplier, the implementation of the disaster recovery and business continuity plan that Supplier is required to maintain under this Agreement).

(b)     The Party hindered by a Force Majeure Event will:

(i)     promptly notify the other Party by telephone and describe at a reasonable level of detail the circumstances causing the hindrance the steps being taken to address such hindrance and the expected duration of such hindrance (to be confirmed in writing or e-mail within twenty-four (24) hours after the event's inception); and

(ii)     notify the other Party promptly when the Force Majeure Event has abated.

(c)     If a Force Majeure Event substantially prevents, hinders or delays the performance by Supplier, its Delegates, or an alternate source (paid by Supplier) of Services necessary for the performance of critical functions of any LBHI Recipient for more than ten (10) days, any affected LBHI Recipient, at its option, may terminate any portion of the affected Statement of Work immediately upon written notice to Supplier (without payment of any Termination for Convenience Fees) and the charges payable to Supplier under such any remaining portions of the Statement of Work(s) will be equitably adjusted to reflect those terminated Services.

**24.4    Disaster Recovery and Business Continuity**

Without limiting the Parties' rights and obligations under <u>Article 15.1(e)</u>, Supplier will implement its BCP in response to a Force Majeure Event, and will otherwise perform its obligations set forth in <u>Schedule 15.1(e)</u>.

**25.    DISPUTE RESOLUTION**

**25.1    Informal Dispute Resolution**

The Parties will attempt to govern the performance and receipt of the Services in the manner described and by the persons or committees described in the Governance Process.

**25.2    Further Dispute Resolution**

(a)     Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 12.4</u> hereof; provided, however, that if the Bankruptcy Court abstains from exercising jurisdiction, the Parties agree to

unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

(b)    Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the Parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 26.8.

### 25.3    Other Remedies

The initiation of the dispute resolution process as described above will not prevent any Party from exercising any of its other rights or remedies hereunder including the right to terminate this Agreement in accordance with Article 13 or seek injunctive relief as described in Section 25.4.  Notwithstanding anything to the contrary in this Agreement, each Party may institute judicial proceedings against the other Party or anyone acting by, through or under such other Party, to enforce the instituting Party's rights hereunder through reformation of contract, specific performance, injunction or similar equitable relief.

### 25.4    Equitable Remedies

Each Party acknowledges and agrees that a breach of any of its obligations under the Articles or Sections of this Agreement listed below, or its infringement or misappropriation of any of the other Party's Intellectual Property Rights may irreparably harm the other Party in a way that could not be adequately compensated by money damages.  In such a circumstance, the aggrieved Party may proceed directly to court.  The relevant Sections subject to this provision are Articles 10, 13, 14, 15, 16, 17, and 20.

### 25.5    Continuity of Services

In the event of a dispute between the Parties, Supplier will continue to so perform its obligations under this Agreement (including any Statements of Work) in good faith during the resolution of such dispute unless and until this Agreement and/or the applicable Statement of Work is terminated in accordance with the provisions hereof (or after the expiration of any Termination Assistance Period, if later).

### 26.    MISCELLANEOUS

### 26.1    Parties' Relationship

The Parties to this Agreement and to the Statements of Work are independent parties.  Supplier, in furnishing the Services, is acting as an independent contractor.  At no time will any Supplier Personnel or any Delegate represent himself or herself or itself as an employee or agent of any

EXECUTION COPY

LBHI Recipient or be considered an employee or agent of any LBHI Recipient. Supplier is not a joint venturer with, nor an employee, agent or partner of any LBHI Recipient and has no authority to represent or bind any LBHI Recipient as to any matters, except as expressly authorized in any Statement of Work.

**26.2    Assignment**

(a)    <u>By LBHI</u>. LBHI will have the right in its sole discretion to transfer or assign its rights, duties or obligations (other than payment) under this Agreement (including any Statements of Work) (in whole or in part), upon the provision of prior written notice to Supplier, to:

(i)    any Affiliate of LBHI so long as the assignee remains an Affiliate of LBHI;

(ii)    a purchaser of all or substantially all of the capital stock or assets of an LBHI Recipient provided that such purchaser or entity agrees in writing to be bound by any such Statement of Work;

(iii)    to an entity with which an LBHI Recipient consolidates or merges; or

(iv)    to a Divested Business; or

No such assignment will be deemed a divestiture for the purposes of <u>Section 4.2</u>. For the sake of clarity, the Parties acknowledge and agree that any permitted assignee hereunder may transfer or assign its rights, duties or obligations, including receiving Services, under this under this Agreement (including any Statements of Work) (in whole or in part) to any other permitted assignee hereunder.

(b)    <u>By Supplier</u>. Supplier will have the right in its sole discretion to transfer or assign its rights, duties or obligations under this Agreement (including any Statements of Work) (in whole or in part), upon the provision of prior written notice to LBHI to any Affiliate of Supplier so long as the assignee remains an Affiliate of Supplier.

(c)    <u>Generally</u>. No permissible assignment or transfer by a Party will relieve such Party of any of its duties, obligations or liabilities under this Agreement (including any Statements of Work). Any Supplier transfer or assignment, whether directly or by merger or otherwise by operation of Law, by Change of Control or otherwise, in contravention of this <u>Section 26.2</u> will be void and of no effect and will constitute a material breach of such Statement of Work by the Party attempting the assignment.

**26.3    Public Disclosures**

Except as required by Law or otherwise upon the written consent of the other Party, neither Party will use or announce, release, disclose, or discuss with any third parties, information regarding this Agreement (including any Statements of Work) or the Services, including the other Party's name or trademark in any media releases, advertising or marketing materials, or disclose that the other is a customer or provider, as applicable.

**26.4    No Waiver**

EXECUTION COPY

No failure, delay or omission by a Party to exercise any right, remedy or power it has under this Agreement (including any Statements of Work) will impair or be construed as a waiver of such right, remedy or power.  A waiver by any Party of any breach or covenant will not be construed to be a waiver of any succeeding breach or any other covenant.  All waivers will be in writing and signed by an authorized representative of the waiving Party.

**26.5    Remedies Cumulative**

Except as otherwise set forth herein:

(a)    all remedies provided for herein (or in any Statement of Work) will be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise; and

(b)    the election by a Party of any remedy provided for herein or otherwise available to such Party will not preclude such Party from pursuing any other remedies available to such Party at law, in equity, by contract or otherwise.

**26.6    Consents, Approvals; Authority for Making Decisions**

Except as specifically set forth in this Agreement (including any Statements of Work), all consents, approvals and requests to be given by either Party under this Agreement (including any Statements of Work) will not be unreasonably withheld, delayed or conditioned unless this Agreement expressly provides that it is in the discretion of the Party.

**26.7    Covenant of Good Faith**

Each Party, in its dealings with the other Party under or in connection with this Agreement (including any Statements of Work), will act reasonably and in good faith.

**26.8    Notices**

Any formal notice, consent, approval, acceptance, agreement or other communication given pursuant to this Agreement (including any Statements of Work) will be in writing and will be effective either when delivered personally to the Party for whom intended, by email or facsimile (with confirmation of delivery), or by overnight delivery services (with confirmation of delivery) (unless delivered after normal business hours, in which case it will be deemed the next Business Day), addressed to such Party at the address set forth below.  A Party may designate a different address by notice to the other Party given in accordance herewith.

> For LBHI:    Lehman Brothers Holdings Inc.
>
> 1271 Avenue of the Americas
>
> New York, NY 10020
>
> Email:  william.gordon@lehmanholdings.com
>
> Attention: William Gordon

With Copies to: Lehman Brothers Holdings Inc.

1271 Avenue of the Americas

New York, NY 10020

Email:  martha.solinger@lehmanholdings.com

Attention:   General Counsel

and:

Weil, Gotshal & Manges LLP

767 Fifth Avenue

New York, NY 10153

Facsimile:  212-310-8007

Attention:  Jeffrey D. Osterman, Esq.

For Supplier:          Omnium, LLC

131 South Dearborn Street,

Chicago, IL 60603

Facsimile:  312-443-5000

Attention:  General Counsel

**26.9    Governing Law**

(a)    <u>Governing Law</u>. This Agreement (and any claims or disputes arising out of or related hereto or to the transactions contemplated hereby or to the inducement of any party to enter herein, whether for breach of contract, tortious conduct or otherwise, and whether predicated on common law, statute or otherwise) shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance, in each case without reference to any conflict of law principles that might lead to the application of the laws of any other jurisdiction.

(b)    <u>Certain Laws Not Applicable</u>.  The parties agree that, to the extent permitted under applicable Law, the provisions of the Uniform Computer Information Transactions Act, the U.N. Convention on Contracts for the International Sale of Goods, any federal or state statutory adoptions or equivalents of the aforementioned Acts and Convention, and any other state or federal laws related to electronic contracts or electronic signatures will not apply to this Agreement.

**26.10    Binding Agreement**

This Agreement (a) shall be binding upon Supplier and its respective heirs, successors, personal representatives and assigns upon execution hereof by Supplier, and (b) shall be binding upon

LBHI and its respective heirs, successors, personal representatives and assigns upon (i) execution hereof by LBHI, (ii) approval of this Agreement by LBHI's board of directors, and (iii) approval of this Agreement by the Bankruptcy Court, *provided, however,* that LBHI shall use diligent efforts to seek the approval of this Agreement by LBHI's board of directors and the Bankruptcy Court.

**26.11    Third-Party Beneficiaries**

There will be no third-party beneficiaries under this Agreement (including any Statements of Work) except as provided in the following sentence. To the extent that any Confidential Information of LBHI contains or consists of the Confidential Information of any third party (including, without limitation, Barclays Capital Inc. or any other third party identified by LBHI), the Parties acknowledge and agree that such third party (including, without limitation, Barclays Capital Inc., as applicable) is an intended third party beneficiary of Article 20 of this Agreement with the right to enforce the terms and conditions of Article 20 with respect to such Confidential Information. Notwithstanding the foregoing, the Parties expressly reserve the right to amend, modify and/or terminate this Agreement without the consent of Barclays Capital Inc. or any other third party beneficiary hereof.

**26.12    Meetings with Customers**

Supplier will, whenever reasonably requested by any LBHI Recipient and at such LBHI Recipient's expense, meet with Customers at a location reasonably designated by such LBHI Recipient or such Customer, or at such LBHI Recipient's option, conduct a telephone conference call to discuss general information about the Services.

**26.13    No Inducements**

No employee, agent or representative of the LBHI Recipients has been offered, will be offered, has received, or will receive, directly or indirectly, from Supplier, any gratuities, merchandise, cash, services benefit, fee, commission, dividend, gift, or other inducements or consideration of any kind in connection with this Agreement (including any Statements of Work).

**26.14    Rules of Construction**

(a)    Entire Agreement.  This Agreement (including these general terms and conditions and the attached Exhibits and Schedules, together with the Statements of Work), constitutes the sole and entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior negotiations, representations and agreements, either written or oral, between the Parties with respect to the subject matter hereto, including, without limitation, (i) any joint and several liability of LBHI pursuant to the On-Site Services Agreement, dated _____, by and between LBHI, Supplier, and Misys IQ LLC, which obligations of joint and several liability are hereby terminated in their entirety; and (ii) the letter agreement, dated September 18, 2009, by and between LBHI and Supplier, which letter agreement is hereby terminated in its entirety.

(b)    Language.  This Agreement (and all Schedules and Exhibits hereto) is in the English language only, which language will be controlling in all respects, and all versions hereof in any other language will be for accommodation only and will not be binding upon the

Parties.  All communication, notices, or other documents to be made, given, or approved pursuant to this Agreement will be made in the English language.

(c)    <u>Use of Certain Words</u>.  Unless the context requires otherwise:

(i)    "including" (and any of its derivative forms) means including but not limited to;

(ii)    "may" means has the right, but not the obligation to do something and "may not" means does not have the right to do something;

(iii)    "will" and "will" are expressions of command, not merely expressions of future intent or expectation;

(iv)    "written" or "in writing" is used for emphasis in certain circumstances, but that will not derogate from the general application of the notice requirements set forth in <u>Section 26.8</u> in those and other circumstances;

(v)    words of one gender will be deemed to include words of other genders;

(vi)    any reference to any statute will be construed as including all statutory provisions consolidating, amending or replacing such statute;

(vii)    the terms "hereof," "hereby," "hereto," "hereunder" and similar terms will refer to this Agreement as a whole;

(viii)    all references to "dollars" or "$" shall be to United States dollars; and

(ix)    use of the singular imports the plural and vice versa.

(d)    <u>Construction</u>.  The terms and conditions of this Agreement and the Statements of Work are the result of negotiations between the Parties.  The Parties intend that neither this Agreement nor any Statement of Work will be construed in favor of or against any Party by reason of the extent to which any Party or its professional advisors participated in the preparation or drafting of the this Agreement or any such Statement of Work.

(e)    <u>Headings and Article, Section, and Schedule References</u>.  The Article and Section headings, Table of Contents, and Table of Schedules are for reference and convenience only and will not be considered in the interpretation of this Agreement (including any Statements of Work).  Unless otherwise indicated, any reference to an Article, Section, Exhibit, Schedule, Recital or Preamble is a reference to an Article, Section, Exhibit, Schedule, Recital or Preamble of the document in which the reference is contained.  References to numbered Articles or Sections of this Agreement (including any Statements of Work) also refer to and include all subsections of the referenced Article or Section.

(f)    <u>Order of Precedence</u>.  If a conflict occurs between this Agreement and any Schedule to this Agreement, the terms of this Agreement will prevail.  In the event of any conflict between this Agreement and any Statement of Work, the terms of this Agreement shall

control to the extent necessary to resolve such conflict, except as expressly provided otherwise in any such Statement of Work.

(g)    <u>Survival</u>.  Any and all provisions of this Agreement (including any Statements of Work) which by their nature or effect are required or intended to be observed, kept, or performed after the expiration or termination of this Agreement (including any Statements of Work) will survive the expiration or any termination of this Agreement or such Statement of Work and remain binding upon and for the Parties' benefit.

(h)    <u>Severability</u>.  If any provision of this Agreement (including any Statements of Work) is found by a court of competent jurisdiction to be invalid, illegal, or otherwise unenforceable, the same will not affect the other terms or provisions hereof or the whole of this Agreement or such Statement of Work, as applicable, but such term or provision will be deemed modified to the extent necessary in the court's opinion to render such term or provision enforceable, and the Parties' duties, obligations or liabilities will be construed and enforced accordingly, preserving to the fullest permissible extent the Parties' intent and agreements set forth in this Agreement or such Statement of Work, as applicable.

(i)    <u>Amendment</u>.  Any terms and conditions varying from this Agreement (including any Statements of Work) on any order or written notification from either Party will not be effective or binding on the other Party.  This Agreement (including any Statements of Work) may be amended or modified solely in a writing signed by an authorized representative of each Party.

(j)    <u>Counterparts</u>.  This Agreement and any Statement of Work may be executed in any number of counterparts, each of which will be deemed an original, but all of which taken together will constitute one single agreement between the Parties.

## 27.    DEFINITIONS

All capitalized terms used in this Agreement shall have the meanings set forth in this <u>Section 27</u>.

"<u>Acceptance Period</u>" has the meaning given in <u>Section 5.2(a)</u>.

"<u>Accessing Party</u>" means the party gaining access to Confidential Information of an Information Owner under this Agreement or under a Statement of Work.

"<u>Acquired Business</u>" means any business acquired by an LBHI Recipient after the relevant Effective Date hereof through acquisition or otherwise.

"<u>Affiliate</u>" means any entity that, directly or indirectly, Controls, is Controlled by or is under common Control with such entity.

"<u>Agreement</u>" has the meaning given in the preamble to this Agreement.

"<u>Agreement Initial Term</u>" has the meaning given in <u>Section 13.1(a)</u>.

"<u>Authorized Designee</u>" means a designee of an LBHI Recipient that:  (a) has been approved by Supplier to use the Data Access Services; and (b) has agreed in writing to be bound by the provisions of <u>Articles 10</u> and <u>20</u> hereof (as applicable) or by terms and conditions of use no less restrictive than those set forth in <u>Articles 10</u> and <u>20</u> (as applicable).

"<u>Authorized Person</u>" means any person authorized by an LBHI Recipient to give proper instructions to Supplier and in respect of whom Supplier has not:  (a) received written notice from an LBHI Recipient that such authorization has been revoked; and (b) been afforded a reasonable opportunity to act thereon.

"<u>Bankruptcy Case</u>" has the meaning given to it in <u>Section 1.1(a)</u>.

"<u>Bankruptcy Code</u>" has the meaning given to it in <u>Section 1.1(a)</u>.

"<u>Bankruptcy Court</u>" has the meaning given to it in <u>Section 1.1(a)</u>.

"<u>Baseline Service Level Period</u>" means, with respect to a particular Service Level, the first full six (6) calendar months following the date on which such Service Level:  (a) becomes part of a Service Level Schedule; or (b) is impacted by an agreed upon Change.

"<u>BCP</u>" has the meaning given to it in <u>Section 15.1(e)</u>.

"<u>Business Days</u>" means the days LBHI is open for business, Monday to Friday, other than holidays.

"<u>Change</u>" means a change to any of the terms and conditions of this Agreement or any executed Statement of Work, including, without limitation, to the nature, scope, elements or frequency of any Services provided thereunder, Fees, Service Locations, the deletion of any Services, or the addition of any new Statement of Work.

"<u>Change Log</u>" means a log that reflects the status of all pending and completed Changes.

"<u>Change Management Procedure</u>" has the meaning given to it in <u>Section 4.1</u>.

"<u>Change Plan</u>" means the definitive written project plan that in relation to a Change describes:

    (i)      Deliverables of Supplier;

    (ii)     the responsibilities of the applicable Customer Recipients and the Third-Party Providers, as applicable;

    (iii)    applicable dependencies, and

    (iv)    milestones that can be used to measure progress toward the achievement of defined targets and objectives.

"<u>Change of Control</u>" means any event whereby:

(a)  any person other than an Affiliate of Supplier as of the Effective Date becomes the ultimate beneficial owner, directly or indirectly, of greater than fifty percent (50%) of the voting power of:

   (i)  Supplier;

   (ii)  or any entity in which the principal operations of the portion of Supplier's business that offers the Services is conducted;

(b)  any person other than an Affiliate of Supplier as of the Effective Date becomes the ultimate beneficial owner, directly or indirectly, of greater than twenty-five percent (25%) of the voting power of Supplier's parent company; or

(c)  there has been a change of Control or other sale, assignment or transfer of all or substantially all of the assets of Supplier's parent company.

"Commissioned Work Product" means (a) any and all Deliverables (including, without limitation, any Information, data, databases, summaries, analyses, reports, extracts, and all formats and formatting thereof, but excluding any Software or Supplier Technology, or any Upgrades thereto) generated by Supplier in the course of performing the Services pursuant to the Statements of Work; and (b) any Software (whether or not included in the Deliverables) that (i) an LBHI Recipient expressly defined (and thereby requested that Supplier create) in advance in a Statement of Work signed by Tom Miglis or Ken Griffin (or such other person designed by Supplier should Tom Miglis and Ken Griifin be unable to sign), and (ii) is thereafter conceived, created, developed, or produced, in whole or in part, by Supplier (or by any third parties or Delegates on behalf of Supplier) in the course of performing the Services pursuant to said Statement of Work, and (iii) is specifically designated as Commissioned Work Product in such Statement of Work.  In no event will "Commissioned Work Product" include Work Product, Supplier Technology, or any Upgrades thereto.

"Confidential Information" of a Party means the Information, documents and materials relating to the businesses conducted by Supplier or any LBHI Recipient (or their Affiliates) or suppliers or customers of Supplier or any LBHI Recipient (or their Affiliates), irrespective of the form of communication (along with all notes, analyses, compilations, forecasts, data, translations, studies, memoranda, copies, extracts, reproductions or other documents that contain or otherwise reflect such Information, documents and materials), including Information, documents and materials related to pricing, rates, productivity, Fees or other similar information, Personal Information, training methods, business practices, plans, projections, trade secrets, this Agreement (including all Statements of Work), customer lists, customer contracts, customer information, information with respect to competitors, account information, research information, accounting information, human resources and personnel information, marketing/sales information, third party contracts, licenses, audits, regulatory compliance information, LBHI Technology, Supplier Technology, Work Product, Commissioned Work Product, LBHI Data, and LBHI Personal Data.

"Confidentiality Obligations" has the meaning given in Section 24.1(c)(i)(A).

"Control" (and derivatives thereof) means, with respect to any entity:  (a) twenty-five percent (25%) or more of the direct or indirect beneficial ownership of such entity; or (b) the possession,

EXECUTION COPY

directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities (or other ownership interest), by contract or otherwise.

"Core Service" means such Services as are identified as "Core Services" in any Statement of Work.

"Cost Productivity" means, during any month, the aggregate reductions in each of the following as compared to the prior month:  (a) direct and indirect material prices, (b) overhead costs, (c) the number of management working hours per Service and (d) direct labor rates, which reductions will be determined in accordance with Article 9 and the applicable Statements of Work.

"Critical Service Levels" means the Service Levels that are designated as "critical service levels" in a Service Level Schedule.

"Customer" means any customer of the LBHI Recipients in relation to which the Services are provided by Supplier hereunder.

"Data Access Services" has the meaning given in Section 10.3(a)(ii).

"Data Protection Laws" has the meaning given in Section 17.2(c).

"Delegate"  means any agent, subcontractor, consultant or other third party appointed by Supplier to be a delegate that is approved in writing by the affected LBHI Affiliate(s) pursuant to Section 2.4(a).

"Deliverable" means any materials or other work product that is (a) created, produced or provided by Supplier to any LBHI Recipient as part of, in connection with, or in the course of performing the Services; and (b) that is capable of being tested.

"De Minimis Change" means a one-off or immaterial Change that requires less than one (1) man hour to effect in accordance with reasonable business practices and that, together with all similar Changes can be completed by the Supplier Personnel during normal business hours and without interruption to the provision of Services or related Service Levels.

"Destructive Elements" means any code or device designed to disrupt, disable, modify, damage, destroy or otherwise impede in any manner, including aesthetic disruptions or distortions, the operation of any Systems or Deliverables, or that would permit a party to access, without authorization, Systems or Deliverables to cause such disablement or impairment or any other similar harmful, malicious or hidden procedures, routines or mechanisms that would cause any Systems or Deliverables to cease functioning or to damage or corrupt data, storage media, programs, equipment, or communications, or otherwise interfere with any LBHI Recipient(s)'s operations (e.g., a virus, Trojan horse, worm, backdoor).

"Divested Business" has the meaning given in Section 4.2(a).

"Divestiture Period" has the meaning given in Section 4.2(a).

"Effective Date" has the meaning given in the Preamble.

EXECUTION COPY

"<u>Engaged Consultants</u>" means those former employees of Supplier or any Delegate who are engaged by LBHI to act as consultants pursuant to <u>Section 13.3(a)(i)(C)(3)</u>.

"<u>Executive Committee</u>" has the meaning given in <u>Section 6.2</u>.

"<u>Fee Schedule</u>" will mean, with respect to a particular Statement of Work, the fee schedule set forth therein or made applicable thereto in accordance with its terms.

"<u>Force Majeure Event</u>" has the meaning given in <u>Section 24.3(a)</u>.

"<u>Form of Statement of Work</u>" has the meaning given in <u>Section 1.2(b)</u>.

"<u>FTE</u>" means the full-time equivalent of the output of a natural person engaged by Supplier who is dedicated to performing Services or any portion thereof, which natural person shall not work less than 1840 hours per calendar year.

"<u>Governance Process</u>" means the governance process described in <u>Schedule 6.1</u>.

"<u>Governmental Entity</u>" means any domestic or foreign federal, state, provincial, local, county or municipal government or supra-national, governmental, judicial, regulatory or administrative agency, department, commission board, bureau, court or other authority or instrumentality or any arbitrator or arbitral panel.

"<u>Governmental Order</u>" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Entity.

"<u>Historical Record</u>" means, with respect to each LBHI Recipient, the books, records, data bases, electronic files, documents and other data and information relating to such LBHI Recipient and/or its Customers maintained by or on behalf of such LBHI Recipient prior to the Statement of Work Effective Date and used or otherwise relied upon by Supplier for the provision of the Services under the applicable Statement of Work.

"<u>Indemnitee</u>" has the meaning given in <u>Section 23.1</u>.

"<u>Indemnitor</u>" has the meaning given in <u>Section 23.1</u>.

"<u>Independent Work</u>" of a Party means any Technology that such Party: (a) created or owned prior to the Effective Date and any modifications and improvements thereto not specifically defined, paid for and assigned in a Statement of Work; or (b) subsequently created and owned outside the scope of and independent from work performed under this Agreement or any Statements of Work.

"<u>Information</u>" means information, whether or not patentable or copyrightable, in written, oral, electronic or other tangible or intangible forms, stored in any medium, including studies, reports, records, books, contracts, instruments, surveys, discoveries, ideas, concepts, know-how, techniques, designs, specifications, drawings, blueprints, diagrams, models, prototypes, samples, flow charts, data, computer data, disks, diskettes, tapes, Software, marketing plans, customer names, communications by or to attorneys (including attorney-client privileged communications), memos and other materials prepared by attorneys or under their direction

EXECUTION COPY

(including attorney work product), and other technical, financial, employee or business information or data.

"Information Owner" has the meaning given in Section 20.1.

"Information Security Policy" means the information security policy of Supplier or the LBHI Recipients, as applicable, and the respective standards set forth therein.

"Infrastructure Statement of Work" has the meaning given in Section 5.2(b)(ii).

"Intellectual Property Rights" means all right, title and interest in and to intellectual and industrial property rights recognized in the United States or any other foreign jurisdiction, including (a) patents, patent applications (along with all patents issuing thereon), statutory invention registrations, and divisions, continuations, continuations-in-part, and substitute applications of the foregoing, and any extensions, reissues, restorations and reexaminations of the foregoing, and all rights therein provided by international treaties or conventions, (b) copyrights, mask work rights, database rights and design rights, whether or not registered, published or unpublished, and registrations and applications for registration thereof, and all rights therein whether provided by international treaties or conventions or otherwise, (c) trade secrets, know-how and proprietary information, (d) trademarks, service marks, trade names, service names, trade dress, logos and other identifiers of source, including all goodwill associated therewith and all common law rights, registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing, (e) all rights arising from or in respect of domain names and domain name registrations and reservations, and (f) all other applications and registrations related to any of the rights set forth in the foregoing clauses (a)-(e) above.

"Investments" means such cash, securities, futures contracts, swaps, derivatives and all other similar instruments of whatsoever nature now owned or to be acquired by or for the account of an LBHI Recipient.

"Key Supplier Position" has the meaning given in Section 7.2(a).

"Laws" means all global, federal, country, state and local laws, rules, regulations, that are applicable to any Party or the conduct of its business, including the provision or receipt of the Services (as applicable), or the exercise of the Parties' respective rights or the performance of their respective obligations under this Agreement (including any Statements of Work), as may be changed, amended, or supplemented.

"LBHI Affiliate" means an Affiliate of LBHI.

"LBHI Auditors" has the meaning given in Section 19.1(a).

"LBHI Confidential Information" means the Confidential Information of LBHI and/or any LBHI Recipient(s).

"LBHI Data" means all information and data, whether or not LBHI Personal Data, received, used or stored by Supplier (including its employees and/or subcontractors) from LBHI or on its behalf in connection with the Services, and any information and data derived from such information

EXECUTION COPY

and data, including any valuations generated by the Services. Supplier agrees that, as between Supplier and LBHI, all LBHI Data is the exclusive property of LBHI and will be deemed LBHI Confidential Information and Supplier hereby waives any interest, title, lien or right to any such LBHI Data.  LBHI acknowledges and agrees that output from third party market data services is excluded from the definition of LBHI Data.

"LBHI Personal Data" has means all Personal Information that relates to the LBHI Recipients or their Customers that is Processed by Supplier as part of the Services, as well as all other Personal Data that the LBHI Recipients make available to Supplier in connection with the Services.  All LBHI Personal Data is, or will be, and will remain the property of the relevant LBHI Recipient and will be deemed LBHI Confidential Information.

"LBHI Program Manager" has the meaning given Schedule 6.1.

"LBHI" has the meaning given in the Preamble of this Agreement.

"LBHI Locations" means the locations at which LBHI receives the Services.

"LBHI Policies" has the meaning given in Section  15.3.

"LBHI Recipient" means (a) LBHI or (b) any Affiliate of LBHI that receives Services pursuant to this Agreement (including any Statement of Work).

"LBHI-Supplier Director" has the meaning given in Section 6.1(c).

"LBHI Technology" means the (a) the Independent Work of LBHI (including Systems) used by Supplier from time to time in the performance of the Services; and (b) LBHI Third-Party Technology.

"LBHI Third-Party Technology" means any Technology (including Systems) owned or controlled by a third party and licensed to any LBHI Recipient that are used by Supplier from time to time in the performance of the Services.

"Losses" has the meaning given in Section 23.1.

"Malicious Code" means any code, program, or sub-program whose known or intended purpose is to damage or interfere with the operation of the computer system containing or connected to the computer System containing the code, program or sub-program, or to halt, disable or interfere with the operation of the software, code, program, or sub-program, itself.

"Mandatory Change" means any Change that is required to be made to any term of this Agreement or any Statement of Work (including the Services) to comply with any applicable Law (other than laws applicable to Supplier and not to the Services), to the extent compliance therewith is dependent upon the manner in which: (a) the Services or other obligations of Supplier are performed, or (b) LBHI or any LBHI Recipient is able to assert its rights under the Agreement or Statement of Work.

"Migration" has the meaning given in Section 3.1.

EXECUTION COPY

"Migration Change" has the meaning given in Section 3.3(c)(ii).

"Migration Period" has the meaning given in Section 3.2(b).

"Migration Plan" means, with respect to a particular Statement of Work, the high level migration plan attached thereto that describes the tasks, methods, procedures and timing of the steps necessary to accomplish the applicable Migration

"Misys" means Misys IQ LLC, Inc.

"Misys Software" means the Misys Loan IQ Version 6.0 software licensed by LBHI pursuant to the Mysis License.

"Misys License" means the Software License and Services New Agreement, Number ON14797-LA-X with an effective date of 20 September 2008 and License Schedule No. 2, Number ON17722 thereto, entered into between LBHI and Misys.

"Monthly Scorecard" has the meaning given in Section 8.3(a).

Misys Loan IQ Version 6.0 software licensed by LBHI pursuant to the Software and License and Services New Agreement, Number ON14797-LA-X with an effective date of 20 September 2008 and License Schedule No. 2, Number ON17722 thereto (the "Misys License", entered into between LBHI and Misys IQ LLC, Inc. ("Misys")

"New Business" has the meaning given in Section 4.3(a).

"Out-Of-Scope Services" has the meaning given in Section 4.4.

"Out-of-Scope Technology" means any and all technology used by an LBHI Recipient for carrying out the business functions of such LBHI Recipient not specifically assumed by Supplier hereunder or as the result of a Change.

"Party" or "Parties" means, as applicable, Supplier, on the one hand, and the LBHI Recipients, on the other hand.

"Persistent Breach" means, in relation to a breach of this Agreement or a Statement of Work, a breach that is repeated sufficiently often to constitute a material breach of this Agreement or such Statement of Work, as applicable.

"Personal Data" has the meaning given in the applicable Laws, as amended from time to time.  If not defined under such Laws, "Personal Data" means Personal Information.

"Personal Information" means any Information that can potentially be used to uniquely identify (or be identifiable with), contact, or locate any natural person (including employees, directors, shareholders, customers, prospects, contacts and suppliers of LBHI Recipients or their Affiliates), including Personal Data (if such term is defined under applicable Laws).

EXECUTION COPY

"Pervasive Breach" means, in relation to a breach of this Agreement or a Statement of Work, a series of breaches, which taken in the aggregate, constitute a material breach of this Agreement or such Statement of Work, as applicable.

"Processing" (and derivatives thereof) of Personal Data means and includes any operation or set of operations which is performed upon Personal Data, whether or not by automatic means, such as collection, recording, organization, storage, adaptation or alteration, retrieval, accessing, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, blocking, erasure or destruction.

"Productivity" means Transaction Productivity and Cost Productivity as agreed to in the Statements of Work.

"Regional Project Managers" has the meaning given in Schedule 6.1.

"Relationship Managers" has the meaning given in Schedule 6.1.

"Representatives" means, with respect to a Party, the directors, officers, partners, employees, agents, consultants, contractors, advisors, legal counsel, accountants, approved subcontractors (including permissible Delegates) and other representatives of such Party.

"Restricted Migration Period" means the period commencing on the Effective Date and ending on the date that is six (6) months after the date on which the Migration has been completed in all material respects.

"Sapient" has the meaning given in Section 2.4(a)(i).

"Seconded Employees" means those employees or agents of Supplier or any Delegate who are seconded to LBHI pursuant to Section 13.3(a)(i)(C)(3).

"Security Breach Incident" means any unauthorized access or intrusion into a Party's Systems that results in an unauthorized disclosure of Confidential Information of the other Party or other unauthorized disclosure that has a material adverse effect to the Confidential Information of the other Party.

"Serviced Assets" means assets that are managed by any LBHI Recipient and, in respect of which, LBHI has expressly requested that Supplier provide Services hereunder or pursuant to a Statement of Work, and receives Services as a result thereof.

"Service Location" has the meaning given in Section 7.5(b).

"Service Level" means the quantitative target and minimum performance standards and service levels, including the Critical Service Levels, set forth in a Service Level Schedule with respect to Services provided thereunder, in each case as mutually agreed upon by the applicable Parties in writing in accordance with the terms and conditions of this Agreement.

"Service Level Credit" has the meaning given in Schedule 1.2(c).

"Service Level Incentive" has the meaning give in Schedule 1.2(c).

"<u>Service Level Schedule</u>" means, with respect to a particular Statement of Work, the schedule thereto that describes the Service Levels, the Critical Service Levels, and the respective obligations of Supplier and the relevant LBHI Recipients in relation thereto, including any penalties and incentives with respect to nonperformance and performance of the Critical Service Levels.

"<u>Services</u>" means all services and Deliverables provided by or on behalf of Provider to LBHI or any LBHI Recipient (or its Affiliates) pursuant to this Agreement and all Statements of Work.

"<u>Software</u>" means all software programs and programming, applications, operating systems, utilities and interfaces, including object code and Source Code and all documentation, media, on-line help facilities and tutorials relating thereto, together with all corrections, improvements, enhancements, modifications, updates, releases or derivative works of any of them.

"<u>Source Code</u>" means the human readable embodiment of any software code, in or on any electronic media that includes, without limitation, developer comments, flow charts, program narratives, and all related system and programming documentation for such software as well as any and all externalizations, utilities and compilers required to use, execute and modify the Source Code and that is sufficient to enable a reasonably skilled programmer to maintain and enhance the software.

"<u>Standard of Care</u>" means, in relation to Supplier, such levels of skill, care and diligence as would be expected of a leading professional provider of the same or substantially similar services as the Services in the United States or such other jurisdictions where Supplier provides such Services and LBHI Recipients receive such Services.

"<u>Statement of Work</u>" means each Statement of Work, as may be amended from time to time by the Parties in writing, describing the Services and Deliverables to be provided by Provider to one or more LBHI Recipient(s)that is agreed to in writing by the Parties thereto from time to time and is entered into in accordance with <u>Section 1.2(b)</u>, including without limitation the Migration Plan and those Statements of Work attached hereto.

"<u>Statement of Work Effective Date</u>" means, with respect to a particular Statement of Work, the date upon which such Statement of Work becomes effective.

"<u>Supplier</u>" has the meaning given in the Preamble.

"<u>Supplier Affiliate</u>" means those Affiliates of Supplier who agree to provide Services to an LBHI Recipient under a Statement of Work.

"<u>Supplier Funded Hours</u>" means the number of man hours of Supplier Personnel that Supplier has agreed to provide, at no cost to the LBHI Recipients, in respect of Changes implemented under a particular Statement of Work in each year of the term of this Agreement, as such number is specified in such Statement of Work.

"<u>Supplier Hourly Rates</u>" means the hourly rates specified in an applicable Fee Schedule or Statement of Work.

"<u>Supplier Infringement Items</u>" has the meaning given in <u>Section 23.1(a)</u>.

EXECUTION COPY

"Supplier Personnel" means any employees or personnel of Supplier or Delegate who perform any Services.

"Supplier Service Jurisdictions" means (A) the U.S. and India, and (B) such other countries that the Parties agree upon in writing (including in the applicable Statement of Work).

"Supplier Solution" means Supplier's initial operating environment.

"Supplier Technology" means (a) the Independent Work of Supplier (including Systems) or its Affiliates used in the performance of the Services; (b) Work Product; and (c) Supplier Third-Party Technology.

"Supplier Third-Party Technology" means the any Technology (including Systems) owned or controlled by third parties and licensed to Supplier that Supplier uses from time to time in the performance of the Services.

"Successor" has the meaning given in Section 14.1.

"Systems" means computer systems, computer networks, Internet environments, data, databases, Software, middleware, hardware, and communications links.

"Taxes" has the meaning given in Section 12.4.

"Technology" means, collectively, all designs, formulae, algorithms, processes, procedures, techniques, specifications, methodologies, ideas, know-how, Software, Systems, programs, models, routines, data, databases, Information, materials, tools, inventions, creations, improvements, works of authorship, compilations, manuals, memoranda, documentation, recordings, graphs, drawings, schematics, blueprints, prototypes, flow charts, charts, graphics, reports, manuscripts, pictorial materials, research in progress, analyses, and other writings, and any other embodiment of the above, in any form, whether or not specifically listed herein, including the LBHI Technology, the Supplier Technology or both, as the context requires.

"Termination Assistance" has the meaning given in Section 14.1.

"Termination Assistance Period" has the meaning given in Section 14.1.

"Termination for Convenience Fees" means the fees payable by an LBHI Recipient in connection with a termination for convenience as set forth in the applicable Fee Schedule or as otherwise set forth in the applicable Statement of Work, subject to adjustment as provided in Section 13.3.

"Third-Party Provider" means any provider of services to any LBHI Recipient or any Customer (other than Supplier or a Delegate) including any investment adviser or sub-advisor, custodian, distributor, dealer, transfer agent, administrator, accounting agent or fiduciary in respect thereof.

"Transaction Productivity" means, during any month, (a) the increase in the volume of Services performed per FTE as compared to the prior month and (b) the performance of a fixed amount of Services utilizing fewer FTEs as compared to the prior month.

EXECUTION COPY

"<u>Turnover</u>" has the meaning given in <u>Section 8.3(a)(iii)</u>.

"<u>Upgrade</u>" has the meaning given in <u>Section 15.5(a)</u>.

"<u>Use</u>" means, with respect to Technology, the right to use, load, access, execute, store, transmit, display, copy, perform, distribute copies of, maintain, modify, enhance, create derivative works, make and have made.  For avoidance of doubt, the Parties do not intend to grant rights to the other Party in their Technology consistent with this definition unless the relevant granting language specifically contains the term "Use" in the upper case and not "use" in the lower case.

"<u>Value Added Service</u>" means any Service that is not a Core Service.

"<u>VAT</u>" has the meaning given in <u>Section 12.4</u>.

"<u>Worldwide Charges</u>" means the aggregate amount of charges payable for Services under all Statements of Work exclusive of Taxes.  For the purpose of analyzing or comparing worldwide charges, all non U.S. dollar charges will be converted into U.S. dollars at the average exchange rate during the period concerned, or at such other rates as Supplier and LBHI may mutually agree in writing.

"<u>Work Product</u>" means any Technology (including any modifications, enhancements or derivative works thereof or based thereon) that is conceived, created, developed, or produced, in whole or in part, by Supplier or its Affiliates (or by any third parties or Delegates on behalf of Supplier) in the course of performing the Services pursuant to the Statements of Work.  In no event will "Work Product" include Commissioned Work Product, LBHI Technology or any Upgrades thereto.

**[Signature Page Follows]**

CONFIDENTIAL                                                    EXECUTION COPY

IN WITNESS WHEREOF, each of LBHI and Supplier have executed or caused this Agreement to be executed as of the date set forth above by its duly authorized representative.

**FOR LEHMAN BROTHERS HOLDINGS INC.**          **FOR OMNIUM LLC**


_____

Name:                                          Name: JOHN BUCKLEY

Title:                                         Title: PRESIDENT



CONFIDENTIAL                                                                                        EXECUTION COPY

IN WITNESS WHEREOF, each of LBHI and Supplier have executed or caused this Agreement to be executed as of the date set forth above by its duly authorized representative.

**FOR LEHMAN BROTHERS HOLDINGS INC.**                      **FOR OMNIUM LLC**

Name: William B. Gordon                                    Name:

Title:  SVP.                                               Title:

**Because of the voluminous nature of the schedules to the MSA, and the sensitive (to Omnium) nature of certain of the commercial information contained therein, the schedules to the MSA have not been included in this filings.  Copies of these schedules, other than schedules 10.3(c), 15.4(h)(i), and 15.4(h)(ii), and the supplement to 15.3(a)(ii), which contain the sensitive information, are available upon request from counsel to the Debtors.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                         :

In re                                  :         **Chapter 11 Case No.**
                                           :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :     **08-13555 (JMP)**
                                         :

                        **Debtors.**       :     **(Jointly Administered)**
                                           :
-------------------------------------------------------------------x

**ORDER GRANTING DEBTORS' MOTION PURSUANT**
**TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE**
**FOR AUTHORIZATION TO ENGAGE OMNIUM AS FUND ADMINISTRATOR**

         Upon the motion, dated February 23, 2010 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-

debtor affiliates, "Lehman"), pursuant to sections 105(a) and 363(b) of title 11 of the United

States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") for authorization to engage Omnium LLC ("Omnium"), all

as more fully described in the Motion; and the Court having jurisdiction to consider the Motion

and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing

Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and

All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of

the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C.

§ 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409;

and due and proper notice of the Motion having been provided in accordance with the

procedures set forth in the amended order entered February 13, 2009 governing case

management and administrative procedures [Docket No. 2837] to (i) the United States Trustee

for the Southern District of New York; (ii) the attorneys for the Official Committee of

Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue

Service; (v) the United States Attorney for the Southern District of New York; and (vi)

Omnium, and it appearing that no other or further notice need be provided; and a hearing

having been held to consider the relief requested in the Motion; and the Court having found and

determined that the relief sought in the Motion is in the best interests of the Debtors, their

estates and creditors, and all parties in interest and that the legal and factual bases set forth in

the Motion establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that pursuant to sections 105(a) and 363(b) of the Bankruptcy Code,

the Debtors are authorized to engage Omnium as a data processing and workflow automation

administrator on the terms and conditions set forth in the Master Servicing Agreement attached

to the Motion as Exhibit A (the "MSA"); and it is further

ORDERED that the Debtors are authorized to take all further actions that may

be necessary or required for the Debtors' entry into and performance of the MSA; and it is

further

ORDERED that the Debtors are authorized to pay the fees and reimburse the

expenses of Omnium in accordance with the terms of the MSA and Omnium shall not be

required to file fee applications with the Court; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), this Order shall be

effective immediately upon entry; and it is further

2

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.

Dated: March __, 2010
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE