# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

In re: )
)
LATSHAW DRILLING COMPANY, LLC. )
)
Debtor. )
)

Case No. 09-13572-R
Chapter 11

**AFFIDAVIT OF TRENT B. LATSHAW IN**
**SUPPORT OF PETITION AND FIRST DAY MOTIONS**

STATE OF OKLAHOMA )
) ss.
COUNTY OF TULSA )

TRENT B. LATSHAW, being duly sworn, deposes and states:

1.      I am the President of Latshaw Drilling and Exploration Company Inc.
("Latshaw D&E") and its wholly-owned subsidiary Latshaw Drilling Company, LLC
("Latshaw"), debtors and debtors in possession ("Latshaw D&E" and "Latshaw" together, the
"Debtors").[1]  In such capacity, I am fully familiar with the Debtors' business, day-to-day
operations and financial affairs.

2.      I submit this affidavit in support of the voluntary petitions for relief filed
by the Debtors under chapter 11 of title 11 of the United States Code and in support of the
motions and applications seeking relief as of the date hereof (collectively the "First Day
Motions").  I have reviewed the First Day Motions or have otherwise had their contents
explained to me and, to the best of my knowledge, insofar as I have been able to ascertain after
reasonable inquiry, I believe that the approval of the relief requested therein is necessary to
minimize disruption to the Debtors' business operations so as to permit an effective transition

---

[1]      The Debtors have also filed a Motion for Administrative Consolidation of the bankruptcy cases of
Latshaw D&E and Latshaw.

786127_4

into chapter 11, preserve and maximize the Debtors's estates and to achieve a successful reorganization. I also believe that, absent access to cash collateral and authority to make certain payments and otherwise continue conducting the Debtors' business, the Debtors would suffer immediate and irreparable harm to the detriment of their estates.

3.      Except as otherwise indicated, the facts set forth in this Affidavit are based upon my personal knowledge of the Debtors' business operations, my review of relevant documents, information provided to me or verified by other executives or the Debtors' professional advisors, including Satterlee Stephens Burke & Burke LLP and Morrell, Saffa, Craige, PC, and/or my opinion based upon my experience, knowledge and information concerning the Debtors' operations, financials and the oil and gas exploration and drilling industry generally. Unless otherwise indicated, the financial information contained in this Affidavit is unaudited and subject to change. I am authorized to submit this Affidavit on behalf of the Debtors, and if called upon to testify, I would testify competently to the facts set forth herein.

## PRELIMINARY STATEMENT

4.      The Debtors operate a successful business, contracting drilling rigs to the oil and gas industry and employing approximately 246 people. As described in detail herein, the sole precipitating factor for this chapter 11 case is the breach by Lehman Commercial Paper Inc. ("Lehman Paper") of a Credit Agreement by its failure to fund a Loan to Latshaw when called upon to do so. Lehman Paper's admitted breach was followed five months later by their belated attempts to improperly call technical defaults under the Credit Agreement, their seizure of funds from Latshaw on the basis of the improperly called defaults, culminating in Lehman Paper's acceleration of amounts due under the Credit Agreement, all in an apparent attempt to avoid  the

2

786127_4

consequences of their breach and the approximately $18 million in damages suffered by Latshaw.  Although the Credit Agreement does not permit assessment of consequential damages, Latshaw has suffered approximately $43 million in lost profits as a result of Lehman Paper's failure to fund in addition to its $18 million in direct damages.

5.      Despite Lehman Paper's material breach, Latshaw has continued to perform under the Credit Agreement, paying approximately $600,000 per month in interest, responding to the artificial defaults – curing where they were colorable and contesting where they were not – and otherwise generally honoring its obligations.

6.      Because of Lehman Paper's continuing material breach of its obligations and its recalcitrance in attempting to resolve the breach on commercially reasonable terms, Latshaw has no choice other than to file for bankruptcy protection in order to restructure the debt obligation under the authority of the Bankruptcy Court in order to continue its otherwise successful business.   A proposed Plan Term Sheet is attached as Exhibit A.

## BACKGROUND

7.      On November 11, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Oklahoma.

8.      By contemporaneous motion, the Debtors seek to have the bankruptcy cases administratively consolidated.

9.      Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their properties and assets as debtors-in-possession.  No trustee, examiner or committee has been appointed in the Debtors' Chapter 11 cases.

3

786127_4

## A.  **The Debtors' Business**

10.  Latshaw, a Texas limited liability company operating in Tulsa, Oklahoma, is a wholly-owned subsidiary of Latshaw D&E, a Texas Subchapter S corporation.[2]

11.  Latshaw, which was established in 1981, is in the business of building and contracting out oil and gas drilling rigs, primarily in the states of Oklahoma, Texas and Louisiana.  Latshaw's customer base is the large public independent oil and gas companies, such as Chesapeake Energy and XTO Energy, which have long-term drilling programs in the areas in which Latshaw works.

12.  Latshaw employs approximately 275 people, and has annual revenues of approximately $81.5 million.  In 2008, Latshaw was ranked number 91 in the entire country, number 1 in the state of Oklahoma, and number four out of 23 energy companies, in the *INC Magazine* annual survey of the 500 fastest growing private companies in the United States, with a 3 year growth rate of 2,045%.  In 2009, Latshaw ranked number 118 on the INC 500 list with a 3 year growth rate of 1,419%, placing them number 2 in the state of Oklahoma, number 1 in Tulsa, and number 5 out of 20 companies in the energy industry.

13.  In 2005, Latshaw had one rig and 23 employees.  During the last four years, a total of 14 rigs have been built, two of which are currently under construction and will be completed in the near future.  The rigs range in depth capacity from 16,000 to 25,000 feet and drill predominately for natural gas.  Depending on size, the rigs cost $10 to $15 million each to build, and employ 22 men each when they are working.  Latshaw's rigs are designed so they can handle the horizontal drilling in the natural gas shale plays that have developed within the last few years.

---

[2]  Latshaw D&E also has another wholly-owned subsidiary, Latshaw Drilling Operations, LLC ("LDO").  LDO, a non-debtor affiliate, is not a party to the Credit Agreement or a guarantor of the debt to Lehman Paper and the Lenders under the Credit Agreement.

4

B.    **The Lehman Credit Agreement**

14.    On June 10, 2005, Latshaw and its parent company Latshaw D&E entered into a Credit Agreement (the "2005 Credit Agreement"), as Borrower, with Lehman Paper as Syndication Agent and Administrative Agent, Lehman Brothers Inc. ("LBI") as Arranger, and several banks and financial institutions as Lenders (collectively, Latshaw, Lehman Paper, LBI, the Lenders, and Latshaw D&E, the "Parties")

15.    The 2005 Credit Agreement was originally for $45 million for five new rigs which Latshaw was building.  Within a few weeks after entering into the 2005 Credit Agreement, the credit line was increased to $60 million after Latshaw obtained contracts for two more rigs.  In January 2006 the credit line was increased to $80 million based upon contracts for another two rigs.  It was at this time that Lehman Paper brought Ableco Finance LLC ("Ableco") in as a loan participant for $20 million, or twenty-five percent (25%) of the total credit line. Because of Latshaw's tight control of costs during the building stage, Latshaw's maximum borrowings under the 2005 Credit Agreement were $78.5 million on the $80 million loan.  In the six months between November 2007 and May 2008, Latshaw paid down $18.5 million on the 2005 Credit Agreement, reducing the loan to $60 million.

16.    In July 2008, due to continued demand in the energy industry, Latshaw decided to build an additional six new rigs, for a cost of $80 to $90 million.  Lehman Paper, with the concurrence of Ableco as one of the Lenders, agreed to increase the credit line to $100 million, or an additional $40 million above the $60 million then owed under the 2005 Credit Agreement.

17.    Accordingly, on July 11, 2008, the Parties entered into that certain "$100,000,000 Amended and Restated Credit Agreement among Latshaw Drilling Company, LLC, as Borrower, Latshaw Drilling & Exploration Company, The Several Lenders from Time

5

to Time Parties Hereto, Lehman Brothers Inc., as Arranger, Lehman Commercial Paper Inc., as Syndication Agent, and Lehman Commercial Paper Inc., as Administrative Agent Dated as of July 11, 2008" (the "<u>Amended Credit Agreement</u>").

**C.     The Lehman Default**

18.     Pursuant to Section 2.2 of the Credit Agreement, upon Latshaw's delivery of a Borrowing Notice to Lehman Paper as Administrative Agent, Lehman Paper was required to promptly notify the Lenders who were to provide their proportionate share of funds to Lehman Paper in order to fund the Loan or Loans to Latshaw on the Borrowing Date.  Latshaw was obligated to tender the Borrowing Notice between one and three days before the Borrowing Date specified in the Borrowing Notice.

19.     On September 15, 2008, Lehman Brothers Holdings Inc. and a number of its subsidiaries commenced voluntary cases under chapter 11 of the Bankruptcy Code in the Southern District of New York, which cases are being jointly administered under Case No. 08-13555 (JMP).  Lehman Paper was not among the subsidiaries which commenced a case on September 15, 2008.

20.     On September 17, 2008, in accordance with the parties prior practice, Latshaw faxed a Borrowing Notice to Lehman requesting a draw of $37,000,000 on September 18, 2008.[3]  A true and correct copy is attached as Exhibit B.

21.     Latshaw received no response to the Borrowing Notice from Lehman Paper or LBI.  Latshaw did receive a response on September 18, 2008, from Ableco, one of the Lenders under the Credit Agreement, pursuant to which Ableco proposed to fund its proportionate share of the Loan, provided that Latshaw remit all payments due to Ableco under

---

[3]     On August 26, 2008, Latshaw had made borrowing request for $3 million in funding which was honored by Lehman Paper, although Lehman Paper deducted the $600,000 commitment fee for the credit line from the funding, effectively providing $2.4 million to Latshaw.

6

786127_4

the Credit Agreement directly to Ableco, rather than to the Administrative Agent (the "Ableco
Agreement").  Latshaw agreed to this arrangement, as did Lehman Paper and LBI, and Latshaw
received $9,250,000 from Ableco.  A true and correct copy of the September 18, 2008 letter from
Ableco is attached as Exhibit C.

22.     On September 23, 2008, Latshaw sent a letter to Lehman Paper, advising
that Lehman Paper was in default under the Credit Agreement for its failure to fund the Loan,
and asking whether Lehman Paper intended to cure the default by funding the remaining loan
request of $27,750,000.  A true and correct copy is attached as Exhibit D.

23.     On October 3, 2008, Latshaw again wrote to Lehman Paper, as did its
counsel, Ewing & Jones by separate letter, advising that no response had yet been received, and
that the interest payment which was due would be made with full reservation of rights – despite
Lehman Paper's continuing default – with 75% being paid to the Lehman Paper as
Administrative Agent and 25% to Ableco pursuant to the Ableco Agreement (to which Lehman
Paper and LBI were signatories).  True and correct copies of the letters are attached as Exhibits E
and F, respectively.

24.     In the October 3rd letter, Latshaw requested that Lehman Paper promptly
return 92.5% of the $600,000 commitment fee which Latshaw had previously paid to Lehman
Paper for the $40 million increase in the credit line under the Amended Credit Agreement, in
light of Lehman Paper's funding only 7.5% of the total commitment, and its continuing default
under the Credit Agreement.

25.     On October 5, 2008, Lehman Paper commenced its voluntary chapter 11
case in the Bankruptcy Court for the Southern District of New York, Case No. 08-13900.

786127_4

26. Latshaw heard nothing from LBI or Lehman Paper, but continued to make payments when due while reserving its rights, with the pro rata share of payment going to Ableco based on the funding provided by Ableco, and the balance to Lehman Paper.

27. Five months later, on February 13, 2009, Lehman Paper – without ever having cured its default under the Credit Agreement – wrote to Latshaw declaring it in default for failing to provide duly executed Bailee's Agreements from owners of real property on which Latshaw's rigs (collateral for the Loan) were located. As shown by the responses of Latshaw, and of Latshaw's counsel Ewing & Jones, this attempt to manufacture a default was done by stretching Section 6.19 of the Credit Agreement to cover situations which the Credit Agreement never contemplated and which were not the practice in the oil and gas industry or among the parties to the Credit Agreement.[4] True and correct copies of the February 13 letter from Lehman Paper and the February 23 and 27 responses from Latshaw's counsel are attached as Exhibits G, H and I, respectively. Nonetheless, Latshaw produced the newly requested Bailee's Agreements for the rigs that were "stacked," i.e., not contracted out.

28. This was the beginning of a series of letters which attempted to fabricate defaults on Latshaw's part where there were none. Among the artificial "defaults" which Lehman Paper declared were:

(a) Latshaw was in default of financial covenants because it provided consolidated financial statements for Latshaw, Latshaw D&E and LDO, rather than statements for Latshaw alone. A true and correct copy of the May 26, 2009 letter from

---

[4] Section 6.19 of the Credit Agreement was designed to cover situations where a rig was not in active use but had been placed in storage on property which did not belong to Latshaw. This provision was never intended to require Bailee's Agreements from every real property owner on which the rig was located while being actively leased, and under the control of Latshaw, sometimes for a mere few weeks at a time. In fact, this was the first time Lehman Paper ever requested Bailee's Agreements for operational rigs during the years of performance under the Credit Agreement.

8

Lehman Paper is attached as Exhibit J.  In fact, Lehman Paper had been accepting consolidated financial statements without objection since 2005.  Further, in a meeting which I attended on June 4, 2009 with representatives of Lehman Paper and Ableco, Lehman Paper agreed to contact Latshaw's certified public accountant to specify its requirements for financial reports.  Without ever contacting Latshaw's accountants, Lehman Paper sent another notice of default on July 10, 2009.  A true and correct copy of the letter (without exhibits) is attached as Exhibit K.

(b)     Latshaw was in default by failing to provide key man life insurance in the amount of $5,000,000.  See, Exhibit K.  In fact, when the original Credit Agreement was entered into in 2005, after a medical examination, three insurance companies refused to provide key man life insurance in an amount greater than $1,500,000, and the parties waived this default pursuant to a written amendment signed by Lehman Paper and dated January 12, 2006.  See, Exhibit L, a true and correct copy of a July 21, 2009 letter from Ewing & Jones.

(c)     Latshaw was in default by failing to provide a Bailee's Agreement with respect to Rig #4.  See, Exhibit K.  In fact, Rig # 4 had not been placed in storage and thus no Bailee's Agreement was required. The rig was contracted out to a customer, and after floods in April 2008 was moved approximately a quarter of a mile – while remaining at the customer location – for repairs.  Nevertheless, Latshaw requested, and subsequently provided to Lehman Paper, a Bailee's Agreement from the customer to which the rig was contracted.  See, Exhibit L at p.3.

29.     These artificially-created defaults culminated in Lehman Paper "sweeping" the entirety of the $5,446,339.41 in Latshaw's bank account on July 13, 2009,

9

further damaging Latshaw. A true and correct copy of the July 13, 2009 letter of Lehman paper is attached as Exhibit M.

30.     From July 13 until September 29, Lehman Paper permitted Latshaw to utilize funds in the account for ongoing operations, effectively returning approximately $2.6 million of the account. However, on September 29, 2009, Lehman Paper notified Latshaw that it was in further and continuing default, that it was exercising its rights to apply the approximately $3.2 million balance in the seized account to the obligations under the Credit Agreement, that all commitments to fund were terminated, and that the loan had been accelerated and was now due and payable. A true and correct copy of the September 29 letter is attached as Exhibit N.

31.     This September 29 letter recited two new fabricated defaults:

(a)     A failure to remit $311,458.67 received in insurance proceeds, to Lehman Paper, despite the fact that the funds were deposited into an account which Lehman Paper controlled, and that Latshaw had advised Lehman of the source and deposit of these funds.

(b)     A failure to pay $75,274.27 in legal fees for Ableco's counsel, when Latshaw had promptly requested, but not yet received, support for the amount of legal fees to permit it to determine whether such fees were reasonable, as required under the Amended Credit Agreement. See, October 1, 2009 response of Ewing & Jones, attached as Exhibit O.

32.     Subsequently, on September 30, 2009, Lehman Paper once again swept Latshaw's bank account, this time removing the $374,266.53 therein. Unlike the first sweep on July 13, 2009, this time Lehman Paper refused access to funds sufficient even to cover checks which had been written by Latshaw but not tendered to the bank prior to the sweep. The bank

honored these checks despite Lehman Paper's sweep of the entire account balance, causing Latshaw to incur overdraft charges.

**D.**     <u>Negotiations with Lehman Paper</u>

33.     Throughout this time, Latshaw has engaged in negotiations with Lehman Paper. However, although Lehman Paper has admitted to breaching the obligation to fund under the Amended Credit Agreement, Lehman Paper cavalierly asserted Latshaw suffered no damages and in fact was aided by Lehman's breach. It has refused to back down from what Latshaw considers to be onerous provisions which would more properly be used in a situation where the borrower was in default under a loan. Accordingly, no agreement to restructure the borrowing under the Amended Credit Agreement has been reached.

34.     On August 5, 2009, Lehman Paper sent a "Forbearance Letter" to Latshaw, stating that it would forbear from exercising its rights under the Amended Credit Agreement, other than continued exercise over the bank account, until September 1, 2009. A true and correct copy of the August 5 letter is attached as Exhibit P.

35.     Latshaw disputed that forbearance was needed, in that it disputed the existence of the events of default asserted by Lehman Paper. A true and correct copy of the August 21, 2009 response of Latshaw is attached as Exhibit Q.

36.     Since that time the parties have been operating under verbal agreements continuing the forbearance period and, until this past week, Lehman Paper has permitted Latshaw to pay its ongoing business operations and expenses from the bank account over which Lehman Paper has dominion, essentially "funding back" money which Lehman Paper had swept to permit Latshaw to pay for its essential operations. Now, as set forth in the September 29, 2009 letter, Lehman Paper has applied Latshaw's funds to the obligations under the Credit

11

Agreement, in the amount of approximately $3.2 million.[5]  See, Exhibit N.  Further, this past week, Lehman Paper has refused to "fund back" amounts swept from Latshaw's bank to allow payment of certain expenses, including the posting of funds as collateral for a letter of credit with respect to Latshaw's workers compensation insurance.

37.    Latshaw has now reached the stage where it is unable to continue to operate under this uncertainty, where the only assurances from Lehman Paper that it can continue to do business are oral agreements, and where Lehman Paper continues to treat Latshaw as if it had been the party to materially breach the Amended Credit Agreement, when, in fact, Lehman Paper was the party to materially breach by its failure to fund in September 2008.

## E.    Latshaw's Damages

38.    As stated above, in addition to approximately $43 million in lost profits, Latshaw has incurred approximately $18 million in direct damages which it should be permitted to recoup from the amounts owed to Lehman Paper under the Amended Credit Agreement.[6] Latshaw's damages, which will be asserted in complete detail and with supporting evidence of such damages in litigation against Lehman Paper to be undertaken in this Bankruptcy Court, consist of:

(a)    Approximately $15.9 million for equipment ordered, and for which delivery had been taken, for the construction of two new rigs which were to be built for a

---

[5]    Subsequent to the September 29 default and acceleration letter and the second sweep of Latshaw's bank account on September 30, Latshaw learned that Lehman Paper had applied $75,274.27 of the funds swept from Latshaw's bank account to the legal fees for Ableco's counsel (fees which Latshaw was contesting pending receipt of details to permit a determination of their reasonableness), and $50,000 to a retainer fee for a company identified as The Storm Group, members or employees of which had performed an inspection at Latshaw's offices in early October on behalf of Lehman Paper.

[6]    Latshaw's assertion that it should be permitted to recoup its damages against amounts owed is without prejudice to its right to argue under applicable state law that it has no obligation to repay the outstanding amounts of the loan because of Lehman Paper's material breach, and to assert a direct claim for its damages against Lehman Paper.

786127_4

new customer with three-year contract terms. The two new rigs had to be cancelled on Lehman Paper's refusal to fund the commitment;

(b)    $600,000 representing the commitment fee for the increase in the credit line in the Amended Credit Agreement;

(c)    Approximately $100,000 in legal fees related to the Amended Credit Agreement and the material breach by Lehman Paper;

(d)    Interest paid on the $15.9 million borrowed with respect to the two new rigs which were not built because of Lehman Paper's material breach of the Amended Credit Agreement.

## FIRST DAY MOTIONS

39.    Contemporaneously herewith, the Debtors have filed a number of First Day Motions. I believe that, among other things, the relief requested in the First Day Motions is necessary to enable the Debtors to operate with minimal disruption during the pendency of their Chapter 11 Cases. A description of the relief requested and the facts supporting each of the motions is set forth below.

**A.    Motion for Entry of Emergency Interim Cash
Collateral Order and for Expedited Hearing**

40.    The Debtors seek to use the cash collateral of Lehman Paper and Abelco on an emergency interim basis and pending a final hearing. Lehman Paper contends that the Lenders hold valid, enforceable and allowable claims, as defined at 11 U.S.C. § 101, against the Debtors in the approximate amount of $69,000,000.00, plus any and all interest, fees (including, without limitation, legal fees), expenses, and other obligations and liabilities of Debtor pursuant to the Lender Note (the "Prepetition Indebtedness"). Lehman further contends that the Lenders hold properly perfected first in priority liens and security interests in all of Debtor's cash,

13

accounts, drilling rigs and other equipment, general intangibles and other personal property including (without limitation) proceeds (collectively, the "Prepetition Collateral"). The total value of the Prepetition Collateral exceeds the Prepetition Indebtedness by at least 180%, affording more than adequate protection to Lehman Paper. The Debtor does not believe there are any parties claiming any valid and perfected lien, claim or encumbrances to be prior in time or superior in priority to any of the Prepetition Collateral. The Debtors dispute that the claims of the Lenders are valid and asserts claims for recoupment of damages and for cancellation of the Prepetition Indebtedness *in toto*.

41. The Debtors have a cash need for the purposes of meeting necessary expenses incurred in the ordinary course of operating their businesses, including, but not limited to, payroll and all taxes related thereto, overhead and other post-petition expenses necessary to maintain Debtors' operations. The Debtors are without sufficient funds to meet such ordinary and necessary expenses without the use of that portion of the Prepetition Collateral that constitutes cash, negotiable instruments, securities, deposit accounts, or any form of cash equivalents whenever acquired including (without limitation) all proceeds, products, rents or profits of the Prepetition Collateral whether existing before or after the commencement of this case.

**B.    Motion for Order Authorizing, but not Directing, Payment of
Certain Prepetition Wages, Salaries and Other Compensation**

42. As of the Petition Date, the Debtors employed 246 full-time employees. To minimize the personal hardship that these employees will suffer if employee-related obligations are not paid, to maintain employee morale and to prevent a loss of employees critical to the Debtors' reorganization efforts, the Debtors are seeking authority to pay prepetition claims relating to unpaid compensation, reimbursable expenses and employee benefits, which include,

14

among other items, wages, salaries, federal and state withholding taxes, payroll taxes, and reimbursable expenses.

43. Prior to the Petition Date and in the ordinary course of its business, the Debtor paid its employees wages and other benefits from the payroll account. The Debtor estimates that, as of the Petition Date, there was approximately $260,000 in accrued prepetition salaries, wages, federal tax withholdings, FICA withholdings, federal unemployment tax, various state tax withholdings, and employee benefits.

44. In the ordinary course of business, the Debtors' Employees are paid bi-weekly. The last payroll was distributed on November 10, 2009. This payroll paid the Employees current through November 3, 2009. However, because the Employees are paid in arrears, the filing of the Petition caused there to be seven days of accrued, but unpaid pre-petition employee obligations as stated above. The Employees are involved in ongoing work. The Debtors' operations cannot continue without these Employees. In addition, the Debtors believe that it would cause serious hardship and be detrimental to the morale of the Employees to deny these payments.

_____
Trent B. Latshaw

Sworn to before me this
11th day of November, 2009

_____
Notary Public

15

786127_4

FIRST DAY AFFIDAVIT EXHIBITS A-Q

# EXHIBIT "A"

**Latshaw Drilling Company , LLC**
**Latshaw Drilling & Exploration Company, Inc.**

<u>**Plan Term Sheet**</u>

**November 11, 2009**

The following is a summary (the "<u>Plan Term Sheet</u>") of certain indicative terms of a proposed plan of reorganization (the "<u>Plan</u>") for the Companies (as defined below). The transactions contemplated by this Plan Term Sheet are subject to further terms and conditions to be set forth in the Plan and other definitive documents. Nothing in the Plan Term Sheet shall be an admission of fact or liability or deemed binding on the Companies, their subsidiaries or affiliates. This Plan Term Sheet does not create or impose any commitment or obligation, express or implied, on any party in any respect regarding a definitive agreement or otherwise.

| **Overview** |
| :--- |

| | |
| :--- | :--- |
| **Transaction Summary** | This Plan Term Sheet describes a restructuring transaction (the "<u>Restructuring</u>") pursuant to which Latshaw Drilling Company, LLC ("<u>Latshaw</u>") and its parent company Latshaw Drilling and Exploration Company ("<u>Latshaw D&E Co.</u>", and together with Latshaw, the "<u>Companies</u>"), will restructure their capital structure through a joint plan of reorganization (the "<u>Plan</u>") filed in connection with cases commenced under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Northern District of Oklahoma. <br><br> This Plan Term Sheet outlines the proposed material terms and conditions of the Restructuring. The Plan Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive documentation governing the Restructuring. |

1

| Secured Debt to be Restructured | (a) The "<u>Lehman Secured Debt</u>": |
|---|---|
| | The Lehman Secured Debt to be treated under a plan of reorganization is approximately $69 million outstanding under that certain "$100,000,000 Amended and Restated Credit Agreement among Latshaw Drilling Company, LLC, as Borrower, Latshaw Drilling & Exploration Company, The Several Lenders from Time to Time Parties Hereto, Lehman Brothers Inc., as Arranger, Lehman Commercial Paper Inc., as Syndication Agent, and Lehman Commercial Paper Inc., as Administrative Agent Dated as of July 11, 2008" (the "<u>Credit Agreement</u>"). |
| | The amount of Secured Debt and the obligations of Latshaw to Lehman Commercial Paper Inc., Lehman Brothers Inc. (collectively "<u>Lehman</u>") and the Several Lenders under the Credit Agreement are in dispute. Latshaw asserts that it is excused under applicable state law from its obligation to repay the Lehman Secured Debt because of Lehman's material breach of the Credit Agreement. Alternatively, Latshaw asserts that it has a right to recoup approximately $18 million in damages caused by Lehman's material breach of the Credit Agreement for failing to fund a draw request thereunder, thus reducing the amount owed to approximately $51 million. As set forth herein, the actual amount of the Lehman Secured Debt to be treated under the Plan will be determined during the course of this bankruptcy case. |
| | (b) The "<u>Peoplesbank Secured Debt</u>": |
| | The Peoplesbank Secured Debt is approximately $961,000. The Peoplesbank Secured Debt is not disputed. |
| **Treatment of Claims and Interests** | |
| Administrative, Priority Tax, and Other Priority Claims: | On or as soon as practicable after the effective date of the Plan (which shall be the first date after confirmation of the Plan that all conditions to effectiveness of the Plan shall have been satisfied or waived, the "<u>Effective Date</u>") or such date as agreed to by any such holder, each holder of an administrative expense, priority tax, or other priority claim will receive cash equal to the full amount of its claim, or will otherwise be left unimpaired, unless the holder and the Company otherwise agree to a different treatment. |

2

| Secured Debt | The holders of the Lehman Secured Debt shall be impaired, and the actual amount of the Lehman Secured Debt will be litigated in this Bankruptcy Court.  Upon the Court's determination of the amount of the Lehman Secured Debt and except to the extent the holders of the Lehman Secured Debt agree to less favorable treatment pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable, and contractual rights to which the Lehman Secured Debt entitles such holders in respect of the Lehman Secured Debt shall be fully Reinstated and retained, except as provided in section 1124(2)(A)-(D) of the Bankruptcy Code, and the Lehman Secured Debt shall be paid and secured.

The holder of the Peoplesbank Secured Debt shall be impaired.  Except to the extent Peoplesbank agrees to less favorable treatment pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable, and contractual rights to which the Peoplesbank Secured Debt entitles Peoplesbank in respect of the Peoplesbank Secured Debt shall be fully Reinstated and retained, except as provided in section 1124(2)(A)-(D) of the Bankruptcy Code, and the Peoplesbank Secured Debt shall be paid and secured for a period of five years commencing on the Effective Date at a fair market rate of interest. |
| --- | --- |
| General Unsecured Claims | The Holders of general unsecured claims shall be impaired and shall receive four (4) equal payments, the first on the Effective Date and every one (1) month thereafter, equal to 100% of such claims, without interest. |
| Existing Equity Interests | TBD. |
| **General Provisions** | |
| Executory Contracts and Unexpired Leases | The Plan will provide for the assumption or rejection, as the case may be, of executory contracts and unexpired leases that will be identified in a supplement to the Plan to the extent that any such executory contracts or unexpired leases have not been otherwise assumed or rejected. |
| Resolution of Disputed Claims | The Plan will provide for the resolution of disputed claims and any reserves therefore. |

3

Case 09-13692-R    Document 44    Filed in USBC ND/OK on 04/14/2009    Page 6 of 5

| | |
|---|---|
| **Avoidance Actions and Other Litigation** | The reorganized Debtors will retain all rights to commence and pursue any and all claims and causes of action arising under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively, the "<u>Avoidance Actions</u>") and other litigation.<br><br>The Debtors will litigate the value of the Lehman Secured Debt, the Debtors' recoupment rights based on damages caused by Lehman's material breach, and the obligations, if any, of the Debtors to pay the Lehman Secured Debt under applicable state law. |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |

4

# EXHIBIT "B"

# LATSHAW DRILLING COMPANY, LLC

P.O. Box 691017
TULSA, OKLAHOMA 74169
PHONE: 918/355-4380
FAX: 918/355-4392
E-MAIL: tblatshaw@earthlink.net

September 17, 2008

Mr. Robert Chambers
Lehman Brothers
Houston, TX

Robert:

As per Section 2.2 of our Amended and Restated Credit Agreement dated 7/11/08 this is
to request a draw on our loan on Thursday 9/18/08 in the amount of $37,000,000. With
our previous draw of $3,000,000 on 8/25/08 this will be the full amount available under
this credit facility.

Please wire the funds to our bank account as follows:

Bank of Oklahoma, NA
ABA #103900036
Account #209915391
Account Name - Latshaw Drilling Company, LLC, Operating Account
Contact – Nick Cooper 981-588-6375

Thanks.

Trent B. Latshaw
President

cc: Tim Fording

# EXHIBIT "C"

ABLECO FINANCE LLC
299 Park Avenue, 23rd Flr
New York, New York 10171

September 18, 2008

Latshaw Drilling Company, LLC
P.O. Box 691017
Tulsa, Oklahoma 74169
Attention:    Trent B. Latshaw, President
Facsimile:    (918) 355-4392

Re: <u>Lehman Commercial Paper Inc.</u>

Dear Mr. Latshaw:

Reference is made to that certain Amended and Restated Credit Agreement dated as of July 11, 2008 (as amended from time to time, the "Credit Agreement") by and among LATSHAW DRILLING COMPANY, LLC, a Texas limited liability company ("Borrower"), LATSHAW DRILLING & EXPLORATION COMPANY, a Texas Subchapter S corporation ("Parent"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "Lenders"), LEHMAN BROTHERS INC., as sole advisor, sole lead arranger and sole bookrunner (in such capacity, the "Arranger"), LEHMAN COMMERCIAL PAPER INC., as the syndication agent (in such capacity, the "Syndication Agent") and as the administrative agent (in such capacity, the "Administrative Agent"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement.

As you know, Ableco Finance LLC (along with its affiliates, "Ableco") is a Lender under the Credit Agreement. Given the financial uncertainty surrounding Monday's filing of a chapter 11 proceeding under the U.S. Bankruptcy Code by the Administrative Agent's parent holding company, we hereby request that, notwithstanding anything to the contrary set forth in Sections 2.4(a) or 2.9(d) of the Credit Agreement or any other provision thereof or under any other Loan Document, the Borrower remit all payments due to Ableco under the Credit Agreement directly to Ableco (rather than the Administrative Agent) in accordance with the following wire instructions:

Bank Name:    The Bank of New York
           New York, NY
ABA Number:    021 000 018
Account Name:    CDO Wire
Account Number:    211551
Sub-Account Name    Ableco Finance LLC Collection
Sub-Account Number    467778
Reference:    Latshaw Drilling
Attention:    Anoop Nair-7299 / Eva Knight-6186

SRZ-10750193.1

Exhibit C
1 of 5

In addition, pursuant to your request, notwithstanding anything to the contrary set forth in Section 2.2 of the Credit Agreement, Ableco hereby agrees to make its ratable portion of each borrowing of Additional Term A Loans directly to the Borrower (rather than the Administrative Agent) in accordance with the following wire instructions:

> Bank Name: Bank of Oklahoma, NA
> ABA Number: 103900036
> Account Number: 209915391
> Account Name: Latshaw Drilling Company, LLC Operating Account
> Attention: Nick Cooper at (981) 588-6375

The foregoing payment direction shall remain in effect until such time as Ableco provides you written notice that it will resume making its portion of the Additional Term A Loans to the Administrative Agent.

Please acknowledge your agreement to the foregoing by signing below and returning this letter to Tim Fording at Ableco via facsimile at 212-909-1488 and, if possible, via email at tfording@ablecofinance.com

> Very truly yours,
>
> ABLECO FINANCE LLC
>
> By: Kevin P. Genda
> Title: Vice Chairman

Acknowledged and Agreed
this ___ day of September, 2008:

LATSHAW DRILLING COMPANY, LLC

By: Trent B. Latshaw
Title: President

SRZ-10750193.1

Exhibit C
2 of 5

LATSHAW DRILLING & EXPLORATION COMPANY

By:    Trent B. Latshaw
Title:  President


Acknowledged and Agreed
this ___ day of September, 2008:

LEHMAN BROTHERS INC.


_____
By: J. Robert Chambers
Title: Managing Director


LEHMAN COMMERCIAL PAPER INC., as administrative agent and a lender


_____
By: J. Robert Chambers
Title: Authorized Signatory

Exhibit C
3 of 5

LATSHAW DRILLING & EXPLORATION COMPANY

By:
Title:


Acknowledged and Agreed
this ___ day of September, 2008:

LEHMAN BROTHERS INC.

By: J. Robert Chambers
Title: Managing Director

LEHMAN COMMERCIAL PAPER INC., as administrative agent and a lender:

By: J. Robert Chambers
Title: Authorized Signatory

SS2-107501911

Exhibit C
4 of 5

Copy to:

Lehman Commercial Paper Inc.
745 Seventh Avenue
New York, New York 10019
Attention: Michelle Rosolinsky
Facsimile: (212) 526-8275
Telephone: (646) 758-5015

Lehman Brothers Inc.
600 Travis Street, Suite 7200
Houston, Texas 77002
Attention: J. Robert Chambers
Facsimile: (713) 236-3912

Akin Gump Strauss Hauer & Feld LLP
1111 Louisiana Street, 44th Floor
Houston, Texas 77002
Attention: J. Michael Chambers
Facsimile: (713) 236-0822

Ewing & Jones, PLLC
6363 Woodway, Suite 1000
Houston, Texas 77057
Attention: J. Randolph Ewing
Facsimile: (713) 590-9601

# EXHIBIT "D"

## LATSHAW DRILLING COMPANY, LLC

P.O. BOX 691017
TULSA, OKLAHOMA 74169
PHONE: 918/355-4380
FAX: 918/355-4392

September 23, 2008

Via Telecopy (212) 526-8275

Lehman Commercial Paper Inc.
745 Seventh Avenue
New York, New York 10019
Attention: Michelle Rosolinsky

> Re:  Amended and Restated Credit Agreement dated July 11, 2008 (as
> amended from time to time, the "Credit Agreement") by and among
> LATSHAW DRILLING COMPANY, LLC, ("Borrower"), LATSHAW
> DRILLING & EXPLORATION COMPANY, a Texas Subchapter S
> corporation ("Parent"), the several banks and other financial institutions or
> entities from time to time parties to this Agreement (the "Lenders"),
> LEHMAN BROTHERS INC., as sole advisor, sole lead arranger and sole
> bookrunner  (in  such  capacity,  the  "Arranger"),  LEHMAN
> COMMERCIAL PAPER INC., as the syndication agent (in such capacity,
> the "Syndication Agent") and as the administrative agent (in such
> capacity, the "Administrative Agent")

Dear Ms. Rosolinsky:

Reference is made to the above referenced Credit Agreement entered into by and
between the above referenced parties. Attached is the loan request Borrower made to
Lenders on Wednesday, September 17, 2008. Borrower has not received the requested
funds nor any response from the Arranger or the Syndication Agent (collectively,
"Lehman"). Borrower and Parent did receive and execute the attached Letter Agreement
by and between Lehman, Ableco Finance LLC ("Ableco"), Borrower and Parent dated
September 18, 2008, which evidences Lehman's agreement that Ableco could send its
portion of the requested funds to Borrower directly. Borrower has in fact received
$9,250,000 from Ableco constituting its entire portion of Borrower's loan request.



Please note that Lender is in default of Section 2.2 of the Credit Agreement which
provides in applicable part as follows:

> "Upon receipt of such Borrowing Notice, the Administrative Agent shall
> promptly notify each Lender thereof. Not later than 12:00 Noon, New
> York City time, on the Borrowing Date specified for Loans hereunder,

C:\Documents and Settings\tlatshaw\Local Settings\Temporary Internet Files\OLK66C\Draft Letter to Lehman 080923 (2).doc

each Lender shall make available to the Administrative Agent at the
Funding Office an amount in immediately available funds equal to the
Loan or Loans to be made by such Lender; *provided* that Borrower shall
not deliver a Borrowing Notice, and no Lender is under any obligation to
make available any funds, for Additional Loans in the aggregate amount
for all Lenders less than $1,000,000 except if such amount is the
remaining unborrowed amount of the Commitments. The Administrative
Agent shall make available to Borrower the aggregate of the amounts
made available to the Administrative Agent by the Lenders, in like funds
as received by the Administrative Agent."

Such default has and will continue to cause Borrower damage. Please let
Borrower know immediately, if Lehman intends to cure this default and satisfy
Borrower's remaining loan request in the amount of $27,750,000. Furthermore, please be
reminded that Borrower paid Lenders a commitment fee of $600,000 for the loans
contemplated under the Credit Agreement to be funded upon Borrower's request. Since
Lenders have breached their funding commitment to Borrower, Borrower reserves the
right to recover Lehman's prorata share of such $600,000 as well as recover other
damages caused by Lenders' breach of the Credit Agreement.

We look forward to your prompt response.

Sincerely,

Trent B. Latshaw
President

Cc:     Mr. J. Robert Chambers (Via Telecopy)
        Mr. J Michael Chambers (Via Telecopy)
        Mr. Tim Fording (Via Telecopy)
        Mr. Randolph Ewing (Via Telecopy)

# EXHIBIT "E"

## LATSHAW DRILLING COMPANY, LLC

P. O. Box 691017
TULSA, OKLAHOMA 74169
PHONE: 918-355-4380
FAX: 918-355-4392
EMAIL: TRENT@LATSHAWDRILLING.COM

October 3, 2008

Via Telecopy (212) 526-6643

Lehman Commercial Paper Inc.
745 Seventh Avenue
New York, New York 10019
Attention: Michelle Rosolinsky

Re:  Amended and Restated Credit Agreement dated July 11, 2008 (as
amended from time to time, the "Credit Agreement") by and among
LATSHAW DRILLING COMPANY, LLC, ("Borrower"), LATSHAW
DRILLING & EXPLORATION COMPANY ("Parent"), the several banks
and other financial institutions or entities from time to time parties to this
Agreement (the "Lenders"), LEHMAN BROTHERS INC., as sole
advisor, sole lead arranger and sole bookrunner (in such capacity, the
"Arranger"), LEHMAN COMMERCIAL PAPER INC., as the syndication
agent (in such capacity, the "Syndication Agent") and as the
administrative agent (in such capacity, the "Administrative Agent")

Dear Ms. Rosolinsky:

Reference is made to the above referenced Credit Agreement entered into by and
between the above referenced parties. Attached is the loan request Borrower made to the
Syndication Agent on Wednesday, September 17, 2008 and the notice letter from
Borrower to the Syndication Agent dated September 23, 2008 pointing out the default by
the Syndication Agent and the Administrative Agent under the Credit Agreement.

To date, neither the Arranger, the Syndication Agent nor the Administrative
Agent (collectively "Lehman") have responded to either letter other than to execute a
letter agreement dated September 18, 2008, a copy of which is attached, authorizing
Borrower to make pro rata payments and receive pro rata funding from Ableco Finance
LLC ("Ableco") directly. As previously stated, Borrower did receive $9,250,000 from
Ableco as Ableco's pro rata portion of Borrower's borrowing request on September 18,
2008. Lehman did not and still has not funded its $27,750,000 portion of Borrower's
loan request.

Page 2
October 3, 2008

The Credit Agreement requires a monthly interest payment to be made by Borrower to Lenders. The amount of this interest payment is $552,171.48. Despite Lehman's continuing default, Borrower is paying Lehman $388,904.29 and Ableco $163,267.19 which represents the entire amount of interest due and owing to each for the previous month.

Borrower paid Lenders a total commitment fee of $600,000 in July, 2008 in consideration of Lenders entering into the Credit Agreement and being contractually obligated to fund the loans requested by Borrower. Ableco has funded its entire portion of the loans requested by Borrower, but Lehman has only funded $2,250,000 of the total $30,000,000 requested from Lehman, and Lehman still has not funded $27,750,000. In essence, Lehman has only funded 7.5% of the total funds requested by Borrower. In light of the fact that Lehman has defaulted on September 18 and continues to be in default in funding Borrower's borrowing request, Borrower hereby requests that Lehman promptly return to Borrower 92.5% of Lehman's $450,000 portion of the commitment fee previously paid by Borrower to Lehman which is a total of $416,250.

Borrower continues to incur damages from the lack of funding by Lehman, and Borrower has no choice but to pursue other alternatives to procure such funding before such damages are irreversible. Lehman is again placed on notice of this fact, and Borrower reserves the right to recover all damages that it continues to incur from Lehman.

Again as previously requested, it would be appreciated if Lehman would promptly let Borrower know if Lehman intends to cure its default by funding Borrower's loan request. We look forward to hearing from you.

Sincerely,

Trent B. Latshaw
President


Cc:     Mr. J. Robert Chambers (Via Telecopy)
        Mr. J Michael Chambers (Via Telecopy)
        Mr. Tim Fording (Via Telecopy)
        Mr. J. Randolph Ewing (Via Telecopy)

# EXHIBIT "F"



October 3, 2008

<u>Via Telecopy (212) 526-8275</u>

Lehman Commercial Paper Inc.
745 Seventh Avenue
New York, New York 10019
Attention: Michelle Rosolinsky

      Re:    Amended and Restated Credit Agreement dated July 11, 2008 (as amended from time to time, the "Credit Agreement") by and among LATSHAW DRILLING COMPANY, LLC, ("Borrower"), LATSHAW DRILLING & EXPLORATION COMPANY ("Parent"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "Lenders"), LEHMAN BROTHERS INC., as sole advisor, sole lead arranger and sole bookrunner (in such capacity, the "Arranger"), LEHMAN COMMERCIAL PAPER INC., as the syndication agent (in such capacity, the "Syndication Agent") and as the administrative agent (in such capacity, the "Administrative Agent")

Dear Ms. Rosolinsky:

      Reference is made to the above referenced Credit Agreement entered into by and between the above referenced parties. This law firm serves as legal counsel to Borrower and Parent. Attached is the loan request Borrower made to the Syndication Agent on Wednesday, September 17, 2008 and the notice letter from Borrower to the Syndication Agent dated September 23, 2008 pointing out the default by the Syndication Agent and the Administrative Agent under the Credit Agreement. 

      To date, neither the Arranger, the Syndication Agent nor the Administrative Agent (collectively "Lehman") have responded to either letter other than to execute a letter agreement dated September 18, 2008, a copy of which is attached, authorizing Borrower to make pro rata payments and receive pro rata funding from Ableco Finance LLC ("Ableco") directly. As previously stated, Borrower did receive $9,250,000 from Ableco as Ableco's pro rata portion of Borrower's borrowing request on September 18, 2008. Lehman did not and still has not funded its $27,740,000 portion of Borrower's loan request.

---

Page 2
October 3, 2008

The Credit Agreement requires an interest payment to be made by Borrower to Lenders on October 1, 2008. In light of the fact that Lehman has defaulted on September 18 and continues to be in default in funding Borrower's borrowing request, Borrower is making an interest payment to Lehman on only the portion of Lehman's pro rata accrued interest through September 18, as well as pay Ableco the entire twenty five percent (25%) of its accrued interest due to it as agreed to by all of the parties in the September 18 letter agreement.

Borrower continues to suffer damage from the lack of funding by Lehman, and Borrower has no choice but to pursue other alternatives to procure such funding before such damages are irreversible.

Demand is also made for the return of $450,000 of the $600,000 loan commitment which represents the portion attributed to all Lenders other than Ableco.

It would be appreciated if you would promptly let Borrower or me know if Lehman intends to cure the default by Lehman. We look forward to hearing from you.

Sincerely,

Randolph Ewing

Cc:    Mr. Trent B. Latshaw (Via Telecopy)
       Mr. J. Robert Chambers (Via Telecopy)
       Mr. J Michael Chambers (Via Telecopy)
       Mr. Tim Fording (Via Telecopy)

# EXHIBIT "G"

## LEHMAN COMMERCIAL PAPER INC.
### 1271 Avenue of the Americas
### New York, NY 10019

February 13, 2009

By Telecopy and Courier

Latshaw Drilling Company, LLC
P.O. Box 691017
Tulsa, OK  74169
Attention: Trent B. Latshaw, President
Fax:  (918) 355-4392

Ewing & Jones, PLLC
6363 Woodway, Suite 1000
Houston, TX  77057
Attention:  J. Randolph Ewing
Fax:  (713) 590-6901

Re:  Latshaw Credit Facility

Dear Mr. Latshaw:

We refer to that certain Amended and Restated Credit Agreement dated as of July 11, 2008 (the "Credit Agreement") among Latshaw Drilling Company, LLC, a Texas limited liability company (the "Borrower"), Latshaw Drilling & Exploration Company, a Texas Subchapter S corporation (the "Parent"), the several lenders from time to time parties thereto (the "Lenders"), Lehman Brothers Inc. as arranger, and Lehman Commercial Paper Inc. as syndication agent and administrative agent (the "Agent"), pursuant to which the Lenders have made certain loans to Borrower.  Capitalized terms used but not defined in this letter have the meanings ascribed to such terms in the Credit Agreement.

Pursuant to Section 6.19 of the Credit Agreement, the Borrower agreed that it would not, and the Parent agreed that it would not permit Borrower to, directly or indirectly "Store or permit any rigs to remain at any location other than on real property to which Borrower has title in fee simple unless the Administrative Agent shall have received a Bailee's Agreement duly executed and delivered by the owner of such location."

It has come to our attention that Borrower is not in compliance with Section 6.19 of the Credit Agreement.  First, we understand that certain Rigs (*i.e.*, Rigs 3 and 7) are presently not under contract, are not being operated, and are being stored and/or allowed to remain at one or more locations as to which the Agent has not been provided duly executed Bailee's Agreements from the owners of the real property on which the Rigs are located.

Second, we understand that certain other Rigs (*i.e.* Rigs 11 and 12), are subject to open drilling contracts, but are not being operated and are being stored and/or allowed to remain

NY2:\1967375\02\1661B02\.DOC\58399.0003

at one or more locations, as to which the Agent has not been provided duly executed Bailee's Agreements from the owners of the real property on which the Rigs are located.

Third, we understand that each of the other Rigs (*i.e.*, Rigs 4, 5, 6, 8, 9, 10, and 15) are being operated and allowed to remain at various locations as to which the Agent has not been provided duly executed Bailee's Agreements from the owners of the real property on which the Rigs are located.

Without waiving any rights and remedies of the Agent or the Lenders under the Loan Documents, and specifically disclaiming any obligation to afford Borrower any opportunity to remedy the preceding circumstances, we are advising you of the foregoing and requesting that Borrower come into compliance with Section 6.19 of the Credit Agreement no later than February 23, 2009, 5:00 pm Eastern Standard Time, by delivering to the Agent a Bailee Agreement for each of the Rigs referenced above, duly executed by the fee simple owner of the real estate on which each of such Rigs is presently located.

Please be advised that our decision to provide such notice and opportunity does not constitute, nor should it be deemed to constitute, a waiver of any right or remedy available to the Agent and/or the Lenders under the Loan Documents or applicable law. Please be further advised that the Loan Documents provide that we may, and we reserve the right on our own behalf and on behalf of the Lenders to, enforce any and all of such rights and remedies at any time, without further notice.

[Remainder of page intentionally left blank]

Very truly yours,

Lehman Commercial Paper Inc.,
as Administrative Agent

By:
Name: David Elman
Title: Vice President

# EXHIBIT "H"



February 23, 2009

Via Telefax – (212) 526-8275

Lehman Commercial Paper Inc.
David Ehrmann, Vice President
1271 Avenue of the Americas
New York, NY 10019

> Re:   Latshaw Credit Facility

Dear Mr. Ehrmann:

As legal counsel for Latshaw Drilling Company, LLC (the "Borrower"), I am in receipt of a letter from you dated February 13, 2009. This letter asserts that the Borrower is in default of that certain Amended and Restated Credit Agreement dated as of July 11, 2008 (the "Credit Agreement") with the Lenders who are a party thereto. This will also confirm the telephone conversation that I had this afternoon with Tim Fording of Abelco, Marty Barash, Abelco's attorney, and Maya Grant and Mark Glover with Weil, Gotshal, and Manges, legal counsel for the Lehman entities that are lenders.

As discussed in that telephone call, Borrower disagrees with the Lenders assertion that it is in default of Section 6.19. The Lenders' interpretation as I understand it is that Borrower must provide Bailee Agreements for any location where a Borrower Rig exists if outside of Borrower's real property. Section 6.19 of the Credit Agreement states: "**Storage of the Rigs. Store or permit any rigs to remain at any location other than on real property to which Borrower has title in fee simple unless the Administrative Agent shall have received a Bailee's Agreement duly executed and delivered by the owner of such location."** The intent of Section 6.19 of the Credit Agreement is to require Bailees' Agreements when the Borrower's Rigs are being stored and/or remain at a location for an indefinite time. Borrower does not believe that Section 6.19 requires a Bailee's Agreement every few weeks as the Borrower's operating Rigs are moved from drill site to drill site.

Page 2
February 23, 2009

      Accordingly, Borrower is not in default of Section 6.19 of the Credit Agreement since Borrower has previously provided the Lenders Bailee's Agreements for the four Rigs that are being stored and/or are remaining at the same location. All of Borrower's other nine Rigs are fully operating and moving from location to location for which Bailee's Agreements are not necessary.

      Please call with any questions. Thank you.

Very truly yours,

Randolph Ewing

Cc:    Via Email

    Ms. Maya Grant
    Mr. Mark Glover
    Mr. Tim Fording
    Mr. Martin Barash
    Mr. Trent B. Latshaw

# EXHIBIT "I"



RANDOLPH EWING                                    rewing@ewingjones.com

February 27, 2009

<u>VIA TELEFAX – (212) 526-8275</u>

Lehman Commercial Paper Inc.
David Ehrmann, Vice President
1271 Avenue of the Americas
New York, New York 10019

      RE:    Latshaw Credit Facility

Dear Mr. Ehrmann:

We have been requested to amplify our response to your assertion that Latshaw Drilling Company, LLC (the "Borrower") is in default under that certain Amended and Restated Credit Agreement dated as of July 11, 2008 (the "Credit Agreement") with the Lenders who are parties thereto for an alleged failure to comply with the provisions of Section 6.19 of the Credit Agreement regarding its operational drilling rigs. The Lenders' position, as we understand it, is that Borrower is required under Section 6.19 of the Credit Agreement to obtain a "Bailee's Agreement" from each landowner where it drills an oil or gas well for one of its customers.

Article IV – Negative Covenants of the Credit Agreement states:

"Borrower and Parent hereby jointly and severally agree that, so long as the Commitments remain in effect or any Loan or other amount is owing to and Lender or any Agent hereunder, Borrower shall not, and Parent shall not permit Borrower to, directly or indirectly:

**"6.19  Storage of the Rigs.** Store or permit any rigs to remain at any location other than on real property to which Borrower has title in fee simple unless the Administrative Agent shall have received a Bailee's Agreement duly executed and delivered by the owner of such location."

This negative covenant clearly applies to rigs that are stored or "parked", and not those that are currently working and in the custody and control of the Borrower. In support of that conclusion, we would point out first that a prerequisite to receipt of a "Bailee's Agreement" is the existence of a bailment. A bailment requires a contract (express or implied) between the bailor and bailee, the delivery of property to the bailee, and acceptance of that property by the

February 27, 2009
Page 2

bailee pursuant to the contract. *Allright v. Elledge*, 508 S.W.2d 864, 866 (Tex.Civ.App. Houston (1st Dist.), certified questions answered), 515 S.W.2d 266 (Tex.1974), judgmt modified, 513 S.W.2d 875 (Tex.Civ.App. Houston (1st Dist.) 1974, no writ); See also the definitions of "bailee", "bailment" and "bailor" in Black's Law Dictionary. An essential to bailment is delivery of the property by the bailor to the bailee and without such a delivery there can be no bailment. *Allright v. Elledge*, *Supra* at 866. Put another way, a bailment arises when personal property is turned over for storage or safekeeping to a third party (the "bailor") and the bailor undertakes to store or safeguard the property. A classic example is a warehouse. Since the property would be under the physical control of the bailor, and not the Borrower, and since the Lenders' security interest might in some rare cases be primed by a warehouseman's possessory lien for the cost of storage and some other costs (Texas Bus. & Comm. Code, Section 7.209(c)), a Bailee's Agreement is reasonably required to protect the Lender's security interest in the collateral and provide for certain remedies in the event of default by Borrower (such as cooperation in Lenders' enforcement of its security interest). Indeed, the Bailee's Agreement that has been approved by Lenders and used by Borrower contemplates this very arrangement. See the copy of the Bailee's Agreement attached to this letter as Exhibit "A". Notably it does not contemplate any situation other than a classic bailment.

Secondly, there is no legal or business reason for the Lender's interpretative position. Drilling rigs that are currently working are within the control and custody of Borrower and no further action is necessary to protect the Lender's security interest, provided it was properly recorded and perfected in the first instance. We do not know of any liens that attach to drilling rigs solely because they move onto a well site to drill an oil or gas well.

Thirdly, the Lender's interpretation of Section 6.19 leads to a completely unworkable result which surely was not contemplated by either the Lenders or the Borrower. It would be almost impossible in most instances to identify who or what entity would be required to sign the Bailee's Agreement in the form propounded by the Lenders. The rigs are almost always operating on surface tracts whose owners are divorced to a substantial degree from the owners of the mineral estate underlying such surface. Since the owner/lessee of the mineral estate is entitled to reasonable use of the surface for extraction of the minerals, absent deed restrictions or specific lease provisions, permission of the surface owner is not required in order to site and drill an oil or gas well and no liens attach by virtue of such operations. Indeed, unless the mineral lease specifically provides otherwise, the surface owner has no right or obligation to approve the drilling operations before they commence. The number of mineral and surface owners can also be substantial for each tract and the difficulties of tracking down each mineral and surface owner to obtain a waiver of a lien that doesn't exist, for which there is no basis in law, <u>and</u> which the landowners have <u>no</u> obligation or incentive to deliver would be almost insurmountable and unprecedented. It is inconceivable to us that Section 6.19 could be interpreted to require this action. And indeed, we are unable to conceive of the form of "Bailee's Agreement" that would somehow fit this situation since none of the mineral owners or surface owners have any control over the rigs.

Lastly, in the collective 65 years of experience that my partner and I have in dealing with drilling contractors, surface and mineral owners, oil and gas working interest owners, and energy

Exhibit I
2 of 5

February 27, 2009
Page 3

business lenders, we have never heard of any lenders attempting to require that a drilling contractor obtain any lien waivers or "Bailee Agreements" from landowners such as the Lenders are apparently now suggesting. We are very surprised that the Lenders believe that this is even an issue with respect to the Credit Agreement, or a plausible interpretation of Section 6.19.

If you would like to discuss this further, please contact John Lange or me. Thank you.

Very truly yours,

Randolph Ewing

Randolph Ewing

cc.  <u>Via Email</u>

Ms. Maya Grant
Mr. Mark Glover
Mr. Martin Barash
Mr. Trent B. Latshaw
Mr. B. John Lange, III (Firm)

p:\client folders\l\latshaw drilling & exploration co\lehamn default\section 6 19 letter-rev1 (2).doc

Exhibit I
3 of 5

# EXHIBIT "A"

February 16, 2009

Ard Epsilon, LLC
14571 FM 730 North
Azle, TX 76020

Re: Latshaw Drilling Company, LLC

Dear Sir:

      Lehman Commercial Paper Inc. *("Lehman")*, as agent for itself and various other lenders (the *"Lenders")* under a Credit Agreement, to be entered into in July 2007, has been informed by Latshaw Drilling Company, LLC, a Texas limited liability company *("LDC")*, and its parent company, Latshaw Drilling & Exploration Company, a Texas Subchapter S corporation (collectively, the *"Company")*, that the Company has delivered certain property (the *"Equipment")* to you for storage at the above address. Lehman has made certain loans to the Company which will be secured by a first priority lien for substantially all of the tangible and intangible personal property of LDC, including the Equipment.

      You hereby agree and acknowledge that the security interests of Lehman in the Equipment are and shall be senior to all liens, rights or claims of title of any nature which you now have or hereafter may have or assert in the Equipment. In addition, you hereby acknowledge that, to the best of your knowledge, you have not received notice of any other lien or security interest in the Equipment.

      The above notwithstanding you are authorized, subject to the conditions described below, to release any of the Equipment to the Company, any authorized agent of the Company or any third party upon the Company's request; *provided, however,* that your authority to release the Equipment to the Company or any other person is subject to the condition that upon the prior written direction of Lehman, (i) you shall refuse to release the Equipment to the Company, agent or third party, as applicable, (ii) you will cooperate with Lehman in its efforts to assemble all of the Equipment, (iii) will permit Lehman to remove the Equipment, (iv) will not hinder Lehman's actions in enforcing its security interests in the Equipment (provided that any entry to the property on which the Equipment is located will be scheduled in advance) and (v) you shall only release the Equipment to Lehman or the party designated by Lehman in such prior written direction.

      The Company agrees that you shall have no liability to the Company if you comply with the written direction of Lehman, as described above. The Company further agrees that it will continue to pay all fees and other expenses related to the storage of the Equipment, and Company hereby agrees to defend, indemnify and hold you harmless for all claims, liabilities, losses, reasonable costs and expenses arising out of or in connection with your compliance with the terms and provisions of this letter.

Exhibit I
4 of 5

02/16/2009  17:20     9406446645              ARD EPSILON LLC              PAGE  03/03
                RECEIVED  02/16/2009 16:49   9406446645          ARD EPSILON LLC
    02-16-09;04:38PM;                                           ;918-355-4392       #  3/  3

Very truly yours,

LEHMAN COMMERCIAL PAPER INC.

By: _____


LATSHAW DRILLING COMPANY, LLC

By: _____

Name: Trent B. Latshaw
Title: President



Acknowledged and agreed to
this  16  day of February 2009

Ard Epsilon

By: _____ /Craig Ard/

Title: President

Exhibit I
5 of 5

# EXHIBIT "J"

**LEHMAN COMMERCIAL PAPER INC.**
1271 Avenue of the Americas
New York, NY 10020

May 26, 2009

By Telecopy and Courier

Latshaw Drilling Company, LLC
P.O. Box 691017
Tulsa, OK 74169
Attention: Trent B. Latshaw, President
Fax: (918) 355-4392

Ewing & Jones, PLLC
6363 Woodway, Suite 1000
Houston, TX 77057
Attention: J. Randolph Ewing
Fax: (713) 590-9601

Re: Latshaw Credit Facility

Dear Mr. Latshaw:

We refer to that certain Amended and Restated Credit Agreement dated as of July 11, 2008 (the "Credit Agreement") among Latshaw Drilling Company, LLC, a Texas limited liability company (the "Borrower"), Latshaw Drilling & Exploration Company, a Texas Subchapter S corporation (the "Parent"), the several lenders from time to time parties thereto (the "Lenders"), Lehman Brothers Inc. as arranger, and Lehman Commercial Paper Inc. as syndication agent and administrative agent (the "Agent"), pursuant to which the Lenders have made certain loans to Borrower. Capitalized terms used but not defined in this letter have the meanings ascribed to such terms in the Credit Agreement.

**Financial Statements and Related Deliverables.**

Pursuant to Section 5.1(a) of the Credit Agreement, the Borrower agreed that it would, and the Parent agreed that it would cause Borrower to, "Furnish to each Agent and each Lender...(a) within 90 days after the end of each Fiscal Year of Borrower, a copy of the audited balance sheet of Borrower as at the end of such year and the related audited statements of income and of cash flows for such year, setting forth in each case in comparative form the figures as of the end of and for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by the Independent Accountant."

Pursuant to Section 5.1(b) of the Credit Agreement, the Borrower agreed that it would, and Parent agreed that it would cause Borrower to, "Furnish to each Agent and Lender . . . as soon as available, but in any event not later than 45 days after the end

of each of the thirst three quarterly periods of each Fiscal year of Borrower, the unaudited balance sheet of Borrower as at the end of such quarter and the related unaudited statements of income and of cash flows for each quarter and the portion of the Fiscal Year through the end of such quarter, setting forth in each case in comparative form the figures as of the end of an for the corresponding period in the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year end audit adjustments)."

Pursuant to Section 5.1(c) of the Credit Agreement, the Borrower agreed that it would, and the Parent agreed that it would cause Borrower to, "Furnish to each Agent and Lender . . . as soon as available, but in any event not later than 20 days after the end of each month occurring during each Fiscal year of Borrower (other than the third, sixth, ninth and twelfth such month), the unaudited balance sheets of Borrower as at the end of such month and the related unaudited statements of income and of cash flows for such month and the portion of the Fiscal Year through the end of such month, setting forth in each case in comparative form, the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as fairly stated in all material respects (subject to normal year-end audit adjustments)."

Pursuant to Section 5.1(f) of the Credit Agreement, the Borrower agreed that it would, and the Parent agreed that would cause Borrower to "Furnish to each Agent and each Lender . . . .(f) until the Rig Construction Completion Date, as soon as possible, but in any event not later than 20 days after the end of each month, a statement reconciling the budgeted versus actual capital expenditures for the preceding month. "

Pursuant to Section 5.3(a) of the Credit Agreement, the Borrower agreed that it would, and the Parent agreed that it would cause Borrower to, "Furnish to the Administrative Agent and each Lender . . . (a) concurrently with the delivery of the financial statements referred to in Section 5.1(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, except as specified in such certificate (it being understood that such certificate shall be limited to the items that independent certified public accounts are permitted to cover in such certificates pursuant to their professional standards and customs of the profession)."

Pursuant to Section 5.3(b) of the Credit Agreement, the Borrower agreed that it would, and the Parent agreed that it would cause Borrower to, "Furnish to the Administrative Agent and each Lender: . . . (b) concurrently with the delivery of any financial statements pursuant to Section 5.1, (i) a certificate of a Responsible Officer stating that, to the best of such Responsible Officer's knowledge, each Loan Party during such period has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Loan Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate and (ii) in the case of quarterly or annual financial statements, (A) a

Compliance Certificate containing all information and calculations necessary for determining compliance by the Loan Parties with the provisions of this Agreement referred to therein as of the last day of the Fiscal Quarter or Fiscal Year of Borrower, as the case may be, (B) to the extent not previously disclosed to the Administrative Agent, a listing of any real property or Intellectual Property acquired by Borrower since the date of the most recent list delivered pursuant to this clause (B) (or, in the case of the first such list so delivered, since the Closing Date) and (C) authorize the filing of any Uniform Commercial Code financing statements or other filings specified in such Compliance Certificate as being reasonably required to be filed or delivered therewith."

Pursuant to Section 5.3(d) of the Credit Agreement, the Borrower agreed that it would, and the Parent agreed that it would cause Borrower to, "Furnish to the Administrative Agent and each Lender . . . (d) within 45 days after the end of each Fiscal Quarter of Borrower, a narrative discussion and analysis of the financial condition and results of operations of Borrower for such Fiscal Quarter and for the period from the beginning of the then current Fiscal year to the end of such Fiscal Quarter, as compared to the portion of the Projections covering such periods and the comparable periods of the previous year."

Notwithstanding delivery of certain consolidated financial statements by the Parent ("Consolidated Financial Statements"), Borrower has failed to deliver (i) the audited financial reports for the Borrower and other deliverables that are expressly required by Sections 5.1(a), 5.1(b), 5.1 (c), 5.1(f) 5.3(a), 5.3(b), 5.3(c) and 5.3(d) of the Credit Agreement and (ii) the 20-day grace period under paragraph (d) of Article VIII of the Credit Agreement has expired with respect to each of those obligations, with the exception of those arising under Sections 5.1(b) and 5.1(c).

First, the Consolidated Financial Statements do not satisfy the requirement in Section 5.1(a) of the Credit Agreement that audited financial statements be provided for the Borrower. The Consolidated Financial Statements purport to combine the financial results of the Borrower, the Parent, and a third entity, Latshaw Drilling Operations, LLC ("LDO"), which is identified as a wholly-owned subsidiary of Parent. Moreover, the Consolidated Financial Statements state that "[a]ll significant intercompany transactions have been eliminated." Thus, it is impossible to discern the financial activity and results of the Borrower from the Consolidated Financial Statements, as distinguished from the financial activity and results of the Parent and LDO.

Second, the Borrower did not comply with the requirements of Section 5.1(b) with respect to financial statements for the quarter ending March 2009, which were due on May 15, 2009. The financial statements provided for such period did not contain a comparison to the previous year's results, as required by Section 5.1(b).

Third, the Borrower did not comply with the requirements of Section 5.1(c) with respect to financial statements for the month ended April 30, 2009, which were due on May 20, 2009. The financial statements provided for such period did not contain a comparison to the previous year's results as required by Section 5.1(c). Further,

the financial statements provided for such period did not contain the certifications required by Section 5.1(c) and 5.3(b).

Fourth, the Borrower did not comply with the requirements of Section 5.1(f) of the Credit Agreement, as it has not delivered any of the budgeted versus actual capital expenditure analysis required by that provision, within 20 days of the end of each month, or otherwise.

Fifth, the Consolidated Financial Statements were not accompanied by a certification of the type that Borrower is required to obtain from its auditor pursuant to Section 5.3(a) of the Credit Agreement. To be sure, the Consolidated Financial Statements were accompanied by an "Independent Auditors' Report," but that report does not contain the certification of the independent certified public accountant expressly required by Section 5.3(a) of the Credit Agreement.

Sixth, the Consolidated Financial Statements were not accompanied by the certifications of a Responsible Officer and the Compliance Certificate that are expressly required by Sections 5.3(b)(i) and 5.3(b)(ii) of the Credit Agreement.

Seventh, the Borrower has failed to timely provide the narrative analysis required by Section 5.3(d) of the Credit Agreement.

Finally, in the Compliance Certificate delivered by Borrower on April 27, 2009, Borrower's representative certified that he "had obtained no knowledge, as of the date of this Compliance Certificate any Default or Event of Default [, except as set forth below]." No exceptions were noted. At the time this certificate was delivered, the Agent already had provided notice to Borrower and its Parent that they were in violation of Section 5.1(a) of the Credit Agreement with respect to annual audited financials, which were not timely delivered. As such, the foregoing statement was materially inaccurate at the time it was furnished.

Please be advised that the rights and remedies of the Agent or the Lenders under the Loan Documents are expressly reserved. The Borrower is not entitled to any opportunity to remedy the preceding (except as noted with respect to Sections 5.1(b) and 5.1(c), to the extent of the balance of the 20-day cure period under Section 7.1(d)). Please be further advised that the Loan Documents provide that we may, and we reserve the right on our own behalf and on behalf of the Lenders to, enforce any and all of such rights and remedies at any time, without further notice. In the event we defer the exercise of any rights or remedies or engage in discussions with Borrower, we nevertheless reserve the right on our own behalf and on behalf of the Lenders to enforce any and all rights and remedies at any time.

4

**Information Requests.**

    In accordance with Section 5.3(m) of the Credit Agreement, and the other Sections identified below, the Agent requests that the Borrower provide the following promptly, *i.e.,* in any event no later than June 5, 2009:

    1.    In respect of the Borrower's obligation under Section 5.6(d) of the Credit Agreement to maintain key man life insurance on the Principal Shareholder in a minimum amount of $5,000,000 that names Agent as the payee, please deliver to Agent copies of all documentation evidencing the Borrower's prior and ongoing compliance with this requirement. If the Borrower has not been or is not presently in compliance with this covenant, please advise the Agent immediately.

    2.    In respect of the Borrower's obligation under Section 5.3(l) to obtain Contractor Release Letters from Significant Contractors for materials and services provided with any Rig Construction, please deliver to Agent copies of all such Contractor Release Letters. As to any Significant Contractor as to which payments have been made, and as to which a Contractor Release Letter is required but has not yet been obtained, please provide all contracts, purchase orders, correspondence and other documents with respect to the materials and services provided by and the payments made to such Significant Contractor, including copies of any and all correspondence demonstrating Borrower's efforts to obtain a Contractor Release Letter.

    3.    In respect of the Borrower's obligation under Section 5.1(d) to provide an 8-week cash flow projection each month, please provide such projection showing cash activity on a weekly basis. The recently-delivered cash flow projection showing cash activity on a monthly basis is not acceptable to Agent.

    4.    In respect of the Borrower's obligation under Section 5.1(e) to provide projected quarterly financial statements of the Borrower for the three-year period following each Fiscal Quarter ("Projections"), please deliver to Agent a written narrative identifying the business, financial and market assumptions underlying the Projections recently delivered to the Agent on May 16, 2009. Please include such a narrative with your quarterly Projections going forward.

    5.    In respect of the Borrower's obligations under Section 6.10 of the Credit Agreement with respect to transactions with Affiliates, please provide all documents evidencing any and all transactions between the Borrower and any Affiliate since July 11, 2008, including contracts, evidence of payments made in respect thereof and any other transfers of property made in respect thereto.

    6.    In respect of the Borrower's obligations under Section 6.20 of the Credit Agreement, please provide copies of all Daywork Drilling Contracts, and any and all documents evidencing any all agreements, understandings, and/or modifications with respect to the terms and conditions of such contracts between Latshaw Drilling Operations and any customer or potential customer.

7       In accordance with Section 5.3(j) of the Credit Agreement, please provide copies of all Tax Returns filed by each Loan Party in respect of taxes measured by income (excluding sales, use and like taxes), on or after July 11, 2008.

8.      In accordance with Section 5.7(c) of the Credit Agreement, please authorize Borrower's independent certified public accountants to disclose to the Agent and the Lenders all financial statements and other information of any kind, including such auditor's work papers, that such auditor may have with respect to the business, financial condition, results of operations or other affairs of the Loan Parties.

Please be advised that the foregoing information requests do not constitute, nor should they be deemed to constitute, a waiver of any right or remedy available to the Agent and/or the Lenders under the Loan Documents or applicable law. Please be further advised that the Loan Documents provide that we may, and we reserve the right on our own behalf and on behalf of the Lenders to, enforce any and all of such rights and remedies at any time (including with respect to matters that are the subject of the foregoing information requests), without further notice.

Very truly yours,

Lehman Commercial Paper Inc.,
as Administrative Agent

By: _____
Name:        Jack McCarthy, Jr.
Title:         Vice President

# EXHIBIT "K"

**LEHMAN COMMERCIAL PAPER INC.**
1271 Avenue of the Americas
New York, NY 10019

July 10, 2009

By Telecopy and Courier

Latshaw Drilling Company, LLC
P.O. Box 691017
Tulsa, OK 74169
Attention: Trent B. Latshaw, President
Fax: (918) 355-4392

Ewing & Jones, PLLC
6363 Woodway, Suite 1000
Houston, TX 77057
Attention: J. Randolph Ewing
Fax: (713) 590-9601

          Re: Latshaw Credit Facility

Dear Mr. Latshaw:

          We refer to that certain Amended and Restated Credit Agreement dated as of July 11, 2008 (the "Credit Agreement") among Latshaw Drilling Company, LLC, a Texas limited liability company (the "Borrower"), Latshaw Drilling & Exploration Company, a Texas Subchapter S corporation (the "Parent"), the several lenders from time to time parties thereto (the "Lenders"), Lehman Brothers Inc. as arranger, and Lehman Commercial Paper Inc. as syndication agent and administrative agent (the "Agent"), pursuant to which the Lenders have made certain loans to Borrower.  Capitalized terms used but not defined in this letter have the meanings ascribed to such terms in the Credit Agreement.

          On May 26, 2009 we sent you a letter, attached hereto as Exhibit A, advising you of the Defaults and Events of Defaults by the Borrower and its Parent that had occurred and were continuing as of the date thereof and also requesting delivery of certain information by June 5, 2009.  As of the date hereof, you have not remedied several of the Defaults and Events of Default and to fulfill our informational requests, including but not limited to delivering audited financial statements of the Borrower to the Agent as required by Section 5.1(a) of the Credit Agreement together with the certificate of an independent certified public accountant as required by Section 5.3(a) of the Credit Agreement, obtaining key man life insurance on the Principal Shareholder in a minimum amount of $5,000,000 that names Agent as the payee as required by Section 5.6(d) of the Credit Agreement, and delivering a Bailee's Agreement covering Rig #4 as required by Section 6.19 of the Credit Agreement.  Furthermore, the 20-day grace period under paragraph (d) of Article VII of the Credit Agreement has expired with respect to several of the continuing Defaults and Events of Default, and therefore they can no longer be cured.

          In addition to the Defaults and Events of Defaults that have occurred and are continuing, it should be noted that the Borrower provided financial projections that show a breach in certain financial covenants under the Credit Agreement on September 30, 2009 and the inability for the Borrower to make payments to the Lenders required by the Credit Agreement on March 31, 2010.

In response to the continuing and expected Defaults and Events of Defaults, we sent you a proposed term sheet for the restructuring of the Credit Agreement on June 17, 2009, attached hereto as Exhibit B. We believe that the proposal addresses your concerns and provides the Borrower an opportunity to pursue its business objectives. However, on July 2, 2009 you informed us that the proposed term sheet is unacceptable to you, but that you will not submit a counterproposal at this time. As such, please deliver to us a detailed 13 week cash flow budget no later than July 15, 2009.

Please be advised that the foregoing does not constitute, nor should it be deemed to constitute, a waiver of any right or remedy available to the Agent and/or the Lenders under the Loan Documents or applicable law. Please be further advised that the Loan Documents provide that we may, and we reserve the right on our own behalf and on behalf of the Lenders to, enforce any and all of such rights and remedies at any time (including with respect to matters that are the subject of the foregoing information requests), without further notice. Please contact Eric Salzman (646) 333-6025 or Howard Liao (646) 333-9406 to discuss.

Very truly yours,

Lehman Commercial Paper Inc.,
as Administrative Agent

By: _____
Name: Jack McCarthy
Title: Vice President

2

# EXHIBIT "L"



**EWING & JONES**
ATTORNEYS AT LAW

RANDOLPH EWING                                                    rewing@ewingjones.com

July 21, 2009

<u>VIA TELEFAX – (212) 526-8275</u>

Lehman Commercial Paper Inc.
Mr. Jack McCarthy, Vice President
Ms. Michelle Rosolinsky
1271 Avenue of the Americas
New York, New York 10019

      RE:    Latshaw Credit Facility

Dear Mr. McCarthy:

This firm serves as legal counsel to Latshaw Drilling Company, LLC (the "Borrower") and is responding to the letters from you to the Borrower dated July 10, 2009 and July 13, 2009 concerning three alleged defaults under that certain Amended and Restated Credit Agreement dated as of July 11, 2008 (the "Credit Agreement") by and among the Borrower, Latshaw Drilling & Exploration, Company, a Texas corporation (the "Parent") and several lenders from time to time parties thereto (the "Lenders") and including Lehman Commercial Paper Inc., as syndication agent and administrative agent (the "Agent"). Capitalized terms contained in this letter shall have the meanings contained in the Credit Agreement except where specifically otherwise indicated.

Your letter asserts three Defaults which have not been cured. The Borrower vigorously contests these claimed and alleged Defaults and non-performance asserted in your letters. The first alleged Default is an assertion that Borrower is in default of Section 5.1(a) of the Credit Agreement by not timely furnishing an audited balance sheet of Borrower as of the end of 2008 together with audited statements of income and cash flows. Borrower first became aware of this alleged Default by your letter dated April 22, 2009. By way of background since the commencement of the original loan relationship between Borrower and Agent June 10, 2005, Agent has always accepted audited financial statements for the Parent which includes the Borrower's financial statements on a consolidated basis. At a meeting between Trent Latshaw, President and Mark Cochran, Chief Financial Officer of the Borrower, Tim Fording of Abelco, and Edward Coku, Scott Francis and Eric Salzman with the Agent on June 4, 2009, the agreement was reached that the Agent would contact Borrower's certified public accountant to let him know exactly what Agent wanted in the way of audited financial statements and the certification thereof. Needless to say, Borrower was totally shocked to see your July 10, 2009 letter that Agent claimed the failure to provide audited financial statements was a Default that

July 21, 2009
Page 2

had not been cured timely. Since there was apparently a misunderstanding as to the Agent's commitment to solve this problem, Borrower will take action to cure this alleged Default by unilaterally and without Agent's assistance advise the certified public accountant to comply with the request in very short order.

The second alleged Default is the failure to provide life insurance in the amount of $5,000,000.00 naming Agent as payee. Borrower is well aware of what Section 5.6(d) states, which is that Borrower shall provide Agent a certificate evidencing key man life insurance on Mr. Latshaw in an amount and on terms satisfactory to Agent. When the original loan was executed between Borrower and Agent on June 10, 2005, Borrower told Agent that there was a $1,500,000 life insurance policy on Mr. Latshaw. Agent told Borrower that it would be appropriate to have a life insurance policy in the amount of $5,000,000. After submitting to an extensive physical that discovered a potential medical problem, Mr. Latshaw was informed that the medical insurance carrier would not issue a policy in the amount of $5,000,000. Mr. Latshaw tried two other insurance companies, both of whom refused to write a policy in the amount of $5,000,000. Mr. Latshaw communicated this to Agent, and Agent agreed that under the circumstances, that $1,500,000 in life insurance coverage was sufficient. Furthermore, the requirement to even provide any life insurance was removed in Section 3(a) of that certain AMENDMENT NO. 1 AND WAIVER TO CREDIT AGREEMENT (this "*Amendment*"), dated as of January 12, 2006, by and between Agent and Borrower which provides in applicable part:

"Waiver of Defaults and Events of Defaults. The Administrative Agent and the Lenders hereby: waive any Default or Event of Default that has occurred or at any time hereafter may occur as a result of Borrower's failure to (i) ........., and (ii) deliver or cause to be delivered to the Administrative Agent, prior to the date 90 days after the Closing Date, certificates evidencing key man life insurance on the Principal Shareholder in an amount and with terms satisfactory to the Administrative Agent, as required pursuant to Section 5.6(d);"

Your letters of May 26, 2009 and July 10, 2009 furthermore wrongfully demand that the Agent be named the loss payee. Please be advised that the payee of the One Million Five Hundred Thousand dollars ($1,500,000.00) policy is the Parent not the Agent. Nothing in the Credit Agreement including but not limited to Section 5.6(d) requires naming Agent as loss payee as your May 26 and July 10 letters incorrectly assert. Unlike a Default that occurs after the Credit Agreement is signed which the Lender may waive for a time and then decide that they no longer want to waive it, Mr. Latshaw's medical condition existed and was known to the Agent prior to the Amendment and the new Credit Agreement and the Agent's agreement to not even require any key man life insurance was satisfactory. Borrower's position is that Agent is attempting to unilaterally, unreasonably and without cause change what it had originally agreed to prior to the Amendment being executed, knowing that Borrower cannot comply and then alleging that this is a Default constitutes an attempt to create a Default when one does not exist. Agent's position seems to be that it can just keep increasing its demand for the amount of the key man life insurance until such time as there is a Default. For the reasons stated herein, we submit there is not a Default by Borrower in failing to provide Agent key man life insurance on Mr. Latshaw in the amount of $5,000,000 naming Agent a loss payee.

Exhibit L
2 of 4

July 21, 2009
Page 3

     The third alleged Default is the failure to provide a Bailee's Agreement for Rig No. 4. Rig No. 4 is located on a drill site located in Limestone County, Texas operated by XTO Energy, a customer of Borrower. Rig No. 4 was operating until it was flooded out and damaged in torrential rains on April 28, 2009. Although Borrower could reasonably take the position that the Rig is not being stored and it will soon be operational when repairs are completed in the very near future, since your July 10 letter for the first time states that there is a Default by not providing a Bailee's Agreement, Borrower is in the process of requesting XTO Energy to execute a Bailee's Agreement. It should be pointed out that your July 10 letter incorrectly states that the May 26 letter provided a previous notice of this request. In fact, there was never a request to provide a Bailee's Agreement prior to the July 10 letter.

     In summary, it is Borrower's position that it has not been given adequate notice and an opportunity to cure the claimed breaches of Section 5.1(a) or 6.19, and that Borrower intends to cure both of these in the near future. Furthermore, it is Borrower's position that it is not in violation of Section 5.6(d) since the $1,500,000.00 life insurance on Mr. Latshaw is and has been in full force and effect for the entire time that the Credit Agreement has existed even though Agent has waived this requirement.

     Demand is hereby made that the entire amount $5,446,339.41 less any funds already released so that Borrower could pay its ordinary course of business accounts payable, be immediately returned to Borrower and that Agent not exercise its remedies. Borrower is being damaged by this wrongful taking of its funds and is reserving the right to recover any and all damages resulting from Agent's breach of the Credit Agreement.

     Borrower has notified Agent several times before and this will again serve as notification, that Borrower is furthermore not waiving its rights to recover and recoup all the damages caused by Agent from its original breach of its funding requirement as contained in the Credit Agreement dated July 11, 2008.

     Thank you in advance for your immediate attention to this matter. We look forward to hearing from you to confirm in writing that your collection and enforcement activities for the claimed Defaults have ceased and are withdrawn; the seized bank funds have been released and bank authorities notified appropriately; and that the requested requirement of establishing a $5,000,000 face amount increase in the life insurance policy has been withdrawn. As Mr. Latshaw has previously informed you, Borrower is working in good faith on a proposed restructure agreement without acknowledging a Default has occurred. Borrower expects to remit such restructure proposal to Agent by July 31, 2009.

                  Very truly yours,

                  Randolph Ewing

Exhibit L
3 of 4

July 21, 2009
Page 4


cc.    Via Email

       Mr. Trent B. Latshaw
       Mr. Mark Cochran




p:\client folders\\latshaw drilling & exploration co\lchamn default\lr to mccarthy 090721.doc

Exhibit L
4 of 4

Case 09-13612-R Document 171-1 Filed in USBC ND/OK on 11/12/09 Page 82 of 75

# EXHIBIT "M"

## LEHMAN COMMERCIAL PAPER INC.
### 1271 Avenue of the Americas
### New York, NY 10019

July 13, 2009

By Telecopy and Courier

Latshaw Drilling Company, LLC
P.O. Box 691017
Tulsa, OK 74169
Attention: Trent B. Latshaw, President
Fax: (918) 355-4392

Ewing & Jones, PLLC
6363 Woodway, Suite 1000
Houston, TX 77057
Attention: J. Randolph Ewing
Fax: (713) 590-9601

Re: <u>Latshaw Credit Facility</u>

Dear Mr. Latshaw:

We refer to that certain Amended and Restated Credit Agreement dated as of July 11, 2008 (the "<u>Credit Agreement</u>") among Latshaw Drilling Company, LLC, a Texas limited liability company (the "<u>Borrower</u>"), Latshaw Drilling & Exploration Company, a Texas Subchapter S corporation (the "<u>Parent</u>"), the several lenders from time to time parties thereto (the "<u>Lenders</u>"), Lehman Brothers Inc. as arranger, and Lehman Commercial Paper Inc. as syndication agent and administrative agent (the "<u>Agent</u>"), pursuant to which the Lenders have made certain loans to Borrower. Capitalized terms used but not defined in this letter have the meanings ascribed to such terms in the Credit Agreement.

As a result of the continuing Defaults and Events of Default under the Credit Agreement, which we have described previously in detail, we have exercised dominion over the Borrower's bank account pursuant to Section 4(b) of the Blocked Account Control Agreement, dated May 2007, by and among the Borrower, the Agent, and Bank of Oklahoma, N.A. We are holding the Borrower's funds as collateral securing the Loans. We intend to release these funds to the Borrower pursuant to a budget to be agreed upon by the Borrower, the Agent, and the Lenders and in a manner that will allow the Borrower to continue its operations.

Please be advised that the foregoing does not constitute, nor should it be deemed to constitute, a waiver of any right or remedy available to the Agent and/or the Lenders under the Loan Documents or applicable law. Please be further advised that the Loan Documents provide that we may, and we reserve the right on our own behalf and on behalf of the Lenders to, enforce any and all of such rights and remedies at any time, without further notice.

Very truly yours,

Lehman Commercial Paper Inc.,
as Administrative Agent

By: _____
Name: Jack McCarthy
Title: Vice President

# EXHIBIT "N"

## LEHMAN COMMERCIAL PAPER INC.
### 1271 Avenue of the Americas
### New York, NY 10019

#### NOTICE OF DEFAULT AND ACCELERATION

September 29, 2009

LATSHAW DRILLING COMPANY, LLC
P.O. Box 691017
Tulsa, OK 74169
Attention:  Trent B. Latshaw, President
Telecopy:  (918) 355-4392

EWING & JONES, PLLC
6363 Woodway, Suite 1000
Houston, TX 77057
Attention:  J. Randolph Ewing
Telecopy:  (713) 590-9601

We refer to that certain Amended and Restated Credit Agreement, dated as of July 11, 2008 (the "Credit Agreement") among Latshaw Drilling Company, LLC, a Texas limited liability company (the "Borrower"), Latshaw Drilling & Exploration Company, a Texas Subchapter S corporation (the "Parent"), the several lenders from time to time parties thereto (the "Lenders"), Lehman Brothers Inc., as arranger, and Lehman Commercial Paper Inc., as syndication agent and administrative agent (the "Agent"), pursuant to which the Lenders have made certain loans to Borrower. Capitalized terms used but not defined in this letter have the meanings ascribed to such terms in the Credit Agreement.

Pursuant to Section 2.7(b) of the Credit Agreement, "if on any date…either Loan Party shall receive Net Cash Proceeds from any Recovery Event then, on the date of receipt by such Loan Party of such Net Cash Proceeds, the Loans shall be prepaid by an amount equal to the amount of such Net Cash Proceeds; *provided, however,* that in the case of any Net Cash Proceeds constituting the Reinvestment Deferred Amount with respect to a Reinvestment Event, Borrower shall prepay the Loans in an amount equal to the Reinvestment Prepayment Amount applicable to such Reinvestment Event, if any, on the Reinvestment Prepayment Date with respect to such Reinvestment Event; *provided further* that the aggregate Net Cash Proceeds of Recovery Events that may be specified as Reinvestment Deferred Amounts in one or more Reinvestment Notices shall not exceed $100,000 in the case of any Recovery Event and $1,000,000 in the aggregate in the case of all Recovery Events."

This letter constitutes notice to you that an Event of Default has occurred and is continuing as a result of the Borrower's failure to make a mandatory prepayment pursuant to Section 2.7(b) of the Credit Agreement in connection with the Borrower's receipt on August 3, 2009 of a check in the amount of $311,458.67, such amount constituting Net Cash Proceeds from a Recovery Event. Because additional Events of Default have occurred and are continuing, as set forth herein and in prior correspondence, the option to reinvest a portion of such Net Cash Proceeds is not available to the Borrower under the terms of the Credit Agreement; therefore an amount equal to 100% of such Net Cash Proceeds was required to be remitted to the Agent pursuant to Section 2.7(b) of the Credit Agreement.

Additionally, pursuant to Section 9.5(b) of the Credit Agreement, the Borrower agreed "to pay or reimburse each Lender and the Agents for all their reasonable out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith, including, without limitation, the reasonable fees and disbursements of counsel to each Lender and of counsel to the Agents." Section 9.5 of the Credit Agreement continues: "All amounts due under this Section 9.5 shall be payable not later than 30 days after written demand therefor."

This letter constitutes notice to you that an Event of Default has occurred and is continuing as a result of the Borrower's failure to pay for the reasonable out-of-pocket costs and expenses of Ableco Finance LLC, a Lender under the Credit Agreement, incurred in connection with the preservation and enforcement of its rights under the Credit Agreement within 30 days of your receipt on August 7, 2009 of written demand for payment thereof.

Pursuant to Article VII of the Credit Agreement and in accordance with the instructions provided by the Required Lenders to the Agent, the Agent hereby notifies the Borrower and the Parent that (i) the Agent has exercised the rights set forth under the Blocked Account Control Agreement to direct the Borrower's bank to remit all deposits specified in that agreement to the Agent, (ii) all Commitments have been terminated, (iii) all Loans and other amounts owing under the Credit Agreement and the other Loan Documents have been accelerated and are now due and payable, and (iv) all funds that have been, and will be remitted to the Agent pursuant to the Blocked Account Control Agreement either have been or will be applied in partial satisfaction of the obligations owing under the Credit Agreement.

Also, please be advised that we will be charging an interest rate equal to the Default Rate pursuant to Section 2.8(b) of the Credit Agreement. Additionally, please be advised that although they have no obligation to do so, the Agent and the Lenders are prepared to continue to consider discretionary advances to the Borrower to meet its essential operational needs, pursuant to one or more budgets that are proposed by the Borrower and approved by the Agent, in its discretion. Please contact us as soon as possible to address this matter.

This letter is without prejudice to, and the Agent and the Lenders hereby specifically reserve, all of their rights and remedies at law, in equity and under the Loan Documents.

Very truly yours,

Lehman Commercial Paper Inc.

By:

Name: William J. Fox
Title: Senior Vice President

2

# EXHIBIT "O"



RANDOLPH EWING                                              rewing@ewingjones.com

October 1, 2009

***VIA TELEFAX – (212) 526-8275***
Lehman Commercial Paper Inc.
Attn: Mr. William J. Fox
Senior Vice President
1271 Avenue of the Americas
New York, New York 10019

      Re:    Latshaw Credit Facility

Dear Mr. Fox:

      This firm serves as legal counsel to Latshaw Drilling Company, LLC (the "Borrower") and is responding to your letter dated September 29, 2009 alleging two defaults under that certain Amended and Restated Credit Agreement dated as July 11, 2008 (the "Credit Agreement") by and among the Borrower, Latshaw Drilling & Exploration, Company, a Texas corporation (the "Parent") and several lenders from time to time parties thereto (the "Lenders") and including Lehman Commercial Paper Inc., as syndication agent and administrative agent (the "Agent"). Capitalized terms contained in this letter shall have the meaning contained in the Credit Agreement except where specifically otherwise indicated.

      The first alleged Default is that Borrower received a check in the amount of $311,458.67 in Net Cash Proceeds from a Recovery Event and that the Net Cash Proceeds were not "remitted to the Agent pursuant to Section 2.7(b) of the Credit Agreement". This is totally untrue and the Net Cash Proceeds were not reinvested in Rig Number 7. The facts are that the engine on Borrower's Rig No. 7 caught fire and was damaged on August 2, 2008. Borrower finally received $311,458.67 from the insurance company insuring Rig No. 7 in August, 2009 and promptly deposited such funds in Borrower's operating bank account at Bank of Oklahoma (the "Bank Account"). Since the Agent through prior alleged Defaults wrongfully seized the Bank Account on July 13, 2009, the Net Cash Proceeds were in fact remitted to the Agent since Agent controls such Bank Account. Not only were the Net Cash Proceeds deposited in the Bank Account that Agent controls, this was highlighted in the Financial Statements furnished to the Lender on September 19, 2009 as well as Mark Cochran, CFO of Borrower, speaking to Tim Fording of Abelco and Howard Liao of Agent and informing them of this occurrence. Accordingly, Borrower has not committed a Default with respect to this allegation.

---

6363 Woodway  ✦  Suite 1000  ✦  Houston, Texas 77057  ✦  ewingjones.com  ✦  *p:*713.590.9600  ✦  *f:*713.590.9601

October 1, 2009
Page 2

The second alleged Default is pursuant to Section 9.5(b) of the Credit Agreement which requires Borrower to "to pay or reimburse each Lender and the Agents for all their reasonable out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith, including without limitation, the reasonable fees and disbursements of counsel to each Lender and of counsel to the Agents". On or about August 7, 2009, Borrower received a legal fees invoice from Klee, Tuchin, Bogdanoff & Stern, counsel to Abelco Finance LLC ("Abelco"), totaling $75,274.27 covering amounts for legal services dated from February 3, 2009 through August 5, 2009. Borrower by letter dated August 26, 2009 (a copy of which is included herewith) from Mark Cochran, to Tim Fording of Abelco requested information to determine the reasonableness of the legal fees and types of legal services performed. For Borrower to be required to pay Abelco's legal fees, Abelco should show Borrower that they are in connection with the enforcement or preservation of Abelco's rights and that they are reasonable. Despite the August 26 request, Borrower has received no response which would allow Borrower to make this determination and justify or require Borrower to pay such legal fees. This evidences yet again the lack of good faith by the Lenders whose goal seems to be to try to set up and/or find Defaults by Borrower so it can start trying to exercise the Default remedies set forth in the Credit Agreement. When can Borrower expect a response to its August 26 letter? Borrower is not in Default of the failure to pay legal fees, and Abelco needs to comply with the Credit Agreement and justify why Borrower should pay all or part of the legal fees incurred by Abelco.

On September 18, 2008, Lenders committed a material breach of the Credit Agreement by failing to honor the Commitment when Borrower made a borrowing request on September 17, 2008. Despite numerous notices, such material breach continues to this day, and continues to substantially damage Borrower. Although the Lenders have seemingly acknowledged such breach, Lenders do not acknowledge any liability or responsibility for the damages caused thereby. New York case law justifies Borrower not honoring the Credit Agreement due to such material breach by Lenders. Despite that, Borrower continues to act in good faith in attempting to comply with the Credit Agreement in every respect possible despite the fact that the Lenders have seized the Borrower's Bank Account, and now accelerated the Loans and implemented a Default penalty interest rate (none of which Borrower acknowledges or agrees with). It is puzzling as to why Lenders continue to assert frivolous Defaults by Borrower and not act in good faith. It is obviously not productive and involves spending time and legal fees, as well as being distracting to the executives of Borrower who are operating their business during this difficult economic time. Notwithstanding Lenders' conduct, Borrower will continue to the best of its ability to make payments on the Credit Agreement as they come due to evidence its good faith, but will do so under protest preserving its rights due to the material breach committed by Lenders; provided, however, that Lenders continue to mutually cooperate in allowing Borrower

October 1, 2009
Page 3

to operate its business despite wrongfully seizing the Bank Account. However, should Lender attempt to enforce any of its Default remedies arising from the alleged and frivolous Default accusations made by Lenders, Borrower will pursue all remedies available to it under the law. Please note that Borrower is not waiving its rights to recover and recoup any and all damages caused by Lenders' material breach of the Commitment, and any and all other breaches by Lenders.

As mentioned in your letter, Borrower would like to discuss this matter further with Agent and to continue to work together on a mutually acceptable budget which fulfills Borrower's and Lenders' mutual needs as has occurred since the Bank Account was originally seized.

Very truly yours,

Randolph Ewing

Cc:     *Via Email*
        Mr. Andrew Calao
        Ms. Maya Grant
        Mr. Trent B. Latshaw
        Mr. Mark Cochran
        Mr. Chris Belmonte

# LATSHAW DRILLING COMPANY, LLC

P. O. BOX 691017
TULSA, OKLAHOMA 74169
PHONE: 918-355-4380
FAX: 918-355-4392

August 26, 2009

Dear Tim:

Attached hereto is a summary legal invoice that I received showing the total amount of $75,274.27 for legal fees incurred by Abelco Finance LLC in connection with Latshaw Drilling Company, LLC that you have requested Latshaw Drilling to pay. This summary shows the names of five (5) attorneys, working on this matter whose billing rates range from $300.00-$850.00 per hour, dates of service and time spent. There is no description as to the types of legal services that were provided which would describe why they were incurred and allow Latshaw to determine their reasonableness. Furthermore and more importantly, Latshaw Drilling does not understand why it should be liable for these attorneys' fees as it does not believe that it is in default under the Credit Agreement with Lehman/Abelco.

We look forward to hearing from you.

Sincerely,

*Mark Cochran*

Mark Cochran
Chief Financial Officer

cc:Randolph Ewing
    Chris Belmonte

LATSHAW - 1603

ABLECO FINANCE LLC - LATSHAW
CLIENT NUMBER 1603

| DATE OF INVOICE<br>INVOICE NUMBER | February 3, 2009<br>8726 | March 11, 2009<br>8848 | April 14, 2009<br>8925 | May 1, 2009<br>8945 | July 9, 2009<br>9144 | August 6, 2009<br>9204 | TOTALS |
|---|---|---|---|---|---|---|---|
| **LEE R. BOGDANOFF (LRB) - PARTNER** GRAD: 1985 | | | | | | | |
| HOURS - $860 | 0.00 | 1.30 | 0.00 | 0.00 | 2.50 | 1.40 | 5.20 |
| AMOUNT | $0.00 | $1,105.00 | $0.00 | $0.00 | $2,125.00 | $1,190.00 | $4,420.00 |
| HOURS - $0 | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.50 |
| AMOUNT | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **MARTIN BARASH (MRB) - PARTNER** GRAD: 1992 | | | | | | | |
| HOURS - $655 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.00 |
| AMOUNT | $1,310.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,310.00 |
| HOURS - $675 | 13.00 | 22.30 | 0.50 | 4.40 | 20.60 | 18.20 | 79.10 |
| AMOUNT | $8,775.00 | $15,052.50 | $337.50 | $2,970.00 | $13,905.00 | $12,352.50 | $53,392.50 |
| HOURS - $0 | 5.10 | 2.20 | 0.00 | 0.00 | 0.40 | 0.10 | 7.80 |
| AMOUNT | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **BRIAN METCALF (BMM) - OF COUNSEL** GRAD: 1999 | | | | | | | |
| HOURS - $575 | 8.20 | 9.10 | 4.60 | 1.00 | 0.00 | 0.00 | 22.90 |
| AMOUNT | $4,715.00 | $5,232.50 | $2,645.00 | $575.00 | $0.00 | $0.00 | $13,167.50 |
| HOURS - $0 | 1.00 | 7.50 | 0.00 | 1.70 | 0.00 | 0.00 | 10.30 |
| AMOUNT | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **LAURA BUCHANAN (LLB) - OF COUNSEL** GRAD: 1991 | | | | | | | |
| HOURS - $575 | | 0.00 | | | | | 0.00 |
| AMOUNT | | $0.00 | | | | | $0.00 |
| HOURS - $0 | | 10.80 | | | | | 10.80 |
| AMOUNT | | $0.00 | | | | | $0.00 |
| **KEVIN DEENIHAN (KED) - ASSOCIATE** GRAD: 2008 | | | | | | | |
| HOURS - $300 | | | | | 2.00 | | 2.00 |
| AMOUNT | | | | | $600.00 | | $600.00 |
| HOURS - $0 | | | | | 7.50 | | 7.50 |
| AMOUNT | | | | | $0.00 | | $0.00 |
| **TOTAL HOURS** | 28.00 | 53.30 | 5.10 | 7.10 | 33.00 | 19.80 | 148.10 |
| **AMOUNT** | $14,800.00 | $21,390.00 | $2,982.50 | $3,545.00 | $16,630.00 | $13,542.50 | $72,890.00 |
| **EXPENSES** | $165.00 | $656.53 | $993.56 | $98.23 | $470.13 | $0.00 | $ 2,384.27 |
| **TOTAL DUE** | $14,965.00 | $22,046.53 | $3,976.06 | $3,643.23 | $17,100.13 | $13,542.50 | $75,274.27 |

**Christopher R. Belmonte**

| | |
|---|---|
| **From:** | Randolph Ewing [rewing@ewingjones.com] |
| **Sent:** | Monday, October 05, 2009 4:42 PM |
| **To:** | Christopher R. Belmonte |
| **Subject:** | FW: Notice of Default and Acceleration |



Randolph Ewing
6363 Woodway, Suite 1000
Houston, Texas 77057
Direct: 713.590.9610
Cell: 713.818.6788
Fax: 713.590.9601
rewing@ewingjones.com
website: www.ewingjones.com

**Confidentiality Notice**

This message has been sent from the law office of Ewing & Jones, PLLC, and is intended to be read only by the individual to whom it is addressed. The message may contain information that is confidential or privileged, or otherwise legally exempt from disclosure. If the message is not addressed to you, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this communication in error, please notify the sender immediately by e-mail and delete all copies of the message.

**Treasury Circular 230 Disclosure**

As required by United States Treasury Regulations, you should be aware that this communication is not intended or written by the sender to be used, and it cannot be used, by any recipient for the purpose of avoiding penalties that may be imposed on the recipient under United States federal tax laws.

**From:** Randolph Ewing
**Sent:** Thursday, October 01, 2009 5:15 PM
**To:** 'Liao, Howard'
**Cc:** Mark Cochran; Salzman, Eric C; Francis, Scott; Timothy Fording; Colao, Andrew; Grant, Maya; Glover, Mark; trent@latshawdrilling.com
**Subject:** RE: Notice of Default and Acceleration

Dear Mr. Liao:  Please forward this to Mr. Fox.  Thank you.



Randolph Ewing
6363 Woodway, Suite 1000
Houston, Texas 77057
Direct: 713.590.9610
Cell: 713.818.6788
Fax: 713.590.9601
rewing@ewingjones.com
website: www.ewingjones.com

**Confidentiality Notice**

This message has been sent from the law office of Ewing & Jones, PLLC, and is intended to be read only by the individual

10/5/2009

to whom it is addressed. The message may contain information that is confidential or privileged or otherwise legally exempt from disclosure. If the message is not addressed to you, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this communication in error, please notify the sender immediately by e-mail and delete all copies of the message.

**Treasury Circular 230 Disclosure**
As required by United States Treasury Regulations, you should be aware that this communication is not intended or written by the sender to be used, and it cannot be used, by any recipient for the purpose of avoiding penalties that may be imposed on the recipient under United States federal tax laws.


```
-----Original Message-----
From: Liao, Howard [mailto:howard.liao@lehman.com]
Sent: Tuesday, September 29, 2009 6:01 PM
To: trent@latshawdrilling.com
Cc: Mark Cochran; Randolph Ewing; Salzman, Eric C; Francis, Scott; Timothy Fording; Colao,
Andrew; Grant, Maya; Glover, Mark
Subject: Notice of Default and Acceleration

Trent,

Please find attached a notice of default and acceleration for the failure to make a mandatory
prepayment pursuant to Section 2.7(b) of the Credit Agreement and the failure to pay or
reimburse reasonable out-of-pocket costs pursuant to Section 9.5(b) of the Credit Agreement.


We would like to schedule a conference call tomorrow to discuss this letter.  Please advise
us of your availability.

Best regards,
Howard



  <<Notice of Default_Acceleration_Latshaw_9_29_09.pdf>>
  _____
Howard Liao
Lehman Brothers | Principal Investments
1271 Avenue of the Americas - 38th Floor New York, NY 10020
Office: 646 333 9406
howard.liao@lehman.com

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use of the designated
recipient(s) named above.  If you are not the intended recipient of this message you are
hereby notified that any review, dissemination, distribution or copying of this message is
strictly prohibited.  This communication is for information purposes only and should not be
regarded as an offer to sell or as a solicitation of an offer to buy any financial product,
an official confirmation of any transaction, or as an official statement of Lehman Brothers.
Email transmission cannot be guaranteed to be secure or error-free.  Therefore, we do not
represent that this information is complete or accurate and it should not be relied upon as
such.  All information is subject to change without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication
(including any attachments) is not intended or written to be used and cannot be used for the
purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.
```

# EXHIBIT "P"

## FORBEARANCE LETTER

August 5, 2009

**Via E-mail, Facsimile and First Class Mail**

To:    Latshaw Drilling Company, LLC
P.O. Box 691017
Tulsa, OK 74169
Attention: Trent B. Latshaw, President
Telecopier: (918) 355-4392

cc:    Ewing & Jones, PLLC
6363 Woodway, Suite 1000
Houston, TX 77057
Attention: J. Randolph Ewing
Telecopier: (713) 590-9601

Re:    Latshaw Credit Facility

Dear Mr. Latshaw:

Reference is made to (a) that certain Amended and Restated Credit Agreement dated as of July 11, 2008 (the "Credit Agreement") among Latshaw Drilling Company, LLC, a Texas limited liability company (the "Borrower"), Latshaw Drilling & Exploration Company, a Texas Subchapter S corporation (the "Parent"), the several lenders from time to time parties thereto (the "Lenders"), Lehman Brothers Inc. as arranger, and Lehman Commercial Paper Inc. as syndication agent and administrative agent (the "Administrative Agent"), pursuant to which the Lenders have made certain loans to Borrower and (b) those certain letters dated as of May 26, 2009, July 10, 2009 and July 13, 2009 from the Administrative Agent to Borrower (the "Notices of Default"). Capitalized terms used but not defined in this letter have the meanings ascribed to such terms in the Credit Agreement.

As you know, Events of Default have occurred and are continuing under the Credit Agreement as noted the Notices of Default (collectively, the "Existing Defaults"), and the Administrative Agent and the Lenders are entitled to exercise various rights and remedies under the Loan Documents and applicable law. In addition to the foregoing, there may be other Defaults or Events of Default that have occurred and are continuing of which the Administrative Agent and the Lenders are not aware. Nothing contained herein shall constitute or be deemed to constitute a waiver of any such Default or Event of Default. Notwithstanding such rights and remedies, all of which are hereby expressly reserved and preserved, the Administrative Agent and the Lenders shall forbear from exercising their respective rights and remedies under the Credit Agreement and the other Loan Documents and applicable law arising as a result of the Existing Defaults, other than the continued exercise of dominion by the Administrative Agent over the Borrower's pledged deposit account, for the period (the "Forbearance Period") from July 14, 2009 through September 1, 2009; provided that the Forbearance Period shall earlier

terminate upon (i) the delivery of a written notice to the Parent or the Borrower by the Administrative Agent, in its sole discretion or at the direction of Required Lenders, terminating the Forbearance Period for any reason (or no reason) whatsoever, which termination shall be effective on the Business Day following such notice or (ii) the occurrence or existence of any Event of Default, other than the Existing Defaults. Upon the expiration or termination of the Forbearance Period, the agreement of the Administrative Agent and the Lenders to forbear shall automatically and without further action terminate and be of no force and effect, and the Administrative Agent and the Lenders may immediately, and without further notice or demand to any Loan Party, exercise any and all of their respective rights and remedies under the Credit Agreement, the other Loan Documents or at law or in equity, including, but not limited to accelerating all of the Obligations; in each case without any further notice to any Loan Party, passage of time or forbearance of any kind.

Other than with respect to the forbearance expressly provided for in this letter, the Administrative Agent and the Lenders hereby expressly reserve all rights, remedies and claims available to them in their entirety, any of which may be exercised or otherwise pursued at any time in the sole and absolute discretion of the Administrative Agent and the Lenders in accordance with the respective terms and provisions of the Credit Agreement, the other Loan Documents and applicable law.

This letter (i) is not intended to establish, and any right, remedy or other action taken or not taken by the Administrative Agent and/or any Lender shall not be deemed or construed to establish, a custom or course of dealing and (ii) does not waive, limit or postpone (and shall not be deemed or construed to waive, limit or postpone) any of the obligations of any Loan Party under the Credit Agreement or the other Loan Documents or otherwise. Nothing herein shall be deemed to confer upon the Parent, the Borrower or any of their subsidiaries any rights or remedies or basis for reliance. Any discussions (whether written or oral) that have occurred or may occur among the respective parties to the Credit Agreement and the other Loan Documents are not intended, and shall not be deemed or construed, to constitute, a waiver, limitation or postponement of any of the rights and remedies of the Administrative Agent or any of the Lenders thereunder or under applicable law, all of which rights and remedies hereby are expressly reserved.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

Delivered as of the date first written above.

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent and Lender

By: _____
    Name:    ~~Frank P. Turner~~
    Title:    ~~Authorized Signa~~

ABLECO FINANCE LLC,
as Lender

By: _____
    Name:    Daniel Wolf
    Title:    President

A3 FUNDING LP,
as Lender
By A3 Fund Management LLC,
    its General Partner

By: _____
    Name:    Daniel Wolf
    Title:    Vice President

Case 09-13542-R   Document 141   Filed in USBC ND/OK on 11/12/09   Page 70 of 75

# EXHIBIT "Q"

# LATSHAW DRILLING COMPANY, LLC

P.O. Box 691017
TULSA, OKLAHOMA 74169
PHONE: 918/355-4380
FAX: 918/355-4392

August 21, 2009

VIA TELEFAX – (212) 525-8275

Lehman Commercial Paper Inc.
Mr. Jack McCarthy, Vice President
Mr. Frank P. Turner
1271 Avenue of the Americas
New York, NY 10019

RE: Latshaw Credit Facility

Gentlemen:

I am in receipt of the executed Forbearance Letter dated August 5, 2009 that you sent on August 18, 2009 that you state is a result of our joint meeting at Lehman's office in New York on July 29, 2009. As stated in that meeting and subsequent thereto, Latshaw Drilling is not interested in a Forbearance Letter and does not see the necessity therefore.

Furthermore, Latshaw Drilling refutes the statements contained in the Forbearance Letter that Latshaw Drilling has committed "Events of Default" that necessitate such a letter, as previously stated in my counsel's letter to Lehman dated July 21, 2009, a copy of which is attached hereto.

Please let me know if you have any questions. Thank you.

Sincerely,

Trent B. Latshaw
President

Cc:     Randolph Ewing
        Mr. Christopher Belmonte



**EWING & JONES**
ATTORNEYS AT LAW

RANDOLPH EWING                                                    rewing@ewingjones.com

July 21, 2009

VIA TELEFAX – (212) 526-8275

Lehman Commercial Paper Inc.
Mr. Jack McCarthy, Vice President
Ms. Michelle Rosolinsky
1271 Avenue of the Americas
New York, New York 10019

        RE:    Latshaw Credit Facility

Dear Mr. McCarthy:

        This firm serves as legal counsel to Latshaw Drilling Company, LLC (the "Borrower")
and is responding to the letters from you to the Borrower dated July 10, 2009 and July 13, 2009
concerning three alleged defaults under that certain Amended and Restated Credit Agreement
dated as of July 11, 2008 (the "Credit Agreement") by and among the Borrower, Latshaw
Drilling & Exploration, Company, a Texas corporation (the "Parent") and several lenders from
time to time parties thereto (the "Lenders") and including Lehman Commercial Paper Inc., as
syndication agent and administrative agent (the "Agent"). Capitalized terms contained in this
letter shall have the meanings contained in the Credit Agreement except where specifically
otherwise indicated.

        Your letter asserts three Defaults which have not been cured. The Borrower vigorously
contests these claimed and alleged Defaults and non-performance asserted in your letters. The
first alleged Default is an assertion that Borrower is in default of Section 5.1(a) of the Credit
Agreement by not timely furnishing an audited balance sheet of Borrower as of the end of 2008
together with audited statements of income and cash flows. Borrower first became aware of this
alleged Default by your letter dated April 22, 2009. By way of background since the
commencement of the original loan relationship between Borrower and Agent June 10, 2005,
Agent has always accepted audited financial statements for the Parent which includes the
Borrower's financial statements on a consolidated basis. At a meeting between Trent Latshaw,
President and Mark Cochran, Chief Financial Officer of the Borrower, Tim Fording of Abelco,
and Edward Coku, Scott Francis and Eric Salzman with the Agent on June 4, 2009, the
agreement was reached that the Agent would contact Borrower's certified public accountant to
let him know exactly what Agent wanted in the way of audited financial statements and the
certification thereof. Needless to say, Borrower was totally shocked to see your July 10, 2009
letter that Agent claimed the failure to provide audited financial statements was a Default that

Exhibit Q
2 of 5

July 21, 2009
Page 2

had not been cured timely. Since there was apparently a misunderstanding as to the Agent's commitment to solve this problem, Borrower will take action to cure this alleged Default by unilaterally and without Agent's assistance advise the certified public accountant to comply with the request in very short order.

The second alleged Default is the failure to provide life insurance in the amount of $5,000,000.00 naming Agent as payee. Borrower is well aware of what Section 5.6(d) states, which is that Borrower shall provide Agent a certificate evidencing key man life insurance on Mr. Latshaw in an amount and on terms satisfactory to Agent. When the original loan was executed between Borrower and Agent on June 10, 2005, Borrower told Agent that there was a $1,500,000 life insurance policy on Mr. Latshaw. Agent told Borrower that it would be appropriate to have a life insurance policy in the amount of $5,000,000. After submitting to an extensive physical that discovered a potential medical problem, Mr. Latshaw was informed that the medical insurance carrier would not issue a policy in the amount of $5,000,000. Mr. Latshaw tried two other insurance companies, both of whom refused to write a policy in the amount of $5,000,000. Mr. Latshaw communicated this to Agent, and Agent agreed that under the circumstances, that $1,500,000 in life insurance coverage was sufficient. Furthermore, the requirement to even provide any life insurance was removed in Section 3(a) of that certain AMENDMENT NO. 1 AND WAIVER TO CREDIT AGREEMENT (this "*Amendment*"), dated as of January 12, 2006, by and between Agent and Borrower which provides in applicable part:

"Waiver of Defaults and Events of Defaults. The Administrative Agent and the Lenders hereby: waive any Default or Event of Default that has occurred or at any time hereafter may occur as a result of Borrower's failure to (i) ........., and (ii) deliver or cause to be delivered to the Administrative Agent, prior to the date 90 days after the Closing Date, certificates evidencing key man life insurance on the Principal Shareholder in an amount and with terms satisfactory to the Administrative Agent, as required pursuant to Section 5.6(d);"

Your letters of May 26, 2009 and July 10, 2009 furthermore wrongfully demand that the Agent be named the loss payee. Please be advised that the payee of the One Million Five Hundred Thousand dollars ($1,500,000.00) policy is the Parent not the Agent. Nothing in the Credit Agreement including but not limited to Section 5.6(d) requires naming Agent as loss payee as your May 26 and July 10 letters incorrectly assert. Unlike a Default that occurs after the Credit Agreement is signed which the Lender may waive for a time and then decide that they no longer want to waive it, Mr. Latshaw's medical condition existed and was known to the Agent prior to the Amendment and the new Credit Agreement and the Agent's agreement to not even require any key man life insurance was satisfactory. Borrower's position is that Agent is attempting to unilaterally, unreasonably and without cause change what it had originally agreed to prior to the Amendment being executed, knowing that Borrower cannot comply and then alleging that this is a Default constitutes an attempt to create a Default when one does not exist. Agent's position seems to be that it can just keep increasing its demand for the amount of the key man life insurance until such time as there is a Default. For the reasons stated herein, we submit there is not a Default by Borrower in failing to provide Agent key man life insurance on Mr. Latshaw in the amount of $5,000,000 naming Agent a loss payee.

July 21, 2009
Page 3

The third alleged Default is the failure to provide a Bailee's Agreement for Rig No. 4. Rig No. 4 is located on a drill site located in Limestone County, Texas operated by XTO Energy, a customer of Borrower. Rig No. 4 was operating until it was flooded out and damaged in torrential rains on April 28, 2009. Although Borrower could reasonably take the position that the Rig is not being stored and it will soon be operational when repairs are completed in the very near future, since your July 10 letter for the first time states that there is a Default by not providing a Bailee's Agreement, Borrower is in the process of requesting XTO Energy to execute a Bailee's Agreement. It should be pointed out that your July 10 letter incorrectly states that the May 26 letter provided a previous notice of this request. In fact, there was never a request to provide a Bailee's Agreement prior to the July 10 letter.

In summary, it is Borrower's position that it has not been given adequate notice and an opportunity to cure the claimed breaches of Section 5.1(a) or 6.19, and that Borrower intends to cure both of these in the near future. Furthermore, it is Borrower's position that it is not in violation of Section 5.6(d) since the $1,500,000.00 life insurance on Mr. Latshaw is and has been in full force and effect for the entire time that the Credit Agreement has existed even though Agent has waived this requirement.

Demand is hereby made that the entire amount $5,446,339.41 less any funds already released so that Borrower could pay its ordinary course of business accounts payable, be immediately returned to Borrower and that Agent not exercise its remedies. Borrower is being damaged by this wrongful taking of its funds and is reserving the right to recover any and all damages resulting from Agent's breach of the Credit Agreement.

Borrower has notified Agent several times before and this will again serve as notification, that Borrower is furthermore not waiving its rights to recover and recoup all the damages caused by Agent from its original breach of its funding requirement as contained in the Credit Agreement dated July 11, 2008.

Thank you in advance for your immediate attention to this matter. We look forward to hearing from you to confirm in writing that your collection and enforcement activities for the claimed Defaults have ceased and are withdrawn; the seized bank funds have been released and bank authorities notified appropriately; and that the requested requirement of establishing a $5,000,000 face amount increase in the life insurance policy has been withdrawn. As Mr. Latshaw has previously informed you, Borrower is working in good faith on a proposed restructure agreement without acknowledging a Default has occurred. Borrower expects to remit such restructure proposal to Agent by July 31, 2009.

Very truly yours,

Randolph Ewing

July 21, 2009
Page 4


cc.     Via Email

        Mr. Trent B. Latshaw
        Mr. Mark Cochran



p:\client folders\l\latshaw drilling & exploration co\lehamn default\lr to mccarthy 090721.doc