# EXHIBIT B

Execution Version

**$100,000,000**

**AMENDED AND RESTATED CREDIT AGREEMENT**

**among**

**LATSHAW DRILLING COMPANY, LLC,**

**as Borrower,**

**LATSHAW DRILLING & EXPLORATION COMPANY,**

**The Several Lenders**

**from Time to Time Parties Hereto,**

**LEHMAN BROTHERS INC.,**

**as Arranger,**

**LEHMAN COMMERCIAL PAPER INC.,**

**as Syndication Agent,**

**and**

**LEHMAN COMMERCIAL PAPER INC.,**

**as Administrative Agent**

**Dated as of July 11, 2008**

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS ..................................................................................1
    1.1    Defined Terms ......................................................................1
    1.2    Other Definitional Provisions ........................................21
    1.3    Computation of Time Periods ........................................22

ARTICLE II AMOUNT AND TERMS OF COMMITMENTS ..........................22
    2.1    Commitments ....................................................................22
    2.2    Procedure for Borrowings ...............................................23
    2.3    Maturity Date ...................................................................23
    2.4    Repayment of Loans; Evidence of Debt .........................23
    2.5    Fees ...................................................................................24
    2.6    Optional Prepayments .....................................................25
    2.7    Mandatory Prepayments ..................................................26
    2.8    Interest Rates, Payment Dates and Computation of Interest and Fees ......27
    2.9    Application of Payments .................................................27
    2.10   Requirements of Law .......................................................29
    2.11   Securitization ....................................................................30
    2.12   Taxes ................................................................................30
    2.13   Indemnity .........................................................................32
    2.14   Change of Lending Office ................................................33

ARTICLE III REPRESENTATIONS AND WARRANTIES ..............................33
    3.1    Financial Condition .........................................................33
    3.2    No Change ........................................................................33
    3.3    Corporate Existence; Compliance with Law ...................33
    3.4    Power; Authorization; Enforceable Obligations .............34
    3.5    No Legal Bar ....................................................................34
    3.6    No Material Litigation .....................................................34
    3.7    No Default ........................................................................35
    3.8    Existing Indebtedness ......................................................35
    3.9    Ownership of Property; Liens ..........................................35
    3.10   Intellectual Property ........................................................35
    3.11   Taxes ................................................................................35
    3.12   Use of Proceeds ...............................................................36
    3.13   Labor Matters ..................................................................36
    3.14   ERISA ..............................................................................36
    3.15   Investment Company Act; Other Regulations .................37
    3.16   Ownership of Borrower; Subsidiaries ..............................37
    3.17   Customers and Suppliers ..................................................37
    3.18   Environmental Matters .....................................................37
    3.19   Accuracy of Information, Etc ..........................................38
    3.20   Security Documents .........................................................39
    3.21   Solvency; No Fraudulent Transfer ...................................40
    3.22   Accounts Receivable ........................................................40

i

| | | |
|---|---|---|
| 3.23 | Contingent Obligations | 40 |
| 3.24 | Rigs | 40 |
| 3.25 | Insurance | 40 |
| 3.26 | Bank Accounts | 40 |

**ARTICLE IV CONDITIONS PRECEDENT** ... 40
| | | |
|---|---|---|
| 4.1 | Conditions Precedent to the Extension of Initial Loans | 40 |
| 4.2 | Conditions Precedent to the Extension of Additional Loans | 42 |
| 4.3 | Deemed Fulfilled Conditions | 43 |

**ARTICLE V AFFIRMATIVE COVENANTS** ... 43
| | | |
|---|---|---|
| 5.1 | Financial Reporting | 43 |
| 5.2 | Collateral Reporting | 44 |
| 5.3 | Certificates; Other Information | 44 |
| 5.4 | Taxes | 46 |
| 5.5 | Conduct of Business and Maintenance of Existence, Etc | 47 |
| 5.6 | Maintenance of Property; Insurance | 47 |
| 5.7 | Inspection of Property; Books and Records; Discussions | 47 |
| 5.8 | Notices | 48 |
| 5.9 | Environmental Matters | 49 |
| 5.10 | Additional Collateral, Etc | 49 |
| 5.11 | Release of Certain Liens | 49 |
| 5.12 | Management | 50 |
| 5.13 | Further Assurances | 50 |

**ARTICLE VI NEGATIVE COVENANTS** ... 50
| | | |
|---|---|---|
| 6.1 | Financial Covenants | 50 |
| 6.2 | Indebtedness | 51 |
| 6.3 | Liens | 51 |
| 6.4 | Fundamental Changes | 52 |
| 6.5 | Disposition of Property | 52 |
| 6.6 | Restricted Payments | 52 |
| 6.7 | Capital Expenditures | 53 |
| 6.8 | Investments | 53 |
| 6.9 | New Subsidiaries | 53 |
| 6.10 | Transactions with Affiliates | 53 |
| 6.11 | Sales and Leasebacks | 54 |
| 6.12 | Negative Pledge Clauses | 54 |
| 6.13 | Lines of Business | 54 |
| 6.14 | Modification of Constituent Documents | 54 |
| 6.15 | Hedging Agreements | 54 |
| 6.16 | Changes in Fiscal Periods | 54 |
| 6.17 | Use of Proceeds | 54 |
| 6.18 | New Bank Accounts | 54 |
| 6.19 | Storage of the Rigs | 54 |
| 6.20 | Certain Transactions | 54 |
| 6.21 | Daywork Drilling Contracts | 55 |

ARTICLE VII EVENTS OF DEFAULT ........................................................................55

ARTICLE VIII THE AGENTS ..................................................................................58
    8.1    Appointment ..................................................................................58
    8.2    Delegation of Duties .......................................................................58
    8.3    Exculpatory Provisions ....................................................................58
    8.4    Reliance by Agents .........................................................................59
    8.5    Notice of Default............................................................................59
    8.6    Non Reliance on Agents and Other Lenders...........................................59
    8.7    Indemnification ..............................................................................60
    8.8    Agent in Its Individual Capacity ........................................................60
    8.9    Successor Administrative Agent .........................................................60
    8.10   Authorization to Release Liens and Guarantees ......................................61
    8.11   The Arranger; the Syndication Agent ..................................................61

ARTICLE IX MISCELLANEOUS ...............................................................................61
    9.1    Amendments and Waivers ................................................................61
    9.2    Notices .......................................................................................62
    9.3    No Waiver; Cumulative Remedies .......................................................63
    9.4    Survival of Representations and Warranties............................................63
    9.5    Payment of Expenses ......................................................................63
    9.6    Successors and Assigns; Participations and Assignments ...........................64
    9.7    Adjustments; Set off .......................................................................68
    9.8    Counterparts .................................................................................69
    9.9    Severability .................................................................................69
    9.10   Integration ...................................................................................69
    9.11   GOVERNING LAW .......................................................................69
    9.12   Submission To Jurisdiction; Waivers ...................................................69
    9.13   Acknowledgments...........................................................................70
    9.14   Confidentiality ..............................................................................70
    9.15   Release of Collateral and Guarantee Obligations ....................................71
    9.16   Accounting Changes .......................................................................71
    9.17   Delivery of Lender Addenda .............................................................71
    9.18   WAIVERS OF JURY TRIAL ............................................................71
    9.19   Amendment and Restatement. ...........................................................72

SCHEDULES:

| 3.4 | Consents, Authorizations, Filings and Notices |
|---|---|
| 3.8 | Existing Indebtedness |
| 3.11 | Taxes |
| 3.20(a)-1 | Borrower UCC Filing Jurisdictions |
| 3.20(a)-2 | Borrower UCC Financing Statements to Remain on File |
| 3.20(a)-3 | Loan Party UCC Financing Statements to be Terminated |
| 3.20(b) | Parent UCC Filing Jurisdictions |
| 3.23 | Contingent Obligations |
| 3.24 | Rigs |
| 3.26 | Bank Accounts |
| 6.22 | Post-Closing Date Deliveries |

EXHIBITS:

| A | Form of Blocked Account Control Agreement |
|---|---|
| B | Form of Borrowing Notice |
| C | Form of Compliance Certificate |
| D | Form of Contractor Release Letter |
| E | Form of Lender Addendum |
| F | Form of Pledge Agreement |
| G | Form of Security Agreement |
| H | Form of Note |
| I | Form of Closing Certificate |
| J | Form of Assignment and Acceptance |

This AMENDED AND RESTATED CREDIT AGREEMENT, dated as of July 11, 2008, is by and among LATSHAW DRILLING COMPANY, LLC, a Texas limited liability company ("*Borrower*"), LATSHAW DRILLING & EXPLORATION COMPANY, a Texas Subchapter S corporation ("*Parent*"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "*Lenders*"), LEHMAN BROTHERS INC., as sole advisor, sole lead arranger and sole bookrunner (in such capacity, the "*Arranger*"), LEHMAN COMMERCIAL PAPER INC., as the syndication agent (in such capacity, the "*Syndication Agent*") and as the administrative agent (in such capacity, the "*Administrative Agent*").

## W I T N E S S E T H:

WHEREAS, Borrower has requested that Lenders make term loans to Borrower in the aggregate principal amount of $100,000,000; and

WHEREAS, Lenders are willing to make term loans on the terms and conditions of this Agreement;

WHEREAS, Borrower, Parent, the Administrative Agent, the Arranger and the Syndication Agent and the other lenders party thereto are parties to that certain Credit Agreement dated as of June 10, 2005, as amended by Amendment No. 1 and Waiver to Credit Agreement dated as of January 12, 2006, Amendment No. 2 and Waiver to Credit Agreement dated as of August 31, 2006 and Amendment No. 3 and Waiver to Credit Agreement dated as of May 10, 2007 (as so amended or otherwise modified or supplemented to the date hereof, the "*Existing Credit Agreement*");

WHEREAS, Borrower, the Administrative Agent and the Lenders are willing to amend and restate the Existing Credit Agreement in order to provide for certain amendments thereto and to provide for the making of the term loans referred to above, all on the terms set forth in this Agreement, which Agreement shall be effective upon satisfaction of certain conditions precedent set forth in this Agreement; and

WHEREAS, it is the intent of the parties hereto that this Agreement not constitute a novation of the obligations and liabilities existing under the Existing Credit Agreement or evidence payment of all or any of such obligations and liabilities; that this Agreement amend and restate in its entirety the Existing Credit Agreement and renew and extend the extensions of credit under the Existing Credit Agreement, as so amended and restated; and that from and after the Closing Date the Existing Credit Agreement be of no further force or effect except as to evidence the incurrence of the obligations of Borrower and its Subsidiaries thereunder and the representations and warranties made and the actions or omissions performed or required to be performed thereunder, in each case prior to the Closing Date;

NOW, THEREFORE, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1    Defined Terms**. As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

*Additional Mortgaged Property*: as defined in Section 5.10(b).

1

***Additional Term A Loans***:  as defined in Section 2.1(b).

***Administrative Agent***:  as defined in the preamble hereto.

***Affiliate***:  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "*control*" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.  Notwithstanding the foregoing, no Lender shall be deemed to be an Affiliate of the Loan Parties.

***Agents***:  the collective reference to the Syndication Agent and the Administrative Agent.

***Aggregate Exposure***:  with respect to any Lender at any time, an amount equal to (a) until the Commitment Termination Date, the sum of the aggregate unpaid principal amount of the Loans of such Lender and the aggregate amount of such Lender's Commitments at such time and (b) thereafter, the aggregate then unpaid principal amount of such Lender's Loans.

***Aggregate Exposure Percentage***:  with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the sum of the Aggregate Exposures of all Lenders at such time.

***Agreement***:  this Amended and Restated Credit Agreement, as amended, restated, replaced, supplemented or otherwise modified from time to time.

***ALTA***:  The American Land Title Association.

***Applicable Interest Margin***:  means, as applicable, the Term A Interest Margin and the Term B Interest Margin.

***Applicable Interest Rate***:  subject to Section 2.10, a rate per annum equal to the LIBOR Rate *plus* the Applicable Interest Margin for such Facility.

***Applicable Premium***:  as defined in Section 2.6(c).

***Approved Appraiser***:  Hadco International or such other independent appraiser reasonably acceptable to the Administrative Agent.

***Arranger***:  as defined in the preamble hereto.

***Asset Sale***:  any Disposition of any Property of Borrower or series of related Dispositions of any Property of Borrower (excluding any such Disposition permitted by clause (b) of Section 6.5 but including any Disposition permitted by clause (a) of Section 6.5) which yields gross proceeds to either Loan Party (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $100,000.

***Assignee***:  as defined in Section 9.6(c).

2

*Assignment and Acceptance*:  as defined in Section 9.6(c).

*Assignor*:  as defined in Section 9.6(c).

*Bailee's Agreement*:  a bailee's agreement in form and substance satisfactory to the Administrative Agent.

*Benefit Plan*:  at a particular time, any employee benefit plan that is covered by ERISA and in respect of which Borrower or a Commonly Controlled Entity is (or, if such Benefit Plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

*Benefited Lender*:  as defined in Section 9.7(a).

*Blocked Account Control Agreement*:  a Blocked Account Control Agreement to be executed among Bank of Oklahoma, N.A., Borrower and the Administrative Agent, substantially in the form of Exhibit A, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

*Board*:  the Board of Governors of the Federal Reserve System of the United States (or any successor).

*Borrower*:  as defined in the preamble hereto.

*Borrowing Date*:  any Business Day specified by Borrower as a date on which Borrower requests the Lenders to make Loans hereunder.

*Borrowing Notice*:  with respect to any request for borrowing of Loans hereunder, a notice from Borrower, substantially in the form of, and containing the information prescribed by, Exhibit B, delivered to the Administrative Agent.

*Business Day*:  a day other than a Saturday, Sunday or other day on which commercial banks in New York City or Houston are authorized or required by law to close.

*Capital Expenditures*:  for any period, with respect to any Person, the aggregate of all expenditures by such Person for the acquisition or leasing (pursuant to a Capital Lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a balance sheet of such Person provided that Capital Expenditures shall exclude expenditures made with the portion of any Reinvestment Deferred Amount relating to any Recovery Event in compliance with Section 2.7(b) and Section 6.7(b).

*Capital Lease*:  any lease (or other arrangement conveying the right to use) of a Person with respect to any Property or a combination thereof, the obligations under which are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP.

*Capital Lease Obligations*:  with respect to any Person, the obligations of such Person to pay rent or other amounts under any Capital Lease and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

**Capital Stock**: any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

**Cash Equivalents**: (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, Eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-2 by Standard & Poor's Ratings Services ("S&P") or P-2 by Moody's Investors Service, Inc. ("Moody's"), or carrying an equivalent rating by a "nationally recognized statistical rating organization" (within the meaning of proposed Rule 3b-10 promulgated by the Securities and Exchange Commission under the Exchange Act), if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory, the securities of which state, commonwealth, territory, political subdivision, taxing authority (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; and (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

**Change of Control**: (a) the Principal Shareholder shall cease to have the power to vote or direct the voting of securities having a majority of the ordinary voting power for the election of directors of Parent (determined on a fully diluted basis); (b) the Principal Shareholder shall cease to own of record and beneficially an amount of common stock of Parent equal to at least 50.01% of the amount of Capital Stock of Parent beneficially owned and held of record by the Principal Shareholder as of the Closing Date; (c) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), shall become, or obtain rights (whether by means or warrants, options or otherwise) to become, the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), excluding the Principal Shareholder, directly or indirectly, of more than 35%, on a fully diluted basis, of the outstanding Capital Stock of Parent entitled to vote for the members of the board of directors; (d) the board of directors of Parent shall cease to consist of a majority of Continuing Directors; (e) Mr. Trent B. Latshaw shall cease to be the president of Borrower or Parent or otherwise cease to be actively involved in the ongoing management of Borrower or Parent, in each case, other than as a result of his death or permanent disability; or (f) Parent shall cease to own and control, collectively, of record and beneficially, directly, 100% of each class of outstanding Capital Stock of Borrower free and clear of all Liens (except Liens created by the Security Documents).

**Closing Date**: the date on which the conditions precedent set forth in Section 4.1 shall have been satisfied, which date shall be not later than July 11, 2008.

4

*Code*: the Internal Revenue Code of 1986, as amended from time to time, the regulations thereunder and publicly available interpretations thereof.

*Collateral*: all of the Capital Stock of Borrower held by Parent and all Property of Borrower, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document.

*Collateral Value Deficiency*: a Facility Collateral Value Deficiency or a Term A Collateral Value Deficiency.

*Commitments*: the Term A Commitment and the Term B Commitment.

*Commitment Termination Date*: the earlier of December 31, 2009 and the date on which the Lenders' Commitments are reduced to zero or otherwise terminated pursuant to the terms hereof.

*Commonly Controlled Entity*: an entity, whether or not incorporated, that is under common control with Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes Borrower and that is treated as a single employer under Section 414 of the Code.

*Comparable Treasury Issue*: the U.S. Treasury security selected by Lehman Brothers Inc. as having a maturity most nearly equal to the period from the Prepayment Date to June 30, 2009, at the time of selection and in accordance with customary financial practice in pricing new issues of corporate debt securities.

*Comparable Treasury Price*: with respect to any Prepayment Date occurring prior to June 30, 2009, the average of three Reference Treasury Dealer Quotations for such Prepayment Date.

*Compliance Certificate*: a certificate duly executed by a Responsible Officer, substantially in the form of Exhibit C.

*Consolidated Asset Value*: the total assets of Borrower and its Subsidiaries at such date determined on a consolidated basis in conformity with GAAP excluding, however, from such determination, (a) any Securities issued by Borrower held as treasury securities, (b) Investments in and moneys due from Affiliates, (c) all goodwill, organizational expenses, research and development expenses, trademarks, trade names, copyrights, patents, patent applications, licenses and rights in any thereof, and other similar intangibles, (d) all prepaid expenses, deferred charges or unamortized debt discount and expense, (e) Securities which are not readily marketable, (f) cash held in a sinking or other analogous fund established for the purpose of redemption, retirement, defeasance or prepayment of any Capital Stock or Indebtedness, (g) any write-up in the book value of any asset resulting from a revaluation thereof, (h) any minority interest in non-wholly owned Subsidiaries that would be reflected on a consolidated balance sheet of Borrower and its Subsidiaries at such date prepared in conformity with GAAP, and (i) any items not included in clauses (a) through (h) above which are treated as intangibles in conformity with GAAP.

*Consolidated Current Assets*: at any date, the total consolidated current assets (other than cash and Cash Equivalents) of Borrower and its Subsidiaries at such date, determined in conformity with GAAP.

*Consolidated Current Liabilities*: at any date, all liabilities of Borrower and its Subsidiaries at such date which should, in conformity with GAAP, be classified as current liabilities on a consolidated balance sheet of Borrower and its Subsidiaries prepared in conformity with GAAP, *but excluding* the sum of (a) the principal amount of any current portion of long-term Indebtedness and (b) (without duplication of clause (a) above) the then outstanding principal amount of the Loans.

*Consolidated EBITDA*:  of any Person for any period, Consolidated Net Income of such Person and its Subsidiaries for such period plus, without duplication and to the extent reflected as a charge in the statement of such Consolidated Net Income for such period, the sum of (a) income tax expense, (b) Consolidated Interest Expense of such Person and its Subsidiaries, amortization or write-off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness, (c) depreciation and amortization expense, (d) amortization of intangibles (including, but not limited to, goodwill) and organization costs, (e) any extraordinary, unusual or non-recurring expenses or losses (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, losses on sales of assets outside of the ordinary course of business) and (f) any other non-cash charges, including (in case of clauses (e) or (f)) charges representing either (i) accruals of or reserves for cash expenditures in a future period or (ii) amortization of prepaid items paid in cash in a prior period, and *minus*, to the extent included in the statement of such Consolidated Net Income for such period, the sum of (a) interest income (except to the extent deducted in determining Consolidated Interest Expense), (b) any extraordinary, unusual or non-recurring income or gains (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, gains on the sales of assets outside of the ordinary course of business) and (c) any other non-cash income, all as determined on a consolidated basis and *minus*, whether or not included in the statement of such Consolidated Net Income for such period, all cash expenditures in such period for (A) previously accrued or reserved charges or (B) prepaid items to be amortized in future periods.

*Consolidated Interest Coverage Ratio*:  for any period, the ratio of (a) Consolidated EBITDA of Borrower for such period to (b) Consolidated Interest Expense of Borrower for such period.

*Consolidated Interest Expense*:  of any Person for any period, total cash interest expense (including that attributable to Capital Lease Obligations) of such Person and its Subsidiaries for such period with respect to all outstanding Indebtedness of such Person and its Subsidiaries (including, without limitation, all commissions, discounts and other fees and charges owed by such Person with respect to letters of credit and bankers' acceptance financing and net costs of such Person under Hedging Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP).

*Consolidated Leverage Ratio*:  as at the last day of any period of four consecutive Fiscal Quarters of Borrower, the ratio of (a) Consolidated Total Debt on such day to (b) Consolidated EBITDA of Borrower for such period; *provided* that for purposes of calculating Consolidated EBITDA of Borrower for any period, (i) the Consolidated EBITDA of any Person acquired by Borrower or its Subsidiaries during such period shall be included on a pro forma basis for such period (assuming the consummation of such acquisition and the incurrence or assumption of any Indebtedness in connection therewith occurred on the first day of such period) if the consolidated balance sheet of such acquired Person and its consolidated Subsidiaries as at the end of the period preceding the acquisition of such Person and the related consolidated statements of income and stockholders' equity and of cash flows for the period in respect of which Consolidated EBITDA is to be calculated (x) have been previously provided to the Administrative Agent and the Lenders and (y) either (1) have been reported on without

6

a qualification arising out of the scope of the audit by independent certified public accountants of nationally recognized standing or (2) have been found acceptable by the Administrative Agent and (ii) the Consolidated EBITDA of any Person Disposed of by Borrower or its Subsidiaries during such period shall be excluded for such period (assuming the consummation of such Disposition and the repayment of any Indebtedness in connection therewith occurred on the first day of such period).

*Consolidated Net Income*: of any Person for any period, the consolidated net income (or loss) of such Person and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP; *provided*, that in calculating Consolidated Net Income of Borrower and its consolidated Subsidiaries for any period, there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary of Borrower or is merged into or consolidated with Borrower or any of its Subsidiaries, (b) the income (or deficit) of any Person (other than a Subsidiary of Borrower) in which Borrower or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by Borrower or such Subsidiary in the form of dividends or similar distributions, (c) the undistributed earnings of any Subsidiary of Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any Contractual Obligation (other than under any Loan Document) or Requirement of Law applicable to such Subsidiary, and (d) any one-time increase or decrease to net income which is required to be recorded because of the adoption of new accounting policies, practices or standards required by GAAP.

*Consolidated Total Debt*: at any date, the aggregate principal amount of all Indebtedness of Borrower and its Subsidiaries at such date, determined on a consolidated basis in accordance with GAAP.

*Constituent Documents*: with respect to any Person, (a) the articles of incorporation, certificate of incorporation, certificate of formation or partnership or limited liability company agreement (or the equivalent organizational documents) of such Person, (b) the by-laws (or the equivalent governing documents) of such Person and (c) any document setting forth the manner of election and duties of the directors or managing members of such Person (if any) and the designation, amount or relative rights, limitations and preferences of any class or series of such Person's Capital Stock.

*Contingent Obligation*: of a Person, any agreement, undertaking or arrangement by which such Person assumes, guarantees, endorses, contingently agrees to purchase or provide funds for the payment of, or otherwise becomes or is contingently liable upon, the obligation or liability of any other Person, or agrees to maintain the net worth or working capital or other financial condition of any other Person, or otherwise assures any creditor of such other Person against loss, including any comfort letter, operating agreement, take or pay contract or the obligations of any such Person as general partner of a partnership with respect to the liabilities of the partnership.

*Continuing Directors*: the directors of Parent on the Closing Date, after giving effect to the other transactions contemplated hereby, and each other director of Parent if, in each case, such other director's nomination for election to the board of directors of Parent is recommended by at least 66 2/3% of the then Continuing Directors.

*Contractor Release Letter*: a letter, substantially in the form of <u>Exhibit D</u>, to be delivered by each Person providing materials or services to Borrower with respect to any Rig.

7

*Contractual Obligation*:  as to any Person, any term, condition or provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound, including, in the case of the Loan Parties, the Daywork Drilling Contracts.

*Control Investment Affiliate*:  as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "*control*" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

*Current Ratio*:  as of any date of determination, the ratio of (a) Consolidated Current Assets at such date to (b) Consolidated Current Liabilities at such date.

*Daywork Drilling Contracts*:  long-term operating contracts for utilization of the Rigs entered into by Parent from time to time with counterparties and in such form and substance as are acceptable to the Lenders.

*Default*:  any of the events specified in Article VII, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

*Default Rate*:  as defined in Section 2.8(b).

*Derivatives Counterparty*:  as defined in Section 6.6.

*Disposition*:  with respect to any Property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition (including by way of a merger or consolidation) of such Property or any interest therein (excluding the creation of any Lien permitted under Section 6.3 on such Property but including the sale or factoring at maturity or collection of any accounts or permitting or suffering any other Person to acquire any interest (other than a Lien permitted under Section 6.3) in such Property) or the entering into of any agreement to do any of the foregoing; and the terms "Dispose" and "Disposed of" shall have correlative meanings.

*Dollars* and *$*:  lawful currency of the United States of America.

*Environmental Laws*:  any and all laws, rules, orders, regulations, statutes, ordinances, guidelines, codes, decrees, or other legally enforceable requirements (including, without limitation, the common law) of any international authority, foreign government, the United States, or any state, local, municipal or other governmental authority, regulating, relating to or imposing liability or standards of conduct concerning pollution, protection of the environment or natural resources or of human health, or employee health and safety, as has been, is now, or may at any time hereafter be, in effect.

*Environmental Permits*:  any and all permits, licenses, approvals, registrations, notifications, exemptions and other authorizations required under any Environmental Law.

*ERISA*:  the Employee Retirement Income Security Act of 1974, as amended from time to time.

8

***Event of Default***: any of the events specified in Article VII, *provided* that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

***Excess Cash Flow***: for any period, the Consolidated EBITDA of Borrower for such period *plus* (a) the excess, if any, of the Working Capital at the beginning of such period over the Working Capital at the end of such period *minus* (b) the sum of (without duplication) (i) scheduled and mandatory cash principal payments on the Loans during such period and optional cash principal payments on the Loans during such period, (ii) scheduled cash principal payments made by Borrower or any of its Subsidiaries during such period on other Indebtedness to the extent such other Indebtedness and payments are permitted by this Agreement, (iii) scheduled payments made by Borrower or any of its Subsidiaries on Capital Lease Obligations to the extent such Capital Lease Obligations and payments are permitted by this Agreement, (iv) Capital Expenditures made by Borrower or any of its Subsidiaries during such period to the extent permitted by this Agreement, (v) the excess, if any, of the Working Capital at the end of such period over the Working Capital at the beginning of such period, (vi) Consolidated Interest Expense for such period and (vii) the Tax Distribution Amount for such period.

***Exchange Act***: Securities Exchange Act of 1934, as amended.

***Existing Credit Agreement***: as defined in the recitals hereto.

***Existing Indebtedness***: collectively, all Indebtedness of the Loan Parties outstanding immediately prior to the Closing Date.

***Existing Loan Documents***: the Existing Credit Agreement, together with all other agreements, instruments, financing statements or other documents executed or delivered thereunder.

***Existing Loan***: as defined in Section 2.1(a).

***Facility***: each of the Term A Facility and the Term B Facility.

***Facility Collateral Value Deficiency***: at any point in time, the amount, if any, by which the Obligations exceed the Rig Asset Value.

***Federal Funds Effective Rate***: for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by the Administrative Agent.

***Fiscal Quarter***: with respect to any year, each three-month time period ending on March 31, June 30, September 30 and December 31.

***Fiscal Year***: each twelve-month time period ending December 31.

***Funding Office***: the office specified from time to time by the Administrative Agent as its funding office by notice to Borrower and the Lenders.

*GAAP*:  generally accepted accounting principles in the United States of America as in effect from time to time, applied in a manner consistent with that used in preparation of the Pro Forma Balance Sheet.

*Governmental Authority*:  any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, any province, commonwealth, territory, possession, county, parish, town, township, village or municipality, whether now existing or hereafter constituted or existing.

*Granting Lender*:  as defined in Section 9.6(h).

*Guarantee Obligation*:  as to any Person (the "*guaranteeing person*"), any obligation of (a) the guaranteeing person or (b) another Person (including, without limitation, any bank under any letter of credit), if to induce the creation of such obligation of such other Person the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "*primary obligations*") of any other third Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by Borrower in good faith.

*Hedging Agreements*:  with respect to any Person, all interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by such Person providing for protection against fluctuations in interest rates, currency exchange rates, commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies.

*Indebtedness*:  of any Person at any date, without duplication (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of Property or services (other than trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person,

10

contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities, (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above; (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on Property (including, without limitation, accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation and (j) for the purposes of Article VII(e) only, all obligations (netted, to the extent provided for therein) of such Person (including but not limited to obligations and liabilities arising in connection with or as a result of early or premature termination of a Hedging Agreement, whether or not occurring as a result of a default thereunder) under Hedging Agreements. The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

*Indemnified Liabilities*: as defined in Section 9.5.

*Indemnitee*: as defined in Section 9.5.

*Independent Accountant*: Sartain Fischbein & Co. or such other independent accountants acceptable to the Administrative Agent.

*Initial Term A Loans*: as defined in Section 2.1(a).

*Insolvency*: with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

*Insolvent*: pertaining to a condition of Insolvency.

*Intellectual Property*: the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

*Interest Payment Date*: beginning subsequent to June 30, 2008, the first Business Day of each month.

*Landlord's Agreement*: the Landlord's Agreement executed and delivered by Kaiser-Francis Realty Operating Co., LLC and each other Person from whom Borrower leases any property in favor of the Administrative Agent and containing only those terms and provisions acceptable to the Administrative Agent in its sole discretion.

*Lehman Entity*: any of Lehman Commercial Paper Inc. or any of its Affiliates.

11

**Lender Addendum**: with respect to any initial Lender, a Lender Addendum, substantially in the form of Exhibit E, to be executed and delivered by such Lender on the Closing Date as provided in Section 9.17.

**Lenders**: as defined in the preamble hereto.

**Liabilities**: as defined in Section 2.11.

**LIBOR Business Day**: a Business Day on which banks in the city of London, England are generally open for interbank or foreign exchange transactions.

**LIBOR Period**: each period commencing on a LIBOR Business Day and ending three months thereafter; *provided* that:

(a)    the first LIBOR Period shall begin on the initial Borrowing Date and each successive LIBOR Period shall begin on the last LIBOR Business Day of the immediately preceding LIBOR Period;

(b)    if any LIBOR Period would otherwise end on a day that is not a LIBOR Business Day, such LIBOR Period shall be extended to the next succeeding LIBOR Business Day unless the result of such extension would be to carry such LIBOR Period into another calendar month in which event such LIBOR Period shall end on the immediately preceding LIBOR Business Day; and

(c)    any LIBOR Period that begins on the last LIBOR Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such LIBOR Period) shall end on the last LIBOR Business Day of a calendar month.

**LIBOR Rate**: for each LIBOR Period, a rate of interest determined by the Administrative Agent equal to the greater of :

(a)    2.50%; and

(b)    (i)    the offered rate for deposits in United States Dollars for the applicable LIBOR Period that appears on Telerate Page 3750 as of 11:00 a.m. (London time) on the second full LIBOR Business Day preceding the first day of each LIBOR Period (unless such date is not a Business Day, in which event the next succeeding Business Day will be used); divided by

(ii)    a number equal to 1.0 minus the aggregate (but without duplication) of the rates (expressed as a decimal fraction) of reserve requirements in effect on the day that is two LIBOR Business Days prior to the beginning of such LIBOR Period (including basic, supplemental, marginal and emergency reserves under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto, as now and from time to time in effect) for Eurocurrency funding (currently referred to as "*Eurocurrency Liabilities*" in Regulation D of the Board) that are required to be maintained by a member bank of the Federal Reserve System.

If such interest rates shall cease to be available from Telerate News Service, the LIBOR Rate shall be determined from such comparable publicly available financial reporting service for displaying any Eurodollar rates as shall be reasonably selected by the Administrative Agent.

*Lien*: any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever intended to assure payment or performance of any Indebtedness or other obligation, (including, without limitation, any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease, any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction naming the owner of the asset to which such Lien relates as debtor).

*Loan* and *Loans*: each of, and collectively, the Initial Term A Loans, the Additional Term A Loans and the Term B Loans.

*Loan Documents*: this Agreement, the Commitment Letter, the Security Documents, the Notes and each certificate, agreement, waiver, consent or document executed by a Loan Party and delivered to the Administrative Agent or any Lender in connection with or pursuant to any of the foregoing.

*Loan Facilities*: the collective reference to the Term A Loan Facility and the Term B Loan Facility.

*Loan Parties*: Borrower and Parent.

*Loan Percentage*: as to any Lender at any time, such Lender's Term A Loan Percentage and Term B Loan Percentage.

*Make-Whole Price*: an amount equal to the greater of:

(1)    100% of the principal amount of the Loans to be prepaid; and

(2)    the sum of the present values of (A) the principal amount of the Loans to be prepaid *plus* the Applicable Premium on June 30, 2009 and (B) the remaining scheduled payments of interest from the Prepayment Date to June 30, 2009 (not including any portion of such payments of interest accrued as of the Prepayment Date) discounted back to the Prepayment Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 50 basis points.

*Material Adverse Change*: a material adverse change in any of (a) the condition (financial or otherwise), business, performance, prospects, operations or properties of Borrower, (b) the legality, validity or enforceability of any Loan Document, (c) the perfection or priority of the Liens granted pursuant to the Security Documents, (d) the ability of the Borrower to repay the Obligations or of the Loan Parties to perform their obligations under the Loan Documents, or (e) the rights and remedies of the Administrative Agent or the Lenders under the Loan Documents.

*Material Adverse Effect*: an effect that results in or causes, or could reasonably be expected to result in or cause, a Material Adverse Change.

*Material Environmental Amount*: an amount or amounts payable or estimated to become payable by either Loan Party, in the aggregate in excess of $50,000, for costs to comply with or any liability under any Environmental Law, failure to obtain or comply with any Environmental Permits; costs of any investigation and remediation of any Material of Environmental Concern; and any other

cost or liability, including compensatory damages (including, without limitation damages to natural resources), punitive damages, fines, and penalties pursuant to any Environmental Law.

***Materials of Environmental Concern***:  any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, natural gas or natural gas products, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos, pollutants, contaminants, radioactivity, and any other substances or forces of any kind, whether or not any such substance or force is defined as hazardous or toxic under any Environmental Law, that is regulated pursuant to or could give rise to liability under any Environmental Law.

***Moody's***:  Moody's Investors Service, Inc. and any successor thereto.

***Mortgaged Properties***:  the real properties described in any Mortgages delivered pursuant to Section 5.10(b), as to which the Administrative Agent for the benefit of the Secured Parties shall be granted a Lien pursuant to one or more Mortgages.

***Mortgages***:  each of the mortgages and deeds of trust made by Borrower in favor of, or for the benefit of, the Administrative Agent for the benefit of the Secured Parties, in form and substance acceptable to the Administrative Agent in its sole discretion, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

***Multiemployer Plan***:  a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

***Net Cash Proceeds***:  (a)  in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) of such Asset Sale or Recovery Event, net of (i) amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset that is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document), (ii) in the case of an Asset Sale, attorneys' fees, accountants' fees, investment bank fees or other customary fees and expenses actually incurred in connection therewith and (iii) taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements); *provided, however*, that the evidence of each of (i), (ii) and (iii) are provided to the Administrative Agent in form and substance reasonably satisfactory to it; and (b) in connection with any issuance or sale of Capital Stock or debt securities or instruments or the incurrence of Indebtedness for borrowed money, the cash proceeds received from such issuance , sale or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith; *provided, however*, that in the case of this clause (b) evidence of such costs is provided to the Administrative Agent in form and substance reasonably satisfactory to it.

***Net Taxable Income***:  an amount equal to the net income of Borrower as calculated for purposes of Section 1 of the Code.

***Non-Excluded Taxes***:  as defined in Section 2.12(a).

***Non-U.S. Lender***:  as defined in Section 2.12(e).

14

*Note*: any promissory note evidencing any Loan.

*Obligations*: the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of Borrower to the Administrative Agent or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by Borrower pursuant hereto) or otherwise.

*Other Taxes*: any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

*Participant*: as defined in Section 9.6(b).

*Participant Register*: as defined in Section 9.6(e).

*Payment Office*: the office in New York specified from time to time by the Administrative Agent as its payment office by notice to Borrower and the Lenders.

*PBGC*: the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

*Permit*: any permit, approval, license, franchise, registration, notification, exemption, variance, permission or other authorization required from a Governmental Authority under an applicable Requirement of Law.

*Person*: an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

*Pledge Agreement*: the Pledge Agreement dated as of June 10, 2005 and executed and delivered by Parent, substantially in the form of Exhibit F, as the same may be amended, restated, replaced, supplemented or modified from time to time.

*Prepayment Date*: (a) with respect to any mandatory prepayment pursuant to Section 2.7, the date of such mandatory prepayment and (b) with respect to any optional prepayment pursuant to Section 2.6, the date of such optional prepayment.

*Principal Shareholder*: Trent B. Latshaw.

*Pro Forma Balance Sheet*: as defined in Section 3.1.

*Projections*: as defined in Section 5.3(c).

*Property*: any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Capital Stock.

*Purchase Price Refund*: any amount received by Borrower as a result of a purchase price adjustment or similar event in connection with any acquisition of the Property by Borrower.

*Qualified Refinancing*: any Indebtedness (a) all of the proceeds of which are used to pay, repay or otherwise refinance in full and in cash all outstanding Obligations related to the Term A Loans; (b) that has a principal amount no greater than the sum of the aggregate principal amount of the Term A Loans outstanding immediately prior to such payment, repayment or refinancing plus the accrued but unpaid interest thereon as of such date; (c) that has an interest rate no higher than that of the Term A Loans at the time of repayment; (d) with a schedule of amortizing principal payments satisfactory to the Term B Lenders; (e) with respect to which the Borrower and the lenders of which (or agent on behalf of such lenders) have executed and delivered to the Administrative Agent an intercreditor agreement satisfactory in form and substance to the Term B Lenders; and (f) that is otherwise on terms and subject to conditions satisfactory to the Term A Lenders and Term B Lenders.

*Rating Agencies*: as defined in Section 2.11.

*Recovery Event*: any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding (or proceeding in lieu thereof) relating to any asset of either Loan Party.

*Reference Treasury Dealer Quotations*: the average, as determined by the Administrative Agent, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) at 5:00 p.m., New York City time, on the third Business Day preceding the Prepayment Date.

*Register*: as defined in Section 9.6(d).

*Regulation H*: Regulation H of the Board as now and from time to time hereafter in effect.

*Regulation U*: Regulation U of the Board as now and from time to time hereafter in effect.

*Regulation X*: Regulation X of the Board as now and from time to time hereafter in effect.

*Reinvestment Deferred Amount*: the aggregate Net Cash Proceeds received by either Loan Party in connection with a Recovery Event that are duly specified in a Reinvestment Notice as not being required to be initially applied to prepay the Loans pursuant to Section 2.7(b) as a result of the delivery of such Reinvestment Notice.

*Reinvestment Notice*: a written notice executed by Borrower stating that no Default or Event of Default has occurred and is continuing and stating that Borrower intends and expects to use all or a specified portion of the Net Cash Proceeds of a Recovery Event specified in such notice to acquire or repair assets owned (or to be owned) by Borrower of the same type as those subject to such Recovery Event or equipment or real property owned (or to be owned) by and useful in the business of Borrower.

*Reinvestment Prepayment Amount*: with respect to any Recovery Event, the Reinvestment Deferred Amount relating thereto less the portion, if any, thereof expended prior to the relevant Reinvestment Prepayment Date to acquire or repair assets owned (or to be owned) by Borrower of the

16

same type as those subject to such Recovery Event or equipment or real property owned (or to be owned) by and useful in the business of Borrower.

*Reinvestment Prepayment Date*: the earlier of (a) the date occurring six months after such Recovery Event and (b) the date on which Borrower shall have determined not to, or shall have otherwise ceased to, acquire assets of the same type as those subject to such Recovery Event or equipment or real property owned (or to be owned) by and useful in the business of Borrower with all or any portion of the relevant Reinvestment Deferred Amount.

*Related Fund*: with respect to any Lender, any fund that (a) invests in commercial loans and (b) is managed or advised by the same investment advisor as such Lender, by such Lender or an Affiliate of such Lender.

*Related Party Register*: as defined in Section 9.6(d).

*Reorganization*: with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

*Reportable Event*: any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

*Required Lenders*: at any time, the holders of 66 2/3% or more of (a) until the Commitment Termination Date, the Aggregate Exposures of all Lenders and (b) thereafter, the aggregate unpaid principal amount of the Loans then outstanding.

*Requirement of Law*: as to any Person, the Constituent Documents of such Person, and the common law, any statute, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

*Responsible Officer*: the chief executive officer, president or chief financial officer of a Loan Party, but in any event, with respect to financial matters, the chief financial officer of a Loan Party.

*Restricted Payments*: as defined in Section 6.6.

*Rig Appraisal*: a written appraisal in form, content and detail reasonably satisfactory to the Administrative Agent prepared by an Approved Appraiser.

*Rig Asset Value*: the "as is, where is" six month, orderly liquidation value of the Rigs.

*Rig Construction*: the construction or refurbishment of up to six land-based drilling rigs to be owned by the Borrower that will be partially or wholly paid for with the proceeds of the Loans hereunder.

*Rig Construction Completion Date*: the date on which all Rig Constructions have been completed and have begun commercial operations.

*Rig Construction Costs*: third party costs incurred in connection with the Rig Constructions in accordance with the budgets therefor.

17

*Rigs*:  all land-based drilling rigs owned or to be constructed, refurbished, or purchased by Borrower, together with all pumps, drilling equipment, machinery, equipment and parts necessary for it to perform commercial service.

*SEC*:  the Securities and Exchange Commission (or successors thereto or an analogous Governmental Authority).

*Secured Obligations*:  in the case of Borrower, the Obligations, and, in the case of any other Loan Party, the obligations of such Loan Party to the Administrative Agent or to any Lender under the Loan Documents to which such Loan Party is a party.

*Secured Parties*:  collectively, the Administrative Agent and any Lender.

*Securities Act*:  as defined in Section 2(a)(1) of the Securities Act of 1933, as amended.

*Securitization*:  as defined in Section 2.11.

*Securitization Parties*:  as defined in Section 2.11.

*Security Agreement*:  the Security Agreement dated as of June 10, 2005 and executed and delivered by the Loan Parties and the Administrative Agent, substantially in the form of Exhibit G, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

*Security Documents*:  the collective reference to the Security Agreement, the Pledge Agreement, all Blocked Account Control Agreements, Landlord's Agreements, Bailees' Agreements, all Mortgages and all other security documents, statements and/or instruments hereafter delivered to the Administrative Agent granting a Lien on or perfecting a security interest in any Property of any Person to secure any of the Obligations.

*Significant Contractor*:  each Person to whom Borrower pays for services and materials, in a single payment or in the aggregate, $50,000 or more.

*Single Employer Plan*:  any Benefit Plan that is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

*Solvent*:  with respect to any Person, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature.  For purposes of this definition (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

18

**SPC**: as defined in Section 9.6(h).

**Standard & Poor's**: Standard & Poor's Ratings Services, a division of The McGraw-Hill companies, Inc. and any successor thereto.

**Stated Maturity**: with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the original documentation governing such Indebtedness, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

**Subsidiary**: as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of Borrower.

**Syndication Agent**: as defined in the preamble hereto.

**Tax Affiliate**: with respect to any Person, (a) any Subsidiary of such Person, and (b) any Affiliate of such Person with which such Person files or is eligible to file consolidated, combined or unitary tax returns.

**Tax Distribution Amount**: an amount equal to (a) the product of (i) Parent's average tax rate and (ii) the Net Taxable Income of Borrower, on a stand alone basis, in each case for the year immediately preceding the Tax Distribution Date, as certified by an Independent Accountant less (b) the amount by of any refund received by Parent insofar as such refund relates to the income tax paid by Parent in the previous year with respect to the Net Taxable Income of Borrower.

**Tax Distribution Date**: for any year, the third Business Day following the delivery to Administrative Agent of a certificate, in a form acceptable to the Administrative Agent, from the Independent Accountant with respect to the Tax Distribution Amount for such year.

**Tax Return**: as defined in Section 3.11.

**Term A Collateral Value Deficiency**: at any point in time, the amount, if any, by which the aggregate principal amount of Term A Loans then outstanding exceeds an amount equal to 50% of the Rig Asset Value.

**Term A Commitment**: as to any Lender, the obligation of such Lender, if any, to make a Term A Loan to Borrower hereunder in a principal amount not to exceed the amount set forth under the heading "Term A Commitment" opposite such Lender's name on Schedule 1 hereto, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original aggregate amount of the Term A Commitments is $55,000,000, and after giving effect to the conversion and continuation on the date hereof of the Existing Loans is $40,000,000.

19

***Term A Interest Margin***: means the rate per annum for such Facility set forth below:

Until, but not including, June 30, 2009 ........................................ 7.25%

Beginning on June 30, 2009 and at all times thereafter:

If Consolidated Leverage Ratio is greater than 3:1 ..................... 5.00%

If Consolidated Leverage Ratio is equal to or
less than 3:1 but greater than 2:1 ................................................ 4.50%

If Consolidated Leverage Ratio is equal to or less than 2:1 ........ 4.00%

***Term A Lender***:  each Lender that has a Term A Commitment or is the holder of a Term A Loan.

***Term A Loan Facility***:  the Term A Commitments and the Term A Loans thereunder.

***Term A Loan Percentage***: as to any Term A Lender at any time, the percentage which such Lender's Term A Commitment then constitutes of the aggregate Term A Commitments (or, at any time after the Commitment Termination Date, the percentage which the aggregate principal amount of such Lender's Term A Loans then outstanding constitutes of the aggregate principal amount of the Term A Loans then outstanding).

***Term A Loans***:  as defined in Section 2.1(b).

***Term B Commitment***:  as to any Lender, the obligation of such Lender, if any, to make a Term B Loan to Borrower hereunder in a principal amount not to exceed the amount set forth under the heading "Term B Commitment" opposite such Lender's name on Schedule 1 hereto, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.  The original aggregate amount of the Term B Commitments is $45,000,000 and after giving effect to the conversion and continuation of the Existing Loans is zero.

***Term B Interest Margin***: means 7.25%.

***Term B Lender***:  each Lender that has a Term B Commitment or is the holder of a Term B Loan.

***Term B Loan Facility***:  the Term B Commitments and the Term B Loans made thereunder.

***Term B Loan Percentage***: as to any Term B Lender at any time, the percentage which such Lender's Term B Commitment then constitutes of the aggregate Term B Commitments (or, at any time after the Commitment Termination Date, the percentage which the aggregate principal amount of such Lender's Term B Loans then outstanding constitutes of the aggregate principal amount of the Term B Loans then outstanding).

***Term B Loans***:  as defined in Section 2.1(a).

***Transferee***:  as defined in Section 9.14.

***Treasury Rate***: with respect to any Prepayment Date prior to June 30, 2009, (1) the yield, under the heading which represents the average for the immediately preceding week, appearing in the most recently published statistical release designated "H. 15(159)" or any successor publication that is published weekly by the Board of Governors of the Federal Reserve System and that establishes yields on actively traded U.S. Treasury securities adjusted to constant maturity under the caption "Treasury Constant Maturities," for the maturity corresponding to the Comparable Treasury Issue (if no maturity is within three months before or after the Stated Maturity, yields for the two published maturities most closely corresponding to the Comparable Treasury Issue shall be determined, and the Treasury Rate shall be interpolated or extrapolated from such yields on a straight-line basis, rounding to the nearest month) or (2) if such release (or any successor release) is not published during the week preceding the calculation date or does not contain such yields, the rate per annum equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, calculated using a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Prepayment Date. The Treasury Rate shall be calculated on the third Business Day preceding the applicable Prepayment Date.

***Working Capital***: at any date, the amount by which the Consolidated Current Assets of Borrower at such date exceeds the Consolidated Current Liabilities of Borrower at such date.

### 1.2    Other Definitional Provisions.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to Borrower and its Subsidiaries not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP; *provided* that for purposes of Section 6.1, any non-cash items arising under FAS 133, 142, 143 or 144 shall be excluded from the relevant calculation.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    Each agreement defined in this Article I shall include all appendices, exhibits and schedules thereto, and references thereto shall be to such agreement as amended, restated, replaced, supplemented or otherwise modified; *provided* that if the prior written consent of the Required Lenders is required hereunder for an amendment, restatement, replacement, supplement or other modification to any such agreement and such consent is obtained, references in this Agreement to such agreement shall be to such agreement as so amended, restated, replaced, supplemented or modified.

(f)     References in this Agreement to any statute shall be to such statute as amended or modified and in effect at the time any such reference is operative.

(g)     The term "including" when used in any Loan Document means "including without limitation" except when used in the computation of time periods.

(h)     The term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or".

(i)     The terms "Lender" and "Administrative Agent" include their respective successors.

(j)     The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities (as such term is defined in the Securities Act), revenues, accounts, leasehold interests and contract rights.

**1.3    Computation of Time Periods**.  In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including."

## ARTICLE II
## AMOUNT AND TERMS OF COMMITMENTS

**2.1    Commitments**.

(a)     The Credit Parties acknowledge and agree that as of immediately prior to the Closing Date the aggregate principal amount of all loans outstanding under the Existing Credit Agreement equals $60,000,000 (the "*Existing Loans*") and that, subject to Section 4.1 (i) $15,000,000 in aggregate principal amount of such loans are hereby converted into and continued as term loans under the Term A Facility (such loans, "*Initial Term A Loans*") and (ii) $45,000,000 in aggregate principal amount of such loans are hereby converted into and continued as term loans under the Term B Facility (such loans, "*Term B Loans*"). Notwithstanding anything set forth herein to the contrary, in order to effect the continuation of the Existing Loans as Initial Term A Loans and as Term B Loans as contemplated by the preceding sentence, the amount to be funded on the first Borrowing Date by each Lender hereunder in respect of its Term A Commitment and Term B Commitment shall be reduced by the principal amount of such Lender's Existing Loans converted into and continued as Initial Term A Loans and Term B Loans, as applicable.

(b)     Subject to the terms and conditions hereof, each Term A Lender severally agrees to make additional term loans to Borrower, from time to time, on any Borrowing Date requested by Borrower pursuant to Section 2.2 in an aggregate principal amount not to exceed such Lender's Term A Commitment as of such Borrowing Date (each such term loan, an "*Additional Term A Loan*" and, together with the Initial Term A Loans, the "*Term A Loans*").

(c)     The Commitment of any Lender shall be reduced on the date of funding of any Loan pursuant to Section 2.1 by the principal amount of the Loan funded.  The remaining

Commitments shall automatically and without notice be reduced to zero at the close of business on the day next preceding the Commitment Termination Date. Once repaid, Loans may not be reborrowed and the Commitments, once terminated or reduced, may not be reinstated.

**2.2    Procedure for Borrowings.**  For all Loans Borrower shall deliver to the Administrative Agent a Borrowing Notice (which Borrowing Notice must be received by the Administrative Agent prior to 12:00 Noon, New York City time, at least one Business Day prior to the requested date of each Loan but not more than three Business Days prior to the requested date) requesting that the Lenders make the Loans on the requested Borrowing Date for such Loans. Upon receipt of such Borrowing Notice, the Administrative Agent shall promptly notify each Lender thereof. Not later than 12:00 Noon, New York City time, on the Borrowing Date specified for Loans hereunder, each Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the Loan or Loans to be made by such Lender; *provided* that Borrower shall not deliver a Borrowing Notice, and no Lender is under any obligation to make available any funds, for Additional Loans in an aggregate amount for all Lenders less than $1,000,000 except if such amount is the remaining unborrowed amount of the Commitments. The Administrative Agent shall make available to Borrower the aggregate of the amounts made available to the Administrative Agent by the Lenders, in like funds as received by the Administrative Agent.

**2.3    Maturity Date.**  The Loan of each Lender shall mature on June 30, 2011.

**2.4    Repayment of Loans; Evidence of Debt.**

(a)    Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Lender the entire unpaid principal amount of each Loan of such Lender on such date on which the Loans become due and payable pursuant to Section 2.4(b), Section 2.6, 2.7 or Article VII. Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.8.

(i)    The aggregate principal amount of the Term A Loans of each Term A Lender shall be payable in consecutive installments on the last Business Day of each Fiscal Quarter, beginning with the Fiscal Quarter ending December 31, 2009, each of which shall be in an amount equal to such Lender's Term A Loan Percentage multiplied by the amount set forth below opposite such installment:

| Installment | Principal Amount |
|---|---|
| December 31, 2009 | $ 5,000,000 |
| March 31, 2010 | $ 6,250,000 |
| June 30, 2010 | $ 6,250,000 |
| September 30, 2010 | $ 6,250,000 |
| December 31, 2010 | $ 6,250,000 |
| March 31, 2011 | $12,500,000 |
| June 30, 2011 | $12,500,000 |

(ii)    The Term B Loan of each Term B Loan Lender shall be payable in consecutive quarterly installments on the last Business Day of each Fiscal Quarter,

23

commencing with the Fiscal Quarter ending March 31, 2010, each of which shall be in an amount equal to such Lender's Term B Loan Percentage multiplied by $125,000, with the remaining outstanding principal amounts of the Term B Loan being due and payable in full in immediately available funds on June 30, 2011.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing Indebtedness of Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent, on behalf of Borrower, shall maintain the Register pursuant to Section 9.6(d), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrower to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from Borrower and each Lender's share thereof.

(d)    The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.4(b) shall, to the extent permitted by applicable law, be *prima facie* evidence of the existence and amounts of the obligations of Borrower therein recorded; *provided, however*, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of Borrower to repay (with applicable interest) the Loans made to Borrower by such Lender in accordance with the terms of this Agreement or Borrower's entitlement to credit for any payment of principal or interest on the Loans.

(e)    Borrower agrees that, upon the request to the Administrative Agent by any Lender, Borrower will promptly execute and deliver to such Lender a promissory note of Borrower evidencing any Loans, of such Lender, substantially in the form of Exhibit H, (a "*Note*"), with appropriate insertions as to date and principal amount; *provided*, that delivery of Notes shall not be a condition precedent to the occurrence of the Closing Date or the making of the Loans on a Borrowing Date.

**2.5    Fees.**

(a)    A Commitment fee equal to $600,000 shall be due and payable by Borrower to the Administrative Agent for the account of each Lender on the initial Borrowing Date.

(b)    Borrower agrees to pay to the Administrative Agent for the account of each Lender a fee equal to 0.50% per annum on the average daily Commitment of such Lender from the date hereof through the Commitment Termination Date, payable in arrears on each Interest Payment Date.

(c)    Borrower shall pay to the Administrative Agent for its own account an annual nonrefundable administration fee equal to $25,000, such fee to be paid in advance on the initial Borrowing Date and thereafter on each anniversary of the Closing Date (or, if such date is not a Business Day, on the first Business Day thereafter).

**2.6    Optional Prepayments**.

(a)    On any date after the Closing Date and prior to June 30, 2009, Borrower may, upon at least three Business Days' prior notice to the Administrative Agent stating the Prepayment Date and aggregate principal amount of the prepayment, prepay the outstanding principal amount of the Term A Loans, in whole or in part, at Borrower's option, at the Make-Whole Price together with accrued interest through the Prepayment Date on the principal amount prepaid.  On or at any time after June 30, 2009, Borrower may, upon at least three Business Days' prior notice to the Administrative Agent stating the Prepayment Date and aggregate principal amount of the prepayment, prepay the outstanding principal amount of the Term A Loans, in whole or in part, at Borrower's option, together with accrued interest through the Prepayment Date on the principal amount prepaid.  If Term A Loans are prepaid in accordance with this Section 2.6(a), in whole or part, directly or indirectly, with the proceeds of any Indebtedness, such Indebtedness shall be pursuant to a Qualified Refinancing.

(b)    On any date prior to June 30, 2009, Borrower may, upon at least three Business Days' prior notice to the Administrative Agent stating the Prepayment Date and aggregate principal amount of the prepayment, prepay, the outstanding principal amount of the Term B Loans in whole or in part, at Borrower's option, at the Make-Whole Price, together with accrued interest through the Prepayment Date on the principal amount prepaid, in accordance with the provisions of this Agreement.

(c)    (i)    On or at any time after June 30, 2009, subject to the concurrent payment of the Applicable Premium, Borrower may, upon at least three Business Days' prior notice to the Administrative Agent stating the Prepayment Date and aggregate principal amount of the prepayment, prepay on any date, the outstanding principal amount of the Term B Loans, in whole or in part, at Borrower's option, together with accrued interest through the Prepayment Date on the principal amount prepaid.

(ii)    For purposes hereof, the "*Applicable Premium*" shall be a cash amount equal to the percentages of principal amount of the Term B Loans being prepaid set forth below:

If prepaid on or after June 30, 2009
but prior to June 30, 2010 ............................................................ 2.0%

If prepaid on or at any time after June 30, 2010 ............................. 0.0%

(d)    Each partial prepayment on any Loan shall be in an aggregate amount not less than $1,000,000 or integral multiples of $1,000,000 in excess thereof and any such prepayment must be accompanied by payment of Agent's and each Lender's out-of-pocket expenses and payment of any LIBOR funding breakage costs in accordance with Section 2.13.  Upon the giving of such notice of prepayment, the principal amount of the Loans specified to be prepaid and at the applicable price specified therefor, together with the accrued interest through the Prepayment Date and, if applicable, the Applicable Premium, shall become due and payable on the Prepayment Date.

**2.7   Mandatory Prepayments**.

(a)      Unless the Required Lenders shall otherwise agree, if (i) Borrower shall issue any Capital Stock, (ii) Borrower shall incur any Indebtedness, or (iii) either Loan Party shall receive any cash payment in connection with the cancellation or termination of any Daywork Drilling Contract, then on the date of such issuance, incurrence, or receipt the Loans shall be prepaid, by an amount equal to (x) the amount of the Net Cash Proceeds of such issuance or incurrence or (y) such cash payment, as applicable. The provisions of this Section 2.7(a) do not constitute a consent to the issuance of any Capital Stock by Borrower, a consent to the incurrence of any Indebtedness by Borrower or the termination or cancellation of any Daywork Drilling Contract.

(b)      Unless the Required Lenders shall otherwise agree, if on any date Borrower shall receive Net Cash Proceeds from any Asset Sale or Purchase Price Refund or either Loan Party shall receive Net Cash Proceeds from any Recovery Event then, on the date of receipt by such Loan Party of such Net Cash Proceeds, the Loans shall be prepaid by an amount equal to the amount of such Net Cash Proceeds; *provided, however*, that in the case of any Net Cash Proceeds constituting the Reinvestment Deferred Amount with respect to a Reinvestment Event, Borrower shall prepay the Loans in an amount equal to the Reinvestment Prepayment Amount applicable to such Reinvestment Event, if any, on the Reinvestment Prepayment Date with respect to such Reinvestment Event; *provided further* that the aggregate Net Cash Proceeds of Recovery Events that may be specified as Reinvestment Deferred Amounts in one or more Reinvestment Notices shall not exceed $100,000 in the case of any Recovery Event and $1,000,000 in the aggregate in the case of all Recovery Events.

(c)      Within 30 days after receipt of written notice from the Administrative Agent that a Collateral Value Deficiency exists, Borrower shall prepay the Loans in an aggregate principal amount equal to such Collateral Value Deficiency or, in the case of a Term A Collateral Value Deficiency only, Borrower shall prepay the Term A Loans in an aggregate principal amount equal to such Term A Collateral Value Deficiency.

(d)      Borrower shall prepay the outstanding principal amount of the Loans within 60 days after the last day of each calendar quarter, in an amount equal to 75% of Excess Cash Flow for each calendar quarter, beginning with the calendar quarter ending March 31, 2010.

(e)      Upon the occurrence of a Change of Control, the Required Lenders, at their sole discretion, may require Borrower to immediately prepay the outstanding principal amount of the Loans, together with a premium equal to 1.0% of the aggregate principal amount of Loans being repaid and all other amounts owing under this Agreement or any Loan Document including, without limitation, any fees and expenses payable under any Loan Document.

(f)      Each prepayment of the Loans pursuant to this Section 2.7 shall be applied in accordance with Section 2.9 below and shall be accompanied by payment of accrued interest to the date of prepayment on the principal amount prepaid. Each prepayment of the Loans pursuant to Section 2.7(a), (b) or (c) shall include a concurrent payment of the Applicable Premium or, in the case of prepayments prior to June 30, 2009, shall be accompanied by a premium equal to the excess, if any, of the Make-Whole Price over the principal amount of Loans being prepaid.

26

**2.8    Interest Rates, Payment Dates and Computation of Interest and Fees.**

(a)    Each Loan shall bear interest for each day on which it is outstanding at the Applicable Interest Rate.

(b)    (i) If all or a portion of the principal amount of any Loan shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), all outstanding Loans (whether or not overdue) (to the extent legally permitted) shall bear interest at a rate per annum that is equal to the Applicable Interest Rate *plus* 2.0% (the "***Default Rate***") and (ii) if all or a portion of any interest payable on any Loan or any fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the Default Rate, in each case, with respect to clauses (i) and (ii) above, from the date of such non payment until such amount is paid in full (after as well as before judgment).

(c)    Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to Section 2.8(b) shall be payable from time to time on demand.

(d)    Interest, fees and commissions payable pursuant hereto shall be calculated on the basis of a year of 360 days.

**2.9    Application of Payments.**

(a)    The borrowing by Borrower from the Lenders hereunder, any reduction of the Commitments of the Lenders and, subject to Section 2.9(c), each payment by Borrower on account of any fee, shall be made *pro rata* according to the Loan Percentages of the relevant Lenders.  Each payment of fees for the account of any Lenders payable hereunder shall be applied to the amounts of such obligations owing to the Lenders *pro rata* according to the respective amounts then due and owing to the Lenders.  Amounts prepaid on account of the Loans may not be reborrowed.

(b)    So long as no Event of Default shall have occurred and be continuing, each payment (including each prepayment) of the Loans outstanding shall be allocated among the Lenders holding such Loans *pro rata* based on the principal amount of such Loans held by such Lenders.

(c)    After the occurrence and during the continuance of any Event of Default, each payment in respect of principal or interest in respect of the Loans and each payment in respect of fees payable hereunder shall be applied in the following order:

(i)    *first*, to the payment or reimbursement of the Administrative Agent for all costs, expenses, disbursements and losses incurred by the Administrative Agent and which Borrower is required to pay or reimburse pursuant to the Loan Documents;

(ii)    *second*, to the payment or reimbursement of the Lenders for all costs, expenses, disbursements and losses incurred by the Lenders and which either Loan Party is required to pay or reimburse pursuant to the Loan Documents;

(iii)    *third*, to the payment of interest on the Loans which is then due;

27

(iv)    *fourth*, to the payment of principal of the Loans which is then due;

(v)    *fifth*, for the payment or prepayment of any other Obligations; and

(vi)    *sixth*, to whomsoever shall be legally entitled thereto.

If any Lender owes payments to the Administrative Agent hereunder, any amounts otherwise distributable under this Section 2.9(c) to such Lender shall be deemed to belong to Administrative Agent to the extent of such unpaid payments, and the Administrative Agent shall apply such amounts to make such unpaid payments rather than distribute such amounts to such Lender. All distributions of amounts described in paragraphs *second* through *fifth* above shall be made by the Administrative Agent to each Lender in accordance with such Lender's Loan Percentage.

(d)    All payments (including prepayments) to be made by Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the relevant Lenders, at the Payment Office, in Dollars and in immediately available funds. Any payment made by Borrower after 12:00 Noon, New York City time, on any Business Day shall be deemed to have been on the next following Business Day. The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate during such extension.

(e)    Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Effective Rate for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the Applicable Interest Rate, on demand, from Borrower.

(f)    Unless the Administrative Agent shall have been notified in writing by Borrower prior to the date of any payment due to be made by Borrower hereunder that Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective *pro rata* shares of a corresponding amount. If such payment is not made to the Administrative Agent by Borrower within three Business Days after such due date, the

Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against Borrower.

(g)    Each payment of the Loans shall be accompanied by accrued interest to the date of such payment on the amount paid.

**2.10    Requirements of Law.**

(a)    If (i) the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof (A) shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by Section 2.12 and changes in the rate of tax on the overall net income of such Lender); (B) shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the LIBOR Rate hereunder; or (C) shall impose on such Lender any other condition; and (ii) the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender reasonably deems to be material, of making, continuing or maintaining Loans bearing interest by reference to the LIBOR Rate, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable. If any Lender becomes entitled to claim any additional amounts pursuant to this Section 2.10, it shall promptly notify Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)    If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy, reserve requirements or similar requirements or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy, reserve requirements or similar requirements (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to Borrower (with a copy to the Administrative Agent) of a written request therefor, Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)    A certificate as to any additional amounts payable pursuant to this Section 2.10 submitted by any Lender to Borrower (with a copy to the Administrative Agent) shall be

conclusive in the absence of manifest error. The obligations of Borrower pursuant to this Section 2.10 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(d)     Notwithstanding anything to the contrary contained herein, if the introduction of or any change in any law or regulation (or any change in the interpretation thereof) shall make it unlawful, or any central bank or other Governmental Authority shall assert that it is unlawful, for any Lender to agree to make or to make or to continue to fund or maintain any Loan bearing interest by reference to the LIBOR Rate, then, unless that Lender is able to make or to continue to fund or to maintain such Loan at another branch or office of that Lender without, in that Lender's opinion, adversely affecting it or its Loans or the income obtained therefrom, on notice thereof and demand therefor by such Lender to Borrower through the Administrative Agent, (i) the obligation of such Lender to agree to make or to make or to continue to fund or maintain Loans bearing interest by reference to the LIBOR Rate shall terminate and (ii) all of such Lender's Loans shall automatically convert at the end of the then-current LIBOR Period with respect thereto or sooner, if required by such law, regulation or interpretation, into Loans bearing interest with respect to such Lender from and after the date of such conversion at a rate per annum equal to (x) the sum of the Federal Funds Effective Rate in effect from time to time *plus* 0.50% and (y) the Interest Margin.

**2.11   Securitization**.  Borrower hereby acknowledges that the Lenders and their Affiliates may sell or securitize the Loans (a "*Securitization*") through the pledge of the Loans as collateral security for loans to the Lenders or their Affiliates or through the sale of the Loans or the issuance of direct or indirect interests in the Loans, which loans to the Lenders or their Affiliates or direct or indirect interests will be rated by Moody's, Standard & Poor's or one or more other rating agencies (the "*Rating Agencies*").  Borrower shall cooperate with the Lenders and their Affiliates to effect the Securitization including by (a) amending this Agreement and the other Loan Documents, and executing such additional documents, as reasonably requested by the Lenders in connection with the Securitization, *provided that* (i) any such amendment or additional documentation does not impose material additional costs on Borrower and (ii) any such amendment or additional documentation does not materially adversely affect the rights, or materially increase the obligations, of Borrower under the Loan Documents or change or affect in a manner adverse to Borrower the financial terms of the Loans, (b) providing such information as may be reasonably requested by the Lenders in connection with the rating of the Loans or the Securitization, and (c) providing in connection with any rating of the Loans a certificate (i) agreeing to indemnify the Lenders and their Affiliates, any of the Rating Agencies, or any party providing credit support or otherwise participating in the Securitization (collectively, the "*Securitization Parties*") for any losses, claims, damages or liabilities (the "*Liabilities*") to which the Lenders, their Affiliates or such Securitization Parties may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any Loan Document or in any writing delivered by or on behalf of any Loan Party to any Agent or Lender in connection with any Loan Document or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein, or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, and such indemnity shall survive any transfer by the Lenders or their successors or assigns of the Loans and (ii) agreeing to reimburse the Agents, the Lenders and their Affiliates for any legal or other expenses reasonably incurred by such Persons in connection with defending the Liabilities.

**2.12   Taxes**.

(a)    All payments made by Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes or franchise taxes (imposed in lieu of net income taxes) imposed on any Agent or any Lender by the jurisdiction in which such Person is organized or has its principal lending office.  If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("*Non-Excluded Taxes*") or any Other Taxes are required to be withheld from any amounts payable to any Agent or any Lender hereunder, the amounts so payable to such Agent or such Lender shall be increased to the extent necessary to yield to such Agent or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement; *provided, however*, that Borrower shall not be required to increase any such amounts payable to any Lender with respect to any Non-Excluded Taxes (i) that are attributable to such Lender's failure to comply with the requirements of Sections 2.12(d) or 2.12(e) or (ii) that are United States withholding taxes imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement, except to the extent that such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from Borrower with respect to such Non-Excluded Taxes pursuant to this Section 2.12(a).

(b)    In addition, Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Whenever any Non-Excluded Taxes or Other Taxes are payable by Borrower, as promptly as possible thereafter Borrower shall send to the Administrative Agent for the account of the relevant Agent or Lender, as the case may be, a certified copy of an original official receipt received by Borrower showing payment thereof.  If Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary evidence, Borrower shall indemnify the Agents and the Lenders for any incremental taxes, interest or penalties that may become payable by any Agent or any Lender as a result of any such failure.  Such indemnification shall be paid within 10 days from the date on which any such Person makes written demand therefore specifying in reasonable detail the nature and amount of such Taxes or Other Taxes.  In connection therewith, upon request of Borrower, such Person shall also provide documentary support for the imposition of such Taxes or Other Taxes.  The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(d)    Each Lender (or Transferee) that is not a citizen or resident of the United States of America, a corporation, partnership or other entity created or organized in or under the laws of the United States of America (or any jurisdiction thereof), or any estate or trust that is subject to federal income taxation regardless of the source of its income (a "*Non-U.S. Lender*") shall deliver to the Administrative Agent (or, (i) in the case of a Participant, to the Lender from which the related participation shall have been purchased, and (ii) in the case of an assignee of a Lender which (x) is an Affiliate, Related Fund or Control Investment Affiliate of such Lender and (y) does not deliver an Assignment and Acceptance to the Administrative Agent pursuant to the last sentence of Section 9.6(c) for recordation pursuant to Section 9.6(d), to the assigning

31

Lender only) a properly completed and duly executed copy of either U.S. Internal Revenue
Service Form W-8BEN, W-8ECI or W-8IMY or any subsequent versions thereof or successors
thereto, in each case claiming complete exemption from, or reduced rate of, U.S. Federal
withholding tax and payments of interest hereunder. In addition, in the case of a Non-U.S.
Lender claiming exemption from U.S. Federal withholding tax under Section 871(h) or 881(c)
of the Code with respect to payments of "portfolio interest", such Non-U.S. Lender hereby
represents to the Agents and Borrower that such Non-U.S. Lender is not a bank for purposes of
Section 881(c) of the Code, is not a 10-percent shareholder (within the meaning of Section
871(h)(3)(B) of the Code) of the Parent and is not a controlled foreign corporation related to the
Parent (within the meaning of Section 864(d)(4) of the Code), and such Non-U.S. Lender
agrees that it shall promptly notify the Administrative Agent in the event any such
representation is no longer accurate. Such forms shall be delivered by each Non-U.S. Lender
on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on
or before the date such Participant purchases the related participation). In addition, each Non-
U.S. Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form
previously delivered by such Non-U.S. Lender. Notwithstanding any other provision of this
Section 2.12(d), a Non-U.S. Lender shall not be required to deliver any form pursuant to this
Section 2.12(d) that such Non-U.S. Lender is not legally able to deliver.

(e)     A Lender that is entitled to an exemption from or reduction of non-U.S.
withholding tax under the law of the jurisdiction in which Borrower is located, or any treaty to
which such jurisdiction is a party, with respect to payments under this Agreement shall deliver
to Borrower (with a copy to the Administrative Agent), at the time or times prescribed by
applicable law or reasonably requested by Borrower, such properly completed and executed
documentation prescribed by applicable law as will permit such payments to be made without
withholding or at a reduced rate, *provided* that such Lender is legally entitled to complete,
execute and deliver such documentation and in such Lender's reasonable judgment such
completion, execution or submission would not materially prejudice the legal position of such
Lender.

**2.13  Indemnity**. Borrower agrees to indemnify each Lender for, and to hold each Lender
harmless from, any losses or expenses that such Lender may sustain or incur as a consequence of
(a) the repayment of any Loans that are repaid in whole or in part prior to the last day of a LIBOR
Period (whether such repayment is made pursuant to any provision of this Agreement or any other
Loan Document or occurs as a result of acceleration, mandatory prepayment, by operation of law or
otherwise); (b) a default in payment when due of the principal amount of or interest on any Loan; (c) a
default in making any borrowing of Loans after Borrower has given notice requesting the same in
accordance herewith; or (d) the failure to make any prepayment of a Loan after Borrower has given a
notice thereof in accordance herewith. Such indemnification shall include any loss (including loss of
margin) or expense arising from the reemployment of funds obtained by it or from fees payable to
terminate deposits from which such funds were obtained. For the purpose of calculating amounts
payable to a Lender under this Section 2.13, each Lender shall be deemed to have actually funded its
relevant Loan through the purchase of a deposit bearing interest at the LIBOR Rate in an amount equal
to the amount of that Loan and having a maturity comparable to the LIBOR Period; provided that each
Lender may fund each of its Loans in any manner it sees fit, and the foregoing assumption shall be
utilized only for the calculation of amounts payable under this Section 2.13. A certificate as to any
amounts payable pursuant to this Section submitted to Borrower by any Lender shall be conclusive in

32

the absence of manifest error. This covenant shall survive the termination of this Agreement and the repayment of the Loans and all other amounts payable hereunder.

**2.14   Change of Lending Office.** Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Sections 2.10 or 2.12(a) with respect to such Lender, it will, if reasonably requested by Borrower, use reasonable efforts (subject to overall policy considerations of such Lender and consistent with legal and regulatory restrictions) to designate another lending office for any Loans affected by such event if such change would avoid the need for any indemnity payment by Borrower in connection with such event; *provided*, that such designation is made on terms that, in the sole reasonable judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage and would not require such Lender to disclose any information that such Lender deems confidential, and *provided*, further, that nothing in this Section 2.14 shall affect or postpone any of the obligations of Borrower or the rights of any Lender pursuant to Sections 2.10 or 2.12(a).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into this Agreement and to make the Loans, Borrower and Parent jointly and severally represent and warrant to each Agent and each Lender that, on and as of the Closing Date:

**3.1   Financial Condition.**

(a)   The unaudited *pro forma* balance sheet of Borrower as at the Closing Date (including the notes thereto) (the "***Pro Forma Balance Sheet***"), copies of which have heretofore been furnished to each Lender, has been prepared giving effect (as if such events had occurred on such date) to (i) the Loans to be made on the Closing Date and the use of proceeds thereof and (ii) the payment of fees and expenses in connection with the foregoing. The Pro Forma Balance Sheet has been prepared based on the best information available to Borrower as of the date of delivery thereof, and presents fairly on a *pro forma* basis the estimated financial position of Borrower as at the Closing Date, assuming that the events specified in the preceding sentence had actually occurred at such date.

(b)   The Pro Form Balance Sheet has been prepared in accordance with GAAP applied consistently throughout the periods involved. Except as disclosed in writing to the Administrative Agent, as of the date hereof, Borrower does not have any material Guarantee Obligations, contingent liabilities and liabilities for taxes, or any long term leases or unusual forward or long term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the Pro Forma Balance Sheet.

**3.2   No Change.** Since December 31, 2007, there has been no Material Adverse Change and there have been no developments or events that in the aggregate have had or reasonably could be expected to have a Material Adverse Effect.

**3.3   Corporate Existence; Compliance with Law.** Each Loan Party (i) is duly organized, validly existing and in good standing under the laws of the State of Texas; (ii) is duly qualified as a foreign corporation or other entity, as the case may be, and in good standing under the laws of each

33

jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification; (iii) has all power and authority, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged; (iv) is in compliance with its Constituent Documents; (v) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect; and (vi) has all necessary licenses, permits, consents or approvals from or by, has made all necessary filings with, and has given all necessary notices to, each Governmental Authority having jurisdiction, to the extent required for such ownership, operation and conduct, except for licenses, permits, consents, approvals or filings which can be obtained or made by the taking of ministerial action to secure the grant or transfer thereof or the failure to obtain or make would not in the aggregate have a Material Adverse Effect.

### 3.4   Power; Authorization; Enforceable Obligations.

(a)      Each Loan Party (i) has the power and authority, and the legal right, to make, deliver and perform each Loan Document to which it is a party and, in the case of Borrower, to borrow hereunder and (ii) has taken all necessary corporate or other action to authorize the execution, delivery and performance of each Loan Document to which it is a party and, in the case of Borrower, to authorize the borrowings on the terms and conditions of this Agreement.

(b)      No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required to be obtained by either Loan Party in connection with the borrowings hereunder or the execution, delivery, performance, validity or enforceability of this Agreement or any of the other Loan Documents, except (i) consents, authorizations, filings and notices described in <u>Schedule 3.4</u>, which consents, authorizations, filings and notices have been obtained or made and are in full force and effect except as set forth therein and (ii) the filings referred to in Section 3.20.

(c)      Each Loan Document has been duly executed and delivered on behalf of each Loan Party that is a party thereto. This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party that is a party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

### 3.5   No Legal Bar.   The execution, delivery and performance of this Agreement, the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof will not result in a violation by either Loan Party of any Requirement of Law or any Contractual Obligation of either Loan Party and will not result in, or require, the creation or imposition of any Lien on any of its properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents). No Requirement of Law or Contractual Obligation applicable to either Loan Party could reasonably be expected to have a Material Adverse Effect. No performance of a Contractual Obligation by either Loan Party, either unconditionally or upon the happening of an event, would result in the creation of a Lien (other than a Lien permitted under Section 6.3) on the Property of Borrower or the Capital Stock of Borrower.

### 3.6   No Material Litigation.   There is no litigation, action, suit, claim, dispute, investigation or proceeding at law or in equity, whether judicial or administrative, on or before any