arbitrator, court or other Governmental Authority that are pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened by, against or affecting the Loan Parties or against any of their respective properties or revenues that could reasonably be expected to have a Material Adverse Effect.

**3.7    No Default**.  Neither Loan Party is in default under or with respect to any of its Contractual Obligations in any respect that could reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing.

**3.8    Existing Indebtedness**.  Set forth on Schedule 3.8 is a complete and accurate list of all Existing Indebtedness of the Loan Parties and, except as set forth on Schedule 3.8, neither Loan Party has any Indebtedness other than pursuant to this Agreement and the other Loan Documents.

**3.9    Ownership of Property; Liens.**

(a)    As of the Closing Date, (i) neither Loan Party has any ownership interest in any real property and (ii) each Loan Party has good and defensible title to, or a valid leasehold interest in, all its other Property, and none of such Property is subject to any Lien except as permitted by Section 6.3.

(b)    All Permits required to have been issued or appropriate to enable all real property leased by Borrower to be lawfully occupied and used for all of the purposes for which they are currently occupied and used have been lawfully issued and are in full force and effect, other than those that could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    The Rigs are (i) mobile equipment which are not designed to be permanently used in any one location; (ii) not property subject to Chapter 501 of the Transportation Code of the State of Texas or any comparable statute, law, regulation or rule of any state in which any of the Rigs is located and not certificated as motor vehicles under the laws of any jurisdiction; and (iii) not fixtures under the laws of any jurisdiction in which any of the Rigs is located.

**3.10    Intellectual Property**.  Each of the Loan Parties owns, or is licensed to use, all Intellectual Property necessary to perform its obligations under any Daywork Drilling Contracts and otherwise for the conduct of its business as currently conducted.  No material claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor do the Loan Parties know of any valid basis for any such claim.  The use of Intellectual Property by the Loan Parties does not infringe on the rights of any Person in any material respects.

**3.11    Taxes**.  Each Loan Party has filed or caused to be filed all Federal, state and other material tax returns, reports and statements (collectively, "***Tax Returns***") that are required to be filed by either Loan Party or any of its Tax Affiliates with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed; all such Tax Returns are true and correct in all material respects and correctly reflect the facts regarding the income, business, assets, operations, activities, status or other matters of the Loan Party and any other information required to be shown thereon; each Loan Party has paid, prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for non-payment thereof, all taxes shown to be due and payable on said returns or on any assessments made against it or any of its Property and all other taxes, fees or

other charges imposed on it or any of its Property by or otherwise due and payable to any
Governmental Authority (other than any the amount or validity of which are currently being contested
in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP
have been provided on the books of such Loan Party); no tax Lien has been filed; and, to the best
knowledge of the Loan Parties, no claim is being asserted, with respect to any such tax, fee or other
charge. To the best knowledge of the Loan Parties, as of the Closing Date, except as set forth on
Schedule 3.11, no Tax Return is under audit or examination by any Governmental Authority and no
notice of such an audit or examination or any assertion of any claim for taxes has been given or made
by any Governmental Authority. Proper and accurate amounts have been withheld by each Loan Party
and each of its Tax Affiliates from their respective employees for all periods in full and complete
compliance with the tax, social security and unemployment withholding provisions of applicable
Requirements of Law and such withholdings have been timely paid to the respective Governmental
Authorities.

     **3.12  Use of Proceeds**. No part of the proceeds of any Loans will be used for "purchasing"
or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under
Regulation U or for any purpose that violates the provisions of the Regulations of the Board. Neither
Loan Party owns any margin stock. If requested by any Lender or the Administrative Agent, Borrower
will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in
conformity with the requirements of FR Form G-3 or FR Form U 1 referred to in Regulation U.

     **3.13  Labor Matters**. There are no strikes or other labor disputes against either Loan Party
pending or, to the knowledge of the Loan Parties, threatened that (individually or in the aggregate)
could reasonably be expected to have a Material Adverse Effect. Hours worked by and payment made
to employees of the Loan Parties have not been in violation of the Fair Labor Standards Act of 1938, as
amended, or any other applicable Requirement of Law dealing with such matters that (individually or
in the aggregate) could reasonably be expected to have a Material Adverse Effect. All payments due
from either Loan Party on account of employee health and welfare insurance that (individually or in
the aggregate) could reasonably be expected to have a Material Adverse Effect if not paid have been
paid or accrued as a liability on the books of such Loan Party.

     **3.14  ERISA**. Neither a Reportable Event nor an "accumulated funding deficiency" (within
the meaning of Section 412 of the Code or Section 302 of ERISA) has occurred during the five year
period prior to the date on which this representation is made or deemed made with respect to any
Benefit Plan, and each Benefit Plan has complied in all material respects with the applicable provisions
of ERISA and the Code. No termination of a Single Employer Plan has occurred, and no Lien in favor
of the PBGC or a Benefit Plan has arisen, during such five-year period. The present value of all
accrued benefits under each Single Employer Plan (based on those assumptions used to fund such
Benefit Plans) did not, as of the last annual valuation date prior to the date on which this representation
is made or deemed made, exceed the value of the assets of such Benefit Plan allocable to such accrued
benefits by a material amount. Neither Loan Party nor any Commonly Controlled Entity has had a
complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be
expected to result in a material liability under ERISA, and neither Loan Party nor any Commonly
Controlled Entity would become subject to any material liability under ERISA if such Loan Party or
any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as
of the valuation date most closely preceding the date on which this representation is made or deemed
made. No such Multiemployer Plan is in Reorganization or Insolvent.

     **3.15  Investment Company Act; Other Regulations**.

(a)    Neither Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. Neither Loan Party is subject to regulation under any Requirement of Law (other than Regulation X) which limits its ability to incur Indebtedness.

(b)    Neither Loan Party is a "holding company" or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company", within the meaning of the Public Utility Holding Company Act of 1935, as amended.

### 3.16  Ownership of Borrower; Subsidiaries.

(a)    Parent has no Subsidiaries other than Borrower and Latshaw Drilling Operations, LLC. Borrower has no Subsidiaries. The authorized Capital Stock of Borrower consists of membership interests, of which 100% are issued and outstanding. All of the outstanding Capital Stock of Borrower has been duly and validly issued, is owned beneficially and of record by Parent, free and clear of all Liens other than the Lien in favor of the Secured Parties created by the Pledge Agreement. There are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments of any nature relating to any Capital Stock of Borrower, except as created by the Loan Documents. There are no agreements or understandings to which Borrower is a party with respect to the voting, sale or transfer of any shares of Capital Stock of Borrower or any agreement restricting the transfer or hypothecation of any such shares.

(b)    Neither Loan Party is a party to any agreement restricting the transfer or hypothecation of any Capital Stock of Borrower, other than the Loan Documents.

### 3.17  Customers and Suppliers.  There exists no actual or threatened termination, cancellation or limitation of, or modification to or change in (a) any Daywork Drilling Contract or (b) the business relationship between (i) either Loan Party, on the one hand, and any customer or any group thereof, on the other hand, whose agreements with either Loan Party is individually or in the aggregate material to the business or operations of Borrower, or (ii) either Loan Party, on the one hand, and any material supplier thereof, on the other hand; and there exists no present state of facts or circumstances that could give rise to or result in any such termination, cancellation, limitation, modification or change. No Person providing any materials or services to either Loan Party has filed, or threatened to file, a mechanics', materialmen's, repairmen's or other like Lien on any of the Rigs.

### 3.18  Environmental Matters.  Other than exceptions to any of the following that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)    The Loan Parties: (i) are, and within the period of all applicable statutes of limitation have been, in compliance with all applicable Environmental Laws; (ii) hold all Environmental Permits (each of which is in full force and effect) required for any of their current or intended operations or for any Property owned, leased, or otherwise operated by any of them; (iii) are, and within the period of all applicable statutes of limitation have been, in compliance with all of their Environmental Permits; and (iv) reasonably believes that: each of its Environmental Permits will be timely renewed and complied with, without material expense; any additional Environmental Permits that may be required of any of them will be timely obtained and complied with; and compliance with any Environmental Law that is or is

expected to become applicable to any of them will be timely attained and maintained, without material expense.

(b)    Materials of Environmental Concern are not present at, on, under, in, or about any real property now or formerly owned, leased or operated by either Loan Party, or at any other location (including, without limitation, any location to which Materials of Environmental Concern have been sent for re-use or recycling or for treatment, storage, or disposal) which could reasonably be expected to (i) give rise to liability of either Loan Party under any applicable Environmental Law or otherwise result in costs to either Loan Party, or (ii) interfere with either Loan Party's continued operations, or (iii) impair the fair saleable value of any real property owned or leased by either Loan Party.

(c)    There is no pending or, to the knowledge of the Loan Parties, threatened judicial, administrative, arbitral or other proceeding (including any notice of violation or alleged violation) under or relating to any Environmental Law or Environmental Permits to which either Loan Party is, or to the knowledge of the Loan Parties will be, named as a party or otherwise affected.

(d)    Neither Loan Party has received any written request for information, or been notified that it is a potentially responsible party or otherwise liable under or relating to the federal Comprehensive Environmental Response, Compensation, and Liability Act or any similar Environmental Law, or with respect to any Materials of Environmental Concern.

(e)    Neither Loan Party has entered into or agreed to any consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum for dispute resolution, relating to compliance with or liability under any Environmental Law.

(f)    Neither Loan Party has assumed or retained, by contract or operation of law, any liabilities of any kind, fixed or contingent, known or unknown, under any Environmental Law or with respect to any Material of Environmental Concern.

(g)    Borrower has provided the Lenders copies of all significant reports, correspondence and other documents in its possession, custody, or control regarding its and its Subsidiaries compliance with or potential liability under Environmental Laws or Environmental Permits.

**3.19    Accuracy of Information, Etc**. No statement or information contained in this Agreement or Loan Document or any other document, certificate or statement furnished to the Administrative Agent or the Lenders or any of them, by or on behalf of either Loan Party for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein not misleading, taken as a whole. As of the date hereof, the representations and warranties of the Loan Parties contained in each of the Loan Documents are true and correct in all material respects. There is no fact known to either Loan Party that could reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in any Loan Document or in any other documents, certificates and statements furnished to the Agents and the

Lenders for use in connection with the transactions contemplated hereby and by the other Loan Documents.

### 3.20  Security Documents.

(a)      The Security Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  When financing statements in appropriate form are filed in the offices specified on Schedule 3.20(a)-1 (which financing statements have been duly completed and delivered to the Administrative Agent) and such other filings and actions as are specified on Schedule 3 to the Security Agreement have been completed (all of which filings have been duly completed), the Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of Borrower in such Collateral and the proceeds thereof, as security for the Secured Obligations, in each case prior and superior in right to any other Person (except, in the case of Collateral other than securities pledged by the Loan Parties, Liens permitted by Section 6.3).  Schedule 3.20(a)-2 lists each Uniform Commercial Code financing statement that (i) names Borrower as debtor and (ii) will remain on file after the Closing Date.  Schedule 3.20(a)-3 lists each Uniform Commercial Code financing statement that (i) names either Loan Party as debtor and (ii) will be terminated on or prior to the Closing Date; and on or prior to the Closing Date, the Loan Parties will have delivered to the Administrative Agent, or caused to be filed, duly completed Uniform Commercial Code termination statements, signed by the relevant secured party, in respect of each Uniform Commercial Code financing statement listed in Schedule 3.20(a)-3.

(b)      The Pledge Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  When financing statements in appropriate form are filed in the offices specified on Schedule 3.20(b) (which financing statements have been duly completed and delivered to the Administrative Agent) and such other filings and actions as are specified on Schedule 3 to the Pledge Agreement have been completed (all of which filings have been duly completed), and when Borrower, pursuant to the Pledge Agreement, has delivered its acknowledgement of the Administrative Agent's control over the Capital Stock of Borrower, the Pledge Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of Parent in such Collateral and the proceeds thereof, as security for the Secured Obligations, in each case prior and superior in right to any other Person.

(c)      Each Mortgage covering any Mortgaged Properties will be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien on such Mortgaged Properties described therein and proceeds thereof and when such Mortgages are filed in the recording office designated by Borrower, each such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Mortgaged Properties described therein and the proceeds thereof, as security for the Secured Obligations, in each case prior and superior in right to any other Person (other than Persons holding Liens or other encumbrances or rights permitted by the relevant Mortgage).  Upon the filing of such Mortgages, the Administrative Agent and the Administrative Agent will have received currently effective, duly executed Mortgages and other Loan Documents.

**3.21 Solvency; No Fraudulent Transfer**. Each Loan Party is, and after giving effect to the incurrence of all Indebtedness, Obligations and other obligations and commitments being incurred in connection herewith and pursuant to the other Loan Documents will be, and will continue to be, Solvent.

**3.22 Accounts Receivable**. The accounts and notes receivable of the Loan Parties reflected on the Pro Forma Balance Sheet, and all accounts and notes receivable arising subsequent to such date, (a) arose from bona fide sales transactions in the ordinary course of business consistent with past practice and are payable on ordinary trade terms, (b) to the knowledge of the Loan Parties, are legal, valid and binding obligations of the respective debtors enforceable in accordance with their respective terms, and (c) to the knowledge of the Loan Parties, are not subject to any valid set-off or counterclaim.

**3.23 Contingent Obligations**. All material Contingent Obligations of the Loan Parties existing at the date hereof are set forth on Schedule 3.23.

**3.24 Rigs**. Set forth on Schedule 3.24 is a complete and accurate list and description of each Rig (including, on a Rig by Rig basis, (a) identification of the rig number of each Rig and the owner thereof, (b) identification of the location of each Rig (by county, state and country), and (c) all major components thereof).

**3.25 Insurance**. All policies of insurance of any kind or nature of Borrower, including policies of fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation and employee health and welfare insurance, are in full force and effect and are of a nature and provide such coverage as is sufficient and as is customarily carried by businesses of the size and character of Borrower. Borrower has not been refused insurance for any material coverage for which it had applied or had any policy of insurance terminated (other than at its request).

**3.26 Bank Accounts**. Schedule 3.26 list all accounts maintained by or for the benefit of Borrower with any bank or other financial institution.

## ARTICLE IV
## CONDITIONS PRECEDENT

**4.1 Conditions Precedent to Effectiveness**. The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent:

(a)    Loan Documents. The Administrative Agent shall have received the following agreements, in each case executed and delivered by a duly authorized officer of each of the parties thereto: (i) this Agreement, (ii) the Security Agreement, (iii) the Pledge Agreement, and (iv) the Blocked Account Control Agreements.

(b)    Constituent Documents. All documents establishing or implementing the ownership, capital and corporate, organizational, tax and legal structure of Borrower shall be reasonably satisfactory to the Administrative Agent.

(c)    Projections and Business Plan. The Administrative Agent shall have received Projections for the 2008 Fiscal Year, a business plan for Fiscal Years 2008 through 2011, and a

written analysis of the business and prospects of the Borrower and its Subsidiaries for the period from the Closing Date to June 30, 2011, in each case satisfactory to it in its sole discretion.

(d)    Pro Forma Balance Sheet.  The Lenders shall have received the Pro Forma Balance Sheet.

(e)    Intentionally omitted.

(f)    Approvals.  All governmental and third party approvals (including landlords' and other consents) necessary to be obtained by either Loan Party in connection with the continuing operations of the Loan Parties and the transactions contemplated hereby shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent, delay or otherwise impose adverse conditions on the consummation of the financing contemplated hereby.

(g)    Daywork Drilling Contracts.  The Administrative Agent shall have received (in each case in form and substance reasonably satisfactory to the Administrative Agent) (i) true, correct and complete copies, certified as to authenticity by a Responsible Officer of Borrower, of each Daywork Drilling Contract and (ii) irrevocable assignments by Parent to Borrower, in form and substance acceptable to the Administrative Agent, of all of its rights, title and interest to, in and under each Daywork Drilling Contract.

(h)    Intentionally omitted.

(i)    Solvency Certificate.  The Lenders shall have received a reasonably satisfactory solvency certificate and analysis of the chief financial officer of Borrower which shall document the solvency of Borrower after giving effect to the borrowings under this Agreement.

(j)    Budget.  The Lenders shall have received a budget for Borrower for Fiscal Year 2008 which budget shall be reasonably acceptable to the Lenders.

(k)    Lien Searches.  The Administrative Agent shall have received the results of a recent lien search in each of the jurisdictions in which Uniform Commercial Code financing statements or other filings or recordations should be made to evidence or perfect security interests in all assets of the Loan Parties, and such search shall reveal no liens on any of the assets of the Loan Party, except for Liens permitted by Section 6.3.

(l)    Material Adverse Change.  Since December 31, 2007, there has been no Material Adverse Change and there has been no events or developments that in the aggregate have had or reasonably could be expected to have a Material Adverse Effect.

(m)    Closing Certificate.  The Administrative Agent shall have received a certificate of each Loan Party, dated the Closing Date, substantially in the form of Exhibit I, with appropriate insertions and attachments.

(n)      Legal Opinion. The Administrative Agent shall have received the legal opinion of Ewing & Jones, PLLC, counsel to the Loan Parties, in form and substance satisfactory to the Administrative Agent.

(o)      Filings, Registrations and Recordings. Each document (including, without limitation, any Uniform Commercial Code financing statement) required by the Security Documents or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 6.3), shall have been filed, registered or recorded or shall have been delivered to the Administrative Agent be in proper form for filing, registration or recordation.

(p)      Insurance. The Administrative Agent shall have received a summary of the insurance carried in respect of Borrower and the Rigs (which insurance shall be for such amounts, against such risk, covering such liabilities and with such deductibles or self-insured retentions as are reasonably acceptable to the Administrative Agent) and certificates of insurance, reasonably satisfactory to the Administrative Agent, naming the Administrative Agent, for the ratable benefit of the Lenders, as *loss payee* under its property loss policies for the Rigs and as *additional insured* on its comprehensive and general policies.

(q)      Representations and Warranties. Each of the representations and warranties made by either Loan Party in or pursuant to the Loan Documents shall be true and correct on and as of such date as if made on and as of such date.

(r)      No Default. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(s)      Due Diligence. The Administrative Agent and the Lenders shall have completed their business, legal and environmental due diligence.

**4.2    Conditions Precedent to the Extension of Additional Loans.** The agreement of each Lender to make the Loans is subject to the satisfaction in full of the following conditions precedent:

(a)      Each of the conditions precedent set forth in Section 4.1 shall have been satisfied in full.

(b)      Fees. The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including reasonable fees, disbursements and other charges of counsel to the Agents), on or before the initial Borrowing Date. All such amounts will be paid with proceeds of Loans made on the initial Borrowing Date and will be reflected in the funding instructions given by Borrower to the Administrative Agent on or before the initial Borrowing Date.

(c)      Representations and Warranties. Each of the representations and warranties made by the Loan Parties in or pursuant to the Loan Documents shall be true and correct on and as of such date as if made on and as of such date, except for such representations and warranties that are by their express terms limited to a specific date.

(d)   No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(e)   No Collateral Value Deficiency.  No Collateral Value Deficiency shall exist as of such date nor would any Collateral Value Deficiency exist after giving effect to the extensions of credit requested to be made on such date.

(f)   Blocked Account Control Agreement.  The Administrative Agent shall have received a Blocked Account Control Agreement in form, substance and from a bank acceptable to the Administrative Agent.

(g)   Additional Documentation.  The Administrative Agent shall have received such additional approvals, opinions or documents as the Administrative Agent may reasonably request.

**4.3   Deemed Fulfilled Conditions**.  Except to the extent that Borrower has disclosed in the Borrowing Notice that an applicable condition specified in Section 4.1 or 4.2, as applicable, will not be fulfilled as of the requested time for the making of the Loans, Borrower shall be deemed to have made a representation and warranty as of such time that the conditions specified in Section 4.1 or 4.2, as applicable, have been fulfilled.  No such disclosure by Borrower that a condition specified in Section 4.1 or 4.2 will not be fulfilled as of the requested time for the making of the requested Loans shall affect the right of each Lender not to make the Loans requested to be made by it if such condition has not been fulfilled at such time.

**ARTICLE V**
**AFFIRMATIVE COVENANTS**

Borrower and Parent hereby jointly and severally agree that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder, Borrower shall, and Parent shall cause Borrower to:

**5.1   Financial Reporting**.  Furnish to each Agent and each Lender:

(a)   as soon as available, but in any event within 90 days after the end of each Fiscal Year of Borrower, a copy of the audited balance sheet of Borrower as at the end of such year and the related audited statements of income and of cash flows for such year, setting forth in each case in comparative form the figures as of the end of and for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by the Independent Accountant;

(b)   as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each Fiscal Year of Borrower, the unaudited balance sheet of Borrower as at the end of such quarter and the related unaudited statements of income and of cash flows for such quarter and the portion of the Fiscal Year through the end of such quarter, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year end audit adjustments);

43

(c)    as soon as available, but in any event not later than 20 days after the end of each month occurring during each Fiscal Year of Borrower (other than the third, sixth, ninth and twelfth such month), the unaudited balance sheets of Borrower as at the end of such month and the related unaudited statements of income and of cash flows for such month and the portion of the Fiscal Year through the end of such month, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments); and

(d)    as soon as possible, but in any event not later than 20 days after the end of each month, a consolidated statement of projected cash flow of Borrower for the following eight-week period;

(e)    as soon as possible, but in any event not later than 45 days after the end of each Fiscal Quarter of Borrower, projected quarterly financial statements of Borrower for the following three-year period (such projections to include consolidated income statements, consolidated balance sheets and consolidated statements of cash flow for each Fiscal Year);

(f)    until the Rig Construction Completion Date, as soon as possible, but in any event not later than 20 days after the end of each month, a statement reconciling the budgeted versus actual capital expenditures for the preceding month; and

(g)    such other information as the Administrative Agent or any Lender may from time to time reasonably request.

All such financial statements are to be complete and correct in all material respects and are to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as approved by such accountants or officer, as the case may be, and disclosed therein).

**5.2    Collateral Reporting.**  Furnish to the Administrative Agent and each Lender (i) on or before each June 30 of each year, beginning June 30, 2009, a Rig Appraisal dated as of each preceding May 1 (or dated later if available) and (ii) promptly upon written request by the Administrative Agent, a Rig Appraisal; *provided that* unless a Default or an Event of Default shall then exist, the Administrative Agent may request, at Borrower's cost and expense, no more than one such Rig Appraisals during any 12-month period, with any additional requests for updated Rig Appraisal during any such period to be at the Administrative Agent's cost and expense, and after the occurrence and during the continuance of a Default or Event of Default, the Administrative Agent may, from time to time, request a Rig Appraisal at the sole cost and expense of Borrower, in each case dated as of the first day of the month during which Borrower receives such request.

**5.3    Certificates; Other Information.**  Furnish to the Administrative Agent and each Lender:

(a)    concurrently with the delivery of the financial statements referred to in Section 5.1(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, except as specified in such certificate (it being understood that such certificate shall be limited to the items that independent certified public

accountants are permitted to cover in such certificates pursuant to their professional standards and customs of the profession);

(b)    concurrently with the delivery of any financial statements pursuant to Section 5.1, (i) a certificate of a Responsible Officer stating that, to the best of such Responsible Officer's knowledge, each Loan Party during such period has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Loan Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate and (ii) in the case of quarterly or annual financial statements, (A) a Compliance Certificate containing all information and calculations necessary for determining compliance by the Loan Parties with the provisions of this Agreement referred to therein as of the last day of the Fiscal Quarter or Fiscal Year of Borrower, as the case may be, (B) to the extent not previously disclosed to the Administrative Agent, a listing of any real property or Intellectual Property acquired by Borrower since the date of the most recent list delivered pursuant to this clause (B) (or, in the case of the first such list so delivered, since the Closing Date) and (C) authorize the filing of any Uniform Commercial Code financing statements or other filings specified in such Compliance Certificate as being reasonably required to be filed or delivered therewith;

(c)    as soon as available, and in any event no later than 45 days after the end of each Fiscal Year of Borrower, a detailed budget for Borrower following Fiscal Year (including a projected balance sheet of Borrower and its Subsidiaries as of the end of the following Fiscal Year, and the related statements of projected cash flow, projected changes in financial position and projected income), and, as soon as available, significant revisions, if any, of such budget and projections with respect to such Fiscal Year (collectively, the "*Projections*"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer stating that such Projections are based on reasonable estimates, information and assumptions and that such Responsible Officer has no reason to believe that such Projections are incorrect or misleading in any material respect;

(d)    within 45 days after the end of each Fiscal Quarter of Borrower, a narrative discussion and analysis of the financial condition and results of operations of Borrower for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, as compared to the portion of the Projections covering such periods and to the comparable periods of the previous year;

(e)    as soon as possible and in any event within five days of obtaining knowledge thereof: (i) any development, event, or condition that, individually or in the aggregate with other developments, events or conditions, could reasonably be expected to result in the payment by either Loan Party, in the aggregate, of a Material Environmental Amount; and (ii) any notice that any Governmental Authority may deny any application for an Environmental Permit sought by, or revoke or refuse to renew any Environmental Permit held by, either Loan Party;

(f)    reports, certifications, engineering studies, environmental assessments, or other written material or data in form, scope, and substance satisfactory to the Administrative Agent or the Lenders, in the event that the Administrative Agent or the Lenders at any time have a reasonable basis to believe that there may be a material violation of any Environmental Law or

45

a condition at any Property owned, operated or leased by either Loan Party that could give rise to material environmental costs or liabilities, or if an Event of Default occurs; *provided, however*, that should either Loan Party fail to provide such reports, certifications, engineering studies or other written material or data within 30 days of the Administrative Agent's or Lender's request, the Administrative Agent shall have the right, at such Loan Parties' sole cost and expense, to conduct such environmental assessments or investigations as may reasonably be required to satisfy the Administrative Agent and the Lenders that the Loan Parties are in material compliance with Environmental Laws;

(g)    within five Business Days after receipt thereof by either Loan Party, copies of each final management letter, exception report or similar letter or report received by such Loan Party from its independent certified public accountants;

(h)    prior to any Asset Sale anticipated to generate in excess of $100,000 in Net Cash Proceeds, a notice (a) describing such Asset Sale or the nature and material terms and conditions of such transaction and (b) stating the estimated Net Cash Proceeds anticipated to be received by either Loan Party;

(i)    promptly after becoming aware of the same, written notice of (i) any material labor dispute to which either Loan Party is or may become a party, including any strikes, lockouts or other disputes relating to any of such Person's plants and other facilities, and (ii) any Worker Adjustment and Retraining Notification Act or related liability incurred with respect to the closing of any plant or other facility of any of such Person that would reasonably be expected to have a Material Adverse Effect;

(j)    upon the written request of the Administrative Agent, copies of all Tax Returns filed by each Loan Party in respect of taxes measured by income (excluding sales, use and like taxes);

(k)    as soon as is practicable following the written request of the Administrative Agent and in any event within 60 days after the end of each Fiscal Year, (i) a report in form and substance reasonably satisfactory to the Administrative Agent and the Lenders outlining all material insurance coverage maintained as of the date of such report by each Loan Party and the duration of such coverage and (ii) an insurance broker's statement that all premiums then due and payable with respect to such coverage have been paid and confirming that the Administrative Agent has been named as loss payee or additional insured, as applicable;

(l)    promptly after any payment to any Significant Contractor for materials and services provided in connection with any Rig Construction, a Contractor Release Letter from such Person; and

(m)    promptly, such additional financial and other information as any Lender may from time to time reasonably request.

**5.4    Taxes.** Pay and discharge before the same shall become delinquent, all lawful governmental claims, taxes, assessments, charges and levies, except where contested in good faith, by proper proceedings and adequate reserves therefor have been established on the books of Borrower in conformity with GAAP.

**5.5    Conduct of Business and Maintenance of Existence, Etc**.

(a)    Preserve, renew and keep in full force and effect the partnership, company or other existence and take all reasonable action to maintain all rights, privileges and franchises material to its business, except, in each case, as otherwise permitted by Section 6.4;

(b)    Comply in all material respects with all Contractual Obligations, Permits and Requirements of Law.

**5.6    Maintenance of Property; Insurance**.

(a)    Keep all Property and systems useful and necessary in its business in good working order and condition, ordinary wear and tear excepted; in particular, and without limitation, maintain, operate or cause to be operated the Rigs in a good and workman-like manner;

(b)    Maintain with financially sound and reputable insurance companies insurance on all its Property in such amounts, against such risks, covering such liabilities and with such deductibles or self-insured retention as are reasonably acceptable to the Administrative Agent;

(c)    Cause all such insurance to name the Administrative Agent, for the ratable benefit of the Lenders, as "*loss payee*" under its property loss policies and as "*additional insured*" on its comprehensive and general policies, to provide that no cancellation, material diminution in amount of coverage or other material change in coverage shall be effective until after 30 days' written notice thereof to the Administrative Agent and otherwise to be reasonably satisfactory to the Administrative Agent in all respects;

(d)    Not later than 90 days after the Closing Date, Borrower shall deliver, or cause to be delivered, to the Administrative Agent certificates evidencing key man life insurance on the Principal Shareholder in an amount and with terms satisfactory to the Administrative Agent; and

(e)    Renew all insurance policies referred to in this Section 5.6 on terms no less favorable to the Administrative Agent for the ratable benefit of the Lenders during the term of this Agreement. Any substitute underwriter shall be, in Borrower's reasonable opinion, as financially sound as Borrower's existing underwriters.

**5.7    Inspection of Property; Books and Records; Discussions**.

(a)    Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities;

(b)    Permit the Administrative Agent and the Lenders, or any agents or representatives thereof, from time to time during Borrower's normal business hours, as often as may be reasonably requested and upon five Business Days' notice (except that during the continuance of an Event of Default, no such notice shall be required) to (i) visit the properties of either Loan Party, (ii) during any such visit, inspect and verify the amount, character and condition of any of the Property of Borrower, (iii) during any such visit, examine and, at

Borrower's cost and expense, make copies of and abstracts from the records and books of account of the Loan Parties, and (iv) discuss the affairs, finances and accounts of the Loan Parties with any of their respective officers, directors, employees or its independent certified public accountants. Except as otherwise stated in clause (iii) above, each Lender will pay the costs and expenses incurred by such Lender in exercising its rights under this Section 5.7(b); *provided, however,* that after the occurrence of an Event of Default, Borrower shall reimburse each Lender promptly after a request therefor for the reasonable costs and expenses incurred by such Lender in connection with the exercise of its rights under this Section 5.7(b); and

(c)      Authorize Borrower's independent certified public accountants to disclose to the Administrative Agent or any Lender any and all financial statements and other information of any kind, as the Administrative Agent or any Lender reasonably requests from Borrower and which such accountants may have with respect to the business, financial condition, results of operations or other affairs of the Loan Parties.

**5.8    Notices**. Promptly, and in any event within three Business Days after knowledge thereof, give notice to the Administrative Agent and each Lender of:

(a)      the occurrence of any Default or Event of Default;

(b)      any (i) default or event of default under any Contractual Obligation of the Loan Parties or (ii) litigation, investigation or proceeding which may exist at any time between either Loan Party and any Governmental Authority;

(c)      any litigation or proceeding affecting either Loan Party in which the amount involved is $50,000 or more and not covered by insurance or in which injunctive or similar relief is sought;

(d)      the occurrence of any Reportable Event with respect to any Benefit Plan, a failure to make any required contribution to a Benefit Plan, the creation of any Lien in favor of the PBGC or a Benefit Plan or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan or the institution of proceedings or the taking of any other action by the PBGC or either Loan Party or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Plan;

(e)      any development or event that has had a Material Adverse Effect or could reasonably be expected to have a Material Adverse Change; and

(f)      the audit or examination of any Tax Return by any Governmental Authority, the receipt by either Loan Party of notice of any such audit or examination or the assertion of any claim for taxes against either Loan Party by any Governmental Authority.

Each notice pursuant to this Section 5.8 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action Borrower proposes to take with respect thereto.

**5.9    Environmental Matters**.

(a)    Comply in all material respects with, and ensure compliance in all material respects by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply in all material respects with and maintain, and ensure that all tenants and subtenants obtain and comply in all material respects with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws.

(b)    Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply in all material respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws.

**5.10    Additional Collateral, Etc**.

(a)    With respect to any Property acquired after the Closing Date by Borrower (other than any Property described in Section 5.10(b)) as to which the Administrative Agent, for the benefit of the Secured Parties, does not have a perfected Lien, promptly, and in any event within five Business Days, (A) execute and deliver to the Administrative Agent such additional Security Documents or amendments to the existing Security Documents as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a security interest in such Property and (B) take all actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest in such Property (other than any Property subject to a Lien expressly permitted by Section 6.3(e)), including without limitation, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the applicable Security Document or by law or as may be requested by the Administrative Agent; and

(b)    With respect to any interest in any real property acquired after the Closing Date by Borrower (such real property, "*Additional Mortgaged Property*"), promptly, and in any event within five Business Days, (i) execute and deliver a first priority Mortgage in favor of the Administrative Agent, for the benefit of the Secured Parties, covering such real property, (ii) if requested by the Administrative Agent, provide the Lenders with (A) title and extended coverage insurance covering such real property in an amount at least equal to the purchase price of such real property (or such other amount as shall be reasonably specified by the Administrative Agent) as well as a current ALTA survey thereof, together with a surveyor's certificate and (B) any consents or estoppels reasonably deemed necessary or advisable by the Administrative Agent in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Administrative Agent and (C) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

**5.11    Release of Certain Liens**. Concurrently with the borrowing by Borrower of the Initial Loans, Borrower shall file or cause to be filed all such statements, instruments, agreements or other documents necessary to fully and unconditionally release all Liens arising under or relating to the Existing Indebtedness other than those arising as a result of the Existing Credit Agreement.

**5.12  Management.**  At all time times Trent Latshaw, or a individual reasonably acceptable to the Administrative Agent, shall be the President and Chief Executive Officer of Borrower.

**5.13  Further Assurances.**

(a)    From time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take such actions, as the Administrative Agent may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Administrative Agent and the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other Property or assets hereafter acquired by Borrower which may be deemed to be part of the Collateral) pursuant hereto or thereto; and

(b)    Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may be required to obtain from the Loan Parties for such governmental consent, approval, recording, qualification or authorization.

## ARTICLE VI
## NEGATIVE COVENANTS

Borrower and Parent hereby jointly and severally agree that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder, Borrower shall not, and Parent shall not permit Borrower to, directly or indirectly:

**6.1  Financial Covenants.**

(a)    <u>Consolidated Leverage Ratio</u>.  Permit the Consolidated Leverage Ratio as at the last day of any period of four consecutive Fiscal Quarters of Borrower (or, if less, the number of full Fiscal Quarters subsequent to the Closing Date) ending with any Fiscal Quarter set forth below to exceed the ratio set forth below opposite such Fiscal Quarter:

| Fiscal Quarter | Consolidated Leverage Ratio |
|---|---|
| September 30, 2008 | 3.00 |
| December 31, 2008 | 3.50 |
| March 31, 2009 | 3.50 |
| June 30, 2009 | 3.00 |
| September 30, 2009 | 2.75 |
| December 31, 2009 | 2.75 |
| Thereafter | 2.50 |

(b)    <u>Consolidated Interest Coverage Ratio</u>.  Permit the Consolidated Interest Coverage Ratio for any period of four consecutive Fiscal Quarters of Borrower (or, if less, the

number of full Fiscal Quarters subsequent to the Closing Date) ending with any Fiscal Quarter set forth below to be less than the ratio set forth below opposite such Fiscal Quarter:

| Fiscal Quarter | Consolidated Interest Coverage Ratio |
|---|---|
| September 30, 2008 | 2.00 |
| December 31, 2008 | 2.00 |
| March 31, 2009 | 2.00 |
| June 30, 2009 | 2.25 |
| September 30, 2009 | 2.25 |
| December 31, 2009 | 2.25 |
| Thereafter | 2.50 |

(c)     Minimum Consolidated EBITDA.  Permit the Consolidated EBITDA for any period of four consecutive Fiscal Quarters of Borrower (or, if less, the number of full Fiscal Quarters subsequent to the Closing Date) ending with any Fiscal Quarter set forth below to be less than the amount set forth below opposite such Fiscal Quarter:

| Fiscal Quarter | Minimum Consolidated EBITDA |
|---|---|
| September, 30, 2008 | $30,000,000 |
| December 31, 2008 | $30,000,000 |
| March 31, 2009 | $30,000,000 |
| June 30, 2009 | $32,500,000 |
| September 30, 2009 | $35,000,000 |
| December 31, 2009 | $35,000,000 |
| Thereafter | $40,000,000 |

**6.2     Indebtedness**.  Create, incur, issue, assume, guaranty, or suffer to exist any Indebtedness, except:

(a)     Indebtedness of Borrower pursuant to any Loan Document;

(b)     Indebtedness of Borrower (including, without limitation, Capital Lease Obligations) secured by Liens permitted by Section 6.3(e) in an aggregate principal amount not to exceed $100,000 at any one time outstanding;

(c)     endorsements of negotiable instruments for collection in the ordinary course of business;

(d)     any Qualified Refinancing.

**6.3     Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except for:

(a)     Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings, *provided* that adequate reserves with respect thereto are maintained on the books of Borrower in conformity with GAAP;

51

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books; *provided*, that at no time shall such sums being contested exceed in the aggregate $50,000;

(c)    pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)    deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)    Liens on fixed or capital assets (other than Rigs) acquired, constructed or improved by Borrower; *provided*, that such Liens (i) secure Indebtedness permitted under Section 6.2(b), (ii) such Liens and the Indebtedness secured thereby are incurred substantially simultaneously with the acquisition, construction or improvement of such fixed or capital assets, (iii) such Liens do not at any time encumber any Property other than the Property financed by such Indebtedness and (iv) the amount of Indebtedness secured thereby is not less than 80% or more than 100% of the purchase price; and

(f)    Liens created pursuant to the Security Documents.

**6.4    Fundamental Changes**.  Enter into any merger, consolidation, restructuring or reorganization, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), Dispose of all or substantially all of its Property or business or amend, modify or otherwise change its name, jurisdiction of organization, organizational identification number or FEIN.

**6.5    Disposition of Property**.  Dispose of any of its Property (including, without limitation, receivables and leasehold interests and any Capital Stock of Borrower), whether now owned or hereafter acquired, to any Person, except:

(a)    the Disposition of assets for which Borrower receives consideration at the time of such Disposition at least equal to the fair market value of such assets and 90% of such consideration is in the form of cash; *provided*, that the requirements of Section 2.7(b) are complied with in connection therewith; and

(b)    any Recovery Event; *provided*, that the requirements of Section 2.7(b) are complied with in connection therewith.

**6.6    Restricted Payments**.  Declare or pay any dividend on, or make any payment or distribution on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement, conversion into or other acquisition of, any Capital Stock of Borrower, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or Property or in obligations of Borrower, or enter into any derivatives or other transaction with any financial institution, commodities or stock exchange or clearinghouse (a "***Derivatives Counterparty***") obligating Borrower to make payments to such Derivatives Counterparty as a result of any change in market value of any such Capital Stock or make or offer to make any optional or voluntary payments, prepayment, repurchase or redemption or,

otherwise voluntarily or optionally defease any Indebtedness of Borrower subordinated to the
Obligations or make any payment or prepayment of principal, premium (if any), interest, fees
(including fees to obtain any waiver or consent) or other charges on, or redemption, purchase,
retirement, defeasance, sinking fund or similar payment with respect to, any Indebtedness of Borrower
(excluding payments on account of the Obligations) (collectively, "*Restricted Payments*"), except that
Borrower may make a distribution to Parent on the Tax Distribution Date equal to the Tax Distribution
Amount; *provided, however*, that such Restricted Payments shall not be permitted if a Default or Event
of Default shall have occurred and be continuing at the date of declaration or payment thereof or would
result therefrom.

**6.7   Capital Expenditures**. Make or commit to make any Capital Expenditure, except for
(a) Capital Expenditures made in the ordinary course of business, *provided, however*, the aggregate
amount of all such Capital Expenditures in any six month period excluding expenditures for Rig
Construction Costs, repair and maintenance and the replacement of drillpipe) shall not exceed
$1,500,000, (b) Capital Expenditures made with the portion of any Reinvestment Deferred Amount to
acquire or repair assets owned by Borrower of the same type as those subject to such Recovery Event
or equipment or real property owned by and useful in the business of the Loan parties and (c) Capital
Expenditures with respect to the Rig Construction which are reasonably necessary in order to render
the Rigs suitable for commercial service under the terms of a daywork drilling contract.

**6.8   Investments**. Make any advance, loan, extension of credit (by way of guaranty or
otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other
debt securities of, or any assets constituting an ongoing business from, or make any other investment
in, any other Person (all of the foregoing, "*Investments*"), except:

(a)   extensions of trade credit in the ordinary course of business;

(b)   investments in Cash Equivalents;

(c)   Investments in assets useful in Borrower's business made by Borrower with the
portion of any Reinvestment Deferred Amount to acquire or repair assets owned by Borrower
of the same type as those subject to such Recovery Event or equipment or real property owned
by and useful in the business of Borrower;

(d)   Investments received by Borrower in connection with workouts with, or
bankruptcy, insolvency or other similar proceedings with respect to, customers, working
interest owners, other industry partners or any other Person.

**6.9   New Subsidiaries**. Acquire, form, incorporate or organize any Subsidiary.

**6.10   Transactions with Affiliates**. Enter into any transaction, including, without limitation,
any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any
management, advisory or similar fees, with any Affiliate unless such transaction (a) is otherwise
permitted under this Agreement, (b) is in the ordinary course of business of Borrower, (c) is upon fair
and reasonable terms no less favorable to Borrower, than it would obtain in a comparable arm's length
transaction with a Person that is not an Affiliate, and (d) does not involve or contemplate payments by
any Loan Party exceeding $500,000 in the aggregate during any 12-month period.

**6.11    Sales and Leasebacks.**  Enter into any arrangement with any Person providing for the leasing by Borrower, of real or personal property which has been or is to be sold or transferred by Borrower to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such Property or rental obligations of Borrower.

**6.12    Negative Pledge Clauses.**  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of Borrower to create, incur, assume or suffer to exist any Lien upon any of their Property or revenues, whether now owned or hereafter acquired, to secure the Obligations other than this Agreement, the other Loan Documents and any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby).

**6.13    Lines of Business.**  Enter into any business, either directly or indirectly, except for those businesses in which Borrower is engaged on the Closing Date of this Agreement or that are reasonably related thereto.

**6.14    Modification of Constituent Documents.**  Amend, modify or otherwise change, any Constitutive Document, including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it, with respect to any of its Capital Stock (including any shareholders' agreement), or enter into any new agreement with respect to any of its Capital Stock, except any such amendments, modifications or changes or any such new agreements or arrangements that do not adversely effect any right, privilege or interest of the Administrative Agent or the Lenders under the Loan Documents or in the Collateral.

**6.15    Hedging Agreements.**  Enter into any Hedging Agreement other than Hedging Agreements entered into by Borrower in the ordinary course of business, limited to the amount of the underlying exposure and not for speculative purposes, to protect against changes in interest rates or commodity prices.

**6.16    Changes in Fiscal Periods.**  Permit the Fiscal Year of Borrower to end on a day other than December 31 or change Borrower's method of determining its Fiscal Year.

**6.17    Use of Proceeds.**  Use or permit the use of all or any portion of the proceeds of any Loan for any purpose other than in order to fund Rig Construction Costs and for other general working capital purposes.

**6.18    New Bank Accounts.**  Open or otherwise establish any bank account (other than the bank accounts listed on Schedule 3.26) in the name or otherwise for the benefit of Borrower unless the Administrative Agent shall have received a deposit account control agreement, in form and substance satisfactory to the Administrative Agent in its sole discretion, executed and delivered by Borrower and the bank or other financial institution at which such account is maintained.

**6.19    Storage of the Rigs.**  Store or permit any Rigs to remain at any location other than on real property to which Borrower has title in fee simple unless the Administrative Agent shall have received a Bailee's Agreement duly executed and delivered by the owner of such location.

**6.20    Certain Transactions.**  After the Closing Date, permit any Affiliate (other than any Loan Party) to (i) enter into any new daywork drilling contract or other agreement for the utilization of land-based drilling rigs with any Person party to a Daywork Drilling Contract (a "*Customer*") that

54

contains terms or conditions more favorable to such Affiliate than those provided by the Customer to the Loan Parties unless the Customer consents to an amendment of the applicable Daywork Drilling Contract in order to provide such more favorable terms and conditions to the Loan Parties, (ii) enter into any loan with, make any promissory note to or otherwise borrow money from any Customer unless the terms of such loan, note or other Indebtedness provide that, the lenders under such loan, note or other Indebtedness shall provide the Lenders (A) 30 days' prior written notice of any sale, assignment or participation of such loan, note or other Indebtedness or any interest therein and (B) written notice of the occurrence of any default or event of default under such loan, note or other Indebtedness and, in each case, (1) the Lenders shall have the right, upon not less than five Business Days' written notice (the "*Option Period*") to the lenders thereof, to purchase such loan, note or other Indebtedness at a price equal to the principal amount thereof then outstanding plus the accrued but unpaid interest thereon and (2) the lenders under such loan, note or other Indebtedness shall not cause or otherwise permit acceleration of the repayment of such Indebtedness or otherwise exercise any remedies with respect to any default or event of default under such Indebtedness prior to the expiration of the Option Period and (iii) enter into any agreement which provides any Person with the right to set off or otherwise net any obligation owed by such Affiliate to such Person, on the one hand, against any obligation owed by such Person to any Loan Party, on the other.

      **6.21   Daywork Drilling Contracts**.  Enter into any daywork drilling contract or similar agreement that does not constitute a Daywork Drilling Contract.

      **6.22   Post-Closing Deliveries**.  Fail to deliver to the Administrative Agent each item set forth in Schedule 6.22, in form and substance reasonably satisfactory to the Administrative Agent and together with each certificate or other document ancillary thereto and reasonably requested by the Administrative Agent and (x) within the periods set forth opposite each such item or action on such Schedule and (y) unless otherwise agreed by the Administrative Agent in respect of any such item or action.

# ARTICLE VII
## EVENTS OF DEFAULT

      If any of the following events shall occur and be continuing:

      (a)     Borrower shall fail to pay when due and payable or when declared due and payable, including without limitation, pursuant to Section 2.6 or Section 2.7, all or any portion of the Obligations (whether of principal, interest, fees and charges due to the Lenders or other amounts constituting Obligations); or

      (b)     Any representation or warranty made or deemed made by either Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made or furnished; or

      (c)     Either Loan Party shall default in the observance or performance of any agreement contained in Sections 5.4, 5.5(a), 5.6(b), (c), (d) and (e), 5.7, 5.8, 5.9 or Article VI,

or in Section 5 of the Security Agreement or (ii) an "*Event of Default*" under and as defined in any Security Document shall have occurred and be continuing; or

(d)     Either Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Article VII), and such default shall continue unremedied for a period of 20 days; or

(e)     Borrower shall (i) default in making any payment of any principal of any Indebtedness (including, without limitation, any Guarantee Obligation, but excluding the Loans) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or to become subject to or mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; *provided*, that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate $100,000; or

(f)     (i) Either Loan Party shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or such Loan Party shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against either Loan Party any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 30 days; or (iii) there shall be commenced against either Loan Party any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against a material portion of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 30 days from the entry thereof; or (iv) either Loan Party shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) either Loan Party shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(g)     Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Benefit Plan, (ii) any "accumulated

funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Benefit Plan, or any Lien in favor of the PBGC or a Benefit Plan shall arise on the assets of either Loan Party or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Required Lenders, likely to result in the termination of such Benefit Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) either Loan Party or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders shall be likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Benefit Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could, in the sole reasonable judgment of the Required Lenders, reasonably be expected to have a Material Adverse Effect; or

(h)    One or more judgments or decrees shall be entered against either Loan Party involving, for the Loan Parties taken together, a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $50,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

(i)    Any of the Security Documents shall cease, for any reason (other than by reason of the express release thereof pursuant to Section 9.15), to be in full force and effect, or either Loan Party or any Affiliate of either Loan Party shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(j)    Any Change of Control shall occur; or

(k)    There shall occur a Material Adverse Change or any event or circumstances which would have a Material Adverse Effect; or

(l)    If either Loan Party is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business affairs; or

(m)    Any provision of any Loan Document shall at any time for any reason be declared to be null and void, or the validity or enforceability thereof shall be contested by either Loan Party, or a proceeding shall be commenced by either Loan Party or by any Governmental Authority having jurisdiction over either Loan Party, seeking to establish the invalidity or unenforceability thereof, or either Loan Party shall deny that either Loan Party has any liability or obligation purported to be created under any Loan Document; or

(n)    Any Daywork Drilling Contract shall be terminated or cancelled prior to the scheduled completion date therefor; or

(o)    Borrower shall make or commit to make any Capital Expenditure in any six month period which individually or together with all other Capital Expenditures in such six-

month period exceeds 110% of the amount permitted by Section 6.7(a) and that is not permitted
by Section 6.7(b);

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of
subsection (f) above with respect to Borrower, automatically the Commitments shall immediately
terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under
this Agreement and the other Loan Documents shall immediately become due and payable, and (B) if
such event is any other Event of Default, with the consent of the Required Lenders, the Administrative
Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to
Borrower, declare that all or any portion of the Commitments be terminated, whereupon the obligation
of each Lender to make any Loan shall immediately terminate, or the Loans hereunder (with accrued
interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to
be due and payable forthwith, whereupon the same shall immediately become due and payable.

## ARTICLE VIII
## THE AGENTS

8.1    **Appointment**. Each Lender hereby irrevocably designates and appoints the Agents as
the agents of such Lender under this Agreement and the other Loan Documents, and each Lender
irrevocably authorizes each Agent, in such capacity, to take such action on its behalf under the
provisions of this Agreement and the other Loan Documents and to exercise such powers and perform
such duties as are expressly delegated to such Agent by the terms of this Agreement and the other Loan
Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any
provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or
responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender,
and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into
this Agreement or any other Loan Document or otherwise exist against any Agent.

8.2    **Delegation of Duties**. Each Agent may execute any of its duties under this Agreement
and the other Loan Documents by or through agents or attorneys in fact and shall be entitled to advice
of counsel concerning all matters pertaining to such duties. No Agent shall be responsible for the
negligence or misconduct of any agents or attorneys-in fact selected by it with reasonable care.

8.3    **Exculpatory Provisions**. Neither any Agent nor any of its officers, directors,
employees, agents, attorneys in fact or Affiliates shall be (i) liable for any action lawfully taken or
omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan
Document (except to the extent that any of the foregoing are found by a final and nonappealable
decision of a court of competent jurisdiction to have resulted from its or such Person's own gross
negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any
recitals, statements, representations or warranties made by either Loan Party or any officer thereof
contained in this Agreement or any other Loan Document or in any certificate, report, statement or
other document referred to or provided for in, or received by the Agents under or in connection with,
this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness,
enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of either
Loan Party to perform its obligations hereunder or thereunder. The Agents shall not be under any
obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the
agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect
the properties, books or records of either Loan Party.

58

**8.4    Reliance by Agents**.  Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Loan Parties), independent accountants and other experts selected by such Agent.  The Agents may deem and treat the payee of any Note as the owner thereof for all purposes unless such Note shall have been transferred in accordance with Section 9.6 and all actions required by such Section in connection with such transfer shall have been taken.  Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

**8.5    Notice of Default**.  No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless such Agent shall have received notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent shall receive such a notice of default, the Administrative Agent shall give notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement); *provided* that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

**8.6    Non Reliance on Agents and Other Lenders**.  Each Lender expressly acknowledges that neither any of the Agents nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of either Loan Party or any Affiliate of either Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender.  Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of Borrower and its Affiliates and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of Borrower and its Affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by

59

the Administrative Agent hereunder, no Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of either Loan Party or any Affiliate of a Loan Party that may come into the possession of such Agent or any of its officers, directors, employees, agents, attorneys in fact or Affiliates.

       **8.7**    **Indemnification**. The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by Borrower and without limiting the obligation of Borrower to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section 8.7 (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), for, and to save each Agent harmless from and against, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever including attorneys' fees and consultants' fees that may at any time (including, without limitation, at any time following the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing, including, without limitation, liability under Environmental Laws; *provided* that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct. The agreements in this Section 8.7 shall survive the payment of the Loans and all other amounts payable hereunder.

       **8.8**    **Agent in Its Individual Capacity**. Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with either Loan Party as though such Agent were not an Agent. With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms *"Lender"* and *"Lenders"* shall include each Agent in its individual capacity.

       **8.9**    **Successor Administrative Agent**. The Administrative Agent may resign as Administrative Agent upon 10 days' notice to the Lenders and Borrower. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default with respect to Borrower shall have occurred and be continuing) be subject to approval by Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term *"Administrative Agent"* shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that is 10 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders

appoint a successor agent as provided for above. The Syndication Agent may, at any time, by notice to the Lenders and the Administrative Agent, resign as Syndication Agent hereunder, whereupon the duties, rights, obligations and responsibilities of the Syndication Agent hereunder shall automatically be assumed by, and inure to the benefit of, the Administrative Agent, without any further act by the Syndication Agent, the Administrative Agent or any Lender. After any retiring Agent's resignation as Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

**8.10   Authorization to Release Liens and Guarantees**. The Administrative Agent is hereby irrevocably authorized by each of the Lenders to effect any release of Liens or guarantee obligations contemplated by Section 9.15.

**8.11   The Arranger; the Syndication Agent**. Neither the Arranger nor the Syndication Agent, in their respective capacities as such, shall have any duties or responsibilities, and shall incur any liability, under this Agreement and the other Loan Documents.

## ARTICLE IX
## MISCELLANEOUS

**9.1   Amendments and Waivers**. Neither this Agreement or any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 9.1. The Required Lenders and each Loan Party to the relevant Loan Document may, or (with the written consent of the Required Lenders) the Agents and each Loan Party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents (including amendments and restatements hereof or thereof) for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as may be specified in the instrument of waiver, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; *provided, however*, that no such waiver and no such amendment, supplement or modification shall:

(a)      forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder or extend the scheduled date of any payment or prepayment thereof, or reduce the amount of any such payment or prepayment or increase the amount or extend the expiration date of any Commitment of any Lender, in each case without the consent of each Lender directly affected thereby;

(b)      amend, modify or waive any provision of this Section 9.1 or reduce the percentage specified in the definition of Required Lenders, consent to the assignment or transfer by Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release all Liens created pursuant to the Security Documents or contractually subordinate such Liens, in each case without the consent of all Lenders;

(c)      reduce the percentage specified in the definition of Required Lenders without the written consent of all Lenders;

(d)      amend, modify or waive any provision of Article VIII without the consent of any Agent directly affected thereby;

(e)      amend, modify or waive any provision of Section 2.9 without the consent of each Lender directly affected thereby; or

(f)      amend, modify or waive any provision of Section 6.5 without the consent of all of the Lenders.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Agents and all future holders of the Loans.  In the case of any waiver, the Loan Parties, the Lenders and the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.  Any such waiver, amendment, supplement or modification shall be effected by a written instrument signed by the parties required to sign pursuant to the foregoing provisions of this Section 9.1; *provided*, that delivery of an executed signature page of any such instrument by facsimile transmission shall be effective as delivery of a manually executed counterpart thereof.

9.2    **Notices**.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or, in the case of telecopy notice, when received, or three Business Days after being deposited in the mail, postage prepaid, addressed (a) to Borrower or Parent at the address set forth below, (b) in the case of the Agents, to the Administrative Agent at the address set forth below, (c) in the case of the Lenders, as set forth in an administrative questionnaire delivered to the Administrative Agent or on Schedule I to the Lender Addendum to which such Lender is a party or, in the case of a Lender which becomes a party to this Agreement pursuant to an Assignment and Acceptance, in such Assignment and Acceptance or (d) in the case of any party, to such other address as such party may hereafter notify to the other parties hereto:

| | |
|---|---|
| Borrower: | Latshaw Drilling Company, LLC |
| | P.O. Box 691017 |
| | Tulsa, Oklahoma  74169 |
| | Attention:     Trent B. Latshaw, President |
| | Facsimile:     (918) 355-4392 |
| | |
| Parent: | Latshaw Drilling & Exploration Company |
| | P.O. Box 691017 |
| | Tulsa, Oklahoma  74169 |
| | Attention:     Trent B. Latshaw, President |
| | Facsimile:     (918) 355-4392 |
| | |
| With a copy to: | Ewing & Jones, PLLC |
| | 6363 Woodway, Suite 1000 |
| | Houston, Texas  77057 |
| | Attention:     J. Randolph Ewing |
| | Facsimile:     (713) 590-9601 |

| | |
|---|---|
| The Administrative Agent: | Lehman Commercial Paper Inc. |
| | 745 Seventh Avenue |
| | New York, New York  10019 |
| | Attention:      Michelle Rosolinsky |
| | Facsimile:      (212) 526-8275 |
| | Telephone:     (646) 758-5015 |
| With a copy to: | Lehman Brothers Inc. |
| | 600 Travis Street, Suite 7200 |
| | Houston, Texas  77002 |
| | Attention:      J. Robert Chambers |
| | Facsimile:      (713) 236-3912 |
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP |
| | 1111 Louisiana Street, 44th Floor |
| | Houston, Texas  77002 |
| | Attention:      J. Michael Chambers |
| | Facsimile:      (713) 236-0822 |

*provided* that any notice, request or demand to or upon any Agent or any Lender shall not be effective until received.

   **9.3    No Waiver; Cumulative Remedies**.  No failure to exercise and no delay in exercising, on the part of  any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

   **9.4    Survival of Representations and Warranties**.  All representations and warranties made herein, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

   **9.5    Payment of Expenses**.  Borrower agrees (a) to pay or reimburse the Agents, the Arranger and each Lender for all of their respective out-of-pocket costs and expenses incurred in connection with the syndication of the Loans (other than fees payable to syndicate members) and the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable fees and disbursements and other charges of counsel to the Administrative Agent and the charges of Intralinks, (b) to pay or reimburse each Lender and the Agents for all their reasonable out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith, including, without limitation, the reasonable fees and disbursements of counsel to each Lender and of counsel to the Agents, (c) to pay,

indemnify, or reimburse each Lender and the Agents for, and hold each Lender and the Agents harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify or reimburse each Lender, each Agent, the Arranger, their respective Affiliates, and their respective officers, directors, trustees, employees, advisors, agents and controlling persons (each, an "*Indemnitee*") for, and hold each Indemnitee harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including, without limitation, any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the ownership or operations of the Loan Parties or any of the Properties and the fees and disbursements and other charges of legal counsel in connection with claims, actions or proceedings by any Indemnitee against them hereunder (all the foregoing in this clause (d), collectively, the "*Indemnified Liabilities*"), *provided*, that Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee. No Indemnitee shall be liable for any damages arising from the use by unauthorized persons of Information or other materials sent through electronic, telecommunications or other information transmission systems that are intercepted by such persons or for any special, indirect, consequential or punitive damages in connection with the Loans. Without limiting the foregoing, and to the extent permitted by applicable law, the Loan Parties agree not to assert, and hereby waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section 9.5 shall be payable not later than 30 days after written demand therefor. Statements payable by Borrower pursuant to this Section 9.5 shall be submitted to the President of Borrower, at the address of Borrower set forth in Section 9.2, or to such other Person or address as may be hereafter designated by Borrower in a notice to the Administrative Agent. The agreements in this Section 9.5 shall survive repayment of the Loans and all other amounts payable hereunder.

**9.6    Successors and Assigns; Participations and Assignments**.

(a)    This Agreement shall be binding upon and inure to the benefit of, Borrower, Parent, the Lenders, the Agents, all future holders of the Loans and their respective successors and assigns, except that Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Agents and each Lender.

(b)    Any Lender may, without the consent of Borrower, in accordance with applicable law, at any time sell to one or more banks, financial institutions or other entities (each, a "*Participant*") participating interests in any Loan owing to such Lender, any Commitment of such Lender or any other interest of such Lender hereunder and under the other Loan Documents. In the event of any such sale by a Lender of a participating interest to a

Participant, such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Lender shall remain solely responsible for the performance thereof, such Lender shall remain the holder of any such Loan for all purposes under this Agreement and the other Loan Documents, and Borrower and the Agents shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents. In no event shall any Participant under any such participation have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by either Loan Party therefrom, except to the extent that such amendment, waiver or consent would require the consent of all Lenders pursuant to Section 9.1. Borrower agrees that if amounts outstanding under this Agreement and the Loans are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall, to the maximum extent permitted by applicable law, be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement, *provided* that, in purchasing such participating interest, such Participant shall be deemed to have agreed to share with the Lenders the proceeds thereof as provided in Section 9.7(a) as fully as if such Participant were a Lender hereunder. Borrower also agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.12 and 2.13 with respect to its participation in the Commitments and the Loans outstanding from time to time as if such Participant were a Lender; provided that, in the case of Section 2.12, such Participant shall have complied with the requirements of said Section.

(c)    Any Lender (an "*Assignor*") may, in accordance with applicable law and upon written notice to the Administrative Agent, at any time and from time to time assign to any Lender or any Affiliate, Related Fund or Control Investment Affiliate thereof or, with the Administrative Agent's consent (which, in each case, shall not be unreasonably withheld or delayed) (*provided* that no such consent need be obtained by any Lender for a period of 180 days following the Closing Date), to an additional bank, financial institution or other entity (an "*Assignee*") all or any part of its rights and obligations under this Agreement pursuant to an Assignment and Acceptance, substantially in the form of Exhibit J (an "*Assignment and Acceptance*"), executed by such Assignee and such Assignor (and, where the consent of the Agents is required pursuant to the foregoing provisions, by the Agent) and delivered to the Administrative Agent for its acceptance and recording in the Register; *provided* that (i) each assignment to an Assignee shall include an assignment of not less than $5,000,000 in aggregate principal amount and (except such minimum amount shall not apply to an assignment by a Lender to (x) an Affiliate, a Related Fund or Control Investment Affiliate of such Lender or (y) a group of new Lenders, each of whom is an Affiliate, Related Fund or Control Investment Affiliate of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least the lesser of (I) $5,000,000 and (II) the remainder of such Lender's Commitment) and (ii) no written notice to or consent of the Administrative Agent shall be required (1) in connection with any assignment by a Lender to an Affiliate, Related Fund or a Control Investment Affiliate of such Lender or (2) if such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of such Lender. Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Assignment and Acceptance, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Acceptance, have the rights and obligations of a Lender hereunder with

Commitments and/or Loans as set forth therein, and (y) the Assignor thereunder shall, to the extent provided in such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of an Assignor's rights and obligations under this Agreement, such Assignor shall cease to be a party hereto, except as to Sections 2.10, 2.11 2.12 and 9.5 in respect of the period prior to such effective date). For purposes of the minimum assignment amounts set forth in this paragraph, multiple assignments by two or more Affiliates, Related Funds or Control Investment Affiliates shall be aggregated. Notwithstanding anything to the contrary contained in this Section 9.6(c), a Lender may assign any or all of its rights under the Loan Documents to an Affiliate, Related Fund or a Control Investment Affiliate of such Lender without delivering an Assignment and Acceptance to the Administrative Agent or to any other Person (a "*Related Party Assignment*"); *provided, however,* that (I) the Borrower and the Administrative Agent may continue to deal solely and directly with such assigning Lender until an Assignment and Acceptance has been delivered to the Administrative Agent for recordation on the Register, (II) the failure of such assigning Lender to deliver an Assignment and Acceptance to the Administrative Agent shall not affect the legality, validity, or binding effect of such assignment, and (III) an Assignment and Acceptance between the assigning Lender and an Affiliate, Related Fund or Control Investment Affiliate of such Lender shall be effective as of the date specified in such Assignment and Acceptance.

      (d)      The Administrative Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain at its address referred to in Section 9.2 a copy of each Assignment and Acceptance delivered to it and a register (the "*Register*") for the recordation of the names and addresses of the Lenders and the Commitments of, and principal amount of the Loans (and stated interest thereon) (the "*Registered Loans*") owing to, each Lender from time to time. Subject to the last sentence of this Section 9.6(d), the entries in the Register shall be conclusive, in the absence of manifest error, and Borrower, each Agent and the Lenders shall treat each Person whose name is recorded in the Register as the owner of the Loans and any Notes evidencing such Loans recorded therein for all purposes of this Agreement. Any assignment of any Loan, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register or Related Party Register (and each Note shall expressly so provide). Any assignment or transfer of all or part of a Loan evidenced by a Note shall be registered on the Register or Related Party Register only upon surrender for registration of assignment or transfer of the Note evidencing such Loan, accompanied by a duly executed Assignment and Acceptance; thereupon one or more new Notes in the same aggregate principal amount shall be issued to the designated Assignee, and the old Notes shall be returned by the Administrative Agent to Borrower marked "canceled". The Register shall be available for inspection by Borrower or any Lender (with respect to any entry relating to such Lender's Loans) at any reasonable time and from time to time upon reasonable prior notice. In the case of an assignment pursuant to the last sentence of Section 9.6(c) as to which an Assignment and Acceptance is not delivered to the Administrative Agent, the assigning Lender shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register (the "*Related Party Register*") comparable to the Register on behalf of the Borrower. Any such Related Party Register shall be available for inspection by the Borrower, any Agent and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)    In the event that any Lender sells participations in a Registered Loan, such Lender shall maintain a register for this purpose as a non-fiduciary agent of the Borrower on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "***Participant Register***"). A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. Any such Participant Register shall be available for inspection by the Borrower, any Agent and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(f)    Upon its receipt of an Assignment and Acceptance executed by an Assignor and an Assignee (and, in any case where the consent of any other Person is required by Section 9.6(c), by each such other Person) together with payment to the Administrative Agent of a registration and processing fee of $3,500 (treating multiple, simultaneous assignments by or to two or more Affiliates, Related Funds or Control Investment Affiliates as a single assignment) (except that no such registration and processing fee shall be payable (i) in connection with an assignment by or to a Lehman Entity or (ii) in the case of an Assignee which is already a Lender or is an Affiliate, Related Fund or Control Investment Affiliate of a Lender or a Person under common management with a Lender), the Administrative Agent shall (A) promptly accept such Assignment and Acceptance and (B) on the effective date determined pursuant thereto record the information contained therein in the Register and give notice of such acceptance and recordation to Borrower. On or prior to such effective date, Borrower, at its own expense, upon request, shall execute and deliver to the Administrative Agent (in exchange for the applicable Notes of the assigning Lender) a new Note or Notes to the order of such Assignee in an amount equal to the applicable Loans assumed or acquired by it pursuant to such Assignment and Acceptance and, if the Assignor has retained any Loans, as the case may be, upon request, new Notes to the order of the Assignor in an amount equal to the Loans retained by it hereunder. Such new Note or Notes shall be dated the Closing Date and shall otherwise be in the form of the Note or Notes replaced thereby.

(g)    For avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this Section 9.6 concerning assignments of Loans and Notes relate only to absolute assignments and that such provisions do not prohibit assignments creating security interests in Loans and Notes, including, without limitation, any pledge or assignment by a Lender of any Loan or Note to any Federal Reserve Bank or any other Person in accordance with applicable law.

(h)    Notwithstanding anything to the contrary contained herein, any Lender (a "***Granting Lender***") may grant to a special purpose funding vehicle (an "***SPC***"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and Borrower, the option to provide to Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC hereunder shall utilize the Commitment of the

Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any state thereof. In addition, notwithstanding anything to the contrary in this Section 9.6(h), any SPC may (A) with notice to, but without the prior written consent of, Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender, or with the prior written consent of Borrower and the Administrative Agent (which consent shall not be unreasonably withheld) to any financial institutions providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans, and (B) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC; *provided* that non-public information with respect to Borrower may be disclosed only with Borrower's consent which will not be unreasonably withheld. This Section 9.6(h) may not be amended without the written consent of any SPC with Loans outstanding at the time of such proposed amendment.

**9.7    Adjustments; Set off**.

(a)    Except to the extent that this Agreement provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "***Benefited Lender***") shall at any time receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set off, pursuant to events or proceedings of the nature referred to in Article VII(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Obligations, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Obligations, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; *provided, however,* that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)    In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to Borrower or Parent any such notice being expressly waived by such parties to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower or Parent, hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of Borrower or Parent, as the case

68

may be. Each Lender agrees promptly to notify Borrower and the Administrative Agent after any such setoff and application made by such Lender, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

**9.8    Counterparts**. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement or of a Lender Addendum by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with Borrower and the Administrative Agent.

**9.9    Severability**. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**9.10    Integration**. This Agreement and the other Loan Documents represent the entire agreement of Parent, Borrower, the Agents, the Arranger and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Arranger, any Agent or any Lender relative to subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

**9.11    GOVERNING LAW**. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

**9.12    Submission To Jurisdiction; Waivers**. Each of Parent and Borrower hereby knowingly, voluntarily and intentionally, irrevocably and unconditionally:

(a)    submits for itself and its Property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party (whether for claims sounding in contract or in tort), or for recognition and enforcement of any judgment in respect thereof, to the nonexclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to Parent or Borrower at its address set forth in Section 9.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

69

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)    WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN THIS SECTION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.

**9.13    Acknowledgments**. Each of Parent and Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    neither the Arranger, any Agent nor any Lender has any fiduciary relationship with or duty to Parent or Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Arranger, the Agents and the Lenders, on the one hand, and Parent and Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Arranger, the Agents and the Lenders or among Parent and Borrower and the Lenders.

**9.14    Confidentiality**. Each of the Agents and the Lenders agrees to keep confidential all non-public information provided to it by either Loan Party pursuant to this Agreement that is designated by such Loan Party as confidential; *provided* that nothing herein shall prevent any Agent or any Lender from disclosing any such information (a) to the Arranger, any Agent, any other Lender or any Affiliate of any thereof, (b) to any Participant or Assignee (each, a "*Transferee*") or prospective Transferee that agrees to comply with the provisions of this Section or substantially equivalent provisions, (c) to any of its employees, directors, agents, attorneys, accountants and other professional advisors, (d) to any financial institution that is a direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section), (e) upon the request or demand of any Governmental Authority having jurisdiction over it, (f) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (g) in connection with any litigation or similar proceeding, (h) that has been publicly disclosed other than in breach of this Section, (i) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized statistical organization that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (j) in connection with the exercise of any remedy hereunder or under any other Loan Document.  Notwithstanding anything in this Agreement to the contrary, the Agents and each Lender may disclose without limitation of any kind, any information with respect to the "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Agents or such Lender relating to such tax treatment and tax structure; *provided* that, with respect to any document or similar item that in either case contains information concerning the tax treatment or tax structure of the transaction as well as other information, this sentence shall only apply to such portions of the

document or similar item that relate to the tax treatment or tax structure of the Loans and transactions contemplated hereby.

### 9.15    Release of Collateral and Guarantee Obligations.

(a)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of Borrower in connection with any Disposition of Property permitted by the Loan Documents, the Administrative Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to release its security interest in any Collateral being Disposed of in such Disposition, and to release any guarantee obligations under any Loan Document of any Person being Disposed of in such Disposition, to the extent necessary to permit consummation of such Disposition in accordance with the Loan Documents.

(b)    Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations have been paid in full, all Commitments have terminated or expired, upon request of Borrower, the Administrative Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to release its security interest in all Collateral, and to release all guarantee obligations under any Loan Document. Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or any substantial part of its property, or otherwise, all as though such payment had not been made.

9.16    Accounting Changes. In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating Borrower's financial condition shall be the same after such Accounting Change as if such Accounting Change had not been made. Until such time as such an amendment shall have been executed and delivered by Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred. "*Accounting Change*" refers to any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the Securities and Exchange Commission.

9.17    Delivery of Lender Addenda. Each initial Lender shall become a party to this Agreement by delivering to the Administrative Agent a Lender Addendum duly executed by such Lender, Borrower and the Administrative Agent.

9.18    WAIVERS OF JURY TRIAL. BORROWER, PARENT, THE AGENTS AND THE LENDERS HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND

71

FOR ANY COUNTERCLAIM THEREIN (IN EACH CASE, WHETHER FOR CLAIMS
SOUNDING IN CONTRACT OR IN TORT).

### 9.19   Amendment and Restatement.

(a)     From and after the Closing Date, (i) this Agreement amends and restates in its
entirety the Existing Credit Agreement; (ii) the Notes issued under this Agreement, if any,
amend and restate the "Notes" (as defined in the Existing Credit Agreement) issued under the
Existing Credit Agreement; and (iii) the Existing Credit Agreement shall thereafter be of no
further force and effect except to evidence (A) the incurrence by any Loan Party of the Existing
Loans and other "Obligations" under and as defined therein (whether or not such "Obligations"
are contingent as of the Closing Date), (B) the representations and warranties made by any
Loan Party prior to the Closing Date and (C) any action or omission performed or required to
be performed pursuant to the Existing Credit Agreement prior to the Closing Date (including
any failure, prior to the Closing Date, to comply with the covenants contained in such Existing
Credit Agreement).  The amendments and restatements set forth herein shall not cure any
breach thereof or any "Default" or "Event of Default" under and as defined in the Existing
Credit Agreement existing prior to the Closing Date.  This Agreement and the Notes, if any,
issued do not constitute and shall not be construed to evidence a novation of or a payment and
readvance of any of the "Obligations" heretofore outstanding under the Existing Credit
Agreement, it being the intention of the parties hereto that this Agreement provide for the terms
and conditions of, and the Notes issued, if any, evidence, at such time, the same "Obligations"
as were then outstanding under the Existing Credit Agreement.  Each Lender shall surrender
the "Notes" outstanding on the Effective Date issued to it under the Existing Credit Agreement.

(b)     The terms and conditions of this Agreement and the Administrative Agent's and
the Lenders' rights and remedies under this Agreement and the other Loan Documents shall
apply to all of the "Obligations" (as defined in the Existing Credit Agreement) incurred under
the Existing Credit Agreement and the Notes issued thereunder.

(c)     Borrower reaffirms the Liens granted pursuant to the Existing Loan Documents
to the Administrative Agent for the benefit of the Lenders, which Liens shall continue in full
force and effect during the term of this Agreement and any renewals or extensions thereof and
shall continue to secure the Obligations hereunder.

(d)     From and after the Closing Date, (i) all references to the Existing Credit
Agreement (or to any amendment, supplement, modification or amendment and restatement
thereof) in the Loan Documents (other than this Agreement) shall be deemed to refer to the
Existing Credit Agreement as amended and restated hereby, (ii) all references to any section (or
subsection) of the Existing Credit Agreement in any Loan Document (but not herein) shall be
amended to become mutatis mutandis, references to the corresponding provisions of this
Agreement and (iii) except as the context otherwise provides, from or after the Closing Date,
all references to this Agreement herein (including for purposes of indemnification and
reimbursement of fees) shall be deemed to be references to the Existing Credit Agreement as
amended and restated hereby.

(e)     This amendment and restatement is limited as written and is not a consent to any
other amendment, restatement, waiver or other modification, whether or not similar, and,
except as expressly provided herein or in any other Loan Document, all terms and conditions of

the Loan Documents remain in full force and effect unless otherwise specifically amended by this Agreement or any other Loan Document.

**[The remainder of this page is intentionally left blank.]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

LATSHAW DRILLING COMPANY, LLC

By:_____

Name:    Trent B. Latshaw
Title:    President

LATSHAW DRILLING & EXPLORATION COMPANY

By:_____

Name:    Trent B. Latshaw
Title:    President

**[Signature Page to Credit Agreement]**

LEHMAN BROTHERS INC., as Arranger

By: _____

    Name:    J. Robert Chambers
    Title:     Managing Director

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent and as Syndication Agent

By: _____

    Name:    J. Robert Chambers
    Title:     Authorized Signatory

[Signature Page to Credit Agreement]

ABLECO FINANCE LLC,
as Lender

By:_____

Name: Daniel Wolf
Title: President


A3 FUNDING LP,
as Lender
By: A3 Fund Management LLC,
Its General Partner

By:_____

Name: Daniel Wolf
Title: Vice President

[Signature Page to Credit Agreement]

SCHEDULE 1

**COMMITMENTS**

| Lender | Term A Commitment | Term B Commitment |
|---|---|---|
| Lehman Commercial Paper Inc. | $41,250,000 | $33,750,000 |
| Ableco Finance LLC | $ 8,321,500 | $ 6,808,500 |
| A3 Funding L.P. | $ 5,428,500 | $ 4,441,500 |