1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555-jmp

ADV No. 08-01420 (JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC.,

        Debtor.

- - - - - - - - - - - - - - - - - - - -x

SECURITIES INVESTOR PROTECTION CORPORATION,

            Plaintiff,

        v.

LEHMAN BROTHERS, INC.

            Defendant.

- - - - - - - - - - - - - - - - - - - -x

            U.S. Bankruptcy Court

            One Bowling Green

            New York, New York


            February 25, 2010

            11:10 AM



B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    Motion for Order Approving Trustee's Allocation of Property of

3    the Estate

4

5    Motion filed by the Trustee for an Order Upholding the

6    Trustee's Determination Regarding Claim of Fifth Third

7    Structured Large Cap Plus and Expunging Objection with Respect

8    to that Determination

9

10   Joint Motion filed by the Trustee and SIPC for Entry of an

11   Order Striking Fifth Third Structured Large Cap Plus Fund's

12   January 6, 2010 Motion for Summary Judgment

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dena Page

3

1

2    A P P E A R A N C E S :

3    HUGHES HUBBARD & REED, LLP

4          Attorneys for SIPA Trustee

5          One Battery Park Plaza

6          New York, NY 10004

7

8    BY:   JAMES B. KOBAK, JR., ESQ.

9          RAMSEY CHAMIE, ESQ.

10

11

12   WEIL, GOTSHAL & MANGES, LLP

13         Attorneys for Lehman Brothers Holdings, Inc.

14         767 Fifth Avenue

15         New York, NY 101153

16

17   BY:   RICHARD P. KRASNOW, ESQ.

18

19

20

21

22

23

24

25

4

1

2    SECURITIES INVESTOR PROTECTION CORPORATION

3         Attorneys for SIPC

4         805 15th Street, N.W.

5         Suite 800

6         Washington, DC 20005

7

8    BY:   KENNETH J. CAPUTO, ESQ.

9

10

11   CLEARY GOTTLIEB STEEN & HAMILTON LLP

12        Attorneys for Barclays Capital

13        One Liberty Plaza

14        New York, NY 10006

15

16   BY:   JOEL S. MOSS, ESQ.

17

18

19   FIFTH THIRD ASSET MANAGEMENT, INC.

20        Attorneys for Fifth Third Fund

21        38 Fountain Square Plaza

22        Cincinnati, OH 45263

23

24   BY:   MATTHEW A. SWENDIMAN, ESQ.

25

5

1

2    K&L GATES LLP

3         Attorneys for Fifth Third Fund

4         1601 K Street, N.W.

5         Washington, DC 20006

6

7    BY:   RICHARD A. KIRBY, ESQ.

8          STEPHEN G. TOPETZES, ESQ.

9

10

11   K&L GATES LLP

12        Attorneys for Fifth Third Fund

13        925 Fourth Avenue

14        Suite 2900

15        Seattle, WA 98104

16

17   BY:   PHILIP M. GUESS, ESQ.

18         KYMBERLY K. EVANSON, ESQ.

19

20

21

22

23

24

25

6

1

2    MILBANK, TWEED, HADLEY & MCCLOY, LLP

3        Attorneys for LBHI Official Creditors' Committee

4        One Chase Manhattan Plaza

5        New York, NY 10005

6

7    BY:   DENNIS C. O'DONNELL, ESQ.

8        DAVID COHEN, ESQ.

9

10

11   MORGAN, LEWIS & BOCKIUS, LLP

12       101 Park Avenue

13       New York, NY 10178

14

15   BY:   HOWARD S. BELTZER, ESQ.

16       ROBERT C. MENDELSON, ESQ.

17

18

19   SALANS

20       Attorneys for Svenska Handelsbanken

21       620 Fifth Avenue

22       New York, NY 10020

23

24   BY:   CLAUDE D. MONTGOMERY, ESQ.

25

7

1

2   CHAPMAN AND CUTLER LLP

3        Attorneys for Creditor, U.S. Bank

4        111 West Monroe Street

5        Chicago, IL 60603

6

7   BY:   JAMES HEISER, ESQ. (TELEPHONICALLY)

8         FRANKLIN H. TOP, III, ESQ. (TELEPHONICALLY)

9

10

11   MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C.

12        Attorneys for Creditor, Teva Pharmaceuticals and

13           SL Green Realty

14        One Financial Center

15        Boston, MA 02111

16

17   BY:   ADRIENNE K. WALKER, ESQ. (TELEPHONICALLY)

18

19

20

21

22

23

24

25

8

1

2    STUTMAN, TREISTER & GLATT

3         Attorneys for Baupost

4         1901 Avenue of the Stars

5         12th Floor

6         Los Angeles, CA 90067

7

8    BY:   ISAAC PACHULSKI, ESQ. (TELEPHONICALLY)

9

10

11   TOBIN & TOBIN

12        Attorneys for Creditor, John S. Rosekrans

13        500 Sansome Street

14        San Francisco, CA 94111

15

16   BY:   JOHN P. CHRISTIAN, ESQ. (TELEPHONICALLY)

17

18

19

20

21

22

23

24

25

9

P R O C E E D I N G S

1

2    THE COURT:  Be seated, please.  Good morning.

3    MR. KOBAK:  Good morning, Your Honor.  James Kobak,

4    Hughes, Hubbard & Reed, LLP for the SIPA Trustee.  We have two

5    matters on the calendar this morning, Your Honor.  The first

6    one listed is the allocation motion which at this point is

7    uncontested with respect to the order that we presented.  So I

8    would propose we do that first.  And my colleague, Mr. Chamie,

9    will then handle the dispute with Fifth Third, which is the

10   other matter on the calendar.

11   THE COURT:  Fine.

12   MR. KOBAK:  Your Honor, our position on the allocation

13   motion this morning is supported by the SEC and SIPC.  The SEC

14   has actually taken a formal agency position and believes their

15   interpretation of their rules and the interaction of those

16   rules with SIPA on what constitutes customer property is

17   entitled to Chevron deference.  The other body with

18   responsibility in this area, SIPC, also agrees and points to

19   the long history of allocations of property in other SIPC

20   cases.  The basic principle behind this motion which I think

21   everyone agrees at this point is that the SEC customer

22   protection rules, the reserve account, and the segregation

23   rules, particularly are supposed to work together with SIPA and

24   its definition of customer property.  And what that means in

25   substance is just as when a broker-dealer in operation would

10

1    have to make up for a deficiency in its reserve account or

2    capital that should be segregated for customers, no matter what

3    the cause, so too the trustee in a SIPA liquidation has to

4    allocate unsegregated property to make up for a demonstrated

5    compliance deficit when appears that will be necessary to avoid

6    shortfalls in payments to customers.  Of course, if it turns

7    out there is no shortfall and there an excess, that gets

8    allocated back to the general estate to satisfy all creditors.

9         This principle is consistent with the nature of

10   broker-dealer operations, with the regulations for the

11   protection of customers and the SEC and SIPC both emphasized,

12   and it has been applied in many other SIPA cases cited in the

13   brief, including, particularly, the next largest SIPA

14   liquidation to this one, the MJK case in Minnesota with which

15   Mr. Caputo, who is here today, is quite familiar.  No one, as I

16   understand it, really objects to this principle of law.  It's

17   embodied in the 1988 amendments to SIPA which now appear as

18   Section 78-lll-4(d) which basically says that property which

19   should have been segregated or held for customers by virtue

20   of -- by operation of law or to comply with regulations is

21   deemed part of customer property, and that's the essential

22   legal principle that underlies this motion.

23        We have had disagreements and continue to have some

24   disagreements with some of the parties as to what specific

25   items actually constituted regulatory deficiencies.  We've

11

1    spent a lot of time over the last several weeks, Mr. Wiltenburg

2    and his team, particularly, sharing information, engaging in

3    dialogue with the Chapter 11 debtors, the creditors' committee

4    in their case, and several of the other objectors.  They and

5    their experts have met with our team and our expert Mr.

6    McIsaac, who's a recognized industry expert on brokerage

7    regulatory matters.  Mr. McIsaac who has submitted an

8    affidavit -- actually two affidavits -- setting forth his

9    opinion and the basis for them and as far as the items in this

10   applications are concerned, no one, as I understand it,

11   anything in that affidavit.  Mr. McIsaac is here in court today

12   and I would proffer his affidavits as a factual support for our

13   motion.  He is here today, so if any party wishes to cross-

14   examine him, we're willing to do that.

15         THE COURT:  It's unlikely that anybody will want to

16   cross-examine him in the context of an uncontested motion, but

17   let me ask if there's any objection of my receipt into evidence

18   of the affidavits that have been proffered.

19         MR. KRASNOW:  Your Honor, just briefly.  Richard

20   Krasnow, Weil, Gotshal & Manges on behalf of the Chapter 11

21   debtors.  We certainly have no objection to the affidavit being

22   submitted as a proffer.  As to those items as to which the

23   trustee's going forward, as Mr. Kobak indicated, there remains

24   some issues, questions with respect to certain of the items

25   that were covered by the motion which sought a reallocation of

12

1    approximately 4.9 billion dollars of noncustomer

2    property/customer property.  I believe that the trustee's going

3    forward on an uncontested basis with respect to items that

4    almost approximate 2.2 billion.  Therefore, as to the balance,

5    we're assuming but we'd like confirmation from Mr. Kobak that

6    they're not submitting the affidavit as a proffer with respect

7    to those remaining items.  If that's the case, we have

8    absolutely no objection to what's being proposed.

9            THE COURT:  Let's confirm your understanding.

10           MR. KOBAK:  Yes, Your Honor, that's correct, and when

11   we come back with respect to other items, we'll make a proffer

12   or offer other proof at that point.  As Mr. Krasnow correctly

13   notes, we did identify a number of potential areas as well as

14   some areas which were still under investigation and still are

15   under investigation by the trustee, and those items, depending

16   on how you value things, totaled approximately 4.9 billion

17   dollars.  As a result of this process of due diligence and

18   dialogue, we've basically agreed with everyone about four sets

19   of items that everyone agrees is proper, at this point, to

20   allocate to customer property, and I believe the best estimate

21   of the value of those items is about 2.15 billion dollars.

22           The other items, what we're going to do is continue

23   this process.  We're going to continue to meet with people,

24   have Mr. McIsaac available, see if we can't reach an agreement

25   on many of them with respect to those that we're unable to

13

1    reach agreement.  At an appropriate time, we anticipate that

2    we'll be back to Your Honor to get a decision.  We think in a

3    lot of instances, there's further factual work to be done,

4    sometimes on our side, sometimes on their side.  Frankly,

5    there's not so much extra property, unfortunately, at this time

6    that it would really make sense to try to allocate a lot of

7    other things.  So we'll come back at an appropriate time.

8        We would ask that Your Honor enter the order that we

9    submitted on Monday which is a revised order.  If you look at

10   the statement that we submitted at that time, I think you'll

11   see there are some -- if you go through the history of

12   blacklines, there are some very substantial changes that were

13   made to the initial order, which I'll get to in a minute.

14       I think it would be appropriate to have this matter

15   carried forward for the June 24th hearing date, which is one of

16   the dates we reserved for LBI customer matters at which time --

17   it would be in the nature of a status report.  I think at that

18   point, we'd kind of know where we're going, what further

19   proceedings there may be with respect to this.

20       THE COURT:  Okay, there's someone who wants to speak

21   who's behind you, but before he is recognized formally, I just

22   want to be clear on what's really happening, procedurally.

23       The allocation motion, in effect, is being resolved in

24   parts?

25       MR. KOBAK:  Yes.

14

1          THE COURT:  And today is part one, it's uncontested,

2     and the balance of approximately 4.9 billion dollars in items

3     that may lead to further agreement or may lead to ongoing

4     controversy is to be effectively adjourned, sine die --

5          MR. KOBAK:  That's correct.

6          THE COURT:  -- with the understanding that there'll be

7     a status conference on where things stand with respect to those

8     disputes on June 24th?

9          MR. KOBAK:  That's correct.  And the remaining items

10    that we've identified are 2.8 billion.  It's 2.1 billion that's

11    covered by this; it was originally 4.9.  There are some other

12    items that are under investigation, as we noted in our papers,

13    and it may be that there will be some things that will be added

14    to that 2.8 billion, if it's necessary to do so and if we have

15    that much property to allocate.

16         THE COURT:  Okay, just so it's clear.  We started with

17    4.9 billion; we're dividing it into two groups --

18         MR. KOBAK:  Right.

19         THE COURT:  -- 2.1, which is uncontested, and the

20    balance which is still subject to ongoing negotiation and

21    litigation if necessary?

22         MR. KOBAK:  That's correct, Your Honor.

23         THE COURT:  Okay.

24         MR. KOBAK:  And just if I may, briefly, the other

25    changes in the order in addition to limiting it to the four

15

1    items and the 2.1 billion dollars, we made a number of other

2    changes in broad terms, and in substance, those are that

3    there'll be no res judicata or preclusive effect or estoppel

4    effect on parties in other disputes where some of these items

5    may be in some way or another involved, such as the Barclays

6    dispute, most notably, but there are several others.

7         We also agreed with Western Bank and the other repo

8    claimants and some of the other objectors that it was premature

9    to ask the Court to actually approve a distribution in advance,

10   so we contemplate that when we're done with the allocation,

11   know where we stand with respect to customer property, and with

12   respect to the amount of customer claims and what's in dispute

13   and are preparing to make a distribution, whether partial or

14   total, we would come to Your Honor with an accounting, more or

15   less, of what we have available, what the claims are, what, if

16   anything, needs to be reserved for at that point and how we

17   propose to distribute the property.

18        We've also agreed, as I think we've always said we

19   would, that with respect to any contested claims, and the repo

20   claimants, for instance, we have a dispute with them as to

21   whether they're entitled to customer treatment or not, but

22   until that dispute is finally decided, we'll reserve for the

23   full amount of their claim so that they'll be treated, if they

24   are customers, the same way any future customers are with

25   respect to distributions.  And we do intend and are working

16

1    with the parties to bring the dispute about how at least

2    certain repo transactions should be treated for SIPA

3    proceedings on before Your Honor at the hearing on the 24th.

4         And, Your Honor, that really concludes my remarks.

5    Unless Your Honor has any questions, we would ask you to enter

6    the order that we filed on Monday afternoon which, as I've

7    said, I think all parties now agree to and will submit a copy

8    of that order at the conclusion of the hearing.

9         THE COURT:  I'm prepared to do that.  I did note that

10   there was an attorney who seems interested in making some

11   comments.  So before I say yes to what you've just said, let me

12   at least give him an opportunity to be heard.

13        MR. MOSS:  Good morning, Your Honor.  Joel Moss from

14   Cleary Gottlieb Steen & Hamilton LLP on behalf of Barclays

15   Capital.  Just to echo what Mr. Kobak said, Barclays Capital

16   does not have an objection to the relief today being granted,

17   subject, of course, to our broad reservation language in terms

18   of nothing about the motion, the order, the McIsaac

19   declaration, having res judicata or collateral estoppel effect,

20   or impairing our rights in the Rule 60 litigation or with

21   respect to Barclay's claims for undelivered assets allegedly

22   not delivered by the trustee under the APA.

23        One other point of clarification that I think all

24   parties would agree about, while the amount of aggregate

25   property that you're dealing with today is approximately 2.1

17

1    billion dollars, as I understand it, the starting point from

2    the whole deficiency calculation in terms of what a shortfall

3    was or was not, had LBI, their last 15(c)(3) calculation, as

4    having an excess in their reserve account of approximately 1.2

5    billion dollars.  I just want to make sure that the four items

6    that Mr. Kobak is dealing with, he's not saying that's dollar-

7    for-dollar shortfall because it's not -- if that's the case,

8    it's not otherwise giving credit to the fact that, you know,

9    just for Your Honor's own information, it's not giving credit

10   to the fact that LBI apparently did have an excess in their

11   calculation.  It's not really such a concern for Barclays

12   because, again, we have our reservation of rights, but in the

13   interest of completeness, I though you would want to know that.

14        THE COURT:  All right, we're throwing around a lot of

15   numbers.  Mr. Kobak, other than the reservation of rights, the

16   question seems to be whether or not the alleged shortfall does

17   or does not take into account the purported balance of

18   approximately 1.2 billion based upon what counsel said.

19        MR. KOBAK:  We don't necessarily agree that there was

20   a balance of 1.2 billion dollars or a balance of anything that

21   was excess, truly.  There were some calculations to that effect

22   by some of the LBI personnel at the end of Lehman's existence

23   before the liquidation.  There were also some calculations that

24   used much different figures.  We will be coming back to the

25   Court with respect to what we consider the core property to be

18

1   that we start with before the allocation, and as I said, before

2   we make distributions, we'll come forward with a schedule and

3   an analysis which will demonstrate what it is we think was in

4   customer property, what we're adding to it and so forth.  So I

5   would suggest any dispute about this would be appropriate at

6   that time and really isn't an issue today.  The principle today

7   is that these four items that happened to total 2.1 billion are

8   properly allocable doesn't really decide what the total amount

9   of customer property is at this point.

10          THE COURT:  Fine.  Look, this is a work-in-progress,

11  that's apparent.  And there's a lot of money involved and there

12  are a lot of financial institutions whose interest are affected

13  by the allocation judgments being made by the trustee.  The

14  matter which is before me this morning is, at this point,

15  uncontested.  I think the record's pretty clear that it is a

16  consent order.  We're not having an evidentiary hearing, and

17  I'm not making findings of fact in reference to any items that

18  may be in dispute or as to which any reservation of rights may

19  apply.

20          MR. KOBAK:  That's correct, Your Honor.

21          THE COURT:  So for that reason, I don't think I need

22  to get into the question of accounting for what was or was not

23  the right number for the reserve account, and anything that's

24  been stated on the record is just that, no more than colloquy.

25          MR. KOBAK:  Good.  Thank you, Your Honor.  Unless Your

19

1   Honor has question, I'm done.

2          THE COURT:  No, I don't, and I'm frankly very pleased

3   that the parties have been able to work so constructively

4   together to reach an agreed order, and I think that the process

5   which you have outlined which calls for ongoing consensual

6   behavior is a way to deal with this difficult issue makes a lot

7   of sense, and I'm happy to approve the order.

8          MR. KOBAK:  Thank you, Your Honor.  Mr. Chamie will

9   now present our position on the Fifth Third Fund.

10         THE COURT:  Oh, and before he does, while I say I'm

11  happy to approve the order, it's clear that I will need an

12  order.

13         MR. KOBAK:  Yeah, we will submit one at the conclusion

14  of the hearing.

15         THE COURT:  Fine.

16         MR. CHAMIE:  Good morning, Your Honor.  Ramsey Chamie

17  of Hughes, Hubbard & Reed on behalf of the SIPA trustee.

18         THE COURT:  Good morning.

19         MR. CHAMIE:  I will present for the trustee, and then

20  Mr. Caputo would like to present SIPA's view after.

21         The trustee respectfully moves for an order upholding

22  the trustee's determination and expunging the objection related

23  to the claim of Fifth Third Structured Large Cap Plus Fund.

24  The issue now before the Court is choosing the proper date to

25  value short positions held in a customer account.  The

20

1    trustee's position is that short positions are to be valued on

2    the filing date as mandated by SIPA.  This is how indebtedness

3    has to be valued for all net equity claims, and this is what

4    the trustee did.  On the filing date, Fifth Third had short

5    positions that were worth 40 million dollars.  This is the

6    amount Fifth Third owed LBI.  The trustee's use of the filing

7    date is consistent with the treatment of all participants in

8    the trustee's prime brokerage protocol.  It is also consistent

9    with the trustee's treatment of all customer claims.  Most

10   important, it's the only approach consistent with the net

11   equity definition.

12        Fifth Third wants the trustee to value its short

13   positions on another date in March when they were worth 22

14   million dollars.  The difference between the value of the

15   shorts on the filing date, 40 million, and in March, 22

16   million, is 18 million dollars, the disputed amount.  Pursuant

17   to a settlement agreement reached in the customer account

18   transfer process, Fifth Third paid the 22 million in partial

19   satisfaction of its debt, and the remaining 18 million was

20   placed in escrow.  Fifth Third received one hundred percent of

21   its assets as of the filing date.  The 18 million in escrow was

22   Fifth Third's remaining debt.  If the Court agrees with Fifth

23   Third's argument, it would not owe the 18 million dollars to

24   the estate.  If the Court agrees with the trustee's and SIPC's

25   reliance on the filing date which is mandated by SIPA, the 18

21

1    million will revert to the estate.

2         There is no other dispute between the parties.  The

3    parties stipulated facts, and the only remaining question is

4    the legal issue presented by this case.

5         Using the filing date to determine a customer's net

6    equity is a hallmark of a SIPA proceeding.  It provides

7    certainty and ensures fairness to all customers.  In a SIPA

8    liquidation, all customers share ratably in the fund of

9    customer property.  Any attempt to recover postpetition damages

10   from this fund is at the expense of other customers.  SIPA

11   prevents this by mandating that all customers are treated

12   equally by determining their net equity as of the filing date.

13        THE COURT:  Okay, let me break in.  I realize you have

14   prepared remarks, and you're following something of an outline.

15   But I have a question about an aspect of this case which I just

16   want to bring to your attention, and in effect, to the

17   attention of other parties as a matter I'm puzzled about.

18        As I understand the transaction that we're dealing

19   with, because of the status of this market participant, its

20   arrangements with LBI included State Street Bank as a third-

21   party custodian that held collateral.  To what extent is the

22   tripartite aspect of this transaction a distinguishing

23   characteristic that I need to take into account in respect of

24   evaluating your arguments as to the importance of September 19

25   as a day and the arguments of the claimant that in effect, this

22

1    is a distinguishing factor, that's a question that I'd like to

2    hear more about from the parties in their argument because at

3    some level, both the trustee and SIPA are making a relatively-

4    speaking simplistic argument.  Your argument is it doesn't

5    matter if there are Bankruptcy Code provisions relating to

6    securities contracts and other safe-harbored instruments

7    because the Court properly can ignore them or disregard them

8    for purposes of proper administration of a SIPA case.  In

9    effect, the filing date trumps everything else.  But my

10   question is, is that true and should it be true in a setting in

11   which we're dealing with what I'll call a hybrid, a situation

12   which is not a pure customer claim where the assets are in a

13   third party's hands and where we have Code provisions that so

14   clearly are designed as a public policy matter to protect

15   financial participants.  That's my overlay to what you've said

16   in prepared remarks, so you should be prepared to deviate from

17   your prepared remarks to respond to what I've said at any time

18   that you want.  But I want you to know how I'm thinking about

19   this.

20        MR. CHAMIE:  Right.  We would agree that the use of

21   equity not only is how it should be treated in this case, but

22   in fact, that's what is mandated.  With respect to the tri-

23   party arrangement and this special agreement, there's nothing

24   in that that's inconsistent with SIPA's definition of customer

25   property.  Under SIPA, customer property is defined as cash and

23

1    securities any time received, acquired, or held by or for the

2    account of the debtor for securities accounts of a customer.

3    And in this situation, there was a tri-party arrangement and

4    the securities were at State Street, but they were under the

5    controlling dominion of LBI.  And Fifth Third had a customer

6    account agreement which established a customer account at LBI

7    that received customer statements from LBI.  It filed a

8    customer claim and it benefited from a customer account

9    transfer process.  So we feel that there's no reason to treat

10   the assets in this case differently than other assets.  And in

11   addition, there were many prime brokerage customers that had

12   securities at various depositories including State Street or

13   Chase or DTC, and we see no reason why this should change the

14   analysis of their net equity on their customer claim.

15          With respect to the provisions of the Code that you've

16   mentioned, we don't dispute those provisions, and we think the

17   trustee has allowed parties holding property to use these

18   provisions without objection.  But these provisions relate to

19   damages, and to allow Fifth Third to recover damages from the

20   fund of customer property would come at the detriment to other

21   customers.  At best, these provisions would allow a general

22   creditor claim in this proceeding.

23          Fifth Third makes two arguments why its short

24   positions should be valued on a date other than a filing date,

25   and I think we've touched on both of them already, the first

24

1    being the Bankruptcy Code provisions, which we don't dispute.

2    Again, we believe that these provisions relate to damages.   The

3    claims to damages are at best general creditor claims, and the

4    amendment to SIPA that they reference in their brief which is

5    78eee(b)-2(C) provides an exception to the stay that allows

6    financial participants to exercise certain contractual rights.

7    Congress never amended the definition of net equity, and --

8            THE COURT:  Might that have been a mistake?

9            MR. CHAMIE:  No, there's no reason to believe that

10   that was a mistake at all.

11           THE COURT:  Well, one of the things that occurs to me,

12   and I just -- I realize that's the right answer to my question,

13   but one of the things that occurs to me is that we have a very

14   complicated regime in SIPA and a very complicated regime in the

15   Bankruptcy Code, and for purposes of this SIPA liquidation

16   proceeding, I look at both statutes.   The amendments that took

17   place in 2005 suggest an intention on the part of Congress to

18   liberalize and clarify safe harbor provisions that are the

19   subject of active litigation throughout the Lehman bankruptcy

20   cases that have never before been litigated.   Today's case, to

21   the best of my knowledge, is completely unprecedented in that

22   we are interpreting and attempting to harmonize provisions

23   which appear not to fit well together.   I would like you to

24   comment as to why I should look at SIPA as the predominant

25   statute as opposed to the Bankruptcy Code where both sets of

25

1    provisions appear designed to deal with issues of importance to

2    the integrity of the securities markets, generally.

3            MR. CHAMIE:  Well, in the first instance, under SIPA

4    78fff(b) it says that the Bankruptcy Code should be applied to

5    the extent that it's consistent with SIPA.  We don't believe

6    that these Bankruptcy Code provisions are consistent with

7    SIPA's treatment of customers.  To allow a customer, one

8    customer, to benefit from certain conditions and, in essence,

9    not repay its debt would create shortfall for the other

10   customers.  And we don't think that this is allowable under

11   SIPA or in line with SIPA's underlying policies and goals.

12           To the extent they have a claim for damages under

13   securities contracts as financial participants, the trustee

14   believes that at best, they have a general creditor claim, and

15   that would, in essence, harmonize the Code with SIPA.

16           THE COURT:  Okay.

17           MR. CHAMIE:  One or two last points, Your Honor, and

18   then I'll cede the podium to Mr. Caputo.

19           With respect to the customer property issue, Fifth

20   Third has raised this argument that their property was

21   segregated and identifiable.  It should be noted that these

22   concepts were written out of the statute by Congress over

23   thirty years ago; the 1978 amendments removed the concept of

24   specifically identifiable property.  There's really only one

25   exception that exists for property that's not considered part

26

1    of the estate, that's customer name securities, which are

2    securities registered in the customer's name in non-negotiable

3    form.  The securities at State Street were not -- in fact, even

4    if they were, they would still have to pay the debt before the

5    release of the customer name securities.  It's undisputed here

6    that this case does not involve customer name securities.

7         One final point is that the trustee believes it's his

8    responsibility to administer the liquidation over the estate in

9    a manner that benefits all customers, and not just Fifth Third,

10   and he's tried to do that here.  For this reason, we ask the

11   Court to uphold the trustee's determination of Fifth Third's

12   claim.

13        At this time, unless the Court has any further

14   questions, I will turn the podium over to Mr. Caputo of SIPC.

15        THE COURT:  I do have a question that doesn't go

16   directly to your argument, but rather to the potential

17   significance of a finding here to the liquidation on an overall

18   basis.  To what extent are the issues presented in the Fifth

19   Third dispute issues that have application to other claims by

20   financial participants, and to what extent does the outcome

21   here have a material impact upon the overall realization of

22   customer claims within the liquidation itself?

23        MR. CHAMIE:  It's difficult to put a monetary value on

24   the impact of the decision that customers with short positions

25   could, in essence, value their shorts and their customer claim

27

1    at the date of their choosing.  Simply, that addresses the

2    problem with that argument which is that it would create

3    uncertainty, which is something that SIPA tries to minimize.

4    We've done a preliminary analysis, and if all the customers

5    with short positions were to value, hypothetically, their

6    shorts on the same date that Fifth Third has chosen, it would

7    create a shortfall of approximately 190 million dollars in the

8    estate, in the fund of customer property.

9         THE COURT:  Now, the date that appears to be a

10   relevant date solely for purposes of this dispute arises out of

11   the settlement agreement that the trustee made with Fifth

12   Third.

13        MR. CHAMIE:  That's correct.

14        THE COURT:  Otherwise there would be no March 2009

15   date.  The date is solely a function of the circumstance of the

16   parties getting together and documenting something as of a

17   certain time in March, correct?

18        MR. CHAMIE:  That's correct, Your Honor.  That's the

19   time the settlement agreement was entered.

20        THE COURT:  One of the things that I noted in the

21   papers and I'm not making too much of it by asking the

22   question, but I do have a question about it, is whether the

23   trustee contributed to this problem by refusing to consent to a

24   transfer of the prime brokerage arrangements with LBI in a more

25   timely way to some third party.  And reading between the lines

28

1    and actually reading the words, there is a suggestion that this

2    was something that could have been solved earlier in a

3    commercial way but, for whatever reason, was not.  To what

4    extent is the delay something that's chargeable to the trustee?

5         MR. CHAMIE:  Well, the trustee issued the prime

6    brokerage protocol for the transfer of prime brokerage customer

7    accounts on October 6th.  I believe the revised version was

8    issued on October 14th.  In that process, we transferred

9    approximately 300 accounts with over 3 billion dollars.

10   Parties that sought to avail themselves to the protocol -- it

11   was a consensual process.  We're confined by the terms of that

12   protocol.  And in the account transfer provision of SIPA, it

13   says that the trustee can transfer accounts under terms

14   satisfactory to the trustee with prior approval of SIPC, which

15   we had in this case.  We transferred the entirety of this

16   account except for the disputed amount, as I said earlier,

17   which is one reason why we believe this is a good test case in

18   this case.  The only issue that we have, in essence, is whether

19   they need to pay the remainder of their debt as of the filing

20   date.

21        So as to whether the trustee contributed to delay, I

22   would say no to the extent that the terms of the protocol set

23   forth very clearly that short positions would be closed on the

24   19th.  To the extent that a customer chose to disagree, we

25   tried to minimize the impact by releasing the securities from

29

1    State Street and reducing the entirety of the claim down to the

2    disputed amount.

3              THE COURT:  All right, thank you.

4              MR. CHAMIE:  Thank you, Your Honor.

5              THE COURT:  Good morning.

6              MR. CAPUTO:  Good morning, Your Honor.  Kenneth Caputo

7    on behalf of the Securities Investor Protection Corporation.

8    Your Honor, a couple of points.  First, your question with

9    regard to whether it's proper for SIPA to trump the Bankruptcy

10   Code as a general rule, and the answer, I think, is found in a

11   strong statutory basis in SIPA itself.  The statute is clear

12   and unambiguous.  And it says that to the extent consistent

13   with the provisions of SIPA, chapters 1, 3, 5, and subchapters

14   1 and 2 of chapter 7 of the Bankruptcy Code apply.  But that's

15   only where it is consistent with the remedial purpose of the

16   statute.  And the remedial purpose of the statute is clear for

17   more than thirty-five years of jurisprudence that all customers

18   are to be treated on an equal basis.  So if the Fifth Third's

19   argument were to be correct, then what you're -- what the

20   conclusion would be is that a mere exception from stay for the

21   ability to take certain actions postliquidation would, in a

22   sense, create different classes of customers within that

23   statutory term.  It's hard-pressed to believe that Congress

24   made a mistake and inadvertently created separate classes of

25   specially-protected customers.

30

1      THE COURT:  It's quite possible they had no idea what

2  they were doing.

3      MR. CAPUTO:  It is.  But the outcome is entirely

4  consistent with case law and with the public policy and the

5  remedial purpose of the statute as envisioned by Congress in

6  the legislative history and with the amendments to SIPA that

7  have been imposed at various points along that thirty-five, now

8  forty year chain, most specifically in 1978 which gave the

9  trustee the ability to transfer accounts like here, transfer

10  over an account to benefit customers equally, like Fifth Third,

11  in a bulk transfer on conditions that satisfy the trustee and

12  SIPC.  And the reason that's so important, and the reason Mr.

13  Chamie made reference to the protocol, which I think was done

14  in a fairly expeditious fashion in this case, in October --

15  remember, this was an incredibly difficult time, as I'm sure

16  this Court is well aware and reminded of continually.  But at

17  the same time, the trustee was asked to come in and assume the

18  role as the leader of perhaps the fourth or fifth largest

19  investment bank in the United States.  And he did so and then

20  expeditiously issued guidelines for the transfer of accounts

21  which were done on a voluntary basis, but using the date in

22  SIPA that has been uniformly applied, and that's the filing

23  date.  To a certain extent, more than 300 prime brokerage

24  customers took advantage of that.  And the received their

25  property, they valued their positions as of the filing date,

31

1   and they're, you know, I think probably quite happy today that

2   they're out of the mess.  Fifth Third did not.  It chose to

3   continue to blame the trustee for not carving out special

4   exceptions for each various financial participant as opposed to

5   dealing with all customers on an equal basis, I think would be

6   to lay blame where it is not properly laid.

7        Now, I want to get to two other points.  One is the

8   characterization by Fifth Third in their own words that they're

9   some sort of specially-protected party.  And the other is their

10  assertion that there's confusion because SIPA was amended in

11  2005 and net equity was not.  So Fifth Third states at various

12  points in its brief, pages 19 and 21, for example, that it is

13  this -- and their words, "specially-protected party".  For

14  example, it states that "regular" customer claims for cash and

15  securities are, indeed, net equity claims, but that certain

16  securities contracts with specially-protected parties like

17  Fifth Third get special protection.  It also argues at another

18  point that the stay added to SIPA in 2005 ensures that

19  specially-protected counterparties to securities contracts get

20  to, you know, exercise rights of setoff and netting out post-

21  filing date.

22       This notion or suggestion that SIPA provides for some

23  other specially-protected group of creditors is, frankly, a

24  notion crafted out of whole cloth.  It finds no support in the

25  statute or in the legislative history, and Fifth Third has

32

1    cited none and can cite no support for that proposition.  Their

2    argument that the exception from stay necessarily includes a

3    calculation of damages based upon the termination date or

4    rejection date, as opposed to the filing date, runs counter to,

5    among other things, the express plain language of the statute

6    where filing date is used more than a dozen times as a marker

7    for various actions that the trustee must undertake, the

8    purpose behind the investor protection scheme in SIPA, and

9    frankly, the well-reasoned and properly applied public policy

10   of providing equal protection to all customers of the debtor.

11          There are two classes of creditors in a SIPA case.

12   There's general creditors, and there's customers, and that's a

13   defined term.  As the trustee has argued, Fifth Third would

14   very much like and very much did enjoy the conclusion that it

15   was a customer of the debtor.  That enabled them to file a

16   customer claim and receive priority attention in this case.  In

17   fact, it afforded them the opportunity to receive the benefit

18   of their allowed claim at this point in time.  Only customers

19   get that.  But only now that we have this disputed amount which

20   they are going to characterize in a few moments, I can tell

21   you, as just merely excess collateral, they want to retreat

22   from the conclusion that they're a customer.  Only now that we

23   get to this point.  It was a terrific idea all along as long as

24   we were treated specially and in priority, but now, they make

25   the argument, oh, we're not a customer at all.  In fact, we

33

1   don't even belong in this estate.  To get to the point about

2   the tri-partite relationship in that regard, if that were true,

3   they should go to State Street and get their assets.  But they

4   can't because the account is opened at LBI.  That's where they

5   signed in a customer agreement.  The account at State Street is

6   entitled "LBI as designee".  They can't go to State Street and

7   get their assets, no more than any other prime brokerage

8   customer could come in and say, you know, my money's at DTC in

9   a separate box; I'm going to go get it.  Or, my money's pledged

10  to Chase.  Oh, in fact, it's at a segregated account at Chase.

11  I'm going to just go get it, and I don't have to be part of the

12  liquidation proceeding because I'm special.  There's no case

13  law in the land, and to impose this statute fairly to protect

14  customers, you could no sooner get to that conclusion by

15  imposing SIPA in any way, shape, or form.

16          So, essentially, when LBI failed, Fifth Third had a

17  valid debt to LBI.  Had some long positions, got the benefit of

18  those, but it also had a debt.  And so while it could, post-

19  filing date, continue to exercise certain rates to the extent

20  possible, it still had to satisfy that debt.  I think we all

21  agree on that, that's the disputed amount, the debt.  But their

22  argument that it could close out its debt at a date of its own

23  choosing postfiling runs counter to the main focus and intent

24  of the statute, and that is that the trustee is a liquidator.

25  He must as promptly as possible return property to customers.

34

1    That's his duty.  It's specified in the statute very clearly,

2    his primary purpose.  He's not a substitute broker who must, or

3    frankly, even can continue to run the broker-dealer's

4    operations, perform mark-to-market calculations as they would

5    have the trustee do with regard to their positions on a daily

6    basis, or engage in securities transactions after the filing

7    date.  He cannot do that.  In fact, the statute, SIPA Section

8    jjj(b) --

9         THE COURT:  You're the only person who can do that on

10   the run.

11        MR. CAPUTO:  Thank you, I've had a few days of

12   practice on that one.  The -- expressly prohibits the trustee

13   from doing that.  It's an express provision in the statute;

14   it's plain.  He cannot run the broker-dealer.  And SIPA,

15   frankly, is entirely clear and consistent, as I said before, in

16   its use of the filing date throughout the statute.  There's

17   more than a dozen references to filing date in that statute as

18   the date for valuation.  Not some other date that a special

19   customer gets to choose, and not just for some customers, and

20   not just for regular customers, as they say it, or not -- as

21   opposed to special customers.

22        We don't dispute much of what they've said in their

23   brief.  There were amendments to the Bankruptcy Code.  There

24   were amendments to SIPA in 2005.  It permits specially-

25   protected parties like financial institutions to engage in

35

1    certain rights postfiling.  Those are well-imposed, well-

2    intended amendments.  They permit these parties to the extent

3    possible to carry on with certain activities like netting out

4    positions.  But to the extent that they -- any party, Fifth

5    Third or any other -- seeks the return of property from the

6    estate that's under the dominion and control of LBI, that do so

7    as either a customer or a general creditor.  And there's no

8    third class, no superpriority class of creditor that's entitled

9    to somehow, A, receive the benefit of the return of their

10   property pursuant to a customer claim, but B, not be subject to

11   the constraints and statutory parameters that every other

12   customer is subject to.  Their argument that they're a special

13   party has no merit as a matter of law.

14          Now, the second point involves the plain language of

15   SIPA and how a claim is to be satisfied, notwithstanding the

16   amendments.  As I've already said, you've got two classes of

17   customer:  you've got the customer and the general creditor.

18   There's no dispute that SIPA was enacted and is intended to

19   provide priority protection to the customers, as opposed to

20   general creditors.  So in order for a customer to get back

21   their property, they can either do so via a bulk transfer,

22   which was done in this case, or via a customer claim, which is

23   what Fifth Third has done.  Claims are paid under SIPA 78fff-

24   2(b) which provides that the trustee shall discharge his

25   obligations by the payment or delivery of net equity claims of

36

1    those customers.  Net equity, as the briefs made clear, is

2    essentially a common sense provision.  It's what the debtor

3    owes the customer minus what the customer owes the debtor.

4    Pretty simple.  We think that's pretty straightforward.

5         When Congress amended SIPA in 2005 along with the

6    Bankruptcy Code to add to SIPA exceptions from stay that we all

7    agree allow financial participants to do certain things, it

8    didn't amend net equity which controlled how a trustee is to

9    determine and value -- the essence of this case, a valuation

10   case -- what a customer is owed and what the customer owes the

11   debtor.  Fifth Third says that this argument is somehow

12   confusing.  We don't think that's confusing at all.  We, too,

13   think it's pretty straightforward.  In other words, while

14   Congress, by the amendments, intended Fifth Third or other

15   participants to engage in activity that would afford them the

16   opportunity to act with regard to certain positions that they

17   may have, it didn't intend to permit them some wholly separate

18   means of calculating what they might owe the trustee or what

19   they are owed the trustee as of the filing date.  It just did

20   not change the valuation terms.  They are equal to every other

21   customer who share on a pro rata basis.  There's no two pro

22   ratas in SIPA.  The longstanding and well-settled concept of

23   providing customer protection to all customers equally or on an

24   equal basis was appropriate left untouched.

25        Finally, were Fifth Third to be correct and be

37

1    permitted to close out its permissions at a date of its own

2    choosing, it and other financial participants would have the

3    benefit of choosing the date upon which to value their claims

4    as opposed to all other customers who would be stuck with the

5    filing date.  There is nothing in SIPA, there is nothing in its

6    legislative history, there is nothing in the legislative

7    history to the amendments at issue that even suggests that, and

8    any suggestion of it runs very clearly, I think, counter to the

9    well-crafted public policy of protecting all customers on an

10   equal basis.

11           Thank you, Your Honor.

12           THE COURT:  Thank you very much.

13           MR. KIRBY:  Good morning, Your Honor.  Richard Kirby

14   from K&L Gates on behalf of Fifth Third.

15           In answer to the question that the Court posed at the

16   outset, it's our view, first, that this -- that the existence

17   of the third-party custody account is important and it presents

18   an important difference between the position of Fifth Third and

19   even potentially other similarly situated, what I would refer

20   to in the papers as specially-protected parties.  And --

21           THE COURT:  Let's stop for a second because there's

22   some controversy about the whole notion of specially-protected

23   parties.  What do you mean by that?

24           MR. KIRBY:  Okay, I think what is meant by that is

25   found in the statute, and it is because of what Congress has

38

1    carved out in various provisions of the statute, 555 and

2    specifically, but in -- the key provision is the exception to

3    the automatic stay that authorizes, basically, 5 by 555, which

4    is in 362(b)(6), which is an exception to the automatic stay

5    which applies not only in bankruptcy cases but, what my

6    colleagues refuse to acknowledge, applies equally in SIPA

7    proceedings which triggers --

8            THE COURT:  What is it --

9            MR. KIRBY:  -- the 555 rights.

10           THE COURT:  Excuse me for breaking in, but what is it

11   about having certain rights to disregard the automatic stay

12   that should have any impact in respect of claims in a SIPA

13   case?

14           MR. KIRBY:  Okay, I think it really goes to this

15   point.  In order to understand what those statutes mean, you

16   have to understand -- and the facts are stipulated -- what the

17   party's rights were on the date of the petition, okay?  And

18   those rights were, with the open securities contracts, that

19   these -- it's stipulated that the collateral and margin that

20   was pledged at the third-party custodian was to be adjusted on

21   a daily basis.  Number two, their agreements require that these

22   contracts be marked to market daily.  Number three, that each

23   day, when those were marked, the custodian, the third-party

24   custodian, to the extent there was excess collateral, would

25   pull the collateral out from the main overriding third party

39

1    custody account where Fifth Third kept its assets, and

2    segregate those assets as pledged to LBI.  But the flip side of

3    that is if the securities prices went down, the third party

4    custodian was required to release excess collateral from that

5    segregated account.  But most important, what the contracts

6    provided -- and again, this is stipulated -- is that any party

7    had the right to terminate that contract at any time by simply

8    delivering the cash and securities.  Either side could effect

9    that termination.  And what those rights -- the exercise of

10   those rights or what's preserved in Section 555 and the other

11   provisions, and Your Honor, look, I've practiced bankruptcy law

12   for a long time.  These provisions are unique, they're unusual.

13   It's not the kind of provisions that most of us get involved in

14   in an ordinary bankruptcy.  Frankly, as Your Honor admitted,

15   these are provisions which few, if any, courts have had an

16   opportunity to address.

17          We have prepared, and I think it would be helpful,

18   copies of some of the selected statutes, which I would offer as

19   a hearing exhibit.  We've highlighted them and what I would

20   propose is to hand this to the Court, and I would like to walk

21   the Court through a couple of those provisions.  Ii think it's

22   important and instructive to focus on those provisions in order

23   to answer the question that you asked, why is my client a

24   specially-protected party.  May I hand this to the clerk?

25          THE COURT:  Sure.  Oh, I need to actually get it.

40

1        MR. KIRBY:  Oh.  Your Honor, what I'm going -- these

2   are just a compendium of various statutes, and I will just

3   refer the Court to the index.  They're just some selected

4   provisions of the provisions that we've discussed in our brief.

5   But what I'm going to ask the Court to do first is refer to tab

6   4, which is an excerpt and reproduction of the 362(b)(6)

7   statute.  And what's important on that point is to focus on the

8   language of the preamble to 32(b) which says "the filing of a

9   petition" -- of course, this is a Bankruptcy Code provision --

10  "or of an application under SIPA does not operate as a stay."

11  And then focus on the language that we bolded here.  Under

12  subsection A, "of the exercise by a financial institution,

13  financial participant of any contractual right" -- now, again,

14  I just went over the Court, what the parties have stipulated is

15  the contractual rights -- "as defined in 555 under a security

16  agreement or arrangement forming a part or related to any

17  securities contract or contractual right as defined in 555 to

18  offset or net out any termination values".  That's excepted

19  from the automatic stay.  That means parties are allowed to

20  continue to do that for the things that I discussed, what the

21  parties have stipulated to, mark-to-market, continues because

22  it's accepted from the automatic stay.  The third party

23  custodian was required to continue to do that.

24        Now, let's look at tab 6 which is the 555 provisions.

25  It says, "the exercise of a contractual right of a financial

41

1    institution/financial participant".  Again, this is what we're

2    referring to as the specially-protected parties, the party --

3    they have stipulated that my client, which is a registered

4    investment company, qualifies as one of the -- both a financial

5    institution and a financial participant.

6            THE COURT:  Okay, I don't think there's any dispute

7    about that, then.

8            MR. KIRBY:  Okay, but I think it's important, Your

9    Honor, to focus on what they're allowed to do as a result of

10   that because remember, this is the thing that's excepted from

11   the automatic stay in 352(b)(6), which is "to cause the

12   liquidation, termination, or acceleration of a securities

13   contract," again, as defined in 741 of this title and the

14   parties have stipulated that what these contracts were,

15   securities contracts, "shall not be stayed, avoided, or

16   otherwise limited by operation of any provision of this title

17   or order unless such order is authorized under the SIPA".

18   Okay?

19           Now, that's what really triggers the importance of

20   the -- and it's under tab 1 -- of the amendments of 2005 that

21   were clarified.  Which, I refer you to tab 1, which is the

22   Section 5(b) of the SIPA, as my colleague, Mr. Caputo, of

23   course, says, it's 78eee(b).  But I don't remember those

24   without looking at them.  But the exception to the stay which

25   is in (c) which says, "notwithstanding anything under 362, an

42

1     application under (a)(3) of this section" -- which is a SIPA

2     application -- "nor any order decree obtained by SIPA shall

3     operate as a stay of any contractual rights of a creditor to

4     liquidate, terminate, accelerate securities contract".  Or

5     master netting agreement, and I want to refer this, "or master

6     netting agreement to offset or net termination values or other

7     obligations arising under one or more contracts".

8          The point of this, and, you know, I have reproduced

9     also for the Court and I will take the time if you like, but

10    the provisions of 561 are also there, and 562.  Each of those

11    provisions recognized that these contracts have a life beyond

12    the bankruptcy.  Now, what does that mean for the Court, and

13    what does it mean in this context?  How does that interact with

14    the SIPA net equity provision?  That's the question that my

15    colleagues pose.  Do these provisions amend, modify in some way

16    the definition of net equity?  The answer is that the SIPA

17    statute has to be looked at in its entirety, as a whole.  And I

18    emphasize that because as the Court is well aware, there is

19    major litigation in another SIPA case involving the Madoff

20    matter.  On the question of what does net equity mean, and the

21    dispute in that case is the question of whether net equity

22    should be calculated on the filing date based upon the

23    documents that the various customers got, or, as SIPC has

24    argued, based upon the other language in the statute which

25    looks to define what those security positions mean, which is by

43

1    reference to all the books and records of the debtor.  And Your

2    Honor, I will ask the Court to take judicial notice of the SIPC

3    trustee's papers as filed in the Madoff matter on this very

4    point which really brings -- okay, Your Honor, I advised my

5    colleagues that I would ask the Court to take judicial notice

6    of this brief.  May I hand it to you?

7         THE COURT:  You can hand it to me.

8         MR. KIRBY:  And what I would ask you to refer to is

9    footnote 4 of this brief, which essentially states our position

10   as well as we could possibly state it.  It's been highlighted

11   on page 6 of the brief.  And what that says is that in order to

12   interpret SIPA, you have to look at the statute as in its

13   entirety.

14        THE COURT:  Okay.  I've looked at it.

15        MR. KIRBY:  Okay.  What that means is that -- what

16   apparently Congress intended and for good reason -- and I want

17   to emphasize the point as to why were these statutes added in

18   2005.  There's little reference in the legislation issue to

19   replace it in our papers.  What they did not want to have is

20   large financial institutions, like my client, which is a

21   registered investment company, which is a fiduciary, for public

22   investors.  We're not talking about a hedge fund or some entity

23   which has administering assets or administering money for a

24   bunch of high-net worth accredited investors.

25        We're talking about a registered mutual fund with

44

1    people who's invested their 401ks and other things in that.

2    They did not want to have these kinds of financial institutions

3    to be hung up in a liquidation proceeding like this for this

4    precise purpose because what's happened to my client is because

5    these assets have been tied up, they've not been able to

6    administer those assets.

7          Even as we seek -- I mean, we were able to negotiate a

8    limited settlement agreement in March of last year but we are

9    now a year later and the assets that are -- that we believe

10   are -- were properly -- if it was properly entitled to under

11   the statute, are hung up in litigation over whether we were

12   entitled to exercise with apparently on the face of the statute

13   from mid -- rights, which would, on the face of statute, would

14   permit.

15         Now they say, "well we entered into this protocol

16   which said if you value them the way we want to, we'll agree to

17   transfer the balance of the assets" but that was a consensual

18   process.  We said no.  We said that these statutes provide

19   special rights.  They would not address those except, you know,

20   here we are, eighteen months after the commencement of this

21   case, discussing the issue of what the statute would,

22   apparently on its face, allow.

23         THE COURT:  Can I ask a question?

24         MR. KIRBY:  Yes.

25         THE COURT:  Based upon your reading of the safe harbor

45

1    provisions as applied to your client, could you have taken

2    action to close out these open short positions in October of

3    2008?

4             MR. KIRBY:  We tried.  We've requested the trustee to

5    consent.

6             Second, what we said to the trustee was "if you would

7    not consent, we would like to have a proceeding before Your

8    Honor to force the issue".  What they said is, "If you seek

9    relief like that, we will seek contempt against you."

10            THE COURT:  What do you mean, "if you seek relief"?

11            MR. KIRBY:  Well, we asked --

12            THE COURT:  Is it your position that you need to ask

13   permission to exercise rights under these provisions of the

14   Bankruptcy Code, which you have just shown me at great length

15   or are they automatic and self-executing?  So that if you are a

16   special entity, such as you claim to be, you can simply do it.

17   Why do you need any consent from the trustee?  Why do you need

18   any relief from this Court?  If you do, you're not so special.

19            MR. KIRBY:  Well, Your Honor, the answer to that is

20   that they're under the third party custody agreement.  The

21   trustee needed the consent to the release of the excess

22   collateral.  And so absent that consent, we needed to -- we

23   needed to commence the proceeding.  What we could've done at an

24   earlier time, was commence an adversary proceeding in this

25   court to compel this issue at an earlier time.

46

1          THE COURT:  Well here's what I'm not understanding --

2     because you've made much about these statutory provisions and

3     I'm actually quite familiar with them, as you may be aware.  If

4     you have a right to exercise relief without regard to the

5     automatic stay or you don't --

6          MR. KIRBY:  Right.

7          THE COURT:  If you're telling me that the right that

8     you have is conditional and that you needed the trustee's

9     consent, then of what impact -- what impact should I draw from

10    your reference to a statutory provision that's not self-

11    executing?

12         MR. KIRBY:  It rises from the question that the Court

13    posed in the first instance.  What are the terms -- does this

14    case turn on the issue of the third party custody --

15    peculiarity terms of the third party custody arrangement

16    between the parties?

17         What that third party custody arrangement provided was

18    that -- now as a registered fund, my client segregated its

19    assets at State Street.  What they -- the special arrangement

20    was that State Street would segregate, in a separate account,

21    collateral and margin -- two times the collateral and margin

22    required for the short positions.

23         In order to release those assets, what it -- State

24    Street required that not -- the consent of the trustee.  In

25    addition, my client could demand it but only if the trustee

47

1    would consent.  The trustee put us in a Catch-22 situation by

2    saying, "We will only consent under -- except under the terms

3    of the protocol."

4         And that is why we are here today because once we

5    closed out the positions as defined in the third party custody

6    agreement, which we have placed before Your Honor -- under the

7    terms of that agreement, that became excess collateral.  And we

8    were entitled to that property under the third party custody

9    agreement.  That is the reason why we have sought the relief

10   that we've sought.

11        Now, whether it should be part of a claims process or

12   part of an adversary proceeding, it's always been my position

13   that -- except for the fact that the trustee said that "Look,

14   if we stipulate to the facts, we can have the Court decide this

15   question through the claims process."  I deferred to the

16   trustee on that but our position is that that collateral

17   belongs, under the terms of the party's agreement, as property

18   of Fifth Third.

19        And as a result of that, that means we're entitled to

20   that amount.  That dispute -- the statutory rights are self-

21   executing.  The party's peculiar third party custody

22   arrangement is the one that said we need the consent of the

23   trustee -- or the permission.

24        THE COURT:  All right.  Well, then -- I'm a little

25   confused and maybe you can clear up some of my confusion.  If

48

1    the provisions that you rely on in order to seek special

2    treatment relative to your customer claim entitling you to the

3    eighteen million dollars which is in dispute -- which eighteen

4    million dollars flows from your having gone into the market in

5    March of 2009 -- if that argument is based both on code

6    provisions that would otherwise entitle a qualifying financial

7    participant to exercise rights and remedies without regard to

8    the automatic stay and a custody agreement, which limits those

9    rights, haven't you undercut your argument with respect to the

10   safe harbor provisions because your very contractual

11   arrangements require you to wait and obtain consent?

12           MR. KIRBY:  We can -- under the contracts, we can -- I

13   mean, if they don't -- if they wrongfully withhold consent,

14   which is where we believe the position is, then we would have

15   to go to court and seek enforcement of our rights under the

16   contract.  It's our view that, under the terms of the third

17   party custody arrangement, they were wrong in withholding that

18   excess collateral.

19           THE COURT:  So why does that affect, in any respect,

20   your rights as a customer in the SIPC liquidation proceeding?

21   And why does that affect, in any respect, the relevant date,

22   which for SIPC purposes is September 19 and for your purposes,

23   purely as a matter of circumstances, is a date in March of 2009

24   because that's when you entered into a stipulation?

25           MR. KIRBY:  Your Honor -- and the answer to that

49

1    question, the way to view it is this.  If we had never filed a

2    customer claim, what we would have done is we would have

3    brought an adversary proceeding to compel enforcement of our

4    rights, which -- what -- and that's -- we believe that we --

5    what we did was we sought a customer claim but in our customer

6    claim, we made it very clear that the relief that we were

7    seeking was release of the -- the trustee's consent to release

8    of the excess collateral in the dispute -- in the third party

9    custody arrangement, which they held and couldn't -- they

10   refused to release, absent their consent.

11          So, the procedural postural we found ourselves in, was

12   do we commence an adversary proceeding -- we sought to try to

13   work it out.  Once we realized that we could not work it out,

14   we entered into a limited settlement agreement, at least to the

15   narrow the scope of the issue and frame the issue properly the

16   Court.

17          But where we are, is that we would have commenced an

18   adversary proceeding to seek to enforce our rights under the

19   third party custody arrangement, which was that it requires the

20   trustee to consent to the release of that -- what's excess

21   collateral now because of the termination of those contracts.

22   And the key point there, Your Honor, is that my client was

23   required as part of the prearrangement was to keep twice the

24   amount of collateral it needed for the contracts.

25          So once -- which was the collateral for the short

50

1    position which was the borrowed stock plus the federal margin

2    requirements which was an additional one time and that's what

3    the party's prepetition arrangement was.  Once that -- those

4    contracts were terminated, the trustee -- we paid the trustee

5    the amount which was the collateral it was entitled to under

6    the prepetition arrangement of the parties, which was the value

7    of the securities and the margin, which should -- under the

8    third party custody arrangement, should be released.

9         That's -- that is what we're after, which is the

10   collateral -- which was defined by the parties as excess

11   collateral.  And I -- you know, I submitted the third party

12   custody arrangement as part of the record.  I can show you the

13   provisions in that arrangement which is -- describes what that

14   is.

15        THE COURT:  Well that custody arrangement was

16   submitted, if I recall correctly, in the context of the

17   disputed procedural ploy on the part of Fifth Third, which was

18   the motion for summary judgment.  And there's a motion to

19   strike that which is also before me today.

20        MR. KIRBY:  That's correct, Your Honor.

21        THE COURT:  So, while I understand that that agreement

22   is part of the record you would like me to have, I'm not

23   presently treating it as part of the record.

24        MR. KIRBY:  I understand but understand also that --

25   and we can address that at that -- on that motion but Your

1    Honor, understand --

2         THE COURT:  We'll get to that when we're done with all

3    of the --

4         MR. KIRBY:  But I do think that -- I think it's

5    important on that point which is that the stipulation of the

6    parties refers to a document which is material to the case.

7    And it clearly, by any normal understanding, would have been

8    incorporated by records.  The parties referred to the third

9    party custody arrangement in the stipulation.  We simply

10    submitted it to the Court to -- so that the Court would have

11    that in order to review and understand something that's been

12    stipulated to the parties.  There's no dispute of what the

13    third party custody arrangement was.

14         THE COURT:  Okay.  I'm not reading that document today

15    for purposes of -- to -- that the argument but it's clearly not

16    disputed by the parties that that agreement, fairly read and

17    construed by both parties, included consent rights for the

18    trustee as successor in interest to LBI.

19         And as a result of that -- and this is really what I'm

20    struggling with in your argument.  It seems to me that the

21    delay associated with the closing of the open short position,

22    which is really at the bottom of this dispute, has very little

23    to do with the safe harbor provisions of the Bankruptcy Code.

24    And your protected status, as you argue it in reference to 555,

25    is a -- almost an irrelevancy because even though you have that

52

1   status, you couldn't exercise rights with respect to it because

2   of the custody agreement that you admit forced you to wait.

3          MR. KIRBY:  It doesn't force us to wait.  What it

4   forces us to -- what it -- and this is where I think there, you

5   know, may be some confusion --

6          THE COURT:  That's -- I told you I was confused

7   earlier.

8          MR. KIRBY:  Okay.

9          THE COURT:  If you can --

10         MR. KIRBY:  The third party custody --

11         THE COURT:  If you can clear it up, that's great.

12         MR. KIRBY:  Okay.  And I cannot do that without

13   reference to the third party custody arrangement but what

14   those -- that provision -- what those provisions provided was

15   that the collateral, at all times, will be property and remain

16   property -- remember, this is just -- this is a security

17   arrangement.

18         So the property is Fifth Third property under the

19   terms of the custody arrangement.  But as one would expect in a

20   third party custody arrangement, if there is a dispute about

21   which -- what is the amount of the pledged amount, then -- and

22   each -- under the terms of the third party custody arrangement,

23   each day the collateral was, as I described and as the facts

24   are stipulated to, each day the parties would have adjusted the

25   collateral that either the collateral would be moved out of the

53

1   segregated account or moved into the segregated account

2   depending on the value of the securities.

3          So, when the trustee takes the position in his

4   protocol that all know will only value these on the date of the

5   filing but the statutory exceptions say that not all these

6   contracts -- these exercises -- these rights which I've

7   described and the parties stipulated to, such as marking to

8   market the margin requirements and adjusting the collateral,

9   those rights continue.  What we demanded of the trustee from

10  the beginning, which is either transfer our account or release

11  the excess collateral which is provided for in the separate

12  agreement.  The trustee says, "No we will not unless you

13  consent to valuing these contracts as of the filing date" but

14  that -- you know, that is the rub of the dispute.  That is why

15  the dispute really turns on what are the statutory exceptions

16  because the trustee refuses to acknowledge that those are

17  amendments to SIPC.

18         THE COURT:  Well here's one of the problems I'm having

19  with your argument and you might as well know it so you can

20  respond to it.

21         MR. KIRBY:  Fair enough.

22         THE COURT:  As I'm understanding the statutory

23  exceptions, they become a convenient way for you to argue that

24  there is an ongoing right beyond September 19, 2008 which is

25  statutorily sanctioned but in point of fact, it seems to me

54

1   that that right is, here, irrelevant because it hasn't been

2   exercised.  It was exercised pursuant to a stipulation which

3   could just as easily have been entered into by the parties

4   without regard to the exceptions of the Bankruptcy Code.

5        Assuming for a moment that the automatic stay applied

6   to your transaction and that you were to argue that you are

7   being adversely affected by your inability to realize the value

8   of your collateral and so you are denied adequate protection,

9   you could have moved on an expedited basis for stay relief and

10  had, in March of 2009, entered into the very same stipulation

11  which led to this litigation.  That is hardly an argument for

12  disregarding September 19 as the operative date for purposes of

13  determining customer property claims.

14       So the problem I'm having with your argument is that

15  while it's facially interesting, based upon the custody

16  agreement that you want me to read, all of those provisions are

17  fundamentally irrelevant to what happened to you.  Fifth Third

18  waited and never had, by its own admission, the ability to

19  exercise rights promptly in October, November, December or

20  January, despite best efforts.  That's my problem with your

21  argument.

22       MR. KIRBY:  The answer, I think, Your Honor, to

23  that -- to the dilemma that you posed is this.  If what we were

24  seeking was customer property claim, the situation would be

25  very different.  We are not -- this matter arises in the

55

1    context of a claim dispute because we accepted the SIPC

2    position that this dispute could be resolved as part of the

3    claims process.  But if it cannot, then the alternative for our

4    client is -- and -- is to have an adversary proceeding to

5    recover property that belongs to it under its contracts.

6          And so, what we view this proceeding before the Court

7    now is adjudicating the rights on all sides of the parties with

8    respect to the disputed amount, either as part of the claims

9    process or that's the reason for why we brought the motion for

10   summary judgment which is so that the Court would have a

11   procedural vehicle to address the issue that -- which we

12   believe is the true issue in the case, which is that that third

13   party custody arrangement is -- permits us under the facts of

14   this -- that are stipulated to, to an order directing turnover

15   of the excess collateral as defined in the third party custody

16   agreement to my client.

17         And so what we're talking about is a procedural issue

18   about whether my client should be before the Court on an

19   adversary proceeding or as part of the claims process.  And

20   since all the facts are stipulated to, we don't think it makes

21   a difference what procedural posture that we're in

22         But having said that, that's the reason why we filed

23   the motion for summary judgment so that we would have a

24   procedural vehicle for the Court to grant us the relief

25   directly that we're seeking but you needed -- in order to do

56

1    that, you need to address the issue of the status of the third

2    party custody arrangement.  Otherwise, what -- we would back

3    here with an adversary proceeding, a motion for summary

4    judgment, which recites exactly the same facts and the Court

5    will then have to address that issue at some future time.

6              THE COURT:  Okay.  Well, you're shifting into a

7    different subject, which is the procedural posture of the

8    current dispute and the motion to strike your summary judgment

9    motion which you have opposed and SIPC has joined in the

10   trustee's motion to strike.  I think we might as well address

11   that now --

12             MR. KIRBY:  I agree.

13             THE COURT:  -- because we're talking about it.

14             And I'm going to give the trustee an opportunity to

15   press its trustee's motion to strike.  You can then oppose it.

16   I don't think we should spend a lot of time on it because it is

17   my candid view that it -- that's a sideshow to the current

18   dispute that your motion for summary judgment was not

19   consistent with local practice that calls for a premotion

20   conference before filing such a motion.  And more to the point,

21   it's a motion for summary judgment that applies not to an

22   adversary proceeding, not to a motion that you have brought but

23   rather, to a motion brought by the trustee that is by its very

24   nature, part of the claims process.

25             And so I have some questions as to how you could file

57

1    a motion for summary judgment consistent with what we're doing.

2    It seems to me that I either agree with the trustee and SIPC or

3    I agree with you in connection with the claims allowance

4    process.  If I agree with you but I find that I'm agreeing with

5    you for reasons that are outside of the four corners of the

6    claims process itself in terms of the substantive reasons.

7    We'll find by stipulation and as so ordered to give you the

8    relief that you're entitled to if in fact, I agree with your

9    position since you told me that everything that you're raising

10   now you would be raising in the context of an adversary

11   proceeding and a summary judgment motion in that proceeding.

12        So what I'm telling you is I think your summary

13   judgment motion is procedurally improper at this moment but I

14   don't think it matters.  It's, for all practical purposes, a

15   non-issue but I'll hear what the trustee has to say and if the

16   trustee just agrees with me, this becomes a short argument.

17        MR. CHAMIE:  Thank you, Your Honor.  Ramsey Chamie

18   from Hughes Hubbard & Reed on behalf of the LBI trustee.  Just

19   very briefly, the summary judgment motion did not comply, as

20   you've stated -- as the Court has stated, with the Court's

21   November 5th consent order or the local bankruptcy rules.  The

22   consent order was the result of extensive communications among

23   Fifth Third, SIPC and the trustee.  And it set forth a briefing

24   schedule to fully address the fund's objection.  The fund

25   consented to the schedule and it did not contemplate separate

58

1    unnecessary motion for summary judgment.

2         In addition, as the Court has noted, the motion is in

3    direct violation of local bankruptcy rule 70561(a).  We

4    believe -- the trustee believes that the motion is burdensome

5    in time and expense and it's redundant.  I have no further

6    comments on that unless you have any questions.

7         THE COURT:  So do you agree with what I said or not?

8         MR. CHAMIE:  Yes, we agree fully.  Thank you.

9    (Laughter)

10        THE COURT:  Okay.  All right.

11        MR. CAPUTO:  SIPC also agrees with the Court, Your

12   Honor.  Ken Caputo for SIPC, just one other point.  The dispute

13   over their claim is a contested matter in -- under the rules.

14   And this court has the opportunity to issue a final order

15   dissolving -- resolving their claim, which is -- you know,

16   gives them all the attendant rights.

17        The fact that we've got a sideshow of another motion

18   as an end-around in an attempt to either put in a different

19   exhibit or make some reference to some point that was in a

20   stipulation.  That's really a sideshow.

21        THE COURT:  Is there any dispute that I can take a

22   look at the custody agreement?

23        MR. CAPUTO:  Not at all, not at all.  You can look at

24   everything.  We have no problem with the facts.

25        THE COURT:  Fine.  So, it seems to me that the way to

59

1    resolve the motion for summary judgment is that it's

2    procedurally improper but it nonetheless has -- by virtue of

3    supplements to the stipulation of uncontested facts, brought to

4    my attention a couple of documents.  If there is no dispute, I

5    will take a look at those documents as part of the record.

6            MR. CAPUTO:  No dispute, Your Honor.

7            THE COURT:  Fine.

8            MR. CHAMIE:  No dispute from the trustee, Your Honor.

9            THE COURT:  Fine.  So the record is supplemented,

10   pursuant to a completely inappropriate procedural gambit.  And

11   the parties have consented to it and -- now, I interrupted your

12   argument to deal with that separate question.  I just want to

13   make sure that from Fifth Third's perspective, that your

14   presentation of the substance of your position is complete.

15           MR. KIRBY:  No.  I would like to address with the

16   Court -- with your permission of course, the issue of what the

17   substance of that third party custody arrangement does say.

18   I -- what I would do is -- you know, given the time and so

19   forth, what I would offer is an exhibit which is a copy of the

20   special custody agreement.  We've highlighted the provisions

21   which we think are the controlling provisions --

22           THE COURT:  Is this already in the binder?

23           MR. KIRBY:  Yes.

24           THE COURT:  Except for the highlighting?

25           MR. KIRBY:  Except for the highlighting.

60

1          THE COURT:  Why don't you just tell me what provisions

2    you highlighted?

3          MR. KIRBY:  Okay.  I've highlighted Sections 2(e) --

4          THE COURT:  Okay.

5          MR. KIRBY:  -- 2(f) and 3(a).  2(e) defines what is

6    excess collateral.

7          2(f) states that the collateral should at all times

8    remain the property of the pledgor, subject to the extent and

9    the interests and rights to the secured party, which you would

10   expect in a third party -- security agreement.

11         And 3(a) describes in further detail -- and we've

12   cited these provisions in our papers.

13         THE COURT:  Okay.

14         MR. KIRBY:  Those are the provisions that I think you

15   need to address and I apologize to the Court about the

16   procedural issue but as long as all -- we can get a resolution

17   of all issues today through one process, that's fine.  Then all

18   parties will have been reserved the rights.

19         THE COURT:  Okay.  Are you now --

20         MR. KIRBY:  Unless the Court has questions, I have

21   nothing further.

22         THE COURT:  Okay.  Now, I'll ask if the trustee or

23   SIPC wishes to state anything further in light of the argument

24   that has taken place with Fifth Third.

25         MR. CHAMIE:  Ramsey Chamie from Hughes Hubbard on

61

1  behalf of the trustee.  The trustee believes that the agreement

2  that's just been entered into the record should, of course, be

3  read in whole, fully, all provisions, not just those

4  highlighted here at this hearing.

5        Thank you.

6        THE COURT:  Okay.

7        MR. CAPUTO:  We concur, Your Honor, and that's it.

8        THE COURT:  All right.  I'll reserve decision.  I will

9  read the entire agreement and get home safely.

10       We're adjourned.

11       MR. KIRBY:  Thank you, Your Honor.

12     (Proceedings concluded at 12:43 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

62

1

2                    C E R T I F I C A T I O N

3

4      I, Dena Page, certify that the foregoing transcript is a true

5      and accurate record of the proceedings.

6

7      _____

8      Dena Page

9

10     Veritext

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date:  February 26, 2010

16

17

18

19

20

21

22

23

24

25