Hearing Date: March 25, 2010
Objection Deadline: March 4, 2010

**LOWENSTEIN SANDLER PC**
Michael S. Etkin, Esq.
Scott Cargill, Esq.
Sean E. Quigley, Esq.
1251 Avenue of the Americas, 18th Floor
New York, New York 10022

-- and --

65 Livingston Avenue
Roseland, New Jersey 07068
Tel:     (973) 597-2500
Fax:     (973) 597-2400

*Counsel for LibertyView (as defined below)*

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.,*<br><br>                                          Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re:<br><br>LEHMAN BROTHERS INC.,<br><br>                                          Debtor. | Case No. 08-01420 (JMP) |

### LIBERTYVIEW'S: (A) JOINDER TO (I) THE TRUSTEE'S MOTION, (II) THE COMMITTEE'S MOTION AND (III) LBHI'S MOTION FOR RELIEF FROM THE SALE ORDERS OR, ALTERNATIVELY, FOR CERTAIN LIMITED RELIEF UNDER RULE 60(b); AND (B) OBJECTION TO BARCLAYS CAPITAL INC.'S MOTION TO ENFORCE THE SALE ORDER

LibertyView (as defined below), through its undersigned counsel, submits this (A)

joinder to (i) the SIPA Trustee's (the "Trustee") Motion for Relief Pursuant to the Sale Orders or,

Alternatively, for Certain Limited Relief under Rule 60(b) [Docket No. 1682], (ii) the Official

Committee of Unsecured Creditors' (the "Committee") Motion for Relief from Order Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20, 2008 and Joinder in [LBHI's] and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order [Docket No. 1686], and (iii) Lehman Brothers Holdings Inc.'s ("LBHI") Motion to Modify the SIPA Sale Order and Joinder in Official Committee of Unsecured Creditors' Motion for Relief from SIPA Sale Order [Docket No. 1702]; and (B) objection to Barclays Capital Inc.'s ("Barclays") Motion to Enforce the Sale Orders and Secure Delivery of All Undelivered Assets [Docket No. 2582] (the "Joinder").   In support of this Joinder, LibertyView respectfully states as follows:

## PRELIMINARY STATEMENT

1.     LibertyView has asserted timely claims against Lehman Brothers Inc. ("LBI") and certain of its affiliates for, *inter alia*, the return of millions of dollars worth of securities.  During the more than seventeen months since the commencement of LBI's SIPA liquidation proceeding (the "SIPA Proceeding"), LibertyView has had no success in obtaining information concerning what LibertyView securities were held at LBI, the circumstances under which the securities were held, or the disposition of any such securities.   This lack of transparency has been a significant concern for LibertyView, as well as other similarly situated customers and claimants.

2.     The events leading up to the sale (the "Sale") of LBI's broker-dealer business are well documented and were closely watched by parties in interest, including LibertyView.  Although the overall structure of the Sale was widely reported, the particulars of exactly which assets were transferred to Barclays were not (and are not) publicly available.

Particularly concerning to LibertyView is the apparent significant movement of stock lines held at LBI in the days immediately prior to the Sale. Indeed, the reconciliation of these stock movements is apparently still on-going. LibertyView has been unable to verify if certain of its assets were -- intentionally or otherwise -- transferred to Barclays as part of the Sale.

3.      It is therefore extremely disconcerting and telling that the parties holding presumably the most knowledge concerning the Sale -- LBHI, the Committee and the Trustee (collectively, the "Movants") -- are now seeking this Court's intervention to determine, *inter alia*, which assets were and were not authorized to be sold to Barclays. LibertyView has particular concerns that certain Customer Property (defined below) belonging to LibertyView was improperly transferred to Barclays and that such asset transfers were neither disclosed to, nor approved by, this Court.

4.      The memorandum filed by Barclays in opposition to the motions of the Movants, and in support of Barclays' motion to enforce this Court's sale order and secure delivery of all undelivered assets, gave further justification to LibertyView's well-founded concerns that its Customer Property may very well have been improperly transferred as part of the Sale. As detailed below, the more than 120 page "Statement of Facts" section of Barclays' memorandum in support of its motion, as well as the 380 exhibits accompanying the memorandum, describe a chaotic several days leading up to the closing of the sale transaction during which assets were hurriedly identified to be included in the Sale. It appears that constantly changing facts and positions taken by creditors required hasty decisions by LBI to provide replacement collateral to Barclays. Moreover, all parties involved seem to agree that the transaction was moving so rapidly that it would be near impossible for anyone to have a complete grasp of all the assets being transferred.

5.      The motions of the Movants, parties charged as fiduciaries and with the best access to the information concerning the transaction, speak volumes to the fact that a more detailed investigation is needed to confirm exactly what the terms of the sale transaction were, if these terms were properly disclosed and approved by this Court, and, most importantly, exactly what and whose assets were transferred to Barclays and if such transfers were proper. For these reasons, LibertyView joins the respective motions of each of the Movants. If the Movants cannot agree on what the terms of the sale transaction were, and the assets involved, due process dictates that further inquiry is required to assure that the interests of affected third parties, such as LibertyView, are protected.

6.      As set forth more fully below, Barclays' motion should be denied. Barclays' own memorandum of law belies its position that there is no need for an evidentiary hearing with respect to the Movants' motions and that Barclays is entitled to the Disputed Assets (defined below) as a matter of law. The facts and exhibits offered by Barclays clearly demonstrate a material factual dispute over the governing terms of the sale transaction and what assets were and should have been transferred as part of the Sale.

7.      This Court has ample authority to grant the relief requested by the Movants. First, this Court has jurisdiction and the inherent power to consider the enforceability of its own orders. This is particularly true when there is a question concerning whether the property purportedly transferred to the buyer is Customer Property. Second, this Court may exercise its equitable powers under section 105 of the Bankruptcy Code to enforce and implement the Sale Orders (defined below). Third, various subsections of Rule 60(b) of the Federal Rules of Civil Procedure (made applicable by Bankruptcy Rule 9024), as set forth below, each provide independent grounds for the relief requested by the Movants and provide a basis for

objection to Barclays' motion.  Importantly, many of the details surrounding the sale transaction only recently became publicly available to parties in interest, such as LibertyView.  This was due in large part to confidentiality provisions, some apparently imposed at the behest of Barclays, which restricted public access to many of the details of the sale transaction.  This newly available evidence, which may directly impact upon LibertyView's property rights, warrants further consideration by this Court of the relief requested by the Movants and full disclosure of all the terms of the sale transaction, identification of the specific assets that were transferred to Barclays, and investigation into whether such assets were improperly transferred.

## GENERAL BACKGROUND

8.    LBI was a broker-dealer registered with the United States Securities and Exchange Commission (the "SEC") under the Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78o-(6) (the "Exchange Act"). LBI was also a member of the Securities Investor Protection Corporation ("SIPC") and currently is being liquidated before this Court pursuant to the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. § 78aaa, *et seq.* ("SIPA").

9.    LibertyView is a group of investment funds[1] (collectively, "LibertyView") whose claims are based upon business conducted with Lehman Brothers International (Europe) ("LBIE") as well as business conducted with LBI prior to the Commencement Date (defined below).

10.    LibertyView's transactions were conducted pursuant to certain Customer Account Agreement Prime Brokerage agreements, (each a "PBA") each executed between the

---

[1]  The funds include LibertyView Credit Opportunities Fund, L.P., LibertyView Credit Select Fund, LP, LibertyView Funds, L.P., LibertyView Global Risk Arbitrage Fund, L.P., and LibertyView Special Opportunities Fund, L.P.

various LibertyView entities and LBI, LBIE, and certain of LBI's affiliates (including LBHI). LibertyView is also a party to certain Margin Lending Agreements (each a "MLA") with LBIE. The MLA provides that loans of securities made pursuant to the MLA shall be governed by the terms of a standard-form Global Master Securities Lending Agreement (May 2000 version) (the "GMSLA"), as modified and supplemented by the Schedule to GMSLA and 2000 UK Tax Addendum.  Each of the PBAs, the MLAs and the GMSLAs (collectively, the "Agreements") is governed by New York law.

11.    On September 15, 2008, LBIE entered into administration proceedings in the United Kingdom. Contemporaneously with the filing of LBIE's administration proceeding, LBHI and certain of its affiliates filed voluntary petitions for relief under chapter 11 (the "Chapter 11 Proceedings") of title 11 of the United States Code (the "Bankruptcy Code").  On September 19, 2008 (the "Commencement Date"), the above-captioned SIPA Proceeding was commenced.  On September 20, 2008, the Court entered certain Sale Orders (defined below) approving the Sale of LBHI's assets to Barclays.

12.    As of the Commencement Date, LibertyView held a positive net position against LBI and all of its affiliates (collectively, "Lehman Brothers") on account of the Agreements in excess of $1.1 billion. LibertyView also holds unliquidated claims against Lehman Brothers for damages and costs related to Lehman Brothers' failure to return to LibertyView its securities and other instruments (the "Customer Property") held by Lehman Brothers in connection with the Agreements.  In addition, LibertyView holds a claim for all cash and consideration that was received by Lehman Brothers after the Commencement Date on account of the Customer Property, including, but not limited to interest payments, dividends and

maturities of securities which LibertyView is entitled to receive under the applicable Agreements.

13.    Upon information and belief, prior to the Commencement Date, a substantial portion of LibertyView's Customer Property and cash were placed into one or more accounts at LBI. However, due in part to the lack of disclosure of certain material terms of the Sale, LibertyView has not been privy to the facts and circumstances that led to LibertyView's Customer Property and cash being held at LBI.

14.    In January 2009, LibertyView timely filed customer claims against LBI in the SIPA Proceeding. In September 2009, LibertyView filed proofs of claim against certain of the Lehman Brothers affiliates that were parties to the Prime Brokerage Agreements whose cases are being administered in the Chapter 11 Proceedings. To date, none of LibertyView's Customer Property or cash has been returned by any of the Lehman Brothers entities.

15.    On February 22, 2010, LibertyView received, through its counsel, four separate notices ("Notices") regarding the Trustee's determination of certain of LibertyView's customer claims.[2] All four Notices deny LibertyView's customer claims on the basis that LBI asserts that LibertyView does not have a direct relationship with LBI, and that cash and/or securities claimed by LibertyView were not held in a customer account with LBI.[3]

### RELEVANT BACKGROUND

---

[2] The Notices relate to customer claims filed on behalf of LibertyView Credit Select Fund LP, LibertyView Focus Fund, LibertyView Funds LP and LibertyView Credit Opportunities Fund LP (Claim Nos. 900005766, 900005541, 900005537 and 900005768).

[3] LibertyView vigorously disputes the Trustee's denial of its claims, as set forth in the Notices, and intends to timely file objections to the Notices, in accordance with the procedures previously approved by this Court. [Docket No. 241]. LibertyView expressly reserves all its rights in this regard.

A.    <u>The Motions</u>

16.    On September 15, 2009, the Trustee filed a redacted Motion for Relief Pursuant to the Sale Orders, or Alternatively, for Certain Limited Relief Under Rule 60(b) (the "<u>Trustee Motion</u>") [Docket No. 1682].  On October 16, 2009, an unredacted version of the Trustee Motion was filed by the Trustee [Docket No. 1971].

17.    The sale orders referenced in the Trustee's Motion include the Court's (i) Order under 11 U.S.C §§ 105(a), 363 and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 19, 2008 (the "<u>LBHI Sale Order</u>") [LBHI Docket No. 258] and (ii) Order Approving, and Incorporating by Reference for the Purposes of this Proceeding, an Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman Brothers Holdings Inc. Chapter 11 Proceeding (the "<u>LBI Sale Order</u>" and collectively with the LBHI Sale Order, the "<u>Sale Orders</u>") [Docket No. 3].

18.    In connection with the Trustee's Motion, the Trustee asserts that the Sale Orders must be read in conjunction with (i) a certain clarification letter (the "<u>Clarification Letter</u>") executed two days after the sale hearing, on September 22, 2008, between Barclays and the Trustee, (ii) a certain letter entered into between the Depository Trust & Clearing Corporation (the "<u>DTCC</u>"), Barclays and the Trustee (the "<u>DTCC Letter</u>"), which, as the Trustee asserts, excluded certain assets (the "<u>Disputed Assets</u>") worth approximately $6.7 billion from the Sale and (iii) a certain transfer and assumption agreement (the "<u>TAA</u>") entered into between the Trustee, Barclays and the Options Clearing Corporation (the "<u>OCC</u>").

19.    Through the Trustee's Motion, the Trustee seeks the entry of an order approving the following:

- Finding that the Trustee's interpretation of the Clarification Letter and the DTCC Letter is correct and consistent with the transaction that the Court approved;

- Finding that, to the extent that the Clarification Letter or the TAA may be read to transfer any of the Disputed Assets to Barclays, these transfers were never approved by the Court and are therefore outside the scope of the Sale Orders;

- To the extent that the Sale Orders authorize the transfer of any of the Disputed Assets to Barclays, granting the Trustee relief from the Sale Orders under Rule 60(b);

- Requiring an accounting of all assets which Barclays has received or to which it claims entitlement under the Sale Orders and the actual value of all liabilities that it assumed under the Sale Orders;

- Permitting the Trustee to take further discovery as necessary to assess the transaction on an accurate and complete record; and

- Awarding such other and further relief as the Court finds just and proper.

<u>See</u> Trustee Motion, ¶ 10.

20.    Contemporaneously with the filing of the Trustee Motion, on September 15, 2009, the Committee filed a Motion for Relief from Order Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 and Joinder in [LBHI's] and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order (the "<u>Committee Motion</u>") [Docket No. 1686].

21.    Through the Committee's Motion, the Committee seeks entry of an order:

- Granting the Committee relief from the Sale Orders to the extent it purports to approve material modifications to the Sale that were not disclosed to the Court;

- Revising the Sale Orders:

  o To remove approval of the Clarification Letter from the Sale Order to the extent it materially modified the Sale Transaction approved by the Court; and

  o To amend the Purchased Assets definition so that it contains assets with a fair value, as of the closing date, that is no greater than the lesser of (a) $47.4 billion and (b) the fair value, as of the closing date, of the actual liabilities assumed by Barclays without the application of any secret or other $5 billion discount described below;

- Requiring a full accounting and reconciliation of all Purchased Assets and assumed liabilities within 10 days (including any disposition of the same); and

- Directing the return to the estates of the value of all Purchased Assets in excess of the above (with interest).

<u>See</u> Committee Motion, p. 1.

22.    Through its motion, the Committee identifies the structure of the Sale, including changes to the asset purchase agreement (the "<u>APA</u>") between LBHI and Barclays. Importantly, the Committee notes that, "on September 17, 2008, the Federal Reserve Bank of New York (the "<u>Fed</u>") insisted that Barclays assume the Fed's obligations to provide financing to LBI," which was executed through a repurchase agreement (the "<u>Fed Repurchase Agreement</u>"). <u>See</u> Committee Motion, at p. 4. The Committee notes that "Barclays agreed to step into the Fed's position and entered into its own repurchase agreement with LBI (the "<u>Barclays-LBI Repurchase Agreement</u>"), which replaced the Fed Repurchase Agreement." <u>Id.</u> "After executing and filing the APA, the parties ultimately decided to transform the Barclays-LBI Repurchase Agreement into an asset sale, with Barclays keeping all of the collateral pledged under the Fed Repurchase Agreement…" <u>Id.</u>

23.    On September 16, 2009, LBHI filed a Motion to Modify the SIPA Sale Order and Joinder in Official Committee of Unsecured Creditors' Motion for Relief from SIPA

Sale Order (the "LBHI Motion") [Docket No. 1702]. By the LBHI Motion, LBHI joins in and adopts the Committee's Motion with respect to the Sale Orders.

24.     On January 29, 2010, in opposition to the Trustee's, the Committee's and LBHI's motions, Barclays filed a Motion to Enforce the Sale Orders and Secure Delivery of All Undelivered Assets (the "Barclays Motion") [Docket No. 2582].  Through the Barclays Motion, Barclays asserts, *inter alia*, that (i) this Court should uphold Barclays' right to certain Disputed Assets, (ii) the Trustee is barred as a matter of law from seeking to rewrite a contract and a sale order agreed to over a year ago and which was successfully defended on appeal, (iii) Rule 60 relief must fail as a matter of law on the facts of this case, (iv) Section 540 avoidance claims, as well as Section 559 claims against Barclays are meritless, (v) all adversary complaints against Barclays should be dismissed and (vi) the Constitution does not permit this Court to rewrite the terms of the sale transaction.

## ARGUMENT

25.     LibertyView joins in each of the respective motions of the Movants and incorporates by reference the arguments contained in each motion as if fully set forth herein.  In addition, LibertyView hereby objects to the relief requested by the Barclays Motion.  In addition to arguments raised by the Movants, LibertyView also has a particular interest to ensure that all of the terms of the Sale are closely reviewed by the Court.  Indeed, the examination of the terms of the sale transaction will likely reveal whether any of the Customer Property belonging to LibertyView that was held by LBI pursuant to the terms of the Agreements were improperly transferred to Barclays as part of the sale transaction.

26.     To date, LibertyView has been unable to obtain any accounting from LBI concerning: (i) what property LBI is currently holding that belongs to LibertyView; (ii) the capacity in which such property is being held; (iii) the facts and circumstances surrounding how LibertyView's property came into the possession of LBI; and (iv) what LibertyView assets, if any, where transferred by LBI to third parties prior or subsequent to the Commencement Date.[4]

27.     Following the closing of the Sale, LibertyView grew increasingly concerned about whether certain of its assets were improperly transferred from LBI to one or more third parties.  This concern became more acute as additional disclosures were made by the administrators overseeing LBIE's administration proceeding in the United Kingdom (the "LBIE Administrators") in August and October 2009 concerning the client property that the LBIE Administrators believed was being held by LBI.[5]  The LBIE Administrators disclosed that, as of September 15, 2008, LBI held approximately $5.9 billion of client property and there were approximately 4,700 stock line claims by LBIE on behalf of its clients against LBI, representing approximately 371 entities (including LibertyView). See October 8, 2009 MFA presentation, p. 21, annexed hereto as **Exhibit A**.  According to the LBIE Administrators, 95% of those stock line claims were reconciled between LBIE and LBI as of September 12, 2008. See August 5, 2009 MFA presentation, p. 13, annexed hereto as **Exhibit B**.  *However, an estimated 3,700 stock lines, or approximately 90% of LBI's client positions, had moved in LBI's records between September 12, 2008 and the September 19, 2008 Commencement Date and there were significant*

---

[4] Although representatives of the administrators overseeing LBIE's administration proceedings (the "LBIE Administrators") recently provided LibertyView with a list of certain securities which the LBIE Administrators believe were held by LBI as of the Commencement Date, there has been no independent verification from LBI that these positions were or are being held by LBI.

[5] On August 5, 2009 and October 8, 2009, the Managed Funds Association (the "MFA") hosted presentations in New York City, on behalf of the LBIE Administrators, whereby the LBIE Administrators provided updates on the LBIE administration proceedings. During these programs, the LBIE Administrators focused on, *inter alia*, the status of LBIE client property held at LBI and the potential treatment of LBIE claims against LBI.

*settlements between September 15, 2008 and September 19, 2008*. Id.; see also Trustee's Second Interim Report for the Period May 30, 2009 through November 11, 2009, ¶ 51 [Docket No. 2055]. LibertyView understands that, more than 17 months after these transfers were completed, these significant movements in client positions have yet to be fully reconciled. Id.

28.     Such extraordinary movements in LBI's stock lines, which have still yet to be fully reconciled, occurred simultaneously with negotiations over the sale of LBI's assets to Barclays. Accordingly, substantial questions exist over whether any of those involved in the sale transactions were fully aware of exactly what assets were being held by LBI, if they were in fact LibertyView's Customer Property, and whether they were properly the subject of the Sale.

29.     On October 5, 2009, the Trustee disclosed to this Court that "during the last week of LBI's operation as a broker-dealer, its compliance systems were not able to cope with the drastic and abrupt changes in LBI's financial condition and compliance obligations that occurred immediately before and after the chapter 11 filing of LBHI." See Trustee's Motion for Order Approving Trustee's Allocation of Property of the Estate, ¶ 77 [Docket No. 1866]. The Trustee has also stated that these lapses in compliance, which require augmentation to Customer Property available to the Trustee for distribution on account of customer claims, aggregate not less than $4.9 billion. Id. at ¶15; see also Trustee's Second Interim Report for the Period May 30, 2009 through November 11, 2009, ¶ 77.

30.     In light of these disclosures, and LibertyView's inability to obtain information from LBI about LibertyView's property located at LBI, LibertyView grew increasingly concerned that its property may have been improperly transferred out of LBI prior to and/or after the Commencement Date. However, as set forth above, most of the details from

the sale transaction were subject to confidentiality provisions.  It was at this time that the Movants filed their respective motions with this Court, raising the concern that billions of dollars worth of assets, beyond what was disclosed to the Court, were transferred from LBI to Barclays.

31.    From LibertyView's perspective, the disclosures in the Movants' motions and elsewhere, and the relief requested, are most troubling in that they recount Barclays' demands for assets, and LBI's hastened attempts to satisfy those demands, without any deliberative process for determining the property rights of customers and clients such as LibertyView, and whether LBI even had the legal authority to effectuate such transfers.  Among the disclosures made by the Movants, which did not become known to LibertyView until recently, were the following:

- Barclays and LBHI negotiated an embedded $5 billion discount to Barclays and is now seeking an entitlement to approximately $6.7 billion worth of Disputed Assets. See Committee Motion, p. 19; Trustee Motion, p. 35.

- The Barclays-LBI Repurchase Agreement contemplated Barclays acquiring all of the collateral pledged under the Fed Repurchase Agreement. See Committee Motion, at p. 4.

- The structure of the sale transaction changed subsequent to the entry of the Sale Order to incorporate a certain Barclays-LBI Repurchase Agreement. See Committee Motion, p. 23.

- The Clarification Letter, which was executed subsequent to entry of the Sale Orders, superseded prior agreements with respect to the cash and securities transferred to Barclays. See Trustee Motion, ¶¶ 46-52; Committee Motion, p. 28.

- A certain Transfer and Assumption Agreement, which provided that Barclays would step into the shoes of LBI at the Options Clearing Corporation, was entered into after entry of the Sale Orders which, as the Trustee notes, did not disclose to the Court, the Trustee or anyone else the magnitude of the sums involved. See Trustee Motion, ¶ 75.

- Barclays agreed to exclude certain assets from the Sale that would otherwise deprive the DTCC of important collateral, which was memorialized in the DTCC Letter between Barclays, the DTCC and the Trustee. However, as noted by the Trustee, Barclays now claims that it is entitled to certain of those assets. See Trustee Motion, ¶¶ 53-59.

32.    The positions of the Movants, on one hand, and Barclays on the other, demonstrate the wide variation concerning what transaction this Court actually approved and what assets Barclays was and is entitled to receive.  Indeed, the potential difference in assets available to the LBI estate could be well over $6 billion (*i.e.*, the Trustee seeks to recover over $3 billion in assets transferred from Barclays, and Barclays seeks over $3 billion of additional cash and securities from LBI). See Trustee's Second Interim Report for the Period May 30, 2009 through November 11, 2009, at ¶ 117.  The significance of the outcome of this litigation cannot be understated and will have a material impact on the ability of LBI to satisfy Customer Property claimants.

33.    Equally important, however, is that the Movants' motions will provide parties in interest with a fuller understanding of exactly what assets where transferred as part of the Sale.  This will allow parties, such as LibertyView, to analyze for itself whether its property was improperly transferred to Barclays and, if so, seek appropriate relief from this Court or another court of competent jurisdiction.[6]  Tellingly, the Committee seeks, as part of the relief requested, "a full accounting and reconciliation of all Purchased Assets and assumed liabilities within 10 days (including any disposition of the same)." See Committee Motion, p. 1.  The Trustee seeks similar relief. See Trustee's Motion, ¶ 10. The fact that such a basic request as this

---

[6] Section 78fff-2(c) of SIPA requires the Trustee to allocate property in his control between customer property and general estate property. See 15 U.S.C. §§ 78fff-2(c) and 78fff(d). Such a requirement to segregate customer property is analogous to determining whether assets are "property of the estate" under the Bankruptcy Code that can be transferred.  See Hill v. Spencer S&L Ass'n (In re Bevill, Bresler & Schulman, Inc.), 94 B.R. 817, 826 (D.N.J. 1989).

must be compelled by motion, more than 17 months after the sale transaction by fiduciaries, is perhaps the best indication of the need for an evidentiary hearing and full disclosure of all assets that were transferred pursuant to the Sale.

34.     Far from addressing the concerns of LibertyView, or the Movants, about the asset transfers undertaken as part of the Sale, the Barclays Motion, and accompanying exhibits, raise further concerns about the process to determine which LBI assets would be included in the Sale and if LBI had the authority to transfer such assets.  In an attempt to explain the risks that Barclays was taking by agreeing to the Sale without conducting all the necessary due diligence it would have preferred, the Barclays Motion describes a completely chaotic situation where LBI was scrambling to locate assets -- apparently *any* assets -- that could satisfy Barclays and allow the Sale to close.  Indeed, the evidence offered by Barclays should give all parties pause to consider what, if any, protections were in place to ensure that Customer Property (including the Customer Property belonging to LibertyView) was not improperly included in the sale transaction.

35.     Set forth below are just a few representative examples from the Barclays Motion, and its exhibits, that magnify LibertyView's concerns about the sale process. The examples include the testimony of certain individuals who were directly involved in the Sale and intimately familiar with the transaction:

§     <u>Mike Keegan - Head of Principle of Credit Trading Group at Barclays:</u>

A: And my recollection is around 8:00 at night, you know, we started getting stuff in and looking at it. We might have started getting it a little bit earlier, around 7, but we started looking at it.

**But about 8:00 at night on Thursday night we noticed that this wasn't the inventory that we had agreed to purchase on**

**Monday. It was different. And it included a lot of the inventory that we thought was overvalued.** At least the initial deliveries were a lot of what we thought was overvalued in the mortgages area, mortgage agencies, that we said we couldn't come to an agreement with Lehman on valuation and we were leaving behind.

**So it was at that point I learned for the first time that the agreement had changed and apparently sometime on Tuesday the Federal Reserve came in to us and said -- you know, it's been relayed to me by third parties, I have no idea what they actually said -- but, in effect, what I've been told, if you guys want the deal to go through you need to take us out of our repo. And so the construct of the deal changed from a purchase of inventory to taking an assignment of repo.**

See Barclays Exhibit 73, Keegan Transcript, 32:12-25; 33:2-14 (emphasis added).

§   Stephen King - Managing Director and Head of Portfolio Mortgage Trading Group at Barclays:

A: …And that's what we started to do on the Thursday in anticipation, what systems are we going to need to help manage that and what are we going to do on the Friday. **Of course, that was complicated, further complicated by the fact on the Friday morning we woke up to discover we don't own the same portfolio we thought we were going to own a day earlier.**

…

A: So we needed to do two things on Wednesday and Thursday. One, an assessment of an estimate of what we thought was a reasonable liquidation value for the portfolio, and then, two, **what was a reasonable guess at the risks that we were taking by being long on that portfolio.** That's what we were doing Thursday.

…

A: But on Friday we now know we are long. Let's say that was at 2 o'clock in the morning or something. No markets are open, so there is no way to start selling or to manage -- actually we couldn't start selling because actually it is just a repo facility, it is not that we are long the assets, so you couldn't sell on the Friday.

So therefore, we would have to think up things we could use to hedge the risk. And that's -- we started that process on Thursday. **By Friday we started to realize there are securities that we**

**thought we were going to take delivery of that we haven't, and there were securities that we have never seen before.**

…

A: …We couldn't eliminate the uncertainty associated with prices, but we ought to be eliminating the uncertainty associated with how we managed the process.

See Barclays Exhibit 77, 88:25; 89:2-8; 90:9-15; 91:14-25; 92:2-3; 92:15-23 (emphasis added).

§     <u>Alex Kirk - Lehman Employee Familiar with Sale:</u>

Q: Did there come a time when you learned whether additional value, additional unencumbered assets were located that could be transferred to Barclays?

A: Sometime late in the afternoon between 3 and 4, Ian came into a meeting where I was about to start a phone call with Bart, the Weil Gotshal lawyers on the phone, and I was sitting in the room with Mark Shapiro and I think it was Jim Seery and the Barclays, again, Diamond, Ricci, Klein and Keegan, and Ian came in and he said there's a -- there's a schedule of assets that we have that are unencumbered. I believe the number was $1.9 billion of marked value.

**In addition, he said there might be value in our 15c3 margin, which at the time I remember that specifically because I was like "Gee, what's that? I've never heard of that." So he said there might be value there, I don't know yet, and there might be others.**

So we said to Ian, well, get us a schedule of what's in the 1.9 billion in the -- I think he referred to it as being in the box unencumbered of these unencumbered assets, i.e., they were being financed by Lehman's unsecured debt, I believe at the time, or equity, and he came back with that list, showed it to myself and to Keegan and some others.

**Keegan looked at it and said, you know, this is the -- these assets are even harder to value than what we already have. I don't even know what these are. I specifically remember there being residential mortgage residual interests and things like IOs and some very illiquid aged positions in high-yield and distressed debt.**

-18-

**I don't specifically recall what else it was, but I do recall the list was a -- there was a reason why there was nobody financing those assets and it was because they were the most illiquid and hardest to value securities that Lehman Brothers owned on its balance sheet**.

See Barclays Exhibit 78, 104:24-25; 105:2-25; 106:2-17 (emphasis added).

§      Rich Ricci - Chief Operating Officer of Barclays' Investment Banking and Investment Management Division:

Q: Now, at the time that you had your conversation with Mr. Kirk in which he said that Lehman had nothing left to transfer to Barclays, did you have an understanding of the value of the collateral that had supported the Fed repo that had been transferred, already been transferred to Barclays?

A: **As I stated earlier, a tremendous amount of uncertainty, wasn't sure what collateral we had, wasn't sure what the value was, didn't have reliable numbers**.

Id. at 258:6-20 (emphasis added).

36.      In light of the significant facts that have come to light subsequent to the Court's entry of the Sale Orders, as well as the complete lack of information concerning the location and movement of LibertyView's property, LibertyView respectfully submits that the circumstances of this case dictate that the Court revisit the Sale Orders at least in order to serve the ends of justice and provide transparency to the sale process.

## BASIS FOR RELIEF REQUESTED

A.      This Court Has Discretion To Reconsider The Sale Orders

37.      This Court has the authority to reconsider the scope of the Sale Orders. See In re Portrait Corp. of Am., Inc., 406 B.R. 637, 641 (Bankr. S.D.N.Y. 2009) ("This Court has core jurisdiction under 28 U.S.C. § 157(b)(1) to interpret and enforce the Sale Order.")(citing, Travelers Indem. Co. v. Bailey, 129 S.Ct. 2195, 2205, 174 L. Ed. 2d 99 (2009)); Jamaica Shipping Co. Ltd. v. Orient Shipping Rotterdam (In re Millenium Seacarriers, Inc.), 458 F.3d 92,

95 (2d Cir. 2006) (citations omitted).  Further, as the court noted in In re: MMH Automotive

Group, LLC,:

> While the sale of assets under 11 U.S.C. §363 is final as to the
> entire world, including those who were not parties to the sale,
> Gekas v. Pipin (In re Met-L-Wood Corp.), 861 F.2d 1012, 1017
> (7th Cir. 1998); In re Clinton St. Food Corp., 254 B.R. 523, 531
> (Bankr. S.D.N.Y. 2000), and therefore, after a valid sale of assets,
> the bankruptcy court loses jurisdiction over the assets, the
> ***bankruptcy court nonetheless always retains jurisdiction to
> consider the enforceability of its own orders, including
> reconsideration of a sale to determine if it was properly
> conducted***.

385 B.R. 347, 355 (Bankr. S.D. Fla. 2008) (citations omitted) (emphasis added).

38.    Moreover, "[t]he Bankruptcy Code applies to SIPA liquidations only to

the extent consistent with SIPA." Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.), 263

B.R. 406, 473 (S.D.N.Y. 2001). Specifically, Section 78fff(b) of SIPA states as follows:

> Application of Title 11:
>
> To the extent consistent with the provisions of this chapter, a
> liquidation proceeding shall be conducted in accordance with, and
> as though it were being conducted under chapters 1, 3 and 5 and
> subchapters I and II of chapter 7 of Title 11. For the purposes of
> applying such title in carrying out this section, a reference in such
> title to the date of the filing of the petition shall be deemed to be a
> reference to the filing date under this chapter.

See 15 U.S.C. § 78fff(b).  Because chapters 3 and 5 of the Bankruptcy Code deal specifically

with property of a debtor's estate, it follows that the Bankruptcy Code is consistent with SIPA

when determining what assets of a debtor's estate may be sold pursuant to 11 U.S.C. § 363.

39.    Moreover, a court may revisit a prior sale order when it is subsequently

determined that not all of the assets included in the sale order were property of the debtor's

estate. See In re: Polycel Liquidation, Inc., 2007 U.S. Dist. LEXIS 955 (D.N.J. January 8, 2007).

In Polycel, certain creditors of the debtor, a manufacturer of large structural foam products, filed an involuntary bankruptcy proceeding on behalf of the debtor under chapter 7 of the Bankruptcy Code in the Eastern District of Kentucky, which was later converted to a voluntary case under chapter 11 in the District of New Jersey. Id. Prior to the debtor's bankruptcy, in 1991, the debtor contracted with Pool Builders Supply of the Carolinas, Inc. ("Pool Builders"), a seller of swimming pool supplies and related items, to manufacture certain swimming pool panels that form the interior surface of in-ground pools. Id. at *3. In order for the debtor to manufacture the pool panels, Pool Builders transferred possession of certain molds (the "Molds") to the debtor, which continued to be in the debtor's possession when the bankruptcy case was filed. Id.

40.    During the debtor's bankruptcy proceeding, the bankruptcy court entered an order approving the sale of the debtor's assets to the purchaser (the "Purchaser"), which included the Molds. Id. at *4. However, in 2004, after the Purchaser and Pool Builders had a disagreement which led to contention over which party owned the Molds, the Purchaser filed an action in the District Court for a declaratory judgment that it owned the Molds at issue. Id. at *10. Pool Builders subsequently moved in the bankruptcy court to clarify the bankruptcy court's sale order. Id. at *12. The bankruptcy court granted the motion and held that the sale order "did not authorize the sale of the Molds because they were not property of the Debtor's estate and Pool Builders was entitled to immediate possession of the Molds…" Id. On appeal, the District Court reversed and remanded based on the fact that the bankruptcy court failed to state the legal basis for its decision. Id. at *13.

41.    On remand, the bankruptcy court conducted an evidentiary hearing and held, inter alia, that the Purchaser did not acquire title to Pool Builders' Molds through the bankruptcy sale and thus title of the Molds would have remained with Pool Builders, not the

debtor. Id. at *14. Accordingly, the bankruptcy court explained that "the most appropriate remedy is not to avoid the entire sale, but only insofar as it pertained to the Molds of Pool Builders…By voiding the title given to [the Purchaser] in the Sale Order, the remedy restores title to Pool Builders and leaves possession with Pool Builders…" Id. at *15. In affirming the bankruptcy court's decision, the District Court noted that "the Bankruptcy Court was simply unaware of the Debtor's true interest in the Molds at the time it entered the Sale Order…" Id. at *28.

42.     Based on the holding in Polycel, it is clear that a bankruptcy court (including a bankruptcy court administering a SIPA Proceeding pursuant to 15 U.S.C. § 78fff(b)) may revisit its previously entered sale order if it is subsequently discovered that the debtor's assets being sold were not actually property of the debtor's estate. In the case *sub judice*, it is not clear what assets Barclays received and whether LBHI and/or LBI had the authority to sell those assets. Accordingly, this Court has the authority to reconsider the Sale Orders to determine whether any assets transferred to Barclays should not have been transferred in the first instance.

B.     The Court Should Exercise its Equitable Powers under 11 U.S.C. Section 105

43.     Separately, Bankruptcy Code § 105(a) provides this Court with the authority to reconsider the Sale Orders in light of the facts about the Sale that have been disclosed over the last several months. Section 105(a) provides, in pertinent part, that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). "Although there are some significant limits to a bankruptcy court's ability to use section 105(a) of the Code . . . section 105(a) plainly may be used 'to enforce and implement earlier orders.'" In re River Center Holdings, LLC, 394 B.R. 704, 711 (Bankr. S.D.N.Y. 2008) (quoting In re Ames Dep't Stores, 317 B.R. 260, 274 (Bankr.

S.D.N.Y 2004)); see also In re Flushing Hospital and Medical Center, 395 B.R. 229, 240-41 (Bankr. E.D.N.Y. 2008). The Ames court stated that "it is manifestly proper, in this Court's view, to invoke section 105(a) 'to enforce or implement' the Court's earlier orders, and to prevent abuses of process. Exercise of the Court's section 105(a) authority in this manner, and for this purpose, vindicates the interests of the *Court*, as much as, (and perhaps more than) it vindicates the interest of an individual litigant." Ames, 317 B.R. at 273-74 (emphasis in original).

44.     In the case at bar, the shear magnitude of the assets involved and the level of disagreement and uncertainty that have come to light mandates that the Court reconsider the Sale Orders to determine what assets Barclays is entitled to and whether Customer Property such as LibertyView's has been improperly transferred. It is unfathomable that Barclays could expect to receive a significant windfall based on information that was not readily available to the Committee or its constituents, such as LibertyView, at the time that the Sale was being negotiated. Accordingly, the Court should exercise its Section 105(a) powers to reconsider the Sale Orders.

C.    Federal Rule of Civil Procedure 60(b) is Applicable in These Circumstances

45.     If the Court is not inclined to exercise its Section 105(a) powers, LibertyView respectfully submits that relief under Fed. R. Civ. P. 60 ("Rule 60") is warranted. Rule 60, made applicable to this bankruptcy case by Bankruptcy Rule 9024 (with certain exceptions not applicable here), provides, in relevant part, as follows:

> (b) On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> > (1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable
diligence, could not have been discovered in time to
move for a new trial under Rule 59(b); or

\*        \*        \*

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  For purposes of Bankruptcy Rule 9024, all orders of the bankruptcy court are subject to Fed. R. Civ. P. 60.  See *Advisory Committee Note* to Fed. R. Bankr. P. 9024.

46.    "It is within the court's broad discretion to grant relief under Rule 60(b)." Mazzone v. Stamler, 157 F.R.D. 212, 214 (S.D.N.Y. 1994). "In exercising this discretion, courts should balance the policy in favor of serving the ends of justice against the policy in favor of finality." Id. "Fed. R. Civ. P. 60(b) is to be given a liberal construction so as to do substantial justice and to prevent the judgment from becoming a vehicle of injustice." MIF Realty L.P., 92 F.3d 752, 755 (8th Cir. 1996).

47.    For the reasons described below and in the Movants' motions, LibertyView joins in the Trustee's Motion, the Committee's Motion and LBHI's Motion for the proposition that Rule 60(b) relief is appropriate in these circumstances.

a)    Rule 60(b)(2) - Newly Discovered Evidence

48.    Rule 60(b)(2) permits a court to reopen a judgment on account of newly discovered evidence.  "To prevail under Rule 60(b)(2) on the grounds of newly discovered evidence, 'the movant must have been justifiably ignorant of [the evidence] despite due diligence…'" Chase v. Chase, 392 B.R. 72, 86 (S.D.N.Y. 2008)(citing United States v. Int'l Bhd. of Teamster, 247 F.3d 370, 392 (2d Cir. 2001)). The rule is "aimed at correcting erroneous judgments based on the unobtainability of evidence." In re Lafata, 344 B.R. 715, 723-724

(B.A.P. 1st Cir. 2006), aff'd, 483 F.3d 13 (1st. Cir. 2007) (quoting Hoult v. Hoult, 57 F.3d 1, 5

(1st Cir. 1995)).    Further, as noted by the court in In re Enron Corp., there are specific

requirements that a party must meet in order to be afforded relief under Rule 60(b)(2):

> [A] party must demonstrate: (1) the newly discovered evidence
> was of facts that existed at the time of trial or other dispositive
> proceeding, (2) the movant must have been justifiably ignorant of
> them despite due diligence, (3) the evidence must be admissible
> and of such importance that it probably would have changed the
> outcome, and (4) the evidence must not be merely cumulative or
> impeaching.  United States v. International Brotherhood of
> Teamsters, 247 F.3d 370, 392 (2d Cir. 2001) (examining Rule
> 60(b)(2)).

2003 Bankr. LEXIS 2111, *50-51 (Bankr. S.D.N.Y. Mar. 21, 2003).

49.    In this case, the Sale of LBHI's and LBI's assets to Barclays was

negotiated and consummated under a confidentiality agreement which deprived the Committee

and other creditors, including LibertyView, of the opportunity to access information about their

securities and whether those securities were or should have been subject to the sale transaction.

As previously described, the newly discovered information referenced in the Trustee's Motion

and the Committee's Motion is exactly the kind of information that the Court should consider in

determining whether the Sale Orders were and are appropriate. Based on this new evidence,

which could have certainly altered the outcome of the sale hearing (the "Sale Hearing"),

particularly with respect to which of LBHI's and LBI's assets were actually being purchased by

Barclays, the Sale Orders must be reconsidered in order for the Court to fully ascertain the intent

of the parties in negotiating the sale transactions and the scope of the transaction itself.  Indeed,

if the Committee could not even opine as to whether the Sale was appropriate -- in fact, the

Committee took no position at the Sale Hearing -- then it would be virtually impossible for

creditors such as LibertyView to do so at the time the Sale Orders were approved by the Court.

b)   Rule 60(b)(1) - Mistake, Inadvertence, Surprise, or Excusable
Neglect

50.   Relief from the Sale Orders is also warranted under Rule 60(b)(1), which permits the court to vacate a prior order based on "mistake, inadvertence, surprise, or excusable neglect." Mistake under Rule 60(b) is not confined to mistakes of the moving party but may be the mistake or neglect of others. See Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.), 346 F.3d 31, 34-35 (2d Cir. 2003). Remedies under Rule 60(b)(1) may also be applied to correct the court's own mistakes of law or fact. Id. at 32 (affirming bankruptcy court's decision to vacate its prior order when court was not aware of relevant facts).

51.   As described above, in these proceedings the Court was presented with facts at the time of entry of the Sale Orders that are surprisingly different from the facts that have now come to light. Thus, at a minimum, the Court should reopen the Sale Orders to consider the applicability of the relevant facts surrounding the sale of LBHI's and LBI's assets to Barclays and the impact those facts may have on all interested parties, including LibertyView.

c)   Rule 60(b)(6) - Any Other Reason That Justifies Relief

52.   Lastly, LibertyView respectfully submits that there are ample grounds for the Court to reconsider the Sale Orders pursuant to Rule 60(b)(6). Rule 60(b)(6) allows the court to relieve a party from a final order for "any other reason that justifies relief." See Fed. R. Civ. P. 60(b)(6). "The sixth subsection of Rule 60(b) is 'reserved for grounds for reconsideration which are not already recognized in the first five subsections' of the rule" and "allows for a different outcome only 'when there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship…'" In re Taub, 421 B.R. 37, *8-9 (Bankr. E.D.N.Y. 2009) (citations omitted).

53.     While relief under Rule 60(b)(6) is allowed only under exceptional circumstances, the facts of this case amply justify such relief. Considering the enormity and significance of this case, the circumstances surrounding the Sale, including the time frame and the apparent lack of full disclosure to the Court at the time of the Sale Hearing, LibertyView submits that there is a strong basis for the Court to grant relief from the Sale Orders pursuant to Rule 60(b)(6).

## CONCLUSION

54.     The concerns raised by the Movants, each of which is a fiduciary, questioning the process by which assets were or are to be transferred by LBHI and LBI to Barclays must be examined in-depth and the Sale Orders reconsidered.  The integrity of the sale process is at stake, which will not only affect LibertyView as a customer claimant in the LBI SIPA Proceeding generally, but will ensure that LibertyView and all parties in interest have access to information necessary to determine whether certain of their property was inappropriately transferred to Barclays as part of the sale transaction.  For the reasons set forth above, as well as in the respective motions of the Movants, the Movants' motions should be granted and the Barclays Motion should be denied.

## RESERVATION OF RIGHTS

55.     LibertyView expressly reserves its right to supplement this Joinder at or on the date of the hearing on the Barclays Motion.

**WHEREFORE**, based upon the foregoing facts and authorities, LibertyView respectfully urges the Court to (i) grant the relief requested by the Movants; (ii) deny the relief

requested by the Barclays Motion; and (iii) grant LibertyView such other and further relief as the

Court deems just and proper.

Respectfully submitted,

**LOWENSTEIN SANDLER PC**

By: /s/ *Michael S. Etkin* _____

Michael S. Etkin, Esq.
Scott Cargill, Esq.
Sean E. Quigley, Esq.
1251 Avenue of the Americas, 18th Floor
New York, New York 10022

-- and --

65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500 (Telephone)
973.597.2400 (Facsimile)

*Counsel for LibertyView*

Dated: March 4, 2010
      New York, New York