UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
:
In re : Chapter 11 Case No.
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*, : 08-13555 (JMP)
:
Debtors. : (Jointly Administered)
:
----------------------------------------------------------x

## GENERAL OBJECTION OF WILLIAM KUNTZ, III Pro Se TO PROPOSED SETTLEMENT, MOTION TO EXTEND TIME AND CROSS MOTION FOR DISTRIBUTION

When I grew up in Dayton, Ohio there was a local bank that was subject to local jokes which was founded by Valentine Winters, great-great-grandfather to the Comedian Jonathan Winters. Despite it's long history "History tells us that the Dayton Bank, predecessor of Winters National Bank, was one of the soundest financial institutions in the entire country." http://www.daytonhistorybooks.com/page/page/4502431.htm the local joke was that Winters was the ' the Winters National Bank and <not to be> Trust<ed> Company.

Over Time, Winters became part of Bank 1 and Bank 1 melded into Chase to become JPMorgan Chase who is before the Court now. From my point of view, not much has changed.

### AS TO JPMORGAN

1) The Debtor's application states early on that JPMorgan '

" JPMorgan Bank required LBI to deposit collateral security for clearing and settlement services performed by JPMorgan Bank. During the summer of 2008, JPMorgan Bank required LBHI to execute a guaranty dated as of August 26, 2008, covering certain of LBI's obligations to JPMorgan Bank and post collateral securing such guaranty."

Accordingly that Morgan would take such acts days before the Ch 11 Petition makes it's position suspect.

2) "One bank caught in the cross hairs is JPMorgan Chase Bank, one of the largest mortgage lenders in the city. Last month, Diana Adams, the US Trustee in Manhattan, filed papers in court supporting punitive financial sanctions against the bank for a string of bad behavior, including seeking to foreclose on homes after they rejected the attempts to make on-time payments and for failing to prove they own the mortgage on a home even as they move to seize it.
Chase filed documents that appear to be patently false or misleading, Adams said in the filing. Although Chase has recently taken steps to address concerns expressed by courts in connection with other cases, based on Chase's past and current conduct it needs to be sanctioned, Adams wrote. A spokesperson for Chase had no comment on the US Trustee's action "

Read more:
http://www.nypost.com/p/news/business/liening_on_brXWsORtBjnxgpXskq8x5N#ixzz0hDME4DJf

3) This is the 3rd time in so many months that a deep pocket Wall Street Firm has come before the court asking for special treatment.

The Court approved dealing with Met Life despite that it was on the Creditors Committee. The Attorney for the Creditors Committee gave the Court an assurance that Met Life recused itself.

It now appears, to this party at least, that Met Life violated it's own internal ethical policy.

"business-related endeavor, in addition to following the ethics and compliance principles set forth
in this Code, MetLife expects you to comply with all of the other applicable corporate policies
and procedures and those laws, rules, and regulations and avoid even the appearance of
impropriety."

http://www.metlife.com/about/corporate-profile/corporate-governance/corporate-conduct/index.html

Rather than try to bring any kind of motion, i just sent info to Congressman Barney Frank who may take some interest. To my knowledge, Met Life did not bother to file an 8K.

4) The Court recently approved a deal with regards to a office building in Stamford, Conn.

Again, with the representation of the Creditor's Committee Counsel about Claims Reduction.

However, a review of the Claims Docket reveals that the Claims were apparently duplicates and for only $250,000,000 and not $400,000,000+ Further it now appears that the so called colorable tax claims were only viable if Security Pacific?<In 1992 Security Pacific Bank merged with San Francisco-based BankAmerica (now called Bank of America),> had taxable income to shelter. The Court might wish to review *in camera* the minutes from the Creditors Committee's subcommittee of Real Estate.

In short a gift of a $60,000,000 allowed claim. In addition, it now appears that the Debtor in locked into a 50 year ground lease with General Re, which I believe is owned by Berkshire Hathaway, controlled by Warren Buffett, one of the 4 richest men in the world.

5) Now in plowing thru the Motion, it appears that the most critical info upon which one might develop a clear understanding is a redacted document listed as Annex B.

Without that, the Court should not approve this. There is no reason why Chase cannot wait until the Plan is confirmed and others might take exception to the obvious infirmities of last minute arrangements with the Debtor

6) Further, it would seem that the following might improve the prospect for the Estate.

a) JPMORGAN would contribute a so called 'equity kicker' to the estate of 10,000,000 shares of the Bank's Common Stock.

b) the Ill-liquid Securities should be put up for auction. At this point, there is a significant risk that the Estate will be painted into a corner prior to any proposed or confirmed plan holding who knows what kind of junk. There seems to be plenty of action in the Debtor's Claims so there should also be great interest in these assets if in fact they are even 'assets'. The options for the Estate Plan should not be anchored down by acquiring more ill-advised assets which will only delay things.

c) that the Cash payment be deferred until 30 months after confirmation and conditioned upon and after only cash payments to the unsecured creditors of 20% of allowed claims.

## AS TO THE REQUST FOR MORE TIME

7) The Court should deny the Request for more time. The Debtor and Debtor's Counsel have squandered huge amounts of time on almost silly things like fighting over allowance of late claims where the sum of the claims were less that 1% of the claims, bitter words with Metavante and others over sums representing less than 3% of what Weil, Gotshal has already been paid in professional fee's,etc. To my knowledge, there is no party that is banking at the door to file a plan and the Denial only effects the Debtor's Exclusive Right to File a Plan. We are after all, dealing with appointed management, not elected management.

To my knowledge there has been a substantial trade down in claims so while the Debtor may say $800 Billion in claims, many have already traded down, to the assignee's might propose a plan, but confirmation is another story.

## UPDATE: Deutsche Bank AG purchases another $240M of Lehman Claims

More filings of claims transfers were posted after the market close for Deutsche Bank AG. As of 2100 EST 02 March 2010 Deutsche Bank AG has purchased $434,122,927 (excluding

likely duplicates) of Lehman claims in a single day.

This brings the total net claims purchases for Deutsche Bank AG since the bankruptcy filing to **$1,529,348,816.29**.

<u>Transfer Spreadsheet</u> for Goldman Sachs, Barclays, JPM Chase, Royal Bank of Scotland, and Deutsche Bank AG.

This brings the total combined NET purchase of Lehman Claims by Goldman, Barclays, JPM Chase, Royal Bank of Scotland, and Deutsche Bank AG to at least **$2,044,469,912.04**

-

# Wednesday, March 3, 2010

### Claims Value Breakdown

**by coach tequila @ <u>IHUB</u>**

**Number Claims..........$ Dollar Value**
8,635....................$ 0
8,751....................$ 0-10K
25,590..................$ 10K-100K
10,426..................$ 100K-500K
2,880....................$ 500K-1M
2,397....................$ 1M-2M
2,683....................$ 2M-5M
1,575....................$ 5M-10M
2,392....................$ 10M-50M
698......................$ 50M-100M
286......................$ 100M-500M
68........................$ 500M-1B
71........................$ 1B-5B
24........................$ 5B+

8) That the Court should direct that the Debtor make a Cash Distribution of 1% of Claims, which

by my math come in about $8.21 Billion US Dollars. So far, the Debtor's Professional have sucked

1/2 Billion. In addition for every lawyer the Court see's in the Courtroom, there no doubt are 5

more out of sight so the Collective Legal Bill must exceed $2 Billion so far.

By allowing Weil, Gotshal and Milbank Tweed, etc almost unfettered access to the Estate's Cash

while the concoct up some kind of "we keep the cash and you get crappy stock" Plan

is unacceptable to this Creditor. Of Course, Institutional Investors can plan for a long

work out, but then that just illustrates how loaded is the Creditors Committee Membership.

To be Candid, I would like to see the remaining Ex-Offico Committee Members join the Official

Committee and that White and Case become Joint Counsel to the Offical Committee.

## CONCLUSION

As I stated before. I think the Bar Date should be extended. The Court has already has to much attention diverted over claims that amount to perhaps 1% of the Estate. Had Debtor's Counsel spent that time in a better fashion the Plan Outline which was promised would be before the Court. Despite the relentless finger pointing by Weil. Gotshal about some old rusty Case in Oklahoma, I do not cite case law to a room full of Lawyers. I have found that counter productive.

I think the time has come for the Estate Lawyers/Visiting Managres to **"put up or shove off"** and file what they have now in the way of a plan as promised or

for the Court to Consider if the Estate's Creditors might be better served by converting to CH 7 Liquidation with a Trustee.

Speaking for myself, I am not interested in some kind of long term constuction project building financial sand castles and lining the pockets of hundreds of Lawyers. A Search of the Docket reveals almost 400 applications by out of District Lawyers for admission into this Case. That is almost 4% of the entire Docket I think that many small creditors share the same thoughs and would welcome a Cash Distribution in toto of 3.69% like that of the Channel Funds < Nassau Tribune, Monday, Jan 25, 2010><Ex 1> and the hell with the rest. Even at that Level the ROI on my Grand Union Notes would exceed 3,600%. It is lucky for me that the Cruel Works sucked out of some Legal Search Engine used by Weil Gotshal does not operate on the Holder in Due Course Rule. I was already subject to a significant attack on that long ago, and even Grand Union flew a Lawyer from Wilmington, Delaware to Lake Placid,NY to take my Deposition some 15 years ago.

ACCORDINGLY, I REQUEST THE COURT DENY BOTH THE MORGAN MOTION AND THE EXTENSION MOTION AND DIRECT A DISTRIBUTION OF 1% OF CLAIMS FROM THE CASH OF THE ESTATE BEFORE MORE HAIRBRAINED SCHEMES ARE HATCHED.

William Kuntz,III
India St
PO Box 1801

Nantucket Island, Massachusetts 02554-1801 USofA

508-775-9717

HYANNIS, MA
MARCH 4, 2010



**UNITED STATES POSTAL SERVICE**

Home | Help | Sign In

Track & Confirm        FAQs

# Track & Confirm

## Search Results

Label/Receipt Number: **0309 1830 0000 6999 1637**
Class: **Priority Mail®**
Service(s): **Delivery Confirmation™**
Status: **Delivered**

Your item was delivered at 7:39 AM on February 25, 2010 in WASHINGTON, DC 20515.

Detailed Results:
- Delivered, February 25, 2010, 7:39 am, WASHINGTON, DC 20515
- Arrival at Unit, February 25, 2010, 6:34 am, WASHINGTON, DC 20022
- Processed through Sort Facility, February 22, 2010, 10:49 pm, NASHUA, NH 03063
- Acceptance, February 22, 2010, 3:46 pm, HYANNIS, MA 02601

Notification Options

**Track & Confirm by email**
Get current event information or updates for your item sent to you or others by email.  ( Go > )



Track & Confirm
Enter Label/Receipt Number.
( Go > )

---

Site Map    Customer Service    Forms    Gov't Services    Careers    Privacy Policy    Terms of Use    Business Customer Gateway

Copyright© 2010 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

---

**U.S. Postal Service™ Delivery Confirmation™ Receipt**

DELIVERY CONFIRMATION NUMBER: 0309 1830 0000 6999 1637

Postage and Delivery Confirmation fees must be paid before mailing.
Article Sent To: (to be completed by mailer)
(Please Print Clearly)

Congressman BJ Frank
it k
Wnshington, DC   20510

Postmark Here
FEB [illegible] 2010

**POSTAL CUSTOMER:**
Keep this receipt. For Inquiries:
Access internet web site at
www.usps.com®
or call 1-800-222-1811

CHECK ONE (POSTAL USE ONLY)
☑ Priority Mail™ Service
☐ First-Class Mail® parcel
☐ Package Services parcel
(See Reverse)

PS Form 152, May 2002

(+)

# $471m fund investors to recover just 3.69%

FROM page 1B

of the Bahamas over the Olympus Univest/Mosaic affair, offering his "full cooperation and assistance". He added: "Although to date no criminal prosecutions have been commenced by the relevant authorities in connection with the losses suffered by the retail investors, the received remains prepared and available to provide any and all assistance to law enforcement agencies and securities regulators in connection with the losses suffered by retail investors."

An annex attached to Mr Massi's report showed that, to date, he and Mr Culmer have recovered Cdn$11.495 million out of the Cdn$17.392 million forecast from Mosaic Composite. These funds include a Cdn$7.813 million investment in another investment fund; Cdn$.1053 million in claims from two Bahamas-based liquidations; and Cdn$730,000 in interest and tax refunds.

And a further Cdn$1.899 million has been received in dividends from BISX-listed Premier Real Estate Investment Corporation, the mutual fund that owns Freeport's First Commercial Centre and two properties owned by the Coca-Cola producer in both Nassau and Freeport, Mosaic Composite, holds a 49 per cent stake in Premier Real Estate, and this equity is the only asset the liquidators have yet to realise. The value of this shareholding, though, was shown to have deteriorated from Cdn$6.38 million as at February 27, 2007, to Cdn$5.897 million as at September 30, 2009.

Premier Real Estate was created by Hannes Babak, a former major shareholder in the First Commercial Centre, and Hancock, was a director of Olympus Univest, Mosaic and a collection of entities known as the Channel Funds, established in the Bahamas in the 1990s to act as investment vehicles for Mosaic.

"At all material times, Norshield Asset Management International (NAMI), of which Hancock was a director, acted as the investment advisor and manager to Mosaic, and Cardinal provided accounting services for Mosaic. NAMI and Cardinal reported Mosaic's NAVs relying on the false valuations of Mosaic's assets," the liquidator claimed.

Mr Massi alleged that as at September 30, 2003, the value of Mosaic's non-hedged assets – its investments in the Channel entities – were overstated by 88 per cent or some $300 million, and should have been closer to $82 million rather than $382 million. He attributed responsibility for this to Xanthoudakis and Smith, not Cardinal or Mr Hancock.

In his defence, Xanthoudakis denied responsibility for Norshield's collapse, and said he was not involved in calculating the NAVs for Olympus Univest or Mosaic. "The NAV calculations were undertaken by Cardinal International Fund Management and NAV Consulting, which were independent and highly-regarded organisations that provide similar services to other major investment funds," he alleged.

Smith's defence followed similar vein, stating that he was "satisfied" that the NAVs "properly reflected the underlying assets of" Olympus Univest and Mosaic Composite.

He based this on "the independence and industry status of Cardinal International Fund Services" as the fund administrator for both, and its calculation of their NAVs.

Further support for this position, Smith alleged, came from the unqualified audit opinions rendered for the 2002 and 2003 financial years by Mosaic and Olympus's external Bahamian auditors, Grant Thornton and Deloitte & Touche.

Mr Massi's report detailed how Norshield placed retail investor monies into its Olympus Funds, which then invested them into the asset manager wholly-owned subsidiary, Barbados-based Olympus Bank.

The bank co-mingled retail investor funds with capital received from institutional investors, such as pension funds and financial institutions, placing all monies into Bahamas-based Olympus Univest. The latter used these funds to make "substantial investments" in Mosaic, a 'fund of funds' structure, which invested in "hedged and non-hedged assets".

Mr Massi said that based on Mosaic's last audited financial statements, as at September 2003, the value of its hedged assets totalled $387 million.

Approximately 13 per cent of the retail investors' investments in Olympus Funds. The receiver further estimates that the net proceeds, which ultimately may be available for distribution to the retail investors, could be between 5.5 per cent and 7.4 per cent.

Other than certain claims against third parties, none of the Receiver, the joint custodians, the Olympus Univest joint official liquidators or the Mosaic joint official liquidators has identified any additional significant assets since the date of the sixth report [March 2007].

Mr Massi said he had met with the Securities Commission

ite. 

diverting them away from the proposed plan structure. The claim is being submitted on behalf of some 1,900 Canadian retail investors.

In his statement of claim, the liquidator alleged that "for most of 2002 and 2003", Mr Hancock, was a director of Olympus Univest, Mosaic and a collection of entities known as the Channel Funds, established in the Bahamas in the 1990s to act as investment vehicles for Mosaic.

Among Premier's founding directors, although he is no longer on the board, was Stephen Hancock, president and chief executive of Cardinal International, the ex-Bahamian fund administrator for Olympus Univest, Mosaic and a number of other entities in the Norshield investment structure.

Norshield's two alleged managing minds, John Xanthoudakis and Dale Smith, have both sought to lay blame for Olympus Univest/Mosaic's inflated net asset values (NAVs) at the feet of Cardinal and, Mr Hancock, who were responsible for these calculations. There is nothing to suggest, though, that Mr Hancock or his former firm have done anything wrong in relation to the Norshield affair.

The Xanthoudakis and Smith claims were made in their defences to a civil action filed against them in Canada by Mr Massi, who is seeking Cdn$159 million in damages from the pair over alleged breach of fiduciary duty to their clients by "artificially inflating" the value of investment assets and consulting, which were independent.