# EXHIBIT A

*Contains Highly Confidential Information*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 Case No. |
| | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) |
| Debtor. | |

## RESPONSE OF BARCLAYS CAPITAL INC. TO
## THE MOVANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

*Contains Highly Confidential Information*

Pursuant to the Court's Scheduling Order concerning Certain Motions Filed by LBHI,

SIPA Trustee and Creditors' Committee, dated October 27, 2009, and with reference to Rule

7056-1 of the Local Bankruptcy Rules, Barclays Capital Inc. ("Barclays") submits this response

to The Movants' Statement of Undisputed Material Facts (the "Movants' Statement") served on

Barclays by (a) Lehman Brothers Holdings, Inc. ("LBHI"); (b) James W. Giddens, as Trustee in

the Securities Investor Protection Act Liquidation of Lehman Brothers Inc. (the "Trustee"); and

(c) the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. and its

Affiliated Debtors and Debtors in Possession (the "Committee") (collectively, the "Movants").

Barclays objects to the Movants' Statement as improper because it contains a number of

paragraphs without a "citation to evidence which would be admissible." Rule 7056-1(e) of the

Local Bankruptcy Rules. These paragraphs should be "disregarded." *Holtz v. Rockefeller &*

*Co., Inc.*, 258 F.3d 62, 73-74 (2d Cir. 2001). Barclays objects to many of the Movants'

individual statements for the reason that they take select phrases from a document or transcript

out of context and distort their meaning. Barclays also objects to many of the Movants'

individual statements for the reason that they are based on material outside the APA and other

contractual documentation executed by the parties and are therefore irrelevant under the

contractual merger clause, BCI Ex. 1 [APA] at § 13.5. Barclays further objects to the lack of

relevancy or materiality of many of the Movants' individual statements to any issue presented on

the Rule 60 Motions to which the Movants' Statement purportedly relates. Barclays' response to

any statement or paragraph does not constitute an admission that the statement or paragraph is

relevant or material to the Rule 60 Motions. Barclays also objects to many of the Movants'

individual statements on the grounds that they are improper legal conclusions. *See, e.g., Kenall*

*Contains Highly Confidential Information*

*Mfg. Co. v. Thomas Group LLC*, 439 F. Supp. 2d 854, 859 (N.D. Ill. 2006) (legal conclusions regarding infringement and claim construction arguments do not comply with Local Rule 56.1).

These objections are incorporated by reference into each response below. Barclays' responses to the Movants' Statement are made without prejudice to Barclays' right to dispute any statements or paragraphs in the Movants' Statement for any other purpose in this or any other proceeding. Barclays reserves the right to correct, supplement, or amend its responses at any time before any evidentiary hearing. Barclays specifically denies all statements and paragraphs in the Movants' Statement, except as expressly admitted below.

<u>Responses</u>

Barclays responds to the specific paragraphs in the Movants' Statement as follows:[1]

1.    **At the time of the sale transaction, Robert Azerad ("Azerad") worked at Lehman and was responsible for liquidity management at Lehman. (A. 1 [Azerad] 14:16-15:7.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 1 as imprecise. Mr. Azerad testified that as Global Head of Asset and Liability Management for Lehman, he had a large number of people reporting to him from three groups, only one of which was liquidity management. BCI Ex. 54 [Azerad Dep. Tr.] at 13:16-17:25.

2.    **At the time of the Sale Transaction, Azerad reported to Paolo Tonucci. (A. 1 [Azerad] 13:4-7; A. 19 [Lowitt] 262:15-17.)**

---

[1] Unless specified herein, abbreviations used in this document are the same as those set forth in the Rule 60 Motions. Exhibits cited herein as "BCI Ex. __" may be found in the Appendix to the Memorandum of Barclays Capital Inc. in Opposition to the Rule 60 Motions and in Support of Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets filed January 29, 2010. The "Sale Transaction" referred to herein is, as defined in the Rule 60 Motions, the Sale, which closed on September 22, 2008, of certain of the assets of LBHI, LB 745 LLC, and LBI to Barclays in accordance with the terms set forth in the Purchase Agreement, as defined by the Sale Order.

*Contains Highly Confidential Information*

Barclays' Response

     Barclays does not dispute the statement in paragraph 2.

**3.**     **Azerad was employed by Lehman from January 2000 through September 2008. (A.**

     **1 [Azerad] 12:17-14:15.)**

Barclays' Response

     Barclays does not dispute the statement in paragraph 3.

**4.**     **Steven Berkenfeld ("Berkenfeld") worked at Lehman from January 1987 to**

     **September 2008. (A. 2 [Berkenfeld] 6:20-7:21.)**

Barclays' Response

     Barclays does not dispute the statement in paragraph 4.

**5.**     **In September 2008, Berkenfeld was Managing Director and Chief Investment**

     **Officer of Lehman's Private Equity Division, and Head of the Legal, Compliance**

     **and Audit Division. (A. 2 [Berkenfeld] 6:20-7:21.)**

Barclays' Response

     Barclays disputes the statement in paragraph 5 as incomplete. Mr. Berkenfeld testified
that he also was Chairman of the "Transaction Approval Committees." BCI Ex. 55
[Berkenfeld Dep. Tr.] at 7:13-15.

**6.**     **Berkenfeld participated in the negotiations regarding the Sale Transaction. (A. 25**

     **[Shapiro] 49:20-50:6, A. 21 [McGee] 11:25-13:6.)**

Barclays' Response

     Barclays disputes the statement in paragraph 6 as not supported by the cited evidence.
Mr. McGee does not identify Mr. Berkenfeld as one of those persons who negotiated the
transaction, either in the portion of his deposition testimony cited by Movants or
anywhere else. Barclays also disputes the statement in paragraph 6 to the extent it

*Contains Highly Confidential Information*

implies that "participation" in the events leading up to the Sale Transaction is the equivalent of "negotiat[ing] the Sale Transaction." The testimony of Mr. Shapiro cited by Movants merely states that Mr. Berkenfeld was involved "in some of the legal negotiations," but "was not ... in the meetings that took place between [Shapiro], Mark Shafir, Archie and Michael Klein." BCI Ex. 97 [Shapiro Dep. Tr.] at 49:23-50:6. Mr. Berkenfeld himself testified that he "was not involved in the negotiation of the business deal" and was involved only in the "lawyering of the Asset Purchase Agreement." BCI Ex. 55 [Berkenfeld Dep. Tr.] at 27:13-15.

7.    **Berkenfeld testified that he was not involved in negotiating the "business deal"**

      **embodied in the Sale Transaction. (A. 2 [Berkenfeld] 26:24-27:17.)**

Barclays' Response

       Barclays does not dispute the statement in paragraph 7.

8.    **Berkenfeld was involved in "lawyering" the Asset Purchase Agreement, which**

      **included preparing and drafting the Asset Purchase Agreement, First Amendment**

      **to the Asset Purchase Agreement, and Clarification Letter. (A. 2 [Berkenfeld]**

      **26:24-27:17.)**

Barclays' Response

       Barclays disputes the statement in paragraph 8 as not supported by the cited evidence. Although Mr. Berkenfeld testified that he was involved in the "lawyering" of the Asset Purchase Agreement," BCI Ex. 55 [Berkenfeld Dep. Tr.] at 27:13-15, he did not testify that he was involved in either the "lawyering" or the "drafting" of the First Amendment to the Asset Purchase Agreement or the Clarification Letter. Rather, Mr. Berkenfeld testified that he was "involved" in preparing and drafting the original APA, but not that he actually drafted anything; his "lawyering" role was limited to "reviewing" the Asset Purchase Agreement. *Id.* at 27:5-6, 41:15. Mr. Berkenfeld testified that he signed the original APA because there was nobody else present and available to sign it who was an authorized officer of LBHI and that, "to some extent, I think the amendments and the clarification letter were brought to me by the counsel just for consistency after that. *Id.* at 163:3-10. Barclays further disputes the statement in paragraph 8 to the extent it implies that Mr. Berkenfeld had any role in negotiating the Sale Transaction, *see* Barclays' response to paragraph 7, or that his "lawyering" role included any significant drafting work, *see* Barclays' response to paragraph 9.

*Contains Highly Confidential Information*

9.    **Berkenfeld was one of the drafters of the Asset Purchase Agreement. (A. 2**

      **[Berkenfeld] 26:24-27:6.)**

Barclays' Response

      Barclays disputes the statement in paragraph 9 as not supported by the cited evidence.
      Mr. Berkenfeld testified that he was "*involved* in the ... drafting of the Asset Purchase
      Agreement" but not that he was a drafter.  BCI Ex. 55 [Berkenfeld Dep. Tr.] at 27:5-6
      (emphasis added); *see also id.* 29:21-30:5.  He further testified that when he joined an
      existing drafting session between Lehman's and Barclays' attorneys on Tuesday, he was
      "playing catch-up in trying to understand what the business terms were."  *Id.* at 29:12-
      30:5 and 31:14-18.

10.   **Berkenfeld signed the Asset Purchase Agreement, dated September 16, 2008, for**

      **LBHl and LBl. (A. 30 at 43; A. 2 [Berkenfeld] 44:4-45:7.)**

Barclays' Response

      Barclays does not dispute the statement in paragraph 10.

11.   **Berkenfeld initialed the financial schedule, time stamped 11:18 a.m., that is**

      **referenced in Section 9.1(c) of the Asset Purchase Agreement (the "9/16/08 Financial**

      **Schedule"). (A. 31; A. 2 [Berkenfeld] 46:14-23.)**

Barclays' Response

      Barclays does not dispute that Mr. Berkenfeld initialed Exhibit A. 31; however, section
      9.1(c) of the APA refers to a "financial schedule delivered to Purchaser on September 16,
      2008 and initialed by an officer of each of Holdings and Purchaser."  BCI Ex. 1 [APA] at
      § 9.1(c).  Exhibit A. 31 is not initialed by an officer of Barclays, and no other version of
      Exhibit A. 31 was initialed by an officer of Barclays.  Moreover, neither Exhibit A. 31
      nor other versions of the same document were part of the Purchase Agreement.  *See*
      Barclays' response to paragraph 278.

12.   **Berkenfeld is Managing Director of Investment Banking at Barclays Capital. (A. 2**

      **[Berkenfeld] 20:7-12.)**

*Contains Highly Confidential Information*

Barclays' Response

> Barclays disputes the statement in paragraph 12 as imprecise. Mr. Berkenfeld testified that his title at Barclays is Managing Director and that his area of responsibility is "in the Investment Banking Division," but did not testify that he had the title of Managing Director of Investment Banking at Barclays Capital. BCI Ex. 55 [Berkenfeld Dep. Tr.] at 20:7-12.

**13.    Berkenfeld's employment agreement with Barclays is dated September 22, 2008.**

   **(A. 143.)**

Barclays' Response

> Barclays does not dispute that Exhibit A. 143 is Mr. Berkenfeld's original employment agreement with Barclays, or that the front page of that agreement is dated September 22, 2008, but does dispute any implication that the agreement was entered into on that date. The employment agreement clearly was signed and "accepted" by Mr. Berkenfeld on September 29, 2008, a full week later. BCI Ex. 372 [Sept. 22, 2008 Steven Berkenfeld Employment Agreement].

**14.    In February or March 2009, Berkenfeld received from Barclays**

   **(A. 2 [Berkenfeld] 22:7-24; A. 143.)**

Barclays' Response

> Barclays disputes the statement in paragraph 14 to the extent it implies that Mr. Berkenfeld                              Barclays was obligated under the APA to pay Transferred Employees "an annual bonus that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation." BCI Ex. 1 [APA] at § 9.1(c). Mr. Berkenfeld's
>
> BCI Ex. 372 [Sept. 22, 2008 Steven Berkenfeld Employment Agreement]; BCI Ex. 148 [Spreadsheet of LBI and Barclays Titles]. Mr. Berkenfeld's
>                              . BCI
> Ex. 339 [Johnson Report] at pp. 9-10.

**15.    Under his employment agreement with Barclays, Berkenfeld has received, or is**

**entitled to receive, from Barclays a**



*Contains Highly Confidential Information*

(A. 2 [Berkenfeld] 57:21-58:4;

A. 143.)

Barclays' Response

> Barclays disputes the statement in paragraph 15 to the extent it implies that the Special
> Cash Award was in any way improper. The Special Cash Award paid over two years was
> a retention payment, which was consistent with market practice at the time of the Sale
> Transaction. BCI Ex. 339 [Johnson Report] at p. 9.

16. **Alastair Blackwell ("Blackwell") worked for Lehman from November 27, 2000 to**

**September 22, 2008. (A. 3 [Blackwell] 14:23–15:4.)**

Barclays' Response

> Barclays does not dispute the statement in paragraph 16.

17. **Blackwell's last position at Lehman was Global Head of Operations for both Capital**

**Markets and Investment Management. (A. 3 [Blackwell] 15:5-15.)**

Barclays' Response

> Barclays does not dispute the statement in paragraph 17.

18. **At the time of the Sale Transaction, Blackwell reported to Ian Lowitt. (A. 3**

**[Blackwell] 15:16-18; A. 19 [Lowitt] 14:4-19.)**

Barclays' Response

> Barclays does not dispute the statement in paragraph 18.

19. **Blackwell is currently employed at Barclays as Managing Director for the Americas**

**Operation Department for Capital Markets. (A. 3 [Blackwell] 8:15-22.)**



*Contains Highly Confidential Information*

Barclays' Response

> Barclays disputes the statement in paragraph 19 as imprecise. Mr. Blackwell testified that his title at Barclays is Managing Director and that he is "responsible for" the Americas Operations Department for Capital Markets.

20.     **Blackwell received a :**                          **(Dep. Ex. 55B[2]**

        **(Blackwell employment letter); A. 3 [Blackwell] 25:14-19.)**

Barclays' Response

> Barclays disputes the statement in paragraph 20 to the extent that it implies that Mr. Blackwell received           Barclays was obligated under the APA to pay Transferred Employees "an annual bonus that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation." BCI Ex. 1 [APA] at § 9.1(c). Mr. Blackwell's
>
>                BCI Ex. 128 [October 2, 2008 Alastair Blackwell Employment Agreement]; *see also* BCI Ex. 148 [Spreadsheet of LBI and Barclays Titles]. Mr. Blackwell's
>       BCI Ex. 339 [Johnson Report] at pp. 9-10; *see also* BCI Ex. 56 [Blackwell Dep. Tr.] at 26:6-17 (the bonus was "standard practice" for transferring between companies and if he had gone to Citibank he would have "expected to receive a guarantee or award").

21.     **At the time of the Sale Transaction, Gerald Donini ("Donini") was Head of Equities**

        **at Lehman. (A. 3 [Blackwell] 223:14-16.)**

Barclays' Response

> Barclays does not dispute the statement in paragraph 21.

22.     **Donini participated in the negotiations regarding the Sale Transaction. (A. 14**

        **[Kelly] 52:13-53:14; A. 21 [McGee] 11:25-13:19.)**

---

[2] Deposition exhibits used in Rule 2004 discovery in this case that were not filed as exhibits to the Rule 60 Motion are cited herein as "Dep. Ex."


REDACTED

*Contains Highly Confidential Information*

Barclays' Response

> Barclays disputes the statement in paragraph 22 as not supported by the cited evidence. The portion of Mr. Kelly's deposition cited by Movants for this proposition does not relate to Mr. Donini. Mr. Kelly testifies elsewhere that Mr. Donini and Mr. McDade were "involved" in discussions surrounding asset classes, but then admits that he himself had no involvement in the discussions and did not actually know who was involved. BCI Ex. 75 [August 18, 2009 Kelly Dep. Tr.] at 49:11-51:16. Similarly, the portion of Mr. McGee's deposition cited by Movants for this proposition names people purportedly involved in the negotiations, but does not mention Mr. Donini. Mr. McGee elsewhere testifies only that he "*assume[d]*" Mr. Donini was involved in discussions with Barclays about how to compensate employees, but does not attest to actual knowledge regarding Mr. Donini. BCI Ex. 86 [McGee Dep. Tr.] at 120:6-13 (emphasis added).

**23.    Donini's transfer to Barclays was deemed critical the Sale Transaction. (A. 2**

  **[Berkenfeld] 16:16-23.)**

Barclays' Response

> Barclays disputes the statement in paragraph 23 as incomplete and not supported by the cited evidence. Although Barclays initially insisted as a condition of the Sale that eight specifically named top executives must remain with the firm, *see* BCI Ex. 11 [Sale Motion] at ¶ 19, this condition was not actually included in the APA, BCI Ex. 1 [APA] at Article X. However, Mr. Donini was one of nine Lehman employees whose transfer to Barclays was deemed by Barclays to be important to the Business going forward. Several other Lehman employees were deemed important to the Business, including: Messrs. McDade, McGee, Felder, Lee, Lowitt, Nagpal, Gelband, and Humphrey. *See* BCI Ex. 295 [Sept. 23, 2008 9:15 am email from M. Evans to B. Diamond, *et al.* with attachment] at attachment 1 n.2; BCI Ex. 355 [Cox Decl.] at ¶ 4.

**24.    After the Sale Transaction, Donini became Managing Director and Head of Equities**

  **at Barclays. (A. 3 [Blackwell] 223:14-19; A. 142.)**

Barclays' Response

> Barclays does not dispute the statement in paragraph 24.

*Contains Highly Confidential Information*

25.     **Donini's employment agreement with Barclays is dated September 24, 2008. (A.**

**142.)**

Barclays' Response

 Barclays does not dispute that Exhibit A. 142 is Mr. Donini's original employment
agreement with Barclays, or that the front page of that agreement is dated September 24,
2008, but does dispute any implication that the agreement was entered into on that date.
The employment agreement clearly was signed and "accepted" by Mr. Donini on
September 25, 2008.  BCI Ex. 126 [September 24, 2008 Gerald Donini Employment
Agreement]

26.     **Under his employment agreement with Barclays, Donini has received, or is entitled**

**to receive, from Barclays a**

**(A. 142.)**

Barclays' Response

 Barclays disputes the statement in paragraph 26 to the extent it implies that Mr. Donini
received

  Barclays was obligated under the APA to pay Transferred Employees "an
annual bonus that, in the aggregate, are equal in amount to 100 percent of the bonus pool
amounts accrued in respect of amounts payable for incentive compensation."  BCI Ex. 1
[APA] at § 9.1(c).  Although Mr. Donini received
, *see* BCI Ex. 356 [Exall Decl.] at ¶ 4, this
was reasonable because executives negotiate with different personal characteristics,
different market value, and different strategies, BCI Ex. 339 [Johnson Report] at pp. 9-
10.  In addition, the
                     *Id.* at p. 9.
For all of these reasons, Mr. Donini's 2008 compensation offer was reasonable in amount
and timing, and consistent with market practice at the time of the Sale Transaction.  *Id.* at
pp. 8-10.

11



*Contains Highly Confidential Information*

**27.    At the time of the Sale Transaction, Eric Felder ("Felder") was Co-Head of Fixed**

**Income at Lehman. (A. 10 [Felder] 10:24–11:6.)**

Barclays' Response

>    Barclays disputes the statement in paragraph 27 to the extent it implies that Mr. Felder
>    held the position of Co-Head of Fixed Income at Lehman for any significant period of
>    time.  Mr. Felder testified that he was appointed to that position only on September 8,
>    2008.

**28.    Prior to becoming Co-Head of Fixed Income, Felder was the Global Head of Credit**

**Products at Lehman. (A. 10 [Felder] 11:9-12.)**

Barclays' Response

>    Barclays disputes the statement in paragraph 28 as imprecise.  Mr. Felder testified that
>    prior to becoming Co-Head of Fixed Income at Lehman, he was Global Head of "global
>    credit products."

**29.    Felder participated in the negotiations regarding the Sale Transaction. (A. 25**

**[Shapiro] 46:13-53:9; A. 14 [Kelly] 52:13-53:14; A. 21 [McGee] 11:25-13:19.)**

Barclays' Response

>    Barclays disputes the statement in paragraph 29 as not supported by the cited evidence.
>    The portion of Mr. Shapiro's deposition cited by Movants for this proposition does not
>    relate to Mr. Felder.  Mr. Shapiro does testify elsewhere that Mr. Felder was "around"
>    during the negotiations, but that he didn't "know exactly" what Mr. Felder's role was and
>    that the "word was ... he wasn't completely around."  BCI Ex. 97 [Shapiro Dep. Tr.] at
>    54:21-55:5.  Similarly, the portion of Mr. Kelly's testimony identified by Movants for
>    this proposition does not relate either to the negotiation of the Sale Transaction or to Mr.
>    Felder.  Mr. Kelly elsewhere testifies only that Mr. Felder attended a meeting the night of
>    September 15th regarding credit assets and "discussing the contents of the portfolio and
>    negotiating an appropriate value for the assets to be sold."  BCI Ex. 79 [Kelly Dep. Tr.]
>    48:3-49:5.  The portion of Mr. McGee's testimony identified by Movants for this
>    proposition does not relate to Mr. Felder.  Mr. McGee elsewhere testifies only that he
>    *"assume[d]"* Mr. Felder was involved in some discussions about how Barclays could
>    compensate the groups of 200 and eight that Barclays wanted to come over.  BCI Ex. 86
>    [McGee Dep. Tr.] at 120:6-13 (emphasis added).  Mr. Felder himself testified his role on
>    Monday, September 15 was limited, that he stayed in the room only for "credit
>    specifically," did not make any presentations, and left around 5 or 6 o'clock that night.

*Contains Highly Confidential Information*

BCI Ex. 65 [Felder Dep. Tr.] at 26:11-16, 27:21-28:25, 30:16-23. Mr. Felder further testified that, "most of the rest of the week [I] was trying to keep the team together and talking to all the individual people within the credit business who were out interviewing and getting job offers to try to keep the team together." *Id.* at 87:16-21. Mr. Felder also testified that he did not do any calculations to determine the value of positions in his area of responsibility. *Id.* at 55:18-22.

30.    **Felder was one of the Lehman executives who met Monday evening, September 15,**

**2008, with representatives from Barclays to discuss a possible transaction with**

**Barclays. (A. 19 [Lowitt] 35:9-36:19.)**

Barclays' Response

Barclays disputes the statement in paragraph 30 as not supported by the cited evidence. Mr. Lowitt testified that Mr. Felder was one of the people who met with Lehman to understand the inventory and assets in the firm, but did not testify that Mr. Lowitt discussed a possible transaction with Barclays. BCI Ex. 83 [Lowitt Dep. Tr.] at 35:19-36:17. Barclays further disputes the statement in paragraph 30 to the extent it implies that Mr. Felder had anything but a limited role at the September 15 meeting. *See* Barclays' response to paragraph 29

31.    **Felder's transfer to Barclays was deemed critical to the Sale Transaction. (A. 19**

**[Lowitt] 16:15-24; A. 2 [Berkenfeld] 16:4-23.)**

Barclays' Response

Barclays disputes the statement in paragraph 31 as incomplete and not supported by the cited evidence. Although Barclays initially insisted as a condition of the Sale that eight specifically named top executives must remain with the firm, *see* BCI Ex. 11 [Sale Motion] at ¶ 19, this condition was not actually included in the APA, BCI Ex. 1 [APA] at Article X. However, Mr. Felder was one of nine Lehman employees whose transfer to Barclays was deemed by Barclays to be important to the business going forward. Several other Lehman employees were deemed important to the business, including: Messrs. McDade, McGee, Donini, Lee, Lowitt, Nagpal, Gelband, and Humphrey. *See* BCI Ex. 295 [Sept. 23, 2008 9:15 email from M. Evans to B. Diamond, *et al.* with attachment]; BCI Ex. 355 [Cox Decl.] at ¶ 4.

32.    **On the morning of September 16, 2008, Felder met with Robert Diamond and Jerry**

**del Missier, both of Barclays, to discuss Felder's future role and compensation at**

**Barclays.  (A. 10 [Felder] 38:15-39:20.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 32.

33.    **On September 21, 2008, Felder signed an employment agreement with Barclays.  (A.**

**140.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 33.

34.    **Felder is Head of Global Credit Trading at Barclays.  (A. 10 [Felder] 10:9-13.)**

Barclays' Response

Barclays disputes the statement in paragraph 34 as imprecise.  Mr. Felder is a Managing
Director and Head of Global Credit Trading at Barclays.  BCI Ex. 148 [Spreadsheet of
LBI and Barclays Titles].

35.    **On or around October 31, 2008, Felder received**

**. (A. 10 [Felder] 39:21-40:13, 42:3-43:11; A. 140.)**

Barclays' Response

Barclays disputes the statement in paragraph 35 as not supported by the cited evidence.
Mr. Felder testified that he did "not recall the exact date that the payment occurred."  BCI
Ex. 65 [Felder Dep. Tr.] at 43:7-8.  Barclays further disputes the statement in paragraph
35 to the extent it implies that Mr. Felder received .

       Barclays was obligated under the APA to pay Transferred Employees "an
annual bonus that, in the aggregate, are equal in amount to 100 percent of the bonus pool
amounts accrued in respect of amounts payable for incentive compensation."  BCI Ex. 1
[APA] at § 9.1(c).  Mr. Felder had already received

                                                    . BCI Ex. 65 [Felder Dep. Tr.]
at 39:23-41:13, and 113:10-19; BCI Ex. 356 [Exall Decl.] at ¶ 5.

14



*Contains Highly Confidential Information*

1

BCI Ex. 65 [Felder Dep. Tr.] at 10:24-11:12. In addition, senior executives' compensation can vary because executives negotiate with different personal characteristics, different market value, and different strategies. For all of these reasons, Mr. Felder's 2008 bonus was reasonable in amount and timing, and consistent with market practice at the time of the Sale Transaction. BCI Ex. 339 [Johnson Report] at pp. 8-10.

36.    **Under his employment agreement with Barclays, Felder has received, or is entitled to receive, from Barclays**

**(A. 140.)**

Barclays' Response

Barclays disputes the statement in paragraph 36 to the extent it implies that

BCI Ex. 339 [Johnson Report] at p. 9.

37.    **Prior to the closing of the Sale Transaction, Michael Gelband ("Gelband") was Head of Capital Markets at Lehman. (A. 5 [Coghlan] 36:12-36:20.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 37.

38.    **Gelband participated in the negotiations regarding the Sale Transaction. (A. 25 [Shapiro] 46:13-53:9; A. 14 [Kelly] 52:13-53:14; A. 21 [McGee] 11:25-13:13.)**

Barclays' Response

Barclays disputes the statement in paragraph 38 as not supported by the cited evidence. The portion of Mr. Shapiro's testimony identified by Movants for this proposition does not relate to Mr. Gelband. Mr. Shapiro elsewhere testifies only that Mr. Gelband was "involved at some point" with giving appropriate information on securities to Barclays and that he "believed" Barry Ridings "probably" talked to Mr. Gelband about the

15



*Contains Highly Confidential Information*

valuation of securities. BCI Ex. 97 [Shapiro Dep. Tr.] at 52:12-53:25, 231:22-24.
Similarly, the portion of Mr. Kelly's testimony identified by Movants for this proposition
does not mention Mr. Gelband as a person who negotiated the transaction, either in the
portion of his deposition testimony cited by Movants or elsewhere. Finally, the portion
of Mr. McGee's testimony identified by Movants for this proposition states only that Mr.
Gelband "was there" during the negotiations. Mr. McGee elsewhere describes Mr.
Gelband only as part of a "working group that determined the balance sheet items." BCI
Ex. 86 [McGee Dep. Tr.] at 68:19-24.

**39.    Gelband's transfer to Barclays was, at one point, a condition to the Sale**

   **Transaction. (A. 19 [Lowitt] 16:12-22.)**

Barclays' Response

Barclays disputes the statement in paragraph 39 as incomplete and not supported by the
cited evidence. Although Barclays initially insisted as a condition of the Sale that eight
specifically named top executives must remain with the firm, BCI Ex. 11 [Sale Motion]
at ¶ 19, this condition was not actually included in the APA, BCI Ex. 1 [APA] at Article
X. However, Mr. Gelband was one of nine Lehman employees whose transfer to
Barclays was deemed by Barclays to be important to the business going forward. Several
other Lehman employees were deemed important to the business, including: Messrs.
McDade, McGee, Donini, Lee, Lowitt, Nagpal, Felder, and Humphrey. *See* BCI Ex. 295
[Sept. 23, 2008 9:15 am email from M. Evans B. Diamond, *et al.*, with attachment]; BCI
Ex. 355 [Cox Decl.] at ¶ 4.

**40.    After the Sale Transaction, Gelband went to work for Millennium Management**

   **LLC. (Business Wire Article, dated October 18, 2008.)**

Barclays' Response

Barclays disputes the statement in paragraph 40 as incomplete. After the Sale
Transaction, Mr. Gelband joined Barclays. He then left Barclays in October 2008. BCI
Ex. 356 [Exall Decl.] at ¶ 7.

**41.    Gelband was offered ：                                              (A. 139.)**

Barclays' Response

Barclays disputes the statement in paragraph 41 to the extent it implies that Mr. Gelband
received                                                              Barclays was obligated
under the APA to pay Transferred Employees "an annual bonus that, in the aggregate, are

16



*Contains Highly Confidential Information*

equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation." BCI Ex. 1 [APA] at § 9.1(c). Mr. Gelband was offered                    on par with the other eight to nine individuals whom Barclays considered important to the business and whom Barclays was focused on retaining in order to preserve the business it was acquiring. BCI Ex. 205 [Sept. 18, 2008 4:48 pm email from C. Corcoran to A. Colleton, *et al.*, with attachments]; *see also* BCI Ex. 356 [Exall Decl.] at ¶ 7. Mr. Gelband's

                                                                        BCI Ex. 339 [Johnson Report] at pp. 8-10.

**42.    Martin Kelly ("Kelly") was employed by Lehman from August 2000 through May 2005, and again from January 2006 through September 2008. (A. 14 [Kelly] 9:18-22; 11:5-9.)**

Barclays' Response

Barclays disputes the statement in paragraph 42 as imprecise. Mr. Kelly testified that he was employed by Lehman from "approximately" August 2000 through May 2005 and from January 2006 through September 2008. BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 9:20-22.

**43.    At the time of the Sale Transaction, Kelly's position at Lehman was Global Financial Controller. (A. 14 [Kelly] 9:18-22; 11:5-9.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 43.

**44.    At the time of the Sale Transaction, Kelly reported to Ian Lowitt. (A. 14 [Kelly] 12:3-5.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 44.

**45.    Prior to Lehman's bankruptcy filing on September 15, 2008, Kelly was involved in due diligence and discussions with Barclays concerning a possible transaction. (A.**



*Contains Highly Confidential Information*

14 [Kelly] 29:14-30:23.)

Barclays' Response

Barclays disputes the statement in paragraph 45 to the extent it implies Mr. Kelly had a
significant role in discussions regarding a potential transaction with Barclays prior to
LBHI's filing for bankruptcy. Mr. Kelly testified that his role in Lehman's negotiations
with Barclays prior to LBHI's filing for bankruptcy was as one member of "a relatively
large team of people" "to assist the Barclays team in coordinating responses to their
requests for information as part of their due diligence." BCI Ex. 75 [Aug. 18, 2009 Kelly
Dep. Tr.] at 30:6-13. He did not testify that he discussed or negotiated a possible
transaction with Barclays, and further testified that he did not even know when those
discussions had ended. *Id.* at 32:4-9. Barclays also disputes the statement in paragraph
45 as immaterial to the present motions.

**46.   Kelly participated in the negotiations regarding the Sale Transaction. (A. 25**

**[Shapiro] 50:7-53:4; A. 14 [Kelly] 52:13-53:14; A. 21 [McGee] 11:25-13:19.)**

Barclays' Response

Barclays disputes the statement in paragraph 46 as not supported by the cited evidence.
The portion of Mr. Kelly's testimony cited by Movants for this proposition does not
relate to whether he participated in the negotiations. Mr. Kelly testified elsewhere that he
had a role in assembling information used for the negotiations but that he was not
involved in negotiations of the Sale Transaction. BCI Ex. 75 [Aug. 18, 2009 Kelly Dep.
Tr.] at 28:23-25 and 36:22-37:2; *see also id.* at 40:8-41:3; 50:19-51:6; 59:22-60:3; 60:15-
22; 65:5-12; 113:7-12; 142:12-143:9; 152:7-15; 153:3-6. Mr. McGee's deposition does
not mention Mr. Gelband as a person who negotiated the transaction, either in the portion
of his deposition testimony cited by Movants or anywhere else. Finally, the portion of
Mr. Shapiro's testimony cited by Movants for this proposition states only that Mr. Kelly
was "involved in helping find" some information that Bart McDade asked for regarding
securities. BCI Ex. 97 [Shapiro Dep. Tr.] at 53:2-4. Shapiro elsewhere testified that he
sat down with Mr. Kelly to try and understand the value of securities being sold, *id.* at
138:4-19, but never testified that Mr. Kelly had a role in the negotiations.

**47.   On Monday, September 15, 2008 and into the early morning of September 16, 2008,**

**Kelly was involved in negotiating the Sale Transaction with Barclays. (A. 14 [Kelly]**

**34:9-35:4, 35:23-37:2.)**

*Contains Highly Confidential Information*

Barclays' Response

      Barclays disputes the statement in paragraph 47 as not supported by the evidence. Mr. Kelly testified that he participated in a meeting in the early morning of September 16, 2008 only to the extent of "assembling information that had been used as part of the negotiations." BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 34:23-25. Mr. Kelly further testified that he was not involved in negotiations of the Sale Transaction. *Id.* at 28:23-25; *see also* Barclays' response to paragraph 46.

**48. In connection with Lehman's discussions with Barclays during the week of**

    **September 15, 2008, Kelly assembled information related to the assets, including the**

    **value of such assets, that would be sold to Barclays in the Sale Transaction. (A. 14**

    **[Kelly] 34:9-35:4, 35:23-37:2.)**

Barclays' Response

      Barclays disputes the statement in paragraph 48 as not supported by the cited evidence. Mr. Kelly testified that he was assembling information around asset classes and values of those assets that had been "discussed between" Barclays and Lehman through Tuesday morning, September 16. BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 36:22-37:2. Mr. Kelly did not testify that the discussed asset classes ended up being those eventually sold to Barclays in the Sale Transaction or that the information he gathered regarding valuation of asset classes was anything other than preliminary estimates of value.

**49. In connection with Lehman's discussions with Barclays during the week of**

    **September 15, 2008, Kelly was involved in calculating the liabilities for**

    **compensation and contract cures that Barclays would assume as part of the Sale**

    **Transaction. (A. 19 [Lowitt] 96:2-13.)**

Barclays' Response

      Barclays disputes the statement in paragraph 49 as not supported by the evidence. Mr. Lowitt named Mr. Kelly only as having been "working on" the "cure payment number," and does not state that Mr. Kelly had any role with respect to assumption of compensation liabilities. Mr. Kelly himself testified only that he had a "general[] aware[ness]" of the compensation estimate, BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 42:15-24, and that he did not know who calculated either the initial estimate or any later estimates of maximum potential cure liability, *id.* at 116:8-117:18; 133:25-134:4.

*Contains Highly Confidential Information*

**50.    After the closing of the Sale Transaction, Kelly became Managing Director and**

**Chief Financial Officer at Barclays Capital U.S.  (A. 14 [Kelly] 8:2-9.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 50 as imprecise.  Mr. Kelly testified that he became a Managing Director and Chief Financial Officer of Barclays, Americas. BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 8:8-9; *see also* BCI Ex. 148 [Spreadsheet of LBI and Barclays Titles].

**51.    Kelly received from Barclays                                        (A. 147.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 51 to the extent it implies that Mr. Kelly received                                                    Barclays was obligated under the APA to pay Transferred Employees "an annual bonus that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation."  BCI Ex. 1 [APA] at § 9.1(c).  Although Mr. Kelly received

senior executives' compensation could vary because executives negotiate with different personal characteristics, different market value, and different strategies.  BCI Ex. 339 [Johnson Report] at pp. 9-10.  Mr. Kelly's

*Id.* at pp. 8-10.

**52.    Under his employment agreement with Barclays, dated October 10, 2008, Kelly has**

**received, or is entitled to receive, from Barclays a**

**(A. 147.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 52 to the extent it implies that the Special Cash Award was in any way improper.  The Special Cash Award paid over two years was a retention payment, which was consistent with market practice at the time of the Sale Transaction.  BCI Ex. 339 [Johnson Report] at p. 9.



*Contains Highly Confidential Information*

53.    **Alex Kirk ("Kirk") was Global Head of Principal Businesses at Lehman from July**

**2008 until September 2008. (A. 16 [Kirk] 7:3-20.)**

Barclays' Response

    Barclays does not dispute the statement in paragraph 53.

54.    **Kirk participated in the negotiations regarding the Sale Transaction. (A. 25**

**[Shapiro] 50:7-53:4; A. 21 [McGee] 12:15-12:21.)**

Barclays' Response

    ʼ    Barclays disputes the statement in paragraph 54 as not supported by the cited evidence.
        In the portion of Mr. Shapiro's testimony cited by Movants for this proposition, Mr.
        Shapiro testifies only that Mr. Kirk was part of a group asked to "pull information"
        requested by Bart McDade regarding securities. Mr. Shapiro elsewhere testified that Mr.
        Kirk was "probably" one of the people involved in helping Barry Ridings during the
        week of September 15 to evaluate the potential loss in value to the estate if the Sale
        Transaction did not close. BCI Ex. 97 [Shapiro Dep. Tr.] at 99:11-17, 229:24-232:5. Mr.
        Shapiro did not testify that Mr. Kirk participated in negotiations regarding the Sale
        Transaction. Similarly, Mr. McGee testified only that Mr. Kirk was "involved around
        some of the balance sheet things *I think*." BCI Ex. 86 [McGee Dep. Tr.] at 12:19-21
        (emphasis added). Moreover, both Mr. McDade and Mr. Kirk himself make clear that
        Mr. Kirk had no involvement in the transaction prior to late on September 18 or early on
        September 19. BCI Ex. 85 [McDade Dep. Tr.] at 119:24-121:6; BCI Ex. 78 [Kirk Dep.
        Tr.] at 31:24-32:18, 131:9-11. Mr. Kirk testified that at that time he began to participate
        in discussions relating to the Sale Transaction, *see* BCI Ex. 78 [Kirk Dep. Tr.] at 23:22-
        24:14, 31:24-32:18; *id.* at 105:4-106:17, but that he "wasn't actually negotiating," and
        "had no authority to negotiate," *id.* at 200:15-22. Mr. McDade similarly testified only
        that Mr. Kirk was one of two executives who supervised a search for additional value
        starting on the 19th, and that Mr. Kirk was "directing traffic" in trying to ascertain the
        value of assets. BCI Ex. 85 [McDade Dep. Tr.] at 164:25-166:8, 169:24-170:6, 173:6-11.

55.    **Kirk worked for Barclays from after the closing in September 2008 until November**

**2008. (A. 16 [Kirk] 8:15-9:22.)**

Barclays' Response

    Barclays does not dispute the statement in paragraph 55.

*Contains Highly Confidential Information*

**56.    Upon his departure from Barclays, Barclays gave Kirk                              (A.**

**16 [Kirk] 11:4-21, 18:12-19:20.)**

Barclays' Response

Barclays disputes the statement in paragraph 56 to the extent it implies that the payment
received by Mr. Kirk was unreasonable. Barclays was obligated under the APA to pay
Transferred Employees "an annual bonus that, in the aggregate, are equal in amount to
100 percent of the bonus pool amounts accrued in respect of amounts payable for
incentive compensation." BCI Ex. 1 [APA] at § 9.1(c). Mr. Kirk was offered :

BCI Ex. 356 [Exall Decl.] at ¶ 10; BCI Ex. 148 [Spreadsheet
of LBI and Barclays Titles].
                                                 BCI Ex. 339 [Johnson Report] at pp. 9-10. Mr. Kirk
left Barclays the first week of November 2008 and was :
                                                                        *Id.* at p. 16; BCI Ex. 78
[Kirk Dep. Tr.] at 9:25-11:19, 18:11-19:7.

**57.    Ian Lowitt ("Lowitt") was Chief Financial Officer at Lehman from June 2008 to**

**September 2008. (A. 19 [Lowitt] 9:21-10:4, 11:17-19.)**

Barclays' Response

Barclays disputes the statement in paragraph 57 as imprecise. In addition to being the
Chief Financial Officer at LBHI at the time of the Sale Transaction, Mr. Lowitt was the
Chief Financial Officer, Controller, and Executive Vice President of LBHI. BCI Ex. 365
[First Day Affidavit of Ian Lowitt]; BCI Ex. 365 [Lowitt Decl.] at ¶ 4.

**58.    During his employment at Lehman, Lowitt reported to Bart McDade. (A. 19**

**[Lowitt] 13:24-14:3.)**

Barclays' Response

Barclays disputes the statement in paragraph 58 as inaccurate. Mr. Lowitt testified only
that he reported to Mr. McDade when he was CFO, a position he began "in or around
June 2008." BCI Ex. 83 [Lowitt Dep. Tr.] at 11:17-19, 13:24-14:3. Mr. Lowitt testified
elsewhere that he started working for Lehman in 1994, held several positions, and spent
some of that time working in Europe. *Id.* at 10:5-11:13. He did not testify that he
reported to Mr. McDade during any of those prior positions. Moreover, Mr. McDade
testified that although Mr. Lowitt as a practical matter reported to Mr. McDade, Mr.



*Contains Highly Confidential Information*

Lowitt was in fact a direct report to Dick Fuld. BCI Ex. 85 [McDade Dep. Tr.] at 40:24-41:5.

59.     **Lehman officers involved in the negotiations have testified that Lowitt participated**

      **in the negotiations regarding the Sale Transaction. (A. 25 [Shapiro] 46:13-53:9; A.**

      **14 [Kelly] 52:13-53:14; A. 21 [McGee] 11:25-13:19.)**

Barclays' Response

    Barclays disputes the statement in paragraph 59 as not supported by the cited evidence.
The portion of Mr. Shapiro's testimony cited by Movants for this proposition states only
that Mr. Lowitt "probably" was involved, but "was probably dealing more with
[McDade]." BCI Ex. 97 [Shapiro Dep. Tr.] at 53:5-9. The portion of Mr. Kelly's
testimony cited by Movants for this proposition does not address Mr. Lowitt. Mr. Kelly
elsewhere testified that Mr. Lowitt was "responsible overall" for preparing "a closing
balance sheet which reflected the transaction," BCI Ex. 75 [Aug. 18, 2009 Kelly Dep.
Tr.] at 54:6-18, but did not testify that Mr. Lowitt participated in the negotiations of the
Sale Transaction. Mr. McGee testified that Mr. Lowitt was "involved around some of the
balance sheet type items," but did not testify that he was part of the negotiations. BCI
Ex. 86 [McGee Dep. Tr.] at 13:17-24. Mr. Lowitt himself testified that he "didn't have a
role in negotiating the transaction." BCI Ex. 83 [Lowitt Dep. Tr.] at 22:7-8.

60.     **Lowitt testified that he "didn't have a role" in negotiating the Sale Transaction, but**

      **"certainly played a role in providing information to [the] folks that were doing the**

      **negotiating." (A. 19 [Lowitt] 22:2-11.)**

Barclays' Response

    Barclays does not dispute that Mr. Lowitt had no role in negotiating the Sale Transaction
or that he provided certain information to those who did do the negotiating, but disputes
the accuracy of the quotation in paragraph 60. Mr. Lowitt testified that he "didn't have a
role in negotiating the transaction" but that he "played a role in providing information to
those folks *who were doing the negotiation.*" BCI Ex. 83 [Lowitt Dep. Tr.] at 22:2-11
(emphasis added).

61.     **Lowitt also testified that he was not kept informed of the transaction in any formal**

      **way, but there "may have been elements" that Bart McDade shared with him. (A.**

*Contains Highly Confidential Information*

19 [Lowitt] 22:12-19.)

Barclays' Response

> Barclays disputes the statement in paragraph 61 as not supported by the cited evidence. Mr. Lowitt testified that he was not kept informed of the "state of the *negotiations*" "in any formal way." BCI Ex. 83 [Lowitt Dep. Tr.] at 22:12-19 (emphasis added). He did not state that he was uninformed about the *transaction*.

62.   **Prior to the closing of the Sale Transaction, Lowitt never saw the Asset Purchase**

   **Agreement. (A. 19 [Lowitt] 52:12-23.)**

Barclays' Response

> Barclays disputes the statement in paragraph 62 to the extent that it implies that Mr. Lowitt should have reviewed the APA prior to the Closing of the Sale Transaction. Mr. Lowitt testified that he was not involved in the negotiation of the transaction and was not kept informed of the negotiations. BCI Ex. 83 [Lowitt Dep. Tr.] at 22:16-19. It therefore is reasonable for Mr. Lowitt not to have reviewed the APA prior to the Closing.

63.   **Prior to the closing of the Sale Transaction, Lowitt never saw the Clarification**

   **Letter.[3] (A. 19 [Lowitt] 54:17-55:7.)**

Barclays' Response

> Barclays disputes the statement in paragraph 63 to the extent that it implies that Mr. Lowitt should have reviewed the Clarification Letter prior to the Closing of the Sale Transaction. Mr. Lowitt testified that he was not involved in the negotiation of the transaction and was not kept informed of the negotiations. BCI Ex. 83 [Lowitt Dep. Tr.] at 22:16-19. It therefore is reasonable for Mr. Lowitt not to have reviewed the Clarification Letter prior to the Closing.

64.   **Lowitt testified he first "heard" of the Clarification Letter a few weeks after the Sale**

   **Transaction had closed. (A. 19 [Lowitt] 55:2-23.)**

---

[3] The "Clarification Letter" referred to herein is the letter, dated as of September 20, 2008, signed by LBHI, LBI, LB 745 LLC and Barclays and filed in the Court in connection with the Sale Transaction. BCI Ex. 5 (Clarification Letter).

*Contains Highly Confidential Information*

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 64 to the extent it implies that Mr. Lowitt should have had specific knowledge of the Clarification Letter prior to the Closing of the Sale Transaction. Mr. Lowitt testified that he was not involved in the negotiation of the transaction and was not kept informed of the negotiations. BCI Ex. 83 [Lowitt Dep. Tr.] at 22:16-19. It therefore is reasonable for Mr. Lowitt not to have had specific knowledge of the Clarification Letter prior to the Closing.

**65. Lowitt's transfer to Barclays was a condition to the Sale Transaction. (A. 19**

   **[Lowitt] 16:12-18; A. 2 [Berkenfeld] 16:16-23.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 65 as incomplete and not supported by the cited evidence. Although Barclays initially insisted as a condition of the Sale that eight specifically named top executives must remain with the firm, *see* BCI Ex. 11 [Sale Motion] at ¶ 19, this condition was not actually included in the APA, BCI Ex. 1 [APA] at Article X. However, Mr. Lowitt was one of nine Lehman employees whose transfer to Barclays was deemed by Barclays to be important to the business going forward. Several other Lehman employees were deemed important to the business, including: Messrs. McDade, McGee, Donini, Lee, Gelband, Nagpal, Felder, and Humphrey. *See* BCI Ex. 295 [Sept. 23, 2008 9:15 am email from M. Evans to B. Diamond, *et al.* with attachment]; BCI Ex. 355 [Cox Decl.] at ¶ 4.

**66. On the morning of September 16, 2008, Lowitt spoke to Richard Ricci at Barclays**

   **about the specific terms of Lowitt's potential employment at Barclays. (A. 19**

   **[Lowitt] 17:12-18:10.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 66 as not supported by the cited evidence. Mr. Lowitt testified that he and Mr. Ricci discussed 2008 compensation and a retention payment. BCI Ex. 83 [Lowitt Dep. Tr.] at 18:3-13. The specific terms of his agreement came two days later, on September 18, when Mr. Lowitt received his offer letter. BCI Ex. 122 [September 18, 2008 Ian Lowitt Employment Agreement].

**67. The terms Lowitt discussed with Barclays on September 16, 2008 included**

25



REDACTED

*Contains Highly Confidential Information*

**(A. 19 [Lowitt] 17:12-18:13,**

**19:14-20.)**

Barclays' Response

Barclays disputes the statement in paragraph 67 to the extent it implies that Mr. Lowitt
received ;                                                        Barclays was obligated
under the APA to pay Transferred Employees "an annual bonus that, in the aggregate, are
equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts
payable for incentive compensation." BCI Ex. 1 [APA] at § 9.1(c). Mr. Lowitt's

BCI Ex. 148 [Spreadsheet of LBI and Barclays Titles]; BCI Ex.
122 [September 18, 2008 Ian Lowitt Employment Agreement].

BCI Ex. 339

[Johnson Report] at pp. 9-10.

*Id.* at p. 9.

68.    **On September 18, 2008, Lowitt signed an employment agreement with Barclays. (A.**

**19 [Lowitt] 19:21-20:10, 30:25-32:8; A. 138.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 68.

69.    **Lowitt joined Barclays as Director of Integration. (A. 19 [Lowitt] 9:6-11.)**

Barclays' Response

Barclays disputes the statement in paragraph 69 as imprecise. While Mr. Lowitt testified
that his title at Barclays in 2008 was Director of Integration for Lehman businesses, his
full and official title was Managing Director, Infrastructure Management. BCI Ex. 148
[Spreadsheet of LBI and Barclays Titles].

70.    **In April 2009, Lowitt was made Chief Operating Officer of Barclays Wealth,**

**Americas. (A. 19 [Lowitt] 8:15-20.)**



*Contains Highly Confidential Information*

Barclays' Response

Barclays does not dispute the statement in paragraph 70.

**71.    Lowitt is head of Wealth Management for Barclays. (A. 19 [Lowitt] 19:17-20.)**

Barclays' Response

Barclays disputes the statement in paragraph 71 as not supported by the cited evidence. The testimony of Mr. Lowitt cited by Movants in support of this proposition does not relate to Mr. Lowitt's title at Barclays. BCI Ex. 83 [Lowitt Dep. Tr.] at 19:17-20. Mr. Lowitt's title at Barclays as of the time of his deposition was Chief Operating Officer of Barclays Wealth, Americas. *See* Barclays' response to paragraph 70.

**72.    Under his employment agreement with Barclays, Lowitt has received, or is entitled**

**to receive, from Barclays '**

**(A. 138.)**

Barclays' Response

Barclays disputes the statement in paragraph 72 to the extent it implies that Mr. Lowitt received an

Barclays was obligated under the APA to pay Transferred Employees "an annual bonus that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation." BCI Ex. 1 [APA] at § 9.1(c). Mr. Lowitt's

BCI Ex. 148 [Spreadsheet of LBI and Barclays Titles]; BCI Ex. 122 [September 18, 2008 Ian Lowitt Employment Agreement]. Mr. Lowitt's

BCI Ex. 339 [Johnson Report] at pp. 8-10. In addition, the

*Id.* at p. 9.

**73.    At the time of the Sale Transaction, Bart McDade ("McDade") was President of**

**LBI. (A. 20 [McDade] 7:11-20.)**



*Contains Highly Confidential Information*

Barclays' Response

> Barclays disputes the statement in paragraph 73 as imprecise. Mr. McDade was President and Chief Operating Officer of both LBI and LBHI at the time of the Sale Transaction. BCI Ex. 148 [Spreadsheet of LBI and Barclays Titles]; BCI Ex. 102 [June 12, 2008 SEC Form 3 of Herbert McDade III].

**74.     McDade was one of Lehman's primary negotiators in connection with the Sale**

  **Transaction.  (A. 20 [McDade] 18:22-19:6, 33:3-7.)**

Barclays' Response

> Barclays does not dispute the statement in paragraph 74.

**75.     McDade's letter from Barclays offering employment is dated September 18, 2008.**

  **(A. 56.)**

Barclays' Response

> Barclays disputes the statement in paragraph 75 to the extent it implies that the draft contract in Exhibit A. 56 was in fact provided to Mr. McDade in September 2008. Mr. McDade testified that he had never seen the draft contract prior to preparation for his deposition. BCI Ex. 85 [McDade Dep. Tr.] at 195:21-196:8. Barclays further disputes the statement in paragraph 75 to the extent it implies Barclays had any discussions with Mr. McDade concerning potential employment at Barclays at any time between the September 16, 2008 meeting of Lehman's Board of Directors at which Weil, Gotshal and Manges LLP ("Weil Gotshal") and Simpson Thacher and Bartlett LLP ("Simpson Thacher") instructed that no such discussions should occur, *see* BCI Ex. 104 [Minutes of the September 16, 2008 LBHI/LBI Board Meeting] at p. 3, and the time that the terms of the Sale Transaction were finalized.

**76.     The offer of employment to McDade proposed by Barclays was worth**

  **approximately            .  (A. 56.)**

Barclays' Response

> Barclays disputes the statement in paragraph 76 to the extent it implies that the draft contract cited by Movants in support of the statement in this paragraph was in fact provided to Mr. McDade in September 2008. *See* Barclays' response to paragraph 75. Barclays further disputes the statement in paragraph 76 to the extent it implies that

28



*Contains Highly Confidential Information*

Barclays had any discussions with Mr. McDade concerning potential employment at
Barclays at any time between the September 16, 2008 meeting of Lehman's Board of
Directors and the time that the terms of the Sale Transaction were finalized. *Id.*

77.    **The offer of employment to McDade proposed by Barclays would have entitled**

**McDade to ;**

**(A. 56.)**

Barclays' Response

Barclays disputes the statement in paragraph 77 to the extent it implies that the draft
contract cited by Movants in support of the statement in this paragraph was in fact
provided to Mr. McDade in September 2008. *See* Barclays' response to paragraph 75.
Barclays further disputes the statement in paragraph 77 to the extent it implies that
Barclays had any discussions with Mr. McDade concerning potential employment at
Barclays at any time between the September 16, 2008 meeting of Lehman's Board of
Directors and the time that the terms of the Sale Transaction were finalized. *Id.* Barclays
also disputes the statement in paragraph 77 to the extent it implies that Mr. McDade's
draft offer letter from Barclays included unreasonably high compensation. Barclays was
obligated under the APA to pay Transferred Employees "an annual bonus that, in the
aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in
respect of amounts payable for incentive compensation." BCI Ex. 1 [APA] at § 9.1(c).
Mr. McDade's

BCI Ex. 148

[Spreadsheet of LBI and Barclays Titles]. The offer of

BCI Ex. 339 [Johnson Report] at p. 9. Mr. McDade's draft offer

*Id.* at pp. 8-9. Finally, Barclays
disputes the statement in paragraph 77 to the extent it implies that Mr. McDade in fact
accepted an offer for compensation on the terms set forth in the draft contract cited by
Movants as support for this statement. Mr. McDade testified that "no offer was made"
for compensation and that he "just continued the Lehman salary that I had." BCI Ex. 85
[McDade Dep. Tr.] at 197:14-15; *see also* BCI Ex. 356 [Exall Decl.] at ¶ 23.

78.    **On September 16, 2008, McDade agreed in a "handshake" deal with Barclays'**

**Archibald Cox to work for Barclays. (Dep. Ex. 413A; A. 8 [Diamond] 75:14- 76:4.)**

29          

*Contains Highly Confidential Information*

Barclays' Response

Barclays objects to the statement in paragraph 78 as not supported by the cited evidence.
The portion of Mr. Diamond's testimony cited by the Movants in support of this
proposition states that Mr. Diamond did not "recall" whether an offer of employment had
been put together for Mr. McDade but that he remembered Mr. McDade saying that "his
handshake would be good enough." BCI Ex. 63 [Diamond Dep. Tr.] at 75:17-25. Mr.
Diamond further testified that he had "no recollection" about a discussion between
McDade and Mr. Cox referring to a handshake deal beyond an email from Mr. Cox
presented to Mr. Diamond at his deposition. *Id.* at 165:24-167:18. Moreover, Mr.
McDade himself testified that no such conversation ever happened. BCI Ex. 85 [McDade
Dep. Tr.] at 61:9-62:14. Barclays further objects to the statement in paragraph 78 to the
extent that it suggests that, if the conversation between Mr. Diamond and Mr. McDade
occurred, that the compensation terms included in the draft contract cited by Movants in
support of paragraphs 75-77 were part of Mr. Diamond's discussions with Mr. McDade.
Mr. Diamond testified that although Mr. McDade said he was "on board" with coming to
Barclays and "would see this through," he did not need to discuss compensation. BCI
Ex. 63 [Diamond Dep. Tr.] at 75:9-13. Barclays further disputes the statement in
paragraph 78 to the extent it implies that Mr. McDade in fact accepted an offer for
compensation on the terms set forth in the draft contract cited by Movants as support for
this statement. *See* Barclays' response to paragraph 77.

**79.    McDade became employed by Barclays the week of September 22, 2008 until**

**December 31, 2008.  (A. 20 [McDade] 6:23-25.)**

Barclays' Response

Barclays disputes the statement in paragraph 79 as imprecise. Mr. McDade testified that
he worked at Barclays from "the end of" the week of September 22, 2008 through
December 31, 2008. BCI Ex. 85 [McDade Dep. Tr.] at 6:24-25.

**80.    During the time period in which McDade was employed by Barclays, he received**

**from                                                                                          (A.**

**20 [McDade] 62:15-63:8, 197:10-18.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 80.



*Contains Highly Confidential Information*

81.   **McDade received**                                                              **. (A. 20 [McDade]**

     **259:21-260:14.)**

Barclays' Response

     Barclays does not dispute the statement in paragraph 81.

82.   **From 2002 until September 2008, Hugh (Skip) McGee ("McGee") was Global Head**

     **of Investment Banking at Lehman.  (A. 21 [McGee] 7:15-9:3.)**

Barclays' Response

     Barclays does not dispute the statement in paragraph 82.

83.   **Prior to the Lehman bankruptcy filing on September 15, 2008, McGee was involved**

     **in discussions with Bank of America and Barclays concerning a potential global**

     **purchase of Lehman.  (A. 21 [McGee] 16:10-17:12.)**

Barclays' Response

     Barclays disputes the statement in paragraph 83 as not supported by the cited evidence.
     Mr. McGee testified that discussions occurred with Bank of America and with Barclays
     leading into the weekend prior to the Lehman bankruptcy filing and that Bank of America
     stopped following up over the weekend, but he did not testify that he was involved in
     those discussions.  BCI Ex. 86 [McGee Dep. Tr.] at 16:10-17:12.  Barclays further
     disputes the statement in paragraph 83 as incomplete.  Mr. McGee testified that Bank of
     America discontinued discussions as of September 13th.  *Id.* at 17:6-12 ("[T]here was a
     point on Saturday [the 13th] where it became clear that the additional request for follow-
     up due diligence evaporated from Bank of America and our speculation was that they
     were off doing something else.").  Barclays also disputes the statement in paragraph 83 as
     immaterial to the present motions.

84.   **McGee participated in the negotiations regarding the Sale Transaction.  (A. 21**

     **[McGee] 10:25-11:24, 34:19-35:22, 61:7-16; A. 20 [McDade] 18:22-19:6, 33:3-34:6;**

     **A. 2 [Berkenfeld] 27:18-22.)**



31

*Contains Highly Confidential Information*

Barclays' Response

      Barclays does not dispute the statement in paragraph 84.

**85.**      **McDade testified that McGee was "one of three" primary Lehman negotiators in**

        **connection with the Sale Transaction and McGee was "absolutely" dealing with all**

        **aspects of the Sale Transaction. (A. 20 [McDade] 18:22-19:6, 33:3-346.)**

Barclays' Response

      Barclays disputes the statement in paragraph 85 to the extent it implies that Mr. McGee
was in fact a primary negotiator of the contract or that he had a role in the negotiations
after September 16. Mr. McGee testified that he "would not characterize [himself] as the
primary negotiator." Rather he "was focused on trying to facilitate the transaction with
the particular focus on trying to make sure that [Lehman] delivered the human capital
side of the equation to that franchise that [Lehman] preserved it, able to then deliver it as
part of the [transaction]." BCI Ex. 86 [McGee Dep. Tr.] at 11:17-24. Mr. McGee further
testified that he was not involved in key parts of the transaction after September 16. *Id.*
at 94:19-96:20.

**86.**      **McGee testified that his role in negotiating the Asset Purchase Agreement was**

        **limited to Article IX. (A. 21 [McGee] 13:20-14:7, 22:13-23:6; 72:15-74:9.)**

Barclays' Response

      Barclays disputes the statement in paragraph 86 as not supported by the cited evidence.
Mr. McGee testified that he was "focused on preserving the franchise. That involved
keeping the people and making sure they were treated fairly. So the place where I was
most directly involved was the provisions of the agreement dealing with comp and
severance." BCI Ex. 86 [McGee Dep. Tr.] at 22:13-23:6. Mr. McGee also stated that he
was "in and out of the room" where the asset purchase negotiations occurred and that he
"was trying to make sure ... that we had an eye on the different pieces of the transaction
and that they were all moving along so that we didn't forget something since we had to
get the entire thing done in 48 hours." *Id.* at 23:16-21.

**87.**      **McGee testified that he played no role in assessing the value of assets transferred to**

        **Barclays under the Sale Transaction or in negotiating the terms of the Asset**

        **Purchase Agreement. (A. 21 [McGee] 13:20-14:7.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays does not dispute that Mr. McGee was not involved in the valuation of assets transferred to Barclays under the Sale Transaction, but disputes the portion of the statement in paragraph 87 that Mr. McGee had *no* role in negotiating the terms of the APA as not supported by the cited evidence. *See* Barclays' responses to paragraphs 84-86.

88.    **McGee was involved in negotiations with Barclays over the "compensation issue"**

       **and drafting Section 9.1 of the Asset Purchase Agreement. (A. 21 [McGee] 72:15-**

       **19; A. 25 [Shapiro] 69:13–70:8.)**

Barclays' Response

Barclays disputes the statement in paragraph 88 as not supported by the cited evidence. Although Mr. McGee testified that he was involved in "drafting" the language in Section 9.1 of the APA, his own description of his work implies he was only "involved in the discussions of these provisions" rather than actually drafting them. BCI Ex. 86 [McGee Dep. Tr.] at 72:20-74:12. Moreover, Mr. Shapiro testified that Mr. McGee only "dealt with the compensation issue," but attorneys from Weil Gotshal and Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb") did the drafting. BCI Ex. 97 [Shapiro Dep. Tr.] at 69:20-70:8.

89.    **McGee testified that he had no knowledge of the Clarification Letter. (A. 21**

       **[McGee] 133:22-134:22.)**

Barclays' Response

Barclays disputes the statement in paragraph 89 to the extent that it implies that Mr. McGee should have had knowledge of the Clarification Letter. Mr. McGee testified that his involvement in negotiations effectively ended on Tuesday, September 16, 2008. BCI Ex. 86 [McGee Dep. Tr.] at 133:22-134:22.

90.    **McGee's transfer to Barclays was deemed critical to the Sale Transaction. (A. 19**

       **[Lowitt] 16:12-17:2; A. 2 [Berkenfeld] 16:3-12.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 39 as incomplete and not supported by the cited evidence. Although Barclays initially insisted as a condition of the Sale that eight specifically named top executives must remain with the firm, *see* BCI Ex. 11 [Sale Motion] at ¶ 19, this condition was not actually included in the APA, BCI Ex. 1 [APA] at Article X. However, Mr. McGee was one of nine Lehman employees whose transfer to Barclays was deemed by Barclays to be important to the business going forward. Several other Lehman employees were deemed important to the business, including: Messrs. McDade, Lowitt, Donini, Lee, Gelband, Nagpal, Felder, and Humphrey. *See* BCI Ex. 295 [Sept. 23, 2008 9:15 am email from M. Evans to B. Diamond, *et al.*, with attachment]; BCI Ex. 355 [Cox Decl.] at ¶ 4.

**91.    On or about October 7, 2008, McGee signed an employment agreement with**

**Barclays. (A. 146; A. 21 [McGee] 55:5-56:7.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 91.

**92.    After the closing of the Sale Transaction, McGee was employed by Barclays as Head**

**of the Global Investment Banking Division. (A. 20 [McGee] 27:12-23.)**

Barclays' Response

Barclays disputes the statement in paragraph 92 as not supported by the cited evidence and as imprecise. The portion of Mr. McGee's testimony cited by Movants in support of this proposition does not relate to Mr. McGee's position at Barclays. Mr. McGee's 2008 title at Barclays was Managing Director, Head of Investment Banking. BCI Ex. 148 [Spreadsheet of LBI and Barclays Titles].

**93.    Barclays paid McGee .                         . (A. 146.)**

Barclays' Response

Barclays disputes the statement in paragraph 93 to the extent it implies that Mr. McGee received an                                            Barclays was obligated under the APA to pay Transferred Employees "an annual bonus that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation." BCI Ex. 1 [APA] at § 9.1(c). Mr. McGee's

34



*Contains Highly Confidential Information*

. BCI Ex. 148 [Spreadsheet of LBI and Barclays Titles];
BCI Ex. 129 [October 6, 2008 Hugh McGee III Employment Agreement]. Mr. McGee's

. BCI Ex. 339 [Johnson Report] at pp. 8-10.

94.    **Under his employment agreement with Barclays, McGee has received, or is entitled**

**to receive, from Barclays**

. **(A. 146.)**

Barclays' Response

Barclays disputes the statement in paragraph 94 to the extent it implies that the

-

BCI Ex. 339 [Johnson Report] at p. 9.

95.    **At the time of the Sale Transaction, Gerald Reilly ("Reilly") was Lehman's Head**

**Global Product Controller.  (A. 19 [Lowitt] 11:20-24, 14:7-10.)**

Barclays' Response

Barclays disputes the statement in paragraph 95 as imprecise. Mr. Lowitt testified that
Mr. Reilly "was the product controller." BCI Ex. 83 [Lowitt Dep. Tr.] at 14:9-10. In
addition, Mr. Reilly's first name was Gerard and, at the time of the Sale Transaction, Mr.
Reilly was the Capital Markets and Investment Banking Chief Financial Officer of
Lehman. BCI Ex. 370 [Sept. 17, 2008 5:57 pm email from M. Kelly to J. Walker, with
attachments].

96.    **Reilly reported to Lowitt.  (A. 19 [Lowitt] 14:7-10.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 96.

97.    **Reilly participated in negotiations regarding the Sale Transaction.  (A. 19 [Lowitt]**

**37:11-22, 38:23039:6.)**



*Contains Highly Confidential Information*

Barclays' Response

 Barclays disputes the statement in paragraph 97 as not supported by the cited evidence. Mr. Lowitt testified that he did not know whether Mr. Reilly participated in negotiations: "I don't know. You know, Jerry Reilly … may well have been involved in some of those meetings ... but I'm not aware specifically of any of my reports [including Reilly] meeting specifically at Barclays, but they may well have." BCI Ex. 83 [Lowitt Dep. Tr.] at 37:11-22. Moreover, the "meetings" Lowitt refers to in the testimony cited to support this assertion were meetings "with the Barclays folks to understand the inventory and assets of the firm" – and not meetings concerning negotiation of the Sale Transaction. *Id.* at 37:11-15. Additionally, Mr. Lowitt listed Mr. Reilly as one of "the senior Lehman folks who were waiting on the 32nd floor to learn whether an agreement had been reached," not that Mr. Reilly had participated in negotiations. *Id.* at 38:23-39:6.

## 98. Reilly died in December 2008. (A. 14 [Kelly] 148:10-148:14.)

Barclays' Response

 Barclays does not dispute the statement in paragraph 98.

## 99. At the time of the Sale Transaction, Mark Shafir ("Shafir") was Global Co-Head of Mergers and Acquisitions at Lehman. (A. 20 [McDade] 83:23-84:13.)

Barclays' Response

 Barclays disputes the statement in paragraph 99 as imprecise. At the time of the Sale Transaction, Mr. Shafir was Managing Director, Global Co-Head of Mergers and Acquisitions at Lehman. BCI Ex. 148 [Spreadsheet of LBI and Barclays Titles]; BCI Ex. 85 [McDade Dep. Tr.] at 83:23-84:13.

## 100. Shafir was one of Lehman's primary negotiators in connection with the Sale Transaction. (A. 2 [Berkenfeld] 27:18-25; A. 16 [Kirk] 28:14-20; A. 21 [McGee] 10:25-12:11; A. 20 [McDade] 18:22-19:6, 33:3-34:22.)

Barclays' Response

 Barclays disputes the statement in paragraph 100 to the extent it implies that Mr. Shafir had a role in negotiations after September 17. On the 17th, Mr. Shafir left Lehman to join Citigroup, thereby ending his role in the Sale Transaction. BCI Ex. 85 [McDade Dep. Tr.] at 121:16-123:7; BCI Ex. 78 [Kirk Dep. Tr.] at 9-22.

*Contains Highly Confidential Information*

101.   **At the time of the Sale Transaction, Mark Shapiro ("Shapiro") was Head of**

   **Restructuring within Lehman's Investment Banking Division.  (A. 25 [Shapiro]**

   **8:20-9:2; 9:14–10:8.)**

Barclays' Response

   Barclays disputes the statement in paragraph 101 as incomplete.  Mr. Shapiro was a
   Managing Director in addition to being the Head of Restructuring within Lehman's
   Investment Banking Division.  BCI Ex. 148 [Spreadsheet of LBI and Barclays Titles].

102.   **At the time of the Sale Transaction, Shapiro reported to Mark Shafir and Paul**

   **Parker (Co-Heads of Mergers & Acquisitions).  (A. 25 [Shapiro] 10:9-15.)**

Barclays' Response

   Barclays does not dispute the statement in paragraph 102.

103.   **On the evening before Lehman filed for bankruptcy, September 14, 2008, Shapiro**

   **suggested to McDade that Lehman could sell itself to Barclays in a Section 363 sale**

   **under the Bankruptcy Code, and Shapiro was present in McDade's office when**

   **McDade called Robert Diamond at Barclays to discuss such a sale.  (A. 25 [Shapiro]**

   **16:15-18:23, 20:2-4.)**

Barclays' Response

   Barclays does not dispute the statement in paragraph 103.

104.   **Shapiro participated in the negotiations regarding the Sale Transaction.  (A. 25**

   **[Shapiro] 46:13-49:19; A. 14 [Kelly] 34:14-35:11; A. 21 [McGee] 11:25-12:11; A. 2**

   **[Berkenfeld] 27:18-28:6; *see also* A. 124 (Shapiro describing himself as "lead[ing]**

   **the bankruptcy filing and sale to Barclays"); A. 48 (Shapiro writing that he "had to**

*Contains Highly Confidential Information*

**quarterback the rescue").)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 104 as not supported by the cited evidence.
Mr. Shapiro did not describe himself as a lead negotiator, but instead testified that he was
one of many "in-the-trench negotiators who [were] negotiating most of the individual
provisions." BCI Ex. 97 [Shapiro Dep. Tr.] at 47:8-9. Mr. Kelly testified that Mr.
Shapiro was in attendance at a meeting on Tuesday, September 16, 2008, but did not
testify as to negotiations by Mr. Shapiro. BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at
34:14-35:11. Mr. McGee described Mr. Shapiro as involved, "[b]ut he was more on the
basis of expertise as opposed to status as a senior Lehman executive." BCI Ex. 86
[McGee Dep. Tr.] at 12:23-13:2. Mr. Berkenfeld testified only that he "believe[d] Mark
Shapiro was involved." BCI Ex. 55 [Berkenfeld Dep. Tr.] at 28:4. Moreover, Mr.
Shapiro left for San Francisco on Saturday morning, effectively ending his role in the
Sale Transaction. BCI Ex. 97 [Shapiro Dep. Tr.] at 164:22-167:15. Exhibits A. 124 and
A. 48 are both personal emails to non-participants in the Sale Transaction, and Mr.
Shapiro's generalizations in such a context about his role do not contradict his own sworn
testimony on this issue.

105.    **Shapiro described himself (along with Mark Shafir, Lehman's head of Mergers &**

        **Acquisitions, and Skip McGee, among others) as someone "down in the trenches"**

        **negotiating the Sale Transaction with Barclays. (A. 25 [Shapiro] 47:3-49:19.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 105 as mischaracterizing Mr. Shapiro's
testimony. Mr. Shapiro did not testify that he was "down in the trenches" negotiating the
Sale Transaction with Barclays. Rather, Mr. Shapiro testified as to a narrower role, that
he, along with Mr. Shafir, Mr. McGee, and attorneys from Weil Gotshal were "in the
trenches *dealing with some specific issues* as we negotiated this deal." BCI Ex. 97
[Shapiro Dep. Tr.] at 48:4-48:9 (emphasis added). Moreover, Mr. Shapiro testified that
"our lead negotiator, the lead overall negotiator, was Bart McDade." *Id.* at 46:16-17; *see*
Barclays' response to paragraph 104.

106.    **Shapiro testified that the Sale Transaction was explained to him, and that he was**

        **involved in the negotiations to make sure that he was comfortable that the Sale**

        **Transaction explained to him was being properly reflected in the Asset Purchase**

        **Agreement. (A. 25 [Shapiro] 72:17-73:11.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 106 as mischaracterizing Mr. Shapiro's
testimony. Immediately prior to the testimony cited by Movants in support of the
proposition in paragraph 106, Mr. Shapiro makes clear that his cited testimony relates
only to issues surrounding compensation, not the Sale Transaction as a whole. BCI Ex.
97 [Shapiro Dep. Tr.] at 71:17-72:16. In addition, in the testimony cited by Movants in
support of the proposition in paragraph 106, Mr. Shapiro made clear that his role in the
compensation discussions was minimal. Mr. Shapiro testified: "So I wouldn't say I was
the intermediary that was communicating the message back to the lawyers. I would say
that one of the principals clearly discussed with Weil Gotshal, maybe Tom Roberts. I
don't know the answer to your question who at Weil. I believe that someone on the Weil
side was told by a senior person at Barclays what the deal was, I think I was also told
what the deal was, and then the lawyers were off drafting and then I was basically there
to read it from my perspective and make sure that I was comfortable that the deal as
explained to me was being properly reflected. Since neither Bart nor Mark and -- well,
Skip I think went to law school and practiced, but he doesn't function as a lawyer, I'm
probably a closer functionary in that respect than they were." BCI *Id.* at 72:17-73:11.

107.    **Shapiro testified that during the negotiations of the Sale Transaction he looked at**

        **"key provisions" of the Asset Purchase Agreement and "made sure that what was in**

        **the contract was what had been agreed to." (A. 25 [Shapiro] 89:5-14.)**

Barclays' Response

Barclays disputes the statement in paragraph 107 to the extent that it implies Mr. Shapiro
was a primary drafter of the APA. Mr. Shapiro testified in his deposition that it was the
outside attorneys, rather than himself, who were responsible for drafting and reviewing
key provisions of the contracts. BCI Ex. 97 [Shapiro Dep. Tr.] at 71:3-16.

108.    **During the negotiations of the Sale Transaction, Shapiro focused on the section of**

        **the Asset Purchase Agreement describing "Purchased Assets." (A. 25 [Shapiro]**

        **96:4-10.)**

Barclays' Response

Barclays disputes the statement in paragraph 108 to the extent it implies that Mr. Shapiro
negotiated provisions concerning "Purchased Assets." His testimony confirms that he
"spent time" on the provision only for the purpose of ensuring that he understood it. BCI
Ex. 97 [Shapiro Dep. Tr.] at 96:4-10.

*Contains Highly Confidential Information*

**109.    During the negotiations of the Sale Transaction, Shapiro had "a little bit of input" in**

**drafting Section 9 of the Asset Purchase Agreement which he testified was being**

**drafted by a Weil lawyer and a Cleary lawyer in a hallway at Lehman's building.**

**(A. 25 [Shapiro] 69:13-70:8, 70:24-71:16.)**

Barclays' Response

Barclays disputes the statement in paragraph 109 as mischaracterizing Mr. Shapiro's
testimony. Mr. Shapiro testified that he "didn't personally draft" Section 9 of the Asset
Purchase Agreement, as paragraph 109 implies. Instead, Shapiro testified that lawyers
from Weil Gotshal and Cleary Gottlieb were "drafting, having things typed, and then
reviewing them basically side-by-side together, and I at one point sat down next to them
and started reading the provisions with them to make sure that I understood it, that I
could report back to make sure that it was accurately reflecting what I was being told the
basic business deal was." BCI Ex. 97 [Shapiro Dep. Tr.] at 71:9-16. Moreover, although
Mr. Shapiro testified that he had "a little bit of input into drafting of the provision," he
made it clear that others provided the substance. *Id.* at 69:24-70:8.

**110.    Shapiro's involvement with the Sale Transaction essentially ended on Friday,**

**September 19, 2008. (A. 25 [Shapiro] 164:8-167:9.)**

Barclays' Response

Barclays disputes the statement in paragraph 110 as incomplete. Mr. Shapiro testified
that he stayed through the entire Sale Hearing, which began on Friday, September 19,
2008 and lasted until "about 1:00 am" on Saturday, September 20, 2008. BCI Ex. 97
[Shapiro Dep. Tr.] at 164:8-17. Barclays does not dispute that Mr. Shapiro's
involvement with the Sale Transaction ended at that time.

**111.    Shapiro was not involved in drafting the Clarification Letter, and prior to this**

**litigation he never saw a copy of it. (A. 25 [Shapiro] 118:3-119:5.)**

Barclays' Response

Barclays disputes the statement in paragraph 111 to the extent it implies that Mr. Shapiro
should have reviewed the Clarification Letter. Mr. Shapiro's role in the Sale Transaction

*Contains Highly Confidential Information*

was limited, and ended in the early morning of September 20. *See* Barclays' responses to paragraphs 104-110.

**112.    On or about October 6, 2008, Shapiro signed an employment agreement with**

**Barclays. (A. 145.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 112 as not supported by the cited evidence. Mr. Shapiro signed an employment agreement with Barclays on October 14, 2008. BCI Ex. 127 [September 25, 2008 Mark Shapiro Employment Agreement].

**113.    Shapiro is Head of Restructuring and Finance in Barclays' Investment Banking**

**Division. (A. 25 [Shapiro] 7:14-18.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 113 as incomplete. Mr. Shapiro is a Managing Director in addition to being the Head of Restructuring and Finance. BCI Ex. 148 [Spreadsheet of LBI and Barclays Titles].

**114.    Under his employment agreement with Barclays, Shapiro received from Barclays a**

**(A. 25 [Shapiro] 78:9-12; A. 145.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 114 to the extent it implies that Mr. Shapiro received                                              . Barclays was obligated under the APA to pay Transferred Employees "an annual bonus that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation." BCI Ex. 1 [APA] at § 9.1(c). Mr. Shapiro's

BCI Ex. 356 [Exall Decl.] at ¶ 16; BCI Ex. 127 [September 25, 2008 Mark Shapiro Employment Agreement]. Mr. Shapiro's
                                   BCI Ex. 339 [Johnson Report] at pp. 9-10.

**115.    Under his employment agreement with Barclays, Shapiro has received, or is entitled**

**to receive, from Barclays**

41



˙. (A. 25 [Shapiro] 79:16-80:22; A.

145.)

Barclays' Response

Barclays disputes the statement in paragraph 115 to the extent it implies that

˙. BCI Ex. 339 [Johnson Report] at p. 9.

116.   **Paolo Tonucci ("Tonucci") joined Lehman in 1996. (A. 26 [Tonucci] 7:19-22.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 116.

117.   **At the time of the Sale Transaction, Tonucci was the Global Treasurer at Lehman.**

**(A. 26 [Tonucci] 7:23-8:12.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 117.

118.   **At the time of the Sale Transaction, Tonucci reported to Lowitt. (A. 19 [Lowitt]**

**14:4-19.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 118.

119.   **Prior to LBHI's bankruptcy filing on September 15, 2008, Tonucci was involved in**

**due diligence discussions with Bank of America and Barclays concerning a possible**

**transaction with Lehman. (A. 26 [Tonucci] 15:10-23.)**



*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 119 as incomplete. Mr. Tonucci was
involved in due diligence discussions with Bank of America and Barclays only on Friday,
September 12, 2008. Mr. Tonucci testified that his discussions with Bank of America
and Barclays that day were "in the capacity of due diligence, not negotiations," meaning
that he was "providing information" to them. BCI Ex. 98 [Tonucci Dep. Tr.] at 16:3-13.
Barclays also disputes the statement in paragraph 119 as immaterial to the motions before
the Court.

120. **Lehman officers involved in the negotiations have testified that Tonucci participated
in the negotiations regarding the Sale Transaction. (A. 14 [Kelly] 43:23-44:23; A. 21
[McGee] 13:14-24.)**

Barclays' Response

Barclays disputes the statement in paragraph 120 as not supported by the cited evidence.
Mr. Kelly testified that Mr. Tonucci "was very involved in the *transaction*," but did not
state that Mr. Tonucci was involved in *negotiations*. BCI Ex. 75 [Aug. 18, 2009 Kelly
Dep. Tr.] at 44:2-3 (emphasis added). Similarly, Mr. McGee testified that Mr. Tonucci
was "involved around some of the balance sheet type items," but did not testify that Mr.
Tonucci was involved in negotiations. BCI Ex. 86 [McGee Dep. Tr.] at 13:17-19. Mr.
Tonucci himself testified that he was not involved in the negotiations. BCI Ex. 98
[Tonucci Dep. Tr.] at 26:25-27:8; *see also id.* at 126:6-11, 137:2-8, 217:13-19.

121. **Tonucci testified that he was not involved in the negotiation of the Sale Transaction.
(A. 26 [Tonucci] 26:11-16; 26:25-27:5.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 121.

122. **Tonucci testified that he did not understand the economics of the Sale Transaction
when it was being negotiated on September 15 and 16, 2008. (A. 26 [Tonucci] 27:18-
28:5.)**

*Contains Highly Confidential Information*

Barclays' Response

      Barclays disputes the statement in paragraph 122 to the extent it implies that Mr. Tonucci should have known the "economics of the Sale Transaction when it was being negotiated on September 15 and September 16, 2008." Mr. Tonucci testified that, while he was aware negotiations were taking place on September 15 and September 16, he was not involved in those negotiations. BCI Ex. 98 [Tonucci Dep. Tr.] at 26:25-27:8.

123. **Tonucci did not see a copy of the Asset Purchase Agreement "until a long time after**

      **the transaction closed." (A. 26 [Tonucci] 41:15-19.)**

Barclays' Response

      Barclays disputes the statement in paragraph 123 to the extent it implies that Mr. Tonucci should have seen a copy of the APA prior to the Closing. Mr. Tonucci did not negotiate the Sale Transaction and therefore had no reason to have seen the APA prior to the Closing. *See* Barclays' responses to paragraphs 120-22.

124. **Tonucci did not see a copy of the Clarification Letter until "long after the close [of**

      **the Sale Transaction.]" (A. 26 [Tonucci] 41:24–42:2.)**

Barclays' Response

      Barclays disputes the statement in paragraph 124 to the extent it implies that Mr. Tonucci should have seen a copy of the Clarification Letter prior to the Closing. Mr. Tonucci did not negotiate the Sale Transaction and therefore had no reason to have seen the Clarification Letter prior to the Closing. *See* Barclays' responses to paragraphs 120-22.

125. **Tonucci knew on September 19, 2008 that he would receive an offer of employment**

      **from Barclays. (A. 26 [Tonucci] 65:19-23, 66:4-15.)**

Barclays' Response

      Barclays disputes the statement in paragraph 125 to the extent it implies that Mr. Tonucci's knowledge of his employment offer on September 19, 2008 was inappropriate. The timing of his offer was reasonable, to be expected, and standard market practice. BCI Ex. 339 [Johnson Report] at pp. 5, 8-9.

*Contains Highly Confidential Information*

126.    **Over the weekend of September 20-21, 2008, Tonucci received a written offer of**

**employment from Barclays.  (A. 26 [Tonucci] 63:24-65:18.)**

Barclays' Response

    Barclays disputes the statement in paragraph 126 as not supported by the cited evidence.
Mr. Tonucci testified that he "believe[s] that the offers went out over the weekend [of
September 20-21, 2008], but I don't recall the exact details of it at that point. I recall the
hard copy in more detail. I am not too sure when that was sent out." BCI Ex. 98
[Tonucci Dep. Tr.] at 65:8-11. Mr. Tonucci's written offer of employment is dated
September 22, 2008, but it was not signed until September 26, 2008. BCI Ex. 125
[September 22, 2008 Paolo Tonucci Employment Agreement].

127.    **On or about September 26, 2008, Tonucci signed an employment agreement with**

**Barclays.  (A. 141.)**

Barclays' Response

    Barclays does not dispute the statement in paragraph 127.

128.    **Under his employment agreement with Barclays, Tonucci has received, or is entitled**

**to receive, from Barclays a**

**(A. 26 [Tonucci] 68:24-69:4,**

**70:16-23, 71:7-21; A. 141.)**

Barclays' Response

    Barclays disputes the statement in paragraph 128 to the extent it implies that Mr. Tonucci
received                                                    . Barclays was obligated
under the APA to pay Transferred Employees "an annual bonus that, in the aggregate, are
equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts
payable for incentive compensation." BCI Ex. 1 [APA] at § 9.1(c). Mr. Tonucci's

              BCI Ex. 125 [September 22, 2008 Paolo Tonucci Employment



*Contains Highly Confidential Information*

Agreement]; BCI Ex. 148 [Spreadsheet of LBI and Barclays Titles]. Mr. Tonucci's
                                                                              BCI Ex.
339 [Johnson Report] at pp. 9-10.

**129.    After the Sale Transaction, Tonucci became Head of Group Balance Sheet of Global**

**Operations for Barclays.  (A. 26 [Tonucci] 6:5-16.)**

<u>Barclays' Response</u>

    Barclays disputes the statement in paragraph 129 as inaccurate.  After the Sale
    Transaction, Mr. Tonucci first joined Barclays with the title of U.S. Treasurer.  BCI Ex.
    98 [Tonucci Dep. Tr.] at 6:22.  It was not until February 2009 that Mr. Tonucci assumed
    the position of Head of Group Balance Sheet at Barclays. *Id.* at 6:10-16; *see also* BCI
    Ex. 356 [Exall Decl.] at ¶ 24.

**130.    Robert E. Diamond ("Diamond") was one of the primary negotiators of the Sale**

**Transaction for Barclays.  (A. 20 [McDade] 19:7-18; A. 25 [Shapiro] 47:17-48:3; A.**

**23 [Ricci] 10:17-11:12, 14:20-15:11, 22:2-25.)**

<u>Barclays' Response</u>

    Barclays disputes the statement in paragraph 130 as not supported by the cited evidence.
    The portion of Mr. McDade's deposition testimony cited by Movants in support of this
    proposition describes Mr. Diamond's role as "[i]n and out" of negotiations and "very
    much involved, but not able to be there every step of the conversations."  BCI Ex. 85
    [McDade Dep. Tr.] at 19:12-18.  Mr. Shapiro testified that he was not certain whether
    Mr. Diamond was involved in negotiations and that Archibald Cox "was, of anybody at
    Barclays, he was the face of Barclays that we saw the most of.  He appeared to be the
    person who was, at least on its face, making the decisions.  He might have been
    consulting with others, including Bob Diamond, for all I know, or Rich Ricci or other
    people."  BCI Ex. 97 [Shapiro Dep. Tr.] at 47:21-48:3.  Mr. Ricci described himself as
    "the senior person to lead discussions from our side," and described Mr. Diamond as on
    the team of Barclays' negotiators – a large group, which included Messrs. del Missier,
    Keegan, King, Evans, Cox, Klein, Varley and the Barclays Board.  BCI Ex. 91 [Ricci
    Dep. Tr.] at 10:20-11:12.



*Contains Highly Confidential Information*

131. **Diamond is President of Barclays Bank, PLC and Chief Executive Officer of the investment banking and investment management businesses. (A. 8 [Diamond] 7:11-16.)**

Barclays' Response

Barclays disputes the statement in paragraph 131 as incomplete. Mr. Diamond is President of Barclays PLC and CEO of Corporate and Investment Banking and Wealth Management. Mr. Diamond is also an Executive Director of the Boards of Barclays PLC and Barclays Bank PLC. *See* BCI Ex. 150 [Robert Diamond Bio from Barclays Capital Inc. Website].

132. **Richard Ricci ("Ricci") was one of the primary negotiators of the Sale Transaction for Barclays. (A. 20 [McDade] 19:7-11; A. 21 [McGee] 24:21-25:6; A. 25 [Shapiro] 47:17-48:3; A. 23 [Ricci] 14:20-15:11, 22:13-25.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 132.

133. **Ricci is Barclays' Chief Operating Officer. (A. 23 [Ricci] 6:15-22.)**

Barclays' Response

Barclays disputes the statement in paragraph 133 as inaccurate. Mr. Ricci was formerly Barclays' Chief Operating Officer of the Investment Banking and Investment Management Division. BCI Ex. 91 [Ricci Dep. Tr.] at 6:15-22. However, Mr. Ricci is currently Co-Chief Executive of Corporate and Investment Banking. He is also a member of the Barclays Group Executive Committee and the individual Executive Committees of Barclays Capital and Barclays Wealth. *See* BCI Ex. 153 [Rich Ricci Bio from Barclays Capital Inc.]

134. **Michael Klein ("Klein") was one of the primary negotiators of the Sale Transaction for Barclays. (A. 20 [McDade] 19:7-11; A. 21 [McGee] 24:21-25:14; A. 25 [Shapiro] 47:17-48:9; A. 23 [Ricci] 12:1116, 23:12-20.)**

*Contains Highly Confidential Information*

<u>Barclays' Response</u>

Barclays does not dispute the statement in paragraph 134

**135. Patrick Clackson ("Clackson") is Chief Financial Officer of Barclays. (A. 4**

**[Clackson] 5:24-6:4.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 135 as incomplete. Mr. Clackson is a
Managing Director and Chief Financial Officer of Corporate and Investment Banking and
Wealth Management, comprising Barclays Capital, Barclays Corporate and Barclays
Wealth. He also has responsibility for the Corporate and Investment Banking and Wealth
Management Strategic Planning team and is a member of the Executive Committee of
Barclays Capital. *See* BCI Ex. 149 [Patrick Clackson Bio from Barclays Capital Inc.
Website].

**136. Ricci identified Diamond as one of Barclays' principal negotiators in connection**

**with the Sale Transaction. (A. 23 [Ricci] 10:17-11:12, 14:20-15:11, 22:13-23:5.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 136 as not supported by the cited evidence.
Mr. Ricci described himself as "the senior person to lead discussions from our side," and
only describes Mr. Diamond as one of many on a team of negotiators that was "built up
over time," a team that included Messrs. del Missier, Keegan, King, Evans, Cox, Klein,
Varley and the Barclays Board. BCI Ex. 91 [Ricci Dep. Tr.] at 10:20-11:12.

**137. At his deposition, Diamond denied he had any detailed role in the Sale Transaction**

**negotiations and he identified Ricci as Barclays' principal negotiator. (A. 8**

**[Diamond] 45:11-50:24, 68:11-71:8, 97:11-98:3, 130:23-131:16.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 137 as mischaracterizing Mr. Diamond's
testimony. Mr. Diamond testified that "Rich [Ricci] ran the deal. I didn't run it," and
that he "asked Rich [Ricci] to take full responsibility for negotiating the agreement within
the authority that we were given from the board." Mr. Diamond further testified that his
involvement during the week of the transaction involved "very many discussions with the

*Contains Highly Confidential Information*

Barclays group, our CEO, the executive committee and the board to keep them abreast.
And there were many internal meetings to review the results of different valuations."
BCI Ex. 63 [Diamond Dep. Tr.] at 68:11-71:8.

**138.  Gerald LaRocca ("LaRocca") is a Managing Director and has been Chief**

**Administrative Officer of Barclays since February 2002.  (A. 18 [LaRocca] 8:2-**

**9:18.)**

Barclays' Response

Barclays disputes the statement in paragraph 138 as inaccurate and incomplete.  Mr.
LaRocca's first name is Gerard, not Gerald.  BCI Ex. 82 [LaRocca Dep. Tr.] at 5:2.  Mr.
LaRocca is a Managing Director and Chief Administrative Officer, Americas, at
Barclays.  He is also the Chief Executive Officer of Barclays U.S. broker-dealer and the
New York Branch Manager for Barclays Bank PLC; he also sits on the Board of its
Mexican affiliate and is an officer of several of its companies.  *See id.* at 8:2-9:25; *see
also* BCI Ex. 151 [Gerard LaRocca Bio from DTCC Website].

**139.  LaRocca also serves as CEO of Barclays Capital's U.S. broker-dealer and the New**

**York Branch Manager for Barclays Bank, PLC.  (A. 18 [LaRocca] 27:4-29:13.)**

Barclays' Response

Barclays disputes the statement in paragraph 139 as not supported by the cited evidence.
The correct evidence is BCI Ex. 82 [LaRocca Dep. Tr.] at 9:19-25.  Barclays also
disputes the statement in paragraph 139 as incomplete.  In addition to being the Chief
Executive Officer of Barclays U.S. broker-dealer and the New York Branch Manager for
Barclays Bank PLC, he also sits on the Board of Barclays Bank PLC's Mexican affiliate
and is an officer of several of its companies, as well as being a Managing Director and
Chief Administrative Officer, Americas, at Barclays.  *See* Barclays' response to
paragraph 138.

**140.  LaRocca reports to Ricci.  (A. 18 [LaRocca] 10:5-13.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 140.

*Contains Highly Confidential Information*

## 141. LaRocca testified that he was "heavily involved" during the week of September 15-

22 with the logistics of the Sale Transaction. (A. 18 [LaRocca] 27:4-29:13.)

Barclays' Response

Barclays disputes the statement in paragraph 141 as incomplete and to the extent it
implies that Mr. LaRocca was a negotiator for Barclays. Mr. LaRocca testified only that
he was working with the Lehman "ops guys and try to be helpful to them." BCI Ex. 82
[LaRocca Dep. Tr.] at 27:20-28:20.

## 142. LaRocca signed the Asset Purchase Agreement for Barclays. (A. 30; A. 18

[LaRocca] 116:10-117:12.)

Barclays' Response

Barclays does not dispute the statement in paragraph 142.

## 143. LaRocca signed the Transfer and Assumption Agreement for Barclays.[4] (A. 18

[LaRocca] 116:10- 117:12.)

Barclays' Response

Barclays does not dispute the statement in paragraph 143.

## 144. LaRocca signed the Clarification Letter for Barclays. (A. 32; A. 18 [LaRocca]

113:319.)

Barclays' Response

Barclays does not dispute the statement in paragraph 144.

## 145. Chris Lucas ("Lucas") is the Chief Financial Officer of Barclays Bank PLC. (A. 4

[Clackson] 6:5-8.)

---

[4] The Transfer and Assumption Agreement referred to therein is the Transfer and Assumption Agreement
dated as of September 20, 2008 and signed on or around September 22, 2008, on behalf of the SIPA Trustee,
Barclays and OCC.

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 145 as imprecise. Mr. Lucas's position is the Group Finance Director of Barclays. *See* BCI Ex. 152 [Chris Lucas Bio from Barclays PLC Website].

146.   **Gary Romain ("Romain") is Barclays' Head of Technical Accounting and Private**

   **Equity Finance. (A. 24 [Romain] 12:12-18.)**

Barclays' Response

Barclays disputes the statement in paragraph 146 as imprecise. Mr. Romain is the Head of Technical Accounting and Private Equity Finance for Barclays Capital. BCI Ex. 94 [Sept. 10, 2009 Romain Dep. Tr.] at 12:12-18.

147.   **John Varley ("Varley") is Barclays Bank PLC's Chief Executive Officer. (A. 27**

   **[Varley] 5:13-15.)**

Barclays' Response

Barclays disputes the statement in paragraph 147 as imprecise. Mr. Varley is Group Chief Executive of Barclays. *See* BCI Ex. 154 [John Varley Bio from Barclays PLC Website].

148.   **Varley had the "responsibility for taking the strategy of the acquisition of the**

   **Lehman North American businesses to the [Barclays] board." (A. 27 [Varley] 6:18-**

   **7:25.)**

Barclays' Response

Barclays disputes the statement in paragraph 148 as providing an incomplete description of Mr. Varley's role in the Sale Transaction. Mr. Varley testified that he "had the responsibility for taking the strategy of the acquisition of the Lehman North American business to the [Barclays] board, receiving their authority to implement, and I then delegated, subject to the strategic framework that we had set for the transaction." BCI Ex. 99 [Sept. 3, 2009 Varley Dep. Tr.] at 7:17-25.

*Contains Highly Confidential Information*

149.   **At the time of the Sale Transaction, Diamond reported to Varley.  (A. 27 [Varley]**

**6:6-17.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 149.

150.   **Michael Klein was an outside consultant to Barclays at the time of the Sale**

**Transaction.  (A. 17 [Klein] 8:14-10:17, 12:21-13:8.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 150.

151.   **Klein participated in the negotiations of the Sale Transaction on behalf of Barclays.**

**(A. 17 [Klein] 8:14-20, 48:22-49:3; A. 23 [Ricci] 10:25-11:12, 221:5-7; A. 8**

**[Diamond] 37:9-38:24.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 151.

152.   **Klein testified that he did not know about, and was not involved in, negotiations**

**about price or the assets to be transferred to Barclays under the Sale Transaction.**

**(A. 17 [Klein] 48:22-50:9, 50:22-51:22, 69:12-19.)**

Barclays' Response

Barclays disputes the statement in paragraph 152 as mischaracterizing Mr. Klein's
testimony. Mr. Klein testified that he "was involved in the discussions on the elements of
the building and elements of the cash paid for the rights to operate the business." BCI
Ex. 79 [Klein Dep. Tr.] at 48:22-49:3. He further testified that, although he was not
involved in "pricing of specific assets," he was brought into "the concept of how the
transaction changed in the later part of the week and, in addition to those changes, the
then resulting shifts of assets and the, what I'll call the weekend of the JPMorgan-related
issues. ... " *Id.* at 50:22-51:23. Mr. Klein further was involved beginning on Friday,
September 19 in negotiating with Lehman regarding the loss of value that occurred as a

*Contains Highly Confidential Information*

result of issues with Barclays taking over the Fed's position in Lehman's tri-party repo with the Fed. *Id.* at 85:3-86:16. He participated in discussions regarding the adequacy of the collateral provided for that financing. *Id.* at 91:17-97:3.

153.    **Klein testified that he had not seen the Asset Purchase Agreement at the time it was**

   **signed. (A.17 [Klein] 57:20-58:13.)**

Barclays' Response

Barclays disputes the statement in paragraph 153 to the extent that it implies that Mr. Klein should have reviewed the APA at the time it was signed. Mr. Klein is not a lawyer and did not sign the agreement. Barclays further disputes the statement in paragraph 153 to the extent it implies that Mr. Klein was not familiar with the terms of the transaction. Mr. Klein participated in negotiations concerning the Sale Transaction and testified only in response to a question regarding whether Mr. Klein was responsible for "the document itself," that he "didn't view the [APA] as being my document or in my, if you will, portfolio." BCI Ex. 79 [Klein Dep. Tr.] at 57:8-10.

154.    **Klein testified that he had not reviewed the Clarification Letter at the time it was**

   **signed. (A.17 [Klein] 122:24-123:18.)**

Barclays' Response

Barclays disputes the statement in paragraph 154 to the extent that it implies that Mr. Klein should have reviewed the Clarification Letter at the time it was signed. Mr. Klein is not a lawyer and did not sign the agreement. Barclays further disputes the statement in paragraph 154 to the extent it implies that Mr. Klein was not familiar with the terms of the transaction. Mr. Klein participated in negotiations concerning the Sale Transaction, including negotiations relating to the identification of Purchased Assets specified in the Clarification Letter. BCI Ex. 79 [Klein Dep. Tr.] at 85:3-86:16. Mr. Klein testified only that the final closing documents were not in his portfolio. *Id.* at 57:8-10.

155.    **In the week before LBHI filed for bankruptcy on September 15, 2008, executives**

   **from Barclays and Lehman discussed a possible acquisition by Barclays of Lehman.**

   **(A. 2 [Berkenfeld] 51:9-52:10; A. 19 [Lowitt] 15:6-11; A. 25 [Shapiro] 15:17-16:9; A.**

   **14 [Kelly] 29:14-24; A. 21 [McGee] 18:6-21; A. 23 [Ricci] 13:10-14:2.)**

*Contains Highly Confidential Information*

Barclays' Response

>   Barclays does not dispute that in the weekend leading up to LBHI's bankruptcy filing,
>   Barclays and Lehman discussed a possible acquisition. However, Barclays disputes the
>   statement in paragraph 155 to the extent that it implies that Barclays was the only party
>   with which Lehman discussed a possible acquisition prior to LBHI's bankruptcy filing.
>   Following the March 2008 failure of Bear Stearns and throughout the spring and summer
>   of 2008, Lehman approached a significant number of financial institutions in an effort to
>   find a suitable acquirer. BCI Ex. 86 [McGee Dep. Tr.] at 66:16-67:7; BCI Ex. 85
>   [McDade Dep. Tr.] at 262:9-17. Barclays also disputes that the statement in paragraph
>   155 is material to the motions before this Court.

156.    **Discussions between Barclays and Lehman during the week prior to September 15,**

   **2008 concerning a possible acquisition by Barclays of Lehman did not result in an**

   **agreement between the parties. (A. 2 [Berkenfeld] 51:9-52:10; A. 19 [Lowitt] 15:6-**

   **11; 25 [Shapiro] 15:17-16:9; A. 14 [Kelly] 29:14-24; A. 21 [McGee] 18:6-21; A. 23**

   **[Ricci] 13:10-14:2.)**

Barclays' Response

>   Barclays does not dispute that discussions between Barclays and Lehman prior to LBHI's
>   bankruptcy filing did not yield an agreement. Barclays disputes the statement in
>   paragraph 156 to the extent that it implies that Barclays was the only party with which
>   Lehman discussed a possible acquisition prior to filing for Bankruptcy. *See* Barclays'
>   response to paragraph 155. Barclays also disputes that the statement in paragraph 156 is
>   material to the motions before this Court.

157.    **On the evening of September 14, 2008, representatives from Barclays and Lehman**

   **discussed Barclays purchasing Lehman's North American broker-dealer business.**

   **(A. 20 [McDade] 16:8-17:25.)**

Barclays' Response

>   Barclays disputes the statement in paragraph 157 as not supported by the cited source.
>   Mr. McDade testified that on the evening of September 14, 2008, Mr. McDade "made a
>   call to Bob Diamond to express interest in continuing a dialogue, despite the
>   bankruptcy." BCI Ex. 85 [McDade Dep. Tr.] at 16:13-18. Mr. McDade further testified,
>   however, that discussions between representatives from Barclays and Lehman did not

*Contains Highly Confidential Information*

actually begin until 7:00 am on Monday, September 15, 2008. *Id.* at 16:18-25.

**158. On September 15, 2008, LBHI filed a voluntary petition under chapter 11 of the**

    **Bankruptcy Code. (Case No. 08-13555 (Bankr. S.D.N.Y.) ("LBHI Docket") No. 1.)**

Barclays' Response

    Barclays does not dispute the statement in paragraph 158.

**159. Negotiations between Barclays and Lehman concerning Barclays purchasing**

    **Lehman's North American broker-dealer business took place throughout the day of**

    **September 15, 2008 and into the early morning hours of September 16, 2008. (A. 25**

    **[Shapiro] 46:2-12; A. 14 [Kelly] 38:12-39:20.**

Barclays' Response

    Barclays disputes the statement in paragraph 159 to the extent it implies that negotiations
relating to the Sale Transaction ended in the early morning hours of September 16, 2008.

**160. On September 16, 2008, LBHI, LBI and LB 745 LLC agreed to sell to Barclays**

    **certain assets. (A. 20 [McDade] 32:17-33:2, 36:19-38:25.)**

Barclays' Response

    Barclays disputes the statement in paragraph 160 to the extent it implies that the
agreement was something other than the sale of an entire Business, as defined in the
APA. The APA provided for Barclays to acquire all assets used in the Business, except
specifically Excluded Assets. BCI Ex. 1 [APA] at § 2.1, pp. 6-8 (definition of Purchased
Assets); BCI Ex. 87 [Miller Dep. Tr.] at 40:4-42:7, 50:14-51:6, 57:5-17, 107:7-108:4;
BCI Ex. 92 [Ridings Dep. Tr.] at 13:43-14:7, 16:6-20, 42:9-12, 64:12-16.

**161. The terms of Barclays, LBHI, LBI and LB 745 LLC's agreement with respect to the**

    **Sale Transaction were set forth in the Asset Purchase Agreement. (A. 2.)**

*Contains Highly Confidential Information*

Barclays' Response

> Barclays does not dispute that the original agreement under which Barclays would acquire all the Purchased Assets in the Business, as defined in the APA, was set forth in the APA. Barclays disputes this statement, however, to the extent it ignores subsequent amendments and clarifications to the APA that were agreed to by the parties and approved by the Court, as documented in the Purchase Agreement, as that term is defined by the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; BCI Ex. 5 [Clarification Letter].

**162.    -] 32:17-33:22, 36:19-38:25.)**

Barclays' Response

> Barclays disputes the statement in paragraph 162 as not supported by the cited source. Mr. McDade testified that a deal had been reached "subject to documentation" in the early afternoon on September 16, 2008. BCI Ex. 85 [McDade Dep. Tr.] at 32:17-22, 36:19-37:2. Asked whether the deal had been documented by that point, Mr. McDade stated, "There is a piece of legal paper. There's no document. Needs to be documented." *Id.* at 37:11-12. The final drafting of the APA last late into the night on September 16, 2008, and was likely not signed until after midnight, during the early morning hours of September 17, 2008. BCI Ex. 364 [Lewkow Declaration] at ¶ 7. Barclays further disputes this statement to the extent it ignores subsequent amendments and clarifications to the APA that were agreed to by the parties and approved by the Court, as documented in the Purchase Agreement, as that term is defined by the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; BCI Ex. 5 [Clarification Letter].

**163.    The Asset Purchase Agreement was signed on September 16, 2008. (A. 2**

**[Berkenfeld] 45:25-46:9.)**

Barclays' Response

> Barclays disputes the statement in paragraph 163 as not supported by the cited source. Mr. Berkenfeld testified that he signed the APA "on or around the Tuesday," September 16, 2008, but did not give a definitive date. BCI Ex. 55 [Berkenfeld Dep. Tr.] 46:7-9. The final drafting of the APA lasted late into the night on September 16, 2008, and was likely not signed until after midnight, during the early morning hours of September 17, 2008. BCI Ex. 364 [Lewkow Declaration] at ¶ 7.

**164.    The Trustee was not involved in the negotiation of the Asset Purchase Agreement.**

Barclays' Response

> Barclays does not dispute that the Trustee was not directly involved in the drafting and negotiations of the APA that occurred on September 15 and 16, 2008, as Judge Lynch did

*Contains Highly Confidential Information*

not appoint the Trustee until September 19, 2008. BCI Ex. 80 [Kobak Dep. Tr.] at 7:17-8:4. Barclays disputes the statement in paragraph 164 to the extent it implies that the Trustee was not aware of the terms of the APA, or that the Trustee was not fully informed of the terms of the Clarification Letter which the Trustee approved and executed through his representative, as the Trustee's time records reflect the Trustee's review of the terms of the transaction. *See* BCI Ex. 40 [HHR First Application for Interim Compensation] at Ex. D.

**165.    The Asset Purchase Agreement was submitted to the Court for approval on**

**September 17, 2008. (A. 148(A)-(B) (Sale Motion [Docket No. 60]).)**

Barclays' Response

Barclays does not dispute that the APA was attached to the Lehman Sale Motion filed September 17, 2008, seeking approval for the Sale and seeking an expedited hearing to obtain approval for the Sale.

**166.    On September 17, 2008, the Office of the United States Trustee appointed the**

**Official Committee of Unsecured Creditors (the "Committee"). (LBHI Docket No.**

**62.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 166.

**167.    The Committee was not formed until the day after the Asset Purchase Agreement**

**was signed. (A. 2.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 167 to the extent it is consistent with the available records concerning when the Committee was selected and formed. Barclays does dispute paragraph 167 to the extent it implies that the Creditors' Committee was not informed about the Sale Transaction. At the September 19, 2008 hearing, Weil Gotshal asked Judge Peck for a recess "so that we can orally explain to this audience the nature of those changes and the significance." BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:25-44:1. In addition, Mr. Seery testified that he "discussed with the Creditors' Committee at length the structure of the transaction before the court hearing and how it had evolved first with respect to some additional assets that Barclays was

*Contains Highly Confidential Information*

looking for and then with respect to how we [Lehman] were unable to deliver any of the short positions." BCI Ex. 96 [Seery Dep. Tr.] at 113:25-114:15. Seery also had a "lengthy call" with an advisor to the Creditors' Committee on September 19, 2008 in which they discussed "the structure of the repo, the transfer of the assets, and the mechanism doing it through the repo, the changes that were occurring before the hearing, the fact that we no longer could deliver the short positions, and the concern that Barclays had about the value of the assets." *Id.* at 126:5-19. Further, Mr. Seery testified that on September 21, 2008, he was asked to "help work with the Committee through the transactions" because, he recalled, the Court approval was "subject to the Committee sign-off on the final deal terms." *Id.* at 148:3-11, 147:6-10. Mr. Seery testified that, as he discussed the transaction with the Committee representatives, they questioned, analyzed, and discussed it. *Id.* at 154:19-21. Moreover, emails from the September 19, 2008 hearing demonstrate that the Creditors' Committee was aware of the $1.9 billion of additional assets that had been added to the transaction earlier that day. Specifically, in response to an email from Mr. Kirk to Mr. Ricci noting that "creditors were squawking" about the inclusion of the $1.9 billion of unencumbered securities, Mr. Klein emailed Mr. Ricci and stated, "[w]e are meeting creditors shortly on this [sic] Weil, Lazard, Lehman all supporting with us aggressively." BCI Ex. 225 [September 19, 2008 5:39 pm email from M. Klein to R. Ricci]; BCI Ex. 91 [Ricci Dep. Tr.] at 160:21-162:15 (discussing email).

**168.   The Asset Purchase Agreement stated that securities included within the**

**"Purchased Assets" were being transferred at "book value as of" the date of the**

**Asset Purchase Agreement, September 16, 2008.   (A. 30 at 6.)**

Barclays' Response

Barclays disputes the statement in paragraph 168 as mischaracterizing the APA. The reference to "book value" in the definition of "Long Positions" (one category of "Purchased Assets") does not apply to the "Purchased Assets" as a whole, which included all "assets of Seller . . . used in connection with the Business." BCI Ex. 1 [APA] at p. 6. Nor does the reference to "book value" in the definition of "Long Positions" relate to how the Long Positions themselves would be "transferred" to Barclays or to the Consideration, a defined term under the APA. *Id.*; *see also* BCI Ex. 74 [Keller Dep. Tr.] at 27:16-20 (the parenthetical reference to "book value" in the definition of Long Positions was added only to help "lend description" to which assets were being referenced). Barclays further disputes the use of the word "transferred" in paragraph 168 as vague.

**169.   On or about September 16, 2008, certain executives of Lehman agreed with certain**

**executives of Barclays that Lehman would sell assets to Barclays for $5 billion less**

*Contains Highly Confidential Information*

**than the amount Lehman had on its books for those assets. (A. 19 [Lowitt] 41:8-**

**42:16; A. 26 [Tonucci] 28:22-30:17; A. 37.)**

Barclays' Response

Barclays disputes the statement in paragraph 169 as mischaracterizing the record and the APA. The APA does not base Consideration on the book value of the Purchased Assets; rather, the APA provides that Barclays would provide Consideration equal to the "Cash Amount" plus the "Assumed Liabilities" (for which a total valuation could not be provided because the liabilities were uncertain) in exchange for all "Purchased Assets," which included all assets used primarily in the Business unless specifically excluded (for which a total valuation could not be provided, because the identity and value of assets in the Business was uncertain and constantly changing). *See* BCI Ex. 1 [APA] at §§ 2.1, 2.3, 3.1, p. 6 (definition of "Purchased Assets"). The valuation estimates by Barclays represented the result of a good faith, arm's length effort to estimate the value of the financial inventory to be included among the Purchased Assets. *See* BCI Ex. 85 [McDade Dep. Tr.] at 26:4-14, 27:21-28:8, 56:8-15, 292:6-11, 293:10-15; BCI Ex. 77 [King Dep. Tr.] at 29:3-5, 72:7-13, 153:6-16; BCI Ex. 73 [Keegan Dep. Tr.] at 24:18-26:9, 25:10-21; BCI Ex. 87 [Miller Dep. Tr.] at 34:6-20, 53:19-54:4; BCI Ex. 101 [Yang Dep. Tr.] at 61:21-62:8; BCI Ex. 82 [LaRocca Dep. Tr.] at 146:22-147:13; BCI Ex. 79 [Klein Dep. Tr. ] at 63:18-64:2. Barclays further disputes the statement in paragraph 169 to the extent it implies that Messrs. Lowitt and Tonucci would have specific knowledge about the terms of the agreement. *See* Barclays' responses to paragraphs 57-64 (relating to Mr. Lowitt's role in the Sale Transaction) and 120-124 (relating to Mr. Tonucci's role in the Sale Transaction).

170.    **Lowitt, as Lehman's CFO, was responsible for the accuracy of Lehman's books. (A.**

**19 [Lowitt] 11:20-12:13; *see* A. 20 [McDade] 76:17-77:21.)**

Barclays' Response

Barclays disputes the statement in paragraph 170 as mischaracterizing the record. Mr. Lowitt was not personally "responsible" for the marking process on September 15 and 16, 2008; he expressly testified that "maintaining the accuracy of the books and records was the responsibility of the – a lot of people in the finance department … ." BCI Ex. 83 [Lowitt Dep. Tr.] at 12:4-6. Barclays also disputes the use of the phrase "responsible for" in paragraph 170 as vague and ambiguous.

171.    **Lehman's books fairly reflected the value of Lehman's assets on September 15 and**

**16, 2008. (A. 19 [Lowitt] 41:8-42:5; A. 14 [Kelly] 65:19-22.)**

*Contains Highly Confidential Information*

Barclays' Response

      Barclays disputes the statement in paragraph 171 as mischaracterizing the record. Mr. Lowitt did not definitively state that Lehman's books were fairly marked on September 15 and September 16; his testimony reflected his belief of the situation. On September 15 and 16, 2008, the marks on Lehman's books for securities were overstated and outdated (particularly in light of the illiquid nature of the securities and volatile state of the markets), and did not take into account the effect of Lehman's bankruptcy. *See* BCI Ex. 85 [McDade Dep. Tr.] at 56:8-24, 248:2-17; BCI Ex. 84 [Marsal Dep. Tr.] at 169:24-170:23; BCI Ex. 73 [Keegan Dep. Tr.] at 25:2-10, 26:2-7; BCI Ex. 77 [King Dep. Tr.] at 153:6-16; BCI Ex. 98 [Tonucci Dep. Tr.] at 140:6-142:2; BCI Ex. 87 [Miller Dep. Tr.] at 25:21-26:3, 112:17-114:2; BCI Ex. 78 [Kirk Dep. Tr.] at 95:20-96:21; BCI Ex. 13 [October 8, 2008 Report by Alvarez & Marsal to Creditors' Committee].

172. **Lowitt testified as follows:**

> **Q: . . . [W]hen you learned on the Tuesday morning that there was a deal, what is your memory of the terms that you learned?**
>
> **A:    I didn't know all of the – I wasn't party to all of the terms. You know, I was aware that the – that Barclays was going to purchase a substantial block of assets for less than the amount that we had on our books to reflect a sort of bid offer that reflected both the size of the purchase, as well as the inherent volatility in the market, which was significant that week.**
>
> **(A. 19 [Lowitt] 42:6-16.)**

Barclays' Response

      Barclays disputes the statement in paragraph 172 because it takes Mr. Lowitt's testimony out of context and distorts its meaning. Mr. Lowitt also testified that he was not involved in the negotiations of the Sale Transaction and that he had a limited role in the transaction. *See* Barclays' responses to paragraphs 57-64. Accordingly, his understanding of the negotiations is not based on personal knowledge. Barclays further disputes this statement to the extent it implies that there was an undisclosed discount in the Sale Transaction. The APA disclosed that Barclays would pay Consideration equal to the "Cash Amount" plus the "Assumed Liabilities" (for which a total valuation could not be provided because the liabilities were uncertain) in exchange for all Purchased Assets, which included all assets used primarily in the Business unless specifically excluded (for which a total valuation could not be provided, because the identity and value of assets in the Business were uncertain and constantly changing). *See* BCI Ex. 1 [APA] at §§ 2.1, 2.3, 3.1, p. 6 (definition of "Purchased Assets"). The APA and testimony before the Court provided an estimated value for the trading assets (Long Positions plus 50% of all

*Contains Highly Confidential Information*

residential mortgages) that was greater than the estimated value provided for the trading liabilities (Short Positions). *See id.*; BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 52:16-53:8. The valuation estimates by Barclays represented the result of a good faith, arm's-length effort to estimate the value of the financial inventory that was to be included among the Purchased Assets. *See* BCI Ex. 85 [McDade Dep. Tr.] at 26:4-14, 27:21-28:8, 56:8-15, 292:6-11, 293:10-295:2; BCI Ex.77 [King Dep. Tr.] at 29:3-5, 72:7-13, 153:6-16; BCI Ex. 73 [Keegan Dep. Tr.] at 24:18-26:9, 25:10-21; BCI Ex. 87 [Miller Dep. Tr.] at 34:6-20, 53:19-54:4; *see also id.* at 50:14-51:6, 60:12-21 (testifying that he did not, directly or indirectly, present the Sale Transaction to the Court as a "wash").

173.    **Lowitt described the difference between the purchase price and the price Lehman**

        **had on its books as follows: "The shorthand for it could be discount." (A. 19**

        **[Lowitt] 43:12-22.)**

Barclays' Response

Barclays disputes the statement in paragraph 173 because it takes Mr. Lowitt's testimony out of context and distorts its meaning. Mr. Lowitt initially testified, "You keep asking whether it was a discount. It was an amount that was less than the amount that we had it on our books for, which reflected a bid offer that was consistent with the size of the purchase, as well as the volatility in the marketplace." Debtor's counsel conceded Mr. Lowitt was "not agreeable to the term 'discount' to describe that," and Mr. Lowitt testified that his "explanation of it is more accurate." BCI Ex. 83 [Lowitt Dep. Tr.] at 43:3-15. Mr. Lowitt also testified that he was not involved in the negotiations of the Sale Transaction and that he had a limited role in the transaction. *See* Barclays' responses to paragraphs 57-64. Accordingly, his understanding of the negotiations is not based on personal knowledge and is not material to the motions before this Court. Finally, Barclays disputes this statement to the extent it implies that there was an undisclosed discount in the Sale Transaction. *See* Barclays' response to paragraph 172.

174.    **Kelly described the terms of the Sale Transaction in an email to Lowitt and Lehman**

        **Treasurer Tonucci at 5:10 a.m. on September 16, 2008:**

> **Well it took all night and lots of back and forth but the deal is done and ready for the Board. Final price did not change meaningfully - approx a $5b all in economic loss versus our marks and $3.6b of resi assets left behind. Assume we can fund this after everything else winds down but Paolo [Tonucci] you need to review this. Also, an extra $1b of comp beyond our accrual and assumption of all trade payables in LBI and LBHI. Took 745 [real estate asset] for $1b and several data centers for $400mm. Bart [McDade] reviewed all of it**

*Contains Highly Confidential Information*

before final agreement. ...

(A. 37.)

Barclays' Response

Barclays does not dispute that Exhibit A. 37 contains the cited language, but disputes the statement in paragraph 174 to the extent it implies Mr. Kelly's description is a material, complete and accurate description of the terms of the Sale Transaction. Mr. Kelly expressly testified that Exhibit A. 37 only ". . . characterized the components of the deal that [he] *was aware of*." BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 51:10-17 (emphasis added). Mr. Kelly also testified that he was not involved in the negotiations of the Sale Transaction and had a limited role in the transaction. *See* Barclays' responses to paragraphs 46-49. Accordingly, his understanding of the negotiations is not based on personal knowledge. Barclays further disputes the statement in paragraph 174 to the extent it implies an understanding of the transaction that is contrary to the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169 and 172. References in the quoted email to "final price" and "economic loss" are unclear, undefined and lacking in foundation on any basis in relation to the actual terms of the APA.

175.   **McDade agreed that Kelly's September 16, 2008 5:10 a.m. email was an accurate**

       **description of the Sale Transaction. (A. 20 [McDade] 41:6-42:2.)**

Barclays' Response

Barclays incorporates its response to paragraph 174 and further disputes the statement in paragraph 175 as not supported by the cited evidence. Mr. McDade did not testify that Mr. Kelly's email was "an accurate description of the Sale Transaction." Mr. McDade testified that the "process with the risk guys went all the way up unto, because markets changed again overnight dramatically, so we had another repricing in terms of the process after this." *Id.* Barclays further disputes the statement in paragraph 175 to the extent it implies an understanding of the transaction that is contrary to the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 18 [Sale Order] at pp. 1-2, 12; BCI Ex. 16 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169 and 172.

176.   **Kelly understood that Lehman and Barclays had agreed that Lehman would sell its**

       **assets to Barclays for $5 billion less than the amount Lehman had on its books for**

       **such assets at the time. (A. 14 [Kelly] 66:7-16; *see also* A. 14 [Kelly] at 46:11-16.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays incorporates its response to paragraph 174 and further disputes the statement in paragraph 176 as a misleading and inaccurate characterization of the transaction, and to the extent it implies an understanding of the transaction that is contrary to the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 18 [Sale Order] at pp. 1-2, 12; BCI Ex. 16 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169 and 172.

177.   **Kelly testified that he "recall[ed] the $5 billion represents the difference between the negotiated price and the value of those assets on Lehman's books." (A. 14 [Kelly] 46:11-16; *see also* A. 14 [Kelly] at 143:14-144:2 (same), 156:3-18 (same), 158:21-159:12 (same).)**

Barclays' Response

Barclays incorporates its response to paragraph 174 and further disputes the statement in paragraph 177 to the extent it takes a selected excerpt of Mr. Kelly's testimony out of context. Mr. Kelly also testified that there was no agreement "to give Barclays a $5 billion discount off the values of those assets as shown on Lehman's books." BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 46:17-23.

178.   **Kelly testified as follows:**

> **Q:      ... Did you have an understanding, sir, that the agreement, the pricing of the agreement was that Barclays would pay Lehman $5 billion less than Lehman had thought the assets were worth?**
>
> **A:      My understanding was that the negotiated sales price across all those asset portfolios resulted in a $5 billion, approximately $5 billion less to Lehman relative to its marks at that time.**

**(A. 14 [Kelly] 66:7-16.)**

Barclays' Response

Barclays incorporates its responses to paragraphs 174 and 177 and further disputes the statement in paragraph 178 because it takes an excerpt of Mr. Kelly's testimony out of context.

*Contains Highly Confidential Information*

179.    **Lowitt responded to Kelly's September 16, 2008 5:10 a.m. email with an email**

   **stating: "You are a hero. Well done." (A. 37.)**

Barclays' Response

   Barclays disputes the statement in paragraph 179 to the extent it implies that Mr. Lowitt's
   response related to Mr. Kelly's communication cited by Movants in paragraph 174,
   which was contained in a different communication within the email chain that is Exhibit
   A. 37. Lowitt testified that he believed he wrote those words because Kelly "had worked
   all night after an extremely tumultuous week around this deal and that he had – and it was
   part of just showing appreciation for that." BCI Ex. 83 [Lowitt Dep. Tr.] at 108:6-13; *see
   also* BCI Ex. 184 [Email chain including Sept. 16, 2008 5:33 am email from I. Lowitt to
   M. Kelly].

180.    **Tonucci responded to Kelly's September 16, 2008 5:10 a.m. email with an email**

   **stating: "Fantastic. Great work." (A. 37.)**

Barclays' Response

   Barclays disputes the statement in paragraph 180 to the extent it implies that Mr.
   Tonucci's response related to Mr. Kelly's communication cited by Movants in paragraph
   174, which was contained in a different communication within the email chain that is
   Exhibit A. 37. BCI Ex. 184 [Email chain including Sept. 16, 2008 5:57 am email from P.
   Tonucci to I. Lowitt].

181.    **Tonucci understood at the time the Sale Transaction was being negotiated that**

   **Lehman and Barclays had agreed that Lehman would sell its assets to Barclays for**

   **$5 billion less than the amount Lehman had on its books for such assets at the time.**

   **(A. 26 [Tonucci] 29:22-30:2.)**

Barclays' Response

   Barclays disputes the statement in paragraph 181 because it disregards other testimony by
   Mr. Tonucci and is a misleading and inaccurate characterization of the transaction. Mr.
   Tonucci testified that he was not involved in the negotiations of the Sale Transaction and
   had a limited role in the transaction. *See* Barclays' responses to paragraphs 120-124.
   Barclays further disputes the statement in paragraph 181 to the extent it implies an
   understanding of the transaction that is contrary to the fully integrated Purchase
   Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex.

*Contains Highly Confidential Information*

18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169 and 172.

182.    **Tonucci testified as follows:**

> **Q:    . . . You understood the 5 billion dollars all in economic loss versus our marks to be a reference to a discount off the marks, correct?**
>
> **A:    Yes.**

**(A. 26 [Tonucci] 29:22-30:2.)**

Barclays' Response

Barclays disputes the statement in paragraph 182 as a misleading and inaccurate characterization of the transaction, and further disputes the statement in paragraph 182 to the extent it implies an understanding of the transaction that is contrary to the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 18 [Sale Order] at pp. 1-2, 12; BCI Ex. 16 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169 and 172. Barclays further disputes the statement in paragraph 182 to the extent it implies that Mr. Tonucci had personal knowledge of the terms of the Sale Transaction. *See* Barclays' response to paragraph 181.

183.    **McDade testified that the price Barclays agreed to pay for Lehman's assets was**

**approximately $5 billion less than their book value. (A. 20 [McDade] 31:14-25.)**

Barclays' Response

Barclays disputes the statement in paragraph 183 as not supported by the cited evidence and because it disregards other testimony by Mr. McDade. Mr. McDade testified that the approximate value of $5bn was "The difference in the marks from Friday [September 12] to the contemplated asset purchase price." BCI Ex. 85 [McDade Dep. Tr.] at 31:19-32:8. Mr. McDade also testified that "Lehman hadn't marked the books since Friday, and the markets were unbelievably different in terms of the nature of the dynamic of what happened in the markets." *Id.* at 31:4-7. Barclays further disputes the statement in paragraph 183 to the extent it implies an understanding of the transaction that is contrary to the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169 and 172.

184.    **McDade testified that the price attributed to the Long Positions in the Asset**

*Contains Highly Confidential Information*

**Purchase Agreement "reflect[ed] the market price or the price agreed to by the**

**individuals, the sellers and the buyer." (A. 20 [McDade] 55:12-57:23.)**

Barclays' Response

> Barclays disputes the statement in paragraph 184 as not supported by the cited evidence.
> The portion of Mr. McDade's testimony quoted in paragraph 184 does not refer to the
> final Sale Transaction, but instead refers to BCI Ex. 106 [Berkenfeld Schedule], a
> September 16, 2008 schedule initialed by Mr. Berkenfeld that was not a part of the
> Purchase Agreement between the parties. *See* BCI Ex. 85 [McDade Dep. Tr.] at 53:2-
> 55:11 (introduction of Berkenfeld Schedule immediately prior to quoted testimony); *see
> also* Barclays' response to paragraph 278. Barclays further disputes that the APA
> contained a "price" for the Long Positions. The APA provides an estimated value for the
> Long Positions as one of nineteen different specifically enumerated categories of
> Purchased Assets and provides that the Consideration to be paid by Barclays for all of the
> Purchased Assets would consist of "(a) the Cash Amount and (b) the assumption of the
> Assumed Liabilities by Purchaser." BCI Ex. 1 [APA] at § 3.1. Barclays therefore
> disputes the statement in paragraph 184 to the extent it implies that the transaction was
> anything other than as agreed upon in the fully integrated Purchase Agreement, as
> defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase
> Agreement]; *see also* Barclays' responses to paragraphs 169 and 172. Barclays further
> disputes any implication from the above statement that fails to take into account the fact
> that Mr. McDade also testified that the "Lehman books hadn't been marked since Friday
> evening, the 12th" although "the markets changed dramatically between the 12th, the last
> process for marking" and the 16th and that the "long assets purchase would reflect
> change in the dynamic of the market, particularly given the nature of what a lot of those
> assets were." BCI Ex. 85 [McDade Dep. Tr.] at 55:12-57:23.

185. **McDade testified that the "book value" described in the Asset Purchase Agreement**

**was actually a negotiated price, not the value Lehman carried on its books. (A. 20**

**[McDade] 85:18-22, 68:4-70:14.)**

Barclays' Response

> Barclays incorporates its response to paragraph 184 and disputes the statement in
> paragraph 185 as not supported by the cited evidence. In the first portion of Mr.
> McDade's testimony cited by Movants in support of this proposition, Mr. McDade
> testifies only that it was his "understanding that the long position was being conveyed at
> market value as opposed to book value." *See* BCI Ex. 85 [McDade Dep. Tr.] at 85:18-22.
> In the second portion of Mr. McDade's testimony cited by Movants in support of this
> position, Mr. McDade does not refer to the Final Sale Transaction, but instead refers to
> BCI Ex. 106 [Berkenfeld Schedule], a September 16, 2008 schedule initialed by Mr.

*Contains Highly Confidential Information*

Berkenfeld that was not a part of the Purchase Agreement between the parties. *See* [McDade Dep. Tr.] at 68:4-70:14; *see also* Barclays' response to paragraph 278. Barclays further disputes that the APA contained a "price" for the Long Positions (the only Purchased Asset with a reference to "book value" within the APA). *See* Barclays' response to paragraph 184. Barclays therefore disputes the statement in paragraph 185 to the extent it implies that the transaction was anything other than as agreed upon in the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at p. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to 169 and 172.

186. **The price reflected in the Asset Purchase Agreement was the result of negotiations**

    **between Lehman and Barclays in which Gelband, Felder, and Donini were involved.**

    **(A. 20 [McDade] 59:19-60:22, 75:4-76:7.)**

Barclays' Response

Barclays incorporates its response to paragraph 184 and disputes the statement in paragraph 186 as not supported by the cited evidence. The first portion of Mr. McDade's testimony cited by Movants in support of this proposition does not relate to the negotiation of the Sale Transaction. BCI Ex. 85 [McDade Dep. Tr.] at 59:19-60:22. In the second portion of Mr. McDade's testimony cited by Movants in support of this proposition, Mr. McDade testified only that Mr. Gelband, Mr. Felder and Mr. Donini were involved in "discussions" relating to "asset values," not that they were involved in "negotiations" about "price." *Id.* 75:4-76:7. Barclays further disputes that the APA contained a "price" for the Long Positions (the particular Purchased Asset discussed in the second portion of Mr. McDade's cited testimony). *See* Barclays' response to paragraph 184. Barclays therefore disputes the statement in paragraph 186 to the extent it implies that the transaction was anything other than as agreed upon in the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169 and 172.

187. **In connection with the Sale Transaction, Barclays had no intention of buying**

    **Lehman's assets at book value. (A. 8 [Diamond] 11:24-14:5; 17:16-18:19; *see also* A.**

    **8 [Diamond] 32:15-23; A. 27 [Varley] 36:8-37:2.)**

Barclays' Response

Barclays incorporates its response to paragraph 184 and disputes the statement in paragraph 187 as not supported by the cited evidence. In the first two portions of Mr.

*Contains Highly Confidential Information*

Diamond's testimony cited by Movants in support of this proposition, Mr. Diamond did not testify about the Sale Transaction, but instead testified regarding a hypothetical transaction discussed in conversations he had "within a month after the Bear Stearns/JP Morgan deal," not in September 2008. BCI Ex. 63 [Diamond Dep. Tr.] at 9:4-21:5. In the third portion of Mr. Diamond's testimony cited by Movants in support of this proposition, Mr. Diamond similarly did not testify regarding the Sale Transaction, but instead testified regarding conversations he had on September 12, 2008 in connection with the failed negotiations between Barclays and Lehman to acquire all of Lehman's assets. *Id.* at 23:25-42:15. Barclays further disputes the use of Mr. Diamond's testimony in support of paragraph 187 as failing to include the following portion of Mr. Diamond's testimony regarding this period: "I think one of the reasons book value is hard to – no one knew what book values were at this point, so – traditionally book value I would say, but in this period, I think that there was a lot of confusion around book value, so I think it would probably be a poor choice of terms to have a discussion. But in spirit, I think what we are saying is the full price of the better market." *Id.* at 20:21-21:3. Barclays also disputes the use of Mr. Varley's testimony in support of the statement in paragraph 187 as mischaracterizing Mr. Varley's testimony. Mr. Varley testified only that the deal needed to have a "delta between asset valuation and liability valuation" that was disclosed publicly in the September 17 Analyst Call and Press Release of the same day. BCI Ex. 99 [Sept. 3, 2009 Varley Dep. Tr.] at 35:12-37:2; *see also* BCI Ex. 109 [Sept. 17, 2008 Barclays Press Release] at p. 4; BCI Ex. 110 [Sept. 17, 2008 Investor Teleconference Tr.]; BCI Ex. 189 [Sept. 17, 2008 9:08 am email from R. Freeman to B. McDade, *et al.*]; BCI Ex. 198 [Sept. 17, 2008 7:42 pm email from M. Miller to M. Miller]; BCI Ex. 285 [Email chain including Sept. 22, 2008 6:53 am email from J. Goldfield to N. Bajpai, *et al.*, and Sept. 21, 2008 3:00 pm email from E. Gilbert to J. Goldfield, *et al.*] Barclays further disputes the statement in paragraph 187 as mischaracterizing the APA. The only reference to "book value" in the APA is in the definition of "Long Positions" (one category of "Purchased Assets") and does not apply to the "Purchased Assets" as a whole, which included all "assets of Seller in connection with the Business." *See* Barclays' response to paragraph 184. Barclays therefore disputes the statement in paragraph 187 to the extent it implies that the transaction was anything other than as agreed upon in the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169 and 172.

**188. In connection with the Sale Transaction, Diamond testified that "it was always a**

**given" that if Barclays was going to do a deal with any investment bank it would be**

**at "a distressed price as opposed to a premium or book value price." (A. 8**

**[Diamond] 11:24-14:5; 17:16-18:19.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 188 as not supported by the cited evidence. In the portions of Mr. Diamond's testimony cited by Movants in support of this proposition, Mr. Diamond was not testifying about the Sale Transaction but was testifying regarding a hypothetical transaction discussed during conversations he had "within a month after the Bear Stearns/JP Morgan deal," not in September 2008. BCI Ex. 63 [Diamond Dep. Tr.] at 9:4-21:5. Barclays further disputes the statement in paragraph 188 as mischaracterizing the APA. The only reference to "book value" in the APA is in the definition of "Long Positions" (one category of "Purchased Assets") and does not apply to the "Purchased Assets" as a whole, which included all "assets of Seller . . . used in connection with the Business." *See* Barclays' response to paragraph 184. Barclays therefore disputes the statement in paragraph 188 to the extent it implies that the transaction was anything other than as agreed upon in the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169 and 172.

**189.    Diamond testified that he told Lehman representatives Barclays would only pay a**

**"very, very distressed price" for Lehman assets. (A. 8 [Diamond] 32:15-23.)**

Barclays' Response

Barclays disputes the statement in paragraph 189 as not supported by the cited evidence. In the portion of Mr. Diamond's testimony cited by Movants in support of this proposition, Mr. Diamond did not testify regarding the Sale Transaction, but instead testified regarding conversations he had on September 12, 2008 in connection with the failed negotiations between Barclays and Lehman to acquire all of Lehman's assets. BCI Ex. 63 [Diamond Dep. Tr.] at 22:6-42:15. Barclays further disputes the statement in paragraph 189 to the extent it implies that the transaction was anything other than as agreed upon in the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169 and 172.

**190.    Varley testified that, in its negotiations and Sale Transaction with Lehman, Barclays**

**was "certainly very fixated on the need to have a substantial discount." (A. 27**

**[Varley] 36:8-37:2.)**

Barclays' Response

Barclays disputes the statement in paragraph 190 as mischaracterizing Mr. Varley's testimony. Mr. Varley made clear that the "substantial discount" quoted by Movants in this paragraph referred to the "delta between asset valuation and liability valuation" that

*Contains Highly Confidential Information*

was disclosed publicly in the September 17 Analyst Call and Press Release. BCI Ex. 99 [Sept 3, 2009 Varley Dep. Tr.] at 35:12-37:2; *see also* Barclays' response to paragraph 187. Barclays further disputes this statement to the extent it implies that there was an undisclosed discount in the Sale Transaction or that the transaction was anything other than as agreed upon in the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169 and 172.

**191.    One document Varley kept in his personal file concerning the Sale Transaction**

**refers to a "negotiated discount – 5 [billion]." (A. 42 at BCI-EX-00166340.)**

Barclays' Response

Barclays disputes the statement in paragraph 191 to the extent it implies Mr. Varley had any knowledge of the document. Mr. Varley testified that he did not know from whom he received the document, and that "I don't recognize the typeface and I don't know its origin." *Id.* at 157:4-8. Barclays further disputes the statement in paragraph 190 to the extent it implies that the "discount" referred to in Exhibit A. 42 was a discount from fair value. The author of Exhibit A. 42 showed values the author expected Barclays to record on its balance sheet. Barclays further disputes the statement in paragraph 191 to the extent it implies that Mr. Varley believed there was any "discount" in the Sale Transaction other than a "buffer" in which trading assets would exceed trading liabilities, as disclosed in the APA and publicly disclosed by Barclays during the September 17 Analyst Call and Press Release, the substance of which was distributed to the Debtor and the Creditors' Committee. *See* BCI Ex. 100 [Sept. 11, 2009 Varley Dep. Tr.] at 154:6-156:21; *see also* Barclays' response to paragraph 187.

**192.    Varley testified that the term "negotiated discount" referred to in his document (A.**

**42) referred to a $5 billion "haircut or buffer or delta, a discount to the asset price**

**paid by [Barclays] for the Lehman transaction." (A. 28 [Varley] 154:25-157:3; *see***

**A. 42.)**

Barclays' Response

Barclays disputes the statement in paragraph 192 because it ignores other related testimony by Mr. Varley. Mr. Varley testified that he did not know what the term "negotiated discount" in the document referred to. BCI Ex. 100 [Sept. 11, 2009 Varley Dep. Tr.] at 155:13-156:21. Mr. Varley only speculated that the term in the document might refer to a concept of a "buffer" in which trading assets would exceed trading liabilities, as disclosed in the APA and in the September 17, Analyst Call and Press

Release discussing the transaction. *Id.* at 155:13-156:21; 70:6-20; *see also* Barclays' responses to paragraphs 190 and 191.

193.   **With regard to the Sale Transaction, Ricci testified that he "would think there would have been a discount [] of Lehman assets – the Lehman marks on their assets [].**" **(A. 23 [Ricci] 44:25-45:19.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 193 as mischaracterizing Mr. Ricci's testimony. The context of Mr. Ricci's testimony was that Barclays believed Lehman's marks were outdated and inaccurate. BCI Ex. 91 [Ricci Dep. Tr.] at 43:15-46:18; *see also* BCI Ex. 85 [McDade Dep. Tr.] at 26:4-14, 27:21-28:8, 56:8-15, 292:6-11, 293:10-15; BCI Ex.77 [King Dep. Tr.] at 29:3-5, 72:7-13, 153:6-16; BCI Ex. 73 [Keegan Dep. Tr.] at 24:18-26:9, 25:10-21; BCI Ex. 87 [Miller Dep. Tr.] at 34:6-20, 53:19-54:4; BCI Ex. 101 [Yang Dep. Tr.] at 61:21-62:8; BCI Ex. 82 [LaRocca Dep. Tr.] at 146:22-147:13; BCI Ex. 79 [Klein Dep. Tr.] at 63:18-64:2.

194.   **In a Barclays conference call with analysts on September 17, 2008 (the "September 17, 2008 analyst call"), Varley, Diamond and other senior executives at Barclays described the agreement Barclays reached with Lehman. (A. 46.)**

<u>Barclays' Response</u>

Barclays does not dispute the statement in paragraph 194 that on September 17, 2008, Barclays held an analyst call in which Mr. John Varley, Mr. Bob Diamond and others gave a general description of the agreement to acquire the Lehman North American broker-dealer business. Barclays does dispute that the investor teleconference provided any detailed description of the contractual terms. BCI Ex. 110 [Sept. 17, 2008 Investor Teleconference Tr.] at p. 2.

195.   **During the September 17, 2008 analyst call, Barclays noted that (a) "[t]he transaction is structured as we wanted it to be" and (b) "we have been very deliberate in our choices [of assets]." (A. 46 at 6-7.)**

*Contains Highly Confidential Information*

Barclays' Response

> Barclays disputes the statement in paragraph 195 to the extent it alters the transcript of
> the September 17 Analyst Call. Barclays' executives explained during the call that they
> had been "very deliberate in choosing either pro or con" and "have been very deliberate
> in our choices here." BCI Ex. 110 [Sept. 17, 2008 Analyst Call Tr.] at p. 7. Barclays
> also disputes the statement to the extent it ignores the changes to the transaction that
> occurred after the September 17 Analyst Call, including changes that resulted in Barclays
> receiving repo collateral that consisted of illiquid assets that were different from the
> assets Barclays originally agreed to acquire. BCI Ex. 73 [Keegan Dep. Tr.] at 34:12-
> 35:15

196.    **During the September 17, 2008 analyst call, Barclays representatives stated that**

**Barclays expected to "preserve the buffer" in valuation because of the manner in**

**which they had marked the assets and how they had calculated the "negative**

**goodwill." (A. 46 at 2-5, 13; see also A. 27 [Varley] 70:15-20 ("the expectation is to**

**preserve it [the buffer] in the transaction").)**

Barclays' Response

> Barclays does not dispute that in response to a question from an analyst, Barclays
> executives explained in the September 17 Analyst Call that it expected to preserve a
> "buffer" of roughly $4 billion between acquired assets and acquired liabilities based on
> "a process where we [Barclays] took the original marks, reviewed them and then took
> some further write downs." BCI Ex. 110 [Sept. 17, 2008 Investor Teleconference Tr.] at
> pp. 3, 5. This information was publicly announced and known to both the Debtor and the
> Creditors' Committee. BCI Ex. 189 [Sept. 17, 2008 9:08 am email from R. Freeman to
> B. McDade, *et al.*]; *see also* BCI Ex. 198 [Sept. 17, 2008 7:42 pm email from A. Miller
> to A. Miller]; BCI Ex. 285 [Email chain including Sept. 22, 2008 6:53 am email from J.
> Goldfield to N. Bajpai, *et al.* and Sept. 21, 2008 3:00 pm email from E. Gilbert to J.
> Goldfeld, *et al.*].

197.    **The "buffer" Barclays disclosed during the September 17, 2008 analyst call was that**

**Barclays was purchasing $72 billion in assets for $68 billion. (A. 46 at 2-3; see also**

**A. 27 [Varley] 63:9-22 ("we [Barclays] had created an appropriate delta between**

**asset and liability values").)**

*Contains Highly Confidential Information*

Barclays' Response

   Barclays does not dispute that during the September 17, 2008 analyst call, Barclays'
   executives discussed the existence of a "buffer" between trading assets and trading
   liabilities. Barclays disputes the statement in paragraph 197 to the extent it implies that
   this discussion was the only way in which the "buffer" was disclosed. The APA
   describes trading assets that are estimated to be worth more than trading liabilities.
   *Compare* BCI Ex. 1 [APA] at pp. 6-8 (definition of Purchased Assets), *with id.* at § 2.3(i).
   Barclays also disputes the statement in paragraph 197 to the extent it implies that
   Barclays agreed to pay for the trading assets by assuming the trading liabilities. The
   APA provides for Barclays to acquire all assets in the Business in consideration for the
   Cash Amount ($250 million plus the appraised value of the real estate) plus the
   assumption of certain Assumed Liabilities, for which no total valuation estimate was
   provided. *See* Barclays' responses to paragraphs 169 and 172.

**198.   Ricci testified that Barclays created a "cushion" in the Sale Transaction through,**

   **among other things, a "liquidity premium." (A. 23 [Ricci] 125:4-20.)**

Barclays' Response

   Barclays disputes the statement in paragraph 198 to the extent it implies that there was an
   undisclosed discount in the Sale Transaction or that the transaction was anything other
   than as agreed upon in the fully integrated Purchase Agreement, as defined in the Sale
   Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see
   also* Barclays' responses to paragraphs 169 and 172.

**199.   Barclays did not to [sic] disclose on the September 17, 2008 analyst call that the**

   **valuations it was using were not Lehman's book valuations. (A. 46; A. 27 [Varley]**

   **63:14-22.)**

Barclays' Response

   Barclays disputes the statement in paragraph 199 as not supported by the cited sources.
   On the September 17, 2008 Analyst Call, Chris Lucas stated that prior to announcing
   financial details of the anticipated deal, Barclays "ha[d] been through a process where we
   took the original marks, reviewed them and then took some further write downs." BCI
   Ex. 110 [Sept. 17, 2008 Investor Teleconference Tr.] at p. 3.

**200.   Varley prepared a set of talking points for the September 17, 2008 analyst call in**

*Contains Highly Confidential Information*

which he noted the "capital accretive" nature of the Sale Transaction as well as the

"negative goodwill." (See A. 42 at BCI-EX-166333-339.)

Barclays' Response

    Barclays does not dispute the statement in paragraph 200.

201.    In Varley's talking points for the September 17, 2008 analyst call, he noted:

- The transaction is capital ratio accretive without additional equity issuance.

- The source of that accretion is the negative goodwill from the transaction, which amounts to some US $2 billion, post tax.

* * *

- The transaction meets our financial tests with significant margin for error.

- We expect it to be immediately economic profit positive.

(A. 42 at BCI-EX-166337-38.)

Barclays' Response

    Barclays does not dispute that Mr. Varley's notes contained the bulleted points in paragraph 201, but disputes the statement in paragraph 201 to the extent it fails to reflect the actual statements made during the September 17 Analyst Call. During that call, Barclays stated that "the acquisition . . . meets some [of] the financial tests that we have which are designed to ensure that we create shareholder benefit." BCI Ex. 110 [Sept. 17, 2008 Investor Teleconference Tr.] at p. 2.

202.    With respect to the Sale Transaction, according to Diamond, a "condition to the

deal from the beginning was capital accretion" for Barclays. (A. 8 [Diamond] 66:13-

19; *see also* A. 8 [Diamond] 61:13-62:5; 62:19-63:09; 82:7-84:4, 87:23-92:9, 98:15-

101:15, 104:5-105:15, 128:7-129:5.)

*Contains Highly Confidential Information*

Barclays' Response

> Barclays disputes the statement in paragraph 202 to the extent it implies that Barclays did
> not disclose this information to Lehman or the public. During the September 17 Analyst
> Call, Mr. Varley stated that "[w]e are acquiring trading assets with a current estimated
> value of 72 billion dollars and trading liabilities with a current estimated value of 68
> billion dollars for a cash consideration of 250 million dollars." BCI Ex. 110 [Sept. 17,
> 2008 Analyst Call Tr.] at p. 2. These figures were also included in the pre-call Press
> Release. BCI Ex. 109 [Sept. 17, 2008 Barclays Press Release]. Mr. Varley went on to
> say that "[i]n fact the transaction is capital ratio accretive without additional equity
> issuance. And the source of that accretion is the negative goodwill from the transaction,
> which amounts to about 2 billion US dollars post tax." BCI Ex. 110 [Sept. 17, 2008
> Analyst Call Tr.] at p. 2. The Press Release also indicated that the transaction would
> strengthen Barclays' capital ratios. BCI Ex. 109 [Sept. 17, 2008 Barclays Press Release].
> This information was received by senior executives at Lehman, including Bart McDade,
> as well as the Creditors' Committee and Lazard. *See also, e.g.*, BCI Ex. 96 [Seery Dep.
> Tr.] at 154:4-21; BCI Ex. 87 [Miller Dep. Tr.] at 62:9-65:6, 70:9-17; BCI Ex. 58 [Burian
> Dep. at 194:18-197:20, 272:7-275:21; 300:4-302:14]; BCI Ex. 88 [O'Donnell Dep. Tr.] at
> 35:10-36:8, 37:19-38:8, 39:24-40:11, 40:22-41:10; BCI Ex. 198 [Sept. 17, 2008 8:23 pm
> email from A. Ogasamara to A. Bruhmuller, *et al.*]; BCI Ex. 285 [Email chain including
> Sept. 22, 2008 6:53 am email from J. Goldfield to N. Bajpai]; BCI Ex. 87 [Sept. 17, 2008
> 8:00 am email from B. Ridings to L. Fife, *et al.*]; BCI Ex. 189 [Email from R. Freeman to
> B. McDade et al., Sept. 17, 2008, 9:08 am]; BCI Ex. 204 [Email from A. Krishnamurthy
> to M. Gelband, Sept. 18, 2008, 3:24 pm].

**203.    On September 16, 2008, the Barclays board of directors was informed that the**

**estimated value for the Sale Transaction was $75 billion. (A. 8 [Diamond] 147:24-**

**150:5; *see* A. 35; A. 36; A. 27 [Varley] 48:5-49:9, 50:15-53:7.)**

Barclays' Response

> Barclays does not dispute that Exhibits A. 35 and A. 36 are both a PowerPoint
> presentation prepared for the Barclays Board of Directors and state that Barclays "would
> acquire $75bn of assets and liabilities." Barclays disputes the statement in paragraph 203
> to the extent it implies that the $75 billion figure in the presentations was anything other
> than a preliminary estimate that (1) evidently used figures taken from a pre-existing
> Lehman presentation that was already outdated as of September 16, 2008, and (2) did not
> reflect the inventory ultimately reflected in the APA. *See* BCI Ex. 131 [Sept. 16, 2008,
> 1:49 am email fom T. McCosker to R. Haworth, *et al.*, with attachment]. For example,
> the $75 billion figure in the presentation includes a line item of $6.5 billion for mortgage-
> backed securities, which apparently represented 100% of Lehman's mortgage-backed
> securities using marks from the prior week. *Id.* Those marks have been acknowledged to
> be difficult to value at that time. BCI Ex. 80 [Kobak Dep. Tr.] at 38:18-39:11; BCI Ex.

*Contains Highly Confidential Information*

77 [King Dep. Tr.] at 87:21-89:8. In addition, the mortgage-backed securities were not included in the definition of the "Long Positions" set forth in the APA. BCI Ex. 1 [APA] at p. 6 (subsection (d) of definition of "Purchased Assets"). Moreover, 50% of those mortgage-backed securities were specifically excluded in the APA. BCI Ex. 1 [APA] at p. 3 (subsection (k) of "Excluded Assets"), p. 6 (subsection (e) of definition of "Purchased Assets"). Barclays therefore disputes any implication that the $75 billion number supports the Movants' statement that Barclays was expecting to value the Long Positions at $5 billion more than the estimated book value set forth in the APA. Barclays therefore also disputes that the statement in paragraph 203 is material to the motions before this Court.

**204.    On September 16, 2008, the Barclays board of directors was informed that the Sale**

**Transaction included "negative goodwill" valued at $3 billion (A. 35; A. 36; A. 27**

**[Varley] 48:5-49:9, 50:15-53:7.)**

Barclays' Response

Barclays does not dispute that A. 35 and A. 36 are both a PowerPoint presentation prepared for the Barclays board of directors and state that "[t]he recognition of negative goodwill amounts to $3.0bn pre tax ($2bn post tax)." Barclays disputes any implication that these numbers were anything more than preliminary estimates. Barclays further disputes any implication that Barclays' expectation of generating approximately $2 billion in negative goodwill after tax was kept secret. To the contrary, Barclays publicly announced this information as part of the September 17 Analyst Call, and the same information was received by senior Lehman executives, the Creditors' Committee and Lazard. *See* Barclays' response to paragraph 202.

**205.    With respect to the Sale Transaction, negative goodwill meant that "the assets**

**would have exceeded the liabilities [Barclays] assumed." (A. 23 [Ricci] 97:3-98:9.)**

Barclays' Response

Barclays disputes the statement in paragraph 205 to the extent it implies that Barclays' expectation of generating approximately $2 billion in negative goodwill after tax was kept secret. To the contrary, Barclays publicly announced this information as part of the September 17 Analyst Call, and the same information was received by senior Lehman executives, the Creditors' Committee and Lazard. *See* Barclays' response to paragraph 202.

*Contains Highly Confidential Information*

206.  **With respect to the Sale Transaction, Clackson described negative goodwill as**

**profit.  (A. 4 [Clackson] 41:12-42:12 (negative goodwill "rolls up into consolidated**

**profit at a group level").)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 206 to the extent it implies that Barclays'
expectation of generating approximately $2 billion in negative goodwill after tax was
kept secret.  To the contrary, Barclays publicly announced this information as part of the
September 17 Analyst Call, and the same information was received by senior Lehman
executives, the Creditors' Committee and Lazard.  *See* Barclays' response to paragraph
202.

207.  **With respect to the Sale Transaction, according to Varley, it was important to**

**Barclays to achieve a $3 billion pre-tax negative goodwill even as the specifics of the**

**transaction were changing and evolving because of market conditions.  (A. 27**

**[Varley] 52:14-53:7.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 207 as mischaracterizing Mr. Varley's
testimony.  Mr. Varley testified in response to a hypothetical question that, if he had told
the Barclays Board to expect pre-tax negative goodwill in a transaction, and the specifics
of the transaction changed to market conditions, he would still attempt to recognize the
negative goodwill, but that he "and the Executive Committee would form a judgment
about whether there was a change in the deal parameters that caused us to go back to the
board."  BCI Ex. 99 [Sept. 3, 2009 Varley Dep. Tr.] at 52:14-53:2.  Barclays further
disputes the statement in paragraph 207 to the extent it implies that Barclays' expectation
of generating approximately $2 billion in negative goodwill after tax was kept secret.  To
the contrary, Barclays publicly announced this information as part of the September 17
Analyst Call, and the same information was received by senior Lehman executives, the
Creditors' Committee and Lazard.  *See* Barclays' response to paragraph 202.

208.  **With respect to the Sale Transaction, according to Varley, "negative goodwill" is an**

**accounting concept that "most people would refer to as a discount."  (A. 27 [Varley]**

**42:14-43:8.)**

*Contains Highly Confidential Information*

Barclays' Response

    Barclays does not dispute that Mr. Varley testified: "If on the other hand you acquire
assets of 10 for a valuation of five, then there would be negative goodwill of five because
of the discount at which you are buying the assets. So negative goodwill is a term of
science describing in a scientific way what most people would refer to as a discount."
BCI Ex. 99 [Sept. 3, 2009 Varley Dep. Tr.] at 43:2-8. Barclays disputes the statement in
paragraph 208 to the extent it implies that Barclays' expectation of generating
approximately $2 billion in negative goodwill after tax was kept secret. To the contrary,
Barclays publicly announced this information as part of the September 17 Analyst Call,
and the same information was received by senior Lehman executives, the Creditors'
Committee and Lazard. *See* Barclays' response to paragraph 202.

## 209.  With respect to the Sale Transaction, Lucas deemed negative goodwill to be profit.

### (A. 123 (Lucas email noting negative goodwill is "accounting profit").)

Barclays' Response

    Barclays does not dispute that in Exhibit A. 123, Mr. Lucas describes negative goodwill
as "accounting profit and tier 1 for regulatory purposes." Barclays disputes the statement
in paragraph 209 to the extent it implies that Barclays' expectation of generating
approximately $2 billion in negative goodwill after tax was kept secret. To the contrary,
Barclays publicly announced this information as part of the September 17 Analyst Call,
and the same information was received by senior Lehman executives, the Creditors'
Committee and Lazard. *See* Barclays' response to paragraph 202.

## 210.  Barclays understood that, upon the closing of the Sale Transaction, it would have an

immediate gain on acquisition. (A. 27 [Varley] 48:5-49:9, 50:15-53:7, A. 35, A. 36;

A. 42.)

Barclays' Response

    Barclays disputes the statement in paragraph 210 to the extent it implies any certainty as
to the final valuations or acquisition accounting as of the time of the closing. Barclays
further disputes the statement in paragraph 210 to the extent it implies that Barclays'
expectation of a gain upon acquisition was kept secret. To the contrary, Barclays
publicly announced this information as part of the September 17 Analyst Call, and the
same information was received by senior Lehman executives, the Creditors' Committee
and Lazard. *See* Barclays' response to paragraph 202.

*Contains Highly Confidential Information*

211.   **In an email from Beatrice Montondy [sic], a Barclays employee, in which she**

   **discussed how the Sale Transaction should be considered for U.S. tax purposes, Ms.**

   **Montondy [sic] wrote:**

> **The context to this question was that, during the asset purchase price
> negotiations, it was essential to the valuation calculation that the
> "discount" between the value of the assets acquired and the purchase
> price NOT be subject to the 46% marginal U.S. tax rate applicable to
> BCI.**

   **(A. 61 at BCI-EX-(S)-00047721.)**

Barclays' Response

   Barclays does not dispute that Exhibit A. 61 contains the quoted language, but disputes
   the statement in paragraph 211 to the extent it fails to disclose that the word "discount" in
   Exhibit A. 61 was used in the context of a technical tax analysis of the transaction where
   (1) there was an expectation that trading assets would exceed trading liabilities; (2) the
   allocation under I.R.C. Section 1060 of the "purchase price" for the acquired assets was
   to be split between multiple Barclays' entities, BCI Ex. 202 [*Email chain including Sept.
   17, 2008 7:13 am email from B. Montaudy to M. Rudduck, et al.*]; and (3) the estimated
   cure and compensation liabilities were not part of the purchase price for purposes of the
   tax allocation. Barclays further disputes the statement in paragraph 211 to the extent it
   implies that Barclays' expectation of a gain upon acquisition was kept secret. To the
   contrary, Barclays publicly announced this information as part of the September 17
   Analyst Call, and the same information was received by senior Lehman executives, the
   Creditors' Committee and Lazard. *See* Barclays' response to paragraph 202. Barclays
   further disputes the statement in paragraph 211 as using the cited evidence out of context.
   Exhibit A. 61 was sent on September 18, 2008, prior to substantial changes in the
   transaction that rendered the estimate in Exhibit A. 61 irrelevant. BCI Ex. 49 [Sept. 19,
   2008 Hearing Tr.] at 43:18.

212.   **According to Ms. Montondy, the immediate gain for Barclays on the Sale**

   **Transaction (as to at least a portion of the acquired portfolios) was in the range of**

   **$2.5 billion. (A. 61.)**

Barclays' Response

   Barclays does not dispute that Exhibit A. 61 contains the quoted language, but disputes
   the statement in paragraph 212 to the extent it fails to disclose that the word "gain" in
   Exhibit A. 61 was used in the context of a technical tax analysis of the transaction where

*Contains Highly Confidential Information*

(1) there was an expectation that trading assets would exceed trading liabilities; (2) the allocation under I.R.C. Section 1060 of the "purchase price" for the acquired assets was to be split between multiple Barclays' entities, BCI Ex. 202 [Email chain including Sept. 17, 2008 7:13 am email from B. Montaudy to M. Rudduck, *et al.*]; and (3) the estimated cure and compensation liabilities were not part of the purchase price for purposes of the tax allocation. Barclays further disputes the statement in paragraph 212 to the extent it implies that Barclays' expectation of a gain upon acquisition was kept secret. To the contrary, Barclays publicly announced this information as part of the September 17 Analyst Call, and the same information was received by senior Lehman executives, the Creditors' Committee and Lazard. *See* Barclays' response to paragraph 202. Barclays further disputes the statement in paragraph 212 as using the cited evidence out of context. Exhibit A. 61 was sent on September 18, 2008, prior to substantial changes in the transaction that rendered the estimate in Exhibit A. 61 irrelevant. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:18.

**213.    Ms. Montondy [sic] wrote an email stating:**

> **U.S. Tax recognized immediately Wednesday am that U.S. Equities acquired to be used as part of BAU EDG would need to be booked in BSCL and gains subject to 46% tax as a result of current transf[e]r pricing. The gain on the equities is day one $2.5 billion USD.**

**(A. 61. at BCI-EX-(S)-00047721.)**

Barclays' Response
_____

Barclays does not dispute that Exhibit A. 61 contains the quoted language, but disputes the statement in paragraph 213 to the extent it fails to disclose that the word "gain" in Exhibit A. 61 was used in the context of a technical tax analysis of the transaction where (1) there was an expectation that trading assets would exceed trading liabilities; (2) the allocation under I.R.C. Section 1060 of the "purchase price" for the acquired assets was to be split between multiple Barclays' entities, BCI Ex. 202 [Email chain including Sept. 17, 2008 7:13 am email from B. Montaudy to M. Rudduck, *et al.*]; and (3) the estimated cure and compensation liabilities were not part of the purchase price for purposes of the tax allocation. Barclays further disputes the statement in paragraph 213 to the extent it implies that Barclays' expectation of a gain upon acquisition was kept secret. To the contrary, Barclays publicly announced this information as part of the September 17 Analyst Call, and the same substantive information was received by senior Lehman executives, the Creditors' Committee and Lazard. *See* Barclays' response to paragraph 202. Barclays further disputes the statement in paragraph 213 as using the cited evidence out of context. Exhibit A. 61 was sent on September 18, 2008, prior to substantial changes in the transaction that rendered the estimate in Exhibit A. 61 irrelevant. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:18.

*Contains Highly Confidential Information*

214.    **In an email from Barclays' James Trevelyan, he attributed at least part of the gain**

**from the Sale Transaction, estimated at $2.7 billion, to the fact that the $4.25 billion**

**in assumed liabilities for compensation and cure would be $1.3 billion, leaving $2.7**

**billion for "negative goodwill." (A. 71.)**

Barclays' Response

> Barclays disputes the statement in paragraph 214 to the extent it implies that the "2.0"
> estimate for potential compensation liabilities and the "2.25" estimate for maximum
> potential cure liabilities referred to in Exhibit A. 71 were anything other than initial
> estimates from Lehman of maximum potential liability. *See* Barclays' responses to
> paragraphs 307 and 323. Barclays further disputes the statement in paragraph 214 for
> failing to disclose that in response to Mr. Trevelyan's email, Mr. Clackson responded
> with his expectation that some of the estimated compensation liabilities might be deferred
> to later periods rather than reflected as accounts payable on the acquisition balance sheet,
> and that, as provided for in the APA, Barclays was not required to accept the maximum
> potential cure liability. BCI Ex. 373 [September 19, 2008 3:06 pm email from P.
> Clackson to R. Ricci]; BCI Ex. 59 [Clackson Dep. Tr.] at 79:10-23. These initial
> estimates by Barclays of its potential accounting gain reflected the belief that Barclays
> might be able to fulfill its compensation and cure obligations under the APA without
> having to record an account payable on its acquisition balance sheet in the amount
> estimated as the maximum potential exposure for those liabilities. *Id.* at 79:10-23, 100:4-
> 101:11; BCI Ex. 94 [September 10, 2009 Romain Dep. Tr.] at 131:25-133:19; BCI Ex. 91
> [Ricci Dep. Tr.] at 55:19-56:11. Barclays further disputes the statement in paragraph 214
> to the extent it implies that Barclays did not fulfill its obligations with respect to the
> compensation and cure liabilities provided under the APA. *See* Barclays' responses to
> paragraphs 307 and 323.

215.    **An analysis Barclays sent to its auditors indicated a gain on the Sale Transaction of**

**$4.701 billion. (A. 134 at BCI-EX-00109160; *see* A. 131, A. 135 at BCI-EX-**

**00115843.)**

Barclays' Response

> Barclays does not dispute that the acquisition balance sheet sent to Barclays' auditors
> showed a pre-tax gain on the transaction of approximately $4.7 billion pre-tax, but
> disputes the statement in paragraph 215 to the extent it fails to disclose that much of this
> gain is attributable to intangibles and similar assets listed in the APA, for which no
> estimated values were provided in the APA, and which would have been valueless to
> Lehman in a liquidation.

*Contains Highly Confidential Information*

**216.** **Kelly testified that he calculated Barclays' gain on the Sale Transaction to be**

**approximately $5.25 billion. (A. 14 [Kelly] 214:8-23, 221:2-229:13 (referring to A.**

**44 (Kelly's notes)).)**

Barclays' Response

Barclays disputes the statement in paragraph 216 as not supported by the cited evidence.
The testimony of Mr. Kelly cited by Movants in support of this proposition discusses a
calculation of loss to Lehman apparently based on a calculation Mr. Kelly did not recall
with certainty at his deposition, not a gain that would be recorded by Barclays. Barclays
further disputes that Mr. Kelly would have had personal knowledge of Barclays'
accounting for the Sale Transaction, which was performed by Gary Romain, and is set
forth in the documents produced by Barclays. BCI Ex. 133 [January 28, 2009 Gross
Acquisition Balance Sheet]; BCI Ex. 357 [Romain Decl.]; BCI Ex. 75 [August 18, 2009
Kelly Dep. Tr.] at 28:23-25; 40:8-41:3; 50:19-51:6; 59:22-60:3; 60:15-22; 65:5-12;
113:7-12; 142:12-143:9; 152:7-15; 153:3-6, 3-4, 13. Mr. Kelly also testified that he was
not involved in the negotiations of the Sale Transaction and had a limited role in the
transaction. *See* Barclays' responses to paragraphs 46-49.

**217.** **Kelly testified that Barclays valued the securities (and related short positions) it**

**ultimately received in the Sale Transaction at approximately $50 billion. (A. 14**

**[Kelly] 214:8-23, 221:2-229:13 (referring to A. 44 (Kelly's notes)).)**

Barclays' Response

Barclays disputes the statement in paragraph 217 to the extent it implies that the cited
testimony of Mr. Kelly reflects anything more than speculation and hearsay. Barclays
disputes that Mr. Kelly had any personal knowledge of the terms of the transaction, or
was in any way a negotiator of the transaction, and therefore disputes that Mr. Kelly had
any basis to testify as to the terms of the transaction or Barclays' accounting of the
transaction. BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 28:23-25; 40:8-41:3; 50:19-
51:6; 59:22-60:3; 60:15-22; 65:5-12; 113:7-12; 142:12-143:9; 152:7-15; 153:3-6. The
accounting for the transaction was performed by Gary Romain, and is set forth in the
documents produced by Barclays. BCI Ex. 133 [Jan. 28, 2009 Gross Acquisition Balance
Sheet]; BCI Ex. 357 [Romain Decl.]. Barclays also disputes this statement to the extent
that the Movants have distorted the nature and timing of Barclays' knowledge of the
value of the financial and other assets it was receiving in the deal, and the source of the
value of what it received, which is accurately set forth in the acquisition balance sheet.
BCI Ex. 133 [Jan. 28, 2009 Gross Acquisition Balance Sheet]

*Contains Highly Confidential Information*

218.  **Kelly's comparison of Lehman's book value to Barclays "proceeds" from the Sale**

**Transaction indicated that the loss to Lehman on the Sale Transaction was**

**approximately $5.25 billion.  (A. 14 [Kelly] 214:8-23, 221:2-229:13 (referring to A.**

**44 (Kelly's notes)).)**

<u>Barclays' Response</u>

Barclays incorporates its response to paragraph 216 and disputes the statement in paragraph 218 as not supported by the cited evidence.  Mr. Kelly also testified that he was not involved in the negotiations of the Sale Transaction and had a limited role in the transaction.  *See* Barclays' responses to paragraphs 46-49.

219.  **On or about September 21, 2008, Azerad circulated to Barclays and Lehman**

**personnel an "Opening Balance Sheet" regarding the Sale Transaction showing that**

**Barclays would have $3.38 billion in "Equity" following the Sale Transaction.  (A.**

**104.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 219 to the extent it implies that the "Opening Balance Sheet" in Exhibit A. 104 was anything more than one person's initial, rough estimate of some, but not all, of the assets and liabilities transferred in the Sale Transaction that did not reflect Barclays' valuations of the items listed.  BCI Ex. 133 [Jan. 28, 2009 Gross Acquisition Balance Sheet]; BCI Ex. 94 [Sept. 10, 2009 Romain Dep. Tr.] at 19:16-25.

220.  **The Opening Balance Sheet Azerad circulated on or about September 21, 2008**

**reflected $52.88 billion in "Total Assets" to be transferred to Barclays.  (***See***

**Opening Balance Sheet (A. 104).)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 220 to the extent it implies that the "Opening Balance Sheet" in Exhibit A. 104 was anything more than one person's initial,

*Contains Highly Confidential Information*

rough estimate of some, but not all, of the assets and liabilities transferred in the Sale Transaction that did not reflect Barclays' valuations of the items listed. *See* Barclays' response to paragraph 219. Barclays further disputes this statement to the extent it implies that it was possible at that time to arrive at reliable valuations for many of the financial assets transferred to Barclays in the Sale Transaction, many of which were illiquid, had outdated or unreliable marks, or for which (as in the case of exchange-traded derivatives) Barclays was unable to receive reliable information. BCI Ex. 77 [King Dep. Tr.] at 153:6-16; BCI Ex. 73 [Keegan Dep. Tr.] at 25:2-10, 26:2-7; BCI Ex. 341 [Pfleiderer Report].

221.   **According to McDade, a Barclays gain of equity in the Sale Transaction is not**

**consistent with the deal Lehman made with Barclays. (A. 20 [McDade] 216:23-**

**217:23;** *see also* **A. 20 [McDade] 107:3-11.)**

Barclays' Response

Barclays incorporates its response to paragraph 237. Barclays further disputes the statement in paragraph 221 to the extent that Mr. McDade's testimony is inconsistent with the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]. *See also* Barclays' responses to paragraphs 169 and 172.

222.   **McDade testified as follows:**

> **Q:     If there were an equity component in the deal on the opening day, sir, of $3.38 billion, that deal would not be in balance is that right?**
>
> \* \* \*
>
> **A:     That's correct.**
>
> **Q:     And the deal you made was one to be in balance; is that right:**
>
> \* \* \*
>
> **A:     That's correct.**
>
> **Q:     So if the opening day balance sheet for the deal reflected that Barclays had $3.38 billion in equity, that's not the deal you made, is it?**

*Contains Highly Confidential Information*

A:     That's correct.

\* \* \*

Q:     And it wouldn't be consistent with the deal you made, would
it?

A:     It would not be consistent, that's correct.

**(A. 20 [McDade] 216:23-217:23 (objections omitted);** *see also* **A. 20 [McDade] at**

**107:3-11.)**

Barclays' Response

Barclays incorporates its response to paragraph 237. Barclays further disputes the
statement in paragraph 222 to the extent that Mr. McDade's testimony is inconsistent
with the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16
[Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays'
responses to paragraphs 169 and 172. Barclays further objects to the statement because it
fails to disclose that Mr. McDade also testified with respect to Exhibit A.104 as follows:

Q.     Well, if the equity line is meant to indicate the equity to Barclays
in the amount of 3.380, given what we've talked about the deal
being in balance –

A:     I didn't create the document. I've never seen the document before.

Q.     I understand.

A.     I prefer not to interpret it.

\* \* \*

A.     I prefer not to interpret it. I don't know what it means.

BCI Ex. 85 [McDade Dep. Tr.] at 216:5-22.

223.   **McDade testified that, given the description of the Sale Transaction to the Court, an**

**immediate gain to Barclays should have been disclosed. (A. 20 [McDade] 185:20-**

**186:5.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays incorporates its response to paragraph 210. Barclays further disputes the
statement in paragraph 223 as mischaracterizing Mr. McDade's testimony. Mr. McDade
did not testify regarding Barclays' accounting for the transaction. Barclays disputes the
statement in paragraph 223 to the extent that Mr. McDade's testimony is inconsistent
with the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16
[Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays'
responses to paragraphs 169 and 172. Barclays further disputes the statement in
paragraph 223 to the extent it is intended to imply that the Sale Transaction was
presented to the Court as a perfect "wash" with assets and liabilities of exactly equal
value. Harvey Miller, the Debtor's lead lawyer who presented the Sale Transaction for
approval, testified unequivocally that he did not, directly or indirectly, present the Sale
Transaction to the Court as a "wash." BCI Ex. 87 [Miller Dep. Tr.] at 50:14-51:6, 60:12-
21.

224.    **McDade testified as follows:**

> **Q:    And given what you heard in the bankruptcy hearing on the 19th
> of September, where you heard the deal described to the judge as
> essentially a balance –**
>
> **A:    Right.**
>
> **Q:    -- it would have been important in your view, sir, to tell the
> judge if it was not in balance because that's a different deal, is it not?**
>
> **A:    Most definitely, yes, sir.**

**(A. 20 [McDade] 185:20-186:5.)**

Barclays' Response

Barclays disputes the statement in paragraph 224 to the extent that Mr. McDade's
testimony is inconsistent with the fully integrated Purchase Agreement, as defined in the
Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement];
*see also* Barclays' responses to paragraphs 169 and 172. Barclays further disputes the
statement in paragraph 224 to the extent it is intended to imply that the Sale Transaction
was presented to the Court as a perfect "wash" with assets and liabilities of exactly equal
value. Harvey Miller, the Debtor's lead lawyer who presented the Sale Transaction for
approval, testified unequivocally that he did not, directly or indirectly, present the Sale
Transaction to the Court as a "wash." BCI Ex. 87 [Miller Dep. Tr.] at 50:14-51:6, 60:12-
21.

*Contains Highly Confidential Information*

225. **Diamond, testified with regard to the Sale Transaction that "the asset liability**

    **mismatch had to have a mismatch in favor of a positive capital accretion [for**

    **Barclays] or we weren't authorized to do the deal." (A. 8 [Diamond] 86:14-87:5; *see***

    **A. 8 [Diamond], 87:23-90:5.)**

Barclays' Response

    Barclays disputes the statement in paragraph 225 as mischaracterizing Mr. Diamond's
testimony. Diamond was asked to explain the term "capital accretive" and testified as
follows:

> The regulators that we are responsible to, the Financial Services Authority
> in the U.K., holds us to specific capital standards, so for example, core
> equity, tier 1 equity, and it was becoming increasingly clear during this
> time that they were focusing more on core equity than tier 1 equity, and
> they were thinking the banks would potentially have to hold higher core
> equity. So when I say capital accretive, accretive to the capital ratios,
> which means that the asset liability mismatch had to have a mismatch in
> favor of a positive capital accretion or we weren't authorized to do a deal.

BCI Ex. 63 [Diamond Dep. Tr.] at 86:17-87:5.

226. **Diamond testified with regard to the Sale Transaction that he did not to know**

    **whether the "capital accretion" to Barclays caused by the imbalance between assets**

    **transferred to and liabilities assumed by Barclays had been disclosed to the Court,**

    **saying, "I have never had a discussion with Judge Peck." (A. 8 [Diamond] 66:13-**

    **24.)**

Barclays' Response

    Barclays disputes the statement in paragraph 226 as mischaracterizing Mr. Diamond's
testimony. Mr. Diamond testified that he was not present at the hearing before the Court
on September 19, 2008, that he was not party to any discussion with the Court and had
delegated the negotiation of the Sale Transaction to Mr. Ricci. BCI Ex. 63 [Diamond
Dep. Tr.] at 62:8-18, 63:10-21; 67:25-68:6. Barclays further disputes the statement in
paragraph 226 to the extent it is intended to imply that the Sale Transaction was
presented to the Court as a perfect "wash" with assets and liabilities of exactly equal
value. Harvey Miller, the Debtor's lead lawyer who presented the Sale Transaction for

*Contains Highly Confidential Information*

approval, testified unequivocally that he did not, directly or indirectly, present the Sale
Transaction to the Court as a "wash."  BCI Ex. 87 [Miller Dep. Tr.] at 50:14-51:6, 60:12-
21.

**227.    By February 2009, Barclays had calculated its gain on acquisition pursuant to the**

**Sale Transaction at £2.62 billion (approximately \$4.2 billion at the exchange rates**

**prevailing in September 2008).  (A. 130.)**

Barclays' Response

Barclays disputes the statement in paragraph 227 as imprecise.  Barclays calculated its
gain on acquisition of Lehman's North American business at £2.262 billion (not £2.62
billion).  BCI Ex. 32 [Barclays PLC Results Announcement, 2008] at pp. 3, 7, 28 and 97;
BCI Ex. 133 [Jan. 28, 2009 Gross Acquisition Balance Sheet].  Barclays further disputes
any implication that this announcement reflected only financial assets, or to the extent the
statement otherwise overlooks the values Barclays was required to book for intangible
assets and other non-financial assets in the business.  BCI Ex. 33 [Jan. 28, 2009 Gross
Acquisition Balance Sheet].

**228.    In February of 2009, Barclays announced:**

> **The excess of the fair value of net assets acquired [from Lehman] over
> consideration paid [to Lehman] resulted in £2,262 m[illion] of gains
> on acquisition.**

**(A. 130 ("Barclays PLC Results Announcement") at 95.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 228.

**229.    Barclays Bank PLC's Form 6-K for the period ending August 3, 2009 states that as**

**of June 30, 2009 Barclays had not received approximately £2.2 (\$4.07) billion of**

**assets allegedly acquired under the Sale Transaction and "[t]his amount is largely**

**comprised of margin and collateral attributable to the acquired businesses and cash**

**and securities receivable under the terms of the acquisitions." (Maguire Decl. Ex. 7**

*Contains Highly Confidential Information*

n.15.)[5]

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 229 to the extent that it contains an unverified U.S. dollar value.

**230.    Barclays Bank PLC's Form 6-K for the period ending August 3, 2009 states that**

**"£1.8 [$3.3] billion of these assets were recognized as part of the initial accounting**

**for the [Lehman] acquisition and are included in the balance sheet as at 30th June**

**2009." (Maguire Decl. Ex. 7 n.15.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 230 to the extent that it contains an unverified U.S. dollar value

**231.    Post-closing accounting adjustments Barclays made to the value of assets acquired**

**in the Sale Transaction had the effect of reducing Barclays' announced gain on the**

**Sale Transaction by $2.09 billion. (A. 24 [Romain] 96:21-97:6; A. 135.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 231 as not supported by the cited evidence. Barclays also disputes this statement because the phrase "post-closing accounting adjustments" is vague and ambiguous. After the Closing, Barclays attempted to identify and ascribe proper valuations to all assets acquired in the Sale Transaction, including numerous illiquid assets that were difficult to value. Mr. Romain testified that the "valuation process ... was ongoing from the time of the acquisition" and that prices were determined in accordance with Barclays' ongoing valuation policies and applicable accounting standards. BCI Ex. 94 [Sept. 10, 2009 Romain Dep. Tr.] at 111:16-23, 149:19-24. Mr. Romain also testified that, "I was ... work[ing] on ensuring that the acquisition balance sheet ... was as accurate as I could make it" but that there was difficulty in valuing the assets. *Id.* at 125:18-24, 140:16-24. Mr. King also testified to the difficulty of valuing assets. BCI Ex. 77 [King Dep. Tr.] at 67:9-68:3, 120:13-121:23, 234:15-24. Mr. Romain explained that "for the less liquid and more complex

---

[5] Citations to "Maguire Decl." herein refer to the Declaration of William R. Maguire in Support of the Trustee's Motion for Relief Pursuant to the Sale Order or, Alternatively, for Certain Limited Relief Under Rule 60(b), dated September 15, 2009 and filed in this litigation.

*Contains Highly Confidential Information*

instruments, the methodology is not something which were typically captured in the Excel spreadsheets. There are extensive valuation procedures and policies within the bank which are used as a reference point for how to value these assets. And the approach, the value of these assets was in mind in those policies both internally and in the opinion of the our outside auditors." BCI Ex. 94 [Sept. 10, 2009 Romain Dep. Tr.] at 151:10-21. Furthermore, Mr. Kobak, the Trustee's representative, testified as to "some securities and other positions that I have been told were illiquid and difficult to value in some cases." BCI Ex. 80 [Kobak Dep. Tr.] at 41:9-14. Mr. Kobak further testified that Deloitte told them it was difficult to value the assets and that, after a year, they were still "investigating" values. *Id.* at 131:20-132:11, 156:6-157:6. Barclays' valuation process was reasonable, appropriate, and likely to produce good valuations. BCI Ex. 341 [Pfleiderer Report] at § II and Appendix Four.

**232.    The "final version" of Barclays' acquisition balance sheet for the Sale Transaction**

**shows a $4.17 billion gain on the transaction. (A. 135; A. 24 [Romain] 18:13-19:8.).)**

Barclays' Response

Barclays disputes the statement in paragraph 232 to the extent it implies that the Acquisition Balance Sheet included only financial assets or otherwise overlooks the values Barclays was required to book for intangible and other non-financial assets in the Business.

**233.    In accounting adjustments made after the Sale Transaction, Barclays wrote-down**

**its valuation of the assets received from Lehman for accounting purposes in the Sale**

**Transaction by approximately $4.3 billion from the values shown on BONY**

**valuations made at the time of the Sale Transaction. (A. 132.)**

Barclays' Response

Barclays disputes the statement in paragraph 233 as not supported by the cited evidence, and to the extent it implies that the valuation process reflected in Exhibit A.132 is unrelated to Barclays' efforts to value properly the assets received in the Sale Transaction. Barclays further disputes the statement in this paragraph because the phrases "accounting adjustments" and "wrote-down" are vague and ambiguous. The values reflected on the Acquisition Balance Sheet (and on Exhibit A. 132) represent the values ascribed by Barclays according to its standard valuation policies, not as an ill-defined "accounting adjustment" or "write down." Mr. Romain testified that the "valuation process … was ongoing from the time of the acquisition" and "prices were

*Contains Highly Confidential Information*

determined in accordance with Barclays' ongoing valuation policies and applicable accounting standards." BCI Ex. 94 [Sept. 10, 2009 Romain Dep. Tr.] at 111:16-23, 149:19-24. Barclays further disputes the statement in paragraph 233 to the extent it implies Barclays' valuation process was anything other than reasonable, appropriate, and likely to produce good valuations. BCI Ex. 341 [Pfleiderer Report] at § II and Appendix Four.

**234.    In accounting adjustments made after the Sale Transaction, Barclays wrote-down**

**the value of assets transferred to Barclays in the Sale Transaction through JP**

**Morgan Chase by $2 billion from their September 2008 marks.    (A. 133.)**

Barclays' Response

Barclays disputes the statement in paragraph 234 as not supported by the cited evidence, and to the extent it implies that the valuation process reflected in Exhibit A.133 is unrelated to Barclays' efforts to value properly the assets received in the Sale Transaction. Barclays further disputes the statement in this paragraph because the phrases "accounting adjustments" and "wrote-down" are vague and ambiguous. Mr. Romain testified about the "mechanics" followed by Barclays to obtain the values set forth in Exhibit A. 133. BCI Ex. 94 [Sept. 10, 2009 Romain Dep. Tr.] at 91:15-93:21, 99:19-100:20. He explained that Barclays discussed the valuation with its auditors, including "the appropriate date to include in our books and records[.]" *Id.* at 90:4-14; *see also* Barclays' response to paragraph 233.

**235.    Shown the Barclays PLC Results Announcement at his deposition and asked if the**

**type of gain on acquisition concerning the Sale Transaction was contemplated by**

**the deal he made with Barclays or described to the Court, McDade testified: "No,**

**absolutely not."    (A. 20 [McDade] 157:16-158:20.)**

Barclays' Response

Barclays disputes the statement in paragraph 235 because the use of the word "contemplated" is vague and ambiguous. Barclays further disputes the statement in paragraph 235 to the extent it implies anything other than that Mr. McDade testified that he did not intentionally structure a transaction for a specific accounting result under Barclays' accounting.

*Contains Highly Confidential Information*

**236.    McDade did not believe the Sale Transaction contemplated a gain on acquisition for**

**Barclays on the transaction. (A. 20 [McDade] 158:21-159:3.)**

Barclays' Response

Barclays disputes the statement in paragraph 236 because the use of the word
"contemplated" is vague and ambiguous. Barclays further disputes the statement in
paragraph 236 as not supported by the cited evidence. Mr. McDade was asked whether
the gain recognized on the Sale Transaction by Barclays in February 2009 was
"contemplated." Mr. McDade testified that "The type of risk that they took on for this
transaction associated with the liabilities *could have led to a gain or a less given the
nature of the markets.* Absolutely not contemplated. *I have no knowledge of how their
accounting works. I have no knowledge of how they hedged and what they did with the
risk.*" BCI Ex. 85 [McDade Dep. Tr.] at 158:11-20 (emphasis added). Accordingly, Mr.
McDade in effect testified that there *could* be an accounting gain on acquisition for
Barclays. Barclays further disputes any implication that Barclays' expectation of
recognizing a gain on the Sale Transaction was kept secret. To the contrary, Barclays
publicly announced this information as part of the September 17 Analyst Call, and the
same substantive information was received by senior Lehman executives, the Creditors'
Committee and Lazard. *See* Barclays' response to paragraph 202.

**237.    McDade testified as follows:**

      **Q:    . . . Was it contemplated there would be a gain on acquisition?**

      **A:    No, it was not.**

**(A. 20 [McDade] 158:21-159:3.)**

Barclays' Response

Barclays disputes the statement in paragraph 237 to the extent it implies that the parties
did not contemplate that Barclays' *could* gain in the acquisition or that *no one*
contemplated there would be a gain on acquisition. Mr. McDade testified that "[t]he type
of risk that [Barclays] took on for this transaction associated with the liabilities *could
have led to a gain or a loss given the nature of the markets.* Absolutely not
contemplated. *I have no knowledge of how their accounting works. I have no knowledge
of how they hedged and what they did with the risk.*" BCI Ex. 85 [McDade Dep. Tr.] at
158:11-20 paren, not bracket [emphasis added]. In addition, Mr. McDade received and
read an email from Roger Freeman summarizing the content of the September 17 Analyst
Call that disclosed that Barclays expected the Sale Transaction to result in a gain on
acquisition for Barclays. *See* BCI Ex. 189 [September 17, 2008 9:08 am email from
Roger Freeman to Bart McDade, *et al.*] (Barclays was acquiring trading assets of $72
billion and accruing liabilities of $68 billion and that "this transaction, due to $2bn in

*Contains Highly Confidential Information*

after-tax negative goodwill *is accretive to capital ratios immediately*" (emphasis added)).
*See also* BCI Ex. 190 [Sept. 17, 2008 9:10 am email from B. McDade to R. Freeman].

**238.    McDade did not believe the Sale Transaction contemplated Barclays paying a price**

**less than the fair value of the net assets acquired. (A. 20 [McDade] 158:25-159:7.)**

Barclays' Response

Barclays disputes the statement in paragraph 238 as immaterial because the terms of the
Sale Transaction are reflected in a fully integrated Purchase Agreement *See* Barclays'
responses to paragraphs 169 and 172.

**239.    McDade testified as follows:**

> **Q:    Was it contemplated that the price paid by Barclays would be
> less than the fair value of the net assets acquired?**
>
> **A:    Absolutely not.**

**(A. 20 [McDade] 159:4-7.)**

Barclays' Response

Barclays disputes the statement in paragraph 239 to the extent it implies that the Sale
Transaction resulted in Barclays paying consideration "less than the fair value of the net
assets acquired." The valuation estimates by Barclays represented the result of a good
faith, arm's-length effort to estimate the value of the financial inventory that was to be
included among the Purchased Assets, because Barclays believed Lehman's marks were
outdated and inaccurate. *See* Barclays' responses to paragraphs 169 and 172.

**240.    McDade testified at the Sale Hearing on September 19, 2008. (A. 20 [McDade]**

**113:10-11.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 240.

**241.    McDade testified at his deposition that the Sale Transaction "was described [to the**

**Court] as a transaction where the assets and the liabilities matched." (A. 20**

*Contains Highly Confidential Information*

[McDade] 160:14-20.)

Barclays' Response

Barclays disputes the statement in paragraph 241 to the extent that Mr. McDade's testimony is inconsistent with the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]. *See also* Barclays' responses to paragraphs 169 and 172. Barclays further disputes the statement in paragraph 241 to the extent it is intended to imply that the Sale Transaction was presented to the Court as a perfect "wash" with assets and liabilities of exactly equal value. Harvey Miller, the Debtor's lead lawyer who presented the Sale Transaction for approval, testified unequivocally that he did not, directly or indirectly, present the Sale Transaction to the Court as a "wash." BCI Ex. 87 [Miller Dep. Tr.] at 50:14-51:6, 60:12-21. Barclays refers to the transcript of the September 19, 2008 hearing for a complete and accurate record of the hearing.

242.    **McDade testified that, from the time the Sale Transaction was first described on**

**September 16, 2008 through the time the Sale Transaction closed on September 22,**

**2008, there was never supposed to be a gain for Barclays on acquisition. (A. 20**

**[McDade] 157:4-9.)**

Barclays' Response

Barclays disputes the statement in paragraph 242 as not supported by the cited source. In the portion of Mr. McDade's testimony cited by Movants in support of this proposition, Mr. McDade testifies concerning a so-called "embedded gain." That term is vague and ambiguous and is never defined for the purposes of Mr. McDade's testimony as a "gain on acquisition." Barclays further disputes the statement in paragraph 242 to the extent it implies that the parties did not contemplate that Barclays' *could* gain in the acquisition or that *no one* contemplated there would be a gain on acquisition. *See* Barclays' response to paragraph 237.

243.    **McDade testified that an imbalance in Barclays' favor in the Sale Transaction**

**would "most definitely" have been important to disclose to the Court. (A. 20**

**[McDade] 185:20-186:5.)**

*Contains Highly Confidential Information*

Barclays' Response

       Barclays incorporates its response to paragraphs 169 and 172 and disputes the statement

in paragraph 243 to the extent it implies that the terms of the Sale Transaction reflected in

the fully integrated Purchase Agreement, as defined in the Sale Order, were not

adequately disclosed to the Court. Barclays further disputes the statement in paragraph

243 to the extent it is intended to imply that the Sale Transaction was presented to the

Court as a perfect "wash" with assets and liabilities of exactly equal value. Harvey

Miller, the Debtor's lead lawyer who presented the Sale Transaction for approval,

testified unequivocally that he did not, directly or indirectly, present the Sale Transaction

to the Court as a "wash." BCI Ex. 87 [Miller Dep. Tr.] at 50:14-51:6, 60:12-21.

Barclays refers to the transcript of the September 19, 2008 hearing for a complete and

accurate record of the hearing.

244.    **An agreement to sell Lehman's assets for less than Lehman's book value was not**

       **communicated to all of the Lehman executives involved in negotiating the Sale**

       **Transaction. (*See, e.g.*, A. 21 [McGee] 70:8-13; A. 2 [Berkenfeld] 70:10-19, 72:9-14.)**

Barclays' Response

       Barclays disputes the statement in paragraph 244 as mischaracterizing the cited evidence.
In the testimony cited by Movants in support of this proposition, neither Mr. McGee nor
Mr. Berkenfeld were questioned about "[a]n agreement to sell Lehman's assets for less
than Lehman's book value." Rather, Messrs. McGee and Berkenfeld were questioned
about a hypothetical undefined and undisclosed "discount." Barclays further disputes this
statement to the extent it implies that there was an undisclosed discount in the
transaction. Barclays also incorporates its responses to paragraphs 169, 172 and 243.

245.    **An agreement to sell Lehman's assets for less than book value was not**

       **communicated to Lehman's lawyers charged with documenting the Sale**

*Contains Highly Confidential Information*

**Transaction. (A. 2 [Berkenfeld] 70:20-71:2.)**

Barclays' Response

    Barclays disputes the statement in paragraph 245 in that the Movants' characterization of the cited testimony is not supported by the cited source. Mr. Berkenfeld testified that, *to his knowledge*, none of the lawyers involved in the drafting were aware of any loss on assets. This testimony does not support the statement in paragraph 245, which purports to assert definitively that a particular piece of information was not communicated to all lawyers involved in the drafting. Barclays also disputes this statement to the extent it implies that there was an undisclosed discount in the transaction. The APA disclosed that Barclays would pay Consideration equal to the Cash Amount plus the Assumed Liabilities (for which a total valuation was not provided and could not be provided because the liabilities were uncertain) in order to acquire all Purchased Assets, which included all assets used primarily in the Business unless specifically excluded (and for which a total valuation was not provided and could not be provided, because the identity and value of all assets in the Business was uncertain and constantly changing). *See* BCI Ex. 1 [APA] at §§ 2.1, 2.3, 3.1, p. 6 (definition of "Purchased Assets"). The APA and testimony before the Court provided an estimated value for the trading assets (Long Positions plus 50% of all residential mortgages) that was greater than the estimated value provided for the trading liabilities (Short Positions). *See id.*; BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 52:16-53:8. The valuation estimates by Barclays represented the result of a good faith, arm's-length effort to estimate the book value of the financial inventory that was to be included among the Purchased Assets, because Barclays believed Lehman's marks were outdated and inaccurate. *See* BCI Ex. 85 [McDade Dep. Tr.] at 26:4-14, 27:21-28:8, 56:8-15, 292:6-11, 293:10-15; BCI Ex. 77 [King Dep. Tr.] at 29:3-5, 72:7-13, 153:6-16; BCI Ex. 73 [Keegan Dep. Tr.] at 24:18-26:9, 25:10-21; BCI Ex. 87 [Miller Dep. Tr.] at 34:6-20, 53:19-54:4. Barclays also incorporates its responses to paragraphs 169, 172 and 243.

**246.**   **Lehman's lawyers involved in drafting the Asset Purchase Agreement were not**

       **aware of an agreement to give Barclays a discount of any kind in connection with**

       **the Sale Transaction. (A. 2 [Berkenfeld] 72:15-73:3.)**

Barclays' Response

    Barclays disputes the statement in paragraph 246 as not supported by the cited source. In the portion of Mr. Berkenfeld's testimony cited by the Movants for this proposition, Mr. Berkenfeld testified that, to his knowledge, none of the lawyers were told of a "bulk discount of some kind given to Barclays." Mr. Berkenfeld did not testify that any particular information was or was not in fact communicated to the lawyers. Mr. Berkenfeld also testified that he was not involved in the negotiations of the Sale Transaction and had a limited role in the transaction. *See* Barclays' responses to

*Contains Highly Confidential Information*

paragraph 6-9. Accordingly, his understanding of the negotiations is not based on personal knowledge. Barclays further disputes this statement to the extent it implies that there was an undisclosed discount in the transaction. *See* Barclays' responses to paragraphs 169, 172 and 243.

**247. An agreement to sell the Long Positions to Barclays for less than Lehman's book**

**value was not described in the Asset Purchase Agreement. (A. 2 [Berkenfeld]**

**133:25-134:13, 70:10-19; 122:17-123:2.)**

Barclays' Response

Barclays disputes the statement in paragraph 247 as not supported by the cited source. In the portion of Mr. Berkenfeld's testimony cited by Movants for this proposition, Mr. Berkenfeld was not questioned about an "agreement to sell the Long positions to Barclays for less than Lehman's book value," but rather, about a hypothetical "bulk discount," a hypothetical "$5 billion discount off of the actual value of the assets transferred," and a hypothetical "discount being given to Barclays for what it was buying." None of these vague and ambiguous hypotheticals were defined as the equivalent of a "[a]n agreement to sell the Long Positions . . . for less than Lehman's book value." Mr. Berkenfeld also testified that he was not involved in the negotiations of the Sale Transaction and had a limited role in the transaction. *See* Barclays' responses to paragraphs 6-9. Accordingly, his understanding of the negotiations is not based on personal knowledge. Barclays further disputes this statement to the extent it implies that there was an undisclosed discount in the transaction. *See* Barclays' responses to paragraphs 169, 172 and 243. Barclays further disputes the statement in paragraph 247 because the APA and testimony before this Court unambiguously provided an estimated value for the trading assets (Long Positions plus 50% of all residential mortgages) that was greater than the estimated value provided for the trading liabilities (Short Positions). *See* BCI Ex. 1 [APA] at §§ 2.1, 2.3, 3.1, p. 6 (definition of "Purchased Assets"); BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 52:16-53:8.

**248. An agreement to sell Lehman's assets for less than Lehman's book value in**

**connection with the Sale Transaction was not communicated to Lehman's lawyers**

**charged with making disclosures regarding the Sale Transaction to the Court.** (*See*,

*e.g.*, **A. 21 [McGee] 70:8-13; A. 2 [Berkenfeld] 70:10-19, 72:22-73:3.)**

Barclays' Response

> Barclays disputes the statement in paragraph 248 as not supported by the cited evidence.
> In the portion of Mr. Berkenfeld's testimony cited by Movants as support for this
> proposition, above, Mr. Berkenfeld was questioned about his knowledge of a hypothetical
> "\$5 billion discount off of the actual value of the assets transferred," and whether "the
> people responsible for making disclosures to the bankruptcy court" were "told there
> would be some kind of bulk discount given to Barclays." Similarly, in the portion of Mr.
> McGee's testimony cited by Movants as support for this proposition, Mr. McGee was
> questioned about his knowledge of a hypothetical "agreed discount off the book value."
> Neither Mr. McGee nor Mr. Berkenfeld were questioned about whether an "agreement to
> sell Lehman's assets for less than Lehman's book value" was "communicated to
> Lehman's lawyers charged with making disclosures regarding the Sale Transaction to the
> Court." Moreover, neither Mr. Berkenfeld nor Mr. McGee testified that any particular
> information was or was not in fact communicated to the lawyers. Mr. Berkenfeld also
> testified that he was not involved in the negotiations of the Sale Transaction and had a
> limited role in the transaction. *See* Barclays' responses to paragraphs 6-9. Accordingly,
> his understanding of the negotiations is not based on personal knowledge. Similarly, Mr.
> McGee testified in response to a question about a hypothetical discount from the book
> value, "*I was not involved in that process* so I have no idea." BCI Ex. 86 [McGee Dep.
> Tr.] at 70:8-13 (emphasis added). Accordingly, his understanding of Movants' theory of
> a hypothetical discount is not based on personal knowledge. Barclays further disputes
> this statement to the extent it implies that there was an undisclosed discount in the
> transaction. *See* Barclays' responses to paragraphs 169, 172 and 243. Barclays further
> disputes the statement in paragraph 248 because the APA and testimony before this Court
> unambiguously provided an estimated value for the trading assets (Long Positions plus
> 50% of all residential mortgages) that was greater than the estimated value provided for
> the trading liabilities (Short Positions). *See* Barclays' response to paragraph 247.

**249.    An agreement to sell Lehman's assets for less than book value in connection with the**

**Sale Transaction was not disclosed to the Court. (A. 2 [Berkenfeld] 133:25-134:13.)**

Barclays' Response

> Barclays disputes the statement in paragraph 249 as not supported by the cited source. In
> the portion of Mr. Berkenfeld's testimony cited by Movants for this proposition, Mr.
> Berkenfeld was questioned about a hypothetical "block discount." He was not
> questioned about an "agreement to sell Lehman's assets for less than book value." Nor
> did he testify that any particular information was or was not in fact communicated to the
> Court. Mr. Berkenfeld also testified that he was not involved in the negotiations of the
> Sale Transaction and had a limited role in the transaction. *See* Barclays' responses to
> paragraphs 6-9. Accordingly, his understanding of the negotiations is not based on
> personal knowledge. Barclays further disputes this statement to the extent it implies that
> there was an undisclosed discount in the transaction. *See* Barclays' responses to

*Contains Highly Confidential Information*

paragraphs 169, 172 and 243. Barclays further disputes the statement in paragraph 249 because the APA and testimony before this Court unambiguously provided an estimated value for the trading assets (Long Positions plus 50% of all residential mortgages) that was greater than the estimated value provided for the trading liabilities (Short Positions). *See* Barclays' response to paragraph 247. Barclays further disputes the statement in paragraph 249 to the extent it is intended to imply that the Sale Transaction was presented to the Court as a perfect "wash" with assets and liabilities of exactly equal value. *See* Barclays' response to paragraph 223.

250. **An immediate gain for Barclays upon the closing of the Sale Transaction was not**

   **disclosed to the Court. (A. 148 [Docket No. 60]; A. 149 [Docket No. 352]; A. 150**

   **[Docket No. 318].)**

Barclays' Response

   Barclays incorporates its responses to paragraphs 169, 172 and 243 and disputes the statement in paragraph 250 to the extent it implies that the terms of the Sale Transaction were not disclosed adequately to the Court. The APA and testimony before the Court provided an estimated value for the trading assets (Long Positions plus 50% of all residential mortgages) that was greater than the estimated value provided for the trading liabilities (Short Positions). *See* BCI Ex. 1 [APA] at §§ 2.1, 2.3, 3.1, p. 6 (definition of "Purchased Assets"); BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 52:16-53:8. Barclays further disputes the statement in paragraph 250 to the extent it implies that Barclays was in the position to determine what was presented to the Court at the Sale Hearing. Section 7.2 of the APA specifically granted to LBHI the sole and exclusive authority to control the court approval process. Barclays further disputes the statement in paragraph 250 to the extent it is intended to imply that the Sale Transaction was presented to the Court as a perfect "wash" with assets and liabilities of exactly equal value. *See* Barclays' response to paragraph 223.

251. **In connection with the Sale Transaction, Kelly did not discuss the discount from**

   **Lehman's book values that was being given to Barclays with anyone other than**

   **McDade, Lowitt, Tonucci and Reilly. (A. 14 [Kelly] 69:22-76:19, 81:6-82:17.)**

Barclays' Response

   Barclays disputes the statement in paragraph 251 as not supported by the cited source. In the portion of Mr. Kelly's testimony cited by Movants in support of this proposition, Mr. Kelly testified regarding a "$5 billion loss against Lehman's marks at that time." He did not testify to the existence of a "discount from Lehman's book values." In addition, Mr.

*Contains Highly Confidential Information*

Kelly testified that he could not recall with whom he generally discussed the "$5 billion
loss against Lehman's marks at that time," testifying, "I can't give you specific names
with absolute clarity. ... My recollection is that I discussed this with Gerry Reilly, Ian
Lowitt, Paolo Tonucci, *and likely others.*" BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at
69:22-76:19 (emphasis added). Mr. Kelly also testified that he was not involved in the
negotiations of the Sale Transaction and had a limited role in the transaction. *See*
Barclays' responses to paragraphs 46-49. Accordingly, his understanding of the
negotiations is not based on personal knowledge. Barclays further disputes this statement
to the extent it implies that there was an undisclosed discount in the transaction. *See*
Barclays' responses to paragraphs 169, 172 and 243. Barclays further disputes the
statement in paragraph 249 because the APA and testimony before this Court
unambiguously provided an estimated value for the trading assets (Long Positions plus
50% of all residential mortgages) that was greater than the estimated value provided for
the trading liabilities (Short Positions). *See* Barclays' responses to paragraphs 243 and
247.

**252.   McGee testified that he had no knowledge of a discount from the book value of**

**Lehman's assets being given to Barclays in connection with the Sale Transaction.**

**(A. 21 [McGee] 70:8-13.)**

Barclays' Response

Barclays disputes the statement in paragraph 252 as mischaracterizing the cited
testimony. In the portion of Mr. McGee's testimony cited by Movants in support of this
proposition, Mr. McGee responded to a question about a hypothetical discount from book
value: "*I was not involved in that process* so I have no idea." BCI Ex. 86 [McGee Dep.
Tr.] at 70:8-13 (emphasis added). Accordingly, his understanding of Movants' theory of
a hypothetical discount from book value is not based on personal knowledge. Finally,
Barclays disputes this statement to the extent it is intended to imply that there was an
undisclosed discount in the transaction. *See* Barclays' responses to paragraphs 169, 172
and 243.

**253.   Shapiro testified that he had no knowledge of a discount from the book value of**

**Lehman's assets being given to Barclays in connection with the Sale Transaction.**

**(A. 25 [Shapiro] 105:12-108:3.)**

Barclays' Response

Barclays disputes the statement in paragraph 253 as mischaracterizing the cited source.
In the portion of Mr. Shapiro's testimony cited by Movants in support of this proposition,

*Contains Highly Confidential Information*

Mr. Shapiro testified, *inter alia*, ". . . as I recall, this 70 billion was a rough approximation of the aggregate book value, you know, based on Lehman's marks, of the asset side of the deal, right? And so I would say, no, there was no discount because obviously it was a book value." BCI Ex. 97 [Shapiro Dep. Tr.] at 105:12-105:25. Barclays further disputes this statement to the extent it is intended to imply that there was an undisclosed discount in the transaction. *See* Barclays' responses to paragraphs 169, 172 and 243.

### 254. Felder testified that he had no knowledge of a discount from the book value of

### Lehman's assets being given to Barclays in connection with the Sale Transaction.

### (A. 10 [Felder] 95:18-96:16.)

Barclays' Response

Barclays disputes the statement in paragraph 254 as mischaracterizing the cited source. In the portion of Mr. Felder's testimony cited by Movants in support of this proposition, Mr. Felder testified that he did not recall specific conversations "about a discount being provided to Barclays on its purchase of Lehman's assets." Mr. Felder did not testify about a "discount from book value." Mr. Felder also testified that he was not involved in the negotiations of the Sale Transaction and had a limited role in the transaction. *See* Barclays' response to paragraph 29. Accordingly, his understanding of Movants' theory of a hypothetical discount from book value is not based on personal knowledge. Barclays further disputes this statement to the extent it is intended to imply that there was an undisclosed discount in the transaction. *See* Barclays' responses to paragraphs 169, 172 and 243.

### 255. Kirk testified he had no knowledge of a discount from the book value of Lehman's

### assets being given to Barclays in connection with the Sale Transaction. (A. 16 [Kirk]

### 38:24-39:5.)

Barclays' Response

Barclays does not dispute that Mr. Kirk testified that he never understood that the "agreement involved a discount of any kind given to Barclays against the amount shown on Lehman's books"; however, Mr. Kirk testified that he was not "asked to be involved in any assessment of the value of the pool of securities that was to be sold." BCI Ex. 78 [Kirk Dep. Tr.] at 38:14-17. Accordingly, his understanding of Movants' theory of a hypothetical discount from book value is not based on personal knowledge. Barclays further disputes this statement to the extent it is intended to imply that there was an undisclosed discount in the transaction. *See* Barclays' responses to paragraphs 169, 172 and 243.

*Contains Highly Confidential Information*

256. **Blackwell testified he had no knowledge of a discount from the book value of**

**Lehman's assets being given to Barclays in connection with the Sale Transaction.**

**(A. 3 [Blackwell] 44:14-45:16, 71:5-9.)**

Barclays' Response

Barclays disputes the statement in paragraph 256 as mischaracterizing the cited source.
In the portion of Mr. Blackwell's testimony cited by Movants in support of this
proposition, Mr. Blackwell testified that he never heard "anyone talk about a discount
that was being awarded to Barclays with respect to Lehman assets." Mr. Blackwell did
not testify about a "discount from book value." Mr. Blackwell also testified that he
"didn't have details" of the deal content and that when "[he] was asked what the deal
content was by one of [his] colleagues, [he] pointed them in someone else's direction to
the deal lawyers." BCI Ex. 56 [Blackwell Dep. Tr.] at 44:14-21. Accordingly, his
understanding of Movants' theory of a hypothetical discount from book value is not
based on personal knowledge. Barclays further disputes this statement to the extent it is
intended to imply that there was an undisclosed discount in the transaction. *See*
Barclays' responses to paragraphs 169, 172 and 243.

257. **Hraska testified he had no knowledge of a discount from the book value of**

**Lehman's assets being given to Barclays in connection with the Sale Transaction.**

**(A. 12 [Hraska] 66:5-23.)**

Barclays' Response

Barclays disputes the statement in paragraph 257 as mischaracterizing the cited source.
In the portion of Mr. Hraska's testimony cited by Movants in support of this proposition,
Mr. Hraska testified that he had never heard the phrase "block discount" in connection
with the Sale, and had no understanding that "Barclays was going to be paying less than
the full value for the assets it was buying from Lehman." Mr. Hraska did not testify
about a "discount from book value." Mr. Hraska also testified that he had no knowledge
of the terms of that transaction. BCI Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at 65:25-
66:13. Accordingly, his understanding of Movants' theory of a hypothetical discount
from book value is not based on personal knowledge. Barclays further disputes this
statement to the extent it is intended to imply that there was an undisclosed discount in
the transaction. *See* Barclays' responses to paragraphs 169, 172 and 243.

*Contains Highly Confidential Information*

258. **Denig testified she had no knowledge of a discount from the book value of Lehman's assets being given to Barclays in connection with the Sale Transaction. (A. 7 [Denig] 72:5-17.)**

Barclays' Response

> Barclays disputes the statement in paragraph 258 as mischaracterizing the cited source. In the portion of Ms. Denig's testimony cited by Movants in support of this proposition, Ms. Denig testified that she had never heard "about a discount being granted to Barclays as to the assets they were going to buy." Ms. Denig did not testify about a "discount from book value." Ms. Denig also testified that she had no role in the negotiation of the Sale Transaction. BCI Ex. 62 [Denig Dep. Tr.] at 23:3-8. Accordingly, her understanding of Movants' theory of a hypothetical discount from book value is not based on personal knowledge. Barclays further disputes this statement to the extent it is intended to imply that there was an undisclosed discount in the transaction. *See* Barclays' responses to paragraphs 169, 172 and 243.

259. **Azerad testified he had no knowledge of a discount from the book value of Lehman's assets being given to Barclays in connection with the Sale Transaction. (A. 1 [Azerad] 57:16-20.)**

Barclays' Response

> Barclays disputes the statement in paragraph 259 as mischaracterizing the cited source. In the portion of Mr. Azerad's testimony cited by Movants in support of this proposition, Mr. Azerad testified that he was unaware of any "discussion with anyone about whether there was a discount in the transaction." Mr. Azerad did not testify about a "discount from book value." Mr. Azerad also testified that he "didn't have an understanding of the economics of a transaction between Lehman and Barclays." BCI Ex. 54 [Azerad Dep. Tr.] at 40:23-41:9. Accordingly, his understanding of Movants' theory of a hypothetical discount from book value is not based on personal knowledge. Barclays further disputes this statement to the extent it is intended to imply that there was an undisclosed discount in the transaction. *See* Barclays' responses to paragraphs 169, 172 and 243.

260. **Berkenfeld testified that he had no knowledge of "a discount given to Barclays off the value of the assets transferred" in connection with the Sale Transaction. (A. 2 [Berkenfeld] 64:9-15; 63:12-18.)**

*Contains Highly Confidential Information*

Barclays' Response

> Barclays does not dispute that Mr. Berkenfeld testified as quoted by Movants but disputes
> the materiality of the statement in paragraph 260 because Mr. Berkenfeld also testified
> that he was not involved in the negotiations of the Sale Transaction and had a limited role
> in the transaction. *See* Barclays' responses to paragraphs 6-9. Accordingly, his
> understanding of the negotiations is not based on personal knowledge. Barclays further
> disputes this statement to the extent it implies that there was an undisclosed discount in
> the transaction. *See* Barclays' responses to paragraphs 169, 172 and 243.

261. **Berkenfeld testified that the contract he signed on Lehman's behalf in connection**

   **with the Sale Transaction reflected an agreement to sell the assets at Lehman's**

   **actual book value. (A. 2 [Berkenfeld] 88:25-89:10, 281:13-282:5.)**

Barclays' Response

> Barclays disputes the statement in paragraph 261 as mischaracterizing the cited evidence.
> In the portion of Mr. Berkenfeld's testimony cited by the Movants in support of this
> proposition, Mr. Berkenfeld testified that "[t]he purchase agreement says that what's
> being transferred over is approximately 70 billion of book value" and that "the
> understanding was that there would be purchased assets, transferred assets that had a
> book value as of the date of approximately 70 million [sic]." Mr. Berkenfeld did not
> testify that Barclays would purchase assets at "Lehman's actual book value." Mr.
> Berkenfeld also testified that he was not involved in the negotiations of the Sale
> Transaction and had a limited role in the transaction. *See* Barclays' responses to
> paragraphs 6-9. Accordingly, his understanding of the negotiations is not based on
> personal knowledge. Barclays further disputes this statement to the extent it implies that
> there was an undisclosed discount in the transaction. *See* Barclays' responses to
> paragraphs 169, 172 and 243.

262. **Berkenfeld testified, "[t]he purchase agreement says that what's being transferred**

   **over is approximately $70 billion of book value." (A. 2 [Berkenfeld] 88:25-89:10;**

   ***see* A. 30 at 6.)**

Barclays' Response

> Barclays does not dispute that Mr. Berkenfeld testified as quoted by Movants but disputes
> the materiality of the statement in paragraph 262 because the terms of the fully integrated
> Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2,
> 12; BCI Ex. 18 [Purchase Agreement], describe the Purchased Assets and because Mr.

*Contains Highly Confidential Information*

Berkenfeld also testified that he was not involved in the negotiations of the Sale
Transaction and had a limited role in the transaction, *see* Barclays' responses to
paragraphs 6-9. Accordingly, his understanding of the negotiations is not based on
personal knowledge. Barclays further disputes this statement to the extent it implies that
there was an undisclosed discount in the transaction. *See* Barclays' responses to
paragraphs 169, 172 and 243.

263.    **Berkenfeld was not aware of any part of the structure of the Sale Transaction that**

   **contemplated "a bulk discount to Barclays from the value of the assets transferred."**

   **2 [Berkenfeld] 72:9-14; 70:10-19)**

Barclays' Response

Barclays does not dispute that Mr. Berkenfeld testified as quoted by Movants but disputes
the materiality of the statement in paragraph 263 because the terms of the Purchase
Agreement are controlling and because Mr. Berkenfeld also testified that he was not
involved in the negotiations of the Sale Transaction and had a limited role in the
transaction. *See* Barclays' responses to paragraphs 6-9. Accordingly, his understanding
of the negotiations is not based on personal knowledge. Barclays further disputes this
statement to the extent it implies that there was an undisclosed discount in the
transaction. *See* Barclays' responses to paragraphs 169, 172 and 262.

264.    **Berkenfeld testified as follows:**

   **Q:    Was it your understanding that the economics of the
          transaction involved a $5 billion overall loss to Lehman versus
          its marks?**

   **A:    I have never been informed of that.**

   **Q:    Have you ever seen any document that says that?**

   **A:    Not that I recall.**

   **Q:    So when you were involved in the drafting of the agreement . . .
          you did not have an understanding there was to be a discount
          given to Barclays off the value of the assets transferred; is that
          right?**

   **A:    I did not have that knowledge.**

(A. 2 [Berkenfeld] 64:2-15.)

*Contains Highly Confidential Information*

Barclays' Response

> Barclays does not dispute that Mr. Berkenfeld testified as quoted by Movants but disputes
> the materiality of the statement in paragraph 264 because Mr. Berkenfeld also testified
> that he was not involved in the negotiations of the Sale Transaction and had a limited role
> in the transaction. *See* Barclays' responses to paragraphs 6-9. Accordingly, his
> understanding of the negotiations is not based on personal knowledge. Barclays further
> disputes this statement to the extent it implies that there was an undisclosed discount in
> the transaction. *See* Barclays' responses to paragraphs 169, 172 and 262.

265. **Berkenfeld testified that there was nothing in the Asset Purchase Agreement that**

**addressed a discount on assets. (A. 2 [Berkenfeld] 70:10-19,** *see also* **A. 2**

**[Berkenfeld] at 133:25-134:13.)**

Barclays' Response

> Barclays does not dispute that Mr. Berkenfeld testified as quoted by Movants but disputes
> the materiality of the statement in paragraph 265 for the reasons as stated in Barclays'
> response to paragraph 262 and because Mr. Berkenfeld also testified that he was not
> involved in the negotiations of the Sale Transaction and had a limited role in the
> transaction. *See* Barclays' responses to paragraphs 6-9. Accordingly, his understanding
> of the negotiations is not based on personal knowledge. Barclays further disputes this
> statement to the extent it implies that there was an undisclosed discount in the
> transaction. *See* Barclays' responses to paragraphs 169 and 172.

266. **Berkenfeld testified that the Asset Purchase Agreement was not designed to give**

**Barclays an immediate gain on the acquisition. (A. 2 [Berkenfeld] 122:17-123:2;** *see*

*also* **A. 2 [Berkenfeld] at 110:23-111:21; 112:7-25.)**

Barclays' Response

> Barclays disputes the statement in paragraph 266 as mischaracterizing the cited evidence.
> In the portion of Mr. Berkenfeld's testimony cited by the Movants in support of this
> proposition, Mr. Berkenfeld testified about a "material embedded gain." He did not
> testify about whether the APA "was designed to give Barclays an immediate gain on
> acquisition." Mr. Berkenfeld also testified that he was not involved in the negotiations of
> the Sale Transaction and had a limited role in the transaction. *See* Barclays' responses to
> paragraphs 6-9. Accordingly, his understanding of the negotiations is not based on
> personal knowledge. Barclays further disputes this statement to the extent it implies that

*Contains Highly Confidential Information*

there was an undisclosed discount in the transaction. *See* Barclays' responses to paragraphs 169, 172 and 262.

267. **Berkenfeld testified as follows:**

> Q:    **And nobody looking at that agreement, at least from the point of view of the man who signed it, would read that to say there was a discount being given to Barclays for what it was buying?**
>
> ***
>
> A:    **I didn't believe at the time when I signed this agreement that the intent of the agreement was to deliver assets with a material embedded gain to them, to Barclays.**

**(A. 2 [Berkenfeld] 122:17-123:2 (objection omitted); *see also* 110:23-112:25.)**

Barclays' Response

Barclays does not dispute that Mr. Berkenfeld testified as quoted by Movants but disputes the materiality of the statement in paragraph 267 because Mr. Berkenfeld also testified that he was not involved in the negotiations of the Sale Transaction and had a limited role in the transaction. *See* Barclays' responses to paragraphs 6-9. Accordingly, his understanding of the negotiations is not based on personal knowledge. Barclays also disputes the statement in paragraph 267 because the testimony upon which it is based is the result of an objectionable question that calls for speculation. Barclays further disputes this statement to the extent it implies that there was an undisclosed discount in the transaction. *See* Barclays' responses to paragraphs 169, 172 and 262.

268. **Berkenfeld testified that, if "getting a discount off of the valuation at the time under the current market" was "part of the business deal agreed to by the parties, then [he] would have expected that to be disclosed to the lawyers who were preparing the document and the lawyers who were presenting to the bankruptcy court." (A. 2 [Berkenfeld] 75:2277:2.)**

Barclays' Response

Barclays does not dispute that Mr. Berkenfeld testified as quoted by Movants but disputes the materiality of the statement in paragraph 268 because Mr. Berkenfeld also testified

*Contains Highly Confidential Information*

that he was not involved in the negotiations of the Sale Transaction and had a limited role in the transaction. *See* Barclays' responses to paragraphs 6-9. Accordingly, his understanding of the negotiations is not based on personal knowledge. Barclays also disputes the statement in paragraph 268 because the testimony upon which it is based is the result of an objectionable question that calls for speculation. Barclays further disputes this statement to the extent it implies that there was an undisclosed discount in the transaction. *See* Barclays' responses to paragraphs 169, 172 and 262. Barclays further disputes the statement in paragraph 268 to the extent it is intended to imply that the Sale Transaction was presented to the Court as a perfect "wash" with assets and liabilities of exactly equal value. *See* Barclays' response to paragraph 223.

**269.** **No one disclosed to Berkenfeld a discount from the book value of Lehman's assets**

**transferred to Barclays in the Sale Transaction. (A. 2 [Berkenfeld] 75:22-77:11.)**

Barclays' Response

Barclays disputes the statement in paragraph 269 as mischaracterizing the cited evidence. In the portion of Mr. Berkenfeld's testimony cited by the Movants in support of this proposition, Mr. Berkenfeld testified about a "discount off the value of the long position transferred." He did not testify about a "discount from the book value of Lehman's assets." Mr. Berkenfeld also testified that he was not involved in the negotiations of the Sale Transaction and had a limited role in the transaction. *See* Barclays' responses to paragraphs 6-9. Accordingly, his understanding of the negotiations is not based on personal knowledge. Barclays further disputes this statement to the extent it implies that there was an undisclosed discount in the transaction. *See* Barclays' responses to paragraphs 169, 172 and 262.

**270.** **At approximately 6:00 a.m. on September 16, 2008, a proposed agreement between**

**Lehman and Barclays was presented for approval at a meeting of the combined**

**boards of directors of LBHI and LBI (the "Lehman Boards"). (A. 39 at 1.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 270.

**271.** **At the September 16, 2008 meeting of the Lehman Boards, the proposed agreement**

**between Lehman and Barclays was described to the Lehman Boards as an exchange**

**of equivalent assets, with $1.45 billion paid for real estate, $250 million paid for the**

*Contains Highly Confidential Information*

**Lehman Brothers name and "[f]or LBI ... a wash – with Barclays assuming**

**liabilities, including employee liabilities and contract cure amounts, basically**

**equivalent to the assets." (A. 39 at 4.)**

Barclays' Response

Barclays does not dispute that Exhibit A. 39 is the minutes of the meeting of the Lehman
Boards held on September 16, 2008 and that those minutes contain the language quoted
in paragraph 271. Barclays disputes the statement in paragraph 271, however, as
contradicted by other evidence. Drafts of the meeting minutes demonstrate that the
proposed agreement between Lehman and Barclays, as explained to the Boards, did not
involve an even exchange of assets and liabilities; rather, the transaction was described as
Barclays assuming "$70B of assets at LBI" and "$64B of liabilities" – with Barclays only
"paying the B/D [LBI] 94% of assets." BCI Ex. 103 [Draft Minutes of September 16,
2008 LBHI/LBI Board Meeting]. Barclays further disputes the statement in paragraph
271 to the extent it implies that the Lehman Boards were not aware of the volatility in the
markets that caused the values of the relevant assets and liabilities to change. The
volatility in the markets during this week was a widely known and reported fact.

**272.   At their September 16, 2008 meeting, the Lehman Boards approved the deal**

**between Lehman and Barclays as described to them and authorized the preparation**

**of the documents necessary to effect the Sale Transaction.  (A. 39 at 6-7.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 272.

**273.   Lowitt attended the September 16, 2008 meeting of the Lehman Boards.  (A. 39 at**

**1.)**

Barclays' Response

Barclays does not dispute that the minutes of the September 16 meeting of the Lehman
Boards reflect that Mr. Lowitt was in attendance.

**274.   At the September 16, 2008 meeting of the Lehman Boards, Lowitt told the Lehman**

**Boards that, if the Sale Transaction were not approved that day, LBI would not be**

*Contains Highly Confidential Information*

**able to fund itself through the day and would have to file bankruptcy immediately.**

**(A. 39 at 4.)**

Barclays' Response

Barclays does not dispute that the minutes of the September 16 meeting of the Lehman
Boards reflect that Mr. Lowitt made such a statement at that meeting. Mr. Lowitt's
statements reflected his belief that LBI would not be able to fund itself that day without
the deal.

275.    **At the September 16, 2008 meeting of the Lehman Boards, Lowitt did not inform**

        **the Lehman Boards about a discount of any kind on Lehman's assets being given to**

        **Barclays in the proposed Sale Transaction.  (A. 39, *passim.*)**

Barclays' Response

Barclays incorporates its responses to paragraphs 169, 172 and 262 and disputes this
statement to the extent it implies that there was an undisclosed discount in the
transaction.

276.    **McDade testified he does not know what the boards of Lehman Brothers Holdings**

        **and Lehman Brothers Inc. were told concerning the Sale Transaction.  (A. 20**

        **[McDade] 34:23-36:18.)**

Barclays' Response

Barclays does not dispute that Mr. McDade testified as set forth in paragraph 276, but
disputes the statement in paragraph 276 as contrary to the minutes of the September 16
meeting of the Lehman Board, which show Mr. McDade in attendance.  BCI Ex. 104
[Minutes of Sept. 16, 2008 LBHI/LBI Board Meeting] at p.1.

277.    **In connection with the Sale Transaction, the 9/16/08 Financial Schedule was**

        **prepared purporting to show the value of certain categories of assets that would be**

        **transferred to Barclays and the liabilities Barclays would assume.  (A. 31; A. 2**

        **[Berkenfeld] 36:337:12, 49:8-20, 78:10-82:15; A. 19 [Lowitt] 80:6-24; A. 20**

*Contains Highly Confidential Information*

[McDade] 53:2-54:20.)

Barclays' Response

Barclays disputes the statement in paragraph 277 as not supported by the cited evidence. Nowhere in the cited evidence, testimony of Messrs. Berkenfeld, Lowitt, and McDade, is there a statement that the 9/16/08 Financial Schedule "purport[s] to show the value" of assets and liabilities that Barclays would assume. To the contrary, they testified that the 9/16/08 Financial Schedule was only intended as general guidance for the categories of assets and liabilities to be included in the sale in its then-existing form. Barclays further disputes the statement in paragraph 277 to the extent it implies an understanding of the transaction that is contrary to the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169, 172 and 262. Additionally, the Schedule was not a part of or even an exhibit to the APA or the Clarification Letter, and was not initialed by Barclays. *See* Barclays' response to paragraph 278.

278. **The 9/16/08 Financial Schedule was "guidance for what was meant in the Asset**

**Purchase Agreement when there was a reference to purchased assets." (A. 2**

**[Berkenfeld] 50:15-24; *see also* A. 20 [McDade] 54:3-20.)**

Barclays' Response

Barclays incorporates its response to paragraph 262 and disputes the statement in paragraph 278 as not supported by the cited evidence. In the testimony of Mr. Berkenfeld cited by Movants in support of this proposition, Mr. Berkenfeld refused to ascribe to the notion that the transaction was "based" on the estimate of assets in the 9/16/08 Financial Schedule. Rather, Mr. Berkenfeld offered his view that, "*at that point in time*," the schedule was used "*kind of* as guidance for what was meant in the Asset Purchase Agreement when there was a reference to purchased assets." (Emphasis added). Moreover, the 9/16/08 Financial Schedule was not a part of the APA or the Clarification Letter. The document was never initialed by Barclays. The APA and Clarification letter both contain integration clauses that exclude extraneous documents such as the 9/16/08 Financial Schedule. BCI Ex. 1 [APA] at § 13.5. In addition, Mr. Berkenfeld himself testified that the schedule was "not part of the agreement." BCI Ex. 55 [Berkenfeld Dep. Tr.] at 49:18-24. Mr. Miller similarly testified that there never was "an accurate balance sheet." BCI Ex. 87 [Miller Dep. Tr.] at 40:8-10. The major changes to Lehman's business and assets during the week of September 15, 2008 and the changes to the Sale Transaction negotiated on September 19 and the following weekend made the 9/16/08 Financial Schedule even less descriptive of the final transaction. Accordingly, the statement in paragraph 278 is not material to the motions before this Court.

*Contains Highly Confidential Information*

**279.    The 9/16/08 Financial Schedule is referenced in Paragraph 9.1(c) of the Asset**

**Purchase Agreement.  (A. 30, ¶ 9.1(c).)**

Barclays' Response

Barclays disputes the statement in paragraph 279 as contrary to the evidence.  The
9/16/08 Financial Schedule was not a part of the APA or the Purchase Agreement
between the parties.  *See* Barclays' responses to paragraphs 262 and 278.

**280.    The amount of liability Barclays assumed relating to the payment of 2008 bonuses to**

**transferred Lehman employees is set forth in the 9/16/08 Financial Schedule.  (A.**

**31; A. 20 [McDade] 54:17-55:11.)**

Barclays' Response

Barclays disputes the statement in paragraph 280 as not supported by the cited evidence.
The portion of Mr. McDade's testimony cited by Movants in support of this proposition
refers to the 9/16/08 Financial Schedule as providing an estimate for Barclays' liability
for "compensation," not for "bonuses."  Barclays further disputes the statement in
paragraph 280 to the extent it implies that the "Comp" figure on the 9/16/08 Schedule
was a "liability" or anything other than an *estimate* of *all* compensation obligations
Barclays was assuming under Article IX of the APA, including both severance and bonus
payments (and related payroll tax obligations).  *See* Barclays' response to paragraph 307.
Barclays further disputes the statement in paragraph 280 because the 9/16/08 Financial
Schedule was not a part of the APA or the Purchase Agreement between the parties, and
was not initialed by an officer of Barclays.  *See* Barclays' responses to paragraphs 262
and 278.  Barclays further disputes the statement in paragraph 280 to the extent it implies
Barclays was required to pay any particular amount in compensation under the Purchase
Agreement.  BCI Ex. 87 [Miller Dep. Tr.] at 81:6-11.

**281.    Kelly worked on the preparation of the 9/16/08 Financial Schedule.  (A. 14 [Kelly]**

**97:15-98:16.)**

Barclays' Response

Barclays disputes the statement in paragraph 281 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties.  The 9/16/08 Financial Schedule was not a part of the agreement between the
parties.  *See* Barclays' responses to paragraphs 262 and 278.

*Contains Highly Confidential Information*

**282.    Kelly and Tonucci provided the 9/16/08 Financial Schedule to Berkenfeld. (A. 2**

**[Berkenfeld] 34:2-14, 46:24-47:9; 63:3-5.)**

Barclays' Response

Barclays disputes the statement in paragraph 282 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' responses to paragraphs 262 and 278.

**283.    Kelly and Tonucci gave the "sign-off" that the 9/16/08 Financial Schedule was the**

**final schedule. (A. 2 [Berkenfeld] 48:2-22.)**

Barclays' Response

Barclays disputes the statement in paragraph 283 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' responses to paragraphs 262 and 278.

**284.    Berkenfeld initialed the 9/16/08 Financial Schedule. (A. 31, A. 2 [Berkenfeld] 47:12-**

**48:12.)**

Barclays' Response

Barclays disputes the statement in paragraph 284 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' responses to paragraphs 262 and 278.

**285.    Lowitt was "involved in the iterative work product" that led to the 9/16/08 Financial**

**Schedule. (A. 19 [Lowitt] 80:19-24.)**

Barclays' Response

Barclays disputes the statement in paragraph 285 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' responses to paragraphs 262 and 278.

*Contains Highly Confidential Information*

286.   **The 9/16/08 Financial Schedule served as guidance for the $70 billion "Long**

   **Position" described in the Asset Purchase Agreement as "book value as of"**

   **September 16.   (A. 2 [Berkenfeld] 78:10-79:3; A. 30 at 6; A. 31.)**

Barclays' Response

   Barclays disputes the statement in paragraph 286 to the extent it implies that the 9/16/08
   Financial Schedule was a part of the APA or the Purchase Agreement between the
   parties.  The 9/16/08 Financial Schedule was not a part of the agreement between the
   parties.  *See* Barclays' responses to paragraphs 262 and 278.  Barclays further disputes
   the statement in paragraph 286 to the extent it implies an understanding of the transaction
   that is contrary to the fully integrated Purchase Agreement, as defined in the Sale Order.
   BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also*
   Barclays' responses to paragraphs 169 and 172.

287.   **Berkenfeld understood that the 9/16/08 Financial Schedule reflected asset values**

   **based on Lehman's marks.   (A. 2 [Berkenfeld] 62:20-63:11.)**

Barclays' Response

   Barclays disputes the statement in paragraph 287 because the use of the word
   "understand," both in Mr. Berkenfeld's testimony and in paragraph 287, is vague and
   ambiguous.  In addition, Mr. Berkenfeld testified that his "understanding" was the result
   of unspecified hearsay from Mr. Tonucci and Mr. Kelly.  BCI Ex. 55 [Berkenfeld Dep.
   Tr.] at 64:3-5.  Mr. Berkenfeld, Mr. Tonucci and Mr. Kelly all testified that they were not
   involved in the negotiations of the Sale Transaction and had a limited role in the
   transaction.  *See* Barclays' responses to paragraphs 6-9 (Mr. Berkenfeld); 46-49 (Mr.
   Kelly); 120-124 (Mr. Tonucci).  Accordingly, their understanding of the negotiations is
   not based on personal knowledge.  Barclays further disputes the statement in paragraph
   287 to the extent it implies that the 9/16/08 Financial Schedule was a part of the APA or
   the Purchase Agreement between the parties.  The 9/16/08 Financial Schedule was not a
   part of the agreement between the parties.  *See* Barclays' responses to paragraphs 262 and
   278.

288.   **Lehman lawyers involved in documenting the Sale Transaction "were relying on**

   **[Kelly and Tonucci] to put together the list of assets that were estimated at the time**

   **would be transferred over to Barclays."   (A. 2 [Berkenfeld] 36:3-37:12.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 288 as failing to disclose that Mr.
Berkenfeld testified that he was not involved in the negotiations of the Sale Transaction
and had a limited role in the transaction. *See* Barclays' responses to paragraphs 6-9.
Accordingly, his understanding of the negotiations is not based on personal knowledge.
Barclays further disputes the statement in paragraph 288 to the extent "the list of assets"
referred to in the paragraph is intended to be the 9/16/08 Financial Schedule. The
9/16/08 Financial Schedule was not a part of the Purchase Agreement. *See* Barclays'
responses to paragraphs 262 and 278.

**289.    The 9/16/08 Financial Schedule listed asset-side cash and securities, including**

**governments and agencies, commercial paper, mortgages, corporate debt, corporate**

**equity, and derivatives, totaling $62.7 billion.  (A. 31.)**

Barclays' Response

Barclays disputes the statement in paragraph 289 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' responses to paragraphs 262 and 278.

**290.    The 9/16/08 Financial Schedule listed an asset-side line item for "Collateralized ST**

**Agr" in the amount of $10 billion.  (A. 31.)**

Barclays' Response

Barclays disputes the statement in paragraph 290 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' responses to paragraphs 262 and 278.

**291.    The 9/16/08 Financial Schedule listed "Adj. Total Assets" as $72.65 billion.  (A. 31.)**

Barclays' Response

Barclays disputes the statement in paragraph 291 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' responses to paragraphs 262 and 278.

*Contains Highly Confidential Information*

292.    **The 9/16/08 Financial Schedule did not reflect the actual Lehman book value of**

   **Lehman's assets.  (A. 14 [Kelly] 108:7-16; A. 20 [McDade 55:12-18.)**

Barclays' Response

Barclays disputes the statement in paragraph 292 to the extent it implies that the 9/16/08
Financial Schedule was a part of the Purchase Agreement between the parties. The
9/16/08 Financial Schedule was not a part of the agreement between the parties. *See*
Barclays' responses to paragraphs 262 and 278. Barclays also disputes the statement in
paragraph 292 as not supported by the cited evidence. Mr. McDade also testified that the
"Lehman books hadn't been marked since Friday evening, the 12th" although "the
markets changed dramatically between the 12th, the last process for marking" and the
16th, and that the "long assets purchase would reflect change in the dynamic of the
market, particularly given the nature of what a lot of those assets were." BCI Ex. 85
[McDade Dep. Tr.] at 55:12-57:23. Similarly, Mr. Marsal also confirmed that Lehman's
marks were not updated after September 12, 2008, and the only effort to update
valuations was the effort by Barclays and Lehman personnel to establish updated
valuations. BCI Ex. 84 [Marsal Dep. Tr.] at 22:24-24:5. Mr. Miller further testified that
there was a "persistent theme" predating the negotiations that Lehman was "aggressive"
on its marks. BCI Ex. 87 [Miller Dep. Tr.] at 34:6-15. Barclays also objects to the
statement in paragraph 292 as failing to disclose that Mr. Kelly testified that he was not
involved in the negotiations of the Sale Transaction and had a limited role in the
transaction. *See* Barclays' responses to paragraphs 46-49. Accordingly, his
understanding of the negotiations is not based on personal knowledge and is not material
to the motions before this Court. Barclays further disputes the use of the phrase "actual
book value" in paragraph 292 as vague and ambiguous. Barclays further disputes the
statement in paragraph 292 to the extent it implies an understanding of the transaction
that is contrary to the fully integrated Purchase Agreement, as defined in the Sale Order.
BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also*
Barclays' responses to paragraphs 169 and 172. Barclays also disputes the statement in
paragraph 292 because there is insufficient evidence to examine the precise inventory
referred to in the 9/16/08 Financial Schedule, and the evidence that does exist does not
support Movants' statement. BCI Ex. 341 [Pfleiderer Report] at pp. 45-54.

293.    **The 9/16/08 Financial Schedule listed values for Lehman's assets reduced below**

   **Lehman's book value.  (A. 14 [Kelly] 105:25-108:16; *see also* A. 14 [Kelly] 120:5-11;**

   **A. 45.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 293 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' responses to paragraphs 262 and 278. Barclays also objects to the
statement in paragraph 293 as failing to disclose that Mr. Kelly testified that he was not
involved in the negotiations of the Sale Transaction and had a limited role in the
transaction. *See* Barclays' responses to paragraphs 46-49. Accordingly, his
understanding of the negotiations is not based on personal knowledge. Barclays also
disputes the statement in paragraph 293 for failing to disclose that by the 16th, Lehman's
marks were outdated and inaccurate. *See* Barclays' response to paragraph 193. Barclays
further disputes the statement in paragraph 293 to the extent it implies an understanding
of the transaction that is contrary to the fully integrated Purchase Agreement, as defined
in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase
Agreement]; *see also* Barclays' responses to paragraphs 169, 172, and 262. Barclays
also disputes the statement in paragraph 293 because there is insufficient evidence to
examine the precise inventory referred to in the 9/16/08 Financial Schedule, and the
evidence that does exist does not support Movants' statement. BCI Ex. 341 [Pfleiderer
Report] at pp. 45-54.

**294.    On September 16, 2008, the value shown on Lehman's books was "[a]pproximately**

**$5 billion higher" than the values assigned to the securities asset classes shown on**

**the 9/16/08 Financial Schedule. (A. 14 [Kelly] 108:7-16.)**

Barclays' Response

Barclays disputes the statement in paragraph 294 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' responses to paragraphs 262 and 278. Barclays also objects to the
statement in paragraph 294 as failing to disclose that Mr. Kelly testified that he was not
involved in the negotiations of the Sale Transaction and had a limited role in the
transaction. *See* Barclays' responses to paragraphs 46-49. Accordingly, his
understanding of the negotiations is not based on personal knowledge. Barclays also
disputes the statement in paragraph 294 for failing to disclose that by the 16th, Lehman's
marks were outdated and inaccurate. *See* Barclays' response to paragraph 292. Barclays
further disputes the statement in paragraph 294 to the extent it implies an understanding
of the transaction that is contrary to the fully integrated Purchase Agreement, as defined
in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase
Agreement]; *see also* Barclays' responses to paragraphs 169, 172 and 262. Barclays also
disputes the statement in paragraph 294 because there is insufficient evidence to examine
the precise inventory referred to in the 9/16/08 Financial Schedule, and the evidence that

*Contains Highly Confidential Information*

does exist does not support Movants' statement. BCI Ex. 341 [Pfleiderer Report] at pp. 45-54.

**295.    In the aggregate, the Lehman book value of the classes of securities listed on the**

**9/16/08 Financial Schedule was understated on such schedule by $5 billion. (A. 14**

**[Kelly] 108:7-16, A. 19 [Lowitt] 45:8-17; 81:18-82:13.)**

Barclays' Response

Barclays disputes the statement in paragraph 295 to the extent it implies that the 9/16/08 Financial Schedule was a part of the APA or the Purchase Agreement between the parties. The 9/16/08 Financial Schedule was not a part of the agreement between the parties. *See* Barclays' responses to paragraphs 262 and 278. Barclays also objects to the statement in paragraph 295 as failing to disclose that Mr. Kelly and Mr. Lowitt testified that they were not involved in the negotiations of the Sale Transaction and had a limited role in the transaction. *See* Barclays' responses to paragraphs 46-49 (Mr. Kelly); 57-64 (Mr. Lowitt). Accordingly their understanding of the negotiations is not based on personal knowledge. Barclays also disputes the statement in paragraph 295 for failing to disclose that by the 16th, Lehman's marks were outdated and inaccurate. *See* Barclays' response to paragraph 292. Barclays further disputes the statement in paragraph 295 to the extent it implies an understanding of the transaction that is contrary to the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169, 172 and 262. Barclays also disputes the statement in paragraph 295 because there is insufficient evidence to examine the precise inventory referred to in the 9/16/08 Financial Schedule, and the evidence that does exist does not support Movants' statement. BCI Ex. 341 [Pfleiderer Report] at pp. 45-54.

**296.    In connection with the Sale Transaction, the reduction in price from Lehman's book**

**values for assets being transferred to Barclays was agreed to in terms of a raw**

**number, not a percentage. (A. 19 [Lowitt] 45:8-17.)**

Barclays' Response

Barclays objects to the statement in paragraph 296 as failing to disclose that Mr. Lowitt testified that he was not involved in the negotiations of the Sale Transaction and had a limited role in the transaction. *See* Barclays' responses to paragraphs 57-64. Accordingly his understanding of the negotiations is not based on personal knowledge. Barclays further disputes the statement in paragraph 296 for failing to disclose that by the 16th, Lehman's marks were outdated and inaccurate. *See* Barclays' response to

*Contains Highly Confidential Information*

paragraph 292. Barclays further disputes the statement in paragraph 296 to the extent it
implies an understanding of the transaction that is contrary to the fully integrated
Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2,
12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169,
172 and 262.

**297. In connection with the Sale Transaction, Lowitt testified about a "top down" and**

**"bottoms up" process, through which the amount of the discount given to Barclays**

**was agreed upon. (A. 19 [Lowitt] 44:9-46:3.)**

Barclays' Response

Barclays disputes the statement in paragraph 297 as mischaracterizing the cited source.
In the portion of Mr. Lowitt's testimony cited by Movants in support of this proposition,
Mr. Lowitt does not testify regarding any "discount given to Barclays." Rather, he
discusses the difference between the value shown on Lehman's books and the price
Barclays was willing to pay for those securities. Barclays also objects to the statement in
paragraph 297 as failing to disclose that Mr. Lowitt testified that he was not involved in
the negotiations of the Sale Transaction and had a limited role in the transaction. *See*
Barclays' responses to paragraphs 57-64. Accordingly his understanding of the
negotiations is not based on personal knowledge. Barclays further disputes the statement
in paragraph 297 for failing to disclose that by the 16th, Lehman's marks were outdated
and inaccurate. *See* Barclays' response to paragraph 292. Barclays further disputes the
statement in paragraph 297 to the extent it implies an understanding of the transaction
that is contrary to the fully integrated Purchase Agreement, as defined in the Sale Order.
BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also*
Barclays' responses to paragraphs 169, 172 and 262.

**298. In connection with the Sale Transaction, the mark-down of assets from Lehman's**

**book value incorporated in the 9/16/08 Financial Schedule was done by "categories"**

**of assets, and not with regard to particular assets. (A. 14 [Kelly] 104:19-106:12; A.**

**19 [Lowitt] 81:18-82:13, 162:21-163:12, 129:9-16 (the "overall goal" was to reflect**

**an agreed reduction, without regard to particular assets).)**

Barclays' Response

Barclays disputes the statement in paragraph 298 as not supported by the cited evidence.
Neither Mr. Kelly nor Mr. Lowitt testified regarding a "mark down of assets from

*Contains Highly Confidential Information*

Lehman's book value." Barclays also objects to the statement in paragraph 298 as failing
to disclose that Mr. Kelly and Mr. Lowitt testified that they were not involved in the
negotiations of the Sale Transaction and had a limited role in the transaction. *See*
Barclays' responses to paragraphs 46-49 (Mr. Kelly); 57-64 (Mr. Lowitt). Accordingly
their understanding of the negotiations is not based on personal knowledge. Barclays
further disputes the statement in paragraph 298 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' responses to paragraphs 262 and 278. Barclays further disputes
the statement in paragraph 298 for failing to disclose that by the 16th, Lehman's marks
were outdated and inaccurate. *See* Barclays' response to paragraph 292. Barclays further
disputes the statement in paragraph 298 to the extent it implies an understanding of the
transaction that is contrary to the fully integrated Purchase Agreement, as defined in the
Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement];
*see also* Barclays' responses to paragraphs 169, 172 and 262. Barclays also disputes the
statement in paragraph 298 because there is insufficient evidence to examine the precise
inventory referred to in the 9/16/08 Financial Schedule, and the evidence that does exist
does not support Movants' statement. BCI Ex. 341 [Pfleiderer Report] at pp. 45-54.

299.    **In a document discussing the $75 billion valuation in the September 16, 2008**

        **Presentation about the Sale Transaction to the Barclays Boards, a Barclays**

        **employee identified a $1.5 billion markdown that was described as an "[u]nallocated**

        **deduction not assigned to a specific asset class." (A. 40 at BCI-EX-00023814;** *see*

        *also* **A. 24 [Romain] 44:5-9.)**

Barclays' Response

        Barclays disputes the statement in paragraph 299 for failing to disclose that by the 16th,
        Lehman's marks were outdated and inaccurate. *See* Barclays' response to paragraph 292.
        Barclays further disputes the statement in paragraph 298 to the extent it implies an
        understanding of the transaction that is contrary to the fully integrated Purchase
        Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex.
        18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169, 172 and 262.

300.    **Kelly testified that: "As part of the process to reflect the [Sale Transaction] in**

        **Lehman's books and records, the assets would have been marked to the negotiated**

        **sale price." (A. 14 [Kelly] 52:13-24.)**

*Contains Highly Confidential Information*

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 300 as failing to disclose that Mr. Kelly testified that he was not involved in the negotiations of the Sale Transaction and had a limited role in the transaction. *See* Barclays' responses to paragraphs 46-49. Accordingly, his understanding of the negotiations is not based on personal knowledge. Barclays also disputes the statement in paragraph 300 for failing to disclose that by September 16th, Lehman's marks were outdated and inaccurate. *See* Barclays' responses to paragraph 292. Barclays further disputes the statement in paragraph 300 to the extent it implies an understanding of the transaction that is contrary to the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169, 172 and 262.

301.  **In connection with the Sale Transaction, on September 17, 2008, Lowitt wrote an**

      **email to Reilly asking if things were "set up" for "barcap to mark the positions**

      **further." (A. 55.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 301 because Mr. Lowitt testified that he was not involved in the negotiations of the Sale Transaction and had a limited role in the transaction. *See* Barclays' responses to paragraphs 57-64. Accordingly his understanding of the negotiations is not based on personal knowledge. Barclays further disputes the statement in paragraph 301 for failing to disclose that by the 16th, Lehman's marks were outdated and inaccurate. *See* Barclays' responses to paragraph 292. Barclays further disputes the statement in paragraph 301 to the extent it implies an understanding of the transaction that is contrary to the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169, 172 and 262.

302.  **Reilly responded to Lowitt's September 17, 2008 email: "[w]e are going to send last**

      **nights assets and marks over [to Barclays] so they can see [the] mix and marks." (A.**

      **55.)**

<u>Barclays' Response</u>

Barclays disputes to the statement in paragraph 296 as failing to disclose that Mr. Reilly was not involved in the negotiations of the Sale Transaction and had a limited role in connection with the transaction. *See* Barclays' response to paragraph 97. Barclays

*Contains Highly Confidential Information*

further disputes the statement in paragraph 302 for failing to disclose that by the 16th, Lehman's marks were outdated and inaccurate. *See* Barclays' response to paragraph 292. Barclays further disputes the statement in paragraph 302 to the extent it implies an understanding of the transaction that is contrary to the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169, 172 and 262.

**303.    In connection with the Sale Transaction, on September 17, 2008, Lowitt believed it**

**would be necessary to mark down the positions on Lehman's books to a level that**

**was consistent with the lower price at which Barclays was willing to purchase them.**

**(A. 19 [Lowitt] 129:17-23; 131:11-135:13.)**

Barclays' Response

Barclays objects to the statement in paragraph 302 as failing to disclose that Mr. Lowitt testified that he was not involved in the negotiations of the Sale Transaction and had a limited role in the transaction. *See* Barclays' responses to paragraphs 57-64. Mr. Lowitt's testimony concerned his recollection of Barclays' view, not concerning his own personal view. Accordingly his understanding of the negotiations is not based on personal knowledge. Barclays further disputes the statement in paragraph 303 for failing to disclose that by the 16th, Lehman's marks were outdated and inaccurate. *See* Barclays' response to paragraph 292. Barclays further disputes the statement in paragraph 303 to the extent it implies an understanding of the transaction that is contrary to the Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraphs 169, 172 and 262.

**304.    The 9/16/08 Financial Schedule listed "Total" liabilities as $72.65 billion. (A. 31.)**

Barclays' Response

Barclays disputes the statement in paragraph 304 to the extent it implies that the 9/16/08 Financial Schedule was a part of the APA or the Purchase Agreement between the parties. The 9/16/08 Financial Schedule was not a part of the agreement between the parties. *See* Barclays' response to paragraph 278. Barclays further disputes the statement in paragraph 304 to the extent it implies an understanding of the transaction that is contrary to the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays' responses to paragraph 169, 172 and 262.

*Contains Highly Confidential Information*

**305.    The 9/16/08 Financial Schedule listed liability-side line items for short inventory,**

**including government and agencies, corporate debt, corporate equities, and**

**derivatives, totaling $33.9 billion. (A. 31.)**

Barclays' Response

Barclays disputes the statement in paragraph 305 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' response to paragraph 278. Barclays further disputes the statement
in paragraph 305 to the extent it implies an understanding of the transaction that is
contrary to the fully integrated Purchase Agreement, as defined in the Sale Order. BCI
Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays'
responses to paragraphs 169, 172 and 262.

**306.    The 9/16/08 Financial Schedule listed a liability-side line item for "Collateralized ST**

**Fund" in the amount of $34.5 billion. (A. 31.)**

Barclays' Response

Barclays disputes the statement in paragraph 306 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' response to paragraph 278. Barclays further disputes the statement
in paragraph 306 to the extent it implies an understanding of the transaction that is
contrary to the fully integrated Purchase Agreement, as defined in the Sale Order. BCI
Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]; *see also* Barclays'
responses to paragraphs 169, 172 and 262.

**307.    The 9/16/08 Financial Schedule listed a liability-side line item for "Comp" at $2**

**billion. (A. 31; A. 2 [Berkenfeld] 60:3-11.)**

Barclays' Response

Barclays disputes the statement in paragraph 307 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' response to paragraph 278. Barclays further disputes the statement
in paragraph 307 to the extent it implies that the $2.0 billion "Comp" figure on the
9/16/08 Schedule was a "liability" or anything other than an *estimate* of *all* compensation

*Contains Highly Confidential Information*

obligations Barclays was assuming under Article IX, including both severance and bonus
payments (and related payroll tax obligations). BCI Ex. 55 [Berkenfeld Dep. Tr.] at
26:11-23; BCI Ex. 86 [McGee Dep. Tr.] at 86:13-18; BCI Ex. 97 [Shapiro Dep. Tr.] at
126:8-15; BCI Ex. 91 [Ricci Dep. Tr.] at 37:17-38:6; BCI Ex. 64 [Exall Dep. Tr.] at
55:12-56:9; BCI Ex. 85 [McDade Dep. Tr.] at 99:10-23; BCI Ex. 57 [Brown Dep. Tr.] at
28:20-29:6. Barclays further disputes the statement in paragraph 307 to the extent it
implies Barclays was required to pay any particular amount in compensation under the
Purchase Agreement. BCI Ex. 87 [Miller Dep. Tr.] at 81:6-11. Barclays also disputes
the statement in paragraph 307 to the extent it implies that Barclays has not met its
contractual obligations under Section 9.1 of the APA. Barclays has paid close to $2
billion in aggregate compensation payments to Transferred Employees and has thereby
fully satisfied its obligations under APA 9.1. BCI Ex. 142 [Exall Spreadsheet].

**308.    The $2 billion accrual for compensation reflected on the 9/16/08 Financial Schedule**

**was not Lehman's accrual for compensation as reflected on its books on September**

**16, 2008. 20 [McDade] 44:4-45:5, 73:14-18, 100:5-22, 105:3-8.)**

Barclays' Response

Barclays disputes the statement in paragraph 308 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' response to paragraph 278. Barclays further disputes the statement
in paragraph 308 to the extent it implies the $2 billion figure for "Comp" in the
9/16/08 Financial Schedule was an "accrual" or anything other than an estimate. *See*
Barclays' response to paragraph 307. Barclays further disputes the statement in
paragraph 308 to the extent it implies Barclays was required to pay any particular amount
in compensation under the Purchase Agreement, or that it has not met its contractual
obligations under Section 9.1 of the APA. *Id.*

**309.    In connection with the Sale Transaction, the "compensation" liability on the 9/16**

**Financial Schedule had been increased by $1 billion over the amount Lehman**

**actually had on its books on September 16, 2008. (A. 37; A. 14 [Kelly] 56:17-23.)**

Barclays' Response

Barclays disputes the statement in paragraph 308 to the extent it implies that the 9/16/08
Financial Schedule was a part of the APA or the Purchase Agreement between the
parties. The 9/16/08 Financial Schedule was not a part of the agreement between the
parties. *See* Barclays' response to paragraph 278. Barclays further disputes the statement

,

in paragraph 309 to the extent it implies that the $2 billion figure for "Comp" in the 9/16/08 Financial Schedule was an actual "liability" or anything other than an estimate. *See* Barclays' response to paragraph 307. Barclays further disputes the statement in paragraph 309 as implying that the "amount Lehman actually had on its books on September 16, 2008" referred to in Mr. Kelly's testimony could serve as anything other than a portion of the total compensation for the entire year. Not only was the amount Lehman had on its books only for a partial year, but it also reflected only the cash portion of expected bonus payments. BCI Ex. 85 [McDade Dep. Tr.] at 286:8-287:25; BCI Ex. 83 [Lowitt Dep. Tr.] at 53:14-54:16. Compared to other Wall Street firms, including Barclays, Lehman paid a higher portion of its annual bonus in the form of equity than cash. BCI Ex. 85 [McDade Dep. Tr.] at 286:12-23. Barclays further disputes the statement in paragraph 309 to the extent it implies that Barclays was required to pay any particular amount in compensation under the Purchase Agreement, or that it has not met its contractual obligations under Section 9.1 of the APA. *See* Barclays' response to paragraph 307.

310. **In connection with the Sale Transaction, the $2 billion accrual for compensation shown on the 9/16/08 Financial Schedule was an "agreed" number between Lehman and Barclays. (A. 19 [Lowitt] 212:23-214:18; A. 14 [Kelly] 109:23-110:4, 117:6-8.)**

Barclays' Response

Barclays disputes the statement in paragraph 310 to the extent it implies that the 9/16/08 Financial Schedule was a part of the APA or the Purchase Agreement between the parties. The 9/16/08 Financial Schedule was not a part of the agreement between the parties. *See* Barclays' response to paragraph 278. Barclays further disputes the statement in paragraph 310 to the extent it implies that the $2 billion figure for "Comp" in the 9/16/08 Financial Schedule was an "accrual" or anything other than an estimate. *See* Barclays' response to paragraph 307. Barclays further disputes the statement in paragraph 310 to the extent it implies that Barclays was required to pay any particular amount in compensation under the Purchase Agreement, or that it has not met its contractual obligations under Section 9.1 of the APA. *Id.* Barclays further disputes the statement in paragraph 310 to the extent it implies that the $2 billion compensation estimate was based on Barclays' information. The $2 billion "Comp" estimate was based information Lehman provided to Barclays. BCI Ex. 91 [Ricci Dep. Tr.] at 37:4-38:6, 62:12-19 ("Lehman presented me and others with a number of roughly $2 billion that they felt they needed to compensate the Lehman staff" and McGee "told me there needs to be a bonus pool of 2 billion."); BCI Ex 85 [McDade Dep. Tr.] at 99:20-100:4 (Mr. McDade testified that the $2 billion number was "absolutely" a good faith estimate "[b]ecause the data was rigorously provided by Lehman and rigorously reviewed and modeled by Barclays." ); *see also id.* at 72:19-73:5; BCI Ex. 59 [Clackson Dep. Tr.] at 76:4-7 ("The number which Lehman produced, there were various versions, but their pro forma balance sheets, and they produced a balance sheet which had a 2 billion-dollar

*Contains Highly Confidential Information*

number for comp accrual."); BCI Ex. 61 [Cox Dep. Tr.] at 58:23-59:20 (when asked if
Barclays generated the $2 billion comp estimate, testifying "No. No. No. Working with
Lehman. Because obviously they had accrued numbers on their books. They had some
facts we didn't have ... . They had some numbers that were accrued on their books.
They had -- they knew what they were going -- they knew what approximately their
liability would be for the year that they thought they had to pay. We obviously had to be
working with Lehman to come up with a number that was arrived at.")

**311. In connection with the Sale Transaction, McDade testified that the $2 billion accrual**

**for compensation on the 9/16/08 Financial Schedule was a number Barclays came**

**up with. (A. 20 [McDade] 44:4-45:5, 73:14-18, 100:5-101:8, 105:3-8.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 311 as imprecise and contrary to the
evidence. The $2 billion "Comp" estimate was based on information Lehman provided
to Barclays. *See* Barclays' response to paragraph 310. Barclays further disputes the
statement in paragraph 311 to the extent it implies that the 9/16/08 Financial Schedule
was a part of the APA or the Purchase Agreement between the parties. The 9/16/08
Financial Schedule was not a part of the agreement between the parties. *See* Barclays'
response to paragraph 278. Barclays also disputes the statement in paragraph 311 to the
extent it implies that the $2 billion figure for "Comp" in the 9/16/08 Financial Schedule
was an "accrual" or anything other than an estimate. *See* Barclays' response to paragraph
307. Barclays further disputes the statement in paragraph 311 to the extent it implies that
Barclays was required to pay any particular amount in compensation under the Purchase
Agreement, or that it has not met its contractual obligations under Section 9.1 of the
APA. *See* Barclays' response to paragraph 307.

**312. In connection with the Sale Transaction, McDade testified that he never saw any**

**calculations concerning compensation from Barclays' "model." (A. 20 [McDade]**

**46:2-15, 100:10-101:20.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 312 to the extent that it implies that the
estimate for compensation was based on Barclays' information. The $2 billion "Comp"
estimate on the 9/16/08 Financial Schedule was based information Lehman provided to
Barclays. *See* Barclays' response to paragraph 310. Barclays further disputes the
statement in paragraph 312 to the extent it implies that Mr. McDade did not understand
the components of compensation that Barclays had agreed to pay. Indeed, Mr. McDade

*Contains Highly Confidential Information*

was fully aware of the components of compensation that Barclays had agreed to pay. As Mr. McDade testified, the $2 billion figure "accurately reflects the combination -- the full cost of employing including all aspects of the 9,000 employees who would and wouldn't stay as a part of the transaction." BCI Ex. 85 [McDade Dep. Tr.] at 102:5-103:16.

**313.    In connection with the Sale Transaction, Kelly testified that McDade told him that**

**the $2 billion accrual for compensation on the 9/16/08 Financial Schedule was a**

**"negotiated" amount.  (A. 14 [Kelly] 81:15-23.)**

Barclays' Response

Barclays disputes the statement in paragraph 313 to the extent it implies that the 9/16/08 Financial Schedule was a part of the APA or the Purchase Agreement between the parties. The 9/16/08 Financial Schedule was not a part of the agreement between the parties. *See* Barclays' response to paragraph 278. Barclays further disputes the statement in paragraph 313 to the extent it implies that the $2 billion figure for "Comp" in the 9/16/08 Financial Schedule was an "accrual" or anything other than an estimate. *See* Barclays' response to paragraph 307. Barclays also disputes the statement in paragraph 313 to the extent that it implies that the estimate for compensation was based on Barclays' information. The $2 billion "Comp" estimate on the 9/16/08 Financial Schedule was based information Lehman provided to Barclays. *See* Barclays' response to paragraph 310. Barclays further disputes the statement in paragraph 313 to the extent it implies that Barclays was required to pay any particular amount in compensation under the Purchase Agreement, or that it has not met its contractual obligations under Section 9.1 of the APA. *See* Barclays' response to paragraph 307.

**314.    In connection with the Sale Transaction, Kelly did not ask McDade why the**

**compensation accrual on the 9/16/08 Financial Schedule was not as shown on**

**Lehman's books but rather was negotiated. (A. 14 [Kelly] 82:18-84:3.)**

Barclays' Response

Barclays disputes the statement in paragraph 314 to the extent it implies that the 9/16/08 Financial Schedule was a part of the APA or the Purchase Agreement between the parties. The 9/16/08 Financial Schedule was not a part of the agreement between the parties. *See* Barclays' response to paragraph 278. Barclays further disputes the statement in paragraph 314 to the extent it implies that the $2 billion figure for "Comp" in the 9/16/08 Financial Schedule was an "accrual" or anything other than an estimate. *See* Barclays' response to paragraph 307. Barclays further objects to the statement in paragraph 314 to the extent it implies that either Mr. Kelly or Mr. McDade did not

understand the components of compensation that Barclays had agreed to pay. *See* BCI
Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 62:18-63:5 (A. "As I previously stated, my
understanding was that the compensation liability to be assumed related to a set of
employees and represented all forms of compensation or liability for all forms of
compensation. Q. Bonus, salary, is that what you mean when you say 'all forms of
compensation' to the components compensation? A. All components. All components,
meaning salary, cash, stock and any other forms of compensation"); BCI Ex. 85 [McDade
Dep. Tr.] at 102:5-103:16 (Section 9.1(c) of APA "accurately reflects the combination
the full cost of employing, including all aspects of the 9,000 employees who would and
wouldn't stay as a part of the transaction"). Barclays further disputes the statement in
paragraph 314 to the extent it implies that Barclays was required to pay any particular
amount in compensation under the Purchase Agreement, or that it has not met its
contractual obligations under Section 9.1 of the APA. *See* Barclays' response to
paragraph 307.

**315.    In connection with the Sale Transaction, Ricci testified that Barclays' assuming**

**more liability than it would potentially pay out was one way to achieve Barclays'**

**desired "cushion" in the deal. (A. 23 [Ricci] 125:4-20.)**

Barclays' Response

Barclays disputes the statement in paragraph 315 as misleading and taken out of context.
The cited testimony of Mr. Ricci does not relate in any manner to the issue of Barclays'
agreements regarding compensation. Barclays further disputes the statement in
paragraph 315 to the extent it implies that the $2 billion figure for "Comp" in the 9/16/08
Financial Schedule was a "liability" or anything other than an estimate. *See* Barclays'
response to paragraph 307. Barclays further disputes the statement in paragraph 315 to
the extent it implies that Barclays was required to pay any particular amount in
compensation under the Purchase Agreement, or that it has not met its contractual
obligations under Section 9.1 of the APA. *Id.*

**316.    In connection with the Sale Transaction, Barclays relied upon the actual**

**compensation liability being only $1.35 billion. (A. 54; *see also* A. 23 [Ricci] 38:14-**

**40:16 ($1.35 billion was Barclays' estimate of what would actually have to be paid),**

**52:25-54:18.)**

*Contains Highly Confidential Information*

Barclays' Response

    Barclays disputes the statement in paragraph 316 as misstating the cited evidence to imply that, at the time of Closing, Barclays had not agreed to assume all employment liabilities required under the Purchase Agreement. The exhibit cited by Movants as evidence in support of the proposition in paragraph 316 is dated September 17, 2008 – several days before the September 22, 2008 date of closing – and says nothing of Barclays' willingness to pay the full and necessary amount in compensation payments to meet Barclays' obligations. In the days before closing there was uncertainty regarding the compensation estimate. As Mr. Ricci testified, "[a]t the time, you know, things were very uncertain. We were concerned about protecting Barclays against downside risk. We had assumed a liability. We had hoped that we might not have to pay it. We had some scenarios where we may not have to pay it we came up with, but we expected that we may indeed have to pay it. So, as part of those iterations, the number 1.4 may have come up. Others may have come up." BCI Ex. 91 [Ricci Dep. Tr.] at 38:24-39:8. Barclays further disputes the statement in paragraph 316 to the extent it implies that Barclays was required to pay any particular amount in compensation under the Purchase Agreement, or that it has not met its contractual obligations under Section 9.1 of the APA. *See* Barclays' response to paragraph 307.

317.    **Prior to the closing of the Sale Transaction, Barclays never intended to pay the full**

    **"assumed" \$2 billion liability for compensation. (*See* A. 23 [Ricci] 35:6-38:13**

    **("What [w]e had agreed was that we would assume a liability related to**

    **compensation. . . . but we didn't agree that we would pay the whole thing out").)**

Barclays' Response

    Barclays disputes the statement in paragraph 317 to the extent it implies that Barclays was required to pay any particular amount in compensation under the Purchase Agreement, or that it has not met its contractual obligations under Section 9.1 of the APA. *See* Barclays' response to paragraph 307. Barclays further disputes the statement in paragraph 317 to the extent it implies that the 9/16/08 Financial Schedule was a part of the APA or the Purchase Agreement between the parties. The 9/16/08 Financial Schedule was not a part of the agreement between the parties. *See* Barclays' response to paragraph 278. Barclays further disputes the statement in paragraph 317 to the extent it implies that the \$2 billion figure for "Comp" in the 9/16/08 Financial Schedule was a "liability" or anything other than an estimate. *See* Barclays' response to paragraph 307. Barclays further disputes the statement in paragraph 317 to the extent it implies that at the time of the Closing, Barclays had not agreed to assume all employment liabilities required under the Purchase Agreement. *See* Barclays' response to paragraph 316.

*Contains Highly Confidential Information*

318. **In connection with the Sale Transaction, regarding compensation liability, Ricci**

   **testified: "We were hoping ... we wouldn't have to pay all of it." (A. 23 [Ricci]**

   **52:25-54:18.)**

Barclays' Response

   Barclays disputes the statement in paragraph 318 to the extent that it implies that at the
   time of the Closing, Barclays had not agreed to assume all employment liabilities
   required under the Purchase Agreement. *See* Barclays' response to paragraph 316.
   Barclays further disputes the statement in paragraph 318 to the extent it implies that
   Barclays was required to pay any particular amount in compensation under the Purchase
   Agreement, or that it has not met its contractual obligations under Section 9.1 of the
   APA. *See* Barclays' response to paragraph 307.

319. **Paul Exall is the Barclays executive in charge of coordinating the compensation to**

   **be paid to former Lehman employees who transferred to Barclays. (A. 9 [Exall]**

   **40:17-41:8.)**

Barclays' Response

   Barclays disputes the statement in paragraph 319 as imprecise. Mr. Exall testified only
   that "part of my responsibility is in relation to compensation of the former Lehman
   Brothers employees that Barclays Capital or Barclays acquired under the transaction."
   BCI Ex. 64 [Exall Dep. Tr.] at 40:24-41:4. He further testified that he was merely "told"
   the compensation numbers to use in charts by his boss, Michael Evans, and by the
   finance people, but did not know the source of the number(s). *Id.* at 191:23-
   192:18, 200:22-201:17.

320. **At the time of the Sale Transaction, Exall was told to plan on paying aggregate**

   **compensation to former Lehman employees of approximately $1.4 billion. (*See* A.**

   **121 at 2; A. 122 at 2; A. 9 [Exall] 199:24-201:12.)**

Barclays' Response

   Barclays disputes the statement in paragraph 320 to the extent that it implies that at the
   time of the Closing, Barclays had not agreed to assume all employment liabilities
   required under the Purchase Agreement. *See* Barclays' response to paragraph 316.
   Barclays further disputes the statement in paragraph 320 to the extent it implies that

*Contains Highly Confidential Information*

Barclays was required to pay any particular amount in compensation under the Purchase Agreement, or that it has not met its contractual obligations under Section 9.1 of the APA. *See* Barclays' response to paragraph 307. Barclays further disputes the statement in paragraph 320 as misrepresenting Mr. Exall's testimony. Mr. Exall made clear that he was asked to prepare multiple schedules with different figures for compensation, including a schedule containing a figure of $2 billion for compensation. BCI Ex. 64 [Exall Dep. Tr.] at 199:24-201:17; BCI Ex. 142 [Exall Spreadsheet]. That schedule, according to Mr. Exall, "reflects a more accurate – an accurate picture of the discharge of those compensation items as of the date it was produced." BCI Ex. 64 [Exall Dep. Tr.] at 63:9-12.

**321. In this litigation, Barclays produced in discovery a spreadsheet it claimed showed**

**that, in the aggregate, Barclays has paid to transferred Lehman employees**

**approximately $1.951 billion in compensation. (A. 137.)**

Barclays' Response

Barclays disputes the statement in paragraph 321 as inaccurate. As explained in Mr. Exall's deposition testimony, Exhibit A. 137 reflects compensation paid or to be paid to former Lehman employees only for 2008 pre-acquisition services. *See* BCI Ex. 64 [Exall Dep. Tr.] at 62-63, 80-158. The spreadsheet does not reflect all payments made to former Lehman employees by Barclays.

**322. Exall testified that several entries on the spreadsheet (A. 137) did not relate to**

**bonuses. (*See, e.g.*, A. [Exall] 78:22-84:3; 110:22-115:18; 124:22-125:6; 128:8-137:7;**

**141:5144:12, 151:15-23.)**

Barclays' Response

Barclays disputes the statement in paragraph 322 as not supported by the cited testimony. In two of the portions of Mr. Exall's testimony cited by Movants for this proposition, Mr. Exall testified that the "Acquisition Buyout vesting over 2 years" and the "ISP awards" were in fact bonuses to Lehman employees for pre-acquisition work. BCI Ex. 64 [Exall Dep. Tr.] at 128:8-17, 141:24-143:24, 151:6-14. Barclays further disputes the statement in paragraph 322 to the extent it implies that Barclays was required to pay any particular amount in compensation under the Purchase Agreement, or that it has not met its contractual obligations under Section 9.1 of the APA. *See* Barclays' response to paragraph 307. Barclays further disputes the statement in paragraph 322 to the extent it suggests that Barclays' agreement to under Section 9.1 of the APA related only to "bonuses" rather *all* compensation obligations Barclays was

*Contains Highly Confidential Information*

assuming under Article IX, including both severance and bonus payments (and related payroll tax obligations). BCI Ex. 55 [Berkenfeld Dep. Tr.] at 26:11-23; BCI Ex. 86 [McGee Dep. Tr.] at 86:13-18; BCI Ex. 97 [Shapiro Dep. Tr.] at 126:8-15; BCI Ex. 91 [Ricci Dep. Tr.] at 37:17-38:6; BCI Ex. 64 [Exall Dep. Tr.] at 55:12-56:9; BCI Ex. 85 [McDade Dep. Tr.] at 99:10-100:19.

**323.   The 9/16/08 Financial Schedule listed a liability-side line item for "Cure pmt" in the**

**amount of $2.25 billion. (A. 31.)**

Barclays' Response

Barclays disputes the statement in paragraph 323 to the extent it implies that the 9/16/08 Financial Schedule was a part of the APA or the Purchase Agreement between the parties. The 9/16/08 Financial Schedule was not a part of the agreement between the parties. *See* Barclays' response to paragraph 278. Barclays further disputes the statement in paragraph 323 to the extent it implies that the $2.25 billion figure for "Cure pmt" in the 9/16/08 Financial Schedule was a "liability" or anything other than an estimate calculated by Lehman of the maximum potential liability to Barclays, that itself was subsequently reduced to $1.5 billion when presented by Lehman's counsel to the Court. BCI Ex. 97 [Shapiro Dep. Tr.] at 55:19–57:23, 63:12-65:2, 66:7-21; BCI Ex. 61 [Cox Dep. Tr.] at 53:10-14; BCI Ex. 96 [Seery Dep. Tr.] at 63:14-64:3, 64:19-22; BCI Ex. 85 [McDade Dep. Tr.] at 110:25-111:9, 288:2-289:16; BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 117:2-5, 133:10-135:3; BCI Ex. 87 [Miller Dep. Tr.] at 81:5-14; BCI Ex. 48 [Sept. 17, 2008 Hearing Tr.] at 23:5-24:15; BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 100:1-4. Barclays further disputes the statement in paragraph 323 to the extent it implies that Barclays did not have the discretion to select contracts to assume in accordance with APA section 2.5. BCI Ex. 1 [APA] at §§ 2.5, 2.4(a); BCI Ex. 85 [McDade Dep. Tr.] at 45:12-25, 151:25-153:22, 288:5-19; BCI Ex. 87 [Miller Dep. Tr.] at 80:18-81:14; BCI Ex. 88 [O'Donnell Dep. Tr.] at 95:23-96:11; BCI Ex. 58 [Burian Dep. Tr.] at 269:20-270:3; BCI Ex. 61 [Cox Dep. Tr.] at 52:10-18; BCI Ex. 92 [Ridings Dep. Tr.] at 54:7-22; BCI Ex. 67 [Fogarty Dep. Tr.] at 36:23-37:19, 132:13-133:12, 140:14-141:4; BCI Ex. 97 [Shapiro Dep. Tr.] at 55:19-57:23, 63:12-65:3, 66:7-21; BCI 19 [Sale Motion] at ¶¶ 14, 31.

**324.   It was represented to the Court on September 17, 2008 that Barclays would, as part**

**of the Sale Transaction, assume a liability of approximately $1.5 billion for contract**

**cures. (A. 149 [Docket No. 352] 9/17/08 Tr. at 23:5-24:15.)[6]**

---

[6] Citations to hearings before the Court are listed herein as "(A.__[Docket No. __] [date] Tr. at __.)"

*Contains Highly Confidential Information*

Barclays' Response

    Barclays disputes the statement in paragraph 324 as misrepresenting the cited source. At
the September 17, 2008 Sale Hearing cited by Movants in support of this proposition, Mr.
Miller explained that "the cure amounts *and other payments* in connection with the
contracts, are *estimated* to be a billion five hundred million dollars." BCI Ex. 48 [Sept.
17, 2008 Hearing Tr.] at 23:5-24:15 (emphasis added). In addition, in the brief filed by
Weil Gotshal seeking Court approval of the Sale Transaction, LBHI, through Weil
Gotshal made clear that Barclays "shall have the right, *but not the obligation*, to take
assignment of contracts and leases which are designated for assumption and assignment
by" Lehman. BCI Ex. 19 [Sale Motion] at ¶14 (emphasis added); *see also id.* at ¶ 31.
Barclays further disputes the statement in paragraph 324 to the extent it implies that
Barclays did not have the discretion to select contracts to assume in accordance with
APA section 2.5. *See* Barclays' response to paragraph 323.

**325.    It was represented to the Court on September 19, 2008, that Barclays would, as part**

**of the Sale Transaction, assume a liability of approximately $1.5 billion for contract**

**cures. A. 150 [Docket No. 318] 9/19/08 Tr. at 101:1-4.)**

Barclays' Response

    Barclays disputes the statement in paragraph 325 as misrepresenting the cited source. At
the September 19, 2008 Sale Hearing cited by Movants in support of their proposition,
Mr. Miller proffered that Barclays would be assuming cure amounts for contract and
leases, with a "*potential* exposure" of $1.5 billion. BCI Ex. 49 [Sept. 19, 2008 Hearing
Tr.] at 100:1-4 (emphasis added). In addition, in the brief filed by Weil Gotshal seeking
Court approval of the Sale, LBHI, through Weil Gotshal made clear that Barclays "shall
have the right, *but not the obligation*, to take assignment of contracts and leases which
are designated for assumption and assignment by" Lehman. BCI Ex. 19 [Sale Motion] at
¶14 (emphasis added); *see also id.* at ¶ 31. Barclays further disputes the statement in
paragraph 325 to the extent it implies that Barclays did not have the discretion to select
contracts to assume in accordance with APA section 2.5. *See* Barclays' response to
paragraph 323.

**326.    In connection with the Sale Transaction, Barclays did not intend to assume $1.5**

**billion or $2.25 billion in cure liabilities. (A. 71; *see also* A. 125.)**

Barclays' Response

    Barclays disputes the statement in paragraph 326 to the extent it implies that either the
$2.25 or $1.5 estimates were "liabilities" or anything other than an estimate calculated by

*Contains Highly Confidential Information*

Lehman of the maximum potential liability to Barclays. *See* Barclays' response to
paragraph 323. Barclays further disputes the statement in paragraph 326 in that it implies
that Barclays had a definite intent with regard to specific amounts of cure liabilities at a
time when Barclays did not have access to the necessary information regarding the
potential cure liabilities. BCI Ex. 61 [Cox Dep. Tr.] at 53:15-19; BCI Ex. 85 [McDade
Dep. Tr.] at 144:3-14, 150:10-151:9; BCI Ex. 97 [Shapiro Dep. Tr.] at 66:2-21. Barclays
further disputes the statement in paragraph 326 to the extent it implies that Barclays did
not have the discretion to select contracts to assume in accordance with APA section 2.5.
*See* Barclays' response to paragraph 323.

**327. In connection with the Sale Transaction, notes made by Cox on the 9/16/08**

**Financial Schedule refer to "$200 [million]" as an estimate for contracts that would**

**be "mission critical." (A. 6 [Cox] 50:24-53:2; A. 41.)**

Barclays' Response

Barclays does not dispute the fact that notes made by Mr. Cox on the 9/16/08 Financial
Schedule refer to "200 [million]" as an estimate from Lehman for contracts that would be
"mission critical," but disputes the statement in paragraph 327 as taking Mr. Cox's
testimony out of context. Mr. Cox testified that he did not remember specifically what the
$200 million figure referred to. *Id. at* 52:19-53:3. Barclays further disputes the
statement in paragraph 327 to the extent it implies that the apparent $200 million estimate
for "mission critical contracts" was substantially incorrect. Before the approval hearing,
Weil Gotshal posted three lists of Closing Date Contracts (Real Estate, Non-IT and IT)
on the LBHI Epiq website, which reflected cure amounts for Closing Date Contracts
totaling approximately $181 million, an amount less than 10% off of the estimate of $200
million for "mission critical" contracts supplied by Lehman. BCI Ex. 12 [Notice of Cure
Amounts]; BCI Ex. 13 [Sept. 18, 2008 11:43 pm List of Non-IT Closing Date Contracts];
BCI Ex 14 [Sept. 19, 2008 1:07 am List of IT Closing Date Contracts]; BCI Ex. 15 [Sept.
19, 2008 1:07 am List of Corporate Real Estate Closing Date Contracts]. Barclays also
disputes the statement in paragraph 327 to the extent it implies that the 9/16/08 Financial
Schedule was a part of the APA or the Purchase Agreement between the parties. The
9/16/08 Financial Schedule was not a part of the agreement between the parties. *See*
Barclays' response to paragraph 278. Barclays finally disputes the statement in
paragraph 327 to the extent it implies that Barclays did not have the discretion to select
contracts to assume in accordance with APA section 2.5. *See* Barclays' response to
paragraph 323.

**328. In this litigation, Barclays produced in discovery a schedule of amounts described in**

**a July 16, 2009 cover letter from Barclays' counsel as showing Barclays' "aggregate**

*Contains Highly Confidential Information*

cure payments." (A. 136)

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 328 to the extent it is incomplete. Barclays produced in discovery, through its counsel, a schedule showing cure payments, current as of July 14, 2009. The cover letter from Barclays' counsel further noted, explicitly, that "a number of cure objections remain outstanding." BCI Ex. 71 [July 16, 2009 letter from J. Stern to R. Gaffey enclosing Schedule of Cure Payments].

329.    **As of July 14, 2009, Barclays had paid approximately $238 million in contract cure**

    **liabilities. (A. 136.)**

<u>Barclays' Response</u>

Barclays does not dispute the statement in paragraph 329.

330.    **In connection with the Sale Transaction, Kelly was the person "responsible" for**

    **calculating the potential liability for cure amounts.  (A. 20 [McDade] 49:8-17, 73:19-**

    **24, 97:14-98:2.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 330.  Martin Kelly testified that while the $2.25 billion figure on the 9/16/08 Financial Schedule was "consistent with what I understood the estimate of that component to be on the same Monday night," but he did not know who made that estimate or why an adjustment was made to the cure amount in subsequent schedules.  BCI Ex. 76 [Nov. 20, 2009 Kelly Dep. Tr.] at 301:7-302:6.

331.    **Kelly testified that the $2.25 billion liability for contract cure payables on the**

    **9/16/08 Financial Schedule overstated by as much as $1 billion the estimate of that**

    **liability derived from Lehman's records.  (A. 14 [Kelly] 133:10-136:14.)**

<u>Barclays' Response</u>

Barclays objects to the statement in paragraph 331 as misrepresenting Mr. Kelly's testimony.  Mr. Kelly testified that only "the estimate for the cure payment did change" during the week of September 15th, that it "went down" and that "estimated liability

*Contains Highly Confidential Information*

appeared to be high relative to the expense run rate of the firm." BCI Ex. 75 [Aug. 18,
2009 Kelly Dep. Tr.] at 133:10-18. Mr. Kelly did not testify that the $2.25 billion figure
on the 9/16/08 Financial Schedule was overstated or inflated at the time it was calculated.
Mr. Shapiro further explained how difficult the early estimate for cure liabilities was,
given that "we were working with imperfect information" and that the only purpose of
the estimate was "trying to give [Barclays] a fair estimate, to the best of our abilities over
the course of that 48-hour period." BCI Ex. 97 [Shapiro Dep. Tr.] at 66:7-21. Barclays
further disputes the statement in paragraph 331 to the extent it implies that the 9/16/08
Financial Schedule was a part of the Purchase Agreement between the parties. The
9/16/08 Financial Schedule was not a part of the agreement between the parties. *See*
Barclays' response to paragraph 278. Barclays also disputes the statement in paragraph
331 to the extent it implies that either the $2.25 or any subsequent estimates were
"liabilities" or anything other than an estimate calculated by Lehman of the maximum
potential liability to Barclays. *See* Barclays' response to paragraph 323. Barclays further
disputes the statement in paragraph 331 to the extent it implies that Barclays did not have
the discretion to select contracts it would assume under APA section 2.5. *Id.*

332. **In connection with the Sale Transaction, Kelly testified that he brought the**

   **overstatement of the estimate for contract cure liabilities reflected in the 9/16/08**

   **Financial Schedule to McDade's attention during the week of September 16, 2008.**

   **(A. 14 [Kelly] 133:10-136:14.)**

Barclays' Response

   Barclays objects to the statement in paragraph 332 as misrepresenting Mr. Kelly's
   testimony. Mr. Kelly did not testify that the $2.25 billion figure on the 9/16/08 Financial
   Schedule was overstated or inflated at the time it was calculated. *See* Barclays' response
   to paragraph 331. Barclays further disputes the statement in paragraph 332 to the extent
   it implies that the 9/16/08 Financial Schedule was a part of the APA or the Purchase
   Agreement between the parties. The 9/16/08 Financial Schedule was not a part of the
   agreement between the parties. *See* Barclays' response to paragraph 278. Barclays also
   disputes the statement in paragraph 332 to the extent it implies that either the $2.25 or
   any subsequent estimates were "liabilities" or anything other than an estimate calculated
   by Lehman of the maximum potential liability to Barclays. *See* Barclays' response to
   paragraph 323. Barclays further disputes the statement in paragraph 332 to the extent it
   implies that Barclays did not have the discretion to select contracts to assume in
   accordance with APA section 2.5. *Id.*

333. **Kelly testified that, when he told McDade the estimate for contract cure liabilities**

   **reflected in the 9/16/08 Financial Schedule was overstated, McDade replied "[w]e**

*Contains Highly Confidential Information*

**just left a billion dollars on the table." (A. 14 [Kelly] 136:2-14.)**

Barclays' Response

Barclays objects to the statement in paragraph 333 as misrepresenting Mr. Kelly's testimony. Mr. Kelly did not testify that the $2.25 billion figure on the 9/16/08 Financial Schedule was overstated or inflated at the time it was calculated. *See* Barclays' response to paragraph 331. Indeed, Mr. McDade himself explicitly refused to use the term "overstated" in his deposition and instead testified that "the number kept moving. It kept moving down." BCI Ex. 85 [McDade Dep. Tr.] at 94:18-96:15. In addition, whether Mr. McDade actually replied as Movants assert is uncertain since Mr. Kelly himself could not "say that they were specifically the words" Mr. McDade used when informed of the new cure estimate. Moreover, neither Mr. McDade nor Mr. Lowitt remembered any such conversation on this issue or those words being ever used in any conversation in which they participated. BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 136:2-14; BCI Ex. 83 [Lowitt Dep. Tr.] at 211:14-212:7; BCI Ex. 85 [McDade Dep. Tr.] at 94:18-96:15. Barclays further disputes the statement in paragraph 333 to the extent it implies that the 9/16/08 Financial Schedule was a part of the APA or the Purchase Agreement between the parties. The 9/16/08 Financial Schedule was not a part of the agreement between the parties. *See* Barclays' response to paragraph 278. Barclays also disputes the statement in paragraph 333 to the extent it implies that either the $2.25 or any subsequent estimates were "liabilities" or anything other than an estimate calculated by Lehman of the maximum potential liability to Barclays. *See* Barclays' response to paragraph 323. Barclays further disputes the statement in paragraph 333 to the extent it implies that Barclays did not have the discretion to select contracts to assume in accordance with APA section 2.5. *Id.*

334.    **McDade testified that through the week, in his dealings with Kelly and others, he**

**learned the contract cure number reflected in the 9/16/08 Financial Schedule was**

**overstated and "kept moving down." (A. 20 [McDade] 96:9-20.)**

Barclays' Response

Barclays disputes the statement in paragraph 334 to the extent it implies that the 9/16/08 Financial Schedule was a part of the APA or the Purchase Agreement between the parties. The 9/16/08 Financial Schedule was not a part of the agreement between the parties. *See* Barclays' response to paragraph 278. Barclays also disputes the statement in paragraph 333 to the extent it implies that either the $2.25 or any subsequent estimates were "liabilities" or anything other than an estimate calculated by Lehman of the maximum potential liability to Barclays. *See* Barclays' response to paragraph 323. Barclays further disputes the statement in paragraph 333 to the extent it implies that Barclays did not have the discretion to select contracts to assume in accordance with APA section 2.5. *Id.*

*Contains Highly Confidential Information*

335.    **In connection with the Sale Transaction, Kelly created, or had created for him,**

**documents that show the increase of both the compensation and contract cure**

**liabilities as "transaction adjustments." (A. [Kelly] 247:25-251:24; *see, e.g.*, A. 62,**

**A. 64, A. 69.)**

Barclays' Response

Barclays does not dispute that the spreadsheets showing "transaction adjustments" for
compensation and contract cure liabilities were created by Lehman, not by Barclays.
Barclays disputes the statement in paragraph 335 to the extent it suggests inaccurately
that the "transaction adjustments" on any of the spreadsheets show that compensation and
contract cure liabilities were either inflated or secret. BCI Ex. 75 [Aug. 18, 2009 Kelly
Dep. Tr.] at 249:19-250:4; BCI Ex. 76 [Nov. 20, 2009 Kelly Dep. Tr.] at 266:23-267:22;
BCI Ex. 1 [APA] at §9.1 (b) and (c); BCI Ex. 106 [Berkenfeld Schedule]; BCI Ex. 55
[Berkenfeld Dep. Tr.] at 26:11-23; BCI Ex. 36 [McGee Dep. Tr.] at 86:13-18; BCI Ex. 97
[Shapiro Dep. Tr.] at 126:9-15; BCI Ex. 41 [Ricci Dep. Tr.] at 37:17-38:6, 282:13-18;
BCI Ex. 64 [Exall Dep. Tr.] at 55:12-56:9; BCI Ex. 85 [McDade Dep. Tr.] at 99:10-
100:4. These spreadsheets were shared with Weil Gotshal, Lazard, and Alvarez &
Marsal before the Approval Hearing. BCI Ex.212 [Sept. 19, 2008 1:12 am email from M.
Kelly to D. Coles, *et al.* with attachment]; BCI Ex. 196 [Sept. 18, 2008 8:51 pm email
from D. Flores to B. Ridings, *et al.*, with attachment]; BCI Ex. 207 [Sept. 18, 2008 7:02
pm email from M. Kelly to R. Krasnow with attachment].

336.    **In connection with the Sale Transaction, a balance sheet dated September 17, 2008**

**containing Kelly's handwritten notes shows a "transaction adjustment" changing**

**the estimate for "bonus payable" from $1.5 billion to $2 billion.  (A. 47 at BCI-EX-**

**00115130.)**

Barclays' Response

Barclays disputes the statement in paragraph 336 to the extent it implies that the $2.0
billion estimate for compensation liability used by the parties during negotiation of the
Sale Transaction was anything other than an estimate of *all* compensation obligations
Barclays was assuming under Article IX, including both severance and bonus payments
(and related payroll tax obligations). *See* Barclays' response to paragraph 307. Barclays
further disputes the statement in paragraph 336 to the extent it suggests inaccurately that
the "transaction adjustments" on any of the spreadsheets show that compensation and

*Contains Highly Confidential Information*

contract cure liabilities were either inflated or secret. *See* Barclays' response to paragraph 335.

**337.** **In connection with the Sale Transaction, on September 18, 2008, Brian Young sent an email to Kelly transmitting a balance sheet showing a $1 billion "transaction adjustment" for "compensation payable" and $383 million inflation of "trade liabilities." (*See* A. 62 at 3.)**

Barclays' Response

Barclays disputes the statement in paragraph 337 to the extent it implies that the $2.0 billion estimate for compensation liability used by the parties during negotiation of the Sale Transaction was anything other than an estimate of *all* compensation obligations Barclays was assuming under Article IX, including both severance and bonus payments (and related payroll tax obligations). *See* Barclays' response to paragraph 307. Barclays also disputes the statement in paragraph 337 to the extent it implies that any of estimates for "trade liabilities" or "cure liability" were anything other than estimates calculated by Lehman of the maximum potential liability to Barclays. *See* Barclays' response to paragraph 323. Barclays further disputes the statement in paragraph 337 to the extent it suggests inaccurately that the "transaction adjustments" on any of the spreadsheets show that compensation and contract cure liabilities were either inflated or secret. *See* Barclays' response to paragraph 335.

**338.** **In connection with the Sale Transaction, on September 18, 2008, Rose Hanzenberg sent an email to Kelly transmitting a balance sheet showing a $1.5 billion "transaction adjustment" for "bonus payable" and $304 million increase for "trade liabilities." (A. 63 at 4.)**

Barclays' Response

Barclays disputes the statement in paragraph 338 to the extent it implies that the $2.0 billion estimate for compensation liability used by the parties during negotiation of the Sale Transaction was anything other than an estimate of *all* compensation obligations Barclays was assuming under Article IX, including both severance and bonus payments (and related payroll tax obligations). *See* Barclays' response to paragraph 307. Barclays also disputes the statement in paragraph 338 to the extent it implies that any of estimates for "trade liabilities" or "cure liability" were anything other than estimates calculated by Lehman of the maximum potential liability to Barclays. *See* Barclays' response to

*Contains Highly Confidential Information*

paragraph 323. Barclays further disputes the statement in paragraph 337 to the extent it suggests inaccurately that the "transaction adjustments" on any of the spreadsheets show that compensation and contract cure liabilities were either inflated or secret. *See* Barclays' response to paragraph 338.

**339. In connection with the Sale Transaction, on September 18, 2008, Rose Hanzenberg**

**sent an email to Kelly transmitting a balance sheet showing a $1.5 billion**

**"transaction adjustment" for "bonus payable" and $286 million for "trade**

**liabilities." (A. 64.)**

Barclays' Response

Barclays disputes the statement in paragraph 339 to the extent it implies that the $2.0 billion estimate for compensation liability used by the parties during negotiation of the Sale Transaction was anything other than an estimate of *all* compensation obligations Barclays was assuming under Article IX, including both severance and bonus payments (and related payroll tax obligations). *See* Barclays' response to paragraph 307. Barclays also disputes the statement in paragraph 339 to the extent it implies that any of estimates for "trade liabilities" or "cure liability" were anything other than estimates calculated by Lehman of the maximum potential liability to Barclays. *See* Barclays' response to paragraph 323. Barclays further disputes the statement in paragraph 339 to the extent it suggests inaccurately that the "transaction adjustments" on any of the spreadsheets show that compensation and contract cure liabilities were either inflated or secret. *See* Barclays' response to paragraph 338.

**340. In connection with the Sale Transaction, on September 19, 2008, Chris O'Meara**

**sent an email to Kelly showing a $2 billion "transaction adjustment" for "bonus**

**payable" and a $1.645 billion "transaction adjustment" for "Cure**

**payments/accounts payable." (A. 69.)**

Barclays' Response

Barclays disputes the statement in paragraph 340 to the extent it implies that the $2.0 billion estimate for compensation liability used by the parties during negotiation of the Sale Transaction was anything other than an estimate of *all* compensation obligations Barclays was assuming under Article IX, including both severance and bonus payments (and related payroll tax obligations). *See* Barclays' response to paragraph 307. Barclays also disputes the statement in paragraph 340 to the extent it implies that any of estimates

*Contains Highly Confidential Information*

for "trade liabilities" or "cure liability" were anything other than estimates calculated by
Lehman of the maximum potential liability to Barclays. *See* Barclays' response to
paragraph 323. Barclays further disputes the statement in paragraph 340 to the extent it
suggests inaccurately that the "transaction adjustments" on any of the spreadsheets show
that compensation and contract cure liabilities were either inflated or secret. *See*
Barclays' response to paragraph 338.

**341.   McDade testified that if the liability for contract cures had been inflated it would be**

**inconsistent with the Sale Transaction as documented and disclosed. (A. 20**

**[McDade] 155:23-156:14.)**

Barclays' Response

Barclays disputes the statement in paragraph 341 to the extent it implies that any of
estimates for "trade liabilities" or "cure liability" were "liabilit[ies] or anything other than
estimates calculated by Lehman of the maximum potential liability to Barclays. *See*
Barclays' response to paragraph 323. Barclays further disputes the statement in
paragraph 341 to the extent it implies that Barclays did not have the discretion to pay any
portion of the maximum potential liability estimate. *Id.* Barclays also disputes the
statement in paragraph 341 to the extent it implies that Mr. McDade testified that, if the
Lehman accrual for trade liabilities was inflated, that would have been inconsistent with
the Sale Transaction. In the portion of Mr. McDade's testimony cited by the Movants for
this proposition, Mr. McDade testifies only that if a number referred to as "that number"
were inflated by a billion dollars, it would be inconsistent with the number in the 9/16/08
Financial Schedule. BCI Ex. 85 [McDade Dep. Tr.] at 155:23-156:11. That financial
schedule is not part of the Purchase Agreement. *See* Barclays' response to paragraph
278. In addition, looking at the entirety of Mr. McDade's testimony on this point, it
becomes clear that "that number" he testifies about is the "total number" representing the
value of the "contracts subject to that process where Barclays has the option of taking or
leaving it." BCI Ex. 85 [McDade Tr.] 152:19-153:4. Mr. McDade did not testify that
such an amount necessarily would have already been accrued on Lehman's books. To
the contrary, it is clear that the full maximum potential liability would not have been on
LBI's books prior to the transaction. BCI Ex. 78 [Kirk Dep. Tr.] 210:16-211:2.

**342.   McDade testified that if the assumed liabilities were inflated, Barclays should have**

**had to pay more to Lehman in other consideration in the Sale Transaction,**

**including greater cash consideration. (A. 20 [McDade] 144:15-145:21.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 342 to the extent it implies that the estimate for compensation liability used by the parties during negotiation of the Sale Transaction was anything other than an estimate of *all* compensation obligations Barclays was assuming under Article IX, including both severance and bonus payments (and related payroll tax obligations). *See* Barclays' response to paragraph 307. Barclays also disputes the statement in paragraph 342 to the extent it implies that any of estimates for "trade liabilities" or "cure liability" were anything other than estimates calculated by Lehman of the maximum potential liability to Barclays. *See* Barclays' response to paragraph 323. Barclays also disputes the statement in paragraph 342 as mischaracterizing Mr. McDade's testimony. In the portion of Mr. McDade's testimony cited by Movants in support of this proposition, Mc Dade testified that had the assumed liabilities dropped, the value to Barclays should also drop, and as the value of the assets went up, the price should also change and Barclays would have to pay more cash. He did not testify that had the liabilities been lower than the "potential exposure" disclosed to the Court, Barclays would have had to pay more to Lehman in other consideration, including more cash. Moreover, regardless of the content of Mr. McDade's testimony, nothing in the Purchase Agreement provides for an adjustment of purchase price as suggested by the Movants. Indeed, the "Adjustment to Cash Amount" provision originally included in the APA was removed from the contract, as the Court was told on September 19. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 47:5-10.

**343.    The lawyers drafting the Asset Purchase Agreement were not told that the 9/16/08**

**Financial Schedule understated the value of the assets being transferred and**

**overstated the liabilities Barclays would assume. (A. 2 [Berkenfeld] 63:12-64:25,**

**69:18-23, 70:1071:2, 78:10-83:24.)**

Barclays' Response

Barclays disputes the statement in paragraph 343 as not supported by the cited evidence. In the first portion of Mr. Berkenfeld's testimony cited by Movants in support of this transaction, Mr. Berkenfeld testified that he had no knowledge of "a discount given to Barclays off the value of the assets transferred" in connection with the Sale Transaction. In the second portion of Mr. Berkenfeld's testimony cited by Movants for this proposition, Mr. Berkenfeld testified only that, to his knowledge, none of the lawyers involved in the drafting were aware of any loss on assets. In the third portion of Mr. Berkenfeld's testimony cited by the Movants for this proposition, Mr. Berkenfeld testified, "The best way to describe it is that the schedule, Exhibit 19, was meant -- *was not part of the Asset Purchase Agreement* and, of course, could have been referred to in this section by the lawyers and incorporated into the Purchase Agreement. It was not." None of this testimony support Movants' assertion that the 9/16/08 Financial Schedule

*Contains Highly Confidential Information*

was "understated" or "overstated" in any way, nor does it suggest that the lawyers were not informed of any pertinent information. Mr. Berkenfeld also testified that he was not involved in the negotiations of the Sale Transaction and had a limited role in the transaction. *See* Barclays' response to paragraph 6-9. Accordingly, his understanding of the negotiations is not based on personal knowledge. Barclays further disputes this statement to the extent it implies that there was an undisclosed discount in the transaction. *See* Barclays' responses to paragraphs 169 and 172. Finally, Barclays disputes the statement in paragraph 343 to the extent it implies that the 9/16/08 Financial Schedule was a part of the APA or the Purchase Agreement between the parties. The 9/16/08 Financial Schedule was not a part of the agreement between the parties. *See* Barclays' response to paragraph 278.

**344.   The Asset Purchase Agreement did not disclose a $5 billion discount off the book**

**value of Lehman's assets. (A. 30, *passim; see also* A. 2 [Berkenfeld] 70:10-19,**

**122:17-123:2.)**

Barclays' Response

Barclays incorporates its responses to paragraphs 169, 172, 243, 262 and 263 and disputes the statement in paragraph 344 because the phrase "discount off the book value" is undefined, lacks foundation, and has been used by the Movants in a misleading manner. Any possible valuation adjustment from stale and inaccurate Lehman marks in estimating the value of the Long Positions was not a "discount," see BCI Ex. 87 [Miller Dep. Tr.] at 112:17-114:2, and was not a "price." *See* BCI Ex. 1 [APA] § 3.1. Barclays also disputes the statement in paragraph 344 because the APA did disclose that the trading and financial assets to be included in the sale were estimated to be worth more than the trading liabilities, and did disclose that Barclays was acquiring all assets in the Business, and therefore did disclose that Barclays may, under its own accounting rules, record an accounting gain on the acquisition, as was publicly announced by Barclays the same day the APA was filed in Court. BCI Ex. 109 [Sept. 17, 2008 Barclays Press Release] at p. 4; BCI Ex. 110 [Sept. 17, 2008 Investor Teleconference Tr.]. Further, the evidence does not establish conclusively whether any adjustment from Lehman's carrying values as of any specific date actually occurred. BCI Ex. 341 [Pfleiderer Report] at Section III.

**345.   The Asset Purchase Agreement did not disclose an overstated assumption of**

**liabilities. (A. 30, *passim*)**

*Contains Highly Confidential Information*

Barclays' Response

> Barclays disputes the statement in paragraph 345, because it incorrectly assumes that the
> APA "overstated" Barclays' assumption of liabilities. As Mr. Miller testified, the figures
> were always "very contingent" because "nobody knew what contracts were going to be
> assumed and how many employees Barclays would ultimately keep." BCI Ex. 87 [Miller
> Dep. Tr.] at 81:6-11.

346.   **In connection with the Sale Transaction, in an email exchange, Reilly and Lowitt**

       **recognized that the discount being given to Barclays is not reflected "in [the]**

       **contract," *i.e.*, the Asset Purchase Agreement. (A. 55.)**

Barclays' Response

> Barclays disputes the statement in paragraph 346 because it excerpts a phrase out of
> context and distorts its meaning. Furthermore, it is not supported by the cited evidence
> and it incorrectly implies that the APA reflected a "discount being given to Barclays."
> The cited evidence, an email exchange between Messrs. Reilly and Lowitt, does not
> mention a "discount." There was no "discount," but rather a good-faith effort to value
> assets that carried stale marks in a highly uncertain and volatile environment. BCI Ex. 85
> [McDade Dep. Tr.] at 56:12-20. Mr. Marsal, the current CEO of Lehman, also confirmed
> that Lehman's books were not being updated after September 12, 2008, and the only
> effort to update valuations was the effort by Barclays and Lehman personnel to establish
> updated valuations. BCI Ex. 84 [Marsal Dep. Tr.] at 22:24-24:5. The cited email does
> not reflect Mr. Lowitt "recognizing" anything he received an email, to which he replied
> "since not in the contract hard to see what to do." Lowitt testified that he never saw the
> contents. BCI Ex. 83 [Lowitt Dep. Tr.] at 133:14-22.

347.   **Berkenfeld believed that the Asset Purchase Agreement indicated there was an**

       **essentially equal exchange of value, with Long Positions having a book value of $70**

       **billion being conveyed to Barclays. (A. 2 [Berkenfeld] 107:21-112:25, 121:12-123:2,**

       **242:12-21, 281:13-282:5.)**

Barclays' Response

> Barclays disputes the statement in paragraph 347 because it distorts the cited testimony
> and fails to consider the terms of the APA itself. Furthermore, the APA discloses that the
> trading and financial assets to be included in the sale were estimated to be worth more
> than the trading liabilities, discloses that Barclays was acquiring all assets in the

Business, and therefore discloses the possibility that under its own accounting rules, Barclays may record an accounting gain, as was publicly announced. BCI Ex. 109 [Sept. 17, 2008 Barclays Press Release] at p. 4; BCI Ex. 110 [Sept. 17, 2008 Investor Teleconference Tr.].

**348.    Shapiro believed the $70 billion "Long Position" described in the Asset Purchase**

**Agreement was a rough approximation of the value of the securities being**

**transferred to Barclays based on Lehman's marks.  (A. 25 [Shapiro] 105:16-107:11.)**

Barclays' Response

Barclays disputes the statement in paragraph 348 because it distorts the cited testimony and fails to consider the terms of the APA itself.  Moreover, it is not supported by the cited evidence.  That evidence, testimony of Mr. Shapiro, is not meaningful without more information, including information concerning the date and accuracy of the marks to which it referred.

**349.    Paragraph 2.3 of the Asset Purchase Agreement did not disclose an inflation of**

**compensation and cure liabilities.  (A. 30 at 11-12.)**

Barclays' Response

Barclays disputes the statement in paragraph 349 in that it incorrectly implies that the . APA inflated compensation and cure liabilities.  As Mr. Miller testified, the figures were always "very contingent" because "nobody knew what contracts were going to be assumed and how many employees Barclays would ultimately keep.  BCI Ex. 87 [Miller Dep. Tr.] at 81:6-11.

**350.    Paragraph 9.1(c) of the Asset Purchase Agreement provides that the Purchaser**

**"shall" pay to each Transferred Employee an annual bonus for the 2008 Fiscal Year**

**that, in the aggregate, was equal to the amount reflected on the 9/16/08 Financial**

**Schedule.  (A. 30 at 35.)**

Barclays' Response

Barclays disputes the statement in paragraph 350 because it distorts the terms of the APA.  Moreover, the 9/16/08 Financial Schedule has no amount for "bonus" liability,

*Contains Highly Confidential Information*

only for "Comp" liability, which includes severance, not just bonus liability. BCI Ex. 106 [Berkenfeld Schedule]; BCI Ex. 86 [McGee Dep. Tr.] at 86:13-18; BCI Ex. 97 [Shapiro Dep. Tr.] at 126:8-15; BCI Ex. 64 [Exall Dep. Tr.] at 55:12-56:9; BCI Ex. 55 [Berkenfeld Dep. Tr.] at 26:11- 23; BCI Ex. 75 [Kelly Dep. Tr.] at 62:18-63:5.

**351.    The "financial schedule" referred to in this Paragraph 9.1(c) was the 9/16/08**

**Financial Schedule. (A. 2 [Berkenfeld] 85:22-86:25.)**

Barclays' Response

Barclays does not dispute that the 9/16/08 Financial Schedule, BCI Ex. 106 [Berkenfeld Schedule], was at one time intended to be the Financial Schedule referenced in section 9.1(c) of the Asset Purchase Agreement, but it was never signed by an authorized representative of Barclays, as required by ¶ 9.1(c).

**352.    On September 17, 2008, LBHI and LB 745 LLC filed a motion seeking Court**

**approval of the Sale Transaction (the "Sale Motion"). (A. 148 [Docket No. 60].)**

Barclays' Response

Barclays does not dispute the statement in paragraph 352.

**353.    The Sale Motion stated that the Sale Transaction was to be consummated on the**

**terms and conditions set forth in the Asset Purchase Agreement. (*See* A. 148**

**[Docket No. 60].)**

Barclays' Response

Barclays disputes the statement in paragraph 353 because it fails to accurately reflect information communicated to the Court. Furthermore, the Court approved the Sale only after being informed of "major changes" to the APA and the need to incorporate such changes in a Clarification Letter. BCI Ex. 110 [Sept. 19, 2008 Hearing Tr.] at 43:14-20, 48:8-10.

**354.    A final version of the Asset Purchase Agreement was attached to the Sale Motion.**

**(A. 148 [Docket No. 60].)**

*Contains Highly Confidential Information*

Barclays' Response

> Barclays disputes the statement in paragraph 354, as the version of the APA attached to
> the Sale Motion ultimately was not the "final" version. *See* Barclays' response to
> paragraph 353. BCI Ex. 16 [Sale Order].

355.   **The 9/16/08 Financial Schedule was not attached to the Sale Motion. (A. 148**

   **[Docket No. 60].)**

Barclays' Response

> Barclays does not dispute the statement in paragraph 355.

356.   **Through the Asset Purchase Agreement was [sic] attached to the Sale Motion, it was**

   **represented to the Court that the "Long Positions" Barclays was purchasing,**

   **including "government securities, commercial paper, corporate debt, corporate**

   **equity, exchange traded derivatives and collateralized short-term agreements" had**

   **a "book value as of the date hereof of approximately $70 billion." (*See* Sale Motion**

   **and attached copy of Asset Purchase Agreement at 7 (Docket No. 60).)**

Barclays' Response

> Barclays disputes the statement in paragraph 356 because it distorts the complete record
> of representations to the Court. Moreover, the APA does not define the price based upon
> book value of the Long Positions. Rather, the APA provides that the consideration to be
> paid by Barclays would consist of " (a) the Cash Amount and (b) the assumption of the
> Assumed Liabilities by Purchaser." BCI Ex. 1 [APA] at § 3.1. In any event, the Court
> did not approve the Sale as it was described in the original APA; the Court approved the
> Sale after being informed of "major changes" to the APA and the need to incorporate
> such changes in a Clarification Letter. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:14-
> 20, 48:8-10. Barclays incorporates its response to paragraph 344.

357.   **Through the Asset Purchase Agreement attached to the Sale Motion and at the**

   **September 17, 2008 hearing, it was represented to the Court that Barclays would**

   **pay $250 million in cash and assume certain liabilities in exchange for the**

*Contains Highly Confidential Information*

Purchased Assets. *(See* Sale Motion and attached copy of Asset Purchase

Agreement at ¶ 3.1 (Docket No. 60); A. 149 [Docket No. 352] 9/17/08 Tr. at 24:6-7 ).)

Barclays' Response

Barclays disputes paragraph 357 because it distorts the complete record of
representations to the Court. Barclays does not dispute that the initial APA provided for
Barclays to pay $250 million in cash and assume certain liabilities in exchange for the
Purchased Assets, if the Sellers delivered the assets they were obliged to deliver under
the APA's terms. To that end, LBHI and its counsel represented to the Court that it "was
a purchase of the business and the assets that went with that business, to the extent not
excluded," irrespective of their values. [Miller Dep. Tr.] at 50:24-51:6. Further, the
Court did not approve the Sale as it was described in the original APA. The Court
approved the Sale after being informed of "major changes" to the APA and the need to
incorporate such changes in a Clarification Letter. BCI. Ex. 49 [Sept. 19, 2008 Hearing
Tr.] at 43:14-20, 48:8-10.

358.    Through the Asset Purchase Agreement attached to the Sale Motion, it was

representated to the Court that Barclays also would assume liability for $69 billion in

"Short Positions" in consideration for the "Purchased Assets." *(See* Sale Motion

and attached copy of Asset Purchase Agreement at ¶ 2.3(i) (Docket No. 60).)

Barclays' Response

Barclays disputes the statement in paragraph 358 because it distorts the complete record
of representations to the Court. In any event, the Court did not approve the Sale as it was
described in the original APA; the Court approved the Sale after being informed of
"major changes" to the APA and the need to incorporate such changes in a Clarification
Letter. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:14-20, 48:8-10.

359.    Through Paragraph 3.3 of the Asset Purchase Agreement attached to the Sale

Motion, it was represented to the Court that there would be a potential "Adjustment

to Cash Amount" of up to $750 million to be determined by reference to the amount

of gross profit, if any, Barclays realized relative to "LBI's mark (book value)" from

the sale of any of the "Purchased Assets" within a year of the Closing Date. *(See*

Sale Motion and attached copy of Asset Purchase Agreement at ¶ 3.3 (Docket No.

60).)

Barclays' Response

Barclays disputes the statement in paragraph 359 because it distorts the complete record of representations to the Court. The Court was informed during the September 19 Sale Hearing that the cited provision no longer remained in the deal.  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 47:5-10.

360.   Through the Sale Motion and at the September 17, 2008 and September 19, 2008

hearings, it was represented to the Court that Barclays would assume liability for

contract cure amounts estimated at $1.5 billion. (*See* Sale Motion at ¶¶ 14, 30

(Docket No. 60); (A. 149 [Docket No. 352] 9/17/08 Tr. at 23:7-24:5; A. 150 [Docket

No. 318] 9/19/08 Tr. 101:1-4.)

Barclays' Response

Barclays disputes the statement in paragraph 360 because it distorts the complete record of representations to the Court. The Court was told that Barclays has the right, but not the obligation, to assume certain contracts. Because it was impossible to determine at that point which contracts Barclays would assume, the parties estimated Barclays' *potential* exposure at $1.5 billion. As Mr. Miller has testified, the figure for cure liability was always "very contingent" because "nobody knew what contracts were going to be assumed." BCI Ex. 87 [Miller Dep. Tr.] at 81:6-11.

361.   Through the Sale Motion and at the September 17, 2008 hearing, it was represented

to the Court that Barclays would assume liability for compensation of employees

transferred to Barclays estimated to cost $2.5 billion.  (*See* Sale Motion at ¶¶ 10, 20

(Docket No. 60); A. 149 [Docket No. 352] 9/17/08 Tr. at 23:7-25).)

Barclays' Response

Barclays disputes the statement in paragraph 361 because it distorts the complete record of representations to the Court. The Court was told that Barclays may "possibly" be exposed to "as much as" $2.5 billion in compensation and severance obligations, which

*Contains Highly Confidential Information*

"may or may not be triggered." As Mr. Miller has testified, the compensation liability estimate was always "very contingent" because "nobody knew ... how many employees Barclays would ultimately keep." BCI Ex. 87 [Miller Dep. Tr.] at 81:6-11. Furthermore, this estimate was lowered to $2 billion during the 9/19/08 Sale Hearing.

**362.   The Sale Motion did not disclose any discount on the book value of the Lehman**

**assets to be transferred to Barclays. (A. 148 [Docket No. 60].)**

Barclays' Response

Barclays disputes the statement in paragraph 362 because the phrase "discount off the book value" is undefined, lacks foundation, and has been used by the Movants in a misleading manner. Any possible valuation adjustment from stale and inaccurate Lehman marks in estimating the value of the Long Positions was not a "discount," *see* BCI Ex. 87 [Miller Dep. Tr.] at 112:17-114:2, and was not a "price." See BCI Ex. 1 [APA] at §3.1. Barclays also disputes the statement in paragraph 362 because the APA did disclose the trading and financial assets to be included in the sale were estimated to be worth more than the trading liabilities, and did disclose that Barclays was acquiring all assets in the Business, and therefore it did disclose the possibility that under its own accounting rules, Barclays may record an accounting gain, as was publicly announced. BCI Ex. 109 [Sept. 17, 2008 Barclays Press Release] at p. 4; BCI Ex. 110 [Sept. 17, 2008 Investor Teleconference Tr.]. Barclays further incorporates its response to paragraph 344.

**363.   On September 17, 2008, there was a hearing before the Court where representations**

**were made about the Sale Transaction. (A.149 [Docket No. 352].)**

Barclays' Response

Barclays does not dispute that there was a hearing on September 17, 2008. However, the Court did not approve the Sale as presented during the September 17, 2008 hearing. The Court approved the Sale after being informed during the 9/19/08 hearing of "major changes" to the APA and the need to incorporate such changes in a Clarification Letter. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:14-20, 48:8-10.

**364.   At the September 17, 2008 hearing, the purported value of the proposed Sale**

**Transaction was described to the Court when the Court was asked to approve a**

**break up fee based on the full value of the deal. (A. 148 [Docket No. 60] ¶¶ 15-18; A.**

*Contains Highly Confidential Information*

149 [Docket No. 352] 9/17/08 Tr. at 22:4-7.)

Barclays' Response

Barclays disputes the statement in paragraph 364 because it distorts the complete record of representations to the Court. Moreover, the Court approved the Sale after being informed during the 9/19/08 hearing of "major changes" to the APA and the need to incorporate such changes in a Clarification Letter. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:14-20, 48:8-10.

365.   **At the September 17, 2008 hearing, Lehman's counsel informed the Court that**

   **"looking at it from the net of this transaction, there will be approximately**

   **1,700,000,000 dollars yielded out of this transaction." (A. 149 [Docket No. 352]**

   **9/17/08 Tr. at 22.)**

Barclays' Response

Barclays disputes the statement in paragraph 365 because it distorts the complete record of representations to the Court. Moreover, the Court approved the Sale after being informed during the 9/19/08 hearing of "major changes" to the APA and the need to incorporate such changes in a Clarification Letter. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:14-20, 48:8-10.

366.   **At the September 17, 2008 hearing, Lehman's counsel informed the Court that, net**

   **of the real estate, the transaction involved equal assets and liabilities. (A. 149**

   **[Docket No. 352], 9/17/08 Tr. at 22.)**

Barclays' Response

Barclays disputes the statement in paragraph 366 because it distorts the complete record of representations to the Court. Barclays also disputes the statement in paragraph 366 because it is not supported by the cited evidence; page 22 of the September 19, 2008 Hearing Transcript contains no statements by any party that, net of the real estate, the transaction involved equal assets and liabilities.

367.   **On September 17, 2008, the Court entered an order approving bid procedures,**

   **including a break-up fee, in connection with the Sale Transaction. ([Docket No.**

*Contains Highly Confidential Information*

88].)

<u>Barclays' Response</u>

Barclays does not dispute the statement in paragraph 367.

368. **On September 19, 2008, there was a hearing concerning the approval of the Sale**

**Transaction (the "Sale Hearing").**

<u>Barclays' Response</u>

Barclays does not dispute the statement in paragraph 368.

369. **At the Sale Hearing, LBHI's counsel informed the Court that the proposed Sale**

**Transaction had changed since the execution of the Asset Purchase Agreement. (*See***

**A. 150 [Docket No. 318] 9/19/08 Tr. at 46:19-25, 63:25-64:19.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 369, except states that LBHI's counsel did
inform the Court of "major changes." BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:14-
20.

370. **At the Sale Hearing, LBHI's counsel stated:**

> **[O]riginally, we were selling assets that had a value of seventy --
> approximately seventy billion dollars. And today, Your Honor, we're
> only selling assets that have a value of 47.4 billion dollars. Barclays is
> assuming liabilities, however, of 45.5 billion dollars in connection with
> those assets. So that has not changed from the original transaction ...
> . Barclays is still agreeing to pay the cure amounts on any leases that
> it assumes or that we assume and assign to it. Barclays is also agreeing
> to the same employee compensation agreements. And it is also
> agreeing to pay the 250 million dollars of goodwill to LBI. With
> respect to the real estate assets, Your Honor ... . the purchaser [will]
> purchase the building[s] at the appraised amount[s] ... . which []
> were lower than we had anticipated.**

**(A. 150 [Docket No. 318] 9/19/08 Tr. at 47:1-48:1)**

*Contains Highly Confidential Information*

Barclays' Response

 Barclays refers to the complete transcript for an accurate record of statements at the hearing.

371. **At the Sale Hearing, LBHI's counsel stated that, while the assets being sold**

 **originally had a value of $70 billion, because "the markets dropped" the Sellers**

 **were now seeking to sell assets having a value of "$47.4 billion." (A. 150 [Docket No.**

 **318] 9/19/08 Tr. at 46:19-47:4.)**

Barclays' Response

 Barclays disputes the statement in paragraph 371, except Barclays refers to the complete transcript for an accurate record of statements at the hearing. Furthermore, Barclays disputes the statement to the extent it wrongly implies "$47.4 billion" was a firm estimate of all the assets being transferred to Barclays or was a cap on the value of assets that could be transferred to Barclays. As Mr. Miller has testified this "was a purchase of the business," and, as such, the assets were being purchased irrespective of their values. BCI Ex. 87 [Miller Dep. Tr.] at 50:24-51:6.

372. **By September 19, 2008, the notional value of the proposed Sale Transaction had, in**

 **fact, shrunk because the "types of assets and amounts of assets changed throughout**

 **the course of the week." (A. 14 [Kelly] 126:2-128:15.)**

Barclays' Response

 Barclays disputes the statement in paragraph 372, except Barclays refers to the complete transcript for an accurate record of statements at the hearing. Barclays does not dispute that, by September, Lehman had lost many of the assets it had agreed to sell to Barclays, and that the value of the remaining assets was substantially lower.

373. **By September 19, 2008, the notional value of the proposed Sale Transaction had**

 **shrunk because a question of "title and/or possession" as to some of the assets**

 **precluded Lehman from being able to transfer them. (A. 14 [Kelly] 126:2-128:15.)**

*Contains Highly Confidential Information*

Barclays' Response

>Barclays disputes the statement in paragraph 373, except Barclays refers to the complete transcript for an accurate record of statements at the hearing. *See* Barclays' response to paragraph 372.

374.   **At the Sale Hearing, LBHI's counsel stated that Barclays would be assuming $45.5**

**billion in liabilities in connection with the assets it was purchasing. (A. 150 [Docket**

**No. 318] 9/19/08 Tr. at 47:5-7.)**

Barclays' Response

>Barclays disputes the statement in paragraph 374 because it distorts the complete record of representations to the Court. It incorrectly implies "$45.5 billion" was a firm estimate of all liabilities Barclays would assume in connection with the Sale.

375.   **At the Sale Hearing, the composition of the $47.4 billion in assets Barclays was to be**

**acquiring and the $45.5 billion in liabilities Barclays was to be assuming was not**

**explained to the Court. (*See generally* A. 150 [Docket No. 318] 9/19/08 Tr. at 47:5-7)**

Barclays' Response

>Barclays disputes the statement in paragraph 375 because it distorts the complete record of representations to the Court. *See* Barclays' responses to paragraphs 374-75. As Mr. Miller has testified, this "was a purchase of the business," and, as such, the assets were being purchased irrespective of their values. BCI Ex. 87 [Miller Dep. Tr.] at 50:24-51:6.

376.   **At the Sale Hearing, no one disclosed that Barclays would pay, or planned to pay,**

**substantially less both in compensation and contract cure payments than the**

**amounts disclosed to the Court. (*See generally* A. 150 [Docket No. 318] 9/19/08 Tr.)**

Barclays' Response

>Barclays disputes the statement in paragraph 376 because it distorts the complete record of representations to the Court. It is premised on the false assumption that "Barclays would pay, or planned to pay, substantially less both in compensation and contract cure payments than the amounts disclosed to the Court." As Mr. Miller has testified, these

*Contains Highly Confidential Information*

figures were always "very contingent" estimates of "potential exposure" because "nobody knew what contracts were going to be assumed and how many employees Barclays would ultimately keep." BCI Ex. 87 [Miller Dep. Tr.] at 81:6-11. In any event, Barclays has paid $2 billion in compensation obligations. BCI Ex. 142 [Exall Spreadsheet]; BCI Ex. 64 [Exall Dep. Tr.] at 73:22-74:9. The APA gave Barclays sole discretion over which contracts it wished to assume. BCI Ex. 1 [APA] at § 2.5. *See* Barclays' response to paragraph 377.

377. **At the Sale Hearing, LBHI's counsel represented that Barclays still would assume**

**the same cure amount as had previously been described to the Court. (A. 150**

**[Docket No. 318] 9/19/08 Tr. at 47:11-15.)**

Barclays' Response

Barclays disputes the statement in paragraph 377 because it distorts the complete record of representations made to the Court, and because counsel did not say this at all. Barclays had 60 days after closing to select, in its sole discretion, which contracts it wished to assume, and the amount of cure Barclays would assume was solely dependent on Barclays' selections. It was never even remotely implied that Barclays would assume all, or even close to all, of the "potential exposure." Moreover, as Mr. Miller has testified, the figure for "potential exposure" was always "very contingent" because "nobody knew what contracts were going to be assumed." BCI Ex. 87 [Miller Dep. Tr.] at 81:6-11.

378. **At the Sale Hearing, it was represented to the Court that Barclays would assume a**

**potential exposure of $1.5 billion in contract cure amounts. (A. 150 [Docket No.**

**318] 9/19/08 Tr. at 100:1-4.)**

Barclays' Response

Barclays disputes the statement in paragraph 378 because it distorts the complete record of representations to the Court. *See also* Barclays' responses to paragraphs 374-77.

379. **At the Sale Hearing, LBHI's counsel represented that Barclays still would assume**

**the same employee compensation amount as had previously been described to the**

**Court. 150 [Docket No. 318] 9/19/08 Tr. at 47:11-15.)**

*Contains Highly Confidential Information*

Barclays' Response

    Barclays disputes the statement in paragraph 379 because it distorts the complete record of representations to the Court. *See also* Barclays' responses to paragraphs 374-77.

**380.   At the Sale Hearing, it was represented to the Court that Barclays would assume**

**liability for employee compensation estimated to be $2 billion. (A. 150 [Docket No.**

**318] 9/19/09 Tr. at 99:22-25.)**

Barclays' Response

    Barclays disputes the statement in paragraph 380 because it distorts the complete record of representations to the Court. *See also* Barclays' responses to paragraphs 374-77.

**381.   At the Sale Hearing, it was represented to the Court that Barclays would still pay**

**$250 million in cash. (A. 150 [Docket No. 318] 9/19/08 Tr. at 47:14-15.)**

Barclays' Response

    Barclays does not dispute the statement in paragraph 381.

**382.   At the Sale Hearing, neither Barclays or any other party made representations or**

**disclosures to the Court regarding the Sale Transaction as being capital accretive to**

**Barclays or Barclays' need to "preserve the buffer" as Barclays had stated on the**

**September 17, 2008 analyst call. (*See generally* A. 150 [Docket No. 318] 9/19/08 Tr.)**

Barclays' Response

    Barclays disputes the statement in paragraph 382 because it distorts the complete record of representations to the Court. No party made any representation to the contrary, or any representation at all as to Barclays' accounting of the sale. Furthermore, Barclays announcement of an expected gain on acquisition was known by all Movants before the Closing. *See* Barclays' response to paragraph 202. As Mr. Miller has testified, he "assume[d] that Barclays was not making this acquisition for the purpose of taking a loss." BCI Ex. 87 [Miller Dep. Tr.] at 65:4-6.

383.    At the Sale Hearing, the parties advised the Court that they were drafting a letter

agreement to reflect the changes to the Sale Transaction and to clarify certain

ambiguities in the Asset Purchase Agreement. (A. 150 [Docket No. 318] 9/19/08 Tr.

at 48:7-13, 54:5-11.)

Barclays' Response

Barclays disputes the statement in paragraph 383 because it distorts the complete record
of representations made to the Court. The Court was told a Clarification Letter needed to
be prepared, in light of the "major changes" to the transaction since the original APA was
signed. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:14-20, 48:8-10.

384.    At the Sale Hearing, LBHI's counsel described to the Court, a "Clarification Letter"

that the parties were working on, as follows:

> MS. FIFE: Some other changes that were made to the contracts affect
> what are called purchase assets and what are excluded assets. There
> was some confusion as to which subsidiaries, if any, were being sold.
> And we've clarified in a clarification letter which we're hoping to
> finalize and actually present to Your Honor whenever it comes down
> here.     But in that letter, we're going to clarify that the only
> subsidiaries that are being purchased by Barclays are Lehman
> Brothers Canada Inc., Lehman Brothers Sudamerica SA and Lehman
> Brothers Uruguay SA. The latter two subsidiaries that I just referred
> to relate to a business that is called PIM, or Private Investment
> Management Business, which is a business that was not part of the
> original deal but is now being purchased by Barclays.

(A. 150 [Docket No. 318] 9/19/08 Tr. at 48:5-17.)

Barclays' Response

Barclays disputes the statement in paragraph 384, except refers to the transcript for a
complete record of all statements made at the hearing. *See also* Barclays' response to
paragraph 383.

385.    The Clarification Letter was not finalized before the Sale Hearing concluded.

*Contains Highly Confidential Information*

Barclays' Response

> Barclays does not dispute the statement in paragraph 385, although it disputes any implication that the Clarification Letter was not approved because it was not finalized before the Sale Hearing concluded.  BCI Ex. 16 [Sale Order] at p. 1.

386.    **The Clarification Letter was not presented to the Court at the Sale Hearing on**

  **September 19, 2008.  (A. 150 [Docket No. 318] 9/19/08 Tr. at 133:21-137:14 (Debtor**

  **counsel offers the Asset Purchase Agreement and First Amendment into evidence).)**

Barclays' Response

> Barclays incorporates its response to paragraph 385.

387.    **At the Sale Hearing, Ms. Fife informed the Court that the "major changes to the**

  **transaction," the changes that were "material," had been disclosed.  (A. 150 [Docket**

  **No. 318]9/19/08 Tr. at 54:18-20.)**

Barclays' Response

> Barclays disputes the statement in paragraph 387 because it distorts the complete record of representations to the Court.  Mr. Miller has testified that Weil Gotshal's September 19 presentation to the Court was "was fair, accurate and appropriate based upon the information which we were given and the assumption that everybody at Lehman was operating in good faith," and he has no reason to believe anyone acted in bad faith.  BCI Ex. 87 [Miller Dep. Tr.] at 59:18-60:7.

388.    **At the Sale Hearing, the Court stated that even a $500 million change in the**

  **proposed Sale Transaction would be "material."  (A. 150 [Docket No. 318] 9/19/08**

  **Tr. at 54:18-23.)**

Barclays' Response

> Barclays does not dispute the statement in paragraph 388.

389.    **At the Sale Hearing, Ms. Fife informed the Court: "And just one other thing I**

*Contains Highly Confidential Information*

wanted to point out to Your Honor we are keeping approximately twenty million

dollars, twenty billion dollars of assets in LBI that are not being transferred. So

those assets will have value and will inure to the benefit [of] the SIPC estate." (A.

150 [Docket No. 318] 9/19/08 Tr. at 55:23-56:3.)

Barclays' Response

Barclays disputes the statement in paragraph 389 because it distorts the complete record
of representations to the Court. It wrongly implies that twenty billion dollars remaining
with LBI was a condition governing the Sale. As Mr. Miller has testified, this was the
sale of a business, and specific assets and liabilities were – or were not – being
transferred irrespective of their values. BCI Ex. 87 [Miller Dep. Tr.] at 50:14-51:6.

390.    At the Sale Hearing, Ms. Fife advised the Court that: "There was a provision in

[the] deal originally which required the debtors to transfer 700 million dollars in

cash to Barclays. And that is no longer the case. There's no cash that's being

transferred to Barclays." (A. 150 [Docket No. 318] 9/19/08 Tr. at 54:21-25.)

Barclays' Response

Barclays disputes the statement in paragraph 390, except refers to the transcript for a
complete record of statements made at the hearing.

391.    At the Sale Hearing, counsel for LBHI, Harvey Miller, stated that "we're not

transferring any cash to Barclays, that's out of the agreement." (A. 150 [Docket No.

318] 9/19/08 Tr. at 242:11-16.)

Barclays' Response

Barclays disputes the statement in paragraph 391, except refers to the transcript for a
complete record of statements made at the hearing.

392.    At the Sale Hearing, counsel for Barclays, Lindsee Granfield, stated, "Barclays is

making this transaction possible to claims by subsidiary creditors . . . [by] los[ing]

*Contains Highly Confidential Information*

the 700 million dollars in cash." (A. 150 [Docket No. 318] 9/19/08 Tr. at 200:7-12.)

Barclays' Response

 Barclays disputes the statement in paragraph 392, except refers to the transcript for a complete record of statements made at the hearing.

393. At the Sale Hearing, the Court stated, "I'm satisfied that given the fact that Barclays is not taking cash ... that in practical terms we should be safe" with respect to an LBIE cash issue that had been brought before the Court. (A. 150 [Docket No. 318] 9/19/08 Tr. at 253:5-8.)

Barclays' Response

 Barclays disputes the statement in paragraph 393, except refers to the transcript for a complete record of statements made at the hearing.

394. At the Sale Hearing, the Court heard from Kenneth Caputo of SIPC and the Trustee, both of whom spoke in support of the transaction. Mr. Caputo urged the sale to close "[a]s soon as possible" to "provide certainty to parties and counterparties so that they can take the actions that they deem necessary to protect their clients" and to "provide certainty to the hundreds of thousands of customers [of LBI]." (A. 150 [Docket No. 318] 9/19/08 Tr. at 73:20-24.) The Trustee emphasized that the "first role of a SIPC proceeding is to maintain orderly markets and try to preserve normalcy for customer accounts." (A. 150 [Docket No. 318] 9/19/08 Tr. at 76:18-21.)

Barclays' Response

 Barclays disputes the statement in paragraph 394, except refers to the transcript for a complete record of statements made at the hearing.

*Contains Highly Confidential Information*

395.  **Representatives of the SEC, the Federal Reserve Bank of New York, and the CFTC appeared at the Sale Hearing in support of the proposed Sale Transaction. The Court incorporated into the record comments that these regulators had made at the September 17, 2008 hearing. (A. 150 [Docket No. 318] 9/19/08 Tr. at 157:21-25.)**

Barclays' Response

Barclays disputes the statement in paragraph 395, except refers to the transcript for a complete record of statements made at the hearing.

396.  **At the Sale Hearing, the Committee advised it lacked sufficient time to complete its due diligence and reach an informed decision whether to support the Sale Transaction, stating that "[W]e're not affirmatively supporting the transaction, Your Honor, because there has been insufficient time for us to really do all the due diligence that we would feel should be done to take the next step of saying yes, this is the best deal and we're supportive actively." (A. 150 [Docket No. 318] 9/19/08 Tr. at 67:16-21.)**

Barclays' Response

Barclays disputes the statement in paragraph 396 because it distorts the complete record of representations to the Court. Although the Committee advised that it was not "affirmatively supporting the transaction," it also told the Court that the "headline is we are not objecting," because of the "lack of a viable alternative." BCI Ex. 49 [Sept. 19, 2009 Hearing Tr.] at 67:7-25.

397.  **At the Sale Hearing, the Court stated that "[t]he essential terms of the transaction, with modifications, have been understood at least for the last few days." (A. 150 [Docket No. 318] 9/19/08 Tr. at 85:7-8.)**

*Contains Highly Confidential Information*

Barclays' Response

> Barclays disputes the statement in paragraph 397, except refers to the transcript for a complete record of all statements made at the hearing. Barclays disputes any implication that terms of the transaction which were not "understood" prior to the Sale Hearing are ineffective. The Court approved the Sale after being informed of "major changes" to the APA and the need to incorporate such changes in a Clarification Letter. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:14-20, 48:8-10.

398. **At the Sale Hearing, the Court observed that there was no better alternative**

   **transaction because, among other things, "[o]nly Barclays can deliver the customer**

   **accounts to safe harbors." (A. 150 [Docket No. 318] 9/19/08 Tr. at 249:7-8.)**

Barclays' Response

> Barclays agrees that the Court made this statement, that there was no better alternative transaction, and that only Barclays "could deliver the customer accounts to safe harbors." BCI Ex. 49 [Sept. 19, 2008 Hearing] at 249:7-8.

399. **The Court concluded that "the customer property, which is the principal concern of**

   **the SIPC trustee, a case which is also pending before me now, will be best protected**

   **by virtue of approving the sale." (A. 150 [Docket No. 318] 9/19/08 Tr. at 249:3-11.)**

Barclays' Response

> Barclays does not dispute the statement in paragraph 399.

400. **Prior to the Sale Hearing, the Trustee had been provided with only limited**

   **information regarding the economics of the sale and the financial condition of LBI.**

   **("Kobak Decl." ¶¶ 4, 6, 9.)[7]**

Barclays' Response

> Barclays disputes the statement in paragraph 400 to the extent it implies the Trustee's approval of the Sale was invalid or uninformed. The Trustee was provided with

---

[7] Citations to "Kobak Decl." herein refer to the Declaration of James B. Kobak Jr. In Support Of The Trustee's Rule 60(b) Motion, dated September 15, 2009.

*Contains Highly Confidential Information*

information concerning the Sale before the hearing, he participated personally in the weekend-long meeting at Weil Gotshal, and he and his team reviewed and discussed drafts of the Clarification Letter and executed the final transaction documents. None of this information caused the Trustee subsequently to inform the Court that it wished to modify or revoke its support of the sale. BCI Ex. 80 [Kobak Dep. Tr.] at 73:15-76:8; 175:3-177:13.

**401. On Saturday, September 20, 2008, the Court entered an Order Under 11 U.S.C. §§ 105(a), 363 and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases (the "LBHI Sale Order"). [Docket No. 258.]**

Barclays' Response

Barclays does not dispute the statement in paragraph 401.

**402. The LBHI Sale Order approved the Sale Transaction based on the record presented to the Court prior to and at the Sale Hearing. (LBHI Sale Order at 2.)**

Barclays' Response

Barclays disputes the statement in paragraph 402, except does not dispute that the Court approved the Sale Order based on its consideration of the totality of information before it, including "the Motion and the record of the Sale Hearing held on September 19, 2008 with respect to the Motion." BCI Ex. 16 [Sale Order] at p. 2.

**403. The LBHI Sale Order purports to approve the Clarification Letter, a document that was still being negotiated at the time the LBHI Sale Order was issued and which was not executed until September 22, 2008.**

Barclays' Response

Barclays disputes the statement in paragraph 403 to the extent it implies the Sale Order did not approve the Clarification Letter. The Sale Order specifically approved "that letter agreement clarifying and supplementing the Asset Purchase Agreement dated September 20, 2008." BCI Ex. 16 [Sale Order] at p. 1.

*Contains Highly Confidential Information*

404. Among other provisions, the LBHI Sale Order provided that "[t]he [Asset] Purchase

Agreement and any related agreements, documents, or other instruments may be

modified, amended or supplemented by the parties thereto, in a writing signed by

the parties, and in accordance with the terms thereof, without further order of the

Court, provided that any such modification, amendment or supplement does not

have material adverse effect on the Debtors' estates and has been agreed to between

the Committee, the Debtors and the Purchaser." (LBHI Sale Order at ¶ 25.)

Barclays' Response

Barclays disputes the insertion of [Asset] in paragraph 404, and otherwise refers to the
Sale Order for its precise terms.

405. On September 19, 2008, the Court entered in the SIPA proceeding an Order

Approving, and Incorporating by Reference for the Purposes of this Proceeding, an

Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman

Brothers Holdings Inc. Chapter 11 Proceeding (the "LBI Sale Order"), which

authorized the Trustee to consummate the Sale Transaction on behalf of LBI.

(Maguire Decl. Ex. 14 (LBI Sale Order) at 1.)

Barclays' Response

Barclays does not dispute the statement in paragraph 405.

406. On September 19, 2008, the Honorable Gerard E. Lynch of the United States

District Court for the Southern District of New York entered the Order

Commencing Liquidation (the "LBI Liquidation Order") pursuant to the provisions

of SIPA. (Case No. 08-CIV-8119 (GEL) (S.D.N.Y.) [Docket No. 3].)

*Contains Highly Confidential Information*

Barclays' Response

      Barclays does not dispute the statement in paragraph 406.

407.     **The LBI Liquidation Order appointed the Trustee and removed the case to the United States Bankruptcy Court for the Southern District of New York. (The LBI Liquidation Order at XIII.)**

Barclays' Response

      Barclays does not dispute the statement in paragraph 407.

408.     **At the September 19, 2008 hearing before Judge Lynch, Kenneth Caputo of SIPC stated that SIPC was seeking the appointment of the Trustee in an "unprecedented case." (Maguire Decl. Ex. 9 (9/19/08 Tr. at 4:16).)**

Barclays' Response

      Barclays does not dispute the statement in paragraph 408.

409.     **At the September 19, 2008 hearing before Judge Lynch, Mr. Caputo asked the Court to take "immediate action to protect public customers and protect the fair and orderly markets," noting that the LBI Liquidation Order permits the Trustee to effect open transactions "so that public customers can get access to their funds and those accounts can be transferred out in the orderly course of business." (Maguire Decl. Ex. 9 (9/19/08 Tr. at 4:17-5:1).)**

Barclays' Response

      Barclays does not dispute the statement in paragraph 409.

*Contains Highly Confidential Information*

410.    At the September 19, 2008 hearing before Judge Lynch, Mr. Caputo stated that the

proposed sale would permit customer accounts to be moved to "acquiring broker-

dealer entities, which of course is intended to afford customers immediate access to

their accounts and to provide again for the fair and orderly markets that we seek."

(Maguire Decl. Ex. 9 (9/19/08 Tr. at 5:5-8).)

Barclays' Response

    Barclays does not dispute the statement in paragraph 410.

411.    After LBHI filed its bankruptcy petition on September 15, 2008, it kept its

brokerage subsidiary, LBI, out of bankruptcy for a few days (based on instructions

from the Federal Reserve Bank of New York ("New York Fed") to avoid undue

disruption in the financial markets and to enable support of the broker-dealer while

Lehman's trading positions and brokerage accounts were unwound or transferred.

(*See* A. 151 [Leventhal Decl.] ¶¶ 6-7.)[8]

Barclays' Response

    Barclays disputes the statement in paragraph 411 because it takes select phrases from the
    document out of context and distorts their meaning. Barclays refers to the Leventhal
    Declaration in its entirety for a description of the Fed's actions in relation to LBI and the
    terms of the Fed Repo. BCI Ex. 30 [Leventhal Decl.].

412.    While the Asset Purchase Agreement was being negotiated, signed and first

presented to the Court for approval, the New York Fed provided temporary

financial support to LBI. (*See* A. 151 [Leventhal Decl.] ¶ 6-7.)

---

[8] Citations to "Leventhal Decl." herein refer to the Declaration of Shari D. Leventhal in Support of the
Trustee's Motion for Entry of an Order Approving a Settlement Agreement, dated December 5, 2008.

*Contains Highly Confidential Information*

Barclays' Response

> Barclays does not dispute the statement in paragraph 412 and refers to the Leventhal Declaration in its entirety for a description of the Fed's actions in relation to LBI and the terms of the Fed Repo.  BCI Ex. 30 [Leventhal Decl.].

413.    **In connection with the Sale Transaction, the New York Fed provided overnight**

**financing to LBI in the form of a repurchase agreement during the early part of the**

**week of September 15, 2008 (the "Fed Repo").  (A. 3 [Blackwell] 55:11-17; A. 12**

**[Hraska] 27:11-28:24).**

Barclays' Response

> Barclays disputes the statement in paragraph 413 in that it is not supported by the cited source, and refers to the Leventhal Declaration for a description of the Fed's actions in relation to LBI and the terms of the Fed Repo.  BCI Ex. 30 [Leventhal Decl.].

414.    **As part of the Fed Repo, LBI had to post collateral to the New York Fed. (A. 3**

**[Blackwell] 55:11-17; A. 12 [Hraska] 27:11-28:24.)**

Barclays' Response

> Barclays does not dispute that LBI had to post collateral to the New York Fed and refers to the Leventhal Declaration for a description of the Fed's actions in relation to LBI and the terms of the Fed Repo.  BCI Ex. 30 [Leventhal Decl.].

415.    **As part of the Fed Repo, the New York Fed required LBI to post as collateral**

**securities valued in excess of the principal amount of the cash the New York Fed**

**advanced.  (A. 151 [Leventhal Decl.] ¶ 9.)**

Barclays' Response

> Barclays does not dispute that, as in repo transactions generally, New York Fed required LBI to post as collateral securities valued in excess of the principal amount of the cash the New York Fed advanced.  Barclays refers to the Leventhal Declaration for a description of the Fed's actions in relation to LBI and the terms of the Fed Repo.  BCI Ex. 30 [Leventhal Decl.].

416.   In general, the excess collateral in a repurchase transaction is referred to

colloquially as the "haircut." (A. 12 [Hraska] 58:9-13.)

Barclays' Response

Barclays disputes the statement in paragraph 416 in that it is not supported by the cited
source.  The term "excess" and "excess collateral" are not defined.  Barclays does not
dispute that the amount by which the value of securities transferred under a repurchase
agreement exceeds the amount paid for those securities is often referred to as a "haircut."
BCI Ex. 96 [Seery Dep. Tr.] at 39:12-40:21;  BCI Ex. 85 [McDade Dep. Tr.] at 134:5-11;
BCI Ex. 83 [Lowitt Dep. Tr.] at 27:17-29:6.

417.   According to Shari Leventhal of the New York Fed, by Wednesday night,

September 17, 2008, the New York Fed had required LBI to post as collateral

securities valued at approximately $50.62 billion in exchange for which the New

York Fed advanced to LBI approximately $46.22 billion in cash. (A. 151 [Leventhal

Decl.] ¶ 9; *see also* A. 34 (Fed haircuts on 9/15/08).)

Barclays' Response

Barclays disputes the statement in paragraph 417, except refers to the Leventhal
Declaration in its entirety for a description of the Fed's actions in relation to LBI and the
terms of the Fed Repo.  BCI Ex. 30 [Leventhal Decl.].

418.   When the New York Fed learned that Barclays was to buy Lehman's broker-dealer

operations, the New York Fed insisted that it be relieved of its short-term financing

role for LBI and that Barclays instead provide such financing to LBI. (A. 151

[Leventhal Decl.] ¶ 7; *see also* A. 52; A. 53; A. 57.)

Barclays' Response

Barclays does not dispute the statement in paragraph 418.

*Contains Highly Confidential Information*

419.    Relieving the New York Fed of the short-term financing role it had been providing

for LBI was accomplished through a Repurchase Agreement, dated September 17,

2008, between Lehman and Barclays (the "Repurchase Agreement"). (A. 151

[Leventhal Decl.] ¶¶ 10-12.)

Barclays' Response

    Barclays disputes the statement in paragraph 419, except refers to the Leventhal
    Declaration for a description of the Fed's actions in relation to LBI and the terms of the
    Fed Repo and refers to the LaRocca Declaration for a description of the Barclays reverse
    repurchase agreement.   BCI Ex. 30 [Leventhal Decl.]; BCI Ex. 31 [LaRocca Decl.].

420.    Under the Repurchase Agreement, Barclays agreed to provide LBI cash so it could

payoff the New York Fed and terminate the Fed Repo. (A. 12 [Hraska] 49:8-18,

61:5-20, 62:3-19; A. 16 [Kirk] 66:5-67:23.)

Barclays' Response

    Barclays disputes the statement in paragraph 420, except refers to the Leventhal
    Declaration for a description of the Fed's actions in relation to LBI and the terms of the
    Fed Repo and refers to the LaRocca Declaration for a description of the Barclays reverse
    repurchase agreement. BCI Ex. 30 [Leventhal Decl.]; BCI Ex. 31 [LaRocca Decl.].

421.    Under the Repurchase Agreement, Barclays' financing of LBI was to be secured by

the collateral that previously had secured the Fed Repo. (A. 57; A. 15 [King] 56:16-

21, 68:9-71:6.)

Barclays' Response

    Barclays disputes the statement in paragraph 421 and refers to the Leventhal Declaration
    in its entirety for a description of the Fed's actions in relation to LBI and the terms of the
    Fed Repo and refers to the LaRocca Declaration for a description of the Barclays reverse
    repurchase agreement.   BCI Ex. 30 [Leventhal Decl.]; BCI Ex. 31 [LaRocca Decl.].
    Barclays does not dispute that its repo was supposed to be secured by the same collateral
    that previously had secured the Fed Repo but, contrary to Barclays' expectation, Barclays
    did not receive the same portfolio of securities that were subject to the Fed Repo. BCI Ex.
    101 [Yang Dep. Tr.] at 65:18-67:20, 72:8-75:15, 76:24-79:15; *id.* at 80:16-81:24; BCI

*Contains Highly Confidential Information*

Ex. 77 [King Dep. Tr.] at 91:4-92:3; *see also* BCI Ex. 341 [Pfleiderer Report] at §§ II.A-
II.C.i; Barclays' response to paragraph 419.

422.    **On September 18, 2008, pursuant to the Repurchase Agreement, Barclays**

        **forwarded to LBI approximately $45 billion in cash. (*See* A. 18 [LaRocca] 40:2-**

        **41:17; A. 12 [Hraska] 58:14-22, 60:15-25; A. 19 [Lowitt] 138:18-139:3, 186:12-187:7;**

        **A. 22 [Petrie] 77:12-19; *see also* A. 79; A. 75 (haircut summary).)**

Barclays' Response

        Barclays disputes the statement in paragraph 422 in that it is not fully supported by the
        cited sources and certain of the cited sources lack direct personal knowledge. The cited
        testimony from Mr. Lowitt's deposition misconstrues the information offered by Mr.
        Lowitt. Lowitt's testimony is in response to a question "If...Barclays gave $45 billion
        and received 50 billion in collateral, does that mean Barclays bought 50 billion in
        collateral for $45 billion?" Mr. Lowitt says that, "if they received all their collateral and
        that was the cash that came to the firm, then, yes, they received $49 billion of collateral--
        $50 billion of collateral for the cash." (A. 19[Lowitt] 138:18- 139: 3). Mr. Lowitt did not
        volunteer the $45 billion figure, but confirmed it in the hypothetical with which he was
        presented. Barclays provided LBI with $45 billion in cash on September 18, 2008, in
        performance of the reverse repurchase agreement between Barclays, BNYM and LBI.
        BCI Ex. 30 [Leventhal Decl.] at ¶ 11; BCI Ex. 31 [LaRocca Decl.] at ¶ 6.

423.    **In connection with the Repurchase Agreement, on or about September 18, 2008,**

        **LBI was to post collateral valued at approximately $50 billion. (*See* A. 18 [LaRocca]**

        **40:241:17; A. 12 [Hraska] 58:14-22, 60:15-61:4; A. 19 [Lowitt] 78:4-9, 138:18-139:3,**

        **186:12-187:7; A. 22 [Petrie] 77:12-78:6; *see also* A. 79; A. 75 (haircut summary).)**

Barclays' Response

        Barclays does not dispute the statement in paragraph 423 that, under the reverse
        repurchase agreement, LBI was supposed to provide Barclays with securities valued at
        approximately $50 billion on September 18, 2008, except that Barclays disputes any
        implication that it actually did receive securities of this value. JPMorgan did not deliver
        roughly $7 billion (based on JPM marks) of the promised collateral to Barclays; some of
        the securities that were delivered were not the same and were of lower quality than the
        Fed Repo collateral; much of the collateral was overvalued or illiquid; and market
        conditions were worsening. The actual value of the securities identified as those that

*Contains Highly Confidential Information*

Barclays was supposed to receive was subject to great uncertainty at the time.  BCI Ex.
30 [Leventhal Decl.] at ¶ 12; BCI Ex. 29 [Trustee's Motion for Entry of Order Approving
Settlement Agreement] at ¶ 10; BCI Ex. 77 [King Dep. Tr.] at 77:21-79:20; 91:21-92:23;
BCI Ex. 341 [Pfleiderer Report] at § II.A; BCI Ex. 87 [Miller Dep. Tr.] at 37:15-25.  The
value of the securities that Barclays actually received was also highly uncertain.

424.    **In connection with the Repurchase Agreement, the difference between the $45**

**billion in cash that Barclays was to forward to LBI and the approximately $50**

**billion in securities to be posted by LBI as collateral reflected an approximate $5**

**billion discount, or "haircut," in the value of LBI's collateral.  (*See* A. 18 [LaRocca]**

**40:2-41:17; A. 12 [Hraska] 58:14-22, 60:15-61:4; A. 19 [Lowitt] 138:18-139:3,**

**186:12-187:7; A. 22 [Petrie] 77:12-78:6; *see also* A. 79; A. 75 (haircut summary).)**

Barclays' Response

Barclays disputes the statement in paragraph 424 because the phrase "discount off the
book value" is undefined, lacks foundation, and has been used by the Movants in a
misleading manner.  Any possible valuation adjustment from stale and inaccurate
Lehman marks in estimating the value of the Long Positions was not a "discount," BCI
Ex. 87 [Miller Dep. Tr.] at 112:17-114:2, and was not a "price,"  BCI Ex. 1 [APA] at §
3.1.  Barclays incorporates its responses to paragraphs 344 and 423.

425.    **In connection with the Repurchase Agreement, a Barclays email, dated September**

**19, 2008 (11:57 a.m.), from Marty Malloy to Gerard LaRocca described the "Repo**

**Cash amount" as "45.00" billion, and the total "Securities/Cash" Barclays received**

**as collateral as "52.19" billion. (A. 77.)**

Barclays' Response

Barclays disputes the statement in paragraph 425 because it takes select phrases from the
email out of context and distorts their meaning, and to the extent it is intended to imply
that Barclays received collateral worth $52.19 billion,.  BCI Ex. 77 [King Dep. Tr.] at
110:2-18; BCI Ex. 101 [Yang Dep. Tr.] at 31:2-32:17; BCI Ex. 34 [Pfleiderer Report] at
§ II.C.iii; BCI Ex. 349 [Malloy Decl.] at ¶¶ 2-4.

*Contains Highly Confidential Information*

426.   **Marty Malloy worked as a trader in Barclays stock loan area. (A. 18 [LaRocca]**

   **65:4-8.)**

Barclays' Response

   Barclays does not dispute that to the best of Gerard LaRocca's recollection at deposition,
   Marty Malloy was a trader in Barclays' stock loan area. However, Barclays refers to the
   Malloy Declaration for a description of Mr. Malloy's position and role. BCI Ex. 349
   [Malloy Decl.] at ¶ 1.

427.   **In connection with the Repurchase Agreement, by the close of business on**

   **September 18, 2008, not all of the collateral that was to be transferred from the Fed**

   **Repo on September 18, 2008, made it into the Repurchase Agreement. (A. 12**

   **[Hraska] 56:18-57:7; A. 85.)**

Barclays' Response

   Barclays does not dispute that it did not receive all of the collateral that was to be
   transferred from the Fed Repo on September 18, 2008, and refers to the direct evidence
   of LBI's failure to deliver all of the securities due Barclays under the reverse repurchase
   agreement, as cited in the expert report of Paul Pfleiderer. BCI Ex. 341 [Pfleiderer
   Report] at § II.C.

428.   **Lehman placed a value of $42.9 billion on the collateral that was successfully**

   **transferred to Barclays under the Repurchase Agreement on September 18, 2008.**

   **(A. 89; A. 88; A. 101; A. 12 [Hraska] 116:25-117:7.)**

Barclays' Response

   Barclays disputes the statement in paragraph 428 and any implication that the delivered
   collateral had an actual value of $42.9 billion. The material cited does not constitute a
   valuation. Information concerning the valuation of the repo securities is set forth
   comprehensively in the Pfleiderer Report at Sections II.C.ii through II.C.iii. BCI Ex. 341
   [Pfleiderer Report] at §§ II.C.ii-iii.

*Contains Highly Confidential Information*

**429.    In connection with the Repurchase Agreement, to make up the difference between**

**the approximately $42.9 billion in collateral actually transferred by LBI to Barclays**

**and the approximately $50 billion LBI was required to transfer, LBI borrowed $7**

**billion from Chase (the "$7 billion loan"). (A. 12 [Hraska] 52:16-54:13, 57:2-4; A.**

**66, A. 80, A. 96, 72.)**

<u>Barclays' Response</u>

> Barclays disputes the statement in paragraph 429 in that it is not supported by the cited
> sources. The sources cited in Appendices 66, 80, 96, and 72 do not describe a loan from
> JPM Chase to LBI—whether in amount, purpose, or otherwise—and Barclays therefore
> disputes the connection between Appendices 66, 80, 96, and 72 and the statement in
> paragraph 429. Barclays does not dispute that LBI agreed to transfer $7 billion in cash to
> Barclays in order to complete performance of its obligations under the reverse repurchase
> agreement between Barclays, BNYM and LBI entered on September 18, 2008. BCI Ex.
> 29 [Trustee's Motion for Entry of Order Approving Settlement Agreement] at ¶ 13; BCI
> Ex. 31 [LaRocca Decl.] at ¶ 17; BCI Ex. 30 [Leventhal Decl.] at ¶ 15.

**430.    The full cash proceeds of the $7 billion loan were to be given to Barclays as a**

**replacement for the portion of collateral that had not been transferred to Barclays**

**under the Repurchase Agreement on September 18, 2008. (A. 12 [Hraska] 50:8-22.)**

<u>Barclays' Response</u>

> Barclays disputes the statement in paragraph 430 in that it is not supported by and
> mischaracterizes the cited source. The cited testimony provides only that "[o]n the night
> of the 18th, Lehman Brothers placed $7 billion on deposit for the benefit of Barclays."
> BCI Ex. 68 [Aug. 14, 2008 Hraska Dep. Tr.] at 50:8-11. Barclays further disputes the
> statement in paragraph 430 because the term "given," as used, is vague and undefined.
> Barclays also disputes the implication that Barclays received the $7 billion that was
> promised. While LBI agreed, on September 18, 2008, to transfer $7 billion in cash to
> Barclays in order to complete performance of its obligations under the reverse repurchase
> agreement, those funds were never actually made available to Barclays. BCI Ex. 31
> [LaRocca Decl.] at ¶¶ 11-12; BCI Ex. 29 [Trustee's Motion for Entry of Order
> Approving Settlement Agreement] at ¶ 20.

**431.    The Bank of New York ("BONY") was Barclays' agent responsible for valuing the**

**collateral in the Repurchase Agreement. (A. 12 [Hraska] 41:15-42:9.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 431 as not supported by the cited source and disputes any implication that the BONY marks accurately valued the collateral. BONY was Barclays' custodial agent for purposes of receiving the repo securities. BCI Ex. 101 [Yang Dep. Tr.] at 31:2-32:17; BCI Ex. 31 [LaRocca Dep. Tr.] at 44:8-46:14.

**432. BONY valued the collateral Barclays received in the Repurchase Agreement at $45**

**billion. (A. 103 at 1; A. 114; A. 94.)**

Barclays' Response

Barclays disputes the statement in paragraph 432 and refers to the testimony of Jasen Yang and declaration of Marty Malloy concerning the BONY marks. *See* Barclays' response to paragraph 431; BCI Ex. 349 [Malloy Decl.] at ¶¶ 2-4; BCI Ex. 101 [Yang Dep. Tr.] at 31:2-32:17. Barclays disputes any implication that the BONY marks accurately valued the collateral.

**433. The difference in value resulted from differing pricing methods employed by**

**Lehman and BONY. (A. 12 [Hraska] 129:16-131:5; A. 126.)**

Barclays' Response

Barclays disputes the statement in paragraph 433 in that it is not supported by the cited source, is substantially controverted by other portions of the record, and does not define the term "pricing methods." In Movants' Appendix 126, BCI Ex. 321 [Sept. 28, 2008 10:54 am email from R. Azerad to J. Hraska, *et al.*, with attachment], and which paragraph 433 relies on, Mr. Azerad states that "[t]here are meaningful differences between the Barclays and Lehman files," the "most worrying difference" being "CUSIP that show up in one file but not in the other." The securities Barclays received were different, of lower quality and riskier than the assets that had been pledged to the New York Fed under LBI's repurchase agreement with it. BCI Ex. 77 [King Dep. Tr.] at 89:4-8, 91:23-92:7, 95:8-96:5, 101:17-105:17; BCI Ex. 73 [Keegan Dep. Tr.] at 32:17-33:3; BCI Ex. 101 [Yang Dep. Tr.] at 78:4-79:15, 82:25-83:13; *see* Barclays' responses to paragraphs 431-32.

**434. In connection with the Repurchase Agreement, Barclays provided Lehman with a**

**list of so-called "excluded assets" which Barclays refused to accept as collateral in**

**the Repurchase Agreement. (A. 12 [Hraska] 191:2-193:5; A. 7 [Denig] 52:5-15,**

*Contains Highly Confidential Information*

**123:9-124:5; A. 60; see also A. 50 ("I think the Barclays folks picked the assets. I**

**recall them saying they didn't want the auction securities ... "); A. 59 ("The**

**Barclays guys chose the assets we did not have anything to do with it.").)**

Barclays' Response

Barclays disputes the statement in paragraph 434 in that it is not supported by the cited sources and mischaracterizes the record. BCI Ex. 62 [Denig Dep. Tr.] at 51:20-52:10; BCI Ex. 68 [Aug. 14, 2008 Hraska Dep. Tr.] at 193:6-194:4. Barclays denies that it was able to actually exercise control over the securities it received in the Fed replacement repo. BCI Ex. 77 [King Dep. Tr.] at 89:4-8, 93:24-95:7; BCI Ex. 73 [Keegan Dep. Tr.] at 32:17-33:3, 34:12-35:15; BCI Ex. 62.

435. **Some assets on the list of "excluded assets" provided by Barclays in connection with**

**the Repurchase Agreement had been used as collateral in connection with the Fed**

**Repo. (A. 12 Hraska] 191:2-193:5; A. 7 [Denig] 52:5-15, 123:9-124:5; A. 60.)**

Barclays' Response

Barclays disputes the statement in paragraph 435 in that it is not supported by the cited sources. The only cited source that touches upon the subject matter of paragraph 435 is deposition testimony in which the witness states "I wouldn't be able to tell that." BCI Ex. 62 [Denig Dep. Tr.] at 51:20-52:10. Barclays also incorporates its response to paragraph 434.

436. **In connection with the Repurchase Agreement, Barclays excluded from the**

**collateral used to secure the Repurchase Agreement $5 billion in so-called RACER**

**securities. (A. 12 [Hraska] 188:5-19; A. 7 [Denig] 139:11-140:8.)**

Barclays' Response

Barclays disputes the statement in paragraph 436 in that it is not supported by the cited sources. The cited testimony does not establish that Barclays was actually able to exclude certain securities from the repo securities it received. Barclays also incorporates its response to paragraph 434.

*Contains Highly Confidential Information*

437. **At the time of the Repurchase Agreement, RACER securities were considered**

**riskier or less secure than the substitute collateral Barclays required Lehman to**

**post in the Repurchase Agreement. (A. 12 [Hraska] 186:8-194:18.)**

Barclays' Response

Barclays disputes the statement in paragraph 437 in that it is not supported by the cited
source. Nowhere in the cited testimony does the witness testify as to the riskiness of
RACERS. RACERS were, however, considered to be securities of doubtful value. BCI
Ex. 73 [Keegan Dep. Tr.] at 45:15-47:11, 115:9-8, 119:2-120:6.

438. **Barclays excluded from the collateral used to secure the Repurchase Agreement**

**many securities backed by residential mortgage obligations. (A. 12 [Hraska] 186:8-**

**194:18.)**

Barclays' Response

Barclays disputes the statement in paragraph 438 in that it is not supported by the cited
source. Barclays incorporates by reference its response to paragraph 434 and cites the
Pfleiderer Report for a complete description of the repo securities Barclays actually
received, with citations to record evidence. BCI Ex. 341 [Pfleiderer Report] at § II.A-C.

439. **At the time of the Repurchase Agreement, securities backed by residential mortgage**

**obligations were considered riskier or less secure than the substitute collateral**

**Barclays required Lehman to post. (A. 12 [Hraska] 186:8-194:18.)**

Barclays' Response

Barclays disputes the statement in paragraph 439 because it is not supported by the cited
source.

440. **Lehman executives charged with transferring collateral to secure the Repurchase**

**Agreement understood and applied Barclays' "excluded assets" list to exclude select**

**groups of assets from the Repurchase Agreement. (A. 12 [Hraska] 191:2-193:5; A. 7**

*Contains Highly Confidential Information*

[Denig] 52:5-15, 123:9-124:5.)

Barclays' Response

Barclays disputes the statement in paragraph 440 because it is not supported by the cited sources. Barclays also incorporates its response to paragraph 434.

441. **At the September 17, 2008 hearing on the Sale Transaction, the Repurchase**

**Agreement was described to the Court as a means to continue short-term financing**

**during the week of September 15, 2008 to enable an orderly liquidation of LBI. (A.**

**149 [Docket No. 352] 9/17/08 Tr. at 23-24.)**

Barclays' Response

Barclays disputes the statement in paragraph 441, except refers to the complete transcript for an accurate record of statements at the hearing. Barclays also disputes any implication that any Movant was not fully aware at closing that the repo collateral was to be transferred in full to Barclays as a component of the Purchased Assets.

442. **By the middle of the week of September 15, 2008 certain executives at Lehman and**

**Barclays had decided to use the Repurchase Agreement as the mechanism to**

**transfer discounted assets to Barclays, by allowing Barclays to keep all the collateral**

**in the Repurchase Agreement, including the "haircut" collateral. (A. 19 [Lowitt]**

**47:9-16; *see also id.* at 138:18-139:3.)**

Barclays' Response

Barclays disputes the statement in paragraph 442. First, there is nothing within the cited testimony referring to such a "decision" concerning "discounted assets" or to "certain executives" making such a decision. Barclays entered into the reverse repo at the insistence of the Fed. BCI Ex. 30 [Leventhal Decl.] at ¶ 7. Moreover, there was no agreement between Barclays and Lehman to enter into the reverse repo as a "mechanism" to transfer "discounted assets." BCI Ex. 341 [Pfleiderer Report] at § II (and sources cited therein). The agreement to treat repo securities as Purchased Assets was reached before the Sale Hearing, at a point when both Barclays and Lehman assessed the value of the repo securities to be not substantially in excess of the repo loan amount, despite the original marks on those securities. All Movants and their legal and financial advisors

*Contains Highly Confidential Information*

were well aware that the repo collateral would be treated as a component of the Purchased Assets. This was extensively discussed during the weekend meetings at Weil Gotshal and was expressly provided in the Clarification Letter, which the Lehman Movants executed and to which the Committee did not object. BCI Ex. 78 [Kirk Dep. Tr.] at 104:24-109:3; *see also* BCI Ex. 91 [Ricci Dep. Tr.] at 164:16-165:25; BCI Ex.79 [Klein Dep. Tr.] at 111:15-112:8; BCI Ex. 85 [McDade Dep. Tr.] at 188:16-191:10; BCI Ex. 97 [Shapiro Dep. Tr.] at 119:6-121:24.

443.  **Lowitt testified that through use of the Repurchase Agreement to provide the**

**agreed upon discount to Barclays the Sale Transaction changed to allow Barclays to**

**"keep the collateral that was in the [Fed R]epo, and those were the assets that**

**Barclays was going to take as part of the [Sale] [T]ransaction." (A. 19 [Lowitt] 47:9-**

**16; *see also* A. 19 [Lowitt] 138:18-139:3.)**

Barclays' Response

Barclays disputes the statement in paragraph 443. It is not supported by the cited source and mischaracterizes the record. The cited testimony does not describe or otherwise mention an "agreed upon discount," or a "discount" of any kind, and there was in fact no "discount." Barclays incorporates its response to paragraph 442.

444.  **By the middle of the week of September 15, 2008, certain executives at Lehman and**

**Barclays agreed that LBI would default on the Repurchase Agreement and Barclays**

**would keep the $50 billion in collateral, including the $5 billion "haircut," it held**

**against the $45 billion in cash it had given LBI under the Repurchase Agreement.**

**(A. 19 [Lowitt] 135:14-139:3.)**

Barclays' Response

Barclays disputes the statement in paragraph 444 because it is not supported by the cited source and mischaracterizes the cited testimony. Barclays incorporates its response to paragraph 442.

*Contains Highly Confidential Information*

445. **Stephen King testified that he understood even before the Repurchase Agreement**

**was executed that there was going to be a Lehman default under that agreement.**

**(A. 15 [King] 80:11-81:18.)**

Barclays' Response

Barclays disputes the statement in paragraph 445, except does not dispute that Mr. King
testified that, given his knowledge that LBI's parent was bankrupt, and given LBI's
financial condition, Barclays was going to end up "long the collateral and have to
liquidate it" during "the mother of all distress." BCI Ex. 77 [King Dep. Tr.] at 80:15-
81:12.

446. **King testified that before the Repurchase Agreement was executed he was planning**

**for Barclays' receipt of the collateral posted under the Repurchase Agreement and**

**how to manage the risk associated with these securities once Barclays received them.**

**(A. 15 [King] 78:22-92:3.)**

Barclays' Response

Barclays disputes the statement in paragraph 446 in that it mischaracterizes the cited
source. Mr. King testified that, given the risk associated with the repo collateral, and
given LBI's imminent bankruptcy and the fact that LBHI already was in bankruptcy,
Barclays had to start managing the risk of the repo collateral in order to protect itself.
BCI Ex. 77 [King Dep. Tr.] at 78:15-79:20.

447. **On September 18, 2008 at 6:03 a.m., Reilly wrote to Lowitt, Gelband, Tonucci and**

**Kelly, suggesting that the Repurchase Agreement presented a mechanism to deliver**

**the "block discount" to Barclays. (A. 58.)**

Barclays' Response

Barclays disputes paragraph 447 because it takes select phrases out of context and
distorts their meaning. Barclays does not dispute that the cited document was sent and
contains the words quoted in paragraph 447. The statement in paragraph 447 is,
however, unreliable hearsay by an individual lacking direct personal knowledge.
Barclays disputes that there was a "block discount" or any agreement to use the reverse

*Contains Highly Confidential Information*

repo as a "mechanism" to "deliver" such a discount, and in fact no "discount" was ever "delivered." Barclays incorporates its response to paragraph 442.

448.    **On September 18, 2008, Reilly wrote:**

> **I need some help resolving these issues today ...**
>
> **3) Not clear on the amount of block discount or how we make it happen. Defaulting on repo could be the best as discount could be taken from haircut. If not that then we need to give business an allocation of block discount so they can mark down the books tonight. Does this create a problem as it could tip the broker early? Would we rather have that be in the sale price tomorrow?**
>
> **(A. 58.)**

Barclays' Response

Barclays does not dispute that the cited document was sent and contains the quoted words. The statement in paragraph 448 is, however, unreliable hearsay by an individual lacking direct personal knowledge. Barclays incorporates its response to paragraph 442.

449.    **On September 19, 2008, LBI was placed in liquidation. (Case No. 08-CIV-8119**

       **(GEL) (S.D.N.Y.) [Docket No. 3].)**

Barclays' Response

Barclays does not dispute the statement in paragraph 449.

450.    **LBI's liquidation constituted an event of default under the Repurchase Agreement.**

       **(A. 33 (Master Repurchase Agreement) at ¶¶ 2(a), 11; A. 68 (Notice of**

       **Termination).)**

Barclays' Response

Barclays does not dispute the statement in paragraph 450.

*Contains Highly Confidential Information*

451.    **In connection with the Repurchase Agreement, Barclays issued a Notice of Default**

    **to LBI on September 19, 2008.  (A. 68.)**

Barclays' Response

    Barclays does not dispute the statement in paragraph 451 but notes this was an
automatically generated and unintentional notice that was rescinded *ab initio*.  BCI Ex. 5
[Clarification Letter] at § 13.

452.    **LBI's default on the Repurchase Agreement left in Barclays' possession**

    **approximately $45 billion in collateral to offset the $45 billion in cash it had**

    **provided under the Repurchase Agreement, plus the excess collateral, the "haircut,"**

    **of approximately $5 billion. (A. 12 [Hraska] 68:18-69:15.)**

Barclays' Response

    Barclays disputes the statement in paragraph 452 because it is untrue and is not supported
by the cited source.  There was no "excess collateral."  Barclays' incorporates its
responses to paragraphs 430 and 442.  Barclays refers to the report of Professor Paul
Pfleiderer for a description of the record evidence concerning the securities Barclays
received in the reverse repo and their value.  BCI Ex. 341 [Pfleiderer Report] at § II.C.

453.    **In September, 2008, Barclays estimated the excess collateral it received under the**

    **Repurchase Agreement to be "$7.19 billion."  (A. 77; *see also* A. 75 (Barclays'**

    **"haircut summary" indicating excess collateral of $7.17 billion); A. 90 (opening**

    **balance sheet spreadsheet circulated to Barclays executives, valuing Repurchase**

    **Agreement assets at $44.8 billion (securities) plus $7 billion (cash), A. 93 (same); A.**

    **102 (same).)**

Barclays' Response

    Barclays disputes the statement in paragraph 453 in that it is not supported by the cited
sources.  Barclays refers to the report of Professor Paul Pfleiderer for a description of the
record evidence concerning the securities Barclays received in the reverse repo and their

*Contains Highly Confidential Information*

value. BCI Ex. 341 [Pfleiderer Report] at § II.C. Barclays' incorporates its response to paragraph 442.

**454.    On September 21, 2008, King wrote to Ricci about the Repurchase Agreement and**

**stated that the "[c]urrent best estimate is the portfolio inc 7 bn cash is 48.5 to 49**

**bn." 108; A. 23 [Ricci] 172:16-173:25.)**

<u>Barclays' Response</u>

Barclays does not dispute that the cited document was sent, but disputes the implication that the numbers listed relate only to the Repurchase Agreement or the repo securities. Barclays refers to the report of Professor Paul Pfleiderer for a description of the record evidence concerning the securities Barclays received in the reverse repo and their value, as well as other securities received in connection with the Sale Transaction. BCI Ex. 341 [Pfleiderer Report] at §§ II.C., V.A-B. Barclays' incorporates its response to paragraph 442.

**455.    Reilly wrote in a September 17, 2008 email to Lowitt that the Asset Purchase**

**Agreement did not provide for a discount from book value:**

> **I went thru all docs and did not see reference to the price haircut. If we want conservative marks to reflect block nature we need to know how much and then can allocate to most logical assets.**

**(A. 55.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 455 because it takes select phrases out of context and distorts their meaning. Barclays does not dispute that the cited document was sent. The statements are, however, unreliable hearsay by an individual lacking direct personal knowledge. Barclays incorporates its response to paragraph 442.

**456.    Lowitt responded to Reilly's September 17, 2008 email: "Since not in contract [it is]**

**hard to see what to d[o]." (A. 55.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 456 because it takes select phrases out of context

and distorts their meaning. Barclays does not dispute that the cited email was sent and

refers to Mr. Lowitt's testimony concerning the email, which places the email in context

and establishes that the parties to these communications lacked direct personal

knowledge: "I didn't know what was in and wasn't in the contract. I had a sense of what

the terms were, but I hadn't reviewed it in the contract." BCI Ex. 83 [Lowitt Dep. Tr.] at

133:14-22. Mr. Lowitt also testified that "[i]t was hard to see how we [Lehman] were

going to identify those assets that Barclays were going to purchase and what the pricing

on each of those individual assets were going to be." *Id.* at 133:23-134:20.

**457.    On the morning of September 18, 2008, Reilly suggested that "[d]efaulting on [the]**

**repo could be the best as [the] discount could be taken from haircut." (A. 59.)**

Barclays' Response

Barclays disputes the statement in paragraph 457 because it takes select phrases out of
context and distorts their meaning. Barclays does not dispute that the cited email was
sent. The statement in paragraph 457, however, is unreliable hearsay by an individual
lacking direct personal knowledge. Barclays disputes that there was such a "discount" or
any agreement to use the reverse repo as a "mechanism" to "deliver" such a discount, and
no "discount" was "delivered." Barclays incorporates its response to paragraph 442.

**458.    Lowitt testified that an "asset-by-asset level" project to mark down Lehman's books**

**to accommodate the $5 billion discount from Lehman book value agreed on**

**September 16, 2008 was not completed because:**

> **I think the transaction changed when the repo was effected, and**
> **because the repo was effected the transaction itself changed.**

**(A. 19 [Lowitt] 129:9-130:5.)**

*Contains Highly Confidential Information*

Barclays' Response

    Barclays disputes the statement in paragraph 458 because it takes select phrases out of context and distorts their meaning. Further, the statement is not supported by the cited source and misrepresents the record. The cited testimony does not reference or describe a "$5 billion discount," nor does it reference a "book value agreed on September 16, 2008." Mr. Lowitt testified that he wasn't aware of information that was at an "asset-by-asset level" and goes on to explain that such information "would have been necessary to effect the transaction." Barclays incorporates its response to paragraph 442.

**459.    Lowitt testified that by September 19, 2008 the Repurchase Agreement became a**

**substitute for the Sale Transaction. (A. 19 [Lowitt] 135:17-136:10.)**

Barclays' Response

    Barclays disputes the statement in paragraph 459 because it is not supported by the cited source. Mr. Lowitt did not testify regarding "substitution," and that term is vague and undefined as used in paragraph 459.

**460.    Lowitt testified as follows:**

> **I think what was clear on the Friday, in part because of the difficulties that we have talked about, but also because the repo was now in place, that the repo represented – was part of what any new transaction was going to be and that what you had in the repo addressed many of the operational questions that we were not sure how to address, which was which of the assets Barclays was going to acquire, because clearly the ones in the repo became the basis of what they were going to acquire, as well as what was the financing haircut associated with that.**

**(A. 19 [Lowitt] 135:17-136:10.)**

Barclays' Response

    Barclays disputes the statement in paragraph 460, except refers to the complete transcript for an accurate record of Mr. Lowitt's testimony.

**461.    Testifying about Reilly's proposal in his September 18, 2008 6:04 a.m. email that**

*Contains Highly Confidential Information*

"[d]efaulting on [the] repo could be the best as [the] discount could be taken from

haircut" (A. 58), Lowitt stated:

> Again, I don't have a recollection of this on the Thursday, but in
> reading the email here, you know, what Jerry is suggesting is that the
> repo transaction is a way in which we could deliver collateral to
> Barclays and that as a basic concept, the financing haircut is a similar
> concept to the item that we were talking about earlier, which is
> Barclays buying collateral for less than the marks to reflect the size of
> their purchase and the volatility of the underlying assets.

(A. 19 [Lowitt] 137:14-138:4; *see also* A. 19 [Lowitt] 138:18-139:3.).)

Barclays' Response

Barclays disputes the statement in paragraph 461 because it takes select phrases out of
context and distorts their meaning. Barclays disputes the implication that the testimony
means that Barclays received any "excess collateral" or "discount." *See* Barclays'
responses to paragraphs 430 and 442.

462.    **Tonucci testified that the Repurchase Agreement was employed to give Barclays the**

**$5 billion discount agreed on September 16, 2008. (A. 26 [Tonucci] 32:4-34:18.)**

Barclays' Response

Barclays disputes paragraph 462 because it takes select phrases out of context and
distorts their meaning. Furthermore, it is not supported by the cited source and
mischaracterizes the cited testimony. Nowhere in the cited testimony does Mr. Tonucci
testify that there was a $5 billion discount agreed on September 16, 2008 (or any other
date), nor does he testify that the reverse repurchase agreement was "employed" to give
Barclays such a "discount." Barclays incorporates its response to paragraph 442.

463.    **Tonucci testified as follows:**

> **Q:      Would it also be fair to say, therefore, that the discount was
> embedded in the haircut on the repo transaction?**
>
> **A:      In a repo transaction there is a haircut, a difference between
> the market value and the cash value received. You could view that as
> a discount. I think in this case it is fair to say that was the settlement
> mechanics and therefore the way that the differences between market
> value and cash paid was accomplished. There was in that sense a**

*Contains Highly Confidential Information*

discount.

(A. 26 [Tonucci] 33:10-34:2.)

Barclays' Response

Barclays does not dispute that Mr. Tonucci gave the testimony excerpted in paragraph 463, but Barclays disputes that there was in fact a "discount" in the repo transaction, BCI Ex. 341 [Pfleiderer Report] at § II, and disputes that there was an evidentiary foundation for the cited testimony, BCI Ex. 98 [Tonucci Dep. Tr.] at 16:7-10; 26:25-27:5; 126:7-11; 136:22-137:4. Barclays incorporates its response to statement 442.

**464.    At the Sale Hearing, the Court was not informed of LBI's default on the Repurchase**

**Agreement. (*See* A. 150 [Docket No. 318] 9/19/08 Tr.)**

Barclays' Response

Barclays disputes the statement in paragraph 464 because it mischaracterizes the cited evidence and is misleading. Weil Gotshal informed the Court about the Barclays reverse repo with LBI and also informed the Court that LBI had entered SIPC liquidation. BCI Ex. 49[Sept. 19, 2008 Hearing Tr.] at 62:5-63:4, 63:16-22.

**465.    At the Sale Hearing, the Court was not told of an agreement that would allow**

**Barclays to keep the "haircut," *i.e.,* the excess collateral in the Repurchase**

**Agreement. (*See* A. 150 [Docket No. 318] 9/19/08 Tr.)**

Barclays' Response

Barclays disputes the statement in paragraph 465 because it is based on the incorrect premise that Barclays received "excess collateral." *See* Barclays' responses to paragraphs 430 and 442. Moreover, all Movants were aware prior to closing that Barclays would be receiving all of the repo collateral as Purchased Assets; this was extensively discussed during the weekend meetings at Weil Gotshal and stated expressly in the Clarification Letter, which the Lehman Movants signed and the Committee approved. *See, e.g.,* BCI Ex. 58 [Burian Dep. Tr.] at 89:7-24, 221:13-225:24.

*Contains Highly Confidential Information*

466.    **At the Sale Hearing, the Court was not told of any role the Repurchase Agreement**

**was to play in conveying assets to Barclays.** (*See* **A. 150 [Docket No. 318] 9/19/08**

**Tr.)**

Barclays' Response

Barclays disputes the statement in paragraph 466 as misleading and incorporates its
responses to paragraphs 464-65.

467.    **On September 18, 2008, Lehman was unable to transfer to Barclays all $50 billion in**

**collateral required under the Repurchase Agreement.  (A. 12 [Hraska] 40:19-41:22,**

**46:2-17, 48:16-49:18.)**

Barclays' Response

Barclays does not dispute that Lehman failed to deliver all collateral due under the
reverse repurchase agreement and refers to the report of Professor Paul Pfleiderer for a
description of the record evidence concerning the securities Barclays received in the
reverse repo and their value.  BCI Ex. 341 [Pfleiderer Report] at § II.C.

468.    **In connection with the Repurchase Agreement, LBI agreed to provide Barclays $7**

**billion in cash to substitute for collateral it could not deliver, which cash Lehman**

**obtained through this $7 billion loan from J.P. Morgan Chase ("Chase").  (A. 12**

**[Hraska] 50:8-22, 53:13-54:10, 57:2-4.)**

Barclays' Response

Barclays does not dispute that LBI agreed to provide Barclays $7 billion in cash to
substitute for collateral it could not deliver, but disputes any implication that Barclays
ever received such funds.

469.    **On September 19, 2008, Hraska transferred or pledged $1.035 billion in securities**

**for the benefit of Barclays. (A. 12 [Hraska] 49:19-51:18, 102:7-103:24, 242:7-11,**

**252:7-260:15.)**

*Contains Highly Confidential Information*

Barclays' Response

 Barclays does not dispute that on September 19, 2008 Mr. Hraska pledged securities marked by Lehman at $1.035 billion for the benefit of Barclays.

**470. Hraska expected that by pledging or transferring the $1.035 billion in securities on**

**September 19, 2008 he would be able to secure the return of $1.035 billion in cash**

**from Barclays to pay off part of the $7 billion loan.  (A. 12 [Hraska] 49:19-51:18,**

**102:7103:24, 252:7-260:15.)**

Barclays' Response

 Barclays disputes the statement in paragraph 470, except Barclays does not dispute that this was Mr. Hraska's intent at the time.  Barclays disputes any implication that Mr. Hraska's intent affects the fact that those securities were ultimately transferred to Barclays as "clearance box" assets pursuant to the APA, including the Clarification Letter and Schedule B thereof.  Mr. Hraska had no knowledge of or involvement in the negotiation of the Purchase Agreement (as that term is defined in the Sale Order).  BCI Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at 23:7-25, 26:13-25.  The Parties and their advisors explicitly agreed that the securities valued by Lehman at $1.035 billion that were pledged to Barclays on Friday, September 19, 2008 were to be listed on Schedule B as "clearance box" assets.  BCI Ex. 5 [Clarification Letter]; BCI Ex. 252 [September 21, 2008 8:12 am email from R. Miller to A. Keller, *et al.*]; BCI Ex. 311 [Sept. 25, 2008 5:10 pm email from D. Murgio to T. Moore, *et al.*, with attachments]; BCI Ex. 316 [Sept. 26, 2008 1:42 pm email from C. Bell to S. Burian, *et al.*, with attachment]; BCI Ex. 324 [September 29, 2008 10:47 am email from H. Miller to D. Murgio].

**471. LBI did not receive $1.035 billion in cash from Barclays as a result of Hraska**

**pledging or transferring the $1.035 billion in securities on September 19, 2008.  (A.**

**12 [Hraska] 50:23-53:16, 102:7-103:24.)**

Barclays' Response

 Barclays disputes any implication that LBI was entitled to receive or should have received $1.035 billion in cash as a result of Mr. Hraska pledging securities marked by Lehman at $1.035 billion on September 19, 2008.  The securities that were pledged on Friday, September 19, 2008 were not intended by the Parties to be exchanged for cash from Barclays.  Instead, the Parties agreed that these securities would be listed on Schedule B as "clearance box" assets that Barclays acquired pursuant to the Purchase

*Contains Highly Confidential Information*

Agreement. *See* Barclays' response to paragraph 470.

472. **LBI was unable to repay any part of the $7 billion loan from Chase using cash received from Barclays for the $1.035 billion in securities. (A. 12 [Hraska] 50:23-53:16, 102:7-103:24.)**

Barclays' Response

Barclays disputes the statement in paragraph 472, because it is immaterial to the Rule 60 motions, and disputes any implication that LBI was entitled to receive or should have received $1.035 billion in cash. The Parties agreed that these securities would be listed on Schedule B as "clearance box" assets that Barclays acquired pursuant to the Purchase Agreement, and all Movants were well aware of this. *See* Barclays' response to paragraph 470.

473. **The $1.035 billion in securities pledged or transferred for the benefit of Barclays on September 19, 2008 were listed on Schedule B of the executed Clarification Letter. (A. 12 [Hraska] 47:12-17, 139:23-148:4, 161:13-24; 222:13-20, 241:11-242:11, 306:22308:2; A. 32; A. 127.)**

Barclays' Response

Barclays does not dispute that the securities marked by Lehman at $1.035 billion that were pledged to Barclays on Friday, September 19, 2009 were listed on Schedule B of the executed Clarification Letter. *See* Barclays' response to paragraph 470.

474. **The $1.035 billion in securities were not in LBI's clearance box at the close of business on September 19, 2009 or at the closing of the transaction. (A. 7 [Denig] 197:24198:10.)**

Barclays' Response

Barclays disputes the statement in paragraph 474. The securities marked by Lehman at $1.035 billion that were pledged to Barclays on September 19 did not leave LBI's clearance box until after the closing of the transaction. BCI Ex. 69 [Jan. 15, 2010 Hraska Dep. Tr.] at 76:5-77:23; BCI Ex. 145 [Jim Hraska 30(b)(6) Deposition Notes] at 1.

*Contains Highly Confidential Information*

Moreover, the parties agreed that those securities would be listed on Schedule B as "clearance box" assets that Barclays acquired pursuant to the Purchase Agreement. *See* Barclays' response to paragraph 470.

**475.    Ricci testified that as of the morning of September 19, 2008 he believed Barclays did**

**not have a sufficient "cushion" in the Sale Transaction. (A. 23 [Ricci] 156:9-157:22.)**

Barclays' Response

Barclays does not dispute that Mr. Ricci testified as set forth in paragraph 475, but disputes any implication that Mr. Ricci's belief was inappropriate or improper. Given the uncertain value of the securities Barclays received in the Fed Replacement Transaction, Barclays was justifiably concerned about the value of the assets it was receiving. *See* BCI Ex. 91 [Ricci Dep. Tr.] at 155:15-157:22; BCI Ex. 78 [Kirk Dep. Tr.] at 101:14-102:15; BCI Ex. 92 [Ridings Dep. Tr.] at 35:19-36:20. Movants and their advisors were aware that additional assets beyond the repo collateral were included in the deal. BCI Ex. 5 (Clarification Letter] at § 1(a)(ii);]; BCI Ex. 87 [Miller Dep. Tr.] at 40:19-43:9; BCI Ex. 58 [Burian Dep. Tr.] at 263:19-264:16.

**476.    In connection with the Sale Transaction, Klein testified that he was instructed by**

**Barclays to ask Lehman for more assets, "to go in and express that we needed more**

**assets." (A. 17 [Klein] 94:3-18.)**

Barclays' Response

Barclays does not dispute that Mr. Klein testified as indicated in paragraph 476, but disputes any implication that Mr. Klein's instructions were inappropriate or improper. Barclays disputes that the process of identifying "more assets" was anything other than the process of identifying assets used in the Business that were covered by the language of the APA but which had not yet been identified to Barclays as a source of potential value. Barclays also disputes any implication that Barclays' request that Lehman identify such assets was inappropriate or not understood by Movants and their advisors independent of Barclays. *See* Barclays' response to paragraph 475

**477.    Barclays informed Lehman on September 19, 2008 that there was a "shortfall" in**

**the amount of assets it would receive through the Repurchase Agreement, but**

**Barclays did not say how much difference had to be made up, only that, without**

**more, the Sale Transaction would not close. (A. 16 [Kirk] 100:10-102:24; A. 23**

*Contains Highly Confidential Information*

[Ricci] 121:8-123:5; *see* A. 17 [Klein] 95:2-97:20.)

Barclays' Response

Barclays does not dispute that Barclays negotiators informed the Lehman negotiators that Barclays would not be willing to close the deal unless additional assets could be identified. Barclays disputes that the process of identifying "additional assets" was anything other than the process of identifying assets used in the Business that were covered by the language of the APA but which had not yet been identified to Barclays as a source of potential value. *See* Barclays' responses to paragraphs 475.

478. **Asked about Barclays' September 19, 2008 request for more assets at his deposition,**

**Diamond testified that Lehman was "scrambling" to add more value for Barclays.**

**(A. 8 [Diamond] 129:11-136:15.)**

Barclays' Response

Barclays disputes the statement in paragraph 478 because it takes select phrases out of context and mischaracterizes Mr. Diamond's testimony. Mr. Diamond testified that "Lehman was in chaos and Lehman was scrambling to find enough assets to complete the deal, and that was happening from the moment we signed Tuesday [September 16] right through the 11th hour Friday." BCI Ex. 63 [Diamond Dep. Tr.] at 135:13-17. The efforts to identify assets were not limited to Friday, September 19. Mr. Diamond explained that the identification of assets was complicated throughout the week because "often things that they would report they could do they actually couldn't do, because they couldn't locate them or a clearing agent had taken them away." *Id.* at 129:18-21. The changes that were made over the course of the week were "driven by Lehman's inability to delivery the things that they had assured that they could deliver." *Id.* at 129:11-136:15.

479. **In connection with the Sale Transaction, on the morning of September 19, 2008,**

**McDade instructed Lowitt to identify "additional sources of value" to "include in a**

**new transaction" with Barclays. (A. 19 [Lowitt] 62:8-15.)**

Barclays' Response

Barclays agrees that, after meeting privately, the Lehman team agreed that Barclays had good reason to be concerned about the value of the repo collateral, and therefore agreed to identify "additional" assets and that Mr. Lowitt was charged with identifying what assets could be delivered to Barclays. BCI Ex. 78 [Kirk Dep. Tr.] at 101:15-22; BCI Ex. 83 [Lowitt Dep. Tr.] at 60:10-24. Barclays disputes that the process of identifying

*Contains Highly Confidential Information*

"additional assets" was anything other than the process of identifying assets used in the Business that were covered by the language of the APA but which had not yet been identified to Barclays as a source of potential value. *See* Barclays' responses to paragraphs 475-478.

**480.    In connection with the Sale Transaction, McDade testified that Barclays demanded**

**additional assets on September 19, 2008 because it was "uncomfortable with the new**

**aspect of what they now had . . . agreed upon." (A. 20 [McDade] 164:23-165:13.)**

Barclays' Response

Barclays disputes the statement in paragraph 480 because it takes select phrases out of context and mischaracterizes Mr. McDade's testimony. Barclays also disputes any implication that the identification of assets with value was improper or inappropriate. To the contrary, Barclays negotiators reasonably informed the Lehman negotiators that Barclays would not be willing close the transaction unless "additional" value could be identified. BCI Ex. 59 [Clackson Dep. Tr.] at 62:12-63:20; BCI Ex. 91 [Ricci Dep. Tr.] at 121:8-15, 121:8-15, 140:17-141:10, 155:15-158:3; BCI Ex. 79 [Klein Dep. Tr.] at 94:5-97:3. Given the uncertain value of the securities Barclays received in the Fed Replacement Transaction, it was entirely reasonable for Barclays to seek the identification of, and for Lehman to identify and confirm its agreement to transfer, the categories of assets identified. *See* BCI Ex. 91 [Ricci Dep. Tr.] at 155:15-157:22; BCI Ex. 78 [Kirk Dep. Tr.] at 101:14-102:15. *See* Barclays' responses to paragraphs 475-479.

**481.    In connection with the Sale Transaction, on the morning of September 19, 2008,**

**Ricci instructed Lowitt "to identify where there were different sources of value" to**

**transfer to Barclays. (A. 19 [Lowitt] 60:10-24.)**

Barclays' Response

Barclays disputes the statement in paragraph 481 because it mischaracterizes Mr. Lowitt's testimony. Mr. Lowitt testified that he was asked by both Mr. McDade and Mr. Ricci to identify different sources of value. Mr. Lowitt did not testify that Mr. Ricci "instructed" him to do anything. Nor did Mr. Ricci, in fact, "instruct" Mr. Lowitt to take any action; rather, Mr. McDade gave Mr. Lowitt his instructions. *See* BCI Ex. 91 [Ricci Dep. Tr.] at 144:22-145:2; BCI Ex. 83 [Lowitt Dep. Tr.] at 61:18-62:3. Barclays agrees that, after meeting privately, the Lehman team agreed that Barclays had good reason to be concerned about the value of the repo collateral, and therefore agreed to look for "additional" assets and that Mr. Lowitt was charged by his superiors at Lehman with identifying what additional assets could be delivered to Barclays. BCI Ex. 78 [Kirk Dep.

*Contains Highly Confidential Information*

Tr.] at 101:15-22; BCI Ex. 83 [Lowitt Dep. Tr.] at 60:10-24. *See* Barclays' responses to paragraphs 475-480.

**482. In connection with the Sale Transaction, Lowitt testified these "additional sources of value" that potentially could be transferred to Barclays would be "elements" of a different deal than the one that had been reached on "Monday and Tuesday." (A. 19 [Lowitt] 59:7-16.)**

Barclays' Response

Barclays disputes the statement made in paragraph 482 because it mischaracterizes Mr. Lowitt's testimony. As the Court was informed at the Sale Hearing on September 19 and through the filing of the Clarification Letter, the deal changed significantly between the signing of the original APA and the Sale Hearing due to Lehman's inability to deliver what it had promised. The Court, LBHI, the Trustee, and the Creditors' Committee were told that there had been "major changes" to the transaction that was originally agreed to as set forth in the original APA. It was understood by all Movants and their advisors that the asset Mr. Lowitt testified about were included in the transaction. BCI Ex. 5 [Clarification Letter]; BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:14-18; BCI Ex. 59 [Clackson Dep. Tr.] at 62:14-63:20; BCI Ex. 87 [Miller Dep. Tr.] at 49:20-50:17; BCI Ex. 78 [Kirk Dep. Tr.] at 105:4-19, 110:17-111:19; BCI Ex. 85 [McDade Dep. Tr.] at 162:16-163:2; *see generally* BCI Ex. 91 [Ricci Dep. Tr.] at 121:8-15, 140:17-141:10, 156:19-157:2. Barclays disputes that the process of identifying "additional assets" was anything other than the process of identifying assets used in the Business that were covered by the language of the APA but which had not yet been identified to Barclays as a source of potential value. *See* Barclays' responses to paragraphs 475-481.

**483. In connection with the Sale Transaction, the assets that Lowitt was instructed to identify beginning on September 19, 2008 were assets in addition to those included in the Repurchase Agreement. (A. 20 [McDade] 138:18-140:27; A. 26 [Tonucci] 118:4-22; A. 23 [Ricci] 172:16-173:25.)**

Barclays' Response

Barclays does not dispute that the assets that Mr. McDade instructed Mr. Lowitt to identify were not part of the repo collateral, but Barclays disputes any implication that those assets were inappropriately included as Purchased Assets. It was understood by all Movants and their advisors that the Purchased Assets included assets in addition to those

*Contains Highly Confidential Information*

included in the Repurchase Agreement. BCI Ex. 5 [Clarification Letter]; BCI Ex. 49
[Sept. 19, 2008 Hearing Tr.] at 43:14-18; BCI Ex. 59 [Clackson Dep. Tr.] at 62:14-63:20;
BCI Ex. 87 [Miller Dep. Tr.] at 49:20-50:17; BCI Ex. 78 [Kirk Dep. Tr.] at 105:4-19,
110:17-111:19; BCI Ex. 85 [McDade Dep. Tr.] at 138:18-140:27, 162:16-163:2; *see
generally* BCI Ex. 91 [Ricci Dep. Tr.] at 121:8-15, 140:17-141:10, 156:19-157:2, 164:16-
165:25.

**484.    In connection with the Sale Transaction, Lowitt knew that finding additional assets**

**was "important." (A. 19 [Lowitt] 63:24-64:8, 64:17-65:2, 148:8-16 ("The whole**

**exercise of identifying additional collateral, which as we talked about was a result of**

**a conversation with Bart as well as with Rich Ricci, was a very important exercise**

**for us on the Friday, which is why I think I would have talked about it in this**

**way.").)**

Barclays' Response

Barclays does not dispute that Barclays negotiators informed the Lehman negotiators that
Barclays would not be willing close the transaction unless additional value could be
identified to make up for the inadequacy of the assets delivered to Barclays on September
18 and that Lowitt considered the work he was doing to ensure that the transaction would
close to be "important." BCI Ex. 59 [Clackson Dep. Tr.] at 62:14-63:20; BCI Ex. 91
[Ricci Dep. Tr.] at 121:8-15, 122:21-122:5, 140:17-141:10, 156:19-157:2; BCI Ex. 79
[Klein Dep. Tr.] at 94:5-97:3. Barclays disputes that the process of identifying
"additional assets" was anything other than the process of identifying assets used in the
Business that were covered by the language of the APA but which had not yet been
identified to Barclays as a source of potential value. *See* Barclays' responses to
paragraphs 475-483.

**485.    In connection with the Sale Transaction, Lowitt worked on finding additional assets**

**that potentially could be transferred to Barclays on the Friday, September 19, 2008,**

**and through the weekend of September 20-21, 2008. (A. 19 [Lowitt] 63:24-64:8,**

**148:8-16.)]**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 485 because it is not supported by the cited

evidence and it takes Mr. Lowitt's testimony out of context. The efforts to identify asset

categories with additional value ended before the Sale Hearing on Friday, September 19.

As Mr. Lowitt testified, efforts continued after the Sale Hearing and after the Closing to

*identify* the assets that fit within the agreed-upon categories of Purchased Assets. BCI

Ex. 83 [Lowitt Dep. Tr.] at 63:24-64:8; BCI Ex. 69 [Aug. 14, 2009 Hraska Dep. Tr.] at

212:2-213:4; BCI Ex. 91 [Ricci Dep. Tr.] at 200:2-21; BCI Ex. 87 [Miller Dep. Tr.] at

48:15-49:15 (The Clarification Letter "did not change the deal that was presented to the

Court"); BCI Ex. 96 [Seery Dep. Tr.] at 148:3-149:20; 153:22-154:3; BCI Ex. 88

[O'Donnell Dep. Tr.] at 42:13-43:11, 46:4-9, 46:16-19, 50:12-17, 51:7-11, 75:15-20.

Barclays disputes that the process of identifying "additional assets" was anything other

than the process of identifying assets used in the Business that were covered by the

language of the APA but which had not yet been identified to Barclays as a source of

potential value. *See* Barclays' responses to paragraphs 475-484.

**486.    In connection with the Sale Transaction, on or around September 19, 2008, McDade**
**asked Kirk to help locate additional assets that potentially could be transferred to**
**Barclays. (A. 16 [Kirk] 102:4-20.)**

Barclays' Response

Barclays disputes the statement in paragraph 486 in that it mischaracterizes and distorts
the cited evidence. Barclays does not dispute that Mr. McDade asked Mr. Kirk to help
identify "additional" value. *See* Barclays' responses to paragraphs 475-485.

*Contains Highly Confidential Information*

487.    **In connection with the Sale Transaction, Kirk worked with Lowitt, Tonucci and**

      **Kelly to satisfy Barclays' request for additional assets. (A. 20 [McDade] 164:23-**

      **165:21; *see also* A. 19 [Lowitt] 60:10-63:14; A. 26 [Tonucci] 54:24-56:20; A. 14**

      **[Kelly] 129:6-130:2.)**

<u>Barclays' Response</u>

    Barclays disputes the statement in paragraph 487 because it mischaracterizes the cited
evidence. Barclays does not dispute that Messrs. Kirk, Lowitt, Tonucci, and Kelly were
involved in the attempt to identify "additional" value. *See* Barclays' responses to
paragraphs 475-486.

488.    **In connection with the Sale Transaction, Kirk's understanding of the "project" to**

      **find additional assets that potentially could be transferred to Barclays was to**

      **continue to locate additional assets until Barclays said "that's enough." (A. 16**

      **[Kirk] 112:10-24.)**

<u>Barclays' Response</u>

    Barclays disputes the statement in paragraph 488 because it mischaracterizes the cited
evidence, and refers to the transcript of Mr. Kirk's testimony.

489.    **In connection with the Sale Transaction, McDade testified that "[i]t was very clear**

      **that Barclays still wanted more value in terms of assets."**

<u>Barclays' Response</u>

    Barclays disputes the statement in paragraph 489 because it takes select phrases out of
context. Mr. McDade testified that he understood that there was a "differential" in terms
of the value of the repo and the estimated cure and comp assumed liabilities numbers that
explained why Barclays was seeking the identification of "additional" value. *See*
Barclays' responses to paragraphs 475-488.

490.    **In connection with the Sale Transaction, Lowitt was given a "target" by McDade of**

      **$3 to $4 billion of additional assets to identify. (A. 19 [Lowitt] 62:16-20; s*ee also* A.**

*Contains Highly Confidential Information*

78 ("The 15c3 lockup looks ok at 1.3 bn ... so we are short 1.7 bn"); A. 19 [Lowitt]

151:2-9 ("[m]y recollection is between 3 and 4, and the math here in [A. 78] suggests

that what we were targeting was $4 billion."); A. 26 [Tonucci] 203:23-204:10

(expectation after Friday's court hearing was $3 billion in unencumbered and 15c3-

3 assets).)

Barclays' Response

Barclays disputes the statement in paragraph 490 because it takes selected phrases out of
context and distorts their meaning. Barclays disputes that there was any precise "target"
amount, and disputes that the process of identifying the "additional assets" was anything
other than the process of identifying assets used in the Business that were covered by the
language of the APA but which had not yet been identified to Barclays as a source of
potential value. *See* Barclays' responses to paragraphs 475-89.

491.    In connection with the Sale Transaction, Kirk wrote an email, dated September 19,

2008, to McDade stating that Ricci "just told me he won't blow up the deal by being

a pig." (A. 81; *see* A. 16 [Kirk] 185:24-189:14.)

Barclays' Response

Barclays disputes the statement in paragraph 491 because it takes select phrases out of
context and distorts their meaning. Barclays does not dispute that it sought the
identification of "additional" assets after becoming uncomfortable with the assets it
received from the repo and ultimately was prepared to accept what Lehman was able to
identify. BCI Ex. 82 [LaRocca Dep. Tr.] at 158:4- 159:4. Barclays disputes that the
process of identifying "additional assets" was anything other than the process of
identifying assets used in the Business that were covered by the language of the APA but
which had not yet been identified to Barclays as a source of potential value. *See*
Barclays' responses to paragraphs 475-490.

492.    In connection with the Sale Transaction, when Kirk informed Ricci there were no

more available assets to give, Ricci told Kirk "we're not going to be pigs and go

after every last nickel." (A. 23 [Ricci] 158:4-159:8.)

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 492 because it mischaracterizes Mr. Ricci's testimony. Barclays disputes that the process of identifying "additional assets" was anything other than the process of identifying assets used in the Business that were covered by the language of the APA but which had not yet been identified to Barclays as a source of potential value. *See* Barclays' responses to paragraphs 475-491.

493.    **In connection with the Sale Transaction, Lowitt and others at Lehman "look[ed]in a**

**number of places to determine – to find extra value." (A. 19 [Lowitt] 151:2-5; A. 26**

**[Tonucci] 54:24-56:20; A. 14 [Kelly] 128:16-130:15.)**

Barclays' Response

Barclays disputes paragraph 493 because it takes selected phrases out of context and distorts their meaning. *See* Barclays' responses to paragraphs 475-492.

494.    **In connection with the Sale Transaction, Lowitt and others searched for additional**

**assets located in a so-called "15c3 lock up." (A. 19 [Lowitt] 59:17-60:2.)**

Barclays' Response

Barclays disputes the statement in paragraph 494 because it takes select phrases out of context and distorts their meaning. Barclays disputes that the process of identifying "additional assets" was anything other than the process of identifying assets used in the Business that were covered by the language of the APA but which had not yet been identified to Barclays as a source of potential value. *See* Barclays' responses to paragraphs 475-493. Paragraph 494 inaccurately suggests that Lowitt was involved in the Sales Transaction. Lowitt identified 15c3 lock-up excess and unencumbered LBI collateral as sources of value that were identified on the Friday. Lowitt went on to say, "I wasn't party to all the elements of what went into the transaction, but I was aware of the work that we did on, you know, those elements." BCI Ex. 83 [Lowitt Dep. Tr.] 59:22-25.

495.    **The term "15-c3 lock up" involved a regulatory requirement that, *inter alia*,**

**brokerages kept on hand assets sufficient to cover a specified percentage of their**

**customer portfolio. 3 [Blackwell] 139:14-140:11.)**

Barclays' Response

Barclays disputes the statement in that the statement is supported by the cited source. 17 C.F.R. Section 240.15c3-3 (2009) defines the 15c3-3 regulatory regime.

*Contains Highly Confidential Information*

496.    In connection with the Sale Transaction, Lehman personnel under the direction of

Lowitt, Tonucci and Kelly searched the so-called "clearance boxes" maintained for

its benefit by JP Morgan Chase and other entities, such as the Depository Trust &

Clearing Corporation ("DTCC"), and performed detailed "depot analysis" and

database reviews to try to locate assets that potentially could be sent to Barclays.

(A. 98 (Lehman's 9/21/08 "depot analysis"); A. 99; A. 12 [Hraska] 48:9-12, 107:18-

108:5, 212:5-215:23; 7 [Denig] 64:17-65:18, 105:10-108:14.)

Barclays' Response

    Barclays disputes the statement in paragraph 496 to the extent the cited testimony does
not support the statement and to the extent the statement is not supported by the
testimony of Messrs. Lowitt, Tonucci and Kelly.

497.    In connection with the Sale Transaction, Lowitt and others searched on Friday,

September 19, 2008, and over the weekend after the Sale Hearing, for additional

"unencumbered assets," to potentially convey to Barclays. (A. 19 [Lowitt] 59:17-

60:2; *see also* A. 115; A. 116; A. 100; A. 117; A. 87; A. 12 [Hraska] 50:23-51:18,

296:11-21.)

Barclays' Response

    Barclays disputes the statement in paragraph 497 because it is not supported by the cited
evidence and mischaracterizes the factual record. *See* Barclays' responses to paragraphs
475-496.

498.    In connection with the Sale Transaction, the term "unencumbered assets" refers to

assets that had not been pledged for other purposes and therefore potentially could

be given to Barclays. (*See* A. 12 [Hraska] 34:14-19; A. 116; A. 117; *see also* A. 12

*Contains Highly Confidential Information*

[Hraska] 50:2351:18.)

Barclays' Response

> Barclays disputes the statement in paragraph 498 because it mischaracterizes the cited evidence. Barclays does not dispute that, in connection with the Sale Transaction, the term "unencumbered assets" was sometimes used to designate assets identified as available to be transferred to Barclays as Purchased Assets (not "given" to Barclays).

499.    **According to Lowitt, the value of additional assets identified over the weekend of**

   **September 20-21, 2008 that potentially could be transferred to Barclays under the**

   **Sale Transaction totaled at least $2.7 billion. (A. 19 [Lowitt] 60:3-19; *see* A. 97; A.**

   **100.)**

Barclays' Response

> Barclays disputes the statement in paragraph 499 because it is not supported by the cited sources and mischaracterizes the record. Barclays does not dispute that, on Friday September 19, Lehman executives reported to Barclays that they had identified additional value in: (1) unencumbered collateral located in LBI's "clearance boxes" that was marked by Lehman at approximately $1.9 billion and (2) an excess amount of value held in LBI's customer reserve account, which was estimated by Lehman to be over $1 billion. BCI Ex. 83 [Lowitt Dep. Tr.] at 59:17-60:9; BCI Ex. 98 [Tonucci Dep. Tr.] at 88:19-89:24; BCI Ex. 78 [Kirk Dep. Tr.] at 105:4-15. No additional assets were identified "over the weekend."

500.    **On September 20, 2008, Klein wrote in an email to Diamond that stayed, in part:**

   **Great day.**

   **We clawed back 3B more of value in the transaction and cut the building prices by 160 mm.**

   **(A. 82.)**

Barclays' Response

> Barclays does not dispute that Mr. Klein wrote those words in an email to Mr. Diamond. Barclays disputes any implication that it was improper or inappropriate for the Parties to engage in good-faith, arm's length negotiations concerning the value of Purchased Assets. Furthermore, Barclays disputes any implication that the asset categories identified were actually worth $3 billion. BCI Ex. 95 [Jan. 13, 2010 Romain Dep. Tr.] at

*Contains Highly Confidential Information*

175:10-177:6, BCI Ex. 138 [Jan. 28, 2009 Gross Acquisition Balance Sheet]; BCI Ex. 341 [Pfleiderer Report] at ¶¶ 48 n.48, 114, 116.

**501.    Lowitt testified as follows:**

> **Q:    And what, as best you recall, is the value of those additional elements, dollar value?**
>
> **A:    The dollar value of the unencumbered collateral was in and around $2 billion, and, you know, the 15c3 excess, my understanding of the deal that was reached vis-a-vis the 15c3 excess was round $750 million to 800 million dollars.**

**(A. 19 [Lowitt] 60:3-9; *see* A. 97 (September 20 update on search of assets); A. 100**

**(identifying $2.3 billion in potentially transferable assets).)**

Barclays' Response

Barclays does not dispute that Mr. Lowitt testified as indicated in paragraph 501. Barclays does dispute any implication that the identification of additional value was improper, inappropriate or undisclosed to any of the Movants or their advisors. BCI Ex. 5 [Clarification Letter]; BCI Ex. 87 [Miller Dep. Tr.] at 40:19-43:9; BCI Ex. 58 [Burian Dep. Tr.] at 263:19-264:16; BCI Ex. 80 [Kobak Dep. Tr.] at 89:23-90:5, 109:14-17. Furthermore, Barclays disputes any implication that those categories were actually worth the Lehman-marked values discussed by Mr. Lowitt. *See* Barclays' response to paragraph 500.

**502.    The so-called "unencumbered assets" potentially available for transfer to Barclays**

**under the Clarification Letter totaled at least $1.9 billion.  (A. 12 [Hraska] 223:4-14,**

**267:19270:18, 293:9-300:2, 304:17-308:2; A. 23 [Ricci] 164:16-165:25 (on Friday,**

**Ricci and McDade agreed that Barclays would accept $1.9 billion in "additional**

**assets"); A. 91 ("Goal Is $1.9 billion in unencumbered"); A. 92 (same); A. 127; A.**

**118.)**

Barclays' Response

Barclays does not dispute that Mr. Lowitt and his team identified "unencumbered assets" marked by Lehman as being worth approximately $1.9 billion. BCI Ex. 83 [Lowitt Dep. Tr.] at 59:17-60:24, 63:9-14; BCI Ex. 98 [Tonucci Dep. Tr.] at 55:4-10, 88:19-89:24.

*Contains Highly Confidential Information*

Barclays disputes any implication that those assets were actually worth what Lehman had
marked them at. *See* Barclays' response to paragraph 500.

**503. Some evidence puts the total so-called "unencumbered assets" to which Barclays**

**claims entitlement under the Clarification Letter as high as $2.3 billion. (A. 12**

**[Hraska] 267:19-270:18, 293:9-300:2, 304:17-308:2; A. 95; A. 132; A. 67; A. 100.)**

Barclays' Response

Barclays does not dispute that some listings of the unencumbered "clearance box" assets
identified over the weekend of September 19, 2008 through September 21, 2008 showed
Lehman marks as high as $2.3 billion. BCI Ex. 341 [Pfleiderer Report] at ¶ 48 n.48; BCI
Ex. 78 [Kirk Dep. Tr.] at 106:14-17; *see* BCI Ex. 251 [Email chain including Sept. 21,
2008 6:11 am email from P. Tonucci to R. Miller, *et al.*, and Sept. 21, 2008 5:17 am
email from M. Forrest to I. Lowitt, *et al.*, with attachment]; BCI Ex. 252 [Sept. 21, 2008
8:12 am email from R. Miller to A. Keller, *et al.*, with portion of attachment omitted].
Barclays disputes any implication that those assets were actually worth what Lehman had
marked them at; in fact, they were worth far less. *See* Barclays' response to paragraph
500.

**504. Between October 2008 and July 2009 Barclays attempted to identify additional so-**

**called "unencumbered assets" that could be transferred from Lehman to Barclays**

**as substitutes for assets Barclays claims it should have received under the Sale**

**Transaction and Clarification Letter. (A. 12 [Hraska] 145:13-21, 245:5-246:20,**

**296:11-19.)**

Barclays' Response

Barclays disputes paragraph 504 because it distorts the factual record and takes Mr.
Hraska's testimony out of context and ignores other related testimony. Efforts continued
to *identify* the assets that were included in the categories of Purchased Assets within the
meaning of the agreements after the Sale Hearing and after the Closing. BCI Ex. 83
[Lowitt Dep. Tr.] at 63:24-64:8; BCI Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at 144:10-
17; 212:2-213:4; BCI Ex. 91 [Ricci Dep. Tr.] at 200:2-21; BCI Ex. 87 [Miller Dep. Tr.] at
48:15-49:15 (the Clarification Letter "did not change the deal that was presented to the
Court."); BCI Ex. 96 [Seery Dep. Tr.] at 148:3-149:20; 153:22-154:3; BCI Ex. 88
[O'Donnell Dep. Tr.] at 42:13-43:11, 46:4-9, 46:16-19, 50:12-17, 51:7-11, 75:15-20; BCI
Ex. 80 [Kobak Dep. Tr.] at 89:23-90:5, 109:14-17. The work that Mr. Hraska described
involved further efforts by Barclays to *identify* the unencumbered assets in LBI's
clearance boxes as of the closing of the transaction. BCI Ex. 68 [Aug. 14, 2009 Hraska

*Contains Highly Confidential Information*

Dep. Tr.] at 146:15-147:2, 295:12-296:19; BCI Ex. 69 [Jan. 15, 2010 Hraska Dep. Tr.] at
89:4-16; BCI Ex. 145 [Jim Hraska 30(b)(6) Dep. Notes]; *see* Barclays' responses to
paragraphs 475-299.

505.    **As recently as July 2009, Barclays directed certain of its employees to try to locate**

    **more securities to substitute for assets Barclays claims it should have received under**

    **the Sale Transaction and Clarification Letter. (A. 12 [Hraska] 296:11-19.)**

Barclays' Response

Barclays disputes paragraph 505 because it distorts the factual record and takes Mr.
Hraska's testimony out of context. Efforts continued to *identify* the assets that were
included in the categories of Purchased Assets within the meaning of the agreements after
the Sale Hearing and after the Closing. BCI Ex. 83 [Lowitt Dep. Tr.] at 63:24-64:8; BCI
Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at 144:10-17; 212:2-213:4; BCI Ex. 91 [Ricci
Dep. Tr.] at 200:2-21; BCI Ex. 87 [Miller Dep. Tr.] at 48:15-49:15 (The Clarification
Letter "did not change the deal that was presented to the Court."); BCI Ex. 96 [Seery
Dep. Tr.] at 148:3-149:20; 153:22-154:3); BCI Ex. 88 [O'Donnell Dep. Tr.] at 42:13-
43:11; *see id.* 46:4-9, 46:16-19, 50:12-17, 51:7-11, 75:15-20; BCI Ex. 80 [Kobak Dep.
Tr.] at 89:23-90:5, 109:14-17. The work that Mr. Hraska described involved further
efforts by Barclays to *identify* the unencumbered assets in LBI's clearance boxes as of the
closing of the transaction. BCI Ex. 68 [Aug. 14, 2009 Hraska Dep. Tr.] at 146:15-147:2,
295:12-296:19; BCI Ex. 69 [January 15, 2010 Hraska Dep. Tr.] at 89:4-16; BCI Ex. 145
[Jim Hraska 30(b)(6) Dep. Notes]; *see* Barclays' responses to paragraphs 475-499.

506.    **McDade has agreed that Lehman never intended for the Clarification Letter to**

    **provide Barclays with billions of dollars in margin at the OCC. (A. 20 [McDade]**

    **277:14-18; A. 82.)**

Barclays' Response

Barclays disputes paragraph 506 because it mischaracterizes Mr. McDade's testimony.
In the cited passage, Mr. McDade simply denied that Lehman intended the Clarification
Letter to transfer to Barclays "an *additional* $2.2 billion in margin at OCC. BCI Ex. 85
[McDade Dep. Tr.] at 277:5-18. (Emphasis added). Even before the Clarification Letter
was drafted, Barclays was entitled to all margin collateral associated with the exchange-
traded derivatives business. BCI Ex. 1 [APA] at p. 6 (defining "Purchased Assets").
Moreover, Mr. McDade acknowledged that he had no recollection as to whether margin
collateral was included in the deal. BCI Ex. 85 [McDade Dep. Tr.] at 295:15-24.

507.    **Kirk testified at his deposition with respect to the Sale Transaction, "[t]his**

transaction was very different than what had been previewed [to the Court] two

days before, and it would have to be explained why it came up." (A. 16 [Kirk]

82:18-25; *see also* A. 19 [Lowitt] 59:7-60:16.)

Barclays' Response

Barclays does not dispute that Mr. Kirk testified as indicated in paragraph 507 but
disputes any impression that Mr. Kirk was referring to changes to the deal after the Sale
Hearing on September 19, 2008. Instead, he was discussing changes between the deal as
agreed on September 17, 2008 and the deal as structured on Friday, September 19, 2008
prior to the Sale Hearing, which were publicly disclosed to the Court by the Debtor and
its counsel. The Court, LBHI, the Trustee, and the Creditors' Committee were told that
there had been "major changes" to the transaction that was originally agreed to as set
forth in the APA. BCI Ex. 5 [Clarification Letter] at § 1(a)(ii); BCI Ex. 49 [Sept. 19,
2008 Hearing Tr.] at 43:14-18; BCI Ex. 59 [Clackson Dep. Tr.] at 62:14-63:20; BCI Ex.
87 [Miller Dep. Tr.] at 49:20-50:17; BCI Ex. 78 [Kirk Dep. Tr.] at 105:4-19, 110:17-
111:19; BCI Ex. 85 [McDade Dep. Tr.] at 162:16-163:2; *see generally* BCI Ex. 91 [Ricci
Dep. Tr.] at 121:8-15, 140:17-141:10, 156:19-157:2.

508.   At the Sale Hearing on September 19, 2008, the search for additional assets to

transfer to Barclays in connection with the proposed Sale Transaction was not

disclosed to the Court.

Barclays' Response

Barclays disputes paragraph 508 because there was no "search for additional assets." *See*
Barclays' responses to paragraphs 475-99. The Court was informed of "major changes"
to the transaction and that changes had been made to the "Purchased Assets." BCI Ex. 49
[Sept. 19, 2008 Hearing Tr.] at 43: 14-20, 48:5-7. Through their participation in the
weekend Weil Gotshal meetings and their approval of the Clarification Letter, Movants
were well aware of which assets would be transferred to Barclays. Weil Gotshal decided,
and no Movant disputed, that there was no need to go back to the Court to describe the
Clarification Letter following the work done over the weekend of September 20 through
September 21, 2008 because the deal "did not change" after the hearing on September 19,
2008. BCI Ex. 87 [Miller Dep. Tr.] at 48:15-49:15.

509.   Over the weekend following the Sale Hearing, the parties negotiated a "letter

agreement clarifying and supplementing the Asset Purchase Agreement dated

September 20, 2008" referenced in the LBHI Sale Order (the "Clarification

*Contains Highly Confidential Information*

Letter"). (Maguire Decl. Ex. 1 [LBHI Sale Order] at p. 1.)

<u>Barclays' Response</u>

Barclays does not dispute the statement in paragraph 509.

510. **The Clarification Letter, dated as of September 20, 2008, was finalized and executed on September 22, 2008. (*See* A.2 [Berkenfeld] 260:22-261:17; 298:4-299:9; A. 18 [LaRocca] 126:25-128:3.)**

<u>Barclays' Response</u>

Barclays does not dispute the statement in paragraph 510.

511. **The Trustee was not an active participant in the drafting process or in the negotiations concerning the Clarification Letter. (Kobak Decl. ¶ 9.)**

<u>Barclays' Response</u>

Barclays disputes paragraph 511, as the Hughes Hubbard billing records and other evidence show that the Trustee personally, and other members of the Hughes Hubbard law firm, spent many hours reviewing drafts of the Clarification Letter and other transaction documents and were present for the weekend-long meetings at Weil Gotshal. Barclays does not dispute that the Trustee delegated some of the drafting and negotiation of the Clarification Letter to Lehman officers and Weil Gotshal. BCI Ex. 40 [HHR First Application for Interim Compensation] at Ex. D; Kobak Decl. at ¶ 9; BCI Ex. 80 [Kobak Dep. Tr.] at 71:6-14, 134:16-135:4.

512. **The Trustee first received a draft of the Clarification Letter on the evening of Sunday, September 21, 2008, and received additional drafts later that night and in the early morning of Monday, September 22, 2008, only hours before the deal was closed. (*See* Kobak Decl ¶ 10; Maguire Decl. Exs. 16-18.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 512. Barclays is aware that Mr. Kobak and
Mr. Maguire submitted declarations attesting under oath to the statement in paragraph
512, but their testimony is incorrect. As documented in the billing records submitted to
the Court, the Trustee, personally and other members of the Hughes Hubbard law firm
spent many hours reviewing the Clarification Letter and other transaction documents over
the weekend leading up to the Closing. In fact, the Trustee's own time records state that
he personally spent 9.7 hours on Saturday, September 20, 2008 on "review of continuing
revisions to APA, Clarification Letter and numerous rounds of negotiations with Weil,
Cleary, and other professionals re changing terms to sale and timetable for closing and
consultations with [Hughes Hubbard], SIPC and SEC teams re same." BCI Ex. 40 [HHR
First Application for Interim Compensation] at Ex. D. Representatives of the Trustee
were present at the offices of Weil Gotshal and via telephone throughout the weekend
while the transaction documents were finalized and drafts of the Clarification Letter were
circulated and discussed. BCI Ex. 80 [Kobak Dep. Tr.] at 71:6-14; 134:16-135:4.

**513.  The Clarification Letter was not put before the Court for approval at the Sale**

**Hearing on September 19, 2008.**

Barclays' Response

Barclays disputes the statement in paragraph 513 to the extent it implies that the
transaction was anything other than as agreed upon in the fully integrated APA, as
defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase
Agreement]. The Court was told at the Sale Hearing that the Clarification Letter was
being negotiated before the Sale Hearing on September 19, 2008 and that it was still
being negotiated during and after the hearing. BCI Ex 49 [Sept. 19, 2008 Hearing Tr.] at
48:5-17, 54:18-20, 172:20-173:9. The Court approved the sale over explicit objections
that approval was inappropriate because the contract was "not final" and the documents
had not been finalized or made available for review by the time of the Sale Hearing
concluded. *Id.* at 172:20-175:9. The Court's Sale Order explicitly approved the
Clarification Order and authorized the transaction to close without further order of the
Court. BCI Ex. 16 [Sale Order] at § 25. The Movants understood that there was no
reason to go back to the Court for approval of the final Clarification Letter before the deal
closed. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 48:5-17, 54:18-20, 172:20-173:9; BCI
Ex. 87 [Miller Dep. Tr.] at 48:15-49:15. Both the Trustee and LBHI have filed
documents with the Court after the Closing that demonstrate their understanding that the
Clarification Letter documented the agreed-upon terms of the Sale Transaction. BCI Ex.
87 [Miller Dep. Tr.] at 48:15-49:15; BCI Ex. 33 [LBHI Brief in Opposition to Bay
Harbour Appeal] at 21-22; BCI Ex. 29 [Trustee's Motion for Entry of Order Approving
Settlement Agreement] at ¶¶ 7, 9-10, 16.

*Contains Highly Confidential Information*

**514.    The Court did not review the Clarification Letter prior to or at the Sale Hearing on**

**September 19, 2008.**

Barclays' Response

Barclays disputes the statement in paragraph 514 and incorporates its response to
paragraph 513. Both the Trustee and LBHI have filed documents with the Court after the
Closing that demonstrate their understanding that the Clarification Letter documented the
agreed-upon terms of the Sale Transaction.

**515.    After the Sale Order had been entered and the Sale Transaction consummated, the**

**Clarification Letter was filed with the Court, as an exhibit, on the afternoon of**

**September 22, 2008, along with the Asset Purchase Agreement and a First**

**Amendment.    (Docket No. 280.)**

Barclays' Response

Barclays does not dispute that the Clarification Letter was filed along with the Asset
Purchase Agreement and a First Amendment on September 22, 2009. Barclays disputes
the statement in paragraph 515 to the extent it implies any impropriety or that the
transaction was anything other than as agreed upon in the fully integrated Purchase
Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex.
18 [Purchase Agreement – Dep. Ex. 26]; BCI Ex. 5 [Clarification Letter]; *see* Barclays'
response to paragraph 513.

**516.    The Clarification Letter was never presented to the Court in a motion for approval**

**and has never been the subject of a court order approving it.    (Maguire Decl. Ex. 19**

**(August 11, 2009 Hearing Tr.) at 106:17-107:3.)**

Barclays' Response

Barclays disputes paragraph 516, as all Movants agreed that no further approval was
needed. See Barclays' response to paragraph 513. The Court was told at the Sale
Hearing that the Clarification Letter was being negotiated before the Sale Hearing on
September 19, 2008 and that it was still being negotiated during and after the hearing.
The Court approved the sale over explicit objections that approval was inappropriate
because the contract was "not final" and the documents had not been finalized or made

available for review by the time the Sale Hearing concluded. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 48:5-17, 54:8-20.

**517.    The Committee presented its position on the Sale Transaction at the Sale Hearing.**

**The Committee never acquiesced to or otherwise consented to any transaction that**

**differed from the transaction presented to the Court at the Sale Hearing.**

Barclays' Response

Barclays disputes the statement in paragraph 517. At the Sale Hearing, the Committee said it did not oppose entry of the Sale Order but lacked sufficient information to support it affirmatively. BCI Ex. 49 [Sept. 19, 2008 Sale Hearing Tr.] at 67:7-25. In light of the fact that the transaction documents were still incomplete at the time of the hearing, the Sale Order effectively tasked the Committee with responsibility to review the final documentation and related negotiations and to raise any objections it might have. BCI Ex. 16 [Sale Order] at ¶ 25. The Committee accepted this assignment and participated in the all-weekend meeting at Weil Gotshal, where drafts of the agreements were circulated and discussed, and the Committee received a "line by line" review of each asset "being transferred and how it was being transferred." BCI Ex. 96 [Seery Dep. Tr.] at 124:14-125:8, 152:21-153:21; BCI Ex. 58 [Burian Dep. Tr.] at 140:4-142:8. The Committee "signed off" on the final versions of the transaction documents, did not raise any issue with the Court or the other parties, and both explicitly and by silence represented that the transaction was ready for closing without the need for further authorization. BCI Ex. 58 [Burian Dep. Tr.] at 65:7-23 ("I thought it was probably fine"), 83:24-84:12; BCI Ex. 88 [O'Donnell Dep. Tr.] at 46:4-9, 46:16-19, 50:12-17, 51:7-11, 75:15-20; BCI Ex. 96 [Seery Dep. Tr.] at 146:22-148:20; BCI Ex. 87 [Miller Dep. Tr.] at 29:5-25, 101:13-102:5 (Committee representatives told him, "If you guys are satisfied with it, we're satisfied").

**518.    The Clarification Letter purported to change the definition of "Purchased Assets"**

**to be sold under the Asset Purchase Agreement.  (A. 32 ¶ 1(a)(ii).)**

Barclays' Response

Barclays does not dispute that the Clarification Letter on its face amends the definition of "Purchased Assets" contained in the original APA, but disputes any implication that this was improper or not fully disclosed to all Movants, who approved that Clarification Letter after full discussion of its terms, or that the modified definition caused a material change that adversely affected the estates. *See* Barclays' response to paragraph 513; BCI Ex. 87 [Miller Dep. Tr.] at 48:15-49:15. The Committee "signed off" on the final versions of the transaction documents. BCI Ex. 58 [Burian Dep. Tr.] at 65:7-23 ("I thought it was probably fine"), 83:24-84:12; BCI Ex. 88 [O'Donnell Dep. Tr.] at 46:4-9,

*Contains Highly Confidential Information*

46:16-19, 50:12-17, 51:7-11, 75:15-20; BCI Ex. 96 [Seery Dep. Tr.] at 146:22-148:20;
BCI Ex. 87 [Miller Dep. Tr.] at 29:5-25, 101:13-102:5) (Committee representatives told
him, "If you guys are satisfied with it, we're satisfied").

519. **The Clarification Letter defined "Purchased Assets" to include "the securities**

**owned by LBI and transferred to [Barclays] or its Affiliates under the Barclays**

**Repurchase Agreement . . . as specified on Schedule A previously delivered by Seller**

**and accepted by [Barclays]. (A. 32 ¶ 1(a)(ii).)**

Barclays' Response

Barclays does not dispute the statement in paragraph 519.

520. **The change in the definition of "Purchased Assets" to include the assets transferred**

**under the Repurchase Agreement appeared for the first time in a draft of the**

**Clarification Letter generated on September 20, 2008 at 2:39 p.m. (A. 83 ¶ 1(a).)**

Barclays' Response

Barclays disputes the statement in paragraph 520 to the extent it implies that the
transaction was anything other than as agreed upon in the fully integrated Purchase
Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex.
18 [Purchase Agreement]. Barclays does not dispute that the draft Clarification Letter
circulated at 2:29 pm on September 20, 2008 shows the change in the definition of
"Purchased Assets" to include all assets transferred to Barclays under the repurchase
agreement, but disputes any implication that this reflects when the Parties agreed on those
terms. Rather, Lehman and Barclays agreed that those assets would become "Purchased
Assets" prior to the Sale Hearing on September 19, 2008. BCI Ex. 77 [King Dep. Tr.]
78:24-79:20. The Movants understood that the repo assets were "Purchased Assets"
within the meaning of the agreements. BCI Ex. 50 [Dec. 22, 2008 Hearing Tr.] at
19:120–20:10; BCI Ex. 87 [Miller Dep. Tr.] at 39:5-40:3, 106:2-107:6.

521. **In a draft of the Clarification Letter at approximately 7:30 p.m. on September 19,**

**2008, the definition of "Purchased Assets" still included the "Long Positions," but**

**stated it was "understood that the Long Positions referred to in clause (d) of**

*Contains Highly Confidential Information*

Purchased Assets do not have a book value of approximately $70 billion." (A. 74 ¶

1(a).)

<u>Barclays' Response</u>

Barclays does not dispute the statement in paragraph 521.

522.   The inclusion of "(B) such securities and other assets held in LBI's 'clearance

boxes'. . ." in the definition of "Purchased Assets" did not exist in any draft of the

Clarification Letter until after the Sale Order was issued on September 20, 2008.

(*See* A. 74 ¶ 1(a).)

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 522 to the extent it implies that the
transaction was anything other than as agreed upon in the fully integrated Purchase
Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex.
18 [Purchase Agreement]. Barclays does not dispute that the draft Clarification Letter
circulated at 2:29 pm on September 20, 2008 was the first such draft circulated that
showed the change in the definition of "Purchased Assets" to include the clearance box
assets but disputes any implication that this reflects when the Parties agreed that the
clearance box assets would be transferred to Barclays as part of the Sale. Rather,
Lehman and Barclays agreed prior to the Sale Hearing on September 19, 2008 to identify
the clearance box assets as in the deal. All Movants and their advisors were aware that
the clearance box assets were part of the deal prior to the Hearing. BCI Ex. 78 [Kirk
Dep. Tr.] at 105:4-19, 110:17-111:19; BCI Ex. 85 [McDade Dep. Tr.] at 162:16-163:2;
BCI Ex. 58 [Burian Dep. Tr.] 315:17-319:14; BCI Ex. 80 [Kobak Dep. Tr.] at 180:11-23;
BCI Ex. 87.

523.   Included within the definition of Purchased Assets in the Clarification Letter were

the securities to be listed on Schedule A and the securities held in LBI's clearance

boxes, which at the close of business on September 21, 2008 were as specified on

Schedule B to the Clarification Letter. (A. 32 ¶ 1(a)(ii).)

*Contains Highly Confidential Information*

Barclays' Response

       Barclays disputes the statement in paragraph 523 to the extent it implies that the transaction was anything other than as agreed upon in the fully integrated Purchase Agreement, as defined in the Sale Order. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement]. Barclays further disputes the statement in paragraph 523 to the extent it misquotes the language in the Clarification Letter and disputes any implication that Barclays was limited to receiving only those clearance box securities listed on Schedule B. BCI Ex. 5 [Clarification Letter] at § 1(a)(ii); BCI Ex. 322 [Sept. 28, 10:50 pm email from D. Murgio to P. Tonucci, *et al.*, with attachments omitted]; BCI Ex. 19 [Sept. 29, 2008 Joint Motion] at p. 4, n.3.

524.    **The final versions of Schedule A and Schedule B to the Clarification Letter were filed with the Court under seal on December 18, 2008. Neither Schedule ascribed market value to any security or a total market value for all the securities. (Schedule A and Schedule B [Docket No. 2303).)**

Barclays' Response

       Barclays does not dispute that Schedules A and B were filed under seal in a joint motion filed on behalf of both LBHI and Barclays but disputes any implication that it was inappropriate not to ascribe "market value to any security or a total market value for all the securities." All Movants were aware prior to Closing of the differing estimates of the values of these securities. *See* Barclays' response to paragraph 502; BCI Ex. 237 [September 20, 2008 1:26 pm email from R. Miller to R. Messineo, *et al.*, with attachment]; BCI Ex. 258 [Sept. 21, 2008 12:46 pm email from D. Murgio to B. Kelly, *et al.* with attachment]; BCI Ex. 251 [Email chain including Sept. 21, 2008 6:11 am email from P. Tonucci to R. Miller, *et al.* and Sept. 21, 2008 5:17 am email from M. Forrest to I. Lowitt, *et al*, with attachment]; BCI Ex. 58 [Burian Dep. Tr.] at 263:25-264:11.

525.    **Schedule A was described in the Clarification Letter as "the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement," which was defined as "the September 18, 2008 repurchase arrangement among Purchaser and/or Affiliates and Bank of New York [("BONY")] as collateral agent." (A. 32 ¶¶ 1(a) (ii), 13.)**

*Contains Highly Confidential Information*

<u>Barclays' Response</u>

    Barclays does not dispute the statement in paragraph 525.

526.    **BONY ascribed a total market value of $45,037,075,446 to the securities on Schedule**

        **A. 132 (BONY's valuation of Schedule A as reflected on a spreadsheet Barclays**

        **provided to its auditors); *see also* A. 131 (July 31, 2009 cover letter from Barclays'**

        **counsel describing the spreadsheet at A. 132 as "containing information that were**

        **provided to Barclays' auditors relating to values that Barclays booked for securities**

        **received from Lehman and JPM").)**

<u>Barclays' Response</u>

    Barclays does not dispute that BONY marked the securities on Schedule A at
    $45,037,05,446.  Barclays disputes any implication that the BONY marks accurately
    reflected the aggregate market value of those securities or provided a reliable basis for
    valuing the repo collateral.  BCI Ex. 341 [Pfleiderer Report] ¶¶ 37, 41-43, Appendix at p.
    106; BCI Ex. 77 [King Dep. Tr.] 111:12-18; BCI Ex. 73 [Keegan Dep. Tr.] 42:6-20; BCI
    Ex. 101 [Yang Dep. Tr.] at 31:2-32:17.

527.    **Lehman ascribed a total market value of $42,902,924,897 to the securities on**

        **Schedule A. (*See* A. 89 (Lehman's valuation of Schedule A subtracting $7 billion in**

        **"TPCASH," which represents the $7 billion cash placeholder for the collateral**

        **shortfall on September 18 under the repo); *see also* A. 132 ("PCG Value" of**

        **$42,578,981,368 in Barclays spreadsheet to its auditors); A. 131.)**

<u>Barclays' Response</u>

    Barclays disputes paragraph 527 because it is not supported by the cited evidence.
    Barclays disputes that the Lehman marks provided a reliable basis for valuing the repo
    collateral and any implication that the Lehman marks represented an accurate depiction
    of the market value of the securities.  BCI Ex.92 [Ridings Dep. Tr.] at 17:12-18:11; BCI
    Ex. 87 [Miller Dep. Tr.] at 19:16-21, 25:21-26:3, 34:6-15; BCI Ex. 341 [Pfleiderer
    Report] at Section II and Appendix Four; BCI Ex. 77 [King Dep. Tr.] at 152:22-154:9;
    BCI Ex. 73 [Keegan Dep. Tr.] at 34:12-35:15.

*Contains Highly Confidential Information*

**528. Barclays ascribed a total market value of $40,690,302,877 to the securities on**

**Schedule (A. 132; *see also* A. 131.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 528 because it mischaracterizes the factual record and disputes that the statement is supported by the cited evidence. The figure cited includes assets in addition to those listed on Schedule A. BCI Ex. 94 [September 10, 2009 Romain Dep. Tr.] at 82:10-25; BCI Ex. 137 [Financial Schedule 1].

**529. Schedule B was described in the Clarification Letter as "such securities and other**

**assets held in LBI's 'clearance boxes' as of the time of the Closing. . . ." (A. 32 ¶ 1**

**(a)(ii).)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 529 because it mischaracterizes the quoted language. The relevant provision in the Clarification Letter provides: "such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser ... ." Barclays also disputes the statement in paragraph 529 to the extent it implies that Barclays was limited to receiving only those clearance box securities listed on Schedule B. BCI Ex. 5 [Clarification Letter] at § 1(a)(ii); BCI Ex. 322 [Sept. 28, 2008 10:50 pm email from D. Murgio to P. Tonucci, *et al.*]; BCI Ex. 19 [Joint Motion] at p. 4 n.3.

**530. According to Barclays, the assets in LBI's clearance boxes at the DTCC had an**

**approximate total market value of $2.4 billion. (*See* Trustee's Br. ¶ 4(i) (the**

**Disputed Assets that Barclays claims from the Trustee include "approximately $<u>2.4</u>**

**<u>billion</u> in assets that were in LBI's clearance boxes, primarily at the DTCC,**

**consisting of approximately $1.6 billion that has been wrongfully transferred to**

**Barclays and approximately $800 million that remains in the boxes.") (emphasis in**

**original).) (*See also* A. 32 ¶¶ 53, 100, 104.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 530 because it mischaracterizes the cited evidence. The Trustee says this, not Barclays, and the Trustee is wrong. The Trustee values the clearance box assets on the basis of stale and inaccurate marks, not market value. The unencumbered assets within the clearing boxes were "the most illiquid and hardest to value securities that Lehman Brothers owned on its balance sheet." BCI Ex. 78 [Kirk Dep. Tr.] at 106:14-17. After months of valuation work, Barclays has determined that the total value of the unencumbered clearance box securities received and not yet received is far less than asserted in this paragraph. BCI Ex. 341 [Pfleiderer Report] at ¶¶ 48 n.48, 114, 116.

531.    **At a minimum, the securities on Schedule B had a total market value of at least $1.9 billion. (*See* A. 100 (Sept. 21, 2008 email from M. Forrest to I. Lowitt, et al. (with analysis of "any unencumbered assets in all boxes" totaling $2,289,572,957.59, including amounts transferred to Barclays on Friday, September 19, 2008); A. 91 (Sept. 20, 2008 email from M. Forrest to I. Lowitt, et al. (stating "Goal is 1.9 billion in unencumbered"); *see also* A. 12 [Hraska] 223:4-14, 267:19-270:18, 293:9-300:2, 304:17-308:2 A. 23 [Ricci] 164:16-165:25; A. 92; A. 95; A. 132; A. 67; A. 127; A. 118.)**

Barclays' Response

Barclays disputes the statement in paragraph 531. The total value of the unencumbered clearance box securities received and not yet received by Barclays is far less than asserted in this paragraph. BCI Ex. 341 [Pfleiderer Report] at ¶¶ 48 n.48, 114, 116. Barclays notes that Mr. Lowitt had no personal knowledge of market value.

532.    **Barclays claims that the addition of paragraph 1(a)(ii)(B) to the Clarification Letter entitles it to additional assets that were in LBI's "clearance boxes," primarily at the Depository Trust & Clearing Corporation ("DTCC").**

*Contains Highly Confidential Information*

Barclays' Response

> Barclays disputes the statement in paragraph 532 as inaccurate and incomplete. Barclays does not dispute that paragraph 1(a)(ii)(B) to the Clarification Letter entitles it to the assets that were in LBI's "clearance boxes," including those assets at the DTCC. However, these were not "additional" assets. They were Purchased Assets even under the original APA. BCI Ex. 1 [APA] at § 1.

533. **Barclays claims that section 1(a)(ii)(B) of the Clarification Letter entitles it to**

 **approximately $1.035 billion that was transferred or pledged to Barclays. (*See***

 **Letter from Jonathan Hughes, Barclays, to James W. Giddens, dated May 13, 2009,**

 **at 5.)**

Barclays' Response

> Barclays does not dispute that the Parties agreed that those securities would be listed on Schedule B within the intent of the agreements. All Movants were aware of this and no one objected. BCI Ex. 5 [Clarification Letter]; BCI Ex. 262 [Sept. 21, 2008 8:12 am email from R. Miller to A. Keller, *et al.*]; BCI Ex. 324 [Sept. 29, 2008 10:47 am email from H. Miller to D. Murgio]. Barclays disputes any implication that those securities were worth $1.035 billion. That figure is based on stale and inaccurate marks, not market value. BCI Ex. 341 [Pfleiderer Report] at ¶¶ 48 n.48, 114, 116.

534. **Barclays claims that section 1(a)(ii)(B) of the Clarification Letter also entitles it to**

 **approximately $430 million that was transferred or pledged to Barclays between**

 **September 26 and 30, 2008. (*See* Letter from Jonathan Hughes, Barclays, to James**

 **W. Giddens, dated May 13, 2009, at 5.)**

Barclays' Response

> Barclays does not dispute that the Parties agreed that those securities would be treated as Purchased Assets under the Purchase Agreement. All Movants were aware of this and no one objected. *See* Barclays' response to paragraph 533. Barclays also disputes any implication that those securities were worth approximately $430 million. *See* Barclays' response to paragraph 533.

535. **Barclays claims that approximately $800 million that remains in LBI's clearance**

*Contains Highly Confidential Information*

boxes should be transferred to it. (*See* Letter from Lindsee Granfield, Cleary

Gottlieb Steen & Hamilton LLP to James Kobak, dated December 29, 2008; Letter

from Jonathan Hughes, Barclays, to James W. Giddens, dated May 13, 2009, at 1-6;

*see also* A. 12 [Hraska] 143:8-145:12; A. 24 [Romain] 104:6-105:11 (testifying that

Lehman's valuation of remaining unencumbered clearance box assets was $600 to

$700 million).)

Barclays' Response

> Barclays position is that, under the fully integrated Purchase Agreement, as defined in the
> Sale Order, it is entitled to all assets that were in LBI's clearance boxes as of the time of
> the Closing. BCI Ex. 16 [Sale Order] at pp. 1-2, 12; BCI Ex. 18 [Purchase Agreement].
> The results of Barclays best efforts to identify those assets on the basis of the information
> available has produced Schedule B and Exhibits 3, 4 and 5 to the Declaration of James
> Hraska. BCI Ex. 359 [Hraska Decl.] at ¶7. To the extent that those assets have not been
> delivered, Barclays is entitled to them.

536.   The existence of additional assets that were in LBI's so-called "clearance boxes,"

primarily at the DTCC (the "clearance box assets") were not disclosed to the Court

or discussed at the September 17 hearing or the Sale Hearing. (*See generally* A. 150

[Docket No. 318] 9/19/08 Tr; A. 149 [Docket No. 352] 9/17/08 Tr.)

Barclays' Response

> Barclays disputes paragraph 536. The Court was informed that Purchased Assets were
> defined broadly in the APA, *see* BCI Ex. 1 [APA] at p. 6 (defining Purchase Assets as
> "all of the assets of Seller and its Subsidiaries used in connection with the Business"),
> and that "[s]ome other changes that were made to the contracts affect what are called
> purchase[d] assets and what are excluded assets," BCI Ex. 49 [Sept. 19, 2008 Hearing
> Tr.] at 48:5-8.

537.   The Asset Purchase Agreement makes no reference to the clearance box assets. (A.

30 § 1.1.)

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes paragraph 537. As defined in the Sale Order, the Purchase Agreement includes the Clarification Letter, which explicitly states that these assets are Purchased Assets. Moreover, these assets were Purchased Assets even under the original APA, as they are assets "used in connection with the Business" and were not listed as Excluded Assets. BCI Ex. 1 [APA] at § 1.1.

538.    **The draft Clarification Letter that existed at the time of the Sale Hearing made no**

    **reference to the clearance box assets. (*See* Maguire Decl. Ex. 11.)**

Barclays' Response

Barclays disputes paragraph 538, as it incorrectly implies that the referenced draft included all matters on which agreement was reached prior to the Sale Hearing. All Movants were aware prior to the hearing or least prior to closing that these assets would be Purchased Assets. *See* Barclays' response to paragraph 536.

539.    **The draft of the Clarification Letter that the Trustee's advisors obtained on Sunday**

    **night, September 21, 2008, indicated a transfer of certain assets from LBI's**

    **clearance boxes at the DTCC. (*See* Maguire Decl. Ex. 16 ¶ 1(a)(ii).)**

Barclays' Response

Barclays disputes the statement in paragraph 539. The Trustee likely knew, or should have known, well before Sunday night that the clearance box assets would be Purchased Assets. This fact was discussed at weekend meetings at Weil Gotshal. BCI Ex. 80 [Kobak Dep. Tr] 175:3-12 (Trustee's advisors were present at Weil over the weekend); BCI Ex. 87 [Miller Dep. Tr.] at 42:19-43:9 ("there was a lot of discussion about clearance box assets").

540.    **The DTCC is a privately-owned company that, through various subsidiaries,**

    **provides clearing, settlement and information services to the domestic and global**

    **securities industry.**

Barclays' Response

Barclays does not dispute the statement in paragraph 540.

*Contains Highly Confidential Information*

541.    **In the week before the Sale Hearing, the DTCC had concerns about LBI's ability to**

**satisfy its liabilities to the DTCC in connection with its open trading positions.**

**(LBHI Sale Order ¶ E [Docket No. 258]; A. 150 [Docket No. 318] 9/19/08 Tr. at 49:8-**

**17, 50:614, 51:24-53:8).)**

<u>Barclays' Response</u>

Barclays does not dispute the statement in paragraph 541.

542.    **Barclays refused to assume LBI's liabilities to DTCC beyond a limited $250 million**

**amount.  (*See* First Amendment To Asset Purchase Agreement ¶ 4 [Docket No.**

**280]; A. 20 [McDade] 278:12-280:16.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 542 because it mischaracterizes the cited
evidence.  Barclays was not willing to provide an unlimited guarantee to the DTCC, but
agreed to provide a guarantee on specified terms set forth in a First Amendment to the
APA.  The First Amendment to the APA was then superseded by the DTCC Letter.

543.    **Barclays' refusal to assume all of LBI's liabilities to DTCC left the DTCC exposed**

**to losses in excess of $250 million that it might incur in clearing hundreds of billions**

**of dollars of open LBI trades. (Maguire Decl. Ex. 24 (DTCC Annual Report 2008) at**

**13.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 543 because it is misleading and is not
proven by the evidence cited.  Barclays further disputes any implication that the DTCC
did not agree that Barclays need not assume the entirety of LBI's accounts and the
liabilities associated with those accounts.  To the contrary, as reflected in the DTCC
Letter and the Clarification Letter, the DTCC satisfied itself that the $250 million
payment provided for in those documents gave it adequate protection. BCI Ex. 374 [Mar.
31, 2009 email from S. Hirshon to E. Kay, *et al.*].

*Contains Highly Confidential Information*

544.  **Barclays' proposal to acquire LBI's assets at the DTCC increased the DTCC's**

**potential exposure by threatening to deprive the DTCC of an important source of**

**collateral.  (Kobak Decl. ¶ 12.)**

Barclays' Response

Barclays disputes the statement in paragraph 544 to the extent it implies the DTCC did
not agree that Barclays need not assume the entirety of LBI's accounts and the liabilities
associated with those accounts.  The parties agreed that the securities *in those accounts*
would transfer to Barclays, and nothing in the DTCC Letter modifies the provision to that
effect in the Clarification Letter.  To the contrary, as reflected in the DTCC Letter and the
Clarification Letter, the DTCC satisfied itself that the $250 million payment provided for
in those documents gave it adequate protection.  *See* Barclays' response to paragraph
543.

545.  **Over the course of the weekend of September 20 and 21, 2008, it appeared that**

**DTCC's concerns might derail the entire transaction.  Tonucci wrote in an email**

**that the DTCC's concerns were "[p]ossibly fatal" (Maguire Decl. Ex. 25), and Bart**

**McDade testified that the DTCC issue could "stop the deal." (A. 20 [McDade] 278:9-**

**280:16.)**

Barclays' Response

Barclays does not dispute that DTCC's concerns posed a threat to the deal until it agreed
to accept a flat payment of $250 million as a limited recourse guarantee for the liabilities
associated with the clearance box accounts.  *See* Barclays' response to paragraph 543.

546.  **Archibald Cox testified that he had been concerned that the deal might "not go**

**through" because of the DTCC's concerns.  (A. 6 [Cox] 92:23-93:8.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 546.

*Contains Highly Confidential Information*

**547.    Barclays agreed that it would exclude the assets at DTCC from the Sale**

**Transaction.  (Maguire Decl. Ex. 23 [DTCC Letter] ¶ 1; Kobak Decl. ¶ 13.)**

Barclays' Response

Barclays disputes the statement in paragraph 547, which is not supported by the cited evidence.  Barclays never agreed to exclude the assets in LBI's DTCC clearance boxes from the Purchased Assets; to the contrary, those assets were specifically provided to Barclays.  BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(B).  The DTCC Letter nowhere contains an agreement to exclude *the assets* at DTCC from the Sale Transaction.  To the contrary, the DTCC Letter merely made clear that Barclays was not assuming Lehman's "accounts" and the obligations associated with those accounts.  The parties agreed that the securities in those accounts would transfer to Barclays, and nothing in the DTCC Letter modifies the provision to that effect in the Clarification Letter, even though the Clarification Letter reflects other changes necessitated by the terms of the DTCC Letter. *Id.* at § 1(d).  No one ever suggested during the negotiations of the DTCC Letter or the Clarification Letter that the DTCC Letter would affect Barclays' entitlement to all clearance box assets, including those in the clearance boxes at the DTC.  BCI Ex. 364 [Lewkow Decl.] at ¶14.  Moreover, the statements and conduct of the parties following the Closing is inconsistent with this statement.  No Movant objected when Weil Gotshal, on behalf of LBHI, and Cleary Gottlieb, on behalf of Barclays, filed Schedule B with the Court.  BCI Ex. 20 [Schedule B].  Similarly, on September 22, 2008, simultaneously with the execution of the Clarification Letter and the DTCC Letter, LBHI and the Trustee also executed a "Services and Settlement Agreement" with JPMorgan Chase Bank N.A., Barclays, SIPC, which provided that:  "BarCap shall have no interest in the cash, securities or other property in the Accounts on the date hereof, *other than* any accounts maintained for LBI's customers or *any lien-free accounts at Depository Trust Company*." BCI Ex. 7 [Services and Settlement Agreement] at ¶ 2 (emphasis added); *see also* BCI Ex. 9 [Dec. 5, 2008 Settlement Agreement] at ¶ 3(b)(iii).  Additionally, the Trustee authorized the transfer of certain clearance box assets after the DTCC Letter was executed, including:  (a) $269 million from the DTCC on September 26; (b) $146 million from the DTCC on September 30; and (c) $15 million from the DTCC on September 30. BCI Ex. 373 [Sept. 26, 2008 4:13 pm email from A. Frelinghuysen to M. Witkin, *et al.*]; BCI Ex. 327 [Sept. 29, 2008 3:52 email from A. Frelinghuysen to M. Witkin, *et al.*].

**548.    Barclays had previously questioned the value of Lehman's DTCC assets, which**

**were "the most illiquid and hardest to value securities that Lehman Brothers owned**

**on its balance sheet." (A. 16 [Kirk] 106:4-108:24.)**

*Contains Highly Confidential Information*

Barclays' Response

> Barclays does not dispute that the clearance box securities were extremely difficult to value and that it was understood the securities were likely worth less than the $1.9 billion estimate provided at the time of Closing.

**549.    The parties recorded their agreement to exclude Lehman's DTCC assets in the DTCC Letter, which the DTCC drafted between late Sunday night and Monday morning September 21-22, 2008 (the "DTCC Letter"). (Kobak Decl. ¶ 13.)**

Barclays' Response

> Barclays disputes the statement in paragraph 549 and incorporates its response to statement 547.

**550.    On early Monday morning, September 22, 2008, the DTCC, Barclays, and the Trustee executed the DTCC Letter. (Maguire Decl. Ex. 23.)**

Barclays' Response

> Barclays does not dispute the statement in paragraph 550.

**551.    The purpose of the DTCC Letter was to satisfy DTCC's concern regarding LBI's ability to honor its liabilities to DTCC arising from the winding down and closing of the LBI accounts. (*See* Letter from Jonathan Hughes, Barclays, to James W. Giddens, dated May 13, 2009, at 3.)**

Barclays' Response

> Barclays disputes the statement in paragraph 551 to the extent it implies the purpose of the DTCC Letter was to guarantee liabilities beyond the $250 million provided for in the Agreement itself. The DTCC had agreed that Barclays need not assume the entirety of LBI's accounts and the liabilities associated with those accounts. Instead, the DTCC was willing to accept a flat payment of $250 million as a limited recourse guarantee for such liabilities. *See* Barclays' response to paragraph 543.

*Contains Highly Confidential Information*

552.    **The DTCC Letter defines LBI's accounts as "Excluded Assets" under the Asset**

**Purchase Agreement. (Maguire Decl. Ex. 23 ¶ 1.)**

Barclays' Response

Barclays does not dispute that the DTCC Letter defines "all of the accounts of LBI
maintained at the Clearing Agencies Subsidiaries" as "'Excluded Assets' within the
meaning of the APA," but Barclays disputes any implication that the exclusion of LBI's
accounts and the liabilities associated with those accounts affects Barclays rights under
the Purchase Agreement to the securities held in those accounts. The obligations
associated with those accounts are severable from the securities held in those accounts,
and the DTCC Letter and Clarification Letter memorialize this distinction. *See* Barclays'
response to paragraph 547.

553.    **The DTCC Letter provides:**

> **Winding Down of Accounts. Barclays has indicated, and hereby
> agrees, that all of the accounts maintained at the Clearing Agencies
> Subsidiaries (the "Accounts") constitute "Excluded Assets" within the
> meaning of the Asset Purchase Agreement. Accordingly, pursuant to
> the authority granted to the Trustee in the Orders, the Trustee hereby
> instructs the Clearing Agency Subsidiaries to close out the pending
> transactions in the Accounts of the Clearing Agency Subsidiaries and
> to use the proceeds in accordance with the Rules and Procedures of
> the Clearing Agency Subsidiaries. Such liquidation transactions shall
> be transferred to, and closed out by, the relevant Clearing Agency
> subsidiary, in the same manner as it closes out positions of
> Participants/Members for whom it has ceased to act.**

> **As Part of this closeout process, the Trustee hereby authorizes DTC to
> accept and act upon instructions from NSCC to deliver securities
> from the DTC LBI Accounts to NSCC's account, in order to reduce or
> eliminate LBI's outstanding delivery obligations to NSCC.**

**(Maguire Decl. Ex. 23. ¶ 1.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 553.

554.    **John Rodefeld, among those to whom the DTCC Letter was addressed, did not have**

**any knowledge of its terms. ([Rodefeld] 112:14-114:9.)**

*Contains Highly Confidential Information*

Barclays' Response

> Barclays disputes the statement in paragraph 554 because it is not supported by the cited evidence. Nowhere in the cited testimony of Mr. Rodefeld is there a statement that he lacked knowledge of the terms of the DTCC Letter.

555. **Gerard LaRocca, who signed the DTCC Letter on Barclays' behalf, did not have**

   **any knowledge of its terms. (A. 18 [LaRocca] 162:19-165:20.)**

Barclays' Response

> Barclays disputes the statement in paragraph 555 because it is not supported by the cited evidence. Nowhere in the cited evidence, the testimony of Mr. LaRocca, is there a statement that he had no knowledge of the terms of the DTCC Letter. He testified that although he does not recall if he read the document, he is "fairly certain [his] internal legal team would have explained this letter" to him. BC Ex. 82[LaRocca Dep. Tr.] at 164:12-16.

556. **On September 19, 2008, Lehman and Barclays executives agreed to include in the**

   **Sale Transaction excess cash or securities that might be released from LBI's Rule**

   **15c3-3 accounts. (A. 20 [McDade] 162:8-164:5; A. 16 [Kirk] 105:4-106:19; A. 19**

   **[Lowitt] 59:17-20; A. 23 [Ricci] 164:16-22, 165:18-25.)**

Barclays' Response

> Barclays disputes the statement in paragraph 556 to the extent it implies that Lehman and Barclays agreed to include in the Sale Transaction only cash or securities that might be released from LBI's Rule 15c3-3 Reserve Accounts. Rather, Lehman and Barclays agreed on September 19, 2008, to include in the Sale Transaction $769 million of securities, whether those securities were held pursuant to Rule 15c3-3 or were securities of substantially the same nature and value. BCI Ex. 5 [Clarification Letter] at § 8(ii); BCI Ex. 91 [Ricci Dep. Tr.] at 160:5-16, 165:18-25; BCI Ex. 79 [Klein Dep. Tr.] at 112:20-113:25; BCI Ex. 85 [McDade Dep. Tr.] at 162:8-163:2.

557. **SEC Rule 15c3-3 requires broker-dealers such as LBI to maintain separately one or**

   **more cash reserve accounts containing the net amount of money the broker-dealer**

   **owes its customers. *See* Customer Protection - Reserves and Custody of Securities,**

*Contains Highly Confidential Information*

17 C.F.R. § 240.15c-3-3 (2009). This statutory minimum requirement is calculated

weekly, and has to be segregated in the form of cash or qualified securities in a

"Special Reserve Bank Account for the Exclusive Benefit of Customers" (the

"Reserve Account"). *Id.* .§ 240.15c3-3(e). With respect to custody of customer fully

paid and excess margin securities, the rule requires that the broker-dealer may not

pledge, hypothecate, or use such securities to support borrowing by the broker-

dealer, but must maintain them free of liens at "good control" locations, available

for prompt return to the customer. *Id.* § 240.15c3-3(b). To the extent that the

broker-dealer is not in compliance with custody requirements, the Reserve Account

deposit must be correspondingly increased. *Id.* § 240.15c3-3(e)(1).

Barclays' Response

Barclays denies paragraph 557 because it is not a statement of fact but a conclusion of
law and does not require a response. To the extent a response is required, Barclays states
that the contours of Rule 15c3-3 are irrelevant to this case because Lehman and Barclays
agreed on September 19, 2008, to include in the Sale Transaction $769 million of
securities, whether those securities were held pursuant to Rule 15c3-3 or were securities
of substantially the same nature and value. *See* Barclays' response to paragraph 556.
Barclays also objects to the statement in paragraph 557 to the extent it implies that
Lehman's 15c3-3 Reserve Amount calculation of September 19, 2008 was incorrect. To
date, no recalculation of that amount has been done. BCI Ex. 45 [McIsaac Affidavit] at
¶31; BCI Ex. 343 [Vinella Report] at p. 6.

558.    In connection with the Sale Transaction, no cash from the 15c3-3 accounts was

committed to Barclays. (A. 150 [Docket No. 318] 9/19/08 Tr. at 54:24-25 ("There's

no cash that's being transferred to Barclays").)

Barclays' Response

Barclays disputes the statement in paragraph 558 because it is not supported by the cited
source and it mischaracterizes Ms. Fife's statement to the extent it takes it out of
context. Ms. Fife's cited statement does not refer to the agreement between Lehman and
Barclays to transfer $769 million of securities to Barclays, whether from Lehman's

*Contains Highly Confidential Information*

15c3-3 reserve accounts or of similar nature and value. Rather, Ms. Fife informed the Court that the Retained Cash provision was being deleted: "There was a provision in a deal originally which required the debtors to transfer 700 million dollars in cash to Barclays. And that is no longer the case." BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 53:20-25; BCI Ex. 5 [Clarification Letter] at¶ 8(ii).

**559.    In connection with the Sale Transaction, Lehman informed Barclays it might be able to provide an additional $769 million in 15c3-3 securities to the extent there was an available excess.  (*See* A. 23 [Ricci] 165:18-25; A. 32 ¶ 8 (valuing 15c3-3 assets at $769 million and directing their transfer to Barclays); A. 119 (same); A. 84; A. 93; A. 76; A. 113; A. 107; A. 109-112.)**

Barclays' Response

Barclays disputes the statement in paragraph 559 because it mischaracterizes the record. The testimony of Mr. Ricci cited by the Movants in support of this proposition does not state that the agreed transfer was "to the extent there was an available excess." BCI Ex. 91 [Ricci Dep. Tr.] at 165:18-25. Moreover, elsewhere Mr. Ricci testifies that the "final deal included ... the 15c3 moneys or equivalent securities to 15c3 moneys." *Id.* at 160:5-16. Mr. Ricci further testified that the agreement reached was "on a number of $765 million – of 15c3 funds or other securities to that amount." *Id.* at 203:12-17. Barclays therefore disputes the statement in paragraph 559 to the extent it implies inaccurately that Lehman and Barclays agreed to anything other than to the transfer to Barclays of securities held pursuant to Rule 15c3-3 or securities of substantially the same nature and value. BCI Ex. 5 [Clarification Letter] at § 8(ii).

**560.    The Clarification Letter provided for the transfer, "to the extent permitted by applicable law," of "$769 million of securities as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value" (the "Rule 15c3-3 Securities").  (A. 32 ¶ 8(ii).)**

Barclays' Response

Barclays disputes the statement in paragraph 560 as incomplete. Section 8(ii) of the Clarification letter provided that Barclays shall receive, as part of the Sale Transaction

*Contains Highly Confidential Information*

"to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value." BCI Ex. 5 [Clarification Letter] at § 8(ii).

561.    **Under the Clarification Letter and provided that it was within the parameters of the**

**deal disclosed to the Court, Barclays would be entitled to the Rule 15c3-3 Securities**

**if, among other things, (i) there was regulatory approval to release funds or**

**securities from the lock-up, (ii) there was an excess in LBI's Reserve Account; and**

**(iii) customer claims could be fully satisfied in the SIPA liquidation. (Kobak Decl. ¶**

**15.)**

Barclays' Response

Barclays disputes the statement in paragraph 561. The cited source, Mr. Kobak, claimed that he had no personal knowledge of the negotiation of the Clarification Letter, and therefore had no basis to attest to specific provisions of this agreement. Mr. Kobak wrote in his declaration that his team "did not actively participate in the negotiation and drafting of the Clarification Letter." Kobak Decl. at ¶ 9. Mr. Kobak also testified in his deposition that the Trustee and his advisors relied on Weil Gotshal to represent Lehman in the negotiations. BCI Ex. 80 [Kobak Dep. Tr.] at 134:16-135:4. Barclays further disputes the statement in paragraph 561 to the extent it implies that Lehman and Barclays agreed to include in the Sale Transaction only cash or securities that might be released from LBI's Rule 15c3-3 Reserve Accounts. Rather, Lehman and Barclays agreed on September 19, 2008, to include in the Sale Transaction $769 million of securities, whether those securities were held pursuant to Rule 15c3-3 or were securities of substantially the same nature and value. *See* Barclays' response to paragraph 556. Barclays further disputes the statement in paragraph 561 to the extent it implies that the Clarification Letter was not disclosed to the Court. Lehman's counsel expressly represented to the Court that there were changes to the deal, and that the APA (which provided for Barclays to acquire all assets in the Business) was being amended through a Clarification Letter. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 43:14-20, 48:8-10. The Movants have acknowledged that the Clarification Letter was part of the final Purchase Agreement and the parties all understood the final Purchase Agreement to be consistent with the transaction that had been described to the Court. BCI Ex. 33 [LBHI Brief in Opposition to Bay Harbour Appeal] at p. 9; BCI Ex. 58 [Burian Dep. Tr.] at 65:7-23; BCI Ex. 70 [Miller Dep. Tr.] at 33:16-24, 48:19-49:11; BCI Ex. 70 [Hughes Dep. Tr.] at 16:8-17:11; BCI Ex. 5 [Clarification Letter] at § 8(ii).

*Contains Highly Confidential Information*

562.    **The release of any excess cash or securities from LBI's Reserve Account required**

      **regulatory approval.** (*See, e.g.,* **A. 20 [McDade] 282:22-283:4 (Lehman's promise to**

      **convey 15c3-3 assets "most definitely" required regulatory approval); A. 26**

      **[Tonucci] 58:12-59:11 ("[i]t was always understood that there was a regulatory**

      **approval that would be required"); A. 1 [Azerad] 196:2-197:4 (the transfer of 15c3-**

      **3 assets and reduction in the amount segregated under Rule 15c3-3 required**

      **regulatory approval).)**

Barclays' Response

      Barclays denies the statement in paragraph 562 because it is an improper legal
conclusion. If a response is required, Barclays disputes the statement in paragraph 562 to
the extent it implies that Barclays' entitlement to $769 million in securities was
contingent on (i) a regulatory approval to release funds or securities from the lock-up, (ii)
the existence of an excess in LBI's Reserve Account; or (iii) customer claims being fully
satisfied in the SIPA liquidation. Kobak Decl. at ¶ 15. Barclays therefore disputes the
statement in paragraph 562 to the extent it implies inaccurately that Lehman and Barclays
agreed to anything other than to the transfer to Barclays of securities held pursuant to
Rule 15c3-3 or securities of substantially the same nature and value. BCI Ex. 5
[Clarification Letter] at § 8(ii).

563.    **Ricci did not recall ever having read paragraph 8(ii) of the Clarification Letter or**

      **being aware that the transfer to Barclays of $769 million in LBI's Rule 15c3-3**

      **Securities was allowed "to the extent permitted by applicable law." (A. 23 [Ricci]**

      **271:18-25.)**

Barclays' Response

      Barclays does not dispute that Mr. Ricci testified that he did not recall having previously
read paragraph 8(ii) of the Clarification Letter. Barclays disputes the remainder of the
statement in paragraph 563 to the extent it implies that the phrase "to the extent permitted
by applicable law" means that Barclays' right to $769 million in securities is conditioned
upon SEC regulatory approval of a release of excess from Lehman's 15c3-3 Reserve
Account, and as mischaracterizing Mr. Ricci's testimony. In the questioning in and
around the portion of Mr. Ricci's testimony cited by Movants for this proposition, Mr.
Ricci repeatedly rejects the Movants' counsel's efforts to equate the language "to the

*Contains Highly Confidential Information*

extent permitted by applicable law" to a requirement that Barclays' entitlement to $769 million in securities was conditioned on regulatory approval or upon the existence of an excess in Lehman's 15c3-3 Reserve Account. BCI Ex.91 [Ricci Dep. Tr.] at 270:13-272:13.

**564.    McDade was not aware that the transfer of LBI's Rule 15c3-3 Securities to Barclays**

**under the Clarification Letter ever became unconditional. (A. 20 [McDade] 285:3-**

**13.)**

Barclays' Response

Barclays disputes the statement in paragraph 564 because it is immaterial to the present dispute. Mr. McDade's awareness (or lack thereof) is irrelevant in light of the Clarification Letter, which provides explicitly that Barclays shall receive "to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value." BCI Ex. 5 [Clarification Letter] at § 8(ii).

**565.    The transfer of LBI's Rule 15c3-3 Securities to Barclays under the Clarification**

**Letter never became unconditional.**

Barclays' Response

Barclays disputes the statement in paragraph 565 as unsupported by evidence and as contrary to the plain terms of the Clarification Letter. The Clarification Letter provided that Barclays shall receive "to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value." BCI Ex. 5 [Clarification Letter] at § 8(ii). The "substantially the same nature and value" clause was added specifically to ensure that Barclays would receive $769 in securities unconditionally, even if regulatory approval for transfer of the 15c3-3 assets could not be obtained. BCI Ex. 364 [Lewkow Decl.] at ¶ 20.

**566.    After the closing of the Sale Transaction, the SEC refused to approve the release of**

**LBI's Rule 15c3-3 Securities because of questions regarding whether there was an**

**excess in the account. (A. 3 [Blackwell] 206:21-207:10, 208:11-21 (Barclays**

*Contains Highly Confidential Information*

"[a]sk[ed] the SEC to ... provide their sign off that the C3 had an excess or

otherwise," but the SEC was not "comfortable doing it").)

Barclays' Response

Barclays disputes the statement in paragraph 566 as incomplete. Mr. Blackwell
testified that he recalled "[a]sking the SEC to review the calculation and release and
authorize -- provide their sign-off that the C3 had an excess or otherwise, but have an
opinion on the C3 and authorize a sign-off to the trustee of LBI to release the cash related
to the margin balances, as I mentioned before, another element of the PIM transfer, and
securities from -- securities from JPMorgan Chase," but that the response was "I don't
think he was comfortable doing it, doing that at that point. He wanted to get a better
understanding of the books and records at that point. So I think we continued to work
with members of the SEC and to try and provide them with a better understanding and the
finance team probably led that effort in terms of the overall 15C3." BCI Ex. 56
[Blackwell Dep. Tr.] at 206:21-208:21. Barclays further disputes the statement in
paragraph 566 to the extent it implies that Barclays' entitlement to $769 million in
securities was contingent on (i) a regulatory approval to release funds or securities from
the lock-up; (ii) the existence of an excess in LBI's Reserve Account; and (iii) customer
claims being fully satisfied in the SIPA liquidation. Kobak Decl. at ¶ 15. Barclays
therefore disputes the statement in paragraph 566 to the extent it implies inaccurately that
Lehman and Barclays agreed to anything other than to the transfer to Barclays of
securities held pursuant to Rule 15c3-3 or securities of substantially the same nature and
value. BCI Ex. 5 [Clarification Letter] at § 8(ii).

567.   Barclays claims that it is entitled to $769 million of securities that LBI had

       maintained in a reserve account pursuant to SEC Rule 15c3-3 or securities of

       substantially the same nature and value. (*See* Letter from Jonathan Hughes,

       Barclays, to James W. Giddens, dated May 13, 2009 at 6-7.)

Barclays' Response

Barclays does not dispute the statement in paragraph 567. BCI Ex. 5 [Clarification
Letter] at § 8(ii).

568.   The Asset Purchase Agreement makes no reference to the transfer of $769 million in

       securities in Lehman's 15c3-3 reserve account. (*See* A. 30 § 1.1.)

Barclays' Response

Barclays disputes the statement in paragraph 568. The Purchase Agreement
explicitly makes a reference to the transfer to Barclays of $769 million in securities
in Lehman's 15c3-3 reserve accounts or securities of substantially the same nature
and value. BCI Ex. 33 [LBHI Brief in Opposition to Bay Harbour Appeal] at p. 9 ("The
Original APA, First Amendment, and Clarification Letter collectively constitute the
APA"); BCI Ex. 5 [Clarification Letter] at § 8(ii). Moreover, these assets were
Purchased Assets even under the original APA, as they were assets "used in connection
with the Business" and were not listed as Excluded Assets. BCI Ex. 2 [APA] at § 1.1.

**569. The transfer to Barclays of assets from LBI's Rule 15c3-3 accounts was not**

**disclosed to the Court or discussed at the September 17 hearing or at the Sale**

**Hearing. (*See generally* 9/19/08 Tr. [Docket No. 318]; 9/17/08 Tr. [Docket No. 352].)**

Barclays' Response

Barclays disputes as misleading the statement in paragraph 569. These assets were
the subject of extensive discussion and documentation during the weekend meetings
at Weil attended by all Movants and their advisors. BCI Ex. 58 [Burian Dep. Tr.] at
305:17-308:8; BCI Ex. 88. [O'Donnell Dep. Tr.] at 82:13-84:18; BCI Ex. 329 [Sept. 27,
2008 12:53 pm email from G. West to J. McCarthy, *et al.* with attachment]. Barclays'
entitlement to these assets is stated explicitly in the Clarification Letter, which all
Movants executed or approved. Barclays also incorporates its response to paragraph 536.

**570. The draft Clarification Letter that existed at the time of the Sale Hearing made no**

**reference to the transfer to Barclays of $769 million in LBI's Rule 15c3-3 Securities.**

**(*See* Maguire Decl. Ex. 11.)**

Barclays' Response

Barclays disputes the statement in paragraph 570 and incorporates its response to
paragraph 536. BCI Ex. 85 [McDade Dep. Tr.] at 162:8-164:5; BCI Ex. 78 [Kirk
Dep. Tr.] at 105:4-106:17; BCI Ex. 83 [Lowitt Dep. Tr.] at 59:17-20; BCI Ex. 91
[Ricci Dep. Tr.] at 164:16-22, 165:18-25; *see also* Barclays' response to paragraph
556; BCI Ex. 5 [Clarification Letter] at § 8(ii).

**571. LBI attempted to calculate its 15c3-3 requirements over the weekend of September**

*Contains Highly Confidential Information*

20 and 21, 2008, but due to various difficulties, including a large number of fails and

stock record breaks, it could not reliably determine whether there was a surplus or

a deficit in the Reserve Account. (*See* A. 19 [Lowitt] 271:16-272:22 ("There was [*sic*]

a lot of fails. There was [*sic*] items that weren't being posted accurately and those

were all elements that made the computation of 15c3 difficult that weekend.");

Maguire Decl. Ex. 27 ("the number of stock record breaks are overwhelming"); A.

26 [Tonucci] 57:8-16 ("There was uncertainty, a great deal of uncertainty about the

excess.").)

Barclays' Response

Barclays disputes the statement in paragraph 571 because it mischaracterizes the
testimony cited to support it. Mr. Lowitt testified that "the estimates of the 15c3
excess that had been generated earlier in the week were believed to be accurate
reflections and that those were computed without all the dirty data that was associated
with all the collateral movements and other issues in LBI, and so the excess that had
been estimated earlier was a good reflection of what the excess was likely to be."
BCI Ex. 83 [Lowitt Dep. Tr.] at 272:4-12.

**572.** **There was no surplus in the 15c3-3 Reserve Account as of September 19, 2008.**

**(Kobak Decl. ¶ 14.)**

Barclays' Response

Barclays disputes the statement in paragraph 572. No re-calculation of LBI's reserve
requirement as of September 19, 2008 has been performed to date and it is therefore
not possible to determine whether there was a surplus in the 15c3-3 Reserve Account
as of the date of the SIPA Liquidation. BCI Ex. 343 [Vinella Report] at 6; BCI Ex. 45
[McIsaac Affidavit] at ¶ 31.

**573.** **Over the weekend of September 20-21, 2008, Lehman executives looked into certain**

**margin accounts maintained by Lehman at the Options Clearing Corporation**

**("OCC") (the "OCC Margin Accounts") as a possible source of assets to transfer to**

231

*Contains Highly Confidential Information*

**Barclays under the Sale Transaction. (*See* A. 78 ("We did find $5 bn of exchange**

**listed options which we are investigating"); A. 106; A. 105; A. 78; *see also* A. 11**

**[Fleming] 132:21-133:11, 137:6-138:3.)**

Barclays' Response

Barclays disputes the statement in paragraph 573 to the extent it implies that Lehman
executives believed at any time that exchange-traded derivatives and associated margin
were not included among the Purchased Assets and Assumed Liabilities; to the contrary,
the inclusion of these assets (and liabilities) was understood from the outset, as the
Lehman executives referenced in paragraph 573 subsequently came to learn. BCI Ex. 83
[Lowitt Dep. Tr.] at 248:13-249:6. Barclays further disputes the statement in paragraph
573 to the extent it implies that Lehman executives believed at any time that any of the
margin associated with exchange-traded derivatives was excluded from the Purchased
Assets. The $5 billion 2008, figure necessarily comprised Lehman's best estimate of all
margin associated with all exchange-traded derivatives (for the positions themselves
carried substantial negative value, and the margin at the OCC alone at no point during
that week approached $5 billion). Barclays further disputes that implication because the
inclusion of all exchange-traded derivatives and all associated margin as acquired assets
(and liabilities) is further confirmed by the APA, which provides that "exchange-traded
derivatives" and "all assets" used in LBI's trading business and business as a futures
commission merchant were included among the Purchased Assets. This is further
confirmed by documentary evidence generated on Thursday, September 18, 2008 and
Friday, September 19, 2008, which demonstrates LBI's understanding that exchange-
traded derivatives and all associated margin were included in the deal. *See* BCI Ex. 206
[Sept. 18, 2008 6:23 pm email from J. Grenier to T. Sullivan, with attachments]; BCI Ex.
217 [Sept. 19, 2008 10:50 am email from S. Byrne to L. James, *et al.*]; BCI Ex. 230
[Sept. 20, 2008 2:18 am email from A. Rovira to J. McDaniel, *et al.*]. This is further
confirmed by documentary evidence from September 20, 2008 and September 21, 2008,
which further demonstrates all parties' understanding that "the LBI accounts and all
positions, cash and securities collateral that are held . . . in respect of those accounts are
intended to be transferred to Barclays." *See id.*; BCI Ex. 235 [Sept. 20, 2008 1:09 pm
email from E. Rosen to J. McDaniel, *et al.*]; BCI Ex. 212 [Sept. 21, 2008 4:03 pm email
from J. McDaniel to E. Rosen, *et al.* with attachment]. Neither LBI nor the Trustee ever
objected to this description of the transaction as being inconsistent with their prior
understanding. Barclays further disputes the implication of paragraph 573 that the cited
sources suggest that exchange-traded derivatives and all associated margin were not
understood to be among the acquired assets (and liabilities) from the outset, for although
they reference the possible existence of "excess" margin at the OCC, they in no way
indicate (or even imply) that such margin was excluded from the deal or not understood
to be part of the deal by the time of their creation.

**574.   On the morning of Sunday, September 21, 2008, Barclays inquired about Lehman's**

*Contains Highly Confidential Information*

**net margin at the options and futures clearing houses. (*See* A. 106.)**

Barclays' Response

    Barclays does not dispute that, at 11:18 a.m. on September 21, 2008, Stephen King wrote to Lily McInerney: "What's I'm trying to be sure about is that we have a clear list of all exchange traded positions (options, futures, etc) as of Friday close. Need this today. Very important. Also, I need to know what the net margin is at the relevant clearing house, and whether that reflects the Friday close marks." BCI Ex. 259 [Sept. 21, 2008 1:05 pm email from F. Pearn to T. Stack, *et al.* with attachment]. Barclays disputes the implication that Mr. King's email was an effort to locate new assets that were not already included in the deal between Barclays and LBI. To the contrary, Mr. King was asking about these assets precisely because he understood that that they were to be part of the deal, and hence needed to understand them, *see, e.g.*, BCI Ex. 91[Ricci Dep. Tr.] at 160:17-161:13; BCI Ex. 59 [Clackson Dep. Tr.] at 122:3-16; BCI Ex. 79 [Klein Dep. Tr.] 192:21-193:8; BCI Ex. 77 [King Dep. Tr.] at 234:11-24; BCI Ex. 217 [Sept. 19, 2008 10:50 am email from S. Byrne to L. James, *et al.*] (shared by LBI and the Trustee). BCI Ex. 2 [APA] at p. 6; BCI Ex. 83 [Lowitt Dep. Tr.] at 248:13-249:6; BCI Ex. 80 [Kobak Dep. Tr.] at 277:2-22; *see* Barclays' response to paragraph 573. Barclays further disputes the statement in paragraph 574 to the extent it implies that Mr. King was a negotiator for the APA, the Clarification Letter, the TAA, or any other operative transaction document that dealt with the assets included in the deal between Barclays and LBI.

575. **Over the weekend of September 20-21, 2008, Lehman's account statements showed**

    **that the OCC Margin Accounts contained excess margin. (*See* A. 106.)**

Barclays' Response

    Barclays does not dispute that OCC account statements bearing "activity date[s]" of September 19, 2008 and September 22, 2008 purported to reflect excess margin in LBI's OCC accounts, but disputes the statement in paragraph 575 because the term "excess margin" is vague and undefined, and because it ignores the fact that on Friday, September 19, 2008, the OCC did not consider any of the margin in the OCC accounts to constitute "excess" in the sense that the OCC would not release any of that margin to LBI. BCI Ex. 354 [Jones Decl.] at ¶¶ 8-9. Barclays further disputes the statement in paragraph 575 to the extent it implies that these account statements were reliable indicators of purported excess, since Barclays was receiving widely divergent information from the OCC and LBI over this weekend concerning whether the OCC accounts contained any excess (including an indication on Saturday, September 20, 2008, that the OCC accounts in fact carried a margin deficit). BCI Ex. 236 [Sept. 20, 2008 1:15 pm email from J. McDaniel to E. Rosen, *et al.*]; BCI Ex. 212 [Sept. 20, 2008 3:52 pm email from J. McDaniel to E. Rosen, *et al.*]. Barclays further disputes the statement in paragraph 575 to the extent it implies that any excess margin on any given day would (or was even likely to) continue to constitute excess on the following day, particularly given the significant fluctuations in

*Contains Highly Confidential Information*

the margin requirements at the OCC during the week preceding the Closing. BCI Ex.
354 [Jones Decl.] at Ex. 1. Barclays further disputes the statement in paragraph 575 to
the extent it implies that the purported "excess" shown on this report all constituted
excess value that Barclays would receive, since the posted margin included letters of
credit that Barclays would need to have re-issued in its own name in order for them to
continue to be included in the relevant calculation. BCI Ex. 230 [Sept. 20, 2008 2:18 am
email from A Rovira to E. Rosen, *et al.*]. Finally, Barclays disputes the statement in
paragraph 575 to the extent it implies that any excess in the OCC accounts (or other
exchange-traded derivatives accounts) was not understood to be included among the
acquired assets for all of the reasons noted in the responses to the statements contained in
paragraphs 573 and 574 above, and thus disputes that the existence or non-existence of
"excess margin" on any given day is even relevant to any issue in this case.

576.    **At 4:07 p.m. on September 21, 2008, Barclays' Tim Stack received an email from**

**Francis Pearn stating that "[h]ere are the OCC statements for LBI as of 9/22**

**reflecting our cash and securities collateral held for LBI account 074," Pearn**

**attached OCC account statements showing that LBI's accounts contained more than**

**$2 billion in margin, including approximately $252 million in letters of credit, $1.08**

**billion in cash, and $814 million in government securities and that LBI's margin**

**was in excess of the OCC's requirements.**

Barclays' Response

Barclays does not dispute that Tim Stack of Barclays received an email that contained the
language quoted in paragraph 576 or that attached to that email was a document that
purported to be an OCC account statement bearing an "activity date" of 9/22/2008, but
disputes the contents of paragraph 576 because the term "excess" is vague and undefined,
and because this OCC statement, as it relates to "excess," does not account for the fact
that the OCC did not consider any of the margin in the OCC accounts to constitute
"excess" as of Friday, September 19, 2008, in the sense that the OCC would not release
any of that margin to LBI. BCI Ex. 354 [Jones Decl.] at ¶¶ 8-9. Barclays further
disputes the statement in paragraph 576 to the extent it implies that Barclays viewed the
documents it received on Sunday, September 21, 2008, as reliable indicators of purported
excess, since Barclays was receiving widely divergent information from the OCC and
LBI over this weekend concerning whether the OCC accounts contained any excess
(including an indication on Saturday, September 20, 2008, that the OCC accounts in fact
carried a margin deficit). BCI Ex. 242 [Sept. 20, 2008 3:52 pm email from J. McDaniel
to E. Rosen, *et al.*]. Barclays further disputes the statement in paragraph 576 to the extent
it implies that any excess margin on any given day would (or was even likely to) continue

*Contains Highly Confidential Information*

to constitute excess on the following day, particularly given the significant fluctuations in the margin requirements at the OCC during the week preceding the Closing. BCl Ex. 354 [Jones Decl.] at Ex. 1. Barclays further disputes the statement in paragraph 576 to the extent it implies that the purported "excess" shown on this report all constituted excess value that Barclays would receive, since the posted margin included letters of credit that Barclays would need to have re-issued in its own name in order for them to continue to be included in the relevant calculation. BCI Ex. 230 [Sept. 20, 2008 2:18 am email from A. Rovira to J. McDaniel, *et al.* with attachment]. Finally, Barclays disputes the statement in paragraph 576 to the extent it implies that any excess in the OCC accounts (or other exchange-traded derivatives accounts) was not understood to be included among the acquired assets for all of the reasons noted in the responses to the statements contained in paragraphs 573 and 574 above, and thus disputes that the existence or non-existence of "excess margin" on any given day is even relevant to any issue in this case.

**577.  By September 22, 2008, the excess margin in the OCC Margin Accounts included**

**$2.3 billion worth of securities and cash. (*See* A. 134 (valuing OCC assets to be**

**transferred at $2.3 billion).)**

Barclays' Response

Barclays disputes the statement in paragraph 577 because it is factually inaccurate and is unsupported by the cited document, and because it incorrectly implies that the amount of excess margin in the OCC Accounts as of September 22, 2008, is in any way relevant to any issue in this case. Nothing in the cited document 4 purports to list "excess margin" under any definition of that phrase. Moreover, the cited document indicates that, while the September 22, 2008 value of the margin that Barclays acquired in the OCC options accounts was approximately $2.3 billion, it also indicates that the options positions themselves in LBI's propriety accounts at the OCC carried a value of negative $1.1 billion. Thus, there is no sense in which $2.3 billion constituted "excess margin" in LBI's OCC options accounts. Moreover, Barclays disputes the implication that the cited document represents information that Barclays had available to it on September 22, 2008, or at any time prior to that. In fact, prior to the Closing, Barclays was receiving widely divergent information from the OCC and LBI over this weekend concerning whether the OCC accounts contained any excess (including an indication on Saturday, September 20, 2008, that the OCC accounts in fact carried a margin deficit, BCI Ex. 242 [Sept. 20, 2008 3:52 pm email from J. McDaniel to E. Rosen, *et al.*], and it took Barclays months after the Closing to determine the September 22, 2008 value of the OCC positions and associated margin. Barclays further disputes the statement in paragraph 577 to the extent it implies that any excess in the OCC accounts (or other exchange-traded derivatives accounts) was not understood to be included among the acquired assets for all of the reasons noted in the responses to paragraphs 573 and 574 above, and thus disputes that the existence or non-existence of "excess margin" on any given day is even relevant to

*Contains Highly Confidential Information*

any issue in this case. Barclays further disputes the statement in paragraph 577 to the extent it implies that the September 22, 2009 gain on acquisition that Barclays made on the OCC derivatives and margin was a lasting one. In fact, LBI's proprietary options at the OCC lost $730 million in value over the two weeks following the acquisition, and Barclays was not able to hedge against these extreme market movements (as it knew it would not be able to) because it took Barclays at least that long to obtain full information concerning the nature of these positions and to upgrade its systems to allow for integration of these positions so that it could perform an accurate assessment of its risk position. BCI Ex. 351 [Clark Decl.] at ¶¶ 5, 6, 9, Ex. 1.

578.    **On the evening of Sunday, September 21, 2008, the Trustee received a draft of the**

**Clarification Letter that included a specific clause that would have transferred to**

**Barclays the entirety of LBI's "margin" and "guaranty fund deposit" maintained in**

**relation to customer property at any clearing agency (the "draft margin transfer**

**clause"). (*See* Maguire Decl. Ex. 16 ¶ 8(ii).)**

Barclays' Response

Barclays admits that the Trustee received a draft Clarification Letter on the evening of Sunday, September 21, 2008 that contained a provision that referenced "margin" and "guaranty fund deposit" but disputes the statement in paragraph 578. The statement in paragraph 578 implies that the referenced provision was not an accurate reflection of the deal that had already been reached by the time the APA was finalized, and that this provision "would have transferred to Barclays" something that was not already understood by all to be among the acquired assets. Both implications are contradicted by all of the evidence referenced in the responses to paragraphs 573 and 574 above. Barclays further disputes the statement in paragraph 578 to the extent it implies that the *substance* of the provision referenced in that paragraph had been removed in the final Clarification Letter. The final Clarification Letter expressly provided, in accordance with all parties' understanding at the time and in accordance with the provision referenced in paragraph 578, that "any property held to secure" the acquired exchange-traded derivatives constituted a Purchased Asset.

579.    **The draft margin transfer clause was deleted from the next draft of the Clarification**

**Letter that the Trustee received at 4:36 a.m. on Monday, September 22, 2008, and it**

**never reappeared in any subsequent draft or in the executed version of the**

**Clarification Letter. (*See* Maguire Decl. Exs. 16-18; A. 32.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the implication that the provision referenced in paragraph 579 was not an accurate reflection of the deal that had been reached by the time the APA was finalized, and that this provision "would have transferred to Barclays" something that was not already understood by all to be among the acquired assets. Both implications are contradicted by all of the evidence referenced in the responses to paragraphs 573 and 574, above. Barclays further disputes the statement in paragraph 579 to the extent it implies that the *substance* of the provision referenced in that paragraph was removed in the final Clarification Letter. The final Clarification Letter expressly provided, in accordance with all parties' understanding at the time and in accordance with the provision referenced in paragraph 579, that "any property held to secure" the acquired exchange-traded derivatives constituted a Purchased Asset.

580.   **The parenthetical expression "(and any property that may be held to secure**

**obligations under such derivatives)" did not appear in any draft of the Clarification**

**Letter provided to the Trustee; it was contained only in the execution copy of the**

**Clarification Letter.** *(See A. 32 ¶ 1(a)(ii)(C); Kobak Decl. ¶ 17.)*

Barclays' Response

Barclays disputes the implication in paragraph 580 that the execution copy of the Clarification Letter was not fully sufficient to put the Trustee on notice of its terms or did not constitute a draft of the Clarification Letter that was provided to the Trustee. Barclays further disputes the statement in paragraph 580 to the extent it implies that the parenthetical referenced therein was not fully consistent with all parties' understanding at that time of the agreed-upon exchange. The fact that the Trustee signed this copy confirms that its terms were consistent with the Trustee's understanding of the agreed upon terms of the acquisition. Barclays further disputes the implication that the Trustee signed the Clarification Letter without reading or understanding its terms, or that, had the Trustee done that, this should prevent the Trustee from being bound by the agreement he signed. Barclays further disputes the statement in paragraph 580 to the extent it implies that the referenced parenthetical was in any way inconsistent with the terms of the prior drafts of the Clarification Letter that the Trustee had received, or with all parties' understanding of the agreed-upon terms of the acquisition, as confirmed by all of the evidence referenced in the responses to paragraphs 573 and 574, above. Indeed, similar and more extensive language was included in prior drafts of the Clarification Letter, as well as all drafts of the Transfer and Assumption Agreement, which the Trustee signed late on the evening of September 19, 2008, or early in the morning of September 20, 2008, and the Trustee never indicated that any draft of any of these agreements (or any of the various emails referenced in the responses to paragraphs 573 and 574, above) was inconsistent with his understanding of the terms of the deal. Thus, Barclays disputes the

*Contains Highly Confidential Information*

implication that the Trustee was unaware that property held to secure obligations under the exchange-traded derivatives (including posted margin) was part of the transaction, and disputes the implication that such margin only became part of the transaction as a result of the inclusion of the quoted parenthetical clause in the final Clarification Letter.

581.    **Barclays claims that it is owed (a) approximately $2.5 billion in LBI assets that were held at the OCC consisting of approximately $1.3 billion in cash that has been transferred to Barclays, approximately $1.2 billion in securities and letters of credit still held by the OCC, and (b) as much as $1 billion in assets at other derivatives exchanges. (*See* Letter from Jonathan Hughes, Barclays, to James W. Giddens, dated May 13, 2009, at 7-8; Maguire Decl. ¶ 2, Ex. 12 at 2 (LBI's OCC margin as of September 23 included $1,375,422,113.24 in cash); A. 24 [Romain] 156:15-19, 160:10-19 (the $1.3 billion in cash has been "substantially delivered" to Barclays).)**

Barclays' Response

Barclays disputes the contents of paragraph 581 because Barclays is not claiming – and has never claimed – that it is owed the value of any letter of credit that was not drawn upon prior to the Closing. Barclays did not receive any benefit from any such letter of credit, and is not claiming that it should. Barclays is owed the current value of all cash and securities held in respect of any LBI exchange-traded derivatives account that contained open positions at the effective time of the Closing that has yet to be delivered or released to Barclays, including cash that resulted from draw downs on letters of credit prior to the Closing, and Barclays disputes the contents of paragraph 581 to the extent it either overstates or understates that claim.

582.    **Barclays claims that the addition of the parenthetical expression "(and any property that may be held to secure obligations under such derivatives)" to the Clarification Letter's paragraph 1(a)(ii)(C) entitles it to LBI's OCC assets. (*See* Letter from Jonathan Hughes, Barclays, to James W. Giddens, dated May 13, 2009, at 7-8; *see also* A. 32 ¶ 1(a)(ii)(C).)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the contents of paragraph 582. From the time the APA was finalized
until the Closing, the parties' agreement was *always* that Barclays would acquire LBI's
exchange-traded derivatives and all assets held to secure LBI's obligations under such
derivatives – at the OCC and elsewhere – including futures positions, options positions,
and all cash and securities held in respect of LBI's exchange-traded derivatives accounts.
Barclays disputes the statement in paragraph 582 that the addition of the referenced
parenthetical in any way changed the nature of the agreed-upon deal; to the contrary, it
reflected precisely the deal that had already been reached and that was always understood
by all relevant parties, as confirmed by the evidence referenced in the responses to
paragraphs 573 and 574, above.

583.    **Barclays claims that the addition of the parenthetical to paragraph 1(a)(ii)(C) to the**

**Clarification Letter entitles Barclays not just to amounts held by LBI, but instead to**

**amounts posted by LBI, and not just to margin required to fund any net liability**

**incurred by Barclays in closing out the long and short derivatives that Barclays was**

**acquiring in the Sale Transaction, but instead to all margin and all clearing funds**

**that LBI posted at the OCC and other derivatives exchanges. (*See* Letter from**

**Jonathan Hughes, Barclays, to James W. Giddens, dated May 13, 2009, at 7-8.)**

Barclays' Response

Barclays disputes the contents of paragraph 583 on the ground that, from the time the
APA was finalized until the Closing, the parties' agreement was always that Barclays
would acquire LBI's exchange-traded derivatives and all assets held to secure LBI's
obligations under such derivatives – at the OCC and elsewhere – including futures
positions, options positions, and all cash and securities held in respect of LBI's exchange-
traded derivatives accounts. This always was understood to include all cash and
securities posted by LBI, and was never limited to "amounts held by LBI." And this was
always understood to include all margin and all clearing funds that LBI posted at the
OCC and other derivatives exchanges, and was never limited to "margin required to fund
any net liability incurred by Barclays in closing out the long and short derivatives that
Barclays was acquiring in the Sale Transaction." Barclays further disputes the
implication in paragraph 583 that the addition of the referenced parenthetical in any way
changed the nature of the agreed-upon deal; to the contrary, it reflected precisely the deal
that had already been reached and that was always understood by all relevant parties, as
confirmed by the evidence referenced in the responses to the statements contained in
paragraphs 573 and 574, above.

*Contains Highly Confidential Information*

584. **The parenthetical in paragraph 1(a)(ii)(C) of the Clarification Letter does not**

    **mention any margin or clearing funds, and does not mention the approximately $2.5**

    **billion in LBI's margin and funds that was at the OCC.** *(See A. 32 ¶ 1(a)(ii)(C).)*

Barclays' Response

    Barclays does not dispute that the specific terms and phrases "margin," "clearing funds,"
and "approximately $2.5 billion in LBI's margin and funds that was at the OCC" were
not expressly referenced in the Clarification Letter, but disputes the implication that these
assets were not encompassed by the parenthetical in the Clarification Letter, which
expressly includes, among the Purchased Assets, "any property that may be held to
secure obligations under such [exchange-traded] derivatives," and by the sentence in the
Clarification Letter that provides that the Purchased Assets included "all of the assets of
Seller used primarily in the Business or necessary for the operation of the Business,"
which Business included LBI's trading business and its business as a futures commission
merchant. Barclays further disputes the implication that the customer property portion of
these assets was not encompassed by paragraph 8 of the Clarification Letter, which
provides that Barclays was to receive "for the account of the customer, any and all
property of any customer, including any held by or on behalf of LBI to secure the
obligations of any customer, whose account(s) are being transferred to Purchaser as part
of the Business." Barclays further disputes the statement in this paragraph to the extent it
implies that LBI and the Trustee were not aware of the amounts of margin at issue, or of
the fact that some of that margin constituted cash. LBI and the Trustee had access to
LBI's books and records and to account statements in LBI's possession that reflected not
only the amount of margin posted in respect of each of LBI's exchange-traded derivatives
accounts but also the breakdown of that margin as between cash and other types of
collateral. Moreover, on September 20, 2008, counsel for the OCC sent an email to
counsel for the Trustee and Barclays that indicated that the OCC was holding roughly $1
billion in cash alone in the LBI margin accounts. BCI Ex. 233 [Sept. 20, 2008 12:45 pm
email from J. McDaniel to R. Berkovich, *et al.*]. Several times during the weekend prior
to the Closing, the Trustee's counsel received emails from the OCC in which the OCC
conveyed its understanding that all margin at the OCC was being acquired by Barclays
and sought confirmation that this understanding was correct. *See id.* BCI Ex. 235 [Sept.
20, 2008 1:09 pm email from E. Rosen to J. McDaniel, *et al.*]; BCI Ex. 262 [Sept. 21,
2008 4:03 pm email from J. McDaniel to E. Rosen, *et al.* with attachment]. At no time
prior to the Closing (or during a significant period of time after the Closing) did the
Trustee suggest that this understanding was incorrect.

585. **At 7:56 p.m. on September 22, 2008, Barclays' Gary Romain circulated a draft**

    **acquisition balance sheet that included a $300 million entry for "[e]xchange traded**

*Contains Highly Confidential Information*

**options" but did not include an entry for OCC margin.** *(See* **Rule 2004 Deposition**

**Ex. 384.) Barclays' acquisition balance sheet was later changed to include a $210**

**million entry for "[e]xchange traded options" and a $980 million entry for "OCC**

**customer and clearing margin."** *(See* **A. 135.)**

Barclays' Response

Barclays does not dispute that Mr. Romain circulated an early draft of an acquisition
balance sheet on September 22, 2008, or that the documents referenced in paragraph 585
contained the referenced figures, but disputes the statement in paragraph 585 because it
inaccurately characterizes what the amounts referenced in that early draft purported to
represent and wholly misconstrues the relationship between the figures included in the
January 28, 2009 acquisition balance sheet. The early draft did not contain – and did not
purport to contain – accurate estimates of the value of assets Barclays acquired in the
deal. As Mr. Romain explained, the evolution of the balance sheet was highly fluid and
early drafts contained many estimates and assumptions necessitated by his inability to
obtain accurate information in such a short time frame. For example, Mr. Romain
testified that the September 22 draft represented his best understanding at the time, but
"[a]t that time [his] understanding of the component parts of the exchange traded options
item was based on very preliminary information." BCI Ex. 94 [Sept. 10, 2009 Romain
Dep. Tr.] at 189:8-14. Barclays further disputes the statement that the $300 million entry
included on the early draft was not intended to encompass the margin at the OCC, or that
any draft of the acquisition balance sheet that Mr. Romain prepared reflected a belief that
margin was not included in the deal. As Mr. Romain's 30(b)(6) notes make clear, every
estimate of the exchange-traded options contemplated that Barclays was contractually
entitled to receive all posted margin, as confirmed by the fact that the values of the
options positions themselves were generally known all along to carry substantial negative
value, and hence could not have been represented as carrying a positive value unless
margin was believed to be included. BCI Ex. 147 [Gary Romain Preparation Notes for
Jan. 13, 2010 Dep.]. Barclays' efforts to calculate an accurate value for the exchange-
traded derivatives component of the transaction were complicated by the difficulty of
determining the value of the posted margin, determining the value of the open positions,
and assessing the recoverability of the posted margin in light of issues relating to the
financial position of LBI affiliates that were holding certain portions of that margin. *Id.*
Barclays' knowledge and understanding on these issues evolved over time, causing the
differences between the early iterations of the acquisition balance sheet and the final one,
which was not completed until February 2009. Thus, Barclays disputes the implication in
paragraph 585 that *any* version of the acquisition balance sheet – draft or final – reflected
or suggested a belief on Barclays' part that Barclays was not contractually entitled to
receive all margin held in respect of all of LBI's exchange-traded derivatives accounts
that held open positions as of the effective time of Closing. Finally, Barclays disputes the
statement in paragraph 585 because it inaccurately portrays the figures contained in the
January 28, 2009 Gross Acquisition Balance Sheet. It is not the case that Barclays

*Contains Highly Confidential Information*

recorded a $210 million asset reflecting the "exchange traded options" and another $980 million asset reflecting the value of the OCC margin. Rather, Barclays recorded assets totaling approximately $2.3 billion reflecting the value of the margin in the OCC options accounts, and an offsetting $1.104 billion liability reflecting the negative value of the proprietary OCC options as of the time of Closing. BCI Ex. 133 [Jan. 28, 2009 Gross Acquisition Balance Sheet]. Thus, without the margin, Barclays would have recorded a $1.104 billion loss in connection with its acquisition of LBI's OCC options.

**586.    The inclusion of any LBI assets held at the OCC as part of the Sale Transaction was**

**not disclosed to the Court or discussed at the September 17 hearing or the Sale**

**Hearing. (*See generally* 9/19/08 Tr. [Docket No. 318]; 9/17/08 Tr. [Docket No. 352].)**

Barclays' Response

Barclays disputes the statement in paragraph 586 because it is contradicted by documentary evidence that confirms that the assets held at the OCC were referenced in multiple documents that were disclosed to the Court during or prior to the two referenced hearings, including in the APA (which included, among the Purchased Assets, all "exchange traded derivatives" and all assets used in "the Business") and the Sale Order (which specifically referenced LBI's assets held at the OCC and indicated that they were being acquired by Barclays). *See* BCI Ex. 1 [APA] at pp. 6, 7 (subparagraph (d) of "Purchased Assets"); BCI Ex. 16 [Sale Order] at ¶ N. Barclays does not dispute that the *value* of the assets held by LBI in its OCC accounts was not specifically disclosed to the Court, but notes that the value of the liabilities associated with LBI's OCC accounts was also not specifically disclosed, and that there were indeed several categories of other assets that were not accorded specific values in the APA. Barclays further disputes the implication that Barclays (or anyone else, for that matter) could have known the value of these assets – or the associated liabilities – by the time of the hearings cited in paragraph 586. Barclays had only very limited and general information about the assets and liabilities associated with LBI's OCC accounts by this time, and the market conditions prevailing at this time made it impossible to reliably value the positions. Barclays further disputes the statement in paragraph 586 to the extent it implies that Barclays failed to disclose anything to the Court. Section 7.2 of the APA specifically granted LBHI the sole and exclusive authority to control the court approval process and accordingly, Barclays was not in the position to determine what was presented to the Court at the Sale Hearing.

**587.    Lehman never intended for the Clarification Letter to provide Barclays with billions**

**of dollars in LBI's margin at the OCC. (A. 20 [McDade] 277:14-18.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the contents of paragraph 587. Barclays can only glean what Lehman intended with respect to the Clarification Letter by reference to the terms of the Clarification Letter that the Trustee signed and the other documentary evidence referenced in the responses to the statements in paragraphs 573 and 574, above, all of which indicate that it was indeed Lehman's intent from the time the APA was finalized - - of which the Trustee was on notice as soon as he entered the picture - for Barclays to receive whatever margin was held in respect of LBI's OCC accounts or any other accounts that contained open exchange-traded derivatives at the time of Closing. Barclays disputes the implication in paragraph 587 that the Clarification Letter provided Barclays with anything more than what all parties had already understood the deal to include. The cited testimony from the deposition of Mr. McDade responses to the question whether he believed Lehman intended the Clarification Letter to provide an *additional* \$2.2 billion to Barclays. Moreover, Mr. McDade's testimony confirms that Lehman did not view the agreement to transfer all posted margin to Barclays as adverse to Lehman's interests, because Lehman recognized that, absent Barclays' willingness to acquire the exchange-traded derivatives, Lehman was unlikely to recover the posted margin in any event in light of its recent experience with the CME on September 18 and 19, 2008. BCI Ex. 85 [McDade Dep. Tr.] at 275:3-13. Finally, Barclays disputes the premise that the transfer provision necessarily "provided Barclays with billions of dollars in LBI's margin." At the time, the value was unknown and constantly changing, and some reports indicated as much as a \$2 billion negative value. What was clear is that the margin would have zero or negative value if LBI kept it, and that Barclays assumed a significant risk by agreeing to take it.

**588.   McDade was not informed about the addition to the Sale Transaction of the margin**

**in the OCC Margin Accounts. (*Id.* at 275:3-278:4.)**

Barclays' Response

Barclays disputes the statement in paragraph 588. First, Barclays disputes the implication that Mr. McDade would necessarily have been informed about all of the details of this transaction, or that his knowledge and participation was necessary for any element of the transaction to be a valid part of the APA or its associated documents. Second, Barclays disputes the implication that the OCC margin was "added" to the Sale, rather than being a component of the transaction embodied in the APA. Any such proposition is contradicted by the substantial evidence referenced in the responses to the statements in paragraphs 573 and 574, above (among other evidence referenced throughout these responses). Finally, Barclays disputes the statement in paragraph 588 because it ignores Mr. McDade's testimony that he understood that clearing and margin deposits at OCC were in fact part of the final transaction. BCI Ex. 85 [McDade Dep. Tr.] at 276:13-277:4.

*Contains Highly Confidential Information*

**589.    McDade never had any discussions with Barclays about Barclays acquiring the**

**billions of dollars in LBI's cash and securities held at the OCC and was not aware of**

**anyone from Barclays ever asking anyone at Lehman to include those assets in the**

**sale. (*Id.* at 275:25-276:12.)**

Barclays' Response

> Barclays disputes the statement of paragraph 589, as well as the implication that Mr.
> McDade would necessarily have known of the discussions between Barclays and "anyone
> at Lehman" concerning LBI's cash and securities held at the OCC. Moreover, Barclays
> disputes the implication that Mr. McDade did not believe LBI's margin and clearing
> deposits at OCC were part of the Sale. Mr. McDade testified that his understanding was
> that clearing and margin deposits at OCC were among the Purchased Assets. BCI Ex. 85
> [McDade Dep. Tr.] at 276:13-277:4. Finally, Barclays disputes the statement in
> paragraph 589 in that, regardless of what Mr. McDade knew about discussions between
> Barclays and Lehman concerning the cash and securities held at the OCC in particular,
> the substantial evidence referenced in paragraphs 573 and 574, above, confirms that all
> relevant parties understood margin to be included in the deal by the time the APA was
> finalized, and that this understanding was communicated in numerous ways: the terms of
> the finalized APA, the terms of the Sale Order, the terms of the proposed agreement
> regarding the collateral account at JP Morgan, the terms of the TAA, several different
> emails that were exchanged between the relevant parties over the weekend of September
> 20-21, 2008, several different drafts of the Clarification Letter that were exchanged over
> that same weekend, and the terms of the final Clarification Letter. Finally, Barclays
> disputes the premise that the transfer provision necessarily provided Barclays "billions of
> dollars in LBI's cash and securities held at the OCC." At the time, the value was
> unknown and constantly changing, and some reports indicated as much as a $2 billion
> negative value. What was clear is that the margin would have zero or negative value if
> LBI kept it, and that Barclays assumed a significant risk by agreeing to take it.

**590.    During Rule 2004 discovery in this case, Barclays designated Ricci as its Rule**

**30(b)(6) witness on "[t]he negotiation and drafting of the Clarification Letter and of**

**the TAA regarding the actual or proposed transfer to Barclays of ... any Exchange**

**Deposit to which Barclays claims entitlement under the Clarification Letter, TAA or**

**otherwise" and "[t]he timing and extent of disclosures to the Bankruptcy Court ...**

**regarding the actual or proposed transfer to Barclays of ... any exchange deposit to**

*Contains Highly Confidential Information*

which Barclays claims entitlement under the Clarification Letter, TAA or

otherwise." (Maguire Decl. Ex. 32 [Debtors' Third Rule 30(b)(6) Deposition Notice

to Barclays on Issues Pertaining to Exchange-Traded Derivatives and Exchange

Deposits, Schedule A, dated Aug. 12, 2009].)

Barclays' Response

Barclays designated Mr. Ricci as its representative with respect to certain topics
designated in Debtors' Third Rule 30(b)(6) Deposition Notice to Barclays on Issues
Pertaining to Exchange-Traded Derivatives and Exchange Deposits. Barclays disputes
the implication that Mr. Ricci was the only representative of Barclays who was
designated to address these issues (Jonathan Hughes was designated to address – and did
address – virtually identical issues in a more recently noticed 30(b)(6) deposition) and
Barclays further disputes the implication that Mr. Ricci was always speaking on behalf of
Barclays during the entirety of his deposition, as he indicated otherwise in some of his
deposition responses.

591.    According to Ricci, Barclays cannot recall "whether anyone at Barclays had any

        discussions with anyone at Lehman as to whether margin at OCC or any other

        exchange was included in the sale to Barclays." (A. 23 [Ricci] 249:21-250:4.)

Barclays' Response

Barclays disputes the statement in paragraph 591. The quoted language appears at 218:5-
16 and not at 249:21-250:4. Barclays further disputes the statement that Mr. Ricci was
speaking on behalf of Barclays in this answer, because the prior answer makes clear that
Mr. Ricci was only purporting to convey his own personal knowledge. BCI Ex. 91 [Ricci
Dep. Tr.] at 217:23-218:4. Moreover, Barclays disputes the implication that other
Barclays witnesses have not provided testimony that addressed Barclays' recollection of
the types of discussions referenced in paragraph 591. Finally, Barclays disputes the
statement in paragraph 591 in that, regardless of what Mr. Ricci knew about discussions
between Barclays and Lehman concerning margin at the OCC and other exchanges, the
substantial evidence referenced in the responses to paragraphs 573 and 574, above, and
elsewhere confirms that all relevant parties understood margin to be included in the deal
by the time the APA was finalized, and that this understanding was communicated in
numerous ways: the terms of the finalized APA, the terms of the Sale Order, the terms of
the proposed agreement regarding the collateral account at JP Morgan, the terms of the
TAA, several different emails that were exchanged between the relevant parties over the
weekend of September 20-21, 2008, several different drafts of the Clarification Letter
that were exchanged over that same weekend, and the terms of the final Clarification

245

*Contains Highly Confidential Information*

Letter.

**592.    In his Rule 30(b)(6) deposition, Ricci could not point to any disclosure made to the**

**Court with respect to LBI's assets held at the OCC. (*See* A. 23 [Ricci] 218:5-16.)**

Barclays' Response

Barclays disputes the statement in paragraph 592 which is not supported by the cited
testimony. Moreover, the statement in paragraph 592 is directly contradicted by Mr.
Ricci's testimony, in which he pointed to disclosures made to the Court in the form of
both the APA (which included, among the Purchased Assets, all "exchange traded
derivatives" and all assets used in the Business) and the Clarification Letter. BCI Ex. 91
[Ricci Dep. Tr.] at 249:23-25. Barclays further disputes the implication that Mr. Ricci's
testimony is the only relevant source of information concerning the disclosures that were
made to the Court in this regard, and notes that yet another instance of such disclosure
was the submission to the Court of the proposed Sale Order, which specifically
referenced LBI's assets held at the OCC and indicated that they were being acquired by
Barclays. Barclays does not dispute that the precise value of the assets held by LBI in its
OCC accounts was not specifically disclosed to the Court, but notes that the value of the
liabilities associated with LBI's OCC accounts was also not specifically disclosed to the
Court, and that there were several categories of assets were not accorded specific values
in the APA. Barclays further disputes the implication that Barclays (or anyone else, for
that matter) could have known the value of these assets – or the associated liabilities – by
the time of the hearing cited in paragraph 592. Barclays had only very limited and
general information about the assets and liabilities associated with LBI's OCC accounts
by this time, and the market conditions prevailing at this time made it impossible to
reliably value the positions. Barclays further disputes the statement in paragraph 592 to
the extent it implies that Barclays failed to disclose anything to the Court. Section 7.2 of
the APA specifically granted LBHI the sole and exclusive authority to control the court
approval process and accordingly, Barclays was not in the position to determine what was
presented to the Court at the Sale Hearing.

**593.    In his Rule 30(b)(6) deposition, Ricci claimed that disclosures with respect to LBI's**

**assets held at the OCC were made in the original Asset Purchase Agreement and the**

**Clarification Letter. (A. 23 [Ricci] at 249:21-25.) Barclays has no knowledge of any**

**other disclosures, aside from statements made months later in Barclays' annual**

**report that Barclays had recognized a multi-billion dollar gain on the acquisition.**

**(A. 23 [Ricci] at 250:2-4.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays does not dispute that Mr. Ricci listed "the original APA," "the clarification letter," and "Barclays' accounts" (by which he meant Barclays' annual report for 2008), BCI Ex. 91 [Ricci Dep. Tr.] at 249:21-250:10, as constituting disclosures concerning LBI's assets held at the OCC, but disputes the second sentence in 593 to the extent it purports to be stating a fact rather than the substance of Mr. Ricci's testimony, and otherwise incorporates by reference its response to paragraph 592 above detailing the reasons why Mr. Ricci's testimony in this regard is not the only relevant source of information concerning the disclosures that were made to the Court.

594.   **The Asset Purchase Agreement makes no mention of any margin or clearing funds**

**at the OCC or at any other derivatives exchange. (*See generally* A. 30.)**

Barclays' Response

Barclays disputes the statement in paragraph 594 and the implication that the APA does not encompass all margin and clearing funds at the OCC and any other derivatives exchange. While it is true that the definition of "Purchased Assets" in the APA did not expressly include margin or clearing funds, it also did not expressly exclude them. The definition of "Excluded Assets" in the APA also does not list margin or clearing funds associated with exchange-traded derivatives, and the APA makes clear that Barclays was acquiring all exchange-traded derivatives and all assets used in the Business (with the term "Business" being defined to include LBI's trading business and its business as a futures commission merchant) except those that were expressly excluded. *See* BCI Ex. 1 [APA] at pp. 6, 7 (subparagraph (d) of "Purchased Assets"); BCI Ex. 16 [Sale Order] at ¶ N. Thus, Barclays disputes the statement in paragraph 592 to the extent it implies that margin and clearing funds were not included among the Purchased Assets under the terms of the APA.

595.   **Derivatives are not margin. (A. 23 [Ricci] 256:22-257:6.).**

Barclays' Response

Barclays does not dispute that *options and futures positions* are not the same thing as the margin that secures the obligations associated with them, but disputes that there is ever a context in which the term "derivatives" – when that term is used to refer to exchange-traded derivatives in particular – can ever be fairly understood to refer to exchange-traded derivative positions to the exclusion of the associated margin that is posted to an exchange. Without margin, a clearing member simply cannot trade derivatives positions on an exchange. Barclays further disputes the implication that exchange-traded derivatives positions and the associated margin are not both necessary parts of any exchange-traded derivatives business, and notes that numerous witnesses have testified to

*Contains Highly Confidential Information*

their understanding that the business Barclays was acquiring necessarily included both exchange-traded derivatives positions and the associated margin. *See, e.g.*, BCI Ex. 91 [Ricci Dep. Tr.] at 160:17-161:13; BCI Ex. 59 [Clackson Dep. Tr.] at 122:3-16; BCI Ex. 79 [Klein Dep. Tr.] 192:21-193:8; BCI Ex. 77 [King Dep. Tr.] at 234:11-24. Barclays further disputes the statement in paragraph 595 to the extent it implies that margin was not encompassed by the relevant terms of the APA, the Sale Order, the TAA, or the Clarification Letter, for all of the reasons noted in the response to paragraphs 573 and 574 (among others), above. Barclays further disputes the implication that, because the fact that the definition of "Purchased Assets" did not use the word "margin," margin was not understood by all relevant parties to be included in the transaction from the time the APA was signed through the time the deal closed.

## 596.   The Trustee's advisors were not involved in any business discussions in which

anyone agreed to give Barclays LBI's margin at the OCC or at other exchanges.

(Kobak Decl. ¶¶ 16, 20.)

### Barclays' Response

Barclays disputes the statement in paragraph 596, as the Trustee and his team were present at the weekend meetings at Weil and at discussions leading to the TAA. Barclays also disputes the statements to the extent it implies that the Trustee's advisors must have been *involved* in business discussions concerning LBI's margin at the OCC or other exchanges in order to have been aware that those discussions had taken place. The Trustee and all of his representatives were on notice of the terms of the APA and the Sale Order, both of which reflect the agreement that LBI's margin at the OCC and other exchanges was to be part and parcel of the Purchased Assets. The Trustee's counsel was also involved in numerous actual discussions regarding the transfer of LBI margin at the OCC and other exchanges to Barclays. As just one example, late on September 19, 2008, or early on September 20, 2008, counsel for the Trustee signed a draft version of the Transfer and Assumption Agreement, which provided that "Lehman hereby sells, assigns, transfers, and sets over to Barclays, without recourse or without representation or warranty (other than as expressly provided herein), all of Lehman's rights, title, interests, powers, privileges, remedies, obligations, and duties in, to, under, and in respect of the Account [defined in the agreement as all of LBI's accounts at the OCC], as of the Effective Date including with respect to: (i) *the Clearing Fund deposit*; (ii) *all margin deposits held by OCC with respect to the Account*; (iii) all settlement obligations with regard to transactions in cleared contracts; and (iv) all rights and obligations in respect of exercises of option contracts and assignments of such exercises." BCI Ex. 3 [TAA] at § 1(a) (emphasis added). The Trustee was also involved in extensive email exchanges over the weekend of September 20 and 21, 2008, during which it was expressly stated, numerous times, that LBI margin and clearing fund deposits at the OCC were going to be transferred to Barclays upon the consummation of the deal, and neither the Trustee nor any of his representatives ever indicated that this was not fully consistent with the

*Contains Highly Confidential Information*

Trustee's understanding of the agreement that had been reached. *See, e.g.*, BCI Ex. 230; [Sept. 20, 2008 2:18 am email from A. Rovira to J. McDaniel, *et al.*]; BCI Ex. 235 [Sept. 20, 2008 1:09 pm email from E. Rosen to J. McDaniel, *et al.*]; BCI Ex. 262 [Sept. 21, 2008 4:07 pm email from J. McDaniel to E. Rosen, *et al.* with attachment]; BCI Ex. 267 [Sept. 21, 2008 4:37 pm email from J. McDaniel to S. Harbeck, *et al.*].

**597. The Trustee's advisors were never advised, and did not understand, that the Clarification Letter would materially and adversely change the Sale Transaction approved by the Court by inserting into the sale a transfer to Barclays of billions of dollars in undisclosed consideration, including some \$2.5 billion in additional LBI assets at the OCC and as much as an additional \$1 billion of LBI assets at other derivatives exchanges. (*Id.* ¶¶ 16, 20.)**

Barclays' Response

Barclays disputes the statement in paragraph 597 to the extent it implies that the Clarification Letter effected any change whatsoever to the Sale approved by the Court or inserted anything new into the Sale, including the margin posted in respect of LBI's exchange-traded derivatives accounts, which was encompassed by the Sale from the time the APA was finalized. Barclays further disputes the implication that the LBI margin at the OCC and other exchange-traded derivatives exchanges constituted undisclosed consideration. As specified in the responses to paragraphs 573, 574, 591, 592, and 593, the inclusion of all margin securing LBI's exchange-traded derivatives was disclosed repeatedly in documents that were provided to the Trustee, the Court, and all other relevant parties to this transaction from the beginning of the week when the APA was finalized through the beginning of the following week when the deal closed. The Clarification Letter neither materially nor adversely changed the transaction. Barclays was entitled to LBI's OCC assets, including futures positions, options positions, and all margin associated with those positions, by virtue of the inclusion among the Purchased Assets in the APA of the exchange-traded derivatives and all assets used in the Business. The parenthetical expression "(and any property that may be held to secure obligations under such derivatives)" represented nothing more than an additional confirmation of what had already been agreed upon. Finally, Barclays disputes the premise that the transfer provision necessarily provided Barclays "\$2.5 billion in additional LBI assets at the OCC and as much as an additional \$1 billion of LBI assets at other derivatives exchanges." At the time, the value was unknown and constantly changing, and some reports indicated as much as a \$2 billion negative value. What was clear is that the margin would have zero or negative value if LBI kept it, and that Barclays assumed a significant risk by agreeing to take it.

*Contains Highly Confidential Information*

**598.     The Trustee understood that, in accordance with the representations made at the**

**Sale Hearing, cash was excluded from the Sale Transaction.  (*Id.* ¶ 20.)**

Barclays' Response

      Barclays disputes the statement in paragraph 598.  The Trustee was aware at the time of
the Sale Hearing that all LBI margin posted at the OCC would be transferred to Barclays
and that this would include margin in any form, including cash, as reflected by the terms
of the Sale Order that was approved at that Sale Hearing,  BCI Ex. 16 [Sale Order] at ¶ N
(noting that "all securities, cash, collateral and other property" was anticipated to be
"transferred to accounts of the Purchaser [Barclays]"), the terms of the Collateral
Agreement that the Trustee signed either prior to or during the Sale Hearing, BCI Ex. 230
[Sept. 20, 2008 2:18 am email from A. Rovira to J. McDaniel, *et al.* with attachment]
("LBI has assigned to Barclays all rights in securities, cash, and other property
('Collateral') pledged by LBI to The Options Clearing Corporation"), and the terms of
the TAA which the Trustee was presented with prior to or during the Sale Hearing and
which the Trustee signed, without equivocation or objection, either during or shortly after
the Sale Hearing had ended, BCI Ex. 3 [TAA] ¶ at 1(a).  Moreover, the Trustee was again
informed on Saturday, September 20, 2008, that the margin that was to be transferred to
Barclays included "nearly $1 billion in cash" at the OCC.  BCI Ex. 230 [Sept. 20, 2008
2:18 am email from A. Rovira to J. McDaniel, *et al.* with attachment], and never once did
the Trustee suggest – at that or any other point prior to the Closing – that any of these
statements conflicted with the Trustee's understanding of the substance of the agreed-
upon exchange.  Barclays further disputes the statement in paragraph 598 to the extent it
implies that it was ever represented to the Court that the deal did not include posted
margin that was in the form of cash, and notes that the Sale Order that was presented to
and approved by the Court at the Sale Hearing expressly contemplated that some of the
margin to be transferred to Barclays was in the form of cash.  BCI Ex. 16 [Sale Order] at
¶ N.  The inclusion of cash margin in the deal was agreed upon in the APA, and fully
disclosed to the Court, because such margin constituted assets used in the Business to
support LBI's trading of exchange-traded derivatives that were to be acquired by
Barclays.

**599.     The Clarification Letter states that, except as otherwise specified in the definition of**

**"Purchased Assets," "'Excluded Assets' shall include any cash, cash equivalents,**

**bank deposits or similar cash items of Seller and its Subsidiaries … ."  (A. 32 ¶**

**1(c).)**

*Contains Highly Confidential Information*

Barclays' Response

    Barclays does not dispute that paragraph 1(c) of the Clarification Letter reads: "Except as otherwise specified in the definition of 'Purchased Assets,' 'Excluded Assets' shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries; provided that 'Excluded Assets' shall not include any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business." Barclays disputes the implication that this "Excluded Assets" provision excluded from the deal any of the cash margin and/or cash clearing fund deposits associated with the exchange-traded derivatives, for it was "otherwise specified in the definition of 'Purchased Assets' – in section 1(a)(ii) of the Clarification Letter – that "*any* property" held to secure LBI's exchange-traded derivatives was included within the definition of "Purchased Assets." Further, the Trustee received explicit and repeated notice that cash posted as margin at the OCC would be transferred to Barclays. *See* BCI Ex. 1 [APA] at p. 6; BCI Ex. 231 [Sept. 20, 2008 2:32 am email from A. Rovira to J. McDaniel, *et al.* with attachment; BCI Ex. 83 [Lowitt Dep. Tr.] at 248:13-249:6; BCI Ex. 235 [Sept. 20, 1008 1:09 pm email from E. Rosen to J. McDaniel, *et al.*]; BCI Ex. 262 [Sept. 21, 2008 4:03 pm email from J. McDaniel to E. Rosen, *et al.* with attachment]; BCI Ex. 80 [Kobak Dep. Tr.] at 277:2-22; BCI Ex. 16 [Sale Order] at ¶ N.

600.    **Approximately $1.3 billion in cash assets held at the OCC has already been transferred to Barclays. (*See* Maguire Decl. ¶ 2, Ex. 12 at 2 (LBI's OCC margin as of September 23 included $1,375,422,113.24 in cash); Kobak Decl. ¶ 20.)**

Barclays' Response

    Barclays does not dispute that certain cash margin held in LBI's OCC accounts has been transferred to Barclays, and notes that this transfer of cash was in accordance with the express terms of the relevant agreements (the APA, the TAA, and the Clarification Letter) and was done with the express approval of the Trustee. Barclays disputes the contents of paragraph 600 to the extent it purports to limit the amount of margin to which Barclays is entitled, and to the extent it implies that there was anything improper about the transfer of this cash to Barclays.

601.    **Barclays did not disclose to the Trustee that the assets that it would claim as a result of adding to the Clarification Letter the parenthetical expression "(and any property that may be held to secure obligations under such derivatives)" or as a result of entering into the TAA included some $1.3 billion in cash at the OCC. (*Id.* ¶**

*Contains Highly Confidential Information*

20.)

Barclays' Response

Barclays disputes the statement in paragraph 601 to the extent it implies that Barclays' right to the margin and clearing fund deposits associated with the exchange-traded derivatives was the "result of" the inclusion in the Clarification Letter of the parenthetical "(and any property that may be held to secure obligations under such derivatives)" or the execution of the TAA. Barclays' right to the margin and clearing fund deposits associated with the exchange-traded derivatives resulted from the inclusion in the APA's definition of Purchased Assets of "exchange-traded derivatives" and all assets used in LBI's "Business," which encompassed LBI's exchange-traded derivatives business and its business as a futures commission merchant. Moreover, the Trustee's counsel had already been told, as early as September 20, 2008, and perhaps earlier, that the LBI margin deposits at the OCC contained roughly $1 billion in cash, and Barclays itself had very little information (and no way to verify the information it had) concerning the assets and liabilities in LBI's OCC accounts (and certainly no more information than LBI). For these reasons, Barclays disputes the implication that Barclays failed to disclose to the Trustee that LBI's assets at the OCC included cash. *See, e.g.*, BCI Ex. 231 [Sept. 20, 2008 2:32 am email from A. Rovira to J. McDaniel, *et al.* with attachment]; BCI Ex. 235 [Sept. 20, 2008 1:09 pm email from E. Rosen to J. McDaniel, *et al.*]. Finally, Barclays disputes the premise that the transfer provision necessarily provided Barclays "$1.3 billion in cash at the OCC." At the time, the value was unknown and constantly changing, and some reports indicated as much as $2 billion negative value. What was clear is that the margin would have zero or negative value had LBI kept it, and that Barclays assumed a significant risk by agreeing to take it.

602.    **LBI included approximately $507 million of its deposits at the OCC as a debit item**

in computing its required reserve for the protection of customers under Rule 15c3-3.

(*See* Maguire Decl. Ex. 35 at 5 (including ($507,418,000) for "OCC Proprietary

Qualified Collateral" in 15c3-3 reserve analysis).)

Barclays' Response

Barclays does not dispute that there is a line item labeled "Customer Margin with OCC" in the cited exhibit to the Maguire Declaration that lists $507,418,000 as the associated value. Barclays disputes the implication that LBI was unwilling or unable to agree to transfer its ownership interest in any part of the LBI margin maintained at the OCC (all of which constituted LBI proprietary assets and none of which constituted customer property) to Barclays, or that the statement contained in paragraph 602, to the extent it is true, is material to any issue in this case. Barclays further disputes the statement in paragraph 602 to the extent it implies that LBI's transfer of its PIM and futures customer

*Contains Highly Confidential Information*

accounts to Barclays would not have decreased LBI's required reserve under Rule 15c3-3 by more than $507 million.

603. **By counting its customer-related margin at the OCC as property available for the**

   **protection of customers, LBI was permitted to maintain a commensurately lower**

   **amount in its Reserve Account. (*See* Affidavit of Daniel McIsaac ¶ 45 [LBI Docket**

   **No. 1867], dated Oct. 5, 2009.)**

Barclays' Response

   Barclays disputes the statement in paragraph 603 to the extent it implies that LBI was unwilling or unable to agree to transfer its ownership interest in any part of the LBI margin maintained at the OCC (all of which constituted LBI proprietary assets and none of which constituted customer property) to Barclays, and Barclays disputes that the statement contained in paragraph 603, to the extent it is true, is material to any issue in this case. Barclays further disputes the statement in paragraph 603 to the extent it implies that LBI's transfer of its PIM and futures customer accounts to Barclays would not have decreased LBI's required reserve under Rule 15c3-3 by more than the amount of margin LBI had posted with the OCC in relation to customer accounts.

604. **Barclays charged LBI for the cost of closing-out certain LBI positions at the OCC.**

Barclays' Response

   Barclays disputes the statement in  paragraph 604.  Barclays is unable, without any specification of the charges to which this statement purports to refer or the "LBI positions" referenced therein, to respond further to this statement, other than to note that Barclays indeed incurred substantial costs in closing out certain LBI exchange-traded derivatives positions – at the OCC and elsewhere – and has not received *any* LBI assets (other than, of course, a portion of the margin to which it was contractually entitled pursuant to the Sale Transaction) to compensate it for these costs.

605. **Shortly after midnight on September 20, the Trustee executed the Transfer and**

   **Assumption Agreement ("TAA"), which provided that Barclays would step into the**

   **shoes of LBI at the OCC. (Kobak Decl. ¶ 18; Maguire Decl. Ex. 34.)**

*Contains Highly Confidential Information*

Barclays' Response

> Barclays admits the Trustee signed the TAA late on September 19, 2008, or early on
> September 20, 2008. The TAA says nothing about "shoes," but provides, among other
> things, that "Lehman hereby sells, assigns, transfers, and sets over to Barclays, without
> recourse or without representation or warranty (other than as expressly provided herein),
> all of Lehman's rights, title, interests, powers, privileges, remedies, obligations, and
> duties in, to, under, and in respect of the Account [defined in the agreement as all of
> LBI's accounts at the OCC], as of the Effective Date including with respect to: (i) *the
> Clearing Fund deposit*; (ii) *all margin deposits held by OCC with respect to the Account*;
> (iii) all settlement obligations with regard to transactions in cleared contracts; and (iv) all
> rights and obligations in respect of exercises of option contracts and assignments of such
> exercises." BCI Ex. 3 [TAA] at § 1(a) (emphasis added).

**606.    Over the course of the weekend following the Sale Hearing, the OCC and Barclays**

**also executed the TAA. (Maguire Decl. Ex. 34.)**

Barclays' Response

> Barclays admits that the OCC and Barclays executed the TAA over the weekend of
> September 20-21, 2008 and/or on the morning of September 22, 2008.

**607.    Ricci had no role in negotiating or drafting the TAA and has no knowledge**

**regarding discussions Barclays had with other parties to the TAA. (A. 23 [Ricci]**

**220:21-24, 221:12-24.)**

Barclays' Response

> Barclays does not dispute that Mr. Ricci was not personally involved in the process of
> negotiating or drafting the TAA, but disputes the materiality of this statement. Barclays
> does not dispute that Mr. Ricci testified to being personally unaware of discussions
> between Barclays and other parties to the TAA, but disputes the implication that Mr.
> Ricci's testimony on this issue was on behalf of Barclays. *See* Barclays' response to
> paragraph 591. Barclays disputes the implication that Barclays had no discussions with
> other parties to the TAA; many such communications took place over the weekend of
> September 20-21, 2008. *See, e.g.*, BCI Ex. 230 [Sept. 20, 2008 2:18 am email from A.
> Rovira to J. McDaniel, *et al.* with attachment]; BCI Ex. 235 [Sept. 20, 2008 1:09 pm
> email from E. Rosen to J. McDaniel, *et al.*]; BCI Ex. 236 [Sept. 20, 2008 1:15 pm email
> from J. McDaniel to E. Rosen, *et al.*]; BCI Ex. 242 [Sept. 20, 2008 3:52 pm email from J.
> McDaniel to E. Rosen, *et al.*]; BCI Ex. 262 [Sept. 21, 2008 4:03 pm email from J.
> McDaniel to E. Rosen, *et al.* with attachment]; BCI Ex. 267 [Sept. 21, 2008 4:37 pm

*Contains Highly Confidential Information*

email from J. McDaniel to S. Harbeck, *et al.*].

**608.    Ricci testified that Michael Klein negotiated the TAA (A. 23 [Ricci] at 221:5-7), but**

**Klein did not recall having seen the TAA. (A. 17 [Klein] 193:9-23.)**

Barclays' Response

> Barclays disputes the statement in paragraph 608 to the extent it implies that Mr. Ricci purported to be certain who negotiated the TAA on Barclays' behalf. The cited portions of Mr. Ricci's deposition merely reflect Mr. Ricci's personal understanding of who negotiated the TAA, and his testimony is clear that he was only stating what he "believe[d]" to be the case. Mr. Klein's cited testimony was likewise his own personal recollection. Barclays disputes the materiality of this statement, as well as the implication that no one at Barclays participated in the negotiation of the TAA.

**609.    The TAA provides:**

> **Lehman hereby sells, assigns, transfers, and sets over to Barclays . . . all of Lehman's rights, title, interests, powers, privileges, remedies, obligations and duties in, to, under, and in respect of [LBI's account at the OCC], as of the Effective Date including with respect to: (1) the Clearing Fund Deposit; (ii) all margin deposits held by OCC with respect to the Account; (iii) all settlement obligations with regards to transactions in cleared contracts, and (iv) all rights and obligations in respect of exercises of <u>option contracts</u> and assignments of such exercises.**

**(Maguire Decl. Ex. 34 ¶ 1(a) (emphasis in original).)**

Barclays' Response

> Barclays admits that the TAA provides, among other things, that "Lehman hereby sells, assigns, transfers, and sets over to Barclays, without recourse or without representation or warranty (other than as expressly provided herein), all of Lehman's rights, title, interests, powers, privileges, remedies, obligations, and duties in, to, under, and in respect of the Account [defined in the agreement as all of LBI's accounts at the OCC], as of the Effective Date including with respect to: (i) the Clearing Fund deposit; (ii) all margin deposits held by OCC with respect to the Account; (iii) all settlement obligations with regard to transactions in cleared contracts; and (iv) all rights and obligations in respect of exercises of option contracts and assignments of such exercises." BCI Ex. 3 [TAA] at § 1(a) (emphasis added). Barclays disputes the assertion that the emphasis in paragraph 609 was in the original TAA (which it was not), as opposed to the original Maguire

255

*Contains Highly Confidential Information*

Declaration (which it was). Barclays also disputes the implication that the rights and obligations Barclays assumed in connection with the TAA were limited to "option contracts" at the OCC. The reason option contracts in particular are referenced in subsection (iv) of the excerpt quoted in paragraph 609 is presumably and logically because that particular subsection addresses exercises and assignments, which only occur in relation to options contracts; futures contracts are not exercised or assigned. In no way does the quoted language suggest that Barclays did not assume the same rights and obligations with respect to margin and clearing fund deposits held in respect of the OCC futures accounts that it assumed with respect to margin and clearing fund deposits held in respect of the OCC options accounts.

610.    **The purpose of the TAA was to protect the OCC from losses associated with**

**winding down LBI's open option positions, without having to take the step of**

**precipitously liquidating all of LBI's open positions at OCC. (Kobak Decl. ¶ 18.)**

Barclays' Response

Barclays disputes the statement in paragraph 610 to the extent it implies that the only purpose of the TAA was "to protect the OCC from losses associated with winding down LBI's open option positions without having to take the step of precipitously liquidating all of LBI's open positions at OCC." The preamble to the TAA makes it clear that the agreement was also designed to facilitate LBI's desire to terminate its OCC membership without retaining any rights, obligations, or liabilities to the OCC, and to allow Barclays to smoothly assume those rights, obligations, and liabilities. BCI Ex. 3 [TAA] at p. 1. The OCC also made it clear that it wanted the TAA executed "to confirm its understanding that the LBI accounts and all positions, cash and securities collateral that are held by OCC in respect of those accounts are intended to be transferred to Barclays." BCI Ex. 235 [Sept. 20, 2008 1:09 pm email from E. Rosen to J. McDaniel, *et al.*]. Barclays does not dispute that, absent Barclays' willingness to enter into the TAA and assume LBI's settlement obligations in respect of the options and futures positions in the OCC accounts, the OCC may well have taken the step of liquidating all of LBI's open positions at the OCC. Indeed, the OCC expressly indicated that, absent Barclays willingness to assume these obligations, "OCC would need to immediately liquidate and close out the LBI accounts and [was] preparing to do so." BCI Ex. 262 [Sept. 21, 2008 4:03 pm email from J. McDaniel to E. Rosen, *et al.* with attachment].

611.    **The Trustee was not told that the TAA would materially change the deal from the**

**purchase of $47.4 billion in assets that had been represented to the Court. (Kobak**

**Decl. ¶ 9.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement in paragraph 611 to the extent it implies that the TAA materially changed the Sale, rather than embodying it and implementing its terms. Barclays further disputes that the representations made to the Court were in any way inconsistent with the fact that Barclays was acquiring all margin, held in any form, in respect of LBI's exchange-traded derivatives accounts. Barclays further disputes the statement in paragraph 611 to the extent it implies that the Trustee was not aware that all margin, held in any form, in respect of LBI's exchange-traded derivatives accounts, was included in the deal from the time the APA was finalized through the time the deal closed. Margin was encompassed by the definition of Purchased Assets contained in both the APA and the Clarification Letter, and the Trustee had full access to both of those agreements (and freely entered into the latter after having received full disclosure about the inclusion of the margin).

612.    **There was no disclosure to the Trustee or the Court of the magnitude of the sums**

   **involved in connection with Barclay's interpretation of the Clarification Letter and**

   **the TAA. (Kobak Decl. ¶ 20.)**

Barclays' Response

Barclays disputes statement in paragraph 612 to the extent it implies that Barclays' interpretation of the Clarification Letter and the TAA is in any way inconsistent with the terms of those agreements, the terms of the APA, or any relevant party's understanding of the agreement that had been reached. Barclays further disputes the implication that Barclays was obligated to determine and disclose to the Trustee the amount of margin to which the relevant agreements entitled it (and the implication that Barclays was even in a position, at any time prior to the Closing, to quantify or value the margin that LBI had posted in connection with its exchange-traded derivatives). Moreover, the Trustee was expressly informed that the cash component of the LBI margin deposit at the OCC alone was roughly $1 billion. BCI Ex. 230 [Sept. 20, 2008 2:18 am email from A. Rovira to E. Rosen, *et al.* with attachment]. The Trustee was also notified that some or all of that amount may be in excess of the OCC's margin requirements. BCI Ex. 235 [Sept. 20, 2008 1:09 pm email from E. Rosen to J. McDaniel]. The Trustee never objected to the transfer of these assets to Barclays at the time of the negotiation of the TAA or the Clarification Letter, nor did the Trustee suggest at any time prior to the Closing (or for some time thereafter) that the transfer of these assets would be contrary to the Trustee's understanding of the terms of the parties' agreement. Finally, Barclays disputes that the transfer of the margin assets necessarily resulted in a transfer of "sums of magnitude," as at the time, the value was unknown and constantly changing, and some reports indicated as much as $2 billion negative value.

*Contains Highly Confidential Information*

**613.    The TAA was never filed with the Court or presented to the Court for approval.**

Barclays' Response

> Barclays disputes the statement in paragraph 613 to the extent it implies that the TAA
> should have been or was required to be filed with the Court or presented to the Court for
> approval. Barclays further disputes the statement in paragraph 613 to the extent it
> implies that any material term of the TAA was not fully disclosed to the Court by virtue
> of the submission to the Court of the APA, the Sale Order, and the Clarification Letter,
> all of which were fully consistent with the terms of the TAA in that they all contained
> definitions of Purchased Assets that encompassed all margin at the OCC.

**614.    While the Sale Order authorized additional agreements to implement the Purchase**

**Agreement, it did not authorize any agreement that would materially change its**

**terms. (*See generally* LBHI Sale Order [Docket No. 258].)**

Barclays' Response

> Barclays disputes the statement as worded in paragraph 614 and notes that the Sale Order
> defined the Purchase Agreement to include the original APA, the First Amendment to the
> APA, and the Clarification Letter. BCI Ex. 16 [Sale Order] at p. 1 (". . . with respect to
> that certain Asset Purchase Agreement, dated September 16, 2008, among the Debtors,
> Lehman Brothers Inc . . . . and Barclays Capital, Inc. . . . collectively with that First
> Amendment Clarifying Asset Purchase Agreement dated September 19, 2008 and that
> letter agreement clarifying and supplementing the Asset Purchase Agreement dated
> September 20, 2008 ("as same may be subsequently modified or amended or clarified,
> the 'Purchase Agreement'"). Barclays notes further that, at the September 19 hearing,
> Weil explained that there had been many changes in the transaction even up to the
> beginning of the hearing and that those final changes would be reflected in an agreement
> to be drafted after the approval order was entered. BCI Ex. 49 [Sept. 19, 2008 Hearing
> Tr.] at 43:11-20 ("In any event, Your Honor, as we described last Wednesday, there are a
> lot of moving parts to this transaction. And they've been moving with great velocity over
> the last days since Wednesday. And as a consequence, Your Honor, there has had to be
> some major changes in the transaction"), 88:5-14. The Court considered objections
> asserting that approval should be withheld on the basis that there was no final agreement
> for the Court to approve. *Id.* at 169:3-9, 173:7-9, 248:25-249:3. Weil informed the Court
> that, given larger concerns, approval was warranted even in the absence of appraisals and
> completed documentation. *Id.* at 59:21-22. The Sale Order contemplated that the final
> agreements would be prepared after the Approval Hearing and provided in paragraph 25
> that "[t]he Purchase Agreement and any related agreements, documents or other
> instruments may be modified, amended or supplemented by the parties thereto, in a
> writing signed by such parties, and in accordance with the terms thereof, without further
> order of the Court, provided that any such modification, amendment or supplement does

*Contains Highly Confidential Information*

not have a material adverse effect on the Debtors' estates and has been agreed to between
the Committee, the Debtors and the Purchaser." The creditors' committee has
acknowledged that the Sale Order "itself made the Creditors' Committee a party, if you
will, to the transaction in the sense that it couldn't be changed without the Creditors'
Committee's consent, even an immaterial change." BCI Ex. 50 [Dec. 22, 2008 Hearing
Tr.] at 46:2-5. *See also* BCI Ex. 58 [Burian Dep. Tr.] at 45:11-48:14. The Committee
"signed off" on the changes. BCI Ex. 96 [Seery Dep. Tr.] at 146:22-148:20; BCI Ex. 87
[Miller Dep. Tr.] at 29:5-25, 101:13-102:5 (Committee representatives told him, "If you
guys are satisfied with it, we're satisfied"). The Committee's financial advisors and
counsel testified that the Clarification Letter did not make any material changes to the
transaction. BCI Ex. 88 [O'Donnell Dep. Tr.] at 75:8-15, 106:6-19, 116:19-24; BCI Ex.
58 [Burian Dep. Tr.] at 65:7-23, 76:20-77:13, 78:25-79:23, 83:24-84:12. Harvey Miller
testified that Weil reached the same conclusion. BCI Ex. 87 [Miller Dep. Tr.] at 48:11-
49:15.

**615. On September 18, 2008, Barclays transferred $45 billion in cash to Lehman in**

**connection with the Repurchase Agreement. (*See* A. 19 [Lowitt] 138:18–139:3; A.**

**77 (describing "Repo Cash amount" as "45.00" billion).)**

Barclays' Response

Barclays disputes the statement in paragraph 615 to the extent that it relies on
inadmissible, hearsay testimony of an individual lacking direct personal knowledge of the
facts and who was not involved in the execution or negotiation of the Fed Repo
Replacement transaction. Barclays instead refers to the best evidence that Barclays
indisputably transferred $45 billion to LBI in replacing the Fed's financing of LBI. *See*
BCI Ex. 116 [Sept. 18, 2008 Payment Details ($3,999,999,999.00)]; BCI Ex. 117 [Sept.
18, 2008 Payment Details ($5,000,000,000)]; BCI Ex. 118 [Sept. 18, 2008 Payment
Details ($9,000,000,000)]; BCI Ex. 119 [Sept. 18, 2008 Payment Details
($9,000,000,001)]; BCI Ex.120 [Sept. 18, 2008 Payment Details ($9,000,000,002)]; BCI
Ex. 121 [Sept. 18, 2008 Payment Details ($9,000,000,003)].

**616. Barclays paid $250 million in cash to DTC as a guaranty on behalf of Lehman**

**pursuant to a letter, dated September 22, 2008, between DTC, Barclays and the**

**SIPA Trustee. (Maguire Decl. Ex. 23 at 2.)**

Barclays' Response

Barclays refers to the terms of the DTCC Letter Agreement for a definitive statement of
its provisions and otherwise disputes the statement in paragraph 616.

*Contains Highly Confidential Information*

**617.    In connection with the Sale Transaction, Barclays has paid $238,200,978 in contract**

**cure liabilities. (A. 136.)**

Barclays' Response

> Barclays disputes the statement in paragraph 617 to the extent it implies that Barclays did
> not meet its contractual obligation to make cure payments under the APA. APA Section
> 2.5 provides that "[f]or a period of 60 days after the Closing, the Purchaser shall have the
> right upon notice to Seller to designate any contract related to the assets purchased from
> the Seller by Purchaser or its Affiliates (the 'Related Contracts') as either (1) a Purchased
> Contract or (2) a Contract not designated as a Purchase Contract (a 'Rejected Contract'),"
> and that "[i]f a related Contract is designated as a Rejected Contract, Purchaser shall have
> no further obligations in respect thereof." In its motion seeking Court approval of the
> Sale, the Debtor made clear that Barclays "shall have the right, but not the obligation, to
> take assignment of contracts and leases which are designated for assumption and
> assignment by" Lehman. BCI Ex. 11 [Sale Motion] at ¶14. The cure payments Barclays
> has paid to date are a matter of public record and Barclays refers to the publicly available
> record of total cure payments to date for a definitive statement of total cure payments to
> date. Finally, the document cited above reflects only aggregate cure payments through
> July 14, 2009.

**618.    In connection with the Sale Transaction, Barclays produced in discovery a**

**spreadsheet showing that the aggregate amount of bonuses paid to transferred**

**Lehman employees appears to be no higher than $1.55 billion, excluding payroll**

**items, taxes, severance and other non-bonus items. (A. 137; A. 9 [Exall] 78:22-84:3,**

**108:11-109:9, 110:22-115:18, 124:22-125:6, 128:8-137:7, 141:5-144:12, 151:15-23.)**

Barclays' Response

> Barclays disputes the statement in paragraph 618 to the extent it implies that Barclays has
> not met its contractual obligations under Section 9.1 of the APA. Barclays produced in
> discovery information demonstrating that Barclays has paid close to $2 billion in
> aggregate compensation payments relating to Transferred Employees and has thereby
> fully satisfied its obligations under APA Section 9.1. *See* BCI Ex. 142 [Exall
> Spreadsheet]. Barclays further disputes the statement in paragraph 618 to the extent that
> it is inaccurate and misleading as to: 1) what the spreadsheet represented; 2) Barclays'
> compensation obligations under the APA; 3) what the September 16, 2008 Financial
> Schedule "Comp" line represented; 4) industry standards and practice in defining

*Contains Highly Confidential Information*

compensation and bonus pool; 5) whether the $2 billion estimate for compensation was
reasonable; and 6) whether the September 16, 2008 Financial Schedule was part of the
APA. *See* Barclays' response to paragraph 321.

**619.   In December 2008, the Trustee, JP Morgan and Barclays entered into a settlement**

**in connection with the Repurchase Agreement (the "December 2008 Settlement").**

**(A. 151 [LBI Docket No. 387]).)**

Barclays' Response

Barclays disputes the statement in paragraph 619 except refers to the December 5, 2008
Settlement Agreement for a complete statement of its terms.

**620.   LBHI is not a party to the December 2008 Settlement.   ([Docket No. 2420] 12/22/08**

**Tr. at 32:6-34:21.)**

Barclays' Response

Barclays disputes the statement in paragraph 620 to the extent it implies that LBHI was
not advised of the settlement or did not acquiesce in the settlement.   While LBHI was not
a signatory to the settlement, LBHI was fully advised of the settlement and conducted
extensive diligence concerning the settlement, and counsel for LBHI stated unequivocally
that the settlement was consistent with the spirit of the Purchase Agreement and that
LBHI did not oppose the motion for approval of the settlement. *See* BCI Ex. 50 [Dec. 22,
2008 Hearing Tr.] at 32:22-24, 33:9-11, 33:15-17.   Barclays incorporates its response to
paragraph 628.

**621.   On December 5, 2008, the Trustee filed his Motion Under 11 U.S.C. §§ 105 And 363**

**And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement**

**Agreement in the SIPA proceeding ("Settlement Motion").   (A. 151 [LBI Docket No.**

**387].)**

Barclays' Response

Barclays does not dispute the statement in paragraph 621.

*Contains Highly Confidential Information*

622.    The Settlement Motion sought approval of the December 2008 Settlement among

the Trustee, Barclays and JPMorgan Chase Bank, N.A. ("Chase") related to certain

claims arising from transactions related to the Repurchase Agreement. (A. 151

[LBI Docket No. 387] at Settlement Motion ¶¶ 9-10 (citing Leventhal Decl. ¶ 12).)

Barclays' Response

Barclays disputes the statement in paragraph 622, except refers to the Settlement Motion
for a complete statement of its scope and purpose.

623.    Barclays claimed it was owed $7 billion in connection with the Repurchase

Agreement. (A. 151 [LBI Docket No. 387] ¶ 17.) Under the December 2008

Settlement, Barclays received a little more than $1.257 billion in cash, and securities

that were valued at the time of the settlement as "substantially less" than $5.743

billion. (A. 151 [LBI Docket No. 387] ¶ 19 (citing Moore Decl. ¶ 6); *see also* [Docket

No. 2420] 12/22/08 Tr. 21:2022.)

Barclays' Response

Barclays disputes the statement in paragraph 623 except refers to the submissions and
statements to the Court in support of the December Settlement for an accurate and
complete description of the basis for that settlement. With respect to the value that
Barclays received in that settlement, Barclays refers to the expert report of Professor Paul
Pfleiderer. BCI Ex. 341 [Pfleiderer Report] at Section II.

624.    On December 19, 2008, the Committee filed its limited objection to the Settlement

Motion (the "Committee's Limited Objection"). ([LBI Docket No. 453].) In the

Committee's Limited Objection, the Committee described its investigation into the

Sale Transaction and discrepancies between the facts reported in the Settlement

Motion and the facts recounted to the Court and the Committee concerning the Sale

Transaction. (*See* Committee's Limited Objection [LBI Docket No. 453].)

*Contains Highly Confidential Information*

Barclays' Response

Barclays does not dispute that the Committee filed its limited objection to the Settlement Motion on December 19, 2008, but disputes that the Committee's submission accurately reflects the Committee's "investigation" or that the Committee genuinely believed or had a good faith reason to believe that there were actually "discrepancies" in the estimates provided to the Committee. The Committee's objection stated unequivocally that the Committee understood, as of the Sale Hearing, that, according to Lehman, the "value of the Fed Portfolio Securities being transferred to Barclays" was "$47.4 billion." BCI Ex. 37 [Committee Objection] at ¶ 9 and n.12; BCI Ex. 58 [Burian Dep. Tr.] at 40:18-41:22. The Committee's professionals have since admitted that they understood that there was uncertainty concerning the value of the Purchased Assets and never objected to the Sale on that basis. BCI Ex. 88 [O'Donnell Dep. Tr.] at 104:10-25, 105:2-7; BCI Ex. 58 [Burian Dep. Tr.] at 100:10-101:7, 105:9-109:14, 289:3-6, 289:7-291:12. Before Closing, the Committee was provided estimated values for certain categories of financial assets to be acquired by Barclays, including a spreadsheet showing the marked value of the repo assets to be $49.9 billion. *See id.*, BCI Ex. 255 [Sept. 21, 2008 11:34 am email from B. Kelly to A. McComiskey, *et al.* with attachment]. Further, the Committee was aware before both the Sale Hearing and the Closing that there was a roughly $5 billion difference between the marked value of the repo securities and the amount that Barclays had advanced. BCI Ex. 143 [Saul Burian Handwritten Notes]; BCI Ex. 58 [Burian Dep. Tr.] at 89:7-24, 221:13-225:24. The Committee was also informed, both before and after the Sale Hearing, that the market value of the repo securities had been estimated by Barclays and Lehman to be in a range from $44-45.5 billion, and the Committee's financial advisors understood that range represented an estimation. *Id.*; BCI Ex. 130 [Michael Klein Handwritten Chart]; BCI Ex. 58 [Burian Dep. Tr.] at 251:7-255:17. Before closing, The Committee was aware of and "very annoyed" about what it called a "$5 billion mismatch," and it repeatedly raised the issue with Weil Gotshal, but never objected to the final transaction documentation. BCI Ex. 88 [O'Donnell Dep. Tr.] at 140:23-141:25, 157:4-24, 163:25-165:6; BCI Ex. 67 [Fogarty Dep. Tr.] at 116:19-119:8.

625.    **The Committee requested an adjournment of consideration of the Settlement**

        **Motion until a final reconciliation of the Sale Transaction had been provided and**

        **the Committee concluded its investigation into the Sale Transaction.  (*See***

        **Committee's Limited Objection [LBI Docket No. 453].)**

Barclays' Response

Barclays does not dispute the statement in paragraph 625 to the extent that it is consistent with the submission cited therein.

*Contains Highly Confidential Information*

626.   **Counsel for Barclays made no statement at the December 22, 2008 hearing on the**

   **settlement motion regarding the total financial assets included in the Sale**

   **Transaction. (*See* [Docket No. 2420] 12/22/08 Tr. at 40:8-45:6.)**

Barclays' Response

   Barclays disputes in paragraph 626, the statement in except refers to the complete
   transcript of the 12/22/08 hearing for an accurate reflection of the statements made at the
   hearing.

627.   **Barclays did not disclose the total financial assets included in the Sale Transaction**

   **until September 2009. (*See generally* A. 4 [Clackson]; A. 24 [Romain].)**

Barclays' Response

   Barclays disputes the statement in paragraph 627. The financial and other assets included
   in the Sale Transaction were described in the final Purchase Agreement, the terms of
   which were described by Weil to the Court in the Sale Motion and at the September 19,
   2008 Sale Hearing. The final Purchase Agreement was filed with the Court on
   September 22, 2008 and no party objected on the basis that it did not adequately describe
   the final transaction or was in any material respect inconsistent with what Weil has
   presented to the Court. BCI Ex. 18 [Purchase Agreement]; BCI Ex. 88 [O'Donnell Dep.
   Tr.] at 106:6-19, 116:19-24; BCI Ex. 58 [Burian Dep. Tr.] at 65:7-23, 76:20-77:13,
   78:25-79:23, 83:24-84:12. Counsel and financial advisors to the Debtors and the
   Committee have testified that they did not identify any material inconsistency between
   the final Purchase Agreement and the Sale Transaction that Weil described to the Court at
   the Approval Hearing and through the Sale Motion. BCI Ex. 87 [Miller Dep. Tr.] at
   48:19-49:15; BCI Ex. 88 [O'Donnell Dep. Tr.] at 75:8-15; BCI Ex. 58 [Burian Dep. Tr.]
   at 65:7-23.

628.   **Pursuant to the December 2008 Settlement, both securities and cash were**

   **transferred to Barclays. (*See* A. 151 [LBI Docket No. 387].)**

Barclays' Response

   Barclays does not dispute the statement in paragraph 628, except that Barclays notes
   further that no party objected to the December Settlement on the grounds that it
   anticipated the transfer of cash to Barclays. Indeed, at the hearing, Mr. Miller stated,
   "We understand what was to be contemplated and to be performed under the asset

*Contains Highly Confidential Information*

purchase agreement. And this [settlement] is within the spirit of that agreement." BCI
Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 33:15-17.

**629. The securities transferred to Barclays pursuant to the December 2008 Settlement**

**were listed on a so-called Annex A to the Settlement Agreement. (*See* A. 151 [LBI**

**Docket No. 387].)**

Barclays' Response

Barclays does not dispute the statement in paragraph 629 except to the extent that the
wording "so-called" suggests that there was anything misleading or inaccurate about
Annex A to the Settlement Agreement.

**630. The Declaration of Jeffrey M. Moore in Support of Trustee's Settlement Motion**

**provided: "In my opinion, the value of the date hereof of the 'Settlement**

**Consideration Fed Portfolio Securities' identified in Annex A to the Settlement**

**Agreement that is the subject of the Motion is substantially less than \$5.743 billion .**

**. . ." (A.151 [LBI Docket No. 387] at Moore Decl. ¶ 6.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 630 to the extent that the quoted
language is read in the context of the complete declaration cited.

**631. The version of Annex A to the December 2008 Settlement Agreement filed under**

**seal on December 8, 2008 had no market values for the securities on it. (*See* Annex**

**A [LBI Docket No. 403].)**

Barclays' Response

Barclays does not dispute the statement in paragraph 631 and notes that the contents of
Annex A are a matter of record.

**632. The Trustee received a valuation from JPMC on November 3, 2008 indicating that**

*Contains Highly Confidential Information*

the securities on Schedule A were worth no more than approximately $3.4 billion.

(HHR_00014658-60.) JPMC had valued most of the securities and found that they

had a total value of approximately $2.9 billion. (HHR_00014658-60.) With respect

to the remaining securities that JPMC was unable to value, even assuming that they

were worth the full amount that a third party had previously ascribed to them, the

total was only $532 million. (HHR_00014658-60.)

Barclays' Response

Barclays disputes the statement in paragraph 632 because the reference to "Schedule A"
is unclear and Barclays lacks direct knowledge concerning the cited information. With
respect to the value of the Annex A securities transferred to Barclays, Barclays refers to
the expert report of Professor Paul Pfleiderer. BCI Ex. 341 [Pfleiderer Report] at § II.

633.    Barclays valued the securities on Annex A to the December 2008 Settlement to have

a market value of $3,916,319,159 as of December 22, 2008. (*See* A. 133 (Barclays

valuation of Annex A as of Dec. 22, 2008 as reflected in Barclays' spreadsheet to its

auditors); A. 131 (July 31, 2009 cover letter from Barclays' counsel (describing the

spreadsheet at A. 133 as "containing information that were provided to Barclays'

auditors relating to values that Barclays booked for the securities received from

Lehman and JPM").)

Barclays' Response

Barclays disputes the statement in paragraph 633, except does not dispute the contents of
the cited documents and refers to the expert report of Professor Paul Pfleiderer for a
complete and accurate statement of Barclays' position concerning the value of the Annex
A securities. BCI Ex. 341 [Pfleiderer Report] at § II.

634.    Pursuant to the December 2008 Settlement, Barclays also was to receive $1.25

billion in cash to "partially account for the undelivered Fed Portfolio Securities that

*Contains Highly Confidential Information*

will not be delivered to Barclays as part of the Settlement Securities (because they

have been liquidated by JP Morgan) and the decline in value of the Settlement

Securities since September 19, 2008 . . . ." ." (*See* A. 151 [LBI Docket No. 387] at

Settlement Motion ¶ 20(b); *see also id.* at Settlement Agreement § 1(a).)

Barclays' Response

Barclays disputes the statement in paragraph 634, except refers to the Settlement Motion
for a complete reflection of the statements made by the Trustee in that motion.

635. Pursuant to the December 2008 Settlement, Barclays also was to receive $14,942,678

"(representing principal and interest payments, and any other distribution, on the

Delivered Securities attributable to the period on and after September 18, 2008

which were received in LBI and/or JPMorgan accounts and not heretofore paid to

BarCap), plus interest accrued thereon . . . ." (*See* A. 151 [LBI Docket No. 387] at

Settlement Motion ¶ 20(c); *see also id.* at Settlement Agreement § 1(b).)

Barclays' Response

Barclays disputes the statement in paragraph 635, except refers to the Settlement Motion
for a complete reflection of the statements made by the Trustee in that motion.

636. At the hearing in connection with the Settlement Motion, counsel for LBHI

explained to the Court that, among other things, there were questions about assets

transferred to Barclays about which discovery might be needed. (A. 152 [Docket

No. 2420] 12/22/08 Tr. at 32:6-34:21.)

Barclays' Response

Barclays disputes the statement in paragraph 636 because it takes select phrases out of
context, and refers to the transcript of the December 22, 2008 hearing for a complete and
accurate reflection of the statements made at that hearing.

*Contains Highly Confidential Information*

637.  **At the hearing in connection with the Settlement Motion, while the Court overruled the Committee's Limited Objection, the Court itself observed that additional factual inquiry would be appropriate about assets transferred under the Sale Order.  (A. 152 [Docket No. 2420] 12/22/08 Tr. at 50:8-52:7.)**

Barclays' Response

> Barclays disputes the statement in paragraph 637 because it takes select phrases out of context, and refers to the transcript of the December 22, 2008 hearing for a complete and accurate reflection of all the statements made at that hearing.

638.  **At the hearing in connection with the Settlement Motion, the Court stated that:**

> **I consider it to be important for us to get to what I'll call closure with respect to the basics of the transaction that was approved by order entered September 20 And this motion with respect to the settlement agreement is a reasonable platform on which to address some of these issues because while this is not fairly to be characterized as a cleanup item, it's a very significant matter.  It does draw all of our attention back to what happened in September.  And I think it important that there be reasonably prompt resolution of outstanding questions that the committee may have on the subject. I would hope that it's not necessary for the committee to have to file 2004 requests in order to get the information that it seeks which seems to be reasonable and consistent with its mandate.**

**(A. 152 [Docket No. 2420] 12/22/08 Tr. at 50:18-51:6.)**

Barclays' Response

> Barclays disputes the statement in paragraph 638, except refers to the transcript of the December 22, 2008 hearing for a complete and accurate reflection of all the statements made at that hearing in context.

639.  **At the hearing in connection with the Settlement Motion, counsel for Barclays stated, "We confirm Your Honor's statement that what is being done here is we are**

*Contains Highly Confidential Information*

approving a settlement agreement. There will not be any collateral estoppel or other

similar effects ... People would remain free to pursue claims if they feel there is

something in the overall sales transaction which gives rise to a claim." ([Docket No.

2420] 12/22/08 Tr. at. 39:13-20.)

Barclays' Response

Barclays disputes the statement in paragraph 639, as the quoted language was not given
by Barclays' counsel. Barclays otherwise refers to the transcript for a complete and
accurate reflection of all statements made at the hearing.

640. **Pursuant to the December 2008 Settlement, certain securities held by the Fed (listed**

**in Annex A to the December 2008 Settlement Agreement), plus $1.25 billion in cash**

**(A. 151 [LBI Docket No. 387]), were transferred to Barclays, along with an**

**additional $7.1 million in cash representing proceeds of securities that were**

**inadvertently liquidated by Chase. (A. 151 [LBI Docket No. 387] at Leventhal Decl.**

**¶ 22; *see also* A. 133 (showing value of securities was $5.99 billion on 9/30/08).)**

Barclays' Response

Barclays disputes the statement in paragraph 640, except refers to the December
Settlement Agreement for a complete and accurate statement of its terms.

641. **The Clarification Letter does not mention the parties' purported agreement to**

**transfer $7 billion from Chase to Barclays. (A. 32.)**

Barclays' Response

Barclays disputes the statement in paragraph 641, except refers to the Clarification Letter
for a complete and accurate statement of its terms.

642. **This cash and securities transferred to Barclays under the December 2008**

**Settlement came from LBI's account at Chase. (A. 151 [LBI Docket No. 387]**

*Contains Highly Confidential Information*

Leventhal Decl. at ¶ 23.)

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 642, except refers to the terms of the December Settlement for a complete and accurate statement of its terms.

643. **Chase agreed to release a lien it held on LBI's account to effect the December 2008**

**Settlement.  (A. 151 [LBI Docket No. 387] Leventhal Decl. at ¶ 23.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 643, except refers to the December Settlement Agreement for a complete description of the agreements contained therein.

644. **An October 11, 2008 letter from the CEO of Chase to John Varley, Barclays Group**

**CEO, noted that the Court had not been apprised of the transfer of assets from**

**Chase to Barclays in connection with the December 2008 Settlement.  (A. 128.)**

<u>Barclays' Response</u>

Barclays disputes the statement in paragraph 644, except refers to the cited letter for a complete reflection of the assertions and statements contained therein.  Barclays further disputes the accuracy of the statements in that letter.

645. **The October 11, 2008 letter from the CEO of Chase to Varley stated, in part:**

> **On Friday night, for the first time as far as we know, the Bankruptcy Court was apprised of a different 'deal' between Barclays Capital and Lehman Brothers – and that Barclays Capital was no longer purchasing $70 billion in assets and assuming $69 billion in related debt.  But the Court was *not* apprised of the purchase that Barclays Capital now says it agreed to make.  Instead of the Court being told that Barclays Capital was purchasing approximately $49.7 billion in securities for $45 billion in cash, the Court was told that Barclays Capital was purchasing $47.4 billion in securities for $45.5 billion in cash.  In addition, the Court was told that the reason for the change was a deterioration in market prices, an explanation that we now know to be incorrect  … .  [I]n as much as you ended up taking securities that had not been part of the 'Fed collateral' – again, some**

*Contains Highly Confidential Information*

were part of the 'Barclays Capital tri-party collateral' and still others
were not financed by JPMorgan at all – we believe that a full
accounting should be done. It is altogether possible that the LBI estate
and its creditors gave you more or less value than you were entitled to
receive. Moreover, the Bankruptcy Court was told that Barclays
Capital was to receive $47.4 billion (not $49.7 billion) in securities and
to pay $45.5 billion (not $45 or $45.2 billion) in cash. We are both
duty-bound to ensure that LBI received the value it was supposed to
receive in exchange for your $45 billion. We have offered several
times to do this accounting with you (and, as appropriate, the Fed),
and it is entirely possible that the SIPA Trustee and the Bankruptcy
Court would want such an accounting, but your personnel have
declined, citing the amount of time and effort it would take. We
should do this accounting and should do it now ... .

(A. 128.)

Barclays' Response

Barclays does not dispute that the quoted language appears in the cited letter, however,
Barclays refers to the cited letter for a complete reflection of the assertions and
statements contained therein. Barclays further disputes the accuracy of statements in that
letter.

646.   On December 29, 2008, Lindsee Granfield of Cleary Gottlieb Steen & Hamilton

LLP ("Cleary") wrote to James B. Kobak of Hughes Hubbard & Reed LLP (Hughes

Hubbard") regarding certain clearance box assets that Barclays believed it was

entitled to under the Asset Purchase Agreement and Clarification Letter, and that

Barclays believed the Trustee had not yet delivered. (Letter from Lindsee P.

Granfield, Cleary, to James Kobak, dated Dec. 29, 2008.)

Barclays' Response

Barclays does not dispute the statement in paragraph 646 except that Barclays notes that
the cited letter defines "Undelivered Clearance Box Assets" as "certain assets that were
in LBI's 'clearance boxes' as of Closing and are still in LBI's clearance boxes that should
have been delivered to Barclays, but Barclays has not received." BCI Ex. 157 [December
29, 2008 letter from L. Granfield to J. Kobak].

647.   Ms. Granfield sent the December 29, 2008 letter one week after the Court granted

*Contains Highly Confidential Information*

the Settlement Motion, permitting Barclays to receive cash and securities. (*See*

Order Approving Settlement Agreement Between Trustee, Barclays Capital Inc.

and JPMorgan Chase Bank, N.A. [LBI Docket No. 464].)

Barclays' Response

> Barclays does not dispute the statement in paragraph 647 except that Barclays notes
> further that the cited letter explains that the Undelivered Clearance Box Assets were
> discussed with Deloitte and Touche by various Barclays representatives and had been
> mentioned to Mr. Kobak by Jonathan Hughes "a couple of weeks ago." BCI Ex. 157
> [December 29, 2008 letter from L. Granfield to J. Kobak].

648.   On January 20, 2009, Mr. Kobak responded to Ms. Granfield's letter, explaining

that, pursuant to the DTCC Letter, the assets identified in her letter remained the

property of the LBI estate. (Letter from James Kobak to Lindsee P. Granfield,

Cleary, dated Jan. 20, 2009.)

Barclays' Response

> Barclays does not dispute the statement in paragraph 648. Barclays disputes the accuracy
> of the statements in the cited letter.

649.   On January 27, 2009, Gerald LaRocca of Barclays wrote to the Trustee asserting a

claim on behalf of Barclays and certain customers to certain undelivered customer

property. (Letter from Gerald S. LaRocca, Barclays, to James W. Giddens, dated

Jan. 27, 2009.)

Barclays' Response

> Barclays does not dispute the statement in paragraph 649 except that Barclays notes
> further that in the cited letter, Mr. LaRocca also wrote that "Barclays agrees to (a)
> provide reasonable assistance and cooperation in the Trustee's reconciliation of this
> claim, including without limitation reconciling it with any potentially duplicative claims
> filed by or on behalf of individual Customers and (b) provide reasonable access to those
> relevant systems, data bases, screens, documents, and information to the extent necessary
> to, and solely for the purpose of, reconciliation of this claim and determination of

Barclays' and customers' claims in respect of the Undelivered Customer Property ... ."
BCI Ex. 159 [January 27, 2009 letter from G. LaRocca to J. Giddens].

650.   **On March 6, 2009, Ms. Granfield wrote to Mr. Kobak, responding to his January**

**20, 2009 letter. Ms. Granfield noted that "the purpose of the [DTCC] letter was to**

**address DTCC's exposures in relation to unsettled positions of LBI in its accounts**

**maintained at DTCC." Ms. Granfield asserted that, although LBI's DTCC**

**"*accounts*" were excluded assets under the Asset Purchase Agreement and DTCC**

**Letter, the "securities *contained in those accounts*" were not, and that the DTCC**

**Letter was not intended to modify the Clarification Letter. (Letter from Lindsee P.**

**Granfield, Cleary, to James Kobak, dated Mar. 6, 2009, at 1-2 (emphasis in**

**original).)**

Barclays' Response

Barclays does not dispute the statement in paragraph 650 except that Barclays notes
further that the cited letter explains that "in the days following the closing of the Asset
Purchase Agreement (as clarified by the Clarification Letter) the Trustee delivered to
Barclays a large portion of the 'securities ... in LBI's "clearance boxes" as of the time of
the Closing,' thereby confirming the above plain reading of the Clarification Letter."
(*See also* the response to paragraph 656.) BCI Ex. 163 [March 6, 2009 letter from L.
Granfield to J. Kobak.]

651.   **On March 25, 2009, Jonathan Hughes of Barclays wrote to the Trustee and**

**identified four categories of assets that Barclays believed it had purchased under the**

**Asset Purchase Agreement and Clarification Letter, but that had not yet been**

**delivered by the Trustee. (Letter from Jonathan Hughes, Barclays, to James W.**

**Giddens, dated Mar. 25, 2009.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 651.

*Contains Highly Confidential Information*

652.   Mr. Hughes noted in his March 25, 2009 letter that "Barclays and the Trustee have worked cooperatively to resolve certain issues relating to the sale of assets from LBI to Barclays in the period since the Closing Date." (Letter from Jonathan Hughes, Barclays, to James W. Giddens, dated Mar. 25, 2009.) The four categories of assets were 1) clearance box assets; 2) $769 million of securities held by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934; 3) approximately $900 million in margin held with the OCC; and 4) "certain cash balances and securities held to secure obligations of LBI and/or its customers in respect of exchange-traded derivatives" or proceeds of such exchange-traded derivatives." (Letter from Jonathan Hughes, Barclays, to James W. Giddens, dated Mar. 25, 2009.)

Barclays' Response

Barclays does not dispute the statement in paragraph 652 except that Barclays notes further that the cited letter explains that in addition to the categories of undelivered assets referenced in paragraph 652, "there are also significant amounts of customer assets not yet delivered to Barclays (although the parties are working through these separately)" and, "there may be other Purchased Assets not mentioned in this letter that have not yet been delivered by the Trustee to Barclays." BCI Ex. 164 [March 25, 2009 letter from J. Hughes to J. Giddens] at n.1.

653.   On March 27, 2009, Mr. Kobak wrote to Ms. Granfield reiterating the Trustee's position with respect to the DTCC and clearance box assets. (Letter from James Kobak to Lindsee P. Granfield, Cleary, dated Mar. 27, 2009.)

Barclays' Response

Barclays does not dispute the statement in paragraph 653. Barclays disputes the accuracy of the statements and legal positions in that letter.

*Contains Highly Confidential Information*

654.    On April 22, 2009, Mr. Kobak wrote to Mr. Hughes explaining the Trustee's

position with respect to each of the four categories of assets detailed in Mr. Hughes'

March 25 letter. (Letter from James Kobak to Jonathan Hughes, Barclays, dated

Apr. 22, 2009.)

Barclays' Response

   Barclays does not dispute the statement in paragraph 654.  Barclays disputes the accuracy
   of the statements and legal positions in the cited letter.

655.    On May 13, 2009, Mr. Hughes wrote to the Trustee to address the Trustee's

positions with respect to each of the four categories of assets and to request "a high-

level meeting to discuss our positions and determine whether an amicable resolution

to these issues is possible." (Letter from Jonathan Hughes, Barclays, to James W.

Giddens, dated May 13, 2009, at 1.)

Barclays' Response

   Barclays does not dispute the statement in paragraph 655.

656.    Mr. Hughes also noted that four transfers of clearance box securities were made:

one each on September 19 and 29, 2008 and two on September 30, 2008, totaling

more than $1.45 billion. (Letter from Jonathan Hughes, Barclays, to James W.

Giddens, dated May 13, 2009, at 5.)

Barclays' Response

   Barclays does not dispute the statement in paragraph 656 except that Barclays notes
   further that the cited letter explains that the four transfers of Clearance Box securities
   referred to were made contrary to the position taken by the Trustee since January 20,
   2009 that the Trustee was not obligated to transfer any Clearance Box securities.  BCI
   Ex. 168 [May 13, 2009 letter from J. Hughes to J. Giddens].

*Contains Highly Confidential Information*

657.    **On May 28, 2009, Mr. Kobak sent an email message to Mr. Hughes requesting,**

**among other things, that Barclays provide documentation to support the position**

**that none of the items that Barclays was claiming could be considered customer**

**property. (E-mail from James Kobak to Jonathan Hughes, dated May 28, 2009.)**

Barclays' Response

    Barclays does not dispute the statement in paragraph 657 except that Barclays notes
    further that Mr. Kobak stated in the May 28, 2009 email that he was unable to schedule a
    meeting, as requested by Mr. Hughes in his May 13, 2009 letter, earlier than June 12,
    2009. BCI Ex.338 [Email chain including May 28, 2009 10:23 am email from J. Kobak
    to J. Hughes, *et al.*]. Barclays disputes the accuracy of the statements and legal positions
    in Mr. Kobak's letter.

658.    **On June 8, 2009, Hamish Hume of Boies, Schiller & Flexner LLP wrote to Mr.**

**Kobak providing spreadsheets showing the specific clearance box securities**

**included in the four September 2008 transfers. (Letter from Hamish Hume, Boies,**

**Schiller & Flexner LLP, to James Kobak, dated June 8, 2009.)**

Barclays' Response

    Barclays does not dispute the statement in paragraph 658 except that Barclays notes
    further that in addition to the referenced spreadsheets, Barclays provided other documents
    with this letter, one of which is referenced in Mr. Kobak's June 11, 2009 letter. BCI Ex.
    169 [June 8, 2009 letter from H. Hume to J. Kobak]; BCI Ex. 170 [June 11, 2009 letter
    from J. Kobak to H. Hume].

659.    **On June 11, 2009, Mr. Kobak wrote to Mr. Hume reiterating the requests for**

**information he had made in his March 27, 2009 letter and May 28, 2009 email.**

**(Letter from James Kobak to Hamish Hume, Boies, Schiller & Flexner LLP, dated**

**June 11, 2009.)**

Barclays' Response

*Contains Highly Confidential Information*

Barclays does not dispute the statement in paragraph 659. Barclays disputes the accuracy of the statements and legal positions in Mr. Kobak's letter.

**660.   On June 12, 2009, a meeting was held between the Trustee and Barclays to discuss**

**Barclays' claims to the above referenced assets.**

Barclays' Response

Barclays does not dispute the statement in paragraph 660.

**661.   On December 12, 2008, in connection with Bay Harbour's appeal of the LBHI and**

**LBI Sale Orders, Barclays noted that the Court was told during the Sale Hearing**

**that "cash was no longer being transferred to Barclays as the Debtors no longer held**

**such cash." (*Bay Harbour Mgmt., L.C. v. Lehman Brothers Holdings, Inc.*, No. 08-cv-**

**08869, Appellee Barclays Capital Inc.'s Mem. of Law in Opp'n to Bay Harbour et**

**al.'s Appeal, at 10 [Docket No. 10] (S.D.N.Y. 2008).)**

Barclays' Response

Barclays disputes the statement in paragraph 661 because it takes select phrases out of context and distorts their meaning. Barclays notes that the statement is consistent with Barclays' understanding of what the Court was told at the Sale Hearing concerning the treatment of "cash." Under the APA, certain cash, defined expressly as the "Retained Cash," was originally to have been transferred to Barclays. BCI Ex. 1 [APA] at p. 6, (Definition of Purchased Assets subsection (a) and page 2, Definition of Excluded Assets subsection (b) (defining "Retained Cash")). At the Sale Hearing, counsel to the Debtors, counsel to Barclays, and the Debtors' witness, Bart McDade, informed the Court that the Retained Cash originally to have been transferred to Barclays was no longer to be transferred because it was no longer held by the Debtors. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 53:20-25, 110:11-24, 200:7-15. Barclays does not believe the Court was ever told that other specifically defined Purchased Assets or Customer Account property to be transferred to Barclays were not to be transferred to Barclays to the extent they may have included cash components.

**662.   Barclays argued that: "It is also undisputed that the Debtors made every possible**

**effort to explain the terms of the proposed Sale to interested parties, demonstrated**

*Contains Highly Confidential Information*

by the meeting held at the Debtors' counsel's office in New York the day before the

Sale Hearing, by the one hour off-the-record explanation of terms during the Sale

Hearing, and by the reading of the main terms of the proposed Sale on the record at

the Sale Hearing itself. Thus, the Bankruptcy Court held that due process was

satisfied because adequate notice was given of the essential terms." (*Bay Harbour*

*Mgmt., L.C. v. Lehman Brothers Holdings, Inc.*, No. 08-cv-08869, Appellee Barclays

Capital Inc.'s Mem. of Law in Opp'n to Bay Harbour et al.'s Appeal at 32 (citation

omitted) [Docket No. 10] (S.D.N.Y. 2008).)

Barclays' Response

> Barclays does not dispute the statement in paragraph 662 except that Barclays notes
> further that LBHI similarly argued that "[i]n light of the exceptional circumstances before
> it, the Bankruptcy Court correctly concluded that the Due Process Clause was satisfied."
> BCI Ex. 33 [LBHI Brief in Opposition to Bay Harbour Appeal] at p. 36. The Trustee
> joined in LBHI's argument. BCI Ex. 34 [LBI Brief in Opposition to Bay Harbour
> Appeal] at p. 4 n.1.

663.   In its response to the appeal, LBHI stated that "[b]y the time the Sale Hearing was

conducted, the value of the securities to be transferred to Barclays declined from

$72 billion at the beginning of that week to $47.4 billion and the liabilities to be

assumed by Barclays declined from $68 billion to $45.5 billion." (Bay Harbour

Mgmt., L.C. v. Lehman Brothers Holdings, Inc., No. 08-cv-08869, Answering Br. of

Lehman Brothers Holdings, Inc., et al. in Opp'n to Bay Harbour Appeal, at 12

[Docket No. 9] (S.D.N.Y. 2008).)

Barclays' Response

> Barclays does not dispute the statement in paragraph 663 except that Barclays notes
> further that in its answering brief, LBHI also stated, among other things, that the "Orders
> should be affirmed in all respects," BCI Ex. 33 [LBHI Brief in Opposition to Bay
> Harbour Appeal] at p. 4, that the APA – *including the Clarification Letter and its*

*Contains Highly Confidential Information*

*schedules* – "fully disclosed each of the assets that would be transferred to Barclays, *id.* at 16, that Barclays was good-faith purchaser and that the sale was an arms-length transaction, *id.* at 16-27. LBHI also argued that in making its Sale Order the Court "did not commit a plain error of law or make a clearly erroneous finding that the sale was made in good faith by Barclays, LBHI, and LBI"; that "the appeal from the Orders should be denied as moot"; and "the Bankruptcy Court did not commit a plain error of law or abuse its discretion in authorizing and approving the sale to Barclays." *Id.*

664.    **Following the Court's December 22, 2008 instruction at the hearing on the Settlement Motion that the Committee pursue information from Barclays regarding the Sale Transaction on a consensual basis, on December 26, 2008, the Committee sent an informal document request to Barclays and the DTC relating to the Sale Transaction. (*See* Letter from James C. Tecce, Quinn Emanuel Urquhart Oliver & Hedges LLP, to Lindsee P. Granfield, Cleary Gottlieb Steen & Hamilton LLP, Jonathan D. Schiller, Boies, Schiller & Flexner, LLP and Sheldon I. Hirshon, Proskauer Rose, dated December 26, 2008.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 664.

665.    **Thereafter, Committee counsel and Houlihan Lokey, the Committee's financial advisor, had a teleconference with Barclays' attorneys on January 13, 2009 regarding the Committee's document request and its attempts to obtain a reconciliation of the Sale Transaction.**

Barclays' Response

Barclays does not dispute the statement in paragraph 665.

666.    **On February 3, 2009, Committee counsel and Houlihan Lokey had an in person meeting with Barclays' attorneys and representatives to discuss both the substance**

*Contains Highly Confidential Information*

of the Sale Transaction and the procedure for the Committee's ongoing investigative

efforts and document production in connection with the Sale Transaction.

Barclays' Response

Barclays disputes the statement in paragraph 666 as it is an incomplete description of the
February 3, 2009 meeting which was attended by Barclays' representatives Messrs.
LaRocca, King and Keegan, at which all aspects of the Sale Transaction, particularly the
Fed Replacement Transaction, were discussed and counsel for and representatives of
Barclays answered all questions put to them by the Committee.

667.    **After the February 3, 2009 meeting, the Committee again provided to Barclays'**

**attorneys an informal document request (on February 10, 2009) clarifying the**

**Committee's initial request and adding some additional categories of documents.**

**(*See* Letter from James C. Tecce, Quinn Emanuel Urquhart Oliver & Hedges LLP,**

**to Lindsee P. Granfield, Cleary Gottlieb Steen & Hamilton LLP, and Jonathan D.**

**Schiller, Boies, Schiller & Flexner, LLP, dated February 10, 2009.)**

Barclays' Response

Barclays does not dispute the statement at paragraph 667 except that Barclays notes
further that Mr. Tecce, in his February 10, 2009 letter, noted his appreciation of the
"spirit of cooperation with which you made representatives of [Barclays] available to
answer our questions." BCI Ex. 160 [February 10, 2009 letter from J. Tecce to L.
Granfield].

668.    **On or about March 30, 2009, Barclays produced documents purportedly responsive**

**to the December 26, 2008 and February 10, 2009 letter requests from the**

**Committee.**

Barclays' Response

Barclays does not dispute the statement in paragraph 668, except to the extent the word
"purportedly" is intended to imply that the produced documents were not responsive or
were incomplete.

*Contains Highly Confidential Information*

669.  Because the format in which Barclays produced the documents rendered them
      indecipherable to the Committee, the parties ultimately negotiated an agreement for
      Barclays to produce them in a different electronic format, which Barclays did on or
      about May 28, 2009.

Barclays' Response

      Barclays disputes the statement in paragraph 669 as inaccurate and incomplete in that the
      documents Barclays originally produced were in an imaged rather than native format and
      were not indecipherable. Barclays later produced the same material in native format
      based on an agreement that the native format material would not be altered.

670.  In connection with its investigation, the Committee also requested documents from
      the DTCC as initially set forth in the December 26, 2008 letter to, among others,
      counsel to the DTCC. (*See* Committee Rule 2004 Joinder [Docket No. 3778].)

Barclays' Response

      Barclays does not dispute the statement in paragraph 670.

671.  Following communications between counsel to the Committee and counsel to the
      DTCC regarding the Committee document request, the DTCC ultimately agreed to
      produce documents to the Committee and did so on or about April 29, 2009.

Barclays' Response

      Barclays does not dispute the statement in paragraph 671.

672.  Thereafter, on May 19, 2009, counsel for the Committee attended an in person
      meeting with representatives form the DTCC and its counsel. (*See* Committee Rule
      2004 Joinder [Docket No. 3778].)

*Contains Highly Confidential Information*

Barclays' Response

    Barclays does not dispute the statement in paragraph 672.

**673.    On or about February 9, 2009, Barclays announced its financial results for the year**

    **ending December 31, 2008. (A. 130.)**

Barclays' Response

    Barclays does not dispute the statement in paragraph 673 except that Barclays notes
further that the Barclays PLC – 2008 Results released on or about February 9, 2009,
contained Barclays' announcement of its preliminary unaudited statement of annual
results which do not comprise statutory accounts within the meaning of Section 240 of
the Companies Act 1985. BCI Ex. 134 [Excerpts of Feb. 9, 2009 Barclays Form 6-K] at
p. 8.

**674.    In February 2009, Barclays announced that it had secured a £2.262 billion gain**

    **from its acquisition of Lehman's North American business.  (A. 130 at 95.)**

Barclays' Response

    Barclays does not dispute the statement in paragraph 674, but incorporates its response to
paragraph 673 and refers to the full text of the announcement for context.

**675.    On February 19, 2009, LBHI wrote Barclays a letter requesting information about**

    **the payment by Barclays of the accrued bonus amount as of August 31, 2008 to**

    **transferred employees and contract cure amounts under the Asset Purchase**

    **Agreement (the "February 19 Letter"). (Rule 2004 Motion, Exhibit B.)[9]**

Barclays' Response

    Barclays does not dispute the statement in paragraph 675.

**676.    The February 19 Letter stated that LBHI had conducted "a preliminary review of**

---

[9] Citations herein to "Rule 2004 Motion" refer to the Motion of Debtor and Debtor in Possession for an
Order, Pursuant to Fed. R. Bankr. P. 2004, Authorizing Discovery from Barclay's Capital, Inc., dated May 18, 2009
and filed in this litigation.

*Contains Highly Confidential Information*

the accrual for bonuses as of August 31, 2008, and it appears that the consolidated

global accrual on the books of LBHI as of that date was only $1.3 billion." (Rule

2004 Motion, Exhibit B.)

Barclays' Response

Barclays does not dispute the statement in paragraph 676. Barclays disputes any
implication that it underpaid bonuses or failed to comply with any compensation
obligations.

677.    The February 19 Letter stated that to date LBHI understands that approximately

$200 million had been paid by Barclays in contract cure costs. (Rule 2004 Motion,

Exhibit B.)

Barclays' Response

Barclays does not dispute the statement in paragraph 677. Barclays disputes any
implication that it underpaid bonuses or failed to comply with any compensation
obligations.

678.    The February 19 Letter requested a meeting with Barclays, and requested

supporting documentation or analysis that explain the bonus and contract cure

amounts paid, or to be paid, by Barclays. (Rule 2004 Motion, Exhibit B.)

Barclays' Response

Barclays does not dispute the statement in paragraph 678.

679.    On February 23, 2009, Barclays responded to the February 19 Letter with a letter

stating that, among other things, "a number of other parties" were also undertaking

a review of the Sale Transaction, and Barclays wanted to discuss how Barclays

could avoid addressing queries related to the Asset Purchase Agreement on a

piecemeal basis. (Rule 2004 Motion, Exhibit B.)

*Contains Highly Confidential Information*

Barclays' Response

Barclays does not dispute the statement in paragraph 679.

**680.    In response to the February 19 Letter, Barclays did not agree to meet with LBHI**

**concerning its questions regarding the bonus and contract cure liabilities.  (Rule**

**2004 Motion, Exhibit B.)**

Barclays' Response

Barclays disputes the statement in paragraph 680 because in his February 23, 2009 letter,
Mr. Hughes stated that Barclays remained "willing to discuss factual issues that may be
helpful to you in administering the estate."  BCI Ex. 162 [February 23, 2009 letter from J.
Hughes to B. Marsal, *et al.*].

**681.    In response to the February 19 Letter, Barclays did not provide LBHI with any**

**supporting documentation or analysis concerning bonus or contract cure liabilities.**

**(Rule 2004 Motion, Exhibit B.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 681 except that Barclays notes
further that in his February 23, 2009 letter, Mr. Hughes stated that Barclays remained
"willing to discuss factual issues that may be helpful to you in administering the estate."
BCI Ex. 162 [February 23, 2009 letter from J. Hughes to B. Marsal, *et al.*].

**682.    In late March 2009, LBHI retained Jones Day as Special Counsel.**

Barclays' Response

Barclays does not dispute the statement in paragraph 682.

**683.    On April 13, 2009, LBHI (through its Special Counsel) wrote a letter to outside**

**counsel for Barclays to, among other things, follow up on the requests made by**

**LBHI in the February 19 Letter (the "April 13 Letter").  (Rule 2004 Motion, Exhibit**

*Contains Highly Confidential Information*

C.)

<u>Barclays' Response</u>

Barclays does not dispute the statement in paragraph 683.

**684.    In the April 13 Letter Jones Day requested that Barclays voluntarily provide certain materials on a cooperative basis and attached a list of the requested materials. (Rule 2004 Motion, Exhibit C.)**

<u>Barclays' Response</u>

Barclays does not dispute the statement in paragraph 684.

**685.    In the April 13 Letter Jones Day requested that Barclays notify LBHI by April 20, 2009 regarding whether Barclays would agree to produce the requested materials. (Rule 2004 Motion, Exhibit C.)**

<u>Barclays' Response</u>

Barclays does not dispute the statement in paragraph 685.

**686.    In the April 13 Letter Jones Day stated that after reviewing the requested materials it was likely that LBHI would also want to interview or take testimony from several former Lehman employees, including Steve Berkenfeld, Ian Lowitt, Gerald Donini, and Eric Felder. (Rule 2004 Motion, Exhibit C.)**

<u>Barclays' Response</u>

Barclays does not dispute the statement in paragraph 686.

**687.    On April 20, 2009, Barclays' counsel responded to the April 13 Letter. (Rule 2004 Motion, Exhibit D.)**

*Contains Highly Confidential Information*

Barclays' Response

     Barclays does not dispute the statement in paragraph 687.

**688.    In its April 20, 2009 Letter, Barclays' counsel referred to LBHI's April 13 Letter as**

**a "current demand for extensive discovery" and "an unnecessarily burdensome and**

**confrontational approach in these circumstances." (Rule 2004 Motion, Exhibit D.)**

Barclays' Response

     Barclays disputes the statement in paragraph 688 because it takes select phrases out of
context and incorporates its response to paragraph 690.

**689.    In its April 20, 2009 Letter Barclays' counsel stated that the document requests in**

**Jones Days' April 13 Letter addressed topics that the Examiner was already**

**investigating, questioned whether LBHI had coordinated with the Examiner, and**

**stated that a "simultaneous and duplicative investigation by LBHI would interfere**

**with Barclays' ability to respond to the Examiner in a timely and complete**

**manner." (Rule 2004 Motion, Exhibit D.)**

Barclays' Response

     Barclays disputes the statement in paragraph 689 because it takes select phrases out of
context and incorporates its response to paragraph 690.

**690.    In response to Jones Days' April 13 Letter, Barclays did not agree to provide LBHI**

**with any of the materials requested. (Rule 2004 Motion, Exhibit D.)**

Barclays' Response

     Barclays does not dispute the statement in paragraph 690 except that Barclays notes
further that in its response to Jones Day's April 13 letter, counsel for Barclays (i) stressed
its view that, under the circumstances, the "current demand for extensive discovery is an
unnecessarily burdensome and confrontational approach;" (ii) expressed, as it had on
February 23, 2009, that it was Barclays' view that Debtors should coordinate their

*Contains Highly Confidential Information*

inquiries with the Examiner's investigation, as had been directed by the Bankruptcy Court, rather than duplicate the Examiner's work; (iii) questioned whether such coordination had taken place; and (iv) stressed, *inter alia*, Barclays' offer to discuss with Mr. Marsal "factual matters relevant to administration of the Estate or other issues of concern ... ," an offer to which Mr. Marsal never responded. BCI Ex. 166 [April 20, 2009 letter from J. Schiller to R. Gaffey, *et al.*].

691.   **In response to Jones Days' April 13 Letter, Barclays did not agree to make available any former Lehman employees for interviews or testimony. (Rule 2004 Motion, Exhibit D.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 691, but incorporates its response to paragraph 690.

692.   **On April 24, 2009, LBHI, through its Special Counsel, requested a copy set of any documents Barclays produced to the Examiner, and again requested that Barclays provide any additional documents responsive to LBHI's document requests set out in the April 13 Letter. (Rule 2004 Motion, Exhibit E.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 692.

693.   **Barclays did not provide, or agree to provide, LBHI with a copy set of any documents Barclays produced to the Examiner.**

Barclays' Response

Barclays disputes the statement in paragraph 693 to the extent it is not limited by date or time inasmuch as Barclays has provided LBHI during the Rule 2004 discovery with a copy of every document it has produced to the Examiner.

694.   **Barclays did not provide, or agree to provide, LBHI with any of the materials LBHI**

**requested in its April 13, 2009 Letter.**

Barclays' Response

Barclays disputes the statement in paragraph 694 to the extent it is not limited by date or time inasmuch as Barclays has provided LBHI during the Rule 2004 discovery with most, if not all, of the materials requested in its April 13, 2009 letter. *See* Barclays' response to paragraph 690.

695.    **On May 13, 2009, Barclays represented that it would provide some of the requested**

discovery and some "aggregate" information in a voluntary manner, but it did not

commit to any deadlines for doing so, and said that it could not be specific as to

what it would produce. (Rule 2004 Motion ¶ 28.)

Barclays' Response

Barclays dispute the statement in paragraph 695 because it takes select phrases out of context. Barclays notes that in an email to Mr. Gaffey on May 13, 2009, counsel for Barclays stated that it continued to "hope that we can work cooperatively to find some acceptable middle ground." BCI Ex. 337 [Email chain including May 13, 2009 10:35 am email from J. Stern to R. Gaffey *et al*].

696.    **On May 15, 2009, Barclays' counsel stated that Barclays would produce to LBHI**

copies of one of the categories of information LBHI requested – documents Barclays

has already produced to the Creditors' Committee, but only upon a confidentiality

agreement being reached.

Barclays' Response

Barclays does not dispute the statement in paragraph 696.

697.    **Barclays did not send LBHI a proposed confidentiality agreement.**

Barclays' Response

Barclays disputes the statement in paragraph 697 because in an email to Mr. Gaffey on May 13, 2009, counsel for Barclays proposed that the parties, "model an agreement on

288

*Contains Highly Confidential Information*

the stipulation we have with the Examiner, as many of your requests call for information we will likely produce to the Examiner under those confidentiality designations." BCI Ex. 337 [Email chain including May 13, 2009 10:35 am email from J. Stern to R. Gaffey, *et al.*].

**698. By May 18, 2009, Barclays had not provided LBHI with any of the information it**

**requested in February or April 2009. (Rule 2004 Motion ¶ 28.)**

Barclays' Response

Barclays disputes the statement in paragraph 698 and incorporates it responses to paragraphs 690 and 695-97. Barclays notes further that the parties were engaged in ongoing meet and confer discussions, and as Barclays counsel noted on May 13, 2009, Barclays continued to "hope that we can work cooperatively to find some acceptable middle ground." BCI Ex. 337 [Email chain including May 13, 2009 10:35 am email from J. Stern to R. Gaffey, *et al.*].

**699. On May 18, 2009, LBHI moved for an order pursuant to Federal Rule of**

**Bankruptcy Procedure 2004 authorizing discovery concerning transactions related**

**to the Asset Purchase Agreement approved in the Sale Order and the SIPA Sale**

**Order. ([Docket No. 3596].)**

Barclays' Response

Barclays does not dispute the statement in paragraph 699.

**700. On June 5, 2009, the Committee filed a response in support of and joined in the**

**Rule 2004 Motion (the "Committee Rule 2004 Joinder"). ([Docket No. 3778].)**

Barclays' Response

Barclays does not dispute the statement in paragraph 700.

**701. On June 22, 2009, the Trustee filed a statement regarding the Rule 2004 Motion in**

**which he requested that, to the extent the Bankruptcy Court granted the Rule 2004**

*Contains Highly Confidential Information*

Motion, the Bankruptcy Court also order that the Trustee be entitled to (i) receive

and/or have access to all documentary discovery produced by Barclays; and (ii)

participate in any interviews or depositions of Barclays personnel. ([Docket No.

4074].)

Barclays' Response

Barclays does not dispute the statement in paragraph 701.

702.    **Barclays opposed the Rule 2004 Motion and the Committee's Rule 2004 Joinder.**

**([Docket No. 3776].)**

Barclays' Response

Barclays does not dispute the statement in paragraph 702 except that Barclays notes
further that in its opposition brief, Barclays stated that "Barclays is willing to provide
LBHI with responsive documents that Barclays intends to produce in response to the
ongoing investigation by the Examiner, subject to any objections the Examiner may have
and the execution of a confidentiality stipulation patterned on the stipulation entered into
between Barclays and the Examiner. In particular, Barclays will produce documents
sufficient to show the amounts it has paid in bonus and other compensation, and the
amounts it has paid in contractual 'cure payments.'" BCI Ex. 43 [Barclays' Objection to
LBHI's Rule 2004 Motion] at ¶ 4.

703.    **On June 25, 2009, the Bankruptcy Court entered an order granting the Rule 2004**

**Motion, authorizing LBHI, the Trustee and the Committee to take certain discovery**

**from Barclays. ([Docket No.4164].)**

Barclays' Response

Barclays does not dispute the statement in paragraph 703.

704.    **On July 14, 2009, Barclays made a first production of documents responsive to the**

**Rule 2004 discovery requested by LBHI. (July 14, 2009 letter from J. Stern to R.**

**Gaffey).**

*Contains Highly Confidential Information*

Barclays' Response

      Barclays does not dispute the statement in paragraph 704.

705.    **Barclays continued to produce documents responsive to the Rule 2004 discovery**

        **throughout July, August and September 2008.**

Barclays' Response

      Barclays does not dispute the statement in paragraph 705.

706.    **Barclays has produced documents responsive to the Rule 2004 discovery as recently**

        **as December 10, 2009. (Letter from C. Green to R. Gaffey, dated December 10,**

        **2009.)**

Barclays' Response

      Barclays disputes the statement in paragraph 706 to the extent that it implies that
Barclays did not complete its production of documents in response to LBHI's Rule 2004
discovery requests until December 10, 2009. Barclays completed its production of
documents in response to LBHI's Rule 2004 discovery requests on September 10, 2009.
Barclays' document production on December 10, 2009 was specifically in response to an
oral request made by the Trustee's counsel during a telephonic meet-and-confer. BCI Ex.
176 [December 10, 2009 letter from C. Green to R. Gaffey].

707.    **On July 6, 2009, LBHI noticed the depositions of Eric Felder, Nancy Denig, Mark**

        **Shapiro, James Hraska, Robert Azerad, Martin Kelly, Dan Fleming, Steven**

        **Berkenfeld, John Coglan, Alastair Blackwell, Hugh McGee, Paolo Tonucci and Ian**

        **Lowitt for dates in July and the first half of August. (Deposition Notice dated July**

        **6, 2009.)**

Barclays' Response

      Barclays does not dispute the statement in paragraph 707.

*Contains Highly Confidential Information*

708.    On July 20, 2009, LBHI noticed the depositions of Mike Keegan, Stephen King,

Gerald LaRocca, Alex Kirk, Bob Diamond, Archibald Cox, Patrick Clackson, John

Varley, Gary Romain and David Petrie, among others. (Deposition Notice dated

July 20, 2009.)

Barclays' Response

Barclays does not dispute the statement in paragraph 708.

709.    On July 31, 2009, Barclays produced its first witness, former Lehman employee Eric

Felder, for his deposition. (A. 10.)

Barclays' Response

Barclays disputes the statement that it produced Eric Felder for his deposition; Barclays
informed Mr. Felder that his deposition had been noticed and he appeared voluntarily.
BCI Ex. 65 [Felder Dep. Tr.].

710.    On August 6, 2009, Barclays produced former Lehman employee Steven Berkenfeld

for his deposition. (A. 2.)

Barclays' Response

Barclays disputes the statement that it produced Steven Berkenfeld for his deposition;
Barclays informed Mr. Berkenfeld that his deposition had been noticed and he appeared
voluntarily. BCI Ex. 55 [Berkenfeld Dep. Tr.].

711.    On August 7, 2009, Barclays produced former Lehman employee Mark Shapiro for

his deposition. (A. 25.)

Barclays' Response

Barclays disputes the statement that it produced Mark Shapiro for his deposition;
Barclays informed Mr. Shapiro that his deposition had been noticed and he appeared
voluntarily. BCI Ex. 97 [Shapiro Dep. Tr.].

*Contains Highly Confidential Information*

712.   **On August 7, 2009, Barclays produced former Lehman employee Alistair Blackwell**

   **for his deposition. (A. 3.)**

Barclays' Response

   Barclays disputes the statement that it produced Alastair Blackwell for his deposition;
   Barclays informed Mr. Blackwell that his deposition had been noticed and he appeared
   voluntarily. BCI Ex. 56 [Blackwell Dep. Tr.].

713.   **On August 10, 2009, Barclays produced former Lehman employee Hugh "Skip"**

   **McGee for his deposition. (A. 21.)**

Barclays' Response

   Barclays disputes the statement that it produced Hugh "Skip" McGee for his deposition;
   Barclays informed Mr. McGee that his deposition had been noticed and he appeared
   voluntarily. BCI Ex. 86 [McGee Dep. Tr.].

714.   **On August 13, 2009, Barclays produced former Lehman employee John Coglan for**

   **his deposition. (A. 5.)**

Barclays' Response

   Barclays disputes the statement that it produced John Coghlan for his deposition;
   Barclays informed Mr. Coghlan that his deposition had been noticed and he appeared
   voluntarily. BCI Ex. 60 [Coghlan Dep. Tr.].

715.   **On August 14, 2009, Barclays produced former Lehman employee James Hraska**

   **for his deposition. (A. 12.)**

Barclays' Response

   Barclays disputes the statement that it produced James Hraska for his deposition;
   Barclays informed Mr. Hraska that his deposition had been noticed and he appeared
   voluntarily. BCI Ex. 69 [Hraska Dep. Tr.].

716.   **On August 14, 2009, Barclays produced former Lehman employee Paolo Tonucci**

*Contains Highly Confidential Information*

for his deposition. (A. 26.)

Barclays' Response

Barclays disputes the statement that it produced Paolo Tonucci for his deposition;
Barclays informed Mr. Tonucci that his deposition had been noticed and he appeared
voluntarily.  BCI Ex. 98 [Tonucci Dep. Tr.].

717.    **On August 17, 2009, Barclays produced former Lehman employee Robert Azerad**

        **for his deposition. (A. 1.)**

Barclays' Response

Barclays disputes the statement that it produced Robert Azerad for his deposition;
Barclays informed Mr. Azerad that his deposition had been noticed and he appeared
voluntarily.  BCI Ex. 54 [Azerad Dep. Tr.].

718.    **On August 18, 2009, Barclays produced former Lehman employee Martin Kelly for**

        **his deposition. (A. 14.)**

Barclays' Response

Barclays disputes the statement that it produced Martin Kelly for his deposition; Barclays
informed Mr. Kelly that his deposition had been noticed and he appeared voluntarily.
BCI Ex. 76 [Kelly August 18, 2009 Dep. Tr.].

719.    **On November 20, 2009, Barclays produced Mr. Kelly to complete his deposition.**

        **(Kelly Tr. dated November 20, 2009.)**

Barclays' Response

Barclays disputes the statement that it produced Martin Kelly for his deposition; Barclays
informed Mr. Kelly that his deposition had been noticed and he appeared voluntarily.
BCI Ex. 76 [Kelly November 20, 2009 Dep. Tr.].

720.    **On August 19, 2009, Barclays produced Gerald LaRocca for his deposition. (A. 18.)**

*Contains Highly Confidential Information*

Barclays' Response

Barclays disputes the statement that it produced Gerard LaRocca for his deposition; Barclays informed Mr. LaRocca that his deposition had been noticed and he appeared voluntarily. BCI Ex. 82 [LaRocca Dep. Tr.].

**721.    On August 20, 2009, Barclays produced former Lehman employee Ian Lowitt for his**

**deposition. (A. 19.)**

Barclays' Response

Barclays disputes the statement that it produced Ian Lowitt for his deposition; Barclays informed Mr. Lowitt that his deposition had been noticed and he appeared voluntarily. BCI Ex. 83 [Lowitt Dep. Tr.].

**722.    On August 21, 2009, Barclays produced former Lehman employee Nancy Denig for**

**her deposition. (A. 7.)**

Barclays' Response

Barclays disputes the statement that it produced Nancy Denig for her deposition; Barclays informed Ms. Denig that her deposition had been noticed and she appeared voluntarily. BCI Ex. 62 [Denig Dep. Tr.].

**723.    On August 26, 2009, Barclays produced David Petrie for his deposition. (A. 22.)**

Barclays' Response

Barclays disputes the statement that it produced David Petrie for his deposition; Barclays informed Mr. Petrie that his deposition had been noticed and he appeared voluntarily. BCI Ex. 89 [Petrie Dep. Tr.].

**724.    On August 27, 2009, Barclays produced Paul Exall for his deposition. (A. 9.)**

Barclays' Response

Barclays does not dispute the statement in paragraph 724.

**725.    On August 28, 2009, Barclays produced former Lehman employee Daniel Fleming**

*Contains Highly Confidential Information*

for his deposition. (A. 11.)

Barclays' Response

> Barclays disputes the statement that it produced Daniel Fleming for his deposition;
> Barclays informed Mr. Fleming that his deposition had been noticed and he appeared
> voluntarily. BCI Ex. 66 [Fleming Dep. Tr.].

726.   **On August 28, 2009, Barclays produced Mike Keegan for his deposition. (A. 13.)**

Barclays' Response

> Barclays disputes the statement that it produced for Mike Keegan his deposition;
> Barclays informed Mr. Keegan that his deposition had been noticed and he appeared
> voluntarily. BCI Ex. 73 [Keegan Dep. Tr.].

727.   **On August 31, 2009, Barclays produced former Lehman employee Alex Kirk for his**

   **deposition. (A. 16.)**

Barclays' Response

> Barclays disputes the statement that it produced Alex Kirk for his deposition on August
> 28, 2009; Mr. Kirk appeared pursuant to a notice issued by LBHI to his counsel. BCI Ex.
> 78 [Kirk Dep. Tr.].

728.   **On September 2, 2009, former Lehman President and CEO Bart McDade was**

   **deposed. (A. 20.)**

Barclays' Response

> Barclays does not dispute the statement in paragraph 728.

729.   **On September 3, 2009, Barclays produced John Varley for his deposition. (A. 27.)**

Barclays' Response

> Barclays does not dispute the statement in paragraph 729.

730.   **On September 4, 2009, Barclays produced Patrick Clackson for his deposition. (A.**

*Contains Highly Confidential Information*

4.)

Barclays' Response

 Barclays disputes the statement that it produced Patrick Clackson for his deposition;
 Barclays informed Mr. Clackson that his deposition had been noticed and he appeared
 voluntarily. BCI Ex. 59 [Clackson Dep. Tr.].

**731. On September 4, 2009, Barclays produced Jasen Yang for his deposition. (A. 29.)**

Barclays' Response

 Barclays does not dispute the statement in paragraph 731.

**732. On September 8, 2009, Barclays produced Rich Ricci for his deposition. (A. 23.)**

Barclays' Response

 Barclays does not dispute the statement in paragraph 732.

**733. On September 10, 2009, Barclays produced Gary Romain for his deposition. (A.**

**24.)**

Barclays' Response

 Barclays does not dispute the statement in paragraph 733.

**734. On September 10, 2009, Barclays produced Stephen King for his deposition. (A.**

**15.)**

Barclays' Response

 Barclays disputes the statement that it produced Stephen King for his deposition;
 Barclays informed Mr. King that his deposition had been noticed and he appeared
 voluntarily. BCI Ex. 77 [King Dep. Tr.].

**735. On September 11, 2009, Barclays produced Bob Diamond, Barclays' President and**

**CEO, for his deposition. (A. 8.)**

*Contains Highly Confidential Information*

Barclays' Response

 Barclays does not dispute the statement in paragraph 735.

**736. On September 11, 2009, Barclays produced John Varley for his second day of**

**deposition. (A. 28.)**

Barclays' Response

 Barclays does not dispute the statement in paragraph 736.

**737. On September 11, 2009, Barclays produced Archibald Cox for his deposition. (A.**

**6.)**

Barclays' Response

 Barclays does not dispute the statement in paragraph 737.

**738. On September 12, 2009, Michael Klein appeared for his deposition. (A. 17.)**

Barclays' Response

 Barclays does not dispute the statement in paragraph 738.

**739. On September 15, 2009, three days after the completion of the Rule 2004 depositions**

**that had been noticed, LBHI, the Trustee and the Committee filed motions,**

**pursuant to Federal Rule of Civil Procedure 60 and Federal Rule of Bankruptcy**

**Procedure 9024 or otherwise, for relief from the Sale Order and the SIPA Sale**

**Order (the "Rule 60 Motions"). ([Docket Nos. 5148,1682, 5169].)**

Barclays' Response

 Barclays does not dispute the statement in paragraph 739.

*Contains Highly Confidential Information*

Dated: New York, New York
January 29, 2010

BOIES, SCHILLER & FLEXNER LLP

By:_____

Jonathan D. Schiller
Hamish P.M. Hume
Jack G. Stern
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*