WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Gerard Uzzi (GU – 2297)
Eric K. Stodola (ES – 1111)

Attorneys for the Ad Hoc Group
of Lehman Brothers Creditors

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------------------x
In re                                           :     Chapter 11
                                                :
LEHMAN BROTHERS HOLDINGS INC., et al.,          :     Case No. 08-13555 (JMP)
                                                :
                        Debtors.                :     Jointly Administered
---------------------------------------------------------------------x
```

**STATEMENT OF AD HOC GROUP OF LEHMAN BROTHERS CREDITORS IN SUPPORT OF MOTION OF DEBTORS TO COMPEL PERFORMANCE BY NORTON GOLD FIELDS LIMITED OF ITS OBLIGATIONS UNDER AN EXECUTORY CONTRACT AND TO ENFORCE THE AUTOMATIC STAY**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Group of Lehman Brothers Creditors (the "Group"), by and through its undersigned counsel, hereby files this statement in support of the Motion of the Debtors Pursuant to Section 105(a), 362, and 365 of the Bankruptcy Code (the "Bankruptcy Code") to Compel Performance by Norton Gold Fields Limited ("Norton") of Its Obligations Under an Executory Contract and to Enforce the Automatic Stay (the "Debtors' Motion") [Docket No. 5897] filed by Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, including Lehman Brothers Commercial Corporation ("LBCC"), (collectively, the "Debtors"), in the above-referenced chapter 11 cases. In support of the Debtors' Motion, the Group respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      These chapter 11 cases have raised a number of issues of first impression in this jurisdiction. The issues raised by Norton, however, are well settled. Just as Metavante Corporation attempted to do, Norton continues to enjoy the benefits of a Swap Agreement with LBCC, while at the same time withholding payments to LBCC on the bases that, among other things, (i) the Agreement is not an executory contract, and (ii) events of default under the Agreement occurred, including the bankruptcy of LBHI as well as the sale of substantially all of LBHI's assets, which excuse Norton's performance.[1] While the Group does not take a position on the veracity of the factual assertions made by either the Debtors or Norton, the Group believes that Norton's position with respect to the above issues is untenable as a matter of law for a number of reasons.

2.      As this Court ruled in both the Metavante Matter[2] and Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd. (In re Lehman Bros. Holdings Inc.), 422 B.R. 407, 416 (Bankr. S.D.N.Y. 2010) (hereinafter, "Saphir"), a swap agreement is an executory contract. Further, the non-debtor party to such an agreement may not simply suspend its performance based on the bankruptcy filing of its counterparty. Metavante at 109:14-18. Norton's free-riding self help more than a year after LBCC's and LBHI's bankruptcy filings is not protected conduct under the safe harbor provisions of the Bankruptcy Code, rather, it constitutes an improper ipso facto modification of LBHI's guarantee rights and obligations under the Guarantee as well as LBCC's rights under the Agreement. As in Metavante, there is nothing in the Bankruptcy Code,

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

[2]     The "Metavante Matter" refers to the proceedings concerning the Debtors' Motion pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code to Compel Performance of Metavante Corporation's Obligations under an Executory Contract and to Enforce the Automatic Stay, dated May 29, 2009 [Docket No. 3691]. All citations to "Metavante" herein are references to this Court's bench ruling issued at the hearing on September 15, 2009 [Docket No. 5261].

the common law or the Swap Agreement itself that entitles Norton to unilaterally suspend payment when the contract is out-of-the money and accept LBCC's performance when the contract is in-the-money.

## ARGUMENT

3. The Group supports the Debtors' Motion and requests that the Court grant the Motion for the reasons identified therein and below. The Agreement is an executory contract and LBHI's bankruptcy filing does not constitute a basis for Norton to suspend performance. Under New York law, which governs the Guarantee, Norton must make an election of remedies if a breach of the Agreement occurs, it may not continue to sit on its hands.

### I. The Agreement Is An Executory Contract.

4. As an initial matter, courts, including this Court, have held that, "[a]lthough complicated at its core [a swap agreement] is, in fact a garden variety executory contract . . . each party to the Agreement still is obligated to make [periodic] payments." Metavante at 109:19-24; Saphir, 422 B.R. at 416 ("The language and structure of the ISDA Master Agreement that forms a central part of the Swap Agreement demonstrate that these contracts are executory."); see In re Enron Corp., No. 01-16034 (AJG), 2005 WL 3874285, *5 n. 11 (Bankr. S.D.N.Y. Oct. 5, 2005) ("[U]nder the Swap Agreement the parties had mutual performance obligations-each party was obligated to make a payment each month based upon an agreed upon formula.").

5. Notwithstanding this Court's prior rulings, Norton attempts to differentiate the Agreement from those at issue in Metavante and Saphir by arguing that the Agreement is an indivisible part of a non-executory financial transaction and, therefore, section 365 of the Bankruptcy Code does not apply. (Norton Obj. ¶ 78.) Norton asserts that financing agreements, in toto, are not executory contracts because no mutual obligations, other than the repayment of

money extended or loaned, remain. (Id. ¶ 80.) Even assuming that the fundamental nature of a swap agreement—which at its core requires continuing payments to be made by both parties—could be ignored merely because it is part of a larger financial transaction, Norton fails to demonstrate how the Financing Transaction in this instance relieves the parties of the Swap Agreement's mutual obligations.

6. The Financing Transaction implicates continuing, monetary and non-monetary mutual obligations, and accordingly, even taken as a whole, is an executory contract. Norton, itself, highlights the extant mutual obligations by alleging that LBCC's failure to perform its continuing obligations under the Financing Transaction excuses Norton's performance: "the failure of Lehman Australia, on behalf of LBCC, to engage in the weekly trade discussions, issue Weekly Confirmations or Weekly Forward Contracts, and as a result, enter into further Weekly Variations Pairs . . . ." (Norton Obj. ¶ 97; see also id. ¶ 126 ("LBCC and the other Lehman entities must comply with their own post-petition obligations.").)

7. In attempting to characterize the Financing Transaction as non-executory, Norton suggests that the purpose of the Transaction Documents was to "ensure repayment of the Notes and the financial accommodations made by the Financing Transaction." (Norton Obj. ¶ 81.) To the extent Norton is impliedly arguing that the Financing Transaction, or any part thereof, is a financial accommodation—thereby removing it from the purview of section 365(e)(1) of the Bankruptcy Code—that argument is equally unavailing. Section 365(e)(2) of the Bankruptcy Code only excludes financial accommodations "to or for the benefit of the debtor." 11 U.S.C. § 365(e)(2) (emphasis added); see also John Deere Co. v. Cole Bros., Inc. (In re Cole Bros., Inc.), 154 B.R. 689, 691 (W.D. Mich. 1992) ("The rationale of [prohibiting the assumption of financial accommodations] is that when 'the debtor files a bankruptcy petition, another party's contractual

commitment to extend new credit <u>to the debtor</u> in the future may be unfairly onerous to that party.'" (quoting Weintraub & Resnick ¶ 7.10[3] at 7-101) (emphasis added)). Accordingly, even if the Financing Transaction is a financial accommodation, it is not a financial accommodation of either LBCC or LBHI. Rather, it is the Debtors that provided a financial accommodation to Norton, as Norton readily admits. (Norton Obj. ¶¶ 5-8 (describing the notes and shares issued by Norton and arranged by Lehman Australia.)

**II.    LBHI's Bankruptcy Filing Did Not Constitute A Basis For
         <u>Norton To Suspend Performance Under The Agreement.</u>**

   **A.    *Sections 2(a)(iii) And 5(a)(ii)(2) Of The Master Agreement Are
            Unenforceable <u>Ipso</u> <u>Facto</u> Clauses Under The Bankruptcy Code.***

   8.   Norton argues that it is excused from paying LBCC based upon the bankruptcy filings of both LBHI and LBCC, as well as LBHI's post-petition asset sale to Barclay's. Norton relies on sections 2(a)(i) and (iii) and 5(a) of the Master Agreement. (Norton Obj. ¶ 67.) Such reliance is misplaced because, as this Court held in <u>Metavante</u>, these contract sections are, by their explicit terms, <u>ipso</u> <u>facto</u> clauses. <u>Metavante</u> at 108:12-23. Section (2)(a)(iii)(1) provides that the absence of an event of default is a condition precedent to a counterparty's payment obligation. (Motion ¶ 31.) Section 5(a)(vii) provides that a party's bankruptcy filing is an event of default. (Motion ¶ 31.) Absent the application of settled bankruptcy law and common law these provisions would operate to permit Norton to suspend its payments under the Agreement upon the bankruptcy filings of either LBCC of LBHI. However, because the Swap Agreement is an executory contract (<u>see</u> <u>supra</u> Section I), section 365 of the Bankruptcy Code renders these contractual provisions unenforceable.

   9.   Section 365(e)(1) provides, in part:

   [A]n executory contract or unexpired lease of the debtor may not be terminated or
   modified, and any right or obligation under such contract or lease may not be

> terminated or modified, . . . solely because of a provision in such contract or lease that is conditioned on—
>
>> (A) the insolvency or financial condition of the debtor at any time before the closing of the case; [or]
>>
>> (B) the commencement of a case under this title . . . .

11 U.S.C. § 365(e)(1). Here, Norton's proposed use of section 2(a)(iii)(1) to modify the rights of LBCC under the Swap Agreement and LBHI under the Guarantee implicates sections 365(e)(1)(A) and (B).

10. With respect to section 365(e)(1)(A), the sole purpose of the Guarantee and the existence of LBHI as a guarantor to LBCC's Obligations is to protect against the financial condition of LBCC. Absent concerns about the financial condition of LBCC, LBHI's guarantee is irrelevant. Accordingly, Norton's declaration that LBHI's bankruptcy filing or its post-petition asset sale were events of default can only be construed as Norton's concern about LBCC's financial condition. See, e.g., Brodie Decl. Ex. B, Sept. 22, 2008 E-mail (alerting Mr. Brodie to Lehman Australia's status following LBHI's filing) ("Got a phone call from Keith Jones at Lehman Brothers on Friday evening stating that they were no longer accepting any settlement payments. . . . As a result, we are not to send Lehman Brothers any money until further notice. . . . On the downside, we are unlikely to have any downside protection if the gold price goes below AUD875").

11. Norton's refusal to perform under the Swap Agreement also violates section 365(e)(1)(B) of the Bankruptcy Code. Under that section, contract clauses that excuse performance based on the commencement of a case under the Bankruptcy Code are unenforceable. Section 365(e)(1)(B)'s reference to the commencement of "a" case includes the commencement of case by a parent guarantor under circumstances such as these. As explained by this Court, the "filing at the holding company level of the corporate structure has significance,

especially in the context of the ipso facto provisions that speak in terms of the commencement of 'a' case under this title" and, thus, "the chapter 11 cases of LBHI and its affiliates is a singular event for the purposes of interpreting this ipso facto language." Saphir 422 B.R. at 420. Accordingly, Norton may not suspend payment to LBCC under the Agreement on account of LBHI's bankruptcy filing.

12. Furthermore, Norton's reliance on LBHI's bankruptcy to suspend payments under the Agreement, is, in fact, an impermissible modification of the rights and obligations of LBHI under the Guarantee that section 365(e)(1)(B) of the Bankruptcy Code renders unenforceable. 11 U.S.C. § 365(e)(1)(B). Here, the Swap Agreement encompasses both the ISDA Master Agreement as well as the Schedule, and therefore also encompasses the Guarantee—appended to the Schedule as Exhibit A—and the Schedule itself defines LBHI as the Credit Support Provider and references the Guarantee as the Credit Support Document.

### B. *Norton's Ability to Rely on the Safe Harbor Provisions is Time-Barred.*

13. As described above, LBHI's filing did not constitute a basis for Norton to suspend performance under the Agreement because section 2(a)(iii)(1) operates as an unenforceable ipso facto provision under sections 365(e)(1)(A) and (B) of the Bankruptcy Code. Further, as this Court concluded in Metavante, having failed to timely exercise its rights to terminate the Agreement, Norton has waived its future right to do so pursuant to sections 560 and 561 of the Bankruptcy Code (together the "Safe Harbor Provisions").

14. Norton's failure to terminate the Agreement after more than a year since LBHI's bankruptcy filing bars it from seeking protection from the Safe Harbor Provisions now. Metavante at 111:24-112:2 ("[W]hile [Metavante] may not have had the obligation to terminate immediately upon the filing of LBHI or LBSF, its failure to do so, at this juncture, constitutes a

waiver of that right at this point."). See also In re Enron Corp., 2005 WL 3874285, at *4 ("To avail itself of the 'safe harbor' provisions of the Bankruptcy Code, however, . . . the election to terminate must be made fairly contemporaneously with the bankruptcy filing.").

15.     The Safe Harbor Provisions serve to create certainty and finality and to ensure that swap obligations continue after the bankruptcy filing "only by mutual consent of both the non-debtor swap participant and the trustee." H.R. Rep. No. 101-484, at 6 (1990), reprinted in 1990 U.S.C.C.A.N. 233, 228. Accordingly, to be relied on, the Safe Harbor Provisions require "[t]he <u>immediate</u> termination" of the swap agreement to protect all parties "in light of the potential for rapid changes in the financial markets." S. Rep. No. 101-285 (1990), 1990 WL 259288 (emphasis added).

16.     The Safe Harbor Provisions must be construed narrowly. <u>See</u> <u>generally</u> H.R. Rep. No. 101-484 (1990), reprinted in 1990 U.S.C.C.A.N. 233 (discussing section 560 as an exception to the other provisions of the Bankruptcy Code). Had Congress intended to safe harbor all acts taken <u>in anticipation</u> of a counterparty's right to cause the liquidation, termination, or acceleration of a swap agreement, section 560 of the Bankruptcy Code would have been drafted accordingly. It wasn't and the language of the Safe Harbor Provisions is clear. If a counterparty may not preserve the right to terminate a swap agreement later—which it cannot—then it certainly cannot take actions now intended to create a right to net out payment amounts at a later date.

17.     Because Norton did not timely elect to terminate the Agreement, it is an ordinary executory contract subject to this Court's ultimate jurisdiction to, among other things: (i) permit LBCC to assume or reject the Agreement; (ii) fix the amount of any claim arising from the

rejection thereof; or (iii) compel Norton to perform under the Agreement. See In re Enron Corp., 2005 WL 3874285, at *4.

### III. Norton Must Make An Election Of Remedies.

18. Norton is seeking to grant itself a free option under the Agreement, to suspend payment when the Agreement is out of the money, while retaining protection for future changes in gold prices. That course of conduct violates LBHI's rights under the Guarantee, which is governed by New York law.

19. Following a default under New York law, the non-breaching party must elect either to cease performance under the contract and seek damages or continue to perform. In re Randall's Island Family Golf Ctrs., Inc., 261 B.R. 96, 101 (Bankr. S.D.N.Y. 2001) (discussing election of remedies for non-breaching party under New York law). See also Romacorp, Inc. v. TR Acquisition Corp., No. 93 Civ. 5394, 1993 WL 497969, *13 (S.D.N.Y. Dec. 1, 1993) ("It is an elementary rule of contract law that one cannot repudiate a contract and at the same time retain the consideration or any part thereof received under the contract."); 14 LORD, WILLISTON ON CONTRACTS § 43:15 (4th ed.) ("the general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply where the latter party, with knowledge of the facts, . . . insists that the defaulting party continue to render future performance").

20. If the non-breaching party's conduct evinces an intention to continue the parties' contractual relationship after the default, that party waives its right to assert the breach and its own obligations under the agreement remain in full force. See e.g., Casita, LP v. Maplewood Equity Partners (Off-Shore) Ltd., No. 603525/05, 2007 WL 4294741, *7 (N.Y. Sup. Ct. Dec. 7,

2007) (non-defaulting party was required to continue with payment obligations after failing to terminate contract following breach by counterparty).

21. A provision in a contract that allows a party the option of terminating the contract must be construed as requiring the non-defaulting party to make such an election within a reasonable period of time. Curnan v. Del. & O.R. Co., 138 N.Y. 480, 489 (1893) ("The right reserved [in the contract], to suspend or delay the work, is to be reasonably construed. [Defendant] could not abandon the enterprise or delay it for an indefinite and unreasonable time, and still refuse to pay the plaintiff."). See also Romacorp, Inc., 1993 WL 497969, at *12 ("[I]t is against the law as well as sound morals to permit a party to a contract to repudiate the contract or his obligation under it, and at the same time retain the consideration that he has received." (quoting McDonald's Corp. v. Robert A. Makin, Inc., 653 F. Supp. 401, 403 (W.D.N.Y. 1986))).

22. Finally, there is nothing inequitable about the Debtors' position. The Debtors' ability to delay the determination of whether to assume or reject the Swap Agreement did not leave Norton without options. For example, had Norton elected to do so in a timely manner, it could have also sought to avail itself of the Safe Harbor Provisions by causing the termination, liquidation, or netting of the Agreement. In re Enron Corp., 349 B.R. 96, 103 (Bankr. S.D.N.Y. 2006) (Safe Harbor Provisions permit counterparty to terminate and net or set-off its position). However, as described above, Norton has since waived that protection.

WHEREFORE, for the foregoing reasons, the Group requests that the Court grant (i) the relief sought in the Motion and (ii) any other relief this Court deems just and proper.

Dated: March 11, 2010
      New York, New York

Respectfully submitted,

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Gerard Uzzi (GU – 2297)
Eric K. Stodola (ES – 1111)

By: */s/ Gerard Uzzi*
    Gerard Uzzi

ATTORNEYS FOR THE AD HOC GROUP
OF LEHMAN BROTHERS CREDITORS