**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC.,            :    08-13555 (JMP)
*et al.*,                                 :
                                          :    (Jointly Administered)
                          Debtors.        :
---------------------------------------------------------- x


## REPORT OF
## ANTON R. VALUKAS, EXAMINER


Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
312-222-9350

919 Third Avenue
37th Floor
New York, NY  10022-3908
212-891-1600

March 11, 2010                            *Counsel to the Examiner*


## VOLUME 2 OF 9

### Section III.A.2: Valuation

### Section III.A.3: Survival

# EXAMINER'S REPORT

# TABLE OF CONTENTS

# (SHORT-FORM)

**VOLUME 1**

### Introduction, Sections I & II:  Executive Summary & Procedural Background

Introduction.................................................................................................................2

I.  Executive Summary of the Examiner's Conclusions ......................................................15

    A.  Why Did Lehman Fail?  Are There Colorable Causes of Action That Arise From Its Financial Condition and Failure?....................................................15

    B.  Are There Administrative Claims or Colorable Claims For Preferences or Voidable Transfers?........................................................................................24

    C.  Do Colorable Claims Arise From Transfers of LBHI Affiliate Assets To Barclays, or From the Lehman ALI Transaction? ...................................................26

II.  Procedural Background and Nature of the Examination .............................................28

    A.  The Examiner's Authority .............................................................................28

    B.  Document Collection and Review...................................................................30

    C.  Systems Access...........................................................................................33

    D.  Witness Interview Process............................................................................35

    E.  Cooperation and Coordination With the Government and Parties.....................37

### Section III.A.1:  Risk

III.  Examiner's Conclusions................................................................................43

    A.  Why Did Lehman Fail?  Are There Colorable Causes of Action That Arise From Its Financial Condition and Failure?....................................................43

        1.  Business and Risk Management .......................................................43

            a)  Executive Summary ......................................................43

b) Facts ..........................................................................................................58

c) Analysis .....................................................................................................163

**VOLUME 2**

**Section III.A.2:  Valuation**

2. Valuation .....................................................................................................203

a) Executive Summary ...................................................................................203

b) Overview of Valuation of Lehman's Commercial Real Estate
   Portfolio ....................................................................................................215

c) Senior Management's Involvement in Valuation....................................241

d) Examiner's Analysis of the Valuation of Lehman's Commercial
   Book...........................................................................................................266

e) Examiner's Analysis of the Valuation of Lehman's Principal
   Transactions Group..................................................................................285

f) Examiner's Analysis of the Valuation of Lehman's Archstone
   Positions....................................................................................................356

g) Examiner's Analysis of the Valuation of Lehman's Residential
   Whole Loans Portfolio .............................................................................494

h) Examiner's Analysis of the Valuation of Lehman's RMBS
   Portfolio ....................................................................................................527

i) Examiner's Analysis of the Valuation of Lehman's CDOs ...................538

j) Examiner's Analysis of the Valuation of Lehman's Derivatives
   Positions....................................................................................................568

k) Examiner's Analysis of the Valuation of Lehman's Corporate
   Debt Positions...........................................................................................583

l) Examiner's Analysis of the Valuation of Lehman's Corporate
   Equities Positions .....................................................................................594

**Section III.A.3:  Survival**

3.  Lehman's Survival Strategies and Efforts........................................................609

    a)  Introduction to Lehman's Survival Strategies and Efforts....................609

    b)  Lehman's Actions in 2008 Prior to the Near Collapse of Bear
        Stearns........................................................................................................622

    c)  Actions and Efforts Following the Near Collapse of Bear Stearns .......631

**VOLUME 3**

**Section III.A.4:  Repo 105**

4.  Repo 105..........................................................................................................732

    a)  Repo 105 – Executive Summary .............................................................732

    b)  Introduction .............................................................................................750

    c)  Why the Examiner Investigated Lehman's Use of Repo 105
        Transactions ............................................................................................764

    d)  A Typical Repo 105 Transaction .............................................................765

    e)  Managing Balance Sheet and Leverage ...................................................800

    f)  The Purpose of Lehman's Repo 105 Program Was to Reverse
        Engineer Publicly Reported Financial Results.........................................853

    g)  The Materiality of Lehman's Repo 105 Practice .....................................884

    h)  Knowledge of Lehman's Repo 105 Program at the Highest Levels
        of the Firm ...............................................................................................914

    i)  Ernst & Young's Knowledge of Lehman's Repo 105 Program.............948

    j)  The Examiner's Conclusions ...................................................................962

**VOLUME 4**

**Section III.A.5:  Secured Lenders**

5.  Potential Claims Against Lehman's Secured Lenders ................................1066

    a)  Introduction and Executive Summary .....................................................1066

    b)  Lehman's Dealings With JPMorgan .......................................................1084

    c)  Lehman's Dealings With Citigroup .........................................................1224

    d)  Lehman's Dealings With HSBC ..............................................................1303

    e)  Lehman's Dealings With Bank of America ............................................1375

    f)  Lehman's Dealings With Bank of New York Mellon...........................1376

    g)  Lehman's Dealings With Standard Bank.................................................1382

    h)  Lehman's Dealings With the Federal Reserve Bank of New York .....1385

    i)  Lehman's Liquidity Pool..........................................................................1401

**Section III.A.6:  Government**

6.  The Interaction Between Lehman and the Government..............................1482

    a)  Introduction ...............................................................................................1482

    b)  The SEC's Oversight of Lehman .............................................................1484

    c)  The FRBNY's Oversight of Lehman .......................................................1494

    d)  The Federal Reserve's Oversight of Lehman ........................................1502

    e)  The Treasury Department's Oversight of Lehman ...............................1505

    f)  The Relationship of the SEC and FRBNY in Monitoring
        Lehman's Liquidity....................................................................................1507

    g)  The Government's Preparation for the "Lehman Weekend"
        Meetings at the FRBNY ...........................................................................1516

h) On the Evening of Friday, September 12, 2008, the Government Convened a Meeting of the Major Wall Street Firms in an Attempt to Facilitate the Rescue of Lehman ..........................................1523

i) Lehman's Bankruptcy Filing ...................................................1535

## VOLUME 5

### Section III.B:  Avoidance Actions

B. Are There Administrative Claims or Colorable Claims for Preferences or Voidable Transfers......................................................................................1544

   1. Executive Summary ...........................................................................1544

   2. Examiner's Investigation of Possible Administrative Claims Against LBHI (First Bullet) ...........................................................................1546

   3. Examiner's Investigation of Possible Avoidance Actions (Third, Fourth and Eighth Bullets)..............................................................1570

   4. Examiner's Investigation of Possible Breaches of Fiduciary Duty by LBHI Affiliate Directors and Officers (Fifth Bullet) ....................................1894

   5. Examiner's Analysis of Lehman's Foreign Exchange Transactions (Second Bullet) .................................................................................1912

   6. Examiner's Review of Intercompany Transactions Within Thirty Days of LBHI's Bankruptcy Filing (Seventh Bullet)....................................1938

   7. Examiner's Analysis of Lehman's Debt to Freddie Mac.............................1951

### Section III.C:  Barclays Transaction

C. Do Colorable Claims Arise From Transfers of LBHI Affiliate Assets to Barclays, or From the Lehman ALI Transaction? ................................................1961

   1. Executive Summary ...........................................................................1961

   2. Facts................................................................................................1965

   3. Whether Assets of LBHI Affiliates Were Transferred to Barclays .............1997

   4. Lehman ALI Transaction....................................................................2055

5.   Conclusions ................................................................................................2063

6.   Barclays Transaction ..............................................................................2103

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
                               :

In re                           :     Chapter 11 Case No.
                               :

LEHMAN BROTHERS HOLDINGS INC.,    :     08-13555 (JMP)
*et al.,*                            :
                               :     (Jointly Administered)
                  Debtors.    :
------------------------------------------------------------ x

# REPORT OF
# EXAMINER ANTON R. VALUKAS

## Section III.A.2: Valuation

# TABLE OF CONTENTS

2. Valuation ...........................................................................................203

   a) Executive Summary ......................................................................203

      (1) Scope of Examination ...........................................................210

      (2) Summary of Applicable Legal Standards...........................212

      (3) Summary of Findings and Conclusions..............................214

   b) Overview of Valuation of Lehman's Commercial Real Estate
      Portfolio .......................................................................................215

      (1) Overview of Lehman's CRE Portfolio.................................217

         (a) Summary of Portfolio......................................... 217

         (b) Overview of Valuation of CRE Portfolio................... 220

            (i)    GREG Leaders .................................. 220

            (ii)   Participants in the Valuation Process............... 220

         (c) Changes in the CRE Portfolio from 2006 through 2008 ......... 223

         (d) "Perfect Storm" Impact on CRE Valuation in 2008................. 227

      (2) Outside Review of Lehman's CRE Valuation Process....................232

         (a) SEC ...................................................................... 233

         (b) Ernst & Young ........................................................ 237

   c) Senior Management's Involvement in Valuation....................................241

      (1) Senior Management's General Role With Respect to CRE
         Valuation ...............................................................................243

      (2) Senior Management's Involvement in Valuation in the
         Second Quarter of 2008 .......................................................245

      (3) Senior Management's Involvement in Valuation in the Third
         Quarter of 2008 ...................................................................247

         (a) Senior Management's Account................................ 248

         (b) Paul Hughson's Account ......................................... 253

         (c) Other Accounts ...................................................... 254

      (4) Examiner's Findings and Conclusions With Respect to
         Senior Management's Involvement in CRE Valuation....................265

   d) Examiner's Analysis of the Valuation of Lehman's Commercial
      Book............................................................................................266

      (1) Executive Summary............................................................266

      (2) Lehman's Valuation Process for its Commercial Book ..................270

(3) Examiner's Findings and Conclusions as to the
Reasonableness of Lehman's Valuation of its Commercial
Book ..................................................................................274

    (a) As of the Second Quarter of 2008 ................................. 274

    (b) As of the Third Quarter of 2008 .................................. 282

e) Examiner's Analysis of the Valuation of Lehman's Principal
Transactions Group..................................................................285

(1) Executive Summary..........................................................285

(2) Overview of Lehman's PTG Portfolio................................292

(3) Evolution of Lehman's PTG Portfolio From 2005 Through
2008...................................................................................296

(4) Lehman's Valuation Process for Its PTG Portfolio..........303

    (a) The Role of TriMont in the Valuation Process for
Lehman's PTG Portfolio.............................................. 306

        (i)    Lehman's Issues with TriMont's Data ............................ 311

        (ii)   Lehman Changed Its Valuation Methodology for
Its PTG Portfolio in Late 2007............................. 312

    (b) The Role of Lehman's PTG Business Desk in the
Valuation Process for Lehman's PTG Portfolio....................... 319

    (c) The Role of Lehman's Product Control Group in Price
Testing the Valuation of Lehman's PTG Portfolio.................. 321

    (d) The Influence of Lehman's PTG Business Desk upon the
Price Testing Function of Lehman's Product Control
Group............................................................................ 326

(5) The Examiner's Findings and Conclusions as to the
Reasonableness of Lehman's Valuation of PTG Portfolio..............329

    (a) Lehman Did Not Mark PTG Assets to Market-Based
Yield ............................................................................. 331

    (b) The Effect of Not Marking to Market-Based Yield ................. 337

        (i)    Effect of Cap * 105 Not Marking to Market-Based
Yield ..................................................................... 337

        (ii)   Effect of IRR Models Not Marking to Market-Based
Yield ..................................................................... 342

        (iii)  Effect of Product Control Price Testing Not
Marking to Market-Based Yield ......................... 349

(iv) Effect of Modifying TriMont's Data in the Third Quarter of 2008 ................................................. 351

(c) Examiner's Findings and Conclusions as to the Effect of Not Marking Lehman's PTG Portfolio to Market-Based Yield ............................................................................. 353

f) Examiner's Analysis of the Valuation of Lehman's Archstone Positions ................................................................................. 356

(1) Executive Summary ..................................................... 356

(2) Lehman's Acquisition of Archstone ............................. 364

(a) Background on Archstone ...................................... 364

(b) Acquisition of Archstone ....................................... 365

(i) Analyst Reaction ......................................... 367

(ii) Lehman's Syndication Efforts ................... 370

(iii) Bridge and Permanent Equity at Closing ... 374

(iv) Capital Structure at Closing ..................... 375

(v) Price Flex ................................................... 377

(vi) Standard & Poor's Credit Rating ............. 380

(3) Lehman's Valuation of Archstone ............................... 382

(a) Valuation Between Commitment and Closing ....... 386

(b) Valuation as of the Closing Date ......................... 388

(c) Valuation as of the Fourth Quarter of 2007 ......... 390

(d) Valuation Issues During the First Quarter of 2008 ... 391

(i) Barron's Article ........................................ 391

a. Archstone's Response to the Barron's Article ......... 392

b. Lehman's Response to the Barron's Article ............. 394

(ii) January 2008 Archstone Update ................ 396

(iii) Valuation as of February 29, 2008 ............ 399

(iv) First Quarter 2008 Earnings Call and Lenders' Discussion Regarding Modifying the Archstone Strategy ............................................................ 401

(e) Valuation Issues During the Second Quarter of 2008 ... 402

(i) March 2008 Archstone Update .................. 402

(ii) March 2008 Valuation .............................. 404

(iii) April 2008 Downgrade by S&P ................. 407

(iv) Einhorn Speech in April 2008 ............................................ 407

(v) May 2008 Valuation ...................................................... 408

(vi) Second Quarter 2008 Earnings Conference Call ............. 411

    a. Preparation and Lehman's Methods of Analyzing Reasonableness of Valuations Prior to the Call .................................................................. 411

    b. Discussion During the Second Quarter 2008 Earnings Call ................................................................ 412

(vii) Lehman's Revised Plan to Sell Archstone Positions ...... 414

(f) Valuation Issues During the Third Quarter of 2008 ................ 416

(i) Discussion Among Lenders in July 2008 ......................... 417

(ii) August 2008 Valuation ...................................................... 417

(g) Product Control's Review of Archstone Valuations ................ 418

(4) Examiner's Analysis of Lehman's Valuation Process for its Archstone Positions ...................................................................419

(a) Discounted Cash Flow Valuation Method ................................ 421

(i) Rent Growth ...................................................................... 422

    a. Net Operating Income ................................................. 426

    b. Sensitivity Analysis .................................................... 429

(ii) Exit Capitalization Rate ................................................... 431

(iii) Exit Platform Value .......................................................... 433

(iv) Discount Rate ................................................................... 436

(b) Sum of the Parts Method ........................................................ 438

(c) Comparable Company Method .................................................. 440

(i) Potential Overvaluation Based on Primary Comparable Companies .................................................... 445

(5) Examiner's Analysis of the Reasonableness of Lehman's Valuation of its Archstone Positions on a Quarterly Basis .............446

(a) Reasonableness as of the Fourth Quarter of 2007 .................... 446

(b) Reasonableness as of the First Quarter of 2008 ........................ 449

(i) Barron's Article ................................................................. 450

(ii) Discussions Among Archstone, Tishman and Lenders ............................................................................. 458

(iii) Lehman's Valuation During the First Quarter of 2008 ...................................................................................... 459

(iv) Sum of the Parts....................................................................... 460

(v) DCF Method.............................................................................. 464

(vi) Examiner's Findings and Conclusions as to the Reasonableness of Lehman's Archstone Valuation as of the End of the First Quarter of 2008 ......................... 466

(c) Reasonableness as of the Second Quarter of 2008.................... 468

(i) Second Quarter Earnings Call ............................................ 469

(ii) Sum of the Parts....................................................................... 476

(iii) DCF Model ............................................................................. 477

(iv) Rent Growth............................................................................. 478

(v) Exit Capitalization Rate...................................................... 479

(vi) Quantification of Changes in Assumptions .................... 480

(vii) Examiner's Findings and Conclusions as to the Reasonableness of Lehman's Archstone Valuation as of the End of the Second Quarter of 2008 .................. 481

(d) Reasonableness as of the Third Quarter of 2008 ...................... 484

(i) Sum of the Parts....................................................................... 487

(ii) DCF Method.............................................................................. 488

(iii) Rent Growth............................................................................. 489

(iv) Exit Capitalization Rate...................................................... 490

(v) Quantification of Changes in Assumptions .................... 491

(vi) Examiner's Findings and Conclusions as to the Reasonableness of Lehman's Archstone Valuation as of the End of the Third Quarter of 2008 ...................... 492

g) Examiner's Analysis of the Valuation of Lehman's Residential Whole Loans Portfolio....................................................................494

(1) Residential Whole Loans Overview ....................................................494

(2) Lehman's U.S. Residential Whole Loans in 2008 ............................497

(3) Lehman's Valuation Process for its Residential Whole Loans .......501

(a) Lehman's May 2008 Price Testing ............................................. 504

(b) Lehman's August 2008 Price Testing......................................... 515

(4) Examiner's Independent Valuation of Lehman's Residential Whole Loans Portfolio....................................................................520

(5) Examiner's Findings and Conclusions With Respect to the Reasonableness of Lehman's Valuation of Its Residential Whole Loans Portfolio ........................................................525

h) Examiner's Analysis of the Valuation of Lehman's RMBS Portfolio ........................................................................527

i) Examiner's Analysis of the Valuation of Lehman's CDOs ..................538

(1) Lehman's Price Testing Process for CDOs ........................................543

(2) Price Testing Results for the Second and Third Quarters 2008 ......551

(a) Lehman's Price Testing of its Ceago CDOs ..............................553

(3) Examiner's Review of Lehman's Largest U.S. ABS/CRE CDO Positions ...................................................................562

(4) Examiner's Findings and Conclusions With Respect to the Reasonableness of Lehman's Valuation of its CDOs ......................567

j) Examiner's Analysis of the Valuation of Lehman's Derivatives Positions............................................................................568

(1) Overview of Lehman's Derivatives Positions...................................568

(2) Lehman's Use of Credit Support Annexes to Mitigate Derivatives Risk ......................................................................574

(3) Lehman's Price Testing of its Derivatives Positions .......................578

k) Examiner's Analysis of the Valuation of Lehman's Corporate Debt Positions ......................................................................583

(1) Overview of Lehman's Corporate Debt Positions ...........................583

(2) Lehman's Price Testing of its Corporate Debt Positions.................585

(3) Examiner's Findings and Conclusions With Respect to the Valuation of Lehman's Corporate Debt Positions............................589

(a) Reliance on Non-Trades...............................................................590

(b) Quality Control Errors – Mismatched Companies .................591

(c) No Testing of Internal Credit Rating .........................................592

l) Examiner's Analysis of the Valuation of Lehman's Corporate Equities Positions ............................................................594

(1) Overview of Lehman's Corporate Equities Positions......................594

(2) Lehman's Valuation Process for its Corporate Equities Positions ..................................................................................596

(3) Examiner's Findings and Conclusions With Respect to the Valuation of Lehman's Corporate Equities Positions......................599

(a) Impaired Debt with No Equity Mark Down ............................ 601

(b) Static Marks ................................................................. 603

### 2. Valuation

#### a) Executive Summary

Under GAAP, Lehman was required to report the value of its financial inventory at fair value.[697] Beginning in the first quarter of 2007,[698] Lehman adopted SFAS 157, which established the fair value of an asset as the price that would be received in an orderly hypothetical sale of the asset.[699]

To increase consistency and comparability in fair value measurements, SFAS 157 created a broad, three-level, fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value.[700] Generally, this hierarchy gives the highest priority to quoted prices in active markets for identical assets or liabilities (Level 1), followed by observable inputs other than quoted prices (Level 2) and the lowest priority to unobservable inputs (Level 3).[701] To the extent that the value of an asset cannot be determined by reference to observable data based on transactions between parties in the market, other than data from distressed sales, SFAS 157 requires the reporting entity to

---

[697] Fin. Accounting Standards Bd., SFAS No. 107, ¶¶ 10-11. In addition, Lehman owned positions within its financial inventory that were classified as held for sale, which were reported at the lower of carrying amount or fair value.

[698] SFAS 157 became mandatory for financial statements issued for fiscal years beginning after November 15, 2007, and FASB encouraged early adoption. Fin. Accounting Standards Bd., SFAS No. 157, ¶ 36.

[699] Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 28, 2007 (Form 10-Q) (filed on Apr. 9, 2007), at p. 14 ("LBHI 10-Q (filed Apr. 9, 2007)") ("We elected to early adopt SFAS 157 beginning in our 2007 fiscal year . . . ."). SFAS 157 and fair value measurements are discussed further in Appendix 1, Legal Issues, Section VII.A.

[700] SFAS No. 157, ¶ 22.

[701] *Id.* at ¶¶ 22-30.

use its judgment to determine fair value, taking into account its view as to the assumptions that market participants would use in pricing the asset.[702]

As the level of market activity declined in late 2007 and 2008 — resulting in valuation inputs becoming less observable — and certain of Lehman's assets became increasingly less liquid, Lehman progressively relied on its judgment to determine the fair value of such assets.[703]  In light of the dislocation of the markets and its impact on the information available to determine the market price of an asset, investors, analysts and the media focused on Lehman's mark-to-market valuations.[704]  Lehman devoted a

---

[702] *Id.* at ¶¶ 22, 30.

[703] Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at pp. 4, 6-8. *See* Lehman, Valuation & Control Report – Fixed Income Division (Feb. 2008), at p. 27 [LBEX-WGM 002260] (noting that to compensate for the lack of sales data, "[p]roduct control is having continuous discussions with Front Office going through deals in more detail and trying to obtain market color using recent syndications, bids, offers and any other market information.")   Lehman reported an increasing amount of Level 2 and Level 3 assets in its financial statements from the end of the fourth quarter for its 2007 fiscal year to the end of the first quarter of 2008.  *See* Lehman Brothers Holdings Inc., Annual Report as of Nov. 30, 2007 (Form 10-K), at p. 41 (filed on Jan. 29, 2008) ("LBHI 2007 10-K") ("During the 2007 fiscal year, our Level 3 assets increased, ending the year at 13% of Financial Instruments and other inventory positions owned."); Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 29, 2008 (Form 10-Q), at p. 23 (filed on Apr. 9, 2008) [LBEX DOCID 1024435] ("LBHI 10-Q (filed Apr. 9, 2008)") (showing an increase in the amount of Level 2 and Level 3 assets on a quarter-over-quarter basis from the end of the 2007 fiscal year).  Although by the end of the second quarter of 2008 the aggregate amount of Lehman's financial inventory considered Level 2 or Level 3 decreased on a quarter-over-quarter basis, the majority of this decrease occurred in the Level 2 asset category, and due to an even more substantial decrease in the amount of Level 1 assets over the same time period, the proportion of Lehman's financial inventory that was categorized as Level 2 and Level 3 increased on a quarter-over-quarter basis.  *See* Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2008 (Form 10-Q), at pp. 29-30 (filed on July 10, 2008) ("LBHI 10-Q (filed July 10, 2008)").

[704] *See* Andrew Bary, *Apartment-House Blues*, Barron's, Jan. 21, 2008, *available at* http://online.barrons. com/article/SB120070919702802265.html#articleTabs_panel_article%3D1 (noting that "based on current REIT prices, the value of the Archstone equity could be zero."); *see also* David Einhorn, Greenlight Capital, Presentation to the Value Investing Congress, A Few Thoughts About Risk (Nov. 29, 2007) [LBEX-DOCID 2490444]; Transcript of Speech by David Einhorn, Presentation to Grant's Spring Investment Conference, Private Profits and Socialized Risk (Apr. 8, 2008), at p. 9, *available at*

considerable part of its earnings calls for the first and second quarters of 2008 to explain the values it had determined for a wide range of its assets and the methodologies it had employed in doing so.[705] Notwithstanding such disclosures, it is apparent that Lehman's valuations, or its "marks," for its illiquid assets, were being questioned by market participants.[706]

For example, David Einhorn of Greenlight Capital, who at the time held short positions in Lehman, stated in an April 8, 2008 speech:

> There is good reason to question Lehman's fair value calculations. . . . Lehman could have taken many billions more in write-downs than it did. Lehman had large exposure to commercial real estate. . . . Lehman does not provide enough transparency for us to even hazard a guess as to how they have accounted for these items. . . . I suspect that greater transparency on these valuations would not inspire market confidence.[707]

---

http://www.foolingsomepeople.com/main/mroom/Grants%20Conference%2004-08-2008.pdf (last visited Feb. 2, 2010); Transcript of Speech by David Einhorn, Presentation to Ira W. Sohn Investment Research Conference, Accounting Ingenuity (May 21, 2008), at pp. 3-4, *available at* http://www.foolingsomepeople.com/main/TCF%202008%20Speech.pdf.

[705] Transcript of Lehman Brothers Holdings Inc. Second Quarter 2008 Earnings Call (June 16, 2008); Transcript of Lehman Brothers Holdings Inc. First Quarter 2008 Earnings Call (March 18, 2008).

[706] Jonathan Weil, *Lehman's Greatest Value Lies In Lessons Learned*, Bloomberg.com (June 11, 2008), available at http://www.bloomberg.com/apps/news?pid=20601039&refer=columnist_weil&sid=aLvc47iu_Re0 ("Lehman's market capitalization, at $19.2 billion, is now almost $7 billion less than the company's $26 billion book value, or assets minus liabilities. That suggests that the market believes Lehman hasn't fully cleaned up its balance sheet and that the worst is still to come, management's assurances notwithstanding.").

[707] Transcript of Speech by David Einhorn, Presentation to Grant's Spring Investment Conference, Private Profits and Socialized Risk (Apr. 8, 2008), at p. 9, *available at* http://www.foolingsomepeople. com/main/mroom/Grants%20Conference%2004-08-2008.pdf. *See also* Transcript of Speech by David Einhorn, Presentation to Ira W. Sohn Investment Research Conference, Accounting Ingenuity (May 21, 2008), at pp. 3-4, *available at* http://www.foolingsome people.com/main/ TCF%202008%20Speech.pdf ("The issue of the proper use of fair value accounting isn't about strict versus permissive accounting. . . . The cycle has exposed the investments to be more volatile and in many cases less valuable than they thought. The decline in market values has forced these institutions to make a tough decision. Do they follow the rules, take the write-downs and suffer the consequences whatever they may be? Or worse, do

Einhorn's skepticism was also reflected in the financial press.  On March 20, 2008, *Portfolio.com* published an article titled "The Debt Shuffle," which asked: "What actually happened to Lehman's balance sheet in the first quarter?  Assets rose.  Leverage rose.  Write-downs were suspiciously miniscule.  And the company fiddled with the way it defines a key measure of the firm's net worth."[708]  Lehman's Head of U.S. Global Credit Products, Eric Felder, forwarded this article to Ian Lowitt, Lehman's Co-Chief Administrative Officer, with the note, "bunch of people looking at this article," to which Lowitt replied, "[d]oesn't help."[709]  Firms such as Lehman required the confidence of the market to assure its sources of short term financing that they would be repaid; and the market's confidence in Lehman was publicly questioned.[710]

According to the SEC, one of the reasons that the market lost confidence in Lehman was that the market had little confidence in the asset values that Lehman was reporting.[711]  This lack of confidence was evident in the performance of Lehman's stock price, which dropped to near historic lows following Lehman's June 9, 2008 preliminary

---

they take the view that they can't really value the investments in order to avoid writing them down?  Or, even worse, do they claim to follow the accounting rules, but simply lie about the values?")

[708] Jesse Eisinger, *The Debt Shuffle: Wall Street cheered Lehman's earnings, but there are questions about its balance sheet*, Portfolio.com (Mar. 20, 2008), *available at* http://www.portfolio.com/news-markets/top-5/2008/03/20/Lehmans-Debt-Shuffle.

[709] *See* e-mail from Eric Felder, Lehman, to Ian T. Lowitt, Lehman (Mar. 23, 2008) [LBHI_SEC07940_625905]; e-mail from Ian T. Lowitt, Lehman, to Eric Felder, Lehman (Mar. 23, 2008) [LBHI_SEC07940_625905].  There is substantial evidence that the market lost a significant degree of confidence in Lehman in the summer of 2008.  In June 2008, S&P, Fitch and Moody's each issued ratings downgrades for Lehman, and Lehman's stock price plummeted following its earnings announcement for the second quarter of 2008.  *See* Section III.B.3.d.2.e of this Report.

[710] Examiner's Interview of SEC staff, Aug. 24, 2009, at p. 14.

[711] *Id.*

earnings announcement.[712]  The decline in Lehman's stock price resulted in Lehman having a market capitalization of $19.2 billion, which was nearly $7 billion below Lehman's book value.  According to Bloomberg.com's Jonathan Weil, the decline in stock price "suggest[ed] that the market believes Lehman hasn't fully cleaned up its balance sheet and the worst is still to come, management's assurances notwithstanding."[713]

The lack of confidence in Lehman's valuations was also evident in the demands for collateral made by Lehman's clearing banks throughout 2008 to secure risks they assumed in connection with clearing and settling Lehman's triparty and currency trades, and other extensions of credit.[714]  To continue the provision of clearing services and intraday credit that Lehman relied upon for day-to-day operations, Lehman's

---

[712] *See* Section III.B.3.d.2.e of this Report for further discussion of the market's lack of confidence in Lehman in summer of 2008.  From the beginning of 2008 through the end of the second quarter of 2008, Lehman's common stock traded in range between a high of $66 per share on February 1, 2008 to a low of $31.75 on March 17, 2008, immediately after the near collapse of Bear Stearns.  Starting in June 2008, Lehman's share price was approaching its 52-week low, would soon fall below $30 per share and would not again return to that level. The last time Lehman's stock had traded below $30/share was in September and October 1998 — in the aftermath of the collapse of Long-Term Capital Management and the Russian Sovereign Debt Crisis.   On June 12, 2008, Lehman's stock opened at $21.35/share, and closed at $21.17/share — lows that Lehman had not reached since 1996 — and the volume on trading of Lehman's shares reached an all-time high of over 173 million — a level of trading that would only be eclipsed in Lehman's final week prior to the bankruptcy filing.  All historical pricing information is publicly available from sites such as Yahoo! Finance.

[713] Jonathan Weil, *Lehman's Greatest Value Lies In Lessons Learned*, Bloomberg.com (June 11, 2008), *available at* http://www.bloomberg.com/apps/news?pid=20601039&refer=columnist_weil&sid=aLvc47iu_Re0. Notably, Robert Azerad, Lehman's Global Head of Asset and Liability Management, forwarded this article to Paolo Tonucci, Lehman's Global Treasurer, and described this article as "[r]epresentative of the tone of the market." E-mail from Robert Azerad, Lehman, to Paolo Tonucci, Lehman (June 11, 2008) [LBHI_SEC07940_517806-809]

[714] *See* Section III.A.5. of this Report for a discussion of the collateral demands made by Lehman's clearing banks.

clearing banks began demanding collateral.[715]   In response, Lehman pledged, or

attempted to pledge, Lehman-structured instruments, such as certain collateralized loan

obligations, to Citigroup and JPMorgan – two of its principal settlement banks.[716]

Citigroup rejected the assets proposed by Lehman, due to their illiquid characteristics

and the inability to establish reliable marks for such assets.[717]   While JPMorgan accepted

Lehman's structured instruments, that bank demanded additional cash collateral after

conducting analyses showing that the collateral was likely not worth the par values

assigned by Lehman.[718]   JPMorgan's collateral call was one of the contributing factors to

the liquidity problems that hastened Lehman's bankruptcy.[719]

Further, the lack of confidence in Lehman's valuation of its CRE assets was a

principal reason why Lehman sought to shed its illiquid CRE assets in a spin-off

---

[715] *See* Section III.A.5. of this Report, which discusses the importance of Lehman's secured lenders in general, and Sections III.A.5.b.-d., which discuss Lehman's dealings with JPMorgan, Citigroup and HSBC, which were three of Lehman's most important clearing and settlement banks.   Each bank requested collateral from Lehman in the summer of 2008.

[716] *See* Section III.A.5.c.1.c.ii of this Report, which discusses Lehman's proposed pledge of securities to Citi; and *see also* Sections III.A.5.b.1.e and III.A.5.b.1.k of this Report which discusses JPMorgan's concerns with securities pledged by Lehman as collateral.

[717] *See* Section III.A.5.c.1.c.ii of this Report, which discusses Lehman's proposed pledge of securities to Citi.

[718] *See* Sections III.A.5.b.1.e and III.A.5.b.1.l, of this Report, which discuss JPMorgan's concerns over Lehman collateral, and certain of JPMorgan's valuation analyses of Lehman's collateral.   *See* Section III.A.5.b.1.k of this Report, which notes that JPMorgan's concerns over the value of Lehman's pledged assets, at least in part, led the bank to ask for a pledge of cash collateral.

[719] *See* Section III.A.6 of this Report which discusses the effect of clearing bank collateral demands on Lehman's liquidity.

company that would not be required to report the fair value of such assets pursuant to SFAS 157.[720]

The uncertainly as to the fair value of Lehman's assets also played a role in the negotiations between BofA and Lehman regarding a potential acquisition of Lehman by BofA. Lewis told the Examiner that for BofA, the question of whether or not it was a good deal was "based entirely on the numbers."[721] BofA put together a diligence team at some point around September 10 or 11, 2008, and it became quickly apparent to them that, without substantial government assistance, the deal would not be beneficial to BofA.[722] The sticking point for BofA was what Lewis described as a "$66 billion hole" in Lehman's valuation of its assets.[723] Although Lewis stated that he did not think that the assets were completely worthless, BofA did not want those $66 billion in assets at any price, and wanted them off the books.[724] Lewis stated that he thought Lehman's marks were "out of line with BofA's."[725] Once it became apparent to Lewis that government assistance was not forthcoming, BofA effectively ended its negotiations with Lehman.[726]

---

[720] Examiner's Interview of SEC staff, Aug. 24, 2009, at p. 14. For a discussion of SpinCo, see Section III.A.5.c.4 of this Report.

[721] Examiner's Interview of Kenneth D. Lewis, Oct. 9, 2009, at p. 4.

[722] *Id.*

[723] *Id.* at p. 5.

[724] *Id.*

[725] *Id.*

[726] *Id.* at p. 6.

### (1) Scope of Examination

To address the tasks in the Examiner's Order, the Examiner evaluated the reasonableness of Lehman's mark-to-market valuations in two distinct but related different contexts. The Examiner considered the reasonableness of Lehman's mark-to-market valuations for two reasons. First, in connection with the Examiner's analysis as to whether LBHI or any LBHI Affiliates were insolvent, the Examiner considered whether there was sufficient evidence that Lehman's valuations for a particular asset class were unreasonable such that the court could adjust, or even disregard, such valuations in determining the solvency of these debtors. Second, where there was sufficient evidence to demonstrate that valuations were unreasonable, the Examiner considered whether such valuations were the product of actions of a Lehman officer that would support a colorable claim of breach of fiduciary duty.

The Examiner's inquiry into the reasonableness of Lehman's valuation focused on Lehman's U.S. assets. The Examiner determined that, in light of the composition of the LBHI Affiliates' assets, the relative inaccessibility of information regarding the valuation and price testing of Lehman's non-U.S. assets and the time and expense necessary to obtain and analyze such information, an assessment of Lehman's non-U.S. assets was not a prudent use of resources. Accordingly, unless otherwise noted, any reference to an asset class or a particular Lehman business unit in this Section is to U.S. assets or a Lehman U.S. business unit.

The Examiner analyzed Lehman's valuation of the following asset categories: commercial real estate ("CRE"), residential whole loans ("RWLs"), residential mortgage-backed securities ("RMBS"), collateralized debt obligations ("CDOs"), derivatives, corporate debt and corporate equity. The Examiner selected these asset categories due to the relative size of each asset class and the risk of a valuation error in light of deteriorating market conditions. Given that the primary purpose of the valuation was to support the solvency analysis, the Examiner focused the valuation analysis on the second and third fiscal quarters of 2008,[727] except with respect to Lehman's valuations of its Archstone positions, which are addressed beginning with the Archstone acquisition in October 2007.

Across all asset classes, the asset values Lehman reported were those determined by its business desk, subject to revision pursuant to a price testing process performed by its Product Control Group.[728] Even within a single asset class, the valuation methodologies employed by the business desk differed, and the Product Control

---

[727] LBHI's market capitalization was approximately $28.1 billion as of the end of its first fiscal quarter on February 29, 2008. *See* LBHI Form 10-Q (filed April 9, 2008), at p. 6. The Examiner focused on the dates May 31, 2008, and August 31, 2008, because these were the last days of Lehman's second and third quarters, respectively. While Lehman did not file a quarterly report for the third quarter of 2008, the business desks did value their positions and the Product Control Group performed price testing for this period. In light of the primary purpose of the valuation analysis, the Examiner determined that it was not a prudent use of resources to examine the reasonableness of Lehman's valuations (other than Archstone) prior to the second quarter of 2008. With respect to Archstone, given the substantial analyst and media focus on this transaction and the nature of Lehman's participation, the Examiner determined it would be prudent to begin the valuation analysis with the Archstone acquisition in the fourth quarter of 2007 to provide appropriate context in which to consider the reasonableness of Lehman's valuations during later periods.

[728] Lehman, Price Verification Policy: Global Capital Markets 2008 [Draft], at p. 4 [LBHI_SEC07940_2965994].

Group's price testing served as a standardized check on the valuation process.   For this reason, the investigation focused on the role played by the Product Control Group and the methods employed in the price testing process.

### (2)  Summary of Applicable Legal Standards

The standard for determining the fair value of an asset pursuant to SFAS 157 is closely aligned with the standard courts have applied in determining the value of a debtor's assets for purposes of a solvency determination.[729]   The Bankruptcy Code defines "insolvent" in relevant part as the "financial condition such that the sum of the entity's debts is greater than all of such entity's property, at a fair valuation[.]"[730]  When assessing the fair value of a debtor's assets, courts consider "the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts."[731]  In this manner, both the SFAS 157 standard for mark-to-market valuation and the courts' solvency analysis are predicated on the price that could be obtained for the asset in the marketplace as of the applicable measurement date.

Given that "valuation is, to a great extent, a subjective exercise,"[732] courts have assessed the reasonableness of a debtor's valuation or projection of future cash flows in

---

[729] *See* Appendix 1, Legal Issues, Section VII.A, for a discussion of the applicable valuation standards under SFAS 157 and for a solvency determination under the Bankruptcy Code.
[730] 11 U.S.C. § 101(32)(A) (definition applicable to entities other than a partnership or municipality).
[731] *In re Roblin Industries, Inc.*, 78 F.3d 30, 35 (2d Cir. 1996).
[732] *In re Iridium Operating LLC*, 373 B.R. 283, 348 (Bankr. S.D.N.Y. 2007).

light of information available at the time the valuation was undertaken. As the Third Circuit has explained with respect to the analysis of a debtor's cash flow projections, "far from 'hindsight' or 'post-hoc' analysis, a court looks at the circumstances as they appeared to the debtor and determines whether the debtor's belief that a future event would occur was reasonable. The less reasonable a debtor's belief, the more a court is justified in reducing the assets (or raising liabilities) to reflect the debtor's true financial condition at the time of the alleged transfers."[733] Accordingly, the Examiner has considered the reasonableness of Lehman's asset values in light of contemporaneous information available to Lehman and with the understanding that valuation of illiquid assets requires the application of considerable judgment.

With respect to the fiduciary duty analysis, a corporate fiduciary would have breached such duty if the fiduciary caused Lehman to improperly value an asset intentionally or with "conscious recklessness — *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence."[734] In order for there to be a colorable claim, the facts need to support a finding that the corporate fiduciary had the necessary scienter.

---

[733] *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc.*, 92 F.3d 139, 157 (3d Cir. 1996).

[734] *See, e.g., Desimone v. Barrows*, 924 A.2d 908, 934-35 & n.89 (Del. Ch. 2007). *See* Appendix 1, Legal Issues, Section II, for a discussion regarding the legal standards for breach of fiduciary duty. *See also South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009).

### (3) Summary of Findings and Conclusions

The Examiner finds insufficient evidence to support a finding that Lehman's valuations of its RWL, RMBS, CDO or derivative positions were unreasonable during the second and third quarters of 2008. Although the Examiner identifies, and discusses below, certain problematic issues related to the price testing of these asset classes, these problems either did not impact the ultimate asset values determined or the resulting valuation errors were immaterial.

Because an assessment of the reasonableness of Lehman's asset values for corporate debt and corporate equity would require an expensive and time consuming asset-by-asset analysis, the Examiner determined that such an assessment was not a prudent use of resources. The Examiner considered Lehman's valuations of the largest corporate debt and corporate equity positions and identified issues that may warrant further review by parties in interest.

With respect to commercial real estate, the Examiner finds insufficient evidence to conclude that Lehman's valuations of its Commercial portfolio were unreasonable as of the second and third quarters of 2008. The Examiner determines that there is sufficient evidence to conclude that certain of the Principal Transactions Group ("PTG") real estate assets were not reasonably valued during these quarters. Furthermore, the Examiner finds sufficient evidence to support a finding that Lehman's valuations of its

Archstone bridge equity investment were unreasonable as of the first, second and third quarters of 2008.[735]

The Examiner did not find sufficient evidence to support a colorable claim for breach of fiduciary duty in connection with any of Lehman's valuations. In particular, in the third quarter of 2008 there is evidence that certain executives felt pressure to not take all of the write-downs on real estate positions that they determined were appropriate; there is some evidence that the pressure actually resulted in unreasonable marks. But, as the evidence is in conflict, the Examiner determines that there is insufficient evidence to support a colorable claim that Lehman's senior management imposed arbitrary limits on write-downs of real estate positions during that quarter.

### b) Overview of Valuation of Lehman's Commercial Real Estate Portfolio

This Section addresses Lehman's valuation of its CRE portfolio, principally during the second and third quarters of 2008,[736] and provides an overview of Lehman's CRE portfolio and Lehman's valuation process across the CRE portfolio. In order to put Lehman's valuation process and decisions in context, this overview summarizes the

---

[735] This analysis also pertains to the permanent equity (*i.e.*, general partner interest) which was valued at $246 million at closing. *See* Lehman, Archstone Monthly Exposure as of July 2008 revised.xls [LBEX-BARFID 0013113].

[736] As is the case with each of the other asset classes that were the focus of the investigation as to Lehman's valuation of assets, the Examiner determined that it would not be a prudent use of resources to conduct an investigation of Lehman's valuation of its non-U.S. CRE assets. With the exception of LCPI, which owned certain European debt and Coeur Defense positions (located in Paris, France), the LBHI Affiliates did not directly own material CRE positions in respect of real estate located outside of the U.S. *See* Section III.B.3.c.3.a of this Report, which discusses the Examiner's finding that LCPI was either insolvent or borderline solvent during the period beginning September 2007.

changes in Lehman's CRE portfolio beginning in 2006 and Lehman's response to the changing market conditions throughout 2007 and 2008, including the write-downs Lehman took in 2008. This Section concludes by addressing the SEC's review of Lehman's price verification processes for its CRE portfolio and the quarterly review performed by E&Y of Lehman's CRE valuations in 2008.

Following the overview, the Examiner discusses the role played by Lehman senior management in the valuation process and, in particular, addresses whether senior managers set predetermined limits on the amount of CRE write-downs for the second and third quarters of 2008. This Report continues with an analysis of the valuation of the CRE assets within each of Global Real Estate Group's ("GREG's") business units — Commercial, Principal Transactions Group ("PTG") and Bridge Equity.[737] The Report, in separate subsections, describes the assets in the PTG and Commercial portfolios, Lehman's Archstone investments,[738] the methodologies employed by Lehman to value such assets and the procedures used to price test those values. Each subsection includes the Examiner's analysis as to whether there is

---

[737] Lehman, GREG Update (Aug. 7, 2008), at p. 2 [LBHI_SEC_07940_ICP_003590]. According to this presentation, the three business units of GREG were Commercial Whole Loans and CMBS (which were referred to as "Commercial"), PTG and Real Estate Advisory. *Id.* Real Estate Advisory "provide[d] comprehensive advisory and capital raising services" but did not "utilize [Lehman's] balance sheet," which means that positions originated from this business unit were not owned by LBHI or the debtors. *Id.; see also* Lehman, Real Estate Update Presentation to S&P (Oct. 2007), at p. 3 [LBHI_SEC07940_126498].

[738] The Examiner's analysis of the Bridge Equity unit's valuation focuses on Lehman's valuation of its Archstone bridge equity position because this single position represented over 50% of the value of Lehman's bridge equity portfolio.

sufficient evidence to support a finding that Lehman's valuations of these assets were unreasonable.[739]

### (1) Overview of Lehman's CRE Portfolio

#### (a) Summary of Portfolio

The Commercial portfolio ("Commercial Book") was comprised of debt instruments, such as commercial mortgage loans and Commercial Mortgage-Backed Securities ("CMBS").[740] These assets were backed by real estate properties that were generating cash flow and Lehman's intention was to syndicate, securitize and/or sell these assets to investors within a few months after their origination or acquisition.[741]

PTG assets were typically highly leveraged debt or equity investments in real estate assets that Lehman intended to hold for its own account while a developer improved or developed the underlying asset.[742] As a general matter, Lehman's strategy

---

[739] While Lehman did not file a quarterly report for the third quarter of 2008, it did value its CRE assets and perform price testing for this period. Lehman publicly disclosed its preliminary third quarter results. Lehman, Press Release: Lehman Brothers Announces Preliminary Third Quarter Results and Strategic Restructuring [LBHI_SEC07940_028677].

[740] Wyatt de Silva, E&Y, Memorandum to Files: Lehman Commercial Real Estate FAS 157 Adoption (Jan. 28, 2008), at pp. 2-4 [EY-LE-LBHI-KEYPERS 2025661]; Lehman, Global Real Estate Product Control Real Estate Americas Price Verification Presentation [Draft] (Feb. 2008), at p. 4 [LBEX-WGM 916015]; Lehman, GREG University: START Analysts & Associates Deep Dive Training Presentation (Sept. 2007), at p. 50 [LBHI_SEC_07940_ICP_007982]. In addition, Lehman would sell whole loans to institutional investors.

[741] Lehman, GREG Update (Aug. 7, 2008), at p. 2 [LBHI_SEC_07940_ICP_003590]; *see also* E&Y Workpaper, Lehman Brothers Holdings Inc. 6 Month Period Ending May 31, 2008, Mortgage Capital Team: Principal Transactions P&L Review, at p. 3 [EY-SEC-LBHI-MC-GAMX-08-138373] ("Commercials are primarily composed of conduit and large loans with a principal exit strategy, historically of sale, namely securitization.")

[742] Lehman, Global Real Estate Product Control Real Estate Americas Price Verification Presentation [Draft] (Feb. 2008), at p. 4 [LBEX-WGM 916018] (describing PTG assets as "High Leveraged debt and equity investments in commercial real estate properties").

was to monetize a PTG investment in connection with a sale of the underlying real estate asset after such development or improvement was completed.[743]

Lehman would provide bridge equity, together with debt financing, to a real estate company in connection with its acquisition of particular properties, or to the acquirer of a real estate company through a leveraged buyout.[744] Lehman intended to sell bridge equity positions it originated over the short-term to medium-term to institutional investors.

As of May 31, 2008, GREG valued its global CRE portfolio at $49.3 billion,[745] which consisted of $28.0 billion in the U.S., $12.5 billion in Europe and $8.9 billion in Asia.[746] As of that date, GREG valued its U.S. CRE positions as follows: Commercial —

---

[743] Wyatt de Silva, E&Y, Memorandum to Files: Lehman Commercial Real Estate FAS 157 Adoption (Jan. 28, 2008), at p. 5 [EY-LE-LBHI-KEYPERS 2025665] ("Lehman's exit strategy for PTG Investments is through sale of the underlying asset or refinance of the debt/equity positions."); Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 7-8.

[744] Lehman, GREG University: START Analysts & Associates Deep Dive Training Presentation (Sept. 2007), at p. 85 [LBHI_SEC_07940_ICP_007982]; Lehman, GREG Approval Policies and Procedures Manual (May 2008 ed.), at § 1 [LBEX-OTS 000245]. *See* Section I.B.2.c, which discusses Lehman's strategy with respect to bridge equity investments.

[745] These amounts refer to Lehman's balance sheet at risk and do not include the value of certain real estate assets held by entities (such as voting-interest entities and variable-interest entities) in which Lehman made debt and equity investments. LBHI 10-Q (filed July 10, 2008) at p. 26 ("[Lehman] considers itself to have economic exposure only to its direct investments to these entities; the Company does not have economic exposure to the total underlying assets in these entities.") The Examiner did not perform a forensic review of Lehman's accounting records. Lehman reported its valuations according to GAAP asset class (*e.g.*, Real Estate Held for Sale) but managed its business according to business unit. The Examiner used data created by Lehman in the ordinary course in connection with this valuation analysis.

[746] Lehman, Global Real Estate Inventory Spreadsheet as of May 31, 2008 (Aug. 8, 2008) [LBEX-DOCID 2077095]. The Examiner's financial advisor has determined that the amounts in this spreadsheet for Commercial Mortgages ($29.4 billion) and Real Estate Held for Sale ($10.4 billion) GAAP asset classes reconcile with Lehman's financial disclosures in its SEC filing for the second quarter of 2008. LBHI 10-Q (filed July 10, 2008) at p. 71. Although the Examiner has limited the investigation into Lehman's CRE

$15.1 billion; PTG — $8.5 billion; and Bridge Equity — $3.1 billion.[747] For assets that were subject to SFAS 157,[748] substantially all of the Commercial positions were classified as Level 2, while the PTG and Bridge Equity positions were generally classified as Level 3.[749]

As of August 31, 2008, GREG valued its global CRE portfolio at $41.3 billion, which consisted of $23.4 billion in the United States, $10.1 billion in Europe and $7.8 billion in Asia.[750] As of that date, GREG valued its U.S. CRE positions as follows: Commercial — $11.9 billion; PTG — $7.8 billion; and Bridge Equity — $2.8 billion.[751] For assets that were subject to SFAS 157, substantially all of the Commercial positions

---

portfolio to the U.S. positions, some portions of the Report will, at times, refer to GREG's global holdings in order to provide context.

[747] Lehman, Global Real Estate Inventory Spreadsheet as of May 31, 2008 (Aug. 8, 2008) [LBEX-DOCID 2077095]. GREG's assets in the U.S. also included $0.8 billion that was classified as "Other." For purposes of analysis and presentation, this Report also reclassifies $0.4 billion of SunCal positions from PTG into the "Other" category.

[748] Real Estate Held for Sale was reported at the lower of its cost basis and fair value, so therefore the valuation analysis is the same for these assets and FAS 157 for the purposes of this Report.

[749] *Id.* GREG reported the following amounts as of May 31, 2008: Level 1 - $57 million; Level 2 - $26.1 billion; Level 3 - $12.8 billion; Real Estate Held for Sale - $10.4 billion.

[750] Lehman, Global Real Estate Inventory Spreadsheet as of Aug. 31, 2008 [LBEX-DOCID 1025119]. Thee Examiner's financial advisor has determined that the combined amount in this spreadsheet for the Commercial Mortgages and Real Estate Held for Sale asset classes ($32.6 billion) reconciles with Lehman's financial disclosures for the third quarter in its September 10, 2008 press release. Lehman, Press Release: Lehman Brothers Announces Preliminary Third Quarter Results and Strategic Restructuring (Sept. 10, 2008) [LBHI_SEC07940_028677]. Similar to the May 31, 2008 amounts, these amounts refer to Lehman's balance sheet at risk and do not include the value of the underlying assets held by entities in which Lehman had an investment interest because Lehman did not have direct economic exposure to such underlying assets.

[751] *Id.* GREG reported the following amounts: Level 1 - $15 million; Level 2 - $20.1 billion; Level 3 - $12.5 billion; and Real Estate Held for Sale - $8.7 billion. GREG's assets in the U.S. included $0.6 billion that was classified as "Other." The Examiner also reclassifies $0.4 billion of SunCal positions from PTG into the "Other" category.

were classified as Level 2, while the PTG and Bridge Equity positions were generally classified as Level 3.[752]

### (b) Overview of Valuation of CRE Portfolio

### (i) GREG Leaders

Mark A. Walsh served as the Head of GREG and reported to the head of Lehman's Fixed Income Division ("FID").[753]  Serving under Walsh were Kenneth Cohen, Head of U.S. Originations, and Paul A. Hughson, Head of Credit Distribution.[754]  Walsh, Cohen and Hughson served on GREG's Global Credit Committee and were responsible for approving origination of CRE deals in the first instance.[755]

### (ii) Participants in the Valuation Process

As with other business units, the applicable GREG business unit was responsible for valuing, or marking, its assets.[756]  The values assigned to assets are commonly referred to as "marks," and determining the value of the assets as "marking the

---

[752] *Id.*

[753] Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 4.  Michael Gelband served as Lehman's Head of FID until May 2007, when he was replaced by Roger Nagioff.  Lehman, Press Release Naming Roger B. Nagioff Global Head of Fixed Income (May 2, 2007) [LBEX-DOCID 1470086], attached to e-mail from Monique Wise, Lehman, to Jasjit Bhattal, Lehman, *et al.* (May 1, 2007) [LBEX-DOCID 1605828]. Nagioff himself departed Lehman in January 2008.

[754] Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 4.

[755] Lehman, GREG Approval Policies and Procedures Manual (June 2006), at p. 12 [LBEX-DOCID 624251]. *See* Section III.A.1.b.2.b.viii for information on the approval process for deal origination.

[756] The process for marking by the business desk is discussed in greater detail in the subsections dealing with valuations of each portfolio and the Archstone positions.

book."[757]   For the PTG positions, asset managers valued these positions based on their knowledge of the development of the underlying real estate asset.[758]   Anthony J. Barsanti, Senior Vice President in PTG, and Aristides Koutouvides, Vice President in PTG, were the two employees primarily responsible for determining the marks for the PTG assets during the period that is the subject of the Examiner's review.   Their valuations were subject to review by Kenneth Cohen, Walsh and other members of Lehman's senior management.[759]

Commercial positions were valued by personnel who marked the book based on their understanding of how debt was trading in the applicable market.[760]   Their valuations were subject to review by Hughson, who also supervised the marking of the Bridge Equity assets.[761]

A group of product controllers was assigned to conduct price verification for the CRE assets.   This price verification, or price testing, process for each GREG business unit is discussed in more detail in the applicable subsection addressing Lehman's valuation of such assets.   Jonathan Cohen, Senior Vice President, directly oversaw this

---

[757] Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 5; Examiner's Interview of Kenneth Cohen, Oct. 20, 2009, at p. 11; Examiner's Interview of Kenneth Cohen, Jan. 21, 2010, at pp. 2, 4; Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 6.

[758] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 11.

[759] *Id.* at pp. 10-11.

[760] Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 10.

[761] *Id.* at p. 10.

process.[762]  Abebual Kebede, Vice President, served under Jonathan Cohen, and was responsible for price testing the Bridge Equity positions and supervised the three product controllers who price tested the Commercial Book and the PTG positions.[763] Jennifer Park price tested Commercial Book, Eli Rabin price tested PTG equity positions and Rebecca Platt price tested the PTG debt positions.[764]

As a general matter, the product controllers performed price testing on positions by inputting position-specific information into spreadsheet models that produced an "output" value based on calculations and formulas selected by Lehman as price testing tools.[765]  The product controllers then compared the model output value to the business desk value to determine whether the difference between the two, referred to as the variance, exceeded a certain threshold.[766]  The product controllers discussed variances with the appropriate business desk person who selected the mark in order to determine

---

[762] Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation [Draft] (Feb. 2008), at p. 3 [LBEX-WGM 916015].

[763] *Id.*; Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 5 (Kebede told the Examiner that his job was "to make sure the marks made sense.")

[764] Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation [Draft] (Feb. 2008), at p. 3 [LBEX-WGM 916015].

[765] *Id.* at pp. 6-10; Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 5.

[766] Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation [Draft] (Feb. 2008), at pp. 6-10 [LBEX-WGM 916015]; Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 6.

whether the business desk or valuation control value should be accepted for each position.[767]

When disagreement persisted as to the variance, Product Control elevated the issue to Kebede, and if Kebede was not satisfied with the business desk's basis for the marks, he would bring the dispute to Jonathan Cohen's attention.[768]  Cohen could further elevate the dispute up through the Product Control chain of command, to Clement Bernard, the CFO for FID,[769] to Gerard Reilly, the Global Product Controller[770] and ultimately to Lehman's CFO.[771]  The interaction between the GREG business desks and Product Control is discussed in the following subsection.

### (c)  Changes in the CRE Portfolio from 2006 through 2008

In order to understand the difficulties Lehman encountered in valuing its CRE positions in the second and third quarters of 2008, it is necessary to first briefly review the material changes in the GREG portfolio and the real estate markets beginning in

---

[767] Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation [Draft] (Feb. 2008), at p. 21 [LBEX-WGM 916015]; Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 3.

[768] Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at pp. 6-8 (noting that prior to 2008, the valuation control team, along with senior GREG employees, including Barsanti and Jonathan Cohen, determined the final marks for CRE assets).

[769] Lehman, Capital Markets and IBD Finance – Offsite Presentation on Valuation and Control Group (Jan. 16, 2008), at p. 12 [LBEX-WGM 756817].

[770] Examiner's Interview of Kenneth Cohen, Oct. 20, 2009, at p. 10.  Gerard Reilly passed away in a skiing accident on December 29, 2008; Christopher M. O'Meara, Lehman's former CFO, described Reilly as the person ultimately responsible for valuations of Level 2 and Level 3 assets. Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at p. 26.

[771] Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at p. 26 (stating that the product controllers who took responsibility for valuation were under his direction as CFO); Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009 at p. 6.

2006.   In 2006, Lehman decided to commit more of its balance sheet to historically

profitable businesses and to put more of Lehman's capital at risk in order to remain

competitive with other investment banks.[772]   That strategy included substantially

increasing its CRE investments.[773]  Lehman executed upon this strategy, reporting that

the aggregate value of its global CRE assets was $55.2 billion as of the end of its 2007

fiscal year, increasing from $28.9 billion as of the end of its 2006 fiscal year.[774]

Over July and August 2007 Lehman personnel recognized that the market for

placing investments backed by commercial real estate was "virtually closed"[775] and the

leveraged loans market had shut down.[776]  In light of these events, Lehman decided to

stop originating new loans in the leveraged loan and commercial real estate businesses

until the end of the third quarter of 2007.[777]  However, Lehman had already committed

to finance several large CRE deals that closed in October and November of 2007,

including Archstone.

---

[772] Examiner's Interview of Kenneth Cohen, Oct. 20, 2009, at p. 7.

[773] *Id.*; e-mail from Paul A. Hughson, Lehman, to Kentaro Umezaki, Lehman, *et al.* (May 9, 2006) [LBEX-DOCID 1776281] (requesting a meeting with Umezaki to discuss "Global Real Estate Risk Appetite-and how the new limits coincide with our plan to expand our business in Asia, Europe and our bridge equity globally").

[774] Lehman, Presentation to Moody's Investors Service, Commercial Real Estate (Feb. 13, 2008), at p. 5 [LBHI_SEC_07940_ICP_008206].

[775] E-mail from William J. Hughes, Lehman, to Alex Kirk, Lehman, *et al.* (July 27, 2007) [LBEX-DOCID 174304].

[776] E-mail from Alex Kirk, Lehman, to Roger Nagioff, Lehman (Aug. 6, 2007) [LBEX-DOCID 173492]; Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 9.

[777] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 9.

As 2007 progressed, Lehman increased its focus on the size of its balance sheet and its leverage.[778]  On November 3, 2007, Walsh e-mailed Roger Nagioff, Lehman's Global Head of Fixed Income, regarding his plans to reduce the balance sheet at a steady rate, with a target of a $45 billion GREG balance sheet on a global basis.[779] GREG's November 6, 2007 presentation to the Executive Committee stated that "under any circumstance an estimated $15 billion reduction in global balance sheet is warranted," and recommended reducing the global GREG balance sheet to $43.7 billion by March 31, 2008.[780]

Despite this emphasis on deleveraging and the stated plan to reduce the GREG balance sheet by $15 billion, GREG's balance sheet of $55.0 billion at the end of February 2008 was only $200 million less than the GREG balance sheet at the end of November 2007.[781]    In the first quarter of 2008, Lehman's plan to reduce its balance

---

[778] *See* Section III.A.4.f on Repo 105/108.  With respect to reducing the size of the GREG balance sheet, Hughson told the Examiner that he and Walsh recognized the need for such reduction in May 2007. Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at pp. 4-5; *see also* e-mail from Paul A. Hughson, Lehman, to Thomas Pearson, Lehman, *et al.* (May 23, 2006) [LBEX-DOCID 1776282].  Walsh pointed to the fall of 2007 as when he knew balance sheet reduction was a necessary step. Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 10.  In September 2007, Kentaro Umezaki, Head of Fixed Income Strategy, told Hughson that a flat growth policy was being considered for GREG. *See* e-mail from Kentaro Umezaki, Lehman, to Paul A. Hughson, Lehman, *et al.* (Sept. 24, 2007) [LBEX-DOCID 1809381].

[779] Walsh broke down the target GREG balance sheet as follows: $25 billion in the United States, $10 billion in Europe and $10 billion in Asia. E-mail from Mark A. Walsh, Lehman, to Roger Nagioff, Lehman (Nov. 3, 2007) [LBEX-DOCID 175741].

[780] Lehman, GREG Global Real Estate Update Presentation (Nov. 6, 2007), at p. 1 [LBEX-DOCID 2072935]; e-mail from Abebual A. Kebede, Lehman, to Jonathan Cohen, Lehman, *et al.* (Nov. 4, 2007) [LBEX-DOCID 523669].

[781] Lehman, GREG Update (June 5, 2008), at p. 1 [LBEX-DOCID 1417258].

sheet resulted in the sale of less than $400 million of CRE assets.[782]  According to former

Lehman CFO Erin Callan, Lehman did not set balance sheet reduction targets for

businesses until after Bear Stearns's near collapse in March 2008.[783]

During the second quarter of 2008, Lehman publicly disclosed that it sold

approximately $8 billion of CRE positions.[784]  Despite the second quarter sales, many of

the largest CRE positions originated in 2007 were not sold or securitized, such that

many of these transactions remained among the 10 largest exposures on GREG's

balance sheet as of May 31, 2008.[785]  Lehman reported that its global CRE positions as of

---

[782] Lehman, GREG Second Quarter 2008 Sales Spreadsheet (May 29, 2008) [LBEX-DOCID 4352112].  The spreadsheet shows the GREG positions that were sold since November 30, 2007.  According to the spreadsheet, during the first quarter of 2008, 13 positions were sold in the United States for $350.5 million, no positions were sold in Europe and one position was sold in Asia for $33.1 million.

[783] Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at pp. 11-12.

[784] Transcript of Lehman Brothers Holdings Inc. Second Quarter 2008 Earnings Call (June 16, 2008), at p. 12.  Lehman also reported to its Audit Committee that it sold approximately $8 billion of CRE positions during the second quarter of 2008.  Lehman, Presentation to the Audit Committee:  Valuation Review - 2nd Quarter 2008 (July 2008), at pp. 21-23 [LBHI_SEC07940_2969525].  However, for purposes of benchmarking its sales during the quarter to the valuation of its remaining CRE positions, Lehman told E&Y that it sold $5.2 billion of CRE assets during the second quarter of 2008.  E&Y Workpaper, Global Real Estate Q208 Sales Activity, Q2.J1 - GREG Sales 2nd Qtr 08 Lead.xls, at p. 30 [EY-SEC-LBHI-MC-GAMX-08-138412]. The Examiner's financial advisor has observed that the difference in these numbers reflects a different methodology for calculating "sales" for the purposes of benchmarking the remaining positions, and the lower number reflects the exclusion of approximately $1 billion of sales in Europe that were seller-financed without recourse, over $600 million of loan payments that were characterized as sales to the Audit Committee and over $250 million from the sale of two U.S. PTG positions that were deemed outside the scope of the benchmarking analysis due to the unique nature of the investments. There were $3.8 billion of Commercial sales in the United States during the second quarter of 2008 that Lehman deemed to be relevant for purposes of benchmarking to the valuation of its remaining positions; there were no such sales for PTG or Bridge Equity positions.  *See* Lehman, GREG Second Quarter 2008 Sales Spreadsheet (May 29, 2008) [LBEX-DOCID 1139324]; Lehman, GREG Second Quarter and Third Quarter 2008 Sales Spreadsheet (Aug. 19, 2008) [LBEX-DOCID 4323975].

[785] Ronald S. Marcus, Office of Thrift Supervision, Report of Examination (July 7, 2008), at p. 6 [LBEX-OTS000004].

that date had a value of approximately $50 billion.[786]  After accounting for total net write-downs, the Commercial Book was valued at $15.1 billion, the PTG positions at $8.5 billion and the Bridge Equity positions at $3.1 billion.[787]

### (d)  "Perfect Storm" Impact on CRE Valuation in 2008

The economic crisis in the 2007 and 2008 was referred to as a "perfect storm" in several Lehman presentations.[788]  As the declining market persisted in the fourth quarter of 2007, Lehman considered taking write-downs on its CRE positions.  On October 28, 2007, Walsh e-mailed Nagioff to let him know that "the last few days in the market have been ugly and cmbs is down big."[789]  As a result, Walsh reported GREG "will be passing thru a significant write down on monday," and anticipated more write-downs to come.[790]

---

[786] LBHI 10-Q (filed July 10, 2008), at p. 70.  The amount of CRE often depends on the definition used by Lehman. Lehman's 10-Q for the second quarter of 2008 listed its CRE holdings at $40 billion, but that amount excluded certain real-estate related corporate debt or corporate equity positions.  The $50 billion total includes those positions, which were determined by the Examiner's financial advisor pursuant to a review of Lehman's product control share drive.  Unless noted otherwise, these figures represent Lehman's numbers as balance sheet at risk.  Balance sheet at risk is the portion of an asset, adjusted to market value (which takes into account the write-downs), that Lehman considered as representative of its economic exposure.  The balance sheet at risk is the best indicator for these purposes because it looks at Lehman's true exposure to an asset as it does not include any third party portion that is consolidated for accounting purposes.

[787] Lehman, Global Real Estate Inventory Spreadsheet as of May 31, 2008 (Aug. 8, 2008) [LBEX-DOCID 2077095].  GREG's assets in the U.S. also included $0.8 billion that was classified as "Other."  The Examiner also reclassified $0.4 billion of SunCal positions from PTG into the "Other" category.

[788] *See* Lehman, GREG 2009 Strategy – Executive Update Draft Presentation (June 20, 2008), at p. 1 [LBHI_SEC07940_124425]; Lehman, Global Commercial Real Estate Presentation (Aug. 6, 2008), at p. 4 [LBHI_SEC07940_302586].

[789] E-mail from Mark A. Walsh, Lehman, to Roger Nagioff, Lehman, *et al.* (Oct. 27, 2008) [LBEX-DOCID 175724].

[790] *Id.*  Also, on November 6, 2007, GREG produced for internal circulation a Global Real Estate Update stating that Lehman's global CRE assets were "maintaining strong profitability based on its conservative

Over the course of 2008, Lehman wrote down its CRE positions by more than $3 billion:

**Net Write-downs by Business Unit[791]**

|            | Q1  | Q2    | Q3    | Total |
|------------|-----|-------|-------|-------|
| PTG        | 271 | 302   | 504   | 1,077 |
| Bridge Equity | 72 | 349  | 265   | 686   |
| Commercial | 293 | 195   | 306   | 794   |
| SunCal[792] | 156 | 178  | 212   | 546   |
| Total      | 792 | 1,025 | 1,286 | 3,103 |

The January 2008 GREG Product Control report on Global Real Estate Markdowns provides a useful summary of the market conditions at the time and their

---

policies and the cushion of imbedded profitability." Lehman, GREG Global Real Estate Update Presentation (Nov. 6, 2007), at p. 1 [LBEX-DOCID 2072935]. The update continued: "Notwithstanding strong real estate fundamentals, transactions have slowed to a trickle due to uncertainty around financing, valuation (stalemate), and weakening of economic forecasts." *Id.* The update stated that Lehman would make net write-downs of its U.S. CRE assets in the amount of $825 million for fiscal year 2007. *Id.*

[791] Lehman, Global Real Estate 2008 Net Mark Downs (Sept. 5, 2008) [LBEX-AM 346991].

[792] SunCal consisted of approximately 25 positions in California real estate that straddled both the PTG and Commercial portfolios. The Examiner's financial advisor has observed that the files containing the write-downs reported one number for SunCal and did not allocate it between PTG and Commercial. Therefore, the Examiner has presented SunCal separately and did not attempt to allocate the total SunCal write-down into its PTG and Commercial components. Further, given that SunCal was comprised of as many as 25 properties (depending on the date), the Examiner determined that it was not a prudent use of resources to investigate the valuation of each SunCal position.

impact on the value of the CRE portfolio.[793]  This report's executive summary stated in full as follows:

- The capital markets meltdown continued into the first quarter. CMBS spreads have widened to all-time highs and investors have been staying on the sidelines.

- CMBS delinquencies are still at historic lows, but real estate is usually a lagging indicator.

- Many of our bank loans and PTG positions are directly related to the residential housing sector, which is extremely troubled.

- In general, the collateral performance of our whole loan positions has not been an issue, but the spread widening at all the debt tranches have led to lower values.

- The inability to hedge our floating rate book and the mezz classes of our fixed rate loans has continued to result in losses.

- The mark downs effected in January are the best estimates by the business and product control at this time.

- As part of its ongoing methodology, the Global Real Estate Group (GREG) performed a valuation review of their entire portfolio. The review took into consideration the continuing widening of credit spreads, continued sluggishness in the residential market, and lack of liquidity in the market place.

- The Real Estate Product Control group has reviewed the mark adjustments and agrees with these adjustments.

- The review resulted in a total mark-down of $665 mn (approx. $505mn in the US, and $160 mn in Europe.

For CMBS positions and loans originated with the intention that they would be transformed into CMBS, the January 2008 report further stated that "[w]rite-downs

---

[793] Lehman, Global Real Estate Product Control, Global Real Estate Markdowns Presentation (Jan. 2008), at pp. 1-2 [LBEX-WGM 771226].

were triggered by spread widening and lack of liquidity."[794]  For both floating-rate and fixed-rate loans, the "[o]riginal exit plan was through syndication to institutional investors" and the "[s]yndication market is suffering from lack of liquidity" in part due to market-wide inability to create liquidity through securitization of loans for sale as CMBS positions.[795]  The value of PTG investments, which were primarily "related to land or condominium development/conversion," were affected by "the softness of the residential market thereby extending the absorption period and reducing sales prices."[796]  With respect to Bridge Equity, the report explains that the "[w]idening of credit spreads eats into the equity yield, making syndication at par difficult."[797]

In February 2008, the Product Control Group observed that the "[f]loating rate securitization market is inactive; no deal in the market since Dec-07."[798]  As a result,

---

[794] *Id.* at p. 4.  The "spread" data referenced in this January 2008 report is CMBS spread data contained in publications such as Commercial Mortgage Alert.  As with spreads produced for other types of assets, the CMBS spreads typically show the difference between the CMBS yield (or return on a CMBS investment divided by each month of ownership) and the yield of some benchmark asset (which is typically U.S. treasuries) assuming the same maturity date for each.  Spreads are an indicator of an asset's risk, as they show the premium (or discount) an investor requires above and beyond the "risk free" benchmark asset. To form CMBS bonds, commercial loans are pooled and carved up into different risk baskets, or "tranches."  The CMBS spread tracks the yield difference for investments in each tranche.  The lower end of the CMBS spread range features tranches containing the pooled loans with the highest risk (*i.e.*, subprime loans) and the higher end of the spread range features tranches with the best credit risk or lowest risk (*i.e.*, conventional loans to borrowers with good credit).  A wider credit spread indicates that the lower-rated portions of the pooled loans will result in lower yields, and as a result, the marketplace imposes a higher discount to the lower-rated tranche in any attempted sale.  In other words, a wide credit spread indicates that investors will either demand a higher rate of return or a reduction in purchase price.
[795] *Id.* at pp. 6-8.
[796] *Id.* at p. 9.
[797] *Id.* at p. 5.
[798] Lehman, Valuation & Control Report – Fixed Income Division (Feb. 2008), at p. 27 [LBEX-WGM 002238]; Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009; Frank S. Aldridge, E&Y Walkthrough

Lehman's ability to verify the prices for floating rate loans had become "extremely challenging."[799] As the market for new issuances of CMBS deteriorated and then eventually shut down (a trend documented in contemporaneous industry publications),[800] Lehman lost the ability to execute its traditional exit strategy for a substantial part of its Commercial Book. Furthermore, Lehman recognized that the lack of securitizations made price testing particularly difficult.[801]

Template for Conduit, Large Loan, and CMBX Price Verification Process (Nov. 30, 2008), at p. 9 [EY-LE-LBHI-MC-GAMX-08-063735] (citing to E&Y Workpaper B32.4); E&Y Workpaper, B32.4 First Quarter Management Valuation & Control Report No. 137 (Nov. 30, 2008) [EY-LE-LBHI-MC-GAMX-08-063053] (containing Lehman's Feb. 2008 Pricing Report with E&Y's note that it "deems management review of pricing reasonable").

[799] Lehman, Valuation & Control Report – Fixed Income Division (Feb. 2008), at p. 27 [LBEX-WGM 002260].

[800] Prudential Real Estate Investors, U.S. Quarterly, Oct. 2007, at p. 1, *available at* http://www.irei.com/web/do/pub/research/view ("The credit market troubles that began with the collapse of the subprime mortgage market in February caught up with commercial real estate in the third quarter, upsetting the debt markets and slowing transaction activity.") The quarterly issuance of U.S. CMBS fell from approximate aggregate amounts of $75.83 billion in second quarter 2007, to $59.94 billion in third quarter 2007, $33.27 billion in fourth quarter 2007, $5.90 billion in first quarter 2008, $6.24 billion in second quarter 2008, and finally to zero throughout the remainder of the 2008 fiscal year. *See* Commercial Mortgage Alert, Summary of CMBS Issuance, Sept. 30, 2009, *available at* http://www.cmalert.com/ranks.php; Commercial Mortgage Alert, Summary of CMBS Issuance, June 30, 2009, *available at* http://www.cmalert.com/ranks.php; Commercial Mortgage Alert, Summary of CMBS Issuance, Mar. 31, 2009, *available at* http://www.cmalert.com/ranks.php; Commercial Mortgage Alert, Summary of CMBS and Real Estate CDO Issuance, Dec. 31, 2008, *available at* http://www.cmalert.com/ranks.php.

[801] The February 2008 Valuation & Control Report also states, with respect to the Commercial Book, that "[s]preads published in third party publications are stale." Lehman, Valuation & Control Report – Fixed Income Division (Feb. 2008), at p. 27 [LBEX-WGM 002260]. This meant that the reported spreads did not reflect the rapid deterioration in the market and were of questionable value for calculating the discount rate used to value Commercial positions. CMBS yields obtained directly from Bloomberg.com show that CMBS AAA Junior yields increased from 6.8% on November 30, 2007 to 9.6% on February 29, 2008. Over the same period, CMBS AAA Mezz yields increased from 6.3% to 8.0%, CMBS AA yields increased from 7.2% to 10.6%, CMBS A yields increased from 8.3% to 12.6% and CMBS BBB yields increased from 11.1% to 17.1%. The movement in yields during the fourth quarter 2007 and first quarter 2008 caused Lehman to be concerned that the lag time for reporting market data in third-party publications would undermine Lehman's ability to price test the marks. Examiner's Interview of Abebual A. Kebede, Oct. 9, 2009, at pp. 2-3, 7-8. The lack of sales data in the marketplace also made it difficult for Lehman to determine the fair market value of its CRE assets. *Id.* To compensate for the lack of such data, the February 2008 Valuation

Lehman noted the effects of the perfect storm on its CRE business in a presentation to the Board of Directors on August 6, 2008 (appearing in earlier iterations throughout the summer),[802] which detailed an "[u]nprecedented [credit] spread widening across the capital structure [that] [d]ramatically reduced CMBS volumes since securitization markets are shut," causing a "[d]ichotomy between *Equity* buyers focused on fundamentals and *Credit* buyers impacted by spread contagion."[803]   The spread widening caused Lehman to "hold [CRE] positions originally originated for securitization/syndication," meaning that assets that had been liquid were now illiquid.[804]

### (2)  Outside Review of Lehman's CRE Valuation Process

In reviewing the reasonableness of Lehman's valuation of its CRE portfolio, the Examiner has taken into consideration the separate reviews of Lehman's valuation process that were undertaken by the SEC and Ernst & Young in 2008.

---

& Control Report stated that "[p]roduct control is having continuous discussions with Front Office going through deals in more detail and trying to obtain market color using recent syndications, bids, offers and any other market information."   Lehman, Valuation & Control Report – Fixed Income Division (Feb. 2008), at p. 27 [LBEX-WGM 002260].

[802] Lehman, GREG 2009 Strategy – Executive Update Draft Presentation [Draft] (June 20, 2008), at p. 1 [LBHI_SEC07940_124424]

[803] Lehman, Global Commercial Real Estate Presentation (Aug. 6, 2008), at p. 4 [LBHI_SEC07940_302580] (emphasis in original).   CMBS AAA Junior spreads widened from 4.15% on May 30, 2008, to 6.95% on August 29, 2008.   Over the same period, CMBS AAA Mezz spreads widened from 2.95% to 4.60%, CMBS AA spreads widened from 5.65% to 9.20%, CMBS A spreads widened from 7.15% to 13.70% and CMBS BBB spreads widened from 14.65% to 21.70%.   The Examiner's financial advisor compiled this data from Bloomberg.

[804] Lehman, Global Commercial Real Estate Presentation (Aug. 6, 2008), at p. 4 [LBHI_SEC07940_302580].

## (a)  SEC

In February 2008 the SEC commenced a special project to review the CSE's price verification processes for their CRE portfolios.[805]  Lehman cooperated with this process, as did the four other CSE firms.[806]  The SEC did not produce a formal report for this project and declined to provide the Examiner any formal conclusions produced in connection with this project.[807]  However, the SEC provided the Examiner with its informal analysis and comments during an interview.[808]

The SEC's inspection included a review of the materials Lehman used in its price verification process, and was initially focused on the marks reported as of January 31, 2008, and then as of February 29, 2008.[809]  The SEC began meeting with Lehman in

---

[805] Memorandum from Raymond Doherty, SEC, *et al.*, to Erik Sirri, SEC, *et al.*, re: Scope Memorandum for the Consolidated Supervised Entity ("CSE") Commercial Real Estate ("CRE") Price Verification Inspections (Feb. 27, 2008), at p. 1 [LBEX-WGM 001752].  An e-mail widely circulated within Lehman stated that "[t]he intent of the inspections program . . . is for the SEC to conduct meaningful and focused inspections of the five CSE firms."  E-mail from Laura Vecchio, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Jan. 22, 2008) [LBHI_SEC07940_068584].  The SEC's letter to Lehman describing the scope of the review stated that it would:

[F]ocus on (1) gaining a general understanding of the CRE products held in inventory by [Lehman], including the related hedging strategies, (2) reviewing the price verification policies and procedures to determine if appropriate valuation controls have been designed, and (3) testing the price verification process to ensure that the controls are operating as intended.  Ultimately, the staff will compare and contrast the various CRE-related price verification policies and procedures across the five CSEs.

Memorandum from Raymond Doherty, SEC, *et al.*, to Erik Sirri, SEC, *et al.*, re: Scope Memorandum for the Consolidated Supervised Entity ("CSE") Commercial Real Estate ("CRE") Price Verification Inspections (Feb. 27, 2008), at p. 1 [LBEX-WGM 001752]

[806] Examiner's Interview of SEC staff, Aug. 24, 2009, at pp. 3-4, 13-14.

[807] *Id.* at p. 14 (noting that the SEC never released its findings formally).  The SEC expressed its concerns informally throughout its inspection but no formal presentation was made .

[808] *Id.* at passim.

[809] *Id.*; Letter from Raymond Doherty, SEC, to Laura Vecchio, Lehman, re:  Commercial Real Estate Price Verification Inspection – Initial Document Request (Feb. 27, 2008), at p. 1 [LBEX-WGM 001754]; e-mail from Thomas O'Dougherty, SEC, to Abebual A. Kebede, Lehman, *et al.* (Apr. 11, 2008)

February 2008 and continued these meetings throughout the spring and summer.[810]

During the first meetings, the SEC conducted a general review of the CRE business, and

the related audit and product control functions.[811] Lehman addressed various topics,

including an overview of the CMBS business,[812] an overview of the real estate risk

review process,[813] real estate product control process,[814] and the fixed income product

control process. As the inspection continued, the SEC focused on Lehman's price

verification procedures,[815] price verification models[816] and the valuation of particular

positions.[817]

---

[LBHI_SEC07940_2229003]. The SEC held a series of meetings to review information and ask questions, and the SEC typically requested materials in advance of and subsequent to a meeting. Letter from Raymond Doherty, SEC, to Laura Vecchio, Lehman, re: Commercial Real Estate Price Verification Inspection – Initial Document Request (Feb. 27, 2008), at pp. 1-2 [LBEX-WGM 001754] (indicating SEC's intent to schedule meetings for an internal audit workpaper review, to walk through the price verification package and to walk through the Quest-GFS reconciliation); e-mail from Laura M. Vecchio, Lehman, to Abebual A. Kebede, Lehman, *et al.* (Feb. 29, 2008) [LBHI_SEC07940_5494331].

[810] In 2008, the SEC met with Lehman on February 7-8, March 5, March 31, May 21-22, June 20, July 3 and July 16.

[811] Lehman, Feb. 8, 2008 Meeting Agenda for SEC-CSE Inspections of Commercial Mortgage Valuations (Jan. 29, 2008) [LBHI_SEC07940_113571], attached to e-mail from Laura Vecchio, Lehman, to Kenneth Cohen, Lehman, *et al.* (Jan. 29, 2008) [LBHI_SEC07940_113570].

[812] Lehman, An Overview of the CMBS Business Presentation to the SEC (Feb. 8, 2008), at pp. 1-22 [LBEX-WGM 000574-95].

[813] Lehman, Holistic Trading Book Migration Presentation to the SEC (Feb. 7, 2008), at pp. 1-32 [LBEX-DOCID 3176398] (addressing risk allowance and model assumptions), attached to e-mail from Laura M. Vecchio, Lehman, to Erin Callan, Lehman, *et al.* (Feb. 8, 2008) [LBEX-DOCID 3186259].

[814] Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation [Draft] (Feb. 2008), at pp. 1-23 [LBEX-WGM 916015-37].

[815] Letter from Raymond Doherty, SEC, to Laura Vecchio, Lehman, re: Commercial Real Estate Price Verification Inspection – Initial Document Request (Feb. 27, 2008), at p. 1 [LBEX-WGM 001754]; e-mail from Laura M. Vecchio, Lehman, to Jonathan S. Cohen, Lehman, *et al.* (Feb. 13, 2008) [LBHI_SEC07940_972136] (noting that SEC has made its first follow-up request, asking for GREG price verification policies and procedures).

[816] E-mail from P.C. Venkatesh, SEC, to Michele Bourdeau, Lehman, *et al.* (Mar. 19, 2008) [LBEX-DOCID 271655]; Letter from Raymond Doherty, SEC, to Laura Vecchio, Lehman, re: Commercial Real Estate

The SEC asked Lehman to provide detailed information regarding the price verification process, including data relating to Lehman's use of a third-party, TriMont Real Estate Advisors ("TriMont"), the third-party servicer for PTG positions.[818]  The SEC sought this information in order to sample CRE positions from all portions of Lehman's CRE book.[819]  In particular, during May and June 2008 the SEC sought supporting documentation confirming the status of $5 billion in sales of CRE positions.[820]  In late

Price Verification Inspection – Initial Document Request (Feb. 27, 2008), at p. 1 [LBEX-WGM 001754]. Based upon the model inventory Lehman provided it, the SEC selected a sample of models designed to get "a broad cross-section---'core' models/frameworks likely to be heavily used; models likely to have some complexity, potential sensitivity to modeling assumptions, and so on."

[817] E-mail from Laura M. Vecchio, Lehman, to Raymond Doherty, SEC, *et al.* (Feb. 21, 2008) [LBHI_SEC07940_977936] (forwarding detailed inventory listing as of January 31, 2008 for CMBS, PTG, and related derivatives).

[818] E-mail from Thomas O'Dougherty, SEC, to Abebual A. Kebede, Lehman, *et al.* (Mar. 31, 2008) [LBHI_SEC07940_2872557].  The SEC requested a list of second quarter "sales and circles" from which it would select a sample for which Lehman would be asked to supply supporting documentation.  E-mail from Thomas O'Dougherty, SEC, to Abebual A. Kebede, Lehman, *et al.* (May 27, 2008) [LBHI_SEC07940_2906636] (requesting additional documentation based on a spreadsheet of post first quarter sales and circles that Laura [Vecchio] provided to the SEC in the middle of April); e-mail from Thomas O'Dougherty, SEC, to Abebual A. Kebede, Lehman, *et al.* (June 18, 2008) [LBHI_SEC07940_2949734-35] (same).  Lehman provided the SEC with a document summarizing its second quarter 2008 total sell-downs as proof that Lehman had minimal losses on sales and supporting the fact that Lehman sold assets at prices that equaled Lehman's marks.  Lehman, Total Selldown Summary for Q2'08 (June 18, 2008) [LBHI_SEC07940_1141406], attached to e-mail from Jeffrey Goodman, Lehman, to Paul A. Hughson, Lehman, *et al.* (June 18, 2008) [LBHI_SEC07940_1141405].  In a June 18, 2008 e-mail forwarding the sell-down summary to the SEC, Jeffrey Goodman, Senior Risk Manager of Fixed Income Risk Management, stated that "[w]e would say that everything we sold was at the marks hence no gain/loss."  E-mail from Jeffrey Goodman, Lehman, to Paul A. Hughson, Lehman, *et al.* (June 18, 2008) [LBHI_SEC07940_1141405].    The SEC apparently discussed the supporting documentation, which included securities trade confirmations, commitment documentation, and bids for select second quarter sales, at a June 20, 2008 meeting with Kebede.  E-mail from Thomas O'Dougherty, SEC, to Abebual A. Kebede, Lehman, *et al.* (June 16, 2008) [LBHI_SEC07940_2946054]; e-mail from Thomas O'Dougherty, SEC, to Abebual A. Kebede, Lehman, *et al.* (May 27, 2008) [LBHI_SEC07940_2946054].

[819] E-mail from Thomas O'Dougherty, SEC, to Abebual A. Kebede, Lehman, *et al.* (May 14, 2008) [LBHI_SEC07940_2889284].

[820] *Id.*

June, the SEC requested the Archstone price flex agreement, materials related to certain February 2008 marks, and further support for second quarter sales.[821]

The SEC's requests for material in July included questions about Lehman's Internal Rate of Return ("IRR") models and information on credit spreads.[822]  Follow-up e-mails continued until early August.[823]  The SEC was unable to complete its inspection of Lehman's price valuation controls before LBHI's bankruptcy filing.  The SEC did not provide Lehman with any formal feedback from the project or issue any formal conclusions related to Lehman.[824]

The SEC did, however, identify strengths and weaknesses in Lehman's price verification procedures from time to time during the inspection.  The SEC believed that Lehman's price verification weaknesses were more pronounced than the other CSEs because of the size of Lehman's balance sheet and the nature of its CRE business.[825]  Specifically, the SEC recognized that Lehman's product control staff was too small to be

---

[821] E-mail from Abebual A. Kebede, Lehman, to Thomas O'Dougherty, SEC, *et al.* (June 20, 2008) [LBHI_SEC07940_7545309].

[822] E-mail from Thomas O'Dougherty, SEC, to Abebual A. Kebede, Lehman, *et al.* (July 7, 2008) [LBEX-DOCID 697796] ("I received the IRR calculations and the SunCal May 31st marks from Laura [Vecchio] on Thursday [July 3, 2008]."); e-mail from Laura M. Vecchio, Lehman, to Thomas O'Dougherty, SEC, *et al.* (July 21, 2008) [LBEX-WGM 011921] (providing a response to SEC's question regarding LehmanLive spreads).

[823] E-mail from Laura M. Vecchio, Lehman, to Thomas O'Dougherty, SEC, *et al.* (Aug. 1, 2008) [LBEX-WGM 011934].

[824] Examiner's Interview of SEC staff, Aug. 24, 2009, at p. 14 (noting that the SEC was unable to complete CSE inspection of Lehman's price valuation controls or give Lehman formal feedback before Lehman collapsed).

[825] *Id.* at pp. 13-14.

an effective independent check on the business desks' valuations given the size and

number of assets in the CRE portfolio.[826]

### (b) Ernst & Young

Although E&Y audited Lehman's valuation of the CRE portfolio as part of the

2007 audit,[827] E&Y's annual 2008 audit of Lehman's valuation of the CRE portfolio was

only in its beginning stages when LBHI filed for bankruptcy.[828]   While E&Y had

performed quarterly reviews throughout 2008, these reviews consisted of "inquiry,

observation, and analytical review" and did not include substantive testing as to the

accuracy or reasonableness of Lehman's marks.[829]   When LBHI filed for bankruptcy,

---

[826] *Id.*

[827] E&Y's 2007 year-end audit included a comprehensive memo on CRE price testing, a memorandum specifically about PTG positions,  a spreadsheet analyzing particular variances between the marks by the business desk and valuation control, and a review of 25 of TriMont's collateral valuations. *See* Wyatt de Silva, E&Y, Memorandum to Files: Commercial Real Estate Testing Approach (Jan. 25, 2008) [EY-LE-LBHI-MC-GAMX-07 067631] (comprehensive memo); Memorandum from Nicholas McClay, E&Y, to Files, re: U.S. PTG Analytics (Feb. 7, 2008) [EY-LE-LBHI-MC-GAMX-07 070778] (memorandum about PTG positions); E&Y, PTG Year End Substantive Analysis:  Product Control Price Verification Variances (Nov. 11, 2007) [EY-LE-LBHI-MC-GAMX-07 074517-74) (spreadsheet analyzing variances); Memorandum from Robert Martinek, E&Y, to E&Y Audit Team for Lehman Brothers, *et al.*, re: Lehman Brothers Commercial Real Estate Portfolio (Dec. 17, 2006) [EY-LE-LBHI-KEYPERS 0 675302] (review of 25 Tri-Mont valuations).

[828] Examiner's Interview of Ernst & Young, Nov. 11, 2009, at pp. 4, 13-14.  The audit process was:  (1) a staff person or senior manager conducts detailed audit work; (2) the results from the audit work are reviewed by an audit team, which formulates an initial opinion and (3) the audit work is reviewed an additional two to four times (the exact number of reviews depends on the risk of the area being tested). Generally, for audit testing of the CRE portfolio, E&Y would design testing, pick two months of product control work papers to review and confirm that product control was performing the work as described in the walkthrough.  E&Y would also designate two months to re-test select positions.  *Id.*

[829] *Id.*  at pp. 3-4.  E&Y's 2008 quarterly reviews of product control and the valuation of Lehman's CRE portfolio focused on whether the process, as a whole, was functioning.  *Id.* at p. 4.  E&Y reviewed price testing files, examined variances between business desk prices and product control's prices, and confirmed that variances deemed to be significant were resolved in accordance with Lehman's internal procedures.  *Id.*  E&Y did not resolve these variances, but merely assured itself that discussions regarding

some underlying testing of the CRE portfolio had begun, but no review of that work had been performed and no initial opinions had been reached.[830]   Regarding CRE specifically, E&Y had not yet selected all of the positions it planned to test.[831]

E&Y performed "walkthrough" analyses as part of the annual audit process to understand how Lehman's Product Control Group performed its independent price verification functions.[832]   The purpose of the walkthroughs was to document the "significant classes of transactions," and "[v]erify that [E&Y had] identified the appropriate 'what could go wrongs' ('WCGWs') that have the potential to materially affect relevant financial statement assertions."[833]   In addition, E&Y identified "the design and implementation of controls" that Lehman had in place to internally regulate its price verification process.[834]

An E&Y's Walkthrough Template memorandum reviewing the price verification process for large loans and CMBS stated that all components of the U.S. CRE portfolio met E&Y's criteria based on price verification data selected from the month of February

---

significant variances were occurring and that product control was ultimately comfortable with the final mark.  *Id.*

[830] Examiner's Interview of Ernst & Young, Nov. 11, 2009, at pp. 13-14.

[831] *Id.*

[832] *Id.* at p. 3.

[833] E&Y, Walkthrough Template (Nov. 30, 2008), at pp. 2, 13 [EY-LE-LBHI-MC-GAMX-08-063735].   The "Walkthrough Template" memoranda contain three sections:  the walkthrough description of the valuation control process, an assessment of whether valuation control is segregated from other incompatible duties, such as management, and a conclusion.

[834] *Id.*

2008.[835]  Other documents produced by E&Y personnel over the course of 2008 indicate that E&Y did not find any material flaws with Lehman's price verification process.[836] E&Y personnel told the Examiner that the conclusions stated in these documents were preliminary in nature and the product of work performed by lower-level auditors, and therefore were not reflective of the opinion of E&Y.[837]

Given the prominence of Archstone and SunCal positions in 2008, E&Y had already determined that it would be substantively testing both positions as part of its 2008 year-end audit.  E&Y separately documented its walkthroughs of these positions as part of its preliminary planning for the 2008 year-end audit testing.[838]

An E&Y memorandum dated July 9, 2008 explained E&Y's quarterly review valuation procedures for Archstone in the second quarter 2008.[839]  E&Y held multiple

---

[835] *Id.* at p. 5.

[836] E&Y, Lehman Brothers Holdings Inc. Summary Review Memorandum, Consolidated Financial Statements Quarter-ended May 31, 2008 (Aug. 8, 2008), at p. 17 [EY-SEC-LBHI-WP-2Q08 000117] ("Based on our review of Company's unaudited interim consolidated financial statements as of and for the three and six-month periods ended May 31, 2008, nothing came to our attention that indicates that a material modification should be made to the unaudited interim financial statements in order for them to be in conformity with U.S. generally accepted accounting principles.  Furthermore, we are not aware of any material modification that in our judgment should be made to the disclosures about changes in internal control over financial reporting in order for management certification to be accurate and to comply with the requirements of Section 302 of the Sarbanes-Oxley Act of 2002."); E&Y Workpaper, GREG Price Verification Summary, Q2 - J1 J2 J3 PTG-Coml Pricing Summary.xls, at p. 1 [EY-SEC-LBHI-MC-GAMX-08-138328] ("Based on the results of our review, we noted that significant positions appear to be valued within Product Control's threshold or were reasonably contemplated and explained."); E&Y Workpaper, Global Real Estate Q208 Sales Activity, Q2.J1 - GREG Sales 2nd Qtr 08 Lead.xls, at p. 1 [EY-SEC-LBHI-MC-GAMX-08-138412] ("Appears Reasonable.")

[837] Examiner's Interview of Ernst & Young, Nov. 11, 2009, at p. 6.

[838] *Id.*

[839] Memorandum from Nicholas McClay, E&Y, to Files, re: Quarterly Review Valuation Procedures for Archstone & SunCal Real Estate Investments (July 9, 2008), at p. 1-2 [EY-SEC-LBHI-DF-MFIN 000048].

meetings with Jonathan Cohen and Kebede "to understand the portfolios of positions, the underlying variables and value drivers of each position, and the summary of the methodology used to price each position in the portfolio."[840]   The memorandum explains that E&Y "obtained and reviewed the Archstone valuation model for reasonableness and noted detailed data inputs and assumptions, specific calculation scenarios, and price sensitivity stress tests of IRR, growth rates, cap rates, development value and timing, loan terms, and other assumptions designed to provide reasonable ranges for position values."[841]   The memorandum states that, based on E&Y's understanding of the Archstone position, Lehman's valuation assumptions and the results of discussions with Lehman management, "the process by which the Archstone … positions are valued as well as the related inputs, assumptions, and calculated values appear reasonable for the purpose of assessing reasonableness for our quarterly review."[842]

Jerry Gruner, a senior manager on the E&Y Lehman audit team, told the Examiner that E&Y had received Lehman's Archstone model but had not reviewed the model or its inputs as part of its quarterly review.[843]   Gruner explained that he and other E&Y auditors had scanned through the Archstone model to confirm that it "looked on its surface to be a complex model. . . . There were a lot of tabs that we flipped through

[840] Id. at p. 1.
[841] Id. at p. 2.
[842] Id.
[843] Examiner's Interview of Ernst & Young, Nov. 11, 2009, at p. 9.

as part of a high level review."[844]   According to Gruner, E&Y intended to review the model and marks in greater detail during the 2008 audit, which never occurred.[845]

William Schlich, E&Y's lead audit partner, told the Examiner that E&Y was aware that Lehman had not sold any Archstone bridge equity and that Lehman was generally having difficulties selling Archstone bridge equity.[846]   Both Schlich and Gruner stated that they never heard any concerns from product controllers that the unsold bridge equity was improperly marked.[847]

### c)   Senior Management's Involvement in Valuation

During the second and third quarters of 2008, Lehman's senior management intensified its focus on valuation of the GREG portfolio.[848]   There had been high profile public criticism that Lehman had not properly marked down its asset values that year.[849]

---

[844] *Id.*

[845] *Id.*

[846] *Id.* at p. 4.

[847] *Id.* at p. 15.

[848] Examiner's Interview of Clement Bernard, Oct. 23, 2009, at p. 13;  Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 8; Examiner's Interview of Eli Rabin, Oct. 21, 2009, at pp. 11-12; Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at p. 10.

[849] *See* Andrew Bary, *Apartment-House Blues*, Barron's, Jan. 21, 2008, *available at* http://online. barrons.com/article/SB120070919702802265.html#articleTabs_panel_article%3D1 (noting that "based on current REIT prices, the value of the Archstone equity could be zero."); *see also* David Einhorn, Greenlight Capital, Presentation to the Value Investing Congress, A Few Thoughts About Risk (Nov. 29, 2007) [LBEX_DOCID 2490444]; Transcript of Speech by David Einhorn, Presentation to Grant's Spring Investment Conference, Private Profits and Socialized Risk (Apr. 8, 2008), at p. 9, *available at* http://www.foolingsomepeople.com/main/mroom/Grants%20Conference%2004-08-2008.pdf.

On the other hand, certain senior Lehman managers were concerned that GREG might have been overly aggressive in taking write-downs.[850]

Beginning in 2008, Mark A. Walsh, Head of GREG, was required to submit proposed mark downs to Andrew J. Morton, Global Head of Capital Markets — FID or Alex Kirk, Co-COO for FID and later, Head of Global Principal Businesses, for approval.[851] It was Walsh's understanding that Morton and Kirk showed the proposed marks to another person, who he assumed to be Joseph M. Gregory, Lehman's President, prior to approving them.[852]

While the firm's senior management had legitimate reasons to be concerned with the valuation process, the potential for undue management involvement in valuation raises two serious issues. First, that involvement might have resulted in unreasonable valuations that must be taken into account when determining the solvency of LBHI and the LBHI Affiliates in the months prior to their bankruptcy cases. Second, if senior management intentionally caused Lehman to report materially inaccurate valuations,

---

[850] Examiner's Interview of Alex Kirk, Jan. 12, 2010, at p. 14. It might seem counter-intuitive that a business unit whose performance was at least partially tied to the valuation of its investments would be incented to mark down those assets more than necessary. But Kenneth Cohen told the Examiner that GREG's senior managers had already been told that they would receive no bonuses in 2008 because of significant GREG losses already incurred; they had no incentive, therefore, to artificially prop up the values of GREG assets in 2008. Examiner's Interview of Kenneth Cohen, Oct. 20, 2009, at p. 11. Kirk and others were concerned that GREG might be incented to mark down assets more than indicated in 2008 to set the stage to show greater profits in 2009 when bonuses presumably would be reinstated. *Id.*, at p. 14.

[851] Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 14.

[852] *Id.* Walsh had no understanding as to whether the review was actually for approval of the marks or simply to give management notice. *Id.* There was no occasion when his proposed marks were changed by Morton, Kirk, Gregory or anyone else. *Id.*

such an action might constitute a breach of the fiduciary duty of care owed by those officers.[853]

The Examiner finds evidence that certain Lehman executives perceived pressure from above in the second quarter of 2008 to artificially limit write-downs, but there is no evidence that any caps were in fact imposed or that improper marks were knowingly taken. In the third quarter of 2008, there is similar evidence that certain executives felt pressure, and there is also some evidence that the pressure actually resulted in improper marks. But the evidence is in conflict, and because it relates to the third quarter it is not possible to conclude that improper marks were actually taken — Lehman, of course, had ceased operations before final third quarter financial statements were prepared. The Examiner therefore finds insufficient evidence to support the existence of a colorable claim that Lehman's senior management imposed arbitrary limits on write-downs of assets during that quarter.

### (1) Senior Management's General Role With Respect to CRE Valuation

As with other asset classes, marks for Lehman's CRE portfolio were determined by its business desks, subject to price testing performed by the Product Control

---

[853] *See* Appendix 1, Legal Issues, Section II, for a discussion of corporate officers' fiduciary duties. Lehman did not file a quarterly report for the third quarter of 2008 before the commencement of the bankruptcy cases. However, during its third quarter earnings call, Lehman did report to its investors and the market that "[o]n a net basis, commercial write-downs for the quarter totaled $1.6 billion." Transcript of Lehman Brothers Holdings Inc. Third Quarter 2008 Earnings Call (Sept. 10, 2008), at p. 9.

Group.[854]  Historically, GREG had full control of its marks and would simply give the head of the FID notice of the marks.[855]  However, during 2008, the process changed and required Walsh to submit GREG's proposed marks to Morton for approval.[856]  At some later point, approval responsibility shifted to Alex Kirk.[857]

Walsh understood that Morton and Kirk showed GREG marks to someone else before they approved them; Walsh assumed it was Joseph Gregory.[858]  Walsh was not clear whether the senior officers reviewed the marks to actually approve them or simply to be informed before write-downs were taken.[859]  Walsh stated that, in any event, there was no occasion on which a write-down GREG proposed to take was overruled or modified.[860]  Likewise, Walsh told the Examiner that there was never a time when senior

---

[854] Examiner's Interview of Kenneth Cohen, Oct. 20, 2009, at pp. 9-10; Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 13.

[855] Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 14.

[856] *Id.*  Walsh was unable to specify the exact date on which this change occurred; however, Morton was appointed head of FID in February 2008, so it must have been after this date.  Kenneth Cohen, head of U.S. Originations for GREG, confirmed the process by which valuations were approved, noting that after GREG came up with marks, Walsh would provide them to the head of FID and that GREG would be "given permission" to take write-downs or write-ups.  Examiner's Interview of Kenneth Cohen, Oct. 20, 2009, at pp. 9-10.

[857] Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 14.

[858] *Id.*

[859] *Id.*

[860] *Id.* at p. 14.  While Walsh was clear that senior management never changed marks he deemed to be appropriate, he did note that management played an active role in resolving disputes between Lehman's trading desks and the Product Control Group as to proper valuations.  Walsh told the Examiner that in late 2007 and 2008 it became difficult for him to resolve disagreements as to a position's value, and Walsh was more inclined to "kick it upstairs" for resolution by McDade, Kirk or Lowitt.  *Id.*

management predetermined the amount of write-downs that would be taken for a quarter or limited the amount of write-downs GREG was permitted to take.[861]

### (2) Senior Management's Involvement in Valuation in the Second Quarter of 2008

During the second quarter of 2008, there was greater scrutiny of Lehman's U.S. CRE marks after an Executive Committee meeting in early 2008 regarding CRE valuations due to "communication problems" between Walsh and Morton.[862]  Gregory stated that Morton thought that the CRE marks were being written down without anyone informing him, and Gregory set up this meeting to discuss the need for clearer and more consistent communication.[863]

Jonathan Cohen, a Senior Vice President and Head of the GREG Product Control Group, recalled an incident in the second quarter of 2008 that made him uncomfortable with the degree to which senior management was involved in the valuation process. Jonathan Cohen proposed to Kenneth Cohen, Head of U.S. Originations for GREG, that certain positions for which Kenneth Cohen was responsible be written down.[864]  These included one PTG position and two or three Commercial positions.   Jonathan Cohen

---

[861] *Id.*  Other members of Lehman's senior management confirmed that Lehman did not place limits on write-downs or predetermine marks for GREG assets. Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at p. 26; Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at pp. 21-22.

[862] Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 8; Examiner's Interview of Joseph Gregory, Nov. 13, 2009, at p. 9; Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 6.

[863] Examiner's Interview of Joseph Gregory, Nov. 13, 2009, at p. 9.

[864] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 7.

recalled that Kenneth Cohen replied that "I can't take it right now."[865] It was Jonathan Cohen's impression that Kenneth Cohen did not have the authority to take the write-down.[866]

Jonathan Cohen explained that he was surprised by Kenneth Cohen's reaction and that he raised the issue with the CFO for FID, Clement Bernard, who in turn went to Morton.[867] Jonathan Cohen was uncomfortable that he was forced to go high up the chain to get approval to take the write-down, but approval was eventually given.[868] Jonathan Cohen told the Examiner that "in the end, all I can do is price test – the front office owns the mark" and "all I can do is start the conversation."[869]

A similar incident was related by Anthony Barsanti, the PTG Senior Vice President responsible for marking the PTG positions.[870] Barsanti recounted that during the second quarter valuation process, he met with Kenneth Cohen to inform him of a list of PTG assets he wanted to write down.[871] Barsanti wanted to take write-downs on three positions, but Kenneth Cohen told him that he was only allowed to write down positions to a certain dollar value, which would not allow Barsanti to take the three

---

[865] *Id.*

[866] *Id.*

[867] *Id.*

[868] *Id.*

[869] *Id.*

[870] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 3, 11.

[871] *Id.*, at p. 15. As noted above, "PTG" refers only to U.S. PTG, and "PTG assets" refers only to assets held or managed by U.S. PTG.

write-downs identified.[872]  The next day, Kenneth Cohen called Barsanti and stated that he could take the write-downs on the three positions.[873]

Kenneth Cohen did not recall the events described by Jonathan Cohen or Barsanti in his interview with the Examiner.[874]

While the incidents described by Jonathan Cohen and Barsanti establish that they perceived pressure to cap write-downs, there is no evidence that any caps were actually imposed; rather, the write-downs Jonathan Cohen and Barsanti determined should have been taken were actually taken.  The Examiner finds insufficient evidence to support the existence of a colorable claim that senior management involvement led to unreasonable valuations in the second quarter of 2008.

### (3)  Senior Management's Involvement in Valuation in the Third Quarter of 2008

Similarly, the Examiner finds insufficient evidence to support the existence of a colorable claim that Lehman predetermined a net loss for GREG in the third quarter of 2008.[875]

The Examiner was given three somewhat different — but not entirely conflicting — accounts of the role that senior management played in the valuation process for the

---

[872] *Id.*

[873] *Id.*

[874] Examiner's Interview of Kenneth Cohen, Oct. 20, 2009, at p. 11; Examiner's Interview of Kenneth Cohen, Jan. 21, 2010, at pp. 4-5.

[875] Because of Lehman's bankruptcy, Lehman's third quarter financial statements were never formally finalized.  The tentative GREG gross write-down for the quarter was $1.732 billion and the gross write-up was $0.147 billion, for a net write-down of $1.585 billion.  *See* Lehman, Global Real Estate 2008 Net Mark Downs (Sept. 5, 2008) [LBEX-AM 346991].

quarter: (1) Senior managers told the Examiner, without reservation or qualification, that there was never a predetermined limit on write-downs for any business unit;[876] (2) Paul Hughson, Head of Credit Distribution, told the Examiner that senior managers initially attempted to impose a limit on write-downs, but GREG eventually prevailed and was allowed to take the marks it had determined were appropriate[877] and (3) Barsanti and Jonathan Cohen told the Examiner that an arbitrary limit prevented GREG from taking write-downs they determined were appropriate.[878]

### (a) Senior Management's Account

During the pressure-filled third quarter of 2008, senior management became concerned with "late breaking news" about proposed CRE write-downs.[879]

Christopher M. O'Meara, Global Head of Risk Management, was asked by Herbert H. "Bart" McDade, III, President and COO, and Ian Lowitt, CFO, during the weekend of August 23, 2008, to help with the third quarter P&L close.[880] Things were chaotic and Lowitt was being pulled away for due diligence on a potential Korea Development Bank transaction; there was a likelihood of an accelerated close and

---

[876] This position is consistent with findings by the SEC, which informed the Examiner that it did not uncover any evidence during the SEC's 2008 review of Lehman's CRE price testing process that Lehman priced its positions to hit predetermined balance sheet or earnings targets. However, it should be noted that the SEC did not examine Lehman's price testing process for the third quarter of 2008. Examiner's Interview of SEC staff, Aug. 24, 2009, at p. 14.

[877] Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 8.

[878] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at pp. 7-8.

[879] Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 14.

[880] Examiner's Interview of Christopher M. O'Meara, Jan. 21, 2010, at p. 2.

preliminary earnings call to address the market's concerns.[881]  As a former CFO, O'Meara had the stature to move the process along and get information to the appropriate finance group more quickly.[882]

O'Meara told the Examiner that he had no direct conversations with McDade or Lowitt about write-downs or how numbers were calculated.[883]  He was simply told by Gerard Reilly, Lehman's Global Product Controller, that there was already an estimate of the GREG quarterly write-down.  He recalled that the write-down was estimated to be $1.5 billion, but he was not sure whether this included hedges or not.  Reilly told O'Meara that the $1.5 billion figure was presented to senior management and had been discussed between the Walsh team and senior management, including McDade and others.[884]

However, on Monday, August 25th, O'Meara heard that the third quarter real estate write-down might be larger.[885]  Subsequent to hearing about the additional write-downs, O'Meara received a fax, the "Q3 Writedown Summary," prepared by Kenneth Cohen and forwarded to him by Reilly, showing position-level estimated PTG write-downs and including two pages of handwritten notes and calculations providing an

---

[881] *Id.*

[882] *Id.*  O'Meara also stated that he was not doing anything in regard to financial reporting and was not involved in planning for the earnings call.  *Id.*

[883] *Id.*

[884] *Id.*

[885] *Id.* at p. 3.

estimated total write-down of $1.561 billion.[886]  O'Meara told the Examiner that he asked Jonathan Cohen whether the numbers had changed since the presentation to senior management, but Jonathan Cohen was not able to provide him specific information. O'Meara stated that Jonathan Cohen told him that he should contact Walsh's team for more information and O'Meara explained that he was disappointed that Cohen did not know more about the valuation process at this point.[887]

In addition to this conversation with Jonathan Cohen, O'Meara stated that he had conversations with Kenneth Cohen, and possibly Walsh, about the Q3 Writedown Summary.  He was told that nothing substantive had changed, and that Kenneth Cohen had advised that the $1.5 billion figure previously provided was the result of rounding.[888]  O'Meara noted that "there was definitely some confusion there," and asked them to go back and take a harder look at the projected write-down.[889]  O'Meara emphasized that he "didn't have a view on any particular number."[890]  O'Meara thought it was fair to characterize this as "pushback" on the higher write-downs GREG wanted to take, but that he did not have a view on what was the appropriate number.[891]  He stated that he just wanted to understand why the number was higher than what had

[886] *See* e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 25, 2008) [LBHI_SEC07940_2278241]; Lehman, Q3 Writedown Summary [LBHI_SEC07940_2278242].
[887] Examiner's Interview of Christopher O'Meara, Jan. 21, 2010, at p. 3.
[888] *Id.*
[889] *Id.*
[890] *Id.*
[891] *Id.*

previously been presented to senior management.  He noted that his response to higher write-downs could be characterized as "resistance" and that he thought the higher write-downs were overly conservative based on the fact that a lower figure had already been provided by GREG to senior management.[892]

O'Meara stated that he thought it was possible that someone may have interpreted something he said as imposing an inflexible limit on write-downs.  He noted that when presented with the higher write-down number he told Jonathan Cohen, Kenneth Cohen and possibly others that "this has to be 1.5," meaning that if nothing had changed the number should be same as what had already been presented to senior management.[893]  O'Meara emphasized that he thought GREG managers were being excessively conservative and he was simply pushing back.[894]  O'Meara told the Examiner that GREG may have felt pressured to change the number as a result of this questioning but insisted that he was merely trying to understand the reasoning for the additional write-down.[895]  The final write-down number, according to O'Meara, was exactly what the business units proposed.[896]

O'Meara's account is consistent with the recollection of Kirk.  Kirk stated that Lowitt was frustrated in late August 2008 because write-downs, particularly on

---

[892] *Id.* at p. 4.

[893] *Id.*

[894] *Id.*

[895] Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at p. 27.

[896] *Id.*

Archstone, were a moving target.[897]  Kirk noted that Kenneth Cohen told the Finance group late in August that GREG write-downs were going to be $1.5 billion and then told them the next day that they were actually $1.6 billion.[898]  Kirk also stated that Lowitt was concerned that GREG wanted lower valuations to set itself up for better bonuses in 2009.[899]  Ultimately, Lowitt sent Reilly to discuss his concerns with managers in GREG.[900]

The specific position at issue was Archstone, where Hughson thought an additional $90 to $100 million in write-downs were appropriate.[901]  Kirk did not think that this amount was material in the context of a $50 billion portfolio, but Hughson was concerned about the mark given Archstone's visibility.[902]  Kirk instructed Kenneth Cohen to discuss the issue with Steven Berkenfeld, Head of the Legal Compliance and Audit Division, Thomas A. Russo, Chief Legal Officer, and Bart McDade and believes that the issue was finally resolved to everyone's satisfaction.[903]  Kirk was clear that he never heard of a cap being set on the amount of write-downs taken.[904]

---

[897] Examiner's Interview of Alex Kirk, Jan. 12, 2010, at p. 14.
[898] *Id.*  In his interview with the Examiner, Kirk stated that the Archstone write-down for the third quarter was originally $1.5 billion and then changed to $1.6 billion.  It is the Examiner's view that this was an accidental misstatement and that Kirk was actually speaking of the total GREG net loss for the quarter. The Archstone valuation write-down for the quarter was much smaller, $125 million.  *See* Lehman, Q3 Writedown Summary, at p. 36 [LBHI_SEC07940_2258765].
[899] Examiner's Interview of Alex Kirk, Jan. 12, 2010, at p. 14.
[900] *Id.*
[901] *Id.*
[902] *Id.*
[903] *Id.*
[904] *Id.*

Lowitt told the Examiner that he had no role in approving write-downs and that senior management had never imposed arbitrary limits on the level of write-downs.[905] Lowitt explained that Lehman had a process of forecasting likely write-downs within asset classes but frequently the final write-downs differed from the forecasts.[906] He was clear that the forecasts were not static but would change when new information was obtained.[907]

### (b) Paul Hughson's Account

Hughson told the Examiner that Kirk communicated to Walsh, who then relayed to Hughson that "you got 1.5 of marks," meaning that GREG could not take write-downs beyond $1.5 billion in the third quarter.[908] Hughson stated that some members of Lehman's senior management, such as Lowitt, had challenged GREG to explain why the write-downs should be greater than $1.0 billion.[909] Hughson stated that he believed

---

[905] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 39.

[906] *Id.*

[907] *Id.*

[908] Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 8. Hughson's description of having conversations with senior management regarding the contentious third quarter marks is partially corroborated by Abebual A. Kebede in the Product Control Group. Kebede stated that Hughson told him that he was unable to write down certain commercial real estate assets as much as he would like during the third quarter of 2008. Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 8-9. Kebede could not recall which assets were discussed, but that Hughson referred to a "bunch of assets." *Id.* at p. 9. Kebede stated that Hughson's statement gave him "suspicion" that there had been an order regarding acceptable levels of write-downs for the quarter. *Id.*

[909] Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 8.

that the appropriate write-downs were approximately $1.7 billion and that he argued for write-downs he and his team determined were appropriate.[910]

David O'Reilly, a Senior Vice President in Real Estate Investment Banking, told the Examiner that he overheard Hughson tell Walsh: "you can tell Alex [] Kirk that if that's the way he wants to mark it, he can talk to the SEC."[911]

Hughson took pride in the fact that he had pushed for higher write-downs and thought that the $1.7 billion figure was the appropriate write-down in light of then-current market conditions. Hughson, who was directly involved in discussions with senior management as to the third quarter write-down, took the fact that the gross write-down ultimately taken was $1.7 billion as evidence that there was no limit on write-downs in the third quarter.[912]

### (c)  Other Accounts

While Hughson, who was responsible for distribution of bridge equity and debt positions held in Lehman's Commercial Book and was ultimately content with the level of write-downs taken in the third quarter of 2008, those responsible for marking and price testing Lehman's PTG book were not.

[910] *Id.*

[911] Examiner's Interview of David O'Reilly, Oct. 26, 2009, at p. 2 (expletive deleted).  Hughson confirmed that this exchange occurred.  Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 8.

[912] Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 8.

Historically, Lehman had used a method it referred to as "Cap * 105" to value the collateral underlying PTG debt and equity positions.[913]  This method simply multiplied the capitalization of the development by 105% to determine the collateral value.[914]  While this method was deemed a conservative approach when real estate values were increasing, Lehman recognized that in the down-market of late 2007 and 2008 it could produce overstated collateral values.[915]  Accordingly, Lehman had worked with its primary asset manager, TriMont, to implement a new valuation model, known as an internal rate of return ("IRR") model, to value PTG collateral.[916]  The process was managed by Anthony Barsanti and Aristides Koutouvides, Asset Managers in Lehman's PTG group.[917]  The IRR model was introduced on a rolling basis and by the third quarter of 2008 a substantial part of Lehman's PTG book was valued using an IRR model.[918]  The switch to the IRR model resulted in lower estimates of collateral values than the old Cap * 105 method, and, as a consequence, indicated that material write-downs were appropriate for a significant number of PTG assets.

---

[913] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 12-13; Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 4.

[914] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 4.

[915] *Id.*; Lehman, Valuation & Control Report - Fixed Income Division (Feb. 2008), at p. 27 [LBEX-BARFID 0000058] ("Current valuation methodology for land and development projects is based on cap * 105%, which was a conservative or prudent approach is an up-market.  Given current market conditions, this approach may not be appropriate.").

[916] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 13.

[917] *Id.*

[918] *Id.*

According to Barsanti, during the third quarter of 2008, he wanted to take $700 million in write-downs on PTG positions.[919]   However, Barsanti stated that Kenneth Cohen directed that no more than $500 million of write-downs could be taken on the PTG portfolio during that quarter.[920]   Kenneth Cohen, during his interview with the Examiner, did not recall any such exchange.[921]

The same $500 million limit on PTG write-downs was also recalled by Jonathan Cohen, who remembered it as one part of a $1.585 billion limit on GREG write-downs generally.   Jonathan Cohen stated that during a meeting with Kenneth Cohen in Kenneth Cohen's office a few days before the end of the third quarter, Kenneth Cohen told him that there was a limit of $1.585 billion for GREG's third quarter loss.[922] Jonathan Cohen stated that Kenneth Cohen explained that this would result in a limit of $500 million in write-downs on PTG assets.[923]   During the meeting, Jonathan Cohen pointed out to Kenneth Cohen that certain write-downs had not been considered in Kenneth Cohen's analysis.   These additional write-downs included $28 million in Asia, "run rate" GREG P&L of $20 million, and Coeur Defense and IMD Archstone

---

[919] *Id.*

[920] *Id.*

[921] Examiner's Interview of Kenneth Cohen, Oct. 20, 2009, at p. 11.  The incident described by Barsanti is somewhat corroborated by Walsh.  Barsanti's proposed write-down was one part of the "late breaking news" during the third quarter that Walsh described.  Walsh stated that when Barsanti informed him that GREG's initial estimate of $1 billion in write-downs should have been increased by $700 million, this caused McDade and Lowitt to become upset about getting information so late in the quarter.  Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 14.

[922] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 7.

[923] *Id.*

write-downs of $19 million.[924]  Jonathan Cohen also stated that during this meeting, Jim Blakemore, a Managing Director in the London office, called and wanted to take an additional $10 to $15 million of write-downs on certain assets and was told by Kenneth Cohen that he could not do so.[925]

Additionally, Jonathan Cohen told the Examiner that at one point during this meeting O'Meara joined by phone.  According to Jonathan Cohen, the three discussed additional write-downs and Jonathan Cohen was told that "the number is the number."[926]

Jonathan Cohen stated that during this meeting he and Kenneth Cohen performed calculations and he took notes on the Q3 Writedown Summary.[927]  In the top right-hand corner of the Q3 Writedown Summary (as sent by Kenneth Cohen), the document shows a column of figures summed to 1,585, the same number Jonathan Cohen stated was the limit imposed on GREG's third quarter write-downs.[928]  The net

---

[924] *Id.*

[925] *Id.*

[926] *Id.* at p. 8.

[927] *See* Lehman, Q3 Writedown Summary [LBHI_SEC07940_2258765].  During their meeting, Jonathan Cohen added additional handwritten notations to this document.  Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 7.

[928] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 7.  The document also shows that the addition of two write-ups to the 1,585 figure, one of "15" related to Europe and another of "9" attributed to "Santa Monica," brought the total net write-down on the document to $1.561 billion.  Lehman, Q3 Writedown Summary, at p. 23 [LBHI_SEC07940_2258765].

loss actually determined by GREG for the quarter was $1.585 billion.[929]  In addition, the bottom of the first page of the document also shows "500" as the number assigned to PTG for third quarter write-downs, consistent with the $500 million limit on write-downs that both Jonathan Cohen and Barsanti described on PTG assets.  The net write-down taken on PTG assets for the third quarter was $504 million.[930]

The Examiner has found no evidence suggesting that the Q3 Writedown Summary, which was circulated on August 25, 2008, was drafted in bad faith.  Kenneth Cohen, who drafted this document, was likely unaware at the time of the significantly larger than expected write-down of PTG assets suggested by the recent switch to IRR models.[931]  Jonathan Cohen told the Examiner that he did not discuss the additional $200 million PTG write-down he thought was appropriate with anyone more senior than

---

[929] Lehman, Global Real Estate 2008 Net Mark Downs, at p. 1 [LBEX-AM 346991].  However, as noted above, Lehman did not finalize its financial statements for the third quarter of 2008 and did not file a Form 10-Q prior to the bankruptcy.

[930] The calculation of this net write-down includes net write-downs of $8 million on a category Lehman labeled "CA Land & Condos - Troxler," $145 million on "CA Land & Condos - Other," and $350 million on "Land and Condos (US excluding CA)." Lehman, Global Real Estate 2008 Mark Downs, at p. 1 [LBEX-AM 346991].  The PTG gross write-down for the quarter was $555 million, with a write-up of $51 million, for a net write-down of $504 million.  *Id.* at pp. 2-4.  The Examiner's financial advisor has observed that a summary of write-downs in E&Y's workpapers suggests $503 million for PTG positions, but attributes this difference to rounding.  See Lehman, 3Q Real Estate Gross and Net MTM Cash Bonds Spreadsheet (Aug. 29, 2008) [EY-SEC-LBHI-MC-GAMX-08-045830].

[931] It should be noted that Kenneth Cohen stated that he heard sometime early in August that some within GREG thought that $700 million in PTG write-downs were appropriate, but that by the end of the quarter, when the conversation with Jonathan Cohen and O'Meara occurred, he thought that only $500 million in write-downs were being suggested.  Examiner's Interview of Kenneth Cohen, January 21, 2010, at p. 4.

himself other than Reilly.[932]  Accordingly, it is the Examiner's view that this document represented a good faith effort to estimate write-downs as of August 25, 2008.

Jonathan Cohen stated that he had never before heard of a predetermined limit on write-downs.[933]  However, even though he knew that such a limit would mean that there were appropriate write-downs that would not be taken, Jonathan Cohen stated that he did not question it with Kenneth Cohen or O'Meara.[934]  He thought that he likely just said "OK" in return.[935]  When asked why he did not raise the issue during this discussion with Kenneth Cohen and O'Meara, Jonathan Cohen explained that "when someone like Chris is telling me 'that is the number,' I'm not going to bring up something else."[936]

When asked whether he was surprised at the limit he understood to be set, Jonathan Cohen stated that he was not because of an analysis he had done for Reilly in late July.[937]  He explained that Reilly told him that he was trying to get a sense of what positions they had to take a write-down on and where they still had options.  Jonathan Cohen stated that Reilly asked him to determine how GREG write-downs would be allocated under different scenarios for global GREG write-downs.[938]  Cohen said that at

---

[932] Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at p. 3.
[933] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 7.
[934] *Id.*
[935] *Id.*
[936] Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at p. 3.
[937] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 8.
[938] *Id.*

that time he understood that he was being asked "if we could only take $X amount in writedowns, what would it be?"[939]  Jonathan Cohen stated that this task prepared him for the idea of predetermined levels of write-downs.  Cohen also stated that during the conversation in which Reilly asked him to do this, he voiced his opinion that they should take more write-downs, but did not ask why the limit was being set or where it was coming from.[940]  Cohen explained that his impression was that the directive was coming from above Reilly.[941]

The document that Cohen prepared is titled "GREG Potential Markdowns - Q308" and sets forth four different scenarios for total GREG write-downs in the third quarter of 2008 and the applicable asset-level write-downs under each scenario.[942]  The total GREG write-downs under each scenario are $2.194 billion, $1.531 billion, $1.0 billion, and $750 million.  Jonathan Cohen told the Examiner that that the target write-down numbers for the last two scenarios were provided by Reilly.[943]

Jonathan Cohen also stated that the write-down numbers for specific assets on this document were "made up numbers," as he did this analysis very quickly and had to

---

[939] *Id.*

[940] *Id.*

[941] *Id.*

[942] Lehman, GREG Potential Markdowns as of July 23, 2008 (July 2008) [LBEX-JC 000001].  The additional handwritten notes on the document were made by Jonathan Cohen.  Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 8.

[943] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 8.

meet the scenarios' targets.[944] For instance, he stated that the write-down number for Archstone on this document was a "completely made up number."[945] Jonathan Cohen explained that there was a lot of juggling to get the numbers to fit the total write-down scenarios and that it was hard to get down to these numbers in the last two scenarios.[946] Jonathan Cohen told the Examiner that it was his opinion at the time that the proper write-downs in the third quarter would have been somewhere between $1.5 billion and $2.2 billion, which are the write-downs reflected by the first two scenarios in this document.[947] He also noted that he personally delivered the document to Reilly and that it was a "good question" whether Reilly asked him not to e-mail it.[948]

After his discussion with Kenneth Cohen and O'Meara, Jonathan Cohen worked to determine how to meet the $500 million write-down target for PTG assets. He and Kebede divided the write-downs into three tiers.[949] The first tier was composed of write-downs that Lehman would be unable to justify not taking.[950] The second and third tiers were composed of potential write-downs that Jonathan Cohen determined were appropriate, but for which Lehman would be able to offer support for a decision

---

[944] *Id.*

[945] *Id.*

[946] *Id.* Jonathan Cohen stated that Kebede helped him put the document together and they had only an hour or two in which to produce the document. *Id.*

[947] *Id.*; Lehman, GREG Potential Markdowns as of July 23, 2008 [LBEX-JC 000001].

[948] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 8.

[949] *Id.* at p. 9.

[950] *Id.*

not to implement.[951]  The third tier was composed of potential write-downs that Jonathan Cohen determined they had the strongest case for not taking.[952]  However, Jonathan Cohen stated that he felt that all of the write-downs in each of the tiers should have been taken.[953]  The total amount of the PTG write-downs Cohen calculated for all tiers was $714 million, or $214 million over the limit he understood was set for PTG.[954]

Ultimately, Jonathan Cohen could not identify any person he believed to be responsible for imposing a limit for GREG third quarter write-downs.[955]  He stated that he did not think that Kenneth Cohen had the authority to impose such a limit on his own and that it also could not have been Walsh.[956]  He speculated that Lowitt, O'Meara, Michael Gelband, Global Head of Capital Markets, or Kirk may have had such authority.[957]

Jonathan Cohen and Barsanti were the only witnesses who had direct contact with Lehman senior management on the subject of possible write-down caps.  But other witnesses provided the Examiner with relevant evidence.  Kebede stated that he found it difficult to explain why write-downs were not taken on many assets during the third

---

[951] *Id.*

[952] *Id.*

[953] *Id.*

[954] *See* Lehman, untitled spreadsheet, at pp. 2-5 [LBHI_SEC07940_2258765]; Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 8.

[955] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 9.

[956] *Id.*

[957] *Id.*

quarter of 2008.[958]  He also noted that, contrary to what had previously been customary, he was not involved in the final decision on write-downs in the second and third quarters of 2008.[959]

Rebecca Platt, a product controller responsible for PTG debt positions, also told the Examiner that she heard of a cap on total write-downs for the quarter, although she did not hear of this directly from senior managers and could not recall a specific number.[960]  She also stated that, in her view, product controllers Jonathan Cohen and Kebede did not have sufficient authority to control valuations and that in many instances they were overruled by the business desk or senior management.[961]  Platt also explained that part of her job was explaining the outcome of the price testing process — that is, why write-downs suggested by Product Control's models were not, in some cases, taken.  She stated that as 2008 progressed, she had increasing difficulty coming up with justifications for not taking write-downs and that requests for write-downs were met with increasing resistance from the business desk and/or senior management.[962]  When Platt could not create a rationale for why the write-down was not taken, she would consult with Kebede.[963]  For the August 2008 pricing report, which set forth the results of the price verification process for the last month in the third

---

[958] Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at p. 5.
[959] *Id.*
[960] Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at p. 10.
[961] *Id.*
[962] *Id.*
[963] *Id..*

quarter, neither Kebede nor Platt could create cogent rationales to explain why certain positions were not written down.[964] Kebede suggested that Platt write "PCG [Product Control Group] is in discussion with desk regarding this variance" with respect to these positions.[965] Platt stated that, although she thought the PTG debt positions were not reasonably marked, there was "only so much [we] could do."[966] Referring to the Product Control Group, she stated that they were, "kind of sadly, the little people."[967]

Eli Rabin, the product controller responsible for PTG equity positions, also told the Examiner that he heard rumors that there was a limit on the amount of write-downs that could be taken on PTG positions in the third quarter of 2008.[968] He did not know whether the limit was imposed on just GREG or all of Lehman and did not specify who set the limit.[969]

Aristides Koutouvides, who worked on the PTG business desk, stated that the role played by senior management changed in the third quarter of 2008.[970] Specifically, he remembered that there was more pushback from senior management as to write-downs.[971] Koutouvides stated that the limit he understood to be in place was allocated

---

[964] *Id.* at p. 11; Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at p. 6.

[965] Lehman, Pricing Report (Aug. 2008), at pp. 19-24 [LBEX-BARFID 0000248]; Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at pp. 10-11; Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at pp. 5-6.

[966] Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at p. 11.

[967] *Id.*

[968] Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 12.

[969] *Id.*

[970] Examiner's Interview of Aristedes Koutouvides, Nov. 20, 2009, at p. 16.

[971] *Id.*

across all positions, such that every position that he felt should be written down was, just not to the extent he deemed appropriate. He recalled one example in which he and Barsanti wanted $500 million in write-downs, but were only allowed $450 million.[972] He was also unable to specify where the supposed limit on write-downs originated. Koutouvides characterized the dialogue between the heads of the business units and senior managers as "expectations management" when it came to valuations.[973]

### (4) Examiner's Findings and Conclusions With Respect to Senior Management's Involvement in CRE Valuation

The evidence is in great conflict as to whether senior management actually attempted to impose artificial limits on write-downs or whether more junior managers misperceived management pushback as management interference. The evidence is murky and based upon speculation as to exactly who among the senior managers would have engaged in such interference if in fact it occurred. The amount of the write-downs not taken because of the possible interference – approximately $200 million in a quarter in which Lehman would report $3.9 billion of losses – is of questionable materiality. Furthermore, the actual write-downs – right or wrong – were never formally reported. For all of these reasons, the Examiner concludes that the evidence does not support the existence of colorable claims arising out of write-downs in the third quarter of 2008.

---

[972] *Id.*
[973] *Id.*

### d) Examiner's Analysis of the Valuation of Lehman's Commercial Book

#### (1) Executive Summary

This section of the Report addresses Lehman's valuation of the commercial real estate assets commonly referred to as the Commercial Book. Lehman's Commercial Book was comprised of debt instruments, such as commercial mortgage loans and CMBS.[974] Within the Commercial Book, Lehman recognized, among others, the following asset categories: Large Loans (Fixed and Floating) and Conduit Loans, B-Notes / Mezzanine Notes, CMBS, and REIT Line of Credit ("LOC").[975] These assets were backed by real estate properties that were typically already constructed, operating and generating cash flow. Lehman's expectation at the time it originated or acquired these positions was that it would be able to syndicate, securitize and/or sell them within a few months. This expectation caused individuals within Lehman to refer to the Commercial Book as being in the "moving" business.[976]

---

[974] Wyatt de Silva, E&Y, Memorandum to Files: Lehman Commercial Real Estate SFAS 157 Adoption (Jan. 28, 2008), at pp. 3-4 [EY-LE-LBHI-KEYPERS 2025663]. A significant portion of positions held in the Commercial Book related to Lehman's investments in Archstone and SunCal. However, Lehman did not price test these positions as part of the Commercial Book price testing process. Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 10. Accordingly, the valuation of these positions is not addressed in this Section, although Archstone is addressed in Section III.A.2.f of the Report.

[975] Lehman, Real Estate Monthly Price Verification Policy and Procedures (July 16, 2008), at p. 1 [LBHI_SEC07940_1184459].

[976] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at pp. 3, 6. Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 6. Examiner's Interview of Lisa Beeson, Oct. 23, 2009, at p. 9. Conversely, Lehman's PTG investments, which were intended to be held while the underlying real estate was being developed, was referred to as the "storage" business. Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 6.

As of May 31, 2008, Lehman determined that the value of its worldwide Commercial Book was approximately $29.5 billion, with $15.1 billion in the U.S., $10.3 billion in Europe, and $4.2 billion in Asia.[977] As of August 31, 2008, Lehman determined the value of its worldwide Commercial Book to be approximately $24.4 billion, with $11.9 billion in the U.S., $8.9 billion in Europe, and $3.6 billion in Asia.[978] As with other asset classes, the analysis in this section focuses on Lehman's U.S. assets, as the Examiner deemed the time and expense necessary to obtain information regarding non-U.S. assets to be an imprudent use of Estate resources.[979]

Historically, Lehman was able to sell certain positions within the Commercial Book shortly after origination.[980] However, beginning in the latter half of 2007 and continuing through the third quarter of 2008, the loss of liquidity due to the deterioration of the securitization and syndication markets forced Lehman to retain more of its Commercial Book assets on its balance sheet at a time when problems in the

---

[977] Lehman, Global Real Estate Inventory Spreadsheet as of May 31, 2008 (August 8, 2008) [LBEX-DOCID 2077095]. The Examiner notes that there is an immaterial difference between the value of the U.S. Commercial Book based on this source ($15.1 billion) as compared to the value of the U.S. Commercial Book positions reviewed by E&Y ($14.9 billion) as discussed below. In addition, price testing models and internal and external Lehman presentations that have been located by the Examiner indicate slightly different values for the U.S. Commercial Book. The Examiner's financial advisor has concluded that the differences among these sources may be due to categorization or mark-to-market adjustments.

[978] Lehman, Global Real Estate Inventory Spreadsheet as of August 31, 2008 [LBEX-DOCID 1025119].

[979] As used in this Section, unless otherwise noted, the term "Commercial Book" refers only Lehman's U.S. assets.

[980] *See* E&Y, Memorandum re: Conduit, Large Loan, and CMBX Price Verification Process, at p. 5 [EY-SEC-LBHI-MC-GAMx-08-063735]. Fixed Rate Conduit Loans & Large Loans were historically syndicated every two to three months. *Id.* at p. 5. Fixed Rate Loans were typically held by Lehman for 180 days. *Id.* at p. 6. However, the average holding period for B-Notes / Mezzanine Notes was over 180 days. *Id.* at p. 8.

real estate market were putting downward pressure on valuations.[981]  As evidenced by contemporaneous e-mails written by senior Lehman personnel, the markets for investments backed by commercial real estate were "virtually closed" at the time.[982]  The reduction in CMBS securitizations after the third quarter of 2007 is demonstrated in the table below:

### Lehman's Commercial Securitization Activities from the Second Quarter of 2006 to the Second Quarter of 2008[983]

| In $Millions | 2Q 06 | 3Q 06 | 4Q 06 | 1Q 07 | 2Q 07 | 3Q 07 | 4Q 07 | 1Q 08 | 2Q 08 |
|---|---|---|---|---|---|---|---|---|---|
| Commercial mortgages securitized | 3,412 | 6,700 | 7,149 | 2,829 | 5,083 | 10,480 | 1,507 | - | 1,500 |
| *Quarter-over-quarter change* | *100.7%* | *96.4%* | *6.7%* | *-60.4%* | *79.7%* | *106.2%* | *-85.6%* | *n/a* | *n/a* |

As the securitization market dried up, and Lehman's exit strategy for these assets became untenable, the value of Lehman's positions fell.  In the second quarter of 2008, Lehman took approximately $195 million in write-downs on assets within its

---

[981] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 3; Diane Hinton, S&P, Liquidity Management In Times Of Stress: How The Major U.S. Broker-Dealers Fare, Nov. 2007, S&P RatingsDirect, (Nov. 8, 2007), at pp. 2-3 [LBHI_SEC07940_439424] ("Recent disruptions in the subprime market and its contagion effects into the leveraged finance, asset-backed commercial paper (ABCP), and CDO spaces have substantially curtailed market liquidity."); FRBNY President Timothy Geithner, Transcript of Remarks to The Economic Club,  New York City, New York, Reducing Systemic Risk In A Dynamic Financial System (June 9, 2008), *available at* http://www.newyorkfed.org/newsevents/speeches/ 2008/tfg080609.html ("The funding and balance sheet pressures on banks were intensified by the rapid breakdown of securitization and structured finance markets.  Banks lost the capacity to move riskier assets off their balance sheets, at the same time they had to fund, or to prepare to fund, a range of contingent commitments over an uncertain time horizon.").

[982] E-mail from William J. Hughes, Lehman, to Alex Kirk, Lehman, *et al.* (Jul. 27, 2007) [LBEX-DOCID 174304].

[983] *See* Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2007 (Form 10-Q) (filed on July 10, 2007), at p. 27 ("LBHI 10-Q (filed July 10, 2007)"); Lehman Brothers Holdings Inc., Quarterly Report as of August 31, 2007 (Form 10-Q) (filed on Oct. 10, 2007), at p. 22 ("LBHI 10-Q (filed Oct. 10, 2007)"); LBHI 2007 10-K at p. 111 ("LBHI 2007 10-K");  LBHI 10-Q (filed July 10, 2008) at p. 35.

Commercial Book. Similarly, in the third quarter of 2008, Lehman took approximately $306 million in write-downs on its Commercial Book. Lehman's valuations of its Commercial Book resulted in cumulative net write-downs of $958 million during the period beginning in the fourth quarter of 2007 and ending in the third quarter of 2008, as set forth in the table below.[984]

**Commercial Book Net Write-downs - First Quarter 2007 to Third Quarter 2008**

|  | $ in millions | | | | | |
|---|---|---|---|---|---|---|
|  | 1Q thru 3Q 07 | 4Q 07 | 1Q 08 | 2Q 08 | 3Q 08 | 4Q 07 thru 3Q 08 |
| Net Write-Downs | (38) | (164) | (293) | (195) | (306) | (958) |

This section of the Report examines whether the value of Lehman's Commercial Book assets, as determined by Lehman in May and August of 2008, was reasonable. The Examiner's investigation has revealed that the sales data used by Lehman to verify the marks for many of its Commercial assets in the second and third quarters of 2008 may not have been sufficiently broad to be applicable to the entirety of the portfolio. However, while there is some uncertainty as to whether the sales data Lehman had for the second and third quarters of 2008 was representative of the assets remaining in its Commercial portfolio, the data shows that Lehman's valuations at this time assumed higher yields, and as a result lower values, than is reflected by actual sales during the quarter. Thus, Lehman's valuations appear reasonable in light of the available sales

---

[984] E&Y, Lehman Brothers Holdings Inc. CRE Sign P&L Q4 and YTD (November 11, 2007), at p. 2 [EY-SEC-LBHI-MC-GAMx-07 071061]; E&Y, Lehman Brothers Holdings Inc. 3Q.RE.8 Gross and Net MTM Cash Bonds 082908.xls [EY-SEC-LBHI-MC-GAMX-08-045833]. Lehman, Global Real Estate 2008 Net Mark Downs (Sept. 5, 2008) [LBEX-AM 346991]. The write-downs exclude SunCal related positions.

data. Furthermore, this sales data was the primary source of information available to Lehman, other than theoretical models that relied, in part, upon data from third parties, to conduct price verification of these assets at the time.[985] Most importantly, the asset values ultimately determined did not fall outside of a range of reasonableness. Accordingly, the Examiner does not find sufficient evidence to support a finding that Lehman's valuation of its U.S. Commercial Book in the second and third quarters of 2008 was unreasonable.

### (2) Lehman's Valuation Process for its Commercial Book

As with other asset classes, the marks Lehman reported for its Commercial Book assets were those determined by its business desk, subject to a price verification process performed by its corresponding Product Control Group.[986] Product Control used a number of methodologies, depending on the asset category and available information, to verify the pricing information provided by Lehman's business desk.[987] For conduits

---

[985] The Examiner notes that Lehman internally recognized that its theoretical models suffered from the use of stale data. *See* Lehman, Valuation & Control Report – Fixed Income Division (February 2008), at p. 27 [LBEX-BARFID 0000058]. This report listed the following "issue" for the "Floating Rate Large Loans & Junior Notes": "Floating rate securitization market is inactive; No deal in the market since Dec-07. Spreads published in third party publications are stale; Pricing becoming extremely challenging." *Id.* The proposed solution was for Product Control to work "with Front Office to obtain market color on deals that are currently in the market for syndication/sale." *Id.* This document also stated "Product control is having continuous discussions with Front Office going through deals in more detail and trying to obtain market color using recent syndications, bids, offers and any other market information." *Id.*

[986] Lehman, Price Verification Policy and Procedure 2008 [Draft] [LBHI_SEC07940_2965994]; Brian Sciacca, *et al.*, Lehman, HG, HY, & EMG Cash Price Testing Policy & Procedure (Jan. 24, 2007) [LBEX-BARVAL 0000001].

[987] Lehman, Price Verification Policy and Procedure 2008 [Draft] [LBHI_SEC07940_2965994]; Brian Sciacca, *et al.*, Lehman, HG, HY, & EMG Cash Price Testing Policy & Procedure (Jan. 24, 2007) [LBEX-BARVAL 0000001]. Testing files for non-U.S. positions were not available and the Examiner expresses no

and large fixed rate loans, prices were historically tested in aggregate using a mock securitization model, based on the most recent comparable Lehman securitization deal. Key model inputs included waterfall payment of the bonds, term to maturity, coupon rate and the Loan-to-Value ("LTV") ratio, which was generally derived from the value of the collateral at the time the loan was originated.[988]  The present value of the subject loan was discounted based on a weighted average yield that was estimated from a mock securitization and/or yield spreads as published in the Commercial Mortgage Alert ("CMA").[989]  However, the use of this methodology became ineffective as the securitization markets closed, causing Product Control to de-emphasize their use in the first quarter of 2008.[990]

For floating rate large loans and mezzanine loans, Lehman's marks were tested using a net present value ("NPV") methodology which considered the subject loan's riskiness and its collateral property value.[991]  Key model inputs included the individual loan's LTV ratio, maturity date, spread, coupon rate, remaining payments, and discount

---

view of the reasonableness of the valuation methodology or ultimate marks reported for Lehman's non-U.S commercial real estate assets.

[988] E&Y, Walkthrough Template re Conduits, Large Loan, and CMBX Price Verification Process, at p. 5 [EY-SEC-LBHI-MC-GAMX-08-063735].

[989] Id. at p. 8; Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification (Feb. 2008), at p. 10 [LBEX-WGM 000762].

[990] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 4.

[991] E&Y, Walkthrough Template re Conduits, Large Loan, and CMBX Price Verification Process, at pp. 7-8 [EY-SEC-LBHI-MC-GAMX-08-063735].

rate.[992]  For the discount rate, Product Control based their calculation on the key model inputs mentioned above and yield spread data published by CMA.[993]

For CMBS, prices were tested using third party pricing data from IDC, and other market sources when available.[994]  Product controllers then compared the average of all third-party pricing data for a position to the mark determined by the business desk.[995]

Finally, REIT LOC and term loans were typically price tested on an individual basis, using the NPV approach based on individual loan characteristics.[996]

During the fourth quarter of 2007 and the first quarter of 2008, the lack of sales of Lehman's Commercial Book assets, due to the slowing pace of securitizations and syndications noted above, meant that there was limited relevant market information to rely upon in performing price testing of these assets.  This lack of information caused Lehman to be heavily reliant upon its theoretical pricing models for purposes of confirming asset valuations.  However, in the second and third quarters of 2008, greater sales activity allowed Lehman's product controllers to use sales data in addition to models to perform price verification of the Commercial Book.[997]  During the second

[992] *Id.* at pp. 7-9.
[993] E&Y, B-Note, Discount Rate Recalculation.xls [EY-SEC-LBHI-MC-GAMX-08-063388].
[994] Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification (Feb. 2008), at p.16 [LBEX-WGM 000762].
[995] E&Y, Walkthrough Template re Liquid Products Price Verification Process, at p. 7 [EY-SEC-LBHI-MC-GAMX-08-067466].
[996] Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification (Feb. 2008), at p. 18 [LBEX-WGM 000762].
[997] The increased sales activity would have also benefited the business desk as they determined the correct mark for their positions.

quarter of 2008, Lehman was able to sell a range of Commercial Book positions for an aggregate price of $3.8 billion.[998]  Similarly, during the third quarter of 2008, Lehman sold various Commercial Book positions for an aggregate price of $2.5 billion.[999]

The volume of actual sales transactions in the second and third quarters of 2008 gave Lehman's management a higher level of confidence in the valuation process compared to prior periods when the lack of any meaningful sales data forced them to rely mostly on theoretical pricing models.[1000]

After the product controllers determined their test marks for a position, variances, defined as the difference between the business desk's mark and the mark calculated by the product controller, were calculated.  Lehman determined certain variance thresholds for each asset category.[1001]  As with other asset classes, variances exceeding these thresholds were resolved through discussions between business desk and product controllers and unresolved variances were escalated to senior management.[1002]

---

[998] Lehman, Q2 Q3 Greg Sales Scatter v2 [LBHI_SEC07940_1234185].

[999] *Id.*

[1000] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at pp. 5-6.

[1001] E&Y, Memorandum re: Conduit, Large Loan, and CMBX Price Verification Process, at p. 9 [EY-SEC-LBHI-MC-GAMX-08-063735]; E&Y, Lehman Brothers Holdings Inc., REIT Price Verification Process, at p. 7 [EY-SEC-LBHI-MC-GAMX-08-0641780]; E&Y, Lehman Brothers Holdings Inc., Liquid Products Price Verification, at p. 8 [EY-SEC-LBHI-MC-GAMX-08-067466]; Lehman, Price Verification Policy and Procedure 2008 [Draft], at p. 4 [LBHI_SEC07940_2965994].

[1002] E&Y, Lehman Brothers Holdings Inc. Price Verification P&P, Securitized Products and Valuation Controls (March 3, 2008), at p. 23 [EY-SEC-LBHI-MC-GMAX-08-067482]; E&Y, Lehman Brothers Holdings Inc. Price Verification Policy and Procedure 2008 [Draft], at p. 4 [LBHI_SEC07940_2965994].

### (3) Examiner's Findings and Conclusions as to the Reasonableness of Lehman's Valuation of its Commercial Book

In assessing the reasonableness of Lehman's marks in the second and third quarters of 2008, the Examiner reviewed valuation analyses provided by Lehman to its auditors, models that Lehman's product controllers used to price test the business desk's asset valuations, and data from completed sales transactions.

### (a) As of the Second Quarter of 2008

In a real estate price verification presentation, the Product Control Group summarized its price testing analysis for the second quarter of 2008.[1003] The presentation provided "Pricing Commentary" that explained how the Product Control Group arrived at its test prices and showed the aggregate variance calculated for the quarter. In the presentation, the Product Control Group identified a $70 million net negative variance, equal to approximately 0.5% of Lehman's $14.5 billion Commercial portfolio.[1004] A negative variance means that Lehman's marks for the assets tested were higher than the test prices, suggesting an overvaluation.

In addition to providing information regarding the test prices determined for the Commercial Book, the Product Control presentation also contained observations on factors impacting the pricing of each asset type.[1005] The presentation noted that some

---

[1003] Lehman, Real Estate Price Verification [Draft] (July 17, 2008), at pp. 2, 3, 5 [LBHI_SEC07940_1169231].

[1004] Id. at p. 2. The Examiner notes that this presentation identified the value of the "US Commercial" portfolio to be approximately $17.5 billion, which included $3.0 billion of bridge equity positions. For the purpose of Commercial Book analysis, bridge equity positions were excluded from the analysis.

[1005] Id. at pp. 2, 3, and 5.

asset classes, specifically Archstone, benefited from price flex.[1006]   Price flex shifted mark-to-market losses from debt positions to equity positions.   A partially-reproduced summary of the Product Control Group's price testing analysis is shown in the table below.

[1006] *Id.* at pp. 2, 5.  The Archstone debt positions were included in the Commercial Book and the valuation of these positions is addressed in Section III.A.4.e of the Report, which addresses Lehman's valuation of its Archstone B bridge equity investment.

275

# Product Control's Draft Price Testing Summary for Q2 2008
## U.S. Commercial[1007]

| | Legal Balance | Mark | Market Value | Pricing Variance | Pricing Commentary |
|---|---|---|---|---|---|
| **Fixed Rate:** | | | | | |
| First Lien | 419 | 90.60 | 379 | | Significant expsure is 61% LTV, $319mn senior loan on GM building marked at 95.7, or a yield of 6.7%. Sold all of $500mn placed into a Q208 securitization. |
| B-Notes/Mezz | 1,021 | 88.50 | 904 | (26) | Apporxiamtely 31% of portfolio has price flex; remainder of booked marked based on comparable spread levels from recent synidcation/sales activity. Sold $947mn during Q208. |
| **Floating Rate:** | | | | | |
| Archstone | 526 | 99.00 | 521 | | Full Price flex on debt, i.e., any loss will be absorbed by bridge equity. 450 DM assumed on mezz in pricing bridge equity yield. |
| First Lien | 3,434 | 94.90 | 3,260 | (12) | Marked based on spreads derived or implied from recent syndication / sales activity on senior loans as well as b-notes / mezz notes. Sold $545 mn during Q208. |
| B-Notes/Mezz (excl. Archstone) | 3,516 | 91.90 | 3,230 | (32) | Price verified based on comparable spread levels on recent syndications / sales activity. Sold $742mn during Q208. |
| **Term Loans / LOCs:** | | | | | |
| Archstone | 2,395 | 98.50 | 2,359 | | Full price flex. Pricing assumptions incorporated in bridge equity (i.e., term loan A to be repaid from asset sales and term loan B to be syndicated @ 90). |
| SunCal | 1,944 | 75.60 | 1,470 | | Priced to target investor yield of 15% (except for Marblehead and Pacific Point, which are at 12% to account for their superior location & demographics compared to the rest of the portfolio). Cash flow and other projections (lot absorption, construction costs, and sale price) obtained either from third party vendors hired by LB or third party industry publications. |
| Others (excl. Archstone and SunCal) | 876 | 96.00 | 841 | | Based on bank debt trading market of similar credits. |
| Corporate Debt | 626 | 100.00 | 626 | | Seller financed trades originated in May 08 at market spreads. |
| **Total (excluding Securities)** | 14,757 | | 13,590 | (70) | |
| Securities | 29,966 | | 908 | | Price verified using third party sources and recent trading activity. Sold $1bn of all tranches of securities during Q2 08. Floating rate IO's marked at zero due to the lack of prepayment protection and short duration. |
| **Total (including Securities)** | 44,723 | | 14,498 | (70) | |

---

[1007] *See* Lehman, Real Estate Price Verification [Draft] (July 17, 2008), at pp. 2-3 [LBHI_SEC07940_1169231]. This table excludes bridge equity positions and collapses the different types of securities into a single line item. The Examiner notes that the total value for U.S. Commercial assets in this draft price testing document ($14.5 billion) is different than the final values reviewed by E&Y ($14.9 billion) and other summaries of the Commercial Book located by the Examiner. The Examiner's financial advisor has concluded that these differences may be due to categorization or mark-to-market adjustments.

For the second quarter of 2008, Lehman provided E&Y an analysis that compared data from sales during the period to the carrying values of the assets that remained on Lehman's balance sheet.[1008] The analysis compared the selling yields that were implied by the prices at which assets were sold during the quarter to the carrying yields used for valuing the portfolio as of quarter-end.[1009] The analysis concluded that the average selling yield was lower than the average carrying yield of the remaining assets; and therefore, the prices that Lehman was achieving on actual sales were, on average, higher than the prices at which Lehman was carrying assets in these categories on its balance sheet.[1010] However, the Examiner notes that there is great variation among positions even within a single asset category and the applicability of a sale price to positions still held by Lehman can only be determined by a position-specific analysis. Assuming that the assets sold were comparable to the remaining assets, the Commercial Book as of May 31, 2008, was undervalued in light of the second quarter sales data available. Lehman relied on the sales data to support the valuation of Commercial assets at quarter end.[1011]

[1008] *See* E&Y, Global Real Estate Q2 '08 Sales Activity [EY-SEC-LBHI-MC-GAMX-08-138412].

[1009] *Id.*

[1010] *Id.*

[1011] Lehman, Real Estate Price Verification [Draft] (July 17, 2008), at p. 1 [LBHI_SEC07940_1169231]. Kebede affirmed the emphasis of sales data during his interview with the Examiner. Examiner's Interview of Abebual A. Kebede on Oct. 6, 2009, at p. 8. E&Y's workpapers stated: "For purposes of the Q2 review, the comparisons between inventory values and yields and sold values and yields appears reasonable to support Product Control's assertions of reasonable, observable, applicable sales activity to support its fair value marks as of 5/30/08 in addition to its other price verification procedures. Appears Reasonable." E&Y, Global Real Estate - Q208 Sales Activity, at p. 1 [EY-SEC-LBHI-MC-GAMX-08-

To evaluate the applicability of the sales data to the value of Lehman's remaining assets, the Examiner reviewed the distribution of sales across the asset categories within the Commercial portfolio.[1012]  This analysis is summarized in the table below.

138412].  William Schlich told the Examiner that E&Y's quarterly reviews are not the same as the annual audit and that E&Y was still in the planning stages for its 2008 audit when Lehman filed for bankruptcy. Examiner's Interview of Ernst & Young, Nov. 11, 2009, at pp. 13-14.

[1012] *See* E&Y, Global Real Estate Q208 Sales Activity [EY-SEC-LBHI-MC-GAMX-08-138412]; Lehman, Q2 Q3 Greg Sales Scatter.xls, [LBHI_SEC07940_1234185].

**U.S. Commercial Asset Classes with Sales Data - Q2 2008**

| | Sales During Quarter | Remaining Exposure | Selling Yield | Carrying Yield on Remaining Portfolio |
|---|---|---|---|---|
| Mezzanine - Floating Rate | 606 | 2,799 | 8.8% | 9.3% |
| Mezzanine - Fixed Rate | 947 | 479 | 8.7% | 9.4% |
| Large Loans - Senior Floating Rate | 545 | 3,575 | 5.9% | 6.6% |
| B-Notes - Floating Rate | 136 | 152 | 6.6% | 9.7% |
| Subtotal #1 | 2,234 | 7,005 | N/A | N/A |
| | | | | |
| Small Fixed Rate Mezzanine | 499 | 379 | 7.5% | N/A |
| Securities | 1,018 | 589 | N/A | N/A |
| Interest Only | 25 | 319 | 0.0% | N/A |
| Subtotal #2 | 1,542 | 1,287 | N/A | N/A |
| Loans to REITs (e.g., Archstone and SunCal) | - | 4,869 | N/A | N/A |
| Floating Rate Mezzanine - Archstone | - | 485 | N/A | N/A |
| B-Notes - Fixed Rate | - | 363 | N/A | N/A |
| Derivatives Mark to Market | - | 893 | N/A | N/A |
| Subtotal #3 | - | 6,610 | N/A | N/A |
| | | | | |
| Total | 3,776 | 14,902 | N/A | N/A |

As this table shows, Lehman was able to sell a substantial portion of assets within certain asset classes, and was unable to sell any portion of assets for other asset

classes. The four categories for which the Examiner obtained both selling yield and carrying yield information together account for approximately 47% of Lehman's Commercial Book, as measured by value.[1013] Within these categories, the average carrying yield for the remaining portfolio was consistently higher than the average selling yield.[1014] The majority of asset classes without any sales data are related to Archstone debt positions, which benefited from price flex, and SunCal.[1015]

While the sales data provides a degree of price transparency, many of the transactions that were executed during the second quarter closed during the last few days of the quarter.[1016] Further, many of the transactions that closed on the last day of the quarter were seller financed (with recourse).[1017] Kebede believed the terms of the seller financing were consistent with market rates at the time.[1018] The Examiner is not aware of any contemporaneous evidence that contradicts Kebede's belief.

The Product Control Group used data from the sale of positions during the quarter to value the remaining positions by comparing positions: (1) within the same deal; (2) within the same sector (*i.e.*, office); (3) within the same geography; (4) with

---

[1013] *See* Lehman, Q2 Q3 Greg Sales Scatter.xls [LBHI_SEC07940_1234185-1234225].

[1014] *See* E&Y, Global Real Estate Q208 Sales Activity [EY-SEC-LBHI-MC-GAMX-08-138412]; Lehman, Q2 Q3 Greg Sales Scatter.xls [LBHI_SEC07940_1234185-1234225].

[1015] *Id.* As noted, the impact of price flex on the valuation of Archstone bridge equity is discussed in Section III.A.4.e.

[1016] E&Y, Global Real Estate Q208 Sales Activity, at pp. 1-10 of 31 [EY-SEC-LBHI-MC-GAMX-08-138412].

[1017] *Id.* Lehman, Seller Financed Positions, at p. 2 [LBEX-WGM 763628]. Because the seller-financing was provided "with recourse," in the event of a default Lehman would be permitted to seek the full outstanding amount of the loan from the borrower, not just the collateral.

[1018] Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at p. 9

similar loan-to-value ratio; and (5) with similar term to maturity.[1019]  For example, Lehman sold a tranche of the 301 Howard mezzanine loan portfolio with a lower LTV ratio than the remaining tranches, which is consistent with the fact that the remaining positions were marked to higher yields than the positions sold.  This is also consistent with the relative riskiness of each tranche – the higher the LTV ratio, the riskier the tranche.

As an additional check of the price testing process, the Examiner investigated how Lehman's valuation models performed when compared to spreads reflected in actual sales data.   A review of available pricing models showed that, when sales data providing spreads was available, these spreads were manually entered by product controllers in place of the spreads calculated by the models.[1020]  Among the 25 Commercial Book positions that the Examiner reviewed, this practice was done for 22 positions.[1021]  To assess the models' ability to predict reasonable carrying spreads, the Examiner replaced the spreads reflected by the sales data with Lehman's own model calculations.   A comparison of the selling spreads to the predicted spreads of the positions examined indicates that Lehman's pricing models, on average, predicted a

[1019] *Id.*

[1020] The Examiner's financial advisor reviewed the majority of sold large loans and mezzanine loans within the Large Loan and Junior Note price testing models.   However, since Lehman reported limited information regarding the selling spreads for several of these sold positions, the Examiner's financial advisor only reviewed 63.7% of the positions as measured by market value.

[1021] Lehman, Large Loans Pricing Summary (Apr. 30, 2008) [LBEX-BARFID 0022055]; Lehman, Junior Loans Pricing Summary (Apr. 30, 2008) [LBEX-BARFID 0020702]; Lehman, Large Loans (PTG Model) Pricing Summary (Apr. 30, 2008) [LBEX-BARFID 0022055].

higher spread than the average selling spread.[1022]   This suggests that the price testing process was generally conservative, producing lower marks than those reflected in the sales data.

Based on the aforementioned facts and analyses, Lehman's Product Control Group had sufficient sales data and other information to effectively price test Lehman's Commercial Book during the second quarter of 2008.   Furthermore, the available sales data suggests that Lehman's marks for these assets were conservative during the quarter.   Accordingly, the Examiner finds that there is insufficient evidence to support a finding that Lehman's valuations of its Commercial Book assets in the second quarter of 2008 were unreasonable.

### (b)  As of the Third Quarter of 2008

The Examiner obtained less information about Lehman's price testing process for the third quarter of 2008 than for the second quarter.   This appears to be due to LBHI's bankruptcy filing, which occurred just 15 days after the third quarter ended.   As a result, the Examiner's financial advisor could not identify a document summarizing Lehman's price testing process similar to the one obtained for the second quarter.   However, the process that Lehman used was generally similar to that for the second quarter - reliance on sales data where available and models in the absence of such data.

---

[1022] The predicted spreads were on average 262 basis points higher than the selling spreads.

Therefore, the Examiner's analysis for the third quarter followed a similar approach as was used for the second quarter.

Lehman sold approximately $2.5 billion of Commercial positions during the third quarter of 2008.[1023]  These sales occurred across a variety of asset classes, as shown in the table below.  Similar to the second quarter, there were no sales of Archstone or SunCal positions.[1024]

### Third Quarter U.S. Commercial Book Asset Sales (Excluding REO/Equity)

| Asset Type | Value (in Millions) |
| --- | --- |
| Large Loans -  Floating Rate | 725 |
| Large Loans -  Fixed Rate | 305 |
| Mezzanine - Floating Rate | 846 |
| Mezzanine - Fixed Rate | 195 |
| B-Note | 144 |
| Securities | 253 |
| **Total** | **2,468** |

The majority of U.S. Commercial positions that were reviewed by the product controllers during this quarter were price tested in two pricing models: the Large Loan price testing model and the Junior Note price testing model.[1025]  Therefore, the Examiner's analysis focused on these two price testing models.

---

[1023] Lehman, Q2 Q3 Greg Sales Scatter.xls [LBHI_SEC07940_1234185].  The $2.5 billion figure excludes REO/Equity sales.

[1024] *Id.*

[1025] *See* Lehman, US Real Estate Inventory vs. Pricing Reconciliation (Aug. 2008), at p. 1 [LBHI_SEC07940_3103034].  Fixed rate and floating rate large loans of an aggregate value of $6.3 billion were price tested in the August Large Loan pricing model.  *See* Lehman, Large Loans Pricing Summary (Aug. 29, 2008), at p. 7 [LBEX-BARFID 0021979].  B-Notes, Fixed rate and floating rate mezzanine loans of an aggregate value of $2.5 billion were price tested in the August Junior Loan pricing model.  *See*

A review of the Large Loan Floating Rate model shows that Product Control's review of the desk's valuations for the third quarter suggested a $45 million positive variance, or a 0.7% potential undervaluation of $6.3 billion worth of positions.[1026] The largest group of positions (excluding Archstone and SunCal) price tested in this model was a group of $412 million of senior Hilton positions, which were benchmarked against the yields received from the sale of relatively junior Hilton positions sold during the quarter.

A review of the Junior Note price testing model shows that Product Control's review of the desk's valuations for the third quarter showed an $87 million net negative variance, or a potential 3.5% overvaluation of $2.5 billion worth of positions.[1027]

Similar to the second quarter review, the Examiner followed the same procedure to examine how Lehman's valuation models performed in the third quarter when compared to the actual selling price/spread. The examination shows that Lehman's pricing models,[1028] on average, predicted a higher spread than the average selling

---

Lehman, Junior Loans Pricing Summary (Aug. 29, 2008), at p. 14 [LBEX-BARFID 0021642]. These two models included $8.8 billion of the $10.4 billion in Commercial Book positions that were price tested as in the third quarter of 2008. Lehman, Real Estate Americas Price Testing Summary (Aug. 29, 2008) [LBEX-DOCID 1971828].

[1026] *See* Lehman, Large Loans Pricing Summary (Aug. 29, 2008) [LBEX-BARFID 0021979].

[1027] *See* Lehman, Junior Loans Pricing Summary (Aug. 29, 2008) [LBEX-BARFID 0021642].

[1028] The Examiner reviewed the majority of sold large loans and mezzanine loans within the Large Loan and Junior Note price testing models. However, since Lehman reported limited information regarding the selling spreads for several of these sold positions, the Examiner only reviewed 30.6% of the positions sold as measured by value.

spread, implying that positions were marked at lower prices than similar positions sold during the third quarter.[1029]

As with the second quarter, based on the aforementioned facts and analyses, the Examiner concludes that there is insufficient evidence to support a finding that the Commercial Book valuations as of the third quarter of 2008 were unreasonable.

### e) Examiner's Analysis of the Valuation of Lehman's Principal Transactions Group

#### (1) Executive Summary

Lehman's Principal Transactions Group ("PTG") made debt and equity investments in real estate projects that were intended to be held for the period during which the underlying real estate was developed or improved.[1030] Unlike Lehman's Commercial Book positions, which were backed by already-developed, income-

---

[1029] The predicted spreads were averaged 117 bps higher than the selling spreads.

[1030] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 4; Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 4. *See* Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation [Draft] (Feb. 1, 2008), at p. 4 [LBEX-WGM 916015]; Wyatt de Silva, E&Y, Memorandum to Files: Commercial Real Estate FAS 157 Adoption (Jan. 28, 2008), at p. 5 [EY-LE-LBHI-KEYPERS 2025661]. As noted above, this Report addresses the valuation of Lehman's U.S. assets. Accordingly, except as noted, the term "PTG" only refers to the GREG Principal Transactions Group in the U.S. and the investments that this group originated and managed. Additionally, the term PTG, as used herein, excludes the SunCal development, which was technically a part of the PTG portfolio. *See* Cushman & Wakefield, Appraisal of Pacifica San Juan Master Plan (289 Lots) (Oct. 1, 2007) [TR00031835]. Lehman's investment in SunCal amounted to, as of May 2008, approximately 4.4% of the balance sheet at risk for the PTG portfolio. Lehman, Global Real Estate Product Inventory Spreadsheet as of May 31, 2008 (Aug. 8, 2008) [LBEX-DOCID 2077095]. However, Barsanti stated that PTG had limited involvement in valuing SunCal, as that position migrated over to Hughson's group. Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 17. Jonathan Cohen also stated that Product Control had no involvement in valuing SunCal. Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 5. Because PTG and Product Control generally excluded SunCal from the valuation process, the Examiner has likewise excluded that asset from consideration of the reasonableness of the PTG marks, except as a basis of comparison in one instance below.

producing real estate and were intended to be sold to investors shortly after origination, PTG positions were not intended for near-term sale. Instead, PTG investments were premised on execution of a business plan, typically of two to five year duration, which often included sale of the underlying property after development.[1031]

Given this business strategy, Lehman generally did not market PTG positions for sale, as it did Commercial Book assets. As a result, PTG positions were relatively illiquid, even when commercial real estate values were increasing and capital was readily available. Anthony J. Barsanti, the PTG Senior Vice President responsible for marking the PTG positions, told the Examiner that Lehman valued these investments through a combination of financial projections and "gut feeling," due to the unique nature of each asset and the lack of sales data regarding comparable debt and equity positions.[1032] Lehman employed valuation models incorporating asset-specific information and projecting expected performance over time. However, while PTG asset managers on the business desk used the models as a guide, they did not regard them as "gospel."[1033] Barsanti and Aristides Koutouvides, the PTG Vice President who reported to Barsanti and also valued PTG positions, made judgment calls as to whether to modify or give weight to the model values.[1034] Barsanti and Koutouvides based these judgment calls on their experience, the collateral's performance with respect to the

---

[1031] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 4.

[1032] *Id.* at p. 11.

[1033] *Id.*

[1034] *Id.* at pp. 9, 11-12; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 11-12.

development's business plan, and other market data related to the collateral's geographic region or property type that was not always accounted for in their models.[1035]

Lehman engaged a third party, TriMont, to produce the asset-specific data used by the business desk.[1036] This TriMont data was also used by the product controllers who separately price tested the asset values determined by the business desk.

Pursuant to GAAP, and specifically SFAS 157, the PTG portfolio's value was supposed to represent Lehman's judgment as to the price at which each position could be sold to a third party as of a particular measurement date, assuming that Lehman had sufficient opportunity to market such investment prior to that date.[1037] However, there was disagreement between Lehman personnel about whether the PTG portfolio reflected this price. Koutouvides and Jonathan Cohen, Senior Vice President, Head of Product Control Group in GREG, told the Examiner that PTG assets were not valued at the price they could be sold to a third-party investor in 2008.[1038] With respect to the values determined by Lehman for PTG assets during 2008, Koutouvides stated, "no one

[1035] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at. pp. 9, 11-12; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 11-12.

[1036] Lehman & TriMont, Amended and Restated Loan Servicing and Asset Management Agreement (Sept. 1, 2004), pp. 11-12 [TR00044479].

[1037] For a more detailed discussion of the legal standards governing this Report's valuation analysis, see Appendix 1, Legal Issues, Section VII.

[1038] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 12; Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 5.

would pay you that."[1039]  In fact, Koutouvides and Jonathan Cohen stated that Lehman was not required to mark the PTG assets at the price at which an investor would purchase such assets as of the particular measurement date.[1040]  In contrast, another witness, Kenneth Cohen, a Managing Director in GREG and Head of U.S. Originations, told the Examiner that the PTG assets were marked at the price that an investor would pay to purchase the asset.[1041]  Barsanti, who Kenneth Cohen identified as the person principally responsible for determining PTG marks, stated that he did not know whether PTG assets could be sold for the price at which they were marked and stated he had not thought about it.[1042]

The Examiner's analysis of the data provided by TriMont, as well as Lehman's use of this information to produce valuations, supports a finding that Lehman's process for valuing its PTG portfolio was systemically flawed because Lehman primarily valued these assets based on whether the development was proceeding according to the project's business plan and not the price a buyer would pay for the asset.  This methodology did result, in the first three quarters of 2008, in approximately $1.1 billion in aggregate write-downs of the  PTG portfolio, which was valued at approximately

---

[1039] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 12.

[1040] *Id.* at pp. 11-12; Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at pp. 4-5.

[1041] Examiner's Interview of Kenneth Cohen, Jan. 21, 2010, at p. 4.

[1042] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 11.

$9.6 billion at the end of fiscal year 2007.[1043]   However, there are sufficient facts to demonstrate that Lehman did not generally value PTG assets in light of the rates of return (or yields) that investors would require to purchase them.   In other words, the facts support a finding that Lehman generally did not value PTG assets during these quarters at the prices at which they could be sold to a third-party investor.

This failure to appropriately consider an investor's required rate of return was initially due to the fact that TriMont calculated the value of the underlying real estate simply by reference to the project's capitalization.[1044]   This calculation was called Cap * 105, because the collateral value — the most important input in the valuation exercise[1045] — was calculated by multiplying the development's capitalization (*i.e.*, outstanding debt plus equity raised) by 105%.[1046]

As the real estate markets deteriorated in 2007, Lehman recognized that Cap * 105 was flawed, and instructed TriMont to produce internal rate of return ("IRR") models for each development.[1047]   The IRR models were typically designed to determine

---

[1043] *See* Lehman, Global Real Estate 2008 Net Mark Downs (Sept. 5, 2008) [LBEX-AM 346991].   Lehman, GREG (PTG) Balance Sheet Position as of Nov. 30, 2007 (Dec. 6, 2007) [LBEX-DOCID 1374315] (Nov. 2007 data).

[1044] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 4.

[1045] Examiner's Interview of Jennifer Park, Sept. 10, 2009, at p. 8, Examiner's Interview of Abebual A. Kebede, Oct. 13, 2009, at p. 6; Examiner's Interview of Eli Rabin, Oct. 21, 2009, at pp. 6-7.

[1046] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 4.

[1047] The Examiner notes that the IRR models referenced here are not the same IRR models referenced elsewhere in this Report in the valuation analysis of Archstone.   *See* Section III.A.2.f of this Report.   The IRR models used in Archstone assumed a value, and the model derived a discount rate.   While TriMont's models could perform the same calculation, Lehman relied on TriMont's models for PTG positions to produce a value based on an assumed discount rate for the collateral.

the value of the real estate by discounting the projected cash flows of the completed project to a present value.  This was a cumbersome and time consuming process, but by July 2008 TriMont was able to provide early versions of the IRR models for substantially all of the PTG assets.[1048]  Lehman recognized that the IRR models required continued development, and this process was projected to take many more months.[1049]  The Examiner has analyzed a subset of the IRR models and determined that the models generally attributed a discount rate for the equity portion of the capital structure based on Lehman's expected rate of return (*i.e.*, 20% for land developments) and, for the debt portion, a discount rate based on the interest rate associated with the underlying loans at origination.[1050]  The IRR models took a weighted average between these two rates to arrive at the weighted average discount rate for the property.[1051]  In this manner, the IRR models used a yield that did not necessarily correspond to investors' required rate of return (*i.e.* market-based interest rates) as of the particular measurement date.

Barsanti and Jonathan Cohen, in part by using the TriMont IRR models, determined that it would be appropriate to write down the PTG assets by approximately $714 million for the third quarter of 2008.[1052]  Jonathan Cohen understood

---

[1048] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 15.

[1049] *Id.*

[1050] TriMont, TriMont Valuation Methodologies – Lehman PTG and LLG CMBS Hold Assets (Apr. 28, 2008) [LBEX-DOCID 2089942].

[1051] The weighted average was based on the equity invested to date and outstanding debt.

[1052] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 15; Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 9.

that there was a $500 million limit on such write-downs for the third quarter,[1053] but he did not inform Kenneth Cohen, Christopher M. O'Meara, Global Head of Risk Management, or anyone senior to him (other than Gerard Reilly, Global Product Controller) that he and Barsanti had calculated proposed write-downs beyond the perceived $500 million limit.[1054]  In this manner, approximately $214 million of the write-downs were not taken.

The Examiner finds there is sufficient evidence to support a finding, for purposes of a solvency analysis, that certain of Lehman's PTG valuations as of May 31, 2008 and August 31, 2008 were unreasonable.  Given that there were approximately 700 PTG positions as of LBHI's bankruptcy filing,[1055] the Examiner determined that it was not a prudent use of resources to determine the range of overvaluation for each investment. For purposes of illustration, the Examiner did analyze select positions, and describes below how Lehman's failure to properly consider the investors' required rate of return affected the valuation.  Due to time constraints and lack of information that fully captures the nuances of PTG positions (or Lehman's internal process for valuing many of them), the Examiner's analysis of these assets does not present an opinion as to the

---

[1053] The Examiner concludes that there is insufficient evidence to support a finding that Lehman's senior managers intended to impose such a limit, but Jonathan Cohen was unambiguous in asserting that it was his understanding that such a limit was in place.   Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at pp. 2-3.  See Section III.A.2.c of this Report, which discusses senior management's process for deciding write-downs for CRE assets, which included PTG assets, in the second and third quarters of 2008.

[1054] Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at pp. 2-3.

[1055] Lehman, GREG Inventory Spreadsheet as of Aug. 31, 2008 (Sept. 13, 2008) [LBEX-DOCID 1025119].

fair value of these assets as of May or August 2008, but simply investigates the assumptions and practices Lehman used in valuing the selected PTG assets and reaches a conclusion as to the reasonableness of those assumptions and practices.

In addition, the evidence does not support the existence of a colorable claim for a breach of fiduciary duty related to Lehman's valuation errors, as there is insufficient evidence to establish that any Lehman officer acted with the necessary scienter to support such a claim.

## (2) Overview of Lehman's PTG Portfolio

Lehman's PTG positions took the form of investments in both the debt and equity of the development or improvement projects.  PTG invested in real estate that required development or improvement in order to produce the desired return on capital.[1056]  Prior to the development or improvement, the underlying PTG real estate had either no cash flow (*i.e.*, land to be developed), or materially less cash flow than was projected to be generated upon development (*i.e.*, conversion of rental apartment buildings to condominiums).[1057]  Lehman generally planned to exit its PTG positions when the underlying real estate project was completed, at which point the real estate would be stabilized and could produce a cash flow through leasing or sales.[1058]  While Lehman actively marketed Commercial Book assets for sale soon after origination,

---

[1056] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 7-8.

[1057] *Id.* at p. 4.

[1058] *Id.*

Lehman usually did not market PTG assets. Development projects were typically completed two to five years after Lehman provided the funding (with the average being three years), at which time the underlying property was typically sold.[1059]

PTG invested in "[p]roperties in markets with lack of competition for the property type or having significant barriers to entry due to complexity of the situation or market issues."[1060] PTG typically invested in the construction of offices or hotels, the leasing of rental units in existing apartments or office buildings, the conversion of rental units into condominium units, and the acquisition and development of land for creation of residential, commercial, or resort properties.[1061]

Lehman partnered with developers on PTG investments. Each Lehman banker within PTG who originated investments had relationships with certain developers with a proven track record in a particular real estate market.[1062] It was not uncommon for Lehman to do multiple deals with a developer who had demonstrated the ability to

[1059] *Id.* *See* Memorandum from Sunny Galynsky, Lehman, to Kenneth Cohen, Lehman, re: Corporate Audit Report for Real Estate: Principal Transactions – Americas (Dec. 19, 2007), at p. 2 [LBEX-DOCID 3570967] ("The Principal Transaction Group provides equity and debt funds for real estate investment in non-stabilized assets which were scheduled to be repaid over a three to five year period. The group engages in originating and restructuring short term mezzanine loans (average duration of 2.5 years) . . . ."); Mark A. Walsh & Kenneth Cohen, Lehman, An Overview of the Global Real Estate Business (June 6, 2005), at p. 18 [LBEX-DOCID 271653].

[1060] Mark A. Walsh & Kenneth Cohen, Lehman, An Overview of the Global Real Estate Business (June 6, 2005), at p. 18 [LBEX-DOCID 271653].

[1061] Lehman, GREG University: START Training Analysts & Associates Deep Dive Training Presentation (Sept. 2007), at p. 79 [LBHI_SEC_07940_ICP_007982].

[1062] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 7; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 8.

successfully complete a project.[1063] While certain PTG positions included sale or transfer restrictions, Lehman recognized that a third-party investor evaluating a PTG investment prior to the completion of a development would need to conduct significant due diligence on the developer responsible for the project, as the profitability of the investment largely depended on the developer's ability to complete the project on time and on budget.[1064] Koutouvides explained that Lehman relied on the developer to successfully complete the project, and that the relationship between Lehman and a developer could be described as a "marriage."[1065]

Lehman recognized that PTG investments were "higher-risk, higher-return" than Commercial Book investments,[1066] due to the lack of stabilized cash flows and the risk that development or improvement of the asset might not be accomplished according to the business plan.[1067] For example, a project could be delayed or derailed due to the developer's failure to timely obtain necessary zoning variances or to successfully

---

[1063] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 7.

[1064] *Id.* at pp. 4, 5, 17.

[1065] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 8.

[1066] *E.g.*, Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 4.

[1067] *E.g.*, Lehman, GREG Global Real Estate Update (Nov. 6, 2007), at p. 12 [LBEX-WGM 771145] (identifying key risks to include "refinancing risk," "residential sales," "execution," and "credit risk"); Lehman, GREG University: START Training Analysts & Associates Deep Dive Training Presentation (Sept. 2007), at p. 96 [LBHI_SEC_07940_ICP_007982] (identifying CRE risks generally); Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 8.

manage a project.[1068]  The developer's failure to perform in accordance with the business plan could have a material effect on the value of the PTG investment.[1069]

Given that the entity owning the underlying real estate was often highly leveraged, and a PTG asset generated insufficient cash flow until the completion of development, Lehman's expectation was that the entity would have substantial difficulty repaying the debt at maturity unless the development was successfully completed.[1070]  Similarly, execution of the business plan was crucial to obtaining Lehman's targeted annual rate of return (or yield), for example, 20% for a PTG equity

---

[1068] E-mail from Aristides Koutouvides, Lehman, to Anthony J. Barsanti, Lehman (May 16, 2008) [LBHI_SEC07940_2229897]; Zev Klasewitz, Lehman, Single Asset Debt Model May 2008 Spreadsheet (June 14, 2008), at tab "Pricing," cell BK98 [LBEX-LL 1985749]; Dennis Grzeskowiak, TriMont, Knickerbocker Hotel IRR Model (July 1, 2008), at cell F2 [TR00021056]; Lehman, Single Asset Debt Model Aug. 2008 Spreadsheet (Aug. 31, 2008), at cell BK95 [LBEX-BARFID 0023236]; Lehman, Valuation & Control Report – Fixed Income Division (Dec. 1, 2007), at p. 22 [LBEX-WGM 755798] ("Project is still in the entitlement process"; "[o]verall financing package is being restructured"); Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 8.

[1069] Lehman, GREG Global Real Estate Update (Nov. 6, 2007), at p. 12 [LBEX-WGM 771145] (identifying key risks to include "refinancing risk," "residential sales," "execution," and "credit risk"); Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 8.

[1070] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 5, 12.  Additionally, if the development failed, Lehman could foreclose on the real estate and attempt to salvage value from the asset by revising the business plan, which could include partnering with a new developer or selling the property.  When Lehman foreclosed and took ownership, the asset became "Real Estate Owned" or "REO."  Lehman, Corporate Audit Dept. Entity Control Evaluation for Commercial Real Estate – Mezzanine & Equity (Jan. 4, 2006), at p. 2 [LBHI_SEC_07940_ICP_010891]; Memorandum from Robert Martinek, E&Y, to E&Y Audit Team for Lehman Brothers, re: Lehman Brothers Commercial Real Estate Portfolio (Dec. 17, 2006), at p. 5 [EY-LE-LBHI-KEYPERS 0675302] (noting that Lehman foreclosed on a borrower and categorized the note as an REO).

investment in land developments.[1071]   Either way, as Barsanti told the Examiner, "[i]f you could not execute your plan – you're dead."[1072]

### (3)  Evolution of Lehman's PTG Portfolio From 2005 Through 2008

As Lehman executed its growth strategy during 2006 and 2007, the PTG portfolio grew larger in size and the average position became riskier.  Beginning in November 2006, the PTG book balance sheet increased substantially, as illustrated by the following graph.[1073]



**U.S. PTG Balance Sheet Value at Risk over Time**

---

[1071] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 5, 12.  According to Koutouvides, this 20% rate for equity approximated Lehman's expected rate of return for underwriting a deal. Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 7.

[1072] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 5.

[1073] *See* Lehman, Balance Sheet Trend and Profit & Loss Spreadsheet (Sept. 14, 2007) [LBEX-DOCID 2504119] (2002-2006 data); Lehman, GREG (PTG) Balance Sheet Position as of Nov. 30, 2007 (Dec. 6, 2007) [LBEX-DOCID 1374315] (Nov. 2007 data); Lehman, Global Real Estate Group (PTG) Balance Sheet Position as of Aug. 31, 2007 (Sept. 7, 2007) [LBEX-DOCID 1639856] (Aug. 2007 data); Lehman, GREG (PTG) Balance Sheet Position as of Feb. 29, 2008 (Mar. 5, 2008) [LBEX-DOCID 1374362] (Feb. 2008); Lehman, GREG (PTG) Balance Sheet Position as of May 31, 2008 (June 4, 2008) [LBEX-DOCID 1639939] (May 2008 data); GREG (PTG) Balance Sheet Position as of Aug. 31, 2008 (Sept. 4, 2008) [LBEX-DOCID 4418520] (Aug. 2008 data).

After remaining relatively constant from 2002 to 2005, the PTG balance sheet grew 57% between fiscal year 2005 and fiscal year 2007, or from $6.1 billion in fiscal year 2005, to $6.9 billion in fiscal year 2006, and to $9.6 billion in fiscal year 2007.

During this period, the composition of the PTG portfolio also changed in ways that made the portfolio more risky.[1074] The increasing level of risk associated with Lehman's PTG investments was largely the result of three factors: (1) an increased focus on land development projects; (2) a focus on California and other boom markets; and (3) a greater proportion of equity investments. Each of these factors is discussed below.

In regard to the first factor, land developments, Lehman determined that certain types of PTG investments, such as office building upgrades, no longer provided the returns the business required due to competition from other investors who were willing to accept lower returns.[1075] In order to obtain the targeted return on investment, PTG redirected its focus to developing land, particularly for residential development.[1076]

---

[1074] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 5; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 8.

[1075] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 5; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 8.

[1076] Lehman, GREG, America's Portfolio as of June 30, 2008 (July 19, 2008), at p. 4 [LBHI_SEC07940_241063] (stating that "PTG's largest exposure is in land"); Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 5; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 8. As noted, Lehman's SunCal positions are not included in this analysis and would inflate the total value of the PTG portfolio if included. However, the Examiner notes that SunCal is another example of this trend. *See, e.g.*, Cushman & Wakefield, Appraisal of Pacifica San Juan Master Plan (289 Lots) (Oct. 1, 2007) [TR00031835].

For example, Lehman's investment in Heritage Fields, PTG's largest position, representing approximately 6% of the PTG portfolio as of May 2008, involved the creation of a new residential community on the site of a decommissioned Marine Corps base near Irvine, California.[1077] The Heritage Fields developer proposed the preparation of parcels to be subdivided between builders of a planned community that included 4,895 residential units, along with parks, a golf course, educational facilities, a medical office, and commercial space.[1078] Lehman provided $500 million in first lien financing for Heritage Fields in December 2005 and provided an additional $275 million of financing in June 2007.[1079]

The PTG portfolio's increasing concentration of land developments, such as Heritage Fields, increased the overall risk profile of the portfolio. Land carries more risk than all other property types and is the most volatile in terms of value.[1080] As a

---

[1077] *See* TriMont, Heritage Fields El Toro LLC IRR Model (May 1, 2008) [LBEX-BARFID 0026891]; Zev Klasewitz, Lehman, Single Asset Debt Model May 2008 Spreadsheet (June 14, 2008) [LBEX-LL 1985749]. Lehman did not invest directly in the homebuilding for Heritage Fields. Instead, Lehman invested in the sponsor, LNR Property Corp., that was to prepare the infrastructure and provide environmental clean-up in order to deliver the land parcels that would be subdivided between builders. Memorandum from Brent Bossung, *et al.*, Lehman, to LBHI Investment Committee, re: Loan Proposal for Heritage Fields, LLC (July 1, 2005), at pp. 3, 6-9 [LBEX-AM 193357].

[1078] Cushman & Wakefield, Heritage Fields Master-Plan Self-Contained Appraisal Report Vol. I (July 1, 2007), at p. 8 [LBEX-DOCID 2501688]; Lehman, Real Estate Deal Summaries:  Top 50 Asset Reviews (Sept. 13, 2008), at tab 8 [CS-SEC-00003929].

[1079] Lehman, Real Estate Deal Summaries:  Top 50 Asset Reviews (Sept. 13, 2008), at tab 8 [CS-SEC-00003929]; TriMont, Heritage Fields El Toro LLC IRR Model (May 1, 2008) [LBEX-BARFID 0026891].

[1080] *See* Stuart M. Saft, 7 Comm. Real Estate Forms 3d § 22.2 (Nov. 2009) ("The biggest risk of an investment in undeveloped and developing land is the virtual impossibility of predicting the direction of growth and the ever increasing cost of holding the land for future development. . . . Another problem is determining the sales price of raw land due to the fact that, unlike securities, there is no established market, which makes determining comparable sales impossible."); John D. Hastie, Real Estate

general matter, land is only projected to appreciate if it is "entitled," meaning that the developer has obtained the various zoning and environmental approvals to construct the development.[1081]  The risk associated with investments in land is that approvals to construct the development might not be obtained, or might be obtained only after significant delay.[1082]  Furthermore, given the time required to obtain such approvals and to then build the physical structures, there is the possibility of significant changes in the real estate market during the development period.  For example, when Lehman first provided financing to Heritage Fields in December 2005, the expectation was that the land entitlements would be obtained in December 2006, construction of improvements would follow over the course of several years, and sales would continue through 2013.[1083]

In addition, the PTG portfolio was particularly concentrated in California land development.  The rising value of all types of California property throughout the 2000s (particularly in 2005 and 2006),[1084] combined with low interest rates, perceived consumer

---

[1081] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 8.

[1082] *Id.*

[1083] Memorandum from Brent Bossung, Lehman, *et al.*, to LBHI Investment Committee, re: Loan Proposal for Heritage Fields, LLC (July 1, 2005) at pp. 3, 6-9 [LBEX-AM 193357].

[1084] *See* Moody's/REAL Commercial Property Price Index, http://mit.edu/cre/research/credl/rca.html; Fed. Housing Fin. Agency, House Price Index for California (CASTHPI), http://research.stlouisfed.org/fred2/series/CASTHPI (showing a peak in house prices in 2005 and 2006).

demand for housing, available liquidity, and Lehman's recent track record of success, made raw California land an attractive PTG investment to Lehman during this period.[1085]  As of the end of the second quarter of 2007, California land development represented 17.6% of the balance sheet at risk in the PTG portfolio.[1086]

Finally, Lehman's risk exposure also increased as it took equity stakes in developments.[1087]  For fiscal year 2004, PTG equity made up approximately 26% of the PTG portfolio, increasing to 34% in 2005 and 2006.[1088]  During 2007, Lehman took note of the softening market and realized that the PTG portfolio was too concentrated in land development and in equity positions.[1089]  Koutouvides noted that the market was "dropping like a stone."[1090]  Kenneth Cohen stopped approving, and originators stopped submitting, deals where Lehman was not sufficiently senior in the capital structure (*i.e.*, first lien debt instead of equity), thereby reducing the risk profile.[1091]

---

[1085] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 5.  A presentation given by Paul A. Hughson outlines several advantageous aspects of the California market.  Paul A. Hughson, Lehman, The Search for Yield – Alternative Real Estate Investment Opportunities (June 20, 2006) [LBEX-DOCID 1745526].

[1086] Lehman, Portfolio Characteristics – Americas (Principal Investments and CMBS Retained Positions) Spreadsheet as of May 31, 2007 (Oct. 23, 2007) [LBEX-DOCID 2501412].  SunCal is not included in this percentage.

[1087] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 5, 8.

[1088] Ketaki Chakrabarti, Lehman, Real Estate Balance Sheet Trends Spreadsheet (Apr. 18, 2007) [LBEX-DOCID 1419729]; Melissa Sullivan, Lehman, Bridge Equity Spreadsheet (July 5, 2007) [LBEX-DOCID 3604474].

[1089] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 6; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 9.  *See* E-mail from Jeffrey Goodman, Lehman, to Anthony J. Barsanti, Lehman (Jan. 3, 2007) [LBEX-DOCID 249993] (discussing deteriorating home-building market in California and forwarding article with a "pretty negative view of CA land").

[1090] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 9.

[1091] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 6.

At the end of fiscal year 2007, despite further growth in the PTG portfolio, the proportion of equity investments had decreased slightly to 30% of the PTG portfolio.[1092] Lehman originated fewer PTG positions during the last quarter of 2007, a trend that continued into 2008.[1093] In addition, Lehman wrote down the value of PTG investments by $137 million in the fourth quarter of 2007 and by $271 million in the first quarter of 2008.[1094] Lehman wrote down PTG assets by $302 million in the second quarter of 2008.[1095]

As of the end of the second quarter of 2008, Lehman held 741 positions in the PTG portfolio. Lehman valued these positions at $8.5 billion with an average position

---

[1092] Lehman, GREG (PTG) Balance Sheet Position as of Nov. 30, 2007 (Dec. 6, 2007) [LBEX-DOCID 1374315].

[1093] Laura M. Vecchio, Lehman, FAS 144 Face_Basis Spreadsheet (July 14, 2008) [LBEX-DOCID 587401]. Lehman originated 52 positions in the fourth quarter of 2007, 40 in the first quarter of 2008, and 19 in the second quarter of 2008. *Id.*

[1094] Lehman, Global Real Estate 2008 Net Mark Downs (Sept. 5, 2008) [LBEX-AM 346991]. The net figures subtract Lehman's write-ups on PTG assets from the write-downs. Although net write-downs typically include the offset from hedging, the Examiner's financial advisor has observed that Lehman did not effectively hedge PTG positions during this period. Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 9. The gross write-down figures are $137 million in fourth quarter 2007 and $318 million in first quarter 2008. Lehman did not write up PTG assets in fourth quarter 2007, but did write up certain PTG assets by $47 million in first quarter 2008 (principally, Troxler – Spring Mountain Ranch). Lehman, Global Real Estate 2008 Net Mark Downs (Sept. 5, 2008) [LBEX-AM 346991].

[1095] Lehman's gross write-down for second quarter 2008 was $316 million, with a $13 million write-up. Lehman, Global Real Estate 2008 Net Mark Downs (Sept. 5, 2008) [LBEX-AM 346991].

size of $11 million.[1096]   At that time, the PTG portfolio featured the following property

types:[1097]



**Balance Sheet Value at Risk by Property Type**

| Property Type | # of Positions |
|---|---|
| Condo | 146 |
| Hotel | 46 |
| Industrial | 27 |
| Land | 210 |
| Multifamily | 103 |
| Office | 128 |
| Other | 64 |
| Retail | 17 |
| **Total** | **741** |

Approximately 33% of the overall portfolio, or 210 positions, was land for development, with condominium developments and conversions comprising the second largest category.

The size of the PTG portfolio decreased slightly between the second and third quarters of 2008, from 741 positions valued at $8.5 billion to 690 positions valued at $7.8

---

[1096] Lehman, Real Estate Price Verification Presentation [Draft] (July 17, 2008), at p. 3 [LBHI_SEC07940_1169231].  The U.S. PTG portfolio accounted for 60.3% of the total PTG portfolio in terms of balance sheet at risk.  The remaining PTG positions were held in the Asia and Europe portfolios. *Id.*

[1097] Lehman, Global Real Estate Inventory Spreadsheet as of May 31, 2008 (Aug. 8, 2008) [LBEX-DOCID 2077095].  The category "Land" was labeled "Land/Single Family" by Lehman in internal presentations. Based on a limited review of underlying positions, the Examiner's financial advisor has observed that this category only contains land development assets.

billion.[1098]  This decrease was primarily driven by a $504 million net write-down in the third quarter.[1099]

By 2008, Lehman had slowed the pace of new originations, but still held many relatively risky positions originated during the up-market of 2004-2007.  These positions, especially equity positions in land development projects, proved difficult to accurately value throughout 2008, as is discussed below.

### (4)  Lehman's Valuation Process for Its PTG Portfolio

Determining the fair value of any asset, especially illiquid assets such as PTG debt and equity positions, requires the party performing the valuation to exercise judgment as to a variety of criteria that a potential purchaser would consider.[1100]  These criteria include, among others, the amount of future expected cash flows expected from the asset and an investor's willingness to accept the risk that the asset will not produce these cash flows.[1101]  These criteria are reflected in the two components of the "mark-to-market" valuation process: "marking to credit" and "marking to yield."[1102]

---

[1098] *Id.*; Lehman, GREG Inventory Spreadsheet as of Aug. 31, 2008 (Sept. 13, 2008) [LBEX-DOCID 1025119].  The SunCal positions are excluded from this calculation.  The Examiner's financial advisor observed that the data in Lehman's PTG files do not include the basis for a position being removed from the PTG portfolio (other than sales to third parties).

[1099] Lehman, Global Real Estate 2008 Net Mark Downs (Sept. 5, 2008) [LBEX-AM 346991].  The Examiner notes that a summary of write-downs in E&Y's workpapers suggests $503 million for PTG positions. The difference is due to rounding.  See Lehman, 3Q Real Estate Gross and Net MTM Cash Bonds Spreadsheet (Aug. 29, 2008) [EY-SEC-LBHI-MC-GAMX-08-045830].

[1100] *See* Appendix 1, Legal Issues, Section VII.A, for a more detailed discussion of the legal standard for determining fair value pursuant to SFAS 157.

[1101] Future expected cash flows refer to the weighted average of projected cash flow projections adjusted for the probability that the cash flow will materialize.  For example, if there were two cash flow projections, (1) a 50% chance that cash flow will be $10 and (2) a 50% chance that cash flow will be $20 in

In the context of Lehman's PTG portfolio, marking to credit refers to recognition of changes in the amount and/or timing of the future expected cash flows from the properties underlying the PTG positions (the "collateral").[1103]  In terms of marking a PTG asset, marking to credit includes the recognition of a changed collateral value due to any change in the business plan that changed the amount of cash flows the collateral was expected to generate and/or the time period in which the expected cash flows would be received.[1104]  Thus, marking to credit takes into account the changed circumstances of the particular asset in question.

In contrast, marking to yield takes into account changes in broader market conditions affecting the value of an asset even if the circumstances of the asset itself have not changed.  Yield — sometimes referred to as a rate of return or discount rate — is the discount rate used to determine the present value of the future expected cash flows, accounting for the risk that the asset will not perform as expected.  As an

---

Year 1, the expected cash flow for Year 1 is $15, which is computed as follows:  (50% * $10) + (50% * $20)  = $15.

[1102] The terms "marking to credit" and "marking to yield" were used by various Lehman personnel who were responsible for the valuation of PTG assets.  *E.g.*, Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 6; Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 7; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 18.  For example, in reviewing the proposed PTG write-downs for the third quarter of 2008, Kenneth Cohen made notes on a document stating whether the reason for the write-down was "Credit" or "Yield."   Kenneth Cohen, Lehman, Q3 Writedown Fax (Aug. 25, 2008) [LBHI_SEC07940_2278242].

[1103] Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 7.

[1104] Marking to credit would result in an increase in value if the change in the business plan resulted in an increase in expected cash flows and/or accelerated the time period in which the expected cash flows would be received.

investor's willingness to accept the risk associated with an asset decreases, the yield demanded to purchase the asset increases and the purchase price goes down.

For the valuation of equity positions in the PTG portfolio, yield is relevant for the determination of the value of the underlying collateral. For the loans and debt instruments in the PTG portfolio, yield is relevant for the same purpose, but also for determining the discount rate required for valuing the debt investments that are backed by the collateral.[1105] Both discount rates adjust value to account for the risk that the expected cash flows will not materialize, but one is in relation to the cash flows produced by the underlying collateral and the other to the cash flows produced by the debt instrument.

In short, marking to market is integral to the concept of fair value. Marking to credit involves adjusting the value for deterioration (or appreciation) of future cash flows expected from the investment. Marking to market-based yield involves discounting the cash flows expected based on a rate of return that is required by investors as of the valuation date.

---

[1105] For an example of a discount rate used in valuing the underlying real estate collateral, see TriMont, Asset Status Report for Heritage Fields El Toro LLC (July 1, 2008), at tab "NPV" [LBEX-BARFID 0027112]. For an example of a discount rate used in valuing the debt investments that were backed by the collateral, see Zev Klasewitz, Lehman, Single Asset Debt Model May 2008 Spreadsheet (June 14, 2008), at tab "matrix(new)" [LBEX-LL 1985749].

### (a) The Role of TriMont in the Valuation Process for Lehman's PTG Portfolio

Lehman's valuation process for its PTG Portfolio began with TriMont providing asset-specific information to the PTG business desk and Product Control. On the business desk, Barsanti and Koutouvides used that information, supplemented by their knowledge of the status of the development and local market conditions, to value the PTG positions.[1106] Product Control entered the TriMont data and other data into their models to price test the valuations determined by the business desk.[1107]

PTG outsourced a substantial part of the loan servicing and asset management functions to TriMont, its primary asset servicer.[1108] Given the substantial number and geographic diversity of PTG positions, it was more cost-effective for TriMont to provide these services than to use Lehman personnel.[1109] As of May 2008, TriMont serviced over 90% of Lehman's PTG assets.[1110]

---

[1106] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 9, 11-12; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 11-12.

[1107] Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation to the SEC (Feb. 1, 2008), at p. 5 [LBEX-WGM 916015]; Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 8; Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at p. 5.

[1108] Lehman & TriMont, Amended and Restated Loan Servicing and Asset Management Agreement (Sept. 1, 2004), at pp. 11-12 [TR00044479].

[1109] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 9; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 8, 9-10.

[1110] *See* Zev Klasewitz, Lehman, Single Asset Debt Model May 2008 Spreadsheet (June 14, 2008) [LBEX-LL 1985749]; Zev Klasewitz, Lehman, Single Family Debt Model May 2008 Spreadsheet (June 14, 2008) [LBEX-LL 1985605]; Lehman, Single Family Equity Model May 2008 Spreadsheet (May 31, 2008) [LBEX-LL 1985924]; Lehman, Strategic Equity Model May 2008 Spreadsheet (May 31, 2008) [LBEX-BARSOX 0000594]; Zev Klasewitz, Lehman, Single Family REO Model May 2008 Spreadsheet (June 13, 2008) [LBEX-LL 1985887]; Lehman, Strategic REO Model May 2008 Spreadsheet (May 31, 2008) [LBEX-LL 1985926].

TriMont serviced loans, handled insurance issues for the underlying real estate, dealt with the administrative aspects of funding borrowings for construction, and dealt with the local developer on a regular basis regarding operational issues.[1111] With respect to the valuation process, TriMont provided Lehman with property-level data, as well as data regarding overall value of the development and the status of the project.[1112] Barsanti and Koutouvides relied on this information to value the PTG positions.[1113] Koutouvides had day-to-day responsibility for working with TriMont.[1114] Lehman's policy was to not disclose its marks to TriMont, thus ensuring that TriMont provided data free from the influence of Lehman's valuation of its investments.[1115]

---

[1111] Lehman & TriMont, Amended and Restated Loan Servicing and Asset Management Agreement (Sept. 1, 2004), at pp. 11-12 [TR00044479]; Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 9. PCCP, LLC, serviced a smaller number of assets that are irrelevant to this analysis. Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation to the SEC (Feb. 1, 2008), at p. 5 [LBEX-WGM 916015]; Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 10.

[1112] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 10, 14. As part of the 2007 audit, E&Y internally circulated a review of 25 positions. Memorandum from Robert Martinek, E&Y, to E&Y Audit Team for Lehman Brothers, *et al.*, re: Lehman Brothers Commercial Real Estate Portfolio (Jan. 24, 2007), at p. 1 [EY-LE-LBHI-WP-HC 000397]. TriMont provided valuation data for all of these positions, and the review concludes for all of them that TriMont provided a valuation estimate "within the expected range of probable values supported by the market." *Id.* at pp. 3, 5, 7-9, 11, 13, 15, 17-18, 20, 22, 24-25, 27, 29, 30, 32, 34-35, 37.

[1113] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 9; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 10, 14.

[1114] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 9; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 10, 14; Lehman, GREG, Introduction to Asset Management (Sept. 11, 2007), at p. 3 [LBEX-LL 2746736] (describing TriMont as "[i]dentify[ing] deals, property types, sponsors and/or markets to focus asset manager efforts" and "[d]evelop[ing] and deliver[ing] efficient reporting to [Lehman] at the deal and portfolio level (projected deal P&L, IRR returns, annual valuations, expected payoffs, etc.").

[1115] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 9; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 12.

The value of the underlying real estate — the collateral value — was the most important piece of information for purposes of valuation.[1116]  For each asset, TriMont provided a collateral value eight months after Lehman made its investment, and annually thereafter.[1117]  Lehman typically did not change a PTG valuation from par (*i.e.*, 100% of the investment or the funded amount) unless there was a "triggering event," such as a failure of the business plan that reduced the collateral value provided to PTG by TriMont[1118]

The data files produced by TriMont for the second quarter of 2008 categorize the collateral valuation methods in a variety of ways, but as the data was incomplete, the Examiner's financial advisor identified the method used to value collateral for 473 of the 741 positions (or 64% of the PTG portfolio).[1119]  Among these 473 positions, the valuation

---

[1116] Examiner's Interview of Jennifer Park, Sept. 10, 2009, at p. 8, Examiner's Interview of Abebual A. Kebede, Oct. 13, 2009, at p. 6; Examiner's Interview of Eli Rabin, Oct. 21, 2009, at pp. 6-7.

[1117] Lehman & TriMont, Amended and Restated Loan Servicing and Asset Management Agreement (Sept. 1, 2004), at p. 23. [TR00044479].  In July 2008, TriMont agreed to reduce this to three months after closing. TriMont, TriMont Valuation Methodologies for Lehman Brothers PTG and LLG Assets: General Guidelines (July 1, 2008) [LBHI_SEC07940_1201683].  TriMont listed both the "current value," which was the present value of the asset, and the "stabilized value," which was the anticipated value of the asset after the development project was completed and the asset was generating sufficient operating revenue. Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 10, 12.

[1118] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 10.  Koutouvides confirmed Barsanti's statement, saying "there had to be a catalyst for the value to change."  Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 10-11.

[1119] TriMont, TriMont Valuation Methodologies for Lehman Brothers PTG and LLG Assets: General Guidelines (July 1, 2008) [LBHI_SEC07940_1201683].  For examples of the TriMont export spreadsheets, see the May 2008 TriMont export spreadsheet for debt positions, TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026], and the May 2008 TriMont export spreadsheet for equity positions. TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362].

method used by TriMont can be separated into two general categories: historical cost-based valuation methods and market-based methods.

The historical cost-based valuation methods were used for at least 228 positions, or about 30% of the positions in the PTG portfolio in the second quarter of 2008.[1120] These methods relied primarily on capitalization of the development, along with some multiplier, to calculate collateral values.[1121] Cap * 105 was the method used for the vast majority of these positions, although variations of the capitalization method were also used.[1122]

The market-based methods were used for at least 245 positions, or 33% of the positions in the PTG portfolio in the second quarter of 2008.[1123] These categories included IRR models (80 positions), as well as other methods that incorporated market-based assumptions.[1124] However, the TriMont spreadsheets contain little explanation for several of these methods. For some categories, such as "purchase offer" (17 positions), the method appears to be self-explanatory, but the TriMont files refer to facts that were

---

[1120] Cap * 105 was used for 225 of these positions and Cap * 100 for 3 positions.

[1121] Due to limitations in the data, the Examiner has not determined why any of the variants of Cap * 105 were used instead of Cap * 105, but all of them appear to be equivalent in using historical cost-based approaches in valuing collateral and not including any market data.

[1122] TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026]; TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362].

[1123] TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026]; TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362].

[1124] The full list of categories includes: purchase offer, IRR, expected sale price, market prices, sell-out calculation, paid off, property sold, and cap rate. For examples of the TriMont export spreadsheets, see the May 2008 TriMont export spreadsheet for debt positions, TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026], and the May 2008 TriMont export spreadsheet for equity positions. TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362].

not documented in the files.[1125]   For other categories, such as one for sell-out developments (95 positions),[1126] the TriMont files simply note a "sell-out calculation" was performed, but provide very little additional information.[1127]   The Examiner's financial advisor has observed that most of these methods appear to rely on market-based assumptions, but there is insufficient information for the Examiner to evaluate the inputs TriMont used or the basis for the collateral value calculated.

However, one particular market-based method for calculating collateral value was the focus of PTG and TriMont during this time – the discounted cash flow method that served as the basis for IRR models.   As described below, Lehman and TriMont were in the process of incorporating IRR models throughout 2007 and 2008.  Because of the increased use of IRR models, and the effect that this switch had on Lehman's valuation of PTG assets, the Examiner has focused on this method in evaluating the reasonableness of Lehman's PTG valuations during the second and third quarters of 2008.

---

[1125] For example, for "purchase offer," the Examiner's financial advisor has observed no evidence showing the terms of any offer from an investor or how that was used to value the collateral.

[1126] A "sell-out" development is a real estate development in which the business plan is to sell off individual units of the property rather than the property as a whole.

[1127] TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026]; TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362].

### (i)  Lehman's Issues with TriMont's Data

According to several Lehman witnesses, it was commonplace for TriMont's data to include errors.[1128]  Koutouvides told the Examiner that TriMont had "weak controls" for valuing land development assets.[1129]  When the data indicated that a position might need to be remarked, it was sometimes caused by an error.[1130]  The errors were substantial and extensive enough that Koutouvides spent much of his time fixing TriMont's errors.[1131]  Koutouvides noted that, despite instructing TriMont to fix data as to an asset in one month, the same problem would often reappear the next month.[1132]  During the period in which TriMont was providing IRR models, Koutouvides

---

[1128] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 13-14; Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 8; Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at p. 5; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 13.  *See* Lehman, Business Requirements Document (Full) for GREG – TriMont Export File [Draft] (Oct. 29, 2007), at p 7 [LBEX-DOCID 3501542] ("In the current system, Trimont has not modeled the exit date as a function to factor the changes in market condition.  The changes in market condition may result in repayment delays and hence the exit date may change."); e-mail from Anthony J. Barsanti, Lehman, to Britt Payne, TriMont (July 25, 2007) [LBEX-DOCID 2291650] (Barsanti responding "I thought so" to Payne's message that "the value for Annapolis Junction at 100% of capitalization is overstated" and "its a write-off"); e-mail from Eli Rabin, Lehman, to Aristides Koutouvides, Lehman (Dec. 12, 2007) [LBEX-DOCID 1639358] ("According to the [TriMont] export, this property has already been sold.  I know this is still an active position on the BS, so I know something is incorrect.").  Because of the errors, Koutouvides considered the stabilized value reported by TriMont to be useless.  Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 15.

[1129] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 13.

[1130] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 13; Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at p. 5.  Platt stated that, on occasion, a position would have a value that made absolutely no sense.  For example, the position should have been making money but was not.  Platt stated that she would assume that TriMont's data was flawed, such as that there was a wrong maturity date that threw off the cash flows, rather than conclude that the position needed to be remarked.  *Id.*

[1131] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 13.

[1132] *Id.*  According to Koutouvides, PTG hired him in late 2006 in part to improve TriMont's data reporting.  Koutouvides stated that, even though he had no prior real estate experience, PTG hired him from Lehman's corporate division because of his experience overhauling Lehman's IT system and infrastructure.  *Id.* at p. 6.

characterized several meetings with TriMont as "screaming matches," where he and Barsanti expressed frustration at TriMont's inability to provide accurate data.[1133]

In Koutouvides' view, TriMont asset managers varied widely in ability, and some had become too close to the developers, such that the asset managers were not reporting on deteriorating local market conditions, preferring instead to rely on the developer's assurances that the project would be a success.[1134]  Koutouvides recalled that, on at least one occasion, his concern that the TriMont asset managers were not obtaining credible data as to the status of the project and local market conditions resulted in his telling TriMont's asset managers to "stop feeding me bullshit.  I don't believe you."[1135]

Barsanti disagreed with Koutouvides' opinion that TriMont provided high valuations, but he confirmed that there were many instances where PTG had to instruct TriMont to correct the data.[1136]

### (ii)  Lehman Changed Its Valuation Methodology for Its PTG Portfolio in Late 2007

As noted, until 2007 Lehman's primary method for valuing the collateral underlying its PTG positions was the Cap * 105 method.  Cap * 105 calculated the

---

[1133] *Id.* at p. 14.

[1134] *Id.*

[1135] *Id.*

[1136] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 13-14.  Barsanti stated that, in his view, TriMont had a conservative view towards valuation. *Id.* Barsanti also stressed throughout his interview with the Examiner the difficulty of valuing PTG assets without sales data to give an indication of value.  *Id.* at p. 11.

current capitalization of the underlying property (*i.e.*, outstanding debt plus equity invested to date), and then multiplied this number by 105% to estimate the value of the collateral as of the specific valuation date.[1137]  The additional 5% represented the presumed appreciation of the collateral.

By late 2007, Lehman had determined that Cap * 105 was not an appropriate methodology for determining collateral value.[1138]  In an upward trending market, Cap * 105 tends to undervalue collateral when appreciation occurs at a rate higher than 5%.[1139]  Kebede, Vice President in Product Control, stated that Cap * 105 was a way to restrain value inflation "when the markets were going crazy."[1140]  Despite pressure from auditors and other business units, PTG's policy was to not write up positions until the business plan was substantially executed and realization of gains was imminent.[1141]

When real estate values began to decline in 2007, Cap * 105 started to overvalue PTG collateral.[1142]  Because Cap * 105 simply calculated current capitalization and added

---

[1137] A deal's "total capitalization" includes all outstanding debt – such as loan principal – and equity as of the valuation date, including borrower's equity and/or invested capital.

[1138] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 12-13; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 15.  *See* e-mail from Ed Dziadul, RealCom Financial Partners LLC, to Dennis Grzeskowiak, TriMont, *et al.* (Mar. 23, 2008) [LBEX-DOCID 2293586] (noting that TriMont's collateral valuation methodology made current value "worthless").

[1139] *See, e.g.*, Lehman, Valuation & Control Report – Fixed Income Division (Dec. 1, 2008), at p. 27 [LBEX-WGM 755798] ("Current valuation methodology for land development projects is based on cap * 105%, which was a conservative or prudent approach [in] an up-market.").

[1140] Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at p. 4; Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 10.

[1141] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 10; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 11.  Barsanti stated that this policy came directly from Kenneth Cohen and Mark A. Walsh.  Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 10.

[1142] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 12-13.

a 5% premium, it could never capture deterioration of collateral value that could happen through, for example, market-wide declines in property values. Product Control determined by the end of 2007 that although Cap * 105 "was a conservative or prudent approach [in] an up-market . . . [g]iven current market conditions, this approach may not be appropriate."[1143]

In early 2007, PTG began to enact a plan to change TriMont's provision of asset-level data.[1144] This overhaul in the reporting system was intended to require TriMont to provide support for assumptions about assets and to be more responsive to marketplace changes.[1145] As part of that overhaul, PTG decided that Cap * 105 was "not going to cut it," and planned to have TriMont's calculation of collateral value move to a more market-based methodology.[1146] PTG and TriMont referred to the new models based on this methodology as IRR models.

Barsanti and Koutouvides preferred IRR models to Cap * 105 because the models had the ability to value collateral under a discounted cash flow method, which Barsanti and Koutouvides considered to be the best method for valuing collateral for PTG

[1143] *See, e.g.*, Lehman, Valuation & Control Report – Fixed Income Division (Dec. 1, 2007), at p. 27 [LBEX-WGM 755798].

[1144] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 12-13; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 15.

[1145] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 4, 15.

[1146] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 13.

positions.[1147]   Under the discounted cash flow method, an IRR model calculated the

current value of collateral by determining the Net Present Value ("NPV") of all monthly

discounted Net Cash Flows ("NCF").[1148]   As a first step, the IRR model calculated the

NCF produced by the asset by taking monthly expected revenue and subtracting

monthly expected expenses.[1149]   To this result, the IRR model applied a discount rate to

produce the NPV of the NCF.   In order to reflect fair value, the discount rate should

reflect, for both equity and debt investments, the yield an investor would require to

purchase the property.   However, Lehman generally attributed a discount rate for the

equity portion of the capital structure based on Lehman's expected rate of return (*i.e.*

20% for land developments) and, for debt, a discount rate based on the interest rate

associated with the underlying loans at origination.[1150]   The IRR models took a weighted

---

[1147] *Id.*; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 4, 15.   The Examiner's financial advisor has observed that IRR models are a flexible tool for valuing collateral and do not necessarily use the discounted cash flow method for every valuation.   However, the primary reason PTG required TriMont to use IRR models was that they performed a discounted cash flow analysis.   *Id.*

[1148] TriMont, TriMont Valuation Methodologies – Lehman PTG and LLG CMBS Hold Assets (Apr. 28, 2008) [LBEX-DOCID 2089942].   The cash flows in this calculation included the cash flows expected to be generated by the property that would be available for distribution to all investors.

[1149] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 14.   Revenues consisted of all of the income that the investors in the property expected to generate from the time of investment through execution of the exit strategy.   As of 2007, the revenues for PTG assets typically were the sales revenue once the project was completed (*i.e.*, sale of a hotel), but sometimes the asset generated revenue in the form of rent, portions of a development sold, or other payments before its sale.   Expenses could include anything the investors expected to pay in development costs (*i.e.*, entitling land, construction), financing costs (*i.e.*, loan fees, interests), or other indirect costs (*i.e.*, administrative fees, marketing).

[1150] TriMont, TriMont Valuation Methodologies – Lehman PTG and LLG CMBS Hold Assets (Apr. 28, 2008) [LBEX-DOCID 2089942].

average between these two rates to arrive at the weighted average discount rate for the property.[1151]

Instead of referring just to what Lehman and the other investors paid for the position to reflect current value, IRR models had the advantage of incorporating future events (projected revenues and expenses) into the present value, and then discounting that value in recognition of the risk that the investment might not be successful. Cap * 105 incorporated no discount for risk, and therefore, generally produced higher collateral values than IRR models in a downward trending market.[1152]

The IRR models were implemented on a rolling basis and the models were calibrated after they were put into use.[1153] TriMont started implementing the IRR models in California in 2007, as valuation of California land developments was a primary source of concern for PTG.[1154] Koutouvides and Barsanti worked closely with TriMont in implementing the IRR models, and Koutouvides stated that in March 2007 he was "on a plane all the time" to visit TriMont.[1155]

---

[1151] The weighted average was based on the outstanding debt and the equity invested to date.

[1152] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 15; Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at p. 4.

[1153] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 15. Koutouvides managed the process of acquiring the models, reviewing them with Barsanti, and following up with TriMont to fix errors in the data. *Id.* at p. 10.

[1154] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 13; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 15.

[1155] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 14. *See* e-mail from Lori Giesler, TriMont, to Chris W. Warren, Lehman (Jan. 21, 2007) [LBEX-DOCID 3606437]. Barsanti occasionally joined Koutouvides on these trips. *See* e-mail from Dennis Grzeskowiak, TriMont, to Jim Hill, TriMont, *et al.* (Mar. 7, 2008) [LBEX-DOCID 2293369].

The rollout of IRR models experienced many delays, and TriMont missed several deadlines in 2007 and 2008, causing more frustration for PTG.[1156]  For example, after one missed deadline, Barsanti stated in a March 2007 e-mail that "[a]s the market continues to soften, I can't tell you how much we depend on these IRRs to mark our position."[1157]  Over a year later, on March 23, 2008, an e-mail sent to TriMont by a PTG consultant indicated that the Cap * 105 method, which was still widely in use, was "worthless."[1158]  In Product Control's Valuation & Control Reports, the same comment appears unchanged over a series of months, stating that TriMont was developing IRR models "and walking away from cap * 105% methodology."[1159]  Because of the delays,

---

[1156] *See* e-mail from Dennis Grzeskowiak, TriMont, to Jim Hill, TriMont, *et al.* (Mar. 7, 2008) [LBEX-DOCID 2293367] ("They are refusing to fund the Monte Sereno draw request until the IRR model is updated to reflect the current scenario."); e-mail from Aristides Koutouvides, Lehman, to Anthony J. Barsanti, Lehman (Mar. 7, 2008) [LBEX-DOCID 2293369] ("[T]hey [TriMont] need to update the model accurately before the final number can be determined."); e-mail from Dennis Grzeskowiak, TriMont, to Ed Dziadul, RealCom Financial Partners LLC (Mar. 23, 2008) [LBEX-DOCID 2293586] (containing an e-mail exchange revealing Dziadul's concern as to why "Current Value . . . determined by discounting the 'Remaining Value' to the Exit Date" was not being applied universally and Grzeskowiak's response that "[t]hat ties to TriMont's current valuation methodology . . . we're working on revising that policy").  Barsanti stated that many times he was "laying the hammer down" on TriMont because of its delays, which made updating the collateral values "lumpy."  Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 13.

[1157] E-mail from Anthony J. Barsanti, Lehman, to Lori Giesler, TriMont, *et al.* (Mar. 13, 2007) [LBEX-DOCID 2290789].

[1158] E-mail from Ed Dziadul, RealCom Financial Partners LLC, to Dennis Grzeskowiak, TriMont, *et al.* (Mar. 23, 2008) [LBEX-DOCID 2293586].  Dziadul was a former PTG employee located in California who, after leaving Lehman, assisted with TriMont's implementation of IRR models.  Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 13.

[1159] Lehman, Valuation & Control Report – Fixed Income Division (June 2008), at p. 29 [LBEX-WGM 370046]; Lehman, Valuation & Control Report – Fixed Income Division (July 1, 2008), at p. 29 [LBEX-WGM 790236]; Lehman, Valuation & Control Report – Fixed Income Division (Aug. 2008), at p. 29 [LBEX-BARFID 0000260].  *See also* e-mail from Brian Barry, Lehman, to Jeffrey Goodman, Lehman, *et al.* (June 19, 2008) [LBHI_SEC07940_2234984] ("Within the last 6+/- months, a change to the methodology (for valuations) was implemented by Trimont (at the request of Prod Control & the business).  Trimont has

Koutouvides stated that he often still relied on collateral values based on Cap * 105 in marking positions, as it was the only available information.[1160]

As noted, TriMont's data provided to Lehman did not contain the information necessary to identify the methods used to value the collateral for each PTG position.[1161] However, in May 2008, at least 228 PTG positions still relied on some variant of the capitalization method (such as Cap * 100 and Cap * 105) to value their collateral.[1162] This represented roughly a third of the PTG portfolio. The Examiner's financial advisor has identified IRR models for 80 PTG positions in the second quarter of 2008.[1163] By July 2008, that total for IRR models found increased to 292. Due to limitations in the data, the Examiner's financial advisor has identified only 105 positions that switched from Cap * 105 to IRR models between May and July of 2008.[1164] Barsanti and Koutouvides

made tremendous progress in implementing these changes, it is just a question of how much has actually made it to the export we receive. With that said, Trimont is actively updating current values."); TriMont, TriMont Valuation Methodologies – Lehman PTG and LLG CMBS Hold Assets (Apr. 28, 2008) [LBEX-DOCID 2089942] (replacing 105% of cap methodology with "[l]esser of 100% of Total Cap or the NPV of all monthly NCF's").

[1160] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 15.

[1161] The Examiner determined that it would not be a prudent use of resources to interview numerous TriMont asset managers to determine if they could recall information that was not set forth in the reports provided to Lehman.

[1162] TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026]; TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362].

[1163] TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026]; TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362].

[1164] TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026]; TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362]; TriMont, Debt Export as of July 5, 2008 (Aug. 1, 2008) [LBEX-AM 267134]; TriMont, Equity Export as of July 5, 2008 (Aug. 4, 2008) [LBEX-AM 267510]. The Examiner's financial advisor has identified 153 positions that transitioned from Cap * 105 (or its variants) to a different valuation method, but has not identified what that new method was for 75 positions. There

asserted that, by July 2008, TriMont had implemented use of IRR models for all of the land deals managed by its California office (which had approximately 100 positions) and 80% of those managed by its larger Atlanta office.[1165]

**(b) The Role of Lehman's PTG Business Desk in the Valuation Process for Lehman's PTG Portfolio**

Since PTG assets were risky, illiquid, medium-to-long term investments, the business desk had a difficult time valuing them, particularly during a market downturn.[1166] Under the classification scheme established by SFAS 157, which categorizes assets based on the degree of certainty the valuation process can provide, almost all PTG assets were classified as Level 3, whose values are the most subjective because they depend on unobservable inputs.[1167]

Consistent with the unobservable nature of the valuation inputs, the Examiner's financial advisor has observed that Lehman's records do not indicate the direct relation between the collateral values provided by TriMont and the business desk's mark.

---

is a high likelihood that there were more than 105 positions that transitioned from Cap * 105 to IRR models in July 2008.

[1165] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 13; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 15.

[1166] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 11-14; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 8-9, 13.

[1167] Fin. Accounting Standards Bd., Fair Value Measurements, SFAS No. 157, ¶¶ 21-22, 24 (2006); Lehman, Global Real Estate Inventory Spreadsheet as of May 31, 2008 (Aug. 8, 2008) [LBEX-DOCID 2077095]. As of May 31, 2008, PTG held no Level 1 assets, 6 Level 2 assets, and 380 Level 3 assets. Lehman, Global Real Estate Inventory Spreadsheet as of May 31, 2008 (Aug. 8, 2008) [LBEX-DOCID 2077095]. The remainder of PTG assets were "Consolidated" assets and not subject to SFAS 157. *See* Lehman Brothers Holdings Inc., Press Release: Lehman Brothers Reports First Quarter Results (Mar. 18, 2008), at p. 14 [CITI-LBHI-EXAM 00078274]; Consolidation of Variable Interest Entities, Interpretation of Fin. Accounting Standards No. 46 (Fin. Accounting Standards Bd. 2003).

Lehman's asset managers, Barsanti and Koutouvides, routinely had to look beyond TriMont's data and refer to the business plans and sub-market data for a particular property type, and then exercise independent judgment as to how much the collateral's current value, as determined by the information provided by TriMont, should inform the mark.[1168] Although PTG's records set forth the status of each project, including any problems that the development was experiencing, they do not describe how Lehman employed its judgment to translate such problems into a write-down of a particular amount for the corresponding PTG asset.[1169]

Koutouvides described his valuation process as casting a net with TriMont's data to identify "outliers" and closely observing those positions to determine which ones needed to be remarked.[1170] According to Koutouvides, Lehman's policy for re-valuing a position was that "there had to be a catalyst for the value to change," such as a failure of the business plan.[1171] Koutouvides focused on harder-to-value land and condominium positions.[1172] Notably, 99% of write-downs taken on the PTG portfolio during 2008 related to positions with land or condominiums as collateral.[1173] When the reliability of

---

[1168] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 9, 11, 13-14.

[1169] For example, the Examiner's financial advisor has observed that TriMont's IRR models and Lehman's price testing files do not indicate how exactly the business desk used this information to mark the portfolio or write down assets. *See, e.g.,* TriMont, Asset Status Report for Heritage Fields El Toro LLC (July 1, 2008) [LBEX-BARFID 0027112]; Lehman, Valuation & Control Report – Fixed Income Division (May 2008), at p. 22 [LBHI_SEC07940_2554301].

[1170] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 13.

[1171] *Id.* at pp. 10-11.

[1172] *Id.* at p. 12.

[1173] Lehman, Global Real Estate 2008 Net Mark Downs (Sept. 5, 2008) [LBEX-AM 346991].

TriMont's method for calculating collateral values improved through the shift to IRR models, Barsanti and Koutouvides relied on those values more frequently, but nothing TriMont provided was taken as "gospel" by the business desk.[1174]

### (c) The Role of Lehman's Product Control Group in Price Testing the Valuation of Lehman's PTG Portfolio

Separate from the marking process of the PTG business desk, the Product Control Group performed an independent price verification of the PTG marks. Jonathan Cohen oversaw Product Control's valuation and price testing, and Abebual A. Kebede worked under him and had day-to-day oversight of the Product Control staff.[1175] Directed by Kebede, two junior product controllers ran models to generate test prices for PTG positions.[1176] Eli Rabin performed price testing on all PTG positions until early 2008, when Lehman hired Rebecca Platt to price test the PTG debt positions.[1177]

Product Control performed the price testing process for a given month at the beginning of the following month and performed its most thorough price testing at quarter end.[1178] To price test, product controllers fed collateral values and other inputs

[1174] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 14.

[1175] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at pp. 6-7.

[1176] Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation to the SEC (Feb. 1, 2008), at p. 3 [LBEX-WGM 916015].

[1177] *Id.*; Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 4; Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at p. 4. Included in the price testing for PTG equity were the positions on which Lehman foreclosed and re-categorized as real estate owned. Lehman, Real Estate Monthly Price Verification Policy and Procedures (July 16, 2008), at p. 12 [LBEX-DOCID 1454682].

[1178] Lehman, Real Estate Price Verification Presentation [Draft] (July 17, 2008), at p. 1 [LBHI_SEC07940_1169231] ("Price Verification is performed on a monthly basis"); Lehman, Real Estate Monthly Price Verification Policy and Procedures (July 16, 2008), at p. 11 [LBEX-DOCID 1454682] ("The

into their models to produce a model price for the debt or equity position, which was compared with the business desk's value. The difference between the two was termed a "variance."[1179]

Rabin and Platt used the same asset-specific data that TriMont provided to the business desk.[1180] They generally applied the collateral values provided by TriMont, whether they were based on Cap * 105 or IRR models.[1181] However, Rabin told the Examiner that both of his superiors in the Product Control Group and business desk personnel sometimes instructed him to disregard the current value provided by the models.[1182] Product Control knew that Cap * 105 caused inaccurate valuations of collateral, but those collateral values were still used in the absence of IRR models.[1183] Platt told the Examiner that she observed a sudden drop in collateral values across the PTG debt book when more IRR models were incorporated in July 2008.[1184] In addition,

---

quarterly analysis is a much more detailed analysis of pricing variances resulting from the routine monthly process."); Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 5.

[1179] Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 5.

[1180] Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation to the SEC (Feb. 1, 2008), at p. 5 [LBEX-WGM 916015]; Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 8; Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at p. 5. Rabin and Platt could contact TriMont on their own to discuss the data. *See, e.g.*, e-mail from Harding Brannon, TriMont, to Rebecca Platt, Lehman (Mar. 13, 2008) [LBEX-DOCID 1802324].

[1181] Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 8; Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at p. 5.

[1182] Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 8.

[1183] Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at p. 7; Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 7. Rabin stated that the Cap * 105 pricing methodology often caused his price verification models to suggest that the values of a PTG position should be written up, even when Rabin had specific knowledge that the underlying deal was not performing well. Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 7.

[1184] Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at p. 7.

the price testing results at this time showed that the marks overvalued the PTG debt book.[1185]

The price testing models for PTG debt used market data to apply a discount rate (or yield) to account for the market-based risk of an investment in the debt of that property type. The risk level was in part determined by the Loan-to-Value ratio ("LTV"), which is the ratio of the value of the outstanding debt divided by the value of the collateral. After determining the LTV of a debt position, Platt referred to the Real Estate Finance & Investments newsletter, which provided discount rates based on LTV and property type.[1186] Platt then applied the appropriate discount rate to determine the present value of the debt position.[1187]

To price test equity positions,[1188] Rabin's models performed a "waterfall" analysis to check the marks, which is a process that examines the distribution of proceeds from a hypothetical sale of the collateral.[1189] In the waterfall analysis any outstanding debt is

---

[1185] *Id.* at pp. 7, 10-11.

[1186] E-mail from Rebecca Platt, Lehman, to Abebual A. Kebede, Lehman (June 16, 2008) [LBHI_SEC07940_2945503]; Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at p. 8. The property types were residential, apartments, retail, malls, strip and power centers, industrial, multi-tenant, office, CBD, suburban, and hotel. *See* Institutional Investors, Inc., Real Estate Fin. & Inv. Newsl., May 26, 2008, at p. 7 [LBHI_SEC07940_2945508]; Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation to the SEC (Feb. 1, 2008), at p. 6 [LBEX-WGM 916015].

[1187] Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at p. 8. There were additional, more technical steps in this process, where the present value calculated by the model was compared to other benchmark values, such as the value of proceeds from the collateral in a liquidation scenario, and the lowest number after these comparisons became the model output. Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation to the SEC (Feb. 1, 2008), at p. 6 [LBEX-WGM 916015].

[1188] PTG REO positions were tested with a similar process as that for PTG equity. Lehman, Real Estate Monthly Price Verification Policy and Procedures (July 16, 2008), at p. 12 [LBEX-DOCID 1454682].

[1189] Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 6.

assumed to be paid out first, with equity holders entitled to the remaining proceeds subject to the terms of any shareholder agreements.[1190]

As noted, after Product Control calculated the model price for a debt or equity position, this price was compared to the business desk's mark to determine the variance. Lehman's policy was that "[v]ariances outside thresholds are discussed with the business for potential mark adjustments."[1191] In the PTG debt and equity models, the threshold for an overvaluation variance was $2 million and the threshold for an undervaluation variance was $5 million.[1192] If Rabin and Platt were unable to resolve the variance with the business desk, the issue was escalated to Kebede and Jonathan Cohen, who could then, if necessary, direct these valuation issues to Lehman's senior managers.[1193]

---

[1190] Id. at p. 6. The models assumed distribution of cash flows in the following order: (1) pay off full amount of debt; (2) distribution to owners for accumulated preferred returns; (3) distribution to owners for return of capital; and (4) distribution to owners for split of any remaining profit according to their profit and loss sharing ratios. Lehman, Real Estate Monthly Price Verification Policy and Procedures (July 16, 2008), at p. 12 [LBEX-DOCID 1454682]; Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation to the SEC (Feb. 1, 2008), at p. 8 [LBEX-WGM 916015].

[1191] Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation to the SEC (Feb. 1, 2008), at pp. 6, 8 [LBEX-WGM 916015].

[1192] For an example of such thresholds in the PTG debt price testing models, see formula in cell BF4 on the "Pricing" tab of Lehman's Single Asset Debt Model from May 2008. Zev Klasewitz, Lehman, Single Asset Debt Model May 2008 Spreadsheet (June 14, 2008), at tab "Pricing," cell BF4 [LBEX-LL 1985749]. For an example of such thresholds in the PTG equity price testing models, see Excel's filter function applied to column BA on the "Valuation" tab of Single Family Equity Pricing Model from June 2008. Lehman, Single Family Equity Model June 2008 Spreadsheet (June 30, 2008), at tab "Valuation" [LBEX-BARFID 0023444].

[1193] See, e.g., e-mail from Rebecca Platt, Lehman, to Abebual A. Kebede, Lehman (June 18, 2008) [LBHI_SEC07940_2949726] (stating that she "wanted to discuss the comment [for positions that had pricing variances] with [Kebede] because they [were] foreclosures"); Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 4; Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at pp. 5, 10-11.

As a result of this escalation and resolution process, the positions for which variances exceeded the given threshold were either remarked or resolved.[1194]  If remarked, the business desk lowered or raised its mark in light of the Product Control test price.[1195]  If resolved, the business desk's mark would remain the same and Product Control provided an explanation for why the position was not remarked.[1196]  The goal of the explanation, noted in Product Control's monthly Valuation & Control Report, was to provide information not captured by the models that justified disregarding the model price and maintaining the desk mark.[1197]

Platt and Kebede told the Examiner that they often had difficulty explaining why positions were not remarked and that in these situations they came up with formulaic explanations.[1198]  As a result, Platt stated that many of the explanations she provided for not changing the marks in the PTG debt pricing models were not meaningful and contained many "form" responses, such as "Based on discussions with the business,

---

[1194] Lehman, Global Real Estate Product Control, Real Estate Americas, Price Verification Presentation to the SEC (Feb. 1, 2008), at p. 21 [LBEX-WGM 916015]; Lehman, Real Estate Price Verification Presentation [Draft] (July 17, 2008), at p. 1 [LBHI_SEC07940_1169231].

[1195] Lehman, Real Estate Price Verification Presentation [Draft] (July 17, 2008), at p. 1 [LBHI_SEC07940_1169231].

[1196] *Id.*

[1197] *Id.*; Lehman, Global Real Estate Product Control, Real Estate Americas Price Verification Presentation to the SEC (Feb. 1, 2008), at p. 21 [LBEX-WGM 916015]; Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at p. 5; Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at pp. 10-11.

[1198] Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at pp. 10-11 (noting that he wrote explanations for marks and that he agreed with "some of them"); Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at p. 4.

position is marked appropriately" and "continue to monitor."[1199]  Kebede confirmed

that no write-down was taken for many of the positions for which a significant price

testing variance was determined in the third quarter of 2008.[1200]  Kebede stated that,

although there was a valid explanation for not writing down some of these positions, he

wrote or oversaw the writing of several "form" responses he did not actually agree with

that were only written to come up with something.[1201]

### (d) The Influence of Lehman's PTG Business Desk upon the Price Testing Function of Lehman's Product Control Group

Several witnesses gave conflicting statements as to whether Product Control had

the ability to effectively provide an independent check on the business desk marks.

Walsh told the Examiner that Product Control existed on an independent track and

could not be "frozen out" of the valuation process.[1202]  Kenneth Cohen also stated that

Product Control ran on a "parallel track," and came up with its own numbers running

its own models.[1203]  Kenneth Cohen stated that the business desk had no control over

Product Control and that, if the business desk could not convince Product Control that

---

[1199] *See e.g.*, Lehman, Valuation & Control Report – Fixed Income Division (May 2008), at p. 22 [LBHI_SEC07940_2554301] (noting, with respect to Calwest and the Nashville Portfolio, that "[b]ased on discussion with [the] desk . . . . No markdown suggested"); Lehman, Valuation & Control Report – Fixed Income Division (July 2008), at pp. 22-23 [LBEX-WGM 790236] (stating, with respect to several positions for which no write-down was taken, including Whitworth Estates Senior, "[i]n discussion with the business"); Lehman, Valuation & Control Report – Fixed Income Division (Aug. 2008), at pp. 22-23 [LBEX-BARFID 0000260] (stating, with respect to Whitworth Estates Senior Whole, "[b]ased on discussions with the business, position is marked appropriately"); Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at pp. 10-11.

[1200] Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at p. 5.

[1201] *Id.*; Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at pp. 10-11.

[1202] Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 13.

[1203] Examiner's Interview of Kenneth Cohen, Oct. 20, 2009, at p. 10.

a number was correct, Product Control could elevate the issue, all the way up to Reilly if necessary.[1204]

Koutouvides considered the Product Control process to be credible, but stated that if there was a difference of opinion between Product Control and the business desk regarding valuation of a PTG asset (which Koutouvides estimated as happening three times a month), the mark did not change.[1205] Koutouvides confirmed that he did not take a suggested write-down from Product Control unless he was convinced that the price testing model was correct.[1206] With the market fluctuation in 2008, Koutouvides stated he was reluctant to remark a position only based on price testing until he could see where the asset was trending after another quarter.[1207] The process resulted in staggered write-downs, where a lag existed between identification of a trend and the resulting write-down.[1208]

Jonathan Cohen described Product Control as compromised by a lack of information, and stated that Product Control often took the business desk's word on

---

[1204] *Id.*

[1205] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 16-17.

[1206] *Id.*

[1207] Lehman, Valuation & Control Report – Fixed Income Division (Aug. 2008), at pp. 21-23 [LBEX-BARFID 0000260]; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 16-17.

[1208] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 16-17. As an illustrative example, if the model suggested a $20 million write-down and if Lehman believed that there was a 60% chance that a write-down was appropriate, Lehman would take a $12 million write-down ($20 million * 60% = $12 million). In some instances, Lehman would wait a quarter to see what happened before taking the $12 million write-down.

valuation issues.[1209]  For example, Jonathan Cohen pointed out that Product Control used the same discount rate for collateral that the business desk used (*e.g.*, 20% for equity investments in land developments).[1210]

Kebede stated that the "form" comments he used to explain why a position was not remarked, such as "based on discussions with the business," indicated that he could not think of anything else to explain as the reason for keeping the current mark and that, in some cases, he may not have actually agreed with the comment.[1211]  Certain e-mails confirm that Kebede's work was to some extent influenced by the PTG business desk.  On August 30, 2008, Koutouvides e-mailed Kebede stating that "Anthony [Barsanti] and I have given you guidance on the senior deals that we feel were incorrect. Please make the changes and let us know how this changed the total."[1212]

Rabin also stated that, in most matters, he deferred to the judgment of Koutouvides on the business desk, given Koutouvides' familiarity with the valuation models and the underlying business fundamentals of each position.[1213]

Platt stated that despite the fact that her models produced large overvaluations in the third quarter of 2008 (which she stated was after the integration of a significant

---

[1209] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 5.

[1210] Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at p. 4.

[1211] Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at p. 5.

[1212] E-mail from Aristides Koutouvides, Lehman, to Abebual A. Kebede, Lehman (Aug. 30, 2008) [LBHI_SEC07940_212040].  *See also* e-mail from Abebual A. Kebede, Lehman, to Anthony J. Barsanti, Lehman, *et al.* (Aug. 27, 2008) [LBEX-DOCID 4449124] (Kebede asking Barsanti "not a large number [$1.4 million], should we look to a write-off?").

[1213] Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 8.

number of IRR models), write-downs were not taken for many PTG assets.[1214]  Platt stated that Lehman did not pay much attention to her third quarter 2008 price testing results, characterizing the Product Control Group as, "kind of sadly, the little people."[1215]

**(5) The Examiner's Findings and Conclusions as to the Reasonableness of Lehman's Valuation of PTG Portfolio**

The Examiner finds sufficient evidence to support a determination that Lehman did not appropriately consider market-based yield when valuing PTG assets in the second and third quarters of 2008.  While the Examiner recognizes that the valuation of illiquid assets requires judgment and that there is a wide range of reasonable valuations for any particular asset, Lehman's systemic failure to incorporate a market-based yield generally resulted in an overvaluation of PTG assets.  Accordingly, the Examiner finds that there is sufficient evidence to support a finding, for purposes of a solvency analysis, that the values Lehman determined for certain of these assets were unreasonable.

The evidence supports a finding that, as real estate markets deteriorated and investors increased their required rates of return, Lehman was unable to quickly replace Cap * 105 with a valuation methodology that employed market-based yields. Furthermore, even when Lehman did implement a valuation methodology that applied

---

[1214] Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at pp. 7, 10-11.
[1215] *Id.* at p. 11.

a yield — IRR models — the yields reflected the weighted average of the contractual interest rate for debt at origination and Lehman's expected rate of return for equity (*i.e.* 20% for land developments), rather than market-based rates.

The Examiner does not find sufficient evidence that Lehman's failure to employ appropriate yields for PTG assets during the second and third quarter of 2008 supports a finding that any Lehman officers breached their fiduciary duties.[1216]  Although there is sufficient evidence to demonstrate that the valuation methodology for PTG assets did not rely on market-based assumptions, there is insufficient evidence to demonstrate that any Lehman officer acted with an intent to produce incorrect values or conducted the valuation process in a reckless manner.  While Lehman's staffing was inadequate to comprehensively value or test the significant number of positions in the PTG portfolio, and there was also questionable judgment in the selection of yields, the valuation determined by Lehman did not result from actions (or omissions) that would support a claim of a breach of fiduciary duty.

The Examiner has determined that it would not be a prudent use of resources to perform an independent valuation of every PTG asset by selecting the market-based yield that would have been applicable in the second and third quarters of 2008.  The uniqueness and illiquidity of PTG assets, combined with the volatile 2008 market, create

---

[1216] *See* Appendix 1, Legal Issues, Section II, for a more detailed discussion of the legal standard governing a claim of breach of fiduciary duty.

a high risk of error for any portfolio-wide estimate of market-based yield.[1217]  Instead of attempting to cast a wide net, the Examiner has made observations about PTG's application of yield generally and has investigated select positions in greater detail, as discussed below.[1218]

### (a)  Lehman Did Not Mark PTG Assets to Market-Based Yield

Former Lehman personnel provided conflicting statements as to whether PTG assets were valued at the price at which the asset could be sold, and in particular, whether the valuation took into account the market-based yield that would be required by an investor in light of then-current market conditions.  However, the statements of those most deeply involved in the process of valuing PTG assets, as well as the documentary evidence, provide sufficient evidence to support a finding that Lehman did not mark its PTG assets to market-based yield in the second and third quarters of 2008.

Mark Walsh, head of GREG, did not indicate to the Examiner whether PTG assets were marked at a price at which they could be sold, but stated that Lehman

---

[1217] This is especially true in that the Examiner's financial advisor has had limited time to review Lehman's files on PTG assets and has had limited data made available during the discovery process.  The Examiner's financial advisor did not find sufficiently detailed information to value many PTG assets. Several witnesses were also unable to remember anything related to the valuation of specific assets.  *See, e.g.,* Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at p. 5; Examiner's Interview of Eli Rabin, Oct. 21, 2009, at pp. 9, 11-12; Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at pp. 7, 9, 10-11; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 18 (providing very few details on Heritage Fields).

[1218] The chief criteria for selecting the assets (or groups of assets) analyzed below is whether the Examiner's financial advisor received sufficient information to issue a conclusion as to the valuation process for these assets in the second and third quarters of 2008.

"always" marked CRE assets to both credit and yield, although he conceded that it became difficult to mark to market-based yield as market conditions deteriorated during 2008.[1219]  Walsh also stated that he was not normally involved in valuation issues and that Barsanti and Kenneth Cohen were more knowledgeable about PTG valuation.[1220]

Kenneth Cohen told the Examiner that PTG assets were marked to the price at which the assets could be sold to an investor.[1221]  He stated that marking to both credit and market-based yield were components of PTG's valuation process.[1222]  Kenneth Cohen described the PTG approach as "marking-to-model" but was clear that the model price was intended to incorporate Lehman's best judgment as to the market-based yield and reflect the price at which the asset could be sold.[1223]  He also stated that a write-down based on credit should also encapsulate the effect of changes to market-based yield as well.[1224]  However, Kenneth Cohen also stated that determining the PTG marks was primarily Barsanti's job.[1225]

---

[1219] Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 13.

[1220] Id.

[1221] Examiner's Interview of Kenneth Cohen, Jan. 21, 2010, at p. 4.

[1222] Id.

[1223] Id.  He maintained this position even as he described PTG's valuation process as based on "mark-to-model," which implies that Lehman valued positions by selecting its own assumptions and inputs for the model.  Id.

[1224] Id.  Jonathan Cohen also said that where a notation in a Lehman document indicated that a write-down was made due to credit, yield was also taken into account.  Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at p. 4.

[1225] Examiner's Interview of Kenneth Cohen, Jan. 21, 2010, at p. 2.  Kenneth Cohen could not recall the specifics of any particular discussion regarding PTG marks and, in particular, did not remember the

Barsanti told the Examiner that Lehman was "probably not marking to yield," and instead would mark PTG assets based more on a "gut feeling" about the position in relation to the market.[1226]  Barsanti, who both Walsh and Kenneth Cohen identified as the person principally responsible for determining PTG marks, stated that he did not know whether PTG assets could be sold for the price at which they were marked and stated he had not thought about it.[1227]  As discussed below, Barsanti's statement is consistent with the Examiner's finding that PTG assets were generally marked in light of whether the development was proceeding according to plan, and not according to the return that an investor would require to purchase the position.

Koutouvides, who reported to Barsanti, spent substantially all of his time working on valuing PTG assets.[1228]  Koutouvides stated that the PTG business desk did not mark to market-based yield in the second and third quarters of 2008, explaining that the desk's asset valuations did not reflect what a buyer would pay for the assets on the open market at that time.[1229]  Koutouvides stated that Lehman's values for assets did not equal the prices at which they could be sold on the market and noted, regarding

---

valuation methodologies used by PTG.  *Id.*  As discussed herein, the use of IRR models in place of Cap * 105 to determine collateral values was a principal driver behind the approximately $214 million in write-downs that were proposed but not taken in the third quarter of 2008.  Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 9.

[1226] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 11.

[1227] *Id.*

[1228] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 13.

[1229] *Id.* at pp. 11-12.  He stated that only assets marked for credit impairment were taken.  *Id.*

Lehman's marks, "no one would pay you that."[1230]  He stated that any sale of illiquid PTG assets would be steeply discounted, due to the many unique factors related to the development of the underlying real estate.[1231]  These factors included the uncertainty surrounding the process of entitling the property and the relationship with the developer who was responsible for the day-to-day management of the project.

Koutouvides also stated that Lehman did not originate positions at the carrying yields used in 2008, meaning Lehman would not enter into investments at the yields it used to value its positions.[1232]  In effect, by 2008 Lehman required a higher rate of return when making a new investment than it would use when marking an equivalent position that was already included in the PTG portfolio.

However, Koutouvides stated that despite not marking to yield, the assets were marked at "fair market value."[1233]  According to Koutouvides, the selection of yield was largely immaterial because it would not make much difference over the short duration of the loans associated with PTG debt positions.[1234]  Koutouvides also pointed to the two to five years that Lehman typically held PTG assets, arguing that it was inappropriate to focus on the value of the investment in the current market environment when Lehman

---

[1230] *Id.* at p. 12.

[1231] *Id.*

[1232] *Id.* at p. 3.

[1233] *Id.* at pp. 11-12; Lehman, Q3 Firmwide Q&A – Summary [Draft] (Sept. 2008), at p. 43 [LBHI_SEC07940_743659] (noting generally that the assets in the CRE portfolio were subject to "fair value (mark to market) accounting").

[1234] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 3.

had no intention to sell the position in the near future.[1235]  Koutouvides explained that, although a sudden decline in values could have a huge effect on the value of the property, the value of a PTG asset did not strictly correlate with market trends.[1236]  Koutouvides dismissed the argument that PTG assets should have been marked based only on macroeconomic trends observed in the 2008 market.[1237]

Jonathan Cohen told the Examiner that it was fair to say that, in the second and third quarters of 2008, the PTG portfolio was generally not marked at  prices at which the assets could be sold.[1238]  Jonathan Cohen stated that, due to the large pricing variances between sellers and buyers in the market at that time, many buyers were offering what he thought of as "fire sale" prices.[1239]  He expressed the view that PTG was not required to mark its assets at these "fire sale" prices.  Specifically, he pointed to a significant number of positions that were carried at 90% of par value and stated that "a willing buyer was not going to pay that."[1240]

With respect to the valuation of PTG assets in the second quarter of 2008, Jonathan Cohen noted that the Cap * 105 method provided no way to mark to credit or

---

[1235] *Id.* at p. 11.  *See* Lehman, Q3 Firmwide Q&A – Summary [Draft] (Sept. 2008), at p. 43 [LBHI_SEC07940_743659] (noting generally for assets in the CRE portfolio that a separate entity – "REI Global" – would be able to manage assets "with a longer time horizon than Lehman would have in the current market environment").

[1236] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 11.

[1237] *Id.*

[1238] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 5.

[1239] *Id.*

[1240] *Id.*

yield.[1241]  He stated that during this time, PTG assets were generally marked to the yield that was incorporated into Lehman's plan for the investment, and that assets were only written down when PTG had specific information that a project was experiencing difficulties.[1242]

When TriMont provided more IRR models in the third quarter of 2008, Jonathan Cohen stated that PTG was then able to mark to market-based yield.[1243]  Cohen stated that he never considered marking to market-based yield a concern until this time, when the IRR models were producing materially lower collateral valuations, and in turn indicating materially lower values for PTG assets.[1244]  Cohen identified approximately $714 million of PTG write-downs for the quarter, and only approximately $504 million of such write-downs were taken.[1245]

The documentary evidence also supports Cohen's assertion that Lehman generally marked for credit and not yield.  A document listing Lehman's third quarter 2008 write-downs shows that 93% of those write-downs were based on credit impairment, with only the remaining 7% related to yield.[1246]  Although both Jonathan

[1241] *Id.* at pp. 4-5.

[1242] Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at p. 4.

[1243] *Id.*; Examiner's Interview of Jonathan Cohen, Jan, 11, 2010, at pp. 4-5.

[1244] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 5; Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at p. 4.

[1245] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 9; Lehman, Global Real Estate 12008, Net Mark Downs (Sept. 5, 2008) [LBEX-AM 34699].

[1246] Jonathan Cohen, Lehman, Q3 Write-downs Spreadsheet (Aug. 2008) [LBHI_SEC07940_2258789].  The Examiner has not found any comparable analyses that allocated write-downs to credit or yield for the PTG write-downs in the second quarter of 2008.

Cohen and Kenneth Cohen stated that a mark for credit impairment would necessarily take into account yield impairment, Jonathan Cohen stated that the rationale given in the document was the primary reason for the write-down.[1247]

### (b) The Effect of Not Marking to Market-Based Yield

### (i) Effect of Cap * 105 Not Marking to Market-Based Yield

The Examiner has investigated the impact of the switch from the Cap * 105 method to IRR models between the second and third quarters of 2008 and concludes that the large drop in collateral values between those quarters provides sufficient evidence to support a finding that collateral values, and thus PTG asset values, were overvalued in the second quarter of 2008.

Jonathan Cohen acknowledged that Cap * 105 could not be used for marking to market-based yield.[1248]  As described, Cap * 105 had no market-based inputs and was incapable of marking collateral to either credit or yield; it simply computed collateral value by multiplying the development's current capital structure (reflecting all outstanding debt plus equity invested to date) by 105%.  Cap * 105 applied no discount and did not calculate cash flows.  The Examiner's financial advisor has observed that, as of May 2008, historical-cost based approaches (such as Cap * 100 and Cap * 105) were still used for collateral valuation for at least 228 positions, which was a third of the PTG

---

[1247] Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at p. 4.

[1248] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at pp. 4-5; Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at p. 4.

portfolio in the second quarter of 2008.[1249]    The Examiner's financial advisor has identified only 54 positions valued by the historical cost-based approach as of July 2008, or less than 10% of the PTG portfolio.[1250]    This does not mean that Lehman carried these positions at the amount of its investment.    Lehman did write down assets for credit based on asset-specific conclusions that, regardless of the Cap * 105 calculation, there was deterioration of the collateral value.    However, the high proportion of PTG assets with collateral values determined by the Cap * 105 method in the second quarter of 2008 is an indication that Lehman did not rely on reasonable collateral values in marking the PTG portfolio.

The large effect of Cap * 105 on collateral values can be observed in Platt's description of her price testing practices during 2008.    As noted above, Platt stated that when more IRR models were added to Lehman's system in July 2008, the current values for collateral in her models dropped significantly and her models produced an output suggesting the PTG debt portfolio was significantly overvalued.[1251]    The Examiner

---

[1249] TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026]; TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362].

[1250] TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026]; TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362]; TriMont, Debt Export as of July 5, 2008 (Aug. 1, 2008) [LBEX-AM 267134]; TriMont, Equity Export as of July 5, 2008 (Aug. 4, 2008) [LBEX-AM 267510].

[1251] Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at p. 7.

investigated and confirmed that Lehman's collateral values dropped substantially when PTG moved away from Cap * 105.[1252]

The Examiner's financial advisor identified 153 PTG positions that used a historical cost-based valuation method (Cap * 105 or Cap * 100) in the second quarter of 2008, and then transitioned to a different valuation method in July 2008.[1253] These 153 positions represented a $3.1 billion value in the second quarter of 2008, or approximately 36% of the PTG portfolio by value. After a significant number of IRR models were incorporated into the price testing process in July 2008, the collateral values for these 153 positions dropped by 20% when compared to the second quarter values.[1254]

Due to limitations in the data, the Examiner's financial advisor has confirmed that 105 of these positions transitioned from Cap * 105 to IRR models between May and July 2008, although it is possible that others did so as well. The May 2008 price testing models suggested that the marks for these 105 positions were undervalued by $192

---

[1252] TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026]; TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362]; TriMont, Debt Export as of July 5, 2008 (Aug. 1, 2008) [LBEX-AM 267134]; TriMont, Equity Export as of July 5, 2008 (Aug. 4, 2008) [LBEX-AM 267510].

[1253] TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026]; TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362]; TriMont, Debt Export as of July 5, 2008 (Aug. 1, 2008) [LBEX-AM 267134]; TriMont, Equity Export as of July 5, 2008 (Aug. 4, 2008) [LBEX-AM 267510].

[1254] TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026]; TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362]; TriMont, Debt Export as of July 5, 2008 (Aug. 1, 2008) [LBEX-AM 267134]; TriMont, Equity Export as of July 5, 2008 (Aug. 4, 2008) [LBEX-AM 267510]. The Examiner's financial advisor found that 228 positions were valued using Cap * 105, but due to limitations in the data, was not able to confirm how collateral for the other 75 positions were valued in third quarter 2008.

million.[1255]  After the switch to calculating collateral values for these 105 positions with IRR models, the price testing result suggested that the marks for these same positions were overvalued by $298 million as of July 31, 2008, and $90 million as of August 31, 2008.[1256]

Both the PTG business desk and Product Control knew that Cap * 105 led to unreasonable valuations in a downward trending market if strictly applied.[1257] Although the Examiner has not found any direct evidence to explain exactly how the business desk used the collateral values based on Cap * 105 in marking the PTG Portfolio, Barsanti and Koutouvides each stated that they used independent judgment, including a judgment that positions with collateral values calculated by Cap * 105

---

[1255] For the full set of 153 positions with collateral values based on a historical cost valuation methodology, the Examiner's financial advisor observed that price testing model suggested a $271 million undervaluation of the marks as of May 2008.  TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026]; TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362]; Zev Klasewitz, Lehman, Single Asset Debt Model May 2008 Spreadsheet (June 14, 2008) [LBEX-LL 1985749]; Zev Klasewitz, Lehman, Single Family Debt Model May 2008 Spreadsheet (June 14, 2008) [LBEX-LL 1985605]; Single Family Equity Model May 2008 Spreadsheet (May 31, 2008) [LBEX-LL 1985924]; Lehman, Strategic Equity Model May 2008 Spreadsheet (May 31, 2008) [LBEX-BARSOX 0000594]; Zev Klasewitz, Lehman, Single Family REO Model May 2008 Spreadsheet (June 13, 2008) [LBEX-LL 1985887]; Lehman, Strategic REO Model May 2008 Spreadsheet (May 31, 2008) [LBEX-LL 1985926].

[1256] TriMont, Debt Export as of July 5, 2008 (Aug. 1, 2008) [LBEX-AM 267134]; TriMont, Equity Export as of July 5, 2008 (Aug. 4, 2008) [LBEX-AM 267510]; TriMont, Debt Export as of Aug. 5, 2008 (Sept. 2, 2008) [LBEX-AM 273310]; TriMont, Equity Export as of Aug. 5, 2008 (Sept. 2, 2008) [LBEX-AM 273058].  The Examiner's financial advisor observed that the lower overvaluation figure in August 2008 is primarily due to Product Control's modifications of the current values based on IRR models, discussed below, that occurred when the principal collateral valuation methodology switched to IRR models.

[1257] E.g., Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at p. 7; Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 13; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 15; e-mail from Ed Dziadul, RealCom Financial Partners LLC, to Dennis Grzeskowiak, TriMont, et al. (Mar. 23, 2008) [LBEX-DOCID 2293586] (describing Cap * 105 as "worthless").

needed to be written down.[1258]  However, collateral value was the most important data point for valuing PTG positions, and there is no indication that Barsanti and Koutouvides used some other method for calculating collateral values when they did not use TriMont's value based on Cap * 105.[1259]

The evidence is sufficient to support a finding that collateral values calculated by Cap * 105 were inflated, and this method calculated collateral values for at least one-third of the PTG portfolio.[1260]  The large drop in collateral values that occurred when PTG moved away from Cap * 105 provides sufficient evidence to support a finding, for purposes of a solvency analysis, that certain marks in the PTG portfolio were not reasonable assessments of fair value as of the second quarter of 2008.

---

[1258] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 11-12; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 12.

[1259] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 13; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 15.

[1260] The Examiner's financial advisor analyzed data from TriMont export files from May 2008 and July 2008.  TriMont, Debt Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262026]; TriMont, Equity Export as of May 5, 2008 (June 2, 2008) [LBEX-AM 262362]; TriMont, Debt Export as of July 5, 2008 (Aug. 1, 2008) [LBEX-AM 267134]; TriMont, Equity Export as of July 5, 2008 (Aug. 4, 2008) [LBEX-AM 267510].  The Examiner's financial advisor also analyzed data from pricing files from May 2008 and July 2008.  Zev Klasewitz, Lehman, Single Asset Debt Model May 2008 Spreadsheet (June 14, 2008) [LBEX-LL 1985749]; Zev Klasewitz, Lehman, Single Family Debt Model May 2008 Spreadsheet (June 14, 2008) [LBEX-LL 1985605]; Lehman, Single Family Equity Model May 2008 Spreadsheet (May 31, 2008) [LBEX-LL 1985924]; Lehman, Strategic Equity Model May 2008 Spreadsheet (May 31, 2008) [LBEX-BARSOX 0000594]; Zev Klasewitz, Lehman, Single Family REO Model May 2008 Spreadsheet (June 13, 2008) [LBEX-LL 1985887]; Lehman, Strategic REO Model May 2008 Spreadsheet (May 31, 2008) [LBEX-LL 1985926]; Lehman, Single Family Debt Model July 2008 Spreadsheet (July 31, 2008) [LBEX-BARFID 0022574]; Lehman, Strategic REO Model July 2008 Spreadsheet (July 31, 2008) [LBEX-BARFID 0024563]; Lehman, Strategic Equity Model July 2008 Spreadsheet (July 31, 2008) [LBEX-BARFID 0012795]; Lehman, Single Family REO Model July 2008 Spreadsheet (July 31, 2008) [LBEX-BARFID 0024208]; Lehman, Single Asset Debt Model July 2008 Spreadsheet (July 31, 2008) [LBEX-BARFID 0023120]; Lehman, Single Family Equity Model July 2008 Spreadsheet (July 31, 2008) [LBEX-BARFID 0023610].

### (ii) Effect of IRR Models Not Marking to Market-Based Yield

IRR models, in discounting projected cash flows, offered a more reasonable method of valuing collateral than Cap * 105. However, even when Lehman did implement IRR models that applied a yield, these models did not base their yields on market-based interest rates.[1261] Both Koutouvides and Jonathan Cohen stated that the yields selected were based on Lehman's expected rate of return at origination, rather than the rate of return that a typical market investor would require.[1262]

The Examiner has investigated select positions to determine whether TriMont's IRR models used a yield comparable to that applied to other positions or provided by other market-data sources, such as an appraisal. This analysis has focused on the property type identified by witnesses as being of greatest concern to PTG asset managers – land developments.

The discount rate that TriMont used in the IRR models to determine the current collateral value of an asset was the weighted average of the discount rates of the equity and debt positions at origination, as discussed above.[1263]

---

[1261] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at pp. 4-5; Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at pp. 3-4. Although Jonathan Cohen also stated that he discussed the issue of marking to market-based yield with Reilly, the Examiner has found no evidence that any such discussion ended up affecting the marks. Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 5.

[1262] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 7, 11-12. Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 5.

[1263] *See, e.g.*, TriMont, Asset Status Report for Heritage Fields El Toro LLC (July 1, 2008), at tab "NPV" [LBEX-BARFID 0027112]. In this manner the discount was a weighted average cost of capital, weighted

Since the cost of debt and cost of equity were based on rates as of deal origination, they remained static regardless of how the market participants' risk assessment changed throughout the investment's lifetime.[1264] Therefore, the discount rates used in IRR models were not market-based, as the discount rate did not materially change if the market's changing assessment of risk resulted in demand for a higher yield.

Heritage Fields provides an example of a position that Lehman valued using IRR models that contained a discount rate for collateral that was materially lower than that produced by a third party, Cushman & Wakefield ("C&W"). In a July 2007 appraisal of Heritage Fields that was provided to Lehman, C&W noted 18% as the discount rate for the collateral,[1265] and in an April 2008 appraisal, that discount rate was 21%.[1266] Meanwhile, TriMont used an 8.23% discount rate in its May 2008 IRR model and 11.98% rate in its July 2008 IRR model.[1267] In the face of this discrepancy, TriMont did not increase the discount rate to be more in line with the April 2008 C&W appraisal, but

in this case by the current outstanding debt and all paid-in equity (which may be different than the capital structure at origination).

[1264] Again, Cap * 105 did not apply a discount rate to collateral values. The Examiner also notes that the capital structure could change over time due to amortization of debt or equity raises, which would impact the weighted average discount rate.

[1265] Cushman & Wakefield, Heritage Fields Master-Plan Self-Contained Appraisal Report Vol. I (July 1, 2007), at pp. 340-41 [LBEX-DOCID 2501688]. This discount rate was characterized by C&W as an unleveraged cost of equity, and the Examiner's financial advisor observed that this is consistent with a weighted average cost of capital rate with only equity in the capital structure. *Id.*

[1266] Cushman & Wakefield, Heritage Fields Master Plan Summary Appraisal Report (Apr. 1, 2008), at p. 61 [LBEX-DOCID 2096020]. The discount rate selected by C&W assumed an unleveraged position.

[1267] TriMont, Heritage Fields El Toro LLC IRR Model (May 1, 2008), at tab "NPV" [LBEX-BARFID 0026891]; TriMont, Asset Status Report for Heritage Fields El Toro LLC (July 1, 2008), at tab "NPV" [LBEX-BARFID 0027112].

rather, in its July 2008 model, TriMont lowered the projected cash flows of the development.[1268]  Through this change, the collateral value TriMont produced in July 2008 for Heritage Fields, $797 million, was close to C&W's collateral value for April 2008, $790 million.[1269]  Even though TriMont adjusted the cash flow and came up with a similar collateral value, the large gap between the discount rates indicates that TriMont's IRR models included discount rates that were too low.

In order to investigate whether the discount rates used in the IRR models were consistently lower than those obtained from other sources, the Examiner compared the discount rate that C&W used for Heritage Fields as a benchmark to measure the discount rates used for other similar properties.  Heritage Fields was a land development with a sell-out component, meaning it was a real estate development where the business plan was to sell off individual units of the property rather than the property as a whole.[1270]  Sell-outs were typically the most risky form of land

---

[1268] *See* TriMont, Asset Status Report for Heritage Fields El Toro LLC (July 1, 2008), at tab "NPV" [LBEX-BARFID 0027112].  For example, absorption – the amount of time it takes to sell-out all lots – was assumed by TriMont to be complete by 2013 in the May data and that was extended to 2015 in the July data.  TriMont, Heritage Fields El Toro LLC IRR Model (May 1, 2008), at tab "CF-Deal," cell BO4 [LBEX-BARFID 0026891]; TriMont, Asset Status Report for Heritage Fields El Toro LLC (July 1, 2008) [LBEX-BARFID 0027112].

[1269] TriMont, Asset Status Report for Heritage Fields El Toro LLC (July 1, 2008) [LBEX-BARFID 0027112].

[1270] *Id.* For example, in a land development, the developer will first purchase a plot of land, then secure entitlement (approvals to build), put in infrastructure (such as grading, roads, utilities, etc.), and subdivide the plot into individual lots.  The developer will then sell the individual lots to merchant builders who will construct homes on the lots.  When all the lots have been sold, the project is "sold-out." Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 4.

development, because they involved overseeing a development to completion and holding onto the asset while it was sold piece-by-piece.[1271]

For the purpose of this comparison, the Examiner included only those positions for which IRR models were used to estimate the collateral values. The Examiner's financial advisor identified three applicable land development sell-out properties meeting these criteria.[1272] Below is a comparison of the collateral values calculated using TriMont's discount rates for these properties with the collateral values calculated by the Examiner's financial advisor using the C&W April 2008 discount rate for Heritage Fields.

| | Property Name | TriMont Discount Rate | TriMont Collateral Value | C&W Heritage Fields Discount Rate | Collateral Value Using C&W Heritage Fields Discount Rate | % Difference in Collateral Values |
|---|---|---|---|---|---|---|
| | | | (A) | | (B) | (B)/(A)-1 |
| 1 | West Bay Club Development | 10.9% | 81,185,918 | 21.0% | 74,636,592 | -8.1% |
| 2 | PlazaCorp 1.Berkley | 7.3% | 72,699,971 | 21.0% | 50,205,769 | -30.9% |
| 3 | Laurel Cove | 12.2% | 53,917,607 | 21.0% | 40,298,467 | -25.3% |
| | Average | 10.1% | 69,267,832 | 21.0% | 55,046,943 | -20.5% |

---

[1271] *See* Tony Sevelka, *Subdivision Development: Risk, Profit, and Developer Surveys*, Appraisal J. 242, 242-52 (Summer 2004), *available at* http://www.entrepreneur.com/tradejournals/article/120353039_2.html (noting generally that "[l]and in a raw state . . . carries the highest level of overall development risk" and that land may be ripe for residential development . . . but the question remains as to whether the developer will be able to sell the proposed finished lots").

[1272] These were West Bay Club Development, PlazaCorp1.Berkley, and Laurel Cove. TriMont, Asset Status Report for West Bay Club Development (July 1, 2008), at tab "NPV" [LBEX-BARFID 0030164]; TriMont, Asset Status Report for PlazaCorp1.Berkley (Aug. 1, 2008), at tab "NPV" [LBEX-BARFID 0029074]; TriMont, Asset Status Report for Laurel Cove (July 1, 2008), at tab "NPV" [LBEX-BARFID 0028845].

The three properties feature discount rates that were materially lower than the discount rate used by C&W in its April 2008 appraisal of Heritage Fields. [1273] If the discount rate in the April 2008 C&W appraisal of Heritage Fields were applied to these positions, the collateral values of these properties would drop by an average of 20%.

An additional benchmark by which the Examiner's financial advisor measured the discount rates Lehman used to value the collateral of these three properties is the discount rates used to value its SunCal collateral. SunCal consisted of investments in California land development projects. [1274] Lehman used a 15% weighted average discount rate for the majority of the SunCal properties. [1275] As shown above, the discount rates for all three PTG land development properties were lower than 15%.

The C&W appraisals for Heritage Fields also illustrate how Lehman's discount rates did not respond to market changes. C&W's two appraisals for Heritage Fields were performed in two different years when, according to Koutouvides, the market

---

[1273] The discount rates used by TriMont were different due to differences in the cost of debt and the weights of debt versus equity in the capital stack. TriMont used the same cost of equity for each position, though it would likely have been more appropriate to use a cost of equity commensurate with the leverage.

[1274] *See, e.g.*, Cushman & Wakefield, Appraisal of Pacifica San Juan Master Plan (289 Lots) (Oct. 1, 2007) [TR00031835].

[1275] Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 9. The SunCal positions were valued based on projections that were influenced by third parties and a discount rate determined by Lehman. Hughson stated that he was the person who determined the 15% unleveraged discount rate for the majority of the positions. *Id.* The 15% unleveraged discount was based on the assumption of a 2/3 debt, 1/3 equity capital structure post restructuring with a cost of debt of 10% and cost of equity of 25%. Hughson stated that this discount rate assumption was supported by asset sales in the region. *Id.*

"was dropping like a stone."[1276]   Therefore, the increase in the discount rates between

C&W's two appraisals – 3% – is likely to have been the result of market-based

activity.[1277]   This assumption is consistent with Lehman's own practices in valuing non-

PTG positions.   In valuing Lehman's bridge equity position in Archstone, Lehman

increased its discount rate from approximately 12% in May 2007 to 15% by the second

quarter of 2008.[1278]   This approximately 3% increase in the Archstone discount rate

reflects Lehman's recognition that market-based yields were increasing as the market

conditions deteriorated for stabilized assets.   In accordance with the "higher risk, higher

return" nature of the PTG investments,[1279] the Examiner's financial advisor has observed

that it is reasonable to expect that the market yield for higher risk, non-stabilized assets

would increase at a similar or higher rate than for stabilized assets (e.g. Archstone) in a

---

[1276] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 9.

[1277] The Examiner notes that it is also possible that the difference in discount rates may suggest specific problems with the Heritage Fields's underlying collateral.

[1278] Memorandum from Mark A. Walsh, Lehman, et al., to LBHI Bridge Loan Committee & Investment Committee, re: Debt and Equity Financing Commitment Proposal for the Potential Acquisition of Archstone-Smith (May 16, 2007), at p. 9 [LBEX-DOCID 1674960].  Lehman, $23.4 billion debt and equity financing commitment in connection with the potential acquisition of Archstone-Smith by Lehman Brothers and Tishman Speyer Properties, May 16, 2007 [LBEX-DOCID 1674960].   The commitment documents identify an IRR for Archstone bridge equity of 12.1%.  This rate included the cost of capital as well as Lehman's expected return from the investment. Therefore, the Examiner's financial advisor observes that, strictly speaking, the cost of capital alone would be less than 12.1%.  E-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman, *et al.* (June 14, 2008) [LBEX-DOCID 1865693]; e-mail from Paul A. Hughson, Lehman, to Webster Neighbor, Lehman, *et al.* (June 15, 2008) [LBEX-DOCID 1865693]; e-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman (Sept. 12, 2008) [LBEX DOCID 2903130].

[1279] *E.g.*, Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 4.

downward trending market.[1280]  Instead, the IRR models for PTG assets incorporated debt and equity discount rates that were incapable of responding to market changes. These rates were equal to the applicable development's rates for debt and equity as of the origination of the investment.

Koutouvides told the Examiner that the choice of discount rate for both the collateral and debt positions did not matter as much for PTG positions because of the short-term maturity date of many of the loans.[1281]  Koutouvides' statement was based on the observation that the difference in yield between what Lehman used in its valuation and what a market participant would require in a sale did not have much time to compound for a short-term debt position.

Koutouvides' argument that the particular yield used is insignificant must be evaluated on a position-by-position basis.  If the position has less leverage (and consequently a lower LTV ratio) and a shorter term maturity for the debt, then it is possible that the changes caused by the discount rate might not have a material effect on value.  However, a longer-term debt position, such as the Heritage Fields position, would have a much longer time for the difference in yield to compound, resulting in a

---

[1280] For one of the three land developments, West Bay Club Development, Lehman did take a write-down of $24 million in August 2008, after the position was valued at $76.5 million in July.  Lehman, Global Real Estate 2008 Net Mark Downs (Sept. 5, 2008), at tab "Position & Monthly Detail," cell M148 [LBEX-AM 346991]  However, Lehman did not write down the other two positions, and the use of a possibly incorrect discount rate for all three properties is sufficient evidence to support a finding that TriMont's IRR models produced discount rates used in the valuation process that were lower than the market supported.

[1281] *Id.* at p. 3.

bigger difference in values. If the development has significant leverage and the debt has a longer maturity date for the debt, then the changes to the discount rate can have a significant effect on value.

The PTG portfolio featured many positions that were highly leveraged debt positions or equity positions that would be affected by a change in collateral values.[1282] Barsanti and Koutouvides would together mark the PTG portfolio, position-by-position, using TriMont's data as modified by their judgment.[1283] The decrease of 20% or 15% in collateral value, as in the examples above, is sufficient evidence to support a finding that the PTG business desk was, at least in part, basing valuations on data that included higher collateral values than the market then supported, even after the transition to IRR models.

### (iii) Effect of Product Control Price Testing Not Marking to Market-Based Yield

According to Barsanti and Koutouvides, the PTG business desk lacked necessary resources.[1284] Barsanti and Koutouvides were primarily responsible for valuing 700 positions in the book, and Koutouvides spent much of his time addressing TriMont's errors.[1285] Although, in theory, Lehman intended Product Control to serve as an

---

[1282] Lehman Brothers, Global Real Estate Product Control Real Estate Americas Price Verification Presentation [Draft] (Feb. 2008), at p. 4 [LBEX-WGM 916018] (describing PTG assets as "High Leveraged debt and equity investments in commercial real estate properties").

[1283] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at pp. 11, 13-14.

[1284] *Id.*; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 10, 13. Examiner's Interview of SEC staff, Aug. 24, 2009, at pp. 14-15.

[1285] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 10, 13.

independent check on the business desk marks, it suffered from a similar lack of resources.[1286]  According to Jonathan Cohen, product controllers were not given sufficient information to properly test values.[1287]  Without an effective Product Control process, the risk of misstating the value of PTG assets rises significantly.

Above all, Product Control had no effective method for using market-based yields to test the marks for PTG assets.  This was largely due to the fact that the Product Control price testing process relied heavily on input from the business desk and, in this manner, was not truly independent.  Product Control used the same collateral values as those provided by TriMont to the business desk.[1288]  Cap * 105 inarguably failed to take market-based yields into account and thus caused overvaluation of collateral in the second quarter of 2008.  As noted above, the IRR models that became more prevalent in the third quarter of 2008 also did not use a market-based yield for determining collateral value.[1289]  Additionally, Product Control would defer to the business desk's

---

[1286] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 5; Examiner's Interview of Rebecca Platt, Nov. 2, 2009, at pp. 4, 7.  The SEC also reached an informal conclusion that Lehman's Product Control staff was too small to be an effective independent check on the business desks' valuations given the size and number of assets in the CRE portfolio.  Examiner's Interview of SEC staff, Aug. 24, 2009, at pp. 3-4, 13-14

[1287] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 5.  Additionally, Jonathan Cohen noted that, without certain necessary information, Product Control could not effectively employ the models available to it.  *Id.*

[1288] Examiner's Interview of Anthony J. Barsanti, Oct. 15, 2009, at p. 9.

[1289] In testing certain PTG debt positions, Product Control applied a discount rate based on the rates published in the Real Estate Investment & Finance newsletter.  Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 8; Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at p. 8; Examiner's Interview of Abebual A. Kebede, Oct. 13, 2009, at p. 7.  The Examiner's financial advisor conducted a review of the spreads used by Product Control to calculate the debt discount rate and determined that the spreads used in the second quarter of 2008 did not reflect current market data.

judgment as to when to replace or modify the collateral values provided by TriMont and use the business desk's collateral values instead. [1290]

### (iv) Effect of Modifying TriMont's Data in the Third Quarter of 2008

According to Jonathan Cohen, the switch to IRR models in the third quarter of 2008 enabled PTG to mark positions to market-based yield.[1291]  This suggests that TriMont's IRR models materially improved Lehman's valuations to account for market-based yields.  However, in many instances in the third quarter of 2008, PTG modified the collateral values provided by TriMont, elected to not give weight to other information suggesting that a position should be remarked, or was not persuaded by price testing results showing a large overvaluation after lower collateral values were incorporated into the price testing models.  These facts provide further evidence that Lehman did not make a concerted effort to mark to market-based yield and that it was not merely the lack of IRR models in the second quarter of 2008 that prevented Lehman from marking PTG assets to market-based yield.

There is sufficient evidence to support a finding that the PTG business desk used its judgment to conclude that it should not use many of the values produced by TriMont when it was replacing Cap * 105 with IRR models.  Among the positions for

---

[1290] *E.g.*, e-mail from Aristides Koutouvides, Lehman, to Abebual A. Kebede, Lehman (Aug. 30, 2008) [LBHI_SEC07940_212040]; Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 8; Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 7; Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 16-17; Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 5.

[1291] Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at pp. 3-4.

which the Examiner's financial advisor has observed that TriMont's collateral values were modified, Lehman substituted a higher collateral value for 14 of the 18 positions (or 78%) in May 2008,[1292] and 38 of the 40 positions (or 95%) in August 2008.[1293] The magnitude of the departure from TriMont's collateral values also materially increased from May to August. In May 2008, the collateral values used by Lehman for these positions were, in aggregate, $636 million higher than TriMont's collateral values.[1294] However, in August 2008, Lehman's collateral values were $1.7 billion higher than TriMont's collateral values.[1295] The Examiner's financial advisor calculated that, had

[1292] *See* Zev Klasewitz, Lehman, Single Asset Debt Model May 2008 Spreadsheet (June 14, 2008) [LBEX-LL 1985749]; Zev Klasewitz, Lehman, Single Family Debt Model May 2008 Spreadsheet (June 14, 2008) [LBEX-LL 1985605]; Single Family Equity Model May 2008 Spreadsheet (May 31, 2008) [LBEX-LL 1985924]; Lehman, Strategic Equity Model May 2008 Spreadsheet (May 31, 2008) [LBEX-BARSOX 0000594]; Zev Klasewitz, Lehman, Single Family REO Model May 2008 Spreadsheet (June 13, 2008) [LBEX-LL 1985887]; Lehman, Strategic REO Model May 2008 Spreadsheet (May 31, 2008) [LBEX-LL 1985926].

[1293] *See* Lehman, Single Asset Debt Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0023236]; Lehman, Single Family Debt Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0022749]; Lehman, Single Family Equity Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0023801]; Lehman, Strategic Equity Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0012946]; Lehman, Single Family REO Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0024249]; Lehman, Strategic REO Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0024594]. The specific valuation methodology for many of these positions is unknown, although the data reflects that only one of these positions was valued in August 2008 using a capitalization method.

[1294] *See* Zev Klasewitz, Lehman, Single Asset Debt Model May 2008 Spreadsheet (June 14, 2008) [LBEX-LL 1985749]; Zev Klasewitz, Lehman, Single Family Debt Model May 2008 Spreadsheet (June 14, 2008) [LBEX-LL 1985605]; Single Family Equity Model May 2008 Spreadsheet (May 31, 2008) [LBEX-LL 1985924]; Lehman, Strategic Equity Model May 2008 Spreadsheet (May 31, 2008) [LBEX-BARSOX 0000594]; Zev Klasewitz, Lehman, Single Family REO Model May 2008 Spreadsheet (June 13, 2008) [LBEX-LL 1985887]; Lehman, Strategic REO Model May 2008 Spreadsheet (May 31, 2008) [LBEX-LL 1985926].

[1295] *See* Lehman, Single Asset Debt Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0023236]; Lehman, Single Family Debt Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0022749]; Lehman, Single Family Equity Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0023801]; Lehman, Strategic Equity Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID

Lehman employed TriMont's collateral values, the price testing in August 2008 would have indicated a $671 million overvaluation for these positions.[1296] Instead, after Lehman used its own collateral values, the price testing indicated only a $56 million overvaluation.[1297]

>    (c)   **Examiner's Findings and Conclusions as to the Effect of Not Marking Lehman's PTG Portfolio to Market-Based Yield**

As a substantial part of the PTG portfolio was not valued based on market-based yield, the Examiner concludes that there is sufficient evidence to support a finding that certain PTG assets were unreasonably valued, for purposes of a solvency analysis, during the second and third quarters of 2008.

Koutouvides and Jonathan Cohen told the Examiner that the PTG marks represented fair value.[1298] According to these witnesses, PTG was not required to mark these illiquid assets, backed by non-stabilized real estate, at prices they could sell for

0012946]; Lehman, Single Family REO Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0024249]; Lehman, Strategic REO Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0024594].

[1296] *See* Lehman, Single Asset Debt Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0023236]; Lehman, Single Family Debt Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0022749]; Lehman, Single Family Equity Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0023801]; Lehman, Strategic Equity Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0012946]; Lehman, Single Family REO Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0024249]; Lehman, Strategic REO Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0024594].

[1297] *See* Lehman, Single Asset Debt Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0023236]; Lehman, Single Family Debt Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0022749]; Lehman, Single Family Equity Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0023801]; Lehman, Strategic Equity Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0012946]; Lehman, Single Family REO Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0024249]; Lehman, Strategic REO Model Aug. 2008 Spreadsheet (Aug. 31, 2008) [LBEX-BARFID 0024594].

[1298] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at pp. 11-12; Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 5; Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at p. 4.

during a sharp market downturn.  Koutouvides, who was closest to the technical details of the business desk's valuation of PTG assets, told the Examiner that Lehman made no attempt to mark PTG assets to market-based yield during the second and third quarters of 2008.[1299]  Koutouvides and Jonathan Cohen asserted that Lehman's intention to hold these assets as long-term investments meant that the asset values should not be subject to short-term fluctuations in the market.  Lehman's logic (as represented in these witness statements) was that selling PTG assets was very difficult, and Lehman did not want to sell PTG assets at steeply discounted prices.  Jonathan Cohen asserted that any sale of PTG assets at this time was a "fire sale," and Lehman had a policy against valuing assets based on distressed sales.[1300]

Lehman did not originate PTG positions with the intention of selling half-developed properties, and the unique features of each project, as well as the "marriage" between Lehman and the developer, made it difficult for a third-party to assess the risks inherent in an unfinished project.  However, marking assets at fair value (whether for purposes of solvency or SFAS 157) is not overridden by the fact that Lehman did not market the underlying property until the project was nearly complete.[1301]

---

[1299] Examiner's Interview of Aristides Koutouvides, Nov. 20, 2009, at p. 11.

[1300] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 5; Examiner's Interview of Jonathan Cohen, Jan. 22, 2010, at p. 4.

[1301] Fin. Accounting Standards Bd., Determining Fair Value When the Volume and Level of Activity for the Asset or Liability Have Significantly Decreased and Identifying Transactions That Are Not Orderly, Staff Position No. 157-4, ¶ 2 (2009) ("Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction (that is, not a forced liquidation or distressed sale) between

The definition of fair value under SFAS 157 relies on a transaction with typical marketing periods.[1302]  This is an objective definition, allowing for the marketing period to extend for an appropriate period of time.

The Examiner's conclusions that there is sufficient evidence to support a finding that certain PTG positions were unreasonably valued during the second and third quarters of 2008 does not extend to all of Lehman's PTG positions.  As described, the process of valuing PTG positions requires asset-specific information and an investigation of the circumstances and current state of a development project.  For the purpose of performing a solvency analysis, a court could discount the PTG asset values reported by Lehman on a case-by-case basis after a consideration of the specific assets in question.

As noted, although there is sufficient evidence to demonstrate that the valuation methodology for PTG assets did not rely on market-based assumptions, there is insufficient evidence to support a colorable claim that any Lehman officer acted with an intent to produce incorrect values or conducted the valuation process in a reckless manner.  The errors in valuation did not result from actions (or omissions) that would support a claim of breach of fiduciary duty.[1303]

---

market participants at the measurement date under current market conditions").  For a more detailed discussion of the legal standard for fair value measurements, see Appendix 1, Legal Issues, Section VII.

[1302] *See* Appendix 1, Legal Issues, Section VII.A.

[1303] For a more detailed discussion of the standard governing a claim of breach of fiduciary duty, see Appendix 1, Legal Issues, Section II.

### f) Examiner's Analysis of the Valuation of Lehman's Archstone Positions

#### (1) Executive Summary

This section of the Report addresses Lehman's valuations of its Archstone positions.

Lehman, together with Tishman Speyer, agreed to acquire Archstone, a publicly traded Real Estate Investment Trust ("REIT"), on May 29, 2007 (the "Commitment Date"). The transaction closed on October 5, 2007 (the "Closing Date"). Lehman funded approximately $5.4 billion of the $23.6 billion purchase price, making Archstone Lehman's largest commercial real estate investment.

After the acquisition was announced, analysts opined that Lehman and Tishman Speyer had negotiated a favorable price. However, as the stock prices of Archstone's publicly traded peers began to decline over the summer and early fall of 2007, a Citigroup analyst suggested that Archstone's enterprise value had declined to a level where the Archstone acquirers would be better off paying the $1.5 billion break-up fee instead of completing the transaction.[1304]

Lehman initially projected that its Archstone investments would generate in excess of $1.3 billion in profits over 10 years. This projection was based on the following assumptions: (1) Archstone would sell certain properties for $8.9 billion

---

[1304] Citigroup, Archstone–Smith Trust: Could the Buyer Cut Their Losses and Walk Away? (July 26, 2007), at p. 1 [LBEX-DOCID 1192001].

contemporaneously with the closing, thereby reducing Lehman's exposure and risk; (2) Archstone's projected debt-to-enterprise ratio of over 80% at closing would be reduced shortly thereafter to approximately 70% pursuant to a $1.9 billion equity offering; (3) the promote feature embedded in Lehman's general partner interest (which it referred to as "permanent equity") would result in that equity interest receiving enhanced returns; and (4) Lehman would syndicate one-half of its Archstone debt and limited partner interests (which it referred to as "bridge equity") within two weeks of closing and the remainder during the following six months.

The assumptions supporting Lehman's initial profit projection were not realized: (1) Archstone sold only $1.4 billion of properties contemporaneously with the closing; (2) Archstone did not execute a post-closing equity offering; (3) by March 2008, Lehman determined that the promote feature would not provide enhanced returns; and (4) Lehman did not syndicate a material part of either its $2.3 billion Archstone entity-level debt or its bridge equity before LBHI filed for bankruptcy.  Also as of the Closing Date, the lenders, including Lehman, only syndicated $71 million of bridge equity, which represented 1.5% of the aggregate $4.6 billion bridge equity commitment.[1305]

---

[1305] The lending group received expressions of interests from D.E. Shaw and Abu Dhabi Investment Authority, but these investors ultimately chose not to participate in the Archstone transaction.  E-mail from Mike Mazzei, Barclays, to Mark Walsh, Lehman (Nov. 19, 2007) [LBEX-DOCID 1787730].  The Abu Dhabi Investment Authority expressed an interest in acquiring $250 to $550 million of bridge equity. Memorandum from Coburn Packard, Lehman, and Arash Dilmanian, Lehman, to Brett Bossung, Lehman, and Mark Newman, Lehman, Archstone Acquisition Update (Sept. 17, 2007), at p. 4 [LBEX-DOCID 2073832].  Lehman sold $50 million to the Irvine Company, $20 million to Consolidated Investor Group, and $1 million to Larry Cohen, a high net worth individual associated with Tishman Speyer.

However, Lehman and its financing partners were able to reduce their aggregate exposure by over $8 billion through the placement of Archstone mortgage debt with Fannie Mae and Freddie Mac at the closing. After the closing, Lehman, BofA and Barclays did not syndicate any bridge equity and only syndicated $43 million of term loans.[1306]

Archstone was a highly leveraged company with 76% loan-to-enterprise value as of the Closing Date.[1307] Lehman's approximately $2.2 billion of entity-level debt was structurally subordinate to over $12.0 billion of Archstone asset-level debt, and its approximately $2.4 billion of equity was subordinate to approximately $17 billion of debt. Given Archstone's leverage, a small decline in Archstone's enterprise value would result in a materially larger decrease in the fair value of Lehman's equity interest. Conversely, a small increase in Archstone's enterprise value would result in a materially larger increase in the fair value of that investment.[1308]

---

Lehman, Archstone Smith Multifamily JV Debt and Equity Redemption Schedule (Jan. 3, 2008), at Redemptions tab [LBEX-DOCID 2502413], attached to e-mail from Keith Cyrus, Lehman, to Paul A. Hughson, Lehman, *et al.* (Jan. 3, 2008) [LBEX-DOCID 2646616].

[1306] Lehman, Pro Forma Capitalization Company Balance Sheet (May 30, 2008), at p. 2 [LBEX-DOCID 4329013] attached to e-mail from Rachel Hamilton, Lehman, to Paul A. Hughson, Lehman, *et. al.* (May 31, 2008) [LBEX-DOCID 4329012].

[1307] The 76% ratio assumes the purchase price was representative of fair value as of the Closing Date.

[1308] The Examiner's financial advisor calculated that Lehman's $2.4 billion Archstone equity investment would be reduced by $1 billion in value if Archstone's enterprise value declined by approximately 10%.

As of the Closing Date, Lehman wrote down the value of its Archstone positions by $230 million, the aggregate amount of underwriting, structuring and M&A advisory fees it received in connection with the acquisition.[1309]

A January 2008 Barron's article suggested Archstone had no equity value based on an analysis of the decline in the stock prices of Archstone's publicly traded peers since the Closing Date.[1310] The lenders, including Lehman, were unable to syndicate any of their Archstone positions during the first quarter of 2008, and Archstone faced a tightening liquidity situation due to, among other things, its inability to execute its plan to sell properties to reduce the acquisition debt. Lehman did not take any valuation-related write-downs during the first quarter of 2008.

During the second quarter of 2008, the lenders, including Lehman, were still unable to syndicate Archstone debt, and over $1 billion of potential Archstone property sales fell through after Bear Stearns's near collapse. Archstone continued to face a tight liquidity situation, and by this time Lehman recognized that apartment building values were generally declining. In late March 2008, based on an updated valuation analysis, Lehman wrote down $200 million on its bridge equity position and $50 million on its permanent equity position.[1311]

---

[1309] Lehman, Archstone Origination Fees Marked into Position, at p. 1 [LBEX-BARFID 0024639].

[1310] Andrew Bary, *Apartment-House Blues*, Barron's, Jan. 21, 2008, at p. 1, *available at* http://online.barrons.com/article/SB120070919702802265.html#articleTabs_panel_article%3D1.

[1311] Lehman, Global Real Estate 2008 Mark Downs, at p. 8 [LBEX-BARFID 0013162].

Lehman continued to conduct an analysis of the value of its Archstone positions, resulting in an additional $90 million write-down on its bridge equity and $10 million on its permanent equity in May 2008.[1312]  At this time, Lehman realized it would not meet its syndication goals for Archstone and changed the estimated completion of the syndication program from October 2008 to fiscal year 2010.  Lehman's May 2008 valuation determination was based on its judgment that Archstone debt and bridge equity positions would be more marketable in the future after Archstone deleveraged by using the proceeds of property sales to satisfy part of the acquisition debt, and restructured certain of its remaining debt.  In August 2008, Lehman took its final Archstone write-down of $110 million on its bridge equity position and $15 million on its permanent equity position.[1313]

In assessing the reasonableness of Lehman's valuations of its Archstone equity, the Examiner recognizes that this investment was an illiquid asset, and Lehman's valuations necessarily relied on unobservable inputs.  In light of the absence of directly applicable market data, a court could find that there are a wide range of valuations that would be reasonable.  In conducting the analysis, the Examiner only considered contemporaneous information that was available to Lehman, and is cognizant of the

---

[1312] Id.
[1313] Lehman, Global Real Estate 2008 Mark Downs, at p. 8 [LBEX-BARFID 0013162].

standard that courts apply in assessing the reasonableness of a debtor's valuation judgments for purposes of a solvency analysis.[1314]

The evidence does not support a finding that Lehman's valuations of its Archstone equity positions as of the fourth quarter of 2007 were unreasonable. However, there is sufficient evidence to support a finding that Lehman's valuations for its Archstone equity positions were unreasonable beginning as of the end of the first quarter of 2008, and continuing through the end of the third quarter of 2008.[1315]

The Examiner's determination as to Lehman's first quarter valuation is based on the deterioration in Archstone's projected fundamentals (*e.g.*, net operating income, rent growth rates and capitalization rates) that occurred between the Commitment Date and the end of first quarter of 2008. The evidence supports a finding that Lehman's models employed unreasonably optimistic assumptions that were generally based on Lehman's assumptions when it committed to participate in the Archstone acquisition in May 2007. Notwithstanding the substantial data available to Lehman regarding the deterioration of such fundamentals, Lehman did not revise the assumptions that supported its valuation. The evidence supports a finding that Lehman's valuation of its Archstone equity was overstated, for purposes of a solvency analysis, by $200 million to $450

[1314] See Appendix 1, Legal Issues, Section VII, for a full discussion of relevant legal issues pertaining to valuation.

[1315] The Examiner's financial advisor quantified the amount of the indicative overvaluation of Lehman's bridge and permanent equity positions assuming the promote feature was turned off, which is consistent with Lehman's valuation analysis as of March 2008, and therefore the bridge and permanent equity would have the same marks.

million as of the end of the first quarter of 2008.  Given that the valuation of an illiquid asset requires judgment, the Examiner determined that it is appropriate to express a range as to which there is sufficient evidence to support a finding that Lehman's Archstone equity valuations were overstated for purposes of a solvency analysis.

Lehman wrote down its Archstone investment by over $350 million during the second quarter of 2008.[1316]  However, the Examiner finds that there is sufficient evidence to support a finding that Lehman's cumulative write-downs did not fully reflect the decline in the value of Archstone equity, in light of the deterioration of the fundamentals supporting the assumptions in Lehman's Archstone model.  The evidence supports a finding that Lehman's valuation of its Archstone equity was overstated, for purposes of a solvency analysis, by $200 million to $500 million as of the end of the second quarter of 2008.

Lehman wrote down its Archstone investment by approximately $125 million during the third quarter of 2008.[1317]  As with the prior quarter, the Examiner finds there is sufficient evidence to support a finding that Lehman's cumulative write-downs did not fully reflect the deterioration in the value of Archstone equity during this period. The Examiner finds that there is sufficient evidence to support a finding that Lehman's Archstone equity valuation was overstated, for purposes of a solvency analysis, by $140 to $400 million as of the end of the third quarter of 2008.

---

[1316] Lehman, Global Real Estate 2008 Mark Downs, at p. 8 [LBHI_SEC07940_7620384].
[1317] *Id.* at p. 12.

The Examiner also considered Product Control's role in the price testing of the Archstone valuations. Jonathan Cohen, the senior GREG product controller, told the Examiner that Product Control was not provided with the data underlying the assumptions and inputs used in the Archstone model that supported the business desk's valuations.[1318] Cohen told the Examiner that Product Control did not have the resources or capabilities to adequately review the Archstone business desk's valuations.[1319] Cohen acknowledged that he deferred to the business desk's valuation of Lehman's Archstone positions because Cohen considered the desk personnel to be more knowledgeable about that investment.[1320] The Examiner finds that there is sufficient evidence to support a finding that Lehman's Product Control Group did not serve as an effective independent check on Lehman's valuation of its Archstone positions.

Although there is sufficient evidence to demonstrate that Lehman's valuations of its Archstone equity positions were unreasonable for purposes of a solvency analysis beginning as of the end of the first quarter of 2008, there is insufficient evidence to support a colorable claim that any Lehman officer acted with an intent to produce incorrect values, or conducted the valuation process in a reckless manner. Lehman's valuations of its Archstone positions were not the product of actions (or omissions) that would support a claim of a breach of fiduciary duty.

---

[1318] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 10.

[1319] *Id.*

[1320] *Id.*

### (2) Lehman's Acquisition of Archstone

#### (a) Background on Archstone

Prior to the acquisition in October 2007, Archstone was a publicly traded REIT.[1321] It was engaged primarily in the acquisition, development, redevelopment, operation and long-term ownership of high-rise and garden apartment communities in desirable, high-barrier-to-entry markets.[1322] Archstone's strategy was to focus on its core markets, characterized by: (1) protected locations with high barriers to entry; (2) expensive single-family home prices; and (3) a strong, diversified economic base with significant employment growth potential.[1323] Archstone's portfolio of properties included high-end apartment buildings in metropolitan areas such as New York, Washington, D.C., San Francisco, Seattle and Boston.[1324] As of December 31, 2007, Archstone owned 154 apartment communities, representing 46,566 units, including units under construction.[1325] Prior to the acquisition, Archstone was the second largest publicly traded apartment REIT in the U.S., as measured by market capitalization[1326] and enterprise value.[1327]

---

[1321] Archstone, Annual Report for 2007 as of Dec. 31, 2007 (Form 10-K) (filed on Apr. 1, 2008), at p. 3.

[1322] *Id.* at p. 9.

[1323] *Id.*

[1324] *Id.* at pp. 9-10.

[1325] *Id.* at p. 20.

[1326] Market capitalization refers to the total market value of a company's outstanding shares, which is calculated by multiplying the number of shares outstanding by the stock price per share.

[1327] Lehman, Presentation to Tishman Speyer, Project Easy Living Discussion / Valuation Materials [Draft] (May 21, 2007), at p. 8 [LBEX-DOCID 1695374]. Enterprise value refers to the total value of the business, taking into account market capitalization, outstanding debt, cash available and other assets.

### (b)  Acquisition of Archstone

Lehman and Tishman Speyer sponsored the purchase as a joint venture and negotiations to acquire Archstone evolved throughout May 2007.  The first offer price was $64.00/share on May 2, 2007.  This offer was reduced to $60.00/share on May 23, 2007.  The final offer of $60.75/share was agreed to on May 29, 2007 (the "Commitment Date"), and publicly announced on the same day.[1328]  The decrease from the initial offer price occurred because: (1) due diligence revealed the existence of certain tax protection agreements that impaired the value of some Archstone properties; (2) due diligence indicated that the yields on Archstone's developments were lower than Lehman and Tishman Speyer expected; and (3) developments in the capital markets.[1329]  According to a May 18, 2007 memo provided to Lehman's Investment Committee, Lehman projected it would earn in excess of $1.3 billion in profit over 10 years on its Archstone investment.[1330]

Based on the terms of the commitment, Archstone's capital structure was projected to have (broadly speaking) three separate components:  asset-level debt,

---

[1328] Lehman, Transaction Timeline provided to the New York Stock Exchange (June 20, 2007), at pp. 4-5 [LBEX-DOCID 2139993]; Archstone, Current Report as of Aug. 17, 2007 (Form 8-K) (filed on Aug. 20, 2007), at p. 14.

[1329] Lehman, Transaction Timeline provided to the New York Stock Exchange (June 20, 2007), at p. 4 [LBEX-DOCID 2139993]; e-mail from Steven R. Hash, Lehman, to David S. Lazarus, Lehman (May 23, 2007) [LBEX-DOCID 1863672].

[1330] Memorandum from Mark A. Walsh, et al., to Exec. Committee of the LBHI Bd. of Directors, re: $23.4 billion debt and equity financing commitment in connection with the potential acquisition of Archstone-Smith Trust (May 18, 2007), at p. 3 [LBEX-DOCID 1722291]; Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 9.

entity-level debt and equity. The asset-level debt — which Lehman referred to as mortgage, mezzanine and assumed debt — would be secured by mortgages on Archstone's properties.[1331] Conversely, term loans would be unsecured obligations and were therefore categorized as entity-level debt.[1332] The equity was split into two categories – bridge equity and permanent equity. When the Archstone deal closed on October 5, 2007 (the "Closing Date"), the asset-level debt was secured by mortgages on Archstone's properties and was comprised of $9.5 billion of first lien mortgage debt, $1.1 billion of mezzanine mortgage debt and $1.4 billion of existing mortgage debt (referred to in the table below as assumed debt).[1333] Archstone had $4.6 billion of bridge equity and $500 million of permanent equity.[1334]

The purchase price (after taking into account assumed liabilities and transactions costs) was $23.6 billion.[1335] In connection with the closing of the Archstone acquisition, $1.4 billion of properties from Archstone's portfolio were sold and the proceeds were used to repay acquisition debt.[1336] This, in effect, reduced Archstone's enterprise value

---

[1331] Lehman, Easy Living Q2 Model Risk (June 15, 2008), at all property level debt tab [LBEX-DOCID 4456413].

[1332] Lehman categorized the debt as entity-level debt. Entity-level debt is structurally subordinate to asset-level debt because the proceeds of an asset sale would first pay off asset-level debt, and then any remaining proceeds would go toward entity-level debt.

[1333] Lehman, Archstone: Financial Summary (June 14, 2008), at p. 5 [LBEX-DOCID 012476].

[1334] *Id.*

[1335] Lehman, Easy Living Model Risk (June 15, 2008) at tab S&U cell M51 [LBEX-DOCID 4456413].

[1336] Lehman, Archstone Q2 2008 Update (June 12, 2008), at p. 10 [LBEX-DOCID 2929329]. The $1.4 billion resulted in the sale of a 90% interest in these properties; Archstone retained the remaining 10% interest in these properties post closing.

from $23.6 billion to $22.2 billion as of the Closing Date.[1337]   The following sets forth

Archstone's initial capitalization:

## Archstone Initial Capitalization[1338]

| | Lehman $ Amount | Total $ Amount | Lehman % of Security | Security % of Total | % of Lehman Investment |
|---|---|---|---|---|---|
| | | $ in millions | | | |
| Mortgage Debt | 272 | 9,529 | 3% | 43% | 5% |
| Mezzanine Debt | 506 | 1,097 | 46% | 5% | 9% |
| Assumed Debt | 0 | 1,391 | 0% | 6% | 0% |
| Term Loans | 2,253 | 4,764 | 47% | 21% | 42% |
| Preferred Equity | 0 | 292 | 0% | 1% | 0% |
| Total Debt and Preferred Equity | 3,031 | 17,073 | 18% | 77% | 56% |
| | | | | | |
| Bridge Equity | 2,142 | 4,600 | 47% | 21% | 40% |
| Permanent Equity | 246 | 500 | 49% | 2% | 5% |
| Total Equity | 2,388 | 5,100 | 47% | 23% | 44% |
| | | | | | |
| Total Capitalization | 5,419 | 22,173 | 24% | 100% | 100% |

### (i)   Analyst Reaction

Industry analysts initially perceived that Lehman and Tishman Speyer had

agreed to acquire Archstone at a favorable price.[1339]   The Wall Street Journal reported

that "[i]nvestors and analysts reacted coolly to Tishman Speyer Properties and Lehman

---

[1337] Lehman, Archstone July 2008 Update (July 29, 2008), at p. 4 [LBHI_SEC07940_ICP_008533].   The sources and uses tab in each of the two models that the Examiner's financial advisor reviewed — Lehman, Bridge Equity Discounting Sensitivity (Mar. 17, 2008) [LBEX-DOCID 1626080] and Lehman, Easy Living Model Risk (June 15, 2008) [LBEX-DOCID 4456413] — show a total sources number of $23.6 billion being adjusted down by $1.42 billion due to "90% Sale: OC/SD JV" (sale of properties in the Orange Country/San Diego area).   The total proceeds from the sale were $1.578 billion (see cell O42 of the S&U tab in the models), but because Archstone owned 90% of the properties, it received $1.42 billion (*i.e.*, 0.9 * 1.578 billion).   The sale price was $23.6 billion, less property sales of $1.4 billion, equaling $22.2 billion.   In analyses of its investment in Archstone post-closing, Lehman repeatedly referred to an initial enterprise value (or initial capitalization) of $22.2 billion.

[1338] Lehman, Archstone: Financial Summary (June 14, 2008), at p. 5 [LBEX-DOCID 012476].

[1339] E-mail from Steven Fiscler, Lehman, to Edwin Mejia, Lehman, *et al*. (May 30, 2007) [LBEX-DOCID 2786297].

Brothers Holdings Inc.'s bid for apartment giant Archstone-Smith Trust, saying the offer is too low given the recent pricing in the commercial real estate world."[1340]

Analyst sentiment changed shortly thereafter. A Wall Street Journal article, "Alltel, Archstone Investors Get Credit Willies," published in early July 2007 and circulated in an e-mail[1341] from Jonathan Cohen to Keith Cyrus, a Vice President in GREG's Bridge Equity unit, specifically mentioned Archstone and reported that "[a] few private-equity firms may be getting a case of buyers remorse. The gap between the offering price and the current share price in a number of large agreed-upon leveraged buyouts is swelling. That indicates a fear on the part of merger investors that the private-equity acquirers may end up walking away from the deals or negotiating a lower price."[1342] An article published in the Wall Street Journal on August 1, 2007, which was circulated by Christopher O'Meara (then CFO) in an e-mail to Gerard Reilly (Global Product Controller), David Goldfarb (Global Head of Strategic Partnerships, Principal Investing, and Risk), Ian Lowitt (then Co-Chief Administrative Officer), Paolo

---

[1340] Alex Frangos, Archstone Bid Gets Cool Reply: Tishman Speyer's Offer Is Seen As Too Low Given the Pricing In Commercial Real Estate, Wall St. J., May 30, 2007, at p. B9, attached to e-mail from Steven Fiscler, Lehman, to Edwin Mejia, Lehman, et al. (May 30, 2007) [LBEX-DOCID 2786297]. A number of shareholder derivative actions were brought in state and federal court alleging, among other things, that Archstone's trustees violated their fiduciary duties to shareholders in approving Archstone's acquisition. The state court cases were consolidated into one case in state court. The consolidated action eventually settled, and the dismissal of the federal action was part of that agreement.

[1341] E-mail from Jonathan Cohen, Lehman, to Keith Cyrus, Lehman (July 3, 2007) [LBEX-DOCID 1437297].

[1342] Posting of Dana Cimilluca to Deal Journal, http://blogs.wsj.com/deals/2007/07/02/alltel-archstone-investors-get-credit-willies (July 2, 2007, 9:55 EST).

Tonucci (Global Treasurer) and Edward Grieb (then Global Financial Controller),[1343] observed that a "credit crunch" was causing buyers to pull out of certain markets altogether or to demand sharply higher yields.[1344]   The article suggested that Lehman might find it advantageous to cancel the acquisition and pay Archstone a $1.5 billion break-up fee.[1345]   A Wall Street Journal article published on August 18, 2007 also noted that it might make sense for Lehman to cancel the Archstone deal rather than "try to swallow all that debt."[1346]   When asked in a contemporaneous e-mail if this was "a good assessment of the situation," Jonathan Cohen responded that it was "spot on."[1347]

---

[1343] E-mail from Christopher M. O'Meara, Lehman, to David Goldfarb, Lehman, *et al.* (Aug. 1, 2007) [LBEX-DOCID 210157].

[1344] Ryan Chittum & Kemba J. Dunham, *Credit Crunch takes its Toll: Commercial Real Estate Feels the Effects of Fewer Buyers for Pooled Mortgage Securities,* Wall St. J., Aug. 1, 2007, at p. B11, attached to e-mail from Christopher M. O'Meara, Lehman, to David Goldfarb, Lehman, *et al.* (July 31, 2007) [LBEX-DOCID 210157] ("Low-cost loans with lenient terms have propelled the commercial-real-estate market to what many feared was an unsustainable level. . . . In the past few weeks, though, nervous buyers of these commercial securities have pulled out of the market altogether or demanded sharply higher yields, fearing that many transactions are too risky. . . . Investors are fretting over the commercial sector despite strong fundamentals because they see similarities to problems that led to the crash of the subprime residential-mortgage market.").

[1345] *Id.* (citing Citigroup, Archstone–Smith Trust: Could the Buyer Cut Their Losses and Walk Away? (July 26, 2007), at p. 1 [LBEX-DOCID 1192001]) ("A report Friday from Citigroup analyst Jonathan Litt speculated that Lehman might find it advantageous to cancel the deal and pay Archstone-Smith a $1.5 billion breakup fee rather than holding the debt involved in the deal.").  The article incorrectly reported that Lehman was responsible for paying the entire break-up free, as opposed to the Archstone acquirers.

[1346] Alex Frangos, *If It Actually Happens*, Wall St. J., Aug. 18, 2007, at p. A2.  The article notes that Archstone's shareholders were expected to "sign off on the deal" on August 21, 2007, and that "[t]hings looked different when the deal was announced in May.  Shareholders complained then that the price, at $60.75 a share, was too low as buildings were still trading at record prices. . . . Given how real-estate stocks have sunk since May, the buyout price now seems a steal.  Nonetheless, some say it might make more sense for the buyers to cancel the deal and pay as much as $1.5 billion in termination fees to Archstone-Smith, rather than try to swallow all that debt."

[1347] E-mail from Jonathan Cohen, Lehman, to Kenneth Lobo, Lehman (Aug. 20, 2007) [LBEX-DOCID 4320989].

### (ii) Lehman's Syndication Efforts

After a financial institution agrees to provide financing to a borrower (such as in connection with an acquisition), it can seek to sell all or a portion of that debt to institutional investors prior to the date on which it is contractually obligated to provide such financing. The sale of such debt to other financial institutions or investors is commonly referred to as syndication.[1348] This term was also used by Lehman to refer to the projected sale of its Archstone bridge equity position.

Lehman's initial plan as of early May 2007 was to syndicate 50% of Lehman's Archstone debt and bridge equity positions to other banks within one to two weeks of the Commitment Date.[1349] Lehman also projected that Archstone would enter into agreements prior to closing to sell $9.2 billion of properties at closing, and Archstone would use the proceeds to immediately repay a portion of the acquisition financing provided by Lehman and its partner banks.[1350] Lehman was highly confident that it would be able to syndicate an additional $9 to $11 billion of debt before the closing, in part because of the "unlimited price flex" that was a standard feature in its debt where

---

[1348] Barry Bobrow *et al.*, The Primary Market, *in The Handbook of Loans Syndications & Trading* 155, 159-160 (Allison Taylor and Alicia Sansone eds. 2007).

[1349] Memorandum from Mark A. Walsh, Lehman, to Exec. Committee of LBHI Board of Directors, re: $21.3 billion debt and equity financing commitment in connection with the potential acquisition of Archstone-Smith by Lehman Brothers and Tishman Speyer Properties (May 7, 2007), at p. 4 [LBEX-DOCID 147230].

[1350] *Id.*

it provided bridge equity.[1351]   Price flex, which is addressed in greater detail below, is designed to allow the originating lender to syndicate the debt without suffering a loss. In light of this plan, Lehman projected that it would only have to fund $2 billion to $6 billion at closing.[1352]   Within two to three weeks of closing, Lehman planned to sell 50% of its remaining Archstone mezzanine debt[1353] and bridge equity positions, with the remainder being sold over the following six months.[1354]   Lehman determined that there was substantial institutional demand for the Archstone bridge equity, based on its conclusion that this equity was a direct investment in high-quality, cash flow generating real estate assets.[1355]

Given the potential size of the Archstone investment, Lehman brought BofA to the acquisition, and on the Commitment Date each institution agreed to provide half of the debt financing and to purchase half of the bridge equity.[1356]   BofA, however, did not

---

[1351] Lehman, Easy Living Talking Points for Executive Committee and Rating Agencies (May 18, 2007), at p. 2 [LBEX-DOCID 200792].

[1352] Lehman, Easy Living Talking Points for Executive Committee and Rating Agencies (May 18, 2007), at p. 2 [LBEX-DOCID 200792], attached to e-mail from Paolo Tonucci, Lehman, to Christopher M. O'Meara, Lehman, et al. (May 18, 2007) [LBEX-DOCID 215761].

[1353] As discussed below, mezzanine debt in the context of Archstone refers to asset-level debt that is subordinate to the first mortgage debt.

[1354] Lehman, Easy Living Talking Points for Executive Committee and Rating Agencies (May 18, 2007), at p. 2 [LBEX-DOCID 200792].

[1355] *Id.* at p. 1.

[1356] Lehman, Term Sheet (Bridge Equity) Project Easy Living (May 28, 2007) [LBEX-DOCID 1624526]; Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 8.

purchase a permanent equity position.[1357]  On June 11, 2007, Barclays agreed to purchase 15% of the debt and 15% of the bridge equity, and on July 2, 2007, agreed to increase its participation to 25% of both the debt and the bridge equity.[1358]  Barclays' commitments came out of BofA's share and did not affect Lehman's potential exposure to Archstone.[1359]  As of July 2, 2007, commitments for debt (excluding mortgage and assumed debt) and bridge equity were as follows: Lehman - 47%, BofA - 28%, and Barclays - 25%.[1360]

On July 27, 2007, Mark A. Walsh, Head of GREG, reported that the institutional market for investments backed by commercial real estate was "virtually closed."[1361]  Also on July 27, D.E. Shaw informed Lehman that its risk committee had rejected a proposed acquisition of a portion of Archstone's bridge equity "given the sell-off in the reit market and the volatility of the credit markets."[1362]  Lehman's Treasury personnel became concerned that, as a result of the market "implosion," it might be necessary to

---

[1357] Memorandum from Lehman to Commitment Committee, Lehman, *et al.*, re: $18.3 billion debt and equity financing commitment in connection with the potential acquisition of Archstone-Smith Trust (May 22, 2007), at p. 9 [LBEX-BARFID 0011582].

[1358] *Compare* Letter from Scott M. Weiner, Barclays, to Lehman and Bank of America, re: Archstone Joint Equity Commitment Letter (June 11, 2007), at p. 1 [LBEX-DOCID 2073685] (redline showing execution copy) *with* Letter from Michael Mazzei, President, Barclays, to Lehman and Bank of America, re: Debt Syndication Commitment Letter (July 2, 2007), at p. 2 [LBEX-DOCID 1451573] (redline showing execution copy).

[1359] Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at pp. 8-9.

[1360] Lehman, Project Easy Living Debt Funding Detail (Oct. 5, 2007), at Summary tab [LBEX-DOCID 598184].  Prior to July 2, 2007, Lehman and BofA adjusted the amounts of their respective debt and bridge equity commitments as set forth above.

[1361] E-mail from William Hughes, Lehman, to Alex Kirk, Lehman (July 27, 2007) [LBEX-DOCID 174304].

[1362] E-mail from Mark A. Walsh, Lehman, to Ian T. Lowitt, Lehman, *et al.* (July 27, 2007) [LBEX-DOCID 155079].

provide $9 billion in funding for the Archstone transaction, rather than the previously budgeted $6.8 billion.[1363]

On September 5, 2007, Freddie Mac agreed to purchase approximately $1 billion of Archstone mortgage debt in connection with the closing of the acquisition.[1364] On September 17, 2007, Fannie Mae committed to purchase $7.1 billion of Archstone mortgage debt.[1365] Walsh and Lisa Beeson, Head of Real Estate Mergers and Acquisitions in Lehman's Investment Banking Division, told the Examiner that the Archstone acquisition would not have closed without this financing.[1366] Walsh and Beeson told the Examiner that Fannie Mae's and Freddie Mac's decision confirmed the underlying soundness of the acquisition.[1367]

As of the closing, Lehman, BofA and Barclays had syndicated only $71 million of bridge equity, which represented 1.5% of the aggregate $4.6 billion bridge equity

---

[1363] E-mail from Jonathan Cohen, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (July 27, 2007) [LBEX-DOCID 1904232].

[1364] *See* Lehman and Freddie Mac, Archstone Smith Holdco Floating Rate Pool Term Sheet (Sept. 5, 2007), at p. 1 [LBEX-DOCID 4452813]; Lehman and Freddie Mac, Archstone Smith Sellco Floating Rate Pool Term Sheet (Sept. 5, 2007), at p. 1 [LBEX-DOCID 4452811].

[1365] Letter from Larry J. Kravetz, Lehman, to Fannie Mae, re: Lehman loan to Entities controlled by Tishman Speyer and Lehman Brothers (Sept. 17, 2007), at p. 2 [LBEX-DOCID 2704241].

[1366] Examiner's Interview of Mark A. Walsh, Oct. 22, 2009, at p. 9; Examiner's Interview of Lisa Beeson, Oct. 23, 2009, at p. 6.

[1367] *Id.* The Freddie Mac and Fannie Mae commitments were allocated pro rata to Lehman (47%), BofA (28%) and Barclays (25%). Lehman, Project Easy Living Debt Funding Detail (Oct. 5, 2007), at Summary tab [LBEX-DOCID 598184].

commitment.[1368]  After the closing, Lehman, BofA and Barclays did not syndicate any bridge equity and only syndicated $43 million of term loans.[1369]

### (iii) Bridge and Permanent Equity at Closing

At closing, Lehman paid $2.1 billion for bridge equity, and its plan was to sell the entire position over the short- to medium-term to institutional investors.[1370]  Lehman also acquired a $250 million permanent equity position, which was held by its Investment Management Division ("IMD").[1371]  As noted above, the Archstone bridge equity referred to a limited partner interest while permanent equity referred to a general partner interest.  The general partner interest benefited from a promote feature

---

[1368] The lending group received expressions of interest from D.E. Shaw and Abu Dhabi Investment Authority, but these investors ultimately chose not to participate in the Archstone transaction.  E-mail from Mike Mazzei, Barclays, to Mark A. Walsh, Lehman (Nov. 19, 2007) [LBEX-DOCID 1787730].  The Abu Dhabi Investment Authority expressed an interest in acquiring $250 to $550 million of bridge equity. Memorandum from Coburn Packard, Lehman, and Arash Dilmanian, Lehman, to Brett Bossung, Lehman, and Mark Newman, Lehman, Archstone Acquisition Update (Sept. 17, 2007), at p. 4 [LBEX-DOCID 2073832].  Lehman sold $50 million to the Irvine Company, $20 million to Consolidated Investor Group, and $1 million to Larry Cohen, a high net worth individual associated with Tishman Speyer. Lehman, Archstone Smith Multifamily JV Debt and Equity Redemption Schedule (Jan. 3, 2008), at Redemptions tab [LBEX-DOCID 2502413], attached *to* e-mail from Keith Cyrus, Lehman, to Paul A. Hughson, Lehman, *et al.* (Jan. 3, 2008) [LBEX-DOCID 2646616].

[1369] Lehman, Pro Forma Capitalization Company Balance Sheet (May 30, 2008), at p. 2 [LBEX-DOCID 4329013] attached to e-mail from Rachel Hamilton, Lehman, to Paul A. Hughson, Lehman, *et. al.* (May 31, 2008) [LBEX-DOCID 4329012].

[1370] E-mail from Jonathan Cohen, Lehman, to Clement Bernard, Lehman (Mar. 3, 2008) [LBHI_SEC07940_984508].  *See* Section III.A.1.b.1.a of this Report, which discusses in more detail Lehman's strategy with respect to bridge equity investments.

[1371] E-mail from Jeffrey Goodman, Lehman, to Donald E. Petrow, Lehman (Jan. 28, 2008) [LBEX-DOCID 3753206].

that provided for the general partners to receive enhanced distributions of 20% once the limited partners had received a rate of return on equity of 8% per year.[1372]

### (iv) Capital Structure at Closing

As discussed above, as of the Closing Date, Lehman owned Archstone mortgage debt, mezzanine debt, term loans, bridge equity and permanent equity. The overwhelming majority of Lehman's positions (86%) fell into two categories: term loans (42%) and bridge/permanent equity (44%).[1373] Therefore, 86% of Lehman's investment was subordinated to over half (54%) of Archstone's capital structure.[1374] This placement in the capital structure exposed Lehman – particularly its equity positions – to the risk of significant impairment and the potential of material gain in the value of its investments if Archstone's enterprise value declined or increased over time.

The Archstone equity positions were subordinated to over three-quarters (77%) of the initial capital structure.[1375] As a result, a decline in enterprise value of less than 25% would result in a complete loss in the value of the equity. The effect of leverage

---

[1372] Tishman Speyer, Lehman, and Bank of America, Term Sheet (Bridge Equity): Project Easy Living (May 30, 2007), at pp. 5-6 [LBEX-DOCID 1624527]; Memorandum from Lehman to Exec. Committee of LBHI Bd. of Directors, re: $23.4 billion debt and equity financing commitment in connection with the potential acquisition of Archstone-Smith Trust (May 18, 2007), at p. 5 [LBEX-DOCID 1722291]. A general partner would no longer benefit from the promote fees in the event of failed syndication. *Id.* Failed Syndication is defined as: "If the syndication of all of Lehman's equity interest in the Joint Venture has not been completed prior to the end of the Syndication Period, then (i) such syndication shall be deemed a "Failed Syndication"; (ii) Lehman shall be entitled to assume sole control over the syndication and shall be permitted to sell its equity position to any investor in Lehman's sole discretion; and (iii) Lehman shall have the sole authority to reduce or eliminate the promote and administrative fees otherwise payable to Sponsor." *Id.*

[1373] Lehman, Archstone: Financial Summary (June 14, 2008), at p. 5 [LBEX-DOCID 012476].

[1374] *Id.*

[1375] This figure was computed as $17 billion of debt divided by $22 billion of total capital.

works in the other direction as well, as a less than 25% increase in enterprise value results in a 100% increase in the value of the equity.

The Examiner's investigation included a solvency analysis of the LBHI Affiliates.[1376] Accordingly, the Examiner ascertained whether debtors owned any Archstone investment positions. As shown in the table below, LCPI, an LBHI Affiliate, owned $1.6 billion of Archstone entity-level debt as of May 2008. While bridge and permanent equity were not directly owned by an LBHI Affiliate or LBHI, any change in the value of such investments would affect LBHI's solvency.[1377]

**Legal Entity Ownership of Archstone Positions as of May 2008**[1378]

| Company | Item(s) Held | Par Value | % of Total Archstone Investment |
|---|---|---|---|
| Lehman Brothers Holdings, Inc. | Mortgage and asset-level debt | $680 million | 15% |
| Lehman Commercial Paper, Inc. | Revolver and term loans | $1.6 billion | 34% |
| Luxembourg Trading Finance | Term B loans | $793.5 million | 17% |
| Property Asset Management, Inc. | Bridge equity | $1.609 billion | 34% |

---

[1376] See Section III.B.3.c of the Report for further details.

[1377] This finding is based on the GFS data. *See* Lehman, Reconciliation Data May 2008 (June 13, 2008), at Sheet 1 tab [LBEX-LL 1104843].

[1378] *Id.* The GFS data does not split out IMD investments and thus the table does not include the permanent equity.

As of August 2008, Luxembourg Trading Finance had transferred $600 million in principal amount of Term Loan B to Luxembourg Residential Properties Loan Finance S.a.r.l., an LBHI Affiliate.[1379]

### (v) Price Flex

The debt positions held by these LBHI Affiliates were covered by price flex.[1380] Price flex, as a general matter, is a mechanism that facilitates syndication or sale of a loan by the initial lender without the lender incurring a loss.[1381]  As a mechanical matter, price flex may permit the initial lender to increase the interest rate to attract buyers of the debt (in which case the borrower is required to pay its lenders a higher interest rate), or require the borrower to reimburse the initial lender for any loss it may suffer as a result of syndicating or selling the debt to a third party at a price less than par.[1382]

Lehman, BofA and Barclays (the "Archstone Lenders") entered into a certain Side Letter, dated October 5, 2007 (as amended pursuant to that certain letter agreement between Archstone and the Archstone Lenders, dated November 27, 2007, the "Archstone Side Letter"), that set forth the price flex terms and conditions.[1383]  The Archstone Side Letter provided that after March 24, 2008, the Archstone Lenders had the right to require Archstone to amend the pricing of the applicable loans (including

---

[1379] Lehman, Reconciliation Data August 2008 (Sept. 17, 2008) [LBEX-LL 1104812].

[1380] Archstone, Side Letter agreement (Oct. 5, 2007), at pp. 1-2 [LBEX-WGM 007973].

[1381] Barry Bobrow *et al.*, The Primary Market, *in The Handbook of Loans Syndications & Trading* 155, 175 (Allison Taylor and Alicia Sansone eds. 2007).

[1382] Examiner's Interview of Clement Bernard, Oct. 23, 2009, at pp. 15-16.  Price flex agreements are subject to the terms agreed upon among the lenders and the borrower.

[1383] Archstone, Side Letter agreement (Oct. 5, 2007), at p. 2 [LBEX-WGM 007973].

the spread or margin) or fees in order to achieve a successful syndication of such loans.[1384]  Prior to March 24, 2008, the Archstone Lenders could make such changes only with Archstone's consent.[1385]  In the event that the Archstone Lenders sold Archstone loans at a discount in accordance with the terms of the Archstone Side Letter, Archstone was obligated to reimburse the Archstone Lenders for such loss, which would be satisfied from an escrow account held at BofA ("Escrow Account").[1386]

The Escrow Account was initially funded with $39 million, and the amount held in the account was intended to equal the potential loss that the Archstone Lenders could suffer based on the market price of the unsold Archstone debt.[1387]  BofA was obligated to "mark to market" such debt on the first day of each month, and Archstone was to "promptly deposit any additional amount required as a result of such mark."[1388]  The only deposit made prior to LBHI's bankruptcy filing was made on February 29, 2008, in the amount of $33 million.[1389]  The account's balance was approximately $74 million as

---

[1384] *Id.*

[1385] *Id.* With respect to the Term Loan A, prior to March 24, 2008, the Archstone Lenders were permitted to increase the pre-default interest rate on Term Loan A to a specified level, and were not permitted to sell or syndicate more than $1.5 billion of the Term A Loans prior to such date without Archstone's consent.  *Id.*  Prior to March 25, 2008, the Archstone lenders were permitted to increase the pricing of the Mezzanine Loans by no more than 50 basis points over the spreads and indices referred to in the Archstone Side Letter.  *Id.*

[1386] *Id.* at pp. 5-6.

[1387] *Id.* at p. 5.

[1388] *Id.* at pp. 5-6.

[1389] BofA, Project EZ Living OID Reserve Fund Money Market Savings (Feb. 29, 2008), at pp. 5-6 [LBEX-BofA 000001].

of the beginning of August 2008, which included interest earned on the balance.[1390]  No withdrawals from the account were made prior to LBHI's bankruptcy filing.[1391]

In the case of Archstone, the bridge equity holders were the same institutions as the debt holders, and therefore, any sales of loans for less than par would necessarily impact the value of their equity positions.  Lehman viewed price flex as effectively requiring equity to guarantee the value of the debt.[1392]

As the purpose and function of price flex is to permit the initial lender to sell the debt to a third party without suffering a loss, and the Examiner found that there was sufficient equity value after accounting for the effect of overvaluations to finance the cost of price flex, the Examiner did not find sufficient evidence to support a determination that Lehman's valuation of its Archstone debt positions covered by price flex was unreasonable.[1393]

---

[1390] BofA, Transactions for account: Bank of America as Administrative Agent Archstone - Operating Trust Expense Reserve Escrow Account (July 20, 2009), at p. 1 [LBEX-BofA 000007].

[1391] The Examiner, while taking into account the BofA marks that were reflected in the Archstone Escrow Account's balance for purposes of assessing the reasonableness of Lehman's valuations, determined that it was not a prudent use of resources to examine BofA's valuation of the Archstone loans.

[1392] Examiner's Interview of Clement Bernard, Oct. 23, 2009, at p. 15; Examiner's Interview of Paul A. Hughson, Dec. 21, 2009, at p. 3; Examiner's Interview of Abebual A. Kebede, Oct. 6, 2009, at p. 8.

[1393] The debt positions subject to price flex were generally carried by Lehman at 99% of funded value, and Lehman's conclusion as to any loss of value of these debt positions was incorporated into the bridge and equity positions.  The Examiner did not investigate the reasonableness of Lehman's reporting of individual units of account (*i.e.*, the recording of the loss in value on debt positions in the debt position that incurred the loss or the equity position that funded the loss in value on debt positions).

### (vi) Standard & Poor's Credit Rating

On September 26, 2007, S&P announced its expected ratings for Archstone's acquisition debt.[1394]   S&P gave the proposed $5.1 billion secured credit facility a BB- rating with a recovery rating of 4.[1395]   S&P also announced that its Archstone ratings remained on CreditWatch[1396] with negative implications and that it expected to lower its corporate credit rating to BB- from BBB+ if the acquisition closed as proposed.[1397]   S&P explained that the expected downgrade was due to the "more aggressive financial profile," "weak" debt protections (measures to insure payment of debt), and the risk associated with Archstone's plan to increase development.[1398]   S&P concluded that these weaknesses were "partly offset" by "good quality and above average historical operating performance of Archstone's portfolio" and that Archstone's management team was remaining in place.[1399]

---

[1394] S&P, Archstone-Smith Trust Ratings Remain on Watch Neg; $5.1 Billion Credit Facility Rated 'BB-' (Sept. 26, 2007), at p. 1 [LBEX-DOCID 1711704], attached to e-mail from Francis X. Gilhool, Lehman, to Paul A. Hughson, Lehman, *et al.* (Sept. 26, 2007) [LBEX-DOCID 1854830].

[1395] *Id.*  A BB- rating implies that the company is "less vulnerable in the near-term but faces major ongoing uncertainties due to adverse business, financial and economic conditions."  S&P's Credit Ratings Definitions and FAQs, http://www.standardandpoors.com/ratings/definitions-and-faqs/en/us (last visited Jan. 27, 2010).  A recovery rating of 4 "denotes an expectation of average (*i.e.* 30%-50%) recovery in the event of default."  S&P's Ratings Definitions, http://www.standardandpoors.com/ratings/articles/en/us/ ?assetID =1245200953923 (last visited Jan. 27, 2010).

[1396] The credit ratings were placed on CreditWatch with negative implications shortly after the agreement to acquire Archstone had been publicly announced.  CreditWatch is an indicator of a potential change in a rating (up or down) based on recent events.  In the current case, S&P indicated that the proposed privatization of Archstone would likely result in a downgrade of Archstone's rating.

[1397] S&P, Archstone-Smith Trust Ratings Remain on Watch Neg; $5.1 Billion Credit Facility Rated 'BB-' (Sept. 26, 2007), at p. 1 [LBEX-DOCID 1711704].

[1398] *Id.*

[1399] *Id.*

S&P noted that the purchase price implied a 4% capitalization rate[1400] and that an increase in capitalization rates to a "more conservative" 7% would reduce Archstone's equity value to zero.[1401]  S&P also observed that the plan to reduce Archstone's debt over time was "heavily reliant on asset sales, which can be unpredictable" and opined that "we expect the future environment for multifamily asset sales and pricing to be less robust than it is currently."[1402]

On October 9, 2007, after the closing of the acquisition, S&P formally lowered its corporate rating on Archstone to BB-.[1403]  S&P justified its rating based on several observations:[1404]

- Archstone's risk profile had increased "given the heightened construction and lease-up risk inherent in new development."

- "[E]xpected yields on new development would be negatively affected if the recent moderation in rents and NOI [net operating income] growth continues, or measurably deteriorates if the economy falls into a recession."

- Archstone's liquidity position was "currently sufficient to meet its capital needs" but the business plan relied "heavily on the generation of aggressive asset sale proceeds."

S&P concluded that the outlook was "stable" and that it would lower the rating "if it appears that the company will be unable to achieve sufficient asset sales to repay

---

[1400] *See* Section III.A.2.f.4.a.ii of this Report for a discussion and analysis of exit capitalization rates.

[1401] *Id.*

[1402] *Id.*  A capitalization rate is the ratio of income to value.  As value is the denominator, the higher the capitalization rate, the lower the value of the real estate asset.

[1403] S&P, Various Rating Actions Taken On Archstone-Smith Operating Trust After Close of Merger (Oct. 9, 2007), at p. 2.

[1404] *Id.* at p. 3.

the bank debt and alleviate the debt burden, or if the company is unable to pull back development activity if the operating environment deteriorates."[1405]

### (3) Lehman's Valuation of Archstone

After the Archstone acquisition, Lehman held $5.4 billion in Archstone positions — $3.0 billion of debt and $2.4 billion of equity.[1406] These amounts are referred to as Lehman's "funded exposure" because they represent the amount that Lehman invested, net of any repayments of debt by Archstone.[1407] By August 31, 2008, this funded exposure was reduced by $423 million due to Archstone's repayment of debt.[1408] The following table sets forth Lehman's funded exposure on a monthly basis:

---

[1405] Id.

[1406] Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBEX-BARFID 0013113].

[1407] As Archstone did not purchase any of its own equity, the funded amounts for bridge or permanent equity did not change.

[1408] Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113]; Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 12 [LBHI_SEC07940_ICP_002615]. The $423 million reduction is computed by subtracting exposure of $4.975 billion as of August 2008 from $5.398 billion as of October 2007.

**Archstone Funded Exposure by Month ($ million, Oct. 07–Aug. 08)**[1409]

| | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Term Loan A & B | 2,232 | 2,220 | 2,153 | 2,090 | 2,045 | 1,977 | 1,975 | 1,963 | 1,927 | 1,893 | 1,980 |
| Development Loan | 236 | 217 | 195 | 200 | 200 | 200 | 200 | 194 | 194 | 132 | N/A |
| Revolver | 0 | 0 | 0 | 211 | 211 | 158 | 203 | 237 | 184 | 114 | 141 |
| Mezzanine Loan | 542 | 542 | 542 | 529 | 529 | 529 | 527 | 527 | 527 | 496 | 466 |
| Bridge Equity | 2,142 | 2,142 | 2,142 | 2,142 | 2,142 | 2,142 | 2,142 | 2,142 | 2,142 | 2,142 | 2,142 |
| Permanent Equity | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 |
| Total | 5,398 | 5,367 | 5,278 | 5,418 | 5,373 | 5,252 | 5,293 | 5,309 | 5,220 | 5,023 | 4,975 |

As of the closing date, Lehman wrote down its Archstone positions in an amount equal to $230 million of fees it received in connection with the acquisition.[1410] Thereafter, Lehman took three valuation-related write-downs on its Archstone positions.[1411] At the end of March 2008, Lehman took a $200 million write-down on the bridge equity and a $50 million write-down on permanent equity.[1412] In May 2008, Lehman took a $90 million write-down on bridge equity and a $10 million write-down on permanent equity.[1413] Finally, in August 2008, Lehman took a $110 million write-down on bridge equity and a $15 million write-down on permanent equity.[1414] Lehman's basis for taking these write-downs is discussed below.

Beginning on November 15, 2007, Lehman wrote down its Archstone position in amounts equal to the difference between the rate that Lehman charged GREG for use of

---

[1409] Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113]; Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 12 [LBHI_SEC07940_ICP_002615].

[1410] Lehman, Archstone Origination Fees Marked into Position, at p. 1 [LBEX-BARFID 0024639].

[1411] Lehman, Global Real Estate 2008 Mark Downs, at pp. 10, 21 [LBEX-BARFID 0013162].

[1412] Lehman, Archstone Origination Fees Marked into Position, at p. 1 [LBEX-BARFID 0024639].

[1413] Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113].

[1414] *Id.*

the balance sheet to finance Archstone debt positions, and the higher rate of interest Lehman charged Archstone on these debt positions.[1415] This difference is called the excess carry.[1416] Jonathan Cohen told the Examiner that Paul Hughson, GREG's Head of Credit Distribution, decided to use excess carry to reduce the bridge equity mark, because Hughson did not want to show profits on Archstone positions.[1417]

The first chart below shows Lehman's Archstone marks by month, and the second chart shows the corresponding valuation of Archstone positions by month:

### Lehman's Archstone Marks by Month ($ million, Oct. 07 – Aug. 08)[1418]

|  | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Term Loan A & B** | 99.0 | 99.0 | 98.9 | 98.9 | 98.9 | 98.8 | 98.9 | 98.8 | 98.8 | 99.2 | 98.2 |
| **Development Loan** | 99.2 | 99.1 | 99.0 | 98.5 | 96.0 | 95.5 | 95.5 | 94.3 | 94.3 | 91.3 | N/A |
| **Revolver** | N/A | N/A | N/A | 99.1 | 99.1 | 98.1 | 98.5 | 99.2 | 98.9 | 99.0 | 99.3 |
| **Mezzanine Loan** | 98.9 | 98.9 | 98.9 | 98.9 | 98.9 | 98.8 | 98.9 | 98.8 | 98.8 | 99.0 | 98.9 |
| **Bridge Equity** | 90.7 | 90.5 | 90.2 | 89.6 | 89.6 | 79.9 | 79.6 | 75.1 | 74.9 | 74.6 | 69.0 |
| **Permanent Equity** | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 79.9 | 79.6 | 75.1 | 74.9 | 74.6 | 69.1 |
| **Weighted Average Mark** | **95.7** | **95.6** | **95.5** | **95.3** | **95.1** | **90.1** | **90.1** | **88.0** | **87.7** | **87.2** | **84.3** |

### Lehman's Valuation of Archstone Positions ($ million, Oct. 07 – Aug. 08)[1419]

|  | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Term Loan A & B** | 2,210 | 2,197 | 2,130 | 2,067 | 2,022 | 1,953 | 1,954 | 1,940 | 1,903 | 1,877 | 1,944 |
| **Development Loan** | 234 | 215 | 193 | 197 | 192 | 191 | 191 | 183 | 183 | 121 | N/A |
| **Revolver** | 0 | 0 | 0 | 209 | 209 | 155 | 200 | 235 | 182 | 113 | 140 |
| **Mezzanine Loan** | 536 | 536 | 536 | 523 | 523 | 522 | 521 | 521 | 521 | 491 | 461 |
| **Bridge Equity** | 1,942 | 1,939 | 1,933 | 1,919 | 1,919 | 1,712 | 1,706 | 1,609 | 1,604 | 1,597 | 1,477 |
| **Permanent Equity** | 246 | 246 | 246 | 246 | 246 | 197 | 196 | 185 | 184 | 184 | 170 |
| **Total** | **5,168** | **5,133** | **5,038** | **5,161** | **5,111** | **4,730** | **4,768** | **4,672** | **4,577** | **4,382** | **4,192** |

---

[1415] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 10.

[1416] *Id.*

[1417] *Id.*

[1418] Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113]; Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 18 [LBHI_SEC07940_ICP_002615].

[1419] Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113]; Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 18 [LBHI_SEC07940_ICP_002615].

A review of the weighted average mark is more instructive than the mark on any single position (*e.g.*, for the bridge equity or permanent equity), because it reflects Lehman's determination as to the value of all of its Archstone holdings in the aggregate. For example, an assessment of Lehman's bridge equity or permanent equity marks, viewed in isolation, would fail to separate the change in value due to the price flex mechanism, which resulted in the equity absorbing any loss of value of the debt.

As of closing, Lehman valued its debt positions at approximately 99, its bridge equity at approximately 91 and its permanent equity at 100.[1420]  At closing, the weighted average mark across Lehman's Archstone portfolio was approximately 96, which indicates Lehman concluded that its entire investment was worth approximately 96% of what it paid.

Lehman's weighted average Archstone mark declined slightly between October 2007 and February 2008 from 95.7 to 95.1 due to application of the excess carry to reduce the marks.  The weighted average mark declined to 90.1 in March, to 88.0 in May and to 84.3 in August 2008 as Lehman took the write-downs described above and continued to apply excess carry to reduce the marks.

---

[1420] Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113]; Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 12 [LBHI_SEC07940_ICP_002615]. Lehman did not take a write-down on its commitment prior to closing.  See the following section, which discusses Lehman's Archstone valuation prior to closing.

### (a) Valuation Between Commitment and Closing

This section discusses Lehman's process with respect to the valuation of its commitment to finance the Archstone acquisition. Financial accounting rules required Lehman to mark its Archstone commitments to market.[1421] That is, even before closing, Lehman was required to determine the value of its commitments to provide financing and purchase debt.[1422]

On August 22, 2008, Gerard Reilly, the Head Product Controller, asked Abebual A. Kebede, GREG's Vice President of Valuation Control, to "put a memo together" on the valuation of the Archstone commitment, as "this will get a lot of focus."[1423] The Examiner did not locate any evidence that demonstrated or suggested that Lehman engaged in any systematic effort to value its Archstone commitments prior to this date.

Kebede e-mailed Hughson on August 22, 2007 to obtain Archstone information.[1424] Kebede wrote that Hughson's colleagues "were hesitant" to give him "any details," and Kebede asked Hughson for "details/support" to perform the required

---

[1421] Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities* (June 1998), ¶ 17.

[1422] Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113]; Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 12 [LBHI_SEC07940_ICP_002615].

[1423] E-mail from Gerard Reilly, Lehman, to Abebual A. Kebede, Lehman, *et al.* (Aug. 21, 2007) [LBEX-DOCID 2723016]. In an e-mail to Reilly on August 21, 2007, Kebede wrote: "Further to your query regarding the MTM [mark-to-market] of our commitment on Archstone I spoke with the deal managers this afternoon . . . ." E-mail from Abebual A. Kebede, Lehman, to Gerard Reilly, Lehman, *et al.* (Aug. 21, 2007) [LBEX-DOCID 2723016].

[1424] E-mail from Jonathan Cohen, Lehman, to Abebual A. Kebede, Lehman (Aug. 22, 2007) [LBEX-DOCID 2689684].

analysis and for the underwriting model.[1425]  Hughson's reply did not address Kebede's request for additional information.[1426]  Instead, Hughson responded that as the Archstone debt benefited from price flex, there was no need to value the debt, and that the bridge equity would initially be marked at 96.[1427]  Jonathan Cohen's one-word response to this e-mail trail was "[u]nreal."[1428]  Jonathan Cohen told the Examiner that his response referred to Hughson's failure to respond to Kebede's request for information.[1429]

On August 23, 2007, Kebede sent Jonathan Cohen a memo he described as a "first attempt on the Archstone valuation review."[1430]  Kebede's valuation memo observed that while only a "minimal" amount of bridge equity had been syndicated, the "business" believed that the marks on the bridge equity were appropriate because the yields implied by the model Lehman used to assess the transaction were "in line with current market yields for similar investments."[1431]

---

[1425] *Id.*

[1426] *Id.*

[1427] *Id.*

[1428] *Id.*

[1429] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at pp. 10-11.

[1430] E-mail from Abebual A. Kebede, Lehman, to Jonathan Cohen, Lehman (Aug. 23, 2007) [LBEX-DOCID 2689696].  Kebede informed Jonathan Cohen: "We will need to update the conclusion once we decide on the marks." *Id.* The Examiner did not locate any updated valuation memo, and Jonathan Cohen did not recall any such update being undertaken.

[1431] Lehman, Archstone Smith Valuation Update (Aug. 23, 2007), at p. 2 [LBEX-BARFID 0011579].

### (b) Valuation as of the Closing Date

As of the closing date, Lehman marked all of its debt positions at 99, its bridge equity at 91 and its permanent equity at 100.[1432] These write-downs were equal to the $230 million in underwriting, structuring and M&A advisory fees Lehman received in connection with the acquisition.[1433] Lehman allocated the fees as follows:

**Allocation of Fees to Initial Archstone Marks[1434]**

| Debt | Fees Allocated to Mark | Resulting Mark |
|------|------------------------|----------------|
| Term Loan A | (11.4) | 99.0% |
| Term Loan B | (11.0) | 99.0% |
| Development Loan | (2.4) | 99.0% |
| Mezzanine Loan | (5.4) | 99.0% |
| Revolver | (3.5) | 99.0% |
| Bridge Equity | (199.5) | 90.7% |
| **Total** | **(233.0)[1435]** | |

Hughson told the Examiner that the fees were applied to the marks based on the state of the debt and equity markets and that these marks were approved by O'Meara and Tonucci.[1436]

---

[1432] Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113].

[1433] Lehman, Archstone Origination Fees Marked into Position, at p. 1 [LBEX-BARFID 0024639].

[1434] *Id.* Lehman's policy was to mark bridge equity fees (typically 4%) into the basis for its bridge equity positions (thus reducing the mark). Lehman, Global Real Estate Mark Downs (Feb. 1, 2008), at p. 5 [LBEX-DOCID 514139].

[1435] The Examiner notes that according to Lehman's records (and as is discussed throughout this Section), Lehman received $233 million of fees related to the Archstone transaction. However, when marking down Archstone to reflect fees, Lehman took a mark-down of $230 million. This difference $3 million difference is immaterial and represents less than 0.1% of Lehman's Archstone investment.

[1436] Examiner's Interview of Paul A. Hughson, Dec. 21, 2009, at p. 3.

On October 4, 2007, the day before the closing, Jonathan Cohen e-mailed Reilly as to the status of the loan syndication: "The term loan syndication is not going so well. No orders yet and it seems the investors want better pricing. Tishman is reluctant to accept the discount as it will impact equity."[1437] Reilly replied, "[w]hat would be the logic in not marking down the term loan?"[1438] Jonathan Cohen replied that the term loans were guaranteed to make a 1% profit,[1439] and the implied yields on the bridge equity investment remained within a reasonable range notwithstanding that, due to price flex, equity would incur losses in value that, absent price flex, would be incurred by the debt.[1440]

On October 9, 2007, Jonathan Cohen, responding to an e-mail asking about Hughson's views on where Archstone debt should be marked, wrote that Hughson "thinks 99, but if the firm wants him to mark it at where we could clear, then maybe at 96."[1441]

---

[1437] E-mail from Jonathan Cohen, Lehman, to Gerard Reilly, Lehman (Oct. 4, 2007) [LBEX-DOCID 1722336].

[1438] *Id.*

[1439] Lehman considered that it would make a 1% profit on the debt because it had allocated fees equaling 1% of the principal amount of its Archstone debt to such debt and concluded that it would not suffer a loss on the sale or syndication of such debt due to price flex. *Id.*

[1440] *Id.* Jonathan Cohen also informed Reilly that Hughson told him there "[a]pparently" was a "written document whereby we agreed NOT to sell the term loan at reduced prices." Jonathan Cohen told Reilly that this meant there was an agreement to not sell into the "depressed" market. E-mail from Jonathan Cohen, Lehman, to Gerard Reilly, Lehman (Oct. 5, 2007) [LBEX-DOCID 2723114].

[1441] E-mail from Jonathan Cohen, Lehman, to Derek Schneider, Lehman (Oct. 9, 2007) [LBEX-DOCID 2802572].

### (c) Valuation as of the Fourth Quarter of 2007[1442]

The Examiner did not locate any formal valuation analyses undertaken by Lehman to value the Archstone positions as of November 30, 2007, the end of Lehman's fiscal year. Hughson, for example, did not recall any specific events that would have caused the need to change Archstone's valuation between October 5, 2007, and November 30, 2007.[1443] Hughson, Jonathan Cohen and Webster Neighbor, who worked in the Bridge Equity unit and operated the Archstone cash flow model that was used to mark the bridge equity position, could not recall any specific discussion or analyses regarding the valuation of the Archstone position as of November 2007.[1444]

E&Y completed a year-end audit of LBHI's financials for the period ending November 30, 2007.[1445] William Schlich, E&Y's lead audit partner, and Jerry Gruner, a senior manager on E&Y's Lehman audit team, told the Examiner that in the approximately two-month period following the close of the Archstone deal, E&Y concluded that the best indication of the fair market value of Lehman's equity investment in Archstone was the price Lehman paid to acquire those positions.[1446] Schlich and Gruner told the Examiner that BofA's and Barclays' participation in the

---

[1442] Lehman's fourth quarter covered September 1, 2007, through November 30, 2007.

[1443] Examiner's Interview of Paul A. Hughson, Dec. 21, 2009, at p. 3.

[1444] *Id.*; Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 10; Examiner's Interview of Webster Neighbor, Nov. 17, 2009, at p. 3.

[1445] Lehman, Exhibit 23.01, at p. 255, attached to LBHI 2007 10-K. E&Y's work papers did not include any formal analysis of the Archstone positions.

[1446] Examiner's Interview of Ernst & Young, Nov. 11, 2009, at pp. 4-5.

same transaction with similar terms served as another indication that a November 30, 2007 valuation based on the closing price on October 5, 2007, was reasonable.[1447]

### (d)  Valuation Issues During the First Quarter of 2008[1448]

### (i)  Barron's Article

On January 21, 2008, Barron's published an article titled "Apartment House Blues" that questioned the value of Archstone's equity.[1449]  According to the article, the Archstone transaction "could prove disastrous for Wall Street firms and other equity investors."[1450]  The article noted that Archstone had a "heavy load" of debt - almost five times the amount of AvalonBay, a comparable publicly traded REIT.[1451]  In light of the 30% decline in the share prices of REITs since October 2007, the article stated that Wall Street was "concerned . . . that rent increases will slow, even in relatively strong markets," and that Archstone was a "classic example of a good company with a bad balance sheet . . . . [T]he value of Archstone equity could be zero."[1452]  This potential loss of all equity value was premised on an observation that the implied capitalization rates for REITs, based on current stock prices, had risen to an average of 7%, and even the

---

[1447] *Id.* at p. 5.

[1448] Lehman's first quarter covered December 1, 2007, through February 29, 2008.

[1449] Andrew Bary, *Apartment-House Blues*, Barron's, Jan. 21, 2008, at p. 1, *available at* http://online.barrons.com/article/SB120070919702802265.html#articleTabs_panel_article%3D1.

[1450] *Id.*

[1451] *Id.*

[1452] *Id.* at pp. 1-2.

"highly regarded" AvalonBay[1453] REIT had an implied capitalization rate of 6.3%.[1454] (The value of real estate is inversely related to changes in capitalization rate – all other factors being equal, an increase in capitalization rates results in decrease in value.)[1455] To estimate an enterprise value for Archstone, the article applied a 6% capitalization rate to "an optimistic $850 million of net operating income for this year" to arrive at $14 billion, which was lower than the face value of Archstone's debt; this "would imply a wipe-out of the $5 billion of equity."[1456]  The article further noted that the use of a 5.5% capitalization rate, which it considered to be "aggressive," still "results in no equity value."[1457]

### a.   Archstone's Response to the Barron's Article

On January 19, 2008, the Friday before Barron's piece was published, R. Scot Sellers, Archstone's CEO, wrote an e-mail to Lehman, Tishman Speyer and Archstone personnel, to set forth a "compilation of talking points that should be helpful in addressing many of the allegations in the article."[1458]  In this e-mail, Sellers made the following arguments:

---

[1453] As discussed below in the Comparable Companies portion of the Analysis section, Lehman deemed AvalonBay to be one of the three "primary comps" to Archstone.

[1454] Andrew Bary, *Apartment-House Blues*, Barron's, Jan. 21, 2008, at p. 2, *available at* http://online.barrons.com/article/SB120070919702802265.html#articleTabs_panel_article%3D1.

[1455] Shannon P. Pratt & Roger J. Grabowski, *Cost of Capital: Applications and Examples* 564 (3d ed. 2008).

[1456] Andrew Bary, *Apartment-House Blues*, Barron's, Jan. 21, 2008, at p. 2, *available at* http://online.barrons.com/article/SB120070919702802265.html#articleTabs_panel_article%3D1.

[1457] *Id.*

[1458] E-mail from R. Scot Sellers, Archstone, to David Augarten, Tishman Speyer, *et. al.* (Jan. 19, 2008) [LBHI_SEC07940_111678].  Jonathan Cohen told the Examiner that Lehman knew the article was going to

- Public markets are not good predictors of real estate values;[1459]

- Values ascribed by public markets are not transactionable;[1460]

- Replacement costs are a good indicator of value;[1461]

- Weakening single family home markets will increase rent growth;[1462]

- Archstone assets are more desirable than other real estate assets;[1463]

- The article "missed" the value of Archstone's platform and development franchise.[1464]

---

be published and that the author did not want to incorporate Archstone's and Lehman's view as to value. Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 10.

[1459] E-mail from R. Scot Sellers, Archstone, to David Augarten, Tishman Speyer, *et. al.* (Jan. 19, 2008) [LBHI_SEC07940_111678]. The "principle mistake in the article is the assumption that public market share prices are in any [way] predictive of real estate values, or represent an 'efficient' market." Sellers goes on to argue "how wrong the public market gets valuations and even directionality from time to time" and cites examples where Archstone bought back its own stock at large discounts to the "value" of the assets when there was a period of illiquidity. He also cited Archstone's "solid" operating fundamentals. *Id.*

[1460] *Id.* "Using a comparison of public market pricing to value our portfolio may seem intuitive to someone who doesn't understand public markets well, but it is flawed for several reasons. First, you simply could not purchase these companies today at anywhere close to current share prices." As support, Sellers cites an example where Archstone was rebuffed in its attempt to acquire another REIT during the last cycle with a cash offer at a "material premium" to the existing stock price. He further states that publicly traded REITs such as AvalonBay and Equity Residential were trading at 35% to 50% below replacement cost and that replacement costs were "unlikely to come down much, if at all, due to the tremendous demand for raw materials from large construction initiatives around the world" and that land prices within Archstone's markets were "unlikely to change much either." *Id.*

[1461] *Id.* "Replacement costs are an especially important benchmark in supply-constrained markets, because of the difficulty of adding new supply. By definition, as demand increases in these markets, it can only be met by developing new units at replacement costs, which in turn requires rents that produce a market rate of return on these costs." *Id.* Replacement cost refers to the cost to replace an asset, such as a building, at the cost that one would incur today, which may be different from the fair market value of the asset. *Id.*

[1462] *Id.* Sellers states that fundamentals for apartments were expected to become stronger due to the deteriorating fundamentals for new single family homes (*i.e.*, people will be more likely to rent than buy). *Id.*

[1463] *Id.* Investors "place a very high value on the ability to acquire these types of [Archstone's] assets, at any point in the real estate cycle." "We are in a period of more limited transactional volume today, but there is still significant demand to purchase the assets we own at very attractive prices, and we will continue to consummate transactions with qualified buyers and partners as we move forward." *Id.*

Sellers closed the e-mail by stating that this was a time to "acquire great assets at attractive prices," because he did not "anticipate seeing a lot of distress in the markets, due to the strong operating fundamentals in our business" and he expected that interest rates would come down.[1465]

### b. Lehman's Response to the Barron's Article

Lehman personnel met with representatives from Tishman Speyer, BofA and Barclays over the weekend of January 19, 2008, to discuss the Barron's article.[1466] While Lehman, BofA and Barclays decided not to issue a formal response, Lehman analyzed public company information, compiled data on recent Archstone asset sales and comparable asset sales, and reviewed Archstone's business plan.[1467]

In a January 21, 2009 e-mail, one of the Lehman participants in the meeting wrote to his colleagues that the implied capitalization rates of publicly traded REITs were "not representative of the company's portfolio. That being said, if we actually thought the

---

[1464] *Id.* "Private real estate investors understand the tremendous value of this platform/franchise, and are willing to pay for it . . . but the public markets don't get this for some reason." Sellers states that both Archstone and AvalonBay were able to "consistent[ly]" create value in supply constrained markets over the course of many years "yet public market investors have never been willing to recognize this." *Id.*

[1465] *Id.*

[1466] E-mail from Scott A. Levin, Lehman, to Steven R. Hash, Lehman, *et al.* (Jan. 21, 2008) [LBEX-DOCID 1488801].

[1467] *Id.* Lehman also identified the following assets that the Barron's article did not appear to incorporate into its analysis: assets held for sale, development pipeline, platform value in Germany, ground leases and other assets. *Id.*

appropriate cap rate for the company's assets was 6.0%, there would not be much equity value in the company (please do not share that information)."[1468]

Shortly after the Barron's article was published, Jonathan Cohen sent an e-mail to Donald E. Petrow, a Senior Vice President and Global Head of Real Estate Risk Management, in which he wrote: "The issue is obviously now that the public thinks the equity could be worthless and we are sitting at a price of 90 while the IMD perm equity position is at par. If we are good at these prices, [] the onus is on us to support that with current info."[1469]

A rebuttal to the Barron's article was presented to Lehman's Executive Committee on January 22, 2008.[1470] The rebuttal stated that the "actual facts contradict the Barron's thesis" and made the following arguments:[1471]

- The 10 most recent trades in Archstone's market occurred at an average capitalization rate of 4.6%, which was significantly lower than the capitalization rates of 6% and above discussed in the Barron's article;[1472]

---

[1468] *Id.* In the e-mail, Levin notes that Archstone created models that illustrated that public markets undervalue REITs compared to private markets and "cap rates for institutional quality apartment buildings in high barrier-to-entry markets have moved relatively little." To support these observations, Levin explained that:
    Archstone's comparables were trading at less than the value of the individual real estate assets;
    A focus on capitalization rates ignores Archstone's non-real estate assets, such as development assets;
    Archstone's capitalization rates would hold steady due to the portfolio's high-quality assets; and
    Apartment buildings are more stable investments compared to other real estate. *Id.*

[1469] E-mail from Jonathan Cohen, Lehman, to Donald E. Petrow, Lehman (Jan. 22, 2008) [LBEX-DOCID 1468672].

[1470] E-mail from Jonathan Cohen, Lehman, to RE Control US, Lehman (Jan. 22, 2008) [LBEX-DOCID 1587277].

[1471] Lehman, Archstone "ASN" - Talking Points (Jan. 22, 2008), at p. 1 [LBEX-DOCID 1625626].

[1472] *Id.*

- Archstone recently sold two assets out of its Washington, D.C. portfolio at a capitalization rate of 4.1%;[1473]

- Underlying fundamentals were strong (as evidenced by actual and projected rent growth of 5%);[1474]

- The stock market was valuing apartment REITs as if they were worth 30% below their net asset value. Lehman noted that the public market "often has these pricing anomalies;"[1475]

- "Barron's gave zero value for the company as a platform and its development pipeline and looked only at a draconian view of asset value."[1476]

On January 22, 2008, after receiving the rebuttal arguments that were presented to the Executive Committee, Jonathan Cohen wrote in an e-mail that the Barron's article was "[n]ot Armageddon as originally thought."[1477]

### (ii) January 2008 Archstone Update

In January 2008, Tishman Speyer provided a memo titled "Archstone Business Plan and Syndication Update," to Lehman, BofA and Barclays.[1478] The memo outlined a plan to "ramp up Archstone's disposition program in 2008" by deleveraging Archstone on an accelerated basis and generating net sales proceeds to pay down the Term Loan A

---

[1473] *Id.*

[1474] *Id.* The rebuttal also provided reasons why asset pricing remained relatively strong, which included: "a) Agencies continue to finance actively (low treasury rates); b) Fewer renters moving to owned housing because of credit crunch (albeit some for sale housing overhang in rental pool; [and] c) Pricing of stand alone assets will never stray too far from replacement cost before local developers buy. This is an important fact and can largely explain the difference between where stocks trade versus asset value."

[1475] *Id.*

[1476] *Id.*

[1477] E-mail from Jonathan Cohen, Lehman, to Gary J. Fox, Lehman (Jan. 22, 2008) [LBEX-DOCID 1587278].

[1478] Memorandum from David Augarten, Tishman Speyer, *et al.*, to R. Scot Sellers, Archstone, *et al.*, Archstone Business Plan and Syndication Update (Jan. 30, 2008), at p. 1 [LBEX-DOCID 1696101].

on an accelerated schedule.[1479]   The lenders were asked "to delay the syndication of Term Loan A for a period of time to allow the Company ample time to execute the Plan before any additional OID [original issue discount] was incurred."[1480]

Lehman, BofA and Barclays met to discuss Archstone's business plan on or about January 30, 2008.[1481]   The successful execution of an accelerated disposition plan was viewed as "a critical first step to solving many of the problems faced by the equity holders and lenders today."[1482]   Tishman Speyer described the "problems" that the lenders and equity holders faced as follows:

- "We still have $4.5 billion of equity left to syndicate and have lost momentum with most of the large investors who were interested in the deal."[1483]

- "There is no urgency for investors to invest in the deal today given the amount of equity left to syndicate (i.e. there is plenty of 'supply')."[1484]

- "Investors are concerned that the Company is not worth what we paid for it because cap rates have crept upwards in most markets.  Although the recent

---

[1479] *Id.*

[1480] *Id.* Original issue discount refers to the reduction in the value of loans that must be incurred to effectuate a transaction between a willing buyer and willing seller (including the borrower and the initial lender).  Frank K. Reilly & Keith C. Brown, *Investment Analysis and Portfolio Management* 528 (6th ed. 2000). For example, OID of 1% would result in a lender advancing $99 and holding a claim of $100 for repayment of principal.  OID generally refers to the difference between the stated principal amount of a debt instrument (*i.e.*, the principal that the borrower must repay) and the amount that the lender actually advanced.  *Id.*  However, in this instance, the term appears to refer to the discount at which the debt would need to be sold by the lenders to a third party investor.

[1481] Memorandum from David Augarten, Tishman Speyer, *et al.*, to R. Scot Sellers, Archstone, *et al.*, re: Archstone Business Plan and Syndication Update (Jan. 30, 2008), at p. 1 [LBEX-DOCID 1696101].

[1482] *Id.*

[1483] *Id.*

[1484] *Id.*

Barron's article grossly overstated the increase in cap rates, it still did not help investor perception of the value of the Company."[1485]

- The current deal model shows returns that were "well below" the targeted returns.[1486] At the time, the model assumed the entity-level debt was worth 97 cents on the dollar and that each $100 million reduction in the value of the entity-level debt reduced the equity returns by 19 basis points (due to the features of the price flex agreement).[1487]

- The capital structure was not "fixed" due to the inability to syndicate the entity-level debt.[1488] It was difficult to syndicate the debt due to the high level of debt and the inability of the operating business to service its debt obligations.[1489]

- "The lenders wanted to syndicate the term loan as quickly as possible, but Archstone was still viewed as a 'risky' credit with leverage at 76% (of acquisition cost) and an operating business that was not covering its debt service."[1490]

- Archstone was "hampered" by an overleveraged balance sheet and had "limited liquidity" to fund its existing development pipeline and to invest in new business opportunities "unless it [could] sell assets and refresh its Revolver capacity over time."[1491]

The Tishman Speyer memo explains that to "fix" these problems, Archstone must "find ways to increase the value of company and improve its liquidity."[1492]

Tishman Speyer proposed that one way of achieving this goal for Archstone was to allocate more capital to "higher returning" development and value-added investments

---

[1485] *Id.*

[1486] *Id.*

[1487] *Id.*

[1488] *Id.*

[1489] *Id.*

[1490] *Id.*

[1491] *Id.*

[1492] *Id.* at p. 2.

while selling certain of its core portfolio apartment complexes.[1493]  While it would be "challenging to achieve all of these goals in the near term," achievement of these goals would make the equity and debt "much more saleable."[1494]  The memo further notes that there were "very few" apartment asset sales since the fall, which made it "hard to precisely estimate value" in most markets.[1495]  According to Tishman Speyer, the Archstone assets that were being marked were expected to be sold at values 10% below recent appraisals and 9% below the values that were the basis for underwriting the acquisition.[1496]

### (iii) Valuation as of February 29, 2008

Lehman did not take any valuation-related write-downs during the first quarter of 2008, ending February 29.[1497]  On February 2, 2008, Jonathan Cohen noted: "For now, I think we are still good at our 90 mark [referring to the bridge equity mark].  Will likely revisit, but the only place it goes is south."[1498]

In a March 3, 2008 e-mail to Clement Bernard, the CFO of FID, Jonathan Cohen explained that the methodology used by Lehman to value its bridge equity positions,

---

[1493] *Id.*

[1494] *Id.*

[1495] *Id.* at p. 3.

[1496] *Id.*

[1497] Jonathan Cohen responded to a question regarding first quarter markdowns that there was "[n]othing thru P&L.  We used maybe 15mm or so from excess carry on the term and mezz loans to mark equity. We never show that in the mark down summary."  E-mail from Jonathan Cohen, Lehman, to Clement Bernard, Lehman (June 8, 2008) [LBEX-DOCID 4320133].

[1498] E-mail from Jonathan Cohen, Lehman, to Robert Shaw, Lehman (Feb. 7, 2008) [LBEX-DOCID 2801006].

including Archstone, in February 2008 was "generally based on initial capitalization structure on day 1, which also includes assumptions of the projected entity level cash flows and estimated yields that we would sell the bridge equity to investors. . . . Since it was always expected to be carried short-term, there was never a robust analysis put in place at the independent servicer to value the equity. . . . That said, these investments are actively monitored from the business side (Paul Hughson) to see if there is any yield impairment to the ultimate equity investor."[1499]

Jonathan Cohen gave a presentation to the head of FID, Andrew J. Morton, in March 2008 to discuss Product Control's review of the reasonableness of Lehman's first quarter Archstone valuations.[1500] The presentation materials include an overview of how Lehman conducted bridge equity valuations, and set forth the internal rate of return[1501] ("IRR") that was implied by Lehman's Archstone mark.[1502] The presentation materials for the meeting with Morton note the following:[1503]

---

[1499] E-mail from Jonathan Cohen, Lehman, to Clement Bernard, Lehman (Mar. 3, 2008) [LBEX-DOCID 1721456].

[1500] E-mail from Jonathan Cohen, Lehman, to Andrew J. Morton, Lehman (Mar. 13, 2008) [LBEX-DOCID 1437587] (discussing these issues further).

[1501] The internal rate of return is the discount rate that equates the series of cash flows to an initial investment. *See* Appendix 12, Valuation - Archstone, for an illustrative example of Lehman's IRR model.

[1502] *Id.*

[1503] Abebual A. Kebede, Lehman, Real Estate Inventory Valuation (Mar. 10, 2008) [LBEX-DOCID 1707877], attached to e-mail from Abebual A. Kebede, Lehman, to Clement Bernard, Lehman, *et al.* (Mar. 10, 2008) [LBEX-DOCID 1854362].

- The pricing methodology for bridge equity positions is described as gauging the yield at which Archstone positions would be palatable to target investors given the origination assumptions.[1504]

- The valuation needs to be based on the collateral values because syndication has stalled.[1505]

- Concerns specific to Archstone bridge equity include increases in capitalization rates and the presence of price flex on the debt.[1506]

Hughson and Neighbor did not recall creating any documents that described their methodology or analysis to support not taking any valuation-related Archstone write-downs in the first quarter.[1507]   Jonathan Cohen told the Examiner that Product Control did not perform adequate analysis regarding the February 2008 mark.[1508]

### (iv) First Quarter 2008 Earnings Call and Lenders' Discussion Regarding Modifying the Archstone Strategy

During Lehman's first quarter 2008 earnings call on March 18, 2008, Erin Callan, CFO of Lehman, stated: "With respect to Archstone, I want to make a comment here again in the interest of transparency ahead of questions, we currently hold 2.3 billion of

---

[1504] *Id.* at Summary tab.

[1505] *Id.* at Issues tab.

[1506] *Id.* at Major concerns tab.  Price flex was listed as a bridge equity valuation concern, because it had a negative impact on valuation of the equity - price flex transferred loss of value of the debt to the bridge equity.

[1507] Examiner's Interview of Paul A. Hughson, Dec. 21, 2009, at p. 3; Examiner's Interview of Webster Neighbor, Nov. 17, 2009, at p. 3.  However, Lehman appears to have prepared a sensitivity analysis shortly after the first quarter ended, as it was based on a version of the model used to assess Lehman's investment in Archstone as of March 3, 2008, as well as the underlying DCF model as of early March 2008.  Jeffrey Wechsler, Lehman, Bridge Equity Discounting Sensitivity (Mar. 4, 2008) [LBEX-DOCID 1391229], attached to e-mail from Jeffrey Wechsler, Lehman, to Jonathan Cohen, Lehman (Mar. 4, 2008) [LBEX-DOCID 1468681]; Lehman, Bridge Equity Discounting Sensitivity (Mar. 17, 2008), at Discounting Sens. tab [LBEX-DOCID 1626080].

[1508] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 7.

the non-investment grade debt related to that transaction and 2.2 billion of equity, both currently carried materially below par. We are actively delevering that company through asset dispositions at attractive levels and improving their financial profile."[1509]

At that time, Lehman marked all of its Archstone debt positions at 99 (with the exception of the development loan at 96), bridge equity at 90, and its permanent equity at 100, for a weighted average mark for its portfolio of 95.1. As previously discussed, the reduction in the mark through February 2008 was attributable to marking the fees and excess carry into the bridge equity position. Jonathan Cohen told the Examiner that he was not consulted before this earnings call and that he would not have used the word "material."[1510] Hughson told the Examiner that he agreed with Callan's characterization as to where Lehman was marking its Archstone positions, because the mark on the overall positions implied a 5% below-funded-amount mark for debt and equity positions.[1511]

### (e) Valuation Issues During the Second Quarter of 2008[1512]

#### (i) March 2008 Archstone Update

According to the Tishman Speyer March 2008 Archstone Update, it became "very difficult" for Archstone to sell assets as market participants became "decidedly more

---

[1509] Final Transcript of Lehman Brothers Holdings Inc. First Quarter 2008 Earnings Call (Mar. 18, 2008), at p. 6.
[1510] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 7.
[1511] Examiner's Interview of Paul A. Hughson, Dec. 21, 2009, at p. 3.
[1512] Lehman's second quarter started on March 1, 2008, and ended May 31, 2008.

cautious."[1513]  The memo reports that "[a]ll of the large deals that we were trying to put together earlier this year have been unsuccessful to date."[1514]  Over $1 billion of potential asset sales that were in negotiations fell apart after Bear Stearns's near collapse.[1515] Tishman Speyer expected it to be "challenging" for Archstone to sell assets until such time as market conditions stabilized.[1516]

In response to this difficult environment, the proposed revised asset disposition plan calls for a willingness to "accept slightly lower prices if necessary, in the near term, to free up some liquidity" and for the marketing of some of Archstone's "trophy" properties.[1517]  The assets that were marketed at this time were determined to be worth 13% less than their appraised values.[1518]  The implications of this determination are explained in the analysis section below.

In response to concerns that Archstone's liquidity situation was worsening due to the cost of servicing the acquisition debt, Archstone started to reduce its investment in capital expenditures.[1519]  Tishman Speyer projected that, as a result of Archstone's inability to execute on the asset sale program, Archstone would run out of liquidity in

---

[1513] Memorandum from David Augarten, Tishman Speyer, *et al.*, to R. Scot Sellers, Archstone, *et al.*, re: Archstone Update (Mar. 24, 2008), at p. 1 [LBEX-DOCID 2932586].

[1514] *Id.*

[1515] *Id.*

[1516] *Id.*

[1517] *Id.* at p. 2.

[1518] *Id.*

[1519] *Id.*

four months (July 2008) if Archstone did not sell assets.[1520]   Tishman Speyer reported

that Archstone's management was "in the process" of reviewing its development plan

to assess what projects should be pursued, renegotiated or cancelled and that

Archstone's peers were also "scaling back" development plans in the short-term.[1521]

### (ii)  March 2008 Valuation

On March 11, Product Control asked the bridge equity desk for a sensitivity

analysis based on the model that the desk used to value the Archstone position.[1522]

Product Control received the underlying model, as well as the sensitivity analysis, on

March 17.[1523]

Discussions regarding a potential $200 million write-down on Archstone bridge

equity appear to have begun in mid-March 2008.[1524]   Jonathan Cohen reported to

Bernard on March 20, 2008 that the bridge equity desk was "running numbers and

stressing cap rates," and the preliminary view was that a write-down of $200 million

could be taken by the end of the month.[1525]   An impetus for this potential write-down

was the aforementioned $1 billion of potential asset sales that did not close in the

---

[1520] *Id.*

[1521] *Id.* at p. 4.

[1522] E-mail from Jonathan Cohen, Lehman, to Jeffrey Wechsler, Lehman, *et al.* (Mar. 11, 2008) [LBEX-DOCID 1468690].  Jonathan Cohen asked for a sensitivity analysis that showed a mark as low as 60.  *Id.*

[1523] E-mail from Jeffrey Wechsler, Lehman, to Jonathan Cohen, Lehman (Mar. 17, 2008) [LBEX-DOCID 4310701].

[1524] E-mail from Jonathan Cohen, Lehman, to Clement Bernard, Lehman, *et al.* (Mar. 20, 2008) [LBEX-DOCID 1854627].

[1525] *Id.*

aftermath of Bear Stearns's near collapse.[1526]  Jonathan Cohen told the Examiner that by

this time, Archstone's bridge equity was essentially "hung," meaning that it was being

held on Lehman's books as opposed to being sold to investors.[1527]

Lehman ultimately took a $200 million write-down on its bridge equity and a $50

million write-down on its permanent equity in March 2008.[1528]  As illustrated in the

previous table titled "Lehman's Archstone Marks by Month," the resulting mark for

both positions after the write-down was 80% of funded value (or a mark of 80).  In

arriving at this valuation, Lehman determined that Term Loan A was worth 100 cents

on the dollar while Term Loan B and the Revolver were worth 90 cents on the dollar.[1529]

Lehman's sensitivity analysis showed that Lehman projected an internal rate of return

("IRR") on its equity investment of 16.5% employing the exit capitalization rate used

when Lehman decided to participate in the acquisition, and 14.6% assuming a 50 basis

points decrease in that exit capitalization rate.[1530]  The Examiner's financial advisor

observed that this analysis shows that Lehman's lower valuation for its Archstone

positions was based on Lehman's determination that either the risk associated with

[1526] *Id.*

[1527] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 10.

[1528] Lehman, Global Real Estate 2008 Mark Downs, at p. 8 [LBHI_SEC07940_7620384].

[1529] E-mail from Lonnie Rothbort, Lehman, to Jonathan Cohen, Lehman (May 16, 2007) [LBEX-DOCID 1438381]; Lehman, Bridge Equity Discounting Sensitivity (Apr. 1, 2008), at p. 1 [LBEX-DOCID 1432509], attached to e-mail from Jonathan Cohen, Lehman, to Lonnie Rothbort, Lehman (May 16, 2008) [LBEX-DOCID 1567463].

[1530] Lehman, Archstone Q2 2008 Update (June 12, 2008), at p. 15 [LBEX-DOCID 2929329].

Archstone generating its projected cash flows increased or it was appropriate to reduce the projected cash flows.

According to a presentation created by Lehman's Product Control Group, the March write-down was taken based on the following rationale: [1531]

- "Buyers walked away from $1 billion in property sales";

- "Increase in cap rate (widened exit cap rates by 50 bps)";

- "Increased premium to investors until company is de-levered through asset sales";[1532]

- "No current cash on cash return for equity investors"; and

- "Liquidity."

Hughson told the Examiner that he agreed with the write-down in March, but did not necessarily agree with the statements in the Product Control presentation.[1533] Hughson stated that his team considered "everything that was happening at the time" and incorporated it into the model in marking Archstone positions.[1534] Hughson stated that his team marked the positions "to the current state of play in the market," including exit capitalization rates, and the team's marks reflected his best judgment as to the value of the Archstone positions at that time.[1535]

[1531] Lehman, Global Real Estate Product Control, Real Estate Americas Potential Write-downs (May 2008), at p. 80 [LBHI_SEC07940_2258765].

[1532] This reflects the increased risk to equity holders until the significant debt on Archstone's books was reduced through property sales.

[1533] Examiner's Interview of Paul A. Hughson, Dec. 21, 2009, at p. 4.

[1534] *Id.*

[1535] *Id.*

### (iii) April 2008 Downgrade by S&P

In April 2008, S&P lowered its corporate credit rating for Archstone from BB- to B, changed its outlook to "negative" and then withdrew the ratings.[1536]  The rationale for the downgrade was the "more challenging credit environment, which has slowed asset sales" and "could hinder [Archstone's] ability to dispose of assets in as profitable and timely a fashion as it had initially considered."[1537]

A contemporaneous e-mail exchange between product controllers Jonathan Cohen and Bernard discusses the potential "consequence" of S&P downgrade to the value of Lehman's positions.[1538]  In an e-mail dated April 29, 2008, Jonathan Cohen wrote to Bernard that he doubted "the rating change changes investors' perception" because the debt had the benefit of price flex and the equity valuation assumed Term Loan B could be sold at 90 cents on the dollar.[1539]

### (iv) Einhorn Speech in April 2008

On April 8, 2008, David Einhorn, President of the hedge fund Greenlight Capital, gave a speech before the Grant's Spring Investment Conference that questioned

---

[1536] S&P, Tishman Speyer, Archstone-Smith, And Related Entity Ratings Lowered, Then Withdrawn (Apr. 28, 2008), at p. 1 [LBHI_SEC07940_120171].  Lehman received notice of the pending downgrade before it was made public.  There was a dialogue within Lehman regarding the potential to change S&P's decision regarding the downgrade or to keep it from becoming public.  E-mail from Francis X. Gilhool, Lehman, to John J. Niebuhr, Lehman, *et al.* (Apr. 25, 2008) [LBHI_SEC07940_120164].

[1537] *Id.*

[1538] E-mail from Clement Bernard, Lehman, to Jonathan Cohen, Lehman (Apr. 29, 2008) [LBEX-DOCID 1488843].

[1539] *Id.* Jonathan Cohen argued the below par price of 90 already took into account the decrease in credit quality.

Lehman's valuations of Archstone.[1540]  Einhorn observed that Archstone's comparable companies' trading prices had fallen 20-30% since the Archstone deal was announced. Einhorn concluded that "the high leverage in the privatized Archstone-Smith would suggest the need for a multi-billion dollar write-down."[1541]

### (v)  May 2008 Valuation

Unlike previous quarters, a substantial number of materials were prepared as part of the May valuation process in anticipation of the second quarter close.  This Section first addresses the materials prepared as part of the valuation process, and then addresses the materials prepared in advance of the earnings call.  In its second quarter earnings call, Lehman discussed its equity valuation and the methodology it used to mark its investment.

On May 16, 2008, Bridge Equity personnel provided an update on "the recent activity around Archstone" and included a discussion of Lehman's valuation methodology ("May 16 Archstone Update").[1542]  The valuation methodology consisted of three components: a discounted cash flow analysis, an analysis based on the implications of the sale of assets from Archstone's core portfolio and a comparison of

---

[1540] David Einhorn, Presentation to Grant's Spring Investment Conference: Private Profits and Socialized Risk (Apr. 8, 2008), *available at* http://www.foolingsomepeople.com/main/mroom/Grants%20Conference%202004-08-2008.pdf.

[1541] *Id.*

[1542] Memorandum from Keith Cyrus, Lehman, *et al.*, to Donald E. Petrow, Lehman, *et al.*, re: Archstone Update (May 16, 2008), at p. 1 [LBEX-DOCID 1416761].

Lehman's valuation of Archstone to the value of Archstone's publicly traded peers based on their stock prices.[1543]

The discounted cash flow analysis, which is described in further detail below, was based on various underwriting scenarios.[1544] The required rate of return for an investment in Archstone's equity was viewed as similar to the returns provided by core-plus funds, which Lehman determined ranged from 12% to 15%.[1545]

The May 16 Archstone Update does not include any analysis of Archstone's sales, but it includes a listing of sales "accomplishments" that reports the company had sold $1.9 billion of assets and that it had $496 million of assets under contract.[1546] The May 16 Archstone Update notes that Archstone was generally selling its lower quality assets and that Archstone was perceived to be a "distressed" seller.[1547] Lehman determined that Archstone's liquidity position and overall markets would improve over time.[1548]

The analysis comparing Lehman's valuation of Archstone to the value of one of its peers was based on valuation analyses published by a third-party research firm that

---

[1543] *Id.* at p. 3 [LBEX-DOCID 1416761]; Lehman, Archstone Update 2008 (May 16, 2008), at pp. 4-14 [LBEX-DOCID 1488847].

[1544] In the model, the primary sensitivity analysis was performed on the timing of asset sales and the exit capitalization rate applied to the long-term hold portfolio. *Id.*

[1545] Memorandum from Keith Cyrus, Lehman, *et al.*, to Donald E. Petrow, Lehman, *et al.*, re: Archstone Update (May 16, 2008), at p. 3 [LBEX-DOCID 1416761].

[1546] Lehman, Archstone Update 2008 (May 16, 2008), at p. 1 [LBEX-DOCID 1488847].

[1547] Memorandum from Keith Cyrus, Lehman, *et al.*, to Donald E. Petrow, Lehman, *et al.*, Archstone Update (May 16, 2008), at p. 3 [LBEX-DOCID 1416761].

[1548] *Id.*

Lehman frequently referenced. The May 16 Archstone Update notes that the capitalization rate a third-party research firm applied to AvalonBay, which was generally viewed as the closest comparable company to Archstone, was higher than the capitalization rate Lehman used for Archstone.[1549] This analysis also included a comparison of Lehman's marks over time on Archstone equity to changes in equity value of Archstone's peers since the Commitment Date.[1550]

On May 27, 2008, Lehman's Product Control Group presented its view of the Archstone sensitivity analysis to Lehman's CFO, Callan.[1551] This analysis suggested a range of additional write-downs ranging from $78 million to $615 million.[1552] As Lehman had already taken $436 million of write-downs, the highest potential write-down of $615 million would result in total write-downs of over $1 billion. Kebede participated in this meeting and recalled being disturbed by Callan's reaction upon being told that the cumulative Archstone write-down could be greater than $1 billion - Callan did not ask any questions and only wrote something in her notebook.[1553] Kebede

---

[1549] Lehman, Archstone Update 2008 (May 16, 2008), at p. 9 [LBEX-DOCID 1488847].

[1550] *Id.*

[1551] Lehman, Real Estate Product Control Update (May 27, 2008), at p. 1 [LBEX-DOCID 4344653] (the presentation to Callan).

[1552] The current valuation model, per Lehman's Product Control Group, used a 5.62% rent growth assumption and an 18% internal rate of return. Lehman, Real Estate Product Control Update (May 27, 2008), at p. 6 [LBEX-DOCID 4344653] (presented to Callan). The sensitivity analysis stressed the rent growth assumption from 100 to 200 basis points and the IRR assumption from 18% to 20%. This analysis suggested a range of incremental write-downs between $78 million (no stress on the rent growth rate assumption and an IRR of 19%) to $615 million (200 basis points decrease in the rent growth rate assumption and an IRR of 20%). *Id.*

[1553] Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 10.

told the Examiner that he expected that the CFO, upon hearing such a report, would have asked at least a few questions in order to understand the basis of the possible write-down.[1554]

Lehman took an additional $100 million write-down in its Archstone positions in May 2008, which reduced the bridge equity mark to 75 and the overall value of Lehman's Archstone positions to 88% of funded value.[1555] E&Y reviewed Archstone's marks as part of its quarterly evaluation, and concluded that "the process by which the Archstone . . . positions are valued as well as the related inputs, assumptions, and calculated values appear reasonable for the purpose of assessing reasonableness for our quarterly review."[1556]

### (vi) Second Quarter 2008 Earnings Conference Call

#### a.   Preparation and Lehman's Methods of Analyzing Reasonableness of Valuations Prior to the Call

In advance of the second quarter 2008 earnings call, GREG prepared a presentation (referred to by Lehman as the "Q2 Book") that sets forth several methods of analysis used by Lehman to assess the reasonableness of reported Archstone

---

[1554] *Id.*

[1555] Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113].

[1556] Memorandum from Nicholas McClay, Ernst & Young, to Files, Ernst & Young, re: Quarterly Review Valuation Procedures for Archstone & SunCal Real Estate Investments (July 9, 2008), at p. 2 [EY-SEC-LBHI-DF-MFIN 000048]. *See* Section III.A.2.b.2.b for a detailed discussion of E&Y's review.

valuations as of May 2008.[1557] The presentation illustrates how the mark of 75 for bridge equity was determined and includes the following methods, which are detailed in the Examiner's analysis of Lehman's Archstone valuations below:[1558]

- Valuation of Archstone based on sum of the parts;

- Comparison of Archstone's fundamentals to its peer group;

- Analysis of sales of Archstone's apartment complexes;

- Comparison of Lehman's valuation of its Archstone equity investment relative to the change in value of Archstone's publicly traded peers.[1559]

### b. Discussion During the Second Quarter 2008 Earnings Call

During Lehman's 2008 second quarter earnings call, Lowitt discussed Lehman's valuation of its Archstone equity investment and the methodology that was used to determine such value.[1560] Lowitt stated: "We have arrived at Archstone's enterprise value primarily using a discounted cash value analysis, which supports a mid-teens

---

[1557] Lehman, Archstone Update — Q2 2008 (June 12, 2008), at pp. 1-3 [LBEX-DOCID 2902980], *attached to* e-mail from Webster Neighbor, Lehman, to Brett Bossung, Lehman, *et al.* (June 12, 2008) [LBEX-DOCID 2902980]; Examiner's Interview of Webster Neighbor, Nov. 17, 2009, at p. 5.

[1558] Lehman, Archstone Q2 2008 Update (June 12, 2008), at p. 15 [LBEX-DOCID 2929329]. The May 30, 2008 mark implied an IRR of 16.9% under the scenario that stressed the exit capitalization rate by 100 basis points. The implied IRR was further reduced to approximately 15% by stressing the exit platform value between $500 million and $1 billion. E-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman, *et al.* (June 14, 2008) [LBEX-DOCID 1865693]. An e-mail exchange between Neighbor and Hughson explains some of the other sensitivity analyses that were considered. Combinations of assumptions that resulted in a 15% IRR included: (1) 75 basis point increase in the exit capitalization rate and 25 basis point decrease in rent growth rate, (2) 50 basis point increase in the exit capitalization rate and 75 basis point decrease in rent growth rate, and (3) 25 basis point increase in the exit capitalization rate and 125 basis point increase in rent growth. *Id.*

[1559] Unlike the analysis discussed in the prior section, this analysis took into account the effect of Archstone's large debt in its capital structure.

[1560] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter Earnings Call (June 16, 2008), at pp. 13-14.

IRR."[1561]  He explained that, "We cross-checked that using a number of different methodologies, including sum of the parts, replacement costs and recent comparable transactions based on both cap rates and price per unit, the most important including asset sales from the Archstone portfolio."[1562]  Lowitt provided further details regarding Archstone's asset sales:

- Archstone sold approximately $2 billion of assets to-date and was under contract or in active negotiation to sell an additional $2 billion;

- The $4 billion in transactions were at an average capitalization rate in the mid 4% range; and

- Many of the assets that were being sold were identified by Archstone as non-core or non-strategic and in certain cases did not represent the highest quality assets in Archstone's portfolio.[1563]

Lowitt explained that Lehman's "valuation reflect[s] the company's business plan of only selling enough assets to reduce debt to a targeted level and to continue to increase value through its development, asset management, and revenue enhancement programs, which have and continue to be very successful.  In that context, we have assumed that capitalization rates will be more than 100 BPS [basis points] higher when the properties are sold than when the transaction was entered into.  Based on this analysis, we are very comfortable with our current Archstone mark."[1564]

---

[1561] *Id.* at p. 14.

[1562] *Id.*

[1563] *Id.*

[1564] *Id.*

Hughson told the Examiner that he received complaints from Barclays and BofA when the 75 equity mark was publicly disclosed, because it was lower than the mark they were using for their own Archstone equity positions.[1565]   The Examiner's financial advisor observed that the cost of price flex implied by Lehman's mark was higher than the cost of price flex implied by the balance of the Escrow Account as of February 29, 2008.[1566]

### (vii)   Lehman's Revised Plan to Sell Archstone Positions

In May 2008, Lehman acknowledged that it would not meet its debt and bridge equity syndication goals and generated new projections.[1567]   Lehman's initial plan was to syndicate all debt and bridge equity while retaining only permanent equity.[1568]   Lehman initially projected it would meet these goals by October 2008, as illustrated by the following graph:

[1565] Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 12.

[1566] BofA, Transactions for Bank of America as Administrative Agent Archstone - Operating Trust Expense Reserve Escrow Account (July 20, 2009), at p. 1 [LBEX-BofA 000007]; Lehman, Easy Living Q2 Model Risk (June 15, 2008), at Sources and Uses tab [LBEX-DOCID 4456413].

[1567] Lehman, Archstone-Smith Trust (May 21, 2008), at p. 1 [LBEX-DOCID 019129]

[1568] Lehman, Standard & Poor's Real Estate Update (Oct. 10, 2008), at p. 19 [LBEX-DOCID 514267].

## Lehman's Plan at Closing to Reduce its Archstone Exposure[1569]



By May 2008, Lehman updated its plan, reflecting a determination that Archstone would need to sell assets to satisfy debt and thereby reduce leverage.[1570] Lehman pushed the goals it had expected to meet by October 2008 to fiscal year 2010.[1571] As set forth in the following Lehman graph, Lehman acknowledged it would still hold approximately $5.0 billion (notional) of Archstone debt and equity at the end of the 2008 fiscal year.[1572]

---

[1569] *Id.*

[1570] Lehman, Archstone-Smith Trust (May 21, 2008), at p. 1 [LBEX-DOCID 019129], attached to e-mail from Paul A. Hughson, Lehman, to Paolo R. Tonucci, Lehman (May 21, 2008) [LBEX-DOCID 074037].

[1571] Lehman, Archstone-Smith Trust (May 21, 2008), at p. 1 [LBEX-DOCID 019129].

[1572] *Id.*

**Lehman's May 2008 Plan to Reduce its Archstone Exposure**[1573]



(f)   **Valuation Issues During the Third Quarter of 2008**[1574]

After relatively small reductions in the marks reflecting excess carry in June and July 2008, Lehman took its final significant Archstone write-down in August 2008, reducing bridge equity by $110 million and permanent equity by $15 million.[1575]  Kebede told the Examiner that this write-down was larger than he thought was warranted, and he did not know why the write-down was taken.[1576]   An e-mail exchange between Neighbor and Hughson included the analysis and the underlying assumptions used to arrive at the $110 million write-down, and is discussed in the Examiner's analysis of the reasonableness of Lehman's Archstone marks.[1577]

---

[1573] *Id.*

[1574] Lehman's third quarter covered June 1, 2008, through August 31, 2008.

[1575] Lehman, Global Real Estate 2008 Mark Downs, at p. 12 [LBHI_SEC07940_7620384].

[1576] Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 10.

[1577] In an e-mail to Hughson on September 12, 2008, Neighbor wrote that that the August mark was calculated using a stressed rental growth compound annual growth rate ("CAGR") of 4.9% and an increased exit capitalization rate of 5.57%.  The platform value remained unchanged at $2 billion.  E-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman (Sept. 12, 2008) [LBEX-DOCID 2903130].  Neighbor told the Examiner that he did not recall whether valuation work occurred in the third quarter of 2008 in particular, and he did not recall whether there was a third quarter Archstone write-down of $110

### (i)  Discussion Among Lenders in July 2008

The discussions among lenders in July 2008 covered the topics addressed in previous months, including progress on asset sales, the current liquidity situation and plans regarding development opportunities.[1578]  As of July 9, 2008, Archstone had sold approximately $1.5 billion assets that were on average 12% below the originally appraised value.[1579]  Archstone projected that it would have enough liquidity to operate through the end of the year.[1580]  Archstone continued to invest in development opportunities but had difficulty finding joint venture deals that resulted in "attractive proposals."[1581]

### (ii)  August 2008 Valuation

As described above, Lehman took an additional write-down of $110 million in its bridge equity and $15 million in its permanent equity in August 2008.[1582]  The Examiner's financial advisor reviewed the model that Lehman used for its August 2008 Archstone valuation, as discussed below.[1583]

---

million on bridge equity and $15 million on permanent equity.  Examiner's Interview of Webster Neighbor, Nov. 17, 2009, at p. 3.  Neighbor also did not recall whether there was anything unusual in the Archstone valuation process in third quarter 2008 (or the first or second quarters of 2008).  *Id.*

[1578] Memorandum from David Augarten, Tishman Speyer, *et al.*, to Mark Walsh, Lehman, *et al.*, re: Archstone Bank Meeting Agenda (July 9, 2008), at pp. 1-2 [LBEX-DOCID 1746835].

[1579] *Id.* at p. 2.

[1580] *Id.*

[1581] *Id.* at p. 1.

[1582] Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 12 [LBHI_SEC07940_ICP_002615].

[1583] It appears that Neighbor adjusted to a more conservative CAGR of 4.90% from the base case of 5.62%. E-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman (Sept. 12, 2008) [LBEX-DOCID 2903130].  Neighbor also increased the exit capitalization rate assumption to an average of 5.57%, which was also more conservative than the base case of 4.82%.[1583]  Neighbor left the platform value at $2 billion,

### (g)  Product Control's Review of Archstone Valuations

Jonathan Cohen told the Examiner that Lehman's Product Control Group "didn't do much to price test" Archstone in 2007 or early 2008, and the group did not look at the platform value in the model until the second or third quarter of 2008.[1584]  According to Cohen, the product controllers did not receive adequate information to test the business desk's valuations, and the Product Control Group did not have its own model or the required knowledge to test the assumptions (*i.e.*, rent growth rates) underlying the valuations.[1585]  Cohen did not recall discussing the model with the business desk prior to March 2008.[1586]  Abebual Kebede, when shown the model and asked to explain how it worked, said that the Examiner should speak with Neighbor.[1587]  Cohen stated that he never saw anything supporting certain assumptions that Lehman used when determining its Archstone valuations (*e.g.*, a capitalization rate of 4.1%).[1588]  Cohen stated that prior to the first quarter 2008 earnings call, he did not review alternative

---

which resulted in a write-down of $110 million for Archstone bridge equity in August.  For the third quarter, Lehman assumed a target IRR of 15.59%.  E-mail from Webster Neighbor, Lehman, to Abebual A. Kebede, Lehman, *et al.* (Sept. 11, 2008) [LBEX-DOCID 1861565].  These assumptions are all reviewed below in the analysis section.

[1584] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 10.

[1585] *Id.* The Archstone bridge equity position was included in price testing files for PTG equity positions. Examiner's Interview of Eli Rabin, Oct. 21, 2009, at p. 9.  However, that model was not used to price test the Archstone positions.  Lehman, Real Estate Product Control Update (May 27, 2008), at p. 115 [LBHI_SEC07940_2258765].

[1586] *Id.*

[1587] Examiner's interview of Abebual A. Kebede, Oct. 13, 2009, at p. 11.

[1588] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at pp. 10-11.

methodologies that would serve as checks on the IRR model discussed on the call, and Cohen was not sure if anyone below him did this either.[1589]

In view of the foregoing, the Examiner finds that there is sufficient evidence to support a finding that the Product Control Group did not serve as an effective, independent check on Lehman's valuation of its Archstone positions.

### (4) Examiner's Analysis of Lehman's Valuation Process for its Archstone Positions

This Section of the Report sets forth the Examiner's analysis of the reasonableness of Lehman's valuations of its Archstone positions, as of the end of each quarter, and beginning with the fourth quarter of 2007.  As the valuation of illiquid assets requires judgment, the Examiner recognizes that there are a range of reasonable determinations regarding the appropriate valuation inputs, and therefore a corresponding range of reasonable valuation outputs.

As discussed above, Lehman recorded the following values for its Archstone positions after the October 5, 2007 closing: $5.13 billion at the end of fourth quarter 2007 (95.6% of funded amount); $5.11 billion at the end of first quarter 2008 (95.1% of funded amount); $4.67 billion at the end of second quarter 2008 (88.0% of funded amount); and $4.19 billion at the end of third quarter 2008 (84.3% of funded amount).[1590]

---

[1589] *Id.*

[1590] *See* Chart, Lehman's Valuation of Archstone Positions (U.S. $ million, Oct 07-Aug 08), at page 1 of this Report.  Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113]; Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 18 [LBHI_SEC07940_ICP_002615].

Lehman used various methods over time to determine or benchmark the valuation of its Archstone positions.  In order to provide the appropriate context for the valuation analysis, this Section begins with a discussion of the methods Lehman employed in 2007 and 2008 to value its Archstone positions.  These methods included: (i) Discounted Cash Flow ("DCF"); (ii) valuation of Archstone's individual assets ("Sum of Parts"); and (iii) an analysis based on the value of publicly traded comparable companies ("Comparable Company").  Although Lehman did not consistently utilize these methods in valuing its positions between October 2007 and the end of the third quarter of 2008, the Examiner's financial advisor considered each approach for each period in order to conduct a consistent review.

The following discussion of these methods, and, in particular, the information and assumptions used to determine value pursuant to the operation of these methods, is set forth to establish a foundation for the analysis by the Examiner's financial advisor of Lehman's valuations of its Archstone positions.  Accordingly, while the following Section considers the component parts of these methods as applied by Lehman, it does not address the reasonableness of the valuations themselves.  That analysis, which is undertaken on a quarter-by-quarter basis, follows thereafter.

### (a) Discounted Cash Flow Valuation Method

The DCF model was the primary methodology Lehman used to value its Archstone positions.[1591]   Lehman's valuation model was not strictly a DCF model. Instead of calculating a value, Lehman's model stipulates a value, solves for the discount rate and then assesses the reasonableness of that discount rate.[1592]   Lehman referred to this approach as the Internal Rate of Return Method ("IRR Method").[1593]   The Examiner's financial advisor determined that Lehman's IRR Method was a reasonable methodology because both the traditional DCF model and Lehman's IRR Method arrive at the same value if the same assumptions are used.[1594]   Accordingly, this Section uses the terms DCF model and IRR Method interchangeably.

The DCF model determines the value of an asset by reducing future expected cash flows to their present value by applying a discount rate.[1595]   In this manner, the two key components in the DCF model are future expected cash flows and the discount rate. The change in the value of an asset is positively correlated with the change in expected

---

[1591] Lowitt stated that the DCF model was Lehman's primary valuation method for valuing its Archstone positions during Lehman's second quarter 2008 earnings.  Final Transcript of Lehman Brothers Holdings Inc. Second Quarter Earnings Call (June 16, 2008), at p. 14 [LBHI_FIN 0007]; Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 3.

[1592] Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008) [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008), at CF-Detail tab [LBEX-DOCID 4456413].

[1593] Memorandum from Keith Cyrus, Lehman, *et al.*, to Donald E. Petrow, Lehman, *et al.*, Archstone Update (May 16, 2008), at p. 3 [LBEX-DOCID 1416761].

[1594] *See* Appendix 12, Valuation - Archstone.

[1595] Aswath Damodaran, *Corporate Finance, Theory and Practice* 750 (2nd ed. 2001); Eugene F. Brigham & Joel F. Houston, *Fundamentals of Financial Management* 395 (8th ed. 1998).

cash flows – *i.e.*, an increase in future expected cash flows results in an increase in value, and a decrease in expected future cash flows results in a decrease in value.[1596] Conversely, the change in value of an asset is negatively correlated with a change in discount rate – *i.e.*, a decrease in the discount rate results in an increase in value, and an increase in the discount rate results in a decrease in value.[1597] Consequently, the Examiner's financial advisor's analysis of Lehman's DCF Method focused on both Lehman's determinations for expected future cash flows and the discount rate.

The future expected cash flows Lehman used in its DCF Method were based on a number of different assumptions,[1598] but three in particular drove the results: rent growth, exit capitalization rates and exit platform value.[1599] Given their importance, the Examiner's financial advisor focused on these three factors.

### (i) Rent Growth

The rent growth assumption refers to the expectation that the rent Archstone charged its tenants would increase over time.[1600] Lehman's valuation analysis incorporated a projection of rent growth for each individual property within

---

[1596] *Id.*

[1597] *Id.*

[1598] Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008) [LBEX-DOCID 1626080].

[1599] Lehman, Archstone Q2 2008 Update (June 12, 2008), at pp. 16-17 [LBEX-DOCID 2929329].

[1600] Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008) [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008) [LBEX-DOCID 4456413].

Archstone's portfolio.[1601]  The rent growth rates for the individual apartment complexes were combined to arrive at a weighted average growth rate for the entire portfolio.[1602] Lehman also performed a sensitivity analysis during the second and third quarters of 2008 to test how lower projected growth rates across many of the apartment complexes would affect the portfolio's value.[1603]  The Examiner's financial advisor's analysis of the rent growth assumption focused on this sensitivity test.

Lehman's base case DCF analysis projected rent for apartment complexes expected to be held through the year 2014 to increase at a compound annual growth rate ("CAGR") during the period beginning 2008 and ending in 2014.[1604]  Lehman's first quarter 2008 DCF model used a CAGR of 5.72%, the second quarter model decreased the CAGR to 5.62% and the third quarter model further decreased the CAGR to 4.90%.[1605]  A CAGR of 5.62% means rent was projected to increase on average 5.62% per year across the portfolio of assets expected to be held through 2014.

---

[1601] Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008), at Drivers tab [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008), at Drivers tab [LBEX-DOCID 4456413].

[1602] *Id.*

[1603] Lehman, Archstone Q2 2008 Update (June 12, 2008), at p. 17 [LBEX-DOCID 2929329]; Lehman, Real Estate Product Control Update (May 27, 2008), at p. 115 [LBHI_SEC07940_2258765]; Lehman, Archstone Sensitivity Analysis — 08-22-08" (Sept. 12, 2008) [LBEX-DOCID 2852318], attached to e-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman (Sept. 12, 2008) [LBEX-DOCID 2903130].

[1604] In Lehman's DCF model, the projection period was from 2008 to 2014.  The DCF model includes a projection period over which specific cash flows are estimated, and a terminal period that assigns a value based on expected future cash flows after the expected projection period.

[1605] Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008) [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008), at Drivers tab [LBEX-DOCID 4456413]; Lehman, Archstone Sensitivity Analysis — 08-22-08 (Sept. 12, 2008) [LBEX-DOCID 2852318], attached to e-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman (Sept. 12,

In December 2007, Bridge Equity personnel were "taking a fresh look at rental growth rates."[1606] The data such personnel collected illustrated that the long-term rental growth rates Lehman used in its DCF analysis were 1.9 to 3.5 percentage points higher than third-party rent growth projections for apartments within Archstone's primary markets.[1607] To put this in perspective, if the third-party projected rent growth rate for one of Archstone's primary markets was 2.0%, Lehman's DCF model projected rent growth rates for Archstone properties in that market of between 3.9% and 5.5%.[1608] On average, the difference between Lehman's assumptions and third-party projections for Archstone's primary markets was 2.9%.[1609] Keith Cyrus, a Vice-President in the Bridge Equity group, observed in a January 4 e-mail that "Archstone's assets should generally exceed the market average, but I want to make sure our assumptions are still sound in light of recent market conditions."[1610] In an e-mail dated February 6, 2008, Kenneth Siebers, a Tishman Speyer employee, wrote to Cyrus: "We have made it very clear in

---

2008) [LBEX-DOCID 2903130]. The Examiner's financial advisor notes that these growth rates are base case figures used in the first quarter and second quarter valuations. As discussed below, Lehman considered lower rent growth rate assumptions in its second quarter 2008 valuation.

[1606] E-mail from Keith Cyrus, Lehman, to Kevin Siebers, Tishman Speyer, *et al.* (Jan. 4, 2008) [TSREV00003176].

[1607] Lehman, Archstone (Jan. 4, 2008), at p. 1 [TSREV00003177], attached to e-mail from Keith Cyrus, Lehman, to Kevin Siebers, Tishman Speyer, *et al.* (Jan. 4, 2008) [TSREV00003176].

[1608] The low end of the range (3.9%) was computed by adding 2.0% with 1.9%. The high end of the range (5.5%) was computed by adding 2.0% with 3.5%.

[1609] *Id.*

[1610] E-mail from Keith Cyrus, Lehman, to Kevin Siebers, Tishman Speyer, *et al.* (Jan. 4, 2008) [TSREV00003176].

every analysis that the growth rates have not been updated."[1611]   Consistent with Siebers' e-mail, there was no material change in the rent growth rates used in Lehman's DCF model through March 31, 2008.

Webster Neighbor also compared the rent growth rates used in Lehman's DCF analysis to third-party projections in an e-mail to Jonathan Cohen and other product controllers on April 1, 2008.[1612]   This comparison showed that the projected rent growth rate Lehman used in its DCF analysis continued to be approximately 3 percentage points higher than what the model referred to as third-party projections for properties in the same markets.[1613]   Neighbor's e-mail described Lehman's rent growth assumptions as generally consistent with this 10-year historical average for properties within Archstone's primary markets.[1614]

The Examiner's financial advisor observed, however, that within Lehman's second quarter DCF model, there was a sensitivity analysis that indicated the model's base case rent growth rate of 5.62% was 1.25 percentage points higher than what the model referred to as the 10-year historical average of 4.37%.[1615]   The third quarter DCF

---

[1611] E-mail from Kevin Siebers, Tishman Speyer, to Keith Cyrus, Lehman, *et al.* (Feb. 6, 2008) [TSREV00003335].

[1612] Lehman, Spot Value Variance: Tishman Speyer - Archstone - Smith Multifamily Fund (Apr. 1, 2008), at Market Data tab [LBEX-DOCID 1525380], attached to e-mail from Webster Neighbor, Lehman, to Jonathan Cohen, Lehman, *et al.* (Apr. 1, 2008) [LBEX-DOCID 1468705].

[1613] *Id.*

[1614] *Id.*

[1615] Lehman, Easy Living Q2 Model Risk (June 15, 2008) [LBEX-DOCID 4456413].  This model contained "Rent Growth Rate Sensitivities."  One of the sensitivities was labeled "10-Year Historical Avg."  The "10-Year Historical Avg" was 125 basis points lower than the "base case" for all of Archstone's markets.

model's base case rent growth of 4.90% was closer to, but still higher than, the 10-year historical average.[1616]

### a. Net Operating Income

The rent growth assumption was one of many assumptions Lehman used in its DCF calculation to arrive at the projected revenue for each Archstone property; the analysis also included assumptions for various types of expenses.[1617] The DCF model projected future expenses and subtracted these from future expected revenue to arrive at projected net operating income ("NOI") for each Archstone property.[1618] NOI represents the "bottom line" or operating profits generated by a business entity and is a fundamental driver of cash flows in the DCF Method.

The materials presented to Lehman's Commitment Committee in May 2007 regarding the potential Archstone acquisition set forth actual and projected NOI growth

---

[1616] The Examiner's financial advisor identified the third quarter base case rental growth rate set forth in Lehman's third quarter model. Lehman's Easy Living corporate third quarter model (Aug. 22, 2008), at Drivers tab [LBEX-DOCID 3119444]. Lehman's third quarter model, unlike the second quarter model, did not include an active comparison to the 10-year historical average. *Id*. The Examiner's financial advisor determined that, as the 10-year historical rental growth would not have materially changed between the second quarter and third quarter of 2008, the financial advisor used the 10-year historical average that was set forth in Lehman's second quarter model for purposes of assessing the third quarter model's base case rental growth rate.

[1617] Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008) [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008), at Drivers tab [LBEX-DOCID 4456413]. The chart shows that a change in the projected rent growth rate of 1.0 percentage points resulted in a change in the NOI growth rate of 1.24 percentage points (from 6.71% to 7.95%). As will be discussed, a similar manipulation using the third quarter model resulted in a 1.25 percentage points reduction.

[1618] Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008) [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008), at Drivers tab [LBEX-DOCID 4456413].

rates for publicly traded apartment REITS, including Archstone.[1619]  However, these materials did not have similar data for rent growth.[1620]  The Examiner's financial advisor reviewed NOI growth rates for the purpose of analyzing the rent growth assumption because: (1) rent growth contributes to NOI growth; (2) Lehman focused on NOI growth when it was deciding whether to commit to the Archstone acquisition; and (3) the Examiner's financial advisor determined that NOI is a relevant benchmark for assessing the reasonableness of Lehman's rent growth assumption.[1621]

Lehman's DCF analysis projected NOI to increase at a higher rate than rent growth due to the combined effect of other revenue and expense assumptions.

---

[1619] Memorandum from Mark Walsh, Lehman, *et al.*, to Bridge Loan Comm. & Inv. Comm., Lehman, $23.4 billion debt and equity financing commitment in connection with the potential acquisition of Archstone-Smith by Lehman Brothers and Tishman Speyer Properties (May 16, 2007), at pp. 21, 25 [LBEX-DOCID 1674960], attached to e-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman (Aug. 22, 2008) [LBEX-DOCID 1684700].  Neighbor referred to this attachment as the "Final CC Memo," which included information regarding NOI growth rates.

[1620] E-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman (Aug. 22, 2008) [LBEX-DOCID 1684700].  The attachments included what was referred to by Neighbor in the e-mail as the "Final Exec Memo," Memorandum from Lehman to Mark Walsh, Lehman, *et al.*, $23.4 billion debt and equity financing commitment in connection with the potential acquisition of Archstone-Smith Trust (May 18, 2007), at p. 1 [LBEX DOCID 1722291], the "Exec Update Memo," Memorandum from GREG, Mark Walsh, *et al.*, Lehman, to Commitment Comm., Lehman, re: [$18.3] billion debt and equity financing commitment in connection with the potential acquisition of Archstone-Smith Trust (May 22, 2007), at p. 1 [LBEX-DOCID 1721764], the "Final CC Memo," Memorandum from Lehman, to Bridge Loan Comm. & Inv. Comm., Lehman, $23.4 billion debt and equity financing commitment in connection with the potential acquisition of Archstone-Smith by Lehman Brothers and Tishman Speyer Properties (May 16, 2007), at p. 1 [LBEX-DOCID 1674960], and the "CC Update Memo," Memorandum from GREG: Mark Walsh, Lehman, *et al.* to Exec. Comm., Lehman, re: $21.3 billion debt and equity financing commitment in connection with the potential acquisition of Archstone-Smith by Lehman Brothers and Tishman Speyer Properties (May 7, 2007), at p. 1 [LBEX-DOCID 1674758].

[1621] The Examiner's financial advisor observed that Lehman applied a sensitivity analysis in the second and third quarter models to the rent growth rate assumption apparently as a proxy for a sensitivity test of the NOI growth rate assumption.  Lehman, Easy Living Q2 Model Risk (June 15, 2008), at CF-Detail tab [LBEX-DOCID 4456413]; Lehman, Easy Living Q2 Model Risk (June 15, 2008), at CF-Detail tab [LBEX-DOCID 4456413]; Lehman, Easy Living Corporate Q3 Model (Aug. 22, 2008), at CF-Detail tab [LBEX-DOCID 3119444].

Lehman's first quarter DCF model projected NOI growth to be 7.63% per year and the second quarter model projected such annual growth to be 7.95%.[1622]  Lehman generally applied these growth rates to the same set of apartment complexes, which is referred to as a "same store" comparison.[1623]

The acquisition memorandum provided to the Commitment Committee set forth the actual same store NOI growth between 1994 and 2006 for publicly traded apartment building REITS, including Archstone, and projected same-store NOI growth for 2007 through 2009.[1624]  The average annual same store growth rate for these REITs between

---

[1622] The first quarter 2008 DCF model projected NOI growth of 8.52% for assets with a five-year holding period and 7.63% for assets with a seven-year holding period.  The second quarter 2008 DCF model projected NOI growth of 8.52% for assets with a five-year holding period and 7.95% for assets with a seven-year holding period.  The Examiner's financial advisor observed that NOI growth was projected to be higher than rent growth in part because rent was projected to grow higher than expenses - which were projected to grow at 3% per year - and in part because there were other drivers of revenue growth.

[1623] Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008) [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008) [LBEX-DOCID 4456413].  Same store comparison means that properties acquired or sold during the studied time period are excluded from the analysis such that the only properties considered are those held for the entire time period.  The Examiner's financial advisor observed that the spreadsheets did not contain a same-store calculation for the projected NOI mentioned above.  However, the spreadsheets do show that the aforementioned growth rates were applied to the long-term hold core portfolio and were not affected by the sale or acquisition of properties.  While this meets one definition of a same-store analysis, sometimes apartment complexes are excluded from the same-store analysis for other reasons (*e.g.*, when there are improvements made to the property).  The Examiner's financial advisor concluded that the spreadsheets did not contain the ability to incorporate this definition of same store for the projected cash flows.  However, the spreadsheets do contain a same-store analysis for the 2007 to 2008 time period in the "Budget Compare" tab.  Over 81% (78 out of 96) of the 7 year long-term hold core portfolio assets were classified as same-store in this analysis.  The Examiner's financial advisor determined that the projected growth rates can be compared to benchmarks of same-store sales, subject to the previously discussed limitations.

[1624] Memorandum from GREG: Mark Walsh, Lehman, *et al.*, to Bridge Loan Comm. & Inv. Comm., Lehman, re: $23.4 billion debt and equity financing commitment in connection with the potential acquisition of Archstone-Smith by Lehman Brothers and Tishman Speyer Properties (May 16, 2007), at p. 21 [LBEX-DOCID 1488740], attached to e-mail from Ketaki Chakrabarti, Lehman, to Paul Higham, Lehman, *et al.*(May 18, 2007) [LBEX-DOCID 1378569].

1994 through 2009 was less than half the growth rate used in Lehman's first quarter 2008 and second quarter 2008 DCF models.[1625]  In this manner, Lehman's base case DCF analysis used NOI growth rates that were more than double the average growth rate for apartment REITs over the fifteen-year period from 1994 and 2009.

A second quarter 2008 Lehman presentation states that Archstone's same store NOI increased cumulatively by 17.2% between 2001 and 2007,[1626] and that Archstone's growth during this period was higher than any of its peers.[1627]  This 17.2% cumulative growth rate over six years converts to a CAGR of 2.7% per year.[1628]  Accordingly, Lehman's projected NOI CAGRs for Archstone's long-term portfolio of 7.63% (first quarter model) and 7.95% (second quarter model) were almost three times larger than Archstone's historical same store NOI CAGR of 2.7%.

### b.  Sensitivity Analysis

The Examiner's financial advisor performed a sensitivity analysis using Lehman's second and third quarter 2008 DCF models[1629] to show how a reduction in the

---

[1625] *Id.*

[1626] Lehman, Archstone Q2 2008 Update (June 12, 2008), at p. 9 [LBEX-DOCID 2929329].

[1627] *Id.*

[1628] NOI increased from a base of 100 in 2001 to 117.2 by 2007, which means that Archstone's same store NOI in 2007 was 1.172 times higher in 2007 than it was in 2001.  The Examiner's financial advisor converted the 17.2% cumulative growth rate to a CAGR through the following calculation: $1.172^{(1/6)} - 1 = 2.68\%$

[1629] Lehman, Easy Living Q2 Model Risk (June 15, 2008) [LBEX-DOCID 4456413] (second quarter model); Lehman, Easy Living Corporate Q3 (August 22, 2008) [LBEX-DOCID 311944] (third quarter model).

projected rent growth rate assumption affected the projected NOI growth rate.[1630]  The table below sets forth the results of this analysis, and demonstrates that a reduction in the assumed rent growth has a slightly larger impact on the corresponding NOI growth rate.  For example, as shown in the table below, reducing the second quarter model's rent growth rate by 100 basis points, from 5.62% to 4.62%, results in a 124 basis point reduction in the NOI growth rate, from 7.95% to 6.71%.

**Rent and NOI Growth Rate Sensitivity**

| Change in Rent Growth[1631] | Q2 Model Rental Growth Rate CAGR | Q2 Model NOI Growth Rate CAGR | Q3 Model Rental Growth Rate CAGR | Q3 Model NOI Growth Rate CAGR |
|---|---|---|---|---|
| Rate used in Model | 5.62% | 7.95% | 4.90% | 7.04% |
| -25 bps | 5.37% | 7.64% | 4.65% | 6.73% |
| -50 bps | 5.12% | 7.33% | 4.40% | 6.42% |
| -75 bps | 4.87% | 7.02% | 4.15% | 6.10% |
| -100 bps | 4.62% | 6.71% | 3.90% | 5.79% |
| -125 bps | 4.37% | 6.40% | 3.65% | 5.47% |
| -150 bps | 4.12% | 6.08% | 3.40% | 5.15% |
| -175 bps | 3.87% | 5.76% | 3.15% | 4.83% |
| -200 bps | 3.62% | 5.45% | 2.90% | 4.50% |

---

[1630] Lehman, Easy Living Q2 Model Risk (June 15, 2008) [LBEX-DOCID 4456413]; Lehman, Easy Living Corporate Q3 Model (Aug. 22, 2008).  A sensitivity analysis could not be performed on the first quarter model due to the structure of that model.  By contrast, the second quarter and third quarter models had a functionality that enabled the user to enter in different sensitivity assumptions for certain variables.  The Examiner's financial advisor entered in the rent growth assumptions of 0 bps through -200 bps at 25 bps intervals and observed the output of the model for NOI growth rates based on the change in rent growth assumptions.

[1631] The model included a function that permitted their user to lower the rent growth numbers.  This column represents the amount by which the Examiner's financial advisor reduced the rent growth assumption for purposes of understanding the relationship between the rental growth rate and the NOI growth rate.

The reasonableness of Lehman's rent growth assumption is considered in later sections that address Lehman's valuations as of specific dates.

### (ii) Exit Capitalization Rate

The capitalization rate is equal to the discount rate minus the expected long term growth rate in expected future cash flows.[1632]  As noted above, the expected growth rate in future expected cash flows and the discount rate are the two primary components of a DCF analysis.  The capitalization rate combines both components into one variable.

The capitalization rate can be used to value an asset, which is calculated by dividing next year's expected cash flows by the capitalization rate.[1633]  Because the capitalization rate is the denominator in this equation, the valuation is inversely correlated with the capitalization rate.  That is, holding all else constant, an increase in the capitalization rate results in a decrease in the asset's value and a decrease in the capitalization rate results in an increase in the asset's value.

Within the real estate industry, it is standard to separately calculate and consider two types of capitalization rates: an entering rate and an exit rate.[1634]  The entering (also called "going-in") capitalization rate is determined based on the expected future cash flows in the first year after the valuation date.  The exit capitalization rate is determined

---

[1632] Shannon P. Pratt & Roger J. Grabowski, *Cost of Capital: Applications and Examples* 25 (3d ed. 2008).

[1633] *Id.* at 596.

[1634] *Id.* at 585.

based on the expected future cash flows in the first year after the end of the projection period, which may occur many years after the valuation date.

Lehman's base case DCF analysis assumed the exit capitalization rate for the portfolio would be approximately 70 basis points higher than the going-in capitalization rate.[1635] That is, Lehman projected the discount rate to increase and/or the long-term growth rate in future cash flows to decrease by approximately 70 basis points over the course of the projection period (which ended in 2014).[1636] The Examiner's financial advisor, in analyzing Lehman's projected exit capitalization rates, assumed that such rate would be 70 basis points higher than the corresponding going-in capitalization rate.[1637]

---

[1635] Webster Neighbor explained the assumption Lehman used regarding the exit capitalization rate in an e-mail to Jonathan Cohen and Abebual Kebede on April 1, 2008. Neighbor wrote that "of the $17.8 bn of stabilized real estate, we plan on holding almost 80% ($14.7 bn) for the 7 yrs. We own these assets at a 4.08% cap (on our allocated value), and plan on selling them 7 years from now at a blended 4.79% cap (in other words, we underwrote as our base case 71 bps of cap widening over the 7 years." E-mail from Webster Neighbor, Lehman, to Jonathan Cohen, Lehman, *et al.* (Apr. 1, 2008) [LBEX-DOCID 1468705]; *see also* Lehman, Archstone Overview (Apr. 1, 2008) [LBEX-DOCID 4320895]. The reference to "allocated value" in the quote refers to the purchase price allocation, which is discussed in Appendix 12, Valuation - Archstone.

[1636] Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008) [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008) [LBEX-DOCID 4456413].

[1637] To benchmark the reasonableness of this assumption, the Examiner's financial advisor reviewed data published by PwC in its Korpacz Real Estate Investors Survey. PricewaterhouseCoopers, Rough Road Ahead for Investors: Korpacz Real Estate Investor Survey (First Quarter 2008), at p. 37 [LBEX-BARFID 0011591]; PricewaterhouseCoopers, Investors Face Ups and Downs: Korpacz Real Estate Investor Survey (Second Quarter 2008), at p. 39 [LBEX-BARFID 0011679]. The Examiner's financial advisor compared the differences between the entering and exit cap rates as reported by PricewaterhouseCoopers in their Real Estate Investor Survey (Korpacz reports) over this time period. The Examiner's financial advisor observed that the increase between the going-in capitalization rates and the exit capitalization rates over this time period were generally consistent with Lehman's assumption.

### (iii) Exit Platform Value

The exit platform value assumption refers to Archstone's ability to generate value from asset management fees, future promotes[1638] and its ability to build apartment buildings in the future for sale to third parties (which is referred to as its "merchant building platform").

Lehman's DCF analysis valued the exit platform at $2.0 billion as of 2014.[1639] This determination was supported by the following analysis included in Lehman's model.[1640]

### Exit Platform Valuation

|  | Valuation Range ($ in millions) | | |
|  | Low | Midpoint | High |
|---|---|---|---|
| Merchant Building Platform | 1,571 | 1,767 | 1,963 |
| Annuitized Fee Stream | 540 | 595 | 661 |
| Value of Future Promotes | 111 | 125 | 138 |
| Total Platform Value | 2,221 | 2,486 | 2,762 |

As the table shows, approximately 71% of the exit platform valuation was attributable to the merchant building platform,[1641] approximately 24% of the exit

---

[1638] Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008), at Intro tab [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008), at Intro tab [LBEX-DOCID 4456413]. Promote refers to the allocation of equity returns amongst different equity investors in a joint venture. The value of future promotes was based on the assumption that (1) Archstone would negotiate transactions with a promote feature and (2) these "promote" investments would result in Archstone receiving higher returns than other equity holders.

[1639] The Examiner's financial advisor observed that the value as of earlier dates would be lower due to the time value of money and risk associated with the future expected cash flows. In other words, whereas the value in 2014 would be $2.0 billion, the value in 2008 would be less than $1 billion.

[1640] Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008) [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008), at Intro tab [LBEX-DOCID 4456413].

[1641] The merchant platform value represented 70.7% of the total based on the low valuation range and 71.1% of the total based on the midpoint and high valuation ranges. The merchant building platform

platform value was attributable to the annuitized fee stream,[1642] and the remaining 5% was attributable to future promotes.[1643]

Lehman's second quarter DCF analysis included sensitivity analyses that reduced the exit platform value from $2 billion to $0, in increments of $500 million.[1644]

---

valuation was based on the following assumptions: (1) Archstone would generate $283 million of net income from its merchant building platform in 2017; (2) the valuation as of 2017 assumed the merchant building platform could be sold at a value that was eight to ten times the $283 million of net income in 2017; and (3) the valuation as of 2017 was discounted to reflect a valuation as of 2014 by applying a 13% annual discount rate. Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008), at Intro tab [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008), at Intro tab [LBEX-DOCID 4456413]. The eight times to ten times multiple was based on the long-term historical average homebuilder multiple. The 13% discount rate was based on the merchant building cost of equity. The most important assumption in this analysis was the projected $283 million of net income in 2017. The Examiner's financial advisor observed that this is the most important assumption because without earnings, there would be no need to apply a valuation multiple or discount a valuation as of 2017 to 2014. This net income figure was based on the following assumptions: (1) Archstone would invest $1.4 billion in developing new apartment complexes in 2017; (2) Archstone would generate NOI equal to 6% of this investment; and (3) the apartment complexes would be sold at a 4.5% capitalization rate. Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008) [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008) [LBEX-DOCID 4456413].

[1642] The Examiner's financial advisor observed that the value of annuitized fee streams represented 24.3% of the total based on the low valuation range and 23.9% of the total based on the midpoint and high valuation ranges. The annuitized fee stream valuation was based on two assumptions: (1) Archstone would generate $31.8 million of annual net income derived primarily from future joint ventures and asset management; and (2) this income stream would increase 17 to 20.8 times as much as the current amount. Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008) [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008) [LBEX-DOCID 4456413]. Approximately 47% of the annuitized net income was projected to be from future joint ventures and asset management, assuming that Archstone would earn asset management fees of 0.35% off of $1.5 billion of assets. The 20.8 multiple was based on the average forward price-to-earnings multiple for Real Estate Asset Management companies. The 17.0 multiple reflected an 18.3% discount to the 20.8 multiple. Lehman, Easy Living Q2 Model Risk (June 15, 2008), at Intro tab [LBEX-DOCID 4456413].

[1643] The Examiner's financial advisor observed that the remaining 5% of the exit platform value was based on the value of future promotes, which was calculated based on the following assumptions: (1) Archstone would generate $114 million of future promotes by 2014; (2) the $114 million of future promotes would be realized ratably over a 7-year period; (3) the appropriate tax rate was the long-term capital gains tax rate of 15%; and (4) the appropriate valuation multiple was between 8.0 and 10.0, which was lower than the equity valuation convention of 12.0 to 15.0 as of the time this assumption was originally made. Lehman, Project Easy Living: Tishman Speyer - Archstone-Smith Multifamily JV, LP (Mar. 17, 2008) [LBEX-DOCID 1626080]; Lehman, Easy Living Q2 Model Risk (June 15, 2008) [LBEX-DOCID 4456413].

The Examiner's financial advisor observed that the sensitivity analyses were not assumptions Lehman used in its valuation determination; rather the sensitivities showed the resulting discount rate assuming Lehman's valuation of Archstone's equity remained the same while adjustments were made to the rent growth, exit capitalization rate and exit platform value assumptions.

A memo written by Tishman Speyer employees and sent to Archstone's management and its investors during the second quarter of 2008 discussed the tension between managing Archstone's liquidity needs and maintaining the value of the exit platform.[1645] This memo suggests that Archstone's platform value may have declined during 2008 due to changes in market conditions.[1646] The Examiner's financial advisor determined that it is difficult to benchmark the reasonableness of Lehman's exit

---

[1644] *Id.*

[1645] Memorandum from David Augarten, Tishman Speyer, *et al.*, to R. Scot Sellers, Archstone, *et al.*, Archstone Update (Mar. 24, 2008), at p. 4 [LBEX-DOCID 2932586]: "While it is helpful to understand how much time we have if we cut back on our capex and development expenditures, there are several negative consequences of doing so. First, if we are not making any new investments because of liquidity issues it will have a negative impact on the platform value. It will also have a negative impact on the overall equity returns of the deal and make it harder to syndicate equity at some future date. Finally, a decision to defer all new development expenditures in 2008 would lead to an exodus of the Company's top development talent, which would impact our ability to successfully complete projects already underway and would diminish the value of the Company's platform. We certainly understand that times have changed and most developers are scaling back their development plans in the short term. We believe that we need to strike a careful balance between not doing any incremental development in 2008 and proceeding with everything currently budgeted. If we can focus our efforts on those deals with the most attractive returns, we should be able to maintain some near term liquidity while also preserving our platform value and retaining our development talent. We will also always put construction financing in-place prior to the start of any new ground-up development in order to minimize the potential equity commitment to each project. In these tough times, we will be most successful if we can find the right balance between managing for liquidity and maximizing the long term return on invested capital."

[1646] *Id.*

platform value assumption because there were no comparable sales of this type of intangible asset, and no sales of Archstone's bridge equity positions which would reflect the platform's valuation as ascribed by contemporaneous market participants. Accordingly, given the absence of evidence supporting a finding that Lehman's assumption as to the value of Archstone's exit platform was unreasonable, the Examiner's financial advisor did not adjust Lehman's exit platform value in the quarter-by-quarter analysis discussed below.

### (iv) Discount Rate

The discount rate assumption refers to the discount applied to convert future cash flows to their present value.[1647]  The discount rate incorporates both the time value of money and the non-diversifiable risk associated with the asset.[1648]  Holding all else constant, an increase in the discount rate assumption results in a decrease in value, just as a decrease in the discount rate assumption results in an increase in value.[1649]

Lehman used a discount rate assumption of approximately 12% in May 2007,[1650] 13% to 14% in August 2007,[1651] 14.6% as of the first quarter of 2008,[1652] and a 15%

---

[1647] Aswath Damodaran, *Corporate Finance, Theory and Practice* 750 (2nd ed. 2001); Eugene F. Brigham & Joel F. Houston, *Fundamentals of Financial Management* 395 (8th ed. 1998).

[1648] *Id.*

[1649] Lehman, Real Estate Product Control Update (May 27, 2008), at p. 115 [LBHI_SEC07940_2258765].

[1650] Memorandum from Mark A. Walsh, Lehman, et al., to LBHI Bridge Loan Committee & Investment Committee, re: Debt and Equity Financing Commitment Proposal for the Potential Acquisition of Archstone-Smith (May 16, 2007), at p. 9 [LBEX-DOCID 1674960].

[1651] Abebual A. Kebede, Lehman, Archstone Smith Valuation Update [Draft] (Aug. 23, 2007) [LBEX-DOCID 2689696]; Lehman, Project Easy Bridge Equity Discounting Sensitivity Spreadsheet (Mar. 17, 2008) [LBEX-DOCID 1626080].

discount rate during the second and third quarters of 2008.[1653]  Lehman used the returns provided by core-plus funds, typically 12%-15%, as the benchmark for its DCF model discount rate.[1654]

The Examiner's financial advisor did not locate materials that specifically support Lehman's discount rate assumptions of between 13% and 15%.[1655]  Hughson and Neighbor told the Examiner that the discount rates were based on judgment and that there was no specific supporting documentation.[1656]  A Product Control Group May 2008 analysis indicated that an appropriate discount rate could be in the range of 18% to 20%.[1657]

The Examiner's financial advisor is not aware of any contemporaneous data that suggests the discount rates used by Lehman were unreasonable, provided that this

---

[1652] Lehman, Archstone Bridge Equity Discounting Sensitivity (Apr. 1, 2008), at p. 1 [LBEX-DOCID 4346983].

[1653] E-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman, *et al.* (June 14, 2008) [LBEX-DOCID 1865693]; Lehman, Archstone Sensitivity Analysis (Aug. 22, 2008), at p. 1 [LBEX-DOCID 2852318], attached to e-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman (Sept. 12, 2008) [LBEX-DOCID 2903130].

[1654] Memorandum from Keith Cyrus, Lehman, *et al.*, to Donald E. Petrow, Lehman, Archstone Update (May 16, 2008), at p. 3 [LBHI_SEC07940_5521903].

[1655] The investigation seeking that information included detailed requests for information from Lehman and a review of the FID drives and Lehman's SOX drives.

[1656] Examiner's Interview of Abebual A. Kebede, Sept. 29, 2009, at p. 6.

[1657] Lehman, Archstone Q2 2008 Update (June 12, 2008), at p. 15 [LBEX-DOCID 2929329].  An e-mail from Jeff Wechsler to Abebual Kebede on May 27, 2008, included this analysis which showed a mark-down from the funded value of $945 million at a discount rate of 20.95%.  Lehman, Archstone Risk Analysis (May 27, 2008), at Base Case tab [LBEX-DOCID 4447789], attached to e-mail from Jeffrey Wechsler, Lehman, to Abebual Kebede, Lehman, *et al.* (May 27, 2008) [LBEX-DOCID 4327665].  Earlier in the chain of e-mails, Kebede asked Wechsler to prepare this analysis as "15% and 12% IRRs are probably less useful at this point."  Kebede also asked for CAGR sensitivities at 5.12% and 4.62% but this request apparently was not fulfilled.

discount rate was applied to expected future cash flows. Expected future cash flows refer to a probability weighted average of projected future cash flows.[1658] Product Control was less familiar with the underlying assumptions for the analysis,[1659] but the Examiner's financial advisor observed that it appears that Product Control used the higher discount rates of 18% to 20% in their sensitivity analysis as a substitute for reducing projected future cash flows to arrive at expected future cash flows.

### (b) Sum of the Parts Method

Lowitt stated on the second quarter earnings call that Lehman used a Sum of the Parts analysis as a cross-check to its DCF analysis. Lehman performed a Sum of the Parts analysis based on its purchase price allocation.[1660] The purchase price allocation was a valuation exercise that allocated $22 billion (representing the purchase price for purposes of this analysis) to Archstone's assets. Lehman assigned $17.8 billion to Archstone's core portfolio, $1.4 billion to projects in development (referred to as "Development" in the following table), $1 billion to the platform (comprised of Archstone's ability to generate value from asset management fees, future promotes and

---

[1658] Shannon P. Pratt & Roger J. Grabowski, *Cost of Capital: Applications and Examples* 17 (3d ed. 2008). For example, the Examiner's financial advisor noted that if there were 2 projected scenarios: a 50% chance that cash flow will be $10 and a 50% chance that cash flow will be $20 in Year 1, the expected cash flow for Year 1 is $15, which is computed as follows: (50% x $10) + (50% x $20) = $15. It is appropriate to apply the 15% discount rate to $15 of projected cash flow in this example. It would be inappropriate to apply the 15% discount rate to $20 (which would result in an overvaluation) or $10 (which would result in an undervaluation) of projected cash flow in this example.

[1659] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at pp. 5-6.

[1660] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter Earnings Call (June 16, 2008), at p. 14 [LBHI_FIN 00007]. *See* Appendix 12, Valuation - Archstone, for a summary of Lehman's purchase price allocation analysis.

the merchant building platform), and $2 billion to other assets. The table below, prepared by Tishman Speyer as part of a sensitivity analysis, includes the value assigned to the various asset categories in the purchase price allocation (see the leftmost column).[1661]

| Core Portfolio Cap Rate | 4.11% | 4.25% | 4.50% | 4.75% | 5.00% | 5.25% | 5.50% | 5.75% | 6.00% |
|---|---|---|---|---|---|---|---|---|---|
| *Cap Rate w/o Platform* | *3.89%* | *4.02%* | *4.24%* | *4.46%* | *4.68%* | *4.90%* | *5.11%* | *5.33%* | *5.54%* |
| | | | | | | | | | |
| Core Portfolio | $17,789 | $17,193 | $16,238 | $15,383 | $14,614 | $13,918 | $13,285 | $12,708 | $12,178 |
| Assets Held for Sale | 596 | 596 | 596 | 596 | 596 | 596 | 596 | 596 | 596 |
| Development | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 |
| Germany Ground | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 |
| Leases | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 |
| Other Assets | 374 | 374 | 374 | 374 | 374 | 374 | 374 | 374 | 374 |
| Platform Value | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Cash / WC | 411 | 411 | 411 | 411 | 411 | 411 | 411 | 411 | 411 |
| **Total Value** | $22,173 | $21,577 | $20,622 | $19,767 | $18,998 | $18,302 | $17,669 | $17,092 | $16,562 |
| | | | | | | | | | |
| Total Debt / Preferred | 17,073 | 17,073 | 17,073 | 17,073 | 17,073 | 17,073 | 17,073 | 17,073 | 17,073 |
| Equity | 5,100 | 4,504 | 3,549 | 2,694 | 1,925 | 1,229 | 596 | 19 | (511) |
| Variance | - | (596) | (1,551) | (2,406) | (3,175) | (3,871) | (4,504) | (5,081) | (5,611) |

[1661] The table was obtained from an attachment to an e-mail that was sent by Siebers (of Tishman Speyer) to many people at Archstone, Lehman, BofA, Barclays and Tishman Speyer on January 31, 2008. Tishman Speyer, Spot Value Variance: Tishman Speyer - Archstone - Smith Multifamily Fund (Jan. 30, 2008) [LBEX-DOCID 1743458], attached to e-mail from Kevin Siebers, Tishman Speyer, to R. Scot Sellers, Archstone-Smith, *et al.* (Jan. 31, 2008) [LBEX-DOCID 1861936]. The table was part of the materials that were circulated by Siebers in advance of a February 1, 2008 meeting. A similar version of this chart is found at Lehman, Spot Value Variance, at p. 11 [LBHI_SEC07940_7548964]. *See* Appendix 12, Valuation - Archstone, for more details regarding the purchase price allocation.

While the table above summarizes the allocation of value to different asset categories, the initial intent of the table was to show the effect of an increase in capitalization rates on the core portfolio valuation.  This can be seen in the columns with different capitalization rates listed on the first line.  As shown in the table above, an increase in the capitalization rate for the core portfolio from 4.10% to 5.75% — assuming such an increase was reasonable — would eliminate virtually all equity value.

The Examiner's financial advisor's review of the Sum of the Parts analysis focused on the data in this table, and more specifically on the $17.8 billion core portfolio valuation and $1 billion platform valuation.  Subsequent Sections that address Archstone valuations by date also address the Examiner's review of the Sum of Parts analysis and its implications for the reasonableness of Lehman's reported Archstone valuations for purposes of the solvency analysis.

### (c)  Comparable Company Method

The Q2 Book included an analysis that compared the value of Archstone to the value of Archstone's publicly traded comparable companies during the second quarter 2008.[1662]  Lehman did not perform a similar analysis for any other quarters.

Paul Hughson told the Examiner that the values of publicly traded companies were "not relevant" for purposes of valuing Archstone once it became privately-held.[1663]

---

[1662] E-mail from Webster Neighbor, Lehman, to Brett Bossung, Lehman, *et al.* [LBEX-DOCID 2820780]; *see also* Lehman, Archstone Q2 2008 Update (June 12, 2008), at p. 8 [LBEX-DOCID 2929329], attached to e-mail from Webster Neighbor, Lehman, to Brett Bossung, Lehman, *et al.* [LBEX-DOCID 2820780].

Jonathan Cohen generally agreed with Hughson's conclusion.[1664] Lehman did use an analysis of comparable companies in its valuation due diligence prior to the Commitment Date.[1665] Hughson told the Examiner that this analysis did not matter once the acquisition closed.[1666] Jonathan Cohen told the Examiner that "he never thought about" replicating a comparable company analysis because it would require a lot of work.[1667]

Lehman's "FAS 157 Fair Value Measurements Policy" stated that a range of factors, including the "trading values on public exchanges for comparable securities," should be considered for purposes of valuing Lehman's private equity positions.[1668] Lehman, however, made a determination that such trading values were not relevant for purposes of valuing Archstone in a private market context. The Examiner recognizes that judgment is employed not only in selecting the inputs for a valuation analysis, but also in the selection of what analysis to perform. Although Lehman's stated policy required consideration of the trading values of Archstone's publicly owned peers, the evidence does not support a finding that Lehman's decision not to undertake such an analysis to determine the fair value of its Archstone equity positions was unreasonable.

[1663] Examiner's Interview of Paul Hughson, Dec. 21, 2009, at p. 2.

[1664] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 10.

[1665] Lehman, Project Easy Living: Discussion / Valuation Materials (May 21, 2007), at p. 8 [LBEX DOCID 1695374].

[1666] Examiner's Interview of Paul Hughson, Dec. 21, 2009, at p. 2.

[1667] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 9.

[1668] Lehman, Lehman Brothers Holdings Inc. Accounting Policy Manual (Nov. 21, 2007), at p. 3 [LBEX DOCID 1717234], attached to e-mail from Marie Stewart, Lehman, to Dilan Abeyratne, Lehman, *et al.* (Nov. 21, 2007) [LBEX DOCID 1926752].

However, given Lehman's policy and that the market's view as to the value of Archstone's peers (as expressed through their stock prices) is a useful indicator of value, the Examiner's financial advisor replicated the comparable company analysis that Lehman undertook in the Q2 Book, and conducted such analysis for the fourth quarter of 2007, and for the first, second and third quarters of 2008.[1669]

The Q2 Book's comparable company analysis involved three separate steps, which the Examiner's financial advisor replicated as discussed below. The Q2 Book's analysis first identified the change in total returns (*i.e.*, stock prices plus dividends) on equity for the companies that Lehman determined were the primary comparables to Archstone – AvalonBay, Essex Properties and BRE Properties.[1670] The Q2 Book observed a 17.8% decline in total returns on equity for Archstone's comparable companies during the period beginning on the Commitment Date and ending on June 10, 2008.[1671] The Examiner's financial advisor replicated this analysis for each of the four quarters of 2007, and the first and third quarters of 2008. As shown in the chart below, the average total returns on equity for the three primary comparable companies declined by over 20% during the period beginning on the Commitment Date and ending February 29, 2008.

---

[1669] The Examiner's financial advisor also analyzed the cost of taking Archstone private, and then compared that cost to the value of Archstone's equity at closing. This analysis is set forth in Appendix 12, Valuation - Archstone.

[1670] Lehman, Archstone Q2 2008 Update (June 12, 2008), at p. 8 [LBEX-DOCID 2929329].

[1671] *Id.* at p. 13 [LBEX-DOCID 2929329].

**Total Returns on Equity for Archstone's Primary Comparable Companies**



The second step in the Q2 Book's analysis was to convert the change in total returns on equity discussed above to a change in total returns on enterprise value.[1672] This step was necessary to normalize the different levels of debt that each company had (*i.e.*, to put the companies on an "apples to apples" basis).[1673] The Q2 Book's analysis observed that the enterprise value of Archstone's peers declined by 10.7% since the Commitment Date. The Examiner's financial advisor replicated this analysis for each of the other quarters and, for example, observed a decline in total returns on enterprise

---

[1672] Lehman, Archstone Q2 2008 Update (June 12, 2008), at p. 13 [LBEX-DOCID 2929329].

[1673] The Examiner's financial advisor observed that Lehman converted the total returns on equity to total returns on enterprise value by making the following determinations: (1) there was no decline in the value of debt for these companies and (2) the capital structure for these companies was 60% debt and 40% equity.

value for Archstone's primary comparable companies of approximately 13% during the period beginning the Commitment Date and ending the last day of the first quarter.[1674]

The third step in Lehman's analysis computed the change in Archstone's enterprise value from the Commitment Date based on Lehman's valuation of its Archstone positions.[1675]  In other words, this calculation applies the Lehman's mark on its Archstone positions to Archstone's enterprise value.  The Q2 Book reported this calculation illustrated that Archstone's enterprise value had declined 5.7% during the period beginning the Commitment Date and ending May 31, 2008.[1676]  The Examiner's financial advisor replicated this analysis for each other quarter, and using this methodology, calculated a 2% decline in Archstone's enterprise value  during the period beginning the Commitment Date and ending on the last day of the first quarter.[1677]

The Examiner's financial adviser conducted a sensitivity analysis for each quarter pursuant to which the change in enterprise value for Archstone based on Lehman's value of its Archstone positions (*e.g.*, 5.7% through the second quarter) was compared to

---

[1674] The baseline value as of May 29, 2007, was $60 equity and $40 debt, which is consistent with a capital structure that was 60% equity and 40% debt.  The value of the equity declined by 21.5% between the Commitment Date and end of the first quarter (based on the total returns mentioned above), which resulted in a revised equity value of approximately $47 ($60 multiplied by (100% - 21.5%) = $47).  The value of the debt remained unchanged at $40.  Therefore, the revised enterprise value was $87 ($47 of equity plus $40 of debt), which was 13% lower than the $100 baseline value as of May 29, 2007.

[1675] Lehman, Archstone Q2 2008 Update (June 12, 2008), at p. 13 [LBEX-DOCID 2929329].

[1676] *Id.*  Lehman valuation as of the end of the second quarter resulted in a 24.9% decline in equity value and 0% decline in debt value, which resulted in 5.7% decline in enterprise value.

[1677] Lehman's valuation as of the end of the first quarter resulted in a 9.3% decline in equity value and 0% decline in debt value, which resulted in a 2.1% decline in enterprise value.  The decline in enterprise value (approximately 2%) is lower than the decline in funded value of Lehman's Archstone positions (approximately 5%) because Lehman's Archstone positions were lower in Archstone's capital structure and therefore its value was more sensitive to changes in Archstone's enterprise value.

the change in enterprise value for Archstone's primary comparable companies (e.g., 10.7% through the second quarter).

In this manner, the sensitivity analysis illustrates what Archstone's enterprise value would have been as of each date if such value had declined in an amount equal to the average decline experienced by Archstone's publicly traded peers. The table below compares that value (in row "Enterprise Value" – Implied by Comparable Company Analysis) to Archstone's enterprise value as implied by Lehman's marks. The difference between those two values, multiplied by Lehman's Archstone equity ownership (expressed as a percentage), illustrates the difference between the value of Lehman's Archstone positions determined according to this comparable company analysis and Lehman's contemporaneous marks.

### (i) Potential Overvaluation Based on Primary Comparable Companies

|                                          | Nov-07 | Feb-08 | May-08 | Aug-08 |
|------------------------------------------|--------|--------|--------|--------|
| Enterprise Value                         |        |        |        |        |
|     Implied by Lehman Marks | 21.8   | 21.7   | 20.9   | 20.6   |
|     Implied by Comparable Company Analysis | 19.3   | 19.3   | 20.4   | 20.4   |
| Difference                               | (2.5)  | (2.4)  | (0.5)  | (0.2)  |
|                                          |        |        |        |        |
| Lehman's equity ownership                | 47%    | 47%    | 47%    | 47%    |
| Impact on Lehman's positions ($ bn)      | (1.2)  | (1.1)  | (0.2)  | (0.1)  |

Given the Examiner's conclusion regarding the reasonableness of Lehman's decision to not employ the comparable company methodology, the following quarter-

by-quarter analysis of Lehman's Archstone valuations focuses on the reasonableness of Lehman's Sum of the Parts and DCF analyses.

>    (5)  **Examiner's Analysis of the Reasonableness of Lehman's Valuation of its Archstone Positions on a Quarterly Basis**

The discussion below addresses the Examiner's analysis of the reasonableness, for purposes of a solvency analysis, of Lehman's Archstone valuations quarter-by-quarter beginning with the fourth quarter of 2007.

>    (a)  **Reasonableness as of the Fourth Quarter of 2007**

Lehman determined that the value of its Archstone positions was $5.1 billion as of the end of the fourth quarter of 2007.[1678]  This valuation reflected a 4.4% discount from Lehman's original Archstone investment.[1679]

The Archstone acquisition closed in October 2007, the second month of the fourth quarter.  As of the Closing Date, Lehman reduced its Archstone marks by the $233 million in fees that it received in connection with the acquisition.  Hughson told the Examiner that recording fees into the positions resulted in a valuation that reflected both Lehman's "best judgment as to the value of the underlying assets at the time of

---

[1678] *See* Chart titled, "Lehman's Valuation of Archstone Positions (U.S. $ million, Oct 07-Aug 08)" in the preceding Section of this Report, with data from Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113] and Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 18 [LBHI_SEC07940_ICP_002615].

[1679] *See* Chart titled "Archstone Marks by Month (Oct 07 - Aug 08)" in the preceding Section of this Report, with data from Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113] and Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 18 [LBHI_SEC07940_ICP_002615].  The discount was computed by subtracting the total mark for November from 100 (*i.e.*, 100 minus 95.6 equals 4.4).

closing," including the state of debt markets, and Lehman's ability to syndicate the bridge equity and the value of underlying assets.[1680]  Lehman did not take any other write-downs – other than for excess carry – on their Archstone positions during that quarter.[1681]

Hughson told the Examiner that he did not recall any details behind Lehman's Archstone valuation analysis for the fourth quarter of 2007.[1682]  Hughson also did not recall any presentations that were prepared to explain the valuation or any events that would have led to a dramatic change in the valuation of Archstone positions between the Closing Date and the end of the fourth quarter.[1683]  Jonathan Cohen told the Examiner that Product Control did little to review the reasonableness of Lehman's Archstone valuation during the fourth quarter.[1684]  The Examiner's financial advisor did not locate any analyses that were purported to have been performed for Archstone valuations as of the fourth quarter of 2007.

William Schlich, lead audit partner at E&Y, told the Examiner that E&Y focused on Lehman's Product Control process when it reviewed Lehman's valuations for

---

[1680] Examiner's Interview of Paul Hughson, Dec. 21, 2009, at p. 3.

[1681] The total variance was $230 million, which was calculated based on the October funded value of $5.398 billion, less the October reported valuation figure of $5.168 billion.  *See* Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113].  The fees were therefore $230 million.

[1682] Examiner's Interview of Paul Hughson, Dec. 21, 2009, at p. 3.

[1683] *Id.*

[1684] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 10.

reasonableness.[1685]  Schlich also told the Examiner that E&Y reviewed and understood the Archstone transaction, but did not do any independent testing or modeling of the Archstone valuation.[1686]  Schlich explained that since the acquisition closed in October 2007, E&Y determined that the best indication of the value of Lehman's Archstone positions was the purchase price since it was based on the terms negotiated between willing buyers and a willing seller.[1687]

Lehman's valuation of Archstone during the fourth quarter of 2007 (and during the subsequent quarters) involved a significant amount of judgment because there were no material sales of Archstone debt or equity positions during the quarter (*i.e.*, SFAS 157 Level 1 inputs), nor were there any meaningful benchmarks for Archstone equity positions in a private market context (*i.e.*, SFAS 157 Level 2 inputs).  The Examiner notes the short period between the Closing Date and the end of the fourth quarter, and that Archstone executed $1.5 billion of asset sales during the fourth quarter at a going-in capitalization rate below 4%.  These sale prices were close to Archstone's budgeted prices.  The Examiner finds that there is insufficient evidence to support a finding that

---

[1685] Examiner's Interview of Ernst & Young, Nov. 11, 2009, at p. 4.  William Schlich is E&Y's lead partner and Jerry Gruner is E&Y's senior manager on the Mortgage Capital team.

[1686] *Id.*

[1687] *Id.* at p. 5.  The Examiner, in analyzing the reasonableness of Lehman's Archstone marks for each quarter, considered the scope and depth of Lehman's valuation efforts during each period.  Given the statements made by Hughson and Jonathan Cohen, and the absence of quarter-end valuation materials, there is sufficient evidence to support a finding that Lehman did not undertake a substantive review of Archstone marks other than in connection with the Closing Date marks.  With respect to the Lehman's fourth quarter valuation efforts, the Examiner has considered that the acquisition closed during the month before the quarter ended, and Fannie Mae and Freddie Mac purchased over $8 billion of Archstone first mortgage debt in connection with the closing.

Lehman's valuation of its Archstone positions was unreasonable as of the fourth quarter of 2007.

### (b) Reasonableness as of the First Quarter of 2008

Lehman determined that the value of its Archstone positions was $5.1 billion as of the end of first quarter of 2008.[1688]  This valuation reflected a 4.9% discount from Lehman's original investment in Archstone.[1689]

Lehman did not record any valuation-related write-downs during the first quarter of 2008.[1690]  Lehman did record a relatively small reduction in Lehman's valuation between the fourth quarter of 2007 and the first quarter of 2008 (from 95.6% of funded value to 95.1% of funded value) primarily based on its decision to mark excess carry on the Archstone debt positions into the Archstone bridge equity position as discussed above.[1691]  Jonathan Cohen told the Examiner that Hughson made the decision to use excess carry to reduce the bridge equity mark because Hughson did not want to show any profits on Archstone positions.[1692]

---

[1688] *See* Chart titled, "Lehman's Valuation of Archstone Positions (U.S. $ million, Oct 07 - Aug 08)" in the preceding Section of this Report, with data from Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113] and Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 18 [LBHI_SEC07940_ICP_002615].

[1689] *See* Chart titled "Archstone Marks by Month (Oct 07-Aug 08)" in the preceding Section of this Report, with data from Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113] and Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 18 [LBHI_SEC07940_ICP_002615].  The discount was computed by subtracting the total mark for November from 100 (*i.e.*, 100 - 95.1 = 4.9).

[1690] Lehman, Global Real Estate 2008 Mark Downs, at p. 10 [LBEX-BARFID 0013153].

[1691] E-mail from Paul Higham, Lehman, to Andy Lu, Lehman, *et al.* (Nov. 16, 2007) [LBEX-DOCID 4320525].  Lehman began recording excess carry into the bridge equity mark after November 14, 2007.

[1692] Examiner's Interview of Jonathan Cohen, Jan. 11, 2010, at p. 10.

### (i)  Barron's Article

Barron's published an article on January 21, 2008 suggesting that Archstone equity could be worthless.[1693]  Lehman prepared an analysis that rebutted Barron's methodology and conclusions.  This Subsection of the Report addresses the Examiner's analysis of the Barron's article and Lehman's rebuttal.

The Barron's article concluded that Archstone's equity may have been worthless based on Archstone's high level of debt and the capitalization rate implied by the stock prices of publicly traded apartment REITs.[1694]  With respect to the capitalization rate, Lehman determined that the Archstone core portfolio (*i.e.*, stabilized apartment complexes) was acquired at a going-in rate of approximately 4%.[1695]  The Barron's article observed that the going-in capitalization rate implied by the stock prices of Archstone's publicly traded peers by late January 2008 was over 7%.[1696]  This steep increase in the going-in capitalization rate (*i.e.*, between the Commitment Date and January 2008) indicated a large decrease in Archstone's enterprise value and therefore a large decrease in the value of Lehman's equity investment in Archstone.  The Barron article's thesis

---

[1693] Andrew Bary, *Apartment-House Blues*, Barron's, Jan. 21, 2008, at p. 1, attached to e-mail from Glenn Schorr, UBS, to Keith A. Murray, UBS, *et al.* [LBEX-UBS 00886713], *available at* http://online.barrons.com/ article/SB120070919702802265.html#articleTabs_panel_article%3D1.

[1694] *Id.*  The Examiner's financial advisor calculated that Lehman's equity investment in Archstone would be practically worthless if the value of Archstone in its entirety declined by more than 24%.

[1695] Lehman, Archstone Update — Q2 2008 (June 12, 2008), at p. 2 [LBEX-DOCID 2902980].

[1696] Andrew Bary, *Apartment-House Blues*, Barron's, Jan. 21, 2008, at p. 1, attached to e-mail from Glenn Schorr, UBS, to Keith A. Murray, UBS, *et al.* [LBEX-UBS 00886713], *available at* http://online.barrons. com/article/SB120070919702802265.html#articleTabs_panel_article%3D1.

was that the increase in capitalization rates was large enough to reduce the value of equity investments in Archstone to zero.[1697]

As discussed above, Hughson told the Examiner that valuations based on the stock prices of comparable public companies were not relevant for purposes of valuing Archstone as a private company.[1698] Hughson also said that comparisons of Archstone to AvalonBay were inapposite because AvalonBay's assets were not as intrinsically valuable as Archstone's assets.[1699] However, after the Barron's article was published, Reilly, the Global Product Controller, asked Jonathan Cohen in an e-mail to "look at" the capitalization rate of AvalonBay when Lehman "bought Archstone" because AvalonBay was the "best comp."[1700]

The Examiner's financial advisor reviewed materials prepared by Lehman prior to its decision to commit to fund the Archstone acquisition, and compared

---

[1697] Andrew Bary, *Apartment-House Blues*, Barron's, Jan. 21, 2008, at p. 1, *available at* http://online.barrons.com/article/SB120070919702802265.html#articleTabs_panel_article%3D1; David Einhorn, Presentation to Grant's Spring Investment Conference, Private Profits and Socialized Risk (Apr. 8, 2008), *available at* http://www.foolingsomepeople.com/main/mroom/Grants%20 Conference%2004-08-2008.pdf.

[1698] Examiner's Interview of Paul A. Hughson, Dec. 21, 2009, at p. 2.

[1699] Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 11. Hughson repeatedly emphasized that Archstone's assets were the best buildings, in the best markets, with the best management. *Id.* As an example, Hughson noted that AvalonBay's New York Metro properties included a large development in New Rochelle (a NYC suburb) directly abutting a major freeway (I-95), whereas Archstone's properties included a large development on West End Avenue in New York City. *Id.* Hughson explained that while a report might list AvalonBay and Archstone as both having properties in the New York metro area, a reasoned judgment of the value of each company required individual scrutiny of each company's specific assets. *Id.*

[1700] E-mail from Gerard Reilly, Lehman, to Jonathan Cohen, Lehman (Jan. 22, 2008) [LBEX-DOCID 2778713].

capitalization rates for AvalonBay and Archstone.[1701]  Lehman's analysis determined that Archstone's stock historically traded at a lower Funds from Operations ("FFO") multiple than its peers.  A comparison of FFO multiples serves to compare the value of an asset (in this case Archstone's stock) to the value of similar assets that were priced by the market.[1702]  Lehman's analysis reveals that Archstone's stock was trading even with or slightly below its peers based on FFO multiples as of May 2007.  Therefore, Lehman concluded that data demonstrated that market participants bought and sold Archstone's stock as if its growth prospects were slightly lower or in-line with its publicly traded peers.[1703]

Lehman prepared materials during this time period that also demonstrate Archstone and AvalonBay had comparable going-in capitalization rates and were valued similarly on a per apartment unit basis.[1704]  Therefore, there is sufficient evidence to support a finding that changes in AvalonBay's capitalization rates between the Commitment Date and February 29, 2008 should be considered for purposes of assessing the reasonableness of Lehman's valuations of its Archstone positions.

---

[1701] Lehman, Project Easy Living: Discussion / Valuation Materials (May 21, 2007), at p. 8 [LBEX DOCID 1695374].

[1702] Aswath Damodaran, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset 453 (2d ed. 2002).

[1703] Lehman, Project Easy Living: Discussion/Valuation Materials (May 21, 2007), at pp. 4, 8 [LBEX DOCID 1695374].

[1704] Id.

While the review by the Examiner's financial advisor of comparable companies, and AvalonBay specifically, generally supports the analysis set forth in the Barron's article, Lehman determined that such analysis was neither accurate nor reasonable.[1705] A rebuttal to the analysis in the Barron's article was presented to Lehman's Executive Committee on January 22, 2008.[1706] Lehman's rebuttal arguments were:

1. The 10 most recent sales in Archstone's markets occurred at an average going-in capitalization rate of 4.6%, which was significantly lower than the going-in capitalization rates of 6% discussed in the Barron's article.[1707]

2. Archstone sold two of its own apartment complexes out of its Washington DC portfolio that closed in January 2008 at a significantly lower going-in capitalization rate (4.1%) than the implied going-in capitalization rates used in the Barron's article (6% or higher).[1708]

3. Underlying fundamentals (as evidenced by actual 5% rent growth in 2007 and projected rent growth of 5% for 2008) were strong.[1709]

4. Stocks for apartment REITs were trading at a 30% discount to Net Asset Value.

5. Barron's did not include any value for many of Archstone's assets, including its platform.[1710]

The Examiner's financial advisor analyzed each of Lehman's rebuttal arguments.

---

[1705] E-mail from Scott A. Levin, Lehman, to Steven R. Hash, Lehman, *et al.* (Jan. 21, 2008) [LBEX-DOCID 1677086].

[1706] Lehman, Archstone "ASN" - Talking Points (Jan. 22, 2008), at p. 1 [LBEX-DOCID 1977228], attached to e-mail from Gerard Reilly, Lehman, to Clement Bernard, Lehman, *et al.* (Jan. 22, 2008) [LBEX-DOCID 1853344].

[1707] *Id.*

[1708] *Id.*

[1709] *Id.*

[1710] *Id.*

*Rebuttal Argument #1: The 10 most recent sales in Archstone's markets occurred at an average going-in capitalization rate of 4.6%, which was significantly lower than the capitalization rates of 6% and higher discussed in the Barron's article.* Lehman produced an internal analysis to demonstrate that the top 10 transactions in Archstone's markets resulted in a 4.6% average going-in capitalization rate.[1711] As this spreadsheet was circulated among Lehman employees at the time they were developing rebuttal analyses to the Barron's article, there is sufficient evidence to support a finding that this analysis served as Lehman's underlying analysis for Rebuttal Argument #1.

The spreadsheet had two sets of data. The first set identified the 10 transactions noted above, as well as the calculation of average going-in capitalization rates for 27 additional transactions for markets where Archstone did not own apartment buildings.[1712] All transactions in this first set had capitalization rates of 5.2% or lower.[1713] The first set was in the print range of the spreadsheet, meaning that it was the only section that would be printed (unless the user manually adjusted the print range).

---

[1711] Lehman, Project Easy Living: Recent Asset Sales" (Jan. 22, 2008), at Sales Comps tab [LBEX-DOCID 1482636], attached to e-mail from Jonathan Cohen, Lehman, to Gary J. Fox, Lehman (Jan. 22, 2008) [LBEX-DOCID 1437414]. This spreadsheet shows that the weighted average of the top 10 transactions was 4.2%. The Examiner's financial advisor computed the median of these 10 transactions as 4.6%. The Examiner's financial advisor observed that this spreadsheet appears to be the support for the 4.6% that was told to the Executive Committee.

[1712] *Id.*

[1713] *Id.*

The second set of transactions was outside of the print range of the spreadsheet. This second set included 250 additional transactions.[1714] Each of these transactions had a going-in capitalization rate of 5.3% or higher.[1715] These transactions were presented in order from lowest to highest capitalization rate.[1716] This second set included several transactions in or near Archstone's markets, including five transactions that had going-in capitalization rates of 6% or higher. If these transactions accurately reflected the capitalization rates for all of Archstone's properties, this would result in virtually no value for Archstone equity.[1717]

*Rebuttal Argument #2*: *Archstone sold two apartment complexes out of its Washington D.C. metro portfolio that closed in January 2008 at a significantly lower going-in capitalization rate (4.1%) than the implied going-in capitalization rates used in the Barron's article (6% or higher).*[1718] The spreadsheet described above included data for the sale of two Archstone properties in Arlington, Virginia (which is located a few miles outside of Washington, D.C.), and there are no other transactions listed for Archstone sales in the Washington,

---

[1714] *Id.*

[1715] *Id.*

[1716] *Id.*

[1717] *Id.* The spreadsheet lists five transactions that were located in the same cities as Archstone's core assets: (1) Creekside ($177,823/unit & 9.1% cap rate) in San Jose, CA; (2) Woodbridge ($208,784/unit, 7.6% cap rate) in Sunnyvale, CA; (3) Hidden Willows ($199,107/unit, 7.2% cap rate) in San Jose, CA; (4) Solaire ($390,278/unit, 6.8% cap rate) in San Mateo, CA; and (5) Somerset on Garfield ($156,449/unit, 6.0% cap rate) in Montebello, CA.

[1718] Lehman, Presentation entitled "Archstone Q2 2008 Update" (June 12, 2008), at p. 10 [LBEX-DOCID 2929329]; Andrew Bary, *Apartment-House Blues*, Barron's, Jan. 21, 2008, at p. 1, *available at* http://online.barrons.com/article/SB120070091970280265.html#articleTabs_panel_article%3D1.

D.C. area.[1719]    The capitalization rates for these two transactions were 4.42% and 4.73%.[1720]    It is possible that the 4.1% going-in capitalization rate Lehman used in this rebuttal argument was computed using a different method than that used in the analysis presented to Lehman's Executive Committee.

*Rebuttal Argument #3: Underlying fundamentals, as evidenced by actual 5% rent growth in 2007 and projected rent growth of 5% for 2008, were strong.*    This Rebuttal fairly describes Archstone's actual and projected rent growth for 2007 and 2008.

*Rebuttal Argument #4: Publicly traded apartment REITs were trading below Net Asset Value as quantified by contemporaneous analysts.*    The basic premise of this argument, which was also articulated by Archstone's CEO, was that the public markets were inefficient and not indicative of value in the private market.[1721]    Lehman pointed to Archstone's ability to sell individual apartment buildings in the private market at relatively low going-in capitalization rates.    While this assertion has merit, it does not directly address the question of whether and to what extent the value of a private real estate company, Archstone, is equally susceptible to other factors that affect the stock price of its publicly traded peers.    Lehman was not able to rebut this argument by

---

[1719] Lehman, Project Easy Living: Recent Asset Sales (Jan. 22, 2008), at Sales Comps tab [LBEX-DOCID 1482636], attached to e-mail from Jonathan Cohen, Lehman, to Gary J. Fox, Lehman (Jan. 22, 2008) [LBEX-DOCID 1437414].    The two properties were Crystal Square and the Bennington.    Lehman, Recent Asset Sales (Jan. 22, 2008), at Sales Comps tab [LBEX DOC ID 1482639].

[1720] Lehman, Recent Asset Sales (Jan. 22, 2008), at Sales Comps tab [LBEX DOC ID 1482639].

[1721] E-mail from R. Scot Sellers, Archstone, to David Augarten, Tishman Speyer, *et. al.* (Jan. 19, 2008) [LBHI_SEC07940_111678].

pointing to sales of Archstone equity during this quarter because there were no such sales.

*Rebuttal Argument #5: Barron's did not include any value for many of Archstone's assets.* As discussed above, Barron's concluded that there was zero equity value at a capitalization rate of 5.5%. Scott A. Levin, a Lehman banker who was responsible for the Archstone positions, wrote in an e-mail that "there would not be much equity value" if the appropriate capitalization rate was 6%.[1722] The Examiner's financial advisor observed that Levin referred to a higher capitalization rate at which point Archstone's equity lost substantially all of its value because Lehman and Tishman Speyer included assets in their valuation that were excluded by Barron.

The Barron's article was based on a simple premise – market participants were buying and selling apartment REITs as if the value of their underlying assets had deteriorated substantially. Some of Lehman's rebuttal arguments were persuasive (*e.g.*, Archstone had been able to sell apartment complexes at relatively low capitalization rates). Other responses, however, did not entirely rebut the argument that the capitalization rate implied by the stock price of publicly traded REITs were relevant in determining the value of Archstone equity.

---

[1722] E-mail from Scott A. Levin, Lehman, to Steven R. Hash, Lehman, *et al.* (Jan. 21, 2008) [LBEX-DOCID 1677086].

**(ii) Discussions Among Archstone, Tishman and Lenders**

Tishman Speyer, in a memo dated January 30, 2008, stated that investors who held debt and/or equity investments in Archstone faced many problems.[1723]  These problems included:

- Investors were concerned that Archstone was not worth what Lehman (and others) had paid for it.[1724]

- Archstone was "hampered" by its high level of debt, which left it with limited funds to invest in its existing development pipeline and new business opportunities.[1725]

- Efforts to syndicate the $4.5 billion of remaining Archstone equity had "lost momentum" and there was "no urgency for investors to invest in the deal today given the amount of equity left to syndicate."[1726]

- It was difficult to syndicate the entity-level debt because Archstone was viewed as a risky credit and its ability to service its debt obligations was dependent on asset sales.[1727]

Tishman Speyer observed that fixing many of these problems required Archstone's management to find ways to increase the value of the company and improve the company's liquidity position.[1728]  They also observed that it would be challenging to fix these problems in the near term.[1729]

---

[1723] Memorandum from David Augarten, Tishman Speyer, *et al.*, to R. Scot Sellers, Archstone, *et al.*, Archstone Business Plan and Syndication Update (Jan. 30, 2008), at p. 1 [LBEX-DOCID 1696101].

[1724] *Id.*

[1725] *Id.*

[1726] *Id.*

[1727] *Id.*

[1728] *Id.* at p. 2.

[1729] *Id.*

### (iii) Lehman's Valuation During the First Quarter of 2008

The Bridge Equity business desk produced a sensitivity analysis on March 4, 2008, which indicated a February 2008 mark for bridge equity of 90.2[1730]  The business desk provided the complete Archstone DCF model to Product Control on March 17, 2008 and this model had substantially the same mark for bridge equity at 89.9.[1731]

Shortly after the end of the first quarter, Jonathan Cohen gave a presentation to Andrew Morton, Lehman's Head of FID, that highlighted the "critical" need to continuously review the collateral valuation of bridge equity positions and that increases in capitalization rates were expected to reduce yields.[1732]  These presentation materials listed Archstone as the top position and also noted "Major Pricing Concerns," which included "[p]rice flex on debt; increase in cap rates; liquidity."[1733]  Cohen also observed after the publication of the Barron's article that the "onus" was on Lehman to support its valuation of Archstone positions "with current info."  Aside from the business desk's sensitivity analysis, the Examiner's financial advisor did not locate any other substantive analysis by Lehman to support its Archstone marks as of the end of the first quarter.

---

[1730] Lehman, Bridge Equity Sensitivity Analysis (Mar. 4, 2008) [LBEX-DOCID 4345834], attached to e-mail from Jeffrey Wechsler, Lehman, to Jonathan Cohen, Lehman [LBEX-DOCID 4447709] (re: ASN Bridge Equity Discounting Sensitivity).  Hughson could not recall any details about any Archstone valuation analysis done during the first quarter of 2008.  Examiner's Interview of Paul Hughson, Dec. 21, 2009, at p. 3.

[1731] *See* Lehman, Project Easy Bridge Equity Discounting Sensitivity Spreadsheet (Mar. 17, 2008) [LBEX-DOCID 1626080].

[1732] Abebual A. Kebede, Lehman, Real Estate Inventory Valuation (Mar. 10, 2008) [LBEX-DOCID 1707877].

[1733] *Id.*

The Examiner's financial advisor analyzed the reasonableness of Lehman's first quarter 2008 valuation pursuant to the Sum of the Parts and DCF methodologies. The Sum of the Parts analysis is presented first because that analysis is relevant to the DCF calculation.

### (iv) Sum of the Parts

Tishman Speyer performed a sensitivity analysis shortly after the Barron's article was published.[1734] This analysis illustrated how an increase in going-in capitalization rates would reduce the value of Archstone's core portfolio,[1735] assuming all other assets (including the platform) remained at their budgeted values.[1736] The table circulated as part of Tishman Speyer's sensitivity analysis is reproduced below:

---

[1734] Tishman Speyer, Spot Value Variance: Tishman Speyer - Archstone - Smith Multifamily Fund (Jan. 30, 2008) [LBEX-DOCID 1743458], attached to e-mail from Kevin Siebers, Tishman Speyer, to R. Scot Sellers, Archstone, *et al.* (Jan. 31, 2008) [LBEX-DOCID 1861936]. This document was part of the materials that were sent to the banks by Tishman Speyer on January 30, 2008.

[1735] Tishman Speyer, Spot Value Variance: Tishman Speyer - Archstone - Smith Multifamily Fund (Jan. 30, 2008) [LBEX-DOCID 1743458], attached to e-mail from Kevin Siebers, Tishman Speyer, to R. Scot Sellers, Archstone-Smith, *et al.* (Jan. 31, 2008) [LBEX-DOCID 1861936].

[1736] *Id.*

**Tishman Speyer's Going-In Capitalization Rate Sensitivity Analysis**

| Core Portfolio Cap Rate | 4.11% | 4.25% | 4.50% | 4.75% | 5.00% | 5.25% | 5.50% | 5.75% | 6.00% |
|---|---|---|---|---|---|---|---|---|---|
| *Cap Rate w/o Platform* | *3.89%* | *4.02%* | *4.24%* | *4.46%* | *4.68%* | *4.90%* | *5.11%* | *5.33%* | *5.54%* |
| | | | | | | | | | |
| **Core Portfolio** | $17,789 | $17,193 | $16,238 | $15,383 | $14,614 | $13,918 | $13,285 | $12,708 | $12,178 |
| Assets Held for Sale | 596 | 596 | 596 | 596 | 596 | 596 | 596 | 596 | 596 |
| Development | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 | 1,418 |
| Germany Ground | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 |
| Leases | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 |
| Other Assets | 374 | 374 | 374 | 374 | 374 | 374 | 374 | 374 | 374 |
| Platform Value | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Cash / WC | 411 | 411 | 411 | 411 | 411 | 411 | 411 | 411 | 411 |
| **Total Value** | $22,173 | $21,577 | $20,622 | $19,767 | $18,998 | $18,302 | $17,669 | $17,092 | $16,562 |
| | | | | | | | | | |
| Total Debt / Preferred | 17,073 | 17,073 | 17,073 | 17,073 | 17,073 | 17,073 | 17,073 | 17,073 | 17,073 |
| Equity | 5,100 | 4,504 | 3,549 | 2,694 | 1,925 | 1,229 | 596 | 19 | (511) |
| Variance | - | (596) | (1,551) | (2,406) | (3,175) | (3,871) | (4,504) | (5,081) | (5,611) |

Tishman Speyer, in a February 14, 2008 e-mail, wrote that the table above could be used to calculate the current valuation of equity investments in Archstone: "We can all estimate what the potential value loss is vs. the appraisals (10%) and/or what cap rate is appropriate for the core portfolio (4.25 - 4.50%?) as a way to triangulate what the real value of the portfolio is today. Then I think we use a real platform value . . .

probably $1B, and whatever gap exists is your 'plug' or potential loss. Of course there will be some range of opinions here."[1737]

The Examiner's financial advisor used the data in this table to conduct a sensitivity analysis. This sensitivity analysis adopts the Tishman Speyer's table's reduction in total equity and applies this reduction to Lehman's Archstone equity position. The Examiner's financial advisor then compared the reduction in Lehman's equity value computed under this analysis to Lehman's cumulative write-downs through the first quarter of 2008.[1738] This analysis produces a value that is relative to Lehman's valuation: a negative number indicates Lehman's valuation may have been too low; a positive number indicates Lehman's valuation may have been too high.

The Examiner's financial advisor deduced the capitalization rate Lehman assumed in its analysis, as illustrated in the table below. The core portfolio cap rate that results in an an incremental write-down closest to a value of 0 (*i.e.*, supporting Lehman's valuation) represents the going-in capitalization rate implicit in Lehman's analysis. Accordingly, the sensitivity analysis below illustrates that Lehman's first quarter 2008 valuation assumed a going-in capitalization rate just below 4.25% (because the incremental write-down was $17 million at this rate). The table below also indicates

[1737] E-mail from Kevin Siebers, Tishman Speyer, to Keith Cyrus, Lehman, *et al.* (Feb. 14, 2008) [TSREV00003451].

[1738] This analysis included all reduction of value as write-downs, including the marking of fees and excess carry into the positions.

the extent to which Lehman's valuation of its Archstone positions would have been overvalued or undervalued based on the assumed going-in capitalization rate.

**Going-In Capitalization Rate Sensitivity Analysis (Q1 2008)**

| Core Portfolio Cap Rate | 4.11% | 4.25% | 4.50% | 4.75% | 5.00% | 5.25% | 5.50% | 5.75% | 6.00% |
|---|---|---|---|---|---|---|---|---|---|
| Reduction in Total Equity Value | 0 | 596 | 1,551 | 2,406 | 3,175 | 3,871 | 4,504 | 5,081 | 5,611 |
| Reduction in Lehman's Equity (46.8%) | 0 | 279 | 726 | 1,127 | 1,487 | 1,813 | 2,109 | 2,379 | 2,627 |
| Write-Downs Taken by Lehman as of Q1 2008 | 262 | 262 | 262 | 262 | 262 | 262 | 262 | 262 | 262 |
| Incremental Write-Downs | (262) | 17 | 464 | 865 | 1,225 | 1,551 | 1,847 | 2,117 | 2,365 |

On January 22, 2008, Jonathan Cohen observed, on the basis of data collected by others within Lehman, that AvalonBay's going-in capitalization rate had increased by over 30 basis points since the Archstone Commitment Date.[1739]  As shown in the table above, applying this increase results in an Archstone capitalization rate approaching 4.50%, and a corresponding incremental write-down approaching $464 million.  The Examiner's financial advisor also observed that a source referenced in Cohen's e-mail[1740] noted the capitalization rate for AvalonBay was between 4.75% and 5.0%, which would result in an incremental write-down between $865 million and $1.225 billion if this capitalization rate also applied to Archstone.

Lehman, in its rebuttal to the Barron's article, indicated that the 10 most recent transactions in Archstone's markets were executed at an implied average capitalization

---

[1739] As previously noted, Reilly considered AvalonBay to be the "best comp."  E-mail from Keith Cyrus, Lehman, to Jonathan Cohen, Lehman, *et al.* (Jan. 22, 2008) [LBEX-DOCID 2778713]; Examiner's Analysis of the Reasonableness of Lehman's Valuation of its Archstone Positions on a Quarterly Basis.
[1740] *Id.*

rate of 4.6%.[1741]   As discussed above, Lehman's transaction analysis excluded relevant transactions with higher capitalization rates, which indicated that the average capitalization rate was higher than 4.6%.  As the table above illustrates, a capitalization rate of 4.75% (the first rate higher than 4.6% in the table) supports an $865 million incremental write-down and a 5.0% capitalization rate results in a $1.2 billion incremental write-down.

### (v)  DCF Method

The analysis by the Examiner's financial advisor of the DCF Method focused on Lehman's assumptions as for rent growth and exit capitalization rates.

In the first quarter, Lehman used an Archstone exit capitalization rate of approximately 4.8%, which was based on an increase of approximately 70 basis points over the going-in capitalization rate of 4.1%.  As discussed above, the going-in capitalization rates had increased since the Commitment Date.  The Examiner's financial advisor reran the DCF analysis using higher exit capitalization rates.

Lehman's rent growth assumption for assets held over the entire projection period was 5.72% per year, and the resulting NOI growth rate was 7.63% per year. Keith Cyrus identified that the long-term rent growth rate used in Lehman's DCF Method for the first quarter of 2008 was almost 3 full percentage points higher than third-party projected growth rates for other apartments within Archstone's markets.

---

[1741] Lehman, Archstone "ASN" - Talking Points (Jan. 22, 2008), at p. 1 [LBEX-DOCID 1977228].

The Examiner's financial advisor determined that Lehman's projected NOI growth rates were significantly (*i.e.*, hundreds of basis points) higher than Archstone's historical growth rate. Accordingly, and given the "problems" identified by Tishman Speyer in the January memo, there is sufficient evidence for a finding that Lehman's rent growth rate assumption was unreasonably high as of the first quarter of 2008.[1742]

As Lehman's first quarter 2008 valuation model could not support sensitivity testing, the Examiner's financial advisor used Lehman's second quarter model (which could run sensitivity analyses) as a proxy for the first quarter 2008 valuation model. The Examiner's financial advisor created four scenarios for purposes of sensitivity analysis, in which the two assumptions discussed above – rental growth rate and exit capitalization rate – were stressed to observe the effect of the same on the valuation of Lehman's Archstone positions. The Examiner's financial advisor did not sensitize Lehman's determination for platform value and discount rate, as such inputs were within the range of reasonableness for purposes of this valuation analysis. The table below sets forth the results of this sensitivity analysis, and "incremental write-down" denotes the additional write-down on Lehman's Archstone marks indicated by each scenario.

---

[1742] Memorandum from David Augarten, Tishman Speyer, *et al.*, to R. Scot Sellers, Archstone, *et al.*, Archstone Business Plan and Syndication Update (Jan. 30, 2008), at p. 1 [LBEX-DOCID 1696101].

## DCF Method Sensitivity Analysis (Q1 2008)

Numbers in Millions unless stated otherwise

| Assumptions | Case 1 | Case 2 | Case 3 | Case 4 |
|---|---|---|---|---|
| **Inputs** | | | | |
| Rental Growth Rate Decrease | 50 bps | 100 bps | 150 bps | 200 bps |
| Exit Cap Rate increase | 25 bps | 25 bps | 50 bps | 50 bps |
| IRR | 14.6% | 14.6% | 14.6% | 14.6% |
| | | | | |
| Total Funded Amount of the Equity | $2,388 | $2,388 | $2,388 | $2,388 |
| Lehman Reported Valuation for the Equity | $2,165 | $2,165 | $2,165 | $2,165 |
| Weighted Average Mark of the Equity | 90.7 | 90.7 | 90.7 | 90.7 |
| Write Down taken by Lehman within the Equity | $223 | $223 | $223 | $223 |
| | | | | |
| **Outputs** | | | | |
| Implied Valuation | $2,128 | $1,946 | $1,605 | $1,433 |
| Implied Mark | 89.1 | 81.5 | 67.2 | 60.0 |
| Implied Incremental Write-Down | $37 | $219 | $560 | $732 |

### (vi) Examiner's Findings and Conclusions as to the Reasonableness of Lehman's Archstone Valuation as of the End of the First Quarter of 2008

As previously discussed, there were no material sales of Archstone debt or equity positions during the quarter, nor any meaningful benchmarks for Archstone equity positions in a private market context. Therefore, Archstone equity was an SFAS 157 Level 3 asset whose valuation required a significant amount of judgment.

For the reasons set forth above, the Examiner concludes that there is sufficient evidence to support a finding for purposes of a solvency analysis that Lehman's valuation for its Archstone bridge and permanent equity investment as of the end of the first quarter of 2008 was unreasonable. Recognizing that the valuation of such an illiquid investment requires the application of judgment to numerous factors and criteria, the Examiner concludes that the evidence supports a finding that Lehman's valuation of $2.165 billion for its Archstone bridge and permanent equity investment

was overvalued by $200 million to $450 million.  Nevertheless, the Examiner does not find sufficient evidence to support a colorable claim that any Lehman officer acted with an intent to produce incorrect values, or conducted the valuation process in a reckless manner.  Lehman's valuations of its Archstone positions were not the product of actions (or omissions) that would support a claim of a breach of fiduciary duty in this or subsequent quarters.

The low end of the range implies a going-in capitalization rate on Archstone's core portfolio (assuming no decrease in value for Archstone's other assets) between 4.25% and 4.50%, which is lower than the increase in going-in capitalization rates for Archstone's "best comp" using the same data source Lehman used in its due diligence for the Archstone acquisition.  The low end employs a rent growth assumption that is 100 basis points lower than Lehman's assumption.  The 100 basis point decrease in the rent growth assumption still results in rent growth rates above third party projections for Archstone's markets and NOI growth rates that are significantly higher than Archstone's historical performance.

The high end of the range implies a going-in capitalization rate on Archstone's core portfolio (assuming no decrease in value for Archstone's other assets) of approximately 4.50%, which is consistent with the increase in going-in capitalization rates for Archstone's "best comp."  The high end employs an exit capitalization rate that is less than 50 basis points higher and a rent growth assumption that is less than 150

basis points lower than Lehman's assumptions.  This less-than-50-basis-points increase in exit capitalization rates is somewhat higher than the increase in going-in capitalization rate for Archstone's "best comp," while this-less-than-150-basis-points decrease in the rent growth assumption still results in rent growth rates above third party projections for Archstone's markets and NOI growth rates that are significantly higher than Archstone's historical performance.

### (c)  Reasonableness as of the Second Quarter of 2008

Lehman determined that the value of its Archstone positions was $4.7 billion as of the end of the second quarter of 2008.[1743]  This valuation reflected a 12.0% discount from Lehman's original Archstone investment.[1744]

The decrease in Lehman's Archstone valuation from a 4.9% reduction of funded value at the end of the first quarter of 2008 to a 12.0% reduction of funded value at the end of the next quarter was primarily due to $350 million of valuation-related write-

---

[1743] *See* Chart titled, "Lehman's Valuation of Archstone Positions (U.S. $ million, Oct 07 - Aug 08)" in the preceding Section, with data from Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113] and Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 18 [LBHI_SEC07940_ICP_002615].

[1744] *See* Chart titled "Archstone Marks by Month (Oct 07 - Aug 08)" in the preceding Section of this Report, with data from Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113] and Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 18 [LBHI_SEC07940_ICP_002615].  The discount was computed by subtracting the total mark for November from 100 (*i.e.*, $100 - 88.0 = 12.0$).

downs that were taken during the quarter.  These write-downs were taken in two stages: $250 million in March and $100 million in May.[1745]

### (i)  Second Quarter Earnings Call

During its second quarter earnings call, Lehman disclosed that it valued its Archstone equity positions at 75% and most Archstone debt positions at 99%.[1746] Together, these resulted in a weighted average valuation of 88% of funded value for Lehman's Archstone positions.[1747]

Lehman disclosed that it "arrived at an Archstone enterprise value primarily using a discounted cash flow analysis, which supports a mid-teens IRR."[1748]  Lehman also disclosed that this analysis "assumed that capitalization rates will be more than 100BPS [basis points] higher when the properties are sold than when the transaction was entered into" and "[b]ased on this analysis, we are very comfortable with our

---

[1745] Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113]. Lehman's decision to take the March write-down was triggered by buyers walking away from over $1 billion of potential Archstone asset sales shortly after Bear Stearns's near collapse.  E-mail from Jonathan Cohen, Lehman, to Clement Bernard, Lehman, *et al*. (Mar. 20, 2008) [LBEX-DOCID 1854627].  Cohen informed Bernard that "[b]efore month end also looking at archstone bridge equity.  Approx $1bn of property sales to 2 different buyers fell thru this week with the horrible market conditions beginning with the bear stearns news.  The desk is running numbers and stressing cap rates.  It could be approx 200mm. We would be holding at approx 20% yield to investors assuming no asset mgmt fee, no promote and we get no preferred return from investor.  I alerted gerry last night, but nothing is definitive at this point. Will update you when I get more info.  Abe has more info if you need."

[1746] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter Earnings Call (June 16, 2008), at p. 14 [LBHI_FIN 00007].

[1747] Lehman, GREG Update, at p. 3 [LBEX-DOCID 1417258].  Hughson told the Examiner that BofA and Barclays were upset with Lehman's public disclosure of it valuation.  Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 12.  Hughson also said that Lehman's investment was more valuable than BofA's and Barclays' investment, due to the higher fees Lehman received and Lehman's ownership of a general partner interest, which BofA and Barclays did not own.  *Id.*

[1748] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter Earnings Call (June 16, 2008), at p. 14 [LBHI_FIN 00007].

current Archstone mark."[1749]  The Examiner's analysis of this Discounted Cash Flow valuation is addressed in the DCF Method subsection below.

Lehman disclosed that it "cross checked" its DCF analysis with "a number of different methodologies, including sum of the parts, replacement costs and recent comparable transactions based on both cap rates and price per unit, the most important including asset sales from the Archstone portfolio."[1750]  The Examiner's financial advisor's analysis of sum of the parts and asset sales from Archstone's portfolio are addressed below.  The Examiner did not place significant emphasis on the replacement costs methodology, as it is difficult to benchmark, is not a valuation analysis per se, and Lehman (and its partners) acquired Archstone at a material discount to replacement costs.[1751]

During the earnings call, Lowitt disclosed that Archstone sold approximately $2 billion of assets after the acquisition and was under contract or in active negotiation to sell in excess of an additional $2 billion of assets.[1752]  Lowitt also stated that the average going-in capitalization rate for the $4 billion of actual and projected asset sales was in

---

[1749] *Id.*

[1750] *Id.*

[1751] Lehman, Archstone Q2 2008 Update (June 25, 2008), at p. 1 [LBEX-DOCID 187370].  According to Lehman's analysis, Archstone's core portfolio was acquired for $328,000 per unit, which reflected a "material" 16% discount to estimated replacement cost of approximately $390,000 per unit.

[1752] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter Earnings Call (June 16, 2008), at p. 14 [LBHI_FIN 00007].

the mid-4% range.[1753] Lehman's Q2 Book, which was prepared in advance of the earnings call, detailed these disclosures[1754] and the table below was created using this data. Consistent with Lehman's public disclosure, the average capitalization rate according to Lehman's analysis was 4.46%.[1755] This table illustrates that this 4.46% average going-in capitalization rate was influenced by the relatively low going-in capitalization rate of 3.62% for the $1.4 billion of asset sales that closed on the acquisition's Closing Date (labeled "October 5, 2007 Deals" in the table below). The analysis by the Examiner's financial advisor also illustrates that transactions that closed, were under contract, or were in negotiation in 2008 had an average going-in capitalization rate of approximately 5%.

**Actual and Budgeted Capitalization Rates from Archstone Asset Sales[1756]**

| | $ in millions | | | Cap Rates | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Budgeted Value | Sale Value | 2008 NOI | Budget | Sales | Variance |
| October 5, 2007 Deals | 1,306 | 1,391 | 50 | 3.86% | 3.62% | 6.56% |
| October 6, 2007 thru December 31 | 331 | 335 | 16 | 4.79% | 4.73% | 1.10% |
| Development Assets sold between January 1 and May 30 | 22 | 21 | n/a | n/a | n/a | -3.72% |
| January 1 through May 30 | 164 | 155 | 8 | 5.12% | 5.41% | -5.42% |
| Under Contract as of May 30 | 398 | 386 | 19 | 4.74% | 4.88% | -2.95% |
| Deals in Negotiation as of May 30 | 1,546 | 1,415 | 71 | 4.58% | 5.00% | -8.44% |
| Development: Under Contract or Deals in Negotiation | 131 | 113 | n/a | n/a | n/a | -13.52% |
| | | | | | | |
| All (non-development) Deals | 3,745 | 3,683 | 164 | 4.39% | 4.46% | |
| All Deals | 3,897 | 3,817 | | | | -2.06% |
| | | | | | | |
| 2007 Deals Cap Rate and Variance | 1,637 | 1,726 | 66 | 4.05% | 3.84% | 5.46% |
| 2008 Deals Cap Rate | 2,108 | 1,957 | 98 | 4.65% | 5.01% | |
| 2008 Deals Variance | 2,260 | 2,091 | | | | -7.50% |

---

[1753] Id.

[1754] Lehman, Archstone Q2 2008 Update (June 12, 2008), at pp. 10-11 [LBEX-DOCID 2929329].

[1755] Id.

[1756] Id.

During the earnings call, Lowitt stated that many of the assets that "were identified for sale by the company as non-core or non-strategic, and in certain cases do not represent the highest quality properties in their portfolio."[1757] The sale of lower-quality properties would be expected to result in higher capitalization rates than Archstone's higher-quality properties.

The Examiner's financial advisor also compared the actual sales prices of assets to Lehman's projections of sale prices (or allocated) value for assets. As set forth in the table above, the sales value for assets sold in 2007 was over 5% above budgeted value, while assets sold, under contract, or in negotiation in 2008 were valued by third parties (as evidenced by their purchase offers) at more than 7% below budgeted value. A Lehman July 29, 2008 analysis of Archstone's asset sales included the same sales values, but different budgeted values.[1758] In particular, the budgeted value for assets under contract or deals in negotiation as of May 30 were higher in the July analysis, which resulted in larger variances of sales values relative to budgeted value. According to the July analysis, the assets that were under contract or in negotiation as of May 30 were approximately 12% below budgeted value as shown in the table below.

---

[1757] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter Earnings Call (June 16, 2008), at p. 14 [LBHI_FIN 00007].

[1758] Lehman, Archstone July 2008 Update (July 29, 2008), at pp. 10-11 [LBHI_SEC_07940_ICP_008526].

# Updated Actual and Budgeted Capitalization Rates from Archstone Asset Sales[1759]

| | $ in millions | | | Cap Rates | | |
|---|---|---|---|---|---|---|
| | Budgeted Value | Sale Value | 2008 NOI | Budget | Sales | Variance |
| October 5, 2007 Deals | 1,306 | 1,391 | 50 | 3.86% | 3.62% | 6.56% |
| October 6, 2007 thru December 31 | 331 | 335 | 16 | 4.79% | 4.73% | 1.10% |
| Development Assets sold between January 1 and May 30 | 22 | 21 | n/a | n/a | n/a | -3.72% |
| January 1 through May 30 | 164 | 155 | 8 | 5.12% | 5.41% | -5.42% |
| Under Contract as of May 30 | 441 | 386 | 19 | 4.27% | 4.88% | -12.43% |
| Deals in Negotiation as of May 30 | 1,606 | 1,415 | 71 | 4.41% | 5.00% | -11.88% |
| Development: Under Contract or Deals in Negotiation | 131 | 113 | n/a | n/a | n/a | -13.52% |
| | | | | | | |
| All (non-development) Deals | 3,849 | 3,683 | 164 | 4.27% | 4.46% | |
| All Deals | 4,001 | 3,817 | | | | -4.59% |
| | | | | | | |
| 2007 Deals Cap Rate and Variance | 1,637 | 1,726 | 66 | 4.05% | 3.84% | 5.46% |
| 2008 Deals Cap Rate | 2,212 | 1,957 | 98 | 4.43% | 5.01% | |
| 2008 Deals Variance | 2,364 | 2,091 | | | | -11.55% |

The below budgeted sale prices support a determination that Archstone's enterprise value declined relative to the purchase price. The Examiner's financial advisor performed a sensitivity analysis to demonstrate the effect of this reduction in enterprise value on the potential overvaluation as of the second quarter of 2008. This analysis is conceptually similar to the sensitivity analysis based on changes in capitalization rates used in the Sum of the Parts method. This sensitivity analysis started with the values at closing: $22.2 billion for enterprise value and $5.1 billion for equity value.[1760] The sensitivity analysis reduced the $22.2 billion enterprise value in 2.5 percentage point increments. The reduction in enterprise value was applied to equity

[1759] Lehman, Valuation Overview (June 12, 2008), at pp. 10-11 [LBEX-DOCID 2929326], attached *to* e-mail from Webster Neighbor, Lehman, to Colleen Day, Lehman, *et al.* (June 12, 2008) [LBEX-DOCID 2871718]; Lehman, Archstone July 2008 Update (July 29, 2008), at pp. 10-11 [LBHI_SEC_07940_ICP_008526].

[1760] Tishman Speyer, Spot Value Variance: Tishman Speyer - Archstone - Smith Multifamily Fund (Jan. 30, 2008) [LBEX-DOCID 1743458], attached to e-mail from Kevin Siebers, Tishman Speyer, to R. Scott Sellers, Archstone-Smith, *et al.* (Jan. 31, 2008) [LBEX-DOCID 1861936].

due to the equity's position in the capital structure (*i.e.*, equity takes the first loss).  The next step was to compare the decrease in equity value indicated by this analysis to the cumulative write-down Lehman took as of the second quarter of 2008.  For example, as shown in the table below, a 5% reduction in enterprise value would warrant a write-down of $500 million.  In such a case, because Lehman had already cumulatively reduced the value of its positions by approximately $600 million,[1761] this analysis indicates a $100 million write-up to Lehman's valuation would have been warranted.  By contrast, a 7.5% reduction in enterprise value would imply an $800 million write-down, which is greater than Lehman's approximately $600 million cumulative write-down and therefore would indicate that Lehman's valuation was overstated by $200 million.[1762]

---

[1761] The actual reduction in the valuation through the end of the second quarter was $628 million.  Lehman, GREG Update (May 30, 2008), at p. 3 [LBEX-DOCID 1417258].  For presentation purposes, all figures in this analysis are rounded to the nearest hundred million dollars.

[1762] The implied undervaluation with a 5% decline in enterprise value and implied overvaluation with a 7.5% decline in enterprise value indicates Lehman's valuation assumed Archstone's enterprise value declined somewhere between 5% and 7.5%.  Lehman's own analysis shows their valuation assumed a 5.72% decline in enterprise value.  Lehman, Archstone Q2 2008 Update (June 12, 2008), at pp. 10-11 [LBEX-DOCID 2929329].

**Enterprise Value Sensitivity Analysis (Q2 2008)**

| | At Purchase ($ billions) | Reduction in Enterprise Value | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 5.0% | 7.5% | 10.0% | 12.5% | 15.0% | 17.5% | 20.0% | 22.5% | 25.0% | 27.5% |
| Initial Enterprise Value | 22.2 | 21.1 | 20.5 | 20.0 | 19.4 | 18.9 | 18.3 | 17.8 | 17.2 | 16.7 | 16.1 |
| Face Value of Debt | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 |
| Amount of Debt Covered | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 | 16.7 | 16.1 |
| Equity Value | 5.1 | 4.0 | 3.4 | 2.9 | 2.3 | 1.8 | 1.2 | 0.7 | 0.1 | - | - |
| Lehman's Equity Value | 2.4 | 1.9 | 1.6 | 1.3 | 1.1 | 0.8 | 0.6 | 0.3 | 0.0 | - | - |
| Implied Write-Down | | 0.5 | 0.8 | 1.0 | 1.3 | 1.6 | 1.8 | 2.1 | 2.3 | 2.6 | 2.9 |
| Write-Downs Taken through May 31 | | -0.6 | -0.6 | -0.6 | -0.6 | -0.6 | -0.6 | -0.6 | -0.6 | -0.6 | -0.6 |
| Incremental Write-Down Required | | (0.1) | 0.2 | 0.4 | 0.7 | 1.0 | 1.2 | 1.5 | 1.7 | 2.0 | 2.3 |

A memo written by Cyrus and Neighbor on May 16, 2008 stated that Archstone "had sold $289 million of core assets to date for a 4.77% cap rate."[1763] Cyrus and Neighbor explained that "[i]t should be noted that these assets, and more broadly the assets held for sale in general, are biased toward lower quality, lower growth assets and thus trade at a wider cap rate than the average Archstone asset. Also, the Company is marketing during unfavorable market conditions and is perceived as a distressed seller (based in part on unfair media commentary by the likes of Barron's), which is putting upward pressure on cap rates. We expect that once the initial marketing process has concluded, Archstone's short-term liquidity issues are resolved, and credit and asset sales markets improve throughout the year, cap rates will be lower on later sales."[1764] Cyrus and Neighbor also mentioned in this memo that the third party research firm

---

[1763] Memorandum from Keith Cyrus, Lehman, *et al.*, to Donald E. Petrow, Lehman, *et al.*, Archstone Update (May 16, 2008), at p. 3 [LBEX-DOCID 1416761].
[1764] *Id.*

Lehman referenced in the first quarter identified a 50 basis point increase in AvalonBay's capitalization rate since Lehman's May 22, 2007 analysis and an approximately 90 basis point increase over the going-in capitalization rate Lehman assigned to Archstone in its purchase price allocation.[1765]  A memo written by Tishman Speyer to the other investors during this quarter noted the "very difficult" environment, stated that the plan was to only accept "slightly lower prices if necessary" and committed "to do everything we can to close deals at reasonable prices without appearing desperate."[1766]  Tishman Speyer also noted that "we are in the midst of discussions with several potential buyers that appear to be promising."[1767]

### (ii)  Sum of the Parts

The Sum of the Parts analysis performed by the Examiner's financial advisor for the second quarter of 2008 is similar to the analysis performed for the first quarter.  This analysis was updated to reflect the additional write-downs that Lehman took during the second quarter.  As a result of the write-downs taken during the second quarter, and assuming the platform continued to be valued at $1 billion, Lehman's valuation as of the second quarter implied a going-in capitalization rate on the core portfolio that was closer to 4.5% than 4.25%, as shown in the table below.

---

[1765] *Id.*; Lehman, Discussion / Valuation Materials (May 21, 2007), at p. 8 [LBEX DOCID 1695375].

[1766] Memorandum from David Augarten, Tishman Speyer, *et al.*, to R. Scot Sellers, Archstone, *et al.*, Archstone Update (Mar. 24, 2008), at p. 1 [LBEX-DOCID 2932586].

[1767] *Id.*

**Going-In Capitalization Rate Sensitivity Analysis (Q2 2008)**

| Core Portfolio Cap Rate | 4.11% | 4.25% | 4.50% | 4.75% | 5.00% | 5.25% | 5.50% | 5.75% | 6.00% |
|---|---|---|---|---|---|---|---|---|---|
| Reduction in Total Equity Value | 0 | 596 | 1,551 | 2,406 | 3,175 | 3,871 | 4,504 | 5,081 | 5,611 |
| Reduction in Lehman's Equity (46.8%) | 0 | 279 | 726 | 1,126 | 1,486 | 1,812 | 2,108 | 2,378 | 2,626 |
| Write-Downs Taken by Lehman as of Q2 2008 | 637 | 637 | 637 | 637 | 637 | 637 | 637 | 637 | 637 |
| Incremental Write-Downs | (637) | (358) | 89 | 489 | 849 | 1,175 | 1,471 | 1,741 | 1,989 |

As discussed above, the average going-in capitalization rate for Archstone assets that were sold, under contract, or in negotiation during 2008 was approximately 5.00%. As illustrated in the table above, a going-in capitalization rate of 4.75% results in a $489 million incremental write-down, and a 5.0% going-in capitalization rate results in an $849 million incremental write-down.

A Lehman research report dated May 2008 published for publicly traded apartment REITs (which was circulated to Jonathan Cohen) noted an average going-in capitalization rate of 6.1% for the industry. AvalonBay had the lowest capitalization rate at 5.5%.[1768] Applying this 5.5% going-in capitalization to Archstone would support a $1.471 billion write-down.

### (iii) DCF Model

Lehman's DCF calculation in the second quarter considered various combinations of downward adjustments to the base case analysis. Lehman disclosed a

---

[1768] David Harris, Lehman, *et al.*, REITs Investor Briefing Package (May 14, 2008), at p. 45 [LBEX-DOCID 4329202], attached to e-mail from Donald E. Petrow, Lehman, to Jonathan Cohen, Lehman [LBEX-DOCID 4432688].

specific scenario on its second quarter earnings call: an increase in exit capitalization rates of over 100 basis points and no other adjustments to the base case.[1769] This is also a scenario set forth in the Q2 Book.[1770] However, the Q2 Book included other combinations of sensitivity scenarios that resulted in a similar valuation.[1771] In an e-mail to Hughson, Neighbor summarized some of these combinations, which included: a 75 basis point increase in the exit capitalization rate and 25 basis point decrease in rent growth rate; a 50 basis point increase in the exit capitalization rate and 75 basis point decrease in rent growth rate; and a 25 basis point increase in the exit capitalization rate and 125 basis point decrease in rent growth.[1772]

### (iv) Rent Growth

Lehman's base case rent growth assumption for assets held over the entire projection period was 5.62% per year and the resulting NOI growth rate was 7.95% per year, which is similar to Lehman's first quarter base case analysis. Therefore, the first quarter analysis performed by the Examiner's financial advisor is applicable to the second quarter as well.[1773] As was the case with the first quarter analysis, the

---

[1769] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter Earnings Call (June 16, 2008), at p. 14 [LBHI_FIN 00007].

[1770] Lehman, Archstone Q2 2008 Update (June 12, 2008), at p. 15 [LBEX-DOCID 2929329].

[1771] *Id.* at pp. 16-17.

[1772] E-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman (June 14, 2008) [LBEX-DOCID 1865693].

[1773] Cyrus recognized that the long-term rent growth rates were approximately 3 percentage points higher than projections made by third parties for apartments in similar markets and the NOI growth rates were significantly higher than Archstone's historical performance. E-mail from Keith Cyrus, Lehman, to Kevin Siebers, Tishman Speyer, et al. (Jan. 4, 2008) [TSREV00003176].

Examiner concludes that there is sufficient evidence to support a finding that Lehman's valuation for its Archstone bridge and permanent equity investment as of the end of the second quarter of 2008 was unreasonable. The largest rent growth decrease in Neighbor's e-mail to Hughson was 125 basis points. A sensitivity analysis prepared by Product Control that was presented to Lehman's CFO considered a decrease in the rent growth assumption of up to 200 basis points.[1774]

### (v) Exit Capitalization Rate

The base case exit capitalization rate was approximately 4.9%, which is similar to the base case analysis in the first quarter of 2008.[1775] Therefore, the observations made by the Examiner's financial advisor in its analysis of the first quarter are applicable to the second quarter as well. Similar to the Examiner's first quarter analysis, a significant increase in the exit capitalization assumption was warranted. Lehman recognized an increase was warranted, as evidenced by its decision to disclose the sensitivity analysis that assigned the largest possible increase in exit capitalization rates, of over 100 basis points.[1776] A sensitivity analysis prepared by Product Control that was presented to Lehman's CFO on May 27, 2008 considered a decrease in the exit capitalization assumption by 50 basis points, which was the same decrease Lehman used in its March

---

[1774] Lehman, Real Estate Product Control Update (May 27, 2008), at p. 115 [LBHI_SEC07940_2258765].

[1775] *Id.*

[1776] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter Earnings Call (June 16, 2008), at p. 14 [LBHI_FIN 00007]. By stressing only one assumption (exit capitalization rates), this analysis resulted in the largest possible reduction to exit capitalization rates that would result in Lehman's valuation. The inclusion of another variable to stress would reduce the ability to reduce the exit capitalization rate and still arrive at the same value.

2008 valuation.[1777]  As discussed in the Sum of the Parts subsection above, going-in capitalization rates were higher than the 4.1% used in the initial purchase price allocation, and Lehman's own valuation implied a going-in capitalization rate that was approaching 4.5%.  These indications are reflected in the Examiner's sensitivity analysis below.

### (vi) Quantification of Changes in Assumptions

The Examiner's financial advisor used Lehman's second quarter valuation model and created four scenarios for purposes of sensitivity analysis.  The first scenario analysis estimated an overvaluation of $183 million (see "Case 1" in the table below).  The assumptions in the subsequent scenarios were progressively more stringent and in the fourth scenario, estimated a potential overvaluation of $657 million.

---

[1777] Lehman, Real Estate Product Control Update (May 27, 2008), at p. 113 [LBHI_SEC07940_2258765]. The March valuation, which resulted in a $250 million write-down, included a 50 basis point increase in exit capitalization rates.  Lehman, Global Real Estate Product Control, Real Estate Americas Potential Write-downs (May 2008), at p. 80 [LBHI_SEC07940_2258765].

**DCF Method Sensitivity Analyses (Q2 2008)**

Numbers in Millions unless stated otherwise

| Assumptions | Case 1 | Case 2 | Case 3 | Case 4 |
|---|---|---|---|---|
| **Inputs** | | | | |
| Rental Growth Rate Decrease | 50 bps | 100 bps | 150 bps | 200 bps |
| Exit Cap Rate increase | 100 bps | 100 bps | 100 bps | 100 bps |
| IRR | 15.0% | 15.0% | 15.0% | 15.0% |
| | | | | |
| Total Funded Amount of the Equity | $2,388 | $2,388 | $2,388 | $2,388 |
| Lehman Reported Valuation for the Equity | $1,794 | $1,794 | $1,794 | $1,794 |
| Weighted Average Mark of the Equity | 75.1 | 75.1 | 75.1 | 75.1 |
| Write Down taken by Lehman within the Equity | $594 | $594 | $594 | $594 |
| | | | | |
| **Outputs** | | | | |
| Implied Valuation | $1,611 | $1,449 | $1,293 | $1,137 |
| Implied Mark | 67.5 | 60.7 | 54.2 | 47.6 |
| Implied Incremental Write-Down | $183 | $345 | $501 | $657 |

### (vii) Examiner's Findings and Conclusions as to the Reasonableness of Lehman's Archstone Valuation as of the End of the Second Quarter of 2008

As previously noted, because there were no meaningful amounts of sales of Archstone debt or equity positions during the quarter, and no meaningful benchmarks for Archstone equity positions in a private market context, Archstone equity was a SFAS 157 Level 3 asset.

The Examiner concludes that there is sufficient evidence to support a finding that Lehman's valuation of Archstone bridge equity as of the end of the second quarter of 2008 was unreasonable, for purposes of a solvency analysis. Recognizing that the valuation of such an illiquid investment requires the application of judgment to numerous factors and criteria, the Examiner concludes that the evidence supports a finding that Lehman's valuation of $1.805 billion for its Archstone bridge and

permanent equity investment was overvalued by $200 million to $500 million.[1778] Nevertheless, the Examiner does not find sufficient evidence to support the existence of a colorable claim for a breach of fiduciary duty in connection with Lehman's valuation of its Archstone positions.

The low end of the range implies a going-in capitalization rate on Archstone's core portfolio (assuming no decrease in value for Archstone's other assets) between 4.50% and 4.75%, which is lower than the average going-in capitalization rate of about 5.0% for the approximately $2 billion of actual sales closed in 2008 or under contract or in negotiation as of May 30, 2008. The low end of the range is consistent with a 7.5% decline in enterprise value since the Commitment Date, which is lower than the 11.6% decline for the approximate $2 billion of actual sales closed in 2008 or under contract or in negotiation as of May 30, 2008. Therefore, these assumptions give some credit to Lehman's argument that these sales were not indicative of the value for the remainder of the portfolio. The Examiner's financial advisor's analysis shows a $200 million incremental write-down is generally consistent with a DCF analysis in which the exit capitalization rate increased 100 basis points and the rent growth assumption decreased 50 basis points. The 100 basis point increase in exit capitalization rate is lower than the

---

[1778] Conclusion on a precise valuation amount would reflect false precision as valuing assets such as real estate properties and entities such as Archstone involves substantial judgment. Accordingly, Lehman when valuing Archstone took write-downs in round numbers (250 in March 2008, 100 in May, and 125 in August). The Examiner's estimations as to whether further write-downs or write-ups were required is done in similar fashion.

assumption Lehman publicly disclosed and is generally consistent with the increase in the average going-in capitalization rate for the approximately $2 billion of actual sales closed in 2008 or under contract or in negotiation as of May 30, 2008, and the actual capitalization rate for AvalonBay noted in Lehman's contemporaneous memo. The 50 basis point decrease in the rent growth assumption still results in rent growth rates above third-party projections for Archstone's markets and NOI growth rates that are significantly higher than Archstone's historical performance.

The high end of the range implies a going-in capitalization rate on Archstone's core portfolio (assuming no decrease in value for Archstone's other assets) of approximately 4.75%, which is lower than the average going-in capitalization rate of approximately 5.0% for the approximately $2 billion of actual sales closed in 2008 or under contract or in negotiation as of May 30, 2008. The high end of the range is consistent with an approximate 11% decline in enterprise value since the Commitment Date, which is generally consistent with the 11.6% decline for the approximate $2 billion of actual sales closed in 2008 or under contract or in negotiation as of May 30, 2008. The Examiner's financial advisor's analysis shows a $500 million incremental write-down is generally consistent with a DCF analysis in which the exit capitalization rate increased 100 basis points and the rent growth assumption decreased 150 basis points. The 100 basis point increase in exit capitalization rate is lower than the assumption Lehman publicly disclosed and is generally consistent with the increase in the average going-in

capitalization rate for the approximately $2 billion of actual sales closed in 2008 or were under contract or in negotiation as of May 30, 2008 and the actual capitalization rate for AvalonBay noted in Lehman's contemporaneous memo.  The 150 basis point decrease in the rent growth assumption still results in rent growth rates above third party projections for Archstone's markets and NOI growth rates that are significantly higher than Archstone's historical performance.

### (d)  Reasonableness as of the Third Quarter of 2008

Lehman determined that the value of its Archstone positions was $4.2 billion as of the end of the third quarter of 2008.[1779]  This valuation reflected a 15.7% discount from Lehman's original Archstone investment.[1780]

The reduction in Lehman's valuation between the second and third quarters of 2008 (88.0% of funded value to 84.3% of funded value) was primarily due to $125 million of valuation-related write-downs that were taken in August.[1781]  That write-down was based on a valuation model similar to that used for the second quarter

---

[1779] *See* Chart titled, "Lehman's Valuation of Archstone Positions (U.S. $ million, Oct 07 - Aug 08)" in the preceding Section of this Report, with data from Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113] and Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 18 [LBHI_SEC07940_ICP_002615].

[1780] *See* Chart titled "Archstone Marks by Month (Oct 07 - Aug 08)" in the preceding Section of this Report, with data from Lehman, Archstone Monthly Expenses as of July 08 (July 2008), at p. 1 [LBHI-BARFID 0013113] and Lehman, Top Global Real Estate Exposures (Aug. 31, 2008), at p. 18 [LBHI_SEC07940_ICP_002615].  The discount rate was computed by subtracting the total mark for November from 100 (*i.e.*, 100 – 84.3. = 15.7).

[1781] The total $125 million write-down comprised a permanent equity write-down of $15 million and a bridge equity write-down of $110 million.

valuation, with changes in the rent growth and exit capitalization rate assumptions resulting in a lower valuation.[1782]

The average variance between Archstone's sales prices (including sales under contract or in negotiation) and Lehman's budgeted values increased from approximately 12% in the second quarter to approximately 15% in the third quarter, as shown in the table below.[1783]  The Examiner's financial advisor obtained an Excel file[1784] that held the underlying data for different bids that Archstone appeared to have been entertaining.  This table had the same headers (Assets Under Contract and Deals in Negotiation) used in presentations to support the marks for Archstone's May 2008 valuation.[1785]  Data in the presentation allowed the Examiner's financial advisor to deduce that it was created between June 27, 2008 and June 30, 2008.[1786]

---

[1782] E-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman (Sept. 12, 2008) [LBEX-DOCID 2903130].

[1783] *Compare* Lehman, Archstone August 2008 Update (Sept. 19, 2008), at p. 7 [LBEX-DOCID 2903110] *with* Lehman, Archstone July 2008 Update (July 29, 2008), at p. 10 [LBHI_SEC_07940_ICP_ 008526].

[1784] Lehman, Archstone Update (July 1, 2008), at Bids tab [LBEX-DOCID 4320349], attached to e-mail from Webster Neighbor, Lehman, to Abebual Kebede, Lehman (July 1, 2008) [LBEX-DOCID 4377703].

[1785] Lehman, Archstone Q2 2008 Update (June 12, 2008), at p. 11 [LBEX-DOCID 2929329].

[1786] Per the July presentation, there had been assets sold on June 30, 2008; however, this file lists the last asset sale as June 27, 2008.  Lehman, Archstone Update (July 1, 2008), at Bids tab [LBEX-DOCID 4320349].  The Examiner's financial advisor noticed that there was an extra category titled "Evaluating Bids" listed in the spreadsheet, which implied that before deals were entered into the "Deals in Negotiation" header, they were first pruned as to be worthy of negotiations.  The Examiner's financial advisor observed that the Evaluating Bids appeared to be severely off budget (19.5%) compared to the Deals in Negotiation (14.5%) and Assets under Contract (7.2%).  The Examiner's financial advisor was not able to find the same spreadsheet for quarter end dates.

**Assets Sale Analysis from Third Quarter 2008**[1787]

| | $ in millions | | | Cap Rates | | |
|---|---|---|---|---|---|---|
| | Budgeted Value | Sale Value | 2008 NOI | Budget | Sales | Variance |
| Assets Sold in 2007 | 1,637 | 1,726 | 66 | 4.0% | 3.8% | 5.5% |
| Assets Sold in 2008 | 1,067 | 941 | 50 | 4.7% | 5.3% | -11.8% |
| Assets Sold | 2,704 | 2,668 | 116 | 4.3% | 4.4% | -1.3% |
| Assets Under Contract | 442 | 404 | 18 | 4.2% | 4.6% | -8.6% |
| ASN Walnut Creek Port. | 232 | 210 | 9 | 4.1% | 4.5% | -9.6% |
| Crystal City Port. | 809 | 680 | 32 | 4.0% | 4.7% | -15.9% |
| New York City Port. | 1,569 | 1,275 | 59 | 3.8% | 4.6% | -18.7% |
| Others | 167 | 152 | 8 | 4.5% | 4.9% | -8.9% |
| Deals in Negotiation | 2,777 | 2,317 | 108 | 3.9% | 4.7% | -16.6% |
| 2008 Deals - Sold, Under Contract and In Negotiation | 4,287 | 3,663 | 177 | 4.1% | 4.8% | -14.5% |
| 2008 Deals - Under Contract and In Negotiation | 3,220 | 2,722 | 127 | 3.9% | 4.7% | -15.5% |
| All Deals | 5,924 | 5,389 | 243 | 4.1% | 4.5% | -9.0% |

As was done for the second quarter 2008, the Examiner's financial advisor performed a sensitivity analysis to demonstrate the effect of a reduction in enterprise value on the required write-down as of the third quarter of 2008. The sensitivity analysis for the third quarter was updated with new information, but otherwise performed in the same manner as in the second quarter. As discussed above, the average asset sale in 2008 occurred at 15% below budgeted value. A 15% reduction in enterprise value results in an implied write-down of $1.6 billion. Lehman's cumulative write-downs through the third quarter were approximately $800 million. Therefore, this analysis suggests a potential overvaluation of $800 million.

---

[1787] Lehman, Archstone August 2008 Update (Sept. 19, 2008), at p. 7 [LBEX-DOCID 2903110].

## (i)  Sum of the Parts

The Examiner's financial advisor's Sum of the Parts analysis for the third quarter of 2008 is similar to the analysis that was performed for the second quarter of 2008. This analysis was updated by the Examiner's financial advisor to reflect the additional write-downs that Lehman took during the third quarter.   See the table below for this analysis.   Assuming the platform continued to be valued at $1 billion, Lehman's valuation as of the third quarter implied a going-in capitalization rate on the core portfolio that was closer to 4.5% than 4.75%, as shown in the table below.

**Going-In Capitalization Rate Sensitivity Analysis (Q3 2008)**

| Core Portfolio Cap Rate | 4.11% | 4.25% | 4.50% | 4.75% | 5.00% | 5.25% | 5.50% | 5.75% | 6.00% |
|---|---|---|---|---|---|---|---|---|---|
| Reduction in Total Equity Value | 0 | 596 | 1,551 | 2,406 | 3,175 | 3,871 | 4,504 | 5,081 | 5,611 |
| Reduction in Lehman's Equity (46.8%) | 0 | 279 | 726 | 1,127 | 1,487 | 1,813 | 2,109 | 2,379 | 2,627 |
| Write-Downs Taken by Lehman as of Q3 2008 | 783 | 783 | 783 | 783 | 783 | 783 | 783 | 783 | 783 |
| Incremental Write-Downs | (783) | (504) | (57) | 344 | 704 | 1,030 | 1,326 | 1,596 | 1,844 |

As discussed above, the average going-in capitalization rate for Archstone assets that were sold, under contract, or in negotiation during 2008 was between 4.7% and 4.8%.   As shown in the chart above, a going-in capitalization rate of 4.75% results in a $344 million incremental write-down and a 5.0% going-in capitalization rate results in a $704 million incremental write-down.   The average sales capitalization rate declined between second and third quarter in part because a deal on a New York property was under negotiation at a 4.6% capitalization rate.   Hughson told the Examiner that these

were the "good assets" that separated Archstone from AvalonBay.[1788]  However it is also important to note that it was precisely this deal that increased the overall variance to budget (*i.e.*, it had a relatively low capitalization rate and a relatively high variance between sales price and Lehman's budgeted value).

### Examiner's Financial Advisor's Sensitivity Analysis

| | At Purchase | Reduction in Enterprise Value ($ in billions) | | | | | | |
| | | 5.0% | 7.5% | 10.0% | 12.5% | 15.0% | 17.5% | 20.0% |
|---|---|---|---|---|---|---|---|---|
| Initial Enterprise Value | 22.2 | 21.1 | 20.5 | 20.0 | 19.4 | 18.9 | 18.3 | 17.8 |
| Face Value of Debt | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 | 17.1 |
| Equity Value | 5.1 | 4.0 | 3.4 | 2.9 | 2.3 | 1.8 | 1.2 | 0.7 |
| Lehman's Equity | 2.4 | 1.9 | 1.6 | 1.3 | 1.1 | 0.8 | 0.6 | 0.3 |
| Implied Write-Down | | (0.5) | (0.8) | (1.0) | (1.3) | (1.6) | (1.8) | (2.1) |
| Write-Downs Taken through Aug 31 | | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |
| Incremental Write-Down Required | | 0.3 | 0.0 | (0.3) | (0.5) | (0.8) | (1.0) | (1.3) |

### (ii)  DCF Method

The Examiner's financial advisor's DCF Method analysis for the third quarter 2008 is similar to the analysis that was performed for the second quarter 2008.  As discussed above, the Examiner's analysis of the DCF Method focused on two assumptions: rent growth and exit capitalization rates.  This Section addresses the Examiner's financial advisor's analysis of the assumptions used in Lehman's valuation for third quarter 2008.

---

[1788] Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 11.

The DCF valuation for the third quarter was based on a similar valuation model Lehman used for its second quarter valuation, though during the third quarter the rent growth was reduced to 4.90% and the exit capitalization rate was increased to 5.57%.[1789] The DCF valuation for the third quarter was lower than the DCF valuation for the second quarter due to these changes in assumptions.[1790]

### (iii) Rent Growth

During the third quarter 2008, Lehman recognized that Archstone's growth rates had declined, and Lehman adjusted its projections downward.[1791] However, it appears this was work was not completed by the end of the third quarter 2008.[1792] To counter this, Lehman ran the DCF model with a rental revenue CAGR of 4.90%, a more conservative assumption than previously used.[1793]

---

[1789] E-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman (Sept. 12, 2008) [LBEX-DOCID 2903130].

[1790] Lehman, Easy Living Corporate Q3 Model (Aug. 22, 2008) [LBEX-DOCID 3119444].

[1791] Lehman ran the model at a CAGR of 4.9%, which was a 74 basis points reduction from the base case. E-mail from Webster Neighbor, Lehman, to Paul Hughson, Lehman (Sept. 12, 2008) [LBEX-DOCID 2903130].

[1792] The projections within the third quarter model, Lehman, Easy Living Corporate Q3 Model (Aug. 22, 2008), at Full Rollup tab [LBEX-DOCID 3119444], were the same ones as those in the second quarter model, Lehman, Easy Living Q2 Model Risk (June 15, 2008), at Full Rollup tab [LBEX-DOCID 4456413]. There was difference in the cash-flows that was driven by more assets having been sold by the end of the third quarter.

[1793] E-mail from Webster Neighbor, Lehman, to Paul Hughson, Lehman, (Sept. 12, 2008) [LBEX-DOCID 2903130].

## (iv) Exit Capitalization Rate

The base case exit capitalization rate was approximately 5.57%, which is 75 basis points higher than the base case analysis as of the second quarter of 2008,[1794] but over 25 basis points below what Lowitt cited as the over 100 basis points increase on the second quarter earnings call.[1795]

The observations made by the Examiner's financial advisor in its analysis of the first and second quarter (*i.e.*, that there is a correlation between going-in and exit capitalization rates, and going-in capitalization rates were increasing) apply to the third quarter as well. The Examiner's financial advisor increased the exit capitalization assumption in its third quarter analysis less than in its first and second quarter analysis since Lehman had recognized the need for an upward adjustment and increased the base case exit capitalization rate by 75 basis points.[1796] The Examiner's financial advisor made a further increase to this rate because Lehman's asset prices were increasing in their variances from the budget and it became more readily apparent that going-in capitalization rates were increasing.[1797] As discussed in the asset sales section above, third quarter going-in capitalization rates were 65-90 basis points higher than the 4.1%

---

[1794] Lehman, Archstone Sensitivity Analysis — 08-22-08 (Sept. 12, 2008) [LBEX-DOCID 2852318], *attached to* e-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman (Sept. 12, 2008) [LBEX-DOCID 2903130].

[1795] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter Earnings Call (June 16, 2008), at p. 14 [LBHI_FIN 00007].

[1796] Lehman, Archstone Sensitivity Analysis — 08-22-08 (Sept. 12, 2008) [LBEX-DOCID 2852318], attached to e-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman (Sept. 12, 2008) [LBEX-DOCID 2903130].

[1797] *See* Section III.A.2.f.4.b for a discussion of the Sum of the Parts valuation method.

used in the initial purchase price allocation, and Archstone's own sales implied a going-in capitalization rate approaching 4.8%. The sensitivity analysis below accounts for these indications by flexing the exit capitalization rate assumption from 5.82% to 6.07%.

### (v)  Quantification of Changes in Assumptions

An e-mail exchange between Webster Neighbor and Alex Kirk details the model Lehman used to value Archstone in the third quarter.[1798] The base case in this model assumed a flexed case of 5.57% for the exit capitalization rate and 4.90% for the rent CAGR.  The Examiner's financial advisor created four different cases in the model stressing each of these two assumptions. In the first case the Examiner's financial advisor assumed that the rental growth assumption was that of the base case that Lehman used (4.90%) and that the exit capitalization rate was 1.0% higher than at closing.  Applying the same rental growth rate assumption Lehman used in the third quarter, the Examiner's financial advisor's stress of the exit cap rate raised it to the rate Lowitt cited in the second quarter earnings call (albeit at a lower rental growth rate). The second case maintained the same exit cap rate but further stressed the rental growth rate by 75 basis points, bringing the rental revenue CAGR to 4.15%.  The third case also maintained the same exit cap rate but further stressed the rental growth rate by an additional 75 basis points, bringing the rental revenue CAGR to 3.90%.  In the last case, the Examiner's financial advisor ran the model at a CAGR of 3.40%.

---

[1798] Lehman, Easy Living Corporate Q3 Model (Aug. 22, 2008), at Full Rollup tab [LBEX-DOCID 3119444].

**DCF Method Sensitivity Analyses (Q3 2008)**

Numbers in Millions unless stated otherwise

| Assumptions | Case 1 | Case 2 | Case 3 | Case 4 |
|---|---|---|---|---|
| **Inputs** | | | | |
| Rental Growth Rate Decrease (from 72 bps) | 0 bps | 75 bps | 100 bps | 125 bps |
| Exit Cap Rate increase (from 75 bps) | 25 bps | 25 bps | 25 bps | 50 bps |
| IRR | 15.0% | 15.0% | 15.0% | 15.0% |
| | | | | |
| Total Funded Amount of the Equity | $2,388 | $2,388 | $2,388 | $2,388 |
| Lehman Reported Valuation for the Equity | $1,647 | $1,647 | $1,647 | $1,647 |
| Weighted Average Mark of the Equity | 69.0 | 69.0 | 69.0 | 69.0 |
| Write Down taken by Lehman within the Equity | $741 | $741 | $741 | $741 |
| | | | | |
| **Outputs** | | | | |
| Implied Valuation | $1,507 | $1,265 | $1,187 | $992 |
| Implied Mark | 63.1 | 53.0 | 49.7 | 41.6 |
| Implied Incremental Write-Down | $140 | $382 | $460 | $655 |

## (vi) Examiner's Findings and Conclusions as to the Reasonableness of Lehman's Archstone Valuation as of the End of the Third Quarter of 2008

As noted earlier, Archstone equity was a SFAS 157 Level 3 asset whose valuation is entitled to a significant amount of judgment. For the reasons set forth above, the Examiner's financial advisor concluded that there is sufficient evidence to support a finding, for purposes of a solvency analysis, that Lehman's valuation for its Archstone bridge equity investment as of the end of the third quarter of 2008 was unreasonable. Recognizing that the valuation of such an illiquid investment requires the application of judgment to numerous factors and criteria, the Examiner concludes that the evidence supports a finding that Lehman's valuation of $1.647 billion for its Archstone bridge and permanent equity investment was overvalued by $140 million to $400 million.

The low end of the range implies a decline in enterprise value of between 7.5% and 10.0% since the acquisition. This decline is less than the decline in value of

Archstone assets under contract or in negotiation at this time; therefore the low end of the range assumes there is some merit to Lehman's argument that asset sales were not indicative of the value for the remainder of the portfolio. The Examiner's financial advisor's analysis shows a $140 million overvaluation based on a DCF analysis using the following assumptions: a 25 basis points increase in exit capitalization rate and a zero basis point decrease in rent growth (which results in rent growth that is significantly higher than third-party projections for Archstone's markets and a NOI growth rate of 7.0%, which is significantly higher than Archstone's historical average). The Examiner's financial advisor used Lehman's base case figure for the rent growth but stressed the exit capitalization rate an extra 25 basis points from Lehman's base case. The resulting exit capitalization rate is the same as the exit capitalization rate used in the second quarter analysis.

The high end of the range implies a decline in enterprise value since the acquisition of 12.5%. A 12.5% decline is still below the decline in value for Archstone assets under contract or in negotiation at this time. The Examiner's financial advisor's analysis shows a $382 million overvaluation based on a DCF analysis making the following assumptions: a 75 basis point decrease in rent growth and a 25 basis points increase in exit capitalization rate. The Examiner's financial advisor stressed the exit capitalization rate to 6.07% based on the implied going-in capitalization rate of 5.37%. This capitalization rate is below the 5.5% that was cited as the appropriate capitalization

rate for AvalonBay in the research report published by Lehman on May 14, 2008.[1799]  The

rental growth CAGR assumed by a 75 basis point decline is 4.15% while the implied

NOI CAGR is 6.1%.  The NOI CAGR is significantly higher than what Archstone was

able to achieve historically while the rent CAGR is slightly higher than Archstone's 10

year historical average.

### g)  Examiner's Analysis of the Valuation of Lehman's Residential Whole Loans Portfolio

This Section of the Report addresses Lehman's valuation of Residential Whole

Loans ("RWLs") and Residential Mortgage-Backed Securities ("RMBS") during the

second and third quarters of 2008.  RWLs, the valuation of which presents the greater

challenge of the two, are addressed first and in greater detail.  The comparatively

straight-forward valuation of RMBS follows.  While this Report notes several issues

with Lehman's price testing of its RWL portfolio, insufficient evidence exists to support

a colorable claim that Lehman's valuation of these assets was unreasonable.  Likewise,

there is insufficient evidence to support a colorable claim that Lehman's valuation of its

RMBS portfolio was unreasonable.

### (1)  Residential Whole Loans Overview

RWLs are residential mortgages from around the world that can be traded and

pooled as the first stage in the securitization process, the goal of which is the creation of

---

[1799] David Harris, Lehman, *et al.*, REITs Investor Briefing Package (May 14, 2008), at p. 45 [LBEX-DOCID 4329202], *attached to* e-mail from Donald E. Petrow, Lehman, to Jonathan Cohen, Lehman [LBEX-DOCID 4432688].

RMBS.[1800]   A sponsor of a RMBS transaction such as Lehman first acquires the underlying RWLs, which are pooled together in the securitization process.  Such pools are generally homogenous in some respects (*e.g.,* in terms of quality of loans and vintage) and are geographically diversified in order to mitigate the risk of loss due to a regional decline in home prices.  Once the pool size reaches its target, the sponsor prepares the legal documentation to sell the pool to a special purpose entity (the "SPE"), proposes a division of the interest and principal payment priorities into bonds that are "tranched," obtains a rating from a rating agency for the applicable bonds, and then sells the bonds, also known as RMBS, to investors.  The purchase money that investors pay to the SPE enables the SPE to purchase the RWL pool from the issuer.

As a predicate to securitization, RWLs are created by loan originators that approve mortgages and lend directly to homeowners.  Government entities, such as Fannie Mae and Freddie Mac, financial firms such as Lehman and other investors buy the pooled mortgages from the originators.  These investors may hold whole loan pools as investments, sell them to other investors or create securities by "carving up" the pools and selling the securities.  This last option is the domain of investment banks such

---

[1800] *See* Peter J. Elmer, *Conduits: Their Structure and Risk,* F.D.I.C. Banking Rev., Dec. 1999, at pp. 27, 32-33. The creation of RMBS is described in greater detail below.

as Lehman. Typically, investment banks securitize or sell RWLs and do not purchase RWLs for the purpose of owning them as investments for an extended period.[1801]

As of May 31, 2008, Lehman reported that it owned RWLs with an aggregate market value of approximately $8.3 billion, as consolidated across subsidiaries.[1802] For valuation purposes, Lehman assigned RWLs to one of several categories that were organized by geographic origin and the type of mortgage loan. The geographic distribution of the RWL assets held by Lehman in May and August of 2008 was as follows:

| Origin/Class | Total Value (in $ billions)[1803] | |
|---|---|---|
| | May 2008 | Aug 2008 |
| U.S. Prime / Alt-A | 2.1 | 1.2 |
| U.S. Subprime / Second Lien | 1.1 | 0.6 |
| Other U.S. | 1.0 | 0.9 |
| Europe | 3.6 | 3.1 |
| Asia Pacific | 0.5 | 0.5 |
| Total | 8.3 | 6.3 |

This Section of the Report examines whether Lehman's valuation of its RWL assets, as determined by Lehman in May and August of 2008, was reasonable.[1804] The

---

[1801] *Id.* at pp. 31-32 (stating that most loans held by conduits are newly originated and may be held for "several months" awaiting securitization).

[1802] LBHI 10-Q (filed July 10, 2008), at p. 69.

[1803] *Id.* at pp. 69-70; Lehman, Q3 Residential Template w_Elq (v83).xls [LBEX-BARFID 0011867]. August data at this level of detail was not publicly disclosed prior to bankruptcy.

[1804] The Examiner has focused on the dates May 31, 2008 and August 31, 2008 because these dates were the ends of Lehman's second and third quarter reporting periods. While Lehman did not actually file a

Examiner's investigation has revealed that Lehman's product control process for RWLs was not particularly robust and that there was some risk of misstatement in this asset class. While certain of the sources Lehman used in price testing its U.S. RWL portfolio in May and August of 2008 proved ultimately unreliable, the asset values arrived at by Lehman did not fall outside a range of reasonableness. Accordingly, the Examiner does not find evidence to support a finding that Lehman's valuation of its U.S. RWL portfolio in May or August of 2008 was unreasonable. In light of this conclusion, and given the expense to the Debtors' estates and the time that would be required for the Examiner to conduct an investigation of the reasonableness of Lehman's valuation of its non-U.S. RWLs, the Examiner determined that conducting such an investigation would not be a prudent use of the estates' resources and therefore limited the investigation to the reasonableness of the valuation of U.S. RWLs.

### (2) Lehman's U.S. Residential Whole Loans in 2008

Lehman divided U.S. RWLs into 10 different categories based on the nature of the underlying mortgage loan.[1805] The table below lists these 10 categories, along with the May 2008 market value of all of Lehman's U.S. assets in that category.[1806]

---

quarterly report for the third quarter of 2008, it did collect prices from its trading desk and perform price testing of its U.S. RWLs for this period.

[1805] *See* Lehman, New 05-30-08 WL Testing.xls, tab "WL Testing Summary" [LBEX-BARFID 0006698]. The categories of loans labeled "Capital Crossing" and "SBF" are not included in this analysis because they are not residential loans. The amounts reported in LBHI's Quarterly Report for the second quarter of 2008 vary slightly with the amounts in the testing files reviewed. Explanations for this variance include the possibility that the testing files included minimal amounts of non-US assets or that Lehman's 10-Q numbers included some hedge positions.

**Categories of U.S. RWLs Held by Lehman as of May 31, 2008 and August, 31, 2008**[1807]

| Collateral Type | Market Value (in $ billions) | |
| --- | --- | --- |
| | May 08 | Aug 08 |
| FHA/VA | 0.27 | 0.12 |
| High LTV | 0.02 | 0.02 |
| Home Express | 0.00 | 0.00 |
| Neg Am | 0.24 | 0.19 |
| Prime Fixed | 0.49 | 0.33 |
| Prime Hybrid ARMs | 1.36 | 0.66 |
| Reverse Mortgages | 0.62 | 0.65 |
| Scratch & Dent | 0.39 | 0.23 |
| Subprime | 0.16 | 0.11 |
| Subprime 2nds | 0.89 | 0.50 |
| Total | 4.44 | 2.80 |

Lehman also divided each of the 10 categories listed above into "performing" and "non-performing" groups, distinguished by whether the loans were still producing timely interest and principal payments. Because loans in the "reverse mortgages" category cannot be non-performing,[1808] Lehman recognized 19 unique categories of U.S. RWLs for pricing purposes in May and August of 2008.

---

[1806] Lehman had distinct Product Control groups for its U.S. and European divisions and there was little communication and no standardization between U.S. and European entities. Examiner's Interview of Brian Sciacca, Oct. 19, 2009, at p. 4.

[1807] Lehman, New 05-30-08 WL Testing.xls, tab "WL Testing Summary" [LBEX-BARFID 0006698]; Lehman, Pricing Package Aug 08.xls (Aug. 29, 2008), tab "Whole Loans" [LBEX-BARFID 0006669].

[1808] In a reverse mortgage, a homeowner borrows against the equity in their home. Unlike in a traditional home equity loan, no repayment is required until the borrower no longer uses the home as their principal residence. Usually marketed to seniors, the loan is repaid with interest and fees when the home is sold by the borrower or the borrower's estate. *See* U.S. Dep't of Hous. and Urban Dev., Top Ten Things to Know if You're Interested in a Reverse Mortgage, Feb. 20, 2009, *available at* http://www.nls.gov/offices/hsg/sfh/hecm/rmtopten.cfm (last visited Feb. 3, 2010).

Despite the relationship between RWLs and RMBS, valuation of RWLs is more difficult than the valuation of RMBS. In comparison to RMBS, the number of identifiable trades of RWL pools establishing typical price and yield ranges is relatively small.[1809] The total value for which RMBS are sold is typically greater than the value of the RWL pool on which they are based due to the value added during the securitization process and the business model of the investment bank.[1810] Additionally, the value of RWL pools is largely dependent on the anticipated opportunity to securitize the assets in the near-term and a robust secondary market for RMBS. Without a functioning market, estimating the value of RWL pools awaiting securitization becomes more difficult. Accordingly, there is less certainty as to the market price of RWL assets held on Lehman's books during 2008 than for such assets during prior periods when the RMBS market was more robust.

In 2008, the pace of new securitizations slowed significantly.[1811] Fewer loans were being made to homeowners,[1812] there was very little trading of RWLs between

---

[1809] This is a direct result of the fact that securitization improves liquidity. Since the securitization of RWL pools into RMBS transactions enhances liquidity, it follows that the number of identifiable RWL trades would be small in comparison to RMBS. *See* Peter J. Elmer, *Conduits: Their Structure and Risk*, F.D.I.C. Banking Rev., Dec. 1999, at pp. 27, 32.

[1810] When the securitization market is functioning, an investment bank will bid for a whole loan pool based on the expected sale proceeds of the securities it will create, the expenses (such as rating agency and legal fees and marketing costs) it will incur, and the desired fees (typically 1-2% of the transaction size). Accordingly, the total RMBS value will exceed the RWL value in a functioning market. Lehman Brothers Holdings Inc., Overview of Securitization [LBEX-BARFID 0012513].

[1811] Examiner's Interview of Joseph Sapia, Oct. 26, 2009, at p. 2; Securities Industry and Financial Markets Association, Mortgage-Related Issuance, (1996 - June 2009), *available at* http://www.sifma.org/research/pdf/Mortgage_Related_Issuance.pdf (last visited Feb. 3, 2010) (showing issuance of non-agency

market participants[1813] and several mortgage originators filed for bankruptcy.[1814]   One result of the significant decline of securitization activity was that it made the pricing of RWL assets extremely difficult.  In May of 2008, Lehman acknowledged internally that "price transparency does not exist for whole loans."[1815]

During the second quarter of 2008, the value of Lehman's U.S. RWL portfolio fell by approximately $2.5 billion — from $6.6 billion to $4.1 billion — due to a mix of write-downs and sales.[1816]   Of this decline of approximately $2.5 billion, approximately $750 million was due to write-downs.[1817]   During this time, the combined gross write-down of both RMBS and U.S. RWLs was $2.4 billion.[1818]   During the third quarter of 2008, the value of Lehman's U.S. RWL portfolio fell by approximately $1.4 billion — from $4.1

mortgage-backed securities fell from approximately $774 billion in 2007 to $41 billion in 2008); Luo Jun, *Credit Crisis Will Extend Into 2009, Oppenheimer Says (Update 1)*, Bloomberg.com, May 20, 2008, *available at* http://www.bloomberg.com/apps/news?pid=20601087&sid=aAMUjyxli6Lc  (noting the "shut down in the securitization market").

[1812] Mortgage Bankers Association, Mortgage Origination Estimates, Oct. 16, 2009, http://www.mbaa.org/files/Research/HistoricalWAS/HistoricalMortgageOriginationEstimates101609.xls  (providing estimates of quarterly mortgage originations).

[1813] W. Joseph Caton, *Will the Loan Trade Market Finally Open Up?*, National Real Estate Investor, Jun. 1, 2008, http://nreionline.com/commentary/finance/real_estate_loan_trade_market_0601  (describing a "virtual standoff in the real estate loan investment and trading marketplace").

[1814] *See* Worth Civils & Mark Gongloff, *Subprime Shakeout*, Wall St. J. Online, http://online.wsj.com/public/resources/documents/info-subprimeloans0706-sort.html  (listing bankruptcy filings of mortgage originators in late 2007).

[1815] Lehman, Pricing Package May 08.xls (May 2008), at p. 1 [LBEX-BARFID 0006591].

[1816] Lehman, Q2 08 High Level Mortgage Roll Forward(v2).xls [LBEX-BARFID 0011863].

[1817] *Id.*

[1818] Lehman, Q3 2008 Financial Review (Sept. 6, 2008), at p. 22 [LBHI_SEC 07940_744701].

billion to $2.7 billion — due to a mix of write-downs and sales.[1819]  Of this decline of approximately $1.4 billion, approximately $840 million was due to write-downs.[1820]  The write-downs Lehman took on these assets throughout the year reflect its recognition of the changed market conditions of 2008 and an acknowledgment of the diminished value of its U.S. RWL and RMBS assets.

### (3)  Lehman's Valuation Process for its Residential Whole Loans

The asset values Lehman reported on its balance sheet for RWLs were the marks reported by its traders, which were subject to revision pursuant to the price testing process described below.[1821]  Each Lehman trading desk had its own method for pricing assets and there was little consistency across desks as to methodology.[1822]  In order to provide a check on the traders' marks, and to provide some standardization, Lehman's Product Control Group performed an independent price verification of U.S. RWL assets on a monthly basis, with special emphasis placed on price verification at the end of each fiscal quarter.[1823]  While the trading desks marked individual RWL assets, meaning that RWLs within a single category could be assigned different marks, the Product Control

---

[1819] See LBHI 10-Q (filed July 10, 2008) at p. 69; Lehman, Pricing Package Aug 08.xls (Aug. 29, 2008), tab "Whole Loans" [LBEX-BARFID 0006669]; Lehman, Q3 Residential Template w_Elq (v83).xls [LBEX-BARFID 0011867].

[1820] Lehman, Q3 Residential Template w_Elq (v83).xls [LBEX-BARFID 0011867].

[1821] Examiner's Interview of Usman Babar, October 16, 2009, at pp. 3-5.

[1822] Id.

[1823] Lehman, Price Verification Policy Global Capital Markets 2008 [Draft], at pp. 4, 49-54 [LBHI_SEC07940_2965994].  While the task of price verification was assigned to the Valuation Control group, Lehman documents, as well as E&Y documents, refer to the "Product Control" group and "product controllers" when describing this function.  For ease of reference and consistency, the terms "Product Control" and "product controllers" are used throughout this Section.

Group's price testing assigned a single mark to each of the 19 categories of U.S. RWLs identified above.[1824]  As described below, the Product Control Group relied on several different methods to value RWL assets depending on the current market conditions and data available.  When the variances between the Product Control Group's price verification and the desk price for a particular asset exceeded certain tolerances,[1825] the Product Control Group would seek to resolve the variance through conversation with the appropriate trading desk and would escalate material unresolved variances to senior management.[1826]  The Product Control Group also prepared summaries of its findings and procedures that were distributed to Lehman's senior management on a monthly basis.[1827]

Prior to 2008, Lehman's Product Control Group used a "mock securitization" model to value its U.S. RWL assets.[1828]  The mock securitization approach is based on the

---

[1824] Lehman, New 05-30-08 WL Testing.xls, tab "WL Testing Summary" [LBEX-BARFID 0006698].  When this report notes a single Lehman "desk price" for a category of RWLs, that number is the weighted average of the prices assigned by the trading desk.  The range of prices reported by Lehman's traders are often extremely large.  For Prime Hybrid ARMs in May of 2008, for example, traders reported a low price of 0.1 and a maximum price of 110.9.  Six of the ten categories of performing RWLs as defined by Lehman showed ranges of essentially 1 to 100.  See Appendix 16, Valuation - Residential Whole Loans, for a more detailed discussion of the range of desk prices assigned to each category of RWLs.

[1825] The tolerance level for RWLs was set at 3%, although in some unspecified instances higher variances would be deemed acceptable.  Lehman, Price Verification Policy Global Capital Markets 2008  [Draft], at p. 53 [LBHI_SEC07940_2965994].

[1826] Id. at p. 54.

[1827] Id. at p. 4.  See, e.g., Lehman, Valuation & Control Report - Fixed Income Division (Feb. 2008), at pp. 3-5 [LBEX-WGM 002234].

[1828] Lehman, Price Verification Policy Global Capital Markets 2008 [Draft], at p. 49, [LBHI_SEC07940_2966042].  The product controllers also relied to a limited extent on sales data, but the primary source for their price testing was mock securitization.  See Lehman Brothers Holdings Inc., "Prime Hybrid Arms.xls" [LBEX-BARFID 0011869].

theory that the value of a pool of RWLs is closely related to the price that could be realized by selling the RMBS created if the pool were to be securitized.[1829]  Using this approach, a recently closed deal with similar underlying collateral — meaning the underlying loans had similar anticipated default rates, recovery rates and rates of prepayment — is selected as a point of reference.  The sum total of the values of all RMBS issued in such a deal is considered to be representative of the price of the RWL pool on which it is based.  As indicated previously, the RWL pool will have a somewhat lower value than the total of all the RMBS created by the pool in functioning markets and this difference is estimated in order to determine the value of RWLs by mock securitization.

The valuation of RWLs became more difficult in 2008 as securitization of residential mortgages slowed significantly.[1830]  Potential buyers of a RWL pool were no longer able to rely on near-term securitization of the pool.  In addition, the slowing pace of securitizations meant that there were fewer potential buyers for RWL pools in 2008, because buyers whose goal was securitization rather than investment diminished in number.  Because of this change in market conditions, in May 2008 Lehman concluded that the mock securitization model was no longer a valid method for valuing its U.S.

---

[1829] E&Y Walkthrough Template, Residential Whole Loans, at p. 5 [EY-LE-LBHI-MC-GAMX-08-072872] (describing mock securitization methodology); Examiner's Interview of Usman Babar, October 16, 2009, at p. 4.

[1830] Examiner's Interview of Joseph Sapia, Oct. 26, 2009, at p. 2.

RWL assets.[1831]  Instead, Lehman decided to rely solely on recent sales data and prices reported by third-party sources as benchmarks for price verification.[1832]

### (a) Lehman's May 2008 Price Testing

Lehman's Product Control Group price tested its entire U.S. RWL portfolio for the second quarter of 2008.[1833]  In price testing assets using recent trade activity, it is important that the recent transactions used as benchmarks involve the same general type of assets as the Lehman assets being valued, and that the trades be close in time to the relevant reporting date.  Furthermore, a greater number of benchmark sales would allow a higher level of confidence in the estimated price of the assets being valued.  However, Lehman had very little relevant trade data to provide benchmark values for its U.S. RWL assets in May and August 2008.  Lehman Product Control records demonstrate that Lehman's Product Control Group identified only seven trades upon which to rely in price testing its U.S. RWL assets for its second quarter reporting.[1834]

The Examiner reviewed the May 2008 price testing records related to all 19 categories of Lehman's U.S. RWL portfolio, ten performing and 9 non-performing.[1835] For five of the 10 performing categories, Lehman's Product Control Group used only

---

[1831] E&Y Walkthrough Template, Residential Whole Loans, at p. 4 [EY-LE-LBHI-MC-GAMX-08-072872].

[1832] *Id.*; Lehman, Valuation Review - 2nd Quarter 2008 (July 2008), at pp. 8-10, [LBHI_SEC07940_750105].

[1833] Lehman, Valuation Review - 2nd quarter 2008 (July 2008), at pp. 8-10, [LBHI_SEC07940_750105].

[1834] Examiner's Interview of Joseph Sapia, Oct. 26, 2009, at p. 2; Lehman, Whole Loan Closings (June 4, 2008), at pp. 1-2 [LBEX-BARFID 0006588]; Lehman, New 05-30-08 WL Testing.xls, at tab "WL Testing Summary" [LBEX-BARFID 0006698].

[1835] Lehman, New 05-30-08 WL Testing.xls, tab "WL Testing Summary" [LBEX-BARFID 0006698].

recent trade activity for price verification.[1836]  Together, these five categories account for $1.7 billion of Lehman's reported U.S. RWL asset value in May 2008.  One of the categories, Federal Housing Administration ("FHA") / Veterans' Administration ("VA") loans, was backed by an FHA guarantee, making its valuation relatively straightforward.[1837]  Another, the Reverse Mortgage category, was priced using a recent sale to the Government National Mortgage Association ("Ginnie Mae"), a strong basis for the mark given.[1838]

However, the other three categories of performing loans valued by reference to recent sales are more problematic.  Many of the trades Lehman used as benchmarks in price testing its U.S. RWL portfolio in May 2008 failed to close and eventually were cancelled, albeit after Lehman relied upon the trades as benchmarks.  In hindsight, it is apparent that the failed trades did not accurately indicate the value of the assets at issue because no assets actually traded at the prices reflected by the trade data reviewed by Lehman's product controllers.  Although it would be unreasonable for Lehman's Product Control Group to rely on trades they knew would be cancelled, the Examiner has not found evidence that the Product Control Group should have known, at the time it performed second quarter 2008 price testing, that the trades used would eventually be cancelled.  The table below provides a list of the then-recent trades used by Lehman to

---

[1836] *Id.*

[1837] *Id.*

[1838] *Id.*

price test its RWL portfolio in May 2008 and the subsequent settlement status of the trades.

**Benchmark Trades Used By Lehman Product Control In May of 2008**[1839]

| Category | Benchmark Trade | Value of Assets Traded ($million) | Price | Settlement / Cancellation |
|---|---|---|---|---|
| High LTV Prime Fixed | Fannie Mae Vertical Mortgage | 56.0 87.5 | 94.7 86.0 | Undetermined Cancelled on 7/1/08 |
| Prime Hybrid ARMs | Chevy Chase Bank | 37.0 | 96.0 | Cancelled on 8/5/08 |
| Reverse Mortgages | Ginnie Mae | 33.0 | 100.8 | Undetermined |
| Scratch & Dent | RLT | 11.0 | 65.0 | Securitization closed on 5/31/08 |
| Subprime | Arch Bay | 105.0 | 65.0 | Not Entered in Trade System |
| Subprime Seconds | Great Western Bank | 11.0 | 65.0 | Cancelled on 6/16/08 |

At the time they valued Lehman's U.S. RWL assets in May 2008, Lehman's product controllers relied on the limited number of trades they were able to identify as the best available information. A review of Lehman's trade database demonstrates that of trades on which Lehman possessed information in May 2008, only 5% of December 2007 trades and no trades in January or February 2008 were cancelled.[1840] Higher rates of cancellation existed for trades in March and April 2008 — 16% and 15%

---

[1839] Lehman, New 05-30-08 WL Testing.xls, at tab "WL Testing Summary" [LBEX-BARFID 0006698]; APB Trade Database Report [LBEX-BARAPB 0049422].

[1840] APB Trade Database Report [LBEX-BARAPB 0049422].

respectively.[1841]  While the March and April 2008 cancellation rates were high enough that Lehman's product controllers should have been aware that there was a possibility that some trades may be cancelled, the cancellation rates were not so high as to render the controllers' reliance on trade data unreasonable during the second quarter price verification process.

During interviews with the Examiner, Lehman's product controllers indicated that no one in their group subsequently checked to confirm if the trades used as valuation benchmarks in May 2008 actually settled and that the group never discussed the settling or cancelling of trades as a potential issue.[1842]  However, even though greater diligence in investigating these trades would have revealed some red flags, such as the fact that at least one trade was never entered in Lehman's trade database, there was no way for the product controllers to know conclusively in May and early June 2008 — at the time the price verification process occurred — that certain trades would be cancelled in the future.  Accordingly, without more reliable information at their disposal, it was reasonable for the product controllers to use the initial trade data in performing price testing.  Each of the trades relied upon is discussed below.

---

[1841] *Id.*

[1842] Examiner's Interview of Brian Sciacca, Oct. 19, 2009, at p. 3; Examiner's Interview of Joseph Sapia, Oct. 26, 2009, at p. 3.

The subprime category of RWLs, valued at $87 million by the trading desk, was price tested based on a trade of $105 million of assets to Arch Bay (at a price of 65).[1843] While the product controllers obtained some information regarding the Arch Bay trade, the Examiner's investigation revealed that this trade never formally settled and ultimately did not occur.[1844] Had Lehman's product controllers checked to confirm that this was a proper trade, they would not have found any entry in Lehman's MTS trade system, which would have been a red flag that this trade was irregular in some way. However, there was no way for the product controllers to know conclusively, in May 2008, that this trade would not close.

Similarly, the Subprime Seconds category of RWLs, valued at $656 million by the trading desk in May 2008, was price tested on the basis of a single trade of $11 million of assets to Great Western Bank (at a price of 65).[1845] Unlike the Arch Bay trade, this trade was entered into the MTS system, but failed to close and was cancelled on June 16, 2008, after the May 2008 price verification process ended.[1846] There was no way for Lehman's product controllers to have realized at the time they performed their price testing that this trade would be cancelled the following month. Even had they further investigated this trade in May 2008, product controllers would only have seen that the

---

[1843] Lehman, New 05-30-08 WL Testing.xls, tab "WL Testing Summary" [LBEX-BARFID 0006698].

[1844] This trade was never entered in Lehman's trade database; accordingly, it is unclear when the trade was scheduled to settle and when it was cancelled. See APB Trade Database Report [LBEX-BARAPB 0049422].

[1845] Lehman, New 05-30-08 WL Testing.xls, tab "WL Testing Summary" [LBEX-BARFID 0006698].

[1846] APB Trade Database Report [LBEX-BARAPB 0049422].

settlement date for this trade was "TBD."[1847]  As such, their decision to rely on this trade in price verification of Lehman's Subprime Seconds RWLs was reasonable at the time.

Finally, the Scratch & Dent category, valued at $158 million by the trading desk in May 2008, was price tested on the basis of a then-recent RMBS securitization. Lehman created this securitization, entitled Residential Loan Trust ("RLT") 2008-2, in May 2008 and provided a mark of 49 that was used as the Product Control price for these assets.[1848]  The underlying loans in the RLT securitization consisted of non-performing loans; the Baupost Group, a third-party hedge fund, provided approximately 60% of the funding for the SPE to purchase the underlying loans, which had already been securitized, and owned approximately 60% of the securitization. When the SPE purchased the underlying RWLs, a relevant price point was established that could be used to test RWL pools with similar characteristics to the loans underlying the RLT securitization.  However, this price was not as robust an indicator of the value of the RWLs as a sale to a wider group of investors would have been.

The Product Control Group's price testing of the other five categories of performing loans, together representing $2 billion of Lehman's $4.1 billion U.S. RWL portfolio in May 2008, employed a price obtained from a Morgan Stanley research

[1847] Lehman, Copy of WholeLoanClosings 06.04.08.xls [LBEX-BARFID 0006588].
[1848] Lehman, New 05-30-08 WL Testing.xls, tab "WL Testing Summary" [LBEX-BARFID 0006698].  While there was little securitization activity in 2008, the RLT securitization was one of the few.

report.[1849]  Two categories of performing loans were valued by reference to this Morgan

Stanley report alone, while another three categories used the report in conjunction with

trade data.[1850]  In an interview with the Examiner, Joseph Sapia, a former Vice President

in Lehman's Securitized Products Valuation and Control group, stated that the trade

data was the primary source of the marks given to these three categories of loans and

that Lehman merely used the Morgan Stanley report to confirm the marks.[1851]  However,

this characterization of the methodology is inconsistent with the Product Control

Group's price testing spreadsheets.  As described above, the prices reflected by the

trade data ranged from 86 to 96 for these three categories.[1852]  However, rather than use

these prices, the product controllers used 89, the price identified by the Morgan Stanley

report, for each of these categories.[1853]

   To value its High LTV, Home Express, Neg Am, Prime Fixed and Prime Hybrid

ARM RWLs, Lehman's Product Control Group used a mark of 89, which was the

---

[1849] *See* Morgan Stanley Research, Special Report: A Writedown Writeup (May 13, 2008), at p. 4 [EY-LE-LBHI-KEYPERS 2818439].  The pricing spreadsheet for these assets states that the price was "[t]ested using Merrill Lynch price for performing prime loans marked back to 93."  Lehman, New 05-30-08 WL Testing.xls, tab "WL Testing Summary" [LBEX-BARFID 0006698].  However, the Examiner's investigation has produced evidence, in the form of an e-mail from Joseph Sapia, a Lehman Vice President in the Securitized Products Valuation and Control Group, that the source referred to is actually a May 13, 2008 Morgan Stanley research report.  *See* e-mail from Joseph Sapia, Lehman, to Nicholas McClay, Lehman (June 14, 2008) [EY-LE-LBHI-KEYPERS 4651500].  It is unclear what the "marked back to 93" note refers to.  The mark used by the Product Control Group was 89.  Lehman, New 05-30-08 WL Testing.xls, tab "WL Testing Summary" [LBEX-BARFID 0006698].

[1850] Lehman, New 05-30-08 WL Testing.xls, tab "WL Testing Summary" [LBEX-BARFID 0006698].

[1851] Examiner's Interview of Joseph Sapia, Oct. 26, 2009, at p. 3.

[1852] Lehman, New 05-30-08 WL Testing.xls, tab "WL Testing Summary" [LBEX-BARFID 0006698].

[1853] *Id.*

average price identified by the Morgan Stanley research report for Alt-A loans.[1854] These categories together represented approximately $2 billion of Lehman's U.S. RWL portfolio. While the Examiner has identified several significant issues with the use of the Morgan Stanley report for May 2008 price testing, it was one of the few sources of information available to Lehman's product controllers in May 2008 and the mark identified therein was not unreasonable, as discussed below.

The Examiner identified the following issues with the Product Control Group's use of the Morgan Stanley research report as part of the May 2008 price verification process. First, and most significantly, the Morgan Stanley report offered an average of the first quarter 2008 marks for Alt-A RWLs. It appears that Lehman simply took this survey of first quarter prices and applied it to value $2 billion of its U.S. RWL portfolio in the second quarter, without any confirmation that the first quarter mark remained valid. Given the rapidly changing market conditions of this period, a three-month-old price would be of limited relevance in determining the present value of RWL assets.[1855]

Second, the Morgan Stanley report provides an average mark for "Alt-A" loans, a broader category than the specific loans Lehman's Product Control Group priced using the report. The Morgan Stanley report is unclear as to which of the specific

---

[1854] *Id.*

[1855] It is possible that some first quarter numbers collected by Morgan Stanley would be for the period ended March 2008. While Lehman and most investment banks end their first quarter in February, some banks end their first quarter in March. However, even two months is an unduly long period of time to assume price stability.

categories of loans, as defined by Lehman, its average price is based upon, making it something of a blunt instrument to use for the pricing of more narrowly defined categories of RWLs.  Third, the Morgan Stanley mark used, 89, is actually the weighted average of the marks given to U.S. and European Alt-A RWL assets.  The Morgan Stanley mark for U.S. assets was 86.  Even if the report was otherwise reliable, Lehman's Product Control Group should have used the U.S. mark, 86, not the weighted average, 89, for pricing Lehman's U.S. RWL assets.[1856]

Despite the problems with the manner in which the Product Control Group used the Morgan Stanley report, the group had very few options for price testing U.S. RWL assets in 2008.  The Morgan Stanley report provided a survey of sales prices, compiled and reported by a credible source.  Furthermore, given the wide uncertainty in the valuation of this asset class in May of 2008, and the fact that the limited trade data Lehman possessed revealed marks between 86 and 96, the mark Lehman's Product Control Group used, 89, was not unreasonable.

It should be noted, however, that two of the three trades the Product Control Group used to conduct price testing in conjunction with the Morgan Stanley report were cancelled and never closed.  Lehman's Prime Hybrid ARMs category, valued at $1.2 billion by the trading desk, was price tested using a combination of the Morgan

---

[1856] When asked about Lehman's use of international data, Joseph Sapia had no explanation for why the weighted average was used and acknowledged that this was simply a mistake.  Examiner's Interview of Joseph Sapia, Oct. 26, 2009, at pp. 3-4.

Stanley report and a sale of $37 million of assets to Chevy Chase Bank at a price of 96.[1857] This sale to Chevy Chase never settled and was cancelled on August 5, 2008.[1858]

Similarly, Lehman's Prime Fixed category of RWLs, valued at $456 million, was price tested using both the Morgan Stanley report and a sale of $87 million of assets to Vertical Mortgage at a price of 86.[1859] The trade to Vertical Mortgage also never settled and was cancelled on July 1, 2008.[1860] As with the cancelled trades discussed above, however, there was no way for Lehman's product controllers to know in May 2008 that these trades would be cancelled. Thus, their decision to rely on these trades for testing was reasonable at the time.

The pricing of the final category, High LTV loans, was based on a sale of $56 million of assets to Fannie Mae, at a price of 95, a trade that did actually settle.[1861] Accordingly, the price testing of this category was based on a more reliable source.

The nine categories of Lehman's non-performing U.S. RWL assets, valued at roughly $829 million, were price verified in May 2008 using the same RLT securitization discussed earlier.[1862] The loans underlying the RLT securitization are sufficiently comparable to Lehman's non-performing loans to use the RLT securitization price as a

---

[1857] Lehman, New 05-30-08 WL Testing.xls, at tab "WL Testing Summary" [LBEX-BARFID 0006698].
[1858] APB Trade Database Report [LBEX-BARAPB 0049422].
[1859] Lehman, New 05-30-08 WL Testing.xls, tab "WL Testing Summary" [LBEX-BARFID 0006698].
[1860] APB Trade Database Report [LBEX-BARAPB 0049422].
[1861] Lehman, New 05-30-08 WL Testing.xls, tab "WL Testing Summary" [LBEX-BARFID 0006698].
[1862] *Id.*

price check for Lehman's non-performing U.S. RWL assets. Accordingly, the Examiner finds the valuation of these assets to have been reasonable.

Overall, the valuations reached by Lehman's Product Control Group in May 2008 were fairly close to the marks applied by the desk. Taken together, there was a net variance of $123 million between Lehman's desk prices for its U.S. RWL assets as of May 31, 2008 and the values calculated by the Product Control Group, about 3% of the total value of the U.S. RWL portfolio reported by Lehman at this time.[1863] In the course of resolving variances there was a net reduction of $78 million in the desk prices of Lehman's U.S. RWL assets, demonstrating that the Product Control Group was able to influence the desk in the valuation of RWLs at this time.[1864]

E&Y conducted a review of Lehman's Product Control processes for price testing of U.S. RWLs in the second quarter of 2008.[1865] In the course of this review, E&Y noted Lehman's decision to switch to a price verification model based on recent sale prices rather than mock securitization and found this decision to be consistent with the lack of

---

[1863] Lehman, New 05-30-08 WL Testing.xls, tab "WL Testing Summary" [LBEX-BARFID 0006698].

[1864] *Id.* The $78 million reduction is the aggregate adjustment taken on all whole loans in the testing file, including the non-residential whole loan categories SBF and Capital Crossing that are not included in this analysis. However, the desk and Product Control prices for these two categories are very close, and for the larger SBF category the Product Control price is actually higher than the desk price. Therefore, the Examiner concludes that that the $78 million reduction was related primarily to RWLs addressed by this Report.

[1865] E&Y Walkthrough Template, Residential Whole Loans (Nov. 30, 2008), at p. 1 [EY-SEC-LBHI-MC-GAMX-08-072875]. The E&Y document is dated November 30, 2008, but discusses second quarter 2008 price testing.

securitization activity in the second quarter of 2008.[1866]   However, the scope of E&Y's review was limited.  E&Y did not conduct an independent valuation of U.S. RWL assets to verify the marks reported by Lehman.  Rather, its review was qualitative in nature, focusing on whether Lehman's Product Control procedures were adequate as designed, whether Lehman followed its own procedures and whether there was a risk of management override of controls.[1867]   Thus, E&Y's report approves of Lehman's decision to use a methodology based on comparison to recent sales data to value its U.S. RWL assets; it does not address the specific valuations reached by Lehman.

### (b)  Lehman's August 2008 Price Testing

The Examiner's investigation has revealed similar problems with Lehman's August 2008 price verification process for U.S. RWLs, but also finds that there is not sufficient evidence to support a finding that the U.S. RWL values determined for August of 2008 were unreasonable.  As noted above, Lehman wrote down the value of its U.S. RWL portfolio by approximately $750 million during the second quarter of 2008 and by $840 million during the third quarter of 2008.[1868]   The Examiner reviewed the August 2008 price testing records related to all U.S. RWL performing and non-performing categories.  As in May, recent sales were used to value many of Lehman's

---

[1866] *Id.* at p. 4.

[1867] *Id.* at p. 16.

[1868] Lehman, Q2 08 High Level Mortgage Roll Forward(v2) [LBEX-BARFID 0011863];   Lehman, Q3 Residential Template w_Elq (v83).xls [LBEX-BARFID 0011867].

U.S. RWL positions in August of 2008.[1869]  Also as in May, the data the Product Control Group relied upon for third quarter price verification was somewhat thin for the purpose of testing the entirety of Lehman's U.S. RWL portfolio.

For its August 2008 U.S. RWL price verification process, Lehman Product Control used the average of four Prime Whole Loan sales to test five categories of performing U.S. RWLs — High LTV, Home Express, Neg Am, Prime Fixed and Prime Hybrid ARMs.[1870]  However, three out of the four benchmark trades were later cancelled and never closed, and one of the trades was never entered into Lehman's trading system.[1871]

Lehman's product controllers' reliance in August 2008 on trades that were ultimately cancelled is more problematic in third quarter price testing than in second quarter testing.  By August of 2008, the product controllers would have been able to discover that most of the trades they relied upon in performing their second quarter price testing were cancelled.  Furthermore, most of the trades used for third quarter price testing were cancelled before the end of that quarter.  Of the four trades averaged

---

[1869] Lehman, Pricing Package Aug 08.xls (Aug. 2008) [LBEX-BARFID 0006669].

[1870] *See* Lehman, Pricing Package Aug 08.xls (Aug. 2008) [LBEX-BARFID 0006669]; Lehman, Whole Loan Sales Q3.xls [LBEX-BARFID 0006667].  The four trades averaged were RWPO 2008-1, Bayview Fund Acquisitions 2008-3, Fortress 2008-1 and Pennymac 2008-1.

[1871] The Fortress 2008-1 trade does not appear in Lehman's transaction databases.  The RWPO 2008-1 and Pennymac 2008-1 trades appear as cancelled.  *See* APB Trade Database Report [LBEX-BARAPB 0049422].

to provide a mark for the five categories of U.S. RWLs, three were cancelled between August 27, 2008 and August 29, 2008.[1872]

Use of canceled trades in performing price testing conducted after the cancellation dates would have been unreasonable. However, despite this methodological problem, the mark applied to these five categories, 66.31, is ultimately reasonable given the fact that the one trade that did actually close had a price of 66.0.[1873]

The Examiner observed that Lehman's product controllers employed a different methodology in price testing three other performing U.S. RWL categories in their third quarter 2008 price verification process. The test prices for the Scratch & Dent, Subprime and Subprime Seconds asset categories were not calculated in the same way as those for the other performing loan categories. Lehman had data on three sales of Scratch & Dent RWL pools during or proximate in time to the third quarter of 2008.[1874] However, instead of taking the average of these prices, as was done with other categories of performing loans during the August 2008 price verification process, Lehman's Product Control Group used 50.25, the highest mark among the three sales, to value these categories of RWLs.[1875] In addition, the single trade used by the Product Control Group to provide the mark for these RWLs was not the largest trade; another trade existed,

---

[1872] *Id.*

[1873] This was the Bayview Fund Acquisitions 2008-3. Lehman, Pricing Package Aug 08.xls (Aug. 2008) [LBEX-BARFID 0006669]; Lehman, Whole Loan Sales Q3.xls [LBEX-BARFID 0006667].

[1874] Lehman, Whole Loan Sales Q3.xls [LBEX -BARFID 0006667].

[1875] This mark was based on the sale of a Fasthold 2008-1 whole loan pool. Lehman, Pricing Package Aug 08.xls (Aug. 2008), tab "Whole Loans" [LBEX-BARFID 0006669].

involving three times the value of RWLs, at a mark of 30.55, 40% less than the mark used by the product controllers.[1876]  The weighted-average mark of the three Scratch & Dent RWL sales was 37.4.  However, these three categories of performing loans, and an additional nine categories of non-performing loans,[1877] together representing a $1.2 billion value as determined by the trading desk, were price tested using the 50.25 mark.

Had the Product Control Group used the average of the three marks, as it did with other asset categories, the third quarter value of these assets would have been approximately $890 million ($1.2 billion * 37.4/50.25), or approximately $310 million less than the value calculated by the product controllers in August of 2008.  When asked about this inconsistency, Joseph Sapia could not recall why the highest price was used instead of the average.[1878]  He speculated that it may have had something to do with the underlying collateral, but could not be certain.[1879]

The decision by the Product Control Group not to use an average of the prices available is also problematic because the single trade relied upon was cancelled on August 8, 2008, well before the end of the third quarter.[1880]  While the methodology used to price these categories of RWLs raises serious issues, both because of the failure to use the average price reflected by the trade data and because the single trade used was

---

[1876] This was a trade of Archbay 2008-2.   Lehman, Whole Loan Sales Q3.xls [LBEX -BARFID 0006667].

[1877] In addition to the issues discussed above, the use of this sale of a pool of performing loans to value non-performing loans is also methodologically questionable.

[1878] Examiner's Interview of Joseph Sapia, Oct. 26, 2009, at p. 5.

[1879] Id.

[1880] APB Trade Database Report [LBEX-BARAPB 0049422].

cancelled well before quarter end, the U.S. RWL values arrived at do not themselves appear unreasonable. The reasonableness of this valuation is discussed in the following Section.

Despite the issues identified above, the Examiner concludes that the U.S. RWL values determined by Lehman in August 2008 were not unreasonable. The marks calculated by the Product Control Group presented a variance with the prices noted by the trading desk of only approximately $28 million, or 1.0% of the total value of Lehman's U.S. RWL portfolio at the time.[1881] As noted, Lehman took approximately $750 million in write-downs on its U.S. RWL portfolio during the second quarter of 2008 and an $840 million write-down during the third quarter of 2008,[1882] demonstrating a responsiveness to changing market conditions. As in May, the product controllers had very little information to rely upon in price testing U.S. RWL assets and had no option but to use information that would have been unreliable, due to its nature and limited scope, in ideal market conditions. Moreover, in August 2008, the market for RWLs was anything but ideal and Lehman's product controllers were forced to make do with the information available. The marks they determined for price testing were not unreasonable under the circumstances.

---

[1881] Lehman, Pricing Package Aug 08.xls (Aug. 2008), tab "Whole Loans" [LBEX-BARFID 0006669].
[1882] Lehman, Q2 08 High Level Mortgage Roll Forward(v2) [LBEX-BARFID 0011863]; Lehman, Q3 Residential Template w_Elq (v83).xls [LBEX-BARFID 0011867].

### (4) Examiner's Independent Valuation of Lehman's Residential Whole Loans Portfolio

Because of the limited sales data available to Lehman to price its U.S. RWL assets in the second and third quarters of 2008, this asset class was at some risk of misstatement. In order to further assess the reasonableness of the values determined by Lehman, the Examiner requested that an independent estimate of the value of these assets be performed. This valuation does not represent the Examiner's opinion of the true value of these assets in May or August 2008, but is simply an alternate method to estimate prices of these assets, providing context in which to assess the reasonableness of Lehman's valuations. For each of four major loan types, Prime Hybrid ARM, Prime - Fixed, Subprime and Alt-A, two representative securitized deals among Lehman's recent securitizations were chosen. The deals chosen are representative of Lehman's U.S. RWL assets in May 2008 as a whole.

The representative deals identified were:

| Loan Type | Representative Deals |
|---|---|
| Prime Hybrid ARMs | SARM 2008 – 02 , SARM 2007-09 |
| Prime Fixed | LMT 2006-03, LMT 2006-04 |
| Subprime | SASCO 2007-BC4, SASCO 2007-BNC1 |
| Alt-A | Lehman XS Trust 07-10H, Lehman XS Trust 2007 – 17H |

The Examiner chose these bonds by either looking at the Securitization Shelf Name used by Lehman's Product Control Group for each category of Whole Loans for

purposes of mock securitization,[1883] or by finding a recent vintage deal originated by Lehman with similar underlying collateral, if available.

The price of all the notes in the selected deals was then estimated using Intex, a data source provider capable of performing calculations based on user-defined inputs.[1884] For inputs, the model relied on estimates as to default rate, loss severity and prepayment rate of the underlying assets, as well as the discount yield demanded by investors. These inputs were based only on information that would have been available to Lehman's product controllers in May and August 2008. The value of all of Lehman's U.S. RWL assets as of May and August 2008 was then estimated by using the weighted average of the estimated note prices, with weights taken as the proportion of the different notes in the capital structure of the securitization.

However, the assumptions required by the analysis were made more uncertain by the distressed market conditions of 2008. While it could be assumed that the default rate, loss severity and prepayment rate of the underlying loans would be the same whether in an unsecuritized RWL or in an RMBS transaction,[1885] the yield demanded by investors for RWLs would be higher for several reasons. There are fewer potential buyers of whole loan pools than for RMBS since the latter has credit ratings, CUSIP identifiers and publicly available data from sources such as Intex. This available data

---

[1883] E&Y Walkthrough Template, Residential Whole Loans, at p. 6 [EY-LE-LBHI-MC-GAMX-08-072872].

[1884] *See* Appendix 16, Valuation - Residential Whole Loans.

[1885] These inputs, which are used in pricing both RMBS and RWLs, are characteristics of the underlying mortgage loans and, by definition, are unaffected by their presence in a securitization.

provides investors significantly more information than is typically available for RWL pools. Primarily for these reasons, RWLs are less liquid than RMBS and an investor would normally demand a higher yield for RWLs than for the corresponding RMBS.[1886] However, reliable expected market yields for RWLs were not available as of mid to late 2008. Therefore, the Examiner used RMBS yields to test RWL assets. The RMBS yields used were the same ones used to test Lehman's RMBS securities, as discussed in the following Section. It is worth noting that because the Examiner's model uses RMBS yields, the resulting values effectively establish an upper limit of value based on the notion that an investor would normally require a higher yield for RWLs than for corresponding RMBS securities.

Using this approach, the Examiner estimated values for the U.S. RWL assets tested that were close to Lehman's values. Having reviewed all of Lehman's U.S. RWL assets, comprising $4.4 billion of Lehman's reported $8.3 billion in worldwide RWL assets as of May 31, 2008, the Examiner's estimated prices result in a valuation $375 million below that of Lehman.[1887]

In contrast, the Examiner's analysis suggests that the third quarter value of Lehman's U.S. RWL assets as determined by the trading desk, $2.8 billion of $6.3 billion worldwide, may have been *under*stated. Applying the same analysis to Lehman's third

---

[1886] *See* Yakov Amihud *et al*., Liquidity and Asset Prices, 1 Found. and Trends in Fin. 269, 269-364 (2005) (providing a detailed study on the relationship between liquidity and asset prices).
[1887] *See* Appendix 16, Valuation - Residential Whole Loans.

quarter U.S. RWL assets, and using August 31, 2008 RMBS yields demanded, the Examiner estimates an understatement of the value of Lehman's U.S. RWL assets of $276 million.[1888]

Because the analysis operates by estimating the average price of all RMBS bonds in a securitization to determine the value of the RWLs underlying the securitization, the accuracy of the Examiner's valuation can be gauged by looking to sales prices of securities from the very securitizations it used for price testing RWLs. There were few trades of RMBS in 2008, but the Examiner identified a few trades of RMBS from the representative securitizations he used to provide estimated prices for Lehman's U.S. RWL portfolio. The trade data identified does not provide prices for every tranche of any one securitization, as would be required to directly estimate the prices of the underlying RWLs. However, the data can be used to check the accuracy of the Examiner's estimated prices for individual tranches that were calculated as an interim step in providing a model price for RWLs. The table below provides sales prices for those tranches for which sales were identified, along with the Examiner's model price.[1889]

[1888] *Id.*

[1889] ABP Trade Database [LBEX-BARAPB 0049422].

| Deal | Tranche | Examiner's Model Price | Transaction Price | Buy/ Sell | Date | Third Party |
|---|---|---|---|---|---|---|
| SARM 2008-2 (Prime) | A1 | 87.4 | 100 | Sell | 5/30/08 | FHLB Seattle |
| | A2 | 87.8 | 88.9 | Sell | 5/30/08 | Mutual of Omaha and United of Omaha Ins. |
| SARM 2007-9 (Prime) | 2A1 | 87.3 | 60.25 | Buy | 6/24/08 | Smith Breeden Assoc. |
| | | | 60 | Sell | 6/25/08 | Smith Breeden Assoc. |
| SASCO 2007-BC4 (Subprime) | A3 | 82.3 | 93.25 | Buy | 4/9/08 | Morgan Stanley & Co. |
| | | | 93.75 | Sell | 4/9/08 | Merrill Lynch |
| | | | 93.625 | Sell | 4/9/08 | Merrill Lynch |
| | | | 94 | Sell | 5/28/08 | R3 Capital Management |
| | M1 | 31.8 | 29 | Sell | 6/30/08 | Harbert Fund Advisors |
| | M2 | 24.6 | 14.5 | Sell | 6/30/08 | Harbert Fund Advisors |

As the table shows, the trades indicate prices both higher and lower than the Examiner's model prices. For example, on June 30, 2008, there was a sale of the M1 and M2 classes of the SASCO 2007-BC4 subprime securitization to Harbert Fund Advisors at prices of 29 and 14.5, respectively. The prices calculated by the Examiner for these tranches were 31.8 and 24.6, respectively, suggesting that the Examiner's prices may have been overstated. In the Prime Hybrid ARMs category, there were trades, both buy and sell, of the 2A1 class of the SARM 2007-9 securitization between Lehman and Smith

Breeden Associates on June 24 and 25, 2008. These trades were expected at prices of 60 and 60.25. The Examiner's mark for this tranche was 87.3, again suggesting that the Examiner's calculations may have been overstated.

Other trades suggest that the Examiner's model prices may have been understated. For example, some of the A1 class of the SARM 2008-2 prime securitization was sold at a price of 100 on May 30, 2008, which compares to the Examiner's price of 87.4. Similarly, some of the A3 tranche of the SASCO 2007-BC4 subprime securitization was sold on May 30, 2008, at a price of 94 to R3 Capital Management, which exceeds the Examiner's model price of 82.3.

In summary, while the trade results generally support the Examiner's estimated marks, the results also support the notion that estimating prices for these assets was difficult, and there was likely a wide range of reasonableness around the value of these assets in May and August 2008. Importantly, the fact that the Examiner's model provides a total value of Lehman's U.S. RWL portfolio less than that reported by Lehman in May 2008 but greater than that determined by Lehman in August 2008 indicates that Lehman's valuations were not uniformly aggressive.

### (5) Examiner's Findings and Conclusions With Respect to the Reasonableness of Lehman's Valuation of Its Residential Whole Loans Portfolio

As noted, Lehman stopped using its own mock securitization model in May 2008 because of the declining rate of mortgage securitizations occurring at approximately

this time.[1890]  For the reasons described above, this decision and the switch to a method based on comparison to recent sales prices were reasonable.  The sales data that Lehman used to price test its U.S. RWL assets in May and August 2008 was thin; however, Lehman's Product Control Group had few options available for price verification at this time.  Even though several of the trades used for price verification in May 2008 were later cancelled, Lehman's product controllers had no way to know this at the time they undertook the price verification process.  While the August 2008 price testing process presents more serious issues, the ultimate valuations determined for the third quarter of 2008 by both the Product Control Group and the trading desk were within the range of reasonableness, and, when compared to the Examiner's model prices described above, appear understated.

The Examiner has identified evident errors and questionable judgments by the Product Control Group in connection with its price testing process for U.S. RWLs in the second and third quarters of 2008.  However, evaluated in the light of the information available in May and August 2008, the Examiner concludes that there are not sufficient facts to support a finding that Lehman's valuations of its U.S. RWL assets as reported in its financial statement for the period ending May 31, 2008, and as determined by its trading desk and Product Control Group as of August 31, 2008, were unreasonable.

---

[1890] *See* Lehman, Valuation Review - 2nd quarter 2008 (July 2008), at pp. 8-10 [LBHI_SEC07940_750105].

### h)  Examiner's Analysis of the Valuation of Lehman's RMBS Portfolio

In reporting the value of its residential mortgage-related assets, Lehman distinguished between RWLs and the RMBS formed by securitization.[1891]  While the valuation of RWLs during 2008 was difficult in light of the issues described above, the valuation of RMBS was more straightforward.  Throughout 2008, there was a greater degree of price transparency for Lehman's RMBS assets than existed for its RWL assets.  Consistent with this observation, the Examiner has not identified problems with Lehman's price testing of RMBS during this period like those which existed for RWLs.  Having investigated the valuation of Lehman's RMBS portfolio during the second and third quarters of 2008, the Examiner concludes that there is insufficient evidence to support a finding that the valuation of these assets was unreasonable.

As described above, RMBS are a form of bond backed by loans to residential property owners.  To create RMBS, the sponsor of an RMBS transaction, often an investment bank such as Lehman, will set up a SPE, identify a group of RWLs and sell the RWLs owned by the bank to the SPE.  The SPE, in turn, receives its funds for the purchase of the RWLs from the investors' purchases of the RMBS.  These RWLs produce the cash flow to pay interest and principal under the RMBS issued by the SPE.  RMBS are generally formed as tranches with claims on the interest and principal payments of varying seniority; thus, investors holding securities from senior tranches

---

[1891] LBHI 10-Q (filed July 10, 2008), at pp. 69-70.

are repaid before those holding the junior tranches. In this manner, the senior tranches are designed to be the least risky while junior tranches carry the most risk. To compensate for the higher level of risk borne by the junior tranches, these securities offer higher coupon payments and/or lower prices.

As noted, the pace of securitization of RWLs into RMBS slowed significantly in 2008.[1892] However, throughout 2008, Lehman still held many RMBS previously securitized by itself and other investment banks. Lehman held $18.2 billion in RMBS on February 29, 2008, $12.4 billion of which consisted of U.S. RMBS.[1893] On May 31, 2008, Lehman's RMBS portfolio had declined to $14.4 billion, $8.5 billion of which consisted of U.S. RMBS.[1894] By August 31, 2008, the value of Lehman's RMBS portfolio had further declined to approximately $8.3 billion, $4.1 billion of which consisted of U.S. RMBS.[1895] These values represent Lehman's entire portfolio of non-CDO securities related to

---

[1892] Examiner's Interview of Joseph Sapia, Oct. 26, 2009, at p. 2; Securities Industry and Financial Markets Association, Mortgage-Related Issuance (1996 - June 2009), *available at* http://www.sifma.org/research/pdf/Mortgage_Related_Issuance.pdf (last visited Feb. 3, 2010) (showing issuance of non-agency mortgage-backed securities fell from approximately $774 billion in 2007 to $41 billion in 2008; Luo Jun, *Credit Crisis Will Extend Into 2009, Oppenheimer Says (Update 1)*, Bloomberg.com, May 20, 2008, *available at* http://www.bloomberg.com/apps/news?pid=20601087&sid=aAMUjyxli6Lc (last visited Feb. 3, 2010) (noting the "shut down in the securitization market").

[1893] LBHI 10-Q (filed July 10, 2008) at pp. 69-70. As with other asset classes, information regarding the valuation and price testing of European and Asian RMBS assets is not available. Accordingly, the Examiner draws no conclusions regarding the reasonableness of the marks applied to these assets by Lehman in 2008.

[1894] *Id.*

[1895] Lehman, Q3 Residential Template w_Elq (v83).xls, tab "Q3 Trade Data" [LBEX-BARFID 0011867].

residential mortgage loans, as reported in its quarterly Form 10-Q statements and reflected in its third quarter Product Control price testing spreadsheets.[1896]

Thus, during the second quarter of 2008, the value of Lehman's U.S. RMBS portfolio fell by approximately $3.9 billion due to a mix of write-downs and sales. Of this decline, approximately $1.0 billion was due to write-downs.[1897] Similarly, during the third quarter of 2008, the value of Lehman's U.S. RMBS portfolio fell by approximately $4.4 billion, of which $2.3 billion was due to write-downs.[1898] The write-downs Lehman took on these assets throughout the year reflect its recognition of the changed market conditions of 2008 and an acknowledgment of the diminishing value of its U.S. RMBS assets.

As with RWLs, the asset values Lehman reported on its balance sheet for its RMBS portfolio were those reported by its trading desks.[1899] These marks were subject to revision pursuant to the price testing process described below.[1900] Unlike with RWLs, the pricing of which was done manually, the pricing of RMBS was an automated

---

[1896] Lehman did not file a quarterly report for the third quarter of 2008 before filing for bankruptcy. Accordingly, information regarding this period is obtained from data compiled by the Product Control group for price testing purposes.

[1897] Lehman, Q2 08 High Level Mortgage Roll Forward (v2).xls.pdf [LBEX-BARFID 0011863].

[1898] Lehman, Q3 Residential Template w_Elq (v83).xls, tab "Q3 Trade Data" [LBEX-BARFID 0011867].

[1899] Examiner's Interview of Usman Babar, Oct. 16, 2009, at pp. 3-4.

[1900] Lehman, Price Verification Policy Global Capital Markets 2008 [Draft], at p. 4 [LBHI_SEC07940_2965994].

process, meaning that the prices provided by the trading desks were standardized across desks.[1901]

As with any asset, the preferred strategy for performing valuation of RMBS is to look to recent trade prices to determine the market value. If recent trade data is not available, models are used to price RMBS; most models function in a similar manner. Though different RMBS bonds vary considerably in level of risk and remaining average life, the common structure of RMBS allows for a relatively standardized valuation process. The key feature of RMBS for valuation purposes is the tranche structure and the associated cash flow waterfall. Once this information, which is available from vendors, is obtained, the only remaining step is for the price tester to apply assumptions regarding the underlying RWL collateral. These assumptions include: (i) the expected default rate, (ii) loss severity expectations, and (iii) expected rates of prepayment. These inputs, along with information about the tranche structure of the RMBS, provide estimates of the cash flow produced by the RMBS. After these cash flows are calculated, the party performing valuation need only take into account the yield demanded by investors in the market to determine the price at which the RMBS could be sold.

Analysts reach different conclusions regarding the value of a given RMBS bond only if they apply different assumptions regarding these variables. Accordingly, the major issue in price testing RMBS is the selection of proper assumptions to use as inputs

---

[1901] Examiner's Interview of Joseph Sapia, Oct. 26, 2009, at p. 4.

in the price testing process. In price testing RMBS, Lehman's Product Control Group confirmed the reasonableness of the assumptions applied by the trading desks.[1902]

The primary model used by Lehman to value RMBS in 2008 was the Intex waterfall engine, the same model used for the mock securitization model described above. Intex is a software tool, publicly available for a subscription fee, which can be used to analyze structured finance transactions. This tool incorporates underlying collateral information and information regarding the tranche structure of many publicly traded RMBS, and projects the cash expected to flow to different tranches under different assumptions applied to the RWL collateral. In performing mock securitization valuation of RWL assets, the value of all RMBS in a securitization is estimated and then, by estimating the costs associated with securitization and profits expected by the originator, the relationship of this value to the value of the underlying RWL can be determined. Because the valuation of RMBS does not require this additional step, and because it does not assume a functioning securitization market, this asset class presents a less complicated valuation exercise than do RWLs.

Price testing for RMBS can also be performed through comparison to recent trade data and third-party prices. Unlike RWLs, where each pool of loans is inevitably unique even within broad categories (*e.g.*, Prime, Alt-A and Sub-prime), bonds from the same tranche of the same RMBS securitization are identical. Therefore, when available,

---

[1902] *Id.*

the prices at which these bonds trade on the secondary market provide a readily observable indicator of the value of RMBS. Additionally, compared to RWLs, there are more identifiable trades of RMBS providing pricing information.[1903] Accordingly, since the secondary market for RMBS is more robust than the market for RWLs, the pricing of RMBS is more straightforward, and a greater degree of price transparency exists, than for RWLs. The stated policy of Lehman's Product Control Group was to price test approximately 60% of Lehman's Prime and non-Prime RMBS using recent trade prices or using Intex.[1904] The other 40% of RMBS, for which there was no trade or Intex data available, were to be price tested by means of third-party prices.[1905]

As with other asset classes, Lehman identified certain tolerances within which variances between the desk prices and Product Control prices would be deemed acceptable for RMBS. The acceptable tolerances were defined by a "tolerance matrix" that took into account whether the collateral backing the RMBS were agency, prime or non-prime loans, and which of several tranche categories the bonds fell into.[1906] The

---

[1903] This is a direct result of the fact that securitization improves liquidity. Since the securitization of RWL pools into RMBS transactions enhances liquidity, it follows that the number of identifiable RWL trades would be small in comparison to RMBS. *See* Peter J. Elmer, *Conduits: Their Structure and Risk*, F.D.I.C. Banking Rev., Dec. 1999, at pp. 27, 32.

[1904] Lehman, Price Verification Policy Global Capital Markets 2008 [Draft], at pp. 62, 64 [LBHI_SEC07940_2965994].

[1905] *Id.*

[1906] *Id.* at p. 61.

categories of bonds included: Interest Only, Principal Only, Inverse, Zero-Coupon, Subordinate, Mezzanine and Supplemental.[1907]

The pace of trading RMBS on the secondary market also slowed considerably in 2008.[1908] This meant that it was difficult for Lehman's trading desks and Product Control Group to gather the information necessary to price RMBS by means of recent trade data. Additionally, while there were still third-party sources providing prices for RMBS, these sources were not as readily available or as reliable as they would be in a normally functioning market. Lehman's Product Control Group did use third-party sources in performing its price testing of RMBS in 2008, but it also relied heavily on Intex to model RMBS cash flows to determine the value of the bonds.[1909] Additionally, the Product Control Group simply noted the valuations of many RMBS bonds — mainly from the IO and subordinate tranches — as "ok," because the trading desks had marked them down so significantly that their market value was immaterial.[1910] Among RMBS bonds backed by sub-prime RWL collateral, the trading desks marked the

[1907] Id.

[1908] Examiner's Interview of Joseph Sapia, Oct. 26, 2009, at p. 2.

[1909] Lehman, 5-30-08 PRICING.xls [LBEX-BARFID 0002548]; Lehman, 08-29-08 PRICING.xls [LBEX-BARFID 0004120].

[1910] Lehman, 5-30-08 PRICING.xls [LBEX-BARFID 0002548]; Lehman, 08-29-08 PRICING.xls [LBEX-BARFID 0004120].

majority down to prices less than 10% of their notional value, and in many cases to prices of just a few cents on the dollar.[1911]

Of Lehman's 80 largest RMBS positions by exposure amount on May 31, 2008, 54 were also held by Lehman on August 31, 2008.[1912] Lehman's Product Control Group price tested these positions using a variety of methods as summarized in the table below.[1913]

| Product Control Group Testing Method | May 2008 positions tested (#) | May 2008 positions tested ($million) | Aug 2008 positions tested (#) | Aug 2008 positions tested ($million) |
|---|---|---|---|---|
| Intex | 41 | 768.5 | 44 | 650.5 |
| Third-party quote | 8 | 71.6 | 4 | 21.8 |
| Trade data | 2 | 154.4 | 0 | 0 |
| Intex/Third-party quote mix | 1 | 49.5 | 0 | 0 |
| Immaterial | 1 | 0.2 | 2 | 1.0 |
| Other | 1 | 149.8 | 4 | 290.1 |
| **Total** | **54** | **1,194.0** | **54** | **963.4** |

As this table shows, the primary method used by the Product Control Group for price testing in May and August 2008 was the Intex model. Third-party quotes and trade data were also used but to a much lesser extent.

---

[1911] Lehman, 5-30-08 PRICING.xls [LBEX-BARFID 0002548]; Lehman, 08-29-08 PRICING.xls [LBEX-BARFID 0004120].

[1912] This information was obtained from Lehman's GFS and GQuest systems.

[1913] Lehman, 5-30-08 PRICING.xls [LBEX-BARFID 0002548]; Lehman, 08-29-08 PRICING.xls [LBEX-BARFID 0004120]. The market values of the positions were obtained from the GFS system. The Other methods included using average prices from other securities, was using a method called "1x multiple," and two marks in August were assigned a value of 0 with a note to follow up with the trade desk.

In order to further assess the reasonableness of the values determined by Lehman, the Examiner performed a valuation of a sample of Lehman's RMBS positions. This valuation does not represent the Examiner's opinion of the value of these assets during May and August 2008, but rather is intended only to provide context in which to evaluate the reasonableness of Lehman's valuations of its RMBS portfolio. The Examiner valued each of the 54 positions noted above, those of the 80 largest RMBS positions that Lehman held on both May 31, 2008 and August 31, 2008, using the Intex model. As previously noted, in determining inputs for the Intex model the reported historical rates of prepayment, default and loss severity serve as a starting point. In order to calculate the present value of RMBS, a user must make assumptions regarding future prepayment rates, default rates and loss severity. For the Examiner's valuation, these assumptions were determined by considering the observed performance of residential mortgages in May and August 2008 as reported by industry research at the time.[1914] Using the actual rates and loss severity as a basis, the Examiner estimated what rates and loss severity market participants would have expected going forward from May and August 2008. The Examiner also estimated the yield that investors would have required for RMBS bonds.

The following tables present the inputs applied by the Examiner in valuing the 54 Lehman RMBS positions identified.

---

[1914] *See* J.P. Morgan, SOS - Summary of Subprime, Alt-A, Prime Jumbo (May 22, 2009), at pp. 1-3.

**The Examiner's Assumptions for Valuation as of May 2008**

| Product Type | Prepayment Rate | Default Rate | Loss Severity (1st/2nd Lien) | Resulting Losses | Yield |
|---|---|---|---|---|---|
| Prime | 15% | 5% | 50% / 100% | High single digits | 10% |
| Alt-A | 10% | 10% | 50% / 100% | High teens – Low 20s | 15% |
| Subprime | 5% | 15% | 50% / 100% | Mid 30s | 20% |

**The Examiner's Assumptions for Valuation as of August 2008**

| Product Type | Prepayment Rate | Default Rate | Loss Severity (1st/2nd Lien) | Resulting Losses | Yield |
|---|---|---|---|---|---|
| Prime | 15% | 5% | 50% / 100% | High single digits | 10% |
| Alt-A | 10% | 10% | 50% / 100% | High teens – Low 20s | 15% |
| Subprime | 4% | 17% | 50% / 100% | Mid - High 30s | 20% |

Applying these assumptions to the 54 Lehman RMBS positions identified, and using Intex to perform a valuation, the Examiner calculated a total value for these bonds close to that determined by Lehman. The table below provides a comparison of the valuations for these assets in May and August 2008.

| | Lehman Total Market Value ($ billion) | Examiner's Estimated Total Market Value ($ billion) |
|---|---|---|
| May 2008 | 1.19 | 1.14 |
| Aug 2008 | 0.97 | 1.04 |

In aggregate, the Examiner's estimated valuation was 4.1% lower than that of Lehman in May 2008 and 7.1% higher than that of Lehman in August 2008. However, the range of results with respect to any particular RMBS was, in some cases,

significantly wider.  For individual RMBS bonds, the Examiner's estimated values in May 2008 ranged from 58% less than Lehman's value at the low extreme to 129% more at the high extreme.  In August 2008, the Examiner's values ranged from 80% less at the low extreme to 70% more at the high extreme.  However, these differences in valuation are not inconsistent with reasonable differences in estimates of prepayment rate, default rate, loss severity and yield.  Furthermore, the fact that the Examiner's valuations fall both above and below those of Lehman suggests that Lehman's valuations were not uniformly aggressive or uniformly conservative.  Despite these wide ranges, because the Examiner's estimates were not consistently above or below the Lehman marks, in aggregate the differences in valuation were not significant.

As described, RMBS do not present the same valuation challenges that arise in attempting to value RWLs.  Even without bond-specific trade data or third-party pricing information, the Intex model provided a reasonable method for estimating the value of these assets in the unprecedented market conditions of 2008.  Of course, the model remains sensitive to the assumptions used as inputs, but industry reports provide some guidance regarding conventional wisdom in the industry as to these inputs throughout 2008.  Although these assumptions may not have accurately predicted ultimate residential mortgage loan performance, it would be reasonable for one to have relied on them for valuation purposes at the time.  Furthermore, Lehman acknowledged the falling value of these assets throughout 2008, as reflected by the

write-down of $1.0 billion it took on its RMBS portfolio in the second quarter of 2008 and the $2.3 billion write-down it took in the third quarter of 2008.  In light of the foregoing, the Examiner has not found evidence sufficient to support a finding that Lehman's valuation of its RMBS portfolio in 2008 was unreasonable.

### i)    Examiner's Analysis of the Valuation of Lehman's CDOs

Collateralized debt obligations ("CDOs") are a form of asset-backed security ("ABS") backed by a portfolio of fixed-income securities such as RMBS, commercial mortgage-backed securities ("CMBS") or corporate bonds and loans.[1915]  CDOs backed by RMBS are typically referred to as "ABS CDOs", while CDOs backed by CMBS are typically referred to as "CRE CDOs."  To create CDOs, an originator, often an investment bank such as Lehman, will set up a special purpose entity ("SPE"), identify a group of debt obligations sharing certain characteristics, such as debt rating, and either transfer to the SPE conforming debt obligations owned by the bank or use investors' funds to purchase such obligations.  Those debt obligations produce the cash flow to pay interest and principal under the CDOs issued by the SPE.  CDOs are divided into tranches and interest and principal payments are made in order of seniority; thus,

---

[1915] Broadly defined, the term CDO includes Collateralized Loan Obligations ("CLO") and Collateralized Bond Obligations ("CBO"), which are also considered in this Section, but are not treated as distinct asset classes.  As a general matter, CLOs and CBOs have the same basic structure as CDOs, the difference being that CLOs are backed by corporate loans and CBOs by corporate bonds.  For the purposes of this Section, the term "CDO" includes CLOs and CBOs unless otherwise noted.  For financial reporting purposes, Lehman grouped CDOs with other asset backed securities in a category it termed "Other Asset Backed." For valuation purposes, Lehman tested each ABS position (including CDO positions) separately, but the overall methods were similar across ABS classes.

investors holding securities from senior tranches are repaid before those holding the junior tranches. In this manner, the senior tranches are designed to be the least risky and junior tranches are designed to carry the most risk. To compensate for the higher level of risk borne by the junior tranches, these securities offer higher coupon payments and/or lower prices.

The assets underlying the CDOs issued by Lehman were primarily RMBS, CMBS and other asset-backed securities.[1916] Lehman originated $16.2 billion of CDOs in fiscal year 2006, $25.0 billion in fiscal year 2007, and $17.0 billion in fiscal year 2008.[1917] This 2008 decline is generally consistent with, but not as drastic as, the decline in the global CDO market, as the following chart indicates.[1918]

---

[1916] Lehman Brothers Holdings Inc., "05-30-08 PRICING.xls" [LBEX-BARFID 0002548].

[1917] The data for this chart was compiled by the Examiner's financial adviser from commercially available sources.

[1918] Securities Industry and Financial Markets Association, Global CDO Market Issuance Data (fourth quarter 2008), *available at* http://www.sifma.org/research/pdf/CDO_Data2008-Q4.pdf (last visited Feb. 3, 2010) .



**Global CDO Issuances by Quarter 1Q04 - 4Q08 (US$million)**

Notwithstanding the billions of dollars worth of CDOs that Lehman originated, from 2006 to 2007 Lehman accounted for only 3% of the total value of new CDO issuances.[1919] Lehman identified its key operating tenet regarding CDOs as "distribute not retain," meaning that it would "move - not warehouse - risk," and minimize its own CDO holdings.[1920] Lehman reported holding CDOs with a value of approximately $1.2 billion as of May 31, 2008, and $0.9 billion as of August 31, 2008.[1921] Because the positions held in Lehman's CDO portfolio were primarily ABS/CRE CDOs, backed by

---

[1919] Lehman, Lehman Brothers ABS CDO Exposure (Nov. 1, 2007), at pp. 5-6 [LBEX-BARFID 0011553].

[1920] *Id.* at p. 5.

[1921] These figures represent the CDO positions identified by Lehman's Product Control group for price verification purposes. *See* Lehman, 05-30-08 PRICING.xls [LBEX-BARFID 0002548]; Lehman, 08-29-08 PRICING.xls [LBEX-BARFID 0004120]. Some Lehman securitizations, such as Pine, Spruce and Verano, would qualify as CDOs or CLOs, but are represented for balance sheet and valuation purposes by the underlying collateral (mostly non-investment-grade bank loans) rather than by CDO/CLO tranches. *See* Lehman, Loans PxTesting_053108–final.xls [LBEX-BARVAL 0061231]. The Examiner located supporting documentation for the U.S. CDO balances noted, but estimates that another $400 million in Non-U.S. CDO assets are on Lehman's balance sheet based on a review of CUSIPs, though no supporting documents have been located to support this estimate.

RMBS and CMBS, they were subject to the disruptions in the credit markets and deteriorating value of mortgages and mortgage-linked securities that occurred in 2007 and 2008.[1922]  As the market deteriorated, Lehman was unable to sell subordinate pieces of securitizations, and many of Lehman's CDO positions were such pieces.[1923]  However, much of Lehman's CDO portfolio was made up of senior tranches of securitizations that it created in 2007 and 2008 and was unable to sell.[1924]

Between the first and second quarters of 2008, Lehman wrote down the value of its ABS/CRE CDO portfolio by $168 million on a gross basis ($97 million net), leaving $834 million on the balance sheet excluding hedges.[1925]  Between the second and third quarters, Lehman further wrote down the value of its ABS/CRE CDO portfolio by another $178 million gross ($99 million net) leaving $489 million on the balance sheet

---

[1922] The term "position" is used to refer to a pool of like securities from the same tranche of a securitization.  Additionally, the term is sometimes used to refer to the market value of the pool.

[1923] Diane Hinton, S&P, Liquidity Management In Times Of Stress: How The Major U.S. Broker-Dealers Fare, Nov. 2007, S&P RatingsDirect, at pp. 2-3 [LBHI_SEC07940_439424] ("Recent disruptions in the subprime market and its contagion effects into the leveraged finance, asset-backed commercial paper (ABCP), and CDO spaces have substantially curtailed market liquidity."); Timothy Geithner, FRBNY President, Transcript of Remarks to The Economic Club, Reducing Systemic Risk In A Dynamic Financial System (June 9, 2008), http://www.newyorkfed.org/newsevents/speeches/2008/tfg080609.html ("The funding and balance sheet pressures on banks were intensified by the rapid breakdown of securitization and structured finance markets.  Banks lost the capacity to move riskier assets off their balance sheets, at the same time they had to fund, or to prepare to fund, a range of contingent commitments over an uncertain time horizon.").

[1924] Over one-third of the total value of Lehman's May 2008 CDO portfolio was comprised of Ceago, a 2007 securitization that Lehman was unable to sell.  See Lehman, 05-30-08 PRICING.xls, tab "ABS Secondary," [LBEX-BARFID 0002548].

[1925] Lehman, Write downs, Key Exposures & Level 3 Assets – 2Q 2008 (July 15, 2008), at p. 1 [LBHI_SEC07940_167791].  Note that this number includes both U.S. and European assets.

excluding hedges.[1926]   These write-downs are generally consistent with what was occurring in the market as ABS/CRE CDOs were experiencing increasing numbers of events of default.[1927]   For example, of the $431 billion of ABS/CRE CDOs originated in 2006-2007, more than half had experienced events of default by November 2008, with increasing numbers of defaults over time.[1928]

The Examiner's analysis of the reasonableness of Lehman's valuation of its CDO positions begins by describing Lehman's process for valuing CDO assets, with particular attention to the price verification procedure of Lehman's Product Control Group, and the E&Y review of that process.   Next, Lehman's largest CDO position, Ceago, is addressed.   While the super-senior Ceago tranche was appropriately valued, the most junior of the Ceago subordinate tranches, together a relatively small portion of the whole, were not accurately valued.   In order to provide further context in which to assess the reasonableness of Lehman's CDO valuations, a sample of Lehman's CDO portfolio is valued by means of an alternate method, with particular attention paid to the most junior Ceago subordinate tranches.   While the Examiner's investigation has

---

[1926] Lehman, Write downs, Key Exposures & Level 3 Assets – Q3 FINAL (Sept. 11, 2008), at p. 6 [LBHI_SEC07940_828711].  Note that this number includes both U.S. and European assets.

[1927] An event of default typically occurs in an ABS CDO due to ratings downgrades of the underlying collateral.  When an event of default occurs, a CDO may either accelerate all cash payments to the AAA controlling investor, liquidate the CDO, or remain in default with cash flows per the waterfall priority.  In all cases, the impact is a large reduction in cash flow and value for tranches beneath the most senior tranche of the CDO.  Additionally, the most senior tranche may not recover its par amount if the collateral values have fallen significantly.

[1928] J.P. Morgan, US Fixed Income Markets 2009 Outlook, Collateralized Debt Obligations (Nov. 28, 2008), at p. 1.

produced evidence that Lehman's price verification process for CDOs was not particularly robust, given the lack of information available and the condition of the CDO market during second and third quarters of fiscal year 2008, the Examiner does not find evidence to support a finding that Lehman's valuations of CDOs as of these dates were unreasonable.

### (1) Lehman's Price Testing Process for CDOs

The asset values Lehman reported on its balance sheet for CDOs were the marks reported by its traders.[1929]  Each trader used his or her own method for pricing assets and there was no uniformity across trading desks as to methodology.[1930]  In order to provide a check on the marks reported by the traders for each position (commonly referred to as "desk marks"), Lehman's Valuation Control group, a part of the Product Control Group, performed an independent price verification of CDO assets.[1931]  The Product Control Group performed price verification procedures on a monthly basis, and particular attention was paid to testing the marks at quarter-end.[1932]  In doing so, the Product Control Group relied on several different methods for price testing CDOs. The preferred method was to use executed trade activity to provide a basis for

---

[1929] Examiner's Interview of Usman Babar, Oct. 16, 2009, at pp. 3-4.
[1930] Examiner's Interview of Brian Sciacca, Oct. 19, 2009, at pp. 2-5.
[1931] Lehman, Valuation Review - 2nd Quarter 2008, at p. 3 (July 2008) [LBHI_SEC07940_750107] (listing "Product Control Core Functions").
[1932] *Id.*

valuation.[1933]  Typically, prices from trades that occurred four to six weeks prior to the month end were considered reasonable to use for this purpose.  However, if markets were so volatile that these trades would be considered stale by month end, trades closer to the valuation date were used to provide a more accurate basis for valuation.[1934]  If there was no recent trade activity with which prices could be verified, the Product Control Group looked to external prices obtained from third-party providers such as Bloomberg, Markit Group Limited ("Markit") and other sources.[1935]

Illiquid products for which recent trade activity or third-party prices are not available are classified as Level 3 assets pursuant to SFAS 157.[1936]  For these assets, the Product Control Group performed an independent valuation of the position's mark by using a model.  The group's Policy & Procedures document identifies the primary tool used for this modeling as the Intex cash flow engine, a program widely used for modeling CDO cash flows.[1937]  However, the Examiner's interviews with product controllers indicated that those controllers responsible for price testing CDOs regarded Intex as unreliable and did not typically use it to price CDOs.[1938]  Instead, some positions were price tested by using interest-only models or by estimating the value of the

---

[1933] Lehman, CDO Price Verification Policy & Procedure (Jan. 24 2008), at p. 3 [LBHI_SEC07940_4228808].
[1934] *Id.*
[1935] *Id.* at pp. 2-4. Additionally, where Lehman hedged a position and the marks on the two positions were the same, the product controllers considered the price to be val*Id.*
[1936] *See* SFAS No. 157, Fair Value Measurements, at SFAS 157-6.
[1937] Lehman, CDO Price Verification Policy & Procedure (Jan. 24, 2008), at p. 4 [LBHI_SEC07940_4228808].
[1938] Examiner's Interview of Brian Sciacca, Oct. 19, 2009, at p. 4.

underlying assets held by the SPE that issued the CDOs.[1939]  Product controllers used various inputs, such as spreads based on collateral type, that were published by JPMorgan, along with prepayment, default and recovery assumptions obtained from other providers, to calculate the mark for each asset tested.[1940]  Additionally, the LehmanLive CDO calculator, which received an Intex feed and a pricing feed to determine the net asset value of a given tranche, was used in some cases.  Finally, interest-only analysis or pricing from ABX indices were used as last options to value CDOs.[1941]

After Product Control determined its estimated mark for a CDO position, it would compare its mark to that of the desk.  Where a variance exceeded the applicable threshold, Product Control would discuss the variance with the appropriate trader.[1942] The product controller and the trader would discuss how each derived their respective marks and would attempt to resolve the variance by agreeing on either the desk mark or the Product Control mark.  In attempting to resolve the variance, the parties would consider market conditions, the quality of the vendors from whom pricing information

---

[1939] *See* Lehman, Ceago & Ballyrock Subs 5-30-08.xls, at tab "IO Analysis," [LBEX-BARFID 0010998]. Because of the relatively small size of Lehman's CDO portfolio, the Examiner did not investigate each of the models used, but focused on those used for the largest positions held by Lehman.

[1940] Lehman, CDO Price Verification Policy & Procedure (Jan. 2008), at p. 4 [LBHI_SEC07940_4228809].

[1941] *Id.*

[1942] The applicable variance threshold for CDOs was $400,000 for SFAS 157 Level 1 and 2 securities, and $300,000 for SFAS 157 Level 3 securities.  *Id.*

was received, traders' track records and the size of the position and the variance.[1943]  If the product controller and the trader could not resolve the variance, the issue would be escalated by Product Control to senior finance management, who would discuss the variance with their counterparts on the trading desk.[1944]  Brian Sciacca, a former Vice President and Head of the Credit Valuation group, stated in an interview that some traders were more open to discussing variances with product controllers than others.[1945] Sciacca recalled one instance in which an issue regarding unresolved variances for bank loan marks was escalated to senior management.  He described the outcome as a "rude awakening" for the trader and an education on the necessity of write-downs.[1946] However, Sciacca also stated that no one trader stood out in his memory as being particularly recalcitrant in conversations with product controllers about variances.

At the conclusion of each monthly price verification process, assets for which there were variances were either remarked by the desk or the Product Control Group determined that the desk price was reasonable.  The Product Control Group then prepared monthly price verification variance reports setting forth the largest variances by asset class and noting whether the desk remarked the asset.  If a material variance

---

[1943] Lehman, CDO Price Verification Policy & Procedure (Jan. 24, 2008), at p. 4 [LBHI_SEC07940_4228809]; Examiner's Interview of Brian Sciacca, Oct. 19, 2009, at p. 4.

[1944] Lehman, CDO Price Verification Policy & Procedure (Jan. 24, 2008), at p. 4 [LBHI_SEC07940_4228809]; Brian Sciacca also described escalating variances to Clement Bernard, former CFO, Fixed Income Division. Examiner's Interview of Brian Sciacca, Oct. 19, 2009, at p. 4.

[1945] Examiner's Interview of Brian Sciacca, Oct. 19, 2009, at p. 4.

[1946] *Id.*

did not result in a write-down of the asset, the report included an explanation as to why the desk price was acceptable. These reports were distributed to Product Control management and the trading desk.[1947]

While the function of the Product Control Group was to serve as a check on the desk marks set by Lehman's traders, the CDO product controllers were hampered in two respects. First, the Product Control Group did not appear to have sufficient resources to price test Lehman's CDO positions comprehensively. Second, while the CDO product controllers were able to effectively verify the prices of many positions using trade data and third-party prices, they did not have the same level of quantitative sophistication as many of the desk personnel who developed models to price CDOs.

Regarding its limited resources, in its May 2008 Valuation and Control Report, the Product Control Group noted that CDOs were an asset class at high risk of misstatement because of a large review backlog of 250 trades and inefficient data preparation.[1948] These issues would have limited the ability of the product controllers to use recent trade data for price verification. However, it is unclear whether these issues had much impact by May 2008, at which time there was very little trade activity upon which to rely. This report also states that the Product Control Group deemed super-senior tranches of CDOs and CLOs to be at a medium risk of misstatement because they

---

[1947] *Id.*

[1948] Lehman, Valuation & Control Report - Fixed Income Division (May 2008), at p. 27 [LBHI_SEC07940_2962709].

were not fully tested and residuals to be at a medium risk of misstatement due to poor coverage.[1949] These problems were not resolved by August 2008, as the same issues are indicated in the August Valuation & Control report.[1950] In May 2008, the Product Control Group noted that it was able to price test 78% of Lehman's CDO positions.[1951] However, it appears that the actual percentage of positions tested may have been much lower.

A review of the Product Control spreadsheets used for May 2008 price testing reveals that approximately half of Lehman's CDO positions were price tested using one of the preferred methods described in the Product Control Group's Policy & Procedures document. A pricing spreadsheet for CDOs shows that the group used prices from third-party providers to verify the prices of approximately 10% of CDO positions and used a "model price" for approximately 37%.[1952] However, approximately a quarter of Lehman's CDO positions were not affirmatively priced by the Product Control Group, but simply noted as "OK" because the desk had already written down the position significantly.[1953] For these positions, the Product Control Group noted that the desk

---

[1949] *Id.* at p. 28.

[1950] Lehman, Valuation & Control Report - Fixed Income Division (Aug. 2008), at pp. 28-29, [LBEX-BARFID 0000257].

[1951] Lehman, 05-30-08 PRICING.xls, tab "ABS Secondary Control Tab" [LBEX-BARFID 0002548]. Note that this is the number of distinct positions, unweighted by position size.

[1952] *Id.* at tab "ABS Secondary." The spreadsheet also shows certain positions for which product controllers had a third-party price but elected not to use it in favor of a higher model price or noted only that the desk had already marked down the position significantly.

[1953] *Id.* On this spreadsheet, these positions are not assigned any model price or third-party price, but are simply noted as being: "OK, distressed market bond has been written down."

price fell below a certain threshold and thus concluded that it required no further review. With only two exceptions, the desk marks given to these positions were less than 10% of par, and in many cases were essentially zero.[1954] The total value of the 35 positions marked in this fashion was approximately $9 million.[1955] Accordingly, it was reasonable for the Product Control Group to have concluded that these positions were so small as to be immaterial and thus not worth expending limited resources to price test. The Product Control Group considered these positions reviewed and they are included in calculating that 78% of CDO positions were reviewed in May 2008. If they are counted as not reviewed, then approximately half of Lehman's CDO portfolio was unreviewed in May 2008.

The effectiveness of the Product Control Group was also limited because it did not have the technical sophistication to develop complex models for pricing CDOs, as did certain of the desk personnel (commonly referred to as "quants") they were charged with monitoring.[1956] Sciacca, a former Vice President and Head of the Credit Valuation group, described their respective roles by explaining that the desk developed models for pricing CDOs, which were checked and approved by the Model Validation group.[1957] The Product Control Group did not have their own models, and did not have the ability to develop or evaluate the type of models being used by Lehman's desk traders.

---

[1954] Lehman, 05-30-08 PRICING.xls, tab "ABS Secondary" [LBEX-BARFID 0002548].

[1955] Id.

[1956] Examiner's Interview of Brian Sciacca, Oct. 19, 2009, at p. 6.

[1957] Id.

Instead, the CDO Product Control Group limited itself to checking the inputs used by the desk to determine whether they were reasonable and using the other price verification methods described above. Sciacca explained his deference to the models developed by the desks by simply stating: "[W]e're not quants."[1958]

The Examiner also reviewed work papers from E&Y's 2007 annual audit and 2008 quarterly reviews. In its 2007 annual review, E&Y examined Lehman's Product Control modeling process for CDOs as well as model inputs.[1959] E&Y noted that "there was much illiquidity in the CDO market during the latter half of 2007" and stated that neither Lehman nor it were able to obtain market prices for CDOs from vendors.[1960] E&Y observed that Lehman's Product Control Group relied on two methods for price testing CDOs: comparison to recent trade activity and Intex modeling.[1961] Reviewing CDO positions comprising between 75% and 80% of Lehman's total CDO population, E&Y concluded that the control was operating as designed and that the value of Lehman's CDO portfolio was fairly stated as of November 30, 2007.[1962] In preparing its second quarter 2008 Summary Review Memorandum, E&Y observed and interviewed

---

[1958] Id.

[1959] Stephanie L. Weed, et al., E&Y, Memorandum to Files: CDO Valuation Approach (Jan. 21, 2008), at p. 1 [EY-SEC-LBHI-ABS 000063].

[1960] Id. at p. 7.

[1961] Id. The observation that the Product Control group used Intex is consistent with Lehman's CDO Price Testing Policy and Procedure document, but is contradicted by statements made in an interview with a CDO product controller. Examiner's Interview of Brian Sciacca, Oct. 19, 2009, at p. 4; see Lehman, CDO Price Verification Policy & Procedure (Jan. 24, 2008), at p. 4 [LBHI_SEC07940_4228809].

[1962] Lehman, CDO Price Verification Policy & Procedure (Jan. 24, 2008), at pp. 7-8 [LBHI_SEC07940_4228809]

Lehman product controllers, focusing on the reasonableness of the product control process and not the specific valuations produced.[1963]   The stated purpose of the quarterly review was to "provide [E&Y] with a basis for communicating whether [they were] aware of any material modifications that should be made to the Company's interim financial information for it to conform with generally accepted accounting principles."[1964]  After observing Lehman's Product Control process for CDOs and noting the write-downs Lehman had taken on its CDO portfolio, which included the super-senior tranche of the Ceago securitization, described below, E&Y did not identify any necessary material modifications.[1965]   While this did not constitute approval of the particular valuations reported, it did reflect the reasonableness of Lehman's Product Control process as a whole.[1966]

### (2)  Price Testing Results for the Second and Third Quarters 2008

The following table summarizes the results of the Product Control Process for CDOs, CLOs and CBOs for the second quarter of 2008.

---

[1963] E&Y's quarterly reviews were of a more limited scope than a full audit and consisted of "applying analytical review procedures and making inquiries of persons responsible for financial and accounting matters." E&Y, Lehman Brother's Holdings Inc. Summary Review Memorandum, Consolidated Financial Statements, Quarter-ended May 31, 2008 (Aug. 8, 2008), at p. 2 [EY_SEC_LBHI-WP-2Q08 000119].

[1964] *Id.*

[1965] *Id.* at pp. 7-8, 17.

[1966] *Id.*

| | Market Value ($000) | Number of Positions | Number of Positions Tested[1968] | Variance between PC and Desk ($000) | % Variance |
|---|---|---|---|---|---|
| CDOs | 679,362 | 93 | 73 | (21,867) | -3.22% |
| CLOs | 447,610 | 23 | 18 | (32) | -0.01% |
| CBOs | 53,764 | 11 | 5 | (4) | -0.01% |
| Total | 1,180,735 | 127 | 96 | (21,903) | -1.86% |

As the table shows, the desk valuation of the CDOs tested was approximately 3% higher than the Product Control valuation for the positions tested, and there was virtually no variance in the pricing of CLOs and CBOs.[1969]

The following table summarizes the results of the Product Control Process for CDOs, CLOs and CBOs for the third quarter of 2008.

U.S. Positions as of August 31, 2008[1970]

| | Market Value (US$000) | Number of Positions | Number of Positions Tested | Variance between PC and Desk ($000) | % Variance |
|---|---|---|---|---|---|
| CDOs | 510,837 | 67 | 64 | (40,284) | -7.89% |
| CLOs | 329,932 | 16 | 4 | (796) | -0.24% |
| CBOs | 50,103 | 9 | 5 | (993) | -1.98% |
| Total | 890,872 | 92 | 73 | (42,073) | -4.72% |

The variances between Lehman's desk and Product Control prices increased from May 2008 to August 2008. The variance in ABS/CRE CDOs was nearly 8% and the

---

[1967] Lehman, 05-30-08 PRICING.xls [LBEX-BARFID 0002548-0004119].

[1968] The reported number of positions tested includes those positions which the Product Control group did not affirmatively test, but deemed acceptable because they had been heavily written-down by the desk.

[1969] Lehman, 05-30-08 PRICING.xls [LBEX-BARFID 0002548-0004119] .

[1970] Lehman, 08-29-08 PRICING.xls, at tab "ABS Secondary" [LBEX-BARFID 0004120].

variance for CDOs, CLOs and CBOs was approximately 4.7%. However, the Product Control spreadsheets showing third quarter 2008 price testing are missing some data found in the second quarter spreadsheets.[1971] Accordingly, although August 2008 marks are calculated for many Lehman positions, it is unclear whether the Product Control Group completed its third quarter price testing process before LBHI filed its chapter 11 petition.

### (a)  Lehman's Price Testing of its Ceago CDOs

Ceago securities were by far the largest CDO position held by Lehman as of May and August 2008. Of the $1.2 billion market value of CDOs Lehman reported it held in May 2008, several tranches of Ceago securities accounted for over $520 million.[1972] This is due to the fact that Lehman was unable to sell, and still held, many of the senior positions of this 2007 securitization. The table below shows how much of each tranche of the Ceago securitization Lehman still held and what it considered the market value of each tranche as of May 31, 2008.

---

[1971] *Id.*

[1972] Lehman, 05-30-08 PRICING.xls, tab "ABS Secondary" [LBEX-BARFID 0002548].

## Retained Ceago Positions as of May 31, 2008

| Tranche | Balance as of May 31, 2008 ($000)[1973] | Notional Value of Lehman Position ($000)[1974] | Percentage Retained by Lehman | Market Value of Lehman Position ($000)[1975] |
|---|---|---|---|---|
| Ceago 2007-1A A1 | 837,385 | 837,385 | 100% | 480,241 |
| Ceago 2007-1A A2 | 104,854 | 76,167 | 73% | 25,897 |
| Ceago 2007-1A B | 20,773 | 20,773 | 100% | 5,816 |
| Ceago 2007-1A C | 11,376 | 11,376 | 100% | 3,185 |
| Ceago 2007-1A D | 2,473 | 2,473 | 100% | 742 |
| Ceago 2007-1A S | 5,782 | 5,782 | 100% | 5,320 |
| Ceago 2007-1A Preferred[1976] | *** | *** | *** | *** |
| Total | 982,643 | 953,957 | 97% | 521,201 |

Lehman sold virtually none of the Ceago securities and, as of May 30, 2008, retained approximately 97% of the securitization. Alone, the securities held by Lehman from the super-senior tranche of Ceago were valued at approximately $480 million,

---

[1973] The balance of each tranche is the value at offering minus principal payments made since offering. This information is obtained from Intex.

[1974] Lehman, 05-30-08 PRICING.xls, tab "ABS Secondary" [LBEX-BARFID 0002548]. The term "notional" refers to the face value of the securities.

[1975] *Id.*

[1976] The price testing spreadsheet shows inconsistent values for this position. While it shows that the notional value of the position is only $4,000, it shows a mark of 515.00 and a market value of approximately $2 million. *Id.* Not only is the mark inexplicably high, but, even accepting that mark, the market value is incorrectly calculated. The position is small enough that these issues do not materially affect the analysis.

over one-third of the total value of Lehman's May 2008 CDO portfolio.[1977]  The size of this position merited closer review of Lehman's valuation.

The product controllers price tested the super-senior tranche of Ceago securities by taking the market value of the underlying collateral and subtracting the value of the other tranches in the deal.[1978]  The S and "Preferred" tranches of Ceago, together valued at $10 million, were price tested using Intex,[1979] and the subordinate tranches, valued at $35 million, were price tested using the interest-only method described below.  In its Second Quarter 2008 Summary Review Memorandum, E&Y reviewed this process and noted that Lehman's Product Control Group price verified each of the underlying collateral in the super-senior tranche of the Ceago CDO through third-party quotes.[1980] E&Y found that this process was methodologically sound and observed that it resulted in no significant variances between the desk and Product Control prices.[1981]

However, E&Y did not review Lehman's price testing of the subordinate Ceago tranches, reasoning that they were immaterial to Lehman's product control process as a whole for purposes of a quarterly, non-audit review.[1982]  Lehman's Product Control Group price tested the subordinate tranches of Ceago as if the tranches were interest-

---

[1977] Id.

[1978] Lehman, Ceago 5-30-08.xls, at tab "SS Value," "Portfolio" and "ESM" [LBEX-BARFID 0011033].

[1979] Lehman, Ceago & Ballyrock Subs 5-30-08.xls, at tabs "Ceago 07-1 S," and "Price-Yield PREF" [LBEX-BARFID 0010998].

[1980] See E&Y, Lehman Brothers Holdings Inc. Summary Review Memorandum Consolidated Financial Statements Quarter-ended May 31, 2008 (Aug. 8, 2008), at pp. 7-8 [EY-SEC-LBHI-WP-2Q08 000125].

[1981] Id.

[1982] Examiner's Interview of Jennifer Jackson, Nov. 3, 2009.

only ("IO") bonds, meaning that although the holder of the tranche was legally entitled to repayment of principal, Lehman determined that the likelihood of such repayment was so remote that the securities should be viewed as paying interest only for a certain period.[1983] Using this analysis, the Product Control Group discounted coupon cash flows obtained from reports prepared by the Ceago trustee at the swap rate corresponding to the projected tenor of the bonds.[1984] However, such a method would be sensitive to the discount rate and tenor assumptions used and it appears that the Product Control Group was overly optimistic in both respects.

The discount rates used by Lehman's Product Controllers were significantly understated. As stated, swap rates were used for the discount rate on the Ceago subordinate tranches. However, the resulting rates (approximately 3% to 4%) were significantly lower than the approximately 9% discount rate used to value the more senior S tranche. It is inappropriate to use a discount rate on a subordinate tranche that is lower than the rate used on a senior tranche.[1985] Doing so would suggest that the subordinate tranche is less risky than the senior tranche. Further, it is understood in the financial industry that applying the prevailing swap rate as the discount yield is

---

[1983] Lehman, Ceago & Ballyrock Subs 5-30-08.xls, at tab "IO Analysis" [LBEX-BARFID 0010998]; Examiner's Interview of Usman Babar, Oct. 16, 2009, at p. 4.

[1984] Based on the offering memorandum for the preferred shares in the Ceago securitization, the trustee was LaSalle Bank National Association. Preferred Shares Offering Memorandum: Ceago ABS CDO 2007-1, Ltd., (Aug.16, 2007) [LBEX-LL 1006113].

[1985] *See* JPMorgan, US Fixed Income Markets 2009 Outlook, Collateralized Debt Obligations (Nov. 28, 2008), at p. 1 (providing CDO spreads showing this relationship).

reasonable when the projected cash flows have minimal uncertainty. For the reasons described above, the cash flows from the subordinate Ceago tranches, and even the senior S tranche, were subject to great uncertainty in May 2008. Thus, there are significant doubts as to the discount rates used to value the subordinate Ceago tranches and as to the ultimate reasonableness of the Product Control Group's marks.

In addition to this overly optimistic discount rate, the periods during which the securities were expected to pay interest, known as the "tenor" assumptions, used for the IO model were also overstated. The Product Control Group assumed a four-year tenor for the C and D Ceago tranches, a six-year tenor for the B tranche, and an eight-year tenor for the A2 tranche.[1986] These tenors assume that the underlying securities will pay interest for longer periods of time than would be estimated by a waterfall cash flow model.[1987] As a contemporaneous Intex calculation would have demonstrated, the Product Control Group's assumptions are unreasonably optimistic given the securities comprising these tranches. 85% of the collateral debt securities underlying the Ceago CDOs were residential mortgage-backed securities.[1988] As stated in the Ceago Offering Memorandum, many of these were comprised of sub-prime mortgage loans posing a heightened risk of default.[1989] As of May 2008, the delinquency rate of U.S. subprime mortgages originated in 2006 was as high as 37%, and that of loans originated in 2007

---

[1986] Lehman, Ceago & Ballyrock Subs 5-30-08.xls, at tab "IO Analysis" [LBEX-BARFID 0010998].
[1987] *See* Appendix 14, Valuation - CDO.
[1988] Ceago ABS CDO 2007-1 Offering Memorandum (Aug. 16, 2007), at p. 32 .
[1989] *Id*. at pp. 35-39.

was almost 26%.[1990]  By August 2008, banks around the world had written off more than $500 billion of value in securities tied to subprime-related assets.[1991]  It was unlikely in May 2008 that RMBS, comprised in large part of sub-prime and Alt-A loans, would continue to provide cash flows for as long as Lehman's Product Control Group assumed in the IO price verification model for the Ceago subordinate tranches.  Had the Product Control Group used an Intex model for the Ceago subordinate tranches they would have discovered that the estimated cash flows following from their tenor assumptions, and thus the valuations of the Ceago subordinate tranches, were overstated.[1992]

It is unclear why the Product Control Group chose the tenor assumptions and discount rate assumptions that it did or why it failed to use an Intex model to price test the subordinate Ceago tranches as instructed by its own Policy & Procedures document.  Usman Babar, a former Vice President and product controller in Securitized Products, told the Examiner that he could not explain why the Product Control Group used the tenor assumptions that it did for the Ceago subordinate tranches or why it failed to do a waterfall cash flow analysis.[1993]  He noted only that the subordinate tranches were a relatively small part of the entire Ceago deal, approximately $100 million notional

---

[1990] Walen Slew, *Subprime, Alt-A Mortgage Delinquencies Rising: S&P*, Reuters, May 22, 2008, http://www.reuters.com/article/gc03/idUSN2249493920080522.

[1991] Yalman Onaran, *Banks' Subprime Losses Top $500 Billion on Writedowns*, Bloomberg.com, Aug. 12, 2008, http://www.bloomberg.com/apps/news?pid=20601087&sid=a8sW0n1Cs1tY&refer=home#.

[1992] *See* Appendix 14, Valuation - CDO.

[1993] Examiner's Interview of Usman Babar, Oct 16, 2009, at p. 4.

value, as compared to the $800 million super-senior tranche.[1994]  As stated above,

Sciacca, a Vice President in Credit Valuation group responsible for price testing CDOs,

stated that he deemed Intex generally unreliable in modeling CDO cash flows,[1995] but

this does not explain the particular tenor and discount rate assumptions used for the IO

model.

By using the IO model with the tenor assumptions and discount rates it adopted,

the Product Control Group valued the subordinate tranches of the Ceago securitization

at prices very close to the desk marks, thus avoiding large variances.  But, because of

the use of unreasonably optimistic tenor and discount rate assumptions, there is a

finding that the May 2008 values calculated by the Product Control Group for the most

junior of the subordinate Ceago tranches was overstated.

The potential extent of this overvaluation is demonstrated by an alternate

valuation method employed by the Examiner to test the reasonableness of Lehman's

reported CDO asset values.  This alternate valuation does not represent the Examiner's

opinion of what the actual value of these assets was at the time, but is rather intended to

provide context in which to judge the reasonableness of Lehman's valuations.  As is

described below, this alternate valuation method provides a price for the B tranche of

Ceago securities that is approximately one-half of the price reported by Lehman.

Furthermore, the prices estimated for the C and D tranches of Ceago securities are

---

[1994] *Id.*

[1995] Examiner's Interview of Brian Sciacca, Oct. 19, 2009, at p. 4.

approximately one-thirtieth of the price reported by Lehman. The table below provides the May 31, 2008 desk prices, Product Control prices, and prices estimated by an alternative method applied by the Examiner's financial advisor,[1996] for each tranche of the Ceago securitization.

**May 31, 2008 Valuations of Tranches of Ceago Securitization**

| Position | CUSIP | Notional Value of the Position ($000)[1997] | Desk Price[1998] | PC Price[1999] | Examiner's Model Price[2000] |
|---|---|---|---|---|---|
| CEAGO 2007-1A A1 | 14984XAA6 | 837,385 | 57.35 | 52.65 | 65.13 |
| CEAGO 2007-1A A2 | 14984XAC2 | 76,167 | 34.00 | 30.83 | 26.33 |
| CEAGO 2007-1A B | 14984XAD0 | 20,773 | 28.00 | 29.39 | 16.63 |
| CEAGO 2007-1A C | 14984XAE8 | 11,376 | 28.00 | 29.68 | 0.91 |
| CEAGO 2007-1A D | 14984XAF5 | 2,473 | 30.00 | 35.78 | 1.10 |
| CEAGO 2007-1A S | 14984XAB4 | 5,782 | 92.00 | 88 | 84.17 |

As noted, the table shows large variances between the Lehman prices and the Examiner's Model price for the B, C, and D Ceago tranches. While the variances between the prices estimated for the other tranches are not insubstantial, the variances seen for these three tranches are large enough to challenge the reasonableness of Lehman's valuations. The valuations for these three tranches also appear less reasonable in light of the methodological problems described above.

---

[1996] This alternative method is described in detail in the following Section and is applied to Ceago and several other Lehman securitizations.

[1997] Lehman, 05-30-08 PRICING.xls, at tab "ABS Secondary" [LBEX-BARFID 0002548].

[1998] *Id.*

[1999] *Id.*

[2000] *See* Appendix 14, Valuation - CDO.

As is described above, the lack of relevant information in May 2008 made the process of determining the appropriate valuations of Lehman's CDO assets very difficult. Accordingly, the Examiner acknowledges a wide range of reasonable valuations for any given class of CDOs. As the table above shows, the alternate valuation performed by the Examiner provides a price that is materially higher than both Lehman's desk and Product Control prices for the large super-senior A1 tranche of Ceago securities. The Examiner used the same model, with different inputs, to value each tranche of the Ceago securitization. The fact that this model produced prices that were for some tranches lower, but for the super-senior tranche higher, than the prices reported by Lehman reflects the wide range of reasonable valuations for CDOs in May 2008. Only those valuations presenting variances that are too large to explain by differing reasonable methodologies and assumptions, such as the 30-1 difference in the Ceago C and D tranches, fall outside of this zone of reasonableness.

Despite the issue identified with the most junior Ceago subordinate tranches,[2001] the problems with Lehman's price verification processes occurred only in testing very small portions of Lehman's CDO portfolio. It should be noted that the most junior of the Ceago subordinate tranches, tranches B, C, and D, accounted for only about 3.6% of the notional value of the securitization and about 1.9% of the market value, as reported

---

[2001] One other instance was identified in which it appears that an IO method with similarly unrealistically optimistic tenor assumptions was used to price the much smaller Ballyrock ABS CDO 2007-1 subordinate tranches. *See* Lehman, Ceago & Ballyrock Subs 5-30-08.xls, at tab "IO Analysis" [LBEX-BARFID 0010998].

by Lehman.[2002]  The much larger super-senior A1 tranche, accounting for almost 88% of the notional value of the securitization and about 92% of the market value,[2003] had a reasonable value.[2004]  Thus, the Product Control Group used a recognized and reliable method for pricing the much larger super-senior tranche of this securitization.  While it used a reasonable methodology in pricing the subordinate tranches, the assumptions used as inputs were unreasonable.  However, given the relatively small size of these subordinate positions, the decisions made in price testing these assets would not support a finding that the valuation of Lehman's entire CDO portfolio in May 2008 was unreasonable.

### (3)  Examiner's Review of Lehman's Largest U.S. ABS/CRE CDO Positions

To provide a second check on the reasonableness of Lehman's valuation of its U.S. ABS/CRE CDO assets, a sample of Lehman's ABS/CRE CDO positions were chosen for review using the Intex cash flow engine.[2005]  This review does not represent the Examiner's opinion of the actual 2008 value of these CDOs, but rather is intended to provide context in which to assess the reasonableness of Lehman's valuations.  Those

---

[2002] Lehman, 05-30-08 PRICING.xls, tab "ABS Secondary" [LBEX-BARFID 0002548].

[2003] *Id.*

[2004] *See* E&Y, Lehman Brothers Holdings Inc. Summary Review Memorandum Consolidated Financial Statements Quarter-ended May 31, 2008 (Aug. 8, 2008), at p. 8 [EY-SEC-LBHI-WP-2Q08 000125].

[2005] The Examiner did not independently review Lehman's valuation of CLOs.  An interview with Usman Babar confirmed that Lehman's product controllers used Intex to value CLOs and had confidence in the market yields used.  While Babar noted that Lehman did not check the Intex model against deal documents, which would typically be best practice, the valuation of CLOs by this method is less likely to result in misstatement.  Examiner's Interview of Usman Babar, Oct. 16, 2009, at p. 3.

positions chosen for valuation were the largest Lehman positions held in May and August of 2008 for which Intex was able to compute cash flows. The ABS/CRE CDOs chosen were CEAGO 2007-1A, the valuation of which is briefly described above, CBRE 2007-1A, ACCDO 5A, and NEWCA 2005-7A. Two of these securities, CEAGO and ACCDO are primarily backed by residential mortgage-backed securities. CBRE and NEWCA are primarily backed by commercial mortgage-backed securities. Taken together, these four CDO positions represent 80% of the total value of the U.S. ABS/CRE CDO positions identified on the Lehman balance sheet as of May 31, 2008.[2006]

Only information available to Lehman's product controllers in May and August 2008 was used in calculating estimated prices for these CDOs. The principal sources of information used were the contractual terms of the securities, along with market interest rate data and credit index data from JPMorgan, Intex Solutions, Markit, and Bloomberg. The prices of the securities were estimated using a waterfall approach. The future cash flows of each CDO were estimated through time according to the terms outlined in the prospectus, including periodic examination of over-collateralization and interest coverage tests. The Examiner estimated the liquidation price and default rate for each security underlying the CDO by looking at rating agency reports for structured products or using representative indices. Prepayment assumptions were calibrated using the historical information available over the last five months for each of the

[2006] *Id.*

underlying securities where available. Recovery assumptions for the underlying securities were calibrated from data in the trustee reports, as provided through Intex. The future cash flows of the assets were applied according to the waterfall and incorporating these default and prepayment assumptions. The coupon and principal payments of each tranche were discounted at the rate of return required by investors, based on the characteristics of the security as calculated from the indices described above in order to determine the price of the security.

The results of this independent valuation were mixed, as would be expected given the extremely illiquid CDO market in May 2008. The following table shows Lehman's desk price, the price calculated by its Product Control Group, and the price estimated by the Examiner's model for tranches of each of the four securitizations selected as of May 31, 2008.

**CDO Positions, Desk Price, PC Price, and Examiner's Model Price as of May 31, 2008**

| Position | CUSIP | Notional Value of the Position ($000)[2007] | Desk Price[2008] | PC Price[2009] | Examiner's Model Price[2010] |
|---|---|---|---|---|---|
| CEAGO 2007-1A A1 | 14984XAA6 | 837,385 | 57.35 | 52.65 | 65.13 |
| CEAGO 2007-1A A2 | 14984XAC2 | 76,167 | 34.00 | 30.83 | 26.33 |
| CEAGO 2007-1A B | 14984XAD0 | 20,773 | 28.00 | 29.39 | 16.63 |
| CEAGO 2007-1A C | 14984XAE8 | 11,376 | 28.00 | 29.68 | 0.91 |
| CEAGO 2007-1A D | 14984XAF5 | 2,473 | 30.00 | 35.78 | 1.10 |
| CEAGO 2007-1A S | 14984XAB4 | 5,782 | 92.00 | 88 | 84.17 |
| | | | | | |
| CBRE 2007-1A D | 1248MLAL7 | 10,000 | 80.00 | NCF | 50.43 |
| CBRE 2007-1A E | 1248MLAN3 | 7,000 | 80.00 | NCF | 50.70 |
| | | | | | |
| ACCDO 5A B | 00388EAB7 | 8,250 | 69.24 | NCF | 40.31 |
| | | | | | |
| NEWCA 2005-7A 3 | 651065AE4 | 5,000 | 79.23 | NCF | 50.72 |

By differing amounts, the model price calculated by the Examiner was lower than the desk and Product Control prices reported by Lehman in almost every instance. As discussed above, the valuation of the most junior of the Ceago subordinate tranches provides significantly lower valuations than those reported by Lehman. However, the one exception to this rule was the super-senior Ceago A1 tranche, which was the largest position of those tested by a factor of 10. For the Ceago A1 tranche, the Examiner's estimate provided a price higher than that reported by Lehman. Applying the prices

---

[2007] Lehman, 05-30-08 PRICING.xls, at tab "ABS Secondary" [LBEX-BARFID 0002548].

[2008] *Id.*

[2009] *Id.*

[2010] *See* Appendix 14, Valuation - CDO.

calculated to the notional values of the positions, the Examiner's estimate of the value of these CDO positions is $44 million higher than the value reported by Lehman.

For August 2008, the same group of CDOs accounted for approximately 81% of the total value of the U.S. ABS CDOs reported on Lehman's balance sheet.

### CDO Positions, Desk Price, PC Price and Examiner's Model Price as of August 31, 2008

| Position | CUSIP | Notional Value of the Position (US$000)[2011] | Desk Price[2012] | PC Price[2013] | Examiner's Model Price[2014] |
|---|---|---|---|---|---|
| CEAGO 2007-1A A1 | 14984XAA6 | 834,033 | 43.50 | 37.09 | 59.94 |
| CEAGO 2007-1A A2 | 14984XAC2 | 76,167 | 30.00 | 30.21 | 21.04 |
| CEAGO 2007-1A B | 14984XAD0 | 20,773 | 25.00 | 23.02 | 12.34 |
| CEAGO 2007-1A C | 14984XAE8 | 11,376 | 10.00 | 9.34 | 0.96 |
| CEAGO 2007-1A D | 14984XAF5 | 2,473 | 10.00 | 11.26 | 1.16 |
| CEAGO 2007-1A S | 14984XAB4 | 5,560 | 92.00 | 85.00 | 80.11 |
|  |  |  |  |  |  |
| CBRE 2007-1A D | 1248MLAL7 | 10,000 | 50.00 | 20.76 | 42.48 |
| CBRE 2007-1A E | 1248MLAN3 | 7,000 | 50.00 | 20.76 | 42.69 |
|  |  |  |  |  |  |
| ACCDO 5A B | 00388EAB7 | 8,250 | 69.24 | 31.23 | 31.61 |
|  |  |  |  |  |  |
| NEWCA 2005-7A 3 | 651065AE4 | 5,000 | 79.23 | 34.21 | 39.02 |

While there are some large differences between the desk and Product Control prices in August 2008, these differences appear largely with Lehman's smaller positions. Furthermore, as in May, the model prices calculated by the Examiner are lower than the

---

[2011] Lehman, 08-29-08 PRICING.xls, at tab "ABS Secondary" [LBEX-BARFID 0004120].

[2012] *Id.*

[2013] *Id.*

[2014] *See* Appendix 14, Valuation - CDO.

desk and Product Control prices reported by Lehman in almost every instance. However, the higher price calculated by the Examiner for the Ceago A1 tranche once again brings the Examiner's total valuation of these CDO positions above that of Lehman by $119 million.

Ultimately, this exercise in valuation confirms only that pricing ABS/CRE CDO assets in the 2008 market was extremely difficult and results were sensitive to small deviations in input assumptions and methodology. However, the fact that this model provides a total valuation that is close to, and slightly higher than, the total valuations reported by Lehman in both May and August 2008, supports the reasonableness of Lehman's valuations by demonstrating the range of possible valuations.

### (4) Examiner's Findings and Conclusions With Respect to the Reasonableness of Lehman's Valuation of its CDOs

The lack of regular transactions in 2007 and 2008 reduced the quality and availability of the basic market information necessary to reliably value many types of securities, including CDOs. This lack of price transparency meant that the exercise of judgment was a large part of the process of providing a valuation of Lehman's CDO portfolio in 2008. The inherent difficulty of pricing Lehman's CDO portfolio in the unprecedented market conditions of 2008 makes it difficult to support a finding that Lehman's valuation of its CDO portfolio was unreasonable. Lehman's own Product Control process, which was reviewed by E&Y, provided May 2008 valuations that varied from the desk prices by only 3%. Furthermore, a review of Lehman's largest

CDO positions using an Intex model provided prices close to those reported by Lehman and actually suggests that the value of Lehman's CDO portfolio may have been slightly understated. As noted, the Examiner identified problems with several aspects of Lehman's price control process for certain CDOs and it does not appear that the Product Control Group was a robust check on desk prices. However, the valuations reported by Lehman were reasonable in the context of 2008 market conditions and the information available. As noted above, the Examiner has identified problems with the valuation of certain portions of Lehman's CDO portfolio during 2008; however, the size of the positions at issue renders these problems immaterial. Accordingly, the Examiner does not find evidence to support a finding that Lehman's CDO valuations were unreasonable.

### j) Examiner's Analysis of the Valuation of Lehman's Derivatives Positions

#### (1) Overview of Lehman's Derivatives Positions

Derivatives are a broad category of financial instruments whose value is derived from some other asset or index.[2015] The derivative itself is a contract between two or more parties and is sometimes referred to as a "financial contract."[2016] Its value is determined by fluctuations in the underlying asset, typically stocks, bonds,

---

[2015] John C. Hull, *Options, Futures, and Other Derivatives* 1 (6th ed. 2006); *see also* International Swaps and Derivatives Association, Product Descriptions and Frequently Asked Questions, http://www.isda.org/educat/faqs.html#1 (last visited Jan. 13, 2010).

[2016] *See, e.g.*, U.S. Dep't of the Treasury, Cross-Border Derivatives Reporting System Becomes Operational (Apr. 27, 2007), *available at* http://www.treas.gov/tic/dqanda.html.

commodities, currencies, interest rates or market indices. Common types of derivatives include futures contracts, in which an agreement is made to buy or sell a particular commodity or financial instrument at a pre-determined price in the future; forward contracts, transactions in which delivery of the commodity is delayed until after the contract is made and the price determined; options, in which a party purchases the right to buy or sell a commodity or financial instrument at a predetermined price at some point in the future; and swaps, the exchange of one security or rate for another.[2017] Derivatives can be used to hedge risk, or for speculative purposes.

Lehman entered into derivative transactions on behalf of its clients and itself to take advantage of speculative opportunities, and to manage its exposure to market and credit risks resulting from its trading activities.[2018] As of May and August of 2008, Lehman held over 900,000 derivatives positions worldwide.[2019] The net value of Lehman's derivatives positions was approximately $21 billion as of May 31, 2008.[2020] At that time, the net value of these positions made up a relatively small percentage of Lehman's total assets, approximately 3.3%. Approximately 90% of Lehman's derivatives assets were classified as Level 2 assets under SFAS 157.[2021] The following

---

[2017] John C. Hull, *Options, Futures, and Other Derivatives* 1-8 (6th ed. 2006); U.S. Commodity Futures Trading Comm'n, Glossary, http://www.cftc.gov/educationcenter/glossary/index.htm (last visited Jan. 13, 2010).
[2018] LBHI 10-Q (filed July 10, 2008) at pp. 91-92.
[2019] FRBNY, External Trade Count [FRBNY to Exam 014654].
[2020] LBHI 10-Q (filed July 10, 2008) at p. 26.
[2021] *Id.* at p. 29.

table shows the value and type of Lehman's various derivatives positions from November 30, 2006 to May 31, 2008.  Derivative contracts with positive values were booked as assets, while those with negative values were booked as liabilities.  As per the Financial Accounting Standards Board, derivative assets are defined as "probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events."[2022]  Derivative liabilities are defined as "probable future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions or events."[2023]

---

[2022] Fin. Accounting Standards Bd., Statement of Financial Accounting Concepts No. 6, Elements of Financial Statements 6 (December 1985).

[2023] *Id.*

# Fair Value of Derivatives and Other Contractual Agreements - Assets and Liabilities[2024]

## Note: All values are in $ million

| | November 30, 2006 | | November 30, 2007 | | May 31, 2008 | |
|---|---|---|---|---|---|---|
| | Assets | Liabilities | Assets | Liabilities | Assets | Liabilities |
| Over-the-Counter | | | | | | |
| Interest rate, currency and credit default swaps and options | $    8,634 | $  5,691 | $    22,028 | $ 10,915 | $ 25,648 | $   9,733 |
| Foreign exchange forward contracts and options | $    1,792 | $  2,145 | $    2,479 | $  2,888 | $ 2,383 | $  2,270 |
| Other fixed income securities contracts (including TBAs and forwards) | $    4,308 | $  2,604 | $    8,450 | $  6,024 | $ 10,341 | $  5,692 |
| Equity contracts (including equity swaps, warrants and options) | $    4,739 | $  4,744 | $    8,357 | $  9,279 | $ 6,022 | $  6,391 |
| Exchange traded | | | | | | |
| Equity contracts (including equity swaps, warrants and options) | $    3,223 | $  2,833 | $    3,281 | $  2,515 | $ 2,597 | $  1,799 |
| Total | $    22,696 | $ 18,017 | $    44,595 | $ 31,621 | $ 46,991 | $ 25,885 |

[2024] Lehman, Annual Report for 2006 as of November 30, 2006 (Form 10-K) (filed on Feb. 13, 2007), at p. 91 ("LBHI 2006 10-K"); LBHI 2007 10-K at p. 106;  LBHI 10-Q (filed July 10, 2008) at p. 26.

The following table shows the net value of Lehman's derivatives positions between November 2006 and May 2008.

**Fair Value of Derivatives and Other Contractual Agreements - Net**[2025]

**Note: All values are in $ million**

|  | November 30, 2006 | November 30, 2007 | May 31, 2008 |
|---|---|---|---|
| Over-the-Counter |  |  |  |
| Interest rate, currency and credit default swaps and options | $ 2,943 | $ 11,113 | $ 15,915 |
| Foreign exchange forward contracts and options | $ (353) | $ (409) | $ 113 |
| Other fixed income securities contracts (including TBAs and forwards) | $ 1,704 | $ 2,426 | $ 4,649 |
| Equity contracts (including equity swaps, warrants and options) | $ (5) | $ (922) | $ (369) |
| Exchange traded |  |  |  |
| Equity contracts (including equity swaps, warrants and options) | $ 390 | $ 766 | $ 798 |
| Total | $ 4,679 | $ 12,974 | $ 21,106 |

While Lehman did not file public financial statements for the third quarter of 2008 before its bankruptcy filing, documents from its Product Control Group show that, as of August 31, 2008, it determined its derivative assets to be $46.3 billion and its derivative liabilities to be $24.2 billion, for a net value of $22.2 billion.[2026] This represents an almost 100% increase over the net value stated nine months earlier.

The largest holder of Lehman's derivatives positions was Lehman Brothers Special Financing ("LBSF"), an LBHI Affiliate.[2027] According to a presentation prepared by the New York Federal Reserve Bank in May of 2008, the three most common types of

[2025] LBHI 2006 10-K at p. 91; LBHI 2007 10-K, at p. 106; LBHI 10-Q (filed July 10, 2008) at p. 26.
[2026] Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812].
[2027] FRBNY, External Trade Count [FRBNY to Exam 014654].

transactions to which Lehman was a party were credit default swaps, interest rate swaps, and foreign exchange derivatives.[2028] Of the top 25 counterparties in terms of number of transactions, all are commercial banks and financial broker-dealers with the exception of American Insurance Group, which, with 5,400 trades, is nineteenth on this list.[2029] The same New York Federal Reserve Bank report shows that Lehman's top three counterparties as of May 2008 were Deutsche Bank, JPMorgan, and UBS, with approximately 59,000, 53,000 and 45,000 trades, respectively.[2030]

The valuation method applied to derivatives differs depending on the assets on which the derivative contract is based. Because derivatives are a large and heterogeneous asset class, there exists no single method to price all derivatives. Rather, depending on the underlying assets, traders develop and apply different valuation methods. Accordingly, the Examiner draws no conclusions regarding the pricing methodology used for any subset of Lehman's more than 900,000 derivatives positions. Rather, the Examiner's analysis has focused on Lehman's ultimate valuations for the derivatives positions reported on the respective LBHI Affiliates' balance sheets.

The Examiner has found insufficient evidence to support a finding that Lehman's valuation of its derivatives portfolio in 2008 was unreasonable. This conclusion is based on two factors. First, the nature of derivative transactions with sophisticated

---

[2028] *Id.*

[2029] FRBNY, Derivatives: Top 25 Counterparties by Deal Count [FRBNY to Exam 014653].

[2030] *Id.*

counterparties, who, through credit support annexes, will agree with or dispute marks in their own self-interest, limits the possibility of misstatement.  Second, a review of the internal price verification performed by Lehman's Product Control Group provides a further level of assurance that the derivative values reported by Lehman in 2008 were reasonable.

### (2)   Lehman's Use of Credit Support Annexes to Mitigate Derivatives Risk

To reduce counterparty credit exposure in its derivative transactions, Lehman, like most other financial institutions, executed binding credit support annexes ("CSAs") with its financial institution counterparties.  CSAs establish the rules and procedures under which a party that is "out of the money" on a derivatives transaction provides collateral to its counterparty based on its mark-to-market liability under the transaction. In this manner, CSAs operate to mitigate the risk that a party would hold an unsecured claim against its counterparty in respect of this liability in the event of early termination of the derivative transaction, such as due to the counterparty's filing for bankruptcy protection.[2031]

A party to a CSA is generally permitted to request, on a daily, weekly, or other defined basis, depending on the terms of the CSA, that its counterparty post

---

[2031] *See* International Swaps and Derivatives Association, 2002 Master Agreement, § 5(a)(vii) (listing bankruptcy as an event of default).

collateral.[2032]  Typically, CSAs provide for a "threshold amount" of risk exposure, below which a counterparty need not post collateral.[2033]  Accordingly, if Lehman determined that a derivatives contract had a present value of $20 million, and the CSA provided for a $5 million threshold amount, Lehman would ask that its counterparty post $15 million in collateral.  CSAs also typically contain a dispute resolution clause, providing a mechanism for parties to resolve disputes about the mark-to-market value of a derivatives contract.[2034]

CSAs are thus constructed to require the parties to come to agreement, or otherwise resolve their differences, regarding the price of a derivatives contract at any given point in time.[2035]  Even though any two parties may have many derivatives transactions between them, a single CSA may cover all of these transactions.  Lehman executed CSAs with the majority of the counterparties with which it entered into derivatives transactions.  Among the top 25 counterparties by number of derivatives transactions, Lehman executed 24 CSAs.[2036]  Of the top 25 counterparties by exposure,

---

[2032] *See* Int'l Swaps and Derivatives Ass'n, Guidelines for Collateral Practitioners (1996), at p. 24, *available at* http://www.isda.org/press/pdf/colguide.pdf.

[2033] Lehman, CSA - Collateral Agreement Screen [LBEX-LL 3150609].

[2034] *Id.*

[2035] The great majority of trades (such as credit default swaps on the majority of reference entities, interest rate swaps, and foreign exchange swaps) have well accepted valuation techniques as defined in the FASB's Accounting Standards Codification 820-10-55 and 815-10.  However, differences of opinions are possible given the role that judgment necessarily plays in valuing financial assets that do not have a readily observable market price.

[2036] FRBNY, Derivatives: Top 25 Counterparties by Deal Count [FRBNY to Exam 014653]; CSAs pulled from "Entity Master," a Barclays system.

Lehman executed 15 CSAs.[2037] Typical industry practice was that only investment-grade sovereign and non-financial corporate entities might not be bound by these agreements, and transactions with such entities were likely to be limited to "vanilla," *i.e.*, standard and not exotic, products.

Derivative counterparties seek to avoid pledging collateral when possible for the reason that doing so diminishes liquidity and imposes an opportunity cost. In other words, if a party did not pledge an asset as collateral under a CSA, it could otherwise finance or sell such asset at its discretion. Hence, a sophisticated party would not accept its counterparty's claim of a derivative's value without performing its own analysis. Just as Lehman would not agree to send $15 million to a counterparty, for example, upon that party's request for collateral without verifying the derivatives marks itself, neither would Lehman's sophisticated counterparties accept Lehman's marks absent their own scrutiny.

As part of the investigation, the Examiner reviewed the values that one of Lehman's counterparties, Citigroup, determined for approximately 700 of its derivative trades with Lehman as of April 18, 2008.[2038] While these marks cover only a small portion of the derivatives positions held by Lehman, they provide an example of how sophisticated counterparties provide a check on the other's marks for derivatives.

---

[2037] *Id.*

[2038] Citigroup, untitled spreadsheet [CITI-LBHI-EXAM 00030489].

The derivative contracts between Lehman and Citigroup included credit default swaps on corporate entities, credit default swaps on ABS and derivatives based on the CDX, LCDX and CMBX indices.[2039]  The Citigroup marks indicate an aggregate value of the positions of approximately $426 million in favor of Lehman.[2040]  Lehman's marks for the same positions suggest an aggregate value of approximately $460 million in its favor, about 8% higher than the Citigroup valuation as of April 18, 2008.[2041]  While this variance is not insignificant, it is not unreasonable for two market participants to have aggregate prices that vary by this much, particularly in light of the adverse market conditions of April 2008.  The comparison of marks revealed in this Citigroup document demonstrates how sophisticated counterparties tracked one another's valuations of derivatives contracts, a process necessitated by CSAs.

In this manner, CSAs operated in the normal course of business to effectively limit the latitude Lehman had in marking its derivatives positions and, relative to other

---

[2039] CDX family of indices is the standard North American and Emerging Markets tradable credit default swap family of indices worldwide. These indices are administered by Markit. The indices provide credit default swaps on a basket of reference entities.  The main indices are: Markit CDX North American Investment Grade (125 names), Markit CDX North American Investment Grade High Volatility (30 names from CDX IG),  Markit CDX North American High Yield (100 names), Markit CDX North American High Yield High Beta (30 names), North American Emerging Markets (15 names), and North American Emerging Markets Diversified (40 names).  LCDX (loan-only credit default swap) consists of 100 reference entities, referencing 1st lien loans listed on the Markit Syndicated Secured List.  These indices are administered by Markit.  CMBX index is a synthetic tradable index referencing a basket of 25 commercial mortgage-backed securities. Markit owns and administers the CMBX, which is a liquid, tradable tool allowing investors to take positions on commercial mortgage-backed securities via CDS contracts.

[2040] Citigroup, untitled spreadsheet [CITI-LBHI-EXAM 00030489].

[2041] *Id.*

asset classes, provided an additional level of protection against a material misstatement.[2042]

### (3) Lehman's Price Testing of its Derivatives Positions

As with other asset classes, the marks Lehman reported for its derivatives assets were determined by its trading desks, and these marks were subject to price testing by Lehman's Product Control Group.[2043] Because of the large number of derivatives positions held by Lehman and the different methods used by the trading desks to mark these positions, the Examiner's analysis has focused on Lehman's Product Control Group and its price verification process for derivatives.[2044]

The Examiner's review of Lehman's product control process for derivatives revealed that Lehman's price testing of these assets was more robust than that for other asset classes. There were four groups at Lehman primarily responsible for valuation,

---

[2042] The Examiner has identified a spreadsheet in which Lehman tracked disputes with its counterparties over the mark-to-market value of derivatives. This spreadsheet also shows which disputes have been resolved, although it does not specify the outcome of each dispute. *See* Lehman, DERIVATIVES_MTM_DISPUTE_LOG.xls [LBEX-LL 3638800]; *see also* e-Mail from Tyler Peters, Lehman, to Ross Shapiro, Lehman, *et al.* (Jun. 25, 2008) [LBEX-LL3638822].

[2043] E&Y, Walkthrough – Global Trading Strategies Walkthrough [EY-SEC-LBHI-EED-GAMX-07-007515]; Lehman, Price Verification Policy Global Capital Markets 2008 [Draft], at pp. 4, 49-54 [LBHI_SEC07940_2965994].

[2044] The Examiner also notes that E&Y performed yearly audits and quarterly reviews of Lehman's Product Control process. After performing quarterly walkthroughs in 2008, E&Y concluded that appropriate controls had been effectively designed and placed in operation for the price verification of Lehman's derivatives. *See, e.g.*, E&Y, Walkthrough Template, Derivative Margin / Collateral Management [EY-SEC-LBHI-EED-GAMX-08-014919]; E&Y, Walkthrough Template, High Grade and High Yield Credit Default Swap Process [EY-SEC-LBHI-FID-GAMX-08-060341]; E&Y, CRE Derivative Price Verification Process [EY-SEC-LBHI-MC-GAMX-08-085788].

price testing and model approval regarding derivatives.[2045]   The Capital Markets Finance group was responsible for daily revenue analysis and reporting, validation of inventory valuations and interfacing with internal and external auditors and regulators.[2046]  The Product Control Group performed price verification procedures for derivatives on a monthly basis.[2047]   The Complex Derivatives Review Committee reviewed complex transactions to ensure that they were modeled, valued and booked appropriately.[2048]   Finally, the Model Control Committee reviewed and approved the models used to mark derivatives positions.[2049]

As noted above, the valuation of derivatives follows no set methodology, but varies according to the nature of the derivative contract at issue.[2050]   Price verification procedures used by the Product Control Group included the use of independent market quotes from vendors, benchmarking against similar assets, recent trading activity and collateral marks.[2051]   In the case of illiquid positions, the Product Control Group could use internally developed analytical procedures or external pricing services.   Variances above certain thresholds were considered for adjustment and variances were resolved

---

[2045] *See* Lehman, Price Verification Presentation (Aug. 10, 2006), at pp. 4, 8, 12 & 15 [LBEX-WGM 747129].

[2046] *Id.* at p. 4.

[2047] *Id.* at pp. 8-9.

[2048] *Id.* at pp. 12-14.

[2049] *Id.* at pp. 15-16.

[2050] Lehman, Price Verification Policy Global Capital Markets 2008 [Draft], at pp. 13-17 [LBHI_SEC07940_2965994] (noting different price verification methodologies for different kinds of derivatives).

[2051] *Id.*

through conversations between the Product Control Group and the appropriate trading desk.[2052]

The Examiner obtained detailed information regarding Lehman's Product Control process for its portfolio of credit default swaps ("CDS") written on asset-backed securities ("ABS") and collateralized debt obligations ("CDOs").  As of May 31, 2008, the total market value of these positions, as reported by Lehman, was approximately $5.4 billion, or 25% of the aggregate market value of Lehman's entire derivatives portfolio.[2053]

To perform price verification of these assets, Lehman's Product Control Group obtained third-party marks for individual CUSIPs[2054] from data providers Fitch Ratings ("Fitch") and Markit. Where the Product Control Group had only one Fitch or Markit price for a particular security, it adopted that price as its mark.  Where both Fitch and Markit prices were available, the average of the two was used.[2055]

While there was some variance at the individual security level between the desk marks and the Product Control valuations, there does not appear to be a bias toward

---

[2052] The established variance thresholds also differed depending on the type of derivative in question.  *See* Lehman, Price Verification Policy Global Capital Markets 2008 [Draft], at pp. 13-17 [LBHI_SEC07940_2965994] (noting different price verification methodologies for different kinds of derivatives).

[2053] *See* Lehman, 5-30-08 CDS on CDO.xls [LBEX-BARFID 0015341]; Lehman, 5-30-08 CDS on ABS.xls [LBEX-BARFID 0013231].

[2054] CUSIP refers to the 9-character alphanumeric security identifier established by the Committee on Uniform Security Identification Procedures.

[2055] *See* Lehman, 5-30-08 CDS on CDO.xls [LBEX-BARFID 0015341]; Lehman, 5-30-08 CDS on ABS.xls [LBEX-BARFID 0013231].

either under- or over-statement. As a result, the aggregate difference in valuation between the desk and Product Control valuations was not significant relative to the value of the positions. The tables below provide the trading desk and Product Control valuations for each of CDS on ABS and CDS on CDO as of May 31, 2008, and August 31, 2008.[2056] Because multiple Lehman entities may have held positions in a single derivatives transaction, the number of positions held as of May 31, 2008, was much greater than the number of unique transaction CUSIPs.

**Valuations of Credit Default Swaps as of May 31, 2008[2057]**

|  | # Positions | # CUSIPs | Notional ($ billion) | Desk Value ($ billion) | Product Control / Third-Party Value | Variance ($ billion) |
|---|---|---|---|---|---|---|
| CDS on ABS | 12998 | 1474 | 6.25 | 4.26 | 4.34 | 0.08 |
| CDS on CDO | 1910 | 349 | 3.38 | 1.18 | 1.20 | (0.02) |

---

[2056] LBSF was likely the primary LBHI Affiliate holding these positions, *see* FRBNY, External Trade Count [FRBNY to Exam 014654], although information confirming this fact was not available.
[2057] 5-30-08 CDS on CDO.xls [LBEX-BARFID 0015341]; "5-30-08 CDS on ABS.xls" [LBEX-BARFID 0013231].

## Valuations of Credit Default Swaps as of August 31, 2008[2058]

|  | # Positions | # CUSIPs | Notional ($ billion) | Desk Value ($ billion) | Product Control / Third-Party Value ($ billion) | Variance ($ billion) |
|---|---|---|---|---|---|---|
| CDS on ABS | 12938 | 1584 | 4.90 | 3.60 | 3.68 | 0.08 |
| CDS on CDO | 572 | 347 | 3.40 | 1.02 | 1.03 | (0.01) |

As the tables above demonstrate, the variance between Lehman's Desk valuation of CDS, which was the valuation reported by Lehman in its public financial statements, and the Product Control valuation was immaterial relative to the size of Lehman's CDS portfolio in both May and August of 2008. Because the Product Control Group based its valuations on third-party pricing sources, its estimated marks represent market opinion and not simply the view of Lehman's product controllers.[2059]

For the reasons described above, including the role played by CSAs, the review provided by the Product Control Group and the lack of material variances with third-

[2058] Lehman, 12.32.6 08-29-08 CDS on CDO[1].xls [LBEX-LL 3642034]; Lehman, 12.32.5 08-29-08 CDS on ABS[1].xls [LBEX-LL 3638826].

[2059] Lehman's Product Control group produced monthly Valuation & Control Reports. *See, e.g.,* Lehman, Valuation & Control Report - Fixed Income Division (July 2008) [LBEX-WGM 790236]; Lehman Brothers Holdings Inc., Valuation & Control Report - Fixed Income Division (June 2008) [LBEX-WGM 763320]. Among other things, these reports note the challenges product controllers faced in performing their price verification duties. Such issues included the fact that the CDS price testing database was inefficient and sometimes created false variances and the fact that some classes of derivatives were not price tested at all. Lehman, Valuation & Control Report - Fixed Income Division (May 2008), at p. 27 [LBHI_SEC07940_2962709]. As these issues related only to the Product Control review process, and not to the trading desks' valuation of derivatives, they did not directly suggest that any marks were misstated. As described with respect to the valuation of residential whole loans, the Examiner has determined that weaknesses in the price verification process did not impact the reasonableness of the marks determined by Lehman.

party pricing sources, the Examiner has found insufficient evidence to support a finding that Lehman's valuation of its derivatives portfolio in 2008 was unreasonable.

### k) Examiner's Analysis of the Valuation of Lehman's Corporate Debt Positions

#### (1) Overview of Lehman's Corporate Debt Positions

Lehman actively invested in the debt of both public and private companies around the world.  In 2008, Lehman's corporate debt portfolio included both high grade and high yield bonds and loans.[2060]  As of May 31 and August 31, 2008, the number of corporate debt positions listed in Lehman's Global Finance System ("GFS"), Lehman's tracking system for financial inventory, was 10,629 and 10,374 respectively.[2061]  As of May 31, 2008, Lehman reported that it held approximately $50.0 billion in corporate debt assets, 89% of which Lehman determined were Level 2 assets.[2062]  As of August 31, 2008, Lehman determined that the value of its corporate debt portfolio was approximately $41.7 billion, all of which it determined were Level 2 assets.[2063]

The valuation of corporate debt positions for which external quotes or recent trade information do not exist involves an analysis of the financial condition and

---

[2060] Lehman, REC May-08 13-June-08 FINAL.xls [LBEX-LL 1104843]; Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812].

[2061] Lehman, REC May-08 13-June-08 FINAL.xls [LBEX-LL 1104843]; Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812].  These thousands of positions approximate the number of unique corporate debt positions held by Lehman, though the actual number of unique positions differed because (1) GFS reports the same investment held by two different legal entities as two different positions, and (2) adjustments to positions made by system users appear in GFS as a unique position when in fact these entries are adjustments to an existing position.

[2062] LBHI 10-Q (filed July 10, 2008) at p. 29.

[2063] Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812].  Lehman did not file a quarterly report for the third quarter of 2008 before its bankruptcy filing.

prospects of the company that issued the debt.[2064]  In order to determine whether there is a finding that Lehman's valuation of its entire portfolio of corporate debt positions was unreasonable, the Examiner would have needed to collect and analyze such contemporaneous information with respect to each of Lehman's corporate debt positions.  The Examiner also considered what impact the valuation of these assets would have on the solvency analysis for LBHI Affiliates.  According to Lehman's GFS database, LCPI was the only LBHI Affiliate holding significant corporate debt assets in May and August 2008.[2065]  Because the Examiner has determined that LCPI was either borderline solvent or insolvent during the relevant period, the valuation of corporate debt assets does not materially enhance the solvency analysis of any LBHI Affiliate.  In light of this fact, and the time and expense of such an exercise, the Examiner determined that extensive investigation of Lehman's valuation of corporate debt assets would be an imprudent use of Estate resources.

However, the Examiner did review a sample of Lehman's largest U.S. corporate debt positions and has identified a number of issues with respect to the price

---

[2064] The information required includes financial and operational metrics such as the debt issuer's balance sheet leverage ratios, profitability ratios, and return on investment.  *See* Shannon P. Pratt *et al.*, *Valuing a Business* 522-25 (4th ed. 2000).

[2065] The Examiner reviewed the largest 15 corporate debt positions held by Lehman in May and August of 2008.  Of these, LBSF held an immaterial amount of assets and LCPI was the only other LBHI Affiliate holding corporate debt assets. *See* Lehman, GFS Reconciliation Files REC Feb-08.03.08 FINAL.xls [LBEX-LL 1104828]; Lehman, REC May-08 13-June-80 FINAL.xls [LBEX-LL 1104843]; Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812].  While the position-level data in Lehman's GFS system was understood to contain some inaccuracies, it was relied on as a management reporting tool and is the only comprehensive source showing ownership of individual positions.  Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 4.

verification process performed by the Product Control Group for these positions. In aggregate, the issues and errors found by the Examiner are not biased toward either under- or overvaluation and do not, by themselves, suggest that there exists a finding that the value of any corporate debt position was unreasonable. Should sufficient time and resources be available these issues may be investigated further.

### (2) Lehman's Price Testing of its Corporate Debt Positions

The marks Lehman reported in its public financial statements for its corporate debt assets were those determined by its trading desks, and, as with other asset classes, these marks were subject to price testing by Lehman's Product Control Group.[2066] The Product Control Group used a number of methodologies to perform price verification of corporate debt positions, ranging from use of external quotes and trade prices to modeling techniques. The method used for price verification was determined according to the SFAS Fair Value level of the position, as well as its liquidity and the availability of information.[2067]

The methods preferred by Lehman's product controllers for price testing corporate debt positions were the use of external quotes and recent trade prices.[2068] If

---

[2066] Lehman, Price Verification Policy Global Capital Markets 2008 [Draft] [LBHI_SEC07940_2965994]; Lehman, HG, HY, & EMG Cash Price Testing Policy & Procedure (Jan. 2008), at p. 2 [LBEX-BARVAL 0000001].

[2067] Id.

[2068] See Lehman, HG, HY, & EMG Cash Price Testing Policy & Procedure (Jan. 2008), at p. 3 [LBEX-BARVAL 0000001]; Lehman, Valuation Review – 2nd Quarter 2008 (July 2008), at p. 15 [LBHI_SEC07940_1184255]. In using external quotes, the product controllers would test desk prices based on bid prices for the asset reported by the Loan Syndications and Trading Association ("LTSA") or

external quotes did not exist and there was no relevant trading activity for a particular position, Lehman's Product Control Group used models to determine a test price for a particular position.[2069]    In addition, product controllers also occasionally used

---

Mark-it Partners.  *See* Lehman, Valuation Review – 2nd Quarter 2008 (July 2008), at p. 15 [LBHI_SEC07940_1184255].  A more generalized price verification policy document also mentions EJV (EJV Partners L.P.), Interactive Data Corporation (IDC), Asset Backed Securities Group (ABSG), IDSI (Interactive Data's securities pricing service), and Bloomberg as pricing sources.  *See* Lehman, HG, HY, & EMG Cash Price Testing Policy & Procedure (Jan. 2008), at p. 3 [LBEX-BARVAL 0000001].  Prices that were more than a month old and prices that were otherwise deemed incorrect were disregarded.  *Id.*

[2069] The models used were known as the Credit Default Swap ("CDS") and Credit Rating ("CR") Matrices. There are three primary drivers or inputs in valuing a debt security: (1) the payments to be received on the debt (*i.e.* the income Lehman would receive from holding the security), (2) the timing of the payments, including how long until maturity, and (3) the appropriate yield to apply to the future payments to estimate the present value.  *See* Shannon P. Pratt *et al.*, *Valuing a Business* 521 (4th ed. 2000). The first input, also called the coupon rate, was determined by looking at the debt instrument itself.  The coupon rate is the stated interest rate paid by the borrower.  The second input, the timing of the payments, was assumed by Lehman to be semi-annual, and, until 2008, was assumed to last until expected maturity.    *See* Lehman, Loans PxTesting_033108.xls [LBEX-BARVAL 0054040-0061041]. Through April 2008, the stated maturity was used as a proxy for expected maturity, with some adjustment for situation-specific information.  *See* Lehman, Loans_PxTesting-022908.xls [LBEX-BARVAL 0000005].  In May 2008, the Product Control group changed its practice so that the expected maturity was assumed to be 60 percent of stated maturity.  *See* Lehman, Loans PxTesting_053108–final.xls [LBEX-BARVAL 0061231].  The third and final value driver in valuation of a debt security is the yield, or discount rate, used to determine the present value of the payments received.  This is an assumption that requires some analysis in order to estimate properly, and a CDS Matrix is a tool that can be used to estimate this rate.    *See* Lehman, Valuation Review – 2nd Quarter 2008 (July 2008), at p. 15 [LBHI_SEC07940_1184255].  When using a CDS Matrix methodology the discount rate is estimated using matrices of yields based on CDS prices reported for the same issuer or a comparable issuer.  Lehman, Loans PxTesting_053108–final.xls [LBEX-BARVAL 0061231].  These yields or spreads are market-based indications of what investors would expect to receive on similar debt, and therefore are appropriate discount rates to use to value the specific debt instrument. If appropriate CDS yields are not available, perhaps because there is no CDS market for the company's debt or a comparable company's debt, an alternative approach known as a Credit Rating ("CR") Matrix may be used to determine an estimated yield.  Lehman, Valuation Review – 2nd Quarter 2008 (July 2008), at p. 15 [LBHI_SEC07940_1184255]. The difference between the CDS Matrix and CR Matrix approaches is in the estimation of the discount rate.  In the CR Matrix methodology, the discount rate is determined based on spreads for debt issued by a benchmark company with a similar business model and capital structure as the subject issuing company.   For this process, Product Controllers developed a credit rating matrix using rating/yield information from Loan Connector, an internal Lehman system, and generic spreads based on loan credit ratings as provided by Reuters Loan Pricing Corporation.

"alternative procedures," which included determining test prices for certain instruments based on typical relationships between the types of loans.[2070]

On a monthly basis, Lehman would populate a Microsoft Excel file, which it called the "price testing workbook," with all of its U.S. bank loans, and perform one of the testing methodologies identified above. In May 2008, the price testing workbook contained positions accounting for $32.7 billion, or 65% of Lehman's corporate debt portfolio.[2071] In August 2008, the price testing workbook contained positions accounting for $29.0 billion, or 70% of the corporate debt portfolio.[2072] Following is a table of the methods used to test Lehman's U.S. positions.

---

[2070] For example, if the price of a Term Loan was assumed to be Fair Market Value, a Delayed Draw Term Loan was priced at 0.5 points above the Term Loan. *See* Ernst & Young, Contingent Acquisition Facility Audit Approach [EY-SEC-LBHI-FID-GAMx-07 025076]. For example, in the May price testing file, the testing mark for the First Data "Sr. Cash Pay Bridge" position was determined based on the test price for the Term Loan (based on a third-party sale) less 4.75 basis points. *See* Loans PxTesting_053108 –final.xls, Tab PV, lines 533-549 [LBEX-BARVAL 0061231]. Similarly, Term Loans were priced at 2 points above Revolving Facilities; Senior Subordinate Notes were priced at 4 points above Senior PIK Bridge Loans; and Senior Bridges were priced at 1 point above Subordinate Bridges. *Id.* The reasonableness of these ranges depends on the particular circumstances of the position in question.

[2071] Lehman, Loans PxTesting_05310–final.xls [LBEX-BARVAL 0061231].

[2072] Lehman, Loans PxTesting_083108 v3.xls [LBEX-BARVAL 0048917]. Testing files for non-U.S. positions were not available and the Examiner expresses no view of the reasonableness of the valuation methodology or ultimate marks reported for Lehman's non-U.S. corporate debt positions.

**Methods Used to Price Test Lehman's Corporate Debt Portfolio
in May and August 2008[2073]**

| Method | Percentage of assets tested (by value of positions) | |
| --- | --- | --- |
| | May-08 | Aug-08 |
| External Quote | 13.8% | 16.3% |
| Trading Activity | 9.6% | 2.3% |
| CDS matrix | 64.2% | 60.3% |
| CR matrix | 11.9% | 15.5% |
| Alternative Process | 0.4% | 5.6% |
| **Total** | **100.0%** | **100.0%** |

As the table above indicates, in May and August of 2008, Lehman's product controllers were unable to use external quotes or trading activity to perform price testing for most corporate debt positions and relied on the modeling techniques described above.

After the product controllers determined their test marks for a position, variances were calculated. Variances are defined as the difference between the trading desk's mark and the mark calculated by the product controller. The thresholds for variances requiring further action were higher for high grade and high yield instruments as compared to debt positions held by the Emerging Markets Group. Variances in excess of $500,000 for high grade and high yield Level 2 and Level 3 positions were considered "significant" and were investigated further.[2074] Variances in

---

[2073] Lehman, Loans PxTesting_053108_final.xls [LBEX-BARVAL 0061231].

[2074] Lehman, HG, HY, & EMG Cash Price Testing Policy & Procedure (January 2008), at p. 3 [LBEX-BARVAL 0000001]. Variances were resolved using the same procedures described above for other asset classes.

excess of $300,000 for Level 1 high grade and high yield assets were treated similarly.[2075]

Variances for emerging markets securities were considered significant above $400,000

for Level 2 and 3 assets and $300,000 for Level 1 assets.[2076]

### (3) Examiner's Findings and Conclusions With Respect to the Valuation of Lehman's Corporate Debt Positions

While the Examiner determined that it was not a prudent use of Estate resources

to perform an extensive investigation of the valuation of Lehman's entire U.S. corporate

debt portfolio, the Examiner did review Lehman's price testing of its largest corporate

debt positions. The review of Lehman's Product Control price testing materials was

revealing in two respects. First, the price testing materials were not well organized,

creating opportunities for errors on the part of the product controllers. Second, the

work required to populate the price testing workbooks was manual and labor intensive,

and certain relevant assumptions did not appear to have any testing process at all. The

Examiner, in the course of reviewing Lehman's price testing process for its largest U.S.

corporate debt positions, identified three weaknesses in the Product Control Group's

price testing of corporate debt: reliance on trades that did not occur, quality control

errors, and no testing of internally-determined credit ratings for debt instruments.

---

[2075] *Id.*
[2076] *Id.*

### (a) Reliance on Non-Trades

As described above, one source of information for price verification is recent trade activity showing the price that a third party paid to acquire the debt instrument in an arms-length transaction. Transactions such as these are a useful source of information because they reflect the value as determined between a willing purchaser and a willing seller. In the price testing workbooks, the product controllers had a column that recorded the counterparty to each transaction that was used as a source for price testing.[2077] In May 2008, there were 57 instances where the listed counterparty was "INVENTORY ADJUSTMENT TMS."[2078] However, this denoted an internal transfer, such as a transfer of a position between Lehman entities, and not a true third-party transaction.[2079] Debt investments marked in May 2008 by internal trades included American Airlines, Aramark Corp., Community Health Systems, DAE Aviation Holdings, Daimler Chrysler, Dana Corp, Dollar General, First Data, HCA Inc., Supervalu Inc., Tribune Company and TXU Energy.[2080]

An error of this nature would not have been captured by the review process, which was designed to identify situations where the price testing generated variances.[2081] The price testing workbook, which was typically completed by a Product

---

[2077] Lehman, Loans PxTesting_053108 –final.xls, Tab "PV" Column BL [LBEX-BARVAL 0061231].

[2078] *Id.*

[2079] Lehman, CATS.XLXS [LBEX-BAR 0001102].

[2080] Lehman, Loans PxTesting_053108 –final.xls, Tab "PV," Column BL [LBEX-BARVAL 0061231].

[2081] Examiner's Interview of Brian Sciacca, Oct. 19, 2009, at pp. 2-5.

Control Group staff member, was not reviewed by senior managers, and was never checked for errors.[2082]  If the marks for the internal transfers were close to the marks obtained from third-party transactions, this error would be unlikely to be significant. However, even if the marks were identical, this error would make it appear that there was a greater number of trades upon which to base price testing of corporate debt assets, lending a greater sense of confidence to the marks than would be warranted.

### (b)  Quality Control Errors – Mismatched Companies

For one of the positions examined, Lehman's product controllers used the wrong asset to verify the trading desk's mark.  CLP Holdings is a private equity firm.  In May 2008, Lehman owned a $250 million position in a term loan to this firm, which was reduced to a $100 million position by August 2008.[2083]  The price of this asset was verified in February and May 2008 using CDS Matrix pricing based on the CLP ticker.[2084] However, CLP is the ticker for Colonial Realty, a publicly traded entity entirely unrelated to CLP Holdings.  The price estimated for the security using a discount rate based on Colonial Realty's debt profile was 100.00 in May 2008, slightly above the Lehman mark.[2085]  The error persisted through July 2008.[2086]  This error would not have

---

[2082] *Id.*

[2083] Lehman, Loans PxTesting_053108 –final.xls, Tab "PV" Cells AA270 and AA271 [LBEX-BARVAL 0061231]; Lehman, Loans PxTesting_083108 v3.xls, Tab "PV", Cell AB261 and AB262 [LBEX-BARVAL 0048917].

[2084] Lehman, Loans PxTesting_053108 –final.xls, Tab "CDS Matrix", Cell E200 [LBEX-BARVAL 0061231].

[2085] Lehman, Loans PxTesting_053108 –final.xls, Tab "PV," Lines 270 and 271 [LBEX-BARVAL 0061231]. The product control group incorrectly relied on the CLP ticker in February 2008 as well.  *See* Lehman, Loans PxTesting_022908.xls Tab "PV" [LBEX-BARVAL 0000005].

generated further scrutiny because the pricing did not generate a significant variance. By August 2008, product controllers were able to obtain external quotes for the security.[2087]

### (c)  No Testing of Internal Credit Rating

For closely-held debt instruments that were not rated by a ratings agency, Lehman generated an internal credit rating.[2088]  The credit rating is a necessary element in assessing the value of a security, and is particularly important when using the CDS Matrix or CR Matrix methodology since these methodologies rely on the credit rating of the security to determine a benchmark discount rate.  In general, a higher rating will translate into a lower spread and yield, which are used to discount the future principal and interest payments.  Therefore, higher ratings will lead to a higher price.  The price testing workbooks included a credit rating for each debt security being price tested, though external and internally generated ratings were indistinguishable.[2089]  An interview with a product controller revealed that the Product Control Group did not have any established procedures to test these internal ratings.[2090]

The Examiner did not test each credit rating assumption.  However, the Examiner did identify one instance that called into question the credit rating

---

[2086] Lehman, Loans PxTesting_073108 –v1.xls [LBEX-BARVAL0037526].

[2087] Lehman, Loans PxTesting_083108 v3.xls, Tab "PV" Cell BJ262 [LBEX-BARVAL 0048917].

[2088] *See* Lehman, Internal Ratings:  Scorecard Framework and User Guide (May 1, 2007), at p. 1 [LBEX-BARFID 0019865].

[2089] Lehman, Loans PxTesting_053108 –final.xls, Tab "CDX MTRX Mapping" [LBEX-BARVAL 0061231].

[2090] Examiner's Interview of Brian Sciacca, Oct. 19, 2008, at pp. 2-5.

assumptions used by product controllers. OZ Management, LLC ("OZ Management") is a subsidiary of Och-Ziff Capital Management Group, LLC, and Lehman held a term loan to OZ Management with a principal amount of $250 million, maturing in 2013. The Product Control Group price tested this security using a credit rating of AA.[2091] However, according to a Commitment Committee memo dated less than one year prior, the OZ Management investment was given an implied BBB- rating as of June 2007.[2092]

Under the terms of the loan agreement, OZ Management was obliged to use its "best efforts" to obtain a rating for the loan in early 2008.[2093] In addition, Lehman indicated that the terms of this investment were "below market."[2094] It does not appear, however, that a rating was ever obtained for this loan. The Examiner was unable to locate any evidence that OZ Management was rated by any rating agency during this time frame. In this particular instance, if the correct rating were BBB- instead of AA, the result would have been an overstatement of value of the investment.

As noted, the Examiner is not able to quantify the potential impact of these issues without performing an independent valuation of each of the more than 10,000 corporate debt positions held by Lehman. Because of the time and expense required by such an exercise, the Examiner did not deem this to be a prudent use of Estate resources.

---

[2091] Lehman, Loans PxTesting_053108 –final.xls, Tab "CDS MTRX," Line 656 [LBEX-BARVAL 0061231].

[2092] Lehman, Request to participate as a Joint Bookrunner in Och-Ziff's IPO (June 1, 2007), at p. 10 [LBEX-AM 112872].

[2093] *See* e-mail from Greg L. Smith, Lehman, to Steven Berkenfeld, Lehman (Oct. 25, 2007) [LBEX-DOCID 821562].

[2094] *Id.*

However, the Examiner notes that the issues identified relate exclusively to the price verification process performed by the Product Control Group and do not directly suggest that the valuation of Lehman's corporate debt positions, as determined by the trading desks, was unreasonable. For the reasons stated above, the Examiner draws no conclusion as to the reasonableness of Lehman's valuation of any particular corporate debt position or the valuation of its corporate debt portfolio as a whole.

### l) Examiner's Analysis of the Valuation of Lehman's Corporate Equities Positions

#### (1) Overview of Lehman's Corporate Equities Positions

Lehman actively invested in the equity of both public and private companies around the world. Corporate equities, as defined by Lehman, include common and preferred securities in both public and private companies, as well as equity options, investments in general partnerships and limited partner positions in private equity or hedge funds.[2095] This Section of the Report addresses Lehman's valuation of common and preferred securities in public and private companies, and the term "corporate equities" as used herein refers only to these types of investments.[2096] As of May 31, 2008, the number of worldwide corporate equity positions listed in GFS, Lehman's tracking

---

[2095] *See* Lehman, REC May-08 13-June-08 FINAL.xls [LBEX-LL 1104843].

[2096] Options are addressed within the Derivatives Section of this Report, assets related to commercial real estate are addressed in the CRE and Commercial Book sections, and limited partnership funds are not addressed because they are marked based on Net Asset Value ("NAV") statements provided by the respective fund, and effectively unreviewable since none of the underlying assets are disclosed. *See* Lehman, Private Investment Valuation, at p. 1 [EY-SEC-LBHI-PE-GAMx-07 000995]. Lehman's marking of fund investments is consistent with how other market participants would have marked fund investments assuming that they were subject to the same accounting rules as was Lehman.

system for financial inventory, was 33,174.[2097]  On August 31, 2008, the total number of positions was 39,205.[2098]  As of May 31, 2008, Lehman reported that it held $47.5 billion in corporate equity assets, approximately 56% of which were Level 1 assets.[2099]  As of August 31, 2008, Lehman determined that the value of its corporate equity portfolio was $43.2 billion, approximately 60% of which were Level 1 assets.[2100]

As is discussed below, the valuation of equity positions in publicly-held companies is more straightforward than the marking and valuation of equities in privately-held companies.  In reviewing Lehman's publicly traded corporate equities, the Examiner has found that Lehman's marks for these positions closely tracked publicly-quoted prices.  The Examiner has found insufficient evidence to support a finding that Lehman's marks for these assets were unreasonable.  With respect to Lehman's equity positions in privately-held companies, evaluating the reasonableness of Lehman's valuations of these assets would require an investigation of the financial circumstances and prospects of each privately-held company.  Furthermore, the Examiner has considered what impact the valuation of these assets would have on the

---

[2097] *Id.*; Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 4 (describing function of GFS system). These thousands of positions approximate the number of unique corporate equity positions held by Lehman.  However, the actual number of unique positions held differed because (1) GFS reports the same investment held by two different legal entities as two different positions, (2) multiple option positions are grouped together into one position for GFS purposes, and (3) system users enter "Adjustments" directly into the system that appear as a position but are more accurately described as adjustments to existing positions.  Lehman., REC May-08 13-June-08 FINAL.xls [LBEX-LL 1104843]

[2098] Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812].

[2099] LBHI 10-Q (filed July 10, 2008) at p. 29.

[2100] Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812]. Lehman did not file a Form 10-Q statement for the third quarter of 2008 before its bankruptcy filing.

solvency analysis for LBHI Affiliates.  According to Lehman's GFS database, LCPI was the only LBHI Affiliate to hold significant corporate equity assets.[2101]  Because the Examiner has determined that LCPI was either borderline solvent or insolvent during the relevant period, an analysis of Lehman's valuation of corporate equity assets would not materially enhance the solvency analysis of any LBHI Affiliate.  For this reason, and because of the time and expense required by such an exercise, the Examiner did not deem an extensive investigation of these assets to be a prudent use of Estate resources.  However, the Examiner has investigated a number of individual equity positions in publicly-held companies and other non-publicly traded equities and identified issues that may be relevant to the valuation of these assets generally.

### (2)  Lehman's Valuation Process for its Corporate Equities Positions

As with other classes of assets, the marks reported by Lehman in its public financial statements for corporate equities were the values determined by its trading desks, and these values were subject to price testing performed by Lehman's Product Control Group.[2102]  Within the Equity Division, the global Equity Valuation Group ("EVG") was responsible for testing equity investments in public companies and some

---

[2101] The Examiner reviewed the largest 15 corporate equity positions held by Lehman in May and August 2008.  No LBHI Affiliate held any of these in May 2008, and only LCPI held any in August 2008.  *See* Lehman, REC Feb-08.03.08 FINAL.xls [LBEX-LL 1104828]; Lehman, REC May-08 13-June-08 FINAL.xls [LBEX-LL 1104843]; Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812].  While the position-level data in Lehman's GFS system was understood to contain some inaccuracies, it was relied on as a management reporting tool and is the only comprehensive source showing ownership of individual positions.  Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 4.

[2102] Lehman, Price Verification Policy Global Capital Markets 2008 [Draft] [LBHI_SEC07940_2965994].

private companies.[2103]  Equity positions in most privately-held companies were price tested by the Private Equity Valuation Committee.[2104]  Each group is discussed below.

The EVG gathered information on listed equity positions held by Lehman from the GQuest system, while information on over-the-counter equities positions was gathered from its GEDS system.[2105]  The preferred method for price testing publicly traded equities was to look to the market price of these assets.[2106]  In order to avoid circular reliance on its own prices, the Product Control Group considered Bloomberg quotes derived from Lehman's own traders' marks to be unreliable.[2107]  Similarly, if the product controllers only had a quote from a single broker, and could not corroborate that quote with information from another source, they would deem that quote to be unreliable.[2108]

For price testing of positions for which they did not have either visible market prices or information from third-party sources, Lehman's product controllers relied on methods they termed "input" pricing.[2109]  In performing input pricing, the Product Control Group used models to determine the appropriate marks for corporate equity

---

[2103] *Id.* at p. 103.

[2104] EVG would test equity investments in certain positions in private companies that were held exclusively in Equities Group within the Capital Markets business line.  This separation of testing was a function of which internal business line held the equity position.

[2105] Lehman, Price Verification Policy Global Capital Markets 2008 [Draft], at p. 104 [LBHI_SEC07940_2965994].

[2106] *Id.*

[2107] *Id.* at p. 105.

[2108] *Id.*

[2109] *Id.* at p. 104.

positions and relied on interpolation and extrapolation from observable indicators.[2110] In addition, product controllers sometimes performed statistical analyses, relying on regression analysis and volatility estimation.[2111]

After the EVG determined a benchmark, the price testing variance between EVG's and the traders' mark was calculated. Product controllers and traders would attempt to resolve variances through conversation and unresolved variances were escalated to senior management as with other asset classes.[2112] A summary of the price testing results was subsequently submitted for inclusion in the Valuation and Control Reports presented to senior management.[2113]

As noted above, the price testing of most private equity positions was a more difficult process than the testing of positions in publicly-held corporations. Lehman's private equity holdings were not price tested as were other asset classes, but rather values were established based on a committee review. A committee, informally titled the Private Equity Valuation Committee ("PEVC"), would meet quarterly to discuss the valuation of private equity assets.[2114] Each private equity investment typically had a

---

[2110] *Id.* at p. 105.

[2111] *Id.*

[2112] *Id.* at p. 107; Lehman, Equities Finance Org Chart [BCI-EX-(S)-00109843].

[2113] Lehman, Price Verification Policy Global Capital Markets 2008 [Draft], at p. 107 [LBHI_SEC07940_2965994].

[2114] Examiner's Interview of James Emmert, October 9, 2009, at pp. 3-4; Lehman, Private Equity Valuation Committee, May 2008, Final Version (June 3, 2008) [LBHI_SEC07940_889460].

trader that would be considered the "owner" of that investment.[2115]  After analysis of a

privately-held corporation, each trader would determine what mark he or she thought

appropriate for Lehman's position in that corporation.  In doing so, the trader would

develop a set of documents to support the mark.  These documents included financial

statements and other documents describing the financial and operational circumstances

of the company in question.  In the course of its quarterly review, these supporting

documents would be presented to the PEVC for its consideration.  The PEVC would

review the supporting documents, the subject corporation's most recent financial

metrics, and any significant events or transactions that would impact the value of

Lehman's investment.[2116]  Based on all the facts available, the PEVC would settle on a

mark for the investment.  Following each quarterly meeting, the PEVC would assemble

a presentation summarizing its findings.[2117]

### (3)  Examiner's Findings and Conclusions With Respect to the Valuation of Lehman's Corporate Equities Positions

The Examiner reviewed a number of Lehman's May and August 2008 publicly

traded Level 1 corporate equity positions and confirmed that the mark used by Lehman

matched the publicly traded price.   This was to be expected given the price

---

[2115] Examiner's Interview of James Emmert, October 9, 2009, at pp. 3-4.

[2116] *Id.*

[2117] *See, e.g.,* Lehman, Private Equity Valuation Committee, May 2008 (June 3, 2008), at p. 2 [LBHI_SEC07940_889460].

transparency for this asset class. These Level 1 assets made up approximately 56% of Lehman's total corporate equity positions in May 2008, and 60% in August 2008.[2118]

Because visible market prices are not available for Level 2 and 3 corporate equity assets, which are generally equity positions in privately-held corporations, a similar approach is not possible for these assets. Rather, the valuation of Level 2 and 3 corporate equity positions typically requires a host of supporting information and a number of assumptions on the part of the party performing the valuation. Typical documents and information that would be required to determine the value of these equity positions included historical financial statements, projections for the business, business plans, capital structure tables, customer lists, discussions with executive officers or others addressing operations and sales, competitor analyses, articles of incorporation, marketing plans and other similar information.[2119]

In order for the Examiner to evaluate the reasonableness of Lehman's valuation of its Level 2 and 3 corporate equity positions, all of this supporting documentation and information would have to be reviewed and analyzed for each privately-held corporation in which Lehman held an equity position. Additionally, interviews with individuals who attended PEVC meetings revealed that this type of background information was sometimes not disclosed in hard copy, but was reported orally by the

[2118] LBHI 10-Q (filed July 10, 2008) at p. 29; Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812].
[2119] Shannon P. Pratt et al.,. Valuing a Business: The Analysis and Appraisal of Closely Held Companies 77 (5TH ED. 2007).

trader responsible for the position.[2120]  As noted, the Examiner determined that the time and expense required to assemble and then analyze this information was not a prudent use of the Estate resources.  Accordingly, the Examiner has not evaluated the reasonableness of each of Lehman's valuations of its equity positions in privately-held corporations.

However, the Examiner did review a limited selection of Lehman's corporate equity positions in order to understand the type of issues that may arise in the valuation of these assets.  The positions reviewed were the 15 largest Level 2 and 15 largest Level 3 positions on May 31, 2008, and August 31, 2008.[2121]  The issues identified in the course of reviewing these positions do not, by themselves, suggest that there exists a finding that the value of any particular corporate equity position held by Lehman was unreasonable.  However, they do indicate that further review of Lehman's corporate equity positions may be warranted if supporting documents and sufficient time and resources are available.

### (a)  Impaired Debt with No Equity Mark Down

The capital structure of any given company is comprised of various types of equity and/or debt.  It is axiomatic that, within a capital structure, debt is senior to equity.  Accordingly, if there is impairment of the value of debt at a particular company

---

[2120] Examiner's Interview of James Emmert, October 9, 2009, at pp. 3-4.

[2121] *See* Lehman, REC May-08 13-June-08 FINAL.xls [LBEX-LL 1104843] and Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812].

due to increased riskiness, it would strongly suggest that the value of the company's equity must also be reduced due to the same risk.

The Examiner identified an example where Lehman had marked down the debt but not the equity of the same company. This company was Bawag PSK ("Bawag"). Bawag is a privately held company that provides financial services, principally in Austria.[2122] In an August 29, 2008 e-mail, there was discussion about the possibility of a 10% write-down of Bawag's equity.[2123] However, by September 1, 2008, it was determined internally that Bawag's equity no longer needed to be written down, even though the debt component, represented by a position held by the Investment Management Division ("IMD"), had already been written down.[2124] It is highly irregular for an equity position to remain unchanged when a debt security sitting higher in the capital structure is written down since both securities would likely be impacted by the same risk factors that cause a decrease in the value of the debt instrument. In the same September 1, 2008 e-mail, it is mentioned that the write-down on equity is still being discussed "due to the impact on IMD," suggesting that the write-down on equity may

---

[2122] Data available from CapitalIQ.
[2123] E-mail from Gilles Aublin, Lehman, to James Emmert, Lehman, *et al.* (Aug. 29, 2008) [LBHI_SEC07940_2492814].
[2124] E-mail from Tony Ellis, Lehman, to Gilles Aublin, Lehman, *et al.* (Sept. 1, 2008) [LBHI_SEC07940_2499269].

not have been evaluated based on fundamentals, but rather how it would affect other businesses within Lehman.[2125]

### (b) Static Marks

The Examiner identified several instances in which the valuations of some of Lehman's corporate equity positions remained unchanged for up to 15 months.[2126] Given day-to-day fluctuations in the market, economic variables, and the circumstances of any particular company and its business operations, it is highly improbable that the value of a company, and therefore the value of Lehman's equity position in it, would remain constant over an extended period of time.

One example of Lehman keeping its mark on an investment unchanged for an extended period of time is Lehman's Bawag investment, mentioned above. In May and August of 2008 Lehman valued its equity position in Bawag at approximately $170 million with a mark of 100 cents on the dollar, implying that $170 million was the amount of its initial investment.[2127] Based on the fact that the initial investment in Bawag was in May 2007, this implies that Lehman marked its position in Bawag at 100

---

[2125] *Id.*

[2126] Examples include First Data Corporation, BATS Holding, Greenbrier Minerals, and Floatel International. *See* Lehman, REC Feb-08.03.08 FINAL.xls [LBEX-LL 1104828]; Lehman, REC May-08 13-June-08 FINAL.xls [LBEX-LL 1104843]; Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812]; Lehman, GFS Export [LBEX-LL 1174708]; Lehman, GFS Export [LBEX-LL 2236006]; Lehman GFS Export [3280239].

[2127] Lehman, REC May-08 13-June-08 FINAL.xls [LBEX-LL 1104843] and Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812].

cents on the dollar for a 15-month period before bankruptcy.[2128]   Comparing Lehman's

valuations of corporate equity positions in February, May and August of 2008, the

Examiner identified 343 examples, totaling $455 million in investments, where the mark

for a corporate equity position did not change over this 6 month time period.[2129]   For

lack of detailed information regarding the companies in question, the Examiner draws

no conclusion about the reasonableness of the valuation of any particular one of these

positions. However, Lehman's static marks for these positions may warrant further

investigation.

In addition to these issues, the Examiner identified other, less significant, issues

with Lehman's valuation of corporate equity assets.  These include the performance of

corporate equity positions as compared to an index of similar companies,[2130] and the

application of a discount for lack of marketability.[2131]

---

[2128] BAWAG Revised Terms and Underwriting Amount, High Yield Commitment Committee, Memorandum (Feb. 7, 2007) [LBEX-DOCID 511627];  *Austrian BAWAG's $4.3 bln sale to Cerberus closed,* Reuters, May 15, 2007

[2129] [2129] Lehman Brothers Holdings Inc., "REC Feb-08.03.08 FINAL.xls [LBEX-LL 1104828 – 1104842]; Lehman Brothers Holdings Inc., "REC May-08 13-June-08 FINAL.xls" [LBEX-LL 1104843 - 1104857]; Lehman Brothers Holdings Inc., "REC August 08 as of 17-September Ext Rep.xls" [LBEX-LL 1104812 – 1104827].

[2130] The Examiner identified several cases in which Lehman's valuation of a private equity position implied that the company in question significantly diverged from, and usually outperformed, a comparable set of publicly-traded corporations.  These include investments in Wilton Re Holdings ("Wilton"), First Data Corporation, ECL Finance, BATS Trading, Castex, and Greenbrier Minerals.  In one such case, that of Wilton, a provider of risk and capital management solutions for the life insurance industry, outperformed an index of comparable companies' equities by 12.6% as of May 31, 2008, and 19.4% as of August 31, 2008, according to Lehman's estimates.  During the first three quarters of 2008, Lehman's marks for Wilton increased slightly while a comparable index showed a significant decrease in value.  *Id.*  It would be inappropriate to blindly conclude that Lehman should have adjusted its valuation of its position in Wilton to match the performance of a set of comparable companies.  The performance of

As noted, none of the issues identified provide evidence that the value of any particular Lehman corporate equity position is misstated. A thorough investigation of the subject company's financial and operational circumstances would be necessary to reach such a conclusion. In fact, without reviewing every one of Lehman's corporate equity positions, it is impossible to know what portion of Lehman's corporate equity

comparable companies is but one indicator of the value of a private equity position, to be considered in the context of the financial information and particular circumstances of the company in question. However, comparable companies provide insight into the valuation trends to which a company in a particular industry may be subject. Instances in which Lehman's valuation of a particular private corporate equity position seem inconsistent with the performance of comparable companies suggest further review may be warranted.

For Wilton, the comparable companies were: AFLAC; The Hartford; Allstate; Everest Re; and Reinsurance Group of America. For First Data Corporation, the comparable companies were: Alliance Data Systems; Global Payments, Inc.; Fidelity National; and Fiserv, Inc. For ECL Finance, the performance was compared to Edelweiss Capital, the publicly traded parent company. For BATS Trading, the comparable companies were: Interactive Brokers; MarketAxess Holdings; Intercontinental Exchange; and BGC Partners. For Castex, the performance was compared to the U.S. Oil Fund ETF, as well as major oil companies. For Greenbrier, the comparable companies were: James River Coal Co.; Alliance Holdings GP, LP; International Coal Group, Inc.; Patriot Coal Corporation; and Arch Coal, Inc. Lehman, GFS Export [LBEX-LL 1174708]; Lehman, GFS Export [LBEX-LL 2236006]; Lehman GFS Export [3280239].

[2131] Of the positions reviewed by the Examiner, a number had a restriction on the sale of the underlying security, sometimes referred to as a lock-up provision. A lock-up provision is a restriction that limits the ability to sell a particular security, even if the security is publicly-traded, for a certain period of time. Lehman's accounting for these restrictions, while consistent with GAAP, resulted in reported values that may have deviated from fair market value for purposes of solvency analysis.

When Lehman held a publicly-traded security that had a restriction, the policy was to apply a discount to the publicly-traded price for valuation purposes, based on the period of restriction. Lehman, Global Consolidated Policy on Valuation Adjustments: Global Capital Markets (Sept. 2008) [LBEX-BARFID 0011765]. This discount, called a discount for lack of marketability ("DLOM"), is typically driven by the duration of the restriction and the volatility of the underlying security. The DLOM, which was booked as a liability, would then be amortized, at a constant or "straight-line" pace, over the life of the restriction. *Id.* Such a process would approximate fair market value at any point along the amortizing timeline unless something significant changes, such as the volatility of the underlying stock. However, the volatility of the underlying stock is always changing and this change in volatility should affect the magnitude of the DLOM, and therefore the fair market value of the position held. Because Lehman's method did not take into account potential changes in volatility of the underlying stock, the values reported on Lehman's GAAP balance sheet may not have reflected fair market value. While this suggests a deviation from fair market value for solvency purposes, the potential misstatement is not likely to be significant unless volatility significantly changes over time.

portfolio may have been subject to these issues, or others like them. However, these limitations applied to a minority of Lehman's corporate equity positions. Most of Lehman's corporate equity portfolio was made up of SFAS Level 1 assets,[2132] which benefited from relative price transparency. The Examiner has not found sufficient evidence to support a finding that the valuation of Lehman's Level 1 corporate equity portfolio was unreasonable. For the reasons described above, and noting that the valuation of these assets does not materially enhance the solvency analysis for any LBHI Affiliate, the Examiner draws no conclusions regarding the reasonableness of Lehman's valuation of its Level 2 and 3 equity positions in privately-held companies.

[2132] LBHI 10-Q (filed July 10, 2008) at p. 29; Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812].

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x
                                 :

In re                           :    Chapter 11 Case No.

                                 :

LEHMAN BROTHERS HOLDINGS INC.,  :    08-13555 (JMP)

*et al.,*                         :

                                 :    (Jointly Administered)

                        Debtors.    :

-------------------------------------------------------- x

# REPORT OF
## EXAMINER ANTON R. VALUKAS

### Section III.A.3: Survival

3. Lehman's Survival Strategies and Efforts.........................................609

   a) Introduction to Lehman's Survival Strategies and Efforts...................609

      (1) Examiner's Conclusions .................................................609

      (2) Introduction to Lehman's Survival Strategies .................................612

   b) Lehman's Actions in 2008 Prior to the Near Collapse of Bear Stearns.........................................................................622

      (1) Rejection of Capital Investment Inquiries ........................................623

         (a) KIA Offer.............................................................. 624

         (b) KDB Makes Its Initial Approach................................... 625

         (c) ICD's Initial Approach ............................................. 626

      (2) Divergent Views..........................................................627

         (a) Competitors Raise Capital ......................................... 627

         (b) Internal Warnings Regarding Capital............................. 629

   c) Actions and Efforts Following the Near Collapse of Bear Stearns .......631

      (1) Lehman's Attempt to Increase Liquidity...........................................633

      (2) Lehman's Attempt to Reduce its Balance Sheet ...............................634

      (3) Lehman Sells Stock to Private and Public Investors.......................638

      (4) SpinCo .....................................................................640

         (a) Evolution of SpinCo ................................................ 642

         (b) Execution Issues .................................................... 644

             (i)    Equity Hole ................................................ 645

             (ii)   Outside Financing for SpinCo ........................... 649

             (iii)  SEC Issues................................................ 653

                  a.   Auditing and Accounting Issues ............... 653

                  b.   Tax-Free Status ................................. 658

             (iv)  Valuation of Assets ....................................... 659

         (c) Barclays' "SpinCo" .................................................. 661

      (5) Potential Strategic Partners.........................................................662

         (a) Buffett and Berkshire Hathaway ................................. 664

             (i)    March 2008 ................................................ 664

             (ii)   Last-Ditch Effort with Buffett ........................... 667

         (b) KDB ..................................................................... 668

  (i)  Discussions Begin................................................................ 668

  (ii)  Discussions Resume: Second Round of Talks
     between KDB and Lehman .................................................. 673

  (iii) Third Round of Talks between KDB and Lehman ......... 677

  (iv) KDB's September 9, 2008 Announcement ...................... 681

 (c) MetLife ....................................................................................... 687

 (d) ICD ............................................................................................. 691

 (e) Bank of America ...................................................................... 694

  (i)  Initial Discussions in the Summer of 2008...................... 694

  (ii)  Talks Resume in September.............................................. 696

 (f) Barclays .................................................................................... 703

(6) Government Communications.........................................................711

 (a) Treasury Dinner ....................................................................... 712

 (b) Short Sales ................................................................................ 713

 (c) Possibility of Federal Assistance ............................................ 716

(7) Lehman's Bankruptcy Planning .......................................................718

### 3. Lehman's Survival Strategies and Efforts

#### a) Introduction to Lehman's Survival Strategies and Efforts

##### (1) Examiner's Conclusions

With the near collapse of Bear Stearns on March 16, 2008, a widely held belief was that Lehman would be the next investment bank to fail.[2133]  SEC Chairman Christopher Cox thought so; FRBNY President Timothy F. Geithner thought so; Treasury Secretary Henry M. Paulson, Jr., thought so; Federal Reserve Chairman Ben S. Bernanke thought so.[2134]  More important, Lehman knew that its survival was in question.  When Lehman announced its second quarter 2008 losses, Secretary Paulson spoke with Richard S. Fuld, Jr.  According to Paulson, Fuld told him that further losses might be reported in the third quarter.[2135]  Fuld, though, told the Examiner that he did not recall previewing Lehman's third quarter results with anyone from Treasury, and noted that Lehman was performing well in the first half of June (Lehman pre-announced its second quarter results on June 9, 2008).[2136]  In any event, Paulson warned

---

[2133] *See, e.g.*, Riley McDermid & Alistair Barr, *Wall Street Watches Lehman Walk on Thin Ice*, MarketWatch, Mar. 17, 2008, *available at* http://www.marketwatch.com/story/wall-street-watches-Lehman-walk-on-thin-ice; David Bogoslaw, *Is Lehman Liquid Enough?*, Business Week, Mar. 18, 2008, *available at* http://www.businessweek.com/investor/content/mar2008/pi20080317_703353.htm?chan=top+news_top+news_index_top+story.

[2134] E-mail from Donald L. Kohn, Federal Reserve, to Ben S. Bernanke, Federal Reserve (June 13, 2008) [FRB to LEH Examiner 000781] (informing Bernanke that institutional investors believed that it was not a question of whether Lehman would fail, but when the failure would occur); Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at pp. 4-5; Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 2; Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at pp. 8-9; Examiner's Interview of Christopher Cox, Jan. 8, 2010, at p. 8.

[2135] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 14.

[2136] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 20.

Fuld that Lehman needed to have a buyer or other survival plan in place before announcing further losses in quarter three or its survival would be in doubt.[2137]

With that backdrop, the Examiner determined that it was necessary to explore what Lehman did and did not do, to assess whether any officer or director breached a fiduciary duty by not diligently pursuing potential survival strategies. The Order appointing the Examiner directed an investigation into "colorable claims for breach of fiduciary duties . . . arising in connection with the financial condition of the Lehman enterprise prior to the commencement of the LBHI chapter 11 case on September 15, 2008."[2138] Accordingly, the Examiner reviewed the actions of Lehman's management and Board, including their efforts to help Lehman survive, for potential breaches of fiduciary duties. In particular, the Examiner investigated the efforts of Lehman's management and Board to raise capital through public offerings; to strengthen its financial position through transactions with one or more strategic partners and investors; and to restructure the firm by spinning off commercial real estate assets into an entity Lehman internally referred to as SpinCo. With respect to those areas, the Examiner analyzed whether Lehman's officers and directors fulfilled or breached their fiduciary duties of care or loyalty, including the duties of candor, monitoring, and good faith during the period following the near collapse of Bear Stearns.

---

[2137] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 19.

[2138] Order Directing Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code, at p. 3, Docket No. 2569, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Jan. 16, 2009).

The Examiner concludes:

1. There is no substantial evidence that Lehman's officers breached their duty of care in connection with the substance of their efforts to raise capital, attract strategic investors or spin off Lehman's commercial real estate assets, particularly in light of the protection provided by the business judgment rule.

2. (a) Lehman's senior management appears not to have been aware of some facts that turned out to be significant. Similarly, Lehman's Board was not aware of facts that turned out to be significant. Even so, there is no substantial evidence that Lehman's officers breached their duty of candor or otherwise breached their duty of loyalty to the Board in connection with efforts to raise capital, attract strategic investors or spin off Lehman's commercial real estate assets, except as set forth elsewhere.[2139]

3. There is no substantial evidence that Lehman's officers breached their duty of candor or otherwise breached their duty of loyalty to Lehman's shareholders in connection with efforts to raise capital, attract strategic investors or spin off Lehman's commercial real estate assets, except as set forth elsewhere.[2140]

4. There is no substantial evidence that Lehman's officers breached their duty of good faith in connection with efforts to raise capital, attract strategic investors, or spin off Lehman's commercial real estate assets.

5. There is no substantial evidence that Lehman's directors breached any applicable fiduciary duty in connection with Lehman's efforts to raise capital, attract strategic investors, or spin off Lehman's commercial real estate assets.

6. There is evidence that KDB may have breached a confidentiality agreement with Lehman, but a claim based on that breach does not appear to be worth pursuing because it would be difficult to establish that the breach caused Lehman to collapse or otherwise to incur substantial damages.

---

[2139] *See* Section III.A.4 of this Report, which discusses Lehman's use of Repo 105 in greater detail.
[2140] *Id.*

### (2)  Introduction to Lehman's Survival Strategies

By the end of 2007, events in the market, such as the collapse of two Bear Stearns hedge funds in July, combined with Lehman's own challenges in funding all of its commitments, led some Lehman executives to recognize that Lehman had to move away from the growth strategy it had been pursuing since 2006.[2141]  In January 2008, Lehman was reducing its positions in some areas but did not see a need to raise additional equity capital.[2142]  To the contrary, at that point, LBHI was continuing its longstanding practice of repurchasing its own shares to prevent dilution that otherwise would result from the issuance of new shares as part of Lehman's compensation process.[2143]  On February 7, 2008, LBHI shifted course and issued a prospectus for an offering of preferred shares in which Lehman raised $1.59 billion.[2144]

On March 16, 2008, JPMorgan announced that it was acquiring Bear Stearns, saving Bear Stearns from bankruptcy.[2145]  After Bear Stearns' near collapse, many

---

[2141] *See, e.g.*, Lehman, Global Real Estate Update (Nov. 6, 2007) [LBEX-DOCID 514265]; Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at pp. 10-11.  *Accord* Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 10; *see also* Section III.A.1,b of this Report, which discusses events in 2007 in greater detail.

[2142] *See, e.g.*, e-mail from David Goldfarb, Lehman, to Richard S. Fuld, Jr., Lehman (Jan. 9, 2008) [LBHI_SEC07940_670045]; e-mail from Erin M. Callan, Lehman, to Larry Wieseneck, Lehman (Feb. 1, 2008) [LBHI_SEC07940_069737]; e-mail from Erin M. Callan, Lehman, to Philip Lynch, Lehman, *et al.* (Mar. 15, 2008) [LBHI_SEC07940_075250].  *Accord* Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at p. 11.

[2143] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Jan. 29, 2008), at pp. 2-3 [LBHI_SEC07940_027446].

[2144] Lehman Brothers Holdings Inc., Prospectus Supplement as of Feb. 5, 2008 (Form 424B2) (filed on Feb. 7, 2008) ("LBHI 424B2 Feb. 7, 2008").

[2145] J.P.Morgan Chase & Co., Current Report as of Mar. 16, 2008 (Form 8-K), at Ex. 99.1 (filed on Mar. 18, 2008) ("JPMorgan 8-K (Mar 18, 2008)").

financial experts speculated that Lehman was the next most vulnerable investment bank.[2146]  However, Lehman's executives were themselves successful investment bankers, skilled in identifying, analyzing, pursuing and consummating strategic deals, and never before had failed to get the deal done when necessary.[2147]  The financial markets' reactions to the near collapse of Bear Stearns, including speculation that Lehman might be the next investment bank to fail, led Lehman to refocus its efforts on improving capital and liquidity.[2148]  At the same time, Lehman management contrasted itself with Bear Stearns in internal discussions by noting how Lehman's liquidity pool and funding requirements, among other things, differed in important respects from Bear Stearns'.[2149]

After the near collapse of Bear Stearns, Lehman moved to raise additional capital.[2150]  Lehman initiated work on an equity offering and restarted efforts to locate candidates willing to make a strategic investment in Lehman.[2151]  In late March, Lehman

---

[2146] *See, e.g.*, Riley McDermid & Alistair Barr, *Wall Street Watches Lehman Walk on Thin Ice*, Mar. 17, 2008, *available at* http://www.marketwatch.com/story/wall-street-watches-Lehman-walk-on-thin-ice;  David Bogoslaw, *Is Lehman Liquid Enough?*, Mar. 18, 2008, *available at* http://www.businessweek.com/investor/content/mar2008/pi20080317_703353.htm?chan=top+news_top+news_index_top+story.

[2147] Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 28.

[2148] See, *infra*, Section III.A.3.c of this Report, which discusses Lehman's efforts after Bear Stearns' near collapse in greater detail.

[2149] Lehman, Lehman Brothers Board of Directors, Liquidity & Market Update (Mar. 25, 2008), at p. 2 [LBHI_SEC07940_027782].

[2150] See *infra*, Section III.A.3.c of this Report, which discusses Lehman's efforts to raise capital after Bear Stearns' near collapse in greater detail.

[2151] See *id.*, *infra* Section III.A.3.c of this Report, which discusses Lehman's efforts to find a strategic partner in greater detail.

undertook discussions with Warren E. Buffett, CEO of Berkshire Hathaway.[2152] However, those discussions did not result in any investment by Buffett, Berkshire Hathaway, or any of its affiliates.[2153] Instead, at the beginning of April 2008, Lehman completed a $4.0 billion convertible preferred stock offering.[2154] Other offerings to bolster Lehman's capital followed in May and June.[2155]

In late May 2008, Lehman began talks with a Korean bank consortium regarding an investment.[2156] By early June, the consortium and Lehman circulated a draft term sheet.[2157] However, Lehman did not complete a deal with the consortium;[2158] instead, Lehman raised capital from other sources.[2159]

---

[2152] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 8; Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at pp. 2-3.

[2153] Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 4; Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 11.

[2154] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Mar. 31, 2008), at p. 1 [LBEX-AM 003597]; Lehman Brothers Holdings Inc., Current Report as of Apr. 1, 2008 (Form 8-K) (filed on Apr. 4, 2008) ("LBHI 8-K (Apr. 4, 2008)").

[2155] *See* Lehman, Presentation to Lehman Brothers Board of Directors, Estimated April 2008 Financial Information (May 7, 2008 ), at p. 8 [LBHI_SEC07940_028014].

[2156] *See* Memorandum from Kunho Cho, Lehman, to Hugh E. McGee, III, Lehman, *et al.,* re: Opportunity Briefing and Key Issues for Investment by Korea Inc. Consortium in Lehman Brothers (May 29, 2008) [LBEX-DOCID 1374131], attached to e-mail from Kunho Cho, Lehman, to David Goldfarb, Lehman (May 29, 2008) [LBEX-DOCID 1466211].

[2157] Hana Investment Bank, Elements of Strategic Relationship [Draft] (June 4, 2008) [LBEX-DOCID 1401999], attached to e-mail from Chan Lee, Hana Investment Bank, to Larry Wieseneck, Lehman, *et al.* (June 4, 2008) [LBEX-DOCID 1527489].

[2158] See *infra* Section III.A.3.c of this Report, which discusses Lehman's June discussions with KDB in greater detail.

[2159] *See* Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (June 6, 2008), at pp. 1-3 [LBEX-AM 003709]; Lehman Brothers Holdings Inc., Current Report as of June 9, 2008 (Form 8-K) (filed on June 12, 2008) ("LBHI 8-K (June 12, 2008)").

On June 9, 2008, Lehman issued prospectuses for two offerings that totaled $6.0 billion,[2160] on the same day that Lehman pre-announced a $2.8 billion loss for the second quarter of 2008.[2161] Lehman's offering was completed on June 12, 2008.[2162] That same day, Lehman announced that Herbert "Bart" H. McDade, III, was replacing Joseph M. Gregory as President, and Ian T. Lowitt was replacing Erin M. Callan as CFO.[2163] Fuld told the Board that he intended the management change to be a "dramatic" demonstration to Wall Street that Lehman was taking action to make changes.[2164] On June 13, 2008, Federal Reserve Vice Chairman Donald L. Kohn expressed to Bernanke the opinion held by some institutional investors, which Kohn appeared to share, that it was not a matter of whether Lehman would fail, but when.[2165] However, Bernanke told the Examiner that he was "never of the view that [Lehman's] failure was inevitable."[2166]

---

[2160] Lehman Brothers Holdings Inc., Prospectus Supplement as of June 9, 2008 regarding Common Stock (Form 424B2) (filed on June 9, 2008); Lehman Brothers Holdings Inc., Prospectus Supplement as of June 9, 2008 regarding Preferred Stock (Form 424B2) (filed on June 9, 2008).

[2161] Lehman Brothers Holdings Inc., Current Report as of June 16, 2008 (Form 8-K) (filed on June 16, 2008) ("LBHI 8-K (June 16, 2008)"); *see also* David Ellis, *Lehman Posts $2.8 Billion Loss*, CNNMoney.com, June 9, 2008; *available at* http://money.cnn.com/2008/06/09/news/companies/lehman_results/index.htm?postversion=2008060909.

[2162] LBHI 8-K (June 12, 2008).

[2163] Lehman Brothers Holdings Inc., Current Report as of June 12, 2008 (Form 8-K) (filed on June 17, 2008) ("LBHI 8-K (June 17, 2008)").

[2164] Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 9. *See* Appendix 18 § III to this Report, which discusses the events of June 12, 2008 in greater detail.

[2165] E-mail from Donald L. Kohn, Federal Reserve, to Ben S. Bernanke, Federal Reserve (June 13, 2008) [FRB to LEH Examiner 000781].

[2166] Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at p. 7.

By mid-June 2008, the Korean consortium had dropped out and only Korea Development Bank ("KDB")[2167] remained principally involved as a potential investor. At the same time, the possible contours of the investment by KDB expanded.[2168] Lehman also explored potential transactions with other possible partners. By the summer of 2008, Lehman was considering a restructuring of its business to return to what Fuld called "core Lehman."[2169] Under that plan, Lehman would restructure itself by spinning off its commercial real estate assets into an entity provisionally called SpinCo,[2170] and by selling all or part of Lehman's Investment Management Division ("IMD"), including the profitable Neuberger Berman ("NB") asset management group.[2171] Some outside observers were skeptical of the SpinCo plan or of Lehman's ability to execute it quickly enough to improve Lehman's situation.[2172] Nonetheless, Lehman worked with the SEC and rating agencies to move Lehman's restructuring plans forward.[2173] Lehman also consulted with Lazard Frères & Co. to explore available options.[2174]

---

[2167] KDB is wholly owned by the Republic of South Korea.

[2168] See *infra* Section III.A.3.c of this Report, which discusses Lehman's June negotiations with KDB in greater detail.

[2169] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 5.

[2170] See *infra* Section III.A.3.c of this Report, which discusses SpinCo in greater detail.

[2171] Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at pp. 23-24.

[2172] See *infra* Section III.A.3.c of this Report, which discusses SpinCo in greater detail.

[2173] *See* e-mail from Paolo R. Tonucci, Lehman, to David Goldfarb, Lehman (Aug. 11, 2008) [LBEX-DOCID 1533879]. *Accord* Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 6-8.

[2174] Examiner's Interview of Gary Parr, Sept. 14, 2009, at p. 6.

In July 2008, rumors circulated globally that Lehman was "done & dusted" with no forthcoming "Bernanke bailout."[2175]  Lehman's Board met numerous times in July to monitor and discuss Lehman's efforts to secure investments and react to developments in the markets.[2176]  Paulson told the Examiner that he advised Fuld in July that there would be no federal assistance for Lehman.[2177]  While Fuld agrees that Paulson never promised federal assistance, Fuld said that Paulson never expressly ruled out the possibility.[2178]  Other senior members of the Government, Wall Street executives and experts doubted that the Government really would refuse to make money available for Lehman if necessary.  As late as September 10, 2008, the FRBNY circulated a presentation that discussed potential federal monetary assistance to Lehman.[2179]  On September 11, 2008, Geithner's discussions with the Financial Services Authority (the

---

[2175] E-mail from Steven Berkenfeld, Lehman, to Beth Rudofker, Lehman, *et al.* (July 11, 2008) [LBEX-DOCID 316032].

[2176] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 13, 2008) [LBEX-AM 003834]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 14, 2008) [LBEX-AM 003837]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 15, 2008) [LBEX-AM 003840]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 16, 2008) [LBEX-AM 003848]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors  (July 17, 2008) [LBEX-AM 003850]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 18, 2008) [LBEX-AM 003852]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 22, 2008) [LBEX-AM 003866]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 31, 2008) [LBEX-AM 003875].

[2177] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at pp. 14-15.

[2178] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 11.

[2179] *See* FRBNY, Liquidation Consortium Presentation (Sept. 10, 2008) [FRBNY to Exam. 003517] (document was neither seen nor approved by Geithner), attached to e-mail from Michael Nelson, FRBNY, to Christine Cumming, FRBNY, *et al*. (Sept. 10, 2008) [FRBNY to Exam. 003516]. *Accord* Examiner's Interview of William Brodows, Aug. 20, 2009, at p. 6; Examiner's Interview of Jan H. Voigts, Aug. 25, 2009.

"FSA") left open the possibility that there would be Government assistance.[2180]   On September 12, 2008, Paulson advised the FSA that the FRBNY might be prepared to provide Barclays with regulatory assistance if necessary.[2181]   Cox told the Examiner that Lehman's apparent belief that the Government would provide help was a "real fact of life" and said that most attendees of the FRBNY meetings on September 12 through 14, 2008, "probably assumed that [Paulson's statement that there would be no Government help] was a negotiation."[2182]   Chairman Bernanke told the Examiner that he remained in Washington, D.C., during Lehman's final weekend in part because a possibility existed that Bernanke might need to convene a meeting of the Federal Reserve Board to exercise the Federal Reserve's emergency lending powers under Section 13(3) of the Federal Reserve Act.[2183]

Similarly, executives and experts on Wall Street doubted Paulson's statement. Gregory L. Curl, Bank of America's ("BofA") executive responsible for global strategic planning, told the Examiner that during the weekend's negotiations, the Government gave conflicting signals regarding the availability of some form of federal assistance.[2184] Lehman director Dr. Henry Kaufman believed that, as a tactical matter, Lehman should

---

[2180] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 10.

[2181] *Id.* ¶ 23.

[2182] Examiner's Interview of Christopher Cox, Jan. 8, 2010, at p. 15.

[2183] Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at p. 9.

[2184] Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at pp. 11-12.

have opened for business on Monday, September 15, 2008, to impress upon the regulatory authorities that a bankruptcy would pose an enormous systemic risk.[2185]

Throughout the summer of 2008, Lehman undertook exploratory discussions with possible strategic partners.[2186] By August and September, Lehman had considered and rejected a proposal from KDB.[2187] Lehman also rejected term sheets from two other potential investors, MetLife[2188] and the Investment Corp. of Dubai ("ICD").[2189] Although Lehman rejected a KDB proposal, Lehman indicated its willingness to continue discussions with KDB.[2190] Lehman's management apprised the Board of the status of talks with potential partners, although it did not provide the terms or conditions of any proposals.[2191]

---

[2185] Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at p. 19.

[2186] See Section III.A.3.c of this Report, which discusses Lehman's efforts to find a strategic partner in greater detail.

[2187] Letter from Jasjit Bhattal, Lehman, to Euoo Sung Min, Korea Development Bank, re: Lehman's "intention to continue pursuing alternative paths" (Sept. 1, 2008) [PWP 00001727]; e-mail from Jasjit Bhattal, Lehman, to Brad Whitman, Lehman, *et al.* (Sept. 1, 2008) [LBHI_SEC07940_651987].

[2188] Letter from Steven A. Kandarian, MetLife, to Richard S. Fuld, Jr., Lehman, re: moving forward with a potential transaction (Aug. 6, 2008) [LBHI_SEC07940_741210]; Examiner's Interview of Steven A. Kandarian, Sept. 17, 2009, at p. 5.

[2189] E-mail from Stefano Marsaglia, Rothschild Ltd., to Jeffrey L. Weiss, Lehman, *et al.* (Sept. 3, 2008) [LBHI_SEC07940_653425].

[2190] Letter from Jasjit Bhattal, Lehman, to Euoo Sung Min, Korea Development Bank, re: Lehman's "intention to continue pursuing alternative paths" (Sept. 1, 2008) [PWP 00001727]; e-mail from Jasjit Bhattal, Lehman, to Brad Whitman, Lehman, *et al.* (Sept. 1, 2008) [LBHI_SEC07940_651987]; Examiner's Interview of Jasjit Bhattal, Oct. 12, 2009, at p. 16.

[2191] *See, e.g.,* Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 31, 2008), at pp. 1-2 [LBEX-AM 003875]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Aug. 6, 2008), at p. 1 [LBEX-AM 003877]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Aug. 13, 2008), at p. 3 [LBEX-AM 003879]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Aug. 25, 2008), at p. 2 [LBEX-AM 003897]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 9, 2008), at pp. 2-3 [LBEX-AM 003910]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 11, 2008), at pp. 1-2 [LBEX-AM 003918]; Lehman

Events accelerated during the week of September 8, 2008. On Sunday, September 7, the Government announced that it had placed Fannie Mae and Freddie Mac into conservatorship, providing $200 billion in federal money.[2192] On September 9, a Korean government official announced that KDB's talks with Lehman had ended.[2193] KDB publicly confirmed that information the following day.[2194] On the morning of Wednesday, September 10, Lehman pre-announced its third quarter earnings and restructuring plans, including the future spin-off of its commercial real estate assets.[2195] By the late afternoon of September 10, Moody's and other rating agencies had placed Lehman on negative watch for a downgrade.[2196]

Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 12, 2008), at pp. 1-2 [LBEX-AM 003920]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 13, 2008), at pp. 1-4 [LBEX-AM 003927].

[2192] United States Treasury, Press Release: Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers (Sept. 7, 2008), *available at* http://www.ustreas.gov/press/releases/hp1129.htm (last visited Jan. 31, 2010); Mark Jickling, Congressional Research Service, CRE Report for Congress: Fannie Mae and Freddie Mac in Conservatorship (Sept. 7, 2008), *available at:* http://fpc.state.gov/documents/organization/110097.pdf.

[2193] E-mail from Catherine Jones, Lehman, to Hugh E. McGee, III, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 131058] (forwarding Jin-Young Yook, *Korea FSC: KDB, Lehman Investment Talks Have Ended,* Dow Jones Int'l News, Sept. 9, 2008); e-mail from Tim Sullivan, Lehman, to Mark G. Shafir, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 131059] (forwarding Steve Goldstein, *Korean regulator says KDB talks with Lehman ended,* MarketWatch, Sept. 9, 2008); e-mail from Hugh E. McGee, III, Lehman, to Jasjit Bhattal, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 224552] (forwarding Evan Ramstad & Jin-Young Yook, *Talks Between KDB, Lehman On Possible Investment End,* Wall St. J. Online, Sept. 9, 2009).

[2194] E-mail from Shelby Lauckhardt, Lehman, to Richard S. Fuld, Jr., Lehman (Sept. 10, 2008) [LBHI_SEC07940_213466]; Leo Lewis, *Korea Blames "Differences" for Ending Lehman Talks,* Times Online, Sept. 10, 2008; Susanne Craig, *et al., Korean Remarks Hit Lehman,* Wall St. J., Sept. 9, 2008.

[2195] Final Transcript of Lehman Brothers Holdings Inc. Third Quarter 2008 Preliminary Earnings Call (Sept. 10, 2008) [LBHI_SEC07940_612771].

[2196] E-mail from Stephen Lax, Lehman, to Rajiv Muthyala, Lehman, *et al.* (Sept. 9, 2008) [LBHI_SEC07940_557829] (forwarding Fitch Press Release, *Fitch Places Lehman Brothers on Rating Watch Negative* (Sept. 9, 2008)); *S&P Places Lehman on Negative Ratings Watch,* Associated Press (Sept. 9, 2008); e-mail from Paolo R. Tonucci, Lehman, to Carlo Pellerani, Lehman (Sept. 10, 2008)

On September 11, 2008, JPMorgan demanded an additional $5 billion in collateral from Lehman.[2197]  That same day, Lehman's management told the Board that "liquidity is forecasted to decrease to $30 billion today as a result of providing collateral," from the previous day's announced liquidity of $42 billion.[2198]  On Friday, September 12, 2008, Citibank obtained an amendment to its Clearing Agreement, which strengthened Citibank's lien over LBI's property at Citibank.[2199]  By the evening of September 12, Lehman's only hope to survive was federal assistance or a merger.  Over the weekend it became clear that those options would not be available.[2200]  Lehman also learned that it would not be able to fund opening in Europe that Monday.[2201]  Finally, on Sunday, September 14, 2008, the SEC, with the support of the FRBNY and Treasury, all but directed Lehman to declare bankruptcy.[2202]

Some published reports assert that Lehman's hasty bankruptcy filing cost the estate billions, and that bankruptcy planning should have begun earlier than

---

[LBHI_SEC07940_558653] (forwarding Moody's Press Release, *Moody's Places Lehman's A2 Rating On Review With Direction Uncertain* (Sept. 9, 2008)).

[2197] E-mail from Paolo R. Tonucci, Lehman, to Daniel Fleming, Lehman, *et al.* (Sept. 12, 2008) [LBEX-DOCID 073346] ("[JPM] want[s] $5bn tomorrow first thing").

[2198] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 11, 2008), at p. 1 [LBEX-AM 003918]; Final Transcript of Lehman Brothers Holdings Inc. Third Quarter 2008 Preliminary Earnings Call (Sept. 10, 2008) [LBHI_SEC07940_612771].

[2199] Citibank, Direct Custodial Services Agreement Deed (Sept. 12, 2008) [CITI-LBHI-EXAM 00005903]; e-mail from Patricia Gomes, HSBC, to Agnes Lau, HSBC, *et al.* (Sept. 12, 2008) [HBUS00001760].

[2200] See *infra* Section III.A.3.c of this Report, which discusses Lehman's negotiations with BofA and Barclays in greater detail.  See also Appendix 15, Section IV-X.

[2201] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 12.

[2202] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008), at p. 4 [LBEX-AM 003932].

September.[2203]  However, Lehman consciously avoided bankruptcy planning because potential strategic partners remained interested and because Lehman's officers and directors believed that bankruptcy planning would become a self-fulfilling prophecy.[2204]

### b) Lehman's Actions in 2008 Prior to the Near Collapse of Bear Stearns

In early 2008, prior to the near collapse of Bear Stearns, Lehman received overtures from several entities that were interested in investing in Lehman.[2205]  Lehman chose not to pursue those overtures for several reasons.  First, Lehman's focus at the time was on selling assets rather than raising capital.[2206]  Either route would result in improved net leverage, an important goal for Lehman.  However, Lehman preferred to sell assets because that would remove Lehman's troubled assets, including its commercial real estate and leveraged loans, from its balance sheet.[2207]  Second, Lehman was concerned that raising capital would signal to the market that Lehman was in a weak position, a perception that Lehman considered harmful.[2208]  Fuld told the

---

[2203] *See, e.g.,* Jeffrey McCracken, *Lehman's Chaotic Bankruptcy Filing Destroyed Billions in Value,* Wall St. J., Dec. 29, 2008.  *Accord* Examiner's Interview of Bryan P. Marsal, Dec. 14, 2009, at p. 2.

[2204] Examiner's Interview of John D. Macomber, Sept. 25, 2009, at p. 5; Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 15; Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at p. 20.

[2205] *See, e.g.,* e-mail from Saleh Faraj, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (Jan. 9, 2008) [LBHI_SEC07940_670045]; e-mail from Jeremy M. Isaacs, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (Jan. 11, 2008) [LBHI_SEC07940_066820]; e-mail from Joonkee Hong, Lehman, to Larry Wieseneck, Lehman (Jan. 31, 2008) [LBHI_SEC07940_069737]; e-mail from Philip Lynch, Lehman, to Jeremy M. Isaacs, Lehman, *et al.* (Mar. 15, 2008) [LBHI_SEC07940_075250]. *Accord* Examiner's Interview of Jeremy M. Isaacs, Oct. 1, 2009, at pp. 8-13.

[2206] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 27.

[2207] *Id.*

[2208] *Id.* at p. 26.

Examiner that neither he nor the majority of Lehman's Executive Committee was aware of any concerns about Lehman's CSE capital adequacy figures.[2209]   Because 2007 had been a record year for Lehman in some respects, Lehman's Board and senior management did not see a need to raise additional equity capital in January 2008.[2210]  Third, Lehman did not think that the proposals it received included a sufficient premium to Lehman's then-current stock price to make any of the transactions attractive.[2211]

### (1)  Rejection of Capital Investment Inquiries

At the beginning of 2008, Lehman declined to pursue investment overtures from the Kuwait Investment Authority ("KIA"), KDB and ICD.[2212]  At the same time, Lehman continued to repurchase its own shares to avoid dilution that otherwise would result when Lehman issued new shares as part of its compensation scheme.[2213]

---

[2209] Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at p. 18.  See Section III.A.1 of this Report, which discusses the capital adequacy figures in more detail.

[2210] *Id*.  Although Eric Felder was the U.S. Head of Credit Products and not yet a member of Lehman's senior management in January 2008, he made a presentation at the January 29, 2008 Board meeting suggesting that Lehman should front-load issuances for the year.  *See* Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Jan. 29, 2008), at p. 9 [LBHI_SEC07940_027446]; Eric Felder, Lehman, 2008 Financial Supply/Demand Dynamics (Jan. 29, 2008), at pp. 16-20 [LBHI_SEC07940_027353].

[2211] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 25.

[2212] On September 4, 2007, Lehman declined an investment overture from CITIC.  At the time, however, CITIC's interest was purely financial, while Fuld sought a strategic partner.  E-mail from Richard S. Fuld, Jr., Lehman, to David Goldfarb, Lehman (Sept. 2, 2007) [LBEX-DOCID 997624]; Examiner's Interview of Richard S. Fuld, Jr.,  Nov. 19, 2009, at p. 18.

[2213] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Jan. 29, 2008), at p. 2 [LBHI_SEC07940_027446].

### (a) KIA Offer

On January 9, 2008, KIA approached Lehman about acquiring shares at a discount to the market price.[2214]  On January 11, 2008, Jeremy M. Isaacs, CEO of LBIE, responded to KIA that Lehman would be a "reluctant seller[]" at $65 per share, a 12% premium over the $58 closing price on January 11, 2008.[2215]  Lehman expressed enthusiasm about developing a broader partnership with KIA but showed no interest in selling shares without receiving a premium.[2216]  Neither the minutes of the January 29, 2008 Board meeting nor the handwritten notes taken by Jeffrey A. Welikson, Lehman's corporate secretary, reflect that management advised the Board of KIA's proposal.[2217]  However, phone logs suggest that Fuld advised directors individually about KIA's proposal.[2218]

---

[2214] E-mail from Saleh Faraj, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (Jan. 9, 2008) [LBHI_SEC07940_670045]; e-mail from Jeremy M. Isaacs, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (Jan. 11, 2008) [LBHI_SEC07940_066820]; Examiner's Interview of Jeremy M. Isaacs, Oct. 1, 2009, at p. 8.

[2215] E-mail from Jeremy M. Isaacs, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (Jan. 11, 2008) [LBHI_SEC07940_066820].  Isaacs told the Examiner that he thought Lehman should have negotiated with KIA regarding its interest in buying Lehman stock, but Fuld was not interested without KIA paying a premium.  Examiner's Interview of Jeremy M. Isaacs, Oct. 1, 2009, at pp. 8-9.

[2216] E-mail from Jeremy M. Isaacs, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (Jan. 11, 2008) [LBHI_SEC07940_066820].

[2217] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Jan. 29, 2008) [LBHI_SEC07940_027446].

[2218] Richard S. Fuld, Jr., Lehman, Call Logs (Jan. 11-15, 2008) [LBEX-WGM 674339].

### (b) KDB Makes Its Initial Approach

In January 2008, Korea Investment Corporation, a sovereign wealth fund, invested $2 billion in preferred Merrill Lynch stock.[2219] In early 2008, KDB began considering various potential investment opportunities in U.S. investment banks, and Lehman was one of those banks.[2220] On January 31, 2008, KDB expressed interest in investing in Lehman.[2221] KDB's desired outcome in February was a $2 to $3 billion private equity investment for a minority share of Lehman.[2222] While Lehman was pleased to have KDB buy its stock in the open market, as of February 2008, Lehman was not looking to raise capital or dilute its shareholders through a private placement at a discounted price.[2223] There is no record that management advised the Board of KDB's overture during an official meeting, although phone logs suggest that Fuld may have advised three members of Lehman's Board of Directors, John D. Macomber, Marsha "Marty" Johnson Evans and Sir Christopher Gent, of KDB's interest.[2224]

---

[2219] Kim Yeon-hee, *S. Korea KIC Changes $2bln into Merrill Common Stock*, Reuters, July 29, 2008 available at http://www.reuters.com/article/is/isUSSE06726320080729.

[2220] Examiner's Interview of KDB, Oct. 26, 2009, at p. 6.

[2221] E-mail from Joonkee Hong, Lehman, to Larry Wieseneck, Lehman (Jan. 31, 2008) [LBHI_SEC07940_069737].

[2222] *Id*.

[2223] E-mail from Erin M. Callan, Lehman to Larry Wieseneck, Lehman (Feb. 1, 2008) [LBHI_SEC07940_069737].

[2224] Richard S. Fuld, Jr., Lehman, Call Logs (Feb. 1-5, 2008), pp. 1-3 [LBEX-WGM 674352].

### (c) ICD's Initial Approach

On March 15, 2008, ICD, a sovereign wealth fund, approached Lehman about buying equity, but Lehman declined to pursue that possibility.[2225]  Lehman had a prior banking relationship with ICD, having worked on the potential financing and derivative overlay on a substantial position ICD considered acquiring.[2226]  Based on that relationship, ICD believed that Lehman's business mix and management were sound.[2227]  ICD expressed an interest in making a capital investment, preferably in equity.[2228]  Lehman told ICD that Lehman's capital and liquidity positions were very strong and that Lehman was not interested in raising "equity capital" at that time.[2229]  ICD responded that if and when Lehman considered raising capital, ICD should be Lehman's "first call in the Middle East."[2230]  The March 25, 2008 Board minutes and Welikson's handwritten notes do not reflect that management advised the Board of ICD's interest.[2231]

---

[2225] *See* e-mail from Philip Lynch, Lehman, to Jeremy M. Isaacs, Lehman, *et al.* (Mar. 15, 2008) [LBHI_SEC07940_075250].

[2226] *Id.*

[2227] *Id.*

[2228] *Id.*

[2229] *Id*.

[2230] *Id*.

[2231] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Mar. 25, 2008) [LBEX-AM 003586]; Jeffrey A. Welikson, Lehman, Board Meeting Notes (Mar. 25, 2008) [WGM_LBEX_00781].

## (2)  Divergent Views

Although Lehman opted not to raise additional equity on the terms available in early 2008, other financial institutions did raise capital.  Some Lehman executives also expressed the belief that Lehman should raise additional equity.[2232]

### (a)  Competitors Raise Capital

After announcing losses during 2007,[2233] during late 2007 and the first quarter of 2008, Merrill Lynch issued $6.2 billion dollars in common stock.[2234]  Merrill sold the shares at $48; Merrill's stock was trading at $54.63 at that time.[2235]  In addition, in January 2008, Merrill issued $6.6 billion of convertible preferred shares to KIA, the Korean Consortium, and Mizuho with a dividend yield of 9%.[2236]

Similarly, during late 2007 and the first quarter of 2008, after announcing losses during 2007,[2237] Citibank issued $30 billion of preferred stock, trust preferred, and forward purchase contracts.  That capital raise included $7.5 billion of equity units that

---

[2232] *See, e.g.*, Eric Felder, Lehman, 2008 Financial Supply/Demand Dynamics, Presentation to the Board of Directors (Jan. 29, 2008), at pp. 16-20 [LBHI_SEC07940_027353].

[2233] Merrill Lynch & Co., Inc., Current Report as of Oct. 24, 2007 (Form 8-K) (filed on Oct. 24, 2007), at p. 1 of Ex. 99.1 ("Merrill 8-K (Oct. 24, 2007)"); Merrill Lynch & Co., Inc., Current Report as of Jan. 17, 2008 (Form 8-K) (filed on Jan. 17, 2008), at p. 1 of Ex. 99.1 ("Merrill 8-K (Jan. 17, 2008)").

[2234] Merrill Lynch & Co., Inc., Annual Report for 2007 as of Dec. 28, 2007 (Form 10-K) (filed on Feb. 25, 2008), at p. 23 ("Merrill 2007 10-K").

[2235] Kristina Cooke, *U.S. Stocks - Market Climbs as Merrill Deal Lifts Financials*, Reuters, Dec. 24, 2007.

[2236] Merrill 2007 10-K  at pp. 53-56.

[2237] Citigroup Inc., Current Report as of Jan. 15, 2008 (Form 8-K) (filed on Jan. 15, 2008), at Ex. 99.1 ("Citi 8-K (Jan. 15, 2008)").

the Abu Dhabi Investment Authority purchased in a private placement on December 3, 2007.[2238]

In December 2007, after posting its first-ever quarterly loss,[2239] Morgan Stanley raised $5 billion through an investment by the China Investment Corporation.[2240] Morgan Stanley sold equity units that included futures contracts to buy common shares.[2241]

Following a decline in income in 2007,[2242] on January 24, 2008, Bank of America sold $6 billion in depositary shares, each representing a 1/25th interest in a share of fixed-to-floating preferred stock.[2243] That same month, Bank of America also sold $6.9 billion of convertible preferred securities.[2244]

On March 5, 2008, after announcing a CHF[2245] 4.4 billion loss (roughly $3.9 billion)[2246] on January 30, 2008,[2247] UBS issued CHF 13 billion (roughly $11.7 billion) in

---

[2238] Citigroup Inc., Annual Report for 2007 as of Dec. 31, 2007 (Form 10-K) (filed on Feb. 22, 2008), at pp. 75-77 ("Citi 2007 10-K") .

[2239] Morgan Stanley & Co., Current Report as of Dec. 19, 2007 (Form 8-K) (filed on Dec. 19, 2007), at Ex. 99.1 ("Morgan 8-K (Dec. 19, 2007)").

[2240] Tomoeh Murakami Tse & David Cho, *First Quarterly Loss Posted In Morgan Stanley's 72 Years*, Washington Post, Dec. 20, 2007.

[2241] Morgan Stanley & Co., Annual Report for 2007 as of Nov. 30, 2007 (Form 10-K) (filed on Jan. 29, 2008), at pp. 178-79 ("Morgan 2007 10-K").

[2242] Bank of America Corp., Current Report as of Oct. 18, 2007 (Form 8-K) (filed Oct. 18, 2007), at Ex. 99.1 ("BofA 8-K (Oct. 18, 2007)"); Bank of America Corp., Current Report as of Jan. 22, 2008 (Form 8-K) (filed on Jan. 22, 2008), at Ex. 99.1 ("BofA 8-K (Jan. 22, 2008)").

[2243] Bank of America Corp., Annual Report for 2007 as of Dec. 31, 2007 (2007 Form 10-K) (filed on Feb. 28, 2008), at p. 125 ("BofA 2007 10-K").

[2244] *Id*.

[2245] CHF is the abbreviation for Swiss francs.

[2246] The converted U.S. dollar amounts are approximations based on the exchange rates in effect at the time.

convertible stock to the government of Singapore Investment Corporation and an undisclosed investor from the Middle East.[2248]

### (b)  Internal Warnings Regarding Capital

In February 2008, Eric Felder, then Lehman's U.S. head of Global Credit Products, voiced concern to Lehman management about Lehman's real estate exposures, continuing a theme he began in March 2007.[2249]  He warned that Lehman's situation would worsen, particularly in terms of market access.[2250]  In early March 2008,

---

[2247] UBS AG, Report of Foreign Issuer as of Jan. 30, 2008 (Form 6-K) (filed on Jan. 30, 2008), at p. 1 ("UBS 6-K (Jan. 30, 2008)").

[2248] UBS AG, Report of Foreign Issuer as of Feb. 27, 2008 (Form 6-K) (filed on Feb. 28, 2008), at p. 1 ("UBS 6-K (Feb. 28, 2008)").

[2249] E-mail from Eric Felder, Lehman, to Andrew J. Morton, Lehman (Feb. 20, 2008) [LBEX-DOCID 1229335]; e-mail from Eric Felder, Lehman, to Andrew J. Morton, Lehman, *et al.* (Feb. 21, 2008) [LBHI_SEC07940_071680].  Beginning as early as March 4, 2007, Felder began to express bearish views on the markets' future.  E-mail from Eric Felder, Lehman, to Brian Maggio, Lehman (Mar. 4, 2007) [LBEX-DOCID 1268976] ("I think it's the end of financials as a safe haven").  On July 17, 2007, two of Bear Stearns' hedge funds collapsed.  *See, e.g.*, Ben White, *et al.*, *Subprime Losses Ravage Bear Funds*, Financial Times, July 17, 2007.  On August 5, 2007, Felder warned about the impact of the collapse of the Bear Stearns hedge funds, predicting that "[i]f bear spreads widen significantly I would also expect we will see pressure on lehman spreads and considerable selling of cash paper."  E-mail from Eric Felder, Lehman, to Alex Kirk, Lehman (Aug. 5, 2007) [LBEX-DOCID 184521].  Felder was not always consistent in his bearish views during 2007.  On February 28, 2007, Felder wrote: "I don't think subprime will take the whole market down and if I had more flexibility I would be way bigger than we are.  I view this as a once in 5 year opportunity and I'm not going to miss it."  E-mail from Eric Felder, Lehman, to Jonathan Hoffman, Lehman (Feb. 27, 2007) [LBEX-DOCID 4075098].  On May 25, 2007, Felder wrote: "We need everyone to be shooting beyond high.  Gelband is gone because he didn't.  I know roger will make us try for 2 b at some point.  I actually think we are supposed to get rid of budgets. They do nothing but constrain.  Also have plenty of room to take the risk up. We won't get any resources if we don't think really big." E-mail from Eric Felder, Lehman, to Thomas Corcoran, Lehman (May 25, 2007) [LBEX-DOCID 4244988].  See Section III.A.1 of this Report, which discusses events in 2007 in greater detail.

[2250] E-mail from Eric Felder, Lehman, to Andrew J. Morton, Lehman (Feb. 20, 2008) [LBEX-DOCID 1229335] ("I remain concerned as a lehman shareholder about our resi and cmbs exposure. . . . [H]aving 18b of tangible equity and 90b in resi (including alt a) and cmbs (including bridge equity) scares me"); e-mail from Eric Felder, Lehman, to Andrew J. Morton, Lehman, *et al.* (Feb. 21, 2008) [LBHI_SEC07940_071680] ("We are again underperforming the market significantly on the backs of

Felder repeatedly warned Lowitt, Callan and Paolo R. Tonucci, Lehman's Global Treasurer, about the difficulty of accessing the markets to raise capital, coupled with an anticipated increase in loans to fund.[2251] Felder urged that Lehman aggressively sell assets, specifically its contingent commitments, in order to bring down its balance sheet.[2252] On March 12, 2008, Felder expressed concerns to Callan focusing on dealer liquidity and shrinking leverage.[2253] Felder forwarded an e-mail from a Lehman trader that warned that dealers were demanding increased haircuts and refusing to take assignments of any Bear or Lehman trades even if the trades were "in-the-money."[2254] On March 17, 2008, the day after JPMorgan made its Bear Stearns offer, Felder warned Lowitt, Callan and McDade that collapsing equity values eventually would compel Lehman to sell assets, and that the distressed prices available would create a need for additional capital, forcing further sales.[2255]

---

rumors of writedowns. . . . [Due to widening spreads,] it wil[l] become very difficult for us to access the market in any significant size on a regular basis (as bsc is going through)").

[2251] *See* e-mail from Eric Felder, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Feb. 29, 2008) [LBHI_SEC07940_053967]; e-mail from Eric Felder, Lehman, to Paolo R. Tonucci, Lehman (Mar. 4, 2008) [LBHI_SEC07940_439441]; e-mail from Eric Felder, Lehman, to Erin M. Callan, Lehman (Mar. 12, 2008) [LBHI_SEC07940_074441].

[2252] *See* e-mail from Eric Felder, Lehman, to Paolo R. Tonucci, Lehman (Mar. 4, 2008) [LBHI_SEC07940_439441]. *Accord* Examiner's Interview of Eric Felder, May 21, 2009, at pp. 7-8; Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at pp. 27-28.

[2253] E-mail from Eric Felder, Lehman, to Erin M. Callan, Lehman (Mar. 12, 2008) [LBHI_SEC07940_074441].

[2254] *Id.*

[2255] *See* e-mail from Eric Felder, Lehman, to Ian T. Lowitt, Lehman (Mar. 17, 2008) [LBHI_SEC07940_075534] (forwarded to Erin M. Callan); e-mail from Eric Felder, Lehman, to Herbert H. McDade, III, Lehman (Mar. 17, 2008) [LBHI_SEC07940_623492].

### c) Actions and Efforts Following the Near Collapse of Bear Stearns

Following the near collapse of Bear Stearns, Wall Street perceived Lehman to be the next most vulnerable bank.[2256] Bernanke, Geithner, Cox and Paulson all told the Examiner that they shared that view.[2257]

Bernanke told the Examiner that the Federal Reserve, SEC and "markets in general" viewed Lehman as the next most vulnerable investment bank because of Lehman's funding model.[2258] Bernanke did not believe that Fuld appreciated Lehman's vulnerability, and believes that Fuld should have worked more aggressively to find ways to strengthen Lehman.[2259] Bernanke told the Examiner that he believed that Fuld was always more optimistic about Lehman's condition than the markets were.[2260]

Geithner told the Examiner that his concerns about Lehman began in August 2007 and grew steadily into 2008.[2261] Geithner told the Examiner that, following Bear Stearns' near collapse, he considered Lehman to be the "most exposed" investment bank.[2262] Geithner told the Examiner that he considered Lehman's proposals to convert

---

[2256] *See, e.g.*, Riley McDermid & Alistair Barr, *Wall Street watches Lehman walk on thin ice*, MarketWatch, Mar. 17, 2008, *available at* http://www.marketwatch.com/story/wall-street-watches-lehman-walk-on-thin-ice; David Bogoslaw, *Is Lehman Liquid Enough?*, Business Week, Mar. 18, 2008, *available at* http://www.businessweek.com/investor/content/mar2008/pi20080317_703353.htm.

[2257] Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at pp. 4-5; Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 2; Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 9; Examiner's Interview of Christopher Cox, Jan. 8, 2010, at p. 8.

[2258] Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at p. 5.

[2259] *Id.* at pp. 3, 5-6.

[2260] *Id.* at p. 6.

[2261] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 2.

[2262] *Id.*

to a bank holding company "gimmicky."[2263]  On the other hand, both Goldman Sachs and Morgan Stanley converted themselves into bank holding companies on September 21, 2008.[2264]

Similarly, Paulson told the Examiner that he began to have concerns about Lehman in 2007 when he learned about the Archstone deal.[2265]  Paulson told the Examiner that he pressed Lehman "less hard" prior to the near collapse of Bear Stearns due to Lehman's record 2007 results, but that after Bear Stearns' near collapse, he focused on Lehman as the most vulnerable investment bank.[2266]  Paulson believes that Fuld heard what he wanted to hear and was more optimistic than he should have been.[2267]  Paulson also told the Examiner that Fuld had "quixotic . . . ideas" about boosting market confidence, citing the removal of Callan, which Paulson thought could be viewed as more alarming than calming.[2268]

In the weeks following Bear Stearns' near collapse,  Lehman took steps: (1) to increase its liquidity; (2) to continue efforts begun in 2007 to reduce its balance sheet; (3) to raise equity from public and private investors; (4) to implement SpinCo; and (5) to find a strategic partner.  This Section discusses those efforts in turn.

---

[2263] *Id.* at p. 6.

[2264] Federal Reserve System, Orders Approving Formation of Bank Holding Companies (Sept. 21, 2008), *available at*  http://www.federalreserve.gov/newsevents/press/orders/orders20080922a1.pdf  and  http://www.federalreserve.gov/newsevents/press/orders/orders20080922a2.pdf.  See Appendix 13 §II to this Report, which discusses Lehman's bank holding company proposal in greater detail.

[2265] Examiner's Interview of Henry M. Paulson, Jr.,  June 25, 2009, at p. 9.

[2266] *Id.* at pp. 10-11.

[2267] *Id.* at pp. 6, 11.

[2268] *Id.* at p. 14.

### (1)  Lehman's Attempt to Increase Liquidity

On March 25, 2008, Lehman's Board met for a regularly noticed meeting. The Board focused in significant part on Lehman's position following the near collapse of Bear Stearns.  In materials provided to the Board, Lehman's management asserted that it had "the strongest liquidity position of the brokers" and that Lehman's funding framework was "significantly different" than Bear Stearns'.[2269]  The materials note that Bear Stearns' liquidity pool relied on short-term debt, a large free credit balance and repo financing.[2270]  The materials imply that Lehman's funding framework did not suffer from the same defects.[2271]  Callan informed the Board that Lehman did not rely on free credit balances, asset-backed commercial paper or secured funding for whole loans.[2272]  Callan also reported that Lehman operated at near-record levels of liquidity.[2273]  Lehman director Marsha "Marty" J. Evans told the Examiner that the tone of the meeting was not about preventing a Lehman collapse similar to Bear Stearns but rather about navigating the troubled waters and moving forward.[2274]

---

[2269] Lehman, Presentation to the Board of Directors, Liquidity & Market Update (Mar. 25, 2008), at p. 2 [LBHI_SEC07940_027782].

[2270] *Id*.

[2271] *Id*.

[2272] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Mar. 25, 2008), at p. 3 [LBEX-AM 003586].

[2273] *Id*.

[2274] Examiner's Interview of Marsha J. Evans, May 22, 2009, at p. 15.

In late March and early April 2008, Lehman reported near-record levels of liquidity to rating agencies.[2275]  At the same time, though, Lehman told the rating agencies that it was focused on building its "liquidity fortress."[2276]  However, Fuld asserted that, even as late as September 15, 2008, he was unaware of any problems with Lehman's liquidity pool.[2277]  Similarly, none of the directors who were asked recalled being apprised of any problem with Lehman's liquidity pool at the March 25, 2008 meeting or at any other time prior to September.[2278]

### (2) Lehman's Attempt to Reduce its Balance Sheet

In the second half of 2007, individuals at Lehman began to discuss the need to reduce Lehman's balance sheet in order to reduce risk and improve Lehman's reported leverage ratio.[2279]  Fuld told the Examiner that by January 2008 he had directed that

---

[2275] *See, e.g.,* Lehman, Fitch Ratings Q1 2008 Update (Mar. 27, 2008), at p. 4 [LBEX-DOCID 1409767] ("Despite market conditions, we have been able to operate close to record levels throughout the period. Closed Q1 2008 with $34B of liquidity, representing $7B excess over our cash capital requirements. Maintained strength over BSC collapse: $31B (3/14), $30B (3/17), $33B (3/20).  Therefore no need access to financing for over one year.").  Lehman also advised the Board of near-record levels of liquidity on March 25, 2008.  Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Mar. 25, 2008), at p. 3 [LBEX-AM 003586].

[2276] *See, e.g.,* Lehman, Moody's Investors Service Q2 2008 Update (May 29, 2008), at p. 12 [LBEX-DOCID 1021230].  See Section III.A.5.i of this Report and Appendix 20 to this Report, which discusses the problems with Lehman's liquidity pool in greater detail.

[2277] Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at p. 19.

[2278] Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at p. 12; Examiner's Interview of Thomas H. Cruikshank, Oct. 8, 2009, at p. 9; Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at p. 23; Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at pp. 6-7; Examiner's Interview of Roland A. Hernandez, Oct. 2, 2009, at pp. 16, 20; Examiner's Interview of John D. Macomber, Sept. 25, 2009, at p. 20.

[2279] *See* Lehman, Global Real Estate Update (Nov. 6, 2007) [LBEX-DOCID 514265] (GREG proposing an estimated $15 billion reduction in its global balance sheet).  *Accord* Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at pp. 10-11; Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 10;  see also Section III.A.1 of this Report, which discusses events during 2006 and 2007 in greater detail.

Lehman reduce its balance sheet in areas in which Lehman was vulnerable.[2280]  In March 2008, Fuld appointed McDade to be "balance sheet czar"[2281] and instructed him to sell off assets and take other actions necessary to reduce the size of Lehman's balance sheet.[2282]    The chart below shows how aspects of Lehman's financial condition changed between December 31, 2006, and May 31, 2008.

---

[2280] Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at p. 11.  Fuld initially told the Examiner that he directed the reduction of all positions but matched book.  Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 26.  Fuld then told the Examiner that he directed the reduction of less liquid assets. Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at pp. 8-9.

[2281] Examiner's Interview of Andrew J. Morton, Sept. 21, 2009, at p. 11.

[2282] See Section III.A.1 of this Report, which discusses Lehman's efforts to reduce the balance sheet in greater detail.

| | Q4 06[2283] | Q1 07[2284] | Q2 07[2285] | Q3 07[2286] | Q4 07[2287] | Q1 08[2288] | Q2 08[2289] |
|---|---|---|---|---|---|---|---|
| **Net Assets ($ Billions)** | 268.936 | 300.797 | 337.667 | 357.102 | 372.959 | 396.673 | 327.774 |
| **Total Shareholder Equity ($ Billions)** | 19.191 | 20.005 | 21.129 | 21.733 | 22.490 | 24.832 | 26.276 |

While Lehman's net assets grew between the end of the fourth quarter of 2007 and the close of the first quarter of 2008, Lehman reduced its holdings in some asset classes.[2290] During the first quarter of 2008, Lehman reduced its mortgage-related inventory by $2.7 billion, its high yield instruments by $2.9 billion and acquisition facilities by $6.1 billion.[2291]

Although Fuld told the Examiner that he directed a reduction in the balance sheet in January 2008, Lehman did not meaningfully reduce its balance sheet in its most

[2283] Lehman Brothers Holdings Inc., Annual Report for 2006 as of Nov. 30, 2006 (Form 10-K) (filed Feb. 13, 2007), at pp. 28-29 ("Lehman 2006 10-K").

[2284] Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 28, 2007 (Form 10-Q) (filed Apr. 9, 2007), at pp. 59, 61 ("Lehman 10-Q (Apr. 9, 2007)").

[2285] Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2007 (Form 10-Q) (filed July 10, 2007), at p. 65 ("Lehman 10-Q (July 10, 2007)").

[2286] Lehman Brothers Holdings Inc., Quarterly Report as of Aug. 31, 2007 (Form 10-Q) (filed Oct. 10, 2007), at p. 68 ("Lehman 10-Q (Oct. 10, 2007)").

[2287] Lehman Brothers Holdings Inc., Annual Report for 2007 as of Nov. 30, 2007 (Form 10-K) (filed Jan. 29, 2008), at pp. 29-30 ("Lehman 2007 10-K").

[2288] Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 28, 2008 (Form 10-Q) (filed Apr. 9, 2008), at p. 72 ("Lehman 10-Q (Apr. 9, 2008)").

[2289] Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2008 (Form 10-Q) (filed July 10, 2008), at pp. 85, 88 ("Lehman 10-Q (July 10, 2008)").

[2290] *See* Lehman, Balance Sheet and Key Disclosures, 2008 3Q Targets [Draft] (June 19, 2008), at p. 3 [LBHI_SEC07940_6952937].

[2291] *Id.*

vulnerable area – commercial real estate – until the second quarter of 2008.[2292]   As disclosed in its periodic filings, Lehman's reduction of its "commercial mortgage-related assets, other asset-backed-related positions and real estate-related investments generally"[2293] is shown in the chart below.

|  | Q4 07[2294] | Q1 08[2295] | Q2 08[2296] |
|---|---|---|---|
| **Commercial Real Estate At Risk ($ Billions)** | 38.938 | 36.110 | 29.390 |

The reduction during the first quarter of 2008 included a large proportion of writedowns – writedowns represented $1.4 billion of the $2.8 billion gross reduction in commercial real estate.[2297]   Asset dispositions accelerated during the second quarter of

---

[2292] *See, e.g.*, e-mail from Gary Mandelblatt, Lehman, to Alex Kirk, Lehman, *et al.* (Jan. 15, 2008) [LBEX-DOCID 1600235] (noting that "the business continues to increase its balance sheet usage but is not selling or syndicating at the same pace putting pressure on funding needs"); e-mail from Mark A. Walsh, Lehman, to Andrew J. Morton, Lehman (Feb. 26, 2008) [LBHI_SEC07940_115814] (stating that a "zero origination" model had been imposed to get the balance sheet down quickly); e-mail from Kenneth Cohen, Lehman, to Carmine Visone, Lehman, *et al.* (Mar. 27, 2008) [LBEX-DOCID 1374413] ("We are very much in need of balance sheet. We must move things off by the end of the quarter. I need you all to go back to clients and offer them discounts to move things off.  We have a lot of wood to chop in a short period of time but we can't afford to fail.  If this means leaving p&l on the table so be it. If you have questions get back to me but we HAVE TO DO THIS!!"); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 21, 2008 (Apr. 22, 2008), at p. 2 [LBEX-DOCID 3187588] (showing continued growth of GREG balance sheet); e-mail from Erin M. Callan, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (Apr. 3, 2008) [LBEX-DOCID 1538729] (expressing dismay in the growth of the balance sheet); e-mail from Erin M. Callan, Lehman, to Joseph M. Gregory, Lehman, *et al.* (May 13, 2008) [LBHI_SEC07940_034732].

[2293] Lehman 2007 10-K at p. 104.

[2294] *Id.*

[2295] Lehman 10-Q (Apr. 9, 2008) at p. 20.

[2296] Lehman 10-Q (July 10, 2008) at p. 69.

[2297] *See id.* at p. 67.

2008, when writedowns represented only $900 million of the $6.7 billion gross reduction in commercial real estate assets.[2298]

Lehman set its balance sheet targets and net leverage ratio targets, in part at least, to improve the firm's stature with the rating agencies. Senior Lehman management made a concerted effort to manage and reduce the firm's balance sheet with an eye towards the rating agencies' views of Lehman.[2299] Fuld explained that although raising equity also could reduce the net leverage ratio, Lehman had to improve its net leverage by ridding itself of inventory because there was a "perception issue" with raising equity, and because raising equity would not eliminate Lehman's problem assets.[2300] Fuld told the Examiner that if Lehman had raised equity, it would have brought down the net leverage number but would not really have fixed anything.[2301]

### (3) Lehman Sells Stock to Private and Public Investors

On March 28, 2008, Lehman approached Buffett about a potential $3.5 billion private investment in convertible preferred stock with a conversion price of $54 per share.[2302] Lehman and Buffett did not agree on terms for an investment, and Lehman proceeded instead with a public offering. On March 31, 2008, Lehman's management

---

[2298] *Id.*

[2299] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 27.

[2300] *Id.*

[2301] *Id.*

[2302] See *infra* Section III.A.3.c of this Report, which discusses Lehman's conversations with Buffett in greater detail.

presented a $4 billion offering of convertible preferred shares to the Board.[2303] Management's presentation to the Board states that the offering constituted part of the firm's plan to deleverage, and that the firm also intended to reduce assets as part of the plan.[2304] The Board passed a resolution authorizing the offering.[2305] On April 4, 2008, LBHI raised $4 billion by issuing convertible preferred stock.[2306] Paulson told the Examiner that Fuld was resistant initially. According to Paulson, Fuld preferred to find a strategic investor, rather than pursue other methods of raising capital.[2307] Although LBHI did raise capital in April 2008, Paulson said that he recommended issuing common rather than preferred stock.[2308]

On April 30, 2008, LBHI issued $1 billion (£500 million) in 10-year senior notes.[2309] On May 2, 2008, LBHI issued $2 billion in 30-year subordinated notes and $2.5 billion in 10-year senior notes.[2310]

On June 6, 2008, Lehman's management presented a stock offering totaling $6 billion to the Board.[2311] The Board passed a resolution authorizing the offering.[2312] On

---

[2303] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Mar. 31, 2008), at p. 2 [LBEX-AM 003597].

[2304] Id.

[2305] Id. at pp. 2-3.

[2306] LBHI 8-K (Apr. 4, 2008).

[2307] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 11.

[2308] Id.

[2309] See Lehman, Presentation to Lehman Brothers Board of Directors, Estimated April 2008 Financial Information (May 7, 2008), at p. 8 [LBHI_SEC07940_028014].

[2310] Id.

[2311] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (June 6, 2008), at p. 3 [LBEX-AM 003709].

June 12, 2008, LBHI sold 2 million shares of convertible preferred stock for $2 billion.[2313] That same day, LBHI sold 143 million shares of common stock for $4 billion ($28 per share), completing the $6 billion offering.[2314]

The Government spoke favorably of Lehman's June 2008 actions to raise capital. Treasury Undersecretary Robert Steel publicly stated that Lehman was "addressing the issues" through its June 2008 capital raise.[2315] Paulson told the Examiner that he did not know of any chief executives who lost their jobs for raising too much equity capital.[2316]

### (4) SpinCo

The SpinCo idea was a variation on a good bank/bad bank structure.[2317] Among Lehman's strategic options, SpinCo had a longer time horizon than other options, because substantial advance work would be needed. By early August 2008,[2318] Lehman anticipated completing the spin-off in the first quarter of 2009.[2319] Lehman intended SpinCo to accomplish four interrelated purposes. The first and primary purpose of

---

[2312] *Id.*

[2313] LBHI 8-K (June 12, 2008).

[2314] *Id.*

[2315] *See* e-mail from Thomas A. Russo, Lehman, to Richard S. Fuld, Jr., Lehman (June 13, 2008) [LBHI_SEC07940_212723].

[2316] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 11.

[2317] Examiner's Interview of Gary Parr, Sept. 14, 2009, at p. 10.

[2318] *See* Lehman, Commercial Real Estate Spin-off Summary (Aug. 6, 2008), at p. 8 [LBHI_SEC07940_013317] ("Preliminary Summary Timeline" shows SpinCo distribution date during the week of 1/2/2009); *accord* Lehman, Project Green - Revised Projected Capital Analysis (Aug. 14, 2008), at p. 1 [LBEX-DOCID 236909] ("CRE assets of $31.7B spun off at the end of 1Q09."), attached to e-mail from Brad Whitman, Lehman, to Kunho Cho, Lehman, *et al.* (Aug. 14, 2008) [LBEX-DOCID 407341].

[2319] Final Transcript of Lehman Brothers Holdings Inc. Third Quarter 2008 Preliminary Earnings Call (Sept. 10, 2008), at p. 5 [LBHI_SEC07940_612771].

SpinCo was to relieve Lehman's balance sheet of its "outsized" commercial real estate exposure that had become a source of increasing market concern and pressure.[2320] Second, by moving those assets to a separate entity, Lehman hoped to avoid the necessity of having to continue marking down those assets as the market continued to deteriorate. That process had exposed Lehman to criticism in the press and by analysts in what Hugh "Skip" E. McGee, III, the head of Lehman's Investment Banking Division, referred to as the "are we marked correctly game."[2321]

Third, by spinning off those assets, Lehman would avoid a "fire sale for the vultures"[2322] that would have locked in its paper losses.[2323] Instead, SpinCo would allow Lehman to manage those assets on a value-maximizing basis for the benefit of Lehman's shareholders, either by selling the SpinCo assets or holding them to maturity.[2324]

---

[2320] See Lehman, Lehman Commercial Mortgage Exposure is Outsized Relative to Peers [LBHI_SEC07940_339455], attached to e-mail from Kevin Thatcher, Lehman, to Ian T. Lowitt, Lehman, *et al.* (June 10, 2008) [LBHI_SEC07940_339451]; Lehman, The Gameplan (Sept. 2008), at p. 4 [LBEX-DOCID 2727665] ("In recent months, shareholders, creditors, and counterparties have expressed increasing concern about the size and concentration of our positions and their impact on our overall creditworthiness, and they have put increasing pressure on the firm to reduce our exposure."). *Accord* Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 9.

[2321] E-mail from Hugh E. McGee, III, Lehman, to Steven R. Hash, Lehman, *et al.* (June 11, 2008) [LBHI_SEC07940_398653]; Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 14; Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at pp. 20-21.

[2322] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 6.

[2323] See e-mail from Larry Wieseneck, Lehman, to Brad Whitman, Lehman (July 5, 2008) [LBHI_SEC07940_401266] ("[CRE spin-off] does not require negotiations with someone who will feel they have leverage against us and demand a lower price."). *Accord* Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 6; Examiner's Interview of David O'Reilly, Oct. 26, 2009, at p. 3; Examiner's Interview of Lisa Beeson, Oct. 23, 2009, at pp. 8-9.

[2324] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 5-6 (SpinCo would take care of the valuation problem for some of the assets); Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 23 (spinning off the commercial real estate assets to the shareholders, who owned them already

Fourth, once Lehman had purged its balance sheet of "toxic" commercial real estate assets, it hoped that the post-spin "clean" or "core" Lehman (a.k.a. "CleanCo") could achieve returns on equity in the low teens, twelve times net leverage, and maintain an A rating.[2325]

However, SpinCo faced substantial structural and execution issues that led some observers to question its feasibility. Paulson told the Examiner that he expressed great skepticism about SpinCo to Fuld and advised him to abandon the plan.[2326] James L. "Jamie" Dimon, JPMorgan's CEO, told the Examiner that he did not believe that SpinCo would work, thinking that the proposal was too leveraged, too complex, and involved too much real estate.[2327] When the concept was described to Buffett, he dismissed it.[2328] Ultimately, Lehman was not able to carry out the SpinCo plan prior to its bankruptcy.

### (a) Evolution of SpinCo

Lehman executives first considered shifting Lehman's troubled real estate assets to an off-balance-sheet entity in March 2008.[2329] On March 12, 2008, Callan asked Mark

---

anyway, would relieve the mark-to-market pressure on Lehman while letting the assets mature out of the glare of the market); Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 17.

[2325] *See, e.g.*, Lehman, Transaction Summary [Draft] (Sept. 5, 2008) [LBEX-DOCID 237627] (investor term sheet describing option to invest in "Cleanco" shares); Lehman, SpinCo Concept and Rationale - Investor Presentation Outline (Aug. 12, 2008), at p. 3 [LBEX-DOCID 2929104] ("Post SpinCo, the remaining 'Clean Lehman' will be well positioned for success"), attached to e-mail from Timothy Lyons, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Aug. 12, 2008) [LBEX-DOCID 3116194]. *Accord* Examiner's Interview of Gary S. Barancik, Sept. 25, 2009, at p. 4.

[2326] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at pp. 3, 24.

[2327] Examiner's Interview of Jamie L. Dimon, Sept. 29, 2009, at p. 5.

[2328] Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 4.

[2329] *See* e-mail from Erin M. Callan, Lehman, to Mark A. Walsh, Lehman (Mar. 12, 2008) [LBHI_SEC07940_116854]; e-mail from Steven R. Hash, Lehman, to Daniel Kerstein, Lehman, *et al.* (Apr.

A. Walsh, the Head of Global Real Estate, what he thought of putting some of Lehman's commercial mortgage assets into a new real estate investment trust and "spinning" it (*i.e.*, transferring ownership of the new entity) to Lehman's shareholders.[2330]  Walsh responded with concerns about how the new entity would trade and its impact on how Lehman would trade.[2331]  Lehman did not pursue the idea at that time.

On June 11, 2008, McGee proposed his own version of the commercial real estate spin-off concept to a group of Lehman's investment bankers.[2332]  The initial response was that other Lehman executives already had rejected the idea because it "required too much equity beneath it."[2333]  Nonetheless, the SpinCo idea gained traction in June 2008 and became a central component of Lehman's post-Bear Stearns survival strategy.

Led by McGee,[2334] the SpinCo plan (code-named by Lehman "Project Green Acres") was a key component of the Firm's self-help strategy.  It was supposed to be a way to address Lehman's problems without a strategic partner, before collapsing

---

11, 2008) [LBHI_SEC07940_089122]; e-mail from Erin M. Callan, Lehman, to Steven R. Hash, Lehman, *et al.* (Apr. 17, 2008) [LBHI_SEC07940_274912]; e-mail from David Baron, Lehman, to David Goldfarb, Lehman, *et al.* (Apr. 23, 2008) [LBEX-DOCID 1558959, 1400312] (attaching slides re "Managing to a 'Bad Asset' Solution").

[2330] E-mail from Erin M. Callan, Lehman, to Mark A. Walsh, Lehman (Mar. 12, 2008) [LBHI_SEC07940_116854].

[2331] E-mail from Mark A. Walsh, Lehman, to Erin M. Callan, Lehman (Mar. 12, 2008) [LBHI_SEC07940_116854].

[2332] *See* e-mail from Hugh E. McGee, III, Lehman, to Larry Wieseneck, Lehman, *et al.* (June 11, 2008) [LBHI_SEC07940_398653].

[2333] E-mail from Larry Wieseneck, Lehman, to Hugh E. McGee, III, Lehman, *et al.*  (June 11, 2008) [LBHI_SEC07940_398653] ( "[Daniel] Kerstein proposed this 3 months ago.  Combo of Goldfarb and parts of RE rejected it.  I think Hash knows why it was challenging.  I believe because it required too much equity beneath it.").

[2334] Lehman, Green Acres - Working Group (July 23, 2008) [LBHI_SEC07940_125904] (showing McGee as head).

commercial real estate values "[took] down the mother ship."[2335]  As Fuld told David

Goldfarb, Lehman's Chief Strategy Officer, in a July 19, 2008 e-mail:  "The key to our

success is the viability of the spinco."[2336]  At the July 22, 2008 Board meeting, McGee

presented SpinCo as a "strategic alternative," and Gary Parr, Deputy Chairman of

Lazard, Lehman's strategic advisor, told the Board that SpinCo was "a great idea that

should be aggressively pursued."[2337] Appendix 13 to this Report provides greater detail

on SpinCo.

### (b)  Execution Issues

From the outset, Lehman recognized that the SpinCo plan faced significant

obstacles.[2338]  First, providing the new entity with substantial cash capital threatened to

leave an equity hole in Lehman's own capital structure.  Second, Lehman needed to find

investors who would be willing, in a troubled market, to finance an entity comprised of

Lehman's commercial real estate assets.  Third, Lehman needed to clear critical

accounting issues with the SEC.  Fourth, preparing financial models for SpinCo would

---

[2335] *See* e-mail from Hugh E. McGee, III, Lehman, to Mark A. Walsh, Lehman (June 13, 2008) [LBHI_SEC07940_123660].  *Accord* Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 23; Examiner's Interview of Herbert H. McDade, III, Sept. 16, 2009, at p. 3; Examiner's Interview of Lisa Beeson, Oct. 23, 2009, at p. 9.

[2336] E-mail from Richard S. Fuld, Jr., Lehman, to David Goldfarb, Lehman (July 19, 2008) [LBHI_SEC07940_213011].

[2337] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 22, 2008), at p. 6 [LBEX-AM 003866].  See Appendix 13 §§ IV,V, which discusses Lazard's proposed alternative and SpinCo in greater detail.

[2338] *See* e-mail from Erin M. Callan, Lehman, to Mark A. Walsh, Lehman (Mar. 12, 2008) [LBHI_SEC07940_116854]; Lehman, Managing to a "Bad Asset" Solution [Draft] [LBEX-DOCID 1400312] (key challenges to Bad Asset solution included financing "NewCo assets" and replenishing "capital lost in asset dispositions"), attached to e-mail from David Baron, Lehman, to David Goldfarb, Lehman, *et al*. (Apr. 23, 2008) [LBEX-DOCID 1558959].

require Lehman to value thousands of rapidly devaluing commercial real estate positions.

### (i)  Equity Hole

To establish SpinCo as a viable independent entity and to avoid consolidation with Lehman, Lehman would have to capitalize SpinCo with substantial equity, amounting to at least 20 to 25 percent of SpinCo's net asset value.[2339]  Providing that equity from Lehman's own cash capital would leave a corresponding "hole" in Lehman's capital structure, which already was depleted by write-downs and losses.[2340] Indeed, when McGee floated the "good bank/bad bank" concept in early June 2008, Larry Wieseneck, Lehman's Global Head of Risk Solutions, responded that Goldfarb and Lehman's Global Real Estate Group had "rejected" the idea because it "required too much equity beneath it."[2341]

---

[2339] *See* e-mail from Daniel Kashdin, Lehman, to Daniel Kerstein, Lehman, *et al*. (July 11, 2008) [LBHI_SEC07940_401374] ("To preclude consolidation, there will need to be a substantial amount of equity in the deal"); e-mail from David Goldfarb, Lehman, to Richard S. Fuld, Jr., Lehman (July 21, 2008) [LBEX-DOCID 1224222] ("There is a minimum of capital needed to de-consolidate which is approx $6 billion and obviously we would like to raise much more to reduce our ongoing financing of Spinco"). *Accord* Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 7; Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 23.

[2340] *See, e.g.,* e-mail from Gerard Reilly, Lehman, to Martin Kelly, Lehman (July 19, 2008) [LBEX-DOCID 2117905] ("I have heard as much as 14b of equity needed on 35b of assets.  Does not leave remaining co w much."); e-mail from Eric Felder, Lehman, to Paolo R. Tonucci, Lehman (Aug. 10, 2008) [LBHI_SEC07940_538151] ("We are too small post spinco in my opinion").

[2341] E-mail from Larry Wieseneck, Lehman, to Hugh E. McGee, III,  Lehman (June 11, 2008) [LBHI_SEC07940_398653]; *see also* e-mail from Daniel Kerstein, Lehman, to Larry Wieseneck, Lehman (July 22, 2008) [LBHI_SEC07940_404505] ("Have been thinking this through and coming to conclusion we won't do spin because too much equity and financing won't work for the spinco"); e-mail from Timothy Lyons, Lehman, to Alex Kirk, Lehman (July 22, 2008) [LBHI_SEC07940_174554] ("Given your views on the likelihood of spinco, I think we need to move hard down the path of Plan B"); e-mail from Eric Felder,

For McGee and Goldfarb, the questions were how big the hole would be and whether Lehman would have to fill it pre- or post-spin.[2342] To fill that "hole" and bolster its own position,[2343] Lehman would need to raise capital.[2344] By mid-summer 2008, Lehman's ability to raise capital by issuing shares was severely constrained by its previous capital raises as well as a constricting market.[2345] The next option was to sell assets, so Lehman looked to its "crown jewel," IMD, and especially, NB, which was IMD's private asset management arm.[2346] During July 2008, Lehman considered selling

Lehman, to Paolo R. Tonucci, Lehman (Aug. 10, 2008) [LBEX-DOCID 1297372] ("We are too small post spinco in my opinion.").

[2342] *See, e.g.*, e-mail from David Goldfarb, Lehman, to Richard S. Fuld, Jr., Lehman (July 20, 2008) [LBHI_SEC07940_213013] ("The construct of Spinco does work. The challenge is getting the outside capital . . . . There is a minimum of capital needed to de-consolidate which is approx $6 billion and obviously we would like to raise much more to reduce our ongoing financing of Spinco"); e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman (Aug. 5, 2008) [LBEX-DOCID 4067934] ("Model suggesting that maintaining 12x leverage would require about $7B in capital in clean RemainderCO. Ian [Lowitt] thinks that we should be targeting higher leverage ratio (because have gotten rid of higher risk weighted assets). Which is to say, he's thinking capital [to fill equity hole] of some number north of $5B."); e-mail from Hugh E. McGee, III, Lehman, to Brad Whitman, Lehman (Aug. 10, 2008) [LBHI_SEC07940_538201] ("We have already raised a lot of capital. Can we use some of what we already raised to bridge us here. Then we raise capital at time of diversion of equity to spinco"). *Accord* Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 23.

[2343] *See* Lehman, SEC talking points [Draft] (Aug. 11, 2008), at p. 2 [EY-LE-LBHI-KEYPERS 0907480] ("The distributed equity [for SpinCo] will not be replaced on a dollar-for-dollar basis as Lehman will no longer be supporting the commercial real estate portfolio").

[2344] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 9-11; Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 23; Examiner's Interview of Gary Parr, Sept. 14, 2009, at pp. 10-11.

[2345] *See, e.g.*, e-mail from Paolo R. Tonucci, Lehman, to Christian Wait, Lehman (July 17, 2008) [LBHI_SEC07940_529261] (forwarding Moody's Investors Service, Press Release (July 17, 2008) ("Lehman has very limited capacity for additional preferred securities in its capital structure, and the difficult market environment for Lehman in raising common equity capital . . . limits its ability to respond to further unexpected losses")).

[2346] Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 18; Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 9-11; Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at pp. 23-24; Examiner's Interview of Gary Parr, Sept. 14, 2009, at pp. 9-10. Lehman senior management had contemplated the possibility of selling off all or part of IMD since 2007. *See* Memorandum from Hugh E. McGee, III, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.*, re: analysis of possible sale or carve

IMD as part of its "Project Green" survival strategies.[2347] By early August 2008, McGee

and other Lehman executives had come to regard an IMD sale as one of the primary

options for addressing the equity hole.[2348] Lehman was concerned that selling IMD

would have a negative impact on Lehman's credit ratings, but by the end of August

2008, Lehman's management and the Board had accepted the need to sell at least part of

IMD to fill the equity hole that SpinCo would create.[2349]

In early September 2008, a Lehman presentation circulated among senior

management, "Capital Hole Analysis," estimates that spinning off $31.6 billion in assets

---

out of IMD (May 29, 2007) [LBEX-DOCID 711211]; David Erickson, Project Hercules (May 18, 2007) [LBEX-DOCID 727278].

[2347] *See* Lehman, Discussion Materials for the Executive Committee (July 21, 2008), at p. 3 [LBEX-DOCID 612664] (estimates that, at $6 billion total valuation of IMD, sale of 100% will generate after-tax cash proceeds of $1.7 billion, plus $3 billion gain to Lehman equity via reduced goodwill), attached to e-mail from Timothy Sullivan, Lehman, to Jasjit Bhattal, Lehman, *et al.* (July 21, 2008) [LBEX-DOCID 741718]; Lazard, Discussion Materials-Project Green [Draft] (Aug. 7, 2008) [LBHI_SEC0794_647930] (comparing effects on Lehman of commercial real estate spin-off with or without a sale of 51% or 100% of IMD); Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 31, 2008), at p. 2 [LBEX-AM 003875-76] (Fuld reported to the Board about "the three-part transaction that had been previously reviewed with the Board of Directors involving a spin-out of the commercial real estate business, the sale of the Investment Management Division, and the raising of capital"). *Accord* Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 9.

[2348] *See, e.g.*, Lehman, Discussion Materials for the Executive Committee (July 21, 2008), at p. 3 [LBEX-DOCID 612664], attached to e-mail from Timothy Sullivan, Lehman, to Jasjit Bhattal, Lehman, *et al.* (July 21, 2008) [LBEX-DOCID 741718]; e-mail from Angela Judd, Lehman, to Hugh E. McGee, III, Lehman, *et al.* (Aug. 8, 2008) [LBHI_SEC07940_647930] (forwarding "Project Green" presentation prepared by Lazard, comparing effects on Lehman of commercial real estate spin-off with or without a sale of 51% or 100% of IMD); Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 31, 2008), at p. 2 [LBEX-AM 003875]. *Accord* Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 9.

[2349] Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at pp. 16-17; Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 13; Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 18. *But see* e-mail from Hugh E. McGee, III, Lehman, to Richard S. Fuld, Jr., Lehman (Aug. 25, 2008) [LBHI_SEC07940_213294] (forwarding talking points that include the need "[t]o fill the equity hole from SpinCo, will need to raise $3-4B of equity. May raise this via partial sale of IMD but that is not the preferred route. Running a process for all of IMD; initial indications for the whole thing range from $8-11B. Total market cap of Green today is ~$9.5 B -- makes no sense").

would require Lehman to transfer $7.9 billion equity to SpinCo for SpinCo to achieve a 75% loan-to-value ratio.[2350]   To provide that $7.9 billion, Lehman hoped to raise $2.5 billion through a sale of 51% of IMD and to raise another $3 billion by issuing equity, but that still would leave $2 billion or more to be raised from a third-party investor.[2351]

When Lehman pre-announced its earnings on September 10, 2008, Lehman had not yet finalized its approach to filling the equity hole. During the earnings call, Lehman announced its plan "to separate a vast majority of our commercial real estate assets from our core business by spinning off those assets to our shareholders and to an independent, publicly traded entity which will be adequately capitalized," and stated that Lehman was "in the final stages of raising capital with sale of a majority stake in IMD."[2352]   Analysts asked whether Lehman needed additional capital in order to capitalize SpinCo, and whether the sale of IMD was expected to result in only $3 billion, to which Lowitt responded: "We don't feel that we need to raise that extra amount to cover the $7 billion because you will have less leverageable equity in core Lehman than in where you are at the end of this quarter."[2353]

---

[2350] Lehman, Capital Hole Analysis (Sept. 8, 2008), at p. 1 [LBHI_SEC07940_409438].

[2351] Id. But see Lehman, SEC talking points [Draft] (Aug. 11, 2008), at p. 2 [EY-LE-LBHI-KEYPERS 0907480] ("The distributed equity [for SpinCo] will not be replaced on a dollar-for-dollar basis as Lehman will no longer be supporting the commercial real estate portfolio").

[2352] Final Transcript of Lehman Brothers Holdings Inc. Third Quarter 2008 Preliminary Earnings Call (Sept. 10, 2008), at p. 3 [LBHI_SEC07940_612771].

[2353] Id. at 19.

After the call, analysts reacted skeptically to Lehman's explanations and zeroed in on the equity hole.[2354]  Barclays Capital analyst Robert Ferguson wrote:

> The key problem is the amount of equity that it will take for the new REI spinoff.  They really seemed to dodge the question on the call. . . .  [H]ow would they expect to transfer the CRE portfolio at its current mark to the SpinCo if the market bids for that are significantly lower?  Wouldn't they have to hold some provision in a non MTM book?[2355]

Vincent Curotto, an analyst for Sanford Bernstein, wrote:

> While Lehman's management yesterday said that it does not expect to have to raise capital in order to reach its destination of being a 'new' LEH (sale of NEU, spinoff of CRE/CMBS, etc), we are skeptical.  Our work in our Monday piece implies that LEH would have to raise $7.5 billion in order to capitalize this spin off adequately and maintain a 20x leverage ratio.[2356]

Analysts estimated that Lehman would have to raise at least $6 to $9 billion to capitalize the spin-off and restore Lehman's leverage ratio.[2357]

### (ii)  Outside Financing for SpinCo

In addition to providing the cash equity needed to capitalize SpinCo, Lehman also would need to finance at least some of the assets that it transferred to the new

---

[2354] *See, e.g.,* e-mail from Robert Ferguson, Barclays Capital, to Mike Keegan, Barclays Capital (Sept. 10, 2008) [BCI-EX-(S)-00035195].

[2355] *Id.*

[2356] E-mail from Vincent Curotto, Sanford Bernstein, to Stuart Schwadron, Sanford Bernstein (Sept. 11, 2008) [SB-SEC 048150].

[2357] *See, e.g., id.* (estimating that Lehman would have to raise $7.5 billion in order to adequately capitalize the spin-off and maintain its leverage ratio); UBS, Notes regarding Lehman's commercial real estate spinoff (Sept. 11, 2008) [SECUBS 00663] (estimating that Lehman would need between $6 billion and $9 billion in equity to fund SpinCo, taking a "pretty good chunk of capital out of the 'good' Lehman and potentially caus[ing] it to raise common equity").

entity.[2358]  Lehman executives recognized from the outset that it would be critical to find

independent financing for the new entity.[2359]  While the spin-off would relieve Lehman's

balance sheet of the transferred assets, Lehman would hold SpinCo's notes — as Fuld

noted to Goldfarb: "We need to get others to finance [SpinCo] so it doesn't sit on our

balance sheet."[2360]

Lehman hoped to attract outside financing for SpinCo by tranching Lehman's

seller financing.[2361]  The initial goal was to sell $2 to $6 billion of the highest-risk,

highest-return "mezzanine" tranches of the debt.[2362]  By August 2008, Lehman's "Project

Green Acres" team had reached out to selected investors,[2363] mostly private equity

---

[2358] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 6-8.

[2359] *See* e-mail from Erin M. Callan, Lehman, to Mark A. Walsh, Lehman (Mar. 12, 2008) [LBHI_SEC07940_116854] ("Clearly have to address financing of the assets which we would primarily have to provide to Newco from the outset"); e-mail from Steven R. Hash, Lehman, to Erin M. Callan, Lehman, *et al.* (Apr. 14, 2008) [LBHI_SEC07940_274912] ("I thought we had decided the structure would not work because independent financing is not available"); e-mail from Steven R. Hash, Lehman, to Daniel Kerstein, Lehman, *et al.* (June 10, 2008) [LBEX-DOCID 1475676] ("[P]roblem is financing and the assets that greg owns.  Ie there is really no independent financing for these assets in the market today.  No financing means no actual business plan").

[2360] E-mail from Richard S. Fuld, Jr., Lehman, to David Goldfarb, Lehman (July 19, 2008) [LBHI_SEC07940_213011].

[2361] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 6-7.

[2362] *See* Lehman, Project Green - Talking Points for Potential Investors (Aug. 6, 2008) [LBEX-DOCID 363782] (describing option to purchase up to 20% stake in post-spin Lehman (via $5 billion forward payment), conditional on purchase of "meaningful portion" ($3-4 billion) of SpinCo mezzanine securities); *see also* e-mail from David Goldfarb, Lehman, to Martin Kelly, Lehman, *et al.* (July 21, 2008) [LBEX-DOCID 2997880] ("SpinCo . . . if we get outside party to purchase full Mezz piece, 5-6 billion-we can own all senior 20 bill and shareholders own equity and we still get to deconsolidate.  Right?").  *Accord* Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 7.

[2363] Notably, McGee stated that he was not aware whether anyone at Lehman approached investors to test the water in the marketplace for SpinCo notes, or made any other effort prior to the September 10, 2008 earnings call to line up investors for SpinCo debt.  Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at pp. 24-25.

groups, about SpinCo's mezzanine debt.[2364]  Lehman also hoped to syndicate part of the

senior debt financing.[2365]   The rating agencies that reviewed the SpinCo plan in mid-

August underscored the importance of Lehman being able to syndicate some of

SpinCo's senior debt.[2366]  Eileen Fahey, a managing director of Fitch, told the Examiner

that her preliminary conclusion was that Lehman would be left financing SpinCo's

assets and would still "be on the hook" for any SpinCo losses.[2367]

In March 2008, Lehman had approached Buffett concerning a private

investment.[2368]  In mid-July 2008, Lehman again considered approaching Buffett about

---

[2364] *See*, Lehman, Project Green Acres - Daily Update (Aug. 8, 2008) [LBEX-DOCID 2253477], attached to e-mail from Sarah Kadetz, Lehman, to Lisa Beeson, Lehman, *et al.* (Aug. 8, 2008) [LBEX-DOCID 2151027]; e-mail from Lisa Beeson, Lehman, to Larry Wieseneck, Lehman, *et al.* (Aug. 8, 2008) [LBEX-DOCID 544666]; Lehman, Summary of Conversations with Potential Capital Providers (Aug. 27, 2008) [LBEX-DOCID 947915] (listing potential investors including Apollo, Blackstone, Carlyle, Cerberus, Colony, Fortress, J.E. Roberts, Lone Star, Lubert Adler, Och-Ziff, Vornado, and Walton Street), attached to e-mail from Alex Kirk, Lehman, to Michael Gelband, Lehman (Aug. 27, 2008) [LBEX-DOCID 961894].

[2365] *See* e-mail from David Goldfarb, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (July 19, 2008) [LBHI_SEC07940_404388] ("Need some creative ways to fund Spinco.  Best to get some relationships which do commercial real estate lending in scale.  They could buy seniors or mezz's.  Start thinking, this is key challenge that needs to be nailed"); e-mail from Gerard Reilly, Lehman, to Ian T. Lowitt, Lehman, *et al.* (July 22, 2008) [LBEX-DOCID 2997880] ("[S]elling mezz certainly helps as it supports validity of capital structure.  If we can find other SR debt in market and gain some comfort on our spread then we could call it [a Level II asset].  Placing some Sr is best").  *Accord* Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 7.

[2366] *See, e.g.,* e-mail from Hugh E. McGee, III, Lehman, to Jeffrey L. Weiss, Lehman, *et al.* (Aug. 13, 2008) [LBHI_SEC07940_406811] (forwarding Tonucci e-mail summarizing a meeting with Fitch re: SpinCo: "[S]elling the senior debt - ability to do so seemed important in their assessment of what had been accomplished"); e-mail from Ian T. Lowitt, Lehman, to Hugh E. McGee, III, Lehman (Aug. 13, 2008) [LBHI_SEC07940_364012] ("[Rating agencies] don't think [SpinCo's] operators will find alternative sources of financing as easily as implied in our model.  Will have to work hard to convince agencies and other potential funders.  Must make sure this is not [G]oldfarb over exuberance at work here").

[2367] Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 6.

[2368] See *infra* Section III.A.3.c of this Report, which discusses Lehman's talks with Buffett in greater detail.

investing in SpinCo debt.[2369]   In late August or early September 2008, McGee called MidAmerican Energy Holdings' President David L. Sokol, hoping to entice Sokol either to have MidAmerican Energy Holdings invest in the SpinCo plan or to advocate the plan to Buffett.[2370]   McDade and McGee showed Sokol Lehman's "Gameplan" presentation, explaining that Lehman was ready to execute the plan if Lehman had an investor.[2371]  Sokol was not interested in investing, but relayed the basic premise of the SpinCo plan to Buffett.[2372]   During that discussion, Buffett dismissed the idea as unrealistic.[2373]

Lehman discussed the SpinCo plan in detail during its pre-announcement earnings call on September 10, 2008, but it did not discuss its efforts to sell portions of Lehman's SpinCo debt, because the syndication was not yet in place.[2374]

---

[2369] *See* e-mail from Larry Wieseneck, Lehman, to Brad Whitman, Lehman, *et al.* (July 18, 2008) [LBHI_SEC07940_404298] ("We should consider getting the [SpinCo] loan rated and possibly wrapped by Berkshire").

[2370] Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 17; Examiner's Interview of David L. Sokol, Sept. 22, 2009, at p. 2.

[2371] Lehman, The Gameplan (Sept. 2008) [LBHI_SEC07940_653681], attached to e-mail from Hugh E. McGee, III, Lehman, to David L. Sokol, MidAmerican Energy Holdings Co. (Sept. 4, 2008) [LBHI_SEC07940_653680]; Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 17; Examiner's Interview of David L. Sokol, Sept. 22, 2009, at p. 4.

[2372] Sokol does not recall specifically whether he communicated Lehman's SpinCo plan to Buffett; however, Buffett recalled Sokol briefing him on the basic contours of the plan – or at least, "something they tossed out" about a CRE spin.  Examiner's Interview of David L. Sokol, Sept. 22, 2009, at p. 3; Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 4.

[2373] Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 4.

[2374] Examiner's Interview of  Richard S. Fuld, Jr., May 6, 2008, at p. 8.

### (iii) SEC Issues

For SpinCo to work as planned, the SEC had to approve the accounting treatment Lehman proposed to use.[2375]   First, Lehman hoped to avoid the requirement that SpinCo provide three years of audited financial statements covering the assets that Lehman would transfer.[2376]   Second, Lehman sought to avoid using mark-to-market or "fair value" accounting of SpinCo's loan assets and sought to account for SpinCo's debt securities on a "hold to maturity" basis.[2377]   Third, Lehman hoped to structure the SpinCo transaction in such a way that the spin-off would be tax-free to Lehman and its shareholders.[2378]   Lehman was able to obtain SEC approval of the first two goals but the SEC agreement effectively doomed Lehman's tax treatment goal.

### a.   Auditing and Accounting Issues

Lehman's accountants regarded preparation of historical financial statements for SpinCo's Form 10 as a major problem.[2379]   SEC rules typically require a company to

---

[2375] *See* e-mail from Daniel Kashdin, Lehman, to Daniel Kerstein, Lehman, *et al.* (July 11, 2008) [LBHI_SEC07940_401374] ("Likely that E&Y would require Lehman to pre-clear [SpinCo] transaction with SEC"); Lehman, SEC Discussion Materials [Draft] (July 28, 2008) [LBHI_SEC07940_404819]; Lehman, Green Acres - Overview of Potential Alternatives [Draft] (July 30, 2008) [LBHI_SEC07940_405303].  *Accord* Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 9.

[2376] Examiner's Interview of Thomas H. Cruikshank, Oct. 8, 2009, at p. 9.

[2377] *Id*.; Examiner's Interview of David O'Reilly, Oct. 26, 2009, at p. 4; Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at pp. 9-10.

[2378] *See*, *e.g.*, Lehman, Key Execution Considerations for Spin-Off [Draft] (July 11, 2008) [LBHI_SEC07940_401591] ("Transaction likely can be structured as tax-free to shareholders if SpinCo is a C-Corp").  *Accord* Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 7.

[2379] *See* e-mail from Martin Kelly, Lehman, to David Goldfarb, Lehman, *et al.* (July 17, 2008) [LBEX-DOCID 560179] ("Single largest issue here will be the form of financial statements required by the s e c - if we need to prepare and have audited a separate set of f[i]nancials for the real estate business that will be a huge undertaking"); Lehman, SpinCo Talking Points for SEC [Draft] (Aug. 6, 2008) [LBEX-DOCID

provide three years of audited financial statements for newly acquired real estate operations.[2380]   Because of the number and diversity of the underlying CRE assets, compiling those statements for SpinCo would be a "huge undertaking" that could delay SpinCo's execution "beyond a practical time horizon."[2381]

In August 2008, Lehman sought a waiver from the SEC.[2382]   Lehman argued that complete historical documentation of the financial performance and administrative costs of SpinCo's numerous, diverse assets simply did not exist.[2383]   Instead of audited historical financial statements, Lehman proposed to provide investors with an audited opening balance sheet and up to three years of *prospective* financial statements, along with specific information on individual assets that would be limited to "type of property, occupancy percentage, geographic location, square footage, acquisition cost, indebtedness and property level cash flows."[2384]

---

1295521], attached to e-mail from Daniel Kerstein, Lehman, to Steven Berkenfeld, Lehman (Aug. 6, 2008) [LBEX-DOCID 1297492].

[2380] *See* Lehman, SEC Talking Points [Draft] (Aug. 8, 2008) [LBEX-DOCID 851411], attached to e-mail from Michael J. Langer, Lehman, to Thomas A. Russo, Lehman, *et al*. (Aug. 8, 2008) [LBEX-DOCID 965295]; *see also* 17 C.F.R. § 210.3-14 (2008), SEC Reg. S-X Rule 3-14, Special Instructions for Real Estate Operations to be Acquired.

[2381] E-mail from Martin Kelly, Lehman, to David Goldfarb, Lehman (July 17, 2008) [LBEX-DOCID 560179]; Lehman, SpinCo - Proposed Term Sheet [Draft] (Aug. 19, 2008), at p. 5 [EY-LE-LBHI-KEYPERS 3670025], attached to e-mail from Robert Downs, Sullivan & Cromwell, to Martin Kelly, Lehman, *et al*. (Aug. 19, 2008) [EY-LE-LBHI-KEYPERS 3670025]; Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 8.

[2382] *See* Lehman, SEC Talking Points [Draft] (Aug. 11, 2008) [EY-LE-LBHI-KEYPERS 0907480], attached to e-mail from Daniel Kerstein, Lehman, to William Schlich, Ernst & Young, *et al*. (Aug. 11, 2008) [EY-LE-LBHI-KEYPERS 0907479].

[2383] *Id.  Accord* Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 14.

[2384] Lehman, SEC Talking Points [Draft] (Aug. 11, 2008) [EY-LE-LBHI-KEYPERS 0907480], attached to e-mail from Daniel Kerstein, Lehman, to William Schlich, Ernst & Young, *et al*. (Aug. 11, 2008) [EY-LE-LBHI-KEYPERS 0907479]; Lehman, SpinCo - Proposed Term Sheet (Aug. 19, 2008), at p. 3 [EY-LE-LBHI-

Following an initial meeting with the SEC on August 12, 2008, Lehman was "cautiously optimistic" and concluded that the SEC was ready to be "helpful" in waiving the requirement of three years of historical financials.[2385]  However, an agreement was not reached quickly.[2386]  The SEC offered to grant Lehman's waiver request in exchange for an agreement that SpinCo would use "fair value," also known as mark-to-market, accounting.[2387]  On August 20, 2008, Fuld reported to the Board that Lehman had "resolved" all major accounting issues with the SEC apart from the mark-to-market accounting question.[2388]

As Fuld indicated to the Board, Lehman's second major challenge was to obtain the SEC's agreement that SpinCo would not need to use mark-to-market or "fair value" accounting (*i.e.*, SFAS 157 and 159) in reporting the value of its commercial real estate

---

KEYPERS 3670027], attached to letter from John W. Bostelman, Sullivan & Cromwell, to John White, SEC (Aug. 19, 2008) [EY-LE-LBHI-KEYPERS 3670025].  Lehman's outside accountants, Ernst & Young, reportedly felt "blindsided" and put in the "hot seat" by the SEC's expectation that Lehman's auditors would certify SpinCo's financial projections. *See* e-mail from Kenneth T. Marceron, Ernst & Young, to Randy G. Fletchall, Ernst & Young, *et al.*  (Aug. 13, 2008) [EY-LE-LBHI-KEYPERS 3669425] ("In this fact pattern, the client would sell securities based solely on a financial forecast rather than any historical financial statements. . . . I don't see practically how we could ever get there given the information that would be required in order to do a forecast even if we wanted to accept this type of engagement").

[2385] E-mail from Ian T. Lowitt, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Aug. 12, 2008) [LBEX-DOCID 2642438].

[2386] *See* letter from Martin Kelly, Lehman, to Wayne Carnall, SEC, re: SEC request that Lehman address why spin-off should not be regarded as the acquisition of a business and why SpinCo should not be required to use fair value accounting (Aug. 21, 2008) [LBEX-DOCID 1298065], attached to e-mail from Robert W. Downes, Sullivan & Cromwell, to Larry Wieseneck, Lehman, *et al.* (Aug. 21, 2008) [LBEX-DOCID 1297924].

[2387] E-mail from David Goldfarb, Lehman, to Larry Wieseneck, Lehman, *et al.* (Aug. 27, 2008) [LBEX-SIPA 007017].

[2388] *See* Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Aug. 20, 2008), at p. 2 [LBEX-AM 003891].

assets.[2389]  Lehman executives believed that using "hold to maturity" accounting for SpinCo's assets was critical to SpinCo's feasibility, but that would require Lehman to be a pioneer in obtaining the SEC's agreement to allow that accounting treatment.[2390]

On August 21, 2008, Lehman presented its request to the SEC.[2391]  Lehman argued that under U.S. GAAP, an entity that can demonstrate the intent and ability to hold debt securities[2392] to maturity is entitled to use "hold to maturity" accounting for those assets, as long as they are valued at their fair values at the time of transfer.[2393]  In response, the SEC sought Lehman's agreement to use mark-to-market accounting by citing "investor

---

[2389] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2008, at p. 7; *see also* Fair Value Measurements, Statement of Fin. Accounting Standards No. 157 (Fin. Accounting Standards Bd. 2008); The Fair Value Option for Financial Assets and Financial Liabilities, Statement of Fin. Accounting Standards No. 159 (Fin. Accounting Standards Bd. 2008).

[2390] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2008, at p. 7; Examiner's Interview of David O'Reilly, Oct. 26, 2009, at p. 4; Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at pp. 9-10; Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 9.

[2391] *See* letter from Martin Kelly, Lehman, to Wayne Carnall, SEC, re: SEC request that Lehman address why spin-off should not be regarded as the acquisition of a business and why SpinCo should not be required to use fair value accounting (Aug. 21, 2008) [LBEX-DOCID 1298065], attached to e-mail from Robert W. Downes, Sullivan & Cromwell, to Larry Wieseneck, Lehman, *et al.* (Aug. 21, 2008) [LBEX-DOCID 1297924].

[2392] While the "hold to maturity" issue applied specifically to debt securities which would constitute only 10% of SpinCo's assets, Lehman also argued that it should not be required to use "fair value" accounting for the bulk of the loans which would make up almost 70% of SpinCo's assets. Lehman wanted to account for the loans "at amortized cost with amortization of discount under the effective yield method and subject to reserve for loan losses," or essentially the same method Lehman wanted to use for debt securities. *See id.* at pp. 10-12.

[2393] *Id.* at p. 2. ("[It is] critical to Spinco's asset management philosophy, as well as investors in Spinco, that the accounting framework of Spinco reflect fundamental asset valuations realizable over longer time horizons, as opposed to valuations reflective of current market liquidity.  This is the foundation of Spinco and the key to its success. . . .  If Spinco were subject to fair value accounting, we believe that it would be at a competitive disadvantage to its peers and would not be able to manage the assets in a fundamentally different manner than how Lehman must manage the assets now and therefore would not be able to maximize value for its shareholders").  The letter defines "hold to maturity" accounting as valuation "at amortized cost with amortization of discount or premium under the effective yield method and recognition of any other-than-temporary declines in value in earnings."  *Id.* at p. 10.

protection" concerns and offering to grant Lehman other waivers instead (*e.g.*, three years' historical financials, auditor-reviewed financial projection, and updated projections and financial statements).[2394]

On August 28, 2008, Lehman reached an agreement with the SEC. SpinCo's initial balance sheet would be prepared at fair value.[2395] SpinCo would not use mark-to-market accounting for its loan assets but instead would account for its debt securities on a "hold to maturity" basis (with provisions for expected loan losses).[2396] SpinCo would still value its equity securities at their market values.[2397] The SEC also agreed not to require SpinCo to file three years of audited historical financial statements.[2398] David

---

[2394] *See* e-mail from Martin Kelly, Lehman, to Thomas A. Russo, Lehman, *et al.* (Aug. 27, 2008) [LBEX-SIPA 007017]. Lehman executives pushed back, arguing that using non-fair value accounting was "critical" to SpinCo's success and that Lehman's proposed accounting treatment was the "right answer." E-mail from David Goldfarb, Lehman, to Larry Wieseneck, Lehman, *et al.* (Aug. 27, 2008) [LBEX-SIPA 007017]. Lehman also pressured Ernst & Young to intervene with the SEC on Lehman's behalf. *See id.*; e-mail from David Goldfarb, Lehman, to William Schlich, Ernst & Young (Aug. 28, 2008) [LBEX-DOCID 2997901].

[2395] *See* e-mail from Martin Kelly, Lehman, to Larry Wieseneck, Lehman, *et al.* (Aug. 28, 2008) [EY-LE-LBHI-KEYPERS 0907577]; *see also* e-mail from David Goldfarb, Lehman, to Beth Rudofker, Lehman, *et al.* (Aug. 30, 2008) [LBHI_SEC07940_015928] ("[T]he debt will be accounted for @ hold to maturity with appropriation provisions for expected loan losses, and equity investments @ lower of cost or market."); e-mail from Martin Kelly, Lehman, to Daniel Kerstein, Lehman, *et al.* (Sept. 10, 2008) [LBHI_SEC07940_916922] ("More factually correct would be to say it is 'non-mark to market accounting.' Meaning loan accounting for loans, non-trading (ie non MTM) security accounting for securities and real estate accounting (lower of cost or fair value less cost to sell) for consolidated real estate. . . . We MUST NOT reference any discussion with SEC around this").

[2396] E-mail from David Goldfarb, Lehman, to Beth Rudofker, Lehman, *et al.* (Aug. 30, 2008) [LBHI_SEC07940_015928].

[2397] *Id.*

[2398] *See* e-mail from Martin Kelly, Lehman, to Larry Wieseneck, Lehman, *et al.* (Aug. 28, 2008) [EY-LE-LBHI-KEYPERS 0907577].

Goldfarb lauded the result as a "[g]reat answer for us."[2399]   However, the terms of the

SEC's agreement effectively would doom Lehman's hopes for a tax-free spin-off.[2400]

### b.   Tax-Free Status

A key advantage of the SpinCo idea, as originally conceived, was that the spin-off would be tax-free to Lehman's shareholders.[2401]   From SpinCo's earliest iteration, Lehman worked to ensure that the spin-off transaction would qualify for tax-free status.[2402]   As planning progressed, however, Lehman's effort to structure SpinCo to avoid historical financials and mark-to-market accounting complicated the tax-free status of the spin-off.[2403]   In particular, Lehman considered organizing SpinCo as a "liquidating trust" rather than an active business in order to avoid mark-to-market

---

[2399] E-mail from David Goldfarb, Lehman, to Beth Rudofker, Lehman (Aug. 29, 2008) [LBEX-DOCID 1609099].

[2400] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 7-8.

[2401] I.R.S. Code Section 355 permits a corporation to distribute equity ownership of a subsidiary under its control to the corporation's shareholders, tax free to both the shareholders and the corporation, as long as both the spun-off subsidiary (which may be newly formed) and the controlling corporation each remains in the same "active trade or business" after the distribution.  *See* I.R.C. § 355 (2008).

[2402] *See* Lehman, Managing to a "Bad Asset" Solution [Draft] (Apr. 23, 2008) [LBEX-DOCID 1400312] (real estate spin-off would be "Tax-free to Parent and to shareholders"); Lehman, Green Acres – Summary of Structural Alternatives (July 3, 2008), at p. 2 [LBHI_SEC07940_008342], attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman (July 3, 2008) [LBHI_SEC07940_008341]; *see also* Lehman, Discussion Materials for the Board of Directors [Draft] (July 19, 2008), at p. 10 [LBHI_SEC07940_404357] ("SpinCo will need to be deemed a viable stand-alone operating business for '40 Act, accounting purposes and to effect a tax-free distribution").

[2403] *See* Lehman, Green Acres – Overview of Potential Alternatives [Draft] (July 30, 2008) [LBHI_SEC07940_405303] (comparing spin-off as operating business versus spin-off as liquidating entity), attached to e-mail from Daniel Kerstein, Lehman, to Larry Wieseneck, Lehman, *et al.* (July 30, 2008) [LBHI_SEC07940_405302]; email from Michael Langer, Lehman, to Larry Wieseneck, Lehman, *et al.* (Aug. 10, 2008) [EY-LE-LBHI-KEYPERS 0850862] (noting that in draft talking points for the SEC "we have been intentionally vague on operating company vs. liquidating trust to keep our alternatives open").

accounting, but the "liquidating trust" structure threatened the tax-free status of the spin-off.[2404]  Lehman was not able to resolve the tax issue before its bankruptcy.[2405]

### (iv) Valuation of Assets

To accomplish the spin-off, the SEC required that SpinCo's initial balance sheet show the fair value of the transferred assets.[2406]  As early as June 2008, some members of Lehman's real estate investment banking team worried that "the assets and their value"

---

[2404] *See id.; see also* e-mail from Larry Wieseneck, Lehman, to Hugh E. McGee, III, Lehman (Aug. 5, 2008) [LBHI_SEC07940_406125]; e-mail from Mark A. Walsh, Lehman, to Kenneth Cohen, Lehman, *et al.* (Aug. 10, 2008) [LBHI_SEC07940_303607]; memorandum from Spencer Kagan, Lehman, to Mark A. Walsh, Lehman, *et al.*, re: Green Acres - Preliminary Estimated Liquidating Trust Rated Debt Proceeds (Aug. 8, 2008) [LBHI-SEC07940_303609]; Lehman, Fitch Ratings - Project Green Acres [Draft] (Aug. 12, 2008), at p. 3 [LBEX-DOCID 612634] ("How 'SpinCo' Will Work: Liquidating Trust"). *But see* Lehman, Fitch Ratings - Project Green Acres (Aug. 12, 2008), at p. 3 [LBEX-DOCID 011904]; Lehman, SEC talking points [Draft] (Aug. 11, 2008), at p. 3 [EY-LE-LBHI_KEYPERSO 0907480]; Lehman, SpinCo - Proposed Term Sheet (Aug. 19, 2008), at p. 1 [EY-LE-LBHI-KEYPERS 3670025]; e-mail from Ian T. Lowitt, Lehman, to Daniel Kerstein, Lehman, *et al.* (Aug. 30, 2008) [LBEX-SIPA 003759] ("At the risk of stating the extremely obvious, [a] key issue [in deciding between C-Corp or partnership] is not upsetting our SEC agreement."  Earlier in the e-mail chain, Yoav Wiegenfeld, Lehman, states: "If we want to do a tax free spin for shareholders the entity will have to be a c-corp.  We need to determine whether we can do a tax free spin, which depends on (I) identifying a qualifying active trade or business (we discussed Aurora) and (ii) having a sign off from the SEC that having this business doesn't change the financial reporting agreement we reached with them"); Lehman, The Gameplan (Sept. 2008), at p. 4 [LBHI_SEC07940_653637].

[2405] *See, e.g.*, e-mail from Larry Wieseneck, Lehman, to Shaun Butler, Lehman, *et al.* (Aug. 29, 2008) [LBHI_SEC07940_651788] ("[W]e can not refer to Spinco as a Liquidating Trust.  It can never be discussed as akin to one not that it is one.  It neither is liquidating no[r] is it a trust.  I want to highlight this because it is currently referenced as such in the document and this is a huge accounting issue.  If it were a liq trust, we would end up in a very bad place accounting wise"); Lehman, Q3 Firmwide Q&A - Summary (no date), at p. 47 [LBHI_SEC07940_750660] ("We are in the process of finalizing the tax and legal structure of the REI Global entity").  *Accord* Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 7-8 (Fuld recalled that SpinCo had to be a non-operating entity to avoid mark-to-market treatment, but as a result, the spin-off was no longer tax-free.  Fuld said that Lehman never resolved that issue).

[2406] *See* e-mail from Martin Kelly, Lehman, to Thomas A. Russo, Lehman, *et al.* (Aug. 27, 2008) [LBEX-SIPA 007017] (terms of deal with SEC include "[i]nitial opening audited [balance sheet] at fair value").

would be SpinCo's greatest obstacle, not the structure or feasibility of the spin-off itself.[2407]

McGee told the Examiner that the issue was not the valuations of the assets *per se*, but rather the combination of the size and complexity of Lehman's CRE portfolio.[2408] Moreover, as SpinCo planning progressed, the deteriorating real estate market made asset valuations a moving target as Lehman modeled SpinCo's operations as an independent entity.[2409] Lehman discussed aggressively writing down the assets pre-spin, recognizing that the write-downs would reduce the size of the equity hole.[2410] In August 2008, Lehman considered engaging a third party to perform an independent valuation of SpinCo's proposed assets.[2411]

---

[2407] E-mail from Steven R. Hash, Lehman, to Larry Wieseneck, Lehman (June 11, 2008) [LBHI_SEC07940_398658]; *see also* e-mail from Steven R. Hash, Lehman, to David Erickson, Lehman, *et al.* (June 10, 2008) [LBEX-DOCID 1475677] ("[P]roblem is financing and the assets that greg owns. [T]here is really no independent financing for these assets in the market today"). *But see, e.g.*, e-mail from Larry Wieseneck, Lehman, to Hugh E. McGee, III, Lehman (July 11, 2008) [LBHI_SEC07940_401362] ("Issue is the use of cash capital not the marks").

[2408] Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at pp. 20-21; *accord* Examiner's Interview of Herbert H. McDade, III, Sept. 16, 2009, at p. 3 (McDade denied that Lehman mis-marked its assets, and asserted that by summer 2008 Lehman's commercial real estate portfolio was "cleaner" than any of its competitors and would have been a profitable investment).

[2409] Examiner's Interview of David O'Reilly, Oct. 26, 2009, at p. 4; *see also* e-mail from Larry Wieseneck, Lehman, to Timothy Sullivan, Lehman, *et al.* (July 18, 2008) [LBHI_SEC07940_404327] ("Need to build in slippage for a mark on commercial pre-spin ($2 - $3 billion)"); Lehman, Breakeven Comparison Between Spin Off and Writedown (Aug. 6, 2008) [LBHI_SEC07940_406362] (comparing SpinCo with a 29% writedown of commercial real estate assets).

[2410] *See* e-mail from Larry Wieseneck, Lehman, to Hugh E. McGee, III, Lehman, *et al.* (Aug. 6, 2008) [LBEX-DOCID 2274043]. *Accord* Examiner's Interview of Lisa Beeson, Oct. 23, 2009, at p. 9.

[2411] *See* Lehman, Project Green Acres - Daily Update (Aug. 7, 2008) [LBEX-DOCID 2253476] ("Consider engaging Blackstone (or other third party) to perform independent valuation . . . Responsibility[:] Goldfarb").

SpinCo was seen by some as validation of their suspicion that Lehman's assets were not properly valued.[2412] David Einhorn, President of Greenlight Capital, told the Examiner that the creation of SpinCo supported his contention that Lehman had not been marking down its commercial assets.[2413] Einhorn believes that Lehman's efforts to spin out its commercial real estate into a company where the assets did not have to be marked to fair value revealed that Lehman had not been marking those assets to fair value.[2414]

### (c) Barclays' "SpinCo"

Lehman was not able to implement the SpinCo plan prior to Lehman's bankruptcy. Nonetheless, Lehman's senior managers believed that SpinCo was an innovative and elegant plan and that Lehman simply ran out of time before it could execute SpinCo.[2415] Lehman's management points to the SEC's waiver of the requirement of three years of audited financial statements and its approval of "hold to maturity" accounting as support to show that SpinCo would have been feasible.[2416]

---

[2412] *See, e.g.,* e-mail from Don Benningfield, Bank of America, to Rochelle Dobbs, Bank of America, *et al.* (Sept. 12, 2008) [BofA-SEC-00002774]. *Accord* Examiner's Interview of David Einhorn, Nov. 19, 2009, at p. 10.

[2413] Examiner's Interview of David Einhorn, Nov. 19, 2009, at p. 10.

[2414] *Id.*

[2415] Lehman, The Gameplan - September 2008 (Sept. 2008), at p. 4 [LBEX-DOCID 2727665]. *Accord* Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 6; Examiner's Interview of Lisa Beeson, Oct. 23, 2009, at p. 9.

[2416] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 7-8; Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at pp. 9-10.

McGee, one of SpinCo's primary architects, moved to Barclays following Lehman's demise.[2417]  In September 2009, Barclays launched its own SpinCo-like entity, selling $12.3 billion of high-risk credit assets to Protium Finance, a newly formed partnership run by former Barclays employees.[2418]  Barclays stated that it was seeking to restructure a significant tranche of credit market exposure in a way that would secure reliable returns for its shareholders over time.[2419]  Barclays provided Protium with $12.6 billion first-loss seller financing, meaning that any potential upside to the assets sold by Protium would accrue solely to Protium's independent investors, not to Barclays or its shareholders.[2420]  Nonetheless, analysts regarded the spin-off as beneficial to Barclays, helping it slash its net exposure to risky credit assets.[2421]  In October 2009, during market conditions much different than a year earlier, Barclays announced plans for a second spin-off of $6.3 billion in complex credit assets.[2422]

### (5)  Potential Strategic Partners

Following the near collapse of Bear Stearns, Lehman reached out to numerous potential partners regarding possible investments or mergers with Lehman.  After Lehman issued its second quarter 2008 financials, Fuld received increasingly blunt

---

[2417] *See* William D. Cohan, *The Highest Paid Man on Wall Street*, The Daily Beast, Jan. 9, 2009.

[2418] *See* Jane Croft & Sam Jones, *Barclays De-Risk Deal Leaves Analysts Puzzled*, FT.com, Sept. 16, 2009.

[2419] *Id*.

[2420] *Id*.

[2421] *Id.*; Tracy Alloway, *Barclays' Protium-Purified Balance Sheet*, FT.com, Nov. 10, 2009.

[2422] *Barclays Said to Plan $6.3 Billion Spin-Off*, N.Y. Times, Oct. 12, 2009.

pressure from Paulson and Geithner to sell Lehman or find a strategic partner.[2423]

Paulson told the Examiner that he perceived that Lehman's announcement of its loss in the second quarter of 2008 convinced Fuld that dramatic action was necessary to save Lehman.[2424] According to Paulson, the release of the numbers served as a wake-up call to Fuld who, at that point, appreciated Lehman's fragility and comprehended that the future portended nothing better.[2425] However, Paulson described Fuld to the Examiner as both one of the most optimistic people Paulson has ever met and a person who heard only what he wanted to hear.[2426]

Geithner explained to the Examiner that Lehman faced the difficult task of having to persuade an investor or investor group to buy into Lehman just at the time the souring economy made potential investors highly skittish about absorbing more risk.[2427] Geithner added: "if you get in a position where you are late, then all of your choices are bad and all the classic avenues you can use to make yourself stronger make you look weaker. That's how you get to the point of no return."[2428]

---

[2423] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 14; Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 6.

[2424] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 14.

[2425] *Id*.

[2426] *Id*. at p. 6.

[2427] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 6.

[2428] *Id*. By the end of the summer, the New York Times "Dealbook" blog was openly asking, "when will Lehman Brothers die? Judging by the headlines, you'd think the troubled investment bank would go belly up any day now." *See* Andrew Ross Sorkin, *Lehman's Woes Haunt the Last Days of Summer*, N.Y. Times (Aug. 26, 2008), *available at* http://dealbook.blogs.nytimes.com/2008/08/26/the-storylines-of-the-last-days-of-summer.

### (a) Buffett and Berkshire Hathaway

### (i) March 2008

In late March 2008, McGee suggested that Lehman reach out to Buffett.[2429] McGee had a pre-existing banking relationship with Sokol of MidAmerican Energy,[2430] which is majority-owned by Buffett's Berkshire Hathaway. Either McGee or Joseph G. Sauvage, LBI Vice-Chairman, called Sokol to ask if Buffett would take Fuld's call.[2431] Jerry A. Grundhofer, who was about to join Lehman's Board, also asked Buffett if he would take Fuld's call.[2432] Buffett agreed.[2433]

Before calling Buffett, Fuld called Sokol on March 27, 2008.[2434] That same day, Lehman prepared a draft of a letter, to be sent by Fuld to Lehman employees, outlining a $3.5 billion investment from Buffett in Lehman's preferred stock at a $54 per share conversion price.[2435] Fuld told the Examiner that he did not know how that letter came to be prepared, and it does not appear that Fuld saw the draft.[2436] Fuld also did not recall Buffett indicating a willingness to invest $3.5 billion.[2437] Buffett was surprised that

---

[2429] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 8.

[2430] At the time, Sokol was President of MidAmerican. In August 2009, Sokol became CEO of NetJets, Inc., another Berkshire Hathaway subsidiary.

[2431] Examiner's Interview of David L. Sokol, Sept. 22, 2009, at p. 3.

[2432] Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 10.

[2433] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 8; Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 10; Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 2.

[2434] Richard S. Fuld, Jr., Lehman, Call Logs (Mar. 27, 2008) [LBHI_SEC07940_016916].

[2435] E-mail from Timothy Lyons, Lehman, to Scott J. Freidheim, Lehman (Mar. 27, 2008) [LBHI_SEC07940_849386].

[2436] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at pp. 9-10.

[2437] *Id*. at p. 10.

Lehman had prepared a draft letter announcing the deal, because he never got close to a deal with Lehman.[2438]

Fuld and Buffett spoke on Friday, March 28, 2008. They discussed Buffett investing at least $2 billion in Lehman.[2439] Two items immediately concerned Buffet during his conversation with Fuld.[2440] First, Buffett wanted Lehman executives to buy under the same terms as Buffett.[2441] Fuld explained to the Examiner that he was reluctant to require a significant buy-in from Lehman executives, because they already received much of their compensation in stock.[2442] However, Buffett took it as a negative that Fuld suggested that Lehman executives were not willing to participate in a significant way.[2443] Second, Buffett did not like that Fuld complained about short sellers.[2444] Buffett thought that blaming short sellers was indicative of a failure to admit one's own problems.[2445]

---

[2438] Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 4.

[2439] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 10; Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 4.

[2440] Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 4.

[2441] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at pp. 9-10; Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 3.

[2442] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at pp. 9-10.

[2443] Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 3.

[2444] *Id*. at p. 4. Paulson told the Examiner that he did not think that Buffett would be interested in Lehman. Paulson told the Examiner that he thought Fuld's suggestion of Buffett as a potential investor indicated that Fuld was "scared, but not scared enough" and did not appreciate the gravity of Lehman's situation in March 2008. Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 12.

[2445] Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 3.

Following his conversation with Buffett, Fuld asked Paulson to call Buffett, which Paulson reluctantly did.[2446]   Buffett told the Examiner that during that call, Paulson signaled that he would like Buffett to invest in Lehman, but Paulson "did not load the dice."[2447]

Buffett spent the rest of Friday, March 28, 2008, reviewing Lehman's 10-K and noting problems with some of Lehman's assets.[2448]   Buffett's concerns centered around Lehman's real estate and high yield investments, lending-related commitments, derivatives and their related credit-market risk, Level III assets and Lehman's securitization activity.[2449]   On Saturday, March 29, 2008, Buffett learned of a $100 million problem in Japan that Fuld had not mentioned during their discussions, and Buffett was concerned that Fuld had not been forthcoming about the issue.[2450]   The problems Buffett saw in the 10-K along with Fuld's failure to alert Buffett to the issue in Japan cemented Buffett's decision not to invest in Lehman.[2451]

At some point in their conversations, Fuld and Buffett also discovered that there had been a miscommunication about the conversion price.  Buffett was interested only

[2446] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 12; Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 8.

[2447] Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 2.

[2448] *Id.* at p. 3.

[2449] *Id.*  Buffett made notes on many of the 10-K pages about Lehman's financials.  Those notes illustrate that Buffett had questions or took issue with much of what Lehman was reporting, as he stated during his interview.  Additionally, Buffett seems to have had a heightened focus on Lehman's real estate and high yield assets and on accounting issues relating to the stock price, assets, or liabilities.  *Id.*

[2450] *Id.* at pp. 3-4.  *Accord* Examiner's Interview of Richard S. Fuld,  Jr., Sept. 30, 2009, at p. 10.

[2451] Examiner's Interview of Warren E. Buffet, Sept. 22, 2009, at p. 4.

in convertible preferred shares.[2452]  Buffett told Fuld that he was willing to agree to a $40 conversion price per share, while Fuld thought Buffett was offering to buy in at "up-40," or 40% above the current market price, which would have been about $56 per share.[2453]  On Friday, March 28, 2008, Lehman's stock closed at $37.87.[2454]

Fuld spoke to Lehman's Executive Committee and several Board members about his conversations with Buffett.[2455]  Lehman recognized that an investment by Buffett would provide a "stamp of approval."  However, Lehman already had better offers for its April capital raise, and Lehman did not think it could give a better deal to Buffett at the same time it gave a less attractive deal to others.[2456]

On Monday, March 31, 2008, before Buffett could tell Fuld that he was not interested, Fuld called Buffett to say that Lehman could not accept his terms.[2457]

### (ii)  Last-Ditch Effort with Buffett

McGee contacted Sokol again in late August or early September 2008 and outlined Lehman's "Gameplan" for survival, specifically SpinCo.[2458]  During a

---

[2452] *Id.* at p. 2.

[2453] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 10.

[2454] *See* Yahoo! Finance, Historical LEH stock prices, *available at* http://finance.yahoo.com/q?s=LEHMQ.PK.

[2455] Richard S. Fuld, Jr., Lehman, Call Logs (Mar. 28 - Apr. 3, 2008) [LBHI_SEC07940_016911]; Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 11; Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 10; Examiner's Interview of John D. Macomber, Sept. 25, 2009, at p. 20.

[2456] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 11.

[2457] Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at p. 4; Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 11.

[2458] Lehman, The Gameplan (Sept. 2008) [LBHI_SEC07940_653681], attached to e-mail from Hugh E. McGee, III, Lehman, to David L. Sokol, MidAmerican Energy Holdings Co., *et al.* (Sept. 4, 2008) [LBHI_SEC07940_653680]; Examiner's Interview of David L. Sokol, Sept. 22, 2009, at p. 4.

subsequent telephone call with Sokol, McGee explained the "good bank/bad bank" scenario and stated that Lehman would need an investor.[2459]  Sokol believed the e-mail and call were intended to induce Sokol to pass that information on to Buffett, so Sokol briefed Buffett on SpinCo.  Buffett thought the idea would not solve Lehman's problems.[2460]

Sometime during the week prior to Lehman's bankruptcy, McGee again reached out to Sokol with what both Sokol and McGee described to the Examiner as a "Hail Mary" pass.[2461]  McGee asked, "Do you have any ideas to save us?"[2462]  Sokol, who was bear hunting in Alaska at the time, told McGee that he did not.[2463]

### (b) KDB

#### (i) Discussions Begin

In late May 2008, Hana Financial Group ("Hana") led a consortium of Korean financial institutions in talks concerning a possible investment in Lehman.[2464]  According to KDB, KDB started discussions with Lehman and Hana concerning an investment in Lehman through a consortium of Korean investors in early June 2008.[2465]  The contemplated consortium included KDB, Korea Investment Corporation ("KIC"), Korea

---

[2459] Examiner's Interview of David L. Sokol, Sept. 22, 2009, at p. 4.

[2460] *Id*.

[2461] *Id*.; Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 16.

[2462] Examiner's Interview of David L. Sokol, Sept. 22, 2009, at p. 4.

[2463] *Id*.

[2464] Examiner's Interview of Kunho Cho, Jan. 7, 2010, at p. 5.

[2465] Examiner's Interview of KDB, Oct. 26, 2009, at pp. 6-7.

National Pension Service ("KNPS") and Hana.[2466]  Hana's intended goal was for Hana

and KDB each to obtain approximately five percent of Lehman.[2467]  The anticipated total

Korean investment was between $3 and $5 billion.[2468]

Lehman and the Korean entities differed over the nature of a possible

investment.  Lehman's draft term sheet, presented to its Executive Committee on June 5,

2008, called for participation by the Korean consortium in joint ventures for Lehman's

funded and unfunded commitments, as well as real estate.[2469]  A revised version

circulated on June 5, 2008, indicated that each of the joint ventures would include $10

---

[2466] *See* memorandum from Kunho Cho, Lehman, to Hugh E. McGee, III, Lehman, *et al.*, re: Opportunity Briefing and Key Issues for Investment by Korea Inc. Consortium in Lehman Brothers (May 29, 2008) [LBEX-DOCID 1374131], attached to e-mail from Kunho Cho, Lehman, to David Goldfarb, Lehman (May 29, 2008) [LBEX-DOCID 1466211].

[2467] KDB told the Examiner that in the first round of negotiations with Lehman and Hana in early June 2008, Hana wanted Hana and KDB to each obtain approximately 5% of Lehman, with an investment of approximately $3 billion.  However, KDB said that it was not privy to all details because Hana was leading the negotiations.  Examiner's Interview of KDB, Oct. 26, 2009, at p. 7.  Bhattal told the Examiner that Hana could invest $1-2 billion by itself, but could invest up to $5 billion with a consortium of other Korean banks.  Examiner's Interview of Jasjit Bhattal, Oct. 12, 2009, at p. 6.  According to Kunho Cho, while Lehman and the Korean consortium initially discussed a $5 billion investment, that number fluctuated throughout the discussions.  Examiner's Interview of Kunho Cho, Jan. 7, 2010, at p. 7.  Lehman and Hana discussed a potential $5 billion investment. *See* memorandum from Kunho Cho, Lehman, to Hugh E. McGee, III, Lehman, *et al.*, re: Opportunity Briefing and Key Issues for Investment by Korea Inc. Consortium in Lehman Brothers (May 29, 2008) [LBEX-DOCID 1374131], attached to e-mail from Kunho Cho, Lehman, to David Goldfarb, Lehman (May 29, 2008) [LBEX-DOCID 1466211].

[2468] *Id.*

[2469] Lehman, Strategic Relationship Term Sheet [Draft] (June 5, 2008) [LBHI_SEC07940_103438], attached to e-mail from Joseph M. Gregory, Lehman, to Jasjit Bhattal, Lehman, *et al.* (June 5, 2008) [LBHI_SEC07940_103437] (forwarding strategic elements term sheet to Executive Committee).

billion worth of Lehman assets.[2470] Hana deleted those joint ventures when it sent back further revised term sheets.[2471]

Jasjit "Jesse" Bhattal, the CEO of Lehman Asia-Pacific, told the Examiner that those term sheets were not "real term sheets" because they did not indicate a price per share or the nature of the security.[2472] Rather, each side prepared the documents to summarize what had been discussed and as a basis for further discussions.[2473] Bhattal did not recall the joint ventures ever becoming a sticking point in the negotiations.[2474] Thomas A. Russo, Lehman's Chief Legal Officer, told the Examiner that the term sheets were not formal term sheets, but instead were drafted for the purpose of putting deal points on paper.[2475] Russo did not recall the joint ventures as being a sticking point in the negotiations.[2476] Although Russo did not believe the talks progressed to the point where Hana commented on the term sheets,[2477] documents reflect that Hana provided comments that included deleting Lehman's commercial real estate joint ventures from

---

[2470] Lehman, Elements of Strategic Relationship Term Sheet [Draft] (June 5, 2008), at p. 2 [LBEX-DOCID 817385], attached to e-mail from Jay Clayton, Sullivan & Cromwell, to Brad Whitman, Lehman, *et al.* (June 5, 2008) [LBEX-DOCID 941706].

[2471] Hana Investment Bank, Elements of Strategic Relationship [Draft] (June 4, 2008) [LBEX-DOCID 1401999], attached to e-mail from Chan Lee, Hana Bank, to Larry Wieseneck, Lehman, *et al.* (June 4, 2008) [LBEX-DOCID 1527489] (providing Hana's comments to Strategic Elements term sheet).

[2472] Examiner's Interview of Jasjit Bhattal, Oct. 12, 2009, at p. 9.

[2473] *Id.*

[2474] *Id.*

[2475] Examiner's Interview of Thomas A. Russo, Dec. 1, 2009, at pp. 10-11.

[2476] *Id.* at p. 11.

[2477] *Id.*

the deal.[2478]  Kunho Cho, head of Lehman Asia investment banking, recalled discussions about the joint ventures but did not think they were a "major focus" of the negotiations.[2479]

One of Hana's goals for an investment in Lehman was to induce Lehman to make Seoul its Asian headquarters, moving Lehman's sophisticated investment banking operations to South Korea.[2480]  Lehman was not willing to agree, because Lehman was unwilling to abandon its headquarters in Tokyo.[2481]  However, Lehman was willing to make Seoul a co-headquarters in Asia.[2482]

Lehman hoped to announce an investment at the same time that it announced its second quarter losses.[2483]  Lehman's second quarter earnings call was originally

---

[2478] See Hana Investment Bank, Elements of Strategic Relationship [Draft] (June 4, 2008) [LBEX-DOCID 1401999] attached to e-mail from Chan Lee, Hana Bank, to Larry Wieseneck, Lehman, et al. (June 4, 2008) [LBEX-DOCID 1527489].

[2479] Examiner's Interview of Kunho Cho, Jan. 7, 2010, at p. 6.

[2480] Examiner's Interview of Jasjit Bhattal, Oct. 12, 2009, at p. 7; Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 23; Examiner's Interview of Thomas A. Russo, Dec. 1, 2009, at p. 9.

[2481] Id.

[2482] Id.

[2483] See memorandum from Kunho Cho, Lehman, to Hugh E. McGee, III, Lehman, et al., re: Opportunity Briefing and Key Issues for Investment by Korea Inc. Consortium in Lehman Brothers (May 29, 2008), at p. 2 [LBEX-DOCID 1374131], attached to e-mail from Kunho Cho, Lehman, to David Goldfarb, Lehman (May 29, 2008) [LBEX-DOCID 1466211]; e-mail from Eric Felder, Lehman, to Paolo R. Tonucci, Lehman (June 3, 2008) [LBEX-DOCID 808343]; e-mail from David Erickson, Lehman, to Hugh E. McGee, III, Lehman (June 4, 2008) [LBEX-DOCID 224486]; e-mail from Kunho Cho, Lehman, to Hugh E. McGee, III, Lehman (June 5, 2008) [LBEX-DOCID 392569]; e-mail from Brad Whitman, Lehman, to Larry Wieseneck, Lehman, et al. (June 5, 2008) [LBEX-DOCID 227666]; e-mail from Scott J. Freidheim, Lehman, to Richard S. Fuld, Jr., Lehman (June 6, 2008) [LBEX-DOCID 1165719]. Accord Examiner's Interview of Kunho Cho, Jan. 7, 2010, at pp. 6-7. However, Jasjit Bhattal expressly stated that he was not aware of any link between the discussions with the Koreans in May and June 2008, and Lehman's $6 billion capital raise that Lehman completed on June 12, 2008. Examiner's Interview of Jasjit Bhattal, Oct. 12, 2009, at pp. 7-8.

scheduled for the week of June 16, 2008, but Lehman pre-announced its second quarter results on June 9, 2008.[2484]

According to KDB, when it learned that Hana was negotiating for less than a majority stake in Lehman,[2485] KDB quickly lost interest in the effort.[2486] When talks with the Korean group failed in June 2008, Lehman turned to other sources to raise capital before announcing second quarter results.[2487] Although no consortium of Korean banks invested in Lehman in June 2008, the talks ended amicably.[2488]

Lehman's negotiations with KDB in May and June 2008 became important later in the year because of KDB's public statements. On June 2, 2008, Lehman and KDB signed a Confidentiality Agreement (the "KDB Confidentiality Agreement") covering

---

[2484] *See, e.g.*, Steven M. Sears, *Lehman Bros. is Losing More than Money*, Barrons Online, June 9, 2008, *available at* http://online.barrons.com/article/SB121298433687756653.html.

[2485] Documents indicate that KIC also was reluctant to enter the transaction to buy a minority stake in Lehman, but Jasjit Bhattal told the Examiner that KIC was not reluctant. E-mail from Brad Whitman, Lehman, to Larry Wieseneck, Lehman, *et al*. (June 5, 2008) [LBEX-DOCID 227666]; Examiner's Interview of Jasjit Bhattal, Oct. 12, 2009, at pp. 9-10. According to Russo, Lehman did not fail to interest KIC in the investment. Rather, Hana was going to "front" the entire investment in Lehman. Once Hana pulled out, Hana suggested that KIC might still be interested. Lehman then made a last-minute pitch to KIC, but that was unsuccessful. Examiner's Interview of Thomas A. Russo, Dec. 1, 2009, at p. 12. Kunho Cho recalled a meeting with KIC, but he believed it was a standard presentation for relationship purposes. Cho did not have meetings with individual members of the proposed Korean consortium, and when he spoke to Hana, he assumed Hana was speaking for the entire consortium. Cho did not know if some members of the consortium may have opposed the deal while others may have been in favor of it. Examiner's Interview of Kunho Cho, Jan. 7, 2010, at p. 7.

[2486] Examiner's Interview of KDB, Oct. 26, 2009, at pp. 7-8.

[2487] Kunho Cho told the Examiner that the talks with the Korean entities at that point were clearly linked to Lehman's June capital raise. Hana was holding out for better terms than Lehman was offering to other participants. Unable to reach an agreement on price, Lehman raised capital from non-Korean sources. Examiner's Interview of Kunho Cho, Jan. 7, 2010, at pp. 6-7.

[2488] *See* e-mail from Thomas A. Russo, Lehman, to Richard S. Fuld, Jr., Lehman, *et al*. (June 9, 2009) [LBHI_SEC07940_212670].

the parties' negotiations.[2489]  The KDB Confidentiality Agreement prohibited disclosure

of "the fact that you are considering a possible transaction with the Company [,] . . . that

discussions or negotiations are taking place concerning a possible transaction involving

the Company or any of the terms, conditions or other facts with respect thereto

(including the status thereof) . . . ."[2490]

### (ii)  Discussions Resume: Second Round of Talks between KDB and Lehman

After a hiatus, talks between Lehman and KDB resumed in late June 2008.[2491]  In

the new round, KDB and Hana were interested in an investment banking joint venture

in South Korea, while Lehman was focused on joint ventures for Lehman's commercial

real estate and other assets.[2492]  Fuld apprised Lehman's Board of developments related

to KDB during a series of phone calls.[2493]

The talks progressed to the point where, at the end of July 2008, Lehman

envisaged that a consortium of Korean banks led by KDB would make a tender offer for

---

[2489] Lehman, Confidentiality Agreement with Korea Development Bank (June 2, 2008) [LBEX-DOCID 816276].  Lehman also signed a confidentiality agreement with Hana on June 2, 2008, and with KIC on June 5, 2008.  *See* Lehman, Confidentiality Agreement with Hana Financial Group (June 2, 2008) [LBEX-DOCID 816281]; Lehman, Confidentiality Agreement with Korea Investment Corporation (June 5, 2008) [LBEX-DOCID 816279].

[2490] Lehman, Confidentiality Agreement with Korea Development Bank (June 2, 2008) [LBEX-DOCID 816276].

[2491] *See* e-mail from Walter Heindl, Lehman, to Jasjit Bhattal, Lehman, *et al.* (June 30, 2008) [LBHI_SEC07940_401001] (summarizing key points from meeting with KDB and Hana); e-mail from Jeffrey L. Weiss, Lehman, to Hugh E. McGee, III, Lehman (June 30, 3008) [LBEX-DOCID 224507].

[2492] *See* e-mail from Walter Heindl, Lehman, to Jasjit Bhattal, Lehman, *et al.* (June 30, 2008) [LBHI_SEC07940_401001] (summarizing key points from meeting with KI); e-mail from Brad Whitman, Lehman, to Jeffrey L. Weiss, Lehman, *et al.* (July 6, 2008) [LBHI_SEC07940_401267] (discussing next steps for real estate and debt purchase).

[2493] Richard S. Fuld, Jr., Lehman, Call Logs (Mar. 15 - Sept. 15, 2008) [LBHI_SEC07940_016911].

approximately 50% of Lehman.[2494]   Bhattal recalled that the core of the deal was a $5 billion tender offer for up to 50% of Lehman's common stock.[2495]   Fuld recalled KDB wanting 51% of Lehman through a tender offer, as well as significant portions of Lehman's commercial real estate, residentials and leveraged loan assets.[2496]   Fuld told the Examiner that KDB changed its focus to a 49% acquisition because of legal concerns that would arise from a change in majority ownership.[2497]

According to KDB, Lehman approached KDB in mid-July with a proposal whereby KDB would obtain a controlling share of Lehman through a $5 to $6 billion tender offer.[2498]   Lehman reportedly packaged that offer with a proposal that KDB acquire some of Lehman's commercial real estate positions.[2499]   KDB was willing to consider acquiring some of Lehman's commercial real estate positions but only because KDB thought that it would be necessary to do so in order to acquire a controlling stake in Lehman.[2500]

On or about July 28, 2008, senior Lehman executives, including Fuld, McDade, McGee, Bhattal and Cho met in Hong Kong with KDB Governor Euoo Sung Min and other KDB executives, as well as Gary S. Barancik of Perella Weinberg Partners, KDB's

---

[2494] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 31, 2008), at p. 1 [LBHI_SEC07940_028534].

[2495] Examiner's Interview of Jasjit Bhattal, Oct. 12, 2009, at p. 13.

[2496] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at pp. 23-24.

[2497] *Id*. at p. 24.

[2498] Examiner's Interview of KDB, Oct. 26, 2009, at p. 9.

[2499] *Id*.

[2500] *Id*.

U.S. advisor.[2501]  Following those meetings, the parties agreed that KDB would begin due diligence in New York.[2502]  The same group scheduled follow-up meetings in New York on August 5 and 6, 2008.[2503]

At the July 31, 2008 Board meeting, Fuld updated the Board on meetings with a "potential foreign partner" (most likely KDB), noting that due diligence was underway, and that the transaction would be a tender offer for approximately 50% of Lehman's common stock.[2504]  He also said that government approval in the potential partners' home country could impact the timeframe.[2505]  Fuld further noted that the parties discussed possible joint ventures for commercial real estate, residential mortgages, acquisition finance and investment banking in the partner's home country.[2506]

Fuld told the Examiner that in June 2008, Lehman directors John D. Macomber and John F. Akers had warned him that Lehman never would sign a deal with KDB because Korean companies historically dragged out discussions without ever completing a deal.[2507]  Fuld said that at the end of the July 29, 2008 meeting, he was beginning to think that Macomber and Akers were prescient in their warning.[2508]

---

[2501] Examiner's Interview of Jasjit Bhattal, Oct. 12, 2009, at p. 12.

[2502] Examiner's Interview of KDB, Oct. 26, 2009, at p. 10; Examiner's Interview of Kunho Cho, Jan. 7, 2010, at p. 8.

[2503] *Id.*

[2504] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 31, 2008), at p. 1 [LBHI_SEC07940_028534].

[2505] *Id.*

[2506] *Id.*

[2507] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 23.

[2508] *Id.* at p. 25.

Barancik, KDB's advisor, told the Examiner that Fuld was so aggressive in pushing Lehman's commercial real estate assets that the August 2008 meetings were uncomfortable.[2509] Fuld told the Examiner that he suggested that if KDB did not want to invest in Lehman, it could invest in "Clean Lehman" after SpinCo, that is, Lehman after it transferred its illiquid commercial real estate assets to SpinCo.[2510]

By August 6, 2008, after KDB had commenced due diligence, KDB had lost interest in the tender offer and joint ventures.[2511] KDB was concerned that Lehman had not taken sufficient write-downs on Lehman's commercial real estate positions and residential mortgage assets.[2512] KDB also expected that further write-downs would be necessary as real estate markets deteriorated.[2513] In addition, KDB had concerns about Lehman's high yield debt and high yield equity assets, which KDB believed could turn sour.[2514] Those concerns led KDB to reject the idea of making a tender offer for a significant stake in Lehman as the company currently was structured.[2515] At the

---

[2509] Examiner's Interview of Gary S. Barancik, Sept. 25, 2009, at p. 4.

[2510] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 25.

[2511] *See* e-mail from Hugh E. McGee, III, Lehman, to Herbert H. McDade, III, Lehman (Aug. 5, 2008) [LBHI_SEC07940_647147]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Aug. 6, 2008), at pp. 1-2 [LBEX-AM 003877]. *Accord* Examiner's Interview of KDB, Oct. 26, 2009, at pp. 10-11.

[2512] Examiner's Interview of KDB, Oct. 26, 2009, at pp. 10-11.

[2513] *Id.*

[2514] *Id.*

[2515] *Id.*

August 6, 2008 Board Meeting, Fuld reported that KDB no longer wanted to do a transaction unless Lehman spun off its commercial real estate.[2516]

### (iii) Third Round of Talks between KDB and Lehman

Almost as soon as the discussions regarding a tender offer ended in early August 2008, KDB, Lehman and Perella Weinberg worked to find a way for KDB to invest in Clean Lehman.[2517]   Although KDB expressed interest in investing in Clean Lehman, many difficult issues remained.[2518]   KDB did not want to assume any risk associated with future write-downs, did not want Clean Lehman to retain any risky assets and was worried about how the SpinCo notes that would remain on Clean Lehman's balance sheet would be rated.[2519]   KDB also needed to be able to obtain approval from skeptical Korean regulators.[2520]

---

[2516] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Aug. 6, 2008), at p. 1 [LBEX-AM 003877].

[2517] Cho told the Examiner that KDB proposed an investment in Clean Lehman following a spin-off of Lehman's commercial real estate toward the end of the meetings in New York in early August 2008.  Only when KBD and Lehman were unable to agree upon a metric for valuing Clean Lehman did that round of negotiations ultimately break down.  Examiner's Interview of Kunho Cho, Jan. 7, 2010, at p. 9.

[2518] *See* e-mail from Hugh E. McGee, III, Lehman, to Brad Whitman, Lehman, *et al.* (Aug. 13, 2008) [LBHI_SEC07940_406804].

[2519] *Id*.  For concerns about the need for a truly clean CleanCo, *see also* e-mail from Hugh E. McGee, III, Lehman, to Larry Wieseneck, Lehman (Aug. 14, 2008) [LBHI_SEC07940_406900]; e-mail from Arjay Jensen, Perella Weinberg Partners, to Chan Lee, Hana Bank (Aug. 28, 2008) [PWP 00000806].  For concerns about the SpinCo notes, *see also* e-mail from Brad Whitman, Lehman, to Martin Kelly, Lehman, *et al.* (Aug. 14, 2008) [LBHI_SEC07940_406973]; e-mail from Larry Wieseneck, Lehman, to Brad Whitman, Lehman (Aug. 19, 2008) [LBHI_SEC07940_407659]; e-mail from Chan Lee, Hana Bank, to Gary S. Barancik, Perella Weinberg Partners (Aug. 23, 2008) [PWP 00001054]; e-mail from Gary S. Barancik, Perella Weinberg Partners, to Chan Lee, Hana Bank (Aug. 31, 2008) [PWP 00000707].

[2520] *See* e-mail from Catherine Jones, Lehman, to Scott J. Freidheim, Lehman (Aug. 25, 2008) [LBHI_SEC07940_856773] (forwarding Heidi N. Moore, *Lehman*, The Tooth Fairy and the Revenge of the Short Sellers, Wall St. J., Aug. 25, 2008); e-mail from Hugh E. McGee, III, Lehman, to Jasjit Bhattal, Lehman (Aug. 29, 2008) [LBHI_SEC07940_651737].

On August 31, 2008, KDB sent Lehman a "Preliminary Term Sheet," under which KDB would make a $6 billion investment in Clean Lehman.[2521]  KDB would receive two Board seats and would have the ability to remove senior executives if Lehman did not meet performance targets.[2522]  Shortly thereafter, KDB sent Lehman a financial analysis, which showed Lehman's valuation of its own assets producing a purchase price of $17.50 per share, while KDB's conservative-case valuation amounted to a purchase price of $6.40 per share.[2523]  KDB thought $6.40 was a fair price, although it did not expect Lehman immediately to accept that offer.[2524]  Cho told the Examiner that Min warned him that Lehman would be surprised by the offer.[2525]  Perella Weinberg thought that KDB's highly conservative valuation was unrealistic.[2526]

Lehman executives have insisted that KDB never made an offer, either because KDB was not authorized by the Korean government to make an actionable offer, or on the basis that the Preliminary Term Sheet did not constitute an offer but rather an outline to begin negotiations.[2527]  Indeed, the Preliminary Term Sheet expressly states

---

[2521] KDB, Project H – Preliminary Term Sheet for Proposed Investment and the Strategic Relationship [Draft] (Aug. 31, 2008) [LBEX-DOCID 281214], attached to e-mail from Gary S. Barancik, Perella Weinberg Partners, to Hugh E. McGee, III, Lehman, *et al.* (Aug. 31, 2008) [LBEX-DOCID 315383].

[2522] *Id.*

[2523] Hana Investment Bank, Scenario Analysis [Draft] (Sept. 1, 2008), at p. 2 [LBEX-DOCID 407413], attached to e-mail from Arjay Jensen, Perella Weinberg Partners, to Hugh E. McGee, III, Lehman, *et al.* (Aug. 31, 2008) [LBEX-DOCID 315396].

[2524] Examiner's Interview of KDB, Oct. 26, 2009, at pp. 12-13.

[2525] Examiner's Interview of Kunho Cho, Jan. 7, 2010, at p. 10.

[2526] Examiner's Interview of Gary S. Barancik, Sept. 25, 2009, at p. 6.

[2527] *See* e-mail from Herbert H. McDade, III, Lehman, to Monique Wise, Lehman (Sept. 3, 2008) [LBHI_SEC07940_653467]; e-mail from Monique Wise, Lehman, to Scott J. Freidheim, Lehman (Sept. 18,

that it is not an offer.[2528]   However, KDB has said in interviews that it was prepared to proceed with the transaction at the $6.40 price had Lehman agreed to that price.[2529] Although KDB still would have needed approval from its own board of directors and from South Korean regulatory bodies, KDB believed that it could have obtained those permissions.[2530]   Barancik warned KDB about being unreasonably low in its starting offer and stated to the Examiner that he had expected Lehman to reject KDB's $6.40 starting offer because it was well below market price at the time.[2531]   Indeed, Barancik believed that KDB's offer was so low that, had Lehman accepted it, it would have further driven down Lehman's share price and would have been detrimental to KDB.[2532]

Lehman quickly rejected KDB's proposal but simultaneously suggested further negotiations in New York.[2533]   Although KDB initially agreed to those talks, KDB did not hold any further discussions with Lehman.[2534]   KDB decided that the global financial situation was deteriorating and that, as a state-owned bank, it was no longer

---

[2008) [LBHI_SEC07940_857773].  *Accord* Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at pp. 26-27; Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at pp. 17-19; Examiner's Interview of Jasjit Bhattal, Oct. 12, 2009, at p. 15.

[2528] KDB, Project H – Preliminary Term Sheet for Proposed Investment and the Strategic Relationship [Draft] (Aug. 31, 2008) [LBEX-DOCID 281214], attached to e-mail from Gary S. Barancik, Perella Weinberg Partners, to Hugh E. McGee, III, Lehman, *et al.* (Aug. 31, 2008) [LBEX-DOCID 315383].

[2529] Examiner's Interview of KDB, Oct. 26, 2009, at pp. 12-13.

[2530] *Id*.

[2531] Examiner's Interview of Gary S. Barancik, Sept. 25, 2009, at pp. 5-6.

[2532] *Id*.

[2533] Letter from Jasjit Bhattal, Lehman, to Euoo Sung Min, Korea Development Bank, re: terms of proposed deal (Sept. 1, 2008) [PWP 00001727] (letter stating Lehman's "intention to continue pursuing alternative paths"); e-mail from Jasjit Bhattal, Lehman, to Brad Whitman, Lehman, *et al.* (Sept. 1, 2008) [LBHI_SEC07940_651987]; Examiner's Interview of Jasjit Bhattal, Oct. 12, 2009, at p. 16.

[2534] Examiner's Interview of KDB, Oct. 26, 2009, at p. 13; Examiner's Interview of Kunho Cho, Jan. 7, 2010, at pp. 10-11.

appropriate for KDB to pursue Lehman.[2535]   Indeed, South Korea's currency, the won, sank by as much as 6% in the first week of September 2008, and South Korea's stock market declined by 12% from early August to early September 2008.[2536]   According to Cho, the Korean government ordered KDB to terminate its discussions with Lehman because of the pressure on the won.[2537]   KDB indicated that it relayed its decision not to continue talks with Lehman on September 2, 2008.[2538]   KDB did not inform Perella Weinberg of its decision to stop negotiations until a few days later, on September 3 or 4, 2008.[2539]

During Lehman's final week, as its stock price plummeted, Barancik tried to renew negotiations between Lehman and KDB.   Barancik told the Examiner that KDB stated that it was not interested.[2540]   Lehman, on the other hand, believed that Min of KDB was coming to New York for continued meetings on September 3, 2008.[2541]   Those

[2535] Examiner's Interview of KDB, Oct. 26, 2009, at p. 13; Examiner's Interview of Kunho Cho, Jan. 7, 2010, at pp. 10-11.

[2536] *See* e-mail from Michael Flaherty, Thomson Reuters, to undisclosed (Sept. 5, 2008) [LBEX-DOCID 1388783] (article reporting turmoil in South Korean markets); Yahoo Finance, South Korean Won historical chart (Aug. 1, 2008 - Sept. 15, 2008), *available at* http://finance.yahoo.com/currency-investing (follow investing, currencies; then enter KRW and follow interactive charts).

[2537] Examiner's Interview of Kunho Cho, Jan. 7, 2010, at p. 11.

[2538] Examiner's Interview of KDB, Oct. 26, 2009, at p. 13.

[2539] *Id.*; Examiner's Interview of Gary S. Barancik, Sept. 25, 2009, at p. 6.

[2540] Examiner's Interview of Gary S. Barancik, Sept. 25, 2009, at p. 7.

[2541] *See* e-mail from Kunho Cho, Lehman, to Brad Whitman, Lehman, *et al.* (Sept. 1, 2008) [LBHI_SEC07940_651987];   Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 3, 2008), at p. 2 [LBEX-AM 003899].   *Accord* Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 26; Examiner's Interview of Jasjit Bhattal, Oct. 12, 2009, at p. 16.

meetings never took place.[2542]   Lehman's Board met on September 3, 2008, and Fuld

informed the Board of the cancelled meeting with KDB.[2543]   Fuld told the Board that

financial concerns in the potential investor's home country had prevented the

investment.[2544]

Lehman's Board was not informed that Lehman received the Preliminary Term

Sheet or that Lehman summarily had rejected KDB's proposal.[2545]   However, several

directors have indicated that term sheets by themselves are preliminary in nature and

generally should not be presented to the Board.[2546]

### (iv) KDB's September 9, 2008 Announcement

Notwithstanding the provisions of the KDB Confidentiality Agreement,[2547]   South

Korean officials and KDB made a series of statements throughout August and early

September 2008 regarding the status of the negotiations between Lehman and KDB,

both to the general public and to executives at JPMorgan.

---

[2542] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 26; Examiner's Interview of Jasjit Bhattal, Oct. 12, 2009, at p. 16.

[2543] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 3, 2008), at p. 2 [LBEX-AM 003899].

[2544] *Id*.

[2545] Examiner's Interview of Michael L. Ainslie, Sept. 22, 2009, at p. 11; Examiner's Interview of Roland A. Hernandez, Oct. 2, 2009, at pp. 19-20; Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at pp. 17-18.

[2546] Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 13; *accord* Examiner's Interview of Michael L. Ainslie, Sept. 22, 2009, at pp. 11-12; Examiner's Interview of John D. Macomber, Dec. 17, 2009, at p. 4.

[2547] Lehman, Confidentiality Agreement with Korea Development Bank (June 2, 2008) [LBEX-DOCID 816276].

On August 22, 2008, a MarketWatch news article reported that Lehman shares rose on news that a KDB spokesman confirmed that KDB was in talks with Lehman about a potential transaction: "We are studying a number of options and are open to all possibilities, which could include (buying) Lehman."[2548] The article also quotes a Korean "government official" as saying that after reviewing Lehman's books in early August, KDB decided that insolvency was a serious concern and a deal would be risky.[2549] The article cites Min as saying that "it is normal that several negotiations and ruptures occur" before a final deal.[2550]

On August 22, 2008, a Reuters article reported that Lehman and KDB were involved in negotiations, and attributed that fact to a KDB spokesperson.[2551] Also on August 22, 2008, Min called JPMorgan, following up on a meeting that had occurred a few days earlier, indicating that he wanted to pursue a significant investment in Lehman and was interested in JPMorgan possibly advising KDB.[2552]

On August 25, 2008, the Wall Street Journal quoted Jun Kwang-woo, the head of South Korea's Financial Services Commission, as saying that it might not be appropriate

---

[2548] *See* e-mail from Timothy Sullivan, Lehman, to Hugh E. McGee, III, Lehman, *et al.* (Aug. 22, 2008) [LBHI_SEC07940_408101] (forwarding MarketWatch article).

[2549] *Id.*

[2550] *Id.*

[2551] Kim Yeon-hee, *S. Korea's KDB Says Buying Lehman a Possibility*, Reuters, Aug. 22, 2008, *available at* http://www.reuters.com/article/ousiv/idUSSEO26101520080822.

[2552] *See* e-mail from Olivier de Grivel, JPMorgan, to Steven D. Black, JPMorgan, *et al.* (Aug. 22, 2008) [JPM-2004 0005910].

for a state-owned institution to take on "excessive burdens."[2553]  The next day, an e-mail

from Steven Lim (JPMorgan's Senior Country Officer and Managing Director,

Investment Banking for Korea) to Steven D. Black (JPMorgan co-CEO), Dimon and

other JPMorgan executives recounted that JPMorgan had spoken to KDB and that the

statements from South Korea's Financial Services Commission were important; as a

result, KDB wanted to stop pursuing Lehman for the time being.[2554]

On August 31, 2008, the Dow Jones Newswires reported that Jun Kwang-woo

had stated that "KDB was considering a possible investment in Lehman Brothers as

well as other global banks."[2555]  Kwang-woo noted that KDB had not yet submitted a

plan to the regulatory body, and that government approval would take more than a day

or two.[2556]

A September 1, 2008, e-mail from Lim to Black, Dimon and other JPMorgan

executives noted that Lim had called Min on August 31, 2008 to persuade Min to select

JPMorgan as a financial advisor on the Lehman deal.[2557]  Min reportedly thanked

---

[2553] E-mail from Catherine P. Jones, Lehman, to Scott J. Freidheim, Lehman, *et al.* (Aug. 25, 2008) [LBHI_SEC07940_856773].

[2554] E-mail from Steven Lim, JPMorgan, to Steven D. Black, JPMorgan, *et al.* (Aug. 26, 2008) [JPM-2004 0005989]; e-mail from Tim Main, JPMorgan, to Steven Lim, JPMorgan, *et al.* (Aug. 26, 2008) [JPM-2004 0006015].

[2555] E-mail from Shelby Lauckhardt, Lehman, to Richard S. Fuld, Jr., Lehman (Sept. 1, 2008) [LBHI_SEC07940_213366] (forwarding Dow Jones Newswires article).

[2556] *Id.*

[2557] E-mail from Steven Lim, JPMorgan, to Steven D. Black, JPMorgan, *et al.* (Sept. 1, 2008) [JPM-2004 0006139]; e-mail from Steven D. Black, JPMorgan, to Jamie L. Dimon, JPMorgan, *et al.* (Sept. 1, 2008) [JPM-2004 0006152].

JPMorgan for the follow-up but said there were issues that needed to be sorted out with the Korean government and Lehman's asset quality.[2558]

On September 2, 2008, Min publicly confirmed that KDB was talking with Lehman, stating that discussions were underway "to form a consortium with private banks as (we) believe it is more desirable to acquire Lehman Brothers jointly rather than alone."[2559]

A September 3, 2008 Bloomberg article noted that KDB released an e-mailed statement reporting: "We have been reviewing acquiring an overseas investment bank, including Lehman Brothers, or an asset management company, but nothing specific has been determined including whether such a deal will succeed."[2560] Lehman management internally commented at the time that KDB's confirmation of talks raised expectations and conditioned the markets to expect that Lehman would announce a strategic partner by the end of the third quarter.[2561]

---

[2558] *Id.*

[2559] E-mail from Anne Lui, Lehman, to Scott J. Freidheim, Lehman, *et al.* (Sept. 2, 2008) [LBHI_SEC07940_857041]; *see also* e-mail from Monique Wise, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (Sept. 2, 2008) [LBEX-DOCID 224538]; e-mail from David Erickson, Lehman, to Hugh E. McGee, III, Lehman, *et al.* (Sept. 2, 2008) [LBEX-DOCID 224548]; e-mail from Randall Whitestone, Lehman, to Scott J. Freidheim, Lehman, *et al.* (Sept. 2, 2008) [LBEX-DOCID 224642].

[2560] E-mail from Frank Mackinney, James Caird Asset Management Group, to Eric Felder, Lehman, *et al.* (Sept. 3, 2008) [LBEX-DOCID 808050] (forwarding article, Bomi Lim, *et al.*, *HSBC, Chinese Banks in Race to Bid for Lehman, Chosun Reports*, Bloomberg, Sept. 3, 2008); *see also* e-mail from Michael Carrier, UBS, to Glenn Schorr, UBS, *et al.* (Sept. 2, 2008) [LBEX-UBS 00048970].

[2561] E-mail from Herbert H. McDade, III, Lehman, to Monique Wise, Lehman (Sept. 3, 2008) [LBHI_SEC07940_653467].

On September 5, 2008, Lim again e-mailed Dimon, Black and other JPMorgan executives and stated that he did not believe KDB would be able to get the deal done by Lehman's September 10, 2008 deadline.[2562]

That same day, JPMorgan decided that it needed additional collateral from Lehman.[2563]  At an internal meeting, JPMorgan executives discussed the fact that a deal between Lehman and KDB did not seem to be moving forward.[2564]  JPMorgan considered the status of Lehman's negotiations with KDB to be another instance of Lehman's deteriorating market position.[2565]

On September 9, 2008, Jun Kwang-woo made a public statement, which was confirmed by another government official, that talks between KDB and Lehman were over.[2566]  KDB declined to comment, although Min noted that KDB could become one of Asia's top three investment banks without Lehman.[2567]

---

[2562] E-mail from Steven Lim, JPMorgan, to Jamie L. Dimon, JPMorgan (Sept. 5, 2008) [JPM-2004 0006258].

[2563] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 2.

[2564] *Id.*

[2565] See Section III.A.5.b of this Report, which discusses KDB's impact on JPMorgan in greater detail.

[2566] Jin-Young Yook, *Korea FSC: KDB, Lehman Investment Talks Have Ended*, Dow Jones International News, Sept. 9, 2008 [LBEX-DOCID 131058]; Steve Goldstein, *Korean regulator says KDB talks with Lehman ended*, MarketWatch, Sept. 9, 2008 [LBEX-DOCID 131059]; Evan Ramstad & Jin-Young Yook, *Talks Between KDB, Lehman On Possible Investment End*, Wall St. J. Online, Sept. 9, 2008 [LBEX-DOCID 224552].

[2567] *Id.*

On September 9, 2008, Lim e-mailed Dimon, Black and others at JPMorgan to inform the group that KDB's Min had called him to confirm that KDB had ended negotiations with Lehman.[2568]

On September 9, 2008, following the public disclosure that Lehman's negotiations with KDB had terminated, many of Lehman's hedge fund clients pulled out, short-term creditors cut lending lines, and the cost of insuring Lehman's debt surged by almost 200 basis points.[2569] On the same day, Lehman executed amended Security and Guaranty Agreements with JPMorgan at their insistence.[2570] Citi also sought a guarantee agreement to cover its exposure to LBI and so that Citi could continue to clear in Asia.[2571]

Lehman's officers believe that KDB's disclosures had a strong downward impact on Lehman's stock.[2572] The decline in Lehman's share price was a driving force behind the decision by Lehman's management to accelerate the third quarter earnings call.[2573] Fuld told the Examiner that on September 9, 2008, he called Kenneth D. Lewis, BofA's

---

[2568] E-mail from Steven Lim, JPMorgan, to Jamie L. Dimon, JPMorgan, *et al.* (Sept. 9, 2008) [JPM-2004 0006320].

[2569] *See* Yalman Onaran & John Helyar, *Lehman's Last Days*, Bloomberg Markets, January 2009.

[2570] *Id.*

[2571] *Id. Accord* Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 8. See Section III.A.5.c of this Report, which discusses those agreements in greater detail.

[2572] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 11; Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 7.

[2573] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 11; Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 7.

CEO, to advise Lewis of KDB's announcement and that the rating agencies "were making noise," therefore Lehman was going to pre-announce.[2574]

On September 10, 2008, prior to Lehman's pre-announcement earnings call, KDB publicly confirmed that talks were over, citing difficulties in the domestic and international financial markets.[2575]

During a November 16, 2009 interview, Min said: "We missed a very good opportunity . . . I think we could have avoided a situation where Lehman collapsed so rapidly."[2576] During the interview, Min said that he had been prepared to raise his offer as high as $9 per share.[2577] Min blamed the confidentiality agreement for preventing KDB from explaining the proposed transaction to Korean regulators while the negotiations were ongoing.[2578]

### (c) MetLife

During 2008, Lehman contacted MetLife several times in an effort to raise capital.[2579] According to Steven A. Kandarian, MetLife's Executive Vice President and

---

[2574] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 5.

[2575] *See* e-mail from Shelby Lauckhardt, Lehman, to Richard S. Fuld, Jr., Lehman (Sept. 10, 2008) [LBHI_SEC07940_213466] (forwarding headlines about mounting pressure against Lehman); Leo Lewis, *Korea Blames "Differences" for Ending Lehman Talks*, Times Online, Sept. 10, 2008.

[2576] Bomi Lim, *KDB's Min Rues "Very Good Opportunity" Missed in Lehman Failure*, Bloomberg, Nov. 18, 2009.

[2577] *Id*.

[2578] *Id*.

[2579] Examiner's Interview of Steven A. Kandarian, Sept. 17, 2009, at p. 4.

CIO, a transaction never occurred because MetLife did not have enough time to conduct due diligence on any of those occasions.[2580]

Kandarian watched as Lehman's stock price fell from approximately $85.00 per share to $12.50 per share.[2581] Kandarian told the Examiner that he considered purchasing Lehman at a distressed price, to provide it with a "safe harbor" during tough times and then take it public in three to seven years once the markets had recovered.[2582] Fuld told the Examiner that he thought that MetLife's proposal to take Lehman private and then spin it back out was an elegant solution and Fuld was willing to give MetLife control of Lehman to do so.[2583] Because Kandarian expected the markets to deteriorate in the short term, however, Kandarian wanted to make sure that any price MetLife offered contained enough of a "buffer" that Lehman could sustain further write-downs without MetLife taking a loss.[2584] Shortly before July 23, 2008,[2585] Kandarian communicated his idea to Steven M. Lessing, head of Lehman's private client group.[2586] Lehman then followed up and the parties arranged for subsequent meetings.[2587]

---

[2580] Id.

[2581] Id.

[2582] Id. at p. 5.

[2583] Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 19.

[2584] Examiner's Interview of Steven A. Kandarian, Sept. 17, 2009, at p. 5.

[2585] See MetLife, Calendar entry re: Lehman meeting (July 23, 2008) [ML-LEH 00012220]. Accord Examiner's Interview of Steven A. Kandarian, Sept. 17, 2009, at p. 5.

[2586] Kandarian could not recall whether he called Lessing or Lessing called him. Examiner's Interview of Steven A. Kandarian, Sept. 17, 2009, at p. 5.

[2587] Id.

At Lehman's July 31, 2008 Board meeting, Fuld informed the Board about the talks with MetLife. Fuld stated that MetLife had begun due diligence and that MetLife had "the likely intention of spinning its interest" in Lehman back out after the markets improved.[2588]

On August 5, 2008, Lehman officers, including Fuld, met with MetLife executives, including Kandarian.[2589] According to Kandarian, Fuld explained at the meeting that he did not like the aspects of MetLife's proposal that called for MetLife to acquire a controlling stake of Lehman with the ability to appoint a majority of Lehman's Board.[2590] That did not concern Kandarian, however. Kandarian told Lehman that MetLife was not going to be Lehman's first choice; instead, MetLife was a safe harbor in a storm, and Lehman should think of MetLife as a backup.[2591] According to Fuld, Kandarian never said that Lehman should view the deal as a "backup," and Fuld was more than willing to cede control to MetLife.[2592]

MetLife began due diligence of Lehman. By August 12, 2008, MetLife had a negative view concerning Lehman's assets, particularly its commercial real estate and

[2588] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 31, 2008), at p. 2 [LBEX-AM 003875].

[2589] See letter from Steven A. Kandarian, MetLife, to Richard S. Fuld, Jr., Lehman, et al. (Aug. 6, 2008) [LBHI_SEC07940_741210]. Accord Examiner's Interview of Steven A. Kandarian, Sept. 17, 2009, at p. 5.

[2590] Examiner's Interview of Steven A. Kandarian, Sept. 17, 2009, at pp. 5-6. See also e-mail from Steven J. Goulart, MetLife, to Steven A. Kandarian, MetLife, et al. (Aug. 13, 2008) [ML-LEH 00012231]; letter from Steven A. Kandarian, MetLife, to Richard S. Fuld, Jr., Lehman, et al., re: Meeting [LBHI_SEC07940_741211].

[2591] Examiner's Interview of Steven A. Kandarian, Sept. 17, 2009, at pp. 5-6.

[2592] Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 19.

residential mortgage assets.[2593]   MetLife continued due diligence beyond that point because it had reviewed only a small portion of Lehman's balance sheet.   Kandarian stated that it also would have been difficult to end MetLife's due diligence investigation so quickly for relationship reasons.[2594]   Nonetheless, MetLife's view of Lehman remained negative.[2595]   MetLife decided that it would not have the "buffer" that Kandarian wanted, especially after future market deterioration.[2596]

Lehman also pitched MetLife to invest in either SpinCo or CleanCo.[2597]   However, based on what MetLife had seen of Lehman's assets, MetLife was not interested in those alternatives.[2598]

On August 20, 2008, MetLife informed Lehman that it was not interested in a deal.[2599]   At the Board of Directors meeting later that day, Fuld informed the Board that

---

[2593] E-mail from Mark Wilsmann, MetLife, to Steven A. Kandarian, MetLife, *et al.*  (Aug. 12, 2008) [ML-LEH 00072857]; Examiner's Interview of Steven A. Kandarian, Sept. 17, 2009, at pp. 5-6.

[2594] Examiner's Interview of Steven A. Kandarian, Sept. 17, 2009, at p. 7.

[2595] E-mail from John Rosenthal, MetLife, to Steven A. Kandarian, MetLife (Aug. 13, 2008) [ML-LEH 00030453]; e-mail from John Rosenthal, MetLife, to Steven A. Kandarian, MetLife (Aug. 14, 2008) [ML-LEH 00031559]; M. Mazzola & J. Ellermeyer, MetLife, Preliminary View on LEH Private Equity and Alternative Investment Holdings (Aug. 15, 2008) [ML-LEH 00009589].

[2596] Examiner's Interview of Steven A. Kandarian, Sept. 17, 2009, at p. 6.

[2597] *See* e-mail from Hugh E. McGee, III, Lehman, to Jeffrey L. Weiss, Lehman, *et al.* (Aug. 20, 2008) [LBHI_SEC07940_407903] (email subject line "M is out." McGee adds that there was "[n]ot enough cushion after incorporating their view of CRE.  Not even a player for cleanco.").  *Accord* Examiner's Interview of Steven A. Kandarian, Sept. 17, 2009, at p. 9.

[2598] *Id.*

[2599] E-mail from Hugh E. McGee, III, Lehman, to Jeffrey L. Weiss, Lehman, *et al.* (Aug. 20, 2008) [LBHI_SEC07940_407903]; Examiner's Interview of Steven A. Kandarian, Sept. 17, 2009, at p. 10.

MetLife was no longer interested in a deal with Lehman "largely because the proposed transaction was too large a financial commitment for this party."[2600]

After Lehman's bankruptcy, Fuld had a breakfast meeting with Kandarian.[2601] Fuld told the Examiner that at that meeting, Kandarian confirmed that the deal died because MetLife already had substantial exposure to commercial real estate and could not take on Lehman's commercial real estate positions as well.[2602]

### (d) ICD

In early August 2008, Lehman considered Investment Corp. of Dubai ("ICD") as a potential investor for up to $250 million in SpinCo junior, or mezzanine, debt.[2603] Talks between Lehman and ICD picked up, with an exchange of draft term sheets by August 22, 2008.[2604] At the August 25, 2008 Board meeting, management informed the Board that there would be meetings with a new potential foreign investor in the coming days.[2605]

---

[2600] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Aug. 20, 2008), at p. 1 [LBEX-AM 003891].

[2601] Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 6.

[2602] *Id.*

[2603] *See* Lehman, Potential Junior Debt Investors (Aug. 1, 2008) [LBHI_SEC07940_012597].

[2604] *See* e-mail from Hugh E. McGee, III, Lehman, to Carol Welter, Lehman (Aug. 20, 2008) [LBHI_SEC07940_2221725]; e-mail from Kelsey Surbaugh, Lehman, to Hugh E. McGee, III, Lehman, *et al.* (Aug. 22, 2008) [LBHI_SEC07940_408063]; e-mail from Jeffrey L. Weiss, Lehman, to Herbert H. McDade, III, Lehman, *et al.* (Aug. 24, 2008) [LBHI_SEC07940_650284]; e-mail from Timothy Sullivan, Lehman, to Scott J. Freidheim, Lehman, *et al.* (Aug. 27, 2008) [LBHI_SEC07940_856902]; e-mail from Larry Wieseneck, Lehman, to Brad Whitman, Lehman, *et al.* (Aug. 28, 2008) [LBHI_SEC07940_408482]; e-mail from Kelsey Surbaugh, Lehman, to Gerard Reilly, Lehman (Aug. 29, 2008) [LBHI_SEC07940_2159297].

[2605] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Aug. 25, 2008), at p. 2 [LBEX-AM 003898].

By September 2, 2008, McGee developed "Project Indigo," which called for ICD to make a $2 billion post-SpinCo investment in Lehman, and also to consider other strategic partnership opportunities.[2606]   However, Rothschild Ltd., ICD's strategic advisor, informed Lehman that ICD had concerns about the real estate market and future write-downs.[2607]  Rothschild told Lehman that ICD was interested in investing in Lehman's IMD as a backup.[2608]

On September 4, 2008, ICD made two proposals to Lehman.  Under the first proposal, ICD would pay between $3.25 billion and $4 billion for 50.1% of "NB/IMD," that is, NB, the private wealth management arm of Lehman's Investment Management Division.[2609]   There is no evidence that Lehman responded to ICD's first proposal. ICD's second proposal was a $3.25 billion investment in Lehman preferred convertible shares after the spin-off of commercial real estate positions, conditioned on Lehman raising an additional $3.25 billion in capital, and requiring protection for ICD against up to $2 billion in write-downs by Lehman over the next year.[2610]  ICD proposed that, in the

---

[2606] *See* e-mail from Ryan Morrell, Lehman, to Hugh E. McGee, III, Lehman, *et al*. (Sept. 2, 2008) [LBHI_SEC07940_2222099].

[2607] *See* e-mail from Ara Cho, Lehman, to Brad Whitman, Lehman, *et al*. (Aug. 20, 2008) [LBEX-DOCID 210862]; e-mail from Jeffrey L. Weiss, Lehman, to Hugh E. McGee, III, Lehman, *et al*. (Aug. 30, 2008) [LBHI_SEC07940_651921]; e-mail from Jeffrey L. Weiss, Lehman, to Herbert H. McDade, III, Lehman (Sept. 2, 2008) [LBHI_SEC07940_652802]; e-mail from Jeffrey L. Weiss, Lehman, to Hugh E. McGee, III, Lehman, *et al*. (Sept. 3, 2008) [LBHI_SEC07940_653425].

[2608] *See* e-mail from Jeffrey L. Weiss, Lehman, to Hugh E. McGee, III, Lehman, *et al*. (Sept. 3, 2008) [LBHI_SEC07940_653425].

[2609] Lehman, Project Green – Transaction Structure Proposal 1 (Sept. 4, 2008) [LBHI_SEC07940_408977].

[2610] Lehman, Project Green – Transaction Structure Proposal 2 (Sept. 4, 2008) [LBHI_SEC07940_408980].

event of substantial write-downs or a ratings downgrade, ICD would have the option for two years to convert its Lehman shares into shares of IMD.[2611]

Fuld knew that ICD was interested in NB as "collateral," but he did not recall hearing that ICD wanted the ability to obtain Neuberger at its option.[2612] Indeed, Fuld could not understand how such a structure would be possible, as Neuberger was so integrated into Lehman that it could not easily be carved out.[2613]

Lehman responded to ICD's second proposal with a term sheet that attempted to protect ICD against future write-downs but that did not allow ICD to convert its shares in Lehman into shares in IMD.[2614] Management did not mention the ICD term sheets to the Board. However, several Board members informed the Examiner that discussing term sheets, in the absence of a firm, fleshed-out offer, would have been a waste of the Board's time.[2615]

Contacts between Lehman and ICD appear to have ceased by September 9, 2008. According to McGee, ICD said that it needed a "time out" after Lehman's stock declined by nearly 50% in a single day on September 9, 2008.[2616] By September 14, 2008,

---

[2611] *Id.*

[2612] Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 21.

[2613] *Id.*

[2614] Lehman, Green Term Sheet [Draft] (Sept. 5, 2008) [LBEX-DOCID 612702], attached to e-mail from Brad Whitman, Lehman, to Faisal Mikou, Investment Corp. of Dubai, *et al.* (Sept. 6, 2008) [LBEX-DOCID 741921].

[2615] Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 13; Examiner's Interview of Michael L. Ainslie, Sept. 22, 2009, at pp. 11-12; Examiner's Interview of John D. Macomber, Dec. 17, 2009, at p. 4.

[2616] Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 22.

Lazard listed ICD as a party that recently performed due diligence but was not interested in Lehman.[2617]

### (e) Bank of America

#### (i) Initial Discussions in the Summer of 2008

In mid-July 2008, Lehman began talks with BofA regarding a potential merger between Lehman and BofA's investment banking division, under which Lehman would own approximately two-thirds of the resulting company.[2618]   On July 13, 2008, Curl, BofA's Global Corporate Strategic Development and Planning Executive, met with Fuld, McDade and H. Rodgin Cohen, Chairman of Sullivan & Cromwell, LLP, to discuss a potential transaction.[2619]   At the meeting, Fuld proposed a deal in which BofA would acquire a 30% interest in Lehman in exchange for BofA's investment banking and advising businesses.[2620]   According to Fuld, the resulting entity would have been two-thirds owned by Lehman and one-third owned by BofA.[2621]   Curl said that Fuld told him that the deal would be a good one for BofA because BofA was made up of commercial bankers, not investment bankers, and Lehman was more experienced than BofA in managing a global investment firm.[2622] Curl further stated that Fuld said that

---

[2617] Lazard, Situation Overview (Sept. 13, 2008) [LBHI_SEC07940_410298], attached to e-mail from Brad Whitman, Lehman, to Hugh E. McGee, III, Lehman, *et al.* (Sept. 14, 2008) [LBHI_SEC07940_410297].

[2618] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 4.

[2619] Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 5.

[2620] *Id.* at pp. 5-6.

[2621] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 4.

[2622] Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at pp. 5-6.

through the deal BofA could capitalize on Lehman's great brand, great future, and robust client list in Europe.[2623]

Following the meeting, Curl was not in favor of the proposed deal for several reasons.[2624] Curl did not believe Lehman was as profitable as BofA in the areas that the deal would include.[2625] He was put off by the fact that Lehman would control the entity while BofA would retain only a 30% interest.[2626] Curl also was concerned that the proposal did not provide BofA the protection of an option to sell the stock at a pre-set price.[2627] Curl saw Lehman's proposal as a risky proposition that would expose BofA's profitable businesses to Lehman's more vulnerable businesses, which had large risks and faced huge challenges.[2628] Curl stated that he told Fuld that he did not believe the deal would work but that he would pass it on to Lewis.[2629] According to Fuld, Curl was quite receptive to the idea, expressing concern only about BofA not being in control of the resultant entity, which Fuld thought could be worked out.[2630]

Curl told the Examiner that he presented the idea to Lewis but, like Curl, Lewis was not in favor of the deal because the logistics of the transaction would be quite

---

[2623] *Id.*

[2624] *Id.* at p. 6.

[2625] *Id.*

[2626] *Id.*

[2627] *Id.*

[2628] *Id.*

[2629] *Id.*

[2630] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 4.

difficult and BofA would not be in control of the resultant entity.[2631]   Lewis told the

Examiner that he was not in favor of the deal because it did not make sense financially

for BofA.[2632]   Fuld recalled being informed that Lewis was not in favor of the deal.[2633]

### (ii)  Talks Resume in September

Talks between Lehman and BofA resumed in late August or early September.

On or about August 26, 2008, Fuld had a conversation with Lewis about SpinCo.[2634]   Not

long after that, Fuld met with Lewis following a dinner at the FRBNY.[2635]   During that

meeting, Fuld explained SpinCo and Lehman's plans.[2636]   Lewis, Fuld, and Geithner all

were aware beforehand that Fuld would meet with Lewis, but the meeting was

arranged in such a fashion as to avoid signaling to other attendees that they were

meeting.[2637]   Lewis recalled that Fuld gave him a "heavy" sales pitch at this meeting but

does not remember what they specifically discussed.[2638]   Lewis told Fuld that he was

reluctant to proceed because BofA had been pursuing Merrill Lynch for some time.[2639]

Fuld emphasized that BofA needed bankers to cover retail clients, which Lehman could

---

[2631] Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 6; Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 3.

[2632] Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 3.

[2633] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 4.

[2634] *Id*. at p. 5.  Fuld was uncertain of the date of the conversation but Fuld's call logs indicate that on August 26, 2008, he had a telephone call with Lewis accompanied by the description "proposed deal." Richard S. Fuld, Jr.,  Lehman, Call Logs (Aug. 26, 2008), at p. 63 [LBHI_SEC07940_016973].

[2635] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 5; Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 4.

[2636] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 5.

[2637] Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 4.

[2638] *Id*.

[2639] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 5.

provide.[2640]   According to Fuld, Lewis was interested and told Fuld that he would speak with Curl about putting together a team for negotiations.[2641]

Sometime after September 1, 2008, Paulson contacted Curl to express his concern that Lehman could become a serious problem and to ask Curl to look into Lehman and see if there was any way BofA could help.[2642]   Curl responded that he was unsure of whether BofA could help because, without knowing the specifics of the situation, the transaction sounded difficult.[2643]   Even in the face of Paulson's request, BofA remained reluctant to look into Lehman.[2644]   Paulson stated to the Examiner that he told Lewis to buy Lehman.[2645]   Paulson also told the Examiner that he warned Fuld in September 2008 that Lehman could not afford the luxury of finding the best "fit" in a buyer as Lehman's survival was at stake.[2646]

---

[2640] *Id.*

[2641] *Id.*

[2642] Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 7.   Paulson described his "job" during this time period as, among other things, working with FRBNY president Timothy Geithner to finalize a deal to sell Lehman to Bank of America or Barclays.   Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 17.

[2643] Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 7.

[2644] *Id.*

[2645] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 19.

[2646] *Id.*   In John Mack's October 14, 2009 speech at Wharton School of Business, Mack said that Paulson urged Mack to sell Morgan Stanley to J.P. Morgan for $1 per share in the week following Lehman's bankruptcy.   Mack refused. John Mack, Leadership in Crisis, speech at Wharton School of Business (Oct. 14, 2009), *available at* http://knowledge.wharton.upenn.edu/article.cfm?articleid=2357.

[2646] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 16.

Government officials continued to call Curl, saying the situation at Lehman was not improving and asking BofA to look at Lehman.[2647]  On September 8 or 9, 2008, Curl contacted Cohen, who previously had served as the intermediary in negotiations between BofA and Lehman, asking him to begin the process of looking into Lehman.[2648]  Curl told the Examiner that BofA began its due diligence of Lehman on September 9 or 10, 2008.[2649]

According to Fuld, he called Lewis again on September 9, 2008 after the news broke that Lehman would not be doing a deal with KDB.[2650]  During that conversation, Fuld informed Lewis that Lehman was planning to pre-announce its quarterly earnings and advised Lewis that the rating agencies were discussing possibly taking action regarding Lehman.[2651]  Lewis told Fuld to keep him apprised of any developments going forward.[2652]  Fuld called Lewis again on September 11, 2008, informing him that the rating agencies were comforted by hearing that Lehman was negotiating with a major bank.[2653]  Fuld told the Examiner that, during the September 11, 2008 conversation, he remarked to Lewis, "You know we're going to do this deal, don't you,

---

[2647] Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 7.  Curl also stated that Lewis was called repeatedly with requests to look into Lehman, but Lewis disavowed any knowledge of pressure by Paulson or any other Government official to look into Lehman.  *Id.*; Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 6.  See Appendix 15 to this Report, which provides a day-by-day discussion of developments with BofA.

[2648] Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 7.

[2649] *Id.*

[2650] *Id.*

[2651] *Id.*

[2652] *Id.*

[2653] *Id.*

Ken?" to which Lewis responded, "Yes, I do, Dick."[2654]  Lewis said he never indicated to Fuld that a deal would get done; Lewis said he was noncommittal.[2655]

Lewis told the Examiner that he knew from the outset that he would agree to a deal only if it was highly beneficial financially for BofA, because BofA would gain little strategic advantage from a transaction with Lehman.[2656]  By the end of Friday, September 12, 2008, BofA was finishing due diligence,[2657] concluding that Lehman's valuations of its commercial real estate positions were too high.[2658]  Moreover, BofA had uncovered approximately $65 - $67 billion worth of Lehman assets that BofA said it did not want at any price.[2659]  Consequently, Lewis felt that any deal with Lehman would not be financially advantageous for BofA,[2660] and BofA was not willing to go forward with Lehman without Government assistance.[2661]  Some members of the Bank of America due diligence team apparently thought a deal could be profitable for Bank of America but they did not share that opinion with BofA senior management.[2662]

[2654] *Id*.

[2655] Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at pp. 5-6.

[2656] *Id*. at p. 4.

[2657] *See* e-mail from David Belk, BofA, to Walter Muller, BofA, *et. al.* (Sept. 12, 2008) [BofA-SEC-00003515].

[2658] *See* e-mail from Don Benningfield, BofA, to Rochelle Dobbs, BofA, *et al.* (Sept. 12, 2008) [BofA-SEC-00002774].

[2659] Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 5.

[2660] *Id*.

[2661] *Id*. at p. 6.

[2662] *See, e.g.*, e-mail from Rochelle Dobbs, BofA, to Nigel Milner, BofA, (Sept. 13, 2008) [BofA-SEC-00003525]. Both Curl and Lewis denied that any members of the due diligence team had indicated to them that they felt the deal would be financially advantageous for BofA.  Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 10; Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 5.

According to Lewis, he had heard prior to the morning of Saturday, September 13, 2008, that the Government would be unwilling to intervene to save Lehman.[2663] Nonetheless, Lewis contacted Paulson to inform him that without sufficient Government assistance to balance out the unwanted assets, BofA could not do a deal for Lehman.[2664] Paulson was unwilling to offer such assistance to Lewis.[2665] Although Paulson told Lewis that the Government would not provide taxpayer money, Paulson wanted to reconvene with BofA later in the day to discuss other options.[2666]

On the night of Friday, September 12, 2008, Fuld's calls to Lewis to discuss the status of the transaction began going unanswered.[2667] Fuld told the Examiner that, as of Friday evening, he did not yet suspect anything was awry.[2668]

On the afternoon of Saturday, September 13, 2008, BofA began talks with Merrill Lynch without informing anyone at Lehman.[2669] According to Lewis, BofA had been interested in Merrill Lynch for years and, once it became evident that Merrill Lynch was looking for a strategic partner, BofA pursued a deal.[2670] According to Lewis, the deal between BofA and Merrill Lynch did not interfere with a deal for Lehman.[2671] Lewis

---

[2663] Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 6.
[2664] *Id.*
[2665] *Id.*
[2666] Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 11.
[2667] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 6.
[2668] *Id.*
[2669] Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 7.
[2670] *Id.*
[2671] *Id.*

told the Examiner that by the time Merrill Lynch approached BofA about a potential transaction, it was already apparent that a deal with Lehman probably would not happen.[2672] BofA already had brought home its due diligence team.[2673]

Throughout the day on Saturday, September 13, 2008, Fuld continued to call Lewis without getting a response.[2674] Lewis' wife eventually answered the phone and said that if her husband wanted to talk to Fuld, he would return the call.[2675] Lewis told the Examiner that he did not answer Fuld's calls because he did not think Fuld was in a position to help move the transaction forward.[2676] According to Lewis, the only way that a transaction could have happened would have been for the Government to provide the assistance requested.[2677] Therefore, Lewis said, any conversations or negotiations with Fuld would have been a distraction.[2678]

Fuld told the Examiner that he believes Lewis was using Lehman as a bargaining chip with the FRBNY regarding assistance the Federal Reserve had apparently promised but never delivered in connection with Bank of America's purchase of Countrywide.[2679] Curl told the Examiner that when Paulson contacted him in early

---

[2672] *Id.*

[2673] *Id.*

[2674] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 7.

[2675] *Id.*

[2676] Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 6.

[2677] *Id.*

[2678] *Id.*

[2679] Fuld told the Lehman Board of Directors on September 13, 2008, when it appeared that no deal with BofA would happen, that BofA appeared to be playing a "game of chicken" with the Fed and the

September 2008 to request that Bank of America look into Lehman, Curl mentioned the Countrywide deal to Paulson.[2680] Curl had expressed frustration to Paulson over the fact that the Government had approved the Countrywide deal but later required remedial steps to be taken regarding capital that negatively affected Bank of America.[2681] According to Curl, Paulson said he believed that, if Curl's account were correct, the Government's actions had been inappropriate.[2682] Paulson promised that the Government would look into that issue.[2683]

On September 15, 2008, the Financial Times reported that Lewis "declined to comment on whether Bank of America had ever entertained any real interest in acquiring Lehman Brothers."[2684] When interviewed by the Examiner, Lewis stated unequivocally that there was no quid pro quo regarding Bank of America's concerns related to Countrywide when BofA looked into Lehman.[2685] Lewis said that BofA would not have done any deal with Lehman that was not in BofA's interests financially.[2686] In any event, after BofA had looked into Lehman, the Countrywide deal was not

---

Treasury. Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 13, 2008), at p. 1 [LBEX-AM 003927]; Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at pp. 6-7.

[2680] Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 7.

[2681] Id.

[2682] Id.

[2683] Id.

[2684] Greg Farrell, *BofA Corrals the "Thundering Herd," The Financial Times*, Sept. 15, 2008.

[2685] Examiner's Interview of Kenneth D. Lewis, Sept. 24, 2009, at p. 7. Lewis explained that the issue in the Countrywide deal was between Bank of America and the Federal Reserve anyway and therefore Paulson and the Treasury would not have had the power to reopen it even if such a bargain had been struck. *Id.*

[2686] *Id.* at pp. 6-7.

reopened.[2687]   Neither Curl nor Lewis indicated that he felt any undue pressure to consummate a deal with Lehman.[2688]

### (f) Barclays

On September 10, 2008, John Varley, Chief Executive Officer of Barclays, contacted Hector Sants, Chief Executive of the Financial Services Authority ("FSA"), the United Kingdom's equivalent of the SEC.[2689]   Varley advised Sants that Barclays was considering a bid for Lehman.[2690]   The FSA did not object to the idea but stressed the importance of Barclays keeping the FSA informed of the details and developments of any proposed transaction.[2691]

On Thursday, September 11, 2008, Fuld informed the Board that he had "not heard from Barclays directly, but had been advised of its potential interest by the Firm's regulators."[2692]   Fuld told the Examiner that, prior to that point, Fuld had at least two conversations with Robert E. Diamond, president of Barclays.[2693]   During those conversations, Diamond told Fuld that there was too much overlap to do a deal.[2694] Sometime during the first two weeks of September, Terrence J. Checki, an Executive

---

[2687] *Id.* at p. 7

[2688] *Id.* at pp. 6-7; Examiner's Interview of Gregory L. Curl, Sept. 17, 2009, at p. 7.

[2689] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 7.  See Appendix 15 to this Report, which provides a discussion of developments with Barclays by the day.

[2690] *Id.*

[2691] *Id.*

[2692] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 11, 2008), at p. 2 [LBEX-AM 003918].

[2693] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 7.

[2694] *Id.*

Vice President at the FRBNY, told Fuld that Barclays was interested in Lehman.[2695]  Fuld called Diamond and was again told there was too much overlap.[2696]

Also on September 11, 2008, Varley informed the FSA that the Barclays board would meet that day to consider whether Barclays should approach Lehman about a possible deal.[2697]  Varley told Sants that Barclays would bid for Lehman if three conditions were met: (1) there was a high degree of confidence that a deal could be completed "with the necessary support of the Federal Reserve to ensure this;" (2) there was liquidity support from the Federal Reserve; and (3) there was a discount on Lehman's net asset values.[2698]  Sants responded that the FSA's review would focus on the impact any transaction structure would have on Barclays' liquidity and capital, warning that the FSA would not approve any core Tier 1 number below the minimum requirement.[2699]  Later that day, Callum McCarthy, the chairman of the FSA, contacted Geithner to discuss Lehman.[2700]  According to the FSA, Geithner left open the possibility of federal assistance for Lehman.[2701]

On September 12, 2008, at 9:00 a.m. in New York, the Barclays board of directors authorized its management to undertake due diligence to determine if there was an

---

[2695] *Id.*

[2696] *Id.*

[2697] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 8.

[2698] *Id.* ¶ 8.

[2699] *Id.* ¶ 9.

[2700] *Id.* ¶ 10.

[2701] *Id.*

opportunity for a transaction with Lehman.[2702]  Barclays' management presented its board two possible acquisition scenarios; both involved transactions that valued Lehman's stock at $5 per share.[2703]  Varley informed Paulson that the Barclays board was prepared to consider a possible bid for Lehman.[2704]

Paulson spoke to Alistair Darling, Chancellor of the Exchequer, on September 12, 2008.[2705] During that conversation, Paulson told Darling that the FRBNY might provide Barclays with regulatory assistance to support a transaction.[2706]  During the day, discussions between the FSA and Barclays focused on quantifying the size and nature of Lehman's assets and their impact on Barclays' capital ratios.[2707]  Barclays advised the FSA that it continued to seek unlimited access to the FRBNY discount window although there remained debate within the Treasury as to who should provide the funding.[2708]

On September 12, 2008, Fuld met with Diamond.[2709]  At that meeting, Fuld told Diamond that Fuld would step aside if they did a deal.[2710]  Barclays expressed two areas of concern about any potential deal with Lehman: long term funding and certain risky

---

[2702] Transcript of deposition testimony of Robert E. Diamond, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y. Sept. 11, 2009, at p. 24:9-22.

[2703] Barclays, Long Island Transaction Overview (Sept. 12, 2008), at p. 3 [BCI-EX-(S)-00053306_000001], attached to e-mail from Richard Haworth, Barclays, to John Varley, Barclays, *et al.* (Sept. 12, 2008) [BCI-EX-(S)-00053305].

[2704] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 8.

[2705] *Id.* ¶ 23.

[2706] *Id.*

[2707] *Id.* ¶ 27.

[2708] *Id.*

[2709] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 7.  *See* Tom Junod, *The Deal of the Century*, Esquire Magazine, Oct. 2009, at p. 157 (placing the meeting on Friday, Sept. 12, 2008).

[2710] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 8.

assets.[2711]  Barclays anticipated that the FSA would share its concerns.[2712]  Between 5:10

p.m. and 6:00 p.m., Varley and Diamond had a call with Paulson and Geithner to

discuss the potential deal.[2713]

Early that evening, Fuld informed the Board that Barclays recently had begun

due diligence, although there had not yet been any discussion of structure or price.[2714]

Fuld also informed the Board that Barclays would need stockholder approval for a

transaction.[2715]

On Saturday, September 13, 2008, Lehman and Barclays discussed a potential

deal that Fuld described as "life after SpinCo" because the contemplated purchase did

not include Lehman's commercial real estate assets.[2716]  Barclays' board had set as a

condition precedent to any deal that Barclays would not take on any asset Lehman

planned to put in SpinCo.[2717]  Barclays' board also conditioned any deal on the FRBNY's

agreement to continue to make the Primary Dealer Credit Facility ("PDCF") available to

Lehman after a takeover. [2718]  During the afternoon, Barclays advised the FSA that the

FRBNY had asked Barclays to guarantee Lehman's obligations during the period prior

---

[2711] *See* e-mail from John Varley, Barclays, to Robert E. Diamond, Barclays, *et al.* (Sept. 12, 2008) [BCI-EX-00078748].

[2712] *Id*.

[2713] *See* Henry M. Paulson Jr., Call Logs (Sept. 2008), *available at* http://www.scribd.com/doc/21221123/Too-Big-To-Fail-Paulson-Call-Logs-and-Calendar-Sept-2008.

[2714] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 12, 2008), at p. 1 [LBEX-AM 003920].

[2715] *Id*.

[2716] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 8.

[2717] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 32.

[2718] *Id*. ¶ 33.

to the closing of the transaction.[2719]  That guaranty would make Barclays responsible for Lehman's existing and new business even if the transaction failed.[2720]  The FSA's Listing Rules required the guaranty to be approved by Barclays' shareholders.[2721]  Late in the day in the United Kingdom, Varley advised Sants that because of the guaranty, it was unlikely that a deal structure could be found that would satisfy Barclays' board.[2722]

On Saturday in New York, however, Cohen, McDade and Kirk told Fuld that the approval of the FSA would not be an issue.[2723]  Fuld reported to the Board on Saturday afternoon that Barclays offered to purchase the operating subsidiaries of Lehman for $3 billion and that Barclays would guarantee Lehman's debt.[2724]  Lehman would receive the cash and would retain its commercial real estate assets, minority investments in hedge fund managers and limited partnership interests in Lehman-sponsored private equity funds.[2725]  On Saturday night, Fuld went home thinking that Lehman had a deal with Barclays.[2726]  Cleary Gottlieb Stein & Hamilton ("Cleary Gottlieb") attorney Robert Davis, who represented Barclays during the negotiations, told the Examiner that he too thought that Lehman and Barclays had reached an agreement in principle on Saturday

---

[2719] *Id.* ¶ 39.

[2720] *Id.*

[2721] *Id.*

[2722] *Id.* ¶ 40.

[2723] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 8.

[2724] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 12, 2008), at p. 1 [LBEX-AM 003920].

[2725] *Id.*

[2726] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 9.

night.[2727]  However, William Schlich, the audit partner for Ernst & Young, noted that as of late Saturday night, there was no deal.[2728]  Schlich did not think a deal could get done absent "drastic changes" because "[t]he buyer's expectations and the resulting need of financing from the street" were too high.[2729]

On Saturday, September 13, 2008, Barclays reached out to Buffett to ask whether Buffett would guarantee Lehman's operations until a Lehman-Barclays deal closed.[2730]  Barclays and Buffett discussed a scenario in which Buffett would provide $5 billion of protection.  Buffett expressed interest in that possibility, but Barclays did not pursue it.[2731]

On Sunday morning in the United Kingdom, the FSA and Barclays discussed the FRBNY's requirement that Barclays guarantee Lehman's obligation.[2732]  The FSA acknowledged that theoretically it could waive the shareholder approval requirement, but the FSA concluded that because no precedent existed, granting a waiver would "represent a compromise of one of the fundamental principles of the FSA's Listing Regime."[2733]  During the early afternoon in the United Kingdom, Geithner called FSA

---

[2727] Examiner's Interview of Lindsee Granfield and Robert Davis, Mar. 10, 2009, at pp. 2-3; Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y. Sept. 2, 2009,  at p. 14:10-15:5.

[2728] E-mail from William Schlich, Ernst & Young, to Carmine DiSibio, Ernst & Young, *et al.* (Sept. 14, 2008) [EY-LE-LBHI-KEYPERS 4908879] (updating on the status of negotiations).

[2729] *Id.*

[2730] Examiner's Interview of Warren E. Buffett, Sept. 22, 2009, at pp. 4-5.

[2731] *Id.*

[2732] FSA, Statement of the FSA (Jan. 20, 2010), ¶ 43.

[2733] *Id.*

Chairman McCarthy. Geithner reiterated the FRBNY's requirement of a guaranty and suggested that the urgency of the situation required a waiver of the shareholder approval requirement.[2734] Later that afternoon, Cox also contacted McCarthy to discuss waiving the shareholder requirement. McCarthy cited the lack of precedent for such a waiver and noted that Barclays had yet to submit a formal proposal for the FSA's review of the deal.[2735] By 4:00 p.m. in the United Kingdom, Varley informed the FSA that discussions had ceased.[2736]

Lehman's management had scheduled a Board meeting for noon on Sunday, September 14, 2008, but delayed the meeting until 5:00 p.m. in order to try to come to some resolution at the FRBNY meetings.[2737] At some point on Sunday, Fuld was told that the FSA would not waive the requirement that a guaranty of Lehman's obligations required the approval of Barclays' shareholders, and therefore the FSA would not approve the Barclays deal.[2738] Fuld asked Paulson to call Prime Minister Gordon Brown, but Paulson said he could not do that.[2739] Fuld asked Paulson to ask President Bush to call Brown, but Paulson said he was working on other ideas.[2740] From that, Fuld inferred that Paulson was going to call Buffett, although Paulson never mentioned

---

[2734] *Id.* ¶ 47.

[2735] *Id.* ¶ 54.

[2736] *Id.*

[2737] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 9.

[2738] *Id.*

[2739] *Id.*

[2740] *Id.*

Buffett's name.[2741]  Fuld brainstormed about other means to contact and convince the FSA to permit the deal, including having Jeb Bush, a Lehman advisor, ask President Bush to call the Prime Minister.[2742]

Paulson believed that Barclays wanted to do a deal with Lehman.[2743]  Indeed, Paulson noted that Barclays had asked him to speak to Alistair Darling, the United Kingdom's Chancellor of the Exchequer.[2744]  Paulson placed the call on Friday, September 12, 2008.  During the call, Paulson said Chancellor Darling did not mention the need for a guaranty of Lehman's debts, but said that the FSA would not reject or approve the deal.  Paulson described Chancellor Darling's statement as a particularly British way of saying no.[2745]

Fuld told the Examiner that in 2009, Fuld had a conversation with Riccardo Banchetti, who had been joint-CEO of Lehman Europe.[2746]  During that conversation, Banchetti told Fuld that "everyone knew that the FSA had no role in this at all" and would not have been in a position to grant an exemption.[2747]

---

[2741] *Id*.

[2742] *Id*. at 10.

[2743] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 20.

[2744] *Id*.

[2745] *Id*.

[2746] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 10.

[2747] *Id*.

### (6) Government Communications

Between the time of Bear Stearns' near collapse in March and the end of May 2008, Fuld was in regular contact with both Paulson and Geithner. Fuld spoke with Paulson no fewer than ten times during that period.[2748] Similarly, Fuld spoke with Geithner at least eighteen times during that same period.[2749] The conversations covered numerous topics. For example, Fuld apprised Paulson of market rumors, potential transactions Lehman explored, and other general market updates.[2750] Fuld's conversations with Geithner included market updates but also addressed Lehman's capital raises, market rumors and Lehman's liquidity.[2751] Between June and the first week of September 2008 — the final week before Lehman's bankruptcy — Fuld's call logs indicate that he updated Geithner at least 23 times, and Paulson 24 times, on various issues, such as potential strategic partners, SpinCo and the market.[2752] Paulson told the Examiner that during August 2008, Paulson delegated contact with Lehman and Fuld to his deputy, Ken Wilson, so that Paulson could focus on Fannie Mae and Freddie Mac.[2753] In addition, Lehman communicated with representatives of the SEC regarding issues such as short-sellers and SpinCo.[2754]

---

[2748] Richard S. Fuld, Jr., Lehman, Call Logs (Mar. 15 - Sept. 15, 2008) [LBHI_SEC07940_016911].

[2749] *Id*.

[2750] *Id*.

[2751] *Id*.

[2752] *Id*.

[2753] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 15.

[2754] See *supra* Section III.A.3.c and *infra* Section III.A.3.c.6. of this Report, which discuss Lehman's communications with the Government regarding SpinCo and short sellers in greater detail.

### (a) Treasury Dinner

On April 11, 2008, Fuld and Paulson both attended a G-7 dinner in Washington, D.C., and Fuld and Paulson conversed at the dinner.[2755]  As Fuld left the dinner, he sent an e-mail to Russo, reporting that Fuld thought Lehman had a "huge brand with [T]reasury" and that Treasury "loved [Lehman's] capital raise."[2756]   Fuld told the Examiner that he believed his e-mail accurately reflected his view of his conversations with Paulson that night.[2757]   Paulson told the Examiner that he assumed that he gave Fuld "a big pat on the back" for raising capital.  Paulson did not recall discussing the capital raise with Fuld at that public dinner.[2758]  Fuld also walked away from the dinner believing that Paulson had a "worried view" of Merrill Lynch, implying that Paulson remained confident of Lehman.[2759]  On the other hand, Paulson told the Examiner that he had become concerned about Lehman when he heard about the Archstone transaction in 2007 and that his concerns intensified after Bear Stearns' near collapse.[2760]

---

[2755] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 17.
[2756] E-mail from Richard S. Fuld, Jr., Lehman, to Thomas A. Russo, Lehman (Apr. 12, 2008) [LBHI_SEC07940_033997].
[2757] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 17.
[2758] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 13.
[2759] E-mail from Richard S. Fuld, Jr., Lehman, to Thomas A. Russo, Lehman (Apr. 12, 2008) [LBHI_SEC07940_033997].
[2760] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at pp. 9-10.

### (b)  Short Sales

Short selling is frequently mentioned as a factor in the near collapse of Bear Stearns.[2761]  On March 17, 2008, the SEC proposed a "naked" short selling anti-fraud rule, Rule 10b-21.[2762]  The SEC noted that although naked short selling as part of a manipulative scheme already was illegal, commentary to the proposed Rule stated that the Rule "would highlight the specific liability" of people whose deception relates to their intention or ability to deliver shares in time for settlement.[2763]  The SEC sought comments to its proposed rule by May 20, 2008.

After Bear Stearns nearly collapsed, short sellers began to focus on Lehman and other banks.  On March 20, 2008, Russo contacted Linda Thomsen, the SEC's Head of Enforcement, regarding rumors of hedge funds "taking another run at Lehman."[2764]  On April 1, 2008, at Lehman's prompting, Erik R. Sirri, head of the SEC's CSE program, made a statement at an annual conference regarding the SEC's view of the seriousness of rumors and stock manipulation in the context of short sales.[2765]  At the April 15, 2008 Board meeting, Lehman's management discussed Lehman's concerns regarding short

---

[2761] *See, e.g.*, Matt Taibbi, *Wall Street's Naked Swindle*, Rolling Stone, Oct. 14, 2009.

[2762] "Naked" Short-Selling Anti-fraud Rule, 73 Fed. Reg. 15376 (proposed Mar. 17, 2008) (to be codified at 17 C.F. R. § 240), *available at* http://www.sec.gov/rules/proposed/2008/34-57511.pdf.

[2763] *Id.*

[2764] E-mail from Thomas A. Russo, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (Mar. 20, 2008) [LBHI_SEC07940_212208] (forwarding discussion with SEC regarding short sellers).

[2765] *See* e-mail from Thomas A. Russo, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (Apr. 1, 2008) [LBHI_SEC07940_033699] (reporting Erik Sirri's statement regarding the SEC's view of short selling in the context of market manipulation).

selling.[2766]   On May 21, 2008, at the Ira Sohn Conference, one day after the comment period for the SEC's proposed rule concluded, Einhorn gave a presentation on Lehman, analyzing Lehman's Form 10-Q, filed April 9, 2008.[2767]   Einhorn announced that he was shorting Lehman's stock based on his belief that the stock was over-valued.[2768]

Before that presentation, Einhorn had corresponded with Callan in mid-May 2008, as part of what he described as fact-checking in advance of his presentation at the Ira Sohn Conference.[2769]   Einhorn focused on four major issues in his correspondence with Callan and in his May 21, 2008 speech: (1) Lehman's disclosures regarding CDO exposure and related write-downs; (2) the difference between the amount of Level III assets disclosed in the Form 10-Q filed in February 2008 and during Lehman's first quarter 2008 earnings call; (3) Lehman's disclosure and valuation of its stake in KSK Energy; and (4) Lehman's write downs of its CMBS assets.[2770]   On the day of Einhorn's speech, Lehman's stock closed down $2.44, with its highest volume of the entire month

---

[2766] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Apr. 15, 2008), at p. 8 [LBEX-AM 003654].

[2767] David Einhorn, Greenlight Capital, Accounting Ingenuity, speech at Ira W. Sohn Investment Research Conference (May 21, 2008) [LBHI_SEC07940_336846].

[2768] *Id*.

[2769] *See* e-mail from David Einhorn, Greenlight Capital, to Erin M. Callan, Lehman (May 20, 2008) [LBHI_SEC07940_098608].

[2770] *Id*.; *see also* e-mail from Eric Felder, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (May 21, 2008) [LBHI_SEC07940_336795] (Felder e-mail reporting on Einhorn's speech).

of May 2008.  Einhorn's criticism of Lehman and Callan is commonly cited as the reason for Callan's replacement less than three weeks later.[2271]

Following the near collapse of Bear Stearns, Einhorn published a book, *Fooling Some of the People All of the Time*, which focused on Allied Capital.  Thomas C. Baxter, Jr., General Counsel to the FRBNY, said that reading Einhorn's book made him think that the FRBNY should pay more attention to short sellers' concerns.[2272]  However, Baxter did not reach that conclusion for the reason that Lehman would have wanted, namely to persuade the Government to regulate short sellers, but rather because it appeared to Baxter that Einhorn may have been shorting Lehman for good cause.  Baxter was unable to say, however, whether anyone at the Federal Reserve followed up on Einhorn's criticism of Lehman in his speech.[2273]

Between March 20, 2008 and July 17, 2008, Lehman sent the SEC, as well as the FRBNY, more than twenty complaints about rumors and short sellers.[2274]  On July 15, 2008, the SEC issued a short-term rule prohibiting short sales.  That rule expired on July

---

[2271] Examiner's Interview of John F. Akers, Apr. 22, 2009, at p. 8; Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 9; Examiner's Interview of Michael L. Ainslie, Sept. 22, 2009, at p. 5.

[2272] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at pp. 7-8.

[2273] *Id.*

[2274] *See, e.g.*, e-mail from Thomas A. Russo, Lehman, to Terrence J. Checki, FRBNY (July 17, 2008) [LBEX-AM 057718]; e-mail from Beth Rudofker, Lehman, to Israel Friedman, SEC, *et al.* (June 17, 2008) [LBEX-WGM 1142544]; e-mail from Beth Rudofker, Lehman, to Laura Vecchio, Lehman (May 27, 2008) [LBEX-WGM 648855] (forwarding e-mail sent to the SEC regarding Einhorn and rumors); e-mail from Thomas A. Russo, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (Mar. 20, 2008) [LBHI_SEC07940_212208] (forwarding discussion with SEC regarding short sellers); e-mail from William Brodows, FRBNY, to Timothy F. Geithner, FRBNY, *et al.* (July 10, 2008) [FRBNY to Exam. 026728]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (July 14, 2008), at p. 2 [LBEX-AM 003837].

29, 2008.[2775]  More than two months later, the SEC responded to the massive disruptions in the market by issuing Rule 10b-21, which became effective on October 17, 2008.[2776] The rule specifically prohibited traders from deceiving brokers about the source of shares that would be used to repurchase shares sold short, if the trader failed to deliver the security when due.[2777]

### (c) Possibility of Federal Assistance

Since Lehman's bankruptcy, Paulson repeatedly has said that he never gave Lehman reason to believe that it would receive a bailout in the event it became necessary.  In a July 2, 2008 speech at Chatham House in London, titled "The U.S., The World Economy and Markets," Paulson noted that "[b]ankruptcy [can] impose[] market discipline on creditors" but that "in a time of crisis, [bankruptcy] could involve undue market disruption."[2778]  After reviewing Paulson's remarks, Felder remarked in a contemporaneous e-mail that it appeared that Paulson was "trying to set the stage" to close the PDCF but wanted to "have a plan in place in case there is an investment bank that fails" after the PCDF closed.[2779]  Paulson told the Examiner that he believed that he

---

[2775] SEC, Press Release, *SEC Enhances Investor Protections Against Naked Short Selling* (July 15, 2008), *available at* http://sec.gov/news/press/2008/2008-143.htm.
[2776] SEC, "Naked" Short Selling Antifraud Rule (Oct. 14, 2008) (codifying 17 C.F.R. § 242.10b-21), *available at* http://sec.gov/rules/final/2008/34-58774.pdf.
[2777] *Id.*
[2778] U.S. Department of Treasury, Henry M. Paulson, Jr., Remarks by U.S. Treasury Secretary on the U.S. The World Economy and Markets speech before the Chatham House (July 2, 2008), *available at* http://www.treas.gov/press/releases/ht1064.htm.
[2779] E-mail from Eric Felder, Lehman, to Ian T. Lowitt, Lehman, *et al.* (July 2, 2008) [LBEX-DOCID 067106].

may have discussed the possibility of bankruptcy with Fuld in July 2008.[2780]  Paulson told the Examiner that, at the very least, he made clear to Fuld that the Government would not provide a bailout for Lehman.[2781]  On the other hand, Fuld told the Examiner that while Paulson never gave him any assurance or reason to believe that the Government would provide assistance, Paulson also never said anything that ruled out the possibility of Government assistance.[2782]

A September 11, 2008 discussion between Geithner and Fuld may have played a role in leading Fuld to believe that a federal bailout was possible.  On Thursday, September 11, Baxter called Russo and suggested that Fuld step down from the Board of the FRBNY.[2783]  Fuld told the Examiner that after Russo told Fuld about the conversation, Fuld called Geithner.[2784]  Geithner asked Fuld to step down from the Board "in case we have to do something for you or with you this weekend."[2785] Geithner told the Examiner that he could not recall making the statement, but he was certain he was careful not to imply that Lehman could expect the Federal Reserve's support.[2786]  Fuld reported that he walked away from his conversation with Geithner

---

[2780] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at pp. 14-15.

[2781] *Id.*

[2782] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 11; Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 21.

[2783] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 11; Examiner's Interview of Thomas Baxter, Jr., Aug. 31, 2009.

[2784] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 11.

[2785] *Id.*

[2786] Examiner's Interview of Treasury Secretary Timothy F. Geithner, Nov. 24, 2009, at p. 9.

with the feeling that, if it came down to it, the FRBNY and Geithner would be there for Lehman.[2787]  A FRBNY meeting agenda dated September 10, 2008 also suggests that a FRBNY representative was contemplating providing public funds for Lehman at the time of the September 11, 2008 conversation between Geithner and Fuld.[2788]

### (7)  Lehman's Bankruptcy Planning

In August 2008, as the magnitude of third quarter losses became clear, Steven Berkenfeld, Head of Lehman's Legal, Compliance and Audit Division, became concerned about the possibility of a Lehman bankruptcy.[2789]  Berkenfeld spoke to Russo about hiring bankruptcy counsel to begin initial preparations as a precaution.[2790]  Russo refused that suggestion because he worried that a leak would turn bankruptcy planning into a self-fulfilling prophecy.[2791]

Public reports imply that no bankruptcy work was done prior to September 14, 2008.  That is not accurate.  On September 10, 2008, after Fannie Mae and Freddie Mac failed, Berkenfeld called Stephen J. Dannhauser, the chairman of Weil, Gotshal &

---

[2787] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 11.

[2788] *See* FRBNY, Liquidation Consortium (Sept. 10, 2008) [FRBNY to Exam. 003517], attached to e-mail from Michael Nelson, FRBNY, to Christine Cumming, FRBNY, *et al.* (Sept. 10, 2008) [FRBNY to Exam 003516].  *Accord* Examiner's Interview of William Brodows, Aug. 20, 2009, at p. 6; Examiner's Interview of Jan H. Voigts, Aug. 25, 2009.

[2789] Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 21.  See Appendix 15 to the Report which provides a chronological discussion of Lehman's pre-bankruptcy planning.

[2790] *Id.*

[2791] *Id.*

Manges LLP ("Weil"), to begin work toward a possible bankruptcy filing.[2792]  Berkenfeld had not obtained any internal authorization to make that call.[2793]  Russo was not pleased to hear about Berkenfeld's call to Weil, because Russo was concerned about a leak and believed that bankruptcy was not a possibility.[2794]  Harvey R. Miller, the chairman of Weil's bankruptcy department, first billed time to Lehman bankruptcy preparation on September 10, 2008.[2795]

On Thursday, September 11, 2008, Weil attorneys began preparing the documents necessary to file a Chapter 11 petition, including attendant motions, resolutions, and affidavits.[2796]  Weil's work continued through the weekend.[2797]

On Friday, September 12, 2008, published reports cited an anonymous Treasury source as saying that Paulson had ruled out the possibility of any Government financial assistance to Lehman.[2798]  Paulson confirmed to the Examiner that, as of September 12, 2008, the Treasury did not plan to offer support to Lehman.[2799]  That same day, Mark J. Shapiro, Lehman's co-head of restructuring, approached Russo about establishing a

---

[2792] *See* Weil, Gotshal & Manges LLP, Time Records (Sept. 10, 2008), at p. 1 [LBEX-WGM 1146447].  *Accord* Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 21.

[2793] Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 21.

[2794] Examiner's Interview of Thomas A. Russo, May 11, 2009, at pp. 9-10.

[2795] Weil, Gotshal & Manges LLP, Time Records (Sept. 10, 2008), at p. 1 [LBEX-WGM 1146447].

[2796] *Id*. at pp. 1, 5, 7, 10, 14, 15, 17 and 19.

[2797] *Id*. at pp. 1-20.

[2798] *See, e.g.*, Anita Raghavan, *Paulson Brothers on Either Side of Lehman Divide*, Forbes, Sept. 12, 2008.

[2799] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 16.

bankruptcy-remote trust for employee medical costs and taxes.[2800]  Russo was hesitant, again due to a concern that any preparations for a bankruptcy would become a self-fulfilling prophecy, but Russo deferred to experts such as Shapiro, who were familiar with bankruptcy-related issues.[2801]  As soon as Russo became aware of Weil's work, he informed the Board.[2802]  As a result, Miller was invited to make a presentation at the telephonic September 12, 2008 Board meeting.[2803]  Although Miller does not recall being physically present at a Board meeting until Sunday, September 14, 2008, Lehman's Board minutes indicate that Miller advised the Board on Friday, September 12, 2008, that "bankruptcy would be a very bad option" under the circumstances.[2804]

At a late afternoon meeting on September 12, 2008, Russo reported to the Board that "the Federal Reserve is interested in helping to facilitate an orderly wind-down and *avoid a bankruptcy*."[2805]  Grundhofer and Kaufman told the Examiner that they were concerned about the systemic risk if the Government allowed Lehman to fail.[2806] Grundhofer believed that Lehman was too big and systemically important to fail and

---

[2800] *See* Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 13, 2008), at p. 2 [LBEX-AM 003927-28].  *Accord* Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 10.

[2801] Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 10.

[2802] *Id*.

[2803] *See* Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 12, 2008), at p. 2 [LBEX-AM 003920].

[2804] *Id*.; Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 5.

[2805] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 12, 2008), at p. 2 [LBEX-AM 003920] (emphasis added).

[2806] Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 15; Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at p. 20.

that Lehman's failure would have global consequences.[2807] Akers did not expect the Federal Reserve to abandon Lehman, because, according to Akers, Fuld had told the Board that the Federal Reserve would assist Lehman.[2808]

On Friday evening, Miller received a call from James L. Bromley, an attorney at the law firm Cleary Gottlieb, which represented the Federal Reserve, requesting a meeting.[2809] Bromley expressed no urgency to meet that night. [2810]

At the noon Saturday, September 13, 2008 Board meeting, Russo stated that "the Federal Reserve believes that any bankruptcy filing by the Firm would be extremely disruptive."[2811] Late Saturday morning or early that afternoon, Weil attorneys Miller, Lori R. Fife and Shai Y. Waisman met with six or seven Federal Reserve officials and Bromley.[2812]

By the morning of Sunday, September 14, 2008, the FSA made clear that it would not waive the shareholder vote requirement, killing the Barclays deal.[2813] After the Barclays deal fell apart, Paulson told Fuld that Paulson was continuing to work on some other things.[2814] By the early afternoon of Sunday, September 14, 2008, Miller learned

[2807] Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 15.

[2808] Examiner's Interview of John F. Akers, Apr. 22, 2009, at p. 12.

[2809] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 6.

[2810] *Id.*

[2811] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 13, 2008), at p. 2 [LBEX-AM 003927].

[2812] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 6.

[2813] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at pp. 9-10.

[2814] *Id.* at p. 9.

that things were not going well for Lehman at the FRBNY.[2815]  Weil attorneys Miller, Fife, Dannhauser and Thomas A. Roberts went to the FRBNY to represent Lehman.[2816] On the way to the FRBNY meeting, Roberts received a call from another Weil partner saying that Citibank had been told that Lehman was being liquidated and was requesting that Weil represent Citibank.[2817]

On September 14, 2008, the Federal Reserve issued a press release stating that "[t]he collateral eligible to be pledged at the Primary Dealer Credit Facility ("PDCF") has been broadened to closely match the types of collateral that can be pledged in the tri-party repo systems of the two major clearing banks."[2818]  Upon learning of the expansion of the PDCF window, Lowitt and Fuld initially believed that Lehman's problem was solved and that Lehman would be able to open in Europe by borrowing from the PDCF.[2819]  However, Lehman soon learned that it was not eligible to use the window.[2820]  The FRBNY limited the collateral LBI could use for overnight financing to the collateral that was in LBI's box at JPMorgan as of Friday, September 12, 2008.[2821] That restriction was referred to as the "Friday criteri[on]."[2822]

[2815] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 7.

[2816] *Id*.

[2817] *Id*.

[2818] Federal Reserve, Press Release (Sept. 14, 2008), *available at* http://www.federalreserve.gov/newsevents/press/monetary/20080914a.htm, Sept. 14, 2008, last visited, May 26, 2009.

[2819] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 13.

[2820] *Id*.

[2821] Examiner's Interview of Robert Azerad, Apr. 20, 2009, at p. 5; Examiner's Interview of Christopher Burke, July 7, 2009, at p. 3.  An experimental allocation by Lehman to the PDCF on Monday morning

Fuld told the Examiner that on Sunday afternoon, Sirri, head of the SEC's Trading and Markets Division, called Fuld and asked him to "promise [Sirri] one thing," which was that Lehman would not file for bankruptcy protection.[2823]  Not long after that conversation with Sirri, McDade called Fuld from the meeting at the FRBNY to tell him that "the Fed has just mandated that we file for bankruptcy."[2824]  At the FRBNY, Baxter said that Lehman needed to file by midnight that night.[2825]  Miller asked why and objected that it could not happen by midnight.[2826]  He said that a Lehman bankruptcy would "bring great destabilization in the market," "bring trading to a halt," and result in "Armageddon."[2827]  In response, the Government representatives told the Lehman representatives that it was decided and there were cars available to return them to Lehman's building.[2828]

After Lehman's executives returned from the meeting at the Federal Reserve, the Board meeting resumed and discussed "the Fed's direct and authoritative statements

showed at least $72 billion of eligible Lehman securities being swept into the PDCF system.  *See* e-mail from John N. Palchynsky, Lehman, to Craig L. Jones, Lehman *et al.* (Sept. 15, 2008) [LBEX-DOCID 076981]; s*ee also* Lehman, PDCF Schedule of Eligible Securities (Sept. 14, 2008) [LBEX-DOCID 405695].

[2822] Examiner's Interview of Robert Azerad, Apr. 20, 2009, at p. 5; Examiner's Interview of Christopher Burke, July 7, 2009, at p. 3.  According to Azerad, this restriction prevented Lehman from posting the range of collateral to the PDCF that other firms were allowed to post after September 15, 2008. Examiner's Interview of Robert Azerad, Apr. 20, 2009, at p. 5; *see also* e-mail from Timothy Lyons, Lehman, to Ian T. Lowitt, Lehman (Sept. 14, 2008) [LBEX-DOCID 070210] (stating "the fed is letting the other eighteen broker dealers fund a much broader range of collateral than us").

[2823] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 12.

[2824] *Id*. at p. 13.

[2825] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 7.

[2826] *Id*.

[2827] *Id*.

[2828] *Id*. at p. 8.

that they wanted the Corporation to file under Chapter 11 that evening."[2829]  During the meeting, Cox, Baxter, Brian G. Cartwright (SEC General Counsel) and Alan L. Beller (a Cleary Gottlieb partner who represented the Federal Reserve and SEC) called in and asked to speak with the Board.[2830]  In response to questions from Board members regarding the necessity of filing, "Mr. Beller stated that the view of the regulators as to the appropriateness of a bankruptcy filing was expressed at the meeting with the Federal Reserve that afternoon, but that the callers did not want to influence the Board's exercise of its fiduciary duties."[2831]  According to Baxter, the purpose of the call was to emphasize that a bankruptcy filing by LBHI "made sense" but that the ultimate decision was for the Board.[2832]  Further, Baxter told the Examiner that he made the point "that opening on Monday was not an option because of the chaos in the markets."[2833]

The Board's initial reaction to the Government's call was "anger."[2834] Nonetheless, the Board discussed the advantages and disadvantages of a bankruptcy filing.[2835]  The Board discussed whether a delay in filing would allow time better to plan

[2829] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008), at p. 3 [LBEX-AM 003932].

[2830] *Id.* at p. 4.

[2831] *Id.* at pp. 4-5.

[2832] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 11.

[2833] *Id.*

[2834] Examiner's Interview of John F. Akers, Apr. 22, 2009, at pp. 13-14; Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 16.

[2835] *See* Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008), at p. 5 [LBEX-AM 003932].

and prepare Lehman to operate under Chapter 11 and prepare a more complete filing.[2836]

Lehman's bankruptcy counsel, Miller, said that he did not think the rushed filing had an adverse impact on the estate.[2837]   On the other hand, Alvarez and Marsal later asserted that as much as $75 billion in value was destroyed by the form of Lehman's bankruptcy.[2838]   For example, Bryan P. Marsal told the Examiner that the bankruptcy resulted in the loss of 70% of $48 billion of receivables from derivatives that could otherwise have been unwound.[2839]

One important consideration for the Board was the anticipated difficulty Lehman would have meeting payment obligations on Monday.[2840]   The Board questioned whether a substantial amount of the collateral pledged to JPMorgan could be recovered prior to filing.[2841]   The Board also noted the clear preference of the Government that Lehman file that night, the Federal Reserve's unwillingness to finance Lehman and the ultimate inevitability of a bankruptcy filing under the circumstances.[2842]   Kaufman was a

---

[2836] *Id*.

[2837] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 9.   Miller did concede that more advance notice and planning could have avoided JPMorgan taking approximately $500 million in collateral.   Miller also said that more value could have been received by liquidating contracts in a more orderly fashion.  *Id.*

[2838] Jeffrey McCracken, *Lehman's Chaotic Bankruptcy Filing Destroyed Billions in Value*, Wall St. J. (Dec. 29, 2008), at A10.

[2839] Examiner's Interview of Bryan P. Marsal, Dec. 14, 2009, at p. 2.

[2840] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008), at p. 5 [LBEX-AM 003932].

[2841] *Id*.

[2842] *Id*.

proponent of "calling the Government's bluff" by opening on Monday,[2843] but the Board concluded that filing for bankruptcy immediately was the appropriate course of action.[2844]

After discussion, the Board unanimously resolved to file for bankruptcy protection under Chapter 11 of the Bankruptcy Code.[2845]   Weil began filing around 1:30 a.m. on Monday, September 15, 2008.[2846]

[2843] Examiner's Interview of Henry Kaufman, Sept. 2, 2009, at p. 19; Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 16.

[2844] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008), at p. 5 [LBEX-AM 003932].

[2845] Id.

[2846] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 9.