UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
                                          :
In re                                     :     Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC.,            :     08-13555 (JMP)
*et al.*,                                 :
                                          :     (Jointly Administered)
                        Debtors.          :
---------------------------------------------------------- x


## REPORT OF
## ANTON R. VALUKAS, EXAMINER


Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
312-222-9350

919 Third Avenue
37th Floor
New York, NY 10022-3908
212-891-1600

March 11, 2010                    *Counsel to the Examiner*


## VOLUME 3 OF 9

## Section III.A.4: Repo 105

**EXAMINER'S REPORT**

**TABLE OF CONTENTS**

**(SHORT-FORM)**

**VOLUME 1**

### Introduction, Sections I & II: Executive Summary & Procedural Background

Introduction ....................................................................................................................2

I. Executive Summary of the Examiner's Conclusions ....................................................15

    A. Why Did Lehman Fail? Are There Colorable Causes of Action That Arise From Its Financial Condition and Failure? .................................................15

    B. Are There Administrative Claims or Colorable Claims For Preferences or Voidable Transfers? ........................................................................................24

    C. Do Colorable Claims Arise From Transfers of LBHI Affiliate Assets To Barclays, or From the Lehman ALI Transaction? .................................................26

II. Procedural Background and Nature of the Examination ..............................................28

    A. The Examiner's Authority .............................................................................28

    B. Document Collection and Review ...................................................................30

    C. Systems Access ...........................................................................................33

    D. Witness Interview Process ............................................................................35

    E. Cooperation and Coordination With the Government and Parties ....................37

### Section III.A.1: Risk

III. Examiner's Conclusions ...........................................................................................43

    A. Why Did Lehman Fail? Are There Colorable Causes of Action That Arise From Its Financial Condition and Failure? .................................................43

        1. Business and Risk Management ...............................................................43

            a) Executive Summary .......................................................................43

b)  Facts .................................................................................................58

c)  Analysis ............................................................................................163

**VOLUME 2**

**Section III.A.2: Valuation**

2.  Valuation ...........................................................................................203

a)  Executive Summary .........................................................................203

b)  Overview of Valuation of Lehman's Commercial Real Estate
    Portfolio ...........................................................................................215

c)  Senior Management's Involvement in Valuation ...................................241

d)  Examiner's Analysis of the Valuation of Lehman's Commercial
    Book .................................................................................................266

e)  Examiner's Analysis of the Valuation of Lehman's Principal
    Transactions Group ...........................................................................285

f)  Examiner's Analysis of the Valuation of Lehman's Archstone
    Positions ...........................................................................................356

g)  Examiner's Analysis of the Valuation of Lehman's Residential
    Whole Loans Portfolio .......................................................................494

h)  Examiner's Analysis of the Valuation of Lehman's RMBS
    Portfolio ...........................................................................................527

i)  Examiner's Analysis of the Valuation of Lehman's CDOs ...................538

j)  Examiner's Analysis of the Valuation of Lehman's Derivatives
    Positions ...........................................................................................568

k)  Examiner's Analysis of the Valuation of Lehman's Corporate
    Debt Positions ..................................................................................583

l)  Examiner's Analysis of the Valuation of Lehman's Corporate
    Equities Positions ..............................................................................594

**Section III.A.3:  Survival**

3.   Lehman's Survival Strategies and Efforts........................................................609

   a)   Introduction to Lehman's Survival Strategies and Efforts....................609

   b)   Lehman's Actions in 2008 Prior to the Near Collapse of Bear
        Stearns........................................................................................................622

   c)   Actions and Efforts Following the Near Collapse of Bear Stearns .......631

**VOLUME 3**

**Section III.A.4:  Repo 105**

4.   Repo 105.............................................................................................................732

   a)   Repo 105 – Executive Summary ..............................................................732

   b)   Introduction ...............................................................................................750

   c)   Why the Examiner Investigated Lehman's Use of Repo 105
        Transactions ...............................................................................................764

   d)   A Typical Repo 105 Transaction ..............................................................765

   e)   Managing Balance Sheet and Leverage ...................................................800

   f)   The Purpose of Lehman's Repo 105 Program Was to Reverse
        Engineer Publicly Reported Financial Results.........................................853

   g)   The Materiality of Lehman's Repo 105 Practice .....................................884

   h)   Knowledge of Lehman's Repo 105 Program at the Highest Levels
        of the Firm .................................................................................................914

   i)   Ernst & Young's Knowledge of Lehman's Repo 105 Program..............948

   j)   The Examiner's Conclusions ....................................................................962

**VOLUME 4**

**Section III.A.5:  Secured Lenders**

5.   Potential Claims Against Lehman's Secured Lenders .................................1066

   a)   Introduction and Executive Summary ....................................................1066

   b)   Lehman's Dealings With JPMorgan ......................................................1084

   c)   Lehman's Dealings With Citigroup........................................................1224

   d)   Lehman's Dealings With HSBC ............................................................1303

   e)   Lehman's Dealings With Bank of America ...........................................1375

   f)   Lehman's Dealings With Bank of New York Mellon...........................1376

   g)   Lehman's Dealings With Standard Bank................................................1382

   h)   Lehman's Dealings With the Federal Reserve Bank of New York .....1385

   i)   Lehman's Liquidity Pool.........................................................................1401

**Section III.A.6:  Government**

6.   The Interaction Between Lehman and the Government.............................1482

   a)   Introduction .............................................................................................1482

   b)   The SEC's Oversight of Lehman ...........................................................1484

   c)   The FRBNY's Oversight of Lehman .....................................................1494

   d)   The Federal Reserve's Oversight of Lehman .......................................1502

   e)   The Treasury Department's Oversight of Lehman ..............................1505

   f)   The Relationship of the SEC and FRBNY in Monitoring
        Lehman's Liquidity.................................................................................1507

   g)   The Government's Preparation for the "Lehman Weekend"
        Meetings at the FRBNY .........................................................................1516

h) On the Evening of Friday, September 12, 2008, the Government Convened a Meeting of the Major Wall Street Firms in an Attempt to Facilitate the Rescue of Lehman ..........................................1523

i) Lehman's Bankruptcy Filing ..................................................1535

## VOLUME 5

### Section III.B:  Avoidance Actions

B. Are There Administrative Claims or Colorable Claims for Preferences or Voidable Transfers...............................................................................1544

1. Executive Summary .....................................................................1544

2. Examiner's Investigation of Possible Administrative Claims Against LBHI (First Bullet) .........................................................................1546

3. Examiner's Investigation of Possible Avoidance Actions (Third, Fourth and Eighth Bullets)...............................................................1570

4. Examiner's Investigation of Possible Breaches of Fiduciary Duty by LBHI Affiliate Directors and Officers (Fifth Bullet) ......................1894

5. Examiner's Analysis of Lehman's Foreign Exchange Transactions (Second Bullet) ............................................................................1912

6. Examiner's Review of Intercompany Transactions Within Thirty Days of LBHI's Bankruptcy Filing (Seventh Bullet)......................1938

7. Examiner's Analysis of Lehman's Debt to Freddie Mac.............................1951

### Section III.C:  Barclays Transaction

C. Do Colorable Claims Arise From Transfers of LBHI Affiliate Assets to Barclays, or From the Lehman ALI Transaction? ................................1961

1. Executive Summary .....................................................................1961

2. Facts............................................................................................1965

3. Whether Assets of LBHI Affiliates Were Transferred to Barclays ............1997

4. Lehman ALI Transaction..............................................................2055

5.  Conclusions ..........................................................................................................2063

6.  Barclays Transaction ...........................................................................................2103

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- x
                                 :

In re                                :    Chapter 11 Case No.
                                 :

LEHMAN BROTHERS HOLDINGS INC.,    :    08-13555 (JMP)
*et al.*,                                 :
                                 :    (Jointly Administered)
                        Debtors.      :
----------------------------------------------------------- x

# REPORT OF
# EXAMINER ANTON R. VALUKAS

### Section III.A.4: Repo 105

4. Repo 105 ............................................................................................732
   a) Repo 105 – Executive Summary ........................................................732
   b) Introduction ...................................................................................750
   c) Why the Examiner Investigated Lehman's Use of Repo 105
      Transactions ....................................................................................764
   d) A Typical Repo 105 Transaction ......................................................765
      (1) The Genesis of Lehman's Repo 105 Program in 2001 ......................765
      (2) Repo 105 Transactions Versus Ordinary Repo Transactions .........766
         (a) Lehman's Accounting Treatment of Repo 105
            Transactions Versus Ordinary Repo Transactions ................. 768
         (b) Lehman's Accounting Policy for Repo 105 Transactions........ 775
         (c) The Accounting Purpose of the Larger Haircut ...................... 777
         (d) Lehman Did Not Record a Cash Borrowing but
            Recorded a Derivative Asset in a Repo 105 Transaction......... 781
      (3) Anatomy of Repo 105 Transactions and the Linklaters True
         Sale Opinion Letter ...............................................................782
      (4) Types of Securities Used in Repo 105 Transactions .........................793
      (5) Product Controllers Manually Booked Repo 105
         Transactions ..........................................................................797
   e) Managing Balance Sheet and Leverage ..............................................800
      (1) Lehman Management's Focus in Late 2007 on Reducing the
         Firm's Reported Leverage......................................................802
         (a) Lehman's Calculation of Net Leverage ..................................... 804
      (2) By January 2008, Lehman Decided to Cut its Net Leverage in
         Half to Win Back the Confidence of the Market, Lenders and
         Investors ...............................................................................805
         (a) Bart McDade, as Newly Appointed Balance Sheet Czar,
            Advised the Executive Committee in March 2008 to Cap
            Lehman's Use of Repo 105 Transactions .................................. 809
         (b) McDade Became President and COO on June 12, 2008
            and Authorized the Reduction of Repo 105 Usage................. 819
      (3) The Market's Increased Scrutiny of the Leverage of
         Investment Banks...................................................................822
         (a) The Cost of Deleveraging ......................................................... 825

(4) "Sticky" Inventory and FID's Balance Sheet Breaches Hampered Lehman's Ability to Manage Its Net Leverage.............828

(5) Deleveraging Resulted in Intense Pressure at Quarter-End to Meet Balance Sheet Targets for Reporting Purposes.......................843

(6) Lehman's Earnings Calls and Press Release Statements Regarding Leverage...............................................................................845

    (a) Analysts' Statements Regarding Lehman's Leverage .............850

f) The Purpose of Lehman's Repo 105 Program Was to Reverse Engineer Publicly Reported Financial Results..........................................853

(1) Lehman Did Not Disclose Its Accounting Treatment For or Use of Repo 105 Transactions in Its Forms 10-K and 10-Q.............853

    (a) Lehman's Outside Disclosure Counsel Was Unaware of Lehman's Repo 105 Program .........................................................855

(2) Lehman's Repo 105 Practice Improved the Firm's Public Balance Sheet Profile at Quarter-End.....................................................856

    (a) Contemporaneous Documents Confirm That Lehman Undertook Repo 105 Transactions to Reduce Its Balance Sheet and Reverse Engineer Its Leverage..................................859

    (b) Witness Statements to the Examiner Regarding the True Purpose of Lehman's Repo 105 Practice....................................867

(3) Quarter-End Spikes in Lehman's Repo 105 Usage Also Suggest the True Purpose of Lehman's Repo 105 Practice Was Balance Sheet Manipulation .....................................................870

(4) Repo 105 Transactions Served No Business Purpose Other Than Balance Sheet Reduction...........................................................877

    (a) Repo 105 Transactions Came at a Higher Cost Than Ordinary Repo Transactions .......................................................877

    (b) Witnesses Also Stated That Financing Was Not the Real Motive for Undertaking Repo 105 Transactions ......................882

g) The Materiality of Lehman's Repo 105 Practice ......................................884

(1) The Repo 105 Program Exposed Lehman to Potential "Reputational Risk"................................................................................884

(2) Lehman's Repo 105 Practice Had a Material Impact on Lehman's Net Leverage Ratio............................................................888

    (a) Lehman Significantly Expanded Its Repo 105 Practice in Late 2007 and Early 2008 .........................................................890

(3) Balance Sheet Targets for FID Businesses Were Unsustainable Without the Use of Repo 105 Transactions ............899

(4) Rating Agencies Advised the Examiner that Lehman's Accounting Treatment and Use of Repo 105 Transactions to Manage Its Net Leverage Ratio Would Have Been Relevant Information ................................................902

(5) Government Regulators Had No Knowledge of Lehman's Repo 105 Program................................................910

    (a) Officials from the Federal Reserve Bank Would Have Wanted to Know about Lehman's Use of Repo 105 Transactions ................................................ 910

    (b) Securities and Exchange Commission CSE Monitors Were Unaware of Lehman's Repo 105 Program ......................913

h) Knowledge of Lehman's Repo 105 Program at the Highest Levels of the Firm ................................................914

(1) Richard Fuld, Former Chief Executive Officer ................................................917

(2) Lehman's Former Chief Financial Officers ................................................921

    (a) Chris O'Meara, Former Chief Financial Officer ......................921

    (b) Erin Callan, Former Chief Financial Officer ............................930

    (c) Ian Lowitt, Former Chief Financial Officer ................................937

(3) Lehman's Board of Directors................................................945

i) Ernst & Young's Knowledge of Lehman's Repo 105 Program............948

(1) Ernst & Young's Comfort with Lehman's Repo 105 Accounting Policy ................................................948

(2) The "Netting Grid" ................................................951

    (a) Quarterly Review and Audit................................................ 953

(3) Ernst & Young Would Not Opine on the Materiality of Lehman's Repo 105 Usage ................................................954

(4) Matthew Lee's Statements Regarding Repo 105 to Ernst & Young................................................956

(5) Accounting-Motivated Transactions................................................962

j) The Examiner's Conclusions ................................................962

(1) Materiality ................................................963

    (a) Whether Lehman's Repo 105 Transactions Technically Complied with SFAS 140 Does Not Impact Whether a Colorable Claim Exists ................................................ 964

(2) Disclosure Requirements and Analysis .............................................967

   (a) Disclosure Obligations:  Regulation S-K and the MD&A ....... 968

   (b) Duty to Disclose ......................................................................... 972

   (c) Lehman's Public Filings .............................................................. 973

      (i) Summary of Lehman's 2000 through 2007 Public Filings ................................................................................ 974

      (ii) Lehman's 2007 Form 10-K, First Quarter 2008 Form 10-Q, and Second Quarter 2008 Form 10-Q .................... 977

         a. Treatment of Repo Transactions and SFAS 140 ....... 978

         b. Net Leverage ................................................................. 980

         c. Derivatives .................................................................... 981

         d. A Reader of Lehman's Forms 10-K and 10-Q Would Not Have Been Able to Ascertain That Lehman Engaged in Temporary Sales Using Liquid Securities ........................................................... 984

   (d) Conclusions Regarding Lehman's Failure to Disclose ............ 985

(3) Colorable Claims ...................................................................................990

(4) Fiduciary Duty Claims ..........................................................................991

   (a) Breach of Fiduciary Duty Claims Against Board of Directors ....................................................................................... 991

   (b) Breach of Fiduciary Duty Claims Against Specific Lehman Officers ........................................................................... 992

      (i) Richard Fuld ...................................................................... 996

         a. There Is Sufficient Evidence to Support a Finding By the Trier of Fact That Fuld Was at Least Grossly Negligent in Causing Lehman to File Misleading Periodic Reports .............................. 997

      (ii) Chris O'Meara ................................................................ 1002

         a. There Is Sufficient Evidence To Support a Colorable Claim That O'Meara Was at Least Grossly Negligent in Allowing Lehman to File Misleading Financial Statements and Engage in Material Volumes of Repo 105 Transactions .......... 1007

         b. There Is Sufficient Evidence To Support a Colorable Claim That O'Meara Breached His Fiduciary Duties by Failing to Inform the

Board and His Superiors of Lehman's Repo 105
Practice ...................................................................... 1009

(iii) Erin Callan ...................................................................... 1013

a. There Is Sufficient Evidence To Support a
Finding By the Trier of Fact That Callan
Breached Her Fiduciary Duties by Causing
Lehman to Make Materially Misleading
Statements ................................................................. 1017

b. There Is Sufficient Evidence to Support a
Colorable Claim That Callan Breached Her
Fiduciary Duty of Care by Failing to Inform the
Board of Directors of Lehman's Repo 105
Program ...................................................................... 1019

(iv) Ian Lowitt ...................................................................... 1021

(c) Remedies ...................................................................... 1024

(5) Malpractice Claims Against Ernst & Young ................................... 1027

(a) Background and Legal Standards ........................................... 1028

(i) Professional Standards ........................................... 1028

(ii) Common Law Standards ........................................... 1031

(b) There Is Sufficient Evidence to Support a Colorable
Claim That Ernst & Young Was Negligent ............................ 1032

(i) Malpractice in Failure to Advise Audit Committee
of Repo 105 Activity and Lee's Allegations .................. 1033

(ii) Lehman's 2008 Forms 10-Q ............................................. 1040

(iii) Lehman's 2007 Form 10-K ............................................. 1048

(iv) Effect on Prior Filings ....................................................... 1050

(v) Causation and Damages ...................................................... 1051

(c) Possible Defenses ...................................................................... 1053

### 4. Repo 105

#### a) Repo 105 – Executive Summary

Lehman employed off-balance sheet devices, known within Lehman as "Repo 105" and "Repo 108" transactions, to temporarily remove securities inventory from its balance sheet, usually for a period of seven to ten days, and to create a materially misleading picture of the firm's financial condition in late 2007 and 2008.[2847] Repo 105 transactions were nearly identical to standard repurchase and resale ("repo") transactions that Lehman (and other investment banks) used to secure short-term financing, with a critical difference: Lehman accounted for Repo 105 transactions as "sales" as opposed to financing transactions based upon the overcollateralization or higher than normal haircut in a Repo 105 transaction.[2848] By recharacterizing the Repo 105 transaction as a "sale," Lehman removed the inventory from its balance sheet.[2849]

---

[2847] Unless otherwise noted, the Report uses the term "Repo 105" to refer to both Repo 105 and Repo 108 transactions. Lehman treated the two transactions identically under the same internal accounting policy and both transactions shared the same anatomy. They differed only in that Repo 105 transactions utilized fixed income securities and required a minimum five percent overcollateralization amount (*i.e.*, a minimum of $105 worth of securities in exchange for $100 cash borrowed) while Repo 108 transactions utilized equities securities and required a minimum eight percent overcollateralization amount (*i.e.*, a minimum of $108 worth of securities in exchange for $100 cash borrowed).

[2848] Sale and repurchase agreements ("repos") are agreements where one party transfers an asset or security to another party as collateral for a short-term borrowing of cash, while simultaneously agreeing to repay the cash and take back the collateral at a specific point in time. When the repo transaction matures, the borrower repays the funds plus an agreed upon interest rate and takes back its collateral. As explained in Section III.A.4.d.2.c of the Report, overcollateralization amounts, or haircuts, in Repo 105 transactions were higher than the typical haircut applied to ordinary repos using similar securities.

[2849] Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Feb. 13, 2008), at p. 2 [LBEX-DOCID 3213297]; ACCOUNTING FOR TRANSFERS AND SERVICING OF FINANCIAL ASSETS AND EXTINGUISHMENTS OF LIABILITIES, Statement of Financial Accounting Standards No. 140, ¶¶ 2, 98 (Fin. Accounting Standards Bd. 2000) ("SFAS 140"). The accounting for a Repo 105 transaction began with the

Lehman regularly increased its use of Repo 105 transactions in the days prior to reporting periods to reduce its publicly reported net leverage and balance sheet.[2850] Lehman's periodic reports did not disclose the cash borrowing from the Repo 105 transaction – *i.e.*, although Lehman had in effect borrowed tens of billions of dollars in these transactions, Lehman did not disclose the known obligation to repay the debt.[2851] Lehman used the cash from the Repo 105 transaction to pay down other liabilities, thereby reducing both the total liabilities and the total assets reported on its balance sheet and lowering its leverage ratios.[2852] Thus, Lehman's Repo 105 practice consisted of a two-step process: (1) undertaking Repo 105 transactions followed by (2) the use of

same entries as an ordinary repo; additional entries were then made to recharacterize the Repo 105 from a secured financing to a sale of an inventory security.

[2850] *See* Sections III.A.4.f.2–4 and III.A.4.g.2 of this Report.

[2851] *See* Sections III.A.4.d.2.d and III.A.4.j.2.c of this Report.

[2852] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 7 (stating that incoming cash from Repo 105 transactions was used to pay business expenses); Examiner's Interview of Edward Grieb, Oct. 2, 2009, at pp. 13-14 (stating that cash received in Repo 105 transactions was used to pay off other liabilities); Examiner's Interview of Matthew Lee, July 1, 2009, at p. 14 (explaining that in order for Lehman to realize the benefit to its leverage ratios as a result of Repo 105 transactions, the firm had to use the cash received to pay off a different liability); e-mail from Anuraj Bismal, Lehman, to Marie Stewart, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223384] (stating the effect of Repo 105 on net leverage ratio, which could only be impacted if Lehman used Repo 105 cash to pay down different liabilities). Given that Lehman undertook $38.6 billion, $49.1 billion, and $50.38 billion of Repo 105 transactions at quarter-end fourth quarter 2007, first quarter 2008, and second quarter 2008, respectively, Lehman's disclosures of its cash holdings at each quarter-end further strengthens the witness statements and other evidence that Lehman used the Repo 105 cash borrowing for other business purposes, including to pay down other short-term liabilities. *See* Lehman Brothers Holdings Inc., Annual Report for 2007 as of Nov. 30, 2007 (Form 10-K) (filed on Jan. 29, 2008), at p. 86 ("LBHI 2007 10-K") (reporting that Lehman had $7.286 billion in cash and cash equivalents on November 30, 2007); Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 29, 2008 (Form 10-Q) (filed on Apr. 9, 2008), at p. 5 ("LBHI 10-Q (filed Apr. 9, 2008)") (reporting that Lehman had $7.564 billion in cash and cash equivalents on February 29, 2008); Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2008 (Form 10-Q) (filed on July 10, 2008), at p. 5 ("LBHI 10-Q (filed July 10, 2008)") (reporting that Lehman had $6.513 billion in cash and cash equivalents on May 31, 2008). While Lehman's Repo 105 transactions spiked at quarter-ends, Lehman's ordinary repo balances dropped off significantly during the same time periods. *See* Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 5.

Repo 105 cash borrowings to pay down liabilities, thereby reducing leverage. A few days after the new quarter began, Lehman would borrow the necessary funds to repay the cash borrowing plus interest, repurchase the securities, and restore the assets to its balance sheet.[2853]

Lehman never publicly disclosed its use of Repo 105 transactions, its accounting treatment for these transactions, the considerable escalation of its total Repo 105 usage in late 2007 and into 2008, or the material impact these transactions had on the firm's publicly reported net leverage ratio.[2854] According to former Global Financial Controller Martin Kelly, a careful review of Lehman's Forms 10-K and 10-Q would not reveal

---

[2853] Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 4; *see also* Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Feb. 13, 2008), at p. 2 [LBEX-DOCID 3213297].

[2854] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 15; Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 9; Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 14; Examiner's Interview of Matthew Lee, July 1, 2009, at p. 15; *see also* Sections III.A.4.f.1 and III.A.4.j.2.c–d of this Report (discussing Lehman's Forms 10-K and 10-Q). In its Forms 10-K and 10-Q, Lehman defined its "net leverage ratio" as net assets divided by tangible equity capital. Lehman defined net assets as total assets excluding: (1) cash and securities segregated and on deposit for regulatory and other purposes; (2) securities received as collateral; (3) securities purchases under agreements to resell; (4) securities borrowed; and (5) identifiable intangible assets and goodwill. LBHI 2007 10-K, at p. 63; LBHI 10-Q (filed Apr. 9, 2008), at p. 72; LBHI 10-Q (filed July 10, 2008), at p. 88. Lehman calculated tangible equity capital by including stockholders' equity and junior subordinated notes and excluding identifiable intangible assets and goodwill. *See* LBHI 2007 10-K (Nov. 30, 2007), at p. 63; LBHI 10-Q (filed Apr. 9, 2008), at p. 72; LBHI 10-Q (filed July 10, 2008), at p. 88. In contrast, Lehman's "leverage ratio" was generally computed by simply dividing total assets by stockholders' equity. The Examiner's conclusion that Lehman never disclosed its Repo 105 practice was confirmed by several Lehman witnesses, including two former Global Financial Controllers who oversaw the preparation of the Forms 10-K and 10-Q. Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 9; Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 14.; *see also* Section III.A.4.j.2 of this Report, *infra* (containing Examiner's analysis of Lehman's Form 10-K and Form 10-Q disclosures). This Report does not reach the question whether Lehman's Repo 105 transactions technically complied with the relevant financial accounting standard, SFAS 140. As set forth below, the answer to that question does not impact whether there is sufficient evidence to support a colorable claim regarding Lehman's failure to disclose its Repo 105 practice and whether that failure rendered the firm's periodic reports materially misleading.

Lehman's use of Repo 105 transactions.[2855]   Lehman failed to disclose its Repo 105 practice even though Kelly believed "that the only purpose or motive for the transactions was reduction in balance sheet;" felt that "there was no substance to the transactions;" and expressed concerns with Lehman's Repo 105 program to two consecutive Lehman Chief Financial Officers – Erin Callan and Ian Lowitt – advising them that the lack of economic substance to Repo 105 transactions meant "reputational risk" to Lehman if the firm's use of the transactions became known to the public.[2856]   In addition to its material omissions, Lehman affirmatively misrepresented in its financial statements that the firm treated all repo transactions as financing transactions – *i.e.*, not sales – for financial reporting purposes.[2857]

Starting in mid-2007, Lehman faced a crisis:  market observers began demanding that investment banks reduce their leverage.[2858]   The inability to reduce leverage could lead to a ratings downgrade, which would have had an immediate, tangible monetary impact on Lehman.[2859]   In a September 2007 e-mail comparing Lehman's net leverage

---

[2855] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 9.

[2856] *Id.* at pp. 7-10.

[2857] The Notes to Lehman's Consolidated Financial Statements for each period stated that Lehman treated "[r]epurchase and resale agreements" as "collateralized agreements and financings for financial reporting purposes."  *See* LBHI 2007 10-K, at p. 97; LBHI 10-Q (filed Apr. 9, 2008), at p. 13; LBHI 10-Q (filed July 10, 2008), at p. 16.  The Notes further stated that "Other secured borrowings principally reflect transfers accounted for as financings rather than sales under SFAS 140."  LBHI 2007 10-K, at p. 97; LBHI 10-Q (filed Apr. 9, 2008), at p. 13; LBHI 10-Q (filed July 10, 2008), at p. 16.

[2858] Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at pp. 5-6; Mark Jickling, Averting Financial Crisis, CRS Report for Congress, at 7-9 (Mar. 10, 2008, updated on Oct. 8, 2008).

[2859] A downgrade in an issuer's credit rating has a significant negative impact on the financial position of a company like Lehman.  *See, e.g.,* e-mail from Ian T. Lowitt, Lehman, to Herbert H. (Bart) McDade III,

ratio to Bear Stearns', Paolo Tonucci, Lehman's Global Treasurer, wrote that Lehman's net leverage calculation "was intended to reflect the methodology employed by S&P who were most interested and focused on leverage."[2860]   In mid-to-late 2007, top Lehman executives from across the firm felt pressure to reduce the firm's leverage for quarterly and annual reports.[2861]   In response to Tonucci's September 2007 e-mail, Ryan Traversari, Senior Vice President for External Reporting, wrote that the "question" of net leverage ratio "has come up multiple times in the 20 seconds that I've been here – largely from [then-CFO] O'Meara, Freidheim, Lowitt, Corporate Strategy, Investor Relations and the like."[2862]

By January 2008, Lehman CEO Fuld ordered a firm-wide deleveraging strategy, hoping to reduce the firm's positions in commercial and residential real estate and

---

Lehman (June 30, 2008) [LBHI_SEC07940_643543] ("One notch downgrade requires 1.7 bn; and 2 notch requires 3.4 bn of additional margin posting.").   Counterparties may respond to a downgrade by demanding that the issuer post additional cash collateral to secure its obligations.  *See* Amadou N.R. Sy, The Systemic Regulation of Credit Rating Agencies and Rated Markets 8-9 (Int'l Monetary Fund, Working Paper, 2009) (noting that broker-dealers may use credit ratings to determine acceptable counterparties, as well as collateral levels for outstanding credit exposure); e-mail from Ian T. Lowitt, Lehman, to Eric Felder, Lehman (July 5, 2008) [LBEX-DOCID 071263] (stating that a downgrade "will affect lines and willingness of counterparties to fund secured").  Some of Lehman's derivative contracts had built-in "triggers" permitting counterparties to require additional cash collateral in the event of a downgrade. *See also* Lehman, Global Treasury Downgrade Effect on Cash Capital Facilities (June 3, 2008) [LBHI_SEC07940_513314] (attached to e-mail from Amberish Ratanghayra, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (June 3, 2008) [LBHI_SEC07940_513312]); *see also* Appendix 13, Survival, at pp. 1-3.

[2860] E-mail from Paolo R. Tonucci, Lehman, to Marie Stewart, Lehman, *et al.* (Sept. 10, 2007) [LBEX-DOCID 1695576].

[2861] E-mail from Ian T. Lowitt, Lehman, to Gerard Reilly, Lehman, *et al.* (Sept. 7, 2007) [LBEX-DOCID 1357178]; e-mail from Ryan Traversari, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 11, 2007) [LBEX-DOCID 1695576]; *see* Sections III.A.4.e.1–3, 6 of this Report (discussing importance of net leverage for public perception of Lehman and for reporting purposes)

[2862] E-mail from Ryan Traversari, Lehman, to Paolo R. Tonucci, Lehman (Sept. 11, 2007) [LBEX-DOCID 1695576].

leveraged loans in particular by half.[2863]  In the words of one internal Lehman presentation, "Reducing leverage is necessary to remove refinancing risk and win back the confidence of the market, lenders, and investors."[2864]

Fuld recalled that Lehman had to improve its net leverage ratio by selling inventory because "there was a perception issue" with raising equity.[2865]  Selling inventory, however, proved difficult in late 2007 and into 2008 because, starting in mid-2007, many of Lehman's inventory positions had grown increasingly "sticky" – *i.e.*, difficult to sell without incurring substantial losses.  Moreover, selling sticky inventory at reduced prices could have led to a loss of market confidence in Lehman's valuations for inventory remaining on the firm's balance sheet since fire-sale pricing would reveal that Lehman "had a lot of air in [its] marks."[2866]

In light of these factors, Lehman relied at an increasing pace on Repo 105 transactions at each quarter-end in late 2007 and early 2008.  Lehman's expansion of its Repo 105 program mitigated, in part, the adverse impact its increasingly "sticky"/illiquid inventory – comprised mostly of the leveraged loans and residential and commercial real estate positions Fuld wanted to exit – was having on the firm's

---

[2863] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at pp. 26-27.

[2864] Erin Callan, Lehman, Lehman Brothers Leverage Analysis (Apr. 7, 2008), at p. 1 [LBEX-DOCID 1401225].

[2865] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 27.  According to Fuld, if Lehman had raised equity, it would have improved net leverage, but would not have fixed Lehman's underlying problem.  *Id.*  Fuld stated that he wanted Lehman to improve its net leverage by selling assets.  *Id.*

[2866] Examiner's Interview of Treasury Secretary Timothy F. Geithner, Nov. 24, 2009, at pp. 7-8.

publicly reported net leverage and net balance sheet.[2867]  An early 2007 document from Lehman's archives concluding that "Repo 105 offers a low cost way to offset the balance sheet and leverage impact of current market conditions," further stated that "[e]xiting large CMBS positions in Real Estate and sub prime loans in Mortgages before quarter end would incur large losses due to the steep discounts that they would have to be offered at and carry substantial reputation risk in the market. . . . A Repo 105 increase would help avoid this without negatively impacting our leverage ratios."[2868]  While Lehman did not utilize Repo 105 transactions for selling sticky inventory, the firm's expanded use of Repo 105 transactions at quarter-end impacted Lehman's publicly reported net leverage ratio.[2869]

---

[2867] *See* Section III.A.4.e.4 of this Report (discussing sticky inventory).  The concept of "net balance sheet" is used interchangeably with "net assets" in this Report.  The "net asset" calculation begins with "total assets" as reported for GAAP purposes in Lehman's Forms 10-K and 10-Q.  From there, Lehman subtracted certain assets to arrive at "net assets": (i) cash and securities segregated and on deposit for regulatory and other purposes; (ii) collateralized lending agreements (*e.g.*, securities Lehman is holding as collateral for a loan made to a third-party); and (iii) identifiable intangible assets and goodwill.  *See* LBHI 2007 10-K, at pp. 30, 61.

[2868] Joseph Gentile, Lehman, Proposed Repo 105/108 Target Increase for 2007 (Feb. 10, 2007), at p. 1 [LBEX-DOCID 2489498] (attached to e-mail from Joseph Gentile, Lehman, to Edward Grieb, Lehman (Feb. 10, 2007) [LBEX-DOCID 2600714]).

[2869] As discussed *infra* at pp. 843-46, Lehman attempted to move less liquid inventory into the Repo 105 program, but was unable to find willing counterparties.  As discussed in Section III.A.4.d.2.a of this Report, *at the moment of* a Repo 105 transaction, Lehman reduced its inventory assets but received cash, thereby having a net neutral effect on total assets.  Because Lehman did not reflect the cash borrowing on its balance sheet as a liability (as it did in ordinary repo transactions), *at the moment of* a Repo 105 transaction, the transaction also had a net neutral effect on total liabilities.  Lehman, however, used the cash borrowing in Repo 105 transactions to pay different short-term liabilities, thereby reducing both total assets and total liabilities.  By engaging in Repo 105 transactions and using the cash borrowings, Lehman reduced its reported leverage ratios.

In this way, unbeknownst to the investing public, rating agencies, Government regulators, and Lehman's Board of Directors, Lehman reverse engineered the firm's net leverage ratio for public consumption. Notably, during Lehman's 2008 earnings calls in which it touted its leverage reduction, analysts frequently inquired about *the means* by which Lehman was reducing its leverage.[2870] Although CFO Callan told analysts that Lehman was "trying to give the group a great amount of transparency on the balance sheet," she reported that Lehman was reducing its leverage through the sale of less liquid asset categories but said nothing about the firm's use of Repo 105 transactions.[2871]

Despite the belief of Lehman personnel that none of the firm's peer investment banks still used similar accounting methods for repo transactions to arrive at their leverage numbers, *to which Lehman's reported net leverage was compared*, Lehman temporarily reduced its net balance sheet at quarter-end through its Repo 105 practice by approximately $38.6 billion in fourth quarter 2007, $49.1 billion in first quarter 2008, and $50.38 billion in second quarter 2008.[2872]

---

[2870] *See* Section III.A.4.e.6 of this Report.

[2871] *See* Final Transcript of Lehman Brothers Holdings Inc. First Quarter 2008 Earnings Call (Mar. 18, 2008), at p. 13 [LBHI_SEC07940_7277784]; *see also* Final Transcript of Lehman Brothers Holdings Inc. Fourth Quarter 2007 Earnings Call (Dec. 13, 2007), at p. 7 [LBHI_SEC07940_7222291]; Transcript of Lehman Brothers Holdings Inc. Preliminary Second Quarter 2008 Earnings Call (June 9, 2008), at pp. 3-4, 12 [LBHI_SEC07940_2554480].

[2872] Numerous Lehman witnesses and internal Lehman e-mails stated that by December 2007, Lehman personnel believed that Lehman was the last of its peer investment banks to use Repo 105-type transactions. The Examiner has not verified whether other CSE firms at one time used this type of transaction but later ceased. Martin Kelly (former Global Financial Controller), Anuraj Bismal (former Senior Vice President Balance Sheet Group), Marie Stewart (former Global Head of Accounting Policy), and Michael McGarvey (FID Finance) said that they believed Lehman was the only CSE firm engaging in

Lehman first introduced its Repo 105 program in approximately 2001.[2873]  Unable to find a United States law firm that would provide it with an opinion letter permitting the true sale accounting treatment under United States law, Lehman conducted its Repo 105 program under the aegis of an opinion letter the Linklaters law firm in London wrote for LBIE, Lehman's European broker-dealer in London, under English law.[2874]  Accordingly, if United States-based Lehman entities such as LBI and LBSF wished to engage in a Repo 105 transaction, they transferred their securities inventory to LBIE in order for LBIE to conduct the transaction on their behalf.[2875]

While not referenced or incorporated into Lehman's internal Repo 105 Accounting Policy, senior Lehman management set limits on the total amount by which

---

Repo 105-type transactions by late 2007.  Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 14; Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 11; Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 7; Examiner's Interview of Martin Kelly, Oct. 2, 2009, at p. 8.  In a December 2007 e-mail, Bismal wrote: "[W]as chatting with ex-lehman employee [Carlos Lo] at Merrill yesterday - he is in their balance sheet group - he told me that they do not use repo 105," to which Marie Stewart replied, "Then that means we are the only one left who does."  E-mail from Marie Stewart, Lehman, to Anuraj Bismal, Lehman, *et al*. (Dec. 5, 2007) [LBEX-DOCID 3223386].  In a January 2008 e-mail, McGarvey wrote: "By the way we are now the only large firm on the street that uses Repo 105."  E-mail from Michael McGarvey, Lehman, to Clement Bernard, Lehman (Jan. 30, 2008) [LBEX-DOCID 2796630].  In a May 2008 e-mail to O'Meara (then-Chief Risk Officer), Ryan Traversari (Senior Vice President External Reporting) reported that Citigroup and JPMorgan "likely do not do Repo 105 and Repo 108 which are UK-based specific transactions on opinions received by LEH from Linklaters. This would be another reason why LEH's daily balance sheet is larger intra-month then at month-end."  E-mail from Ryan Traversari, Lehman, to Christopher M. O'Meara, Lehman, *et al*. (May 16, 2008) [LBEX-DOCID 574498].  In sum, it was widely believed within Lehman by late 2007 that it was the only firm using Repo 105-type transactions to reduce balance sheet and impact the firm's net leverage ratio.

[2873] *See* Section III.A.4.d.1 of this Report.

[2874] *See* Section III.A.4.d.3 of this Report and Appendix 17, Repo 105 Appendix.

[2875] As explained in Section III.A.4.d.3 of this Report, United States-based Lehman entities engaged only in Repo 105, and not in Repo 108 transactions.  Regardless of which Lehman entity transferred securities in either a Repo 105 or Repo 108 transaction, the balance sheet and leverage reduction benefit was firm-wide, as Lehman ran its business on a consolidated basis.

the firm could reduce its balance sheet on any given day using Repo 105 transactions.[2876]

In July 2006, the limit was set at "1x leverage" for Repo 105 transactions, or $17 billion.[2877]  Combined with a $5 billion limit for Repo 108 transactions, Lehman's firm-wide cap on combined Repo 105/108 transactions was $22 billion in the summer of 2006.[2878]  As of January 2008, the firm-wide cap on combined Repo 105/108 transactions at quarter-end was $25 billion, though in fact, Lehman exceeded the cap by approximately $25 billion in first and second quarter 2008.[2879]  Beginning in mid-2007 – the very time that the market began to particularly focus on investment banks' leverage – Lehman breached its internal limit on Repo 105 activity at every quarter-end,

---

[2876] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 27; Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 8.

[2877] Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 2 [LBEX-WGM 748489].  When questioned about the calculation of the Repo 105 limit set out in the Global Balance Sheet Overview Presentation, former Lehman Financial Controller Ed Grieb could not recall the calculation of the limit or whether the "1x leverage or $17 billion" definition referred to one of Lehman's leverage ratios or, rather, to tangible equity capital.  Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 9.  Lehman's Form 10-Q from the same period as the Global Balance Sheet Overview Presentation shows that Lehman's tangible equity capital was $17.4 billion and that the firm's net leverage ratio was 13.8, suggesting that the setting of Lehman's Repo 105 limit may have been tied to tangible equity capital. Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2006 (Form 10-Q) (filed on July 10, 2006), at p. 58 ("LBHI 10-Q (filed July 10, 2006)").  The Global Balance Sheet Overview Presentation itself suggested that tangible equity is the appropriate measure of leverage.  Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/Repo 108 Equities (July 2006), at p. 5 [LBEX-WGM 748489; *see also* Duff & Phelps, Repo 105/108 Usage vs. Limit Comment (Oct. 16, 2009), at p. 1.  The conclusion that "1 x leverage" means that the Repo 105 limit was 1 x the tangible equity metric is also supported by the fact that the denominator of Lehman's net leverage ratio is tangible equity.  Duff & Phelps, Repo 105/108 Usage vs. Limit Comment (Oct. 16, 2009), at p. 1 & n. 4.  The setting of the Repo 105 limit at 1 x tangible equity implies that Lehman management authorized Repo 105 usage to reduce Lehman's net leverage ratio by up to one multiple, or 1.0.  *Id.* at p. 2.

[2878] Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 2 [LBEX-WGM 748489].

[2879] E-mail from Sigrid Stabenow, Lehman, to Clement Bernard, Lehman, *et al*. (Jan. 25, 2008) [LBEX-DOCID 1853428] (requesting that Repo 105 limit of $20 billion be expanded to $23 billion).

temporarily removing as much as $50.38 billion in securities inventory from its balance sheet in second quarter 2008.[2880]

Lehman dramatically ramped up its use of Repo 105 transactions in late 2007 and early 2008 despite concerns about the practice expressed by Lehman officers and personnel. In an April 2008 e-mail asking if he was familiar with the use of Repo 105 transactions to reduce net balance sheet, Bart McDade, Lehman's former Head of Equities (2005–2008) and President and Chief Operating Officer (June–September 2008), replied: "I am very aware . . . it is another drug we r on."[2881]  A week earlier, McDade had recommended to Lehman's Executive Committee that the firm set a cap on the use of Repo 105 transactions.[2882]  A senior member of Lehman's Finance Group considered Lehman's Repo 105 program to be balance sheet "window-dressing" that was "based on legal technicalities."[2883]  Other former Lehman employees characterized Repo 105

---

[2880] Lehman, Total Repo 105/108 Trend (Feb. 20, 2008) [LBHI_SEC07940_1957956] (stating total Repo 105 usage for August 30, 2007, close of third quarter 2007, was $36.4 billion); Lehman, Total Repo 105 & Repo 108 Report (Dec. 5, 2007) [LBEX-DOCID 3219746] (attached to e-mail from Anuraj Bismal, Lehman, to Marie Stewart, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223384] and stating that total firm-wide Repo 105 usage on Nov. 30, 2007 was $38.634 billion); Lehman, Total Repo 105 & Repo 108 Report (June 11, 2008) [LBEX-DOCID 2078195] (attached to e-mail from Kristie Wong, Lehman, to Martin Kelly, Lehman (June 11, 2008) [LBEX-DOCID 2325872] and stating that total firm-wide Repo 105 usage on Feb. 29, 2008 was $49.102 billion and on May 30, 2008 was $50.383 billion).  Note that in 2008, May 31 was a Saturday. As set forth below, the Examiner concludes that the evidence supports the existence of colorable claims arising from Lehman's *failure to disclose* its Repo 105 practice and the impact these transactions had on Lehman's publicly reported net leverage and balance sheet.

[2881] E-mail from Herbert H. (Bart) McDade III, Lehman, to Hyung Lee, Lehman (Apr. 3, 2008) [LBEX-DOCID 1570783].

[2882] Examiner's Interview of Herbert H. (Bart) McDade III, Jan. 28, 2010, at pp. 3-4.

[2883] E-mail from Michael McGarvey, Lehman, to Jormen Vallecillo, Lehman (July 2, 2008) [LBEX-DOCID 3379145].

transactions as an "accounting gimmick" and a "lazy way of managing the balance sheet."[2884]

In addition to the firm-wide cap on total Repo 105 usage, management created two related rules loosely known within Lehman as (1) the "80/20" or "continual use" rule and (2) the "120%" rule.[2885] These rules prescribed, respectively, a minimal level of continual use of Repo 105 transactions throughout the quarter and a maximum volume of Repo 105 transactions at quarter-end.[2886] Former Financial Controller Ed Grieb described the purpose of the rules: "to make sure there was a legitimate business purpose" for Repo 105 transactions.[2887]

Lehman did not actually follow these self-imposed rules. That is not surprising, since no witness was able to provide a rational business explanation for the arbitrary 1x leverage, continual use, and 120% rules. If Repo 105 transactions made good business

---

[2884] Examiner's Interview of Murtaza Bhallo, Sept. 14, 2009; Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 7.

[2885] Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 13; Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 2 [LBEX-WGM 748489] ("Repo 105 transactions must be executed on a continual basis and remain in force throughout the month. To meet this requirement, the amount outstanding at any time should be maintained at approximately 80% of the amount at month-end. [per Chris O'Meara and Ed Grieb.]"); e-mail from Michael McGarvey, Lehman, to Kentaro Umezaki, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 1635769] ("The guide line for month end usage of repo 105 is that it should not exceed 120% of your daily average.").

[2886] *See* Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 2 [LBEX-WGM 748489] ("Repo 105 transactions must be executed on a continual basis and remain in force throughout the month. To meet this requirement, the amount outstanding at any time should be maintained at approximately 80% of the amount at month-end. [per Chris O'Meara and Ed Grieb.]"); e-mail from Michael McGarvey, Lehman, to Kentaro Umezaki, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 1635769] ("The guide line for month end usage of repo 105 is that it should not exceed 120% of your daily average.").

[2887] Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 13.

sense on their own, there would be no apparent reason to arbitrarily restrict the amount of such transactions to 1x leverage or to impose intra-month limits to ensure that the amount of the transactions at reporting periods did not spike to more than 120% of average usage. No reason, that is, except to keep the transactions under the radar, by limiting their total and the amount of a quarter-end spike.

Lehman's Fixed Income Division ("FID"), in particular, employed Repo 105 transactions to reach quarter-end balance sheet targets set by senior Lehman management in connection with the firm-wide effort to reduce net leverage. For example, four days prior to the close of fiscal year 2007, Jerry Rizzieri was in search of a way to meet his balance sheet target and wrote to Mitchell King: "Can you imagine what this would be like without 105?"[2888] When FID's balance sheet was above target in the days leading up to the close of the first quarter 2008, a senior financial officer within that division warned that the division was "looking at selling what ever we can and also doing some more repo 105."[2889] Similarly, the head of the Liquid Markets group within FID wrote at the same quarter-end regarding the group's balance sheet: "We

---

[2888] E-mail from Jerry Rizzieri, Lehman, to Mitchell King, Lehman (Nov. 26, 2007) [LBEX-DOCID 3232804].
[2889] E-mail from Clement Bernard, Lehman, to Martin Potts, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 1854189].

have a desperate situation and I need another 2 billion from you, either through Repo 105 or outright sales.  Cost is irrelevant, we need to do it."[2890]

Lehman's reliance upon Repo 105 transactions for quarter-end balance sheet relief continued into Lehman's second quarter 2008.  In an e-mail titled "Q2 balance sheet" and dated May 21, 2008 – ten days before Lehman's second quarter close – the head of the Liquid Markets group wrote: "Do as much as you can in Repo 105" in response to the question "Do u thk we can be flexible beyond $3bn in 105?"[2891]  In another May 21, 2008 e-mail, the head of Liquid Markets asked: "Are we going to make the FID Europe [balance sheet] target," which elicited the response: "V close . . . anything that moves is getting 105'd."[2892]

Several additional contemporaneous e-mails retrieved from Lehman archives succinctly set forth Lehman's purpose for undertaking Repo 105 transactions:

- "[T]he firm has a function called repo 105 whereby you can repo a position for a week and it is regarded as a true sale to get rid of net balance sheet."[2893]

- "We have been using Repo 105 in the past to reduce balance sheet at the quarter-end."[2894]

---

[2890] E-mail from Kaushik Amin, Lehman, to Kieran Higgins, Lehman (Feb. 28, 2008) [LBEX-DOCID 3234351].

[2891] E-mail from Kaushik Amin, Lehman, to Thomas Siegmund, Lehman (May 21, 2008) [LBEX-DOCID 756545].

[2892] E-mail from Kieran Higgins, Lehman, to Kaushik Amin, Lehman (May 21, 2008) [LBEX-DOCID 3234382].

[2893] E-mail from Anthony Jawad, Lehman, to Andrea Leonardelli, Lehman (Feb. 29, 2008) [LBEX-DOCID 224902].

[2894] E-mail from Raymond Chan, Lehman, to Paul Mitrokostas, Lehman, *et al.* (July 15, 2008) [LBEX-DOCID 3384937].

When pressed to identify any legitimate business purpose for Lehman's use of Repo 105 transactions, certain witnesses noted the secured short-term financing afforded by the transactions. While one outcome of Repo 105 transactions was that Lehman received financing in exchange for collateral – which was not reflected in Lehman's periodic reports as a borrowing or liability – a Repo 105 transaction was a more expensive way for Lehman to secure such short-term financing as compared to an ordinary repo transaction. Lehman had the ability to conduct an ordinary repo transaction using the same securities and with substantially the same counterparties as in Repo 105 transactions, at a lower cost.[2895] As such, the same witnesses who identified a financing purpose for Repo 105 transactions, as well as several other former Lehman personnel, uniformly acknowledged that the overarching goal of Repo 105 transactions was to meet net balance sheet targets – *i.e.*, reduce the net asset component (the numerator) of the net leverage ratio calculation – in connection with the filing of Lehman's financial statements. While the Examiner found a large number of contemporaneous documents that talk about the use of Repo 105 transactions to manage the balance sheet and meet leverage targets, few, if any, contemporaneous documents describe any other purpose for those transactions. Repo 105 transactions were not used for a business purpose, but instead for an accounting purpose: to reduce Lehman's publicly reported net leverage and net balance sheet.

---

[2895] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 6.

As set forth more fully below, the Examiner concludes that a fact finder could find that Lehman's *failure to disclose* its use of Repo 105 transactions to impact its balance sheet at a time when both the market and senior Lehman management were keenly focused on the reduction of Lehman's firm-wide net leverage and balance sheet, and particularly in light of the specific volumes at which Lehman undertook Repo 105 transactions at quarter-end in fourth quarter 2007, first quarter 2008, and second quarter 2008, materially misrepresented Lehman's true financial condition.

A trier of fact could find that Lehman's use of tens of billions of dollars of Repo 105 transactions at quarter-end in late 2007 and early 2008 rendered the firm's financial statements and related disclosures materially misleading. Indeed, audit walk-through papers prepared by Lehman's outside auditor, Ernst & Young,[2896] regarding the process for reopening or adjusting a closed balance sheet stated: "Materiality is usually defined as any item individually, or in the aggregate, that moves net leverage by 0.1 or more (typically $1.8 billion)."[2897] Repo 105 moved net leverage not by tenths, but by whole points.[2898]

---

[2896] Ernst & Young refers only to Ernst & Young LLP (*i.e.*, Ernst & Young North America) unless stated otherwise.

[2897] Ernst & Young, LBHI/LBI Walkthrough Template for Balance Sheet Close Process (Nov. 30, 2007), at p. 14 [EY-LE-LBHI-CORP-GAMX-07-033384]; *see also* Section III.A.4.g, which discusses and analyzes the materiality of Repo 105 transactions.

[2898] *See* Section III.A.4.g.2 of this Report; e-mail from Anuraj Bismal, Lehman, to Marie Stewart, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223384] (stating that Lehman "would be at net leverage of 18.0x [vs say 16.3x] without repo 105/8").

Lehman's publicly reported net leverage ratio for November 30, 2007 (fourth quarter 2007), February 29, 2008 (first quarter 2008), and May 31, 2008 (second quarter 2008) was 16.1x, 15.4x and 12.1x, respectively.[2899]  Without the balance sheet benefit of Repo 105 transactions, Lehman's net leverage ratios for the same periods would have been 17.8x, 17.3x and 13.9x, respectively:[2900]

| Date | Repo 105 Usage | Reported Net Leverage | Leverage Without Repo 105 | Difference |
|------|----------------|----------------------|---------------------------|------------|
| Q4 2007 | $38.6 B[2901] | 16.1[2902] | 17.8[2903] | 1.7 |
| Q1 2008 | $49.1 B[2904] | 15.4[2905] | 17.3[2906] | 1.9 |
| Q2 2008 | $50.38 B[2907] | 12.1[2908] | 13.9[2909] | 1.8 |

---

[2899] LBHI 2007 10-K, at p. 64; LBHI 10-Q (filed Apr. 9, 2008), at p. 72; LBHI 10-Q (filed July 10, 2008), at p. 89.

[2900] Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 8; *see also* Section III.A.4.g.2 of the Report (discussing impact of Lehman's Repo 105 practice on Lehman's net leverage ratio).

[2901] Lehman, Total Repo 105/108 Trend (Feb. 20, 2008) [LBHI_SEC07940_1957956] (stating that fourth quarter 2007 Repo 105 usage was $38.634 billion); *see also* Lehman, Global Consolidated Balance Sheet (Final) (Nov. 30, 2007) [LBEX-DOCID 3439086] (stating that fourth quarter 2007 Repo 105 usage was $38.634 billion).  Note that many internal Lehman documents, such as the Global Consolidated Balance Sheet, used a "Repo 105" heading to refer to both Repo 105 and Repo 108 usage.  In such documents, Repo 108 usage may be disaggregated from the Repo 105 usage by identifying the line item for Equities. "Repo 105" transactions using Equities inventory were actually "Repo 108" transactions.

[2902] *See* LBHI 2007 10-K, at pp. 29, 64.

[2903] Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 8.

[2904] Lehman, Total Repo 105 & Repo 108 Report (June 11, 2008) [LBEX-DOCID 2078195] (stating that firm-wide Repo 105 usage was $49.102 billion at close of first quarter 2008, Feb. 29, 2008).

[2905] *See* LBHI 10-Q (filed Apr. 9, 2008), at p. 72.

[2906] Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 8.

[2907] Lehman, Total Repo 105 & Repo 108 Report (June 11, 2008) [LBEX-DOCID 2078195] (stating that firm-wide Repo 105 usage was $50.3834 billion at close of second quarter 2008, May 30, 2008).  Note that May 31 in 2008 was a Saturday.

[2908] *See* LBHI 10-Q (filed July 10, 2008), at p. 89.

[2909] Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 8.

Lehman's directors, the rating agencies, and Government regulators – all of whom were unaware of Lehman's use of Repo 105 transactions – have advised the Examiner that Lehman's Repo 105 usage was material or significant information that they would have wanted to know.[2910]  The Examiner concludes that sufficient evidence exists for a trier of fact to find that Lehman's quarter-end Repo 105 practice was material and should have been disclosed.[2911]

Because Lehman treated Repo 105 transactions as sales rather than financing transactions, accounting rules did not require Lehman to record the liabilities arising from the cash borrowings in Repo 105 transactions.  Nevertheless, there is sufficient evidence to support a determination that disclosure of the obligation to repurchase the securities and repay the cash borrowing was required in the Management's Discussion and Analysis ("MD&A") section of Lehman's publicly filed financial statements because the repurchase was a known event that was reasonably likely to occur and would have had a material effect on the company's financial condition or results of operations.[2912]  A trier of fact could further find that by failing to disclose the tens of billions of dollars of Repo 105 transactions and cash borrowings, Lehman's disclosures in the Liquidity and

---

[2910] *See* Sections III.A.4.g.4–5 and III.A.4.h.3 of this Report (discussing rating agencies, Government regulators and Lehman Board of Directors).

[2911] *See* Sections III.A.4.j.2.a–d of this Report (explaining disclosure requirements and providing Examiner's conclusions regarding Lehman's disclosures).

[2912] *See* Section III.A.4.j.2 of this Report (discussing and analyzing disclosure requirements).

Capital Resources Section of the MD&A were deficient.[2913]    In addition, Lehman's description of its net leverage was misleading because it omitted disclosing that the ratio was reduced by means of temporary, accounting-motivated transactions.[2914]

The Examiner concludes that there is sufficient evidence to support a colorable claim that: (1) certain of Lehman's officers breached their fiduciary duties by exposing Lehman to potential liability for filing materially misleading periodic reports and (2) Ernst & Young, the firm's outside auditor, was professionally negligent in allowing those reports to go unchallenged.    The Examiner concludes that colorable claims of breach of fiduciary duty exist against Richard Fuld, Chris O'Meara, Erin Callan, and Ian Lowitt, and that a colorable claim of professional malpractice exists against Ernst & Young.[2915]

**b) Introduction**

Sale and repurchase agreements ("repos") are agreements in which one party transfers assets to another party as collateral for a short-term borrowing of cash, while simultaneously agreeing to repay the cash and take back the collateral at a specific point in time.[2916]    When the repo transaction matures, the borrower repays the funds plus an

---

[2913] *See* Section III.A.4.j.2 of this Report (discussing and analyzing disclosure requirements).

[2914] *See* Sections 4.g.2 and 4.j.2.c of the Report (discussing impact of Repo 105 practice on net leverage ratio and Lehman's public filings, respectively).

[2915] *See* Sections III.A.4.j.4.b and III.A.4.j.5 of this Report (discussing evidence supporting colorable claims against certain Lehman officers and Ernst & Young).

[2916] *See* ACCOUNTING FOR TRANSFERS AND SERVICING OF FINANCIAL ASSETS AND EXTINGUISHMENTS OF LIABILITIES, Statement of Financial Accounting Standards No. 140, ¶ 96 (Fin. Accounting Standards Bd. 2000) ("Government securities dealers, banks, other financial institutions and corporate investors

agreed upon interest rate or other charge and takes back its collateral. Repo transactions are widely used by financial institutions and are a legitimate tool for raising short-term funding.

Like other large investment banks, Lehman engaged, on a daily basis, in tens of billions of dollars of repo transactions in its normal course of business for financing purposes ("ordinary repo" or "traditional repo" transactions). Lehman accounted for these ordinary repo transactions as financing transactions.[2917] Accordingly, in Lehman's traditional repo transactions:

- The transferred securities inventory remained on Lehman's balance sheet during the term of the repo.

- Because the inventory remained on Lehman's balance sheet, the incoming borrowed cash increased Lehman's total assets.

- Total liabilities also increased because Lehman recorded a corresponding liability representing its obligation to repay the borrowed cash.

While simplified and for illustrative purposes only, the five illustrations that follow demonstrate the impact of an ordinary repo transaction and a Repo 105 transaction on Lehman's balance sheet and leverage ratios.

---

commonly use repurchase agreements to obtain or use short-term funds. Under those agreements, the transferor ('repo party') transfers a security to a transferee ('repo counterparty' or 'reverse party') in exchange for cash and concurrently agrees to reacquire that security at a future date for an amount equal to the cash exchanged plus a stipulated 'interest' factor.").

[2917] Lehman reported in its Forms 10-Q and 10-K that it treated repurchase (repo) transactions as financing transactions for accounting and reporting purposes. *See* LBHI 2007 10-K, at p. 97; LBHI 10-Q (filed Apr. 9, 2008), at p. 13; LBHI 10-Q (filed July 10, 2008), at p. 16.

**Illustration 1**

Assume this simplified balance sheet for Lehman:

| Assets (in millions) | | Liabilities | |
|---|---|---|---|
| Cash | 7,500 | Short Term Borrowings | 200,000 |
| Financial Instruments | 350,000 | Collateralized Financings | 325,000 |
| Collateralized | | | |
| Agreements | 350,000 | Long Term Borrowings | 150,000 |
| Receivables | 20,000 | Payables | 98,000 |
| Other | 72,500 | Stockholders' Equity | 27,000 |
| **Total** | 800,000 | | 800,000 |
| **Gross Leverage**[2918] | 30 | | |
| **Net Leverage**[2919] | 17 | | |

Illustration 2, *below*, shows the impact of an ordinary repo on Lehman's balance sheet and leverage ratios.

---

[2918] Gross leverage, *for illustrative purposes in this set of examples only*, is calculated as total assets divided by stockholders' equity.

[2919] *For illustrative purposes in this set of examples only*, a simplified definition of net leverage is used: net leverage = (total assets – collateralized agreements) divided by stockholders' equity.

**Illustration 2**

If Lehman executes $50 billion of typical repo transactions with $50 billion of its financial instruments, those instruments remain on the balance sheet; Lehman receives a $50 billion cash borrowing, increasing its cash position; and Lehman records $50 billion of additional collateralized financing liabilities; at the moment of the repo transactions, total balance sheet and leverage increase:

| Assets (in millions) | | Liabilities | |
|---|---|---|---|
| Cash | *57,500* | Short Term Borrowings | 200,000 |
| Financial Instruments | 350,000 | Collateralized Financings | *375,000* |
| Collateralized | | | |
| Agreements | 350,000 | Long Term Borrowings | 150,000 |
| Receivables | 20,000 | Payables | 98,000 |
| Other | 72,500 | Stockholders' Equity | 27,000 |
| **Total** | *850,000* | | *850,000* |
| **Gross Leverage** | *31* | | |
| **Net Leverage** | *19* | | |

Illustration 3, *below*, shows the impact of an ordinary repo followed by the use of the cash borrowing to pay down liabilities.

**Illustration 3**

Assuming Lehman were to use the $50 billion cash borrowing from typical repo transactions to pay off current liabilities, the effect on the balance sheet would be neutral – no net increase in total assets/liabilities, and no effect upon leverage:[2920]

| Assets (in millions) | | Liabilities | |
|---|---|---|---|
| Cash | 7,500 | Short Term Borrowings | 200,000 |
| Financial Instruments | 350,000 | Collateralized Financings | *325,000* |
| Collateralized | | | |
| Agreements | 350,000 | Long Term Borrowings | 150,000 |
| Receivables | 20,000 | Payables | 98,000 |
| Other | 72,500 | Stockholders' Equity | 27,000 |
| **Total** | 800,000 | | *800,000* |

| | |
|---|---|
| **Gross Leverage** | 30 |
| **Net Leverage** | 17 |

Although Lehman publicly reported that it treated all repo transactions as financing transactions for accounting purposes,[2921] Lehman booked "Repo 105" transactions as sales under the Financial Accounting Standards Board's Statement of

---

[2920] This is not to suggest that Lehman regularly used the funds received in a typical repo transaction to pay down liabilities. In the Notes to its Consolidated Financial Statements, for example, Lehman stated "We enter secured borrowing and lending transactions to finance inventory positions, obtain securities for settlement and meet clients' needs." *See* LBHI 2007 10-K, at p. 110.

[2921] *See* LBHI 2007 10-K, at p. 97 (stating that Lehman treats repo transactions as financing transactions for reporting purposes); LBHI 10-Q (filed Apr. 9, 2008), at p. 13 (same); LBHI 10-Q (filed July 10, 2008), at p. 16 (same); *see also* Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 1 [LBEX-WGM 748489] ("Repo transactions are normally recorded on the balance sheet as financings.").

Financial Accounting Standards No. 140 ("SFAS 140"), *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities.*[2922]

SFAS 140 governs, in part, when to recognize a transfer of assets as a financing transaction or, alternatively, as a sale.[2923]  Although SFAS 140 more often is discussed in the context of securitization transactions, a particular provision of SFAS 140 – specifically SFAS 140.98 – permits the transferor of assets in a repo agreement to account for the repo transaction as a "sale" with a forward purchase commitment if the transaction satisfies certain criteria.[2924]  As an accounting matter, and consistent with Lehman's publicly reported statements, the vast majority of repo transactions do *not* satisfy SFAS 140's criteria to recharacterize the repo transaction as a sale and thereby move the transferred inventory "off balance sheet."[2925]

---

[2922] As discussed more fully at Section III.A.4.d.2.c of the Report, the "105" and "108" descriptions refer to the "haircut" necessary for Lehman to account for the transaction as a "sale" under SFAS 140.  Lehman utilized treasuries, agencies, and other government securities in "Repo 105" transactions and utilized equities securities in "Repo 108" transactions.  *See* Section III.A.4.d.4 of this Report.

[2923] ACCOUNTING FOR TRANSFERS AND SERVICING OF FINANCIAL ASSETS AND EXTINGUISHMENTS OF LIABILITIES, Statement of Financial Accounting Standards No. 140, ¶¶ 2, 98 (Fin. Accounting Standards Bd. 2000) ("SFAS 140").  Issued in June 2009 and effective as of the beginning of each reporting entity's first annual reporting period that begins after November 15, 2009, SFAS 160 and SFAS 167 amended certain aspects of SFAS 140.  *See* ACCOUNTING FOR TRANSFERS OF FINANCIAL ASSETS, AN AMENDMENT OF FASB STATEMENT NO. 140, Statement of Financial Accounting Standards No. 166 (Fin. Accounting Standards Bd. 2009); AMENDMENTS TO FASB INTERPRETATION NO. 46(R), Statement of Financial Accounting Standards No. 167 (Fin. Accounting Standards Bd. 2009).

[2924] *See* SFAS 140, ¶ 98; *see also* Section III.A.4.j.2.c.ii.a of this Report (discussing Lehman's disclosures regarding securitization activities and SFAS 140).

[2925] Paragraph 208 of SFAS 140 notes that sale treatment for repo transactions is unusual. Specifically, Paragraph 208 provides, "[P]articipants in the very large markets for repurchase agreements and securities lending transactions are, for the most part, unaccustomed to treating those transactions as sales, and a change to sale treatment would have a substantial impact on their reported financial position." SFAS 140, ¶ 208.

The recharacterization of a repo transaction from a financing or "borrowing" transaction to a "sale" transaction pursuant to SFAS 140 leads to several consequences:

- The transferred securities inventory are derecognized, *i.e.*, considered sold and removed from the transferor's/seller's balance sheet during the term of the repo even though the transferor/seller is required to repurchase the inventory at a future date.[2926]

- Additionally, when a repo transaction is recharacterized as a sale, the transferor/seller does not record a liability representing its obligation to repay the borrowed funds.[2927] In other words, the "borrowing" is not reflected on the balance sheet, even though the economic substance of the transaction is a borrowing, and thus, the transferor's total liabilities do not increase.[2928]

- Although the transferor's inventory decreases, *at the moment* of the transaction the transferor's total assets remain unchanged because the transferor receives cash borrowings in exchange for the securities inventory.

Consequently, Lehman's Repo 105 transactions removed securities inventory from Lehman's balance sheet for the duration of the repo – typically seven to ten days.[2929] At the moment of the Repo 105 transaction, Lehman received cash.[2930] Thus,

---

[2926] *See* SFAS 140, ¶ 11.a ("Upon completion of a transfer of financial assets that satisfies the conditions to be accounted for as a sale (paragraph 9), the transferor shall: a. Derecognize all assets sold."); *see also* Appendix E: Glossary of SFAS 140 ("Derecognize: Remove previously recognized assets or liabilities from the statement of financial position.").

[2927] *See* SFAS 140, ¶ 98 ("If the criteria in paragraph 9 are met, including the criterion in paragraph 9(c)(1), the transferor shall account for the repurchase agreement as a sale of financial assets and a forward repurchase commitment, and the transferee shall account for the agreement as a purchase of financial assets and a forward resale commitment.").

[2928] *Id.*

[2929] Examiner's Interview of Tejal Joshi, Sept. 15, 2009, at p. 4; Examiner's Interview of Mark Gavin, Sept. 24, 2009, at p. 4; Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 5; Examiner's Interview of Matthew Lee, July 1, 2009, at p. 13.

[2930] Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 1 [LBEX-WGM 748489]; Examiner's Interview of Edward Grieb, Oct. 2, 2009, at pp. 13-14 (stating that cash received in Repo 105 transactions was used to pay off other liabilities); Examiner's Interview of Matthew Lee, July 1, 2009, at p. 14 (explaining that in order for Lehman to realize the benefit to its leverage ratios as

although Lehman reduced its inventory, the incoming cash resulted in no change to the volume of Lehman's total assets.[2931]  Because Lehman booked Repo 105 transactions as sales under SFAS 140, rather than as financings, it did not record any liabilities arising from the obligation to repay the short-term funding secured by a Repo 105 transaction.[2932]  Consequently, as demonstrated in Illustration 4, *below*, Lehman was also able to borrow tens of billions of dollars without disclosing the borrowing.

---

a result of Repo 105 transactions, the firm had to use the cash received to pay off a different liability); Duff & Phelps, Explanation of Repo 105 Accounting Ledger Entries and Trading System Output (Jan. 5, 2010), at p. 2.  In addition, as explained in Letter from Linklaters, to Lehman Brothers International (Europe), re: Repurchase Transactions under a Global Master Repurchase Agreement (May 21, 2006), §2.4 [LBEX-LBIE 000001], Section III.A.4.d.2.a of this Report and Appendix 17, Repo 105 Appendix, during the term of the Repo 105 transaction – as in a typical repo transaction – Lehman continued to receive the income stream arising from the transferred securities during the term of the transaction.

[2931] Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 3; Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 13-14 (stating Lehman used Repo 105 cash borrowing to pay other liabilities); Examiner's Interview of Matthew Lee, July 1, 2009, at p. 14 (explaining that in order for Lehman to realize the benefit to its leverage ratios as a result of Repo 105 transactions, the firm had to use the cash received to pay off a different liability).

[2932] Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at pp. 3-4.

**Illustration 4**

If Lehman executes $50 billion of Repo 105 transactions, rather than typical repos, the transaction is recharacterized as a sale and $50 billion of financial instruments, considered sold, are removed from the balance sheet;[2933] Lehman receives $50 billion in cash, exchanging one form of asset for another, so total assets are unchanged; Lehman records no liability to return the cash borrowing so liabilities likewise remain unchanged; at the moment of the Repo 105 transactions, leverage is unaffected:

| Assets (in millions) | | Liabilities | |
|---|---|---|---|
| Cash | *57,500* | Short Term Borrowings | 200,000 |
| Financial Instruments | *300,000* | Collateralized Financings | 325,000 |
| Collateralized Agreements | 350,000 | Long Term Borrowings | 150,000 |
| Receivables | 20,000 | Payables | 98,000 |
| Other | 72,500 | Stockholders' Equity | 27,000 |
| **Total** | 800,000 | | 800,000 |
| **Gross Leverage** | 30 | | |
| **Net Leverage** | 17 | | |

---

[2933] As discussed in greater detail in Section III.A.4.d.2.d of this Report, Lehman created a $5 derivative asset for every $105 worth of securities removed from its balance sheet in a Repo 105 transaction. For the sake of simplification, Illustrations 3 and 4 do *not* include the $5 derivative.

Lehman used the borrowed funds from Repo 105 transactions to pay down short-term liabilities such as ordinary repo transactions, as in Illustration 5, *below*.[2934]  By doing so, Lehman reduced its total assets, thereby reducing its leverage ratios.

[2934] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 7 (stating that incoming cash from Repo 105 transactions was used to pay business expenses); Examiner's Interview of Edward Grieb, Oct. 2, 2009, at pp. 13-14 (stating that cash received in Repo 105 transactions was used to pay off other liabilities); Examiner's Interview of Matthew Lee, July 1, 2009, at p. 14 (explaining that in order for Lehman to realize the benefit to its leverage ratios as a result of Repo 105 transactions, the firm had to use the cash received to pay off a different liability); *see* e-mail from Anuraj Bismal, Lehman, to Marie Stewart, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223384] (stating that Lehman would have a net leverage of 18.0x instead of 16.3x without Repo 105, which indicates that Lehman used Repo 105 cash to pay down different liabilities).  Given that Lehman undertook $38.6 billion, $49.1 billion, and $50.38 billion of Repo 105 transactions at quarter-end fourth quarter 2007, first quarter 2008, and second quarter 2008, respectively, Lehman's disclosures of its cash holdings at each quarter-end further strengthens the testimony and other evidence that Lehman used the cash borrowing from Repo 105 transactions to pay down short-term liabilities.  *See* LBHI 2007 10-K, at p. 86 (reporting that Lehman had $7.286 billion in cash and cash equivalents on November 30, 2007); LBHI 10-Q (filed Apr. 9, 2008), at p. 5 (reporting that Lehman had $7.564 billion in cash and cash equivalents on February 29, 2008); LBHI 10-Q (filed July 10, 2008), at p. 5 (reporting that Lehman had $6.513 billion in cash and cash equivalents on May 31, 2008).  While Lehman's Repo 105 transactions spiked at quarter-ends, Lehman's ordinary repo balances dropped off significantly during the same time periods.  Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 5.

**Illustration 5**

In a Repo 105 transaction, Lehman uses the cash it generates to reduce traditional borrowings, such as ordinary repos ("collateralized financings" in the example below). By applying the cash from a Repo 105 transaction to pay down liabilities such as ordinary repos, Lehman reduces its balance sheet and leverage.

| Assets (in millions) | | Liabilities | |
|---|---|---|---|
| Cash | 7,500 | Short Term Borrowings | 200,000 |
| Financial Instruments | *300,000* | Collateralized Financings | *275,000* |
| Collateralized | | | |
| Agreements | 350,000 | Long Term Borrowings | 150,000 |
| Receivables | 20,000 | Payables | 98,000 |
| Other | 72,500 | Stockholders' Equity | 27,000 |
| **Total** | *750,000* | | *750,000* |
| **Gross Leverage** | *28* | | |
| **Net Leverage** | *15* | | |

When the Repo 105 transaction matured, Lehman borrowed funds to repay the Repo 105 cash borrowing plus interest and the previously transferred securities inventory returned to Lehman's balance sheet as securities inventory.[2935]  Accordingly, total assets and total liabilities increased.

Although it is undisputed that Lehman received cash as part of Repo 105 transactions, the documents and witness testimony reveal that the financing Lehman

---

[2935] Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 1 [LBEX-WGM 748489]; Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 4; Duff & Phelps, Explanation of Repo 105 Accounting Ledger Entries and Trading System Output (Jan. 5, 2010), at p. 5.

received under a Repo 105 transaction was not the real or primary purpose for entering into Repo 105 transactions.  Lehman could have obtained the same financing at a lower cost by engaging in ordinary repo transactions with substantially the same counterparties using the same assets involved in Repo 105 transactions.[2936]

Lehman's primary motive for undertaking tens of billions of dollars in Repo 105 transactions at or near each quarter-end in late 2007 and 2008 was to temporarily remove the securities inventory involved from its balance sheet in order to report lower leverage and net leverage ratios than Lehman actually had.[2937]  Numerous witnesses told the Examiner that Lehman's motive for undertaking a Repo 105 transaction, as opposed to an ordinary repo, turned solely on Lehman's need to manage the firm-wide balance sheet and effect the publicly disclosed leverage.[2938]

---

[2936] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 6.

[2937] Leverage is the relationship of a company's total assets to stockholders' equity.  LBHI 2007 10-K, at p. 30.  Lehman believed that "net leverage based on net assets and tangible equity capital" was "a more meaningful measure of leverage."  *See* LBHI 2007 10-K, at pp. 30, 63.  Lehman defined "net leverage ratio" as "net assets divided by tangible equity capital."  *Id.*  Lehman's "net asset" calculation begins with "total assets" as reported for GAAP purposes in Lehman's Forms 10-K and 10-Q.  From there, Lehman subtracted certain assets in order to arrive at "net assets": (i) cash and securities segregated and on deposit for regulatory and other purposes; (ii) collateralized lending agreements (i.e., securities Lehman is holding as collateral for a loan made to a third-party); and (iii) identifiable intangible assets and goodwill.  *See id.* at p. 30.

[2938] Examiner's Interview of Tejal Joshi, Sept. 15, 2009, at pp. 4, 6 (stating that Repo 105 "allowed us to treat trades of positions that would be financing trades as true sales instead" and that at quarter-end there was a mad scramble to meet balance sheet targets through use of Repo 105); Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 27 (stating that at the end of reporting periods, Lehman deployed Repo 105 transactions to net down its balance sheet); Examiner's Interview of Mark Gavin, Sept. 24, 2009, at p. 4 (stating purpose of Repo 105 transactions was "balance sheet management"); Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 7 ("[T]he only purpose or motive for the [Repo 105 transactions] was reduction in balance sheet."); Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 11 (stating Repo 105 transactions were used to bring balance sheet in line with targets); Examiner's Interview of John Feraca, Oct. 9, 2009, at pp. 6, 10 ("It was universally accepted throughout the entire institution that Repo

From 2001, when Lehman first began using Repo 105 transactions,[2939] until early-to-mid-2007, Lehman engaged in a relatively consistent volume of Repo 105 transactions, including at quarter-end, generally within a range of between $20 and $25 billion.[2940]  Lehman also maintained internal rules – based on senior management's judgment, rather than any accounting requirement – limiting the total firm-wide use of Repo 105 transactions to $22 billion, later increased to $25 billion.[2941]

In mid-to-late 2007, however, Lehman increased dramatically the volume of firm-wide Repo 105 transactions at quarter-end.  By first quarter 2008, the dollar value

---

105 was used for balance sheet relief at quarter end"); Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 6 (stating that Repo 105 was a balance sheet management mechanism, "a tool that could be used to reduce Lehman's net balance sheet"); Examiner's Interview of Clement Bernard, Oct. 23, 2009, at p. 7 ("Repo 105 was a mechanism FID relied on to get its balance sheet down"); Examiner's Interview of Matthew Lee, July 1, 2009, at p. 15 (stating Repo 105 transactions driven by management's imperative to reverse-engineer leverage ratio).

[2939] Though Repo 105 started in 2001, Lehman did not initiate Repo 108 transactions, used for equities securities, until May 2006.  *See* Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 4 [LBEX-WGM 748489].

[2940] *Id.* (showing Repo 105 month-end trend between January 2005 and May 2006 of between approximately $11 billion and $21 billion); Joseph Gentile, Lehman, Proposed Repo 105/108 Target Increase for 2007 (Feb. 10, 2007), at p. 1 [attached to e-mail from Joseph Gentile, Lehman, to Edward Grieb, Lehman (Feb. 10, 2007) [LBEX-DOCID 2600714] and showing daily total Repo 105 usage for December 1, 2006 through February 2, 2007 remained between approximately $14 billion and $24 billion).

[2941] *See, e.g.*, Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 2 [LBEX-WGM 748489] (setting Repo 105 limit at $17 billion and Repo 108 limit at $5 billion); Joseph Gentile, Lehman, Proposed Repo 105/108 Target Increase for 2007 (Feb. 10, 2007), at p. 1 [LBEX-DOCID 2489498] (attached to e-mail from Joseph Gentile, Lehman, to Edward Grieb, Lehman (Feb. 10, 2007) [LBEX-DOCID 2600714] and proposing to increase $22 billion combined Repo 105/108 limit to $25 billion; e-mail from Sigrid Stabenow, Lehman, to Clement Bernard, Lehman, *et al.* (Jan. 25, 2008) [LBEX-DOCID 1853428] (requesting that Repo 105 limit of $20 billion be expanded to $23 billion); Examiner's Interview of Andrew J. Morton, Sept. 21, 2009, at pp. 4, 22 (stating Repo 105 limits established at inception of program in 2001); Examiner's Interview of Edward Grieb, Oct. 2, 2009, at pp. 9-10; Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 10; Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 7.  The Repo 105 limit was a management decision, was not based on accounting rules, and was not part of Lehman's internal Repo 105 Accounting Policy.

of assets that Lehman temporarily removed from its balance sheet at quarter-end through Repo 105 transactions was $49 billion.[2942]  Lehman escalated its Repo 105 activity despite its understanding that its peer investment banks – to whom Lehman's leverage was compared – did not use similar devices.[2943]

Lehman greatly expanded its Repo 105 program at a time when market observers increased their focus on the leverage of investment banks and Lehman management placed increased pressure on the businesses within the firm to reduce their net assets.  CEO Fuld noted that marketplace perceptions of Lehman precluded Lehman from improving its net leverage ratio by means of raising equity.[2944]  Moreover, as Lehman's inventory grew increasingly illiquid, it became difficult to sell without reducing prices and incurring losses or calling into question Lehman's marks for inventory remaining on its balance sheet.[2945]

---

[2942] *See* Lehman, Total Repo 105 & Repo 108 Report (June 11, 2008) [LBEX-DOCID 2078195] (attached to e-mail from Kristie Wong, Lehman, to Martin Kelly, Lehman (June 11, 2008) [LBEX-DOCID 2325872] and showing total firm-wide Repo 105 usage at May 30, 2008).

[2943] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 14; Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 11; Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 7; Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 7; Examiner's Interview of Matthew Lee, July 1, 2009, at p. 14; *see also* e-mail from Anuraj Bismal, Lehman, to Marie Stewart, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223386]; e-mail from Michael McGarvey, Lehman, to Clement Bernard, Lehman (Jan. 30, 2008) [LBEX-DOCID 2796630]; e-mail from Ryan Traversari, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (May 16, 2008) [LBEX-DOCID 574498]; e-mail from Michael McGarvey, Lehman, to Jormen Vallecillo, Lehman (July 2, 2008) [LBEX-DOCID 3379145].

[2944] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 27.

[2945] *See* Section III.A.4.e.3–4 of this Report.

### c) Why the Examiner Investigated Lehman's Use of Repo 105 Transactions

As part of the Examiner's investigation of internal Lehman audits of risk management controls, the Examiner became aware of Lehman's Repo 105 off-balance sheet effect.   As the Examiner obtained a critical mass of information regarding Lehman's use of these transactions and the firm's motive in undertaking them at increasing volumes in late 2007 and 2008, it became apparent that Lehman's use of Repo 105 transactions intersected with several issues involved in the Examiner's investigation, including the directive that the Examiner investigate whether there are colorable claims for breach of fiduciary duties by officers and directors.[2946]  As described *infra*, the Examiner concludes that a colorable claim of breach of fiduciary duty exists against certain Lehman officers – namely, Richard Fuld, Chris O'Meara, Erin Callan, and Ian Lowitt.

The Examiner further concludes that a colorable claim of professional malpractice exists against Ernst & Young.[2947]

---

[2946] Order Directing Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code, Docket No. 08-13555 (JMP), *In re Lehman Brothers Holdings Inc.*, No. 08-13555, at p. 3 (Bankr. S.D.N.Y.  Jan. 16, 2009).

[2947] Ernst & Young's conduct in connection with Lehman's failure to disclose its use of Repo 105 transactions falls within the Court's January 16, 2009 directive that the Examiner "perform the duties specified in sections 1106(a)(3) and (4) of the Bankruptcy Code."  *Id.* at 5.  Sections 1106(a)(3) and (4) of the Bankruptcy Code provide that the Examiner shall "investigate the acts, conduct, assets, liabilities and financial condition of the debtor [and] the operation of the debtor's business" and "file a statement of any investigation . . . including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate."  11 U.S.C. § 1106 (2006).

### d) A Typical Repo 105 Transaction

#### (1) The Genesis of Lehman's Repo 105 Program in 2001

Lehman initiated its Repo 105 program sometime in 2001, soon after SFAS 140 took effect in September 2000.[2948]  At that time, heads of various Lehman business units from New York and London, and representing several of the firm's business divisions and groups, including Credit, Treasury, Product Control, Accounting Policy, Legal, and Compliance, convened to assess how Lehman could use SFAS 140 to manage its balance sheet.[2949]  Lehman's outside auditors and lawyers participated in the firm's review of SFAS 140.[2950]  Indeed, Lehman vetted the concept of a SFAS 140 repo transaction with its outside auditor, before the firm formalized a Repo 105 accounting policy and approved Repo 105 transactions for use by firm personnel.[2951]

---

[2948] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 7; Examiner's Interview of John Coghlan, Nov. 11, 2009, at p 5.  Lehman added Repo 108 transactions to the program in May 2006.  *See* Lehman, Global Balance Sheet, Lehman, Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 4 [LBEX-WGM 748489] ("Repo 108 for equity securities was introduced as at May 2006 [$0.6B].").

[2949] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 7.  While he did not dispute Feraca's recollection, John Coghlan, former Head of Prime Services to whom Feraca directly reported, recalled that Lehman developed its Repo 105 policy and began engaging in Repo 105 transactions in approximately 2001, after senior management at the firm had grown aware that other peer Consolidated Supervised Entities ("CSE") firms were undertaking similar off-balance sheet repo transactions.  Examiner's Interview of John Coghlan, Nov. 11, 2009, at p. 5.

[2950] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 7.  Asked directly to name the auditors and lawyers, Feraca did not recall the specific identities of the firms or individuals.  Although Lehman acquired true sale opinion letters, as required by SFAS 140, from the Linklaters law firm (discussed more fully below), the evidence referencing Linklaters' opinion letters is silent on the issue of Linklaters' involvement at the development stage of Lehman's Repo 105 program.

[2951] *Id.*

Several months of internal meetings and discussions occurred before Lehman finalized the structure of its Repo 105 program.[2952]   Ultimately, Lehman designed the model structure for a Repo 105 transaction and drafted an official, internal Lehman Accounting Policy that covered what became known at the firm as "Repo 105," and eventually included "Repo 108," transactions.[2953]   Lehman's Accounting Policy Manual for Repo 105 transactions was distributed to all "business people" within the firm.[2954] Repo 105 transactions firm-wide had to comply with this policy.

### (2)  Repo 105 Transactions Versus Ordinary Repo Transactions[2955]

Generally, "[r]epurchase Agreements, or repos, are the primary instruments used by [United States] broker-dealers to finance their inventory positions."[2956]   Repo

---

[2952] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 7.

[2953] *Id.*  Lehman's Accounting Policy Manual for Repo 105 and Repo 108 is reprinted in its entirety in Appendix 17, Repo 105 Appendix.

[2954] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 8; Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 7; Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 7.

[2955] Repo transactions are characterized differently under bankruptcy, tax, insurance, and securities law. That is, some bodies of law characterize repo transactions as sales, while others characterize repo transactions as loans or secured transactions.  For example, in bankruptcy disputes between creditors and debtors where a claim involves an alleged breach of the duty to liquidate the securities transferred in a repo transaction in a commercially reasonable manner, the Southern District of New York held that a repo transaction was a sale rather than a secured loan, thereby suggesting that a repo transaction should be governed by Article 8 of the Uniform Commercial Code (the "UCC") as opposed to Article 9 of the UCC.  *Granite Partners, L.P v. Bear, Stearns & Co.*, Inc., 17 F. Supp.2d 275, 302 (S.D.N.Y. 1998).  On the other hand, for purposes of tax law, the United States Supreme Court has held that repo transactions are secured loans rather than sales.  *Nebraska Dep't of Revenue v. Loewenstein*, 513 U.S. 123, 130-31 (1994).  An analysis of the characterization of repo transactions under law is beyond the scope of this Report, which, with respect to Lehman's Repo 105 program, focuses on the accounting treatment of Repo 105 transactions, the treatment of Repo 105 transactions for financial reporting purposes, and Lehman's disclosure obligations.

[2956] Lehman, Repo Manual (Nov. 8, 2005), at p. 6 [LBEX-LL 1175483].  The Repo Manual was an internal Lehman publication intended as a reference guide for sales people engaging in repo transactions.

transactions consist of two legs.[2957]  In the first leg, Lehman would transfer securities inventory to a repo lender in return for cash.[2958]  In the second leg, Lehman would repay the cash amount plus interest, and the repo lender would return the securities inventory.[2959]  The difference between the value of the securities inventory transferred and the cash received is referred to as the "haircut" on the repo transaction.  As explained in detail below, in an ordinary repo transaction involving liquid securities during the late 2007 and 2008 time period, the haircut third parties typically required was approximately 2% while in a Repo 105 or Repo 108 transaction, the haircut involved was required to be at least five percent or eight percent, respectively, and was often more.[2960]

---

[2957] *See* Lehman, Repo Manual (Nov. 8, 2005), at p. 7 [LBEX-LL 1175483].

[2958] *See* Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 8; Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 7.

[2959] *See* Lehman, Repo Manual (Nov. 8, 2005), at p. 7 [LBEX-LL 1175483].

[2960] Examiner's Interview of Mark Gavin, Sept. 24, 2009, at p. 7; Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 6; *see* Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 2 [LBEX-WGM 748489].



**Ordinary Repo Flow Diagram**

*Transaction Start:* Lehman transfers securities to counterparty as collateral for a borrowing. Counterparty transfers cash to Lehman.

Lehman Brothers → $102 Security → Counterparty
Lehman Brothers ← $100 Cash ← Counterparty

*Transaction End:* Lehman returns borrowed cash plus an interest payment. Counterparty returns collateral securities to Lehman.

Lehman Brothers → $100 Cash + interest → Counterparty
Lehman Brothers ← $102 Security ← Counterparty

### (a) Lehman's Accounting Treatment of Repo 105 Transactions Versus Ordinary Repo Transactions

For accounting and financial reporting purposes – consistent with Lehman's policy as disclosed in its publicly filed statements – the substance of an ordinary repo transaction is a short-term borrowing or financing transaction.[2961]  The transferor in an ordinary repo transaction, also known as the "repo borrower," receives cash, but the ordinary repo transaction also creates a liability for the transferor to repay the amount

---

[2961] *See* Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 1 [LBEX-WGM 748489] ("Repo transactions are normally recorded on the balance sheet as financings."); *see also* Section III.A.4.j.2.c.ii.a of the Report (discussing Lehman's characterization of repo transactions for purposes of financial reporting in Forms 10-K and 10-Q).

of cash borrowed.[2962]   Accordingly, the accounting impact of an ordinary repo on the transferor's balance sheet is to increase both: (1) total assets, as a result of the incoming cash, and (2) total liabilities, by an amount corresponding to the obligation to repay the cash.[2963]   Typically the repo borrower in an ordinary repo continues to receive the income from the coupon payments of the securities that serve as collateral for the borrowing of cash from the transferee.[2964]

When an ordinary repo transaction matures, that is, the term of the transaction expires, the transferor repays the cash to the transferee and the transferee, also known as a "repo lender," returns to the transferor the securities held as collateral.[2965]   The effect of the maturing of the ordinary repo transaction on the transferor's balance sheet

---

[2962] *See* Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 2.

[2963] *Id.*; *see also* SFAS 140 ¶ 100 ("Repurchase agreements that do not meet all the criteria in paragraph 9 shall be treated as secured borrowings.").

[2964] *See, e.g.*, Master Repurchase Agreement (September 1996 Version) between Lehman Brothers Inc., Lehman Commercial Paper Inc. and Lehman Brothers International (Europe) (Oct. 6, 1998), ¶ 5 Income Payment [LBEX-AM 333493] (stating that repo seller is entitled to receive all income paid or distributed on or in respect of the transferred securities to the full extent it would be so entitled if the securities had not been sold); Master Repurchase Agreement (September 1996 Version) between Dresdner Bank AG, New York Branch and Lehman Brothers Inc., Lehman Commercial Paper Inc. (July 19, 2002, 1998), ¶ 5 Income Payment [LBEX-AM 334017] (same); Master Repurchase Agreement (September 1996 Version) between Lehman Brothers Inc. and Bank for International Settlements (Aug. 14, 1998), ¶ 5 Income Payment [LBEX-AM 333532] (same).  *cf.* Lehman Brothers, Repo Manual (Nov. 8, 2005), at p. 15 [LBEX-LL 1175483] (stating that for its standard repo transactions, Lehman uses BMA Master Repurchase Agreement, which includes interest payment terms).  The Supreme Court's decision in *Nebraska Dep't of Revenue v. Loewenstein*, in which the Court held that repo transactions were secured loans rather than sales, noted that the interest charged by the repo lender bears no relation to the coupon interest paid or accruing on the securities during the term of the repo. 513 U.S. 123, 131 (1994).  The fact that the coupon interest on the securities continued to flow to the repo borrower was one factor the Court considered in holding that repo transactions were secured loans rather than sales under tax law.  *Id.* at 130.

[2965] Lehman, Repo Manual (Nov. 8, 2005), at p. 7 [LBEX-LL 1175483].

is to reduce both: (1) total assets, as a result of the repayment of the borrowed cash, and (2) total liabilities, because the obligation to repay has been extinguished.[2966]

Consistent with the firm's disclosures in its financial statements, Lehman recorded ordinary repo transactions as secured lending or financing transactions.[2967] Accordingly, when Lehman engaged in an ordinary repo transaction as transferor, the securities that Lehman transferred remained on Lehman's balance sheet as inventory, a subset of total assets.[2968]

Repo 105 transactions were structurally and substantively identical to ordinary repo transactions; indeed, Lehman used the same documentation to execute both Repo 105 and ordinary repo transactions, and these transactions were conducted with the same collateral and substantially the same counterparties.[2969] Specifically, in a Repo 105

---

[2966] *See* Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 2.

[2967] Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 1 [LBEX-WGM 748489] ("Repo transactions are normally recorded on the balance sheet as financings."); LBHI 2007 10-K, at p. 97 (stating that Lehman treats repo transactions as collateralized agreements and financings for financial reporting purposes); LBHI 10-Q (filed Apr. 9, 2008), at p. 13 (same); LBHI 10-Q (filed July 10, 2008), at p. 16 (same); *see also* Duff & Phelps, Explanation of Repo 105 Accounting Ledger Entries and Trading System Output (Jan. 5, 2010), at p. 3 (stating that Lehman's accounting systems recorded repo transactions as financing transactions and that manual intervention required to recharacterize the repo as a sale (*i.e.*, a Repo 105)).

[2968] *See* SFAS 140, ¶ 100 ("Repurchase agreements that do not meet all the criteria in paragraph 9 shall be treated as secured borrowings.").

[2969] John Feraca, who ran Lehman's Secured Funding Desk which was responsible for executing ordinary repo and Repo 105 transactions, stated that with most counterparties, Lehman had capacity to do either an ordinary repo or a Repo 105 transaction; that nothing prevented Lehman from engaging in a standard, overnight repo transaction using the same assets with the same counterparty but at a lower haircut; and that Lehman used the same GMRA for ordinary repo and Repo 105 transactions with the same counterparty. Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 6  Mark Gavin, who worked for LBIE's Secured Financing Desk believed that a single GMRA, which governed both ordinary repo and

transaction, just as in an ordinary repo transaction, Lehman would transfer securities to a repo lender in exchange for short-term financing.[2970]   Additionally, in a Repo 105 transaction, just as in an ordinary repo transaction, Lehman, as the borrower, was obligated to "repurchase" the securities posted as collateral (stated differently, to repay the cash borrowing) upon maturity of the repo.[2971]

During the term of a Repo 105 transaction, as with a typical ordinary repo transaction, Lehman continued to receive the stream of income (the coupon payments) from the securities transferred in a Repo 105 transaction.[2972]   As in an ordinary repo transaction, Lehman was charged interest on the cash borrowing in a Repo 105 transaction.[2973]  Lehman paid the repo interest separately upon the completion of a Repo

Repo 105 transactions, was in place for many of Lehman's counterparties.  Examiner's Interview of Mark Gavin, Sept. 24, 2009, at p. 6.

[2970] See Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 3.

[2971] Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 9;  Examiner's Interview of Matthew Lee, July 1, 2009, at p. 10 (stating that Lehman repurchased the inventory approximately 4 to 5 days after new quarter began).

[2972] The May 2001 Linklaters true sale opinion letter, discussed in greater detail below, makes clear that in the transactions contemplated under the letter, income received during the transaction period by the repo buyer (i.e., Lehman's United Kingdom counterparty in the case of Repo 105 transactions) from the transferred securities would be paid or otherwise credited to the repo seller's (i.e., LBIE) account by the buyer.  Letter from Linklaters, to Lehman Brothers International (Europe), re: Repurchase Transactions under a Global Master Repurchase Agreement (May 21, 2006), §2.4 [LBEX-LBIE 000001].  The Global Master Repurchase Agreements, upon which the Linklaters letter is based, also contain wording to this effect.   See, e.g., Global Master Repurchase Agreement (2000 Version) between Lehman Brothers International (Europe) and Barclays Bank PLC (May 4, 2006), ¶ 5 Interest Payment [LBEX-AM 333643]; Global Master Repurchase Agreement (2000 Version) between Lehman Brothers International (Europe) and Fortis Bank NV/SA (July 16, 2004), ¶ 5 Interest Payment [LBEX-AM 334046]; Global Master Repurchase Agreement (1995 Version) between CS First Boston Limited and Lehman Brothers International (Europe) (Jan. 3, 1996), ¶ 5 Interest Payment [LBEX-AM 333769].

[2973] See SFAS 140 ¶ 96 ("Government securities dealers, banks, other financial institutions, and corporate investors commonly use repurchase agreements to obtain or use short-term funds.  Under those

105 transaction (*i.e.*, when the term expired), just as Lehman would on all ordinary repo transactions.[2974]    Accordingly, Lehman would debit an "interest expense" income statement item.[2975]

Despite the identical structure and substance of ordinary repos and Repo 105 transactions, the latter received critically different accounting treatment: Lehman treated Repo 105 transactions as "sales" of financial assets for accounting purposes under SFAS 140, which in effect enabled Lehman to move the securities inventory off its balance sheet during the term of the Repo 105 transaction; with the reduction in inventory, the net impact of the incoming cash from a Repo 105 transaction was that total assets remained unchanged.[2976]

Under SFAS 140, "A transfer of financial assets . . . in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the

---

agreements, the transferor ('repo party') transfers a security to a transferee ('repo counterparty' or 'reverse party') in exchange for cash and concurrently agrees to reacquire that security at a future date for an amount equal to the cash exchanged plus a stipulated 'interest' factor."); *see also* Duff & Phelps, Explanation of Repo 105 Accounting Ledger Entries and Trading System Output (Jan. 5, 2010), at p. 5.

[2974] Duff & Phelps, Explanation of Repo 105 Accounting Ledger Entries and Trading System Output (Jan. 5, 2010), at p. 5.

[2975] *Id.*   At the transactional level, each repo – ordinary or Repo 105 – had a specific interest rate charge. But, all the interest charges were rolled up into one number ("interest expense") that appeared in the income statement of Lehman's reported financials.

[2976] Lehman Brothers Holdings Inc., Accounting Policy Memo, Repo 105 and Repo 108 (Feb. 13, 2008), at pp. 1-2 [LBEX-DOCID 3213297] (attached to e-mail from Marie Stewart, Lehman, to Martin Kelly, Lehman (Apr. 10, 2008) [LBEX-DOCID 3223687]; Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at pp. 1-2 [LBEX-DOCID 3213286] (attached to e-mail from Marie Stewart, Lehman, to Martin Kelly, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223386]; Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 (Dec. 1, 2004), at pp. 1-2 [LBEX-DOCID 647239] (attached to e-mail from Kieran Higgins, Lehman, to Kaushik Amin, Lehman (Nov. 21, 2007) [LBEX-DOCID 738606]).

extent that consideration other than beneficial interests in the transferred assets is received in exchange."[2977] SFAS 140 also states that "The transferor has surrendered control over transferred assets if and only if all of the following conditions are met":

- The transferred assets have been isolated from the transferor – put presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership.

- Each transferee has the right to pledge or exchange the assets (or beneficial interests) it received, and no condition both constrains the transferee (or holder) from taking advantage of its right to pledge or exchange and provides more than a trivial benefit to the transferor.

- The transferor does not maintain effective control over the transferred assets through either (1) an agreement that both entitles and obligates the transferor to repurchase or redeem them before their maturity or (2) the ability to unilaterally cause the holder to return specific assets, other than through a cleanup call.[2978]

If a repo transaction satisfies each of these three criteria, the repo transferor is deemed to have surrendered control of the transferred collateral, and consequently, SFAS 140 permits the transferor to account for the transaction as a "sale" of financial

---

[2977] ACCOUNTING FOR TRANSFERS AND SERVICING OF FINANCIAL ASSETS AND EXTINGUISHMENTS OF LIABILITIES, Statement of Financial Accounting Standards No. 140, ¶ 9 (Fin. Accounting Standards Bd. 2000) ("SFAS 140").

[2978] SFAS 140, ¶ 9.

assets and a forward purchase commitment.[2979] Lehman determined that its Repo 105

transactions met these criteria and accounted for them accordingly.[2980]

Consequently, recharacterizing a Repo 105 transaction as a sale had the following

immediate consequences:

- Unlike in an ordinary repo transaction, the securities that Lehman transferred in a Repo 105 transaction to the repo lender did not remain on Lehman's balance sheet as securities inventory during the term of the repo. Instead, Lehman removed the securities from its balance sheet, thereby reducing securities inventory (one class of asset) on its balance sheet.[2981]

- Although there was a reduction in inventory, total assets remained the same as a result of the incoming cash.[2982] Thus, unlike an ordinary repo transaction, in which both total assets and total liabilities increase, Lehman's total assets and total liabilities did not increase as the result of a Repo 105 transaction.[2983]

- At the moment of a Repo 105 transaction, because total assets and total liabilities were unchanged, Lehman's leverage ratios also remained unaffected even though Lehman had borrowed, in the aggregate, billions of dollars.

---

[2979] SFAS 140, ¶ 11; Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/108 (Equities) (July 2006), p. 1 [LBEX-WGM 748489]; Lehman Brothers Holdings Inc., Accounting Policy Manual, Repo 105 and Repo 108 (Sept. 9, 2006), at p. 1 [LBEX-DOCID 3213293] (attached to e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Mar. 6, 2008) [LBEX-DOCID 3223442].

[2980] Lehman Brothers Holdings Inc., Accounting Policy Manual, Repo 105 and Repo 108 (Sept. 9, 2006), at pp. 1-2 [LBEX-DOCID 3213293] (attached to e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Mar. 6, 2008) [LBEX-DOCID 3223442].

[2981] *Id.*; *see also* Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at pp. 3-4.

[2982] Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 3.

[2983] Lehman's total assets were reduced when Lehman engaged in a Repo 105 transaction because Lehman both removed the inventory from the balance sheet and used the incoming Repo 105 cash for other business purposes, including to pay off other liabilities (rather than having the cash remain on the firm's balance sheet).

- Moreover, unlike in an ordinary repo transaction where liabilities increased because Lehman recorded the obligation to repay the cash borrowing, in a Repo 105 transaction, Lehman did not record any obligation to repay the cash borrowing.[2984]

But Lehman's Repo 105 practice had two steps. While the first step had no impact upon net leverage, in step two Lehman used the cash borrowing from Repo 105 transactions to pay down different liabilities and thereby reduce the firm's reported leverage ratios.[2985]

### (b) Lehman's Accounting Policy for Repo 105 Transactions

After Lehman established its Repo 105 program in 2001, the firm published an internal Repo 105 Accounting Policy.[2986] All Repo 105 transactions firm-wide were required to comply with this policy.[2987]

---

[2984] *See* Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 3.

[2985] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 7; Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 9; Examiner's Interview of Matthew Lee, July 1, 2009, at p. 14; *see also* e-mail from Anuraj Bismal, Lehman, to Marie Stewart, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223384] (stating Repo 105's effect on net leverage ratio, which can only be impacted if Lehman used Repo 105 cash to pay down different liabilities); Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at pp. 4-5. In addition, Lehman's public disclosures state that it held between approximately $6 to $7 billion cash at quarter-ends when Lehman undertook $38.6 billion, $49.1 billion, and $50.38 billion of Repo 105 transactions in fourth quarter 2007, first quarter 2008, and second quarter 2008, respectively, also demonstrating that Lehman did not hold the incoming Repo 105 cash borrowing but used it for other business purposes, including to pay down liabilities. *See* LBHI 2007 10-K, at p. 86 (reporting that Lehman had $7.286 billion in cash and cash equivalents on November 30, 2007); LBHI 10-Q (filed Apr. 9, 2008), at p. 5 (reporting that Lehman had $7.564 billion in cash and cash equivalents on February 29, 2008); LBHI 10-Q (filed July 10, 2008), at p. 5 (reporting that Lehman had $6.513 billion in cash and cash equivalents on May 31, 2008).

[2986] Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006) [LBEX-DOCID 3213286] (attached to e-mail from Marie Stewart, Lehman, to Martin Kelly, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223386]).

[2987] The Examiner has reproduced Lehman's Repo 105 Accounting Policy in its entirety in Appendix 17, Repo 105 Appendix.

Excerpted here is certain of the policy's more pertinent language:

- The Policy acknowledged that Lehman treated ordinary repo transactions as "secured financing transactions" but treated Repo 105 transactions as "sales of inventory and forward agreements to repurchase."[2988]

- "Repo 105 and Repo 108 transactions refer to repos with a counterparty in which we sell securities valued at a minimum of 105% (for fixed income securities) or 108% (for equity securities) of the cash received. That is, we sell fixed income securities with a fair value of at least $105 in exchange for $100 of cash for Repo 105, and equity securities with a fair value of at least $108 in exchange for $100 of cash for Repo 108."[2989]

- "Repo 105 and Repo 108 contracts typically are executed by Lehman Brothers International (Europe) ('LBIE') because true sale opinions can be obtained under English law. We generally cannot obtain a true sale opinion under U.S. law."[2990]

- "Re-characterization of a repo from a secured financing transaction to a sale of inventory and a forward to repurchase assets is allowed only if we can demonstrate we have relinquished control of the transferred assets."[2991]

- "When [certain identified] criteria are met, the assets transferred are removed from our balance sheet and an asset under a derivative contract is

---

[2988] Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 1 [LBEX-DOCID 3213286].

[2989] *Id.* Although Lehman's Accounting Policy required an 8% haircut for a Repo 108 transaction, Ed Grieb (former Lehman Global Financial Controller) had approved as a general matter a 7% haircut for Repo 108 transactions. *See* e-mail from Marie Stewart, Lehman, to Christopher McEwan, Lehman, *et al.* (July 13, 2006) [LBEX-DOCID 3234337] ("[B]ack in May we had agreed that it was OK to do Repo 108 at 107. . . . I have re-cleared 107 with Ed Grieb and he is fine.").

[2990] Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 1 [LBEX-DOCID 3213290] (attached to e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223389]); *cf.* e-mail from John Feraca, Lehman, to Michael McGarvey, Lehman (Apr. 17, 2008) [LBEX-DOCID 3213321] (stating that in order to proceed with a Repo 105 transaction, "[y]ou have to get approval from both Finance and Legal" and that "you need a true sale legal opinion for the repo agreement and the entity you operate from and affirmation that your counterpart operates in an enforceable legal jurisdiction. . . .").

[2991] Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 2 [LBEX-DOCID 3213290].

recorded to reflect that we will repurchase, under a forward contract, the transferred assets."[2992]

### (c) The Accounting Purpose of the Larger Haircut

The labels "Repo 105" and "Repo 108" referred to Lehman's "haircut" on the transaction. A haircut in a repo transaction is the difference between the value of the collateral used to secure a borrowing and the amount of cash that is borrowed.[2993]

The five percent minimum required haircut in a Repo 105 transaction (or eight percent minimum in a Repo 108 transaction) was greater than the haircut Lehman faced in an ordinary repo transaction involving treasury-type securities, which witnesses indicated was typically approximately 2%.[2994] However, the larger haircut in Repo 105 transactions was an essential component for Lehman to avail itself of SFAS 140 accounting treatment.

Under SFAS 140, recharacterizing a repo from a financing transaction to a sale of inventory requires the transferor to demonstrate that it has relinquished control over

---

[2992] *Id.*

[2993] *See* Business Definition for "Haircut," *available at* http://www.allbusiness.com/glossaries/haircut/4948623-1.html (last visited Jan. 3, 2010).
    For each $100 Lehman borrowed in a Repo 105 transaction it needed to transfer $105 of collateral to its counterparty (lender), *i.e.*, it over collateralized the borrowing by five percent. As such, in a Repo 105 transaction in which Lehman borrowed $100 and posted $105, the "haircut" was actually ($105 - $100)/ $105 = 4.76%. However, for purposes of discussion in this Report, we refer to the five percent overcollateralization as a five percent "haircut." Similarly, the "haircut" on a Repo 108 transaction was actually ($108 - $100)/$108 = 7.4%, but for purposes of this discussion, we refer to the eight percent overcollateralization as an eight percent haircut.

[2994] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 6; *see also* Agreement between Lehman, FRBNY and JP Morgan re: Custodial Undertaking in Connection with Master Open Market Agreement, Schedule of Eligible Securities, Margin Percentage column (Sept. 14, 2008) [JPM-2004 0055343] (showing repo collateral haircuts at the time).

the transferred assets.[2995]  Paragraphs 47 through 49, 217, and 218 of SFAS 140 contain the relevant discussion of "control."[2996]  The FASB determined that "to maintain effective control, the transferor must have *both* the contractual right and the contractual obligation to reacquire securities that are identical to or substantially the same as those concurrently transferred."[2997]  "[T]he transferor's right to repurchase is not assured unless it is protected by obtaining collateral sufficient to fund substantially all of the cost of purchasing identical replacement securities during the term of the contract."[2998]

Paragraph 218 of SFAS 140 further provided:

> Judgment is needed to interpret the term *substantially all* and other aspects of the criterion that the terms of a repurchase agreement do not maintain effective control over the transferred asset.  However, arrangements to repurchase or lend readily obtainable securities, typically with as much as 98 percent collateralization (for entities agreeing to repurchase) or as little as 102 percent overcollateralization (for securities lenders), valued daily and adjusted up or down frequently for changes in the market price of the securities transferred and with clear powers to use that collateral quickly in the event of default, typically fall clearly within that guideline.  The Board believes that other collateral arrangements typically fall well outside that guideline.[2999]

---

[2995] ACCOUNTING FOR TRANSFERS AND SERVICING OF FINANCIAL ASSETS AND EXTINGUISHMENTS OF LIABILITIES, Statement of Financial Accounting Standards No. 140 (Fin. Accounting Standards Bd. 2000) ("SFAS 140").

[2996] SFAS 140, ¶¶ 47-49, 217-218.

[2997] SFAS 140, ¶ 217 (emphasis in original).

[2998] SFAS 140, ¶ 218.

[2999] *Id.* (emphasis in original).  In other words, the FASB believed that when the collateralization was between 98% and 102%, a repo borrower maintained effective control over transferred assets and consequently the assets could not be moved off the borrower's balance sheet.

Like ordinary repos, Repo 105 transactions included a commitment from Lehman to repurchase the assets/securities upon the maturation of the repo.[3000]  But a general repurchase commitment is not dispositive of "control" for purposes of a SFAS 140 analysis.  Consistent with SFAS 140 and FASB's implementation guide for SFAS 140, Lehman interpreted SFAS 140 to mean that the greater haircuts Lehman applied to Repo 105 transactions established the requisite relinquishment of control of the assets involved in the transactions.[3001]

Specifically, if Lehman had the ability to "fund substantially all of the cost of purchasing the same or substantially the same replacement assets," Lehman would be "viewed as having the means to replace the assets" and was therefore "considered not to have relinquished control of the assets."[3002]  Lehman determined, however, that under the rule, it did not have the ability to fund substantially all of the cost of repurchasing the assets because of the difference – via the larger haircut – between the value of the assets/securities transferred and the funding Lehman borrowed in a Repo 105

---

[3000] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at pp. 10-11; Examiner's Interview of Matthew Lee, July 1, 2009, at p. 14. The boilerplate contract used in Repo 105 transactions – the GMRA – could also be used in ordinary repo transactions.

[3001] SFAS 140 ¶ 218. *See also* FASB Staff Implementation Guidance, Guide to Implementation of Statement 140 on Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, questions 45 and 46 (issued February 2001, last revised March 2006).

[3002] *See* Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 2 [LBEX-DOCID 3213286] (attached to e-mail from Marie Stewart, Lehman, to Martin Kelly, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223386]).

transaction. Therefore, Lehman effectively relinquished "control" of the assets for purposes of a SFAS 140 analysis.[3003]

At bottom, Lehman applied a higher haircut to what otherwise could be an ordinary repo transaction in order to avail itself of the accounting classification under SFAS 140.[3004]   Thus, Lehman's use of Repo 105 transactions "clearly . . . was an effort to reduce balance sheet.  Traders had balance sheet limits and this was one way they could meet them."[3005]  Counterparties to Lehman's Repo 105 transactions did not necessarily – or even usually – require or ask for a higher five percent or eight percent haircut on a Repo 105 or Repo 108 transaction.[3006]   Lehman posted more collateral in a Repo 105 transaction for the same loan it could acquire through an ordinary repo in order to achieve the off-balance sheet treatment for the collateral.[3007]

---

[3003] Lehman's internal Repo 105 Accounting Policy provided, "[W]e have retained control of the transferred assets if a fixed income security is margined at less than 105% of the cash received or an equity security is margined at less than 107% of the cash received." Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 2 [LBEX-DOCID 3213293] (attached to e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Mar. 6, 2008) [LBEX-DOCID 3223442]). It continued: "Transfers in which we transfer fixed income securities valued at a minimum of 105% of the cash received and equity securities at a minimum of 107% of the cash received are considered to be sales and a forward to repurchase rather than secured financing transactions." *Id.*

[3004] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 6.  In both an ordinary repo transaction and a Repo 105 transaction: (1) the collateral used eventually returned to Lehman; (2) the same assets could be used for either an ordinary repo transaction or a Repo 105 transaction; and (3) with most counterparties, Lehman had capacity to do either an ordinary repo transaction or a Repo 105 transaction.  *Id.*

[3005] *Id.*

[3006] *Id.*

[3007] *Id.* (stating that Lehman offered the five percent or eight percent haircut to its counterparties because Lehman wanted to remove the securities from its balance sheet).

### (d) Lehman Did Not Record a Cash Borrowing but Recorded a Derivative Asset in a Repo 105 Transaction

Unlike an ordinary repo transaction, Lehman did not record the borrowing of cash from a Repo 105 transaction even though Lehman was obliged to repay the borrowing.[3008] Instead, Lehman established a long inventory derivative asset representing the obligation under a forward contract to repurchase the full amount of securities "sold."[3009] As Lehman's internal Repo 105 Accounting Policy explained, assuming Lehman borrowed $100 cash in exchange for a pledge of $105 of fixed income collateral, Lehman booked a $5 derivative, which represented Lehman's obligation to repurchase the securities at the end of the term of the repo transaction.[3010] The $5 arose

---

[3008] *See* SFAS 140 ¶ 98 ("If the criteria in paragraph 9 are met, including the criterion in paragraph 9(c)(1), the transferor shall account for the repurchase agreement as a sale of financial assets and a forward repurchase commitment, and the transferee shall account for the agreement as a purchase of financial assets and a forward resale commitment."). As discussed above, ordinary repo transactions are considered financing or borrowing transactions. *See* Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 1 [LBEX-WGM 748489]. In addition to the incoming cash (an asset), in an ordinary repo transaction, the repo borrower also records a liability (the obligation to repay the borrowed cash). *See* SFAS 140 ¶ 100 ("Repurchase agreements that do not meet all the criteria in paragraph 9 shall be treated as secured borrowings."). If the Repo 105 transaction technically qualified for true sale accounting under SFAS 140, Lehman was not required for accounting purposes to record a liability, although the economic reality was that Lehman had borrowed cash it had to repay. Instead, Lehman recorded the cash proceeds of the Repo 105 transaction as an asset (cash), but re-characterized this secured financing as a sale of the securities used as collateral for the borrowing, resulting in a reduction to its Securities Inventory balance. Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 2 [LBEX-DOCID 3213293] (attached to e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Mar. 6, 2008) [LBEX-DOCID 3223442]). Thus, the Repo 105 device allowed Lehman to borrow tens of billions of dollars in cash without reflecting the borrowing on its balance sheet.

[3009] Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 2 [LBEX-DOCID 3213293], at p. 3 (attached to e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Mar. 6, 2008) [LBEX-DOCID 3223442]) ("We have a receivable under a derivative contract because we are *required* to repurchase under a forward contract $105 worth of securities for payment of only $100.") (emphasis added).

[3010] *Id.*

from the fact that when it came time to repurchase the pledged securities, Lehman paid $100 cash for $105 worth of securities.[3011]  The transaction therefore had a $5 value to Lehman reflecting the market value of the "overcollateralization" amount of the Repo 105 transaction.[3012]  Because it had a positive fair value of $5, the derivative was recorded as an asset under SFAS 133.[3013]

### (3) Anatomy of Repo 105 Transactions and the Linklaters True Sale Opinion Letter

In addition to the required haircut, Lehman had to take one additional step to qualify Repo 105 transactions as "sales" and enjoy the balance sheet and leverage relief afforded by that classification.  Lehman had to either originate these transactions or conduct them through Lehman Brothers International (Europe) ("LBIE") in London.

Broadly speaking, Lehman effected Repo 105 transactions through LBIE employing two alternative structures (depending upon the origin of the securities that Lehman ultimately transferred to the counterparty).[3014]  To understand the reason for

---

[3011] *Id.*

[3012] *Id.*

[3013] Ernst & Young work papers from Lehman's second quarter 2008 show that Ernst & Young reviewed the value of Lehman's Repo 105 derivatives.  *See* Ernst & Young, Fair Value of OTC Derivative Contracts by Maturity as of May 31, 2008 (July 8, 2008) [EY-SEC-LBHI-WP-2Q08-000535]; *see also* e-mail from Jared Pedowitz, Ernst & Young, to James Billingham, Ernst & Young (Apr. 24, 2008), at p. 4  [EY-LE-LBHI-KEYPERS 0373642–0373645] ("I am currently working on the Q1 Fair Value of OTC Derivative Contracts in the MD&A. . . . [W]e need to verify. . . the Repo 105 population . . . .[W]ould you be able to confirm the $4.818 bn balance is consistent with your teams review of this area?"); Ernst & Young, Repo 105 Pivot Table [EY-LE-LBHI-KEYPERS 0373646] (showing total value of Repo 105/108 derivatives was $4.818 billion).  *See* Section III.A.4.j.2.c.ii.c of this Report for discussion of Lehman's deficient disclosures regarding the Repo 105 derivative.

[3014] This discussion is limited to Repo 105 transactions, and does not include Repo 108 transactions.

Lehman's alternative structures requires a brief detour back through the requirements of SFAS 140.

In order for a repo transferor to be deemed to have surrendered control of an asset under SFAS 140 – so as to achieve "true sale" treatment under SFAS 140 and remove the transferred securities from the transferor's balance sheet – the transferred assets must be *isolated* from the transferor, that is, put presumptively beyond the reach of the transferor and its creditors, even in the event of the transferor's bankruptcy.[3015] To be isolated under SFAS 140, there must have been a true sale *at law*.[3016] Typically, to meet this requirement, the transferor obtains a true sale opinion letter.[3017]

Lehman's internal Repo 105 Accounting Policy echoed the SFAS 140 requirement that the "transaction [be] a true sale at law."[3018] The problem was that Lehman was unable to obtain a true sale opinion from a United States lawyer. Lehman's Repo 105 Accounting Policy states: "We generally cannot obtain a true sale opinion under U.S.

[3015] ACCOUNTING FOR TRANSFERS AND SERVICING OF FINANCIAL ASSETS AND EXTINGUISHMENTS OF LIABILITIES, Statement of Financial Accounting Standards No. 140, ¶ 9.a. (Fin. Accounting Standards Bd. 2000) ("SFAS 140").

[3016] Auditing guidance provides that "A determination about whether the isolation criterion has been met to support a conclusion regarding surrender of control is largely a matter of law. This aspect of surrender of control, therefore, is assessed primarily from a legal perspective." Using the Work of a Specialist: Auditing Interpretations of Section 336, AU § 9336.01, The Use of Legal Interpretations as Evidential Matter to Support Management's Assertion that a Transfer of Financial Assets Has Met the Isolation Criterion in Paragraph 9(a) of SFAS 140 (Pub. Co. Accounting Oversight Bd. 2001) ["Using the Work of a Specialist: Auditing Interpretations of Section 336, AU § 9336"].

[3017] "[S]ince the isolation aspect of surrender of control is assessed primarily from a legal perspective, the auditor usually will not be able to obtain persuasive evidence in a form other than a legal opinion." Using the Work of a Specialist: Auditing Interpretations of Section 336, AU § 9336.21.

[3018] Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 1 [LBEX-DOCID 3213293] (attached to e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Mar. 6, 2008) [LBEX-DOCID 3223442]).

law;" "Repos generally cannot be treated as sales in the United States because lawyers cannot provide a true sale opinion under U.S. law."[3019]  Lehman was able to get a true sale opinion from the Linklaters law firm in London, in several iterations, under the laws of the United Kingdom.[3020]

The Linklaters letter was addressed to LBIE, and analyzes repo transactions executed under a 1995 or 2000 version of a Global Master Repurchase Agreement under English law, as applied by English courts.[3021]  The Linklaters letter provides "[t]his

---

[3019] *Id.*  Several witnesses similarly recalled that Lehman was unable to obtain a true sale opinion from a law firm based in the United States related to Lehman's Repo 105 transactions.  Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 13; Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 7; Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 8; Examiner's Interview of John Coghlan, Nov. 11, 2009, at p. 9; Examiner's Interview of Matthew Lee, July 1, 2009, at p. 15.

[3020] *See generally* Letter from Linklaters, to Lehman Brothers International (Europe), re: Repurchase Transactions under a Global Master Repurchase Agreement (May 31, 2006) [LBEX-LBIE 000001]. Lehman's internal Repo 105 Accounting Policy and an internal PowerPoint presentation referenced several iterations of the Linklaters opinion letter and witnesses state that Lehman refreshed the Linklaters letter on more than one occasion.  *See* Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 3 [LBEX-WGM 748489] (stating that true sale opinion letter for GMRA was first obtained in May 2001, updated in September 2004, and further updated in May 2006); Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 1 [LBEX-DOCID 3213293] (stating that Linklaters has issued opinions under a GMRA); Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 8 (stating that Ed Grieb refreshed the Linklaters letter).  Though Lehman refreshed the letter several times, the Examiner has been able to locate only one version of the Linklaters letter, dated May 31, 2006.    The May 2006 Linklaters Letter is reproduced at Appendix 17, Repo 105 Appendix.

[3021] Letter from Linklaters, to Lehman Brothers International (Europe) re: Repurchase Transactions under a Global Master Repurchase Agreement (May 31, 2006) [LBEX-LBIE 000001]; *see also* Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 1 [LBEX-DOCID 3213293] ("This policy addresses repo transactions executed in the UK under a Global Master Repurchase Agreement ('GMRA') provided the counterparty resides in a jurisdiction covered under English law…. The UK law firm of Linklaters has issues us true sale opinions covering Repo 105 and Repo 108 transactions documented under a GMRA under English law."); Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 1 [LBEX-WGM 748489] ("A repo under a Global Master Repurchase Agreement [GMRA] is a 'true sale'"); *id.*, at 3 (stating legal opinion in place for GMRA). Lehman's internal Repo 105 Accounting Policy likewise stated that "Repo 105 and Repo 108 contracts are typically executed by Lehman Brothers International (Europe) ('LBIE') because true sale opinions can be

opinion is addressed to you [LBIE] solely for your benefit" and that "[i]t is not to be

transmitted to anyone else, nor is it to be relied upon by anyone else or for any other

purpose. . . ."[3022]   The letter stated, however, that "a copy of this opinion may be

---

obtained under English law." Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 1 [LBEX-DOCID 3213293].  Lehman acquired legal opinions from Linklaters covering other forms of contracts – the OSLA (Overseas Securities Lending Agreement), GESLA (Master Gilt Edged Stock Lending Agreement) and GMSLA (Global Master Securities Lending Agreement) – but these were never used.  Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 3 [LBEX-WGM 748489]; Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 1 [LBEX-DOCID 3213293].  The requirement of a true sale opinion letter was well known throughout the firm.  *See* e-mail from John Feraca, Lehman, to Annie Lin, Lehman (Apr. 17, 2008) [LBEX-DOCID 3347035] ("You have to get approval from both Finance and Legal locally before you proceed on this.  If they need assistance, they can work with their respective counterparts in London and NY. Effectively you need a true sale legal opinion for the repo agreement and the entity you operate from and affirmation that your counterpart operates in an enforceable legal jurisdiction. Doubt we have one from LBAU. Then you need to get approval from Finance.  As such, I know LBIE and the GMRA agreement used by it are ok. You can do back to back repos with LBIE who can in turn repo to third parties. Not ideal though."); *see also* e-mail from Brett Beldner, Lehman, to Jignesh Doshi, Lehman, *et al.* (Dec. 13, 2007) [LBEX-DOCID 3383368] (transmitting Repo 105 Accounting Policy and stating "beside getting in contact with Europe legal to make sure you can get the true sale opinion, you also should probably get John Feraca and Mike McGarvey into the loop. They deal with Repo 105 from both a structure/capacity side (John) and the Product Control side (Mike) and can probably direct you to the proper contacts to address any legal/operational questions.").  All Repo 105 transactions were undertaken pursuant to a "GMRA" or Global Master Repurchase Agreement, which is published by PSA and the International Securities Market Association, used for international repo agreements, and governed by English law, though parties may modify the governing law.  *See* Appendix 17, Repo 105 Appendix (discussing GMRA in contrast to MRA, or Master Repurchase Agreement).

[3022] Letter from Linklaters, to Lehman Brothers International (Europe), re: Repurchase Transactions under a Global Master Repurchase Agreement (May 31, 2006), at p. 8 [LBEX-LBIE 000001]. Despite that express condition and the express acknowledgement in Lehman's Repo 105 Accounting Policy that Lehman was unable to obtain a true sale opinion under United States law, Lehman's financial officers were unconcerned that a significant portion of Lehman's firm-wide Repo 105 transactions utilized securities/assets that were owned by and originated from United States-based Lehman entities.  John Feraca recalled "indifference" among Lehman mid-level management to the divergence between English and American law that prevented a United States law firm from issuing Lehman a true sale opinion for Repo 105 transactions. Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 8 (stating "there was never any angst about it").  Feraca recalled that Lehman's inability to get a true sale opinion under United States law was discussed as early as 2001, when Lehman first designed its Repo 105 program. *Id.*  Feraca did not recall any Lehman employee undertaking an analysis of whether an intercompany repo between a United States-based Lehman entity and LBIE, conducted solely for purposes of executing a Repo 105 transaction, complied with Lehman's internal Repo 105 Accounting Policy. *Id.*  Ed Grieb, former Global Financial Controller, was aware that Lehman was unable to get a United States true sale opinion to

provided by Lehman Brothers to its auditors for the purpose of preparing the firm's balance sheets."[3023]  The Linklaters letter did not contain any reference to United States GAAP or SFAS 140.[3024]

Although the Linklaters letter was written for the exclusive benefit of LBIE, a significant volume of Lehman's Repo 105 transactions was executed for the benefit and using the securities of one or more United States-based Lehman entities, such as LBI and LBSF, based in New York.[3025]

Consequently, there were two alternative structures for Repo 105 transactions: (1) a LBIE-only Repo 105 or Repo 108 transaction, executed by LBIE in London using securities owned by LBIE, and (2) a Repo 105 transaction using securities that were owned by, and originated from, a United States-based Lehman entity such as LBI or LBSF.[3026]

---

engage in Repo 105 transactions and that this fact was explicitly referenced in Lehman's Repo 105 Accounting Policy.  Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 7.  Grieb also knew that some volume of assets was transferred to LBIE from United States-based Lehman entities for the sole purpose of executing Repo 105 transactions. *Id.*  When the Examiner asked whether Grieb was ever concerned that in the face of not being able to acquire a United States true sale opinion, United States-based Lehman entities transferred inventory to LBIE for inclusion in Repo 105 transactions on its behalf, Grieb answered "It never raised a concern because I never linked the issues in my head." *Id.*

[3023] Letter from Linklaters, to Lehman Brothers International (Europe), re: Repurchase Transactions under a Global Master Repurchase Agreement (May 31, 2006) [LBEX-LBIE 000001], at pp. 8-9.

[3024] *See generally id.*

[3025] *See* Section III.A.4.d.3 of this Report.  Furthermore, the volume of Repo 105 transactions using LBI securities, for the benefit of LBI's balance sheet, grew significantly after late 2007.

[3026] United States-based Lehman entities generally engaged in Repo 105, rather than Repo 108 transactions. Repo 108 transactions were limited to equities securities.  *See* Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 4 [LBEX-WGM 748489]; Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 1 [LBEX-DOCID 3213304].

The anatomy of a Repo 105 transaction involving assets that originated on the books of LBIE was identical to the anatomy of an ordinary repo transaction, except the Repo 105 transaction carried a greater haircut. In this type of Repo 105 transaction, LBIE transferred $105 or $108 worth of securities it owned to its counterparty in exchange for $100 in cash.[3027] LBIE then used the $100 in cash to pay down other short-term liabilities.[3028]

When the Repo 105 transaction matured, LBIE repaid the cash plus interest and received its collateral back.[3029] Because Lehman was a consolidated business and LBIE's financial results were rolled into the consolidated financial statements LBHI filed in the United States, the LBIE-only Repo 105 practice impacted LBHI's publicly reported balance sheet and leverage ratios.[3030]

---

[3027] The only difference between the anatomy of a standard repo and a Repo 105 transaction is the haircut or overcollateralization; structurally, standard repo and Repo 105 transactions are identical.

[3028] *See* LBIE Repo 105 Flow Diagram, *infra*; Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at pp. 4-5; Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 9; Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 7; Examiner's Interview of Matthew Lee, July 1, 2009, at p. 14; LBHI 2007 10-K, at p. 86 (reporting that Lehman had $7.286 billion in cash and cash equivalents on November 30, 2007); LBHI 10-Q (filed Apr. 9 2008), at p. 5 (reporting that Lehman had $7.564 billion in cash and cash equivalents on February 29, 2008); LBHI 10-Q (filed July 10, 2008), at p. 5 (reporting that Lehman had $6.513 billion in cash and cash equivalents on May 31, 2008).

[3029] *See* LBIE Repo 105 Flow Diagram, *infra*; Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at pp. 6-8.

[3030] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 11; Examiner's Interview of Kaushik Amin, Sept. 17, 2009, at p. 8; Examiner's Interview of Ernst & Young, Oct. 16, 2009, at p. 11 (statement of William Schlich).



**LBIE Repo 105 Flow Diagram**

*Transaction Start:* *LBIE transfers securities to counterparty as collateral for a borrowing. Counterparty transfers cash to LBIE.*

LBIE — $105 Security → Counterparty

LBIE ← $100 Cash — Counterparty

*Transaction End:* *LBIE returns borrowed cash plus an interest payment. Counterparty returns collateral securities to LBIE.*

LBIE — $100 Cash + interest → Counterparty

LBIE ← $105 Security — Counterparty

When a United States-based Lehman entity undertook a Repo 105 transaction, that entity transferred securities valued at a minimum of $105 to LBIE via an intercompany repo transaction.[3031]   No haircut was applied to the intercompany repo between the United States-based Lehman entity and LBIE.[3032]   Upon receiving the securities inventory from the United States-based Lehman entity, LBIE would execute a

---

[3031] Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 9; Examiner's Interview of Mark Gavin, Sept. 24, 2009, at pp. 6-7; Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 8; *see also* Duff & Phelps, Explanation of Repo 105 Accounting Ledger Entries and Trading System Output (Jan. 5, 2010), at p. 1.

[3032] Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 1 [LBEX-WGM 748489].

Repo 105 transaction with a European counterparty using those securities.[3033]  The minimum haircut for the transaction between LBIE and the counterparty, which was the actual Repo 105 transaction, was five percent.[3034]

LBHI provided LBIE with an additional $5 cash in order for LBIE to then transfer $105 in cash to the United States-based Lehman entity in exchange for its securities inventory.[3035]  The United States-based Lehman entity used the $105 in cash either to pay for the repoed securities inventory or, more likely, to pay down its short-term liabilities.[3036]  When the term of the repo expired, LBIE repurchased the securities from the Repo 105 counterparty and then returned the securities to the United States-based Lehman entity through an intercompany repo.[3037]

---

[3033] Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 9; Examiner's Interview of Mark Gavin, Sept. 24, 2009, at pp. 5-6; Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 8.

[3034] Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 1 [LBEX-WGM 748489]; Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at pp. 1-2 [LBEX-DOCID 3213293].

[3035] Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 1 [LBEX-WGM 748489].

[3036] Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 9; Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 7; Examiner's Interview of Matthew Lee, July 1, 2009, at p. 14;  LBHI 2007 10-K, at p. 86 (reporting that Lehman had $7.286 billion in cash and cash equivalents on November 30, 2007); LBHI 10-Q (filed Apr. 9, 2008), at p. 5 (reporting that Lehman had $7.564 billion in cash and cash equivalents on February 29, 2008); LBHI 10-Q (filed July 10, 2008), at p. 5 (reporting that Lehman had $6.513 billion in cash and cash equivalents on May 31, 2008).

[3037] See Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 1 [LBEX-WGM 748489].  In fact, Repo 105 transactions using United States-based securities could include two intercompany repo transfers: first from LBSF to LBI, and then LBI to LBIE.



Source: LBEX-WGM 748491

Numerous documents from Lehman's archives and numerous witness statements bear out that when a United States-based Lehman entity sought to employ Repo 105 transactions to remove securities inventory from its balance sheet at quarter-end, the United States-based Lehman entity would book the Repo 105 transactions through LBIE using an inter-company repo transaction.[3038] A substantial volume of

---

[3038] *See, e.g.*, E-mail from Kaushik Amin, Lehman, to Thomas Siegmund, Lehman, *et al.* (Aug. 23, 2006) [LBEX-DOCID 2786869] ("We have additional $2.5 Bln in Repo 105 that the firm has signed off on . . . . So, let's max out the capacity. We should be able to use some of the collateral from the Agency business in the US."); e-mail from Anthony Jawad, Lehman, to Terry Burke, Lehman (Mar. 3, 2008) [LBEX-DOCID 224902] ("[W]henever I do 105 for ledgers based in ny we never do a ledger transfer for the 105 part, the true sale is recognized and the long cash account debited."); e-mail from Michael McGarvey, Lehman, to Jerry Rizzieri, Lehman (Feb. 20, 2008) [LBEX-DOCID 3235353] (McGarvey: "For quarter end balance sheet do you still feel Rates Americas will be able to make target?" Rizzieri: "Can we get more Repo 105?"); e-mail from Jerry Rizzieri, Lehman, to Chaz Gothard, Lehman, *et al.* (Feb. 20, 2008) [LBEX-DOCID 3385847] ("I know you work with Mitch King [United States Agency Desk] to secure more repo 105 financing for agency product. I would like to know if we could continue to push the capacity higher. We are likely to use more agency product as collateral and might even use some TIPS and discount notes."); e-mail from Mark Gavin, Lehman, to John Feraca, Lehman, *et al.* (Feb. 29, 2008) [LBEX-DOCID 098494] ("Repo 105 on

US T's Agencies, TIPS, Aid Bonds for Q end just shy of $18bln."); e-mail from Mark Neller, Lehman, to Marc Silverberg, Lehman, *et al.* (Mar. 4, 2008) [LBEX-DOCID 3234667] (responding to request for list of confirmed quarter-end Repo 105 trades done out of LBI, Lehman's New York-based broker-dealer, sending Total Repo 105 & Repo 108 Report as attachment [LBEX-DOCID 3219760], and instructing "if you filter for Sum Americas you should see all your anticipated benefits"); e-mail from Michael McGarvey, Lehman, to Clement Bernard, Lehman, *et al.* (Mar. 13, 2008) [LBEX-DOCID 2794226] ("We have failed on 3 bn of repo 105 to UBS for this week's roll. . . . This is an ops issue that occurs sometimes due to the time difference between NY and London. If the repo desk in London does a 105 trade and those bonds are not in sitting in LBI's box we can fail. . . ."); e-mail from Jeff Michaels, Lehman, to Phil Morgan, Lehman, *et al.* (May 22, 2008) [LBEX-DOCID 3385953] (stating that the Repo 105 "point people" in the United States are Mitch King in Front Office Trading, Michael McGarvey in Finance Control, and Tejal Joshi in Balance Sheet Management); e-mail from Michael McGarvey, Lehman, to Mark Gavin, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 810932] (sending London desk "a list of corporate bonds held in NY (all above BBB and 10 mm in market value) available for any additional Repo 105 capacity we can find" contained in attached schedule of securities [LBEX-DOCID 791568]); e-mail from Chaz Gothard, Lehman, to James W. Hraska, Lehman, *et al.* (Oct. 1, 2007) [LBEX-DOCID 3233264] (transmitting attached lists of Repo 105 trades from United States Agency Desk with Mizuho [LBEX-DOCID 3219676 and LBEX-DOCID 3235916], Barclays [LBEX-DOCID 3235823], UBS [LBEX-DOCID 3235853]); e-mail from Michael McGarvey, Lehman, to Jerry Rizzieri, Lehman (Nov. 5, 2007) [LBEX-DOCID 3233300] (transmitting lists of United States Agency Desk Repo 105 trades [LBEX-DOCID 3235736, LBEX-DOCID 3235807, LBEX-DOCID 3235832, LBEX-DOCID 3235928] and stating that "[w]e will try to get as high as possible for month end," *i.e.*, end of fiscal year 2007); e-mail from Mark Gavin, Lehman, to James W. Hraska, Lehman, *et al.* (Dec. 4, 2007) [LBEX-DOCID 3385990] (transmitting lists [LBEX-DOCID 3369462, LBEX-DOCID 3369531, LBEX-DOCID 3369532, LBEX-DOCID 3369537] of Repo 105 trades for United States Agency Desk). Tejal Joshi, Michael McGarvey, Mark Gavin, Mitch King, Ed Grieb and other witnesses stated that LBI was involved in Lehman's Repo 105 program. Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 9; Examiner's Interview of Tejal Joshi, Sept. 15, 2009, at p. 7; Examiner's Interview of Mitchell King, Sept. 21, 2009, at pp. 5-6, 8; Examiner's Interview of Mark Gavin, Sept. 24, 2009, at pp. 5-6; Examiner's Interview of Edward Grieb, Oct. 2, 2009, at pp. 7-8; Examiner's Interview of Kaushik Amin, Sept. 17, 2009, at p. 8; Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 13. In order to effectuate timely transfers of securities from United States-based Lehman entities to LBIE, Lehman's New York desk and its London (LBIE) desk communicated regularly. The United States desk did not use the Repo 108 mechanism, which was used on European Equities securities. Each Friday, Marc Silverberg, an analyst assigned to Lehman's Americas Rates trading desk in New York (within Lehman's Fixed Income Division), compiled lists of securities/assets that Lehman's Americas Rates business wanted to make available for use in Repo 105 transactions through LBIE the following week. E-mail from Marc Silverberg, Lehman, to Chaz Gothard, Lehman, *et al.* (Aug. 3, 2007) [LBEX-DOCID 3232701] (transmitting schedule of United States Agency Desk Repo 105 trades for Aug. 8, 2007 through Aug. 15, 2007 [LBEX-DOCID 3235803]); e-mail from Marc Silverberg, Lehman, to Mitchell King, Lehman, *et al.* (Feb. 26, 2008) [LBEX-DOCID 3234639] (transmitting attached list of United States Agency Desk collateral used in Repo 105 transactions [LBEX-DOCID 3235977; LBEX-DOCID 3235986]); e-mail from Marc Silverberg, Lehman, to Michael McGarvey, Lehman, *et al.* (Mar. 4, 2008) [LBEX-DOCID 3233386] (transmitting attached lists of Repo 105 trades from United States Agency Desk [LBEX-DOCID 3232665, LBEX-DOCID 3235775, LBEX-DOCID 3236009, LBEX-DOCID 3236010, and LBEX-DOCID 3236012]); e-mail from Marc Silverberg, Lehman, to Mark Gavin, Lehman, *et al.* (Nov. 27, 2007) [LBEX-DOCID 3232772] (transmitting lists [LBEX-DOCID 3219744, LBEX-DOCID 3235939] of additional collateral United States Agency Desk wished to use for Repo 105

Lehman's firm-wide Repo 105 transactions at each quarter-end in late 2007 through mid-2008 involved assets that originated with a United States-based Lehman entity.[3039]

Specifically:

- fourth quarter 2007: $8.3036 billion[3040]

---

transactions over year-end); e-mail from Marc Silverberg, Lehman, to Chaz Gothard, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 3232669] (transmitting list [LBEX-DOCID 3236024] of United States Agency Desk's Repo 105 trades). Lehman traders based in New York City created the lists of potential Repo 105 securities, which they gave to Silverberg each week. Silverberg then sent the lists to Lehman's London trading desk each Friday, in hopes that LBIE could find Repo 105 capacity among counterparties. According to one document of confirmed, executed Repo 105 trades for securities from New York's trading desk, the Rates Americas business (one unit within Lehman's FID) alone was able to reduce its quarter-end balance sheet in first quarter 2008 by $14.871 billion through the use of Repo 105 transactions. E-mail from Mitchell King, Lehman, to Jeff Michaels, Lehman (May 20, 2008) [LBEX-DOCID 3233043] (transmitting "Rates America Repo 105 Q1 Roll" list [LBEX-DOCID 3235728] of trades, by ledger, cusip, description of securities, face value, and repo value). On occasion, Michael McGarvey, the former Finance Controller in Lehman's Fixed Income Division, compiled lists of United States securities available for potential use in Repo 105 transactions. E-mail from Michael McGarvey, Lehman, to Jeff Michaels, Lehman, *et al.* (May 22, 2008) [LBEX-DOCID 3385955] ("The attached asset list [LBEX-DOCID 3369637] shows all available collateral by cusip, what has already been sent out on 105 (including subs) and what will be sent out. Please let us know of any additional collateral that you want to send out.").

[3039] *See* Lehman, Total Repo 105 & Repo 108 Report (Dec. 5, 2007) [LBEX-DOCID 3219746] (attached to e-mail from Anuraj Bismal, Lehman, to Marie Stewart, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223384]); Lehman, Total Repo 105 & Repo 108 Report (June 11, 2008) [LBEX-DOCID 2078195] (attached to e-mail from Kristie Wong, Lehman, to Martin Kelly, Lehman (June 11, 2008) [LBEX-DOCID 2325872]. Michael McGarvey, the former Finance Controller in Lehman's FID, said that a certain volume of Repo 105 trades were executed using "assets that were held in U.S. trading books." Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 9. Consequently, according to McGarvey, "the Repo 105 benefit applied to a U.S. trading desk." *Id.* McGarvey stated that the United States-based securities were usually "agencies, bullets, Fannie and Freddie." *Id.* McGarvey also stated that a Lehman New York trading desk would book an intercompany repo, transferring the securities to LBI's "box" in London. *Id.* John Feraca, who formerly worked in the Secured Funding Desk of Lehman's Prime Services Group, similarly stated that a certain volume of assets used in Lehman's Repo 105 transactions originated in New York at a United States-based Lehman entity, and landed on the books of LBIE by means of an intercompany transfer between LBI and LBIE, before LBIE transferred the assets to a third-party via the Repo 105 transaction. Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 8. Feraca said that this process was "well known in Finance and Accounting Policy, completely up the ranks." *Id.* McGarvey's and Feraca's description of the mechanics of how a United States-based Lehman entity engaged in Repo 105 transactions, using an inter-company repo with LBIE, is consistent with both flow diagrams of Repo 105 transactions contained in internal Lehman documents and descriptions from other witnesses. *See* Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 1 [LBEX-WGM 748489].

- first quarter 2008:  $14.889 billion[3041]

- second quarter 2008:  $13.6307 billion.[3042]

### (4)  Types of Securities Used in Repo 105 Transactions

Lehman's Repo 105 Accounting Policy required that the assets used in a Repo 105 transaction "be readily obtainable," meaning that "a market must exist where the assets are either traded on a formal exchange or are considered liquid and trade in a market where price quotations either are published or are obtainable through another verifiable source."[3043]  The Linklaters opinion letter for Repo 105 transactions conditioned its opinion on the assumption that "the Purchased Securities consist of liquid securities, so that the Buyer could easily dispose of the Purchased Securities and acquire equivalent securities if it wished."[3044]

---

[3040] *See* Lehman, Total Repo 105 & Repo 108 Report (Dec. 5, 2007) [LBEX-DOCID 3219746] (attached to e-mail from Anuraj Bismal, Lehman, to Marie Stewart, Lehman, *et al*. (Dec. 5, 2007) [LBEX-DOCID 3223384]).  The United States entities engaged in $8.3036 billion of Repo 105 transactions, out of a global total of $29.916 billion Repo 105-only or $38.634 billion combined Repo 105/108.  *Id.*

[3041] *See* Lehman, Total Repo 105 & Repo 108 Report (June 11, 2008) [LBEX-DOCID 2078195] (attached to e-mail from Kristie Wong, Lehman, to Martin Kelly, Lehman (June 11, 2008) [LBEX-DOCID 2325872]).  The United States entities engaged in $14.889 billion of Repo 105 transactions out of a global total of $42.200 billion Repo 105-only or $49.102 billion combined Repo 105/108.  *Id.*

[3042] *See* Lehman, Total Repo 105 & Repo 108 Report (June 11, 2008) [LBEX-DOCID 2078195] (attached to e-mail from Kristie Wong, Lehman, to Martin Kelly, Lehman (June 11, 2008) [LBEX-DOCID 2325872]).  The United States entities engaged in $13.6307 billion of Repo 105 transactions out of a global total of $44.536 billion of Repo 105-only or $50.383 billion combined Repo 105/108.  *Id.*

[3043] *See, e.g.,* Lehman Brothers Holdings Inc., Accounting Policy Manual, Repo 105 and Repo 108 (Sept. 9, 2006), at p. 2 [LBEX-WGM 754598].

[3044] Letter from Linklaters, to Lehman Brothers International (Europe), re: Repurchase Transactions under a Global Master Repurchase Agreement (May 31, 2006), at p. 2 [LBEX-LBIE 000001].  *See* Appendix 17, Repo 105 Appendix.

The "liquidity requirement" for Repo 105 transactions was widely known throughout Lehman.[3045]    Lehman had intermittent controls in place to ensure that Lehman personnel transferred only liquid securities as part of Repo 105 transactions, as required by Lehman's Repo 105 Accounting Policy.[3046]    Contemporaneous documents reveal that employees within Lehman's Product Control group periodically would identify securities that had been included erroneously in Repo 105 transactions.    For example, in October 2007, one Lehman employee wrote: "Having spoken to Product Control the following positions should not have been included for Repo 105 benefit as they related to Failed Sale Gross Up for Windermere 11 and 12. . . . Going forward,

---

[3045] Anuraj Bismal, a former Senior Vice President in Lehman's Balance Sheet Group, explained that the requirement in Lehman's internal Repo 105 Accounting Policy that only highly liquid securities or "govies" could be used in Repo 105 transactions was well known throughout the firm.  Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 10; Examiner's Interview of Herbert H. "Bart" McDade III, Sept. 16, 2009, at p. 4 (stating only highly liquid securities could be used in Repo 105/108); Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 14 (same); e-mail from Thomas Siegmund, Lehman, to Kaushik Amin, Lehman (May 2, 2008) [LBEX-DOCID 601783] ("[I]nternal accounting set rules on what paper can be 105'ed…in the past, we had to use the most liquid paper . . . . the true sale opinion is linked to liquidity and quality of paper – the lower liquidity and quality, the deeper the discount would have to be… and consequently the more expensive the exercise.").

[3046] Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 9 (explaining that Lehman's Balance Sheet Group would intermittently "ask the guys in Europe to check that the securities were liquid").  Bismal characterized this testing as a "snapshot test" that was "not a regular thing."  *Id.*  For example, in June 2008, Martin Kelly received a collateral quality testing report.  *See* Lehman, Repo 105 Collateral Quality Testing (May 30, 2008) [LBEX-DOCID 2057755] (attached to e-mail from Kristie Wong, Lehman, to Martin Kelly, Lehman (June 11, 2008) [LBEX-DOCID 2325872]); *see also* Lehman, Repo 108 Checklist (June 1, 2008) [LBEX-DOCID 2078196] (attached to e-mail from Kristie Wong, Lehman, to Martin Kelly, Lehman (June 11, 2008) [LBEX-DOCID 2325872]).  The May 2008 Collateral Quality Test reported that nearly 95% of the securities Lehman utilized in Repo 105 transactions "were rated investment grade by S&P, Moody's, Fitch, or DBRS Ratings Services."  Lehman, Repo 105 Collateral Quality Testing (May 30, 2008) [LBEX-DOCID 2057755].  Less than 1% of the securities had no ratings information available.  *Id.*  A similar test from May 2007 reported that 8.27% of the tested Repo 105 securities were rated investment grade by S&P, Moody's, Fitch, or DBRS, and that 80.74% of the remaining securities had "similar company Investment grade ratings."  Lehman, Repo 105 Collateral Quality Testing (May 31, 2007) [LBEX-DOCID 2464013] (attached to e-mail from Divyesh Chokshi, Lehman, to Anuraj Bismal, Lehman, *et al.* (Oct. 2, 2007) [LBEX-DOCID 2687082]).

Product Control will advise us of all positions relating to the FAS140 Failed Sale Gross Up."[3047]

In addition, documentary evidence suggests that as Global Head of Accounting Policy, Marie Stewart, was consulted on new applications of the Repo 105 mechanism.[3048] Stewart said that it was very "typical of people in the Front Office" to try to apply the Repo 105 mechanism to new situations, such as when FID Asia tried to include Australian securities in a Repo 105 transaction.[3049]

---

[3047] E-mail from Divyesh Chokshi, Lehman, to Anuraj Bismal, Lehman, *et al.* (Oct. 2, 2007) [LBEX-DOCID 2687082]; *see also* Lehman, Real Estate Europe Product Schedule (Oct. 2, 2007) [LBEX-DOCID 2717917] (attached to e-mail from Divyesh Chokshi, Lehman, to Anuraj Bismal, Lehman, *et al.* (Oct. 2, 2007) [LBEX-DOCID 2687082] and listing Windermere product names). The failed SFAS 140 true sale accounting treatment of the Windermere products was reported up to the Global Head of Accounting Policy. *See* e-mail from Marie Stewart, Lehman, to Todd Weiner, Lehman, *et al.* (Oct. 23, 2007) [LBEX-DOCID 3223368].

[3048] For example, when Mark Cosaitis hoped to use the Repo 105 mechanism to get failed sales deconsolidated, Stewart was involved, along with Ernst & Young and Ed Grieb, in denying him permission. *See* e-mail from Brett Beldner, Lehman, to Marie Stewart, Lehman, *et al.* (Aug. 17, 2008) [LBEX-DOCID 3223803]; e-mail from Marie Stewart, Lehman, to Mark Cosaitis, Lehman, *et al.* (Aug. 17, 2008) [LBEX-DOCID 3223806]; *see also* e-mail from Todd Weiner, Lehman, to Annie Lin, Lehman (Apr. 17, 2008) [LBEX-DOCID 739685] ("All new repo 105 activity needs to be discussed with Marie Stewart and Martin Kelly in New York.").

[3049] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 10; e-mail from Annie Lin, Lehman, to Todd Wiener, Lehman, *et al.* (Apr. 16, 2007) [LBEX-DOCID 739685] (asking whether Lehman Brothers Australia Ltd. ("LBAU") could "do a back to back position transfer between LBAU and LBIE in order to benefit from repo 105 rule"); e-mail from Marie Stewart, Lehman, to Annie Lin, Lehman, *et al.* (Apr. 17, 2008) [LBEX-DOCID 739685] ("You cannot do Repo 105 in Australia. We will not approve it even if it technically works. I will explain further when I am back from vacation . . . ."); e-mail from Thomas Siegmund, Lehman, to Kaushik Amin, Lehman (Apr. 17, 2008) [LBEX-DOCID 739685] ("As B/S will be super tight, I need to make sure we make best use of 105: I want to investigate whether 105-mechanics can apply to Aussie paper. An answer like below, 'no . . . will explain when back from vac' is unacceptable in any circumstances and really out of line in the current situation!").

For the vast majority of Repo 105 transactions, Lehman used relatively liquid securities, but, there were certain exceptions.[3050]  Notably, these same securities could have been used in ordinary repo transactions as well.

Most securities Lehman used in Repo 105 transactions were "governmental" in nature, suggesting a certain level of liquidity.[3051]  Indeed, the vast majority of securities Lehman utilized in Repo 105 transactions were investment grade, with all but a few of

---

[3050] *See, e.g.,* e-mail from Clement Bernard, Lehman, to Roger Nagioff, Lehman, *et al.* (Nov. 20, 2007) [LBEX-DOCID 173748] ("In the US we believe that most of our Agency positions will be out through 105 transactions…"); e-mail from Dominic Gibb, Lehman, to Mark Cosaitis, Lehman, *et al.* (Feb. 28, 2008) [LBHI_SEC07940_1829372] ("Jock and his team are aggressively working to obtain repo 105 funding for all eligible govvies positions. If they are successful then we will have $23 bn of assets on Repo 105 at quarter end. . . . This would leave FID with a net balance sheet of $51.7bn, $4.7 bn above the FID limit. . . ."). Certain documents, however, suggest that Lehman perhaps *attempted* to use less liquid collateral in Repo 105 transactions. *See* e-mail from Michael McGarvey, Lehman, to Gerard Reilly, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 3213312] ("There was call this morning with John Feraca on getting Mortgages out on 105. London is going to show some examples of fixed AAA non-agency mortgages to Mizuho (who we have a good relationship with) to see if they would be open to taking them. Based on Mizuho's reaction we are going to meet again Monday to determine [how] much we can do."); e-mail from Kentaro Umezaki, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 1533678] ("John Feraca is working on Repo 105 for our IG mortgage and real estate assets to reduce our Q3 balance sheet. . . . He will test the waters a bit in London with one counterparty.").

[3051] Governmental securities were used in Repo 105 transactions only. Repo 108 transactions utilized equities securities. Governmental security type includes, but is not limited to, governments, treasuries, and agencies. Agencies included Freddie Mac, Fannie Mae, and Federal Home Loan Bank System securities. *See* e-mail from Michael McGarvey, Lehman, to Jeff Michaels, Lehman, *et al.* (May 22, 2008) [LBEX-DOCID 482311] (transmitting list [LBEX-DOCID 472396] of all available collateral for Repo 105, including Freddie Mac and Fannie Mae). By late summer 2008, however, Repo 105 counterparties were unwilling to accept Freddie Mac securities. E-mail from Marc Silverberg, Lehman, to Chaz Gotthard, Lehman, *et al.* (Aug. 7, 2008) [LBHI_SEC07940_1742976] (stating that Freddie Mac had been removed from a Repo 105 counterparty's list because it is "no longer acceptable collateral to post for 105."). Some internal Lehman e-mails from within the Liquid Markets division referred to certain agency securities as "sticky," but the use of that term in such e-mails would not have indicated illiquidity, only that certain agency securities were more difficult to sell than others. *See* e-mail from Jeff Michaels, Lehman, to Kaushik Amin, Lehman (July 30, 2008) [LBEX-DOCID 613324] (stating "balance sheet allocation[] . . . [which] is really a bottom-up process about who has sticky inventory. Obviously in the US it is agencies. . . ." and transmitting graph of Agency Desk gross and net balance sheet pre-Repo 105 [LBEX-DOCID 775856] and graph of Euro Inflation Desk gross and net balance sheet pre-Repo 105 [LBEX-DOCID 775857]).

the securities falling within the A to AAA range.[3052]  In addition, the majority of

Lehman's Repo 105 securities fit within Level 1 under SFAS 157's "Fair Value Level"

GAAP-required reporting categories.[3053]

Lehman also used the following volumes of non-"government" securities in

Repo 105 transactions:[3054]

- November 30, 2007: $4.8 billion (out of a total of $29.9 billion in Repo 105 transactions), or 16% of the total Repo 105 volume;

- February 29, 2008: $4.8 billion (out of a total of $41.8 billion in Repo 105 transactions), or 11% of the total Repo 105 volume; and

- May 30, 2008:  $4.2 billion (out of a total of $44.5 billion in Repo 105 transactions), or 9% of the total Repo 105 volume.

### (5)  Product Controllers Manually Booked Repo 105 Transactions

Repo 105 transactions began as ordinary repos booked in the same trading and

accounting systems as ordinary repos.[3055]   Lehman's electronic accounting systems

---

[3052] Duff & Phelps Report, Repo 105 Security Liquidity Analysis (Oct. 21, 2009), at p. 5.

[3053] *Id.* at p. 6.  The valuation of Level 1 assets under SFAS 157 requires the use of directly observable inputs, *i.e.*, quoted prices in active markets for identical assets or liabilities accessible on the valuation date.  FAIR VALUE MEASUREMENTS, Statement of Fin. Accounting Standards No. 157, ¶ 24 (Fin. Accounting Standards Bd. 2006) ("SFAS 157").   The valuation of Level 2 assets requires the use of directly or indirectly observable prices in active markets for similar assets or liabilities, quoted prices for identical or similar items in markets that are not active and inputs other than quoted prices such as yield curves, credit risks, and volatilities. SFAS 157, ¶ 28. The valuation of Level 3 assets requires the use of unobservable inputs that reflect management's own assumptions about the assumptions that market participants would make.  SFAS 157, ¶ 30.

[3054] Duff & Phelps Report, Repo 105 Security Liquidity Analysis (Oct. 21, 2009), at p. 3.  Note that the figures listed report only the volumes of *Repo 105* transactions that Lehman engaged in at quarter-end for the reported period.   The figures do not include the volume of Repo 108 transactions that Lehman undertook at the quarter-end periods.

[3055] Duff & Phelps, Explanation of Repo 105 Accounting Ledger Entries and Trading System Output (Jan. 5, 2010), at p. 3.

797

automatically treated all repo transactions as financing transactions, *i.e.*, borrowings.[3056] Since the accounting and trading systems were not designed to treat any repo transactions as sales, a "manual intervention" into Lehman's electronic books and records systems was necessary to re-characterize Repo 105 borrowings as sales for accounting purposes.[3057]

The financial results of LBIE's business operations rolled up into LBHI's consolidated financial statements filed in the United States. Lehman entities around the world maintained their books and records using United States GAAP principles.[3058] In addition, LBIE and LBSF product controllers were responsible for "transactional policing" and booking Repo 105 transactions manually and in a manner that complied with United States GAAP.[3059]

---

[3056] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at pp. 9-10; Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 9; Examiner's Interview of Matthew Lee, July 1, 2009, at p. 13; Duff & Phelps, Explanation of Repo 105 Accounting Ledger Entries and Trading System Output (Jan. 5, 2010), at p. 3.

[3057] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at pp. 9-10; Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 9; Duff & Phelps, Explanation of Repo 105 Accounting Ledger Entries and Trading System Output (Jan. 5, 2010), at p. 3.

[3058] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 11.

[3059] *Id.* at p. 11; Duff & Phelps, Explanation of Repo 105 Accounting Ledger Entries and Trading System Output (Jan. 5, 2010), at p. 3 (citing statements of LBSF Controller Michael Montella and LBHI Controller Clifford Feibus that LBSF manual adjustments were made in New York and LBIE manual adjustments done in London); *see also* e-mail from Gerard Reilly, Lehman, to Kentaro Umezaki, Lehman, *et al.* (Sept. 4, 2007) [LBEX-DOCID 3232534] (stating that McGarvey, a product controller, "is our point on [Repo 105] from finance"); e-mail from Marie Stewart, Lehman, to Todd Weiner, Lehman (Sept. 7, 2007) [LBEX-DOCID 3223832] (responding to Weiner's request for internal Accounting Policy Manual for Repo 105 transactions "to circulate. . . amongst our colleagues in Product Control. . . apparently more folks looking to use Repo 105," by transmitting a copy of manual [LBEX-DOCID 3213300] and writing that "certain people in London P[roduct] C[ontrol] have had this policy forever"); e-mail from Marie Stewart, Lehman, to Gary Bachman, Lehman, *et al.* (Nov. 21, 2007) [LBEX-DOCID 3223383] ("Feraca knows all about Repo 105/108 and makes sure we keep by the rules. Also, FYI that we've had a few problems with people

Consequently, when LBIE's financial statements rolled up into LBHI's consolidated financial statements, no conversion to United States GAAP was

---

claiming Repo 105/108 benefit recently when they should not have."); e-mail from John Feraca, Lehman, to Marie Stewart, Lehman (Nov. 22, 2007) [LBEX-DOCID 3223383] ("Conceptually yes I am the point person for the business. But Product Controllers in London are responsible for the day to day transactional policing. . . keep in mind I am not reviewing the transactional detail on a day to day basis nor making final decisions on what remains off balance sheet."). Gerard Reilly, Global Product Controller, appointed McGarvey, a product controller for Finance in FID to be the point person for Lehman's Repo 105 program. Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 10; *see also* e-mail from Michael McGarvey, Lehman, to Gerard Reilly, Lehman (Sept. 4, 2007) [LBEX-DOCID 3232534] ("We have been reviewing with the London repo desk and finance on a regular basis (We have roughly 80% of the month end 105 balance outstanding for the entire month although the daily average has been slipping.) We'll stay in front of it for the rest of the year."). When businesses within FID anticipated breaching their balance sheet limits, they would ask McGarvey for additional Repo 105 capacity. E-mail from Jerry Rizzieri, Lehman, to Michael McGarvey, Lehman (Feb. 20, 2008) [LBEX-DOCID 3235353] (McGarvey: "For quarter end balance sheet do you still feel Rates Americas will be able to make target?" Rizzieri: "Can we get more Repo 105?"). Documentary evidence shows that McGarvey regularly reported to Clement Bernard, CFO for FID, about Repo 105 policy, volumes and actual transactions. *See, e.g.,* e-mail from Michael McGarvey, Lehman, to Paul Mitrokostas, Lehman, *et al.* (June 3, 2008) [LBEX-DOCID 3235388] (reporting to Bernard and others that FID Net Balance Sheet for second quarter 2008 was $213.8 billion, $5.1 billion under target, and that the firm-wide Repo 105 benefit for second quarter 2008 was $50.9 billion); e-mail from Michael McGarvey, Lehman, to Clement Bernard, Lehman, *et al.* (Jan. 30, 2008) [LBEX-DOCID 2796630] ("We have repo 105 funding benefit trades on constantly in the normal course of business because accounting policy stipulates it must be a regular way fund our positions. We increase the balances for month end but try to keep it within 120 percent of the average daily usage. . . . I have a meeting Thursday with Mark Cositis and the London Repo desk to determine client appetite for Q1."); e-mail from Michael McGarvey, Lehman, to Clement Bernard, Lehman (Feb. 28, 2008) [LBEX-DOCID 810932] ("Given the critical balance sheet situation we are currently in I've attached a list of corporate bonds held in NY. . . available for any additional Repo 105 capacity we can find."). Notably, only days before Lehman's bankruptcy filing, Gerard Reilly asked Michael McGarvey to remove all references to Repo 105 from a third quarter schedule of all of Lehman's US government securities. *See* e-mail from Gerard Reilly, Lehman, to Michael McGarvey, Lehman, *et al.* (Sept. 12, 2008) [LBEX-DOCID 641537]. Bernard and Amin were among the recipients of the e-mail. Prior to Clement Bernard's assumption of the role of FID Chief Financial Officer, McGarvey reported on total Repo 105 trends. *See* Lehman, Global Repo 105/108 Trend (Aug. 2007) [LBEX-DOCID 3219672] (attached to e-mail from Michael McGarvey, Lehman, to Steven Becker, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 3221344]); e-mail from Michael McGarvey, Lehman, to Clement Bernard, Lehman, *et al.* (Mar. 13, 2008) [LBEX-DOCID 2794226] (Bernard: "Do you know what is happening here on these repo 105?" McGarvey: "Repo ops has worked through most of it and we have delivered all but 750mm. This is an ops issue that occurs sometimes due to the time difference between NY and London. If the repo desk in London does a 105 trade and those bonds are not sitting in LBI's box we can fail . . . .").

required.[3060]  LBHI did not subsequently verify that the Repo 105 entries manually entered by LBIE employees complied with United States GAAP.[3061]  "With a UK legal opinion [*i.e.*, the Linklaters letter] that covered the [Repo] 105 [transactions], [Repo] 105 [transaction]s would be respected as a sale in the books of the entities doing them and booking them in US GAAP."[3062]

In short, Lehman undertook transactions in a foreign jurisdiction (the United Kingdom) that purported to comply with SFAS 140, where Lehman was unable to obtain a SFAS 140 true sale opinion from a United States law firm, and Lehman then relied upon the non-United States-based Lehman entity to ensure that the transaction complied with United States GAAP.

### e)   Managing Balance Sheet and Leverage

Starting in mid-2007, market participants began to more carefully scrutinize the leverage of investment banks.[3063]  Consequently, in 2007, top Lehman executives pressured the firm's businesses to reduce balance sheet and leverage in order to meet market expectations and avoid a ratings downgrade.[3064]  By January 2008, Richard Fuld

---

[3060] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 11.

[3061] *Id.*

[3062] *Id.* at p. 12.

[3063] Examiner's Interview of John Coghlan, Nov. 11, 2009, at p. 11 (recalling media's focus on the appropriateness of high leverage among financial institutions and that once the market was focused on leverage, Lehman executives believed Lehman should deleverage); Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 8 (stating that one of the motivations behind his desire to reduce net leverage was that rating agencies focused on the net leverage ratio).

[3064] Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 5 (stating that the leverage ratio target was "absolutely about how rating agencies would view Lehman" and that leverage was the "most critical"

made a strategic decision that Lehman would embark upon a firm-wide effort to reduce its balance sheet and lower the firm-wide net leverage ratio by selling assets.[3065]   But many of Lehman's inventory positions had by then become increasingly "sticky" or difficult to sell without incurring substantial losses.   It is against this backdrop of increased market focus on leverage that Lehman significantly increased its quarter-end use of Repo 105 transactions.

---

topic for senior Lehman management in late 2007 and 2008).  A downgrade in an issuer's credit rating has a significant negative impact on the financial position of a company like Lehman.  *See, e.g.,* E-mail from Ian T. Lowitt, Lehman, to Herbert H. (Bart) McDade III, Lehman (June 30, 2008) [LBHI_SEC07940_643543] ("One notch downgrade requires 1.7 bn; and 2 notch requires 3.4 bn of additional margin posting."). Counterparties may respond to a downgrade by demanding that the issuer post additional cash collateral to secure its obligations.  *See* Amadou N.R. Sy, The Systemic Regulation of Credit Rating Agencies and Rated Markets 8-9 (Int'l Monetary Fund, Working Paper, 2009) (noting that broker-dealers may use credit ratings to determine acceptable counterparties, as well as collateral levels for outstanding credit exposure); e-mail from Ian T. Lowitt, Lehman, to Eric Felder, Lehman (July 5, 2008) [LBEX-DOCID 071263] (stating that a downgrade "will affect lines and willingness of counterparties to fund secured."). Some of Lehman's derivative contracts had built-in "triggers" permitting counterparties to require additional cash collateral in the event of a downgrade.  Lehman Brothers Holdings Inc., Current Report as of May 31, 2008 (Form 10-Q) (filed on July 10, 2008) ("LBHI 10-Q (filed July 10, 2008)"); *see also* Lehman, Global Treasury Downgrade Effect on Cash Capital Facilities 3-Jun-08 (June 2008) [LBHI_SEC07940_513314], attached to e-mail from Amberish Ratanghayra, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (June 3, 2008) [LBHI_SEC07940_513312]; *see also* Appendix 13, Survival, at pp. 1-3.

[3065] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at pp. 26-27 (stating that as part of deleveraging efforts in 2008, Fuld wanted Lehman to bring all of its inventory positions down, except the matched book, that he was concerned with reducing net leverage because rating agencies were concerned with net leverage, and that he wanted to reduce net leverage by reducing assets); Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at pp. 8-9 (stating that after Christmas 2007, Fuld gave clear directive to McDade to bring balance sheet down and that Fuld's focus was on less liquid assets, i.e., leveraged loans, residential securities, and CRE); Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at p. 10 (stating that he did not want to reduce the balance sheet in the matched book or on-the-run governments, but rather, in CMBS and RMBS).

### (1) Lehman Management's Focus in Late 2007 on Reducing the Firm's Reported Leverage

In mid-to-late 2007, senior management began to consider the balance sheet and leverage ratios as important metrics followed by investors and the rating agencies.[3066] Lehman's Ryan Traversari (Senior Vice President-External Reporting) wrote in September 2007 to Tonucci that the "question" of net leverage ratio "has come up multiple times in the 20 seconds that I've been here – largely from [CFO] O'Meara, Freidheim, Lowitt, Corporate Strategy, *Investor Relations* and the like."[3067]

---

[3066] *See, e.g.*, e-mail from Edward Grieb, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Dec. 7, 2007) [LBEX-DOCID 3759517] (discussing net assets and leverage with Grieb, O'Meara, Callan, Tonucci and Kelly); LBHI 10-Q (filed Apr. 9, 2008), at p. 65 ("During the 2008 quarter, the Company operated in a liquidity, funding, and capital environment characterized by constrained market liquidity driven in part by balance sheet and leverage concerns."); e-mail from Ryan Traversari, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 10, 2007) [LBEX-DOCID 1695576] (comparing Lehman's net leverage ratio to that of Bear Stearns, Tonucci wrote that Lehman's net leverage calculation "was intended to reflect the methodology employed by S&P who were most interested and focused on leverage"). At least until late 2007, Lehman's Finance Committee – comprised of the firm's Chief Financial Officer (in chronological order, Christopher M. O'Meara, Erin M. Callan, and Ian T. Lowitt), Paolo Tonucci, Head of the firm's Fixed Income Division (in chronological order, Michael Gelband, Roger Nagioff, and Andrew Morton), plus other senior executives – set firm-wide balance sheet targets and leverage ratio targets. Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 7; Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 5; Examiner's Interview of Tejal Joshi, Sept. 15, 2009, at p. 5; Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 5; Examiner's Interview of Kaushik Amin, Sept. 17, 2009, at p. 5; Examiner's Interview of Mitchell King, Sept. 21, 2009, at p. 5; Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 11; Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 9; Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 5; *see also* Lehman, Treasury October 2007 Balance Sheet and Leverage Ratio Targets (Oct. 19, 2007) [LBEX-DOCID 3215540] (attached to e-mail from Lisa Kennish, Lehman, to Michael McGarvey, Lehman, *et al.* (Oct. 19, 2007) [LBEX-DOCID 3233628]); e-mail from Anuraj Bismal, Lehman, to Marie Stewart, Lehman, *et al.* (Dec. 21, 2007) [LBEX-DOCID 3223846] ("The finance committee does set balance sheet targets for each and every month end."). In approximately March 2008, however, Bart McDade was named Lehman's "balance sheet czar," tasked with setting and implementing balance sheet targets for Lehman to control leverage. Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 26; Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at p. 3; Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 8.

[3067] E-mail from Ryan Traversari, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 11, 2007) [LBEX-DOCID 1695575] (emphasis added).

In a September 7, 2007 e-mail to O'Meara and Lowitt, Reilly wrote: "we need to keep the pressure on and get the firm's leverage to a good spot for year end. At least we need to restrict what inventory lines it can be used for."[3068]  Lowitt agreed with Reilly's suggestion and said that Lehman "need[ed] to get tighter on B/S."[3069]  Lowitt continued: "I am more worried about *how leverage number will be accepted by the market* than Chris [O'Meara] is."[3070]

Also in September 2007, O'Meara reported to the Finance and Risk Committee that Lehman's net leverage ratio was in line with Lehman's peers.[3071]  Management's presentation regarding the net leverage metric noted:

> In the past, leverage was the key measure of equity adequacy.  Between 2003 and 2006 we significantly reduced leverage.  Low leverage was positively viewed by rating agencies and contributed to our 2005 upgrades.  In 2006 and 2007, we worked with the regulatory and rating agencies to implement more accurate adequacy measures.  As a result, we are comfortable with allowing our leverage to increase.[3072]

In a November 2007 e-mail, O'Meara, then-Lehman CFO, wrote to Reilly, "I realize we're in a tough spot given mkt, but we should be pressuring everywhere to try

---

[3068] E-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Sept. 7, 2007) [LBEX-DOCID 1357178]

[3069] E-mail from Ian T. Lowitt, Lehman, to Gerard Reilly, Lehman, *et al.* (Sept. 7, 2007) [LBEX-DOCID 1357178]

[3070] *Id.* (emphasis added).

[3071] Lehman, Risk, Liquidity, Capital and Balance Sheet Update Presentation to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at pp. 2, 30 [WGM_LBEX_02247] (with Welikson's Handwritten Notes); Lehman Brothers Holdings Inc., Finance and Risk Committee Minutes (Sept. 11, 2007), at pp. 2-3 [LBEX-AM 067018].

[3072] Lehman, Presentation on Risk, Liquidity, Capital and Balance Sheet Update to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at p. 50 [LBEX-AM 067167].

to end year in good way on balance sheet . . . especially since the rev's are not materializing."[3073]  Upon becoming Global Financial Controller on December 1, 2007, Martin Kelly studied net leverage ratio components and the definition of net assets across peer firms.[3074]

### (a)  Lehman's Calculation of Net Leverage

Under Lehman's definition of net leverage ratio, Lehman divided net assets by tangible equity, as a more "meaningful" calculation and a "more useful measure of leverage, because it excluded certain low-risk, non-inventory assets."[3075]  In its Forms 10-K and 10-Q, Lehman defined net assets as total assets excluding: (1) cash and securities segregated and on deposit for regulatory and other purposes; (2) securities received as

---

[3073] E-mail from Christopher M. O'Meara, Lehman, to Gerard Reilly, Lehman (Nov. 20, 2007) [LBEX-DOCID 578184].

[3074] Lehman, Components of Net Leverage Across Peer Firms Report (Dec. 7, 2007) [LBEX-DOCID 3299584] (attached to e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Dec. 7, 2007) [LBEX-DOCID 3306110]; Lehman, Components of Net Leverage Across Peer Firms Graph (Dec. 7, 2007) [LBEX-DOCID 3328581] (attached to e-mail from Anuraj Bismal, Lehman to Martin Kelly, Lehman, *et al.* (Dec. 7, 2007) [LBEX-DOCID 3306110]; e-mail from Marie Stewart, Lehman, to Martin Kelly, Lehman, *et al.* (Dec. 7, 2007) [LBEX-DOCID 3306112] ("I understand that everyone negotiates their own definition of net assets with rating agencies and anytime I have asked about this historically I sensed hesitancy for us to renegotiate our definition. I had mentioned to Martin [Kelly] earlier this week that Paolo [Tonucci] and Ed [Grieb] could give him background on why our calculation is different from our peers."); e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Dec. 7, 2007) [LBEX-DOCID 3759517] (reporting to Kelly that firm's net leverage was 16.2x).  Recall that Lehman calculated net assets by subtracting from total assets: cash and securities segregated and on deposit for regulator and other purposes; securities under agreement to resell; identifiable intangible assets and goodwill; securities received as collateral; securities borrowed.  That sum was divided by tangible equity capital, which was calculated by adding total stockholder's equity and junior subordinated notes and subtracting identifiable intangible assets and goodwill.  *See* LBHI 2007 10-K, at p. 30; LBHI 10-Q (filed Apr. 9, 2008), at p. 70; LBHI 10-Q (filed July 10, 2008), at p. 56; Lehman, Components of Net Leverage across Peer Firms (Dec. 7, 2007) [LBEX-DOCID 3299584].

[3075] LBHI 2007 10-K, at p. 63; LBHI 10-Q (filed Apr. 9, 2008), at p. 72; LBHI 10-Q (filed July 10, 2008), at p. 88.

collateral; (3) securities purchased under agreements to resell; (4) securities borrowed; and (5) identifiable intangible assets and goodwill.[3076] Lehman calculated tangible equity capital by including stockholders' equity and junior subordinated notes and excluding identifiable intangible assets and goodwill.[3077]

The net leverage ratio calculation – a "brutal, rudimentary measurement"[3078] – did not capture the quality of the assets,[3079] and was therefore an expedient measurement for Lehman to utilize given the firm's "sticky" inventory.  As Clement Bernard, former FID CFO wrote in early 2008: "[T]he firm is trying to move away from net leverage.  However, they *cannot do that until* the quality of assets improve ie *we reduce our exposure to sticky assets* like Mortgages and Real Estate."[3080]

> **(2) By January 2008, Lehman Decided to Cut its Net Leverage in Half to Win Back the Confidence of the Market, Lenders and Investors**

By no later than January 2008, Fuld was focused on net leverage and balance sheet reduction.  Soon after Roger Nagioff replaced Michael Gelband as Head of FID in

---

[3076] LBHI 2007 10-K, at p. 63; LBHI 10-Q (filed Apr. 9, 2008), at p. 72; LBHI 10-Q (filed July 10, 2008) at p. 88.

[3077] LBHI 2007 10-K, at p. 63; LBHI 10-Q (filed Apr. 9, 2008), at p. 72; LBHI 10-Q (filed July 10, 2008) at p. 88.

[3078] Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at pp. 6-7.

[3079] *Id.* at pp. 6-7; *see also* U.S. Securities and Exchange Commission Office of Inspector General, Report No. 446-A, SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program (Sept. 25, 2008), at p. 93 ("[A] leverage ratio is a crude measure and implicitly assumes that every dollar of balance sheet involves the same risk whether due to a treasury bond or an emerging market equity. . . . Finally, a leverage limit creates an incentive for firms to move exposures off balance sheet. . . .").

[3080] E-mail from Clement Bernard, Lehman, to Andrew J. Morton, Lehman, *et al.* (Feb. 1, 2008) [LBEX-DOCID 1853655] (emphasis added).

May 2007, Fuld authorized Nagioff to bring down positions in leveraged loans.[3081]  By the end of 2007, Fuld expressed increasing concern about the economy.[3082]  According to Fuld, in early 2008 he instructed Bart McDade, who would replace Joe Gregory and become Lehman's President and Chief Operating Officer in June 2008, to bring down Lehman's net balance sheet and net leverage ratio.[3083]  Fuld at various times described the balance sheet reduction as applying to: (1) all positions except matched book; and (2) less liquid assets, such as leveraged loans, RMBS, CMBS, and CRE.[3084]  Fuld and other members of senior firm management were concerned with reducing Lehman's large net balance sheet, *i.e.*, the inventory that Lehman owned, because the rating agencies only looked at Lehman's net leverage.[3085]

---

[3081] Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 2.

[3082] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at pp. 26-27; Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at pp. 8-9; Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at p. 10.

[3083] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at pp. 26-27; Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 8; Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at p. 10; e-mail from Herbert H. (Bart) McDade III, Lehman, to Herbert H. (Bart) McDade III, Lehman (Jan. 14, 2008) [LBEX-DOCID 3101094] ("[L]earning how to say no again…del[e]vering the balance sheet by 3 turns"); e-mail from Larry Wieseneck, Lehman, to Michael Konigsberg, Lehman, *et al.* (Mar. 19, 2008) [LBHI_SEC07940_390282] ("The firm is asking Bart McDade…to represent the firm's interests as the 'Balance Sheet Czar' - the point person for the firm's Exec Comm relative to the use of balance sheet and capital").

[3084] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at pp. 26-27 (recalling that Fuld told McDade to bring down all positions except matched book); Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 8 (stating that his focus was on bringing down less liquid assets, *i.e.*, leveraged loans, RMBS, CMBS, and CRE); Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at p. 10 (stating that he did not instruct McDade to bring down matched book or on-the-run government securities as part of directive to reduce balance sheet).

[3085] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 27.  Fuld recalled that rating agencies looked at net leverage because gross balance sheet included matched book.  *Id.*  Matched book is "where a trader reverses in and repos out collateral to the same or different dates."  Lehman, Repo Manual (Nov. 8, 2005), at p. 16 [LBEX-LL 1175483].  "When the maturities of the reverse repos and repos are the same,

Contemporaneous documents from the Lehman archives confirm that senior management at all levels were critically focused on reducing Lehman's firm-wide leverage beginning in early 2008, including focusing on the impact leverage had on the firm's ratings:

- Two weeks before the close of Lehman's first quarter 2008 on February 29, 2008, Erin Callan, then-CFO, wrote to Tonucci, Reilly and Martin Klein, "would love to see the target projection [for net leverage] at 15.1."[3086] Reilly forwarded Callan's message to Andrew Morton, the head of Lehman's Fixed Income Division, stating "Would be great if fid could come in lower as leverage could be 1 of the few bright spots for the quarter."[3087] Morton replied, "Will pull out all the stops."[3088]

- In a March 19, 2008 e-mail, Larry Wieseneck reported "on a step the firm is taking to more actively manage the balance sheet usage across the firm."[3089] He continued: "The firm is asking Bart McDade (Head of Global Equities) to represent the firm's interests as the 'Balance Sheet Czar' – the point person for the firm's Exec Comm relative to the use of balance sheet…. He will coordinate with the trading desks and banking businesses across the firm as it relates to managing balance sheets down to target levels…. This will insure that we are 'disciplined'…."[3090]

---

he or she is said to be running a matched book. But, in reality, most 'matched' books are actually 'mismatched' in that a trader will reverse in collateral to dates which are different than those maturities on the corresponding repos." *Id.* "A trader does this to profit from future shifts in interest rates that might occur between the unmatched maturities on the reverse repos and repos." *Id.* To be clear, Repo 105 transactions were **not** matched book transactions. *See also* e-mail from Robert Azerad, Lehman, to Edward Grieb, Lehman, *et al.* (Mar. 27, 2008) [LBEX-DOCID 3184420] (commenting upon external blog's critique of Lehman's leverage ratios calculation and balance sheet).

[3086] E-mail from Erin M. Callan, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Feb. 15, 2008) [LBEX-DOCID 1729329].

[3087] E-mail from Gerard Reilly, Lehman, to Andrew J. Morton, Lehman (Feb. 15, 2008) [LBEX-DOCID 1729329].

[3088] E-mail from Andrew J. Morton, Lehman, to Gerard Reilly, Lehman (Feb. 15, 2008) [LBEX-DOCID 1729329].

[3089] E-mail from Larry Wieseneck, Lehman, to Michael Konigsberg, Lehman, *et al.* (Mar. 19, 2008) [LBHI_SEC07940_390282].

[3090] *Id.*

- In a March 27, 2008 e-mail, Ken Cohen wrote: "We are very much in need of balance sheet. We must move things off by the end of the quarter. I need you all to go back to clients and offer them discounts to move things off. We have a lot of wood to chop in a short period of time but we can't afford to fail. If this means leaving p&l on the table so be it. If you have questions get back to me but we HAVE TO DO THIS!!"[3091]

Statements of numerous senior Lehman personnel also confirm that Lehman was focused on the net leverage ratio and the reduction of net assets beginning in late 2007:

- Tonucci recalled that McDade wanted to bring down Lehman's firm-wide balance sheet by "a few turns."[3092]

- McDade, who was named balance sheet czar in March 2008 and who became President and COO in June 2008, said that deleveraging was "absolutely" a critical issue to Lehman in early 2008.[3093]

- Ed Grieb, Lehman's former Global Financial Controller, stated that "the focus on balance sheet and net leverage gained much more importance" beginning in mid-2007.[3094]

- Murtaza Bhallo, Business/Risk Manager in Proprietary Trading Group for Liquid Markets, said that beginning in 2007, there was a "squeeze" on Lehman's balance sheet, and that Lehman personnel were worried about reporting the level of Lehman's assets against Lehman's equity (*i.e.*, leverage ratio).[3095]

- Anuraj Bismal, a former Senior Vice President in Lehman's Balance Sheet Group, said that Lehman's meeting of its leverage ratio target was the most critical piece ("a very hot topic") for senior management by the end of 2007.[3096] Bismal said that balance sheet targets and leverage ratio targets

---

[3091] E-mail from Ken Cohen, Lehman, to Carmine Visone, Lehman (Mar. 27, 2008) [LBEX-DOCID 1374413]. *See* Section III.A.5.e.2 of the Report for further discussion of Lehman's deleveraging efforts.

[3092] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 26.

[3093] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 5.

[3094] Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 13.

[3095] Examiner's Interview of Murtaza Bhallo, Sept. 14, 2009, at p. 3.

[3096] Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 5.

were "absolutely about how rating agencies would view Lehman, and also creditors and the investing public."[3097]

- John Feraca, the former head of the Secured Funding Desk in Lehman's Prime Services group, said that in late 2007, as the industry was changing and entering a crisis period, Lehman made certain commitments to deleverage.[3098]

- Marie Stewart, Lehman's former Global Head of Accounting Policy, confirmed that Lehman set balance sheet targets with any eye to reaching certain leverage ratios that rating agencies used to measure and gauge Lehman's performance.[3099]

### (a) Bart McDade, as Newly Appointed Balance Sheet Czar, Advised the Executive Committee in March 2008 to Cap Lehman's Use of Repo 105 Transactions

Bart McDade, who spent 25 years at Lehman, served as Lehman's Co-Global Head of FID from 2002 through 2005 and Global Head of Equities from 2005 until 2008.[3100] In March 2008, while remaining Global Head of Equities, McDade took on the additional role of balance sheet "czar" or balance sheet point person, for the Executive Committee.[3101] McDade later became Lehman's President and Chief Operating Officer, replacing Joe Gregory in June 2008.[3102]

---

[3097] Id.

[3098] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 9.

[3099] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 7.

[3100] Examiner's Interview of Herbert H. "Bart" McDade III, Sept. 16, 2009, at p. 1.

[3101] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 7.

[3102] Id. at p. 5.

According to Fuld, McDade had full authority to reduce firm-wide net leverage.[3103] Although Lehman's Treasury and Finance groups previously had set balance sheet targets,[3104] beginning in approximately March 2008, Gregory, Lehman's then-President and COO, assisted McDade with determining the balance sheet targets firm-wide.[3105] Although Fuld did not specifically direct Gregory and McDade on which Lehman divisions should have their balance sheet reduced, Fuld wanted to see the balance sheet reduction, particularly in less liquid asset classes, *i.e.* leveraged loans and residential and commercial real estate.[3106]

McDade took his responsibilities as balance sheet point person "very seriously."[3107] He viewed his "mission" as to coordinate Lehman's balance sheet issues.[3108] McDade wanted "to organize, coordinate, and influence."[3109] Bear Stearns had just nearly collapsed and McDade knew that Lehman had "tough assets" on its

---

[3103] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at pp. 26-27 (stating that Fuld instructed McDade to bring down all of Lehman's positions except for matched book in order to get net leverage down to the low teens); Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at pp. 2-3 (stating that Fuld told McDade, after Christmas 2007, to bring down net leverage by half and that Fuld did not specifically direct Gregory and McDade on which divisions should have their balance sheets brought down); Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at p. 10 (stating that Fuld wanted reductions in places that Lehman was vulnerable, such as RMBS and CMBS).

[3104] Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 5.

[3105] Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at pp. 8-9.

[3106] *Id.*

[3107] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 7; e-mail from Larry Wieseneck, Lehman, to Michael Konigsberg, Lehman (Mar. 19, 2008) [LBHI_SEC07940_390282].

[3108] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 3.

[3109] *Id.* at p. 7.

balance sheet.[3110]  In his role as balance sheet czar, McDade created a Daily Balance Sheet and Disclosure Scorecard report in order to have greater transparency with respect to the balance sheet.[3111]  The Daily Scorecard was widely disseminated among senior Lehman management from April through September 2008 and routinely contained references to the impact Repo 105 transactions had on Lehman's daily balance sheet.[3112]

---

[3110] *Id.* at p. 3.

[3111] *Id.* at pp. 8-9 (stating also "I needed a daily scorecard to know where I wanted to push" on balance sheet issues).

[3112] *See, e.g.*, Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 7, 2008 (Apr. 9, 2008), at p. 9 [LBEX-DOCID 520619] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Apr. 9, 2008) [LBEX-DOCID 523578] and showing consolidated FID and Equities balance sheet reduced by $18.527 billion and Prime Services balance sheet reduced by $4.458 billion through Repo 105 transactions as of April 7, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 8, 2008 (Apr. 10, 2008), at p. 9 [LBEX-DOCID 520620] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.*  (Apr. 10, 2008) [LBEX-DOCID 523579] and showing consolidated FID and Equities balance sheet reduced by $18.853 billion and Prime Services balance sheet reduced by $4.562 billion through Repo 105 transactions as of April 8, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 9, 2008 (Apr. 10, 2008), at p. 9 [LBEX-DOCID 251339] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Apr. 10, 2008) [LBEX-DOCID 258560] and showing consolidated FID and Equities balance sheet reduced by $19.688 billion and Prime Services balance sheet reduced by $4.548 billion through Repo 105 transactions as of April 9, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 10, 2008 (Apr. 14, 2008), at p. 9 [LBEX-DOCID 251342] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 275231] and showing consolidated FID and Equities balance sheet reduced by $19.967 billion and Prime Services balance sheet reduced by $4.491 billion through Repo 105 transactions as of April 10, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 11, 2008 (Apr. 14, 2008), at p. 9 [LBEX-DOCID 251344] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 258562] and showing consolidated FID and Equities balance sheet reduced by $20.260 billion and Prime Services balance sheet reduced by $4.517 billion through Repo 105 transactions as of April 11, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 12, 2008 (May 13, 2008), at p. 1 [LBEX-LL 1950262] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (May 13, 2008) [LBEX-DOCID 3187357] and stating "Rates decreased by $(5.0B) from prior day due to . . . increased Repo 105 usage. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 22, 2008 (May 27, 2008), at p. 1 [LBEX-LL 1950706] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (May 27, 2008) [LBEX-DOCID 275984] and stating "Global rates net balance sheet decreased ($2.0B), predominantly due to an increase in Repo 105 benefit. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 28, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950670] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart)

In one his first acts as balance sheet point person, and in connection with his plan to aggressively reduce Lehman's firm-wide balance sheet, McDade requested that Lehman convene a special meeting of the Executive Committee on Friday, March 28, 2008, at 9:00 a.m.[3113]  The entire Executive Committee, except Fuld, as well as *ex officio* members Ian Lowitt and Scott Friedheim, attended the meeting.[3114]

Broadly speaking, McDade's goal going into the March 28 meeting "was to have the Executive Committee come together and agree" about the direction Lehman would pursue, at least from the balance sheet perspective.[3115]  More specifically, McDade said that his purpose in seeking a special meeting of the committee was "to request Joe

McDade III, Lehman, *et al.* (May 30, 2008) [LBEX-DOCID 275995] and stating "Global rates net balance sheet decreased by ($3.1B) primarily due to a decrease in Americas driven by an increased utilization of Repo 105 within the Agency business"); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 29, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950658] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (June 2, 2008) [LBEX-DOCID 011127] and stating "Global Rates net balance sheet decreased ($6.5B) . . . [t]he decrease in Europe is coming from increased utilization of Repo 105"); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date June 18, 2008 (June 20, 2008) [LBEX-LL 1950514] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (June 20, 2008) [LBEX-DOCID 275942] and stating that "Global rates net balance sheet decreased…driven by a[n] . . . increase in Repo 105 utilization. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 13, 2008 (Aug. 14, 2008) [LBEX-LL 782812] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Aug. 14, 2008) [LBEX-DOCID 4214810] and stating that "Global rates net balance sheet decreased . . . driven by an increase in Repo 105 benefit. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 25, 2008 (Aug. 26, 2008) [LBEX-LL 782924] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Aug. 26, 2008) [LBEX-DOCID 079536] and stating that "Global Rates net balance sheet decreased . . . driven by an increase in repo 105 usage. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 28, 2008 (Aug. 29, 2008) [LBEX-LL 782966] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Aug. 29, 2008) [LBEX-DOCID 275880] and stating that "Global rates [net balance sheet] was down . . . driven by increased Repo 105 benefit. . . .").

[3113] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 3.  According to McDade, Lehman's Executive Committee usually met only on Mondays or Tuesdays.  *Id.*  The March 28, 2008 meeting to discuss firm-wide balance sheet issues occurred on a Friday.

[3114] *Id.* at p. 4.

[3115] *Id.* at p. 3.

Gregory's approval to institute" the balance sheet reduction recommendations that McDade presented at the meeting.[3116]

The night before the March 28, 2008 Executive Committee meeting, McDade's assistant[3117] circulated two documents to the entire Executive Committee, Lowitt, and the assistants to Executive Committee members: (1) a meeting agenda, which listed seven total items, including "Repo 105/108," "Delever v Derisk" and "'Limit' Accountability;"[3118] and (2) a "Balance Sheet and Cash Capital Update."[3119] McDade and Gerard Reilly prepared the two documents to be discussed at the March 28 Executive Committee meeting.[3120]

At the March 28 Executive Committee meeting, McDade presented the Balance Sheet and Cash Capital Update document.[3121] McDade "tried to lay out very specifically the firm-wide balance sheet for the Executive Committee. We wanted to focus the Executive Committee on those things that impacted the firm's net leverage and balance

---

[3116] *Id.*

[3117] E-mail from Patricia Lombardi, Assistant to Herbert H. (Bart) McDade III, Lehman, to Lehman Brothers Executive Committee Members, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 120929].

[3118] Lehman Brothers, Executive Committee Meeting Material, Agenda (Mar. 28, 2008) [LBEX-DOCID 115827] (attached to e-mail from Patricia Lombardi, Assistant to Herbert H. (Bart) McDade III, Lehman, to Lehman Brothers Executive Committee Members, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 120929]).

[3119] Herbert H. (Bart) McDade III, Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008) [LBEX-DOCID 095961] (attached to e-mail from Patricia Lombardi, Assistant to Herbert H. (Bart) McDade III, Lehman, to Lehman Brothers Executive Committee Members, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 120929]).

[3120] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 3.

[3121] *Id.*

sheet."[3122]   With respect to net balance sheet limits, McDade wanted to impose "accountability," meaning that he "wanted all at the firm to stick within those limits."[3123]

McDade specifically recalled discussing with Executive Committee members on March 28, 2008 Lehman's use of Repo 105 transactions.[3124]   The Balance Sheet and Capital Update document expressly reported that Lehman's quarter-end Repo 105 usage for first quarter 2008 was $49.1 billion.[3125]   As balance sheet point person, McDade had no authority to authorize a firm-wide cap on Lehman's use of Repo 105 transactions.[3126]   But McDade recommended to the Executive Committee during the meeting that Lehman cap or limit its firm-wide Repo 105 usage at a certain dollar amount.[3127]   McDade said that "in order to make the seismic change" he wanted to accomplish with the balance sheet in March 2008, Lehman "had to make big changes," which included significantly reducing or ceasing the firm's use of Repo 105

---

[3122] *Id.* at p. 4.

[3122] *Id.*

[3123] *Id.* at p. 3.

[3124] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at pp. 3-4.

[3125] Herbert H. (Bart) McDade III, Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008), at pp. 1-2 [LBHI_SEC07940_628517]; Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 3; *see also* e-mail from Jennifer Fitzgibbon, Lehman, to Leonard Sciutella, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 1854825] (transmitting Balance Sheet and Cash Capital Update presentation and stating "attached balance sheet presentation discussed in today's executive committee meeting. . . . Reviewed with Bart [McDade] yesterday").  During his first Interview with the Examiner, McDade said that he was surprised when the Examiner advised him that Lehman reduced its net balance sheet at quarter-end of second quarter of 2008 by more than $50.38 billion using Repo 105 transactions.  Examiner's Interview of Herbert H. "Bart" McDade III, Sept. 16, 2009, at p. 4.  McDade said he thought that the volume of Lehman's quarter-end Repo 105 usage was no higher than $20 billion.  *Id.*

[3126] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at pp. 3-4.

[3127] *Id.*

transactions.[3128]  From McDade's perspective, Lehman's traders should have sold inventory to reduce balance sheet, rather than engage in Repo 105 transactions.[3129]

On April 2, 2008, McDade received an e-mail that said "Not sure you are familiar with Repo 105 but it is used to reduce net balance sheet in our government businesses around the world."[3130]  McDade responded that he considered Lehman's use of Repo 105 transactions to be undisciplined, "another drug we r on."[3131]  McDade wanted Lehman's traders to exercise more discipline:  "[T]raders knew that they could get access to balance sheet through these more costly transactions," meaning Repo 105 transactions.[3132]  In other words, when traders found it hard to sell sticky assets or wanted to avoid selling them at a discount, they knew that they could "rent the balance sheet," according to McDade, by removing certain inventory temporarily through Repo 105 transactions while allowing other inventory to remain on the balance sheet and still

---

[3128] *Id.*

[3129] *Id.*

[3130] E-mail from Hyung Lee, Lehman, to Herbert H. (Bart) McDade III, Lehman (Apr. 3, 2008) [LBEX-DOCID 1570783].

[3131] *See* e-mail from Herbert H. (Bart) McDade III, Lehman, to Hyung Lee, Lehman (Apr. 3, 2008) [LBEX-DOCID 1570783]; s*ee also* e-mail from Herbert H. (Bart) McDade III, Lehman, to Andrew J. Morton, Lehman (Apr. 3, 2008) [LBEX-DOCID 1570784] (explaining that the fact that Lehman's net balance sheet could increase at quarter-end if it could not find Repo 105 counterparty "is exactly why the drug is a problem").

[3132] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 6.  Kaushik Amin recalled McDade stating that Lehman should use fewer Repo 105 transactions; Amin believed this was because of "a sense within Lehman that [Repo 105] might not meet a rigorous test in the market place."  Examiner's Interview of Kaushik Amin, Sept. 17, 2009, at p. 8.

reach Lehman's balance sheet targets.[3133]   McDade wanted traders to sell assets rather than rent the balance sheet.[3134]

Although McDade's Balance Sheet and Cash Capital Update presentation was discussed at the March 28, 2008 Executive Committee meeting,[3135] during a time when Erin Callan was a member of the Executive Committee and Lowitt sat as an *ex officio* member, when questioned by the Examiner, neither Callan nor Lowitt could recall the actual volume of quarter-end Repo 105 usage in late 2007 and 2008, or whether the Executive Committee discussed Lehman's Repo 105 usage.[3136]   On April 9, 2008, twelve

---

[3133] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 8.

[3134] *Id.*

[3135] E-mail from Jennifer Fitzgibbon, Lehman, to Leonard Scicutella, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 1854825] (transmitting copy of Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008) [LBEX-DOCID 1698670] and stating "please [see] attached balance sheet presentation discussed in today's executive committee meeting"); *see also* e-mail from Gerard Reilly, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 124422] (transmitting copy of Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008) [LBEX-DOCID 095966] and stating "This is the bs doc for exec co in the morning"); e-mail from Gerard Reilly, Lehman, to Martin Kelly, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 2636182] (transmitting copy of Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008) [LBEX-DOCID 2489767] and stating "This was the exec b[alance] s[heet] pres[entation]"); Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at pp. 2-3.

[3136] Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at pp. 17, 19 (stating that she believed Lehman's Repo 105 usage was $20 billion and that she did not recall being part of any discussions regarding limits on Repo 105 usage); Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at pp. 11, 13 (stating that he was not present at any Executive Committee meeting at which Repo 105 was discussed and that he had no recollection of focusing on Lehman's Repo 105 usage, including the $25 billion third quarter target); Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 7 (stating that he did not attend any Executive Committee meeting where Repo 105 was discussed and stating he had no knowledge of Lehman's Repo 105 usage).  Andrew Morton, who served on the Executive Committee beginning in June 2008, however, recalled that Lehman used Repo 105 transactions to reduce its net balance sheet and that these were "widely used, widely understood" transactions. Examiner's Interview of Andrew J. Morton, Sept. 21, 2009, at p. 4.

days after McDade's presentation to the Executive Committee, Callan signed Lehman's quarterly report.[3137]

Following Fuld's directive, and in connection with McDade's balance sheet point person role, Gregory and McDade sat down with Lehman division heads and discussed targets for asset classes and business lines.[3138]  Gregory and McDade frequently checked in with division heads in mid 2008 regarding their progress in meeting balance sheet targets, and provided updates to Fuld, although not on a very granular level.[3139]  Fuld recalled that Gregory was comfortable with the progress Lehman was making in bringing down its balance sheet and Fuld said that he believed Lehman was meeting its balance sheet targets by selling illiquid assets.[3140]

Other documents contemporaneous to McDade's presentation to the Executive Committee demonstrate that the issue of balance sheet and leverage reduction was being discussed at the highest levels of senior Lehman management:[3141]

- An April 1, 2008 internal Lehman presentation by Eric Felder, then-United States Head of Credit Products, highlighted how the market's mood and perception of risk had changed, and Lehman started to penalize brokers for maintaining high leverage.[3142]  According to the presentation: "brokers will

---

[3137] LBHI, 10-Q (filed Apr. 9, 2008), at p. 92.

[3138] Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 9.

[3139] *Id.*

[3140] *Id.*

[3141] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 8 (stating that rating agencies cared about net leverage ratio).

[3142] Eric Felder, Lehman, Untitled Internal Presentation [Draft] (Apr. 1, 2008), at pp. 7-10 [LBHI_SEC07940_085870].

be ***forced to de-lever to maintain ratings*** and access to low-cost debt."[3143] Indeed, a ratings downgrade could lead to counterparty demands that Lehman post additional collateral for secured financing.[3144]

- An April 2008 "Leverage Analysis" report sent to Tonucci and Reilly compared Lehman's first quarter 2008 leverage ratios and balance sheet by business with the same measurements for Lehman's fourth quarter 2003.[3145] It also compared Lehman's and its competitors' net leverage ratios and net assets.

Two weeks before the close of Lehman's second quarter 2008 in May 2008, and following a meeting with Fidelity, Callan wrote to Gregory and Fuld about Fidelity's feedback:

> [W]e may get a very short leash if we show up with a rough quarter if we do not get the balance sheet exercise completed. No matter what, *the skeptics are focused on our balance sheet and that is the key to the future.* . . . I know we are saying it over and over but *we HAVE to deliver on the balance sheet reduction this quarter and cannot give any room to FID for slippage.*[3146]

At the close of Lehman's second quarter in May 2008, and in connection with Morton's Global FID meeting on balance sheet issues, Freidheim, a Lehman Managing Director, wrote to Lowitt and Morton about the materiality of Lehman's balance sheet reduction:

---

[3143] *Id.* (emphasis added).

[3144] E-mail from Ian T. Lowitt, Lehman, to Eric Felder, Lehman (July 5, 2008) [LBEX-DOCID 071263] (stating that a downgrade "will affect lines and willingness of counterparties to fund secured"); Amadou N.R. Sy, The Systemic Regulation of Credit Rating Agencies and Rated Markets 8-9 (Int'l Monetary Fund, Working Paper, 2009) (noting that broker-dealers may use credit ratings to determine acceptable counterparties, as well as collateral levels for outstanding credit exposure).

[3145] Lehman, Leverage Analysis Report (Apr. 4, 2008) [LBEX-DOCID 103786] (attached to e-mail from Robert Azerad, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Apr. 4, 2008) [LBEX-DOCID 125281]).

[3146] E-mail from Erin M. Callan, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (May 13, 2008) [LBHI_SEC07940_034732] (emphasis added).

Regarding balance sheet reduction - I would not say 'we have reduced the balance sheet and brought it down from 15.6 to 12.6' - that is *material non public information* and everyone (the market) is looking for the number etc. and in a forum of thousands of people is not sr mgmt and leak possibility is very high). however you can say whatever erin has said 'it is a significant accomplishment that we have deleveraged the balance sheet so quickly + positioned ourselves for future' . . . I would not use the number.[3147]

### (b) McDade Became President and COO on June 12, 2008 and Authorized the Reduction of Repo 105 Usage

Lehman used $50.38 billion of Repo 105 transactions at the end of the second quarter on May 30, 2008, up slightly from the previous quarter.[3148] Upon becoming Lehman's President and COO on June 12, 2008, McDade was finally empowered to authorize a firm-wide reduction in Repo 105 usage.[3149] On June 17, 2008, Reilly circulated to McDade, Lowitt, Andrew Morton (Head of FID), and Chris O'Meara a document entitled "Balance Sheet and Key Disclosures" that incorporated McDade's plan to reduce Lehman's firm-wide Repo 105 usage by half – from $50 billion to $25 billion in third quarter 2008.[3150] In response to Reilly's circulation of the presentation announcing that Lehman's firm-wide Repo 105 usage would be cut by 50% in the third

---

[3147] E-mail from Scott J. Freidheim, Lehman, to Ian T. Lowitt, Lehman, *et al.* (May 30, 2008) [LBEX-DOCID 1906851] (emphasis added).

[3148] *See, e.g.,* Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets [Draft] (June 16, 2008), at p. 3 [LBHI_SEC07940_641516].

[3149] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 9.

[3150] Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets [Draft] (June 16, 2008), at p. 3 [LBEX-DOCID 3363493] (attached to e-mail from Gerard Reilly, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (June 17, 2008) [LBEX-DOCID 3383643]); *see also* e-mail from Gerard Reilly, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Aug. 17, 2008) [LBEX-DOCID 4517376] ("Repo 105 should be 25 b about half of what it was last quarter.").

quarter 2008, Morton complained that the proposed balance sheet target for FID in third quarter 2008 was identical to the second quarter target, but with the Repo 105 limit cut in half, the Rates business of FID would not survive.[3151] Reilly responded to Morton: "Think this is most conservative case and initially Bart [McDade] had a view of keeping total assets flat but that was two weeks ago and may have changed."[3152]

McDade, Reilly, Lowitt, Morton and O'Meara met to discuss the Balance Sheet and Key Disclosures document in June 2008.[3153] McDade recalled that he brought O'Meara "back in the [balance sheet] process" to help in light of O'Meara's past experience as CFO.[3154]

McDade discussed the Balance Sheet and Key Disclosures document with Richard Fuld in June 2008.[3155] McDade "specifically walked Fuld through the

---

[3151] E-mail from Andrew J. Morton, Lehman, to Gerard Reilly, Lehman (June 17, 2008) [LBEX-DOCID 4553451].

[3152] E-mail from Gerard Reilly, Lehman, to Andrew J. Morton, Lehman (June 17, 2008) [LBEX-DOCID 4553451].

[3153] E-mail from Christopher M. O'Meara, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (June 17, 2008) [LBEX-DOCID 033813] (replying to receipt of Balance Sheet and Key Disclosures 2008 3Q Targets [Draft] (June 16, 2008) and stating that "meeting is being set up to discuss" the Balance Sheet and Key Disclosure 2008 3Q Targets document); e-mail from Gerard Reilly, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (June 19, 2008) [LBEX-DOCID 2962369] (transmitting Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets (June 19, 2008) [LBEX-DOCID 2932594] and stating "[u]pdated from our meeting"). One e-mail suggests that the Executive Committee approved the reduction soon thereafter. *See* e-mail from Jennifer Fitzgibbon, Lehman, to Francis Pearn, Lehman, *et al.* (June 23, 2008) [LBEX-DOCID 1856501] (transmitting Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets (June 19, 2008) [LBEX-DOCID 1698850] and stating "[a]ttached is final balance sheet and certain key disclosure targets for 3Q. Should be approved by exec comm today").

[3154] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 8

[3155] *Id.* at p. 5.

presentation. . . ."[3156]  McDade discussed page three of the presentation with Fuld, which identified that Lehman used $38.6 billion, $49.1 billion, and $50.3 billion of Repo 105 transactions, at quarters-end fourth quarter 2007, first quarter 2008, and second quarter 2008, respectively.[3157]  McDade said that, as referenced on page three of the Balance Sheet and Key Disclosures document, he also told Fuld that he (McDade) recommended that Lehman reduce its firm-wide Repo 105 usage to $25 billion in the third quarter 2008.[3158]

McDade observed that Fuld "was familiar with the term 'Repo 105.'"[3159]  McDade recalled that Fuld's response to the entire document was "good, good, good; he was nodding approval" and that Fuld was "supportive of reducing the firm's use of Repo 105."[3160]  More specifically, regarding McDade's recommendation to cut Lehman's use of Repo 105 in half in the third quarter 2008, McDade recalled Fuld asked, "Is it doable?  Is it necessary?  If so, [Fuld] said, go do it."[3161]  McDade concluded that "Fuld knew about the accounting of Repo 105."[3162]

During the June meeting with Fuld over the Balance Sheet and Key Disclosures document, McDade and Fuld discussed that Lehman's need to deleverage was

---

[3156] *Id.*

[3157] *Id.*

[3158] *Id.*

[3159] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 5.

[3160] *Id.*

[3161] *Id.* at p. 6.

[3162] *Id.*

"absolutely" a critical issue to Lehman.[3163]  On July 10, 2008, a few weeks after

discussing the "Balance Sheet and Key Disclosures" document with McDade, Fuld

signed Lehman's quarterly report.[3164]  Fuld denied any recollection of conversations

with McDade or other members of Lehman's Executive Committee regarding Repo

105.[3165]

> ### (3)  The Market's Increased Scrutiny of the Leverage of Investment Banks

In mid-to-late 2007, Lehman faced a growing challenge: the market began

demanding that investment banks shrink their balance sheet and lower their

leverage.[3166]  Before mid-2007, rating agencies, media, and outside analysts who

---

[3163] *Id.* at p. 5.

[3164] LBHI, 10-Q (filed July 10, 2008), at p. 160.

[3165] Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 8.

[3166] Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 6; Mark Jickling, Averting Financial Crisis, CRS Report for Congress, at 18 (Mar. 10, 2008, updated on Oct. 8, 2008) (explaining that the market began demanding that investment banks lower their balance sheet and reduce leverage).  Balance sheet management, which refers to the manner in which firms control the size of their balance sheet, is important to firms for numerous reasons, including the impact balance sheet has on leverage.  Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at pp. 5-6; Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 26 (stating that balance sheet targets were driven by what managers considered a good range for leverage); Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at pp. 30-31; e-mail from Ian T. Lowitt, Lehman, to Roger Nagioff, Lehman (Apr. 16, 2007) [LBEX-DOCID 175349] (transmitting balance sheet management policy [LBEX-DOCID 148914] and 2007 Balance Sheet Targets and Usage).  The purpose of balance sheet management at Lehman was to control the firm's leverage ratios.  Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 5.  Capital adequacy, as that phrase is used vis-à-vis large investment banks, is commonly measured using a leverage ratio, which divides some measurement of the investment bank's assets by the capital equity in the bank, to determine the risk profile and relative solvency of the entity.  *See* LBHI 2007 10-K, at pp. 30, 63; Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), 2009, at p. 6.  Thus, in order to control leverage, Lehman's balance sheet targets were "reverse engineered," working backward from the firm's leverage ratio target.  Examiner's Interview of Matthew Lee, July 1, 2009, at p. 15; Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 5; Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 6. There is nothing necessarily improper about balance sheet management; it is a normal business practice

observed Lehman focused on the firm's revenues and profit and loss, "P&L."[3167]

Sometime in mid-2007, however, those same outside rating agencies and analysts pronounced the metrics of an investment bank's balance sheet and capital at least as important, if not more, than revenue and P&L.[3168] The breakdown of securitization and structured finance markets in late 2007 intensified balance sheet pressures on banks.[3169]

---

used by many institutions. As discussed in the Examiner's Conclusions, balance sheet management done in a way that materially misrepresents the true financial position of the company can, however, give rise to a colorable claim.

[3167] Mike Shedlock, MISH's Global Economic Trend Analysis, Bank Balance Sheets and Earnings, http://globaleconomicanalysis.blogspot.com/2007/09/bank-balance-sheets-and-earnings.html (Sept. 30, 2007, 1:38 PM); Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 6.

[3168] *See, e.g.*, Ben Bernanke, Chairman of the Bd. of Governors of the U.S. Fed. Reserve Sys., The Recent Financial Turmoil and its Economic and Policy Consequences, Address at the Economic Club of New York 3 (Oct. 15, 2007), *available at*:

http://www.federalreserve.gov/newsevents/speech/bernanke20071015a.htm (stating that strains in financial markets prompted banks "to become protective of their liquidity and balance sheet capacity"); Tobias Adrian and Hyun Song Shin, Liquidity, Monetary Policy, and Financial Cycles, CURRENT ISSUES IN ECON. & FIN. (Jan. - Feb. 2008), at 4, available at http://www.nyfrb.org/research/current_issues (discussing how financial institutions' chief tool in adjusting leverage is collateralized borrowing and lending (*i.e.*, repo and reverse repo agreements) and that in times of market turmoil, financial institutions try to lower their leverage); The Economic Outlook: Hearing Before H. Comm. on the Budget, 110th Cong. (Jan. 17, 2008) (statement of Ben Bernanke, Chairman of the Bd. of Governors of the U.S. Fed. Reserve Sys.), *available at*: http://www.federalreserve.gov/newsevents/testimony/bernanke20080117a.htm; Mark Jickling, Averting Financial Crisis, CRS Report for Congress, at 18 (Oct. 8, 2008, updated on Mar. 21, 2009) (explaining that the market began demanding that investment banks lower their balance sheet and reduce leverage); Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 6.

[3169] Timothy F. Geithner, President, Fed. Reserve Bank of N.Y., Reducing Systemic Risk In A Dynamic Financial System, Remarks at the Economic Club, New York City, New York, (June 9, 2008), *available at* http://www.newyorkfed.org/newsevents/speeches/2008/tfg060809.html ("The funding and balance sheet pressures on banks were intensified by the rapid breakdown of securitization and structured finance markets. Banks lost the capacity to move riskier assets off their balance sheets, at the same time they had to fund, or to prepare to fund, a range of contingent commitments over an uncertain time horizon."); *see also* Diane Hinton, Standard & Poor's RatingsDirect, Liquidity Management In Times Of Stress: How The Major U.S. Broker-Dealers Fare (Nov. 8, 2007), at pp. 2-3 [LBHI_SEC07940_439424] ("Recent disruptions in the subprime market and its contagion effects into the leveraged finance, asset-backed commercial paper (ABCP), and CDO spaces have substantially curtailed market liquidity. The sudden loss of appetite for subprime and other high-yield exposure has significantly narrowed these markets, while uncertainty regarding asset valuations left many institutions unable to unwind exposures at fair market prices. . . . As a result, the markets for these assets have considerably shrunk.").

One analyst wrote in late September 2007: "[Banks'] net incomes this quarter don't matter. And they don't matter because of one simple rule for financial services firms: *The income statement is the past. The balance sheet is the future.* . . . At the top of a credit cycle, the income statement for a financial institution shows 'the best of times' but *buried in the balance sheet is 'the worst of times' to come.*"[3170]

The market's increased focus on balance sheet and leverage only intensified in 2008.[3171] Rating agencies, analysts, and the media became more concerned about the types of inventory investment banks, including Lehman, maintained on their respective balance sheets, the size of a bank's balance sheet, and how much of its balance sheets a firm used.[3172] For example, following the near collapse of Bear Stearns in March 2008, an editorial columnist asked the question "Will Citibank Survive?" and answered by

---

[3170] Mike Shedlock, MISH's Global Economic Trend Analysis, Bank Balance Sheets and Earnings, http://globaleconomicanalysis.blogspot.com/2007/09/bank-balance-sheets-and-earnings.html (Sept. 30, 2007, 1:38 PM) (emphasis added); *see also* Cong. Research Serv., 110th Cong., <u>Financial Crisis? The Liquidity Crunch of August 2007</u> 7 (CRS Report RL 34182) (Darryl E. Getter, *et al*.) (stating that market optimism and underestimation of risk "encouraged the overuse of leverage, or borrowed money, to boost returns"); Mark Jickling, Averting Financial Crisis 6, CRS Report for Congress (Mar. 10, 2008) ("As its capital loses value, the firm must shrink its balance sheet to maintain a given leverage ratio. As firms sell assets to reduce balance sheet exposure, asset prices are driven down.").

[3171] E-mail from Peter Eavis, Wall Street Journal, to Kerrie Cohen, Lehman (Mar. 18, 2008) [LBEX-DOCID 1610003] (asking Lehman to explain its net leverage calculation); LBHI 10-Q (filed Apr. 9, 2008), at p. 65 ("During the 2008 quarter, the Company operated in a liquidity, funding, and capital environment characterized by constrained market liquidity driven in part by balance sheet and leverage concerns."); John Hilsenrath, *et al. Goldman, Morgan Scrap Wall Street Model, Become Banks in Bid to Ride Out Crisis*, Wall St. J. (Sept. 22, 2008) at A1 (reporting that the "world no longer tolerates high leverage" and that analysts felt that investment banks relied too heavily on short-term borrowed money).

[3172] Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 6.

"examining Citi's balance sheet [and] ignoring its income statement because in a crisis, future cash-flow is basically irrelevant to a bank's survival and need for liquidity."[3173]

The market turned its focus to the leverage of investment banks in mid-to-late 2007, just as Lehman found it increasingly difficult to sell its "sticky" inventory.[3174] As a consequence, by late 2007, the highest levels of Lehman senior management placed increasing emphasis on reducing the balance sheet and reducing Lehman's leverage.[3175] This "concerted effort" by senior Lehman management was done with an eye towards the rating agencies' views of Lehman.[3176]

### (a) The Cost of Deleveraging

In order to reduce its net leverage, Lehman could have either decreased the numerator used in its net leverage ratio calculation (*i.e.*, net assets), or increased the denominator by raising equity.[3177]  Fuld acknowledged that although raising equity

---

[3173] James Turk, Will Citibank Survive?, Financial Sense, Mar. 17, 2008, http://www.financialsense.com/editorials/turk/2008/0317.html; *see also* Systemic Regulation, Prudential Matters, Resolution Authority and Securitization: Hearing Before H. Comm. on Financial Servs., 111th Cong. 3 (Oct. 29, 2009) (statement of Jane D'Arista, Americans for Financial Reform) (explaining how excessive leverage throughout the financial system made institutions "vulnerable to any event that might threaten their ability to roll over the funding that supported their inflated balance sheets").

[3174] Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 6.

[3175] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 8.  Fuld explained that he made strategic decisions to reduce Lehman's balance sheet and bring down the net leverage ratio to improve market perceptions of Lehman.

[3176] Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at pp. 5, 8; Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 5; *see also* Lehman, Lehman Presentation to Rating Agencies [Draft] (May 12, 2008), at p. 20 [LBEX-DOCID 3192668] (attached to e-mail from Kevin Thatcher, Lehman, to Ian T. Lowitt, Lehman, *et al.* (May 21, 2008) [LBEX-DOCID 3200389] and stating that "[i]n an effort to reduce Q2 '08 leverage ratios, the Firm is undergoing a deleveraging exercise which will be driven by specific balance sheet reductions coupled with capital raising").

[3177] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 27.

could also reduce the net leverage ratio, Lehman had to improve its net leverage by reducing its net assets (*i.e.*, selling inventory) because "there was a perception issue" with raising equity.[3178]   "If we raised equity, we would have brought the [net leverage ratio] number down, but would not have really fixed anything."[3179]   Accordingly, to meet its goal of reducing the firm-wide net leverage ratio, Lehman sought to reduce its net assets.[3180]

Reducing net assets through outright sales, however, also came at a cost to Lehman.  First, the sale of many of its inventory positions would result in substantial losses to Lehman.  An internal Lehman PowerPoint presentation that CFO Erin Callan prepared in early April 2008, entitled "Leverage Analysis," illustrates this point.[3181]   "Lehman's growth in net balance sheet has been weighted toward mortgages and loans. Deleveraging will require selling these assets, which will result in losses for Lehman. . . . Reducing leverage is necessary to remove refinancing risk and win back the confidence of the market, lenders, and investors."[3182]   Winning back the confidence of the market was necessary, in part, because "[a]fter initially declining, Lehman Brothers' net

---

[3178] *Id.*

[3179] *Id.*

[3180] *Id.*; Examiner's Interview of Clement Bernard, Oct. 23 2009, at p. 12.  Clement Bernard made a similar point as Fuld regarding Lehman's route to reducing its net leverage ratio.  Bernard stated that Lehman could easily have reduced its gross balance sheet by reducing matched book, but that reducing net balance sheet was more difficult as it required Lehman either to sell assets or engage in additional Repo 105 transactions.

[3181] Erin M. Callan, Lehman, Lehman Brothers - Leverage Analysis (Apr. 7, 2008), at p. 1 [LBEX-DOCID 1401225] (attached to e-mail from Edward Grieb, Lehman, to Edward Grieb, Lehman (Apr. 5, 2008) [LBEX-DOCID 1542476]).

[3182] *Id.* at p. 1.

leverage. . . ha[d] crept back towards the higher end of the peer group in recent years, signaling higher risk."[3183]  Lehman's "change in Net Leverage [wa]s small, but weighted towards illiquid assets like mortgages and loans."[3184]  In fact, the composition of Lehman's Level 3 assets was 60% mortgages.[3185]  Callan reported the potential cost to Lehman of deleveraging: moving $22 billion of illiquid assets would have cost Lehman an estimated $750 million.[3186]

In addition to the losses Lehman would incur by selling "sticky" assets at fire-sale prices, deleveraging also raised the additional problems of market perception and valuation.[3187]  As Secretary Timothy Geithner explained to the Examiner, selling "sticky" assets at discounts could hurt Lehman by revealing to the market that Lehman "had a lot of air in [its] marks" and thereby further draining confidence in the valuation of the assets that remained on Lehman's balance sheet.[3188]

---

[3183] *Id.* at p. 5.

[3184] *Id.* at p. 7.

[3185] *Id.* at p. 9.

[3186] Erin M. Callan, Lehman, Lehman Brothers - Leverage Analysis (Apr. 7, 2008), at p. 12 [LBEX-DOCID 1401225].

[3187] Examiner's Interview of Secretary Timothy F. Geithner, Nov. 24, 2009, at pp. 7-8.

[3188] *Id.*; *see also* The Economic Outlook: Hearing Before H. Comm. on the Budget, 110th Cong. (Jan. 17, 2008) (statement of Ben Bernanke, Chairman of the Bd. of Governors of the U.S. Fed. Reserve Sys.), *available at*: http://www.federalreserve.gov/newsevents/testimony/bernanke20080117a.htm (explaining that as financial institutions came under pressure in 2007 and 2008 to remove hard-to-value products from balance sheet of special purpose entities and onto their own balance sheet, banks' balance sheets swelled with illiquid, sticky inventory).

### (4) "Sticky" Inventory and FID's Balance Sheet Breaches Hampered Lehman's Ability to Manage Its Net Leverage

Lehman expanded its Repo 105 practice in the context of an increasingly "sticky" balance sheet.  In February 2007, Joseph Gentile, FID's then-Chief Financial Officer who reported directly to Gerard Reilly, sent a proposal to Ed Grieb, then-Global Financial Controller, petitioning Grieb to increase the firm's $22 billion combined firm-wide Repo 105/108 limit to $25 billion.[3189]  Gentile's February 2007 request provided three interrelated reasons why Lehman should increase its internal Repo 105 limit:

- Lehman's Real Estate Group likely would not be able to conduct its Windermere securitization ($2B) in first quarter 2007 and Lehman's Mortgages Group "will have a great deal of difficulty in selling sub prime loans (5.0bn), adversely affecting balance sheet.  Exiting these position[s] would be impossible or prohibitively costly."[3190]

- "Repo 105 offers a low cost way to offset the balance sheet and leverage impact of current market conditions."[3191]

- Lehman would have significant difficulty "exiting" large positions in its Real Estate and Mortgage Groups without "incur[ring] large losses due to the steep discounts that they would have to be offered at and [the] substantial reputation risk in the market as it would suggest a serious 'issue' with our Mortgage/Real Estate concentrations.  A Repo 105 increase would help avoid this without negatively impacting our leverage ratios."[3192]

---

[3189] Joseph Gentile, Lehman, Proposed Repo 105/108 Target Increase for 2007 (Feb. 10, 2007) [LBEX-DOCID 2489498] (attached to e-mail from Joseph Gentile, Lehman, to Edward Grieb, Lehman (Feb. 10, 2007) [LBEX-DOCID 2600714]).  Recall that a July 2006 Overview of Repo 105/108 Presentation stated that Grieb and CFO Chris O'Meara were responsible for setting Lehman's limits on Repo 105 activity at $17 billion and Repo 108 activity at $5 billion for a total of $22 billion in combined Repo 105/108 limits.

[3190] Joseph Gentile, Lehman, Proposed Repo 105/108 Target Increase for 2007 (Feb. 10, 2007) [LBEX-DOCID 2489498].

[3191] *Id.*

[3192] *Id.*; *see also* e-mail from Heidimarie Echterman, Lehman, to Gerard Reilly, Lehman (Feb. 23, 2007) [LBEX-DOCID 1620265] ("Net leverage is down 1 turn vs number discussed at this morning's FOC (15.5x

Subsequent Lehman e-mails indicate that Lehman raised the combined Repo 105/108 limit in February 2007 by $3 billion, from $22 billion to $25 billion.[3193]

As it became increasingly difficult in 2007 for Lehman to exit certain positions, Lehman's maneuverability with respect to meeting balance sheet and leverage targets diminished.[3194]   This put additional pressure on more liquid businesses within Lehman to reduce balance sheet, as exemplified by Gentile's February 2007 request to Grieb.[3195]

---

now 15.4x vs target 14.8x). Do you think we will be able to get below this for quarter end? I have not had any discussion with Chris on this - do we need to alert him?").  Echterman forwarded this e-mail to Paolo Tonucci, then-Treasurer, adding: "Sorry I meant to copy you – it's all in IRP and Real Estate. They are looking to do more Repo 105 and sell down positions. Gelband has been alerted by Joe [Gentile]."  *Id.*

[3193] E-mail from Joseph Gentile, Lehman, to Michael Gelband, Lehman, *et al.* (Feb. 21, 2007) [LBEX-DOCID 4553218] ("I have been able to get a temp limit of 3 bn for repo 105 activity, which covers known real estate issues. . . ."); e-mail from Joseph Gentile, Lehman, to Gerard Reilly, Lehman (Feb. 21, 2007) [LBEX-DOCID 4553220] (responding to question "Where did the 3bn come from?" by writing: "We spoke with grieb…and he was ok with a temporary excession of $3. . . ."); e-mail from Michael McGarvey, Lehman, to Anuraj Bismal, Lehman, *et al.* (May 9, 2007) [LBEX-DOCID 3223356] ("17 bn was the year end limit for FID. In Q1 Joe Gentile spoke to Edward Grieb about raising it to 20bn (based on the attached doc) and according to Joe Ed agreed.").

[3194] Joseph Gentile, Lehman, Proposed Repo 105/108 Target Increase for 2007 (Feb. 10, 2007) [LBEX-DOCID 2489498] (attached to e-mail from Joseph Gentile, Lehman, to Edward Grieb, Lehman (Feb. 10, 2007) [LBEX-DOCID 2600714]); e-mail from Sigrid Stabenow, Lehman, to Eric Addington, *et al.* Lehman (Feb. 1, 2008), [LBHI_SEC07940_1840953] ("The FID business analysis team . . . review[ed] 'how' FID is using its balance sheet. The purpose [of the review] is . . . to give clarity on what is movable balance sheet in the current env't and . . . to address the Q1 balance sheet limit issues we're facing. . . . [T]he global problem that FID is facing [is] that they are expected to be $15 bn over limit. . . . The stickiness of real estate & securitized products in americas and europe are creating issues."); e-mail from Clement Bernard, Lehman, to Andrew J. Morton, Lehman, *et al.*  (Feb. 4, 2008) [LBEX-DOCID 1849805] (discussing firm-wide net leverage ratio, FID's sticky/illiquid/Level 3 inventory, the percentage of FID's balance sheet that this sticky inventory constitutes, and that Level 3 assets "have increased a lot in 2007 due [to] some assets becoming less observable").  Lehman management monitored and assessed whether the dollar value of its assets (the numerator in the net leverage ratio equation used at Lehman) was at an appropriate level by setting balance sheet targets for the firm, specific business units, and even for individual traders. Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at pp.5-6; Examiner's Interview of Tejal Joshi, Sept. 15, 2009, at p. 5; Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 5; Examiner's Interview of Kaushik Amin, Sept. 17, 2009, at p. 5; Examiner's Interview of Mitchell King, Sept. 21, 2009, at p. 5; Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 11; Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 5.  Balance sheet targets were a function of the firm-wide leverage ratio target, which was reported publicly.  *See, e.g.,* e-mail from Clement Bernard, Lehman, to Roger Nagioff, Lehman, *et al.* (Nov.

20, 2007) [LBEX-DOCID 173748] ("The net Balance Sheet forecast for FID for November 30 has increased to $232.6 Bio from a previous forecast of $227 Bio. This is $12.6 Bio above the limit of $220 Bio. The limit of $220 Bio equates to a leverage ratio of 16 which is the current firm target…. Based on my conversations with Paolo [Tonucci] we need to get down to $225 Bio in order for the ratio to be back to target."); Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 26 (stating that Lehman's balance sheet targets were driven by what an acceptable range of leverage for the firm would be); Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 11; Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 5; Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at pp. 30-31 (stating that collaborative process between Finance, Fixed Income, Markets, and Treasury used to set balance sheet targets for businesses but that leverage ratio target was a firm-wide target). After the leverage target was set, each Lehman business group or division would allocate balance sheet usage to units within that business based upon how much balance sheet was needed to run a group's operations. For example, as part of his management reporting duties, Joseph Gentile, the former Financial Officer of Lehman's FID, tracked FID's balance sheet on a daily basis and as part of Lehman's balance sheet management process. Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 5. If Lehman's firm-wide net leverage ratio was too high, individual businesses such as FID would be informed of the impact their respective balance sheet breaches had on the firm's leverage ratio. *Id.; see also* e-mail from Gerard Reilly, Lehman, to Joseph Gentile, Lehman (Feb. 21, 2007) (stating the impact of $10 billion balance sheet breach by FID on Lehman's net leverage ratio and stating: "These guys are going to have to take accountability for under performance. At least tell guys to cut b[alance] s[heet] if they don't make money."); e-mail from Joseph Gentile, Lehman, to Gerard Reilly, Lehman (Feb. 21, 2007) [LBEX-DOCID 4553347]. Michael McGarvey similarly said that beginning sometime in 2007 (as leverage became increasingly important to market observers) and until September 2008, when Lehman filed for bankruptcy, he assumed a newly-created role in which he both worked with different product groups within FID to develop daily estimates of the group's balance sheet and how much funding each desk was using, and communicated to FID product controllers the balance sheet targets set by Lehman's Treasury group. Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 6. McGarvey also communicated these targets to the Financial Controller. *See* e-mail from Michael McGarvey, Lehman, to Martin Kelly, Lehman (Jan. 30, 2008) [LBHI_SEC07940_861472-861474] (reporting that FID's Rates business has $113.6 billion in net assets, that the quarter-end forecast is more than $3 billion over target, so Lehman should reduce net assets by $68 billion). Lehman documents, including PowerPoint presentations and e-mail communications, confirm the setting of balance sheet targets and leverage ratio targets at the firm. *See, e.g.*, Lehman, Rates Business Projected Balance Sheet Spreadsheet (Aug. 21, 2006) [LBEX-DOCID 2783441]; e-mail from Kentaro Umezaki, Lehman, to Ian T. Lowitt, Lehman (Apr. 16, 2007) [LBEX-DOCID 288764] ("Giving out targets for Q2 as we speak. Numbers attached . . . all biz's are aware of it's importance now . . . Gerry [Reilly] has us working with a 195 net balance sheet target now . . . to get us to 15x net leverage by end of May . . . ."); Lehman, Lehman Asset Statement Balance Sheet January 10, 2007 Spreadsheet (Jan. 11, 2007) [LBEX-DOCID 648081]; e-mail from Michael McGarvey, Lehman, to Clement Bernard, Lehman (Nov. 29, 2007) [LBEX-DOCID 1852001] (discussing whether Rates Asia, within FID, will make its balance sheet target); Lehman, Rates Projected Balance Sheet Spreadsheet (Jan. 25, 2007) [LBEX-DOCID 1447282]; e-mail from Kentaro Umezaki, Lehman, to Joseph Gentile, Lehman (Feb. 21, 2007) [LBEX-DOCID 1808076] ("What is our lev ratio target this quarter?"); Lehman, Global FID Balance Sheet Forecast as of November 12, 2007 (Nov. 13, 2007) [LBEX-DOCID 3215542]; e-mail from Sarah Paek, Lehman, to Balance Sheet Group, Lehman (Nov. 29, 2007) [LBEX-DOCID 1851789] (transmitting attached FID balance sheet forecast [LBEX-DOCID 1733969] reporting amount by which business within FID are over/under gross and net balance sheet targets); e-mail from Michael McGarvey, Lehman, to Martin Kelly, Lehman (Jan. 30, 2008) [LBEX-

Although, as noted above, only highly liquid securities were eligible for Repo 105

treatment, Grieb, Reilly and others explored whether they could remove sticky

inventory from Lehman's balance sheet through the use of Repo 105 transactions.[3196]

DOCID 1728898] ("As of the 28th, Rates had 113.6bn of net assets. Right now our quarter-end forecast is at ~3bn over target so we should reduce net assets by 68 bn."); e-mail from Clement Bernard, Lehman, to Roger Nagioff, Lehman, *et al.* (Nov. 20, 2007) [LBEX-DOCID 173748] ("The net Balance Sheet forecast for FID for November 30 has increased to $232.6 [billion] from a previous forecast of $227 [billion]. This is $12.6 [billion] above the limit of $220 [billion]. The limit of $220 [billion] equates to a leverage ratio of 16 which is the current firm target. . . . Based on my conversations with Paolo [Tonucci] we need to go down to $225 [billion] in order for the ratio to be back to target."); *id.* (noting also that most of the United States Agency positions will be off balance sheet through Repo 105 transactions).

[3195] Joseph Gentile, Lehman, Proposed Repo 105/108 Target Increase for 2007 (Feb. 10, 2007) [LBEX-DOCID 2489498] (attached to e-mail from Joseph Gentile, Lehman, to Edward Grieb, Lehman (Feb. 10, 2007) [LBEX-DOCID 2600714]); *see also* e-mail from Kaushik Amin, Lehman, to Herbert H. (Bart) McDade III, Lehman (June 3, 2008) [LBEX-DOCID 574610] (stating that Liquid Markets division within FID made "Herculean" efforts to reduce its balance sheet $25 billion lower than its actual balance sheet target near the quarter-end in second quarter 2008 in order to compensate for other businesses within FID that were unable to meet their targets and transmitting report [LBEX-DOCID 522198] showing Liquid Markets conducted over $42 billion in Repo 105 transactions at close of second quarter 2008 and over $39 billion in Repo 105 transactions at close of first quarter 2008).

[3196] For example, Grieb recommended to Lehman's Accounting Policy Group that Lehman use the Repo 105 program to remove from the balance sheet certain residual positions from mortgage backed and real estate backed securitizations. *See* e-mail from Marie Stewart, Lehman, to Mark Cosaitis, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 3223799] ("I discussed the issue . . . with Ed Grieb to make sure he would be OK with doing this. . . . You will need to repo 105 every single piece of the deal on b/sheet. Is that the plan?"); e-mail from Mark Cosaitis, Lehman, to Marie Stewart, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 3223800] (discussing whether, if Lehman can transfer all Windermere securities using Repo 105, Lehman "can...eliminate the gross up in addition to netting down the bonds?"); e-mail from Marie Stewart, Lehman, to Mark Cosaitis, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 3223801] (indicating that Stewart planned to have a meeting that day with Grieb to discuss possibility of placing Windermere bonds into Repo 105 program); e-mail from Marie Stewart, Lehman, to Brett Beldner, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 3223803] ("Ed told me yesterday that it was his idea that we use Repo 105 to achieve this outcome. . . . I'm not warm and fuzzy about using [Repo 105] to get entire deals off b/sheet and [Ed Grieb] should discuss with E&Y."); e-mail from Brett Beldner, Lehman, to Marie Stewart, Lehman (Aug. 17, 2007) [LBEX-DOCID 3223803] ("I am also convinced that E&Y will say it doesn't work."); e-mail from Marie Stewart, Lehman, to Mark Cosaitis, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 3223806] ("I spoke to Ed [Grieb]. While a Repo 105 would work for saying the specific assets under the Repo 105 have been sold, because a repo involves a promise to repurchase those assets (and we actually book a fwd) we don't think it will work to get failed sales deals deconsolidated. Brent Beldner in process of double checking with E&Y. . . ."); *see also* Lehman, Repo 105/108 Benefit Summary (Nov. 9, 2007) [LBEX-DOCID 3219736] (attached to e-mail from Anuraj Bismal, Lehman, to David Vasey, Lehman, *et al.* (Nov. 9, 2007) [LBEX-DOCID 3223369] and showing $744,212,553 in Repo 105 transactions using

Specifically, in the summer of 2007, Grieb and Reilly enlisted the help of John Feraca, Kentaro Umezaki, and Michael McGarvey in an attempt to move mortgage-backed securities into the Repo 105 program.[3397]  Though they were unsuccessful in their efforts

---

"real estate held for sale" in third quarter 2007 and calling this "something odd"); e-mail from Anuraj Bismal, Lehman, to Marie Stewart, Lehman, *et al.* (Nov. 12, 2007) [LBEX-DOCID 3223374] ("Sounds to me that we did Repo 105 on Real Estate Held for Sale. We have introduced a control check to try and detect if this happens at Q4."); e-mail from Marie Stewart, Lehman, to Anuraj Bismal, Lehman, *et al.* (Nov. 12, 2007) [LBEX-DOCID 3223375] (replying to news that commercial mortgage backed securities were used for Repo 105 by stating, "My head will explode if we have to talk them about this again"); e-mail from Marie Stewart, Lehman, to Richard Holmes, Lehman, *et al.* (Nov. 12, 2007) [LBEX-DOCID 3223373] (stating that "because the CMBS we hold do not exist for GAAP we cannot get a repo 105 benefit from them"); e-mail from Marie Stewart, Lehman, to Gary Bachman, Lehman, *et al.* (Nov. 21, 2007) [LBEX-DOCID 3223381] ("FYI that we've had a few problems with people claiming Repo 105/108 benefit recently when they should not have.").

[3397] E-mail from Gerard Reilly, Lehman, to Steven Becker, Lehman, *et al.* (Aug. 16, 2007) [LBEX-DOCID 251602] ("Why can't we repo 105 some prime AAA stuff?"); e-mail from Steven Becker, Lehman, to Gerard Reilly, Lehman, *et al.* (Aug. 16, 2007) [LBEX-DOCID 251603] ("I spoke with John who is currently trying to get off as much of the European deals [apparently CMOs or collateralized mortgage obligations] as he can via REPO 105."); e-mail from Gerard Reilly, Lehman, to Steven Becker, Lehman, *et al.* (Aug. 16, 2007) [LBEX-DOCID 251605] ("Any mortgage should be our highest priority."); e-mail from Kentaro Umezaki, Lehman, to Gerard Reilly, Lehman (Aug. 16, 2007) [LBEX-DOCID 1905992] ("Who can give me a repo 105 status/projection. This is around the mortgage inventory and using repo 105. . . . I need some sense of what we are doing, and whether we can move some of the high rated mortgage products into that framework."); e-mail from John Feraca, Lehman, to Gerard Reilly, Lehman (Aug. 18, 2007) [LBEX-DOCID 4553350] (Feraca and Reilly discuss putting either commercial mortgage backed securities or residential mortgage backed securities into Repo 105); e-mail from Gerard Reilly, Lehman, to John Feraca, Lehman (Aug. 18, 2007) [LBEX-DOCID 4553351] ("Many benefits to us getting these assets [CMBS and RMBS] into the [Repo 105] program."); e-mail from John Feraca, Lehman, to David Sherr, Lehman, *et al.* (Aug. 19, 2007) [LBEX-DOCID 4553352] ("[W]e are looking at the possibility of Repo 105 for AAA RMBS and CMBS positions . . . only want to focus on non-agency products for this exercise as both agency pass-thrus and agency CMOs roll up as government or agency products in the balance sheet, not mortgages."); e-mail from David Sherr, Lehman, to John Feraca, Lehman, *et al.* (Aug. 19, 2007) [LBEX-DOCID 4553353] (discussing placement of CMBS and RMBS into Repo 105 program); e-mail from Gerard Reilly, Lehman, to John Feraca, Lehman, *et al.* (Aug. 19, 2007) [LBEX-DOCID 4553356] (same); e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman (Aug. 19, 2007) [LBEX-DOCID 4553354] (forwarding previous e-mail chain discussions regarding mortgage backed securities and Repo 105 to Chris O'Meara).

to place mortgage-backed securities into the Repo 105 program in 2007,[3198] by May 2008,

Reilly raised the idea again.[3199]

Lehman was ultimately not able in 2007 to remove non-agency residential and commercial mortgage-backed securities ("RMBS" and "CMBS") from its balance sheet through Repo 105 transactions, but senior management soon recognized that ramping-up the use of Repo 105 transactions still offered Lehman a way to relieve some of the balance sheet pressure caused by the firm's illiquid and sticky positions.[3200] As Reilly wrote in one e-mail, "At least . . . cut b[alance] s[heet] if [you] don't make money."[3201] In

---

[3198] E-mail from John Feraca, Lehman, to David Sherr, Lehman, *et al.* (Aug. 20, 2007) [LBEX-DOCID 4553357] ("We spoke to the 3 of the 4 counterparties we currently use for Repo 105 on UST and Agencies via LBIE (the MTS equivalent) and all 3 declined our proposal to use AAA private label RMBS and CMBS. . . . [O]ur only other choice will be to look if any of our existing counterparties in LBI would be willing to transact through LBIE."); *see also* e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 20, 2007) (forwarding Feraca e-mail discussing use of RMBS and CMBS in Repo 105 program); e-mail from Kentaro Umezaki, Lehman, to John Feraca, Lehman, *et al.* (Aug. 20, 2007) [LBEX-DOCID 4553359] (Umezaki replies to Feraca, "not sure that is worth the effort…we need Chris [O'Meara] to opine."); e-mail from Gerard Reilly, Lehman, to Kentaro Umezaki, Lehman, *et al.* (Aug. 21, 2007) [LBEX-DOCID 4553360] ("What about agency cmo's [collateralized mortgage obligations]? We should pass on non-agency at this point."); e-mail from John Feraca, Lehman, to Gerard Reilly, Lehman, *et al.* (Aug. 21, 2007) [LBEX-DOCID 4553361] ("My understanding is agency cmos roll up to govt products for our balance sheet disclosures and I do not think it will change the view we got from the lenders we approached yesterday.").

[3199] E-mail from Gerard Reilly, Lehman, to John Feraca, Lehman, *et al.* (May 1, 2008) [LBEX-DOCID 4553429] ("If we can get mortgage assets into 105 we need to do that. I would think it is hard to do but clearly they would be our priority.").

[3200] *Cf.* E-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Feb. 25, 2008) [LBEX-DOCID 3187495] (stating that FID's overage in balance sheet "is in real Estate and Securitized Products which currently have less ability to reduce balance sheet" and that "FID would like to do more [Repo 105] but it's a question of available capacity").

[3201] E-mail from Gerard Reilly, Lehman to Joseph Gentile, Lehman (Feb. 21, 2007) [LBEX-DOCID 4553198]. By April 2007, FID's balance sheet had grown 19% since 2005, while its revenue had grown only 3%. Lehman, FID Balance Sheet Management (April 2007), at p. 2 [LBEX-DOCID 1303268]. Moreover, 52% of FID's balance sheet was in businesses with Return on Assets (ROA) below FID's average. *Id.* During this same period of time, FID's off-balance sheet Repo 105 "benefit" grew from $15 billion in first quarter 2006 to $22 billion in first quarter 2007. *Id.*

a November 2007 e-mail from Reilly to Clement Bernard, Reilly wrote: "Let's get our best thoughts on fid b[alance] s[heet]. *We are slipping in real estate*. Take a look at liquid holdings like cp and *items we can put into the repo 105 program*. We need fid close to 5b on net."[3202]

Consistent with Gentile's recommendation to Grieb to increase the firm's Repo 105 limits, Anuraj Bismal, a former Senior Vice President in Lehman's Balance Sheet Group, said that the "stickiness" of mortgage-backed securities and other real estate securities inventory put pressure on "everything else."[3203]  That is, to the extent Lehman could not remove sticky inventory from its balance sheet by selling it, Lehman had to remove even greater amounts of other types of inventory from its balance sheet – either via sales or Repo 105 transactions – to meet the balance sheet and leverage ratio targets set by senior management.  According to Bismal, this was a factor in Lehman's increased use of Repo 105 transactions starting in mid-to-late 2007.[3204]  Mitch King, the former head of Lehman's United States Agencies Trading Desk, also believed that Lehman's increased use of Repo 105 transactions beginning in mid-to-late 2007 was linked to the balance sheet pressure Lehman faced caused by illiquid assets on its balance sheet that the firm could not sell.[3205]

[3202] E-mail from Gerard Reilly, Lehman, to Clement Bernard, Lehman (Nov. 20, 2007) [LBEX-DOCID 3221687] (emphasis added).
[3203] Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 6.
[3204] *Id.*
[3205] Examiner's Interview of Mitchell King, Sept. 21, 2009, at pp. 4-7.

The reasons Gentile advanced for why Lehman's Repo 105 limit should be increased in February 2007 – namely, sticky inventory Lehman could not sell or could only sell by incurring substantial losses – only became more relevant in late 2007 and early 2008, as even more of Lehman's real estate and mortgage assets became illiquid and difficult to sell without substantial losses. Indeed, a significant portion of Lehman's real estate securities ultimately proved very difficult for Lehman to sell.[3206] As a result, Lehman's illiquid holdings ballooned during 2007. At the same time during 2007, Lehman's FID consistently breached its balance sheet limits.[3207]

The origins of Lehman's balance sheet difficulties rest in Lehman's aggressive countercyclical growth strategy spearheaded by Fuld in 2006 and early-to-mid-2007.[3208] This strategy included a decision to spend capital to make acquisitions, which, in turn, greatly increased the risk profile of the firm.[3209] Within the Global Real Estate Group ("GREG"), a business unit that fell mostly under the firm's Fixed Income Division umbrella,[3210] the growth strategy involved deploying capital more aggressively, increasing the bridge equity business, and acquiring and originating CMBS.[3211] GREG

---

[3206] *See* Section III.A.1.b.4 of the Report.

[3207] Lehman, FID Balance Sheet Management (April 2007), at p. 2 [LBEX-DOCID 1303268] (attached to e-mail from Anuraj Bismal, Lehman, to Matthew Lee, Lehman (Apr. 30, 2007) [LBEX-DOCID 1334311]).

[3208] *See* Sections III.A.1.b.1–2 of the Report; *see also* Lehman Brothers, Executive Committee Offsite, Opportunities for Additional Risk Deployment (Aug. 3, 2006) [LBEX-DOCID 2781866].

[3209] *See* Sections III.A.1.b.1–2 of the Report; *see also* Lehman Brothers, Executive Committee Offsite, Opportunities for Additional Risk Deployment (Aug. 3, 2006) [LBEX-DOCID 2781866].

[3210] With the exception of Real Estate Private Equity, which was co-managed with Private Equity, GREG was a unit within FID.

[3211] *See* Section III.A.1.d of the Report.

also oversaw the leveraged buyout of the Archstone-Smith REIT by the joint venture between Lehman and Tishman Speyer. [3212]

As a result of these acquisitions, the size of Lehman's commercial real estate ("CRE") asset holdings significantly escalated in 2006 and 2007.[3213] A significant part of the CRE inventory ultimately proved very difficult, if not impossible, for Lehman to sell.[3214] The total illiquid positions on Lehman's balance sheet increased from $41 billion in 2006 to $115 billion in 2007 and $120 billion in the first quarter of 2008.[3215]

While deleveraging took on more urgency in 2008, it was not a new subject; Lehman had been concerned about balance sheet and net leverage for some time. An April 2007 internal Lehman FID Balance Sheet Management Presentation reported that FID failed to meet its net balance sheet targets 11 out of the prior 15 months.[3216] The

---

[3212] *See* Section III.A.1.d of the Report.

[3213] *See* Section III.A.1.d of the Report; *see also* Lehman, Global Real Estate Group, Global Real Estate Update (Nov. 6, 2007) [LBEX-DOCID 2504331]; Mark Walsh, Lehman, Commercial Real Estate Update, Presentation to Lehman Board of Directors (Mar. 25, 2008), at p. 4 [LBHI_SEC07940_127250] (March 2008 CRE Update).

[3214] *See* Section III.A.1.b.4 of this Report. In early February 2008, then Lehman President Joseph Gregory warned GREG that it had to get its real estate balance sheet down quickly. E-mail from Mark Walsh, Lehman, to Andrew J. Morton, Lehman (Feb. 26, 2008) [LBHI_SEC07940_115814]. At that time, firm CFO Erin Callan told GREG to get $5 billion of CRE off its balance sheet by the time of Lehman's March 18, 2008 earnings call. E-mail from Paul Hughson, Lehman, to Mark Gabbay, *et al.* Lehman (Feb. 27, 2008) [LBEX-DOCID 1869265] (discussing the schedule for the $5 billion reduction target); e-mail from Paul Hughson, Lehman, to Mark Gabbay, Lehman, *et al.* (Mar. 7, 2008) [LBEX-DOCID 1723168] (providing update on sales progress and asking for updates regarding progress toward the $5 billion reduction target).

[3215] Andrew J. Morton, Lehman, Fixed Income Update, Presentation to Lehman Board of Directors, (May 7, 2008), at p. 4 [LBHI_SEC07940_027994].

[3216] Lehman, FID Balance Sheet Management (April 2007), at p. 2 [LBEX-DOCID 1303268] (attached to e-mail from Anuraj Bismal, Lehman, to Matthew Lee, Lehman, *et al.* (Apr. 30, 2007) [LBEX-DOCID 1334311]; *see also* e-mail from Joseph Gentile, Lehman, to Gerard Reilly, Lehman (Feb. 20, 2007) [LBEX-

presentation further provided, "Accounting changes have grown 'Dead Balance Sheet' to 21.2 bn and continues to put pressure on the balance sheet limit."[3217]  As a result of the stress on its balance sheet, Lehman proposed a policy of incentives and penalties for meeting balance sheet targets.[3218]  The cover e-mail to FID's April 2007 balance sheet presentation indicated that one of the purposes of the balance sheet management policy changes discussed in the presentation was to position Lehman for a ratings upgrade.[3219]

The same month as the FID Balance Sheet Management Presentation, April 2007, Kentaro Umezaki informed Ian Lowitt that he had distributed balance sheet targets for second quarter 2007 and that relevant Lehman personnel were "aware of its importance now."[3220]  The new targets were meant to allow Lehman to reach a 15x net leverage ratio

---

DOCID 4553219] (complaining about FID's serious balance sheet breaches and arguing that not only is FID unable to meet the balance sheet target, it isn't even "making money"); e-mail from Sigrid Stabenow, Lehman, to Gerard Reilly, Lehman, *et al.* (Apr. 4, 2007) [LBEX-DOCID 4553228] (transmitting presentation [LBEX-DOCID 4553110] and saying "talking points and key themes for  the argument that FID needs to address balance sheet efficiency"); e-mail from Paul Mitrokostas, Lehman, to Kentaro Umezaki, Lehman (Nov. 14, 2007) [LBEX-DOCID 1859142] (reporting that FID Core looks to be $7 to $15 billion over its balance sheet limit).

[3217] Lehman, FID Balance Sheet Management (April 2007), at p. 2 [LBEX-DOCID 1303268] (attached to e-mail from Anuraj Bismal, Lehman, to Matthew Lee, Lehman, *et al.* (Apr. 30, 2007) [LBEX-DOCID 1334311]).

[3218] Lehman, FID Balance Sheet Management Policy (April 2007), at p. 3 [LBEX-DOCID 1303268] ("Penalty Charge of 5mm per billion on net balance sheet overages (Monthly) applicable at a regional POD level."); *see also* e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Feb. 25, 2008) [LBEX-DOCID 3187495] ("In the past the Fixed Income Division has had in place a 'speeding ticket' charge for businesses that exceed their net balance sheet target…"); e-mail from Kaushik Amin, Lehman, to Kentaro Umezaki, Lehman, (May 18, 2007) [LBEX-DOCID 1811290] ("[T]he new balance sheet limits are going to really hurt the business. At a time when I am trying to get the traders to take more risk, this is inconsistent.").

[3219] E-mail from Kentaro Umezaki, Lehman, to Kaushik Amin, Lehman, *et al.* (Apr. 20, 2007) [LBEX-DOCID 1334311].

[3220] E-mail from Kentaro Umezaki, Lehman, to Ian T. Lowitt, Lehman (Apr. 16, 2007) [LBEX-DOCID 288764].

by the end of second quarter 2007.[3221]  Umezaki advised Lowitt that Lehman's mortgage assets and real estate securities were the primary obstacles to Lehman reaching its net leverage ratio target at that time.[3222]

Another internal Lehman e-mail from April 2007 illustrates the discourse and dissension among senior Lehman management regarding the firm's balance sheet.[3223]  In the e-mail chain, Chris O'Meara, Umezaki, Lowitt, Gelband and others discussed the "balance sheet belt tightening effort in FID" in light of a talk between Fuld and the firm's managing directors the night before.[3224]  Umezaki indicated that senior management was sending conflicting messages: Fuld wanted to emphasize revenue growth, while the message within FID was that meeting balance sheet targets was necessary in order to achieve ratings upgrades.[3225]  O'Meara noted that the firm had allowed its leverage ratio to increase higher than planned, which further exacerbated

---

[3221] *Id.* ("Gerry has us working with a 195 net balance sheet target . . . to get us to 15x net leverage by end of May. . . .").

[3222] *Id.*

[3223] *See* e-mail from Kentaro Umezaki, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 18, 2007) [LBEX-DOCID 187618]; *see also* e-mail from Kentaro Umezaki, Lehman, to Paolo R. Tonucci, Lehman (Apr. 19, 2007) [LBEX-DOCID 318475].

[3224] E-mail from Kentaro Umezaki, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 18, 2007) [LBEX-DOCID 187618].

[3225] *Id.*  When asked about a related e-mail from the following day in which Umezaki complained about inconsistent messages around risk and growth, Fuld explained that as CEO, he tried to motivate people but that he left it up to the Executive Committee to translate his remarks to the people in their ranks. Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 17.  Fuld did not specifically recall hearing that there was confusion about balancing growth and risk and was not aware of Umezaki's concerns. *Id.*

the tension between the two messages (growth vs. balance sheet belt-tightening).[3226] O'Meara continued: "I think we will have to make choices on how to best deploy the balance sheet we have available. From my perspective, getting AA- can be accomplished with our planned balance sheet leverage ratio."[3227]

In May 2007, Jonathan Cohen, a Senior Vice President in GREG, asked Umezaki whether GREG could trade its balance sheet allocation with other firm business groups to ease the pain of GREG's balance sheet breaches.[3228] Cohen suggested that if trading balance sheet was not an option, GREG would have no choice but to sell certain positions at discount prices in order to meet balance sheet targets and stay under the limit.[3229]

Significant effort was expended to remind FID, in particular, of its quarter-end balance sheet targets. Joseph Gentile, and after him, Clement Bernard, each of whom reported directly to Gerard Reilly, Lehman's Global Product Controller, was tasked with applying pressure on the head of FID to ensure FID met its quarterly balance sheet targets.[3230] Typically in this process, Gentile or Bernard would remind and cajole FID

---

[3226] E-mail from Kentaro Umezaki, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 18, 2007) [LBEX-DOCID 187618].

[3227] *Id.*

[3228] E-mail from Jonathan Cohen, Lehman, to Kentaro Umezaki, Lehman, *et al.* (Apr. 27, 2007) [LBEX-DOCID 188165].

[3229] *Id.*; *see also* Lehman, Global Real Estate Group, Global Real Estate Update (Nov. 6, 2007), at p. 1 [LBEX-DOCID 1419292] ("GREG believes that under any circumstances an estimated $15Bn reduction in global balance sheet is warranted.").

[3230] Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 5; Examiner's Interview of Clement Bernard, Oct. 23, 2009, at p. 11.

business leaders regarding their respective balance sheet targets as quarter-end approached.[3231] Michael McGarvey (Finance) would apply the same pressure on Lehman's individual trading desks and then report back to Reilly and Bernard.[3232]

In some instances, Gentile recalled having heated discussions with Umezaki in early 2007 about using every effort to ensure that FID attempted to meet its balance sheet target so that Gentile could avoid facing criticism from O'Meara, Lehman's then-

---

[3231] *See, e.g.*, E-mail from Joseph Gentile, Lehman, to Michael Gelband, Lehman, *et al.* (Feb. 21, 2007) [LBEX-DOCID 810934] ("[W]e have a serious balance sheet issue for FID coming into the end of the Quarter. All businesses with the exception of credit are running large excessions. . . . I need you to stress to [your business leaders] the need to manage down their excessions."); e-mail from Kentaro Umezaki, Lehman, to Joseph Gentile, Lehman (Feb. 20, 2007) [LBEX-DOCID 1808077] (Umezaki: "What is 'serious'?" Gentile answers a $10 billion excession of the balance sheet limit and also states that "leverage ratio is too high."); e-mail from Clement Bernard, Lehman, to Kieran Higgins, Lehman (Feb. 22, 2008) [LBEX-DOCID 1854016] ("I am following up on the conversation that we had…on the Balance sheet. As you may know we are still struggling on our Balance Sheet. We are currently at 19 bn above our target. Within that number Rates Europe is 3.7 bn above target. . . . You mentioned that you would be doing some reduction in gvt and maybe add repo 105."); e-mail from Clement Bernard, Lehman, to Kaushik Amin, Lehman (Feb. 25, 2008) [LBEX-DOCID 756417] ("To follow up on our conversation for Q1. We are currently running at 15.0 bn above and we need to go down an extra $5.0 bn for the firm to meet its net leverage limit of 15.2. I need your help on this. . . . Let me know what you can do. . ."); e-mail from Clement Bernard, Lehman, to Eric Felder, Lehman (Feb. 25, 2008) [LBEX-DOCID 2080410] ("We need to reduce our net Balance sheet to hit the firm target net leverage ratio of 15.2. Currently FID is projected to be $15.0bn above its limit. . . . Let me know if there is anything you could do to reduce the Balance Sheet and what would the price of doing that."); e-mail from Clement Bernard, Lehman, to Eric Felder, Lehman (Feb. 25, 2008) [LBEX-DOCID 981497] ("I have currently a forecast of 11.8 vs a limit of 10.4. Let me know what you can do and if there is a price to move some BS out."); e-mail from Clement Bernard, Lehman, to Kaushik Amin, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 1854189] ("FID's net balance sheet overage has increased to 14.3bn from 9.7bn as of yesterday. . . . This will drive Lehman net leverage ratio above target. Please let me know what we can do to minimize the impact. . . . I know it is late in the process but what ever we can do would help our ratio."); e-mail from Clement Bernard, Lehman, to Martin Potts, Lehman (Feb. 28, 2008) [LBEX-DOCID 1854189] ("We are looking at selling what ever we can and also doing some more repo 105."); e-mail from Clement Bernard, Lehman, to Paul Mitrokostas, Lehman, *et al.* (May 13, 2008) [LBEX-DOCID 1697936] (discussing progress in reaching quarter-end balance sheet targets).

[3232] E-mail from Michael McGarvey, Lehman to Mark Gavin, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 810932] ("Given the critical balance sheet situation we are currently in I've attached a list of corporate bonds held in NY (all above BBB and 10mm in market value) available for any additional Repo 105 capacity we can find. Please let us know what issues are sent out so we can inform the desk not to trade them for the term of the repo.").

CFO, and Grieb, the firm's then-Global Financial Controller, if FID breached its quarter-end balance sheet target.[3233] Despite these efforts of senior management, FID routinely failed to meet its balance sheet targets in every quarter of Lehman's 2007 fiscal year and in 2008.[3234]

Even near the time of Lehman's bankruptcy, FID continued to perform poorly. In response to a late August 2008 e-mail from Reilly asking, "How much repo 105 do we have now and how much will we have at 8/31," McGarvey replied, "FID is the worst run division in the company."[3235]

In 2008, FID's breaches of the balance sheet limits continued to be concentrated in difficult-to-sell securitized products and real estate.[3236] A "FID Core Global Balance Sheet Liquidity" document dated January 17, 2008 (*reproduced below*) indicated that FID

---

[3233] Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at pp. 5-6.

[3234] Examiner's Interview of Clement Bernard, Oct. 23, 2009, at p. 11; Lehman, FID Balance Sheet Management (April 2007), at p. 2 [LBEX-DOCID 1303268] ("FID has missed its net balance sheet target 11 out of the last 15 months."); e-mail from Dominic Gibb, Lehman, to Mark Cosaitis, Lehman, *et al.* (Feb. 28, 2009) [LBHI_SEC07940_1829372] ("Jock and his team are aggressively working to obtain repo 105 funding for all eligible govvies positions. If they are successful then we will have $23bn of assets on Repo 105 at quarter end. . . . This would leave FID with a net balance sheet of $51.7bn, $4.7bn above the FID limit. . . ."); e-mail from Clement Bernard, Lehman, to Andrew J. Morton, Lehman (Mar. 3, 2008) [LBEX-DOCID 1849880] ("We ended up at 15.6% on our net leverage ratio. . . . FID was $238 bn vs a limit of 223 ie 15 bn over limit.").

[3235] E-mail from Michael McGarvey, Lehman, to Gerard Reilly, Lehman, (Aug. 29, 2008) [LBEX-DOCID 4517471].

[3236] *See* Section III.A.1.b.4 of the Report; *see also* e-mail from Gary Mandelblatt, Lehman, to Alex Kirk, Lehman, *et al.* (Jan. 15, 2008) [LBEX-DOCID 1600235] (stating that "the lack of sales and syndication [was] a function of the tight credit markets"); Notes from Lehman Monthly Risk Meeting with SEC (June 19, 2008), at p. 7 [LBEX-SEC 007583] (Hughson stating that, in June 2008, "buyers and sellers [were] just staring at each other."); *see also* e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Feb. 25, 2008) [LBEX-DOCID 3187495] (stating that "a part of FID Core's [balance sheet] overage is in Real Estate and Securitized Products which currently have less ability to reduce balance sheet anyways.").

held $115.857 billion in illiquid assets at that time.[3237]  Of that amount, $55.747 billion was in real estate.[3238]

| GLOBAL BUSINESS UNIT | Net B/S 1/17 | Acct Gross Up | MTM | Fails/Other | Long Inventory | Illiquid | Dedicated Prop | Cash Hedges | 'Movable' |
|---|---|---|---|---|---|---|---|---|---|
| Global Rates | 116,249 | 0 | 12,536 | 1,354 | 102,359 | - | 7,662 | 17,514 | 77,183 |
| Foreign Exchange | 5,789 | 0 | 2,076 | 269 | 3,444 | - | 35 | 13 | 3,396 |
| **Liquid Markets** | **122,038** | **0** | **14,612** | **1,623** | **105,803** | **-** | **7,698** | **17,527** | **80,579** |
| **Commodities** | **2,411** | **0** | **1,915** | **333** | **163** | **-** | **-** | **-** | **163** |
| High Grade | 15,921 | 0 | 393 | 219 | 15,309 | 4,250 | 0 | 293 | 10,766 |
| CDO | 10,365 | 2,483 | 3,907 | 349 | 3,626 | 3,377 | 249 | - | (0) |
| High Yield | 15,449 | 0 | 251 | 66 | 15,132 | 2,875 | 0 | 5 | 12,252 |
| **Credit** | **41,735** | **2,483** | **4,551** | **634** | **34,067** | **10,502** | **249** | **298** | **23,017** |
| **Real Estate** | **65,798** | **9,407** | **154** | **488** | **55,748** | **55,747** | **-** | **2** | **(0)** |
| **Securitized Products** | **67,622** | **9,748** | **3,520** | **2,411** | **51,944** | **40,488** | **-** | **2,938** | **8,517** |
| **Municipals** | **7,045** | **885** | **2,506** | **1** | **3,653** | **-** | **415** | **67** | **3,171** |
| IBD Loans | 6,014 | 0 | 0 | 2 | 6,012 | 6,012 | - | - | 0 |
| FID Corp Loans | 1,981 | 0 | 0 | 0 | 1,981 | 1,981 | - | - | 0 |
| FID Corp | 2,308 | 0 | 43 | 1,090 | 1,176 | 1,127 | - | - | 48 |
| **FID Corporate** | **10,303** | **0** | **43** | **1,091** | **9,168** | **9,120** | **-** | **-** | **48** |
| **TOTAL FID CORE** | **316,952** | **22,523** | **27,300** | **6,583** | **260,547** | **115,857** | **8,362** | **20,832** | **115,496** |
| **Americas** | **212,075** | **15,361** | **20,325** | **3,998** | **172,391** | **76,563** | **7,898** | **5,808** | **82,123** |
| **Europe** | **72,530** | **5,366** | **6,942** | **2,289** | **57,933** | **26,010** | **429** | **12,627** | **18,866** |
| **Asia** | **32,347** | **1,796** | **33** | **296** | **30,223** | **13,284** | **35** | **2,396** | **14,508** |

Similarly, an April 29, 2008 FID CORE balance sheet purporting to show first quarter 2008 figures, listed $108.75 billion in total illiquid securities inventory, of which $52.12 billion was real estate securities.[3239]  So large was the amount of illiquid assets that some within Lehman referred colloquially to these FID balance sheets as "dead asset schedules."[3240]

---

[3237] Lehman, Presentation regarding FID Global Balance Sheet (Jan. 17, 2008), at p. 4 [LBHI_SEC07940_1954891].

[3238] *Id.*

[3239] Lehman, FID Core Q1 Balance Sheet (Apr. 29, 2008) [LBEX-DOCID 1741665] (attached to e-mail from Neeraj Chopra, Lehman, to Abe Kebede, Lehman (May 15, 2008) [LBEX-DOCID 1953960]).

[3240] Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 6; Examiner's Interview of Matthew Lee, July 1, 2009, at pp. 10-11.

### (5) Deleveraging Resulted in Intense Pressure at Quarter-End to Meet Balance Sheet Targets for Reporting Purposes

The market focus on balance sheet and leverage in late 2007 and 2008 meant increased pressure from Lehman senior management on its various business units to meet their balance sheet targets to position the firm to meet its net leverage ratio target.[3241] In the time leading up to each of the firm's quarter-ends, business units and individual traders scurried to meet their balance sheet targets in time for the reporting period, in the case of FID, often through the expanding use of Repo 105 transactions.[3242]

---

[3241] Examiner's Interview of Tejal Joshi, Sept. 15, 2009, at pp. 5-6; Examiner's Interview of Kaushik Amin, Sept. 17, 2009, at p. 5; Examiner's Interview of Mitchell King, Sept. 21, 2009, at pp. 4-6.

[3242] Examiner's Interview of Tejal Joshi, Sept. 15, 2009, at pp. 5-6; Examiner's Interview of Kaushik Amin, Sept. 17, 2009, at p. 5; Examiner's Interview of Mitchell King, Sept. 21, 2009, at pp. 4-6. Numerous documents demonstrate the intense balance sheet pressure, especially near or at quarter-end. *See, e.g.*, e-mail from Mitchell King, Lehman, to Mark Gavin, Lehman, *et al.* (Dec. 3, 2007) [LBEX-DOCID 3232555] (stating with respect to US Agency Desk use of Repo 105, "As we approach our quarter end, we start to raise the balances so that we 'reserve' size with our counterparties the week we will need it (over quarter end). At this fiscal year end we took the amounts as high as we could, as we knew there would be intense balance sheet pressure."); e-mail from Jerry Rizzieri, Lehman, to Mitchell King, Lehman (Feb. 19, 2008) [LBEX-DOCID 3233177] (stating ten days before close of quarter, "Balance Sheet still a big push. Agency business, even with 105, still over by almost $4 billion. . . ."); e-mail from Mark Gavin, Lehman, to John Feraca, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 098492] ("Just took a call from FID mgmt - seems they're up on net b/s by 3 bln unanticipated & are a little excited w Q end. I am looking to do an additional repo 105 with Mizuho using this additional limit . . . if they have appetite."); e-mail from Alvaro Mucida, Lehman, to Gabriel Buteler, Lehman, *et al.* (May 2, 2008) [LBEX-DOCID 601783] ("[P]ressure for balance sheet here is enormous and I was told that even 105 was scarce…"); e-mail from Mitchell King, Lehman, to Ryan Murphy, Lehman (May 19, 2008) [LBEX-DOCID 3233040] (stating 12 days before close of quarter, "Getting close, management walking around talking balance sheet"); e-mail from Mark Gavin, Lehman, to Michael McGarvey, Lehman, *et al.* (May 22, 2008) [LBEX-DOCID 3232907] (stating nine days before close of quarter, "there is a drive to get more Repo 105 in place"); e-mail from Kevin Croutier, Lehman, to Mitchell King, Lehman (May 22, 2008) [LBEX-DOCID 3233057] (nine days before close of quarter, Croutier: "How much more repo 105 trades are you trying to do before month end?" King: "We are trying to get everything out that we can."); e-mail from Mitchell King, Lehman, to Marc Silverberg, Lehman (May 28, 2008) [LBEX-DOCID 3233083] (stating three days before close of quarter, "I just want to see if there is any possibility to add to 105. . . . I'm pretty sure we have almost everything out, but want to check").

In November 2007, Lehman's Treasurer Paolo Tonucci informed Clement Bernard, FID's Chief Financial Officer, that FID's balance sheet limit had to be reduced, despite FID's repeated breaches of the balance sheet limit, in order to meet the firm's leverage ratio targets.[3243] Bernard typically communicated balance sheet limits and related net leverage ratio targets to FID personnel and pressured the FID business heads to reduce balance sheet by any means necessary, which usually entailed increased Repo 105 transactions at or near quarter-ends.[3244]

In a January 2008 e-mail, Michael McGarvey informed Bernard about a discussion with Alex Kirk and Andrew Morton regarding FID's $13 billion breach of the balance sheet limit. McGarvey wrote: "Alex was going to have a conversation with Kaushik [Amin] about potentially coming in under their target for balance sheet if need be" and that "[a] meeting has been set up . . . to review the next steps for Repo 105 for the Q1 (It would be helpful to know if Gerry [Reilly] has a view on what the maximum tolerable level of repo 105 is for the firm)."[3245]

Mitch King, the former Head of FID's United States Agencies Trading Desk, recalled "there was always balance sheet pressure at quarter ends," but that sometime in mid-2007 "there was a definite change" and the firm began "trying desperately to

---

[3243] E-mail from Clement Bernard, Lehman, to Roger Nagioff, Lehman, *et al.* (Nov. 20, 2007) [LBEX-DOCID 272199].

[3244] Examiner's Interview of Clement Bernard, Oct. 23, 2009, at pp. 9-11.

[3245] E-mail from Michael McGarvey, Lehman, to Clement Bernard, Lehman (Jan. 28, 2008) [LBEX-DOCID 3384755].

reduce its balance sheet," thereby further intensifying the quarter-end alarm.[3246]  The message from senior Lehman management was to "keep making P&L but . . . get balance sheet down."[3247]  King continued: "There was a way to . . . to reduce balance sheet at quarter end . . . . To the powers that be, Repo 105 counted as balance sheet reduction."[3248]

Thus, Repo 105 transactions were used as a shortcut for meeting quarter-end balance sheet targets (*i.e.*, avoiding balance sheet limit breaches) and reaching the firm-wide net leverage ratio target:

- "Is there a formal limit on Repo 105? We are trying to do more of these in order to reduce the bs [balance sheet]."[3249]

- "As B/S [balance sheet] will be super tight, I need to make sure we make best use of [Repo] 105."[3250]

### (6)  Lehman's Earnings Calls and Press Release Statements Regarding Leverage

In its earnings calls and press releases in 2008, Lehman spoke extensively about the size of the firm-wide balance sheet, FID's performance, and firm-wide aggressive efforts to deleverage.  Notably, Lehman never disclosed that it relied upon an expanded

---

[3246] Examiner's Interview of Mitchell King, Sept. 21, 2009, at p. 4.  When he held the position of Global Financial Controller, Edward Grieb would hold monthly "issues" meetings with his staff. Examiner's Interview of Matthew Lee, July 1, 2009, at p. 16. At least one attendee, Matthew Lee, recalled that when the issue of the volume of Lehman's Repo 105 transactions was raised, the response was usually that then-Chief Financial Officer Chris O'Meara was "quite keen on" reducing the balance sheet.  *Id.*

[3247] Examiner's Interview of Mitchell King, Sept. 21, 2009, at p. 5.

[3248] *Id.*

[3249] E-mail from Clement Bernard, Lehman, to Gerard Reilly, Lehman (Jan. 27, 2008) [LBEX-DOCID 2793484].

[3250] E-mail from Thomas Siegmund, Lehman, to Kaushik Amin, Lehman (Apr. 17, 2008) [LBEX-DOCID 739685].

use of Repo 105 transactions at quarter-end to manage its balance sheet when market conditions declined.  Similarly, Lehman never disclosed that its net leverage ratio – which Lehman publicly touted as evidence of its discipline and financial health – depended upon Lehman's Repo 105 practice.

During the first quarter 2008 earnings conference call, then-Chief Financial Officer Erin Callan remarked that since the previous quarter, Lehman had been "trying to give the group [*i.e.*, the analysts] a great amount of transparency on the balance sheet."[3251]  At no time, however, did Callan or anyone else from Lehman disclose the firm's use of Repo 105 transactions to manage the balance sheet.  Callan told the analysts that Lehman "did, very deliberately, take leverage down for the quarter. We ended with a net leverage ratio of 15.4 times down from 16.1 at year end.  And we will continue to allocate capital on the balance sheet in the market in a way that we consider prudent, and that reflects the liquidity profile of the balance sheet."[3252]

When Callan briefly addressed Lehman's ordinary repo transactions during the first quarter 2008 earnings call, she made no mention of Lehman's Repo 105 program.[3253]

---

[3251] Final Transcript of Lehman Brothers Holdings Inc., First Quarter 2008 Earnings Call (Mar. 18, 2008), at p. 7 [LBHI_SEC07940_7579849].

[3252] *Id.* at p. 8.  This "deliberate" deleveraging strategy is consistent with documentary evidence in which Clement Bernard, Kaushik Amin and others pressured FID business leaders to reduce their respective balance sheets at quarter-end, through either sales or Repo 105 transactions, so the firm could make its net leverage ratio target.  Callan's statement also indicates that senior management gave orders to aggressively deleverage.

[3253] *Id.* at p. 9 ("Total repo, exclusive of the match[ed] book, was 215 billion of which a substantial majority of this collateral is eligible to be pledged under the new fed facility. We have 115 billion of tri-party

During the question and answer portion of the first quarter 2008 earnings call, an Oppenheimer analyst asked Callan to comment on "the lack of a permanent buyer for so many of these securities" and the time horizon and pace at which Lehman anticipated bringing down its leverage ratios.[3254] Callan's response linked the increased illiquidity of Lehman's balance sheet with Lehman's deliberate plan to deleverage, but she indicated that Lehman achieved the reduction in leverage through the sale of assets:

> We did have a deliberate decision this quarter to take leverage down, which I think is more appropriate for the increased illiquidity of the balance sheet, and if the environment continues to stay this way we'll continue to be focused on that discipline. The real balancing act that I'm sure you can appreciate, that we think hard about is the balancing act of our fundamental view of the assets themselves, what we consider to be the loss of P&L associated with selling an asset at a given price today, given what we think its MPV is. And the trade-off with that with prudent balance sheet management.[3255]

When a Bank of America analyst again raised the topic of leverage during the first quarter 2008 earnings call, Callan explained that Lehman would continue to sell assets in order to reduce its leverage.[3256] Callan told analysts that Lehman's "goal is to continue to take that leverage down . . . . In order to do so . . . we will sell assets as appropriate and within the right pricing context, to get to that outcome . . . . I don't see why there's any reason at this point to change off that course and we'll stay on that path

---

secured financing, which is really just the total repo amount less treasuries and agencies which go through the FICC system anonymously.").

[3254] *Id.* at p. 13.

[3255] *Id.*

[3256] Final Transcript of Lehman Brothers Holdings Inc., First Quarter 2008 Earnings Call (Mar. 18, 2008), at p. 23 [LBHI_SEC07940_7579849].

until . . . something about the environment . . . tells us we should behave differently."[3257]

No analyst could have been aware, on the basis of Lehman's statements during the first quarter 2008 earnings call, that Lehman employed over $49 billion of quarter-end Repo 105 transactions to manage its publicly reported net leverage for first quarter 2008.

In its second quarter 2008, which ended on May 31, 2008, Lehman continued to highlight its deleveraging efforts.[3258] Early in a June 9 analysts call, Callan focused on Lehman's success in reducing its net leverage and balance sheet:

> The net loss of $2.8 billion compares to net income of $489 million last quarter and $1.3 billion in the second quarter of 2007. Importantly – and you will hear this throughout the call – during the quarter we executed on a number of the capital and liquidity goals that we set out for ourselves, which includes as follows – lowering growth and net leverage to less than 25 times and less than 12.5 times, respectively. Both of those numbers are prior to today's capital raise. Reducing our gross assets by approximately $130 billion and our net assets by approximately $60 billion with a large part of the reduction, as I will talk about in detail, coming from less liquid asset categories and also providing significant price visibility for marking the remainder of our inventory.[3259]

Callan said that, taking into account the early June 2008 capital raise, Lehman reduced its net leverage to 10x.[3260] Callan described the firm's deleveraging effort as "aggressive" but said "we do not expect to use the proceeds of this equity raise to

---

[3257] *Id.*

[3258] In addition to lowering its leverage ratios in second quarter 2008, Lehman also grew its cash capital surplus to $15 billion from $7 billion in first quarter 2008, and its liquidity pool to $45 billion from $34 billion in the previous quarter. Final Transcript of Lehman Brothers Holdings Inc. Second Quarter 2008 Preliminary Earnings Call (June 9, 2008), at p. 3. During this time, the performance of Lehman's Fixed Income Division was weak, with revenues of negative $3 billion. *Id.* at p. 4.

[3259] *Id.* at pp. 3-4.

[3260] *Id.* at p. 7.

further decrease leverage but rather to take advantage of future market opportunities."[3261]  A Goldman Sachs analyst questioned Callan about Lehman's "defensive" deleveraging process during the second quarter preliminary earnings call.[3262]  Callan's reply confirmed that senior Lehman management imposed strict balance sheet targets that quarter:

> I think part of the rationale for us this quarter of why we were so aggressive, why we put out explicit targets, and why we had such a tight schedule was exactly that. . . . [T]he business operators . . . knew what the targets were. We were explicit from the beginning of the quarter. . . . So I think the discipline of getting it done primarily in a single quarter was important to keep the mindsets focused.[3263]

One Merrill Lynch analyst asked Callan during the June 9 call to respond "to critics who are going to say that the $130 billion of assets sales [by which Lehman deleveraged] must be the absolute easiest assets to sell."[3264]  Callan provided "anecdotal evidence" that Lehman sold whole loan positions from its commercial real estate and residential real estate books.[3265]  Callan said nothing about Lehman's use of Repo 105 transactions, which as noted above involved only the firm's most liquid securities, to effectuate temporary sales at quarter-end to remove assets from the firm's balance sheet.

---

[3261] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter 2008 Preliminary Earnings Call (June 9, 2008), at p. 7.

[3262] *Id.* at p. 9.

[3263] *Id.* at p. 9.

[3264] *Id.* at p. 12.

[3265] *Id.*

Lehman held another second quarter 2008 earnings call on June 16, 2008. By that time, Ian Lowitt had replaced Callan as Lehman's CFO and Bart McDade had replaced Joe Gregory as Lehman's President and Chief Operating Officer. McDade stated on the call that Lehman made "substantial improvements" in its balance sheet and that Lehman's "balance sheet improvements give us the additional resources and additional capacity to drive our client model."[3266] Asked whether the sales by which Lehman achieved the balance sheet improvements were "pretty much ratably spread over the quarter or were they more skewed toward either the early or latter part of the quarter," Lowitt replied that the sales "were spread over the whole quarter."[3267] Lehman's use of Repo 105 transactions, however, spiked at quarter-end, including the end of the second quarter 2008. For example, the total amount of assets involved in Repo 105 transactions on April 30, 2008 was $24.74 billion, but increased to $50.38 billion on May 30, 2008, at Lehman's quarter-end.[3268]

### (a)  Analysts' Statements Regarding Lehman's Leverage

In addition to documents demonstrating that Lehman, internally, continued to focus in 2008 on reducing its firm-wide leverage, analysts and the market similarly

---

[3266] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter 2008 Earnings Call (June 16, 2008), at p. 10 [LBHI_SEC07940_1139550].

[3267] Id. at p. 14.

[3268] Lehman, Total Repo 105 & Repo 108 Report (June 11, 2008), at p. 1 [LBEX-DOCID 2078195] (attached to e-mail from Kristie Wong, Lehman, to Martin Kelly, Lehman (June 11, 2008) [LBEX-DOCID 2325872]. (May 31, 2008, Lehman's quarter-end, was a Saturday).

continued their focus on the firm's leverage. A few illustrative examples of analyst

comments follow:

- "The modest silver lining is that LEH was able to reduce gross assets by $130 billion, including large reductions in mortgage related (15%-20%) and leveraged loan (35%) exposures."[3269]

- "Leverage is down a lot (and even more post capital raise) . . . illiquid positions are down 15%-20% . . . ."[3270]

- "While LEH reduced gross leverage from 32x to 25x, increased their liquidity pool from $34B to $45B, and drove reductions across most troubled asset classes (and reduced total assets by $130B or 17%), we await more details on total remaining troubled assets in aggregate as well as a L-III or illiquid asset update to help answer the question of whether $6B in incremental capital raise is sufficient."[3271]

- "[T]he firm aggressively de-leveraged in the quarter as total balance sheet assets declined by $130 bn and net assets declined by about $60 bn, bringing gross leverage to 25.0x from 31.7x and net leverage to 12.5x from 15.4x. This broad based selling likely exacerbated the write-downs the firm took this quarter. As part of its de-leveraging, Lehman reduced RMBS and CMBS exposure by 15-20%, leveraged loans by 35% and high yield by 20%. While Lehman is clearly not out of the woods just yet, we believe today's announced capital raise will reduce investors' fears and help promote a better liquidation of assets should LEH want to continue to reduce its leverage."[3272]

---

[3269] Sandler O'Neill & Partners Report, Lehman Brothers Holdings Inc. (June 9, 2008), at p. 1 [LBEX-DOCID 015863] (attached to e-mail from Roopali Hall, Lehman, to Lehman Brothers Executive Committee Members, Lehman (June 9, 2008) [LBEX-DOCID 15861]).

[3270] UBS Investment Research, First Read: Lehman Brothers (June 9, 2008), at p. 1 [LBEX-DOCID 015863] (attached to e-mail from Roopali Hall, Lehman, to Lehman Brothers Executive Committee Members, Lehman, *et al.* (June 9, 2008) [LBEX-DOCID 15861]).

[3271] Bank of America Equity Research Report, Lehman Brothers Holdings Inc. (June 9, 2008), at p. 1 [LBEX-DOCID 015863] (attached to e-mail from Roopali Hall, Lehman, to Lehman Brothers Executive Committee Members, Lehman, *et al.* (June 9, 2008) [LBEX-DOCID 15861]).

[3272] Goldman Sachs Report, Lehman Brothers Holdings Inc. (June 9, 2008), at p. 1 [LBEX-DOCID 015863] (attached to e-mail from Roopali Hall, Lehman, to Lehman Brothers Executive Committee Members, Lehman, *et al.* (June 9, 2008) [LBEX-DOCID 15861])

- "Despite the negative results this quarter, there were some positive takeaways: Balance sheet and leverage reduced . . . . Riskier assets cut . . . ."[3273]

- "Overall, we believe the company's moves to de-leverage the balance sheet are positive factors from a ratings perspective."[3274]

- "LEH reduced its balance sheet by $130bn (or 17%) and reduced net assets by $60bn.  Even despite the large loss, this drove net leverage down to 12.5x and gross leverage below 25x.  After the announced capital raise of $4bn in common equity and $2bn in mandatory convertible preferred, we expect gross leverage on a pro forma basis to fall to close to 20x and net leverage to fall to 10x – by far the lowest in the industry (25% – 35% lower than peers) . . . . [M]anagement noted that much of the sell down was focused on the riskier and less liquid assets, rather than the high grade and more liquid securities."[3275]

- "Lehman is the most levered large investment bank to the fixed income market, and hence a more challenging fixed income market (with higher long-term interest rates, lower volatility and wider credit spreads) could hurt them the most . . . . While Lehman reduced gross leverage from 32x to 25x, increased their liquidity pool from $34B to $45B, & drove reductions across most troubled asset classes (& reduced total assets by $130B, or 17%), we await more details on total remaining troubled assets in aggregate as well as a L-III or illiquid asset update to help answer the question of whether $6B incremental capital raise is sufficient."[3276]

- "The company's gross leverage ratio improved to 24.3x (vs. 31.7x in 1Q08) and its net leverage ratio decreased to 12.0x, down from 15.4x in the prior

[3273] Buckingham Research Report, Lehman Brothers Holdings Inc. (June 9, 2008), at p. 2 [LBEX-DOCID 245428] (attached to e-mail from Roopali Hall, Lehman, to Lehman Brothers Executive Committee Members, Lehman, *et al.* (June 9, 2008) [LBEX-DOCID 244039]).

[3274] CreditSights Report, Lehman Brothers Holdings Inc. (June 9, 2008), at p. 4 [LBEX-DOCID 245428] (attached to e-mail from Roopali Hall, Lehman, to Lehman Brothers Executive Committee Members, Lehman, *et al.* (June 9, 2008) [LBEX-DOCID 244039]).

[3275] Buckingham Research Report, Lehman Brothers Holdings Inc. (June 9, 2008), at p. 2 [LBEX-DOCID 245428] (attached to e-mail from Roopali Hall, Lehman, to Lehman Brothers Executive Committee Members, Lehman, *et al.* (June 9, 2008) [LBEX-DOCID 244039]).

[3276] Bank of America Equity Research Report, Lehman Brothers Holdings Inc. (June 9, 2008), at pp. 1, 3 [LBEX-DOCID 245428] (attached to e-mail from Roopali Hall, Lehman, to Lehman Brothers Executive Committee Members, Lehman, *et al.* (June 9, 2008) [LBEX-DOCID 244039]).

quarter.  The improvement in the leverage ratios were driven by lower asset levels, partially offset by a drop in equity as the firm delevered its balance sheet.  Lehman noted that it had finished the balance sheet de-leveraging it wanted to achieve, but it had not achieved the balance sheet mix that it wanted.  So, we sense the company will continue to opportunistically dispose of mortgage-related exposures and leveraged lending."[3277]

### f) The Purpose of Lehman's Repo 105 Program Was to Reverse Engineer Publicly Reported Financial Results

When senior management gave balance sheet targets to business divisions within Lehman, the orders were given so that the firm could manage its business towards a target net leverage ratio with an eye toward rating agencies and the firm's public disclosures.[3278]  Lehman used SFAS 140's true sale accounting treatment for Repo 105 transactions and Repo 105 cash borrowings to make its balance sheet appear stronger than it actually was.  In order for this off-balance sheet device to benefit Lehman, the firm had to conceal information regarding its Repo 105 practice from the public.

### (1) Lehman Did Not Disclose Its Accounting Treatment For or Use of Repo 105 Transactions in Its Forms 10-K and 10-Q

Lehman reported a lower net leverage ratio in its publicly filed financial statements without revealing that it employed Repo 105 transactions to manage its net leverage ratio.  Several Lehman witnesses with financial reporting responsibilities

---

[3277] CreditSights Report, Lehman Brothers Holdings Inc. (June 16, 2008), at p. 2 [LBEX-DOCID 015911].

[3278] Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 5 (stating that Lehman as a firm managed its entire business towards a target net leverage ratio); Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 10 (stating that businesses within Lehman managed their respective businesses toward balance sheet targets).

confirmed the Examiner's conclusion that Lehman did not disclose its accounting treatment or use of Repo 105 transactions in its Forms 10-K and 10-Q.[3279]

Ed Grieb, former Lehman Financial Controller who prepared Lehman's Form 10-Q and Form 10-K statements, recalled that Lehman did not disclose its use of Repo 105 transactions or the accounting treatment they received.[3280] Marie Stewart, former Global Head of Accounting Policy, also said that Lehman made no disclosures relating to its Repo 105 program.[3281]

Lehman's increasing reliance on Repo 105 transactions and the absence of any disclosure of that fact in Lehman's Forms 10-Q and 10-K disquieted Martin Kelly (whose department was responsible for the preparation of Lehman's periodic reports).[3282] Kelly, Grieb's successor, told the Examiner that if an analyst or a member of the investing public were to read Lehman's Forms 10-Q and 10-K from cover to cover, taking as much time as she or he needed, "they would have no transparency into [Lehman's] Repo 105 program."[3283]

Similarly, Matthew Lee, who reported to Kelly, recalled that Lehman did not disclose its Repo 105 practice in its publicly filed statements. "If you don't say anything, is that disclosure? [Lehman] was telling the public they reduced the balance

---

[3279] A detailed analysis of Lehman's Form 10-K and 10-Q misstatements and omissions appears in Section III.A.4.j.2.c.ii of this Report.
[3280] Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 14.
[3281] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 15.
[3282] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 9.
[3283] *Id.*

sheet, but not telling them they were doing so by unartful means."[3284]  Lee recalled that Lehman "had way more leverage than people thought; it was just out of [the public's] sight."[3285]

### (a)  Lehman's Outside Disclosure Counsel Was Unaware of Lehman's Repo 105 Program

Simpson Thacher & Bartlett served as Lehman's disclosure counsel in connection with Lehman's preparation and filing of its Forms 10-Q and 10-K statements during the time periods relevant to the Examiner's investigation.  Andrew Keller, a Simpson Thacher partner involved in the preparation of Lehman's publicly filed financial statements, was not aware of Lehman's use of Repo 105 transactions, either by name or description.  Nor was Keller aware of the impact Lehman's use of Repo 105 transactions had on Lehman's reported net leverage.[3286]

In his role as Lehman's disclosure counsel, Keller "always assumed that repos were treated as secured financings" because that was the "general rule" and was Lehman's stated policy in the notes to its financial statements.[3287]

Though he never had such a discussion with Lehman personnel regarding Repo 105, Keller advised the Examiner that if he had needed to discuss an off-balance sheet

---

[3284] Examiner's Interview of Matthew Lee, July 1, 2009, at p. 16.

[3285] *Id.*

[3286] Examiner's Interview of Andrew Keller, Nov. 20, 2009, at p. 3.  Keller explained that he generally spoke directly to Lehman's in-house counsel and Ryan Traversari, Senior Vice President of External Reporting, who reported to Lehman's Global Financial Controller.  *Id.*

[3287] *Id.*; *cf.* Section III.A.4.j.2.c of this Report, discussing Lehman's actual Form 10-K and 10-Q disclosures regarding its repo transactions, including its statement that it treated repo transactions as financing transactions for reporting purposes.

item with Lehman as a general matter, he would have likely spoken to Ryan Traversari, Lehman's Senior Vice President of External Reporting, who reported to the Financial Controller.[3288]  Traversari, whom Keller relied upon, knew about but did not disclose Lehman's Repo 105 practice in his discussions with Keller.[3289]  In an interview with the Examiner, Traversari said he was familiar with Lehman's use of Repo 105 transactions and recalled that Lehman undertook these transactions on the basis of an opinion letter that a Lehman United Kingdom subsidiary had acquired.[3290] Traversari understood that Repo 105 transactions effectively reduced Lehman's net balance sheet and he did not recall any business purpose to the transactions.[3291]

### (2) Lehman's Repo 105 Practice Improved the Firm's Public Balance Sheet Profile at Quarter-End

Kaushik Amin, the former head of the Liquid Markets group within Lehman's FID (a large user of Repo 105 transactions), pressured those who reported to him to meet the balance sheet targets that senior management imposed on Amin.[3292]  Amin

---

[3288] Examiner's Interview of Andrew Keller, Nov. 20, 2009, at p. 3.

[3289] *Id.* (stating that Ryan Traversari would have been the Lehman employee to inform him of off-balance sheet arrangements and that Keller was never informed of Repo 105 transactions or their accounting treatment); Examiner's Interview of Ryan Traversari, Sept. 24, 2009, at pp. 4-5 (stating that he was aware of Lehman's Repo 105 program and the impact of these transactions on Lehman's balance sheet).

[3290] Examiner's Interview of Ryan Traversari, Sept. 24, 2009, at pp. 4-5.

[3291] *Id.*

[3292] *See, e.g.*, E-mail from Gary Lynn, Lehman, to Kaushik Amin, Lehman (Aug. 22, 2006) [LBEX-DOCID 2786867] (informing Amin, nine days before quarter-end, that he may use $20 billion, rather than $17.5 billion, of Repo 105 transactions in order to meet balance sheet target, but that with the additional $2.5 billion of Repo 105, he is still $7.9 billion over his net balance sheet target); e-mail from Kaushik Amin, Lehman, to Thomas Siegmund, Lehman (Aug. 23, 2006) [LBEX-DOCID 2786869] ("We have additional $2.5 Bln in Repo 105 that the firm has signed off on . . . . So, let's max out the capacity. We should be able to use some of the collateral from the Agency business in the US."); e-mail from Gary Lynn, Lehman, to

explained that the quarter-end rush to meet balance sheet targets put discipline on traders to liquidate securities inventory as quickly as possible.[3293]   Indeed, the investigation and review of internal Lehman documents revealed that Amin often sent forceful balance sheet target e-mails to those who reported to him, or on behalf of his peers, often at or near the close of the quarter.[3294]

Lehman management cared more about meeting quarter-end balance sheet targets, as opposed to monthly balance sheet targets, because Lehman's quarter-end balance sheet figures were published in the firm's quarterly financial reports and 10-Q

---

Sharan Mirchandani, Lehman, *et al.* (Feb. 21, 2007) [LBEX-DOCID 1431154] (writing one week before quarter-end, "[W]e are significantly over the Q1 balance sheet limits for IRP and LMP with one week to go, and Kaushik has delivered that message to the business heads that we need to come down further as there is no room for us to be over our limits"); e-mail from Clement Bernard, Lehman, to Kaushik Amin, Lehman (Feb. 25, 2008) [LBEX-DOCID 1849835] (Bernard: "To follow up on our conversation on Friday on the net balance sheet for Q1. We are currently running at 15.0 bn above and we need to go down an extra $5.0 bn for the firm to meet its net leverage limit of 15.2." Amin: "The entire team is focused on this and I am pushing everybody pretty hard. We should make the target."); e-mail from Kaushik Amin, Lehman, to Martin Kelly, Lehman (Apr. 17, 2008) [LBEX-DOCID 3223698] (following FID Asia's attempt to apply the Repo 105 mechanism to Australian securities, which Marie Stewart in Lehman's Accounting Policy forbade, Amin implored Kelly: "This is important for us. Would appreciate your help here").

[3293] Examiner's Interview of Kaushik Amin, Sept. 17, 2009, at pp. 5-6.

[3294] E-mail from Gary Lynn, Lehman, to Sharan Mirchandani, Lehman, *et al.* (Feb. 21, 2007) [LBEX-DOCID 1431154] ("As you are aware we are significantly over the Q1 balance sheet limits…with one week to go, and Kaushik has delivered that message to the business heads that we need to come down further as there is no room for us to be over our limits."); e-mail from Kaushik Amin, Lehman, to Kieran Higgins, Lehman (Feb. 28. 2008) [LBEX-DOCID 3234351] ("We have a desperate situation and I need another 2 billion from you, either through Repo 105 or outright sales. Cost is irrelevant, we need to do it."); e-mail from Kaushik Amin, Lehman, to Borut Miklavcic, Lehman (May 13, 2008) [LBEX-DOCID 2103909] ("[M]y target for Global Rates is only $75 Billion. There is no way I can hit my global target with you anywhere close to your current number."); e-mail from Kaushik Amin, Lehman, to Thomas Siegmund, Lehman (May 21, 2008) [LBEX-DOCID 756545] ("Do as much as you can in Repo 105. Can you find Repo 105 capacity among Japanese counterparties to take US Agencies?"); e-mail from Kaushik Amin, Lehman, to Kieran Higgins, Lehman (May 21, 2008) [LBEX-DOCID 3234382] ("Let's max out on the Repo 105 for your stuff and see where we end up.").

statements.[3295]   As one e-mail put it, "The recent increase in [Repo] 105 business was urgently transacted to improve the Firm's balance sheet profile over . . . quarter-end."[3296]  In another e-mail discussing Repo 105 usage at quarter-end, Michael McGarvey wrote: "We only focus on meeting our quarter end balance sheet targets. The intra month targets historically haven't been actively managed."[3297]   Later in the same e-mail, McGarvey continued: "Being the non-quarter month end balance sheets aren't

[3295] Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 5.

[3296] *See* e-mail from Stephen Allery, Lehman, to Miyuki Suzuki, Lehman (Aug. 31, 2007) [LBEX-DOCID 98492]. This e-mail chain regarding Allery's ongoing attempt to get increased capacity to undertake Repo 105 transactions with Mizuho contains interesting dialogue that provides transparency into the levels to which Lehman personnel went to utilize Repo 105 transactions for balance sheet relief during the late 2007-early 2008 time period. In November 2007, Allery implored Suzuki, "Given the very sensitive business environment faced by Lehman at present and *our on-going desire to manage balance sheet to bolster our image* and financial strength objectives, I am rather disappointed that Credit is imposing this rigid approach [*i.e.*, a limit to Repo 105 capacity]. Is there any latitude *to trade at higher levels across key reporting dates* such as Nov 30th?" E-mail from Stephen Allery, Lehman, to Miyuki Suzuki, Lehman (Nov. 8, 2007) [LBEX-DOCID 98492] (emphasis added). November 30 was the end of Lehman's fiscal year. Allery continued to press for Repo 105 capacity with Mizuho. On February 19, 2008, he wrote, "Quarter-end is approaching and we would like to maximize balance sheet efficiency via Mizuho." E-mail from Stephen Allery, Lehman, to Miyuki Suzuki, Lehman (Feb. 19, 2008) [LBEX-DOCID 98492]. The next day, he wrote again to Suzuki, "Sorry to chase, but we are being asked about our capacity to help FID reduce B/S at qtr-end." E-mail from Stephen Allery, Lehman, to Miyuki Suzuki, Lehman (Feb. 20, 2008) [LBEX-DOCID 98492]. Suzuki replied, "Could you advise how much you need for the balance sheet relief for the quarter end?" E-mail from Miyuki Suzuki, Lehman, to Stephen Allery, Lehman (Feb. 21, 2008) [LBEX-DOCID 98492]. On February 28, 2008, one day before the close of the quarter, Lehman's credit line for Repo 105 transactions with Mizuho was finally doubled to $5 billion. E-mail from Miyuki Suzuki, Lehman, to Stephen Allery, Lehman (Feb. 28, 2008) [LBEX-DOCID 98492]; *see also* Lehman Brothers, Credit Risk Management, Credit Review, Mizuho Financial Group, Inc. (Nov. 27, 2007) [LBEX-DOCID 2513180] (containing review and proposal for Repo 105 line increase with Mizuho, stating that "limit increase is to accommodate . . . increasing business requests for repo 105 activities at LBIE for our balance sheet relief, especially toward our fiscal year end" and attached to e-mail from Fumiyoshi Ooka, Lehman, to Patrick McGarry, Lehman (Nov. 27, 2007) [LBEX-DOCID 2552287]).

[3297] E-mail from Michael McGarvey, Lehman, to Dominic Gibb, Lehman, *et al.* (Dec. 20, 2007) [LBEX-DOCID 3223846].

published in the financials we don't focus on them. We don't want traders spending money to come down in balance sheet unless it's really necessary."[3298]

### (a) Contemporaneous Documents Confirm That Lehman Undertook Repo 105 Transactions to Reduce Its Balance Sheet and Reverse Engineer Its Leverage

Lehman's Repo 105 practice engendered a certain level of cynicism within the firm.[3299] Notably, in response to an e-mail stating "[n]ot sure you are familiar with Repo 105 but it is used to reduce net balance sheet in our governments businesses around the

---

[3298] E-mail from Michael McGarvey, Lehman, to Dominic Gibb, Lehman (Dec. 20, 2007) [LBEX-DOCID 3223846]. Dominic Gibb, a Lehman Managing Director based in London, became "nervous" about McGarvey's statements regarding quarter-end focus, writing: "We historically haven't liked to see massive swings in our utilisation of repo 105 just at quarter end." E-mail from Dominic Gibb, Lehman, to Michael McGarvey, Lehman (Dec. 20, 2007) [LBEX-DOCID 3223846]. This sentiment was echoed by Gerard Reilly, who replied to a request by Clement Bernard for expanded capacity for Repo 105 transactions to reduce the firm's balance sheet as follows: "If we find our positions in this manner all the time then we can do it. Can't just be at quarter end." E-mail from Gerard Reilly, Lehman, to Clement Bernard, Lehman (Jan. 29, 2008) [LBEX-DOCID 2796630]. *See* Section III.A.4.f.3 (discussing continual use and 120% rules).

[3299] One e-mail appears to reflect a certain level of nervousness by one Lehman employee with respect to how counterparties would react to the "truth" about Repo 105 transactions. In the e-mail, LBIE's Jawad wrote to Higgins about his "quest for more counterparties for 105." *See* e-mail from Anthony Jawad, Lehman, to Kieran Higgins, Lehman (May 22, 2008) [LBEX-DOCID 3234386]. Jawad reported that the Reserve Bank of Australia asked Lehman why Lehman wanted to engage in Repo 105 transactions. *Id.* Jawad then stated, "I spoke to Mark Cosaitis about this and he obviously would like us to give a vague reason about getting better net down treatment, which isn't a lie. However, if they want a deeper explanation then we may have to get down to the nitty gritty of the truth. Do you want us to go down this line or want us to just give it a miss . . . . [T]he more people that know the truth, the more dodgy it can be." *Id.* Assi wrote back, "For the record the truth is that what we are doing is perfectly legal." *Id.* Amin replied, "My view is the same as Georges'. Accounting rules are very clear around Repo 105 . . . ." *Id.* The statement by Jawad about "better net down treatment" refers to Lehman's terminology for the reduction of net assets by means of Repo 105. *See* Duff & Phelps, Explanation of Repo 105 Accounting Ledger Entries and Trading System Output (Jan. 5, 2010), at pp. 3-4 (stating that "net down was the method of removal of the security from Lehman's consolidated balance sheet, *i.e.*, the amount by which the securities inventory would be reduced (sold) in a Repo 105 transaction pursuant to Lehman's Accounting Policy"). Though Assi referred to the legality of repo transactions, the issue from the Examiner's perspective is whether proper disclosure has been made by Lehman in its securities filings and other public statements.

world," Bart McDade, Lehman's former President and Chief Operating Officer, replied:

"I am very aware . . . it is another drug we r on."[3300]

Numerous internal Lehman e-mails referred to Repo 105 transactions in pejorative terms, such as "balance sheet window-dressing."  An illustrative example is found in the following July 2008 e-mail exchange:

> Vallecillo:  "So what's up with repo 105? Why are we doing less next quarter end?"[3301]
>
> McGarvey:  "*It's basically window-dressing. We are calling repos true sales based on legal technicalities*. The exec committee wanted the number cut in half."[3302]
>
> Vallecillo:  "I see . . . so it's legally do-able but doesn't look good when we actually do it?  Does the rest of the street do it?  Also is that why we have so much BS [balance sheet] to Rates Europe?[3303]
>
> McGarvey:  "Yes, No and yes. :)"[3304]

---

[3300] E-mail from Herbert H. (Bart) McDade III, Lehman, to Hyung Lee, Lehman (Apr. 3, 2008) [LBEX-DOCID 1570783].  During his first interview with the Examiner, McDade attempted to explain his "drug" comment as simply the thought that Repo 105 might be an easier way of managing the balance sheet than a more disciplined approach.  Examiner's Interview of Herbert H. "Bart" McDade III, Sept. 16, 2009, at p. 4.  In a related e-mail, McDade continued with his drug analogy.  In response to an e-mail stating that a Repo 105 counterparty's refusal to roll Lehman's Repo 105 transactions would lead to an increase in Lehman's quarter-end net balance sheet unless Lehman could find an additional Repo 105 counterparty, McDade stated that this was "exactly why the drug is a problem."  E-mail from Herbert H. (Bart) McDade III, Lehman, to Andrew J. Morton, Lehman (Apr. 3, 2008) [LBEX-DOCID 2984871].

[3301] E-mail from Jormen Vallecillo, Lehman, to Michael McGarvey, Lehman (July 2, 2008) [LBEX-DOCID 3379145].

[3302] E-mail from Michael McGarvey, Lehman, to Jormen Vallecillo, Lehman (July 2, 2008) [LBEX-DOCID 3379145] (emphasis added).

[3303] E-mail from Jormen Vallecillo, Lehman, to Michael McGarvey, Lehman (July 2, 2008) [LBEX-DOCID 3379145].

[3304] E-mail from Michael McGarvey, Lehman, to Jormen Vallecillo, Lehman (July 2, 2008) [LBEX-DOCID 3379145].

Numerous other internal Lehman e-mails confirm that Lehman's true purpose for undertaking Repo 105 transactions at quarter-end was balance sheet and leverage manipulation. By way of example only:

- In reference to the Agencies business's use of Repo 105 transactions: "As we approach quarter end, we start to raise the balances so that we 'reserve' size with our counterparties the week we really need it (over quarter end). At this fiscal year end we took the amounts up as high as we could, as we knew there would be intense balance sheet pressure."[3305]

- "[T]he firm has a function called repo 105 whereby you can repo a position for a week and it is regarded as a true sale to get rid of net balance sheet."[3306]

- "We have been using Repo 105 in the past to reduce balance sheet at quarter-end. . . ."[3307]

- When Lehman's repo trading desk in London informed personnel in Lehman's New York Fixed Income Division that certain Repo 105 counterparties were no longer interested in participating in Repo 105 transactions, Kentaro Umezaki wrote to Clement Bernard and Gerard Reilly, copying Kaushik Amin and Andrew Morton, stating "Looks like we may need to rethink how much of [Repo 105] we can rely on for balance sheet relief. Could someone in Finance coordinate how much of this we should expect to have available for balance sheet relief at month/quarter end going forward?"[3308]

---

[3305] E-mail from Mitchell King, Lehman, to Mark Gavin, Lehman, *et al.* (Dec. 3, 2007) [LBEX-DOCID 3232555].

[3306] E-mail from Anthony Jawad, Lehman, to Andrea Lenardelli, Lehman (Mar. 3, 2008) [LBEX-DOCID 235036].

[3307] E-mail from Raymond Chan, Lehman, to Paul Mitrokostas, Lehman (July 15, 2008) [LBEX-DOCID 3384937].

[3308] E-mail from Kentaro Umezaki, Lehman, to Clement Bernard, Lehman, *et al.* (Sept. 4, 2007) [LBEX-DOCID 3232534]. Numerous other documents support the conclusion that Lehman's Repo 105 program was a mechanism for managing the balance sheet at quarter-end. *See, e.g.*, e-mail from Anuraj Bismal, Lehman, to Marie Stewart, Lehman, *et al.* (Jan. 29, 2008) [LBHI-SEC07940_861461] (consisting of e-mail chain discussion regarding balance sheet projections and rise in net leverage in which Michael McGarvey states that additional Repo 105 will clean up the balance sheet and Anuraj Bismal calls Repo 105/108 "an important feature."); e-mail from Sigrid Stabenow, Lehman, to Gerard Reilly, Lehman, *et al.* (Jan. 30, 2008) [LBEX-DOCID 4292184] (reporting to Reilly and Clement Bernard regarding "the gap to quarter end

- Bernard wrote to Amin and Higgins on February 28, 2008, regarding FID's net balance sheet overage; in particular, Bernard indicated that FID's Rates business was $4.5 billion over target.[3309] Bernard warned: "This will drive Lehman net leverage ratio above target. Please let me know what we can do to minimize this impact . . . . I know it is late in the process but what ever we can do would help our ratio."[3310] Later that day, Bernard forwarded that message to Martin Potts, adding the message: "We are looking at selling what ever we can and also doing some more repo 105."[3311]

- After successfully lobbying for additional Repo 105 capacity at quarter-end, Jeff Michaels wrote to Amin: "The good news is . . . as soon as lehman gives the green light, we can reduce the net/gross by another 2.5–3 bn."[3312]

Indeed, Repo 105 transactions became such a deeply ingrained feature of balance sheet management that balance sheet targets and Repo 105 often were discussed together, as when Michaels e-mailed Amin "a spreadsheet Tejal [Joshi] helped me put together with my suggested allocations for the global balance sheet/repo 105 for this quarter."[3313] When Michaels explained in an e-mail that he was working on balance

---

target" and stating that "FID is forecasting to be $15 bn over quarter end limit" and FID leaders made a "[r]ecommendation that Repo 105 program is expanded."); e-mail from Jerry Rizzieri, Lehman, to Kieran Higgins, Lehman, *et al.* (Apr. 22, 2008) [LBEX-DOCID 756532] (following the announcement of "new balance sheet targets for quarter end," Rizzieri wrote: "We will need to be focused very early in the process in order to meet these targets," that there is "no room for error this quarter" and that accordingly "we also need to have a coordinated approach to repo 105 allocation").

[3309] E-mail from Clement Bernard, Lehman, to Kaushik Amin, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 1854189].

[3310] *Id.*

[3311] E-mail from Clement Bernard, Lehman, to Martin Potts, Lehman (Feb. 28, 2008) [LBEX-DOCID 1854189].

[3312] E-mail from Jeff Michaels, Lehman, to Kaushik Amin, Lehman (May 21, 2008) [LBEX-DOCID 736186].

[3313] E-mail from Jeff Michaels, Lehman, to Kaushik Amin, Lehman, *et al.* (July 31, 2008) [LBEX-DOCID 756327] (transmitting attached spreadsheet of balance sheet targets and Repo 105 allocations [LBEX-DOCID 633334]).

sheet allocations, he wrote: "It is really a bottom-up process about who has sticky inventory. Obviously in the US it is Agencies, and in London it is Inflation."[3314]

Lehman's internal balance sheets tracked the firm's Repo 105 usage and its resulting benefit to the firm-wide balance sheet.[3315] These balance sheets were used by

---

[3314] E-mail from Jeff Michaels, Lehman, to Kaushik Amin, Lehman (July 30, 2008) [LBEX-DOCID 613324]. Because Michaels worked for the Liquid Markets division, "sticky" in this context does **not** refer to actually illiquid assets, but rather, is used relative to the most liquid inventory. Sticky agencies, for example, would likely refer to "off-the-run" securities – all government and treasury securities issued before the most recently issued security of a particular maturity is "off the run." "Off the run" securities are less frequently traded and are therefore "illiquid" compared to the most recently issued security.

[3315] *See, e.g.,* Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary [Draft] (Aug. 31, 2007) [LBEX-DOCID 3215510] (stating Repo 105 usage on Aug. 31, 2007 was $36.627 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary [Draft] (Sept. 28, 2007) [LBEX-DOCID 2705059] (stating Repo 105 usage on Sept. 28, 2007 was $24.406 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary [Draft] (Oct. 31, 2007) [LBEX-DOCID 2705943] (stating Repo 105 usage on Oct. 31, 2007 was $29.623 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Nov. 30, 2007) [LBEX-DOCID 3439086] (stating Repo 105 usage on Nov. 30, 2007 (quarter-end) was $38.634 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Jan. 29, 2008) [LBEX-DOCID 3363236] (stating Repo 105 usage on Jan. 29, 2008 was $28.883 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Feb. 13, 2008) [LBEX-DOCID 1697794] (stating Repo 105 usage on Feb. 13, 2008 was $23.602 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Feb. 22, 2008) [LBEX-DOCID 3363289] (stating Repo 105 usage on Feb. 22, 2008 was $31.029 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Feb. 29, 2008) [LBEX-DOCID 579841] (stating Repo 105 usage on Feb. 29, 2008 (quarter-end) was $49.102 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Mar. 13, 2008) [LBEX-DOCID 765323] (stating Repo 105 usage on Mar., 13, 2008 was $26.212 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Apr. 14, 2008) [LBEX-DOCID 766086] (stating Repo 105 usage on Apr. 14, 2008 was $19.546 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Apr. 21, 2008) [LBEX-DOCID 766088] (stating Repo 105 usage on Apr. 21, 2008 was $21.907 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Apr. 28, 2008) [LBEX-DOCID 766092] (stating Repo 105 usage on Apr. 28, 2008 was $24.077 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Draft) (Apr. 30, 2008) [LBEX-DOCID 394333] (stating Repo 105 usage on Apr. 30, 2008 was $24.709 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (May 6, 2008) [LBEX-DOCID 766102] (stating Repo 105 usage on May 6, 2008 was $24.388 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (May 13, 2008) [LBEX-DOCID 766107] (stating Repo 105 usage on May 13, 2008 was $25.282 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (May 28, 2008) [LBEX-DOCID 766924] (stating Repo 105 usage on May 28, 2008 was $43.112 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (May 29, 2008) (stating Repo 105 usage on May 29, 2008 was $46.820 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Aug. 14, 2008) [LBEX-DOCID 84891] (stating

management and were not reported externally.[3316]   LBHI's Global Consolidated Balance Sheet, for example, showed securities inventory levels pre-Repo 105 usage and with Repo 105, and contained columns for "Repo 105/108 added back" as well as balance sheet targets.[3317]   The Fixed Income Division's Global Rates business's balance sheet projections spreadsheets recorded the balance sheet target and projected net balance sheet, and populated with data individual columns for "actual pre-Repo 105," "Repo 105," "actual post-Repo 105," and "Repo 105 target."[3318]   The Global Rates business's balance sheet management reports included side-by-side columns for gross balance sheet, net balance sheet, and Repo 105.[3319]   Other balance sheet spreadsheets from the

Repo 105 usage on Aug. 14, 2008 was $18.274 billion); *see also* e-mail from Mark Neller, Lehman, to Anthony Kush, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223384] ("Please be aware that all Repo 105 benefit taken to Management Balance Sheet at November month end needs to be replicated within respective entities DBS accounting.").

[3316] *See* e-mail from Jody Li, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Mar. 15, 2008) [LBEX-DOCID 117307] (transmitting to Lehman's Treasurer the Global Consolidated Balance Sheet [LBEX-DOCID 120158] showing Repo 105 balance on Mar. 13, 2008); e-mail from Gerard Reilly to Herbert H. (Bart) McDade III (Mar. 27, 2008) [LBEX-DOCID 560109] (transmitting Global Consolidated Balance Sheet for Feb. 29, 2008 (Mar. 27, 2008) [LBEX-DOCID 579841] and stating "Bart this is the firm bs"); e-mail from Atiba Rodriguez, Lehman, to Clement Bernard, Lehman, *et al.* (May 29, 2008) [LBEX-DOCID 3221577] (transmitting Global Consolidated Balance Sheet [LBEX-DOCID 3237577] to Chief Financial Officer for FID).

[3317] E-mail from Gerard Reilly to Herbert H. (Bart) McDade III (Mar. 27, 2008) [LBEX-DOCID 560109] (transmitting Global Consolidated Balance Sheet for Feb. 29, 2008 (Mar. 27, 2008) [LBEX-DOCID 579841] to President and COO and stating "Bart this is the firm bs").

[3318] Lehman, Global Rates Net Balance Sheet (Dec. 20, 2007) [LBEX-DOCID 3215591] (attached to e-mail from Mark Neller, Lehman, to Divyesh Chokshi, Lehman (Dec. 21, 2007) [LBEX-DOCID 3234333]).

[3319] Lehman, Global Rates Q3 Balance Sheet Management (Aug. 18, 2008) [LBEX-DOCID 637339] (attached to e-mail from Tejal Joshi, Lehman, to Kaushik Amin, Lehman, *et al.* (Aug. 19, 2008) [LBEX-DOCID 736504]); Lehman, Global Rates Q3 Balance Sheet Management (Aug. 19, 2008) [LBEX-DOCID 637341] (attached to e-mail from Tejal Joshi, Lehman, to Kaushik Amin, Lehman, *et al.* (Aug. 20, 2008) [LBEX-DOCID 736507]); Lehman, Global Rates Q3 Balance Sheet Management (Aug. 21, 2008) [LBEX-DOCID 637338] (attached to e-mail from Tejal Joshi, Lehman, to Kaushik Amin, Lehman, *et al.* (Aug. 22, 2008) [LBEX-DOCID 736506]).

Rates business tracked net balance sheet, "[a]dditional Repo 105," reduction of government inventory, and total balance sheet reduction by trading desk.[3320]  Similarly, the Liquid Markets group within FID reported internal balance sheet projection figures for both gross and net balance sheet targets along with Repo 105.[3321]

Senior management exerted pressure, particularly at or near quarter-end, to utilize the Repo 105 mechanism to meet the firm-imposed balance sheet targets:

- Four days before the close of Lehman's fiscal year in November 2007, Mitch King wrote to Marc Silverberg: "Let me know if we have room for any more repo 105. I have some more I can put in over month end."[3322]  Jerry Rizzieri, who reported directly to Kaushik Amin, replied to King: "Can you imagine what this would be like without 105?"[3323]

- On February 28, 2008, one day before the close of Lehman's first quarter 2008, Amin, then-Head of Liquid Markets, wrote to Kieran Higgins: "We have a desperate situation and I need another 2 billion from you, either through Repo 105 or outright sales. Cost is irrelevant, we need to do it."[3324]

- Also on February 28, 2008, Mark Gavin wrote to John Feraca: "Just took a call from FID mgmt - seems they're up on net b/s by 3 bln unanticipated & are a little excited w Q end. I am looking to do an additional repo 105 with Mizuho. . . ."[3325]

---

[3320] Lehman, Rates Americas Balance Sheet (Feb. 26, 2008) [LBEX-DOCID 3218412] (attached to e-mail from Michael McGarvey, Lehman, to Jerry Rizzieri, Lehman (Feb. 28, 2008) [3233807].

[3321] Lehman, Liquid Markets Balance Sheet (May 15, 2008) [LBEX-DOCID 3439007] (attached to e-mail from Michael McGarvey, Lehman, to Tal Litvin, Lehman (May 19, 2008) [LBEX-DOCID 3383917].

[3322] E-mail from Mitchell King, Lehman, to Marc Silverberg, Lehman (Nov. 26, 2007) [LBEX-DOCID 3232804].

[3323] E-mail from Jerry Rizzieri, Lehman, to Mitchell King, Lehman (Nov. 26, 2007) [LBEX-DOCID 3232804].

[3324] E-mail from Kaushik Amin, Lehman, to Kieran Higgins, Lehman (Feb. 28, 2008) [LBEX-DOCID 3234351].

[3325] E-mail from Mark Gavin, Lehman, to John Feraca, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 98492].

- Higgins wrote to Jeff Michaels, on May 2, 2008: "In light of…the firms max ratio at q end to month avg [] we started to [Repo] 105 irp balance sheet several weeks ago for q end (this has a real cost though)."[3326]

- On May 21, 2008, Amin wrote to Higgins: "Let's max out on the Repo 105 for your stuff and see where end up."[3327]  When Amin asked Higgins for an update on the balance sheet management, Higgins replied: "*[A]nything that moves is getting 105'd.*"[3328]

- In an e-mail from McGarvey to Reilly written ten days before the close of Lehman's second quarter 2008, McGarvey wrote: "Kaushik [Amin] has just requested that they do as much Repo 105 as possible."[3329]

- In an e-mail to Thomas Siegmund, also ten days from the close of Lehman's second quarter, Amin wrote: "Do as much as you can in Repo 105.  Can you find Repo 105 capacity among Japanese counterparties to take US Agencies?"[3330]

- As the close of Lehman's third quarter 2008 was approaching, Amin asked Andrew Morton, then-head of Lehman's Fixed Income Division, for additional Repo 105 authority in order to make balance sheet targets.[3331]

---

[3326] E-mail from Kieran Higgins, Lehman, to Jeff Michaels, Lehman (May 2, 2008) [LBEX-DOCID 601783].

[3327] E-mail from Kaushik Amin, Lehman, to Kieran Higgins, Lehman (May 21, 2008) [LBEX-DOCID 3234382].

[3328] E-mail from Kieran Higgins, Lehman, to Kaushik Amin, Lehman (May 21, 2008) [LBEX-DOCID 3234382] (emphasis added).

[3329] E-mail from Michael McGarvey, Lehman, to Gerard Reilly, Lehman, *et al.* (May 21, 2008) [LBEX-DOCID 3221744].

[3330] E-mail from Kaushik Amin, Lehman, to Thomas Siegmund, Lehman (May 21, 2008) [LBEX-DOCID 756545]; *see also* e-mail from Jeff Michaels, Lehman, to Kaushik Amin, Lehman (May 27, 2008) [LBEX-DOCID 723365] (responding to Amin's message "Important to get as much of the Agency inventory out as possible," by stating: "They continue to do so, and have repo 105'd everything they can. . . .").

[3331] *See* e-mail from Kaushik Amin, Lehman, to Andrew J. Morton, Lehman (Aug. 20, 2008) [LBEX-DOCID 3234406] (responding to Morton's question "Can you keep going on bal sheet[?]" by stating: "I am squeezing hard. But, the challenge is that liquidity is poor given the European holidays. Most of our tough balance sheet is inflation and Agencies, which is extremely illiquid. I think we should relax the Repo 105 constraints a bit. Instead of $20 Bln, we should take it up to say $25 Bln.").

### (b) Witness Statements to the Examiner Regarding the True Purpose of Lehman's Repo 105 Practice

Virtually every witness the Examiner questioned regarding Lehman's Repo 105 practice, including some in the top echelon of Lehman's management, agreed that Lehman relied upon Repo 105 transactions to reduce its net balance sheet at quarter-end. Among the statements made during the investigation of the Repo 105 issue are:

- Paolo Tonucci, former Treasurer, recalled that near the end of reporting periods, Lehman would deploy Repo 105 transactions to reduce its balance sheet.[3332] He also acknowledged that Lehman's use of Repo 105 transactions impacted Lehman's net leverage ratio.[3333]

- Ian Lowitt, former Chief Financial Officer, recalled that Lehman established a "regime of limits," meaning balance sheet targets, for each business unit to manage to and that Repo 105 was one way to "sell down assets" to meet the targets.[3334]

- Ed Grieb, former Global Financial Controller, stated that Lehman's total assets were reduced by Repo 105 transactions because the securities inventory came off Lehman's books and, importantly, the cash that Lehman received in a Repo 105 transaction was used to pay down other liabilities or to pay for securities it repoed.[3335] Grieb made clear that Lehman would not have simply sat on the cash it received in Repo 105 transactions, which would have resulted in a net zero impact on Lehman's assets.[3336] Accordingly, Grieb agreed that one consequence of Lehman's Repo 105 transactions was a reduction in Lehman's net leverage ratio.[3337]

---

[3332] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 27.

[3333] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 26.

[3334] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 10.

[3335] Examiner's Interview of Edward Grieb, Oct. 2, 2009, at pp. 9, 11.

[3336] *Id*.

[3337] *Id*. at p. 11.

- Martin Kelly, former Global Financial Controller, said that "the only purpose or motive for [Repo 105] transactions was reduction in the balance sheet" and that "*there was no substance to the transactions.*"[3338]

- Clement Bernard, former Chief Financial Officer for FID, said that as the end of a quarter drew near, Lehman personnel relied upon Repo 105 transactions for "balance sheet relief" and to reach firm-imposed balance sheet targets.[3339]

- John Feraca, who ran the Secured Funding Desk in Lehman's Prime Services Group, stated: "Senior people felt urgency only in the sense of trying to get to their targets because the Finance Division wanted to report as healthy a balance sheet and leverage ratio as possible for investors, creditors, rating agencies and analysts."[3340] He added: "It was universally accepted throughout the entire institution that Repo 105 was used for balance sheet relief at quarter end."[3341]

- Kaushik Amin, former Head of Liquid Markets, said that Lehman reduced its net balance sheet at quarter-end by engaging in tens of billions of dollars of Repo 105 transactions and that a number of days after the opening of the new quarter, the Repo 105 inventory would return to Lehman's balance sheet.[3342]

- Matthew Lee, former Senior Vice President, Finance Division, in charge of Global Balance Sheet and Legal Entity Accounting, recalled that Lehman would "sell" assets through Repo 105 transactions approximately four or five days before the close of a quarter and then repurchase them approximately four or five days after the beginning of the next quarter in order to "reverse engineer" its net leverage ratio for its publicly filed financial statements.[3343]

---

[3338] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 7. *See* Sections III.A.4.g.1 and III.A.4.h.3.b–c of the Report for discussion of Kelly's discomfort with Repo 105 transactions; *see also* e-mail from Martin Kelly, Lehman, to Marie Stewart, Lehman (Feb. 14, 2008) [LBEX-DOCID 3223647] ("What is our current BS 'advantage' resulting from Repo 105/108 approx?"). When asked about this e-mail, Kelly told the Examiner that balance sheet "advantage" referred to a reduction of net balance sheet through Repo 105. Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 6.

[3339] Examiner's Interview of Clement Bernard, Oct. 23, 2009, at p. 7.

[3340] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 9.

[3341] *Id.*

[3342] Examiner's Interview of Kaushik Amin, Sept. 17, 2009 at p. 6.

[3343] Examiner's Interview of Matthew Lee, July 1, 2009, at p. 13.

- Marie Stewart, the former Global Head of Lehman's Accounting Policy Group, described Repo 105 transactions as "a lazy way of managing the balance sheet as opposed to legitimately meeting balance sheet targets at quarter end."[3344]

- Anuraj Bismal, former Senior Vice President in Lehman's Balance Sheet group, agreed with other witness statements describing the firm's Repo 105 program in pejorative terms, such as "window-dressing" and a "drug."[3345] Bismal explained that although Lehman had acquired a legal opinion and developed an accounting policy justifying Repo 105 transactions, there remained "discomfort" within Lehman regarding the use of Repo 105 transactions for removing securities inventory from the balance sheet.[3346]

- Murtaza Bhallo, the former Business/Risk Manager for PTG Liquid Markets, said that Repo 105 was "an accounting gimmick."[3347]

- Mitch King was the former head of Lehman's United States Agencies trading desk who was required on a weekly basis to compile lists of collateral available for inclusion in Repo 105 transactions and send the lists to LBIE personnel.[3348] King stated that no business purpose existed for Repo 105 transactions other than to reduce Lehman's net balance sheet.[3349] King referred to Lehman's Repo 105 program as a "nuisance."[3350] Accordingly, he said, "[t]here was no reason for me to go out and Repo 105."[3351] King further stated that "[f]rom a trader's perspective, I would have rather never seen anything Repo 105-related. It was just another thing I had to do that was not a trade and that was not a part of my business. I would not go out and seek to Repo 105 [*i.e.*, if he wasn't required to by superiors]."[3352]

[3344] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 7.

[3345] Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at pp. 7-8.

[3346] *Id.*

[3347] Examiner's Interview of Murtaza Bhallo, Sept. 14, 2009).

[3348] Examiner's Interview of Mitchell King, Sept. 21, 2009, at p. 6.

[3349] *Id.*

[3350] *Id.*

[3351] *Id.*

[3352] *Id.*

### (3) Quarter-End Spikes in Lehman's Repo 105 Usage Also Suggest the True Purpose of Lehman's Repo 105 Practice Was Balance Sheet Manipulation

The documentary evidence and witness statements establish that Lehman employed Repo 105 transactions for quarter-end balance sheet reduction. This conclusion is further confirmed by the fact that that Lehman's use of Repo 105 transactions regularly spiked up at quarter-end.[3353]

Notably, this quarter-end spike in Repo 105 usage occurred notwithstanding evidence that certain Lehman personnel expressed concern about the concentration of transactions at quarter-end. For example, Martin Kelly, Lehman's Global Financial Controller from December 1, 2007 through September 2008, said that he had "discomfort" with the "skewing of Repo 105 transactions at quarter-end."[3354] Kelly further explained that he had expressed that concern about the quarter-end concentration to both CFOs to whom he reported, Erin Callan and Ian Lowitt.[3355]

To the extent senior Lehman personnel had "discomfort" regarding the quarter-end spikes in Repo 105 usage, or concern about the risk of growing dependant upon large volumes of Repo 105 transactions at quarter-end given that the FASB could potentially change SFAS 140, Chris O'Meara, Ed Grieb, and Gerard Reilly mandated a set of two related guidelines loosely known within Lehman as (1) the "80/20" or

---

[3353] *See* Duff & Phelps, Repo 105/108 Usage vs. Limit Comment (Oct. 16, 2009), at pp. 7-9.

[3354] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 7.

[3355] *Id.* *See* Sections III.A.4.h.3.b–c of this Report (describing the conversations between Kelly and each Chief Financial Officer in detail).

"continual use rule" and (2) the "120% rule."[3356]   Those guidelines provided,

respectively, that (1) Repo 105 transactions outstanding at any time should be

maintained at a level throughout an entire month that was approximately 80% of the

amount at that month-end; and (2) the month or quarter-end spike in Repo 105 activity

could not result in a balance that exceeded 120% of the daily average usage throughout

that month.[3357]

---

[3356] Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 13.  Paolo Tonucci, former Treasurer, attributed the setting of a cap on Repo 105 usage to concern regarding overdependence on Repo 105 transactions to manage balance sheet.  Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 26.

[3357] *See* Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 2 [LBEX-WGM 748489] ("Repo 105 transactions must be executed on a continual basis and remain in force throughout the month. To meet this requirement, the amount outstanding at any time should be maintained at approximately 80% of the amount at month-end. [per Chris O'Meara and Ed Grieb."); e-mail from Michael McGarvey, Lehman, to Kentaro Umezaki, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 1635769] ("The guide line for month end usage of repo 105 is that it should not exceed 120% of your daily average.").  In another e-mail, McGarvey explained the rule to Clement Bernard (former FID CFO): "We have repo 105 funding benefit trades on constantly in the normal course of business because accounting policy stipulates it must be a regular way [to] fund our positions. We increase the balances for month end but try to keep it within 120 percent of the average daily usage (we are decent at this, not great)."  *See* e-mail from Michael McGarvey, Lehman, to Clement Bernard, Lehman (Jan. 31, 2008) [LBEX-DOCID 2796633].  McGarvey was mistaken, however, that the "continual use rule" was part of Lehman's Repo 105 Accounting Policy, which does not mention the guideline.  Grieb stated that the continual use rule was *not* an accounting-based rule.  Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 13.  *See also* E-mail from Clare Christofi, Lehman, to Joseph Gentile, Lehman, *et al.* (Dec. 1, 2006) [LBEX-DOCID 3234175] (forwarding earlier message stating "We have a provision for Repo 105/108 which is $24.6 bn…. The daily average for November is $18.1 bn giving $21.8 bn total that can be taken at 120%, so we are over by $2.9 bn."); e-mail from Anuraj Bismal, Lehman, to Clare Christofi, Lehman, *et al.* (May 8, 2007) [LBEX-DOCID 3234167] ("[I]t's more about consistent usage of Repo 105 and 108 - we should not have the deep troughs of usage that we used to have [in FID world]. The 80% rule that Clare talks about addresses that head on."); e-mail from Anuraj Bismal, Lehman, to Michael McGarvey, Lehman, *et al.* (May 9, 2007) [LBEX-DOCID 3223356] ("As the bs continues to grow- then maybe a higher limit would be supported by the 80% math."); e-mail from Divyesh Chokshi, Lehman, to Anuraj Bismal, Lehman, *et al.* (Aug. 14, 2007) [LBEX-DOCID 3234164] ("I thought that we had moved away from the Limit definitions as the desk needs to demonstrate a consistent application during the month of Repo [105] benefit taken."); e-mail from Divyesh Chokshi, Lehman, to Anuraj Bismal, Lehman, *et al.* (Aug. 14, 2007) [LBEX-DOCID 3234166] (disputing with Bismal whether Bismal knew that Lehman had moved away from limits and stating "we needed to ensure that there was a consistent application of Repo 105 Benefit. If hard limits have been set then let me know"; e-mail from Clare Christofi, Lehman, to Anuraj Bismal, Lehman, *et al.* (Aug. 14, 2007)

Grieb stated that the guidelines were "put in place to make sure the transactions had a legitimate business purpose."[3358]  Grieb, O'Meara, and Reilly "put together" the guidelines because they "wanted to see there was a business purpose, that counterparties were doing this on an ongoing basis, and . . . that there were no spikes just at the end of the month or quarter-end."[3359]

Anuraj Bismal similarly recalled that Lehman management mandated Repo 105 usage throughout a quarter to demonstrate that Lehman's use of Repo 105 transactions was not solely window-dressing aimed at improving the firm's quarter-end financial number.[3360]  Bismal stated that the so-called "80/20" rule was aimed at addressing firm-wide "discomfort" that no valid business reason existed for Repo 105 transactions.[3361]  In Bismal's words, the continual use rule was for mitigating "the dips between the peaks."[3362]

---

[LBEX-DOCID 3234180] ("Ed [Grieb] and Gerry [Reilly] were interested in the 80/120% of av daily balance…."); Lehman, Global Repo 105/108 vs. 120% of Daily Average Graph (July 31 - Aug. 15, 2007) [LBEX-DOCID 3219672] (attached to e-mail from Michael McGarvey, Lehman, to Steven Becker, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 3221344]); e-mail from Michael Anthony, Lehman, to Kieran Higgins, Lehman (Oct. 12, 2007) [LBEX-DOCID 738606] ("[I]t looks like the only limitation we have on size [for Repo 105] is the month end balance can't be more than 120% of our daily average throughout the month. More specifically for the index business, if all positions are term repo'd for at least one month than effectively there is no cap on size as our positions will be included as part of the daily average.").

[3358] Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 13.

[3359] *Id.*

[3360] Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 8.  According to Bismal, in approximately 2005, then-Chief Financial Officer Chris O'Meara requested that John Feraca prepare a "business case justification" document.  *Id.*  Bismal believed that the document set forth the proposition that if Repo 105 transactions were a normal (*i.e.*, constant) source of funding for Lehman, a valid business reason existed to undertake the transactions.  *Id.*

[3361] *Id.*

[3362] *Id.*

Lehman did not actually follow these self-imposed rules. That is not surprising, since no witness was able to explain a business rationale for the arbitrary 1x leverage, continual use, and 120% rules.[3363] If Repo 105 transactions made good business sense on their own, there would be no apparent reason to arbitrarily restrict the amount of such transactions to 1x leverage or to impose intra-month limits to ensure that the amount of the transactions at reporting periods did not spike to more than 120% of average usage. No reason, that is, except to keep the transactions under the radar, by limiting their total and the amount of a quarter-end spike.

These dips were nevertheless pronounced. For instance, the total amount of Repo 105 transactions at the end of first quarter (February) 2008 was approximately $49 billion, the intra-quarter dip as of April 30, 2008 was approximately $24.7 billion and the quarter-end amount for second quarter (May) 2008 was approximately $50.38 billion.[3364] Numerous balance sheet documents from Lehman's archives establish that Lehman's

---

[3363] Note that Lehman's former Global Treasurer, Paolo Tonucci, cited two reasons why Lehman management set limits on Repo 105 usage: (1) if there were a change to SFAS 140, such that true sale treatment for repo transactions was no longer available, Lehman did not want to experience a seismic shift in its balance sheet; and (2) without limits, there was a risk that Lehman's businesses would become "too dependent on the amount of flexibility the Repo [105] arrangement provided." Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 27.

[3364] *See* Lehman, Total Repo 105 & Repo 105 Report (June 11, 2008) [LBEX-DOCID 2078195] (showing that total Repo 105 usage at close of first quarter 2008 was $49.1024 billion, April 30, 2008 total Repo 105 usage was $24.7439 billion, and total Repo 105 usage at close of second quarter 2008 was $50.3834).

intra-quarter use of Repo 105 transactions dipped significantly, as low as $12.75

billion.[3365]

---

[3365] *See, e.g.*, Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Aug. 31, 2007) [LBEX-DOCID 3237230] (stating Repo 105 usage on Aug. 31, 2007, a quarter-end, was $36.407 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary [Draft] (Sept. 28, 2007) [LBEX-DOCID 2705059] (stating Repo 105 usage on Sept. 28, 2007 was $24.406 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Draft) (Oct. 31, 2007) [LBEX-DOCID 2705943] (stating Repo 105 usage on Oct. 31, 2007 was $29.936 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Nov. 30, 2007) [LBEX-DOCID 3439086] (stating Repo 105 usage on Nov. 30, 2007, a quarter-end, was $38.634 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Jan. 29, 2008) [LBEX-DOCID 3363236] (stating Repo 105 usage on Jan. 29, 2008 was $28.883 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Feb. 13, 2008) [LBEX-DOCID 1697794] (stating Repo 105 usage on Feb. 13, 2008 was $23.602 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Feb. 15, 2008) [LBEX-DOCID 3215625] (stating Repo 105 usage on Feb 15, 2008 was $24.217 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Feb. 22, 2008) [LBEX-DOCID 3363289] (stating Repo 105 usage on Feb. 22, 2008 was $31.029 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Feb. 28, 2008) [LBEX-DOCID 4517138] (stating Repo 105 usage on Feb. 28, 2008 was $40.003 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Feb. 29, 2008) [LBEX-DOCID 579841] (stating Repo 105 usage on Feb. 29, 2008, a quarter-end, was $49.102 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Mar. 12, 2008) [LBEX-DOCID 022302] (stating Repo 105 usage on Mar. 12, 2008 was $26.685 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Mar. 13, 2008) [LBEX-DOCID 765323] (stating Repo 105 usage on Mar., 13, 2008 was $26.212 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Mar. 14, 2008) [LBEX-DOCID 3438624] (stating Repo 105 usage on Mar. 14, 2008 was $12.750 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Mar. 27, 2008) [LBEX-DOCID 3363367] (stating Repo 105 usage on Mar. 27, 2008 was $22.104 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Mar. 28, 2008) [LBEX-DOCID 3363367] (stating Repo 105 usage on Mar. 28, 2008 was $24.597 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Apr. 3, 2008) [LBEX-DOCID 3438756] (stating Repo 105 usage on Apr. 3, 2008 was $21.835 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Apr. 4, 2008) [LBEX-DOCID 3438756] (stating Repo 105 usage on Apr. 4, 2008 was $18.653 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Apr. 11, 2008) [LBEX-DOCID 766086] (stating Repo 105 usage on Apr. 11, 2008 was $20.260 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Apr. 14, 2008) [LBEX-DOCID 766086] (stating Repo 105 usage on Apr. 14, 2008 was $19.546 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Apr. 18, 2008) [LBEX-DOCID 1961054] (stating Repo 105 usage on Apr. 18, 2008 was $19.785 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Apr. 21, 2008) [LBEX-DOCID 766088] (stating Repo 105 usage on Apr. 21, 2008 was $21.907 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Apr. 28, 2008) [LBEX-DOCID 766092] (stating Repo 105 usage on Apr. 28, 2008 was $24.077 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Draft) (Apr. 30, 2008) [LBEX-DOCID 394333] (stating Repo 105 usage on Apr. 30, 2008 was $24.709 billion); Lehman,



Global Consolidated Balance Sheet, Global Consolidated Summary (May 6, 2008) [LBEX-DOCID 766102] (stating Repo 105 usage on May 6, 2008 was $24.388 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (May 12, 2008) [LBEX-DOCID 766107] (stating Repo 105 usage on May 12, 2008 was $25.550 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (May 13, 2008) [LBEX-DOCID 766107] (stating Repo 105 usage on May 13, 2008 was $25.282 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (May 27, 2008) [LBEX-DOCID 3237577] (stating Repo 105 usage on May 27, 2008 was $39.237 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (May 28, 2008) [LBEX-DOCID 766924] (stating Repo 105 usage on May 28, 2008 was $43.112 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (May 29, 2008) (stating Repo 105 usage on May 29, 2008 was $46.820 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (May 30, 2008) [LBEX-DOCID 1427836] (stating Repo 105 usage on May 30, 2008, a quarter end, was $50.383 billion); Lehman, Total Repo 105 & Repo 108 Report (July 14, 2008) [LBEX-DOCID 3363529] (stating Repo 105 usage on July 14, 2008 was $17.315 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (July 15, 2008) [LBEX-DOCID 3363529] (stating Repo 105 usage on July 15, 2008 was $16.828 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (July 21, 2008) [LBEX-DOCID 3363538] (stating Repo 105 usage on July 21, 2008 was $15.528 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (July 23, 2008) [LBEX-DOCID 3363541] (stating Repo 105 usage on July 23, 2008 was $14.786 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (July 29, 2008) [LBEX-DOCID 3363542] (stating Repo 105 usage on July 29, 2008 was $14.548 billion); Lehman, Global Consolidated Balance Sheet, Global Consolidated Summary (Aug. 14, 2008) [LBEX-DOCID 84891] (stating Repo 105 usage on Aug. 14, 2008 was $18.274 billion).

The chart above, for illustrative purposes only, uses confirmed Repo 105 data reported in Lehman's Global Consolidated Balance Sheet, a comprehensive report Lehman produced for purposes of tracking its success in achieving its gross and net balance sheet targets.[3366] The data from the Global Consolidated Balance Sheets demonstrate that Lehman's Repo 105 usage spiked at quarter-ends and fell off on an intra-quarter basis.[3367]

Lehman consistently failed to comply with the 80/20 rule.[3368] For most months (and all quarter-end months) Lehman failed to maintain an average daily balance throughout the month that equaled or exceeded 80% of the month-end balance.[3369] Similarly, at every quarter-end (and most month ends) after the first quarter 2006,

---

[3366] *See* note 3365, *supra* (providing more data from Lehman's Global Consolidated Balance Sheet regarding Repo 105 usage on particular dates) and Appendix 17, Repo 105 Appendix (providing data in table form). Lehman's Global Consolidated Balance Sheet generally summarized, by division and business unit, Lehman's consolidated financial position – *e.g.*, its balance sheet size, day-over-day changes, net and gross balance sheet targets, amounts by which it was over/under targets – and the impact of Repo 105 on the net balance sheet was summarized as well. The impact of Repo 105 on Lehman's gross and net balance sheet as presented in the Global Consolidated Balance Sheet reports is consistent with the impact of Repo 105 usage on Lehman's net balance sheet that Duff & Phelps independently ascertained in its analyses. *See* Duff & Phelps, Assumed Hierarchy of Repo 105 Usage Data (Jan. 26, 2010), at p. 2 (also stating that Lehman's Global Consolidated Balance Sheet data on Repo 105 is very authoritative).

[3367] *See* note 3365, *supra*; Appendix 17, Repo 105 Appendix.

[3368] Duff & Phelps, Repo 105/108 Usage vs. Limit Comment (Oct. 16, 2009), at p. 7; *see also* e-mail from Michael McGarvey, Lehman, to Clement Bernard, Lehman (Jan. 30, 2008) [LBEX-DOCID 2796630] ("We increase the balances for month end but try to keep it within 120 percent of the average daily usage (we are decent at this, not great.)").

[3369] *See* Duff & Phelps, Repo 105/108 Usage vs. Limit Comment (Oct. 16, 2009), at p. 7.

Lehman's Repo 105 usage exceeded 120% of the preceding month's daily average usage.[3370]

### (4) Repo 105 Transactions Served No Business Purpose Other Than Balance Sheet Reduction

When pressed to identify any legitimate business purpose for Lehman's use of Repo 105 transactions, several witnesses noted the secured short-term financing for the transactions in addition to the balance sheet reduction purpose.[3371] While one consequence of Repo 105 transactions was that Lehman received financing in exchange for collateral (which, as noted above, it did not record as a borrowing), a Repo 105 transaction was a more expensive way for Lehman to secure short-term financing as compared to an ordinary repo.[3372]

### (a) Repo 105 Transactions Came at a Higher Cost Than Ordinary Repo Transactions

Nothing prevented Lehman from engaging in a traditional overnight repo transaction – using the same assets, with the same counterparty, but at a lower haircut (*e.g.*, 102 assets/$100 versus 105 or 108 assets/$100) and lower cost – on any particular

---

[3370] *See id.*

[3371] Examiner's Interview of Mark Gavin, Sept. 24, 2009, at pp. 4-5 (stating that primary purpose of Repo 105 transactions was balance sheet management, but stating that they also had a funding purpose, though repeatedly acknowledging that "a regular repo would have been cheaper"); Examiner's Interview of John Coghlan, Nov. 11, 2009, at p. 7 (stating that the purpose was balance sheet reduction and financing, and acknowledging that Repo 105 transactions were more expensive than ordinary repo transactions).

[3372] Examiner's Interview of Mitchell King, Sept. 21, 2009, at p. 7; Examiner's Interview of Mark Gavin, Sept. 24, 2009, at pp.4-5; Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 6; Examiner's Interview of Matthew Lee, July 1, 2009, at p. 14.

date when Lehman engaged in a Repo 105 transaction.[3373]  The more expensive route was taken because the traditional repo transaction would not have provided Lehman the balance sheet benefit that Repo 105 transactions provided to the firm – namely, Repo 105 transactions enabled Lehman to reverse engineer its externally reported net balance sheet and net leverage ratio for public consumption.[3374]

A Repo 105 transaction was more expensive to Lehman than an ordinary repo transaction for several reasons:[3375]

- Repo 105 transactions generally carried a higher yield, that is, the interest rate the counterparty charged Lehman for the borrowing.[3376]  "[C]ertain of

---

[3373] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 6 (stating that the same assets could be used in either an ordinary repo or a Repo 105 transaction, that with most counterparties, Lehman had the capacity to do either type of transaction).  This is not to suggest that any counterparty with which Lehman engaged in ordinary repos would have also agreed to enter into a Repo 105 agreement with Lehman.  Rather, Repo 105 counterparties would have been willing to enter into ordinary repo transactions.

[3374] Examiner's Interview of Mark Gavin, Sept. 24, 2009, at pp. 4-5 (stating that a regular repo transaction would have been cheaper than a Repo 105 transaction and that the latter was chosen for balance sheet management); Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 6 (stating that Repo 105 transactions were more expensive and that Lehman engaged in them because "[c]learly, this was an effort to reduce balance sheet."); Examiner's Interview of Matthew Lee, July 1, 2009, at p. 14.

[3375] Andrew J. Morton Interview, Sept. 21, 2009, at p. 22 (Repo 105 transaction more expensive than ordinary repo transaction); Examiner's Interview of John Coghlan, Nov. 11, 2009, at p. 7 (same); e-mail from Mark Gavin, Lehman, to Mark Neller, Lehman, *et al.* (Aug. 26, 2008) [LBEX-DOCID 3232989] ("FYI – am now running into pretty unpalatable levels on these trades . . . .")

[3376] Examiner's Interview of Mitchell King, Sept. 21, 2009, at p. 7 (stating that Repo 105 was "more costly" and "expensive way to finance," that he believed the charges were "unfair," and that there were sometimes discrepancies of 5 bps in the amount different Repo 105 counterparties charged for the same securities); Examiner's Interview of Mark Gavin, Sept. 24, 2009, at p. 7 (explaining that haircut, interest rate, and offshore trading made Repo 105 more expensive than ordinary repo); Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 5 (explaining why Repo 105 more expensive than ordinary repo).  But note that Kaushik Amin said even though Repo 105 transactions were costlier than regular repo transactions, the additional cost was negligible and immaterial.  Examiner's Interview of Kaushik Amin, Sept. 17, 2009, at p. 7.  Unlike ordinary repos, the most common of whose term was overnight, Repo 105 transactions typically had a seven or ten day term.  The longer term *could* carry a costlier interest rate than the overnight rate.  However, during the relevant period (late 2007 to 2008), the interest rate on overnight repos was just as likely to be more expensive than the interest rate on a week-long repo using the same

our counterparties charge very expensive levels [for Repo 105], so we cannot retain those types of trades for any longer than necessary."[3377]

- As set forth above, Repo 105 transactions were required to carry a higher margin or haircut (*e.g.*, the minimum five percent haircut for Repo 105 transactions, as opposed to a two percent haircut for an ordinary repo transaction using highly liquid collateral), which Lehman itself had to fund.[3378] That is, Lehman would have had to fund the additional haircut by either dipping into its equity or through long term borrowings.[3379] John

treasury collateral. *See* Bloomberg Finance L.P. "RP GT 01D" Repo Financing OVERNIGHT and "RP GT 01W" Repo Financing 1 Week. Consequently, the higher interest rate in a Repo 105 could not have been a function of the term of the repo.

[3377] E-mail from Mitchell King, Lehman, to Mark Gavin, Lehman, *et al.* (Dec. 3, 2007) [LBEX-DOCID 3232555].

[3378] Examiner's Interview of Mitchell King, Sept. 21, 2009, at p. 7 (stating that Repo 105 was "more costly" and "expensive way to finance," that he believed the charges were "unfair," and that there were sometimes discrepancies in the amount different Repo 105 counterparties charged for the same securities; Examiner's Interview of Mark Gavin, Sept. 24, 2009, at p. 7 (explaining that haircut, interest rate, and offshore trading made Repo 105 more expensive than ordinary repo); Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 5 (explaining why Repo 105 more expensive than ordinary repo).

In late 2007 and 2008, Lehman often faced a 6.5% or higher haircut on Repo 105 transactions and a nine percent haircut on Repo 108 transactions. Lehman had been "losing liquidity" since July 2007, as repo lenders across the board gradually increased collateral requirements in their transactions with Lehman. Examiner's Interview of Richard Policke, May 28, 2009, at p. 4; *see also* Peter Hordahl & Michael R. King, Developments in Repo Markets During the Financial Turmoil, Banking Int'l Settlements Q. Rev., Dec. 2008, at 37 (focusing on the period since the start of the financial turmoil in mid-2007 and noting that "[a]s financing in unsecured markets became more expensive or unavailable, financial institutions with funding requirements bid more aggressively in repo markets to secure financing"); Gary Gorton, National Bureau of Economic Research, *Securitized Banking and the Run on Repo*, Yale ICF Working Paper No. 09-14 (Nov. 13, 2009), at 1, *available at*: http://ssrn.com/abstract=1440752 ("We argue that the financial crisis that began in August 2007 is a 'systemic event'. . . . We argue that the current crisis is similar [to the banking panics of the 19th century] in that contagion led to . . . unprecedented repo haircuts and even the cessation of repo lending on many forms of collateral."). Consequently, it appears that haircuts for all repos – not just Repo 105 transactions – could have increased in mid-2007 and 2008. *See* e-mail from Michael McGarvey, Lehman, to Divyesh Chokshi, Lehman (Aug. 21, 2007) [LBEX-DOCID 3234192] ("I was on a call with the funding desk on Friday and was told they were having difficulty maintaining Repo 105 term liquidity on even the best collateral."); e-mail from Michael McGarvey, Lehman, to Anuraj Bismal, Lehman (Aug. 23, 2007) [LBEX-DOCID 3232709] (stating that Mizuho rejected Freddie Mac subdebt for Repo 105 transactions and that "[t]his is just indicative of the liquidity situation in the market."); e-mail from Michael McGarvey, Lehman, to Anuraj Bismal, Lehman, *et al.* (Jan. 31, 2008) [LBEX-DOCID 3223415] (referring to "disruptions in the repo market which Jawad described as the worst he's seen in 7 years").

[3379] The contribution to the cost of a Repo 105 transaction of 3% additional collateral, relative to an ordinary repo, is significant. Ultimately, if all other features of a Repo 105 and ordinary repo transaction (including stated interest rate) were identical, the Repo 105 transaction would be more expensive. This is

Feraca, who was responsible for Lehman's Secured Funding Desk, said that unlike ordinary repo haircuts, the haircut on a Repo 105 was funded with more expensive forms of financing, such as long term debt.[3380]

- "Offshore trading" of United States agency securities, treasuries, and government securities was potentially more expensive than domestic trading within the United States.[3381] (Recall that a substantial volume of Lehman's Repo 105 transactions, conducted in Europe, involved these types of securities).

- As one witness recalled, "We were in a bit of a price-taking situation because the range of [Repo 105] counterparties was limited."[3382]

---

due to the fact that the additional overcollateralization of Repo 105 borrowings was not financeable in the transaction and had to be funded by Lehman itself with equity or other long-term, more permanent forms of funding that carried higher costs. Further, the haircut determined the amount of leverage an institution undertook in a transaction. Such increases in haircuts from very low levels can have a particularly harmful impact on an institution's ability to maintain its level of earnings and its return on equity. This places a significant burden, potentially including the need to raise equity capital, on institutions that experience increasing haircuts. *See* Tobias Adrian, *et al. Financial Intermediaries, Financial Stability and Monetary Policy*, Federal Reserve Bank of New York Staff Report No. 346 (Sept. 2008), at pp. 11-13, *available at*: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1266714.

[3380] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 5.

[3381] Examiner's Interview of Mark Gavin, Sept. 24, 2009, at p. 7.

[3382] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 5; *see also* e-mail from Stephen Gerber, Lehman, to Gary Lynn, Lehman (Aug. 22, 2007) [LBEX-DOCID 3234616] (responding to Gerber's statement that "As we discussed yesterday, counterparties are getting a little pickier with Repo," by stating, "Uh oh…is this for repo 105?" to which Gerber responded: "Yes."). In the 2007 to 2008 period, Lehman's Repo 105 counterparties were primarily restricted to Mizuho, Barclays, UBS, Mitsubishi, and KBC, though some of these also tapered off their Repo 105 trading in 2008. E-mail from Chaz Gothard, Lehman, to Mark Gavin, Lehman, *et al.* (Sept. 4, 2007) [LBEX-DOCID 4553246] ("KBC are no longer able to finance our 105 agency trades. . . . This effectively means we only have 3 counterparts with which to transact this business – Mizuho, Barclays & UBS. Whilst they have taken all the paper we've thrown at them to date this situation should not be relied upon."); e-mail from John Feraca, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 3207903] (reporting Repo 105 trades with "Barclays – $ 3 billion, UBS – $ 6 billion, Mizuho – $ 2 billion"); e-mail from Mark Gavin, Lehman, to Daniel Malone, Lehman, *et al.* (May 20, 2008) [LBEX-DOCID 736184] (noting in e-mail with subject line "RE: Repo 105 CPS" that "Mizuho - $5bln," "[n]o longer at the table: Barclays up to $15 bln," "UBS up to $10 bln," "Mitsubishi up to $1 bln," and "KBC up to $2 bln"); *see also* Lehman, US Agency Desk, Repo 105 12 Mar–19 Mar Mizuho @ 2.73% (Mar. 12, 2008) [LBEX-DOCID 4523953] (listing 6.5% haircut on Repo 105 transactions); Lehman, US Agency Desk, Repo 105 12 Mar–19 Mar. UBS @ 3.10% (Mar. 12, 2008) [LBEX-DOCID 4523950] (listing seven percent haircut on Repo 105 transactions); Lehman, US Agency Desk Repo 105 12 Mar–19 Mar UBS @ 2.75% (Mar. 12, 2008) [LBEX-DOCID 4523955] (listing 6.5% haircut on Repo 105 transactions); Lehman, US Agency Desk, Repo 105 28 May–4 Jun Mizuho @ 2.24 (May 27, 2008) [LBEX-DOCID 4523968]

Many variables impacted the interest rate for both an ordinary repo transaction and a Repo 105 transaction, so it is difficult to precisely measure the magnitude by which the interest rate on a Repo 105 was greater than an ordinary repo.[3383]   However, witnesses who have knowledge on the subject uniformly advised the Examiner that Repo 105 trades generally were more expensive to Lehman than ordinary repos.[3384]

As one e-mail succinctly states: "Everyone knows 105 is an off balance sheet mechanism so counterparties are looking for ridiculous levels to take them."[3385]   Asked

---

(reflecting haircuts on Repo 105 transactions ranging from 6.5% to 210%); Lehman, US Agency Desk, Repo 105 Mizuho 28 May–4 June (May 27, 2008) (showing 2.6% and 2.42% interest rate and 6.5% haircut on Repo 105 transaction).  Lehman frequently petitioned to expand its Repo 105 line with Mizuho.  *See, e.g.*, E-mail from Paolo R. Tonucci, Lehman, to Matthew Pinnock, Lehman (May 22, 2008) [LBEX-DOCID 1548434] ("Think I can get Chris [O'Meara] to agree [to] another $2 bill, but it is critical to get some context around what is changing.").  In May 2008, only ten days before quarter-end, Matthew Pinnock, on behalf of Jeff Michaels and Kaushik Amin of FID, attempted to increase its Repo 105 line with counterparty Mizuho.  *Id.*  Tonucci and O'Meara were involved in this process of authorizing a temporary increase in Lehman's Repo 105 capacity limits for the close of second quarter 2008.  *Id.*  In February 2008, Lehman found a new Repo 105 counterparty in ABN Amro Bank NV (London Branch).  *See* e-mail from Nirav Patel, Lehman, to Kandy Hosea, Lehman, *et al.* (Feb. 29, 2008) [LBEX-DOCID 3383394].  Deutsche Bank was also a Repo 105 counterparty to Lehman in 2008.  When a Repo 105 transaction with Deutsche Bank failed, Tonucci assigned Carlo Pellerani (International Treasurer) to ensure the problem was resolved.  *See* e-mail from Paolo R. Tonucci, Lehman, to John Coghlan, Lehman (Mar. 25, 2008) [LBEX-DOCID 117336].

[3383] Lehman's Repo Manual, a reference guide the firm published for internal use by its own sales people, provided that "[T]he rate used to calculate the interest is a function of many factors, including, but not limited to: the supply and demand for the securities used as collateral, the supply and demand for cash, the maturity of the Repo, and the method used to transfer the securities used as collateral from the dealer to the investor."  Lehman, Repo Manual (Nov. 8, 2005), at p. 10 [LBEX-LL 1175483].  The Manual also stated that the repo interest rate "bears no relation to the interest rate on the securities used as collateral." *Id.*  The calculation of the repo interest rate payment is as follows: (cash investment) x (repo interest rate) x (number of days repo outstanding) divided by 360 = repo interest. *Id.*

[3384] Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 10; Examiner's Interview of Mitchell King, Sept. 21, 2009, at p. 7; Examiner's Interview of Mark Gavin, Sept. 24, 2009, at p. 7; Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 5; Examiner's Interview of John Coghlan, Nov. 11, 2009, at p. 7.

[3385] E-mail from Michael McGarvey, Lehman, to Anuraj Bismal, Lehman (Jan. 31, 2008) [LBEX-DOCID 3384033]. Given that in a Repo 105 transaction, Lehman provided its counterparty with more collateral for the same amount of cash as in an ordinary repo, one might expect the interest rate to be lower, as the

by the Examiner to explain this statement, McGarvey, the author of the e-mail, stated that counterparties such as Mizuho knew that Repo 105 transactions received off-balance sheet treatment and as a result might "try to squeeze Lehman."[3386]

### (b) Witnesses Also Stated That Financing Was Not the Real Motive for Undertaking Repo 105 Transactions

When asked directly, Joseph Gentile, a former FID Finance executive who reported to Gerard Reilly, did not believe that Lehman's motive for undertaking Repo 105 transactions was financing.[3387] Gentile stated unequivocally that no business purpose for Lehman's Repo 105 transactions existed other than obtaining balance sheet relief.[3388] Gentile said that he received his "Repo 105 education" sometime near the end of Lehman's 2006 fiscal year from Ed Grieb, Lehman's Global Financial Controller who

---

terms were better for the lender, *i.e.*, had greater protection in the form of more collateral in the case Lehman did not repay its borrowing. The Examiner's analysis shows that, on the contrary, the interest rate in a Repo 105 transaction was higher than in an ordinary week-long repo despite the overcollateralization. Based on witness statements that Lehman was in a "price taking situation," and documents such as the e-mail in which Lehman staffers begged to increase the Repo 105 credit line with Mizuho to improve the balance sheet profile at quarter end, the higher interest rate in a Repo 105 transaction was likely a consequence of Repo 105 counterparties being aware of Lehman's desperation. Examiner's Interview of John Feraca (Oct. 9, 2009), at p. 5; *see* e-mail from Stephen Allery, Lehman, to Miyuki Suzuki, Lehman (Feb. 19, 2008) [LBEX-DOCID 098492].

[3386] Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 10.

[3387] Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at pp. 6-7. Similarly, Irina Veksler believed that Repo 105 transactions were not used to generate liquidity. Examiner's Interview of Irina Veksler, Sept. 11, 2009, at p. 8. What these witnesses meant is that Lehman's motive or purpose for entering into Repo 105 transactions was not financing. In other words, although Lehman received cash just as it did in an ordinary repo transaction, this was just an outcome of the transaction but not Lehman's motive for undertaking Repo 105 transactions. As described in detail in this Report, Lehman conceived its Repo 105 program for purposes of managing its balance sheet, particularly at quarter-end reporting periods. If Lehman had actually wanted to use its assets for purely financing arrangements to raise needed cash, Repo 105 transactions were a costlier and less effective means of generating liquidity than ordinary repo transactions.

[3388] Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 6.

reported directly to then-CFO Chris O'Meara.[3389]  According to Gentile, Grieb explained that Repo 105 transactions were a balance sheet management mechanism: "a tool that could be used to reduce Lehman's net balance sheet."[3390]

Though Gentile did not understand the specific mechanics of Repo 105 transactions, he recalled that "Repo 105 was a vehicle that Grieb owned and he was using it to take my balance sheet away."[3391]  When the Examiner asked for further explanation of that statement, Gentile said that if FID had "excessions" in its balance sheet, Grieb would authorize additional Repo 105 capacity to alleviate potential breaches of the balance sheet limit.[3392]  Gentile explained that two ways existed for FID to make its balance sheet targets where excessions existed: by selling assets or by engaging in Repo 105 transactions.[3393]  Repo 105 transactions filled the gap between what Lehman could sell through normal business practices and the assets that Lehman needed to move off its balance sheet in order to meet balance sheet targets.[3394]

---

[3389] *Id.* Before arriving at Lehman in June 2006, Gentile had never heard of Repo 105 transactions, either by name or description.  *Id.*  Without any prompting, Gentile said that it was his understanding that neither JP Morgan, where Gentile he had worked for 11 years, nor Bank of America, where he had worked for 5 years, used such a mechanism.  *Id.*

[3390] *Id.*  John Feraca similarly told the Examiner that the purpose of Repo 105 transactions was to take advantage of SFAS 140 for purposes of managing its balance sheet.  Examiner's Interview of John Feraca, Oct. 9, 2009, at pp. 6-7, 12-13.

[3391] Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 6.

[3392] *Id.*  As Lehman's quarter-end approached, O'Meara, Grieb and Reilly would pressure Gentile to ensure that FID met its balance sheet targets. *Id.*  Grieb, on the other hand, denied having any recollection of Lehman facing balance sheet pressures in its Fixed Income Division in 2007.  Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 11.

[3393] Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 6.

[3394] *See, e.g.*, E-mail from Kaushik Amin, Lehman, to Herbert H. (Bart) McDade III, Lehman (June 3, 2008) [LBEX-DOCID 574610] (stating that the Liquid Markets business within FID "targeted lower numbers

Similarly, Matthew Lee said there was no legitimate business purpose for Repo 105 transactions.[3395]  In his view, Lehman's Repo 105 practice was for "window-dressing the balance sheet to make the credit rating higher."[3396]

### g) The Materiality of Lehman's Repo 105 Practice

#### (1) The Repo 105 Program Exposed Lehman to Potential "Reputational Risk"

Martin Kelly, who CFO Erin Callan hand-picked to assume the role of Global Financial Controller on December 1, 2007 (replacing Ed Grieb) and who retained that position until Lehman's bankruptcy petition date in September 2008, first became familiar with Lehman's use of Repo 105 transactions soon after he became Financial Controller.[3397]  Lehman's reliance on Repo 105 transactions for balance sheet relief

---

since the rest of FID was having difficulty meeting its target," transmitting Liquid Markets Balance Sheet Report for May 30, 2008 [LBEX-DOCID 522198] showing that Liquid Markets used $42.221 billion in Repo 105 transactions to come in $9.2 billion below its quarter-end net balance sheet target, and stating "we spent a lot of money to achieve these targets. Now, we have to make money").

[3395] Examiner's Interview of Matthew Lee, July 1, 2009, at p. 16.

[3396] Id.

[3397] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 6.  Kelly described a transition period at the end of 2007, when Grieb was transitioning out of the role of Financial Controller and Kelly was transitioning in.  Id.  In a November 6, 2007 e-mail, Marie Stewart (Global Head of Accounting Policy) sent Kelly a copy of the August 2007 version of the Balance Sheet Netting Grid, an accounting policy document that outlined the various mechanisms by which Lehman made adjustments to its balance sheet. E-mail from Marie Stewart, Lehman to Martin Kelly, Lehman (Nov. 6, 2007) [LBEX-DOCID 2736621] (stating "this is the doc that summarizes every reason we net down the b/sheet.  As discussed, E&Y are in the process of reviewing it" and transmitting Accounting Policy Review Balance Sheet Netting and Other Adjustments (Aug. 2007) [LBEX-DOCID 2720761] ("The Netting Grid")). The Netting Grid includes a brief discussion of the Repo 105 program.  See Accounting Policy Review Balance Sheet Netting and Other Adjustments (Aug. 2007), at p. 26 [LBEX-DOCID 2720761] ("Under certain conditions that meet the criteria as described in paragraphs 9 and 218 of FAS 140, Lehman policy permits…repo agreements to be recharacterized as purchases and sales of inventory.").  An e-mail from December 2007 reveals that Kelly and Stewart intended to discuss the Repo 105 program sometime after Lehman filed its 2007 Form 10-K. See e-mail from Marie Stewart, Lehman, to Martin Kelly, Lehman (Dec. 18, 2007) [LBEX-DOCID 3221244].

caused Kelly "discomfort,"[3398] because of the magnitude of Lehman's usage and, in part, because he believed Lehman was the last of its peer CSE firms to employ similar accounting for these types of transactions.[3399]

Kelly further attributed his discomfort with Lehman's use of Repo 105 transactions to the fact "*that the only purpose or motive for the transactions was reduction in balance sheet*" and that "there was no substance to the transactions."[3400] Kelly thought that the lack of business purpose for these transactions, combined with the magnitude

[3398] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 7.

[3399] *Id.* The Balance Sheet Group regularly apprised Kelly of the volume of Lehman's Repo 105 transactions. *See, e.g.*, E-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223388] ("We ended the year with $38 billion of repo 105/8 nettings"); Lehman, Current Day November 30, 2007 Total Repo 105 and Repo 108 Graph (Dec. 5, 2007) [LBEX-DOCID 3238265] (attached to e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223388] and stating that total Repo 105 usage on November 30, 2007 was $38.634 billion); e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 3223439] ("Per PC - look like Repo 105/108 may land at $40B or slightly higher"); e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Mar. 6, 2008) [LBEX-DOCID 3223441] ("Our initial estimates are that for Q1 2008 we used $48 Billion of repo 105/8 nettings."). Numerous witnesses and internal e-mails state that Lehman was the last of its peer investment banks to be using Repo 105-type transactions by December 2007. The Examiner has not verified whether other CSE firms had at one time used these kinds of transactions but later ceased using them. Bismal, Stewart, and McGarvey said that they believed that Lehman was the only CSE firm engaging in Repo 105 transactions by late 2007. Murtaza Bhallo said that Barclays did not use Repo 105 transactions. Joseph Gentile said that he had personal knowledge that JP Morgan and Bank of America did not engage in Repo 105-type transactions for managing their respective balance sheets. In December 2007, Bismal wrote: "Was chatting with ex-lehman employee [Carlos Lo] at Merrill yesterday – he is in their balance sheet group – he told me that they do not use repo 105/8," to which Marie Stewart replied, "Then that means we are the only one left who does." E-mail from Anuraj Bismal, Lehman, to Marie Stewart, Lehman (Dec. 5, 2007) [LBEX-DOCID 3223386]. In a January 2008 e-mail, McGarvey wrote: "By the way we are now the only large firm on the street that uses Repo 105." E-mail from Michael McGarvey, Lehman, to Clement Bernard, Lehman (Jan. 30, 2008) [LBEX-DOCID 2796630]. In a May 2008 e-mail from Ryan Traversari to O'Meara, Traversari reported that Citigroup and JP Morgan "likely do not do Repo 105 and Repo 108 which are UK-based specific transactions on opinions received by LEH from Linklaters. This would be another reason why LEH's daily balance sheet is larger intra-month then at month-end." E-mail from Ryan Traversari, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (May 16, 2008) [LBEX-DOCID 574498].

[3400] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 7.

of Lehman's Repo 105 usage at quarter-end (at $38.6 billion at fiscal year end 2007, when Kelly became Global Financial Controller) carried a potential for "*reputational risk*" to Lehman and that, should it become public knowledge, it may "reflect[] poorly on the firm."[3401]

Kelly further explained that "the size of the program in an absolute sense was of a size that presented *headline risk*," particularly as "the program was skewed to quarter ends."[3402] When asked by the Examiner what he meant by "headline risk," Kelly stated that "if there were more transparency to people outside the firm around the transactions, it would present a dim picture" of Lehman.[3403]

Lehman's increasing reliance on the Repo 105 transactions and the absence of any disclosure of that fact in Lehman's Forms 10-Q and 10-K disquieted Kelly; he remarked that if an analyst or a member of the investing public were to read Lehman's Forms 10-Q and 10-K from cover to cover, taking as much time as she or he needed, "they would have no transparency into [Lehman's] Repo 105 program"[3404]

Kelly's concerns about Lehman's use of Repo 105 transactions prompted him to raise them to both of the Chief Financial Officers in place during Kelly's tenure as

---

[3401] *Id.*; *cf.* e-mail from Martin Kelly, Lehman, to Kaushik Amin, Lehman (Apr. 17, 2008) [LBEX-DOCID 488108] ("[Repo 105] Program has some risk to it. Reluctance to expand to new regions/geographies.").
[3402] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 8.
[3403] *Id.*
[3404] *Id.*

Global Financial Controller: Erin Callan and, later, Ian Lowitt.[3405]  According to Kelly, "the purpose of the conversations being to make sure they understood the size of the program and that there was risk in the program."[3406]

Kelly spoke first to Callan and then to Lowitt, Callan's successor, regarding Lehman's use of Repo 105 transactions on separate occasions when each was serving as Lehman's CFO.[3407]  Kelly recalled raising the following topics in his Repo 105 conversations with both Callan and Lowitt: (1) Kelly's discomfort with the possible "*reputational risk*" Lehman would suffer if the investing public and analysts learned that Lehman used Repo 105 transactions solely to reduce its balance sheet; (2) the size of Lehman's Repo 105 program, that is, the volume of Repo 105 transactions that Lehman undertook at quarter-end to reduce its balance sheet; (3) the "technical basis," from an accounting perspective, by which Lehman was authorized to engage in Repo 105 transactions; (4) Kelly's belief that none of Lehman's peer investment banks used Repo 105 transactions; and (5) the fact that Lehman's Repo 105 activity was "skewed at quarter-end," in other words, that the firm's Repo 105 usage spiked at quarter-end, during Lehman's reporting periods.[3408]

---

[3405] *Id.*; *see also* e-mail from Marie Stewart, Lehman, to Dominic Gibb, Lehman (Dec. 21, 2007) [LBEX-DOCID 3223846] ("FYI that our use of Repo 105 is a conversation at the CFO level at this point.").

[3406] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 8.

[3407] *Id.*

[3408] *Id.*  Kelly's discussion with the CFOs is discussed further at Sections III.A.4.h.2.b–c of this Report.

### (2) Lehman's Repo 105 Practice Had a Material Impact on Lehman's Net Leverage Ratio

Lehman's Repo 105 practice at quarter-end in late 2007 and for the first two quarters 2008 had a material impact on Lehman's publicly-reported net leverage ratio – and Lehman management knew it. For example, in a December 5, 2007 e-mail, Bismal reported that Lehman "would be at net leverage of 18.0x [vs say 16.3x] without repo 105/8."[3409] Consistent with Bismal's e-mail, Lehman publicly reported a firm-wide net leverage ratio of 16.1x in its Form 10-K for the 2007 fiscal year.[3410]

Using Lehman's firm-wide Repo 105 usage at the end of each quarter from November 2006 through May 2008, the Examiner analyzed the impact that Lehman's removal of assets from its balance sheet using Repo 105 transactions had on the firm's publicly-reported net leverage ratio. As the chart below demonstrates, for each of those seven reporting periods – fourth quarter 2006 through second quarter 2008 – by employing Repo 105 transactions rather than ordinary repo transactions, Lehman was able to reduce its published net leverage ratio by a minimum of 9%, with that reduction increasing to 12% and 15% in first quarter 2008 and second quarter 2008, respectively:

---

[3409] E-mail from Anuraj Bismal, Lehman, to Marie Stewart, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223384].
[3410] LBHI 2007 10-K, at pp. 29, 64.

**Gross and Net Balance Sheet Ratios**

| $ in Millions | | May 31, 2008 | Feb 29, 2008 | Nov 30, 2007 | Aug 31, 2007 | May 31, 2007 | Feb 28, 2007 | Nov 30, 2006 |
|---|---|---|---|---|---|---|---|---|
| (a) | Total Assets | 639,432 | 786,035 | 691,063 | 659,216 | 605,861 | 562,283 | 503,545 |
| | *Less:* | | | | | | | |
| | Cash and securities segregated and on deposit for regulatory and other purposes | (13,031) | (16,569) | (12,743) | (10,579) | (7,154) | (6,293) | (6,091) |
| | Collateralized lending agreements * | (294,526) | (368,681) | (301,234) | (287,427) | (257,388) | (251,662) | (225,156) |
| | Identifiable intangible assets and goodwill | (4,101) | (4,112) | (4,127) | (4,108) | (3,652) | (3,531) | (3,362) |
| (b) | Net Assets | 327,774 | 396,673 | 372,959 | 357,102 | 337,667 | 300,797 | 268,936 |
| (c) | Total Stockholder's Equity | 26,276 | 24,832 | 22,490 | 21,733 | 21,129 | 20,005 | 19,191 |
| (d) | Tangible Equity Capital ** | 27,179 | 25,696 | 23,103 | 22,164 | 21,881 | 19,487 | 18,567 |
| | Leverage Ratio    (a) / (c) | 24.3 x | 31.7 x | 30.7 x | 30.3 x | 28.7 x | 28.1 x | 26.2 x |
| | Net Leverage Ratio   (b) / (d) | 12.1 x | 15.4 x | 16.1 x | 16.1 x | 15.4 x | 15.4 x | 14.5 x |
| (e) | Repo 105/108 Usage | 50,383 | 49,102 | 38,634 | 36,407 | 31,943 | 27,284 | 24,519 |
| | *If repos were used in place of repo 105s:* | | | | | | | |
| | Leverage Ratio    ((a) + (e)) / (c) | 26.3 x | 33.6 x | 32.4 x | 32.0 x | 30.2 x | 29.5 x | 27.5 x |
| | *% increase over actual Leverage Ratio* | 8% | 6% | 6% | 6% | 5% | 5% | 5% |
| | Net Leverage Ratio   ((b) + (e)) / (d) | 13.9 x | 17.3 x | 17.8 x | 17.8 x | 16.9 x | 16.8 x | 15.8 x |
| | *% increase over actual Net Leverage Ratio* | 15% | 12% | 10% | 10% | 9% | 9% | 9% |

*Notes:*
* Collateralized lending agreements are securities received as collateral, securities purchased under agreements to resell, and securities borrowed
** Tangible Equity Capital is Total Stockholders' Equity plus junior subordinated notes less identifiable intangible assets and goodwill.

*Sources:*
Asset and Equity data: Lehman Brothers' SEC 10-K and 10-Q filings.
Repo 105/108 Usage: Q4 2006, Q1, Q2 and Q3 2007: LBEX-DOCID 3363434; Q4 2007: LBEX-DOCID 3219746; Q1 and Q2 2008: LBEX-DOCID 2078195

A walk-through document related to Ernst & Young's 2007 fiscal year-end audit of Lehman defines "materiality," with respect to the process for reopening or adjusting a closed balance sheet, as "*any item individually, or in the aggregate, that moves net leverage by 0.1 or more (typically $1.8 billion).*"[3411]  William Schlich, former lead partner on Ernst & Young's Lehman team, stated that this was Lehman's, rather than Ernst & Young's, definition of materiality and that it represented "Lehman's determination of a

---

[3411] Ernst & Young, LBHI/LBI Walkthrough Template for Balance Sheet Close Process (Nov. 30, 2007), at p. 14 [EY-LE-LBHI-CORP-GAMX-07-033384] ("Materiality is usually defined as any item individually, or in the aggregate, that moves net leverage by 0.1 or more (typically $1.8 billion).").  Accordingly, an item that impacted net leverage by 0.1 point was deemed material enough to re-open books.  The walkthrough paper also states, "Net leverage is an important ratio analyzed by the rating agencies and included in Lehman's earnings releases.*" Id.*

materiality threshold" in connection with Lehman's own criteria for when to consider reopening and adjusting the closed balance sheet.[3412]

As a result of its quarter-end Repo 105 practice from late 2007 through the second quarter 2008, Lehman publicly reported a net leverage ratio that was 1.7 to 1.9 points lower than what its net leverage ratio would have been if Lehman had used ordinary repo transactions instead of Repo 105 transactions.

> **(a) Lehman Significantly Expanded Its Repo 105 Practice in Late 2007 and Early 2008**

Although Lehman had used Repo 105 transactions since 2001, beginning in mid-2007, Lehman required greater amounts of Repo 105 relief to improve its reported net leverage ratio.[3413] As a result, Lehman's quarter-end use of Repo 105 transactions significantly increased beginning in mid-2007 with the close of Lehman's third quarter 2007 in August 2007, at which time Lehman's combined Repo 105 usage was $36.4

---

[3412] Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at p. 7 (statement of William Schlich). Asked if he could describe what level of impact to Lehman's firm-wide net assets Ernst & Young would have considered "material," Schlich said that Ernst & Young did not have a hard and fast rule defining materiality in the balance sheet context. *Id.* He said that with respect to balance sheet issues, "materiality" depends upon the facts and circumstances. *Id.*

[3413] Andrew Morton, the former Global Head of Lehman's Fixed Income Division, stated that Lehman established limits on Repo 105 usage at the inception of the program in 2001. Examiner's Interview of Andrew J. Morton, Sept. 21, 2009, at p. 4. John Feraca also recalled that Lehman placed limits on Repo 105 usage at the program's inception: "There were limits to Repo 105 going back to the beginning. Sometimes these were more emphatic and sometimes relaxed." Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 8. Feraca recalled a firm-wide limit of between $10 billion and $20 billion when Lehman first conceived its Repo 105 program in 2001. *Id.* Feraca said that a certain level of seniority was required to set the caps on Repo 105 and that these caps/limits were communicated to the trading desks as well as to him at the funding desk. *Id.*

billion.[3414]  At the close of Lehman's fiscal year in November 2007, Lehman's total Repo 105 was $38.63 billion, in contrast to the $25 billion internal limit supposedly in effect at that time.[3415]

**Total Repo 105/108 at Quarter-End** [3416]

|  | Q3 2006 | Q4 2006 | Q1 2007 | Q2 2007 | Q3 2007 | Q4 2007 | Q1 2008 | Q2 2008 |
|---|---|---|---|---|---|---|---|---|
| **Repo 105** | n/a | $19.213 | $20.578 | $23.054 | $29.054 | $29.727 | $42.200 | $44.536 |
| **Repo 108** | n/a | $5.091 | $6.4 | $8.575 | $6.863 | $8.854 | $6.902 | $5.847 |
| **Total** | $27.153 | $24.519 | $27.284 | $31.943 | $36.407 | $38.634 | $49.102 | $50.383 |

Key:

- Dollar amounts are given in billions.

- For purposes of this chart, Repo 105 amount refers to the total volume of Repo 105 transactions undertaken by the Fixed Income Division.

- For purposes of this chart, Repo 108 amount refers to the total volume of Repo 108 transactions undertaken by the Equities Division.

- Total Repo 105/108 amount may be greater than the sum of Repo 105 and Repo 108 volumes reported in this chart due to intermittent and *de minimis* amount of Repo 105 transactions undertaken by other Lehman divisions or groups.

---

[3414] Lehman, Total Repo 105/108 Trend (Feb. 20, 2008) [LBHI_SEC07940_1957956].

[3415] *Id.*; Lehman, Total Repo 105 & Repo 108 Report [LBEX-DOCID 3219746] (Dec. 5, 2007) (attached to e-mail from Anuraj Bismal, Lehman, to Marie Stewart, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223384]); e-mail from Michael McGarvey, Lehman, to Kentaro Umezaki, Lehman, *et al.* (May 8, 2007) [LBEX-DOCID 1811432] ("25 bn is the total Lehman Repo 105/108 limit. FID's share is 20bn.  Rates have been generally using 16-18bn out of the 20bn with the remainder in credit."); e-mail from Sigrid Stabenow, Lehman, to Clement Bernard, Lehman, *et al.* (Jan. 25, 2008) [LBEX-DOCID 1853428] (recommending that Repo 105 program be expanded from $20 billion to $23 billion).

[3416] E-mail from Mark Ciolli, Lehman, to Michelle Ng, Lehman, *et al.* (Sept. 6, 2006) [LBEX-WGM 748487] (stating that total Repo 105 usage on August 31, 2006, close of third quarter 2006, was $27.1533 billion); Lehman, Total Repo 105 & Repo 108 Report (Jan. 2, 2007) [LBEX-DOCID 2715058] (stating total Repo 105 usage on November 30, 2006, close of fourth quarter 2006, was $24.5192 billion); Lehman, Total Repo 105/108 Trend (Feb. 20, 2008) [LBHI_SEC07940_1957956] (stating total Repo 105 usage on August 30, 2007, close of third quarter 2007, was $36.4 billion); Lehman, Total Repo 105 & Repo 108 Report (Dec. 5, 2007) [LBEX-DOCID 3219746] (stating total Repo 105 usage on November 30, 2007, close of fourth quarter 2007, was $38.634 billion); Lehman, Total Repo 105 & Repo 108 Report (June 11, 2008) [LBEX-DOCID 2078195] (stating total Repo 105 usage on February 29, 2008, close of first quarter 2008, was $49.102 billion and for May 30, 2008, close of second quarter 2008, was $50.3834 billion); *see also* Lehman, Total Repo 105/108 Trend Report (June 20, 2008) [LBEX-DOCID 3363434] (stating total quarter-end Repo 105 usage for fourth quarter 2006 through second quarter 2008).

Lehman Treasurer Paolo Tonucci recalled that Lehman placed a cap on total Repo 105 usage because accounting rules could potentially change and without a limit in place, there was a risk that Lehman's business would become "too dependent" on the Repo 105 off-balance sheet arrangement.[3417]   A July 2006 document reveals that, at that time, the limits were: $17 billion for Repo 105 transactions and $5 billion for Repo 108 transactions.[3418]   The $17 billion limit on Repo 105 transactions was keyed to tangible equity.[3419]   Other documents demonstrate that throughout 2007 and into January 2008, the official internal limits on Lehman's use of Repo 105/108 transactions remained in the mid-$20 billion range, generally $17 to $20 billion for Repo 105 transactions and $5 billion for Repo 108 transactions.[3420]

---

[3417] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009 at p. 26.

[3418] Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 2 [LBEX-WGM 748489] ("Global Balance Sheet Overview"); *see also* e-mail from Gary Lynn, Lehman, to Kaushik Amin, Lehman, *et al.* (Aug. 22, 2006) [LBEX-DOCID 2786867] (discussing temporary increase of Repo 105 limit to $20 billion from $17.5 billion).

[3419] *See* Duff & Phelps, Repo 105/108 Usage vs. Limit Comment (Oct. 16, 2009), at pp. 1-2 (explaining that the Repo 105 limit was set at 1 x Tangible Equity).  The Global Balance Sheet Overview said that "Repo 105 is capped at $15 B (1 x leverage)."   Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 2 [LBEX-WGM 748489].  The Overview also implied that "1 x leverage" meant that Repo 105 usage should not exceed Tangible Equity.  *Id.* at p. 5.

[3420] E-mail from Gary Lynn, Lehman, to Kaushik Amin, Lehman, *et al.* (Aug. 22, 2006) [LBEX-DOCID 2786868]; e-mail from Clare Christofi, Lehman, to Anuraj Bismal, Lehman, *et al.* (May 8, 2007) [LBEX-DOCID 3234172] ("Limits were $5 bn for Eq[uities] and $17 bn for FID."); e-mail from Michael McGarvey, Lehman, to Kentaro Umezaki, Lehman, *et al.* (May 8, 2007) [LBEX-DOCID 1811432] ("25 bn is the total Lehman Repo 105/108 limit. FID's share is 20bn.  Rates has been generally using 16-18bn out of the 20bn with the remainder in credit."); e-mail from Michael McGarvey, Lehman, to Gerard Reilly, Lehman (May 23, 2007) [LBEX-DOCID 4553348] ("We're projecting to land at 24.5bn in Repo 105/108. 18.5bn FID/6.5bn Equities."); e-mail from Sigrid Stabenow, Lehman, to Clement Bernard, Lehman, *et al.* (Jan. 25, 2008) [LBEX-DOCID 1853428] (recommending that Repo 105 program be expanded from $20 billion to $23 billion).

As market conditions worsened and the pressures on Lehman to reduce its net leverage ratio increased, pressure mounted inside Lehman to adjust upward these limits on Repo 105 transactions.[3421]  As discussed above, in February 2007, Joseph Gentile (FID Chief Financial Officer) recommended to Grieb that Lehman increase the $22 billion combined Repo 105/108 limit ($17 billion in Repo 105 and $5 billion in Repo 108) by $3 billion to mitigate problems caused by: "[e]xiting large CMBS positions in Real Estate and sub prime loans in Mortgages [that] before quarter would [result in] large losses."[3422]

When interviewed by the Examiner, Grieb had no recollection of receiving this recommendation from Gentile.[3423]  Grieb also did not recall what happened as a result of Gentile's request to increase the Repo 105 limit by $3 billion and further disclaimed

---

[3421] *See* Sections III.A.4.e.1 and III.A.4.e.4–5 of this Report.

[3422] Lehman, Proposed Repo 105/108 Target Increase for 2007 (Feb. 9, 2007) [LBEX-DOCID 2489498] (attached to e-mail from Joseph Gentile, Lehman, to Edward Grieb, Lehman (Feb. 10, 2007) [LBEX-DOCID 2600714]; *see also* e-mail from Joseph Gentile, Lehman, to Edward Grieb, Lehman (Feb. 8, 2007) [LBEX-DOCID 2604414] ("What is your appetite for us exceeding our repo 105 limit by $1.6 bn at month end? From 17.0 to 18.6?").  Gentile's proposal is discussed at length, *supra*, at Section III.A.4.e.4.  When the Examiner interviewed Gentile, he did not recall preparing the February 2007 analysis and recommendation he sent to Grieb in which he requested the $3 billion increase in the firm-wide Repo 105 limit for first quarter 2007 (from $22 billion to $25 billion), though he recalled that authorization was required to exceed the firm-wide Repo 105 limit.  Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 8.  Gentile speculated that someone from Lehman's Balance Sheet group may have prepared portions of the report for him, but Gentile was absolutely certain that he would have shown the analysis and recommendation to Reilly, to whom he reported, before submitting it to Grieb.  *Id.*

[3423] Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 12.  Similarly, Grieb claimed to have never before heard the phrase "sticky assets" and claimed to have no recollection of market conditions in 2007.  Grieb said that he did not even recollect that the $22 billion combined Repo 105 limit was in place in February 2007, though he said he had no reason to dispute this fact.  *Id.*  Likewise (and contrary to numerous documents and other witness statements), Grieb said that he had no recollection of balance sheet pressures within Lehman's FID in 2007.  *Id.*

knowledge of whether Chris O'Meara and Gerard Reilly received similar petitions.[3424] Though Grieb had no recollection "specifically" of a $3 billion increase in the Repo 105 cap (even when shown later e-mails which confirm that Grieb granted Gentile's request for the $3 billion increase), he recalled "generally" that "at some point in time, as a result of discussions with O'Meara and Reilly, we raised the limit."[3425]

Gentile also did not recall specifically whether Grieb approved the $3 billion increase, which would have pushed Lehman's firm-wide Repo 105 limit to $25 billion.[3426] But when shown an e-mail he sent to Michael Gelband (then-Head of FID) indicating that Grieb had approved the requested increase, Gentile said that he would never have written such an e-mail unless Grieb had in fact authorized the increase.[3427] Consistent with statements in his e-mail to Gelband, Gentile stated that the $3 billion

---

[3424] *Id.*

[3425] *Id.*; *see* e-mail from Joseph Gentile, Lehman, to Gerard Reilly, Lehman (Feb. 21, 2007) [LBEX-DOCID 4553220] ("We spoke with grieb and . . . he was ok with a temporary excession of $3. . . ."); e-mail from Gary Lynn, Lehman, to Sharan Mirchandani, Lehman, *et al.* (Feb. 21, 2007) [LBEX-DOCID 1431154] ("As you are aware we are significantly over the Q1 balance sheet limits…with one week to go, and Kaushik has delivered that message to the business heads that we need to come down further as there is no room for us to be over our limits. Please note that the current projected overage…already includes an additional $3bn of Repo 105 that we have been granted above the normal Repo 105 limits, but it has been communicated to me that this additional Repo 105 is to satisfy overages we currently have in other business lines."). Marie Stewart (former Global Head of Accounting Policy) recalled that Repo 105 transactions became more prevalent in late 2007 and 2008, but she did not specifically recall an official "ramping up" policy. Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 10.

[3426] Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 8.

[3427] Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 8; e-mail from Joseph Gentile, Lehman, to Michael Gelband, Lehman, *et al.* (Feb. 20, 2007) [LBEX-DOCID 1808077] ("I have been able to get a temp limit of 3 bn for repo 105 activity, which covers known real estate issues. We have issues in mortgages and liquid markets."). In the same e-mail, Gentile also noted that FID was more than $10 billion over its balance sheet target for the quarter and that consequently, Lehman's firm-wide net leverage ratio was 15.6 rather than the target, 14.8. *Id.*

increase was temporary and intended to apply to Lehman's first quarter 2007 only.[3428]

Other e-mails confirm that the $3 billion increase was granted.[3429]  As noted in this

Report, however, within months of February 2007, Lehman's firm-wide Repo 105 usage

was exceeding even that increased limit.[3430]

---

[3428] E-mail from Joseph Gentile, Lehman, to Kentaro Umezaki, Lehman (Feb. 21, 2007) [LBEX-DOCID 1808077].

[3429] E-mail from Gerard Reilly, Lehman, to Joseph Gentile, Lehman (Feb. 21, 2007) [LBEX-DOCID 4553218] (asking after Gentile informed Reilly of a $3 billion increase to the Repo 105 limit, "Where did the 3b come from? How far over is fid?"); e-mail from Joseph Gentile, Lehman, to Gerard Reilly, Lehman (Feb. 21, 2008) [LBEX-DOCID 4553220] ("We spoke with grieb and did an analysis which showed we did not spike and he was ok with a temporary excession [in the Repo 105 limit] of $3 [billion].").

[3430] No witness was able to explain to the Examiner why Lehman exceeded, by a significant margin, Lehman's self-imposed Repo 105 limits.  Martin Kelly was not involved with the setting or increasing of Lehman's Repo 105 limits at any time while he was Financial Controller.  Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 6.  In fact, Kelly said he would have had no authority to set a firm-wide Repo 105 limit and that "a broader and more senior group than [him]" would have had authority over those limits.  *Id.*  Gentile stated unequivocally that authorization from senior Lehman personnel was required to exceed Lehman's firm-wide Repo 105 limit during Gentile's tenure at Lehman (June 2006 through May 2007).  Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 7.  Gentile explained that "You had to go through the chain of command through the legal entity side of the business to get more Repo 105" and that "FID could never blow by the [Repo 105] limits. . .someone had to approve it."  *Id.*  If an individual or group at Lehman sought to exceed the Repo 105 limit, according to Gentile, they needed to obtain approval from Grieb for the "excession."  *Id.*  According to Grieb, the limits on Lehman's Repo 105 usage were not exclusively for quarter-end; rather, they represented the limit for any given moment throughout the quarter.  Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 9.  Accounting rules applicable to Repo 105 transactions did *not* prescribe a firm-wide limit on Repo 105 usage.  *Id.*  Rather, Grieb, O'Meara, and Reilly set Repo 105 limits as a prophylactic measure to prevent firm personnel from becoming too reliant upon Repo 105 transactions as a tool for balance sheet relief "just in case that funding source drie[d] up and counterparties los[t] interest."  *Id.*  During his interview with the Examiner, Grieb had no recollection of the quarter-end amounts of assets moved off Lehman's balance sheet via Repo 105 transactions.  *Id.*  Grieb recalled, however, that at the time he was Lehman's Financial Controller, he would have read, at least several times a month, reports that listed Lehman's firm-wide Repo 105 usage, but that he simply did not recall the volumes at present.  *Id.*  When the Examiner showed Grieb a Lehman-prepared chart that indicated the total firm-wide Repo 105 usage at the end of fourth quarter 2007 was $38.634 billion – when Grieb was still Lehman's Controller – Grieb stated that he had no recollection of this number but did not dispute its accuracy and said the figure did not "shock" him.  Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 12.  When asked to explain how Lehman's firm-wide Repo 105 usage got as high as $39 billion in November 2007, approximately six months after Lehman increased its firm-wide Repo 105 limit to $25 billion, Grieb recalled having discussions with O'Meara and Reilly about possibly increasing Lehman's firm-wide repo limit in mid-to-late-2007.  *Id.*

By the close of Lehman's first quarter 2008, February 29, 2008, Lehman's total Repo 105 quarter-end usage was $49.1 billion.[3431]  And at the close of Lehman's second quarter 2008, May 30, 2008, Lehman's total Repo 105 usage was $50.38 billion.[3432]  Thus, Lehman's use of Repo 105 transactions more than doubled in the span of five reporting periods, from approximately $24 billion at fourth quarter 2006 (November 2006) to $49.1 billion and $50.38 billion at first quarter 2008 (February 2008) and second quarter 2008 (May 2008), respectively.[3433]  The Examiner tracked Lehman's actual Repo 105 usage and compared it to the limit as a ratio of tangible equity, as seen in the chart below:

[3431] *See* Lehman, Total Repo 105 & Repo 108 Report (June 11, 2008) [LBEX-DOCID 2078195] (showing February 29 and May 30, 2008 total Repo 105 usage).  Note that May 31, 2008 was a Saturday.

[3432] *Id*.

[3433] Lehman, Total Repo 105 & 108 Report (Dec. 13, 2006) [LBEX-DOCID 2521357] (stating November 30, 2006 total Repo 105 usage was $24.519 billion); e-mail from Michael McGarvey, Lehman, to Gerard Reilly, Lehman, *et al.* (May 23, 2007) [LBEX-DOCID 4553348] (stating firm-wide Repo 105 usage projected at $24.5 billion); Lehman, Balance Sheet and Cash Capital (Mar. 27, 2008), at p. 1 [LBEX-DOCID 1698667] (attached to e-mail from Clement Bernard, Lehman to Lisa Rivera, Lehman (Mar. 28, 2008) [LBEX-DOCID 1854835] and showing firm-wide quarter-end Repo 105 usage of $49.1 billion for first quarter 2008); e-mail from Michael McGarvey, Lehman, to Clement Bernard, Lehman, *et al.* (Apr. 15, 2008) [LBEX-DOCID 3221734] ("FID used 42bn in Repo 105 in Q1 and Equities used 7.0b so 49 bn was the total firm number. This was an increase of 24bn from Q4'06.").



**Repo 105[1] Usage vs. 1 X Tangible Equity**

**(Repo 105 Usage as a Multiple of Tangible Equity)**

|  | Q4 2006 | Q1 2007 | Q2 2007 | Q3 2007 | Q4 2007 | Q1 2008 | Q2 2008 |
|---|---|---|---|---|---|---|---|
| Repo 105 Usage | 19,213 | 20,578 | 23,054 | 29,075 | 29,916 | 41,844 | 44,536 |
| 1 X Tangible Equity | 18,567 | 19,487 | 21,881 | 22,164 | 23,103 | 25,696 | 27,179 |
| Usage X Tangible Equity | 1.0 X | 1.1 X | 1.1 X | 1.3 X | 1.3 X | 1.6 X | 1.6 X |

1. Please note these amounts refer only to Repo 105, not to combined Repo 105 and Repo 108 amounts.

<u>Sources:</u>

Actual Repo 105/108 Usage:
    Q4 2006, Q1, Q2 and Q3 2007: LBEX-DOCID 3363434. Repo 105 Usage is assumed to be the Fixed Income Division's total usage.
    Q4 2007: LBEX-DOCID 3219746
    Q1 2008: LBEX-DOCID 3219760
    Q2 2008: LBEX-DOCID 2078195

Tangible Equity:
    Lehman Brothers' SEC 10-K and 10-Q filings.

Repo 105 Limit as 1 X Tangible Equity:
    [1] LBEX-WGM 748489: See page 2 for "Operating Rules." See page 5 for suggestion that Tangible Equity is the appropriate measure of leverage.

Clement Bernard, who replaced Gentile in approximately August 2007, did not recall *how* Lehman's firm-wide Repo 105 usage reached $50 billion in early 2008, even though a series of e-mails shown to him revealed that: (1) he was informed of the total Repo 105 usage in 2008; (2) he was informed that the usage had doubled since 2006; and

(3) he pressured FID leaders to meet quarter-end balance sheet targets by means of either sales of assets or Repo 105 transactions.[3434] When asked by the Examiner if the significant increase in Lehman's firm-wide Repo 105 usage in late 2007 and 2008 caused him any alarm, Bernard answered: "no."[3435]

Lehman's Repo 105 usage as of November 30, 2007, February 29, 2008, and May 31, 2008 was "in line with" what John Feraca, the former head of the Secured Funding Desk for Lehman's Prime Services Group, "would have expected" even though it far

---

[3434] E-mail from Clement Bernard, Lehman, to Kieran Higgins, Lehman (Feb. 22, 2008) [LBEX-DOCID 1854016] (informing Higgins that "[w]e are currently at 19 bn above our target" and asking him how many Repo 105 transactions he can undertake); e-mail from Clement Bernard, Lehman, to Kaushik Amin, Lehman (Feb. 25, 2008) [LBEX-DOCID 756417] (informing Amin that "[w]e are currently running at 15.0 bn above [net balance sheet target] and we need to go down an extra $5.0 bn for the firm to meet its net leverage limit of 15.2. I need your help on this…"); e-mail from Clement Bernard, Lehman, to Eric Felder, Lehman (Feb. 25, 2008) [LBEX-DOCID 2080410] ("We need to reduce our net Balance sheet to hit the firm target net leverage ratio of 15.2. Currently FID is projected to be $15.0 bn above its limit… Let me know if there is anything you could do to reduce the Balance Sheet and what would [be] the price of doing that."); e-mail from Clement Bernard, Lehman, to Martin Potts, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 1854189] ("We are looking at selling what ever we can and also doing some more repo 105 [because over balance sheet target by $ 14.3 billion]."); e-mail from Clement Bernard, Lehman, to Mark Cosaitis, Lehman (Feb. 29, 2008) [LBEX-DOCID 2803733] (thanking Cosaitis for his efforts in undertaking Repo 105 transactions using corporate positions during last day of quarter and stating he expects the firm to make the 15.2 net leverage ratio target); Lehman, Balance Sheet and Cash Capital (Mar. 27, 2008), at p. 1 [LBEX-DOCID 1698667] (attached to e-mail from Clement Bernard, Lehman to Lisa Rivera, Lehman (Mar. 28, 2008) [LBEX-DOCID 1854835] and showing $49.1 billion in Repo 105 quarter-end usage first quarter 2008); e-mail from Michael McGarvey, Lehman, to Clement Bernard, Lehman, *et al.* (Apr. 15, 2008) [LBEX-DOCID 3221734] ("FID used 42bn in Repo 105 in Q1 and Equities used 7.0b so 49 bn was the total firm number. This was an increase of 24 bn from Q4'06.").

[3435] Examiner's Interview of Clement Bernard, Oct. 23, 2009, at p. 9. Bernard explained that he had been focused at that time on Lehman's sticky assets – like commercial real estate and leveraged loans – and that he did not pay particular attention to Lehman's use of Repo 105 transactions. *Id.* Bernard did not recall discussions with Reilly, Bernard's supervisor, or anyone else about the volumes of Lehman's Repo 105 usage or discomfort with Lehman's reliance upon Repo 105 transactions. *Id.* Bernard did, however, recall that Reilly wanted Lehman to curtail its use of Repo 105 in 2008, though Bernard could only speculate why. *Id.* Bernard recalled that it would not have been uncommon for Lehman traders to have the ability to move upwards of $2 billion of assets, through Repo 105 transactions, in a single hour as a quarter was ending. *Id.*

exceeded the last known limit of $25 billion, which was in place in early 2007.[3436]   The ramp-up in Lehman's firm-wide Repo 105 usage was "probably a combination of an increase in limits and a lack of policing, though probably more of the latter."[3437]   Feraca continued: "The fact that we were going to breach the [Repo 105] limit at quarter-end was not an issue for management."[3438]   Feraca had no recollection "of anyone saying 'you're over limit,'" nor did he have any recollection of a formal increase of the Repo 105 limit.[3439]   "I know why it happened. The business wanted more, needed more, to make targets. The numbers were reported internally, daily, so there was transparency, but there was no stoppage."[3440]

### (3) Balance Sheet Targets for FID Businesses Were Unsustainable Without the Use of Repo 105 Transactions

Bart McDade's description of the Repo 105 mechanism for quarter-end balance sheet relief as a "drug" was apt:  Repo 105 enhanced Lehman's reported net leverage ratio and without the artificial floor Repo 105 created, balance sheet and net leverage ratio targets were beyond reach.   In a March 19, 2008 e-mail to McDade, Andrew Morton, Mark Walsh, and other Lehman personnel, Munir Dauhajire warned that

---

[3436] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 11; *see also* Lehman, Total Repo 105 & Repo 108 Report (Dec. 5, 2007) [LBEX-DOCID 3219746] (showing Repo 105 usage at close of fourth quarter 2007); Lehman, Total Repo 105 & Repo 108 Report (June 11, 2008) [LBEX-DOCID 2078195] (showing Repo 105 usage at close of first quarter and second quarter 2008).
[3437] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 11.
[3438] *Id.*
[3439] *Id.*
[3440] *Id.*

"RUNNING A FIRM WIDE BALANCE SHEET OF 15.3 X LEVG IS NOT GOING TO BE A SUSTAINABLE BUSINESS MODEL FOR THE FIRM."[3441]

After engaging in over $49.1 billion and $50.38 billion of Repo 105 transactions at the end of the first and second quarters 2008, respectively, by June 2008, when Bart McDade had become President and COO, McDade set a quarter-end Repo 105 target for third quarter 2008 of $25 billion.[3442] The evidence also shows that senior Lehman management sought to completely abolish the firm's use of Repo 105 transactions by the beginning of the fourth quarter 2008.[3443]

The reduction in Repo 105 usage for third became well known throughout the firm.[3444] A July 2008 e-mail noted that "[t]he exec committee wanted the number [of Repo 105] cut in half."[3445] The result of the announced reduction in approved firm-wide

---

[3441] E-mail from Munir Dauhajre, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Mar. 19, 2008) [LBEX-DOCID 119728] (all capitals in original).

[3442] One week before close of Lehman's third quarter 2008, Reilly wrote to McGarvey: "How much repo 105 do we have now and how much will we have at 8/31?" E-mail from Gerard Reilly, Lehman, to Michael McGarvey, *et al.* Lehman (Aug. 26, 2008) [LBEX-DOCID 4297834]. McGarvey replied that the forecast at quarter-end was $21 billion in Repo 105 and $3.8 billion in Repo 108. *Id.*; *see also* Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets [Draft] (June 16, 2008) [LBEX-DOCID 012458] (attached to e-mail from Gerard Reilly, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (June 17, 2008) [LBEX-DOCID 011380] and containing balance sheet target and proposing a Repo 105 target of $25 billion for Q3 2008).

[3443] *See* e-mail from Jeff Michaels, Lehman, to Kaushik Amin, Lehman (July 30, 2008) [LBEX-DOCID 613324] ("Repo 105 is going away by Q4…."); e-mail from Jeff Michaels, Lehman, to Kaushik Amin, Lehman, *et al.* (July 31, 2008) [LBEX-DOCID 756327] ("Repo 105 is going to zero in Q4….").

[3444] *See* Section III.A.4.e.2.a of this Report (discussing role of Bart McDade in proposing reduction in Repo 105 usage).

[3445] E-mail from Michael McGarvey, Lehman, to Jormen Vallecillo, Lehman (July 2, 2008) [LBEX-DOCID 3379145]. When questioned about this e-mail, McGarvey could not explain why the Executive Committee had decided to reduce Lehman's Repo 105 usage by half. Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 11.

Repo 105 usage was disquiet. As one internal Lehman presentation put succinctly: "Wean ourselves off Repo 105 ASAP!"[3446]

When in June 2008 Reilly communicated the proposed $25 billion Repo 105 cap for third quarter 2008, Andrew Morton, then-Head of FID, replied: "rates business cannot survive at these levels, ie reducing r105 by 20."[3447] When also in June 2008, Paul Mitrokostas, the Chief Operating Officer of FID, communicated the third quarter 2008 balance sheet target and the fact that FID's Repo 105 limit for that quarter was being reduced to $25 billion, Amin protested that a $55 billion net balance sheet limit for the firm's Rates business, with $22 billion less of Repo 105 capacity available at quarter-end, was unsustainable: "We can't run the business under those parameters."[3448]

Similarly, Jeff Michaels complained to Amin in July 2008 that given the reduction in FID's Repo 105 capacity for third quarter 2008, and the complete curtailment of Repo 105 usage in fourth quarter 2008, "there are not many places we can reallocate balance sheet from if Repo 105 is gone for the inflation book."[3449] In another e-mail, Michaels wrote: "[Repo] 105 is going to zero in Q4, which means we either need more balance

---

[3446] Lehman, Global Rates Mid-Year Review 2008 (Sept. 12, 2008) [LBEX-DOCID 659022], at p. 5 (attached to e-mail from Jeff Michaels, Lehman, to Kaushik Amin, Lehman (Sept. 12, 2008) [LBEX-DOCID 679130]). A hard copy of this presentation was also found among Clement Bernard's documents. *See* Lehman, Global Rates Mid-Year Review 2008 (no date) [LBEX-WGM 756153].

[3447] E-mail from Andrew J. Morton, Lehman, to Gerard Reilly, Lehman (June 17, 2008) [LBEX-DOCID 4553446].

[3448] E-mail from Kaushik Amin, Lehman, to Paul Mitrokostas, Lehman, *et al.* (June 20, 2008) [LBEX-DOCID 2319659].

[3449] E-mail from Jeff Michaels, Lehman, to Kaushik Amin, Lehman (July 30, 2008) [LBEX-DOCID 613324]. Inflation book or inventory likely refers to Treasury Inflation Protected Securities ("TIPS"), which are inflation-indexed bonds issued by the United States Treasury.

sheet from FID or we need to make significant reductions in Europe, which has not happened until now.  There is no way we can make Q4 balance sheet without Repo 105 unless our inflation inventory is cut by 60-75% from current levels."[3450]

> **(4)  Rating Agencies Advised the Examiner that Lehman's Accounting Treatment and Use of Repo 105 Transactions to Manage Its Net Leverage Ratio Would Have Been Relevant Information**

Just as it did in its Forms 10-Q and 10-K, Lehman emphasized its net leverage ratio to the ratings agencies throughout 2008 as Lehman attempted to forestall a ratings downgrade.  The concerted effort by Lehman's senior management to cut the balance sheet by half, achieved by reducing the firm's net leverage ratio, and Lehman's public statements about this achievement, improved the firm's standing with at least two of the three rating agencies, Fitch Rating ("Fitch"), and Standard & Poor's ("S&P").[3451]

In May 2008, Lehman gave a presentation to Moody's Investor Service in which one of the key messages in the presentation was that because Lehman had strengthened its capital position through "active deleveraging" including "approximately $50 billion reduction in net assets," no negative rating action for the firm was justified.[3452]  The

---

[3450] E-mail from Jeff Michaels, Lehman, to Kaushik Amin, Lehman, *et al.* (July 31, 2008) [LBEX-DOCID 756327] (transmitting Lehman, Balance Sheet-Global Rates [LBEX-DOCID 633334], and showing Global Rates business Repo 105 usage).

[3451] Fitch's and S&P's analysis of Lehman took into account the firm's net leverage ratio.  Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 6; Examiner's Interview of Diane Hinton, Sept. 22, 2009, at p. 5.  Moody's, on the other hand, looked primarily to other indicators, particularly risk.  Examiner's Interview of Peter E. Nerby, Oct. 8, 2009, at p. 5.

[3452] Lehman, Moody's Investor Service Q2 2008 Update (May 29, 2008), at pp. 1, 4, 6-8 [Moody's Confidential Shared Information 1114-1159].

presentation to Moody's noted that net leverage was expected to decrease from 15.4x to 12.6x and that the net balance sheet reduction of $50.38 billion in second quarter 2008 included key FID high-risk assets, such as commercial and residential mortgages.[3453] Lehman's presentation also noted that the "net leverage ratio" was "heavily quoted by journalists and analysts."[3454]

On June 3, 2008, Lehman gave a similar presentation to Fitch, stating that Lehman did "not believe Q2 '08 results justify any negative rating action for Lehman Brothers."[3455] Lehman told Fitch that its "[c]apital position is stronger than ever with de-levering bringing both net and gross leverage ratios to multi-year lows."[3456]

On June 5, 2008, Lehman made a similar presentation to S&P in which Lehman advanced its position that second quarter 2008 "results [do not] justify any negative rating action for Lehman Brothers"[3457] in part because of Lehman's "shrinkage of the balance sheet."[3458] In that presentation, Lehman advised S&P that "Net balance sheet (primarily inventory) is expected to be almost $70 billion lower than Q1 '08, and gross balance sheet is expected to be almost $140 billion lower."[3459] The presentation also projected that Lehman's net leverage ratio would drop to 12.1x in second quarter

---

[3453] *Id.* at pp. 6-7.
[3454] *Id.* at p. 8.
[3455] Lehman, Fitch Ratings Q2 2008 Update (June 3, 2008), at p. 4 [FITCH-LEH BK 00000151].
[3456] *Id.* at p. 40.
[3457] Lehman, S&P Ratings Q2 2008 Update (June 5, 2008), at p. 4 [S&P Examiner 000946].
[3458] *Id.* at p. 6.
[3459] *Id.*

2008.[3460]  Another slide in the presentation touted Lehman's historically low net leverage ratio and contrasted it with that of peer investment banks.[3461]

Nowhere in the presentations that Lehman made to the rating agencies in May or June 2008 did Lehman disclose its use of Repo 105 transactions, the impact Repo 105 transactions had on the firm's quarter-end balance sheet, or the impact Repo 105 transactions ultimately had on Lehman's net leverage ratio.[3462]

Following Fitch's decision in June 2008 to downgrade Lehman by one ratings grade, from AA- to A+ (long-term) and F-1+ to F-1 (short-term), Tonucci sent Fitch another Lehman presentation "to consider in the context of a potential appeal."[3463] Lehman marshaled certain facts in defense of its "disagreement" with the ratings downgrade by Fitch.  Under the heading "Significant Shrinkage of the Balance Sheet," Lehman informed Fitch that "Net balance sheet (primarily inventory) is expected to be almost $70 billion lower than Q1 '08. . . ."[3464]  Not including the impact of the $4 billion common equity and $2 billion non-cumulative preferred offering that Lehman had undertaken in June 2008, Lehman boasted to Fitch that it reduced its net leverage ratio

---

[3460] *Id.*

[3461] *Id.* at p. 8.

[3462] *See generally* Lehman, Moody's Investor Service Q2 2008 Update (May 29, 2008) [Moody's Confidential Shared Information 1114-1159]; Lehman, Fitch Ratings Q2 2008 Update (June 3, 2008) [FITCH-LEH BK 00000151]; Lehman, S&P Ratings Q2 2008 Update (June 5, 2008) [S&P Examiner 000946].

[3463] Lehman, Presentation to Fitch Ratings Rating Appeal [Draft] (June 9, 2008) [FITCH-LEH BK 00002449] (attached to e-mail from Paolo R. Tonucci, Lehman, to Eileen A. Fahey, Fitch (June 9, 2008) [FITCH-LEH BK 00002447]).

[3464] *Id.* at p. 2.

from 15.4x in first quarter 2008 to an anticipated 12.0x in second quarter 2008.[3465] Accounting for the equity raise, Lehman touted that it had reached its "lowest leverage ratios since becoming a public firm."[3466]

Lehman, as with its prior presentations to the rating agencies, made no mention in its second presentation to Fitch of its reliance on Repo 105 transactions to manage its balance sheet and net leverage.[3467] Recall that at the end of its second quarter 2008, May 31, 2008 – just weeks before Tonucci sent the presentation to Fitch – Lehman had reduced its net balance sheet by over $50.38 billion using Repo 105 transactions. Yet, despite the significant role of the firm's Repo 105 practice in its balance sheet management, this fact was not disclosed in Lehman's presentations.

The Examiner interviewed representatives from the three leading ratings agencies, Fitch, Standard & Poor's, and Moody's, and none had knowledge of Lehman's use of Repo 105 transactions, either by name or by description.[3468] Not one of the rating agencies was aware that Lehman recorded some volume of repo transactions as true sales to temporarily remove the securities inventory from its balance sheet at quarter-end thereby reducing Lehman's publicly reported leverage ratios.

---

[3465] *Id.*

[3466] *Id.* at p. 3.

[3467] *See generally id.*

[3468] Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 7; Examiner's Interview of Diane Hinton, Sept. 22, 2009, at p. 6; Examiner's Interview of Peter E. Nerby, Oct. 8, 2009, at pp. 5-6.

Eileen Fahey, an analyst at Fitch, said that she had never heard of repo transactions being accounted for as true sales on the basis of a true sale opinion letter or repo transactions known as Repo 105 transactions.[3469]  Fahey stated that a transfer of $40 billion or $50 billion of securities inventory – *regardless of the liquidity of that inventory* – from Lehman's balance sheet at quarter-end would be "material" in Fitch's view, and upon having a standard Repo 105 transaction described, Fahey remarked that such a transaction "sounded like fraud."[3470]

The Examiner inquired whether, if Fitch had known about Lehman's use of such transactions to remove assets off its balance sheet at quarter-end, it likely would have affected the Fitch rating of Lehman.[3471]  Fahey replied that the transaction spoke to

---

[3469] Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 7.

[3470] *Id.*  While freely admitting that Lehman moved tens of billions of dollars' worth of inventory off the firm's net balance sheet at quarter-end through Repo 105 transactions, and that the moved inventory came back on to the firm's balance sheet a week to ten days later, Kaushik Amin, former Head of Liquid Markets, believed it was immaterial and "completely irrelevant."  Examiner's Interview of Kaushik Amin, Sept. 17, 2009, at p. 9.  Amin believed that neither the rating agencies nor the investing public would have cared about Lehman's Repo 105 practice because Lehman used liquid inventory.  *Id.*  In Amin's view, "our risk was not represented any differently because of [Repo] 105."  *Id.*  Amin's view is belied by the statements of representatives of each of the three main ratings agencies, one of whom said that Lehman's undisclosed Repo 105 activity would have been "material" to the agency's view of Lehman and the other two who said they would have wanted to know of Lehman's Repo 105 activity.  Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 7; Examiner's Interview of Diane Hinton, Sept. 22, 2009, at p. 6; Examiner's Interview of Peter E. Nerby, Oct. 8, 2009, at p. 5.  Like Fahey, when asked whether it would have changed her answers if the securities that were removed from the balance sheet in Repo 105 transactions were liquid, S&P's Hinton responded that it would not.  Examiner's Interview of Diane Hinton, Sept. 22, 2009, at p. 6.

[3471] Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 7.  Fitch used three leverage numbers to assess Lehman, including the net leverage ratio.  *Id.* at p. 6.

Lehman's liquidity, and that the impact on Fitch's rating would depend on whether the described transaction was done repeatedly or if it was a one-time occurrence.[3472]

Fahey also remarked that treating a repo transaction as a sale (thereby removing the securities from the transferor's balance sheet) appears to be an accounting manipulation done to make the business look better, as contrasted with an ordinary repo transaction, which she described as a financing transaction done in the regular course of business (and for which the securities remain on the transferor's balance sheet).[3473] Fahey likened this "manipulation" to an investment bank telling regulators that it did not own any mortgage-backed securities when, in fact, it owned them but had temporarily transferred them to a counterparty and was obligated to repurchase them shortly thereafter.[3474]

Diane Hinton, an analyst at Standard & Poor's and the firm's lead analyst for Lehman from April 2007 until July 2008, likewise was unaware of Lehman engaging in Repo 105 transactions.[3475] When the Examiner described the "true sale" accounting treatment of Repo 105 transactions to Hinton, she stated that S&P "would have wanted to know" if Lehman had moved $20 billion, $40 billion, or $50 billion in net assets off its

---

[3472] *Id.* at p. 7.

[3473] *Id.*

[3474] *Id.*

[3475] Examiner's Interview of Diane Hinton, Sept. 22, 2009, at p. 6.

balance sheet at quarter-end.[3476]  When asked whether it would have changed her answers if the securities that were removed from the balance sheet in Repo 105 transactions were liquid, Hinton responded that it would not.[3477]

Hinton explained that S&P looked at leverage ratios – including the net leverage ratio – in the context of its capital analysis of Lehman.  Hinton further explained that S&P began its calculation of the net leverage ratio with information taken solely from Lehman's Forms 10-K and 10-Q, and that "anything that affects the balance sheet is something we would have wanted to know."[3478]  She further stated that S&P only tracked Lehman's leverage ratios at quarter-end.[3479]  She said that any change in the net leverage ratio would have been relevant, but whether such a change was relevant to S&P's rating of Lehman would depend on other factors and committee deliberations.[3480]

Peter Nerby of Moody's similarly stated that Moody's had no knowledge of Lehman engaging in Repo 105 transactions, either by name or by description.[3481]  However, unlike S&P and Fitch, the net leverage ratio did not drive many rating decisions at Moody's.[3482]  Nerby said that Lehman would have been aware that Moody's

---

[3476] *Id.*  While advising the Examiner that she "would have wanted to know" about Lehman's Repo 105 practice, Hinton neither stated nor denied that information about Lehman's use of Repo 105 transactions would have been "material."

[3477] *Id.* at p. 6.

[3478] *Id*. at pp. 5-6.

[3479] *Id.* at p. 6.

[3480] Examiner's Interview of Diane Hinton, Sept. 22, 2009, at p. 6.

[3481] Examiner's Interview of Peter E. Nerby, Oct. 8, 2009, at p. 5.

[3482] *Id.* Moody's focused more on the risk effects of a transaction.  *Id.* at p. 6.  While a repo transaction that was recorded as a true sale affects a firm's net leverage ratio, it would not affect other ratios (*e.g.,* VaR,

considered net leverage ratio to have "limited usefulness" as revealed by Moody's published rating methodology.[3483]  Still, Nerby stated that if Lehman reduced its net balance sheet by $20 billion or up to $50 billion, he would have wanted to know and that Moody's would have looked to see if and where the reduction was captured by some risk measure.[3484]

A number of Lehman witnesses said that Lehman remained at risk for the assets it removed from its balance sheet as a result of Repo 105 transactions because of Lehman's obligation to repurchase the securities and repay the cash borrowing.[3485]  A June 2008 e-mail from Dominic Gibb recommended to Martin Kelly that Lehman "have another look" at its definition of "long inventory at risk in the daily balance sheet and disclosure scorecard" because the definition did not include "any of the assets on repo 105/108" even though they are "still at risk."[3486]  Gibb concluded: "[W]e are *understating what we have at risk by a material amount especially around quarter ends*."[3487]

---

stress test results, Level III assets to total inventory) and Moody's, according to Nerby, examined all of these ratios.  *Id.*  Nerby speculated that if the transaction was off balance sheet, it would probably be captured by some other risk measure.  *Id.*  When the Examiner asked Nerby if Moody's view of Repo 105 transactions would have been impacted if the assets involved were purely liquid assets, Nerby's counsel instructed him not to answer the question, claiming that the question delved into Moody's deliberative process.  Examiner's Interview of Peter E. Nerby, Oct. 8, 2009, at p. 6.

[3483] *Id.*

[3484] *Id.*

[3485] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 11; Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 8; Examiner's Interview of Tejal Joshi, Sept. 15, 2009, at p. 6;  Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 9.

[3486] E-mail from Dominic Gibb, Lehman, to Martin Kelly, Lehman, *et al.* (June 19, 2008) [LBEX-DOCID 3233813].

[3487] *Id.* (emphasis added).

### (5) Government Regulators Had No Knowledge of Lehman's Repo 105 Program

Lehman did not disclose the fact of its engaging in Repo 105 transactions, or any other information regarding its use of Repo 105 transactions to manage its balance sheet, to Government regulators.[3488]

### (a) Officials from the Federal Reserve Bank Would Have Wanted to Know about Lehman's Use of Repo 105 Transactions

From 2003 to 2009, Treasury Secretary Timothy Geithner served as President of the Federal Reserve Bank of New York ("FRBNY"). The Examiner described to Secretary Geithner how Lehman used Repo 105 transactions to remove approximately $50 billion of liquid assets from the balance sheet at quarter-end in 2008 and explained that this practice reduced Lehman's net leverage. Secretary Geithner "did not recall being aware of" Lehman's Repo 105 program, but stated: "If this had been a bank we

---

[3488] For example, Lehman's external regulatory reporting did not disclose Lehman's use of Repo 105 transactions to the Office of Thrift Supervision ("OTS") of the Department of the Treasury. OTS was responsible for reviewing Lehman Brothers Bank, FSB ("LBB") and examined the holding company ("LBHI") to determine its influence and connections with LBB. In response to the economic downturn, the OTS decided in 2008 to create a continuous supervision program of Lehman, Merrill Lynch, and Morgan Stanley. Examiner's Interview of Ronald S. Marcus, Nov. 4, 2009, at p. 5. The purpose, as to Lehman, was to obtain a general understanding of Lehman's risk as it related to LBB. *Id.* The OTS documented all of LBHI's repo transactions in its Report of Examination on the secured funding and lending activities of LBI and LBIE, the principal broker-dealer subsidiaries of Lehman Brothers Holdings Inc. ("LBHI"). *See* OTS, Dept. of Treasury, Report of Examination for Lehman Brothers Bank, FSB (Aug. 6, 2007), at pp. 4-5 [LBEX-OTS 000082]. This report was the end-product of an on-site field visit OTS conducted on May 30, 2008. *Id.* Absent from the report is any reference to Repo 105 transactions, either by name or description (*i.e.*, as repo transactions that are treated as true sales for accounting purposes). *Id.* Ronald Marcus, who served as the examiner for the continuous program at Lehman beginning in March 2008 and completed two targeted reviews prior to the bankruptcy, had no knowledge of Lehman's use of Repo 105 transactions. Examiner's Interview of Ronald S. Marcus, Nov. 4, 2009, at p. 11.

were supervising, that [*i.e.*, Lehman's Repo 105 program] would have been a huge issue for the New York Fed."[3489]

Jan Voigts, who was an Examining Officer in FRBNY's Bank Supervision Department, had no knowledge of Lehman removing assets from its balance sheet at or near quarter-end via a repo trade treated as a true sale under a United Kingdom opinion letter.[3490] Voigts was surprised at and unfamiliar with the idea of using a repo to remove assets from the balance sheet under a true sale opinion where those assets would return to the balance sheet the following quarter.[3491] When the Examiner described to Voigts the steps Lehman undertook in a standard Repo 105 transaction, Voigts said that knowledge of such a practice by Lehman would have been "very important" to him.[3492]

After having Repo 105 transactions described to him generally, Voigts differentiated Repo 105 transactions from other forms of balance sheet management like certain matched book repo trading.[3493] Voigts said that he also found interesting that

---

[3489] Examiner's Interview of Treasury Secretary Timothy F. Geithner, Nov. 24, 2009, at p. 5. By his comment "if this had been a bank we were supervising," Secretary Geithner meant that the SEC – and not the FRBNY – was the primary regulator of Lehman. *Id.*

[3490] Examiner's Interview of Jan H. Voigts, Oct. 1, 2009, at p. 5.

[3491] *Id.*

[3492] *Id.*

[3493] *Id.* The matched book business consisted of entering into offsetting long and short positions through repo and reverse repo transactions of the same government securities. Under OFFSETTING OF AMOUNTS RELATED TO CERTAIN REPURCHASE AND REVERSE REPURCHASE AGREEMENTS, FASB Interpretation No. 41 (Fin. Accounting Standards Bd. 1994) ("FIN 41"), which may be applied only to repo and reverse repo transactions if certain criteria are satisfied, Lehman could offset the asset (reverse repo) and liability (repo). As a consequence of offsetting the reverse repos and repos, Lehman could include in its balance

Lehman was repoing out treasury securities at a higher haircut than would normally be used for such liquid collateral.[3494]   Voigts said he would have wanted to know more about any "off-market" transactions Lehman undertook.[3495]

Arthur Angulo, who was a Senior Vice President in FRBNY's Bank Supervision department, likewise was unaware that Lehman engaged in repo transactions at quarter-end, under a United Kingdom true sale opinion letter, where the assets would be returned to Lehman's balance sheet following the end of the reporting period.[3496] Angulo said that the described repo transactions appeared to go "beyond other types of [permissible] balance sheet management."[3497]   Angulo also said that he would have

---

sheet totals for repo and reverse repo agreements only as a net amount with each of its counterparties, resulting in a reduction in the size of the gross balance sheet.  Offsetting under FIN 41 is optional and permitted only if all of the following requirements (provided in summary form) are met: (1) the repo and reverse are executed with the same counterparty; (2) the repo and reverse have the same explicit settlement date specified at inception of the agreement; (3) the repo and reverse are executed in accordance with a master netting agreement; (4) the securities underlying the repos and reverses exist in "book entry" form; (5) the repos and reverses are settled in a securities transfer system that transfers "book entry" securities and banking arrangements are in place so that the entities must only keep cash on deposit sufficient to cover net payables; and (6) the same account at the clearing bank is used for the cash inflows of the settlement of the reverses and for settlement of the cash outflows of the repos.  *See* FIN 41, ¶ 3.  "Netting" under FIN 41 is very different from balance sheet reduction achieved by means of Repo 105 transactions.  With Repo 105, Lehman: (1) recharacterized a repo transaction (a liability) as a sale, and thereby removed inventory from its balance sheet and (2) borrowed cash without reflecting the borrowing on its financial statements and related disclosures.  With FIN 41, two counterparties that owe each other money are simply netting identical transactions and showing the net amounts on the balance sheet.

[3494] Examiner's Interview of Jan H. Voigts, Oct. 1, 2009, at p. 5.

[3495] *Id.*

[3496] Examiner's Interview of Arthur G. Angulo, Oct. 1, 2009, at p. 2.

[3497] *Id.*  The question of whether and why some window-dressing may be considered acceptable by the financial community is beyond the scope of the Examiner's Report.  The Examiner has investigated Lehman's use of Repo 105 transactions and has concluded that the balance sheet manipulation was intentional, for deceptive appearances, had a material impact on Lehman's net leverage ratio, and,

wanted to know about off-market transactions where Lehman accepted a higher haircut than a repo seller normally would accept for a certain type of collateral.[3498]

Thomas Baxter, FRBNY General Counsel, had no knowledge of Repo 105 transactions, either by name or design.[3499] Baxter was generally aware of firms using quarter-end and month-end "balance sheet window-dressing," but did not recall this being an issue linked to Lehman specifically.[3500]

### (b) Securities and Exchange Commission CSE Monitors Were Unaware of Lehman's Repo 105 Program

The Examiner interviewed multiple employees of the Securities and Exchange Commission who had some responsibility to monitor Lehman's business operations as part of the Consolidated Supervised Entity ("CSE") division: Michael Macchiaroli, Phillip Minnick, James Giles, Michelle Danis, Gina Lai, and Raymond Doherty. None had been informed of Lehman's use of Repo 105 transactions.[3501]

The SEC's Matthew Eichner, who was involved with the CSE division, was not aware of Lehman's use of Repo 105 transactions, by name or description, to remove assets from the balance sheet and impact its leverage ratios.[3502] Asked if the SEC – in connection with its monitoring responsibilities under the CSE division – would have

---

because Lehman did not disclose the accounting treatment of these transactions, rendered Lehman's Forms 10-K and 10-Q (financial statements and MD&A) deceptive and misleading.

[3498] *Id.*

[3499] Examiner's Interview of Thomas C. Baxter, Jr., Aug. 31, 2009, at pp. 3-4, 9.

[3500] *Id.*

[3501] Examiner's Interview of SEC Staff, Aug. 24, 2009, at pp. 3, 10.

[3502] Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 9.

wanted to know that Lehman's net leverage calculation was based, in part, on "true sale" accounting for certain repo transactions, Eichner explained that because the SEC's CSE monitors did not put much stock in leverage numbers, knowledge of the volumes of Repo 105 transactions would not have signaled to them "that something was terribly wrong."[3503] The SEC's CSE division had the "strong view that, for complicated financial institutions, leverage information is not often going to give you the right answer for a variety of business reasons."[3504]

### h) Knowledge of Lehman's Repo 105 Program at the Highest Levels of the Firm

Many former members of senior Lehman management recalled generally Lehman's use of Repo 105 transactions – such as the existence of Lehman's Repo 105 program, that Lehman used these transactions to manage its balance sheet, and that the internal Repo 105 accounting policy had been vetted by outside auditors and lawyers.[3505] These same witnesses, however, disavowed any knowledge on a number of significant topics:[3506]

---

[3503] *Id.* Note that Eichner was not involved in monitoring public disclosures. His comments about net leverage were made in reference to the SEC's role in monitoring Lehman under the CSE division. *See* Section III.A.6.b of this Report (discussing the SEC's oversight of Lehman and the CSE program).

[3504] Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 9.

[3505] Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at p. 4 (stating he knew that Repo 105 transactions netted down the balance sheet); Examiner's Interview of Herbert H. "Bart" McDade III, Sept. 16, 2009, at p. 4 (stating that Lehman had vetted its Repo 105 policy with Ernst & Young and that inventory was removed from Lehman's balance sheet as a result of Lehman's Repo 105 transactions); Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at pp. 17-19 (acknowledging she was aware, as CFO, that Lehman's Repo 105 practice impacted net balance sheet, that the transactions had to be routed through Europe); Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at pp. 10-12, 14 (acknowledging that he was aware of Lehman's Repo 105 program for many years, that Lehman used the transactions to

- the volumes of Repo 105 transactions that Lehman engaged in at quarter-end;

- that Lehman more than doubled its Repo 105 usage from late 2006 to February and May 2008;

- that Lehman vastly exceeded its self-imposed limits on Repo 105 transactions in 2007 and 2008;

- that Lehman's use of Repo 105 transactions had a material impact on the firm's net leverage ratio; and

- that securities of United States-based Lehman entities were used for Repo 105 transactions.

Notwithstanding the professed ignorance by witnesses of virtually any of these issues central to the scope of Lehman's Repo 105 program, contemporaneous documents demonstrate that many former top executives were regularly apprised of the scope of the firm's Repo 105 usage.[3507] For example, a report entitled the "Balance Sheet

---

meet balance sheet targets, that Repo 105 transactions used only liquid inventory, and that Lehman set internal limits on Repo 105 usage but that Chris O'Meara was involved with limit-setting).

[3506] Examiner's Interview of Christopher M. O'Meara, Sept. 23, 2009, at pp. 7-8 (disavowing any knowledge of a cap on Repo 105 usage or volume of Lehman's Repo 105 usage); Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at pp. 17, 20 (disavowing knowledge of the volume of Lehman's Repo 105 transactions and stating she had no awareness of or discussions regarding a cap on Repo 105 usage); Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at pp. 12-13 (stating that he had no recollection of volume of Lehman's Repo 105 usage or that senior management had decided by mid-2008 to reduce Lehman's Repo 105 usage). When the Examiner first interviewed Bart McDade in September 2009, McDade disavowed any knowledge that Lehman's Repo 105 usage every exceeded $20 billion. Examiner's Interview of Herbert H. "Bart" McDade III, Sept. 16, 2009, at p. 4. When the Examiner interviewed McDade a second time, McDade acknowledged that he was aware of the volume of Lehman's Repo 105 usage and that in 2008, he had ordered a firm-wide cap on Repo 105 usage for third quarter 2008 of $25 billion down from more than $50 billion at the end of the second quarter 2008. Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at pp. 2-8.

[3507] The Examiner's role is not to make credibility determinations but rather to point out where a trier of fact would be justified in doing so and, therefore, that a colorable claim exists. The Examiner does not opine one way or another on the credibility of the statements of various officers denying any substantive knowledge of Repo 105 transactions. But the Examiner notes that a trier of fact would have to assess the credibility of individual denials of recollection against the notable, collective lack of memory of a $50

and Disclosure Scorecard," which was circulated to various members of senior Lehman management on a daily basis from April 2008 through September 2008, tracked, among other things, the daily benefit that Repo 105 transactions provided to Lehman's balance sheet.[3508] Lehman created the Daily Balance Sheet and Disclosure Scorecard in April

---

billion ongoing program, disclosed on multiple documents, that impacted the report of a critical metric, by the firm's one CEO, a COO and three CFOs.

[3508] This Daily Balance Sheet and Disclosure Scorecard was a more comprehensive PowerPoint version of a daily balance sheet and disclosures scorecard e-mail report that was distributed regularly. The condensed e-mail summary of the report also contained frequent references to Repo 105. The PowerPoint version of the report contained an Executive Summary that also contained frequent references to Repo 105 transactions, as well as global and regional Net Balance Sheet, Gross Balance Sheet, Balance Sheet at Risk, and Cash Capital schedules. This report was regularly distributed to Bart McDade, Chris O'Meara, Erin M. Callan, Ian T. Lowitt, and many other top Lehman executives and members of senior management between April 2008 and September 2008. *See, e.g.*, Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 7, 2008 (Apr. 9, 2008) [LBEX-DOCID 520619] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Apr. 9, 2008) [LBEX-DOCID 523578]); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 8, 2008 (Apr. 10, 2008) [LBEX-DOCID 520620] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Apr. 10, 2008) [LBEX-DOCID 523579]); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 9, 2008 (Apr. 10, 2008) [LBEX-DOCID 251339] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Apr. 10, 2008) [LBEX-DOCID 258560]); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 10, 2008 (Apr. 14, 2008) [LBEX-DOCID 251342] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 275231]; Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 11, 2008 (Apr. 14, 2008) [LBEX-DOCID 251344] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 258562]; Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 14, 2008 (Apr. 15, 2008) [LBEX-DOCID 012177] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Apr. 15, 2008) [LBEX-DOCID 079620]); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 12, 2008 (May 13, 2008) [LBEX-LL 1950262], at p. 1 (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (May 13, 2008) [LBEX-DOCID 3187357] and stating "Rates decreased by $(5.0B) from prior day due to…increased Repo 105 usage. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 22, 2008 (May 27, 2008), at p. 1 [LBEX-LL 1950706] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (May 27, 2008) [LBEX-DOCID 275984] and stating "Global rates net balance sheet decreased ($2.0B), predominantly due to an increase in Repo 105 benefit. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 28, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950670] (attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (May 30, 2008) [LBEX-DOCID 275995] and stating "Global rates net balance sheet decreased by ($3.1B) primarily due to a decrease in Americas driven by an increased utilization of Repo 105 within the Agency business"); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 29, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950658] (attached to e-mail from Tal Litvin, Lehman, to

2008 at Bart McDade's specific request and in connection with his role as balance sheet point person.[3509]   According to McDade, "I needed a daily scorecard to know where I wanted to push" on balance sheet issues.[3510]   McDade recalled that he was focused on the "Repo 105" figures that appeared in many of the Daily Balance Sheet and Disclosure Scorecards.[3511]   For example, a column entitled "Repo 105" in the report's Consolidated Balance Sheet Summary clearly documented the volume of Repo 105 transactions undertaken by each Lehman business unit or division.[3512]

### (1)  Richard Fuld, Former Chief Executive Officer

Richard Fuld, Lehman's former Chief Executive Officer denied any recollection of Lehman's use of Repo 105 transactions.[3513]   Fuld said he had no knowledge that Lehman treated any kind of repo transaction as a true sale or that Lehman ever removed from its balance sheet assets transferred in a repo transaction.[3514]   In addition, Fuld did not recall having seen any reports referencing the amount of the firm's Repo 105 activity.[3515]   Fuld further stated that he did not know that Lehman removed

Herbert H. (Bart) McDade III, Lehman, *et al.* (June 2, 2008) [LBEX-DOCID 011127] and stating ("Global Rates net balance sheet decreased ($6.5B) . . . [t]he decrease in Europe is coming from increased utilization of Repo 105").

[3509] Examiner's Interview of Herbert H. (Bart) McDade III, Jan. 28, 2010, at p. 8.

[3510] *Id.*

[3511] *Id.* at pp. 8-9.

[3512] *See, e.g.,* Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 8, 2008 (Apr. 10, 2008), at p. 9 [LBEX-DOCID 520620]; Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 18, 2008 (Apr. 21, 2008), at p. 10 [LBEX-DOCID 275233].

[3513] Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at pp. 7-8.

[3514] *Id.*

[3515] *Id.*

approximately $49 and $50 billion in inventory off its balance sheet at quarter-end through the use of Repo 105 transactions in first quarter 2008 and second quarter 2008, respectively.[3516]   Fuld said, however, that if he had learned that Lehman was temporarily cleansing its balance sheet of assets at quarter-end through Repo 105 transactions, it would have concerned him.[3517]

Fuld's denial of recollection must be weighed by a trier of fact against other evidence.  Fuld recalled having many conversations with his executives about reducing net leverage and emphasized to the Examiner how important it was for Lehman to reduce its net leverage.[3518]  The night before the March 28, 2008 Executive Committee meeting, Fuld received materials for the meeting, including an agenda of topics including "Repo 105/108" and "Delever v Derisk" and a presentation that referenced Lehman's quarter-end Repo 105 usage for first quarter 2008 – $49.1 billion.[3519]  The materials also were forwarded by Fuld's assistant to other Lehman executives.[3520]

---

[3516] *Id.*

[3517] *Id.*

[3518] Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at pp. 7-8.

[3519] Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008), at p. 1 [LBEX-DOCID 506399] (attached to e-mail from Angela Judd, Assistant to Richard S. Fuld, Jr., Lehman, to Scott J. Freidheim, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 561761], containing Firm Balance Sheet Details with Repo 105/108 column showing total usage of $49.102 billion and break-out for Repo 105 usage by business group); Lehman, Executive Committee Meeting Material, Agenda (Mar. 28, 2008) [LBEX-DOCID 545869] (attached to e-mail from Angela Judd, Assistant to Richard S. Fuld, Jr., Lehman, to Scott J. Freidheim, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 561761], listing topics for discussion at Executive Committee meeting, including "Repo 105/108" and "Delever v Derisk").

[3520] E-mail from Angela Judd, Assistant to Richard S. Fuld, Jr., Lehman, to Scott J. Freidheim, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 561761].  Fuld's attorney asserted to the Examiner that Fuld does not use a computer, uses only a Blackberry and does not have the ability to open attachments. Examiner's Meeting with Patricia Hynes re: Richard S. Fuld, Jr., Jan. 20, 2010, at p. 2.

It appears that Fuld did not attend the March 28 meeting, but Bart McDade recalled having specific discussions with Fuld about Lehman's Repo 105 usage in June 2008.[3521] Sometime that month, McDade spoke to Fuld about reducing Lehman's use of Repo 105 transactions.[3522] McDade walked Fuld through the Balance Sheet and Key Disclosures document (reproduced in part below) and discussed with Fuld Lehman's quarter-end Repo 105 usage – $38.6 billion at year-end 2007; $49.1 billion at first quarter 2008; and $50.3 billion at second quarter 2008.[3523]

[3521] Richard S. Fuld, Jr., Lehman, Call Log, at pp. 6-7 [LBHI_SEC07940_016911] (showing Fuld had telephone calls the morning of the Executive Committee meeting); Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at pp. 3-4 (stating that Fuld did not attend the March 28, 2008 Executive Committee meeting but that "in quarter three, I certainly talked to Fuld about Repo 105.").

[3522] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 4.

[3523] *Id*. at p. 5; *see also* Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets (Draft) (June 16, 2008), at p. 3 [LBHI_SEC07940_641516].

## Other Targets

*in $ Billions*

**Repo 105**

| | Q4'07 | Q1'08 | Q2'08 | Q3'08 Target |
|---|---|---|---|---|
| FID Core | $29.7 | $42.0 | $44.4 | $21.0 |
| Equities Core | $1.5 | $1.1 | $1.4 | $1.0 |
| Prime Services | $7.4 | $6.0 | $4.5 | $3.0 |
| **Total** | **$38.6** | **$49.1** | **$50.3** | **$25.0** |

**Level III**

| | Q4'07 | Q1'08 | Q2'08 | Q3'08 Target |
|---|---|---|---|---|
| Level III Net | $38.9 | $40.2 | $37.8 | $36.0 |

**Other Targets**

| | Q3'08 Target |
|---|---|
| **Month End Intra Quarter Balance Sheet** | |
| Gross Balance Sheet | $815 |
| Net Balance Sheet | $420 |
| **Muni TOB Inventory** | $3 |

**LEHMAN BROTHERS**
FOIA CONFIDENTIAL TREATMENT
REQUESTED BY LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2932594

3

Based upon their conversation, McDade understood that "Fuld knew, at a basic level, that Repo 105 was used in the firm's bond business" and that Fuld "was familiar with the term Repo 105."[3524]   McDade recalled that when he advised Fuld in June 2008 that Lehman should reduce its Repo 105 usage to $25 billion, "Fuld understood that this

---

[3524] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p.5.

would put pressure on traders."[3525]  McDade also recalled that "Fuld knew about the accounting of Repo 105."[3526]

### (2)  Lehman's Former Chief Financial Officers

Although interview statements given to the Examiner were inconsistent at times, no reasonable dispute exists that each of Lehman's Chief Financial Officers from late 2007 to September 2008 possessed some knowledge of and/or involvement with multiple aspects of Lehman's Repo 105 program, including the existence of firm-wide Repo 105 limits, the volume of Repo 105 activity Lehman engaged in at quarter-end, and Lehman's efforts to manage its balance sheet using Repo 105 transactions.

### (a)  Chris O'Meara, Former Chief Financial Officer

Chris O'Meara served as Lehman's CFO from December 2004 through December 2007.[3527]  No later than July 2006, O'Meara and Ed Grieb, then Global Financial Controller, set a limit or cap on Lehman's firm-wide Repo 105 usage.[3528]  According to a July 2006 internal Lehman presentation, O'Meara and Grieb set the limit for Repo 105 at $17 billion or "1 x leverage" and the limit for Repo 108 at $5 billion.[3529]  The Examiner

---

[3525] *Id.* at p. 6.

[3526] *Id.*

[3527] Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at p. 6.

[3528] Lehman, Global Balance Sheet Overview of Repo 105 (FID)/Repo 108 Equities (July 2006), at p. 2 [LBEX-WGM 748489]; Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 8.

[3529] Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/Repo 108 Equities (July 2006), at p. 2 [LBEX-WGM 748489].  The same document also suggests that total Repo 105 usage should be maintained at 80% tangible equity intra-month.  *See* Section III.A.4.f.3 of this Report (discussing continual use rule). When questioned about the calculation of the Repo 105 limit set out in the Global Balance Sheet Overview Presentation, Grieb could not recall the calculation of the limit or whether the "1x leverage or $17 billion"

questioned O'Meara about Lehman's Repo 105 program on two separate occasions. During his first interview, O'Meara disavowed knowledge of the program, stating that he was "not that close to" the Repo 105 issue.[3530] O'Meara further stated during his initial interview that he never instructed Lehman's business units to lower their balance sheets at quarter-end using Repo 105 transactions.[3531]

Internal Lehman documents and interview statements of other witnesses evidence greater involvement than O'Meara recalls. For example, the July 2006 internal Lehman Power Point presentation titled "Overview of Repo 105 (FID)/108 (Equities)" identifies numerous "Operating Rules" related to Lehman's Repo 105 program, including "Repo 105 is capped at $17B (1 x leverage) [per Chris O'Meara and Ed Grieb]"; "Repo 108 is capped at $5B [per Chris O'Meara and Ed Grieb]"; and "Repo 105 transactions must be executed on a continual basis and remain in force throughout the

definition referred to one of Lehman's leverage ratios or, rather, to tangible equity capital. Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 9. Lehman's Form 10-Q from the same period as the Global Balance Sheet Overview Presentation shows that Lehman's tangible equity capital was $17.4 billion and that the firm's net leverage ratio was 13.8, suggesting that the calculation of Lehman's Repo 105 limit may have been tied to tangible equity capital. Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2006 (Form 10-Q) (filed on July 10, 2006), at p. 58 ("LBHI 10-Q (filed July 10, 2006)"). The Global Balance Sheet Overview Presentation itself suggested that tangible equity is the appropriate measure of leverage. Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/Repo 108 Equities (July 2006), at p. 5 [LBEX-WGM 748489]; *see also* Duff & Phelps, Repo 105/108 Usage vs. Limit Comment (Oct. 16, 2009), at p. 1. Bismal described the "1 x leverage" metric as 1 x the net leverage ratio. Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 10. The conclusion that "1 x leverage" means that the limit was 1 x tangible equity metric is also supported by the fact that the denominator of the net leverage ratio is tangible equity. Duff & Phelps, Repo 105/108 Usage vs. Limit Comment (Oct. 16, 2009), at p. 1 & n. 4. The setting of the Repo 105 limit at 1 x tangible equity implies that senior Lehman management determined Repo 105 usage would be permitted by the firm to reduce Lehman's net leverage ratio by up to one multiple. Duff & Phelps, Repo 105/108 Usage vs. Limit Comment (Oct. 16, 2009), at p. 2.

[3530] Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at p. 29.

[3531] *Id.*

month. To meet this requirement, the amount outstanding at any time should be maintained at approximately 80% of the amount at month-end. [per Chris O'Meara and Ed Grieb]."[3532]

During O'Meara's second interview, the Examiner showed O'Meara the July 2006 presentation.[3533]  O'Meara said he had never before seen the presentation and did not know who drafted it.[3534]  O'Meara continued that he had "no specific recollection" that he was involved in setting firm-wide limits or caps for Lehman's Repo 105 usage.[3535]  When the Examiner asked directly whether he was the "source for the cap on Repo 105," O'Meara said no.[3536]  O'Meara further said that he could not recall if anyone ever told him that Repo 105 transactions would help reduce Lehman's balance sheet or net leverage.[3537]

Finally, when asked why Lehman would choose to engage in Repo 105 transactions instead of ordinary repo transactions, given the higher haircut for Repo 105 transactions, O'Meara could not explain, saying only "I'm just not close enough to it."[3538] O'Meara stated also that he could not recall having any conversations regarding

---

[3532] Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/Repo 108 Equities (July 2006), at p. 2 [LBEX-WGM 748489].

[3533] Examiner's Interview of Christopher M. O'Meara, Sept. 23, 2009 at p. 6.

[3534] *Id.* at pp. 6-8.

[3535] *Id.*

[3536] *Id.*

[3537] *Id.*

[3538] Examiner's Interview of Christopher M. O'Meara, Sept. 23, 2009, at p. 7.

Lehman's Repo 105 program with Richard Fuld, Joe Gregory, Erin Callan, Ed Grieb, any Government personnel, or anyone from the ratings agencies.[3539]

Grieb, on the other hand, recalled many conversations with O'Meara about Lehman's use of Repo 105 transactions.[3540] Grieb communicated regularly, throughout his tenure as Global Financial Controller – which Grieb recalled lasted for "several years" and ended on December 1, 2007 – with O'Meara and Reilly about firm-wide limits or targets for Lehman's Repo 105 program.[3541]

According to Grieb, he, O'Meara, and Reilly shared responsibilities in setting firm-wide Repo 105 limits for several years, as late as November 2007.[3542] Grieb said that he alone did not have the authority to change or increase the limit or to authorize a person or group to exceed the limit; instead, a change in Lehman's firm-wide Repo 105 limit required consensus among Grieb, O'Meara and Reilly.[3543]

---

[3539] Id.

[3540] Examiner's Interview of Edward Grieb, Oct. 2, 2009, at pp. 10, 12-13.

[3541] Id. Grieb stated that he never discussed Repo 105-related issues with Callan or Lowitt, each of whom became CFO after Grieb left his Financial Controller position.

[3542] Id.; see also Lehman, Global Balance Sheet Overview of Repo 105 (FID)/Repo 108 Equities (July 2006), at p. 2 [LBEX-WGM 748489].

[3543] Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 8. Although acknowledging that he had some role in setting the Repo 105 limits, Grieb denied any recollection of the formula by which Lehman calculated the limits. Id. at p. 9. When the Examiner attempted to refresh his recollection with the July 2006 Lehman presentation which stated that the firm-wide cap on Repo 105 was set at "1x leverage," or $17 billion, Grieb stated his belief that the cap was related to firm's "overall leverage ratio." Id. But when shown Lehman's Form 10-Q for second quarter 2006 (the same general time period as the July 2006 presentation), which disclosed that Lehman's firm-wide shareholder equity was approximately $17 billion and the firm's net leverage ratio was 13.8x, Grieb stated he was less certain that the Repo 105 limit was calculated on the basis of leverage. Id.

A number of other documents show that O'Meara was involved with Lehman's

Repo 105 program:

- As CFO, O'Meara regularly received a report titled "Weekly Finance Update," at least one version of which included a reference to the firm's use of Repo 105 transactions.[3544]

- In August 2007, Kentaro Umezaki wrote to O'Meara and others: "FYI: John Feraca is working on Repo 105 for our IG mortgage and real estate assets to reduce our Q3 balance sheet. We've agreed we'd regroup on Tuesday to see to what extent we can utilize that facility for Qend."[3545] The following day, Reilly replied to O'Meara alone: "I thought 105 would be a better answer than the cds structure we talked about. May be no appetite."[3546]

- Another August 2007 e-mail chain regarding Repo 105 usage was forwarded to O'Meara from Reilly.[3547] Around the same time that Grieb recommended to Lehman's Accounting Policy Group that Lehman use the Repo 105 program to remove from the balance sheet certain residual positions from mortgage-backed securitizations, Reilly was pursuing a similar effort.[3548] In a series of e-mails from August 2007, Reilly unsuccessful attempted to transfer non-agency mortgage-backed securities into the Repo 105 program.[3549] Reilly

---

[3544] Lehman, Weekly Finance Update, Week Ended August 11, 2006 (Aug. 15, 2006), at p. 11 [LBEX-DOCID 1346667] ("IRP's Net Balance Sheet increased by $5B mostly due to Repo 105.") (attached to e-mail from Polina Savelieva, Lehman to Christopher M. O'Meara, Lehman, *et al.* (Aug. 15, 2006) [LBEX-DOCID 1361132].

[3545] E-mail from Kentaro Umezaki, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 197155].

[3546] E-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman (Aug. 18, 2007) [LBEX-DOCID 197155].

[3547] E-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman (Aug. 19, 2007) [LBEX-DOCID 4553354]; e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman (Aug. 20, 2007) [LBEX-DOCID 4553358].

[3548] E-mail from Marie Stewart, Lehman, to Brett Beldner, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 3223803] (discussing Grieb's idea of placing mortgage-backed securities into Repo 105 program).

[3549] E-mail from John Feraca, Lehman, to Gerard Reilly, Lehman (Aug. 18, 2007) [LBEX-DOCID 4553350]; e-mail from Gerard Reilly, Lehman, to John Feraca, Lehman (Aug. 18, 2007) [LBEX-DOCID 4553351]; e-mail from John Feraca, Lehman, to David Sherr, Lehman, *et al.* (Aug. 19, 2007) [LBEX-DOCID 4553352]; e-mail from David Sherr, Lehman, to Gerard Reilly, Lehman, *et al.* (Aug. 19, 2007) [LBEX-DOCID 4553353]; e-mail from Gerard Reilly, Lehman, to John Feraca, Lehman, *et al.* (Aug. 19, 2007) [LBEX-DOCID 4553356]; e-mail from John Feraca, Lehman, to David Sherr, Lehman, *et al.* (Aug. 20, 2007) [LBEX-DOCID 4553357].

enlisted the help of John Feraca and David Sherr in this effort so that Lehman could reduce its mortgage positions through the Repo 105 program.[3550] Notably, Reilly kept O'Meara informed of these efforts by forwarding to him the e-mail communications with Feraca and Sherr.[3551] At the same time, per O'Meara's request, Grieb made inquiries regarding a potential credit default swap structure for Lehman's RMBS and CMBS securities in addition to the plan to move them into the Repo 105 program.[3552] Specifically, O'Meara told Reilly that "the plan is to do both [Repo 105 and credit default swap] if all checks out fine with legal and accounting."[3553]

Documents also establish that O'Meara continued to be involved in Lehman's

Repo 105 program after leaving the CFO position in December 2007[3554] and taking on the

role of Chief Risk Officer:

---

[3550] E-mail from John Feraca, Lehman, to Gerard Reilly, Lehman (Aug. 18, 2007) [LBEX-DOCID 4553350]; e-mail from Gerard Reilly, Lehman, to John Feraca, Lehman (Aug. 18, 2007) [LBEX-DOCID 4553351]; e-mail from John Feraca, Lehman, to David Sherr, Lehman, *et al.* (Aug. 19, 2007) [LBEX-DOCID 4553352]; e-mail from David Sherr, Lehman, to Gerard Reilly, Lehman, *et al.* (Aug. 19, 2007) [LBEX-DOCID 4553353]; e-mail from Gerard Reilly, Lehman, to John Feraca, Lehman, *et al.* (Aug. 19, 2007) [LBEX-DOCID 4553356]; e-mail from John Feraca, Lehman, to David Sherr, Lehman, *et al.* (Aug. 20, 2007) [LBEX-DOCID 4553357].

[3551] E-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman (Aug. 19, 2007) [LBEX-DOCID 4553354]; e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman (Aug. 20, 2007) [LBEX-DOCID 4553358].

[3552] E-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman (Aug. 20, 2007) [LBEX-DOCID 197157].

[3553] *Id.*

[3554] Lehman's fiscal year ended on November 30, 2007. Though Lehman did not file its 2007 10-K – signed by Callan – until January 29, 2008, O'Meara served as CFO for the entire period reflected in the 2007 10-K. Moreover, the Examiner has located evidence suggesting that O'Meara sub-certified the 2007 10-K for Callan and was responsible for certain financial reporting in Lehman's Form 10-Q for first quarter 2008. *See* Lehman Brothers Holdings Inc., Reporting Instructions, Quarter Ended February 29, 2008 (Feb. 22, 2008), at p. 5 ( [LBEX-DOCID 3756724] (stating that O'Meara was the certifier for the Review of Risk Management narrative for accuracy of MD&A discussions of credit risk, market risk, operational risk, reputational risk, value at risk, other measures of risk and distribution of trading revenues); e-mail from Martin Kelly, Lehman, to Ian T. Lowitt, Lehman (July 8, 2008) [LBEX-DOCID 2329856] ("[W]ould you like to have Erin sign a sub-certification letter (not necessary strictly speaking but we did have Chris sub-certify to Erin at year end."); e-mail from Martin Kelly, Lehman, to Erin M. Callan, Lehman (July 9, 2008) [LBEX-DOCID 1536331] (asking Callan "if I could have you sub-certify on the quarter[ly report] (Chris [O'Meara] sub-certified to you at year end)"); e-mail from Ian T. Lowitt, Lehman, to Martin Kelly, Lehman (July 9, 2008) [LBEX-DOCID 2329856] ("I spoke to Tom [Russo about sub-certification] and he

- O'Meara received a March 2008 e-mail transmitting an internal presentation, "Balance Sheet and Cash Capital Update," that illustrated the quarter-end volume of Repo 105 transactions for first quarter 2008, $49.102 billion, and broke out the amount of Repo 105 usage by business segment.[3555]

- An April 11, 2008 e-mail from O'Meara to Reilly indicates that the two men were planning to discuss Lehman's Repo 105 program on April 14, 2008.[3556]

- An e-mail from Traversari to O'Meara reveals that O'Meara asked Traversari questions about daily balance sheet management at Lehman "compared to traditional banks."[3557] Traversari wrote to O'Meara that one reason why Lehman's balance sheet was larger intra-month than at month-end was because, unlike other banks, Lehman used Repo 105 transactions "which are UK-based specific transactions on opinions received by LEH from Linklaters."[3558]

- When Lehman was facing "significant reduction in repo 105 availability for month end" only ten days before the close of the second quarter 2008 because certain counterparties "retrenched" and Lehman had already used its available credit line with Mizuho, Matthew Pinnock asked Tonucci to "speak[] with O'Meara for a temp increase [in repo 105] to get us over month end."[3559] Tonucci inquired: "Any room to upsize Mizuho?"[3560] O'Meara thereafter continued the discussion with Tonucci by telephone.[3561]

---

thinks better if didn't come from him and better to present as consistent with what Chris did when Erin overlapped.").

[3555] Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008), at p. 1 [LBEX-DOCID 506398] (attached to e-mail from Christopher M. O'Meara, Lehman, to James Emmert, Lehman (Mar. 28, 2008) [LBEX-DOCID 574581]).

[3556] E-mail from Christopher M. O'Meara, Lehman, to Gerard Reilly, Lehman (Apr. 11, 2008) [LBEX-DOCID 4553298].

[3557] E-mail from Ryan Traversari, Lehman, to Christopher M. O'Meara, Lehman (May 16, 2008) [LBEX-DOCID 3233899].

[3558] *Id.*

[3559] E-mail from Matthew Pinnock, Lehman, to Paolo R. Tonucci, Lehman (May 21, 2008) [LBEX-DOCID 1548431]. Tonucci replied that he would speak with O'Meara about a Repo 105 increase. *See* e-mail from Paolo R. Tonucci, Lehman, to Matthew Pinnock, Lehman (May 21, 2008) [LBEX-DOCID 1548433].

[3560] E-mail from Paolo R. Tonucci, Lehman, to Christopher M. O'Meara, Lehman (May 21, 2008) [LBEX-DOCID 1533687]; *see also* e-mail from Jeff Michaels, Lehman, to Kaushik Amin, Lehman (May 21, 2008) [LBEX-DOCID 3234376] (regarding Repo 105 counterparties, Pinnock reports that Tonucci "understands urgency and is discussing with O'Meara"); e-mail from Jeff Michaels, Lehman, to Kaushik Amin, Lehman

- A June 17, 2008 e-mail from Reilly to O'Meara, McDade, Lowitt, and Morton, attached a "strawman target doc for Q3" entitled "Balance Sheet and Key Disclosures 2008 3Q Targets."[3562]  The attachment, dated June 16, 2008, identified not only net and gross balance sheet targets for various Lehman business groups, but also contained a Repo 105 target chart.[3563]  The Repo 105 target chart noted the total volume of Repo 105[3564] transactions Lehman engaged in at quarter-end for fourth quarter 2007 ($38.6 billion), first quarter 2008 ($49.1 billion), and second quarter 2008 ($50.3 billion).[3565]  On June 17, 2008, O'Meara replied to Reilly and the other recipients of Reilly's e-mail, stating: "A meeting is being set up to discuss this, this week."[3566]

- When Bank of France terminated a Repo 105 trade in September 2008, O'Meara received an e-mail with subject line "IRP LBI inventory risk" informing him of the fail.[3567]

- In addition, O'Meara received a recurring report between April and September 2008, the "Daily Balance Sheet Disclosure Scorecard," which often referenced Repo 105 activity and its impact on Lehman's balance sheet.[3568]

---

(May 21, 2008) [LBEX-DOCID 3234378] (stating, in response to Amin's request, that Amin can get an additional $3.5 billion of Repo 105 with Mizuho "[i]f O'Meara and Paolo let us").

[3561] E-mail from Christopher M. O'Meara, Lehman, to Paolo R. Tonucci, Lehman (May 21, 2008) [LBEX-DOCID 1533688].

[3562] Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets [Draft] (June 16, 2008) [LBEX-DOCID 3363493] (attached to e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (June 17, 2008) [LBEX-DOCID 3383643].

[3563] Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets [Draft] (June 16, 2008), at p. 3 [LBEX-DOCID 3363493].

[3564] The chart refers only to Repo 105, but Lehman frequently used "Repo 105" to refer to both Repo 105 and Repo 108.  The figures used in the chart are consistent with the total combined Repo 105/108 amounts reported in other documents.

[3565] Brothers, Balance Sheet and Key Disclosures 2008 3Q Targets [Draft] (June 16, 2008), at p. 3 [LBEX-DOCID 3363493].

[3566] E-mail from Christopher M. O'Meara, Lehman, to Gerard Reilly, Lehman, *et al.* (June 17, 2008) [LBEX-DOCID 033813].  The meeting appears to have taken place on Thursday, June 19, 2008.  *See* e-mail from Gerard Reilly, Lehman, to Janet Marrero, Lehman (June 19, 2008) [LBEX-DOCID 4553465] ("Can you print me 6 copies of this [Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets] for the meeting at 3:30 [?]").

[3567] E-mail from Jeffrey Goodman, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Sept. 17, 2008) [LBEX-DOCID 182776] (Jeff Michaels: "Just to be clear, I am not hedging this risk because I know it is substantially wrong. Bank of France terminated a repo 105 trade yesterday as it went through LBIE…." Goodman: "Can we get ops/mo to book terminates/sales for positions that we know to be terminated so we can have a semblance of reality in what we are showing in the systems?")

3568 *See, e.g.*, Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 7, 2008 (Apr. 9, 2008) [LBEX-DOCID 520619], at p. 9 (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 9, 2008) [LBEX-DOCID 523578] and showing consolidated FID and Equities balance sheet reduced by $18.527 billion and Prime Services balance sheet reduced by $4.458 billion through Repo 105 transactions as of April 7, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 8, 2008 (Apr. 10, 2008) [LBEX-DOCID 520620], at p. 9 (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 10, 2008) [LBEX-DOCID 523579] and showing consolidated FID and Equities balance sheet reduced by $18.853 billion and Prime Services balance sheet reduced by $4.562 billion through Repo 105 transactions as of April 8, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 9, 2008 (Apr. 10, 2008) [LBEX-DOCID 251339], at p. 9 (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 10, 2008) [LBEX-DOCID 258560] and showing consolidated FID and Equities balance sheet reduced by $19.688 billion and Prime Services balance sheet reduced by $4.548 billion through Repo 105 transactions as of April 9, 2008); Balance Sheet and Disclosure Scorecard for Trade Date April 10, 2008 [LBEX-DOCID 251342], at p. 9 (attached to e-mail from Tal Litvin, Lehman to Christopher M. O'Meara, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 275231] and showing consolidated FID and Equities balance sheet reduced by $19.967 billion and Prime Services balance sheet reduced by $4.491 billion through Repo 105 transactions as of April 10, 2008); Balance Sheet and Disclosure Scorecard for Trade Date April 11, 2008 [LBEX-DOCID 251344], at p. 9 (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 258562] and showing consolidated FID and Equities balance sheet reduced by $20.260 billion and Prime Services balance sheet reduced by $4.517 billion through Repo 105 transactions as of April 11, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 12, 2008 (May 13, 2008) [LBEX-LL 1950262], at p. 1 (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (May 13, 2008) [LBEX-DOCID 3187357] and stating "Rates decreased by $(5.0B) from prior day due to . . . increased Repo 105 usage. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 22, 2008 (May 27, 2008), at p. 1 [LBEX-DOCID 1950706] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (May 27, 2008) [LBEX-DOCID 275984] and stating "Global rates net balance sheet decreased ($2.0B), predominantly due to an increase in Repo 105 benefit. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 28, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950670] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (May 30, 2008) [LBEX-DOCID 275995] and stating "Global rates net balance sheet decreased by ($3.1B) primarily due to a decrease in Americas driven by an increased utilization of Repo 105 within the Agency business"); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 29, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950658] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (June 2, 2008) [LBEX-DOCID 011127] and stating ("Global Rates net balance sheet decreased ($6.5B)…[t]he decrease in Europe is coming from increased utilization of Repo 105"); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date June 18, 2008 (June 20, 2008) [LBEX-LL 1950514] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (June 20, 2008) [LBEX-DOCID 275942] and stating that "Global rates net balance sheet decreased . . . driven by a[n] . . . increase in Repo 105 utilization. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 13, 2008 (Aug. 14, 2008) [LBEX-LL 782812] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 14, 2008) [LBEX-DOCID 4214810] and stating that "Global rates net balance sheet decreased . . . driven by an increase in Repo 105 benefit. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 25, 2008 (Aug. 26, 2008) [LBEX-LL 782924] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 26, 2008) [LBEX-DOCID 079536] and stating that "Global Rates net balance sheet

### (b) Erin Callan, Former Chief Financial Officer

Erin Callan served as Lehman's CFO from December 1, 2007 until June 12, 2008.[3569]  In her interview with the Examiner, Callan recalled very little about Lehman's Repo 105 program.[3570]  Callan said she had little to no independent recollection of Lehman's use of Repo 105 transactions, but that her memory had been refreshed to a limited extent by documents the Examiner provided to her in advance of her interview.[3571]

Martin Kelly told the Examiner that he spoke to Callan about Kelly's discomfort with Lehman's use of Repo 105 transactions, raising five discrete concerns about Repo 105: (1) Kelly's discomfort with the possible "reputational risk" Lehman would suffer if the investing public and analysts learned that Lehman used Repo 105 transactions solely to reduce its balance sheet; (2) the size of Lehman's Repo 105 program, that is, the volume of Repo 105 transactions that Lehman undertook at quarter-end to reduce its balance sheet; (3) the "technical basis," from an accounting perspective, by which Lehman was authorized to engage in Repo 105 transactions; (4) Kelly's belief that none of Lehman's peer investment banks used Repo 105 transactions; and (5) the fact that Lehman's Repo 105 activity was "skewed at quarter-end," in other words, that the

---

decreased…driven by an increase in repo 105 usage …."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 28, 2008 (Aug. 29, 2008) [LBEX-LL 782966] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 29, 2008) [LBEX-DOCID 275880] and stating that "Global rates [net balance sheet] was down…driven by increased Repo 105 benefit…").

[3569] Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at pp. 7-9.

[3570] *Id.* at p. 17.

[3571] *Id.*

firm's Repo 105 usage spiked at quarter-end, during Lehman's reporting periods.[3572]

Kelly recalled having several conversations with Callan about Lehman's use of Repo 105 transactions.[3573]

With regard to Kelly's discussion with Callan of the very technical accounting basis underlying Lehman's reliance on Repo 105 transactions, Kelly "wanted Callan to make sure Repo 105 transactions were being accounted for properly."[3574] Indeed, Kelly recalled a detailed discussion with Callan about each of SFAS 140's requirements for a transaction to receive "true sale" accounting treatment.[3575] Kelly "wanted to present [to Callan] a balanced analysis of the transactions . . . what GAAP requires and . . . [whether] we compl[ied] with GAAP."[3576]

With respect to the issue that none of Lehman's peer investment banks used Repo 105 transactions, Kelly informed Callan of this understanding because he "was trying to give Callan a balanced presentation or analysis" and "wanted to frame the quantum of risk involved in the program."[3577]

Callan recalled speaking to Kelly in late February or March 2008 about Repo 105 transactions, and recalled that Kelly advised her that he was unsure whether Lehman's

---

[3572] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 8; *see also* Section III.A.4.f of this Report.
[3573] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 9.
[3574] *Id.*
[3575] *Id.*
[3576] *Id.*
[3577] *Id.* at p. 10.

peer CSE firms were also engaging in Repo 105 transactions at that time.[3578]  Callan did not dispute Kelly's account of his conversations with her about the potential "reputational risk" Lehman's Repo 105 program might have posed to the firm, but did not specifically recall Kelly's comments.[3579]  Callan speculated that Kelly's concerns about "reputational risk" likely were subsumed in his concerns about whether Lehman was the only Wall Street firm using Repo 105-type transactions.[3580]

According to Callan, she and Kelly agreed that Kelly should determine whether Lehman was the lone user of Repo 105-type transactions on Wall Street and, if so, to ensure the practice was appropriate.[3581]  In addition, Callan recalled that she and Kelly agreed that Kelly would consult with Ernst & Young and certain of Lehman's business units about the firm's Repo 105 practices.[3582]  Callan, however, could not recall whether Kelly followed through on their conversation or whether he ever reported back to Callan with his findings.[3583]  Callan suggested that Kelly's concerns about Lehman's Repo 105 program likely fell by the wayside, given Bear Stearns' near collapse shortly after their conversation, and that she and Kelly became deeply engaged in more pressing issues at that time, such as capital raises and setting balance sheet limits.[3584]

---

[3578] Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at p. 17.
[3579] *Id.*
[3580] *Id.*
[3581] *Id.*
[3582] *Id.*
[3583] Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at p. 17.
[3584] *Id.*

Kelly advised the Examiner that, based upon Callan's reaction to his concerns about Lehman's use of Repo 105 transactions, Kelly "inferred general awareness of what the program was and how it was used" at the senior management level within Lehman and that assuaged his concerns at least to a certain extent.[3585]  According to Kelly, Callan's initial response was to "gather facts and think about it" but she eventually "acknowledged there was risk and that [Kelly] felt discomfort."[3586]  Kelly "[couldn't] say she [Callan] shared the concern."[3587]

Specifically as regards the issue of quarter-end spikes in Repo 105 usage, Kelly recalled that Callan merely "acknowledged" or "understood" Kelly's concern that "the program increased significantly at quarter-end," but that Callan appeared not to be surprised at the quarter-end increases.[3588]  All told, Kelly said that it was his impression that Callan understood each of the issues he raised, but nonetheless that Callan authorized Lehman's continued use of Repo 105 transactions.[3589]  Although one

---

[3585] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at pp. 8, 10.

[3586] *Id.*

[3587] *Id.*

[3588] *Id.* Although he agreed that the volume of Lehman's Repo 105 transactions gave him concern as a general matter, Kelly was unable to specifically recall the approximate volume of Lehman's Repo 105 usage at each quarter-end.  *Id.*  Kelly had no specific recollection of the tens of billions of dollars in Lehman's total Repo 105 usage at quarter-end for fourth quarter 2007, first quarter 2008 and second quarter 2008, even though those figures were reported in numerous charts and e-mails Kelly received and which the Examiner used as exhibits during the interview.  Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 11; *see also* Repo 105 & Repo 108 Current Day Report (Nov. 30, 2007) [LBEX-DOCID 3238268] (showing over $38 billion of total Repo 105 usage on November 30, 2007 and attached to e-mail from Anuraj Bismal, Lehman, to Martin Kelly, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223389] (stating "We ended the year with $38 Billion of repo 105/8 nettings")).

[3589] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 10.

December 2007 document states that "Repo 105 [was] a conversation at the CFO level,"[3590] Callan said that Lehman's use of Repo 105 transactions was "not high on [her] list," and that she did not recall spending "any meaningful amount of time on the topic at all."[3591]   Asked if she recalled Lehman having engaged in $50 billion worth of Repo 105 transactions at the end of first quarter 2008, Callan said no, and said that she had thought the total amount was approximately "twenty something."[3592]

Callan told the Examiner that she did not recall engaging in any discussions about Repo 105 transactions with Fuld, McDade, Gregory, Tonucci, Lehman's Executive Committee, or Ernst & Young.[3593]   Callan said she had no recollection of any internally set caps or limits on Lehman's Repo 105 usage.[3594]

Callan, however, attended the March 28, 2008 Executive Committee meeting requested by McDade to make certain balance sheet reduction recommendations.[3595] The night before the meeting, McDade's assistant circulated to Callan and other members of  the Executive Committee two documents in connection with the meeting:

---

[3590] E-mail from Marie Stewart, Lehman, to Dominic Gibb, Lehman, *et al.* (Dec. 21, 2007) [LBEX-DOCID 3223846] ("[O]ur use of Repo 105 is a conversation at the CFO level at this point….Also, I think anymore on this topic is best by conversations and not email.").

[3591] Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at p. 17.

[3592] *Id.*

[3593] *Id.*

[3594] *Id.*   Callan and Kelly's direct predecessors, O'Meara and Grieb, respectively set the firm's Repo 105 limits.   *See* Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 2 [LBEX-WGM 754587] ("Repo 105 is capped at $17B (1x leverage) [per Chris O'Meara and Ed Grieb]" and "Repo 108 is capped at $5 B [per Chris O'Meara and Ed Grieb].").

[3595] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 4 (stating that the entire Executive Committee, except for Fuld, and *ex officio* members Lowitt and Friedheim attended the March 28, 2008 meeting).

(1) an agenda, listing "Repo 105/108" as one of seven topics to be discussed, and (2) a "Balance Sheet and Cash Capital Update," the first page of which included various firm-wide financial data, including a column titled "Repo 105/108," which listed the $49.1 billion in Repo 105 transactions that Lehman had undertaken at the end of the first quarter 2008.[3596] The presentation also broke out the volumes of Repo 105 usage by business segment.[3597] McDade specifically recalled discussing with Executive Committee members on March 28, 2008, Lehman's use of Repo 105 transactions and recommending that Lehman place a cap on Repo 105.[3598] On April 9, 2008, twelve days after McDade's presentation to the Executive Committee, Callan signed Lehman's quarterly report for first quarter 2008.[3599]

During her tenure as CFO, Callan received numerous other documents that referenced Lehman's use of Repo 105 transactions to meet balance sheet targets.

- In a January 2008 e-mail, Reilly forwarded Callan an e-mail in which McGarvey informed Bernard that Rates (a business within the Fixed Income Division) was running over its balance sheet target for December 2007 by $72.3 billion and that a contributing factor was that Rates was using $18 billion less in Repo 105 transactions in December 2007 because there was

---

[3596] Herbert H. (Bart) McDade III, Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008), at p. 1 [LBEX-DOCID 095966] (attached to e-mail from Gerard Reilly, Lehman, to Erin M. Callan, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 124422] and indicating that the attachment is for the Executive Committee meeting)); *see also* Herbert H. (Bart) McDade III, Lehman, Executive Committee Meeting Material, Agenda (Mar. 28, 2008) [LBEX-DOCID 115827] (attached to e-mail from Patricia Lombardi, Assistant to Herbert H. (Bart) McDade III, to Lehman Executive Committee Members, Lehman (Mar. 28, 2008) [LBEX-DOCID 120929] and listing among seven topics of discussion for March 28, 2008 Executive Committee meeting "Repo 105/108" and "Delever v Derisk"). Callan was a member of the Executive Committee.
[3597] Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008), at p. 1 [LBEX-DOCID 095966].
[3598] *Id.* at pp. 3-4.
[3599] LBHI, 10-Q (filed Apr. 9, 2008), at p. 92, 31.02.

little counterparty appetite.[3600]   In his e-mail to Callan, Reilly referenced the balance sheet overage and stated, "Repo 105 liquidity was very tight (this should only be a year end issue but I don't recall it being this material in the past)."[3601]

- In February 2008, Reilly again wrote Callan, forwarding to her an e-mail with an attached FID Balance Sheet PowerPoint presentation that "was used to educate sr fid guys on the bs and generate ideas to make the bs target."[3602] The e-mail forwarded to Callan noted that the FID team working on balance sheet issues had reached the "recommendation that Repo 105 program is expanded."[3603]

- In March 2008, Reilly e-mailed Callan, as well as Lowitt and McDade, to report on the net balance sheet trend since the end of the first quarter.  Reilly wrote: "Rates is way up w PT trade and drop off in Repo 105."[3604]

- From April through the end of June 2008, Callan received the "Daily Balance Sheet Scorecard," which routinely referenced the impact of Lehman's Repo 105 transactions on the firm's daily balance sheet.[3605]

---

[3600] E-mail from Gerard Reilly, Lehman, to Erin M. Callan, Lehman (Jan. 3, 2008) [LBEX-DOCID 3383445].

[3601] *Id.*

[3602] E-mail from Gerard Reilly, Lehman, to Erin M. Callan, Lehman (Feb. 1, 2008) [LBEX-DOCID 3383459] (transmitting Lehman Brothers, FID - Balance Sheet (Jan. 17, 2007) [LBEX-DOCID 3363222]).

[3603] E-mail from Gerard Reilly, Lehman, to Erin M. Callan, Lehman (Feb. 1, 2008) [LBEX-DOCID 3383459]

[3604] E-mail from Gerard Reilly, Lehman, to Erin M. Callan, Lehman (Mar. 20, 2008) [LBEX-DOCID 3221723] (transmitting Daily Net Average Assets March 2008 schedule [LBEX-DOCID 3215629]).

[3605] *See, e.g.*, Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 7, 2008 (Apr. 9, 2008), at p. 9 [LBEX-DOCID 520619] (attached to e-mail from Tal Litvin, Lehman, to Erin M. Callan, Lehman, *et al.* (Apr. 9, 2008) [LBEX-DOCID 523578] and showing consolidated FID and Equities balance sheet reduced by $18.527 billion and Prime Services balance sheet reduced by $4.458 billion through Repo 105 transactions); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 10, 2008 (Apr. 14, 2008), at p. 9 [LBEX-DOCID 251342] (attached to e-mail from Tal Litvin, Lehman, to Erin M. Callan, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 275231] and showing consolidated FID and Equities balance sheet reduced by $19.967 billion and Prime Services balance sheet reduced by $4.491 billion through Repo 105 transactions); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 11, 2008 (Apr. 14, 2008), at p. 9 [LBEX-DOCID 251344] (attached to e-mail from Tal Litvin, Lehman, to Erin M. Callan, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 258562] and showing consolidated FID and Equities balance sheet reduced by $20.260 billion and Prime Services balance sheet reduced by $4.517 billion through Repo 105 transactions); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 12, 2008 (May 13, 2008), at p. 1 [LBEX-LL 1950262] (attached to e-mail from Tal Litvin, Lehman, to Erin M. Callan, Lehman, *et al.* (May 13, 2008) [LBEX-DOCID 3187357] and stating "Rates decreased by $(5.0B) from prior day due to . . . increased Repo 105 usage. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date

### (c) Ian Lowitt, Former Chief Financial Officer

Ian Lowitt served as Lehman's CFO from June 12, 2008 through LBHI's bankruptcy filing on September 15, 2008.[3606]   Prior to his appointment to the CFO position, Lowitt served as Lehman's co-CAO.[3607]

Lowitt acknowledged that Lehman initiated its Repo 105 program "at some point in the early 2000s."[3608]   Asked to describe how he came to be aware of Lehman's Repo 105 program, Lowitt recalled that Lehman had established a "regime" of month-end balance sheet targets for each business unit, and that each business unit had the discretion to determine how to meet that target with support from Product Control and Finance.[3609]   One means available to the Fixed Income and Equities Divisions for reaching balance sheet targets, Lowitt recalled, was by "sell[ing] down assets" through Lehman's Repo 105 program.[3610]   Lowitt recalled senior Lehman management setting aggressive targets to reduce commercial and residential real estate inventory, but he

---

May 22, 2008 (May 27, 2008), at p. 1 [LBEX-LL 1950706] (attached to e-mail from Tal Litvin, Lehman, to Erin M. Callan, Lehman, *et al.* (May 27, 2008) [LBEX-DOCID 275984] and stating "Global rates net balance sheet decreased ($2.0B), predominantly due to an increase in Repo 105 benefit. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 28, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950670] (attached to e-mail from Tal Litvin, Lehman, to Erin M. Callan, Lehman, *et al.* (May 30, 2008) [LBEX-DOCID 275995] and stating "Global rates net balance sheet decreased by ($3.1B) primarily due to a decrease in Americas driven by an increased utilization of Repo 105 within the Agency business"); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 29, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950658] (attached to e-mail from Tal Litvin, Lehman, to Erin M. Callan, Lehman, *et al.* (June 2, 2008) [LBEX-DOCID 011127] and stating "Global Rates net balance sheet decreased ($6.5B) . . . [t]he decrease in Europe is coming from increased utilization of Repo 105").

[3606] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 7.

[3607] *Id.*

[3608] *Id.* pp. 10-11.

[3609] *Id.*

[3610] *Id.*

stated that he had no specific recollection of Repo 105 targets even though he recalled that Repo 105 was "one of the things that the businesses were doing to operate at their [balance sheet] limits."[3611]

Lowitt believed that Ernst & Young had approved the firm's use of Repo 105 transactions early in the Repo 105 process (sometime in the early 2000s), and as a result, Lowitt never was concerned about Lehman's use of the transactions.[3612] Lowitt also said he was unaware of any geographical limitations with respect to Repo 105 – for instance, he did not know that Lehman's internal Repo 105 Accounting Policy limited the transactions to LBIE.[3613] Lowitt had no recollection of ever having read the Accounting Policy, but he recalled that only the most liquid assets could be used in Repo 105 transactions.[3614]

Despite recalling very little specific information about his own involvement in Lehman's Repo 105 program, Lowitt generally recalled that O'Meara played a role in Lehman's Repo 105 program.[3615] Lowitt stated that O'Meara and Grieb were responsible for setting firm-wide limits on Repo 105 usage.[3616] In addition, when Lowitt

---

[3611] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 13.

[3612] *Id.* at p. 3.

[3613] *Id.* at p. 11.

[3614] *Id.* at pp. 11, 14.

[3615] *Id.* at pp. 11, 14.

[3616] *Id.* As explained elsewhere in the Report, O'Meara told the Examiner that he had no involvement in the setting of Repo 105 limits. Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009 at pp. 28-29 (stating he was "not close to" Lehman's Repo 105 program); Examiner's Interview of Christopher M. O'Meara, Sept. 23, 2009, at pp. 6-7 (stating, with respect to Lehman's Repo 105 usage and limits "I don't have a recollection of any of this"). On the other hand, Grieb recalled O'Meara's involvement in the Repo

was Lehman's Chief Administrative Officer in Europe, between 2005 and 2006, he recalled that O'Meara "felt some need to establish guidelines for Repo 105" usage in Lehman's European offices.[3617]

Kelly raised with Lowitt the same Repo 105-related concerns that Kelly raised with Callan, including concerns about Lehman's reliance on Repo 105 transactions for balance sheet relief, the expanding nature of that reliance, the technical accounting basis for the transactions, the quarter-end spikes in usage, and the possible "reputational risk" to Lehman.[3618] Kelly noted, however, that his Repo 105 discussions with Lowitt were "more truncated" because, unlike Callan, Kelly viewed Lowitt as "quite familiar with the program and [Lowitt] understood its details."[3619]

Kelly recalled that after he "expressed the same reservations" to Lowitt about Lehman's use of Repo 105 transactions that Kelly had previously expressed to Callan, his concerns met a similar result with Lowitt: "Even [after a] consideration of the size of

---

105 program. Examiner's Interview of Edward Grieb, Oct. 2, 2009, at pp. 10, 12-13; *see also* Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 2 [LBEX-WGM 754587].

[3617] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 13.

[3618] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at pp. 8-10. Kelly continued to press his concerns with Lehman's Repo 105 program following his discussion with Callan. *Id.* In a May 2008 internal Lehman Power Point presentation to Finance Control entitled "Information, Controls and Issues," discussing problems faced by Finance Control and strategies for dealing with them, Kelly included "Repo 105/108" as an issue for discussion in the third quarter 2008. Martin Kelly, Lehman, Information, Control and Issues (May 2008), at p. 10 [LBEX-DOCID 1999716].

[3619] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 10.

the program and the risks involved did not change the fact that the program should continue."[3620]

Lowitt said that "no one raised [Repo 105] to me as something I should be spending any more attention on" and he did not recall any conversations with Kelly on the subject.[3621]  Similarly, Lowitt did not recall discussing Lehman's use of Repo 105 transactions with Fuld, McDade, Gregory, Callan, O'Meara, Lehman's Executive Committee, or Ernst & Young.[3622]

Lowitt, however, attended as an *ex officio* member the March 28, 2008 Executive Committee meeting, and received the agenda and balance sheet document circulated by McDade's assistant.[3623]  Lowitt received two other copies of the balance sheet

---

[3620] *Id.*

[3621] Examiner's Interview of Ian T. Lowitt, Oct. 28 2009, at p. 11.

[3622] *Id.* The Examiner attempted to refresh Lowitt's recollection of his involvement in the Repo 105 program through documents (including e-mails in which Lowitt specifically inquired about Repo 105 transactions), and by recounting communications that Kelly told the Examiner he had with Lowitt.  But, Lowitt's memory was not revived and he continually stated that he "knew [Repo 105] was something the firm engaged in" but that it was not an issue he focused on or understood.  *Id.*

[3623] Herbert H. (Bart) McDade III, Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008), at p. 1 [LBEX-DOCID 095961] (attached to e-mail from Gerard Reilly, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 120929] and indicating that the attachment is for the Executive Committee meeting)); *see also* Herbert H. (Bart) McDade III, Lehman, Executive Committee Meeting Material, Agenda (Mar. 28, 2008) [LBEX-DOCID 115827] (attached to e-mail from Patricia Lombardi, Assistant to Herbert H. (Bart) McDade III, to Ian T. Lowitt, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 120929] and listing among seven topics of discussion for March 28, 2008 Executive Committee meeting "Repo 105/108" and "Delever v Derisk").

presentation on March 28, 2008 – one set sent personally by McDade[3624] and the other sent by Reilly.[3625]

On June 17, 2008, Reilly sent to Lowitt the "Balance Sheet and Key Disclosures" document that incorporated McDade's planned directive to reduce Lehman's firm-wide Repo 105 usage by half – from $50 billion to $25 billion in third quarter 2008.[3626] The report also stated that Lehman's firm-wide Repo 105 usage at quarter-end for second quarter 2008 was $50.3 billion.[3627] Lowitt met with McDade, Reilly, O'Meara, and Morton to discuss the Balance Sheet and Key Disclosures document, which was then updated and redistributed to Lowitt and the others.[3628] These discussions and meeting took place only weeks before Lehman filed its second quarter 2008 Form 10-Q, signed by Lowitt, on July 10, 2008.

---

[3624] Herbert H. (Bart) McDade III, Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008) [LBEX-DOCID 095965] (attached to e-mail from Herbert H. (Bart) McDade III, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 110658]).

[3625] *Id.*

[3626] Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets [Draft] (June 16, 2008), at p. 3 [LBEX-DOCID 3363493] (attached to e-mail from Gerard Reilly, Lehman, to Ian T. Lowitt, Lehman, *et al.* (June 17, 2008) [LBEX-DOCID 3383643]).

[3627] *Id.*

[3628] E-mail from Christopher M. O'Meara, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (June 17, 2008) [LBEX-DOCID 033813] (replying to receipt of Balance Sheet and Key Disclosures 2008 3Q Targets [Draft] (June 16, 2008) and stating that "meeting is being set up to discuss" the Balance Sheet and Key Disclosure 2008 3Q Targets document); e-mail from Gerard Reilly, Lehman, to Ian T. Lowitt, Lehman, *et al.* (June 19, 2008) [LBEX-DOCID 2962369] (transmitting updated version of Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets (June 19, 2008) [LBEX-DOCID 2932594]).

In addition, Lowitt received a number of other documents that referenced Lehman's use of Repo 105 transactions both prior to and during his tenure as Lehman's CFO:

- In an August 2007 e-mail, Kentaro Umezaki informed Lowitt about John Feraca's attempts to place real estate securities into the Repo 105 program.[3629]

- On February 28, 2008, Feraca notified Lowitt and Tonucci that Lehman had executed $11 billion in Repo 105 trades via LBIE with Barclays, UBS, and Mizuho, using agencies securities.[3630] Feraca later informed Lowitt that the final tally of Repo 105 trades using United States Liquid Markets Products was close to $13 billion[3631] and by the next day reported yet again another revised number of $17 billion.[3632] Lowitt questioned Feraca why the amount of Repo 105 changed from quarter to quarter.[3633]

When Lowitt was asked about the February 28, 2008 e-mail, he said that he was "wondering if we were doing more or less of it [*i.e.*, Repo 105 transactions]," that he was attempting to gauge how "material" Lehman's Repo 105 usage was.[3634] Asked why as co-Chief Administrative Officer, he would have been communicating with Feraca of the Secured Funding Desk about Lehman's Repo 105 program, Lowitt replied that Feraca likely thought it was important to report on the status of Lehman's Repo 105 usage to

---

[3629] E-mail from Kentaro Umezaki, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Aug. 17, 2008) [LBEX-DOCID 1533678].

[3630] E-mail from John Feraca, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 3207903].

[3631] E-mail from John Feraca, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 3207907].

[3632] E-mail from John Feraca, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Feb. 29, 2008) [LBEX-DOCID 3207911].

[3633] E-mail from Ian T. Lowitt, Lehman, to John Feraca, Lehman (Feb. 28, 2008) [LBEX-DOCID 3207905]; e-mail from John Feraca, Lehman, to Ian T. Lowitt, Lehman (Feb. 28, 2008) [LBEX-DOCID 3207908]; e-mail from John Feraca, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Feb. 29, 2008) [LBEX-DOCID 3207910].

[3634] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 12.

Lowitt and Tonucci because of their involvement in Lehman's Asset Liability Committee ("ALCO").[3635]

- In March 2008, Reilly informed Lowitt that the Rates Business' balance sheet was "way up" since the close of the first quarter because of a "drop off in Repo 105."[3636] Reilly later provided more color to Lowitt regarding the "breakdown" of the $95 billion increase in the Rates Business's balance sheet since close of first quarter, $22.4 billion of which was a reduction in Repo 105 usage since quarter-end.[3637]

- In May 2008, Lowitt asked Feraca if Lehman was experiencing any funding issues with its secured transactions.[3638] Feraca replied to Lowitt and Tonucci, "There were a few counterparties last week who had at least noted some of the rumblings in the press last week. . . . Daiwa who [was] contemplating a Repo 105 trade with us. Not a big funder for us. I think counterparties will reserve judgment for now. . ."[3639]

- In a July 2008 e-mail to Lowitt and Tonucci regarding FID's plans for cash capital limits and balance sheet targets in third quarter 2008, Robert Azerad said that FID's plan to "shrink[] the repo book potentially a lot (20 bn). . .is not consistent with B/S targets given to FID (flat excluding Repo 105)."[3640]

---

[3635] *Id.* When shown the same e-mail, Feraca could not recall, specifically, why Lowitt and Tonucci would have asked him for information about Repo 105. Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 11. Feraca recalled generally that "[b]alance sheet targets were more important at this time. There was more heightened concern regarding balance sheet and leverage ratio." *Id.*

[3636] E-mail from Gerard Reilly, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Mar. 20, 2008) [LBEX-DOCID 103526] (transmitting March Net Balance Sheet Daily Trend Excel Sheet (Mar. 20, 2008) [LBEX-DOCID 103961]).

[3637] E-mail from Gerard Reilly, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Mar. 20, 2008) [LBEX-DOCID 2973597].

[3638] E-mail from Ian T. Lowitt, Lehman, to John T. Feraca, Lehman, *et al.* (May 27, 2008) [LBEX-DOCID 070831].

[3639] E-mail from John Feraca, Lehman, to Ian T. Lowitt, Lehman, *et al.* (May 27, 2008) [LBEX-DOCID 070831].

[3640] E-mail from Robert Azerad, Lehman, to Ian T. Lowitt, Lehman, *et al.* (July 9, 2008) [LBEX-DOCID 8961].

- Lowitt also received the "Daily Balance Sheet and Disclosures Scorecard" between April and September 2008, which frequently referred to the impact of Repo 105 transactions on Lehman's firm-wide balance sheet.[3641]

---

[3641] *See, e.g.*, Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 7, 2008 (Apr. 9, 2008), at p. 9 [LBEX-DOCID 520619] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 9, 2008) [LBEX-DOCID 523578] and showing consolidated FID and Equities balance sheet reduced by $18.527 billion and Prime Services balance sheet reduced by $4.458 billion through Repo 105 transactions as of April 7, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 8, 2008 (Apr. 10, 2008), at p. 9 [LBEX-DOCID 520620] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 10, 2008) [LBEX-DOCID 523579] and showing consolidated FID and Equities balance sheet reduced by $18.853 billion and Prime Services balance sheet reduced by $4.562 billion through Repo 105 transactions as of April 8, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 9, 2008 (Apr. 10, 2008), at p. 9 [LBEX-DOCID 251339] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 10, 2008) [LBEX-DOCID 258560] and showing consolidated FID and Equities balance sheet reduced by $19.688 billion and Prime Services balance sheet reduced by $4.548 billion through Repo 105 transactions as of April 9, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 10, 2008 [LBEX-DOCID 251342], at p. 9 (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 275231] and showing consolidated FID and Equities balance sheet reduced by $19.967 billion and Prime Services balance sheet reduced by $4.491 billion through Repo 105 transactions as of April 10, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 11, 2008 (Apr. 14, 2008), at p. 9 [LBEX-DOCID 251344] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 258562] showing consolidated FID and Equities balance sheet reduced by $20.260 billion and Prime Services balance sheet reduced by $4.517 billion through Repo 105 transactions as of April 11, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 12, 2008 (May 13, 2008), at p. 1 [LBEX-LL 1950262] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (May 13, 2008) [LBEX-DOCID 3187357] and stating "Rates decreased by $(5.0B) from prior day due to . . . increased Repo 105 usage . . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 22, 2008 (May 27, 2008), at p. 1 [LBEX-LL 1950706] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (May 27, 2008) [LBEX-DOCID 275984] and stating "Global rates net balance sheet decreased ($2.0B), predominantly due to an increase in Repo 105 benefit . . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 28, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950670] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (May 30, 2008) [LBEX-DOCID 275995] and stating "Global rates net balance sheet decreased by ($3.1B) primarily due to a decrease in Americas driven by an increased utilization of Repo 105 within the Agency business"); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 29, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950658] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (June 2, 2008) [LBEX-DOCID 011127] and stating "Global Rates net balance sheet decreased ($6.5B) . . . [t]he decrease in Europe is coming from increased utilization of Repo 105"); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date June 18, 2008 (June 20, 2008) [LBEX-LL 1950514] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (June 20, 2008) [LBEX-DOCID 275942] and stating that "Global rates net balance sheet decreased . . . driven by a[n] . . . increase in Repo 105 utilization . . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 13, 2008 (Aug. 14, 2008) [LBEX-LL 782812] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 14, 2008) [LBEX-DOCID

### (3) Lehman's Board of Directors

Without exception, former Lehman directors were unaware of Lehman's Repo 105 program and transactions.[3642]

As discussed in greater detail below, Lehman's own Corporate Audit group led by Beth Rudofker, together with Ernst & Young, investigated allegations about balance sheet substantiation problems made in a May 16, 2008 "whistleblower" letter sent to senior management by Matthew Lee.[3643]  On June 12, 2008, during the investigation, Lee informed Ernst & Young about Lehman's use of $50 billion of Repo 105 transactions in the second quarter of 2008.[3644]  At a June 13, 2008 meeting, Ernst & Young failed to disclose that allegation to the Board's Audit Committee.[3645]

Former Lehman director Cruikshank recalled that he made very clear he wanted a full and thorough investigation into each allegation made by Lee, whether the

---

4214810] and stating that "Global rates net balance sheet decreased . . . driven by an increase in Repo 105 benefit . . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 25, 2008 (Aug. 26, 2008) [LBEX-LL 782924] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 26, 2008) [LBEX-DOCID 079536] and stating that "Global Rates net balance sheet decreased . . . driven by an increase in repo 105 usage . . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 28, 2008 (Aug. 29, 2008) [LBEX-LL 782966] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 29, 2008) [LBEX-DOCID 275880] and stating that "Global rates [net balance sheet] was down . . . driven by increased Repo 105 benefit . . . .").

[3642] Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at p. 21; Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 10; Examiner's Interview of Roland Hernandez, Oct. 2, 2009, at p. 22; Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at p. 22; Examiner's Interview of Roger Berlind, Dec. 18, 2009, 4; Examiner's Interview of Michael L. Ainslie, Dec. 22, 2009, at p. 4; Examiner's Interview of Thomas Cruikshank, Jan. 20, 2010, at p. 2; Examiner's Interview of Sir Christopher Gent, Jan. 20, 2010, at p. 4.

[3643] *See* Section III.A.4.i.4 of this Report (discussing Matthew Lee's statements to Ernst & Young).

[3644] *Id.*

[3645] *Id.*

allegation was contained in Lee's May 16, 2008 letter or raised by Lee in the course of the investigation.[3646]  Another former Lehman director, Berlind, similarly stated that the Audit Committee explicitly instructed Lehman's Corporate Audit Group and Ernst & Young to keep the Audit Committee informed of all of Lee's allegations.[3647]  Berlind also said that he would have wanted to know about Lehman's Repo 105 program and that if he had known about Lehman's Repo 105 transactions, he would have asked Lehman's auditors to test the transactions to ensure they were appropriate.[3648]  Upon learning from the Examiner the volume of Repo 105 transactions at quarter-end in late 2007 and 2008, Sir Christopher Gent said that he believed the volume mandated disclosure to the Audit Committee and further investigation.[3649]

Dr. Kaufman, on the other hand, stated that he would have wanted to know about Repo 105 transactions only if they were "huge" and fraudulent, by which he meant in violation of specific accounting rules or in violation of the law.[3650]  Dr. Kaufman did not believe that $50 billion in Repo 105 transactions was significant even if that volume changed Lehman's net leverage ratio by approximately two points.[3651]  Dr.

---

[3646] Examiner's Interview of Thomas Cruikshank, Oct. 8, 2009, at p. 7.
[3647] Examiner's Interview of Roger Berlind, Dec. 18, 2009, at p. 4.
[3648] *Id.*
[3649] Examiner's Interview of Sir Christopher Gent, Jan. 20, 2010, at p. 3.
[3650] Examiner's Interview of Henry Kaufman, Dec. 22, 2009.
[3651] *Id.*

Kaufman considered a four or five point change in the net leverage ratio to be significant.[3652]

In late 2007 and 2008, management made numerous presentations to the Board regarding balance sheet reduction and deleveraging; in no case was the use of Repo 105 transactions disclosed in those presentations.[3653]

---

[3652] *Id.*

[3653] *See, e.g.,* Lehman Brothers Holdings Inc., Minutes of Meeting of the Board of Directors (Sept. 11, 2007), at p. 3 [LBHI_SEC07940_026364] (including O'Meara statements regarding leverage ratios); Lehman Brothers Holdings Inc., Minutes of Meeting of the Board of Directors (Oct. 15, 2007), at p. 3 [LBHI_SEC07940_026407]; Lehman Brothers Holdings Inc., Minutes of Meeting of the Board of Directors (Nov. 8, 2007), at p. 4 [LBHI_SEC07940_026650] (same); Lehman Brothers, Minutes of Meeting of the Finance and Risk Committee (Jan. 29, 2008), at pp. 2 [LBEX-AM 067022]; Lehman Brothers, Confidential Presentation to Finance and Risk Committee of the Board of Directors, 2008 Financial Plan (Jan. 29, 2008), at p. 8 [LBHI_SEC07940_068559] (stating "We plan to deploy the capital created to reduce leverage and support $60 billion of asset growth" and that "[b]alance sheet growth in December [2007] was largely in highly liquid asset classes for which we were able to source repo financing."); Lehman Brothers, Confidential Presentation to Finance and Risk Committee, Additional Materials (Jan. 29, 2008), at pp. 1-2 [LBEX-AM 067269] (stating "We have been able to grow repo financing to meet the balance sheet and leverage increases," and that Lehman's net assets and leverage grew in 2007 across all asset classes and leverage increased at a lesser rate than peer firms); Eric Felder, Lehman, 2008 Financial Supply/Demand Dynamics, Presentation to Lehman Board of Directors (Jan. 28, 2008), at p. 10 [LBHI_SEC07940_027353] (noting rise in leverage ratios among the five big investment banks); Lehman Brothers Holdings Inc., Minutes of Meeting of the Finance and Risk Committee (Mar. 25, 2008), at p. 2 [LBEX-AM 003592] (informing the Board of "industry-wide pressure to delever" and that the firm was working on a plan for reducing total assets which would most likely focus on the Fixed Income and Principal Investment business units); Erin M. Callan, Lehman, Estimated March 2008 Financial Information, Confidential Presentation to Lehman Brothers Board of Directors (Apr. 15, 2008), at p. 8 [LBHI_SEC07940_027952] (explaining that as part of the "de-levering plan," Lehman's "[t]argeted balance sheet reduction by Q2 '08" included a reduction of net assets by $55 billion to $342 billion); Lehman Brothers Holdings Inc., Finance and Risk Committee of the Board, Liquidity and Risk Management Update (May 7, 2008), at p. 10 [LBEX-AM 067320] ("The Firm has set aggressive targets to reduce balance sheet and cash capital usage below their Q4 2007 levels by the end of this quarter. This should result in bringing net leverage to 12x, gross leverage to 25x and generating a cash capital surplus of $8-10 billion – large enough to avoid the need to issue in public debt markets for the rest of the year."); *id.* at p. 16 (stating "lower leverage going forward will help reduce the Firm's liquidity risk"); Lehman Brothers Holdings Inc., Minutes of Meeting of the Board of Directors (June 19, 2008), at p. 3 [LBEX-AM 003764] (discussing Lehman's plans regarding leverage, and "potential changes in GAAP which would potentially require companies to bring certain assets back onto the balance sheet"); Lehman Brothers Holdings Inc., Minutes of Meeting of the Board of Directors (July 22, 2008), at p. 7 [LBEX-AM 003866]

### i) Ernst & Young's Knowledge of Lehman's Repo 105 Program

During several Rule 30(b)(6)-type[3654] interview sessions, the Examiner interviewed members of Ernst & Young's Lehman audit team regarding Ernst & Young's knowledge of and involvement in Lehman's Repo 105 program.

#### (1) Ernst & Young's Comfort with Lehman's Repo 105 Accounting Policy

The Examiner interviewed Ernst & Young's lead partner on the Lehman audit team, William Schlich, regarding Lehman's Repo 105 program. According to Schlich, Ernst & Young had been aware of Lehman's Repo 105 policy and transactions for many years.[3655] Consistent with the statements of Lehman's John Feraca (Secured Funding Desk), Schlich stated that Lehman introduced its Repo 105 Accounting Policy on the heels of the FASB's promulgation of SFAS 140.[3656] During that time, Ernst & Young "discussed" the Repo 105 Accounting Policy (including Lehman's structure for Repo 105 transactions) and Ernst & Young's team had a number of additional conversations with Lehman about Repo 105 over the years.[3657] However, according to Schlich, Ernst &

---

(informing the Board that "it was important to size the Firm's financial leverage to maintain the Firm's 'A' credit rating in order to maintain the value of the Firm's franchise").

[3654] Federal Rule of Civil Procedure Rule 30(b)(6) governs depositions of a corporation or organization. The organization designates one or more representatives to testify on the identified areas of inquiry. The representative speaks for the organization.

[3655] Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at p. 4.

[3656] *Id.* at p. 5.

[3657] *Id.*

Young had no role in the drafting or preparation of Lehman's Repo 105 Accounting Policy.[3658]

Schlich stated definitively that Ernst & Young had no advisory role with respect to Lehman's use of Repo 105 transactions and that Ernst & Young did not "approve" the Accounting Policy.[3659]   Rather, according to Schlich, Ernst & Young "bec[a]me comfortable with the Policy for purposes of auditing financial statements."[3660]

Following "consultation and dialogue" about the proper interpretation and application of SFAS 140, Ernst & Young "clearly. . .concurred with Lehman's approach" to SFAS 140 and subsequent literature by FASB on the issue of "control" of assets involved in a repo transactions.[3661]   Ernst & Young's view, however, was not based upon an analysis of whether actual Repo 105 transactions complied with SFAS 140.[3662]   Rather, Ernst & Young's review of Lehman's Repo 105 Accounting Policy was purely "theoretical."[3663]   In other words, Ernst & Young solely assessed Lehman's understanding of the requirements of SFAS 140 in the abstract and as reflected in its Accounting Policy; Ernst & Young did not opine on the propriety of the transactions as

---

[3658] *Id.*

[3659] *Id.*

[3660] Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at p. 5.

[3661] *Id.* at pp. 5-6.

[3662] *Id.* at p. 6.

[3663] *Id.*

a balance sheet management tool.[3664]  Ernst & Young did not review the Linklaters letter, referenced in the Accounting Policy Manual.[3665]

According to Martin Kelly, it was not unusual for him to discuss various issues, including Repo 105, with Ernst & Young.[3666]  Indeed, Kelly recalled specifically speaking with Schlich about Repo 105 transactions soon after becoming Financial Controller on December 1, 2007, in an effort to learn more about the program and "to understand [Ernst & Young's] approach before talking to Callan."[3667]

Kelly "wanted to ensure that Ernst & Young analyzed the program in the same way that [Marie] Stewart [Global Head of Accounting Policy] had analyzed it."[3668] Kelly's conversations with Ernst & Young focused on the accounting treatment of Repo 105 transactions.[3669]  According to Kelly, Ernst & Young "was comfortable with the treatment under GAAP for the same reasons that Lehman was comfortable."[3670]  Kelly also discussed with Ernst & Young Lehman's inability to get a true sale opinion under

---

[3664] Id.

[3665] The Examiner asked Schlich a series of questions to establish whether a good faith basis existed for showing him the Linklaters letter.  Schlich told the Examiner that he did not know if anyone at Ernst & Young LLP (i.e., the United States-based Ernst & Young) ever reviewed the Linklaters letter. Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at p. 10.  Schlich further stated that LBIE's books and records were audited by Ernst & Young United Kingdom, not Ernst & Young LLP, though he acknowledged that LBIE's financials rolled up into LBHI's publicly filed financial statements, which Ernst & Young LLP audited.  Id. at pp. 10-11.  Because, based upon Schlich's statements, the Examiner did not have a good faith basis to believe Ernst & Young LLP previously had seen the Linklaters letter (as is required under the Examiner's protective order with Alvarez & Marsal/LBHI to show the letter to Ernst & Young LLP), the Examiner did not show Schlich the Linklaters letter.

[3666] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 11.

[3667] Id.

[3668] Id.

[3669] Id.

[3670] Id.

United States law for Repo 105 transactions.[3671]  Kelly could not recall whether he discussed with Ernst & Young his discomfort with Lehman's Repo 105 program.[3672]

### (2) The "Netting Grid"

Throughout 2007, Lehman maintained a document entitled "Accounting Policy Review Balance Sheet Netting and Other Adjustments," known colloquially among Lehman's Accounting Policy and Balance Sheet Groups, as well at Ernst & Young, as the "Netting Grid."  The Netting Grid identified and described various balance sheet netting mechanisms employed by Lehman: one such balance sheet mechanisms was Lehman's use of Repo 105 transactions.[3673]

Lehman provided the Netting Grid to Ernst & Young at least in August 2007 (the close of Lehman's third quarter 2007) and in November 2007 (the close of Lehman's fiscal year 2007).[3674]  Notably, the Netting Grid provided by Lehman to Ernst & Young in August 2007 and November 2007 only contained Repo 105 volumes from November 30,

---

[3671] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 11.

[3672] *Id.*

[3673] *See, e.g.*, Lehman, Accounting Policy Review Balance Sheet Netting and Other Adjustments (Aug. 2007) [LBEX-DOCID 2720761] (attached to e-mail from Marie Stewart, Lehman, to Martin Kelly, Lehman (Nov. 6, 2007) [LBEX-DOCID 2736621] ("[T]his is the doc that summarizes every reason we net down the b/sheet. As discussed, E&Y are in the process of reviewing it."); Lehman, Accounting Policy Review Balance Sheet Netting and Other Adjustments (Nov. 2007) [LBEX-DOCID 2720762] (attached to e-mail from Marie Stewart, Lehman, to Martin Kelly (Nov. 6, 2007) [LBEX-DOCID 2736622]).

[3674] E-mail from Margaret Sear, Lehman, to Jerry Gruner, Ernst & Young, *et al.* (Aug. 15, 2007) [LBEX-DOCID 3235498] ("Here is the netting grid as you requested."); Lehman, Accounting Policy Review Balance Sheet Netting and Other Adjustments (Aug. 2007) [LBEX-DOCID 3213803] (attached to e-mail from Margaret Sear, Lehman, to Jerry Gruner, Ernst & Young, *et al.* (Aug. 15, 2007) [LBEX-DOCID 3235498]); e-mail from Margaret Sear, Lehman, to Jerry Gruner, Ernst & Young, *et al.* (Nov. 6, 2007) [LBEX-DOCID 3235499] (transmitting, Accounting Policy Review Balance Sheet Netting and Other Adjustments [Draft] (Nov. 2007) [LBEX-DOCID 3213271]).

2006 and February 28, 2007.[3675]  Schlich was unaware whether Ernst & Young asked Lehman to provide its second quarter 2007 and third quarter 2007 Repo 105 usage figures or a forecast of Lehman's fourth quarter 2007 Repo 105 numbers.[3676]

Ernst & Young reviewed the Netting Grid, analyzed the various balance sheet netting mechanisms identified in the Netting Grid, and used the document in connection with its 2007 year-end audit of Lehman.[3677] According to Schlich, Ernst & Young, as part of its review of Lehman's Netting Grid, approved of Lehman's internal Repo 105 Accounting Policy only, and did not pass upon the actual practice.[3678]

The Netting Grid described the transactions and United States GAAP reference as follows: "Under certain conditions that meet the criteria described in paragraphs 9 and 218 of SFAS 140, Lehman policy permits reverse repo and repo agreements to be recharacterized as purchases and sales of inventory."[3679]  With respect to Lehman's use of Repo 105 transactions to reduce its net balance sheet, the Netting Grid sets forth the

[3675] Lehman, Accounting Policy Review Balance Sheet Netting and Other Adjustments (Aug. 2007), at p. 26 [LBEX-DOCID 3213803] (stating total Repo 105 usage for November 30, 2006 was $24.519 billion and total Repo 105 usage for February 28, 2007 was $29.258 billion); Lehman, Accounting Policy Review Balance Sheet Netting and Other Adjustments [Draft] (Nov. 2007), at p. 26 [LBEX-DOCID 3213271] (same).

[3676] Examiner's Interview of Ernst & Young, Repo 105 Session (Oct. 16, 2009), at p. 9 (statement of William Schlich).

[3677] Id. at p. 8.  By this, Ernst & Young referred to its audit of other balance sheet netting mechanisms. Ernst & Young United States did not audit Repo 105 transactions.

[3678] Id.

[3679] Lehman Brothers, Accounting Policy Review Balance Sheet Netting and Other Adjustments (Aug. 2007), at p. 26 [LBEX-DOCID 3213803]; Lehman, Accounting Policy Review Balance Sheet Netting and Other Adjustments [Draft] (Nov. 2007), at p. 26 [LBEX-DOCID 3213271].

conclusion that Lehman's "current practice [for Repo 105] is correct."[3680] Schlich noted that this conclusion about the Repo 105 practice was Lehman's, not Ernst & Young's.[3681] To test Lehman's conclusion, however, Ernst & Young "reviewed how Lehman applied the control provisions of the accounting rules."[3682]

Ernst & Young's review, however, applied only to the accounting basis for these transactions, not to their volume or purpose. Specifically, Ernst & Young's review and analysis of Lehman's Repo 105 program did not account for the volumes of Repo 105 transactions Lehman undertook at quarter-end.[3683] Indeed, Schlich was unable to confirm or deny the volumes of Repo 105 transactions Lehman undertook at Lehman's fiscal year-end 2007, or in the first two quarter-ends of 2008.[3684] Nor was Schlich able to confirm or deny that Lehman's use of Repo 105 transactions was increasing in late 2007 and into mid 2008.[3685]

### (a)  Quarterly Review and Audit

Through Schlich, Ernst & Young maintained that its duties as Lehman's auditor required it to ensure that transactions were accounted for correctly (*i.e.*, that they complied with accounting rules) and that Lehman's financial disclosures were not

---

[3680] *Id.*  Although Lehman's internal Repo 105 Accounting Policy could have theoretically been applied to reverse repos, the policy explicitly stated that Lehman did not, in fact, use the Repo 105 mechanism for reverse repos.  *See* Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108 (Sept. 9, 2006), at p. 1 [LBEX-DOCID 3213286].

[3681] Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at p. 8.

[3682] *Id.*

[3683] *Id.*

[3684] *Id.*

[3685] *Id.*

materially misstated.[3686]   According to Schlich, Ernst & Young's audit did not require Ernst & Young to consider or review the volume or timing of Repo 105 transactions.[3687] Accordingly, as part of its year-end 2007 audit, Ernst & Young did not ask Lehman about any directional trends, such as whether its Repo 105 activity was increasing during fiscal year 2007.[3688]   Notably, as part of its quarterly review process, Ernst & Young did not audit any of Lehman's Repo 105 transactions.[3689]

### (3) Ernst & Young Would Not Opine on the Materiality of Lehman's Repo 105 Usage

Ernst & Young, through Schlich, was unwilling to comment to the Examiner on the materiality of the volume of Lehman's quarter-end Repo 105 transactions.[3690]  Asked whether, as part of its responsibility to ensure Lehman's financial statements were not materially misstated, Ernst & Young should have considered the possibility that strict technical adherence to SFAS 140 or any other specific accounting rule could nonetheless lead to a material misstatement in Lehman's publicly-reported financial statements, Schlich refrained from comment.[3691]

When pressed further, Schlich stated that the volume of any particular transaction impacts neither the question of whether accounting rules are applied

---

[3686] Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at pp. 6-7.
[3687] *Id.* at p. 6.
[3688] *Id.* at p. 9.
[3689] *Id.* at p. 3.
[3690] *Id.* at p. 6.
[3691] Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at p. 6.

correctly, nor the question of whether a financial statement is materially misleading.[3692]

However, Schlich eventually acknowledged that "when you look at a balance sheet issue, volume is a factor."[3693]

Notably, the definition of "materiality" contained in a "walk-through" document related to Ernst & Young's 2007 fiscal year-end audit of Lehman was: "any transaction that would move Lehman's firm-wide net leverage by 0.1 or more."[3694] This definition reflected "Lehman's determination of a materiality threshold" in connection with Lehman's own criteria for when to consider reopening and adjusting its balance sheet.[3695]

When Schlich was asked what level of impact to Lehman's firm-wide net assets Ernst & Young would have considered "material," Schlich replied that Ernst & Young did not have a hard and fast rule defining materiality in the balance sheet context, and that, with respect to balance sheet issues, "materiality" depends upon the facts and circumstances.[3696] Schlich agreed that Lehman made no specific disclosures about Repo

---

[3692] *Id.*

[3693] *Id.* at p. 7.

[3694] Ernst & Young, LBHI/LBI Walkthrough Template for Balance Sheet Close Process (Nov. 30, 2007), at p. 14 [EY-LE-LBHI-CORP-GAMX-07-033384] ("Materiality is usually defined as any item individually, or in the aggregate, that moves net leverage by 0.1 or more (typically $1.8 billion)."). Accordingly, an item that impacted net leverage by 0.1 point was deemed material enough to re-open the books. The walkthrough paper also stated, "Net leverage is an important ratio analyzed by the rating agencies and included in Lehman's earnings releases." *Id.*

[3695] Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at p. 7.

[3696] *Id.*

105 transactions in its Forms 10-K and Form 10-Q, including the MD&A section.[3697]

Schlich believed, however, that Lehman's public filings would have included general language regarding secured borrowings and compliance with SFAS 140.[3698]  Schlich was not aware whether Ernst & Young ever discussed Lehman's disclosures *vel non* of Repo 105 activity with senior Lehman management.[3699]

### (4) Matthew Lee's Statements Regarding Repo 105 to Ernst & Young

On May 16, 2008, Matthew Lee, then-Senior Vice President in the Finance Division responsible for Lehman's Global Balance Sheet and Legal Entity Accounting, sent a letter to certain members of Lehman's senior management identifying possible violations of Lehman's Ethics Code related to accounting/balance sheet issues.[3700]

---

[3697] *Id.*

[3698] *Id.*  As noted in Section III.A.4.j.2.c.ii.a, however, language regarding SFAS 140 in Lehman's Forms 10-K and 10-Q relate solely to Lehman's securitization activities.

[3699] Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at p. 7.

[3700] Letter from Matthew Lee, Lehman, to Martin Kelly, Lehman, *et al.* (May 16, 2008) [EY-LE-LBHI-KEYPERS 5826885].  Lee's letter contained the following six allegations: (1) on the last day of each month, Lehman's books and records contained approximately $5 billion of net assets in excess of what was managed on the last day of the month, thereby suggesting that the firm's senior management was not in control of its assets to be able to present full, fair, and accurate financial statements to the public; (2) Lehman had "tens of billions of dollars of unsubstantiated balances, which may or may not be 'bad' or non-performing assets or real liabilities;" (3) Lehman had tens of billions of dollars of illiquid inventory and did not value its inventory in a "fully realistic or reasonable" way; (4) given Lehman's rapid growth and increased number of accounts and entities, it had not invested sufficiently in financial systems and personnel to cope with the balance sheet; (5) the India Finance office lacked sufficient knowledgeable management, resulting in the real possibility of potential misstatements of material facts being distributed by that office; and (6) certain senior level audit personnel were not qualified to "properly exercise the audit functions they are entrusted to manage."  *Id.*

Lehman involved Ernst & Young in its investigation of the concerns raised in Lee's May 16, 2008 letter.[3701]

Subsequently, less than a month later, on June 12, 2008, Ernst & Young – Schlich and Hillary Hansen – interviewed Lee.[3702]  Hansen's notes of the interview reveal that Lee made certain statements to Ernst & Young about Lehman's Repo 105 practice, including, most notably, the volume of Repo 105 activity that Lehman engaged in at quarter-end (May 31, 2008).[3703]  Hansen's notes specifically recount Lee's allegation that Lehman moved $50 billion of inventory off its balance sheet at quarter-end through Repo 105 transactions and that these assets returned to the balance sheet approximately a week later.[3704]

---

[3701] Examiner's Interview of Thomas Cruikshank, Oct. 8, 2009, at p. 7 (stating that although Beth Rudofker led the investigation, as Chair of the Audit Committee, he made sure Ernst & Young was involved as well); Examiner's Interview of Michael L. Ainslie, Dec. 22, 2009, at p. 3; Examiner's Interview of Roger Berlind, Dec. 18, 2009, at pp. 2-3; Examiner's Interview of Sir Christopher Gent, Jan. 20, 2010, at p. 2; Examiner's Interview of Beth Rudofker, Dec. 15, 2009, at p. 7; *see also* Employee Letter Review, Presentation to the Audit Committee (July 22, 2008), at p. 2 [LBEX-AM 067664] (noting that "Corporate Audit has largely completed an evaluation of [Lee's] observations in partnership with Financial Control and Ernst and Young").

[3702] Examiner's Interview of Ernst & Young, Nov. 3, 2009, at p. 14 (statement of William Schlich) (noting that Lehman's counsel Joe Polizzotto was present initially but left so Schlich and Hansen could interview Lee privately); *see also* e-mail from William Schlich, Ernst & Young, to Hillary Hansen, Ernst & Young (June 10, 2008) [EY-LE-LBHI-KEYPERS 0853892 (scheduling meeting with Lee for June 12, 2008).

[3703] Hansen's notes indicate that Lehman's "Rates [and] Liquid Markets" businesses engaged in "Repo 105/Repo 108 [to] reduce[] assets by 50B [by] moving off B/S [i.e., balance sheet] in Europe & back in 5 days later." Hillary Hansen, Ernst & Young, Handwritten Notes (June 12, 2008), at p. 1 [EY-LE-LBHI-KEYPERS 5826869]. This is consistent with the Examiner's conclusions that at quarter-end in second quarter 2008, Lehman reduced its balance sheet by slightly more than $50 billion through Repo 105 transactions.

[3704] *Id.*

When interviewed by the Examiner, Schlich did not recall Lee saying anything about Repo 105 transactions during that interview, although he did not dispute the authenticity of Hansen's notes from the Lee interview.[3705]  In spite of Hansen's notes, Schlich maintained that Ernst & Young did not know that Lehman engaged in the following Repo 105 activity during the listed time periods: $49.1 billion at first quarter 2008 (Feb. 29, 2008); and $50.38 billion at second quarter 2008 (May 31, 2008).[3706]

During the Examiner's interview of Hansen, Hansen recalled that while Ernst & Young questioned Lee about his May 16, 2008 letter, Lee "rattled off" a list of additional issues and concerns he held, one of which was Lehman's use of Repo 105 transactions.[3707]  Ernst & Young had no further conversations with Lee about Repo 105 transactions.[3708]  Prior to her interview of Lee in June 2008, Hansen had heard the term Repo 105 "thrown around" but she did not know its meaning; according to Hansen, Schlich described Repo 105 transactions to her shortly after they met with Lee.[3709]

Following Ernst & Young's June 12, 2008 interview of Lee, Schlich and Hansen met with Lehman's Gerard Reilly to discuss Lee's assertions regarding improper

---

[3705] Examiner's Interview of Ernst & Young, Oct. 9, 2009, at p. 5; Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at p. 5; Examiner's Interview of Ernst & Young, Nov. 3, 2009, at p. 16.
[3706] Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at p. 12 (Schlich (1) disavowed any knowledge on the part of Ernst & Young of Lehman's actual Repo 105 usage for the first and second quarter of 2008 and (2) said he was not personally aware of Lehman's Repo 105 usage at the close of fiscal year 2007).
[3707] Examiner's Interview of Ernst & Young, Nov. 3, 2009, at p. 14.
[3708] *Id.*
[3709] *Id.*  Schlich maintains that he does not recall discussing Repo 105 either during or after Lee's interview.  *Id.*

valuations.[3710]  During that meeting, Hansen informed Reilly of the $50 billion Repo 105

figure Lee provided during Ernst & Young's interview of Lee.[3711]  According to Schlich,

Reilly (now deceased) told the auditors that he had no knowledge that Lehman used

Repo 105 transactions to move $50 billion in assets off its balance sheet.[3712]  "Hillary

[Hansen] took away from the meeting with Reilly that he did not know and it was not

$50 billion."[3713]

On June 13, 2008 – *the day after* Lee informed Ernst & Young of the $50 billion in

Repo 105 transactions that Lehman undertook at the end of the second quarter 2008 –

Ernst & Young spoke to Lehman's Audit Committee but did not inform the committee

of Lee's allegation, even though the Chairman of the Audit Committee had clearly

stated that he wanted *every* allegation made by Lee – whether in Lee's May 16 letter or

during the course of the investigation – to be investigated.[3714]  Ernst & Young met with

the Audit Committee on July 8, 2008, to review the second quarter financial statements

---

[3710] Examiner's Interview of Ernst & Young, Oct. 9, 2009, at p. 6 (statement of William Schlich); Examiner's Interview of Ernst & Young, Nov. 3, 2009, at p. 16 (statement of William Schlich).

[3711] Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at p. 11 (statement of William Schlich).

[3712] *Id.*

[3713] *Id.* at p. 12 (statement of William Schlich).  Schlich had no personal recollection of discussing Repo 105 with Reilly during the meeting.  *Id.* at p. 11.  He said he only knew that Hansen recalled discussing the issue with Reilly and Reilly's response.  *Id.*  There are no notes from Schlich and Hansen's meeting with Reilly.  Examiner's Interview of Ernst & Young, Nov. 3, 2009, at p. 17 (statement of Hillary Hansen).

[3714] Examiner's Interview of Thomas Cruikshank, Oct. 8, 2009, at p. 7 (stating that Internal Audit and Ernst & Young were explicitly instructed to report and investigate any allegation made by Lee during course of investigation); Examiner's Interview of Roger Berlind, Dec. 18, 2009, at p. 2 (same); Examiner's Interview of Michael L. Ainslie, Dec. 22, 2009, at p. 3 (same); Examiner's Interview of Sir Christopher Gent, Jan. 20, 2010, at p.2 (same); Examiner's Interview of Thomas Cruikshank, Jan. 20, 2010, at p. 3; Examiner's Interview of Beth Rudofker, Dec. 15, 2009, at pp. 6-7; *see also* Lehman Brothers Holdings Inc., Minutes of the Meeting of Audit Committee (June 13, 2008) [LBEX-AM 003759].

and again did not mention Lee's allegations regarding Repo 105.[3715]  On July 22, 2008,

Ernst & Young was also present when Beth Rudofker, Head of Corporate Audit, gave a

presentation to the Audit Committee on the results of the investigation into Lee's

allegations.[3716]

Ernst & Young did not disclose to the Audit Committee – either during the

meetings or in private executive sessions after – that Lee made an allegation related to

Repo 105 transactions being used to move assets off Lehman's balance sheet at quarter-

end.[3717]  Cruikshank told the Examiner that he would have expected to be told about

Lee's Repo 105 allegations.[3718]  Similarly, Sir Gent told the Examiner that the alleged

---

[3715] Lehman Brothers Holdings Inc., Minutes of Meeting of Audit Committee (July 8, 2008), at pp. 1-2 [LBEX-AM 003831].

[3716] Lehman Brothers Holdings Inc., Minutes of Meeting of Audit Committee (July 22, 2008), at p. 4 [LBEX-AM 003861]; *see also* Employee Letter Review, Presentation to the Audit Committee (July 22, 2008), at p. 2 [LBEX-AM 067664] (concluding that "[n]o material issues have been identified during the review [of Lee's allegations] and this report to the Audit Committee summarizes the findings and recommendations").  The presentation contains no reference to Lee's allegation regarding Repo 105.  *Id.*  Ernst & Young did not inform Rudofker about Lee's allegation regarding Repo 105.  Examiner's Interview of Beth Rudofker, Dec. 15, 2009, at p. 7.

[3717] Examiner's Interview of Thomas Cruikshank, Jan. 20, 2010, at p. 3; Examiner's Interview of Roger Berlind, Dec. 18, 2009, at p. 4; Examiner's Interview of Michael L. Ainslie, Dec. 22, 2009, at p. 3; Examiner's Interview of Sir Christopher Gent, Jan. 20, 2010, at pp. 2, 3; Examiner's Interview of Beth Rudofker, Dec. 15, 2009, at p. 7.; *see also* Lehman Brothers Holdings Inc., Minutes of Meeting of Audit Committee (June 13, 2008) [LBEX-AM 003759];  Lehman Brothers Holdings Inc., Minutes of Meeting of Audit Committee (July 8, 2008) [LBEX-AM 003831]; Lehman Brothers Holdings Inc., Minutes of Meeting of Audit Committee (July 22, 2008) [LBEX-AM 003861].

[3718] Examiner's Interview of Thomas Cruikshank, Jan. 20, 2010, at p. 3.  Cruikshank, who had no knowledge of Lehman's internal Repo 105 Accounting Policy, said that it was the responsibility of Ernst & Young and Lehman management to analyze the accounting treatment for Repo 105 transactions and ensure the standards were properly applied to these transactions.  *Id.* at pp. 2-3.

volume of Lehman's Repo 105 transactions mandated disclosure to the Audit Committee as well as further investigation.[3719]

Ernst & Young did not follow-up on either Lee's allegations regarding Lehman's Repo 105 activity or Reilly's claim that he had no knowledge of Lehman's alleged $50 billion Repo 105 usage figure.[3720]   Ernst & Young signed a Report of Independent Registered Public Accounting Firm for Lehman's second quarter 2008 Form 10-Q on July 10, 2008, less than four weeks after Schlich and Hansen interviewed Lee.[3721]

---

[3719] Examiner's Interview of Sir Christopher Gent, Jan. 20, 2010, at p. 3.

[3720] Examiner's Interview of Ernst & Young, Nov. 3, 2009, at p. 16 (statement of William Schlich)

[3721] LBHI 10-Q (filed July 10, 2008), at p. 53 (stating that "[b]ased upon our review, we are not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles"); Examiner's Interview of Ernst & Young, Nov. 3, 2009, at p. 17 (statement of William Schlich) (stating that Ernst & Young "signed off" on Lehman's second quarter 2008 10-Q).   On June 5, 2008, only a few days after the close of Lehman's second quarter 2008 and a few days before Lehman's $6 billion equity raise, Schlich wrote to Ernst & Young's Carmine DiSibio and Stephen Howe about Lehman's second quarter financial results and a general report on Lehman's performance.  E-mail from William Schlich, Ernst & Young, to Carmine DiSibio, Ernst & Young, *et al.* (June 5, 2008) [EY-LE-LBHI-KEYPERS 0853883].  Schlich's note to DiSibio and Howe also referenced Matthew Lee's letter to senior Lehman management, as well as certain off-balance sheet items:

> [W]e are also dealing with a whistleblower letter, that is on its face pretty ugly and will take us a significant amount of time to get through. I am confident from what I have seen it shouldn't result in any significant issues around financial reporting, but again there is a lot of work to do yet. This combined with some very difficult accounting issues around off-balance sheet items is adding stress to everyone.

*Id.*  Schlich denied that the "off-balance sheet items . . . adding stress to everyone" referenced in his note were Repo 105 transactions.  Examiner's Interview of Ernst & Young, Oct. 9, 2009, at p. 10 (statement of William Schlich).  Rather, Schlich maintained, the "stress" referenced in his message was due to the public criticism Lehman was then facing over its sale of certain assets to the R3 hedge fund, an approximately $4.5 billion deal.  *Id.*  The total dollar amount of off-balance sheet items resulting from Lehman's Repo 105 transactions at the end of second quarter 2008, when Schlich wrote his note, was over $50 billion, or more than eleven times the size of the R3 deal.

### (5) Accounting-Motivated Transactions

Ernst & Young did not evaluate the possibility that Repo 105 transactions were accounting-motivated transactions that lacked a business purpose.[3722] Schlich characterized the off-balance sheet treatment of Lehman's assets in Repo 105 transactions as a consequence of the accounting rules, rather than a motive for the transactions.[3723]

### j) The Examiner's Conclusions

There is sufficient evidence to support a determination by a trier of fact that Lehman's failure to disclose that it relied upon Repo 105 transactions to temporarily reduce the firm's net balance sheet and net leverage ratio was materially misleading. In addition, a trier of fact could find that Lehman affirmatively misrepresented its accounting treatment for repos by stating that Lehman treated repo transactions as financing transactions rather than sales for financial reporting purposes, despite the fact that Lehman treated tens of billions of dollars in repo transactions – namely, Repo 105 transactions – as true sale transactions.

---

[3722] Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at p. 13 (statement of William Schlich). An SEC staff paper discourages "accounting-motivated structured transactions" because a company engaging in such transactions runs the risk of presenting an inaccurate picture of its true financial condition. *See* OFFICE OF THE CHIEF ACCOUNTANT, SEC, REPORT AND RECOMMENDATIONS PURSUANT TO SECTION 401(C) OF THE SARBANES-OXLEY ACT OF 2002 ON ARRANGEMENTS WITH OFF-BALANCE SHEET IMPLICATIONS, SPECIAL PURPOSE ENTITIES AND TRANSPARENCY OF FILINGS BY ISSUERS, at p. 100 (2005) ["SEC SOX Off Balance Sheet Report"]. According to this report, "accounting-motivated structured transactions" are "transactions that are structured in an attempt to achieve reporting results that are not consistent with the economics of the transaction, and thereby impair the transparency of financial reports." *Id.* "[A]ttempt[s] to portray the transactions differently from their substance do not operate in the interests of investors, and may be in violation of the securities laws." *Id.*

[3723] *Id.*

The Examiner thus concludes that sufficient evidence exists from which a trier of fact could find the existence of a colorable claim that certain Lehman officers breached their fiduciary duties to Lehman and its shareholders by causing the company to file deficient and materially misleading financial statements, thereby exposing the company to potential liability. Certain officers of Lehman not only failed to inform the public of its reliance on Repo 105 transactions to reduce its balance sheet, they also failed to advise Lehman's Board of Directors of the firm's Repo 105 practice. Thus, the Examiner concludes that a trier of fact could find that certain Lehman officers breached their fiduciary duties to Lehman's Board of Directors by failing to inform them of: (1) the firm's reliance upon Repo 105 to reduce the balance sheet at quarter-end, (2) the ramp-up in Repo 105 usage in mid-to-late 2007 and 2008, (3) the impact of these transactions on Lehman's publicly reported net leverage ratio, or (4) the fact that Lehman did not disclose its Repo 105 practice in its publicly reported financials statements and MD&A.

### (1) Materiality

The materiality of information is evaluated from the perspective of a reasonable investor.[3724] Information is deemed material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as

---

[3724] *See SEC v. Stanard*, No. 06 Civ. 7736(GEL), 2009 WL 196023, at *26 (S.D.N.Y. Jan. 27, 2009) (citations omitted).

having significantly altered the 'total mix' of information made available."[3725] Materiality does not require, however, that the information be of a type that would cause an investor to change his investment decision.[3726]

### (a) Whether Lehman's Repo 105 Transactions Technically Complied with SFAS 140 Does Not Impact Whether a Colorable Claim Exists

This Report does not reach the question of whether Lehman's Repo 105 transactions technically complied with the relevant financial accounting standard, SFAS 140, because the answer to that question does not impact whether a colorable claim exists regarding Lehman's failure to disclose its Repo 105 practice and whether that failure rendered the firm's financial statements materially misleading.

Even if Lehman's use of Repo 105 transactions technically complied with SFAS 140, financial statements may be materially misleading even when they do not violate GAAP.[3727] The Second Circuit has explained that "GAAP itself recognizes that technical compliance with particular GAAP rules may lead to misleading financial statements,

---

[3725] *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[3726] *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d. Cir. 2000). Lehman's audit walk-through papers defined as material any item that alone or in the aggregate had a one-tenth (0.1) of a point impact on firm-wide net leverage ratio (or $1.8 billion). *See* Ernst & Young, LBHI/LBI Walkthrough Template for Balance Sheet Close Process (Nov. 30, 2007), at p. 14 [EY-LE-LBHI-CORP-GAMX-07-033384] (defining materiality in the context of re-opening a closed balance sheet).

[3727] *See generally United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006), *cert. denied*, 127 S.Ct. 1483 (2007).

and imposes an overall requirement that the statements as a whole accurately reflect the financial status of the company."[3728]

Similarly, as noted in *In re Global Crossing Ltd. Securities Litigation*, even if a defendant established that its accounting practices "were in technical compliance with certain individual GAAP provisions . . . this would not necessarily insulate it from liability. This is because, unlike other regulatory systems, *GAAP's ultimate goals of fairness and accuracy in reporting require more than mere technical compliance*."[3729] The court explained that "when viewed as a whole," GAAP has no "loopholes" because its purpose, shared by the securities laws, is "to increase investor confidence by ensuring transparency and accuracy in financial reporting."[3730] Technical compliance with specific accounting rules does not automatically lead to fairly presented financial statements. "Fair presentation is the touchstone for determining the adequacy of disclosure in financial statements. While adherence to generally accepted accounting principles is a tool to help achieve that end, it is not necessarily a guarantee of fairness."[3731] Moreover, registrants are "*required to provide whatever additional information*

---

[3728] *Id.* at 126.

[3729] *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp.2d 319, 339 (S.D.N.Y. 2004) (emphasis added).

[3730] *Id.*

[3731] *Id.* at 340 (internal citations omitted).

*would be necessary to make the statements in their financial reports fair and accurate, and not misleading.*[3732]

This view is echoed in an SEC enforcement order, concluding that GAAP compliance does not excuse a misleading or less than full disclosure regarding a transaction, especially if the transaction's purpose is "the attainment of a particular financial reporting result."[3733] "[E]ven if the transactions comply with GAAP, the issuer is required to evaluate the material accuracy and completeness of the presentation made by its financial statements."[3734]  Issuers must "ensure that the way they publicly portray themselves discloses, as required, the material elements of [their] economic and business realities and risks."[3735]

---

[3732] *Id.* (citing 17 C.F.R. § 240.10b-5(b) and 17 C.F.R. § 230.408 (requiring that "in addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading") (emphasis added); *see also SEC v. Seghers*, 298 Fed. App'x 319, 331 (5th Cir. 2008) ("The Commission's proof of Segher's misrepresentations and omissions does not depend on compliance with GAAP, but instead depends on evidence that Segher's statements and omissions were false or misleading to investors."); *United States v. Olis*, Civil Action No. H-07-3295, Criminal No. H-03-217-01, 2008 WL 5046342, at *20 (S.D. Tex. Nov. 21, 2008) ("The scheme to defraud alleged and proved in this case did not turn on whether the treatment accorded to Project Alpha in Dynegy's financial statements technically complied with GAAP or whether Olis and his co-conspirators intended to violate GAAP but, instead, on whether the defendants' disclosures about Project Alpha intentionally omitted material facts that caused Dynegy's financial statements to be materially false and misleading.") (citing *United States v. Rigas*, 490 F.3d 208, 221 (2d Cir. 2007), and *United States v. Ebbers*, 458 F.3d 110, 125-26 (2d Cir. 2006)).
[3733] *In re PNC Fin. Servs. Group, Inc.*, 2002 WL 1585523, at *14 (Securities Act Release No. 33-8112, Exchange Act Release No. 34-46225) (July 18, 2002).
[3734] *Id.*
[3735] *Id.*

### (2) Disclosure Requirements and Analysis

Section 13(a) of the Securities Exchange Act of 1934 required Lehman to file periodic reports with the SEC, including its annual reports on Form 10-K and quarterly reports on Form 10-Q.[3736]  Lehman also filed registration statements under the Securities Act with respect to its public offerings of securities in the United States.  Each of these filings required certain disclosures, in each instance subject to the requirement that Lehman provide such "further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."[3737]

A review of Lehman's public filings confirms that Lehman did not disclose its use of Repo 105 transactions, either by name or characterization, in its Forms 10-K or 10-Q.  Moreover, Lehman affirmatively represented that it treated its repo transactions as financing transactions – that is, not as sales – for purposes of financial reporting.  Further, the net leverage ratio Lehman reported was misleading because Lehman did not disclose how it achieved this result.[3738]  Lehman's MD&A statements about its

---

[3736] Section 13(a) is codified at 15 U.S.C. § 78m(a).  It requires the filing of such annual and quarterly reports as the SEC prescribes.  17 C.F.R. 249.310 prescribes the Form 10-K and 17 C.F.R. 249.308a prescribes the Form 10-Q.

[3737] Securities Exchange Act Rule 12b-20, 17 C.F.R. § 240.12b-20; Securities Act Rule 408, 17 C.F.R. § 230.408.

[3738] According to two of Lehman's former Global Financial Controllers and Lehman's former Global Head of Accounting Policy, each of whom was responsible in some fashion for preparing and/or reviewing Lehman's public filings, Lehman did not in any way disclose or report its Repo 105 activity in its Forms 10-K or 10-Q.  Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 15; Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 9; Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 14.  In

liquidity and liabilities (*i.e.*, obligation to repurchase the securities) were also deficient and misleading; in contrast to a borrowing under an ordinary repurchase agreement, the amount borrowed under a Repo 105 was not reflected in Lehman's MD&A statements.[3739]

### (a)  Disclosure Obligations:  Regulation S-K and the MD&A

Item 303 of Regulation S-K, Management's Discussion and Analysis of Financial Condition and Results of Operations (the "MD&A"), requires management to discuss the issuer's financial condition, changes in financial condition, and results of operations. MD&A in each periodic report (Form 10-K/10-Q) must contain the following:[3740]

- MD&A requires not only a "discussion," but also an "analysis" of known material trends, events, demands, commitments, and uncertainties.  The

---

[3739] particular, Martin Kelly, who served as Lehman's Global Financial Controller from December 1, 2007 until September 20008, stated that if an individual read Lehman's Forms 10-K and 10-Q from cover to cover, "they would have no transparency into the Repo 105/108 program."  Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 9.  Kelly himself met regularly with the SEC and the New York Federal Reserve Bank as a matter of course in his role as Global Financial Controller, both before the near collapse of Bears Stearns in March 2008 and after federal regulators arrived on-site at Lehman following Bears Stearns' collapse.  *Id.*  Kelly stated that he personally never disclosed to the regulators the fact that Lehman engaged in Repo 105 transactions.  *Id.*  Grieb, who served as Lehman's Global Financial Controller for several years until November 30, 2007 and then served as Lehman's Director of Investor Relations, similarly said that Lehman did not disclose its Repo 105 practice in its Forms 10-K or 10-Q. Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 14.  Nor did Grieb recall ever discussing Lehman's Repo 105 program, or the fact of its Repo 105 transactions, with any analyst who covered Lehman.  *Id.*

[3739] In an ordinary repurchase agreement, as demonstrated by the accounting entries in Section III.A.4.d.2 of this Report, a liability would have been created reflecting an obligation to repay the borrowing, and securities used as collateral would have remained on the balance sheet in securities inventory.

[3740] 17 C.F.R. § 229.303 (2009).

MD&A should not be merely a restatement of financial statement information in a narrative form.[3741]

- When a description of known material trends, events, demands, commitments, and uncertainties is set forth, companies should consider including, and may be required to include, an analysis explaining the underlying reasons or implications, interrelationships between constituent elements, or the relative significance of those matters.[3742]

As set forth in SEC guidance regarding MD&A, the principal objectives of MD&A are to provide: (1) a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management; (2) context within which financial information should be analyzed; and (3) information about the quality of, and potential variability of, a company's earnings and cash flow so that investors can ascertain the likelihood that past performance is indicative of future performance.[3743]

Regulation S-K – together with SEC guidance – supports the Examiner's conclusion that the trier of fact could find that Lehman had an obligation to disclose certain aspects of its Repo 105 program in the MD&A:

**Liquidity:**

- "Identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way… Also

---

[3741] Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, Exchange Act Release No. 48,960, 81 SEC Docket 2905 (Dec. 19, 2003).

[3742] *Id.*

[3743] *Id.*

identify and separately describe internal and external sources of liquidity…."[3744]

- Identifying the intermediate effects of trends, events, demands, commitments and uncertainties alone, without describing the reasons underlying these effects, may not provide sufficient insight for a reader to see the business through the eyes of management.[3745]

**Capital Resources:**

- "Describe any known material trends, favorable or unfavorable, in the registrant's capital resources.  Indicate any expected material changes in the mix and relative cost of such resources.  The discussion shall consider changes between equity, debt and *any off-balance sheet financing arrangements*."[3746]

**Results of Operations of the MD&A:**

- "Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."[3747]

**Off-balance sheet arrangements:**

- "In a separately-captioned section, discuss the registrant's off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors."[3748]

- The disclosure of off-balance sheet arrangements shall include the following items "to the extent necessary to an understanding of such arrangements and

---

[3744] Item 303(a)(1) of Regulation S-K.

[3745] Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, Exchange Act Release No. 48,960, 81 SEC Docket 2905 (Dec. 19, 2003).

[3746] Item 303(a)(2)(ii) of Regulation S-K (emphasis added).

[3747] Item 303(a)(3) of Regulation S-K.

[3748] Item 303(a)(4)(i) of Regulation S-K.

effect and shall also include such other information that the registrant believes is necessary for such an understanding"[3749]:

○ "The nature and business purpose to the registrant of such off-balance sheet arrangements;"[3750]

○ "The importance to the registrant of such off-balance sheet arrangements in respect of its liquidity, capital resources, market risk support, credit risk support or other benefits;"[3751]

○ "The amounts of revenues, expenses and cash flows of the registrant arising from such arrangements; […]; and the nature and amounts of any other obligations or liabilities (including contingent obligations or liabilities) of the registrant arising from such arrangements that are or are reasonably likely to become material and the triggering events or circumstances that could cause them to arise;"[3752]

○ "Any known event, demand, commitment, trend or uncertainty that will result in or is reasonably likely to result in the termination or material reduction in availability to the registrant, of its off-balance sheet arrangements that provide material benefits to it, and the course of action that the registrant has taken or proposes to take in response to any such circumstances."[3753]

**SEC guidance explains when disclosure is required:**

● Where the reported financial information is NOT indicative of the future – *i.e.,* where additional explanation is required to enhance the indicative value of reported results.[3754]

● To describe unusual events and transactions, demands, commitments, and uncertainties in order to reveal, identify, or further define apparent trends.[3755]

---

[3749] *Id.*

[3750] Item 303(a)(4)(i)(A) of Regulation S-K.

[3751] Item 303(a)(4)(i)(B) of Regulation S-K.

[3752] Item 303(a)(4)(i)(C) of Regulation S-K.

[3753] Item 303(a)(4)(i)(D) of Regulation S-K.

[3754] Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, Exchange Act Release No. 48,960, 81 SEC Docket 2905 (Dec. 19, 2003).

[3755] *Id.*

- If management determines that a trend, demand, commitment, event or uncertainty is reasonably likely to occur, disclosure is required unless management determines that a material effect on the company's financial condition or results of operation is not reasonably likely to occur.[3756]

Disclosure of the agreement to repurchase component of Repo 105 transactions was required in the MD&A. Lehman's repurchase of the securities was a known event that was reasonably likely to occur and would have had a material effect on the company's financial condition or results of operations. Lehman's disclosure in the Liquidity and Capital Resources section should have included a discussion of what was known with respect to the timing and/or amounts of the cash flow created by the repayment of the Repo 105 cash borrowing in the first seven to ten days after quarter-end, specifically: (1) the availability of cash as a result of the repayment of the Repo 105 cash borrowing; (2) the ability to borrow more capital because of a reduction in debt rating or deterioration in leverage ratio due to the repayment of the Repo 105 cash borrowing; (3) the effect of the repayment of the Repo 105 cash borrowing on the cost of capital/credit rating; and (4) the economic substance and business purpose of the Repo 105 arrangements.

### (b) Duty to Disclose

SEC Rule 12b-20 requires that all filings contain such additional information necessary to make the information contained in the filing not misleading. Moreover,

---

[3756] Management's Discussion and Analysis of Financial Condition and Results of Operation; Certain Investment Company Disclosures, Securities Act Release 33-6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,461, 43 SEC Docket 1330 (May 18, 1989).

"Once defendants choose to speak about their company, they undertake a duty to 'speak truthfully and to make such additional disclosures as…necessary to avoid rendering the statements misleading.'"[3757]

### (c) Lehman's Public Filings

An investor reviewing Lehman's 2007 Form 10-K and two 2008 Forms 10-Q would not have been able to discern that Lehman was engaged in Repo 105 transactions.[3758]   Indeed, Lehman made no disclosures in its Statement of Income, Statement of Financial Condition, Statement of Cash Flows, or MD&A sections (including its section on liquidity) from which an investor could infer that Lehman treated a certain volume of repo transactions as sales under SFAS 140, thereby decreasing its net assets and its net leverage ratio.[3759]

---

[3757] *Hall v. The Children's Place*, 580 F. Supp.2d 212, 226 (S.D.N.Y. 2008) (citing *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990); *see also Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp.2d 221, 237 (S.D.N.Y. 2006) (holding that "upon choosing to speak one 'has a duty to be both accurate and complete'") (quoting *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002); *In re Alstom SA Sec. Litig.*,, 406 F. Supp.2d 433, 445 (S.D.N.Y. 2005) ("The Second Circuit has held that 'one circumstance creating a duty to disclose arises when disclosure is necessary to make prior statements not misleading.'") (quoting *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)).

[3758] Former Lehman Global Financial Controllers Grieb and Kelly, as well as the former Lehman Global Head of Accounting Policy, confirmed that Lehman made no disclosures in its Forms 10-K and 10-Q about its Repo 105 practice.  Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 15; Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 9; Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 14.

[3759] As discussed in Section III.A.4.d.2 of this Report, Lehman used incoming cash from Repo 105 transactions to pay down other liabilities, so an investor reading Lehman's publicly-filed statements would not have seen an increase in Lehman's cash holdings.  *See* LBHI 2007 10-K, at p. 86 (reporting that Lehman had $7.286 billion in cash and cash equivalents as of November 30, 2007); LBHI 10-Q (filed Apr. 9, 2008), at p. 5 (reporting that Lehman had $7.564 billion in cash and cash equivalents as of February 29, 2008); LBHI 10-Q (filed July 10, 2008), at p. 5 (reporting that Lehman had $6.513 billion in cash and cash equivalents as of May 31, 2008).  While Lehman's Repo 105 transactions spiked at quarter-ends, Lehman's

### (i) Summary of Lehman's 2000 through 2007 Public Filings

The Examiner reviewed Lehman's Forms 10-K and Forms 10-Q from 2000 through third quarter 2007. Several items are worth noting:

- FASB issued SFAS 140 in September 2000. Lehman's first disclosure regarding SFAS 140 is found in its Form 10-K405 for 2000.[3760] In its Form 10-K405 (Nov. 30, 2000), Lehman explained that SFAS 140 changed the criteria used to evaluate whether a financial asset is controlled and whether a vehicle constitutes a Qualifying Special Purpose Entity ("QSPE").[3761]

- Lehman never disclosed in any of its Forms 10-K and 10-Q from 2000 through third quarter 2007 that it treated some repo transactions as sales pursuant to SFAS 140.[3762] Because Lehman treated Repo 105 transactions as

---

ordinary repo balances dropped off significantly during the same time periods. Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 5.

[3760] Lehman Brothers Holdings Inc., Annual Report for 2000 as of Nov. 30, 2000 (Form 10-K405) (filed on Feb. 28, 2001), at p. 52 ("LBHI 2000 10-K405").

[3761] *Id.*; *see also* Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2002 (Form 10-Q) (filed on July 15, 2002), at p. 7 ("LBHI 10-Q (filed July 15, 2002)").

[3762] *See generally* Lehman Brothers Holdings Inc., Annual Report for 2001 as of Nov. 30, 2001 (Form 10-K405) (filed on Feb. 28, 2002) ("LBHI 2001 10-K405"); Lehman Brothers Holdings Inc., Annual Report for 2002 as of Nov. 30, 2002 (Form 10-K) (filed on Feb. 28, 2003) ("LBHI 2002 10-K"); Lehman Brothers Holdings Inc., Quarterly Report as of Aug. 31, 2003 (Form 10-Q) (filed on Oct. 15, 2003) ("LBHI 10-Q (filed Oct. 15, 2003)"); Lehman Brothers Holdings Inc., Annual Report for 2003 as of Nov. 30, 2003 (Form 10-K) (filed on Feb. 26, 2004) ("LBHI 2003 10-K"); Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 29, 2004 (Form 10-Q) (filed on Apr. 14, 2004) ("LBHI 10-Q (filed Apr. 14, 2004)"); Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2004 (Form 10-Q) (filed on July 14, 2004) ("LBHI 10-Q (filed July 14, 2004)"); Lehman Brothers Holdings Inc., Quarterly Report as of Aug. 31, 2004 (Form 10-Q) (filed on Oct. 15, 2004) ("LBHI 10-Q (filed Oct. 15, 2004)"); Lehman Brothers Holdings Inc., Annual Report for 2004 as of Nov. 30, 2004 (Form 10-K) (filed on Feb. 14, 2005) ("LBHI 2004 10-K"); Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 28, 2005 (Form 10-Q) (filed on Apr. 11, 2005) ("LBHI 10-Q (filed Apr. 11, 2005)"); Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2005 (Form 10-Q) (filed on July 11, 2005) ("LBHI 10-Q (filed July 11, 2005)"); Lehman Brothers Holdings Inc., Quarterly Report as of Aug. 31, 2005 (Form 10-Q) (filed on Oct. 11, 2005) ("LBHI 10-Q (filed Oct. 11, 2005)"); Lehman Brothers Holdings Inc., Annual Report for 2005 as of Nov. 30, 2005 (Form 10-K) (filed on Feb. 13, 2006) ("LBHI 2005 10-K"); Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 28, 2006 (Form 10-Q) (filed on Apr. 10, 2006) ("LBHI 10-Q (filed Apr. 10, 2006)"); Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2006 (Form 10-Q) (filed on July 10, 2006) ("LBHI 10-Q (filed July 10, 2006)"); Lehman Brothers Holdings Inc., Quarterly Report as of Aug. 31, 2006 (Form 10-Q) (filed on Oct. 10, 2006) ("LBHI 10-Q (filed Oct. 10, 2006)"); Lehman Brothers Holdings Inc., Annual Report for 2006 as of Nov. 30, 2006 (Form 10-K)

sales rather than borrowings (as it treated other repo transactions), Lehman did not disclose its liabilities arising from the obligation to repay the cash borrowing.

- Lehman consistently represented that it treated repo transactions as "secured financing" transactions "for financial reporting purposes," without disclosing that it treated some repos as sales.[3763]

- Lehman repeatedly disclosed that SFAS 140 required it to classify in its financial statements certain collateral that Lehman owned, but pledged to its counterparty, as "financial instruments and other inventory owned but pledged as collateral."[3764] One example of collateral that is owned but pledged consists of securities that are transferred in an ordinary repo transaction. Lehman stated that it was required to classify as a separate line item ("Securities Owned Pledged as Collateral") on the balance sheet under "Assets" those securities that were owned by Lehman but pledged to its counterparty if the counterparty had "the right, by contract or custom, to sell or repledge the securities."[3765] Accordingly, securities that Lehman

---

(filed on Feb. 13, 2007) ("LBHI 2006 10-K"); Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2007 (Form 10-Q) (filed on July 10, 2007) ("LBHI 10-Q (filed July 10, 2007)"); Lehman Brothers Holdings Inc., Quarterly Report as of Aug. 31, 2007 (Form 10-Q) (filed on Oct. 10, 2007) ("LBHI 10-Q (filed Oct. 10, 2007)").

[3763] LBHI 2001 10-K405, at p. 67; LBHI 2002 10-K, at p. 69; LBHI 10-Q (filed Oct. 15, 2003), at pp. 10-11; LBHI 2003 10-K, at p. 76; LBHI 10-Q (filed Apr. 14, 2004), at p. 10; LBHI 10-Q (filed July 14, 2004), at p. 11; LBHI 10-Q (filed Oct. 15, 2004), at p. 11; LBHI 2004 10-K, at p. 89; LBHI 10-Q (filed Apr. 11, 2005), at pp. 11-12; LBHI 10-Q (filed July 11, 2005), at pp. 11-12; LBHI 10-Q (filed Oct. 11, 2005), at p. 11; LBHI 2005 10-K, at p. 81; LBHI 10-Q (filed Apr. 10, 2006), at p. 11; LBHI 10-Q (filed July 10, 2006), at p. 12; LBHI 10-Q (filed Oct. 10, 2006), at pp. 11-12; LBHI 2006 10-K, at pp. 85-86; LBHI 10-Q (filed July 10, 2007), at p. 12; LBHI 10-Q (filed Oct. 10, 2007), at p. 12.

[3764] LBHI 2000 10-K405, at p. 2; Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 28, 2001 (Form 10-Q) (filed on Apr. 16, 2001), at p. 26 ("LBHI 10-Q (filed Apr. 16, 2001)"); Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2001 (Form 10-Q) (filed on July 16, 2001), at p. 29 ("LBHI 10-Q (filed July 16, 2001)"); LBHI 2001 10-K405, at p. 57.

[3765] LBHI 2001 10-K405, at p. 66; Lehman Brothers Holdings Inc., Quarterly Report as of Aug. 31, 2002 (Form 10-Q) (filed on Oct. 15, 2002), at p. 17 ("LBHI 10-Q (filed Oct. 15, 2002)"); LBHI 2002 10-K, at p. 91; Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 28, 2003 (Form 10-Q) (filed on Apr. 14, 2003), at pp. 12-13 ("LBHI 10-Q (filed Apr. 14, 2003)"); Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2003 (Form 10-Q) (filed on July 15, 2003), at pp. 14-15 ("LBHI 10-Q (filed July 15, 2003)"); LBHI 10-Q (filed Oct. 15, 2003), at p. 20; LBHI 10-Q (filed Apr. 14, 2004), at p. 16; LBHI 10-Q (filed July 14, 2004), at pp. 16-17; LBHI 10-Q (filed Oct. 15, 2004), at p. 17; LBHI 2004 10-K, at p. 99; LBHI 10-Q (filed Apr. 11, 2005), at p. 19; LBHI 10-Q (filed July 11, 2005), at p. 19; LBHI 10-Q (filed Oct. 11, 2005), at p. 18; LBHI 10-Q (filed Apr. 10, 2006), at p. 21; LBHI 10-Q (filed July 10, 2006), at p. 20; LBHI 10-Q (filed Oct. 10, 2006), at p. 21; LBHI 2006 10-K (filed Nov. 30, 2006), at p. 95.

transferred in ordinary repo transactions where the repo counterparty had the right to sell or repledge the securities should have been included among the assets reported on Lehman's balance sheet under "Securities Owned Pledged as Collateral."

- Because Lehman treated financial instruments transferred and pledged in Repo 105 transactions as "sold," those securities were *not* included in the line item for "Securities Owned Pledged as Collateral."

- Lehman repeatedly disclosed that it obtained short-term financing on a secured basis through the use of repo transactions, which were primarily collateralized by government, agency, and equity securities.[3766]

- In a few of its financial statements, Lehman stated that "The Company accounts for transfers of financial assets in accordance with SFAS 140" and followed this statement with a summary of SFAS 140's three criteria for recognizing the transfer of financial assets as sales.[3767]  In these instances where Lehman made the general disclosure regarding SFAS 140: (1) the SFAS 140 disclosure was listed under "Consolidation Accounting Policies" along with a disclosure regarding Special Purpose Entities or was part of a "Securitization activities" disclosure; (2) Lehman did *not* state that it treated some repo transactions as sales under SFAS 140; *and* (3) the financial statement contained other disclosure(s) stating that Lehman treats repo transactions as secured financings (*i.e.*, not as sales) and/or regarding securities owned and pledged as collateral (as described above).[3768]

---

[3766] *See, e.g.*, LBHI 2000 10-K405, at p. 62; LBHI 2001 10-K405, at pp. 67-68; LBHI 2002 10-K, at p. 69; LBHI 10-Q (filed Oct. 15, 2003), at pp. 10-11;  LBHI 2003 10-K, at p. 76; LBHI 10-Q (filed Apr. 14, 2004), at p. 10; LBHI 10-Q (filed Oct. 15, 2004), at p. 11; LBHI 2004 10-K, at p. 89 (filed Feb. 14, 2005); LBHI 10-Q, at p. 11-12 (filed Apr. 11, 2005); LBHI 10-Q, pp. 11-12 (filed July 11, 2005); LBHI 10-Q, at p. 11 (filed Oct. 11, 2005); LBHI 2005 10-K, at p. 81; LBHI 10-Q, at pp. 11-12 (filed Apr. 10, 2006); LBHI 10-Q, at p. 12 (filed July 10, 2006); LBHI 10-Q, at pp. 11-12 (filed Oct. 10, 2006); LBHI 2006 10-K, at pp. 85-86; LBHI 10-Q, at p. 12 (filed Apr. 9, 2007); LBHI 10-Q, at p. 12 (filed Jul 10, 2007); LBHI 10-Q, at p. 12 (filed Oct. 10, 2007).

[3767] LBHI 10-Q (filed July 15, 2002), at p. 8; *see also id.* at p. 42 (discussing SFAS 140 in the context of securitizations and special purpose entities).

[3768] *See* LBHI 10-Q (filed July 15, 2002), at pp. 8, 14; LBHI 10-Q (filed Oct. 15, 2002), at pp. 9-10, 17; LBHI 2002 10-K, at pp. 69, 71, 91; LBHI 10-Q (filed Oct. 15, 2003), at pp. 10-11, 12-13, 20; Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 28, 2007 (Form 10-Q) (filed on Apr. 9, 2007), at pp. 11-12 ("LBHI 10-Q (filed Apr. 9, 2007)"); LBHI 10-Q (filed July 10, 2007), at pp. 11-12; LBHI 10-Q (filed Oct. 10, 2007), at pp. 11-12.

At no time did Lehman disclose that it recharacterized certain repo transactions as sales or the impact this accounting treatment had on its net balance sheet or leverage ratios.  In addition, although Lehman in its 2006 Form 10-K disclosed that "[t]he overall size of our balance sheet will fluctuate from time to time and, at specific points in time, may be higher than the year-end or quarter-end amounts," and that "[o]ur net assets at quarter-ends were, on average, approximately 5% and 6% lower than amounts based on a monthly average over the four and eight quarters ended November 30, 2006," Lehman removed any such disclosure in its 2007 Form 10-K and first and second quarter 2008 Forms 10-Q, at the very time Lehman escalated its quarter-end Repo 105 usage.[3769]

### (ii)  Lehman's 2007 Form 10-K, First Quarter 2008 Form 10-Q, and Second Quarter 2008 Form 10-Q

Nowhere in Lehman's 2007 Form 10-K or Forms 10-Q for the first and second quarter 2008 did Lehman disclose that it engaged in Repo 105 transactions.  Moreover, Lehman affirmatively misrepresented how it treated repo transactions for financial reporting purposes.  As a result of omitting information regarding its Repo 105 practice, Lehman's statements regarding its net leverage were rendered misleading.  Furthermore, Lehman's omissions, including its lack of disclosures regarding Repo 105 derivatives, precluded a reader of the periodic reports from ascertaining that Lehman used temporary off-balance sheet repo transactions to impact its net leverage.

---

[3769] LBHI 2006 10-K, at p. 51; *see generally* LBHI 2007 10-K; LBHI 10-Q (filed Apr. 9, 2008); LBHI 10-Q (filed July 10, 2008).

### a.  Treatment of Repo Transactions and SFAS 140

In its 2007 Form 10-K, first quarter 2008 Form 10-Q, and second quarter 2008 Form 10-Q, Lehman affirmatively represented that it treated repurchase agreements as financings – not as sales.  In Note 1 to Lehman's Consolidated Financial Statements in each filing, Lehman stated that it treated "[r]epurchase and resale agreements," as "*collateralized agreements and financings for financial reporting purpose*" which Lehman described were "collateralized primarily by government and government agency securities."[3770]  In addition, Lehman further stated in each filing: "Other secured borrowings principally reflect transfers *accounted for as financings* rather than sales under SFAS 140."[3771]

Lehman disclosed that it recognized the transfer of financial assets as sales pursuant to SFAS 140 – but it said so only with respect to "securitization activities."[3772] Securitization activities, however, bear no relation to repo transactions generally, or to

---

[3770] LBHI 2007 10-K, at p. 97; LBHI 10-Q (filed Apr. 9, 2008), at p. 13; LBHI 10-Q (filed July 10, 2008), at p. 16 (emphasis added). This disclosure is under the heading "Collateralized Lending Agreements and Financings."

[3771] LBHI 2007 10-K, at p. 97; LBHI 10-Q (filed Apr. 9, 2008), at p. 13; LBHI 10-Q (filed July 10, 2008), at p. 16 (emphasis added).  In Note 5 to its financial statements, Lehman disclosed that it pledged its own assets to collateralize financing arrangement.  LBHI 2007 10-K, at p. 110.  It further stated that "[t]hese pledged securities, where the counterparty has the right by contract or custom to sell or repledge the financial instruments, were approximately $63 billion…at November 30, 2007…."  *Id.; see also* LBHI 10-Q (filed Apr. 9, 2008), at p. 26 (same); LBHI 10-Q (filed July 10, 2008), at p. 34 (same).  Note 5 refers to a subset of ordinary repo transactions – *not to Repo 105 transactions*, which Lehman treated as sales rather than financing arrangements and did not identify or disclose.

[3772] LBHI 2007 10-K, at p. 96; LBHI 10-Q (filed Apr. 9, 2008), at p. 13; LBHI 10-Q (filed July 10, 2008), at pp. 15-16.  "Securitization activities" is a separate heading in the Note.

Repo 105 transactions specifically.[3773]    Just as Lehman's disclosures dealt with securitization activities and repo transactions separately, SFAS 140 addressed these distinct transactions separately as well.[3774]

Lehman's MD&A for its 2007 Form 10-K and Forms 10-Q for the first and second quarter 2008 were also misleading with respect to Lehman's liabilities, *i.e.*, the obligation to repay the Repo 105 cash borrowing.  Lehman's repayment of the Repo 105 cash borrowing (the "repurchase" of the Repo 105 securities) was a known event that would have a material impact on Lehman's cash flow and liabilities.[3775]

---

[3773] Securitization occurs when a pool of "financial assets such as mortgage loans, automobile loans, trade receivables, credit card receivables, and other revolving charge accounts" is created and then securities representing interests in that pool are sold.  ACCOUNTING FOR TRANSFERS AND SERVICING OF FINANCIAL ASSETS AND EXTINGUISHMENTS OF LIABILITIES, Statement of Financial Accounting Standards No. 140, ¶ 73 (Fin. Accounting Standards Bd. 2000) ("SFAS 140").  The pool is created by transferring the financial assets to a special purpose entity ("SPE").  "An originator of a typical securitization (the transferor) transfers a portfolio of financial assets to an SPE, commonly a trust."  SFAS 140, ¶ 74.  "Beneficial interests in the SPE are sold to investors and the proceeds are used to pay the transferor for the assets transferred."  SFAS 140, ¶ 75.  When the criteria of SFAS 140 are met, a company can remove from its balance sheet the loans, receivables or other assets that it transferred to the special purpose vehicle as the first step in the securitization activity.  In contrast, and as discussed at length at the beginning of this Report, a repo transaction allows a repo borrower to borrow cash from a repo lender in exchange for the transfer of securities.  When the term of the repo matures, the repo borrower repurchases the securities from the repo lender and pays an additional interest rate on the borrowed cash.  *See* SFAS 140, ¶ 96.

[3774] SFAS 140 deals with securitizations in Paragraphs 73 through 84, and with repo agreements in Paragraphs 96 through 101.

[3775] If a Repo 105 transaction technically complied with SFAS 140, SFAS 140 did not require that the cash borrowing be recorded as a liability because the repo transaction was recharacterized as a sale.  However, because Lehman made no disclosures in its periodic reports regarding its accounting treatment for and volume of Repo 105 transactions, sufficient evidence exists for a finding that Lehman's MD&A was deficient because it did not disclose that Lehman had borrowed tens of billions of dollars it was required to repay in the short-term and that repayment of the Repo 105 borrowing would require Lehman to find financing.

### b. Net Leverage

As discussed earlier in the Report, Lehman's MD&A discussion of Capital Ratios stated that a "more meaningful" ratio than "leverage ratio" is "net leverage, which is the result of net assets divided by tangible equity capital."[3776] According to Lehman's MD&A, Lehman "calculates net assets by excluding from total assets: (i) cash and securities segregated and on deposit for regulatory and other purposes; (ii) collateralized lending agreements; and (iii) identifiable intangible assets and goodwill."[3777] Lehman informed the investing public that it viewed "net leverage based on net assets to be a more useful measure of leverage, because it excludes certain low-risk, non-inventory assets and utilizes tangible equity capital as a measure of equity base."[3778]

Lehman's net leverage ratio on November 30, 2007, as reported in its 2007 Form 10-K, was 16.1x.[3779] If Lehman had used ordinary repos instead of its undisclosed Repo 105 transactions for the approximately $38 billion in Repo 105 transactions that Lehman

---

[3776] LBHI 2007 10-K, at p. 63; LBHI 10-Q (filed Apr. 9, 2008), at p. 72; LBHI 10-Q (filed July 10, 2008), at p. 88.
[3777] LBHI 2007 10-K, at p. 63; LBHI 10-Q (Apr. 9, 2008), at p. 72; LBHI 10-Q (July 10, 2008), at p. 88.
[3778] LBHI 2007 10-K, at p. 63; LBHI 10-Q (filed Apr. 9, 2008), at p. 72; LBHI 10-Q (filed July 10, 2008), at p. 88.
[3779] LBHI 2007 10-K, at p. 29.

undertook at the close of its fiscal 2007, Lehman's net leverage at close of fiscal year 2007 would have been 17.8x.[3780]

Lehman's net leverage ratio on February 29, 2008, as reported in its first quarter 2008 Form 10-Q, was 15.4x.[3781] If Lehman had used ordinary repo transactions rather than its undisclosed Repo 105 transactions for the $49.1 billion in Repo 105 transactions that Lehman undertook at the close of the first quarter 2008, Lehman's net leverage at close of its first quarter 2008 would have been 17.3x.[3782]

Lehman's net leverage ratio on May 31, 2008, as reported in its second quarter 2008 Form 10-Q, was 12.06x.[3783] If Lehman had used ordinary repo transactions rather than its undisclosed Repo 105 transactions for the approximately $50.38 billion in Repo 105 transactions that Lehman undertook at the close of the second quarter 2008, Lehman's net leverage at close second quarter 2008 would have been 13.9x.[3784]

### c. Derivatives

As discussed *supra* at Section III.A.4.d.2.d of the Report, when Lehman employed Repo 105 transactions, it established a long inventory derivative asset representing the

---

[3780] *See* Section III.A.4.g.2 of this Report (discussing the impact of Lehman's Repo 105 practice upon its net leverage); Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 8.

[3781] LBHI 10-Q (filed Apr. 9, 2008), at p. 72.

[3782] *See* Section III.A.4.g.2 of this Report (discussing the impact of Lehman's Repo 105 practice upon its net leverage); Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 8.

[3783] LBHI 10-Q (filed July 10, 2008), at p. 89.

[3784] *See* Section III.A.4.g.2 of this Report (discussing the impact of Lehman's Repo 105 practice upon its net leverage); Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 8.

obligation under a forward contract to repurchase the full amount of securities "sold" in a Repo 105 transaction.[3785]   Assuming Lehman borrowed $100 cash in exchange for a pledge of $105 of fixed income collateral, Lehman booked a $5 derivative, which represented Lehman's obligation to repurchase the securities at the end of the term of the repo transaction.[3786]   The $5 reflected the market value of the overcollateralization of the Repo 105 transaction.

A comprehensive review of Lehman's 2007 Form 10-K, first quarter 2008 Form 10-Q, and second quarter 2008 Form 10-Q does not allow a user – even one who knows of the existence of Lehman's Repo 105 practice, including the creation of a derivative –to identify the amount of the Repo 105 borrowing, or the existence of and size of the derivative asset created that would represent Lehman's obligation to repurchase the securities.[3787]

---

[3785] Lehman Brothers Holdings Inc., Accounting Policy Manual Repo 105 and Repo 108, at p. 2 [LBEX-DOCID 3213293].

[3786] *Id.*

[3787] Lehman's former Global Financial Controller, Martin Kelly, advised the Examiner that the "risk" of a Repo 105 transaction was represented in the derivatives created by these transactions, which were aggregated with other derivatives.  Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 13.  Kelly stated that "risk reporting was just an aggregate – you could *not* have known about Repo 105 from risk disclosures."  *Id.*  Lehman's 2007 10-K MD&A discussion of Off-Balance Sheet Arrangements included a disclosure of the notional amount of off-balance sheet arrangements including derivative contracts.  LBHI 2007 10-K, at p. 66.  A footnote to the table included in this MD&A discussion states that the fair value of Lehman's derivative contracts as of November 30, 2007, was $38.6 billion.  *Id.* at p. 67.  No mention (by name or description) or break out of Repo 105 derivatives is included.  The 2007 10-K MD&A's risk management discussion also references derivatives, breaking out the fair value of OTC derivatives by maturity.  *Id.* at p. 72.  Lehman stated that the fair value of its OTC derivative assets at November 30, 2007 was $41.3 billion.  *Id.*  Again, there is no mention or break out of Repo 105 derivatives.  The volume of Repo 105 derivative assets (roughly $4 billion) would presumably feed into the $313.129 billion line item "Financial Instruments and Other Positions Owned" on Lehman's Consolidated Statement of Financial

Condition as of November 30, 2007, but again, no mention or break out of Repo 105 is given. *Id.* at p. 86. Note 1 to the financial statements discusses "Derivative Financial Instruments" without mention or break out of Repo 105 derivatives. *Id.* at p. 95. Note 3 regarding "Financial Instruments and Other Inventory Positions" provides detail on the single line item from the balance sheet, mentioned above. It states that $44.595 billion of the $313.129 billion line item is comprised of derivatives and other contractual agreements. LBHI 2007 10-K, at p. 103. No break out or disclosure of the Repo 105 derivative exists. Later in the same Note, Lehman broke out individual derivative segments in a table on "Fair Value of Derivatives and Other Contractual Agreements." *Id.* at p. 106. Again, there is no disclosure regarding Repo 105 derivatives. Note 4 to the financial statements breaks out the fair value of derivatives according to FAS 157 level. *Id.* at p. 107. Lehman stated that its total derivative assets at fair value as of November 30, 2007 was $44.595 billion. *Id.* Repo 105 derivatives are not identified or broken out. Derivatives are mentioned in Note 8 solely as interest rate liability tools. *See id.* at 116 ("End-User Derivative Activities"). Note 9 on "Commitments, Contingencies and Guarantees" discusses derivative contracts that are guarantees and duplicates the table from the MD&A's discussion of Off-Balance Sheet Arrangements (discussed above and at LBHI 2007 10-K, p. 67). *Id.* at p. 120. The notional amount of derivatives is broken out by year and discussed in the context of guarantor accounting of those derivatives considered to be guarantees. *Id.* The Note contains no mention or break out of Repo 105 derivatives. Lehman's quarterly reports similarly failed to disclose any information regarding the Repo 105 derivative. *See* LBHI 10-Q (filed Apr. 9, 2008), at p. 5 (balance sheet line item "Financial instruments and other inventory positions owned" was $326.569 billion and contains no mention or break out of Repo 105 derivatives); *id.* at p. 12 (Note 1's discussion of "Derivative financial instruments" makes no reference to Repo 105 derivatives); *id.* at p. 19 ( Note 3's discussion of "Financial Instruments and Other Inventory Positions" contains derivatives and other contractual agreements line item of $55.612 billion, but no break out or mention of Repo 105 derivative); *id.* at p. 21 (Note 3 table "Fair Value of Derivatives and Other Contractual Agreements" breaks out some derivative segments but makes no mention of Repo 105 derivative); *id.* at p. 31 (Note 8 on "Commitments, Contingencies and Guarantees" discusses derivative contracts that are guarantees with no mention of Repo 105 derivatives); LBHI 10-Q (filed Apr. 9, 2008), at p. 75 (MD&A Off-Balance-Sheet Arrangements contains disclosure of the notional amount of off-balance sheet arrangements including derivative contracts, but no break out or mention of Repo 105 derivatives); *id.* at p. 80 (discussion of derivatives, breaking out the fair value of OTC derivatives by maturity, but no break-out or mention of Repo 105 derivatives); *see also* LBHI 10-Q (filed July 10, 2008), at p. 5 (balance sheet line item "Financial instruments and other inventory position owned" was $269.409 billion and contains no mention or break out of Repo 105 derivatives); *id.* at p. 12 (Note 1's discussion of "Derivative financial instruments" makes no reference to Repo 105 derivatives); *id.* at p. 24 (Note 3's discussion of "Financial Instruments and Other Inventory Positions" contains derivatives and other contractual agreements line item of $46.991 billion, but no break out or mention of Repo 105 derivative); *id.* at p. 26 (Note 3 table "Fair Value of Derivatives and Other Contractual Agreements" breaks out some derivative segments but makes no mention of Repo 105 derivative); *id.* at p. 40 (Note 8 on "Commitments, Contingencies and Guarantees" discusses derivative contracts that are guarantees with no mention of Repo 105 derivatives); LBHI 10-Q (filed July 10, 2008), at p. 91 (MD&A Off-Balance-Sheet Arrangements contains disclosure of the notional amount of off-balance sheet arrangements including derivative contracts, but no break out or mention of Repo 105 derivatives); *id.* at p. 97 (discussion of derivatives, breaking out the fair value of OTC derivatives by maturity, but no break-out or mention of Repo 105 derivatives).

### d. A Reader of Lehman's Forms 10-K and 10-Q Would Not Have Been Able to Ascertain That Lehman Engaged in Temporary Sales Using Liquid Securities

In addition, even a sophisticated reader of Lehman's financial statements would not have been able to ascertain from Lehman's 2007 Form 10-K or its first and second quarter 2008 Forms 10-Q the amount of Lehman's Repo 105 usage, nor even ascertain the fact that Lehman was engaged in these transactions, by attempting to quantify the amount of liquid securities temporarily removed from the balance sheet, as reported in Lehman's public financial statements.

- Note 3 of Lehman's financial statements provided a break out of the "Financial Instruments and Other Inventory Positions" balance sheet line item.[3788] Note 3 presented Lehman's long and short inventory using very high-level, generalized descriptions of security type.[3789] The securities inventory that Lehman "sold" through Repo 105 transactions were excluded from the aggregate numbers in the financials, and Lehman's Forms 10-K and 10-Q contained no textual disclosures about the exclusions (or the subsequent obligation to repurchase the temporarily "sold" assets). Even if a user of the financials was aware of the existence of Repo 105 transactions, the user would be unable to deduce the size of the Repo 105 program or the securities being used. Since Repo 105 transactions were done on a continual basis and were indistinguishable from ordinary asset sales for the purposes of financial presentation, and since maturities of Repo 105 were staggered, *i.e.*, one week, two week, multi-month or multi-quarter, it would have been impossible to disaggregate the fluctuations in assets without being privy to additional information that is not presented in the financial statements.

- Further, a reader of Lehman's Forms 10-K and 10-Q would have had no idea that Lehman was selling highly liquid securities in Repo 105 transactions on

---

[3788] LBHI 2007 10-K, at p. 103; LBHI 10-Q (filed Apr. 9, 2008), at p. 19; LBHI 10-Q (filed July 10, 2008), at p. 24.

[3789] LBHI 2007 10-K, at p. 103; LBHI 10-Q (filed Apr. 9, 2008), at p. 19; LBHI 10-Q (filed July 10, 2008), at p. 24.

a temporary basis. The categories of asset classes were very broad, and the disclosures are snapshots of quarter-end only, which do not allow the user to determine balances of securities moving on or off balance sheet on an intra-quarter basis. Additionally, to the extent that the reader could see various security balances increasing or decreasing, *i.e.*, that Lehman sold liquid securities, the reader would not know the sales were temporary from the information provided.

- Moreover, sophisticated readers of financial statements – the professional analysts who covered Lehman – asked Lehman officers during earnings calls what Lehman was selling in order to ascertain what types of assets Lehman was moving in its efforts to deleverage.[3790] Former CFO Erin Callan informed analysts that Lehman was selling illiquid positions to deleverage.[3791]

### (d) Conclusions Regarding Lehman's Failure to Disclose

**SEC Filings.** As discussed above, Section 13(a) of the Securities Exchange Act of 1934 required Lehman to file periodic reports with the SEC, including its annual report on Form 10-K and quarterly reports on Form 10-Q. Those filings must contain the information required by the SEC's Rules and Interpretations, including the MD&A requirement discussed above. In addition, SEC Rule 12b-20 requires that all filings contain such additional information necessary to make the information contained in the filing not misleading. There is sufficient evidence to support a determination by the trier of fact that Lehman's filings were deficient and misleading. In the wake of the Enron scandal, at the request of four major accounting firms, the SEC provided additional guidance with respect to the duty to provide meaningful discussion of a company's financial statements. Among other things, SEC guidance from 2002 stated:

---

[3790] *See* Section III.A.4.e.6.a of this Report (discussing analyst statements).
[3791] *Id.*

The Commission has long recognized the need for a narrative explanation of the financial statements, because numerical presentations and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company.

And, as we said in 1989, '[t]he MD&A requirements are intended to provide in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future.'[3792]

Lehman made no disclosure with respect to its use of Repo 105 transactions. Lehman had a duty to disclose this information because the omission rendered several statements misleading.

Lehman's MD&A stated that the firm considered the net leverage ratio to be a more meaningful measurement of leverage than other calculations. When Lehman embarked on an aggressive deleveraging campaign, it announced improvements to this net leverage ratio to shareholders on its periodic reports, as well as press releases, particularly during the run-up to an equity raise. The point of these announcements was to indicate to current and potentially new shareholders that Lehman was financially healthy and a good investment.

---

[3792] Statement About Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act No. 8056, Exchange Act No. 45,321, 67 Fed. Reg. 3746 (Jan. 22, 2002).

Sufficient evidence exists to support a finding by the trier of fact that as a result of failing to disclose its use of and accounting treatment for Repo 105 transactions, Lehman misled readers of its Forms 10-K and 10-Q about its financial condition. Typically, seven or ten days after executing Repo 105 transactions, Lehman had to repay the Repo 105 cash borrowing (*i.e.*, repurchase the assets). In order to repay the cash borrowing (plus an interest rate) shortly after the reporting period, Lehman had to obtain financing. The obligation to repay the cash borrowing (repurchase the assets) was not reflected in Lehman's periodic reports. As a result, Lehman's statements in its MD&A regarding liquidity were rendered misleading. This is exactly the kind of information the SEC has expressly required:

> Disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations. Accordingly, the development of MD&A disclosure should begin with management's identification and evaluation of what information, including the potential effects of known trends, commitments, events, and uncertainties, is important to providing investors and others and accurate understanding of the company's current and prospective financial position and operating results.[3793]

For the reasons outlined above, sufficient evidence exists from which a finder of fact could conclude that the picture Lehman painted of its financial position in late 2007 and into 2008 was materially misleading because Lehman failed to inform investors and the market that it managed its balance sheet by accounting for a large volume of repo transactions as true sales on the basis of an English opinion letter. Lehman employed

---

[3793] *Id.*

temporary accounting-motivated transactions, *i.e.* Repo 105 transactions, and then failed to disclose them in order to publicly report a reverse-engineered net leverage ratio in its periodic reports. Consequently, Lehman's statement that the net leverage ratio was a "more meaningful" measurement of leverage was rendered misleading because that ratio – as reported by Lehman – was not an accurate indicator of Lehman's actual leverage, and in fact, understated Lehman's leverage significantly. In light of the market's focus on the leverage of investment banks in late 2007 and 2008, sufficient evidence exists from which a trier of fact could conclude that Lehman's reported net leverage ratio was materially misleading during that period.

In addition, Lehman was required by law to disclose, in its MD&A, off-balance sheet arrangements "that have or are reasonably likely to have a current or future effect on the registrant's financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors."[3794] Lehman made no such disclosure in the MD&A of its use of Repo 105 transactions even though the use of these off-balance sheet arrangements impacted Lehman's financial reporting by lowering its net leverage ratio by almost two entire points, thereby improving its credit rating, and its liquidity by requiring Lehman to finance the cost of repurchasing all the assets when the repo transaction matured.

---

[3794] Item 303(a)(4)(i) of Regulation S-K.

Moreover, Lehman made affirmative misstatements about its practice for recording repo transactions on its financial statements. Lehman stated in its publicly-filed financial statements that "securities sold under agreements to repurchase are collateralized primarily by government and government agency securities" and are "treated as collateralized agreements and financings for financial reporting purposes."[3795]

**Earnings Calls.** In its earnings calls from late 2007 through mid 2008, Lehman spoke extensively about the size of its firm-wide balance sheet, balance sheet management, and a firm-wide deliberate, aggressive effort to deleverage. Though Callan stated during the first quarter 2008 earnings call that Lehman was being "transparent" with its management of the balance sheet, at no time did Lehman disclose to analysts that it used Repo 105 transactions, either by name or characterization, to manage its balance sheet – even though Lehman transferred approximately $50 billion in inventory temporarily off its balance sheet at quarter-end in the first quarter of 2008 through the use of Repo 105 transactions. As Lehman continued to boast of its deleveraging success during earnings calls in the second quarter of 2008, neither Callan nor Lowitt disclosed that Lehman managed its balance sheet and leverage, in part, through Repo 105 transactions, which were only temporary.

---

[3795] LBHI 2007 10-K, at p. 97; LBHI 10-Q (filed Apr. 9, 2008), at p. 13; LBHI 10-Q (filed July 10, 2008), at p. 16. This disclosure is under the heading "Collateralized Lending Agreements and Financings."

### (3) Colorable Claims

The Examiner finds that sufficient evidence exists to support the finding of colorable claims against Richard Fuld, Christopher O'Meara, Erin Callan, and Ian Lowitt in connection with their actions in causing or allowing Lehman to file periodic reports that did not disclose Lehman's use of Repo 105 transactions and against Ernst & Young for its failure to meet professional standards in connection with that lack of disclosure.

After reaching the tentative conclusion that claims existed against Fuld, O'Meara, Callan, Lowitt, and Ernst & Young, the Examiner reached out to counsel for each, advised them of the basis for the potential finding, and invited each of them to present any additional facts or materials that might bear on the final conclusion. All counsel accepted the Examiner's offer. In the weeks leading up to the submission of this Report, the Examiner had individual, face to face meetings with counsel for Fuld, O'Meara, Callan, Lowitt, and Ernst & Young, and carefully considered the materials raised by each. While there were credible facts and arguments presented by each that may form the basis for a successful defense, the Examiner concluded that these possible defenses do not change the now final conclusion that there is sufficient evidence to support a finding that claims of breach of fiduciary duty exist against Fuld, O'Meara, Callan, and

Lowitt and a colorable claim of professional malpractice exists against Ernst & Young.[3796]

### (4) Fiduciary Duty Claims

#### (a) Breach of Fiduciary Duty Claims Against Board of Directors

With the exception of Richard Fuld, there is not sufficient evidence to support colorable claims of breach of fiduciary duty against Lehman directors arising from Lehman's use of Repo 105 transactions or the firm's failure to adequately disclose these transactions and the transactions' impact on Lehman's financial position in its publicly filed financial statements.

First, Lehman directors were protected by Lehman's certificate of incorporation from breach of duty of care claims:

> A director shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director; provided that this sentence shall not eliminate or limit the liability of a director (i) for any breach of his duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the [Delaware General Corporation Law], or (iv)

---

[3796] Prior to this invitation and during Schlich's four-day interview as an Ernst & Young representative, the Examiner invited Ernst & Young to opine on why Repo 105 transactions were proper and did not result in Lehman filing materially misleading financial statements. Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at p. 14. Schlich replied that the transactions were proper if they complied with Lehman's self-defined Accounting Policy. *Id.* Despite an additional invitation from the Examiner, Ernst & Young has not offered any further explanation.

for any transaction from which the director derives an improper personal benefit.[3797]

Courts will uphold such a clause as protecting directors from liability so long as there is not a concurrent violation of the duty of loyalty, which was not implicated here.[3798]

Second, Lehman's directors were not informed about the existence of Lehman's Repo 105 program. No director had even heard of Repo 105 transactions, either by name or description.

### (b) Breach of Fiduciary Duty Claims Against Specific Lehman Officers

There is sufficient evidence to support a colorable claim that certain Lehman officers – Richard Fuld, Chris O'Meara, Erin Callan, and Ian Lowitt – breached their fiduciary duties by engaging in one or more of the following: (1) allowing and certifying the filing of financial statements that omitted or misrepresented material information regarding Lehman's use of Repo 105 transactions and their accounting treatment, thus exposing the firm to potential liability; and/or (2) failing to disclose to Lehman Directors information about the firm's Repo 105 program.

As a threshold matter, the business judgment rule is a standard of judicial review requiring a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the

---

[3797] Lehman Brothers Holdings, Inc., Certificate of Incorporation, at § 10.1, Limitation of Liability of Directors.

[3798] *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006) ("Such a provision can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty.").

action taken was in the best interests of the company."[3799]   Thus, "a court will not substitute its judgment for that of the board if the latter's decision can be attributed to any rational business purpose."[3800]   The business judgment rule presumption may be surmounted when the "decision was the product of an irrational process or . . . directors failed to establish an information and reporting system reasonably designed to provide the senior management and the board with information regarding the corporation's legal compliance and business performance, resulting in liability."[3801]   Moreover, the business judgment rule does not protect a director or officer from personal liability for inaction unless the failure to act resulted from a conscious decision to take no action.[3802]

The business judgment rule does not protect director's or officer's decisions made in bad faith.[3803]   "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than advancing the best interests of

---

[3799] *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (internal quotation omitted)..

[3800] *Id.* (internal quotation omitted).

[3801] *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005).

[3802] *In re Dwight's Piano, Co.*, No. 1:04-CV-066, 2009 WL 2913942, at *18 (Bankr. S.D. Ohio Sept. 9, 2009) (applying Delaware law) ("The 'business judgment rule' does not apply to director inaction. The appropriate standard for determining liability for director inaction is generally gross negligence.") (internal citations omitted); *see also See McMullin v. Beran*, 765 A.2d 910, 922 (Del. 2000) ("The business judgment rule is rebutted if the plaintiff shows that the directors failed to exercise due care in informing themselves before making their decision."); *see also Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985), *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695, 713 (Del. 2009); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).

[3803] *See Unocal*, 493 A.2d at 954.

the corporation . . . or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[3804]

Sufficient evidence exists to support a finding by the trier of fact that Fuld, O'Meara, Callan, and Lowitt are not entitled to the business judgment rule presumption with respect to Lehman's use of Repo 105 transactions because they: (1) were at least grossly negligent in causing Lehman to file deficient and misleading periodic reports that failed to disclose the firm's use of Repo 105 transactions, thus exposing Lehman to potential liability; or (2) withheld from the Board, which relies upon the accurate transmission of information, material information regarding Lehman's Repo 105 program, thereby depriving the Board of the opportunity to make well-informed decisions about Lehman's leverage and deceiving the Board of Directors regarding Lehman's financial statements.  Either one of these factors alone is sufficient to overcome the business judgment rule presumption.[3805]

*In re American Int'l Group, Inc.* ("*In re AIG*") is instructive.  There, the court held that shareholders stated a claim for breach of duty of loyalty and failure to monitor by AIG's top managers, including its Chairman/CEO and his "inner circle," for allowing AIG to file materially misleading financial statements that overstated the value of the

---

[3804] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

[3805] *See Brehm*, 746 A.2d at 264 n.66 ("[D]ecisions will be respected by courts unless the directors have a conflicting interests or lack independence with respect to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose, or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available.").

corporation by billions of dollars and made AIG appear more secure than it really was.[3806]   The single largest deception involved an elaborate $500 million sham transaction "staged to make AIG's balance sheet look better."[3807]   Though the plaintiffs could not allege with great specificity the precise involvement of each of the defendants for each of the schemes and deceptions, the complaint detailed the sham transaction and other schemes with such specificity that the court was unwilling to infer that AIG engaged in risky and innovative transactions of such magnitude without the involvement or knowledge of the Chairman/CEO and his inner circle.[3808]   Specifically, the court rejected the notion that the disputed products "came to market through the spontaneous, unsupervised actions of lower-level AIG actors."[3809]

One defendant in particular, who possessed knowledge that the sole purpose of the $500 million sham transaction was to dress up the company's balance sheet, tried to escape liability for fraud by imputing his knowledge onto the corporation.   The court rejected this argument, stating:

> [U]nder Delaware law, where officers and directors have disabling conflicts that give them an interest in hiding information from a corporation's independent directors and stockholders, the conflicted fiduciaries' knowledge is not imputed to the corporation for purposes of holding those fiduciaries liable for the harm they caused to the corporation.   In colloquial terms, *a fraud on the board has long been a fiduciary violation under our law* and typically involves the failure of

---

[3806] *In re American Int'l Group, Inc.* ("*In re AIG*"), 965 A.2d 763, 774-75 (Del. Ch. 2009).

[3807] *Id.* at 775.

[3808] *See id.* at 795-99.

[3809] *Id.* at 797.

insiders to come clean to the independent directors about their own wrongdoing, the wrongdoing of other insiders, or information that the insiders fear will be used by the independent directors to take actions contrary to the insiders' wishes. ***Delaware law provides no safe harbor to high-level fiduciaries who group together to defraud the board.*** The Stockholder Plaintiffs have alleged that Tizzio and the other AIG insiders who participated in the Gen Re Transaction [the "sham" transaction] ***violated their fiduciary duties by causing AIG to engage in illegal conduct***. If true, that was bad faith conduct that gave Tizzio and the other guilty insiders an interest in hiding what they had done.[3810]

*In re AIG* illustrates how fiduciaries that cause their company to engage in illegal conduct breach their duty of loyalty and good faith to the company, and as a result acquire a motive to breach their duty of candor to the board by intentionally failing to disclose information relating to their wrongdoing.[3811]

The Examiner finds that sufficient evidence exists to support a colorable claim that each of the following officers breached his or her fiduciary duties to Lehman and/or its Board of Directors:

### (i) Richard Fuld

Having been advised by Bart McDade in June 2008 that the firm relied on Repo 105 transactions to manage the balance sheet, and that McDade believed Lehman should curtail and eventually cease its use of Repo 105 transactions, Fuld took no action to determine whether Lehman's use of Repo 105 transactions materially impacted its publicly filed financial statements and related disclosures. There is sufficient credible

---

[3810] *Id.* at 806-7 (emphasis added).
[3811] *Cf. In re AIG*, 965 A.2d at 795 ("[T]hose who engage in sophisticated forms of financial fraud do their best not to leave an obvious paper trail. Rather, consistent with their improper objectives, those at the top of such schemes try to conceal their roles and not leave marked paths leading to their doorsteps.").

evidence to support a determination that Fuld's failure to make a deliberate decision about Lehman's disclosure obligations was grossly negligent or demonstrated a conscious disregard of his duties.[3812]

### a. There Is Sufficient Evidence to Support a Finding By the Trier of Fact That Fuld Was at Least Grossly Negligent in Causing Lehman to File Misleading Periodic Reports

The duty of care requires that (1) directors and officers inform themselves, prior to making a business decision, of "all material information reasonably available to them" and (2) directors and officers "act with requisite care in the discharge of their duties."[3813]   A claim that an officer acted with gross negligence is the same as a claim that he breached his duty of care.[3814]

---

[3812] Pursuant to Section 302 of the Sarbanes-Oxley Act, the SEC adopted Rules 13a-14 and 15d-14, promulgated under the Securities Exchange Act of 1934, requiring the principal executive and financial officers to certify, among other things, that "[b]ased on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading" and that "[b]ased on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in the report." *See* Pub. L. No. 107-204 § 302, 116 Stat. 777 (codified at 15 U.S.C. § 7241 (2006)); Certification of Disclosure in Companies' Quarterly and Annual Reports, Exchange Act Release No. 33-8124, 67 Fed. Reg. 57,276, 57,277 (Aug. 28, 2002). A "fair presentation of an issuer's financial condition, results of operations and cash flows" requires the "disclosure of financial information that is informative and reasonably reflects the underlying transactions and events *and the inclusion of any additional disclosure necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition*, results of operations and cash flows." *Id.* at 57,279 (emphasis added).

[3813] *Aronson*, 473 A.2d at 812, *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).

[3814] *Albert v. Alex Brown Mgmt. Servs. Inc.*, C.A. Nos. 04C-05-250 PLA, 04C-05-251 PLA, 2004 WL 2050527, at *6 (Del. Super. Sept. 15, 2004); *see also Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985), *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695, 713 (Del. 2009).

Lehman's exculpatory charter shielded directors, but not officers, from liability for good faith breaches of the duty of care.[3815]  Although Fuld served Lehman as both an officer and a director, Lehman's exculpatory charter for directors does not shield him from liability for breach of the duty of care with respect to his duties as an officer.[3816]

There is sufficient evidence to support a determination that by no later than March 28, 2008 – twelve days before signing Lehman's first quarter Form 10-Q – Fuld knew or should have known that Lehman's quarter-end Repo 105 transactions for first quarter 2008 reduced Lehman's net balance sheet by $49.1 billion.[3817]  Fuld met regularly, at least twice a week, with Gregory and members of the Executive Committee to discuss the state of the firm.  On March 28, 2008, McDade requested a special meeting of the Executive Committee to discuss Lehman's Repo 105 program and other balance

[3815] See Lehman Brothers Holdings, Inc., Certificate of Incorporation, at § 10.1, Limitation of Liability of Directors; see also DEL. CODE ANN. tit. 8, § 102(b)(7) (2009); Stone v. Ritter, 911 A.2d 362, 367 (Del. 2006) ("Such a provision can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty.").

[3816] See Arnold v. Society for Savings Bancorp. Inc., 650 A.2d 1270, 1288 (Del. 1994) (stating that officers who are also directors are protected by the exculpatory charter for their actions as directors only and that where a defendant is a director and officer, only those actions taken solely in the defendant's capacity as an officer are outside the purview of Section 102(b)(7)) (citing R. Franklin Balotti & Jesse A. Finkelstein, Delaware Law of Corp. & Business Org. § 4.19, at 4-335 (Supp.1992)).

[3817] Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008), at p. 1 [LBEX-DOCID 506399] (attached to e-mail from Angela Judd, Assistant to Richard S. Fuld, Jr., Lehman, to Scott Friedheim, et al. Lehman (Mar. 28, 2008) [LBEX-DOCID 561761] and containing Firm Balance Sheet Details with Repo 105 column showing total quarter-end usage of $49.102 billion); see also Lehman Brothers, Executive Committee Meeting Material, Agenda (Mar. 28, 2008) [LBEX-DOCID 545869] (attached to e-mail from Angela Judd, Assistant to Richard S. Fuld, Jr., Lehman, to Scott J. Freidheim, et al. Lehman (Mar. 28, 2008) [LBEX-DOCID 561761] and containing topics for discussion line-item "Repo 105/108"); e-mail from Jennifer Fitzgibbon, Lehman, to Leonard Sciutella, et al. Lehman (Mar. 28, 2008) [LBEX-DOCID 1854825] (transmitting copy of Balance Sheet and Cash Capital Update (Mar. 27, 2008) [LBEX-DOCID 1698670] and stating "please [see] attached balance sheet presentation discussed in today's executive committee meeting").

sheet reduction issues, and to request Gregory's blessing in freezing Lehman's Repo 105 usage.[3818]   Although Fuld may not have attended the meeting because he was on one or more telephone calls, both Fuld and his assistants received the meeting materials.[3819] The materials also were forwarded by Fuld's assistant to other Lehman executives.[3820] The meeting materials included a presentation that referenced Lehman's $49.1 billion quarter-end Repo 105 usage for first quarter 2008.[3821]

In light of Fuld's receipt of the presentation, the fact that Fuld regularly communicated with other Executive Committee members including Gregory, Fuld's admitted focus on balance sheet and net leverage reduction in 2008, and the significance that McDade placed on the need to impose discipline on Lehman's Repo 105 program, there is sufficient evidence to support a colorable claim that Fuld knew or should have known before signing Lehman's first quarter Form 10-Q that Lehman had reduced its

---

[3818] *See* Section III.A.4.e.2.a of this Report.

[3819] Herbert H. (Bart) McDade III, Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008) [LBEX-DOCID 095961] (attached to e-mail from Patricia Lombardi, Assistant to Herbert H. (Bart) McDade III, Lehman, to Lehman Brothers Executive Committee Members, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 120929]); Lehman, Executive Committee Meeting Material, Agenda (Mar. 28, 2008) [LBEX-DOCID 115827] (attached to e-mail from Patricia Lombardi, Assistant to Herbert H. (Bart) McDade III, Lehman, to Lehman Brothers Executive Committee Members, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 120929]).

[3820] E-mail from Angela Judd, Assistant to Richard S. Fuld, Jr., Lehman, to Scott J. Freidheim, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 561761].

[3821] Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008), at p. 1 [LBEX-DOCID 506399] (attached to e-mail from Angela Judd, Assistant to Richard S. Fuld, Jr., Lehman, to Scott J. Freidheim, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 561761], containing Firm Balance Sheet Details with Repo 105 column showing total usage of $49.102 billion and break-out for Repo 105 usage by business group); Lehman, Executive Committee Meeting Material, Agenda (Mar. 28, 2008) [LBEX-DOCID 545869] (attached to e-mail from Angela Judd, Assistant to Richard S. Fuld, Jr., Lehman, to Scott J. Freidheim, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 561761], listing topics for discussion at Executive Committee meeting, including "Repo 105/108" and "Delever v Derisk").

net balance sheet by $49.1 billion using Repo 105 transactions. Such a finding could support a claim of gross negligence against Fuld for failing to ensure that Lehman's first quarter 2008 Form 10-Q fairly presented its financial condition, thereby exposing Lehman to potential liability.

In addition, sufficient evidence exists to support a finding that in June 2008, only weeks before he signed Lehman's second quarter Form 10-Q, Fuld had actual knowledge of Lehman's quarter-end Repo 105 usage for that quarter. McDade recalled having specific discussions with Fuld in June 2008 about Lehman's Repo 105 usage and McDade's plan to reduce the firm's use of Repo 105 transactions by half in the third quarter 2008.[3822] McDade walked Fuld through a report of Lehman's quarter-end Repo 105 usage – $38.6 billion at year-end 2007; $49.1 billion at first quarter 2008; and $50.38 billion at second quarter 2008.[3823] The Examiner reproduces below one page from the document McDade walked Fuld through in mid-June 2008.[3824]

---

[3822] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 4 ("[I]n quarter three, I certainly talked to Fuld about Repo 105.").

[3823] *Id*. at p. 5; *see also* Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets (Draft) (June 16, 2008), at p. 3 [LBHI_SEC07940_641516].

[3824] Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets (Jun. 19, 2008), at p. 3 [LBEX-DOCID 2932594].

## Other Targets

*in $ Billions*

**Repo 105**

| | Q4'07 | Q1'08 | Q2'08 | Q3'08 Target |
|---|---|---|---|---|
| FID Core | $29.7 | $42.0 | $44.4 | $21.0 |
| Equities Core | $1.5 | $1.1 | $1.4 | $1.0 |
| Prime Services | $7.4 | $6.0 | $4.5 | $3.0 |
| **Total** | **$38.6** | **$49.1** | **$50.3** | **$25.0** |

**Level III**

| | Q4'07 | Q1'08 | Q2'08 | Q3'08 Target |
|---|---|---|---|---|
| Level III Net | $38.9 | $40.2 | $37.8 | $36.0 |

**Other Targets**

| | Q3'08 Target |
|---|---|
| **Month End Intra Quarter Balance Sheet** | |
| Gross Balance Sheet | $815 |
| Net Balance Sheet | $420 |
| **Muni TOB Inventory** | $3 |

LEHMAN BROTHERS 3

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY LEHMAN BROTHERS HOLDINGS INC.                    LBEX-DOCID 2932594

McDade recalled that when he advised Fuld that Lehman should reduce its Repo 105 usage to $25 billion, "Fuld understood that this would put pressure on traders."[3825] McDade also recalled that "Fuld knew about the accounting of Repo 105."[3826]   Fuld's Repo 105 discussions with McDade took place only weeks before Lehman filed its second quarter 2008 Form 10-Q on July 10, 2008.   Fuld denied any recollection of conversations with McDade or other members of Lehman's Executive Committee

---

[3825] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. at 6
[3826] *Id.*

regarding Repo 105.[3827]  A finder of fact will have to further evaluate Fuld's statements in light of other evidence of his knowledge of Repo 105 and his interest in reducing Lehman's net leverage.

Accordingly, there is sufficient evidence to support a colorable claim that Fuld was at least grossly negligent for failing to ensure Lehman's second quarter 2008 Form 10-Q fairly presented Lehman's financial condition and for allowing Lehman to file financial statements that misrepresented Lehman's accounting treatment for repo transactions.

### (ii)  Chris O'Meara

There is credible evidence that, as CFO from December 2004 until December 1, 2007, O'Meara actively managed Lehman's Repo 105 program.  Although O'Meara professed limited knowledge of and involvement with Lehman's Repo 105 program, contemporaneous documents show that:

- O'Meara was involved in establishing firm-wide limits on Repo 105 activity no later than mid-2006 and through December 1, 2007.[3828]

- An increase in the Repo 105 cap required O'Meara's authorization.[3829] O'Meara was involved with and the evidence shows he approved an increase of the cap, from $22 billion to $25 billion in February 2007.[3830]

---

[3827] Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 8.

[3828] Lehman, Global Balance Sheet, Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 2 [LBEX-WGM 754587] (stating that Grieb and O'Meara set cap on total Repo 105 and Repo 108 usage); Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 8 (stating that Grieb, Reilly and O'Meara shared responsibilities in setting limits through December 2007).

- O'Meara regularly discussed Repo 105 limits and Lehman's reliance on Repo 105 with Grieb and Reilly, including in mid-to-late 2007 at approximately the same time that Lehman began to ramp-up its use of Repo 105 transactions.[3831]

- O'Meara was instrumental in creating the "80/20" or "continual use" and "120%" rules that, according to Grieb, were intended to ensure Repo 105 transactions were not undertaken solely at quarter-end.[3832] Based upon documents and witness statements, sufficient credible evidence exists from which a reasonable inference could be drawn that there was no legitimate business purpose for the "80% rule" other than to mask Lehman's Repo 105 practice.

- As CFO until December 2007, O'Meara worked with other members of Lehman's Finance Committee to set balance sheet targets and net leverage ratio targets.[3833] During several Board meeting in 2007, O'Meara discussed Lehman's net leverage ratio.[3834] O'Meara also was involved in balance sheet tightening efforts in FID.[3835]

---

[3829] Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 8 (stating that Grieb was not empowered to authorize FID to exceed its Repo 105 limit and that an excession or change in limit required consensus among O'Meara and Reilly). Grieb reported directly to O'Meara.

[3830] *See* e-mail from Joseph Gentile, Lehman, to Michael Gelband, Lehman, *et al.* (Feb. 21, 2007) [LBEX-DOCID 4553218] ("I have been able to get a temp limit of 3 bn for repo 105 activity, which covers known real estate issues. . . ."); e-mail from Joseph Gentile, Lehman, to Gerard Reilly, Lehman (Feb. 21, 2007) [LBEX-DOCID 4553220] (responding to question "Where did the 3bn come from?" by writing: "We spoke with grieb…and he was ok with a temporary excession of $3. . . ."); e-mail from Michael McGarvey, Lehman, to Anuraj Bismal, Lehman, *et al.* (May 9, 2007) [LBEX-DOCID 3223356] ("17 bn was the year end limit for FID. In Q1 Joe Gentile spoke to Ed Grieb about raising it to 20bn (based on the attached doc) and according to Joe Ed agreed."). Grieb recalled generally that in 2007 "as a result of discussions with O'Meara and Reilly, we raised the limit." Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 12. Grieb further stated that he did not have the authority to change the limit alone and that an increase or change to the limit required consensus among O'Meara and Reilly. *Id.*

[3831] *Id.* at pp. 10, 12.

[3832] Lehman, Global Balance Sheet Overview of Repo 105 (FID)/108 (Equities) (July 2006), at p. 2 [LBEX-WGM 748489]; Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 13; Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 13.

[3833] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 7; Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 5; Examiner's Interview of Tejal Joshi, Sept. 15, 2009, at p. 5; Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 5; Examiner's Interview of Kaushik Amin, Sept. 17, 2009, at p. 5; Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 11; Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 9; Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 5.

[3834] *See, e.g.*, Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 11, 2007), at p. 3 [LBHI_SEC07940_026364]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors

- O'Meara's involvement with Lehman's balance sheet targets continued in 2008, while he was CRO.[3836]

- O'Meara understood that the motivation for, and a consequence of, undertaking Repo 105 transactions was balance sheet reduction, particularly at quarter-end.[3837] For example, on a regular basis between April 2008 and September 2008 while he was CRO, O'Meara received the daily balance sheet scorecard, wherein the consolidated balance sheet routinely tracked the reduction to Lehman's balance sheet caused by Repo 105.[3838]

---

(Oct. 15, 2007), at p. 3 [LBHI_SEC07940_026407]; Lehman Brothers Holdings Inc., Minutes of Meeting of the Board of Directors (Nov. 8, 2007), at p. 4 [LBHI_SEC07940_026650].

[3835] *See* e-mail from Kentaro Umezaki, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 18, 2007) [LBEX-DOCID 187618]; e-mail from Kentaro Umezaki, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 19, 2007) [LBEX-DOCID 318475]; e-mail from Ian T. Lowitt, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Sept. 7, 2007) [LBEX-DOCID 1357178]; Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 6 (discussing O'Meara's criticism of Gentile if FID breached its balance sheet limit); e-mail from Christopher M. O'Meara, Lehman, to Gerard Reilly, Lehman (Nov. 20, 2007) [LBEX-DOCID 578184] (stating "we should be pressuring everywhere to try to end year in good way on balance sheet . . . especially since the rev's are not materializing").

[3836] *See* e-mail from Jackson Tam, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (May 29, 2008) [LBEX-DOCID 079846] (transmitting Lehman, May 2008 Balance Sheet Projection (May 28, 2008) [LBEX-DOCID 019912]).

[3837] *See* e-mail from Ryan Traversari, Lehman, to Christopher M. O'Meara, Lehman (May 16, 2008) [LBEX-DOCID 3233899] (stating that Lehman's balance sheet is larger intra-month than at month-end because of Repo 105 transactions). Moreover, Grieb, who reported directly to O'Meara and said that he was not authorized to make decisions about Repo 105 limits without O'Meara's approval, informed Joseph Gentile of Lehman's FID that Repo 105 was "a tool that could be used to reduce Lehman's net balance sheet" when FID was in breach of its balance sheet limit. *See* Examiner's Interview of Joseph Gentile, Oct. 21, 2009, at p. 6. Given that O'Meara established the Repo 105 cap, authorized increases in Repo 105 volumes, established the continual use rule, and communicated regularly with Grieb and Reilly who were deeply involved in Lehman's Repo 105 program and acknowledged its primary purpose was balance sheet reduction, sufficient evidence exists from which a trier of fact could make a finding that O'Meara also was aware of the motive for undertaking Repo 105 transactions.

[3838] *See, e.g.*, Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 7, 2008 (Apr. 9, 2008), at p. 9 [LBEX-DOCID 520619] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 9, 2008) [LBEX-DOCID 523578] and showing consolidated FID and Equities balance sheet reduced by $18.527 billion and Prime Services balance sheet reduced by $4.458 billion through Repo 105 transactions as of April 7, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 8, 2008 (Apr. 10, 2008), at p. 9 [LBEX-DOCID 520620] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 10, 2008) [LBEX-DOCID 523579] and showing consolidated FID and Equities balance sheet reduced by $18.853 billion and Prime Services balance sheet reduced by $4.562 billion through Repo 105 transactions as of April 8, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 9, 2008 (Apr. 10, 2008), at p. 9 [LBEX-DOCID 251339] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 10, 2008) [LBEX-

- O'Meara understood that Reilly and others within Lehman viewed Repo 105 as a temporary means of dealing with "sticky" inventory.[3839]   When Reilly

---

DOCID 258560] and showing consolidated FID and Equities balance sheet reduced by $19.688 billion and Prime Services balance sheet reduced by $4.548 through Repo 105 transactions as of April 9, 2008); Balance Sheet and Disclosure Scorecard for Trade Date April 10, 2008 (Apr. 14, 2008), at p. 9 [LBEX-DOCID 251342] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 275231] and showing consolidated FID and Equities balance sheet reduced by $19.967 billion and Prime Services balance sheet reduced by $4.491 billion through Repo 105 transactions as of April 10, 2008); Balance Sheet and Disclosure Scorecard for Trade Date April 11, 2008 (Apr. 14, 2008), at p. 9 [LBEX-DOCID 251344] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 258562] and showing consolidated FID and Equities balance sheet reduced by $20.260 billion and Prime Services balance sheet reduced by $4.517 billion through Repo 105 transactions as of April 11, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 12, 2008 (May 13, 2008), at p. 1 [LBEX-LL 1950262] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (May 13, 2008) [LBEX-DOCID 3187357] and stating "Rates decreased by $(5.0B) from prior day due to . . . increased Repo 105 usage . . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 22, 2008 (May 27, 2008), at p. 1 [LBEX-LL 1950706] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (May 27, 2008) [LBEX-DOCID 275984] and stating "Global rates net balance sheet decreased ($2.0B), predominantly due to an increase in Repo 105 benefit . . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 28, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950670] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (May 30, 2008) [LBEX-DOCID 275995] and stating "Global rates net balance sheet decreased by ($3.1B) primarily due to a decrease in Americas driven by an increased utilization of Repo 105 within the Agency business"); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 29, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950658] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (June 2, 2008) [LBEX-DOCID 011127] and stating "Global Rates net balance sheet decreased ($6.5B) . . . [t]he decrease in Europe is coming from increased utilization of Repo 105"); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date June 18, 2008 (June 20, 2008) [LBEX-LL 1950514] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (June 20, 2008) [LBEX-DOCID 275942] and stating that "Global rates net balance sheet decreased...driven by a[n]...increase in Repo 105 utilization . . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 13, 2008 (Aug. 14, 2008) [LBEX-LL 782812] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 14, 2008) [LBEX-DOCID 4214810] and stating that "Global rates net balance sheet decreased . . . driven by an increase in Repo 105 benefit . . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 25, 2008 (Aug. 26, 2008) [LBEX-LL 782924] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 26, 2008) [LBEX-DOCID 079536] and stating that "Global Rates net balance sheet decreased . . . driven by an increase in repo 105 usage  . . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 28, 2008 (Aug. 29, 2008) [LBEX-LL 782966] (attached to e-mail from Tal Litvin, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 29, 2008) [LBEX-DOCID 275880] and stating that "Global rates [net balance sheet] was down . . . driven by increased Repo 105 benefit . . . .").

[3839] *See* e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman (Aug. 19, 2007) [LBEX-DOCID 4553354] (forwarding to Christopher M. O'Meara e-mail chain discussions from John Feraca, Reilly, and David Sherr regarding possibility of placing mortgage-backed securities into the Repo 105 program); e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 20, 2007)

and others attempted to move "sticky" inventory into the Repo 105 program, they informed O'Meara and requested his opinion.[3840]

- By no later than June 17, 2008, O'Meara knew that the actual volumes of firm-wide Repo 105 for the fourth quarter 2007, first quarter 2008, and second quarter 2008 were $38.6 billion, $49.1 billion and $50.38 billion, respectively.[3841] Lehman filed its second quarter 2008 Form 10-Q, signed by Fuld and Lowitt, on July 10, 2008, less than four weeks later.

- O'Meara had knowledge of the proposed firm-wide $25 billion Repo 105 cap for third quarter 2008.[3842]

- O'Meara was involved in re-establishing and/or extending credit lines with Repo 105 counterparties.[3843]

(same); *see also* e-mail from John Feraca, Lehman, to Gerard Reilly, Lehman (Aug. 18, 2007) [LBEX-DOCID 4553350] (discussing possibility of moving either CMBS or RMBS into Repo 105); e-mail from Gerard Reilly, Lehman, to John Feraca, Lehman (Aug. 18, 2007) [LBEX-DOCID 4553351] ("Many benefits to us getting these assets [CMBS and RMBS] into the [Repo 105] program."); e-mail from John Feraca, Lehman, to David Sherr, Lehman, *et al.* (Aug. 19, 2007) [LBEX-DOCID 4553352] ("[W]e are looking at the possibility of Repo 105 for AAA RMBS and CMBS positions . . . only want to focus on non-agency products for this exercise as both agency pass-thrus and agency CMOs roll up as government or agency products in the balance sheet, not mortgages."); e-mail from David Sherr, Lehman, to John Feraca, Lehman, *et al.* (Aug. 19, 2007) [LBEX-DOCID 4553353] (same); e-mail from Gerard Reilly, Lehman, to John Feraca, Lehman, *et al.* (Aug. 19, 2007) [LBEX-DOCID 4553356] (same); e-mail from John Feraca, Lehman, to David Sherr, Lehman, *et al.* (Aug. 20, 2007) [LBEX-DOCID 4553357] ("We spoke to the 3 of the 4 counterparties we currently use for Repo 105 on UST and Agencies via LBIE (the MTS equivalent) and all 3 declined our proposal to use AAA private label RMBS and CMBS . . . our only other choice will be to look if any of our existing counterparties in LBI would be willing to transact through LBIE.").

[3840] *See* note 993, *supra*; *see also* e-mail from Kentaro Umezaki, Lehman, to John Feraca, Lehman, *et al.* (Aug. 20, 2007) [LBEX-DOCID 4553359] (Umezaki replies to Feraca, "not sure that is worth the effort . . . we need Chris [O'Meara] to opine.").

[3841] Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets [Draft] (June 16, 2008), at p. 3 [LBEX-DOCID 012458] (attached to e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (June 17, 2008) [LBEX-DOCID 011380]); e-mail from Christopher M. O'Meara, Lehman, to Gerard Reilly, Lehman, *et al.* (June 17, 2008) [LBEX-DOCID 033813].

[3842] Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets [Draft] (June 16, 2008), at p. 3 [LBEX-DOCID 012458] (attached to e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (June 17, 2008) [LBEX-DOCID 011380]).

[3843] *See* e-mail from Matthew Pinnock, Lehman, to Paolo R. Tonucci, Lehman (May 21, 2008) [LBEX-DOCID 1548431] (asking for authorization from O'Meara for Repo 105 increase with Mizuho); e-mail from Paolo R. Tonucci, Lehman, to Matthew Pinnock, Lehman (May 21, 2008) [LBEX-DOCID 1548433] (same); e-mail from Paolo R. Tonucci, Lehman, to Christopher M. O'Meara, Lehman (May 21, 2008) [LBEX-DOCID 1533687] (same); e-mail from Christopher M. O'Meara, Lehman, to Paolo R. Tonucci,

Moreover, net leverage reduction was an issue of importance during O'Meara's tenure as CFO. O'Meara reported to the Finance and Risk Committee on Lehman's net leverage ratio.[3844] In a November 2007 e-mail, O'Meara wrote: "I realize we're in a tough spot given mkt, but we should be pressuring everywhere to try to end year in good way on balance sheet . . . especially since the rev's are not materializing."[3845]

### a. There Is Sufficient Evidence To Support a Colorable Claim That O'Meara Was at Least Grossly Negligent in Allowing Lehman to File Misleading Financial Statements and Engage in Material Volumes of Repo 105 Transactions

The Examiner finds there is sufficient evidence to support a colorable claim that O'Meara breached his fiduciary duties by permitting the expansion of Lehman's Repo 105 practice while the program and its impact on Lehman's reported net leverage ratio remained undisclosed in the firm's publicly reported financial statements. Although O'Meara was no longer Lehman's CFO when the firm filed its 2007 Form 10-K on January 29, 2008, the Examiner concludes that there is sufficient evidence to support a finding that O'Meara continued to have culpable knowledge and involvement in

Lehman (May 21, 2008) [LBEX-DOCID 1533688] (same); *see also* e-mail from Christopher M. O'Meara, Lehman, to Gerard Reilly, Lehman (Apr. 11, 2008) [LBEX-DOCID 4553298] (setting up meeting to discuss Lehman's Repo 105 program); e-mail from Christopher M. O'Meara, Lehman, to Gerard Reilly, Lehman , *et al.* (June 17, 2008) [LBEX-DOCID 033813].

[3844] Lehman, Risk, Liquidity, Capital and Balance Sheet Update Presentation to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at pp. 2, 30 [WGM_LBEX_02247] (with Welikson's Handwritten Notes); Lehman Brothers Holdings Inc., Finance and Risk Committee Minutes (Sept. 11, 2007), at pp. 2-3 [LBEX-AM 067018]; *see also* Lehman, Presentation on Risk, Liquidity, Capital and Balance Sheet Update to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at p. 50 [LBEX-AM 067167].

[3845] E-mail from Christopher M. O'Meara, Lehman, to Gerard, Reilly, Lehman (Nov. 20, 2007) [LBEX-DOCID 578184].

Lehman's Repo 105 practice in late 2007 and early 2008 as well as involvement in the preparation of Lehman's 2007 Form 10-K.[3846]

As CFO through December 1, 2007 and the highest ranking officer overseeing Lehman's Repo 105 program, O'Meara had a duty to: (1) monitor Lehman's use of Repo 105 transactions and (2) ensure Lehman filed accurate and complete Forms 10-K and 10-Q.

O'Meara and Grieb established an internal limit of $22 billion for firm-wide Repo 105 transactions, which they increased to $25 billion in February 2007. The limit was not required under accounting rules, and appears to have been a decision on their part to keep Lehman's Repo 105 activity within a range they deemed immaterial.

In late 2007 and early 2008, the volume of Lehman's undisclosed Repo 105 transactions was material. Under O'Meara's watch, the volume of Repo 105

---

[3846] Though Erin M. Callan took over the role of CFO in December 2007, O'Meara continued to be involved in the drafting sessions for Lehman's 2007 Form 10-K. E-mail from Joy Fernandez, Lehman, to Erin M. Callan, Lehman (Nov. 5, 2007) [LBEX-DOCID 2974570] (stating that Chris O'Meara was scheduled to attend January 14, 2008 meeting to review LBHI 2007 10-K along with Erin M. Callan, Edward Grieb, Steve Rossi, and Ryan Traversari). Moreover, the Examiner has located evidence suggesting that O'Meara sub-certified the 2007 10-K for Callan and was responsible for certain financial reporting in Lehman's Form 10-Q for first quarter 2008.. *See* Lehman Brothers Holdings Inc., Reporting Instructions, Quarter Ended February 29, 2008 (Feb. 22, 2008), at p. 5 [LBEX-DOCID 3756724] (stating that O'Meara was the certifier for the Review of Risk Management narrative for accuracy of MD&A discussions of credit risk, market risk, operational risk, reputational risk, value at risk, other measures of risk and distribution of trading revenues); e-mail from Martin Kelly, Lehman, to Ian T. Lowitt, Lehman (July 8, 2009) [LBEX-DOCID 2329856] ("[W]ould you like to have Erin sign a sub-certification letter (not necessary strictly speaking but we did have Chris sub-certify to Erin at year end."); e-mail from Martin Kelly, Lehman, to Erin M. Callan, Lehman (July 9, 2008) [LBEX-DOCID 1536331] (asking Callan "if I could have you sub-certify on the quarter[ly report since] (Chris [O'Meara] sub-certified to you at year end)"); e-mail from Ian T. Lowitt, Lehman, to Martin Kelly, Lehman (July 9, 2008) [LBEX-DOCID 2329856] ("I spoke to Tom [Russo about sub-certification] and he thinks better if didn't come from him and better to present as consistent with what Chris did when Erin overlapped.").

transactions rose to $38 billion at the close of Lehman's fourth quarter 2007 – $13 billion (and more than 50%) over the last known "limit" of $25 billion. The expansion of Lehman's Repo 105 activity was due primarily to "a lack of policing" and it was "not an issue for management."[3847] The volume of Lehman's Repo 105 usage was known to senior management, but because FID needed more Repo 105 to make balance sheet targets, "there was no stoppage."[3848]

In light of O'Meara's knowledge of the volume of Lehman's Repo 105 transactions, his involvement in setting internal management rules for Repo 105 usage, and his awareness of the purpose of Repo 105 transactions, sufficient evidence exists to support a colorable claim that O'Meara was at least grossly negligent in permitting Lehman to file a materially misleading 2007 Form 10-K.

> **b. There Is Sufficient Evidence To Support a Colorable Claim That O'Meara Breached His Fiduciary Duties by Failing to Inform the Board and His Superiors of Lehman's Repo 105 Practice**

The Examiner also finds that sufficient evidence exists to support a colorable claim that, as CRO from December 1, 2007 through September 2008, O'Meara breached his fiduciary duties to the Board of Directors and his superiors, including the CEO and CFO who were responsible for certifying Lehman's financial statements, by failing to report material information within the scope of his agency.

---

[3847] Examiner's Interview of John Feraca, Oct. 9, 2009, at p. 11.

[3848] *Id.* Ed Grieb also recalled reading reports on the firm-wide volume of Repo 105 transactions on at least a monthly basis. Examiner's Interview of Edward Grieb, Oct. 2, 2009, at p. 12.

O'Meara had a duty to inform his superiors of material information regarding Lehman's Repo 105 usage. Officers and key managerial personnel of Lehman are agents of the corporation that employs them.[3849] Principles of agency law squarely hold that an agent has a duty of candor or a duty to disclose relevant information to his principal.[3850]

Commentators agree that officers have an obligation to "inform the superior officer to whom, or the board of directors . . . to which, the officer reports of information about the affairs of the corporation known to the officer, within the scope of the officer's

---

[3849] *See Science Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980). In *Science Accessories Corp*, the Delaware Supreme Court held that the "principles and limitations of agency law carry over into the field of corporate employment so as to apply not only to officers and directors, but also key management personnel." *Id.* "[U]nder elemental principles of agency law, an agent owes his principal a duty of good faith, loyalty and fair dealing. Encompassed within such general duties of an agent is a duty to disclose information that is relevant to the affairs of the agency entrusted to him." *Id.* The imposition of these duties reflects the courts' "concern for the integrity of the employment relationship, which has led courts to establish a rule that demands of a corporate officer or employee undivided and unselfish loyalty to the corporation." *Id.* (quoting *Md. Metals, Inc. v. Metzner*, 382 A.2d 564, 568 (Md. 1978); *see also Cahall v. Lofland*, 114 A. 224, 228 (Del. Ch. 1921) (stating that under "well-established and familiar rules of equity," a director of a corporation "is not accountable to the stockholder for withholding information" about the value of the stock, but to the corporation) (quoting *Du Pont v. Du Pont*, 242 F. 98, 136 (D.C. Del. 1917)). The Delaware Supreme Court has characterized these employee-agent obligations as fiduciary duties. *Science Accessories Corp*, 425 A.2d at 965 (former employees' failure to disclose off-duty development of competing business "was not, without more, a violation of their fiduciary duty of loyalty"); *see also Lewis v. Vogelstein*, 699 A.2d 327, 334 (Del. Ch. 1997) (describing agent's duties to principal as "fiduciary in character").

[3850] *See* RESTATEMENT (THIRD) AGENCY § 8.11 ("An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows…or should know…the principal would wish to have…or…are material to the agent's duties to the principal."); RESTATEMENT (SECOND) AGENCY § 381 ("[A]n agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agency has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person.").

functions, and known to the officer to be material to such superior officer, board or committee."[3851]

There is sufficient evidence to support a finding that in 2008, as he assisted other Lehman officers with the firm's balance sheet reduction efforts, O'Meara had knowledge of the mechanics and magnitude of Lehman's Repo 105 practice. O'Meara received a copy of McDade's March 28, 2008 balance sheet reduction presentation to the Executive Committee, which included a reference to Lehman's quarter-end Repo 105 usage for first quarter 2008.[3852] After he became President in June 2008, McDade brought O'Meara "back in the [balance sheet] process" to help in light of O'Meara's past experience as Lehman CFO.[3853] In June 2008, O'Meara met with McDade and others to discuss the Balance Sheet and Key Disclosures document, which reported the firm-wide quarter-end Repo 105 usage.[3854]

---

[3851] ABA Comm'n on Corporate Laws, Changes in the Model Business Corporations Act, 60 BUS. LAW. 943, 951 (2005); *see also* Shannon German, What They Don't Know Can't Hurt Them: Corporate Officers' Duty of Candor to Directors, 34 DEL. J. CORP. L. 221, 223 (2009) ("Extending the duty of candor to impose on corporate officers a duty to provide information to the board of directors would give the corporation a way to seek redress for harm caused by misconduct within the corporation of which the board was not aware."); Z. Jill Barclift, Senior Corporate Officers and the Duty of Candor: Do the CEO and CFO Have a Duty to Inform?, 41 VAL. U. L. REV. 269, 270 (2006) ("The broadening of the definition of the duty to inform that senior officers owe directors to include an underlying affirmative duty to provide information, even when director or shareholder action is not requested, offers an opportunity for greater monitoring of corporate governance by focusing on those often most culpable.").

[3852] Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008) [LBEX-DOCID 197391] (attached to e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman (Mar. 28, 2008) [LBEX-DOCID 214211]).

[3853] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 8.

[3854] Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets [Draft] (June 16, 2008), at p. 3 [LBEX-DOCID 3363493] (attached to e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (June 17, 2008) [LBEX-DOCID 3383643]); e-mail from Christopher M. O'Meara, Lehman, to Herbert H.

To form a basis for a fiduciary's personal liability for breaching the duty of candor to his principal, the undisclosed or misrepresented facts must be material to the principal's decisions or responsibilities.[3855]   While materiality for purposes of information to shareholders is determined under the "total mix of information" standard, the Delaware Supreme Court has adopted a *lower* standard of materiality with respect to management's disclosure of information to the board.[3856]  Information must be disclosed if it is "relevant" to the board and of sufficient "magnitude" to be important.[3857]  Similarly, under agency law principles, an agent breaches his duty of care to the principal when he fails to provide information to the principal that may be material to the principal's decision-making, such as by enabling the principal to: (1) reconsider a course of action or make alternate arrangements; (2) take action to avoid harm to third parties; or (3) take action to protect the principal's interests.[3858]

When an agent has an ongoing relationship with his principal and the relationship involves more than the execution of specific orders, the duty to inform the

---

(Bart) McDade III, Lehman, *et al.* (June 17, 2008) [LBEX-DOCID 033813] (replying to receipt of Balance Sheet and Key Disclosures 2008 3Q Targets [Draft] (June 16, 2008) and stating that "meeting is being set up to discuss" the document); e-mail from Gerard Reilly, Lehman, to Ian T. Lowitt, Lehman, *et al.* (June 19, 2008) [LBEX-DOCID 2962369] (transmitting updated version of Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets (June 19, 2008) [LBEX-DOCID 2932594] and indicating that a meeting among Reilly, Lowitt, O'Meara, McDade and Patrick Whalen took place).

[3855] *See* RESTATEMENT (THIRD) OF AGENCY § 8.11, cmt. d.

[3856] *See Brehm v. Eisner*, 746 A.2d 244, 260 n. 49 (Del. 2000).

[3857] *Id.* at n.49 ("The term 'material' is used in this context to mean relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decision-making.").

[3858] *See* RESTATEMENT (THIRD) OF AGENCY § 8.11 cmts. b-d.

principal is wide in scope.[3859]   Thus, although O'Meara was primarily responsible for risk management in 2008, he also had involvement in Lehman's balance sheet reduction efforts and continued to have a duty to report to his principal(s) material information of which he was aware.   "If an agent fails to provide information to the principal that is material to decisions that the principal will make, the agent may not have acted with the due diligence and care reasonably to be expected of an agent in a particular position."[3860]

Given O'Meara's extensive prior involvement in the Repo 105 program and his continued access to information regarding Lehman's use of Repo 105 transactions, O'Meara understood the impact of the transactions on Lehman's balance sheet and the purpose for engaging in these transactions, was aware of FID's difficulties in making balance sheet targets, and knew of the volumes at which FID engaged in Repo 105 transactions.   Under agency law principles, O'Meara had a duty to report this information to any of his superiors responsible for Lehman's publicly filed financial statements, including the Board of Directors, CEO and CFO.

### (iii) Erin Callan

Callan became Lehman's CFO on December 1, 2007.   As early as January 2008, Callan received e-mails from Reilly, Lehman's Global Product Controller, and others

---

[3859] *See* RESTATEMENT (THIRD) OF AGENCY § 8.11 cmt. c.
[3860] RESTATEMENT (THIRD) OF AGENCY § 8.11 cmt. d.

regarding Lehman's Repo 105 program and its relation to balance sheet management.[3861] One e-mail that was forwarded to Callan indicated that Lehman's Fixed Income Division had recommended that the Repo 105 program be expanded.[3862]

During meetings in early 2008, Callan was warned by Lehman's Global Financial Controller, Martin Kelly, that:

- The large size of the Repo 105 program presented "headline risk;"

- Because Lehman did not disclose Repo 105 transactions in its publicly filed statements, Lehman exposed itself to "reputational risk" if its use of Repo 105 were to become public;

- Repo 105 transactions lacked economic substance, and were used to reduce net balance sheet primarily at quarter-end; and

- Kelly and other Lehman employees believed that none of Lehman's peer investment banks used Repo 105-type transactions.[3863]

In addition to the red flags raised by Kelly, Callan was put on further notice of potential risks or problems with Lehman's Repo 105 program during the March 28, 2008 Executive Committee meeting in which McDade recommended to the Executive Committee that Lehman cap its Repo 105 usage.[3864]  Callan received the materials the night before the meeting, which listed the $49.1 billion in Repo 105 transactions that

[3861] E-mail from Gerard Reilly, Lehman, to Erin M. Callan, Lehman (Jan. 3, 2008) [LBEX-DOCID 3383445].
[3862] E-mail from Gerard Reilly, Lehman, to Erin M. Callan, Lehman (Feb. 1, 2008) [LBEX-DOCID 3383459] (transmitting Lehman, FID – Balance Sheet (Jan. 17, 2008) [LBEX-DOCID 3363222]).
[3863] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 8.
[3864] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 4.

Lehman had undertaken at the end of the first quarter 2008.[3865]  McDade discussed with Executive Committee members on March 28, 2008, Lehman's use of Repo 105 transactions and recommended to the Executive Committee during the meeting that Lehman limit its firm-wide Repo 105 usage to a certain dollar amount.[3866]  On April 9, 2008, twelve days after McDade's presentation to the Executive Committee, Callan signed Lehman's quarterly report.[3867]

Starting in April 2008, Callan received the Daily Balance Sheet and Disclosure Scorecard, through which she was informed on a regular basis of the impact of Repo 105 transactions on Lehman's firm-wide balance sheet.[3868]

---

[3865] Herbert H. (Bart) McDade III, Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008), at p. 1 [LBEX-DOCID 095966] (attached to e-mail from Gerard Reilly, Lehman, to Erin M. Callan, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 124422] and indicating that the attachment is for the Executive Committee meeting); *see also* Herbert H. (Bart) McDade III, Lehman Brothers, Executive Committee Meeting Material, Agenda (Mar. 28, 2008) [LBEX-DOCID 115827] (attached to e-mail from Patricia Lombardi, Assistant to Herbert H. (Bart) McDade III, to Lehman Executive Committee Members (Mar. 28, 2008) [LBEX-DOCID 120929] and listing among seven topics of discussion for March 28, 2008 Executive Committee meeting "Repo 105/108" and "Delever v Derisk").  Callan was a member of the Executive Committee.

[3866] *Id.* at pp. 3-4.

[3867] LBHI, 10-Q (filed Apr. 9, 2008), at p. 92.

[3868] *See, e.g.*, Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 7, 2008 (Apr. 9, 2008), at p. 9 [LBEX-DOCID 520619] (attached to e-mail from Tal Litvin, Lehman, to Erin M. Callan, Lehman, *et al.* (Apr. 9, 2008) [LBEX-DOCID 523578] and showing consolidated FID and Equities balance sheet reduced by $18.527 billion and Prime Services balance sheet reduced by $4.458 billion through Repo 105 transactions); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 10, 2008 (Apr. 14, 2008), at p. 9 [LBEX-DOCID 251342] (attached to e-mail from Tal Litvin, Lehman, to Erin M. Callan, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 275231] and showing consolidated FID and Equities balance sheet reduced by $19.967 billion and Prime Services balance sheet reduced by $4.491 billion through Repo 105 transactions); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 11, 2008 (Apr. 14, 2008), at p. 9 [LBEX-DOCID 251344] (attached to e-mail from Tal Litvin, Lehman, to Erin M. Callan, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 258562] and showing consolidated FID and Equities balance sheet reduced by $20.260 billion and Prime Services balance sheet reduced by $4.517 billion through Repo 105 transactions); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 12, 2008 (May 13, 2008), at p. 1 [LBEX-LL 1950262] (attached to e-mail from Tal Litvin, Lehman, to Erin M. Callan, Lehman,

Callan thus had ample red flags to alert her to potential problems arising from Lehman's Repo 105 program before she signed Lehman's first quarter Form 10-Q. Callan ignored these red flags even though she trusted the judgment of Kelly and hand-picked him to serve as Lehman's Global Financial Controller. Callan did not report to her superiors or the Board of Directors Kelly's discomfort with Lehman's Repo 105 program or the risks that non-disclosure in Lehman's publicly filed statements entailed.[3869]

Callan told the Examiner that following her meetings with Kelly in early 2008, Kelly's concerns likely fell by the wayside because of other more pressing issues following Bear Stearns' near collapse.[3870] Lehman's Repo 105 program was "not high" on Callan's "list" so she did not spend "any meaningful amount of time" on it.[3871] While

---

et al. (May 13, 2008) [LBEX-DOCID 3187357] and stating "Rates decreased by $(5.0B) from prior day due to . . . increased Repo 105 usage. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 22, 2008 (May 27, 2008), at p. 1 [LBEX-LL 1950706] (attached to e-mail from Tal Litvin, Lehman, to Erin M. Callan, Lehman, et al. (May 27, 2008) [LBEX-DOCID 275984] and stating "Global rates net balance sheet decreased ($2.0B), predominantly due to an increase in Repo 105 benefit. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 28, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950670] (attached to e-mail from Tal Litvin, Lehman, to Erin M. Callan, Lehman, et al. (May 30, 2008) [LBEX-DOCID 275995] and stating "Global rates net balance sheet decreased by ($3.1B) primarily due to a decrease in Americas driven by an increased utilization of Repo 105 within the Agency business"); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 29, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950658] (attached to e-mail from Tal Litvin, Lehman, to Erin M. Callan, Lehman, et al. (June 2, 2008) [LBEX-DOCID 011127] and stating "Global Rates net balance sheet decreased ($6.5B)…[t]he decrease in Europe is coming from increased utilization of Repo 105").

[3869] Callan told the Examiner that she did not discuss Repo 105 with Fuld, McDade, Gregory, Tonucci, the Executive Committee, or Ernst & Young. Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at pp. 18-19.

[3870] Id. at p. 17.

[3871] Id.

a trier of fact could accept that explanation, Callan's failure to act, which did not result from a reasoned decision, is not protected by the business judgment rule.[3872]

> **a. There Is Sufficient Evidence To Support a Finding By the Trier of Fact That Callan Breached Her Fiduciary Duties by Causing Lehman to Make Materially Misleading Statements**

To establish "director liability based on a disclosure violation, plaintiffs must plead facts that show that the violation was made knowingly or in bad faith, a showing that requires allegations regarding what the directors knew and when."[3873] A Delaware court would apply the same standard to officer liability.[3874] The evidence of Callan's knowledge of Lehman's Repo 105 program and the warnings she received from Kelly, coupled with Callan's responsibilities as the firm's CFO, is sufficient to support a colorable claim that she breached her fiduciary duties when she knowingly or in bad faith caused Lehman to publicly file periodic reports that contained material omissions and/or misrepresentations.

Corporate fiduciaries breach their duty of loyalty under Delaware law by intentionally failing to act in the face of a known duty to act, demonstrating a conscious

---

[3872] The business judgment rule does not protect an officer from personal liability for inaction unless the failure to act was the result of a conscious and reasoned decision to take no action. *McMullin v. Beran*, 765 A.2d 910, 922 (Del. 2000) ("The business judgment rule is rebutted if the plaintiff shows that the directors failed to exercise due care in informing themselves before making their decision."). Alternatively, Callan's failure to act in the face of a known duty to act also rebuts the business judgment rule presumption.

[3873] *In re Citigroup*, 964 A.2d at 133-34.

[3874] *See Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009) (stating that fiduciary duties of officers and directors are identical).

disregard for their duties and a lack of true devotion to the interests of the corporation and its shareholders.[3875]

Through her discussions with Kelly regarding the potential reputational harm Lehman would suffer if the public were to learn about the firm's use of Repo 105 transactions to manage its balance sheet and net leverage ratio, Callan was warned not only of the potential harm to Lehman, but also of the likely materiality of information regarding Lehman's Repo 105 program. With knowledge of these aspects of Lehman's Repo 105 program, Callan nonetheless caused Lehman to file its first quarter Form 10-Q in April 2008 without disclosing the firm's reliance upon Repo 105 transactions, thereby exposing Lehman to potential liability.[3876]

Sufficient evidence also exists to support a colorable claim that Callan breached her fiduciary duties to Lehman by exposing the firm to potential liability for making misleading statements during Lehman's earnings calls for the first quarter and second quarter of 2008. The March 18, 2008 earnings call demonstrates that "transparency on the balance sheet" and Lehman's efforts at deleveraging were of interest to analysts and the market. During the call, Callan reported to analysts the drop in Lehman's net leverage ratio from the fourth quarter 2007 to the first quarter 2008, but did not disclose that the reduction in leverage was partially attributable to an approximately $11 billion

---

[3875] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243-44 (Del. 2009) (stating that directors breach their duty of loyalty "if they knowingly and completely fail[] to undertake their responsibilities").

[3876] *See* Sections III.A.4.j.1–2 of this Report (discussing materiality and disclosure obligations).

increase in quarter-end Repo 105 usage between fourth quarter 2007 and first quarter 2008 (from approximately $38 billion at the end of fiscal year 2007 to approximately $49 billion at the end of first quarter 2008). When asked repeatedly about the means by which Lehman deleveraged, Callan only mentioned the sale of assets, at no time mentioning Lehman's use of off-balance sheet repo transactions to manage the balance sheet and improve net leverage. Similarly, during the preliminary second quarter 2008 earnings call, Callan focused on Lehman's reduced leverage but failed to mention that Lehman had temporarily removed $50 billion in assets from its balance sheet using Repo 105 transactions.

> **b. There Is Sufficient Evidence to Support a Colorable Claim That Callan Breached Her Fiduciary Duty of Care by Failing to Inform the Board of Directors of Lehman's Repo 105 Program**

On March 25, 2008, Callan spoke to the Board's Finance and Risk Committee about the "industry-wide pressure to delever" and the firm's plan for reducing total assets, focusing primarily on the Fixed Income Division, but she failed to disclose in that presentation that the Fixed Income Division relied heavily on Repo 105 transactions for managing its balance sheet at quarter-end.[3877] During an April 15, 2008 meeting of the Board of Directors, Callan reported Lehman's net leverage ratio and the firm's plan

---

[3877] Lehman Brothers Holdings Inc., Minutes of Meeting of the Finance and Risk Committee (Mar. 25, 2008), at p. 2 [LBEX-AM 003592].

at further reducing leverage through targeted reductions in net assets, but again said nothing about the firm's use of Repo 105 transactions.[3878]

In light of the market demand that Lehman deleverage and Kelly's concerns about the risks of Lehman's Repo 105 practice, Callan knew or should have known that information regarding Lehman's Repo 105 practice (*e.g.*, accounting treatment, lack of disclosure, volumes of quarter-end transactions, and impact on Lehman's publicly reported net leverage ratio) would have been material to Lehman's directors.[3879] Information must be disclosed if it is "relevant" to the board and of sufficient "magnitude" to be important.[3880]

Given Callan's actual knowledge about Lehman's Repo 105 program when speaking to the Board of Directors and the likely potential materiality of information relating to Repo 105 transactions' impact on the firm-wide balance sheet and net leverage ratio, the Examiner concludes that sufficient evidence exists to support a colorable claim that Callan violated her duties of loyalty, good faith, and due care by failing to disclose material information to the Board.

---

[3878] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Apr. 15, 2008), at p. 4 [LBEX-AM 003654].

[3879] To form a basis for an officer's personal liability for breaching the duty of candor, the undisclosed or misrepresented facts must be material to the principal's decisions or responsibilities. While materiality for purposes of information to shareholders is determined under the "total mix of information" standard, the Delaware Supreme Court has adopted a *lower* standard of materiality with respect to management's disclosure of information to the board. *See Brehm*, 746 A.2d at 259-60 n.49.

[3880] *Id.* at 260 n.49 ("The term 'material' is used in this context to mean relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decisionmaking."); *see also* RESTATEMENT (THIRD) OF AGENCY § 8.11 cmts. b-d.

### (iv) Ian Lowitt

There is sufficient evidence to support a finding by the trier of fact that Lowitt was at least grossly negligent in causing Lehman to file materially misleading financial statements. According to Kelly, by the time Lowitt became Lehman's CFO in June 2008, Lowitt was "quite familiar" with Lehman's use of Repo 105 transactions to reduce its balance sheet at quarter-end and "understood [the] details" of the program.[3881] In addition:

- While serving as co-CAO, Lowitt was informed of John Feraca's ultimately unsuccessful attempts to place real estate securities into the Repo 105 program.[3882] Lowitt recalled that Feraca would report on Lehman's Repo 105 use to him because Lowitt was a member of Lehman's Asset Liability Committee ("ALCO").[3883] Feraca also informed Lowitt of the volume of Repo 105 transactions with specific counterparties at the close of the first quarter 2008.[3884] Lowitt recalled that at the close of the first quarter 2008, he attempted to gauge the materiality of Lehman's Repo 105 usage and asked Feraca for information to determine whether Lehman was increasing its Repo 105 activity.[3885]

---

[3881] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 10 (stating that when he raised his concerns about Repo 105 to Lowitt, Lowitt was already "quite familiar with the program and understood its details); Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 10 (recalling that Lehman had initiated its Repo 105 program in the early 2000s and that FID and Equities division would use Repo 105 transactions to reach balance sheet targets).

[3882] E-mail from Kentaro Umezaki, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 17, 2007) [LBEX-DOCID 1533678].

[3883] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 12.

[3884] E-mail from John Feraca, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 3207903]; e-mail from John Feraca, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 3207907]; e-mail from John Feraca, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Feb. 28, 2008) [LBEX-DOCID 3207908]; e-mail from John Feraca, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Feb. 29, 2008) [LBEX-DOCID 3207910].

[3885] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 12.

- During the second quarter 2008, Lowitt was told that the intra-quarter balance sheet increase of $95 billion in FID's rates business was due, in part, to a $22.4 billion reduction in Repo 105 since quarter-end.[3886]

- Lowitt received the Daily Balance Sheet and Disclosure Scorecard from April to September 2008, which made frequent mention of the impact of Repo 105 transactions on Lehman's balance sheet.[3887]

---

[3886] *See* e-mail from Gerard Reilly, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Mar. 20, 2008) [LBEX-DOCID 4220790]; Lehman, March Net Balance Sheet Daily Trend (Mar. 20, 2008) [LBEX-DOCID 4070215]; e-mail from Gerard Reilly, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Mar. 20, 2008) [LBEX-DOCID 2973597].

[3887] *See, e.g.,* Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 7, 2008 (Apr. 9, 2008), at p. 9 [LBEX-DOCID 520619] (attached to e-mail from Tal Litvin, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Apr. 9, 2008) [LBEX-DOCID 523578] and showing consolidated FID and Equities balance sheet reduced by $18.527 billion and Prime Services balance sheet reduced by $4.458 billion through Repo 105 transactions as of April 7, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 8, 2008 (Apr. 10, 2008), at p. 9 [LBEX-DOCID 520620] (attached to e-mail from Tal Litvin, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Apr. 10, 2008) [LBEX-DOCID 523579] and showing consolidated FID and Equities balance sheet reduced by $18.853 billion and Prime Services balance sheet reduced by $4.562 billion through Repo 105 transactions as of April 8, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 9, 2008 (Apr. 10, 2008), at p. 9 [LBEX-DOCID 251339] (attached to e-mail from Tal Litvin, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Apr. 10, 2008) [LBEX-DOCID 258560] and showing consolidated FID and Equities balance sheet reduced by $19.688 billion and Prime Services balance sheet reduced by $4.548 billion through Repo 105 transactions as of April 9, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 10, 2008 (Apr. 14, 2008), at p. 9 [LBEX-DOCID 251342] (attached to e-mail from Tal Litvin, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 275231] and showing consolidated FID and Equities balance sheet reduced by $19.967 billion and Prime Services balance sheet reduced by $4.491 billion through Repo 105 transactions as of April 10, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date April 11, 2008 (Apr. 14, 2008) [LBEX-DOCID 251344], at p. 9 (attached to e-mail from Tal Litvin, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Apr. 14, 2008) [LBEX-DOCID 258562] and showing consolidated FID and Equities balance sheet reduced by $20.260 billion and Prime Services balance sheet reduced by $4.517 billion through Repo 105 transactions as of April 11, 2008); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 12, 2008 (May 13, 2008), at p. 1 [LBEX-LL 1950262] (attached to e-mail from Tal Litvin, Lehman, to Ian T. Lowitt, Lehman, *et al.* (May 13, 2008) [LBEX-DOCID 3187357] and stating "Rates decreased by $(5.0B) from prior day due to . . . increased Repo 105 usage. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 22, 2008 (May 27, 2008), at p. 1 [LBEX-LL 1950706] (attached to e-mail from Tal Litvin, Lehman, to Ian T. Lowitt, Lehman, *et al.* (May 27, 2008) [LBEX-DOCID 275984] and stating "Global rates net balance sheet decreased ($2.0B), predominantly due to an increase in Repo 105 benefit. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 28, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950670] (attached to e-mail from Tal Litvin, Lehman, to Ian T. Lowitt, Lehman, *et al.* (May 30, 2008) [LBEX-DOCID 275995] and stating "Global rates net balance sheet decreased by ($3.1B) primarily due to a decrease in Americas driven by an increased utilization of Repo 105 within the Agency business"); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date May 29, 2008 (May 30, 2008), at p. 1 [LBEX-LL 1950658] (attached to e-mail from Tal Litvin, Lehman, to Ian T. Lowitt, Lehman, *et al.* (June 2, 2008) [LBEX-DOCID

- Four days before the close of second quarter 2008, Lowitt was informed of funding problems with certain Repo 105 counterparties.[3888]

Furthermore, Lowitt attended the March 28, 2008 special meeting of the Executive Committee requested by McDade.[3889] Lowitt received the same documents that listed the $49.1 billion in Repo 105 transactions Lehman had undertaken at the end of the first quarter 2008, and was present when McDade discussed Lehman's use of Repo 105 transactions.[3890]

---

011127] and stating "Global Rates net balance sheet decreased ($6.5B) . . . [t]he decrease in Europe is coming from increased utilization of Repo 105"); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date June 18, 2008 (June 20, 2008) [LBEX-LL 1950514] (attached to e-mail from Tal Litvin, Lehman, to Ian T. Lowitt, Lehman, *et al.* (June 20, 2008) [LBEX-DOCID 275942] and stating that "Global rates net balance sheet decreased . . . driven by a[n] . . . increase in Repo 105 utilization. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 13, 2008 (Aug. 14, 2008) [LBEX-LL 782812] (attached to e-mail from Tal Litvin, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Aug. 14, 2008) [LBEX-DOCID 4214810] and stating that "Global rates net balance sheet decreased . . . driven by an increase in Repo 105 benefit. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 25, 2008 (Aug. 26, 2008) [LBEX-LL 782924] (attached to e-mail from Tal Litvin, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Aug. 26, 2008) [LBEX-DOCID 079536] and stating that "Global Rates net balance sheet decreased . . . driven by an increase in repo 105 usage. . . ."); Lehman, Balance Sheet and Disclosure Scorecard for Trade Date August 28, 2008 (Aug. 29, 2008) [LBEX-LL 782966] (attached to e-mail from Tal Litvin, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Aug. 29, 2008) [LBEX-DOCID 275880] and stating that "Global rates [net balance sheet] was down . . . driven by increased Repo 105 benefit. . . .").

[3888] E-mail from John Feraca, Lehman, to Ian T. Lowitt, Lehman, *et al.* (May 27, 2008) [LBEX-DOCID 070831]

[3889] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at p. 4 (stating that the entire Executive Committee, except for Fuld, and *ex officio* members Lowitt and Friedheim attended the March 28, 2008 meeting).

[3890] Examiner's Interview of Herbert H. "Bart" McDade III, Jan. 28, 2010, at pp. 3-4; Herbert H. (Bart) McDade III, Lehman, Balance Sheet and Cash Capital Update (Mar. 27, 2008), at p. 1 [LBEX-DOCID 095961] (attached to e-mail from Gerard Reilly, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 120929] and indicating that the attachment is for the Executive Committee meeting)); *see also* Herbert H. (Bart) McDade III, Lehman, Executive Committee Meeting Material, Agenda (Mar. 28, 2008) [LBEX-DOCID 115827] (attached to e-mail from Patricia Lombardi, Assistant to Herbert H. (Bart) McDade III, to Ian T. Lowitt, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 120929] and listing among seven topics of discussion for March 28, 2008 Executive Committee meeting "Repo 105/108" and "Delever v Derisk").

Lowitt also received the June 2008 Balance Sheet and Key Disclosures document that incorporated McDade's planned directive to reduce Lehman's firm-wide Repo 105 usage by half – from $50 billion to $25 billion in third quarter 2008 – and met with McDade, Reilly, O'Meara, and Morton to discuss the issues.[3891]  Thus, at the time Lowitt signed the second quarter 2008 Form 10-Q, sufficient evidence exists to support a colorable claim that he was aware of the material impact that Lehman's Repo 105 practice had on the firm-wide balance sheet and publicly reported leverage ratios.

Lowitt took no action to ensure Lehman filed accurate and complete financial statements and MD&A.   Lowitt certified Lehman's second quarter 2008 Form 10-Q, exposing Lehman to potential liability for making material misstatements and omissions in publicly filed financial statements and MD&A; there is sufficient evidence to support a colorable claim that Lowitt breached his fiduciary duty of care.

### (c)  Remedies

The primary remedy for a breach of fiduciary duty is forcing the fiduciary to "disgorge" his or her profits.   A fiduciary is liable to disgorge profits regardless of

---

[3891] E-mail from Christopher M. O'Meara, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (June 17, 2008) [LBEX-DOCID 033813] (replying to receipt of Balance Sheet and Key Disclosures 2008 3Q Targets [Draft] (June 16, 2008) and stating that "meeting is being set up to discuss" the Balance Sheet and Key Disclosure 2008 3Q Targets document); e-mail from Gerard Reilly, Lehman, to Ian T. Lowitt, Lehman, *et al.* (June 19, 2008) [LBEX-DOCID 2962369] (transmitting updated version of Lehman, Balance Sheet and Key Disclosures 2008 3Q Targets (June 19, 2008) [LBEX-DOCID 2932594] and indicating that a meeting with Reilly, Lowitt, O'Meara, and McDade took place).

whether it can be proven that the breach injured the fiduciary's principal.[3892] If a plaintiff is seeking disgorgement of salary, however, then the plaintiff must also demonstrate a quantifiable harm to the principal.[3893] Outside Delaware, there is considerable authority for the proposition that a corporate officer must disgorge all of the compensation paid for services during the period of the breach.[3894] Courts applying Delaware law, however, appear to be split between applying this rule of full disgorgement and requiring disgorgement of only the compensation attributable to the breaching conduct.[3895]

---

[3892] *Thorpe ex rel. Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996) (finding defendant liable for disgorgement plus reimbursement of "any expenses, including legal and due diligence costs, that the corporation incurred").

[3893] *See Cintron v. Merritt-Chapman & Scott Corp*., 407 A.2d 1040, 1045 (Del. 1979).

[3894] *See, e.g.*, *Wilshire Oil Co. of Texas v. Riffe*, 406 F.2d 1061, 1062 (10th Cir. 1969) (holding that, under Oklahoma law, a corporation was entitled to judgment against former officer in an amount equal to seven-twelfths of the salary and bonus paid him for services during a calendar year, where he was in breach for period of seven months in that year); *see also Carco Group, Inc. v. Maconachy*, 644 F. Supp. 2d 218, 244 (E.D.N.Y. 2009) ("Under New York law, an employee is required to forfeit all compensation, including 'commissions or salary,' paid beginning with his first disloyal act."); *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 153 (S.D.N.Y. 1999) (holding that, under New York law, an unfaithful fiduciary was obligated to return all salary paid to him during the time in which he was in violation of his fiduciary duties); *In re Omni Mech. Contractors, Inc.*, 114 B.R. 518, 541 (Bankr. E.D. Tenn. 1990) ("The general rule . . . is that corporate officers who breach their duty of loyalty or who willfully breach their contract of employment are not entitled to any compensation for services performed during that time period even though some services were performed properly.").

[3895] *Compare Borden v. Sinskey*, 530 F.2d 478, 497-98 (3d Cir. 1976) (disgorging unfaithful fiduciary defendant of all salaries earned from companies that he wrongfully acquired for himself instead of presenting his employer with the opportunity to acquire them), and *Guth v. Loft*, 5 A.2d 503, 508 (Del. 1939) (upholding a decision requiring an officer to turn over to his former employer "all salary or compensation" paid to him by a competing interest from the time he began self dealing as well as any compensation paid above what was reasonable after his fiduciary relationship with the plaintiff ended ) *with Technicorp Intern. II, Inc. v. Johnston*, No. Civ. A. 15084, 2000 WL 713750, at *53 (Del. Ch. May 31, 2000) (permitting agents to retain an amount representing reasonable compensation for the services they had "legitimately and beneficially performed for the corporations."), and *Julian v. E. States Const. Serv., Inc.*, Civ. A. No. 1892-VCP, 2008 WL 2673300 at * 1 (Del.Ch. July 8, 2008) (disgorging only the bonuses

While the most common remedies for breach of fiduciary duty are in equity, a plaintiff's recovery is not limited to disgorgement or other remedies that may be traced directly to the breach.[3896] Indeed, Delaware courts have wide latitude to craft damage remedies to compensate a party with respect to whom a defendant breached a fiduciary duty.[3897] Another remedy that may be available to a party asserting a breach of fiduciary duty would be compensatory damages, which would attempt to rectify any financial harm caused to the beneficiary by a fiduciary's breach of his duties.[3898] The Restatement of Torts supports the contention that, in the case of a breach of fiduciary

directors awarded themselves in violation of their fiduciary duties instead of all compensation paid to them while they were in violation of their duties).

[3896] *See, e.g., Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1166 (Del. 1995) (citations omitted) ("[T]he measure of damages for *any* breach of fiduciary duty, under an entire fairness standard of review, is 'not necessarily limited to the difference between the price offered and the 'true' value as determined under the appraisal proceedings.' . . . [T]he [Court of Chancery] 'may fashion any form of equitable and monetary relief as *may* be appropriate, including rescissory damages.'"); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983) ("Under such circumstances [involving a breach of fiduciary duty], the [court's] powers are complete to fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages."); *Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487, 500 (Del. 1982) ("[T]he relief available in equity for tortious conduct by one standing in a fiduciary relation with another is necessarily broad and flexible.").

[3897] *See Weinberger v UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983) ("[T]he Chancellor's powers are complete to fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages.").

[3898] *See, e.g., Noerr v. Greenwood*, No. 14320-NC, 2002 WL 31720734, at *5 (Del. Ch. Nov. 22, 2002) (granting class certification to a claim requesting primarily compensatory damages based on a breach of fiduciary duty); *Painewebber R & D Partners II, L.P. v. Centocor, Inc.*, No. 14405, 1999 WL 160123, at *15 (Del. Ch. Mar. 15, 1999) (approving settlement agreement including compensatory damages for alleged breaches of fiduciary duty); *see also Thorpe*, 676 A.2d at 445 (holding that Delaware case law did not only require that the defendant not profit from disloyal conduct but that the beneficiary of the duty also suffer harm as a result of the breach and, therefore, damages could be appropriate if proven); *cf. In re JP Morgan Chase & Co. S'Holder Litig.*, 906 A.2d 766, 772 (Del. 2006) (denying plaintiff's claim for compensatory damages not because compensatory damages were inapplicable to a claim for breach of fiduciary duty but because the requested damages could not be connected to the alleged breach).

duty, compensatory damages may be awarded.[3899]  A party seeking compensatory damages would have to prove damages and causation in order to be successful.[3900]

In the event that Lehman is eventually subject to liability as a consequence of the actions of one or more of its officers, those officers may be liable to Lehman accordingly.

### (5)  Malpractice Claims Against Ernst & Young

The Examiner concludes that sufficient evidence exists to support colorable claims against Ernst & Young LLP ("Ernst & Young") for professional malpractice arising from Ernst & Young's failure to follow professional standards of care with respect to communications with Lehman's Audit Committee, investigation of a whistleblower claim, and audits and reviews of Lehman's public filings.[3901]

---

[3899] RESTATEMENT (SECOND) OF TORTS § 874 cmt. b (1979) ("The remedy of a beneficiary against a defaulting or negligent trustee is ordinarily in equity; the remedy of a principal against an agent is ordinarily at law.  However, irrespective of this, the beneficiary is entitled to tort damages for harm caused by the breach of duty arising from the relation. . . .").

[3900] *See LNC Invs., Inc. v. First Fidelity Bank, N.A., N.J.*, 173 F.3d 454, 465 (2d Cir. 1999) ("[W]here damages are sought for breach of fiduciary duty under New York law, the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability."); *Am. Fed. Group, Ltd v. Rothenberg*, 136 F.3d 897, 908 n.7 (2d Cir. 1998) (stating that in breach of fiduciary duty cases where the remedy sought is damages to compensate for loss, the usual damages-causation rule for tort cases applies).

[3901] The Examiner consulted with an industry expert, Gary L. Holstrum, PhD, CPA, to assist in the analysis of professional auditing standards.  Dr. Holstrum earned a PhD in accounting from the University of Iowa's School of Business.  He recently served as an Associate Chief Auditor and Director of Research, and has been a consultant to the Office of Chief Auditor, at the Public Company Accounting Oversight Board.  He has been a professor of accountancy at several universities, including the University of Southern California, the University of Texas at Austin, the University of Florida, and the University of South Florida.  In 2009, Dr. Holstrum received the Distinguished Service in Auditing Award from the Auditing Section of the American Accounting Association.  Dr. Holstrum's experience, including publications and service on the Auditing Standards Board, is more fully described in his resume, Appendix 17, Repo 105 Appendix.  Dr. Holstrum concurs with the findings in this Section of the Report,

### (a) Background and Legal Standards

### (i) Professional Standards

One of the primary responsibilities of an external auditor is to express an opinion whether the company's financial statements are presented fairly, in all material respects, in accordance with Generally Accepted Accounting Principles ("GAAP"). Professional standards have been established to ensure that external auditors fulfill their obligations when auditing and reviewing financial statements and other information contained in SEC filings. Those standards are known as generally accepted auditing standards, or "GAAS." GAAS consists of authoritative standards, originally established by the American Institute of Certified Public Accountants ("AICPA"), which auditors must comply with when they conduct audits and reviews.

The Sarbanes-Oxley Act of 2002 authorized the Public Accounting Oversight Board ("PCAOB") to establish auditing and related professional practice standards to be used by registered public accounting firms.[3902] PCAOB Rule 3100, *Compliance with Auditing and Related Professional Practice Standards*, issued by the PCAOB and approved by the SEC, requires registered public accounting firms to comply with all applicable auditing and related professional practice standards of the PCAOB in their

---

and in his opinion, a valid claim for professional malpractice can be raised on these facts. The Examiner met with counsel for Ernst & Young to discuss the colorable claims identified in this Section, and counsel presented several arguments as to why Ernst & Young did not commit malpractice. Following that presentation, the Examiner discussed Ernst & Young's presentations with Dr. Holstrum, and Dr. Holstrum's opinion as to the existence of colorable claims did not change.

[3902] *See* Pub. L. No. 107-204, § 103(a)-(d), 2002 U.S.C.C.A.N. (116 Stat), 745, 755-57 (codified at 15 U.S.C. § 73213 (2006)).

engagements relating to documents filed with the SEC, including audits of annual financial statements and reviews of interim financial information of public companies.[3903]   The PCAOB adopted as interim auditing standards the generally accepted auditing standards described in the AICPA's Auditing Standards Board ("ASB") Statement on Auditing Standards No. 95, *Generally Accepted Auditing Standards*, in existence on April 16, 2003.[3904]

GAAS consists of ten standards (three general standards, three fieldwork standards, and four reporting standards) that are further interpreted and defined in "Statements on Auditing Standards" or "SASs" which are referred to by reference to "AU" sections.[3905] Among the ten auditing standards are the following:

- Due professional care is to be exercised in the performance of the audit and the preparation of the report.

---

[3903] *See* Order Approving Proposed Rule Relating to Compliance with Auditing and Related Professional Practice Standards, Exchange Act Release No. 48,730, 81 SEC Docket 1509 (Oct. 31, 2003).

[3904] *See* Order Regarding Section 103(A)(3)(B) of the Sarbanes-Oxley Act of 2002, Securities Act Release No. 8222, Exchange Act Release No. 47,745, 80 SEC Docket 142 (Apr. 25, 2003). Ernst & Young is registered with and regulated by the PCAOB, and Ernst & Young's audits and reviews for public companies such as Lehman are subject to the PCAOB's auditing standards.  The PCAOB Auditing Standards, which are applicable to the Ernst & Young annual audit and interim review engagements of Lehman during the periods addressed in this Report, are shown in the "Standards" section of the PCAOB web site (www.pcaob.org).  The PCAOB adopted as its "Interim Auditing Standards" only those SASs issued by the ASB that were issued before April 16, 2003.  After that date, the PCAOB issued its own additional Auditing Standards and revisions of the Interim Auditing Standards as it deemed appropriate, subject to its due process requirements, including approval by the SEC.  Any SAS issued by the ASB after April 16, 2003 (essentially after SAS No. 101) did not and does not become a PCAOB Auditing Standard, applicable to audits of public companies (and, consequently, is not shown on the PCAOB web site).

[3905] Codification of Accounting Standards and Procedures, Statement on Auditing Standards No. 95, AU § 150.02 (Am. Inst. of Certified Pub. Accountants 2002).  The AU standards adopted by the PCAOB are available at http://www.pcaobus.org/Standards/Interim_Standards/Auditing_Standards/index.aspx.  They are referenced by the applicable section and paragraph number for the remainder of this Section of the Report.

- A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

- Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

- The auditor's report must state whether the financial statements are presented in accordance with GAAP.

- Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

- The report shall contain either an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefore should be stated.

*See* AU § 150.02.

The objective of an auditor's "review" of quarterly financial information is to provide a basis for reporting whether the reviewer is aware of material modifications that should be made to the information to conform with GAAP. *See* AU § 722.07. A review includes obtaining sufficient knowledge of the entity's business and its internal control as it relates to the preparation of both annual and interim financial information to: (1) identify the types of potential material misstatements in the interim financial information and consider the likelihood of their occurrence; and (2) select the inquiries and analytical procedures that will provide the accountant with a basis for communicating whether he or she is aware of any material modifications that should be made to the interim financial information for it to conform with GAAP. *See* AU

§ 722.09.  In the course of reviewing interim financial information, auditors are required to make inquiries of members of management who have responsibility for financial and accounting matters concerning, among other things, significant transactions occurring or recognized in the last several days of the interim period.  *See* AU § 722.18(c).

### (ii)  Common Law Standards

To state a claim of auditor malpractice under New York law,[3906] a client must allege the existence of a duty, a breach of that duty, proximate causation, and damages.[3907]  Generally, breaches of duty are demonstrated by a showing that the auditor departed from accepted standards of practice and that this departure was the proximate cause of plaintiff's injury.[3908]  In determining whether an auditor has deviated from accepted standards, courts and tribunals routinely look to the recognized and

---

[3906] Lehman's engagement letter with Ernst & Young does not contain a choice-of-law provision, but New York law would likely apply to a malpractice action given that Lehman was headquartered in New York and most of Ernst & Young's audit work was centered in New York.  *See AIG v. Greenberg*, 965 A.2d 763, 817-22 (Del. Ch. 2009) (New York law governed malpractice and breach of contract claims against auditor where auditing work was performed primarily in New York and audited client was headquartered in New York).  The engagement letter for the 2007 audit contains a mandatory arbitration clause, *see* Letter from Ernst & Young to Christopher M. O'Meara, Lehman, re: 2007 audit services (May 15, 2007), at ¶ 33 [EY-LE-KEYPERS 2641786] ("Engagement Letter (May 15, 2007)"), and such clauses are generally adhered to in bankruptcy proceedings in this jurisdiction.  *See In re Refco, Inc. Sec. Litig.*, Nos. 07 MDL 1992(GEL), 07 Civ. 11604(GEL), 2008 WL 2185676, at *5 (S.D.N.Y. May 21, 2008) (holding that the trustee was bound by arbitration clause in engagement letters between debtor and auditing firm); *In re Hagerstown Fiber Ltd. P'Ship*, 277 B.R. 181, 206 (Bankr. S.D.N.Y. 2002) ("If the debtor agreed in a pre-petition contract to arbitrate a dispute, the trustee, suing as successor to the debtor, is likewise bound by the arbitration clause.").  Lehman and Ernst & Young had not yet signed the 2008 engagement letter, but the 2007 engagement letter states that Ernst & Young will continue to provide audit services in later years pursuant to the terms of the 2007 agreement unless terminated by Lehman or Ernst & Young.  Engagement Letter (May 15, 2007) at ¶ 9 [EY-LE-KEYPERS 2641786].

[3907] *See VTech Holdings, Ltd. v. Pricewaterhouse Coopers*, LLP, 348 F. Supp 2d 255, 262 (S.D.N.Y. 2004).

[3908] *Id.*; *Hous. Works, Inc. v. Turner*, 179 F. Supp 2d 177, 215 (S.D.N.Y. 2001).

accepted professional standards for accountants and auditors, generally measured by GAAP and GAAS.[3909]

### (b) There Is Sufficient Evidence to Support a Colorable Claim That Ernst & Young Was Negligent

The Examiner finds that sufficient evidence exists to support at least three colorable claims that could be asserted against Ernst & Young relating to Lehman's Repo 105 activities and reporting: (1) negligence in connection with the investigation into whistleblower Matthew Lee's claims concerning $50 billion in Repo 105 activities at the end of the second quarter 2008, including failing to conduct an adequate inquiry into the allegations prior to the filing of Lehman's Form 10-Q, and failing to properly inform management and the Audit Committee of Lee's allegations; (2) at least with respect to Lehman's first quarter and second quarter 2008 Forms 10-Q, if not with respect to earlier filings, negligence by failing to take proper action when Ernst & Young was made aware that the financial information may be materially misleading because of the failure to disclose the effect of the timing and volume of Lehman's Repo 105 activities (which had a material effect on interim financial statement items), and failing to take proper action with respect to materially misleading statements contained in the MD&A sections of the Forms 10-Q for these quarters; and (3) at least with respect

---

[3909] *See, e.g., Cumis Ins. Soc'y Inc. v. Tooke*, 739 N.Y.S.2d 489, 493 (App. Div. 2002). As discussed in Section III.A.4.j.5.a.i of the Examiner's Report, the PCAOB standards incorporate GAAS and must be followed for all audits and reviews of public companies by public accounting firms, which in turn must be registered with the PCAOB.

to Lehman's 2007 Form 10-K, if not with respect to earlier Forms 10-K, negligence by failing to take proper action when Ernst & Young was made aware that the financial statements may be materially misleading because of the failure to disclose the effect of the timing and volume of Lehman's Repo 105 activities (which had a material effect on financial statement items), and failing to take proper action with respect to materially misleading statements contained in the MD&A sections of the Form 10-K.[3910]

### (i) Malpractice in Failure to Advise Audit Committee of Repo 105 Activity and Lee's Allegations

The Examiner concludes that sufficient evidence exists to support a colorable claim for malpractice[3911] against Ernst & Young arising from Ernst & Young's failure to apprise the Audit Committee of Matthew Lee's allegations relating to Lehman's extensive quarter-end Repo 105 activity:

---

[3910] Professional negligence claims may also be presented as breach-of-contract claims, although a similar liability standard would be applied under either cause of action.  In addition, if Lehman were subject to a securities fraud claim and sought to allocate fault to Ernst & Young, Lehman would likely need to demonstrate scienter on the part of Ernst & Young, rather than mere negligence.  *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (securities fraud complaint alleged accounting firm had violated various GAAP provisions; those allegations, without corresponding fraudulent intent, were insufficient to state claim); *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 120-21 (2d Cir. 1982) (assuming accountant's recklessness could satisfy *scienter* requirement of securities fraud action, such recklessness must be conduct that is "highly unreasonable" and represents "an extreme departure from the standards of ordinary care").  The Examiner has not analyzed whether any of the actions or inaction of Ernst & Young could amount to recklessness sufficient to satisfy the more demanding standard of *scienter*.

[3911] Based on these facts, the Examiner also considered whether there also is a colorable claim against Ernst & Young for aiding and abetting breaches of fiduciary duty.  The Examiner concluded that there is not sufficient, credible evidence identified at this time to support a claim.  That said, however, with further discovery, such a claim may be uncovered.

- In May/June 2008, the Chairman of the Audit Committee and internal audit requested that Ernst & Young assist with the investigation into allegations made by Lee in a May 16, 2008 letter.[3912]

- Lee's letter alleged a number of possible accounting irregularities, including balance sheet substantiation discrepancies, valuation issues, and the lack of competence and independence of Lehman's internal audit department.[3913] Lee's letter did not mention Repo 105 transactions.

- As part of the investigation, William Schlich (Ernst & Young Audit Partner) and Hillary Hansen (another Ernst & Young partner) met with Lee on June 12, 2008, and during that meeting, Lee raised an additional allegation not contained in his letter; specifically, he advised Schlich and Hansen that at the end of the second quarter 2008, Lehman moved $50 billion in assets off its balance sheet using Repo 105 transactions, only to move those assets back onto the balance sheet a few days later.[3914]  Although Schlich stated that he had no recollection of Lee's Repo 105 assertions, those assertions were prominent in Hansen's contemporaneous notes of the meeting with Lee and

---

[3912] Examiner's Interview of Thomas Cruikshank, Oct. 8, 2009, at p. 7; Examiner's Interview of Thomas Cruikshank, Jan. 20, 2010, at p. 3; Examiner's Interview of Roger Berlind, Dec. 18, 2009, at p. 3; Examiner's Interview of Michael L. Ainslie, Dec. 22, 2009, at p. 2; Examiner's Interview of Sir Christopher Gent, Jan. 20, 2010, at p. 2; Examiner's Interview of Beth Rudofker, Dec. 15, 2009, at p. 5.

[3913] Letter from Matthew Lee, Lehman, to Martin Kelly, Lehman, *et al.* (May 16, 2008) [EY-LE-LBHI-KEYPERS 5826885].  Lee's letter contained the following six allegations: (1) on the last day of each month, Lehman's books and records contained approximately $5 billion of net assets in excess of what was managed on the last day of the month, thereby suggesting that the firm's senior management was not in control of its assets to be able to present full, fair, and accurate financial statements to the public; (2) Lehman had "tens of billions of dollars of unsubstantiated balances, which may or may not be 'bad' or non-performing assets or real liabilities"; (3) Lehman had tens of billions of dollars of illiquid inventory and did not value its inventory in a "fully realistic or reasonable" way; (4) given Lehman's rapid growth and increased number of accounts and entities, it had not invested sufficiently in financial systems and personnel to cope with the balance sheet; (5) the India Finance office lacked sufficient knowledgeable management, resulting in the real possibility of potential misstatements of material facts being distributed by that office; and (6) certain senior level internal audit personnel were not qualified to "properly exercise the audit functions they are entrusted to manage."

[3914] Examiner's Interview of Ernst & Young, Nov. 3, 2009, at p. 14 (statement of Hillary Hansen); Examiner's Interview of Matthew Lee, July 1 and July 10, 2009, at p. 17; *see also* Hillary Hansen, Ernst & Young, Notes from meeting with Matthew Lee, June 12, 2009, at p. 1 [EY-LE-LBHI-KEYPERS 5826869].

Schlich, and Hansen specifically recalled conferring with Schlich about Lee's Repo 105 allegations.[3915]

- The next day – on June 13, 2008 – Schlich met with the Audit Committee and participated in an update to the committee on the Lee investigation.[3916] Schlich did not inform the Audit Committee about the Repo 105 claims made by Lee, even though the Audit Committee asked to be told about each allegation.[3917]

- On July 8, 2008, the Audit Committee met with Schlich, Kelly, Lowitt, and Beth Rudofker to review the second quarter MD&A and financial statements.[3918] At that meeting, Schlich did not raise any issues concerning the adequacy of the disclosures or financial statements, and stated that Ernst & Young would issue an unqualified review report.[3919]

- On July 10, 2008, Ernst & Young issued an unqualified review report in connection with the issuance of Lehman's Form 10-Q.[3920]

- On July 22, 2008, Schlich again remained silent as to Lee's Repo 105 allegation at an Audit Committee meeting, where internal audit presented the results of the investigation into each of the claims made by Lee in his May 16, 2008 letter to management.[3921] At that meeting, the Audit Committee

---

[3915] Examiner's Interview of Ernst & Young, Nov. 3, 2009 at p. 14 (statement of Hillary Hansen); *Id.* at p. 16 (statement of William Schlich); Examiner's Interview of Ernst & Young, Oct. 9, 2009, at p. 5 (statement of William Schlich).

[3916] Examiner's Interview of Roger Berlind, Dec. 18, 2009, at p. 4; Examiner's Interview of Michael L. Ainslie, Dec. 22, 2009, at p. 2; Examiner's Interview of Sir Christopher Gent, Jan. 20, 2010, at p. 2.; *see also* Lehman Brothers Holdings Inc., Minutes of Meeting of Audit Committee (June 13, 2008) [LBEX-AM 003759].

[3917] Examiner's Interview of Roger Berlind, Dec. 18, 2009, at pp. 2, 4; Examiner's Interview of Michael L. Ainslie, Dec. 22, 2009, at pp. 2, 3; Examiner's Interview of Sir Christopher Gent, Jan. 20, 2010, at p. 2; Examiner's Interview of Thomas Cruikshank, Jan. 20, 2010, at p. 3; Examiner's Interview of Beth Rudofker, Dec. 15, 2009, at p. 7; *see also* Lehman Brothers Holdings Inc., Minutes of Meeting of Audit Committee (June 13, 2008) [LBEX-AM 003759].

[3918] Lehman Brothers Holdings Inc., Minutes of Meeting of Audit Committee (July 8, 2008) at p. 2 [LBEX-AM 003831].

[3919] *Id.*

[3920] LBHI 10-Q (filed July 10, 2008), at p. 53.

[3921] Employee Letter Review, Presentation to the Audit Committee (July 22, 2008) [LBEX-AM 067664]; Examiner's Interview of Thomas Cruikshank, Jan. 20, 2010, at pp. 2, 3; Examiner's Interview of Michael L. Ainslie, Dec. 22, 2009, at p. 3; Examiner's Interview of Roger Berlind, Dec. 18, 2009, at pp. 3-4; Examiner's

was told that "[c]orporate audit has largely completed an evaluation of [Lee's] observations in partnership with Financial Control and Ernst and Young."[3922]

There is sufficient evidence to support a colorable claim that Ernst & Young failed to exercise due professional care by failing to notify the Audit Committee of Lee's allegations about end-of-quarter Repo 105 transactions as a means to manipulate publicly reported balance sheet reductions.[3923]  *See, e.g.*, AU § 316.79 ("Whenever the auditor has determined that there is evidence that fraud may exist, that matter should be brought to the attention of an appropriate level of management.  This is appropriate even if the matter might be considered inconsequential, . . . Fraud involving senior management and fraud . . . that causes a material misstatement of the financial statements should be reported directly to the audit committee"); AU § 317 (if auditor becomes aware of possible violations of laws or regulations which may have a direct or indirect effect on the financial statements, he or she must make inquiries, perform additional tests, and inform management and the audit committee of the issue).[3924]

---

Interview of Sir Christopher Gent, Jan. 20, 2010, at pp. 2-3; Examiner's Interview of Beth Rudofker, Dec. 15, 2009, at p. 7.

[3922] Employee Letter Review, Presentation to the Audit Committee (July 22, 2008), at p. 2 [LBEX-AM 067664]; *see also* Lehman Brothers Holdings Inc., Minutes of Meeting of Audit Committee (July 22, 2008), at pp. 4-5 [LBEX-AM 003861].

[3923] On two occasions during the course of the examination, the Examiner offered Ernst & Young the opportunity to provide the Examiner with a presentation, narrative, or explanation regarding the business purpose of Lehman's Repo 105 transactions.  Ernst & Young declined that invitation.

[3924] *See also In re Allou Distribs., Inc.*, 395 B.R. 246, 272-73 (Bankr. E.D.N.Y. 2008) (finding that plaintiff sufficiently pled that auditing firm committed malpractice by failing to report suspicious circumstances and material discrepancies to the audit committee); Springer, Exchange Act Release No. 44858, 75 S.E.C. Docket 2095 (Sept. 27, 2001) (finding, in addition to other auditing violations, that an accountant had violated Section 10A of the Securities Exchange Act and engaged in professional misconduct by failing to

Moreover, in addition to its duty to report a determination that there is evidence that fraud "may" have occurred, Ernst & Young was required to discuss with the Audit Committee the quality of Lehman's accounting principles as applied to financial reporting, *see* AU § 380.11, which would include moving $30-$50 billion temporarily off the balance sheet at quarter-end through overseas "true sale" legal opinions that could not be obtained in the United States. Indeed, AU Section 380.11 states that auditors should discuss accounting policies, unusual transactions, the clarity and completeness of the financial statements, and unusual transactions with the audit committee. Specifically, that standard states that an auditor:

---

notify the client's audit committee that he had detected information indicating that the client had reported $1.3 million in false revenues in its quarterly report). Section 10A(b) of the Securities Exchange Act of 1934, 15 US.C. § 78j-1(b), provides that:

> If, in the course of conducting an audit pursuant to this title to which subsection (a) applies, the registered public accounting firm detects or otherwise becomes aware of information indicating that an illegal act (whether or not perceived to have a material effect on the financial statements of the issuer) has or may have occurred, the firm shall, in accordance with generally accepted auditing standards, as may be modified or supplemented from time to time by the Commission—
>
> (A)　　(i) determine whether it is likely that an illegal act has occurred; and
>
> 　　　　(ii) if so, determine and consider the possible effect of the illegal act on the financial statements of the issuer, including any contingent monetary effects, such as fines, penalties, and damages; and
>
> (B) as soon as practicable, inform the appropriate level of the management of the issuer and assure that the audit committee of the issuer, or the board of directors of the issuer in the absence of such a committee, is adequately informed with respect to illegal acts that have been detected or have otherwise come to the attention of such firm in the course of the audit, unless the illegal act is clearly inconsequential.

should discuss with the audit committee the auditor's judgments about the quality, not just the acceptability, of the entity's accounting principles as applied in its financial reporting. . . The discussion . . . should include such matters as the consistency of the entity's accounting policies and their application, and the clarity and completeness of the entity's financial statements, which include related disclosures. The discussion should also include items that have a significant impact on the representational faithfulness, verifiability, and neutrality of the accounting information included in the financial statements. Examples of items that may have such an impact are the following:

- Selection of new or changes to accounting policies

- Estimates, judgments, and uncertainties

- Unusual transactions

- Accounting policies relating to significant financial statement items, including the timing of transactions and the period in which they are recorded.

*See* AU § 380.11. Contrary to that standard, Ernst & Young never communicated anything about the Repo 105 transactions to Lehman's Audit Committee members – let alone discuss the substantial and increasing volumes at quarter end.[3925]

---

[3925] Examiner's Interview of Thomas Cruikshank, Jan. 20, 2010, at pp. 1-2.; Examiner's Interview of Michael L. Ainslie, Dec. 22, 2009, at p. 3; Examiner's Interview of Roger Berlind, Dec. 18, 2009, at pp. 3, 4; Examiner's Interview of Sir Christopher Gent, Jan. 20, 2010, at pp. 3, 4; *see also* Lehman Brothers Holdings Inc., Minutes of Meeting of Audit Committee (June 13, 2008) [LBEX-AM 003759]; Lehman Brothers Holdings Inc., Minutes of Meeting of Audit Committee (July 8, 2008) [LBEX-AM 003831]; Lehman Brothers Holdings Inc., Minutes of Meeting of Audit Committee (July 22, 2008) [LBEX-AM 003861]. The Examiner reviewed Ernst & Young's work papers for the 2007 year-end audit and 2008 quarterly reviews and found no reference to any communication with the Audit Committee about Repo 105. The Examiner also reviewed relevant documents, dated from January 1, 2007 through September 15, 2008, from the e-mail accounts and desk files of 43 mid-to-senior-level auditors at Ernst & Young, and uncovered no communications with or references to communications with Lehman's Audit Committee regarding Repo 105. Ernst & Young does not dispute the fact that it did not discuss Lee's Repo 105 allegations with the Audit Committee.

The Examiner therefore concludes that Ernst & Young's failure to discuss these matters with the Audit Committee gives rise to a colorable claim of malpractice, particularly in light of: (1) the failure to disclose in public filings the use of Repo 105 transactions to reduce the balance sheet items that were used to calculate Lehman's net leverage ratio; (2) the impact of the Repo 105 transactions on Lehman's net leverage ratio;[3926] (3) Lehman's emphasis to the public of the importance of its net leverage ratio; (4) the sheer size and timing of the end-of-quarter activity that Lee highlighted to Ernst & Young ($50 billion); and (5) the Audit Committee's explicit request to be apprised of all of Lee's allegations.

---

[3926] GAAS requires an auditor to understand its client's business, and therefore, Ernst & Young had a duty to understand the importance of net leverage ratios to Lehman and the investing public. *See* AU § 722.10 (auditor/reviewer has responsibility of becoming sufficiently knowledgeable about client's business to allow auditor to identify the types of potential material misstatements and to select inquiries and analytical procedures that will provide the auditor with a basis for communicating whether he or she is aware of any material modifications that should be made for such financial information to conform with GAAP). Here there is no question that Ernst & Young had a full understanding of the net leverage ratio. Ernst & Young's documents contain calculations of materiality with respect to net leverage ratios, and Ernst & Young reviewed financial statements and other public disclosures emphasizing the importance of the ratio. *See, e.g.,* Ernst & Young, LBHI/LBI Walkthrough Template for Balance Sheet Close Process (Nov. 30, 2007) at p. 14 [EY-LE-LBHI-CORP-GAMX-07-033384] (stating that, with respect to reopening a closed balance sheet, "[m]ateriality is usually defined as any item individually, or in the aggregate, that moves net leverage by 0.1 or more (typically $1.8 billion)" and that "[n]et leverage is an important ratio analyzed by the rating agencies and included in Lehman's earnings release"); e-mail from William Schlich, Ernst & Young, to Carmine DiSibio, Ernst & Young, *et al.* (June 5, 2008) [EY-LE-LBHI-KEYPERS 0853883] (noting that Lehman's game plan for combating the release of its second quarter loss is to emphasize its capital raise and "significant de-levering of the balance sheet"); e-mail from William Schlich, Ernst & Young, to Ryan Traversari, Lehman, *et al.* (June 14, 2008) [LBEX-DOCID 2374461] (providing Schlich's comments on the attached draft version of the second quarter 2008 preliminary earnings call speech); Transcript of Lehman Brothers Holdings Inc. Second Quarter 2008 Preliminary Earnings Call [Draft] (June 16, 2008), at p. 15 [LBEX-DOCID 2046258] (noting that "deleveraging and de-risking the balance sheet was an important goal this quarter" and that net leverage as of May 31 had been reduced from 15.4x to 12.0x).

## (ii)  Lehman's 2008 Forms 10-Q

The Examiner also finds that sufficient evidence exists to support colorable claims for malpractice against Ernst & Young arising from Ernst & Young's review of Lehman's first and second quarter Form 10-Q financial statements and MD&A sections.[3927]

Sufficient evidence exists to support a finding that the financial statements in both quarters of 2008 were misleading because:  (1) the notes stated that Lehman treated repos as collateralized agreements and financings, as opposed to disclosing that a significant volume of repo transactions were treated as sales (and thus were "off balance sheet"); and (2) the notes referred to the transfer of certain financial assets as sales pursuant to SFAS 140, but *only* with respect to securitization activities, without anywhere disclosing Lehman's Repo 105 activity.[3928]

Although a review of interim financial statements is "substantially less in scope than an audit," *see* AU § 722.09, the SEC requires a registrant such as Lehman  to engage an independent accountant to review its interim financial information before the registrant files its Form 10-Q.[3929]  The SEC further requires that an accountant's review report be filed with the interim financial information if the entity states that the interim

---

[3927] For purposes of this analysis, the Examiner does not reach the issue of whether the treatment of the Repo 105 transactions as sales under SFAS 140 is proper.  However, as discussed in Section III.A.4.j.2, there is sufficient evidence to support a determination by the trier of fact that the notes to the financial statements and other written disclosures presented a misleading picture of Lehman's financial condition by failing to disclose the effect of the volume and timing of Lehman's Repo 105 activity.

[3928] *See* Section III.A.4.j.2.c.ii of the Examiner's Report.

[3929] *See* Rule 10-01(d) of Regulation S-X, 17 C.F.R. § 210.10-01(d) (2009).

financial information has been reviewed by an independent public accountant.[3930]  Ernst & Young filed such review reports in connection with both of Lehman's Forms 10-Q in 2008.[3931]

An auditor can, of course, be liable for violating professional standards in connection with the preparation of interim financial reports.[3932]  Auditing and related professional practice standards applicable to the Examiner's finding of a colorable claim against Ernst & Young in the context of Ernst & Young's 2008 quarterly reviews of the notes to Lehman's quarterly financial statements include:

- AU Section 722.41-43 applies in situations where the auditor is aware that the interim financials contain inadequate disclosures or do not conform to GAAP in other ways.  In those instances, the auditor should issue a modified review report that describes the inadequacies or non-GAAP compliant matters.  The auditing standards define conformance with GAAP to mean not only that the accounting principles applied have general acceptance, but also to mean that the "financial statements, including the related notes, are informative of matters that may affect their use, understanding, and interpretation."  *See* AU § 411.04 (addressing the meaning of "present fairly in conformity with [GAAP]").[3933]

---

[3930] *Id.*

[3931] *See* LBHI 10-Q (filed April 9, 2008), at 42; LBHI 10-Q (filed July 10, 2008), at 53.

[3932] *See, e.g., William Iselin & Co., Inc. v. Landau*, 522 N.E.2d 21, 23 (N.Y. 1988) (regardless of whether the activity is characterized as an "audit" or a "review," the accountant owes the party contracting for the services a duty to exercise due care in the performance of professional accounting services); *Collins v. Esserman & Pelter*, 681 N.Y.S.2d 399, 401 (App. Div. 1998) ("Even with respect to a review . . . the accountant is obligated to exercise due care in the performance of the engagement."); Kantor, Geisler & Oppenheimer, P.A., PCAOB Release No. 105-2007-009 (Dec. 14, 2007) (finding that accounting firm violated Section 10A(b) of the Exchange Act and PCAOB standards in quarterly review when, upon learning information indicating that an illegal act may have occurred, the firm failed to address appropriately the threshold question of whether it was likely that an illegal act had occurred).

[3933] *See also* AU § 431.02 (under GAAP, financial statements should contain "adequate disclosure of material matters. . . [regarding] form, arrangement, and content of the financial statements and their appended notes, including, for example, the terminology used, the amount of detail given, the

- AU Section 722.07 relating to "Interim Financial Information" states that the objective of a review of interim financials is to provide the accountant with a basis for communicating whether the accountant is aware of any material modifications that should be made to the interim financial information for it to conform with GAAP.

- AU Section 722.07 states that an interim review typically does not require the auditor to perform tests of or obtain evidence that corroborates the financial information, but that the review instead principally consists of performing analytical procedures and making inquiries of persons responsible for accounting and financial matters.[3934]

- AU Section 722.10 charges the auditor with the responsibility of becoming sufficiently knowledgeable about the entity's business to allow the auditor to identify the types of potential material misstatements and to select the inquiries and analytical procedures that will provide the accountant with a basis for communicating whether he or she is aware of any material modifications that should be made to the interim financial information for it to conform with GAAP.

- AU Section 722.18(c) provides that an auditor engaged in an interim review should inquire of management about significant transactions occurring or recognized in the last several days of the interim period.

- AU Section 722.18(c) states that an auditor engaged in an interim review should inquire of management about allegations of fraud or suspected fraud affecting the entity, for example, received in communications from employees, former employees, analysts, regulators, short sellers, or others.

- AU Section 722.18(c) provides that an auditor engaged in an interim review should inquire of management about unusual or complex situations that may have an effect on the interim financial information.

---

classification of items in the statements, and the bases of amounts set forth. An independent auditor considers whether a particular matter should be disclosed in light of the circumstances and facts of which he is aware at the time").

[3934] Note that the standard goes on to require that when the reviewer becomes aware that the interim financial information may not be in conformity with GAAP in all material respects (which includes adequacy of disclosure), the reviewer is required to make additional inquiries and perform other procedures to corroborate the financial information. *See* AU § 722.22, *infra*.

- AU Section 722.22 specifies that if a reviewer of interim financial information becomes aware of information leading the reviewer to believe that the interim financial information may not be in conformity with GAAP in all material respects, the reviewer should make additional inquiries and perform other procedures that the reviewer considers appropriate to provide a basis for communicating whether the reviewer is aware of any material modifications that should be made to the interim financial information. The standards set forth the following example: "[I]f the accountant's interim review procedures lead him or her to question whether a significant sales transaction is recorded in conformity with [GAAP], the accountant should perform additional procedures, such as discussing the terms of the transaction with senior marketing and accounting personnel, reading the sales contract, or both, to resolve his or her questions."

- AU Section 722.26 states that if an "inadequate disclosure" is brought to the auditor's attention during an interim review, the auditor should evaluate matters such as the nature, cause, amount, and materiality of the "likely misstatement." Footnote 18 of AU Section 722.26 reminds the reviewer of the requirements concerning adequacy of disclosure that are contained in Rule 10-01 of Regulation S-X, including that "[t]he interim financial information shall include disclosures either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading. . . ."

- AU Section 722.28 provides that a reviewer should not issue a review report if the reviewer has not completed the necessary review procedures or if the client does not provide the reviewer with the written representations the reviewer believes are necessary to achieve the objective of an interim review.

- AU Section 722.28-31 states that if the auditor performing the review becomes aware of matters that cause him or her to believe that material modifications should be made to make the interim information conform with GAAP (which includes adequacy of disclosure) such matters should be communicated to management, and if management does not respond appropriately, then the auditor should inform the audit committee. If the audit committee does not respond appropriately, then the auditor should consider whether to resign from the review engagement and as the entity's auditor.

- AU Section 722.32 states that if the auditor becomes aware of information indicating that fraud or an illegal act has or may have occurred, the auditor

must also determine his or her responsibilities under AU Section 316, *Consideration of Fraud in a Financial Statement Audit*, AU Section 317, *Illegal Acts by Clients*, and Section 10A of the Securities Exchange Act of 1934.

- AU Section 722.34 incorporates AU Section 380, which concerns communications with those charged with governance.[3935]

- AU Section 722.36 provides that if the accountant has identified matters to be communicated to "those charged with governance," the accountant should attempt to make such communications to the audit committee, or at least to the chair of the audit committee, and a representative of management *before* the entity files its interim financial information with a regulatory agency.

These and other professional standards are also incorporated into Ernst & Young's engagement letter with Lehman:

"If we determine that there is evidence that fraud or possible illegal acts *may have occurred,* we will bring such matters to the attention of an appropriate level of management.  If we become aware of fraud involving senior management or fraud (whether by senior management or other employees) that causes a material misstatement of the consolidated financial statements, we will report this matter directly to the Audit Committee.  We will *ensure that the Audit Committee is adequately informed* of illegal acts that come to our attention unless they are clearly inconsequential. . . ."[3936]

The Examiner concludes that sufficient evidence exists to support a colorable claim that Ernst & Young should have made appropriate inquiries of management and performed analytical procedures concerning significant transactions that occurred at the ends of the quarters in 2008 and analyzed their impact upon the financial statements, including the footnotes.  Particularly after Lee alerted Ernst & Young to $50 billion in

---

[3935] *See* Section III.A.4.j.5.b.i. of this Report, which discusses the requirements of AU Section 380.

[3936] Letter from Ernst & Young to Christopher M. O'Meara, Lehman, re: 2007 audit services (May 15, 2007), at ¶ 9 [EY-LE-KEYPERS 2641786] (emphasis added).

Repo 105 transactions prior to the filing of the second quarter Form 10-Q, Ernst & Young should have reported to senior management and the Audit Committee that Lehman was using Repo 105 transactions to temporarily and artificially reduce balance sheet and its net leverage ratio for reporting purposes, without disclosing the practice to the public.[3937]

Sufficient evidence exists to support a colorable claim that Ernst & Young knew or should have known that the notes to the financial statements were false and misleading because, among other things, those notes describe all repos as "financings," which Ernst & Young knew was not the case, and those notes did not disclose the Repo 105 transactions.  Ernst & Young had a professional obligation to communicate the issue to both senior management and the Audit Committee and to recommend corrections of the Forms 10-Q, and also to either issue modified review reports noting the materially inadequate disclosures, or to withhold its review reports altogether.

There is also sufficient evidence to support the existence of a colorable claim against Ernst & Young for malpractice in connection with the misleading statements concerning Lehman's net leverage ratio contained in the MD&A sections of Lehman's

---

[3937] Before issuing its first and second quarter 2008 review reports, Ernst & Young obtained standard written representations from Lehman management stating that management was not aware of fraud or alleged fraud, and also disclosing transfers involving qualifying special purpose entities that were treated as sales under SFAS 140.  *See* Letter from Richard S. Fuld, Jr., Lehman, *et al*. to Ernst & Young, re: Lehman Management Representations (Apr. 9, 2008), at pp. 2, 6-7 [EY-SEC-LBHI-GAMX-1Q08 002679]; Letter from Richard S. Fuld, Jr., Lehman, *et al*. to Ernst & Young, re: Lehman Management Representations (July 9, 2008), at pp. 2, 6-7 [EY-SEC-LBHI-WP-2Q 000277].  Ernst & Young cannot, however, rely on these letters as a defense to its failure to act on Lee's allegations, given that, among other things, Lee presented his allegations directly to Ernst & Young (and outside the presence of management).

two 2008 Forms 10-Q.  Sufficient evidence exists to find that those disclosures were materially inadequate and misleading because Lehman did not disclose the fact that the reported assets, net assets, leverage ratio and the reduction in the net leverage ratio were materially affected by temporary Repo 105 transactions.

Auditors have a far more limited responsibility for disclosures and "other information" in filings accompanying financial statements, as opposed to the financial statements and accompanying footnotes, but the standards require the auditor to "read the other information [*e.g.*, the MD&A] and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the financial statements." *See* AU § 550.04.  In addition, AU Section 550.05 states that if the auditor "becomes aware of information that he believes is a material misstatement of fact that is not a material inconsistency, . . . he should discuss the matter with the client. . . . If the auditor concludes he has a valid basis for concern, he should propose that the client consult with some other party whose advice might be useful to the client, such as the client's legal counsel".[3938]  If the misstatement is not resolved, then the auditor should consider actions such as notifying

---

[3938] *See generally* AU § 312.10 (assessment of materiality involves both quantitative and qualitative considerations, including whether the omission of information would make it probable that the judgment of a reasonable person relying on the information would have been changed or influenced).

the client in writing of his or her views.  *See* AU § 550.06.[3939]  Here, Ernst & Young did

none of those things.

There is sufficient evidence for a trier of fact to conclude that Ernst & Young

should have insisted on proper disclosures of Repo 105 transactions in the interim

information that it reviewed or withheld an unmodified review report because the

interim information disclosures were materially inadequate and misleading.

Furthermore, the MD&A information implied that Lehman had achieved desirable net

leverage numbers by balance sheet reductions, without disclosing that those net

numbers would have been significantly higher but for the Repo 105 transactions.  There

is credible evidence that Ernst & Young was aware of Lehman's Repo 105 policy as

early as 2001,[3940] that Ernst & Young was aware of over $29 billion in Repo 105

transactions in 2007 when it received the Netting Grid,[3941] and that Ernst & Young was

on notice as to the $50 billion in such transactions by no later than June 2008.[3942]  Ernst &

Young was aware of the importance in Lehman's industry of the net leverage number,

---

[3939] Further, the standards state that "if the accountant concludes that there is a material inconsistency, *or becomes aware of information that he or she believes is a material misstatement of fact,* the action taken will depend on his or her judgment under the circumstances."  *See* AU § 722.18(f) (cross-referencing to AU § 550.04-06) (emphasis added).  In addition, as discussed in Section III.A.4.j.2.a of this Report, there is an SEC requirement that companies disclose "known trends" in MD&A sections.

[3940] Examiner's Interview of Ernst & Young, Repo 105, Oct. 16, 2009, at pp. 4-5 (statement of William Schlich); Examiner's Interview of  John Feraca, Oct. 9, 2009, at p. 7.

[3941] Lehman, Accounting Policy Review Balance Sheet Netting and Other Adjustments [Draft] (Nov. 2007), at p. 26 [LBEX-DOCID 3213271] (stating total amount of Repo 105 for Feb. 28, 2007 was $29.258 billion), attached to e-mail from Margaret Sear, Lehman, to Jerry Gruner, Ernst & Young, *et al.* (Nov. 6, 2007) [LBEX-DOCID 3235499].

[3942] *See* Sections III.A.4.i.4 and III.A.4.j.5.b.i of this Report, which discuss Lee's statements to Ernst & Young.

as those numbers were being touted by Lehman in the press and investor calls.[3943]

Given those facts, the Examiner finds that sufficient evidence exists to support a colorable claim against Ernst & Young in connection with its reviews of Lehman's interim financial information and its responsibilities regarding Lehman's MD&A information in both quarters of 2008.

### (iii) Lehman's 2007 Form 10-K

Lehman's 2007 Form 10-K contained essentially the same statements as those in its later 2008 Forms 10-Q. In its 2007 Form 10-K, Lehman represented that it treated repurchase agreements as financings (*i.e.*, not as sales) even though Repo 105 transactions were treated as sales. In Note 1 to Lehman's Consolidated Financial Statements, Lehman stated that Lehman treated "[r]epurchase and resale agreements" as "collateralized agreements and financings for financial reporting purpose" which Lehman described were "collateralized primarily by government and government agency securities."[3944] In addition, Lehman stated that "[o]ther secured borrowings principally reflect transfers accounted for as financings rather than sales under SFAS 140."[3945] Lehman disclosed that it recognized the transfer of financial assets as sales pursuant to SFAS 140 – but it said so only with respect to "securitization activities."[3946]

---

[3943] *See* Section III.A.4.e.6 of this Report.
[3944] LBHI 2007 10-K, at p. 97. This disclosure is under the heading "Collateralized Lending Agreements and Financings."
[3945] *Id.*
[3946] *Id.* at p. 96. "Securitization activities" is a separate heading in the Note.

There is also sufficient evidence for a trier of fact to conclude that Ernst & Young knew or should have known that that those statements were materially misleading and failed to provide necessary disclosures concerning Lehman's use of Repo 105 transactions.  Therefore, the Examiner finds sufficient evidence to support a colorable claim of malpractice against Ernst & Young in connection with its 2007 audit of Lehman.[3947]

The financial statements accompanying the 2007 Form 10-K were audited – as opposed to "reviewed" – by Ernst & Young and thus higher standards and requirements of professional care applied.  For example, while quarterly reviews require the auditor to perform analytical procedures and make inquiries of management, among many other things, year-end audits mandate that the auditor perform tests, gather corroborating evidence that supports the financial statements, obtain reasonable assurance about whether the financial statements are free of material misstatements, and provide a positive opinion regarding whether the financial statements are fairly presented in conformity with GAAP.  *See, e.g.*, AU §§ 310, 311, 326.

Accordingly, in performing its 2007 year-end audit, Ernst & Young was required to look at the data underlying the financial statements.  Such an audit should have

---

[3947] While the issue concerning the lack of disclosure with respect to Lehman's Repo 105 activity goes back to earlier periods, the Examiner's investigation of potential claims against Ernst & Young has focused on the late 2007 and early 2008 critical period because of the increasing volume of Repo 105 transactions, the emphasis on reducing net leverage, and Lehman's public touting of its deleveraging during that time.

revealed that a significant volume of Lehman's repo activity was not treated as financings, but instead was reported as sales. In addition, the MD&A section to Lehman's 2007 Form 10-K discussed the net leverage ratio without disclosing the role that Repo 105 transactions played in that calculation. Ernst & Young's failure to require proper disclosures in the MD&A section and in footnotes to the financial statements constitutes sufficient evidence to find a colorable claim of malpractice.

### (iv) Effect on Prior Filings

Finally, while Ernst & Young should have required proper disclosures in the 2007 Form 10-K and 2008 first quarter Form 10-Q prior to those filings, Ernst & Young also had a duty, upon learning in June 2008 of Lee's allegations concerning Repo 105 transactions, to revisit the earlier filings. The auditor's responsibilities in such situations is addressed in AU Section 561.04-06, which states that when an auditor becomes aware that facts may have existed at the date of a previously issued audit report which might have affected the report had the auditor then been aware of such facts, the auditor should investigate whether the new information is reliable and existed at the time of the original report and whether the new information indicates that the previously issued opinion is incorrect and should not be relied on. If the previously issued audit report is incorrect, the auditor should consider action to prevent future reliance on the prior reports.

### (v)  Causation and Damages

One measure of damages in an audit malpractice action against Ernst & Young would be the recovery of fees Lehman paid to Ernst & Young in connection with the 2007 audit and/or the 2008 reviews.[3948]  It also is possible that the estate could recover additional damages beyond fees paid to Ernst & Young if it is shown that Lehman suffered damages that could have been avoided had Ernst & Young adhered to professional accounting standards.  For example, had Ernst & Young fulfilled its obligation to advise the Audit Committee of the extent and significance of Repo 105 activities, the Audit Committee may have insisted on measures to actually and substantially reduce leverage or to take other remedial or strategic steps that might

---

[3948] *See, e.g., Stanley L. Bloch, Inc. v. Klein*, 258 N.Y.S.2d 501, 508 (Sup. Ct. 1965) (holding that measure of damages for professional negligence of accountant in issuing balance sheet containing substantial errors was accounting and auditing fees paid to accountant for year of service immediately prior to issuance of balance sheet and accounting and auditing fees necessitated by review thereof).

have led to a different outcome.[3949]  Ernst & Young, in turn, may have a compelling

argument that such a measure of damages is too speculative.[3950]

In addition, the estate may be able to seek compensation from Ernst & Young for

fees and expenses that the estate incurred or will incur as a result of Ernst & Young's

malpractice.  For example, if an accountant's negligence in the preparation or

certification of financial statements results in litigation against the accountant's client

brought by purchasers of the client's securities, the client may be able to recover the

expenses of the litigation and the amount of any judgment or reasonable settlement.[3951]

---

[3949] *See, e.g., Bd. of Trs. of Cmty. Coll. Dist. No. 508, County of Cook v. Coopers & Lybrand LLP*, 775 N.E.2d 55, 63 (Ill. App. 2002) (applying Illinois law, holding that auditor's failure to detect treasurer's violation of investment policy during audits could be the proximate cause of damages caused by investments made after the audit, where members of the board testified that they would have ended those investment practices had auditor detected them), *rev'd on other grounds*, 803 N.E.2d 460 (Ill. 2003); *Plan Comm. v. PricewaterhouseCoopers*, 335 B.R. 234, 249-51 (D.D.C. 2005) (creditors committee adequately alleged damages against debtor's auditing firm under District of Columbia law, where committee asserted that malpractice proximately caused debtor's insolvency and bankruptcy and specifically alleged that the board would have taken actions to avoid insolvency if it had been "timely alerted by appropriately audited financial statements to the fact that [company] was performing significantly worse than was presented in the negligently audited financial statements"), *dismissed on other grounds*, No. 02-01487 (TFH), 2007 WL 119917 (D.D.C. Apr. 20, 2007).

[3950] *See VTech Holdings Ltd. v. Pricewaterhouse Coopers* 348 F. Supp 2d 255, 267 (S.D.N.Y. 2004) (buyer of wired business could recover lost profits and consequential damages under New York law on accountant malpractice claim only if they were capable of being measured based on reliable factors).

[3951] A plaintiff generally is entitled to "actual out-of-pocket costs" that "flow as a natural and continuous consequence" from or are otherwise "proximately caused" by the defendant's breach of its legal duties. *Crowley v. Chait*, Civ. No. 85-2441 (HAA), 2004 U.S. Dist. LEXIS 27238, at *39 (D.N.J. Aug. 25, 2005); *Baker Hughes Oilfield Operation, Inc. v. Seabulk Tankers, Inc.*, No. Civ.A. 03-1230, 2004 WL 1290576, at *1 (E.D. La. June 8, 2004) (Baker I); *Keywell Corp. v. Piper & Marbury LLP*, No. 96-CV-0660E (SC), 1999 WL 66700, at *5 (W.D.N.Y. Feb. 11, 1999).  Among the expenses that could be considered to flow from the breach of a legal duty are those incurred to repair harm to the plaintiff caused by the defendant's breach.  *See, e.g. World Radio Labs., Inc. v. Coopers & Lybrand*, 557 N.W.2d 1, 15 (Neb. 1996) (holding that client was entitled to recover damages for accounting fees paid to second auditing firm as a result of defendant auditing firm's negligence).

### (c) Possible Defenses

The Examiner recognizes that Ernst & Young may have valid defenses to these claims. As a general matter, the question of whether an auditor committed malpractice is a fact-intensive inquiry and requires the testimony and opinion of experts in the field. Indeed, many of the auditing standards set forth above do not impose bright line rules, but instead provide general guidance and principles. Ernst & Young likely would submit expert testimony in support of its view that it adhered fully to its professional responsibilities in its reviews and audits of Lehman's financial statements, and may take the position that some of the professional standards cited above apply only where an auditor has a subjective belief that a disclosure or other information is materially inaccurate. Ernst & Young also may take the position that preparation of financial statements is the responsibility of management – and not of the outside auditor.

The Examiner concludes that there is sufficient basis for claims to be submitted to a trier of fact, who will have to evaluate those claims in light of any defenses raised by Ernst & Young.