**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x
                                            :
In re                                       :    Chapter 11 Case No.
                                            :
LEHMAN BROTHERS HOLDINGS INC.,              :    08-13555 (JMP)
*et al.*,                                   :
                                            :    (Jointly Administered)
                            Debtors.        :
--------------------------------------------------------- x


# REPORT OF
# ANTON R. VALUKAS, EXAMINER


Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
312-222-9350

919 Third Avenue
37th Floor
New York, NY  10022-3908
212-891-1600

March 11, 2010                    *Counsel to the Examiner*


## VOLUME 4 OF 9

### Section III.A.5: Secured Lenders

### Section III.A.6: Government

**EXAMINER'S REPORT**

**TABLE OF CONTENTS**

**(SHORT-FORM)**

**VOLUME 1**

**Introduction, Sections I & II:  Executive Summary & Procedural Background**

Introduction.................................................................................................................2

I.   Executive Summary of the Examiner's Conclusions ....................................................15

    A.   Why Did Lehman Fail?  Are There Colorable Causes of Action That
    Arise From Its Financial Condition and Failure?.....................................................15

    B.   Are There Administrative Claims or Colorable Claims For Preferences or
    Voidable Transfers?...............................................................................................24

    C.   Do Colorable Claims Arise From Transfers of LBHI Affiliate Assets To
    Barclays, or From the Lehman ALI Transaction? ...................................................26

II.  Procedural Background and Nature of the Examination ............................................28

    A.   The Examiner's Authority .............................................................................28

    B.   Document Collection and Review.........................................................................30

    C.   Systems Access.................................................................................................33

    D.   Witness Interview Process...................................................................................35

    E.   Cooperation and Coordination With the Government and Parties.....................37

**Section III.A.1:  Risk**

III. Examiner's Conclusions...................................................................................43

    A.   Why Did Lehman Fail?  Are There Colorable Causes of Action That
    Arise From Its Financial Condition and Failure?.....................................................43

        1.   Business and Risk Management.......................................................................43

            a)   Executive Summary .......................................................................43

b)  Facts.............................................................................................................58

c)  Analysis .......................................................................................................163

**VOLUME 2**

**Section III.A.2:  Valuation**

2.  Valuation ...................................................................................................203

a)  Executive Summary ....................................................................................203

b)  Overview of Valuation of Lehman's Commercial Real Estate
Portfolio ......................................................................................................215

c)  Senior Management's Involvement in Valuation....................................241

d)  Examiner's Analysis of the Valuation of Lehman's Commercial
Book..............................................................................................................266

e)  Examiner's Analysis of the Valuation of Lehman's Principal
Transactions Group.....................................................................................285

f)  Examiner's Analysis of the Valuation of Lehman's Archstone
Positions........................................................................................................356

g)  Examiner's Analysis of the Valuation of Lehman's Residential
Whole Loans Portfolio................................................................................494

h)  Examiner's Analysis of the Valuation of Lehman's RMBS
Portfolio .......................................................................................................527

i)  Examiner's Analysis of the Valuation of Lehman's CDOs ...................538

j)  Examiner's Analysis of the Valuation of Lehman's Derivatives
Positions........................................................................................................568

k)  Examiner's Analysis of the Valuation of Lehman's Corporate
Debt Positions..............................................................................................583

l)  Examiner's Analysis of the Valuation of Lehman's Corporate
Equities Positions ........................................................................................594

**Section III.A.3: Survival**

3. Lehman's Survival Strategies and Efforts.........................................609

    a) Introduction to Lehman's Survival Strategies and Efforts....................609

    b) Lehman's Actions in 2008 Prior to the Near Collapse of Bear Stearns........................................................................................622

    c) Actions and Efforts Following the Near Collapse of Bear Stearns .......631

**VOLUME 3**

**Section III.A.4: Repo 105**

4. Repo 105...................................................................................732

    a) Repo 105 – Executive Summary ...............................................732

    b) Introduction ........................................................................750

    c) Why the Examiner Investigated Lehman's Use of Repo 105 Transactions .......................................................................764

    d) A Typical Repo 105 Transaction ............................................765

    e) Managing Balance Sheet and Leverage ...................................800

    f) The Purpose of Lehman's Repo 105 Program Was to Reverse Engineer Publicly Reported Financial Results.........................853

    g) The Materiality of Lehman's Repo 105 Practice ......................884

    h) Knowledge of Lehman's Repo 105 Program at the Highest Levels of the Firm ........................................................................914

    i) Ernst & Young's Knowledge of Lehman's Repo 105 Program.............948

    j) The Examiner's Conclusions ..................................................962

**VOLUME 4**

**Section III.A.5:  Secured Lenders**

5.  Potential Claims Against Lehman's Secured Lenders ................................1066

    a)  Introduction and Executive Summary ....................................................1066

    b)  Lehman's Dealings With JPMorgan ......................................................1084

    c)  Lehman's Dealings With Citigroup........................................................1224

    d)  Lehman's Dealings With HSBC ............................................................1303

    e)  Lehman's Dealings With Bank of America ...........................................1375

    f)  Lehman's Dealings With Bank of New York Mellon...........................1376

    g)  Lehman's Dealings With Standard Bank................................................1382

    h)  Lehman's Dealings With the Federal Reserve Bank of New York .....1385

    i)  Lehman's Liquidity Pool........................................................................1401

**Section III.A.6:  Government**

6.  The Interaction Between Lehman and the Government..............................1482

    a)  Introduction ............................................................................................1482

    b)  The SEC's Oversight of Lehman ...........................................................1484

    c)  The FRBNY's Oversight of Lehman ......................................................1494

    d)  The Federal Reserve's Oversight of Lehman ........................................1502

    e)  The Treasury Department's Oversight of Lehman ...............................1505

    f)  The Relationship of the SEC and FRBNY in Monitoring
        Lehman's Liquidity..................................................................................1507

    g)  The Government's Preparation for the "Lehman Weekend"
        Meetings at the FRBNY ..........................................................................1516

h)   On the Evening of Friday, September 12, 2008, the Government Convened a Meeting of the Major Wall Street Firms in an Attempt to Facilitate the Rescue of Lehman ........................................1523

i)   Lehman's Bankruptcy Filing ...................................................1535

## VOLUME 5

### Section III.B:  Avoidance Actions

B.  Are There Administrative Claims or Colorable Claims for Preferences or Voidable Transfers..................................................................................1544

    1.  Executive Summary ...........................................................................1544

    2.  Examiner's Investigation of Possible Administrative Claims Against LBHI (First Bullet) .............................................................................1546

    3.  Examiner's Investigation of Possible Avoidance Actions (Third, Fourth and Eighth Bullets)...............................................................1570

    4.  Examiner's Investigation of Possible Breaches of Fiduciary Duty by LBHI Affiliate Directors and Officers (Fifth Bullet) ....................1894

    5.  Examiner's Analysis of Lehman's Foreign Exchange Transactions (Second Bullet) ...............................................................................1912

    6.  Examiner's Review of Intercompany Transactions Within Thirty Days of LBHI's Bankruptcy Filing (Seventh Bullet)....................1938

    7.  Examiner's Analysis of Lehman's Debt to Freddie Mac.............................1951

### Section III.C:  Barclays Transaction

C.  Do Colorable Claims Arise From Transfers of LBHI Affiliate Assets to Barclays, or From the Lehman ALI Transaction? ................................1961

    1.  Executive Summary ........................................................................1961

    2.  Facts................................................................................................1965

    3.  Whether Assets of LBHI Affiliates Were Transferred to Barclays .............1997

    4.  Lehman ALI Transaction................................................................2055

5.  Conclusions ........................................................................................................2063

6.  Barclays Transaction .........................................................................................2103

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x
                                  :

In re                            :     Chapter 11 Case No.

                                    :

LEHMAN BROTHERS HOLDINGS INC.,     :     08-13555 (JMP)
*et al.,*                                   :

                                    :     (Jointly Administered)

                             Debtors.     :
-------------------------------------------------------- x

# REPORT OF
# EXAMINER ANTON R. VALUKAS

## Section III.A.5: Secured Lenders

# TABLE OF CONTENTS

5.  Potential Claims Against Lehman's Secured Lenders .................................. 1066
    a)  Introduction and Executive Summary ................................................. 1066
        (1) JPMorgan ........................................................................... 1068
        (2) Citibank ............................................................................. 1073
        (3) HSBC ................................................................................. 1077
        (4) Other Lenders .................................................................... 1080
        (5) The Federal Reserve Bank of New York ......................... 1081
        (6) Lehman's Liquidity Pool ..................................................... 1082
    b)  Lehman's Dealings With JPMorgan ...................................... 1084
        (1) Facts ................................................................................. 1084
            (a) Overview of JPMorgan-Lehman Relationship ....................... 1084
            (b) Triparty Repo Prior to 2008 ...................................... 1089
            (c) JPMorgan Restructures Its Approach to Triparty Risk ......... 1094
            (d) Lehman Begins Posting Additional Collateral ...................... 1101
            (e) JPMorgan Concern Over Lehman Collateral in August
                2008 ............................................................................. 1105
            (f) The August Agreements ............................................. 1113
            (g) Background to the September 9 Collateral Request and
                September Agreements ............................................. 1125
            (h) September 9 Calls Between Steven Black and Richard
                Fuld ............................................................................. 1138
            (i) September Agreements ............................................. 1143
            (j) Daily Liquidity Pool Updates From Lehman to
                JPMorgan ................................................................. 1156
            (k) September 11 Collateral Request Pursuant to the
                September Agreements ............................................. 1158
            (l) Additional Valuation Analyses by JPMorgan Beginning
                September 11 ............................................................. 1165
            (m) Lehman Requests for Return of Collateral ........................... 1168
        (2) Analysis of Potential Claims ............................................. 1172
            (a) The Evidence Does Not Support a Colorable Claim
                Against JPMorgan for Economic Duress ........................... 1173
                (i) Legal Background: Economic Duress ........................... 1173

(ii)  There Is No Available Evidence of an Express Unlawful Threat Made by JPMorgan in Connection With the Formation of the September Agreements ..... 1174

(iii)  The Available Evidence Suggests JPMorgan Did Not Have an Improper Purpose ..................................... 1178

(iv)  There Was a Degree of Negotiation Over the Terms of the September Agreements ......................................... 1181

(b)  There Is Insufficient Evidence to Support a Colorable Claim That the September Agreements Are Invalid for Lack of Consideration ................................................ 1183

(c)  There is Sufficient Evidence to Support the Existence of a Technical, But Not Colorable, Claim That the September Agreements Are Invalid for Lack of Authority ..................... 1186

(i)  Tonucci May Have Acted With Apparent Authority ......................................................... 1190

(ii)  There Is Substantial Evidence That Lehman Ratified the September Agreements .............................. 1193

(d)  There Is Insufficient Evidence to Support a Colorable Claim That JPMorgan Fraudulently Induced the September Agreements .............................................. 1198

(e)  There Is Insufficient Evidence to Support a Colorable Claim for Breach of Contract of the September Agreements Based on JPMorgan's Refusal to Return Collateral .................................................................... 1200

(i)  Legal Background: Contractual Obligations Under September Agreements ................................... 1200

(ii)  There Was No Written Notice for Collateral Return ... 1208

(f)  There Is Evidence to Support a Colorable, But Not Strong, Claim That JPMorgan Breached the Implied Covenant of Good Faith and Fair Dealing by Demanding Excessive Collateral in September 2008 .................................. 1210

(i)  Legal Standards Governing Implied Covenant of Good Faith and Fair Dealing .......................................... 1211

(ii)  There Is Sufficient Evidence To Support a Colorable, But Not a Strong, Claim That JPMorgan Violated the Implied Covenant by Demanding Excessive Collateral ......................................................... 1214

(iii) A Trier of Fact Will Likely Have to Resolve a Waiver Defense.................................................................. 1220

c) Lehman's Dealings With Citigroup.......................................................1224

    (1) Facts............................................................................................................1224

        (a) Citigroup Provided Continuous Linked Settlement Service and Other Clearing and Settlement Operations to Lehman................................................................................ 1224

            (i) Background Information on the Continuous Linked Settlement Service Citi Provided to Lehman... 1224

            (ii) Other Clearing and Settlement Services That Citi Provided to Lehman ........................................................ 1227

            (iii) Citi's Clearing and Settlement Exposure to Lehman, Generally............................................................ 1229

            (iv) The Terms of Lehman's CLS Agreement with Citi ...... 1231

        (b) Lehman Provided a $2 Billion Cash Deposit with Citi on June 12, 2008 To Support its Clearing Needs.......................... 1233

            (i) The Market Environment and Other Circumstances Surrounding Citi's Request for the $2 Billion Cash Deposit on June 12 ...................................................... 1235

            (ii) The Parties Did Not Share the Same Understanding of the Terms of the $2 Billion Cash Deposit .................. 1242

                a. What Lehman Understood the Terms of the Deposit To Be............................................................ 1243

                b. What Citi Understood the Terms of the Deposit To Be.............................................................. 1245

                c. The Exact Terms of the "Comfort Deposit" Are Unknown Because the Terms Were Not Reduced to Writing..................................................... 1250

            (iii) Citi Knew the "Comfort Deposit" was Included in Lehman's Liquidity Pool.................................................. 1250

        (c) Collateral Pledge Discussions Between Lehman and Citi Began in June 2008 and Continued Until September 2008 ... 1251

            (i) The Unexecuted Pledge Agreement: the Parties Agreed to Negotiate the Terms but Not Execute the Agreement Until It Was Needed..................................... 1251

(ii)  Citi Had Difficulty Pricing the Collateral Offered by Lehman as a Substitute for the Cash Deposit .......... 1254

(iii)  The Guaranty Amendment Was Signed in a "Fire Drill" on September 9, 2008 ............................................. 1261

    a.  Events Prior to the Signing of the September 9 Guaranty Amendment from Citi's Perspective ..... 1263

    b.  Events Prior to the Signing of the September 9 Guaranty Amendment from Lehman's Perspective ................................................................ 1265

    c.  Negotiations Between Lehman and Citi Personnel Regarding Which Lehman Entities Were To Be Added to the Parent Guaranty by the September 9 Guaranty Amendment ................. 1268

(iv)  September 12, 2008: A Lehman Collateral Account at Citi was Activated After Two Months of Discussion, and Lehman Signed an Amendment to the Direct Custodial Services Agreement ...................... 1273

(d)  Lehman's Clearing Environment at Citi During the Week of September 8, 2008 ....................................................... 1276

(i)  Citi Required Lehman To Operate Under Lower Daylight Overdraft Limits ............................................... 1276

(ii)  Lehman Deposited Amounts in Excess of the $2 Billion Deposit at Various Times in 2008 With Citi ...... 1279

(iii)  Citi Endeavored To Help Lehman in September 2008, Prior to the Bankruptcy Filing ............................... 1281

(iv)  Lehman's Accounts at Citi Closed on Friday September 12 With Funds in Excess of the $2 Billion Deposit ................................................................ 1284

(e)  Citi's Participation in "Lehman Weekend" Events ................ 1285

(f)  Citi's Actions Toward Lehman After Lehman Filed for Bankruptcy Protection ................................................................ 1287

(i)  Citi Continued to Provide CLS Services for Lehman, But Not in an Entirely Uninterrupted Manner ................................................................................ 1287

(ii)  Prior to Lehman's Bankruptcy Filing, Citi Set Off a Portion of the Cash Deposit ............................................. 1290

(2)  Analysis of Potential Colorable Claims ........................................... 1291

(a) Validity of the September 9 Guaranty Amendment............. 1291

    (i) Economic Duress............................................................. 1291

        a. Legal Framework ....................................................... 1292

        b. The Evidence Does Not Support the Existence of a Colorable Claim Against Citi for Economic Duress ........................................................................ 1293

    (ii) The Failure of Consideration.......................................... 1297

        a. Legal Framework ....................................................... 1298

        b. The Evidence Does Not Support the Existence of a Colorable Claim Against Citi for Failure of Consideration .......................................................... 1298

(b) Breach of the Duty of Good Faith and Fair Dealing in Connection With the CLS Services Agreement ...................... 1300

    (i) The Evidence Does Not Support the Existence of a Colorable Claim Against Citi for Breach of the Duty of Good Faith and Fair Dealing in Connection With the CLS Services Agreement................................... 1301

d) Lehman's Dealings With HSBC .............................................................1303

   (1) Overview of HSBC's Relationship With Lehman ..........................1305

      (a) HSBC Provided CREST Clearing and Settlement Services to Lehman ................................................................. 1306

      (b) Overview of the Operative Agreements ................................. 1309

   (2) The Examiner's Investigation of Particular Transactions .............1311

      (a) HSBC Cancelled a $1 Billion Intraday Credit Facility ........... 1311

      (b) Lehman Maintained a $1 Billion Segregated Deposit with HSBC ..................................................................... 1312

      (c) Lehman Deposited $750 Million with HSBC on June 24 ...... 1314

      (d) Lehman Committed $25 Million on August 15 to HSBC's Syndicated Lending Facility.................................................... 1315

      (e) Lehman Pledged $6 Million to HSBC as Collateral for Letters of Credit ........................................................ 1317

      (f) Other Significant Exposures.................................................... 1318

   (3) HSBC Required Lehman to Provide Approximately $1 Billion in Collateral While Quietly Ending Their Relationship ...............................................................................1319

      (a) HSBC Determined to End Its Relationship with Lehman .... 1319

(b) HSBC Demanded Collateral for Intraday Credit .................. 1322

(c) HSBC Agreed To Accommodate Lehman at Quarter End ... 1325

(d) Lehman Deposited the Cash Collateral With HSBC ............. 1326

(e) Lehman Negotiated New Terms and Executed the Cash
Deeds ....................................................................................... 1327

    (i) Lehman Secured Concessions in the U.K. Cash
Deeds................................................................................ 1327

    (ii) Lehman Executed the Hong Kong Cash Deed Late
on September 12 ............................................................. 1329

(f) HSBC and LBHI Stipulated To Set Off and Return Some
of the Funds Covered by the U.K. Cash Deeds ...................... 1332

(4) Other Issues Stemming from HSBC's Collateral Demand............1333

(a) Lehman Included the Deposits Covered by the Cash
Deeds in Its Reported Liquidity Pool ...................................... 1333

(b) HSBC Considered Withholding Payments or Requiring
Prefunding of Trades in the Asia-Pacific Region Prior to
Lehman's Bankruptcy ............................................................... 1336

(5) The Evidence Does Not Support the Existence of Colorable
Claims Arising From HSBC's Demand That Lehman Provide
Cash Collateral and Execute Cash Deeds in Order for HSBC
to Continue Providing Clearing and Settlement Services............1336

(a) The Parameters of the Examiner's Analysis ........................... 1336

(b) The Facts Provide Little to No Support for Invalidating
the U.K. Cash Deeds.................................................................. 1339

    (i) Analytical Framework.................................................... 1339

        a. English Law Governs Contract Claims Arising
from the U.K. Cash Deeds ......................................... 1339

        b. English Contract Law Treats Deeds Differently
from Other Contracts................................................ 1340

    (ii) The Evidence Does Not Support the Existence of a
Colorable Claim That the U.K. Cash Deeds Are
Invalid for Want of Consideration................................. 1341

    (iii) The Evidence Does Not Support the Existence of a
Colorable Claim for Economic Duress Because the
CREST Agreement Allowed HSBC To Cease
Clearing and Settlement at Its Absolute Discretion ..... 1343

a.    Elements of Economic Duress ................................. 1343

b.    Application to Lehman Facts ................................. 1344

c.    Other Transactions Do Not Give Rise to
Economic Duress Claims ......................................... 1346

(iv)  The Evidence Does Not Support the Existence of a
Colorable Claim that HSBC Violated a Duty of
Good Faith and Fair Dealing by Demanding Cash
Collateral .......................................................... 1348

a.    English Law Does Not Recognize a Principle of
Good Faith and Fair Dealing of General
Application................................................................. 1349

b.    Application to Lehman Facts ................................. 1349

(v)  The Evidence Does Not Support the Existence of a
Colorable Claim that HSBC Violated the Notice
Provision of the CREST Agreement .............................. 1352

a.    Construction of Terms.............................................. 1352

b.    Application to Lehman Facts ................................. 1353

(vi)  The Cash Deeds Were Not Contracts of Adhesion
or Standard Form Contracts ........................................... 1355

a.    Characteristics of Standard Form Contracts or
Contracts of Adhesion.............................................. 1355

b.    Application to Lehman Facts ................................. 1355

(c)  Other Potential Theories of Liability......................................... 1357

(i)  English Law Governs the Remaining Potential
Claims Even Though They Are Not Covered by the
Choice-of-Law Provision of the Cash Deeds................. 1357

a.    Analytical Framework.............................................. 1357

b.    Application to Remaining Potential Claims........... 1359

(ii)  The Evidence Does Not Support The Existence Of a
Colorable Claim For Unjust Enrichment Because
Lehman Conveyed a Benefit on HSBC Pursuant to
Lehman's Valid Contractual Obligations ...................... 1360

a.    Elements of Unjust Enrichment ............................. 1361

b.    Application to Lehman Facts ................................. 1362

(iii)  The Evidence Does Not Support a Colorable Claim
That HSBC Breached a Fiduciary Duty to Lehman

Because HSBC and Lehman Were Sophisticated Parties in a Relationship Governed by an Agreement That Limited HSBC's Obligations .............. 1363

    a.   Elements of Breach of Fiduciary Duty and Misappropriation ....................................................... 1364

    b.   Application to Lehman Facts ................................... 1365

(iv)  The Evidence Does Not Support a Colorable Claim that HSBC's Demand for Collateral Tortiously Interfered With Lehman's Other Business or Contracts Because HSBC Was Acting To Protect Its Own Economic Interests .................................................. 1367

    a.   Elements of Tortious Interference ........................... 1368

    b.   Application to Lehman Facts ................................... 1369

(v)   The Evidence Does Not Support a Finding that HSBC Fraudulently or Negligently Misrepresented Its Plan to Withdraw ....................................................... 1371

    a.   Elements of Fraud and Misrepresentation ............. 1371

    b.   Application to Lehman Facts ................................... 1373

e)   Lehman's Dealings With Bank of America ............................................1375

f)    Lehman's Dealings With Bank of New York Mellon............................1376

   (1)  BNYM Demands and Receives a Collateral Deposit ....................1377

   (2)  The Deposit Is Significant Because of Internal Lehman Concerns About Including It in Its Pool ..........................................1379

g)   Lehman's Dealings With Standard Bank.................................................1382

h)   Lehman's Dealings With the Federal Reserve Bank of New York .....1385

   (1)  The FRBNY Supervises Deposit-Taking Institutions and Assists in Managing Monetary Policy, but Lacks Authority To Regulate Investment Bank Holding Companies .....................1385

   (2)  In Response to the Bear Stearns Near Collapse, the FRBNY Created a Variety of Facilities To Backstop the Liquidity of Broker-Dealers; Lehman, In Turn, Drew on These Facilities........1387

     (a)  The Primary Dealer Credit Facility .......................................... 1387

     (b)  The Market Greeted the Creation of the PDCF as a Positive Step Toward Backstopping Broker-Dealer Liquidity, and as Shoring Up Lehman's Liquidity ................ 1390

        (c)  In Addition to a Liquidity Backstop, Lehman Viewed the
PDCF as an Outlet for Its Illiquid Positions ............................ 1392

        (d)  Lehman Was Reluctant to Draw on the PDCF Because of
a Perceived "Stigma" Attached to Borrowing from the
Facility ...................................................................................... 1396

        (e)  Lehman Accessed the PDCF Ten Times in 2008;
Lehman's Use of the PDCF Was Concentrated in Periods
Immediately After the Bear Stearns Near Collapse, and
Immediately After LBHI Filed for Bankruptcy ...................... 1398

    (3)  Other FRBNY Liquidity Facilities .................................................. 1400

        (a)  The Term Secured Lending Facility ......................................... 1400

        (b)  Open Markets Operations ........................................................ 1401

i)   Lehman's Liquidity Pool ........................................................................ 1401

    (1)  Introduction and Executive Summary ............................................ 1401

    (2)  The Importance of Liquidity to Broker-Dealers and
Investment Bank Holding Companies Generally ......................... 1406

    (3)  Lehman's Liquidity Pool ................................................................. 1408

        (a)  The Purpose and Composition of Lehman's Liquidity
Pool ........................................................................................... 1408

        (b)  Lehman Tested Its Liquidity Pool and Shared the Results
of These Tests with Rating Agencies ...................................... 1413

        (c)  Market Participants Formed Favorable Opinions of
Lehman's Liquidity on the Basis of Lehman's
Representations About Its Liquidity Pool .............................. 1415

    (4)  Lehman's Clearing Banks Sought Collateral Pledges and
Cash Deposits To Secure Intraday Credit Risk; Lehman
Included This Collateral in Its Liquidity Pool ............................... 1417

        (a)  Lehman Pledged CLOs and Other Securities to
JPMorgan Throughout the Summer of 2008 to Meet
Triparty-Repo Margin Requirements ...................................... 1417

        (b)  The Securities Posted to Meet JPMorgan's Margin
Requirements Were Included in Lehman's Liquidity
Pool ........................................................................................... 1422

        (c)  On June 12, 2008, Lehman Transferred $2 Billion to Citi
as "Comfort" for Continuing CLS Settlement ........................ 1424

(d) The Citi "Comfort Deposit" Was Included in Lehman's Liquidity Pool.......................................................................... 1430

(e) On August 25, 2008, Lehman Executed a Security Agreement with Bank of America, Granting the Bank a Security Interest in a $500 Million Deposit ............................ 1433

(f) LBHI and JPMorgan Executed an Amendment to the June 2000 Clearance Agreement, a Security Agreement and a Holding Company Guaranty, all Dated August 26, 2008 ........................................................................................ 1436

(g) Lehman Assets Subject to the August Security Agreement Were Included in Lehman's Liquidity Pool ....... 1439

(h) September 2, 2008: Lehman Transferred Just Under $1 Billion to HSBC to Continue Clearing Operations, and Encumbered This with "Cash Deeds" Executed on September 9 and September 12................................................. 1441

(i) The HSBC Deposit Was Represented as "Liquid" and Was Included in LBHI's Liquidity Pool ................................. 1446

(j) Lehman and JPMorgan Executed Another Round of Security Documentation Dated September 9, 2008; Lehman Made $3.6 Billion and $5 Billion Pledges to JPMorgan Subject to the Terms of These Agreements .......... 1446

(k) Lehman Made a Deposit to Bank of New York Mellon to Cover Intraday Exposure, and Included That Deposit in Its Liquidity Pool .................................................................... 1448

(l) The Cumulative Impact of Lehman's Inclusion of Clearing-Bank Collateral and Deposits in Its Liquidity Pool ......................................................................................... 1450

(5) Disclosures Concerning the Inclusion of Clearing-Bank Collateral in Lehman's Liquidity Pool ............................................ 1454

(a) Lehman Did Not Disclose on Its June 16, 2008 Second Quarter Earnings Call That It Was Including the $2 Billion Citi "Comfort Deposit" in Its Liquidity Pool ............. 1454

(b) Lehman Did Not Disclose in Its Second Quarter 2008 10-Q, Filed July 10, 2008, That It Was Including Both the $2 Billion Citibank "Comfort Deposit" and Approximately $5.5 Billion of Securities Collateral Pledged to JPMorgan in Its Liquidity Pool .................................................. 1455

(c) Lehman Did Not Disclose On Its September 10, 2008
    Earnings Call That a Substantial Portion of Its Liquidity
    Pool Was Encumbered by Clearing-Bank Pledges ................ 1457

(d) Senior Executives Did Not Disclose to the Board of
    Directors at the September 9, 2008 Finance Committee
    Meeting the Fact That a Substantial Portion of Its
    Liquidity Pool Was Encumbered by Clearing-Bank
    Pledges ........................................................................................ 1460

(e) Lehman Officers Did Not Disclose to the Board of
    Directors That Its Liquidity Position Was Substantially
    Impaired by Collateral Held at Clearing Banks Until the
    Evening of September 14, 2008 ................................................. 1464

(f) Lowitt's Views on Including Clearing-Bank Collateral in
    the Liquidity Pool ...................................................................... 1466

(6) Rating Agencies Were Unaware That Lehman Was
    Including Clearing-Bank Collateral in Its Liquidity Pool ............ 1467

(a) Fitch ............................................................................................. 1467

(b) Standard & Poor's ...................................................................... 1468

(c) Moody's ....................................................................................... 1469

(7) The FRBNY Did Not View the Clearing-Bank Collateral in
    the Liquidity Pool as "Unencumbered" .......................................... 1469

(8) The SEC, Lehman's Primary Regulator, Was Unaware of the
    Extent to Which Lehman Was Including Clearing-Bank
    Collateral in Its Liquidity Pool; to the Extent It Was Aware,
    the SEC Did Not View This Practice as Proper .............................. 1472

(9) Certain Lehman Counsel Were Aware That Agreements
    with Its Clearing Banks Were Structured to Include
    Clearing-Bank Collateral in Its Liquidity Pool, but
    Disclaimed Knowledge Concerning What Assets Were
    Appropriate or Inappropriate for the Liquidity Pool .................... 1476

(10) Lehman's Auditors Monitored Lehman's Liquidity Pool, but
    Viewed the Composition of the Pool as a Regulatory Issue ......... 1478

(11) There Is Insufficient Evidence To Support a Determination
    That Any Officer or Director Breached a Fiduciary Duty in
    Connection With the Public Disclosure of Lehman's
    Liquidity Pool .................................................................................. 1479

PAGE INTENTIONALLY LEFT BLANK

### 5. Potential Claims Against Lehman's Secured Lenders

#### a) Introduction and Executive Summary

Pursuant to the eighth bullet of paragraph 2 of the Examiner Order, this Section of the Report examines transactions and transfers among the debtors and pre-Chapter 11 third-party lenders. The Examiner has consulted with the parties in interest, reviewed issues identified by those parties, conducted his own independent review and examination and exercised his discretion as to which issues to include in the Report. This Section of the Report covers potential common law claims against Lehman's lenders. Section III.B covers potential avoidance and preference actions.

Throughout 2008, and up to the date that Lehman filed for bankruptcy, Lehman's clearing banks demanded collateral to secure risks they assumed in connection with clearing and settling Lehman's triparty and currency trades, and other extensions of credit. This Section of the Report examines the circumstances surrounding Lehman's provision of approximately $15 to $21 billion in collateral (both in cash and securities) to its clearing banks, and Lehman's simultaneous inclusion of those funds in its reported liquidity pool.

As set forth in more detail below, the importance of liquidity to investment bank holding companies cannot be overstated. Broker-dealers are dependent on short-term financing to fund their daily operations, and a robust liquidity pool is critical to a broker-dealer's access to such financing. The Examiner has found that the size of

Lehman's liquidity pool provided comfort to market participants and observers, including rating agencies. The size of Lehman's liquidity pool encouraged counterparties to continue providing essential short-term financing and intraday credit to Lehman. In addition, the size of Lehman's liquidity pool provided assurance to investors that if certain sources of short-term financing were to disappear, Lehman could still survive.

Critically, the collateral posted by Lehman with its various clearing banks was initially structured in a manner that enabled Lehman to claim the collateral as nominally lien-free (at least overnight), and continue to count it in its reported liquidity pool. However, by September 2008, much of Lehman's reported liquidity was locked up with its clearing banks, and yet this fact remained undisclosed to the market prior to Lehman's bankruptcy.

What follows is a review of the demands for added credit protection by JPMorgan, Citi, HSBC, Bank of America, Bank of New York Mellon and Standard Bank, followed by a brief synopsis of the Examiner's legal conclusions. The Examiner concludes that there may be a colorable claim against one clearing bank – JPMorgan – arising from these collateral demands in 2008. Then, this Section discusses Lehman's public statements about its liquidity pool.

### (1) JPMorgan

JPMorgan acted as LBI's principal clearing bank pursuant to a Clearance Agreement between JPMorgan and LBI. The most significant component of JPMorgan's clearing services was "triparty repo" clearing. Although triparty-repo investors typically required a broker-dealer such as LBI to post "margin" (that is, additional collateral) overnight to account for investor risk, before 2008, JPMorgan did not retain that margin intraday.

In February 2008, JPMorgan informed Lehman that JPMorgan would begin retaining the same margin intraday that triparty investors required overnight. This change – JPMorgan's retention of "triparty-investor margin" – was implemented gradually in 20 percent increments over the course of approximately five months.

JPMorgan also determined that its risk vis-à-vis broker-dealers such as LBI was greater than the risk faced by overnight investors. JPMorgan therefore instituted an additional margin requirement, which it called "risk-based margin," and incrementally imposed that margin on broker-dealers as well. Lehman initially responded to JPMorgan's risk-based margin requirement by posting approximately $5 billion in securities in June 2008. Lehman continued to post additional collateral at JPMorgan throughout the summer in response to JPMorgan's margin requirements.

In August 2008, JPMorgan raised concerns about collateral that Lehman had posted. In particular, Lehman had posted illiquid and difficult-to-price CDOs that

Lehman had self-priced.  JPMorgan was also concerned because LCPI (not LBI or its holding company) had posted collateral to cover JPMorgan's risk-based margin. Lehman transferred much of this collateral from LCPI to LBHI in early August to alleviate JPMorgan's concern.

At the end of August, after significant negotiation, Lehman and JPMorgan entered into three agreements: an Amendment to the Clearance Agreement, a Guaranty and a Security Agreement.  The Amendment to the Clearance Agreement added additional Lehman parties to the Clearance Agreement.  Under the Guaranty, LBHI guaranteed the Lehman parties' obligations under the Clearance Agreement.  The Security Agreement secured LBHI's Guaranty, granting JPMorgan a security interest in a Cash Account, Securities Account and certain related accounts.  The Security Agreement also provided for an "Overnight Account" into which LBHI could transfer cash or securities overnight if no obligations remained outstanding under the Clearance Agreement at the end of the day.  Those assets, however, generally had to be returned to Lehman's liened accounts by morning in order for JPMorgan to continue clearance operations.  Lehman understood the August Agreements as documenting existing practice, not fundamentally altering its relationship with JPMorgan.

By late August and early September, Lehman's deteriorating financial condition became increasingly apparent.  On September 4, 2008, Lehman and JPMorgan executives met to discuss Lehman's third quarter earnings and survival strategies.

JPMorgan emerged concerned with Lehman's plans. JPMorgan also reviewed a draft of Lehman's planned presentation to rating agencies, and JPMorgan expressed concerns about that presentation as well. The following day (September 5), JPMorgan's Investment Bank Risk Committee met to discuss the Investment Bank's exposures to various broker-dealers, and expressed particular concerns about Lehman. Then, on September 9, 2008, reports surfaced that acquisition talks between Lehman and KDB had fallen through, and Lehman's stock plummeted. In response, Lehman decided to preannounce its third quarter earnings the following morning, September 10. Also on September 9, JPMorgan requested $5 billion of additional collateral to cover all of JPMorgan's exposures to Lehman, not limited to triparty-repo clearing exposure. Lehman agreed to post $3 billion immediately, and posted the $3 billion in cash and money market funds by the next day.

JPMorgan further determined that it wanted a new "master-master" agreement with Lehman to cover its entire relationship across all Lehman liabilities and entities. For the collateral that JPMorgan requested on September 9 to cover all of JPMorgan's exposures to all Lehman entities, new documentation had to be executed. JPMorgan insisted that an Amendment to the Clearance Agreement, Security Agreement and Guaranty be in place before Lehman's earnings call the next morning. The evidence does not suggest, however, that JPMorgan threatened to cease clearing for Lehman if the agreements were not executed by then.

JPMorgan's and Lehman's legal teams negotiated the documents through the night. Lehman's attorneys received virtually no input from Lehman's senior financial officers or other business personnel, who were immersed in preparations for the upcoming earnings call. Indeed, neither Lehman's Treasurer nor its Chief Financial Officer reviewed the terms of the agreements or even a summary of the key terms before the agreements were signed.

These agreements significantly extended JPMorgan's rights to request and retain collateral by expanding the Lehman accounts over which JPMorgan had a lien and the obligations that its lien secured. The September Security Agreement and Guaranty also required three-days' written notice for LBHI to attempt to retrieve any of its collateral.

On September 11, JPMorgan executives met to discuss significant valuation problems with securities that Lehman had posted as collateral over the summer. JPMorgan concluded that the collateral was not worth nearly what Lehman had claimed it was worth, and decided to request an additional $5 billion in cash collateral from Lehman that day. The request was communicated in an executive-level phone call, and Lehman posted $5 billion in cash to JPMorgan by the afternoon of Friday, September 12. Around the same time, JPMorgan learned that a security known as Fenway, which Lehman had posted to JPMorgan at a stated value of $3 billion, was actually asset-backed commercial paper credit-enhanced by Lehman (that is, it was Lehman, rather than a third party, that effectively guaranteed principal and interest

payments). JPMorgan concluded that Fenway was worth practically nothing as collateral.

Notwithstanding JPMorgan's concerns with the quantity and quality of collateral posted by Lehman, Lehman believed that JPMorgan was overcollateralized. There is no evidence, however, that Lehman requested in writing the return of the billions of dollars of collateral it had posted in September. Lehman did informally request the return of at least some of its collateral, and JPMorgan returned some securities to Lehman on September 12. JPMorgan did not, however, release any of the cash collateral that Lehman had posted in response to the September 9 and September 11 requests.

The Examiner has analyzed a number of potential common law claims against JPMorgan in connection with the September Agreements and collateral demands. The Examiner concludes:

- The evidence does not support the existence of a colorable claim against JPMorgan for economic duress principally because the Examiner has found no evidence of an express unlawful threat by JPMorgan.

- The evidence does not support the existence of a colorable claim that the September Agreements are invalid for lack of consideration because (i) the September Amendment to the Clearance Agreement was a modification of an existing contract and, therefore, required no additional consideration, and

(ii) the September Security Agreement and Guaranty were supported by JPMorgan's continued extension of credit to Lehman.[3952]

- There may be a technical claim that the September Agreements are invalid for lack of authority, but there are substantial defenses to such a claim, including that Lehman ratified the agreements when it posted collateral on September 12. Accordingly, the Examiner concludes that the evidence does not support the existence of a colorable claim.

- The evidence does not support the existence of a colorable claim that JPMorgan fraudulently induced the September Agreements even if JPMorgan counsel told Lehman counsel that an agreement in principle had already been reached by Lehman's and JPMorgan's senior management. There is conflicting evidence as to whether there was such an agreement in principle. Nonetheless, regardless of the outcome of that disputed issue of fact, it does not appear that Lehman counsel in fact relied on the representation or reasonably could have relied upon it.

- The Examiner also concludes that the evidence does not support the existence of a colorable claim that JPMorgan breached the September Agreements by refusing to return collateral to Lehman. JPMorgan was not legally required to do so principally because Lehman failed to provide JPMorgan with written notice for return of collateral as required under the September Agreements.

- Finally, the Examiner concludes that the evidence may support the existence of a colorable claim – but not a strong claim – that JPMorgan breached the implied covenant of good faith and fair dealing by making excessive collateral requests to Lehman in September 2008. A trier of fact would have to consider evidence that the collateral requests were reasonable and that Lehman waived any claims by complying with the requests.

### (2) Citibank

Citibank was Lehman's designated settlement member on the Continuous

Linked Settlement ("CLS") system, a trading platform operated by a consortium of

---

[3952] *See infra* Section III.B.3.g.5.a for a discussion of claims to avoid the September Guaranty under applicable fraudulent transfer law where a different standard applies for assessing "reasonably equivalent value."

banks for the clearance and settlement of foreign exchange ("FX") trades. In executing trades for Lehman on the CLS system, Citi accepted Lehman's CLS trades, submitted them to the CLS Bank, and extended intraday credit to Lehman, thereby assuming a certain amount of intraday credit risk. Citi provided the clearing and settlement services on CLS under the aegis of a CLS Settlement Services Agreement for CLS User Members, originally entered into by Lehman and Citi in December 2003, and later amended in October 2004. Notably, this Agreement provided that any extension of credit by Citi was within Citi's "sole discretion."

Citi provided Lehman with additional financial services, such as maintaining cash deposit and custodial accounts, providing credit facilities, and some custody and clearing services in emerging markets and in the United States.

After the market's negative reaction to Lehman's second quarter earnings announcement and Lehman's announced personnel changes on June 12, 2008, Citi sought to reduce its intraday risk exposure to Lehman. Consequently, on that same day, Citi obtained a $2 billion "comfort" deposit from Lehman, to be maintained at Citi in an overnight call account. Although the $2 billion deposit was not formally pledged, Citi believed that it had a general right of setoff. In addition, according to Citi personnel, had Lehman withdrawn the deposit, Lehman would have had to prefund its transactions in order for Citi to continue clearing and settling Lehman's trades. The $2 billion deposit was included in Lehman's reported liquidity pool.

Further, beginning in July, the parties negotiated – without success – the terms of a formal pledge agreement on the understanding that Lehman would pledge securities to collateralize Citi's clearing and settlement lines, in lieu of the cash deposit. Citi proposed several versions of a collateral pledge agreement, and Lehman proposed different portfolios of assets to post as collateral. Citi declined to accept any of the securities proposed by Lehman as collateral; Citi had difficulty pricing the assets and questioned whether there was a ready market for them.

The negotiations between Citi and Lehman over the pledge agreement ceased when, between September 9 and 12, Lehman and Citi amended two critical agreements instead of executing the pledge agreement. By early September, Citi had become acutely concerned about its claim on the $2 billion deposit. Then, on September 9, the reported failure of the KDB deal, coupled with Lehman's announcement that it would accelerate its third quarter earnings announcement to September 10, prompted Citi to request that Lehman immediately amend the parent Guaranty Amendment to expand the scope of the holding company Guaranty (to include obligations owed to Citi under any custodial agreement with Citi in addition to extensions of credit by Citi) and ultimately added 10 additional Lehman subsidiaries to the guaranty (Citi had originally requested that 17 be added). On September 12, the parties also amended the Direct Custodial Services Agreement ("DCSA"), which provided Citi with a broad and explicit security interest over cash, securities or other assets held by Citi on behalf of Lehman.

Citi continued thereafter to provide clearing and trade settlement services for Lehman, albeit under reduced clearing limits, until Lehman filed for bankruptcy on September 15. Ultimately, Citi cleared for Lehman through CLS until Friday, September 19.

The Examiner has identified potential common law claims against Citi arising out of these transactions, but has not found any of them to be colorable.

- The evidence does not support the existence of a colorable claim for economic duress surrounding Citi's demand that Lehman execute the September 9 amendment to the Guaranty because, *inter alia*, there is no evidence of an express unlawful threat by Citi to induce Lehman to agree to its terms. Indeed, Lehman successfully negotiated certain terms in its favor prior to signing the amendment.

- Likewise, the evidence does not support the existence of a colorable claim for failure of consideration: Citi extended credit to Lehman at its sole discretion, and the September 9 amendment induced Citi to continue providing intraday credit to Lehman subsidiaries. Given the rapidly deteriorating market conditions, it was not unreasonable for Citi to seek added security from Lehman.[3953]

- The evidence does not support the existence of a colorable claim against Citi for breach of the duty of good faith and fair dealing in connection with its CLS agreement with Lehman. The Examiner found no evidence to suggest any obligation by Citi to provide clearing and settlement services to Lehman, and given the increased risk Citi faced vis-à-vis Lehman on September 9, there is no colorable claim that Citi acted unreasonably, irrationally, arbitrarily, or in bad faith by exercising or threatening to exercise its contractual right to cease extending clearing advances and to cease serving as Lehman's CLS settlement member bank.

---

[3953] *See infra* Section III.B.3.g.5.b for a discussion of claims to avoid the Guaranty under applicable fraudulent transfer law where a different standard applies for assessing "reasonably equivalent value."

### (3)  HSBC

HSBC principally provided Lehman with clearing and settlement services for sterling-denominated trades in CREST, a clearing and settlement system for certain securities.  Sterling-denominated trades in CREST are settled in real time; consequently, as Lehman's settlement bank, HSBC extended Lehman intraday credit to facilitate the settlement of its CREST trades.  The governing agreement between Lehman and HSBC (the "CREST agreement") provided that HSBC had "absolute discretion" to terminate its responsibilities as Lehman's CREST settlement bank (which included extensions of intraday credit associated with settling Lehman's trades).  The CREST agreement further provided that HSBC could terminate the contract without notice, only requiring 30 days' notice to the extent that HSBC "consider[ed] it practicable and appropriate."

HSBC provided myriad other banking services to Lehman, including acting as Lehman's trustee for special purpose vehicles in the Cayman Islands, as Lehman's counterparty in derivatives trades and other transactions, and providing various other credit products to Lehman.  HSBC's most significant credit exposure, however, derived from HSBC's role as Lehman's CREST settlement bank.

Beginning in mid-2006, HSBC took steps to reduce its credit exposure to the financial sector generally, and, in 2007, it reduced its lines of uncommitted credit available to the investment banks.  HSBC accelerated these measures after the near collapse of Bear Stearns in early 2008.  Viewing Lehman as the next most vulnerable

investment bank, HSBC further reduced various lines of credit it had extended to Lehman. Initially, HSBC implemented these measures quietly, undetected by both Lehman and the marketplace. However, on August 18, 2008, HSBC advised Lehman of its intention to withdraw from its business relationship with Lehman entirely. In addition, over the next several days, HSBC demanded that Lehman deposit just under $1 billion into accounts in the U.K. and in Hong Kong, ultimately to be secured by three cash deeds. HSBC intended the U.K. deposit to cover its exposure arising from CREST clearing and settling. The smaller Hong Kong deposit was intended to collateralize various lines of credit HSBC provided to Lehman subsidiaries in the Asian market.

Lehman understood that HSBC would cease clearing and settling trades in CREST for Lehman if Lehman did not post this collateral. Lehman initially deposited the equivalent of approximately $800 million with HSBC on August 28. Later that same day, HSBC permitted Lehman to retrieve that deposit to assist Lehman in meeting its third quarter balance sheet targets. Lehman subsequently re-deposited the equivalent of approximately $800 million with HSBC on September 1. On September 2, Lehman deposited approximately $180 million in an HSBC Hong Kong account.

Negotiations over the terms of the cash deeds ensued, and Lehman secured favorable concessions during that process. Two cash deeds were executed to cover the U.K. deposit on September 9 (the "U.K. Cash Deeds"), and the parties executed a third cash deed on September 12 related to the Hong Kong deposit (the "Hong Kong Cash

Deed"). English law governed the terms of the U.K. Cash Deeds, while Hong Kong law governed the terms of the Hong Kong Cash Deed. Notably, the deeds limited Lehman's ability to access the collateral unless there were no debts in certain, specified accounts (and no contingent liabilities), and HSBC retained general rights of setoff in all events.

The Examiner has identified several potential claims under English law against HSBC arising out of these transactions involving the U.K. Cash Deeds, but has not found any of them to be colorable.

- The evidence does not support the existence of a colorable claim that the U.K. Cash Deeds are invalid for lack of consideration. English law does not require consideration to enforce an agreement contained in a deed. In any event, because the CREST agreement gave HSBC absolute discretion in providing Lehman with settlement and clearing services, Lehman received consideration in HSBC's agreement to continue providing those services. Lehman may have also received consideration in the form of the interest it received on the collateral it posted.

- Likewise, the evidence does not support the existence of a colorable claim for economic duress because the operative CREST agreement (and other credit agreements) permitted HSBC to terminate its services at its discretion. In any event, the Examiner found no evidence of duress, in particular given that Lehman negotiated more favorable terms for itself in the provisions of the deeds.

- The evidence does not support the existence of a colorable claim for breach of the duty of good faith and fair dealing. HSBC's absolute discretion over offering CREST services and extensions of credit to Lehman is not subject to such an obligation under English law, and even if it was, HSBC's demands were grounded in legitimate commercial concerns about Lehman's viability.

- HSBC did not breach the notice provision of the CREST agreement. HSBC's determination not to provide more advanced notice of its decision to terminate services was not arbitrary, capricious, unreasonable or in bad faith; instead, it was legitimately grounded in its commercial interest.

- The evidence does not support the existence of a colorable claim that the U.K Cash Deeds were contracts of adhesion or standard form contracts. HSBC and Lehman were sophisticated parties to agreements that were extensively negotiated (ultimately resulting in changes that favored Lehman).

- Likewise, the evidence does not support the existence of a colorable claim that HSBC was unjustly enriched through the U.K. Cash Deeds. The Examiner concludes that the U.K. Cash Deeds are valid contracts, under which Lehman had a duty to convey a benefit to HSBC, for which Lehman received a benefit.

- The evidence does not support the existence of a colorable claim that HSBC breached a fiduciary duty to Lehman. HSBC did not owe Lehman a duty independent of its narrowly defined role as Lehman's CREST settlement bank, and the CREST agreement imposed no obligation on HSBC to continue providing services to Lehman.

- Even if HSBC's collateral demands were to have factored materially in Lehman's decision to file for bankruptcy, the evidence does not support the existence of a colorable claim that HSBC's demand for collateral tortiously interfered with Lehman's contracts with other parties. HSBC was acting to protect its own commercial interests.

- Finally, the evidence does not support the existence of a colorable claim that HSBC fraudulently or negligently represented its plans to terminate its commercial relationship with Lehman. To the contrary, HSBC was forthright about its intentions to reduce its exposure to Lehman and ultimately to cease doing business with Lehman.

### (4)  Other Lenders

Several banks, in addition to JPMorgan, Citi and HSBC, demanded increased security from Lehman in the weeks preceding the petition date. While the Examiner did not investigate whether or not there were colorable claims arising from these transactions, the Examiner sets forth factual findings as they are relevant to the analysis of Lehman's reported liquidity pool.

- **Bank of America ("BofA")**.  BofA provided clearing and other financial services to Lehman.  In connection with its clearing services, BofA provided unsecured, intraday credit to cover overdrafts.  On August 14, 2008, BofA demanded a deposit from Lehman in order for Lehman to retain its overdraft credit.  In addition, BofA required Lehman to sign a Security Agreement (executed on August 25), in which Lehman agreed to maintain $500 million in collateral with BofA, and granted BofA a security interest in that collateral.  The Security Agreement permitted Lehman to remove assets from the deposit account with advance notice of three days.

- **Bank of New York Mellon ("BNYM")**.  BNYM provided Lehman with credit related to commercial paper and medium term note programs.  On August 20, BNYM requested that Lehman prefund its transactions with BNYM.  After a series of discussions, Lehman and BNYM agreed on September 8, 2008, that Lehman would open a money market account with BNYM and maintain a sufficient deposit there to cover BNYM's forecasted intraday exposure to Lehman.  Thereafter, on September 11, Lehman and BNYM executed a Collateral Deposit Agreement, requiring Lehman initially to deposit $125 million intraday and maintain a collateral account of at least $50 million.

- **Standard Bank**.  Standard Bank provided Lehman with clearing and settlement services in South Africa.  On August 18, Standard Bank requested that Lehman begin prefunding its trades.  Discussions ensued, and on September 4, 2008, Standard Bank demanded $200 million in collateral by September 9, or it would cease settling Lehman's trades.  Consequently, Lehman provided $200 million in collateral to Standard Bank on September 9, and executed a pledge agreement to cover the deposit on September 11.  The Examiner's financial advisors have not been able to identify a U.S. debtor as the source of these funds.

### (5)  The Federal Reserve Bank of New York

The FRBNY was one of Lehman's major creditors, particularly in the wake of Bear Stearns' near collapse in March 2008, and in the weeks subsequent to Lehman's bankruptcy.

During the time period surrounding the near collapse of Bear Stearns in March 2008, the FRBNY established the Primary Dealer Credit Facility, or PDCF, through which the FRBNY offered short-term, collateralized loans to broker-dealers at its "discount window," in effect acting as a repo counterparty of last resort. Additionally, the FRBNY created the Term Securities Lending Facility, or TSLF, under which, every 28 days, broker-dealers could engage in a competitive auction and could swap mortgage-backed securities and other securities for Treasuries. The Examiner finds the evidence does not support the existence of colorable claims in connection with the lending transactions between the FRBNY and Lehman.

### (6)  Lehman's Liquidity Pool

Lehman represented in regulatory filings and in public disclosures that it maintained a liquidity pool that was intended to cover expected cash outflows for 12 months in a stressed liquidity environment and was available to mitigate the loss of secured funding capacity. After the Bear Stearns crisis in March 2008, it became acutely apparent to Lehman that any disruption in liquidity could be catastrophic; Lehman thus paid careful attention to its liquidity pool and how it was described to the market.

Lehman reported the size of its liquidity pool as $34 billion at the end of first quarter 2008, $45 billion at the end of second quarter, and $42 billion at the end of the third quarter. Lehman represented that its liquidity pool was unencumbered – that it

was composed of assets that could be "monetized at short notice in all market environments."

The Examiner's investigation of Lehman's transfer of collateral to its lenders in the summer of 2008 revealed a critical connection between the billions of dollars in cash and assets provided as collateral and Lehman's reported liquidity. At first, Lehman carefully structured certain of its collateral pledges so that the assets would continue to appear to be readily available (*i.e.*, the Overnight Account at JPMorgan, the $2 billion comfort deposit to Citi, and the three-day notice provision with BofA). Witness interviews and documents confirm that Lehman's clearing banks required this collateral and without it would have ceased providing clearing and settlement services to Lehman or, at the very least, would have required Lehman to prefund its trades. The market impact of either of those outcomes could have been catastrophic for Lehman. Lehman also included formally encumbered collateral in its liquidity pool. Lehman included the almost $1 billion posted to HSBC and secured by the U.K. Cash Deeds in its liquidity pool; Lehman included the $500 million in collateral formally pledged to BofA; Lehman included an additional $8 billion in collateral posted to JPMorgan and secured by the September Agreements; and Lehman continued to include the $2 billion at Citi, even after the Guaranty and DCSA amendments.

By the second week of September 2008, Lehman found itself in a liquidity crisis; it no longer had sufficient liquidity to fund its survival. Thus, an understanding of

Lehman's collateral transfers, and Lehman's attendant loss of readily available liquidity, is essential to a complete understanding of why Lehman ultimately failed.

### b) Lehman's Dealings With JPMorgan

This Section of the Report discusses collateral posted by Lehman entities during 2008 in response to requests made by JPMorgan Chase ("JPMorgan") and agreements between Lehman and JPMorgan relating to clearing operations, credit, and collateral. In addition to the many witness interviews conducted and documents reviewed by the Examiner, the Examiner has informally sought and obtained information from Alvarez & Marsal, counsel for the Debtors, counsel for JPMorgan and counsel for the Creditors' Committee relating to the issues discussed in this Section of the Report.

### (1) Facts

### (a) Overview of JPMorgan-Lehman Relationship

JPMorgan acted as LBI's (LBHI's U.S. broker-dealer subsidiary) principal clearing bank for securities trading and triparty repurchase ("repo") agreements.[3954]  In that role, JPMorgan assisted in the clearance and settlement of securities traded by LBI and LBI funding through triparty repos.  Clearing banks facilitate security trades between buyers and sellers and secured loans between borrowers and lenders by

---

[3954] JPMorgan engaged in other roles with Lehman, including as a counterparty to derivative transactions, counterparty to purchases and sales of securities and other financial instruments, lender on both secured and unsecured terms, investment banker to assist with the issuance of loans, bonds and equity, and counterparty to securities lending transactions.  Tonucci described Lehman's dealings with JPMorgan as Lehman's "most important relationship."  Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 4.

providing services such as valuing the collateral posted by borrowers, applying and enforcing specific rules regarding collateralization and moving cash and collateral between accounts.[3955] JPMorgan was one of only two banks in the United States that provided the vast majority of clearing services to broker-dealer entities such as LBI; the other was The Bank of New York.[3956]

JPMorgan's clearing services for broker-dealers such as LBI consisted principally of triparty-repo clearing and clearing for other types of securities transactions. Triparty repos are a principal source of funding for broker-dealers[3957] and represented the largest intraday risk to JPMorgan of the clearing activities it carried out for Lehman.[3958] As implied by its name, triparty repo involves three parties: an investor (typically a pension fund, money market mutual fund or bank), a borrower (such as a broker-dealer) and a clearing bank.[3959] In a triparty repo, a triparty clearing bank such as

---

[3955] *See, e.g.,* Tobias Adrian, *et al., The Federal Reserve's Primary Dealer Credit Facility,* CURRENT ISSUES IN ECON. & FIN., Aug. 2009, at p. 6, *available at* http://www.newyorkfed.org/research/current_issues/ci15-4.pdf [hereinafter "Current Issues: PDCF"]; Lehman, Repo Manual (Nov. 8, 2005), at p. 11 [LBEX-LL 1175483] [hereinafter "Repo Manual"].

[3956] Current Issues: PDCF, at p. 6; Working Group on Government Securities Clearance and Settlement, *Report to the Federal Reserve Board* (Dec. 2003), at p. 10, *available at* http://www.federalreserve.gov/boarddocs/press/Other/2004/20040107/attachment.pdf [hereinafter "Working Group Report"].

[3957] Counterparty Risk Management Policy Group III, *Containing Systemic Risk: The Road to Reform* (Aug. 6, 2008), at p. 113, *available at* http://www.crmpolicygroup.org/docs/CRMPG-III.pdf [hereinafter "CRMPG III Report"]. A document drafted by JPMorgan, "Best Practices – Intraday and Overnight Tri-party Dealer Financing," formed a basis for what was ultimately published by the CRMPG. Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 7; JPMorgan, Best Practices – Intraday and Overnight Tri-Party Dealer Financing [JPM-EXAMINER00006026]; Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 4 (explaining that Lehman was "very reliant on triparty repo" and that triparty repo "is the lifeblood of an investment bank").

[3958] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 5.

[3959] Current Issues: PDCF, at pp. 2, 6.

JPMorgan acts as an agent, facilitating cash transactions from investors to broker-dealers, which, in turn, post securities as collateral.[3960]  The broker-dealers and investors negotiate their own terms; JPMorgan acts only as an agent.[3961]  Triparty repos typically mature overnight, although investors and broker-dealers can also enter into "term repos" (repos that mature at a later time) or "open repos" (repos without a set maturity date that permit the agreement to be terminated on any day).[3962]

Each night collateral is allocated to investors (into designations called "triparty shells"), either manually by the broker-dealer or, more typically, through an automated process in JPMorgan's Broker Dealer Automation System ("BDAS").[3963]  The investors, in turn, provide overnight or longer-term funding to the broker-dealer.  The following morning, JPMorgan "unwinds" the triparty repos, returning cash to the triparty investors and retrieving the securities posted the night before by the broker-dealer.

[3960] CRMPG III Report, at p. 114; Repo Manual, at p. 7 [LBEX-LL 1175483].  Triparty repos are similar to loans in which collateral is posted to secure the loan.  *See* Current Issues: PDCF, at p. 2 ("In a repo transaction, the holder of a security obtains funds by selling that security to another financial market participant under an agreement to repurchase the security at a fixed price on a predetermined future date.  In essence, the seller is borrowing funds against the security, typically as a means of financing the original purchase of the security.").

[3961] *E.g.*, Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 3.

[3962] *See* CRMPG III Report, at pp. 114-15; Committee on Payment and Settlement Systems of the Central Banks of the Group of Ten Countries, *Cross-Border Securities Settlements* (Mar. 1995), at p. 42, *available at* http://www.bis.org/publ/cpss12.pdf.

[3963] JPMorgan's Responses to Examiner's First Set of Questions re Lehman/JPM Accounts & Collateral dated September 3, 2009 (Oct. 23, 2009), at pp. 1, 19 [hereinafter "JPMorgan First Written Responses"]; Examiner's Interview of John N. Palchynsky, May 11, 2009, at p. 4.  BDAS is a mainframe system that JPMorgan uses to manage its clearance activities.  Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 12; JPMorgan, U.S. Clearance, http://www.jpm.com/tss/General/U_S_Clearance/1114735376505 (last visited Dec. 17, 2009).  BDAS handles tens of thousands of trade settlements daily. JPMorgan, U.S. Clearance, http://www.jpm.com/tss/General/U_S_Clearance/1114735376505 (last visited Dec. 17, 2009).

These securities then serve as collateral against the risk created by JPMorgan's cash advance to investors.[3964]  During the business day, broker-dealers arrange the funding that they will need at the close of business through new triparty-repo agreements.  This new funding must repay the cash that JPMorgan advanced during the business day, as well as any other non-JPMorgan cash needs.  Thus, throughout the day, broker-dealers send instructions into JPMorgan's system to indicate the details of new triparty repos (*e.g.*, collateral amount and type) that will close at the end of the day.[3965]  The process then repeats itself.

JPMorgan also facilitates the settlement of broker-dealer sales and purchases of securities.[3966]  For example, a broker-dealer client may wish to purchase a bond for $10 million.  At time of settlement, the "delivery-versus-payment" ("DVP") convention entails the simultaneous exchange of cash for the security.  JPMorgan would advance the $10 million cash for the benefit of the broker-dealer.  The cash would go out while the security came in to an account over which JPMorgan held a security interest.  The broker-dealer would effectively receive a $10 million loan from JPMorgan collateralized by the security.  The broker-dealer will in most cases repay this loan at end of day by borrowing the $10 million from a triparty-repo investor.  The risks to JPMorgan after advancing the cash and prior to repayment are that the just-purchased security will fall

---

[3964] *See* CRMPG III Report, at pp. 114-15.

[3965] Examiner's Interview of John N. Palchynsky, May 11, 2009, at pp. 3-4; JPMorgan First Written Responses, at p. 19.

[3966] *See* CRMPG III Report, at p. 113; Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 4.

in value below the $10 million cash advance or the broker-dealer will default on its repayment obligation.

The JPMorgan-LBI clearing relationship was governed by a Clearance Agreement between LBI and JPMorgan's predecessor, The Chase Manhattan Bank, executed in June 2000.[3967]  JPMorgan agreed to act as LBI's "non-exclusive clearance agent for securities transactions" and "to open and maintain a clearance account."[3968]

The Clearance Agreement also provided for the extension of credit to LBI by JPMorgan, but at JPMorgan's sole discretion.  JPMorgan could "solely at [its] discretion, permit [LBI] to use funds credited to the Account prior to final payment . . . or otherwise advance funds to [LBI] prior to final payment."[3969]   Further, "[n]otwithstanding the fact that [JPMorgan] may from time to time make advances or loans . . . or otherwise extend credit to [LBI], whether or not as a regular pattern, [JPMorgan] may at any time decline to extend such credit at [JPMorgan's] discretion, with notice."[3970]

In consideration of any advances or loans JPMorgan extended to LBI pursuant to the Clearance Agreement, LBI granted JPMorgan "a continuing security interest in, lien upon and right of set-off as to" certain LBI assets (explicitly excluding certain

---

[3967] Clearance Agreement (June 15, 2000), at p. 20 [JPM-2004 0031786].  For ease of reference, The Chase Manhattan Bank is referred to hereinafter as part of JPMorgan.

[3968] *Id*. at p. 1.  The clearance account is actually a set of accounts: Clearing Accounts, Custody Accounts and Segregated Accounts.  *Id*.

[3969] *Id*. at p. 4.

[3970] *Id*.

segregated customer accounts).[3971]  In other words, daily credit extended by JPMorgan was secured by a lien on certain LBI accounts maintained at JPMorgan.

Initially, the Clearance Agreement was to expire on October 7, 2002, at which time if the parties had not entered into a written extension, the agreement would automatically renew for a one-year period.[3972]  The Examiner is unaware of any written extension of the agreement during that time.  The parties, however, continued to operate pursuant to the terms of the Clearance Agreement, as evidenced by their amending the agreement on May 30, 2008.[3973]

### (b)  Triparty Repo Prior to 2008

The September 11, 2001 terrorist attacks significantly disrupted the operations of the clearing banks (in particular the Bank of New York, due to its proximity to the World Trade Center), exacerbating policy concerns about the concentration of clearing banks and risk of disruptions to financial markets.[3974]  In the attacks' aftermath, the Federal Reserve, the SEC and the Treasury Department initiated discussions with

---

[3971] *Id*. at pp. 12-13.  In the Clearance Agreement, this provision was in tension with the definition of "Clearing Accounts" and "Custody Accounts," which JPMorgan agreed to "hold as [LBI's] custodian, free of [JPMorgan's] lien, claim or interest."  *Id*. at p. 1.  In May 2008, the Clearance Agreement was amended to delete this lien-free language in the definition of "Clearing Accounts" and "Custody Accounts." Amendment to Clearance Agreement (May 30, 2008), at p. 1 [JPM-2004 0085662].

[3972] Clearance Agreement (June 15, 2000), at p. 17 [JPM-2004 0031786].

[3973] The May Amendment to the Clearance Agreement added Lehman Commercial Paper Inc. ("LCPI") as a party to the Clearance Agreement.  Amendment to Clearance Agreement (May 30, 2008), at p. 1 [JPM-2004 0085662].  Furthermore, JPMorgan and Lehman entered into agreements after the Clearance Agreement that secured Lehman's obligations arising from JPMorgan's provision of specific clearing services to Lehman.  *See, e.g.*, Cash Collateral Agreement (Oct. 3, 2005) [JPM-2004 0085509].

[3974] Working Group Report, at p. 11; Examiner's Interview of Christopher J. McCurdy, Aug. 26, 2009, at p. 2.

market participants to explore the risks of having only two clearing banks.[3975]   The

Federal Reserve considered the option of creating its own clearing bank of last resort

called "NewBank."  It looked at ways to transfer positions quickly from one clearing

bank to "NewBank" in the event that customers lost confidence in a clearing bank or in

the event that a clearing bank was incapacitated by some catastrophic event.

Ultimately, there was "no easy solution" to these problems, and the "NewBank" project

was held in abeyance.[3976]   The Federal Reserve and the clearing banks continued,

however, to discuss a broad range of risks to clearing banks, including risks posed by

failure of a broker-dealer.[3977]

    In evaluating triparty-repo clearing risks in 2008, JPMorgan recognized that the

triparty-repo market had recently expanded, both in terms of volume and the types of

---

[3975] Working Group Report, at p. 11.

[3976] Examiner's Interview of Christopher J. McCurdy, Aug. 26, 2009, at p. 2; *see also* Working Group Report, at pp. 28-37; Working Group on NewBank Implementation, *Report to the Federal Reserve Board* (Dec. 2005), *available at* http://www.federalreserve.gov/boarddocs/Press/Other/2005/20051215/attachment.pdf [hereinafter "NewBank Working Group Report"].

[3977] *See, e.g.,* e-mail from Janet Birney, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Feb. 26, 2008) [LBEX-DOCID 280175] ("The recent market turmoil has prompted the Fed to question JPMC on the viability of Triparty financing in the event of broker dealer default."); e-mail from Janet Birney, Lehman, to Daniel J. Fleming, Lehman, *et al.* (May 5, 2008) [LBEX-DOCID 065656]; e-mail from Lucinda M. Brickler, FRBNY, to Timothy F. Geithner, FRBNY, *et al.* (July 16, 2008) [FRBNY to Exam. 034046] (attaching "talking points" the FRBNY developed for a July 17, 2008 meeting with "Dimon and Kelly regarding near-term measures to enhance the stability of the triparty repo market"); FRBNY, Talking Points, Near-term Measures to Enhance the Stability of the Triparty Repo Market [Draft] (July 16, 2008), at p. 1 [FRBNY to Exam. 034047] (talking points noting, "[i]n the event of the default of a large borrower, the potential for systemic risk to materialize co[u]ld be reduced").

securities funded.[3978]    That is, more triparty-repo transactions were occurring and triparty-repo parties were using less-liquid and often harder-to-price securities.[3979] Liquidity and ease-of-pricing are both critical factors affecting risks to triparty investors and clearing banks.  The premise of a triparty repo is that it constitutes secured funding in which the lender (investor) has the opportunity to sell the collateral immediately upon a broker-dealer's (borrower's) failure to pay maturing principal.  U.S. Treasury securities are the optimal collateral for U.S. dollar transactions since large blocks can be sold readily within one trading day and the widely quoted prices of such securities are highly reliable.  Stated differently, if a triparty investor has, for example, a value of par on its $100 million of Treasury security collateral and needs to sell it quickly because a borrower failed to repay its loan in the morning, the investor would almost certainly be able to sell the collateral during the same business day at a value very close to par.

To guard against the possibility of the investor realizing less than the loan amount in a liquidation scenario, the borrower must pledge additional "margin" (*i.e.*, additional collateral) to the lender[3980] – for example, $100 million of Treasury securities in exchange for $98 million in cash.  This 2 percent "haircut" (*i.e.*, discount) is typical for

---

[3978] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 4; *see also* Current Issues: PDCF, at p. 2.

[3979] CRMPG III Report, at pp. 113-14; Current Issues: PDCF, at p. 2.

[3980] Repo Manual, at p. 14 [LBEX-LL 1175483].

U.S. Treasury collateral.[3981]  Even if the borrower defaults, the lender will suffer no loss

if it can sell the $100 million of Treasury securities for $98 million or more.

As noted above, the risk of investor loss depends upon the investor's ability to

sell collateral quickly and on the accuracy of the quoted price.  Illiquid collateral

requires longer time periods for sale at more uncertain prices, with time periods and

prices dependent on the type of collateral, the amount of collateral to sell and prevailing

market conditions.[3982]

Due to the salvage-value uncertainty associated with illiquid collateral, triparty

investors demand higher haircuts as perceived collateral illiquidity increases.  Equally

important, haircuts generally increase as market volatility increases.  For example, some

lenders increased haircuts on asset-backed securities by 10 percent or more during

times of market turmoil.[3983]  Larger haircuts directly reduce the amount of funding

---

[3981] *See, e.g.*, NewBank Working Group Report, at p. 10.

[3982] As one example, consider a broker-dealer that owns $10 million of a triple-B rated residential mortgage-backed security (RMBS).  Assume the entire issuance of this particular bond is $20 million, so the broker-dealer owns half of the bond issue.  Typically there would be zero or very few observable trades of this specific bond during the preceding month.  Hence, there is no way to know beforehand how the market will react – in terms of liquidation time and price – to a triparty-repo investor (as lender to the broker-dealer secured by the RMBS collateral) who seeks to sell $10 million of the RMBS bond quickly (upon a default of the broker-dealer).  The market may treat this triple-B bond as it has other similarly rated RMBS bonds in the prior month, but assumptions of this type add uncertainty.  Even the quoted price in advance of any attempt to sell the bond is an estimate based on models and the recent performance of the prevailing residential housing market rather than a representation of recent trade activity.  In short, the more illiquid the collateral, the greater the uncertainty of the salvageable value of such collateral to the triparty lender.

[3983] *See, e.g.*, e-mail from Laura M. Vecchio, Lehman, to Lori Bettinger, SEC, *et al.* (May 7, 2008) [LBEX-WGM 012803] (showing Dresdner increasing haircut on ABS from 110 to 120 during stress period); *see also* e-mail from Amberish Ratanghayra, Lehman, to John Feraca, Lehman, *et al.* (Mar. 24, 2008) [LBEX-DOCID 046250] ("Danske has requested an increase in haircut to 15%.").  Craig Delany, a managing

available to a broker-dealer, which may force the broker-dealer to sell collateral, find other funding arrangements (such as issuance of unsecured debt), or accept a reduction in excess liquidity.

As triparty-repo agent to broker-dealers, JPMorgan was effectively their intraday triparty lender. When JPMorgan paid cash to the triparty investors in the morning and received collateral into broker-dealer accounts (which secured its cash advance), it bore a similar risk for the duration of the business day that triparty lenders bore overnight. If a broker-dealer such as LBI defaulted during the day, JPMorgan would have to sell the securities it was holding as collateral to recoup its morning cash advance.

JPMorgan used a measurement for triparty and all other clearing exposure known as Net Free Equity ("NFE"). In its simplest form, NFE was the market value of Lehman securities pledged to JPMorgan plus any unsecured credit line JPMorgan extended to Lehman minus cash advanced by JPMorgan to Lehman.[3984] An NFE value greater than zero indicated that Lehman had not depleted its available credit with JPMorgan. The NFE methodology also enabled JPMorgan to monitor its exposure position at all times during the trading day and thereby evaluate collateral substitutions

---

director at JPMorgan's Investment Bank, however, stated that, in triparty repos, typically investors look to the counterparty (*i.e.*, broker-dealer) first and the collateral second when setting haircuts. In other words, a haircut may not be sufficient for an investor if it has serious concerns about the viability of its counterparty. Examiner's Interview of Craig M. Delany, Sept. 9, 2009, at p. 13.

[3984] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 5.

by Lehman that might produce undesired credit exposures.[3985]  If a trade would put Lehman's NFE below zero, the trade would not be permitted.[3986]  Through February 2008, JPMorgan gave full value to the securities pledged by Lehman in the NFE calculation and did not require a haircut for its effective intraday triparty lending. Consequently, through February 2008, JPMorgan did not require that Lehman post the margin required by investors overnight to JPMorgan during the day.[3987]

Dan Fleming, Lehman Global Head for Cash and Collateral Management, stated that Lehman objected to the opaque nature of JPMorgan's NFE formula and that there often was disagreement between Lehman and JPMorgan regarding NFE figures, with Lehman struggling to find causal connections between drops in NFE and Lehman's actions.[3988]  In February 2008, Lehman requested that JPMorgan provide a daily NFE snapshot in order to allow Lehman to obtain better estimates of its position.[3989]

### (c)  JPMorgan Restructures Its Approach to Triparty Risk

In early 2008, the Federal Reserve Bank of New York ("FRBNY") urged JPMorgan to focus on the risks associated with its intraday exposure to broker-dealer

---

[3985] Id. at p. 6.

[3986] Id. at p. 5; Examiner's Interview of Daniel J. Fleming, Apr. 22, 2009, at p. 3.

[3987] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 4.

[3988] Examiner's Interview of Daniel J. Fleming, Apr. 22, 2009, at p. 4; Examiner's Interview of Craig L. Jones, Sept. 28, 2009, at p. 5.  Tonucci described NFE as "not a transparent thing."  Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 6.

[3989] E-mail from Craig L. Jones, Lehman, to Daniel J. Fleming, Lehman (Feb. 26, 2008) [LBEX-DOCID 280175].

clients.[3990]   In February 2008, JPMorgan's Ricardo Chiavenato, a risk manager at

JPMorgan, was tasked with reviewing JPMorgan's triparty business.[3991]  After analyzing

the market and increasing risks faced by clearing banks handling triparty repo

transactions, Chiavenato recommended that JPMorgan retain triparty-investor margin –

the same margin triparty investors required.[3992]   JPMorgan decided to implement the

margin requirements gradually.[3993]

JPMorgan incorporated its new margin requirements into the NFE calculation.

Under its new approach, JPMorgan reduced the value it assigned to securities it held

commensurate with the margin requirements of the triparty investors.[3994]  For example,

if Lehman had borrowed $19 million in an overnight triparty repo from an investor, it

might have pledged $20 million (market value) of corporate bonds as collateral (at a

haircut of 5 percent).  Before February 2008, JPMorgan required no triparty-investor

margin, so JPMorgan's payment of $19 million cash in the morning to repay the lender

(a cash advance for the benefit of Lehman) in concert with the receipt of the $20 million

---

[3990] *See* e-mail from Janet Birney, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Feb. 26, 2008) [LBEX-DOCID 280175].

[3991] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at pp. 3, 5.

[3992] *Id.* at p. 5.  This recommendation that clearing banks retain margin against cash advances is consistent with a December 2005 report of a working group commissioned by the Federal Reserve Board to study "NewBank" feasibility.  A portion of this report dealt with prudent risk management practices and included the requirement that clients post margin to collateralize the clearing bank's risk exposure.  *See* NewBank Working Group Report, at p. 17.

[3993] E-mail from Janet Birney, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Feb. 26, 2008) [LBEX-DOCID 280175].

[3994] *Id.*; Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 6.

of securities would give Lehman an immediate $1 million "surplus" of NFE.[3995]  Lehman could then use this surplus by withdrawing cash or securities or by executing other trades that might draw down the surplus.

Upon full implementation of JPMorgan's plan to retain triparty-investor margin, the change to the NFE calculation would be to treat the $20 million market value of corporate bonds as if they were worth only $19 million.  With this applied discount, there would then be no NFE surplus to Lehman generated by JPMorgan paying $19 million cash in the morning and receiving $20 million of bonds.  Operationally, JPMorgan implemented this change by adjusting NFE each morning by the amount of margin required by triparty investors the night before.[3996]  For example, if triparty investors required $4.5 billion margin from LBI on Tuesday night, JPMorgan would subtract $4.5 billion from LBI's NFE on Wednesday morning, effectively retaining the same amount of margin as triparty investors required.

Lehman and JPMorgan representatives discussed these new collateral requirements, as well as other changes, on a February 26, 2008 conference call. JPMorgan explained that because "recent market turmoil . . . prompted the Fed to question JPMC on the viability of [t]riparty financing in the event of broker dealer default," JPMorgan proposed that it "hold back the margin on the collateral as a counter

---

[3995] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 4.
[3996] *See* JPMorgan's Responses to Examiner's Second Set of Questions re Lehman/JPM Accounts & Collateral dated October 13, 2009 (Nov. 2, 2009), at p. 6 [hereinafter "JPMorgan Second Written Responses"].

debit to the Net Free Equity (NFE) calculation, e.g. - for an asset at 102 they would keep the 2."[3997]  JPMorgan offered to implement this plan "incrementally . . . over the next 5-6 weeks."[3998]

Despite Lehman's initial resistance to JPMorgan's proposal,[3999] effective March 17, 2008, JPMorgan began accounting for 20 percent of the triparty-investor margin in its NFE calculation for Lehman.[4000]  Lehman reported internally that JPMorgan had begun implementing the intraday margin due to "market conditions."[4001]  "[M]arket conditions" was an apparent reference to the near collapse of Bear Stearns and resultant market instability occurring at the time.

JPMorgan continued to meet with Lehman throughout the summer to discuss triparty risk and margin requirements.  On May 2, 2008, Fleming and others from Lehman participated in a conference call with Ed Corral, then JPMorgan's Global Head of U.S. Fixed Income Clearing, Mark Doctoroff, JPMorgan's primary relationship

---

[3997] E-mail from Janet Birney, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Feb. 26, 2008) [LBEX-DOCID 280175].

[3998] *Id.*

[3999] *See* e-mail from Paolo R. Tonucci, Lehman, to Janet Birney, Lehman, *et al.* (Feb. 29, 2008) [LBEX-DOCID 098461] (describing JPMorgan's proposal as "a blunt tool being used to address a very complex issue").  Lehman was concerned that "debiting the NFE for the margin [would] be a problem," apparently because Lehman had "hit [its] NFE limit several times" over the prior few weeks.  E-mail from Craig L. Jones, Lehman, to Daniel J. Fleming, Lehman (Feb. 26, 2008) [LBEX-DOCID 280175].

[4000] Lehman, JPM Chase Triparty Repo, at p. 4 [LBEX-AM 001399]; e-mail from Jack Fondacaro, Lehman, to Janet Birney, Lehman, *et al.* (Mar. 17, 2008) [LBEX-DOCID 280168] ("Chase just notified us that they will begin charging us intra day margin (20% of the 2%)."); JPMorgan Second Written Responses, at pp. 4-5.

[4001] E-mail from Jack Fondacaro, Lehman, to Janet Birney, Lehman, *et al.* (Mar. 17, 2008) [LBEX-DOCID 280168].

manager for Lehman, and others from JPMorgan.[4002]  JPMorgan had "requested the meeting to discuss where they are headed and how their risk department is looking at the [triparty product] business (prompted by discussions with the FED)."[4003]  According to Lehman, JPMorgan "was very clear that the meeting was a product specific issue and . . . assured [Lehman] that they had no intention of hindering [Lehman's] business."[4004]  The parties discussed, among other things, "[c]hanges to the [i]ntra-[d]ay [m]argining process and the impact on Lehman's NFE."[4005]  At the meeting JPMorgan stated that Lehman must post 100 percent triparty-investor margin by the end of June.[4006]  In addition, "Chase agreed to provide a real time credit screen to monitor their NFE and analysis on the potential impact to [Lehman's] NFE."[4007]

---

[4002] E-mail from Janet Birney, Lehman, to Daniel J. Fleming, Lehman, *et al.* (May 5, 2008) [LBEX-DOCID 065656].

[4003] *Id.*

[4004] *Id.*

[4005] E-mail from Janet Birney, Lehman, to Jack Fondacaro, Lehman, *et al.* (May 2, 2008) [LBEX-DOCID 036292]; Discussion Points [LBEX-DOCID 077455].  The parties also discussed a schedule of "[c]ollateral and haircut changes for Lehman end-of-day 'box' clearance loans."  E-mail from Janet Birney, Lehman, to Jack Fondacaro, Lehman, *et al.* (May 2, 2008) [LBEX-DOCID 036292]; Discussion Points [LBEX-DOCID 077455]; *see also* JPMorgan, Fail Financing Collateral Schedule [LBEX-DOCID 014193]; Lehman, JPM Chase Triparty Repo, at p. 1 [LBEX-AM 001399] ("JPM Chase wants to revise the collateral schedule for overnight box loans.  This would include the exclusion of certain asset types and an overall increase in haircuts.").

[4006] E-mail from Janet Birney, Lehman, to Daniel J. Fleming, Lehman, *et al.* (May 5, 2008) [LBEX-DOCID 065656].  There apparently was some confusion as to whether JPMorgan would require the same margin amount as triparty investors held overnight or instead a static 2 percent margin.  JPMorgan clarified that it intended the former.  E-mail from Craig L. Jones, Lehman, to Janet Birney, Lehman, *et al.* (May 5, 2008) [LBEX-DOCID 065656]; e-mail from Craig L. Jones, Lehman, to Janet Birney, Lehman (May 5, 2008) [LBEX-DOCID 023260].

[4007] E-mail from Craig L. Jones, Lehman, to Rachel Zera, Lehman (May 2, 2008) [LBEX-DOCID 031544].  As here, some witnesses refer to JPMorgan as "Chase."  It appears that Lehman also "[a]greed to pledge over to Chase excess non-investment grade and non-rated priced collateral to assist with NFE."  *Id.*;  Examiner's Interview of Craig L. Jones, Sept. 28, 2009, at p. 7 (pledging non-rated assets to JPMorgan was

Retention of 100 percent triparty-investor margin, phased in incrementally, was only one aspect of JPMorgan's risk-mitigation measures for its triparty-repo business.[4008] JPMorgan believed that its risk was actually *greater* than that of individual triparty investors because, as a clearing bank, JPMorgan would hold larger collateral positions than any individual investor, and thus would face greater risks in a liquidation scenario.[4009] In addition, JPMorgan concluded that triparty-repo investors had not adequately assessed risks in the margins they charged.[4010] Thus, in order to mitigate liquidation and price risk, JPMorgan advised Lehman, as well as other broker-dealer clients, that additional margin would be required, based on collateral type, above and beyond the margin required by the investors.[4011] JPMorgan's new "risk-based margin"

---

beneficial to NFE). Despite having access to its own credit screen, Lehman often struggled to understand NFE and how different factors affected it. *E.g.*, Examiner's Interview of Craig L. Jones, Sept. 28, 2009, at pp. 2, 9-10; Examiner's Interview of Daniel J. Fleming, Apr. 22, 2009, at p. 4; e-mail from Craig L. Jones, Lehman, to Daniel J. Fleming, Lehman (July 7, 2008) [LBEX-DOCID 055604].

[4008] As of early summer, JPMorgan was assigning a 125 percent margin to equities without regard to triparty-investor margin. *See, e.g.*, JPMorgan, Tri-party Repo Discussion - Lehman (May 29, 2008), at p. 2 [JPM-EXAMINER00006028]; e-mail from Ricardo S. Chiavenato, JPMorgan, to David A. Weisbrod, JPMorgan (Aug. 20, 2008) [JPM-2004 0006544]; e-mail from Ricardo S. Chiavenato, JPMorgan, to David A. Weisbrod, JPMorgan, *et al.* (Sept. 8, 2008) [JPM-2004 0007292].

[4009] For example, a triparty-repo investor that had loaned $19 million against collateral with quoted market value of $20 million (5 percent haircut) would need to sell this collateral during the trading day if the borrower declared bankruptcy overnight. JPMorgan's "concentration risk" to the broker-dealer borrower was much higher than that of any triparty investor. The bank faced a higher relative risk than any one investor given the concentration of positions it held against a single broker-dealer. Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at pp. 9-10.

[4010] *E.g.*, *id*. at p. 10; Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 4 (overnight investors were not concerned about liquidation pricing because they assumed clearing banks would unwind securities).

[4011] *See, e.g.*, e-mail from Ricardo S. Chiavenato, JPMorgan, to Thomas H. Mulligan, JPMorgan, *et al.* (Aug. 14, 2008) [JPM-2004 0061182] (discussing risk-based margin with respect to "all dealers"); e-mail from Jane Buyers-Russo, JPMorgan, to Stephen Eichenberger, JPMorgan, *et al.* (Sept. 11, 2008) [JPM-2004 0032729] ("We have taken steps this summer to improve the intraday exposures by increasing margins

would take into account "liquidation risk" to account for one-day price volatility for securities, and "price risk," an "estimate of potential vendor price overstatement for illiquid securities."[4012]

As with triparty-investor margin, JPMorgan planned to implement its new risk-based margin requirement incrementally. JPMorgan first calculated risk-based margin manually because BDAS did not yet have the capability.[4013] Initially JPMorgan was able to calculate only a static snapshot of risk-based margin based on a broker-dealer's collateral pool at the start of the day. Throughout the day, however, broker-dealers could substitute triparty collateral and buy and sell securities. Both activities changed the risk profile of the collateral pool. JPMorgan planned eventually to implement the risk-based-margin concept and "dynamic" margining into BDAS, which would track JPMorgan's risk in real-time as collateral was substituted.[4014]

---

and excluding certain collateral classes . . . ."); Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 6.

[4012] JPMorgan, Tri-party Repo Discussion - Lehman (May 29, 2008), at p. 10 [JPM-EXAMINER00006028]. Chiavenato explained that vendor pricing may not be accurate for some types of securities; JPMorgan accounted for this "price risk" in its risk-based margin calculation. The "price risk" component did not mitigate the risk of dealer self-pricing. Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 11. JPMorgan's views of the liquidation risk and the price risk rolled up into one haircut (or margin amount) for each collateral type. *See* JPMorgan, Detailed Summary - Breakdown by Security and Rating (Sept. 5, 2008) [JPM-EXAMINER00006088].

[4013] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 6; e-mail from Thomas H. Mulligan, JPMorgan, to Jane Buyers-Russo, JPMorgan, *et al.* (Sept. 11, 2008) [JPM-2004 0032729] ("We are close to having a system to calculate the risk based margin required to address the 1 day price + liquidation risk (Zubrow agreed to this methodology).").

[4014] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 6. JPMorgan had not implemented dynamic margining as of September 15, 2008, when LBHI filed its bankruptcy petition. *E.g.*, *id.*

### (d) Lehman Begins Posting Additional Collateral

On June 2, 2008, JPMorgan met with Lehman to discuss the move toward risk-based margin.[4015]  At that time, JPMorgan was applying only 20 percent investor margin for intraday financing.[4016]  JPMorgan presented Lehman with calculations showing that $2.8 billion of additional collateral would be required to reach 100 percent investor margin and an additional $3.2 billion would be necessary to satisfy JPMorgan's new risk-based margin requirement based on the prevailing (May 23, 2008) portfolio data.[4017]  JPMorgan calculated that $6.1 billion of additional collateral (with apparent rounding) was necessary to cover both the liquidation and price risk.[4018]  As a result of that meeting, Lehman agreed to post $5 billion of collateral to begin to cover this deficit.[4019]  Although JPMorgan's calculations from late May suggest that JPMorgan required only an additional $3.2 billion to cover risk-based margin (and that the $6.1 billion figure included the adjustment to 100 percent triparty-investor margin as well), JPMorgan witnesses stated that the $5 billion that Lehman agreed to post covered risk-based

---

[4015] Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 5; JPMorgan Second Written Responses, at p. 5.

[4016] JPMorgan, Tri-party Repo Discussion - Lehman (May 29, 2008), at p. 2 [JPM-EXAMINER00006028].

[4017] *Id.* at pp. 3, 5, 7.

[4018] *Id.* at p. 5.

[4019] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at pp. 10-11; Examiner's Interview of Edward J. Corral, Sept. 30, 2009, at pp. 4-5; Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 5; JPMorgan Second Written Responses, at p. 5.  JPMorgan and Lehman initially attempted to document this collateral pledge through a letter agreement.  *See* e-mail from Daniel J. Fleming, Lehman, to Mark G. Doctoroff, JPMorgan, *et al.* (July 16, 2008) [LBEX-AM 001354]; Letter from JPMorgan to Paolo R. Tonucci, Lehman, re: Delivery to JPMorgan Chase Bank, N.A. of $5 billion of Securities [Draft] (July 2008) [LBEX-AM 001356].  That letter agreement does not appear to have ever been executed.  Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 7.

margin, not triparty-investor margin.[4020]  Internally, Lehman stated in August that the amount required for JPMorgan's risk-based margin was "estimated at $6.2 billion" and "[i]n lieu of implementing the additional haircut systemically" JPMorgan reduced Lehman's "intraday credit position by $5 billion, requiring [Lehman] to pledge additional collateral for a like amount."[4021]  Although the additional $5 billion was not the ultimate level of collateral JPMorgan wanted, JPMorgan viewed the $5 billion collateral as a "step in the right direction."[4022]

To fulfill its offer to pledge $5 billion of collateral, Lehman posted approximately $5.7 billion (face value) of securities at JPMorgan on June 19, 2008.[4023]  The collateral consisted of large positions in four CDOs – called SASCO, Freedom, Spruce and Pine – and one asset-backed commercial paper position, known as Fenway.[4024]  Lehman posted

---

[4020] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 10; Examiner's Interview of Edward J. Corral, Sept. 30, 2009, at pp. 4-5; Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at pp. 4-5; *see also* e-mail from Ricardo S. Chiavenato, JPMorgan, to Mark G. Doctoroff, JPMorgan, *et al*. (Aug. 13, 2008) [JPM-2004 0061165] (referencing "the $5bi static margin to meet our risk-based margin"); e-mail from Ricardo S. Chiavenato, JPMorgan, to David A. Weisbrod, JPMorgan (Aug. 20, 2008) [JPM-2004 0006544] (listing "$5 bi extra collateral" separate from "100% of tri-party investor margin"); JPMorgan Second Written Responses, at p. 5.

[4021] E-mail from Janet Birney, Lehman, to Paolo R. Tonucci, Lehman, *et al*. (Aug. 5, 2008) [LBEX-DOCID 4165589]; *see also* e-mail from Daniel J. Fleming, Lehman, to Janet Birney, Lehman (Aug. 1, 2008) [LBEX-DOCID 63603].  While risk-based margin changed throughout the summer, it appears that Birney was likely referencing the $6.1 billion calculation from late May.

[4022] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 11.

[4023] JPMorgan Second Written Responses, at p. 5.

[4024] E-mail from Craig L. Jones, Lehman, to John Feraca, Lehman, *et al*. (June 19, 2008) [LBEX-DOCID 055575]; JPMorgan Second Written Responses, at p. 5.  The SASCO 2008-C2 ("SASCO") bond was a commercial real estate ("CRE") CDO, although it was sometimes described less precisely as a collateralized mortgage obligation ("CMO").  Freedom, Spruce and Pine were collateralized loan obligations ("CLOs") – a special type of CDO that consists of primarily high-yield (or "leveraged") loans to corporate borrowers.  The Fenway transaction was widely described as asset-backed commercial paper

these securities to a clearance account within JPMorgan called "LCD," which JPMorgan characterizes as an LBI account.[4025] The securities pledged in June, however, were owned by LCPI.[4026]

Lehman did not reach 100 percent triparty-investor margin by JPMorgan's original target date.[4027] On July 2, 2008, Lehman posted over $1 billion additional collateral to the LCD account: Kingfisher (an Asian CLO) and HD Supply (a corporate loan).[4028] Lehman continued to post collateral to and substitute collateral in the LCD account throughout July and August 2008, including a large position in another CDO called Verano.[4029]

("ABCP"), but most short-term debt obligations of this issuer were extendible CP also known as "secured liquidity notes" ("SLNs"). For purposes of this discussion we will refer to Fenway as ABCP. Lehman created all of these positions in 2008 (except for Fenway, which was first launched in 2007) by securitizing (the CDOs) or funding (the ABCP) its own illiquid corporate and commercial real estate loans.

[4025] JPMorgan First Written Responses, at p. 7; JPMorgan Second Written Responses, at p. 5; see also Spreadsheet [JPM-EXAMINER00006151] (spreadsheet showing LCD as part of DG92, an LBI dealer group). Alvarez & Marsal, however, "underst[ood] JPMorgan referred to the LCD account in a way that suggests it was a LCPI account." Alvarez & Marsal, Responses to Questions for Alvarez & Marsal/Weil, Gotshal & Manges (Dec. 7, 2009), at p. 1.

[4026] JPMorgan First Written Responses, at p. 7; see also e-mail from Rob Rodriguez, Lehman, to Michael Prestolino, Lehman, et al. (Aug. 11, 2008) [LBEX-DOCID 116020] (e-mail chain documenting "sale of CDO assets to LBHI from LCPI"); e-mail from Ricardo S. Chiavenato, JPMorgan, to Henry R. Yeagley, JPMorgan, et al. (Aug. 7, 2008) [JPM-2004 0008051] (discussing "collateral posted by LCPI").

[4027] See e-mail from Piers Murray, JPMorgan, to Paolo R. Tonucci, Lehman (July 1, 2008) [LBEX-DOCID 036475].

[4028] See e-mail from John N. Palchynsky, Lehman, to Richard Policke, Lehman, et al. (July 2, 2008) [LBEX-DOCID 077515] (e-mail chain documenting pledge); JPMorgan Second Written Responses, at p. 5.

[4029] JPMorgan Second Written Responses, at p. 6; see e-mail from Ricardo S. Chiavenato, JPMorgan, to Henry R. Yeagley, JPMorgan, et al. (Aug. 7, 2008) [JPM-2004 0008051]; JPMorgan, Position Pricing Report (Aug. 7, 2008), at p. 1 [JPM-2004 008062] (listing securities in LCD as of August 7, 2008).

Securities in the LCD account contributed to LBI's NFE requirement, which, as discussed above, was incrementally adjusted to account for triparty-investor margin.[4030] By the end of July, Lehman had posted approximately $8 billion to JPMorgan (face value), and Lehman understood that JPMorgan had "taken an official lien over $5bn . . . above and beyond what [was] required for NFE."[4031] The final adjustment to achieve 100 percent triparty-investor margin occurred on August 14, 2008.[4032]

Additionally, Lehman posted collateral in July to an LCPI clearance account called "LCP," including smaller amounts in securities known as Golden Gate (surplus notes of a captive reinsurer SPV), Loan FNG (a Lehman loan to the R3 hedge fund), Delta Topco (a non-public security comprised of high-yield loans), Cayman Partners (a Lehman loan to an SPV) and Riopelle Broadway (another Lehman loan to an SPV).[4033]

---

[4030] *See* JPMorgan Second Written Responses, at p. 6. JPMorgan also adjusted LBI's NFE to account for the $5 billion of risk-based margin that Lehman agreed to post. This adjustment ceased when securities were moved to the "LCE" account in early August. *See* Jenner & Block, Memorandum re November 18, 2009 Teleconference with JPMorgan Counsel (Nov. 19, 2009), at p. 3; *see also infra* at Section III.A.5.b.1.e (discussing transfer of securities).

[4031] E-mail from Craig L. Jones, Lehman, to James W. Hraska, Lehman (July 31, 2008) [LBEX-DOCID 077621].

[4032] *See* e-mail from Daniel J. Fleming, Lehman, to Paolo R. Tonucci, Lehman (Sept. 3, 2008) [LBEX-AM 000870]; JPMorgan Second Written Responses, at p. 7; *see also* Lehman, NFE Tracking Spreadsheet, at pp. 140-42 [LBEX-LL 385672] (spreadsheet of NFE tracking maintained by Craig Jones that shows NFE Adjustment increasing from $10.6 billion on August 13 to $11.6 billion on August 14).

[4033] *See* JPMorgan Second Written Responses, at pp. 7-8; e-mail from Craig L. Jones, Lehman, to Daniel J. Fleming, Lehman, *et al*. (Aug. 27, 2008) [LBEX-DOCID 454649]; Lehman, NFE Data (Aug. 27, 2008), at p. 2 [LBEX-DOCID 453380] (listing these securities as pledged collateral); *see also* Lehman, $[450],000,000 Floating Rate Surplus Notes due 20[37], First British American Reinsurance Company II, Information Memorandum (2006) [LBEX-WGM 974136] (information concerning Golden Gate); Lehman, R3 Capital Partners Strategic Acquisition Review Committee (May 20, 2008) [LBHI_SEC07940_098444] (information concerning R3 and Loan FNG); Spreadsheet [LBEX-BARFID 0016221] (information concerning Delta Topco); Spreadsheet re: Financing Trades [LBHI_SEC07940_2594028] (information concerning Riopelle Broadway and Cayman Partners). Riopelle Broadway was transferred out of LCP on August 27; Golden

Lehman also posted Pine physicals, Spruce physicals, Verano physicals and SASCO physicals to an LCPI physical account, Titan account G 72456.[4034]  Although Lehman listed these securities on internal "NFE Collateral" charts,[4035] according to JPMorgan, neither LCP nor G 72456 contributed to LBI's NFE.[4036]  Appendix 18 summarizes some of the significant collateral postings and movements during the summer of 2008.

### (e)  JPMorgan Concern Over Lehman Collateral in August 2008

By early August 2008, JPMorgan had learned that Lehman had pledged self-priced CDOs as collateral over the course of the summer.[4037]  By August 9, to meet JPMorgan's margin requirements, Lehman had pledged $9.7 billion of collateral, $5.8

Gate was transferred out of LCP on August 29.  *See* JPMorgan Second Written Responses, at pp. 7-8; e-mail from Craig L. Jones, Lehman, to Daniel J. Fleming, Lehman (Sept. 3, 2008) [LBEX-DOCID 055415]; Lehman, NFE Data (Sept. 2, 2008), at p. 2 [LBEX-DOCID 046772] (no longer listing these securities as pledged collateral).

[4034] *See* e-mail from Kristen Coletta, Lehman, to Craig L. Jones, Lehman (Sept. 3, 2008) [LBEX-DOCID 055422]; Lehman, NFE Data (Sept. 3, 2008), at p. 3 [LBEX-DOCID 046675] (showing new pledged CUSIPs of Pine, Spruce, Verano and SASCO); e-mail from Michael Prestolino, Lehman, to Carolyn Murillo, Lehman, *et al.* (Aug. 27, 2008) [LBEX-DOCID 046646] (identifying CUSIPs as physical notes); Collateral Pledged to JPM for Intraday As of 9/12/2008 COB [LBEX-AM 047008]; JPMorgan Second Written Responses, at p. 8.

[4035] *See, e.g.,* e-mail from Kristen Coletta, Lehman, to Craig L. Jones, Lehman, *et al.* (Sept. 11, 2008) [LBEX-DOCID 055424]; Lehman, NFE Collateral Details As of 9/10/2008 COB (Sept. 11, 2008) [LBEX-DOCID 046774]; e-mail from Craig L. Jones, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Aug. 27, 2008) [LBEX-DOCID 454649]; Lehman, NFE Data (Aug. 27, 2008), at p. 2 [LBEX-DOCID 453380].

[4036] JPMorgan Second Written Responses, at pp. 7-8; JPMorgan First Written Responses, at p. 7.  *But see* e-mail from John N. Palchynsky, Lehman, to Craig L. Jones, Lehman (July 15, 2008) [LBEX-DOCID 053633] (confirming that Lehman could pledge assets to LCPI's physicals box "to get . . . NFE benefit").  According to Alvarez & Marsal, Lehman believed that securities pledged in LCP and Titan account G 72456 impacted LBI's NFE.  Alvarez & Marsal, Responses to Questions for Alvarez & Marsal/Weil, Gotshal & Manges (Dec. 7, 2009), at p. 1.

[4037] *See, e.g.,* e-mail from Ricardo S. Chiavenato, JPMorgan, to Mark G. Doctoroff, JPMorgan, *et al.* (Aug. 9, 2008) [JPM-2004 0006527].  Lehman attempted to pledge some of these CLOs to Citi in early August as well, namely, Kingfisher, Freedom, Spruce and Verano.  E-mail from Michael Mauerstein, Citigroup, to Yingli Xie, Citigroup, *et al.* (Aug. 4, 2008) [CITI-LBHI-EXAM 00082162].  Unlike JPMorgan, Citi refused to accept the CLOs as collateral.  E-mail from Michael Mauerstein, Citigroup, to Katherine Lukas, Citigroup, *et al.* (Aug. 12, 2008) [CITI-LBHI-EXAM 00021175].

billion of which were CDOs priced by Lehman, mostly at face value.[4038]   JPMorgan expressed concern as to the quality of the assets that Lehman had pledged and, consequently, Lehman offered to review its valuations.[4039]   Although JPMorgan remained concerned that the CDOs were not acceptable collateral,[4040] Lehman informed JPMorgan that it had no other collateral to pledge.[4041]   The fact that Lehman did not have other assets to pledge raised some concerns at JPMorgan about Lehman's liquidity.[4042]

---

[4038] E-mail from Ricardo S. Chiavenato, JPMorgan, to Mark G. Doctoroff, JPMorgan, *et al.* (Aug. 9, 2008) [JPM-2004 0006527].

[4039] E-mail from Edward J. Corral, JPMorgan, to Ricardo S. Chiavenato, JPMorgan, *et al.* (Aug. 8, 2008) [JPM-2004 0006511]; e-mail from Edward J. Corral, JPMorgan, to Ricardo S. Chiavenato, JPMorgan, *et al.* (Aug. 8, 2008) [JPM-2004 0006515].   Chiavenato explained that only when JPMorgan finally received prospectuses for Lehman's CDOs did it realize that the CDOs were not the type of collateral that JPMorgan would typically take.   Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 11; *see also* e-mail from Daniel J. Fleming, Lehman, to Mark G. Doctoroff, JPMorgan (Sept. 8, 2008) [JPM-2004 005807] (attaching offering memoranda for Pine, Spruce, Verano and SASCO).   Chiavenato stated that he was unaware of Lehman ever having defended the quality of its collateral.   Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 16.   At least in early August 2008, however, Tonucci questioned whether JPMorgan should be the price provider.   E-mail from Paolo R. Tonucci, Lehman, to Craig L. Jones, Lehman, *et al.* (Aug. 8, 2008) [LBEX-SIPA 003932]; *see also* e-mail from Mark G. Doctoroff, JPMorgan, to Ricardo S. Chiavenato, JPMorgan, *et al.* (Aug. 5, 2008) [JPM-2004 0061153] (reporting that Lehman did "not agree with [JPMorgan's] liquidity/price risk numbers"); e-mail from Paolo R. Tonucci, Lehman, to Mark G. Doctoroff, JPMorgan, *et al.* (Aug. 5, 2008) [LBHI_SEC07940_534634] ("Not sure whether it makes sense to be collateralising you on the basis [of] your wrong/erroneous information.").   Corral recalled that Lehman provided prospectuses of its securities to try to persuade JPMorgan's third-party pricing provider to revise its pricing, but that provider did not change its values.   Examiner's Interview of Edward J. Corral, Sept. 30, 2009, at p. 9.

[4040] *See* e-mail from Donna Dellosso, JPMorgan, to Ricardo S. Chiavenato, JPMorgan (Aug. 6, 2008) [JPM-2004 0061153] ("I . . . don't want [CDOs] as collateral for the intra-day exposure."); e-mail from Ricardo S. Chiavenato, JPMorgan, to Mark G. Doctoroff, JPMorgan, *et al.* (Aug. 9, 2008) [JPM-2004 0006527] ("We never intended to have our margin requirements met by CDOs . . . .").

[4041] E-mail from Ricardo S. Chiavenato, JPMorgan, to Donna Dellosso, JPMorgan (Aug. 6, 2008) [JPM-2004 0061153].

[4042] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 5.

At the time, the market for CDOs was illiquid generally, rendering them less desirable as collateral.[4043] With regard to the specific CDOs pledged by Lehman, JPMorgan's David Weisbrod commented in an August 6 e-mail that "[e]ssentially [Lehman was] packaging up securities it underwrote and structured and couldn't sell. [Lehman] put[] its own price on these securities . . . ."[4044] Weisbrod questioned Lehman's intentions: "[T]his strikes me as borderline insulting to think we would accept Lehman's self structured and self priced CDOs to meet our margin requirements."[4045] Chiavenato told the Examiner that Lehman had posted the worst type of collateral with Lehman's own prices attached.[4046] Yet, at the time, at least one person within JPMorgan, Mark Doctoroff, defended Lehman's conduct. Doctoroff stated in a contemporaneous e-mail that "it sounds like we think [Lehman has] been acting in bad faith, which I disagree with as we did not give clear instructions to them when we asked for the $5bn . . . ."[4047] The Examiner has not discovered evidence suggesting that JPMorgan told Lehman directly that Lehman could not post CDOs as collateral through August 2008.

---

[4043] *Id*. at p. 4.

[4044] E-mail from David A. Weisbrod, JPMorgan, to Edward J. Corral, JPMorgan (Aug. 6, 2008) [JPM-2004 0061153].

[4045] E-mail from David A. Weisbrod, JPMorgan, to Ricardo S. Chiavenato, JPMorgan, *et al.* (Aug. 6, 2008) [JPM-2004 0061153].

[4046] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 15.

[4047] E-mail from Mark G. Doctoroff, JPMorgan, to Ricardo S. Chiavenato, JPMorgan, *et al.* (Aug. 9, 2008) [JPM-2004 0006537].

In early August 2008, JPMorgan engaged Gifford Fong Associates ("GFA"), a third-party boutique pricing vendor, to price Lehman's difficult-to-value collateral. JPMorgan's Ed Corral noted that GFA "impressed the heck out of" him,[4048] although the managing director that oversaw JPMorgan's Investment Bank's triparty-repo business, Craig Delany, stated that he ignored almost any pricing from GFA.[4049] Delany stated that, in his experience, model pricing is materially inaccurate and could not be trusted for large, illiquid assets.[4050] Nonetheless, JPMorgan used GFA to value Lehman's self-priced CDOs and continues to use GFA to price other difficult-to-price assets in its system.[4051]

On August 8, 2008, GFA priced Lehman's collateral at a significantly lower value than the value assigned by Lehman.[4052] Chiavenato explained that, using GFA's pricing, the $5.8 billion of pledged CDOs would be worth less than $2 billion.[4053] Chiavenato likely misstated GFA's results, however. At the time, GFA had not priced Kingfisher

---

[4048] E-mail from Edward J. Corral, JPMorgan, to David A. Weisbrod, JPMorgan (Aug. 7, 2008) [JPM-2004 0061153].

[4049] Examiner's Interview of Craig M. Delany, Sept. 9, 2009, at p. 8.

[4050] *Id.*

[4051] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at pp. 7, 11; Examiner's Interview of Edward J. Corral, Sept. 30, 2009, at p. 8.

[4052] *See* e-mail from Edward J. Corral, JPMorgan, to Ricardo S. Chiavenato, JPMorgan, *et al.* (Aug. 8, 2008) [JPM-2004 0008073]; e-mail from Jessie Zhang, GFA, to Edward J. Corral, JPMorgan, *et al.* (Aug. 8, 2008) [LBEX-GF 000040].

[4053] E-mail from Ricardo S. Chiavenato, JPMorgan, to Mark G. Doctoroff, JPMorgan, *et al.* (Aug. 9, 2008) [JPM-2004 0006527]. JPMorgan also learned that Lehman had $3.9 billion in CDOs in its triparty shells which, using GFA's pricing of Lehman's extra collateral as a proxy, would have been worth less than $1.5 billion. *See id.*; *see also* e-mail from Ricardo S. Chiavenato, JPMorgan, to Henry R. Yeagley, JPMorgan, *et al.* (Aug. 7, 2008) [JPM-2004 0008051]. For the reasons stated in text, the valuation applied as a proxy was likely too low.

and Verano;[4054] instead of accounting for that fact, Chiavenato apparently assigned a price of zero to Kingfisher and Verano. Excluding Kingfisher and Verano, approximately $3.5 billion of pledged CDOs were valued at about $2 billion by GFA – still a significant difference.[4055] Later in the summer, when Lehman had fewer securities pledged in the relevant collateral account, GFA again assigned a significantly lower value to Lehman's securities than had Lehman.[4056]

Upon learning that JPMorgan had been accepting dealer self-pricing, Chiavenato undertook a general analysis of dealer-priced securities tracked in JPMorgan's BDAS system. In late August, Chiavenato concluded that Lehman was providing more self-priced securities than other dealers.[4057] Those securities, he explained, were also the riskiest ones.[4058]

In addition to concerns it had with valuation, JPMorgan in early August raised concerns over the fact that LCPI, rather than LBI or LBHI, was posting collateral to

---

[4054] *See* e-mail from Edward J. Corral, JPMorgan, to Ricardo S. Chiavenato, JPMorgan, *et al.* (Aug. 8, 2008) [JPM-2004 0008073]; LB Excess Collateral Priced by GF (Aug. 8, 2008) [JPM-2004 0008074].

[4055] *See* e-mail from Edward J. Corral, JPMorgan, to Ricardo S. Chiavenato, JPMorgan, *et al.* (Aug. 8, 2008) [JPM-2004 0008073]; LB Excess Collateral Priced by GF (Aug. 8, 2008) [JPM-2004 0008074].

[4056] E-mail from Edward J. Corral, JPMorgan, to David A. Weisbrod, JPMorgan, *et al.* (Sept. 4, 2008) [JPM-2004 0006562] (reporting that GFA priced three CDOs $1.5 billion lower than Lehman's assigned market value of approximately $3.25 billion); Spreadsheet (Sept. 4, 2008) [JPM-2004 0006563].

[4057] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 7; e-mail from Ricardo S. Chiavenato, JPMorgan, to Edward J. Corral, JPMorgan, *et al*. (Aug. 27, 2008) [JPM-2004 0009300] ("Lehman has the highest number and market value of self-priced securities.").

[4058] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 7; *see also* e-mail from Thomas H. Mulligan, JPMorgan, to Ricardo S. Chiavenato, JPMorgan, *et al.* (Aug. 29, 2008) [JPM-2004 0006549] ("The risk is the size of the largest securities in each of the dealers pool of securities. For example Lehman has 4 securities of dealer priced securities with a total par value of $4,900MM in its portfolio valued at 100%.").

cover intraday risk.[4059] JPMorgan preferred that "additional collateral supporting LBI's clearing exposure be provided by LBI itself, or its parent company, LBHI."[4060] Lehman – according to JPMorgan – "want[ed] to avoid substituting other collateral for this block as it would have to come from the holdco liquidity pool directly and the way they report this number would change."[4061] As of August 5, 2008, LCPI had pledged both $5 billion in "extra collateral" for risk-based margin and $4 billion related to triparty-investor margin.[4062] In order to alleviate JPMorgan's concern, Lehman transferred Spruce, Freedom, Pine, Kingfisher and Verano from LCPI to LBHI on August 8, and JPMorgan sought and obtained a guaranty from LBHI for LBI's obligations.[4063] The securities moved concurrently from LCD to "LCE," an LBHI account at JPMorgan.[4064] Lehman also transferred Fenway from LCPI to LBHI (and from LCD to LCE) on August

---

[4059] *See, e.g.,* e-mail from Ricardo S. Chiavenato, JPMorgan, to Edward J. Corral, JPMorgan, *et al.* (Aug. 5, 2008) [JPM-2004 0061153].

[4060] JPMorgan First Written Responses, at p. 7.

[4061] E-mail from Piers Murray, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Aug. 1, 2008) [JPM-2004 0061182].

[4062] E-mail from Ricardo S. Chiavenato, JPMorgan, to Edward J. Corral, JPMorgan, *et al.* (Aug. 5, 2008) [JPM-2004 0061153]. As discussed *supra,* these LCPI securities were posted in LCD, apparently an LBI account, according to JPMorgan. Through counsel, JPMorgan clarified that "we do not believe that there was an agreement that there would be separate collateral requirements for the approximately $4 billion in investor margin. Rather, that margin was implemented by entry of a debit to NFE each morning in the amount of the preceding night's investor margin." JPMorgan Second Written Responses, at pp. 5-6.

[4063] *See* e-mail from Michael Prestolino, Lehman, to Craig L. Jones, Lehman, *et al.* (Aug. 8, 2008) [LBEX-DOCID 046703]; Lehman, Prices for LCD Box (Aug. 8, 2008) [LBEX-DOCID 023772].

[4064] JPMorgan Second Written Responses, at pp. 6-7.

11.[4065]  The guaranty from LBHI was memorialized in a new agreement, discussed below.

JPMorgan's collateral requests through the summer of 2008 were all part of JPMorgan's move toward requiring a risk-based margin.[4066]  Chiavenato described Lehman's responses to JPMorgan's request as Lehman dragging its feet.[4067]  In Chiavenato's view, Lehman had delayed collateral pledges and pledged collateral of questionable quality.[4068]

At least some of the Lehman personnel involved in discussions with JPMorgan believed that JPMorgan was requiring more margin than necessary.[4069]  Paolo Tonucci, LBHI's Vice President and Global Treasurer, stated that JPMorgan's haircuts and related

---

[4065] E-mail from Rob Rodriguez, Lehman, to Michael Prestolino, Lehman, *et al.* (Aug. 11, 2008) [LBEX-DOCID 116020]; JPMorgan Second Written Responses, at p. 7.

[4066] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at pp. 15-16.  The amount of risk-based margin required increased over the course of the summer.  *See, e.g.,* e-mail from David A. Weisbrod, JPMorgan, to Piers Murray, JPMorgan, *et al.* (Aug. 3, 2008) [JPM-2004 0061182] ("Based on the 7/29 numbers provided by Ricardo, our approach should be to get $6.7bn of margin to achieve coverage for the liquidity risk and price risk.").  By August 22, 2008, JPMorgan calculated risk-based margin every morning and Lehman's "risk-based margin ha[d] gone up to the $8bi range due to more volume, CDOs, and higher risk factors for ABSs and CPs."  E-mail from Ricardo S. Chiavenato, JPMorgan, to David A. Weisbrod, JPMorgan (Aug. 22, 2008) [JPM-2004 0061234].

[4067] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 16.

[4068] *Id.* at pp. 11, 15.

[4069] *E.g.,* Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 6.  On August 5, Doctoroff reported that Lehman did "not agree with [JPMorgan's] liquidity/price risk numbers."  *See* e-mail from Mark G. Doctoroff, JPMorgan, to Ricardo S. Chiavenato, JPMorgan, *et al.* (Aug. 5, 2008) [JPM-2004 0061153]; *see also* e-mail from Paolo R. Tonucci, Lehman, to Mark G. Doctoroff, JPMorgan (Aug. 5, 2008) [LBHI_SEC07940_534634] ("Not sure whether it makes sense to be collateralising you on the basis [of] your wrong/erroneous information.").  Chiavenato recalled that Lehman believed its margin was higher than it should be.  Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 12.  In a follow-up e-mail the same day, Doctoroff stated that Lehman "agree[d]/underst[ood] the margin/price/liquidity risk."  E-mail from Mark G. Doctoroff, JPMorgan, Ricardo S. Chiavenato, JPMorgan, *et al.* (Aug. 5, 2008) [JPM-2004 0061153].

collateral demands were "completely inappropriate" and made pursuant to "simplistic calculations" that were not done on a "sophisticated portfolio-wide basis."[4070] Lehman believed that JPMorgan was requiring too much margin because JPMorgan unnecessarily unwound term repos daily.[4071] Term repos lasted longer than one day, and, therefore, theoretically should not have required an extension of credit by JPMorgan every morning to unwind. But JPMorgan unwound all repos – including term repos – in the morning, apparently to allow broker-dealers to substitute allocated securities during the day.[4072] Chiavenato stated that term-repo investors had come to expect to receive cash intraday.[4073] JPMorgan did not alter this process prior to Lehman's bankruptcy.[4074] Lehman also resisted to some degree JPMorgan's risk-based margin implementation by asking for more time to meet JPMorgan's demands.[4075]

Notably, however, Dan Fleming – one of Lehman's principal contacts with JPMorgan – believed that, at least through mid-August, JPMorgan had been acting in good faith in negotiating issues surrounding NFE and the adequacy of Lehman

---

[4070] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 7.

[4071] See, e.g., e-mail from Thomas H. Mulligan, JPMorgan, to Ricardo S. Chiavenato, JPMorgan, et al. (Aug. 9, 2008) [JPM-2004 0006537] (Lehman "feel[s] that the margin will be reduced dramatically once we can stop the daily unwind of the term repo."); e-mail from Mark G. Doctoroff, JPMorgan, to David A. Weisbrod, JPMorgan, et al. (Aug. 3, 2008) [JPM-2004 0061182] ("Lehman's Treasurer and other seniors there believe that the liquidity and price risks are different or non-existent on certain types of repo, like the term repo that they do not think they have to unwind, as well as some open repo."); Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 8; Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 6.

[4072] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 8.

[4073] Id.

[4074] Id.

[4075] Id. at p. 9.

collateral.[4076]  Ian Lowitt also believed that until September 11 (the date of an additional collateral request, discussed below) JPMorgan had not acted unreasonably toward Lehman.[4077]

### (f)  The August Agreements

As discussed above, JPMorgan requested that Lehman enter into new agreements in part because JPMorgan wanted a guaranty from LBHI.  In addition, JPMorgan requested the new agreements upon discovering that additional Lehman subsidiaries were conducting operations through JPMorgan's clearing system.[4078]  On August 18, 2008, Doctoroff e-mailed Fleming "the documents . . . that will allow for the lien in all the clearance accounts in Lehman's broker/dealer group," that is, a draft Amendment to the Clearance Agreement, draft Guaranty and draft Security Agreement (collectively, the "August Agreements").[4079]

Paul Hespel, Lehman's outside counsel at Goodwin Procter, stated that the primary business issue animating the August Agreements was a concern by Lehman counterparties that Lehman's clearing relationship with JPMorgan consisted of an undocumented course of dealing.[4080]  Specifically, several Lehman subsidiaries were already trading using JPMorgan's system, but were not formally added to the Clearance

---

[4076] Examiner's Interview of Daniel J. Fleming, Apr. 22, 2009, at p. 5.
[4077] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at pp. 20-21.
[4078] Examiner's Interview of Daniel J. Fleming, Apr. 22, 2009, at p. 5.
[4079] E-mail from Mark G. Doctoroff, JPMorgan, to Daniel J. Fleming, Lehman (Aug. 18, 2008) [LBEX-DOCID 451527].
[4080] Examiner's Interview of Paul W. Hespel, Apr. 23, 2009, at p. 3.

Agreement until the August Agreements.[4081]   Paolo Tonucci also explained that the August Agreements were meant to "close gaps in exposure" – multiple Lehman entities did business with JPMorgan, but JPMorgan did not believe that the obligations of these entities were adequately secured.[4082]   Tonucci emphasized that the August Agreements were executed to manage exposures more efficiently and did not represent a fundamental change in the JPMorgan-Lehman clearing relationship.[4083]

The August Agreements also clarified that Lehman's collateral would secure only JPMorgan's intraday risk.   In the weeks leading up to the August Agreements, JPMorgan raised the issue of collateralizing its overnight exposures as well.[4084]   Lehman objected to the change.[4085]   JPMorgan's request appeared to be the result of a misunderstanding:   internally, JPMorgan had recognized that its goal had "always been to ensure that our intraday exposure to Lehman [was] properly collateralized."[4086]   Thus,

---

[4081] *Id.*

[4082] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at pp. 8-9.

[4083] *Id.* at p. 9.

[4084] Examiner's Interview of Craig L. Jones, Sept. 28, 2009, at p. 13; e-mail from Craig L. Jones, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Aug. 8, 2008) [LBEX-DOCID 457557] (relaying "an urgent call from a group at Chase" in which JPMorgan "stated they want[ed] to ensure the assets have a continuing lien and not just an intraday lien"); e-mail from Craig L. Jones, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Aug. 14, 2008) [LBEX-AM 001764] (noting that Doctoroff apologized for JPMorgan requesting a continuing rather than intraday lien); e-mail from Edward J. Corral, JPMorgan, to Ricardo S. Chiavenato, JPMorgan, *et al.* (Aug. 8, 2008) [JPM-2004 0006527] (explaining that Fleming was concerned that JPMorgan was looking for an overnight lien but agreement was for an intraday lien only).

[4085] *See, e.g.,* e-mail from Edward J. Corral, JPMorgan, to Ricardo S. Chiavenato, JPMorgan, *et al.* (Aug. 8, 2008) [JPM-2004 0006519].  Fleming stated that JPMorgan was acting unreasonably because JPMorgan did not face an overnight exposure with Lehman.  Examiner's Interview of Daniel J. Fleming, Apr. 22, 2009, at p. 5.

[4086] E-mail from Ricardo S. Chiavenato, JPMorgan, to Mark G. Doctoroff, JPMorgan, *et al.* (Aug. 9, 2008) [JPM-2004 0006519].

Doctoroff called Craig Jones, a Senior Vice President at Lehman in charge of cash and collateral management, on or about August 15 "to apologize for the issues raised when Chase requested the continuing lien" and acknowledged that "he was well aware it was only intended to be an intraday lien."[4087]  The August Agreements were understood as "documentation for the intraday lien."[4088]

The August Agreements were negotiated over more than a week by legal and business representatives of both parties, with much interaction over specific terms.[4089] In the course of drafting and negotiating the August Agreements, Lehman's counsel interacted with Lehman business personnel, who provided the "big picture idea" of how the legal agreements would affect Lehman's dealings with JPMorgan.[4090]

The parties ultimately executed three documents on August 29, 2008 (though dated August 26):[4091]  (i) an Amendment to the Clearance Agreement, (ii) a Guaranty and (iii) a Security Agreement.  The Amendment to the Clearance Agreement and

---

[4087] E-mail from Craig L. Jones, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Aug. 15, 2008) [LBEX-DOCID 457560].

[4088] *Id*.

[4089] *See, e.g.*, e-mail from Mark G. Doctoroff, JPMorgan, to Daniel J. Fleming, Lehman (Aug. 18, 2008) [LBEX-DOCID 451527]; e-mail from Daniel J. Fleming, Lehman, to Mark G. Doctoroff, JPMorgan (Aug. 21, 2008) [LBEX-DOCID 310528]; e-mail from Jeffrey Aronson, JPMorgan, to Paul W. Hespel, Goodwin Procter, *et al.* (Aug. 25, 2008) [JPM-2004 0003466]; e-mail from Nikki G. Appel, JPMorgan, to Paul W. Hespel, Goodwin Procter, *et al.* (Aug. 28, 2008) [JPM-2004 0004408].

[4090] Examiner's Interview of Paul W. Hespel, Apr. 23, 2009, at p. 3; Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 2.

[4091] *See* e-mail from Paul W. Hespel, Goodwin Procter, to Nikki G. Appel, JPMorgan, *et al.* (Aug. 29, 2008) [JPM-2004 0004629].

Security Agreement were executed by LBHI Treasurer Paolo Tonucci; the Guaranty was executed by LBHI Chief Financial Officer Ian Lowitt.[4092]

The Amendment to the Clearance Agreement expanded the reach of the Clearance Agreement in two ways. First, the parties added LBHI, Lehman Brothers International (Europe), Lehman Brothers OTC Derivatives Inc. and Lehman Brothers Japan Inc. as "Customers," that is, parties to the Clearance Agreement.[4093] In addition, pursuant to a request from Lehman,[4094] the parties added language providing that the liability of Lehman entities under the Clearance Agreement was several, not joint (with the exception of LBHI's obligations under the Security Agreement and Guaranty), and, therefore, "any security interest, lien, right of set-off or other collateral accommodation provided by any Lehman entity pursuant to" the Clearance Agreement would "not be available to support the obligations of any other Lehman entity" under that agreement.[4095]

Under the Guaranty, LBHI "unconditionally and irrevocably guarantee[d] to [JPMorgan] the punctual payment of all obligations and liabilities" of the Lehman parties to the Clearance Agreement (other than LBHI) "of whatever nature, whether

---

[4092] *See* Security Agreement (Aug. 26, 2008), at p. 6 [JPM-2004 0005867]; Amendment to Clearance Agreement (Aug. 26, 2008), at pp. 1-2 [JPM-2004 0005856]; Guaranty (Aug. 26. 2008), at p. 6 [JPM-2004 0005879].

[4093] *See* Amendment to Clearance Agreement (Aug. 26, 2008), at p. 1 [JPM-2004 0005856].

[4094] *See* e-mail from Paul W. Hespel, Goodwin Procter, to Jeffrey Aronson, JPMorgan, *et al.* (Aug. 25, 2008) [JPM-2004 0003439].

[4095] Amendment to Clearance Agreement (Aug. 26, 2008), at p. 1 [JPM-2004 0005856]; *see also* e-mail from Jeffrey Aronson, JPMorgan, to Paul W. Hespel, Goodwin Procter, *et al.* (Aug. 26, 2008) [JPM-2004 0003482]; Amendment to Clearance Agreement [Draft] (Aug. 26, 2008), at p. 1 [JPM-2004 0003485].

now existing or hereinafter incurred . . . pursuant to the Clearance Agreement."[4096]  The

Guaranty further gave JPMorgan a right of setoff against LBHI.[4097]

The Security Agreement secured LBHI's commitments under the Guaranty and

granted JPMorgan "a security interest in, and a general lien upon and/or right of set-off

of" certain LBHI accounts and proceeds from these accounts.[4098]  Although JPMorgan

initially sought a lien on essentially all LBHI accounts,[4099] Lehman successfully

narrowed the lien in the Security Agreement to cover only a "Securities Account"

(known as "LCE"), a "Cash Account" (known as "DDA# 066-141-605") and certain

related accounts.[4100]    Andrew Yeung, Lehman in-house counsel and one of the

negotiators of the August Agreements, described this as a "floating" lien that followed

the proceeds of the Cash Account and the Securities Account.[4101]

The Security Agreement contained a provision that allowed LBHI to transfer

collateral from its encumbered accounts to a generally lien-free "Overnight Account" at

---

[4096] Guaranty (Aug. 26, 2008), at p. 1 [JPM-2004 0005879].

[4097] *See id*. at p. 4.

[4098] Security Agreement (Aug. 26, 2008), at p. 2 [JPM-2004 0005867].  Lehman initially questioned JPMorgan's request for a stand-alone Security Agreement given that the Clearance Agreement already granted JPMorgan a lien on Lehman assets for obligations incurred under the Clearance Agreement. Examiner's Interview of Paul W. Hespel, Apr. 23, 2009, at p. 3; Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 3; e-mail from James J. Killerlane, Lehman, to Jeffrey Aronson, JPMorgan, *et al.* (Aug. 22, 2008) [JPM-2004 0003332].  Yeung explained, however, that JPMorgan may have wanted the Security Agreement because it offered greater detail over the parties' rights and remedies in the event of a breach or default.  Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 3.

[4099] *See* e-mail from Mark G. Doctoroff, JPMorgan, to Daniel J. Fleming, Lehman (Aug. 18, 2008) [LBEX-DOCID 451527]; Security Agreement [Draft] (Aug. 18, 2008), at p. 1 [LBEX-DOCID 448423].

[4100] Security Agreement (Aug. 26, 2008), at p. 1 [JPM-2004 0005867].

[4101] Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 4.

the end of each business day if LBHI had no outstanding obligations under the Clearance Agreement.[4102] Specifically, in the overnight-account provision, the Security Agreement provided:

> Except as otherwise provided herein, at the end of a business day, if [LBHI] has determined that no [obligations under the Clearance Agreement] remain outstanding, [LBHI] may transfer to an account (the "Overnight Account") any and all Security held in or credited to or otherwise carried in the Accounts [(that is, the Securities Account, Cash Account, and certain related accounts)]. Any determination of [Lehman] that no Obligations remain outstanding shall not be binding upon the Bank.[4103]

Under the Security Agreement, JPMorgan had a general lien upon the "Security," defined as:

> (i) the Accounts, together with any security entitlements relating thereto and any and all financial assets, investment property, funds and/or other assets from time to time held in or credited to the Accounts or otherwise carried in the Accounts (or to be received for credit or in the process of delivery to the Account), (ii) any interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Security and (iii) all proceeds of any and all of the foregoing Security.[4104]

"Accounts" was defined as:

> (i) the . . . "Securities Account" . . . , (ii) . . . the "Cash Account" . . . and (iii) any other account at [JPMorgan] to which [LBHI] transfer[ed] (A) cash from the Cash Account, (B) any interest, dividends, cash, instruments and other property from time to time received, receivable (including without limitation sales proceeds) or otherwise distributed in respect of or in

---

[4102] *See* Security Agreement (Aug. 26, 2008), at p. 3 [JPM-2004 0005867]; Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 5.

[4103] Security Agreement (Aug. 26, 2008), at p. 3 [JPM-2004 0005867].

[4104] *Id*. at pp. 1-2.

exchange for any or all of the cash or securities in the Securities Account or the Cash Account or (C) any cash or securities from the Securities Account or the Cash Account during such time as [Lehman] ha[d] an outstanding obligation or liability to [JPMorgan] under the Guaranty or the Clearance Agreement.[4105]

As relevant here, with the exception of the Cash Account and Securities Account, the "Accounts" definition covered only accounts to which LBHI transferred "securities from the Securities Account . . . during such time as [Lehman] ha[d] an outstanding obligation or liability to [JPMorgan] under the Guaranty or the Clearance Agreement."[4106] Thus, were Lehman to transfer securities to the Overnight Account at a time during which it had no outstanding obligation to JPMorgan, JPMorgan would have no lien on that account.

In theory, Lehman would have only intraday liability to JPMorgan under the Clearance Agreement because, at the end of the day, cash from triparty investors repaid JPMorgan's early morning cash advances.[4107] Therefore, as a general matter, if Lehman did not have any advances or loans under the Clearance Agreement outstanding overnight (generally known as "failed financing" or "box loans"), assets in the Overnight Account transferred from the Securities Account would be lien-free.[4108]

---

[4107] *Id.* at p. 1.

[4106] *Id.*

[4107] *Cf.* e-mail from Daniel J. Fleming, Lehman, to Mark G. Doctoroff, JPMorgan (Aug. 21, 2008) [LBEX-DOCID 035862] ("at the end of the day (after we have settled all of our obligations with JPM) we will have the full value of the collateral in the Holdings account . . . to apply to other Leh needs . . . .").

[4108] Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 5 (explaining that the Overnight Account was lien-free); Examiner's Interview of Donna Dellosso, Feb. 27, 2009, at p. 3 (collateral in Overnight Account would be free of any lien overnight but subject to a lien again in the morning).

The Security Agreement did not specifically define an "Overnight Account." According to JPMorgan's counsel, the Overnight Account was a construct that Lehman never actually sought to use.[4109] Lehman did have an LBHI account at JPMorgan called "LXH," which it had opened earlier in August.[4110] LXH was a "seg account" associated with the LBHI clearance account LCE (that is, the "Securities Account" defined in the Security Agreement and the account into which Lehman transferred securities from LCD in early August).[4111] At the end of the day, the contents of LCE were automatically transferred to LXH and to a shell referred to as "LHXX"; after the triparty unwind, those securities were swept back into LCE at the beginning of each day.[4112] Although, according to JPMorgan counsel, LHXX was not technically a "lien-free excess shell" (that is, the type of shell into which a broker-dealer would place securities not slated for

---

[4109] Jenner & Block, Memorandum re November 18, 2009 Teleconference with JPMorgan Counsel (Nov. 19, 2009), at pp. 1-2. Alvarez & Marsal advised the Examiner that it was not aware of what account at JPMorgan was the "Overnight Account." Alvarez & Marsal, Responses to Questions for Alvarez & Marsal/Weil, Gotshal & Manges (Dec. 7, 2009), at p. 1.

[4110] See Letter from Emily M. Critchett, Lehman, to Lika Vaivao, JPMorgan (Aug. 14, 2008) [LBEX-DOCID 462130].

[4111] JPMorgan First Written Responses, at p. 9; see e-mail from Michael A. Mego, JPMorgan, to Janet Birney, Lehman, et al. (Aug. 13, 2008) [JPM-2004 0005515] (identifying LXH as a "seg account"). A "seg account" corresponded to a particular clearance account and consisted of one or more triparty-repo shell designations into which securities from the clearance account would be transferred. Shells were used in triparty repos, but could also hold securities pledged to JPMorgan to collateralize extensions of credit or be "no-lien excess shells," which would hold securities overnight not needed for triparty repos or overnight financing. JPMorgan First Written Responses, at p. 1.

[4112] JPMorgan First Written Responses, at p. 9; Jenner & Block, Memorandum re November 16, 2009 Teleconference with JPMorgan Counsel (Nov. 16, 2009), at p. 2. Jones stated that the sweep into LBI lien-free shells was not automatic but done manually by John Palchynsky. Examiner's Interview of Craig L. Jones, Sept. 28, 2009, at p. 17; Examiner's Interview of John N. Palchynsky, May 11, 2009, at p. 4.

triparty repo overnight), and LXH was a "pledge account,"[4113] from August 26 to September 9, Lehman had no outstanding overnight obligations under the Clearance Agreement.[4114]  Thus, there was no obligation for LXH or the LHXX shell to secure overnight.  LHXX therefore was, in practice, essentially a lien-free excess shell similar to what was described in the Security Agreement as the "Overnight Account."

According to JPMorgan's counsel, Lehman could not transfer securities out of LXH or the LHXX shell on its own; Lehman would have had to ask JPMorgan to issue such an instruction.[4115]  Lehman could issue an instruction to transfer securities out of LCE, but a $5 billion NFE block imposed by JPMorgan ensured that $5 billion of

---

[4113] Jenner & Block, Memorandum re November 18, 2009 Teleconference with JPMorgan Counsel (Nov. 19, 2009), at pp. 1-2. Lehman, however, sometimes internally referred to LHXX as a lien-free excess shell. *See* e-mail from John N. Palchynsky, Lehman, to Jack Fondacaro, Lehman, *et al.* (Aug. 18, 2008) [LBEX-DOCID 459729].  There is some evidence that JPMorgan – at least after Lehman's bankruptcy – referred to LHXX as such as well.  *See* e-mail from Karen Donahue, JPMorgan, to Paolo R. Tonucci, Lehman (Sept. 21, 2008) [LBEX-DOCID 036183]; Spreadsheet (Sept. 21, 2008) [LBEX-DOCID 014382] (referring to LHXX as "LBHI LIEN FREE EXCESS").  And, although the account-opening letter referred to LXH as a "pledge account," Lehman attempted to put a no-lien letter in place.  *See* Letter from Emily M. Critchett, Lehman, to Lika Vaivao, JPMorgan (Aug. 14, 2008) [LBEX-DOCID 462130]; e-mail from Emily M. Critchett, Lehman, to Lika Vaivao, JPMorgan, *et al.* (Aug. 18, 2008) [LBEX-DOCID 451532] ("As this account is a segregated account we will require a no-lien letter be put in place.").  Yet, in his interview with the Examiner, Richard Policke, Senior Vice President of Lehman, stated that there was a lien on LHXX. Examiner's Interview of Richard Policke, May 28, 2009, at p. 6.

[4114] Jenner & Block, Memorandum re November 18, 2009 Teleconference with JPMorgan Counsel (Nov. 19, 2009), at p. 1.

[4115] Jenner & Block, Memorandum re November 16, 2009 Teleconference with JPMorgan Counsel (Nov. 16, 2009), at p. 2.  According to JPMorgan, Lehman could not transfer or otherwise control securities in seg accounts, and, therefore, Lehman could not control securities in LXH – whether or not lien-free – overnight.  JPMorgan First Written Responses, at pp. 1, 9.  Tonucci confirmed that Lehman never attempted to remove collateral overnight from its lien-free account at JPMorgan.  Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 10; Examiner's Interview of Craig L. Jones, Sept. 28, 2009, at pp. 17-18.  Yeung's understanding, however, was that Lehman was able to transfer funds in the "Overnight Account," and, indeed, could transfer funds outside of JPMorgan.  Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 4.

securities remained in that account during the day.[4116]  In other words, any attempt to remove securities from LCE that would reduce its value under $5 billion would result in negative NFE, and, thus, the transaction would be blocked.

Whether or not Lehman had the right, as a technical matter, to access the securities in LXH, it could not, as a practical matter, have transferred or monetized those securities overnight.[4117]  According to Chiavenato, by the time JPMorgan freed collateral at night, it would be too late for Lehman to sell the securities because the markets would be closed.[4118]  In addition, JPMorgan's BDAS system was not even accessible overnight.[4119]  Furthermore, JPMorgan stated that it required almost all of the collateral the following morning to support the triparty unwind.[4120]  Thus, it is unsurprising that Tonucci could not recall any instance in which Lehman transferred

---

[4116] Jenner & Block, Memorandum re November 16, 2009 Teleconference with JPMorgan Counsel (Nov. 16, 2009), at p. 2; JP Morgan First Written Responses, at p. 10; *see also* e-mail from Michael A. Mego, JPMorgan, to Ray Stancil, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0051670] ("Instead of putting in a Debit (WDDB) daily for $5 billion on the LCE account and having it drop overnight.  We have asked to put in a $5 billion debit on the LCE intra day line of Credit so as to always have a debit on the account at all times.").  Note that this "NFE Adjustment" was unrelated to LBI's NFE.  LCE was an LBHI account and, therefore, the adjustment was placed on LBHI's NFE.

[4117] Lehman's ability to liquidate quickly the securities in the "Overnight Account" is relevant to an analysis of Lehman's liquidity pool, discussed in Section III.A.5.i of this Report.

[4118] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 18.

[4119] Jenner & Block, Memorandum re November 18, 2009 Teleconference with JPMorgan Counsel (Nov. 19, 2009), at p. 3.

[4120] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 18.  JPMorgan confirmed each morning whether Lehman had sufficient collateral prior to the triparty unwind.  Examiner's Interview of Edward J. Corral, Sept. 30, 2009, at p. 6.  While Lehman did have sufficient collateral each morning, Corral confirmed that if Lehman had ever failed this test, JPMorgan could have decided not to unwind the triparty repos.  *Id*.  Corral dismissed the possibility that JPMorgan would partially unwind the triparty repos (and await collateral for uncovered trades) in such a scenario, noting that practically speaking, the triparty unwind was an all or nothing proposition.  *Id*.

these securities (such as Spruce, Pine, Fenway and Verano) out of JPMorgan overnight.[4121]  Craig Jones of Lehman Treasury also confirmed the practical impossibility of Lehman transferring the securities overnight, stating that such a move would require someone to reopen the DTC credit facility in the middle of the night.[4122]  At most, Jones thought Lehman may have been able to transfer collateral overnight between its accounts at JPMorgan if JPMorgan reopened during the night, but Jones did not recall any such overnight transfer and only recalled generally the collateral movement from LCD to LCE.[4123]

According to Lehman's counsel, the overnight-account provision formalized a prior course of dealing between JPMorgan and Lehman.[4124]  At least as of August 18 (around the time when the LXH account was created), securities were swept from LCE each night into a separate account overnight.[4125]  Lehman understood that the overnight-account provision in the August Agreements confirmed that JPMorgan's lien operated

---

[4121] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 9.

[4122] Examiner's Interview of Craig L. Jones, Sept. 28, 2009, at p. 17.

[4123] *Id.* at pp. 17-18; *see supra* at Section III.A.5.b.1.e.

[4124] Examiner's Interview of Paul W. Hespel, Apr. 23, 2009, at p. 4; Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 3 (characterizing this prior course of business as using excess funds in clearance accounts at the end of each day to fund overnight lending and describing the overnight-account provision as "mechanical").  JPMorgan's counsel stated, however, that there was no particular statement or action by Lehman or JPMorgan that made the overnight-account provision resemble a "carry-over" of a structure already in place.  Jenner & Block, Memorandum re November 18, 2009 Teleconference with JPMorgan Counsel (Nov. 19, 2009), at p. 2.

[4125] *See* JPMorgan First Written Responses, at p. 9.

on an intraday basis only, and that Lehman's excess collateral was lien-free overnight.[4126]

According to JPMorgan witnesses, however, Lehman requested the overnight-account provision because Lehman needed contractual language to justify Lehman's inclusion of pledged collateral as part of Lehman's liquidity pool.[4127] Significantly, Lehman's counsel, Hespel, confirmed that the overnight-account provision was important for liquidity-reporting purposes and that assets in the Overnight Account were classified as unencumbered in Lehman's liquidity estimations.[4128] Contemporaneous internal Lehman e-mails further confirmed that the overnight-account provision related to liquidity reporting,[4129] and Lehman did, in fact, include securities pledged under the August Agreements in its liquidity pool.[4130]

---

[4126] *E.g.*, Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 8 (Yeung recalled an e-mail exchange with Fleming in which Fleming instructed him that JPMorgan's lien was an intraday lien and that Lehman had to be able to claim for liquidity-reporting purposes the collateral was lien-free); e-mail from Daniel J. Fleming, Lehman, to Mark G. Doctoroff, JPMorgan (Aug. 21, 2008) [LBEX-DOCID 310528] ("at the end of the day (after we have settled all of our obligations with JPM) we will have the full value of the collateral in the Holdings account").

[4127] Examiner's Interview of Mark G. Doctoroff, Apr. 29, 2009, at pp. 12, 22-23 (recalling that Paolo Tonucci represented that the purpose of the overnight-account provision was to preserve Lehman's ability to include in Lehman's Liquidity Pool collateral pledged to cover JPMorgan's intraday risk); Examiner's Interview of Donna Dellosso, Feb. 27, 2009, at p. 3 (Lehman informed JPMorgan that it wanted overnight access to the collateral, presumably for its overnight liquidity pool); e-mail from Mark G. Doctoroff, JPMorgan, to David A. Weisbrod, JPMorgan, *et al.* (Sept. 2, 2008) [JPM-2004 0006556] (acknowledging that $5 billion posted by Lehman was part of Lehman's liquidity pool).

[4128] Examiner's Interview of Paul W. Hespel, Apr. 23, 2009, at p. 4.

[4129] Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 8 (Yeung recalled an e-mail exchange with Fleming in which Fleming instructed him that Lehman had to be able to claim collateral pledged with JPMorgan was lien-free for liquidity reporting).

[4130] *See infra* at Section III.A.5.i (discussing the propriety of including certain assets in Lehman's liquidity pool). It should be noted, however, that Lehman had the ability to, and did, remove securities from the

### (g) Background to the September 9 Collateral Request and September Agreements

In late August and September, Lehman's deteriorating financial condition became increasingly apparent.[4131]   On September 4, 2008, JPMorgan executives, led by Chief Risk Officer Barry Zubrow, met with Lehman executives Ian Lowitt, Paolo Tonucci and Chris O'Meara, to discuss Lehman's upcoming third quarter results, then scheduled for release on September 18.[4132]   In preparation for the meeting, JPMorgan summarized significant issues affecting Lehman:

> We expect [Lehman] will have further significant asset write-downs primarily originating from their commercial and residential real estate related assets.  Their 3Q results will likely also come with announcements regarding the actions they will be taking to shore-up their balance sheet, bolster capital . . . , and to operate successfully in the coming quarters in the new market environment.  Major themes in the press – (i) potential capital injection by Korea Development Bank (KDB) or other sovereign wealth fund; (ii) sale of all or part of their Investment Management Division (Neuberger Berman included) . . . ; (iii) sale of real estate assets or

---

LCE account during the day as long as the value of the LCE account remained at or above $5 billion.  For example, Lehman moved Kingfisher from LCE to LCD on September 2.  *See* JPMorgan Second Written Responses, at p. 8; Jenner & Block, Memorandum re November 18, 2009 Teleconference with JPMorgan Counsel (Nov. 19, 2009), at p. 2.

[4131] *See supra* at Section III.A.3.a.2; *e.g.,* Andrew Ross Sorkin, *Struggling Lehman Plans to Lay Off 1,500*, N.Y. Times, Aug. 28, 2008 (Lehman shares lost 73 percent of their value between January 2008 and the end of August 2008); *see also* e-mail from Ricardo S. Chiavenato, JPMorgan, to David A. Weisbrod, JPMorgan (Aug. 22, 2008) [JPM-2004 0061226] ("Lehman may face serious problems next week if it is not acquired . . . and its losses are large.").

[4132] JPMorgan, Lehman Brothers Holdings Inc. Briefing Memorandum (Sept. 4, 2008), at p. 1 [JPM-2004 0006171]; *see also* Lehman, JP Morgan Agenda (Sept. 4, 2008) [LBEX-DOCID 445367].   Although the JPMorgan agenda indicated that the earnings call was initially scheduled for September 17, it was in fact scheduled for September 18.   *See* AFP, *Lehman Brothers in Freefall as Hopes Fade for New Capital* (Sept. 9, 2008), *available at* http://afp.google.com/article/ALeqM5jEijYPZUGeWNO_FflIPEg_6CaQ7w.

formation of a bad bank/good bank with a private equity sponsor/s may be touched on during this discussion.[4133]

Tonucci described the meeting as an opportunity for Lowitt to update JPMorgan on Lehman's third quarter earnings and the status of its "SpinCo" plans.[4134]

In the September 4 meeting between executives from Lehman and JPMorgan, the parties also discussed issues concerning triparty repo and Lehman's posted collateral,[4135] although Tonucci stated that this was not the focus of the meeting.[4136]   At that time Lehman had about $8 billion of collateral (as priced by Lehman) on deposit with JPMorgan to support intraday triparty risk in the United States, and discussions were underway to secure $2 billion in intraday risk associated with European triparty exposures.[4137]   Lehman believed that JPMorgan was overcollateralized against intraday risk, and JPMorgan acknowledged that Lehman disagreed with JPMorgan's collateral valuations and that collateral substitutions might be necessary.[4138]   Notably, JPMorgan

---

[4133] JPMorgan, Lehman Brothers Holdings Inc. Briefing Memorandum (Sept. 4, 2008), at p. 1 [JPM-2004 0006171].  JPMorgan's Briefing Memorandum also stated: "There is a strong desire at [Lehman] to have open and frank dialogue with JPM at all levels of our organizations. . . . As [Lehman]'s primary operating services provider, [Lehman] management want to ensure that we are fully briefed on their strategy and challenges as they need our support to operate their business." *Id*.

[4134] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at pp. 10-11.

[4135] *See* JPMorgan, Lehman Brothers Holdings Inc. Briefing Memorandum (Sept. 4, 2008), at pp. 1-2 [JPM-2004 0006171]; Lehman, JP Morgan Agenda (Sept. 4, 2008) [LBEX-DOCID 445367].

[4136] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 11; Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 18.

[4137] JPMorgan, Lehman Brothers Holdings Inc. Briefing Memorandum (Sept. 4, 2008), at p. 2 [JPM-2004 0006171]; Lehman, JP Morgan Agenda (Sept. 4, 2008) [LBEX-DOCID 445367].

[4138] JPMorgan, Lehman Brothers Holdings Inc. Briefing Memorandum (Sept. 4, 2008), at p. 2 [JPM-2004 0006171].

also acknowledged that Lehman's collateral postings were "part of [its] liquidity pool . . . despite their less than cash liquidity profile."[4139]

JPMorgan had its doubts about the plan that Lehman presented at the September 4 meeting.[4140]  For example, Lehman walked JPMorgan through its SpinCo proposal (whereby Lehman planned to spin off its illiquid assets into a separate company in order to remove them from Lehman's balance sheet),[4141] but the proposal did not instill confidence in JPMorgan executives.  Zubrow had difficulty understanding how Lehman would infuse enough money into the SpinCo entity to cover the exposure of its real estate loans.[4142]  He told Lowitt that Lehman needed to provide more clarity on SpinCo, and relayed concern that Lehman's plan would "spook" the market.[4143]   Tonucci confirmed to the Examiner that JPMorgan was concerned about the viability of the SpinCo plan.[4144]

JPMorgan offered to assist Lehman by providing feedback on the presentations Lehman was planning to make to the various rating agencies in the coming days.[4145] Accordingly, later in the evening of September 4, Tonucci sent to JPMorgan a draft copy of a presentation Lehman intended to give the ratings agencies, seeking JPMorgan's

[4139] *Id*.
[4140] Examiner's Interview of Mark G. Doctoroff, Apr. 29, 2009, at p. 15.
[4141] *See* Section III.A.3.c.4 (discussing Lehman's SpinCo proposition).
[4142] Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 7.
[4143] *Id*.
[4144] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 11.
[4145] Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 7.

comments.[4146]  Executives at JPMorgan found the presentation to be too vague and were concerned about the strategies Lehman outlined.[4147]  Zubrow viewed the presentation as not detailed enough to provide confidence in Lehman's planned course of action with its SpinCo proposal.[4148]  Doctoroff consolidated the feedback from JPMorgan in an e-mail to Tonucci on September 5, 2008.[4149]  Among other concerns, JPMorgan identified the following: Lehman needed to be more definitive about its timeline and how its business would be operated over that timeline; Lehman should determine whether it could make its expense reduction more aggressive; and Lehman needed to address additional issues such as management changes.[4150]  JPMorgan executives also expected more focus on liquidity, especially expected liquidity uses over the 12 to 18 months ahead.[4151]  JPMorgan further suggested that Fuld participate in the rating agency meetings.[4152]  This final point was the most important in JPMorgan's view because

---

[4146] E-mail from Paolo R. Tonucci, Lehman, to Mark G. Doctoroff, JPMorgan, *et al.* (Sept. 4, 2008) [JPM-2004 0006300].  Lehman highlighted the sensitive nature of these documents multiple times.  *See id.* ("There is a lot of confidential info . . . ."); e-mail from Ian T. Lowitt, Lehman, to Barry L. Zubrow, JPMorgan (Sept. 5, 2008) [JPM-2004 0006314] ("The materials we sent you are obviously very sensitive . . . ."); e-mail from Ian T. Lowitt, Lehman, to Barry L. Zubrow, JPMorgan (Sept. 7, 2008) [JPM-2004 0006317].  JPMorgan limited the circulation of the materials.  *See* e-mail from Barry L. Zubrow, JPMorgan, to Ian T. Lowitt, Lehman, *et al.* (Sept. 8, 2008) [JPM-2004 006317].

[4147] Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 7; *see* e-mail from Mark G. Doctoroff, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 5, 2008) [JPM-2004 0006286].

[4148] Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 7; *see* e-mail from Barry L. Zubrow, JPMorgan, to Mark G. Doctoroff, JPMorgan, *et al.* (Sept. 5, 2008) [JPM-2004 0006286] ("strategy is presented with a lot of equivocation").

[4149] *See* e-mail from Mark G. Doctoroff, JPMorgan, to Paolo R. Tonucci, Lehman (Sept. 5, 2008) [LBHI_SEC07940_556179].

[4150] *See id.*

[4151] *Id.*

[4152] *Id.*

Lehman needed to show the rating agencies and the larger market that Lehman was resolute about bringing its plan to completion, and that vision had to start from the top.[4153]  Tonucci agreed with JPMorgan's feedback and said he would push Fuld to participate in future meetings with the agencies.[4154]

While concern was growing inside JPMorgan about Lehman's condition, Doctoroff stated that there was no serious belief within JPMorgan at the time that Lehman would file for bankruptcy.[4155]  Other JPMorgan witnesses likewise stated that they did not see the bankruptcy of Lehman as a serious possibility until the weekend preceding LBHI's bankruptcy filing.[4156]  JPMorgan was, however, facing increasing risks from its business with Lehman.

Also on September 5, JPMorgan's Investment Bank Risk Committee ("IBRC") met and discussed a presentation titled "Overview of Debt Maturities for Major US Broker Dealers" (the "IBRC Deck").[4157]  The discussion of the IBRC Deck was led by

---

[4153] *See* e-mail from Mark G. Doctoroff, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 5, 2008) [JPM-2004 0006304].

[4154] *Id.*

[4155] Examiner's Interview of Mark G. Doctoroff, Apr. 29, 2009, at p. 15.

[4156] *E.g.*, Examiner's Interview of Jamie L. Dimon, Sept. 29, 2009, at p. 10 (the first time he thought Lehman may not survive was Saturday, September 13); Examiner's Interview of John J. Hogan, Sept. 17, 2009, at p. 8 (the first time he thought Lehman may not survive was Sunday, September 14).  On Friday morning, September 12, however, Lowitt anticipated problems with JPMorgan over the weekend and felt that JPMorgan was "acting as though" Lehman was "filing over the weekend."  E-mail from Ian T. Lowitt, Lehman, to Paolo R. Tonucci, Lehman (Sept. 12, 2008) [LBEX-DOCID 072153].

[4157] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 6; JPMorgan, Overview of Debt Maturities for Major US Broker Dealers, IBRC Presentation (Sept. 5, 2008) [JPM-EXAMINER00005998].  The details underlying this presentation are reflected in another presentation, "Lehman Brothers Exposure Overview," which calculated exposure as of September 5 (the IBRC Deck calculated exposure as of September 1).  The second presentation was not discussed at the September 5 meeting.  *See* JPMorgan

Piers Murray, and the meeting included broad discussions about investment banks, trading, markets and the skittishness of hedge funds regarding novations.[4158]  JPMorgan was supportive of accepting novations and, thus, stepping into hedge funds' shoes to face investment banks, but discussed the risk of runs on the banks.[4159]  There were particular concerns about Lehman and one other broker-dealer, but JPMorgan reiterated its support of both entities.[4160]  The IBRC Deck covered a number of broker-dealers, including Lehman, and revealed that JPMorgan had a primary exposure to Lehman of $2.645 billion, the largest component of which was $1.904 billion in derivatives exposure.  The IBRC Deck showed an approved limit for settlement and operating exposure of $10.681 billion intraday (but did not show how much exposure JPMorgan actually had during the day).[4161]  The presentation addressed the exposure only of JPMorgan's Investment Bank, separate from the triparty-repo business.[4162]

First Written Responses, at p. 17; JPMorgan, Lehman Brothers Exposure Overview (Sept. 2008) [JPM-EXAMINER00005966].

[4158] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 6.  Lehman was aware by the end of July 2008 that novation requests were increasing, and some banks were declining novation requests from Lehman counterparties.  See e-mail from Eric Felder, Lehman, to Ian T. Lowitt, Lehman, et al. (July 28, 2008) [LBEX-DOCID 028924].

[4159] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 6.

[4160] Id.

[4161] JPMorgan, Overview of Debt Maturities for Major US Broker Dealers, IBRC Presentation (Sept. 5, 2008), at p. 6 [JPM-EXAMINER00005998].

[4162] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at pp. 2, 6-7; see JPMorgan, Overview of Debt Maturities for Major US Broker Dealers, IBRC Presentation (Sept. 5, 2008), at p. 6 [JPM-EXAMINER00005998].  "Intraday exposure" in the IBRC Deck referred to Investment Bank intraday exposure, not intraday exposure related to clearing activities.  See JPMorgan, Overview of Debt Maturities for Major US Broker Dealers, IBRC Presentation (Sept. 5, 2008), at p. 6 [JPM-EXAMINER00005998].  Notably, analyzing the September 5 triparty-repo unwind data, Chiavenato concluded that JPMorgan held $9.9 billion in collateral (incorporating Gifford Fong's pricing of collateral in the LCE account) where

JPMorgan subsequently shared information discussed in IBRC meetings with the FRBNY.[4163]

Zubrow stated that after the September 5 IBRC meeting he called Lowitt to relay that JPMorgan might need an additional $5 billion in collateral given its concerns about an adverse market reaction to Lehman's plans.[4164]  Zubrow characterized this as a speculative and informal conversation to provide a "place marker" in case JPMorgan followed through with a collateral request.[4165]  According to Zubrow, while Lowitt hoped that JPMorgan would ultimately not make the request, Lowitt assured him that he understood the nature of the situation.[4166]  Lowitt recalled speaking with Zubrow by phone, but could not be certain of when the call took place or whether Zubrow specified the precise amount of collateral sought by JPMorgan.  The focus of the conversation, according to Lowitt, was the rating agency meetings.[4167]

---

only $9.4 billion was needed to cover risk-based margin.  E-mail from Ricardo S. Chiavenato, JPMorgan, to David A. Weisbrod, JPMorgan, *et al.* (Sept. 8, 2008) [JPM-2004 0007292].  Yet, Chiavenato also pointed out that collateral held by triparty investors overnight and securing JPMorgan's exposure intraday included "$15 bi in less liquid collateral self-priced by Lehman, with half of that priced in the 90-100+ range (which we believe is overstated) - using lower vendor prices [would] reduce" JPMorgan's margin. *Id.*

[4163] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 11; *see also* e-mail from Arthur G. Angulo, FRBNY, to Timothy F. Geithner, FRBNY, *et al.* (Sept. 10, 2008) [FRBNY to Exam. 014605] (attaching September 7, 2008 JPMorgan "Lehman Brothers Exposure Overview").

[4164] Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 10.

[4165] *Id.*

[4166] *Id.*

[4167] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 18.

JPMorgan witnesses stated that JPMorgan's derivatives exposure was the primary impetus for the new collateral request.[4168]  In addition, Donna Dellosso, a risk manager in JPMorgan's investment bank, stated that the $5 billion figure was grounded in the IBRC Deck analysis,[4169] and Steven Black, co-Chief Executive Officer of JPMorgan's Investment Bank, described JPMorgan's arrival at the $5 billion figure as "art, not science."[4170]  JPMorgan witnesses stated that no one at JPMorgan believed a $5 billion request was too high; indeed, JPMorgan believed that it could have requested more.[4171]  Through its counsel, JPMorgan explained to the Examiner that:

> The derivatives primary exposure was a principal item of focus because it was expected to increase substantially due to novations and market changes. . . . On the other hand, JPMorgan viewed the settlement and operating exposures as likely to decrease over time as Lehman de-leveraged.  JPMorgan also recognized that it was possible to ameliorate the operating and settlement exposures through careful attention to the timing of payments and deliveries.  Thus, JPMorgan did not feel it necessary to request collateral in the full amount of the identified settlement and operating exposures.  Taking all of this into consideration, it was decided that, in order to be able to continue to support Lehman, it

---

[4168] Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 10; Examiner's Interview of John J. Hogan, Sept. 17, 2009, at pp. 3-4.

[4169] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 7.

[4170] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 6.

[4171] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 8.  Buyers-Russo recalled that triparty-repo stress analyses at the time showed a shortfall approaching $20 billion.  Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 5.  In addition, Ed Corral stated his view that JPMorgan was undercollateralized throughout the summer of 2008 and could have asked for more collateral, even in a magnitude reaching $25 billion.  Examiner's Interview of Edward J. Corral, Sept. 30, 2009, at p. 12.  As discussed in more detail below, there is some evidence to suggest that JPMorgan may have considered itself already adequately collateralized.  *See, e.g.*, JPMorgan, Tri-Party Repo Margin Gap Analysis – Lehman – 9/10/2008 (Sept. 10, 2008), at pp. 2-3 [JPM-2004 0029886].  But, as discussed *infra*, JPMorgan asserted that its written collateral analyses assumed face values for certain illiquid Lehman collateral, and thus understated JPMorgan's exposure.

was necessary for JPMorgan to obtain collateral of $5 billion for the existing and anticipated risks.[4172]

In addition, JPMorgan determined that it needed a "master-master" agreement with Lehman to cover the entire relationship across all Lehman and JPMorgan entities.[4173]  Dellosso stated that she discussed such an agreement with Tonucci.[4174]  JPMorgan witnesses also stated that during this same time period JPMorgan sought additional collateral, as well as broader guaranties and pledge agreements, from other broker-dealers in addition to Lehman.[4175]

By September 9, the following Tuesday, Lehman's situation had continued to deteriorate.  Reports began to surface that The Korea Development Bank ("KDB") had abandoned (or was likely to abandon) its acquisition talks with Lehman,[4176] and Lehman's stock had dropped significantly.[4177]  Ultimately, a news article reporting that

---

[4172] JPMorgan First Written Responses, at p. 17.

[4173] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 8; Examiner's Interview of John J. Hogan, Sept. 17, 2009, at p. 7.

[4174] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 8.

[4175] Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 6; Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 8; *see also* JPMorgan Second Written Responses, at p. 1.  Although discussions with other broker-dealers could have been taking place at this time, JPMorgan did not provide evidence of any agreements with other broker-dealers that were actually executed in late August or September prior to the date of the LBHI bankruptcy petition.

[4176] Francesco Guerrera, *et al.*, *Equities Suffer as Lehman Shares Fall 45%*, Fin. Times, Sept. 9, 2008 ("Lehman's shares fell after a newswire report cited an unnamed Korean government official as saying that Korea Development Bank, a state-run lender, had decided not to invest in Lehman."); Susanne Craig, *et al.*, *Korean Remarks Hit Lehman*, Wall St. J., Sept. 9, 2008 ("A KDB official said the comments [by the Chairman of South Korea's Financial Services Commission] would likely be strong enough to deter the bank from pursuing a Lehman deal . . . ."); *see also supra* at Section III.A.3.c.5.b.

[4177] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 11; Examiner's Interview of Donna Dellosso, Feb. 27, 2009, at p. 4; Susanne Craig, *et al.*, *Lehman Faces Mounting Pressures*, Wall St. J., Sept. 10, 2008, at A1; Susanne Craig, *et al.*, *Korean Remarks Hit Lehman*, Wall St. J., Sept. 9, 2008.

KDB had determined not to strike a deal with Lehman prompted Lehman to accelerate its earnings announcement; instead of releasing its earnings on September 18, as planned, Lehman decided to make its announcement the next morning, on September 10.[4178]  Black explained that the "rumor mill" was rampant with claims that firms were no longer doing business with Lehman.[4179]

As discussed in more detail below, on September 9, JPMorgan formally requested $5 billion of additional collateral from Lehman.[4180]  This collateral request intersected with already-commenced discussions about preparing new agreements with Lehman.  JPMorgan insisted that the collateral be posted and the documentation signed by the following morning.[4181]

Several JPMorgan witnesses stated that in determining the amount of collateral to request, JPMorgan did not want to do anything that would harm Lehman or destabilize financial markets.[4182]  For example, Jane Buyers-Russo, who heads the securities industry coverage group at JPMorgan's corporate bank, stated that JPMorgan

---

[4178] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 11.

[4179] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 6; *see also* e-mail from Pandora Setian, JPMorgan, to Jamie L. Dimon, JPMorgan, *et al.* (Sept. 9, 2008) [JPM-2004 0006332] ("Today S&P placed the ratings of Lehman Brothers on CreditWatch with negative implications.").

[4180] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 6.

[4181] Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 6; Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 9; *see also infra* at Section III.A.5.b.1.  JPMorgan was not the only bank to request additional documentation from Lehman on September 9; Lehman also executed a Guaranty Amendment with Citi and cash deeds with HSBC.  *See infra* at Sections III.A.5.c.1, III.A.5.d.3.

[4182] *E.g.*, Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 6.

wanted to maintain a market-neutral stance so that outsiders would observe JPMorgan facing Lehman normally in its operating and trading businesses.[4183]

There were discussions within JPMorgan about JPMorgan's options if Lehman did not post the collateral or execute the additional agreements by September 10, and how those options related to JPMorgan's desire to remain a stabilizing force. One option available to JPMorgan was to cease unwinding triparty repos in the morning, which would result in LBI default on payment obligations (causing government securities not to trade and investors to lock up). This was an option JPMorgan retained, but was not one it wanted to use because it would be highly disruptive of the market.[4184] JPMorgan also considered limiting transfers until accounts were funded, but, again, outsiders would notice if they were not receiving payments in a timely fashion.[4185] JPMorgan further considered restricting or reducing JPMorgan's extension of intraday liquidity.[4186] JPMorgan's options fell along a spectrum: on one extreme, JPMorgan could cancel all lines and require manual approval for all Lehman transactions and, on the other extreme, JPMorgan could continue business as usual with Lehman. In between

[4183] Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 6. There is some evidence of concern about harming Lehman in contemporaneous internal JPMorgan communications. *See* e-mail from Ricardo S. Chiavenato, JPMorgan, to Paul Wilson, JPMorgan (Sept. 9, 2008) [JPM-2004 0032609] ("For the time being we are not changing any credit limits for seclending due to our collateralization and to the fact that pulling out at this stage might make things worse and even trigger their collapse.").
[4184] Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 6.
[4185] *Id.*
[4186] *Id.*

these extremes, for example, JPMorgan could scale back lines and put personnel on alert to monitor Lehman accounts.[4187]

Jamie Dimon, JPMorgan's CEO and Chairman of the Board, asserted that in every conversation he had with Fuld, Dimon reiterated that JPMorgan wanted to help and that if anything JPMorgan was doing was hurting Lehman, Fuld should let Dimon know.[4188] Dimon stated that JPMorgan did not want to harm Lehman and that at no time did Lehman come to JPMorgan for relief on the amount of collateral sought.[4189] Dimon stated that had Fuld called him, JPMorgan probably would not have insisted on the collateral because JPMorgan did not want to be blamed for Lehman's demise.[4190] The Chief Risk Officer in JPMorgan's Investment Bank, John Hogan, stated that when he spoke with Lehman's Chief Risk Officer, Chris O'Meara, about collateral, including a call with O'Meara about the September 9 request, O'Meara expressed no acrimony and said he understood why JPMorgan needed the collateral.[4191] Hogan added that JPMorgan wanted to protect its own risk, but not to a point where it would cause

---

[4187] *Id.* at pp. 6-7.

[4188] Examiner's Interview of Jamie L. Dimon, Sept. 29, 2009, at p. 2.

[4189] *Id.* at pp. 2, 10. Chiavenato stated that, although collateral return was not his decision, he would not have recommended that JPMorgan return any collateral in August in response to a request from Lehman. At that point, JPMorgan claimed it did not have enough collateral. Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at pp. 15-16; Examiner's Interview of Edward J. Corral, Sept. 30, 2009, at p. 12.

[4190] Examiner's Interview of Jamie L. Dimon, Sept. 29, 2009, at p. 10.

[4191] Examiner's Interview of John J. Hogan, Sept. 17, 2009, at p. 4.

Lehman any distress; he stated he had heard from others that Fuld had no issue with the September 9 collateral request.[4192]

Finally, Ed Corral, JPMorgan's head of Fixed Income Clearing, stated that he believed that JPMorgan did not ask for nearly as much collateral as it could or should have because it wanted to help Lehman.[4193]  While the Examiner gives little weight to these statements made long after the fact and in light of pending claims between Lehman and JPMorgan (in particular the suggestion that JPMorgan would have backed down from its collateral requests if Fuld had just asked), it is significant that in contemporaneous notes made on September 9, Buyers-Russo wrote that JPMorgan "[did]n't want to push [Lehman] over edge or signal to market."[4194]  And, on a conference call with the FRBNY the following afternoon, when the FRBNY questioned whether "senior management ha[d] put forth any triggers or course of events that would signal a desire by JPMC to stop trading, cut lines, and run from Lehman," JPMorgan risk executives "reiterated, as they [had] in the past, that they [did] not want to be the first one to make that call and [were] mindful of the implications of such a decision.  However, they did state that they [did] not want to be the last one to make

[4192] *Id*. at p. 5.

[4193] Examiner's Interview of Edward J. Corral, Sept. 30, 2009, at pp. 2, 11; Examiner's Interview of Donna Dellosso, Feb. 27, 2009, at p. 4 (stating that the September 9 collateral request should have been higher given JPMorgan's aggregate risk exposures to Lehman).

[4194] Jane Buyers-Russo, JPMorgan, Unpublished Notes (Sept. 9, 2008), at p. 2 [JPM-EXAMINER00006052]; *see also* e-mail from Jane Buyers-Russo, JPMorgan, to Kelly A. Mathieson, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0050097] ("The goal was to protect jpm without pushing [Lehman] over the edge.").

that decision . . . ."[4195]  The evidence suggests that JPMorgan exhibited some flexibility as to the amount of collateral it would accept from Lehman,[4196] but there is no contemporaneous evidence suggesting JPMorgan would have eliminated its September collateral requests in the face of resistance from Lehman.

### (h) September 9 Calls Between Steven Black and Richard Fuld

According to JPMorgan witnesses, Black communicated the $5 billion collateral request to Richard Fuld by telephone on September 9.[4197]  Black stated that he explained that the collateral was intended to cover JPMorgan's exposure to Lehman in its entirety, and was not limited to triparty-repo exposure.[4198]  Ultimately, according to Black, Lehman offered to post $3 billion immediately and post an additional $2 billion at a later time.[4199]  There is some evidence, however, that Lehman agreed only to top up to $4 billion.[4200]

---

[4195] E-mail from Gregory Gaare, FRBNY, to William A. Rutledge, FRBNY, *et al.* (Sept. 10, 2008) [FRBNY to Exam. 014605].

[4196] *See* Section III.A.5.b.1.h.

[4197] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 6; Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 10; Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 7. Deciphering a contemporaneous note, Buyers-Russo recalled that JPMorgan would ask for $5 billion, but accept $3 billion from Lehman.  Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 9; Jane Buyers-Russo, JPMorgan, Unpublished Notes (Sept. 9, 2008), at p. 1 [JPM-EXAMINER00006052].  In a later contemporaneous note on September 9, Buyers-Russo wrote, "Black called Dick[,] asked for $3B – said ok."  Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 10; Jane Buyers-Russo, JPMorgan, Unpublished Notes (Sept. 9, 2008), at p. 3 [JPM-EXAMINER00006052].

[4198] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 7.  Note, however, that Dellosso, in an internal e-mail, referred to the new collateral as covering intraday exposure.  *See* e-mail from Donna Dellosso, JPMorgan, to Steven D. Black, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0006377] ("[Lehman] will maintain collateral of $4bln to cover intra-day exposure.").

[4199] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at pp. 6, 9; *see also* JPMorgan First Written Responses, at p. 17.  Black's communications did not occur in a single telephone call with Lehman that

Black stated that he relayed to Fuld that JPMorgan was not trying to solve JPMorgan's problem by creating new problems for Lehman. He asserted that he told Fuld that, if Lehman was "near the edge," Fuld should say so. According to Black, Fuld asked whether JPMorgan was interested in making a capital infusion, but JPMorgan was not. Black stated that he advised Fuld that if Lehman were skating close to the edge, Lehman should call the Federal Reserve so that the Federal Reserve could "herd the cats" needed to assist Lehman. According to Black, Fuld said Lehman was not anywhere close to the point of needing such assistance.[4201]

Taking advantage of JPMorgan's offer to help in another way, Fuld asked Black to send a JPMorgan team to a meeting that evening with Citi and Lehman to discuss a capital markets plan.[4202] JPMorgan did so.[4203] The JPMorgan team reported back that Lehman had not offered a viable plan and that a preannouncement of Lehman's

---

day, but in multiple calls. Examiner's Interview of Steven D. Black, Sept. 23, 2009, at pp. 6-9. Lehman's acceptance of the $3 billion request is consistent with the September Guaranty which specifically invoked that figure in establishing maximum liability. Guaranty (Sept. 9, 2008), at p. 2 [JPM-2004 0005813] ("The Guarantor's maximum liability under this Guaranty shall be THREE BILLION DOLLARS ($3,000,000,000) or such greater amount that the Bank has requested from time to time as further security in support of this Guaranty.").

[4200] *See* e-mail from Donna Dellosso, JPMorgan, to Steven D. Black, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0006377] ("[Lehman] will maintain collateral of $4bln to cover intra-day exposure."); e-mail from Daniel J. Fleming, Lehman, to Mark G. Doctoroff, JPMorgan (Sept. 12, 2008) [LBEX-DOCID 405652] ("JPM now has a total of 4.6bn, 600mm more then agreed.").

[4201] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at pp. 6-7.

[4202] *Id*. at p. 7.

[4203] *See* e-mail from Jane Buyers-Russo, JPMorgan, to Tim Main, JPMorgan (Sept. 9, 2008) [JPM-2004 0006361].

earnings without a plan in place was unwise.[4204]  The JPMorgan team also noted that Lehman had sent junior executives who pitched a "good bank/bad bank" proposal, but who could not answer specific questions or provide enough detail for JPMorgan to take the proposal seriously.[4205]

Black also stated that he told Fuld that if JPMorgan ultimately did not need the collateral that Lehman was pledging, JPMorgan would return it.[4206]  In response to the Examiner's questions about issues that may have come up in JPMorgan's discussions with Lehman that evening concerning whether the collateral would be available to Lehman overnight, Black recalled that there was a "capital issue" that Lehman was attempting to solve vis-à-vis the September Agreements, but he was not involved in specific discussions about it.[4207]

Internal JPMorgan documents are consistent with the statements by JPMorgan executives to the Examiner that on September 9, 2008, Black requested additional

---

[4204] *See* e-mail from John J. Hogan, JPMorgan, to Steven D. Black, JPMorgan (Sept. 9, 2008) [JPM-2004 0006362]; Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 7.  JPMorgan's Investment Bank Management Committee listened to Lehman's earnings call the next morning.  Black stated that JPMorgan's concerns from the night before were realized.  JPMorgan became concerned after the call because, in Black's words, it revealed that "the emperor had no clothes."  Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 9.

[4205] Examiner's Interview of John J. Hogan, Sept. 17, 2009, at p. 8; e-mail from John J. Hogan, JPMorgan, to Steven D. Black, JPMorgan (Sept. 9, 2008) [JPM-2004 0006362].  This proposal is discussed in more detail *supra* at Section III.A.3.c.4.

[4206] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 8.

[4207] *Id.*  The "capital issue" that Black recalled was likely Lehman's request for a three-day notice period to call its collateral back so that Lehman could count the cash as part of its liquidity pool.

collateral from Fuld, who agreed to the request.[4208]  Fuld, however, denied having made any such agreement.  Indeed, he stated that he did not even have the authority to agree to changes in collateral.[4209]

Although there is a September 9 entry in Fuld's call log reflecting a call with Black,[4210] Fuld stated that he had no recollection of any such call.[4211]  Fuld explained that he was reminded of the call by Thomas Russo (Lehman's Chief Legal Officer) weeks after LBHI's bankruptcy, who suggested that Fuld would not recall a conversation with Black because Fuld had asked Russo to return Black's call.[4212]  However, Russo said he did not recall speaking with Black specifically, but did recall speaking with someone at JPMorgan related to an agreement that JPMorgan wanted signed quickly.[4213]  Fuld, however, recalled Russo reporting to him that the topic of the call was collateral and that Russo did not have authority to agree to changes in collateral.[4214]

Lehman's posting of additional collateral on September 9 and 10 is consistent with statements by witnesses from JPMorgan to the Examiner that Lehman did agree on

---

[4208] E-mail from Jane Buyers-Russo, JPMorgan, to Susan Stevens, JPMorgan, *et al.* (Sept. 9, 2008) [JPM-2004 0006331] ("Black spoke with Fuld who agreed to the $3B."); Jane Buyers-Russo, JPMorgan, Unpublished Notes (Sept. 9, 2008), at p. 3 [JPM-EXAMINER00006052] ("Black called Dick[,] asked for $3B – said ok.") Doctoroff was informed of the conversation by Buyers-Russo and instructed to work with Fleming to put the request in place.  Examiner's Interview of Mark G. Doctoroff, Apr. 29, 2009, at p. 11.

[4209] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 15-16.

[4210] OOC Client Activity Log (03/15/2008-09/15/2008), at p. 66 [LBHI_SEC07940_016911].

[4211] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 15-16; Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at p. 4.

[4212] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 15-16.

[4213] Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 4.

[4214] Examiner's Interview of Richard S. Fuld, May 6, 2009, at p. 16.

September 9 to post up to $3 billion in collateral. On September 9, Lehman pledged to JPMorgan $1 billion in cash and approximately $1.7 billion of money market funds.[4215] The next day Lehman "top[ped] [JPMorgan] up to $3Bn" by delivering another $300 million cash.[4216]

On September 10, Lehman requested that JPMorgan substitute corporate bonds (from LBI) for a portion of the $3 billion Lehman had just posted.[4217] Lehman transferred approximately $1.6 billion of corporate bonds to JPMorgan, which were placed into an account subject to JPMorgan's lien and held by JPMorgan overnight.[4218] JPMorgan endeavored to value the corporate bonds that Lehman provided, haircutting them to approximately $1 billion.[4219] On September 11, Lehman posted an additional

---

[4215] JPMorgan Second Written Responses, at p. 9; Lehman, Collateral Pledged to JPM for Intraday As of 9/12/2008 COB [LBEX-AM 047008]; *see also* e-mail from Mark G. Doctoroff, JPMorgan, to Jane Buyers-Russo, JPMorgan, *et al.* (Sept. 9, 2008) [JPM-2004 0032520]; e-mail from Daniel J. Fleming, Lehman, to Paolo R. Tonucci, Lehman (Sept. 9, 2008) [LBEX-DOCID 073380].

[4216] E-mail from Mark G. Doctoroff, JPMorgan, to Donna Dellosso, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0032634]; *see also* e-mail from Mark G. Doctoroff, JPMorgan, to Donna Dellosso, JPMorgan (Sept. 10, 2008) [JPM-2004 0010289]; JPMorgan Second Written Responses, at p. 9; Lehman, Collateral Pledged to JPM for Intraday As of 9/12/2008 COB [LBEX-AM 047008].

[4217] *See* e-mail from Mark G. Doctoroff, JPMorgan, to Donna Dellosso, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0010289]; e-mail from John N. Palchynsky, Lehman, to Jon Ciciola, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0002216]; e-mail from Mark G. Doctoroff, JPMorgan, to Donna Dellosso, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0032634]; JPMorgan Second Written Responses, at p. 2. As described *infra*, JPMorgan ultimately did not agree to this substitution.

[4218] JPMorgan Second Written Responses, at pp. 2-3; e-mail from Mark G. Doctoroff, JPMorgan, to Donna Dellosso, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0032684]; e-mail from Mark G. Doctoroff, JPMorgan, to Donna Dellosso, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0032634]; e-mail from Mark G. Doctoroff, JPMorgan, to Daniel J. Fleming, Lehman (Sept. 10, 2008) [LBEX-DOCID 035938]. Initially, on September 10, Lehman provided ABSs and CMOs to JPMorgan as well, but JPMorgan informed Lehman that it would not consider that collateral. JPMorgan Second Written Responses, at p. 2; e-mail from Mark G. Doctoroff, JPMorgan, to Donna Dellosso, JPMorgan, *et al.* (Sept. 11, 2008) [JPM-2004 0032684].

[4219] JPMorgan Second Written Responses, at pp. 2-3; e-mail from Mark G. Doctoroff, JPMorgan, to Daniel J. Fleming, Lehman (Sept. 10, 2008) [LBEX-DOCID 035938]; e-mail from Donna Dellosso, JPMorgan, to

$600 million in cash[4220] and requested that $500 million of the corporate bonds be returned.[4221]   JPMorgan released a portion of the bonds to Lehman, but retained approximately $1 billion (market value according to Lehman) of them.[4222]   The posting of the additional $600 million in cash, as well as JPMorgan's retention – at least temporarily – of some of the corporate bond collateral, is consistent with Black's statement that Lehman had agreed to post $3 billion initially and supplement the collateral at a later date.   Thus, at the end of the day on September 11, JPMorgan held $1.9 billion in cash, approximately $1.7 billion in money market funds and approximately $1 billion in corporate bonds from Lehman (in addition to the securities collateral pledged by Lehman over the course of the summer).

### (i)   September Agreements

Shortly before 9:00 p.m. on September 9, JPMorgan sent draft guaranty and security agreements to Yeung.[4223]   A draft amendment to the Clearance Agreement

---

Matthew E. Zames, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0010289]; e-mail from Craig M. Delany, JPMorgan, to Henry E. Steuart, JPMorgan (Sept. 11, 2008) [JPM-EXAMINER00006219].

[4220] Collateral Pledged to JPM for Intraday As of 9/12/2008 COB [LBEX-AM 047008]; Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 12; e-mail from Mark G. Doctoroff, JPMorgan, to Henry E. Steuart, JPMorgan, *et al.* (Sept. 11, 2008) [JPM-2004 0062065]; JPMorgan Second Written Responses, at p. 9.

[4221] JPMorgan Second Written Responses, at p. 3; e-mail from Mark G. Doctoroff, JPMorgan, to Henry E. Steuart, JPMorgan, *et al.* (Sept. 11, 2008) [JPM-2004 0062065].

[4222] JPMorgan Second Written Responses, at p. 3; *see* e-mail from Henry E. Steuart, JPMorgan, to Jane Buyers-Russo, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-EXAMINER00006225]; e-mail from Robert H. Milam, JPMorgan, to John J. Hogan, JPMorgan, *et al.* (Sept. 11, 2008) [JPM-EXAMINER00006222].  The remainder of these bonds was returned on September 12.  *See infra* at Section III.A.5.b.1.m.

[4223] E-mail from Jeffrey Aronson, JPMorgan, to Andrew Yeung, Lehman, *et al.* (Sept. 9, 2008) [JPM-2004 0005594]; Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4.

arrived later that night.[4224]   The new agreements surprised Yeung, both because they came so soon after the August Agreements were negotiated and executed, and because small wording changes dramatically expanded the scope of JPMorgan's lien and the scope of obligations guaranteed by LBHI.[4225]

Yeung stated that while reviewing the draft documents that evening, he placed a call to Gail Inaba, a JPMorgan in-house counsel.[4226]   According to Yeung, Inaba explained that the changes to the agreements had already been agreed upon in a conversation between Black and Fuld.[4227]  She further explained that the agreements had to be executed prior to Lehman's accelerated earnings announcement scheduled for the next morning.[4228]  This message was communicated among business personnel as well. Dellosso stated that she called Tonucci on the night of September 9 and told him that the documents needed to be signed.   According to Dellosso, Tonucci replied that he

---

[4224] E-mail from Jeffrey Aronson, JPMorgan, to Andrew Yeung, Lehman, *et al.* (Sept. 9, 2008) [JPM-2004 0005039].  A draft Aurora Guaranty and draft Control Agreement were sent with the draft Amendment to the Clearance Agreement as well.  *See id.*  The September Guaranty, Security Agreement and Amendment to the Clearance Agreement are referred to herein as the "September Agreements."

[4225] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 3.

[4226] *Id*. at p. 4.  Inaba did not recall Yeung calling her that night.  Examiner's Interview of Gail Inaba, Apr. 28, 2009, at p. 7.

[4227] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4.   According to Yeung, when he expressed his concern over the expanded scope of the collateral pledge, Inaba said "if you have concerns about this we will contact Dick Fuld."  *Id.*  Although she did not remember Yeung calling her, Inaba stated to the Examiner that she told Yeung and Hespel that an agreement had been reached by very senior management at both firms, though not necessarily that Fuld and Black had reached agreement. Examiner's Interview of Gail Inaba, Apr. 28, 2009, at p. 7.

[4228] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4; Examiner's Interview of Gail Inaba, Apr. 28, 2009, at p. 8.

needed to speak to Lowitt, who was sleeping at the time.[4229]  Dellosso further said that Tonucci told her that he needed Lowitt's approval of the agreements, but she did not recall any follow-up information from Tonucci as to whether Lowitt was consulted.[4230] Similarly, Mark Doctoroff, at the instruction of Dellosso, told Dan Fleming between 10 p.m. and 11 p.m. that Lehman needed to wake Lowitt up because the agreements had to be completed.[4231]

Tonucci recalled an evening phone call with Buyers-Russo on September 9. According to Tonucci, Buyers-Russo inquired whether Lowitt had reviewed the agreements; he had not.  Tonucci reported that Lowitt was likely asleep and, although Buyers-Russo requested that Tonucci wake him up, Tonucci decided not to do so.[4232] Buyers-Russo did not discuss any such call with the Examiner,[4233] and it may be that Tonucci was mistaken in saying that the call was with Buyers-Russo rather than Dellosso.[4234]

Yeung and Hespel negotiated the agreement with JPMorgan.  The core JPMorgan in-house legal team consisted of Inaba, who took the lead in the negotiations, Jeffrey

---

[4229] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 9.

[4230] *Id*.

[4231] Examiner's Interview of Mark G. Doctoroff, Apr. 29, 2009, at p. 19; Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 9.

[4232] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 13.

[4233] Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at pp. 6-11.

[4234] This interpretation is supported by the fact that Buyers-Russo's notes from September 9 do not refer to such a conversation with Tonucci.  *See* Jane Buyers-Russo, JPMorgan, Unpublished Notes (Sept. 9, 2008), at pp. 1-5 [JPM-EXAMINER00006052].  Her September 11 notes, by comparison, do record conversations with Tonucci.  *See* Jane Buyers-Russo, JPMorgan, Unpublished Notes (Sept. 11, 2008), at p. 5 [JPM-EXAMINER00006040].

Aronson, who worked on the Guaranty and Security Agreement, and Nikki Appel, who worked on the Amendment to the Clearance Agreement.[4235]

The draft agreements raised several concerns for Yeung, which he identified in e-mails to Tonucci and others.[4236] Thus, notwithstanding the representation from Inaba that the agreements reflected an understanding between senior executives of Lehman and JPMorgan, Yeung took the step of identifying his concerns to Lehman business personnel in order to confirm their understanding. In response, Fleming instructed Yeung to proceed as if Lehman would ultimately agree to all of JPMorgan's proposed terms.[4237] According to Yeung, Fleming separately instructed Yeung to do everything required to advance the agreements as quickly as possible, and that Tonucci would review them eventually.[4238]

Through the night and into the next morning, Yeung and Hespel negotiated the agreements with JPMorgan's legal team. Yeung said he felt he was under "significant

---

[4235] Examiner's Interview of Gail Inaba, Apr. 28, 2008, at p. 6. In addition, Peter Wasserman worked on a separate LBHI Guaranty on behalf of Aurora Loan Services, LLC. *Id.*

[4236] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4; Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 9. As discussed below, Tonucci stated that he did not review his e-mails that evening. Yeung stated that Fleming told him that the agreements had already been agreed to, but Yeung responded that he would review them and provide comments nonetheless. Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 9.

[4237] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4. Fleming stated that he consulted with Tonucci before responding to Yeung's e-mail. Examiner's Interview of Daniel J. Fleming, Apr. 22, 2009, at p. 7. Tonucci did not report any such consultation and instead noted that after forwarding the original drafts of the agreements to Yeung and Fleming, he "paid no attention" to the issue on the evening of September 9. Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 13. Further, Tonucci added that he turned his Blackberry off that night and recalled that Fleming was likely the only business contact working with counsel on the night of September 9. *Id.*

[4238] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4.

pressure" and subject to a "very fast time-frame."  He felt the terms of the proposed agreements were "dictated" rather than negotiated, and that JPMorgan did not expect substantive changes or any "drawn-out discussion" on material provisions.[4239]  Appel, by contrast, described the negotiations as "professional" and "cordial."[4240]  Although JPMorgan continually emphasized that the agreements had to be in place by the next morning, no Lehman witness on either the legal or business side told the Examiner that anyone at JPMorgan made any explicit threat during the negotiation to cease clearing services for Lehman if Lehman did not sign by the morning.[4241]

According to Dellosso, if Lehman did not sign the agreements, it would have been difficult for JPMorgan to extend credit to and continue being supportive of Lehman.  Dellosso recalled discussing with Tonucci JPMorgan's desire to continue to support Lehman in the public domain and JPMorgan's extension of credit to Lehman.[4242] Tonucci did not recall any specific threat from Dellosso (or anyone else at JPMorgan)

[4239] *Id*. at p. 5.  Hespel described the negotiations as "acrimonious."  Examiner's Interview of Paul W. Hespel, Apr. 23, 2009, at p. 6.  While different in tone and manner from the August negotiations, the September Agreements were not the first time Lehman had experienced difficulties negotiating with JPMorgan.  For instance, when JPMorgan was negotiating a SubCustodial agreement with Lehman and one of its triparty investors, Federated, one of the Lehman negotiators commented: "In the past year or so, JPMorgan has become increasingly uncooperative, reneging on previous agreements regarding acceptable language, dictating the form of agreements that they will review . . . and taking positions contrary to either the clear language of an agreement . . . or refusing to take language acceptable in the Lehman-boilerplate form if inserted in a different form provided by the counterparty . . . ."  E-mail from Charles Witek, Lehman, to George V. Van Schaick, Lehman, *et al*. (Apr. 23, 2008) [LBEX-DOCID 110245].
[4240] Examiner's Interview of Nikki G. Appel, Sept. 11, 2009, at p. 4.
[4241] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4; Examiner's Interview of Paul W. Hespel, Apr. 23, 2009, at p. 6; Examiner's Interview of Daniel J. Fleming, Apr. 22, 2009, at p. 7; Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 15.
[4242] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 9; *see* e-mail from Donna Dellosso, JPMorgan, to Steven D. Black, JPMorgan, *et al*. (Sept. 10, 2008) [JPM-2004 0061485].

concerning what would happen if the agreements were not signed.[4243] Indeed, Tonucci believed that JPMorgan would have continued to clear for Lehman without the agreements in place, albeit with "friction," "stress," and "operational difficulties" for Lehman.[4244]

Other than the general instructions from Fleming to proceed with the agreements, Yeung received almost no guidance that night from Lehman's business-side regarding the crucial September Agreements.[4245] Yeung believed that the September Agreements had already been agreed to in principle, and stated that Fleming had specifically told him that the agreements had been agreed to; accordingly, Yeung reported that Fleming was not expecting too much from Yeung by way of comments.[4246] Yeung's only communication from Tonucci occurred on the morning of September 10, and was for the limited purpose of executing the final documents.[4247] Tonucci confirmed that he "paid no attention" to the agreements during the evening of September 9.[4248] Indeed, while the September Agreements were being negotiated, Lehman senior management was immersed in all-night meetings to ready the earnings

---

[4243] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 15.

[4244] *Id*.

[4245] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at pp. 4-5; Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 9.

[4246] Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 9. Fleming repeatedly attempted to distance himself from any role in providing business guidance, stating it was not his job. He said: "This is why we have lawyers." Examiner's Interview of Daniel J. Fleming, Apr. 22, 2009, at pp. 2, 6.

[4247] Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 9.

[4248] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 13.

report for early release on the morning of September 10.[4249]  According to Tonucci, he

and Lowitt were off e-mail the entire night.[4250]  Thus, it appears that there was no

Lehman executive-level review of the agreements or even an effort by Lehman

executives to obtain a summary of the terms or impact of the proposed agreements.

Although in the course of the negotiations JPMorgan did not significantly alter

the scope of the Security Agreement and Guaranty from JPMorgan's original proposal,

JPMorgan did make some changes to the proposed agreements at Lehman's request.

For example, JPMorgan agreed to change language in the Guaranty to reference

collateral "request[s]" rather than stronger language suggestive of an obligation or

demand.[4251]  JPMorgan also removed language by which LBHI guaranteed performance

obligations.[4252]  In the Amendment to the Clearance Agreement, although initially

against the change,[4253] JPMorgan ultimately removed references to affiliates in the lien

---

[4249] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4.  According to Yeung, Lowitt left the earnings meeting that night because he felt ill.  *Id.*

[4250] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at pp. 2, 13; Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 19.

[4251] *Compare* Guaranty [Draft] (Sept. 9, 2008), at p. 2 [JPM-2004 0005596] ("maximum liability" is $3 billion or "such greater amount that the Bank has notified the Guarantor it must deliver to the Bank in support of this Guaranty"), *with* Guaranty (Sept. 9, 2008), at p. 2 [JPM-2004 0005813] ("maximum liability" is $3 billion or "such greater amount that the Bank has requested from time to time as further security in support of this Guaranty").

[4252] *Compare* Guaranty [Draft] (Sept. 9, 2008), at p. 1 [JPM-2004 0005595] (guaranteeing "punctual payment and performance of all obligations and liabilities"), *with* Guaranty (Sept. 9, 2008), at p. 1 [JPM-2004 0005813] (guaranteeing "punctual payment of all obligations and liabilities").

[4253] *See* e-mail from Nikki G. Appel, JPMorgan, to Andrew Yeung, Lehman, *et al.* (Sept. 10, 2008) [JPM-2004 0001997].

provision intended to provide for cross-collateralization.[4254] These changes did not involve the most significant aspects of the agreements, but it is clear that at least some give-and-take occurred during the negotiation.

At 6:30 a.m. on September 10, Yeung e-mailed JPMorgan counsel and reported that he had sent the agreements "on to our executive officers for their final approval and signature."[4255] Yeung instructed Fleming to prepare Lowitt to sign the agreements,[4256] but Tonucci signed them. Shortly after 7:00 a.m., Fleming e-mailed Doctoroff and informed him that "Andrew [was] on his way . . . to pick up signed docs from Paolo/Ian."[4257] Yeung forwarded the signature pages to JPMorgan at approximately 7:30 a.m.[4258] Appel stated that JPMorgan did not request any type of

---

[4254] *Compare* Amendment to Clearance Agreement [Draft] (Sept. 9, 2008), at p. 1 [JPM-2004 0005055], *with* Amendment to Clearance Agreement (Sept. 9, 2008), at p. 1 [JPM-2004 0005861]. Examiner's Interview of Gail Inaba, Apr. 28, 2009, at p. 7.

[4255] E-mail from Andrew Yeung, Lehman, to Gail Inaba, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0002032]. Under Lehman's Code of Authorities, other than for a "Guaranteed Subsidiary," a Holdings' guaranty of a subsidiary's obligations for over $500 million or for an unspecified amount must be approved by LBHI's CEO, President, COO or CFO. LBHI & LBI, Amended and Restated Code of Authorities (July 1, 2004), at Ex. 3 [LBEX-AM 043802]. LBI – one of the entities covered by the September Guaranty – is not a "Guaranteed Subsidiary," and thus this provision governs. *See* Alvarez & Marsal, Responses to Questions for Alvarez & Marsal/Weil, Gotshal & Manges (Dec. 7, 2009), at p. 1 (confirming LBI was not a "Guaranteed Subsidiary"). The Code of Authorities also provides, however, that "[i]f the required approval is obtained, any proper officer of Holdings . . . may sign documents." LBHI & LBI, Amended and Restated Code of Authorities (July 1, 2004), at Ex. 1 [LBEX-AM 043802].

[4256] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 5.

[4257] E-mail from Daniel J. Fleming, Lehman, to Mark G. Doctoroff, JPMorgan (Sept. 10, 2008) [LBEX-DOCID 457582].

[4258] E-mail from Andrew Yeung, Lehman, to Gail Inaba, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0005218].

certification of Tonucci's authority; she stated that JPMorgan relied on apparent authority.[4259]

Notably, Tonucci told the Examiner that he "did not understand" the terms of the agreements when he signed them and, if he had, he would have been "reluctant" to sign.[4260]  Lowitt spoke with Tonucci about the September Agreements after the earnings call on September 10 (after the agreements were signed).  Lowitt did not recall communicating with anyone about the agreements prior to that point.[4261]  Tonucci relayed to Lowitt that JPMorgan had wanted Lowitt to sign the agreements the night before, but that Tonucci had decided not to bother Lowitt.  In response to questions from the Examiner, Lowitt recalled having no concern about Tonucci's authority to sign the agreements, citing the fact that even though JPMorgan wanted Lowitt to sign, they accepted Tonucci's signature.[4262]  In any event, neither Lowitt nor anyone else at Lehman sought to rescind the agreements based on Tonucci's lack of authority.

As executed, the September Amendment to the Clearance Agreement expanded JPMorgan's lien on the Lehman parties' accounts, securing their "existing or future indebtedness, obligations and liabilities of any kind" to JPMorgan whether arising

---

[4259] Examiner's Interview of Nikki G. Appel, Sept. 11, 2009, at p. 6.

[4260] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 14.

[4261] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at pp. 19-20.  Yeung did e-mail Lowitt that evening, but Lowitt did not respond.  Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4; *see also* e-mail from Paul W. Hespel, Goodwin Procter, to Jeffrey Aronson, JPMorgan (Sept. 10, 2008) [LBEX-AM 039572] (forwarding Lehman comments on draft Guaranty and Security Agreement to JPMorgan, copying Lowitt).

[4262] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 19.  Lowitt's reasoning does not, of course, address the issue of Lehman's chain-of-authority requirements.

under the Clearance Agreement or not.[4263]   The September Guaranty also extended LBHI's liability.  LBHI "unconditionally and irrevocably guarantee[d] to [JPMorgan] the punctual payment of all obligations and liabilities of" all direct or indirect subsidiaries of LBHI to JPMorgan and its affiliates, subsidiaries, successors and assigns "of whatever nature, whether now existing or hereinafter incurred."[4264]   Not only did the universe of guaranteed Lehman entities expand, but LBHI guaranteed obligations irrespective of whether they accrued pursuant to the Clearance Agreement and guaranteed obligations to all JPMorgan affiliates as well.

In addition, as requested by Lehman, the September Guaranty imposed a three-day written notice requirement[4265] on Lehman to transfer any security:

> . . . [LBHI] may upon three written days notice to [JPMorgan] transfer any Security . . . , provided that [LBHI] shall not transfer any such Security if [JPMorgan] has exercised or been stayed or otherwise prohibited from exercising any of its rights under this Guaranty or the Security Agreement or in the event any default . . . has occurred and is continuing, in any such case, prior to the end of the three day notice period.[4266]

---

[4263] Amendment to Clearance Agreement (Sept. 9, 2008), at p. 1 [JPM-2004 0005861].  The September Amendment to the Clearance Agreement contained a recital of consideration.  It stated that it was entered "for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged."  *Id*.

[4264] Guaranty (Sept. 9, 2008), at p. 1 [JPM-2004 0005813].  The September Guaranty contained a recital of consideration.  It stated that it was entered "for good and valuable consideration and in order to induce the Bank from time to time, to extend or continue to extend credit, clearing advances, clearing loans or other financial accommodations to [LBHI and its subsidiaries] and/or to transact business, trade or enter into derivative transactions with [LBHI and its subsidiaries]."  *Id*.  It further noted that "[t]his Guaranty shall be in addition to and does not replace that certain Guaranty dated August 26, 2008."  *Id*.  Neither the September Guaranty nor the September Security Agreement defined the term "affiliates."

[4265] The three-day provision first appeared in Bank of America's agreement with Lehman, discussed in more detail in Section III.A.5.e, *infra*.

[4266] Guaranty (Sept. 9, 2008), at p. 2 [JPM-2004 0005813].

Although Yeung stated that the three-day-notice provision in the draft Guaranty originated with JPMorgan,[4267] all other evidence supports the view that it was Lehman that first requested the provision.[4268] As reported in a contemporaneous e-mail from Doctoroff, Lehman would provide collateral only if JPMorgan agreed to "a 3-day notice period to call the cash back."[4269] He explained that Lehman had requested this condition to "allow [Lehman] to count the cash as part of their liquidity pool."[4270] Lehman's "logic [was] that with a 3-day notice [JPMorgan could] effectively stop doing business that creates exposure if [Lehman] want[ed] to take [the collateral] back."[4271] If JPMorgan did not agree, Doctoroff noted that there would be "the public issue of [Lehman's] liquidity pool having to drop."[4272] Discussion of Lehman's request occurred among several JPMorgan executives, including Dellosso, Corral, Hogan, Buyers-Russo and Murray, and the group decided to accede to Lehman's request.[4273] Buyers-Russo regarded Lehman's proposal as giving Lehman the right to make a request for a return of

---

[4267] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 5; Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 7.

[4268] *E.g.*, Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at pp. 7-8; Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 8; Examiner's Interview of Paul W. Hespel, Apr. 23, 2009, at pp. 5-6.

[4269] E-mail from Mark G. Doctoroff, JPMorgan, to Jane Buyers-Russo, JPMorgan, *et al.* (Sept. 9, 2008) [JPM-2004 0032520].

[4270] *Id*.

[4271] *Id*.

[4272] *Id*.

[4273] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 8.

collateral, but imposing no obligation on JPMorgan. She understood having just the right to request that collateral be returned to be meaningless.[4274]

In parallel, the September Security Agreement expanded the definition of "Accounts" in which JPMorgan held a security interest; instead of just one cash account, one securities account and related accounts, it now included "all accounts of [LBHI] at [JPMorgan or its affiliates] . . . or any shares or accounts held by or registered to [LBHI] or any nominee in any money market fund issued, managed, advised or subadvised by [JPMorgan or its affiliates]," except for the Overnight Account.[4275] A three-day notice provision was repeated in the September Security Agreement as well.[4276]

Three other Lehman entities executed clearance agreements with JPMorgan on the morning of September 10: Lehman Brothers Bankhaus, Lehman Brothers Commercial Bank and Lehman Brothers Bank FSB.[4277] According to Nikki Appel, those entities maintained essentially inactive clearance boxes at the time, and JPMorgan

---

[4274] Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 7.

[4275] Security Agreement (Sept. 9, 2008), at p. 1 [JPM-2004 0005873]. The September Security Agreement contained a recital of consideration. It stated that it was entered "[i]n consideration of [JPMorgan] extending credit to and/or transacting business, trading or engaging in derivative transactions with [Lehman and subsidiaries]." *Id.*

[4276] *Id.* at p. 3.

[4277] *See* e-mail from Andrew Yeung, Lehman, to Gail Inaba, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0005696]; e-mail from Andrew Yeung, Lehman, to Gail Inaba, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0002093]; e-mail from Andrew Yeung, Lehman, to Gail Inaba, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0002133]. These agreements had been discussed earlier in the week. E-mail from Daniel J. Fleming, Lehman, to Mark G. Doctoroff, JPMorgan (Sept. 8, 2008) [JPM-2004 005807] ("Paul, our outside counsel, received a call today from JPM asking that the three banking entities we left off the amended clearance agreement be added back on. . . . I think the preferred route is to execute a separate agreement for each.").

wanted to ensure clearance agreements were in place in case Lehman moved any assets into them.[4278]

Consistent with the broad reach of the September Agreements,[4279] once the agreements were executed, JPMorgan notified LBIE that its previously unsecured credit line of $2 billion was effectively secured by the execution of the agreements.[4280]

---

[4278] Examiner's Interview of Nikki G. Appel, Sept. 11, 2009, at p. 6. When JPMorgan initially did not receive the clearance agreement for Lehman Brothers Bank FSB, it informed Lehman that it would "close its account this morning." E-mail from Jeffrey Aronson, JPMorgan, to Andrew Yeung, Lehman (Sept. 10, 2008) [JPM-2004 0002124]. Lehman quickly informed JPMorgan that the document would be executed shortly. E-mail from Andrew Yeung, Lehman, to Jeffrey Aronson, JPMorgan (Sept. 10, 2008) [JPM-2004 0002124].

[4279] The Examiner's financial advisors have estimated the potential impact of the September Agreements to be as follows: First, JPMorgan applied LBHI collateral to set off claims totaling approximately $10.6 million that LBHI had not guaranteed prior to entering the September Agreements. Second, JPMorgan applied LBHI collateral to set off claims totaling approximately $1.94 billion from collateral it pledged pursuant to the September Agreements for obligations that had been unsecured prior to LBHI entering the September Agreements. Third, JPMorgan received payments in excess of $1.1 billion (against the newly secured obligations) through setoff of collateral other than the LBHI collateral obtained under the September Agreements (*i.e.*, collateral held at LBHI subsidiaries). Fourth, JPMorgan asserts claims that are not yet paid for approximately $943 million related to lost fees and losses in managed funds. Duff & Phelps, Impact on LBHI Claim Payments of the September 9 Agreements (Jan. 5, 2010). Thus, assuming *arguendo* the validity of the JPMorgan claims, the September Agreements may have had a $4 billion impact on LBHI.

[4280] *See* e-mail from Kelly A. Mathieson, JPMorgan, to Daniel J. Fleming, Lehman, *et al.* (Sept. 10, 2008) [JPM-2004 0032674]; Examiner's Interview of Kelly A. Mathieson, Oct. 7, 2009, at pp. 11, 13-14; *see also* Lehman, JPM Chase Triparty Repo, at p. 1 [LBEX-DOCID 014562] ("JPM Chase provides a $2bn line of unsecured credit to facilitate triparty repo in Europe. JPM Chase has indicated that they want to change the line from unsecured to secured."). Lehman's U.K. executives understood even during the summer of 2008 that JPMorgan's discussions with Tonucci and O'Meara were part of a "high-level" discussion to further collateralize the clearance business. E-mail from Joseph Igoe, Lehman, to Philip Morgan, Lehman, *et al.* (July 31, 2008) [LBEX-DOCID 075820]. While the September Agreements were being negotiated, JPMorgan's executives in charge of global collateral management were preparing for possible options if Lehman refused to sign. *See* e-mail from Kelly A. Mathieson, JPMorgan, to Steven X. Taylor, JPMorgan (Sept. 10, 2008) [JPM-2004 0032521]; Examiner's Interview of Kelly A. Mathieson, Oct. 7, 2009, at pp. 14-15. At 5:17 a.m. London time on September 10 when the September Agreements were still not executed, Kelly Mathieson reported instructions from Barry Zubrow and Mark Doctoroff to move LBIE's unsecured credit line to $1.1 billion – the amount that LBIE was using at that time – until the agreements were executed. *See* e-mail from Kelly A. Mathieson, JPMorgan, to Colleen T. Morris, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0029858]; Examiner's Interview of Kelly A. Mathieson, Oct. 7, 2009, at p. 14.

### (j)  Daily Liquidity Pool Updates From Lehman to JPMorgan

In September, Dellosso received daily liquidity pool updates from Lehman.[4281] Dellosso believed that Doctoroff and others at JPMorgan also received these updates. After Lehman posted collateral in response to JPMorgan's September 9 request, Dellosso realized that Lehman's liquidity pool had not changed, and at the same time Dellosso recalled the three-day notice provision in the September Agreements.  Dellosso linked the three-day notice provision to the unchanged Lehman liquidity-pool number. She made that observation to JPMorgan senior managers, but did not discuss the issue with anyone at Lehman.  Dellosso stated to the Examiner that she would not have counted Lehman's collateral pledge in a liquidity pool.[4282]  Dellosso explained that if Lehman had requested collateral back on three days' notice, JPMorgan would have needed to consider factors such as JPMorgan's exposure before agreeing to return any collateral.[4283]  Thus, to Dellosso, Lehman's pledged assets seemed like encumbered assets.[4284]

---

[4281] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 11; e-mail from Edward A. Deleon, JPMorgan, to Donna Dellosso, JPMorgan (Sept. 4, 2008) [JPM-2004 0001065]; e-mail from Mark G. Doctoroff, JPMorgan, to Donna Dellosso, JPMorgan, *et al.* (Sept. 11, 2008) [JPM-2004 0002262].

[4282] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 11.

[4283] *Id.* at pp. 3, 8.

[4284] *Id.* at p. 8.  Dimon stated that there were no firm industry rules and there may be circumstances under which one might count a pledged asset in a liquidity pool.  However, he noted that he would not have characterized as liquid the collateral that Lehman posted with JPMorgan because it was the subject of valuation disputes between Lehman and JPMorgan.  Examiner's Interview of Jamie L. Dimon, Sept. 29, 2009, at p. 12.

Similarly, Tonucci, while defending Lehman's decision to include collateral posted to JPMorgan in the liquidity pool, stated that he understood Lehman would have needed JPMorgan's permission to withdraw the collateral.[4285] Lowitt stated that collateral pledged with JPMorgan was ultimately Lehman's money, although he acknowledged that JPMorgan probably would have been "reluctant" to give back the collateral.[4286]

When Dellosso advised Buyers-Russo that Lehman's reported liquidity had not changed despite pledges of collateral to JPMorgan, Buyers-Russo also "connected the dots" between the three-day notice provision and Lehman's liquidity pool.[4287] Buyers-Russo stated to the Examiner that she also believed it was inappropriate for Lehman to include encumbered assets in its liquidity pool.[4288] Buyers-Russo did not understand the three-day notice provision as rendering Lehman's collateral unencumbered because, in her view, JPMorgan had no duty to return that collateral upon Lehman's request.[4289]

---

[4285] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 20. Lehman outside counsel Hespel also believed that the return of collateral to Lehman upon the end of the three-day period was not mandatory and that JPMorgan could refuse to return it. Examiner's Interview of Paul W. Hespel, Apr. 23, 2009, at p. 6.

[4286] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 22. While JPMorgan's Hogan offered no general view as to whether the assets pledged by Lehman should have been included in Lehman's liquidity pool, he believed that, hypothetically speaking, Lehman could have taken back its collateral on a couple of days' notice. Examiner's Interview of John J. Hogan, Sept. 17, 2009, at p. 7.

[4287] Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 8.

[4288] *Id.*

[4289] *Id.*

Even if JPMorgan did have such a duty, Buyers-Russo explained, Lehman should not have counted pledged collateral in its liquidity pool until that collateral was returned.[4290]

### (k) September 11 Collateral Request Pursuant to the September Agreements

After September 9, JPMorgan continued to evaluate its exposure to Lehman and the value of Lehman's collateral. On September 10, Chiavenato prepared a presentation titled, "Tri-Party Repo Margin Gap Analysis - Lehman - 9/10/2008."[4291] The presentation analyzed the previous night's triparty-repo portfolio.[4292] Chiavenato concluded that "Lehman's total intraday margin on 9/10 was sufficient to cover JPM's risk-based margin, which was calculated as US$9.2 billion based on the estimated one-day liquidation risk and the price risk of the collateral."[4293] Chiavenato explained that this

---

[4290] *Id.*

[4291] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 17; JPMorgan, Tri-Party Repo Margin Gap Analysis – Lehman – 9/10/2008 (Sept. 10, 2008), at pp. 1-4 [JPM-2004 0029886]. There is at least one earlier version of this analysis, JPMorgan, Tri-Party Repo Margin Gap Analysis – Lehman – 9/9/2008 (Sept. 9, 2008) [JPM-EXAMINER00006009], though it is not clear whether Chiavenato or Weisbrod authored it, *see* e-mail from Ricardo S. Chiavenato, JPMorgan, to David A. Weisbrod, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0029885] (sending Weisbrod the September 10 analysis and stating, "[h]ere is the 3-page deck you sent for Lehman with this morning's numbers").

[4292] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 17; JPMorgan, Tri-Party Repo Margin Gap Analysis – Lehman – 9/10/2008 (Sept. 10, 2008), at p. 2 [JPM-2004 0029886].

[4293] JPMorgan, Tri-Party Repo Margin Gap Analysis – Lehman – 9/10/2008 (Sept. 10, 2008), at p. 2 [JPM-2004 0029886]; Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 17. Chiavenato further analyzed a "worst-case scenario" that would occur if no triparty investor rolled and Lehman had to rely on the PDCF for overnight financing. In that situation, Chiavenato concluded that JPMorgan would be 116 percent collateralized. JPMorgan, Tri-Party Repo Margin Gap Analysis – Lehman – 9/10/2008 (Sept. 10, 2008), at p. 3 [JPM-2004 0029886]. Chiavenato repeated this analysis on September 12 and concluded that JPMorgan would be 117 percent collateralized in a triparty worst-case scenario. JPMorgan, Tri-Party Repos and Collateral – Lehman – 9/11/08 (Sept. 12, 2008), at p. 3 [JPM-EXAMINER00006022]. Notably, this analysis did not account for the $3 billion posted on September 9-10 or the $5 billion posted on September 12. *Id.* Chiavenato performed this analysis again on September 13 and concluded that JPMorgan would be 125 percent collateralized during a September 15 unwind in a triparty-worst-case

conclusion did not mean that JPMorgan was overcollateralized, however, because JPMorgan was still valuing the "extra collateral" (*i.e.*, collateral in the LCE account) Lehman had posted at $4.5 billion. Even though that number reflected GFA's pricing, Chiavenato explained that there was a problem with the Fenway commercial paper (valued at $3 billion) that had not yet been resolved. In addition, Chiavenato stated that his analysis did not account for dealer-pricing of collateral in the triparty shell.[4294]

Although there had been conversations within JPMorgan in August concerning valuation of Lehman collateral, JPMorgan witnesses stated that it was not until September 11, during a widely attended internal meeting, that JPMorgan concluded that much of the collateral that Lehman had posted was not worth anything near what Lehman had represented.[4295] Black stated that this came as a surprise to many people at the September 11 meeting.[4296] JPMorgan's outside counsel described the substance of the meeting as follows:

> Questions were raised by senior management about the value of each of the non-cash items of JPMorgan's additional collateral [posted by Lehman]. Specifically, there was considerable doubt expressed about the value of the "conduit CP" [Fenway] and the CLOs [Spruce, Pine and Verano], all of which had been represented by Lehman to be worth par,

---

scenario. JPMorgan, Tri-Party Repos and Collateral – Lehman – 9/12/08 (Sept. 13, 2008), at p. 3 [JPM-2004 0033219]. This analysis, however, also valued the "extra collateral" posted by Lehman at Gifford Fong prices of $4.5 billion. *Id*. at pp. 2-3. While the analysis recognized that JPMorgan would have "the additional US$5 billion cash collateral" obtained on September 12 "as a cushion," the analysis noted that that collateral "covers all JPM's credit exposure" and not just intraday financing. *Id*. at p. 2.

[4294] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at pp. 17-18.

[4295] Examiner's Interview of Barry L. Zubrow, Oct. 20, 2009, at pp. 4-5; Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 12; Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 14.

[4296] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 12.

with a total face value of $6.7 billion. . . . Craig Delany and analysts working with him were asked to provide a ballpark estimate of the value of these and other large securitized positions in the tri-party repo portfolio, and the conclusion that was brought back to senior management was that the collateral securities and some of the securities in the tri-party portfolio could not be relied upon to be worth anything near par if liquidated. As a result, JPMorgan believed it had at least a $5 billion deficiency in its existing collateral, and informed Lehman that it had to have $5 billion in cash collateral in order to continue to extend credit and support Lehman the next day.[4297]

Black described JPMorgan's formulation of the $5 billion amount as "part art, part science, and part catch up."[4298]

---

[4297] JPMorgan First Written Responses, at p. 18. Through counsel, JPMorgan also identified one document, "Collateral Detail," prepared by a member of Dellosso's team, as the only document that constitutes a quantitative analysis underlying JPMorgan's September 11 collateral request. *See* JPMorgan, Collateral Detail, at p. 1 [JPM-2004 0084867]. Buyers-Russo, however, did not recall any particular document being discussed at the September 11 meeting. Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 14. Delany confirmed that the first file he received that contained the collateral he was tasked with pricing was sent to him around 8:00 p.m. that night (although he received an incorrect file around 5:00 p.m.). Examiner's Interview of Craig M. Delany, Sept. 9, 2009, at pp. 5-6; e-mail from Edward J. Corral, JPMorgan, to Craig M. Delany, JPMorgan (Sept. 11, 2008) [JPM-2004 0013515]. An analyst sent Delany a spreadsheet containing a "net exposure" analysis a few hours later. E-mail from Jonathan D. Platt, JPMorgan, to Craig M. Delany, JPMorgan (Sept. 11, 2008) [JPM-2004 0017401] (attaching spreadsheet calculating "net exposure"). Although Delany's written analysis was not completed until after the meeting, JPMorgan counsel stated that Delany had conversations throughout the day with Matt Zames, who led the JPMorgan trading desk, and that Zames made oral reports to the meeting about Lehman's collateral valuation. Jenner & Block, Memorandum re November 18, 2009 Teleconference with JPMorgan Counsel (Nov. 19, 2009), at p. 4.

[4298] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 12 n.4. In addition, by September 11, JPMorgan knew there were "key reductions" from Lehman counterparties, as well as an "uptick in novations" with Lehman. Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at pp. 16-17; Jane Buyers-Russo, JPMorgan, Unpublished Notes (Sept. 11, 2008), at pp. 6-7 [JPM-EXAMINER00006040]; *see also* e-mail from Eric S. Rosen, JPMorgan, to Steven D. Black, JPMorgan, *et al.* (Sept. 11, 2008) [JPM-2004 0006397] ("[M]oody's suggested a downgrade to Baa if asset sales were not completed quickly with a real counterparty."). JPMorgan also believed that Lehman had liquidity in the order of $20 billion to $40 billion such that a $5 billion request would not hurt Lehman. Examiner's Interview of Barry L. Zubrow, Oct. 20, 2009, at p. 5; Examiner's Interview of Donna Dellosso, Feb. 27, 2009, at pp. 7-8. By the early evening, however, when the call was made to Lehman, JPMorgan had reason to believe that Lehman's liquidity was not so robust. E-mail from John J. Hogan, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 11, 2008) [JPM-2004 0006404] (Chris O'Meara, Chief Risk Officer at Lehman, "did not know at this

After the internal JPMorgan meeting, Black and Dimon called Fuld, who brought

Lowitt into the conversation.[4299]   Tonucci from Lehman and Zubrow from JPMorgan

recalled participating in the conversation as well.[4300]   On that call, Black and Dimon

requested $5 billion in collateral from Lehman, in cash, by the next morning.[4301]

JPMorgan witnesses stated to the Examiner that they informed Lehman that JPMorgan

was concerned about the value of the collateral that Lehman had previously

provided.[4302]   According to Black, the collateral request was also based, in part, on the

fact that Lehman had provided only $3.6 billion in response to JPMorgan's September 9

moment where the liquidity stood relative to the $36 bio they quoted on the earnings call . . . .").  Further, JPMorgan was aware of the changes in Lehman's triparty-repo book.  E-mail from Jane Buyers-Russo, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 11, 2008) [JPM-2004 0029932] (Trend analysis shows "how the balances have reduced from a peak of $222B to $123B last night.  While much of this decline up to last week has been self imposed and they've been fairly steady for the past month or so, there was an $18B decline last night, which I believe was replaced with funding via the FICC's GCF product."); *see also* e-mail from Ricardo S. Chiavenato, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0050420]; e-mail from Julia A. Fox, JPMorgan, to Edward J. Corral, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0006456] ("Fidelity has requested back all the TPR overnight deals with Lehman.").  At the same time, JPMorgan was aware of the effects its decisions with respect to Lehman's triparty repo book might have on Lehman.  E-mail from Jane Buyers-Russo, JPMorgan, to Heidi Miller, JPMorgan (Sept. 11, 2008) [JPM-2004 0029932] ("It will cause an immediate liquidity issue for [Lehman] if we give them zero intraday value for the non-pdcf collateral.").

[4299] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 12; e-mail from Jane Buyers-Russo, JPMorgan, to Bryn Thomas, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0050095] ("Jamie Dimon and Steve Black spoke with Fuld and Ian Lowitt last night.").

[4300] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 16; Examiner's Interview of Barry L. Zubrow, Oct. 20, 2009, at pp. 5-6.  Lowitt recalled Tonucci being on the call.  Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 21.

[4301] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 13; Examiner's Interview of Jamie L. Dimon, Sept. 29, 2009, at pp. 9-10; Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 12; Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 21.

[4302] Examiner's Interview of Jamie L. Dimon, Sept. 29, 2009, at p. 10; Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 12; Examiner's Interview of Barry L. Zubrow, Oct. 20, 2009, at p. 6.  Tonucci stated that JPMorgan did not give any reason for the collateral call.  Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 16.

collateral request for $5 billion;  Black stated that Lehman understood that it still needed to provide $1.4 billion in response to the September 9 request.[4303]

Tonucci recalled that during the call, or on a separate call the same day, he asked why JPMorgan wanted the collateral.   According to Tonucci, one of the JPMorgan participants, perhaps Jamie Dimon, responded "no reason."   Tonucci stated that he then asked: "What is to keep you from asking for $10 billion tomorrow?" to which someone, perhaps Dimon, responded: "nothing" and "maybe we will."[4304]   Zubrow recalled that when questions were raised by Lehman executives about having to send more collateral, Lehman's Herbert "Bart" McDade cut off the discussion and stated that Lehman understood what JPMorgan needed, and that Lehman would forward the collateral to JPMorgan as soon as possible.[4305]

Fuld stated to the Examiner that Dimon told both him and Lowitt that JPMorgan would give the collateral back at the end of the day.[4306]   Dimon, however, had no

---

[4303] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at pp. 12-13.  As discussed, *supra*, however, Lehman did post corporate bonds (at least temporarily) as well, and may have understood its obligation as posting $4 billion.

[4304] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 16.  Dimon did not recall anyone asking this question on the call, but stated that he could understand why someone would.  Examiner's Interview of Jamie L. Dimon, Sept. 29, 2009, at p. 10.

[4305] Examiner's Interview of Barry L. Zubrow, Oct. 20, 2009, at p. 6.

[4306] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 13.  The Examiner is unaware of any contemporaneous e-mail documenting this understanding.  In the early morning of September 12, Ian Lowitt e-mailed Paolo Tonucci to ask "Deposit to jpm.  Do we have ability to call it back at end of the day or could they hold it over weekend?"  E-mail from Ian T. Lowitt, Lehman, to Paolo R. Tonucci, Lehman (Sept. 12, 2008) [LBEX-DOCID 70144].  Tonucci responded, "We should be able to call back."  E-mail from Paolo R. Tonucci, Lehman, to Ian T. Lowitt, Lehman (Sept. 12, 2008) [LBEX-DOCID 70144].

recollection as to whether he made that promise.[4307]  Lowitt also did not recall any discussion about Lehman retrieving its collateral from JPMorgan.[4308]  However, Tonucci believed that the $5 billion discussed on the call was meant to collateralize only intraday exposure, but also stated that this point was not clarified during the call.[4309]  According to Black, when Lehman agreed to post $5 billion cash collateral, Lehman asked JPMorgan to return some of the "detritus" (Black's description) that JPMorgan was holding in exchange.  JPMorgan did give some of it back, although Black was not involved in the details.[4310]

Dellosso and Buyers-Russo separately relayed the $5 billion collateral request to Lehman through Tonucci.  On a September 11 telephone call, they said that they wanted to continue to be supportive of Lehman through the extension of credit and other services.[4311]  Buyers-Russo told Tonucci that, in order to execute the triparty unwind, JPMorgan needed additional collateral.[4312]  According to Buyers-Russo, JPMorgan wanted to continue to support Lehman in as public and as stabilizing a way as possible; thus, Buyers-Russo advised Tonucci that JPMorgan preferred to have Lehman post collateral rather than reducing lines of credit or ceasing trading, which

---

[4307] Examiner's Interview of Jamie L. Dimon, Sept. 29, 2009, at p. 8.
[4308] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 22.
[4309] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 16.
[4310] Examiner's Interview of Steven D. Black, Sept. 23, 2009, at p. 13.  *See* Section III.A.5.b.1.m, *infra* (discussing return of selected collateral).
[4311] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 10.
[4312] Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 13.

would be more visible to the market.[4313]  Buyers-Russo stated that Tonucci responded that JPMorgan was making things difficult for Lehman.[4314]  Dellosso recalled that Tonucci said that he was not sure whether he should continue doing business with JPMorgan.[4315]  According to Buyers-Russo, Tonucci also defended Lehman's valuation of its collateral.[4316]  He additionally said, according to Dellosso, that he needed to discuss the request with Lowitt.[4317]  Buyers-Russo recalled referring to Lehman's $35 billion liquidity pool in her conversation with Tonucci; Tonucci responded that Lehman's liquidity pool was not, in fact, $35 billion: $15 billion of the liquidity pool was already encumbered.[4318]  Buyers-Russo recorded this statement in contemporaneous notes.[4319]

Buyers-Russo later forwarded Tonucci written notice of the $5 billion collateral call "as discussed between senior management."[4320]  Pursuant to the notice, if JPMorgan did not receive this collateral by the opening of business on September 12, 2008, JPMorgan would "exercise [its] right to decline to extend credit to [Lehman] under the

---

[4313] *Id.* at pp. 13-14.

[4314] *Id.* at p. 13.

[4315] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 10.

[4316] Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 14.

[4317] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 10.  During his interview with the Examiner, Tonucci did not have a clear recollection of a call with just Dellosso and Buyers-Russo, and may have been conflating various calls he had with JPMorgan.  Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 16 (recalling call with Buyers-Russo, Dellosso, Dimon, and others from JPMorgan).

[4318] Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 15.

[4319] *See* Jane Buyers-Russo, JPMorgan, Unpublished Notes (Sept. 11, 2008), at p. 12 [JPM-EXAMINER00006040] ("15 of 35 is encumber[e]d intraday"); Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 17.

[4320] E-mail from Jane Buyers-Russo, JPMorgan, to Paolo R. Tonucci, Lehman (Sept. 11, 2008) [JPM-2004 0005411].

[Clearance] Agreement."[4321]  The Notice made no mention of JPMorgan returning the collateral at night.

Lehman delivered the full $5 billion cash collateral to JPMorgan by the following afternoon.[4322]  Much of the cash was delivered from LBHI's cash account at Citi.[4323]

### (l) Additional Valuation Analyses by JPMorgan Beginning September 11

As discussed above, on September 11, 2008, Craig Delany, a managing director at JPMorgan's Investment Bank, had been asked to review the valuation of Lehman's securities.  Delany had not had any significant involvement with Lehman collateral before that point.[4324]

Delany first reviewed the valuation of selected securities, and stressed problems with the valuations of two in particular: RACERS, which was part of the triparty shell

---

[4321] *Id.* at p. 2 (Revised Notice re Credit Extension attachment).  At the same time, JPMorgan revised credit lines for some Lehman entities.  E-mail from David A. Weisbrod, JPMorgan, to Kelly A. Mathieson, JPMorgan (Sept. 12, 2008) [JPM-2004 0050026] (revised LBIE credit line from $2 billion to $1.4 billion); Examiner's Interview of Kelly A. Mathieson, Oct. 7, 2009, at pp. 16-17.

[4322] E-mail from Christopher D. Carlin, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0033002] ("At 1130 EDT current balance in the Lehman Holding Co account is 4 billion 450 million vs the target 5 billion."); e-mail from Christopher D. Carlin, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0050902] ("Last 550 million received from Citi at 1:26PM NY time . . . balance in the Lehman Holding co account is now at 5 billion . . . ."); *see also* e-mail from Paolo R. Tonucci, Lehman, to Ian T. Lowitt, Lehman (Sept. 12, 2008) [LBEX-DOCID 4050567] ("JP should have their $5 bn.").

[4323] Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at p. 14; Jane Buyers-Russo, JPMorgan, Unpublished Notes (Sept. 11, 2008), at p. 12 [JPM-EXAMINER00006040] (Buyers-Russo's notes indicating "3B coming from Citi"); e-mail from Mark G. Doctoroff, JPMorgan, to Christopher D. Carlin, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0006447] (e-mail chain showing accumulation and sources of $5 billion cash collateral); *see also* e-mail from Katherine Lukas, Citigroup, to Tom Isaac, Citigroup, *et al.* (Sept. 11, 2008) [CITI-LBHI-EXAM 00014488] (Lehman deposited $3.02 billion with Citi on the evening of September 11 in addition to Lehman's $2 billion cash deposit).

[4324] Examiner's Interview of Craig M. Delany, Sept. 9, 2009, at pp. 3-4.

(and, thus, pledged to third-party investors overnight and held by JPMorgan during the day), and Fenway, which was collateral pledged by Lehman outside of the triparty shell (*i.e.*, it was in the LCE account).[4325] Delany concluded that the two securities were problematic because of their structure (commercial paper and short-term notes credit-enhanced by Lehman) and because of the illiquidity of the underlying assets.[4326] Delany concluded that RACERS and Fenway should be considered greatly devalued, far below their $8 billion assigned face value.[4327]

Although Fenway positions had been pledged to JPMorgan since June, Delany may have been the first person to question Fenway's value as collateral. GFA had not priced Fenway, and, as of September 4, Corral had indicated "we have no issue with its value."[4328] On September 12, Delany wrote Corral and expressed that "the real dicey position is" Fenway and "you should not accept this collateral."[4329]

At the same time, Delany valued the other collateral posted by Lehman in the LCE account, namely the Pine, Spruce and Verano CDOs. He priced Pine at 70 percent

---

[4325] *Id*. at p. 6.

[4326] *Id*. at pp. 6-8.

[4327] *Id*. at pp. 7, 9.

[4328] E-mail from Edward J. Corral, JPMorgan, to David A. Weisbrod, JPMorgan (Sept. 4, 2008) [JPM-2004 0006562]; *see also* e-mail from Edward J. Corral, JPMorgan, to David A. Weisbrod, JPMorgan, *et al.* (Sept. 3, 2008) [JPM-2004 0006557] ("we are OK with [Fenway's] value"); e-mail from Mark G. Doctoroff, JPMorgan, to Jane Buyers-Russo, JPMorgan, *et al.* (Sept. 3, 2008) [JPM-2004 0006558] ("at least the $3bn is firm").

[4329] E-mail from Craig M. Delany, JPMorgan, to Edward J. Corral, JPMorgan (Sept. 12, 2008) [JPM-2004 0050997]. Chiavenato explained, however, that he learned by late August that Fenway was worth nothing. Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 16.

face value and Spruce and Verano at 50 percent.[4330] Although GFA had priced Verano similarly, it priced Pine and Spruce at a lower value than Delany had.[4331]

Delany also determined new margin requirements by collateral type and produced a series of spreadsheets that calculated JPMorgan's "net exposure" vis-à-vis Lehman's triparty book, factoring in the additional collateral that Lehman had posted. One version of Delany's spreadsheets suggests that, including the $5 billion cash deposit that day, JPMorgan was *over*collateralized by as much as $6.1 billion on September 12.[4332] Delany stressed in his interview with the Examiner, however, that the resultant number was not a real "net exposure" because, for the triparty shell, he accepted all market values contained in the BDAS system as accurate.[4333] (Delany did, however, incorporate his own valuations for collateral in the LCE account; he assigned no value to Fenway.)[4334] Delany stated that in retrospect his spreadsheets should have

---

[4330] E-mail from Craig M. Delany, JPMorgan, to Edward J. Corral, JPMorgan (Sept. 12, 2008) [JPM-2004 0050997].

[4331] E-mail from Edward J. Corral, JPMorgan, to David A. Weisbrod, JPMorgan (Sept. 4, 2008) [JPM-2004 0006562].

[4332] *See* JPMorgan, Spreadsheet, at p. 8 [JPM-2004 0029769]; *see also* JPMorgan, Spreadsheet, at p. 1 [JPM-2004 0017402] (similar exposure analysis); JPMorgan, Spreadsheet, at p. 4 [JPM-2004 0025920] (similar exposure analysis).

[4333] Examiner's Interview of Craig M. Delany, Sept. 9, 2009, at p. 9; *see* e-mail from Craig M. Delany, JPMorgan, to Mike Cavanagh, JPMorgan, *et al.* (Sept. 14, 2008) [JPM-2004 0025947] (noting that analysis "[a]ssumes all tss market values are correct mid market valuations" and that "[t]his may NOT be a good assumption for collateral priced by the collateral provider").

[4334] Examiner's Interview of Craig M. Delany, Sept. 9, 2009, at p. 9 n.11.

made clear that JPMorgan did not agree with the values in BDAS, citing RACERS as an example.[4335]

### (m) Lehman Requests for Return of Collateral

Lehman sought the return of some of its collateral between September 10 and September 15. On September 10, for example, Lehman advised JPMorgan that Lehman would request that $1.3 billion of its cash collateral be returned in connection with discussions about separately securing LBIE's $2 billion line of credit.[4336] Lehman believed it was overcollateralized with JPMorgan,[4337] insisting that it had excess securities in both its U.S. and U.K. clearance accounts and that the value of these securities, coupled with the $3 billion in cash Lehman posted, exceeded $4 billion (the amount Tonucci allegedly assured JPMorgan that Lehman would post).[4338] At the time, Lehman had the impression that JPMorgan's "requests for collateral (more top-ups) [were] somewhat arbitrary and also that the collateral valuation [was] arbitrary, which [caused] some confusion/mistrust."[4339] JPMorgan ultimately determined that the

---

[4335] *Id.* at p. 9.

[4336] JPMorgan Second Written Responses, at p. 3; e-mail from Mark G. Doctoroff, JPMorgan, to Donna Dellosso, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0032684].

[4337] E-mail from Mark G. Doctoroff, JPMorgan, to Donna Dellosso, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0032684].

[4338] JPMorgan Second Written Responses, at p. 3; e-mail from Donna Dellosso, JPMorgan, to Steven D. Black, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0006377] ("After speaking with LEH's Treasurer, we have confirmed that they will maintain collateral of $4bln to cover intra-day exposure."). Note that Black stated that Lehman agreed to post $3 billion collateral immediately on September 9 and top up to $5 billion (not $4 billion) collateral shortly thereafter. Examiner's Interview of Steven D. Black, Sept. 23, 2009, at pp. 8-9.

[4339] E-mail from Mark G. Doctoroff, JPMorgan, to Donna Dellosso, JPMorgan, *et al.* (Sept. 11, 2008) [JPM-2004 0061651].

collateral posted under the September Agreements was needed to cover the LBIE $2 billion line (among other things).[4340]  Thus, that collateral was not returned.

On September 12, JPMorgan released nearly $1 billion of the Pine CLO back to Lehman upon Lehman's request.[4341]  Although JPMorgan initially agreed to release Pine on the condition that Lehman replace it with cash,[4342] Pine was ultimately released without any provision of additional cash.[4343]  Through counsel, JPMorgan explained that the conditions for the release of that collateral changed once Lehman posted the full $5 billion JPMorgan had requested on September 11.[4344]  JPMorgan's counsel also stated that Lehman operationally could have removed Pine from LCE without asking JPMorgan first, and that Lehman likely made the request, rather than effecting the transfer itself, as a matter of relationship management.[4345]

---

[4340] JPMorgan Second Written Responses, at p. 3.

[4341] E-mail from Edward J. Corral, JPMorgan, to Michael A. Mego, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-EXAMINER00005961] ("Let the CLO go."); e-mail from Michael A. Mego, JPMorgan, to Mark G. Doctoroff, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-EXAMINER00005936] ("Lehman Brothers is looking to Release $1 billion from the $6.2 billion held on their LCE account."); e-mail from Edward J. Corral, JPMorgan, to Jane Buyers-Russo, JPMorgan (Sept. 12, 2008) [JPM-2004 0033023] ("JBR, my gut tells me to let Lehman do what they want here. We have so heavily discounted the value of this security (one of the CLOs), that we (JPM) isn't giving much up."); e-mail from Michael A. Mego, JPMorgan, to Ray Stancil, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0050888] ("Lehman wants to release CUSIP # 722490AA7 for $1,000,000,000."); JPMorgan Second Written Responses, at p. 10.

[4342] E-mail from Henry E. Steuart, JPMorgan, to Jon Ciciola, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-EXAMINER00005961] (stating conditions for agreement including JPMorgan wanting "to receive the face value of the CLO ($1.025B) back in cash"); e-mail from Mark G. Doctoroff, JPMorgan, to Edward J. Corral, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0032972].

[4343] Examiner's Interview of Edward J. Corral, Sept. 30, 2009, at p. 11 (Corral was not aware of any condition attached to the release of the Pine CLO); JPMorgan Second Written Responses, at p. 10.

[4344] JPMorgan Second Written Responses, at p. 10.

[4345] Jenner & Block, Memorandum re November 18, 2009 Teleconference with JPMorgan Counsel (Nov. 19, 2009), at p. 2.

In addition, on September 12, Lehman requested that JPMorgan release $600 million of the approximately $1 billion of corporate bond collateral that JPMorgan was still holding so that Lehman could fund part of JPMorgan's $5 billion collateral request.[4346] JPMorgan agreed to do this and, by the end of the day, all of these corporate bonds that JPMorgan was still holding at the time were released back to Lehman.[4347]

There is also evidence to suggest that after the close of business on Friday, September 12, Lehman sought the return of its $5 billion in collateral posted in response to JPMorgan's September 11 request. Tonucci reported to Lowitt at 6:10 p.m. that Lehman may end up long in its account with JPMorgan.[4348] When Lowitt asked if JPMorgan would release cash to Lehman that night, Tonucci replied that it was too late to get cash that night, but that JPMorgan should release cash on Monday (September 15).[4349]

In addition, on the evening of September 12, there were conversations within Lehman about the need to pressure JPMorgan to return collateral, including with

---

[4346] JPMorgan Second Written Responses, at p. 3; e-mail from Mark G. Doctoroff, JPMorgan, to Jane Buyers-Russo, JPMorgan (Sept. 12, 2008) [JPM-2004 0050446].

[4347] JPMorgan's Second Written Responses, at p. 3; e-mail from Edward J. Corral, JPMorgan, to Mark G. Doctoroff, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0050913]; e-mail from Lika Vaivao, JPMorgan, to Karen M. Sharf, JPMorgan, *et al.* (Sept. 12, 2008) [JPM-EXAMINER00006236]; Examiner's Interview of Mark G. Doctoroff, Apr. 29, 2009, at p. 23; Examiner's Interview of Edward J. Corral, Sept. 30, 2009, at p. 12; Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 9. *Compare* Lehman, Collateral Pledged to JPM for Intraday As of 9/10/2008 COB [LBEX-DOCID 046681] (showing corporate bonds pledged), *with* Lehman, Collateral Pledged to JPM for Intraday As of 9/12/2008 COB [LBEX-DOCID 046684] (no longer showing corporate bonds pledged).

[4348] E-mail from Paolo R. Tonucci, Lehman, to Ian T. Lowitt, Lehman (Sept. 12, 2008) [LBEX-DOCID 3331070].

[4349] E-mail chain between Paolo R. Tonucci, Lehman, and Ian T. Lowitt, Lehman (Sept. 12, 2008) [LBEX-DOCID 3331070].

assistance from the FRBNY.[4350]  Then-President of the FRBNY, Timothy Geithner, did

contact Dimon about concerns surrounding JPMorgan's collateral requests.  Dimon

insisted, however, that Geithner was merely reporting what he had heard, rather than

having those concerns himself.[4351]  In addition, Steven Berkenfeld, Head of the Legal,

Compliance, and Audit Division at Lehman Brothers, stated that on the afternoon of

September 14 he participated in a call between Dimon and several Lehman executives

in which Dimon expressed sympathy that LBHI would be filing for bankruptcy and that

he wished JPMorgan could assist further.  Berkenfeld replied to Dimon that the decision

to file for bankruptcy was not yet made, and that JPMorgan could assist by returning

Lehman's collateral.[4352]  According to Berkenfeld, Dimon then left the call without

responding to Berkenfeld, and the call ended.[4353]

The Examiner is not aware of any written request or notice by Lehman to

JPMorgan for return of collateral pursuant to the September Agreements.  It is clear,

however, that by the end of the weekend of September 13 to 14, Lehman had made

---

[4350] E-mail from Michael Gelband, Lehman, to Herbert H. (Bart) McDade III, Lehman (Sept. 12, 2008) [LBEX-AM 001337].

[4351] Examiner's Interview of Jamie L. Dimon, Sept. 29, 2009, at pp. 8-9.

[4352] Examiner's Interview of Steven Berkenfeld, Oct. 5 & 7, 2009, at p. 21.  Although Lowitt recalled speaking to Dimon with Berkenfeld on September 14, Lowitt stated that the call was not about collateral. Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 21.

[4353] Examiner's Interview of Steven Berkenfeld, Oct. 5 & 7, 2009, at p. 21.  At 8:31 p.m. on that same day, September 14, Berkenfeld sent an e-mail directly to Stephen Cutler, JPMorgan's General Counsel, titled "Urgent - Need to speak to you as soon as possible" that read: "It is extremely important and could have devastating consequences if we do not resolve it tonight."  E-mail from Steven Berkenfeld, Lehman, to Stephen M. Cutler, JPMorgan (Sept. 14, 2008) [JPM-2004 0047020].  The e-mail, however, does not specify what Berkenfeld needed to speak to Cutler about, and came at a frantic time just hours before LBHI declared bankruptcy.  *See id.*

several calls to JPMorgan requesting the return of collateral,[4354] and that JPMorgan had not responded by the time LBHI filed for bankruptcy.[4355]

### (2) Analysis of Potential Claims

After receiving substantial evidence from the interested parties, the Examiner has analyzed a number of potential common-law claims arising out of the facts discussed above. The Examiner has not attempted to analyze all conceivable claims and has excluded, for example, potential claims that appeared particularly weak on their face.

This Section of the Report focuses on several possible common law claims relating to JPMorgan's collateral demands.[4356] The Examiner's legal analysis is based on his review of documents and interviews of Lehman and JPMorgan witnesses.[4357] Formal

---

[4354] E-mail from Ian T. Lowitt, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 14, 2008) [LBEX-AM 5640836] (At 5:18 p.m., Lowitt wrote, "Can you press jpm to get our cash back?"); e-mail from Ian T. Lowitt, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 14, 2008) [LBEX-AM 5640835] (At 9:21 p.m., Lowitt followed up with an e-mail titled "Where do we stand getting cash from chase?" and asks if Tonucci or Berkenfeld had spoken to "jane," presumably Buyers-Russo).

[4355] *See* e-mail from Heidi Miller, JPMorgan, to Jamie L. Dimon, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0006510] ("[W]e need to talk this morning about the calls Leh has been making about having us return a portion of our excess collateral to their holding co."); e-mail from Heidi Miller, JPMorgan, to Matthew E. Zames, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0029748] (Miller explained that Lehman had "a full court press on to get us to release"); e-mail from Barry L. Zubrow, JPMorgan, to Heidi Miller, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0068975] ("We have to make sure that we do not allow LEH to suck our collateral away from us thru these different requests."); e-mail from Jane Buyers-Russo, JPMorgan, to Heidi Miller, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0029748] ("I am of the opinion we should not give any collateral back to Lehman if we are going to continue to operate for them.").

[4356] See Section III.B below for a discussion of potential avoidance and preference actions. See Section III.C below for a discussion of potential claims against JPMorgan arising out of the Barclays transaction.

[4357] In addition to the many witness interviews conducted and documents reviewed by the Examiner, the Examiner sought and obtained information from Alvarez & Marsal, counsel for the Debtors, counsel for JPMorgan, and counsel for the Creditors' Committee relating to the issues discussed in this Section of the Report.

discovery between the parties could lead to additional evidence that could materially affect the legal analysis of these claims.

This Section of the Report discusses the following common-law theories under which the September Agreements between Lehman and JPMorgan could be deemed invalid: economic duress, lack of consideration, lack of authority and fraudulent inducement.  In addition, this Section discusses theories of breach of the September Agreements and the implied covenant of good faith and fair dealing, assuming the agreements are enforceable.[4358]

### (a)  The Evidence Does Not Support a Colorable Claim Against JPMorgan for Economic Duress

The evidence available to the Examiner does not support a colorable claim that the agreements Lehman executed with JPMorgan in September 2008 are invalid due to economic duress.[4359]

### (i)  Legal Background: Economic Duress

Under New York law, "[a] contract may be voided and a party may recover damages 'when it establishes that it was compelled to agree to the contract terms because of a wrongful threat by the other party which precluded the exercise of its free will.'"[4360]  The Examiner has analyzed the available evidence to determine if the

---

[4358] The Examiner is not aware of any plausible common law claim to invalidate the August Agreements between Lehman and JPMorgan and thus does not address that issue.

[4359] For a discussion of the September Agreements, see Section III.A.5.b.1 of this Report.

[4360] *Madey v. Carman*, 858 N.Y.S.2d 784, 786 (App. Div. 2008) (quoting *805 Third Ave. Co. v. M.W. Realty Assocs.*, 448 N.E.2d 445, 447 (N.Y. 1983)).

following elements of economic duress are present: "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative."[4361]

The burden on a party seeking to invalidate a contract on grounds of economic duress is formidable.[4362] "This is so regardless of evidence that one side enjoyed a decided economic advantage over the other at the moment the agreements were executed."[4363] The burden is particularly difficult to meet where, as here, the parties involved are sophisticated entities represented by both in-house and outside counsel. Significantly, "to establish a claim of economic duress, a sophisticated party must do more than merely claim that the other party knew about and used his or her poor financial condition to obtain an advantage in contract negotiations. Rather, the plaintiff must demonstrate that the defendant's actions deprived him of his free will, and that the ordinary remedy of an action for breach of contract would not be adequate."[4364]

### (ii) There Is No Available Evidence of an Express Unlawful Threat Made by JPMorgan in Connection With the Formation of the September Agreements

The September Agreements were negotiated and executed by the parties under an atmosphere that was rushed, and JPMorgan had considerable leverage over Lehman.

---

[4361] *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989) (quoting *Gulf & W. Corp. v. Craftique Prods., Inc.*, 523 F. Supp. 603, 610 (S.D.N.Y. 1981)).

[4362] *Davis & Assocs., Inc. v. Health Mgmt. Servs., Inc.*, 168 F. Supp. 2d 109, 114 (S.D.N.Y. 2001) ("The party seeking to void" an agreement "on grounds of economic duress shoulders a heavy burden." (internal quotation marks and citation omitted)).

[4363] *Id.* (internal quotation marks and citation omitted).

[4364] *Id.* (internal quotation marks and citation omitted).

Lehman's stock price was plummeting and reports had surfaced that at least one of its major survival strategies, involving KDB, had fallen through.[4365] Lehman could ill afford to challenge its primary clearing bank in the face of intense market pressures, and any attempt to change clearing banks overnight, when Lehman was attempting to restore market confidence, would have been exceedingly difficult if not impossible. The negotiation of the agreements occurred literally overnight, at a time when senior Lehman executives were engaged in an evaluation of survival strategies and how to approach a critical earnings call the next morning.[4366] Nevertheless, JPMorgan's substantial leverage and pressure on Lehman to sign the agreements by the morning are not sufficient under New York law to invalidate the agreements due to economic duress.

Rather, evidence of an actual and wrongful threat made by JPMorgan is a necessary element of any claim against JPMorgan for economic duress. The Examiner has found no evidence of an explicit threat by JPMorgan, much less a wrongful explicit threat. Key Lehman witnesses each denied that any JPMorgan employee made an express threat to them during the negotiation of the September Agreements.[4367] And Yeung, Fleming and Tonucci, as well as Lehman's outside counsel, Hespel, were each

[4365] *See* Section III.A.3.c.5.b of this Report, which discusses Lehman's potential deal with KDB.
[4366] *See supra* at Section III.A.5.b.1.i.
[4367] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4; Examiner's Interview of Paul W. Hespel, Apr. 23, 2009, at p. 7; Examiner's Interview of Daniel J. Fleming, Apr. 22, 2009, at p. 7; Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 15.

questioned by the Examiner on the issue.[4368]  The Examiner finds this testimony particularly credible given the absence of any discussion of a JPMorgan threat in any contemporaneous *internal* Lehman correspondence related to the September Agreements.  Had such a threat been made, someone at Lehman, either at the time of the negotiations or when questioned by the Examiner, would have identified the threat and its effect on Lehman's actions.

Although the Examiner places much less weight on after-the-fact statements made when the parties were contemplating litigation, Dimon, Inaba and Doctoroff all denied that any JPMorgan employee made any threats to Lehman in connection with the negotiation of the September Agreements.  However, Dellosso stated that if Lehman had not signed the September Agreements, it would have been difficult for JPMorgan to extend credit to and continue being supportive of Lehman.  She stated that she recalled discussing being supportive and "extending credit" with Tonucci.[4369]  Significantly, however, Tonucci did not recall Dellosso ever threatening him that JPMorgan would stop advancing credit if the September Agreements were not put in place.[4370]  To the contrary, Tonucci stated he believed JPMorgan would have continued to clear for

---

[4368] Yeung and Hespel were Lehman's counsel who negotiated the agreements directly with JPMorgan; their only direct business contact at Lehman that evening was Fleming, as Lowitt and Tonucci did not check their e-mails that evening.  *See supra* Section III.A.5.b.1.i.

[4369] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 9.

[4370] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 15.

Lehman even if Lehman had refused to execute the September Agreements.[4371] There is also no evidence that Tonucci directed others at Lehman to proceed with the agreements because of an express threat by JPMorgan.

In addition, "[t]he threatened exercise of a legal right cannot constitute duress."[4372] Even before September 9, under the agreement governing the clearance arrangement between Lehman and JPMorgan (including the amendments made pursuant to the August Agreements), the decision to advance credit was wholly within JPMorgan's discretion.[4373]

As noted above, there is little doubt that Lehman was experiencing extraordinary economic difficulty and that JPMorgan's provision of clearing services was particularly crucial to Lehman at the time. Economic difficulty, however, even in the exceptional circumstances confronted by Lehman, is not sufficient by itself to establish economic duress. "Duress may 'take the form of unlawful restraint of property or use of wrongful economic compulsion to force a party to yield to demands that would otherwise be rejected,' but it 'may not be found merely from the existence of a difficult bargaining position or the pressure of financial circumstances.'"[4374] The testimony of

---

[4371] *Id.*

[4372] *Marine Midland Bank v. Stukey*, 427 N.Y.S.2d 123, 123 (App. Div. 1980); *Kamerman*, 891 F.2d at 432.

[4373] Clearance Agreement (June 7, 2000), at p. 4 [JPM-2004 0031786] (Section 5 provides that JPMorgan "may at any time decline to extend such credit at [its] discretion, with notice"). This remained so even after the August Amendments to the Clearance Agreement.

[4374] *Del Turco v. BRB Ceramic Tiles Marble & Stone*, 03 CV 1516(JG), 2006 U.S. Dist. LEXIS 61390, at *17 (E.D.N.Y. Aug. 18, 2006) (quoting *McIntosh v. Consolidated Edison Co.*, No. 96-3624, 1999 WL 1511102, at *2 (S.D.N.Y. Mar. 19, 1999)).

Lehman witnesses that there was no direct threat, and the absence of any mention of such a threat in Lehman's internal e-mails during the negotiation, lead the Examiner to conclude there is no colorable claim that the September Agreements are invalid due to economic duress.

### (iii) The Available Evidence Suggests JPMorgan Did Not Have an Improper Purpose

In the context of a claim of economic duress, a threat can be considered wrongful or unlawfully made when motivated by an improper purpose.[4375] Nevertheless, the threatened exercise of a legal right does not generally constitute an improper purpose.[4376]

Some courts applying New York law have suggested that to establish a claim of business or economic duress, improper purposes "may be accomplished through lawful means . . . if they are used to trade upon the victim's poor financial condition with the improper purpose of securing personal advantage."[4377] "A necessary element of [this] type of business compulsion, however, is a showing that the victim's financial straits

---

[4375] *See* 28 Williston on Contracts § 78:13 (4th ed. 2009).

[4376] *Marine Midland Bank*, 427 N.Y.S.2d at 123 ("The threatened exercise of a legal right cannot constitute duress."); *Kamerman*, 891 F.2d at 432 (same).

[4377] *US West Fin. Servs., Inc. v. Tollman*, 786 F. Supp. 333, 338 (S.D.N.Y. 1992) (*quoting Nat. Am. Corp. v. Fed. Republic of Nigeria*, 448 F. Supp. 622, 644 (S.D.N.Y. 1978), *aff'd*, 597 F.2d 314 (2d Cir. 1979)). In *US West*, Judge Mukasey found that a bank requiring a guaranty from an investor group did not cause the financial distress of the investor group even though the bank knew of the investor group's precarious financial condition and the bank's actions "may have further destabilized" the investor group's financial condition. *Id.* at 339-340.

were caused by the other party."[4378]  Thus, even under this view, Lehman would have to demonstrate that its underlying financial straits had been caused by JPMorgan.  There is no credible basis to conclude that prior to September 9, JPMorgan was the cause of Lehman's financial straits.

Furthermore, by September 9 Lehman's creditors had a reasonable basis for concern as to whether Lehman would default on its obligations.[4379]  JPMorgan had witnessed how rapidly Bear Stearns had declined, and JPMorgan executives had analyzed and expressed serious concerns with Lehman's survival plans.[4380]  For example, JPMorgan was concerned about the viability of Lehman's SpinCo proposal, which had been discussed at a September 4 meeting involving JPMorgan and Lehman executives.[4381]  JPMorgan similarly expressed concerns about presentations that Lehman prepared for the rating agencies, including Lehman's presentation of survival strategies.[4382]

In addition, JPMorgan's Investment Bank Risk Committee met on September 5 and reviewed the exposure of JPMorgan's Investment Bank to Lehman.  At that time, JPMorgan had a primary exposure to Lehman of $2.645 billion, the largest component

[4378] *Id*. at 338.

[4379] *See* Section III.A.3 of this Report, which discusses Lehman's survival strategies, and Appendix 15 of this Report, which discusses the events of the week of September 8, 2008.

[4380] *See id.*

[4381] *See* Section III.A.5.b.1 of this Report.

[4382] Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 7; *see* e-mail from Barry L. Zubrow, JPMorgan, to Mark G. Doctoroff, JPMorgan, *et al*. (Sept. 5, 2008) [JPM-2004 0006286].

of which was a $1.904 billion derivatives exposure.[4383]  Several JPMorgan witnesses

focused on JPMorgan's derivative exposure as the key factor motivating the September

9 collateral request.[4384]  Moreover, on September 9, public reports surfaced stating that

KDB had abandoned (or was likely to abandon) its acquisition talks with Lehman.[4385]

As an apparent result, Lehman's stock had dropped significantly.[4386]

Furthermore, the FRBNY had been discussing with JPMorgan for months the

need for better protection against a broker-dealer failure.[4387]  The fact that other banks

were demanding more protection from Lehman at the same time further demonstrates

---

[4383] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at pp. 6-7; JPMorgan, IBRC Presentation, Overview of Debt Maturities for Major US Broker Dealers (Sept. 5, 2008), at p. 6 [JPM-EXAMINER00005998].

[4384] Examiner's Interview of Barry L. Zubrow, Sept. 17, 2009, at pp. 9-11; Examiner's Interview of John J. Hogan, Sept. 17, 2009, at p. 4.

[4385] Francesco Guerrera, *et al.*, *Equities Suffer as Lehman Shares Fall 45%*, FT.com, Sept. 9, 2008 ("Lehman's shares fell after a newswire report cited an unnamed Korean government official as saying that Korea Development Bank, a state-run lender, had decided not to invest in Lehman."); Susanne Craig, *et al.*, *Korean Remarks Hit Lehman*, Wall St. J., Sept. 9, 2008; *see also supra* at Section III.A.3.c.5.b.

[4386] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 11; Examiner's Interview of Donna Dellosso, Feb. 27, 2009, at p. 4; *Lehman Drops 45%*; Wall St. J., Sept. 10, 2008; Susanne Craig, *et al.*, *Korean Remarks Hit Lehman*, Wall St. J., Sept. 9, 2008.

[4387] *See, e.g.*, e-mail from Janet Birney, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Feb. 26, 2008) [LBEX-DOCID 280175] ("The recent market turmoil has prompted the Fed to question JPMC on the viability of Triparty financing in the event of a broker dealer default."); e-mail from Janet Birney, Lehman, to Daniel J. Fleming, Lehman, *et al.* (May 5, 2008) [LBEX-DOCID 065656] (JPMorgan reevaluation of risk associated with Triparty financing "prompted by discussions with the FED"); e-mail from Lucinda Brickler, FRBNY, to Timothy F. Geithner, FRBNY, *et al.* (July 16, 2008) [FRBNY to Exam. 034046] (attaching "talking points" the FRBNY developed for a July 17, 2008 meeting with "Dimon and Kelly regarding near-term measures to enhance the stability of the triparty repo market"); Talking Points, at p. 1 [FRBNY to Exam. 034047] (noting "[i]n the event of the default of a large borrower, the potential for systemic risk to materialize co[u]ld be reduced").

that there was overall market concern with Lehman's viability, and that it was not improper for JPMorgan to seek greater security.[4388]

The Examiner concludes that there is insufficient evidence to support a colorable claim that JPMorgan had an improper purpose in seeking the September Agreements.[4389]

### (iv) There Was a Degree of Negotiation Over the Terms of the September Agreements

Lehman counsel Hespel and Yeung suggested that, for all practical purposes, JPMorgan dictated the material terms of the September Agreements.[4390]  Even if there had been no meaningful negotiation, there is no colorable claim of economic duress because the Examiner has found no evidence of an explicit and wrongful threat.  That conclusion is further supported by the evidence of a limited negotiation between the parties.

During the overnight negotiations of the September Agreements, JPMorgan agreed to certain changes proposed by Yeung, including (a) changing the language regarding additional collateral from "obligations" to "requests"; (b) agreeing to remove performance obligations of Lehman subsidiaries; and (c) agreeing to remove reference

---

[4388] *See* Sections III.A.5.c and III.A.5.d of this Report, which discuss Lehman's dealings with Citi and HSBC, respectively.

[4389] Whether JPMorgan truly "needed" the full amount of collateral it demanded on September 9 and September 11 is a different question, but the Examiner concludes that JPMorgan had a legitimate basis for seeking additional protection in the form of the September Agreements.

[4390] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 5; Examiner's Interview of Paul W. Hespel, Apr. 23, 2009, at p. 6.

to Lehman's affiliates in the Amendment to the Clearance Agreement.[4391]  The change to the Amendment to the Clearance Agreement is of note because JPMorgan had originally rejected this proposed change at 3:11 a.m. on September 10.[4392]  When asked by the Examiner about the degree of negotiation of the agreements, JPMorgan counsel Inaba pointed to the deletion of these references as one of the points of negotiation between the parties.[4393]

The negotiation never reached the point of Lehman fully testing whether JPMorgan might yield on the core issues, such as the expansion of the agreements to cover all Lehman liabilities of any type.  Yeung made some effort to confirm with Lehman business managers whether Lehman had actually agreed in principle to expand the agreements to cover all Lehman liabilities.  Yeung did not, however, recommend to senior executives that Lehman resist the proposed terms or escalate any issues to senior JPMorgan executives.  Whether or not JPMorgan would have agreed to remove terms that expanded the agreements to cover all liabilities if Lehman had escalated the dispute, Lehman's failure to push the issue and fully test JPMorgan's

---

[4391] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 5; Examiner's Interview of Gail Inaba, Apr. 28, 2009, at p. 7.

[4392] E-mail from Nikki G. Appel, JPMorgan, to Andrew Yeung, Lehman, *et al*. (Sept. 10, 2008) [JPM-2004 0001997] (Appel told Yeung that JPMorgan had reviewed Lehman's proposed changes to the Amendment to the Clearance Agreement and JPMorgan requested "that the scope of the amendment stay unchanged.").

[4393] Examiner's Interview of Gail Inaba, Apr. 28, 2009, at p. 7.

resolve – knowing JPMorgan had agreed to at least some changes Lehman requested – creates yet another significant hurdle to a viable claim of economic duress.[4394]

> **(b) There Is Insufficient Evidence to Support a Colorable Claim That the September Agreements Are Invalid for Lack of Consideration**

The Examiner concludes that there is insufficient evidence to support a colorable claim against JPMorgan to invalidate or rescind the September Agreements for lack of consideration.[4395]  Consideration is "either a benefit to the promisor *or* a detriment to the promisee."[4396]  "Failure of consideration gives the disappointed party the right to rescind the contract."[4397]  By New York statute, however, a contract modification "shall not be invalid because of the absence of consideration, provided that the [modification] agreement . . . shall be in writing and signed by the party against whom it is sought to enforce the . . . modification . . . or by his agent."[4398]

The September Amendment to the Clearance Agreement is a modification to an existing contract (that is, the 2000 Clearance Agreement), in writing, and signed by both Lehman and JPMorgan.  It therefore requires no additional consideration.[4399]

---

[4394] *See* Section III.A.5.b.1 of this Report, which notes that JPMorgan agreed to at least some of the changes that Lehman requested to current drafts.

[4395] *See* Section III.B.3.g of this Report.

[4396] *Holt v. Feigenbaum*, 419 N.E.2d 332, 336 (N.Y. 1981).

[4397] *Fugelsang v. Fugelsang*, 517 N.Y.S.2d 176, 177 (App. Div. 1987).

[4398] N.Y. Gen. Oblig. Law § 5-1103 (2009); *see also Deutsche Bank Secs. Inc. v. Rhodes*, 578 F. Supp. 2d 652, 660 (S.D.N.Y. 2008).

[4399] *See* Amendment to Clearance Agreement (Sept. 9, 2008), at pp. 1-6 [JPM-2004 005861].  In addition, the September Amendment to the Clearance Agreement states that it was entered "for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged."  *Id*.

The September Guaranty and the September Security Agreement, however, are best understood as new agreements. The September Guaranty explicitly states that it is "in addition to and does not replace that certain Guaranty dated August 26, 2008" made by LBHI.[4400] The September Security Agreement expressly references the September Guaranty, and includes a reference to the "Existing Security Agreement," that is, the August Security Agreement.[4401] The question thus arises whether the September Guaranty and Security Agreement are supported by consideration.

Both agreements contain recitations of consideration. The September Guaranty expressly notes:

> The Guarantor and each of the direct or indirect subsidiaries of the Guarantor . . . desires to transact business and/or trade with and/or enter into derivative transactions with and/or to obtain credit, clearing advances, clearing loans or other financial accommodation from the Bank and to continue such business, trading, derivative activity and/or such extensions of credit, clearing advances, clearing loans or other financial accommodation and *the Bank has requested that it receive the following guaranty of the undersigned before it will consider extending such credit*.[4402]

The September Security Agreement provides:

> In consideration of JPMORGAN CHASE BANK, N.A. or any of its affiliates, subsidiaries, successors and assigns . . . extending credit to and/or transacting business, trading or engaging in derivative transactions with the undersigned and/or its subsidiaries, the undersigned hereby

---

[4400] Guaranty (Sept. 9, 2008), at p. 1 [JPM-2004 0005813].

[4401] Security Agreement (Sept. 9, 2008), at p. 1 [JPM-2004 0005873].

[4402] Guaranty (Sept. 9, 2008), at p. 1 [JPM-2004 0005813] (emphasis added) (the recitation of consideration states "for good and valuable consideration and in order to induce the Bank from time to time, to extend or continue to extend credit, clearing advances, clearing loans, or other financial accommodations to the Borrowers and/or to transact business, trade or enter into derivative transactions with the Borrowers.").

agree(s) that the Bank shall have the rights, remedies and benefits hereinafter set forth.[4403]

Even when a contract includes a recitation of consideration, however, a party may use parol evidence to challenge that recitation.[4404] Having reviewed all available evidence, the Examiner concludes that there is no colorable claim that the September Agreements were not supported by sufficient consideration.

Although "[a] promise by one party to do that which he is already under a legal obligation to perform is insufficient as a consideration to support a contract,"[4405] an agreement to continue to act where there is no obligation to do so is proper consideration.[4406] The September Agreements are supported, *inter alia*, by JPMorgan's agreement to continue extending credit to Lehman. Under the Clearance Agreement, that extension of credit was discretionary.[4407] Buyers-Russo confirmed that JPMorgan considered ceasing or limiting credit extensions as an option if Lehman did not sign the

---

[4403] Security Agreement (Sept. 9, 2008), at p. 1 [JPM-2004 0005873].

[4404] *See Diamond v. Scudder*, 845 N.Y.S.2d 452, 453-54 (App. Div. 2007); *see also Ehrlich v. Am. Moninger Greenhouse Mfg. Corp.*, 257 N.E.2d 890, 892 (N.Y. 1970) ("The recitation of receipt of consideration is a mere admission of a fact which, like all such admissions, may be explained or disputed by parol evidence." (citation and internal quotation marks omitted)).

[4405] *Carpenter v. Taylor*, 58 N.E. 53, 55 (N.Y. 1900); *see also Roth v. Isomed, Inc.*, 746 F. Supp. 316, 319 (S.D.N.Y. 1990).

[4406] *See Andre v. Gaines Berland, Inc.*, No. 95-10524, 1996 U.S. Dist. LEXIS 9383, at *6-7 (S.D.N.Y. July 8, 1996) (where "ongoing professional services relationship [was] terminable at-will," there was no obligation to continue providing such services and, thus, continued services constituted valid consideration for subsequent agreements); *see also* 3 WILLISTON ON CONTRACTS § 7:41 (4th ed.) ("If one is privileged to avoid a contractual duty or to refuse to perform under a contract, and promises to perform or does perform in consideration of the promise of some additional payment by another . . . the promise to perform or the actual performance is consideration . . . .").

[4407] Clearance Agreement (June 7, 2000), at p. 4 [JPM-2004 0031786].

September Agreements.[4408]  Dellosso also recalled discussing the extension of credit with

Tonucci in the context of the September Agreements.[4409]   JPMorgan's agreement to

continue extending discretionary credit to Lehman is sufficient consideration to support

the September Agreements.[4410]

### (c)  There is Sufficient Evidence to Support the Existence of a Technical, But Not Colorable, Claim That the September Agreements Are Invalid for Lack of Authority

The Examiner concludes that there is sufficient evidence to support a technical

claim that the September Agreements are invalid for lack of authority but that the claim

is not colorable because of substantial evidence supporting defenses to such a claim,

including that Lehman ratified the agreements when it posted collateral on September

12.

Tonucci, Lehman's Treasurer, signed the September Agreements on LBHI's

behalf.[4411]   However, under Lehman's Code of Authorities, an LBHI guaranty of a

subsidiary's obligations – other than certain "Guaranteed Subsidiaries" – for over $500

---

[4408] Examiner's Interview of Jane Buyers-Russo, Sept. 25, 2009, at pp. 6-7.  JPMorgan did in fact continue extending credit to Lehman in the days after the September Agreements were executed.  For example, it continued to unwind Lehman's triparty repos.  JPMorgan also extended discretionary credit when, after the execution of the September Agreements, it restored to LBIE a $2 billion line of credit.  In addition, there is evidence that JPMorgan continued accepting novations from Lehman counterparties after September 9, even with rumors that others were abandoning Lehman.  *See* e-mail from John J. Hogan, JPMorgan, to Donna Dellosso, JPMorgan, *et al*. (Sept. 12, 2008) [JPM-2004 0050952] (recognizing that JPMorgan was still "trading" with Lehman in that they were still allowing Lehman derivative credit).

[4409] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 9.

[4410] *See, e.g., Weiss v. Weiss*, 41 N.Y.S.2d 777, 777 (App. Div. 1943) ("Performance by a promisee of an act which he is not obligated to perform, or the surrender by him of a privilege which he has the legal right to assert, is sufficient consideration for a promise . . . .").

[4411] *See* Security Agreement (Sept. 9, 2008), at p. 6 [JPM-2004 0005873]; Guaranty (Sept. 9, 2008), at p. 6 [JPM-2004 0005813]; Amendment to Clearance Agreement (Sept. 9, 2008), at p. 3 [JPM-2004 0005861].

million or an unspecified amount required the approval of LBHI's CEO, President, COO or CFO.[4412] LBI – one of the entities covered by the September Guaranty – was not a "Guaranteed Subsidiary."[4413] Notably, "[i]f the required approval [was] obtained, any proper officer of Holdings . . . [could] sign documents."[4414] Thus, for Tonucci to have had actual authority to sign the September Guaranty, the agreement had to have been approved by Lowitt or Fuld.

The Code of Authorities is less clear about Tonucci's authority to sign the September Security Agreement and Amendment to the Clearance Agreement.[4415]

---

[4412] LBHI & LBI, Amended and Restated Code of Authorities (July 1, 2004), at p. 7 [LBEX-AM 043802].

[4413] *See* Alvarez & Marsal, Responses to Questions for Alvarez & Marsal/Weil, Gotshal & Manges (Dec. 7, 2009), at p. 1.

[4414] LBHI & LBI, Amended and Restated Code of Authorities (July 1, 2004), at p. 2 [LBEX-AM 043802].

[4415] According to Alvarez & Marsal, the Amendment to the Clearance Agreement was governed by the "secured borrowings" provision of the Code of Authorities, which provided that "[a]ny secured borrowings (excluding any collateral arrangement authorized under the Trading Lines)" requires approval of the "CEO, President, COO, CFO, or Treasurer." LBHI & LBI, Amended & Restated Code of Authorities (July 1, 2004), at Ex. 6 [LBEX-AM 043802]; Alvarez & Marsal, Responses to Questions for Alvarez & Marsal/Weil, Gotshal & Manges (Dec. 7, 2009), at p. 2. It thus appears that Tonucci had actual authority to sign the Amendment to the Clearance Agreement. Alvarez & Marsal also stated that Lehman personnel evidently believed that the Security Agreement was governed by the "secured borrowings" provision as well, but stated no opinion as to whether this belief was correct. *See* Alvarez & Marsal, Responses to Questions for Alvarez & Marsal/Weil, Gotshal & Manges (Dec. 7, 2009), at p. 2. The Estate may argue that the September Agreements are so intertwined as to constitute a single agreement, and, thus, if one of the September Agreements is invalid, then they all must be. *See Tecorp Entm't Ltd. v. Heartbreakers, Inc.*, No. 209861, 2001 Mich. App. LEXIS 661, at *9-10 (Mich. Ct. App. Feb. 9, 2001) (per curiam) (affirming trial court's holding that, where management agreement was void ab initio because there was no meeting of the minds, asset purchase agreement was void ab initio given that agreements were interdependent). Agreements contained in separate documents are generally presumed to be separable in the absence of a clear indication that the parties intended otherwise. *See Nat. Union Fire Ins. Co. v. Clairmont*, 662 N.Y.S.2d 110, 112 (N.Y App. Div. 1997); *Ripley v. Int'l Rys. of Central Am.*, 171 N.E.2d 443, 446 (N.Y. 1960). "In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances." *Rudman v. Cowles Commc'ns, Inc.*, 280 N.E. 2d 867, 873 (N.Y. 1972). Although there may be a reasonable argument that the September Guaranty and Security Agreement are integrated given that, for example, both documents were executed by LBHI and the Security Agreement incorporated the Guaranty's definition of "Liabilities," *see* Security

Yeung, Lehman's counsel, did not differentiate among the September Agreements and explained that they all required Lowitt's approval.[4416] Yet, somewhat inconsistently, he also noted that the August agreements were executed in a "typical" fashion, with Tonucci signing the Amendment to the Clearance Agreement and Security Agreement, and Lowitt signing the Guaranty, per Lehman's Code of Authorities.[4417]

According to JPMorgan's Donna Dellosso, Tonucci informed her on the evening of September 9 that the agreements had to be approved by Lowitt, who was sleeping at the time. Tonucci also informed the Examiner that Buyers-Russo called him on the night of September 9 to inquire whether Lowitt had reviewed the agreements.[4418] According to Tonucci, Lowitt had not reviewed the agreements – he had left Lehman's headquarters earlier that evening to rest in advance of the following morning's earnings call, which Lowitt would lead, and was likely asleep at the time of Buyers-Russo's call.

---

Agreement (Sept. 9, 2008), at p. 1 [JPM-2004 0005873], an argument that the Amendment to the Clearance Agreement is integrated with the other September Agreements is weaker. The Amendment to the Clearance Agreement, for example, was executed by several Lehman parties in addition to LBHI. *See* Amendment to the Clearance Agreement (Sept. 9, 2008), at pp. 1-3 [JPM-2004 0005861]. It also modifies an already existing standalone agreement – the Clearance Agreement – that was not intertwined with the September Security Agreement and Guaranty. In addition, while New York courts have suggested that a breach of one agreement may be a breach of another agreement with which it is interrelated, *see, e.g., Rudman*, 280 N.E.2d at 873, the Examiner is unaware of any case under New York law in which the invalidity of one agreement requires the invalidity of another agreement with which it is interrelated but that is not subject to the same infirmity. This issue, of course, is not relevant if JPMorgan is able to establish that Tonucci acted with apparent authority or that Lehman ratified the September Guaranty.

[4416] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 5.

[4417] *Id*. at p. 3.

[4418] Tonucci may have confused a phone call with Dellosso for one with Buyers-Russo.

Tonucci recalled that although Buyers-Russo asked Tonucci to wake up Lowitt, Tonucci did not do so.[4419]

Lowitt spoke with Tonucci about the September Agreements after the earnings call on September 10 (and thus *after* they were signed). Lowitt did not recall whether he communicated with anyone about the agreements prior to that point.[4420] Tonucci relayed to Lowitt that JPMorgan had wanted Lowitt to sign the agreements the night before, but that Tonucci had decided not to bother Lowitt.[4421] Thus, the available evidence suggests that Lowitt had not approved of the September Agreements before Tonucci signed them.[4422]

Lowitt told the Examiner that he had no questions about Tonucci's authority to sign the agreements, citing the fact that even though JPMorgan wanted Lowitt to sign,

---

[4419] Doctoroff stated that he called Fleming between 10:00 and 11:00 p.m. on September 9 at the direction of Dellosso to tell Fleming to wake Lowitt up. Examiner's Interview of Mark G. Doctoroff, Apr. 29, 2009, at p. 19.

[4420] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at pp. 19-20. Yeung did e-mail Lowitt that evening, but Lowitt did not respond. Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4; *see also* e-mail from Paul W. Hespel, Goodwin Procter, to Jeffrey Aronson, JPMorgan (Sept. 10, 2008) [LBEX-AM 039572] (forwarding Lehman comments on draft Guaranty and Security Agreement to JPMorgan, copying Lowitt).

[4421] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 19.

[4422] Notably, despite Lowitt's lack of approval of the September Agreements with JPMorgan before they were executed, Lowitt had approved an amendment to Lehman's Guaranty with Citi on September 9. E-mail from Paolo R. Tonucci, Lehman, to Emil R. Cornejo, Lehman (Sept. 9, 2008) [LBEX-AM 008564] (reporting that Lowitt signed Lehman's Guaranty amendment with Citi); Amendment 1 to Guaranty (Sept. 9, 2008) [LBEX-DOCID 4263143] (executed amendment with Lowitt's signature). Indeed, Lowitt was told that he was "required to sign" the Guaranty amendment with Citi. E-mail from Emil F. Cornejo, Lehman, to Ian T. Lowitt, Lehman, et al. (Sept. 9, 2008) [LBEX-AM 008571].

JPMorgan had accepted Tonucci's signature.[4423]   Fuld denied knowing about the agreements until after Lehman filed for bankruptcy, [4424] although there is evidence that the agreements were based at least in part on a high-level agreement reached between Fuld and JPMorgan's Steven Black.[4425]

### (i)   Tonucci May Have Acted With Apparent Authority

Assuming that Tonucci lacked actual authority to sign the September Guaranty, he may have acted with apparent authority.  Apparent authority is established by the words or conduct of the principal, *i.e.*, Lehman, vis-à-vis the third party, *i.e.*, JPMorgan.[4426]  Apparent authority "arises when a principal places an agent in a position where it appears that the agent has certain powers which he may or may not possess.  If a third person holds the reasonable belief that the agent was acting within the scope of his authority and changes his position in reliance on the agent's act, the principal is estopped to deny that the agent's act was not authorized."[4427]   Formulated slightly differently, "a principal may be estopped from denying apparent authority if (1) the principal's intentional or negligent acts, including acts of omission, created an appearance of authority in the agent, (2) on which a third party reasonably and in good

---

[4423] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 19.  This reasoning is not relevant to a legal analysis of apparent authority, but does reflect Lowitt's personal views.

[4424] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at pp. 15-16.

[4425] *See supra* at Section III.A.5.b.1.h.

[4426] *See Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir. 1989).

[4427] *Gen. Overseas Films, Ltd. v. Robin Int'l, Inc.*, 542 F. Supp. 684, 688-89 (S.D.N.Y. 1982) (citation and internal quotation marks omitted).

faith relied and (3) such reliance resulted in a detrimental change in position on the part of the third party."[4428]

Under New York law, in the apparent authority context, a duty of inquiry arises when "(1) the facts and circumstances are such as to put the third party on inquiry, (2) the transaction is extraordinary, or (3) the novelty of the transaction alerts the third party to a danger of fraud."[4429]  The duty of inquiry is an "alternative way of asking whether reliance was reasonable."[4430]  The question whether JPMorgan reasonably relied on Tonucci's apparent authority is essentially a question of fact.[4431]

There are disputed issues of fact on the issue of apparent authority.  JPMorgan, on the one hand, can point to the fact that at the conclusion of negotiations, Yeung e-mailed JPMorgan counsel and reported that he had sent the agreements "on to our executive officers for their final approval and signature."[4432]  Later, Fleming e-mailed Doctoroff and informed him that "Andrew [was] on his way . . . to pick up signed docs from Paolo/Ian."[4433]  As noted above, Paolo Tonucci, as LBHI's Vice President and Global Treasurer, signed the agreements on LBHI's behalf.  The fact that JPMorgan sent the agreements to Lehman's counsel, who returned them signed by Tonucci – coupled

---

[4428] *Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996).

[4429] *FDIC v. Providence Coll.*, 115 F.3d 136, 141 (2d Cir. 1997).

[4430] *Providence Coll.*, 115 F.3d at 142.

[4431] *See C.E. Towers Co. v. Trinidad & Tobago (BWIA Int'l) Airways Corp.*, 903 F. Supp. 515, 524 (S.D.N.Y. 1995).

[4432] E-mail from Andrew Yeung, Lehman, to Gail Inaba, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0002032].

[4433] E-mail from Daniel J. Fleming, Lehman, to Mark Doctoroff, JPMorgan (Sept. 10, 2008) [LBEX-DOCID 457582].

with Tonucci's title – could establish that JPMorgan reasonably relied on Tonucci's apparent authority.[4434]  In addition, the fact that Tonucci signed the August Amendment to the Clearance Agreement and Security Agreement further bolsters his apparent authority to sign analogous agreements in September.[4435]  Moreover, the statements that the agreements had been sent to the "executive officers for their final approval" and that the signed documents were being picked up from "Paolo/Ian," and not just "Paolo," could have led to a reasonable conclusion by JPMorgan that Lowitt had approved of the agreements, even though they were signed by Tonucci.  (JPMorgan counsel Appel stated to the Examiner that JPMorgan relied on "apparent authority" as to the September Agreements, but the Examiner places little weight on this after-the-fact statement at a time when litigation was contemplated between JPMorgan and Lehman.[4436]  Appel further explained that JPMorgan generally did not require regular customers to provide certification of authority.)[4437]

The Estate and Creditors Committee, on the other hand, can point to the fact that JPMorgan apparently knew that Lowitt had to approve the agreements but was asleep on the night of September 9.  Indeed, JPMorgan encouraged Tonucci to wake Lowitt, but did not pursue the inquiry to determine if Lehman had done so and obtained

---

[4434] *Cf. C.E. Towers Co.*, 903 F. Supp. at 524.

[4435] *See Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 774 N.E.2d 696, 700-01 (N.Y. 2002) (third-party's reliance on apparent authority was reasonable where agent executed similar agreements on behalf of principal in past).

[4436] Examiner's Interview of Nikki G. Appel, Sept. 11, 2009, at p. 6.

[4437] *See id.*

Lowitt's approval.  JPMorgan was also aware that it was Lowitt, not Tonucci, who had signed the August Guaranty.[4438]  JPMorgan may therefore have been under a duty to conduct further inquiries concerning Tonucci's authority.[4439]

### (ii)  There Is Substantial Evidence That Lehman Ratified the September Agreements

Ratification is "the express or implied adoption of acts of another by one for whom the other assumes to be acting but without authority."[4440]  Consequently, "a principal may ratify and thereby become liable for the acts of an agent even if those acts were initially unauthorized."[4441]  Whether express or implied, the principal's intent to ratify the unauthorized act "must be clearly established and may not be inferred from

---

[4438] The Estate and Creditors Committee may also argue that Yeung's statements concerning approval of the agreements do not constitute actions by the "principal" because Yeung was not a senior executive.

[4439] *See Providence Coll.*, 115 F.3d at 141 (duty of inquiry arises when "the facts and circumstances are such as to put the third party on inquiry"); *Herbert Constr. Co. v. Continental Ins. Co.*, 931 F.2d 989, 996 (2d Cir. 1991) ("Apparent authority can exist only as long as the third person, to whom the principal has made a manifestation of authority, continues reasonably to believe that the agent is authorized." (citation and internal quotation mark omitted)); *Scientific Holding Co. v. Plessey Inc.*, 510 F.2d 15, 24 (2d Cir. 1974) ("a person with notice of a limitation which has been placed on an agent's authority cannot subject the principal to liability upon a transaction with the agent if he knows or should know that it is outside the scope of the agent's authority").  Among other factors relevant to the issue of inquiry notice is whether the underlying transaction was "extraordinary."  *Providence Coll.*, 115 F.3d at 141.  Although courts have held the guaranty of a debt of an unrelated corporation to be "extraordinary" and, thus, sufficient to trigger the duty of inquiry, *see, e.g.*, *Gen. Overseas Films*, 542 F. Supp. at 691, here, LBI and other Holdings' subsidiaries were far from unrelated to LBHI.  Indeed, LBHI entered into a Guaranty on behalf of several subsidiaries (including LBI) just a few weeks earlier.  Nevertheless, expansion of the agreements to extend to all Lehman liabilities, as part of an overnight negotiation and at a time when Lehman was rapidly deteriorating, could be viewed as "extraordinary."  *Cf. Gen. Overseas Films, Ltd. v. Robin Int'l, Inc.*, 542 F. Supp. 684, 691 (S.D.N.Y. 1982) (extraordinary transaction where corporate treasurer executed agreement to guarantee debt of unrelated corporation).

[4440] *Prisco v. New York*, 804 F. Supp. 518, 523 (S.D.N.Y. 1992); s*ee also Hamm v. United States*, 483 F.3d 135, 140 (2d Cir. 2007).

[4441] *Prisco*, 804 F. Supp. at 523.

doubtful or equivocal acts or language."[4442]  In order for a ratification to be effective, the individual ratifying an unauthorized contract must have been able to authorize the contract originally.[4443]  In other words, only those individuals who could have originally authorized a certain contract or act on behalf of the corporation can ratify it after it has been made without authority or performed.[4444]  The question of ratification is a question of fact.[4445]

A principal ratifies an act by manifesting assent or by conduct that justifies a reasonable assumption that the principal consents to becoming subject to the legal consequences of the act.[4446]  Lehman received a notice from JPMorgan on September 11 explicitly requesting funds to "be held by JPMorgan as collateral under the Security Agreement, dated September 9, between [LBHI] and JPMorgan."[4447]  JPMorgan initially sent the notice to Tonucci, who forwarded it to Lowitt. [4448]  On September 12, Lehman

---

[4442] *Holm v. C.M.P. Sheet Metal, Inc.,* 455 N.Y.S.2d 429, 432 (App. Div. 1982).

[4443] *N.Y. State Med. Transporters Ass'n, Inc. v. Perales,* 566 N.E.2d 134, 138 (N.Y. 1990) (citing RESTATEMENT (SECOND) OF AGENCY § 84(2) (1958)).

[4444] *Schwab v. E.G. Potter Co.,* 87 N.E. 670, 673 (N.Y. 1909); *Aronoff v. Albanese,* 446 N.Y.S.2d 368, 370 (App. Div. 1982); *see also* 11 William Meade Fletcher et al., Fletcher Cyclopedia  of the Law of Corporations § 763 (rev. vol. 2009) ("[T]he president or other like officer of a corporation may ratify a contract that he or she has authority to make; but an unauthorized contract . . . cannot be binding on the corporation, even though it has been ratified by both the president and secretary, if they themselves possessed no power to enter such a contract.").

[4445] *See In re Nigeria Charter Flights Contract Litig.,* 520 F. Supp. 2d 447, 466 (E.D.N.Y. 2007).

[4446] RESTATEMENT (THIRD) OF AGENCY § 4.01 (2009).

[4447] E-mail from Jane Buyers-Russo, JPMorgan, to Paolo R. Tonucci, Lehman (Sept. 11, 2008) [JPM-2004 0005411] (September 11, 2008 Notice attachment).

[4448] E-mail from Paolo R. Tonucci, Lehman, to Ian T. Lowitt, Lehman (Sept. 12, 2008) [LBEX-DOCID 036127].

pledged $5 billion in cash collateral in response.  Such affirmative conduct, in and of itself, suggests that Lehman intended to be bound by the September Agreements.

Ratification can also occur "when the principal, upon learning of an unauthorized act of its agent, acquiesces in, or affirms that act through his conduct by retaining any benefits of the compromise."[4449]  As discussed above, the September Agreements allowed Lehman to continue to receive credit from JPMorgan.  Lehman continued to take advantage of JPMorgan's extensions of credit after the agreements were signed, and posted collateral pursuant to those agreements in order to continue receiving such credit. [4450]

Not only did Lehman explicitly perform under the September Agreements, but the Examiner is aware of no instance in which Lehman sought to repudiate the September Agreements due to concerns over Tonucci's authority to sign them.  Upon learning on September 10 that Tonucci had signed the September Agreements, Lowitt took no action to repudiate them.[4451]  Failure to repudiate is considered evidence from which ratification may be inferred,[4452] and will often support a presumption of

---

[4449] *Marnell v. Carbo*, 499 F. Supp. 2d 202, 208 (N.D.N.Y. 2007) (citation and internal quotation mark omitted).

[4450] The September notice stated, "[i]f JPMorgan does not receive such monies by opening of business tomorrow . . . we intend to exercise our right to decline to extend credit to you under the [Clearance Agreement]."  E-mail from Jane Buyers-Russo, JPMorgan, to Paolo R. Tonucci, Lehman (Sept. 11, 2008) [JPM-2004 0005411] (September 11, 2008 Notice attachment).

[4451] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 19.

[4452] 2A N.Y. Jur. 2d *Agency* § 197 (1979); *see also Suncoast Capital Corp. v. Global Intellicom, Inc.*, 719 N.Y.S.2d 652, 652 (App. Div. 2001) (where principal's attorney did not renounce stipulation when copy was faxed

ratification.[4453]  In determining whether a principal's silence demonstrates a failure to repudiate, courts look to the relationship between the agent and the principal.  The principal's silence is generally more significant where, as here, an agency relationship exists and the agent in the particular case has exceeded the delegated powers.[4454]

The principal performing an allegedly ratifying act generally must have knowledge of the material facts of the unauthorized contract.[4455]  While Fuld and Lowitt arguably may not have had full knowledge of the material facts of the September Agreements at the time of the September 12 pledge,[4456] they cannot avoid the effect of ratification if they were in a position to learn those facts at that time.[4457]  A principal "having once ratified its agents' acts, cannot afterwards avoid the effect of such ratification by showing that it was not acquainted with all of the facts of the transactions ratified, when it was always in a position and was in possession of means of learning them."[4458]  Lowitt knew that the September Agreements had been signed as of

---

to him immediately upon execution, and only renounced it six months later in response to a motion to enforce, such silence constituted ratification of agent's authority).

[4453] *Agency*, § 197 (citing *Goldstein v. Tank*, 134 N.Y.S. 262, 264 (App. Div. 1912)).

[4454] *Id.* § 199 (1979) (citing *Merritt v. Bissell*, 50 N.E. 280 (N.Y. 1898)).

[4455] *See Perales*, 566 N.E.2d at 138 (1990); *Cooperative Agricole Groupement de Producteurs Bovins de L'Ouest v. Banesto Banking Corp.*, No. 86-8921, 1989 WL 82454, at *16 (S.D.N.Y. July 19, 1989) ("Ratification requires knowledge by the principal of the material facts of a transaction, coupled with the retention of benefits."), *aff'd*, 904 F.2d 35 (2d Cir. 1990).

[4456] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 3; Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at pp. 19-20; Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at pp. 13-14.

[4457] *See Orix Credit Alliance v. Phillips-Mahnen, Inc.*, No. 89-8376, 1993 WL 183766, at *5 (May 26, 1993) (a principal "may be deemed to have ratified the acts of an agent through silence when there is an opportunity to speak and, under the circumstances, a desire to repudiate would normally be expressed").

[4458] *Harvey v. J. P. Morgan & Co.*, 2 N.Y.S.2d 520, 531 (N.Y. Mun. Ct. 1937), *rev'd on other grounds*, 25 N.Y.S.2d 636 (N.Y. App. Term 1938) (per curiam).

September 10;[4459] he clearly was in a position to read the agreements himself or confer with others more familiar with them.

Despite this evidence of ratification, the Estate could argue that Lehman did not have adequate time in which to knowingly ratify or repudiate the September Agreements given that Lehman filed for bankruptcy shortly after the agreements were executed.[4460]  Although a principal does have a "reasonable time"[4461] to repudiate, Lehman did more than simply remain silent or tacitly acquiesce after the September Agreements were executed; it had knowledge of the agreements and, instead of repudiating them, affirmatively acted under them.  Finally, if Lehman ratified the agreements by posting collateral in response to the September 11 request, any later repudiation would be ineffective; once ratified, an act is as binding as if it had been originally authorized by the principal.[4462]  Accordingly, the Examiner concludes that a claim to invalidate the September Agreements based on a lack of authority is not colorable in light of substantial evidence of apparent authority and/or ratification.

---

[4459] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 19.

[4460] In addition, JPMorgan terminated the Clearance Agreement as to LBI on September 22, 2008. Letter from Edward J. Corral, JPMorgan, to Paolo R. Tonucci, Lehman, re: termination of Clearance Agreement (Sept. 22, 2008), at p. 1 [LBEX-DOCID 088860].

[4461] See, e.g., Merex A.G. v. Fairchild Weston Sys., Inc., 810 F. Supp. 1356, 1370-71 (S.D.N.Y. 1993).

[4462] See Hamm, 483 F.3d at 140.

### (d) There Is Insufficient Evidence to Support a Colorable Claim That JPMorgan Fraudulently Induced the September Agreements

The Examiner concludes that there is insufficient evidence to support a colorable claim that JPMorgan fraudulently induced the September Agreements when Inaba told Yeung in the midst of their negotiation that an agreement in principle had already been reached by senior management at Lehman and JPMorgan.[4463]

Under New York law, a fraud claim has five elements: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff."[4464]

As recounted above, if Inaba's statement was true, that would of course defeat a claim of fraud. Regardless of the outcome of that disputed issue of fact, however, it does not appear that Yeung in fact relied on Inaba's statement or reasonably could have. When Inaba told Yeung about the alleged agreement, Yeung said he would confirm Inaba's understanding with Lehman's "business guys."[4465] Yeung e-mailed Lowitt, Tonucci and others, identifying issues of concern in the draft agreements and seeking to

---

[4463] Yeung recalled that Inaba relayed that the terms of the September Agreements had been agreed upon by Steven Black and Richard Fuld. Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4. Inaba recalled that she advised Yeung that the September Agreements were agreed to in principle by very senior management, but did not recall whether she mentioned Black and Fuld specifically. Examiner's Interview of Gail Inaba, Apr. 28, 2009, at p. 7.

[4464] *Fierro v. Gallucci*, No. 06-5189, 2008 WL 2039545, at *7 (E.D.N.Y. May 12, 2008) (citations and internal quotation marks omitted).

[4465] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4.

confirm their understanding.[4466]   It is therefore clear that Yeung did not solely rely on JPMorgan's representation as to the alleged executive-level understanding.   Fleming responded by instructing Yeung to proceed as if Lehman would ultimately agree to all of JPMorgan's proposed terms.[4467]   This evidence establishes that despite Inaba's representation, Yeung sought business-side approval of key terms and was instructed by Fleming to proceed.

Moreover, even if Yeung had relied on Inaba's statement, that reliance would not have been reasonable.[4468]   The Examiner does not believe it would be reasonable for counsel negotiating a major agreement to accept the representation of the counterparty that critical terms had already been agreed to by the client, without at least confirming that representation with the client.   This is not a case in which the critical facts – whether a lawyer's own client had consented to the terms of an agreement – were in the sole possession of the counterparty or otherwise inaccessible to the party claiming fraudulent inducement.   There is insufficient evidence to support a colorable claim for fraudulent inducement because it would not have been reasonable for Lehman to have

---

[4466] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4; Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 9.

[4467] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4.   Yeung stated that Fleming confirmed to Yeung that the September Agreements had already been agreed to, but that Yeung responded that he would review the agreements and comment on them nonetheless.   Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 9.

[4468] *See Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984) ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information, but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.").

relied without verification on a general statement by JPMorgan that Lehman had previously consented to the proposed terms, and because Lehman did not in fact rely on such a representation.

* * *

Next, the Examiner analyzes claims arising under the September Agreements – assuming that they are, in fact, enforceable – based on JPMorgan's collateral demands and failure to return collateral to Lehman in its final week.

### (e)  There Is Insufficient Evidence to Support a Colorable Claim for Breach of Contract of the September Agreements Based on JPMorgan's Refusal to Return Collateral

After considering all available evidence, the Examiner concludes that there is insufficient evidence to support a colorable claim against JPMorgan for breach of contract for failure to return collateral to Lehman.

### (i)  Legal Background: Contractual Obligations Under September Agreements

From the period of February 26 to September 11, 2008, JPMorgan made a number of collateral requests to Lehman pursuant to the 2000 Clearance Agreement and amendments thereto, the August and September Guaranties, and the August and September Security Agreements.  By the close of business on Friday, September 12,

2008, Lehman had posted collateral totaling nearly $17 billion as a result of these requests.[4469]

The three dominant collateral components were (i) JPMorgan's clearing-related margin requirements aggregating to roughly $8 billion during 2008, (ii) JPMorgan's request of $5 billion on September 9, 2008, primarily relating to the exposure of its Investment Bank to Lehman entities and (iii) JPMorgan's request for $5 billion cash on September 11, 2008. Derivative termination risk (that is, the risk that the non-defaulting party will not be properly compensated by posted collateral) was the dominant factor of the September 9 collateral request.[4470] Primary elements of the September 11 request were a perceived deficit in Lehman's fulfillment of the earlier September 9 request and JPMorgan's determination that collateral in the form of securities it had already received was valued inappropriately or otherwise constituted inappropriate collateral.[4471]

The Examiner has considered whether there is a colorable claim that JPMorgan breached any of the September agreements by refusing to return to Lehman collateral that JPMorgan was not entitled to retain. The Examiner is not aware of any requests by Lehman for return of allegedly "excess" collateral prior to the execution of the

---

[4469] E-mail from Edward J. Corral, JPMorgan, to Michael A. Mego, JPMorgan (Sept. 12, 2008) [JPM-2004 0050402]. As discussed in Section III.A.5.b.1 above, the value of the collateral is disputed.

[4470] *See supra* at Section III.A.5.b.1.g.

[4471] *See supra* at Section III.A.5.b.1.g.

September Agreements.[4472]   Thus, while the Examiner provides a description of the evolving contractual landscape between Lehman and JPMorgan during the period from February 2008 until September 15, 2008, the most relevant set of contractual obligations for JPMorgan are those established by the September Agreements.

(1) February 2008 to August 26, 2008.   Between February 2008 and the execution of the August Agreements, JPMorgan and Lehman were bound by the terms of the 2000 Clearance Agreement.   Under that agreement, JPMorgan agreed to act as Lehman's "non-exclusive clearance agent for securities transactions."[4473]

To accomplish this purpose, Section 3 of the Clearance Agreement authorized JPMorgan:

> (a) to receive and transfer securities for any purpose whatsoever, including, without limitation, as a pledge of collateral; (b) to make payments and collections of monies; (c) to permit [Lehman] to make transfers between the Clearing Account(s), Custody Account(s) and the Segregated Account(s) or other accounts, it being understood that we shall only permit transfers from the Clearing Account(s) to the Custody Account(s) or Segregated Account(s) to the extent that after such transfer we remain fully collateralized; have been fully paid with respect to any securities being transferred into the Segregated Account(s) or other accounts; and (d) to transfer securities which we hold for [Lehman] as such securities may be needed to secure loans with such entities as [Lehman] may specify; (e) to receive from such entities as [Lehman] may specify securities held as collateral for loans against the payment of funds

---

[4472] When asked by the Examiner, Alvarez & Marsal and counsel for JPMorgan were not able to identify any evidence of requests by Lehman for return of allegedly "excess" collateral prior to the execution of the September Agreements.  The Examiner is aware of certain collateral movements, however, such as the removal of Freedom from LCD on August 15 and the transfer of Kingfisher from LCE to LCD on September 2.

[4473] Clearance Agreement (June 7, 2000), at p. 1 [JPM-2004 0031786].

required to obtain the release of [Lehman's] collateral; (f) to perform any other act incidental or necessary to the performance of the above.[4474]

This contractual provision enabled JPMorgan to clear triparty repurchase transactions for Lehman. In doing so, JPMorgan reserved the following right: "All credits to the Account in connection with triparty repo transactions and physical securities, regardless of how characterized, are conditioned upon the actual receipt of final payment and may be reversed to the extent payment is not received."[4475] Further, under the same Section 4(d), JPMorgan could credit the Clearing Account with proceeds from sales from triparty repurchase prior to actual receipt of final payment (*e.g.,* "immediately available" or "same day" funds). JPMorgan had the discretion but not the obligation to allow Lehman to use any such funds prior to final payment.[4476]

Importantly, under Section 5, while JPMorgan could – solely at its discretion – advance or loan Lehman funds, the 2000 Clearance Agreement emphasized JPMorgan's right to decline credit: "Notwithstanding the fact that we may from time to time make advances or loans pursuant to this paragraph or otherwise extend credit to you, whether or not as a regular pattern, we may at any time decline to extend such credit at our discretion, with notice and if we are precluded from extending such credit as a result of any law, regulation or applicable ruling."[4477]

---

[4474] *Id.* at pp. 1-2 (§ 3).
[4475] *Id.* at p. 3 (§ 4(d)).
[4476] *See id.*
[4477] *Id.* at p. 4 (§ 5).

The 2000 Clearance Agreement provided several liens to JPMorgan "in consideration of any advances or loans [JPMorgan] may extend to [Lehman] pursuant to this Agreement."[4478] Specifically, Section 11 of the Clearance Agreement provided:

- a continuing security interest, lien upon and right of a setoff as to all collateral;

- if any advances or loans are outstanding at the end of a business day, a right to, with notice to Lehman, carry any collateral in JPMorgan's general account and to sell, transfer, assign, pledge, re-pledge, hypothecate and re-hypothecate any collateral;

- if any advances or loans are not re-paid, the right to sell collateral;

- the ability to maintain that all collateral is in its "possession" and under its "control" unless and until JPMorgan receives full and final payment for advances or loans;

- no denial of JPMorgan's status as a bona fide purchaser of all or part of any collateral;

- status as securities intermediary with respect to any securities accounts maintained with JPMorgan, which entitles JPMorgan to a priority lien over all property maintained in such accounts pursuant to Section 8-106(e).[4479]

Thus, in operation, the 2000 Clearance Agreement provided a framework for clearance services, including triparty repos, which enabled JPMorgan to provide "same day" and "immediately available" loans or advances to Lehman, and in return conferred liens on Lehman accounts with respect to such advances or loans.

This Agreement, as amended by the parties, was the operative contractual framework prior to the execution of the August Agreements.

---

[4478] *Id*. at pp. 12 (§ 11).

[4479] *See id*. at pp. 12-14 (§ 11).

*(2) August Agreements.*  The operative contractual framework was modified by the three August Agreements.

The August Amendment to the Clearance Agreement expanded the reach of the 2000 Clearance Agreement by (1) adding several Lehman entities (LBHI, LBIE, LB OTD Derivatives and LBJI); and (2) including a provision clarifying that liability was several and not joint for all Lehman entities under the Clearance Agreement.[4480]

The parties also executed Guaranty and Security Agreements.  The Security Agreement included an "Overnight Account" provision to the effect that "[e]xcept as otherwise provided herein, at the end of a business day, if the undersigned has determined that no" advances or loans "remain outstanding, the [undersigned Lehman entities] may transfer to an account (the "Overnight Account") any and all Security held in or credited to or otherwise carried in their Accounts."[4481]

*(3) September Agreements.*  Shortly after execution of the August Agreements, JPMorgan and Lehman once again executed a set of agreements that changed their contractual obligations.

As discussed above, the September 9 Amendment to the Clearance Agreement broadened the scope of the obligation in Section 11 of the Clearance Agreement, by

---

[4480] Amendment to Clearance Agreement (Aug. 26, 2008), at p. 1 [JPM-2004 0005856].  LCPI had been added as a Customer in May.  Amendment to Clearance Agreement (May 30, 2008), at p. 1 [JPM-2004 0085662].

[4481] Security Agreement (Aug. 26, 2008), at p. 3 [JPM-2004 0005867].  The Security Agreement was silent as to what type of account Lehman had the right of transfer.

replacing language that limited Section 11 to clearing-related advances and loans with the following:

> In consideration of any credit, advances, loans or other financial accommodations [JPMorgan] may extend to [Lehman] and in order to induce [JPMorgan] from time to time, in our discretion, to extend or continue to extend credit, clearing advances, clearing loans or other financial accommodations to any of the Customers and/or to transact business, trade or enter into derivative transactions with any of the Customers and as security for the payment of all of your existing or future indebtedness, obligations, and liabilities of any kind to [JPMorgan] including, without limitation, arising in connection with trades, derivative transactions, settlement of securities hereunder or any other business (hereinafter the "Obligations") you hereby:[4482]

The September Amendment to the Clearance Agreement thus greatly expanded the scope of "Obligations" from being limited to loans and advances specifically in connection with clearing services to encompassing any indebtedness or obligation *of any kind* with JPMorgan. This language significantly expanded the scope of JPMorgan's security liens.

In addition, the parties executed a Guaranty and a Security Agreement that likewise expanded the scope of JPMorgan's lien. For purposes of evaluating whether a colorable breach of contract claim exists, a few provisions are salient.

First, the Security Agreement states: "As security for the payment of all the Liabilities, the undersigned hereby grant(s) to the Bank a security interest in, and a

---

[4482] Amendment to Clearance Agreement (Sept. 9, 2008), at p. 1 [JPM-2004 0005861] (emphasis added).

general lien upon and/or right of set-off of, the Security."[4483]  The Security Agreement incorporates the Guaranty's broad definition of "Liabilities," which includes "all obligations and liabilities of the Borrowers to the Bank of whatever nature" with the proviso that: "The Guarantor's maximum liability under this Guaranty shall be THREE BILLION DOLLARS ($3,000,000,000) or such greater amount that the Bank has requested from time to time as further security in support of this Guaranty."[4484]  This last provision of the Guaranty is also consistent with a clause in the Security Agreement that states: "The undersigned acknowledges and agrees that the Bank may from time to time request further security or payments on account of any of the Liabilities."[4485]

The practical effect of this language was that JPMorgan could, under the September Agreements, make collateral requests to cover the broad definition of Liabilities.

The September Agreements also altered Lehman's ability to secure the return of collateral – and JPMorgan's contractual obligation to do so.  The Security Agreement included a "three-day notice provision" for the return of a Security to Lehman:

> Notwithstanding anything provided for herein, the undersigned may upon *three days written notice* to the Bank transfer any Security, provided that the undersigned shall not transfer any Security if the Bank has exercised or been stayed or otherwise prohibited from exercising any of its rights under this Security Agreement or the Guaranty or in the event any

---

[4483] Security Agreement (Sept. 9, 2008), at pp. 1-2 [JPM-2004 0005873].

[4484] Guaranty (Sept. 9, 2008), at pp. 1-2 [JPM-2004 00005813].  The Guaranty defines "Borrowers" as "the direct or indirect subsidiaries" of LBHI.  *Id.* at p. 1.

[4485] Security Agreement (Sept. 9, 2008), at p. 5 [JPM-2004 0005873].

> DEFAULT has occurred and is continuing, in either case, prior to the end
> of the three day notice period and upon any such transfer in the security
> interest hereunder shall be released.[4486]

This meant that Lehman had to provide written notice three days in advance before it could attempt to require JPMorgan to transfer any security under the September Agreements.

### (ii) There Was No Written Notice for Collateral Return

To invoke the right to access collateral under the September 2008 Security Agreement, Lehman would have needed, at a minimum, to provide JPMorgan with written notice for return of collateral.[4487] Lehman never provided any such written notice.

The Examiner is aware of a claim by Fuld that on a September 11 conference call between Fuld and Lowitt of Lehman and Black and Dimon of JPMorgan, there was some type of oral promise for the return of collateral. According to Fuld, Dimon promised that if Lehman would post $5 billion in additional collateral the next day,

---

[4486] *Id*. at p. 3 (emphasis added).

[4487] The Examiner has considered whether providing notice might be regarded as futile. If a party understands that honoring a contractual notice requirement may be futile, there are at least some circumstances under which a party is relieved of that requirement. *24/7 Records, Inc. v. Sony Music Entm't Int'l*, 566 F. Supp. 2d 305, 313 (S.D.N.Y. 2008). That line of cases, however, requires that it be clear that the other party – in this case, JPMorgan – will not live up to its contractual obligations. The Examiner has not found any credible evidence to suggest that JPMorgan made clear that it would not have returned at least some collateral under any circumstances on three days' written notice. Indeed, there *is* evidence that JPMorgan returned some of Lehman's collateral. *See, e.g.*, e-mail from Edward J. Corral, JPMorgan, to Michael A. Mego, JPMorgan (September 12, 2008) [JPM-EXAMINER00005961] ("Let the CLO go."); Examiner's Interview of Edward J. Corral, Sept. 30, 2009, at p. 11.

JPMorgan would return that collateral at the end of that business day.[4488]  Dimon denied knowledge of any such promise.[4489]  The existence of such a promise is a disputed issue of fact, but an oral promise could not have modified the written notice requirement of the September 2008 Security Agreement.  By their terms, the September Guaranty and Security Agreement provide that all modifications to their terms be in writing.[4490]  Further, New York General Obligations Law § 15-301(1) reinforces these provisions, providing:

> A written agreement . . . which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.

Although there are some doctrinal exceptions to the statute – waiver, equitable estoppel and partial performance – none appears applicable here given that Lehman's actions (*i.e.*, pledging collateral) were consistent with the original agreements.[4491]  Thus, a written modification would have been needed to satisfy the written notice requirement from the September Agreements.

---

[4488] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 14.

[4489] Examiner's Interview of Jamie L. Dimon, Sept. 29, 2009, at pp. 9-10.

[4490] Guaranty (Sept. 9, 2008), at p. 5 [JPM-2004 0005813] (Section 13 states: "No amendment or waiver of any provision of this Guaranty . . . shall be effective unless it is in writing and signed by the Bank, and then the waiver or consent shall be effective only in the specific instance and for the specific purpose for which given."); Security Agreement (Sept. 9, 2008), at p. 6 [JPM-2004 0005873] ("No provision hereof shall be modified or limited except by a written instrument expressly referred hereto and to the provision so modified or limited.").

[4491] *See* 22A N.Y. Jur. 2d *Contracts* § 486 (2009).

As noted above, the Examiner has not identified any such written request from Lehman to JPMorgan for the return of collateral. The Examiner specifically requested from JPMorgan, Alvarez & Marsal and the Creditors' Committee any evidence of any written requests, but none of those entities was aware of any written requests.[4492] Accordingly, and assuming the validity of the September Agreements, the Examiner concludes there is insufficient evidence to support a colorable claim that JPMorgan breached agreements with Lehman by refusing to return collateral to Lehman following the execution of the September Agreements.[4493]

> **(f) There Is Evidence to Support a Colorable, But Not Strong, Claim That JPMorgan Breached the Implied Covenant of Good Faith and Fair Dealing by Demanding Excessive Collateral in September 2008**

The Examiner concludes that there is evidence to support a colorable claim that JPMorgan breached the implied covenant of good faith and fair dealing by making excessive collateral requests of Lehman during September 2008. The claim is not strong,

---

[4492] There is some circumstantial evidence suggesting that at various times between September 11 and September 15, Lehman executives informally inquired about the return of collateral. *E.g.*, Examiner's Interview of Steven Berkenfeld, Oct. 5 & 7, 2009, at p. 21 (Berkenfeld stated that on a telephone call on the afternoon of September 14 he asked Dimon to return collateral); e-mail from Michael Gelband, Lehman, to Herbert H. (Bart) McDade III, Lehman (Sept. 12, 2008) [LBEX-AM 001337] (discussing the need to pressure JPMorgan for return of collateral). These requests are discussed in detail in Section III.A.5.b.1.m of this Report. The Examiner, however, has found no evidence that any of these informal requests were sent in written form as required by the September Agreements.

[4493] Notably, Lowitt told the Examiner that even if JPMorgan had agreed to return some collateral to Lehman, the larger issue for Lehman was that Lehman had lost enormous amounts of secured funding and the confidence of the market. Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at pp. 22-23.

however, because of evidence that the requests were reasonable and that Lehman waived any such claim by complying with the requests.

### (i) Legal Standards Governing Implied Covenant of Good Faith and Fair Dealing

Under New York common law, implicit in every contract is the covenant of good faith and fair dealing.[4494]  To succeed on a claim for breach of the covenant of good faith and fair dealing, a plaintiff must prove "1) fraud, 2) malice, 3) bad faith, 4) other intentional wrongdoing, or 5) reckless indifference to the rights of others such as gross negligence."[4495]  Where a contract contemplates the exercise of discretion, the duty of good faith and fair dealing "includes a promise not to act arbitrarily or irrationally."[4496]  However, a "party to a contract is allowed to act in its own self-interest consistent with its rights under the contract."[4497]

The plaintiff must show that the defendant's conduct infringed on the plaintiff's "actual rights or benefits embodied in the underlying contract,"[4498] and "[n]o obligation can be implied . . .  which would be inconsistent with other terms of the contractual relationship."[4499]  In addition, New York law "does not recognize a separate cause of

---

[4494] *Cont'l Cas. Co. v. State of N.Y. Mortgage Agency*, No. 94 Civ. 8408, 1998 WL 513054, at *13 (S.D.N.Y. Aug. 18, 1998).

[4495] *Cont'l Cas.*, 1998 WL 513054, at *13 (internal citation and quotation mark omitted).

[4496] *Citibank v. United Subcontractors, Inc.*, 581 F. Supp. 2d 640, 645 (S.D.N.Y. 2008) (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)).

[4497] *Id.* at 646.

[4498] *Sch. Dist. of Erie v. J.P. Morgan Chase Bank*, Nos. 08 CV 07688, 08 CV 07982, 2009 WL 234128, at *5 (S.D.N.Y. Jan. 30, 2009).

[4499] *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983).

action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled."[4500]  A claim for breach of the implied covenant "will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract."[4501]

New York courts have allowed claims for breach of the duty of good faith and fair dealing to proceed where a plaintiff alleges that a bank has valued its secured position in bad faith.  For example, in *CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*,[4502] the court denied Wachovia's motion for judgment on the pleadings as to plaintiff's claim that Wachovia breached the implied covenant of good faith and fair dealing where the plaintiff alleged that Wachovia had acted "arbitrarily and irrationally" in its capacity as "Valuation Agent" under ISDA agreements between the parties.[4503]  When the plaintiff challenged a collateral demand made by Wachovia,

---

[4500] *CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, No. 07 Civ. 11078, 2009 U.S. Dist. LEXIS 59540, at *19 (S.D.N.Y. July 13, 2009) (quoting *Harris v. Provident Life & Accidental Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)).

[4501] *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997) (quoting *Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 914 F. Supp. 964, 989 (S.D.N.Y. 1995), *modified by* 914 F. Supp. 997 (S.D.N.Y. 1996)).

[4502] No. 07 Civ. 11078, 2009 U.S. Dist. LEXIS 59540 (S.D.N.Y. July 13, 2009).

[4503] *Id.* at *21-22; *see also Mallon Res. Corp. v. Midland Bank, PLC*, No. 96 Civ. 7458, 1997 U.S. Dist. LEXIS 10346, at *8 (S.D.N.Y. July 17, 1997) (denying motion to dismiss claim of breach of covenant of good faith and fair dealing where contract allowed defendant in its discretion to determine a "Borrowing Base" premised upon values assigned to plaintiff's assets, where plaintiff alleged that its business was successful and its reserves had substantially increased).  Notably, however, the court held that the plaintiff failed to state a breach of contract claim based on Wachovia's collateral demands where the contract at issue "unambiguously provide[d] Wachovia with the right to make [collateral] demands" and

Wachovia, in its capacity as Valuation Agent, was required to recalculate its exposure.[4504] Wachovia confirmed the legitimacy of the collateral request and ultimately demanded that plaintiff post collateral in excess of the notional amount of the contract – a result that the plaintiff alleged was "absurd."[4505] The court held these allegations sufficient to state a claim for breach.[4506]

In addition, under N.Y. U.C.C. Law Section 1-203, JPMorgan had an obligation of good faith in its performance or enforcement of its various security agreements with Lehman.[4507] N.Y. U.C.C. Law Section 9-102, which applies to secured transactions, defines "[g]ood faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing."[4508] The second clause of this definition – "the observance of reasonable commercial standards of fair dealing" – establishes an objective standard for

---

the plaintiff "complied with Wachovia's [collateral] demands on fourteen occasions without exercising its right . . . to challenge the . . . demands." *CDO Plus Master*, 2009 U.S. Dist. LEXIS 59540, at *15-17.

[4504] *CDO Plus Master*, 2009 U.S. Dist. LEXIS 59540, at *5-6.

[4505] *Id.* at *7, *21.

[4506] *Id.* at *22. The determination of good faith is generally a question of fact. *See Pernet v. Peabody Eng'g Corp.*, 248 N.Y.S.2d 132, 135 (App. Div. 1964).

[4507] N.Y. U.C.C. Section 1-208 also imposes an obligation to act in good faith in the request of additional collateral. The annotations to Section 1-208 refer to it "as an application of [Section] 1-203 which imposes a general obligation of good faith upon the parties in performing or enforcing obligations." N.Y. U.C.C. Law § 1-208 N.Y. annotations (McKinney's 2001).

[4508] N.Y. U.C.C. Law § 9-102(a)(43). This definition of "good faith" applies both under Section 1-203 and Section 1-208. The official comment to Revised Article 9 notes that Section 9-102's definition of "good faith" – which includes the objective consideration of "the observance of reasonable commercial standards of fair dealing" – applies "for purposes of the obligation of good faith imposed by Section 1-203." *Id.* § 9-102(a)(43) official cmt. 19. Section 1-208 cross-references Section 1-201, *id.* § 1-208 official cmt., which provides an alternate definition of "[g]ood faith" as "honesty in fact in the conduct or transaction concerned," *id.* § 1-201(19). This alternate definition of "good faith" provided in Section 1-201, however, is "[s]ubject to additional definitions contained in the subsequent Articles of this Act which are applicable to specific Articles or Parts thereof," including the definition of "good faith" provided in Section 9-102. *See id.* § 1-201. Thus, the definition of "good faith" provided in Section 9-102 would also control the obligations imposed by Section 1-208.

good faith, in addition to the requirement of "honesty in fact."[4509]   Under the objective

component of the standard, JPMorgan was required to observe reasonable commercial

standards of fair dealing in the determination of its collateral demands from Lehman.

> **(ii) There Is Sufficient Evidence To Support a Colorable, But Not a Strong, Claim That JPMorgan Violated the Implied Covenant by Demanding Excessive Collateral**

The September Guaranty provided that LBHI's "maximum liability under this

Guaranty shall be THREE BILLION DOLLARS ($3,000,000,000) or such greater amount

that *the Bank has requested from time to time as further security* in support of this

Guaranty."[4510]   The September Security Agreement, in turn, provided "that the Bank

may from time to time request further security or payments on account of any of the

Liabilities [including Liabilities as defined in the Guaranty]."[4511]   As discussed in detail

above,[4512] the definition of "Liabilities" in the Guaranty had been greatly expanded to

---

[4509] *See Christie's Inc. v. Davis*, 247 F. Supp. 2d 414, 421 (S.D.N.Y. 2002) (applying Section 9-102 definition of "good faith" to reasonableness of presale valuations and noting that "the fact that of the 52 items of collateral that have been auctioned, only 9 sold for more than their high presale estimate, and most were well within the two estimates"); *see also Wawel Savings Bank v. Jersey Tractor Trailer Training, Inc. (In re Jersey Tractor Trailer Training, Inc.)*, 580 F.3d 147, 156 (3d Cir. 2009) (finding that identical definition of "good faith" under New Jersey U.C.C. provision governing secured transactions "has both a subjective prong – 'honesty in fact' – and an objective prong – observance of 'reasonable commercial standards of fair dealing'"); *Bank of Am., N.A. v. Prestige Imports,* 917 N.E.2d 207, 218 n.25 (Mass. App. Ct. 2009) (noting that Massachusetts' revision of U.C.C. definition of "good faith" to "honesty in fact and the observance of reasonable commercial standards of fair dealing" adds "an objective component to the previously subjective definition"); *Sunoco, Inc. (R & M) v. Honeywell Int'l Inc.*, No. 05CIV7984, 2006 WL 709202, at *6 (S.D.N.Y. Mar. 21, 2006) (observing that an almost-identical definition of "good faith" under the Pennsylvania Commercial Code "has a subjective and objective component").

[4510] Guaranty (Sept. 9, 2008), at p. 2 [JPM-2004 0005813] (emphasis added).

[4511] Security Agreement (Sept. 9, 2008), at p. 5 [JPM-2004 0084861].

[4512] *See supra* at Section III.A.5.b.2.e.i.

cover any type of Lehman obligation to JPMorgan and its affiliates.[4513]  Thus, the September Agreements established that JPMorgan had the discretion to make additional collateral requests to cover any of its liabilities with Lehman, but the September Agreements did not expressly define how JPMorgan was to calculate its exposure.  Under these circumstances, JPMorgan's discretion was limited by its common law duty to avoid acting in an arbitrary or irrational manner, and by its duty under the New York U.C.C. to exhibit honesty in fact while observing reasonable commercial standards of fair dealing.[4514]

It is standard in the industry to request and hold collateral with market value in excess of a loan amount.[4515]  The Examiner is aware of no clear-cut definition, however, as to how much collateral cushion is "too much" – for example, at what point a bank's legitimate demands for self-protection in the face of uncertainties in exposure and valuation of existing collateral become arbitrary or irrational.  A trier of fact would almost certainly require expert testimony as to objective standards of reasonable conduct in estimating exposure and assessing and valuing collateral.[4516]

---

[4513] Guaranty (Sept. 9, 2008), at p. 1 [JPM-2004 0005813].

[4514] *See supra* at Section III.A.5.b.2.f.i (discussing legal background).

[4515] *See* Current Issues: PDCF, at p. 2 (noting that clearing banks require collateral with a higher market value than the amount a lender can borrow).

[4516] In addition, the parties would likely seek to introduce studies or literature relevant to ascertaining typical industry practices as to capitalization, margin and collateral practices of clearing banks.  *See, e.g.,* NewBank Working Group Report.

Based on testimony and evidence as to reasonable commercial practices in the industry, the trier of fact would then need to evaluate the reasonableness of JPMorgan's requests and whether JPMorgan had acted irrationally or arbitrarily – in addition to evaluating whether JPMorgan subjectively exhibited "honesty in fact."

There are sufficient competing facts for a trier of fact to resolve as to whether JPMorgan acted reasonably,[4517] and thus the Examiner concludes a colorable claim exists. Some of JPMorgan's own documents suggest that JPMorgan recognized it was overcollateralized during the days leading up to Lehman's bankruptcy. For example, JPMorgan's Ricardo Chiavenato prepared a series of analyses concerning JPMorgan's triparty-repo exposure that suggested that JPMorgan was sufficiently collateralized at least as of September 10, 2008.[4518] Starting on September 11, 2008, Craig Delany did the same.[4519] One version of Delany's analysis suggests that JPMorgan was overcollateralized by as much as $6.1 billion on September 12.[4520] These documents could be interpreted to suggest that JPMorgan understood it was more than adequately collateralized as to clearing risks.[4521]

---

[4517] The Examiner hereinafter uses the term "reasonably" as shorthand to encompass both the U.C.C. standard and the common law standard of good faith and fair dealing.

[4518] *See supra* at Section III.A.5.b.1.k.

[4519] *See supra* at Section III.A.5.b.1.l.

[4520] *See* JPMorgan, Spreadsheet, at p. 8 [JPM-2004 0029769].

[4521] In addition, an internal JPMorgan e-mail could be interpreted to suggest that JPMorgan believed it was overcollateralized as of September 15. *See* e-mail from Heidi Miller, JPMorgan, to Jamie Dimon, JPMorgan, *et al*. (Sept. 15, 2008) [JPM-2004 0006510] ("All we need to talk this morning about the calls Leh has been making about having us return a portion of our excess collateral to their holding co. We have

There is also substantial evidence to support a contention that JPMorgan's collateral requests were reasonable. First, both Chiavenato's and Delany's analyses accounted only for JPMorgan's triparty-repo exposure to Lehman. The September Agreements, however, expanded LBHI's obligations under the Guaranty and Security Agreement to all manner of liabilities between Lehman and JPMorgan. Thus the written analyses do not reflect JPMorgan's full range of exposures under the September Agreements.[4522] As discussed above, JPMorgan stated that it based the September 9 collateral request on its Investment Bank exposure – a request that Black characterized as "art, not science."[4523] Second, it was reasonable for JPMorgan to have taken into account Lehman's rapidly deteriorating financial condition and the risk of a Lehman failure. There is evidence, for example, suggesting that JPMorgan continued to accept novations from Lehman counterparties, and that novation requests were increasing over time.[4524] Ultimately, because the JPMorgan September 9 request was based on "art" and not science, a trier of fact will have to evaluate expert testimony and

---

taken the position that their is no excess but they have not yet accepted that. We should make sure our statements are consistent since I am sure you will soon get called as well").

[4522] Several JPMorgan witnesses stated that JPMorgan could have justified a request for more collateral than JPMorgan ultimately demanded. *See supra* at Section III.A.5.b.1.g.

[4523] *See id.* Note, however, that Dellosso, in an internal e-mail, referred to the new collateral as covering intraday exposure. *See* e-mail from Donna Dellosso, JPMorgan, to Steven D. Black, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0006377] ("[Lehman] will maintain collateral of $4bln to cover intra-day exposure."). JPMorgan's largest Investment Bank exposure to Lehman was in the form of derivative transactions. While Lehman and JPMorgan employed standard ISDA and credit support agreements to mitigate counterparty risk, each party still faced the risk that, in the event of a default, it would not be able to replace the defaulted trades at the previously understood market value. At the time of the September 9 collateral request, JPMorgan also had exposure due to its provision of a $2 billion credit line to LBIE. *See supra* at Section III.A.5.b.1.i.

[4524] *See supra* at Sections III.A.5.b.1.k & III.A.5.b.2.b.

determine whether the amount JPMorgan arrived at was consistent with reasonable commercial standards.

With respect to JPMorgan's September 11 collateral request, JPMorgan witnesses contend that the internal JPMorgan analyses discussed above, which imply overcollateralization, did not reflect JPMorgan's concerns with specific elements of the existing Lehman collateral. Chiavenato stated that his written analysis assumed the full face value of $3 billion for the "Fenway" commercial paper even though he knew that there was a problem with its valuation,[4525] and that his analysis did not account for dealer-pricing of collateral in the triparty shell.[4526] Delany similarly stressed that his analysis accepted all valuations of triparty-shell collateral in the BDAS system as accurate.[4527] In addition, as with the September 9 request, the reasonableness of the September 11 request must be analyzed in part based on Lehman's deteriorating position in the market.

---

[4525] As discussed above, Delany concluded that RACERS and Fenway were problematic because of their structure (commercial paper and short-term notes credit-enhanced by Lehman) and because of the illiquidity of the underlying assets. Delany concluded that RACERS and Fenway should be considered greatly devalued, far below their $8 billion assigned face value. *See supra* at Section III.A.5.b.1.l; *see also infra* Section III.A.5.c.1.c.ii (Citigroup witness characterized CLOs offered by Lehman to Citigroup – including Freedom, Spruce and Verano – as "bottom of the barrel" and "junk"). Because LBHI was the ultimate liquidity and credit provider for the Fenway securities, Fenway was effectively equivalent to Lehman short-term debt that would pay principal at maturity only if Lehman remained creditworthy. Stated differently, Fenway's value would drop precipitously upon a Lehman default, and it was not unreasonable for JPMorgan to have discounted its value as collateral.

[4526] *See supra* at Section III.A.5.b.1.k.

[4527] *See supra* at Section III.A.5.b.1.l.

Furthermore, there are disputed issues of fact concerning the impact of post-petition events, if any, on an analysis of the reasonableness of JPMorgan's collateral demands in the first instance.[4528]  For example, according to JPMorgan, it has unpaid claims of $7.60 billion, against $7.14 billion of remaining cash and money market funds – suggesting it was undercollateralized, or at least that its collateral demands were reasonable.[4529]  In addition, JPMorgan also holds "unliquidated securities collateral" separately pledged by LBHI, LCPI and LBI for which JPMorgan asserts the value is not currently determinable.[4530]  The Examiner understands that the Estate contends the "unvalued collateral" is worth approximately $6 billion (and was worth that amount in September 2008), which would arguably imply that JPMorgan was more than $5 billion over-collateralized.[4531]  Ultimately, however, the Examiner concludes that JPMorgan's assessment of its exposure on September 9 and September 11, and the factors and data JPMorgan considered at that time, are the most probative evidence of whether JPMorgan acted reasonably and honestly in making the September collateral requests.

---

[4528] The trier of fact will have to determine the probative value, if any, of evidence as to the effect of post-September 11 activity (such as liquidations and valuations) on the question whether the collateral requests were reasonable at the time they were made.

[4529] Duff & Phelps, Ex Post Evaluation and Claims of JPM Collateralization (Jan. 15, 2010), at p. 1.  A trier of fact considering the probative value of these post-petition events would have to consider, among other things, the underlying validity of JPMorgan's post-petition claims (for example, whether JPMorgan is attempting to apply collateral to obligations that fall outside the scope of the September Guaranty), and the impact of intervening events after September 11 on the value of the collateral Lehman originally provided.

[4530] *Id.* at p. 1.

[4531] *Id.* at p. 2.  In addition, JPMorgan continued to extend credit to Lehman the week of September 15, 2008, supported in part by collateral received from Lehman prior to September 15.  Those events, including the involvement of the FRBNY, are discussed in Section III.A.6.

The different potential interpretations of this evidence and the necessity of establishing industry standards by expert testimony are sufficient to support the existence of a colorable claim as to the reasonableness of JPMorgan's September 2008 collateral requests.

### (iii) A Trier of Fact Will Likely Have to Resolve a Waiver Defense

JPMorgan will likely raise a defense of waiver to any claim that JPMorgan breached its contractual obligations or duty of good faith and fair dealing in making the September 2008 collateral requests.  Under New York law, "[i]t is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach."[4532]  JPMorgan will likely contend that Lehman not only acceded to the September requests by posting collateral, but that Lehman also enjoyed the benefits of its actions by continuing to receive discretionary credit from JPMorgan.

A recent New York decision, *VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A. ("Citibank")*,[4533] applied the waiver doctrine to bar a claim of breach of the implied covenant of good faith and fair dealing.  In that case, VCG entered into a credit

---

[4532] *VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334, 342 (S.D.N.Y. 2008) (quoting *Nat'l Westminster Bank v. Ross, U.S.A.*, 130 B.R. 656, 675 (S.D.N.Y. 1991), *aff'd sub nom. Yaeger v. Nat'l Westminster*, 962 F.2d 1 (2d Cir. 1992)), *reconsideration denied,* No. 08-CV-01563, 2009 WL 311362 (S.D.N.Y. Jan. 29, 2009), *aff'd*, No. 08-5707-cv, 2009 WL 4576542 (2d Cir. Dec. 8, 2009).
[4533] 594 F. Supp. 2d 334.

default swap transaction with Citibank. Although the parties disagreed as to whether their contract allowed Citibank "to demand additional collateral (or 'variation margin') based upon a downward movement in the daily 'mark-to-market value' of the underlying reference obligation," Citibank demanded collateral from VCG four times over a span of weeks.[4534] While VCG delivered the collateral each time, VCG alleged that it questioned Citibank's evaluation of its credit risk under the transactions. VCG claimed that it delivered the sums out of fear that Citibank might use a refusal to deliver the collateral as a reason to declare a technical default under the agreements.[4535] The Court found VCG had waived its breach of contract claim, concluding that "[g]iven VCG's actual posting of the disputed credit support, and its receipt of Citibank's regular payments during this time, VCG cannot now claim that Citibank breached the CDS Contract by wrongly demanding additional collateral."[4536] The Court then applied the same reasoning to conclude that VCG had also waived its claim that Citibank breached the implied covenant of good faith and fair dealing.[4537]

JPMorgan could argue that Lehman similarly waived any breach of the implied covenant of good faith and fair dealing by posting collateral in response to JPMorgan's

---

[4534] *Id.* at 338. The Court later stated that it disagreed with VCG's contract interpretation and noted that "[t]he Credit Support Annex allowed Citibank to request additional collateral from VCG." *Id.* at 342.

[4535] *Id.* at 338.

[4536] *Id.* at 342-43. The Court also noted that VCG was barred from challenging Citibank's request for additional collateral because the Credit Support Annex to the contracts in question had a Dispute Resolution provision with which VCG failed to comply. *See id.* at 343.

[4537] *Id.* at 344 ("With regard to VCG's allegation of a breach of the implied covenant on the basis of variation margin, . . . this claim is waived in light of VCG's continued posting of the demanded collateral and acceptance of the benefits of the CDS Contract.").

demands. The September Security Agreement and September Guaranty specifically allowed JPMorgan to make collateral requests to secure a broad range of obligations.[4538] Furthermore, like VCG's actions in *Citibank*, even though Lehman at times questioned JPMorgan's valuation of Lehman's collateral or the size of JPMorgan's requests,[4539] Lehman ultimately posted additional collateral in response to the September 9 and September 11 requests.

There is also evidence available to Lehman to contest a defense of waiver. Lehman did not provide the full $5 billion requested on September 9 by JPMorgan, suggesting that Lehman did not entirely cede to JPMorgan's demands.[4540] Also, there are reports that Lehman did resist the collateral requests, especially on September 11, when they were first communicated by JPMorgan.[4541] For example, there is evidence that Fleming and Tonucci communicated to Doctoroff on September 10 Lehman's view that JPMorgan's requests for collateral were "somewhat arbitrary" as was JPMorgan's valuation of collateral.[4542] The Estate could argue that such resistance was sufficient to

---

[4538] *See* Security Agreement (Sept. 9, 2008), at p. 5 [JPM-2004 0084865]; Guaranty (Sept. 9, 2008), at p. 2 [JPM-2004 0005813].

[4539] *See supra* at Section III.A.5.b.1.

[4540] *See id., supra.* Lehman's objections to the full amount of the demand may not, however, excuse a waiver as to the amounts it did provide.

[4541] *See id., supra.*

[4542] *See* e-mail from Mark G. Doctoroff, JPMorgan, to Donna Dellosso, JPMorgan, *et al.* (Sept. 11, 2008) [JPM-2004 0061651] (reporting the impression of Fleming and Tonucci); *see also* e-mail from Donna Dellosso, JPMorgan, to Steven D. Black, JPMorgan, *et al.* (Sept. 10, 2008) [JPM-2004 0061485] (reporting that while Tonucci confirmed that Lehman "will maintain collateral of $4bln to cover intra-day exposure," Tonucci believed JPMorgan had "excess collateral in [Lehman's] UK and US boxes that in addition to the cash and money market funds likely exceeds our $4bln request").

constitute a notice to JPMorgan of its breach of the implied covenant of good faith and fair dealing.[4543] Finally, there are reports of requests from Lehman for return of its collateral, including evidence to support the contention that Lehman believed that the $5 billion posted in response to the September 11 request would be returned at the end of the day on September 12.[4544] This evidence could support the position that Lehman's posting of collateral was not a waiver because it was not "an intentional and voluntary relinquishment of a known right."[4545] Thus, there are credible disputed issues of material fact concerning whether JPMorgan would ultimately succeed on a defense of waiver.

The Examiner concludes that there is sufficient evidence to determine that a colorable claim exists for breach of the implied covenant of good faith and fair dealing, but that the claim is not strong because of substantial evidence that JPMorgan was neither arbitrary nor irrational in its requests for collateral pursuant to its broad discretion under the September Agreements, and because of evidence that Lehman

---

[4543] "[A] party to an agreement who believes it has been breached may elect to continue to perform the agreement rather than terminate it, and later sue for breach; this is true, however, only where notice of the breach has been given to the other side." *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991), *aff'd sub nom. Yaeger v. Nat'l Westminster*, 962 F.2d 1 (2d Cir. 1992). *But cf. Citibank*, No. 08-CV-01563, 2009 WL 311362, at *2 (S.D.N.Y. Jan. 29, 2009) (denying motion for reconsideration; "VCG's hindsight explanations for why it failed to object to the collateral demands do not constitute notice of a breach to Citibank. Neither do VCG's attempts to introduce 'expert discovery' to demonstrate that ISDA documents have not caught up with the substance of the transaction at issue.").

[4544] *See supra* at III.A.5.b.1.

[4545] *Citibank*, 2009 WL 311362, at *2.

waived the right to assert such a claim by complying with the collateral requests without asserting a breach, and by accepting benefits from JPMorgan.

### c) Lehman's Dealings With Citigroup

This Section analyzes Lehman's relationship with Citigroup, Inc., another of its clearing banks, and certain of its subsidiaries and affiliates ("Citi" or "Citibank"), focusing predominantly on the parties' interaction in 2008.

#### (1) Facts

##### (a) Citigroup Provided Continuous Linked Settlement Service and Other Clearing and Settlement Operations to Lehman

Citigroup provided a wide array of financial services to Lehman, including "the establishment and maintenance of cash deposit and custodial accounts, the provision of credit facilities, trade clearing and settlement services, agency and trust services, foreign exchange-related services, and securities lending."[4546]

###### (i) Background Information on the Continuous Linked Settlement Service Citi Provided to Lehman

Citibank, N.A. (London) was the Designated Settlement Member on the CLS system for Lehman's broker-dealer, LBI, and three other Lehman subsidiaries.[4547] The

---

[4546] Statement of Citigroup, Inc. in Support of Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, at p. 2 (¶ 1), Docket No. 110, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008). In addition, Citi was counterparty to some Lehman entities in connection with "thousands of trading positions under numerous financial contracts such as interest-rate and foreign-exchange swap agreements, securities contracts, and repurchase agreements." *Id.*

[4547] Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, Ex. A, Docket No. 109, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008). The LBI-Citibank CLS relationship was established by a "CLS Settlement

CLS system is a trading platform, operated by a consortium of banks, for the clearance and settlement of foreign exchange ("FX") trades.[4548]   Approximately 80 percent of Lehman's FX trades went through CLS.[4549]

In the CLS community, Lehman was a shareholder and "user member," while Citi was Lehman's "settlement member."[4550]   As a "user member" of the CLS system, Lehman relied on Citi to execute FX trades in the CLS system by making payments to the CLS Bank[4551] at scheduled times throughout the day.[4552]   Each member submitted trades on a gross basis, and the system then determined a payment schedule setting forth net amounts companies had to pay in at certain times and for various currencies.[4553]   By executing Lehman's FX trades in the CLS system, Citi indicated its acceptance of those trades, extended intraday credit to the Lehman entity, and assumed

---

Services Agreement for CLS User Members" dated December 19, 2003.  *Id*. at p. 1.  This CLS clearance agreement was amended and restated in a "Citibank CLS Settlement Services Amended and Restated Agreement for CLS User Members" dated October 28, 2004.  *Id*.  References to the "CLS Agreement" refer to the Agreement as amended and restated.

[4548] *See* CLS, About CLS, http://www.cls-group.com/About/Pages/default.aspx (last visited Dec. 23, 2009).

[4549] Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 6.

[4550] *Id*. at p. 5.  A settlement member "has a single multi-currency account with CLS Bank" and may submit payment instructions relating to its own FX transactions in addition to FX transactions of its customers.  *See* CLS, Our Community, http://www.cls-group.com/About/Community/Pages/default.aspx (last visited Dec. 30, 2009).  A user member, on the other hand, does not have an account with the CLS Bank and must submit its payment instructions through its settlement member.  *Id*.  The settlement member must then authorize the user member's instruction, at which point, the settlement member becomes "responsible for all funding obligations" related to the user member's instructions.  *Id*.

[4551] CLS Bank is owned by the foreign exchange community and operates the largest multi-currency cash settlement system.  CLS, About CLS, http://www.cls-group.com/About/Pages/default.aspx (last visited Dec. 23, 2009).

[4552] Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 5.

[4553] *Id*.

a corresponding amount of intraday risk in connection with that credit.[4554]   After Citi

authorized Lehman's payment instructions, Citi was obligated to settle all of Lehman's

currency payments to the CLS Bank.[4555]

The timing for payments to the CLS Bank was such that Citi's payments into the

system on Lehman's behalf preceded currency funding and payment cutoff times,

which meant that Citi often had to pay the CLS Bank monies Lehman owed before

Lehman received funds from non-CLS settlement trades.[4556]   For instance, Citi paid

Japanese Yen to the CLS Bank for Lehman's obligations well before Citi received U.S.

dollars into Lehman's accounts, thus leaving Citi at risk for the Japanese Yen amount if

Lehman's U.S. dollar funds did not come in.[4557]   Prior to 6:00 p.m. New York time each

business day, Citi had the option of not settling the CLS transactions, but, after 6:00

p.m., Citi was "irrevocably committed to settle" the CLS transactions.[4558]   Typically, Citi

---

[4554] *Id.*; *see also* Lehman, Citibank Clearing and Intraday Credit (June 17, 2008), at p. 1 [LBHI_SEC07940_745595].

[4555] Lehman, Citibank Clearing and Intraday Credit (June 17, 2008), at p. 1 [LBHI_SEC07940_745595].

[4556] *Id.* at p. 2.

[4557] E-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al.* (June 17, 2008) [CITI-LBHI-EXAM 00073791]; *see also* e-mail from Julius Silbiger, Citigroup, to Thomas Obermaier, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00065668] (explaining that Japanese Yen had been released late that day and all other Asian Currencies had been approved for release, creating a daylight overdraft limit overdraft of $1.4 billion which was scheduled to be repaid later in the day on September 10 when U.S. dollars came in).

[4558] Citigroup, Overview of GTS Clearing and Settlement Lines (Sept. 4, 2008), at p. 4 [CITI-LBHI-EXAM 00102127].

received an overview of the next day's anticipated CLS payment flows by 6:30 p.m. the previous evening.[4559]

As part of its FX business on the CLS system, Lehman consolidated its currency-specific "nostro" accounts with Citi.[4560]  A nostro account is "an account one bank holds with a bank in a foreign country, usually in the currency of that foreign country."[4561]  For instance, a Lehman Japanese Yen nostro account would exist at Citi in Tokyo because the payments and receipts occurred during Tokyo business hours.[4562]  At the end of the day, the nostro accounts should have had a zero balance because the accounts were used to facilitate purchases and sales where Lehman would buy Japanese Yen from one entity and sell the Japanese Yen to another entity in the same day.[4563]

### (ii) Other Clearing and Settlement Services That Citi Provided to Lehman

Citi provided other clearing and settlement services to Lehman in addition to CLS.  Citi served as Lehman's primary cash clearer and a significant provider of custody and clearing services in emerging markets, as well as a provider of those services in the United States.[4564]  Citi Direct Custody and Clearing facilitated

---

[4559] E-mail from Janet Birney, Lehman, to Robert Eby, Lehman, *et al.* (Sept. 10, 2008) [LBEX-AM 008560].

[4560] Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 5.

[4561] *See* InvestorWords.com, Nostro Account, http://www.investorwords.com/3348/nostro_account.html (last visited Dec. 23, 2009).

[4562] Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 5.

[4563] *Id.*

[4564] Lehman, Citibank Clearing and Intraday Credit (June 17, 2008), at p. 1 [LBHI_SEC07940_745595].

international clearing and settlement of securities transactions.[4565]  Occasionally, Citi had to extend intraday credit to pay out cash or transfer securities in connection with securities transactions on behalf of Lehman if insufficient funds or securities were available in Lehman's account at the time when payments were required.[4566]

As Lehman's cash clearer in emerging markets and in the United States, Citi provided uncommitted clearing lines, which meant the lines could be cancelled at Citi's discretion.[4567]  Generally, Citi expected Lehman to cover the intraday credit extended by the day's end in New York.[4568]

As of May 31, 2008, Citi provided Lehman with substantial clearing lines to support the business Lehman transacted on Citi's Global Transaction Services Securities and Cash Clearing business.[4569]  Among the 26 countries in which Citi extended a clearing line to Lehman were:  the United Kingdom ($6.3 billion), the United States ($5.9 billion), Italy ($3.1 billion), Japan ($1.8 billion), Canada ($500 million) and Mexico ($500 million).[4570]  As Lehman's Global Transaction Services clearing agent, Citi served as an

---

[4565] Citigroup, Overview of GTS Clearing and Settlement Lines (Sept. 4, 2008), at p. 3 [CITI-LBHI-EXAM 00102127].

[4566] *Id*.

[4567] *Id*. at p. 5.

[4568] *See* e-mail from Julius Silbiger, Citigroup, to Thomas Obermaier, Citigroup, *et al*. (Sept. 9, 2008) [CITI-LBHI-EXAM 00065668] (concerning intraday credit limit overdraft created by processing payments of Japanese Yen on Lehman's behalf would be repaid by U.S. dollars later in the day on September 10).

[4569] Citigroup, Lehman Brother Holding Inc. (Exposure Summary) (as of May 31, 2008), at p. 1 [CITI-LBHI-EXAM 00110721].

[4570] *Id*.

intermediary between Lehman and its trade counterparties, acting as both buyer and seller for the securities trades.

### (iii) Citi's Clearing and Settlement Exposure to Lehman, Generally

As of mid-June 2008, Lehman had approximately 487 bank accounts with Citi in the United States, Europe and Asia.[4571] By then, Citi had pared back to $3 billion the intraday-credit amounts provided in the aggregate for CLS and non-CLS eligible currencies, $3 billion for U.S. dollar clearing and $1.2 billion for Asian currencies.[4572] These aggregate intraday-credit allotments were divided among various Lehman facilities and subsidiaries.[4573] In order to exceed the set credit limits, an excess approval request had to be submitted to Citi Risk personnel in the New York office; local Citi personnel outside of New York did not have the authority to authorize a Lehman transaction to be paid if it exceeded the established credit limit.[4574]

---

[4571] Lehman, Citibank Clearing and Intraday Credit (June 17, 2008), at p. 1 [LBHI_SEC07940_745595].

[4572] *Id.*

[4573] *See* e-mail from Risk Systems Support Europe group, Citigroup, to CMB CRMS LatAm group, Citigroup (Sept. 9, 2008) [CITI-LBHI-EXAM 00007751] (Lehman Brothers Incorporated had a $10 million settlement risk limit for its Chile unit); e-mail from Risk Systems Support Europe group, Citigroup, to CMB CRMS Asia group, Citigroup (Sept. 9, 2008) [CITI-LBHI-EXAM 00006741] (Lehman Brothers Securities Taiwan had a direct risk limit of approximately $10 million through Citi).

[4574] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 7; *see also* e-mail from Thomas Fontana, Citigroup, to Anna Jankowiak, Citigroup, *et al.* (June 26, 2008) [CITI-LBHI-EXAM 00042270] (Fontana approved a $6.2 million excess for a Lehman Brothers RR3 transaction); e-mail from Melissa J. Torres, Citigroup, to Anna Jankowiak, Citigroup, *et al.* (July 2, 2008) [CITI-LBHI-EXAM 00042500] (Torres approved a $1.3 million excess for a Lehman Brothers RR3 transaction).

According to officials at Citi, Lehman rarely made it through a day in the spring of 2008 without being overdrawn at some point.[4575] According to Lehman, it exceeded its CLS intraday credit line because of an imbalance between CLS and non-CLS trades, which, once realized, Lehman was able to monitor and control better by having its FX desk trade in or out of CLS as necessary.[4576] Following discussions with Lehman in June 2008, Citi analyzed Lehman's usage of the daylight overdraft limit during the week of June 23 to June 27, 2008.[4577] Because Citi did not have the "technology to systemically track intraday exposure," Citi created a manual process through which local Citi staff physically noted Lehman's cash and securities overdraft positions on an hourly basis over those five days.[4578] The exercise was carried out in seven major markets that accounted for 94 percent of Lehman's clearing lines with Citi.[4579] However, the manual nature of the process made it prone to human error.[4580] Nevertheless, Citi came to the conclusion through this exercise that Lehman's *average* daily daylight overdraft limit usage for cash and securities clearing combined ranged from $1.457 billion to $2.53

---

[4575] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (July 11, 2008) [CITI-LBHI-EXAM 00076243] (noting that that day was the first time in more than three months that Lehman was not overdrawn at all); *see also* e-mail from Katherine Lukas, Citigroup, to Seamus Kennedy, Citigroup, *et al.* (May 2, 2008) [CITI-LBHI-EXAM 00023281] (reporting Lehman used the full CLS clearing line of $3 billion and exceeded that limit on a regular basis).

[4576] Lehman, Citibank Clearing and Intraday Credit (June 17, 2008), at p. 3 [LBHI_SEC07940_745595].

[4577] Citigroup Global Transaction Services Risk Management, Lehman: Intraday (DOL) Usage Profile (July 2, 2008), at p. 2 [CITI-LBHI-EXAM 00107335].

[4578] *Id.*

[4579] *Id.*

[4580] *Id.*

billion, while Lehman's actual minimum usage of the daylight overdraft limit was $7.741 million and the actual maximum usage was $10.354 billion.[4581]

### (iv) The Terms of Lehman's CLS Agreement with Citi

LBI and Citibank, N.A. (London) entered into a CLS Settlement Services Agreement for CLS User Members on December 19, 2003, and later agreed to the Citibank CLS Settlement Services Amended and Restated Agreement for CLS User Members ("Agreement" or "CLS Agreement") on October 28, 2004.[4582] For purposes of the issues analyzed by the Examiner, the October 28, 2004 version governs.[4583] The Agreement lists Lehman Brothers Commercial Corporation ("LBCC") as a "Permitted Affiliate," which meant that LBI could submit CLS transaction instructions on behalf of LBCC as well as itself.[4584] In addition to LBCC, Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers International (Europe) ("LBIE") were added as affiliates on November 8, 2007.[4585]

---

[4581] *Id*. at p. 6. Citi also measured the potential maximum usage for cash and securities clearing combined at $17.654 billion. *Id*.; *see also* e-mail from Vivek Tyagi, Citigroup, to Thomas Fontana, Citigroup, *et al*. (July 2, 2008) [CITI-LBHI-EXAM 00107333] (stating there "was a high degree of volatility over the week" that Citi performed this exercise).

[4582] Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, Ex. A at p. 1, Docket No. 109, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008).

[4583] *Id*. (specifying that the "Original Agreement is hereby amended and restated in its entirety").

[4584] *Id*. at pp. 1, 12-13.

[4585] *Id*.; Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, Ex. B at p. 1, Docket No. 109, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008). These four Lehman entities are the only entities that agreed to the terms of the CLS Agreement. Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, Ex. A at pp. 1, 12, Docket No. 109, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008); Motion of Debtors for Order, Pursuant

Under the CLS Agreement, LBI could submit transaction instructions for itself or the three Lehman "affiliates" either directly to the CLS Bank or through Citi.[4586]   As Lehman's "Designated Settlement Member," Citi had to authorize the transaction instructions that LBI submitted directly to the CLS Bank, and the decision whether to provide such authorization was to "be made in Citibank's sole discretion."[4587]   By authorizing a transaction in the CLS system, "Citibank necessarily assume[d] a credit exposure to CLS Bank" on Lehman's behalf.[4588]   Further, the Agreement provides:

> Unless Citibank has expressly agreed in writing to a committed credit facility and received a commitment fee therefore, any extension of credit on behalf of the Customer or a Permitted Affiliate is within Citibank's *sole discretion* and may be changed or discontinued at any time without prior notice, notwithstanding any other provision of this agreement, provided, however, that Citibank may not without Customer's consent, cancel or rescind any instruction that Citibank has previously authorized.[4589]

While the Agreement provided that Lehman could terminate the Agreement at any time, the Agreement required that Citibank provide 90 days' written notice before it could terminate the "Agreement as a whole or with respect to any Permitted

---

to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, Ex. B at p. 1, Docket No. 109, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008); *see also* Letter from Citibank, N.A., to Lehman Brothers Inc., *et al.*, re:  CLS Settlement Services Agreement (Sept. 15, 2008), at p. 2 [LBEX-DOCID 462068] (terminating the CLS Agreement with LBI, LBCC, LBSF and LBIE on the afternoon of September 15).

[4586] Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, Ex. A at p. 2 (¶ 1), Docket No. 109, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008).  The CLS Agreement also holds LBI responsible for any transaction submitted by an affiliate even if that affiliate is not a "Permitted Affiliate."  *Id.*

[4587] *Id.*

[4588] *Id.* at p. 3.

[4589] *Id.* (emphasis added).

Affiliate."[4590]  However, Citibank "reserve[d] the right to terminate this Agreement immediately, without notice" in other instances, including in the event of:  (1) a Default;[4591] (2) a bankruptcy, reorganization or receivership against any of the Transaction Parties or parent corporation; or (3) "upon the occurrence of a material adverse change in the financial or other condition of a Transaction Party."[4592]  Paragraph 8 of the Agreement specifies that the laws of England govern the Agreement.[4593]

### (b)  Lehman Provided a $2 Billion Cash Deposit with Citi on June 12, 2008 To Support its Clearing Needs

Following the near collapse of Bear Stearns in March 2008, Lehman's second quarter 2008 earnings preannouncement on June 9 of a $2.8 billion loss, and Lehman's announced changes in upper-management on June 12, Citibank requested a "comfort deposit" from Lehman to help cover Citi's risk exposure.[4594]  Consequently, on June 12,

---

[4590] *Id*. at p. 6 (¶ 6: Termination).

[4591] As defined in ¶ 6 of the CLS Agreement an event of Default with respect to a "Transaction Party shall exist immediately upon the occurrence of any of the following events with respect to that Transaction Party:  (i) Transaction Party fails to make any payment to Citibank to fund a short balance of such Transaction Party in any currency by the applicable cut-off time; (ii) Transaction Party has breached any obligation hereunder to make any payment other than a payment covered by (i) by the applicable due date and fails to remedy such default within ten (10) days after Customer's receipt of notice from Citibank advising Transaction Party of such failure to pay; or (iii) Transaction Party has breached any material obligation hereunder not covered by (i) or (ii) and fails to remedy such default within thirty (30) days after Customer's receipt of notice from Citibank detailing the nature of the claimed breach."  *Id*.  A "Transaction Party" is defined as the "Customer or the Permitted Affiliate on whose behalf an instruction is submitted with respect to a transaction to which it is a counterparty."  *Id*. at p.2 (¶ 1).

[4592] *Id*. at p. 6 (¶ 6).

[4593] *Id*. at p. 9 (¶ 8).

[4594] E-mail from Brian R. Leach, Citigroup, to Vikram S. Pandit, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00114115] (stating that Citi initially asked for $3 billion segregated but Lehman sent $2 billion in a call account).

Lehman posted a $2 billion deposit in an overnight call account with Citi.[4595]  Citi and Lehman had discussions for the next several months regarding Lehman pledging securities to cover intraday risk, but a formal pledge agreement was never executed.[4596] Instead, on September 9, 2008, Lehman signed an amendment to its 2004 Guaranty Agreement,[4597] adding nine subsidiaries to its holding company guaranty and an additional subsidiary on September 11.[4598]  Additionally, on September 12, Lehman and Citi amended their DSCA,[4599] which gave Citi stronger rights over the assets it held for Lehman.[4600]

---

[4595] E-mail from Daniel J. Fleming, Lehman, to Ian T. Lowitt, Lehman (June 12, 2008) [LBEX-AM 008608].

[4596] *See* e-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup (Sept. 10, 2008) [CITI-LBHI-EXAM 00075863] (discussing how Citi spent two months negotiating the collateral arrangement and should have had it completed long ago instead of the "fire drill" of getting the Guaranty Amendment on September 9).

[4597] Guaranty (Jan. 7, 2004) [LBEX-DOCID 1090071].

[4598] *See* Amendment 1 To Guaranty (Sept. 9, 2008) [LBEX-DOCID 090568] (executed version signed by Ian Lowitt and adding LBCC on September 11, 2008).  Even though LBCC was added to the Guaranty Amendment on September 11, the executed document retains "September 9, 2008" as the amendment date specified in the text.  As such, references in this Report to the "September 9 Guaranty Amendment" refer to the amendment as effective on the evening of September 11 with LBCC added.

[4599] The DCSA is alternatively titled the Direct Custody Agreement ("DCA") in the document signed on March 26, 1992, and referred to as the DCSA in the September 12, 2008 amendment.  However, the DCA and DCSA are the same document, amended by the Deed addendum on September 12, 2008.  For consistency, the Examiner refers to the 1992 version as the "DCSA," or "original DCSA," and the 2008 version as the "DCSA Amendment."  *See* Direct Custodial Services Agreement Deed (Sept. 12, 2008) [LBEX-DOCID 4263617] (referring to the DCSA entered into by LBI, then known as Shearson Lehman Brothers Inc., and Citibank on March 26, 1992), *and* Direct Custody Agreement for Citibank, N.A., Subsidiaries and Affiliates and Shearson Lehman Brothers Inc. (Mar. 26, 1992) [LBEX-DOCID 1091570].

[4600] Direct Custodial Services Agreement Deed (Sept. 12, 2008), at p. 2 [LBEX-DOCID 4263617].

### (i) The Market Environment and Other Circumstances Surrounding Citi's Request for the $2 Billion Cash Deposit on June 12

In March 2008, after the near collapse of Bear Stearns, counterparties and clearing banks turned their attention to those broker-dealers regarded as the next-most vulnerable. LBI, as the next-smallest, with its large leverage ratios and real estate-heavy balance sheet at the parent company level, was widely viewed as particularly vulnerable.[4601]

In addition, in a June 5, 2008 meeting with Citi, Lehman previewed its second quarter earnings announcement, disclosing an anticipated $2.6 billion loss.[4602] Subsequently, Lehman's then-CFO Callan formally delivered the earnings announcement on June 9 during a preannouncement call, where she reported an official loss amount of $2.8 billion.[4603] The market reacted negatively, and Lehman lost further credibility in the market when it also announced a $6 billion equity capital raise on June 9[4604] even though Callan had stated numerous times, including on February 6, 2008, that

---

[4601] Jenny Anderson, *At Lehman, Allaying Fears About Being the Next to Fall*, N.Y. Times, Mar. 18, 2008.

[4602] Lehman, Q2 2008 Update (June 4, 2008), at p. 2 [CITI-LBHI-EXAM 00078768]; e-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup, *et al*. (June 4, 2008) [CITI-LBHI-EXAM 00081461] (describing the agenda for the June 5 meeting as including a look at Lehman's second quarter results).

[4603] *Preliminary 2008 Lehman Brothers Holdings Inc. Earnings Conference Call - Final*, Fair Disclosure Wire, June 9, 2008.

[4604] *Id.* The $6 billion capital raise was comprised of $4 billion of common equity and $2 billion of mandatorily convertible preferred stock. *Id.*

Lehman had no interest in raising new common equity capital.[4605] Lehman announced

on June 12 that Callan and Gregory had been dismissed from their positions, although

Callan remained at Lehman in an investment-banking position[4606] until she resigned in

mid-July 2008.[4607]

Thus, as a result of Lehman's rapidly declining stock price, and negative market

reactions to Lehman's earnings preannouncement and changes in upper-management,

Citi experienced a three-fold increase in novation requests on June 12[4608] for a total of

approximately 26 novation requests to trade out of Lehman that week.[4609] Typically,

when a novation would occur, Citi would step in to face Lehman in place of one of

---

[4605] *Lehman Brothers Holdings Inc. at Credit Suisse Group Financial Services Forum - Final*, Fair Disclosure Wire, Feb. 6, 2008 ("We have no interest -- and someone may ask me this question at some point, in raising new common equity capital."); *see also* Citigroup, Initial Classification Memorandum (June 13, 2008), at p. 1 [CITI-LBHI-EXAM 00051049] (noting that Lehman's "management team's credibility however has come under fire with 3 additional capital raises since January after the company indicated it did not need any more after the first one" when Callan said in March 2008 that Lehman would not need to raise additional capital after raising $1.9 billion in February, but had since raised an additional $10 billion in fresh capital).

[4606] Alistair Barr, *et al., Lehman CFO Callan, COO Gregory ousted from posts*, MarketWatch, June 12, 2008.

[4607] Jenny Anderson, *Demoted Lehman Officer Leaves for Credit Suisse*, N.Y. Times, July 16, 2008, *available at* http://www.nytimes.com/2008/07/16/business/16lehman.html (last visited Dec. 23, 2009).

[4608] Lehman, CITIGROUP Call Report (June 17, 2008), at p. 1 [LBEX-AM 008578] (summarizing remarks made by Citi CRO Brian Leach in a June 17, 2008 meeting with Lehman that "Citi began receiving three times the number of novation requests (on average 6) starting in Asia" on June 12) (attached to e-mail from Emil F. Cornejo, Lehman, to Julie M. Boyle, Lehman, *et al*. (June 20, 2008) [LBEX-AM 008577].

[4609] E-mail from Thomas Fontana, Citigroup, to Brian R. Leach, Citigroup, *et al*. (June 16, 2008) [CITI-LBHI-EXAM 00115773]. Fontana identified the counterparties who requested novations during the week of Monday June 9: "Putnam (15 trades), GSAM (4), BOA (2), KingStreet (2), Elliot (2) and Citadel (1)." *Id*. Additionally, Fontana stated that Bracebridge novated nine trades to Citi during the week of June 2, and other Lehman counterparties who sought novations out of Lehman in the preceding few weeks included MetWest, PIMCO and ING. *Id.; see also* e-mail from Paolo R. Tonucci, Lehman, to Ian T. Lowitt, Lehman, *et al*. (June 12, 2008) [LBEX-DOCID 458725] (Lehman was informed that Citi Asia refused to take a novation on an Indonesia credit default swap).

Lehman's counterparties who wanted out of the transaction.[4610]  In the first half of 2008, Citi had accepted a total of approximately 1100 novation requests industry-wide, where the average notional value per trade was just under $10 million[4611] and the average monthly total was $3-4 billion.[4612]  Approximately 90 percent of the novation requests Citi received involved credit default swaps.[4613]  Citibank Global Financial Institutions Risk Management Risk Officer Thomas Fontana, in an internal June 12 Citi e-mail exchange, stated:

> Fuld oust[ed the] CFO and COO. . . . We have cut back clearing lines in Asia . . . . This is bad news.  Market is saying Lehman can not make it alone.  Loss of confidence here is huge at the moment.  We are seeing novations and are passing on them![4614]

In a later e-mail in the same chain, Fontana wrote that Citi's "internal team has lost complete confidence [in Lehman].  No telling what will happen."[4615]  Citi was loath to reject these counterparty requests, but desired additional security for the increased

---

[4610] A novation is defined as "an agreement to change a contract by substituting a third party for one of the two original parties."  *See* BNET Business Dictionary, Business Definition for: Novation, http://dictionary.bnet.com/definition/novation.html.

[4611] E-mail from Thomas Fontana, Citigroup, to Paolo R. Tonucci, Lehman, *et al.* (June 20, 2008) [LBEX-DOCID 038249].  The 1100 novations were not Lehman-specific.  *See id.*

[4612] E-mail from Thomas Fontana, Citigroup, to Brian R. Leach, Citigroup, *et al.* (June 16, 2008) [CITI-LBHI-EXAM 00115773].

[4613] *Id.*

[4614] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00072923].

[4615] *Id.*; Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 3 (explaining that only a few people on Fontana's internal team had lost confidence, not the entire Citi team).

risk exposure it faced in novating these trades.[4616]   That day, Citi turned down "a number of trades with clients desiring to novate" over to them.[4617]

Later that day, Citi requested that Lehman deposit $3-5 billion to cover intraday exposures or end of day shortages.[4618]   The documents suggest that Citi and Lehman negotiated the deposit amount:   Fontana reported internally at Citi that Citi "made a request for $5B in a cash deposit,"[4619]   Fleming informed Lowitt by e-mail that Citi was seeking a $3 billion cash deposit to cover intraday exposures,[4620] but, later that day,

---

[4616] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00106013] (Fontana wrote "[a]fter speaking with the CFO and Treasurer [of Lehman], we made a request for $5B in a cash deposit" and noted that Citi had turned down a number of trades with clients desiring to novate over to Citi); *see also* e-mail from Jasmin Herrera, Lehman, to Emil F. Cornejo, Lehman (June 16, 2008) [LBEX-AM 008659] (attached memorandum summarizes the cash deposit negotiations from Lehman's perspective); Jasmin Herrera, Lehman, Global Creditor Relations-Highlights Citigroup (June 16, 2008), at p. 1 [LBEX-AM 008660]).   The memorandum states that, "[u]ntil June 12, 2008, Citi has consistently been Lehman's strongest provider of credit.   However, due to a substantial increase in novation requests from counterparties, Citi requested that we collateralize $3-$5 B in intraday exposure.   Lehman declined, but did agree to a $2B term deposit, callable daily."   Jasmin Herrera, Lehman, Global Creditor Relations-Highlights Citigroup (June 16, 2008), at p. 1 [LBEX-AM 008660]; *see also* e-mail from Christopher M. Foskett, Citigroup, to John P. Havens, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00026400] (Foskett wrote that he had been on the phone that morning with Lowitt and Tonucci, and that he asked Lehman to put up a cash deposit "to keep our clearing capabilities at levels they require to efficiently operate").

[4617] E-mail from Brian R. Leach, Citigroup, to Vikram S. Pandit, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00114272]; e-mail from Thomas Fontana, Citigroup, to Brian R. Leach, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00114466].

[4618] E-mail from Brian R. Leach, Citigroup, to Vikram S. Pandit, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00114115] (stating that Citi initially asked for $3 billion segregated but Lehman sent $2 billion in a call account).   *But see* e-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00106013] (Fontana wrote that Lehman asked for $5 billion in a cash deposit); Jasmin Herrera, Lehman, Global Creditor Relations-Highlights Citigroup (June 16, 2008), at p. 1 [LBEX-AM 008660] (stating that Citi asked Lehman to collateralize $3-5 billion in intraday exposure).

[4619] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00106013].

[4620] E-mail from Daniel J. Fleming, Lehman, to Ian T. Lowitt, Lehman (June 12, 2008) [LBEX-AM 008609].

LBHI agreed to deposit a $2 billion "comfort deposit" with Citibank.[4621] Some within Citi questioned whether this was the right thing to do,[4622] while others viewed Lehman's $2 billion cash deposit as necessary for Citi "to continue to do business with them-- that's just for us to keep answering the phones if they call."[4623]

Citi had received a similar deposit from Bear Stearns during the summer of 2007.[4624] According to Michael Mauerstein, Citi's Managing Director of the Financial Institutions - Broker Dealers Group, Citi's motivation in seeking the "comfort deposit" from Lehman was grounded mainly in concerns about operational efficiency, but also due, to a lesser extent, to concerns about Lehman's stability.[4625] When Mauerstein met with Lehman's Emil Cornejo (Senior Vice President Treasury), Julie Boyle (Senior Vice President in Commercial Bank and Global Creditor Relations) and Janet Birney (Global Head of Network Management) on the evening of June 12, they informed Mauerstein that Citi was the only bank to "bother" them that day.[4626]

---

[4621] E-mail from Daniel J. Fleming, Lehman, to Ian T. Lowitt, Lehman (June 12, 2008) [LBEX-AM 008608].

[4622] E-mail from Vikram S. Pandit, Citigroup, to Lewis Kaden, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00114272].

[4623] E-mail from Stephen G. Malekian, Citigroup, to Sanjay V. Reddy, Citigroup, *et al.* (June 14, 2008) [CITI-LBHI-EXAM 00034822].

[4624] E-mail from Christopher M. Foskett, Citigroup, to John P. Havens, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00026400].

[4625] Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at pp. 2, 4.

[4626] E-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup (June 12, 2008) [CITI-LBHI-EXAM 00072943].

Initially, Citibank had asked for a pledge of cash or the right of setoff on collateral rather than just a cash deposit,[4627] but Lehman refused that request because Lehman did not want to reduce the size of its liquidity pool, as Tonucci and Cornejo were concerned about keeping the liquidity pool at a high reported level.[4628] In addition, Citi expressed its concern to Lehman that such a collateral pledge might trigger a requirement that Lehman report the transaction by filing an 8-K form with the SEC.[4629] Cornejo asked Citi to consider higher yielding alternatives to the overnight account into which Citi's Funds desk swept Lehman's deposit, as the sweep paid about 20 to 30 basis points below what Lehman earned on its money market funds.[4630] However, Lehman officials indicated numerous times that they would not encumber the deposit, even if such an encumbrance would earn them a higher interest rate on the deposit.[4631] Citi understood that Lehman wanted to keep the $2 billion deposit an

---

[4627] Lehman, Citigroup Agenda (June 17, 2008), at p. 2 [LBEX-AM 008597].

[4628] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 5.

[4629] E-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al.* (July 12, 2008) [CITI-LBHI-EXAM 00076243] (Mauerstein conveyed his opinion that Lehman would not agree to grant collateral at the Treasurer level because granting $2 billion in collateral "will likely be an 8-K event and therefore a CEO discussion"); e-mail from Emil F. Cornejo, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (July 13, 2008) [LBHI_SEC07940_528212] (Cornejo stated that Mauerstein "opined that a pledge of this size would probably be a reportable event"). An 8-K is "the 'current report' companies must file with the SEC to announce major events that shareholders should know about." *See* SEC, Form 8-K, *available at* http://www.sec.gov/answers/form8k.htm.

[4630] E-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (June 17, 2008) [CITI-LBHI-EXAM 00047242].

[4631] E-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00073732] (reporting that Lehman indicated it will not encumber the deposit); e-mail from Christopher M. Foskett, Citigroup, to Thomas Fontana, Citigroup, *et al.* (July 14, 2008) [CITI-LBHI-EXAM 00076293] (recapping conversation where Lowitt conveyed concern about not wanting to tie up Lehman's liquidity unnecessarily); e-mail from Emil F. Cornejo, Lehman, to Joseph Igoe, Lehman (July 4,

overnight deposit "to have maximum liquidity,"[4632] and Lowitt explained to Christopher Foskett (Managing Director, Global Head of Citi's Financial Institutions Group) that Lehman was willing to work out a solution to Citi's intraday credit concerns, so long as the solution did not tie up Lehman's liquidity unnecessarily.[4633]

Throughout the summer, after Lehman posted the $2 billion cash deposit, Lehman proposed several alternatives to the cash deposit in an effort to, *inter alia*, protect the deposit from a Citi insolvency.[4634] Lehman considered the $2 billion cash deposit to be a direct exposure to Citi because Lehman's exposure was "rolling intraday and not one consistent exposure."[4635] According to Mauerstein, Tonucci proposed giving Citi a cash deposit each morning in anticipation of clearing and getting that deposit back each evening when Lehman closed flat, *i.e.*, without any overdrafts.[4636] Cornejo proposed not leaving a deposit with Citi, which would have caused Citi to reduce Lehman's daylight overdraft limits to zero, prompting Lehman to use its cash as

---

2008) [LBEX-DOCID 1078431] (Cornejo explains that Lehman could make the cash deposit "a time deposit, but steve needs to keep the deposit liquid").

[4632] E-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup (July 10, 2008) [CITI-LBHI-EXAM 00076191].

[4633] E-mail from Christopher M. Foskett, Citigroup, to Thomas Fontana, Citigroup, *et al.* (July 14, 2008) [CITI-LBHI-EXAM 00076293] (summarizing conversation in which Lowitt conveyed concern about not wanting to tie up Lehman's liquidity unnecessarily).

[4634] E-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (July 21, 2008) [CITI-LBHI-EXAM 00082127]. Specifically, Tonucci sought to ensure that any securities Lehman pledged would be remote from a Citibank insolvency. *Id*.

[4635] Katherine Lukas, Citigroup, Unpublished Notes (July 10, 2008), at p. 36 [CITI-LBHI-EXAM 00110294] (contemporaneous handwritten notes).

[4636] E-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup (July 14, 2008) [CITI-LBHI-EXAM 00018024] (conveying topics discussed during a conversation Mauerstein had with Tonucci).

working capital during the day in lieu of Citi extending intraday credit to Lehman.[4637]

Yet another proposal from Tonucci was for Lehman to put up securities that would apply only to outstanding clearing exposure, with the understanding that the securities would only be "pledged" when Lehman actually had outstanding clearing exposure.[4638] None of these alternatives were ever implemented, nor does it appear any of these alternatives advanced beyond preliminary discussions.[4639]

### (ii) The Parties Did Not Share the Same Understanding of the Terms of the $2 Billion Cash Deposit

Citi required the deposit in order to continue clearing and settling trades for Lehman; if Lehman failed to maintain the deposit at Citi, Lehman likely would have had to prefund its trading activity.[4640]  In addition, Citi officials informed Lehman that Citi believed it had a general right of offset against the $2 billion deposit.[4641]  Finally, Citi subjected the deposit to a number of internal controls designed to retain the funds at Citi.[4642]  In contrast, Lehman officials maintained that the deposit was simply a sign of

---

[4637] *Id*.

[4638] E-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (July 21, 2008) [CITI-LBHI-EXAM 00082127].  According to Mauerstein, Tonucci also wanted further clarification that the securities pledged would be remote from a Citi insolvency (which was part of Lehman's concern about leaving the cash deposit with Citi), wanted clarification that the collateral amount would match the lower level of daylight overdraft limit Lehman was using at the time, and wanted to discuss this with the Federal Reserve.  *Id*.  Tonucci reportedly further commented that, should Lehman not feel protected, it would take its clearing business away from Citi.  *Id*.

[4639] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 7.

[4640] *Id*. at p. 9.

[4641] Lehman, CITIGROUP Call Report (Aug. 7, 2008), at p. 1 [LBEX-DOCID 450310].

[4642] E-mail from Katherine Lukas, Citigroup, to Ranjit Chatterji, Citigroup, *et al.* (Aug. 27, 2008) [CITI-LBHI-EXAM 00020787]; Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 5.

Lehman's "good faith," and could have been retrieved by Lehman upon request.[4643] Lehman included the deposit in its reported liquidity pool.[4644]

### a. What Lehman Understood the Terms of the Deposit To Be

In a June 12 e-mail to Lowitt and Tonucci, Fleming characterized the terms of the deposit as "[n]o lien or right of offset, a straight overnight fed funds deposit."[4645] The assumption that the deposit was freely returnable, and distinguishable from a "pledge" of collateral, was widely held within Lehman.[4646] In his interview with the Examiner, Tonucci stated that he made it abundantly clear to Citibank that the deposit should be returnable to Lehman daily, and that there were to be no restrictions on getting the deposit back.[4647] He also characterized the deposit as a "good faith deposit" to maintain Citibank's "good will."[4648] Lehman was "always beholden, to an extent, on the good will of its clearing banks," Tonucci explained, and Lehman gave the $2 billion deposit to Citi to maintain its positive relationship with that bank.[4649] By early August, Tonucci

---

[4643] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 20; Examiner's Interview of Irina Veksler, Sept. 11, 2009, at p. 6.

[4644] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 21.

[4645] E-mail from Daniel J. Fleming, Lehman, to Ian T. Lowitt, Lehman, *et al.* (June 12, 2008) [LBEX-AM 008608].

[4646] Lehman, Citigroup Agenda (June 17, 2008), at p. 2 [LBEX-AM 008597]. Lehman's Agenda stated: "Lehman did not agree to pledge cash or give the right of set-off on collateral as Citi requested, but we reluctantly did agree to deposit $2B in a call account, callable daily." *Id.*

[4647] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 20; Examiner's Interview of Irina Veksler, Sept. 11, 2009, at p. 6 (expressing her understanding that Lehman could have the $2 billion cash deposit at Citi at any time).

[4648] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 20.

[4649] *Id.*

and Cornejo were aware that Citi believed it had the right under New York law to offset the cash deposit.[4650]  Fleming stated that while Citi viewed the deposit as something that could be offset, Lehman viewed it as a trade where Lehman was earning a return on the deposit.[4651]

Tonucci further noted that Lehman could have operated with less intraday credit from Citi.[4652]  In addition, Tonucci expressed confidence that Lehman could have continued to trade through Citi, albeit with a little more difficulty, even if Lehman had withdrawn the $2 billion cash deposit.  Tonucci, however, acknowledged that the full impact of Lehman withdrawing its deposit was unknown because it was never attempted.[4653]  Had Lehman withdrawn the $2 billion cash deposit prior to September 2008, Fleming acknowledged that this would likely have resulted in senior-level discussions at Citi, but he also expressed doubt that Citi would actually have returned the deposit if asked.[4654]  However, Fleming stated that, in hindsight, Lehman likely could not have continued to clear through Citi had Lehman successfully withdrawn its cash deposit.[4655]

---

[4650] Lehman, CITIGROUP Call Report (Aug. 7, 2008), at p. 1 [LBEX-DOCID 450310].  Cornejo and Tonucci participated in the call for Lehman, while Foskett and Mauerstein participated for Citigroup.  *Id*. According to Lehman's summary, Citi would not have the right to offset unpledged securities if Lehman replaced the $2 billion cash deposit with less liquid collateral.  *Id*.

[4651] Examiner's Interview of Daniel J. Fleming, Sept. 24, 2009, at p. 8.

[4652] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 20.

[4653] *Id*.

[4654] Examiner's Interview of Daniel J. Fleming, Sept. 24, 2009, at p. 8.

[4655] *Id*.

### b. What Citi Understood the Terms of the Deposit To Be

Interviews of witnesses from Citi confirmed that the deposit was structured as an unencumbered, overnight call deposit, returnable daily upon Lehman's request.[4656] However, Fontana, Mauerstein and Foskett each stated his belief that, either under New York state law or the Uniform Commercial Code, Citi had a right of setoff against the $2 billion, which gave the bank some measure of comfort.[4657]

However, Citi officials recognized that Lehman's comfort deposit was not as secure as the deposit posted with Citi by Bear Stearns in the summer of 2007.[4658] The deposit agreement Citi reached with Bear Stearns explicitly provided a right of offset, whereas there was no "clean right of offset" with respect to the Lehman deposit.[4659] Foskett explained that this concern about the lack of a clean right of offset to the deposit

---

[4656] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 2. Fontana stated that the $2 billion deposit was structured as a lien-free, overnight call deposit, returnable daily on Lehman's request. *Id.* Mauerstein stated that the deposit was structured as an unencumbered call deposit with Citi's Federal Funds desk, which was returnable on Lehman's request. Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 5; *see also* e-mail from Michael Mauerstein, Citigroup, to Katherine Lukas, Citigroup, *et al.* (Aug. 29, 2008) [CITI-LBHI-EXAM 00076678] (describing the deposit as "an overnight deposit that Lehman can ask to be returned at any time").

[4657] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 5 (Foskett explained that someone in Citi's legal department informed him that Citi had a general right of offset, the type that any bank generally has against a bank deposit); Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 5; Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 5; e-mail from Michael Mauerstein, Citigroup, to Katherine Lukas, Citigroup, *et al.* (Aug. 29, 2008) [CITI-LBHI-EXAM 00076678] (Mauerstein wrote that Citi personnel believed they had the right of offset under New York state law).

[4658] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00073732]; *see also* e-mail from Patrick Ryan, Citigroup, to Elena T. Matrullo, Citigroup (Mar. 14, 2008) [CITI-LBHI-EXAM 00113393] (the amount of the deposit Bear Stearns placed with Citi was $1.5 billion as of March 2008).

[4659] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00073732].

arose, in part, from the fact that the deposit supporting Citi's relationship with LBI did not come from LBI, but from LBHI.[4660]   Additionally, unlike the Bear Stearns deposit, Lehman was not borrowing from Citi and had not executed a "promissory note with 'right of offset' language" with Citi as Bear Stearns had done.[4661]   While Bear Stearns' deposit was pledged to Citi and Bear Stearns could only borrow against the deposit, there was no similar pledge with Lehman's deposit when the deposit was made.[4662] Citi's Global Head of Global Transaction Services viewed overnight accounts (such as Lehman's $2 billion cash deposit) that could be "yanked" at any time by the client as counting "for nothing as it relates to collateral / security interest."[4663]

Although the Lehman deposit with Citi was not formally pledged as collateral, there was an understanding within Citi as to the consequences to Lehman if Lehman were to withdraw the deposit.[4664]   In response to an internal Citi e-mail from Mauerstein highlighting the distinction between treating the $2 billion amount as a "pledge" versus a "deposit," Citi's Managing Director of Global Transaction Services Cash Management stated, "Mike, I am aware and understand all of this – though their asking for the

---

[4660] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 5.

[4661] E-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00073732].

[4662] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 4.

[4663] E-mail from Paul S. Galant, Citigroup, to Jerry Olivo, Citigroup, *et al.* (Aug. 29, 2008) [CITI-LBHI-EXAM 00076678].

[4664] *See* e-mail from Jerry Olivo, Citigroup, to Michael Mauerstein, Citigroup, *et al.* (Aug. 29, 2008) [CITI-LBHI-EXAM 00076678].

deposit back does have distinct impacts on clearing capacity."[4665]  Fontana further explained that, had Lehman withdrawn the deposit, Citi would have reassessed whether it would have continued doing "business as usual" with Lehman, and that, in order for Citi to continue clearing and settling trades for Lehman, Lehman would have had to prefund its transactions through Citi.[4666]  According to Fontana, that prefunding would have been a liquidity drain for Lehman.[4667]  Mauerstein and Foskett each also opined that Citi would likely have reduced Lehman's intraday credit lines if Lehman had withdrawn the deposit.[4668]  Moreover, Fontana and Foskett stated that Citi would have stopped providing credit lines to Lehman if Lehman had withdrawn its cash deposit and did not replace it by, for example, pledging collateral or prefunding.[4669]

Notably, Citi subjected the "comfort deposit" to a number of internal controls designed to keep the $2 billion within Citi.[4670]  Shortly after Lehman provided the deposit, Fontana stated in an internal Citi e-mail exchange:

> My concerns are twofold:  keeping the liquidity [of the deposit] within Citi and being able to control the release of the deposit.  I don't want to learn the deposit was not renewed a week after Lehman has the funds.  The standing order to Eddie [Hewett, Jr.] is as soon as he gets the call [from

---

[4665] *Id.*

[4666] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 5.

[4667] *Id.*

[4668] Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 9; Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 9.

[4669] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 9; Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 5.

[4670] *See* e-mail from Katherine Lukas, Citigroup, to Ranjit Chatterji, Citigroup, *et al.* (Aug. 27, 2008) [CITI-LBHI-EXAM 00020787].

Lehman asking for release of the deposit] he is to call me to advise me of [Lehman's] intentions.[4671]

Citi's Risk Treasury desk was charged with notifying Fontana prior to the release of any portion of the deposit.[4672] Further, in discussions concerning the most applicable interest rate to provide Lehman on the $2 billion, and how to count the "comfort deposit" internally within Citi's systems, Citi's Managing Director of Global Transaction Services Cash Management characterized the deposit as "essentially captive funds."[4673]

In providing "background" to others at Citi on the nature of the "comfort deposit," one relationship manager at Citi described the deposit as:

> [A] $2BN Cash Deposit from [LBHI] placed with Eddie's Risk Treasury Desk. . . . This is an overnight investment that gets rolled on a daily basis. Once of the caveats from Risk was that Citi Risk would have control and final approval prior to releasing funds should Lehman look to pull the funds back. A process is in place for Tom Fontana to be notified for approval by the desk prior to a withdrawal being made.[4674]

In his interview with the Examiner, Fontana confirmed that an internal notification process, such as the one described above, governed the release of the deposit.[4675] Although Citi likely would have released the deposit if asked, before

[4671] E-mail from Thomas Fontana, Citigroup, to Robert Blackburn, Citigroup, *et al.* (June 19, 2008) [CITI-LBHI-EXAM 00018405].

[4672] *Id.*

[4673] E-mail from Jerry Olivo, Citigroup, to Robert Blackburn, Citigroup, *et al.* (June 25, 2008) [CITI-LBHI-EXAM 00020787].

[4674] E-mail from Katherine Lukas, Citigroup, to Ranjit Chatterji, Citigroup, *et al.* (Aug. 27, 2008) [CITI-LBHI-EXAM 00020787].

[4675] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 5.

releasing the deposit Citi would have decided internally if it would continue to conduct "business as usual" with Lehman.[4676]  This internal procedure was "just to check" with people at Citi before the deposit was released.[4677]

Thus, while Lehman considered the deposit to be "lien-free" and offered merely as a "good faith" gesture to maintain a positive working relationship, Citi officials emphasized that Citi had a legal right of setoff against the deposit, and that withdrawing the deposit would have negative implications on Citi's willingness to clear for Lehman.  Further, Citi subjected the deposit to an internal procedure, whereby release of the deposit was subject to its risk desk's notification and approval.[4678]

At least once during the summer of 2008, Lehman used $210 million of the $2 billion deposit to cover a Demand Deposit Account overdraft, and promised to replace the used funds the next business morning.[4679]  Neither Fontana nor Foskett recalled another instance where Lehman asked for any portion of its cash deposit back.[4680]

---

[4676] *Id.*

[4677] Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 5.

[4678] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 5; Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 5.

[4679] E-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup (June 30, 2008) [CITI-LBHI-EXAM 00074989]; *see also* e-mail from Thomas Fontana, Citigroup, to Brian R. Leach, Citigroup, *et al.* (July 1, 2008) [CITI-LBHI-EXAM 00111749] (reporting that Lehman had a fail from another bank on June 30, 2008, which would have resulted in a $268 million overdraft, but Citi "permitted the company to use part of its deposit to cover the OD [and this] avoided a potential asset which the OD would have created over month-end"); e-mail from Emil F. Cornejo, Lehman, to Joseph Igoe, Lehman (July 4, 2008) [LBEX-DOCID 1078431] (Cornejo explained that Lehman withdrew $210 million from the deposit at Citi to cover a fail in Lehman's account with Citi); Citigroup, Spreadsheet (as of Sept. 18, 2008) [CITI-LBHI-EXAM 00115772] (showing a $210 million withdrawal on June 30, 2008).

[4680] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 5; Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 6.

### c. The Exact Terms of the "Comfort Deposit" Are Unknown Because the Terms Were Not Reduced to Writing

The terms controlling Lehman's $2 billion "comfort deposit" were not reduced to writing.[4681]  Foskett said that, after the near collapse of Bear Stearns, it became "standard" practice for clients to leave a deposit with Citi to facilitate clearing without the parties necessarily formalizing the arrangement in writing.[4682]  Specifically, during the summer of 2008, at least one other large investment bank in addition to Lehman maintained a cash deposit at Citi for clearing purposes, and Citi was in talks with another investment bank to do the same until market conditions in September 2008 made that deposit unnecessary.[4683]

### (iii) Citi Knew the "Comfort Deposit" was Included in Lehman's Liquidity Pool

Lehman included the $2 billion "comfort deposit" in its liquidity pool.[4684]  Fontana understood that Lehman included the $2 billion deposit in its liquidity pool.[4685]  In preparation for a June 17, 2008 meeting with Lehman, Mauerstein's list of "talking points" included conveying to Lehman that "Lehman has over $40 billion liquidity

---

[4681] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 4; Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 5.

[4682] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 4.

[4683] *Id.*

[4684] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 21.

[4685] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 6.  Fontana was not aware, however, that Lehman's deposits or collateral pledges with other clearing banks were included in the liquidity pool.  *Id.*  When presented with this possibility by the Examiner, Fontana stated:  "The whole thing [pool] could have been pledged out!"  *Id.*

pool, and [Citi] felt that it would help us if Lehman kept some of that on deposit with us."[4686]   Likewise, Foskett recalled that Lehman insisted the deposit be liquid so that Lehman could include the $2 billion in the liquidity pool in reports sent to analysts and regulators (and, presumably, filings with the SEC for public investors as well).[4687]   From Mauerstein's perspective, Lehman's decision about what to report in its liquidity pool was a matter between Lehman and its regulators.[4688]   Foskett, Mauerstein and Fontana each acknowledged that they did not consider the June 12 cash deposit officially encumbered.[4689]

### (c)   Collateral Pledge Discussions Between Lehman and Citi Began in June 2008 and Continued Until September 2008

### (i)   The Unexecuted Pledge Agreement:  the Parties Agreed to Negotiate the Terms but Not Execute the Agreement Until It Was Needed

Several weeks after Lehman placed the $2 billion "comfort deposit" with Citi on June 12, 2008, Citi and Lehman began to discuss executing a collateral pledge agreement

---

[4686] E-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al*. (June 17, 2008) [CITI-LBHI-EXAM 00073791]; *see also* e-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup, *et al*. (July 2, 2008) [CITI-LBHI-EXAM 00073015] (Mauerstein wrote that "[w]e should remind prople in our organization that Lehman has $50 billion of holding company cash/liquidity (including the $2B with us) and access to the Fed discount window").

[4687] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 5.

[4688] Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 6.

[4689] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 5; Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 6; Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 5.

to replace the cash deposit.[4690]  Citi and Lehman met in late June and agreed that Citi would collect data on daylight overdrafts, which Citi would then use to perform its risk analysis, and from that, the parties would be able to determine how much collateral Citi would request.[4691]

In mid-July, the parties planned to agree on the terms of the pledge agreement, but to leave it unexecuted with the idea that the parties could execute the agreement later if the market deteriorated further.[4692]  The rationale was that, should market conditions deteriorate such that the agreement would become necessary from Citi's perspective, the firms' respective legal departments would have already reviewed the agreement and the companies could execute the agreement immediately.[4693]  Some at Citi questioned the logic of this, and queried whether the parties would actually be willing to execute the agreement at a time when it was needed because market conditions or company circumstances would likely have changed significantly.[4694] Nevertheless, the parties proceeded with this arrangement and Mauerstein sent the first

---

[4690] E-mail from Christopher M. Foskett, Citigroup, to Michael Mauerstein, Citigroup, *et al.* (July 2, 2008) [CITI-LBHI-EXAM 00073015] (discussing whether Citi should take some collateral from Lehman since Lehman offered).

[4691] E-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (July 2, 2008) [CITI-LBHI-EXAM 00073015].

[4692] E-mail from Emil F. Cornejo, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (July 13, 2008) [LBHI_SEC07940_528212].

[4693] Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 7; e-mail from Richard C.S. Evans, Citigroup, to Gregory Frenzel, Citigroup, *et al.* (July 16, 2008) [CITI-LBHI-EXAM 00082047] ("What we need is their agreement to agree the documentation now so that it can be signed at a moment's notice, and not require another 24-48 hours of legal review at a later stage when we don't have that time.").

[4694] *E.g.*, Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 8.

version of a draft pledge agreement to Cornejo on July 14, 2008,[4695] a second version on July 16, 2008,[4696] and a third version on July 28, 2008.[4697]  As of July 18, 2008, a collateral account titled "Lehman Brothers Holdings Inc., Pledge to Citibank" had been reserved (but not yet opened).[4698]

Lehman wanted to move away from a cash deposit in July toward a "more cash capital friendly collateral deposit" of less liquid securities.[4699]  Specifically, Tonucci was agreeable to replacing the cash deposit with securities,[4700] but in general Lehman was resistant to a pledge of any kind.[4701]

Some Citi officials questioned whether the comfort deposit would have been returned upon the execution of the pledge agreement.  Citi's Chief Risk Officer in Global Transaction Services expressed his preference in July to hold the cash deposit for

---

[4695] E-mail from Michael Mauerstein, Citigroup, to Emil F. Cornejo, Lehman, *et al.* (July 14, 2008) [LBEX-DOCID 1078879].

[4696] E-mail from Michael Mauerstein, Citigroup, to Emil F. Cornejo, Lehman (July 16, 2008) [LBEX-DOCID 1076467].

[4697] E-mail from Michael Mauerstein, Citigroup, to Emil F. Cornejo, Lehman (July 28, 2008) [LBEX-DOCID 1076205].

[4698] E-mail from Ken Porcaro, Citigroup, to Katherine Lukas, Citigroup (July 18, 2008) [CITI-LBHI-EXAM 00022307]; e-mail from Katherine Lukas, Citigroup, to Janet Birney, Lehman, *et al.* (Aug. 4, 2008) [LBEX-DOCID 459043] (informing Lehman that the collateral account had been reserved).

[4699] E-mail from Reto Faber, Citigroup, to Vivek Tyagi, Citigroup, *et al.* (July 15, 2008) [CITI-LBHI-EXAM 00022615].

[4700] E-mail from Thomas Fontana, Citigroup, to Michael Mauerstein, Citigroup, *et al.* (July 22, 2008) [CITI-LBHI-EXAM 00075055].

[4701] E-mail from Emil F. Cornejo, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (July 13, 2008) [LBHI_SEC07940_528212] (Cornejo told Mauerstein "that any pledge would not be acceptable to [L]ehman").

"10 years" before Citi had to give any back.[4702]  When asked whether Citi would have returned the cash deposit to Lehman upon a pledge of securities, Foskett speculated that it would likely have depended on how the collateral was structured.[4703]

Finally, as set forth *supra*, Citi officials opined that a pledge of this size would likely be an 8-K reportable event for Lehman, which would require CEO approval.[4704] The pledge agreement negotiations continued into September, but an agreement was never finalized and executed.[4705]

### (ii) Citi Had Difficulty Pricing the Collateral Offered by Lehman as a Substitute for the Cash Deposit

Part of the delay in agreeing to terms for the collateral pledge agreement stemmed from the difficulties Lehman and Citi encountered in July and August in negotiating what securities would be placed with Citi.[4706]

---

[4702] E-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup (July 2, 2008) [CITI-LBHI-EXAM 00081921)].

[4703] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 6.

[4704] E-mail from Emil F. Cornejo, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (July 13, 2008) [LBHI_SEC07940_528212]; e-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al.* (July 12, 2008) [CITI-LBHI-EXAM 00076243] ("Granting $2B collateral will likely be an 8-K event and therefore a CEO discussion."); e-mail from Richard C.S. Evans, Citigroup, to Gregory Frenzel, Citigroup, *et al.* (July 16, 2008) [CITI-LBHI-EXAM 00082047] (characterizing the execution of a pledge agreement as a regulatory disclosure for Lehman).

[4705] *See* e-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup (Sept. 10, 2008) [CITI-LBHI-EXAM 00075863] (discussing how Citi should have had the collateral arrangement completed long ago instead of the "fire drill" of getting the Guaranty Amendment on September 9).

[4706] *See, e.g.,* e-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al.* (Aug. 4, 2008) [CITI-LBHI-EXAM 00074286] (noting the absence of a ready market for the collateral and the difficulty of pricing the collateral because the referenced CLOs did not trade); e-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (Aug. 12, 2008) [CITI-LBHI-EXAM 00077310] (questioning the reliability of Citi's Global Transaction Services collateral system to provide real prices which Citi could execute against); Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 7.

An overview of a contemplated transaction in April 2008 between Citi and Lehman is helpful for an understanding of the securities valuation issue. Prior to the collateral negotiations in connection with the pledge agreement, in April 2008, Citi's CEO Vikram Pandit and Lehman's CEO Richard Fuld discussed setting up a "commercial real estate" repo.[4707] While this proposed repo was not connected to the pledge negotiations of import to the instant analysis, valuation difficulties in both instances were similar because both instances involved illiquid assets.[4708] According to Foskett, the repo discussions in April and May 2008 broke down in part because Citi

---

[4707] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 6; *see* e-mail from Nancy Kim, Citigroup, to Thomas Mellina, Citigroup, *et al.* (May 21, 2008) [CITI-LBHI-EXAM 00034330] (attaching CMAC Memo - BVP against Lehman's Asset Backed Notes); Citigroup, Lehman Brother Holding Inc (June 4, 2008), at p. 2 [CITI-LBHI-EXAM 00078763] (detailing Lehman's CEO contact of Citi's Pandit in spring 2008 concerning Citi providing some liquidity against certain Lehman commercial real estate assets). A Borrow versus Pledge transaction was proposed where Citi would have borrowed a security (a RACERS Trust Note that was backed by commercial real estate assets) from Lehman and pledged U.S. Agency Mortgages to Lehman as collateral for the borrowed security. Citigroup, Lehman Brother Holding Inc (June 4, 2008), at p. 2 [CITI-LBHI-EXAM 00078763]. Lehman then would have lent out the agency securities in return for cash. *Id.* The commercial real estate assets being considered were loans against Hilton properties. *Id.* Citi's Senior Risk Management was not comfortable with taking any additional exposure to Hilton properties and declined to approve the financing transaction. *Id.* This "would have been booked as direct exposure (not PSE) given that Citi's ability to liquidate the collateral under a Lehman bankruptcy remained questionable." *Id.*; *see also* e-mail from Thomas Fontana, Citigroup, to Patrick Ryan, Citigroup, *et al.* (Apr. 25, 2008) [CITI-LBHI-EXAM 00038195] (noting Pandit and Fuld having some discussion regarding commercial real estate financings); e-mail from Christopher M. Foskett, Citigroup, to Michael Mauerstein, Citigroup, *et al.* (Apr. 18, 2008) [CITI-LBHI-EXAM 00080817] (noting high level dialogue between Fuld and Pandit); e-mail from Thomas Mellina, Citigroup, to Thomas Fontana, Citigroup, *et al.* (May 30, 2008) [CITI-LBHI-EXAM 00081443] (summarizing how the deal fell through because Lehman was supposed to contribute a diverse pool of commercial real estate assets but, instead, contributed only loans against Hilton properties; also, the deal was supposed to be structured so that it would be safe from a bankruptcy stay, but this failed); e-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup (May 29, 2008) [CITI-LBHI-EXAM 00081410] (summarizing a conversation Mauerstein had with Cornejo that the deal falling through was not about Lehman risk and more because Citi's risk people expected the portfolio to contain a diverse set of commercial real estate assets but the deal presented was only against a single asset - Hilton).

[4708] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 8.

was prepared to give only 50 cents on the dollar for the collateral, whereas Lehman thought the assets were worth closer to 90 cents on the dollar.[4709]

With this recent significant discrepancy in valuation, some at Citi recognized that any collateral deposit negotiations were going to be difficult, particularly when Lehman offered more illiquid assets, this time in the form of CLOs and CDOs, in July in connection with the collateral pledge agreement negotiations.[4710] Citi communicated to Lehman that Citi was trying to be flexible in what collateral Citi would accept, and suggested it would not view favorably a proposition that included emerging market sovereign bonds.[4711] Citi expanded the collateral listed in the proposed pledge agreement to reflect that Citi would accept more than just government securities, which Citi had initially requested.[4712]

---

[4709] *Id.* at p. 6. One of the advantages of using this type of trade was that it disguised the source of the assets by sending it through a trust. *See* e-mail from Thomas Mellina, Citigroup, to Joseph Martinelli, Citigroup, *et al.* (May 16, 2008) [CITI-LBHI-EXAM 00082707]. Thomas Mellina commented that, "[w]hen the market becomes concerned about a given party, the market should not be willing to lend against assets issued by or guaranteed by that party," and the special structure of the repo would hide the issuer's identity for a while. *Id.; see also* e-mail from Thomas Mellina, Citigroup, to Thomas Fontana, Citigroup, *et al.* (July 23, 2008) [CITI-LBHI-EXAM 00115293] (showing that the repo discussions did not terminate entirely in May, but the parties had not made much progress by the end of July because Citi was still trying to create a financing structure that addressed all of Citi's concerns); e-mail from Stephen J. Bujno, Citigroup, to Kenneth Quay, Citigroup (Sept. 3, 2008) [CITI-LBHI-EXAM 00034297] (forwarding "Lehman CRE Repo" document).

[4710] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 8.

[4711] E-mail from Michael Mauerstein, Citigroup, to Emil F. Cornejo, Lehman (July 25, 2008) [LBEX-DOCID 1078883] (relaying a message from Fontana in response to Cornejo's query regarding what type of collateral Citi would consider taking, including Fontana's comment that the collateral had "to be relatively simple from a pricing perspective and we are quite limited in our [collateral management systems] abilities") (brackets in original).

[4712] E-mail from Michael Mauerstein, Citigroup, to Emil F. Cornejo, Lehman (July 28, 2008) [LBEX-DOCID 1076205] (Mauerstein commented that Citi's "inhouse attorney revised the Pledge Agreement to include securities other than US Govies").

In early August, Lehman offered Citi the Kingfisher, Freedom, Spruce and Verano CLOs – recently rated tranches of asset-backed securities that were backed by corporate loans and structured by Lehman – as collateral in connection with the pledge agreement.[4713]  Cornejo was concerned about Citi's reaction to Lehman proposing these assets as collateral[4714] and, according to Mauerstein, Lehman was not surprised when Citi ultimately rejected the CLOs as collateral.[4715]  Citi personnel characterized the CLOs offered by Lehman in connection with the pledge negotiations as "bottom of the barrel"[4716] and "junk."[4717]

Citi encountered several problems when trying to price this collateral due to Citi not having a robust platform for valuing the collateral,[4718] the absence of a ready market

---

[4713] E-mail from Michael Mauerstein, Citigroup, to Yingli Xie, Citigroup, *et al.* (Aug. 4, 2008) [CITI-LBHI-EXAM 00082162]; *see also* e-mail from Michael Mauerstein, Citigroup, to Anthony Lieggi, Citigroup, *et al.* (Aug. 1, 2008) [CITI-LBHI-EXAM 00022065] (seeking information on Lehman's Kingfisher, Freedom and Spruce CLOs).  The CLOs Lehman offered to Citigroup were pledged to JPMorgan in response to JPMorgan's margin requirements.  *Compare* e-mail from John N. Palchynsky, Lehman, to Richard Policke, Lehman, *et al.* (July 2, 2008) [LBEX-DOCID 077515] (Kingfisher), e-mail from Craig L. Jones, Lehman, to John Feraca, Lehman, *et al.* (June 19, 2008) [LBEX-DOCID 55577] (Freedom and Spruce), *and* LB Excess Collateral Priced by GF (Aug. 8, 2008) [JPM-2004 0008074] (Verano), *with* e-mail from Michael Mauerstein, Citigroup, to Yingli Zie, Citigroup, *et al.* (Aug. 4, 2008) [CITI-LBHI-EXAM 00082162] (listing CUSIPs for Kingfisher, Freedom, Spruce and Verano).  JPMorgan was also having difficulty pricing these securities.
[4714] E-mail from Emil F. Cornejo, Lehman, to Julie M. Boyle, Lehman (July 31, 2008) [LBEX-AM 008649].
[4715] Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 8.
[4716] *Id*.
[4717] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 6.
[4718] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (Aug. 12, 2008) [CITI-LBHI-EXAM 00077310] (questioning the reliability of Citi's Global Transaction Services collateral system to provide real prices against which Citi could execute); Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 7.  Citi's clearing risk division also did not have the ability to track a company's clearing usage in real time.  E-mail from Thomas Fontana, Citigroup, to Brian R. Leach, Citigroup, *et al*. (July 1, 2008) [CITI-LBHI-EXAM 00111749].  Additionally, in April 2008, Lehman's CLS line was reduced from $3 billion to $1.8 billion, and Lehman's clearing lines were removed from the nostro accounts.  E-

for the collateral and the nature of the collateral itself.[4719]  The CLOs were held by Lehman and, according to Citi's secondary trading desk, the CLOs proposed by Lehman did not trade.[4720]  If Citi wanted to sell them in the market under conditions that existed in August 2008, Citi estimated that perhaps five investors would show a price and that Citi would essentially have to do a road show.[4721]  On a call with Citi's Foskett and Mauerstein, Tonucci described the CLOs in the initial collateral portfolio as trading "only occasionally."[4722]

In August 2008, Mauerstein told Cornejo that Citi would not consider taking any CLOs as collateral unless Citi was sure it could value them and was confident it could sell them for an amount that covered the advance rate.[4723]  However, Citi believed it had

---

mail from Katherine Lukas, Citigroup, to Seamus Kennedy, Citigroup, *et al.* (May 2, 2008) [CITI-LBHI-EXAM 00023281].

[4719] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 7; *see also* e-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al.* (Aug. 4, 2008) [CITI-LBHI-EXAM 00074286].

[4720] E-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al.* (Aug. 4, 2008) [CITI-LBHI-EXAM 00074286].

[4721] *Id.*

[4722] Lehman, CITIGROUP Call Report (Aug. 7, 2008), at p. 1 [LBEX-DOCID 1035842].  Based on document research and witness testimony, the Examiner does not believe these Lehman CLOs ever traded.  Lehman was occasionally able to repo them for short periods, but actual trades between arm's length counterparties that would permit even limited price discovery do not appear to have occurred.  *See* e-mail from Marie Stewart, Lehman, to Jonathan Cohen, Lehman, *et al.* (May 8, 2008) [LBHI_SEC07940_1069905] ("Like Freedom CLO and Spruce CLO [SASCO transaction] is just creating securities to take to Fed window"); Lehman, Securitizing Leveraged Loans: Freedom, Spruce, Thalia CLOs, at p. 2 [LBEX-WGM 835699] ("Securities thereby created are not meant to be marketed" with unidentified person's handwriting in the margin emphasizing "No intention to market").

[4723] E-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al.* (Aug. 5, 2008) [CITI-LBHI-EXAM 00076589] (relaying a conversation Mauerstein had with Cornejo the previous day).

no basis for establishing any initial price for the CLOs.[4724]  Citi's secondary trading desk had informed Mauerstein that there were no active secondary market prices for the CLOs Lehman offered as collateral, and Citi was not going to price them based solely on their ratings.[4725]  Fontana found it surprising that, according to Lehman's valuation, a single-A rated CLO would be priced as high as 96 to 97 cents on the dollar.[4726]  Overall, Citi seemed more concerned about whether there was a ready market for these CLOs, as opposed to Citi's ability (or inability, as it were) to assign an exact price to them – but Citi could not get sufficient information in either respect.[4727]  Ultimately, Citi decided in mid-August that the CLOs Lehman offered were not going to "work" for the pledge agreement.[4728]

On August 11, Emil Cornejo provided another portfolio of securities that Lehman proposed Citi accept as collateral; according to Lehman, these securities were asset-backed across the spectrum with a notional value of $3.7 billion.[4729]  Fontana still

---

[4724] E-mail from Thomas Fontana, Citigroup, to Michael Mauerstein, Citigroup, *et al.* (Aug. 4, 2008) [CITI-LBHI-EXAM 00074286].

[4725] E-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al.* (Aug. 5, 2008) [CITI-LBHI-EXAM 00076589].

[4726] E-mail from Thomas Fontana, Citigroup, to Joseph A. Cuniglio, Citigroup, *et al.* (Aug. 1, 2008) [CITI-LBHI-EXAM 00022065].

[4727] E-mail from Michael Mauerstein, Citigroup, to Yingli Xie, Citigroup, *et al.* (Aug. 4, 2008) [CITI-LBHI-EXAM 00082162].

[4728] E-mail from Michael Mauerstein, Citigroup, to Katherine Lukas, Citigroup, *et al.* (Aug. 12, 2008) [CITI-LBHI-EXAM 00021175] (discussing pricing the proposed portfolio of asset-backed securities for the pledge agreement).

[4729] E-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al.* (Aug. 11, 2008) [CITI-LBHI-EXAM 00077310]; *see also* Lehman, CITIGROUP Call Report (Aug. 7, 2008), at p. 1 [LBEX-DOCID 450310] (describing the second portfolio of collateral as $3 billion "of investment grade private label ABS, CMOs").

doubted whether Citi's desk would be able to provide pricing information on many of these newly proposed assets, and noted that most of the securities had limited liquidity in the market at the time.[4730]  By late August, some at Citi wanted an agreement in place as soon as possible detailing which securities Lehman would pledge as collateral in place of the cash deposit.[4731]

Contributing to the difficulty of finding collateral that was agreeable to both parties was the fact that Fleming told Citi that Lehman repoed out for cash all of the marketable securities in its liquidity pool.[4732]  On July 31, 2008, Cornejo stated, "[a]pparently, the only way to find acceptable collateral for Citi, is to repo in collateral which then can be pledged."[4733]  In contrast, if Citi had accepted the CLOs, Lehman would not have had to reverse repo in any securities.[4734]  Thus, if Citi refused to accept the CLOs, and requested that Lehman pledge marketable securities to Citi in connection with the pledge agreement, Lehman would have had to "reverse-in securities to deliver to us, and absorb the funding cost (what they would avoid doing if they pledge CLOs)."[4735]

---

[4730] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (Aug. 12, 2008) [CITI-LBHI-EXAM 00077310].

[4731] E-mail from Paul S. Galant, Citigroup, to Jerry Olivo, Citigroup, *et al.* (Aug. 29, 2008) [CITI-LBHI-EXAM 00076678].

[4732] E-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al.* (Aug. 5, 2008) [CITI-LBHI-EXAM 00076589] (recounting a conversation he had with Fleming the previous week).

[4733] E-mail from Emil F. Cornejo, Lehman, to Julie M. Boyle, Lehman (July 31, 2008) [LBEX-AM 008649].

[4734] E-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al.* (Aug. 5, 2008) [CITI-LBHI-EXAM 00076589].

[4735] *Id.*

### (iii) The Guaranty Amendment Was Signed in a "Fire Drill" on September 9, 2008

The original Guaranty between Citi and Lehman, whereby LBHI guaranteed the credit obligations of certain subsidiaries, was signed on January 7, 2004, and listed seven Lehman entities as "Borrowers" which LBHI guaranteed.[4736]  This was subsequently amended between September 9 and 11, 2008 by adding ten Lehman subsidiaries and extending the scope of the Guaranty.[4737]

In the January 7, 2004 Guaranty, the consideration provision stated that LBHI entered into the Guaranty "[f]or good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce Citigroup to extend and/or maintain credit to or for the account of [LBHI's] subsidiaries listed on Schedule A."[4738]  Section 1 of the Guaranty provided that LBHI unconditionally guaranteed "the punctual payment when due . . . of all obligations . . . of each Borrower to Citigroup under any and all extensions of credit extended and/or maintained by Citigroup."[4739]

The September 9, 2008 "Amendment 1 to Guaranty" ("September 9 Guaranty Amendment") contained an identical consideration provision, as it provided that LBHI entered into the Amendment "[f]or good and valuable consideration, the receipt and

---

[4736] Guaranty (Jan. 7, 2004), at pp. 1, 6 [LBEX-DOCID 1090071].  Schedule A lists the seven "Borrowers:" Lehman Brothers Holdings PLC, Lehman Brothers Securities Asia Limited, Lehman Brothers Special Financing Inc., Lehman Brothers Japan Inc., Lehman Brothers International (Europe), Lehman Brothers Commercial Corporation Asia Limited and Lehman Brothers Bankhaus AG.  *Id*. at p. 6.

[4737] *See* Amendment 1 To Guaranty (Sept. 9, 2008) [LBEX-DOCID 090568] (executed version signed by Ian Lowitt on September 11, 2008).

[4738] Guaranty (Jan. 7, 2004), at p. 1 [LBEX-DOCID 1090071].

[4739] *Id*. (§ 1).

sufficiency of which are hereby acknowledged, and to induce Citigroup to extend and/or maintain credit to or for the account of [LBHI's] subsidiaries listed on Schedule A."[4740]  The September 9 Guaranty Amendment altered Section 1 of the original Guaranty so that LBHI now unconditionally guaranteed "the punctual payment when due . . . of all obligations . . . of each Borrower (i) under any agreements with Citigroup or any Citigroup Entity pursuant to which any Citigroup Entity opens and maintain accounts for the custody of cash, securities, and/or other assets of such Borrower or provides custodial and related services for such Borrower . . . and (ii) to any Citigroup Entity under any and all extensions of credit . . . ."[4741]

Fontana characterized the September 9 Guaranty Amendment as adding "the clearing side which was not previously expressly covered in our existing guarantees" and confirmed that the $2 billion deposit was thereby "completely secure[d] for [Citi] and any exposures."[4742]  Thus, the Amendment (1) increased the number of entities covered by LBHI's Guaranty by adding ten Lehman subsidiaries, including LBI, and (2) expanded the category of obligations covered by the Guaranty by including

---

[4740] Amendment 1 To Guaranty (Sept. 9, 2008), at p. 1 [LBEX-DOCID 090568].

[4741] *Id*. (§ 1).

[4742] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup (Sept. 10, 2008) [CITI-LBHI-EXAM 00075863].  *But see* e-mail from Emil F. Cornejo, Lehman, to Huw Rees, Lehman, *et al*. (Sept. 13, 2008) [LBEX-DOCID 1078385] (Cornejo stated there is no agreement, and the deposit is still a callable one); e-mail from Emil F. Cornejo, Lehman, to Huw Rees, Lehman, *et al*. (Sept. 13, 2008) [LBEX-DOCID 1078385] (Cornejo stated that, because Citi had a right of offset under New York law, if there was a negative balance the cash would not be released).

obligations owed to Citigroup under any custodial agreement with Citi in addition to extensions of credit provided by Citi.[4743]

### a. Events Prior to the Signing of the September 9 Guaranty Amendment from Citi's Perspective

By September 2008, Citi had become increasingly concerned about the lack of an ironclad claim to Lehman's $2 billion "comfort deposit," and had worked on the collateral pledge arrangement with Lehman for approximately two months.[4744]   On September 9, the failure of the KDB deal was widely reported, Lehman accelerated its third quarter 2008 earnings announcement to September 10, and Lehman's stock price plummeted.   These events led Citi to seek the September 9 Guaranty Amendment.[4745] Specifically, on the morning of September 9, the Head of Citi's Institutional Clients Group requested that the comfort deposit be officially taken into collateral.[4746]   In response to this request, Citi sought an amendment to the 2004 Guaranty that would allow Citi to offset the $2 billion deposit against obligations that LBI and several other

---

[4743] Amendment 1 To Guaranty (Sept. 9, 2008) [LBEX-DOCID 090568].

[4744] E-mail from Thomas Fontana, Citigroup, to Brian R. Leach, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00077391] (discussing attempts to improve Citi's claim on the $2 billion deposit)*; see also* e-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup (Sept. 10, 2008) [CITI-LBHI-EXAM 00075863] (stating that Citi should have had the collateral arrangement completed long ago instead of the "fire drill" of getting the Guaranty Amendment on September 9).

[4745] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 8.

[4746] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00076762].

Lehman entities owed to Citi.[4747]  Additionally, on September 9, Citi reduced Lehman's clearing lines significantly, some to zero.[4748]  Worldwide, Lehman's clearing lines at Citi that were not reduced to zero were reduced to the level of the deposit Lehman had posted with Citi, which remained at $2 billion.[4749]

Citi set a deadline of 6:00 p.m. Eastern time[4750] on September 9 by which Lehman had to execute the amendment.[4751]  According to Foskett, Citi did not present the amendment on a "take-it-or-leave-it" basis,[4752] and Lehman said it had no problem with providing a guaranty for LBI.[4753]  In fact, Foskett stated that Lehman quickly faxed the signed amendment back to Citi[4754] after Ian Lowitt signed it shortly before the 6:00 p.m. deadline.[4755]

After LBI was added to the Guaranty prior to the 6:00 p.m. deadline, the negotiations continued in an effort by Citi to get additional Lehman subsidiaries added,

---

[4747] Amendment 1 To Guaranty (Sept. 9, 2008) [LBEX-DOCID 4263143] (adding LBI to the January 7, 2004 LBHI Guaranty and expanding the scope of the Guaranty to include Custody Agreements as well as Credit Agreements).

[4748] E-mail from Thomas Fontana, Citigroup, to Brian R. Leach, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00076776].

[4749] E-mail from Gregory Frenzel, Citigroup, to John Dorans, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00076798].

[4750] All time references in this section regarding the September 9 Guaranty Amendment refer to Eastern Time.

[4751] E-mail from Emil F. Cornejo, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Sept. 9, 2008) [LBEX-AM 008564].

[4752] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 9.

[4753] E-mail from Christopher M. Foskett, Citigroup, to Thomas Fontana, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00077391] (noting Citi sending over an amendment to the existing agreement to reflect Lehman's agreement to guarantee LBI).

[4754] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 9.

[4755] E-mail from Paolo R. Tonucci, Lehman, to Emil F. Cornejo, Lehman (Sept. 9, 2008) [LBEX-AM 008564].

specifically those in Asia.[4756]  Indeed, Citi advised Lehman that Citi would not open for Lehman in Asia under the existing Guaranty.[4757]  This meant that Citi would reduce Lehman's intraday credit lines to zero for the entities not covered by the Guaranty if Lehman did not sign the amendment in time; it did not mean that Citi would cease clearing for Lehman entirely.[4758]  Citi likely would have continued clearing for Lehman even without a signed amendment, but Lehman would have had to prefund its trades.[4759]  In order to prefund its trades, Lehman would have had to estimate its exposure and provide funds to cover that exposure, rather than relying on Citi to cover the exposure while being able to pay Citi back later in the day.  Citi was concerned about its own business at this time and had to balance these issues carefully so that it did not expose itself to so much Lehman risk that Citi's business became endangered.[4760]

### b. Events Prior to the Signing of the September 9 Guaranty Amendment from Lehman's Perspective

At 12:47 p.m. on September 9, Cornejo wrote to Tonucci and Boyle stating that he had just received a call from Foskett, during which Foskett told Cornejo that Citi was requesting a guaranty with LBI [in fact, an amendment of the existing 2004 LBHI-Citibank Guaranty] with the right to set off the $2 billion comfort deposit that had been

---

[4756] E-mail from Thomas Fontana, Citigroup, to Emil F. Cornejo, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 1079016].

[4757] *Id.*

[4758] Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 8.

[4759] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 9.

[4760] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 8; *see also* Thomas Fontana, Citigroup, Unpublished Notes (Sept. 12, 2008), at p. 193 [CITI-LBHI-EXAM 00099649] (contemporaneous handwritten notes noting the "need to protect shareholders").

placed by Lehman in a call account with Citi on June 12.[4761]  Cornejo wrote that this request was coming in response to Lehman's "stock price decline," and that Lehman had a $3.4 billion intraday overdraft with Citi when he spoke with Foskett.[4762]  Cornejo was initially resistant to the idea and said he would get back to Foskett.[4763]  Tonucci suggested Cornejo speak to Andrew Yeung, in-house counsel at Lehman, because Lehman "did something similar for JP[Morgan] so hopefully [it will not be] an issue to have legal review and agree."[4764]

Cornejo sent the draft agreement to James "Jim" Killerlane in Lehman's legal department for review.[4765]  Killerlane expressed some concern about how the setoff provision in the original Guaranty would interact with Lehman's Custody Agreements.[4766]  Despite this concern, Killerlane stated he would be comfortable with executing the amendment if Lowitt and Treasury personnel were comfortable with it.[4767] While Killerlane was expressing his concern about the proposed amendment, Craig Jones e-mailed Fleming, writing:  "Citibank still has not released our $2bn.  They say

---

[4761] E-mail from Emil F. Cornejo, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 9, 2008) [LBEX-AM 008563].

[4762] *Id*.

[4763] *Id*.

[4764] E-mail from Paolo R. Tonucci, Lehman, to Emil F. Cornejo, Lehman, *et al.* (Sept. 9, 2008) [LBEX-AM 008690].

[4765] E-mail from Emil F. Cornejo, Lehman, to James J. Killerlane, Lehman (Sept. 9, 2008) [LBEX-DOCID 1079080].

[4766] E-mail from James J. Killerlane, Lehman, to Emil F. Cornejo, Lehman (Sept. 9, 2008) [LBEX-AM 008571] (stating that he was "not sure if we can logistically [sign the amendment to the guaranty] with our Custody Agreements or if we are comfortable with this").

[4767] *Id*.

they are working on it. We have over funded the account"[4768] such that it appears Lehman believed it had more money in the account than was necessary to release the payment.

At 5:45 p.m., Cornejo forwarded Lowitt and Tonucci an execution draft of the Guaranty Amendment, stating in the e-mail: "Citi is holding payments unless we execute by 6pm tonight. Jim [Killerlane] has reviewed . . . . Ian, you are required to sign. . . . I will deliver to Citi tonight."[4769] In fact, at approximately 4:14 p.m. on the afternoon of September 9, Citi had ordered a $2.088 billion CLS payment to be held[4770] because Lehman's account balance was only $37 million with no daylight overdraft limit.[4771] When Lehman's account balance reached $2.085 billion, Fontana provided verbal approval shortly after 5:30 p.m. to release the CLS payment even though the account was $3 million short.[4772]

At approximately 5:56 p.m., Cornejo transmitted the executed document to Citi[4773] after Lowitt signed the September 9 Guaranty Amendment.[4774] In the first

---

[4768] E-mail from Craig L. Jones, Lehman, to Daniel J. Fleming, Lehman (Sept. 9, 2008) [LBEX-AM 008562].

[4769] E-mail from Emil F. Cornejo, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Sept. 9, 2008) [LBEX-AM 008571].

[4770] E-mail from William R. Maher, Citigroup, to Katie Evans, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00032799].

[4771] E-mail from Katie Evans, Citigroup, to William R. Maher, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00032799].

[4772] E-mail from Chris Deukmedjian, Citigroup, to Peter Dehaan, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00032799].

[4773] E-mail from Emil F. Cornejo, Lehman, to Michael Mauerstein, Citigroup (Sept. 9, 2008) [LBEX-DOCID 4043703].

[4774] E-mail from Paolo R. Tonucci, Lehman, to Emil F. Cornejo, Lehman (Sept. 9, 2008) [LBEX-AM 008564].

executed version of the amendment, LBI was the only entity listed on "Schedule 1," which specifies the Lehman subsidiaries added to the parent Guaranty.[4775]

### c. Negotiations Between Lehman and Citi Personnel Regarding Which Lehman Entities Were To Be Added to the Parent Guaranty by the September 9 Guaranty Amendment

At 12:54 p.m. on September 9, Mauerstein e-mailed the draft parent Guaranty Amendment to Cornejo, which proposed an additional 17 subsidiaries to the LBHI guaranty.[4776] Mauerstein told the Examiner that Citi had not sought a guaranty of LBI prior to September 9 because the U.S. broker-dealer was usually the most creditworthy Lehman entity.[4777] Nevertheless, because most of Citi's exposure was through LBI, Citi determined that, given market events, it needed its exposure to LBI covered.[4778] In the initial amendment draft, Citi's proposed list of 17 Lehman subsidiaries to be added to the parent guaranty included LBI.[4779]

---

[4775] Amendment 1 To Guaranty (Sept. 9, 2008) [LBEX-DOCID 4263143].

[4776] E-mail from Michael Mauerstein, Citigroup, to Emil F. Cornejo, Lehman (Sept. 9, 2008) [LBEX-DOCID 1079048].

[4777] Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 8.

[4778] Id.

[4779] Amendment 1 To Guaranty [Draft] (Sept. 9, 2008), at p. 3 [LBEX-DOCID 1032313] (this proposed draft was attached to Mauerstein's September 9, 2008 e-mail (LBEX-DOCID 1079048) at 12:54 p.m. to Cornejo). The subsidiaries that Citi proposed be added were: Caistor Trading BV, Lehman Brothers Australia Securities Pty Limited, Lehman Brothers Finance AG, Lehman Brothers Financial Products Incorporated, Lehman Brothers Incorporated, Lehman Brothers (Taiwan) Limited, Lehman Brothers Securities Private Limited, Libertus Jutaku Loan K.K., Neuberger Berman LLC, Lehman Brothers Commodity Services Incorporated, Lehman Brothers Equity Finance (Cayman) Limited, Lehman Brothers Finance Japan Incorporated, Lehman Brothers GCS Financing, Lehman Brothers Securities Taiwan Limited, Lehman Scottish Finance LP, Marcy Limited and Property Asset Management Inc. Id.

However, the signed amendment that was returned to Citi shortly before the 6:00 p.m. deadline only extended the Guaranty to LBI.[4780] When Citi received the September 9 Guaranty Amendment shortly before 6:00 p.m. on September 9 with only LBI added, Citi viewed the absence of Lehman's Asian subsidiaries as problematic for opening in Asia the next day.[4781] Lehman officials explained to Citi that it intended to provide guarantees for the Asian subsidiaries, but that Lehman needed to check with its overseas offices to ensure that no regulatory issues would prevent LBHI from doing so.[4782] Nevertheless, Citi still needed Lehman to add the subsidiaries initially listed on the amendment's schedule of parties, and stated it would withhold credit in Asia until Lehman did so.[4783]

Specifically, at 6:34 p.m., Fontana e-mailed Cornejo to request that Lehman guarantee all of the entities Citibank had included in its initial proposal, including "the international subs which are critical for us to clear for you in Asia."[4784] Cornejo

---

[4780] E-mail from Emil F. Cornejo, Lehman, to Michael Mauerstein, Citigroup (Sept. 9, 2008) [LBEX-DOCID 4043703]; *see also* Amendment 1 To Guaranty (Sept. 9, 2008) [LBEX-DOCID 4263143] (first executed version remitted to Citigroup shortly before 6:00 p.m. on September 9, 2008 and adding only LBI as a guaranteed subsidiary).

[4781] E-mail from Thomas Fontana, Citigroup, to Gregory Frenzel, Citigroup (Sept. 9, 2008) [CITI-LBHI-EXAM 00108845]; e-mail from Christopher M. Foskett, Citigroup, to Thomas Fontana, Citigroup (Sept. 9, 2008) [CITI-LBHI-EXAM 00073290] (relaying Michael Mauerstein's statement that Lehman had guaranteed the U.S. broker-dealer).

[4782] E-mail from Emil F. Cornejo, Lehman, to Thomas Fontana, Citigroup (Sept. 9, 2008) [LBEX-DOCID 1079021].

[4783] E-mail from Thomas Fontana, Citigroup, to Emil F. Cornejo, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 1079021] (specifically, Fontana wrote that Citi "will not open you in Asia with the agreement we have in place").

[4784] *Id.*

responded that Lehman intended to include those subsidiaries in the Guaranty, but needed more time to ensure there were no regulatory obstacles.[4785]  Shortly after 7:00 p.m., Cornejo forwarded the September 9 Guaranty Amendment to others within Lehman to make sure there were no local legal or regulatory issues that prevented Lehman from adding any the remaining 16 subsidiaries that Citi had requested.[4786]

At 7:11 p.m., Fontana e-mailed Cornejo, "[w]e have a problem as we will not open you in Asia with the agreement we have in place.  Call me."[4787]  In an e-mail from Cornejo to Lehman personnel at 7:36 p.m., Cornejo wrote that "Citi wants LBHI to guaranty each of these legal entities. . . . I am not sure each of the entities is 100% owned by Lehman or that we have lines in Asia.  Citi will reduce all limits to 0, unless we sign. . . . We signed off on [a] guaranty today in NY for LBI."[4788]  Citi explained to the Examiner that Lehman either needed to agree to a parental guaranty for those Lehman entities or prefund its trades in order for Citi to clear for Lehman in Asia the next day.[4789]

---

[4785] E-mail from Emil F. Cornejo, Lehman, to Thomas Fontana, Citigroup (Sept. 9, 2008) [LBEX-DOCID 1079021].

[4786] E-mail from Emil F. Cornejo, Lehman, to Aireen Phang, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 1079057].

[4787] E-mail from Thomas Fontana, Citigroup, to Emil F. Cornejo, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 1079021].

[4788] E-mail from Emil F. Cornejo, Lehman, to Janet Birney, Lehman, *et al.* (Sept. 9, 2008) [LBEX-AM 008669].

[4789] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 9 (Citi counsel Claudia Hammerman clarified this point to the Examiner).

During the evening of September 9, Lehman rejected eight of the original 17 entities that Citi had proposed including in the amended guaranty, and the final version that night contained nine Lehman subsidiaries that were ultimately added to the Guaranty.[4790] Specifically, Cornejo noted in an e-mail that evening that Lehman personnel had deleted five of the 17 additional subsidiaries Citi had proposed.[4791] Following that modification, Lehman removed three more entities because: (i) two of the subsidiaries had no accounts with Citi, and (ii) another subsidiary was "a division SARL."[4792] Lehman personnel also confirmed that one of the subsidiaries Cornejo had removed earlier was appropriately removed because it was a Special Purpose Vehicle.[4793] Thus, the Guaranty was amended on September 9 to add nine Lehman subsidiaries,[4794] while a tenth, LBCC, was added late on September 11, 2008[4795] after

[4790] *See* e-mail from Emil F. Cornejo, Lehman, to Thomas Fontana, Citigroup, *et al.* (Sept. 10, 2008) [LBEX-DOCID 458344)]; Schedule 1 (To Amendment 1) (Sept. 9, 2008) [LBEX-DOCID 443684] (attached to Cornejo e-mail).

[4791] E-mail from Emil F. Cornejo, Lehman, to Janet Birney, Lehman (Sept. 9, 2008) [LBEX-DOCID 1075546]. (sent at 8:59 p.m. Eastern time). Cornejo noted that "[w]e have deleted the following names" but did not explain why the subsidiaries were deleted. *Id*. The deleted names were: Lehman Brothers Financial Products Incorporated, Property Asset Management Inc., Libertus Jutaku Loan K.K., Marcy Limited, and Caistor Trading BV. *Id*.

[4792] E-mail from Emily Critchett, Lehman, to Janet Birney, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 1009802] (sent at 9:08 p.m. Eastern time). "SARL" is the abbreviation for "*société à responsibilité limitée,*" and typically appears after the name of a French private limited company. Encyclopedia.com, SARL definition (last accessed Jan. 27, 2010).

[4793] E-mail from Emily Critchett, Lehman, to Janet Birney, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 1009802] The subsidiary was Lehman Brothers Financial Products Incorporated. *Id*.

[4794] *See* Schedule 1 (To Amendment 1) (Sept. 9, 2008), at p. 1 [LBEX-DOCID 443684]. Those nine entities added on September 9, 2008 were: Lehman Brothers Australia Securities Pty Limited, Lehman Brothers Incorporated, Lehman Brothers (Taiwan) Limited, Lehman Brothers Securities Private Limited, Neuberger Berman LLC, Lehman Brothers Commodity Services Incorporated, Lehman Brothers Finance

Mauerstein told Cornejo that LBCC's CLO obligations would have to be prefunded that night if Lehman did not sign the Schedule to the Guaranty with LBCC included.[4796]

With the exception of the Lehman subsidiaries that were initially proposed, the terms of the executed Guaranty Amendment remained unchanged from what was sent via e-mail to Cornejo by Mauerstein at 12:54 p.m. on September 9.[4797]  The documents do not show whether Lehman advised Citi as to the reasons for its removal of some of the proposed subsidiaries from the list, nor do they establish whether Citi resisted Lehman's removal of eight of the subsidiaries initially proposed by Citi.[4798]

---

Japan Incorporated, Lehman Brothers GCS Financing and Lehman Brothers Securities Taiwan Limited. *Id*.

[4795] E-mail from Rosa Garcia, Lehman, to Emil F. Cornejo, Lehman, *et al*. (Sept. 12, 2008) [LBEX-DOCID 065565] (noting that the attached signed Guaranty was sent to Mauerstein at Citi; this e-mail was sent at 8:55 p.m. Eastern time); s*ee also* Amendment 1 To Guaranty (Sept. 9, 2008) [LBEX-DOCID 090568] (executed version signed by Ian Lowitt on September 11, 2008).

[4796] E-mail from Michael Mauerstein, Citigroup, to Emil F. Cornejo, Lehman (Sept. 11, 2008) [LBEX-DOCID 1078857].

[4797] *Compare* Amendment 1 To Guaranty [Draft] (Sept. 9, 2008) [LBEX-DOCID 1032313] (draft version sent by Mauerstein to Cornejo at 12:54 p.m. on September 9, 2008), *with* Amendment 1 To Guaranty (Sept. 9, 2008) [LBEX-DOCID 4263143] (executed version from September 9 which added only LBI to the Guaranty), *and* Amendment 1 To Guaranty (Sept. 9, 2008) [LBEX-DOCID 090568] (final executed version signed by Ian Lowitt on September 11, 2008, listing 10 Lehman subsidiaries that were ultimately added to the parent Guaranty).

[4798] *See generally* e-mail from Paolo R. Tonucci, Lehman, to Emil F. Cornejo, Lehman, *et al*. (Sept. 9, 2008) [LBEX-AM 008690] (suggesting that, because Lehman had executed a similar guaranty with JPMorgan, this guaranty amendment would not, he hoped, be an issue for Lehman's legal department).

**(iv) September 12, 2008: A Lehman Collateral Account at Citi was Activated After Two Months of Discussion, and Lehman Signed an Amendment to the Direct Custodial Services Agreement**

A collateral account titled "Lehman Brothers Holdings Inc., Pledge to Citibank" at Citi was reserved by July 18,[4799] opened on September 11, and became active on September 12,[4800] but no collateral was ever transferred into it. The account was opened in conjunction with the proposed pledge of securities by LBHI because Lehman needed to have a "US securities custody account and cash account" at Citi.[4801]

Unlike JPMorgan, which discussed a guaranty amendment with Lehman on September 9 that was subsequently signed on September 10 and followed by a Security Agreement from Lehman on September 10,[4802] Citi did not obtain a Security Agreement. However, Citi did obtain an amendment on September 12, 2008 to its DCSA with Lehman.[4803]   Specifically, on the afternoon of September 12, Citibank's Lukas and Lehman's Birney and Boyle signed the DCSA amendment which gave Citi stronger

---

[4799] E-mail from Ken Porcaro, Citigroup, to Katherine Lukas, Citigroup (July 18, 2008) [CITI-LBHI-EXAM 00022307]; e-mail from Katherine Lukas, Citigroup, to Janet Birney, Lehman, *et al.* (Aug. 4, 2008) [LBEX-DOCID 459043] (informing Lehman that the collateral account had been reserved).

[4800] E-mail from Robson R. Morri, Citigroup, to Thomas Fontana, Citigroup, *et al.* (Sept. 11, 2008) [CITI-LBHI-EXAM 00012865].

[4801] E-mail from Deborah Mercer-Miller, Citigroup, to Craig S. Dudsak, Citigroup, *et al.* (Sept. 11, 2008) [CITI-LBHI-EXAM 00012697].  The collateral account number was 203489.  E-mail from Deborah Mercer-Miller, Citigroup, to Rachel V. Cole, Citigroup, *et al.* (Sept. 11, 2008) [CITI-LBHI-EXAM 00012697]; e-mail from Robson R. Morri, Citigroup, to Thomas Fontana, Citigroup, *et al.* (Sept. 11, 2008) [CITI-LBHI-EXAM 00012865].

[4802] *See* Section III.A.5.b of this Report, which discusses the JPMorgan agreement amendments.

[4803] Direct Custodial Services Agreement Deed (Sept. 12, 2008) [LBEX-DOCID 4263617]; *see also* Direct Custodial Services Agreement Deed (Sept. 12, 2008) [CITI-LBHI-EXAM 00005903] (with Katherine Lukas' signature).

rights over the custody assets and included a carve-out for customer accounts that Lehman requested be added.[4804]

Lehman had initially approached Citi in February 2008 about updating the original DCSA.[4805] While the parties negotiated this, Citi sought to re-introduce lien and setoff language into the agreements (Fontana noted in July that most major broker-dealers had negotiated the lien language out of the DCSA).[4806]

In the original DCSA signed on March 26, 1992, LBI authorized Citi to establish Custody Accounts[4807] and Client Deposit Accounts[4808] in LBI's name.[4809] The original DCSA granted Citi "a general lien" on property so long as it was not held for the benefit

---

[4804] Direct Custodial Services Agreement Deed (Sept. 12, 2008), at p. 1 (§ 1.3) [LBEX-DOCID 4263617]. The carve-out provision specifies that the "security interest and right of set-off provided in this Deed shall not apply to any account and cash or Securities held therein if the account is identified as for the benefit" of LBI's customers, except to the extent that the client assets are needed to be used to cover fees, administrative expenses and irrevocable transactions yet to settle. *Id.*; *see also* e-mail from Katherine Lukas, Citigroup, to Emily Critchett, Lehman, *et al.* (Sept. 12, 2008) [LBEX-DOCID 4026355] (noting that the updated Deed attached "includes the language relating to customer accounts under [section] 1.3"); e-mail from Katherine Lukas, Citigroup, to Tom Isaac, Citigroup, *et al.* (Sept. 12, 2008) [CITI-LBHI-EXAM 00011569] (explaining that the Deed includes a carve-out paragraph for customer accounts except Citi retains a lien over the client assets "for fees and admin expenses as well as being covered for those irrevocable transactions yet to be settled").

[4805] E-mail from Reto Faber, Citigroup, to Kathy El Ong, Citigroup, *et al.* (Aug. 1, 2008) [CITI-LBHI-EXAM 00022171]; *see also* e-mail from Emily Critchett, Lehman, to Katherine Lukas, Citigroup, *et al.* (Feb. 29, 2008) [LBEX-DOCID 1010232].

[4806] E-mail from Thomas Fontana, Citigroup, to Brian R. Leach, Citigroup (July 1, 2008) [CITI-LBHI-EXAM 00111749].

[4807] Direct Custody Agreement for Citibank, N.A., Subsidiaries and Affiliates and Shearson Lehman Brothers Inc. (Mar. 26, 1992), at p. 1 [LBEX-DOCID 1091570]. Custody Accounts were "for the deposit of any Securities, Precious Metals and other property (apart from cash) from time to time received by" Citi for the account of LBI. *Id.* at p. 4 (§ 2).

[4808] *Id.* Client Deposit Accounts were "for the deposit of funds in any currency from time to time" received by Citi for the account of LBI. *Id.*

[4809] *Id.*

of Lehman's customers.[4810]  The general lien in the original DCSA extended to Property "held by [Citi] under this Agreement until the satisfaction of all liabilities and obligations of [LBI] (whether actual or contingent) owned to [Citi] hereunder, provided, that such lien shall secure only [LBI's] obligations to [Citi] for the safe custody and administration of the Property."[4811]

In Section 4.1 of the September 12 DCSA amendment, the lien was strengthened and expanded as Lehman granted Citi "a first fixed security interest . . . over all rights it has or may have now or in the future in respect of the Collateral" where Collateral was defined to include cash, securities or other assets held by Citi.[4812]  Citi was only "obliged to release Collateral to [LBI] if there are no outstanding or contingent Secured Obligations."[4813]  The Deed defines Secured Obligations as "(i) all obligations of the Client to reimburse the Custodian in respect of Irrevocable Commitments; and (ii) all other present and future obligations of the Client to repay the Custodian including, but not limited to, daylight and overnight overdraft lines and reversals of provisional

---

[4810] *Id*. at p. 19 (§ 17).

[4811] *Id*.  Section 1 contains the definitions, including defining "Property" as "any Securities, Precious Metals, cash or any other property held" by Citi under the terms of the Agreement.  *Id*. at p. 4 (§ 1).

[4812] Direct Custodial Services Agreement Deed (Sept. 12, 2008), at p.2 (§ 4.1) [LBEX-DOCID 4263617].  The amendment defines Collateral in section 1.1 as "(i) cash held in any cash account with any Custodian; (ii) Securities or other assets held by any Custodian; and (iii) rights in respect of transactions in Securities in conjunction [with] services provided by any Custodian."  *Id*.  The "Custodian" is defined as "CITIBANK, N.A. on behalf of each branch or affiliate of the Bank from time to time selected and appointed by [LBI] as custodian or clearing agent."  *Id*.

[4813] *Id*. at p. 2 (§ 4.2).

credits."[4814]   Additionally, Section 5 of the DCSA amendment provides Citi with the right to set off any payment obligation owed by Lehman against any such obligation owed by Citi to Lehman, and specifies that Citi "may set off an amount estimated by it in good faith to be the amount of that obligation" if the obligation is unliquidated or unascertained.[4815]

### (d) Lehman's Clearing Environment at Citi During the Week of September 8, 2008

### (i) Citi Required Lehman To Operate Under Lower Daylight Overdraft Limits

During the collateral pledge negotiations in July 2008, some Citi personnel were baffled as to why Lehman needed such large daylight overdraft limits with Citi, as Citi understood Lehman to have almost $50 billion in its liquidity pool.[4816]   Citi did not understand why Lehman could not put to use some of its liquidity, so that Citi could significantly reduce the daylight overdraft limits, as "this doesn't create any disclosure issues and [Lehman has] the liquidity."[4817]   Moreover, in Citi's view, because Lehman

---

[4814] *Id*. at p. 1 (§ 1.1).

[4815] *Id*. at p. 2 (§ 5).

[4816] E-mail from Gregory Frenzel, Citigroup, to Thomas Obermaier, Citigroup, *et al*. (July 16, 2008) [CITI-LBHI-EXAM 00082047] (concerning the Lehman Pledge Agreement, Frenzel suggested Citi insist on a larger pledge amount and set the intraday lines to that amount, or reduce Lehman's intraday lines to zero and let Lehman use its liquidity to prefund its transactions).

[4817] E-mail from John Dorans, Citigroup, to Brian R. Leach, Citigroup, *et al*. (July 16, 2008) [CITI-LBHI-EXAM 00108067].

represented that it had such a large liquidity pool, it would have been helpful to Citi if Lehman kept some of that deposit with Citi.[4818]

On Friday, September 5, 2008, Citi decided to downgrade its internal classification of Lehman's creditworthiness.[4819] Citi took this step because Lehman had "clearly defined problems,"[4820] whereas Lehman's prior creditworthiness classification at Citi only indicated "potential weakness."[4821] When Citi internally downgraded Lehman's creditworthiness on September 5, "the credit [system] automatically suspended all trading lines," which meant not that Citi cut the lines, but that Citi more carefully, manually monitored Lehman's trading activities.[4822] In addition to carefully monitoring Lehman's trading activities, Citi required internal approvals for any trades that were larger, longer in tenor, or riskier than usual.[4823] On September 10, Citi personnel mistakenly informed Lehman that Citi had cut the trading lines, which was

[4818] E-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al.* (June 17, 2008) [CITI-LBHI-EXAM 00073791].

[4819] E-mail from Melissa J. Torres, Citigroup, to John J. Foley, Citigroup, *et al.* (Sept. 6, 2008) [CITI-LBHI-EXAM 00088683] (noting this change was made on Friday, September 5, 2008); *see also* e-mail from Gregory Frenzel, Citigroup, to NA IRM Weekly Updates group, Citigroup (Sept. 7, 2008) [CITI-LBHI-EXAM 00107376] (weekly update from September 5, 2008); e-mail from Michael Mauerstein, Citigroup, to Katherine Lukas, Citigroup, *et al.* (Sept. 8, 2008) [CITI-LBHI-EXAM 00051890] (noting that the classification "is strictly an internal Citi matter," Citi had not communicated anything to Lehman about the change in its internal classification of Lehman, nor had Citi changed its operations with Lehman due to the classification change).

[4820] Thomas Fontana, Citigroup, Unpublished Notes (Sept. 5, 2008), at p. 168 [CITI-LBHI-EXAM 00099649] (contemporaneous handwritten notes).

[4821] Thomas Fontana, Citigroup, Unpublished Notes (Sept. 12, 2008), at p. 191 [CITI-LBHI-EXAM 00099649] (contemporaneous handwritten notes).

[4822] E-mail from Kathy El Ong, Citigroup, to Ajaypal S. Banga, Citigroup, *et al.* (Sept. 11, 2008) [CITI-LBHI-EXAM 00012823].

[4823] *Id.*

not the case, and Citi thereafter reminded its employees to be extra vigilant so that misinformation would not be communicated to Lehman or to the marketplace.[4824]

On September 8, Lehman presented to Citi's Mauerstein, Fontana and Foskett its expected third quarter 2008 results and game plan for Lehman going forward.[4825]  Citi's impression of the presentation was that the plan made sense, but that executing the plan was going to be key.[4826]  Foskett commented that Lehman was "the most open amongst the brokers about [third quarter 2008] results and [its] plans to address the stress and strain of the current environment."[4827]

Mid-day on September 9, Citi's Silbiger requested that Lehman's daylight overdraft limit be reduced from $3 billion to zero while Citi, instead, used Lehman's $2 billion deposit (plus any overnight funds that Lehman had placed with Citi's treasury desk) to clear transactions for Lehman.[4828]  Citi's Chief Risk Officer requested that Citi pare back the Global Transaction Services clearing lines "in order to monitor flows" while keeping FX trading available.[4829]  Citi had frequently requested that Lehman leave a larger deposit, and had difficulty manually managing Lehman's clearing and

---

[4824] *Id.*

[4825] E-mail from Christopher M. Foskett, Citigroup, to Ian T. Lowitt, Lehman (Sept. 8, 2008) [LBEX-DOCID 070422].

[4826] *Id.*

[4827] *Id.*

[4828] E-mail from Joseph Chesakis, Citigroup, to Katherine Lukas, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00014706].  Citigroup's Responses to Examiner's First Set of Questions re Pre-Bankruptcy Setoff dated November 16, 2009 (Dec. 18, 2009), at p. 4 [hereinafter "Citigroup First Written Responses"].

[4829] E-mail from Paul Egan, Citigroup, to Ajaypal S. Banga, Citigroup, *et al.* (Sept. 10, 2008) [CITI-LBHI-EXAM 00075863].

settlement activities using just the $2 billion deposit after the lines had been reduced to zero.[4830]  Despite the reduced daylight overdraft limit, Citi told its FX traders to continue trading with Lehman, so long as Citi's net exposure to Lehman did not exceed the $2 billion deposit.[4831]

In an interview with the Examiner, Foskett stated that, prior to Lehman Weekend, several smaller multi-national companies had to prefund their activity with Citi, suggesting that such prefunding was possible.[4832]  Additionally, Foskett stated that over Lehman Weekend, two large companies had to prefund their transactions through Citi.[4833]

### (ii) Lehman Deposited Amounts in Excess of the $2 Billion Deposit at Various Times in 2008 With Citi

At various times during the summer of 2008, Lehman deposited excess cash with Citi overnight, including:  $343 million on June 13,[4834] $900 million on July 10,[4835] $1

---

[4830] E-mail from Thomas Fontana, Citigroup, to Michael Mauerstein, Citigroup, *et al*. (Sept. 9, 2008) [CITI-LBHI-EXAM 00065673].

[4831] E-mail from Christopher M. Foskett, Citigroup, to Paul Egan, Citigroup, *et al*. (Sept. 10, 2008) [CITI-LBHI-EXAM 00076841].

[4832] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 8.  Two broker-dealers, each with approximately $1 billion in daily clearing exposure, pre-funded their cash clearing through Citi after the collapse of Bear Stearns.  In addition, a larger broker-dealer may have also pre-funded after Citi limited its clearing exposure facing it.  Citigroup First Written Responses, at p. 6.

[4833] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 8.

[4834] E-mail from Edward A. Hewett, Jr., Citigroup, to Scott Bere, Citigroup, *et al*. (June 13, 2008) [CITI-LBHI-EXAM 00115260].

[4835] E-mail from Edward A. Hewett, Jr., Citigroup, to Scott Bere, Citigroup, *et al*. (July 10, 2008) [CITI-LBHI-EXAM 00114179].

billion on July 11,[4836] $1.25 billion on July 14,[4837] $1.4 billion on July 15[4838] and $1.1 billion on August 6.[4839] Citi viewed these excess cash deposits as Lehman's attempts "to demonstrate to us that they [did] not have a liquidity issue."[4840] These funds would typically be returned to Lehman the following business day, along with interest earned on the deposit overnight.[4841] During the week of September 8, 2008, Lehman continued to deposit additional funds with Citi overnight: $680 million on the evening of September 9,[4842] $3.3 billion on September 10[4843] and $3.02 billion on September 11.[4844] On the morning of September 12, Lehman requested Citi return $1.8 billion, the last of the

[4836] E-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al.* (July 12, 2008) [CITI-LBHI-EXAM 00076243].

[4837] E-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup (July 14, 2008) [CITI-LBHI-EXAM 00018024] (conveying topics discussed during a conversation Mauerstein had with Tonucci).

[4838] E-mail from Edward A. Hewett, Jr., Citigroup, to Scott Bere, Citigroup, *et al.* (July 15, 2008) [CITI-LBHI-EXAM 00115664].

[4839] E-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (Aug. 7, 2008) [CITI-LBHI-EXAM 00074313].

[4840] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (July 11, 2008) [CITI-LBHI-EXAM 00082020]; e-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (Aug. 7, 2008) [CITI-LBHI-EXAM 00074313] (commenting that the $1.1 billion excess deposit on August 6, 2008, was "possibly a demonstration of 'liquidity'"); Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 7.

[4841] E-mail from Thomas Fontana, Citigroup, to Brian R. Leach, Citigroup, *et al.* (Sept. 10, 2008) [CITI-LBHI-EXAM 00054016] (noting that, while Lehman's deposit was $2.68 billion that morning, the $680 million in excess of the $2 billion cash deposit was to be returned that morning); Citigroup First Written Responses, at p. 4.

[4842] E-mail from Emil F. Cornejo, Lehman, to Michael Mauerstein, Citigroup (Sept. 10, 2008) [LBEX-DOCID 1078918]; *see also* Citigroup First Written Responses, at p. 4 (identifying the amount sold as $679 million).

[4843] E-mail from Thomas Fontana, Citigroup, to Brian R. Leach, Citigroup, *et al.* (Sept. 10, 2008) [CITI-LBHI-EXAM 00054016].

[4844] E-mail from Katherine Lukas, Citigroup, to Tom Isaac, Citigroup, *et al.* (Sept. 11, 2008) [CITI-LBHI-EXAM 00014488].

additional funds Lehman had placed with Citi's desk the previous night.[4845]   Citi

complied approximately three hours later at 12:52 p.m.[4846]   Citi tried to hold on to the

additional funds as long as it could on September 12 because Citi saw $4 billion of line

utilization, "including FX settlements from Asia, trade settlements and clearing usage in

Europe,"[4847] but Fontana later authorized the release of the funds in excess of the $2

billion cash deposit because "Lehman [was] in dire need" of the money.[4848]   When

trading ended on September 12, Lehman did not ask for its $2 billion deposit back.[4849]

### (iii) Citi Endeavored To Help Lehman in September 2008, Prior to the Bankruptcy Filing

Citi endeavored to assist Lehman on numerous occasions in the days leading up

to Lehman's bankruptcy filing.   For example, on September 10, Citi approved a $500

million extension of credit in excess of the aggregate deposit held so that a CLS

payment could be made.[4850]   That brought all of Lehman's clearing lines up to capacity,

---

[4845] *See* e-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, *et al.* (Sept. 12, 2008) [CITI-LBHI-EXAM 00101294] (reporting that Fleming made the request prior to 10:00 a.m. that day).

[4846] E-mail from Katherine Lukas, Citigroup, to Chris Deukmedjian, Citigroup, *et al.* (Sept. 12, 2008) [CITI-LBHI-EXAM 00032758] (funds were released back to Lehman shortly before 1:00 p.m.).

[4847] E-mail from Thomas Fontana, Citigroup, to Thomas Schwartz, Citigroup, *et al.* (Sept. 12, 2008) [CITI-LBHI-EXAM 00048225].

[4848] E-mail from Thomas Fontana, Citigroup, to Richard C.S. Evans, Citigroup, *et al.* (Sept. 12, 2008) [CITI-LBHI-EXAM 00048225].

[4849] E-mail from Thomas Fontana, Citigroup, to Karen Kirchen, Citigroup (Sept. 12, 2008) [CITI-LBHI-EXAM 00054412].   *But see* e-mail from Daniel J. Fleming, Lehman, to David Forsyth, Lehman (Sept. 12, 2008) [LBEX-DOCID 083098] (Fleming confirmed that morning that he wanted to ask Citi for the money back, but it is not clear whether he was referring to the $2 billion cash deposit or the $3 billion in extra funds deposited with Citi the evening of September 11; also, there is no indication from this e-mail or others that Lehman renewed this request at the end of the day on September 12).

[4850] E-mail from Thomas Fontana, Citigroup, to Brian R. Leach, Citigroup, *et al.* (Sept. 10, 2008) [CITI-LBHI-EXAM 00108863].

and Citi advised Lehman that Lehman needed to get more money into its accounts before any further payments could be made.[4851]  Additionally, late on September 14, Citi transferred $500 million from LBHI's account at Citi to LBI's account at Citi to fund Lehman's CLS obligations after Fleming made the request on the afternoon of September 14.[4852]

Citi sought other ways to help Lehman in September.[4853]  For example, Citi was engaged by Hellman and Friedman regarding a potential acquisition of Neuberger Berman.[4854]  Citi also approached Lehman in early September to see if Citi could assist with capital raises.[4855]  Lehman also discussed spinning off most of its illiquid real estate assets into a separate publicly traded company, the "bad bank," to move those assets off

---

[4851] *Id.*

[4852] E-mail from Daniel J. Fleming, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 14, 2008) [LBEX-DOCID 457630]; *see also* e-mail from Julius Silbiger, Citigroup, to Thomas Obermaier, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00104189] (stating that the $500 million had moved by 9:42 p.m. that evening); e-mail from Roger Barnes, Citigroup, to Naresh N. Kumar, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00104189] (explaining that Citichecking opened at 9 p.m. that evening so the transfer could be made then); e-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00101129] (approving the transfer); Lehman Brothers Inc. Account Report (Oct. 1, 2008), at p. 1033 [CITI-LBI 00024142] (account statement confirming that the transaction transferred $500 million from Lehman Brothers Holdings Main Open Account 4061-5202 to Lehman Brothers Inc. account 3054-4658).

[4853] E-mail from John P. Havens, Citigroup, to Herbert H. (Bart) McDade III, Lehman (Sept. 9, 2008) [LBEX-DOCID 4191451].

[4854] E-mail from Gary Shedlin, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00075818].

[4855] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 9; e-mail from Christopher M. Foskett, Citigroup, to Gary Shedlin, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00075818] (asking whether Shedlin and David Head "have any interest in getting involved to help Lehman" as it is "obvious they need capital"); e-mail from Christopher M. Foskett, Citigroup, to Peter Heidinger, Citigroup, *et al.* (Sept. 10, 2008) [CITI-LBHI-EXAM 00076841] (Citi in discussions with Lehman on a capital raise transaction).

Lehman's balance sheet.[4856]   Under this plan, Lehman would provide a cash infusion, but then seek more funds from shareholders or other investors to enable the spin-off company to operate.[4857]   Although Lehman did not ask Citi to fund the real estate assets in the "bad bank" part of the good bank/bad bank alternative,[4858] Citi dispatched personnel from its equity capital markets business to speak with Lehman about alternatives for raising money to support those assets.[4859]   In addition, Citi was involved in discussions over Lehman Weekend with other banks (as part of a proposed loan facility for Lehman by a bank consortium) to fund the $33 billion in assets that Lehman contemplated spinning off into a "bad bank."[4860]

Throughout Lehman's difficulties, Citi seemed to maintain confidence in the firm almost until the petition date.[4861]   On September 12, Foskett wrote that "[m]arket forces are irrational," and he and Fontana lamented how the market was treating Lehman.[4862] This exchange is similar to Citi's view of Lehman in June 2008 when, even though Citi personnel referred to a "loss of confidence" in Lehman on June 12, Foskett clarified that

---

[4856] *See* Section III.A.3 of this Report, which discusses SpinCo.

[4857] *See id.*

[4858] *See id.*

[4859] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 9.

[4860] E-mail from Thomas Fontana, Citigroup, to William Mandaro, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00073424].   Citigroup First Written Responses, at p. 4.

[4861] *See* e-mail from Geoff Richards, Citigroup, to John Trohan, Citigroup, *et al.* (May 29, 2008) [CITI-LBHI-EXAM 00082821] (the "No Smoking Guns" research paper assessed Lehman's liquidity as good and thought concerns about another Bear Stearns-type funding problem were overblown); e-mail from John P. Havens, Citigroup, to Herbert H. (Bart) McDade III, Lehman (Sept. 9, 2008) [LBEX-DOCID 4191451] (Citi's team was very positive about Lehman's September 8, 2008 game plan presentation).

[4862] E-mail from Christopher M. Foskett, Citigroup, to Thomas Fontana, Citigroup (Sept. 12, 2008) [CITI-LBHI-EXAM 00073399].

the "loss of confidence" referred to a couple of people on Fontana's team, not a Citi-wide loss of confidence in Lehman.[4863]

### (iv) Lehman's Accounts at Citi Closed on Friday September 12 With Funds in Excess of the $2 Billion Deposit

On September 12, Citi was aware of approximately $1.5 billion in anticipated payments that Citi would have had to make on Lehman's behalf on September 15.[4864] Thus, in preparation for trading on September 15, Citi held on to the full $2 billion deposit on September 12.[4865]  According to contemporaneous Citi e-mails, in addition to the $2 billion deposit, Lehman ended Friday with approximately $970 million in additional funds in its accounts at Citi because Citi did not make four Lehman payments worth just over $2.4 billion.[4866]  Two of the transactions failed because there

---

[4863] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 3.

[4864] E-mail from Thomas Fontana, Citigroup, to Brian R. Leach, Citigroup, *et al.* (Sept. 12, 2008) [CITI-LBHI-EXAM 00054412].

[4865] *Id.*

[4866] E-mail from Julius Silbiger, Citigroup, to Naresh N. Kumar, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00068053] (breaking down the failed transaction amounts as affecting LBHI ($616 million), LBI ($335 million) and LBSA ($19 million)); e-mail from Paul S. Galant, Citigroup, to John P. Havens, Citigroup (Sept. 12, 2008) [CITI-LBHI-EXAM 00114766] (listing the failed payments as "$883MM to Chase; $850MM to Chase; $670MM to Chase; and 224MM (USD eqv) C$ to RBC"); *but see* e-mail from Thomas Fontana, Citigroup, to Richard C.S. Evans, Citigroup (Sept. 13, 2008) [CITI-LBHI-EXAM 00052719] (stating the amount in excess of the deposit was $996 million).  It appears that most of the money in the LBHI account was transferred on September 14 to LBI's account at Citi to support CLS service.  *See* e-mail from Julius Silbiger, Citigroup, to Thomas Obermaier, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00104189] (stating that the $500 million had moved by 9:42 p.m. that evening); e-mail from Roger Barnes, Citigroup, to Naresh N. Kumar, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00104189] (explaining that Citichecking opened at 9 p.m. that evening so the transfer could be made then); e-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00101129] (approving the transfer); Lehman Brothers Inc. Account Report (Oct. 1, 2008), at p. 1033 [CITI-LBI 00024142] (account statement confirming that the transaction transferred $500 million from Lehman Brothers Holdings Main Open Account 4061-5202 to Lehman Brothers Inc. account 3054-4658).

was not enough cash to cover them, the third was returned by JPMorgan, and the fourth payment failed because Lehman did not fund its Canadian currency in time.[4867] According to an e-mail from Fontana, Lehman ran its balances at Citi too late on Friday, and Citi decided not to ask for an extension of the Fedwire service[4868] so that Citi could attempt to send those payments out.[4869] Similarly, Fleming wrote that day that Lehman did not have enough time that evening to transfer the funds.[4870] One Citi official's contemporaneous characterization of the day's activity was that it looked like Lehman was "clearing out the cash."[4871]

### (e) Citi's Participation in "Lehman Weekend" Events

Over Lehman Weekend, Citi personnel worked with other banks to value Lehman's assets and participated in discussions with other banks about the possibility of creating a loan facility for Lehman to support the wind-down of certain Lehman assets.[4872]

---

[4867] E-mail from Paul S. Galant, Citigroup, to John P. Havens, Citigroup (Sept. 12, 2008) [CITI-LBHI-EXAM 00114766].

[4868] Fedwire services are owned and operated by the Federal Reserve Banks, and provide a secure method of transferring large-value, time-critical payments between participants. *See* Federal Reserve Bank, Fedwire Services Offerings, *available at* http://www.frbservices.org/fedwire/index.html (last accessed Jan. 21, 2010).

[4869] E-mail from Thomas Fontana, Citigroup, to Richard C.S. Evans, Citigroup (Sept. 13, 2008) [CITI-LBHI-EXAM 00052719].

[4870] E-mail from Daniel J. Fleming, Lehman, to Ian T. Lowitt, Lehman (Sept. 12, 2008) [LBEX-DOCID 070225] (explaining that Lehman ran out of time that evening to make certain payments because "by the time Citi confirmed our position it was after 6:30 which is the last time banks can transfer funds through the fed").

[4871] E-mail from John P. Havens, Citigroup, to Vikram S. Pandit, Citigroup (Sept. 12, 2008) [CITI-LBHI-EXAM 00114766].

[4872] Citigroup First Written Responses, at p. 4.

With regard to the latter, the Examiner's investigation revealed that Citi personnel were involved in discussions regarding the creation of a loan facility by a consortium of banks that would assist in an orderly wind-down of assets that were excluded from a sale, but these discussions ended when the proposed purchaser withdrew.[4873]  In addition, discussion about creating a $100 billion equity repo backstop facility to fund collateral that could not be pledged at the PDCF was mooted by the FRBNY's announcement that it was expanding the types of collateral it would accept at the TSLF and PDCF windows.[4874]

In addition, Citi was one of several banks involved with valuing Lehman's real estate portfolios to gain a better understanding of Lehman's hidden contingencies and unfunded obligations.[4875]  According to FRBNY e-mails, through this valuation analysis, the banks reported to the FRBNY that they assigned a value to Lehman's CRE of $17-20 billion in contrast to the $41 billion value Lehman had assigned.[4876]  In addition,

---

[4873] *Id.*

[4874] Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 9; Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 9; e-mail from Christopher M. Foskett, Citigroup, to Albert May, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00075998];  Citigroup First Written Responses, at p. 4.

[4875] E-mail from Sarah Bell, FRBNY, to Meg McConnell, FRBNY, *et al.* (Sept. 14, 2008) [FRBNY to Exam. 014832]; *see also* e-mail from Kenneth Cohen, Lehman, to Kevin Genirs, Lehman, *et al.* (Sept. 13, 2008) [LBEX-DOCID 1900538] (stating that Credit Suisse, Goldman Sachs and Citi would have access shortly to information on the estimated $41 billion global commercial real estate balance sheet, and noting that this would not include cash flows).

[4876] E-mail from Sarah Bell, FRBNY, to Meg McConnell, FRBNY, *et al.* (Sept. 14, 2008) [FRBNY to Exam. 014832]; *see also* e-mail from Brian R. Leach, Citigroup, to Vikram S. Pandit, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00114272] (expressing doubt that Lehman's balance sheet could be liquidated within 10 percent of its marks and commenting that it would likely be worse than that unless the government stepped in).

regarding Lehman's residential real estate, the banks reported an assigned value (exclusive of derivatives) of $9 billion, compared to Lehman's assigned value of $17.2 billion.[4877]  However, according to e-mails produced by the FRBNY, the banks, including Citi, did not think they had either sufficient time or information to value Lehman's assets thoroughly.[4878]  Indeed, some within Citi specifically recognized that "time is not on anyone's side,"[4879] especially given Lehman's complex balance sheet.[4880]

On the afternoon of Sunday September 14, Lehman informed Citi that it would be filing for bankruptcy.[4881]

### (f)  Citi's Actions Toward Lehman After Lehman Filed for Bankruptcy Protection

#### (i)  Citi Continued to Provide CLS Services for Lehman, But Not in an Entirely Uninterrupted Manner

On September 15, 2008, Citi sent a letter to Lehman's CLS user members – LBI, LBCC, LBSF and LBIE – advising them that, "effective immediately, we are terminating

---

[4877] E-mail from Sarah Bell, FRBNY, to Meg McConnell, FRBNY, *et al.* (Sept. 14, 2008) [FRBNY to Exam. 014832].

[4878] *Id.*

[4879] E-mail from Thomas Obermaier, Citigroup, to Paul S. Galant, Citigroup (Sept. 12, 2008) [CITI-LBHI-EXAM 00101309].

[4880] Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at pp. 9-10; *see also* e-mail from Christopher M. Foskett, Citigroup, to David J. Spinks, Citigroup (Sept. 14, 2008) [CITI-LBHI-EXAM 00074716] (responding to Spinks' comment that Spinks hoped Henry Paulson and the Federal Reserve knew what they were doing by not putting together a deal to save Lehman, Foskett stated "FSA put the squash on the Barclays deal").

[4881] *See* e-mail from Christopher M. Foskett, Citigroup, to FIG Executive Committee, Citigroup (Sept. 14, 2008) [CITI-LBHI-EXAM 00074716] ("Lehman will be filing for bankruptcy.  There is no deal to save them.").

the CLS Settlement Services Amended and Restated Agreement."[4882]  Later that same day, Lowitt signed an agreement requiring that Lehman deposit $1 billion in a deposit account at Citi in exchange for Citi agreeing to maintain CLS services for LBI and LBCC on September 16.[4883]  Consequently, LBI established a $1 billion time deposit at Citi on the afternoon of September 15 to induce Citi to continue to effect CLS payments for LBI and LBCC.[4884]  In recognition of this, Citi sent another letter suspending the September 15 termination notice for one day, which meant that Lehman was "authorized to submit orders through the CLS system using Citibank's account" on September 16.[4885]  Some within Lehman viewed Citi's change in position on the evening of September 15 as the result of pressure from officials at the Federal Reserve and SEC.[4886]

During the evening of September 17, Citi again terminated the CLS Agreement with LBI, which, by that point, was the only Lehman subsidiary still authorized by Citi

---

[4882] Letter from Citibank, N.A., to Lehman Brothers Inc., *et al.*, re: CLS Settlement Services Agreement (Sept. 15, 2008) [LBEX-DOCID 462068].

[4883] E-mail from Julie Barboza, Lehman, to Latoya Horton, Citigroup (Sept. 15, 2008) [LBEX-DOCID 4043766]; Letter Agreement from Citibank, N.A., to Lehman Brothers Inc. and Lehman Brothers Commercial Corporation, re: CLS Agreement (Sept. 15, 2008) [LBEX-DOCID 4043766x4264053]; *see also* e-mail from Jonathan D. Williams, Lehman, to Rob Close, CLS Bank, *et al.* (Sept. 15, 2008) [LBEX-DOCID 457922] (rescinding trades in CLS for LBIE and LBSF because LBIE was in receivership in the U.K. and LBSF was a U.S. non-regulated entity with very few FX trades).

[4884] Letter Agreement from Citibank, N.A., to Lehman Brothers Inc. and Lehman Brothers Commercial Corporation, re: CLS Agreement (Sept. 15, 2008) [LBEX-DOCID 4264053]; *see also* Letter Agreement from Citibank, N.A., to Lehman Brothers Inc., re: CLS Agreement (Sept. 16, 2008) [CITI-LBI 00024114] (referencing the September 15, 2008 Letter Agreement).

[4885] Letter from Citibank, N.A., to Lehman Brothers Inc., *et al.*, re: CLS Settlement Service Agreement and our letter dated 15th September (the Letter) (Sept. 15, 2008), at p. 1 [LBEX-DOCID 462068].

[4886] E-mail from Gregory Eickbush, Lehman, to Alastair Blackwell, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 026761] ("FED and SEC told Citi to turn CLS back on for us.  All fine for a few days.").

to submit orders to the CLS system.[4887]   This termination lasted only approximately three hours because Barclays signed a pledge agreement with Citi on the evening of September 17 in the amount of $700 million so that Citi would clear for value for LBI on September 18.[4888]  After receiving the $700 million pledge from Barclays at LBI's request, Citi withdrew its termination of the CLS Agreement.[4889]   Citi thereafter cleared for Lehman through the CLS system through Friday September 19.[4890]

Citi felt comfortable continuing to serve as Lehman's CLS agent the week LBHI filed for bankruptcy protection because Barclays had stepped into the shoes of LBI, and because Citi still held the $2 billion comfort deposit.[4891]   In the end, Citi served as Lehman's settlement member in CLS through Friday, September 19, by which time the

---

[4887] Letter from Citibank, N.A., to Lehman Brothers Inc., re: CLS Settlement Services Agreement (Sept. 17, 2008) [LBEX-DOCID 462072]; *see also* Letter Agreement from Citibank, N.A., to Lehman Brothers Inc., re: CLS Agreement (Sept. 16, 2008) [CITI-LBI 00024114] (listing only LBI as authorized to submit orders to the CLS system on September 17, 2008).

[4888] E-mail from Katherine Lukas, Citigroup, to Daniel J. Fleming, Lehman, *et al.* (Sept. 17, 2008) [LBEX-DOCID 457387)] (with letter attached concerning Citi "withdrawing the termination of the CLS Agreement" as to LBI); *see also* e-mail from John P. Emert, Citigroup, to Stephen W. Stites, Paul Weiss, *et al.* (Sept. 17, 2008) [BCI-EX-00077688] (the proposed pledge agreement for Barclays to sign is referenced as attached to the e-mail).  For the entire pledge agreement, *see* Pledge Agreement (Sept. 17, 2008) [BCI-EX 00077694] (unexecuted version), and Signature Page (Sept. 17, 2008) [BCI-EX 00077639] (signature page of the pledge agreement contains Gerard LaRocca's signature, Managing Director at Barclays, but the Citibank signature block is blank).

[4889] Letter from Citibank, N.A., to Lehman Brothers Inc., re: CLS Settlement Services Agreement (Sept. 17, 2008) [LBEX-DOCID 457387x462072].  Citi ultimately returned the $700 million to Barclays pursuant to the terms of the November 13, 2008 Supplement to Pledge Agreement.  *See* Supplement to Pledge Agreement (Nov. 13, 2008) [CITI-LBI 000541].

[4890] Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 6 (Citi's clearing for Lehman included Wednesday September 17, which was the International Monetary Market's quarterly settlement date for CME currency futures and which Williams explained was significant because a "huge volume" of trades settled that day through CLS); e-mail from Jonathan D. Williams, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 16, 2008) [LBEX-DOCID 457949] (commenting that having CLS service on September 17 was extremely important because it was the IMM settlement date).

[4891] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 10.

settlement activity was significantly less than it had been at the beginning of the week.[4892]  Citi stopped advancing funds and terminated the CLS agreement when Citi's exposure reached approximately $16 billion.[4893]  Citi notified Lehman for the last time on September 19 that, effective September 22, Citi was terminating the CLS Services Agreement.[4894]

### (ii) Prior to Lehman's Bankruptcy Filing, Citi Set Off a Portion of the Cash Deposit

Late on Sunday night, September 14, 2008, Citi's John Dorans wrote in an e-mail that Citi had "set-off certain funds and the balance of the money on deposit we will be holding as cash collateral subject to determining what we are ow[ed] by Lehman."[4895] The amount of the setoff was $512 million,[4896] which was ordered to be placed in a

---

[4892] Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 6.

[4893] Thomas Fontana, Citigroup, Unpublished Notes (Sept. 17-18, 2008), at pp. 236, 241 [CITI-LBHI-EXAM 00099649] (contemporaneous handwritten notes suggesting CLS was short $15 billion on September 17, 2008, and short $16 billion when the New York markets opened on September 18, 2008).

[4894] Letter from Tom Isaac, Citigroup, to Lehman Brothers Inc., re: CLS Settlement Services Agreement (Sept. 19, 2008) [CITI-LBI 00024117].

[4895] E-mail from John Dorans, Citigroup, to James A. Forese, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00105795].

[4896] Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, at p. 3 n.1, Docket No. 109, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008).  Citigroup First Written Responses, at p. 1; Thomas Fontana, Citigroup, Unpublished Notes (Sept. 14-15, 2008), at pp. 202, 211, 219, 223 [CITI-LBHI-EXAM 00099649] (contemporaneous handwritten notes showing a breakdown of the $512 million setoff as $275 million for Lehman Brothers Commercial Corporation Asia Ltd. facility, $164 million for overdrafts and placements, $50 million for letters of credit and $23 million for miscellaneous mark-to-market.  The $164 million amount was further broken down into $56 million for Lehman Brothers Finance AG Zurich Placement, $43 million for LBHI NY, $17.3 million for LBHI U.K. and $48.3 million for Lehman Brothers Securities Asia Ltd.).

segregated account in Citibank North America's name,[4897] but, according to Citi's counsel, was reversed (by $275 million) on September 16.[4898]  The balance of the setoff was reversed ($237 million) on December 18, 2008, when Citi transferred those funds back into LBHI's cash deposit account 3077-8171.[4899]  LBHI still maintains a $2 billion deposit with Citibank, against which Citibank "asserts rights of netting, offset, recoupment, or other claims of right."[4900]

### (2) Analysis of Potential Colorable Claims

The Examiner's investigation has not revealed evidence supporting the existence of any colorable claims against Citi.

### (a) Validity of the September 9 Guaranty Amendment

### (i) Economic Duress

Because the September 9 Guaranty Amendment was proposed and executed in the same day, and because Citi officials stated on September 9 that they would not open

---

[4897] E-mail from Thomas Fontana, Citigroup, to Edward A. Hewett, Jr., Citigroup (Sept. 14, 2008) [CITI-LBHI-EXAM 00068353].

[4898] Citigroup First Written Responses, at p. 7.

[4899] Account 3077-8171 Statement (Jan. 2, 2009), at p. 1 [CITI-LBHI 0005070].

[4900] Notice of Presentment of Stipulation and Order Authorizing (1) Transfer of Certain Prepetition Deposits, and (2) Preservation of Citibank's Setoff Rights, if any, in Respect of Amounts Transferred, Annex at p. 2, Docket No. 3272, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Apr. 3, 2009) (stating that LBHI maintains a $2 billion deposit with Citibank); Stipulation and Order Authorizing (1) Transfer of Certain Prepetition Deposits, and (2) Preservation of Citibank's Setoff Rights, if any, in Respect of Amounts Transferred, at p. 2 (¶ B), Docket No. 3372, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Apr. 15, 2009) (order signed by Judge James M. Peck); *see also* Statement of Citigroup Inc. in Support of Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, at p. 2 (¶ 2), Docket No. 110, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008) (showing that, as of September 18, 2008, the amount in LBHI's cash deposit account at Citi excluding any potential amount that had been set off, was $1.763 billion.).

for Lehman in Asia the next day without an amended agreement, this Section analyzes whether the September 9 Guaranty Amendment is invalid due to economic duress.

### a.  Legal Framework

Section 4 of the September 9 Guaranty Amendment provides that the Amendment is to be "governed by and construed in accordance with the laws of the State of New York."[4901]

As discussed *supra* in the analysis of potential colorable claims against JPMorgan, at Section III.A.5.b.2.a, under New York law "[a] contract may be voided and a party may recover damages 'when it establishes that it was compelled to agree to the contract terms because of a wrongful threat by the other party which precluded the exercise of its free will.'"[4902]  The elements of economic duress are: "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative."[4903]

---

[4901] Amendment 1 To Guaranty (Sept. 9, 2008), at p. 2 [LBEX-DOCID 090568] (executed version signed by Ian Lowitt and adding LBCC on September 11, 2008).

[4902] *Madey v. Carman*, 858 N.Y.S.2d 784, 786 (App. Div. 2008) (*quoting 805 Third Ave. Co. v. M.W. Realty Assocs.*, 448 N.E.2d 445, 447 (N.Y. 1983)).

[4903] *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989) (*quoting Gulf & W. Corp. v. Craftique Prods., Inc.*, 523 F. Supp. 603, 610 (S.D.N.Y. 1981)).

### b. The Evidence Does Not Support the Existence of a Colorable Claim Against Citi for Economic Duress

Citi imposed a tight, same-day deadline on Lehman on September 9, providing Lehman with less than six hours to review the September 9 Guaranty Amendment.[4904] Internal Lehman e-mails suggest Citi was holding up payments until the amendment was signed and, specifically, that Citi was not releasing a $2 billion CLS payment.[4905] Moreover, while negotiating the inclusion of Lehman's Asian subsidiaries in the later-added parties to the September 9 Guaranty Amendment, Citibank informed Lehman that it would "not open [Lehman] in Asia with the agreement we have in place."[4906] Citi personnel stated to the Examiner that this meant Citibank would not clear trades for Lehman entities unless LBHI guaranteed the entities or they prefunded the trades.[4907]

The e-mails between Cornejo and Killerlane suggest that Lehman may have had very little time to verify whether Lehman could sign the amendment without infringing on their Custody Agreements. Specifically, Killerlane was unsure about how the setoff provision in the original Guaranty would interact with Lehman's Custody

---

[4904] E-mail from Emil F. Cornejo, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 9, 2008) [LBEX-AM 008563] (Foskett called Cornejo just prior to 1:00 p.m. requesting a guaranty with LBI); e-mail from Emil F. Cornejo, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Sept. 9, 2008) [LBEX-AM 008564] (explaining that Citi wanted the guaranty executed by 6:00 p.m. that evening).

[4905] E-mail from Emil F. Cornejo, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Sept. 9, 2008) [LBEX-AM 008571]; e-mail from Craig L. Jones, Lehman, to Daniel J. Fleming, Lehman (Sept. 9, 2008) [LBEX-AM 008562].

[4906] E-mail from Thomas Fontana, Citigroup, to Emil F. Cornejo, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 1079016].

[4907] Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 8; Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 9.

Agreements.[4908]   Nor did Killerlane seem comfortable with the September 9 Guaranty Amendment, but stated he would not demur, so long as Lowitt and Treasury at Lehman were comfortable with it.[4909]

Citi e-mails suggest that Lehman had little to no objection to signing the amendment to the Guaranty,[4910] and that Cornejo's only hesitation was that Lehman needed to verify that providing a guaranty for Asian entities would not create any regulatory issues.[4911]   Based on documentary evidence, there was no disagreement over any of the substantive terms of the amendment, and there is no evidence contradicting Foskett's statement that Citi did not present the amendment to Lehman on a "take-it-or-leave-it" basis.[4912]

Moreover, Citi's initial proposal early in the afternoon of September 9 included 17 Lehman entities.   Lehman, however, accepted these entities piecemeal, first agreeing prior to 6:00 p.m. to amend the Guaranty to include only LBI, and subsequently adding eight more Lehman entities on September 9, followed by one more subsidiary on September 11.   Thus, Lehman agreed to add only one of the 17 proposed entities before the 6:00 p.m. deadline on September 9 before finally accepting eight additional entities

---

[4908] E-mail from James J. Killerlane, Lehman, to Emil F. Cornejo, Lehman (Sept. 9, 2008) [LBEX-AM 008571] (stating that he was "not sure if we can logistically [sign the amendment to the guaranty] with our Custody Agreements or if we are comfortable with this").

[4909] *Id.*

[4910] E-mail from Christopher M. Foskett, Citigroup, to Thomas Fontana, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00077391].

[4911] E-mail from Emil F. Cornejo, Lehman, to Thomas Fontana, Citigroup (Sept. 9, 2008) [LBEX-DOCID 1079021].

[4912] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 9.

later that evening, and adding LBCC on September 11. Even though some of Lehman's refusals were based on the fact that three of the proposed subsidiaries had no accounts with Citi or were Special Purpose Vehicles, Lehman's ability to resist Citi's demands at least to some degree indicates Lehman's acceptance of the terms was not involuntary.

To the extent that the reference to Citi's "holding payments" until execution of the Amendment[4913] refers to holding clearing advances under the CLS Agreement, the advance of those funds was left to Citi's "sole discretion," and was a practice that could be ended "without prior notice."[4914] Thus, any statement by Citi that it would or would not do something that was within Citi's "sole discretion" would not be unlawful or improper. The same is true if Fontana's threat not to "open [Lehman] in Asia"[4915] was made and understood to be a threat not to advance credit to Lehman rather than a complete refusal to clear. Citi personnel have confirmed to the Examiner that Fontana's statement that it would not open for Lehman in Asia without the signed amendment simply meant that Lehman would have had to prefund its trades in the region if the subsidiaries in Asia were not added to the holding company guaranty.[4916] This reading is further supported by Fontana's approval to release CLS payments Citi was holding

---

[4913] *See* e-mail from Emil F. Cornejo, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Sept. 9, 2008) [LBEX-AM 008564].

[4914] Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, Ex. A at p. 3 (§ 1), Docket No. 109, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008).

[4915] E-mail from Thomas Fontana, Citigroup, to Emil F. Cornejo, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 1079021].

[4916] Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 8; Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 9.

on September 9; Citi waited until Lehman had prefunded the payment by providing $2.085 billion of the $2.088 billion necessary to cover the payment.[4917]  The documents suggest that Citi was holding that payment, not because Citi refused to clear trades for Lehman in order to induce Lehman to sign the September 9 Guaranty Amendment, but because Citi had reduced Lehman's daylight overdraft limit to zero and Lehman's account did not have sufficient funds to cover the payment.

Additionally, the 6:00 p.m. deadline imposed by Citi on September 9 must be viewed in the context of the rest of the news of that day, including the KDB deal falling through, the advancement of Lehman's third quarter 2008 earnings announcement to September 10 and Lehman's stock price continuing to plummet.  The 6:00 p.m. deadline was important for Citi because Citi was "irrevocably committed to settle" Lehman's CLS transactions after that time.[4918]  In this setting, imposing a sub-six hour deadline for executing the amendment was not an unreasonable effort by Citi to protect its own business interests.  As Foskett explained to the Examiner, Citi was very concerned about its business at this time and had to balance its actions carefully regarding Lehman to avoid harming itself.[4919]

---

[4917] E-mail from Thomas Fontana, Citigroup, to Chris Deukmedjian, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00032799].

[4918] Citigroup, Overview of GTS Clearing and Settlement Lines (Sept. 4, 2008), at p. 4 [CITI-LBHI-EXAM 00102127].

[4919] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 8; *see also* Thomas Fontana, Citigroup, Unpublished Notes (Sept. 12, 2008), at p. 193 [CITI-LBHI-EXAM 00099649] (contemporaneous handwritten notes noting the "need to protect shareholders").

Alternatively, Lehman may have ratified the September 9 Guaranty Amendment through acquiescing to its terms. Many Lehman entities, including those operating on the CLS system, continued to accept clearing advances from Citi after the execution of the Amendment. Far from repudiating the September 9 Guaranty Amendment, Lehman sought to confirm the status of Citibank clearing advances in the Bankruptcy Court after the holding company filed its petition.[4920] There is also no evidence that the period of duress continued through that time, nor is there evidence that Lehman desired to repudiate the Amendment at any point.

The Examiner concludes that the evidence does not support the existence of a colorable claim that the September 9 Guaranty Amendment is invalid due to economic duress.

### (ii) The Failure of Consideration

The September 9 Guaranty Amendment greatly expanded Citi's protection while, on the surface, did not provide Lehman with any clearing or custody services beyond what Citi had previously been providing. Based on these facts, this Section analyzes whether the September 9 Guaranty Amendment fails for lack of consideration.[4921]

---

[4920] *See* Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, Docket No. 109, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008).

[4921] See Section III.B.3 for a discussion of claims to avoid the September 9 Guaranty Amendment under applicable fraudulent transfer principles where "the consideration needed to support a simple contract"

### a. Legal Framework

Consideration is "either a benefit to the promisor or a detriment to the promisee."[4922] A recitation of consideration in a contract is an admission of fact that can be disputed or explained with parol evidence.[4923] Notably, "a promise by one party to do that which he is already under a legal obligation to perform is insufficient as a consideration to support a contract."[4924] "Failure of consideration gives the disappointed party the right to rescind the contract."[4925] By New York statute, however, a contract modification "shall not be invalid because of the absence of consideration, provided that the [modification] agreement . . . shall be in writing and signed by the party against whom it is sought to enforce the . . . modification . . . or by his agent."[4926]

### b. The Evidence Does Not Support the Existence of a Colorable Claim Against Citi for Failure of Consideration

Even though both the original 2004 Guaranty and the September 9 Guaranty Amendment contain the same boilerplate recitation of consideration, and even though Citi did not offer to increase the credit lines extended to Lehman in any way, the

---

is not sufficient to establish reasonably equivalent value. *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981).

[4922] *Holt v. Feigenbaum*, 419 N.E.2d 332, 336 (N.Y. 1981).

[4923] *See Diamond v. Scudder*, 45 A.D.3d 630, 632 (App. Div. 2007).

[4924] *Carpenter v. Taylor*, 58 N.E. 53, 55 (N.Y. 1900); *see also Roth v. Isomed, Inc.*, 746 F. Supp. 316, 319 (S.D.N.Y. 1990); *see also supra* Section III.A.5.b.2.b for further discussion of legal principles relating to consideration.

[4925] *Fugelsang v. Fugelsang*, 131 A.D.2d 810, 812 (App. Div. 1987).

[4926] N.Y. Gen. Oblig. Law § 5-1103 (McKinney 2009); *see also Deutsche Bank Secs. Inc. v. Rhodes*, 578 F. Supp. 2d 652, 660 (S.D.N.Y. 2008).

September 9 Guaranty Amendment is a modification of the January 7, 2004 Guaranty. Paragraph 1 of the September 9 Guaranty Amendment explicitly states that "[s]ection 1 of the Guaranty is amended by replacing the first sentence thereof in its entirety with the following."[4927]   As such, under New York law, because the September 9 Guaranty Amendment is in writing and signed by Lowitt, additional consideration is not required and the Amendment is valid.   The September 9 Guaranty Amendment gave Citi a guaranty for the repayment of credit obligations of various additional Lehman subsidiaries in order to induce Citi to extend or continue extending credit to those subsidiaries.

Under the CLS Agreement, the authorization of any transaction through the CLS system was left to Citi's "sole discretion," and any extension of credit could be changed or terminated without prior notice.[4928]   Therefore, there was consideration for the Amendment insofar as the September 9 Guaranty Amendment induced Citi to provide or continue providing credit to Lehman subsidiaries, and insofar as Citi did not have an obligation to continue extending credit under the CLS Agreement – or, for that matter, any other credit agreement known to the Examiner.  Considering the difficult economic

---

[4927] Amendment 1 To Guaranty (Sept. 9, 2008) [LBEX-DOCID 090568] (executed version signed by Ian Lowitt and adding LBCC on September 11, 2008).

[4928] Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, Ex. A at p. 3 (¶ 1), Docket No. 109, *In re Lehman Bros. Holdings, Inc.,* No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008).

situation Lehman found itself in on September 9, it does not seem unreasonable for Citi to have sought additional security from Lehman via the Guaranty Amendment.

Moreover, the documents suggest that Citi intended to continue to extend clearing advances to Lehman after the execution of the September 9 Guaranty Amendment. During negotiations over the September 9 Guaranty Amendment, Citibank refused to extend intraday credit to Lehman entities that were not guaranteed by LBHI, requiring them to prefund their trades. After Lehman executed the September 9 Guaranty Amendment, Citibank set Lehman's credit lines for clearing at the level of the deposit amount of $2 billion with the expectation that Citi personnel would manually approve extensions of credit above the deposit amount. Thus, there was consideration for the September 9 Guaranty Amendment because it induced Citi to continue providing intraday credit to Lehman.

The Examiner has thus concluded that the evidence does not support the existence of a colorable claim that the September 9 Guaranty Amendment is invalid due to lack of consideration.

### (b) Breach of the Duty of Good Faith and Fair Dealing in Connection With the CLS Services Agreement

The CLS Agreement specifies that the laws of England govern the rights and obligations between Citibank and Lehman. Generally, New York courts honor parties'

choice of law provisions.[4929]  As discussed in more detail in the HSBC Section below at Section III.A.5.d, English contract law does not recognize a generally applicable principle of good faith and fair dealing, and English courts will allow a commercial lender to exercise contractual, discretionary powers in what the lender genuinely believes to be its best commercial interest.

        **(i)   The Evidence Does Not Support the Existence of a Colorable Claim Against Citi for Breach of the Duty of Good Faith and Fair Dealing in Connection With the CLS Services Agreement**

Only four Lehman subsidiaries were authorized to submit transaction instructions to the CLS Bank through LBI:  LBI, LBCC, LBSF and LBIE.[4930]  If an instruction were submitted to the CLS Bank directly, Citi still had to authorize the transaction and did not have any responsibility for any such transaction that it had not yet authorized.[4931]  On September 9, Citi significantly reduced the amount of credit it

---

[4929] *Boss v. Am. Express Fin. Advisors, Inc.*, 791 N.Y.S.2d 12, 14 (App. Div. 2005).

[4930] Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, Ex. A at pp. 1, 12, Docket No. 109, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008) (LBI and LBCC); Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, Ex. B at p. 1, Docket No. 109, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008) (listing LBSF and LBIE as Affiliates); *see also* Letter from Citibank, N.A., to Lehman Brothers Inc., *et al.*, re:  CLS Settlement Services Agreement (Sept. 15, 2008), at p. 2 [LBEX-DOCID 462068] (terminating the CLS Agreement with LBI, LBCC, LBSF, and LBIE on the afternoon of September 15).

[4931] Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, Ex. A at p. 2 (¶ 1), Docket No. 109, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008).

extended to Lehman for its CLS transactions, and Citi found it difficult to manage manually using only the $2 billion deposit.[4932]

As discussed *infra*, English law will likely recognize that any extension of credit provided by Citi to Lehman was within Citi's *sole discretion* unless Citi had expressly agreed in writing to provide a committed credit facility and had received a commitment fee. The Examiner did not discover anything to suggest that Citi had any such express agreement or was obligated to provide a certain level of CLS clearing service. Citi was obligated to make a CLS payment *only after* Citi had authorized the transaction, and that authorization was given in Citi's sole discretion. Given the increased risk Citibank faced vis-à-vis Lehman in September 2008, it is unlikely a court would find that Citi acted unreasonably, irrationally, arbitrarily, or in bad faith in exercising, or threatening to exercise, its contractual right to cease extending clearing advances, and cease serving as Lehman's settlement member.

Moreover, the terms of the CLS Agreement between Lehman and Citibank left the extension of credit to Citibank's "sole discretion," and provided Citibank with the right to "discontinue[]" such advances "at any time, without prior notice" so long as Citi had not already authorized the transaction instruction.[4933] The CLS Agreement also

---

[4932] E-mail from Thomas Fontana, Citigroup, to Michael Mauerstein, Citigroup, *et al.* (Sept. 9, 2008) [CITI-LBHI-EXAM 00065673].

[4933] Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, Ex. A at p. 3 (¶ 1), Docket No. 109, *In re Lehman Bros. Holdings, Inc.,* No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008).

granted Citi the right to terminate the agreement immediately and without notice if any one of a number of events occurred, including: a bankruptcy of a Lehman party, a material adverse change in the financial condition of a party, or the inability of a party to pay debts as they came due.[4934]   Under the legal framework above, it is unlikely a court would use the implied covenant to contradict an express term of the Agreement - namely that it was within Citi's "sole discretion" to stop advancing funds "without notice."

The Examiner has thus concluded that the evidence does not support the existence of a colorable claim for breach of the covenant of good faith and fair dealing in connection with the CLS Agreement.

### d)   Lehman's Dealings With HSBC

HSBC was a clearing bank, source of intraday credit for settling trades and counterparty to Lehman for a variety of treasury products.[4935]   Approximately one month prior to the petition date, HSBC informed Lehman that HSBC would be completely, albeit gradually, exiting their relationship.[4936]   During the last week of August and the first week of September, HSBC demanded the equivalent of approximately $945 million and received the equivalent of approximately $947 to 992

---

[4934] *Id*. at p. 6 (¶ 6).

[4935] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 3.

[4936] Nicholas J. Taylor, HSBC, Briefing Note — Project Milan (Aug. 18, 2008), at pp. 1-2 [HBUS 90]; Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 6; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 4.

million cash collateral in order to continue providing clearing and settlement services to Lehman.[4937] (HSBC returned approximately $282 million of these funds on September 11).[4938]

HSBC also demanded that Lehman execute the U.K. and Hong Kong Cash Deeds to secure the collateral.[4939] Lehman successfully negotiated with HSBC to narrow the proposed right of setoff and expand its own access to the cash secured by the cash

---

[4937] E-mail from Guy Bridge, HSBC, to Carlo Pellerani, Lehman, *et al.* (Aug. 27, 2008) [HBUS 3] (demanding combined deposits of $945 million in London and Hong Kong); e-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Aug. 28, 2008) [HBUS 9250] (reporting receipt of GBP 435 million, or approximately $800 million); e-mail from Martina C. W. Kung, HSBC, to Patricia Gomes, HSBC, *et al.* (Sept. 1, 2008) [HBUS 397] (reporting pending deposit of HKD 1.4 billion, or approximately $180 million); Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 5. *But see* e-mail from Stirling Fielding, Lehman, to Carlo Pellerani, Lehman, *et al.* (Sept. 1, 2008) [LBEX-AM 008963] (recording instant message conference stating that the Hong Kong deposit is equivalent to $192 million with unspecified credit due to Lehman); Memorandum from Ken Coleman, HSBC counsel, to Examiner, re: Transfers in Connection With the Hong Kong Cash Deed (Oct. 23, 2009), at p. 1 (representing that HSBC's Hong Kong affiliate received the equivalent of approximately $148 million). As discussed below, the Examiner's financial advisors were unable to identify a Hong Kong transfer with certainty. Pellerani and Lowitt discussed the possibility of offering securities instead of cash, although Lowitt expressed concern that such an offer might "set off alarm bells." E-mail from Carlo Pellerani, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Sept. 11, 2008) [LBEX-AM 008934]. The plan to use securities as collateral instead of cash never progressed beyond the proposal stage. Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 9. On September 11, HSBC returned to Lehman approximately EUR 200 million, or approximately $280 million, of the cash collateral. *See* Section III.A.5.d.4, *infra*.

[4938] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 7. According to Lehman's Daily Funding Call Update e-mail for September 11: "Trsy have reduced cash deposit with HSBC to GBP200m to release liquidity in the firm." E-mail from Maria Barrio, Lehman, to Neil Ullman, Lehman, *et al*. (Sept. 11, 2008) [LBEX-DOCID 1898196]. The Examiner's financial advisors' analysis of Lehman's transactions during this period shows that this report was erroneous, and that Lehman received EUR 200 million on September 11. Duff & Phelps, Preliminary Findings re: HSBC Deposits (Dec. 2, 2009), at p. 1.

[4939] E-mail from Guy Bridge, HSBC, to Carlo Pellerani, Lehman, *et al.* (Aug. 27, 2008) [HBUS 3]; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at pp. 5-6; Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at pp. 6-7 (discussing plan to require collateral).

deeds.[4940]  Lehman executed two cash deeds to cover the U.K. deposit (collectively, the "U.K. Cash Deeds") on September 9,[4941] and the Hong Kong Cash Deed on September 12.[4942]  Because Lehman executed the Hong Kong Cash Deed too late in the day for HSBC to transfer the cash collateral to a secured account covered by the deed, and because of a September 15 public holiday in Hong Kong, HSBC was unable to transfer the funds into such an account until September 16,[4943] and the funds were subsequently returned to a Lehman cash account.[4944]  On September 9, 2009, HSBC and LBHI entered into a stipulation allowing HSBC to offset GBP 100,062,061.97 (approximately $164.6 million) in debts and interest covered under the U.K. Cash Deeds.[4945]

### (1)  Overview of HSBC's Relationship With Lehman

HSBC's relationship with Lehman covered four broad functions:  1) facing Lehman as a counterparty in derivatives trades and other transactions; 2) acting as a trustee for Lehman's special purpose vehicles in the Cayman Islands; 3) performing

---

[4940] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 6; *see* e-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 3, 2008) [HBUS 570] (discussing Lehman's refusal to sign the Cash Deeds without changes to the terms).

[4941] E-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 9, 2008) [HBUS 1179]; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 6.

[4942] E-mail from Patricia Gomes, HSBC, to Agnes Y. L. Lau, HSBC, *et al.* (Sept. 12, 2008) [HBUS 1760].

[4943] *See id.*

[4944] Memorandum from Ken Coleman, HSBC counsel, to Examiner, re: Transfers in Connection With the Hong Kong Cash Deed (Oct. 23, 2009), at p. 1.

[4945] Stipulation, Agreement and Order, Pursuant to Sections 362 and 553 of the Bankruptcy Code, Modifying the Automatic Stay for the Limited Purpose of Permitting HSBC Bank plc to Effect Setoff and Resolution of Certain Banking Arrangements Between Lehman Brothers Holdings Inc. and HSBC Bank plc, at p. 2, Docket No. 5089, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 9, 2009). The stipulation also allowed a setoff of GBP 605,000 for a misdirected payment and committed to return EUR 70,000,000 to Lehman at a later date.  *Id.* at pp. 2-3.

clearing and settlement services for Lehman's sterling-denominated securities trades in the CREST system; and 4) providing credit support to LBHI and its subsidiaries through a variety of credit products. [4946] For purposes of this Report, functions three and four — HSBC's exposure to Lehman through credit products, including credit advanced as part of clearing and settlement services for CREST — are the most significant aspects of the HSBC-Lehman relationship.

### (a) HSBC Provided CREST Clearing and Settlement Services to Lehman

The CREST system is a clearing and settlement system for certain securities.[4947] CREST settles securities trades denominated in U.S. dollars, Euros and Pounds Sterling.[4948] Sterling-denominated trades are the most relevant to this Report.

In the CREST system, a CREST member bank, such as LBIE, appoints one of the 14 approved commercial banks, such as HSBC, to act as its CREST settlement bank.[4949] The CREST settlement bank then "stands in" for the CREST member bank to execute trades through CREST's central computer system.[4950]

---

[4946] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 3 (describing the first three functions); Examiner's Interview of Ken Coleman, David Esseks, and Angela Somers, July 22, 2009, at p. 2 (describing the first three functions); Lehman Global Annual Review (May 12, 2008), at pp. 1-2 [HBUS 10275] (describing exposure to Lehman arising from other credit products).

[4947] Angela Somers, HSBC counsel, CREST System Overview (July 22, 2009), at p. 1.

[4948] *Id.* at p. 2.

[4949] *Id.*; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 3.

[4950] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 3; Angela Somers, HSBC counsel, CREST System Overview (July 22, 2009), at pp. 1-2 (describing in more detail the process of settlement banks acting for member banks).

Sterling-denominated trades are settled in real-time.[4951]   Throughout the day, CREST members direct their CREST settlement banks to execute trades.[4952]  The CREST settlement banks then send messages with the trade information to the CREST central computer system.[4953]   The CREST central computer checks the transferee member's CREST account to determine whether it holds sufficient funds and the transferor member's CREST account to determine whether it holds the relevant securities.[4954]  If both conditions are satisfied, the CREST central computer system settles the transaction in its records and generates a message notifying the parties that the transaction has been completed.[4955]

Unlike other settlement systems such as Euroclear or DTC, the CREST system is neither a custodian nor depository of the securities being traded.[4956]  Once the CREST central computer system settles a trade, the settlement bank (here, HSBC) — not the member bank (here, Lehman) — is directly liable for payment of the transaction.[4957] Rather than require member banks to prefund every transaction with their settlement banks, settlement banks often extend intraday credit to facilitate trades.[4958]   In the

---

[4951] Angela Somers, HSBC counsel, CREST System Overview (July 22, 2009), at p. 2.

[4952] *Id.* at p. 1; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 3.

[4953] Angela Somers, HSBC counsel, CREST System Overview (July 22, 2009), at p. 2.

[4954] *Id.*

[4955] *Id.*

[4956] *Id.*

[4957] *Id.* at pp. 1-2.

[4958] *Id.*; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 3; Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 7.

CREST system, this credit is called the "debit cap."[4959]  The member bank and settlement bank typically settle their account at the end of each day.[4960]

A settlement bank may reduce the debit cap to zero at any time, although the settlement bank would be obligated to clear trades that had been approved through CREST before the reduction, and the CREST member would still be able to *sell* securities with a debit cap of zero.[4961]  However, HSBC personnel opined that it would be impractical to the point of impossible to trade securities through CREST without intraday credit.[4962]  According to Nicholas J. Taylor, Chief Operating Officer of HSBC's Global Financial Institutions Group and head of HSBC's Financial Institutions Group for the Americas, relying on prefunding instead of intraday credit is not feasible because of the difficulty of accurately modeling a member bank's CREST trades each day.[4963]  Inaccurate modeling could cause a member bank to post inadequate funds to cover its trades, which would cause failed trades and send negative signals to the market about the financial health of the member bank.[4964]

---

[4959] Angela Somers, HSBC counsel, CREST System Overview (July 22, 2009), at p. 2.

[4960] *Id.*; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 3; Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 7 (discussing impracticality of prefunding trades compared to relying on intraday credit).

[4961] Angela Somers, HSBC counsel, CREST System Overview (July 22, 2009), at p. 2.

[4962] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 5; Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 7.

[4963] Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 7; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 5.

[4964] Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 7.

### (b)  Overview of the Operative Agreements

The CREST relationship between HSBC and LBIE was governed by a Facility Letter, which makes the CREST settlement facility available to LBIE;[4965] a Security Deed, which grants HSBC a security interest in LBIE's property held in connection with or derived from the CREST facility;[4966] and a list of Terms and Conditions, which are incorporated into the Facility Letter and specify the parties' rights and obligations.[4967] At the time of the petition, the CREST relationship between Lehman and HSBC was governed by a facility letter HSBC sent to Lehman on July 31, 2008, which Lehman accepted on August 19, 2008.[4968]  This agreement supersedes the terms Lehman approved when it expanded its CREST activity with HSBC on May 5, 2007, but does not change the parties' relationship in a way that would be material to the bankruptcy proceedings.[4969]

---

[4965] *See* CREST Facility Letter between LBIE and HSBC (Aug. 19, 2008) [HBEU 138].

[4966] *See* Security Deed Creating Charges over CREST Stock (Gilts and Equities) and Receivables to Secure the Liabilities of a CREST Member or Sponsored Member (Apr. 24, 2002) [HBEU 72].

[4967] *See* Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008) [HBEU 102].

[4968] *See* CREST Facility Letter between LBIE and HSBC (Aug. 19, 2008), at p. 4 [HBEU 138].

[4969] *See* Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (May 5, 2007) [HBEU 142]; Letter from HSBC to LBI(E), re: CREST Settlement Bank Facility Made Available in Multicurrency on a Secured Basis (Apr. 3, 2007) [HBEU 174]; CREST Facility Letter between LBIE and HSBC (May 5, 2007) [HBEU 174] (adding additional participant IDs for LBI(E) under existing Terms and Conditions); Jenner & Block, Memorandum re: Representations by HSBC counsel (Jan. 11, 2010), at pp. 2-3.  The Terms and Conditions attached to the May 5, 2007 Letter grant HSBC absolute discretion to terminate, without notice.  *See* Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (May 5, 2007), at § 16.1 [HBEU 142].  This clause is materially identical to the termination clause in the August 19, 2008 Terms and Conditions.  *See* Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at § 16.1 [HBEU 102].

Further, Section 16.1 of the Terms and Conditions of the CREST facility allows HSBC to

> terminate its responsibilities as Settlement Bank for the Customer under this Agreement either generally or in relation to one or more Designated Currencies [EUR, USD and GBP] at any time and at its absolute discretion, without notice, provided that [HSBC] shall, where it considers it practicable and appropriate, give not less than 30 days' notice to the Customer and Euroclear U.K. & Ireland Limited but shall not in any event have any liability to the Customer if it fails to do so.[4970]

LBIE also acknowledged that HSBC does not owe a duty of care to monitor or enforce compliance with CREST requirements and procedures.[4971]  LBIE further agreed to various indemnifications of HSBC[4972] and exemptions of HSBC from liability.[4973]  The parties additionally agreed that the terms of the exclusions and limitations of liability contained in the agreement are fair and reasonable,[4974] and that any single waiver, forbearance or failure to exercise rights under the contract in one instance would not operate as waiver or forbearance in any other instance or prevent a party from exercising its rights under the agreement.[4975]  Finally, the agreement grants HSBC an irrevocable right to apply, without notice, any debts arising under the CREST agreement against any credit balance LBIE held with HSBC.[4976]

---

[4970] Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at § 16.1 [HBEU 102].

[4971] *Id.* at § 9.7.

[4972] *Id* at § 7.

[4973] *Id.* at §§ 3.4-3.5, 9.

[4974] *Id.* at § 9.11.

[4975] *Id.* at § 18.

[4976] *Id.* at § 19.

As Lehman's CREST settlement bank, HSBC routinely extended between $100 million and $1 billion in intraday credit for CREST transactions, and Lehman typically repaid the balance at the end of the day.[4977]   Lehman was one of HSBC's 25 largest clients for sterling clearing and settlement services.[4978]   HSBC was Lehman's only bank for clearing and settling sterling-denominated securities trades.[4979]

### (2)  The Examiner's Investigation of Particular Transactions

The most significant issues arising from the HSBC-Lehman relationship stem from HSBC's demand that Lehman post collateral and execute cash deeds in exchange for continued CREST clearing and settlement services.  Accordingly, that demand and the related transactions are the focus of this Section of the Report.

The Examiner has also identified other transactions that do not directly affect the CREST relationship but nevertheless warrant additional explanation because of their size, timing, or divergence from the usual course of dealing between HSBC and Lehman.  They are:

### (a)  HSBC Cancelled a $1 Billion Intraday Credit Facility

The single largest component of HSBC's exposure to Lehman through credit products and services other than CREST was a $1 billion intraday credit facility.  HSBC had provided Lehman with a $1 billion intraday credit facility for the limited purpose

---

[4977] Examiner's Interview of Ken Coleman, David Esseks, and Angela Somers, July 22, 2009, at p. 2.
[4978] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 3.
[4979] Id.

of financing the intraday liquidity risk Lehman incurred when marketing its clients' issuances of new equity.[4980]

Paul Lopez, HSBC's Global Relationship Manager for Financial Institutions, stated that Lehman had not used the facility since approximately 2003.[4981] Sometime between May and July 2008, Lehman proposed repurposing the facility as a general intraday liquidity facility to cover shortfalls in triparty repos with JPMorgan.[4982] Lopez stated that he decided not to proceed with repurposing the facility because Lehman's deteriorating financial condition made it too difficult to justify taking on an unsecured exposure to cover risks JPMorgan would not accept.[4983] HSBC cancelled the unused credit facility in July 2008 as a risk reduction measure during "Project Opaque," discussed *infra*.[4984] However, the decision to cancel the facility may have preceded the decision to withdraw from Lehman.[4985]

### (b) Lehman Maintained a $1 Billion Segregated Deposit with HSBC

Documents produced by HSBC (through its American subsidiary, HSBC Bank USA, N.A. ("HBUS")) indicate that in June 2008, personnel at HSBC were concerned

---

[4980] Examiner's Interview of Paul M. Lopez, Oct. 19, 2009, at pp. 3-4 (referring to corroborating statements by both Lopez and Taylor to the Examiner).

[4981] *Id*.

[4982] *Id*.

[4983] *Id*.

[4984] Memorandum from Nicholas J. Taylor, HSBC, to Global Financial Institutions Group, HSBC, re: Project Opaque [Draft] (July 28, 2008), at p. 4 [HBUS 16204] (describing cancellation of day loan facility as "already in train"). See Section III.A.5.d.3.a, below, for further discussion of Project Opaque.

[4985] Examiner's Interview of Paul M. Lopez, Oct. 19, 2009, at p. 3 (expressing uncertainty about when the facility was cancelled but opining that the cancellation preceded the decision to withdraw from Lehman).

that Lehman would withdraw a $1 billion deposit that was technically unencumbered but nevertheless governed by an "understanding" that Lehman would not make withdrawals.[4986] Lopez confirmed that LBI kept this deposit with HSBC to satisfy the net capitalization requirements of broker-dealers under Rule 15c3, promulgated under the Securities Exchange Act of 1934.[4987] Lopez explained that HSBC was concerned that Lehman's clients would make simultaneous withdrawals from their accounts at Lehman and prompt Lehman to withdraw funds from the segregated deposit at HSBC to meet the demand.[4988] Lopez stated that the deposit was unencumbered and that HSBC had expressly waived its right of setoff.[4989] Lopez stated that the deposit was available to Lehman on demand, but that Lehman was required to provide notice to HSBC before making a withdrawal.[4990] Lopez also explained that sometime post-petition in September 2008, Lehman directed HSBC to deliver the deposit to Barclays

---

[4986] *E.g.*, e-mail from Paul M. Lopez, HSBC, to Karen von Ruffer, Lehman (June 5, 2008) [HBUS 12633] (describing the deposit and understanding).

[4987] Examiner's Interview of Paul M. Lopez, Oct. 19, 2009, at p. 4. Rule 15c3 establishes the minimum net capital broker-dealers must keep on hand in order to participate in various market activities, including holding funds and securities on behalf of customers. *See* 17 C.F.R. § 240.15c3-1; *see also* Memorandum from Robert Azerad, Lehman, to Investor Relations Department, Lehman, re: 2008 Q2 Liquidity Position (June 7, 2008), at p. 3 [LBEX-DOCID 008829] (discussing customer free credit balances in LBI that "are segregated from the Firm's liquidity per Rule 15c3"), attached to e-mail from Robert Azerad, Lehman, to John Feraca, Lehman, *et al.* (June 7, 2008) [LBEX-DOCID 68690].

[4988] Examiner's Interview of Paul M. Lopez, Oct. 19, 2009, at p. 4.

[4989] *Id.*

[4990] *Id.* (Lopez could not recall precisely how much notice was required).

and that HSBC complied with the request.[4991]    According to Lehman's internal memoranda, LBHI did not include this deposit as part of its liquidity pool.[4992]

### (c)  Lehman Deposited $750 Million with HSBC on June 24

On June 24, Lehman personnel notified Lopez that Lehman was placing deposits with HSBC totaling $750 million.[4993]   Lopez did not recall the specific deposits except insofar as he recalled that they were part of the ordinary course of business between Lehman and HSBC.[4994]  Lopez opined that the deposits represented Lehman selling $750 million to HSBC's money desk, and that the deposits would have likely been returned to Lehman the next day.[4995]  Lopez stated that these sorts of transactions usually passed without comment, and this transaction was unusual only in that it was brought to his attention.[4996]  Lopez opined that Lehman was publicizing the deposits up to his level in order to show the strength of its liquidity pool and to build its relationship with HSBC by placing some of that liquidity with HSBC.[4997]

---

[4991] *Id.* at pp. 4-5.

[4992] Memorandum from Robert Azerad, Lehman, to Investor Relations Department, Lehman, re: 2008 Q2 Liquidity Position (June 7, 2008), at p. 3 [LBEX-DOCID 008829] (stating that customer free credit balances in LBI "are segregated from the Firm's liquidity per Rule 15c3"), attached to e-mail from Robert Azerad, Lehman, to John Feraca, Lehman, *et al.*, (June 7, 2009) [LBEX-DOCID 68690].

[4993] E-mail from Karen von Ruffer, Lehman, to Paul M. Lopez, HSBC (June 24, 2008) [HBUS 14054].

[4994] Examiner's Interview of Paul M. Lopez, Oct. 19, 2009, at p. 5.

[4995] *Id.*

[4996] *Id.*

[4997] *Id.*

### (d) Lehman Committed $25 Million on August 15 to HSBC's Syndicated Lending Facility

After HSBC advised Lehman of its intent to withdraw and after HSBC requested that Lehman provide approximately $1 billion in cash collateral, Lehman requested to be released from a $25 million commitment to a syndicated credit revolver for HSBC.[4998] Lehman Brothers Commercial Bank had committed to this facility on August 15, 2008.[4999] HSBC personnel believed Lehman was participating in the facility to secure HSBC's continued support.[5000] HSBC personnel used Lehman's need for continued credit support as leverage to encourage Lehman's participation.[5001] In a June 15, 2008 e-mail to Lopez and other HSBC personnel, Taylor reports that he recently had a "long call" with Pellerani: "[In] the context of reciprocity and our continuing support during this period, I suggested they participated in HSBC Finance's current syndicated. He was positive about this and requested full details."[5002] At the time, Pellerani viewed this as an opportunity to "cement the relationship" by gaining the gratitude of HSBC management rather than an opportunity to secure a binding promise that HSBC would

---

[4998] E-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Aug. 27, 2008) [HBUS 129].

[4999] Side Letter from HSBC to LBCB (Aug. 15, 2008) [LBEX-DOCID 089911] (signed by HSBC); Side Letter from HSBC to LBCB (Aug. 15, 2008) [LBEX-DOCID 089916] (signed by LBCB).

[5000] E-mail from Nicholas J. Taylor, HSBC, to Mark Stadler, HSBC, *et al.* (June 15, 2008) [HBUS 9925]; e-mail from Guy Bridge, HSBC, to Craig T. Thiele, HSBC, *et al.* (June 17, 2008) [HBUS 10046] ("They are under no illusion it could be extremely helpful to show their support . . . ").

[5001] E-mail from Nicholas J. Taylor, HSBC, to Mark Stadler, HSBC, *et al.* (June 15, 2008) [HBUS 9925].

[5002] *Id.*

continue providing credit support for CREST services or otherwise.[5003] The actual agreement governing the syndicated revolver contains a merger clause and does not promise continued credit support.[5004] For its part, the CREST agreement requires that any changes be made in writing.[5005]

Documents from HBUS reflect that HSBC personnel initially supported releasing Lehman from the agreement.[5006] Taylor told the Examiner that the agent bank (Citibank, N.A.)[5007] refused the request because of the precedent that cancelling Lehman's commitment would establish for the other banks participating in the revolver, and because cancelling the commitment risked sending negative market signals that could further erode Lehman's market position.[5008] For his part, Pellerani believed that HSBC did not expect Lehman to meet the commitment once HSBC had demanded collateral.[5009]

---

[5003] *See* e-mail from Carlo Pellerani, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Aug. 27, 2008) [LBEX-AM 008936] (stating that participation would "cement the relationship" and was "extremely appreciated at the most senior levels" of HSBC, but making no mention of promises to do or refrain from doing anything).

[5004] *See* Three-Year Revolving Credit Agreement (July 11, 2008), at § 19.07 [LBEX-DOCID 1029995]; *see also* Side Letter from HSBC to LBCB (Aug. 15, 2008) [LBEX-DOCID 089911] (signed by HSBC); Side Letter from HSBC to LBCB (Aug. 15, 2008) [LBEX-DOCID 089916] (signed by LBCB).

[5005] Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at § 17.1 [HBEU 102].

[5006] E-mail from Nicholas J. Taylor, HSBC, to Guy Bridge, HSBC, *et al.* (Aug. 27, 2008) [HBUS 129] (agreeing that HSBC should allow Lehman to exit the facility).

[5007] Three-Year Revolving Credit Agreement (July 11, 2008) [LBEX-DOCID 1029995].

[5008] Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 8.

[5009] Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at pp. 7-8.

HSBC ultimately rescinded its support for Lehman's request to withdraw.  In a September 9, 2008 e-mail to Taylor regarding Lehman's request to cancel the commitment, HSBC's senior vice president of Money and Capital Markets wrote: "As we have discussed, we do not plan to consent to this termination request because of the negative signal and precedent it would send to our other banks in the deal."[5010] However, HSBC never drew on the $25 million commitment.[5011]

### (e)  Lehman Pledged $6 Million to HSBC as Collateral for Letters of Credit

On August 11, 2008, Lehman pledged $6 million to HSBC as collateral for a letter of credit.[5012]  HSBC had already issued two unsecured letters of credit of $3.6 million and $750,000 to Lehman on or around June 27 and July 1, respectively.[5013]  All three letters were issued pursuant to a June 24, 2008 Master Letter of Credit Agreement that allows HSBC to set off any of Lehman's deposits held at HSBC against any debts incurred under the master letter of credit.[5014]  HSBC entered a claim for $116,083 for fees, interest, expenses and funds drawn against the letters of credit by the beneficiaries.[5015]

---

[5010] E-mail from Craig T. Thiele, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 9, 2008) [HBUS 5707].

[5011] Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at pp. 7-8.  Taylor stated that Lehman did not otherwise transfer the funds to HSBC.  Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 8.

[5012] Annex A to Proof of Claim of HSBC Bank USA, N.A., Claim No. 18857, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2009).

[5013] Annex B to Proof of Claim of HSBC Bank USA, N.A., Ex. 2, Claim No. 18857, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2009).

[5014] *Id.* (¶ 21).

[5015] Annex A to Proof of Claim of HSBC Bank USA, N.A., Claim No. 18857, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2009).

HSBC also asserted a contingent claim for future draws against the letters of credit by the beneficiaries.[5016]

### (f) Other Significant Exposures

HSBC's remaining exposure to Lehman arises from $2,562,770.97 in payments erroneously directed to Lehman for delivery to London Diversified Fund Limited on September 29, 2008,[5017] and claims of at least $345,276,915.79 related to various securities transactions.[5018]

---

[5016] *Id.*

[5017] Annex A to Proof of Claim of HSBC Bank USA, N.A., Claim No. 18084, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2009).

[5018] *See* Ken Coleman, HSBC counsel, Spreadsheet of Claims by HSBC and Related Entities (Jan. 5, 2010). The claims break down as follows: HSBC Bank plc asserts a $2,910,446 claim against LBHI under an ISDA and guaranty, and a $64,337,830.50 claim against LBHI and LBSF under an ISDA and guaranty; HSBC Bank USA asserts a $6,320,245.45 claim against LBHI under an ISDA and guaranty, and a $50,420,868.24 claim against LBHI and LBSF under an ISDA and guaranty; HSBC Financial Products (France) SNC asserts a $4,652,646.23 claim against LBHI under an ISDA and guaranty, and a $311,526.01 claim under an OSLA and guaranty; HSBC Hang Seng asserts a $298,154.89 claim against LBHI under an ISDA and guaranty; HSBC Private Bank (Suisse) SA asserts a $477,970 claim against LBHI for a failed trade, a $724,723.40 claim against LBHI for another failed trade, and a $124,123.38 claim against LBHI under an ISDA and guaranty; HSBC France asserts a $79,998,295.50 claim against LBHI and LBSF under an ISDA and guaranty; HSBC Ltd. (Hong Kong) asserts a $28,479,863.12 claim against LBHI under an OSLA and guaranty, a $3,421,677.57 claim against LBHI and LBSF under an ISDA and guaranty, and a $10,095,478.51 claim under an ISDA and guaranty; Halbis US Credit Alpha Master Fund Ltd. asserts a $1,228,570.59 claim against LBHI and LBSF under an ISDA and guaranty; Halbis France asserts a $2,334,155 claim, a $1,313,837 claim, and a $1,605,357 claim against LBHI for various program securities; HSBC Assurance Vie (France) asserts an $85,206,000 claim for various program securities; HSBC PB France asserts a $568,815.30 claim against LBHI for various program securities on behalf of a client; HSBC plc asserts a $368,706 claim and a $49,925.63 claim against LBHI for various program securities, and a $27,700.47 for various program securities and a guaranty. At the time of drafting, HSBC plc had not yet determined the precise amount of its remaining claims against LBHI, which are therefore excluded from this total. *Id.* Although this debt has not been set off against the funds held pursuant to the U.K. Cash Deeds, HSBC reserved the right to make such setoffs in its stipulation with LBHI, and LBHI has agreed to "work in a commercially reasonable manner to address the issues surrounding" HSBC's claims not disposed of by the stipulation. Stipulation, Agreement and Order, Pursuant to Sections 362 and 553 of the Bankruptcy Code, Modifying the Automatic Stay for the Limited Purpose of Permitting HSBC Bank plc to Effect Setoff and Resolution of Certain Banking Arrangements Between Lehman Brothers Holdings

### (3) HSBC Required Lehman to Provide Approximately $1 Billion in Collateral While Quietly Ending Their Relationship

### (a) HSBC Determined to End Its Relationship with Lehman

Taylor stated that in mid-2006, HSBC began an in-depth examination of its exposure to the financial sector.[5019] According to Taylor, HSBC decided to conduct the examination because HSBC was concerned that Lehman and other financial institutions had not adequately disclosed their exposures to risks from subprime mortgages.[5020]

In fact, Lehman's public disclosures concerning its subprime mortgage exposure from this period relied on a definition of "subprime" that excluded Alt-A and so-called Alt-B mortgages even as the performance of those products increasingly resembled that of subprime.[5021] Moreover, Lehman continued to increase its exposure by pursuing a countercyclical business strategy in which it continued to originate subprime mortgages until August 2007, and Alt-A and Alt-B mortgages until January 2008.[5022]

---

Inc. and HSBC Bank plc, Docket No. 5089, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 9, 2009).

[5019] Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 4; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 4 (describing the same process).

[5020] Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 4.

[5021] *See* Letter from Christopher M. O'Meara, Lehman, to Jeffrey Gordon, SEC (Aug. 16, 2007), at p. 2 [LBEX-DOCID 2703435]. In response to questions from the SEC about the extent of Lehman's subprime exposure, O'Meara explained that Lehman's definition considered a borrower with a FICO score below 620 as a key feature of a subprime loan. *Id.* However, the Interagency Guidance for Subprime Lending Programs considered a borrower with a FICO score below 660 to be characteristic of a subprime loan. FDIC Press Release, "Expanded Guidance for Subprime Lending Programs" (Jan. 31, 2001), at p. 2.

[5022] Examiner's Interview of Lana Franks Harber, Sept. 23, 2009, at p. 1.

As a result of HSBC's evaluation of its exposure to the financial sector, in 2007, HSBC reduced the amount of uncommitted credit available to the investment banks.[5023] According to Taylor, other banks did the same.[5024] Taylor noted that, despite this reduction, the stress tests conducted by the investment banks during this period relied on assumptions that the credit was still available.[5025] Taylor said that the cash capital model of calculating liquidity was "discredited" by 2008 precisely because it relied on these overly optimistic assumptions about the availability of credit and unsupported assumptions about the value of certain asset-backed securities.[5026]

HSBC's concerns increased after the near collapse of Bear Stearns in March 2008, and HSBC viewed Lehman as the weakest remaining broker-dealer.[5027] In July 2008, HSBC increased its efforts to reduce its exposure to Lehman by further reducing the limits of various lines of credit it had extended to Lehman.[5028] HSBC initially focused its efforts on lines of credit that Lehman seldom used so that the reductions would not

---

[5023] Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 4.

[5024] *Id.*

[5025] *Id.*

[5026] *Id.* at p. 5.

[5027] *Id.*; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 4.

[5028] Memorandum from Nicholas J. Taylor, HSBC, to Global Financial Institutions Group, HSBC [Draft] (July 28, 2008), at pp. 1-2 [HBUS 16204]; Memorandum from HSBC Financial Institutions Group, re Project Milan (Aug. 2008), at pp. 1-2 [HBUS 17459]. As part of this decision, HSBC also declined to renew Lehman's letters of credit after maturity. Memorandum from Nicholas J. Taylor, HSBC, to Global Financial Institutions Group, HSBC [Draft] (July 28, 2008), at p. 2 [HBUS 16204].

alert Lehman or other market participants to HSBC's actions.[5029] HSBC referred to its plan to mitigate exposure to the financial sector as "Project Opaque" but renamed the plan "Project Milan," which focused on Lehman specifically.[5030]

As part of Projects Opaque and Milan, HSBC asked Lehman to execute credit support annexes ("CSAs") to existing swap and derivative trading agreements ("ISDAs") that were not already accompanied by CSAs.[5031] Counsel for HSBC has represented that, as of the petition date, HSBC was a net provider of collateral to LBHI under the CSAs.[5032] The Examiner's investigation has not uncovered any evidence that HSBC withheld collateral from Lehman through the CSAs.

On August 18, 2008, Taylor informed Tonucci that HSBC intended to end its business relationship with Lehman entirely through an "orderly withdrawal."[5033] Lehman and HSBC personnel met over August 21 and 22 and discussed ways for HSBC

---

[5029] Financial Institutions Group, HSBC, Lehman Exposure Summary (July 2008), at p. 1 [HBUS 15615] (describing the avoidance of actions that would be transparent to the market or to Lehman under "Objectives").

[5030] Memorandum from Nicholas J. Taylor, HSBC, to Global Financial Institutions Group, HSBC [Draft] (July 28, 2008), at p. 2 [HBUS 16204] (referring to Project Opaque); Memorandum from HSBC Financial Institutions Group, re Project Milan (Aug. 2008), at p. 1 [HBUS 17459]; Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 5.

[5031] E-mail from Martin J. Holcombe, HSBC, to Sidhu Gurshinder, HSBC, *et al.* (July 9, 2008) [HBUS 14796] (forwarding e-mail chain discussing HSBC project to execute CSAs for all eligible swap and derivative trading agreements, focusing on top 25 clients and attaching files related to agreements with Lehman). When one party holds assets in excess of the value owed under the ISDA, the CSA gives the other party a security interest in the excess assets until they are returned. *See generally, e.g.*, ISDA Credit Support Annex to the Schedule to the Master Agreement dated October 5, 2000 between Lehman Brothers Finance S.A. and HSBC Bank USA (2000), at ¶¶ 3, 13 [HBUS 2135].

[5032] Memorandum from Ken Coleman, HSBC counsel, to Examiner, re: Transfers in Connection With the Hong Kong Cash Deed (Oct. 23, 2009), at p. 1.

[5033] Nicholas J. Taylor, HSBC, Briefing Note — Project Milan (Aug. 18, 2008), at pp. 1-2 [HBUS 90].

to continue reducing its exposure to Lehman without impacting Lehman's business and without alerting the market.[5034]

### (b)  HSBC Demanded Collateral for Intraday Credit

On August 27, 2008, Guy Bridge, a director in HSBC's Financial Institutions Group in London, informed Pellerani that HSBC required Lehman to deposit the equivalent of $800 million into an account in the U.K. and $145 million into an account in Hong Kong by August 29.[5035]  Bridge told Pellerani that HSBC would require Lehman to execute cash deeds to secure the deposits.[5036]  Bridge explained to Pellerani in an e-mail that "[t]his is required to ensure we can continue to provide the support for your clearing/settlement business as principal Bankers in these regions."[5037]  Both HSBC and Lehman understood Bridge's letter to mean that HSBC would cease clearing and settling trades in CREST for Lehman if Lehman did not provide the collateral.[5038]

---

[5034] E-mail from Guy Bridge, HSBC, to Carlo Pellerani, Lehman (Aug. 23, 2008) [LBEX-AM 008910].

[5035] E-mail from Guy Bridge, HSBC, to Carlo Pellerani, Lehman, *et al.* (Aug. 27, 2008) [HBUS 3]; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 5.

[5036] E-mail from Carlo Pellerani, Lehman, to Guy Bridge, HSBC, *et al.* (Aug. 27, 2008) [HBUS 3]; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at pp. 5-6.

[5037] E-mail from Guy Bridge, HSBC, to Carlo Pellerani, Lehman, *et al.* (Aug. 27, 2008) [HBUS 3].

[5038] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 5; Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at p. 7; *see* e-mail from Huw Rees, Lehman, to Andrew Yeung, Lehman, *et al.* (Aug. 28, 2008) [LBEX-AM 008941] ("[T]here is a possibility that, without an agreement, our UK clearing operations will be impacted."); e-mail from Carlo Pellerani, Lehman, to Paolo R. Tonucci, Lehman (Aug. 27, 2008) [LBEX-AM 008916] ("[W]e need to give them ~$1b of deposit by Friday with a legal right to set-off, non negotiable, or they will not settle for us."); e-mail from Paolo R. Tonucci, Lehman, to Ian T. Lowitt, Lehman (Aug. 27, 2008) [LBEX-AM 008918] ("[T]hey want us to deposit cash by Friday if they are to continue clearing for us.").

HSBC intended the U.K. deposit to cover its exposure to Lehman arising from CREST clearing and settlement activities.[5039] HSBC intended the Hong Kong deposit to cover HSBC's exposure arising from various credit lines extended to Lehman subsidiaries in Asia-Pacific markets.[5040] HSBC requested collateral to cover these exposures in the short term instead of reducing Lehman's credit lines because Lehman would have had difficulty replacing HSBC's services in either area.[5041]

Not granting HSBC's demand would have been "terminal" for Lehman.[5042] Bridge told the Examiner that replacing HSBC's CREST services would have been impossible in the short term and "very difficult" in the medium term.[5043] Taylor stated to the Examiner that Lehman would also have had difficulty replacing HSBC's credit services in the Asia-Pacific region.[5044] Lehman agreed to make the deposits and review a draft deed.[5045] HSBC agreed to assist Lehman in finding ways to reduce the size of the required deposit by reducing Lehman's use of intraday credit.[5046]

---

[5039] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at pp. 5-6; Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at pp. 6-7; Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at p. 7.

[5040] E-mail from Guy Bridge, HSBC, to Carlo Pellerani, Lehman, *et al.* (Aug. 27, 2008) [HBUS 3] (demanding combined deposits of $945 million in London and Hong Kong to cover clearing and settlement activities in those regions).

[5041] Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at pp. 6-7.

[5042] Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at p. 7 ("Basically they were not going to allow us to do business. . . . They put a gun to our head.").

[5043] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 2.

[5044] Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at pp. 6-7 (referring to agreement to accept collateral for clearing and settlement services that would be difficult to replace).

[5045] E-mail from Carlo Pellerani, Lehman, to Guy Bridge, HSBC, *et al.* (Aug. 27, 2008) [HBUS 3].

[5046] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at pp. 3-4; e-mail from Carlo Pellerani, Lehman, to Guy Bridge, HSBC, *et al.* (Aug. 27, 2008) [HBUS 3] (requesting assistance identifying ways to reduce the

Pellerani told Taylor he would alert government regulators – the Federal Reserve, the Financial Services Authority, or both – of HSBC's demand.[5047] Bridge told Taylor via e-mail that the Federal Reserve was already aware of HSBC's "intended course."[5048] Bridge told the Examiner that he had not spoken with anyone at the Federal Reserve, but that he believed that either Taylor or another HSBC employee in New York had done so.[5049] Taylor informed the Examiner that he did not speak with anyone at the Federal Reserve, nor was he aware of anyone at HSBC who did.[5050] Taylor said that he assumed the Federal Reserve was aware of HSBC's cash collateral demand and plans to withdraw through its observation team embedded at Lehman.[5051] Pellerani did not recall directly informing the FSA of HSBC's demand, but said that the FSA had been informed either through daily discussions with on-site evaluators or daily written updates sent to the FSA.[5052]

---

required deposit); e-mail from Guy Bridge, HSBC, to Carlo Pellerani, Lehman (Aug. 23, 2008) [LBEX-AM 008910] (suggesting coordination between HSBC and Lehman).

[5047] E-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Aug. 28, 2008) [HBUS 1900]; e-mail from Carlo Pellerani, Lehman, to Paolo R. Tonucci, Lehman (Aug. 27, 2008) [LBEX-AM 008916].

[5048] E-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Aug. 28, 2008) [HBUS 1900].

[5049] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at pp. 5-6.

[5050] Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 7.

[5051] *Id.*

[5052] Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at p. 7.

### (c) HSBC Agreed To Accommodate Lehman at Quarter End

Lehman deposited the equivalent of approximately $800 million with HSBC in the U.K. on the morning of August 28.[5053]   That same day, following conversations between Lowitt and HSBC's Chief Risk Officer, HSBC allowed Lehman to retrieve the deposit in order to hold it over the Labor Day weekend "to help with [Lehman's] quarter end BS targets."[5054]

Taylor stated that HSBC's purpose in returning the deposit was to assist with Lehman's cash management at the end of the quarter.[5055]   According to Taylor, cash management issues are magnified at the end of each month, and even more so at the end of each quarter.[5056]   As a consequence, Taylor did not think that there was anything wrong with a temporary return of the approximately $800 million deposit to assist Lehman at quarter end.[5057]   Nevertheless, Taylor remarked that, in light of Lehman's

---

[5053] E-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Aug. 28, 2008) [HBUS 9250].  The transfer may not have been completed before HSBC notified Lehman that it would allow Lehman to hold the deposit until after the end of the quarter.  Lehman's bank records list an "attempted" transfer of GBP 435 million (approximately $800 million) on August 28 from LBIE to an HSBC account held by the London branch of LBHI, LBHI(U.K.).  Duff & Phelps, Preliminary Findings re: HSBC Cash Transfer (Nov. 4, 2009), at p. 1.  There are no wire data or bank confirmations associated with this entry.  *Id.*

[5054] E-mail from Carlo Pellerani, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Aug. 28, 2008) [LBEX-AM 008853]; *see* e-mail from Ian T. Lowitt, Lehman, to Jeremy Isaacs, Lehman (Aug. 28, 2008) [LBEX-AM 008940] (referring to conversation with HSBC's CRO and HSBC's accommodation and its concern about Lehman over the quarter-end).

[5055] Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at pp. 8-9.

[5056] *Id.*

[5057] *Id.*

reported liquidity pool, he was surprised Lehman requested that HSBC temporarily return the funds.[5058]

### (d)  Lehman Deposited the Cash Collateral With HSBC

E-mails from HSBC report that Lehman again deposited the equivalent of approximately $800 million with HSBC on September 1 for value on September 2, bringing the total U.K. deposit back up to the equivalent of approximately $800 million.[5059]  On September 2, Lehman deposited the equivalent of approximately $180 million in a Hong Kong account.[5060]

Bridge also sent Huw Rees, Head of European Creditor Relations at Lehman, a draft cash deed on the morning of August 28.[5061]  Rees then sent the draft deed to Lehman in-house counsel, Andrew Yeung, for review.[5062]

---

[5058] *Id.* at p. 9.

[5059] E-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 1, 2008) [HBUS 401]. Lehman's bank records show an "attempted" transfer on September 1.  Duff & Phelps, Preliminary Findings re: HSBC Cash Transfer (Nov. 4, 2009), at p. 1.  There are no wire data or bank confirmations associated with this record.  *Id.*  Lehman's bank records show an actual transfer of GBP 435 million, equivalent to approximately $800 million, from LBIE into LBHI(U.K.)'s HSBC account on September 2. *Id.*

[5060] E-mail from Patricia Gomes, HSBC, to Guy Bridge, HSBC, *et al.* (Sept. 1, 2008) [HBUS 397] (stating that the Hong Kong deposit is equivalent to $180 million).  *But see* e-mail from Stirling Fielding, Lehman, to Carlo Pellerani, Lehman, *et al.* (Sept. 1, 2008) [LBEX-AM 008963] (recording instant message conference stating that the Hong Kong deposit is equivalent to $192 million with unspecified credit due to Lehman). The Examiner's investigation has not revealed any other references to a Hong Kong deposit equivalent to $192 million.  The Examiner's financial advisors identified a September 1 transfer equivalent to $192 million from a Lehman Brothers Asia Holdings money market account, but were not able to determine if all of these funds were used for a deposit.  Duff & Phelps, Preliminary Findings re: HSBC Deposits (Dec. 2, 2009), at p. 2.

[5061] E-mail from Guy Bridge, HSBC, to Huw Rees, Lehman, *et al.* (Aug. 28, 2008) [LBEX-AM 008941].

[5062] *Id.*

On September 3, Pellerani informed Bridge that Lehman would not sign the deed without narrowing the scope of the right of setoff, and then began negotiating its terms.[5063]  Lehman sought to narrow the debts that could be set off with the collateral and to broaden the circumstances under which it would have access to the funds.[5064]

### (e)  Lehman Negotiated New Terms and Executed the Cash Deeds

#### (i)  Lehman Secured Concessions in the U.K. Cash Deeds

Lehman executed the U.K. Cash Deeds on September 9 to cover the U.K. deposit of the equivalent of approximately $800 million.[5065]  As described below, HSBC returned the equivalent of approximately $282 million of these funds on September 11.[5066]

One deed is between HSBC Bank plc and LBIE.[5067]  The second U.K. deed is between HSBC Bank plc and LBHI(U.K.).[5068]  Lehman signed both deeds on September 9.[5069]  HSBC split the LBHI(U.K.) deed into separate deeds to be joined by a cross-guaranty because HSBC believed administrative hurdles would delay execution of any

---

[5063] E-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 3, 2008) [HBUS 570].

[5064] *Id.*  Pellerani quickly distanced himself from negotiations with HSBC to the extent possible because he had become so "animated" over HSBC's collateral demand.  Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at p. 7.  The actual negotiations were handled by Rees, who was supervised by Pellerani.  *Id.*

[5065] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 6.

[5066] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 7.

[5067] Cash Deed between HSBC and LBIE (Sept. 9, 2008) [HBUS 1180].

[5068] Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008) [HBUS 1190].

[5069] E-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 9, 2008) [HBUS 1179]; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 6.

deed that covered LBHI(U.K.), and HSBC wanted to gain as much security as soon as possible.[5070]

In both of the U.K. Cash Deeds, Lehman successfully negotiated for a more limited definition of debt for setoff purposes and greater access to the cash collateral covered by the deeds.[5071] The original draft cash deed defines "debt" eligible for setoff under the deed as "all money and liabilities whatever, whenever, and however incurred whether now or in the future due or becoming due from you to [HSBC]."[5072] The executed U.K. Cash Deeds limit the definition of debt to money owed on specified accounts held by LBIE, LBHI(U.K.) and Lehman Brothers Ltd.[5073] and to Lehman's debts for sterling clearing and settlement services.[5074]

The original draft cash deed would have allowed Lehman to access the deposit only when HSBC determined that there was no outstanding debt (broadly defined).[5075] The executed U.K. Cash Deeds require that HSBC exercise good faith in determining whether the deposit was adequate to cover the outstanding debt (more narrowly defined).[5076] However, Lehman's access to the deposit was still subject to HSBC's

---

[5070] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 6.

[5071] *Id.*

[5072] Cash Deed between HSBC and LBIE [Draft] (Aug. 28, 2008), at § 1(c) [LBEX-DOCID 4468302].

[5073] Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008), at § 1 [HBUS 1190].

[5074] Cash Deed between HSBC and LBIE (Sept. 9, 2008), at §§ 1(e)(1)(c), 2 [HBUS 1180]; Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008), at § 1(e)(1)(c) [HBUS 1190].

[5075] Cash Deed between HSBC and LBIE [Draft] (Aug. 28, 2008), at § 4 [LBEX-DOCID 4468302].

[5076] Cash Deed between HSBC and LBIE (Sept. 9, 2008), at §§ 3-4 [HBUS 1180]; Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008), at §§ 5-6 [HBUS 1190].

approval, and the deposit was still subject to any right of setoff HSBC would have against an unsecured deposit.[5077]

Finally, the U.K. Cash Deeds specify that they are governed by English law.[5078]

### (ii) Lehman Executed the Hong Kong Cash Deed Late on September 12

Lehman continued negotiating the terms of the Hong Kong Cash Deed until Friday, September 12.[5079]  The parties to the executed deed are Lehman Brothers Asia Holdings ("LBAH") and HSBC Ltd.[5080]  Like the U.K. Cash Deeds, the executed Hong Kong Cash Deed grants HSBC Ltd. a right of setoff against payments made on behalf of or overdrafts on specified accounts.[5081]  Instead of covering HSBC's credit exposure arising from CREST, the Hong Kong Cash Deed covers HSBC's exposure from credit lines (both intraday and longer-term) extended to Lehman entities in the Asia-Pacific region.[5082]

---

[5077] *See* Cash Deed between HSBC and LBIE (Sept. 9, 2008), at §§ 4-5 [HBUS 1180]; Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008), at §§ 5-6 [HBUS 1190].

[5078] Cash Deed between HSBC and LBIE (Sept. 9, 2008), at § 22 [HBUS 1180]; Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008), at § 27 [HBUS 1190].

[5079] *See* e-mail from Patricia Gomes, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 12, 2008) [HBUS 1760] (announcing execution of Hong Kong deeds).

[5080] Cash Deed between LBAH and HSBC Ltd (Sept. 12, 2008), at p. 1 [HBAP 13].

[5081] *Compare id.* at § 1(f), *with* Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008), at § 1 [HBUS 1190].

[5082] Cash Deed between LBAH and HSBC Ltd (Sept. 12, 2008), at § 1(f) [HBAP 13]; *see also* e-mail from Patricia Gomes, HSBC, to Eddie C. H. Ching, HSBC (Sept. 12, 2008) [HBUS 7642] (stating that the Hong Kong deed secures "all Cat A and PSL of HK and India").  PSL lines are lines used for credit settlement activity and Cat A lines are for longer term credit products.  Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 6 (defining Cat S as credit lines for settlement activity and Cat A as non-settlement loans); Nicholas J. Taylor, HSBC, Briefing Note — Project Milan (Aug. 18, 2008), at p. 1 [HBUS 90] (listing PSL credit lines under the heading, "Cat S").

The Hong Kong Cash Deed also grants HSBC Ltd. a right of setoff against debts incurred through providing clearing and settlement services to certain Lehman entities (including LBI) designated in the Hong Kong Cash Deed.[5083]   As with the U.K. Cash Deeds, Lehman was obligated to maintain a sufficient balance in specified accounts to cover good faith estimates of HSBC's aggregate exposure covered by the deed.[5084]

Lehman could access the collateral – subject to HSBC Ltd.'s approval – if there were no debts in the specified accounts (and so long as HSBC Ltd. had no actual or contingent obligation to incur such a debt on Lehman's behalf); although HSBC Ltd. could not exercise the setoff rights contained in the deed against the remaining funds, HSBC Ltd. reserved its right to exercise any *other* rights of setoff it may have against those funds.[5085]   The Hong Kong Cash Deed contains a choice-of-law provision specifying that the deed is to be governed by Hong Kong law.[5086]

LBAH signed the Hong Kong Cash Deed too late in the day on September 12 for HSBC to move the Hong Kong deposit into an account secured by the deed.[5087]   The banks in Hong Kong were closed on Monday, September 15 for a public holiday, so the earliest HSBC could move the deposit into a secured account was September 16.[5088] HSBC counsel has represented that HSBC transferred the equivalent of approximately

---

[5083] Cash Deed between LBAH and HSBC Ltd (Sept. 12, 2008), at §§ 1, 4 [HBAP 13].

[5084] *Id.* at § 5(a).

[5085] *Id.* at §§ 5(b), 6(a).

[5086] *Id.* at § 27.

[5087] E-mail from Patricia Gomes, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 12, 2008) [HBUS 1760].

[5088] *Id.*

$148 million (on September 16) from the cash collateral deposit into an LBAH cash account and then into a secured account as specified by the Hong Kong Cash Deed.[5089] HSBC has limited its document production from overseas subsidiaries, including HSBC Asia-Pacific ("HBAP"), but HSBC counsel has represented that the deposit was transferred out of the secured account and back to the LBAH cash account later in the day on September 16 on instructions from Lehman's Treasurer for the Asia-Pacific region, Gregory Ito.[5090]   According to HSBC counsel, the Hong Kong deposit was commingled with other Lehman funds in the cash account.[5091]

HSBC counsel has also advised that KPMG, the provisional liquidators of LBAH, instructed HSBC to freeze all LBAH accounts, at which point all outgoing payments required prior approval from KPMG.[5092]  Further, on October 3, 2008, KPMG instructed HSBC to transfer the balance of the Hong Kong deposit to an account specified by KPMG.[5093]  HSBC counsel represented that HSBC Ltd. made the transfer on October 6 after receiving (with KPMG's approval) the equivalent of approximately $680,000 for checks clearing from the account and $3 million, which "was subsequently setoff against an obligation of LBAH to [HSBC Ltd.] under a loan agreement."[5094]   HSBC

---

[5089] Memorandum from Ken Coleman, HSBC counsel, to Examiner, re: Transfers in Connection With the Hong Kong Cash Deed (Oct. 23, 2009), at p. 1.

[5090] *Id.*

[5091] *Id.*

[5092] *Id.*

[5093] *Id.*

[5094] *Id.*

counsel stated further that the $3 million setoff "took place automatically pursuant to the mandatory insolvency setoff under Section 35 of the Hong Kong Bankruptcy Ordinance, following the making of a winding up order against LBAH by the High Court of the Hong Kong Special Administrative Region on 19 November 2008."[5095]

###### (f) HSBC and LBHI Stipulated To Set Off and Return Some of the Funds Covered by the U.K. Cash Deeds

Prior to entering into a stipulation with LBHI, HSBC held the equivalent of approximately $495 million from the U.K. Cash Deeds.[5096]  On September 9, 2009, the bankruptcy court approved an August 28, 2009 stipulation between HSBC and LBHI.[5097] The stipulation allows HSBC to set off the equivalent of approximately $164 million against these funds for overdrafts, $114,070 for interest, and unspecified amounts for additional accrued interests, costs and expenses pursuant to the terms of the U.K. Cash Deeds.[5098]  HSBC and LBHI also stipulated that LBHI will remit a misdirected payment equivalent to approximately $999,516, which had been erroneously deposited in an account covered by the U.K. Cash Deeds.[5099]  Additionally, HSBC agreed to return the equivalent of approximately $101 million to an account designated by LBHI once the

---

[5095] *Id.*

[5096] Stipulation, Agreement and Order, Pursuant to Sections 362 and 553 of the Bankruptcy Code, Modifying the Automatic Stay for the Limited Purpose of Permitting HSBC Bank plc to Effect Setoff and Resolution of Certain Banking Arrangements Between Lehman Brothers Holdings Inc. and HSBC Bank plc, at p. 2, Docket No. 5089, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 9, 2009) (referring to account balance of EUR 343,446,459.96).

[5097] *Id.* at p. 8 (referring to setoff of GBP 99,992,714.37 for overdrafts and GBP 69,347.60 for interest).

[5098] *Id.* at pp. 2-3.

[5099] *Id.*

setoffs were complete.[5100]  HSBC expressly reserved its rights to additional setoffs against the remaining funds, and LBHI agreed to "work in a commercially reasonable manner to address" those setoffs.[5101]  As described above, HSBC counsel has represented that HSBC claims total more than $345 million related to various securities transactions.[5102]

### (4) Other Issues Stemming from HSBC's Collateral Demand

#### (a) Lehman Included the Deposits Covered by the Cash Deeds in Its Reported Liquidity Pool

Lehman reported a liquidity pool in excess of $40 billion as of September 2, 2008.[5103]  Lehman included the collateral placed with HSBC in connection with the cash deeds in its reported liquidity pool.[5104]  Bridge told the Examiner that he was not aware that Lehman included the collateral in its liquidity pool, but opined that the cash Lehman posted with HSBC should not have been included in Lehman's liquidity pool

---

[5100] *Id.* at p. 3 (referring to return of EUR 70 million).

[5101] *Id.*

[5102] *See* Ken Coleman, HSBC counsel, Spreadsheet of Claims by HSBC and Related Entities (Jan. 5, 2010).

[5103] FRBNY, "Lehman IB Updates" (Sept. 12, 2008) [FRBNY to Exam. 007965].  Earlier in the year, HSBC's May 12 "Global Annual Review" reported that Lehman had an "excess liquidity cushion" of $93 billion. HSBC, Lehman Global Annual Review (May 12, 2008), at p. 7 [HBUS 10281].  According to Taylor, the excess liquidity cushion was calculated differently than the liquidity pool, and the Global Annual Review data was often months out-of-date because of the preparation and review process for those reports. Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at pp. 4-5.  The excess liquidity cushion was calculated by assuming 50 percent funding of non-investment grade commitments, then subtracting unsecured obligations maturing within 12 months and additional collateral required for trading in the event of a one notch ratings downgrade from the sum of unencumbered assets and global cash available. *Id.*

[5104] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 19; *see also, e.g.*, Lehman, Liquidity Update (Sept. 10, 2008), at p. 3 [LBHI_SEC07940_742574] (listing a U.K. deposit with a pledge value of $966 million with the comment, "HSBC, etc," categorizing Lehman's ability to monetize the deposit as "low"); Lehman, Ability to Monetize Table (Sept. 12, 2008) [LBEX-WGM 784607].

because Lehman did not have immediate access to the money.[5105]   Bridge stated that, in his lay opinion, the cash deposit was encumbered collateral from the moment Lehman posted it.[5106]   Bridge said that he did not believe that HSBC would have "pulled the plug" if Lehman had attempted to withdraw the cash it placed with HSBC before it was secured by the deeds, but he said that "a number of things would [have] happened."[5107]   Bridge also noted that, given the size of the deposit with HSBC, Lehman's liquidity would likely have been impacted and that Lehman probably would have been obliged to report the restriction placed on the funds.[5108]

Taylor said that, in his view, the deposits were unencumbered before Lehman executed the deeds, but that HSBC had implemented processes through which he would be notified if Lehman attempted to withdraw the deposits.[5109]   Taylor stated that an e-mail from Bridge in which Bridge said Lehman could not withdraw the deposits "without our say so" referred to such processes.[5110]   Taylor described the deposits as having a "strong encumbrance" after Lehman executed the cash deeds.[5111]

Pellerani said that he was not aware of the precise terms of the U.K. Cash Deeds and did not know what happened to the cash once it was posted to HSBC, but said that

[5105] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 7.

[5106] *Id.* at p. 6.

[5107] *Id.* at p. 7.

[5108] *Id.*

[5109] Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 9.

[5110] *Id.*; e-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 3, 2008) [HBUS 570].

[5111] Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 9.

he was "not counting on" using the cash. Pellerani assumed that if Lehman withdrew part of the deposit during the day, HSBC would have reduced its clearing and settlement services accordingly.[5112] As described in more detail in the Bank of New York Mellon Section below, Pellerani did not consider such deposits to be available for inclusion in the liquidity pool.[5113]

Analysts from rating agencies were unaware that Lehman's liquidity pool included the deposits with HSBC (or similar deposits with other banks).[5114] Fitch's analyst opined that it would be inappropriate to include encumbered assets in the liquidity pool and would have considered the restrictions on the cash deposits at HSBC and elsewhere "material."[5115] Analysts for Standard & Poor's and Moody's (interviewed on a later date) both stated that they "would have wanted to know" about the deposits.[5116]

HSBC returned the equivalent of approximately $282 million from the U.K. deposit to Lehman on September 11.[5117] Bridge told the Examiner that the return of

---

[5112] Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at p. 8.

[5113] *See* Section III.A.5.f, *infra*; Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at pp. 3-4, 8.

[5114] Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 5; Examiner's Interview of Diane Hinton, Sept. 22, 2009, at p. 6; Examiner's Interview of Peter E. Nerby, Oct. 8, 2009, at p. 4.

[5115] Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 5.

[5116] Examiner's Interview of Diane Hinton, Sept. 22, 2009, at p. 6; Examiner's Interview of Peter E. Nerby, Oct. 8, 2009, at pp. 4-5.

[5117] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 7. According to Lehman's Daily Funding Call Update e-mail for September 11: "Trsy have reduced cash deposit with HSBC to GBP200m to release liquidity in the firm." E-mail from Maria Barrio, Lehman, to Neil Ullman, Lehman, *et al*. (Sept. 11, 2008) [LBEX-DOCID 1898196]. The Examiner's financial advisors' analysis of Lehman's transactions during

funds was the result of "rebalancing" the account in Lehman's favor based on credit usage.[5118]

### (b) HSBC Considered Withholding Payments or Requiring Prefunding of Trades in the Asia-Pacific Region Prior to Lehman's Bankruptcy

On Sunday September 14, Taylor exchanged e-mails with other HSBC personnel regarding orders to withhold payments and/or requiring prefunding of trades for Lehman when the Asian markets opened on Monday.[5119]  Taylor instructed HSBC personnel to "leave ourself the option to close [CREST lines covered by the cash deeds] and everything."[5120]  Bridge told the Examiner that HSBC opened in Asia on a business as usual basis with Lehman on September 15.[5121]

### (5) The Evidence Does Not Support the Existence of Colorable Claims Arising From HSBC's Demand That Lehman Provide Cash Collateral and Execute Cash Deeds in Order for HSBC to Continue Providing Clearing and Settlement Services

### (a) The Parameters of the Examiner's Analysis

The Examiner focused on the transactions surrounding the cash deeds because of the amount of collateral they secured, the timing of HSBC's demand, and the potential

---

this period shows that this report was erroneous, and that Lehman received EUR 200 million on September 11.  Duff & Phelps, Preliminary Findings re: HSBC Deposits (Dec. 2, 2009), at p. 1.

[5118] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 7.  Bridge stressed that HSBC approved the release and that Lehman could not have directed money out of the collateral accounts without HSBC's approval.  *Id.*  Taylor was unaware of the transfer.  Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 3.  Pellerani was also unaware of the transfer.  Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at p. 8.

[5119] E-mail from Nicholas J. Taylor, HSBC, to Christine Coe, HSBC, *et al.* (Sept. 14, 2008) [HBUS 1987].

[5120] E-mail from Nicholas J. Taylor, HSBC, to Martin Nicholson, HSBC, *et al.* (Sept. 14, 2008) [HBUS 1999].

[5121] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 7.

consequences to Lehman had it refused to comply. This investigation has produced sufficient information to analyze plausible claims. However, the Examiner has had limited access to relevant documents held by HSBC (headquartered in the U.K.) and some of its overseas subsidiaries. Accordingly, this analysis relies in part on representations made by HSBC's counsel.[5122]

The Examiner's investigation has determined that the transactions related to the letters of credit, syndicated credit facility, the CSA agreements and the Hong Kong deposit do not represent a material portion of the estate.

HSBC counsel represented that HSBC returned the Hong Kong deposit to an LBAH cash account before transferring the funds to KPMG in their capacity as the provisional liquidators of LBAH, minus a $3 million setoff required under Hong Kong law and the equivalent of approximately $680,000 used for clearing checks on LBAH's cash account.[5123] As described above, HSBC counsel represented that KPMG approved the equivalent of approximately $680,000 for clearing checks and that the $3 million setoff was made pursuant to an order by the High Court of the Hong Kong Special Administrative Region.[5124]

---

[5122] *See, e.g.*, Memorandum from Ken Coleman, HSBC counsel, to Examiner, re: Transfers in Connection With the Hong Kong Cash Deed (Oct. 23, 2009).

[5123] *Id.* at p. 1.

[5124] *Id.*

HSBC's present claim based on the letters of credit is only $116,083 for fees, interest, expenses and funds drawn against the letters of credit by the beneficiaries.[5125] The remaining $6 million is contingent upon further draws by the beneficiary of the unexpired letter of credit.[5126] The Examiner's investigation has not uncovered any evidence that Lehman did not exchange fair value for these letters of credit.

Lehman agreed to contribute $25 million to a revolving credit facility for HSBC's benefit on August 15. However, Lehman never delivered the funds.[5127] HSBC has not brought a claim based on the side letter committing the $25 million.[5128]

Finally, the CSA agreements executed in the months preceding the bankruptcy gave each party a security interest in certain assets transferred in excess of the value of the parties' swap and derivatives trades; as a net provider of collateral as of the petition date, HSBC was providing Lehman with excess funds rather than the reverse.[5129] The Examiner's investigation has not uncovered any evidence that HSBC withheld any collateral from Lehman under the CSAs. These transactions are factually significant only insofar as they relate to or provide context for HSBC's efforts to secure the U.K. Deeds.

---

[5125] Annex A to Proof of Claim of HSBC Bank USA, N.A., at p. 3, Claim No. 18857, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2009).

[5126] *Id.* Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at pp. 7-8.

[5127] Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 8.

[5128] *See* Ken Coleman, HSBC counsel, Spreadsheet of Claims by HSBC and Related Entities (Jan. 5, 2010); *see also S*ide Letter from HSBC to LBCB (Aug. 15, 2008) [LBEX-DOCID 89911] (signed by HSBC); Side Letter from HSBC to LBCB (Aug. 15, 2008) [LBEX-DOCID 89916] (signed by LBCB).

[5129] Jenner & Block, Memorandum re: Representations by HSBC counsel (Jan. 11, 2010), at p. 1.

### (b) The Facts Provide Little to No Support for Invalidating the U.K. Cash Deeds

### (i) Analytical Framework

#### a. English Law Governs Contract Claims Arising from the U.K. Cash Deeds

Express choice-of-law provisions in contracts are *prima facie* valid under New York law.[5130] A party seeking to invalidate an express choice-of-law provision must establish that enforcement of the clause "would be unreasonable, unjust, or would contravene public policy, or that the clause would be invalid because of fraud or overreaching."[5131] Each of the U.K. Cash Deeds contains an identical provision specifying that it is to be governed by and construed in accordance with English law.[5132] The deeds are between HSBC Bank plc, headquartered in London, and LBIE[5133] and the U.K. branch of LBHI,[5134] respectively. The relevant facts support a determination that the choice of law provision is valid.

Lehman may argue the choice-of-law provision is invalid because HSBC overreached by demanding that Lehman either execute the deeds or confront the alternative of HSBC ceasing CREST clearing and settlement services. The Examiner's

---

[5130] *Boss v. Am. Express Fin. Advisors, Inc.*, 791 N.Y.S.2d 12, 14 (App. Div. 2005), *aff'd* 844 N.E.2d 1142 (N.Y. 2006).

[5131] *Id.* (citing *Koko Contracting v. Cont'l Envtl. Asbestos Removal Corp.*, 709 N.Y.S.2d 825, 826 (App. Div. 2000).

[5132] Cash Deed between HSBC and LBIE (Sept. 9, 2008), at § 22 [HBUS 1180]; Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008), at § 27 [HBUS 1190].

[5133] Cash Deed between HSBC and LBIE (Sept. 9, 2008), at p. 1 [HBUS 1180].

[5134] Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008), at p. 1 [HBUS 1190].

investigation has not uncovered any evidence that Lehman contested the choice-of-law provision, and, moreover, Lehman successfully negotiated favorable changes to other terms of the deeds (this issue is discussed in more detail below in reference to economic duress). There is no colorable argument that that the choice-of-law provision is invalid.

### b. English Contract Law Treats Deeds Differently from Other Contracts

English law distinguishes deeds from "informal" contracts.[5135] Deeds must "(a) effect the transference of an interest, right or property; (b) create an obligation binding on some person or persons; [or] (c) confirm some act whereby an interest, right or property has already passed."[5136] An instrument must make clear on its face that the parties intended it to be a deed and it must be validly executed as a deed.[5137] If the deed is executed by a company (organized under the Companies Act), the instrument must be duly executed and "delivered as a deed" — meaning that it must be done evidencing an intent to be bound by a deed.[5138] Delivery is presumed upon execution, and generally, a company or corporation aggregate may duly execute deeds by affixing the corporation's common seal or through the signature of two signatories authorized by a director of the company, in the presence of a witness.[5139] However, corporations aggregate are required (at least in principle) to affix the company seal to execute a

---

[5135] CHITTY ON CONTRACTS, 56 (H.G. Beale *et al.* eds., Thompson Reuters 2008) (1826) [hereinafter CHITTY].
[5136] *Id.* at 60-61.
[5137] *Id.* at 67.
[5138] *Id.* at 69.
[5139] *Id.* at 68-69.

deed.[5140]  This requirement may be satisfied by affixing any seal and having the board of directors or one such member and a permanent officer (or deputy of a permanent officer) attest that it is the corporation's seal and was affixed in their presence.[5141]

The U.K. Cash Deeds meet these criteria.  They transfer a right to the U.K. deposit from Lehman to HSBC and they expressly state that they are executed as deeds.[5142]  Lehman's common seal is affixed to the LBIE deed,[5143] and Huw Rees and Craig Goldband signed the LBHI(U.K.) deed,[5144] which is accompanied by an authorization letter signed by Tonucci and Jeffrey Welikson (LBHI's secretary),[5145] and by a sheet of authorized signatures for verification.[5146]

### (ii) The Evidence Does Not Support the Existence of a Colorable Claim That the U.K. Cash Deeds Are Invalid for Want of Consideration

English law does not ordinarily require consideration to enforce a contract contained in a deed, although consideration is required for other contracts.[5147]  The

---

[5140] *Id.* at 69.

[5141] *Id.*

[5142] Cash Deed between HSBC and LBIE (Sept. 9, 2008) [HBUS 1180]; Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008) [HBUS 1190].

[5143] LBIE Power of Attorney (July 9, 2008), at p. 1 [HBUS 1188] (attached to Cash Deed between HSBC and LBIE).

[5144] Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008), at p. 10 [HBUS 1190].

[5145] *See* LBHI(U.K.) Authorized Signature List (Apr. 2008), at pp. 1-3 [HBUS 1200].

[5146] LBHI(U.K.) Authorized Signature List "A"(Apr. 2008) [HBUS 1205].

[5147] CHITTY, 72 (citing *Morley v. Boothby* (1825) 130 Eng. Rep. 455, 456-57 (C.P.)).

absence of consideration to support a contract contained in a deed will, however, prevent parties from obtaining equitable remedies such as specific performance.[5148]

The evidence does not support the existence of a colorable claim for failure of consideration of the U.K. Cash Deeds. Because the CREST agreement grants HSBC "absolute discretion" to determine whether or not to continue providing CREST clearing and settlement services,[5149] Lehman received consideration in the form of HSBC's continuing to provide those services, at least temporarily, after it determined to withdraw from Lehman. Lehman may also have received consideration in the form of a higher rate of interest on the deposits secured by the deeds. Internal Lehman e-mails refer to promises by Bridge that Lehman would receive higher than market rates on the collateral deposits, although Lehman personnel complained that they did not receive the level of interest that they had expected.[5150] Even if Lehman did not receive consideration, the failure of consideration would not be sufficient to rescind the deeds because deeds do not require consideration under English law.

---

[5148] *Id.* (citing *Kekewich v. Manning* (1851) 42 Eng. Rep. 519, 525 (Ch.)).

[5149] Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at § 16.1 [HBEU 102].

[5150] E-mail from Barbara Ginet, Lehman, to Huw Rees, Lehman (Sept. 1, 2008) [LBEX-AM 008968].

### (iii) The Evidence Does Not Support the Existence of a Colorable Claim for Economic Duress Because the CREST Agreement Allowed HSBC To Cease Clearing and Settlement at Its Absolute Discretion

The evidence does not support the existence of a colorable claim for economic duress against HSBC in connection with the Cash Deeds. Although Lehman agreed to execute the deeds after HSBC raised the possibility of the cessation of CREST clearing and settlement services, HSBC merely proposed to do what it had a contractual right to do: exercise its absolute discretion over the provision of CREST clearing and settlement services.[5151] Even without the "absolute discretion" provision of the CREST agreement, Lehman's ability to secure important concessions during negotiations over the cash deeds provides a factual basis to support a finding that Lehman's agreement was not the result of economic duress despite the severe potential consequences to Lehman had it failed to post the demanded collateral and failed to execute the cash deeds.

#### a. Elements of Economic Duress

English law recognizes economic duress as grounds to avoid a contract. A contract is voidable if the defendant applies "pressure (a) whose practical effect is that there is a compulsion on, or lack of practical choice for the victim, (b) which is illegitimate, and (c) which is a significant cause in inducing the claimant to enter into

---

[5151] *See* CHITTY, 616 (citing *Alec Lobb Ltd. v. Total Oil G.B. Ltd.* [1983] 1 W.L.R. 87, 93-94 (Ch.) *varied on other points by* [1985] 1 W.L.R. 173) (A.C.); Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at § 16.1 [HBEU 102] (granting HSBC absolute discretion to terminate CREST clearing and settlement services).

the contract."[5152]  A proposal does not rise to the level of economic duress if the principal reason for the complying party's agreement was that he or she was prepared to comply anyway, as is the case when the complying party agrees, believing he or she will lose little by granting the illegitimate demand.[5153]

In determining whether the defendant applied "illegitimate pressure," English courts look to "a range of factors," including:

> whether there has been an actual or threatened breach of contract; whether the person allegedly exerting the pressure has acted in good or bad faith; whether the victim had any realistic practical alternative but to submit to the pressure; whether the victim protested at the time; and whether he affirmed and sought to rely on the contract.[5154]

English courts have also made clear that "[t]hreatening to carry out something perfectly within one's rights will not normally amount to duress . . . ."[5155]

### b.  Application to Lehman Facts

Bridge said that HSBC was Lehman's primary CREST bank, that Lehman had no secondary bank, that it would have been impossible for Lehman to replace HSBC in the short term and "very difficult" in the medium term, and that both Lehman and HSBC understood HSBC's demand to mean that HSBC would cease to provide CREST

---

[5152] *DSND Subsea Ltd. v. Petroleum Geo-Servs. ASA*, [2000] B.L.R. 530 at [131] (Q.B.);  *see also Dimskal Shipping Co. v. Int'l Transp. Workers Fed'n (The Evia Luck No. 2)* [1992] 2 AC 152, 165 (H.L.) (appeal taken from Eng.).

[5153] CHITTY, 607 (citing *Pao On v. Lau Liu Long* [1980] A.C. 614, 635 (P.C. 1979) (appeal taken from H.K.)).

[5154] *DSND Subsea Ltd. v. Petroleum Geo-Servs. ASA*, [2000] B.L.R. 530 at [131] (Q.B.).

[5155] CHITTY, 616 (citing *Alec Lobb Ltd. v. Total Oil G.B. Ltd.* [1983] 1 W.L.R. 87, 93-94 (Ch.) *varied on other points by* [1985] 1 W.L.R. 173) (A.C.).

clearing and settlement services if Lehman did not acquiesce.[5156]  Pellerani described the demand as  "put[ting] a gun to our head" because HSBC acting on its threat would have been "terminal."[5157]

For its part, HSBC believed that publicity of its decision to withdraw from Lehman would have sent negative market signals that could have precipitated Lehman's collapse.[5158]  Although HSBC took care to prevent publicity while negotiating the cash deeds, ending the CREST relationship entirely would have been public and brought the same (or greater) risk of precipitating Lehman's collapse.  Lehman had no practical option but to comply with HSBC's demand or risk the collapse of the firm.

Nevertheless, HSBC's conduct was legitimate under its agreement with Lehman. HSBC had "absolute discretion" to provide or not provide CREST services,[5159] and invoking the ability to cease clearing would not amount to duress despite the adverse consequences to Lehman.[5160]

In addition, Lehman only agreed to the terms of the deeds after an extended negotiation over several days that yielded more favorable terms on the points of its

---

[5156] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 2; Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at pp. 6-7 (reporting that HSBC agreed to maintain credit lines that would have been difficult to replace if Lehman provided collateral to cover HSBC's exposure).

[5157] Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at p. 7.

[5158] *Id.*

[5159] Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at § 16.1 [HBEU 102].

[5160] *See* CHITTY, 616 (citing *Alec Lobb Ltd. v. Total Oil G.B. Ltd.* [1983] 1 W.L.R. 87, 93-94 (Ch.) *varied on other points by* [1985] 1 W.L.R. 173) (A.C.).

greatest concern.[5161]   Lehman also obtained an agreement from HSBC to return the equivalent of approximately $800 million so that Lehman would be able to manage its cash requirements at quarter end.[5162]   These facts support a finding that the agreements were not the result of duress.

### c.   Other Transactions Do Not Give Rise to Economic Duress Claims

HSBC cancelled or reduced other credit lines and products as part of Projects Opaque and Milan.[5163]   However, HSBC did not make any demands until the August 18, 2008 meeting between Taylor and Tonucci.   Indeed, as the name implies, Project Opaque was designed to avoid attracting any notice,[5164] and the Examiner's investigation has not uncovered any discussions between Lehman and HSBC about the reduction in credit prior to August 18.   Bridge and Taylor described the credit lines cancelled or reduced under Projects Opaque and Milan as underused or unused, and the documents corroborate that assertion.[5165]   Further, as described above, the

---

[5161] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 6.

[5162] E-mail from Carlo Pellerani, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Aug. 28, 2008) [LBEX-AM 008853]; *see also* e-mail from Ian T. Lowitt, Lehman, to Jeremy Isaacs, Lehman (Aug. 28, 2008) [LBEX-AM 8940]; Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at pp. 8-9.

[5163] Memorandum from Nicholas J. Taylor, HSBC, to Global Financial Institutions Group, HSBC, re: Project Opaque [Draft] (July 28, 2008), at p. 1 [HBUS 16204] (describing Project Opaque); *see also* Financial Institutions Group, HSBC, Project Milan (Aug. 2008) [HBUS 17459] (substantially similar plan for Project Milan).

[5164] Memorandum from Nicholas J. Taylor, HSBC, to Global Financial Institutions Group, HSBC, re: Project Opaque [Draft] (July 28, 2008), at p. 1 [HBUS 16204] (referring to "covert reduction of exposure" in which "client and market assumes business as usual and GTB revenues protected.").

[5165] *See* Lehman, Spreadsheet of Credit Lines Subject to Examination by HSBC and LBHI (Aug. 28, 2008) [HBUS 237] (created in concert with Lehman to determine utilization of lines for further reductions).

cancellation of the unused day loan facility, the execution of CSAs, and the other transactions related to the letters of credit did not impact Lehman significantly.

Lehman may argue that HSBC's August 27, 2008 offer to reduce the approximately $1 billion deposit if Lehman reduced its use of credit lines amounted to an improper threat to cancel those lines unless Lehman posted sufficient collateral. HSBC has not produced the agreements governing each of the credit lines at issue. Counsel for HSBC has represented that HSBC provided these credit lines solely at its discretion.[5166]

Even if HSBC did not have the discretion to cancel these other lines, HSBC did have absolute discretion under the CREST agreement to cease providing CREST clearing and settlement services if Lehman did not provide sufficient collateral.[5167] Instead of an improper threat, HSBC would arguably have been proposing a modification to the agreements governing the other lines:  HSBC would reduce the collateral required for continued CREST services in exchange for Lehman agreeing to reduce the other credit lines that HSBC (hypothetically) did not have discretion to reduce unilaterally.

---

[5166] Memorandum from Ken Coleman, HSBC counsel, to Examiner, re: Transfers in Connection With the Hong Kong Cash Deed (Oct. 23, 2009), at p. 1; *see also* Citigroup, Overview of GTS Clearing and Settlement Lines (Sept. 4, 2008), at p. 5 [CITI-LBHI-EXAM 00102127] (explaining that Citi provided uncommitted clearing lines, which meant the lines could be cancelled at Citi's discretion).
[5167] *See* Section III.A.5.d.iii.b, *supra*.

Further, the cancellation of the other lines was not a significant factor in Lehman's decision to post the collateral and execute the cash deeds. The immediate reaction within Lehman to the August 27 demand was the concern that HSBC would cease clearing and settling CREST trades.[5168] If anything, HSBC's offer to reduce the amount of the cash collateral demanded if Lehman reduced its use of intraday credit was viewed as an opportunity: Pellerani's response to the August 27 demand was to ask Bridge for assistance in identifying lines that could be cancelled.[5169] Thus, the loss of CREST clearing and settlement services dominated Lehman's concerns with regard to the collateral demand. The other credit reductions, on their own, were not a significant factor in Lehman's decision to execute the deeds and thus will not support a claim of economic duress.

### (iv) The Evidence Does Not Support the Existence of a Colorable Claim that HSBC Violated a Duty of Good Faith and Fair Dealing by Demanding Cash Collateral

The evidence does not support the existence of a colorable claim that HSBC breached a duty of good faith and fair dealing under English law. HSBC's absolute discretion over offering CREST services is not subject to an obligation of good faith and

---

[5168] *See* e-mail from Huw G. Rees, Lehman, to Andrew Yeung, Lehman, *et al.* (Aug. 28, 2008) [LBEX-AM 008941] ("[T]here is a possibility that, without an agreement, our UK clearing operations will be impacted."); e-mail from Carlo Pellerani, Lehman, to Paolo R. Tonucci, Lehman (Aug. 27, 2008) [LBEX-AM 008916] ("[W]e need to give them ~$1b of deposit by Friday with a legal right to set-off, non negotiable, or they will not settle for us."); e-mail from Paolo R. Tonucci, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Aug. 27, 2008) [LBEX-AM 008918] ("[T]hey want us to deposit cash by Friday if they are to continue clearing for us.").

[5169] E-mail from Carlo Pellerani, Lehman, to Guy Bridge, HSBC, *et al.* (Aug. 27, 2008) [HBUS 3].

fair dealing and, even if it were, HSBC's financial concerns support a determination that HSBC exercised its discretion in good faith when it decided to withdraw from Lehman.

### a. English Law Does Not Recognize a Principle of Good Faith and Fair Dealing of General Application

"[I]in English contract law, there is no principle of good faith of general application . . . ."[5170]   English courts have nevertheless implied terms requiring that parties bargain in good faith on particular kinds of contracts, such as employment contracts.[5171]   English courts have "sometimes used the implication of a term to restrict the ambit of a unilateral discretionary power conferred on one of the parties by the contract,"[5172] but this would not prevent a commercial lender from conducting "its business in what it genuinely believes to be its best commercial interest."[5173]   Express terms requiring parties to act in good faith are enforceable, but the court interprets those terms narrowly, such that an obligation to bargain in good faith will not be deemed violated absent indicia of fraud.[5174]

### b. Application to Lehman Facts

HSBC would have made Lehman's situation significantly more difficult had HSBC simply ceased providing CREST clearing and settlement services in the short

---

[5170] CHITTY, 20.

[5171] *Id.* at 28 (citing *Johnson v. Unisys Ltd* [2001] UKHL 13 [2003] 1 A.C. 518, 536 (H.L.) (appeal taken from Eng.)).

[5172] *Id.* at 29 (citing *Paragon Fin. plc v. Nash* [2001] EWCA Civ. 1466 [2002] 1 W.L.R. 685, 700 (Eng.)).

[5173] *Id.* (quoting *Paragon Fin. plc v. Pender* [2005] EWCA Civ. 760 [2005] 1 W.L.R. 3412, 3440 (Eng.)).

[5174] *Id.* at 26 (citing *Petromec Inc. v. Petrolo Brasileiro SA Petrobras (No.3)* [2005] EWCA Civ 891, [117]-[121] [2006] 1 Lloyd's Rep. 121, 153 (Eng.)).

term (as opposed to the "orderly withdrawal" from Lehman that HSBC in fact instituted).[5175] Lehman understood that it faced the possibility of HSBC ceasing to clear and settle trades if Lehman did not meet HSBC's demand that Lehman provide nearly $1 billion in collateral and that Lehman reduce its use of other credit products.[5176] HSBC provided CREST services solely at its discretion under the CREST agreement.[5177] Although the CREST agreement does not contain express terms imposing an obligation of good faith on determinations of whether or not to provide CREST services,[5178] the court might imply an obligation to exercise that discretion consistent with principles of good faith and fair dealing.

Even if the court were to imply such an obligation, English courts interpret such obligations narrowly (English courts likewise interpret express obligations narrowly).[5179] The facts support a determination that HSBC was motivated by a genuine concern for

---

[5175] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at pp. 2, 4 (stating that Lehman could not replace clearing services in the short term and reiterating that HSBC adopted a cautious approach when withdrawing to avoid being blamed for causing Lehman's collapse).

[5176] *See* e-mail from Carlo Pellerani, Lehman, to Guy Bridge, HSBC (Aug. 2, 2008) [HBUS 3]; e-mail from Guy Bridge, HSBC, to Carlo Pellerani, Lehman (Aug. 23, 2008) [LBEX-AM 008910]; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 5; Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at pp. 6-7; Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at p. 7.

[5177] Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at § 16.1 [HBEU 102].

[5178] The only express requirement in the contract to act in good faith applies to Euroclear U.K. & Ireland in making determinations over whether a particular transaction was entered in error. Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at § 4.5 [HBEU 102]. Further, the agreement states that any action by HSBC taken in accordance with its normal procedures applicable to settlement banks will be considered to be taken in good faith and with due care. *Id.* at § 9.5.

[5179] CHITTY, 25 (citing *Petromec Inc. v. Petrolo Brasileiro SA Petrobras (No.3)* [2005] EWCA Civ 891, 117-121 [2006] 1 Lloyd's Rep. 121, 153 (Eng.)); *Id.* at 29 (quoting *Paragon Fin. plc v. Nash* [2001] EWCA Civ. 1466 [2002] W.L.R. 685, 702 (Eng.)).

its own commercial interests, which would be adequate to establish good faith despite the potential negative effect on Lehman.

Taylor's August 18 briefing note summarizing his meeting with Tonucci explains that HSBC's decision to reduce its credit risk with regard to Lehman was motivated by commercial concerns about exposure to the financial sector in general, and Lehman in particular.[5180]  Interviews of HSBC personnel and the Examiner's review of documents corroborate that explanation.[5181]  The Examiner's investigation has not revealed any indication of malice or ulterior motives in HSBC's determination to withdraw.

The U.K. Cash Deeds contain express terms imposing an obligation on HSBC to exercise good faith in determining the amount of collateral required to cover the exposures that were to be secured by the deeds.[5182]  However, the good faith terms in the deeds would only be relevant to the question of whether HSBC exercised good faith in determining how much of HSBC's exposure to Lehman was covered by the deeds (and therefore, how much of the collateral Lehman provided was secured by the deeds).  The Examiner has not discovered any evidence that these determinations were made in bad faith.

---

[5180] Nicholas J. Taylor, HSBC, Briefing Note — Project Milan (Aug. 18, 2008), at p. 2 [HBUS 90].

[5181] *See, e.g.*, Memorandum from Nicholas J. Taylor, HSBC, to Global Financial Institutions Group, HSBC, re: Project Opaque [Draft] (July 28, 2008), at p. 4 [HBUS 16204] (explaining credit risk impetus for Project Opaque); Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at pp. 4-6 (explaining source of concern about financial sector); Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 4 (agreeing with Taylor's assessment of withdrawing from Lehman).

[5182] Cash Deed between HSBC and LBIE (Sept. 9, 2008), at §§ 2(c), 3 [HBUS 1180]; Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008), at §§ 4(c), 5 [HBUS 1190].

### (v) The Evidence Does Not Support the Existence of a Colorable Claim that HSBC Violated the Notice Provision of the CREST Agreement

The evidence does not support the existence of a colorable claim that HSBC violated the notice provision of the CREST agreement. As set forth below, the agreement states that HSBC may terminate the contract without notice, only requires 30-days' notice to the extent that HSBC "considers it practicable and appropriate" and exempts HSBC from any liability for failing to provide notice.

### a. Construction of Terms

Terms of a contract are understood to bear the meaning that the parties using the terms would reasonably have understood them to mean against the relevant background of the transaction.[5183] Courts will attempt to give effect to the entire contract.[5184] If different parts of a contract are inconsistent with one another, the court may reject portions that would defeat the parties' intention as expressed by the contract as a whole.[5185] Clauses that limit or qualify, but do not entirely negate, obligations created in other clauses are not inconsistent.[5186] If an agreement gives one party

---

[5183] CHITTY, 841-42 (discussing *Investors Comp. Scheme Ltd. v. W. Bromwich Bldg. Soc'y (No. 1)* [1998] 1 W.L.R. 896, 912 (H.L) (appeal taken from Eng.)).

[5184] *Id.* at 855 (citing *Taylor v. Rive Droite Music Ltd.* [2005] EWCA Civ 1300, [26] [2006] E.M.L.R 4, 65-66 (Eng.)).

[5185] *Id.*

[5186] *Id.* at 856 (citing *Pagnan SpA v. Tradax Ocean Transp. SA* [1987] 2 Lloyd's Rep. 342, 351).

discretion to rescind the agreement, that party may not exercise that discretion "arbitrarily, or capriciously, unreasonably" or in bad faith.[5187]

### b. Application to Lehman Facts

Although HSBC had informed Lehman on August 18, 2008, of its intention to withdraw, HSBC did not set a date for cancelling CREST services until August 27, when Bridge informed Pellerani that HSBC would cease providing CREST services if Lehman did not provide collateral equivalent to approximately $945 million in two days' time.

Section 16.1 of the Terms and Conditions to the CREST agreement gives HSBC "absolute discretion to terminate without notice," qualifies that "absolute" discretion with a requirement that HSBC give 30-days' notice "where [HSBC] considers it practicable and appropriate," and provides that HSBC shall not have liability "in any event" for failing to provide notice.[5188] The second clause limits, but does not entirely negate, HSBC's exercise of discretion by conditioning it upon a secondary exercise of discretion. Thus, the "practicable and appropriate" clause suggests that termination without notice would be arbitrary, capricious, unreasonable, or in bad faith if HSBC had determined that notice would have been practicable and appropriate, and yet failed to provide any.

---

[5187] *Id.* at 244 (quoting *Selkirk v. Romar Invs., Ltd.* [1963] 1 W.L.R. 1415, 1422 (P.C.) (appeal taken from Bah.)).

[5188] Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at § 16.1 [HBEU 102].

The facts do not support a determination that HSBC's decision not to provide more advanced notice was arbitrary, capricious, unreasonable, or in bad faith. As described above, the court will not imply restrictions on a commercial lender's exercise of discretion that would prevent it from conducting "its business in what it genuinely believes to be its best commercial interest."[5189] Bridge informed the Examiner that HSBC intended to exit its relationship with Lehman as swiftly as practicable in an effort to protect HSBC's commercial interests,[5190] and Lehman had been able to provide the bulk of the collateral before being granted an extension on August 28.[5191] Thus, the notice, while short, would not violate the agreement.[5192] Moreover, more than a week before HSBC issued its two-day deadline, Taylor and Tonucci had already discussed HSBC's intention to request collateral. Furthermore, HSBC subsequently allowed Lehman to

---

[5189] CHITTY, 29 (quoting *Paragon Fin. plc v. Pender* [2005] EWCA Civ. 760, [2005] 1 W.L.R. 3412, 3440).

[5190] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 4.

[5191] E-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Aug. 28, 2008) [HBUS 9250].

[5192] Even if the two-day notice did violate the agreement, HSBC has a colorable defense of waiver by estoppel. A contracting party that represents it will not enforce its strict legal rights under a contract is estopped from later asserting those rights against the party intended to rely upon the representation. CHITTY, 303 (citing *B.P. Exploration (Libya) v. Hunt (No.2)* [1979] 1. W.L.R. 783, 812 (Q.B), *aff'd* [1983] 2 A.C. 352). The representation may be inferred from conduct. *Id.* (citing *Bremer Handelsgesellschaft mbH v. Vanden Avenne-Izegem P.V.B.A.* [1978] 2 Lloyd's Rep. 109, 126 (H.L.)). Here, Lehman entered into a stipulation allowing HSBC to set off funds under the U.K. Cash Deeds instead of challenging the adequacy of the two-day ultimatum HSBC gave when it demanded Lehman execute the deeds or face the consequence of HSBC ceasing clearing services. *See* Stipulation, Agreement and Order, Pursuant to Sections 362 and 553 of the Bankruptcy Code, Modifying the Automatic Stay for the Limited Purpose of Permitting HSBC Bank plc to Effect Setoff and Resolution of Certain Banking Arrangements Between Lehman Brothers Holdings Inc. and HSBC Bank plc, Docket No. 5089, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 9, 2009).

delay posting the collateral until September 2.[5193]  Finally, even if HSBC had violated the notice provision, the agreement exempts HSBC from liability.[5194]

### (vi) The Cash Deeds Were Not Contracts of Adhesion or Standard Form Contracts

The evidence does not support the existence of a colorable claim that the cash deeds were contracts of adhesion or standard form contracts.  HSBC and Lehman were sophisticated parties to an agreement that was the product of several days' worth of negotiations that secured changes from the initial proposed draft that were favorable to Lehman.[5195]

### a.  Characteristics of Standard Form Contracts or Contracts of Adhesion

Under English law, the court may modify or reject terms of a contract where contracting parties are of unequal bargaining power and the terms are offered on a take-it-or-leave-it basis.[5196]

### b.  Application to Lehman Facts

Even though HSBC and Lehman were both sophisticated parties, HSBC held substantially greater bargaining power.  HSBC was the only bank that could provide

---

[5193] E-mail from Carlo Pellerani, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Aug. 28, 2008) [LBEX-AM 008853]; *see* e-mail from Ian T. Lowitt, Lehman, to Jeremy Isaacs, Lehman (Aug. 28, 2008) [LBEX-AM 8940] (referring to a conversation with HSBC's CRO and HSBC's accommodation and its concern about Lehman over the quarter-end).

[5194] Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at § 16.1 [HBEU 102].

[5195] *See* Section III.A.5.d.3.e, *supra.*

[5196] *See Levison v. Patent Steam Carpet Cleaning Co.*, [1978] Q.B. 69, 79.

Lehman with CREST clearing and settlement services in the short term, and likely the medium term as well.[5197]  HSBC would have had even more leverage if, as Bridge believed, ceasing to clear and settle CREST trades would have sent negative signals to the market that could have hastened Lehman's collapse.[5198]

Nevertheless, the deeds were not offered on a take-it-or-leave-it basis.  HSBC was willing to negotiate the terms of the contracts as well as the size of the required deposit.[5199]  Over a period of days, Lehman was able to negotiate more favorable terms, expanding its own access to the collateral, while narrowing the scope of debts HSBC could offset against the secured accounts.[5200]  Thus, the evidence does not support the existence of a colorable claim that the U.K. Cash Deeds were contracts of adhesion or standard form contracts.

---

[5197] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 2 (stating that it would not be possible to replace HSBC's CREST services in the short term and would be very difficult to do so in the medium term); Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at pp. 6-7 (describing CREST settlement lines as the "lion's share" of the credit that would be difficult to replace quickly); Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at p. 7 (stating that cessation of clearing would have been "terminal" for Lehman).

[5198] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 4 (reiterating that HSBC attempted to exit its relationship with Lehman as quickly as possible, but also attempted to be flexible with Lehman out of concern that HSBC's actions might be viewed as the impetus of a Lehman collapse).

[5199] *See* e-mail from Carlo Pellerani, Lehman, to Guy Bridge, HSBC (Aug. 27, 2008) [HBUS 3]; e-mail from Guy Bridge, HSBC, to Carlo Pellerani, Lehman (Aug. 23, 2008) [LBEX-AM 008910] (discussing effect of credit usage on collateral requirements); Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 6.

[5200] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 6; e-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 3, 2008) [HBUS 570].

### (c) Other Potential Theories of Liability

### (i) English Law Governs the Remaining Potential Claims Even Though They Are Not Covered by the Choice-of-Law Provision of the Cash Deeds

### a. Analytical Framework

Although English law governs the potential, material claims arising from the facts described herein, this analysis is conducted independent of the choice-of-law provision in the CREST agreement. New York law applies contractual choice-of-law clauses to claims sounding in tort only where the parties to a contract draft a "sufficiently broad" choice-of-law clause.[5201]

Here, the scope of the language in the U.K. Cash Deeds and CREST agreement is nearly identical to choice-of-law clauses New York courts have found insufficiently broad to cover tort claims: "This Deed is governed by and shall be construed in accordance with English law."[5202] The Examiner's investigation has not revealed any negotiations over the scope of the choice-of-law clause, or any other factual basis to support applying the choice-of-law provision to tort claims.

---

[5201] *Fin. One Public Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 335 (2d Cir. 2005) (applying New York law).

[5202] *Compare* Cash Deed between HSBC and LBIE (Sept. 9, 2008), at § 22 [HBUS 1180], *and* Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008), at § 27 [HBUS 1190], *and* Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at § 24.1 [HBEU 102], *with Twinlab Corp. v. Paulson*, 724 N.Y.S.2d 496, 496 (App. Div. 2001) (choice-of-law provision specifying New York law would govern "validity, interpretation, construction, and performance" of contract not broad enough to govern tort claims that did not arise from contractual obligations), *and Fin. One Public Co.*, 414 F.3d at 335 (choice-of-law provision inapplicable to claim for setoff where contract did not establish right and only stated "this contract shall be governed by the laws of the State of New York").

Where the law of two or more jurisdictions may apply to a dispute, New York courts examine whether the laws conflict.[5203]  Where a conflict exists, New York employs one of two methods to determine which law should apply, depending on the nature of the claim.  New York employs a "center of gravity" test for contract claims and an "interest analysis" for tort claims and any other claim where no specific approach is called for.[5204]  Quasi-contract claims are decided under the "center of gravity" test.[5205]

Under the center of gravity test, the court examines the place of negotiation, place of performance, execution location and subject matter of the contract, and domicile of the parties, giving the location of the contract's execution and performance the most weight.[5206]

Under an interest analysis, the court conducts two separate inquiries: "(1) what are the significant contacts and in which jurisdiction they are located; and (2) whether the purpose of the law is to regulate conduct or allocate loss."[5207]  Where the purpose of the law is to regulate conduct, the law of the location of the tort generally governs.[5208] Where the purpose of the law is to allocate loss, parties with domiciles in different jurisdictions are generally governed by the law of the jurisdiction where the injury occurred and parties with domiciles in the same jurisdiction are generally governed by

---

[5203] *K.T. v. Dash*, 827 N.Y.S.2d 112, 116 (App. Div. 2006).
[5204] *Fin. One Public Co.*, 414 F.3d at 336.
[5205] *Global Fin. Corp. v. Triarc Corp.*, 715 N.E.2d 482, 484 (N.Y. 1999).
[5206] *Brink's Ltd. v. S. African Airways*, 93 F.3d 1022, 1030-31 (2d Cir. 1996) (applying New York law).
[5207] *Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001, 1002 (N.Y. 1994).
[5208] *Id.*

the jurisdiction of the shared domicile.[5209]  New York law considers a corporation to be domiciled in the jurisdiction of its headquarters.[5210]  New York courts have also considered New York's policy interest in maintaining its "preeminent financial position" as "a financial capital of the world" by protecting "the justified expectations of the parties to [a] contract."[5211]

### b.  Application to Remaining Potential Claims

The potential claims arising from Lehman's relationship with HSBC are governed by English law.  The facts do not implicate any conflict of laws over torts that allocate loss and the CREST agreement is the only contract that gives rise to claims that may be material to the bankruptcy proceedings.

**English Law Will Govern Claims Based on Quasi-Contract and Conduct-Regulating Tort Claims.**  The U.K. Cash Deeds were signed in London and governed the U.K.-based CREST clearing and settlement services.  HSBC is headquartered in London.  The Lehman parties to the deed were LBHI(U.K.) and LBIE.  LBHI(U.K.) was a London-based branch office of LBHI, and LBIE was headquartered in the U.K.  These facts support a determination that the "center of gravity" test requires the application of English law.

---

[5209] *Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 281 (N.Y. 1993).

[5210] *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 682 (N.Y. 1985).

[5211] *Wells Fargo Asia Ltd. v. Citibank, N.A.*, 936 F.2d 723, 726 (2d Cir. 1991) (quoting *J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.*, 333 N.E.2d 168, 172 (N.Y. 1975)).

The same facts support the existence of significant contacts to the U.K. for the "analysis of interests" test. Further, any tortious conduct arising from the deeds would have occurred in the U.K., as did any injury to LBIE and LBHI(U.K.). To the extent that there is a conflict of laws over torts that regulate conduct between any parties or over torts that allocate losses between parties with the same domicile, these facts support a determination that the "analysis of interests" test requires the application of English law.

### (ii) The Evidence Does Not Support The Existence Of a Colorable Claim For Unjust Enrichment Because Lehman Conveyed a Benefit on HSBC Pursuant to Lehman's Valid Contractual Obligations

The evidence does not support the existence of a colorable claim that HSBC was unjustly enriched through the cash deeds. The cash deeds are likely valid contracts, under which Lehman had a duty to convey a benefit to HSBC for which Lehman received consideration. As described above, the Examiner's investigation has not uncovered sufficient facts to support a colorable claim to invalidate the cash deeds. On these facts, HSBC would have a defense to a claim of unjust enrichment because any benefit conveyed by Lehman pursuant to the cash deed transactions was conveyed pursuant to Lehman's duty to perform its valid contractual obligations.

### a.    Elements of Unjust Enrichment

Unjust enrichment is a quasi-contractual claim in New York.[5212]  Where the court determines there is a conflict between English and New York law, the court will apply the "center of gravity test." [5213]    As described above, this will likely result in the application of English law.

English law does not recognize a general cause of action of "unjust enrichment," but the principle of unjust enrichment has been recognized judicially[5214] and statutorily[5215] as a basis for recovery in individual instances where the law creates a right of restitution, such as an action for money had and received.[5216]

The elements of the unjust enrichment principle under English law are: (1) enrichment of the defendant by receipt of a benefit, (2) at the expense of the claimant, (3) where the retention of the benefit is unjust and (4) where there is no defense to the claim.[5217]  Among the defenses to claims based on the principle of unjust enrichment are that the claimant conferred the benefit to the defendant pursuant to a common law,

---

[5212] *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742, 746 (N.Y. 2005).

[5213] *Fin. One Public Co.*, 414 F.3d at 336.

[5214] CHITTY, 1843 (citing *Lipkin Gorman v. Karpnale Ltd*. [1991] 2 A.C. 548, 559 (H.L.) (appeal taken from Eng.)).

[5215] *Id*. (citing the Civil Liability (Contribution) Act, 1978, c. 47; the Insolvency Act, 1986 c. 45 § 382(4); and the Torts (Interference with Goods) Act, 1977 c. 32 § 7(4)).

[5216] *Id*. at 1845 (citing *Moses v. Macferlan* (1760) 97 Eng. Rep. 676, 678 (K.B.)).

[5217] *Id*. (citing *Banque Financiere de la Cite v. Parc (Battersea) Ltd.* [1999] 1 A.C. 221, 234 (H.L.) (appeal taken from Eng.).

equitable or statutory duty[5218] and that the claimant is estopped from bringing a claim.[5219]

### b.  Application to Lehman Facts

HSBC received a benefit from Lehman in the form of the U.K. and Hong Kong deposits, and an additional benefit in the form of security through the cash deeds. HSBC acquired this benefit by causing Lehman to believe that HSBC would cease providing CREST settlement and clearing services for Lehman if it did not meet HSBC's demands.[5220]  The consequences of not complying were severe:  It would have been impossible for Lehman to replace HSBC's services quickly and, therefore, HSBC's withdrawal would have quickly and inevitably become public knowledge.[5221]  Such a negative market signal could have had a significant adverse effect on Lehman's situation.[5222]  HSBC was careful, however, to avoid alerting any market participants of its intent to withdraw from Lehman.[5223]

Nevertheless, HSBC received the deposits and the additional security through the cash deeds in exchange for continuing to provide CREST clearing and settlement services.  As described above, there are facts supporting the validity of these contracts

---

[5218] *Id*. at 1846 (citing *Ocean Shipping Ltd. v. Creditcorp Ltd*. [1994] 1 W.L.R. 161, 164 (H.L.) (appeal taken from Eng.)).

[5219] *Id*.

[5220] See Sections III.A.5.d.3, *supra*.

[5221] See *id*.

[5222] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at pp. 2, 4; Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at p. 7.

[5223] *See, e.g.*, Memorandum from Nicholas J. Taylor, HSBC, to Global Financial Institutions Group, HSBC [Draft] (July 28, 2008), at p. 4 [HBUS 16204] (referring to "covert reduction of exposure").

and the legitimacy of HSBC's demands. Under English law, these facts would constitute a defense to a claim based on unjust enrichment to the extent that they establish that any benefit HSBC received was not unjust, but was conveyed pursuant to Lehman's duty to perform under valid contracts. Further, LBHI has already agreed to allow HSBC to set off the funds under the U.K. Cash Deeds, and so it may be estopped from claiming that HSBC was unjustly enriched through those deeds.[5224]

### (iii) The Evidence Does Not Support a Colorable Claim That HSBC Breached a Fiduciary Duty to Lehman Because HSBC and Lehman Were Sophisticated Parties in a Relationship Governed by an Agreement That Limited HSBC's Obligations

HSBC did not owe Lehman a fiduciary duty independent of HSBC's role as an agent in the CREST system. The terms and conditions impose limited obligations on HSBC to execute CREST trades pursuant to the contract, and those obligations were subject to various indemnifications and exemptions from liability. Most importantly, the agreement imposed no obligation on HSBC to continue providing clearing and settlement services.

---

[5224] *See* Stipulation, Agreement and Order, Pursuant to Sections 362 and 553 of the Bankruptcy Code, Modifying the Automatic Stay for the Limited Purpose of Permitting HSBC Bank plc to Effect Setoff and Resolution of Certain Banking Arrangements Between Lehman Brothers Holdings Inc. and HSBC Bank plc, Docket No. 5089, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 9, 2009).

### a. Elements of Breach of Fiduciary Duty and Misappropriation

Breach of fiduciary duty is a conduct-regulating tort in New York. [5225] Where the court determines there is a conflict between English and New York law, the court will apply an interest analysis to determine which to apply. [5226] As described above, this will likely result in the application of English law.

English law recognizes a fiduciary relationship where one party "has undertaken to act for or on behalf of another in a particular matter or circumstance which gives rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. . . . Breach of fiduciary obligation, therefore, connotes disloyalty or infidelity." [5227] Parties to relationships governed by commercial contracts negotiated at arms-length are generally understood to represent their own interests. [5228] Nevertheless, "[t]he existence of the contract does not exclude the co-existence of concurrent fiduciary duties (indeed the contract may well be their source); but the contract can and does modify the extent and nature of the general duty that would otherwise arise." [5229]

---

[5225] *Reid v. Ernst & Young Global, Ltd.*, No. 604028/2005, 2006 WL 3455259, at *7 (N.Y. Sup. Ct. Nov. 15, 2006).

[5226] *See id.*

[5227] *Bristol and W. Bldg. Soc'y v. Mothew* [1998] Ch. 1, 18.

[5228] Christa Band, *Conflicts of Interests in Financial Services and Markets*, 21 J. OF INT'L BANKING L. AND REG. 677, 678-79 (2006).

[5229] *Henderson v. Merrett Syndicates* [1995] 2 A.C. 145 206 (H.L.) (appeal taken from Eng.).

### b. Application to Lehman Facts

HSBC acted as Lehman's agent when executing Lehman's sterling-denominated securities trades in the CREST system[5230] and so may have owed Lehman a duty of loyalty in providing those services. Additionally, HSBC used its knowledge of Lehman's need for HSBC credit support as leverage to encourage Lehman to make an additional commitment to HSBC through the syndicated credit facility, even though HSBC had been covertly reducing Lehman's credit through Project Opaque.

However, HSBC acted as Lehman's agent in a sharply circumscribed context, and certainly did not owe Lehman any fiduciary duties beyond that. Both Lehman and HSBC are highly sophisticated entities conducting business with one another and dealing with each other through numerous arms-length transactions. Although HSBC acted as Lehman's agent in executing CREST trades, the Examiner's investigation has not uncovered any evidence that HSBC had any obligation to provide credit to support those services. These facts would undermine any claim under English law that HSBC had any broader fiduciary obligation (if it had any obligation at all) beyond providing CREST clearing and settlement services to Lehman as dictated by the limited terms of the agreement between the parties.

---

[5230] *See* Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at §§ 4.1, 6 [HBEU 102]; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 3 (describing HSBC's role in CREST trades as "standing in" for Lehman).

The agreement between HSBC and Lehman limits HSBC's obligations in several ways, the most significant of which was HSBC's absolute discretion to terminate CREST services at any time.[5231] Further, the CREST agreement contains various exclusions of HSBC's liability under the agreement,[5232] agreements to indemnify HSBC,[5233] and an acknowledgement that HSBC does not owe Lehman a duty of care to monitor or enforce compliance by any person with any obligations applicable to participation in the CREST system.[5234] These provisions limit the scope of HSBC's obligations to Lehman, and exclude any parallel duty to ensure that Lehman complied with the requirements of the CREST system. This supports a determination that HSBC was only obliged to execute Lehman's CREST trades, and owed no further duty to assist Lehman. Moreover, HSBC's obligation to execute Lehman's CREST trades was itself contingent upon HSBC's absolute discretion over whether to terminate the agreement.[5235]

Lehman's willingness to contribute $25 million to HSBC's syndicated credit facility in the hope of securing credit support from HSBC in the future may indicate that Lehman believed HSBC would provide assistance beyond the narrowly defined obligations in the CREST agreement, but such belief alone would not establish a fiduciary duty. Further, HSBC personnel, at least initially, supported allowing Lehman

---

[5231] *See* Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at § 16.1 [HBEU 102].

[5232] *Id.* at §§ 3.4-3.5.

[5233] *Id.* at § 7.

[5234] *Id.* at § 9.7.

[5235] *See id.* at § 16.1.

to withdraw its commitment.[5236]  Although there is conflicting evidence regarding what role HSBC played in the final decision not to allow Lehman to withdraw, the decision was based, at least in part, on considerations that Lehman's withdrawal would have sent a negative signal to the market, and the concomitant risk of precipitating Lehman's collapse.[5237]

Thus, HSBC does not appear to have had any relevant fiduciary obligations to Lehman beyond acting as its agent when executing CREST trades.  Lehman and HSBC were commercial parties to an arms-length transaction governed by an agreement that substantially limited HSBC's obligations to Lehman and, moreover, expressly gave HSBC absolute discretion over the provision of credit and settlement services.

### (iv) The Evidence Does Not Support a Colorable Claim that HSBC's Demand for Collateral Tortiously Interfered With Lehman's Other Business or Contracts Because HSBC Was Acting To Protect Its Own Economic Interests

Even if HSBC's actions related to the cash deeds were to have factored materially into Lehman's decision to file for bankruptcy, the evidence does not support the

---

[5236] E-mail from Nicholas J. Taylor, HSBC, to Guy Bridge, HSBC, *et al.* (Aug. 27, 2008) [HBEU 129] (agreeing that HSBC should cancel Lehman's commitment to the syndicated facility).

[5237] *Compare* Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 8 (stating that the agent bank administering the revolver made the ultimate decision), *with* e-mail from Nicholas J. Taylor, HSBC, to Craig T. Thiele, HSBC (Sept. 9, 2008) [HBUS 5709] (referring to discussion and decision within HSBC not to consent to the cancellation), *and* e-mail from Paul M. Lopez, HSBC, to Guy Bridge, HSBC, *et al.* (Sept. 2, 2008) [HBUS 566]

existence of a colorable claim of tortious interference under English law because HSBC demanded collateral in order to protect its economic interests.[5238]

### a. Elements of Tortious Interference

Tortious interference is a conduct-regulating tort in New York.[5239] Where the court determines English and New York law conflict, it will apply an interest analysis to determine which to apply.[5240] As described above, this will likely result in the application of English law.

Under English law, a party commits the tort of interference with rights where the defendant procures or induces the violation of a right held by the plaintiff through some actionable wrong.[5241] Injury alone is insufficient to sustain a tort of interference if the defendant acted lawfully and the plaintiff's legal rights were not violated.[5242] Knowingly inducing a third party to break a contract with the claimant (or threatening to do so) is an interference with contractual rights absent some reasonable justification or excuse.[5243] The pursuit of "normal and legitimate business interests" is considered a

---

[5238] Nicholas J. Taylor, HSBC, Briefing Note — Project Milan (Aug. 18, 2008), at pp. 1-2 [HBUS 90].

[5239] *See Discover Group, Inc. v. Lexmark Int'l, Inc.*, 333 F. Supp. 2d 78, 84 (E.D.N.Y. 2004) (applying New York law).

[5240] *See id.*

[5241] *Law Debenture Trust Corp. v. Ural Caspian Oil Corp.* [1995] Ch. 152, 155.

[5242] *Id.*

[5243] *Pitman Training Ltd. and Another v. Nominet U.K. and Another* [1997] F.S.R. 797, 807 (Ch.) (finding no interference with contract where the defendant induced a domain name registrar to restore its use of a particular URL that another domain name registrar had subsequently allocated to another company).

reasonable justification even where it may have the effect of causing a third party to breach a contract.[5244]

### b. Application to Lehman Facts

HSBC's demand that Lehman provide the equivalent of $945 million in collateral reduced Lehman's cash on hand in the week prior to the petition date. According to Lehman's internal post-mortem analysis of its bankruptcy, the loss of liquidity to clearing banks' collateral demands may have been the cause of the bankruptcy.[5245] By September 14, LBHI's "free cash" available for intraday funding had dwindled to $2 billion, while LBIE faced a projected cash shortfall of $4.5 billion.[5246] According to the post-mortem, this prompted Lehman to place LBIE into administration, which caused a cross-default that triggered LBHI's filing.[5247] Through the bankruptcy, LBHI breached contracts with numerous counterparties. Had Lehman refused to provide HSBC with collateral and had HSBC *immediately* ceased providing CREST services, the same result likely would have occurred, given that HSBC personnel were concerned that publicity of the plan to *eventually* withdraw could precipitate Lehman's collapse.[5248]

Even if the post-mortem analysis were correct, HSBC would have a defense to a claim of tortious interference. HSBC acted to protect its economic interests by securing

---

[5244] *Id.* at 809.

[5245] Lehman, Liquidity of Lehman Brothers (Oct. 7, 2008), at p. 9 [LBHI_SEC07940_844701].

[5246] *Id.*

[5247] *Id.*

[5248] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at pp. 2, 4.

its own credit risk against a potential default by Lehman. Taylor's August 18 memorandum summarizing the meeting where he informed Tonucci of HSBC's plan for an "orderly withdrawal" states that the decision "is on the basis of deteriorating risk and business fundamentals, continuing performance/valuation uncertainty, capital erosion, and significant [Financial Institutions] Group exposure to Lehman in particular and the sector as a whole."[5249] Interviews with HSBC personnel have corroborated the claim that HSBC's demand for collateral was motivated by a desire to reduce its unsecured exposure to Lehman because of these concerns.[5250] Further, it is not clear that the post-mortem analysis correctly identifies LBIE's default as the cause of LBHI's bankruptcy, as the bankruptcy may have been inevitable before that point. Interviews with members of LBHI's Board of Directors indicate that Lehman already decided to file for bankruptcy on September 14 at the prompting (though not necessarily the explicit instruction) of U.S. regulators.[5251] Regulators made these judgments independent of an analysis of how LBIE's entering administration would impact LBHI's funding; Thomas Baxter, the General Counsel for the FRBNY, said that the Government was taken by

---

[5249] Nicholas J. Taylor, HSBC, Briefing Note — Project Milan (Aug. 18, 2008), at p. 2 [HBUS 90].

[5250] Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 4; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 4.

[5251] Examiner's Interview of John F. Akers, Apr. 22, 2009, at pp. 13-14; Examiner's Interview of Roger Berlind, May 8, 2009, at p. 11; Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at pp. 13-14; Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 16; *see also* Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008), at pp. 3-5 [LBEX-AM 003932] (unanimously voting to file for bankruptcy protection following a conference call with Thomas Baxter, Jr., general counsel of the FRBNY, and Christopher Cox, then-Chairman of the SEC).

surprise by the effect of LBIE entering administration.[5252]  These facts tend to undermine a claim for tortious interference under English law.

### (v) The Evidence Does Not Support a Finding that HSBC Fraudulently or Negligently Misrepresented Its Plan to Withdraw

The evidence does not support the existence of a colorable claim of fraudulent misrepresentation, fraudulent inducement, or negligent misrepresentation under English law against HSBC in relation to the cash deeds or the prospect of continued credit support in exchange for participating in the syndicated revolver.

### a. Elements of Fraud and Misrepresentation

Fraud is a conduct-regulating tort in New York. [5253]  Where the court determines English and New York law conflict, it will apply an interest analysis to determine which to apply.[5254]  As described above, this will likely result in the application of English law.

The elements of misrepresentation in English law are derived from common law, and the relief available is governed by the Misrepresentation Act of 1967.[5255]  A misrepresentation must be (1) "a false statement of fact, past or present, as distinct from a statement of opinion, or of intention or mere commendatory statements,"[5256] (2) by or

---

[5252] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 11.
[5253] *Chase Manhattan Bank v. N.H. Ins. Co.*, 749 N.Y.S.2d 632, 634-35 (Sup. Ct. 2002).
[5254] *Id.*
[5255] CHITTY, 503-06.
[5256] *Id.* at 505 (citing *Dimmock v. Hallett* (1866-67) L.R. 2 Ch. App. 21, 27).

known to a party to the contract or a party's agent,[5257] (3) that the claimant was intended to act upon.[5258]

To prove fraudulent misrepresentation, the claimant must also establish that the representation was made in the absence of an honest belief.[5259] A defendant who suspects, but does not know, that a statement is inaccurate will have made the statement in the absence of an honest belief.[5260]

To prove negligent misrepresentation, the claimant must show: (1) that the representation was made without reasonable grounds for believing it to be true; and (2) either (a) that the defendant owed a duty to the claimant or (b) that the defendant induced the claimant to enter into a contract through the misrepresentation.[5261]

The Misrepresentation Act allows damages to be awarded for fraudulent and negligent misrepresentations.[5262] Claimants may also seek rescission, but the Act grants the court discretion to impose damages instead of rescission for negligent misrepresentation.[5263] If the claimant seeks rescission of a contract instead of damages,

---

[5257] *Id*. at 516 (citing *Hasan v. Wilson* [1977] 1 Lloyd's Rep. 431, 444 (Q.B.)).

[5258] *Id*. at 519.

[5259] *Id*. at 530 (citing *Derry v. Peek* (1889) 14 App. Cas. 337, 379 (H.L.) (appeal taken from Eng.)).

[5260] *Id*. (citing *Reese River Silver Mining Co. v. Smith* (1869) L.R. 4 H.L. 64, 79-80 (H.L.) (appeal taken from Eng.)).

[5261] *Id*. at 540-541 (citing *Howard Marine & Dredging Co. v. A. Ogden & Sons (Excavations) Ltd.* [1978] Q.B. 574, 595).

[5262] Misrepresentation Act, 1967 c. 7 § 2(1).

[5263] *Id*. § 2(2).

the claimant need only show that the misstatement "materially influenced" the decision to enter into the contract.[5264]

### b. Application to Lehman Facts

HSBC began reducing its exposure to Lehman through Project Opaque by means calculated to conceal its actions from Lehman.[5265] Meanwhile, HSBC pursued a $25 million commitment from Lehman for HSBC's syndicated credit facility, aware that Lehman was participating in the hope that HSBC would continue to provide credit support.[5266] Taylor encouraged this belief, suggesting that Lehman participate in the facility in "the context of reciprocity and [HSBC's] continuing support during this period."[5267] Lehman formally committed to the facility on August 15, three days before HSBC notified Lehman that it intended to exit the relationship.[5268]

However, it is not clear that Taylor or anyone else at HSBC led Lehman to believe that committing $25 million to the syndicated credit facility would secure continued credit support from HSBC rather than merely securing an improved relationship with HSBC and a favorable disposition toward continued support. Pellerani remarked only that HSBC's management appreciated Lehman's participation,

---

[5264] CHITTY, 524 (citing *Edgington v. Fitzmaurice* (1885) 29 Ch. D 459, 483 (describing materiality as "actively present to [the hearer's] mind")).

[5265] *See* Memorandum from Nicholas J. Taylor, HSBC, to Global Financial Institutions Group, HSBC [Draft] (July 28, 2008), at p. 1 [HBUS 16204].

[5266] E-mail from Nicholas J. Taylor, HSBC, to Mark Stadler, HSBC, *et al.* (June 15, 2008) [HBUS 9925]; e-mail from Guy Bridge, HSBC, to Craig T. Thiele, HSBC, *et al.* (June 17, 2008) [HBUS 10046].

[5267] E-mail from Nicholas J. Taylor, HSBC, to Mark Stadler, HSBC, *et al.* (June 15, 2008) [HBUS 9925].

[5268] Side Letter from HSBC to LBCB (Aug. 15, 2008) [LBEX-DOCID 89911] (signed by HSBC); Side Letter from HSBC to LBCB (Aug. 15, 2008) [LBEX-DOCID 89916] (signed by LBCB).

and that it would serve to "cement the relationship" and made no mention of continued credit support.[5269] Further, the agreement itself contains a merger clause and makes no promise of continued support.[5270] In addition, the CREST agreement requires that any variation of its terms be made in writing.[5271] Taylor's initial willingness to allow Lehman to cancel its commitment once he informed Tonucci of HSBC's plan to withdraw also undermines any theory that Taylor made intentional misrepresentations to secure Lehman's commitment before Lehman learned of the withdrawal.[5272]

Finally, the Examiner's investigation has not revealed any evidence of fraudulent or negligent misrepresentation in connection with the cash deeds themselves. To the contrary, once HSBC informed Lehman of its intention to withdraw, HSBC was forthright about its intentions to continue to reduce its exposure through the cash deeds, and even disclosed its intentions to request additional collateral following the execution of the deeds.[5273] Although HSBC decided to withdraw from Lehman before August 18, HSBC had no duty to inform Lehman of its plan to terminate the CREST

---

[5269] E-mail from Carlo Pellerani, Lehman, to Ian T. Lowitt, Lehman (Aug. 27, 2008) [LBEX-AM 008936] (summarizing events leading to HSBC's decision to withdraw, including the then-recent commitment to the credit facility).

[5270] *See* Three-Year Revolving Credit Agreement (July 11, 2008), at § 19.07 [LBEX-DOCID 1029995]; *see also* Side Letter from HSBC to LBCB (Aug. 15, 2008) [LBEX-DOCID 89911] (signed by HSBC); Side Letter from HSBC to LBCB (Aug. 15, 2008) [LBEX-DOCID 89916] (signed by LBCB).

[5271] Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at § 17.1 [HBEU 102].

[5272] *See* e-mail from Nicholas J. Taylor, HSBC, to Guy Bridge, HSBC, *et al.* (Aug. 27, 2008) [HBUS 129] (agreeing that HSBC should allow Lehman to exit the facility).

[5273] E-mail from Guy Bridge, HSBC, to Carlo Pellerani, Lehman (Aug. 27, 2008) [HBUS 1].

agreement because the CREST agreement allowed HSBC to terminate at any time.[5274]

Thus, the evidence does not support the existence of a colorable claim against HSBC for

fraudulent misrepresentation or negligent misrepresentation under English law.

### e) Lehman's Dealings With Bank of America

This Section briefly summarizes Lehman's dealings with Bank of America

("BofA") in 2008.  At the time of this writing, Lehman and BofA are before the Court in

an adversary proceeding.  The pending dispute stems from BofA's November 10, 2008

setoff of approximately $509 million from various LBHI accounts.[5275]  Specifically, BofA

set off the funds against debts it claims LBSF incurred through derivative and swap

agreements with BofA.[5276]

Out of deference to the Court and to avoid interfering with active litigation, the

Examiner has limited his direct investigation of this claim and does not reach

conclusions about the relative merits of the parties' arguments.  However, the $500

million collateral deposit and the related negotiations in 2008 are significant to the

Examiner's investigation of Lehman's liquidity pool, discussed in more detail in Section

5.i of this Report.  In particular, as noted in Appendix 19, "Lehman's Dealings With

Bank of America," and Section 5.i, the Security Agreement executed by Lehman and

---

[5274] Terms and Conditions Relating to CREST Settlement Bank Facilities Made Available to a CREST Member or Sponsored Member (Aug. 19, 2008), at § 16.1 [HBEU 102].  Although HSBC agrees to provide at least 30-days notice "where [HSBC] considers it practicable and appropriate," HSBC is not subject to liability for failing to do so.  *Id.*

[5275] Joint Stipulation of Undisputed Facts, at ¶ 44, Docket No. 74, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, No. 08-01753 (Bankr. S.D.N.Y. Dec. 7, 2009).

[5276] *Id*. at ¶ 45.

BofA on August 25, 2008 contains a provision requiring Lehman to provide three-days' written notice in order to retrieve any part of the collateral deposit. This is significant to the Examiner's investigation because Lehman continued to include the $500 million collateral deposit in Lehman's liquidity pool calculations, and Lehman inserted the three-day notice provision into the September Guaranty and Security Agreement with JPMorgan.

A more complete summary of Lehman's interaction with BofA is contained in "Appendix 19 – Lehman's Dealings with the Bank of America."

### f) Lehman's Dealings With Bank of New York Mellon

The Bank of New York Mellon ("BNYM") provided, among other services, account support to Lehman for Lehman's European commercial paper trading program and account and financing support for medium-term note issuances and redemptions.[5277] As a result, BNYM believed that it bore intraday credit risk from Lehman, and requested collateral in August of 2008.[5278]

On December 3, 2009, the Court approved a stipulation among LBHI, LBSF and BNYM that requires BNYM to return a $170 million collateral deposit to LBHI.[5279] BNYM acquired these funds through a series of transfers between September 10 and 12,

---

[5277] E-mail from Graham Kettle, Lehman, to Joseph Igoe, Lehman, *et al.* (Aug. 21, 2008) [LBEX-DOCID 1066642] (explaining sources of BNYM's intraday exposure to Lehman).

[5278] *Id.*

[5279] Stipulation and Agreed Order Between Lehman Brothers Holdings Inc., Lehman Brothers Special Financing Inc. and Bank of New York Mellon Regarding (1) Turnover of Collateral Deposit and (2) Return of Misdirected Wires, at pp. 1-2, Docket No. 6040, *In re Lehman Bros. Holdings, Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Dec. 3, 2009).

2008,[5280] and held them pursuant to a collateral deposit agreement executed on September 11, 2008.[5281] Because the parties have agreed to the return of the funds, this transaction is primarily relevant to the Examiner's Report because of the relationship of the collateral deposit to Lehman's reported liquidity pool (as discussed *infra*, Section 5.i).

### (1) BNYM Demands and Receives a Collateral Deposit

A relationship manager at BNYM for Lehman's accounts contacted Emil Cornejo on August 20, 2008 to request that Lehman prefund its European commercial paper and medium term note programs.[5282] After a series of meetings, LBHI and BNYM agreed on September 8, 2008 that LBHI New York would open a money market account with BNYM and maintain a sufficient deposit to cover BNYM's forecasted intraday exposure to Lehman.[5283]

On September 11, 2008, LBHI and BNYM's London branch executed an agreement that required Lehman to deposit $125 million initially and thereafter

---

[5280] E-mail from Graham Kettle, Lehman, to Scott Alvey, Lehman, *et al.* (Sept. 10, 2008) [LBEX-DOCID 1065130] (ordering the transfer of $125 million from LBHI to an account held for the benefit of BNYM); e-mail from Steven J. Engel, Lehman, to Graham Kettle, Lehman, *et al.* (Sept. 10, 2008) [LBEX-DOCID 65930] (providing transaction details); e-mail from Craig L. Jones, Lehman, to Stirling Fielding, Lehman, *et al.* (Sept. 10, 2008) [LBEX-DOCID 65919] (confirming outgoing payment); e-mail from Graham Kettle, Lehman, to Steven J. Engel, Lehman, *et al.* (Sept. 11, 2008) [LBEX-DOCID 65879] (reporting BNYM ordering the return of $75 million to Lehman); e-mail from Graham Kettle, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Sept. 12, 2008) [LBEX-DOCID 65923] (reporting deposit of $120 million with BNYM).

[5281] Collateral Deposit Agreement between Lehman Brothers Holdings, Inc. and the Bank of New York Mellon, London Branch (Sept. 11, 2008) [LBEX-DOCID 1031225] (final version for execution).

[5282] E-mail from Joseph Igoe, Lehman, to Emil F. Cornejo, Lehman, *et al.* (Aug. 20, 2008) [LBEX-DOCID 1066675] (forwarding summary of call with BNYM's Global Risk Manager).

[5283] E-mail from Graham Kettle, Lehman, to Carlo Pellerani, Lehman, *et al.* (Sept. 8, 2008) [LBEX-DOCID 65890].

maintain a collateral account with at least $50 million (with more required if BNYM forecasted greater intraday exposure).[5284]    The funds were transferred to BNYM's London branch by LBHI(U.K.).[5285]

On September 12, BNYM held $170 million in collateral under the September 11 agreement.[5286]   Lehman expected to be able to withdraw $120 million from the account on Monday, September 15, leaving BNYM with the minimum $50 million collateral required under the September 11 agreement.[5287]   However, because of the bankruptcy filing on September 15, BNYM was left holding the $170 million deposit.[5288]

---

[5284] E-mail from Gerry Barber, BNYM, to Carlo Pellerani, Lehman, *et al*. (Sept. 11, 2008) [LBEX-DOCID 1065087] (attaching "Final Version" of collateral deposit agreement); Collateral Deposit Agreement between Lehman Brothers Holdings, Inc. and the Bank of New York Mellon, London Branch (Sept. 11, 2008), at §§ 1.1, 2.3 [LBEX-DOCID 1031225] (setting minimum deposit at $50 million).  The agreement allowed BNYM to set off "all present and future monies, obligations and liabilities" LBHI or other specified Lehman entities owed under any "legal documentation . . . related to the issuance of securities." *Id*. at §§ 1.1, 4.  If any of BNYM's agreements with Lehman required BNYM to make a payment on Lehman's behalf, Lehman had three business days to repay BNYM, after which BNYM could withdraw an equivalent amount from the collateral deposit.  *Id*. at § 3.  Lehman was entitled to direct BNYM to transfer any excess collateral out of the account.  *Id*. at § 3.1.5.  Further, BNYM could, in its "absolute discretion," allow Lehman to withdraw funds from the collateral account even though Lehman was not otherwise entitled to do so under the agreement.  *Id*. at § 5.3.

[5285] *See* e-mail from Graham Kettle, Lehman, to Huw Rees, Lehman, *et al*. (Sept. 12, 2008) [LBEX-DOCID 65923] (announcing successful payment of $120 million to BNYM by LBHI(U.K.), per the agreement).

[5286] E-mail from Graham Kettle, Lehman, to Daniel J. Fleming, Lehman, *et al*. (Sept. 12, 2008) [LBEX-DOCID 065923] (discussing $120 million payment to BNYM on September 12 in addition to $50 million already held by BNYM).

[5287] E-mail from Graham Kettle, Lehman, to Daniel J. Fleming, Lehman, *et al*. (Sept. 12, 2008) [LBEX-DOCID 065875] (discussing $120 million payment to BNYM on September 12 and expectation that BNYM would return $120 million to Lehman on September 15).

[5288] *See* Stipulation and Agreed Order Between Lehman Brothers Holdings Inc., Lehman Brothers Special Financing Inc. and Bank of New York Mellon Regarding (1) Turnover of Collateral Deposit and (2) Return of Misdirected Wires, at p. 1, Docket No. 6040, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Dec. 3, 2009).

### (2) The Deposit Is Significant Because of Internal Lehman Concerns About Including It in Its Pool

The parties' stipulation to return the collateral deposit to Lehman removes the need for substantial analysis of the transfers described above. Moreover, at the time, Lehman personnel regarded meeting BNYM's demand as a minor concession compared to the benefits a good relationship with BNYM provided.[5289]

For example, on September 10, 2008, Janet Birney suggested meeting BNYM's demands without further negotiation in light of the significant amount of business BNYM brought Lehman: "The economics of the $600 million don't make sense to argue over as we invest $15B with them."[5290] Stirling Fielding agreed, stating, "my view is that we are too busy right now to be worrying over this. . . . However, if Steve Engel says he reall[y] needs the liquidity that might change things."[5291] Nevertheless, this deposit is

---

[5289] E-mail from Stirling Fielding, Lehman, to Janet Birney, Lehman (Sept. 10, 2008) [LBEX-DOCID 1066546].

[5290] E-mail from Janet Birney, Lehman, to Stirling Fielding, Lehman (Sept. 10, 2008) [LBEX-DOCID 1066546] (misspelling in original). BNYM reduced its demand to $125 million after Lehman exited the trades that generated most of BNYM's intraday exposure. *See* e-mail from Sara Mahoney, Lehman, to Janet Birney, Lehman (Sept. 10, 2008) [LBEX-DOCID 1065014] ("Looks like we will only be paying $50mil now"); e-mail from Graham Kettle, Lehman, to Emil F. Cornejo, Lehman, *et al.* (Sept. 10, 2008) [LBEX-DOCID 1065036] (reporting that a delay in exiting a trade will require Lehman initially deposit $125 million). BNYM ultimately held $170 million because Lehman placed a $120 million collateral deposit with BNYM on Friday, September 12, 2008, even though BNYM was already holding a $50 million collateral deposit. E-mail from Graham Kettle, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Sept. 12, 2008) [LBEX-DOCID 065923]. Lehman expected that BNYM would return the $120 million deposit on Monday, September 15. E-mail from Graham Kettle, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Sept. 12, 2008) [LBEX-DOCID 065875].

[5291] E-mail from Stirling Fielding, Lehman, to Janet Birney, Lehman (Sept. 10, 2008) [LBEX-DOCID 1066546].

significant in light of the Examiner's findings with regard to Lehman's reported liquidity pool.

The September 9, 2008 "Ability to Monetize" internal chart of Lehman's liquidity pool includes a "Dreyfus" entry in the "Low" ability to monetize.[5292] It is not clear that this is the same Dreyfus account used for the BNYM agreement because Lehman did not designate the Dreyfus account for use with the BNYM collateral deposit until September 10.[5293] However, Lehman was "already placing cash in a [BNYM] money fund" on September 8.[5294]

It is clear that Lehman intended to include the deposit in its liquidity pool. In a September 8 e-mail exchange, Carlo Pellerani, Lehman's International Treasurer, asked Graham Kettle, Lehman's vice president of Cash and Collateral Management, why Kettle had said Lehman and BNYM had held a "good meeting" when Lehman had just agreed to place $500 million in collateral in a BNYM money market account.[5295] Kettle responded:

---

[5292] Lehman, Liquidity Pool Summary (Sept. 9, 2008), at p. 4 [LBHI_SEC07940_557815] (attached to e-mail from Robert Azerad, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 9, 2008) [LBHI_SEC07940_557814], circulating a revised "ability to monetize" table). See Section 5.i of this Report for further discussion of this chart.

[5293] E-mail from Graham Kettle, Lehman, to Scott Alvey, Lehman, *et al.* (Sept. 10, 2008) [LBEX-DOCID 1065130].

[5294] E-mail from Graham Kettle, Lehman, to Carlo Pellerani, Lehman, *et al.* (Sept. 8, 2008) [LBEX-DOCID 065890].

[5295] E-mail from Carlo Pellerani, Lehman, to Graham Kettle, Lehman, *et al.* (Sept. 8, 2008) [LBEX-DOCID 065890]. The amount of the required deposit fluctuated over the next few days as Lehman attempted to reduce BNYM's intraday exposure. *See* e-mail from Sara Mahoney, Lehman, to Janet Birney, Lehman (Sept. 10, 2008) [LBEX-DOCID 1065014] ("Looks like we will only be paying $50mil now"); e-mail from

The only reason I say good is the fact we are already placing cash in a [BNYM] money fund, so its not additional — all that would change is that it will be placed on behalf of LBHINY and [BNYM] be taking a pledge over this. Does not effect our liquidity pool.[5296]

Pellerani replied: "Disagree with that view. If we need to have this locked then there is an argument for this not to be available liquidity."[5297] Cornejo then responded to Pellerani: "Carlo, we don't have the legal docs yet, but it would not be a pledge. The money will be in a Lehman account, with some right of offset."[5298]

Pellerani told the Examiner that he did not understand Cornejo's distinction between pledged deposits and deposits subject to a right of setoff.[5299] Indeed, Pellerani was also unaware of other strategies – the "three-day provision" and the five-day horizon for monetizing "liquid" assets – Lehman relied upon to justify including deposits at clearing banks in the liquidity pool.[5300] In Pellerani's view, assets placed at

---

Graham Kettle, Lehman, to Emil F. Cornejo, Lehman, *et al.* (Sept. 10, 2008) [LBEX-DOCID 1065036] (reporting that a delay in exiting a trade required Lehman to initially deposit $125 million).

[5296] E-mail from Graham Kettle, Lehman, to Carlo Pellerani, Lehman, *et al.* (Sept. 8, 2008) [LBEX-DOCID 065890].

[5297] E-mail from Carlo Pellerani, Lehman, to Graham Kettle, Lehman, *et al.* (Sept. 8, 2008) [LBEX-DOCID 065890].

[5298] E-mail from Emil F. Cornejo, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Sept. 8, 2008) [LBEX-DOCID 065890]. Note that in July, Citibank personnel had proposed to Cornejo that Lehman agree to the terms of but not actually execute a pledge for the $2 billion comfort deposit. E-mail from Paolo R. Tonucci, Lehman, to Emil F. Cornejo, Lehman, *et al.* (July 14, 2008) [LBHI_SEC07940_528212] (discussing Citibank proposal). This issue is discussed in more detail in Section III.A.5.c of this Report.

[5299] Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at p. 5.

[5300] This is corroborated by Pellerani's e-mail exchanges with Rees during the negotiations over the HSBC cash deeds. Pellerani ordered Rees to remove the three-day provision that had been carried over from the Bank of America agreement on the grounds that neither Pellerani nor Rees knew why it had been included in the first place, and it appeared to them to be against Lehman's interests. E-mail from Carlo Pellerani, Lehman, to Huw Rees, Lehman, *et al.* (Sept. 9, 2008) [LBEX-AM 008965] ("I would also like to question why that clause was embedded in the BofA agreement and remove it."). As discussed in App. 19, according to BofA, the three-day provision had been included expressly to allow Lehman to continue

clearing banks to secure clearing and settlement services were not available liquidity and should not have been included in the pool.[5301]   Nevertheless, this exchange illustrates one of Lehman's responses to arguments against including in its liquidity pool deposits Lehman had placed to induce banks to continue providing intraday credit or clearing and settlement services.   This issue is analyzed in more detail in the Liquidity Section of this Report at Section 5.i.

### g)  Lehman's Dealings With Standard Bank

Standard Bank was Lehman's clearing and settlement bank for trades in South Africa.[5302]  Standard Bank, like other clearing banks, demanded and received a collateral deposit shortly before Lehman's bankruptcy.[5303]   The Standard Bank deposit – $200 million[5304] – is small relative to the other clearing-bank deposits, only applied to LBIE and LBI's clearing-related debts in the South African market,[5305] and was set off against approximately $10 million in advances of settlement funds on September 16.[5306]

---

counting the BofA deposit in its liquidity pool.  *See* Memorandum of Law in Opposition to Lehman Brothers' Motion for Summary Judgment and in Further Support of Bank of America's Motion for Summary Judgment, at pp. 6, 17, Docket No. 58, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.*), No. 08-01753 (Bankr. S.D.N.Y. Oct. 19, 2009).

[5301] Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at pp. 4-5.

[5302] E-mail from Jonathan Seeranj, Lehman, to Stirling Fielding, Lehman, *et al.* (Sept. 4, 2008) [LBEX-DOCID 455717].

[5303] E-mail from Joseph Igoe, Lehman, to Steve Durrant, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 455717].

[5304] *Id.*

[5305] Letter from Kenny Fihla, Standard Bank, to Huw Rees, Lehman, re: Notice of Enforcement of Pledge and Cession (Sept. 16, 2008), at p. 1 [LBEX-DOCID 1090737].

[5306] *Id.*

On August 7, 2008, LBIE's account with Standard Bank ran an intraday overdraft of ZAR 2.1 billion (approximately $280 million) that was not cleared until shortly before the close of the day.[5307] As a consequence, Standard Bank was "unsettled" by the "possible overnight overdraft of a substantial amount."[5308] On August 18, Standard Bank requested that Lehman begin prefunding its trades.[5309] On August 21, Lehman ran another intraday overdraft at Standard Bank and, again, did not repay the funds until just before the close of the day.[5310]

Standard Bank and Lehman continued discussing how to address Standard Bank's concerns[5311] until September 5, 2008, when Standard Bank informed Lehman that it must pledge $200 million in collateral, and that Standard Bank would fail Lehman's

---

[5307] Letter from Hugh Lilienfeld, Standard Bank, to Joseph Igoe, Lehman, re: Custody Settlement Arrangements (Aug. 18, 2008), at p. 1 [LBEX-DOCID 2806149] (demanding prefunding for trades because of "substantial" possible overdraft that "unsettled" Standard Bank on August 7); e-mail from Odette van der Merwe, First Rand Bank, to Abbie Goddard, Lehman, *et al.* (Aug. 7, 2008) [LBEX-DOCID 49831] (chronicling attempts to ensure payments arrive in time to clear overdraft before the end of the day). There are conflicting accounts among the parties to the relevant transactions – Citigroup, Lehman, First Rand, and Standard Bank – over which bank was responsible for the delay. E-mail from Joseph Igoe, Lehman, to Steve Durrant, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 1058373] ("Citibank was late in paying our cash agent, First Rand, who in turn was late in paying Standard Bank"); e-mail from Catherine Mwangi, Citigroup, to Katherine Lukas, Citigroup (Aug. 7, 2008) [CITI-LBHI-EXAM 00017552] (internal Citigroup e-mail chain stating that Citigroup was waiting on First Rand); e-mail from Odette van der Merwe, First Rand Bank, to Abbie Goddard, Lehman, *et al.* (Aug. 7, 2008) [LBEX-DOCID 49831] (chronicling attempts to ensure payments arrive in time to clear overdraft before the end of the day).
[5308] Letter from Hugh Lilienfeld, Standard Bank, to Joseph Igoe, Lehman, re: Custody Settlement Arrangements (Aug. 18, 2008), at p. 1 [LBEX-DOCID 2806149].
[5309] *Id.*
[5310] E-mail from Abbie Goddard, Lehman, to Stirling Fielding, Lehman, *et al.* (Aug. 21, 2008) [LBEX-DOCID 617] (discussing complaints from Standard Bank).
[5311] E-mail from Stirling Fielding, Lehman, to Robert Eby, Lehman, *et al.* (Sept. 3, 2008) [LBEX-DOCID 1669].

trades that were not timely funded or supported by adequate collateral.[5312]  The next day, Standard Bank set a deadline of September 9 to receive the funds or it would cease settling Lehman's trades.[5313]

Accordingly, Lehman made a $200 million deposit on September 9.[5314]  On September 11, LBIE executed and delivered a pledge agreement to cover the deposit.[5315] The pledge agreement allows Standard Bank to set off debts LBIE or LBI owed Standard in connection with clearing and settlement in the South African market.[5316]  On September 16, Standard Bank set off $10,422,859.72 from LBIE's account to cover advances for trades settling on September 15 and 16.[5317]

Lehman's revised September 9, 2008 "ability to monetize" chart, discussed in more detail in Section 5.i, includes an entry for a collateral deposit of $200 million titled "STANDARDJOB," associated with LBIE and assigned to the "mid" category of the

---

[5312] E-mail from Steve Durrant, Lehman, to Shaun Lawrence, Lehman, *et al.* (Sept. 8, 2008) [LBEX-DOCID 1058390] (e-mail chain discussing how to respond to Standard Bank).

[5313] E-mail from Joseph Igoe, Lehman, to Steve Durrant, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 455717] (brief chronology of events in Lehman's interaction with Standard Bank between March 2008 and September 2008).

[5314] *Id.*  At least one e-mail claims that the deposit was actually made on September 8, 2008.  E-mail from Maria Barrio, Lehman, to Neal Ullman, Lehman, *et al*. (Sept. 10, 2008) [LBEX-DOCID 1075773] (referring to "pledged collateral" requested and received on September 8).  The confusion may have arisen from overnight deposits Lehman had placed with Standard Bank since September 5.  E-mail from Carlo Pellerani, Lehman, to Paolo R. Tonucci, Lehman (Sept. 5, 2008) [LBEX-DOCID 2443971].

[5315] E-mail from Stirling Fielding, Lehman, to Maria Barrio, Lehman, *et al.* (Sept. 11, 2008) [LBEX-DOCID 1777132].

[5316] Letter from Kenny Fihla, Standard Bank, to Huw Rees, Lehman, re: Notice of Enforcement of Pledge and Cession (Sept. 16, 2008), at p. 1 [LBEX-DOCID 1090737].

[5317] *Id.*

ability to monetize.[5318]   To date, neither the Examiner nor the Examiner's financial advisors have been able to identify a transfer from a U.S. debtor as the source of the September 9 deposit of $200 million.

### h)   Lehman's Dealings With the Federal Reserve Bank of New York

This Section analyzes Lehman's relationship with the Federal Reserve Bank of New York ("FRBNY").   The FRBNY was a major creditor of Lehman Brothers, in particular during the one-week period between LBHI's petition date and that of its broker-dealer subsidiary, LBI. The Examiner has investigated Lehman's interactions with the FRBNY in the context of the FRBNY's role as a secured lender to Lehman following Bear Stearns' near collapse.[5319]

This Section of the Report is divided into two parts: (1) an overview of the FRBNY's role managing monetary policy; and (2) a discussion of Lehman's borrowings under various FRBNY liquidity facilities.

### (1)   The FRBNY Supervises Deposit-Taking Institutions and Assists in Managing Monetary Policy, but Lacks Authority To Regulate Investment Bank Holding Companies

The FRBNY is the largest of the 12 regional Federal Reserve Banks, which together with the Federal Reserve Board of Governors, comprise the U.S. Federal

---

[5318] Lehman, Liquidity Pool Summary (Sept. 9, 2008), at p. 2 [LBHI_SEC07940_557815].

[5319] In its capacity as a potential secured lender, the FRBNY also conducted intensive monitoring of Lehman's liquidity position, and embedded analysts on-site at Lehman to that end.   The FRBNY's liquidity monitoring function is discussed  at Section III.A.6.

Reserve System.[5320]  The Federal Reserve Banks supervise and regulate "bank holding companies," or depository institutions such as national and state-chartered banks.[5321] These depository institutions are distinguished from securities broker-dealers, such as investment banks, for which the SEC serves as primary regulator.[5322]

In addition to examining deposit-taking institutions, the FRBNY occupies a special role in discharging the Federal Reserve System's statutorily-mandated obligation to set monetary policy.  Section 2a of the Federal Reserve Act of 1913 charges the Board of Governors and the Federal Open Market Committee ("FOMC") – of which the President of FRBNY is a member – with setting monetary policy in order to achieve "maximum employment, stable prices, and moderate long-term interest rates."[5323]  The Federal Reserve System employs three policy tools toward this end.  The first tool, known as Open Market Operations ("OMO"), allows the FRBNY to buy and sell Treasuries on the secondary market in transactions with certain securities dealers; the FRBNY adds credit to the banking system when it buys Treasuries, and drains credit when it sells the securities.[5324]  Second, each of the 12 Federal Reserve Banks is authorized to extend, on a collateralized basis, short-term loans directly to depository

---

[5320] Federal Reserve Bank of New York, *Introduction to the New York Fed*, http://www.newyorkfed.org/aboutthefed/introtothefed.html (Nov. 2009).

[5321] *Id.*

[5322] *See Systemic Risk and Financial Markets: Before the H. Comm. on Financial Servs.*, 110th Cong. 6-8 (2008) (statement of then-SEC Chairman Christopher Cox) (distinguishing banking activity and securities-related activity, and describing the SEC's responsibility as a regulator of the latter).

[5323] 12 U.S.C. § 225a (2006).

[5324] Federal Reserve Bank of New York, *Introduction to the New York Fed*, http://www.newyorkfed.org/aboutthefed/introtothefed.html (Nov. 2009).

institutions temporarily in need of liquidity; such lending is conducted via the so-called "discount window."[5325]  Third, the FOMC sets requirements for levels of funds depository institutions must leave on reserve with Federal Reserve banks; by increasing or decreasing reserve requirements the FOMC can increase or decrease bank credit, and consequently encourage or restrain monetary activity.  According to the FRBNY, "a reduction in the reserve [requirements]," by freeing up funds for banks to lend to commercial borrowers, "would be viewed as stimulative monetary policy."[5326]  The three mechanisms outlined above all influence the supply of money in the economy, and thereby "the cost and availability of credit," and affect economic activity and prices.[5327]

> **(2)  In Response to the Bear Stearns Near Collapse, the FRBNY Created a Variety of Facilities To Backstop the Liquidity of Broker-Dealers; Lehman, In Turn, Drew on These Facilities**

> **(a)  The Primary Dealer Credit Facility**

Bear Stearns' near collapse occurred largely over the course of a mere two days – March 13 and 14, 2008.  The near collapse was viewed by the market as a classic "run on the bank;" counterparties and customers lost confidence in the firm's viability, pulled deposits and withdrew short-term secured financing.  The Bear Stearns run was unique, however, in that the investment bank suffered a complete loss of liquidity despite being

---

[5325] *Id.*

[5326] *Id.*

[5327] *Id.*

considered adequately capitalized by regulators, and possessing liquid collateral against which it should have been able to secure financing. Bear's regulators took note of this novel circumstance. As then-SEC Chairman Christopher Cox stated in an address to securities traders:

> The Bear Stearns experience demonstrated . . . that the prevailing measurements of capital and liquidity that were then being used by the SEC and by every bank and securities regulator . . . were inadequate to prevent the "run on the bank" that Bear endured. In just two days between Thursday, March 13, and the close of business on Friday, March 14, Bear's liquidity pool fell by over 83% — from $12 billion to $2 billion.

> This was a development that . . . [no] bank regulatory model had anticipated. Short-term secured financing was unavailable even when Bear offered high quality collateral such as agency securities. What neither the [SEC] regulatory approach nor any existing regulatory model had taken into account is the possibility that secured funding, even if it was over-collateralized with U.S. Treasury or agency securities, might disappear in a crisis of confidence.[5328]

Thus, after Bear Stearns, market participants were sensitive to the fact that an investment bank may be adequately capitalized, hold liquid collateral, and nonetheless collapse in a liquidity crisis. In response, Chairman Cox called for a system of mandatory regulation of investment bank holding companies.[5329] The FRBNY, however, devised a program more narrowly-tailored in an effort to mitigate the problem at hand.

Section 13(3) of the Federal Reserve Act allows the Board of Governors of the Federal Reserve to authorize the Federal Reserve Banks to make secured loans to

---

[5328] Christopher Cox, then-Chairman, Secs. and Exchange Comm., Address to the Securities Traders 12th Annual Washington Conference (May 7, 2008), *available at* http://www.sec.gov/news/speech/2008/spch050708cc.htm.

[5329] *Id.*

virtually any individual or corporation in "unusual and exigent circumstances" when the borrower is "unable to secure adequate credit accommodations from other banking institutions."[5330]  On March 16, 2008, "at the height of the Bear Stearns crisis" the Board of Governors of the Federal Reserve granted the FRBNY the authority to establish the Primary Dealer Credit Facility ("PDCF").[5331]

Under the PDCF, the FRBNY would make collateralized loans to broker-dealers, such as LBI, and in effect, act as a repo counterparty.  Unlike a typical counterparty, though, with the creation of the PDCF, the FRBNY was generally understood by market participants to be the "lender of last resort to the broker-dealers."[5332]  Reflecting the fact that broker-dealer liquidity had become increasingly dependent on overnight repos to obtain short-term secured financing,[5333] the PDCF was structured as an overnight facility.

Pursuant to the Federal Reserve Act's requirement that a Federal Reserve Bank lend only on a secured basis, and according to the convention in repo lending, the FRBNY advanced funds against a schedule of collateral.  Collateral accepted by the PDCF initially consisted of:  Treasuries, government agency securities, mortgage-

---

[5330] 12 U.S.C. § 343 (2006).

[5331] Tobias Adrian, *et al.*, *The Federal Reserve's Primary Dealer Credit Facility*, Current Issues in Econ. & Fin., Aug. 2009, at p.1, *available at* http://www.newyorkfed.org/research/current_issues/ci15-4.pdf [hereinafter "Current Issues:  PDCF"]; *see also* Press Release, Board of Governors of the Federal Reserve System (March 16, 2008) (announcing creation of the PDCF), *available at* http://www.federalreserve.gov/newsevents/press/monetary/20080316a.htm.

[5332] E-mail from Stephen Lax, Lehman, to Stephen Lax, Lehman (Mar. 23, 2008) [LBHI_SEC07940_077953] (quoting Press Release, Standard & Poor's, S&P Affirms Leman Bros., Goldman Sachs (Mar. 23, 2008)).

[5333] Current Issues: PDCF, at pp. 1-2.

backed securities issued or guaranteed by government agencies, and investment grade corporate, municipal, mortgage- and asset-backed securities priced by clearing banks.[5334] The FRBNY set the lending rate for PDCF advances equal to the rate charged by the Federal Reserve's discount window, available to depository institutions.[5335]  In fact, the PDCF was frequently analogized to the traditional discount window, or viewed as expanding the discount window to securities broker-dealers.[5336]

On Sunday, September 14, 2008, the day before LBHI filed for bankruptcy, the class of eligible collateral was expanded to "closely match the types of collateral that can be pledged in the tri-party repo systems of the two major clearing banks."[5337]  That is, the pool of eligible collateral was expanded to include non-investment grade securities and equities.

### (b) The Market Greeted the Creation of the PDCF as a Positive Step Toward Backstopping Broker-Dealer Liquidity, and as Shoring Up Lehman's Liquidity

The market greeted the news of the creation of the PDCF positively.   The Canadian rating agency, DBRS, stated in a press release:  "DBRS views the [PDCF] as particularly valuable in the current stressed market conditions, as it adds a highly

---

[5334] Press Release, Board of Governors of the Federal Reserve System (Sept. 14, 2008) (announcing the expansion of PDCF-eligible collateral), *available at* http://www.federalreserve.gov/newsevents/press/monetary/20080914a.htm.

[5335] Current Issues: PDCF, at p. 8.

[5336] *Id.* at p. 4.

[5337] Press Release, Board of Governors of the Federal Reserve System (Sept. 14, 2008) (announcing the expansion of PDCF-eligible collateral), *available at* http://www.federalreserve.gov/newsevents/press/monetary/20080914a.htm.

reliable source of liquidity to the range of existing funding options available to the major broker dealers."[5338]  Given that Lehman was widely perceived to be the investment bank with a business model closest to Bear Stearns', and as a result, the next most vulnerable firm,[5339] the PDCF was viewed as particularly helpful in buoying Lehman's liquidity.  Citigroup's Global Markets Equity Research division upgraded Lehman to "buy" on the back of the expansion of the PDCF.  Referring to the PDCF, the Citigroup analysis states:  "In our view, it's tough to have a liquidity-driven meltdown when you're being backed by government entities that have the ability to print money."[5340]  The Citigroup analysis elaborated on that point:  "With $34b in liquidity at the parent company, [and] the ability to get access to over $200b in liquidity from the Fed's primary dealer credit facility, . . . access to liquidity is a non-issue."[5341]  Lehman also promoted this line of thinking.  In a statement issued on Monday March 17, 2008, Fuld said: "The Federal Reserve's decision to create a lending facility for primary dealers and permit a broad range of investment-grade securities to serve as collateral

---

[5338] Press Release, DBRS, DBRS Confirms Lehman Brothers at AA (low), Keeps Stable Trend (Mar. 18, 2008) [LBHI_SEC07940_076814].

[5339] Landon Thomas, Jr., *Aftershocks of a Collapse, With a Bank at the Epicenter*, N.Y. Times, Mar. 18, 2008, at p. C1.

[5340] Citi Global Markets Equity Research, Citigroup, Lehman Brothers Holdings Inc. (LEH): Upgrading To Buy; Reality Will Trump Fear (Mar. 28, 2008), at p. 1 [CITIGROUP 0006117].

[5341] *Id.*

improves the liquidity picture and, from my perspective, takes the liquidity issue for the entire industry off the table."[5342]

### (c) In Addition to a Liquidity Backstop, Lehman Viewed the PDCF as an Outlet for Its Illiquid Positions

The PDCF not only provided Lehman with a ready response to those who speculated it would go the way of Bear Stearns, but also a potential vehicle to finance its illiquid corporate and real estate loans.  A day after the PDCF became operational, Lehman personnel commented: "I think the new 'Primary Dealer Credit Facility' is a LOT bigger deal than it is being played to be . . . ."[5343]  They mused that if Lehman could use the PDCF "as a warehouse for all types of collateral, we should have plenty of flexibility to structure and rethink CLO/CDO structures . . . ."[5344]  Additionally, by viewing the PDCF as "available to serve as a 'warehouse' for short term securities [b]acked by corporate loans,"[5345] the facility "MAY BE THE 'EXIT STRATEGY' FUNDING SOURCE WE NEED TO GET NEW COMPETITION IN THE CORPORATE LOAN MARKET."[5346]

---

[5342] Zachery Kouwe, *Lehman Is Not Ready To Fuld — Chairman Bullish Despite 19% Drop*, N.Y. Post, Mar. 18, 2008, at p. 37.

[5343] E-mail from Geoffrey Feldkamp, Lehman, to Eric Felder, Lehman, *et al.* (Mar. 18, 2008) [LBHI_SEC07940_390192].

[5344] *Id.*

[5345] *Id.*

[5346] *Id.* (capitalization in original).  Feldkamp hypothesized that banks would be able to take advantage of the PDCF's warehousing potential over the long term, believing the FRBNY could not discontinue the temporary program in the near term, and that the program would eventually become entrenched:

Bernanke and co may have 'saved the day', and JPM has a great public affairs approach to make the Bear deal look extremely positive for everyone, by emphasizing how it will be looking

Lehman did indeed create securitizations for the PDCF with a view toward treating the new facility as a "warehouse" for its illiquid leveraged loans. In March 2008, Lehman packaged 66 corporate loans to create the "Freedom CLO."[5347] The transaction consisted of two tranches: a $2.26 billion senior note, priced at par, rated single A, and designed to be PDCF eligible, and an unrated $570 million equity tranche.[5348] The loans that Freedom "repackaged" included high-yield leveraged loans,[5349] which Lehman had difficulty moving off its books,[5350] and included unsecured loans to Countrywide Financial Corp.[5351]

Lehman did not intend to market its Freedom CLO, or other similar securitizations, to investors. Rather, Lehman created the CLOs exclusively to pledge to the PDCF.[5352] An internal presentation documenting the securitization process for

---

forward to applying this new [CDO packaging] technology to [the] resolution of this crisis. Once applied successfully, the Fed will not be able to end the facility. They'll have to conti[n]ue it and manage it as a standard monetary policy tool.

*Id.*

[5347] Lehman, Liquidity Funding and Review Special Topics, Apr. 14, 2008, at p. 5 [LBEX-WGM 677805].

[5348] *Id.*; Memorandum from Margaret Sear, Lehman, *et al.*, to Files, Lehman (Apr. 11, 2008), at p. 1 [LBEX-WGM 762264] (discussing accounting practices applied to Freedom CLO notes and use at the PDCF).

[5349] Lehman, Securitizing Leveraged Loans: Freedom, Spruce, Thalia CLOs [LBEX-WGM 835699].

[5350] Pierre Paulden, *Lehman Creates CLO to Get Buyout Loans Off Its Books*, Bloomberg.com, Mar. 3, 2008, http://www.bloomberg.com/apps/news?pid=20601087&sid=a4fHfr0N0dbI&refer=home. The article notes that Credit Suisse and Deutsche Bank had engaged in similar transactions to reduce the impact of buyout loans on their balance sheets without selling those loans on the open market.

[5351] E-mail from Jan H. Voigts, FRBNY, to Arthur G. Angulo, FRBNY, *et al.* (Apr. 9, 2008) [FRBNY to Exam. 030264] (cover e-mail and attached excerpt of the indenture for the Freedom CLO)).

[5352] *See* Lehman, Securitizing Leveraged Loans: Freedom, Spruce, Thalia CLOs, at p. 2 [LBEX-WGM 835699] (noting that the "opening of the Fed / ECB discount windows to non-banks provided trigger to complete [Freedom securitization] immediately" and that Freedom, Spruce, Thalia, and other Lehman-structured products were "not meant to be marketed"); *see also* e-mail from Marie Stewart, Lehman, to Jonathan Cohen, Lehman, *et al.* (May 8, 2008) [LBHI_SEC07940_1069905] (noting that the SASCO

Freedom and similar CLOs named "Spruce" and "Thalia," noted that the "[r]epackage[d] portfolio of HY [high yield leveraged loans]" constituting the securitizations, "are not meant to be marketed."[5353]  Handwriting from an unknown source underlines this sentence and notes at the margin: "No intention to market."[5354]

Lehman may have also managed its disclosures to ensure that the public did not become aware that the CLOs were not created to be sold on the open market, but rather were intended solely to be pledged to the PDCF.  An April 4, 2008 e-mail containing edits to talking points concerning the Freedom CLO to be delivered by Fuld stated:

> Given that the press has not focused (yet) on the Fed window in relation to the [Freedom] CLO, I'd suggest deleting the reference in the summary below.  Press will be in attendance at the shareholder meeting and my concern is that volunteering this information would result in a story.[5355]

It is unclear, based solely on the e-mail, why a reference linking the FRBNY's liquidity facility to the Freedom CLO was deleted.  One explanation could be that

---

securitization "[l]ike Freedom CLO and Spruce CLO . . . is just creating securities to take to the Fed window").  Further evidence that Freedom CLO-style transactions had limited liquidity value outside of the PDCF is found in Citibank's rejection of Freedom and similar CLOs when they were offered by Lehman as collateral to secure Citi's intraday clearing exposure.  *E.g.*, e-mail from Anthony Lieggi, Citigroup, to Michael Mauerstein, Citigroup, *et al.* (Aug. 1, 2008) [CITI-LBHI-EXAM 00082156] (quoting exchange among Citigroup analysts and Mauerstein about pricing Lehman CLOs).  Lieggi noted that Citibank was unable to obtain pricing data from Bloomberg for the collateral offered by Lehman ("Freedom," "Spruce," "Pine," "Verano" and "Kingfisher" CLOs).  *Id.*  Lieggi also noted that a Citibank risk manager assigned to Lehman, Tom Fontana, "expressed strong concern" about this collateral.  *Id.* According to Mauerstein, these CLOs were "bottom of the barrel" securities that Lehman could not repo out.  Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 8.  Mauerstein said that the securities "may have been investment-rated, but we know what that means now." *Id.*

[5353] Lehman, Securitizing Leveraged Loans: Freedom, Spruce, Thalia CLOs, at p. 2 [LBEX-WGM 835699].

[5354] *Id.*

[5355] E-mail from Kerrie Cohen, Lehman, to Erin Callan, Lehman, *et al.* (April 8, 2008) [LBHI_SEC07940_087671].  The talking points included below the break of the e-mail do not include reference to any FRBNY facility, so it seems that Cohen may have deleted the references already, in the e-mail she sent to Callan.

Lehman did not want the public to learn that it had securitized illiquid loans exclusively to be pledged to the PDCF. Another reason may have been to hide the fact that Lehman needed to access the PDCF in the first place, given that accessing the securities dealers' lender of last resort could have negative signaling implications.[5356]

The FRBNY was aware that Lehman viewed the PDCF not only as a liquidity backstop for financing quality assets, but also as a means to finance its illiquid assets. Describing a March 20, 2008 meeting between the FRBNY and Lehman's senior management, FRBNY examiner Jan Voigts wrote that Lehman "intended to use the PDCF as both a backstop, and business opportunity."[5357] With respect to the Freedom securitization in particular, Voigts wrote that Lehman saw the PDCF

> as an opportunity to move illiquid assets into a securitization that would be PDCF eligible. They [Lehman] also noted they intended to create 2 or 3 additional PDCF eligible securitizations. We avoided comment on the securitization but noted the firm's intention to use the PDCF as an opportunity to finance assets they could not finance elsewhere.[5358]

Thus, the FRBNY was aware that Lehman viewed the PDCF as an opportunity to finance its repackaged illiquid corporate loans. The Examiner's investigation has not determined whether the FRBNY also understood that these Freedom-style securitizations were never intended for sale on the broader market. In response to a question from FRBNY analyst Patricia Mosser on whether Voigts knew "if they

---

[5356] Lehman's concerns regarding the negative signaling effects of tapping the PDCF are discussed below.
[5357] E-mail from Jan H. Voigts, FRBNY, to Timothy F. Geithner, FRBNY, *et al.* (Apr. 9, 2008) [FRBNY to Exam. 026077].
[5358] *Id.*

[Lehman] intend to pledge to triparty or PDCF,"[5359] Voigts replied that the Freedom CLO was "created with the PDCF in mind."[5360]

According to internal Lehman documents, Lehman did in fact pledge the Freedom CLO to the PDCF. On three dates, March 24, 25 and 26, 2008, Lehman pledged the Freedom CLO to the FRBNY on an overnight basis, and received $2.13 billion for each transfer.[5361] FRBNY discussions concerning the CLO's underlying assets, however, took place on or around April 9, 2008[5362] — more than a week after the FRBNY began accepting the CLO.

### (d) Lehman Was Reluctant to Draw on the PDCF Because of a Perceived "Stigma" Attached to Borrowing from the Facility

Paradoxically, while the PDCF was created to mitigate the liquidity flight caused by the loss of confidence in an investment bank, use of the PDCF was seen both within Lehman, and possibly by the broader market, as an event that could trigger a loss of confidence. A report by Lehman Brothers Capital Markets Prime Services captured a common critique of the facility:

---

[5359] E-mail from Patricia Mosser, FRBNY, to Jan H. Voigts, FRBNY, *et al.* (Apr. 9, 2008) [FRBNY to Exam. 026079].

[5360] E-mail from Jan H. Voigts, FRBNY, to Patricia Mosser, FRBNY (Apr. 9, 2008) [FRBNY to Exam. 026078].

[5361] Memorandum from Margaret Sear, Lehman, *et al.*, to Files, Lehman (Apr. 11, 2008), at p. 1 [LBEX-WGM 762264] (accounting policy memorandum).

[5362] *E.g.*, e-mail from Jan H. Voigts, FRBNY, to Timothy F. Geithner, FRBNY, *et al.* (Apr. 9, 2008) [FRBNY to Exam. 026077] (internal FRBNY exchange regarding the Freedom CLO); e-mail from Jan H. Voigts, FRBNY, to Arthur G. Angulo, FRBNY, *et al.* (Apr. 9, 2008) [FRBNY to Exam. 030264] (same).

PDCF borrowing has a considerable stigma in spite of the Fed's efforts to cloak access and guarantee anonymity. Instead, primary dealers view the PDCF as a last resort and will exhaust all other financing sources before pledging collateral here. For this reason, borrowing at this program has evaporated since the [Bear Stearns] merger closed.[5363]

Lehman complained internally, and to the FRBNY, about the stigma attached to PDCF borrowing. In an internal e-mail, Lehman personnel appeared to view the PDCF as a net negative, writing that Lehman could not use it due to its "stigma," owing to the fact that "should the Fed disclose the [PDCF] borrowers, it would likely further damage confidence in the institutions that tapped the facilities."[5364] Yet, at the same time, Lehman personnel suggested that the mere existence of FRBNY facilities forced Lehman to "quell rumors and bad press,"[5365] presumably regarding whether Lehman was suffering liquidity problems or was forced to access the PDCF. Tonucci also complained of the stigma, elevating his concerns to the FRBNY. Tonucci relayed the rumor to the FRBNY, which he attributed to Standard & Poor's, that "usage of the PDCF would cause [the rating agency] to change [Lehman's] outlook from stable to negative."[5366]

---

[5363] Lehman, Liquid Markets: TSLF expansion (Aug. 21, 2008), at p. 2 [LBHI_SEC07940_2218563].

[5364] E-mail from Stephen Lax, Lehman, to Kevin Thatcher, Lehman, *et al.* (June 4, 2008) [LBHI_SEC07940_3207832].

[5365] *Id.*

[5366] E-mail from Brian Peters , FRBNY, to Steven Manzari, FRBNY, *et al.* (Mar. 19, 2008) [FRBNY to Exam. 032418] (quoting earlier e-mail from Manzari). Peters replied that he spoke to Standard & Poor's Diane Hinton who said the rumor was "not at all" true. *Id.*

In recognition of the danger inherent in allowing market participants to believe Lehman had tapped the PDCF, in the late spring, summer, and early fall of 2008, the firm was careful to advise the market that it was not currently accessing the facility.[5367]

### (e) Lehman Accessed the PDCF Ten Times in 2008; Lehman's Use of the PDCF Was Concentrated in Periods Immediately After the Bear Stearns Near Collapse, and Immediately After LBHI Filed for Bankruptcy

Lehman drew on the PDCF facility sparingly prior to its bankruptcy. Lehman accessed the PDCF seven times in the liquidity stress period that followed the Fed-brokered sale of Bear Stearns to JPMorgan.[5368] Both internally, and to third parties, Lehman characterized these draws as "tests,"[5369] although witnesses from the FRBNY have stated that these were not strictly "tests," but instances in which Lehman drew upon the facility for liquidity purposes.[5370]

Lehman documents reveal the dates for all seven instances, prior to LBHI's bankruptcy, on which Lehman pledged collateral to the PDCF in exchange for cash loans. On March 18, 19 and 20, Lehman pledged collateral to the PDCF in return for

---

[5367] Joe Bel Bruno, *Lehman Bros. Denies It Approached Federal Reserve*, Associated Press (June 3, 2008) (quoting Tonucci as saying Lehman last accessed the primary broker-dealer facility "on April 16 for testing purposes").

[5368] Robert Azerad, Lehman, 2008 Q2 – Liquidity Position (June 6, 2008), at p. 3 [LBHI_SEC07940_516173] (attached to e-mail from Robert Azerad, Lehman, to John Feraca, Lehman, *et al.* (June 7, 2008) [LBHI_SEC07940_516172]).

[5369] *E.g.*, Robert Azerad, Lehman, 2008 Q2 – Liquidity Position (June 6, 2008), at p. 3 [LBHI_SEC07940_516173] (referring to "test trades" with the PDCF); *see also* Joe Bel Bruno, *Lehman Bros. Denies It Approached Federal Reserve*, Associated Press (June 3, 2008) (quoting Tonucci as stating "[t]he last time we accessed the [PDCF] facility was on April 16 for testing purposes").

[5370] *E.g.*, Examiner's Interview of Thomas Baxter, Jr., May 20, 2009, at p. 4.

$1.6 billion, $2.3 billion, and $2.3 billion in cash, respectively.[5371]  On March 24, 25 and 26, Lehman, via LBI, pledged the $2.26 billion senior tranche of its Freedom CLO to the PDCF for $2.13 billion in cash financing.[5372]  On April 16, 2008, Lehman pledged an unknown class of collateral to the PDCF, likely in the amount of $2 billion.[5373]

Lehman abstained from obtaining liquidity from the PDCF during the week prior to bankruptcy, as its liquidity pool came under pressure due to clearing bank collateral requests and associated liens.  Immediately after LBHI filed for Chapter 11, however, LBI again resorted to the facility.  On September 15, 2008, LBI borrowed $28 billion from the PDCF against $31.7 billion of collateral.[5374]  Likewise, on September 16, LBI obtained $19.7 billion of financing against $23 billion of collateral.[5375]  Finally, on September 17, 2008, the day Barclays announced it would acquire the Lehman broker-dealer, LBI obtained $20.4 billion against $23.3 billion of collateral.[5376]

---

[5371] Lehman, Presentation to the Federal Reserve: Update on Capital, Leverage & Liquidity (May 28, 2008) [LBHI_SEC07940_062599].

[5372] Memorandum from Margaret Sear, Lehman, *et al.*, to Files, Lehman (Apr. 11, 2008), at p. 2 [LBEX-WGM 762264] (accounting policy memorandum).

[5373] Robert Azerad, Lehman, 2008 Q2 -- Liquidity Position (June 6, 2008), at p. 3 [LBHI_SEC07940_516173]; *see also* Joe Bel Bruno, *Lehman Bros. Denies It Approached Federal Reserve*, Associated Press (June 3, 2008) (quoting Tonucci as stating "[t]he last time we accessed the [PDCF] facility was on April 16 for testing purposes").

[5374] *See* e-mail from David Weisbrod, JPMorgan, to Jamie L. Dimon, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0080146] (noting that Lehman borrowed $28 billion from the PDCF on September 15, 2008); Examiner's Interview of Robert Azerad, Sept. 23, 2009, at p. 5.

[5375] *Id.*

[5376] *Id.* Analysis of potential claims arising from Lehman's borrowings from the FRBNY are analyzed in Section III.B of this Report.

### (3) Other FRBNY Liquidity Facilities

### (a) The Term Secured Lending Facility

The Term Securities Lending Facility ("TSLF") was created on March 11, 2008 amid the series of events that led to the near collapse of Bear Stearns.[5377] In the weeks preceding the near collapse of Bear, the FRBNY was growing increasingly concerned over the tightening of liquidity in the mortgage-backed securities ("MBS") market.[5378] During that period, officials in the FRBNY were involved in intense discussions over how to restore liquidity to the market. One idea was to "swap-out" treasuries to broker-dealers in exchange for their otherwise illiquid MBS.[5379]

This proposal was eventually realized in the TSLF. Under the TSLF, to this day, every 28 days, broker-dealers engage in a competitive auction where they can swap MBS and other securities for Treasuries.[5380]

Lehman borrowed from the TSLF,[5381] which, unlike the PDCF, did not have a stigma associated with its use.

---

[5377] Examiner's Interview of Thomas Baxter, Jr. May 20, 2009, at p. 6.

[5378] *Id.*

[5379] *Id.*

[5380] Federal Reserve Bank of New York, Frequently Asked Questions, http://www.newyorkfed.org/markets/tslf_faq.html (June 25, 2009).

[5381] Declaration of Shari D. Leventhal In Support of Trustee's Motion for Entry of an Order Approving a Settlement Agreement, at p. 2, Docket No. 387, *Special Investor Protection Corp. v. Lehman Brothers Inc.*, (*In re Lehman Brothers Holdings Inc.*) No-08-0420 (Bankr. S.D.N.Y. Dec. 5, 2008) (noting that the FRBNY traded with LBI under the PDCF, OMO, and TSLF).

### (b)  Open Markets Operations

Open Market Operations ("OMO") lending is one of the basic ways the FRBNY controls the supply of Treasuries, and thereby implements monetary policy.[5382]  The FRBNY buys and sells Treasuries in transactions with broker-dealers under the OMO program by engaging in repo and reverse repo transactions with those entities.  The FRBNY advances Treasuries against a large pool of eligible collateral, including investment grade asset-backed securities, corporates and MBS.  The FRBNY was a creditor to Lehman under the OMO.[5383]

### i)  Lehman's Liquidity Pool

### (1)  Introduction and Executive Summary

The Examiner's investigation of Lehman's clearing banks and other lenders, as directed by the eighth bullet of the Examiner Order, required that the Examiner review Lehman's liquidity pool, that is, cash, government securities and other high-quality assets that Lehman set aside for its known funding needs.[5384]  Multiple witnesses confirmed that certain assets Lehman deposited with or pledged to its clearing banks were counted in Lehman's liquidity pool.  By the second week of September 2008, as

---

[5382] *Id.*

[5383] *Id.*

[5384] The January 16, 2009 Order directing the U.S. Trustee to appoint an Examiner charged the Examiner with investigating, among other things:

> The transactions and transfers, including but not limited to the pledging or granting of collateral security interest among the debtors and the pre-chapter 11 lenders and/or financial participants including but not limited to, JPMorgan Chase, Citigroup, Inc., Bank of America, the Federal Reserve Bank of New York and others.

Order Directing Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code, at p. 4, Docket No. 2569, *In re Lehman Brothers Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Jan. 16, 2009).

market pressures and collateral calls increased, Lehman no longer had sufficient assets in its liquidity pool to weather a crisis. The inadequacy of Lehman's liquidity pool is directly connected to Lehman's bankruptcy filing.[5385]

Like its peer institutions, Lehman was "heavily reliant upon wholesale financing sources"[5386] to fund a substantial portion of its balance sheet every 24 hours using overnight repos. Liquidity – the immediate ability to access funds – is the life's blood of an investment bank. "Liquidity is more important than capital; most entities which go bankrupt do so because they run out of financing, not because the value of their assets falls below the value of their liabilities."[5387] One witness explained, "corporates die of cancer," but "financial firms [like Lehman] die of heart attacks."[5388]

Lehman knew that liquidity played a crucial role in its business model. Its annual report stated, "Liquidity, that is access to funds, is essential to our businesses."[5389] Lehman also knew that the consequences of a liquidity disruption could be catastrophic. As Erin Callan noted after Bear Stearns' near collapse, "liquidity is the

---

[5385] The Examiner Order also mandates that the Examiner investigate "[t]he events that occurred from September 4, 2008 through September 15, 2008 or prior thereto that may have resulted in the commencement of the LBHI chapter 11 case." *Id.*

[5386] Diane Hinton, Standard & Poor's RatingsDirect, Liquidity Management In Times Of Stress: How The Major U.S. Broker-Dealers Fare (Nov. 8, 2007), at p. 2 [LBHI_SEC07940_439424].

[5387] E-mail from Paul Shotton, Lehman, to Christopher M. O'Meara, Lehman (Apr. 15, 2008) [LBHI_SEC07940_768467].

[5388] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 9.

[5389] Lehman Brothers Holdings Inc., Annual Report for 2007 as of Nov. 30, 2007 (Form 10-K) (filed on Jan. 29, 2008), at p. 17 ("LBHI 2007 10-K").

thing that will kill you in a moment."[5390]  For this reason, Lehman paid careful attention to its liquidity pool and to how it described the pool to the public.  But as pressures mounted during the summer of 2008, Lehman began to include encumbered assets in its liquidity pool.

Beginning in June 2008, Lehman agreed to deposit $2 billion with Citigroup to cover clearing-related concerns.  Lehman believed it could call the deposit back, so it continued to count the $2 billion in its liquidity pool.  But Citigroup held the view that it had a right of setoff against the deposit and Lehman understood that a withdrawal of the deposit would have an impact on Citi's willingness to clear and settle trades for Lehman.[5391]

Lehman's deposit with Citigroup was the start of a trend.  During the summer, Lehman posted billions in collateral to its clearing banks through more direct pledges.  A week after Citigroup requested collateral, Lehman pledged more than $5 billion in securities to JPMorgan, Lehman's primary U.S. clearing bank, to mitigate the effects of the bank's revised margin requirements.  But Lehman continued to include most of this collateral in its liquidity pool.

---

[5390] Maria Bartiromo, *Lehman CFO Erin Callan: Back from Ugly Monday*, Business Week, Mar. 20, 2008.

[5391] *See, e.g.*, FRBNY, Lehman IB Update, (July 14, 2008) [FRBNY to Exam. 008163] (an FRBNY analyst reported that Lehman's Global Treasurer, Paolo R. Tonucci said, "even though Lehman 'technically' has access to the $2B [Citigroup deposit], if they [Lehman] pull it or a major portion thereof, Citi will stop clearing.").

August 2008 brought additional demands for collateral. Lehman met these demands but still counted the collateral in its liquidity pool. On August 14, 2008, Bank of America began demanding collateral to secure intraday exposures. Lehman posted $500 million with the bank, subject to a security agreement dated August 25, 2008. Lehman included this collateral in its liquidity pool despite the fact that the collateral was subject to a security interest, was returnable to Lehman only on three days' notice and was placed to ensure that Bank of America would continue its clearing operations. Likewise, in late August, at JPMorgan's request, Lehman and JPMorgan executed a security agreement and holding company guaranty, formalizing JPMorgan's intraday security interest in two specified accounts. Lehman included amounts in these accounts in its liquidity pool, even though JPMorgan required almost all of the funds in those accounts each morning to unwind the previous day's triparty-repo trades. HSBC requested and received more than $800 million to secure its intraday credit exposure to Lehman on August 28, an amount also included in Lehman's liquidity pool. And from September 9 through 12, JPMorgan requested and received more than $8 billion in cash to secure JPMorgan's exposure to Lehman, an amount that Lehman also included in its liquidity pool.

Lehman took the position that including the Citigroup deposit and Lehman's intraday collateral with JPMorgan in its liquidity pool was appropriate. But the SEC and the rating agencies later expressed contrary views. While there may have been

legitimate differences of opinion as to the appropriateness of counting the Citigroup deposit and the intraday collateral in the liquidity pool, it is far more difficult to justify Lehman's counting of *pledged* assets in Lehman's liquidity pool, such as those Lehman pledged to JPMorgan on or after September 10, 2008.

The FRBNY knew that Lehman included pledged assets in its liquidity pool, but as Lehman's lender rather than its regulator, the FRBNY took no steps to compel Lehman to disclose the discrepancy between Lehman's reported liquidity pool figure and the actual, smaller number. Lehman's primary regulator, the SEC, was unaware of the extent to which Lehman was including clearing-bank collateral in its liquidity pool. The SEC did not have a full understanding of the encumbrances on Lehman's liquidity pool until September 12 – the Friday before Lehman's bankruptcy filing.[5392]

Most significantly, Lehman never advised the rating agencies or the investing public of the deposits and pledges affecting its liquidity pool. During Lehman's earnings announcement on September 10, CFO Ian Lowitt said nothing about these encumbrances. Although there is some evidence that Lowitt knew that the liquidity pool contained clearing-bank collateral, the Examiner concludes that there is not sufficient evidence to support the existence of a colorable claim that Lowitt breached his

---

[5392] The SEC asserts that it was aware, prior to this date, that Lehman pledged "$5 billion of previously unencumbered assets, and not cash" to JPMorgan "on an intraday basis." The SEC also asserts, however, that it "was told by Lehman personnel that [the pledge did] not affect the liquidity pool." Letter from Samuel M. Forstein, Assistant General Counsel, Securities and Exchange Commission, to Robert L. Byman, Counsel to the Examiner (Jan. 29, 2010) (on file with the Examiner). The Examiner has no other documentation to support this assertion.

fiduciary duties to the corporation and its shareholders through material omissions and

misrepresentations regarding Lehman's liquidity pool.

### (2) The Importance of Liquidity to Broker-Dealers and Investment Bank Holding Companies Generally

"Liquidity is the ability of a bank to fund increases in assets and meet obligations

as they come due, without incurring unacceptable losses."[5393]  Liquidity is absolutely

critical to the broker-dealer and investment bank holding company business model due

to the fact that these financial entities are dependent on short-term secured financing to

fund their daily operations.[5394]  The near collapse of Bear Stearns, and ultimately, the

collapse of Lehman, is testimony to the fact that investment banks "live and die by

liquidity."[5395]

After Bear Stearns fell, Lehman was widely regarded as the investment bank

second-most dependent on short-term secured financing.[5396]  A June 30, 2008 Morgan

Stanley research report noted Lehman's "disproportionate reliance on 'repo' funding" –

---

[5393] Bank for International Settlements, Basel Committee on Banking Supervision, Principles for Sound Liquidity Risk Management and Supervision (Sept. 2008), at p. 1.

[5394] *See, e.g.*, Current Issues: PDCF, at p. 2 ("Primary dealers [*i.e.*, broker-dealers] rely heavily on the repo market – the market for repurchase agreements – to finance their portfolios of securities. . . . [T]he primary dealers stand out as the market's largest group of borrowers. . . . Repos constitute a major source of short-term financing for broker-dealers . . . .").

[5395] Diane Hinton, Standard & Poor's RatingsDirect, Liquidity Management In Times Of Stress: How The Major U.S. Broker-Dealers Fare (Nov. 8, 2007), at p. 3 [LBHI_SEC07940_439424].

[5396] *See, e.g.*, Morgan Stanley, Bruised, Not Broken – and Poised for Profitability (June 30, 2008), at p. 8 [FRBNY to Exam. 027135] ("Given [Lehman's] relative size, less diverse revenue composition vs. larger peers, and short-term funding profile, the firm had to contend with heightened scrutiny leading up to and following the liquidity run on Bear Stearns.").

a type of short-term (usually overnight) financing.[5397]  As of the first quarter of 2008, "repo funding accounted for 5.7x of [Lehman's] liquidity reserve compared with 2.6x for peers."[5398]  In the second quarter of fiscal year 2008, repo borrowings accounted for nearly 26% of the liabilities on Lehman's balance sheet.[5399]  Lehman's reliance on short-term repos for day-to-day funding left it vulnerable to the risk of a liquidity crisis in the event those repos stopped rolling.  Lehman acknowledged this point in its public filings, noting:

> Liquidity, that is ready access to funds, is essential to our businesses. Financial institutions rely on external borrowings for the vast majority of their funding, and failures in our industry are typically the result of insufficient liquidity.[5400]

An internal Lehman document noted:  "Short term secured financing represents the largest source of secured funding for the Firm.  Consequently, one key objective is to ensure that these funding sources are maintained in adverse market environments[.]"[5401]  Thus, for a firm dependent on short-term financing, the importance of liquidity takes on a special dimension.

---

[5397] *Id.*

[5398] *Id.*

[5399] *See id.* at p. 17 (According to a table created by Morgan Stanley research, using Lehman company data and Morgan Stanley research estimates, Lehman's balance sheet included $158.677 billion of "Securities Sold Under Repo Agreements" included in the "Collateralized Borrowings" portion of Lehman's "Liabilities."  Total liabilities were estimated to be $612.724 billion.  $158.677 billion is 25.9% of $612.724 billion.).

[5400] LBHI 2007 10-K, at p. 17.

[5401] Lehman, Funding Lehman Brothers *(*Sept. 11, 2008), at p. 6 [LBHI_SEC07940_744139].

### (3) Lehman's Liquidity Pool

#### (a) The Purpose and Composition of Lehman's Liquidity Pool

In regulatory filings and disclosures to the public, Lehman represented that it maintained a "liquidity pool . . . primarily intended to cover expected cash outflows for twelve months in a stressed liquidity environment."[5402] The pool was designed on the assumption that Lehman could not issue new unsecured debt or generate liquidity outside that pool of assets to satisfy the expected cash outflows during the stressed twelve-month period.[5403] These "expected cash outflows" consisted of obligations such as: portions of long-term debt coming current; maturing short-term, unsecured debt such as commercial paper; and bank loans and hybrid financial instruments coming due within a one-year span.[5404] Additionally, the liquidity pool was designed to cover contingent collateral calls in connection with Lehman's derivatives contracts, that is, automatic collateral pledges to derivatives counterparties under ISDA (International Swaps and Derivatives Association, Inc.) CSA (Credit Support Annex) agreements, triggered in the event that Lehman suffered a ratings downgrade.[5405]

---

[5402] Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2008 (Form 10-Q) (filed on July 10, 2008), at p. 80 ("LBHI 10-Q (July 10, 2008)").

[5403] *Id.*

[5404] *See id.*

[5405] *See id.* at pp. 80-82 (noting that the liquidity pool was sized to cover, among other things, "additional collateral that would be required to be posted against derivative contracts and other secured funding arrangements" in the event of a one-notch ratings downgrade).

Although the pool was "primarily intended to cover expected cash outflows for twelve months in a stressed liquidity environment,"[5406] Lehman described the pool as being available to cover other events as well. For instance, Lehman reported that "[a]s a last resort," the liquidity pool was "available" to the firm "to mitigate the loss of secured funding capacity."[5407] Specifically, the liquidity pool was reported to be "available" to mitigate a "loss of repo capacity" on at least $32 billion in illiquid assets.[5408]

Lehman reported the size of its liquidity pool as $34 billion at the end of the first quarter of 2008,[5409] $45 billion at the end of the second quarter[5410] and $42 billion at the end of the third quarter.[5411] Intra-quarter in 2008, following the near collapse of Bear Stearns, Lehman, primarily through Laura Vecchio, head of the Project Management Office,[5412] and Global Treasurer Paolo Tonucci,[5413] provided daily liquidity pool

---

[5406] *Id.* at p. 80.

[5407] *Id.* at p. 84.

[5408] *Id.* at p. 85.

[5409] Final Transcript of Lehman Brothers Holdings Inc., First Quarter 2008 Earnings Call (Mar. 18, 2008), at p. 9.

[5410] Final Transcript of Lehman Brothers Holdings Inc., Second Quarter 2008 Earnings Call (June 16, 2008), at p. 10.

[5411] Final Transcript of Lehman Brothers Holdings Inc., Third Quarter 2008 Earnings Call (Sept. 10, 2008), at p. 11.

[5412] Vecchio transmitted reports regarding Lehman's liquidity pool and risk management to the FRBNY and SEC; however, she did not create the reports. Rather, Treasury and Risk Management were responsible for the contents of their respective reports. Examiner's Interview of Laura M. Vecchio, Apr. 16, 2009, at p. 4.

[5413] Tonucci provided verbal updates to FRBNY on-site analyst Jan Voigts. *See, e.g.,* FRBNY, Lehman IB Update (July 11, 2008) [FRBNY to Exam. 008207] (summarizing updated liquidity pool and repo information gleaned through a "Discussion with Treasurer").

estimates to the SEC and FRBNY.[5414]  The quarter-end figures disclosed to regulators were the same as those disclosed publicly.  The intra-quarter liquidity pool estimates were similar to those disclosed at quarter-end.[5415]

Lehman's 10-Q for the second quarter of 2008 reported that the pool of assets held to meet its maturing obligations was composed primarily of "cash instruments, government and agency securities and overnight repurchase agreements collateralized by government and agency securities."[5416]  In the second quarter of 2008, Lehman's liquidity pool did indeed contain such assets: true to its regulatory filings and disclosures, as of May 31, 2008, the majority of the pool was invested in treasuries, and government and agency securities.[5417]

Lehman represented that its liquidity pool was unencumbered.  After detailing the composition of the liquidity pool, the second quarter 10-Q provided "[e]stimated values of the liquidity pool and other unencumbered (*i.e.*, unpledged) asset

---

[5414] *See, e.g.*, FED Documentation [LBEX-WGM 030111] (attachment to e-mail with list of documentation and verbal updates that Lehman was to provide to the FRBNY on daily, weekly, and quarterly bases. "Liquidity Pool Detail – Footnote" and "Liquidity Executive Summary" were two daily written reports distributed to the FRBNY.  The FRBNY also received a daily verbal "Estimate of Liquidity Pool."); e-mail from Laura M. Vecchio, Lehman, to Paolo R. Tonucci, Lehman, *et al*. (Mar. 31, 2008) [LBEX-WGM 030110] (attaching "FED Documentation"); Examiner's Interview of Jan H. Voigts, Aug. 21, 2009, at p. 6 (confirming that the FRBNY received the documents listed in Vecchio's March 31, 2008 e-mail to Tonucci).

[5415] *See, e.g.*, FRBNY, Lehman IB Updates (Aug. 18, 2008-Sept. 12, 2008) [FRBNY to Exam. 007943] (updates produced by FRBNY in the course of monitoring Lehman's liquidity; the intra-quarter reporting for third quarter 2008 reflects that Lehman's pool fluctuated, day-over-day between $38 and $42 billion).

[5416] LBHI 10-Q (July 10, 2008), at p. 81.  In addition to describing "unencumbered" assets as "unpledged" assets, Lehman publicly described "unencumbered" assets as those "that have not been financed against, [and are] available . . . to get additional cash at any time."  Transcript of Lehman Brothers Holdings Inc., First Quarter 2008 Earnings Call (March 18, 2008).

[5417] *See* Lehman, Detailed Liquidity Pool Composition, (May 31, 2008), pp. 1-14 [LBEX-BARLQP 0000437].

portfolios."[5418]  Lehman emphasized the liquid, unencumbered nature of the assets in its liquidity pool to regulators.  For example, in a presentation to the SEC dated March 14, 2008, Lehman characterized its liquidity pool as composed of "primarily cash and cash equivalents and *unencumbered, liquid,* investment grade collateral."[5419]  Likewise, in a presentation to the Office of Thrift Supervision ("OTS") on April 4, 2008, Lehman represented that its liquidity pool was composed of "primarily cash and cash equivalents and *unencumbered, liquid,* investment grade collateral."[5420]  Similarly, in materials prepared for a joint presentation to the Federal Reserve and SEC dated March 26, 2008, Lehman held out its liquidity pool as "invested in instruments that can be *monetized at short notice in all market environments.*"[5421]

Lehman emphasized the purportedly liquid, easy-to-monetize nature of its liquidity pool to its significant repo counterparties and clearing banks as well.  For example, in response to inquiries about Lehman's liquidity pool by JPMorgan's Mark Doctoroff, Lehman Cash and Collateral Management head Dan Fleming said on

---

[5418] LBHI 10-Q (filed July 10, 2008), at p. 81.

[5419] Lehman, Presentation to: U.S. Securities & Exchange Commission, Liquidity & Funding 2008 Q1 Review (Mar. 14, 2008), at p. 5 [LBHI_SEC07940_446200] (emphasis added);  *see also* e-mail from Peter Giacone, Lehman, to Laura M. Vecchio, Lehman, *et al.* (Mar. 14, 2008) [LBEX-DOCID 4227753] (describing the meeting as having gone very well and having lasted about 90 minutes).

[5420] Lehman, Presentation to: OTS, OTS Quarterly Review, First Quarter 2008 (Apr. 4, 2008), at p. 26 [LBHI_SEC07940_473107] (emphasis added);  *see also* e-mail from Ronald S. Marcus, OTS, to Thomas Francis, Lehman, *et al.* (Apr. 9, 2008) [LBEX-DOCID 357853] (following up on the April 7 presentation Lehman made regarding Audit, Finance and Risk Management).

[5421] Lehman, Presentation to Federal Reserve and SEC, Liquidity Management at Lehman Brothers (Mar. 26, 2008), at p. 2 [LBHI_SEC07940_741690] (emphasis added);  *see also* e-mail from Paolo R. Tonucci, Lehman, to John F. Coghlan, Lehman, *et al.* (Mar. 28, 2008) [LBEX-DOCID 125099] (forwarding the presentation given the previous day to the SEC and Federal Reserve).

September 2, 2008 that about "90%" of Lehman's "$42 billion" liquidity pool "was invested in cash and cash equivalents, [g]overnment and [a]gency securities and E1 (major index) equities, *all of which can be monetized at very short notice*."[5422]  Tonucci told the Examiner that Lehman's internal definition of a "liquid" asset, appropriate for inclusion in the liquidity pool, was one that could be monetized within five days.[5423]  However, International Treasurer Carlo Pellerani was not familiar with this internal definition, and the Examiner is not aware of any document that sets forth such a definition of "liquidity."[5424]  No law, SEC regulation or GAAP-style rule governed the definition of a "liquid" asset in the context of a CSE's liquidity pool, although Matthew Eichner, former Assistant Director of the SEC's Division of Trading and Markets, which supervised Lehman under the CSE program, told the Examiner he conveyed to Lehman that assets in its liquidity pool should be monetizable "within twenty-four hours."[5425]

---

[5422] E-mail from Daniel J. Fleming, Lehman, to Mark G. Doctoroff, JPMorgan, *et al.* (Sept. 2, 2008) [LBEX-AM 042892] (emphasis added).  Fleming also disclosed that "[t]he balance . . . was invested in Lehman CLO securities, two thirds of which are backed by corporate loans, which have been relatively liquid."  *Id.*

[5423] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 17.  Tonucci could not cite a particular Lehman document that established this five-day definition, but he stated his belief that this was official policy, predating his tenure as Global Treasurer.  *Id.*  Steven Engel, former Global Head of Funding at Lehman, echoed this standard; he stated that assets in Lehman's liquidity pool should be monetizable in about a week.  Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 9 & n.6.

[5424] Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at pp. 2, 5.

[5425] Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 6.  Eichner said that he conveyed to Lehman the "twenty-four hour" monetization standard found in an SEC memorandum defining the scope of SEC liquidity inspections; however, Eichner could not recall to whom at Lehman or when he conveyed the monetization standard.  *Id.  See also* Memorandum from Phillip Minnick, SEC, *et al.*, to Erik Sirri, SEC, *et al.*, re: Parent Company Liquidity Inspections Scope Memorandum for the Consolidated Supervised Entities ("CSE") (Feb. 20, 2008), at p. 2 [LBEX-WGM 017294] (providing the twenty-four hour standard).  It is likely that Lehman saw this memorandum as well, given that it bears a Lehman Bates-stamp.

### (b) Lehman Tested Its Liquidity Pool and Shared the Results of These Tests with Rating Agencies

Periodically, throughout 2008, Lehman tested the adequacy of its liquidity pool in self-run analyses designed to ensure that liquidity could be mobilized to satisfy obligations, not only over a 12-month period, but also in a more severe liquidity shock closer to the "run on the bank" scenario that befell Bear Stearns.[5426] For example, a presentation dated May 28, 2008 included an analysis designed to test the adequacy of Lehman's liquidity pool against a stress scenario three-to-four times more severe than what Lehman experienced during the Bear Stearns crisis the week of March 17, 2008.[5427] In that analysis, Lehman entered a hypothetical four-week stress period with a $44.4 billion liquidity pool, and successfully weathered the scenario, retaining $20.5 billion at the end of the stress-period.[5428] Lehman thereafter disclosed in its public filings that the liquidity pool was available to "mitigate[]" the "cash outflows" contemplated in its liquidity "stress testing."[5429]

---

[5426] *See, e.g.*, Lehman, Presentation to the Federal Reserve, Update On Capital, Leverage & Liquidity (May 28, 2008), at pp. 5-14 [LBHI_SEC07940_527576] (including a liquidity stress scenario designed to test the adequacy of Lehman's liquidity pool).

[5427] *Id.* at p. 12.

[5428] *Id.* at p. 13.

[5429] LBHI 10-Q (filed July 10, 2008), at p. 85. These liquidity stress tests, conducted by Lehman's Treasury function, are distinct from Lehman's market risk stress tests conducted by Lehman's Market Risk Management function. *See* Lehman, ICAAP Supporting Document: Market Risk Management Overview (May 2008), at p. 19 [LBEX-DOCID 383057].

Although such analyses were originally developed at the request of Lehman's regulators,[5430] Lehman distributed the results of the stress tests to rating agencies, counterparties, and other market participants.  The firm distributed one such analysis to Standard & Poor's in the third quarter of 2008 – a time when Lehman was besieged by short sellers, market rumors, and increasingly large CDS spreads, and was pressed to demonstrate its ability to withstand a looming liquidity crisis.[5431]  Similar to the analyses shared with regulators, this scenario assumed Lehman would incur substantial losses in both secured and unsecured funding, and contingent collateral calls triggered by a two-level ratings downgrade.  More specifically, the stress scenario assumed a significant loss in Lehman's ability to obtain short-term secured financing from its repo of asset-backed securities, equities and corporates, as well as prime broker free credit balances.[5432]  Further, the analysis assumed Lehman would not be able to roll its unsecured short-term debt or commercial paper.[5433]  While these liquidity sources evaporated, outstanding debt obligations would continue to come due, requiring Lehman to draw on its liquidity pool to satisfy maturing short-term debt, current portions of its maturing long-term debt, commercial paper, and CSA-mandated

---

[5430] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 22; Joint Request of SEC and FRBNY: Liquidity Scenarios for CSEs (May 20, 2008), at p. 1 [LBHI_SEC07940_505195]; Lehman, Finance & Risk Committee of the Board: Risk, Liquidity, Capital And Balance Sheet (Sept. 9, 2008), at. p. 11 [LBHI_SEC07940_742509].

[5431] Lehman, Standard & Poor's Overview of Lehman's 3Q 2008, Results and Game Plan (Sept. 5, 2008), at pp. 41-42 [LBHI_SEC09740_747779]. *See* Section III.A.3 of this Report, which discusses Lehman's financial condition during the third quarter of 2008.

[5432] *Id.* at p. 41.

[5433] *Id.*

collateral calls.[5434]   According to Lehman's analysis, its $42 billion liquidity pool, combined with LBI's, LBIE's, LBJ's and Bankhaus' liquidity pools, would allow it to withstand a four-week liquidity shock and emerge from the crisis with a $13 billion cash position.[5435]

### (c) Market Participants Formed Favorable Opinions of Lehman's Liquidity on the Basis of Lehman's Representations About Its Liquidity Pool

On the basis of Lehman's reported liquidity pool, specifically its reported size and composition of easy-to-monetize assets, market participants formed positive opinions of Lehman's liquidity profile.   Certain influential participants, and rating agencies in particular, cited Lehman's liquidity pool as the basis for concluding that Lehman's liquidity position was sound.   For example, an April 15, 2008 Moody's report titled "Liquidity Risk Assessment: Lehman Brothers Holdings Inc." concludes: "Moody's views the liquidity profile of [LBHI] as very strong."[5436]   "The basis for Moody's assessment of Lehman's liquidity," the report continues, "is the strength of their overall funding framework, which includes an ample liquidity cushion of high-quality unencumbered assets."[5437]

---

[5434] *See id.* (noting that the liquidity stress scenario assumed that CSA agreements would require additional collateralization and that loans would continue to be funded per the funding schedule for leveraged loans).

[5435] *Id.* at p. 42.

[5436] Moody's Investment Service Global Credit Research, Liquidity Risk Assessment: Lehman Brothers Holdings Inc. (Apr. 15, 2008), at p. 1 [LBHI_SEC07940_090274].

[5437] *Id.*

Even as late as September 11, 2008 – less than two business days before LBHI filed for bankruptcy – market analysts cited Lehman's large liquidity pool as support for the conclusion that the firm's "[l]iquidity risk appears low."[5438]  In a research memo recommending a "neutral" rating for LBHI, The Buckingham Research Group analysts cited Lehman's $42 billion reported liquidity pool, along with its lack of reliance on prime brokerage free credit balances and access to the Federal Reserve's Primary Dealer Credit Facility ("PDCF") window, to reach the conclusion that "[Lehman] remains well positioned in a 'run on the bank' scenario;"[5439] and: "[B]ottom line, run on the bank scenario risk seems very low with respect to [Lehman]."[5440]  Thus Lehman's large, and reportedly unencumbered, liquidity pool gave rating agencies and market participants a positive impression of Lehman's liquidity – and financial viability – right up to the days immediately preceding LBHI's bankruptcy.

---

[5438] The Buckingham Research Group, Lehman Brothers (LEH), Rating Agency Risk Too High (Sept. 11, 2008), at p. 3 [LBEX-WGM 928802].
[5439] *Id*.
[5440] *Id*.

### (4) Lehman's Clearing Banks Sought Collateral Pledges and Cash Deposits To Secure Intraday Credit Risk; Lehman Included This Collateral in Its Liquidity Pool

After the sudden near collapse of Bear Stearns in March 2008, counterparties and clearing banks focused their attention on those institutions regarded as the next-most vulnerable. Lehman, with its large leverage ratios and real-estate heavy balance sheet, was widely seen as a particularly vulnerable firm.[5441] In a progression of events, banks demanded collateral from Lehman; Lehman met those demands but continued to include the collateral in its liquidity pool.

### (a) Lehman Pledged CLOs and Other Securities to JPMorgan Throughout the Summer of 2008 to Meet Triparty-Repo Margin Requirements

JPMorgan served as Lehman's clearing bank for triparty repos.[5442] In a triparty repo, Lehman pledged collateral to a counterparty's account at JPMorgan, typically overnight in exchange for cash, which was then transferred to Lehman's account at JPMorgan. The following morning the repo matured, and JPMorgan "unwound" the trade: Lehman returned the cash, plus interest, to the repo counterparty's account,

---

[5441] *See, e.g.,* Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at p. 6 (Bernanke "knew" Lehman was the weakest of the investment banks, after Bear Stearns); Examiner's Interview of Treasury Secretary Timothy F. Geithner, Nov. 24, 2009, at p. 2 (after Bear Stearns nearly collapsed, Geithner regarded Lehman as the weakest investment bank, followed by Merrill Lynch); Jenny Anderson, *At Lehman, Allaying Fears About Being the Next to Fall,* N.Y. Times, Mar. 18, 2008 (noting similarities between Bear Stearns and Lehman business models, in particular reliance on short-term financing and the mortgage market).

[5442] *See* Section III.A.5.b of this Report, which discusses Lehman's dealings with JPMorgan. JPMorgan is one of only two clearing banks providing triparty-repo clearing services in the United States. The other is Bank of New York Mellon. Working Group on Government Securities Clearance and Settlement, *Report to the Federal Reserve Board* (Dec. 2003), at p. 10.

while the counterparty returned the collateral to Lehman. To facilitate the unwind process, JPMorgan advanced Lehman intraday credit, secured by the collateral returned by triparty investors, which was, ideally, repaid by the end of the day as Lehman re-booked trades.[5443]

JPMorgan historically gave full value to the securities pledged by Lehman securing intraday-credit advances. Citing "[m]arket [r]isk" inherent in triparty-repo financing, JPMorgan advised Lehman in February 2008 that it would begin applying haircuts to collateral that Lehman posted to secure intraday credit advances.[5444] As originally envisioned by JPMorgan, this margin requirement would be phased in incrementally over the course of five to six weeks.[5445] The size of the haircut was to be equivalent to the haircut that triparty investors imposed on Lehman collateral.[5446] In other words, JPMorgan would retain intraday the same margin that triparty investors held overnight. Upon learning of JPMorgan's proposal to discount Lehman collateral, Fleming elevated the issue to Tonucci, noting: "The [haircut] proposal may create very

---

[5443] *See* Section III.A.5.b of this Report, which provides a more detailed discussion of JPMorgan's role in clearing Lehman's triparty-repo trades; *see also* Counterparty Risk Management Policy Group III, *Containing Systemic Risk: The Road to Reform* (Aug. 6, 2008), at p. 114 (noting that clearing banks extend intraday credit to dealers through unwinding triparty repos at the beginning of the trading day by crediting the triparty investor's account on behalf of the dealer).

[5444] E-mail from Janet Birney, Lehman, to Daniel J. Fleming, Lehman *et al.* (Feb. 26, 2008) [LBHI_SEC07940_436414].

[5445] *Id.* It ultimately took the course of the summer. *See* Section III.A.5.b of this Report, which discusses Lehman's dealings with JPMorgan.

[5446] E-mail from Janet Birney, Lehman, to Daniel J. Fleming, Lehman *et al.* (Feb. 26, 2008) [LBHI_SEC07940_436414].

sizeable intraday liquidity challenges for us."[5447]  Thus, Fleming recognized this margin-requirement created a tension between two competing priorities for Lehman: providing its clearing banks with adequate security so that Lehman could continue obtaining short-term secured financing, while simultaneously attempting to maintain its reported liquidity pool.[5448]

Subsequently, JPMorgan imposed the investor margin in 20% increments beginning on March 17, 2008.[5449]  The full triparty-investor margin was imposed by August 14, 2008.[5450]

JPMorgan's margin requirements negatively affected Lehman's Net Free Equity ("NFE").[5451]  NFE was the measure of risk exposure that JPMorgan calculated to determine whether it would continue extending clearing advances to its client broker-dealers.[5452]  In its simplest form, NFE was the market value of Lehman securities pledged to JPMorgan plus any unsecured credit line JPMorgan extended to Lehman

---

[5447] E-mail from Daniel Fleming, Lehman to Paolo R. Tonucci, Lehman (Feb. 26, 2008) [LBHI_SEC07940_436414].

[5448] Fleming was not referring specifically to the liquidity pool in his February 26, 2008 e-mail; rather, he was referring to potential intraday liquidity issues.  These are, however, two sides of the same coin, as intraday liquidity shortfalls may have required Lehman to dip into its liquidity pool.

[5449] See Section III.A.5.b of this Report, which discusses Lehman's dealings with JPMorgan. See JPMorgan Second Written Responses, at p. 4.

[5450] E-mail from Craig L. Jones, Lehman, to Paolo R. Tonucci, Lehman, et al. (Aug. 14, 2008) [LBEX-AM 001764] (informing Tonucci that the intraday margin imposed by JPMorgan reached 100% that day).  The total amount of the haircut was "~$5bn."  Id.

[5451] See e-mail from Janet Birney, Lehman, to Jack Fondacaro, Lehman, et al. (May 2, 2008) [LBEX-DOCID 036292]; Discussion Points [LBEX-DOCID 077455] (noting that changes to JPMorgan's margin requirements would impact Lehman's NFE).

[5452] See Section III.A.5.b of this Report, which discusses Lehman's dealings with JPMorgan, and NFE in particular.

minus cash advanced by JPMorgan to Lehman.[5453]   An NFE value greater than zero indicated that Lehman had not depleted its available credit with JPMorgan.  If a trade would put NFE below zero, that trade would be stopped.[5454]   Fleming relayed to the Examiner that an "NFE deficit" would result in an inability to clear particular triparty-repo trades – a scenario which he characterized as disastrous for Lehman, given Lehman's dependence on triparty-repo financing.[5455]

Additionally, JPMorgan concluded that triparty-repo investors had themselves inadequately assessed risks in the margins they charged.[5456]   Thus, in order to mitigate liquidation and price risk, JPMorgan advised Lehman, as well as other broker-dealer clients, that additional margin would be required, based on collateral type, above and beyond the margin required by triparty-repo investors.   JPMorgan's new "risk-based margin" would take into account "liquidation risk" (to account for one-day price

---

[5453] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at p. 5.

[5454] *Id*.

[5455] Examiner's Interview of Daniel J. Fleming, Sept. 24, 2009, at pp. 4-5, 7.  When asked what would have happened if JPMorgan ceased to provide secured financing on an intraday basis through its clearing services, Fleming responded: "September 15 [2008] [the date of LBHI's bankruptcy filing]  is a good example of what happens."  *Id*. at p. 5.  Later in the interview, Fleming reiterated that without JPMorgan's clearing services, "Lehman wouldn't be able to open its doors."  And a loss of JPMorgan clearing services would be akin to "having no gas in your car."  *Id*. at p. 7.  *See* Section  III.A.5.b.1.c of this Report, which discusses Lehman's dealings with JPMorgan, triparty repos, and NFE.

[5456] Examiner's Interview of Ricardo S. Chiavenato, Sept. 21, 2009, at pp. 9-10; Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 4 (overnight investors were not overly concerned about liquidation pricing because they assumed clearing banks would unwind securities).

volatility for securities) and "price risk" (an estimate of potential vendor-price overstatement for illiquid securities).[5457]

Lehman initially transferred roughly $5.7 billion face value in collateral to JPMorgan on June 19, 2008, to begin covering risk-based margin.[5458]  This collateral consisted of certain collateralized loan obligations ("CLOs") including Freedom, Spruce and Pine, a commercial real estate ("CRE") collateralized debt obligation ("CDO") known as SASCO and the asset-backed commercial paper ("ABCP") known as Fenway.[5459]

Lehman continued to transfer collateral to JPMorgan after the initial June 19, 2008 delivery.  By the beginning of August 2008, as part of continuing efforts by Lehman to mitigate the effects of JPMorgan's margin requirements, Lehman had posted approximately $9 billion of collateral at JPMorgan.[5460]  By August 7, 2008, an LBI clearance account at JPMorgan called "LCD" held securities called Freedom, Pine,

---

[5457] JPMorgan, Triparty Repo Discussion – Lehman (May 29, 2008), at p. 10 [JPM-EXAMINER00006028].

[5458] E-mail from Craig L. Jones, Lehman, to John Feraca, Lehman, *et al.* (June 19, 2008) [LBEX-AM 001775] ("Today we moved several unencumbered assets (Sasco, Freedom, Spruce, Pine, Fenway) to LCPI's DTC box at Chase"); JPMorgan Second Written Responses, at p. 5.

[5459] E-mail from Craig L. Jones, Lehman, to John Feraca, Lehman, *et al.* (June 19, 2008) [LBEX-AM 001775] CLOs and CDOs are forms of asset-backed securities that derive their value from underlying assets; in the case of these two security types, revenue streams from loan and debt payments respectively.  ABCP is commercial paper that derives its value in part from underlying assets rather than solely from its issuer's promise to pay.

[5460] E-mail from Janet Birney, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Aug. 5, 2008) [LBHI_SEC07940_534733]; e-mail from Ricardo S. Chiavenato, JPMorgan, to Edward J. Corral, JPMorgan, *et al.* (Aug. 5, 2008) [JPM-2004 0061153] (noting that JPMorgan held $9 billion in Lehman collateral). Although in an August 5, 2008 e-mail Chiavenato referred to Lehman's collateral as coming from LCPI, JPMorgan counsel stated that this e-mail is incorrect in that regard; the collateral was located in LCD, an account owned and pledged by LBI.  *See* JPMorgan Second Written Responses, at pp. 5-6.

Spruce, Verano, SASCO, Kingfisher, HD Supply and Fenway.[5461]  Securities held in LCD contributed to LBI's NFE.[5462]  Then, from August 8 to 11, 2008, Lehman transferred the Spruce, Freedom, Pine, Kingfisher, Verano, and Fenway securities from LCD to an LBHI account at JPMorgan called "LCE."[5463]  Securities in LCE did not contribute to LBI's NFE; yet LBHI was operationally required to maintain securities valued at $5 billion in the LCE account.[5464]  On August 15, 2008, Lehman removed Freedom from LCE and on September 2, Lehman transferred Kingfisher from LCE to LCD.[5465]

### (b)  The Securities Posted to Meet JPMorgan's Margin Requirements Were Included in Lehman's Liquidity Pool

Lehman posted five securities with JPMorgan on June 19, 2008 (SASCO, Freedom, Spruce, Pine, and Fenway).[5466]  On that same date, Lehman included four of the five securities in its liquidity pool (SASCO, Spruce, Pine, and Fenway).[5467]

---

[5461] *See* JPMorgan Second Written Responses, at pp. 5-6.

[5462] *See id.*

[5463] *See, e.g.,* e-mail from Michael Prestolino, Lehman, to Craig L. Jones, Lehman, *et al.* (Aug. 8, 2008) [LBEX-DOCID 046703]; Lehman, Prices for LCD Box (Aug. 8, 2008) [LBEX-DOCID 023772] (showing prices for Freedom, Pine, Spruce, Verano assets located in the LCD box, and noting that they are to be transferred to LBHI).

[5464] JPMorgan First Written Responses, at p. 10 (noting that, because Lehman had the ability to move collateral in and out of the LCE account but JPMorgan wanted Lehman to keep collateral in the account to secure margin requirements, JPMorgan placed a $5 billion debit on the LCE account, requiring Lehman to maintain at least that amount in LCE); *see* e-mail from Michael A. Mego, JPMorgan, to Karen M. Sharf, JPMorgan, *et al.* (Aug. 23, 2008) [JPM-EXAMINER00005942] (describing the $5 billion debit); *see also* Section III.A.5.b of this Report, which discusses Lehman's dealings with JPMorgan.

[5465] JPMorgan Second Written Responses, at pp. 7-8; *see also* Appendix 18 of this Report, which discusses Lehman's collateral at JPMorgan.

[5466] E-mail from Craig L. Jones, Lehman, to John Feraca, Lehman, *et al.* (June 19, 2008) [LBEX-AM 001775] ("Today we moved several unencumbered assets (Sasco, Freedom, Spruce, Pine, Fenway) to LCPI's DTC box at Chase"); JPMorgan Second Written Responses, at p. 5.

Tonucci acknowledged that at least some of the securities posted to meet JPMorgan's margin requirements were included in Lehman's liquidity pool.[5468]    A JPMorgan internal agenda from a September 4, 2008 meeting with Lehman reflects JPMorgan's knowledge that the securities were included in Lehman's pool.[5469]

The Examiner has reviewed detailed CUSIP-by-CUSIP inventories of the liquidity pool for dates in March through September 2008.  The following table shows the securities collateral that Lehman transferred to either the LCD or LCE collateral accounts at JPMorgan and simultaneously included in the liquidity pool.

---

[5467] Lehman, Detailed Liquidity Pool Composition (June 19, 2008), at pp. 21-22 [LBEX-BARLQP 0002062] (showing SASCO, Spruce, Pine, and Fenway securities in the liquidity pool).

[5468] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 19.

[5469] JPMorgan, Lehman Brothers Holdings Inc. Briefing Memorandum (Sept. 4, 2008), at p. 2 [JPM-2004 0006170].

**Pledge Value (in $ billions) of JPMorgan
Securities Collateral in the Liquidity Pool** [5470]

|  | 19-Jun | 10-Jul | 24-Jul | 14-Aug | 11-Sep |
|---|---|---|---|---|---|
| **Freedom** |  |  |  | 1.1 |  |
| **Pine** | 1.0 | 1.0 | 0.1 | 1.0 | 0.9 |
| **Spruce** | 1.0 | 0.9 | 0.8 | 0.8 | 0.7 |
| **Verano** |  |  |  | 1.3 | 1.2 |
| **SASCO** | 1.1 | 1.1 | 0.9 | 1.7 | 0.5 |
| **Fenway** | 1.7 | 1.0 | 2.0 |  |  |
| **Kingfisher** |  | 0.8 | 0.8 | 0.8 | 0.9 |
| **Total CDO/ABCP In the Liquidity Pool:** | **4.8** | **4.8** | **4.6** | **6.7** | **4.2** |

As the table indicates, as of June 19, 2008, the date that Lehman initially transferred the securities collateral to JPMorgan, $4.8 billion of the liquidity pool was comprised of assets posted to JPMorgan clearing accounts.

### (c) On June 12, 2008, Lehman Transferred $2 Billion to Citi as "Comfort" for Continuing CLS Settlement

Citibank, N.A. was LBI's agent-bank on the CLS system. [5471] The CLS system was a trading platform, operated by a consortium of banks, for the clearance and settlement

---

[5470] Duff & Phelps, LBHI Securitizations in the Liquidity Pool (Jan. 10, 2010) (data compiled by comparing securities in the "LCE" and "LCD" Position Summaries for specified dates (sourced from "RCBPPR92 Reports") with the Detailed Liquidity Pool Compositions for those same dates).

[5471] *See* Section III.A.5.c of this Report, which discusses Lehman's dealings with Citigroup. The LBI-Citibank CLS relationship was established by a "CLS Settlement Services Agreement for CLS User Members" dated December 19, 2003. This CLS agreement was amended and restated in a "Citibank CLS Settlement Services Amended and Restated Agreement for CLS User Members" dated October 28, 2004. References to the "CLS Agreement" refer to the agreement as amended and restated.

of FX trades.[5472]  As a "user member" of the CLS system, LBI relied on Citi to execute its FX trades on CLS.[5473]  In doing so, Citi would extend intraday credit to LBI, and by extension assume a certain amount of intraday risk in connection with that credit.[5474]

On June 5, 2008, Lehman previewed its second-quarter earnings announcement to Citi, in which Lehman disclosed an anticipated record $2.6 billion loss.[5475]  CFO Erin Callan formally delivered the announcement of a $2.8 billion loss on June 9.  The market reacted poorly.[5476]  Lehman announced on June 12 that Callan and Lehman President and COO, Joe Gregory, had been removed from their positions.[5477]  As a result of Lehman's rapidly declining stock price and negative market reactions to Lehman's earnings announcement, Citi experienced a three-fold increase in novation requests.[5478]  Citibank risk manager Thomas Fontana stated, in an internal June 12 Citi e-mail

---

[5472] *See* Section III.A.5.c of this Report, which discusses Lehman's dealings with Citigroup; Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 5.

[5473] Three other Lehman entities were user members. *See* Section III.A.5.c of this Report, which discusses Lehman's dealings with Citigroup.   Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 5.

[5474] *See* Section III.A.5.c of this Report, which discusses Lehman's dealings with Citigroup; *see also* Lehman, Citibank Clearing and Intraday Credit (June 17, 2008), at p. 3 [LBHI_SEC07940_745595] (noting that Citibank's provision of intraday credit is necessary for efficient CLS settlement).

[5475] Lehman, Q2 2008 Update (June 4, 2008), at p. 2 [CITI-LBHI-EXAM 00078768]; e-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (June 4, 2008) [CITI-LBHI-EXAM 00081461] (describing the agenda for the June 5 meeting as including a look at Lehman's second quarter results).

[5476] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00072923] (noting negative market reaction).

[5477] *Id*. ("Fuld oust CFO [Callan] and COO [Gregory]. Lowitt brought back to CFO role.").

[5478] Lehman, CITIGROUP Call Report (June 17, 2008), at p. 1 [LBEX-AM 008578] (recounting remarks made by Citi CRO Brian Leach in a June 17, 2008 meeting with Lehman).  In a novation, the clearing bank stepped into the counterparty's shoes, and faced Lehman directly in a trade.  The clearing bank became fully exposed to the trading risks associated with facing Lehman.

exchange, that Citi was passing on novation requests and loss of confidence in Lehman was "huge."[5479]

Citi was loath to reject these counterparty requests and desired additional security for the increased risk exposure it faced in novating these trades.[5480]  In a later e-mail in the same chain, Fontana wrote that Citi's "internal team has lost complete confidence [in Lehman].  No telling what will happen."[5481]

Thus, on June 12, 2008, Fleming informed Lowitt (on his first day on the job as CFO) that Citi was seeking a $3 to 5 billion cash deposit to cover its intraday exposure.[5482]  Later that day, Lehman agreed to deposit $2 billion with Citibank.[5483]  In an e-mail to Lowitt and Tonucci, Fleming characterized the terms of the deposit as: "[n]o lien or right of offset, a straight overnight fed funds deposit."[5484]  The assumption that the deposit was freely returnable, and distinguishable from a "pledge" of collateral, was

---

[5479] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00072923].

[5480] Jasmin Herrera, Lehman, Global Creditor Relations–Highlights Citigroup (June 16, 2008), at p. 1 [LBEX-AM 008660] ("Until June 12, 2008, Citibank has consistently been Lehman's strongest provider of credit.  However, due to a substantial increase in novation requests from counterparties, Citi requested that we collateralize $3-$5 B in intraday exposure.  Lehman declined, but did agree to a $2B term deposit, callable daily.").

[5481] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00072923].

[5482] E-mail from Daniel J. Fleming, Lehman to Ian T. Lowitt, Lehman (June 12, 2008) [LBEX-AM 008609]; Jasmin Herrera, Lehman, Global Creditor Relations–Highlights Citigroup (June 16, 2008), at p. 1 [LBEX-AM 008660] (stating that Citi requested Lehman collateralize $3-5 billion in intraday exposure).

[5483] E-mail from Daniel J. Fleming, Lehman to Ian T. Lowitt, Lehman, *et al.* (June 12, 2008) [LBEX-AM 008608].  Citi had requested and received a similar deposit from Bear Stearns in the summer of 2007.  E-mail from Christopher M. Foskett, Citigroup, to John Havens, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00026400].

[5484] E-mail from Daniel J. Fleming, Lehman to Ian T. Lowitt, Lehman, *et al.* (June 12, 2008) [LBEX-AM 008608].

widely held within Lehman.[5485]  In his interview with the Examiner, Tonucci stated that there were "no restrictions" on Lehman's ability to get the deposit back.[5486]  He also stated that the deposit was a "good faith" deposit intended to maintain Citibank's "good will."[5487]  Lehman was "always beholden to an extent on the good will of its clearing banks," Tonucci explained.[5488]

Lehman's internal statements that Citi did not have a right of offset against the deposit and that no conditions attached to the return of the deposit were not shared within Citi.  It was Citi's view that under either New York state law or the Uniform Commercial Code, Citibank had a right of setoff against the $2 billion.[5489]  Citi recognized that it was not secured by a pledge agreement.[5490]  Fontana, in one e-mail, noted that a similar deposit agreement Citi reached with Bear Stearns a year earlier was better than that with Lehman because it provided a right to offset, whereas there was no "clean right of offset" with respect to the Lehman deposit.[5491]  Michael Mauerstein, a relationship manager for Lehman at Citigroup, also contrasted the Lehman deposit with

---

[5485] For example, an internal Lehman agenda for a meeting with Citibank, dated June 17, 2008, stated: "Lehman did not agree to pledge cash or give the right to set-off on collateral as Citi requested, but we reluctantly did agree to deposit $2B in a call account, callable daily."  Lehman, Citigroup Agenda (June 17, 2008), at p. 2 [LBEX-AM 008597].

[5486] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 18.

[5487] *Id.*

[5488] *Id.*

[5489] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 5; Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 5; Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 5.

[5490] E-mail from Paul S. Galant, Citigroup, to Jerry Olivo, Citigroup, *et al.* (Aug. 29, 2008) [CITI-LBHI-EXAM 00076678] (distinguishing between the $2 billion deposit and a formal pledge of securities).

[5491] E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00073732].

the Bear Stearns deposit, noting that Lehman was not borrowing from Citi and had not executed a "promissory note with 'right of offset' language" with Lehman as it had with Bear Stearns.[5492]  In late August, however, Mauerstein stated that although Citi did not view the deposit as "collateral" and that Lehman could "ask [for it] to be returned at any time," "we consider that we have a right of offset under NYS [New York state] law."[5493]  In response to Mauerstein's e-mail highlighting the distinction between treating the $2 billion as "collateral" versus a "deposit," Citibank's Jerry Olivo stated, "Mike, I am aware and understand all of this – though their asking for the deposit back does have distinct impacts on clearing capacity."[5494]

While Lehman characterized the $2 billion deposit as an overnight deposit with no strings attached, Citibank subjected it to a number of internal controls designed to keep the $2 billion within Citi.  Shortly after Lehman made the deposit, Fontana stated in an internal Citi exchange that his main concerns were "keeping the liquidity [of the deposit] within Citi and being able to control the release of the deposit."[5495]  With those

---

[5492] E-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup, *et al*. (June 12, 2008) [CITI-LBHI-EXAM 00073732].

[5493] E-mail from Michael Mauerstein, Citigroup, to Katherine Lukas, Citigroup, *et al*. (Aug. 29, 2008) [CITI-LBHI-EXAM 00076678].  In this same e-mail exchange, Citigroup's Paul Galant also stated: "Overnight deposits that can be yanked at anytime by the client count for nothing as it relates to collateral / security interest."  Galant then directed Mauerstein and his team to get a collateral pledge of securities to replace the deposit as soon as possible.  E-mail from Paul S. Galant, Citigroup, to Jerry Olivo, Citigroup, *et al*. (Aug. 29, 2008) [CITI-LBHI-EXAM 00076678].

[5494] E-mail from Jerry Olivo, Citigroup, to Michael Mauerstein, Citigroup, *et al*. (Aug. 29, 2008) [CITI-LBHI-EXAM 00076678].

[5495] E-mail from Thomas Fontana, Citigroup, to Robert Blackburn, Citigroup, *et al*. (June 19, 2008) [CITI-LBHI-EXAM 00018405].

concerns in mind, Citi set up a notification structure whereby Citi's Risk Treasury desk was instructed to notify Fontana of any Lehman request for the deposit prior to the release of the deposit.[5496]

In discussions concerning the most appropriate interest rate to provide Lehman on the $2 billion, and how to count the "comfort deposit" internally within Citi's systems, Olivo characterized the deposit as "essentially captive funds."[5497] Additionally, Citi described the comfort deposit internally as "an overnight investment that gets rolled on a daily basis" and explained that a process was in place for Fontana to be notified before any withdrawal was made.[5498]

Fontana confirmed that a notification process such as the one described above governed the release of the deposit. Fontana said that while Citi would likely have released the deposit if asked, Citi would have decided internally if it would continue to conduct "business as usual" with Lehman prior to releasing the deposit.[5499]

Thus, while Lehman considered the deposit to be lien-free and offered merely as a "good faith" gesture to maintain a positive working relationship, Citi believed that it had the right to set off against the deposit, and that withdrawal of the deposit would

---

[5496] *Id.*

[5497] E-mail from Jerry Olivo, Citigroup, to Robert Blackburn, Citigroup, *et al.* (June 25, 2008) [CITI-LBHI-EXAM 00020787].

[5498] E-mail from Katherine Lukas, Citigroup, to Ranjit Chatterji, Citigroup, *et al.* (Aug. 27, 2008) [CITI-LBHI-EXAM 00020787].

[5499] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 2.

have negative implications for Citi's ability to clear for Lehman.[5500]  Further, Citi subjected the deposit to an internal procedure under which release of the deposit would have been subject to its risk desk's notification and approval.

### (d) The Citi "Comfort Deposit" Was Included in Lehman's Liquidity Pool

Tonucci acknowledged that Lehman included the "comfort deposit" in Lehman's liquidity pool.[5501]  Fleming stated that, because Lehman was at least legally entitled to the $2 billion deposit and it was returnable on relatively short notice, it was appropriate for Lehman to include it in the liquidity pool.[5502]  Yet Erin Callan, when asked if she would have included in the liquidity pool deposits that were required to conduct business, such as the $2 billion cash deposit with Citi, said she probably would not have been comfortable doing so.[5503]  Lehman International Treasurer Carlo Pellerani, although unaware that Lehman included clearing-bank collateral or deposits in its liquidity pool, agreed that funds allocated to clearing banks to cover exposures, intraday or otherwise, were not appropriate for inclusion in the liquidity pool.[5504] Similarly, Steve Engel, former Lehman Senior Vice-President, Funding Desk, expressed his disagreement with Lehman's decision to include the $2 billion cash deposit at Citi in

---

[5500] Lehman management knew at least as of early August that Citibank believed it had a right to offset the deposit.  *See* Lehman, CITIGROUP Call Report (Aug. 7, 2008), at p. 1 [LBEX-DOCID 450310] (reporting that Citibank believed it had a right to offset the deposit).
[5501] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 19.
[5502] Examiner's Interview of Daniel J. Fleming, Sept. 24, 2009, at p. 7.
[5503] Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at pp. 4, 16.
[5504] Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at pp. 4-5.

its liquidity pool.[5505]  He reasoned that, if the assets were not readily convertible to cash or capable of being repoed, they did not belong in the liquidity pool.[5506]

Citi understood that Lehman included the $2 billion deposit in its liquidity pool.[5507]  From Mauerstein's perspective, Lehman's decision about what to report in its liquidity pool was a matter between Lehman and its regulators.[5508]  Foskett, Mauerstein and Fontana each acknowledged that they did not consider the June 12 cash deposit formally encumbered when it was initially made.[5509]

Officials from the SEC advised the Examiner that they knew Lehman included the $2 billion Citi deposit in Lehman's liquidity pool, and that the SEC did not think it was appropriate for Lehman to include these funds in its liquidity pool.[5510]  According to the SEC, the issue was escalated internally at the SEC and the SEC discounted those

---

[5505] Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 10.

[5506] Id.

[5507] Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at pp. 2, 5.  However, Fontana did not know whether Lehman was including other clearing bank deposits or pledges in its pool.  When presented with such a hypothetical, Fontana stated, "the whole thing [pool] could have been pledged out!" and said this was a question Citi should have asked at the time.  Id. at p. 5; e-mail from Michael Mauerstein, Citigroup, to Thomas Fontana, Citigroup, et al. (June 17, 2008) [CITI-LBHI-EXAM 00073791]; e-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup, et al. (July 2, 2008) [CITI-LBHI-EXAM 00073015] (Mauerstein wrote that "[w]e should remind [people] in our organization that Lehman has $50 billion of holding company cash/liquidity (including the $2B with us) and access to the Fed discount window"); Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 5.

[5508] Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 6.

[5509] Examiner's Interview of Christopher M. Foskett, Sept. 24, 2009, at p. 5; Examiner's Interview of Michael Mauerstein, Sept. 16, 2009, at p. 6; Examiner's Interview of Thomas Fontana, Aug. 19, 2009, at p. 5 (Fontana distinguished the deposit from a "pledge" but noted that Citi believed it had a right of offset against the deposit).

[5510] Examiner's Interview of SEC staff, Aug. 24, 2009, at p. 11.  The SEC's Matthew Eichner stated that he was not aware that Lehman included the $2 billion deposit at Citi in its liquidity pool and said that such a deposit would not have "raised eyebrows" in February of 2008, but that, by September 2008, people were focused on how much was on deposit at the various banks.  Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 8.

funds from its internal calculation of Lehman's liquidity pool.[5511] Notably, the FRBNY also discounted Lehman's liquidity pool by the amount of the deposit with Citi; the FRBNY did not find the inclusion of the deposit prudent because it was not freely available for other uses, particularly in August and September 2008 when companies were becoming increasingly anxious about liquidity.[5512] FRBNY Senior Vice President Art Angulo said there was a "real question" whether the $2 billion deposit should have been included in the pool at all given that it had to be returned to Citi every morning to support Lehman's clearing.[5513]

Additionally, rating agency analysts whom the Examiner interviewed stated they were not aware of the $2 billion deposit Lehman placed with Citi, but that they would have wanted to know about it for purposes of their rating analysis of Lehman.[5514] Further, two rating agency analysts stated that it would not have been appropriate to include a deposit in the liquidity pool like the one Lehman provided Citi beginning June 12 because the funds could not be used for any other purpose.[5515]

---

[5511] Examiner's Interview of SEC staff, Aug. 24, 2009, at p. 11.
[5512] Examiner's Interview of Arthur G. Angulo, Oct. 1, 2009, at p. 4; Examiner's Interview of Jan H. Voigts, Oct. 1, 2009, at pp. 3-4.
[5513] Examiner's Interview of Arthur G. Angulo, Oct. 1, 2009, at p. 4.
[5514] Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 5; Examiner's Interview of Diane Hinton, Sept. 22, 2009, at p. 4; Examiner's Interview of Peter E. Nerby, Oct. 8, 2009, at p. 4.
[5515] Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 5; Examiner's Interview of Diane Hinton, Sept. 22, 2009, at pp. 4-5.

**(e) On August 25, 2008, Lehman Executed a Security Agreement with Bank of America, Granting the Bank a Security Interest in a $500 Million Deposit**

Bank of America ("BofA") was one of Lehman's clearing banks for transactions in Asia.[5516]  BofA was viewed by Lehman as critical for Lehman Brothers Japan ("LBJ") operations, as well as for FX clearing for Japanese Yen.[5517]  Lehman moved over $10 billion a day through BofA's clearing function, via several Lehman entities.[5518] Moreover, as the global business day opened with trading activity in Asia, Lehman was dependent on reliable clearing operations in that region to finance its positions elsewhere around the world later in the day.[5519]

As with JPMorgan and Citibank, BofA approached Lehman in the summer of 2008 with concerns regarding risk exposures incurred through its provision of intraday credit.  Thus, on the evening of August 20, 2008, BofA's James Dever placed a call to Lehman's  Emil Cornejo and Tonucci, informing them that BofA would drop Lehman's $1 billion intraday line of credit to zero the coming Monday if Lehman did not place a

---

[5516] *See* Section III.A.5.e and Appendix 19 of this Report, which discuss Lehman's dealings with Bank of America.

[5517] *See* E-mail from Gregory Ito, Lehman, to Carlo Pellerani, Lehman, *et al*. (Aug. 21, 2008), at p. 2 [LBHI_SEC07940_547285].

[5518] E-mail from Stirling Fielding, Lehman, to Paolo R. Tonucci, Lehman, *et al*. (Aug. 21, 2008), at p. 1 [LBHI_SEC07940_547285].

[5519] E-mail from Gregory Ito, Lehman, to Carlo Pellerani, Lehman, *et al*. (Aug. 21, 2008), at p. 2 [LBHI_SEC07940_547285] ("Without their [BofA] support we are unable to borrow from the O/N [overnight] call market in a reliable way.").

deposit with BofA.[5520]    Tonucci raised the issue with the FRBNY, informing his FRBNY contacts of the consequences of BofA's actions, namely that Lehman would lose intraday credit from BofA and would be required to prefund all clearing through the bank.[5521]    In an internal Lehman e-mail, he characterized the FRBNY as "suitably concerned" about BofA's actions.[5522]    Tonucci contacted Government officials the next day as well to inform them that BofA still had not forwarded the draft documentation to establish "the intraday collateralisation that [would] replace the 'intraday credit.'"[5523] The SEC's Matthew Eichner asked that Tonucci keep him "in the loop" on his discussions with BofA.[5524]    Recognizing the importance of the relationship, Lehman mobilized to place a deposit with BofA to induce the bank to continue clearance operations.  Initially, Tonucci approved placing a $200 million deposit with the bank.[5525] Stirling Fielding, head of Cash, Collateral, and Network Management in Lehman's International Treasury, reported back that BofA was reducing all of Lehman's credit

---

[5520] E-mail from Emil F. Cornejo, Lehman, to Daniel J. Fleming, Lehman *et al.* (Aug. 20, 2008) [LBHI_SEC07940_547120].

[5521] E-mail from Paolo R. Tonucci, Lehman, to William Brodows, FRBNY, *et al.* (Aug. 20, 2008) [LBEX-AM 055584].

[5522] E-mail from Paolo R. Tonucci, Lehman, to Julie Boyle, Lehman (Aug. 21, 2008) [LBHI_SEC07940_547284].

[5523] E-mail from Paolo R. Tonucci, Lehman, to Matthew Eichner, SEC, *et al.* (Aug. 21, 2008) [LBEX-AM 055372].

[5524] E-mail from Matthew Eichner, SEC, to Paolo R. Tonucci, Lehman, *et al.* (Aug. 21, 2008) [LBEX-AM 055372].

[5525] E-mail from Paolo R. Tonucci, Lehman, to Gregory Ito, Lehman, *et al.* (Aug. 21, 2008) LBHI_SEC07970_547284].

lines, and that Lehman would need to post a $500 million deposit.[5526] Further, BofA sought a lien granting a security interest in the deposit.[5527] Tonucci elevated the issue to COO Bart McDade, and requested that McDade elevate it to Richard Fuld to discuss with BofA CEO Kenneth Lewis.[5528]

In considering the proper amount to deposit with BofA, Fielding suggested an amount larger than the $500 million. In that same exchange, Fielding wrote Tonucci:

> Paolo, if you are going to include this deposit as part of the liquidity profile and it doesn't impact other models[,] we should consider being prudent and starting with a larger deposit. The main risk is that it becomes evident to the market that we have liquidity issues. Without intraday liquidity[,] our clients, counterparts and agent banks will all be receiving payments much later than usual. Many of them an hour before cut-off. It also increases the risk that some large payments are released too late in the day and fail, either to an agent bank or to a client.[5529]

Thus, while Tonucci was inclined to transfer as small an amount as possible, Fielding, in advocating for a larger deposit, noted the importance of intraday liquidity, and the role of clearing banks in providing that liquidity. He also noted that so long as Lehman would include this deposit in its liquidity pool, there would be no harm in making a larger deposit.

[5526] E-mail from Stirling Fielding, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Aug. 21, 2008) [LBHI_SEC07940_547284].

[5527] *See* e-mail from Andrew Yeung, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Aug. 23, 2008) [LBEX-SIPA 003280] (recounting Lehman's efforts to negotiate terms of the security agreement initially advanced by BofA and noting "[t]he security agreement will only secure overdraft obligations[; t]he initial draft . . . could have been interpreted to secure other debt obligations to BofA").

[5528] *See* e-mail from Paolo R. Tonucci, Lehman, to Heidimarie Echtermann, Lehman (Aug. 21, 2008) [LBHI_SEC07940_547415].

[5529] E-mail from Stirling Fielding, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Aug. 21, 2008) [LBEX-SIPA 003306].

Ultimately, Lehman acceded to BofA's demand for the $500 million and documentation establishing a lien over the deposit via a security agreement dated August 25, 2008.[5530] The agreement provided that the $500 million collateral was transferable outside BofA only upon three-days' written notice from Lehman, and only to the extent that doing so would leave sufficient collateral to cover the aggregate amount of overdrafts Lehman incurred against BofA.[5531] With the $500 million deposit in place, encumbered by the August 25, 2008 Security Agreement, BofA continued to clear for Lehman.

The $500 million Bank of America deposit, subject to the August 25, 2008 Security Agreement, was included in Lehman's liquidity pool.[5532]

### (f) LBHI and JPMorgan Executed an Amendment to the June 2000 Clearance Agreement, a Security Agreement and a Holding Company Guaranty, all Dated August 26, 2008

JPMorgan and Lehman executed an amendment to their standing Clearance Agreement (the "August Amendment"), a security agreement (the "August Security Agreement"), and a guaranty by LBHI for clearing obligations of certain of its

---

[5530] *See* Security Agreement (Aug. 25, 2008) [LBEX-DOCID 000584].

[5531] *See id.* at p. 2.

[5532] *See, e.g.*, e-mail from Robert Azerad, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 9, 2008) [LBHI_SEC07940_557814]; Lehman, Liquidity Pool Summary (Sept. 9, 2008), at pp. 2, 4 [LBHI_SEC07940_557815] (showing the $500 million BofA deposit in the liquidity pool).

subsidiaries (the "August Guaranty") on August 29, 2008 (back-dated to August 26, 2008).[5533]

The August Amendment added LBHI, LBIE, Lehman Brothers OTC Derivatives and LBJ to the standing Clearance Agreement, to which LBI, LCPI, and JPMorgan were already parties.[5534]

The August Guaranty bound LBHI to guarantee the clearing obligations of its affiliates that were parties to the Clearance Agreement, incurred under the terms of the Clearance Agreement.[5535] Under the Clearance Agreement, the Lehman borrowers were obligated to repay JPMorgan's discretionary credit advances.[5536]

The August Security Agreement established a JPMorgan lien on two specific accounts to secure obligations under the Clearance Agreement: 1) an "LCE" "Securities Account" and 2) a "DDA 066-141-605" "Cash Account."[5537] The August Security Agreement also established a lien on certain related accounts.[5538] The August Security Agreement notably provided for an "Overnight Account" into which "at the end of a business day" LBHI could transfer amounts from the liened accounts provided that it

---

[5533] *See* Section III.A.5.b.1 of this Report, which discusses Lehman's dealings with JPMorgan; *see also* Amendment to Clearance Agreement (Aug. 26, 2008), at pp. 1-2 [JPM-2004 0005856]; Security Agreement (Aug. 26, 2008), at p. 6 [JPM-2004 0005867]; Guaranty (Aug. 26, 2008), at p. 6 [JPM-2004 0005879].

[5534] Amendment to Clearance Agreement (Aug. 26, 2008), at p. 1 [JPM-2004 0005856].

[5535] Guaranty (Aug. 26, 2008), at p. 1 [JPM-2004 0005879].

[5536] Clearance Agreement (June 15, 2000), at p. 4 [JPM-2004 0031786].

[5537] Security Agreement (Aug. 26, 2008), at pp. 1-2 [JPM-2004 0005867].

[5538] *Id*.

owed no outstanding obligations to JPMorgan as defined under the Clearance Agreement.[5539]

In early August, JPMorgan sought a "continuing" as opposed to an "intraday" lien on Lehman collateral.[5540] As executed, however, the August Agreements provided that Lehman's collateral was only meant to cover intraday obligations.[5541]

Lehman structured the lien provisions of the August Security Agreement, limiting the lien to its intraday clearing exposure, so that Lehman could claim the collateral as lien-free overnight for the purpose of reporting it as part of LBHI's liquidity pool.[5542] Andrew Yeung acknowledged that he received an e-mail from Dan Fleming providing this specific guidance.[5543] JPMorgan risk manager Donna Dellosso and JPMorgan's Doctoroff stated that Lehman structured the "Overnight Account" provision of the August Agreements such that Lehman could include collateral pledged

---

[5539] *Id.* at p. 3; *see* Section III.A.5.b.1.f of this Report, which discusses Lehman's dealings with JPMorgan and provides greater detail on the Overnight Account.

[5540] *See* Section III.A.5.b.1.f of this Report, which discusses Lehman's dealings with JPMorgan; Examiner's Interview of Craig L. Jones, Sept. 28, 2009, at p. 13; e-mail from Craig L. Jones, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Aug. 8, 2008) [LBEX-DOCID 457557] (relaying "an urgent call from a group at Chase" in which JPMorgan "stated they want[ed] to ensure the assets have a continuing lien and not just an intraday lien").

[5541] *See* e-mail from Craig L. Jones, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Aug. 14, 2008) [LBEX-AM 001764] ("Mark Doctoroff [of JPMorgan] called from Singapore to apologize for the issues raised when Chase requested the continuing lien acknowledging he was well aware it was only intended to be an intraday lien.").

[5542] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at pp. 9-10.

[5543] Examiner's Interview of Andrew Yeung, May 14, 2009, at p. 8 (Yeung recalled an e-mail exchange with Dan Fleming in which Fleming instructed him that Lehman had to be able to claim collateral pledged with JPMorgan was lien-free for liquidity reporting).

to JPMorgan intraday in its liquidity pool.[5544]  Doctoroff was most explicit on this point, specifically stating that it was Tonucci who insisted that JPMorgan's intraday lien not extend overnight so that Lehman could include the collateral subject to the August Security Agreement in its liquidity pool.[5545]

> **(g) Lehman Assets Subject to the August Security Agreement Were Included in Lehman's Liquidity Pool**

At least some of the assets subject to the intraday lien, memorialized in the August Security Agreement with JPMorgan, were included in the liquidity pool. Tonucci confirmed this fact in his interview with the Examiner.[5546]  Doctoroff explained that he understood from Lehman that assets subject to the August Security Agreement were included in Lehman's liquidity pool.[5547]  The documentary evidence confirms this point.  The August Security Agreement encumbered assets in LBHI's LCE and DDA 066-141-605 accounts at JPMorgan.  A snapshot of the LCE account distributed within Lehman on August 26, 2008 shows that CLOs and ABCP pledged to meet JPMorgan's margin requirements, namely Fenway, Pine, Spruce, Kingfisher and Verano, were

---

[5544] Examiner's Interview of Donna Dellosso, Feb. 27, 2009, at p. 3 (Lehman informed JPMorgan that it wanted overnight access to the collateral, presumably for its overnight liquidity pool); Examiner's Interview of Mark G. Doctoroff, Apr. 29, 2009, at p. 12 (recalling that Paolo Tonucci represented that the purpose of the overnight-account provision was to preserve Lehman's ability to include in Lehman's liquidity pool collateral pledged to cover JPMorgan's intraday risk).

[5545] Examiner's Interview of Mark G. Doctoroff, Apr. 29, 2009, at p. 12.  For his part Doctoroff said he was not concerned with Lehman's inclusion of JPMorgan intraday collateral in its liquidity pool because JPMorgan did not face clearing exposure to Lehman at the end of the day.  *Id.* at p. 14.  Further, Doctoroff was comforted by the inclusion of the collateral in the pool because of the implied liquidity of the collateral.  *Id.* at p. 13.

[5546] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 19.

[5547] Examiner's Interview of Mark G. Doctoroff, Apr. 29, 2009, at pp. 17, 22-23.

located in that encumbered account.[5548]  The collateral in the LCE box as shown on this chart was worth about $7.2 billion.[5549]  All of these securities were included in Lehman's liquidity pool in late August as well.[5550]  As of September 2008, the Pine, Spruce, Kingfisher, and Verano funds were still in the liquidity pool.[5551] As of that date, those funds were simultaneously held as collateral by JPMorgan.[5552]  A JPMorgan-drafted agenda for the September 4 meeting with Lehman also makes plain that collateral placed to cover JPMorgan's margin requirements was included in the liquidity pool.[5553]

Tonucci stated that, had Lehman attempted to remove collateral posted at JPMorgan, there were "steps short of not clearing" that the bank might have taken. Perhaps, Tonucci suggested, JPMorgan would have agreed to reduce the volume of clearing in exchange for the return of some collateral.[5554]  Had Lehman contracted its

---

[5548] E-mail from Kristen Coletta, Lehman, to Craig L. Jones, Lehman (Aug. 26, 2008) [LBEX-DOCID 055369]; Lehman, Spreadsheet (Aug. 26, 2008) [LBEX-DOCID 046640] (showing LCE box as of August 20, 2008).

[5549] Lehman, Spreadsheet (Aug. 26, 2008) [LBEX-DOCID 046640] (showing par values for collateral in the LCE box as of August 20, 2008).

[5550] See Lehman, Detailed Liquidity Pool Composition, (Aug. 21, 2008), at pp. 19-20 [BARLQP0003950] (showing Spruce, Pine, Fenway, Kingfisher, and Verano securities in the liquidity pool).

[5551] Lehman, Liquidity Update (Sept. 10, 2008), at p. 3 [LBEX-WGM 725919] (showing the "[a]bility to [m]onetize" assets in the liquidity pool and listing Pine and Verano as "low" ability to monetize; Spruce is given a "mid" level ability to monetize because it is "PDCF [e]ligible").  Note that the Kingfisher securities were in the LCD, not LCE, account by this point.  Thus, Kingfisher was subject to the lien provisions of Section 11 of the Clearance Agreement, rather than the lien provision of the August Security Agreement.

[5552] See Lehman, Collateral Pledged to JPM for Intraday As of 9/10/2008 COB [LBEX-DOCID 046681] (showing Pine, Spruce, Kingfisher and Verano funds, among others, as collateral pledged to JPMorgan).

[5553] E-mail from Emil F. Cornejo, Lehman, to Paolo R. Tonucci, Lehman, et al. (Sept. 3, 2008) [LBEX-AM 000862], attaching JPMorgan Agenda (Sept. 3, 2008), at p. 2 [LBEX-AM 000863] (noting that the collateral placed as margin consisted of assets that Lehman included in its liquidity pool).

[5554] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 10.

triparty-repo book, for example, presumably less triparty-investor margin would have been required by investors overnight and retained by JPMorgan the next morning.  This action arguably could have resulted in JPMorgan requiring less collateral.[5555]  Moreover, through counsel, JPMorgan confirmed that Lehman could remove collateral from LCE to the extent the total value of that account did not drop below $5 billion.[5556]  Although there would be no operational barrier to such a transaction, JPMorgan's counsel could not address what "alarms" would have gone off within JPMorgan had Lehman given such an instruction.[5557]  Indeed, it appears that Lehman effected two such transfers: Lehman removed Freedom from LCE on August 15 and moved Kingfisher from LCE to LCD on September 2.[5558]

> **(h) September 2, 2008: Lehman Transferred Just Under $1 Billion to HSBC to Continue Clearing Operations, and Encumbered This with "Cash Deeds" Executed on September 9 and September 12**

HSBC cleared and settled sterling-denominated securities trades for Lehman via the "CREST" system.[5559]  CREST is a network of servers on which CREST members, such

---

[5555] Contraction of collateral required by triparty investors overnight (and thus required by JPMorgan intraday) would have affected the amount of collateral Lehman was required to maintain in the LCD account or other LBI clearing account.  *See* Section III.A.5.b.1 of this Report, which discusses Lehman's dealings with JPMorgan (Lehman posted securities to the LCD account to mitigate the effect of the margin retained by JPMorgan intraday).

[5556] Jenner & Block, Memorandum re November 16, 2009 Teleconference with JPMorgan Counsel (Nov. 16, 2009), at p. 2.

[5557] *Id.*

[5558] JPMorgan Second Written Responses, at p. 7; Jenner & Block, Memorandum re November 18, 2009 Teleconference with JPMorgan Counsel (Nov. 19, 2009), at p. 2.

[5559] *See* Section III.A.5.d.1 of this Report, which discusses Lehman's dealings with HSBC.

as LBIE, trade, using the services of a "CREST Settlement Bank" to execute those trades. HSBC was Lehman's CREST Settlement Bank. As with a bank clearing triparty repos (JPMorgan), or FX trades on the CLS system (Citi), HSBC intermediated between Lehman and counterparties seeking to make securities trades. As with other clearing and settlement banks, HSBC extended intraday credit to facilitate this function.

As set forth in further detail in Section III.A.5.d of this Report, beginning in mid-to-late 2006, HSBC began reducing its credit exposure industry-wide and to Lehman in particular. After the near collapse of Bear Stearns, those efforts were increased. By August 18, 2008, HSBC decided to exit its relationship with Lehman entirely. This decision was driven by macro-level and Lehman-specific concerns:

> The decision to withdraw is on the basis of deteriorating risk and business fundamentals, continuing performance/valuation uncertainty, capital erosion and significant Group exposure to Lehman in particular and the sector as a whole. . . . On balance, Lehman is the weakest with less diversification and relatively more exposure to troubled fixed income classes. Also, arguably, with its business model terminally damaged, it is perhaps the least likely to be saved. . . . It has $50bn of risky real estate/mortgage assets including $10bn of Alt A. It also retains $11bn of leveraged loans. Many now predict further write downs and a consequent fiscal Q3 loss (ending August) c$2bn instead of the $250m profit previously expected.[5560]

---

[5560] Nicholas J. Taylor, HSBC, Briefing Note – Project Milan (Aug. 18, 2008), at p. 2 [HBUS 90]. "Project Milan" was the name given by HSBC to its efforts to minimize its exposure to Lehman Brothers, and ultimately, withdraw from the relationship. Memorandum from HSBC Financial Institutions Group, re Project Milan (Aug. 2008), at p. 1 [HBUS 17459]; Examiner's Interview of Nicholas Taylor, Oct. 15, 2009, at p. 5; *see* Section III.A.5.d.1 of this Report, which discusses Lehman's dealings with HSBC.

HSBC Financial Institutions Group head Nicholas Taylor relayed this decision to Tonucci in New York on August 18.[5561]    According to internal HSBC documents, Tonucci expressed surprise at Taylor's announcement, and concern over Lehman's ability to replace HSBC as a core clearing bank in markets such as the U.K. and India.[5562] Tonucci urged Taylor to discuss HSBC's concerns with Pellerani, while indicating that Lehman would "look into this and how we can reduce your risk quickly."[5563]   In August, HSBC continued drawing down credit lines, working with Pellerani to determine which lines were under-utilized by Lehman.[5564]

On August 22, HSBC's Guy Bridge informed Pellerani that the bank would seek collateralization of HSBC's credit lines, formalized by a "cash deed [that] can be executed very quickly."[5565]   On Wednesday, August 27, Pellerani informed Tonucci that HSBC would require Lehman to post roughly "$1 bn of deposit by Friday, with a legal right to set off, non-negotiable, or they will not settle for us."[5566]   Pellerani recommended to Tonucci that Lehman "[i]nform FSA," "[i]nform FED and SEC," and "[f]ind out if

---

[5561] Nicholas J. Taylor, HSBC, Briefing Note – Project Milan (Aug. 18, 2008), at p. 1 [HBUS 90].

[5562] *Id*.

[5563] *See* e-mail from Carlo Pellerani, Lehman, to Guy Bridge, HSBC, *et al.* (Aug. 27, 2008) [HBUS 3]; Lehman, Spreadsheet of Credit Lines Subject to Examination by HSBC and LBHI (Aug. 28, 2008) [HBUS 237] (created in concert with Lehman to determine utilization of lines for further reductions).

[5564] *See* e-mail from Carlo Pellerani, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Aug. 22, 2008) [LBEX-AM 008959] ("Spoke at length yesterday and today with HSBC.  They are bringing to zero all lines they see as unutilised and work on reducing exposure for the settlement lines. . . . I was unsuccessful in convincing them to be measured on [the credit lines that HSBC brought to zero].").

[5565] E-mail from Guy Bridge, HSBC, to Carlo Pellerani, Lehman, *et al*. (Aug. 22, 2008) [LBEX-AM 008906].

[5566] E-mail from Carlo Pellerani, Lehman, to Paolo R. Tonucci, Lehman (Aug. 27, 2008) [LBEX-AM 008916].

legally we can stop them from doing this."[5567]  Tonucci, in turn, elevated the issue to Lowitt, communicating that a deposit by Friday was essential "if they [HSBC] are to continue clearing for us."[5568]  Similarly, in enlisting in-house counsel Yeung's assistance, Lehman's Huw Rees remarked "there is a possibility that, without an agreement, our UK clearing operations will be impacted."[5569]

Subsequently, Lehman deposited GBP 435 million (nearly $800 million at the time) with HSBC in the U.K. on the morning of August 28.[5570]  Following conversations between Lowitt and HSBC's Chief Risk Officer, however, on August 28 HSBC agreed to allow Lehman to temporarily retrieve the deposit and hold it until after the end of the quarter, in order "to help with [Lehman's] quarter end [balance sheet] targets."[5571]

Lehman returned GBP 435 million to HSBC in the U.K. on September 1 for value on September 2.[5572]  In addition, on September 2, Lehman deposited the equivalent of approximately $180 million in a Hong Kong account.[5573]

---

[5567] *Id.*

[5568] E-mail from Paolo R. Tonucci, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Aug. 27, 2008) [LBEX-AM 008918].

[5569] E-mail from Huw Rees, Lehman, to Andrew Yeung, Lehman, *et al.* (Aug. 28, 2008) [LBEX-AM 008941].

[5570] E-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Aug. 28, 2008) [HBUS 9250].

[5571] E-mail from Carlo Pellerani, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Aug. 28, 2008) [LBEX-AM 008853]; e-mail from Craig Goldband, Lehman, to Huw Rees, Lehman, *et al.* (Aug. 28, 2008) [LBEX-AM 008853]; *see also* e-mail from Ian T. Lowitt, Lehman, to Jeremy Isaacs, Lehman (Aug. 28, 2008) [LBEX-AM 008940].

[5572] E-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 1, 2008) [HBUS 401].

[5573] E-mail from Patricia Gomes, HSBC, to Guy Bridge, HSBC, *et al.* (Sept. 1, 2008) [HBUS 397] (stating that Hong Kong deposit is equivalent to $180 million).  *But see* e-mail from Stirling Fielding, Lehman, to Carlo Pellerani, Lehman, *et al.* (Sept. 1, 2008) [LBEX-AM 008963-64] (recording instant message conference stating that Hong Kong deposit is equivalent to $192 million with unspecified credit due to Lehman).

The HSBC deposits in the U.K. were encumbered by two "Cash Deeds" executed on September 9, 2008 by LBHI(U.K.) and LBIE (the "U.K. Cash Deeds").[5574] One Cash Deed provided that LBHI(U.K.) was required to maintain a deposit with HSBC equal to the amount that HSBC estimated, in its good faith, was required to cover aggregate intraday exposures to LBHI(U.K.), LBIE, and Lehman Brothers Limited.[5575] The deposit was only available to Lehman provided that HSBC was satisfied that none of these specified Lehman entities owed any outstanding debt to HSBC.[5576] HSBC had the right to setoff against the deposit.[5577] The LBHI(U.K.) Cash Deed formally recognized that any extension of credit by HSBC to the same three Lehman entities was left to HSBC's discretion.[5578]

A third Cash Deed was to be executed between HSBC and Lehman Brothers Asia Holdings Limited ("LBAH") to secure the Hong Kong deposit (the "Hong Kong Cash Deed").[5579] The funds, however, were not moved into a collateral account until after the petition date. At Lehman's request, the funds were moved back into a cash account on

---

The Examiner's investigation has not revealed any other references to a Hong Kong deposit equivalent to $192 million. The Examiner's financial advisors identified a September 1 transfer equivalent to $192 million from a Lehman Brothers Asia Holdings money market account, but were not able to determine if all of these funds were used for a deposit. Duff & Phelps, Preliminary Findings re: HSBC Deposits (Dec. 2, 2009), at p. 2.

[5574] Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008) [HBUS 1190]; Cash Deed between HSBC and LBIE (Sept. 9, 2008) [HBUS 1180].

[5575] Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008), ¶ 5 [HBUS 1190].

[5576] *Id.* ¶ 6.

[5577] *Id.* ¶ 4.

[5578] *Id.* ¶ 10.

[5579] E-mail from Patricia Gomes, HSBC, to Nicholas Taylor, HSBC, *et al.* (Sept. 12, 2008) [HBUS 1760].

September 16, 2008 (that was subsequently frozen on September 19 by KPMG, the provisional liquidators for LBAH).[5580]

### (i) The HSBC Deposit Was Represented as "Liquid" and Was Included in LBHI's Liquidity Pool

Tonucci confirmed that the total HSBC deposit, valued at almost $1 billion, was included in LBHI's liquidity pool.[5581] Documents, including liquidity presentations and "ability to monetize" tables prepared during Lehman's final week before bankruptcy, reveal that approximately $1 billion of Lehman's liquidity pool was earmarked "HSBC," and assigned a "low" ability to monetize.[5582] The deposit was maintained in the liquidity pool despite the fact that it was placed with HSBC as a precondition for HSBC's clearance of trades in vital markets, that the deposit could not be removed unless Lehman zeroed its exposure with HSBC, and that HSBC held a clear right of setoff against the deposit.

### (j) Lehman and JPMorgan Executed Another Round of Security Documentation Dated September 9, 2008; Lehman Made $3.6 Billion and $5 Billion Pledges to JPMorgan Subject to the Terms of These Agreements

On the eve of Lehman's accelerated earnings announcement, scheduled to be delivered September 10, 2008, JPMorgan engaged various senior officials at Lehman and advised that they were seeking a new round of security documentation. JPMorgan

---

[5580] *Id.*

[5581] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 19.

[5582] *See, e.g.*, Lehman, Liquidity Update (Sept. 10, 2008), at p. 3 [LBEX-WGM 725919]; Lehman, Ability to Monetize Table (Sept. 12, 2008) [LBEX-WGM 784607].

insisted that Lehman execute the documents before the commencement of the next morning's earnings call.[5583]

The new agreements consisted of a revised Security Agreement, a revised Guaranty, and a new Amendment to the Clearance Agreement. The new documentation expanded JPMorgan's rights over Lehman collateral. For instance, the new Security Agreement and Guaranty gave JPMorgan a security interest in all Lehman accounts (save the "Overnight Account") to secure all Lehman obligations to JPMorgan – not simply clearance-related obligations.[5584] Unlike the August Security Agreement, under the September Security Agreement collateral was returnable to Lehman only upon three-days written notice to JPMorgan,[5585] a provision inserted at Lehman's request for liquidity reporting purposes.[5586]

On September 9, JPMorgan requested $5 billion of additional collateral from Lehman and Lehman agreed to post $3 billion immediately. Lehman posted $1 billion in cash and $1.7 billion in money market funds on September 9. Lehman then posted

---

[5583] Examiner's Interview of Andrew Yeung, March 13, 2009, at p. 4; Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 13.

[5584] *See* Guaranty (Sept. 9, 2008), at p. 1 [JPM-2004 0005813]; Security Agreement (Sept. 9, 2008), at p. 1 [JPM-2004 0005873].

[5585] Security Agreement (Sept. 9, 2008), at p. 3 [JPM-2004 0005873].

[5586] E-mail from Mark G. Doctoroff, JPMorgan, to Jane Buyers-Russo, JPMorgan, *et al*. (Sept. 9, 2008) [JPM-EXAMINER00005933] (noting that Doctoroff "[j]ust spoke to Dan Fleming. The one condition they [Lehman] want in giving us [a] lien against [the collateral] is that they have a 3-day notice period to call the cash [collateral] back -- this will allow them to count the cash as part of their liquidity pool. . . . If not able to provide this, then . . . there is the public issue of their liquidity pool having to drop . . . .").

$300 million in cash the following day. On September 11, Lehman delivered an additional $600 million in cash to JPMorgan.[5587]

JPMorgan demanded $5 billion more in cash collateral on September 11, 2008, which Lehman provided by the afternoon of September 12.[5588] Although the collateral was posted pursuant to the September Agreements, which covered all Lehman obligations to JPMorgan – not just intraday exposures – Lehman believed that JPMorgan's demand for $5 billion was solely for intraday purposes.[5589] An e-mail sent by JPMorgan to Lehman memorializing the transaction, however, contains no mention of returning the collateral to Lehman at the end of the day.[5590]

### (k) Lehman Made a Deposit to Bank of New York Mellon to Cover Intraday Exposure, and Included That Deposit in Its Liquidity Pool

On September 1, 2008, Lehman's Graham Kettle informed Pellerani that Bank of New York Mellon ("BNYM"), one of Lehman's clearance and settlement banks, was seeking to "eliminate any intraday exposure."[5591] In response, on September 11, 2008, LBHI and BNYM's London branch executed an agreement that required Lehman to deposit $125 million initially and thereafter maintain a collateral account with at least

---

[5587] *See* Section III.A.5.b.1.g of this Report, which discusses Lehman's dealings with JPMorgan.

[5588] *See id.*

[5589] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 16.

[5590] E-mail from Jane Buyers-Russo, JPMorgan, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 11, 2008) [JPM-2004 0005411].

[5591] E-mail from Graham Kettle, Lehman, to Carlo Pellerani, Lehman, *et al.* (Sept. 1, 2008) [LBEX-DOCID 065890].

$50 million – with more required if BNYM forecasted greater intraday exposure.[5592]  The

funds were transferred to BNYM's London branch by LBHI(U.K.).[5593]

There is evidence that Lehman included this deposit in its liquidity pool.[5594]

While the deposit was subject to BNYM's contractual right of setoff and was placed to

cover the bank's intraday exposure to Lehman, thus facilitating BNYM's settlement

activity, Kettle relayed to Pellerani that the deposit would "not [a]ffect the liquidity

pool."[5595]  Pellerani responded: "Disagree with that view.  If we need to have this locked

up then there is an argument for this not to be available liquidity."[5596]  Lehman's Emil

---

[5592] E-mail from Gerry Barber, BNYM, to Carlo Pellerani, Lehman, *et al.* (Sept. 11, 2008) [LBEX-DOCID 1065087] (attaching "Final Version" of collateral deposit agreement); Collateral Deposit Agreement between Lehman Brothers Holdings, Inc. and the Bank of New York Mellon, London Branch (Sept. 11, 2008), §§ 1.1, 2.3 [LBEX-DOCID 1031225] (setting minimum deposit at $50 million). The agreement allowed BNYM to set off "all present and future monies, obligations and liabilities" LBHI or other specified Lehman entities owed under any "legal documentation . . . related to the issuance of securities." *Id.* §§ 1.1, 4.  If any of BNYM's agreements with Lehman required BNYM to make a payment on Lehman's behalf, Lehman had three business days to repay BNYM, after which BNYM could withdraw an equivalent amount from the collateral deposit.  *Id.* § 3.  Lehman was entitled to direct BNYM to transfer any excess collateral out of the account.  *Id.* § 3.1.5.  Further, BNYM could, in its "absolute discretion," allow Lehman to withdraw funds from the collateral account even though Lehman was not otherwise entitled to do so under the agreement.  *Id.* § 5.3.

[5593] *See* e-mail from Graham Kettle, Lehman, to Huw Rees, Lehman, *et al.* (Sept. 12, 2008) [LBEX-DOCID 65923] (announcing successful payment of $120 million to BNYM by LBHI(U.K.), per the agreement).

[5594] *See* e-mail from Emil F. Cornejo, Lehman, to Daniel J. Fleming, Lehman *et al.* (Sept. 8, 2008) [LBEX-DOCID 065890] (indicating that Lehman would include the collateral in its liquidity pool after the collateral deposit agreement was executed).  Lehman authorized BNYM to invest the "Collateral Account" in a "Dreyfus Cash Management Plus" money fund.  Collateral Deposit Agreement between Lehman Brothers Holdings, Inc. and the Bank of New York Mellon, London Branch (Sept. 11, 2008), at p. 20 (Schedule 3) [LBEX-DOCID 1031225].  Lehman directed that the $125 million BNYM deposit be invested in that Dreyfus fund.  E-mail from Graham Kettle, Lehman, to Scott Alvey, Lehman, *et al.* (Sept. 10, 2008) [LBEX-DOCID 1065130]; Lehman included this money fund in its liquidity pool. Lehman, Detailed Liquidity Pool Composition (Sept. 11, 2008) at pp. 7, 9 [LBEX-BARLQP 0003839].

[5595] E-mail from Graham Kettle, Lehman, to Carlo Pellerani, Lehman, *et al.* (Sept. 8, 2008) [LBEX-DOCID 065890].

[5596] E-mail from Carlo Pellerani, Lehman, to Graham Kettle, Lehman, *et al.* (Sept. 8, 2008) [LBEX-DOCID 065890].

Cornejo, in turn, responded that the deposit was not structured as a formal "pledge" and was instead only in a "Lehman account, with some right of offset," implying that it could be counted in the liquidity pool.[5597]  In his interview with the Examiner, Pellerani rejected the "pledge" versus "deposit" distinction, and expressed his view that the BNYM deposit was not appropriate for the liquidity pool.[5598]  Pellerani, however, said he did not know that the BNYM – or any other – clearing-bank collateral was included in Lehman's liquidity profile.[5599]

> ### (l) The Cumulative Impact of Lehman's Inclusion of Clearing-Bank Collateral and Deposits in Its Liquidity Pool

Tonucci confirmed that by the second week of September 2008, a material portion of LBHI's liquidity pool had become locked up as assets that were transferred to Lehman's clearing banks.[5600]  This trend began in June 2008 as Lehman attempted to navigate the competing demands of providing clearing banks with adequate security and preserving Lehman's public liquidity pool numbers.  In its attempts to strike a balance between these demands, Lehman included both the billions of dollars in collateral for JPMorgan's margin requirements and the $2 billion Citibank comfort deposit in its liquidity pool.  In addition to the JPMorgan and Citibank amounts, by late

---

[5597] E-mail from Emil F. Cornejo, Lehman, to Daniel J. Fleming, Lehman *et al.* (Sept. 8, 2008) [LBEX-DOCID 065890].

[5598] Examiner's Interview of Carlo Pellerani, Jan. 13, 2010, at pp. 4-5.

[5599] *Id.* at p. 4.

[5600] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 19.

summer Lehman was also including in its liquidity pool $500 million in Bank of America collateral, and nearly $1 billion in HSBC collateral. Lehman's liquidity pool was further encumbered in the second week of September 2008, when Lehman pledged more than $8 billion of additional collateral to JPMorgan under the September Agreements, and when Citibank and HSBC obtained formal rights of setoff and security interests in Lehman's deposits.

These collateral calls and intraday credit usages were satisfied from Lehman's liquidity pool, without that fact being disclosed to the market or to significant market participants such as rating agencies. The lack of disclosure is particularly evident when the "liquidity updates" and "ability to monetize" charts produced by Lehman during the week of September 8 are compared to Lehman's public disclosures.[5601] For example, the "Liquidity Summary as of 9/13"[5602] deck circulated within Lehman, and distributed to the SEC and FRBNY (the first time Lehman had circulated such data), described Lehman's "[r]eportable [l]iquidity" in the context of the "[a]bility to [m]onetize" that putative liquidity.[5603] Lehman ended the prior week with a reportable pool of $42.1

---

[5601] *See, e.g.*, Lehman, Liquidity Update (Sept. 11, 2008), at p. 2 [LBEX-WGM 784543].

[5602] Lehman, Liquidity Summary (Sept. 13, 2008) [LBEX-DOCID 647325] (attachment containing "ability to monetize" chart); e-mail from Robert Azerad, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Sept. 13, 2008) [LBEX-DOCID 717430] (attaching same).

[5603] Lehman, Liquidity Summary (Sept. 13, 2008) [LBEX-DOCID 647325] (attachment containing "ability to monetize" chart); e-mail from Robert Azerad, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Sept. 13, 2008) [LBEX-DOCID 717430] (attaching chart); e-mail from Laura M. Vecchio, Lehman, to Michael A. Macchiaroli, SEC, *et al.* (Sept. 14, 2008) [LBEX-DOCID 69577] (distributing same to the SEC); e-mail from Laura M. Vecchio, Lehman, to Jan H. Voigts, FRBNY (Sept. 14, 2008) [LBEX-DOCID 731444] (distributing

billion, and a highly monetizable portion of that pool of $33.8 billion.[5604]  On September 10, as the effects of the security documentation demanded by Lehman's clearing banks and JPMorgan's September 9 cash collateral pledge took hold, Lehman's reportable liquidity declined to $37.6 billion, while the "low" ability to monetize portion jumped to $27.3 billion.[5605]  Finally, by Friday, September 12, Lehman's last day operating as a going concern, the firm's reportable liquidity dropped and, reflecting the impact of JPMorgan's $5 billion collateral call, $30.1 billion of $32.5 billion reportable liquidity was classified as assets with a "low" ability to monetize.[5606]  In other words, only $2.4 billion of Lehman's $32.5 billion liquidity pool was readily convertible to cash on September 12.  Another internal Lehman document succinctly captures the impact of including the clearing-bank collateral in the liquidity pool on Lehman's ability to monetize that pool; as of September 12, 2008:[5607]

same to FRBNY).  The September 13 deck is the first instance of which the Examiner is aware of any disclosure to Lehman's regulators of the firm's "ability to monetize" the liquidity pool.

[5604] Lehman, Liquidity Summary (Sept. 13, 2008) [LBEX-DOCID 647325].

[5605] *Id*.

[5606] *Id*.

[5607] Lehman, Ability to Monetize Table (Sept. 12, 2008) [LBEX-WGM 784607] (handwriting in the original).

| Ability to Monetize | Collateral Type | 12-Sep | Comment |
|---|---|---|---|
| High | UK Deposit | 216 | |
| | US Deposit | 560 | Citi, JPM (on top of prefunding) |
| | US Money Funds | 96 | |
| | Boxed assets | 562 | Boxed Inventory in LBIE |
| **Total** | | **1,434** | |
| Mid | US CLO | 734 | Spruce - PDCF Eligible |
| | US Money Funds | 200 | LOTC upstreamable bal. |
| **Total** | | **934** | |
| Low | US CLO | 2,490 | Sasco, Kingfisher, Verano |
| | UK Bond Funds | 522 | Pioneer |
| | US Deposit | 9,400 | Citi, BOA, JPM |
| | UK Deposit | 947 | HSBC, etc |
| | UK Money Funds | 904 | JPM |
| | US Money Funds | 750 | JPM, Dreyfus |
| | Cash at Banks | 360 | various entities in Asia |
| | Boxed assets | 4,709 | LBI box lock up |
| | Boxed assets | 10,039 | LBIE box lock up |
| **Total** | | **30,121** | |
| **Total Liquidity Pool** | | **32,489** | |

SEC analyst Michael Hsu, realized, albeit on September 12, 2008, that Lehman's pool of purportedly liquid assets was mostly composed of assets placed to secure clearing-bank risk. His reaction presaged LBHI's liquidity reckoning, due the coming Monday. "Key point," Hsu wrote: "[L]ehman's liquidity pool is almost totally locked up with clearing banks to cover intraday credit ($15bn with jpm, $10bn with others like citi and bofa). This is a really big problem."[5608]

Lehman's own post-mortem analysis (prepared by Tonucci and Azerad) reflects the fact that Lehman's liquidity crisis was traceable to the inclusion of clearing-bank deposits and pledges in the pool. Four slides throughout the deck, "Liquidity of Lehman Brothers," implicate the usage of intraday liquidity as clearing-bank collateral

[5608] E-mail from Michael Hsu, SEC, to Til Schuermann, FRBNY (Sept. 12, 2008) [FRBNY to Exam. 014851].

as a significant factor in LBHI's bankruptcy filing.[5609]  Indeed, according to the Tonucci-

Azerad analysis, the depletion of the liquidity pool appears to have been the immediate

cause of LBHI's bankruptcy filing.  That analysis concludes:

> Post earnings announcement on September 9[, 2008], Holdings' liquidity decreased . . . from $41 billion to $25 billion – $16 billion of which was required by clearing banks at the start of the day and approximately $7 billion of which was in liquid securities that became near impossible to monetize immediately in this extremely stressed market environment – primarily because of a loss of repo capacity.

> As a result, . . . "free cash" available intra day was less than $2 billion. With LBIE facing a projected cash shortage of $4.5 billion on September 15, Lehman had no choice but to place LBIE into administration because of potential director liability.   This resulted in a cross-default of and triggered the filing [of LBHI] on September 15.[5610]

### (5)  Disclosures Concerning the Inclusion of Clearing-Bank Collateral in Lehman's Liquidity Pool

#### (a)  Lehman Did Not Disclose on Its June 16, 2008 Second Quarter Earnings Call That It Was Including the $2 Billion Citi "Comfort Deposit" in Its Liquidity Pool

Lowitt led the portion of Lehman's June 16, 2008 second quarter earnings call

concerning Lehman's liquidity position.  He stated: "we have significantly increased . . .

our liquidity pool to $45 billion from $34 billion."[5611]   Lowitt did not disclose that

between the end of the quarter (May 31, 2008) and the June 16 call that Lehman had

---

[5609] *See* Lehman, Liquidity of Lehman Brothers (Oct. 7, 2008), at pp. 4, 7, 9, 15 [LBEX-WGM 787681]. Tonucci said that he directed Azerad to prepare the deck and that it reflects Tonucci's analysis. Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 20.

[5610] Lehman, Liquidity of Lehman Brothers (Oct. 7, 2008), at p. 9 [LBEX-WGM 787681]. Note that while the presentation states that the earnings announcement occurred on September 9, it in fact occurred on September 10.

[5611] Final Transcript of Lehman Brothers Holdings Inc., Second Quarter 2008 Earnings Call (June 16, 2008), at p. 10 (statement of Ian T. Lowitt).

placed a $2 billion "comfort deposit" (on June 12) with Citigroup to allay Citigroup's intraday risk concerns.

A number of factors militate against the potential impropriety, or materiality, of such a non-disclosure of the Citi deposit: (1) Lehman believed the deposit to be "lien-free" and did not grant Citi the right to setoff;[5612] (2) the deposit was understood to simply cover intraday risk and was callable by Lehman daily;[5613] and (3) market conditions were probably not yet such that Citi would have refused to return the deposit. The Examiner is aware, for example, that Lehman requested, and Citibank granted, the return of $210 million of this deposit on June 30, 2008.[5614]

### (b) Lehman Did Not Disclose in Its Second Quarter 2008 10-Q, Filed July 10, 2008, That It Was Including Both the $2 Billion Citibank "Comfort Deposit" and Approximately $5.5 Billion of Securities Collateral Pledged to JPMorgan in Its Liquidity Pool

Lehman filed its 10-Q for the second quarter of 2008 on July 10, 2008. Lowitt signed the certification. The 10-Q disclosed the following regarding Lehman's liquidity and liquidity pool:

> The funding market environment became very challenging during the second quarter of 2008 as a series of credit and liquidity events . . . resulted in a sharp decrease in the supply of liquidity in March, which was partially reversed in April and May. Despite this difficult

---

[5612] *See* e-mail from Daniel J. Fleming, Lehman to Ian T. Lowitt, Lehman, *et al.* (June 12, 2008) [LBEX-AM 008608].

[5613] Lehman, Citigroup Agenda (June 17, 2008), at p. 2 [LBEX-AM 008597].

[5614] *See, e.g.*, e-mail from Michael Mauerstein, Citigroup, to Christopher M. Foskett, Citigroup (June 30, 2008) [CITI-LBHI-EXAM 00074989]. Lehman replenished the deposit the morning of the next business day. *Id.*

environment, the Company strengthened its liquidity position, finishing the quarter with record levels of liquidity. . . . The Company's liquidity pool at May 31, 2008 was approximately $45 billion, up from approximately $34 billion at February 29, 2008 and $35 billion at November 30, 2007.[5615]

The 10-Q further characterized Lehman's liquidity pool as "unencumbered." Recounting the "[e]stimated values of the liquidity pool," the 10-Q referred to "the liquidity pool and other unencumbered (*i.e.*, unpledged) asset portfolios . . . ."[5616]

While the data in the 10-Q represented data for the second quarter of 2008, which ended May 31, 2008, the 10-Q itself was filed July 10, 2008. Between the end of the reporting period and the filing date:

- Lehman made its $2 billion Citibank "comfort deposit" (June 12, 2008) that was simultaneously included in Lehman's liquidity pool;[5617] and

- Lehman began pledging securities collateral to JPMorgan to mitigate the effects of JPMorgan's margin requirements for triparty collateral (June 19, 2008 and dates following). The securities collateral was apparently owned initially by LCPI and placed in an LBI collateral account at JPMorgan. Pursuant to a June 2000 Clearance Agreement between JPMorgan and LBI, JPMorgan had a lien on collateral in such accounts.[5618] As of the 10-Q filing date, Lehman simultaneously counted Spruce, Pine, SASCO, Kingfisher and Fenway securities in both its liquidity pool and clearing accounts maintained

---

[5615] LBHI 10-Q (July 10, 2008), at p. 80.

[5616] *Id.* at p. 81.

[5617] Lehman Brothers, Detailed Liquidity Pool Composition (July 10, 2008), at p. 7 [LBEX-BARLQP 0002443] (showing $2 billion Citibank deposit in the liquidity pool).

[5618] *See* Clearance Agreement (June 15, 2000), at pp. 11-12 [JPM-2004 0031786] amended by Amendment to Clearance Agreement (May 30, 2008), at p. 1 [JPM-2004 0085662] (establishing a "lien upon . . . every account" maintained by a party to the Clearance Agreement with JPMorgan). At least as of late July 2008, Lehman personnel acknowledged in internal e-mails that JPMorgan had a lien over some of the collateral placed to mitigate margin requirements. *See* e-mail from Craig L. Jones, Lehman, to James W. Hraska, Lehman (July 31, 2008) [LBEX-DOCID 077621] (noting that "Chase has taken an official lien over $5 bn [of collateral]").

with JPMorgan.[5619]  Lehman included approximately $5.5 billion of JPMorgan margin collateral in its liquidity pool as of the filing date.[5620]

### (c) Lehman Did Not Disclose On Its September 10, 2008 Earnings Call That a Substantial Portion of Its Liquidity Pool Was Encumbered by Clearing-Bank Pledges

On September 10, 2008, Lehman held its third quarter 2008 earnings announcement via conference call.  Lowitt led the portion of the call updating investors on Lehman's liquidity position.  Lowitt's remarks on Lehman's liquidity pool were as follows:

> I will now provide an update on our liquidity position, which remains very strong.  We maintained our cash capital surplus at $15 billion at the end of the third quarter.  Our liquidity pool also remains strong at $42 billion, versus a record $45 billion at May 31.  The decline in this figure versus the end of the second quarter is strictly attributable to our managing down our commercial paper outstandings, which ended the quarter at $4 billion versus $8 billion at the end of the second quarter . . . . Through last night, our liquidity pool remained essentially unchanged at $41 billion.[5621]

Lowitt did not disclose that Lehman, as of the night before the earnings call, included in its liquidity pool:

---

[5619] *Compare* Lehman, Detailed Liquidity Pool Composition (July 10, 2008), at pp. 20-21 [LBEX-BARLQP 0002443] (showing Spruce, Pine, SASCO, Kingfisher, and Fenway securities in the liquidity pool), *with* Duff & Phelps, JPMC Collateral Account "LCD" Position Summary, showing the contents of the LCD account as of July 10, 2008 (Jan. 3, 2010) (showing Fenway, Kingfisher, Pine, SASCO and Spruce in the LCD account).

[5620] Duff & Phelps, JPMC Collateral Account "LCD" Position Summary, showing the contents of the LCD account as of July 10, 2008 (Jan. 3, 2010) (the combined trade value of the Fenway, Kingfisher, Pine, SASCO, and Spruce securities in both the encumbered LCD account and in the liquidity pool was $5,457,847,089).

[5621] Final Transcript of Lehman Brothers Holdings Inc., Third Quarter 2008 Earnings Call (Sept. 10, 2008), at p. 11.

- Roughly $4 billion of CLOs pledged to JPMorgan (Spruce, SASCO, Pine, Kingfisher, and Verano);[5622]

- $2.7 billion in cash and money market funds pledged to JPMorgan on September 9, 2008;[5623]

- The $2 billion Citibank cash deposit, subject to a right of setoff formalized in a Guaranty Amendment executed between Citi and Lehman the evening of September 9, 2008;[5624]

- The $500 million Bank of America cash deposit, subject to a Security Agreement executed between Bank of America and Lehman on August 25, 2008; and[5625]

- The nearly $1 billion collateral deposit with HSBC, subject to a right of setoff formalized against the U.K. deposit by the U.K. Cash Deeds executed between HSBC and LBHI(U.K.) and LBIE on September 9, 2008.[5626]

Lowitt also did not disclose that Lehman and JPMorgan executed expanded security documentation on the morning of September 10, before the earnings call. This documentation granted JPMorgan a security interest in practically all Lehman accounts

---

[5622] *Compare* Duff & Phelps, JPMC Collateral Account "LCE" – Position Summary for Sept. 9, 2008 (Jan. 3, 2010) (showing Spruce, Pine and Verano located in the LCE account), *and* Duff & Phelps, JPMC Collateral Account "LCD" - Position Summary for Sept. 9, 2008 (Jan. 3, 2010) (showing SASCO and Kingfisher in the LCD), *with* Lehman, Liquidity Pool Summary (Sept. 9, 2008), at pp. 1-2 [LBHI_SEC07940_557815] (showing Spruce, Pine, Verano, SASCO and Kingfisher securities in the liquidity pool) (attached to e-mail from Robert Azerad, Lehman, to Paolo R. Tonucci, Lehman, *et al*. (Sept. 9, 2008) [LBHI_SEC07940_557814]) (the total value of the securities depends on whether one aggregates the values in the LCD and LCE position summaries, or whether one aggregates those in the liquidity pool summary; in the former the combined value of the securities is $4,668,490,656, for the latter the combined value is $3,994,841,869).

[5623] *See* Section III.A.5.b.1.g of this Report, which discusses Lehman's dealings with JPMorgan, and its pledges to JPMorgan in particular; JPMorgan Second Written Responses, at p. 9; Lehman, Collateral Pledged to JPM for Intraday As of 9/12/2008 COB [LBEX-AM 047008]; *see also* e-mail from Mark G. Doctoroff, JPMorgan, to Jane Buyers-Russo, JPMorgan, *et al*. (Sept. 9, 2008) [JPM-2004 0032520]; e-mail from Daniel J. Fleming, Lehman, to Paolo R. Tonucci, Lehman (Sept. 9, 2008) [LBEX-DOCID 0073380].

[5624] Lehman, Liquidity Pool Summary (Sept. 9, 2008), at pp. 2, 4 [LBHI_SEC07940_557815] (attached to e-mail from Robert Azerad, Lehman, to Paolo R. Tonucci, Lehman, *et al*. (Sept. 9, 2008) [LBHI_SEC07940_557814]).

[5625] Lehman, Liquidity Pool Summary (Sept. 9, 2008), at pp. 2, 4 [LBHI_SEC07940_557815].

[5626] *Id.*

at JPMorgan for all Lehman exposures to JPMorgan – beyond those exposures related to triparty clearance.

Reproduced below is a snapshot of Lehman's liquidity pool, on the evening of September 9, 2008, extracted from one of Lehman's internal documents. It reflects that the collateral pledges itemized above were included in the pool, reducing Lehman's "ability to monetize" that reserve:[5627]

| | A | B | C | D |
|---|---|---|---|---|
| 1 | | | | |
| 2 | Ability to Monetize | Collateral Type | Pledge Value | Comment |
| 3 | High | UK EMF | 941 | ECB Eligible |
| 4 | | US Deposit | 740 | Citi, JPM (on top of prefunding) |
| 5 | | UK Money Funds | 3,833 | |
| 6 | | US Money Funds | 14,916 | |
| 7 | | Agencies | 1,250 | Boxed Inventory in LBHINY |
| 8 | | Various securities | 2,979 | Boxed Inventory in LBIE |
| 9 | Total | | 24,659 | |
| 10 | Mid | US CLO | 734 | Spruce - PDCF Eligible |
| 11 | | US Money Funds | 200 | LOTC upstreamable bal. |
| 12 | Total | | 934 | |
| 13 | Low | US CLO | 3,231 | Sasco, Pine, Kingfisher, Verano |
| 14 | | UK Bond Funds | 533 | Pioneer |
| 15 | | US Deposit | 3,500 | Citi, BOA, JPM |
| 16 | | UK Deposit | 970 | HSBC, etc |
| 17 | | UK Money Funds | 924 | JPM |
| 18 | | US Money Funds | 1,220 | JPM, Dreyfus |
| 19 | | US Trust Investment | 408 | JPM |
| 20 | | Cash at Banks | 360 | various entities in Asia |
| 21 | | Various securities | 2,148 | LBI box lock up / Pending |
| 22 | | Various securities | 1,697 | LBIE box lock up |
| 23 | Total | | 14,991 | |
| 24 | | | | |
| 25 | Total Liquidity Pool | | 40,584 | |

While the total size of the pool was approximately $40.6 billion, Lehman managers had determined that they had a "high" ability to monetize approximately $25 billion of the pool, a "mid" ability to monetize approximately $1 billion of the pool, and only a "low" ability to monetize approximately $15 billion, or 37%, of the total pool.

---

[5627] *Id.* at p. 4.

**(d) Senior Executives Did Not Disclose to the Board of Directors at the September 9, 2008 Finance Committee Meeting the Fact That a Substantial Portion of Its Liquidity Pool Was Encumbered by Clearing-Bank Pledges**

The Finance and Risk Committee of the Board of Directors for LBHI met at 10:00 a.m. on September 9, 2008.[5628]  Present for the Board were Henry Kaufman, John Akers, Roger Berlind, Marsha Johnson Evans and Roland Hernandez.[5629]  Lehman officers present by invitation were Lowitt, O'Meara, Tonucci, and Jeffrey Welikson.[5630]

According to Committee minutes, Tonucci updated the Committee on LBHI's liquidity and capital, as well as general market conditions, over the third quarter of 2008.[5631]  Board minutes, as well as a deck prepared to guide Tonucci's presentation, show that Tonucci debriefed the Committee on the status of Lehman's liquidity pool, cash capital, commercial paper, and secured funding, among other topics related to liquidity.[5632]  The deck accompanying Tonucci's presentation states: "Despite [the] challenging market environment, Lehman Brothers was able to broadly maintain the status quo in terms of liquidity[.]"[5633]

---

[5628] Lehman Brothers Holdings Inc., Minutes of Meeting of Finance and Risk Committee (Sept. 9, 2008), at p. 1 [LBEX-AM 059210].

[5629] *Id*.

[5630] *Id*.

[5631] *Id.* at pp. 1-2.

[5632] *Id.* at p. 2.

[5633] Lehman, Finance & Risk Committee of the Board, Risk, Liquidity, Capital And Balance Sheet (Sept. 9, 2008), at p. 2 [LBEX-AM 067342].

Absent from either the Committee minutes, or the deck guiding Tonucci's presentation, is any disclosure of significant events affecting the liquidity pool over the course of the third quarter, [5634] including:

- On June 12, 2008, Lehman provided Citi with a $2 billion cash deposit to allay Citi's intraday risk concerns, and that this deposit was simultaneously included in the liquidity pool;

- On or about June 19, 2008, Lehman began pledging more than $5 billion in securities to JPMorgan to mitigate the effects of its margin requirements for triparty repo, and that many of the securities pledged were included in Lehman's liquidity pool;

- LBHI and BofA executed a security agreement dated August 25, 2008 that granted BofA a security interest in a $500 million collateral deposit, which was also included in Lehman's liquidity pool;

- LBHI and JPMorgan executed a security agreement dated August 26, 2008 that granted JPMorgan a security interest in the LCE account. Collateral in this account was included in Lehman's liquidity pool, on the rationale that it was lien-free at night. JPMorgan required almost all of that collateral to be returned to the encumbered accounts every morning, however, to facilitate the daily unwind of triparty repos; and

- On August 28, 2008, Lehman transferred at HSBC's request approximately $1 billion in collateral to HSBC to secure the intraday clearing and settlement risk. HSBC returned that collateral to Lehman the same day to assist Lehman with month-end reporting. Lehman returned the collateral to HSBC on September 1, 2008. This collateral was simultaneously counted in Lehman's liquidity pool.

In his interview with the Examiner, the Chairman for the Board's Finance and Risk Committee, Dr. Henry Kaufman, stated that he was never told that Lehman

---

[5634] Tonucci did not disclose that Lehman executed documentation on September 9, 2008 with Citibank and HSBC, strengthening the claim of those banks on Lehman collateral, although it should be noted that those documents were executed *after* the 10:00 am Committee meeting. Likewise, the September Agreements between LBHI and JPMorgan, which also strengthened JPMorgan's claim on Lehman collateral, were executed the morning of September 10 (*i.e.*, after the Committee meeting).

included clearing-bank collateral in its liquidity pool.[5635]   However, Kaufman did not think it was improper to include this collateral in the pool, from a reporting sense.[5636] Under the circumstances such as Lehman faced the week of September 8, Kaufman thought it would have been impossible for Lehman to obtain and maintain adequate liquidity to save itself.[5637]

Other Directors, with one exception, made statements similar to Kaufman's view. Director Roger Berlind said he did not recall much discussion over the effect of collateral calls on Lehman's liquidity; indeed he was not concerned about collateral demands because of Lehman's "record levels" of liquidity.[5638]  He said he assumed that funds pledged intraday were included in the liquidity pool.[5639]   Director Thomas Cruikshank said he had no knowledge as to whether Lehman included clearing-bank collateral, or difficult-to-monetize assets in its liquidity pool.[5640]   Neither the Board nor the Audit Committee reviewed the liquidity pool in that level of detail, he said.[5641] Director Sir Christopher Gent said he did not recall any discussion over pledged assets being included in Lehman's liquidity pool;[5642] Gent said that Lehman's management repeatedly assured the Board that assets in the liquidity pool were appropriate for the

---

[5635] Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at pp. 3, 12.
[5636] *Id*.
[5637] *Id*. at p. 20.
[5638] Examiner's Interview of Roger Berlind, May 8, 2009, at p. 2.
[5639] *Id*.
[5640] Examiner's Interview of Thomas Cruikshank, Oct. 8, 2009, at p. 9.
[5641] *Id*.
[5642] Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at p. 13.

pool.[5643] Director Jerry Grundhofer said he could not recall whether Lehman's management disclosed that intraday clearing-bank collateral was included in the liquidity pool;[5644] but stated that the inclusion of intraday collateral would not concern him because Lehman had other sources of liquidity and that it could negotiate with counterparties to effect the return of intraday collateral.[5645] Grundhofer said the issue to him was what percentage of Lehman's total liquidity consisted of intraday collateral.[5646] When pressed for what percentage of the liquidity pool would have been "significant" to him, Grundhofer said that ultimately it did not matter whether Lehman had $30 billion or $50 billion in its liquidity pool, because a run on the bank would have depleted all liquidity.[5647] Grundhofer also had confidence that if Lehman's inclusion of intraday collateral in its liquidity pool were an issue, that Lehman's management would have informed the Board.[5648]

Director Marsha Johnson Evans, however, stated that she did not focus on whether funds pledged to clearing banks were included in Lehman's liquidity pool, but said that her impression was that such assets should not be included in the pool.[5649]

---

[5643] *Id*. at p. 3.
[5644] Examiner's Interview of Jerry A. Grundhofer, Oct. 15, 2009, at p. 6.
[5645] *Id*.
[5646] *Id*.
[5647] *Id*.
[5648] *Id*. at p. 2.
[5649] Examiner's Interview of Marsha Johnson Evans, May 22, 2009, at p. 3.

**(e)  Lehman Officers Did Not Disclose to the Board of Directors That Its Liquidity Position Was Substantially Impaired by Collateral Held at Clearing Banks Until the Evening of September 14, 2008**

The Board of Directors convened the evening of September 14, 2008, to discuss, among other things, the status of its prospective deal for a sale to Barclays, the deterioration of the firm's financial condition and the possibility of filing bankruptcy and winding down the firm.[5650]  The Board voted to file for Chapter 11 bankruptcy at the conclusion of the meeting.[5651]

It was only at this meeting that Lehman officers, namely Chief Legal Officer Thomas Russo and Lowitt, disclosed to the Board that Lehman's liquidity position had been compromised by pledges and deposits with the firm's clearing banks.  According to the minutes of that meeting: "Mr. Russo reported that the Firm [LBHI] had a liquidity problem, with much of its liquidity tied up at clearing banks (primarily JPMorgan Chase Bank) . . . ."[5652]  After the meeting adjourned at 6:10 p.m. and reconvened at 7:55 p.m., Lowitt:

> reported that cash and collateral were being tied up by the Firm's clearing banks, with Chase holding approximately $17 billion of collateral (half in collateral and half in cash). . . . Mr. Lowitt reported that cash had drained very quickly over the last three days of the previous week and that Chase had demanded an additional $5 billion on Friday.[5653]

---

[5650] *See generally* Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008) [LBEX-AM 003932].

[5651] *Id*. at p. 5.

[5652] *Id*. at p. 2.

[5653] *Id*. at p. 4.

According to the Board minutes and supplemental Board materials, this was the first time that the qualifications on Lehman's reported liquidity position were disclosed to the Board of Directors.  Lowitt was accurate in his disclosure that cash had drained "very quickly" over the previous week, as JPMorgan received over $3 billion in cash and money market collateral on September 9, 10, and 11, 2008, and an additional $5 billion in cash collateral on September 12, 2008.  Despite being transferred as collateral to JPMorgan, and subject to a security interest granted by the September 9, 2008 LBHI-JPMorgan Security Agreement, these assets remained in the firm's liquidity pool.[5654]

Lowitt did not disclose, in the September 14 Board meeting or any other, that Lehman had begun including clearing-bank deposits (and eventually collateral) in its liquidity pool on or about June 12, 2008, and continued to do so in increasing amounts throughout the quarter.

---

[5654] *Compare* Lehman, Liquidity Update (Sept. 11, 2008), at p. 3 [LBEX-WGM 784543], *with* Lehman, Ability to Monetize Table (Sept. 12, 2008) [LBEX-WGM 784607] (showing that between September 11, 2008 and September 12, 2008 the low ability to monetize "US Deposit" held by clearing banks including JPMorgan increased exactly $5 billion, confirming that Lehman included the $5 billion JPMorgan pledge on September 12, 2008 in its liquidity pool).  Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 19 (confirming that the $3 billion in collateral pledged to JPMorgan the week of September 8, 2008, prior to the September 12, 2008 pledge, was included in the liquidity pool).

### (f) Lowitt's Views on Including Clearing-Bank Collateral in the Liquidity Pool[5655]

According to Lowitt, Treasury (headed by Tonucci) was responsible for monitoring the liquidity pool,[5656] and Lowitt himself was "not . . . very attentive to what was in the liquidity pool."[5657]  While Lowitt said he did not know what the rationale was for including clearing-bank collateral in the liquidity pool at the time Lehman did so, he said he later learned that Lehman considered the collateral transferred to banks to be Lehman's and that Lehman could recall the collateral if it wished, although doing so would entail conversations with the entities with which collateral was placed.[5658]  Lowitt also said that he did not recall anyone at Lehman suggesting that Lehman disclose the firm's "ability to monetize" assets in the liquidity pool on the September 10, 2008 third-quarter earnings call.[5659]

Nevertheless, the Clearance Agreement (as amended), Security Agreements, and Guaranties granted JPMorgan liens over collateral that was simultaneously reported as part of Lehman's liquidity pool.  By September 9, 2008, Citibank, HSBC and BofA had executed documentation granting security interests and/or rights of setoff against

---

[5655] The views of additional former senior members of Lehman management on the inclusion of clearing-bank collateral in the liquidity pool can be found in the appendix. *See* Appendix 20 of this Report. Tonucci defended including the collateral in the liquidity pool.  Lehman International Treasurer Carlo Pellerani was unaware that Lehman included the collateral in its liquidity pool, and stated that it would have been improper for Lehman to have done so.

[5656] Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at p. 24.

[5657] *Id*. at p. 23.

[5658] *Id*. at pp. 23-24.

[5659] *Id*. at p. 26.

collateral Lehman placed with them as well. Pulling collateral from the clearing banks likely would have affected Lehman's ability to clear through those banks.

### (6) Rating Agencies Were Unaware That Lehman Was Including Clearing-Bank Collateral in Its Liquidity Pool

#### (a) Fitch

Eileen Fahey, a managing director at Fitch, was involved in rating broker-dealers, such as Lehman's U.S. broker-dealer, LBI.[5660] Fahey's primary contact at Lehman was Tonucci.[5661] Fahey said she was not aware of any restricted cash or pledged securities being included in Lehman's liquidity pool.[5662] Fahey said it would have been "completely inappropriate" to include encumbered assets in Lehman's liquidity pool.[5663] In her opinion, cash deposits that were not formally pledged would be inappropriate for a firm's liquidity pool if that firm's clearing bank demanded the deposit due to deteriorating market conditions.[5664] Fahey said Lehman did not inform Fitch that it made any collateral pledges or deposits to its clearing banks, and that she considered such information "material" to her analysis of Lehman.[5665]

---

[5660] Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at pp. 1-2.

[5661] *Id.* at p. 2.

[5662] *Id*. at p. 5.

[5663] *Id*.

[5664] *Id*.

[5665] *Id*.

### (b) Standard & Poor's

Diane Hinton of Standard & Poor's, or S&P, was the primary analyst assigned to Lehman at S&P through July 2008.[5666] Hinton stated that S&P did not render opinions about the appropriateness of the contents of Lehman's liquidity pool, nor did S&P audit the contents of the pool.[5667] Hinton said she was not aware that Lehman included encumbered assets in its liquidity pool.[5668] When asked by the Examiner if the inclusion of a hypothetical $5 billion pledge to a clearing bank in a firm's liquidity pool would have been relevant to her analysis of that firm's liquidity pool, Hinton replied that it would have been.[5669] Hinton said that S&P does not include pledged assets in its assessment of liquidity, and that S&P would likely subtract the value of any pledged assets from a firm's liquidity pool; thus if a $40 billion liquidity pool contained $5 billion in pledged assets, S&P would consider the pool to actually contain $35 billion.[5670] Hinton's answer did not change when the Examiner asked that she assume that the assets were encumbered by a lien intraday, but were lien-free overnight – she would have subtracted any intraday collateral as well.[5671] Hinton further stated that if she had

---

[5666] Examiner's Interview of Diane Hinton, Sept. 22, 2009, at p. 1.
[5667] *Id.* at p. 4.
[5668] *Id.* at p. 5.
[5669] *Id.* at p. 4.
[5670] *Id.*
[5671] *Id.*

known that Lehman was including deposits held by third parties in its liquidity pool that she would likely have communicated this to others at S&P.[5672]

### (c) Moody's

Peter Nerby was Moody's lead analyst assigned to Lehman from 1998 to 2003, and its back-up analyst from 2004 to 2008.[5673]  Nerby did not recall ever being told that Lehman included pledged assets, intraday or otherwise, in its liquidity pool.[5674]  Nerby said that he would have wanted to know if Lehman had been including a $2 billion clearing bank cash deposit in its liquidity pool.[5675]  Likewise, he said he would have wanted to know if Lehman had been including in its liquidity pool collateral that was encumbered by a lien intraday, but which was swept to a lien-free account overnight.[5676]  Nerby said that Lehman represented to Moody's that liquidity pool assets were unencumbered.[5677]

### (7) The FRBNY Did Not View the Clearing-Bank Collateral in the Liquidity Pool as "Unencumbered"

The FRBNY monitored Lehman's liquidity position continuously, and embedded several FRBNY analysts on-site at Lehman toward this end.[5678]  The FRBNY was aware that as of late August 2008, Lehman had posted, or was planning to post, collateral to

---

[5672] *Id.* at p. 5.

[5673] Examiner's Interview of Peter E. Nerby, Oct. 8, 2009, at p. 1.

[5674] *Id.* at p. 4.

[5675] *Id.* Nerby did not express an opinion as to whether Moody's would have deducted the clearing-bank collateral from the liquidity pool if Moody's had known about the issue.

[5676] *Id*.

[5677] *Id.* at pp. 4-5.

[5678] Examiner's Interview of Jan H. Voigts, Aug. 25, 2009, at pp. 2, 5.

JPMorgan, Citigroup, BofA and BNYM. Lehman's Paolo Tonucci told the FRBNY that "none of these [collateral] requirements will affect the liquidity pool."[5679]

On August 20, 2008, in his daily "Lehman update" e-mail, FRBNY on-site Lehman liquidity monitor Jan Voigts summarized recent clearing-bank collateral requests, and Lehman's posting of collateral to satisfy some of those requests.[5680] In response to Voigts' update, Angulo noted that Lehman was apparently including in the liquidity pool its $2 billion Citibank cash deposit and $5 billion of collateral posted with JPMorgan.[5681] Angulo wrote, "seems like LEH has $7B (and perhaps soon to be $8B+) less in available liquidity than reported . . . [.]"[5682] Voigts replied: "The liquidity pool looks largely unchanged - which leads me to want to look more closely at the three card monte routine we see in intercompany funding."[5683] Angulo responded:

> Conceptually, I can see an argument for including the $7B in the liquidity pool if JPM and C[itigroup] release the collateral to LEH every night – if triparty investors decline to roll at the end of the day, LEH can repo the $7B to replace the funding for the assets not financed by the triparty

[5679] FRBNY, Lehman IB Update (Aug. 26, 2008) [FRBNY to Exam. 007969] (summarizing Lehman's collateral postings securing intraday funding with BofA, BNYM, JPMorgan and Citi, and prefacing that summary with the statement: "The Treasurer [Paolo Tonucci] provided the following recap and noted that none of these requirements will affect Lehman's liquidity pool.").

[5680] E-mail from Jan H. Voigts, FRBNY, to Arthur G. Angulo, FRBNY, *et al.* (Aug. 20, 2008) [FRBNY to Exam. 033297].

[5681] *Id.*

[5682] E-mail from Arthur G. Angulo, FRBNY, to Jan H. Voigts, FRBNY, *et al.* (Aug. 20, 2008) [FRBNY to Exam. 033297].

[5683] E-mail from Jan H. Voigts, FRBNY, to Arthur G. Angulo, FRBNY (Aug. 20, 2008) [FRBNY to Exam. 033297]. In an interview with the Examiner, Voigts explained that his "three card monte in intercompany funding" remark alluded to the fact that daily transfers of assets between LBIE, LBHI, LBI, and Lehman Brothers Bankhaus, AG all affected Lehman's liquidity pool. Examiner's Interview of Jan H. Voigts, Oct. 1, 2009, at p. 8. Voigts stated that the FRBNY tried, but was never able to gain an adequate understanding of the funding effects of Lehman's intercompany transactions. *Id.*

investors[.] *On the other hand, doesn't feel quite right to view the $7B as 'unencumbered[.]'*[5684]

Voigts replied: "Agreed."[5685]

Angulo explained to the Examiner that collateral posted to Lehman's clearing banks, which was simultaneously included in Lehman's liquidity pool, "doesn't seem liquid" and could only be considered liquid in the limited event that counterparties were to stop rolling their repos and the collateral would therefore no longer be needed to support the intraday clearing risk associated with clearing those repos.[5686] Absent such a "narrow situation," Angulo said, it "would've been very difficult" to monetize this collateral for other liquidity purposes.[5687] Angulo further noted that in the period immediately preceding LBHI's bankruptcy, the FRBNY discounted the value of Lehman's liquidity pool to subtract out the value of the clearing-bank collateral that Lehman was including in the pool.[5688] "At some point," Angulo said, the FRBNY came to the conclusion that "the liquidity pool isn't 'X;' it's 'X minus something,'" where that "something" was the clearing-bank collateral.[5689]

---

[5684] E-mail from Arthur G. Angulo, FRBNY, to Jan H. Voigts, FRBNY (Aug. 20, 2008) [FRBNY to Exam. 033297] (emphasis added).

[5685] E-mail from Jan H. Voigts, FRBNY, to Arthur G. Angulo, FRBNY (Aug. 21, 2008) [FRBNY to Exam. 033297].

[5686] Examiner's Interview of Arthur G. Angulo, Oct. 1, 2009, at p. 4.

[5687] *Id*.

[5688] *Id*.

[5689] *Id*.

The FRBNY discounted the value of Lehman's pool to account for these collateral transfers.[5690]   However, the FRBNY did not request that Lehman exclude this collateral from its reported liquidity pool.   In the words of one of the FRBNY's on-site monitors: "how Lehman reports its liquidity is between Lehman, the SEC, and the world."[5691]   In the same vein, FRBNY witnesses repeatedly stated that they were mindful that the FRBNY was not Lehman's "primary regulator" under the CSE program, and that the FRBNY was not monitoring Lehman with an eye toward compliance or enforcement.[5692]

### (8)   The SEC, Lehman's Primary Regulator, Was Unaware of the Extent to Which Lehman Was Including Clearing-Bank Collateral in Its Liquidity Pool; to the Extent It Was Aware, the SEC Did Not View This Practice as Proper

SEC statements concerning its monitoring of Lehman's reported liquidity are somewhat contradictory.   On the one hand, according to SEC personnel, the SEC did not monitor Lehman's liquidity pool from a "disclosure perspective;" instead, it monitored Lehman's liquidity internally by applying haircuts to assets in the liquidity pool that the SEC viewed as less than completely liquid in order to determine Lehman's

---

[5690] *See, e.g.,* e-mail from Arthur G. Angulo, FRBNY, to Jan H. Voigts, FRBNY (Aug. 20, 2008) [FRBNY to Exam. 033297] (discounting Citibank and JPMorgan collateral from Lehman's liquidity pool); e-mail from Arthur G. Angulo, FRBNY, to Timothy F. Geithner, FRBNY, *et al.* (Sept. 12, 2008) [FRBNY to Exam. 014855] (discounting Citibank and JPMorgan collateral from Lehman's liquidity pool); e-mail from Jan H. Voigts, FRBNY, to Timothy F. Geithner, FRBNY, *et al.* (Sept. 13, 2008) [FRBNY to Exam. 000709] (discounting value of liquidity pool by subtracting amount of collateral allocated to clearing banks).

[5691] Examiner's Interview of Jan H. Voigts, Oct. 1, 2009, at p. 7.

[5692] Examiner's Interview of Treasury Secretary Timothy F. Geithner, Nov. 24, 2009, at p. 4 (repeatedly emphasizing that the SEC, not the FRBNY, was Lehman's primary "supervisor"); Examiner's Interview of Arthur G. Angulo, Aug. 12, 2009, at pp. 3-4.

overall capital position.[5693]  Further, in meetings with the Examiner, the SEC stated it had little authority to regulate CSE behavior with respect to liquidity practices.[5694]  Yet, an internal February 20, 2008 SEC memorandum defines the SEC's mandate to inspect Lehman's liquidity pool broadly.  According to that memorandum:

> To verify the composition of assets that comprise parent company liquidity, the [SEC's Trading and Markets Division] staff will identify all components of liquidity held by, or available to, the parent company without any restrictions.
>
> . . .
>
> Once the pool of assets is defined, the staff will sample the pool to confirm, among other things, the existence of the assets, the legal entity with rights to the assets, that the assets are liquid, and that the assets are available to the parent without restriction.[5695]

The memorandum further states that the SEC's "primary focus will be to verify that [non-cash assets in the liquidity pool] may be monetized quickly and that the cash proceeds are available to the parent company immediately, usually within twenty-four

---

[5693] Examiner's Interview of SEC staff, Aug. 24, 2009, at p. 10.

[5694] *Id.* at p. 12.

[5695] Memorandum from Phillip Minnick, SEC, *et al.*, to Erik Sirri, SEC, *et al.*, re: Parent Company Liquidity Inspections Scope Memorandum for the Consolidated Supervised Entities ("CSE") (Feb. 20, 2008), at p. 1 [LBEX-WGM 017294].  In his interview with the Examiner, former SEC Assistant Director of Trading and Markets, Matthew Eichner, shed additional light on this document.  In early 2007, the SEC determined that it should hire staff whose sole responsibility was to examine CSE firms' liquidity.  The SEC finished hiring staff in late 2007, and the program went live in early 2008.  This memorandum defined procedures for the just-hired staff to follow for parent company liquidity inspections.  Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 5.  The SEC later asserted that the memorandum does not "establish Commission guidelines or policy," rather, the SEC clarifies, it "defined the scope of the upcoming liquidity pool inspection to be performed at CSE firms."  Letter from Samuel M. Forstein, SEC, to Robert L. Byman, Jenner & Block (Jan. 29, 2010) (on file with the Examiner).  The SEC did confirm that "the CSE inspections staff was asked to verify (1) the composition of assets that comprise liquidity held by the parent company, [and] (2) the mechanism for immediate monetization of non-cash assets . . . ." *Id.*

hours."[5696]    According to former SEC Assistant Director for Trading and Markets Matthew Eichner, the SEC conveyed this "twenty-four hours" standard to Lehman, although Eichner could not recall who at the SEC conveyed it, or when.[5697]   That this standard was conveyed, however, is confirmed by the fact that the SEC's memo was produced to the Examiner by Weil, Gotshal & Manges, counsel for the Debtors, and therefore was in Lehman's custody.[5698]

The SEC acted upon its authority to verify the contents of the liquidity pool at certain times.  The SEC analyzed Lehman's liquidity pool critically, identified assets in the pool that should not have been there, and directed Lehman to remove those assets. For example, in 2005 the SEC identified and objected to the inclusion of a certain $1.5 billion bank facility.[5699]  Further, Tonucci told the Examiner that the SEC requested that Lehman remove a certain "Aegis" commercial paper (backstopped by Lloyds of London) from its liquidity pool in late 2007 or early 2008, and that Lehman did so.[5700]

---

[5696] Memorandum from Phillip Minnick, SEC, *et al.*, to Erik Sirri, SEC, *et al.*, re: Parent Company Liquidity Inspections Scope Memorandum for the Consolidated Supervised Entities ("CSE") (Feb. 20, 2008), at p. 2 [LBEX-WGM 017294].

[5697] Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 6.

[5698] The "LBEX-WGM" Bates prefix indicates that the document was produced to the Examiner by Weil, Gotshal & Manges**.**

[5699] SEC, Lehman Brothers Holdings, Inc. Report on Liquidity & Funding Risk Management (July 26, 2005), at p. 7 [LBEX-SEC 010903]**.**

[5700] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 25; *see* Lehman, Confidential Presentation To: U.S. Securities & Exchange Commission Liquidity & Funding 2007 Q4 Review (Jan. 18, 2008), at pp. 6-7 [LBHI_SEC07940_323589] (noting that Lehman agreed to remove a $1.5 billion committed facility from its liquidity pool in order to bring its definition of liquidity in line with that of the SEC, and noting that in the fourth quarter of 2007 that Lehman decided to remove the Aegis investments from its liquidity pool as well).

The SEC was aware that Lehman was including a cash deposit with Citibank in its liquidity pool. The SEC did not believe the deposit belonged in the pool, elevated the issue internally, and discounted the value of the deposit from its own calculations of Lehman's liquidity.[5701] Lehman, however, continued to include the Citi deposit in its reported liquidity pool.[5702] In August 2008, the SEC learned that JPMorgan wanted Lehman to post additional collateral, but was told by Tonucci that the posting would "not affect" the liquidity pool.[5703] The SEC was also aware of "grumblings" on September 12 that Lehman pledged an additional $5 billion to JPMorgan.[5704] The SEC was unaware of the August 26 and September 9, 2008 security agreements executed between LBHI and JPMorgan, however, which substantially expanded JPMorgan's power over collateral that Lehman simultaneously included in its liquidity pool.[5705]

Despite the SEC's knowledge of the inclusion of the Citi deposit and Lehman's September 12 pledge to JPMorgan, the SEC did not believe that there "were any strings attached" to Lehman's $34 billion liquidity pool as of September 12, 2008.[5706] Asked whether collateral pledged to clearing banks, even if putatively lien-free overnight, should have been included in the liquidity pool, the SEC stated that it would have been

---

[5701] Examiner's Interview of SEC Staff, Aug. 24, 2009, at p. 11.
[5702] *Id.*
[5703] *Id.*
[5704] *Id.*
[5705] *Id.*
[5706] *Id.*

inappropriate to include such assets in the liquidity pool.[5707]  Eichner, however, stated that he was "not sure" whether the SEC ever reached a "final view" concerning the propriety of intraday collateral in a firm's liquidity pool.[5708]

Moreover, Eichner stated, the SEC applied a "much different standard" to holding company liquidity pools than the companies themselves did.[5709]  Eichner characterized the SEC's standard as "narrower" than the standard to which the holding companies held themselves in public disclosures.[5710]  Additionally, he said that the SEC was "very comfortable living with a world where numbers in the public were the ones the firms worked out with their accountants," as opposed to the narrower numbers worked out by the SEC.[5711]

### (9) Certain Lehman Counsel Were Aware That Agreements with Its Clearing Banks Were Structured to Include Clearing-Bank Collateral in Its Liquidity Pool, but Disclaimed Knowledge Concerning What Assets Were Appropriate or Inappropriate for the Liquidity Pool

Lehman in-house counsel Andrew Yeung was involved in drafting security documentation with both JPMorgan and Bank of America.[5712]  Yeung recalled an exchange between himself and Fleming in which Fleming instructed Yeung to limit any lien in the August JPMorgan Security Agreement to the intraday period so that

---

[5707] *Id.*

[5708] Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 8.

[5709] *Id.* at p. 7.

[5710] *Id.*

[5711] *Id.*

[5712] Examiner's Interview of Andrew Yeung, May 14, 2009, at pp. 6-7.

Lehman would be able to characterize the collateral as lien-free for liquidity reporting purposes.[5713]  Yeung was unable to recall further exchanges on this topic, however, and stated that the liquidity reporting issue was not given much attention in the negotiation of the August and September JPMorgan agreements.[5714]  Yeung offered, however, that around the time that the August JPMorgan agreements were being documented, Lehman was negotiating agreements with other clearing banks with an eye toward preserving liquidity while simultaneously giving those banks increased security.[5715]  In particular, Yeung said that concerns regarding the preservation of liquidity were more pronounced in the context of Lehman's negotiations with Bank of America, culminating in the August 25, 2008 Security Agreement.[5716]  That security agreement, like the September 9, 2008 Security Agreement between Lehman and JPMorgan, included a provision allowing for the return of collateral upon three-days written notice.[5717]

Lehman Chief Legal Officer Thomas Russo was unaware that Lehman included clearing-bank collateral in its liquidity pool.[5718]  To the extent that Lehman did include such collateral in its liquidity pool, Russo had no opinion regarding the propriety of

---

[5713] *Id.* at p. 7.
[5714] *Id*.
[5715] *Id*.
[5716] *Id*.
[5717] *Id.* at pp. 7-8; *see* Security Agreement (Aug. 25, 2008) [LBEX-DOCID 000584] (containing three-day provision for the release of collateral).
[5718] Examiner's Interview of Thomas A. Russo, May 11, 2009, at p. 8.

Lehman's actions.[5719]   He further stated that he did not know what collateral was appropriate or inappropriate for inclusion in the pool and that he had no role in advising Lehman on this issue.[5720]

Andrew Keller, a partner at Simpson, Thacher & Bartlett, served as Lehman's disclosure counsel.   Mr. Keller recalled working on the liquidity portion of the September 10, 2008 earnings call.[5721]   He was not aware, however, of any collateral pledges, deposits or agreements, aside from the $500 million Bank of America deposit.[5722]   He was not aware that this deposit, or any other similar deposit or pledge, was included in Lehman's liquidity pool at the time of the earnings call, nor did he become aware at any point before his interview with the Examiner.   Mr. Keller said he could not recall any "significant issues or debates" regarding how to disclose Lehman's liquidity pool.[5723]

### (10) Lehman's Auditors Monitored Lehman's Liquidity Pool, but Viewed the Composition of the Pool as a Regulatory Issue

William Schlich, lead auditor for Ernst & Young's Lehman audit team, represented to the Examiner that he was highly involved in monitoring Lehman's

---

[5719] *Id.*

[5720] *Id.*

[5721] Examiner's Interview of Andrew R. Keller, Jan. 6, 2010, at p. 2.

[5722] *Id.*

[5723] *Id.*

liquidity pool following Bear Stearns' near collapse in March 2008.[5724]  Schlich said he

wanted to know what Lehman was telling its regulators, specifically whether Lehman

was rolling its repos or whether counterparties were backing away.[5725]  Asked whether

Ernst & Young was aware of or had concerns with Lehman's inclusion of certain assets,

such as the Citibank deposit or JPMorgan's intraday collateral, in its liquidity pool,

Schlich stated that the composition of the liquidity pool was a "regulatory issue."[5726]

Rather, Ernst & Young's focus was whether Lehman could fund its balance sheet on a

daily basis and, if not, whether the firm had a contingency plan.[5727]

> **(11) There Is Insufficient Evidence To Support a Determination
> That Any Officer or Director Breached a Fiduciary Duty in
> Connection With the Public Disclosure of Lehman's Liquidity
> Pool**

It is not within the scope of his mandate and the Examiner expresses no view as

to whether or not the disclosures made by Lehman about the size and composition of its

liquidity pool might give rise to causes of action.  The Examiner did consider whether

any officer or director breached a fiduciary duty by acting with actual or constructive

knowledge to cause Lehman to make misleading statements about liquidity and

thereby potentially expose Lehman to causes of action by third parties.

---

[5724] Ernst & Young Presentation to the Examiner, Sept. 16, 2009 (held at Ernst & Young's request to provide the Examiner with an overview of Ernst & Young's role as Lehman's external auditor).
[5725] *Id.*
[5726] *Id.*
[5727] *Id.*

Given that: (1) there are no definitive standards or requirements for reporting a liquidity pool; (2) there are no definitive standards or requirements for what should or should not be included in a liquidity pool; (3) the SEC and FRBNY had some knowledge of Lehman's inclusion of questionable components in its reported pool but did not direct Lehman to make any disclosure or corrective statement; (4) the amount of questionable components in the reported pool did not become a significant portion of the reported total until late August 2008; and (5) the individual who publicly reported the amount of the liquidity pool after that time may validly assert reliance upon others for the accuracy of the information he recited, the Examiner finds insufficient evidence to support a determination that any officer or director breached a fiduciary duty in connection with the reporting of Lehman's liquidity pool.

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                            :
In re                                       :   Chapter 11 Case No.
                                            :
LEHMAN BROTHERS HOLDINGS INC.,              :   08-13555 (JMP)
*et al.,*                                   :
                                            :   (Jointly Administered)
                              Debtors.      :
------------------------------------------------------------ x


# REPORT OF
# EXAMINER ANTON R. VALUKAS


## Section III.A.6: Government

# TABLE OF CONTENTS

6.   The Interaction Between Lehman and the Government ............................ 1482

    a)   Introduction ............................................................ 1482

    b)   The SEC's Oversight of Lehman .......................................... 1484

    c)   The FRBNY's Oversight of Lehman ....................................... 1494

    d)   The Federal Reserve's Oversight of Lehman ......................... 1502

    e)   The Treasury Department's Oversight of Lehman .............. 1505

    f)   The Relationship of the SEC and FRBNY in Monitoring
        Lehman's Liquidity .................................................. 1507

    g)   The Government's Preparation for the "Lehman Weekend"
        Meetings at the FRBNY .......................................... 1516

    h)   On the Evening of Friday, September 12, 2008, the Government
        Convened a Meeting of the Major Wall Street Firms in an
        Attempt to Facilitate the Rescue of Lehman ......................... 1523

    i)   Lehman's Bankruptcy Filing ................................................ 1535

### 6. The Interaction Between Lehman and the Government

#### a) Introduction

In the course of the Examiner's investigation, it became clear that an analysis of Lehman's survival strategies, its liquidity, its collateral pledges and the events leading to the bankruptcy filing must include a discussion of the interaction between Lehman and the Government agencies that regulated and oversaw Lehman. For example, when the Examiner questioned Lehman executives and other witnesses about Lehman's financial health and reporting, a recurrent theme in their responses was that Lehman gave full and complete financial information to Government agencies, and that the Government never raised significant objections or directed that Lehman take any corrective action. To test that assertion, and to understand the events leading to Lehman's bankruptcy filing, the Examiner had to analyze the role of the agencies.

At the highest levels, each of these agencies recognized – as early as 2007 but certainly by mid-March 2008, after the Bear Stearns near collapse – that Lehman could fail.[5728] Treasury Secretary Paulson, Fed Chairman Bernanke, FRBNY President Geithner and SEC Chairman Cox all had direct communication with Fuld. The day

---

[5728] Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at p. 5 (noting that after Bear Stearns nearly collapsed, the Government focused on the stability of investment banks, and that Lehman was seen as particularly vulnerable); Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 3 (noting concerns with Lehman throughout 2008, particularly around the time of Bear Stearns' near collapse, and that Lehman was viewed as the next-most vulnerable after Bear); Examiner's Interview with Henry M. Paulson, Jr., June 25, 2009, at p. 11 (noting that Paulson was particularly concerned with Lehman after Bear's near collapse and thus urged Lehman CEO Dick Fuld to raise capital or arrange for an investment by or sale to a third party).

after Bear Stearns Weekend, teams of Government monitors from the SEC and FRBNY were dispatched to and took up residence at Lehman to review and monitor its financial condition.[5729]

The SEC monitored Lehman as the company's primary regulator under the "Consolidated Supervised Entities" ("CSE") Program. Chief among the SEC's regulatory obligations was its responsibility to monitor and verify the contents of Lehman's liquidity pool.[5730] The FRBNY served as a lender to Lehman under the Fed's discount window, which became available to broker-dealers after Bear Stearns' near collapse. In this capacity, the FRBNY lent billions of dollars to Lehman secured by certain of Lehman's assets. Other Government entities, including the Department of the Treasury and the Federal Reserve, also had oversight authority over Lehman.

Although various Government agencies had information that raised serious questions about Lehman's reported liquidity and about the sufficiency of its capital and liquidity to withstand stress scenarios, the agencies generally limited their activities to collecting data and monitoring.

---

[5729] Examiner's Interview of Arthur G. Angulo, Aug. 12, 2009, at p. 2; Examiner's Interview of Jan H. Voigts, Aug. 25, 2009, at pp. 2-3.

[5730] Memorandum from Phillip Minnick, SEC, *et al.*, to Erik Sirri, SEC, *et al.*, re: Parent Company Liquidity Inspections Scope Memorandum for the Consolidated Supervised Entities (Feb. 20, 2008), at p. 1 [LBEX-WGM 017294] (defining the scope of the SEC's inspection of CSE liquidity, and directing the SEC to inspect CSE liquidity pools).

### b) The SEC's Oversight of Lehman

### (1) The CSE Program

The FRBNY, the Federal Reserve, and the Treasury Department all viewed that the SEC was Lehman's primary regulator.[5731] The SEC has statutory authority over broker-dealers such as LBI, but its authority over LBHI as the holding company is voluntary, not statutory.

In 2003, the European Union ("EU") issued the Financial Conglomerates Directive, which required that financial conglomerates operating within the EU be supervised either under EU financial regulations or by a set of substantially equivalent rules.[5732] The major investment banks preferred SEC regulation to EU regulation. The Gramm-Leach-Bliley Act of 1999 had created a void in the regulation of systemically-important large investment bank holding companies.[5733] Neither the SEC nor any other agency was given statutory authority to regulate such entities. To fill this regulatory

---

[5731] Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at p. 4 (Bernanke noted that the SEC – not the Fed – was Lehman's regulator); Examiner's Interview of Timothy F., Geithner, Nov. 24, 2009, at p. 4 (Geithner told the Examiner that the SEC - not the FRBNY - was Lehman's primary regulator); Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 8 (Paulson explained that the SEC – not Treasury – bore primary responsibility for regulating Lehman); SEC/FRBNY, Memorandum of Understanding Between the United States Securities and Exchange Commission and the Board of Governors of the Federal Reserve System Regarding Coordination and Information Sharing in Areas of Common Regulatory and Supervisory Interest (July 7, 2008), at p. 4 (Memorandum of Understanding between the SEC and FRBNY stating that the SEC is the "primary supervisor" of the CSEs).

[5732] Examiner's Interview with the SEC staff, Aug. 24, 2009, at p. 3.

[5733] SEC, Press Release, Chairman Cox Announces End of Consolidated Supervised Entities Program (Sept. 26, 2008).

gap, the SEC created the Consolidated Supervised Entities ("CSE") Program in 2004.[5734]

The CSE Program was technically voluntary: holding companies that agreed to the

SEC's supervision on a consolidated basis received an exemption from the SEC's net

capital rule in exchange for agreeing to submit to CSE regulation, but the firms

remained free to comply with the net capital rule and withdraw from CSE

supervision.[5735] The consequence of withdrawal would have been EU regulation,

however, so as a practical matter the firms had little choice but to submit to CSE

regulation.[5736] Goldman Sachs, Morgan Stanley, Bear Stearns, Merrill Lynch, and

Lehman Brothers all opted into the CSE Program and became supervised consolidated

entities.[5737]

The CSE Program was designed to protect broker-dealers affiliated with CSEs

from collapse.[5738] Unlike commercial banks that could access income streams from

customer deposits, the CSE investment banks were completely dependent on the credit

---

[5734] *Id.*

[5735] *Id.* Since the net capital rule required only $5 billion of capital, compliance was not an issue for the CSE firms.

[5736] Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 4 (noting that CSEs had strong incentives to join the CSE Program due to EU regulations).

[5737] Examiner's Interview of SEC staff, Aug. 24, 2009, at pp. 3-4.

[5738] *Id.* at p. 4. Former SEC Chairman Christopher Cox explained to Congress that the purpose of the CSE Program was "to monitor for, and act quickly in response to, financial or operational weakness in a CSE holding company or its unregulated affiliates that might place regulated entities . . . or the broader financial system, at risk." *The State of the United States Economy and Financial Markets: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 110th Cong. 2 (2008) (Statement of Christopher Cox, Former SEC Chairman). Cox told the Examiner that the SEC's authority was limited to the broker-dealer, and that when he told Congress that the purpose of the CSE Program was to act quickly, he meant to act quickly with respect to the broker-dealer entity. Examiner's Interview of Christopher Cox, January 8, 2010, at p. 6.

markets for funding and did not enjoy backup protection from the Federal Deposit Insurance Corporation. As a result, liquidity risk was the SEC's foremost concern under the CSE Program.[5739]

The CSE Program gave the SEC the right to inspect.[5740] The SEC's oversight was particularly focused on the firms' liquidity and risk-management monitoring functions.[5741] Although the SEC did not develop a formula of rigid filing requirements, it did require the firms to satisfy a number of liquidity and risk-management related conditions. CSEs were required to implement liquidity models that ensured a level of liquidity sufficient to sustain themselves on a stand-alone basis for a minimum of one year without access to unsecured funding and without having to liquidate a substantial position.[5742] Assets in the firms' liquidity pools needed to be funded and accessible without regulatory interference or other impediments.[5743]

Each CSE was also required to maintain and document a system of internal controls for risk-management purposes. The CSEs' internal controls needed to be approved by the SEC prior to their implementation and the firms were required to submit to regular monitoring of their internal control mechanisms. The CSE Program

---

[5739] Examiner's Interview of SEC staff, Aug. 24, 2009, at p. 10.

[5740] *Id.* at p. 4.

[5741] *Id.*

[5742] *Id.*

[5743] *Id.*

required the firms to conduct regular market-based and liquidity-related stress testing.[5744]

### (2) Lehman's Participation in the CSE Program

Lehman became a CSE participant in 2005.[5745]  The SEC found Lehman to be "highly cooperative," and the regulators received "everything they asked for."[5746]  Even before mid-March 2008, when SEC staff periodically inspected Lehman on-site, the SEC staff met frequently with Lehman risk managers, internal auditors and financial personnel.  A primary focus of the SEC was liquidity and the composition of Lehman's liquidity pool.[5747]

Although the SEC staff scrutinized both the size of and ability to monetize the pool, it did not look at Lehman's liquidity pool from a disclosure perspective.[5748]  Instead, the SEC applied discounts to the assets that it viewed as less than completely liquid, or "easy to monetize," to assess Lehman's overall capital position.[5749]  The SEC did not, however, suggest or demand that Lehman take similar haircuts when it publicly disclosed the amount of its pool.[5750]

---

[5744] *Id.*

[5745] *Id.* at p. 5.

[5746] *Id.*

[5747] *Id.* at p. 10.

[5748] *Id.*

[5749] Examiner's Interview of SEC staff, Aug. 24, 2009, at p. 11.

[5750] *Id.* (the SEC discounted the Citibank deposit from the value of Lehman's liquidity pool; the SEC was not aware, however, of the other clearing bank pledges and deposits Lehman included in the pool).

For example, in June 2008, the SEC became aware that Lehman included in its liquidity pool a multi-billion dollar deposit that Lehman had made with Citigroup as a precondition of continued banking relations.[5751]  Because the deposit could not be withdrawn without adverse effects upon Lehman's day-to-day business, the SEC staff disagreed with Lehman's view that the deposit was properly included in the liquidity pool.  Accordingly, the SEC staff discounted that amount for its own assessments of Lehman's liquidity.[5752]  The SEC did not, however, take any action to require Lehman to remove the deposit from the amount it continued to report publicly.

Liquidity was an important factor in the stress testing that Lehman was required to run under the CSE Program.  After March 2008 when the SEC and FRBNY began on-site daily monitoring of Lehman, the SEC deferred to the FRBNY to devise more rigorous stress-testing scenarios to test Lehman's ability to withstand a run or potential run on the bank.[5753]  The FRBNY developed two new stress scenarios:  "Bear Stearns" and "Bear Stearns Light."[5754]  Lehman failed both tests.[5755]  The FRBNY then developed a

---

[5751] *Id*.  Although the SEC believed that Lehman had deposited $5 billion with Citigroup, the actual amount of the deposit was $2 billion. *See* Section III.A.5.c of this Report, which discusses Lehman's dealing with Citigroup. The SEC later stated that this was an inaccurate recollection on the part of an SEC staffer and further stated that SEC was aware that the correct size of the deposit was $2 billion. SEC, References to SEC (Jan. 29, 2010), at p. 11.

[5752] Examiner's Interview of SEC staff, Aug. 24, 2009, at p. 11.

[5753] *Id*.  The regulators used different stress tests for risk and liquidity.  *See* Section III.A.1 of this Report, which discusses risk management and risk stress tests.

[5754] William Brodows, *et al.*, FRBNY, Primary Dealer Monitoring: Initial Assessment of CSEs (May 12, 2008), at p. 9 [FRBNY to Exam. 000017] (describing the framework for both the "Bear" and "Bear Light" scenarios).

new set of assumptions for an additional round of stress tests, which Lehman also failed.[5756]   However, Lehman ran stress tests of its own, modeled on similar assumptions, and passed.[5757]  It does not appear that any agency required any action of Lehman in response to the results of the stress testing.

The SEC recognized in 2007 that there were potential asset-valuation problems across the investment banking industry.[5758]   SEC staff reviewed Lehman's asset valuations to ensure that the firm maintained an independent price valuation function that complied with various CSE reporting requirements.  Lehman's valuation problems were more pronounced than those of other firms because its exposure to commercial real estate and Alt-A mortgages was larger than that of any of the other CSE firms.[5759]

In January 2008, the SEC began an inspection of valuation procedures in all of the CSE firms to ensure that the firms were complying with internal controls, to compare procedures across the five firms and to provide feedback to the firms.[5760]   The SEC inspection revealed significant problems at Lehman.  The SEC found that Lehman's

---

[5755] *Id.* at p. 10 (showing that Lehman would need to raise $84 billion to survive a "Bear" run on the bank, and $15 billion to survive a "Bear Light" liquidity event).

[5756] FRBNY, Primary Dealer Monitoring: Liquidity Stress Analysis (June 25, 2008 (Revised June 26, 2008)), at pp. 3, 5 [FRBNY to Exam. 000033] (concluding that Lehman required $15 billion in additional liquidity to survive a liquidity stress event on this test's revised assumptions).

[5757] *See, e.g.,* Lehman, Presentation to the Federal Reserve & SEC: Updated Stressed Liquidity Scenario (July 2, 2008), at p. 9 [LBHI_SEC07940_348894] (showing that Lehman would survive the stress test with $13.1 billion in excess cash).

[5758] Examiner's Interview of SEC staff, Aug. 24, 2009, at p. 13.

[5759] *Id.*

[5760] *Id.*

Price Valuation Group was understaffed; and it found that Lehman's asset pricing function was overly "process driven."[5761]   But the SEC did not release its findings or formally present them to Lehman prior to Lehman's demise.

### (3)  The SEC/OIG Findings

On April 2, 2008, Iowa Senator Charles E. Grassley requested the SEC Office of Inspector General ("SEC/OIG") to analyze the SEC's oversight of the CSE Program in the wake of Bear Stearns' near collapse.   The SEC/OIG released its audit report on September 25, 2008, shortly after Lehman had filed for bankruptcy,[5762] but the report was circulated in draft form during the summer of 2008 and was reviewed by the CSE staff.[5763]

The SEC/OIG Report was critical of the SEC's regulation of Bear Stearns in particular and the CSE Program in general.   The Report found that the SEC knew Bear Stearns had high leverage, had insufficient capital, and held an excessive volume of mortgage-backed securities; yet the SEC had taken no action to require a change in the firm's policies, despite the many potential red flags of excessive risk evident at Bear Stearns.[5764]

---

[5761] Notably, no one at the SEC ever saw any evidence suggesting that Lehman managed its valuations based on predetermined balance sheet targets.  *Id*. at p. 14.

[5762] SEC/OIG, SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program, Rpt. No. 446-A (Sept. 25, 2008).

[5763] Examiner's Interview of Christopher Cox, Jan. 8, 2010, at p. 14.

[5764] SEC/OIG, SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program, Rpt. No. 446-A (Sept. 25, 2008) at p. ix.

The SEC/OIG questioned why the SEC imposed no leverage ratio limit on CSE firms such as Bear Stearns.[5765]  The SEC/OIG noted that the SEC had also been aware of deficiencies in Bear Stearns' risk management but did not require changes.[5766]  The SEC/OIG concluded that the SEC's capital requirements for CSEs were inadequate.[5767]  The SEC/OIG Report found the SEC's liquidity requirements for CSEs to be unrealistically low.[5768]

At the time of Bear Stearns' near collapse in March 2008, it was widely thought at the highest levels of every relevant Government agency that Lehman could be the next investment bank to fail.[5769]  Lehman's business model was markedly similar to Bear Stearns': high leverage, low capitalization, and a concentration of assets in illiquid

---

[5765] The CSE Program did not impose leverage ratio limits.  The SEC/OIG Report emphasized Bear Stearns' high gross leverage ratio – 33:1 – at the time of its near collapse.  The Report observed that high leverage can both cause a loss of liquidity during a financial crisis and adversely influence market confidence in a highly leveraged firm.  *Id.* at pp. x, 19-20.

[5766] The SEC/OIG found that, based upon the experience of Bear Stearns' U.K. mortgage originator subsidiary in the second quarter of 2006, the SEC had identified the risks that arose in the subprime crisis in the U.S. less than a year later.  Yet the SEC did not apply pressure to Bear Stearns to reduce its subprime exposure.  *Id.* at pp. x, 18, 21-22, 25.

[5767] The SEC/OIG found no evidence that the SEC required Bear Stearns to take increased charges to capital for its positions in stressed repos.  *Id.* at pp. 11-13, 30-32.

[5768] *Id.* at pp. 14-15.

[5769] Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at p. 5 (noting that after Bear Stearns nearly collapsed, the Government focused on the stability of investment banks, and that Lehman was seen as particularly vulnerable); Examiner's Interview of Christopher Cox, Jan. 8, 2010, at pp. 7-8 (following the near collapse of Bear Stearns, liquidity concerns made Lehman the SEC's "number one focus"); Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 3 (noting concerns with Lehman throughout 2008, particularly around the time of Bear Stearns' near collapse, and that Lehman was viewed as the next-most vulnerable after Bear); Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 11 (noting that Paulson was particularly concerned with Lehman after Bear nearly collapsed and urged Fuld to raise capital or arrange for an investment by or sale to a third party).

investments such as subprime or Alt-A mortgages.[5770]  The Examiner asked the CSE staff whether it modified its approach to Lehman or directed any action by Lehman in light of the SEC/OIG proposed findings that it saw in summer 2008.  The CSE officer in charge of Lehman responded that the SEC did not take any action:  "We were tied to the mast here; the opportunities for re-engineering were quite limited, and to imply otherwise is wrong."[5771]

### (4)  The View From the Top

The Examiner interviewed former SEC Chairman Christopher Cox, who related that the investment banking industry was "increasingly viewed as precarious" in 2008 and, as a result, all investment banks were a concern for the SEC.[5772]  The SEC focused on increasing capital and liquidity for all investment banks.[5773]  The SEC had some success in that Bear Stearns increased its liquidity, but not enough to survive.  Cox did not think there was any liquidity number large enough to withstand a run on the bank: "There's no amount of liquidity that can protect you from an indefinite run."[5774]  After

---

[5770] Jenny Anderson, *At Lehman, Allaying Fears About Being the Next to Fall*, N.Y. Times, Mar. 18, 2008 (noting similarities between Bear Stearns' and Lehman's business models, in particular their common reliance on short-term financing and the mortgage market).
[5771] Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 14.
[5772] Examiner's Interview of Christopher Cox, Jan. 8, 2010, at p. 7.
[5773] *Id.*
[5774] *Id.*

Bear Stearns was sold to JPMorgan in March 2008, "Lehman became the number one focus."[5775]

Before Bear, Cox believed that he should not "hobnob" with the CEOs of regulated entities. He explained that the SEC might have to investigate those firms, or they might already be under investigation, and Cox did not want his communications to have any influence on those investigations.[5776] But Cox deliberately changed that approach after the near collapse of Bear Stearns.[5777] He told the Examiner: "Things were moving too fast" to observe careful protocols.[5778]

Beginning in March, 2008, Cox had direct calls with Fuld every couple of weeks, generally on two issues: (1) Fuld's desire that the SEC deal with short sellers, and (2) Lehman's plans with respect to SpinCo.[5779]

The Examiner asked Cox whether, in hindsight, he believed that the SEC could have done anything different that might have saved Lehman. Cox responded that many analysts have wondered why Fuld did not sell Lehman at a lower price, or take other actions to save Lehman earlier than he did.[5780] Cox said that "it came as a surprise [to Lehman] that the Government would not financially participate," and he believed

---

[5775] *Id.* at p. 8.

[5776] *Id.*

[5777] *Id.* at p. 9.

[5778] *Id.*

[5779] *Id.* SpinCo, and other of Lehman's survival strategies, are discussed in Section III.A.3.

[5780] Examiner's Interview of Christopher Cox, Jan. 8, 2010, at p. 20.

that the Government's unwillingness to make a commitment to Lehman "entered into the FSA's judgment" in deciding not to approve a Barclays-Lehman deal.[5781]  Although he said that he has no criticism of any agency, Cox stated that no statutory framework existed on September 14, 2008, that allowed the Government to help Lehman in a material way.[5782]  Yet, Cox said, "I think people would have behaved differently if they were not expecting the Government to do something.  In the end, the fact that there was no Government contribution made it impossible to get across the finish line."[5783]  Further, Cox stated: "Maybe if the message could have been provided [that no Government funding existed] more than a week before [the bankruptcy], people might have ordered their affairs differently if they had known what was going to happen."[5784]

### c)   The FRBNY's Oversight of Lehman

Timothy Geithner, current Secretary of the Treasury and then-President of the FRBNY, developed serious concerns about Lehman as early as August 2007.[5785]  The concerns grew in 2008, particularly in March after Bear Stearns nearly collapsed.[5786]

---

[5781] *Id.*

[5782] *Id.*

[5783] *Id.*

[5784] *Id.*  Note however, that Secretary Paulson never promised Fuld Government assistance for Lehman. Examiner's Interview with Henry M. Paulson, Jr., June 25, 2009, at p. 17; Examiner's Interview with Richard S. Fuld, Jr., Sept. 30, 2009, at p. 21.

[5785] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 3.

[5786] *Id.*

After Bear, Geithner viewed Lehman as the most exposed investment bank, with Merrill Lynch a distant second.[5787]

The problem was far broader than Lehman.[5788]  Through the summer of 2008, it became clear to Geithner that the recession was building in magnitude and that it was going to imperil a range of institutions.[5789]  Geithner became worried that the economic crisis was a gathering storm that "was getting away from us" and that it could "escalate in terms of force and we might not be able to contain it."[5790]  Even so, "everyone got it wrong by underestimating the scale of the problem."[5791]

In March 2008, the FRBNY installed teams of monitors at Lehman, not as a regulator but as a potential lender.[5792]  The FRBNY on-site analysts received real-time data on Lehman's liquidity and capital position through formal and informal channels at the firm, and synthesized this data in comprehensive daily reports distributed

---

[5787] *Id.*; Examiner's Interview of Arthur G. Angulo, Aug. 12, 2009, at p. 5 (FRBNY analysts viewed Lehman as the next-most vulnerable firm after Bear Stearns nearly collapsed); Examiner's Interview of Jan H. Voigts, Aug. 25, 2009, at p. 3 n.3 (FRBNY viewed Lehman as "the weakest of the pack" following Bear Stearns' collapse).

[5788] Examiner's Interview of Jan H. Voigts, Aug. 25, 2009, at p. 3 (while Lehman was perceived to be weak, it was not "idiosyncratic" in this regard; rather Lehman was "symptomatic" of more structural problems in the financial sector around this time).

[5789] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 3.

[5790] *Id.*

[5791] *Id.*; Examiner's Interview of Jan H. Voigts, Aug. 25, 2009, at pp. 5-6 (stating that the FRBNY did not fully appreciate the consequences of a bankruptcy by Lehman's holding company).

[5792] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 4 (FRBNY monitored Lehman as a potential lender under the TSLF and PDCF programs); Examiner's Interview of Arthur G. Angulo, Aug. 12, 2009, at p. 2 (FRBNY monitored Lehman as a prospective lender); Examiner's Interview of Jan H. Voigts, Aug. 25, 2009, at pp. 2-3 (same).

throughout the FRBNY.[5793]  Geithner participated in several meetings with Lehman and other investment banks to "understand where [the investment banks] were [with capital and liquidity], and where they were going, and pull them to a more conservative place regarding capital and liquidity."[5794]  Geithner was "consumed" with the "challenge to figure out how to make [Lehman] get more conservatively funded."[5795]

Although the SEC and FRBNY had equal access to the same data and Lehman personnel, the two agencies did not necessarily share their conclusions and analyses with one another.[5796]  Indeed, because of what Bernanke described as "tricky" issues, he and Cox became directly involved in the negotiation of a formal Memorandum of Understanding ("MOU") that would allow the exchange of information between the two agencies.[5797]  The MOU was not executed until July 2008.[5798]  Yet even with the MOU

---

[5793] See, e.g., FRBNY, Lehman IB Update (Aug. 27, 2008) [FRBNY to Exam. 007968] (a representative FRBNY daily report analyzing Lehman's liquidity pool, the status of Lehman's secured and unsecured funding, intraday funding, stock price, clearing bank actions, and significant stories about Lehman circulating in the press).

[5794] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 4.

[5795] Id.

[5796] Examiner's Interview of Jan H. Voigts, Aug. 25, 2009, at p. 3 (the FRBNY and SEC did not often share their conclusions in the course of monitoring Lehman's liquidity).

[5797] Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at p. 7.  Bernanke described the "tricky" aspects of the MOU as whether, for example, the SEC could use information shared by the FRBNY to undertake an investigation.  Bernanke did not state whether there had been any resolution to this issue.

[5798] SEC/FRBNY, Memorandum of Understanding Between the United States Securities and Exchange Commission and the Board of Governors of the Federal Reserve System Regarding Coordination and Information Sharing in Areas of Common Regulatory and Supervisory Interest (July 7, 2008).

in place, FRBNY witnesses noted that they did not receive all the documents they requested from the SEC in connection with Lehman's liquidity.[5799]

Certain FRBNY on-site personnel expressed the view to the Examiner that the SEC on-site personnel did not have the background or expertise to adequately evaluate the data they were given.[5800]

Geithner had a number of telephone conversations with Fuld around the time of Bear Stearns' near collapse, Lehman's announcement of its second quarter 2008 earnings and the days leading up to Lehman's bankruptcy. The calls centered around three topics: (1) Geithner repeatedly informed Fuld that the "Government cannot solve this problem for you;" and, therefore, (2) Lehman needed to raise more capital; or (3) form a strategic alliance with another entity with a stronger balance sheet.[5801] Geithner also spoke with Fuld about Fuld's proposal that Lehman become a bank holding

---

[5799] Examiner's Interview of Jan H. Voigts, Oct. 1, 2009, at p. 7 (noting that the FRBNY did not receive certain SEC analyses regarding CSE commercial real estate positions and CSE liquidity pools despite asking for such information); Examiner's Interview of Arthur G. Angulo, Aug. 12, 2009, at p. 3 (noting that the MOU was "not significant").

[5800] Examiner's Interview of Arthur G. Angulo, Aug. 12, 2009, at p. 3 (noting that the SEC lacked sufficient staff and sufficient time to analyze Lehman "in-depth"); Examiner's Interview of Thomas C. Baxter, Jr., Aug. 31, 2009, at pp. 2, 5 (the "primary weakness" of the CSE Program was "SEC understaffing" and the lack of "higher-level skill sets" for SEC staffers). Those views percolated to the top. Bernanke observed that the Fed had "some skepticism and concern about the SEC's capacity, going back to Bear, where they were blindsided to a significant extent there as well." Bernanke was careful not to assign blame or fault, but observed that the SEC was "in over [its] head." Examiner's Interview with Ben S. Bernanke, Dec. 22, 2009, at p. 8. Chairman Cox countered the suggestion that SEC personnel were not competent by pointing out that other agencies, including Treasury and the Fed, hired them away. Examiner's Interview of Christopher Cox, Jan. 8, 2010, at pp. 19-20.

[5801] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at pp. 5-6.

company.  Geithner viewed that as "gimmicky:"  "You can't solve a liquidity/capital problem by becoming a bank holding company."[5802]

Geithner believed that Fuld understood by July 2008 that Lehman required "a very substantial and expensive change" to survive.[5803]  Geithner told the Examiner: "There is always some hope and denial in these things," but that it had appeared Fuld was attempting to find solutions with due urgency.[5804]  The fundamental difficulty facing Lehman was timing.  Lehman needed to persuade an investor (or investors) to buy into Lehman just at the time when the souring economy made potential investors highly skittish about absorbing more risk.[5805]

FRBNY witnesses uniformly emphasized to the Examiner that the SEC – not the FRBNY – was Lehman's primary regulator.[5806]  The FRBNY's role was as a potential lender, not a regulator; after Bear Stearns nearly collapsed, the FRBNY opened the discount window to investment banks such as Lehman, and thereby became a "rather

---

[5802] *Id.* at p. 6.

[5803] *Id.*

[5804] *Id.*

[5805] *Id.*

[5806] Examiner's Interview of Arthur G. Angulo, Aug. 12, 2009, at p. 3 (SEC, not the FRBNY, was Lehman's "main supervisor"); Examiner's Interview of Thomas C. Baxter, Jr., Aug. 31, 2009, at p. 4 (the SEC was "without question" Lehman's primary regulator); Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 4 (the SEC, not FRBNY, was Lehman's primary "supervisor"); Examiner's Interview of Jan H. Voigts, Aug. 25, 2009, at p. 2 (the SEC was Lehman's "primary regulator"); Examiner's Interview of William L. Rutledge, Aug. 27, 2009, at p. 4 (the SEC was "absolutely without question" the primary regulator of the CSEs).

late, reluctant creditor."[5807]  As such, the FRBNY monitored Lehman's liquidity profile to be well-positioned to lend to Lehman under its new liquidity facilities.[5808]  But the FRBNY, as an "interested creditor," worked with the SEC to "induce a series of behaviors regarding liquidity across the investment banks."[5809]

In advance of September 2008, the FRBNY was considering proactive measures to prevent, or mitigate, the collapse of major broker-dealers, and Lehman specifically. For example, in July 2008, FRBNY analysts presented Geithner with a proposal to provide intraday financing for broker-dealers via clearing banks in addition to providing overnight financing to broker-dealers via the PDCF.[5810]  In such a scenario, the FRBNY could "enter into a 'conditional' non-recourse loan with the clearing bank at the beginning of the day, collateralized by a cash claim on the dealer in question, and the associated collateral."[5811]  The clearing bank would then continue to extend credit to the dealer, and assuming the dealer survived the trading day, the clearing bank would then repay the FRBNY loan.[5812]  The FRBNY tailored this plan to Lehman's repo book,

---

[5807] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 4.

[5808] Examiner's Interview of Jan H. Voigts, Aug. 25, 2009, at p. 2.

[5809] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 4.  Indeed, the FRBNY worked with the SEC to produce the liquidity stress scenarios that urged Lehman to increase its liquidity and reduce reliance on overnight commercial paper and less-liquid repos. *See* FRBNY, Primary Dealer Monitoring: Liquidity Stress Analysis (June 25, 2008 (Revised June 26, 2008)), at p. 5 [FRBNY to Exam. 000038].

[5810] Memorandum from Lucinda Brickler, FRBNY, *et al.*, to Timothy F. Geithner, FRBNY, re Managing a Loss of Confidence in a Major Tri-party Repo Borrower (July 7, 2008), at p. 1 [FRBNY to Exam. 027043].

[5811] *Id.* at p. 2.

[5812] *Id.* The plan was designed to address the possibility of an investment bank such as Lehman Brothers "los[ing] [the] confidence of its investors or clearing bank," which would then "pull away from providing

applying haircuts to Lehman's available collateral, and arriving at an additional amount of collateral that Lehman would need, in order to realize the full pledge value of that collateral.[5813]

In July 2008, senior FRBNY official (and current FRBNY president) William Dudley proposed a plan "[v]ery much in the spirit of what we did with Bear" to extend to Lehman a "Maiden Lane type vehicle."[5814]  The "Maiden Lane" vehicle employed in Bear Stearns was a special purpose vehicle ("SPV") set up to induce JPMorgan to acquire Bear and to guarantee Bear's outstanding obligations; the FRBNY extended to JPMorgan a $30 billion non-recourse loan, collateralized by illiquid Bear assets.[5815] Under Dudley's proposal, this new "Maiden Lane type vehicle" would hold $60 billion in illiquid Lehman assets backstopped by $5 billion in Lehman equity.[5816]  The Fed would then "guarantee[] financing or finance [] the remaining $55 billion."[5817]  After removing the illiquid assets via the Maiden Lane SPV, a Clean Lehman ("Clean

---

intraday credit" – a result that would be "disastrous for the firm and also cast widespread doubt on [triparty repos] as a nearly risk-free, liquid overnight investment." *Id.*

[5813] *Id.* at pp. 4-8.  The proposal noted that such a plan would require further legal research.

[5814] E-mail from Timothy F. Geithner, FRBNY, to William Dudley, FRBNY (July 7, 2008) [FRBNY to Exam. 034332] (quoting and responding to Dudley's proposal).

[5815] FRBNY, Maiden Lane Transactions, *available at* http://www.newyorkfed.org/markets/ maidenlane.html.

[5816] E-mail from Timothy F. Geithner, FRBNY, to William Dudley, FRBNY (July 7, 2008) [FRBNY to Exam. 034332] (quoting and responding to Dudley's proposal).

[5817] *Id.*

Lehman") would remain. The FRBNY, in turn, would have an equity stake in Clean Lehman.[5818]

Dudley's plan, while taking "illiquid assets off the market," and "preserv[ing] Lehman franchise value," provided for "[p]rotections to the Fed" as well.[5819] Geithner responded that further thought was required on "how we decide what assets to take," and that any plan would require "high procedural hurdles."[5820]

Ultimately, the FRBNY decided not to extend a Maiden Lane-style vehicle to Lehman. Rather, during the weekend of September 12-14, 2008, the FRBNY convened meetings to encourage a consortium of Wall Street to finance Lehman's illiquid assets, with the intention of facilitating a sale of Lehman to Barclays or another buyer.[5821]

The Examiner asked Geithner whether, in hindsight, he believed that the FRBNY could have done anything different that might have saved Lehman. Geithner's answer was no. He noted that "the Government of the United States left too much of the burden on the Fed to contain [the damage], and it was too late to use the full arsenal of Government powers . . . If these [emergency statutory powers] had come earlier, we

---

[5818] *Id.*

[5819] *Id.* The plan's envisaged protections included interest from repayments to the FRBNY on the non-recourse loan, and equity in Clean Lehman. Dudley's plan also accounted for moral hazard, noting that the "[m]oral hazard considerations [would be low] given [the] equity dilution" involved for the salvaged investment bank. *Id.*

[5820] *Id.*

[5821] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at pp. 9-11.

could have made it somewhat less damaging."[5822]  However, Geithner noted that he would have opposed any effort to give Lehman or other investment banks earlier access to the Fed's liquidity facilities.  The challenge for the Government, and for troubled firms like Lehman, was to reduce risk exposure, and the act of reducing risk by selling assets could result in "collateral damage" by demonstrating weakness and exposing "air" in the marks.[5823]  Geithner said that the FRBNY had "to make sure that the system would be held together and that the strongest institutions would not be imperiled by the weakest."[5824]

### d) The Federal Reserve's Oversight of Lehman

Federal Reserve Chairman Bernanke agreed with Geithner that the SEC was Lehman's regulator and that the Fed had neither "direct [n]or indirect responsibility" for Lehman; nevertheless the Fed "followed [Lehman's] progress."[5825]

The Fed "became interested" in investment banks around the time that JPMorgan acquired Bear Stearns with the Fed's assistance in March 2008.  Bernanke believed Lehman was the next-most vulnerable investment bank after Bear Stearns.[5826]

---

[5822] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at pp. 9-10; *see, e.g.*, the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5201-61.
[5823] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 10.
[5824] *Id*.
[5825] Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at p. 5.
[5826] *Id*.

Although he viewed Lehman's $6 billion capital raise in June 2008 positively, he believed that Lehman was "still perceived as a weak institution."[5827]

Bernanke had frequent communications with Geithner and then-Secretary Paulson about Lehman. Bernanke noted that Paulson was "frustrated" and "dissatisfied" by Fuld's "more inertial behavior" with respect to raising capital and finding strategic partners.[5828] The Fed, the FRBNY and the Treasury department were "trying to pressure Fuld to be more aggressive," but the Fed was "very conscious" of its "appropriate role" given that the SEC was the regulator.[5829]

The Examiner asked Bernanke whether, in hindsight, he believed that he or the Fed could have done anything different that might have saved Lehman. Bernanke responded that he should have been more engaged in dealings with the U.K. about Barclays' pre-bankruptcy efforts to acquire Lehman.[5830] Nevertheless, Bernanke did not believe that the Fed had the legal authority to bail out Lehman in September 2008. He noted that a Federal Reserve Bank such as the FRBNY could make a loan only if it was satisfactorily secured, that is, that the bank could reasonably expect a 100 percent return.[5831] Bernanke said a "fundamental impediment" existed for Lehman: By mid-

---

[5827] *Id.*
[5828] *Id.* at p. 6.
[5829] *Id.*
[5830] *Id.* at p. 15.
[5831] *Id.* at 11.

September, Lehman lacked not just "standard" collateral, but "any" collateral.[5832] Lehman's tangible assets and securities fell "considerably short of the obligations that would come due."[5833] Bernanke believed that Lehman was insolvent by the week of September 8, 2008.[5834] Providing a loan to Lehman under those circumstances would be "lending into a run."[5835] If, as was the case, Lehman's collapse appeared imminent, a Federal Reserve loan would not stop the run; the collateral would run out before Lehman paid off all of the claims. Bernanke stated: "The assessment was that if there was a run, which there would be, the business value would be compromised, and all we would have accomplished would be to make counterparties whole and not succeed in preventing the collapse of the company."[5836]

Bernanke noted that, after passage of the TARP legislation, the Treasury had authority to inject capital directly into institutions: "If we had that [TARP] authority on September 14, we would have been able to save [Lehman], no question about it."[5837]

---

[5832] *Id.*

[5833] *Id.*

[5834] *Id.* at p. 13.

[5835] *Id.* at 11.

[5836] *Id.* at p. 12. In contrast, Bernanke explained, AIG had "considerable business value as reflected in its stock price." He stated that AIG had a large insurance company, which was a valuable asset and provided sufficient security for a loan. *Id.*

[5837] *Id.* at p. 13. The Examiner asked Bernanke if he could have made the case for TARP to Congress if Lehman had *not* failed. Bernanke responded: "Let me push back against any inference that we thought [Lehman] should fail in order to get the tools [to inject capital directly]." Bernanke was emphatic: "We never believed" that the Fed should let a major institution fail when it had the option to help. *Id.*

Bernanke told the Examiner: "I speak for myself, and I think I can speak for others, that at no time did we say, 'We could save Lehman, but we won't.' Our concern was about the financial system, and we knew the implications for the greater financial system would be catastrophic, and it was."[5838] According to Bernanke, a "range of views" existed about the likely effect of Lehman's failure on the economy. If the effect was measured on a scale of 0 to 100, some thought a Lehman failure would be a "minor disruption" – in the 1-15 range. Bernanke's own view was in the 90-95 range.[5839] However, the actual effect turned out to be "maybe 140."[5840] "It was worse than almost anybody expected."[5841]

### e) The Treasury Department's Oversight of Lehman

Like Geithner and Bernanke, then-Treasury Secretary Paulson considered the SEC to be Lehman's regulator.[5842]

---

[5838] *Id.* at p. 14.

[5839] *Id.*

[5840] *Id.*

[5841] *Id.*

[5842] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 8. The Office of Thrift Supervision ("OTS"), a division of Treasury, did have regulatory jurisdiction over Lehman's bank subsidiary, and in the course of that authority, issued a report in July 2008 that was critical of Lehman's risk procedures. *See* Ronald S. Marcus, OTS, Report of Examination Lehman Brothers Holdings Inc. (July 7, 2008), at pp. 1-2 [LBEX-OTS 000392]. The report concluded that Lehman had made an "outsized bet" on commercial real estate – larger than its peer firms, despite Lehman's smaller size. The report further concluded that Lehman was "materially overexposed," *id.* at p. 1, to the commercial real estate sector, which was experiencing deteriorating market conditions. *Id.* at p. 2. The report faulted Lehman for "major failings in its risk management process," and noted that Lehman had made its "outsized bet" in violation of established internal risk limits. *Id.* As a result, the report stated that shedding "a substantial portion" of these positions "may be key to the survival of LBHI as an independent firm." *Id.* It is unclear that any corrective course of action was ever directed or implemented following the issuance of the OTS Report.

Paulson told the Examiner that, in his view, the economic crisis started in August 2007 when two Bear Stearns hedge funds failed. Despite those failures, Paulson initially believed the economic effects of the subprime crisis were contained and would not infect the rest of the economy.[5843] Paulson did not fully appreciate the global reach of the economic crisis until October 2008.[5844]

Paulson first became concerned about Lehman in November 2007, when he heard about Lehman's purchase of the Archstone-Smith Trust and immediately perceived the decision as unwise, given the condition of the market.[5845] After Bear Stearns failed in March 2008, Paulson viewed Lehman as the next most vulnerable bank. Paulson repeatedly urged Fuld to raise capital, find a strategic partner or sell Lehman.[5846]

Paulson never promised Fuld or Lehman that the Government would provide Lehman financial assistance.[5847] Fuld confirmed that no promise was made; nevertheless, Fuld continued to hold the belief that the Government would not let Lehman fail.[5848]

---

[5843] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 2.
[5844] *Id.*
[5845] *Id*. at p. 9.
[5846] *Id*. at p. 11.
[5847] *Id*. at p. 14.
[5848] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 21.

Paulson believed that the Government lacked authority to inject capital into Lehman Brothers. The Federal Reserve's willingness to provide financial help to Bear Stearns (toward the JPMorgan purchase) and AIG was not, in his view, inconsistent with the Federal Reserve's decision to deny aid to Lehman. With Bear Stearns, the Federal Reserve had a willing buyer (JPMorgan); Lehman did not. With AIG, AIG had valuable insurance subsidiaries to use as collateral; again, Lehman had nothing comparable.[5849]

### f) The Relationship of the SEC and FRBNY in Monitoring Lehman's Liquidity

The SEC and FRBNY both monitored Lehman's liquidity. The SEC monitored to verify that Lehman's liquidity pool was unrestricted and could be monetized quickly,[5850] while the FRBNY monitored Lehman's liquidity as a potential lender. While both agencies theoretically had access to the same information, they did not necessarily share the information they collected with one another.[5851]

---

[5849] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 17.

[5850] Memorandum from Phillip Minnick, SEC, *et al.*, to Erik Sirri, SEC, *et al.*, re: Parent Company Liquidity Inspections Scope Memorandum for the Consolidated Supervised Entities (Feb. 20, 2008), at p. 1 [LBEX-WGM 017294].

[5851] Examiner's Interview of Jan H. Voigts, Oct. 1, 2009, at p. 7 (FRBNY did not readily share information without prompting because SEC was Lehman's primary regulator).

## (1) The SEC Performed Only Limited Monitoring of Lehman's Liquidity Pool

A February 20, 2008 memorandum from the SEC titled "Parent Company Liquidity Inspections Scope for the Consolidated Supervised Entities" (the "Liquidity Inspections Scope Memorandum") states:

> [T]he [SEC] staff will identify all components of liquidity held by, or available to, the parent company without any restrictions. These assets generally will include a mixture of cash and highly liquid securities . . . . Once the pool of assets is identified the staff will sample the pool to confirm among other things, the existence of the assets, the legal entity with rights to the assets, that the assets are liquid, and that the assets are available to the parent without restriction . . . . The primary focus will be to verify that the cash proceeds are available to the parent company immediately, usually within twenty-four hours. Accordingly, the staff will review the firms' monetization policies.[5852]

The "primary focus" of the SEC's liquidity monitoring, as explained by the Liquidity Inspections Scope Memorandum, was to "verify" that CSE liquidity pools were "available to the parent without restriction" and could be monetized "immediately, usually within twenty-four hours."[5853] A former senior SEC CSE staff member, Matthew Eichner, told the Examiner that the Liquidity Inspections Scope Memorandum was never formally implemented as part of the CSE Program.[5854] Nevertheless, Eichner recalled that he communicated the "twenty-four hours" standard

---

[5852] Memorandum from Phillip Minnick, SEC, *et al.*, to Erik Sirri, SEC, *et al.*, re: Parent Company Liquidity Inspections Scope Memorandum for the Consolidated Supervised Entities (Feb. 20, 2008), at pp. 1-2 [LBEX-WGM 017294].

[5853] *Id.* at p. 2.

[5854] Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at pp. 5-6.

to Lehman.[5855]  Lehman had a copy of the Liquidity Inspections Scope Memorandum in its possession, implying that the SEC had shared it with Lehman.  But Lehman applied a "five days" monetization standard for assets in its liquidity pool.[5856]  There is no evidence that the SEC directed Lehman to comply with the 24-hour standard.

Eichner said that the SEC only "sampled" the CSE's liquidity pools to ensure that the firms' representations were accurate.[5857]  Eichner stated that this sampling was not statistically significant, and that he never received any report indicating that Lehman did not pass these sampling tests.[5858]  Eichner said that the SEC never had the opportunity to implement fully the steps set forth in the Liquidity Inspections Scope Memorandum because of the chaos surrounding Bear Stearns' near collapse.[5859]

On several occasions, the SEC did ask Lehman to remove questionable assets from its liquidity pool.  For example, in a July 26, 2005 report on liquidity and risk management, the SEC identified a $1.5 billion committed, multi-currency unsecured bank facility as part of Lehman's liquidity pool.  Contrary to Lehman's internal accounting, however, the SEC did not consider the facility a proper part of the liquidity

---

[5855] *Id.* at p. 6.
[5856] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 16.
[5857] Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 6.
[5858] *Id.*
[5859] *Id.* at p. 5.

pool.[5860]  In late 2007 or early 2008, the SEC disagreed with Lehman's inclusion in its liquidity pool of certain classes of assets, and asked Lehman to remove them.[5861]

The SEC was aware in June 2008 that Lehman's liquidity pool included a $2 billion "comfort" deposit at Citigroup.[5862]  The SEC staff viewed Lehman's inclusion of that deposit in its liquidity pool as problematic,[5863] and discounted the value of the pool accordingly.[5864]  Nevertheless, there is no evidence that the SEC directed Lehman to remove the comfort deposit from its calculation of reported liquidity.  Eichner told the Examiner that "we applied a much different standard [for including assets in the liquidity pool] than anyone else," and that the SEC "was very comfortable living with a world where the numbers in the public were the ones the firms worked out with their accountants."[5865]

---

[5860] SEC, Lehman Brothers Holdings Inc.: Report on Liquidity & Funding Risk Management (July 26, 2005), at p. 9 [LBEX-SEC 010895].

[5861] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 25 (Tonucci said the SEC asked Lehman to remove an "AEGIS" facility from its liquidity pool, and that Lehman complied).

[5862] Examiner's Interview of SEC staff, Aug. 24, 2009, at p. 11.  There is some question whether the SEC thought the deposit was $2 billion or $5 billion.  *Id*.

[5863] The SEC states that the SEC's CSE staff "noted that it was a problem to include the [Citi] deposit[] when determining the size of the pool . . . .The CSE [s]taff did, however, raise this as a concern with the Division Director."  SEC, References to SEC (Jan. 29, 2010), at p. 20.

[5864] Examiner's Interview of SEC staff, Aug. 24, 2009, at p. 11.

[5865] Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 6.  Nor is there evidence that within the SEC, the Division of Trading and Markets advised the Division of Corporation Finance that there was an issue as to whether Lehman should have updated its public disclosures about its liquidity pool.  *Id*. at p. 8.

In late August 2008, the SEC learned that JPMorgan wanted Lehman to pledge $5 billion in collateral to continue to fund Lehman trades.[5866] SEC personnel spoke to Lehman, and Lehman Treasurer Paolo Tonucci told them that $5 billion would "not affect" Lehman's liquidity pool.[5867] The SEC did not know that JPMorgan had demanded that Lehman post additional capital the week of September 8.[5868] The SEC was not aware of any significant issues with Lehman's liquidity pool[5869] until September 12, 2008, when officials learned that a large portion of Lehman's liquidity pool had been allocated to its clearing banks to induce them to continue providing essential clearing services.[5870] In a September 12, 2008 e-mail, one SEC analyst wrote:

> Key point: Lehman's liquidity pool is almost totally locked up with clearing banks to cover intraday credit ($15bn with jpm, $10bn with others like citi and bofa). This is a really big problem.[5871]

### (2) The SEC and FRBNY Did Not Always Share Information about Lehman

The SEC and FRBNY each gathered and analyzed data concerning Lehman's liquidity pool. Although the two agencies executed a formal MOU sharing agreement, the agencies did not in fact share documents in several significant instances.

---

[5866] Examiner's Interview of SEC staff, Aug. 24, 2009, at 11-12.

[5867] *Id.*

[5868] *Id.*

[5869] *Id.*

[5870] E-mail from Michael Hsu, SEC, to Til Schuermann, FRBNY (Sept. 12, 2008) [FRBNY to Exam. 014851].

[5871] *Id.*

As a participant in the CSE Program, Lehman continuously transmitted liquidity information to the SEC for use in its scheduled on-site liquidity inspections. The FRBNY, by contrast, installed teams of officers on-site at each of the four CSEs, and the teams conducted their monitoring in-person and on a daily basis, in addition to receiving a continuous stream of liquidity-related reports. Given their overlapping monitoring functions, the SEC and Board of Governors of the Federal Reserve System executed an MOU on July 7, 2008, which allowed the regulators to share information regarding Lehman's liquidity position.[5872] Article III of the MOU established "procedures for sharing information in areas of common regulatory and supervisory interest." The MOU set forth:

> 13. As *primary supervisor* of CSEs, the [SEC] will provide the Federal Reserve, on an ongoing basis to the extent requested –
>
>> a. Information and analysis regarding the financial condition, risk management systems, internal controls and capital, liquidity and funding resources of the CSEs . . . .[5873]

Likewise, the MOU stated:

> 12. The Federal Reserve will provide the [SEC] on an ongoing basis to the extent requested –

---

[5872] SEC/FRBNY, Memorandum of Understanding Between the United States Securities and Exchange Commission and the Board of Governors of the Federal Reserve System Regarding Coordination and Information Sharing in Areas of Common Regulatory and Supervisory Interest (July 7, 2008), at p. 4, *available at* http://www.federalreserve.gov/newsevents/press/bcreg/bcreg20080707a1.pdf.
[5873] *Id.* (emphasis added.)

> a. Information and analysis regarding the financial condition, risk management systems, internal controls and capital, liquidity and funding resources of the CSEs . . . .[5874]

That is, by the terms of the MOU, the FRBNY and SEC were to share information insofar as the other agency affirmatively requested it. Bernanke said that the "premise" of the MOU was that the agencies would share information about the CSEs.[5875] The MOU further stated:

> 17. The [SEC] and Federal Reserve will collaborate and cooperate with each other in –
>
> a. Obtaining (including through visitations, reports and other means), analyzing and evaluating information regarding the capital, liquidity, and funding position, and resources, and associated risk management systems and controls of CSEs . . .;
>
> b. Setting supervisory and regulatory expectations, guidelines, or rules concerning the capital, liquidity, and funding position and resources, and associated risk management systems and controls, of CSEs . . . .[5876]

---

[5874] *Id.*

[5875] Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at p. 7. While noting the broad premise of the MOU, Bernanke noted some "tricky" aspects of the MOU as well, *e.g.,* whether the SEC could use information shared by the FRBNY to undertake an investigation. Bernanke did not state whether there had been any resolution to this issue. Bernanke further stated that he worked on the MOU personally, with SEC Chairman Christopher Cox. *Id.*

[5876] SEC/FRBNY, Memorandum of Understanding Between the United States Securities and Exchange Commission and the Board of Governors of the Federal Reserve System Regarding Coordination and Information Sharing in Areas of Common Regulatory and Supervisory Interest (July 7, 2008), at p. 5, *available at* http://www.federalreserve.gov/newsevents/press/bcreg/bcreg20080707a1.pdf.

Lehman prepared materials for distribution to both agencies, and gave presentations on liquidity issues to both agencies simultaneously.[5877] The SEC and FRBNY did share information and insight they obtained individually regarding Lehman's liquidity,[5878] but not always.

On or about August 20, 2008, the FRBNY became aware that a substantial portion of Lehman's liquidity pool was also allocated to clearing banks as collateral. In an e-mail exchange pertaining to Lehman's ongoing negotiations with clearing banks, FRBNY officer Voigts updated senior FRBNY personnel (including Geithner) on recent requests by Lehman's clearing banks for additional intraday collateral.[5879] Voigts noted (1) that Lehman had posted $5 billion to JPMorgan to match triparty investor haircuts, soon to be encumbered by a lien; and (2) that Lehman continued to post $2 billion in

---

[5877] *See, e.g.*, e-mail from Danielle de la Vega, Lehman, to Michael A. Macchiaroli, SEC, *et al.* (July 29, 2008) [LBEX-DOCID 731328] (forwarding daily executive summary of Lehman's liquidity position for July 29, 2008); e-mail from Danielle de la Vega, Lehman, to Jan H. Voigts, FRBNY, *et al.* (July 30, 2008) [LBEX-DOCID 697484] (forwarding same); e-mail from Danielle de la Vega, Lehman, to Michael A. Macchiaroli, SEC, *et al.* (Aug. 21, 2008) (forwarding daily executive summary of Lehman's liquidity position for August 20, 2008); e-mail from Danielle de la Vega, Lehman, to Jan H. Voigts, FRBNY, *et al.* (Aug. 21, 2008) [LBEX-DOCID 731312] (forwarding same).

[5878] *See e.g.*, e-mail from Arthur G. Angulo, FRBNY, to Timothy F. Geithner, FRBNY (Sept. 12, 2008) [FRBNY to Exam. 014851] (forwarding e-mail exchange between Hsu and Schuermann) (discussed above); e-mail from Til Schuermann, FRBNY, to William Brodows, FRBNY, *et al.* (July 14, 2008) [FRBNY to Exam. 047757] (forwarding e-mail exchange between Hsu and Schuermann).

[5879] E-mail from Jan H. Voigts, FRBNY, to Arthur G. Angulo, FRBNY (Aug. 20, 2008) [FRBNY to Exam. 033297].

collateral to Citibank, intraday.[5880]  The analysts concluded that Lehman had $7 billion less in liquidity than reported.[5881]

The FRBNY discounted the value of Lehman's pool to account for these collateral transfers.  The FRBNY did not ask Lehman to exclude this collateral from its pool, or to take further action as a result of these revelations.  Voigts explained:  "how Lehman reports its liquidity is up to the SEC and the world."[5882]   In the same vein, FRBNY witnesses repeatedly stated that they were mindful that the FRBNY was not Lehman's "primary regulator" under the CSE Program, and that the FRBNY was not monitoring Lehman with an eye toward regulatory compliance or enforcement.[5883]  These functions, the witnesses have uniformly stated, were within the ambit of the SEC's CSE oversight.[5884]  Nevertheless, the FRBNY apparently did not take steps to ensure that the SEC had the same information.[5885]

---

[5880] *Id.*

[5881] *Id.* Angulo wrote to Voigts: "Seems like LEH has $7B (and perhaps soon to be $8B+) less in available liquidity than reported," and later: "[c]onceptually I can see an argument for including the $7B in the liquidity pool if JPM and C[iti] release the collateral to LEH every night . . . . On the other hand, [it] doesn't seem quite right to view the $7B as 'unencumbered.'"  E-mail from Arthur G. Angulo, FRBNY, to Jan H. Voigts, FRBNY (Aug. 20, 2008) [FRBNY to Exam. 033297].  Voigts agreed with Angulo's assessment.  E-mail from Jan H. Voigts, FRBNY, to Arthur G. Angulo, FRBNY (Aug. 21, 2008) [FRBNY to Exam. 033297].

[5882] Examiner's Interview of Jan H. Voigts, Oct. 1, 2009, at p. 7.

[5883] Examiner's Interview of Arthur G. Angulo, Aug. 12, 2009, at p. 3; Examiner's Interview of Thomas C. Baxter, Jr., Aug. 31, 2009, at p. 4 (the SEC was "without question" Lehman's "main supervisor," and the FRBNY monitored Lehman as a potential lender).

[5884] Examiner's Interview of Jan H. Voigts, Oct. 1, 2009, at p. 7.

[5885] *Id.*

There is no evidence that the FRBNY declined to share information that was specifically requested by the SEC; however the FRBNY witnesses told the Examiner that they did not perceive any duty to volunteer liquidity information to the SEC because the SEC did not always share information with the FRBNY. The FRBNY was aware of and asked the SEC to share two "horizontals," or sector-wide reviews of CSE commercial real estate exposures and liquidity positions, the SEC had conducted. The SEC affirmatively declined to share these horizontals.[5886] In the words of one FRBNY witness: "there was not a warm audience" for sharing information between the two entities.[5887] The SEC confirmed that it did not share these analyses with the FRBNY, but represented that the analyses were still in draft at the time of Lehman's bankruptcy, and as such, not in a condition to be shared externally.[5888]

In sum, even though the SEC and FRBNY had an MOU in place to facilitate the exchange information about CSE liquidity, the FRBNY and the SEC did not share all material information that each collected about Lehman's liquidity pool.

### g) The Government's Preparation for the "Lehman Weekend" Meetings at the FRBNY

The FRBNY, Treasury Department, the SEC and the Federal Reserve coordinated actions in what became known as the "Lehman Weekend" meetings of September 12-

---

[5886] Examiner's Interview of Jan H. Voigts, Oct. 1, 2009, at p. 7.

[5887] *Id*.

[5888] Letter from SEC to Robert L. Byman, Counsel to the Examiner (Jan. 29, 2010).

14, 2008, at the FRBNY, in which the Government attempted to orchestrate a private-sector rescue of Lehman.

On Wednesday, September 10, 2008, FRBNY staff put together a draft gameplan for a "liquidity consortium" of major Wall Street banks to "provide a forum where these firms can explore possibilities of joint funding mechanisms to avert Lehman's insolvency."[5889]    Although a draft, the staff's proposed gameplan is an instructive, contemporaneous record of the thinking of some in the FRBNY with respect to how to approach Lehman during the uncertain week of September 8, 2008.

The draft gameplan contemplated that the meeting would occur "at the very latest" on Friday the 12th.[5890]   Consortium members would be given "[v]ery little advance" notice, "2 hours max," in order to "minimize the risk of outside leaks."[5891]   The gameplan further specified: "FRBNY to host.   [Treasury Secretary Henry] Paulson delivers introductory remarks."[5892]   Substantively, the gameplan provided that the officials from the assembled banks would be

---

[5889] FRBNY, Liquidity Consortium (Sept. 10, 2008), at p. 1 [FRBNY to Exam. 003517]; e-mail from Michael Nelson, FRBNY, to Christine Cummings, FRBNY, *et al.* (Sept. 10, 2008) [FRBNY to Exam. 003516] (distributing Liquidity Consortium outline with the subject line, "revised liquidity gameplan").  Possible consortium members would include those depository and investment banks with exposures to Lehman through loans, triparty repos and derivatives; such firms would include: Citibank, Credit Suisse, Deutsche Bank, Goldman Sachs, Morgan Stanley, Merrill Lynch, JPMorgan, and the Royal Bank of Scotland. FRBNY, Liquidity Consortium (Sept. 10, 2008), at p. 1 [FRBNY to Exam. 003517].
[5890] *Id.*
[5891] *Id.*
[5892] *Id.* at p. 2.

told by Paulson that they have until the opening of business in Asia (Sunday night N[ew] Y[ork] time) to explore whether they can jointly come up with a credible plan to recapitalize Lehman to an extent necessary to enable an orderly winding down. Paulson conveys willingness of the official sector to let Lehman fail.[5893]

The draft states that the FRBNY should fix a maximum amount that it would be willing to finance to the consortium, "but not divulge our willingness to do so to the consortium."[5894] Similarly, the draft states that the FRBNY must "hone in on the monetary figure we think the consortium will have to provide in new capital," as well as "the type/maximum amount of any FR [Federal Reserve] financing to support the consortium."[5895] Geithner later told the Examiner that any extension of Government funding to Lehman contemplated in the gameplan draft was contingent on Lehman having a willing buyer.[5896]

As of September 10, 2008, the FRBNY had settled on the public line that no government funds would be invested to rescue Lehman.[5897] This public line was a bargaining strategy to encourage a private consortium of banks to provide the funds themselves.[5898] The draft liquidation consortium gameplan, however, did not foreclose

---

[5893] *Id.*

[5894] *Id.* at p. 2.

[5895] *Id.* at p. 5.

[5896] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 9 (when shown the Liquidity Consortium gameplan document, Geithner confirmed that the FRBNY would have considered extending financing to Lehman, but only if a willing buyer for the firm had surfaced).

[5897] Examiner's Interview of Thomas C. Baxter, Jr., Aug. 31, 2009, at p. 7.

[5898] *Id.* (shown the Liquidity Consortium gameplan document, Baxter confirmed the Examiner's understanding that the references in the document to a "willingness" in the official sector to let Lehman

the possibility that the FRBNY would finance some amount of liquidity; despite noting legal and fiscal obstacles in other areas, the draft did not raise any concern about the possibility of FRBNY financing.[5899] The gameplan slated the FRBNY to communicate with "foreign supervisors" on the evening of Friday September 12 while the consortium convened for its initial meeting.[5900]

A more detailed draft timeline for the implementation of the FRBNY's liquidation consortium plan was circulated the next morning, Thursday, September 11, 2008.[5901] The timeline provided that later in the morning Geithner would (1) inform Bernanke and Paulson that the FRBNY would convene the liquidity consortium on Friday; and (2) ask Paulson to make an introductory address to the group.[5902] Geithner would then contact BofA CEO Kenneth Lewis to probe BofA's interest in acquiring

---

"fail," and the FRBNY's unwillingness to "divulge" the amount of financing it was willing to extend to the consortium was a "strategy" to encourage the gathered banks not to expect a "Bear Stearns solution," and thus to contribute their own funds to an industry solution to the Lehman problem).

[5899] The "Open Issues" section of the document identifies issues to be resolved in advance of the consortium meeting. FRBNY, Liquidity Consortium (Sept. 10, 2008), at pp. 2-3 [FRBNY to Exam. 003517]. These issues include: shareholder approval for any deal emerging from the meeting; the risk that creditors could put Lehman into involuntary bankruptcy prior to a resolution; and the need to obtain "[r]egulatory approvals," including from regulators outside of the United States. *Id.* Concern over legal authority or financial means to intervene to rescue Lehman is not present under the "Legal" sub-section of the draft agenda's "Open Issues" discussion. *Id.*

[5900] *Id.* at p. 2.

[5901] E-mail from Michael Nelson, FRBNY, to Christine Cumming, FRBNY (Sept. 11, 2008) [FRBNY to Exam. 003513] (cover e-mail); FRBNY, Timeline — Liquidation Consortium (Sept. 11, 2008) [FRBNY to Exam. 003514].

[5902] FRBNY, Timeline – Liquidation Consortium (Sept. 11, 2008), at p. 1 [FRBNY to Exam. 003514].

Lehman.[5903]  If Lewis declined to make a bid on behalf of BofA, or if Lehman rejected the bid, the FRBNY would proceed with its consortium plan.[5904]

The September 11 draft timeline contemplated that the FRBNY would prepare the final list of consortium members on the evening of September 12, and settle on "minimum capital contributions expected from the consortium" as well as the "level" or "type of liquidity to be offered, if necessary, by the Federal Reserve."[5905]  The timeline would have the FRBNY contact foreign regulators on the evening of September 12.[5906]

The timeline proposed that on Saturday and Sunday, after the consortium was convened, it would engage in due diligence on Lehman's assets in order to gauge the feasibility of any recapitalization plan, and report its progress to Bernanke, Paulson, and Geithner.[5907]  If no plan was forthcoming, the FRBNY would "reach out to regulators in DC and abroad to inform them of potential market disruptions at the opening of business on Monday and/or possible bankruptcy filing by Lehman."[5908]

In his interview with the Examiner, FRBNY General Counsel Thomas Baxter described the Government's approach to the Lehman crisis succinctly.  There were two possible models for Government intervention, Baxter explained:  (1) the FRBNY could

---

[5903] *Id.*
[5904] *Id.*
[5905] *Id.*
[5906] *Id.*
[5907] *Id.* at p. 2.
[5908] *Id.*

extend a "Maiden Lane"-style non-recourse loan to a potential purchaser of Lehman, as it did to JPMorgan with Bear Stearns;[5909] or (2) the FRBNY could convene a consortium of private market participants to finance Lehman's bad assets, as it had in the case of the near-failure of the hedge fund Long Term Capital Management ("LTCM") in 1998.[5910] The goal, Baxter said, was to make Wall Street view the LTCM intervention, rather than the Bear Stearns intervention, as the model for Lehman.[5911]

The FRBNY's actions in the Bear Stearns rescue placed public funds at risk and stood in contrast to the FRBNY's approach to LTCM. LTCM was a hedge fund that had become over-leveraged and was brought to the brink of collapse by market conditions caused by Russia's default on its debt obligations in 1998.[5912] The FRBNY feared that LTCM's creditors and counterparties would close out their positions, and liquidate collateral supporting those positions simultaneously. Such an *en masse* liquidation, the

---

[5909] In order to contain the economic fallout of the Bear Stearns near collapse and to facilitate an acquisition of the failed investment bank by JPMorgan, on March 16, 2008, the Federal Reserve Board of Governors granted the FRBNY authority to extend a $29 billion senior loan to a newly-created Delaware LLC called "Maiden Lane." JPMorgan also extended a $1 billion subordinated note to Maiden Lane. Maiden Lane, in turn, purchased $30 billion of illiquid assets from Bear Stearns, as marked-to-market by Bear on March 14, 2008. The transfer involved $30 billion in illiquid real estate-related assets from Bear Stearns to Maiden Lane. Because the FRBNY loan was styled as a non-recourse loan, the FRBNY's commitment was secured only by the portfolio of assets held by Maiden Lane. Thus the U.S. Government was responsible for any losses in the event the liquidation of the transferred assets could not fully repay the principal advanced by the FRBNY. *See* FRBNY, Press Release: Summary of Terms and Conditions Regarding the JPMorgan Facility (Mar. 24, 2008), *available at* http://newyorkfed.org/newsevents/news/markets/2008/rp080324b.html.

[5910] Examiner's Interview of Thomas C. Baxter, Jr., Aug. 31, 2009, at p. 8.

[5911] *Id.*

[5912] General Accounting Office, *Long-Term Capital Management: Regulators Need to Focus Greater Attention on Systemic Risk*, Report to Congressional Requesters (Oct. 29, 1999), at 42.

FRBNY believed, would result in "a likelihood that a number of credit and interest rate markets would experience extreme price moves and possibly cease to function for a period of one or more days and maybe longer."[5913] After remedies short of Government intervention had failed, the FRBNY convened a consortium of LTCM's major creditors to devise an industry-created plan to recapitalize the hedge fund. Thus, on September 22 and 23, 1998, 14 banks and securities firms met at the FRBNY's offices, created a term sheet for a recapitalization of the hedge fund and, ultimately, committed to inject $3.6 billion in LTCM to avoid a disorderly liquidation.[5914] As former FRBNY President William McDonough emphasized in his testimony before the U.S. House of Representatives: "[T]his was a private sector solution to a private sector problem, involving an investment of new equity by Long-Term Capital's creditors and counterparties."[5915]

Rather than a Bear Stearns-style "bailout" for Lehman,[5916] the FRBNY went forward with plans for a LTCM-style "liquidation consortium" on September 12, 2008.

---

[5913] Statement by William J. McDonough, President of the Federal Reserve Bank of New York Before the Comm. on Banking and Financial Servs., U.S. House of Representatives, Oct. 1, 1998, at 4.

[5914] *Id*. at pp. 6-7; GAO Report to Congressional Requesters, Long-Term Capital Management: Regulators Need to Focus Greater Attention on Systemic Risk (Oct. 29, 1999), at 44.

[5915] Statement by William J. McDonough, President of the Federal Reserve Bank of New York Before the Comm. on Banking and Fin. Servs., U.S. House of Representatives, Oct. 1, 1998, at p. 7.

[5916] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 9.

**h) On the Evening of Friday, September 12, 2008, the Government Convened a Meeting of the Major Wall Street Firms in an Attempt to Facilitate the Rescue of Lehman**

By all accounts, the liquidation consortium meetings at the FRBNY began largely as conceived in the draft agenda and timelines. The FRBNY convened a meeting of the major Wall Street financial institutions, all of which agreed to finance Lehman's bad assets and thereby facilitate the sale of Lehman to one of its suitors.[5917] However, the deal foundered on the issue of whether Barclays would be able to guarantee Lehman's outstanding trades, as requested by the FRBNY.

True to the FRBNY's draft gameplan, Geithner spoke with Callum McCarthy, then-Chairman of the British Financial Services Authority ("FSA") on September 11, and informed McCarthy of FRBNY plans to convene "a consortium of financial institutions . . . to rescue Lehman."[5918]

During the morning of September 12, 2008, John S. Varley, Group Chief Executive of Barclays, spoke with Paulson.[5919] Varley informed Paulson that Barclays was interested in making a bid for Lehman.[5920] Paulson responded that any purchaser would need to make a bid before the end of the weekend, after which time the

---

[5917] *Id.* at pp. 9-10.
[5918] Financial Services Authority (U.K.), Statement of the Financial Services Authority (Jan. 20, 2010), at p. 2.
[5919] *Id.* at p. 3.
[5920] *Id.*

Government planned to place Lehman into an orderly wind-down.[5921]  According to the

FSA, in a conversation later that day, Alistair M. Darling, Chancellor of the Exchequer,

advised Paulson "that no transaction with Barclays would be possible if the level of risk

to Barclays was inappropriate."[5922]  Paulson "accepted this and advised that the FRBNY

might be prepared to provide Barclays with regulatory assistance to support such a

transaction if it was required."[5923]

On the evening of Friday, September 12, 12 investment bank CEOs were

summoned to the FRBNY's headquarters at 33 Liberty Street in New York City.[5924]

Bernanke remained in Washington, given the possibility that the Federal Reserve might

need to exercise its emergency lending powers, which would require him to convene a

Federal Reserve Board meeting.[5925]  The CEO participants present at 33 Liberty included:

JPMorgan's Jamie Dimon, Morgan Stanley's John Mack, Citigroup's Vikram Pandit and

Robert Wolf of UBS.  Executives from Lehman Brothers did not attend.[5926]

Paulson opened the meeting by noting the absence of Lehman representatives.[5927]

Paulson said their absence was intentional, because the meeting was convened to

---

[5921] *Id.*

[5922] *Id.* at p. 5.

[5923] *Id.*

[5924] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 9.

[5925] Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at p. 9.

[5926] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 9.

[5927] *Id.*

discuss Lehman specifically.[5928]  Paulson noted the absence of BofA and Barclays Capital executives as well, due to the fact that these banks were involved in potential deals to acquire Lehman.[5929]

Paulson stated that the purpose of the meeting was twofold.  First, the Government tasked the CEOs with creating a plan to facilitate the acquisition of Lehman, and second, if such a plan was not forthcoming, Paulson stated the onus was on the CEOs to provide the Government with the means to resolve the consequences of Lehman's failure.[5930]  Moreover, with regard to the financing of any potential rescue of Lehman, Paulson stated:  "Not one penny will come from the Government."[5931]  Paulson did not elaborate, but Lehman's only options were to be rescued by a firm (or a consortium of firms) or to file for bankruptcy on Monday, September 15.[5932]

Secretary Paulson told the Examiner that no Government aid would be forthcoming because he concluded that the Government lacked authority to inject capital into struggling institutions.[5933]  While Paulson allowed that under Section 13(3)

---

[5928] *Id.*

[5929] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at pp. 15-16.

[5930] *Id.* at p. 16.

[5931] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 9 (reporting Paulson's statement).

[5932] *Id.*  Cox said that most attendees "probably assumed that [Secretary Paulson's statement of no government help] was a negotiation" strategy and were "generally surprised when in fact there was no money there."  Examiner's Interview of Christopher Cox, Jan. 8, 2010, at p. 15.

[5933] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 16.

of the Federal Reserve Act the Fed might be able to lend against any collateral,[5934] he feared that providing emergency funds to the ailing bank would cause its clients to flee, ensuring its demise.[5935]

That weekend, Lehman's "financial team" came on-site to the FRBNY and "opened their books" to representatives from the investment banks in order to work out the details of any potential rescue.[5936] Barclays was permitted to examine Lehman's books, in order to conduct the due diligence necessary to determine whether it would acquire Lehman.[5937] Baxter noted concern among the firms that by negotiating a rescue for Lehman, they would be "financing a sweetheart deal for one of their competitors."[5938] Nevertheless, due diligence and planning continued.

But Barclays and the British regulators had their own reservations. During the evening of September 13, 2008, Barclays advised the FSA that the FRBNY was asking Barclays to guarantee Lehman's financial obligations in a manner similar to that

---

[5934] Section 13(3) provides that a Federal Reserve Bank may, "[i]n unusual and exigent circumstances" lend to any individual or corporation so long as the lending is "secured to the satisfaction" of the Federal Reserve Bank. 12 U.S.C. § 343. But the Fed and FRBNY emphasized that they could not lend against insufficient collateral. Examiner's Interview of Ben S. Bernanke, December 22, 2009, at 2 (then-FRBNY President Timothy F. Geithner informed Chairman Bernanke that the Fed would be "lending into a run," and that, while a loan might help pay off some counterparties, it would not save Lehman. Chairman Bernanke concluded that Lehman was insolvent and lacked any collateral, given that its assets fell short of obligations that would come due).

[5935] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 16.

[5936] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at pp. 9-10.

[5937] Financial Services Authority (U.K.), Statement of the Financial Services Authority (Jan. 20, 2010), at p. 5.

[5938] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 10.

provided by JPMorgan when it acquired Bear Stearns.[5939]  Barclays recognized, and the FSA confirmed, that British regulations would require shareholder approval before such a guaranty could be granted.[5940]  Later that evening, Barclays advised the FSA that "because of the guarantee" issue, it was "unlikely that a suitable structure to purchase Lehman could be put in place which would satisfy [its] Board."[5941]  McCarthy spoke to Geithner that evening about the state of the negotiations, and McCarthy reported that although no proposal had yet been shown to the FSA by Barclays, "if one was it would raise significant issues."[5942]  Yet, because no proposal had "been put forward . . . it was impossible to say whether any particular proposal would prove acceptable."[5943]

On the afternoon of Sunday, September 14, 2008 (London time), the FSA informed the FRBNY that the guaranty issue would need to be resolved before any take-over could be approved.[5944]  According to the FSA, Geithner replied that the FRBNY had arranged for a consortium of Wall Street firms to take Lehman's illiquid assets, but that a guaranty from Barclays "would still be required."[5945]  Barclays, the FSA

---

[5939] Financial Services Authority (U.K.), Statement of the Financial Services Authority (Jan. 20, 2010), at p. 7.

[5940] *Id.*

[5941] *Id.*

[5942] *Id.*

[5943] *Id.*

[5944] *Id.* at p. 8.  Baxter advised the Examiner that the FRBNY did not learn that providing a guaranty had become an issue until "late" on Sunday, September 14. Examiner's Interview of Thomas C. Baxter, Jr., Aug. 31, 2009, at p. 8.

[5945] Financial Services Authority (U.K.), Statement of the Financial Services Authority (Jan. 20, 2010), at p. 8.

and the FRBNY continued to discuss the regulatory and prudential obstacles presented by the guaranty issue throughout the day on September 14. By late afternoon or early evening, however the FSA and Barclays "agreed that neither the Barclays Board nor the FSA could approve any transaction structure that required Barclays to provide the guarantee asked for by the FRBNY."[5946]

Over the weekend, the assembled banks had agreed to provide at least $20 billion in financing to facilitate Lehman's acquisition by Barclays.[5947] According to Government witnesses, it was not for want of cooperation, coordination or Government pressure that Lehman was not acquired.[5948] Rather, those Government representatives present for the meetings laid the failure of the deal on Barclays' inability to guarantee trading losses associated with the acquisition.[5949]

Baxter was clear in his conviction that the inability of Barclays to obtain a guaranty was due to the unwillingness of the British government, specifically the FSA, to waive the British legal requirement that Barclays obtain a shareholder vote on the issue.[5950] This critical viewpoint was uniformly held among the FRBNY witnesses interviewed by the Examiner. Voigts agreed that a sale of Lehman was not possible because Barclays was unable to obtain a waiver from the FSA to guarantee Lehman's

---

[5946] *Id*. at p. 10.

[5947] Examiner's Interview of Henry M. Paulson, June 25, 2009, at p. 18.

[5948] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 9.

[5949] *Id*.; Examiner's Interview of Jan H. Voigts, Aug. 25, 2009, at p. 7.

[5950] Examiner's Interview of Thomas C. Baxter, Jr., Aug. 31, 2009, at p. 8.

obligations.[5951]  Geithner echoed these comments, stating that a deal during Lehman Weekend was impracticable because Lehman lacked a buyer.[5952]  In Geithner's view, had Lehman had a buyer in Barclays or any other third party, the Government would have extended financing to that buyer to help facilitate the sale.[5953]  Bernanke also attributed the Government's ultimate inability to rescue Lehman to the absence of a buyer for the firm.[5954]

Baxter stated his belief that the British government simply did not want Barclays to acquire Lehman, and therefore refused to allow Barclays to guarantee the deal, or otherwise backstop the transaction.[5955]  The FSA explained to the Examiner that, because Barclays was one of the U.K.'s clearing banks, "it was important to ensure that Barclays did not expose itself to a level of risk that would weaken it to an extent that could have a wider systemic impact on the U.K. financial system."[5956]  Further, Chairman McCarthy told Chairman Cox that there was no precedent for waiving the U.K. law requirement that Barclays obtain shareholder approval prior to agreeing to any guaranty in these

---

[5951] Examiner's Interview of Jan H. Voigts, Aug. 25, 2009, at p. 7.
[5952] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 9.
[5953] *Id*.
[5954] Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at p. 2.
[5955] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 10.
[5956] The Examiner sought, but was not granted, an interview with the FSA decision makers; but the FSA did provide written answers to questions.  Financial Services Authority (U.K.), Statement of the Financial Services Authority (Jan. 20, 2010), at p. 6.

exigent circumstances.[5957]  Cox indirectly confirmed to the Examiner that the FSA acted reasonably.[5958]  For his part, Baxter stated that there was a "policy issue" with the FRBNY providing a backstop for an acquisition by a British bank.[5959]  Baxter said that the FRBNY lacked this authority because the FRBNY could not issue a guaranty to support the transaction.[5960]  Rather, the FRBNY could only provide secured financing in support of such a transaction.[5961]  Baxter stated that he found it "shocking" that the deal would founder for lack of a guaranty, and that it was the financing of the deal, rather than the guaranty which should have been the most challenging barrier to overcome in any rescue of Lehman.[5962]

Paulson distinguished the Government's action to intervene to backstop AIG, from the absence of Government action to backstop Lehman.  According to Paulson, Lehman had liquidity problems and no hard assets against which to lend.[5963]  AIG, by contrast, Paulson said, had a capital problem at the holding company level, but

---

[5957] *Id*. at p. 10.

[5958] Examiner's Interview of Christopher Cox, Jan. 8, 2010, at p. 18. (Cox recalled a specific conversation on the subject, but after SEC counsel would not permit him to recount that conversation, invoking the "deliberative process" privilege, Cox answered the general question:  "In all your conversations with the FSA, did they ever take an unreasonable position?"  Chairman Cox responded:  "At no time in my dealings with the FSA did I think they were unreasonable; they had reasons for what they did.").

[5959] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 10.

[5960] *Id*.

[5961] *Id*.

[5962] *Id*.

[5963] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 16.

otherwise had regulated insurance companies that were perceived by the market as stable, well-capitalized, and having real value.[5964]

A bankruptcy filing by the holding company was another of the contingency plans discussed at the FRBNY that weekend.[5965]  The Government concluded that an *en masse* liquidation of the holding company would be "awful," and should be avoided.[5966]  Nevertheless, assuming no alternative was available, the plan envisioned by the Government would be for LBHI to file for Chapter 11, while JPMorgan continued to lend to LBI as a going concern.  LBI would then be eased into a SIPA proceeding, and wound down in an orderly way.[5967]  This plan did not play out once Barclays came back to the bargaining table with a proposal to acquire the broker-dealer after LBHI entered bankruptcy.

On Sunday September 14, Baxter and Cox participated in a conference call with Lehman's Board of Directors.[5968]  Also present on the Government side of the call were SEC General Counsel Brian Cartwright and Alan Beller of Cleary Gottlieb Steen & Hamilton, who was engaged by the Treasury Department.[5969]  Baxter said the call was

---

[5964] *Id.*

[5965] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 10.

[5966] *Id.*

[5967] *Id.* at pp. 10-11.

[5968] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008) [LBEX-AM 003932] (noting that Baxter and Cox addressed the Board by telephone).

[5969] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 10.

arranged at the request of Paulson and Geithner.[5970]  According to Lehman Board

minutes, Baxter and Cox emphasized that the Board needed to make a decision

regarding whether to file for bankruptcy quickly, and that this was a decision for the

Board alone.[5971]  Baxter recalled making statements to this effect.[5972]  Cox recalled that he

did not mention bankruptcy, but rather stated that whatever decision Lehman might

make needed to be made immediately.[5973]  Cox also recalled that "others from the Fed"

who were on the call added that the Government had made it clear in earlier meetings

that Lehman should file for bankruptcy.[5974]  Baxter said he made the point "that opening

on Monday was not an option because of the chaos in the markets."[5975]

Also that evening, the Federal Reserve broadened the collateral eligible for

financing through the PDCF "to closely match the types of collateral that can be

pledged in the triparty repo systems of the two major clearing banks."[5976]  However, the

FRBNY limited the collateral LBI could use for overnight financing to the collateral that

---

[5970] *Id.*

[5971] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 14, 2008), at pp. 5-6 [LBEX-AM 003932].

[5972] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 11.

[5973] Examiner's Interview of Christopher Cox, Jan. 8, 2010, at p. 17.

[5974] *Id.*

[5975] Lehman Brothers Holdings Inc., Minutes of the Meeting of the Board of Directors (Sept. 14, 2008), at pp. 5-6 [LBEX-AM 003932]; Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 10.

[5976] FRBNY, Press Release (Sept. 14, 2008), *available at* http://www.federalreserve.gov/ newsevents/press/monetary/20080914a.htm.

was in LBI's box at JPMorgan as of Friday, September 12, 2008.[5977]  This restriction was referred to as the "Friday criteri[on]."[5978]  In addition, the FRBNY imposed larger haircuts on LBI's PDCF borrowing than it did on other investment banks,[5979] and the haircuts imposed on LBI's PDCF borrowing were larger than under Lehman's pre-bankruptcy triparty borrowing.[5980]

In connection with Lehman's preparations to file the LBHI Chapter 11 petition, the FRBNY, acting as a lender of last resort, advised Lehman that it would provide up

---

[5977] Examiner's Interview of Robert Azerad, Sept. 23, 2009, at p. 5; Examiner's Interview of Christopher Burke, July 7, 2009, at p. 3.  An experimental allocation by Lehman to the PDCF on Monday morning showed at least $72 billion of eligible Lehman securities being swept into the PDCF system.  *See* e-mail from John N. Palchynsky, Lehman, to Craig L. Jones, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 076981];. *see also* Lehman, PDCF Schedule of Eligible Securities (Sept. 14, 2008) [LBEX-DOCID 405695].

[5978] Examiner's Interview of Robert Azerad, Sept. 23, 2009, at p. 5; Examiner's Interview of Christopher Burke, July 7, 2009, at p. 3.  According to Azerad, this restriction prevented Lehman from posting the range of collateral to the PDCF that other firms were allowed to post after September 15, 2008.  Examiner's Interview of Robert Azerad, Sept. 23, 2009, at p. 5; *see also* e-mail from Timothy Lyons, Lehman, to Ian T. Lowitt, Lehman (Sept. 14, 2008) [LBEX-DOCID 070210] (stating "the fed is letting the other eighteen broker dealers fund a much broader range of collateral than us").

[5979] Examiner's Interview of Christopher Burke, July 7, 2009, at p. 3; *see also* e-mail from Ricardo S. Chiavenato, JPMorgan, to Christopher Carlin, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0055329]; Examiner's Interview of Robert Azerad, Sept. 23, 2009, at p. 5.  According to Azerad, the Fed imposed the wider haircuts on Lehman because the Fed was not willing to take any losses in its overnight financing of Lehman.  *Id.*

[5980] *See* e-mail from Sindy Aprigliano, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 4572426, 4579671] (attaching list of an estimated haircut impact of approximately $4 billion); e-mail from Sindy Aprigliano, Lehman, to George Van Schaick, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 077028] (discussing the larger haircuts imposed by the Fed on Lehman's PDCF borrowing); e-mail from Robert Azerad, Lehman, to Susan McLaughlin, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 457643] (explaining the PDCF haircuts would "result in a $4 billion drain in liquidity . . . ."); *see also* Lehman, PDCF Schedule of Eligible Securities (Sept. 14, 2008) [LBEX-DOCID 405695] (detailing the PDCF haircuts applied to Lehman for the various categories of accepted securities); e-mail from Ricardo S. Chiavenato, JPMorgan, to Christopher Carlin, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0055329].  *But see* e-mail from Sindy Aprigliano, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 068353] (stating the haircut impact from using the PDCF would be $2 billion).

to two weeks of overnight secured financing through the PDCF to allow LBI to accomplish an orderly liquidation.[5981]

Baxter rejected the idea that "moral hazard" arguments played a role in "allowing" Lehman to fail. Baxter said the whole purpose of the FRBNY's extraordinary actions that weekend was to rescue Lehman in some form:[5982] "In no way was the idea to make Lehman a 'poster child' for moral hazard."[5983] "Clearly," Baxter said, "my sense was that [the Government] was not just going through the motions" and that Lehman was not "sacrificed to moral hazard."[5984] Baxter attributed the failure of the rescue effort to the British government's refusal to offer a guaranty to backstop the acquisition.[5985] In his interview, Paulson said that although economic health depends on Wall Street firms believing that the Government cannot and will not rescue them in a crisis, economic stability was nevertheless more important to the economy than moral hazard.[5986]

---

[5981] Examiner's Interview of Shari D. Leventhal, Apr. 30, 2009, at pp. 4-5. Some FRBNY employees thought the FRBNY was risking too much exposure with the two-week funding timeframe. *Id.* at p. 5.

[5982] *Id.*

[5983] *Id.*

[5984] *Id.*

[5985] *Id.* There were two distinct issues: (1) The U.K. regulators' refusal to waive the shareholder vote requirement necessary to approve a Barclays guaranty of outstanding Lehman trades; and (2) Lehman's failure to obtain a guaranty from Barclays, or any other entity, for potential trading losses.

[5986] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 22.

### i) Lehman's Bankruptcy Filing

LBHI filed for bankruptcy protection on Monday, September 15. The FRBNY was surprised by the consequences that Lehman's filing had in terms of funding LBIE, which was taken into administration by British regulators due to inadequate capitalization.[5987] The FRBNY was unaware that LBIE was financed entirely by the parent – that is, that LBHI pulled liquidity into New York, and would then re-route that funding to LBIE in the U.K.[5988] Baxter said he was unaware until that Monday that LBIE was dependent on its LBHI parent, but he learned otherwise when LBHI was forced to file for bankruptcy due to cross defaults from LBIE going into administration in the U.K.[5989] Even then, Baxter assumed that the Bank of England had the capacity to fund LBIE in a manner similar to that by which the FRBNY funded LBI through the Primary Dealer Credit Facility discount window for broker-dealers.[5990] The FSA told the Examiner that once it became known that LBHI would file for bankruptcy, the FSA asked the FRBNY if financing (via the FRBNY's discount window for broker-dealers) would be made available to LBIE and was told that it would not.[5991]

---

[5987] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 11; Examiner's Interview of Jan H. Voigts, Aug. 25, 2009, at pp. 7-8 (noting surprise at the extent to which LBIE was dependent on LBHI, the consequences of LBHI's bankruptcy, and the importance and complexity of intercompany funding within Lehman generally).

[5988] Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 11.

[5989] *Id.*

[5990] *Id.*

[5991] Financial Services Authority (U.K.), Statement of the Financial Services Authority (Jan. 20, 2010), at pp. 10-11.

Following Lehman's bankruptcy, Lehman, through its broker-dealer, LBI, relied on the PDCF to obtain $40 to $50 billion in overnight financing needed to repay its clearing banks.[5992]  In addition, Lehman funded itself after the bankruptcy filing through two other FRBNY programs, the Open Market Operations ("OMO") and the Term Securities Lending Facility ("TSLF"),[5993] as well as triparty term repos that had not yet expired.[5994]  The FRBNY's overnight financing of LBI began Monday evening, September 15, with Lehman borrowing approximately $28 billion via the PDCF.[5995]  The FRBNY's overnight financing continued through Thursday morning, September 18, 2008.[5996]  LBI was placed into SIPA proceedings on September 19, 2008.

---

[5992] *See* e-mail from David A. Weisbrod, JPMorgan, to Jamie L. Dimon, JPMorgan, *et. al.* (Sept. 15, 2008) [JPM-2004 0080146] (listing Lehman's triparty repo borrowing at $51 billion ($28 billion from the PDCF, $2 billion from Barclays, and $21 billion from other investors) for Monday); Alvarez & Marsal, Summary of Meeting with James Hraska on 10/08/08 [Draft] (Oct. 8, 2008), at pp. 1-4 [LBEX-AM 003302] (listing the Fed's funding of Lehman (via the PDCF, OMO, and TSLF) for the week following the LBHI petition).

[5993] Examiner's Interview of Christopher Burke, July 7, 2009, at p. 4; Alvarez & Marsal, Summary of Meeting with James Hraska on 10/08/08 [Draft] (Oct. 8, 2008), at pp. 1-4 [LBEX-AM 003302].

[5994] *See* e-mail from David A. Weisbrod, JPMorgan, to Jamie L. Dimon, JPMorgan, *et. al.* (Sept. 15, 2008) [JPM-2004 0080146-47] (listing $21 billion in "mainly term repos" as part of LBI's triparty borrowing for September 15).

[5995] *See* e-mail from Edward J. Corral, JPMorgan, to William Walsh, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0031195] (notifying the Fed that the Lehman assets used in LBI's $28 billion PDCF repo on Monday night satisfied the Friday criterion).  Earlier on Monday, Lehman estimated that it would borrow up to $35 billion through the PDCF on Monday night.  *See* e-mail from Sindy Aprigliano, Lehman, to Robert Azerad, Lehman (Sept. 15, 2008) [LBEX-DOCID 1071653] (providing John Feraca's PDCF estimate of $27 billion plus a buffer of $8 billion); e-mail from Robert Azerad, Lehman, to Susan McLaughlin, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 071550] (estimating $34 billion of PDCF borrowing); e-mail from Paolo R. Tonucci, Lehman, to Susan McLaughlin, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 071550] (estimating $28.3 billion for the collateral value of the PDCF borrowing).

[5996] Examiner's Interview of Robert Azerad, Apr. 20, 2009, at p. 5.