UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                                      :
In re                                    :     Chapter 11 Case No.
                                                        :
LEHMAN BROTHERS HOLDINGS INC.,    :     08-13555 (JMP)
*et al.,*                                           :
                                                        :     (Jointly Administered)
                                Debtors.     :
------------------------------------------------------- x

# REPORT OF
# ANTON R. VALUKAS, EXAMINER

Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
312-222-9350

919 Third Avenue
37th Floor
New York, NY  10022-3908
212-891-1600

March 11, 2010                         *Counsel to the Examiner*

## VOLUME 6 OF 9

## Appendix 1

**EXAMINER'S REPORT**

**TABLE OF APPENDICES**

**VOLUME 6**

> **Tab 1**     Legal Issues

**VOLUME 7**

> **Tab 2**     Glossary, Acronyms & Abbreviations

> **Tab 3**     Key Individuals

> **Tab 4**     Witness Interview List

> **Tab 5**     Document Collection & Review

> **Tab 6**     Lehman Systems

> **Tab 7**     Bibliography

**VOLUME 8**

> **Tab 8**     Risk Management Organization and Controls

> **Tab 9**     Risk Appetite and VaR Usage Versus Limits Chart

> **Tab 10**     Calculation of Certain Increases in Risk Appetite Limits

> **Tab 11**     Compensation

> **Tab 12**     Valuation - Archstone

> **Tab 13**     Survival Strategies Supplement

> **Tab 14**     Valuation - CDO

> **Tab 15**     Narrative of September 4 Through 15, 2008

> **Tab 16**     Valuation - Residential Whole Loans

**Tab 17**    Repo 105

**Tab 18**    Summary of Lehman Collateral at JPMorgan

**Tab 19**    Lehman's Dealings with Bank of America

**Tab 20**    Knowledge of Senior Lehman Executives Regarding The Inclusion of Clearing-Bank Collateral in the Liquidity Pool

**Tab 21**    LBHI Solvency Analysis

**Tab 22**    Preferences Against LBHI and Other Lehman Entities

**VOLUME 9**

**Tab 23**    Analysis of APB, Journal Entry, Cash Disbursement, and JPMorgan Collateral

**Tab 24**    Foreign Exchange Transactions

**Tab 25**    Intercompany Transactions Occurring Within Thirty Days Before Bankruptcy

**Tab 26**    CUSIPs with Blank Legal Entity Identifiers

**Tab 27**    CUSIPs Not Associated with an LBHI Affiliate

**Tab 28**    CUSIPs Associated Solely with an LBHI Affiliate

**Tab 29**    CUSIPs Associated with Both LBI and LBHI Affiliates

**Tab 30**    CUSIPs Associated with Subordinated Entities

**Tab 31**    CUSIPs Associated with LBHI Affiliates Not Delivered to LBI in a Financing Trade

**Tab 32**    September 19, 2008 GFS Dataset

**Tab 33**    Summary Balance Sheets of LBHI Affiliates

**Tab 34**    Tangible Asset Balance Sheet Variations

# APPENDIX 1:  LEGAL ISSUES

Appendix 1 provides legal analysis supporting many Sections of the Report.

I.   COLORABLE CLAIM STANDARD .................................................................. 5

   A.   Bankruptcy Standing Cases ........................................................................ 5

   B.   Summary Judgment Standard .................................................................. 12

   C.   Examiner Orders from Other Bankruptcy Cases .................................... 13

      1.   *In re Worldcom, Inc.*, Case No. 02-13533 (Bankr. S.D.N.Y.) ............... 13

      2.   *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y.) ................. 14

      3.   *In re Refco, Inc.*, Case No. 05-60006 (Bankr. S.D.N.Y.) ..................... 16

      4.   *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (Bankr. D.
           Del.) ...................................................................................................... 17

      5.   *In re SemCrude, L.P.*, Case No. 08-11525 (Bankr. D. Del.) ............... 18

   D.   Conclusion ............................................................................................... 20

II.  FIDUCIARY DUTIES ................................................................................... 20

   A.   Delaware Corporate Fiduciary Duties .................................................... 21

      1.   Business Judgment Rule ....................................................................... 22

         a)   The Business Judgment Rule as Applied to Directors ........................... 22

         b)   The Business Judgment Rule as Applied to Officers .............................. 26

         c)   The Intersection Between the Business Judgment Rule and Illegal
              Conduct - the *AIG* Case ..................................................................... 28

      2.   Duty of Care ........................................................................................ 30

      3.   Duty of Loyalty and Good Faith ......................................................... 33

      4.   *Caremark* Duty to Monitor ................................................................. 35

         a)   Origins of the Duty to Monitor ............................................................ 36

         b)   Elements of a *Caremark* Claim .......................................................... 37

         c)   Application of *Caremark* to Risk Oversight: *In re Citigroup Inc.* ......... 42

      5.   Disclosure Obligations ........................................................................ 44

         a)   The Board's Obligation to Provide Information to Shareholders .......... 45

         b)   Management's Duty of Disclosure to the Board .................................... 48

   B.   Causation and Damages in Corporate Fiduciary Cases ......................... 54

   C.   Liability for Aiding and Abetting Breach of Fiduciary Duty ................. 61

   D.   Duties of Directors of an Insolvent Wholly Owned Subsidiary ............ 63

E. Duties of a Controlling Shareholder ........................................................ 67

F. Standing to Assert Fiduciary Breach Claims Against Lehman Officers and Directors ................................................................................................ 69

III. SECURITIES LAW ISSUES .......................................................................... 70

A. Relevant Required Disclosures ................................................................. 71

B. Overview of Possible Disclosure Causes of Action ................................. 75

C. Materiality ................................................................................................. 77

D. Causation and Reliance ............................................................................ 78

E. Claims Based on Liquidity Disclosures .................................................... 79

F. The Sarbanes-Oxley Act ........................................................................... 81

IV. BANKRUPTCY LAW ISSUES ...................................................................... 84

A. Avoidance Actions .................................................................................... 85

    1. Transfers with Fraudulent Intent under Section 548(a)(1)(A) ...................... 86

    2. Constructive Fraudulent Transfers under Section 548(a)(1)(B) ................... 88

        a) Insolvency ......................................................................................... 89

        b) Unreasonably Small Capital ............................................................ 90

        c) Inability To Pay Debts ...................................................................... 96

        d) Employment Contracts ..................................................................... 97

B. Defenses to Avoidance of Fraudulent Transfers Pursuant to § 548(a)(1) of the Bankruptcy Code ........................................................................... 99

C. Avoidance of Fraudulent Conveyances Pursuant to New York Debtor Creditor Law, art. 10, §§ 273-76 (McKinney 2010) ................................ 101

D. Avoidance of Preferential Transfers ....................................................... 106

    1. Preferences under Section 547 of the Bankruptcy Code ............................ 106

    2. Preferences under New York and Delaware Law ........................................ 111

E. The Safe Harbor Provisions of the Bankruptcy Code ............................ 112

F. Applicability of the Preemption Doctrine to State Law Claims by the Safe Harbor Provisions of the Bankruptcy Code ........................................... 118

G. Avoidance of Transfers under Section 549 of the Bankruptcy Code ................ 122

H. Avoidance of Transfers outside of the Ordinary Course of Business and Not Approved by the Court Pursuant to Section 363 of the Bankruptcy Code ........................................................................................................ 123

I. Recovery Issues under Sections 550 and 502 of the Bankruptcy Code ............. 125

J. Setoff Issues under Section 553 of the Bankruptcy Code ...................... 126

    K.   Turnover of Property to the Estate.........................................................................129

V.  NON-FEDERAL LAW ISSUES ................................................................................130

    A.   Separability of Multiple Agreements with the Same Party................................131

    B.   Apparent Authority ............................................................................................132

    C.   Express Choice-of-Law Provisions under New York Law..................................133

    D.   Contractual and Quasi-Contractual Claims ......................................................135

        1.   Economic Duress ........................................................................................135

            a)   New York Law....................................................................................135

            b)   English Law........................................................................................136

        2.   Failure of Consideration.............................................................................138

            a)   New York Law....................................................................................138

            b)   English Law........................................................................................139

        3.   Breach of the Covenant of Good Faith and Fair Dealing............................140

            a)   New York Law....................................................................................140

            b)   English Law........................................................................................143

        4.   Construction of Terms in the Absence of a General Obligation of
            Good Faith .................................................................................................144

    E.   Unjust Enrichment .............................................................................................144

        1.   Under New York Law...................................................................................144

        2.   Under English Law ......................................................................................149

    F.   Misrepresentation and Fraud .............................................................................150

        1.   New York Law.............................................................................................150

        2.   English Law.................................................................................................150

    G.   Breach of Fiduciary Duty and Misappropriation under English Law.................152

    H.   Tortious Interference under English Law ...........................................................153

    I.   Defenses to Claims:  Ratification and Waiver by Estoppel ...............................153

        1.   Ratification of Agents Acting without Authority under New York
            Law .............................................................................................................153

        2.   Waiver by Estoppel under English Law ......................................................155

    J.   Action to Recover Chattel..................................................................................156

    K.   Trade Secret Misappropriation...........................................................................160

    L.   Unfair Competition ............................................................................................163

    M.   Tortious Interference with Employment Relations .............................................166

    N.   Conversion.........................................................................................................169

O. Auditor Malpractice ................................................................ 174

VI. SECURITIES INTERMEDIARIES (ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE) ................................................................ 178

A. Protected Purchaser and the Securities Intermediary Rules ............................... 178

B. Terms Used in the Protected Purchaser and Securities Intermediary Provisions ................................................................ 180

    1. Meaning of "Gives Value" under the UCC ................................... 180

    2. Meaning of "Obtains Control" under the UCC ........................... 181

        a) Control of a Certificated Security ............................................ 181

        b) Control of an Uncertificated Security ..................................... 182

        c) Control of a Security Entitlement ............................................ 183

    3. Meaning of "Notice of Adverse Claim" ...................................... 184

    4. Meaning of "Collusion" under the UCC ....................................... 186

        a) The Restatement Approach ....................................................... 187

        b) Collusion ................................................................................... 193

VII. SFAS 157 ................................................................................... 195

A. Accounting Standards Under SFAS 157 ............................................................... 195

    1. The Financial Accounting Standards Board and Financial Accounting Standard 157 ................................................................ 197

        a) Definition of Fair Value ............................................................ 199

        b) Valuation Techniques and Fair Value Hierarchy .................... 200

        c) Disclosures ................................................................................ 204

    2. Supplemental Guidance Regarding SFAS 157 ............................. 204

        a) FSP SFAS 157-3: Determining the Fair Value of a Financial Asset When the Market for the Asset is Not Active ......................................... 205

        b) FSP SFAS 157-4: Determining Fair Value When the Volume and Level of Activity for the Asset or Liability Have Significantly Decreased and Identifying Transactions That Are Not Orderly .......... 207

B. Legal Standards Governing Retrospective Review of Validity of Valuations for Bankruptcy Analysis ........................................................ 212

    1. Insolvency: Relationship to Mark-to-Market Valuations ............. 213

    2. Hindsight Analysis in Insolvency Determinations ...................... 213

## I.    COLORABLE CLAIM STANDARD

The Bankruptcy Court's Order Directing Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code (the "Examiner Order") used the phrase "colorable claims" or "colorable causes of action" in four of the topics to be investigated by the Examiner.   Examiner Order, at pp. 3-4, Docket No. 2569, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Jan. 16, 2009).   In the Report, the Examiner considers a claim to be colorable if there is sufficient credible evidence to support findings of fact that make out the claim.[1]   That standard accords well with the extensive factual investigation that the Examiner has conducted.

This Section discusses three areas of law that provide context for the Examiner's considered use of the credible evidence test.   Section A discusses the use of the phrase "colorable claim" in connection with applications by creditors' committees to pursue claims for the benefit of a debtor's estate, a standard that resembles the one applied on a motion to dismiss; Section B discusses the standard courts use in deciding motions for summary judgment; and Section C reviews the standards that examiners have used to identify claims in previous cases.

### A.   Bankruptcy Standing Cases

The Bankruptcy Code does not define the word "colorable."   However, the phrase "colorable claim" is used in bankruptcy cases in the context of analyzing

---

[1] See Section I.A. of the Report.

whether a creditors' committee has standing under either 11 U.S.C. § 1103(c)(5)[2] or 11 U.S.C. § 1109(b)[3] to file suit on behalf of a debtor in possession or trustee.[4]

Under the Bankruptcy Code, creditors' committees do not have explicit authority to initiate adversary proceedings. However, courts have found that creditors' committees have an "implied, but qualified, right . . . to initiate adversary proceedings in the name of the debtor in possession." *Unsecured Creditors Comm. of Debtor STN Enters. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904 (2d Cir. 1985) (Sections 1103(c)(5) and 1109(b) "imply a qualified right for creditors' committees to initiate suit with the approval of the bankruptcy court."); *see also La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 252-53 (5th Cir. 1988) (creditors' committee could sue a corporation's officers and directors for gross negligence, mismanagement, and breach of fiduciary duty). To determine whether to allow a creditors' committee or another party in interest to pursue a claim on behalf of a bankruptcy estate, a court will analyze whether the debtor or trustee unjustifiably refused to pursue that claim.

The Second Circuit has stated that, to obtain standing, a committee must present a "colorable claim," that is a claim "for relief that on appropriate proof would support a

---

[2] Section 1103(c)(5) states: "(c) A committee appointed under section 1102 of this title may— . . . (5) perform such other services as are in the interest of those represented."

[3] Section 1109(b) states: "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."

[4] The phrase "colorable claim" has been used by courts in a wide variety of cases dating back to at least the mid-19th century. Considering the context of how the phrase is used in this case—a bankruptcy court's order appointing an examiner—the research and analysis for this portion of the memorandum was limited to the use of the phrase in bankruptcy cases.

recovery." *In re STN*, 779 F.2d at 905. Other courts have described the analysis as "much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim." *In re America's Hobby Ctr., Inc.*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998). The test is not particularly stringent: "[c]aselaw construing requirements for 'colorable' claims has made it clear that the required showing is a relatively easy one to make." *In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005) (Gerber, J.).

In *In re STN*, a creditors' committee requested leave to sue the probate estate of the sole stockholder of debtor STN Enterprises, Inc. as well as the stockholder's wife, who had served as a director and corporate secretary of the debtor, alleging waste, malfeasance, and fraudulent conveyance. *In re STN*, 779 F.2d at 902. The Second Circuit concluded that the committee's request triggered a two-part inquiry: (1) the committee must present "a colorable claim or claims for relief that on appropriate proof would support a recovery;" and (2) the debtor must have unjustifiably failed to bring suit in light of the probabilities of success, the potential financial recovery, and the cost of the action. *Id.* Because the district court had not performed that analysis, the Second Circuit reversed and remanded the case for further proceedings. *Id.* at 906.

The Second Circuit's opinion in *STN* was the first of three opinions regarding parties' standing to sue, which became known as the "*STN* Trilogy." The other two cases are: (1) *Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96 (2d

Cir. 2001) (extending the *STN* principles to situations where the debtor in possession consented to the prosecution of claims by a committee); and (2) *Glinka v. Murad (In re Housecraft Indus. USA, Inc.)*, 310 F.3d 64 (2d Cir. 2002) (extending the *STN* and *Commodore* principles to permit a bankruptcy court to confer standing upon a committee to sue as a co-plaintiff with the debtor on behalf of the estate). The Second Circuit has continued to apply the *STN* standard. *See In re Adelphia Commc'ns Corp.*, 544 F.3d 420, 423-424 (2d Cir. 2008) (Sotomayor, J.) (citing the *STN* standard for recognizing derivative standing).

Several bankruptcy cases in the Second Circuit have utilized the *STN* standard. In *In re America's Hobby Center*, a creditors' committee sued the debtor's post-petition lender. 223 B.R. at 278. The bankruptcy court permitted the committee to pursue some but not all of the claims it had proposed. *Id.* at 286-87. The bankruptcy court applied *STN* to decide whether the committee presented a colorable claim and whether the proposed actions were likely to benefit the estate. *Id.* at 282. The bankruptcy court stated, "[b]ecause the creditors' committee is not required to present its proof, the first inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim." *Id.*

Similarly, in *Official Committee of Unsecured Creditors of the Debtors v. Austin Financial Services (In re KDI Holdings, Inc.)*, the creditors' committee brought an adversary proceeding against the debtors' pre-petition lenders. 277 B.R. 493, 498

(Bankr. S.D.N.Y. 1999). The bankruptcy court applied the *STN* standard to determine whether the committee had standing to pursue the adversary proceeding. The bankruptcy court held that the committee's claims were sufficiently colorable and were likely to confer a benefit on the estate, so the court allowed the action to proceed. *Id.* at 520. The court explained that "[i]n determining whether there is a colorable claim, the Court must engage in an inquiry that is 'much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim.'" *Id.* at 507-08 (quoting *In re America's Hobby Ctr.*, 223 B.R. at 281).

Finally, in *In re Adelphia*, the creditors' committee and equity holders' committee moved for leave to prosecute claims against lenders on behalf of the Chapter 11 estates. 330 B.R. 364, 368 (Bankr. S.D.N.Y. 2005). The bankruptcy court held that the committees would be authorized to pursue claims that included fraudulent conveyance claims and claims of aiding and abetting breaches of fiduciary duties. *Id.* at 386. The bankruptcy court applied the *STN* standard, noting that:

> Caselaw construing requirements for "colorable" claims has made it clear that the required showing is a relatively easy one to make. In *STN*, the Second Circuit eschewed extensive merits review, requiring instead, "a colorable claim . . . for relief that *on appropriate proof* would support a recovery. In this district, on *STN* motions, Chief Judge Brozman has observed that authorization should be denied only if the claims are "facially defective," and Judge Gonzalez has noted that in determining whether there is a colorable claim, the court must engage in an inquiry that is "much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim."

> *Id.* at 376 (citations omitted).

Bankruptcy cases outside of the Second Circuit have applied similar standards in determining whether a creditors' committee has standing to bring suit. *See, e.g., In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003) ("On the issue of whether a claim is 'colorable,' the Court should consider whether the Committee has asserted claims for relief that on appropriate proof would support a recovery. Because the creditors' committee is not required to present its proof, the first inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim."); *In re G-I Holdings, Inc.*, 313 B.R. 612, 652 (Bankr. D.N.J. 2004) (committee did not satisfy its burden of presenting a colorable claim to challenge the securitization transaction because a valid affirmative defense to the proposed action existed – lack of subject matter jurisdiction); *In re Tenn. Valley Steel Corp.*, 183 B.R. 795, 800 (Bankr. E.D. Tenn. 1995) (citing *In re STN* for the proposition that the court must decide whether the committee has asserted "claims for relief that on appropriate proof would support a recovery" and stating that "[d]etermining whether the Committee has asserted colorable claims in its Amended Complaint is not the equivalent of determining whether the Defendants are entitled to summary judgment").

A claim is "colorable" under *STN* if the allegations supporting that claim are sufficient to withstand a motion to dismiss. Historically, federal courts reviewed motions to dismiss under the standard that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set

of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). However, recent Supreme Court decisions have tightened the standard applied to motions to dismiss. In *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), the Supreme Court construed Rule 8(a)(2) to require that a complaint include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. Two subsequent Supreme Court cases, *Erickson v. Pardus*, 551 U.S. 89 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), have elaborated on the "plausibility" requirement; in *Erickson* the Court emphasized that a court must assume all factual allegations in a complaint are true, but in *Iqbal* the Court held that the assumption of truth does not apply to allegations that are "conclusory."

In *Iqbal*, the Court explained the "plausibility" standard:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, "it stops short of the line between possibility and plausibility of entitlement to relief."

*Iqbal*, 129 S. Ct. at 1949. (quoting *Twombly*, 550 U.S. 544 at 570). Although *Twombly* and *Iqbal* have altered the standard that courts apply in deciding motions to dismiss, they did not change the basic principle that a court deciding a motion to dismiss looks to the

allegations of the complaint, without the benefit of the factual record that is developed in discovery.

**B.  Summary Judgment Standard**

Courts apply a different procedural mechanism – summary judgment – to assess the sufficiency of allegations in light of a more developed factual record.  Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, depositions, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

In *Anderson v. Liberty Lobby*, the Supreme Court explained the summary judgment standard:  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue as to *material* fact."  477 U.S. 242, 247-48 (1986).  To defeat a motion for summary judgment, the non-moving party must show (1) that there is a genuine dispute as to the facts in the case; and (2) that the disputed facts are material to the determination of the case.

In determining what facts are material for summary judgment purposes, courts consider whether a dispute may affect the outcome of the case.  *Id.* at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law

will properly preclude the entry of judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* In deciding a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 250. There is no issue for trial, and summary judgment may be granted, if the evidence favoring the non-moving party is "merely colorable," *id.* at 249 (citing *Dombrowki v. Eastland*, 387 U.S. 82 (1967)), or is "not significantly probative." *Id.* at 249-50 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In *Liberty Lobby*, the Supreme Court noted that a judge considering a typical summary judgment motion "must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252.

### C. Examiner Orders from Other Bankruptcy Cases

Examiners in other large and complex bankruptcies have used varying standards to analyze potential claims. Notably, however, none of the examiner orders in those cases used the phrase "colorable claim."

#### 1. *In re Worldcom, Inc.*, Case No. 02-13533 (Bankr. S.D.N.Y.)

On July 22, 2002, the Bankruptcy Court for the Southern District of New York entered an order directing the appointment of an examiner in the *Worldcom* bankruptcy case. Order Granting the Motion of the United States Trustee for the Appointment of an

Examiner, Docket No. 53, *In re Worldcom, Inc.*, Case No. 02-13533 (Bankr. S.D.N.Y. July 22, 2002) (the "Worldcom Examiner Order"). The Worldcom Examiner Order directed the Worldcom Examiner, among other things, to:

> investigate any allegations of fraud, dishonesty, incompetence, mismanagement or irregularity in the arrangement of the affairs of any of the Debtors by current or former management, including but not limited to issues of accounting irregularities.

Worldcom Examiner Order, at p. 2.

In his report, the Worldcom Examiner set forth findings and identified potential claims. The Worldcom Examiner stated:

> The Examiner does not believe that every instance of wrongdoing identified in his Reports gives rise to a potential cause of action on behalf of WorldCom. Instead, the Examiner has identified the potential causes of action that the Examiner, after reviewing the applicable facts and law, believes would most likely survive motions to dismiss or for summary judgment and reach a fact-finder if presented in a lawsuit. The Examiner has sought to avoid discussing potential causes of action that the Examiner believes bear a significant risk of being dismissed as a matter of law.

Third and Final Report of Dick Thornburgh, Bankruptcy Court Examiner, at p. 5 n.7, Docket No. 10624, *In re Worldcom, Inc.*, Case No. 02-13533 (Bankr. S.D.N.Y. Jan. 26, 2004).

### 2. *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y.)

On April 8, 2002, the Bankruptcy Court for the Southern District of New York entered an order directing the appointment of an examiner in the *Enron* bankruptcy case. Order Pursuant to 11 U.S.C. §§ 1104(c) and 1106(b) Directing Appointment of Enron Corp. Examiner, Docket No. 2838, *In re Enron Corp.*, Case No. 01-16034 (Bankr.

S.D.N.Y. Apr. 8, 2002) (the "Enron Examiner Order"). The Enron Examiner Order provided, among other things, that:

> the Enron Examiner shall have the authority to investigate and report on transactions involving not only Enron Corp., but also any entity controlled by Enron Corp. and any other debtor in these jointly administered cases.
>
> • • •
>
> [T]he Enron Examiner shall have the authority and power to investigate all transactions (as well as all entities as defined in the Bankruptcy Code and pre-petition professionals involved therein): (i) involving special purpose vehicles or entities created or structured by the Debtors or at the behest of the Debtors (the "SPEs"), that are (ii) not reflected on the Enron Corp. balance sheets, or that (iii) involve hedging using the Enron Corp. stock, or (iv) as to which the Enron Examiner has the reasonable belief are reflected, reported or omitted in the relevant entity's financial statements not in accordance with generally accepted accounting principles, or that (v) involve potential avoidance actions against any pre-petition insider or professional of the Debtors;
>
> Enron Examiner Order, at pp. 1-4.

In the Enron Examiner's Final Report, the Enron Examiner described the standard adopted:

> The Examiner is not the ultimate decision maker on these matters. The Examiner has analyzed the evidence he has gathered to date against the legal standards applicable to the issues identified in this Report. The Examiner has considered direct evidence and the reasonable inferences that can be drawn therefrom. If there are sufficient facts to support a claim, even though there is evidence to the contrary, then a court would submit that claim to a fact-finder. Where the Examiner reaches the conclusion that there is *sufficient evidence for a fact-finder to conclude* that a claim exists, the Examiner has determined that in a legal proceeding regarding such matter, the proposition would be submitted to the fact-finder for decision. In most cases, the fact-finder would be a jury, although in equitable subordination actions the Bankruptcy Court serves as the fact-finder. The decision of the fact-finder would be made after

evaluating the documentary evidence, the testimony and credibility of witnesses and the reasonable inferences that may be drawn from this evidence.

Final Report of Neal Batson, Court-Appointed Examiner, at pp. 13-14, Docket No. 14455, *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y. Nov. 24, 2003) (footnote omitted).

### 3. *In re Refco, Inc.*, **Case No. 05-60006 (Bankr. S.D.N.Y.)**

On March 16, 2006, the Bankruptcy Court for the Southern District of New York entered an order directing the appointment of an examiner in the *Refco* bankruptcy case. Order Granting the Motion of the United States Trustee for the Appointment of an Examiner, Docket No. 1487, *In re Refco, Inc.*, Case No. 05-60006 (Bankr. S.D.N.Y. Mar. 16, 2006) (the "Refco Examiner Order"). The Refco Examiner Order authorized the Refco Examiner to:

investigate and to report on any topic that might reasonably result in the assertion of a claim or right by any of the Debtors' estates with the exception of any claim or right of Refco Capital Markets, Ltd.

Refco Examiner Order, at pp. 1-2.

The Refco Examiner's Final Report explained the standard applied:

The Examiner concludes that the Debtors' estates could state claims for relief, sufficient to withstand a motion to dismiss, against certain of Refco's prepetition professionals who contributed to, or failed to prevent, the harm suffered by Refco, including: . . . [listing potential claims for professional negligence, breaches of fiduciary duties, violations of Delaware General Corporation Law, aiding and abetting fraud and breaches of fiduciary duty, avoidance and recovery of fraudulent conveyances and preferential transfers].

• • •

> Several significant factual and legal defenses are potentially available to all parties against whom claims may be asserted. Among the most significant potential defenses are the "*Wagoner*" rule and, in some cases, the statute of limitations.

Final Report of Examiner, pp. 7-8 (footnote omitted), Docket No. 5530, *In re Refco, Inc.*, Case No. 05-60006 (Bankr. S.D.N.Y. July 11, 2007).

### 4. *In re New Century TRS Holdings, Inc.*, **Case No. 07-10416 (Bankr. D. Del.)**

On June 1, 2007, the Bankruptcy Court for the District of Delaware entered an order directing the appointment of an examiner in the *New Century* bankruptcy case. Order Denying in Part and Granting in Part Motion of the United States Trustee for an Order Directing the Appointment of a Chapter 11 Trustee, or in the Alternative, an Examiner, Docket No. 1023, *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (Bankr. D. Del. June 1, 2007) (the "New Century Examiner Order"). The New Century Examiner Order directed the New Century Examiner to:

> (a) investigate any and all accounting and financial statement irregularities, errors or misstatements, including but not limited to such irregularities, errors or misstatements that (i) gave rise to the announced need to restate the Debtors' financial statements for the first three quarters of 2006 and/or (ii) led the Debtors' management and Audit Committee to conclude that it was more likely than not that pre-tax earnings in the 2005 financial statements were materially overstated, and identify and evaluate any claims or rights of action that the estates might have arising from or relating to such irregularities, errors or misstatements, (b) investigate any possible post-petition unauthorized use of cash collateral by the Debtor, and (c) otherwise perform the duties of an examiner set forth in section

1106(a)(3) (as limited by this Order) and 1106(a)(4) of the Bankruptcy Code.

New Century Examiner Order, at. pp. 2-3.

In the New Century Examiner's Final Report, the New Century Examiner identified potential causes of action and defenses that the bankruptcy estates may assert. Final Report of Michael J. Missal Bankruptcy Court Examiner, pp. 517-51, Docket No. 5518, *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (Bankr. D. Del. Mar. 26, 2008) (the "New Century Examiner's Final Report"). With respect to potential causes of action regarding breaches of fiduciary duties, the New Century Examiner discussed the officers' and directors' conduct but did not include a detailed discussion of potential claims because "[b]reach of fiduciary duty claims against officers and directors have strong defenses to overcome, particularly the business judgment rule and statutory or other limitations." New Century Examiner's Final Report, at p. 2.

### 5. *In re SemCrude, L.P.*, Case No. 08-11525 (Bankr. D. Del.)

On September 10, 2008, the Bankruptcy Court for the District of Delaware entered an order directing the appointment of an examiner in the *SemCrude* bankruptcy case. Order Directing United States Trustee to Appoint an Examiner, Docket No. 1295, *In re SemCrude, L.P.*, Case No. 08-11525 (Bankr. D. Del. Sept. 10, 2008) (the "SemCrude Examiner Order"). The SemCrude Examiner Order directed the SemCrude Examiner to:

> (a) investigate the circumstances surrounding (i) the Debtors' Trading Strategy and the transfer of their NYMEX account, (ii) the Insider Transactions and the formation of Energy Partners, and (iii) the potential improper use of borrowed funds and funds generated from the Debtors' operations and the liquidation of their assets to satisfy margin calls related to the Trading Strategy for the Debtors and certain entities owned or controlled by the Debtors' officers and directors; and (b) otherwise perform the duties of an examiner set forth in 11 U.S.C. § 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code; [and]
>
> •   •   •
>
> report on whether (a) any directors, officers, or employees of the Debtors participated in fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the Debtors and (b) the Debtors' estates have claims or causes of action against current or former officers, directors, or employees of the Debtors arising from any such participation.

SemCrude Examiner Order, at pp. 2-3.

In the SemCrude Examiner's Final Report, the SemCrude Examiner identified potential claims or causes of action that the debtors' estates had. Final Report of Louis J. Freeh, pp. 18-21, Docket No. 3701, *In re SemCrude, L.P.*, Case No. 08-11525 (Bankr. D. Del. Apr. 15, 2009) (the "SemCrude Examiner's Final Report"). Regarding theories of potential liability, the SemCrude Examiner stated:

> The Examiner has summarized the basic elements which support the Examiner's conclusions with respect to certain potential causes of action that the Debtors' estates may have under Delaware and Oklahoma law against Kivisto, Wallace, Foxx, Cooper, and others, and leaves the task of preparing detailed legal analyses and arguments to the fiduciaries of the Debtors' estates to the extent such claims are pursued.

SemCrude Examiner's Final Report, at p. 249.

## D.   Conclusion

In light of *STN* and subsequent cases, there is legal support for a standard, akin to that applied to a motion to dismiss, under which any claim supported by plausible allegations is colorable.   However, because the Examiner has conducted an extensive factual investigation, the Examiner has concluded that a higher threshold is appropriate, just as a motion for summary judgment is decided on a more exacting standard than a motion to dismiss at the outset of a case.   Accordingly, in the Report, the Examiner considers a claim to be colorable if there is sufficient credible evidence to support findings of fact that make out the elements of that claim.

## II.    FIDUCIARY DUTIES

This Section discusses principles of fiduciary duty law that are applied in the Examiner's Report.   Because LBHI was incorporated in Delaware, those principles are governed by Delaware law.   *See Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 385-86 (3d Cir. 2007); *In re Topps Co. S'holders Litig.*, 924 A.2d 951, 958-60 (Del. Ch. 2007).   Part A below considers the fiduciary duties that directors and officers owe under Delaware law.   Part B addresses causation and damages in fiduciary duty cases.   Part C discusses a claim for aiding and abetting a breach of fiduciary duty Part D considers the duties of directors of insolvent wholly owned subsidiaries.   Part E addresses the duties that a controlling shareholder owes to the minority shareholder.

Part F discusses principles of standing applicable to a claim for a breach of fiduciary duty.

## A.  Delaware Corporate Fiduciary Duties

Under Delaware law, officers and directors historically have owed the corporation three fiduciary duties: due care, loyalty, and good faith.  *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).  In practice, though, the duty of good faith has become a subsidiary element of the duty of loyalty.  *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  The duty to monitor the actions of subordinates, also known as the *Caremark* duty,[5] and the duty to disclose material facts, also known as the duty of candor, sometimes have been treated as independent duties and sometimes as subsidiaries of the duties of care or loyalty.

This Part first discusses the "business judgment rule," the principle that protects officers and directors from personal liability for business decisions that have resulted in financial losses to the corporation unless their actions are proven to have been grossly negligent.  This Part then discusses the duty of care, the duties of loyalty and good faith, the duty to monitor, and the duty of disclosure.

---

[5] *In re Caremark Int'l Inc., Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).

### 1. Business Judgment Rule

#### a) The Business Judgment Rule as Applied to Directors

Delaware courts will not substitute their own judgments for those of corporate directors. Consequently, most decisions made by directors will not be adjudicated based on their substantive merits but rather on whether the directors employed the appropriate procedures to come to the decision. That is a result of the business judgment rule, which presumes that officers' actions were substantively proper.

The business judgment rule creates a "'presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). Some courts have employed the business judgment rule only in cases involving the duty of care, while other courts have applied the rule in cases implicating the duties of loyalty and good faith as well. *Compare Kahn v. Roberts*, No. C.A. 12324, 1995 WL 745056, at *4 (Del. Ch. Dec. 6, 1995) (applying the business judgment rule to just the duty of care), *with Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007) (discussing the business judgment rule in the context of the duty of loyalty but finding that it had been overcome through the fiduciary's disloyalty). The distinction is largely an academic one, because a party acting disloyally or in bad faith would not satisfy the rule's prerequisites in any event.

Under the business judgment rule, directors' "decisions will be respected by courts unless the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available." *Brehm v. Eisner*, 746 A.2d 244, 264 n.66 (Del. 2000). *See also Unocal*, 493 A.2d at 954 (quoting *Aronson*, 473 A.2d at 812).

Courts are reluctant to invoke the exception to the business judgment rule for failure to consider all reasonably available material facts. *See, e.g., Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1356 (Del. 1985) (defendant directors were properly informed when they had been provided with a three-page notebook summarizing the issues and the board had discussed the issues with counsel and investment bankers); *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 929 (Del. 2003) (it was not a *per se* breach of fiduciary duty that a board of directors did not read a merger agreement but relied instead on a summary of the terms); *Brehm*, 746 A.2d at 261 (a board of directors was entitled to rely on an expert in making a business judgment and, in relying on that opinion without necessarily evaluating the underlying facts independently, was fully protected by the business judgment rule); *Citron v. Fairchild Camera and Instrument Corp.*, Civ.A. No. 6085, 1988 WL 53322, at *17 (Del. Ch. May 19, 1998) (directors' rushed decision was not outside the bounds of the business judgment rule because, although the board did not thoroughly consider all alternatives, the decision was complicated by

a short deadline); *see also* DEL. CODE ANN. tit. 8, § 141(e) (2010) ("A member of the board of directors, or a member of any committee designated by the board of directors, shall . . . be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors."). *But see Smith v. Van Gorkom*, 488 A.2d 858, 874-75 (Del. 1985) ("At a minimum for a report to enjoy the status conferred by § 141(e), it must be pertinent to the subject matter upon which a board is called to act, and otherwise be entitled to good faith, not blind, reliance."), *overruled on other grounds by Gantler*, 965 A.2d at 713.[6]

A decision by a director falls outside the business judgment rule in "those rare cases where the decision under attack 'is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith[,]' [or] [t]he decision must be 'egregious,' . . . constitute a 'gross abuse of discretion,' or be so thoroughly defective that it carries a 'badge of fraud.'" *Alidina v. Internet.com Corp.*, No. Civ.A. 17235-NC, 2002 WL 31584292, at *4 (Del. Ch. Nov. 6, 2002) (internal citations omitted). A court "will not substitute [its] judgment for that of the board if the latter's decision can be 'attributed to any rational business purpose.'" *Unocal*, 493 A.2d at 949

---

[6] In *Gantler*, the Delaware Supreme Court overruled its previous holding in *Smith v. Van Gorkom* regarding whether a ratifying shareholder vote extinguishes a claim for violation of the duty of care or simply subjects the decision to business judgment review. Other portions of the court's decision in *Smith v. Van Gorkom* were affected by the Delaware legislature's enactment of DEL. CODE ANN. tit. 8, § 102(b)(7), which established a corporation's ability to exculpate its directors from personal liability for potential violations of the duty of care. The balance of the court's holding in *Smith v. Van Gorkom* remains good law and continues to be cited by Delaware courts.

(quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)); *see also In re Caremark Int'l Inc., Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

The business judgment rule does not protect decisions that involve fraud or illegality. *See Smith v. Van Gorkom*, 488 A.2d at 873; *Litt v. Wycoff*, C.A. No. 19083-NC, 2003 WL 1794724, at *6-7 (Del. Ch. Mar. 28, 2003); *In re W. Nat'l Corp. S'holders Litig.*, Consolidated C.A. No. 15927, 2000 WL 710192, at *26-27 (Del. Ch. May 22, 2000). Under Delaware law, intentionally causing a corporation to violate the law is a breach of the duties of loyalty and good faith. *Gifford*, 918 A.2d at 357-358. "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006); *see also Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007) ("[I]t is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully."); *Metro Commc'n Corp. BVI v. Advanced MobileComm Techs., Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004) ("Under Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity."); *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("[O]ne cannot act loyally as a corporate director by causing the

corporation to violate the positive laws it is obliged to obey."). Directors "have no authority knowingly to cause the corporation to become a rogue, exposing the corporation to penalties from criminal and civil regulators." *Desimone*, 924 A.2d at 934.

The business judgment rule does not protect a director from personal liability for inaction unless the failure to act resulted from a conscious decision to take no action. *Official Comm. of Unsecured Creditors v. Hendricks (In re Dwight's Piano Co.)*, No.1:04-CV-066, 2009 WL 2913942, at *18 (S.D. Ohio Sept. 9, 2009) (applying Delaware law) ("The 'business judgment rule' does not apply to director inaction. The appropriate standard for determining liability for director inaction is generally gross negligence.").

### b) The Business Judgment Rule as Applied to Officers

Actions alleging breaches of fiduciary duties against officers are rarely litigated in Delaware, and as a result only a few reported cases analyze the application of the business judgment rule to officers.[7]   However, based upon the Delaware Supreme Court's recent holding in *Gantler*, 965 A.2d at 708-09, that the fiduciary duties of directors and officers are "identical," it is likely that officers are protected by the business judgment rule when they act under an express delegation of authority from the board.  It also is likely that officers are protected by the business judgment rule

---

[7] Until recently Delaware provided that non-resident directors, but not officers, of Delaware corporations were deemed to have consented to personal jurisdiction in Delaware courts. *See* DEL. CODE ANN. tit. 10 § 3114 (2010).  The former rule may have limited the number of cases in which Delaware courts were called upon to apply the business judgment rule to officers.

when they act within the scope of their discretion (even if not pursuant to express delegation by the board).

It is unlikely, however, that the business judgment rule would protect corporate officers from personal liability under several other circumstances.

First, because an officer must act on an "informed basis" to qualify for protection under the business judgment rule, that rule should not cover an officer who failed to be fully informed of the facts relevant to the decision in question. *See*, *e.g.*, *McMullin v. Beran*, 765 A.2d 910, 922 (Del. 2000) ("The business judgment rule is rebutted if the plaintiff shows that the directors failed to exercise due care in informing themselves before making their decision."); *see also Smith v. Van Gorkom*, 488 A.2d at 872; *Aronson*, 473 A.2d at 812.

Second, the business judgment rule may not protect an officer who acted without disclosing material facts concerning the matter in question to the board or a superior officer, because that failure to disclose deprives the officer of the presumptive authority to take the action in question. *Cf. Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1988) ("[J]udicial reluctance to assess the merits of a business decision ends in the face of illicit manipulation of a board's deliberative process by self-interested corporate fiduciaries."). Similarly, where a plaintiff challenges an action that was beyond the scope of an officer's authority, the business judgment rule may not protect the officer. *Gifford*, 918 A.2d at 354 ("A board's knowing and intentional decision to

exceed the shareholders' grant of express (but limited) authority raises doubt regarding whether such decision is a valid exercise of business judgment."); *Massaro v. Vernitron Corp*, 559 F. Supp. 1068, 1080 (D. Mass. 1983) (business judgment rule can be overcome upon a showing of "'fraud, bad faith, gross overreaching or abuse of discretion'" (quoting *Painter v. Marshall Field & Co.*, 646 F.2d 271, 293 (7th Cir. 1981))); *Omnibank v. United Southern Bank*, 607 So. 2d 76, 84-85 (Miss. 1992) (refusing to apply business judgment rule when officer exceeded his authority). An action outside of an officer's authority or contrary to corporate policy may be considered to have been taken in bad faith and thus fall outside the protection of the business judgment rule. *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) (plaintiffs could defeat the business judgment rule defense if they could "demonstrate that no business person could possibly authorize the action in good faith."); *see also Massaro*, 559 F. Supp. at 1080.

### c) The Intersection Between the Business Judgment Rule and Illegal Conduct - the *AIG* Case

The Delaware Chancery Court's recent decision in *In re American International Group, Inc.* ("*In re AIG*"), 965 A.2d 763 (Del. Ch. 2009), illustrates the limits of the business judgment rule. In that case, the court held that shareholders stated a claim for breach of the duty of loyalty and the duty to monitor against AIG's top managers, including its Chairman/CEO and his "inner circle," for materially misleading financial statements that overstated the value of the corporation by billions of dollars and made

AIG appear more financially secure than it really was. *Id.* at 774-75. The single largest deception involved an elaborate $500 million sham transaction "staged to make AIG's balance sheet look better." *Id.* at 775. Although the plaintiffs did not allege the precise involvement of each of the defendants in each of the putative schemes and deceptions, the complaint detailed the sham transaction and other schemes with enough specificity that the court was unwilling to infer that AIG engaged in risky and innovative transactions of such magnitude without the involvement or knowledge of the Chairman/CEO and his inner circle. *See id.* at 795-99. The court rejected the contention that the disputed products "came to market through the spontaneous, unsupervised actions of lower-level AIG actors." *Id.* at 797. The court noted that fiduciaries involved in an improper scheme possess a motive to hide information relating to their wrongdoing. *Cf. id.* at 795 ("[T]hose who engage in sophisticated forms of financial fraud do their best not to leave an obvious paper trail. Rather, consistent with their improper objectives, those at the top of such schemes try to conceal their roles and not leave marked paths leading to their doorsteps.").

One defendant, who knew that the sole purpose of the $500 million sham transaction was to manipulate the company's balance sheet, tried to escape liability for fraud by imputing his knowledge to the corporation. The court rejected that argument, stating:

> [U]nder Delaware law, where officers and directors have disabling conflicts that give them an interest in hiding information from a

corporation's independent directors and stockholders, the conflicted fiduciaries' knowledge is not imputed to the corporation for purposes of holding those fiduciaries liable for the harm they caused to the corporation. In colloquial terms, *a fraud on the board has long been a fiduciary violation under our law* and typically involves the failure of insiders to come clean to the independent directors about their own wrongdoing, the wrongdoing of other insiders, or information that the insiders fear will be used by the independent directors to take actions contrary to the insiders' wishes. *Delaware law provides no safe harbor to high-level fiduciaries who group together to defraud the board.* The Stockholder Plaintiffs have alleged that Tizzio and the other AIG insiders who participated in the Gen Re Transaction [the "sham" transaction] *violated their fiduciary duties by causing AIG to engage in illegal conduct.* If true, that was bad faith conduct that gave Tizzio and the other guilty insiders an interest in hiding what they had done.

*Id.* at 806-07 (emphasis added). *AIG* illustrates how fiduciaries who cause their company to engage in illegal conduct breach their duties of loyalty and good faith.

## 2. Duty of Care

A corporate director's duty of care is a duty of informed decision-making. *Smith v. Van Gorkom*, 488 A.2d at 873. The duty polices the process by which directors make business decisions, not the content of those decisions. *Caremark*, 698 A.2d at 967. In assessing whether a fiduciary satisfied the duty of care, courts "do not measure, weigh or quantify directors' judgments [and] do not even decide if they are reasonable in this context. Due care in the decision-making context is *process* due care only." *Brehm*, 746 A.2d at 264.

The duty of care has two aspects. First, prior to making a business decision, directors are responsible for informing themselves of "all material information

reasonably available to them." *Aronson*, 473 A.2d at 812. Second, having considered the necessary information, directors must "act with requisite care in the discharge of their duties." *Id.*

Gross negligence is required for a court to find a breach of the duty of care. *Smith v. Van Gorkom*, 488 A.2d at 873. "[A] claim that a corporate manager acted with gross negligence is the same as a claim that she breached her fiduciary duty of care." *Albert v. Alex. Brown Mgmt. Servs. Inc.*, C.A. Nos. 04C-05-250 PLA, 04C-05-251 PLA, 2004 WL 2050527, at *6 (Del. Super. Ct. Sept. 15, 2004). "[G]ross negligence is a 'high standard' requiring proof of 'reckless indifference' or 'gross abuse of discretion.'" *Tomczak v. Morton Thiokol, Inc.*, Civ.A. No. 7861, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) (internal citations omitted). In addition, Delaware protects directors from personal liability to the extent their decisions are based on information provided to them by management. *See* DEL. CODE ANN. tit. 8, § 141(e) (2010); *see also Brehm*, 746 A.2d at 261; *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 132 n.86 (Del. Ch. 2009).

Like many Delaware corporations, Lehman immunized its directors from claims of breaches of the duty of care. Lehman's certificate of incorporation provides:

> A director shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director; provided that this sentence shall not eliminate or limit the liability of a director (i) for any breach of his duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the [Delaware General Corporation Law], or (iv)

for any transaction from which the director derives an improper personal benefit.

Lehman, Restated Certificate of Incorporation of Lehman Brothers Holdings, Inc. (Oct. 10, 2006), § 10.1, *Limitation of Liability of Directors*, attached to Lehman, Quarterly Report (Form 10-Q) (filed on Oct. 10, 2006).

The wording of Lehman's exculpatory clause is nearly identical to § 102(b)(7) of the Delaware General Corporation Law, which authorizes a corporation to exculpate its directors from personal liability for breaches of fiduciary duties. *See* DEL. CODE ANN. tit. 8, § 102(b)(7) (2010). Courts uphold exculpatory clauses in order to protect directors from liability, provided that the conduct in question does not violate the directors' duty of loyalty. *See Stone*, 911 A.2d at 367 ("Such a provision can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty."). As discussed below, however, an exculpatory clause does not extend to directors' *Caremark* duty to monitor management. Moreover, Lehman's certificate of incorporation does not immunize officers from personal liability for breaching the duty of care. *See* Lehman, Restated Certificate of Incorporation, at § 10.1, *Limitation of Liability of Directors.*

There are relatively few Delaware decisions addressing breaches of the duty of care. In one case, the Delaware Chancery Court held that issuing shares in violation of a clear and unambiguous limitation was a violation of a director's duty of care. *Sanders v. Wang*, Case No. 16640, 1999 WL 1044880, *5 (Del. Ch. Nov. 8, 1999). The Delaware

Supreme Court also has held that directors may breach their duty of care if they approve a merger without receiving a written summary of the terms of the merger and without information to support the adequacy of the price of the merger. *Smith v. Van Gorkom*, 488 A.2d at 874. In other cases, courts applying Delaware law have held that failing to consider a proposed transaction with sufficient information, consideration, or deliberation could constitute a breach of the duty of care. *Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, No. Civ. A 20228-NC, 2004 WL 1949290, at *12 (Del. Ch. Aug. 24, 2004) (board's approval of compensation arrangements); *McMullin*, 765 A.2d at 921-22 (board's allegedly rushed approval of sale of corporation).

### 3. Duty of Loyalty and Good Faith

A director's duty of loyalty "essentially . . . mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993). Cases involving the duty of loyalty often involve situations in which directors utilize their corporate authority to confer special benefits onto themselves or majority stockholders. *Aronson*, 473 A.2d at 812. Those circumstances are referred to as "self-dealing" or "interested" situations. *See id.* "A director is considered interested when he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders" on a pro rata basis. *Globis Partners, L.P. v. Plumtree Software, Inc.*, Civ. A. No. 1577-VCP, 2007

WL 4292024, at *5 (Del. Ch. Nov. 30, 2007).  Directors also are considered interested where their motivations in executing a business decision appear to be subservient to the interests of a majority stockholder.  *See e.g., Emerald Partners v. Berlin*, 787 A.2d 85, 94 (Del. 2001); *Tooley v. AXA Fin., Inc.*, No. 18414, 2005 WL 1252378, at * 5 (Del. Ch. May 13, 2005).

The duty to act in good faith is a subsidiary element of the duty of loyalty and "does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty."  *Stone*, 911 A.2d at 370.  Although the duty of good faith has been described as one of a triad of duties on par with the duties of care and loyalty, the duty of good faith is best seen as a subset of the duty of loyalty.  *Id.*  "The good faith required of a corporate fiduciary includes . . . all actions required by a true faithfulness and devotion to the interests of the corporation and its shareholders."  *In re Walt Disney*, 906 A.2d at 67.

Acts taken in bad faith violate the duty of loyalty.  *Gifford*, 918 A.2d at 357.  Bad faith fiduciary conduct is not limited to conduct motivated by an actual or subjective intent to do harm.  *In re Walt Disney*, 906 A.2d at 64-67.  Bad faith also encompasses misconduct that does not involve self-interest in a decision but "is qualitatively more culpable than gross negligence."  *Id.* at 66.  Apart from self-interested dealing, this duty imposes personal liability only on directors who have handled their responsibility in a reckless or irrational manner:

Directors' decisions must be reasonable, not perfect. "In the transactional context, [an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties." . . . Only if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty.

*Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243-44 (Del. 2009) (quoting *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 654-55 (Del. Ch. 2008)).

### 4.  *Caremark* **Duty to Monitor**

The Delaware Chancery Court's decision in *Caremark* established that directors may be liable for failing to fulfill the fiduciary duty to monitor management's compliance with corporate reporting and control systems.  *Citigroup*, 964 A.2d at 122. The fiduciary duty to monitor management is breached if "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  *Id.* at 123.  The Delaware Supreme Court has adopted the *Caremark* standard "for assessing director oversight liability." *Stone*, 911 A.2d at 365. The Supreme Court stressed, however, that a director may be held liable only for a "conscious" failure to fulfill the oversight function:

> [I]mposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.  Where directors fail to act in the face of a known duty to act, thereby demonstrating a

conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

*Id*. at 370.

### a) Origins of the Duty to Monitor

*Caremark* created an exception to the general rule set forth in *Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d 125 (Del. 1963), that "directors are entitled to rely on the honesty and integrity of their subordinates until something occurs to put them on suspicion that something is wrong" and that "'absent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists.'" *See Caremark*, 698 A.2d at 969 (quoting *Graham*, 188 A.2d at 130).

*Caremark* qualified the holding in *Graham* by distinguishing between "*a board decision* that results in loss [to the corporation] because that decision was ill advised or 'negligent'" (which decision is subject to the business judgment rule) and "*an unconsidered failure of the board to act* in circumstances in which due attention would, arguably, have prevented the loss" (which failure can give rise to liability if it reflects a "sustained or systemic failure"). *See Caremark*, 698 A.2d at 967-71 (emphasis in original). The latter category includes an unconsidered failure to ensure there is "a corporate information and reporting system, which the board concludes is adequate." *Id*. at 970.

A plaintiff asserting a *Caremark* claim must establish that the directors are responsible "for a failure to properly monitor or oversee employee misconduct or violations of law." *Citigroup*, 964 A.2d at 123 (citing *David B. Shaev Profit Sharing Account v. Armstrong*, C.A. No. 1449-N, 2006 WL 391931, at *2 (Del. Ch. Feb. 13, 2006)). To meet that standard, plaintiffs may "point to so-called 'red flags' that should have put defendants on notice of the problems" at issue. *Citigroup*, 964 A.2d at 124. The burden of proof for such a claim is high: director liability based on the duty of oversight "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Caremark*, 698 A.2d at 967.

### b) Elements of a *Caremark* Claim

Bare allegations that directors failed to discover a fraud or a crime committed by the corporation or its employees do not state a *Caremark* claim. *Desimone*, 924 A.2d at 940 ("Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient."); *David B. Shaev Profit Sharing Account*, 2006 WL 391931, at *5 ("A claim that an audit committee or board had notice of serious misconduct and simply failed to investigate . . . would survive a motion to dismiss, even if the committee or board was well constituted and was otherwise functioning. But the one thing that is emphatically not a *Caremark* claim is the bald allegation that directors bear liability where a concededly well-constituted oversight mechanism, having received no specific indications of misconduct, failed to

discover fraud."); *see also Stone*, 911 A.2d at 373 ("[D]irector's good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability . . . .").

"[D]irectors will be potentially liable for breach of their oversight duty only if they ignore 'red flags' that actually come to their attention, warning of [internal] compliance problems." *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, CA. No. 1091-VCL, 2007 WL 2982247, at *7 (Del. Ch. Oct. 9, 2007). Directors' liability for failure to monitor is strictly limited because "with an effective compliance system in place, corporate directors are entitled to believe that, unless red flags surface, corporate officers and employees are exercising their delegated powers in the best interest of the corporation." *Id.*

To date nearly all *Caremark* claims have been brought against directors rather than officers. Unlike officers, directors are not involved in the day-to-day affairs of the corporation. Courts consider directors' limited role in applying the *Caremark* duty to monitor. "Most of the decisions that a corporation, acting through its human agents, makes are, of course, not the subject of director attention." *Caremark*, 698 A.2d at 968; *see also Stone*, 911 A.2d at 372. "[E]ven directors who make a good faith effort . . . might miss a key problem area or be deceived by management," so courts "proceed with great caution," recognizing that "directors can only be expected to fulfill certain core

oversight responsibilities." Leo E. Strine, Jr., *Derivative Impact? Some Early Reflections on the Corporation Law Implications of the Enron Debacle*, 57 BUS. LAW. 1371, 1393 (2002).

Accordingly, to state a claim that directors failed to monitor and correct a corporate impropriety, a plaintiff must allege "(1) the directors knew or should have known that a violation of the law was occurring and, (2) 'the directors took no steps in a good faith effort to prevent or remedy the situation.'" *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 976 (Del. Ch. 2003) (quoting *Caremark*, 698 A.2d at 971).

In the past, Delaware courts evaluated *Caremark* claims under the duty of care. However, in *Stone*, the Delaware Supreme Court re-categorized *Caremark* claims from the duty of care to the duty of loyalty and "clarified one of the most difficult questions in corporate law – when directors with no motivation to injure the firm can be held responsible if the corporation incurs serious harm as a result of its failure to obey the law." *Desimone*, 924 A.2d at 935; *see also Stone*, 911 A.2d at 370. The *Stone* court explained that "the fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest." *Stone*, 911 A.2d at 370. "It also encompasses cases where the fiduciary fails to act in good faith." *Id.* A fiduciary "'cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest.'" *Id.* (quoting *Guttman*, 823 A.2d at 506 n.34). *Stone* explained that "*Caremark* articulates the necessary conditions predicate for

director oversight liability" and "[w]here directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." *Stone*, 911 A.2d at 370. Accordingly, in order to hold a director liable for failure to monitor, the director's "indolence [must be] so persistent that it [can] not be ascribed to anything other than a knowing decision not to even try to make sure the corporation's officers had developed and were implementing a prudent approach to ensuring law compliance." *Desimone*, 924 A.2d at 935 (discussing *Stone*).

The re-classification of *Caremark* claims as breaches of the duty of loyalty rather than the duty of care means that the exculpatory provision of a corporation's articles of incorporation no longer applies. *Caremark*-based claims do not fall under the protection of Section 102(b)(7) of the Delaware General Corporation Law (authorizing exculpation of directors from monetary liability for a breach of the duty of care but not for conduct that is in bad faith) or Section 145 of the Delaware General Corporation Law (permitting indemnification of a director, officer, employee, or agent where that person "acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation"). DEL. CODE ANN. tit. 8, § 102(b)(7)(2010); DEL. CODE ANN. tit. 8, § 145(a)(2010); *see Stone*, 911 A.2d at 367; *In re Walt Disney*, 906 A.2d at 65-66.

Although the issue rarely has been litigated, a *Caremark* fiduciary duty of oversight or duty to monitor likely applies to officers, provided that those officers occupied a position of seniority and had supervisory responsibilities. *See World Health Alternatives, Inc. v. McDonald (In re World Health Alternatives, Inc.)*, 385 B.R. 576, 591 (Bankr. D. Del. 2008) (construing Florida law but looking to Delaware law for guidance). *But see Bridgeport Holdings Inc., Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 574 (Bankr. D. Del. 2008) (stating that, with respect to "a charge of 'sustained and systemic failure of oversight' . . . under Delaware law, this theory of liability typically applies to directors and not to officers"). Applying the duty to monitor to officers appears to follow directly from established principles of Delaware law: *Caremark* establishes that directors have a duty to monitor, and the Delaware Supreme Court has held that the fiduciary duties of directors and officers are "identical." *See Gantler*, 965 A. 2d at 708-09.

Although the Delaware Supreme Court and Chancery Court have not expressly applied the *Caremark* duty to officers, a Delaware bankruptcy court has permitted such a claim to proceed. In *In re World Health Alternatives*, the bankruptcy court held that the Chapter 7 trustee stated a *Caremark* claim for breach of fiduciary duty against a former officer (vice president of operations and general counsel) for "failing to implement an adequate monitoring system and/or the failure to utilize such system to safeguard against corporate wrongdoing" the result of which included "material

misrepresentations contained in World Health's SEC filings." 385 B.R. at 590-91. The court noted that under SEC rules "a general counsel has an affirmative duty to inspect the truthfulness of the SEC filings." *Id.* (citing Sarbanes-Oxley Act § 307, 15 U.S.C. § 7245 (2006) and 17 C.F.R. § 205.01 *et seq.* (2010)). An attorney must "'report evidence of a material violation of securities law or breach of fiduciary duty or similar violation by the issuer up-the-ladder within the company.'" *Id.* at 591 (quoting Sarbanes-Oxley Act § 307, 15 U.S.C. § 7245 (2006)). The court held that "as the in-house general counsel and only lawyer in top management of World Health during the relevant period, [the defendant] had a duty to know or should have known of these corporate wrong doings and reported such breaches of fiduciary duties by the management." *Id.* The court further reasoned that courts applying Delaware law have recognized that officers owe the same fiduciary duties to the corporation as directors, and that "the *Caremark* decision itself suggests that the same test [for duty to monitor] would be applicable to officers." *Id.* at 592.

### c) Application of *Caremark* to Risk Oversight: *In re Citigroup Inc.*

In *Citigroup*, the Delaware Chancery Court rejected a claim that Citigroup's current and former directors and officers had "breached their fiduciary duties by failing to properly monitor and manage the risks the Company faced from problems in the subprime lending market and for failing to properly disclose Citigroup's exposure to subprime assets." 964 A.2d at 111. The complaint alleged multiple theories of liability,

including a breach of the *Caremark* duty to monitor. Plaintiffs based their claims on several "red flags" that allegedly "should have given defendants notice of the problems that were brewing in the real estate and credit markets." *Id.*

The court rejected the claim. Noting that the supposed red flags "amount[ed] to little more than portions of public documents that reflected the worsening conditions in the subprime mortgage market and the economy generally," the court found the allegations legally insufficient "to show that the directors were or should have been aware of any wrongdoing at the Company or were consciously disregarding a duty somehow to prevent Citigroup from suffering losses." *Id.* at 128. The court held that the complaint failed to state a claim for director liability under the *Caremark* standard. *Id.* at 139-40.

The court also held that a *Caremark* claim involving risk management must be consistent with the business judgment rule:

> It is almost impossible for a court, in hindsight, to determine whether the directors of a company properly evaluated risk and thus made the "right" business decision.
>
> •   •   •
>
> To impose liability on directors for making a 'wrong' business decision would cripple their ability to earn returns for investors by taking business risks.

*Id.* at 126.

The plaintiffs admitted that Citigroup "had procedures and controls in place that were designed to monitor risk." *Id.* at 127. They asserted that the directors had failed to

satisfy their oversight duty because the corporate mechanisms were inadequate or the directors failed to comply with established procedures. *Id.* The court held that the plaintiffs had failed to allege how the putatively inadequate corporate risk management system formed the basis for a *Caremark* claim:

> [P]laintiffs' allegations do not even specify how the board's oversight mechanisms were inadequate or how the director defendants knew of these inadequacies and consciously ignored them. Rather, plaintiffs seem to hope the Court will accept the conclusion that since the Company suffered large losses, and since a properly functioning risk management system would have avoided such losses, the directors must have breached their fiduciary duties in allowing such losses.

*Id.*

The court emphasized that "red flags" sufficient to state a *Caremark* claim must go beyond "signs in the market that reflected worsening conditions and suggested that conditions may deteriorate even further . . . ." *Id.* at 130. The court stressed that misreading market signals does not render directors personally liable for their corporation's losses:

> Oversight duties under Delaware law are not designed to subject directors, even expert directors, to *personal liability* for failure to predict the future and to properly evaluate business risk.

*Id.* at 131.

### 5. Disclosure Obligations

In some situations, a failure to properly inform shareholders or directors of material information has been evaluated as a potential breach of the duty of care. *In re Transkaryotic Therapies*, 954 A.2d 346, 356-58 (Del. Ch. 2008). At other times, though,

courts have reviewed nondisclosures under the standards for a breach of the duty of loyalty. *Id.* In still other circumstances, failures to disclose are considered to be breaches of an independent fiduciary duty. *Id.* The following subparts discuss a board's duty of disclosure to shareholders and management's duty of disclosure to the board.

### a) The Board's Obligation to Provide Information to Shareholders

#### (1) The Standard for Directors' Personal Liability

##### (a) Information Material to a Shareholder Vote

The "duty of disclosure" applies in situations where the corporation has made statements to shareholders in connection with a request for shareholder action. *See Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1172 (Del. 2000); *Orloff v. Shulman*, No. Civ.A. 852-N, 2005 WL 3272355, at *14 (Del. Ch. Nov. 23, 2005); *Steinman v. Levine*, No. Civ.A. 19107, 2002 WL 31761252, *13 (Del Ch. Nov. 27, 2002), *aff'd* 822 A.2d 397 (Del. 2003).

Where the nondisclosure of material information occurs before a shareholder vote, Delaware courts are more likely to grant injunctive relief delaying the vote in order to permit the information to be provided rather than to award after-the-fact damages, that may be difficult if not impossible to determine. *See In re Transkaryotic Therapies*, 954 A.2d at 360-63. A court may award damages for nondisclosure without evidence that the nondisclosure amounted to a breach by directors of their duties of

loyalty or good faith. *Id.* at 362. An award of damages, though, requires proof of at least gross negligence. *Metro*, 854 A.2d at 157.

### (b) Information Provided Generally to Shareholders

If a board disseminates false information to shareholders outside a situation involving a request for shareholder action, the issue is not whether the directors "breached their duty of disclosure," but "whether they breached their more general fiduciary duty of loyalty and good faith by knowingly disseminating to the stockholders false information about the financial condition of the company." *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998). Stockholders "are entitled to rely upon the truthfulness of all information disseminated to them," including public statements directors or officers make to the market. *Id.* at 10-11; *see also Malpiede v. Townson*, 780 A.2d 1075, 1086 n.2 (Del. 2001) ("'[D]irectors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances.'") (quoting *Malone*, 722 A.2d at 9). The Delaware Chancery Court recently explained:

> When a Delaware corporation communicates with its shareholders, even in the absence of a request for shareholder action, shareholders are entitled to honest communication from directors, given with complete candor and in good faith. Communications that depart from this expectation, *particularly when it can be shown that the directors involved issued their communication with the knowledge that it was deceptive or incomplete*, violate the fiduciary duties that protect shareholders. Such violations are sufficient to subject directors to liability in a derivative claim.

*In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007) (emphasis added).

In situations not involving requests for shareholder action, directors can be held liable for failing to provide material information when communicating with shareholders, only on proof that they knowingly disseminated false information, a standard of proof that is higher than even common law fraud. *Metro*, 854 A.2d at 157-58.

### (2) Materiality as to Shareholders

A breach of the duty of disclosure requires proof that the defendant failed to disclose information that was material and within the defendant's control. *Wayne County Employees' Ret. Sys. v. Corti*, Civ. A. No. 3534-CC, 2009 WL 2219260, at *8 (Del. Ch. July 24, 2009); *see also Malone*, 722 A.2d at 12. The standard for materiality is whether a reasonable person, standing in the shoes of the party to whom the disclosure should have been made, would have considered the information to significantly alter the "total mix" of information available to that person. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Zirn v. VLI Corp.*, 621 A.2d 773, 779 (Del. 1993); *Gantler*, 965 A.2d at 710. The test is objective, not subjective. *See Zirn*, 621 A.2d at 779.

Materiality does not require that the beneficiary of the duty would have behaved differently if provided with the information, but only that the information would have "assumed actual significance in the deliberations" of that person. *TSC*, 426 U.S. at 449; *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994). Materiality is an

issue of fact that rarely will be decided by a court at either the motion to dismiss or even the summary judgment stage. *Khanna v. McMinn*, No. Civ.A. 20545-NC, 2006 WL 1388744, at *29 (Del. Ch. May 9, 2006); *Kelly v. McKesson HBOC, Inc.*, No. Civ.A. 99C-265WCC, 2002 WL 88939, at *9 (Del. Super. Ct. Jan. 17, 2002).

### b) Management's Duty of Disclosure to the Board

#### (1) The Standard for Officers' Personal Liability

Delaware case law does not specifically define a corporate officer's fiduciary duty of disclosure with respect to the board. However, the Delaware Supreme Court recently has held that "the fiduciary duties of officers are the same as those of directors." *Gantler*, 965 A.2d at 709. After *Gantler*, it is safe to conclude that officers have a duty of disclosure with respect to the board. *See In re AIG*, 965 A.2d at 806-07.

Although there has been little case law in Delaware with respect to officers' fiduciary duties, the issue has been the subject of abundant scholarly commentary in recent years. *See* Shannon German, *What They Don't Know Can Hurt Them: Corporate Officers' Duty of Candor to Directors*, 34 Del. J. Corp. L. 221 (2009); Stephen M. Bainbridge, *Caremark, and Enterprise Risk Management*, 34 J. Corp. L. 967 (2009); Aaron D. Jones, *Corporate Officer Wrongdoing and the Fiduciary Duties of Corporate Officers under Delaware Law*, 44 Am. Bus. L.J. 475 (2007); Z. Jill Barclift, *Senior Corporate Officers and the Duty of Candor: Do the CEO and CFO Have a Duty to Inform?*, 41 Val. U. L. Rev. 269, 271 (2006) ("The broadening of the definition of the duty to inform that senior officers owe

directors to include an underlying affirmative duty to provide information, even when director or shareholder action is not requested, offers an opportunity for greater monitoring of corporate governance by focusing on those often most culpable."); Lawrence A. Hamermesch & A. Gilchrist Sparks III, *Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson*, 60 BUS. LAW. 865 (2005); Donald C. Langevoort, *Agency Law Inside the Corporation: Problems of Candor and Knowledge*, 71 U. CIN. L. REV. 1187 (2003).

Commentators agree that officers have an obligation to "inform the superior officer to whom, or the board of directors or the committee thereof to which, the officer reports of information about the affairs of the corporation known to the officer, within the scope of the officer's functions, and known to the officer to be material to such superior officer, board or committee." ABA Comm. on Corporate Laws, *Changes in the Model Business Corporations Act – Amendments Relating to Chapters 1, 7, 8 and 14*, 60 BUS. LAW. 943, 951 (2005).

Agency and corporate law also provide guidance. Officers and key managerial personnel are agents of the corporation that employs them. *See Science Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980). In *Science Accessories Corp.*, the Delaware Supreme Court held that the "principles and limitations of agency law carry over into the field of corporate employment so as to apply not only to officers and directors, but also key management personnel." *Id.* at 962. The imposition of duties on

management reflects the courts' "'concern for the integrity of the employment relationship, which has led courts to establish a rule that demands of a corporate officer or employee undivided and unselfish loyalty to the corporation.'" *Id.* (quoting *Md. Metals, Inc. v. Metzner*, 382 A.2d 564, 568 (Md. 1978)); *see also Cahill v. Lofland*, 114 A. 224, 228 (Del. Ch. 1921) (under "'well-established and familiar rules of equity,'" a director of a corporation "'is not accountable to the stockholder for withholding information from him which affects the value of the stock, but to the corporation'" (quoting *DuPont v. DuPont*, 242 F. 98 (D. Del. 1917))). The Delaware Supreme Court has characterized an employee-agent's obligations as fiduciary duties. *Science Accessories*, 425 A.2d at 965 (former employee's failure to disclose off-duty development of competing business "was not, without more, a violation of their fiduciary duty of loyalty"); *see also Lewis v. Vogelstein*, 699 A.2d 327, 335 (Del. Ch. 1997) (describing agent's duties to principal as "fiduciary in character").

An agent has a duty of candor and a duty to disclose relevant information to the principal. *See Science Accessories*, 425 A.2d at 962 ("[U]nder elemental principles of agency law, an agent owes his principal a duty of good faith, loyalty and fair dealing. Encompassed within such general duties of an agent is the duty to disclose information that is relevant to the affairs of the agency entrusted to him.").

Agency law defines an agent's duty to disclose information to the principal as an affirmative duty to use reasonable efforts to provide the principal with relevant

information.  *See* RESTATEMENT (THIRD) OF AGENCY § 8.11 (2006) ("An agent has a duty

to use reasonable effort to provide the principal with facts that the agent knows . . . or

should know . . . the principal would wish to have . . . or . . . are material to the agent's

duties to the principal."); RESTATEMENT (SECOND) OF AGENCY § 381 (1951) ("[A]n agent is

subject to a duty to use reasonable efforts to give his principal information which is

relevant to affairs entrusted to him and which, as the agent has notice, the principal

would desire to have and which can be communicated without violating a superior

duty to a third person.").

An agent breaches its duty if the agent fails to provide information to the

principal that may be material to the principal's decision-making, such as by enabling

the principal to: (1) reconsider a course of action or make alternate arrangements; (2)

take action to avoid harm to third parties; or (3) take action to protect the principal's

interests.  *See* RESTATEMENT (THIRD) OF AGENCY § 8.11 cmts. b-d (2006).  The comments

to the Restatement state:

> An agent's duty to furnish information is often an important component
> of the agent's duty of care. . . . If an agent fails to provide information to
> the principal that is material to decisions that the principal will make, the
> agent may not have acted with the diligence and care reasonably to be
> expected of an agent in a particular position. An agent's duty of care may
> require the agent to obtain information that is material to the principal's
> interests. If an agent's inquiry or investigation has been limited in some
> respect, the agent has a duty so to inform the principal.

*Id*. at § 8.11 cmt. d.

Because the board relies upon management for information about the corporation's business, directors would be unable to satisfy their own fiduciary duties of care and disclosure unless senior managers provide material information on the matters within the board's responsibilities. Indeed, as discussed above, directors of Delaware corporations are immunized from personal liability to the extent they rely in good faith upon information provided by competent and informed corporate officers and employees.  DEL. CODE ANN. tit. 8, § 141(e) (2010); *see also Brehm*, 746 A.2d at 261; *Citigroup*, 964 A.2d at 132 n.86.

Delaware cases do not specify the level of intent required to establish a breach of an officer's duty of disclosure to the board.  As discussed above, directors can be held personally liable only for gross negligence in connection with a request for shareholder action, or for knowingly providing false or misleading information when no shareholder action is requested.  *See Metro*, 854 A.2d at 157-58.  By analogy, an officer likely would be personally liable: (1) based upon gross negligence for providing less than all material information pertinent to a decision that the board is to make; and (2) for knowingly providing false or misleading information as to matters falling within the Board's general responsibility to monitor management with respect to major corporate matters.

### (2) Materiality as to the Board

To form a basis for an officer's personal liability for breaching the duty of disclosure, undisclosed or misrepresented facts must be material to the board's decisions or responsibilities. The Delaware Supreme Court has adopted a standard of materiality for disclosures by officers to the board that differs from the standard for disclosures by the board to shareholders. The materiality of information provided to shareholders is determined under the standard adopted in *TSC*, 426 U.S. at 449, namely whether the information would significantly alter the "total mix" of information available to a shareholder. In *Brehm*, however, the Delaware Supreme Court adopted a standard of materiality with respect to management's disclosure of information to the board that is "distinct" from and broader than the standard for materiality to shareholders. 746 A.2d at 260 n.49 (quoting *O'Malley v. Boris*, 742 A.2d 845, 850 (Del. 1999)). Information is material if it is "relevant" to the board and of sufficient "magnitude" to be important:

> The term "material" is used in this context to mean relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decision making. In this sense, it is distinct from the use of the term "material" in the quite different context of disclosure to stockholders in which "an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."

*Id.*

### (3) Misleading Statements in Marking Assets

There is little case law addressing whether the valuation of a mark-to-market asset can constitute a breach of fiduciary duty, although the cases that exist suggest that the standard would be stringent.

In order to establish a breach of fiduciary duty based on mark-to-market valuations, a plaintiff would have to prove, at a minimum, that those mark-to-market valuations were false statements. *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d 187, 197 (2d Cir. 2009). In order to establish that a mark-to-market valuation was false – as opposed to being merely an inaccurate prediction – a plaintiff would have to prove that the valuation was incorrect based on what reasonably could have been known at the time.

Moreover, for a plaintiff to demonstrate that a public statement about an asset was fraudulent, the plaintiff must demonstrate that the defendant acted with scienter, a mental state embracing intent to "deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

### B. Causation and Damages in Corporate Fiduciary Cases

Causation and damages normally are not elements of a claim for breach of fiduciary duty claim. Thus, a claim that an officer breached a fiduciary duty to the corporation does not require proof that the breach injured the corporation. *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994) ("Furthermore, breaches

of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages."); *Nw. Nat'l Ins. Co. v. Alberts*, 769 F. Supp. 498, 506 (S.D.N.Y. 1991) ("A plaintiff alleging breach of fiduciary duty . . . is not required to meet the higher standard of loss or proximate causation."); *see also Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) ("[T]he absence of specific damage to a beneficiary is not the sole test for determining disloyalty by one occupying a fiduciary position. It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary. The result is nonetheless one of unjust enrichment which will not be countenanced by a Court of Equity."); *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939) ("The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.").

Causation and damages are not elements of an action for breach of fiduciary duty because a fiduciary is liable to disgorge profits irrespective of whether it can be proven that the breach injured the fiduciary's principal. *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996); *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319, 334 (Del. 1993), *overruled on other grounds as recognized by Williams v. McGreevy (In re*

*Touch Am. Holdings, Inc.)*, 401 B.R. 107, 123 n.28 (Bankr. D. Del. 2009); *Citron v. Merritt-Chapman & Scott Corp.*, 407 A.2d 1040, 1045 (Del. 1979). On the other hand, a plaintiff asserting a breach of fiduciary duty must prove causation and damages if the plaintiff seeks damages for the breach in addition to disgorging the fiduciary's profits. *See Thorpe*, 676 A.2d at 445. A plaintiff also must prove quantifiable damages when the plaintiff's claim is based on a failure to disclose. Although Delaware courts once recognized what essentially amounted to *per se* damages for a breach of the duty of disclosure, the Delaware Supreme Court expressly rejected that rule and now requires quantifiable damages. *Loudon v. Archer-Daniels Midland Co.*, 700 A.2d 135, 140-42 (Del. 1997), *overruling In re Tri-Star*, 634 A.2d at 326.

In the bulk of cases in which fiduciaries have been required to disgorge profits, the funds to be disgorged were directly traceable to the breach of fiduciary duty, as in the case of a party earning a salary while working for a direct competitor or awarding herself an excessive bonus. *See, e.g., Triton Const. Co. Inc. v. Eastern Shore Elec. Servs., Inc.*, Civ. A. No. 3290-VCP, 2009 WL 1387115, at *28 (Del. Ch. May 18, 2009) (disgorging compensation received from one competitor while working for another). Courts have held, however, that a party may be ordered to disgorge compensation received while in violation of fiduciary duties. *See, e.g., Citron,* 407 A.2d at 1045. In such circumstances, the fiduciary may offset the disgorgement by the amount of salary that the fiduciary legitimately earned during the time at issue. *Technicorp Int'l II, Inc. v. Johnston*, No.

Civ.A. 15084, 2000 WL 713750, at *51-54 (Del. Ch. May 31, 2000) ("To avoid unjust enrichment, courts of equity . . . have implicitly recognized that even where a corporate fiduciary's breach of the duty of loyalty results in his being stripped of all profit flowing from the breach, it is appropriate to offset against the corporation's recovery an amount that represents reasonable compensation to the fiduciary for services legitimately performed.").

If a plaintiff seeks damages beyond disgorgement, those damages usually are measured based on the diminution in value of the corporation as a result of the defendant's actions. *See, e.g., Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999) ("Because of the nature of the wrongs committed here, it is not a sufficient remedy to award plaintiffs their pure out-of pocket damages, at least as measured (as defendants insist I must) by the fair market value of ITI at the time of the Merger without giving effect to the debt restructuring. So valued, plaintiff's shares are worthless or nearly so. Instead, what plaintiffs are entitled to receive is, at a minimum, what their shares would have been worth at the time of the Merger if [the defendant] had not breached his fiduciary duties.").

Compensatory damages are available as a remedy for a breach of fiduciary duty, and are measured by the amount necessary to rectify any financial harm caused to the beneficiary by the breach. *See, e.g., Noerr v. Greenwood*, No. 14320-NC, 2002 WL 31720734, at *5-6 (Del. Ch. Nov. 22, 2002) (granting class certification on a claim seeking

primarily compensatory damages based on a breach of fiduciary duty); *Painewebber R & D Partners II, L.P. v. Centocor, Inc.*, No. 14405, 1999 WL 160123, at * 15 (Del. Ch. Mar. 15, 1999) (approving settlement agreement including compensatory damages for alleged breaches of fiduciary duty); *see also Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983) (affording the courts wide latitude to craft damage remedies to compensate a party with respect to whom a defendant breached a fiduciary duty); *Thorpe*, 676 A.2d at 445 (Delaware law required not only that the defendant not profit from disloyal conduct but that the beneficiary of the duty also suffer harm as a result of the breach, so that damages could be appropriate if proven); *cf. Taylor v. Harrison (In re JP Morgan Chase & Co. S'holder Litig.)*, 906 A.2d 766, 772 (Del. 2006) (denying plaintiff's claim for compensatory damages not because compensatory damages were inapplicable to a claim for breach of fiduciary duty but because the requested damages could not be connected to the alleged breach). A plaintiff that seeks compensatory damages must prove both causation and damages. *See LNC Invs., Inc. v. First Fidelity Bank, N.A., N.J.*, 173 F.3d 454, 465 (2d Cir. 1999) ("[W]here damages are sought for breach of fiduciary duty under New York law, the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability."); *Am. Fed. Group, Ltd v. Rothenberg*, 136 F.3d 897, 908 n.7 (2d Cir. 1998) (usual damages-calculation rule for tort cases applies in breach of fiduciary duty cases where the remedy sought is damages to compensate for loss).

Some violations of fiduciary duties also may lead to awards of consequential damages. *See Metro*, 854 A.2d at 137-38 (Del. Ch. 2004) (rejecting plaintiff's claim for consequential damages based on a breach of fiduciary duty due to a faulty causation argument, not because consequential damages were inappropriate); *Thorpe v. CERBCO, Inc.*, No. Civ. A. No. 11713, 1997 WL 67833, at *3 (Del. Ch. Feb. 6, 1997) (claim for breach of fiduciary duty "did support an award of consequential damages or disgorgement of any gains that [the defendant] might have realized"); *In re Cencom Cable Income Partners, L.P.*, Civ. A. No. 14634, 1997 WL 666970, at *12-13 (Del. Ch. Oct. 15, 1997) ("This claim [for breach of fiduciary duty] unrelated to the purchase price, if proved at trial, could result in consequential damages"). Consequential damages are damages that "typically 'do not arise as an immediate, natural, and probable result of the act done, but arise from the interposition of an additional cause, without which the act done would have produced no harmful result.'" *Concord Plaza Assoc., Inc. v. Honeywell, Inc.*, Civ. A. No. 84C-JL-128, 1987 WL 8884, at *2 (Del. Super. Ct. Mar. 20, 1987) (quoting *United States v. Chicago B. & Q. R. Co.*, 82 F.2d 131, 136 (8th Cir. 1936)).

The Restatement of Torts supports the contention that tort-based damages may be awarded for a breach of fiduciary duty. RESTATEMENT (SECOND) OF TORTS § 874 (1965) ("The remedy of a beneficiary against a defaulting or negligent trustee is ordinarily in equity; the remedy of a principal against an agent is ordinarily at law. However, irrespective of this, the beneficiary is entitled to tort damages for harm

caused by the breach of duty arising from the relation."). Thus, a corporation that becomes subject to civil liability as a consequence of the actions of one or more of its officers, likely could assert a claim against those officers for the amount of the liability. *See Stepak v. Ross*, Civ. A. No. 7047, 1985 WL 21137, at *2-5 (Del. Ch. Sept. 5, 1985) (accepting as "fair to all concerned" a settlement that resolved claims brought against fiduciaries for indemnification based on exposing the corporation to liability for securities violations).

Courts also may award other legal or equitable relief as appropriate in a particular case. *See, e.g., Cinerama Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1166 (Del. 1995) ("[T]he measure of damages for *any* breach of fiduciary duty, under an entire fairness standard of review, is 'not necessarily limited to the difference between the price offered and the 'true' value as determined under the appraisal proceedings. . . . [T]he [Court of Chancery] 'may fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages.'"); *Weinberger*, 457 A.2d at 714 ("Under such circumstances [involving a breach of fiduciary duty], the [court's] powers are complete to fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages."); *Harman v. Masonelian Int'l, Inc.*, 442 A.2d 487, 500 (Del. 1982) ("[T]he relief available in equity for tortious conduct by one standing in a fiduciary relation with another is necessarily broad and flexible.").

## C.  Liability for Aiding and Abetting Breach of Fiduciary Duty

Delaware law recognizes a cause of action for aiding and abetting a breach of fiduciary duty.  *See, e.g., Malpiede*, 780 A.2d at 1096.  There are four elements:  (1) an underlying fiduciary duty; (2) breach of that duty by the fiduciary; (3) knowing participation by a nonfiduciary in the breach; and (4) damages.  *Id.; accord Gatz v. Ponsoldt*, 925 A.2d 1265, 1275 (Del. 2000); *Triton Constr. Co.*, 2009 WL 1387115, at *16.[8]

The first two elements require the existence of a fiduciary duty and a breach.  If a plaintiff cannot prove that a third party breached a fiduciary duty, then that plaintiff cannot prevail on a claim for aiding and abetting a breach of fiduciary duty.  *See, e.g., Vichi v. Koninklijke Philips Electronics N.V.*, Civ. A. No. 2578-VCP, 2009 WL 4345724, at *21 (Del. Ch., Dec. 1, 2009) (if the plaintiff fails to make a cognizable claim that a fiduciary breach ever occurred, then the claim that the defendant aided and abetted such a breach is bound to fail).

If a plaintiff can prove that a fiduciary breached a duty, the inquiry turns to whether the nonfiduciary defendant knowingly participated in that breach.  "Knowing participation in a . . . fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."  *Malpiede*, 780 A.2d at 1097.  Under that standard, "arm's-length negotiations cannot give rise to

---

[8] Some cases call a claim for aiding and abetting breach of fiduciary duty a "civil conspiracy."  However labeled, the elements are the same.  *See Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986).

liability for aiding and abetting liability" where the nonfiduciary is simply seeking the best deal that it can obtain from the opposing contracting party. *Id.; see also In re John Q. Hammons Hotels, Inc. S'holder Litig.*, Civ. A. No. 758-CC, 2009 WL 3165613, at *17-18 (Del. Ch. Oct. 2, 2009) (refusing to grant summary judgment against a plaintiff because there was an issue of material fact as to whether the defendant knew that the plaintiff's employee was engaged in self-dealing and not just negotiating with both the company and the employee); *Tomczak*, 1990 WL 42607, at * 16 ("Although Dow's purchases certainly had the effect of putting economic pressure on Morton Thiokol, what Dow essentially did was to simply pursue arm's-length negotiations with Morton Thiokol through their respective investment bankers in an effort to obtain Texize at the best price it could."). However, aiding and abetting liability can arise from arm's length-negotiations if the nonfiduciary exploits a conflict of interest in the fiduciary's company. *Malpiede*, 780 A.2d at 1097. Courts have held that there is no bar to a corporation being sued for aiding and abetting breaches of fiduciary duty committed by directors of its subsidiaries. *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038-40 (Del. Ch. 2006).

It is not sufficient for a plaintiff to allege in conclusory terms that the defendant had knowledge that the actions at issue would cause the third party to breach a fiduciary duty. *Greene v. N.Y. Mercantile Exch. (In re NYMEX S'holder Litig.)*, Civ. A. Nos. 3621-VCN, 3835-VCN, 2009 WL 3206051, at *12-13 (Del. Ch. Sept. 30, 2009)

(conclusory allegation that the defendant knew there was a fiduciary duty was insufficient; plaintiff's allegations must create a reasonable inference that the defendant knew of the breach).  However, "[i]n some circumstances, 'the terms of the negotiated transaction themselves [may be] so suspect as to permit, if proven, an inference of knowledge of an intended breach of trust.'"  *Gatz*, 925 A.2d at 1276 (quoting *Malpiede*, 780 A.2d at 1097) (second alteration in original).

Finally, unlike a direct action against a fiduciary, a plaintiff in an action for aiding and abetting a breach of fiduciary duty must prove damages.  *Malpiede*, 780 A.2d at 1096; *Gatz*, 925 A.2d at 1275; *Triton Constr. Co.*, 2009 WL 1387115, at *16.

### D. Duties of Directors of an Insolvent Wholly Owned Subsidiary

In the case of a wholly owned subsidiary, the fiduciary duties owed by the directors of the subsidiary corporation normally run to the benefit of the parent corporation, as that is the subsidiary's sole shareholder.  *Anadarko Petrol. Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988) ("[I]n a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."). Consequently, the directors of a subsidiary corporation may take actions that benefit its parent even where those actions cause financial harm to the subsidiary.  *In re Teleglobe Commc'ns Corp.*, 493 F.3d at 366-367 n.24 ("[T]here is nothing wrong (or even unusual) about a parent causing its wholly owned subsidiary to act in a way that benefits the

corporate family but harms the individual subsidiary." (citing *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 192 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007) ("[T]he final judgment of the Court of Chancery should be affirmed on the basis of and for the reasons assigned by the Court of Chancery.")).   Moreover, the fact that a subsidiary becomes insolvent does not retroactively call into question the propriety of actions taken for the benefit of the parent while the subsidiary was solvent.  *Trenwick*, 906 A.2d at 202-03 ("[B]ecause the Trenwick America board, as directors of  a wholly owned subsidiary, was entitled to follow the parent's instructions unless those instructions required the board to violate the legal rights of others, no due care claim may be brought against them.  Otherwise, a subsidiary board could not follow parental direction without risk that the failure of the parent's business strategy, and thus the subsidiary, would later expose the subsidiary board to negligence-based liability for its loyalty to the parent.").  A wholly owned subsidiary exists for the benefit of the parent, so the board of directors of the subsidiary should act to benefit the parent, even where those actions are to the detriment of the subsidiary.

The right of a wholly owned subsidiary's directors to act in the interest of the parent corporation ceases if the subsidiary corporation becomes insolvent.  If the subsidiary is insolvent, the directors of the subsidiary owe their duties to the subsidiary corporation itself and, through the corporation, to its creditors.  *Claybrook v. Morris (In re*

*Scott Acquisition Corp.),* 344 B.R. 283, 290 (Bankr. D. Del. 2006) ("[U]pon insolvency directors of a wholly-owned subsidiary owe fiduciary duties to the subsidiary and its creditors."); *see also Trenwick*, 906 A.2d at 195 n.75 ("To ensure that the directors manage the enterprise to maximize its value so that the firm can meet as many of its obligations to creditors as possible – the new goal of the firm – the jurisprudence refers to the directors as owing fiduciary duties to the firm and its creditors.").  The directors of the insolvent subsidiary are then subject to potential derivative suits by creditors or a bankruptcy trustee to recoup losses resulting from breaches of fiduciary duty.  *Id.* (creditors' claims against a wholly owned subsidiary are derivative claims and cannot be brought directly by individual creditors (citing Stephen M. Bainbridge, *Much Ado about Little?  Directors' Fiduciary Duties in the Vicinity of Insolvency*, 1 J. Bus. & Tech. L. 335 (2007))).

The insolvency exception requires actual insolvency; it is not sufficient that the subsidiary is in dire financial straits or nearing insolvency.  *Trenwick*, 906 A.2d at 195 ("If a plaintiff seeks to state a claim premised on the notion that a corporation was insolvent and that the directors of the corporation were therefore obligated to consider the corporation's creditors, as an object of their fiduciary beneficence, the plaintiff must plead facts supporting an inference that the corporation was in fact insolvent at the relevant time.").  Until the subsidiary reaches the point of insolvency, the directors of

the subsidiary may continue to act to benefit the parent corporation rather than the subsidiary itself or its creditors.

In a suit brought on behalf of the creditors of an insolvent wholly owned subsidiary, the actions of a subsidiary's directors are protected by the business judgment rule. *Trenwick*, 906 A.2d at 174 ("Even when a firm is insolvent, its directors may, in the appropriate exercise of their business judgment, take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red."). The corporation's insolvency does not subject the actions of the directors to scrutiny different from that which would otherwise apply. *Id.* at 195 n.75 ("[T]he business judgment rule protects the directors of solvent, barely solvent, and insolvent corporations, and . . . the creditors of an insolvent firm have no greater right to challenge a disinterested, good faith business decision than the stockholders of a solvent firm."). Although the party for whose benefit the directors of the subsidiary owe their fiduciary duties changes upon the insolvency of the subsidiary, the conduct of the directors is measured by the same standards as any other claim for breach of fiduciary duty.

The foregoing rule applies only to wholly owned subsidiaries. If, in addition to the parent, another party has a minority interest in the subsidiary corporation, the directors' fiduciary duties to the subsidiary require that they act in the best interests of the subsidiary, not the parent. *Teleglobe*, 493 F.3d at 367 ("If the subsidiary is not wholly

owned, however, in the interest of protecting minority shareholders we revert to requiring that whoever controls the corporation seek to maximize its economic value with requisite care and loyalty.").  Consequently, the directors of a subsidiary corporation that is not wholly owned cannot take actions that damage the subsidiary corporation's interests simply to benefit the parent corporation without violating their fiduciary duties.  *Id.*

### E.  Duties of a Controlling Shareholder

Under Delaware law, a majority shareholder owes fiduciary duties to minority shareholders.  *Gabelli & Co., Inc. Profit Sharing Plan v. Liggett Group, Inc.*, 444 A.2d 261, 264 (Del. Ch. 1982).  Among other things, the majority shareholder is required to be fair in its dealings insofar as those dealings affect the interests of the minority shareholders. *Getty Oil Co. v. Skelly Oil Co.*, 267 A.2d 883, 886 (Del. 1970); *Meyerson v. El Paso Natural Gas Co.*, 246 A.2d 789, 790 (Del. Ch. 1967).  The majority shareholder ordinarily will be protected by the business judgment rule, under which a court will not disturb the judgments of a board of directors "if they can be attributed to any rational business purpose." *Sinclair Oil*, 280 A.2d at 720.  Where, however, a plaintiff can prove that the majority shareholder has used its control over the board of directors to engage in self-dealing, Delaware courts will assess the self-dealing action of the dominated board under a standard of "intrinsic fairness." *Id.* at 719-20; *Warshaw v. Calhoun*, 221 A.2d 487, 492-93 (Del. 1966); *Chasin v. Gluck*, 282 A.2d 188, 192 (Del. Ch. 1971). Under that test,

those asserting the validity of the corporation's actions have "'the burden of establishing its entire fairness' to the minority stockholders, sufficient to 'pass the test of careful scrutiny by the courts.'" *Singer v. Magnavox Co.*, 380 A.2d 969, 976 (Del. 1977) (quoting *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109 (Del. 1952)), *overruled on other grounds by Weinberger*, 457 A.2d at 704.

When a corporation becomes insolvent, the majority shareholder's fiduciary duties must be exercised for the benefit of the corporation's creditors. In *Official Committee of Unsecured Creditors of Hechinger Investment Company of Delaware v. Fleet Retail Finance Group (In re Hechinger Inv. Co. of Delaware)*, the creditor's committee of an insolvent corporation brought an adversary suit against the corporation's majority shareholder for breach of fiduciary duty, and the majority shareholder moved to dismiss on the grounds that majority shareholders owe no duty to creditors under Delaware law. 280 B.R. 90, 91-92 (D. Del. 2002). The district court denied the motion, predicting that Delaware courts would hold that a majority shareholder's fiduciary duties extend to the corporation's creditors when the corporation is in the "zone of insolvency." *Id.* The court acknowledged that there was no Delaware case law directly on point, but based its prediction on two propositions that the court considered well-settled under Delaware law. The first was that creditors are owed fiduciary duties when a corporation is in the zone of insolvency. *Id.* (citing *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, Civ.A. No 12150, 1991 WL 277613 (Del. Ch. Dec.

30, 1991) and *Geyer v. Ingersoll Publ'ns. Co.*, 621 A.2d 784, 787 (Del. Ch. 1992)). The second proposition was that controlling shareholders may, in certain circumstances, owe fiduciary duties. *Id.* (citing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110 (Del. 1994)). Delaware courts subsequently have clarified that fiduciary duties always run to the corporation and may be enforced by creditors only when a corporation becomes insolvent. *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101-102 (Del. 2007). That clarification does not appear to affect the Bankruptcy Court's extension to majority shareholders of the principle that creditors of an insolvent corporation may enforce breaches of fiduciary duties owed to the corporation.

**F.  Standing to Assert Fiduciary Breach Claims Against Lehman Officers and Directors**

In bankruptcy, a claim that a shareholder ordinarily would assert in a derivative action, such as a claim that an officer or director breached fiduciary duties, belongs to the debtor corporation's estate. *Cohen v. Nat'l Union Fire Ins. Co. (In re County Seat Stores, Inc.)*, 280 B.R. 319, 326 (Bankr. S.D.N.Y. 2002) (breach of fiduciary duty and corporate waste and mismanagement claims "belong to and can be enforced by the corporation or through a shareholders' derivative action," and therefore "these claims become property of the estate immediately upon the commencement of a bankruptcy case" pursuant to Section 541 of the Bankruptcy Code); *see also Morley v. Ontos, Inc. (In re Ontos, Inc.)*, 478 F.3d 427 (1st Cir. 2007), *cert. denied*, 128 S. Ct. 166 (2007) (trustee has power to settle fraudulent transfer and breach of fiduciary duty claims because they are

derivative of the debtor's claims and those claims belong to the estate); *Mitchell Excavators, Inc. by Mitchell v. Mitchell*, 734 F. 2d 129, 131 (2d Cir. 1984); 5 COLLIER ON BANKRUPTCY, § 541.08 (15th ed. 2006) ("[I]t has been held that the trustee may prosecute a cause of action based on the fraud of the officers, directors or shareholders for fiduciary misconduct, unlawful diversion of assets, or upon a statutory liability created by the law of the state of incorporation."); 9 NORTON BANKR. LAW & PRACTICE § 174.60 (3d ed. 2010) ("Shareholder derivative suits are properly causes of action belonging to the debtor and therefore, in a bankruptcy case, are property of the estate.").

## III.   SECURITIES LAW ISSUES

Two federal securities laws, the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (2006) (the "Securities Act") and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (2006) (the "Exchange Act"), require publicly traded companies, such as Lehman, to make specified disclosures.

The Securities Act required Lehman to file a registration statement, 15 U.S.C. § 77f (2006) and prospectus, 15 U.S.C. § 77j (2006), for each of its public offerings. The Exchange Act required Lehman to file periodic reports with the SEC, including annual reports on Form 10-K and quarterly reports on Form 10-Q. 15 U.S.C. § 78m (2006). In addition to a number of specific items that must be disclosed, both periodic reports and offering documents also must include such "material information, if any, as may be necessary to make the required statements, in the light of the circumstances under

which they are made not misleading." 17 C.F.R. § 240.12b-20 (2010); 17 C.F.R. § 240.408(a) (2010).

## A. Relevant Required Disclosures

Item 303 of Regulation S-K, which applies both to registration statements under the Securities Act and periodic reports under the Exchange Act, required Lehman's periodic reports to include a section disclosing Management's Discussion and Analysis of Financial Condition and Results of Operations (the "MD&A"). 17 C.F.R. § 229.303 (2010). In the MD&A, management must discuss the registrant's financial condition, changes in financial condition, and results of operations. *Id.* The MD&A is required to provide: (1) "a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;" (2) "the context within which financial information should be analyzed;" and (3) "information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance." SEC, Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Release Nos. 33-8350, 34-48960, 68 Fed. Reg. 75,056, 75,056 (Dec. 29, 2003) ("Release No. 33-8350").

All periodic reports, both annual reports (Forms 10-K) and quarterly reports (Forms 10-Q), must include a MD&A section. 17 C.F.R. § 229.303 (2010). The SEC has made clear that the MD&A may not merely repeat the registrant's financial statements

in a narrative form.  Release No. 33-8350.  Instead, the MD&A should discuss and analyze material trends, events, demands, commitments, and uncertainties.  17 C.F.R. § 229.303 (2010).  The SEC has stated that registrants should consider including an analysis that explains the reasons or implications underlying interrelationships between constituent elements, or the relative significance of those matters.  *Id.*

Item 303 of Regulation S-K and SEC guidance provide that the MD&A must include specific information concerning liquidity, capital resources, results of operations, and off-balance sheet arrangements.  *Id*.

First, with respect to liquidity, Item 303 of Regulation S-K requires a registrant  to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way. . . . Also identify and separately describe internal and external sources of liquidity . . . ." 17 C.F.R. § 229.303(a)(1) (2010). A registrant must describe the reasons for intermediate effects of trends, events, demands, commitments and uncertainties when necessary to enable a reader to see the business through the eyes of management.  Release No. 33-8350.

Second, with respect to capital resources, Item 303 requires a registrant to describe "any known material trends, favorable or unfavorable, in the registrant's capital resources."  17 C.F.R. § 229.303(a)(2)(ii) (2010).  The registrant must "[i]ndicate any expected material changes in the mix and relative cost of such resources.  The

discussion shall consider changes between equity, debt and any off-balance sheet financing arrangements." *Id.*

Third, with respect to results of operations, Item 303 requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii) (2010).

Fourth, Item 303 of Regulation S-K also requires a registrant to disclose its off-balance sheet arrangements: management must "discuss the registrant's off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors." 17 C.F.R. § 229.303(a)(4)(i) (2010). That disclosure must discuss, to the extent necessary for an investor to understand the off-balance sheet arrangement, (1) "[t]he nature and business purpose to the registrant of such off-balance sheet arrangements," 17 C.F.R. § 229.303 (a)(4)(i)(A) (2010); (2) "[t]he importance to the registrant of such off-balance sheet arrangements in respect of its liquidity, capital resources, market risk support, credit risk support or other benefits," 17 C.F.R. § 229.303 (a)(4)(i)(B) (2010); (3) "[t]he amounts of revenues, expenses and cash flows of the registrant arising from such arrangements; . . . and the nature and amounts of any other obligations or liabilities (including contingent obligations or liabilities) of

the registrant arising from such arrangements that are or are reasonably likely to become material and the triggering events or circumstances that could cause them to arise," 17 C.F.R. § 229.303 (a)(4)(i)(C) (2010); and (4) "[a]ny known event, demand, commitment, trend or uncertainty that will result in or is reasonably likely to result in the termination or material reduction in availability to the registrant, of its off-balance sheet arrangements that provide material benefits to it, and the course of action that the registrant has taken or proposes to take in response to any such circumstances." 17 C.F.R. § 229.303 (a)(4)(i)(D) (2010).

If the financial statements and the accompanying footnotes in a periodic report fail to provide a complete description of a company's financial condition and results of operation, then Item 303 of  Regulation S-K requires additional disclosures in the MD&A.  17 C.F.R. § 229.303 (2010).  For example, where the reported financial statements and footnotes to those statements are not representative of future performance due to known trends, demands, commitments, events and uncertainties, the MD&A must include additional explanation to clarify the representative value of the reported results.  Release 33-8350.  In addition, the SEC's guidance suggests that management should describe those events and transactions, demands, commitments, and uncertainties in order to reveal, identify, or further define apparent trends.  *Id*. Finally, if management determines that a trend, demand, commitment, event, or uncertainty is reasonably likely to occur, the report must disclose that likely event

unless management determines that the event is not reasonably likely to have a material effect on the company's financial condition or results of operations. SEC, Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, Release Nos. 33-6835, 34-26831, 54 Fed. Reg. 22,427-01, 22,430 (May 24, 1989).

### B. Overview of Possible Disclosure Causes of Action

The SEC is authorized to prosecute civil violations of the federal securities laws and rules, including disclosure and reporting violations. *See* 15 U.S.C. § 77t (2006). In addition, the Securities Act creates a private right of action in favor of purchasers against an issuer of registered securities (as well as others involved in the registration process) for material misstatements or omissions. *See* 15 U.S.C. § 77k (2006), 15 U.S.C. § 77l (2006). An implied private right of action exists for actual purchasers or sellers of a security, who have standing to pursue a claim for fraud under Exchange Act Section 10(b) and Rule 10b-5. 15 U.S.C. § 78j(b) (2006); 17 C.F.R. § 240.10b-5 (2009); *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975).

The SEC may bring a claim for violation of reporting requirements pursuant to Rule 12b-20, which the SEC issued pursuant to the Exchange Act. *See* 15 U.S.C. § 78o (2006) ("Registration and regulation of brokers and dealers"); 17 CFR § 240.12b-20 (2010). The purpose of the required disclosures is embodied in SEC Rule 12b-20, which requires that all filings contain such additional information necessary to make the

information contained in the filing not misleading. "[O]nce [registrants] choose to speak about their company, they undertake a duty to 'speak truthfully and to make such additional disclosures as . . . necessary to avoid rendering the statements misleading.'" *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008) (citing *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)); *see also Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) (holding that "upon choosing to speak one 'has a duty to be both accurate and complete'") (quoting *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 445 (S.D.N.Y. 2005) ("The Second Circuit has held that 'one circumstance creating a duty to disclose arises when disclosure is necessary to make prior statements not misleading'") (quoting *Trading Corp. Employees' Money Purchase Pension Plan v. Ross (In re Time Warner, Inc. Sec. Litig.)*, 9 F.3d 259, 268 (2d Cir. 1993).

Section 10(b) of the Exchange Act prohibits the use of any "manipulative or deceptive device or contrivance in contravention" of SEC rules and regulations. Under powers granted in the Exchange Act, the SEC promulgated Rule 10b-5 under Section 10(b). *See* 15 U.S.C. § 78w (2009). Rule 10b-5 bars:

> the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud

or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2010).

In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975), the Supreme Court held that actual purchasers or sellers of a security have standing to pursue a claim under Rule 10b-5. In order for a plaintiff to state a claim under Rule 10b-5, a plaintiff must show that the issuer: (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. *See, e.g., Kowal v. Int'l Bus. Machs. Corp. (In re Int'l Bus. Machs. Corp. Sec. Litig.)*, 163 F.3d 102, 106 (2d. Cir. 1998); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005); *ATSI Commc'n, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99-100 (3d Cir. 2007); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 268-70 (S.D.N.Y. 2008); *Ganino v. Citizens Utils.* Co., 228 F.3d 154, 161 (2d Cir. 2000); *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003).

## C.  Materiality

The concept of materiality permeates any analysis of potential claims for violations of securities disclosure requirements. For example, a claim under Section 11(a) of the Securities Act, requires proof that a registration statement contained "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." Rule

10b-5(b) of the Exchange Act makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary. . . to make the statements made . . . not misleading . . . ."  17 C.F.R. § 240.10b-5(b) (2010).

Information is deemed to be material if a "reasonable shareholder would consider it important" or if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Information may be material, however, even if that information is not sufficient in itself to cause an investor to change an investment decision, *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000), but only if that information "would have assumed actual significance in the deliberations of the reasonable shareholder."  *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

### D.  Causation and Reliance

Although the SEC may not need to prove reliance or causation when bringing enforcement actions, a private plaintiff must prove reliance, transaction causation, and loss causation.  15 U.S.C. § 77k(a)(5) (2006).  With respect to securities that are widely traded in an established open market, such as Lehman securities, there is a rebuttable presumption that a purchaser or seller is relying on the integrity of the price set by the

market, so that a plaintiff in such a case meets both the transaction causation and the reliance requirements. *Basic*, 485 U.S. at 245.

Loss causation, however, is a different matter. Under that requirement, a private plaintiff must allege and prove that the defendant's misrepresentations or omissions were the proximate cause of the plaintiff's loss. *Dura Pharms., Inc. v, Broudo*, 544 U.S. 336, 346 (2005); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F. 3d 161, 175 (2d Cir. 2005); *see In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 287, 305 (S.D.N.Y. 2005).

### E. Claims Based on Liquidity Disclosures

Both the SEC and private claimants have brought actions based on misleading disclosure concerning liquidity issues. For example, in the *America West*, case the SEC found that America West's Form 10-Q contained incomplete disclosures concerning material uncertainties in its liquidity position. *In re Am. W. Airlines, Inc.*, Release No. 562, 56 SEC Docket 1787, 1994 WL 183412, at *7-8 (May 12, 1994). America West stated in its Form 10-Q for the first quarter ending March 31, 1991 that it was in compliance with agreements with creditors requiring it to maintain a certain level of unencumbered cash. *Id.* However, the SEC concluded that the MD&A discussion in that Form 10-Q "failed to discuss as required the known uncertainties that the Company faced concerning its ability to remain in compliance with its cash covenant." *Id.* Although America West technically was in compliance with its agreements to maintain a certain level of liquidity, the firm met the terms of its agreements only because it received

waivers from its creditors allowing it to fall below the stated requirements – a fact not disclosed in the 10-Q. *Id.* at *9.  The SEC concluded:

> In light of the foregoing, the MD & A failed to include required information about the material uncertainties that the Company faced relating to its liquidity, thus leaving investors with an incomplete picture of the Company's weakened liquidity position, and denying them the opportunity to see the Company's liquidity problems "through the eyes of management." . . . America West's MD & A disclosures in both its Form 10-K . . . and Form 10-Q . . . were materially deficient . . . . [They] failed to disclose . . . known uncertainties that materially affected the Company's liquidity position.

*Id.* at *10.

In a recent private lawsuit in the Southern District of New York, the court denied defendants' motion for summary judgment where plaintiffs argued that the defendant corporation's "false and misleading statements concealed the risk of a liquidity crisis." *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 366 (S.D.N.Y. 2009).  In that case, the "subject of Vivendi's allegedly fraudulent statements" covered "perhaps most importantly, how quickly Vivendi could convert assets into cash." *Id.; see also Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 97-98 (2d Cir. 2001) (risk of liquidity crisis concealed by modified background report omitting important negative events in an executive's financial and business history).  In *In re Parmalat Sec. Litig.*, shareholder and bondholder plaintiffs filed suit under Section 10(b) alleging that the defendants hid "massive undisclosed debt" that the corporation  was unable to service. 375 F. Supp. 2d at 307.  That "concealed risk" materialized when the company "suffered

a liquidity crisis," causing its stock and bond values to plummet. *Id*. The defendants moved to dismiss, arguing that plaintiffs had failed to allege loss causation. *Id*. at 282. The court denied that motion. *Id*. at 312.

## F. The Sarbanes-Oxley Act

Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") directed the SEC to adopt rules that require an issuer's principal executive and financial officers to certify information contained in the issuer's quarterly and annual reports. *See* Pub. L. No. 107-204 § 302, 116 Stat. 777 (codified at 15 U.S.C. § 7241 (2006)); SEC, Certification of Disclosure in Companies' Quarterly and Annual Reports, Exchange Act Release No. 33-8124, 67 Fed. Reg. 57,276, 57,276-77 (Aug. 28, 2002). Section 302 also requires the principal executive and financial officers:

> to certify that they are responsible for establishing, maintaining and regularly evaluating the effectiveness of the issuer's internal controls; they have made certain disclosures to the issuer's auditors and the audit committee of the board of directors about the issuer's internal controls; and they have included information in the issuer's quarterly and annual reports about their evaluation and whether there have been significant changes in the issuer's internal controls or in other factors that could significantly affect internal controls subsequent to the evaluation.

*Id.* at 57, 276.

Pursuant to Section 302 of Sarbanes-Oxley, the SEC adopted Rules 13a-14 and 15d-14, requiring the principal executive and financial officers to certify, among other things, that "[b]ased on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make

the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report" and that "[b]ased on his or her knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in the report." *Id.* at 57,277.

The Sarbanes-Oxley certification "is not limited to a representation that the financial statements and other financial information have been presented in accordance with 'generally accepted accounting principles.'" *Id.* at 57,279. Rather, a "fair presentation of an issuer's financial condition, results of operations and cash flows encompasses the selection of appropriate accounting policies, proper application of appropriate accounting policies, disclosure of financial information that is informative and reasonably reflects the underlying transactions and events *and the inclusion of any additional disclosure necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition*, results of operations and cash flows." *Id.* (emphasis added).

Sarbanes-Oxley's certification requirements are tied to the knowledge of the certifying officer. *Id.* Criminal penalties may attach when the certifying officer *knowingly* or *willfully* certifies a quarterly or annual statement that does not comport with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act. *See* 18

U.S.C. § 1350(c) (2006) (officer who knowingly certifies deficient statement may be fined no more than $1 million or imprisoned not more than ten years or both, and that officer who willfully certifies deficient statement may be fined not more than $5 million or imprisoned not more than twenty years or both).

Courts interpreting Sarbanes-Oxley's certification requirements have held that knowledge, willfulness, or recklessness is a predicate for civil liability. Thus, if the certifying officer, "'at the time of the certification . . . *knew or consciously avoided any meaningful exposure to the information* that was rendering their [Sarbanes-Oxley] certification erroneous,' a false or misleading certification may form the basis of a § 10(b) and Rule 10b-5 claim." *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, Civ. Action No. 08-969, 2009 WL 3837659, at * 11-12 (D. Del. Nov. 13, 2009) (quoting *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 290 (D.N.J. 2007)) (emphasis added); *see also Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006) ("Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements. This requirement is satisfied if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions.").

Sarbanes-Oxley does not provide for a separate private right of action for violations of the certification requirements, and none can be implied. *See City of Roseville Employees' Ret. Sys.*, 2009 WL 3837659, at *11.

## IV.   BANKRUPTCY LAW ISSUES

This Section sets forth legal standards relevant to the Examiner's analysis of avoidance actions available to the Debtors' estates as set forth in Section III.B of his Report.   Part A discusses the avoidance of actually and constructively fraudulent transfers under federal and state law.   Part B addresses defenses to avoidance of fraudulent transfer actions pursuant to Section 548(a)(1).   Part C discusses the avoidance of fraudulent conveyances under New York debtor creditor law.   Part D discusses the avoidance of preferential transfers under federal and state law.   Part E discusses the Bankruptcy Code's safe harbor provisions.  Part F discusses the avoidance of postpetition transfers under the Bankruptcy Code.  Part G addresses the avoidance of post-petition transfers pursuant to Section 549 of the Bankruptcy Code.   Part H discusses the recovery of avoided transfers and defenses to such actions under Section 550 of the Bankruptcy Code.   Part I discusses setoff issues under Section 553 of the Bankruptcy Code.  Part J discusses actions to recovery property of the estate pursuant to Section 542 of the Bankruptcy Code.

## A.  Avoidance Actions

Section 548(a)(1) allows a trustee to avoid transfers that are actually or constructively fraudulent.  *See* 11 U.S.C. § 548(a)(1) (2006).  Specifically, Section 548(a)(1) provides:[9]

> (a) (1) The trustee may avoid any transfer (including a transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or an obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
>> (A)     made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>>
>> (B)     (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>>
>>> (ii)     (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>>>
>>> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>>>
>>> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>>>
>>> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

---

[9] Section 1107 of the Bankruptcy Code gives debtor in possession all the rights of a trustee with exceptions not relevant here.  As such, the sections of the Bankruptcy Code that grant avoiding powers to a trustee provide those same avoiding powers to a debtor in possession, such as Lehman.

### 1. Transfers with Fraudulent Intent under Section 548(a)(1)(A)

The Bankruptcy Code provides that the trustee may avoid a transfer if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . . " 11 U.S.C. § 548(a)(1)(A) (2006). "Actual intent" usually refers to the intent of the debtor, not the intent of the transferee. *See Rubin Bros. Footwear, Inc. v. Chem. Bank* (*In re Rubin Bros. Footwear, Inc.*), 119 B.R. 416, 423 (S.D.N.Y. 1990) ("For the purposes of 11 U.S.C. § 548(a)(1), plaintiff must show fraudulent intent on the part of the transferor, rather than on the part of the transferee."). Bankruptcy courts, however, have considered the intent of the transferee in situations where the transferee controls the debtor. *See Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R. 406, 442-43 (S.D.N.Y. 2001) (fraudulent intent of a transferee may be imputed to the debtor where the "*transferee possesses the requisite intent to hinder, delay or defraud the debtor's creditors . . . the transferee 'must be in a position to dominate or control'* . . . the pertinent domination and control relates to 'the debtor's disposition of his property'"); *Pirrone v. Toboroff* (*In re Vaniman Int'l, Inc.*), 22 B.R. 166, 182-85 (Bankr. E.D.N.Y. 1982) (where the transferee is dominant or in position of control, the intent of the transferee may be imputed to the debtor; *Varon v. Trimble, Marshall & Goldman, P.C.* (*In re Euro-Swiss Intern. Corp.*), 33 B.R.

872, 884 (Bankr. S.D.N.Y. 1983).)  The plaintiff bears the burden of proof with respect to intent.  *Mottaz v. Oswald* (*In re Frierdich*), 294 F.3d 864, 867 (7th Cir. 2002).

Intent may be inferred from circumstantial evidence or the presence of factors commonly referred to as "badges of fraud," which include: (1) a lack or inadequacy of consideration; (2) a closely associated relationship between the parties; (3) retention of possession, benefit, or use of the property in question; (4) the financial condition of the party sought to be charged before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry. *See Le Café Crème, Ltd. v. Le Roux* (*In re Le Café Crème, Ltd.*), 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000) (citing *Salomon v. Kaiser* (*In re Kaiser*) 722 F.2d 1574, 1582 (2d Cir. 1983)). As one court has stated, "[i]t is sufficient for a plaintiff to demonstrate that the transferor 'acted under circumstances that preclude any reasonable conclusion other than that the purpose of the transfer was fraudulent as to creditors.'"  *Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC)*, 396 B.R. 810, 827 (Bankr. S.D.N.Y. 2008) (quoting 5 COLLIER ON BANKRUPTCY § 548.04[1] (15th ed. rev. 2006)).

## 2. Constructive Fraudulent Transfers under Section 548(a)(1)(B)

To establish constructive fraud, a plaintiff must show that, when the transfer or obligation was made or incurred and the debtor received less than reasonably equivalent value or fair consideration for the transfer or obligation, one of four alternative circumstances existed: (1) the debtor was insolvent or rendered insolvent as a result of the transfer or obligation; (2) the debtor was undercapitalized; (3) the debtor intended to incur or believed it would incur debts beyond the ability of the debtor to repay as such debts matured; or (4) the transfer was made to or for the benefit of an insider or the obligation was incurred for the benefit of an insider, under an employment contract and not in the ordinary course of business. *See* 11 U.S.C. § 548(a)(1)(B)(i)-(ii)(I)-(IV) (2006). The plaintiff bears the burden to prove the elements of Section 548(a)(1)(B). *See In re Bayou Group*, 396 B.R. at 827.

Under Section 548, "value" means property or the satisfaction or securing of a present or antecedent debt of the debtor. The inquiry focuses on "the specific transaction the trustee seeks to avoid, *i.e.,* the *quid pro quo* exchange between the debtor and transferee, rather than an analysis of the transaction's overall value to a debtor as it relates to the welfare of the debtor's business." *See Balaber-Strauss v. Sixty-Five Brokers* (*In re Churchill Mortg. Inv. Corp.*), 256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000), *aff'd sub nom. Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001). Quantitatively, the "debtor should receive a 'fair equivalent' or an 'amount not disproportionately small as

compared with the value of the property or obligation' the debtor has given up." *Id*; *see also In re 375 Park Ave. Assoc., Inc.*, 182 B.R. 690, 695-96 (Bankr. S.D.N.Y. 1995)). That standard has been described as a "measurement test." *Baleber-Strauss*, 256 B.R. at 678 (citing *Yoder v. T.E.L. Leasing, Inc.* (*In re Suburban Motor Freight, Inc.*), 124 B.R. 984, 997 (Bankr. S.D. Ohio 1990)).

The following subparts consider in turn the four alternative circumstances in which a transfer may be avoided based on constructive fraud.

### a) Insolvency

To establish insolvency, the trustee must show the debtor "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation." 11 U.S.C. § 548(a)(1)(B)(ii)(I) (2006). The Bankruptcy Code defines "insolvent" to refer to an entity's "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A) (2006). The Second Circuit, in *Roblin,* stated:

> The matrix within which questions of solvency and valuation exist in bankruptcy demands that there be no rigid approach taken to the subject. Because the value of property varies with time and circumstances, the finder of fact must be free to arrive at the "fair valuation" defined in § 101[32] by the most appropriate means.

*Lawson v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 38 (2d Cir. 1996) (quoting *Porter v. Yukon Nat'l Bank,* 866 F.2d 355, 357 (10th Cir. 1989)) (alteration in original).

"No rigid approach should be taken regarding the fair valuation of a company within the context of a solvency analysis, but rather courts should consider the totality of the circumstances." *Iridium Capital Corp. v. Motorola, Inc.* (*In re Iridium Operating L.L.C.*), 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007) (Peck, J.) (noting that the Second Circuit has adopted a "flexible approach to insolvency analysis" (citing *Union Bank of Switz. v. Deutsche Fin. Servs. Corp.*, 2000 WL 178278, at *8 (S.D.N.Y. Feb. 16, 2000))).

### b) Unreasonably Small Capital

Unlike insolvency, whose meaning is relatively settled, the legal test for "unreasonably small capital" is "far from clear." *In re Best Prods. Co., Inc.*, 168 B.R. 35, 54 (Bankr. S.D.N.Y. 1994).[10]  At a basic level, a company has "unreasonably small capital" when it lacks the "resources it needed to carry on its business." *Barrett v. Cont'l Ill. Nat'l Bank & Trust Co.*, 882 F.2d 1, 4 (1st Cir. 1989) (quoting *United States v. Gleneagles Inv. Co., Inc.*, 565 F. Supp 556, 580 (M.D. Pa. 1983)).  The term "capital" as used in the "unreasonably small capital" test has a broad definition, meaning "all reasonably anticipated sources of operating funds, which may include new equity infusions, cash

---

[10] There is no statutory definition of the term "unreasonably small capital" (or its equivalent, "unreasonably small assets") in the Bankruptcy Code or applicable state law. The "unreasonably small capital" test requires "judicial consideration of the overall state of affairs surrounding the corporation and the challenged transfer itself," and thus is generally analyzed and applied on a "case-by-case" basis. *Yoder v. T.E.L. Leasing, Inc (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 998-99 (Bankr. S.D. Ohio 1990). *See also Credit Managers Ass'n  v. Federal Co.*, 629 F. Supp. 175, 183 (C.D. Cal. 1985) (describing the "unreasonably small capital" test as "a question of fact that must be ascertained on a case by case basis"); *Barrett v. Cont'l Ill. Nat'l Bank & Trust Co.*, 882 F.2d 1, 4 (1st Cir. 1989) ("'Unreasonably' is clearly a relative term and demands, for the purposes of [Section 5 of the UFCA], the sort of relative, contextual judgment which looks to both the ends served by § 5 and the overall state of affairs surrounding the transferor corporation and the challenged transfer itself.").

from operations, or cash from secured or unsecured loans over the relevant time period." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1072 n.24 (3rd Cir. 1992). However, not all "inadequacy" of capital is necessarily unreasonable. As Judge Posner noted in *Baldi v. Samuel Son & Company, Ltd.*, 548 F.3d 579, 583 (7th Cir. 2008):

> [S]uppose a bank is very heavily leveraged—that is, it has a very high ratio of borrowed money to equity. It lends out the borrowed money, and as long as the borrowers pay on time it is fine. If many of them default, however, the present value of the bank's revenues may dip below what is owes its depositors and other lenders, and if so then without an adequate equity cushion, the bank will go broke. But until the defaults reach the point at which its liabilities exceed its assets, the bank will be solvent. So "undercapitalization" . . . increases the risk of insolvency, is not insolvency, and does not require separate consideration in a bankruptcy case.

Central to the "unreasonably small capital" test is the task of "balanc[ing] the need to protect creditors from transactions that cripple a company with the need to preserve the market for a debtor's assets." *Daley v. Chang (In re Joy Recovery Technology Corp.)*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002). After all, "businesses fail for all sorts of reasons, and . . . fraudulent [conveyance] laws are not a panacea for all such failures." *Moody*, 971 F.2d at 1073 (quoting Bruce A. Markell, "Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital," 21 IND. L. REV. 469, 506 (1988)). Some courts require the debtor to be so highly leveraged that it is "technically solvent but doomed to fail." *See Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009); *MFS/Sun Life Trust High Yield Series v. Van Dusen Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995); *see also In Re Joy Recovery*, 286 B.R. at 76 ("Being left without

adequate capital would mean that the transaction in issue put [the debtor] on the road to ruin."). Other decisions describe the relationship between "unreasonably small capital" and insolvency in language that suggests less dire circumstances. For example, the court in *In re Vadnais Lumber Supply, Inc.*, stated that "[u]nreasonably small capitalization . . . encompasses difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some point in the future." 100 B.R. 127, 137 (Bankr. D. Mass. 1989); *see also Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370, 407 (Bankr. D. Mass. 1991) ("[U]nreasonably small capitalization encompasses financial difficulties which are short of equitable insolvency or bankruptcy insolvency but are likely to lead to some type of insolvency eventually."). One court has emphasized "foreseeability of insolvency" over "likelihood of insolvency" as the touchstone for "unreasonably small capital," describing the condition as "an unreasonable risk of insolvency, not necessarily a likelihood of insolvency" that is "similar to the concept of negligence, which is conduct that creates an unreasonable risk of harm to another's person or property." *Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.)*, 208 B.R. 288, 302 (Bankr. D. Mass. 1997).

To determine whether a company has "unreasonably small capital," a fact-finder must assess "both the nature of the enterprise itself and the extent of the enterprise's need for capital during the period in question." *Barrett*, 882 F.2d at 4. In conducting that analysis, courts "compare a company's projected cash inflows (also referred to as

'working capital' or 'operating funds') with the company's capital needs throughout a reasonable period of time after the questioned transfer." *In re Iridium*, 373 B.R. at 344. Furthermore, as the Third Circuit noted in *Moody*, "parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error." 971 F. 2d at 1073. Accordingly, the unreasonably small capital test analyzes not only the company's capital structure at a given point in time, but also how a company's capital structure would hold up under reasonably foreseeable conditions of stress, to determine "whether a company has sufficient capital to support operations *in the event that* performance is below expectations." *In re TOUSA, Inc.*, No. 08-10928-JKO, 2009 WL 3519403, at *74 (Bankr. S.D. Fla. Oct. 30, 2009) (emphasis added); *see also Carpenter v. Roe*, 10 N.Y 227, 228-29, 232 (1851) (invalidating a pre-bankruptcy transfer made at a time when the debtor was indebted, and had reason to believe that "insolvency would be the inevitable or probable result of *want of success* in the business in which he was engaged"). Thus, a company may make projections based on "[o]nly those cash inflows that were reasonable for a company to have expected to receive" under the circumstances. *In re Iridium*, 373 B.R. at 344.

The reasonableness of a company's projections is central to the "unreasonably small capital" analysis under a stress-based approach. *Moody*, 971 F.2d at 1073 ("The critical question is whether the parties' projections were reasonable."). Because any

entity would fail under sufficiently dire conditions, the "unreasonably small capital" test assesses projected capital adequacy only against stress conditions that are not only foreseeable, but reasonably likely to occur. *See, e.g.*, *United States v. 58th Street Plaza Theatre, Inc.*, 287 F. Supp. 475 (S.D.N.Y. 1968) (assessing the probability, as of the date of a transfer, that certain pending tax claims, then being judicially determined, would turn out to be valid). In one of the earliest cases in the United States on the "unreasonably small capital" test, *Carpenter v. Roe*, the Court of Appeals for the State of New York invalidated a pre-bankruptcy transfer made at a time when the debtor was indebted, and had reason to believe that "insolvency would be the inevitable or probable result of want of success in the business in which he was engaged." 10 N.Y. at 232. More recently, a court using the stress-based approach considered "whether the remaining assets left the [debtors] reasonably able to pay obligations that they should have expected to arise out of their business." *Intervest Mortgage Inv. Co. v. Skidmore*, 655 F. Supp. 2d 1100, 1107 (E.D. Cal. 2009); *see also Ferrarri v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)*, 148 B.R. 97, 122 (Bankr. D. Mass. 1992) (finding it relevant that the new owner following a leveraged buy-out transaction "understood" that it would need "luck" in order to survive following the transaction); *Murphy v. Meritor Sav. Bank (In Re O'Day Corp.)*, 126 B.R. 370, 406 (Bankr. D. Mass. 1991) ("reasonableness of the projections" was "impugned by evidence that clearly established that [the debtors] were

well aware of the decrease in gross profit margin and consequent decline in EBIT prior to the LBO closing").

A recent bankruptcy decision from the Southern District of Florida illustrates how contemporaneous statements and documents can demonstrate a finding of "unreasonably small capital." *In re TOUSA*, 2009 WL 3519403, at * 13. In that case, a creditors' committee sought to avoid and recover $500 million in liens granted by the debtor and certain of its subsidiaries approximately 6 months prior to the debtor's official bankruptcy. *Id.* at *1. The debtor, TOUSA, was engaged in the homebuilding business and made a "disastrous business venture" involving real estate in Florida which led, among other things, to a default on debt used to finance that venture. *Id.* The business venture failed in large part because of economic conditions—a substantial housing downturn in the Florida market. *Id.* at *3. In July 2007, TOUSA borrowed $500 million to settle litigation arising from the failed venture, and secured the loan with liens against assets held by its subsidiaries, who themselves had no exposure to the venture or the litigation. *Id.* at *4.

In assessing whether creditors could invalidate the liens that the subsidiaries had granted, the court applied the "unreasonably small capital" test to ask "whether a company has sufficient capital to support operations in the event that performance is below expectations." *Id.* at *74. The court found that the debtors were operating with "unreasonably small capital" at the time of the transaction based on contemporaneous

statements made by TOUSA management and outside observers about the dire financial condition of the debtor and its subsidiaries. *Id.* at *13-14,*42. Those statements demonstrated the managers knew that the debtors were "already dangerously over-leveraged and in need of an infusion of capital." *Id.* at *6. The court stated that "no plausible conclusion could be reached on the evidence presented other than those entities were left with no financial maneuvering room, no assets upon which they could borrow, and no way out of a hopeless financial squeeze which TOUSA's management recognized months, weeks, and days before the closing on July 31, 2007." *Id.* at *51.

### c) Inability To Pay Debts

To establish an inability to pay debts, the trustee must show the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B)(ii)(III) (2006). The "inability to pay debts" alternative of Section 548 is met if the plaintiff can show that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured. *WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants (In re WRT Energy Corp.)*, 282 B.R. 343, 415 (Bankr. W.D. La. 2001) (citing 2 COLLIER ON BANKRUPTCY § 548.05[4] (3d ed. rev. 2000)). Although the statute suggests a standard based on subjective intent, the "courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the

debtor could not have reasonably believed that it would be able to pay its debts as they matured."  *Id.* (citing *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 1001 (Bankr. S.D. Ohio 1990), and *In re Taubman*, 160 B.R. 964, 986-87 (Bankr. S.D. Ohio 1993)).

### d)  Employment Contracts

To avoid a transfer under the insider-transfer prong of Section 548, the trustee must show that the debtor "made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business."  11 U.S.C. § 548(a)(1)(B)(ii)(IV) (2006).  To date, there are no reported decisions interpreting the term "employment contract" for purposes of Subsection (IV), and the Bankruptcy Code does not define the term.  *See* 11 U.S.C. § 101 (2006) (providing no definition for "employment contract").

The legislative history of Section 548(a)(1)(B)(ii)(IV) notes that Subsection (IV) was added to "make it easier for a trustee to avoid prepetition transfers."  H.R. Rep. No. 109-31(I), pt. 1, at 154 (2005) *reprinted in* 2005 U.S.C.C.A.N. 88, 211.  Congress added Subsection (IV) "to enhance the recovery of avoidable transfers and excessive prepetition compensation, such as bonuses, paid to insiders of a debtor."  *Id*.  The types of transfers that Congress sought to avoid include "golden parachutes" and other payments made to a debtor's executives.  *See* 5 COLLIER ON BANKRUPTCY § 548.05[5], at 548-52.3 (15th rev. ed. 2009).  At the same time, "regular bonuses granted to a sales

force, or to a division, will likely not be vulnerable under this section, even if the debtor did not receive reasonably equivalent value in exchange." *Id.*

Neither the Bankruptcy Code nor legislative history provides guidance as to how the term "not in the ordinary course of business" should be interpreted for purposes of § 548(a)(1)(B)(ii)(IV). *See* 11 U.S.C. § 101 (2006) (providing no definition for "ordinary course of business"). A narrow construction of the ordinary course of business exception in Section 548(a)(1)(B)(ii)(IV) may be appropriate in view of Congress' intent to "make it easier" to recover "excessive prepetition compensation." H.R. Rep. No. 109-31(I), pt. 1, at 154 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 211.

Courts have interpreted the phrase "ordinary course of business" in connection with preference actions under § 547. In that context, courts have construed the ordinary course of business exception under § 547(c)(2) narrowly. *See In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 458-59 (Bankr. S.D.N.Y. 2007) ("Further, the [§ 547(c)(2)] defense is narrowly construed."); *see also, Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1339 (10th Cir. 1996) ("[T]he defense should be narrowly construed."); *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 96 B.R. 474, 476 (Bankr. D.N.J. 1988) (courts "should not give untrammeled access to Section 547(c)(2), but should construe the statute narrowly"). Courts have noted that, as a general matter, evaluation of "ordinary course of business" under Section § 547(c)(2) is a "peculiarly factual" analysis, *McClarty v. Colletta (In re D.C.T. Inc.)*, 295 B.R. 236, 239 (Bankr. E.D. Mich. 2003), such that

determination of whether a transfer occurred in the ordinary course of business depends on the "facts and circumstances surrounding the payments." *Jacobs v. Matrix Capital Bank (In re AppOnline.com, Inc.*), 315 B.R. 259, 284 (Bankr. E.D.N.Y. 2004) (citing *Tolz v. Signal Capital Corp. (In re Mastercraft Graphics, Inc.)*, 157 B.R. 914, 919 (Bankr. S.D. Fla. 1993)); *see also Everlock Fastening Sys., Inc. v. Health Alliance Plan (In re Everlock Fastening Sys.)*, 171 B.R. 251, 254 (Bankr. E.D. Mich. 1994) (applying totality of circumstances test in evaluating ordinary course of business defense); *Richardson v. Phila. Hous. Auth. (In re Richardson)*, 94 B.R. 56, 62 (Bankr. E.D. Pa. 1988) (same). In some circumstances, a first-time transaction may take place in the ordinary course of business. *See, e.g., Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642-43 (7th Cir. 2003); *Huffman v. N.J. Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 735 (Bankr. W.D. Va. 1995). *But see In re Enron*, 376 B.R. at 462-64 (ordinary course of business exception did not apply to severance payment).

**B.  Defenses to Avoidance of Fraudulent Transfers Pursuant to § 548(a)(1) of the Bankruptcy Code**

Section 548(c) provides a limited defense to avoidance under Section 548(a). A transferee that takes for value and in good faith has a lien or may retain an interest transferred (or enforce any obligation incurred) to the extent the transferee gave value to the debtor in exchange for the transfer (or obligation). *See* 11 U.S.C. §548(c); *see also In re Adler, Coleman Clearing Corp.*, 263 B.R. at 471 ("As a threshold matter, by its very terms § 548(c) provides that, in order to invoke this defense, the transferee must satisfy

three standards: take (1) for value *and* (2) in good faith, and (3) claim the applicable right to the interest only to the extent the transferee gave value to the debtor in exchange.") The transferee bears the burden of proof with respect to each element under Section 548(c). *See Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 403 (Bankr. S.D.N.Y. 2007); *McColley v. Rosenberg (In re Candor Diamond Corp.)*, 76 B.R. 342, 351 (Bankr. S.D.N.Y. 1987).

The Bankruptcy Code does not define "good faith" as used in Section 548(c). *In re Bayou Group*, 396 B.R. at 844. Nonetheless, "federal courts have reached a consensus that 'good faith' as used in Section 548(c) must be determined according to an 'objective' or 'reasonable person' standard, and does not turn on the subjective knowledge or belief of the transferee." *Id*. Accordingly, courts "look to what the transferee objectively 'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint." *Id*. at 845 (quoting *Hayes v. Palm Seedlings Partners (In re Agric. Research and Tech. Group, Inc.)*, 916 F.2d 528, 535-36 (9th Cir. 1990)).

Thus, a "transferee cannot be found to have taken a transfer in good faith if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose." *Id.* at 845. Good faith requires either that (1) the transferee was not on "inquiry notice," or (2) if on notice, the transferee was "diligent in its investigation" of the transferor. *Id.*

Whether a transferee was on "inquiry notice" also may turn on the experience or sophistication of the transferee. *In re M & L Bus. Mach. Co.*, 84 F.3d at 1338.

Courts have found transferees to be on "inquiry notice" based on a variety of showings, including: (1) the fraudulent purpose of the transfer; (2) underlying fraud; (3) the unfavorable financial condition of the transferor; (4) the insolvency of the transferor; (5) improper nature of the transaction; and (6) the voidability of the transfer. *In re Bayou Group,* 396 B.R. at 845-46. The enumerated examples, however, "are not exhaustive and thus 'good faith' must be evaluated on a case-by-case basis." *Id.* at 846.

Once on inquiry notice, a transferee that fails to conduct a diligent investigation cannot make out a good faith defense. *Id.* In order to establish a transferee's "good faith," the "diligent investigation" must "ameliorate the issues that placed the transferee on inquiry notice in the first place." *Id.* In other words, a "transferee cannot put his head in the sand in the face of unusual or suspicious circumstances and then take advantage of the 'good faith' defense afforded by Section 548(c)." *Id.* at 847.

## C. Avoidance of Fraudulent Conveyances Pursuant to New York Debtor Creditor Law, art. 10, §§ 273-76 (McKinney 2010)

Subsection 544(b) of the Bankruptcy Code allows the trustee to avoid any transfer of the debtor or any obligation incurred by the debtor that a creditor holding a valid, allowable unsecured claim against the debtor could have avoided as of the debtor's petition date. *See* 11 U.S.C. § 544(b) (2006). Although Section 548 allows the trustee to avoid fraudulent transfers made only during the two years preceding a

debtor's bankruptcy filing, Subsection 544(b) entitles a trustee to step into the shoes of a creditor exercising avoidance rights under state law such that the applicable state law statute of limitations (generally four or six years) applies to Section 544(b) actions. Thus, a trustee may be entitled to a longer reach back period for fraudulent transfer actions brought under Section 544(b) than for actions brought under Section 548.

New York has adopted the Uniform Fraudulent Conveyance Action ("UFCA") which provides, in relevant part:

### § 273. Conveyances by insolvent

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

### §274. Conveyances by persons in business

Every conveyance made without fair consideration when the person making it is engaged or about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

### §275. Conveyances by a person about to incur debts

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

### §276. Conveyances made with intent to defraud

> Every conveyance made an every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

N.Y. DEBT. & CRED. LAW §§ 273-76 (McKinney 2010).

Case law interpreting Section 276 (conveyances made with intent to defraud) indicates that the plaintiff has the burden of proving the intent of the transferee as well as the transferor. *See MarketXT Holding Corp.*, 376 B.R. at 403. On the other hand, in *HBE Leasing v. Frank*, the Second Circuit referred only to the intent of the transferor in a case under Section 276. 61 F.3d 1054, 1059 n.5 (2d Cir. 1995). In any event, "it is established under New York law that in an intentional fraudulent conveyance case the relevant inquiry is whether the transferee had either 'an actual or constructive knowledge of the fraudulent scheme.'" *Id*. (quoting *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995)); *Actrade Fin. Tech.*, 337 B.R. at 810.

Under Section 272 of the New York Fraudulent Conveyance Law, the test to determine "fair consideration" is whether there is an exchange of property, obligation, or antecedent debt that is "a fair equivalent therefor" or "not disproportionately small as compared with the value of the property, or obligation obtained." N.Y. DEBT. & CRED. LAW § 272 (McKinney 2010). "Fair consideration" under the New York Fraudulent Conveyance Law and "reasonably equivalent value" under Section 548(a)(1)(b) have the "same fundamental meaning." *Balabar-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.*), 256 B.R. 664, 677 (Bankr. S.D.N.Y. 2000), *aff'd sub nom.*

*Balabar-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001). Because Sections 273 (conveyances by insolvent), 274 (conveyances by persons in business), and 275 (conveyances by a person about to incur debts) of the New York Fraudulent Conveyance Law parallel Section 548 of the Bankruptcy Code, the two statutes are interpreted similarly by the courts. *See id.* (citing *HBE Leasing Corp.,* 48 F.3d at 638; *In re Adler, Coleman Clearing Corp.,* 247 B.R. at 116; *European Am. Bank v. Sackman Mortgage Corp.* (*In re Sackman Mortgage Corp.*), 158 B.R. 926, 938 (Bankr. S.D.N.Y. 1993); *Scherling v. Pan Trading Corp., S.A.* (*In re Chadborne Indus., Ltd.*), 71 B.R. 86, 89 (Bankr. S.D.N.Y. 1987); *Murdock v. Plymouth Enters., Inc.* (*In re Curtina Int'l, Inc.*), 23 B.R. 969, 974 (Bankr. S.D.N.Y. 1982); *Pereira v. Checkmate Commc'n. Co.* (*In re Checkmate Stereo and Elecs.*), 9 B.R. 585, 591 (Bankr. E.D.N.Y. 1981), *aff'd*, 21 B.R. 402 (E.D.N.Y. 1982); *Breeden v. Bennett* (*In re Bennett Funding Group, Inc.*), 220 B.R. 743, 754 (Bankr. N.D.N.Y. 1997).

Section 278 of the New York Fraudulent Conveyance Law is New York's parallel to Section 548(c) of the Bankruptcy Code. That Section provides that "[w]here a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person *except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase*, or one who has derived title immediately or mediately from such purchaser . . . [h]ave the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim . . . ." N.Y. Debt. & Cred. Law § 278 (McKinney 2010) (emphasis added); *see also In re Churchill Mortg. Inv. Corp.,* 256 B.R. at

676. Thus, even a trustee who is able to establish a fraudulent transfer pursuant to the New York Fraudulent Conveyance Law will not be able to recover against a transferee who takes for "fair consideration and without knowledge." *Id.*

Section 278 "reflects the [Fraudulent Conveyance Law's] policy of protecting innocent creditors or purchasers for value who have received the debtor's property without awareness of any fraudulent scheme." *HBE Leasing Corp.*, 48 F.3d at 636. The transferee, however, "need not have actual knowledge of the scheme that renders the conveyance fraudulent . . . [C]onstructive fraudulent schemes will be attributed to transferee who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such an inquiry." *Id.* (citing *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3rd Cir. 1986) (lenders "knew, or should have known" that monies would not be retained by debtor)).

Where a party asserts a claim to recover property under the New York Fraudulent Conveyance Act, the party may recover the value of the property at the time of transfer if the grantee subsequently has disposed of the property or if the property has depreciated in value. *See Marine Midland Bank v. Murkoff*, 508 N.Y.S.2d 17, 24-25 (App. Div. 1986). A party also may be entitled to recover a money judgment from a transferee who has tortiously interfered with the property. *See id.* Otherwise, the party's recovery will be limited to the property rights conveyed. *See id.* at 25.

### D. Avoidance of Preferential Transfers

#### 1. Preferences under Section 547 of the Bankruptcy Code

Section 547(b) of the Bankruptcy Code allows the debtor to avoid transfers that are preferential, providing:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

    (1) to or for the benefit of a creditor;

    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3) made while the debtor was insolvent;

    (4) made—

        (A) on or within 90 days before the date of the filing of the petition; or

        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

    (5) that enables such creditor to receive more than such creditor would receive if—

        (A) the case were a case under chapter 7 of this title;

        (B) the transfer had not been made; and

        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (2006).

The Bankruptcy Code provides that the debtor has the burden of proof on each element under Section 547(b). 11 U.S.C. § 547(g) (2006). It also presumes insolvency

"on and during the 90 days immediately preceding the date of the filing of the petition," 11 U.S.C. § 547(f) (2006), but that presumption of insolvency can be rebutted by introducing evidence that tends to suggest that the debtor was solvent at the time the transfer was made. *Id.; see also In re Roblin Indus.*, 78 F.3d at 34. Even in cases involving a one-year reach back period, such as those against insiders, the presumption of insolvency applies only to the ninety days before the petition date. *See, e.g., In re Am. Eagle Coatings, Inc.*, 353 B.R. 656, 669 (Bankr. W.D. Mo. 2006) ("Plaintiff is not entitled to the benefit of a presumption of insolvency for claims asserted against insiders during the extended reachback period."); *In re Carolyn's Kitchen, Inc.*, 209 B.R. 204, 208 (Bankr. N.D. Tex. 1997) ("Since this transfer was outside the ninety-day preference period, there is no § 547(f) insolvency presumption . . . ."); *In re F.H.L., Inc.*, 91 B.R. 288, 294 (Bankr. D.N.J. 1988) ("[T]he presumption of insolvency applies *only* during the ninety days immediately preceding the date of the filing of the petition.").

To determine whether a debt is "antecedent" under the provisions of the Bankruptcy Code, courts look at the date on which the debt is incurred, not the date the payment is due. *Pelz v. New Age Consulting Servs., Inc.*, 279 B.R. 99, 102 (Bankr. D. Del. 2002); *G.G. Survivor Creditor Corp. v. Harari (In re G. Survivor Corp.)*, 217 B.R. 433, 440 (Bankr. S.D.N.Y. 1998). Accordingly, prepayments may be avoided as preferences. *Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337, 347-48 (Bankr. S.D.N.Y. 1999) (payment that allegedly constituted prepayment of debtor's obligation could be recovered); *see*

*also Breeden v. L.I. Bridge Fund, L.L.C. (In re Bennett Funding Group, Inc.)*, 220 B.R. 739, 742 (B.A.P. 2d Cir. 1998) ("[F]or purposes of Section 547(b)(2), 'an antecedent debt' is a pre-existing debt that was incurred when the debtor previously obtained a property interest in the consideration provided by the creditor that gave rise to the debt.  The consideration may have been a loan or the furnishing of goods or services, but when the debtor obtained the loan, goods or services, the creditor had a claim, matured or unmatured, that it could then assert against the debtor's bankruptcy estate if payment was not made at the time a petition was filed.  At that point the debt was 'antecedent' for purposes of Section 547(b)(2).").

Under most circumstances, the hypothetical Chapter 7 liquidation requirement is satisfied if the claim of the creditor is a general unsecured claim.  *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458, 465 (6th Cir. 1991) ("Unless the estate is sufficient to provide a 100% distribution, any unsecured creditor . . . who receives a payment during the preference period is in a position to receive more than it would have received under a Chapter 7 liquidation."); *McColley v. Navaro Gem Ltd. (In re Candor Diamond Corp.)*, 68 B.R. 588, 594-95 (Bankr. S.D.N.Y. 1986) ("To establish a preferential transfer requires the trustee to show that the creditor received more than he would have had the transfer not been made, had the case been one under [C]hapter 7 and had the creditor received payment only to the extent provided by the Code. . . . As a practical matter, this element of a preference is almost always satisfied where a debtor

transfers property to an unsecured creditor . . . and the creditor would receive less than 100% in a Chapter 7 liquidation.").

Even where a plaintiff can satisfy all of the elements of a preference under Section 547(b) of the Bankruptcy Code, the transferee will not be liable if it can establish a defense under Section 547(c).  11 U.S.C. § 547(c), (g) (2006).  Three defenses are relevant here.

First, the transferee will not be liable if the transfer was intended to be, and was, a "contemporaneous exchange" for new value given to the debtor.  11 U.S.C. § 547(c)(1) (2006).

Second, no liability will be found if the transfer occurred "'in the ordinary course of business" between the parties.  11 U.S.C. § 547(c)(2) (2006).  The purpose of Section 547(c)(2) "'is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.'"  *Savage & Assocs., P.C. v. Mandl* (*In re Teligent, Inc.*), 380 B.R. 324, 340 (Bankr. S.D.N.Y. 2008) (quoting H.R. Rep. No 95-595, at 373 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6329).

To determine whether a debt was incurred in the ordinary course of business, courts look to other transactions between the parties.  *In re AppOnline.com.*, 315 B.R. at 283; *see also In re Teligent*, 380 B.R. at 340 ("In determining whether a transfer is made in the ordinary course of business, a court may consider (i) the prior course of dealing

between the parties, (ii) the amount of the payment, (iii) the timing of the payment, (iv) the circumstances of the payment, (v) the presence of unusual debt collection practices, and (vi) changes in the means of payment."); *In re Schick*, 234 B.R. at 348 ("[T]he cornerstone of this element of a preference defense is that the creditor needs to demonstrate some consistency with other business transactions between the debtor and the creditor."). However, courts interpret the "ordinary course of business" exception under Section 547(c)(2) narrowly. *In re Enron Creditors Recovery Corp.*, 376 B.R. at 458-59 ("[T]he [§ 547(c)(2)] defense is narrowly construed.").

Third, the transferee cannot be held liable if after the transfer in question was made, the creditor gave new value to or for the benefit of the debtor. 11 U.S.C. § 547(c)(4) (2006). The majority rule under Section 547(c)(4) provides that extensions of new value extensions can be credited against prior preferences. *See Williams v. Agama Sys., Inc. (In re Micro Innovations Corp.)*, 185 F.3d 329, 336-37 (5th Cir. 1999) (discussing the majority and minority rules for "new value," and adopting majority rule, which permits the crediting of new value against any prior preference and not the immediately preceding one); *see also G.H. Leidenheimer Baking Co., Ltd. v. Sharp (In re SGSM Acquisition Co., LLC)*, 439 F.3d 233, 241 (5th Cir. 2006); *Van Dyck/Columbia Printing v. Katz (In re Van Dyck/Columbia Printing)*, 289 B.R. 304, 314 (D. Conn. 2003); 5 COLLIER ON BANKRUPTCY § 547.04[4][d] (15th rev. ed. 2009).

## 2. Preferences under New York and Delaware Law

State preference law "is an adjunct to, and supplemental of, those powers specifically provided for in the Bankruptcy Code which enable the trustee to avoid certain transfers." *Perkins v. Petro Supply Co., Inc.* (*In re Rexplore Drilling, Inc.*), 971 F.2d 1219, 1222 (6th Cir. 1992); *see also Provident Hosp. & Training Ass'n v. GMAC Mortgage Co. of Pa. (In re Provident Hosp. & Training Ass'n)*, 79 B.R. 374, 379 (Bankr. N.D. Ill. 1987) (recognizing availability of state preference law as a means of attacking a transfer under Section 544(b)); *Associated Grocers of Neb. Coop., Inc. v. Am. Home Products Corp.* (*In re Associated Grocers of Neb. Coop.), Inc.*, 62 B.R 439, 445 (D. Neb. 1986) (quoting 4 COLLIER ON BANKRUPTCY, § 547.01 (15th ed. 1986) (same)). *But see Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203 (9th Cir. 2005) (state preference law was preempted by Section 547).

New York does not have a preference statute that would apply here. *See, e.g., Sharp Int'l Corp. v. State Street Bank and Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 54-55 (2d Cir. 2005) (preferential payments to non-insiders are not fraudulent conveyances and are not avoidable under New York law). Although Delaware has a preference statute, DEL. CODE ANN. tit. 10, § 10(6)(7)(2009), it has been applied narrowly by Delaware courts. *See Dodge v. Wilmington Trust Co.*, Civ. A. No. 1257-k, 1995 WL 106380, at *2-4 (Del. Ch. Feb. 3, 1995) (recognizing that Delaware's preference statute had "not

been cited by a Delaware court since 1917" and refusing to broaden its reach beyond assignments in trust).

### E.   The Safe Harbor Provisions of the Bankruptcy Code

In an effort to avoid disruptions to financial markets, the Bankruptcy Code sets forth exceptions to preference actions and fraudulent transfer avoidance claims known as the "safe harbor" provisions.   The safe harbor provisions generally protect the following parties: commodity brokers; forward contract merchants; stockbrokers; financial institutions; financial participants; securities agencies; swap participants; repo participants; and master netting agreement participants (the "Protected Parties"), in connection with the following types of contracts or agreements: securities contracts; commodity contracts; forward contracts; repurchase agreements; swap agreements; and master netting agreements (the "Protected Contracts").  11 U.S.C. § 546 (2006).  Sections 546(e), (f), (g), and (j) provide exceptions to preference and fraudulent transfer avoidance actions for transfers made by, to, or for the benefit of the Protected Parties both pursuant to Protected Contracts or made "in connection with" Protected Contracts. *Id*.  Section 546(e) provides that:

> [n]otwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant,

or securities clearing agency, in connection with a securities contract, as defined in 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e) (2006).

Courts have tended to construe broadly the phrase "in connection with" in each of Sections 546(e), (f), (g), and (j). One court has stated that a "natural reading of 'in connection with' suggests a broader meaning similar to 'related to.'" *Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.)*, 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999). Another court held that prejudgment attachments that a party to prepetition swap agreements had obtained in state court actions alleging breaches of those swap agreements were transfers made "in connection with" swap agreements, and thus were protected by Section 546(g). *See Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A. (In re Case de Cambio Majapara S.A. de C.V.)*, 390 B.R. 595, 599 (Bankr. N.D. Ill. 2008). The court reasoned that the party's actions stemmed from the failure of the swap agreements. *Id.*

The legislative history of the safe harbor provisions reveals that Congress sought to reduce systemic risk in the financial marketplace by preventing the insolvency of one financial firm from triggering failures elsewhere in the market. *See* H.R. Rep. No. 97-420, at 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 583. Congress wanted to prevent such a "ripple effect." *Id.*

Cases interpreting the safe harbor provisions most often have focused on Section 546(e) and the definition of "settlement payment." The Third, Sixth, Eighth and Tenth Circuits all have held that a transfer in connection with a leveraged buy-out qualifies as a settlement payment. *See QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*, 571 F.3d 545, 550 (6th Cir. 2009); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985-86 (8th Cir. 2009); *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 516 (3rd Cir. 1999); *Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.)*, 952 F.2d 1230, 1237 (10th Cir. 1991); *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*, 913 F.2d 846, 849 (10th Cir. 1990). Although some courts have declined to extend safe harbor protection to transactions that do not involve a financial intermediary,[11] every circuit court to decide the issue has ruled to the contrary, including three in the last year. *Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.),* No. 08-2616 2009 WL 4912137, at *2 (3rd Cir. Dec. 22, 2009) (safe harbors not intended to exclude privately held securities transactions); *Contemporary Indus.*, 564 F.3d at 986 (safe harbors are not limited to public securities transactions, nor is there a requirement that the financial intermediary involved have a "beneficial interest"); *In re QSI Holdings*, 571 F.3d at 550 (same).

---

[11] *See, e.g., Kapila v. Espirito Santo Ban*k *(In re Bankest Capital Corp.)*, 374 B.R. 333, 345-46 (Bankr. S.D. Fla. 2007) (safe harbor inapplicable to a direct purchase of stock from shareholders in leveraged buy-out); *Norstan Apparel Shops Inc. v. Lattman (In re Norstam Apparrel Shops, Inc.)*, 367 B.R. 68, 77 (Bankr. E.D.N.Y. 2007) (same); *Zahn v. Yucaipa Capital Fund*, 218 B.R. 656, 676 (D.R.I. 1998); *Jewel Recovery v. Gordon*, 196 B.R. 348, 353 (N.D. Tex. 1996) (same); *Wieboldt Stores, Inc. v. Schottenstein*, 131 B.R. 655, 664-65 (N.D. Ill. 1991) (same).

The bankruptcy and district courts of the Southern District of New York have interpreted the safe harbors narrowly, particularly where there is evidence of fraud, criminal conduct or other wrongful acts;[12] misconduct, impropriety, manipulation, deception, or illegality;[13] or where the transactions are unenforceable under applicable state law. *See Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 876 (Bankr. S.D.N.Y. 2005). Courts have based their decisions on the legislative history of Section 546(e) or on the definition of "settlement payment" in Section 741(8), which provides:

> "settlement payment" means a preliminary settlement payment, a partial settlement payment an interim settlement payment, a settlement payment on account, a final settlement payment, or *any other similar payment commonly used in the securities trade.*

11 U.S.C. § 741(8) (emphasis added); *see, e.g., Enron Corp. v. JPMorgan Sec., Inc.* (*In re Enron Corp.*), Nos. M-47 (BGD), 01-6034 (AJG), 2008 WL 281972, at *5 (S.D.N.Y. Jan. 25, 2008) ("Where transactions are not merely unorthodox, but rather are fundamentally tainted by misconduct or impropriety, such as manipulation, deception or illegality, a payment made to effectuate such transactions has been found not to be common in the securities trade, and hence not a settlement payment.").

Courts that have limited Section 546(e)'s scope of protection have read Section 741(8)'s definition of "settlement payment" to restrict the types of transactions

---

[12] *See Jackson v.* Mishkin *(In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 481-83 (S.D.N.Y. 2001).

[13] *See Enron Corp. v. JP Morgan Sec., Inc. (In re Enron Corp.)*, Nos. M-47 (GBD), 01-6034 (AJG), 2008 WL 281972, at *5 (S.D.N.Y. Jan. 25, 2008).

encompassed by the safe harbor. However, a recent Southern District of New York decision reversed a bankruptcy court ruling that relied primarily on the "commonly used in the securities trade" language of Section 741(8) to exempt a transaction for Section 546(e)'s safe harbor. *Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.),* Bankr. No. 01-16034 (AJG), 2009 WL 5174119, at *6 (S.D.N.Y. Nov. 20, 2009). The district court noted that "five circuit courts of appeal (albeit not the Second Circuit) have addressed the meaning of the term in the context of Section 546(e)'s 'safe harbor,' and all have agreed that a 'settlement payment' is not limited to a payment that is 'commonly used in the securities trade.'" *Id.* Applying conventions of statutory interpretation, the court held that Section 741(8) does not limit "settlement payments" to payments "in the ordinary course" or payments "commonly used in the securities trade." *Id.*

The court in *Alfa* adopted the five key factors identified in *In re Adler, Coleman Clearing Corp.* to determine whether a safe harbor applies to any particular set of facts:

1. [this type of] transaction[] has long [been] settled by means of actual transfers of consideration, so that subsequent reversal of the trade may result in disruption of the securities industry, creating a potential chain reaction that could threaten collapse of the affected market;

2. consideration was paid out in exchange for the securities or property interest as part of [the] settlement of the transaction;

3. the transfer[s] of cash or securities effected contemplates consummation of a securities transaction;

4. the transfer[s] [were] made to financial intermediaries involved in the national clearance and settlement system;

5. the transaction[s] implicated participants in the system of intermediaries and guarantees which characterize the clearing and settlement process of public markets and therefore would create the potential for adverse impacts on the functioning of the securities market if any of those guarantees in the chain were invoked.

*Id.* at *16 (quoting *In re Adler, Coleman Clearing Corp.*, 263 B.R. 479-80).

The Financial Netting Improvements Act of 2006 ("FNIA") substantially broadened Section 546(e) to protect not only settlement or margin payments, but also transfers made by, to, or for the benefit the protected parties in connection with securities, commodity, or forward contracts. 12 U.S.C.A. § 1821 (West 2010). There are no published cases interpreting the 2006 amendment, but the amendment calls into question the foregoing cases interpreting the "settlement payment" clause. Under the language of the 2006 amendment, it appears that the only portion of Section 548 that is not limited by the safe harbor is Section 548(a)(1)(A), which allows avoidance based on actual fraudulent transfers and which is explicitly carved out from the safe harbor. *Id.* However, some courts may continue to limit the protections of Section 546(e) by looking to the legislative history and the purpose of the safe harbor protections or by looking to the precedent of courts interpreting "settlement payment."

## F. Applicability of the Preemption Doctrine to State Law Claims by the Safe Harbor Provisions of the Bankruptcy Code

There is limited case law addressing whether state law claims are subject to Section 546(e)'s safe harbor provisions. Two courts have held that state law causes of action based upon the same underlying facts as federal bankruptcy actions are preempted by federal law. *See Contemporary Indus.*, 564 F.3d at 988 (state law claims for unjust enrichment and illegal and/or excessive shareholder distributions preempted by Section 546(e)); *Official Comm. Unsecured Creditors of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.)*, 274 B.R. 71, 96 (D. Del. 2002) (unjust enrichment claim preempted by Section 546(e)). Thus, the safe harbor provisions may preempt a trustee from proceeding on alternative state law theories to recover on account of otherwise unavoidable transfers.

The preemption doctrine is grounded in the Supremacy Clause of the Constitution and requires courts to ascertain congressional intent, which is "'the ultimate touchstone' of preemption analysis." *See O & G Indus., Inc., v. Nat'l R.R. Passenger Corp.*, 537 F.3d 153, 160 (2d. Cir. 2008) (quoting *Cipollone v. Ligget Group, Inc.*, 505 U.S. 504, 516 (1992)). Intent to preempt state law may be found where: "'(1) Congress expressly states its intent to preempt; (2) where Congress's scheme of federal regulation is sufficiently comprehensive to give rise to a reasonable inference that it leaves no room for the state to act; and (3) where state law actually conflicts with federal law.'" *Id.* at 162 (quoting *Marsh v. Rosenbloom*, 499 F.3d 165, 177 (2d Cir. 2007)). Because

"the common law of the various states provides much of the legal framework for the operation of the bankruptcy system, it cannot be said that Congress has completely preempted all state regulation which may affect the actions of parties in bankruptcy court." *Koffman v. Osteoimplant Tech., Inc.*, 182 B.R. 115, 124 (D. Md. 1995).

*In re Hechinger* is the leading authority on the issue of the applicability of Section 546(e)'s safe harbor provisions to state law. 274 B.R. at 71 (D. Del. 2002). In *In re Hechinger*, the creditors' committee brought fraudulent transfer and unjust enrichment claims seeking to avoid and recover payments made to the debtors' shareholders in connection with a leveraged buyout. *Id.* at 79. The payments were made by a financial institution, fell within the scope of Section 546(e), and were therefore entitled to safe harbor protection. *Id*. at 87-88.

In *In re Hechinger*, the shareholder defendants contended that the doctrine of preemption barred the unjust enrichment claims because those claims sought essentially the same relief as the fraudulent transfer claims prohibited by Section 546(e), thereby creating a conflict between state and federal law. *Id.* at 95. The court ruled that the Bankruptcy Code preempted the state law claims:

> Because the Committee's unjust enrichment claim effectively acts as a section 544 fraudulent conveyance claim, it directly conflicts with the remedial exemption set forth in Code section 546(e). Allowing recovery for unjust enrichment here would implicate the same concerns regarding the unraveling of settled securities transactions more than one year after settlement, which is precisely the result that section 546(e) precludes.

*Id*. at 96.

Alternatively, the court held that the Bankruptcy Code provides the exclusive remedy for claims to avoid transfers made within one year of the petition date:

> [T]he Bankruptcy Code, particularly sections 544 and 546(e), provides an exclusive framework for addressing claims that seek to avoid transfers made more than one year before bankruptcy. Thus the Code preempts the field and precludes supplemental state remedies because the Code alone comprehensively addresses such claims.

*Id*. at 97.

The Eighth Circuit cited *In re Hechinger* with approval in *Contemporary Industries*, 564 F.3d at 981. In *Contemporary Industries*, the Eighth Circuit determined that the debtor-in-possession's unjust enrichment and illegal or excessive shareholder distributions claims pursuant to Section 544 were preempted by Section 546(e). *Id*. at 988. Like the court in *In re Hechinger*, the Eighth Circuit held that the debtor's state law claims "seek[] to recover the same payments we have already held are unavoidable under § 546(e). Allowing recovery on these claims would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section." *Id*. (citing *In re Hechinger*, 574 B.R. at 96).

In *Enron Corp. v. Bear, Stearns International Ltd.*, the defendants argued that Section 546 preempts inconsistent state law on the basis of either conflict or field preemption. 323 B.R. at 872. The court disagreed, stating that:

> [I]f it is established that Enron was insolvent, pursuant to Oregon law, the transaction would be void and have no legal effect at all. As a complete nullity, there would be no resulting settlement payment. This consequence is not a result of the bankruptcy filing, it is simply a function

of state law that was not preempted by 546(e).  The safe harbors were enacted to preserve markets by protecting payments made regarding securities transactions, not to create markets by protecting securities transactions that are a "nullity" under state law.

*Id.* at 876.

In *Contemporary Industries*, the Eighth Circuit distinguished *Enron Corp. v. Bear, Stearns Int'l Ltd.* on the basis that Oregon law provided that the subject transactions were void, while the plaintiff there had cited no authority indicating that Nevada would consider the underlying transactions to be void.  546 F.3d at 988.  Thus, "the Enron holding provides no support the [the plaintiff's] position" and the state law claims were preempted by Section 546."  *Id.*

In *In re U.S. Wireless Corp.*, the United States Bankruptcy Court for the District of Delaware held that Section 546(e) preemption did not apply, but the court did not explain its holding.  *Liquidating Trust of U.S. Wireless Corp., Inc. v. Bhatnagar (In re U.S. Wireless Corp.)*, 333 B.R. 688 (Bankr. D. Del. 2005).  *In re U.S. Wireless* involved a debtor's unjust enrichment claim against a defendant who failed to reimburse the debtors for their payment of his tax obligations arising from the defendant's exercise of employee stock options.  *Id.* at 692.  The bankruptcy court rejected the defendant's Section 546(e) preemption defense, asserting without explanation that "[o]n its face, that section has no application to the instant matter."  *Id.* at 693.

Neither of the Section 546(e) preemption cases specifically addresses the issue of whether Section 546(e) preempts state law claims brought pursuant to Section 541, and

Section 546(e) does not expressly list Section 541 as within its scope.  11 U.S.C. § 541(e) (2006).  Under *In re Hechinger,* a court may analyze whether state law causes of action brought pursuant to Section 541 "effectively act[] as . . . section 544 fraudulent conveyance claim[s]."  274 B.R. at 76.  Applying the case law by analogy, however, a court may "strictly construe[]" the Section 546(a) limitations period "as applicable only to the actions named" and not "look to the underlying nature of the proceeding." *DiCello v. United States (In re Ry. Reorganization Estate, Inc.),* 133 B.R. 578, 582 (Bankr. D. Del. 1991).  Accordingly, because Section 541 is not expressly subject to the safe harbor provisions, the doctrine of preemption may not apply.

### G.  Avoidance of Transfers under Section 549 of the Bankruptcy Code

Section 549(a) provides that a debtor "may avoid a transfer of property of the estate . . . that occurs after the commencement of the case . . . that is not authorized under [the Bankruptcy Code] or by the court." 11 U.S.C. § 549(a) (2006).  Two limits on the scope of Section 549(a)'s avoidance power may be relevant here.  First, Section 549 may not be used to avoid transfers of real property to good faith purchases without knowledge of the bankruptcy, unless notice of the petition was filed in the appropriate office for recording transfers of that real property.  11 U.S.C. § 549(c) (2006).  Second, Section 549(a)'s scope is limited by Section 546(b), which provides that Section 549's avoiding powers are subject to any applicable law that permits the perfection or

continuation of an interest in property to be effective against an entity that acquires rights before the date of perfection or continuation. 11 U.S.C. § 546(b) (2006).

**H. Avoidance of Transfers outside of the Ordinary Course of Business and Not Approved by the Court Pursuant to Section 363 of the Bankruptcy Code**

Section 363 governs the use, sale, or lease of property of a debtor. 11 U.S.C. § 363 (2006). Pursuant to Section 363(c)(1), a debtor may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing. *Id.* If a transaction is outside of the ordinary course of business, notice and a hearing are required under Section 363(b). *Id.* Postpetition transactions made without court approval are subject to avoidance under Section 549 if the court determines the transfers to be outside of the ordinary course of business. *See Aalfs v. Wirum (In re Straightline Invs. Inc.)*, 525 F.3d 870, 879 (9th Cir. 2008).

Pursuant to Section 549, a trustee may avoid a transfer of the debtor's property that occurs after the commencement of a case that is not authorized under the Code or by the court. 11 U.S.C. § 549 (2006). Section 550 provides that "to the extent that a transfer is avoided under section . . . 549 . . ., the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from - (1) the initial transferee of such transfer . . . ." 11 U.S.C. § 550 (2006). Therefore, if the court finds that a postpetition transaction was not in the ordinary course of business, the court can avoid the transfer made by the debtor to the transferee.

Some courts have credited the transferee for property transferred to the debtor in exchange for a postpetition transaction. *See Dobin v. Presidential Fin. Corp. (In re Cybridge Corp.)*, 312 B.R. 262, 271-72 (D.N.J. 2004) (upholding bankruptcy court decision to grant equitable credit to transferee of avoided postpetition transfer, where both transfers were of cash, based on Section 550(d) which limits recovery to a "single satisfaction," and Section 105(a) which allows bankruptcy courts to exercise equitable power as long as the exercise does not conflict with the Code); *Shubert v. Stranahan (In re Penn. Gear Corp.)*, Ch. 7 Case No. 02-36436DWS, Adv. No. 03-0940, 03-0942, 2008 WL 2370169, at *9 (Bankr. E.D. Pa. Apr. 22, 2008) (trustee acknowledged a credit due to the transferee for transfers back to the debtor).

Where the transferee of an avoided post-petition transfer seeks to recover from the estate for the amount it has had to return, the transferee may not succeed in obtaining any relief unless the transferee's claim qualifies as an administrative expense. 11 U.S.C. 503 (2006). Administrative expense claim are allowed under Section 503(b)(1)(A) for the actual, necessary costs and expenses of preserving the estate. *Id*. Courts have denied recovery to transferees whose claims do not qualify as administrative expenses. *See Aalfs*, 525 F.3d at 885 (avoiding debtor's transfer of accounts receivable under Section 549, and rejecting transferee's arguments for the return of $186,455 paid to debtor for the accounts receivable, despite windfall to the estate, where transferee was found to have acted inequitably); *Martino v. First Nat'l Bank*

*of Harvey (In re Garofalo's Finer Foods, Inc.)*, 186 B.R. 414, 435 (N.D. Ill. 1995) (avoiding postpetition transaction that was not in the ordinary course of business pursuant to Section 364 and noting that although the result seemed harsh, lenders were well advised to err on the side of caution and provide notice and a hearing or suffer the consequences).

### I.  Recovery Issues under Sections 550 and 502 of the Bankruptcy Code

Section 550 of the Bankruptcy Code allows the trustee to recover either the property transferred in avoided transfers or the value of the transferred property.  *See* 11 U.S.C.A. §550(a) (2009).  "Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the [avoided] transfers had not occurred." *Hirsch v. Gersten* (*In re Centennial Textiles*), 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998).

If a transfer is avoided as a fraudulent conveyance, the trustee may recover from either the initial transferee or any immediate or mediate transferees of that transferee ("successor transferees").  *See* 11 U.S.C. § 550(a) (2006).  The ability of a trustee to recover from an initial transferee is absolute.  *See* 11 U.S.C. § 550 (2006); *see also Bowers v. Atlanta Motor Speedway, Inc.* (*In re Se. Hotel Props. Ltd. P'ship*), 99 F.3d 151, 154 (4th Cir. 1996).  The ability of a trustee to recover from successor transferees, however, is limited by Section 550(b), which provides that the trustee may not recover from a transferee that takes for value or a transferee that takes in good faith.  *See* 11 U.S.C. § 550(b) (2006).  The Bankruptcy Code does not define "good faith," but bankruptcy courts in the

Southern District of New York apply an objective standard, looking to whether the transferee objectively "knew or should have known" of the fraudulent purpose. *See In re Bayou Group,* 396 B.R. at 844-45 ("[A] transferee cannot be found to have taken a transfer in good faith 'if the circumstances would place a reasonable person in inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose.'"). Objective evidence of a transferee's subjective good faith is also relevant to the court's analysis. *See id.* at 849

Section 502(d) adds an important consequence to the avoidance of a preference or a fraudulent transfer that applies where the transferee has not repaid the estates: "the court shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . . of this title or that is a transferee of a transfer avoidable under section . . . 547 [or] 548 . . . unless such entity or transferee has paid the amount, or turned over any property, for which such entity is liable under section . . . 550 [of the Bankruptcy Code]." 11 U.S.C. § 502(d) (2006); *see also United States Lines, Inc. v. United States (In re McLean Indus., Inc.),* 196 B.R. 670, 655-67 (Bankr. S.D.N.Y. 1996) (affirming disallowance of claim).

**J.    Setoff Issues under Section 553 of the Bankruptcy Code**

Section 553 permits the setoff of mutual debts that arose before a debtor's petition date. 11 U.S.C. § 553 (2006). Section 553 "does not create a right of setoff, but rather preserves whatever right exists under applicable non-bankruptcy law." *Official*

*Comm. of Unsecured Creditors v. Manuf. and Traders Trust Co. (In re Bennett Funding Group, Inc.)*, 146 F.3d 136, 138-39 (2d Cir. 1998).  Setoff "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913).  Whether or not to allow setoff "is a decision that lies within the sound discretion of the bankruptcy court." *In re Bennett Funding Group*, 146 F.3d at 140.

Although the debts to be setoff may arise from different transactions, they must be mutual.  *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2d Cir. 2002).  Debts are mutual when "'they are due to and from the same persons in the same capacity.'" *Id.* (quoting *Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.)*, 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995)).

Section 553 generally precludes triangular setoffs.  *See, e.g., Sherman v. First City Bank of Dallas (In re United Sciences of Am., Inc.)*, 893 F.2d 720, 723 (5th Cir. 1990); *In re Elcona Homes Corp.*, 863 F.2d 483, 486 (7th Cir. 1988); *Ferguson v. Garden Ridge Corp. (In re Garden Ridge Corp.)*, 399 B.R. 135, 140 n.9 (Bankr. D. Del. 2008); *see also MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 618 n.2 (2d. Cir. 1989) "[U]nder federal bankruptcy law, a subsidiary's debt may not be set off against the creditor of a parent.").  Many cases have recognized contractual exceptions to the mutuality requirement.  *See, e.g., In re Garden Ridge Corp.*, 338 B.R. 627, 634 (Bankr. D. Del. 2006);

*U.S. Bank v. Custom Coals Laurel (In re Custom Coals Laurel)*, 258 B.R. 597, 607 (Bankr. W.D. Penn. 2001); *Equibank v. Lang Mach. Co. (In re Lang Mach. Corp.)*, Nos. 86-00415, 87-0347 and 87-0346, 1988 WL 110429, at *5 (Bankr. W.D. Pa. Oct. 19, 1988).  However, "not one of these cases has actually upheld or enforced an agreement that allows for a triangular setoff; each and every one of these decisions have simply recognized such an exception in the course of denying the requested setoff or finding mutuality independent of the agreement."  *In re SemCrude, L.P.*, 399 B.R. 388, 394 (Bankr. D. Del. 2009).  The *SemCrude* court held that private agreements cannot confer mutuality on non-mutual debts and that there is no contractual exception to the "mutual debt" requirement of Section 553.  *Id.* at 396-399.

The party that sought a setoff in *SemCrude* filed a motion for reconsideration that argued, among other things, that the contracts in question were exempt from the automatic stay as protected "forward contracts" or "swap agreements" within the meaning of the safe harbor provisions of Sections 556, 557 and 561.  Chevron Products Company's Motion for Reconsideration of the Court's Opinion Dated January 9, 2009 Regarding Contractual Netting, at p. 2, Docket No. 2853, *In re SemCrude, L.P.*, No. 08-11525 (Bankr. D. Del. Jan. 20, 2009).  The court denied the motion to reconsider, stating that "at no point was it ever alleged that the agreements at issue were governed by the  . . . statutory scheme pertaining to 'safe harbored' agreements."  Order Denying Chevron Products Company's Motion for Reconsideration of the Court's Opinion Dated

January 9, 2009 Regarding Contractual Netting, at p. 1, Docket No. 3305, *In re SemCrude, L.P.*, No. 08-11525 (Bankr. D. Del. Mar 20, 2009). Thus, limiting its prior ruling, the court clarified that "the January 9 Opinion construes only § 553, does not construe §§ 556, 557 or 561, and does not address directly any issue relating to the 'safe harbored' contracts." *Id.*

### K. Turnover of Property to the Estate

Section 542(a) provides that "an entity, other than a custodian, in possession, custody, or control, during the case, of property" of the estate "shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a) (2006). The "property" referred to is "property that the trustee may use, sell, or lease under section 363" or that the debtor "may exempt under section 522." *Id.* According to the Supreme Court, "[i]n the absence of controlling federal law, 'property' and 'interests in property' are creatures of state law." *Barnhill v. Johnson,* 503 U.S. 393, 398 (1992). In enacting the Bankruptcy Code, Congress "generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. U.S.*, 440 U.S. 48, 54 (1979). Section 542(a) essentially requires that, as of the date of filing, any party holding property of the estate from which the estate may benefit must deliver the property to the trustee. *See Braunstein v. McCabe*, 571 F.3d 108, 116 (1st Cir. 2009). In effect, Section 542(a) "grants to the estate a possessory interest in certain property of the debtor that

was not held by the debtor at the commencement of reorganization proceedings." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 207 (1983).

A turnover action is not an action to recover damages for the taking of estate property but an action to recover possession of property belonging to the estate at the time of the filing. *See Braunstein*, 571 F.3d at 116. Such an action invokes the bankruptcy court's basic equitable powers to gather and manage property of the estate. *Id.* at 117.

Property that is subject to an avoidance claim does not become property of the estate until after it has been recovered. *In re Teligent*, 307 B.R. at 751. Thus, the trustee cannot use the turnover procedure to circumvent the more restrictive process for avoiding a fraudulent transfer. *Id.*

## V.       NON-FEDERAL LAW ISSUES

This Section discusses principles of state law and English law that are pertinent to issues addressed by the Examiner's Report. Part A considers the separability of multiple agreements with the same party. Part B discusses apparent authority to enter into contracts. Part C addresses express choice-of-law provisions under New York law. Part D discusses contractual and quasi-contractual claims, including economic duress, failure of consideration, breach of the covenant of good faith and fair dealing, and the construction of terms in the absence of a general obligation of good faith. Part E addresses unjust enrichment. Part F discusses misrepresentation and fraud under New

York and English law.  Part G addresses claims for breach of fiduciary duty and misappropriation under English law.  Part H discusses tortious interference under English law.  Part I considers defenses to claims, such as ratification, waiver, and estoppel.  Part J addresses actions to recover chattel.  Part K discusses trade secret misappropriation.  Part L discusses unfair competition.  Part M discusses tortious interference with employment relations.  Part N addresses conversion.

## A.  Separability of Multiple Agreements with the Same Party

Agreements contained in separate documents generally are presumed to be separable in the absence of a clear indication that the parties intended otherwise.  *See Ripley v. Int'l Rys. of Cent. Am.*, 171 N.E.2d 443, 446-47 (N.Y. 1960); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Clairmont*, 662 N.Y.S.2d 110, 112 (App. Div. 1997).  "In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances."  *Rudman v. Cowles Commc'ns, Inc.*, 280 N.E.2d 867, 873 (N.Y. 1972).  New York courts have suggested that a breach of one agreement may constitute a breach of another agreement with which it is interrelated.  *See*, *e.g.*, *Rudman*, 280 N.E.2d at 873.  However, there do not appear to be any cases under New York law addressing the situation in which the invalidity of one agreement requires the invalidity of another agreement with which it is interrelated but that is not subject to the same infirmity.

## B. Apparent Authority

Apparent authority "'arises when a principal places an agent in a position where it appears that the agent has certain powers which he may or may not possess. If a third person holds the reasonable belief that the agent was acting within the scope of his authority and changes his position in reliance on the agent's act, the principal is estopped to deny that the agent's act was not authorized.'" *Gen. Overseas Films, Ltd. v. Robin Int'l, Inc.*, 542 F. Supp. 684, 688-89 (S.D.N.Y. 1982) (quoting *Masuda v. Kawasaki Dockyard Co.*, 328 F.2d 662, 665 (2d Cir. 1964)). Formulated slightly differently, "a principal may be estopped from denying apparent authority if (1) the principal's intentional or negligent acts, including acts of omission, created an appearance of authority in the agent, (2) on which a third party reasonably and in good faith relied, and (3) such reliance resulted in a detrimental change in position on the part of the third party." *Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996).

Under New York law, a duty to inquire further concerning apparent authority arises when "(1) the facts and circumstances are such as to put the third party on inquiry, (2) the transaction is extraordinary, or (3) the novelty of the transaction alerts the third party to a danger of fraud." *F.D.I.C. v. Providence Coll.*, 115 F.3d 136, 141 (2d Cir. 1997). Courts have held that a willingness to guarantee a debt of an unrelated corporation is "extraordinary" and, thus, sufficient to trigger the duty of inquiry. *See, e.g., Gen. Overseas Films*, 542 F. Supp. at 691 (S.D.N.Y. 1982). The duty of inquiry is an

"alternative way of asking whether reliance was reasonable." *Providence Coll.*, 115 F.3d at 142.

### C.  Express Choice-of-Law Provisions under New York Law

Where the law of two or more jurisdictions may apply to a dispute, New York courts first examine whether the laws conflict.  *K.T. v. Dash*, 827 N.Y.S.2d 112, 116 (App. Div. 2006).  Where a conflict exists, New York employs one of two methods to determine which law should apply, depending on the nature of the claim.  New York employs a "center of gravity" test for contract claims and an "interest analysis" for conduct-regulating tort claims as well as other claims. *Financial One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 336 (2d Cir. 2005).  Quasi-contract claims are decided under the "center of gravity" test.  *See Global Fin. Corp. v. Triarc Corp.*, 715 N.E.2d 482, 484 (N.Y 1999).

Under the center-of-gravity test, the court examines the place of negotiation, place of performance, location and subject matter of the contract, and domicile of the parties, giving the location of contract and performance the most weight.  *Brink's Ltd. v. S. Afr. Airways*, 93 F.3d 1022, 1030-31 (2d Cir. 1996).  The center-of-gravity test is used to resolve conflicts of law relating to claims such as economic duress, failure of consideration, breach of the covenant of good faith and fair dealing, and unjust enrichment.

Under an interest analysis, the court conducts two separate inquiries: "(1) what are the significant contacts and in which jurisdiction they are located; and (2) whether the purpose of the law is to regulate conduct or allocate loss." *Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001, 1002 (N.Y. 1994). Where the purpose of the law is to regulate conduct, the law of the location of the tort generally governs. *Id.* Conduct-regulating torts include misrepresentation, fraud, breach of fiduciary duty, and tortious interference. Where the purpose of the law is to allocate loss, parties with domiciles in different jurisdictions are generally governed by the law of the jurisdiction where the injury occurred and parties with domiciles in the same jurisdiction are generally governed by the jurisdiction of the shared domicile. *Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 281 (N.Y. 1993). New York law considers a corporation to be domiciled in the jurisdiction of its headquarters. *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 682 (N.Y. 1985). New York courts also consider New York's policy interest in maintaining its "preeminent financial position" as "'a financial capital of the world'" by protecting "'the justified expectations of the parties to [a] contract.'" *Wells Fargo Asia Ltd. v. Citibank, N.A.*, 936 F.2d 723, 726 (2d Cir. 1991) (quoting *J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.*, 333 N.E.2d 168, 172 (N.Y. 1975)).

Express choice-of-law provisions in contracts are *prima facie* valid under New York law. *Boss v. Am. Express Fin. Advisors, Inc.*, 791 N.Y.S.2d 12, 14 (App. Div. 2005), *aff'd*, 844 N.E.2d 1142 (N.Y. 2006). A party that seeks to invalidate an express choice-of-

law provision must establish that enforcement of the clause "'would be unreasonable, unjust, or would contravene public policy, or that the clause would be invalid because of fraud or overreaching.'" *Id.* (quoting *Koko Contracting, Inc. v. Cont'l Envtl. Aesbestos Removal Corp.*, 709 N.Y.S.2d 825, 826 (App. Div. 2000)). However, an express choice-of-law clause does not necessarily govern tort claims related to contract disputes; New York law applies contractual choice-of-law clauses to claims sounding in tort only where the parties to a contract draft a "sufficiently broad" choice-of-law clause. *Financial One Pub. Co.*, 414 F.3d at 335.

### D. Contractual and Quasi-Contractual Claims

#### 1. Economic Duress

##### a) New York Law

Under New York law "[a] contract may be voided and a party may recover damages 'when it establishes that it was compelled to agree to the contract terms because of a wrongful threat by the other party which precluded the exercise of its free will.'" *Madey v. Carman*, 858 N.Y.S.2d 784, 786 (App. Div. 2008) (quoting *805 Third Ave. Co. v. M.W. Realty Assocs.*, 448 N.E.2d 445, 447 (N.Y. 1983)). The elements of economic duress are: "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative." *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989).

The burden on a party seeking to invalidate a contract on grounds of economic duress is not light.  *Davis & Assocs., Inc. v. Health Mgmt. Servs., Inc.*, 168 F. Supp. 2d 109, 114 (S.D.N.Y. 2001) ("The party seeking to void [an] agreement on grounds of economic duress 'shoulders a heavy burden.'" (quoting *Orix Credit Alliance, Inc. v. Bell Realty, Inc.* No. 93 Civ 4949 (LAP), 1995 WL 505981, at *3 (S.D.N.Y. Aug. 23, 1995))).  "This is so regardless of evidence that one side enjoyed a 'decided economic advantage' over the other at the moment the agreements were executed."  *Id.* (quoting *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 123 (2d Cir. 2001)).  The burden is particularly difficult to meet where the parties involved are sophisticated entities who were represented by both in-house and outside counsel.  Significantly, "to establish a claim of economic duress, a sophisticated party must 'do more than merely claim that the other party knew about and used his or her poor financial condition to obtain an advantage in contract negotiations.'"  *Id.* (quoting *DuFort v. Aetna Life Ins. Co.*, 818 F. Supp. 578, 582 (S.D.N.Y. 1993)).  "Rather, the plaintiff must demonstrate 'that the defendant's actions deprived him of his free will, and that the ordinary remedy of an action for breach of contract would not be adequate.'"  *Id.* (quoting *Berman v. Parco*, No. 96 Civ. 0375 (KMW), 1996 WL 465749, at *7 (S.D.N.Y. August 15, 1996)).

### b)  English Law

English law recognizes economic duress as a basis for invalidating a contract.  A contract is voidable if the defendant applies "pressure (a) whose practical effect is that

there is a compulsion on, or lack of practical choice for the victim, (b) which is illegitimate, and (c) which is a significant cause in inducing the claimant to enter into the contract." *DSND Subsea Ltd. v. Petroleum Geo Servs. ASA*, [2000] B.L.R. 530 at [131] (Q.B.); *see also Dimskal Shipping Co. v. Int'l Tranp. Workers Fed'n (The Evia Luck No. 2)* (1992) 2 AC 152, 165 (H.L.) (appeal taken from Eng.). A proposal is not the cause of economic duress if the principal reason for the complying party's agreement was that he or she was prepared to comply anyway, as is the case when the complying party agrees, believing he or she will lose little by granting the illegitimate demand. CHITTY ON CONTRACTS, 607 (H.G. Beale et al. eds., Thompson Reuters 2008) (1826) ["CHITTY"], (citing *Pao On v. Lau Liu Long* [1980] A.C. 614, 635 (P.C. 1979) (appeal taken from H.K.)).

In determining whether a party applied "illegitimate pressure," English courts look to "a range of factors," including:

> whether there has been an actual or threatened breach of contract; whether the person allegedly exerting the pressure has acted in good or bad faith; whether the victim had any realistic practical alternative but to submit to the pressure; whether the victim protested at the time; and whether he affirmed and sought to rely on the contract.

*DSND Subsea Ltd. v. Petroleum Geo Servs. ASA*, [2000] B.L.R. 530 at [131] (Q.B.).

"Threatening to carry out something perfectly within one's rights will not normally amount to duress . . . ." CHITTY, 616 (citing *Alec Lobb Ltd. v. Total Oil G.B. Ltd.* [1983] 1 W.L.R. 87, 93-94 (Ch.), *varied on other points by* [1985] 1 W.L.R. 173) (A.C.).

## 2. Failure of Consideration

### a) New York Law

Consideration consists of "either a benefit to the promisor or a detriment to the promisee." *Holt v. Feigenbaum*, 419 N.E.2d 332, 336 (N.Y. 1981). "Failure of consideration gives the disappointed party the right to rescind the contract." *Fugelsang v. Fugelsang*, 517 N.Y.S.2d 176, 177 (App. Div. 1987). Even when a contract includes a recitation of consideration, a party may use parol evidence to challenge that recitation. *See Diamond v. Scudder*, 845 N.Y.S.2d 452, 453-54 (App. Div. 2007); *see also Ehrlich v. Am. Moninger Greenhouse Mfg. Corp.*, 257 N.E.2d 890, 892 (N.Y. 1970) ("The recitation of receipt of consideration is a mere admission of a fact which, like all such admissions, may be explained or disputed by parol evidence.").

"A promise by one party to do that which he is already under a legal obligation to perform is insufficient as a consideration to support a contract." *Carpenter v. Taylor*, 58 N.E. 53, 55 (N.Y. 1900); *see also Roth v. Isomed, Inc.*, 746 F. Supp. 316, 319 (S.D.N.Y. 1990). However, an agreement to continue to act where there is no obligation to do so is proper consideration. *See Andre v. Gaines Berland, Inc.*, 95 Civ. 10524 (DC), 1996 WL 383239, at *2 (S.D.N.Y. July 8, 1996) (where "ongoing professional services relationship [was] terminable at-will," there was no obligation to continue providing such services and, thus, continued services constituted valid consideration for subsequent agreements); *see also* 3 WILLISTON ON CONTRACTS § 7:41 (4th ed.) ("If one is privileged to

avoid a contractual duty or to refuse to perform under a contract, and promises to perform or does perform in consideration of the promise of some additional payment by another . . . the promise to perform or the actual performance is consideration . . . .").

Under New York statute, a contract modification "shall not be invalid because of the absence of consideration, provided that the [modification] agreement . . . shall be in writing and signed by the party against whom it is sought to enforce the . . . modification . . . or by his agent." N.Y. GEN. OBLIG. LAW § 5-1103 (McKinney 2010); *see also Deutsche Bank Sec., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 660 (S.D.N.Y. 2008).

### b) English Law

English law does not ordinarily require consideration to enforce a contract contained in a deed, though consideration is required for other contracts. CHITTY, 72 (citing *Morley v. Boothby* (1825) 130 Eng. Rep. 455, 456-57 (C.P.)). However, an absence of consideration to support a contract contained in a deed will prevent parties from obtaining equitable remedies such as specific performance. *Id.* at 72 (citing *Kekewich v. Manning* (1851) 42 Eng. Rep. 519, 525 (Ch.)).

English law distinguishes deeds from "informal" contracts. *Id.* at 56. Deeds must "(a) effect the transference of an interest, right or property; (b) create an obligation binding on some person or persons; [or] (c) confirm some act whereby an interest, right or property has already passed." *Id.* at 60-61. An instrument must make clear on its face that the parties intended it to be a deed and it must be validly executed as a deed.

*Id.* at 67.  If the deed is executed by a company (organized under the Companies Act), the instrument must be duly executed and "delivered as a deed"– meaning that the company must evidence an intent to be bound by a deed.  *Id.* at 69.  Delivery is presumed upon execution, and generally, a company or corporation aggregate may duly execute deeds by affixing the corporation's common seal or through the signature of two signatories authorized by a director of the company, in the presence of a witness. *Id.* at 68-69.  However, corporations aggregate are required (at least in principle) to affix the company seal to execute a deed.  *Id.* at 69.  That requirement may be satisfied by affixing any seal and having the board of directors or one board member and a permanent officer (or deputy of a permanent officer) attest that it is the corporation's seal and was affixed in their presence.  *Id.*

### 3.  Breach of the Covenant of Good Faith and Fair Dealing

#### a)  New York Law

Under New York common law, the covenant of good faith and fair dealing is implied in every contract.  *Cont'l Cas. Co. v. State of N.Y. Mortgage Agency*, No. 94 Civ. 8408 (KMW), 1998 WL 513054, at *13 (S.D.N.Y. Aug. 18, 1998).  To state a claim for breach of the covenant of good faith and fair dealing, a plaintiff must allege "'1) fraud, 2) malice, 3) bad faith, 4) other intentional wrongdoing, or 5) reckless indifference to the rights of others such as gross negligence.'"  *Id.* (quoting *T.K.R. Constr. Corp. v. S. Am. Ins. Co.*, 752 F. Supp. 105, 112 (S.D.N.Y. 1990)).  The plaintiff must show that the defendant's

conduct infringed on the plaintiff's "actual rights or benefits embodied in the underlying contract." *Sch. Dist. v. J.P. Morgan Chase Bank*, No. 08 CV 07688LAP, 08 CV 07982, 2009 WL 234128, at *5 (S.D.N.Y. Jan. 30, 2009). "No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship." *Murphy v. Am. Home Prod. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983), *superseded on other points by* N.Y. LAB. LAW § 740 (McKinney 2010). To that end, New York law "'does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled.'" *CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, No. 07 Civ. 11708 (LTS) (AJP) 2009 2009 WL 2033048, at *7 (S.D.N.Y. July 13, 2009) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)). A claim for breach of the implied covenant "'will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.'" *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997) (quoting *Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 914 F. Supp. 964, 989 (S.D.N.Y. 1995)).

Where a contract contemplates the exercise of discretion, "the duty of good faith and fair dealing 'includes a promise not to act arbitrarily or irrationally.'" *Citibank, N.A. v. United Subcontractors, Inc.*, 581 F. Supp. 2d 640, 645 (S.D.N.Y. 2008) (quoting *Dalton v. Educ. Testing Serv.*, 662 N.E.2d 289, 291 (N.Y. 1995). However, a "party to a contract is

allowed to act in its own self-interest consistent with its rights under the contract." *Id*. at 646.

New York courts have allowed claims for breach of the duty of good faith and fair dealing to proceed where plaintiffs allege that a bank has valued its secured position in bad faith. For example, in *CDO Plus Master Fund*, the court denied Wachovia's motion for judgment on the pleadings where the plaintiff alleged that Wachovia had acted "arbitrarily and irrationally" in its capacity as "Valuation Agent" under ISDA agreements between the parties. 2009 WL 2033048, at *7. When the plaintiff challenged a collateral demand made by Wachovia, Wachovia, in its capacity as Valuation Agent, was required to recalculate its exposure. *Id*. at *2. Wachovia ultimately demanded that the plaintiff post collateral in excess of the notional amount of the contract – a result that the plaintiff alleged was "absurd." *Id*. at *7. The court held that those allegations were sufficient to state a claim for breach of the implied covenant. *Id.* at *21-22. *See also Mallon Res. Corp. v. Midland Bank, PLC*, No. 96-7458, 1997 WL 403450, at *3 (S.D.N.Y. July 17, 1997) (denying motion to dismiss where contract allowed defendant in its discretion to determine Borrowing Base upon values assigned to plaintiff's assets where plaintiff alleged that its business was successful and its reserves had substantially increased).

The determination of good faith is generally a question of fact. *See Wallace v. Merrill Lynch Capital Servs., Inc.*, No. 602604/2005, 10 Misc. 3d 1062(A), 2005 WL 3487809,

at *5 (N.Y. Sup. Ct. Dec. 14, 2005); *Advanced Safety Sys. NY, Inc. v. Mfrs. & Traders Trust Co.*, 592 N.Y.S.2d 159, 160 (N.Y. App. Div. 1992) (whether defendant acted in good faith presents an issue of fact sufficient to defeat summary judgment).

### b) English Law

"[I]n English contract law, there is no principle of good faith of general application . . . ." CHITTY, 20. English courts nevertheless have implied terms requiring that parties bargain in good faith on particular kinds of contracts, such as employment contracts. *Id.* at 28 (citing *Johnson v. Unisys Ltd* [2001] UKHL 13 [2003] 1 A.C. 518, 536 (H.L.) (appeal taken from Eng.). English courts have "sometimes used the implication of a term to restrict the ambit of a unilateral discretionary power conferred on one of the parties by the contract,"[14] but that would not prevent a commercial lender from conducting "its business in what it genuinely believes to be its best commercial interest." *Id.* at 29 (quoting *Paragon Fin. plc v. Pender* [2005] EWCA Civ. 760 [2005] 1 W.L.R. 3412, 3440 (Eng.). Express terms requiring parties to act in good faith are enforceable, but courts interpret those terms narrowly, so that a plaintiff alleging a breach of an agreement to bargain in good faith must show indicia of fraud. *Id.* at 26 (citing *Ptromec Inc. v. Petrolo Brasileiro SA Petrobras (No.3)* [2005] EWCA Civ 891, [117]-[121], [2006] 1 Lloyd's Rep. 121, 153 (Eng.)).

---

[14] *Id.* at 29 (citing *Paragon Fin. plc v. Nash* [2001] EWCA Civ. 1466 [2002] 1 W.L.R. 685, 700 (Eng.)).

### 4. Construction of Terms in the Absence of a General Obligation of Good Faith

Terms in a contract are understood to bear the meaning which the parties using the terms reasonably would have been understood to mean against the relevant background of the transaction. CHITTY, 841-42 (discussing *Investors Comp. Scheme Ltd. v. W. Bromwich Bldg. Soc'y,* (No. 1) [1998] 1 WLR 896, 912 (H.L) (appeal taken from Eng.)). Courts will attempt to give effect to the entire contract. *Id.* at 855 (citing *Taylor v. Rive Droite Music Ltd.* [2005] EWCA Civ 1300, [26] [2006] E.M.L.R 4, 65-66 (Eng.)). If different parts of a contract are inconsistent with one another, the court may reject portions that would defeat the parties' intention as expressed by the contract as a whole. *Id.* at 855. If an agreement gives one party unilateral discretion to rescind the agreement, that party may not exercise that discretion "arbitrarily, or capriciously, unreasonably," or in bad faith. *Id.* at 244 (quoting *Selkirk v. Romar Invs, Ltd.* [1963] 1 W.L.R. 1415, 1422 (P.C.) (appeal taken from Bah.)). A court may modify or reject terms of a contract where contracting parties are of unequal bargaining power and the terms are offered on a take-it-or-leave it basis. *See Levinson v. Patent Steam Carpet Cleaning Co.,* [1978] Q.B. 69, 79.

### E. Unjust Enrichment

#### 1. Under New York Law

Unjust enrichment is a quasi-contractual claim that applies if the plaintiff (1) conferred a benefit on the defendant, (2) without being adequately compensated by the defendant for the conferred benefit, and (3) equity and good conscience require

restitution. *See Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 13 (App. Div. 1998); *Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield* (*In re Mid-Island Hosp., Inc.*), 276 F.3d 123, 129-30 (2d Cir. 2002); s*ee also Bradkin v. Leverton*, 257 N.E.2d 643, 645 (N.Y. 1970); *Whitman Realty Group, Inc. v. Galano*, 838 N.Y.S.2d 585, 588 (App. Div. 2007). A benefit is broadly defined as any form of advantage. RESTATEMENT (FIRST) OF RESTITUTION § 1 cmt. b (1937) ("A person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or chooses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage.").

Unjust enrichment "does not require wrongful conduct by the one enriched[,] only that 'the enrichment be unjust.'" *Ultramar Energy, Ltd. v. Chase Manhattan Bank, N.A.*, 579 N.Y.S.2d 353, 354 (App. Div. 1992) (quoting *McGrath v. Hilding*, 363 N.E.2d 328, 331 (App. Div. 1977)). Even an innocent defendant that did not take any action to obtain a benefit can be unjustly enriched. *See Aetna Cas. & Sur. Co. v. LFO Constr. Corp.*, 615 N.Y.S.2d 389, 391 (App. Div. 1994); *Ultramar Energy,* 579 N.Y.S.2d at 354. In addition, a claim for unjust enrichment may proceed even if the benefit that the defendant received was the result of the plaintiff's negligence or mistake of law or fact. *See Bank of N.Y. v. Spiro*, 700 N.Y.S.2d 207, 209 (App. Div. 1999); *Mfrs. Hanover Trust Co. v. Chem. Bank*, 559 N.Y.S.2d 704, 707 (App. Div. 1990); *Blue Cross of Cent. N.Y., Inc. v. Wheeler*, 461 N.Y.S.2d 624, 626 (App. Div. 1983). Nevertheless, there is no unjust

enrichment where a matter is controlled by contract. *See Goldman v. Metro. Life Ins. Co.,* 841 N.E.2d 742, 746-47 (N.Y. 2005); *MT Property, Inc. v. Ira Weinstein and Larry Weinstein, LLC,* 855 N.Y.S.2d 627, 628 (App. Div. 2008). In addition, the enrichment must be real, rather than hypothetical. *See Axel Johnson, Inc. v. Arthur Anderson & Co.,* 830 F. Supp. 204, 212 (S.D.N.Y. 1993).

Where a plaintiff confers a benefit that the defendant did not solicit and does not desire, that benefit may be deemed officious, so that the plaintiff will be barred from recovering. RESTATEMENT (FIRST) OF RESTITUTION § 2 (1937) ("A person who officiously confers a benefit upon another is not entitled to restitution therefore."). For example, if an owner of farm equipment leaves the equipment with a mechanic for certain repairs, and the mechanic does additional repairs without the owner's knowledge or approval, the mechanic cannot recover payment for the additional repairs in an action for unjust enrichment. *Tom Growney Equip. v. Ansley,* 888 P.2d 992, 994-95 (N.M. Ct. App. 1994) (reversing award of summary judgment for repairer). Courts often find a benefit to be officious where the plaintiff conferred the benefit without giving defendant a suitable opportunity to decline. *Id.* at 994 (referring to owner's "fundamental right" to determine whether and by whom its property is repaired); *see also* John W. Wade, *Restitution for Benefits Conferred Without Request,* 19 VAND. L. REV. 1183, 1198 (1966) ("No Recovery for Benefits Conferred Without Suitable Opportunity To Decline, in Absence of Reasonable Excuse for Failure to Afford Opportunity"). The rule embodies the

policy that one should not be required to pay for a benefit thrust upon him or her without a suitable opportunity to refuse that benefit.  FARNSWORTH ON CONTRACTS § 2.20 (3d ed. 2004).

Even where a plaintiff has failed to give the defendant an opportunity to decline the benefit conferred, the plaintiff may recover if he can show that he acted pursuant to a mistake.  Wade, *supra*, 19 VAND. L. REV. at 1202.  Courts have permitted plaintiffs to recover mistaken payments of debts or other legal obligations.  *See* RESTATEMENT (FIRST) OF RESTITUTION §§ 162, 171 (1937); *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 355-58 (Md. 2007) (reversing award of summary judgment for defendant where plaintiff alleged defendant was unjustly enriched by mistaken payment of defendant's debt); *Brookfield v. Rock Island Improvement Co.*, 169 S.W.2d 662, 665 (Ark. 1943) (plaintiff's mistaken payment of taxes on lands owned by defendant was not officious).  Courts considering other types of mistaken enrichments have been less likely to award recovery, although courts are divided on the issue.  Wade, *supra*, 19 VAND. L. REV. at 1202 (examining divergent case law).

Unjust enrichment requires a measurable benefit to the defendant.  FARNSWORTH ON CONTRACTS § 2.20 (3d ed. 2004).  In most cases, a plaintiff cannot prevail if there is no actual benefit to the defendant.  *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 831 F. Supp. 94, 112 (E.D.N.Y. 1993) (plaintiff alleging that defendant induced him to develop costly computer equipment could not recover on claim for unjust enrichment where

computers were never finished or delivered), *aff'd in part, vacated in part on other grounds*, 47 F.3d 39 (2d Cir. 1995); *McGrath*, 363 N.E.2d at 331 (construction of addition to defendant's home, which defendant did not request, was not necessarily beneficial: "A larger house is not necessarily better than a small house. A man who needs and wants a compact car is not enriched by a limousine, especially if its saleability may be more difficult."). However, actual benefit may not be required if the defendant actively induced the plaintiff to provide something that the defendant later finds useless. *Farash v. Sykes Datatronics, Inc.*, 452 N.E.2d 1245, 1247 (N.Y. 1983) (plaintiff could recover on a claim for unjust enrichment where defendant encouraged him to make renovations to a building defendant was considering leasing). *But see Treen Constr. Co. v. Schott*, 866 So. 2d 950, 956 (La. Ct. App. 2004) (home buyers were not enriched by costly architectural plans their builder commissioned where those plans were not ultimately used to build their home).

The remedy for unjust enrichment is restitution. *See Wiener*, 672 N.Y.S.2d at 12-13. The purpose of restitution is to "restore the plaintiff to the position he or she was in before the defendant received the benefit." 22A N.Y. JUR. 2D *Contracts* § 586 (West 2009). Generally, restitution provides for recovery of the specific property transferred or its value. *See Matter of Wieczorek*, 587 N.Y.S.2d 755, 756 (App. Div. 1992) (remedy was return of real property at issue); *First Wall St. Settlement Corp. v. Hart*, 590 N.Y.S.2d 81, 82 (App. Div. 1992) (awarding value); *see also A.R. Fuels, Inc. v. City of New York*, 469

N.E.2d 524, 525 (N.Y. 1984). If a defendant did not engage in tortious conduct and was not at fault, or at least not more at fault than the plaintiff for the conferral of the benefit, the measure of recovery is limited to the value of the benefit in advancing the interests of the defendant. *See* 22A N.Y. JUR. 2D *Contracts* § 587 (West 2009) (citing RESTATEMENT (FIRST) OF RESTITUTION § 142 cmt. b (1937). "If a [defendant] who is without fault has received specific . . . chattel[], [the defendant's] duty of restitution is limited to the return of [the chattel] . . . ." 22A N.Y. JUR. 2D *Contracts* § 587 (West 2009) (citing RESTATEMENT (FIRST) OF RESTITUTION § 142 cmt. b (2009). This may be combined with compensation for the value of its use. *See* RESTATEMENT (FIRST) OF RESTITUTION §§ 157-58 (1937).

### 2. Under English Law

English law does not recognize a general cause of action of "unjust enrichment," but the principle of unjust enrichment has been recognized judicially, CHITTY, 1843 (citing *Lipkin Gorman v. Karpnale Ltd*. [1991] 2. A.C. 548, 559) (H.L.) (appeal taken from Eng.)), and statutorily, CHITTY, 1843 (citing the Civil Liability (Contribution) Act, 1978, c. 47; the Insolvency Act, 1986 c. 45, § 382(4); and the Torts (Interference with Goods) Act, 1977 c. 32 § 7(4)), as a basis for recovery in individual instances where the law creates a right of restitution, such as an action for money had and received. CHITTY, 1845 (citing *Moses v. Macferlan* (1760) 97 Eng. Rep. 676, 678 (K.B.)).

The elements of the unjust enrichment principle in English law are: 1) enrichment of the defendant by receipt of a benefit, 2) at the expense of the claimant, 3) where the retention of the benefit is unjust, and 4) where there is no defense to the claim. CHITTY, 1845 (citing *Banque Financiere de la Cite v. Parc (Battersea) Ltd.* [1999] 1 A.C. 221, 234) (H.L.) (appeal taken from Eng.)). Defenses to a claim based on the principle of unjust enrichment include that the claimant conferred the benefit to the defendant pursuant to a common law, equitable, or statutory duty, CHITTY, 1846 (citing *Ocean Shipping Ltd. v. Creditcorp Ltd.* [1994] 1 W.L.R. 161, 164 (H.L.) (appeal taken from Eng.)), and that the claimant is estopped from bringing a claim. CHITTY, 1846.

### F.   Misrepresentation and Fraud

#### 1.   New York Law

Under New York law, a fraud claim has five elements: "'(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff.'" *Fierro v. Gallucci*, No. 06-5189, 2008 WL 2039545, at *7 (E.D.N.Y. May 12, 2008) (quoting *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006)).

#### 2.   English Law

The elements of misrepresentation in English law are derived from common law, while the relief available is governed by the Misrepresentation Act of 1967. CHITTY, 503-

06.   A misrepresentation must be (1) "a false statement of fact, past or present, as distinct from a statement of opinion, or of intention or mere commendatory statements," CHITTY, 505 (citing *Dimmock v. Hallett* (1866-67) L.R. 2 Ch. App. 21, 27), (2) by or known to a party to the contract or a party's agent, CHITTY, 516 (citing *Hasan v. Wilson* [1977] 1 Lloyd's Rep. 431, 444 (Q.B.)), (3) that the claimant was intended to act upon. CHITTY, 519.

To prove fraudulent misrepresentation, the claimant must establish that the representation was made in the absence of an honest belief.  CHITTY, 530 (citing *Derry v. Peek* (1889) 14 App. Cas. 337, 379 (H.L. (appeal taken from Eng.)).  A defendant who suspects, but does not know, that a statement is inaccurate will have made the statement in the absence of an honest belief.  CHITTY, 530 (citing *Reese River Silver Mining Co. v. Smith* (1869) L.R. 4 H.L. 64, 79-80 (H.L.) (appeal taken from Eng.)).

To prove negligent misrepresentation, the claimant must show: (1) that the representation was made without reasonable grounds for believing it to be true; and (2) either (a) that the defendant owed a duty to the claimant, or (b) that the defendant induced the claimant to enter into a contract through the misrepresentation.  CHITTY, 540-541 (citing *Howard Marine and Dredging Co. v. A. Ogden & Sons (Excavations) Ltd.* [1978] Q.B. 574, 595).

The Misrepresentation Act allows damages to be awarded for fraudulent and negligent misrepresentations.  Misrepresentation Act 1967 c. 7 § 2(1).  Claimants also

may seek rescission, but the Act grants the court discretion to impose damages instead of rescission for negligent misrepresentations. *Id.* at § 2(2). If claimant seeks rescission of a contract instead of damages, the claimant need show only that the misstatement "materially influenced" the decision to enter the contract. CHITTY, 524 (citing *Edgington v. Fitzmaurice* (1885) 29 Ch. D 459, 483) (describing materiality as "actively present to [the hearer's] mind")).

### G. Breach of Fiduciary Duty and Misappropriation under English Law

English law recognizes a fiduciary relationship where one party "has undertaken to act for or on behalf of another in a particular matter or circumstance which gives rise to a relationship of trust and confidence. *Bristol and W. Bldg. Soc'y v. Mothew* [1998] Ch. 1, 18. "The distinguishing obligation of a fiduciary is the obligation of loyalty . . . Breach of fiduciary obligation, therefore, connotes disloyalty or infidelity." *Id.* Parties to relationships governed by commercial contracts negotiated at arms length are generally understood to represent their own interests. Christa Band, *Conflicts of Interests in Financial Services and Markets*, 21 J. OF INT'L BANKING L. AND REG. 677, 678-79 (2006). Nevertheless, "[t]he existence of the contract does not exclude the co-existence of concurrent fiduciary duties (indeed the contract may well be their source); but the contract can and does modify the extent and nature of the general duty that would otherwise arise." *Henderson v. Merrett Syndicates* [1995] 2 A.C. 145 206 (H.L.) (appeal taken from Eng.).

### H. Tortious Interference under English Law

Under English law, a party commits the tort of interference with rights where the defendant procures or induces the violation of a right held by the plaintiff through some actionable wrong. *Law Debenture Trust Corp v. Ural Caspian Oil Corp.* [1995] Ch. 152, 155. Injury alone is insufficient to sustain a tort of interference if the defendant acted lawfully and the plaintiff's legal rights were not violated. *Id.* Knowingly inducing a third party to break a contract with the claimant (or threatening to do so) is an interference with contractual rights absent some reasonable justification or excuse. *Pitman Training Ltd. and Another v. Nominet U.K. and Another*, [1997] F.S.R. 797, 807 (Ch.) (finding no interference with contract where the defendant induced a domain name registrar to restore its use of a particular URL that another domain name registrar had subsequently allocated to another company). The pursuit of "normal and legitimate business interests" is considered a reasonable justification even where it may have the effect of causing a third party to breach a contract. *Id.* at 809.

### I. Defenses to Claims: Ratification and Waiver by Estoppel

#### 1. Ratification of Agents Acting without Authority under New York Law

"Ratification is the express or implied adoption of acts of another by one for whom the other assumes to be acting but without authority." *Prisco v. New York*, 804 F. Supp. 518, 523 (S.D.N.Y. 1992); *see also Hamm v. United States*, 483 F.3d 135, 140 (2d. Cir. 2007). Consequently, "a principal may ratify and thereby become liable for the acts

of an agent even if those acts were initially unauthorized." *Prisco*, 804 F. Supp. at 523.

A principal's intent to ratify the unauthorized act "must be clearly established and may

not be inferred from doubtful or equivocal acts or language." *Holm v. C.M.P. Sheet*

*Metal, Inc.*, 455 N.Y.S.2d 429, 432 (App. Div. 1982). In order for a ratification to be

effective, the individual ratifying an unauthorized contract must have had the authority

to enter into the contract in the first place. *Matter of N.Y. State Med. Transporters Ass'n,*

*Inc. v. Perales,* 566 N.E.2d 134, 138 (N.Y. 1990) (citing RESTATEMENT (SECOND) OF AGENCY

§ 84(2) (1958)). In other words, only those individuals who could have authorized a

contract on behalf of the corporation can ratify that agreement. *Schwab v. E.G. Potter Co.,*

87 N.E. 670, 673 (N.Y. 1909); *Aronoff v. Albanese*, 446 N.Y.S.2d 368, 370 (App. Div. 1982);

*see also* 11 FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 763 (rev. vol. 2009)

("[T]he president or other like officer of a corporation may ratify a contract that he or

she has authority to make; but an unauthorized contract . . . cannot be binding on the

corporation, even though it has been ratified by both the president and secretary, if they

themselves possessed no power to enter such a contract."). Ratification is an issue of

fact. *See In re Nigeria Charter Flights Contract Litig.*, 520 F. Supp. 2d 447, 466 (E.D.N.Y.

2007).

A principal ratifies an act by manifesting assent or by conduct that justifies a

reasonable assumption that the principal consents to becoming subject to the legal

consequences of the act. RESTATEMENT (THIRD) OF AGENCY § 4.01 (2006). Ratification

also can occur "when the principal, upon learning of an unauthorized act of its agent, acquiesces in, or affirms that act through his conduct by retaining any benefits of the compromise." *Marnell v. Carbo*, 499 F. Supp. 2d 202, 208 (N.D.N.Y. 2007).

To ratify an agreement, the principal must have knowledge of the material facts of the unauthorized contract. *See Perales*, 566 N.E.2d at 138; *Cooperative Agricole Groupement de Producteurs Bovins de L'Ouest v. Banesto Banking Corp.*, No. 86-8921, 1989 WL 82454, at *16 (S.D.N.Y. July 19, 1989) ("Ratification requires knowledge by the principal of the material facts of a transaction, coupled with the retention of benefits."), *aff'd*, 904 F.2d 35 (2d Cir. 1990). A principal "having once ratified its agents' acts, cannot afterwards avoid the effect of such ratification by showing that it was not acquainted with all of the facts of the transactions ratified, when it was always in a position and was in possession of means of learning them." *Harvey v. J. P. Morgan & Co.*, 2 N.Y.S.2d 520, 531 (Mun. Ct. 1937), *rev'd on other grounds*, 25 N.Y.S.2d 636 (App. Term 1938).

A contract provision that requires that all modifications be in writing is enforceable. New York General Obligations Law Section 15-301(1) (2010) provides that:

> A written agreement . . . which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.

### 2. Waiver by Estoppel under English Law

Under English law, a contracting party that represents it will not enforce its strict legal rights under a contract is estopped from later asserting those rights against the

party who was intended to rely upon the representation. CHITTY, 303 (citing *B.P. Exploration (Libya) v. Hunt (No.2)* [1979] 1. W.L.R. 783, 812 (Q.B.), *aff'd* [1983] 2 A.C. 352 (H.L.)).  That is "waiver by estoppel," a subset of the equitable doctrine of estoppel. CHITTY, 1544 (citing *Hughes v. Metro. Ry Co.* (1877) 2 App. Cas. 439).  For waiver by estoppel to apply:

> there must be a legal relationship giving rise to rights and duties between the parties; a promise or a representation by one party that he will not enforce against the other his strict legal rights arising out of that relationship; an intention on the part of the former party that the latter will rely on the representation; and such reliance by the latter party.

*Id.* at 303 (citing *B.P. Exploration (Libya) v. Hunt (No.2)* [1979] 1. W.L.R. 783, 812 (Q.B.) *aff'd* [1983] 2 A.C. 352 (H.L.)).

The promise or representation may be in writing, oral, or inferred from conduct. *Id.* at 303 (citing *Bremer Handelsgesellschaft mbH v. Vanden Avenne-Izegem P.V.B.A.* [1978] 2 Lloyd's Rep. 109, 126 (H.L.)).  To constitute waiver, the promise or representation must be "clear" or "unequivocal," meaning that it cannot be so vague or imprecise that it would not amount to an offer.  *Id.* at 305-06.  A court nevertheless may decline to apply the waiver doctrine if it would be equitable to allow the waiving party to reassert its strict legal rights.  *Id.* at 303.

### J.   Action to Recover Chattel

In an action to recover chattel, a plaintiff seeking to obtain possession of property must show that it has a superior right to possession.  *See* N.Y. C.P.L.R. 7101 (McKinney

2010) ("An action under this article may be brought to try the right to possession of a chattel."); *see also Byrne Compressed Air Equip. Co. v. Sperdini*, 506 N.Y.S.2d 593, 594 (App. Div. 1986). Such an action is distinct from a conversion claim in that an action to recover chattel is brought to recover lost property, while a conversion action is brought to recover money damages. *See, e.g., Honeywell Info. Sys., Inc., v. Domographic Sys., Inc.*, 396 F. Supp. 273, 275 (S.D.N.Y. 1975) (granting order of replevin to plaintiff seeking return of data processing equipment). *See generally* N.Y. C.P.L.R. 7101-12 (McKinney 2010). In New York, an action to recover chattel has replaced the common law claim of replevin. *See* 23 N.Y. JUR. 2D *Conversion* § 87 (West 2009) ("The statutory action to recover chattel is basically a substitute for the common-law remedy."). *See generally* N.Y. C.P.L.R. 7101-12 (McKinney 2009). In the absence of a controlling statutory provision, New York courts apply the common law of replevin. *See* 23 N.Y. JUR. 2D *Conversion* § 87 (West 2009) ("[T]he common law is controlling in the absence of current statutory directive."). An action to recover chattel requires that the defendant possessed the chattel at some point; most often the defendant is in possession of the chattel at the commencement of the action. *See Sinnot v. Feiock*, 59 N.E. 265, 267 (N.Y. 1901) (in a replevin action, the defendant must possess the property at the time of the commencement of the suit unless the defendant voluntary parted with the chattel); *Gonzalez v. Port Auth. of N.Y. and N.J.*, 500 N.Y.S.2d 782, 783 (App. Div. 1986); *see also* N.Y. C.P.L.R. 7102(c) (McKinney 2010) ("The application for an order of seizure shall be

supported by an affidavit which . . . shall state: . . . that the chattel is wrongfully held by the defendant named . . . .").

If the defendant is not in wrongful possession of the chattel, then the plaintiff must demand that the defendant return the chattel and the defendant must refuse the demand in order for the plaintiff to sustain an action to recover chattel. *See New York City Transit Auth. v. N.Y. Historical Soc'y*, 635 N.Y.S.2d 998, 1001 (Sup. Ct. 1995) ("A demand is only a substantive requirement of a cause of action to recover chattels where one in possession of the chattels acquired such possession lawfully or where . . . the initial possession of the chattels is not considered wrongful."); *Borneo Sumatra Trading Co. v. Sec. Door & Panel Corp.*, 183 N.Y.S.2d 137, 138 (Sup. Ct. 1959). *But see Rochester Gas & Elec. Corp. v. Chatterton*, 366 N.Y.S.2d 323, 327 (County Ct. 1975) (noting that demand is not required if it would be useless or futile). If the defendant did not obtain the chattel lawfully, demand is not required. *See New York City Transit Auth.*, 635 N.Y.S.2d at 1001 (demand not required where plaintiff alleged that Board of Transit Authority lacked authority to make gift of historical documents to Historical Society; defendant's motion for summary judgment denied).

A plaintiff may pursue a plenary action to determine the right of possession to the chattel, or may seek a prejudgment seizure of the chattel through New York's codified replevin procedure. *See* N.Y. C.P.L.R. 7101-02 (McKinney 2010). A prejudgment seizure requires, among other things, a finding by the court that "it is

probable the plaintiff will succeed on the merits . . . ."  N.Y. C.P.L.R. 7102(d) (McKinney 2010).  Whichever procedure the plaintiff follows, the plaintiff must prove "a possessory right to the chattel superior to that of the defendant."  *Bendheim v. Butler*, 679 N.Y.S.2d 460, 461 (App. Div. 1998).

Under the New York Code, "chattel" means tangible items, "goods . . . [and] specific personal property, such as . . . stocks, bonds, notes, or other securities or obligations."  N.Y. GEN. CONSTR. LAW § 15 (McKinney 2010).  New York law is unclear on whether an action to recover chattel extends to electronic data indistinguishable from its tangible form.  Although the Court of Appeals of New York has extended conversion to include "electronic records . . . indistinguishable from printed documents," the Court limited its decision to the common law claim of conversion. *Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d 1272, 1278 (N.Y. 2007).  Nevertheless, the Court's rationale that "[w]e cannot conceive of any reason in law or logic why this process of virtual creation should be treated any differently from production by pen on paper," suggests that to the extent the possession of such electronic data can be transferred from the defendant to the plaintiff, electronic data indistinguishable from printed documents can be subject to an action to recover chattel.  *Id.; see Shmueli v. Corcoran Group*, 802 N.Y.S.2d 871, 876 n.4 (Sup. Ct. 2005) ("[A]ssuming the plaintiff's ability to prove the elements of conversion, she should not be precluded from the remedy of replevin of her client/investor list if it be retrievable.").

The remedy in an action to recover chattel consists of (1) recovery of possession of the chattel, and (2) compensatory damages for the wrongful taking or for injury to or depreciation of the chattel. *See Byrne Compressed Air Equip. Co.*, 506 N.Y.S.2d at 594; N.Y. C.P.L.R. 7108(a) (McKinney 2010). If the chattel is not in the possession of the defendant at the time of the judgment, then the plaintiff is entitled to the value of the chattel at the time of trial, subject to some adjustments. *See* N.Y. C.P.L.R. 7108(a) (McKinney 2010).

## K. Trade Secret Misappropriation

Misappropriation occurs when a "defendant is using [a] trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990). New York has not adopted the Uniform Trade Secrets Act (UTSA) or any variation of that statute.[15] However, the UTSA has been widely adopted in other jurisdictions and provides guidance on the showing that is required to establish misappropriation of a trade secret. For purposes of the UTSA, "misappropriation" means:

> (i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (ii) disclosure or use of a trade secret of another without express or implied consent by a person who
>> (A) used improper means to acquire knowledge of the trade secret; or

---

[15] A bill to adopt a version of the UTSA is pending in the 2010 session of the New York Legislature. *See* S.B. 4162/A. 6185, 2010 Leg. (N.Y. 2010).

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

    (I) derived from or through a person who had utilized improper means to acquire it;

    (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

    (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of his [or her] position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*See* Unif. Trade Secrets Act § 1(2) (1985).

Under any of the USTA's alternative means of showing misappropriation, the alleged wrongdoer must either have obtained the information by improper means or known or had reason to know that the material was obtained by improper means. *See Newport News Indus. v. Dynamic Testing, Inc.*, 130 F. Supp. 2d 745, 750-51 (E.D. Va. 2001); *Infinity Prods., Inc. v. Quandt*, 810 N.E.2d 1028, 1034 (Ind. 2004). Although cases from other jurisdictions have reached differing conclusions as to whether an employer may be liable for the acts of its employees that were acting within the scope of their duties (but the employer did not know what they were doing), New York recognizes *respondeat superior* liability for misappropriation of a trade secret. *See Rosenberg, Minc & Armstrong v. Mallilo & Grossman*, 798 N.Y.S.2d 322, 328 (Sup. Ct. 2005) (law firm partners vicariously liable for associate's misappropriation of customers from competing law firm because the associate pursued the customers while working at their firm and at the encouragement of partners to bring in business); *cf. Demas v. Levitsky*, 738 N.Y.S.2d 402,

409-10 (App. Div. 2002) (university not vicariously liable when one of its professors misappropriated confidential work product of student to obtain grant because this theft was for his own personal gain and therefore not within the scope of his employment).

Although New York has not legislatively adopted the UTSA's definition of misappropriation, New York common law is consistent with that definition. Specifically, while employees who disclose protectable information to new employers in violation of an agreement or duty to maintain it in confidence may be liable for misappropriation, and "third parties who use the secret *with knowledge* of the breach of confidence are equally liable with the ex-employee himself." *A.H. Emery Co. v. Marcan Prods. Corp.*, 268 F. Supp. 289, 299 (S.D.N.Y. 1967) (emphasis added); *see also Licata & Co. v. Goldberg*, 812 F. Supp. 403, 410 (S.D.N.Y. 1993) ("Unlike patents, trade secrets are not protected from use by others absent . . . breach or knowingly taking advantage of such breach by others."); *Anacomp, Inc. v. Shell Knob Servs., Inc.*, No. 93 CIV. 4003 (PKL), 1994 WL 9681, at *12-13 (S.D.N.Y. Jan. 10, 1994) (misappropriation may arise even when the defendant himself has not breached a duty if that defendant obtains material that he knows to be proprietary and thereafter uses or discloses it).

As a result of the knowledge requirement, a business will not be liable for trade secret misappropriation if it comes into possession of trade secrets that it has done nothing to seek out or steal. *See Sys. 4, Inc. v. Landis & Gyr, Inc.*, 8 Fed.Appx. 196, 200-01 (4th Cir. 2001) (party not liable for misappropriation after government agency

mistakenly gave it another business's proprietary bid information because even though the first party received and viewed the proprietary material, it did not obtain the material through trickery or deception and it did not use or disclose the information after receiving it). Rather, a business will be liable for an inadvertent or innocent acquisition of trade secrets only if it subsequently uses or discloses information when it knows or should know that the material is confidential. *See MicroStrategy, Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 417 (E.D. Va. 2004) ("Where the defendant did not utilize 'improper means' to acquire a trade secret, the fact that it possessed a trade secret will not alone constitute misappropriation. Something more is required: disclosure or use. For example, if the trade secret is revealed accidentally or is thrust upon the defendant, unsolicited, the defendant will not be liable for its mere possession of the trade secret. However, should it act on that trade secret, liability will result."); *Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, No. 07-1029, 2007 WL 4394447, at *8 (E.D. Pa. Dec. 13, 2007) (defendant that gained access to proprietary information from e-mails that were inadvertently sent to server of corporation whose assets it purchased could be liable for trade secret misappropriation when it used and disclosed the proprietary information it obtained knowing that it was confidential).

## L. Unfair Competition

Even where confidential information, processes or customer data do not rise to the level of a protectable trade secret, parties who improperly take or use such assets

may be liable in New York on a common law claim for unfair competition. *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 209 (S.D.N.Y. 2008). That cause of action is available when "the defendant has misappropriated the labors and expenditures of another" through "'some element of bad faith.'" *Id.* at 208-09 (quoting *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980)). More specifically, "the gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another by . . . exploitation of proprietary information or trade secrets." *Eagle Comtronics, Inc. v. Pico Prods., Inc.*, 682 N.Y.S.2d 505, 505 (App. Div. 1998). Because the claim is not for trade secret misappropriation, there is no need to show that the plaintiff made any effort to keep its information secret. *Fairfield Fin. Mortgage Group, Inc. v. Luca*, 584 F. Supp. 2d 479, 488 (E.D.N.Y. 2008).

In *Demetriades v. Kaufmann*, 698 F. Supp. 521, 525-28 (S.D.N.Y. 1988), a plaintiff survived a motion to dismiss by alleging that a defendant misappropriated its architectural designs by "pilfer[ing] plans" and trespassing onto the property at issue and taking photographs of the building as it was being constructed. The court noted that courts recognize protectable property interests in an individual's "'labor, skill, expenditure, name and reputation'" that may be enforced through an unfair competition action. *Id.* at 526 (quoting *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp*, 101 N.Y.S.2d 483, 492 (Sup. Ct. 1950)). Because the designs were the result of the plaintiff's skill and labor, they were protectable. *Id.* at 526-27.

Similarly, in *Robotic Vision Sys., Inc. v. Gen. Scanning, Inc.*, the parties had engaged in merger discussions, but the plaintiff pursued other acquisition opportunities with a third company when the original deal collapsed. No. 96-CV-3884 JG, 1997 WL 1068696 at *1-2 (E.D.N.Y. Sept. 8, 1997). In the process of developing its bid for the third company, the plaintiff invested significant labor, money, and skill in learning about the target company's business and devising its bid strategy. *Id*. at *5. However, the defendant's CEO induced the plaintiff to reveal that information under the guise of re-visiting their merger discussions. *Id*. at *7. The defendant then used the information to out-bid the plaintiff, and the plaintiff sued for unfair competition. *Id*. The court denied the defendant's summary judgment motion. *Id.* at *8.

In *LinkCo, Inc. v. Fujitsu, Ltd.*, a plaintiff stated a valid cause of action for unfair competition by alleging that the defendant had stolen software that the plaintiff had developed. 230 F. Supp. 2d 492, 501-02 (S.D.N.Y. 2002). In *LinkCo.*, the plaintiff spent significant time developing computer software architecture, and one of its employees secretly met with the defendant and transmitted information about this software to it. *Id.* After reviewing the evidence, the court concluded that a jury could find that the plaintiff had invested labor, skill and expenditures in developing the product, and that the defendant had misappropriated the information in bad faith. *Id.* at 502; *see also Cont'l Dynamics Corp. v. Kanter*, 408 N.Y.S.2d 801, 802 (App. Div. 1978) (denying

defendant's summary judgment motion where defendant physically removed customer lists from plaintiff's file cabinet and did not return them).

## M. Tortious Interference with Employment Relations

In general, an employee is free to work wherever he or she wishes because of "'powerful considerations of public policy which militate against sanctioning the loss of a [person's] livelihood.'" *Reed, Roberts Assocs., Inc. v. Strauman*, 353 N.E.2d 590, 593 (N.Y. 1976) (quoting *Purchasing Assocs., Inc. v. Weitz*, 196 N.E.2d 245, 247 (N.Y. 1963)).[16] However, agreements with employees constitute valuable assets that employers may protect against infringement by third parties.

A lesser showing is required to state a claim for tortious interference with a contract than for a non-contractual relationship. *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004). That is because the protection available to a plaintiff "is defined by the nature of the plaintiff's enforceable legal rights." *Id.* (quoting *NBT Bancorp Inc. v. Fleet/Northstar Fin. Group, Inc.*, 644 N.E.2d 492, 496 (N.Y. 1996)). As a result, while a claim for tortious interference with contract may stand even where the defendant's behavior was lawful, a tortious interference with a non-contractual relationship requires a showing of "'more culpable conduct on the part of the defendant.'" *Id.* (quoting *NBT Bancorp*, 644 N.E.2d at 496).

---

[16] That rule does not preclude employees from agreeing to restrictive covenants that contractually prohibit them from accepting employment with competitors upon termination.

Under New York law, a plaintiff who alleges tortious interference with contractual employment relations must establish that: (1) there is a valid contract; (2) a third party knew of the contract; (3) the third party intentionally and improperly procured the breach of the contract; and (4) the plaintiff was damaged by the breach. *Siotkas v. LabOne, Inc.*, 594 F. Supp. 2d 259, 274-75 (E.D.N.Y. 2009). If the employee did not have a contract and was an at-will employee, however, he or she would have to show that the third party engaged in "fraud or misrepresentation or acted with malice" in interfering with the employment relationship in order to recover. *Id.* at 275; *see also Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001) (at-will employee may not recover for tortious interference with employment relations under New York law unless he or she demonstrates that the interference was procured by fraud, misrepresentation, or threats or that the defendant acted with malice or in violation of a duty). *But see McCormick v. J.P. Morgan Chase*, No. 05 Civ. 10576 (TPG), 2007 WL 2456444, at *2 (S.D.N.Y. Aug. 29, 2007) (stating the general rule that an at-will employee has no cause of action for tortious interference with employment relations without acknowledging exceptions); *Negron v. JP Morgan Chase/Chase Manhattan Bank*, 789 N.Y.S.2d 257, 258 (App. Div. 2005) (same).

When employees are terminable at will, courts generally will not recognize causes of action for tortious interference unless the competitor that solicited them engaged in wrongful conduct rising to the level of "'physical violence, fraud or

misrepresentation, civil suits and criminal prosecutions, [or] some degrees of economic pressures.'" *Agency Dev., Inc. v. MedAmerica Ins. Co.*, 327 F. Supp. 2d 199, 205 (W.D.N.Y. 2004) (quoting *Hannex Corp. v. GMI*, 140 F.3d 194, 206 (2d Cir. 1998)).  A plaintiff in such a situation would have to demonstrate that "the defendants acted with the sole purpose of harming plaintiffs."  *Id.*; *see also San Sung Korean Methodist Church v. Prof'l USA Constr. Corp.*, No. 6613, 2004 WL 1563255, at *3 (N.Y. Sup. Ct. Feb. 5, 2004).  Further, a competitor is under no obligation to investigate whether an employee is subject to such a contractual obligation, as "there is no action for negligent interference."  *Trionic Assocs. v. Harris Corp.*, 27 F. Supp. 2d 175, 185 (E.D.N.Y. 1998); *see also Golden Distrib., Ltd. v. Weber (In re Golden Distrib., Ltd.)*, 128 B.R. 352, 363 (Bankr. S.D.N.Y. 1991) (competitor may accept employee's explanation that its former employer has breached an employment contract and therefore employee is no longer bound by a restrictive covenant).

In *In re Flagstaff Foodservice Corp.*, two companies had engaged in negotiations for one to purchase the assets and operations of the other.  *Flagstaff Foodservice Corp. v. Consol. Foods Corp. (In re Flagstaff Foodservice Corp.)*, 25 B.R. 844, 846 (Bankr. S.D.N.Y. 1982).  After the potential buyer learned that the seller was planning to file for Chapter 11 bankruptcy, it began contacting the seller's employees to float the idea of working for it.  *Id.* at 851.  In light of the timing, the court noted that it could reasonably infer that "[the buyer] realized that they had the possibility of obtaining the [seller's]

operations sales volume by hiring the [seller's] salesmen without the necessity of purchasing the [seller's] assets and understood that if they were able to do so that [the seller's] operations might well not withstand the blow." *Id.* at 851. The court observed that although there was no fiduciary relationship between the buyer and the seller, the parties owed heightened duties to one another because they had been engaged in active negotiations pursuant to which sensitive information was exchanged. *Id.* at 853. As a result, the court could not conclude as a matter of law that the buyer acted without malice. *Id.* at 854.

## N. Conversion

Conversion is "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 660 N.E.2d 1121, 1126 (N.Y. 1997). The remedy for conversion is damages. *See Kranz v. Town of Tusten*, 653 N.Y.S.2d 194, 195 (App. Div. 1997).

A defendant commits conversion by exercising an act of ownership over the plaintiff's property without the right to do so. *See New York City Transit Auth.*, 635 N.Y.S.2d at 1001. The exercise of dominion over the plaintiff's property suffices for a conversion claim; actual physical possession of the plaintiff's property by the defendant is not required. *See Gen. Elec. Co. v. Am. Export Isbrandtsen Lines, Inc.*, 327 N.Y.S.2d 93, 95 (App. Div. 1971). A defendant's good faith or ill intent in exercising ownership over the

property is irrelevant to conversion. *See Dywer v. Citizens United Bank, N.A.*, 470 N.Y.S.2d 200, 202 (App. Div. 1983) (lack of good faith is not a requirement for a conversion action); *Bunge Corp. v. Mfrs. Hanover Trust Co.*, 318 N.Y.S.2d 819, 830 (App. Div. 1971) ("Good faith is not a defense in a conversion action."); *New York City Transit Auth.*, 635 N.Y.S.2d at 1001-02. In addition, "[a] transfer may be wrongful and constitute a conversion even where . . . the plaintiff was unaware at the time that the taking was wrongful. *Id.* at 1001. Conversion does not require a defendant to know that the converted property is owned by another. *See* RESTATEMENT (SECOND) OF TORTS § 244 (1965) ("An actor is not relieved of liability to another . . . for conversion by his belief, because of a mistake of law or fact not induced by the other, that he . . . has possession of the chattel or is entitled to its immediate possession . . . ."); *see also P.F. Jurgs & Co. v. O'Brien*, 629 A.2d 325, 329-30 (Vt. 1993) ("[T]he converter's good faith belief in ownership of the property, or lack of knowledge as to its true ownership, is irrelevant . . . . A 'knowing' conversion is not required.").

Nevertheless, a defendant must commit some affirmative act of ownership over the asset, such as "asportation by the defendant or another person, denial of access to the rightful owner[,] . . . assertion to the owner of a claim on the goods, [or] sale or other commercial exploitation of the goods by the defendant . . . ." *New York v. Seventh Regiment Fund*, 774 N.E.2d 702, 711 (N.Y. 2002); *see Colavito v. New York Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006) (defendant must intentionally assume or

exercise control over the property). A defendant's action (or refusal to act) must interfere with the plaintiff's rights of ownership (such as possession, control, or dominion) over plaintiff's property. *See id.* at 717; *Galtieri v. Kramer*, 648 N.Y.S.2d 144, 145 (App. Div. 1996); *see also Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 404 (2d Cir. 2006).

To commit conversion, a defendant must exercise control over a plaintiff's property that so seriously interferes with the plaintiff's rights in the property that the defendant may justly be required to pay the plaintiff the full value of the property. RESTATEMENT (SECOND) OF TORTS § 222A (1965). In determining whether the seriousness of the defendant's interference with the plaintiff's property is great enough to require the defendant to pay the plaintiff the full value of his property, courts generally consider several factors. Relevant factors include, but are not limited to: the extent and duration of the defendant's exercise of control over the plaintiff's property; the defendant's intent to assert a right in fact inconsistent with the plaintiff's right of control; the defendant's good faith or ill intent; the extent and duration of the resulting interference with the plaintiff's right of control; the harm done to the plaintiff's property; and the inconvenience and expense caused to the plaintiff. *Id.*

A plaintiff need not demand the return of its property from the defendant before suing for conversion if the defendant took possession unlawfully. *See New York City Transit Auth.*, 635 N.Y.S.2d at 1001. If the defendant's original possession was lawful,

however, the plaintiff must first demand the return of the property. *See D'Amico v. First Union Nat'l Bank*, 728 N.Y.S.2d 146, 151 (App. Div. 2001) ("[W]here the original possession is lawful, a conversion does not occur until after a demand and refusal to return the property."); *see also Heneghan v. Cap-A-Radiator Shops*, 506 N.Y.S.2d 132, 134 (App. Div. 1986) (where plaintiff left his car for repairs at defendant's car shop, a conversion claim based on possession required plaintiff to demand that defendant return the plaintiff's car); *Johnson v. Gumer*, 464 N.Y.S.2d 318, 319 (App. Div. 1983) ("Where the original possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property."); *Lawrence v. Meloni*, 558 N.Y.S.2d 360, 361 (Sup. Ct. 1990) (innocent purchaser of stolen goods is in lawful possession until the purchaser refuses the owner's demand for return of the property).

If a defendant has possession of the property but does not exclude the plaintiff from the exercise of its ownership rights over the property, then the defendant is not liable for conversion. *See Seventh Regiment Fund, Inc.*, 774 N.E.2d at 710 ("[A] defendant who, though having custody of goods, does not 'exclude the owner from the exercise of his rights' is not liable for conversion." (quoting *Bradley v. Roe*, 27 N.E.2d 35, 39 (N.Y. 1940))); *Veeco Instruments, Inc. v. Candido*, 334 N.Y.S.2d 321, 324 (Sup. Ct. 1972) ("[A]ny use of . . . property beyond the authority which the owner conferred upon the user, or in violation of the instructions given, is conversion.").

In *Thyroff v. Nationwide Mutual Insurance Co.*, the defendant seized computer hardware and software systems that were leased to the plaintiff and contained data owned by the plaintiff. 460 F.3d at 403. The court found that the defendant's denial of the plaintiff's access to its data supported a finding of conversion. *Id.* at 404-05. In *Long Island Women's Health Care Assocs. v. Haselkorn-Lomansky*, the court rejected the plaintiff's conversion claim because the mere downloading of a confidential electronic patient list without removal, deletion, or some other act asserting ownership action over the data did not deprive the plaintiff of the list itself or the plaintiff's rights to the data. No. 13769-04, 2005 WL 3610336, at *4 (N.Y. Sup. Ct. Dec. 27, 2005); *see also A & G Research, Inc. v. GC Metrics, Inc.*, No. 05870/2007, 2008 WL 2150110, at *26 (N.Y. Sup. Ct. May 21, 2008) (plaintiffs' copying and uploading onto their own systems of the defendant's data was not by itself sufficient for a conversion claim).

Until recently, the New York law of conversion required that the property at issue "constitute identifiable tangible personal property." *See Roemer & Featherstonhaugh P.C. v. Featherstonhaugh*, 699 N.Y.S.2d 603, 604 (App. Div. 1999). However, in *Thyroff*, the New York Court of Appeals expanded conversion to cover "electronic records of customer contacts and related data," which included the plaintiff's e-mails, correspondence, and other customer data. *See Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d 1272, 1273, 1278 (N.Y. 2007). Under *Thyroff*, the test for

whether electronic data is subject to a conversion claim is whether the electronically stored information lost significant value when converted to a tangible form. *Id*. at 1278.

The remedy for conversion is damages. A successful plaintiff receives "the value of the property at the time and place of conversion, plus interest." *Kranz*, 653 N.Y.S.2d at 195.

### O. Auditor Malpractice

To state a claim of auditor malpractice under New York law, a client must allege (1) "a departure from accepted standards of practice," and (2) "that the departure was the proximate cause of an injury." *See VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 262 (S.D.N.Y. 2004); *Hous. Works, Inc. v. Turner*, 179 F. Supp. 2d 177, 215 (S.D.N.Y. 2001). The plaintiff must also allege that the plaintiff was in privity with the accountant or had "'a bond so close as to approach that of privity.'" *VTech Holdings*, 348 F. Supp. 2d at 262 (quoting *Parrott v. Coopers & Lybrand, L.L.P.*, 741 N.E.2d 506, 508 (N.Y. App. Div. 2000)).

In determining whether an auditor has deviated from accepted standards, courts and tribunals routinely look to the recognized and accepted professional standards for accountants and auditors, generally measured by Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Auditing Standards ("GAAS"). *See, e.g.*, *Cumis Ins. Soc'y v. Tooke*, 739 N.Y.S.2d 489, 493 (App. Div. 2002).

Auditors can be liable for violating professional standards in connection with the preparation of interim financial reports. *William Iselin & Co. v. Landau*, 522 N.E.2d 21, 23 (N.Y. 1988) (regardless of whether the activity is characterized as an "audit" or a "review," accountant owes client a duty to exercise due care in the performance of professional accounting services); *Collins v. Esserman & Pelter*, 681 N.Y.S.2d 399, 401 (App. Div. 1998) ("Even with respect to a review . . . the accountant is obligated to exercise due care in the performance of the engagement."); *see also In re Kantor, Geisler & Oppenheimer, P.A.*, PCAOB Release No. 105-2007-009 (Dec. 14, 2007) (accounting firm violated Section 10A(b) of the Exchange Act and PCAOB standards in quarterly review when, upon learning information indicating that an illegal act may have occurred, the firm failed to address appropriately the threshold question of whether it was likely that an illegal act had occurred).

Auditors also may face liability if they fail to disclose suspicious information to corporate audit committees. *Silverman v. KPMG LLP (In re Allou Distribs., Inc.)*, 395 B.R. 246, 272-73 (Bankr. E.D.N.Y. 2008) (plaintiff sufficiently pled that auditing firm committed malpractice by failing to report suspicious circumstances and material discrepancies to the audit committee); *In re Springer*, Exchange Act Release No. 44858, 75 S.E.C. Docket 2095 (Sept. 27, 2001) (accountant who violated Section 10A of the Securities Exchange Act engaged in professional misconduct by failing to notify client's

audit committee that he had detected information indicating that the client had reported $1.3 million in false revenues in its quarterly report).

Under New York law, clients generally may recover fees paid to negligent auditors. *Stanley L. Bloch, Inc. v. Klein*, 258 N.Y.S.2d 501, 508 (Sup. Ct. 1965) (measure of damages for professional negligence of accountant in issuing balance sheet containing substantial errors was accounting and auditing fees paid to accountant for year of service immediately prior to issuance of balance sheet and accounting and auditing fees necessitated by review thereof).

In addition to fees, other jurisdictions have recognized that a plaintiff is entitled to **"**actual out-of-pocket costs" that "flow as a natural and continuous consequence" from or are otherwise "proximately caused" by the defendant's breach of its legal duties. *Crowley v. Chait*, Civ. No. 85-2441 (HAA), 2004 WL 5434953, at *12 (D.N.J. Aug. 25, 2004); *Baker Hughes Oilfield Operation, Inc. v. Seabulk Tankers, Inc.***,** No. Civ. A. 03-1230, 2004 WL 1290576, at *2 (E.D. La. June 8, 2004); *Keywell Corp. v. Piper & Marbury L.L.P.*, No. 96-CV-0660E (SC), 1999 WL 66700, at *5 (W.D.N.Y. Feb. 11, 1999). Among the expenses that may be considered to flow from a breach of a legal duty are those incurred to repair harm to the plaintiff caused by the defendant's breach. *See, e.g.*, *World Radio Labs., Inc. v. Coopers & Lybrand*, 557 N.W.2d 1, 15 (Neb. 1996) (client was entitled to recover damages for accounting fees paid to second auditing firm as a result of defendant auditing firm's negligence).

Some jurisdictions permit a bankrupt client to seek damages based on allegations that its auditor's negligence proximately caused its bankruptcy. *See, e.g., Bd. of Trs. of Cmty. Coll. Dist. No. 508 v. Coopers & Lybrand LLP*, 775 N.E.2d 55, 63 (Ill. App. 2002) (under Illinois law, auditor's failure to detect treasurer's violation of investment policy during audits could be the proximate cause of damages caused by investments made after the audit, where members of the board testified that they would have ended those investment practices had auditor detected them), *rev'd on other grounds*, 803 N.E.2d 460 (Ill. 2003); *see also Plan Comm. v. PricewaterhouseCoopers, LLP*, 335 B.R. 234, 249-51 (D.D.C. 2005) (creditors committee adequately alleged damages against debtor's auditing firm under District of Columbia law, where committee asserted that malpractice proximately caused debtor's insolvency and bankruptcy and specifically alleged that the board would have taken actions to avoid insolvency if it had been "timely alerted by appropriately audited financial statements to the fact that [company] was performing significantly worse than was presented in the negligently audited financial statements"), *dismissed on other grounds*, No. 02-01487 (TFH), 2007 WL 1191917 (D.D.C. Apr. 20, 2007).

## VI.  SECURITIES INTERMEDIARIES (ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE)

This Section sets forth legal standards relevant to the analysis of the impact of Article 8 of the Uniform Commercial Code (the "UCC") on avoidance actions, in support of Section III.B of the Examiner's Report.[17]

### A.  Protected Purchaser and the Securities Intermediary Rules

Under Section 8-303 of the UCC, a purchaser of a certificated or uncertificated security, or of an interest therein, acquires its interest in the security free of any adverse claim as long as the purchaser: "(1) gives value; (2) does not have notice of any adverse claim to the security; and (3) obtains control of the certificated or uncertificated security."  U.C.C. § 8-303 (2008).[18]

Section 8-303's protected purchaser rule applies only to securities held directly. 17 WILLISTON ON CONTRACTS § 51:58 (4th ed.)  However, purchasers of investments also are protected to some extent by the indirect holding rules contained in Part 5 of the UCC.  Specifically, under Section 8-502, an action based on an adverse claim to a financial asset may not be asserted against a person who acquires a security entitlement for value and without notice of an adverse claim.  U.C.C. § 8-502 (2008).  Moreover, Section 8-503 provides similar protection to purchasers of securities entitlements (or

---

[17] New York's UCC statute follows the uniform version of the UCC with respect to all provisions discussed in this Section.  N.Y.U.C.C. LAW § 1-101 *et seq.* (McKinney 2010); *see Cont'l Info Sys. v. Met. Life Ins. Co. of N.Y.*, 732 N.Y.S.2d 952, 954 (App. Div. 1980).

[18] An "adverse claim" is **a** claim that a claimant has a property interest in a financial asset and that it is a violation of the rights of the claimant for another person to hold, transfer, or deal with the financial asset." U.C.C. § 8-102(a) (2008).  *See* Section VI.A.3 of this Appendix.

securities that are subject to securities entitlements) from a securities intermediary.  8 U.C.C. § 503 (2008).

Under Article 8 of the UCC, a "securities intermediary" is "(i) a clearing corporation; or (ii) a person, including a bank or *broker*, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity."  U.C.C. § 8-102(a)(14) (2008) (emphasis added).

Section 8-503 describes the property interest of an entitlement holder with respect to financial assets held by its securities intermediary. Section 8-503(a) states that:

> To the extent necessary for a securities intermediary to satisfy all security entitlements with respect to a particular financial asset, all interests in that financial asset held by the securities intermediary are held by the securities intermediary for the entitlement holders, are not property of the securities intermediary, and are not subject to claims of creditors of the securities intermediary, except as otherwise provided in Section 8-511.

U.C.C. § 8-503(a) (2008).

As a result, a securities intermediary that transfers its customers' (the "entitlement holders'") securities without their consent commits an actionable wrong.

That does not mean that an entitlement holder can recover the securities from the purchaser.  Rather, Subsection (d) of Section 8-503 provides that:  "an entitlement holder's property interest with respect to a particular financial asset under subsection (a) may be enforced against the purchaser of the financial asset or interest therein only if:"  (1) "insolvency proceedings have been initiated by or against the securities intermediary"; (2) "the securities intermediary does not have sufficient interest in the

financial asset to satisfy the security entitlements of all of its entitlement holders to that financial asset"; (3) "the securities intermediary violated its obligation under § 8-504 by transferring the financial asset or interest therein to the purchaser"; and (4) "the purchaser is not protected under subsection (e)." U.C.C. § 8-503(d) (2008).

Subsection (e) provides a purchaser of securities from a securities intermediary with broad protection from suits by entitlement holders:

> An action based on the entitlement holder's property interest with respect to a particular financial asset under subsection (a), whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may not be asserted against any purchaser of a financial asset or interest therein who [1] gives value, [2] obtains control, and [3] does not act in collusion with the securities intermediary in violating the securities intermediary's obligations under Section 8–504.

U.C.C. § 8-503(e) (2008).

Accordingly, if a purchaser from a securities intermediary (1) gave value for the securities, (2) obtained control of the securities, and (3) did not collude with the securities intermediary to violate the rights of third parties, then the entitlement holder cannot recover from the purchaser.

### B. Terms Used in the Protected Purchaser and Securities Intermediary Provisions

#### 1. Meaning of "Gives Value" under the UCC

A person gives value for rights if he or she acquires them:

(1)  in return for a binding commitment to extend credit or for the extension of immediately available credit, whether or not drawn upon and

whether or not a charge-back is provided for in the event of difficulties in collection; or

(2) as security for, or in total or partial satisfaction of, a pre-existing claim; or

(3) by accepting delivery under a pre-existing contract for purchase; or

(4) generally, in return for any consideration sufficient to support a simple contract.

U.C.C. § 1-204 (2008).

### 2. Meaning of "Obtains Control" under the UCC

"Control" of a security depends on whether the security is "certificated," "uncertificated," or is a "security entitlement." U.C.C. § 8-106 (2008). Each of those alternatives is addressed separately below.

### a) Control of a Certificated Security

Section 8-106(a) provides that "[A] purchaser has 'control' of a certificated security in bearer form if the certificated security is delivered to the purchaser.[19] U.C.C. § 8-106(a) (2008). Section 8-106(b) provides that a purchaser has "control" of a certificated security in registered form if the certificated security is delivered to the purchaser, and: (1) the certificate is endorsed to the purchaser or in blank by an effective endorsement; or (2) the certificate is registered in the name of the purchaser, upon

---

[19] "'Bearer form,' as applied to a certificated security, means a form in which the security is payable to the bearer of the security certificate according to its terms but not by reason of an indorsement." U.C.C. § 8-102(a)(2) (2008).

original issue or registration of transfer by the issuer.[20]   U.C.C. § 8-106(b) (2008).

Delivery of a certificated security occurs in one of three circumstances, the most

common of which is that the purchaser acquires possession of the security certificate.

*See* U.C.C. § 8-301(a) (2008).

### b)  Control of an Uncertificated Security

Section 8-106(c) provides that "[a] purchaser has 'control' of an uncertificated

security if:  (1) the uncertificated security is delivered to the purchaser; or (2) the issuer

has agreed that it will comply with instructions originated by the purchaser without

further consent by the registered owner."   U.C.C. § 8-106(c) (2008).   Delivery of

uncertificated securities is described in Section 8-301(b):

> (b) Delivery of an uncertificated security to a purchaser occurs when:
>
> (1) the issuer registers the purchaser as the registered owner, upon original issue or registration of transfer; or
>
> (2) another person, other than a securities intermediary, either becomes the registered owner of the uncertificated security on behalf of the purchaser or, having previously become the registered owner, acknowledges that it holds for the purchaser.

U.C.C. § 8-301(b) (2008).

---

[20] "'Registered form,' as applied to a certificated security, means a form in which: (i) the security certificate specifies a person entitled to the security; and (ii) a transfer of the security may be registered upon books maintained for that purpose by or on behalf of the issuer, or the security certificate so states." U.C.C. § 8-102(a)(13) (2008).

### c) Control of a Security Entitlement

A "security entitlement" consists of the rights and property interests of a person who holds securities or other financial assets through a securities intermediary. U.C.C. § 8-102(7), (17) (2008). A security entitlement is not a property interest in any specific financial asset held by a securities intermediary or by the clearing corporation, *see* U.C.C. §§ 8-104(c), 8-503 (2008), but instead consists of personal rights against the securities intermediary and its property. U.C.C. § 8-102 cmt. 17 (2008); *see also* U.C.C. § 8-503 cmt. 2 (2008) ("A security entitlement is not a claim to a specific identifiable thing; it is a package of rights and interests that a person has against the person's securities intermediary and the property held by the intermediary."). A security entitlement is acquired when "a securities intermediary: (1) indicates by book entry that a financial asset has been credited to the person's securities account; (2) receives a financial asset from the person or acquires a financial asset for the person and, in either case, accepts it for credit to the person's securities account; or (3) becomes obligated under other law, regulation, or rule to credit a financial asset to the person's securities account." U.C.C. § 8-501(b) (2008). "[T]he entirety of Part 5 [of Article 8] is the definition of 'security entitlement' because the Part 5 rules specify the rights and property interest that comprise a security entitlement." U.C.C. Art. 8 Prefatory Note II.C (2008).

Section 8-106(d) provides that a purchaser has "control" of a security entitlement if:

(1) the purchaser becomes the entitlement holder;

(2) the securities intermediary has agreed that it will comply with entitlement orders originated by the purchaser without further consent by the entitlement holder; or

(3) another person has control of the security entitlement on behalf of the purchaser or, having previously acquired control of the security entitlement, acknowledges that it has control on behalf of the purchaser.

U.C.C. § 8-106(d) (2008).  A secured party that receives a security interest is considered to be a purchaser.  U.C.C. §§ 1-201(29), (30) (2008).

### 3.    Meaning of "Notice of Adverse Claim"

Section 8-102(a)(1) defines an "adverse claim" as "a claim that a claimant has a property interest in a financial asset and that it is a violation of the rights of the claimant for another person to hold, transfer, or deal with the financial asset." U.C.C. § 8-102(a)(1) (2008).    Consequently, an "adverse claim" does not encompass all circumstances in which a third party asserts a property interest in securities, but applies only to situations where the claimant asserts that transferring the security would violate the claimant's property interest.  U.C.C. § 8-105 cmt. 2 (2008).

Under Sec. 8-105(a), a person has notice of an adverse claim if:

(1) the person knows or the adverse claim;

(2) the person is aware of facts sufficient to indicate that there is a significant probability that the adverse claim exists and deliberately avoids information that would establish the existence of the adverse claim; or

(3) the person has a duty, imposed by statute or regulation, to investigate whether an adverse claim exists, and the investigation so required would establish the existence of the adverse claim.

U.C.C. § 8-105(a) (2008).

Official Comment 3 to Section 8-105 explains that paragraph (a)(1) requires actual knowledge of an adverse claim.  U.C.C. § 8-105 cmt. 3 (2008); *see also* U.C.C. § 1-201(25) (2008) (knowledge is defined as actual knowledge).   Official Comment 4 explains that paragraph (a)(2) codifies the "willful blindfulness" test which turns on whether the person: (1) is aware of facts sufficient to indicate that there is a significant probability that an adverse claim exists (which necessarily turns on the actor's state of mind), and (2) deliberately avoids information that would establish the existence of the adverse claim.   8 U.C.C. § 8-105 cmt. 3 (2008).   Finally, Official Comment 5 explains that paragraph (a)(3) applies "only if there is some other statute or regulation that explicitly requires persons dealing with securities to conduct some investigation."  8 U.C.C. § 105 cmt. 3 (2008).   For instance, a purchaser of a certificated security has notice of an adverse claim if the security certificate: (1) whether in bearer or registered form, has been indorsed "for collection" or "for surrender" or for some other purpose not involving transfer; or (2) is in bearer form and has on it an unambiguous statement that it is the property of a person other than the transferor, but the mere writing of a name on the certificate is not such a statement.  17 WILLISTON ON CONTRACTS § 51:57 (4th ed.).

Subsection 8-105(b) provides that, "[h]aving knowledge that a financial asset or interest therein is or has been transferred by a representative imposes no duty of inquiry into the rightfulness of a transaction and is not notice of an adverse claim." U.C.C. § 8-105(b) (2008).  In other words, "[k]nowledge of the existence of the representative relation is not enough in itself to constitute 'notice of an adverse claim' that would disqualify the purchaser from protected purchaser status.  A purchaser may take a security on the inference that the representative is acting properly."  U.C.C. § 8-105 cmt. 6 (2008). The UCC defines "representative" to include "an . . . agent or any other person empowered to act for another."  U.C.C. § 1-201(35) (2008).

### 4.   Meaning of "Collusion" under the UCC

"Collusion" is not defined in either Section 8-503 or the Official Comment to Section 8-503.  Official Comment 5 to Section 8-115 suggests that an analogy to the that courts use to determine whether a person is liable for aiding and abetting tortious conduct:

> If the conduct of a securities intermediary or a broker or other agent or bailee rises to a level of complicity in the wrongdoing of its customer or principal, the policies that favor protection against liability do not apply. . . . The collusion test is intended to adopt a standard akin to the tort rules that determine whether a person is liable as an aider and abettor for the tortious conduct of a third party.  *See* RESTATEMENT (SECOND) OF TORTS §876 (1965).

> Knowledge that the action of the customer is wrongful is a necessary but not sufficient condition of the collusion test.  The aspect of the role of securities intermediaries and brokers that Article 8 deals with is the clerical and ministerial role of implementing and recording the

securities transactions that their customers conduct. Faithful performance of this role consists of following the instructions of the customer. It is not the role of the record-keeper to police whether the transactions recorded are appropriate, so mere awareness that the customer may be acting wrongfully does not itself constitute collusion. That, of course, does not insulate an intermediary or broker from responsibility in egregious cases where its action goes beyond the ordinary standards of the business of implementing and recording transactions, and reaches a level of affirmative misconduct in assisting the customer in the commission of a wrong.

U.C.C. § 8-115 cmt. 5 (2008).

### a) The Restatement Approach

As noted above, Section 8-115 of the UCC refers to the Restatement in connection with the test for aiding and abetting liability. *Id*. Section 876 of the RESTATEMENT (SECOND) OF TORTS provides that a party is subject to liability for harm resulting to a third person from the tortious conduct of another if he:

(a)     does a tortious act in concert with the other or pursuant to a common design with him, or

(b)     knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c)     gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

RESTATEMENT (SECOND) OF TORTS § 876 (1965).

According to comment a to Section 876:

Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words and may

be implied and understood to exist from the conduct itself whenever two or more persons commit tortious acts in concert, each becomes subject to liability for the acts of the others, as well as for his own acts.

*Id.* cmt. a.  Courts have stated that Section 876(a) corresponds to a theory of "conspiracy," rather than aiding and abetting.  *See, e.g., Lindsay v. Lockwood*, 625 N.Y.S.2d 393, 396-97 (Sup. Ct. 1994).  Official Comment 5 to UCC § 8-115 provides that "[t]he collusion test is intended to adopt a standard akin to the tort rules that determine whether a person is liable as an aider or abettor for the tortious conduct of a third party."  U.C.C. § 8-115 cmt. 5 (2008).

Under Section 876(b), a third party is liable for aiding and abetting if the third party has actual knowledge of the primary wrong and gives substantial assistance to the primary wrongdoer.  RESTATEMENT (SECOND) OF TORTS § 876(b) (1965).

A plaintiff must establish that the defendant had "actual knowledge" of the violator's underlying tort; constructive knowledge is insufficient.  *See In re Consol. Welfare Fund ERISA Litig.*, 856 F. Supp. 837, 842 (S.D.N.Y. 1994) ("It is clear that liability for aiding and abetting a tort cannot attach absent actual knowledge of the underlying tort."); *see also Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 302 B.R. 760, 770 (E.D.N.Y. 2003); *Ryan v. Hunton & Williams*, No. 09-CV-5938 (JG), 2000 WL 1375265, at *8 (E.D.N.Y. Sept. 20, 2000); *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996).  The plaintiff "may not rest on a bare inference that the defendant must have known the facts; '[t]he plaintiff must support the inference with some reason to

conclude that the defendant has thrown in his lot with the primary violators.'" *In re Centennial Textiles, Inc.*, 227 B.R. 606, 612 (S.D.N.Y. 1998) (quoting *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 497 (7th Cir. 1986)).

In *In re Sharp*, a Chapter 11 debtor brought an adversary proceeding against its lender for aiding and abetting breaches of fiduciary duty by the debtor's principals. 302 B.R. at 764. The debtor alleged that its principals had inflated its reported sales and revenues, used those falsified statements to raise money, and then looted those funds. *Id.* at 765.

Recognizing that the "case law suggests that assertions that an alleged aider and abettor harbored well-founded – but unconfirmed – suspicions of the primary violator's wrongdoing are not sufficient to plead actual knowledge simply because, with the benefit of hindsight, those suspicions turned out to be correct," the court held that "determining the precise point at which evidence giving rise to suspicions of fraud reache[d] a cumulative critical mass sufficient to support an inference of actual knowledge is a fact intensive inquiry not easily resolved on the face of the pleadings." *Id.* at 771-72. Drawing all reasonable inferences in the debtor's favor, the district court found that the debtor's allegations were sufficient to plead the bank's actual knowledge. *Id.* at 772. The court nevertheless affirmed the bankruptcy court's dismissal of the debtor's complaint because the debtor had failed to allege "substantial assistance." *Id.* at 776.

In *Ryan*, defrauded investors alleged that the defendant bank aided and abetted a fraudulent Ponzi scheme carried out through accounts at the bank. 2000 WL 1375265, at *8-10. The plaintiffs alleged that the bank was on notice of "red flags" that indicated fraudulent conduct. *Id.* at *1. The court found that the plaintiffs failed to allege that the bank had actual knowledge of the fraud and that plaintiffs' allegations that the bank suspected fraudulent activity did not raise an inference of actual knowledge. *Id.* at *9.

In *In re Centennial Textiles*, a Chapter 7 trustee sued the vice-president of one of the debtor's creditors, alleging that the defendant had aided and abetted the debtor's breach of fiduciary duty in scheming to repay a portion of the creditor's prepetition claims by overpaying for postpetition services. 227 B.R. at 608. The court held that for the defendant to have had knowledge of the debtor's breach of fiduciary duty, the defendant would have had to know about the Chapter 11 cases at the time the debtors paid the inflated invoices. *Id.* at 613. The court found that although some evidence supported an inference that the defendant knew about the bankruptcies, it was conceivable that he did not understand the significance of that evidence. *Id.*

In *Lerner v. Fleet Bank, N.A.*, investors in a Ponzi scheme orchestrated by a lawyer brought claims for aiding and abetting fraud and a breach of fiduciary duty against banks in which the investors' funds were deposited. 459 F.3d 273, 278 (2d Cir. 2006). The funds were deposited into attorney trust accounts and Interest on Lawyers Accounts. *Id.* at 281. The complaint alleged that the bank had knowledge that the

lawyer violated his fiduciary duty because the lawyer's accounts were overdrawn, numerous checks written on the accounts were dishonored for insufficient funds, and the lawyer, on numerous occasions, transferred funds from the client accounts to his personal accounts. *Id* at 294. The court dismissed plaintiffs' claims for aiding and abetting fraud, finding that, although events alleged in the complaint may have put the banks on notice that some impropriety may have been taking place, those facts did not create a strong inference of actual knowledge of the lawyer's theft of client funds. *Id.* at 293. However, the court found that plaintiffs had satisfied the knowledge requirement with respect to their claim for aiding and abetting a breach of fiduciary duty. *Id.* at 294-95.

In addition to actual knowledge, a plaintiff also must prove that the defendant provided "substantial assistance" to the primary wrongdoer. RESTATEMENT (SECOND) OF TORTS § 876(b) (1965). A defendant provides substantial assistance if he or she "'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables a [breach of fiduciary duty] to proceed.'" *In re Sharp,* 302 B.R. at 774 (quoting *Kolbeck*, 939 F. Supp. at 247); *see also Ryan*, 2000 WL 1375265, at *9; *Lerner*, 459 F.3d at 295. In general, inaction does not constitute substantial assistance unless the defendant owes a special duty directly to the plaintiff. *See, e.g., Lerner*, 459 F.3d at 295; *In re Sharp*, 302 B.R. at 774-75. Official Comment d to Section 876(b) provides that:

> The assistance of or participation by the defendant may be so slight that he is not liable for the act of the other. In determining this, the nature of

the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind are all considered.

RESTATEMENT (SECOND) OF TORTS § 876(b) cmt d (1965). In addressing the aiding and abetting claims against banks, courts have held that the "mere fact that all the participants in the alleged scheme used accounts at [a bank] to perpetrate [the breach], without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability." *Williams v. Bank Leumi Trust Co. of N.Y.*, No. 96 Civ. 6695, 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997); *see also Ryan*, 2000 WL 1375265 at *9.

In *Lerner*, the defendant banks argued that they could not have given substantial assistance by failing to report the lawyer's bounced checks because they owed no independent fiduciary duty to the lawyer's clients. *Lerner*, 459 F.3d at 295. The court rejected that argument, finding that while a "bank has no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation," New York law requires banks to "safeguard trust funds deposited with them when confronted with clear evidence that those funds are being mishandled." *Id.* at 294-95.

In *In re Sharp*, the debtor alleged that the bank affirmatively assisted the fraud in three ways: (1) providing the debtor with continued access to the line of credit; (2) deliberately avoiding phone calls from investors calling to inquire about the debtor's

credit; and (3) consenting to the debtor's sale without which the deal could not have gone forward. 302 B.R. at 775. The court found those allegations to be insufficient because the alleged affirmative acts were better characterized as failures to act and the bank had no duty to protect the debtor's interests. *Id*. at 776.

In *Ryan*, the court also found that the plaintiff failed to allege that the bank substantially assisted the fraudulent Ponzi scheme. 2000 WL 1375265 at *9-10. The court found that plaintiff's allegations of the bank's inaction, such as failing to shut down the accounts sooner or to inform the investor plaintiffs about the suspected fraud, did not rise to the level of substantial assistance because the plaintiffs and that the bank did not have a fiduciary relationship with the plaintiff. *Id.* at *10.

### b) Collusion

In *Nathan W. Drage, P.C. v. First Concord Sec., Ltd*, the court considered a claim of collusion under New York law. 707 N.Y.S.2d 782-84 (N.Y. Sup. Ct. 2000). In *Drage*, the alleged collusion took the form of overvaluing the collateral and extending excessive credit, knowing that the securities intermediary was unable to meet its obligations. *Id.* at 787. The plaintiff deposited shares of stock in its account with the defendant. *Id.* The defendant, in turn, deposited those shares in an account it maintained at another brokerage. *Id.* at 784. Pursuant to the account agreement between the defendant and the other brokerage, shares in the defendant's account served as collateral for any obligations owed to the brokerage by the defendant. *Id.* The defendant defaulted on an

obligation to the brokerage, and the brokerage enforced its security interest by selling the shares that were being held on behalf of the plaintiff.  *Id.*

The plaintiff argued that Section 8-504 of the UCC prevented the brokerage from establishing a security interest in the shares.  The court, however, disagreed:

> "[E]ven though [the defendant] violated the terms of [§] 8-504(b) by pledging [the plaintiff's stock] as collateral without plaintiff's permission, this offense is not dispositive of the issue of whether [the brokerage] obtained a perfected security interest which takes priority over plaintiff's claim."
>
> •   •   •
>
> Here, it is clear that [the brokerage] obtained "control" of the . . . shares held by [the brokerage] pursuant to the Security Clearance Agreement and pledged by [the defendant] in the Agreement. . . . Accordingly, the court finds that [the brokerage] did have a perfected security interest in the . . . shares in [the defendant's] account.

*Id.* at 785-86 (quoting *Nathan W. Drage, P.C. v. First Concord Sec., Ltd.*, 1999 WL 12936336 (N.Y. Sup. Ct. July 1, 1999)).

The plaintiff in *Drage* also sought to recover the shares at issue under Section 8-503(d) and (e).  *Id.* at 787.  The court concluded that the plaintiff's amended complaint sufficiently alleged that the dealer acted in collusion with the intermediary to deprive the plaintiff of its entitlement holding by extending credit to the intermediary far in excess of the amount provided for in the note and pledge agreement, knowing that the intermediary did not have sufficient assets to cover the increased credit, and by artificially inflating the price of the collateral shares in order to recover as much as

possible of the intermediary's debit balance. *Id.* Thus, the plaintiff pled valid claims for conversion and unjust enrichment to recover damages against the dealer. *Id.*; *see also Cotton v. PrivateBank & Trust Co.*, No. 01 C 1099, 2003 WL 360099, at *4, 1281 (N.D. Ill. Feb. 18, 2003) (dismissing complaint brought under Section 8-115 where plaintiff pled only negligence). *Compare H & R Block Fin. Advisors, Inc. v. Express Scripts, Inc.*, No. 05-73306, 2006 WL 2125226, at *6-7 (E.D. Mich. July 27, 2006) (active wrongdoing is not protected by § 8-115), *with Pine Belt Enters., Inc. v. SC & E Admin. Servs., Inc.*, No. Civ. A. 04-105 (SRC), 2005 WL 2469672, at *7 (D.N.J. Oct. 6, 2005) (allegations that securities intermediary conducted no due diligence before transferring funds from escrow account did not state a claim for collusion given that Section 8-115 makes clear that there is no duty to inquire even if defendant had notice or knowledge that another person asserted a claim to the securities). In *Drage*, the court also held that, in accordance with UCC Section 8-503(d) and the Official Comments to Section 8-511, the plaintiff, or its representative in insolvency proceedings, must first attempt to recover from the secured creditor before prosecuting a separate claim against the intermediary. *Drage*, 107 N.Y.S.2d at 788.

## VII.    SFAS 157

### A.  Accounting Standards Under SFAS 157

This Section addresses the legal standards that relate to valuation issues in support of Section III.A.2 of the Examiner's Report. Part A provides an overview of

SFAS 157, which, among other things, establishes standards for determining the fair value of financial inventory. Part B describes the interaction among legal standards that courts employ in assessing the solvency of a debtor.

The Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 157: Fair Value Measurements ("SFAS 157") in September 2006 to "define[] fair value, establish[] a framework for measuring fair value, and expand[] disclosures about fair value measurements." FASB, Original Pronouncements as Amended: Statement of Financial Accounting Standards No. 157: Fair Value Measurements, ¶ 1 (Sept. 15, 2006) ("SFAS 157"). SFAS 157 "provides procedural guidance for measuring fair value estimates required by other authoritative accounting pronouncements." Patrick A. Cosabona and Sylwia Gornik-Tomaszewski, *Special Issue: Fair Value in Financing Reporting, Auditing, and Tax Accounting, Editor's Note*, St. John's U. Rev. of Bus. (2007 Special Accounting Issue), at 3. Lehman adopted SFAS 157 in the first quarter of 2007. Lehman Brothers Holdings, Inc., Quarterly Report as of Feb. 28, 2007 (Form 10-Q) (filed on Apr. 9, 2007), at p. 10 ("We elected to early adopt SFAS 157 beginning in our 2007 fiscal year."). Lehman was then required to, among other things, define fair value based on exit prices, apply market-based measurements of fair value determined from assumptions that market participants would use, apply a "fair value hierarchy," include assumptions and adjustments for risk in fair value, and comply with new disclosure requirements. *See* SFAS 157, at 2-3.

1. **The Financial Accounting Standards Board and Financial Accounting Standard 157**

Although fair value accounting standards have existed for decades, their use increased in the 1970s due to "concerns about the appropriate measurement attribute[s] for securities," and in the 1980s when the savings and loan crisis "further exposed challenges to the historic cost model of accounting." James L. Kroeker, Acting Chief Accountant, U.S. Securities and Exchange Commission, Testimony Concerning Mark-to-Market Accounting: Practices and Implications Before the Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises of the House Committee on Financial Services (Mar. 12, 2009), at pp. 2-3, 2009 WL 625648. Responses to financial crises led to the fair value accounting standards that currently exist. *Id.* As part of that trend, FASB issued SFAS 157 on September 15, 2006. *Id*. at 3. SFAS 157 was adopted to address the lack of a common framework for measuring fair value, which lack resulted in inconsistent application. *Id.* at 8. FASB's objective was to "define[] fair value, establish[] a framework for measuring fair value in generally accepted accounting principles ("GAAP"), and expand[] disclosures about fair value measurements." SFAS 157, ¶ 1.

Prior to SFAS 157, "there were different definitions of fair value and limited guidance for applying those definitions in GAAP." *Id*. at 2. The guidance that was available "was dispersed among many accounting pronouncements," and "[d]ifferences in [those pronouncements] created inconsistencies that added to the complexity in

applying GAAP." *Id*. SFAS 157 brought "increased consistency and comparability in fair value measurements," as well as "expanded disclosures." *Id*.

SFAS 157 implemented several significant changes. First, its definition of fair value "focuses on the price that would be received from selling an asset or paid to transfer a liability (an exit price), not the price that would be paid to acquire an asset or received to assume a liability (an entry price)." *Id*. Second, SFAS 157 "emphasizes that fair value is a "market-based measurement, not an entity-specific measurement." *Id*. Therefore, a "fair value measurement should be determined based on the assumptions that market participants would use," favoring the skepticism of a risk-adverse buyer to the optimism of the asset owner. *Id*. Third, SFAS 157 creates a fair value hierarchy that ranks the quality and reliability of information used to determine fair values. *Id*. It distinguishes between market participant assumptions based on market data obtained from independent sources, and assumptions based on the reporting entity's own projections about market participant assumptions. *Id*. Fourth, SFAS 157 makes clear that market participant assumptions must include assumptions about risk and adjustment for risk, "assumptions about the effect of a restriction on the sale or use of an asset" and reflections of nonperformance risk for a liability. *Id*. at FAS157-3.

Although SFAS 157 has significantly improved the accuracy of some aspects of financial accounting, subjective aspects remain in some fair value estimates, in particular valuations of illiquid investments, and the risk management process remains

subjective. *See, e.g.,* Laura S. Friedrich et al., *Ethical Issues and Conflicts of Interest for Private Equity Funds in the Current Environment*, 1751 PLI/Corp 137, 156 (2009). Level 3 asset valuation involves the most subjective judgments and valuation inputs. *See, e.g.,* Andrew J. Ceresney et al., *Regulatory Investigations and the Credit Crisis: The Search for Villains*, 46 AM. CRIM. L. REV. 225, 248 (2009).

### a)   Definition of Fair Value

SFAS 157 provides a single definition of fair value for financial accounting: "Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." SFAS 157, ¶ 5; *see also* Bernhard Grossfeld & Hansjoerg Heppe, *The 2008 Bankruptcy of Literacy: A Legal Analysis of the Subprime Mortgage Fiasco*, 15 L. & BUS. REV. AM. 713, 732 (2009).

A fair value measurement applies to a "particular asset or liability," and "[t]herefore, the measurement should consider attributes specific to the asset or liability." SFAS 157, ¶ 6. "A fair value measurement assumes that the asset or liability is exchanged in an orderly transaction between market participants to sell the asset or transfer the liability at the measurement date." *Id*. ¶ 7; *see also Level 3 Commc'ns, LLC v. Ariz. Dept. of Revenue*, No. 1 CA-TX 08-0001, 2009 WL 2195048, at *13 n.2 (Ariz. App. Div. 1 July 23, 2009). An orderly transaction is non-forced and "assumes exposure to the market for a period prior to the measurement date to allow for marketing activities that are usual and customary for transactions involving such assets or liabilities." SFAS

157, ¶ 7. "A fair value measurement assumes that the transaction to sell the asset or transfer the liability occurs in the principal market for the asset or liability or, in the absence of a principal market, the most advantageous market." *Id*. ¶ 8.

"The principal market is the market in which the reporting entity would sell the asset or transfer the liability with the greatest volume and level of activity for the asset or liability." *Id*. "The most advantageous market is the market in which the reporting entity would sell the asset or transfer the liability with the price that maximizes the amount that would be received for the asset or minimizes the amount that would be paid to transfer the liability, considering transaction costs in the respective market(s)." *Id*. Market participants are assumed to be buyers and sellers in the principal market independent of the reporting entity, knowledgeable, able to transact, and willing to transact for the asset or liability. *Id*. ¶ 10. The fair value measurement is "determined based on the assumptions that market participants would use in pricing the asset or liability," and it "assumes the highest and best use of the asset by market participants." *Id*. ¶¶ 11-12.

**b) Valuation Techniques and Fair Value Hierarchy**

"Valuation techniques consistent with the market approach, income approach, or cost approach should be used to measure fair value." *Id*. ¶ 18. "The market approach uses prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities . . . ." *Id*. ¶ 18. The income approach uses

valuation techniques to convert future cash flows or earnings to a single present amount, and "[t]he measurement is based on the value indicated by current market expectations about those future amounts." *Id.* "The cost approach is based on the amount that currently would be required to replace the service capacity of an asset . . . ." *Id.* Depending on circumstances, single or multiple valuation techniques may be appropriate, but they must be consistently applied. *Id.* ¶¶ 19-20.

The inputs to the valuation process consist of "assumptions that market participants would use in pricing the asset or liability" and include observable inputs, "assumptions market participants would use . . . based on market data obtained from sources independent of the reporting entity" and unobservable inputs, "the reporting entity's own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances." *Id.* ¶ 21.

To increase consistency and comparability in fair value measurements and related disclosures, SFAS 157 created a broad, three-level, fair value hierarchy that "prioritizes the inputs to valuation techniques used to measure fair value." *Id.* ¶ 22; *see also* James E. Anderson et al., PRACTISING LAW INSTITUTE: MUTUAL FUND REGULATION, *Fair Value Pricing*, § 16:3.2, at *16-13 - 16-14 (2008) (discussing disclosure guidelines). The hierarchy gives the highest priority to quoted prices and the lowest priority to unobservable inputs, and if inputs fall into different levels of the hierarchy, the fair

value measurement is "determined based on the lowest level input that is significant to the fair value measurement in its entirety." SFAS 157, ¶ 22.

"Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities that the reporting entity has the ability to access at the measurement date." *Id*. ¶ 24. "An active market . . . is a market in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis." *Id*.

"Level 2 inputs are inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly," and "[i]f the asset or liability has a specified . . . term, a Level 2 input must be observable for substantially the full term of the asset or liability." *Id*. ¶ 28. Level 2 inputs include (a) "[q]uoted prices for similar assets or liabilities in active markets," (2) "[q]uoted prices for identical or similar assets or liabilities in markets that are not active," meaning "markets in which there are few transactions for the asset or liability, the prices are not current, price quotations vary substantially either over time or among market makers . . ., or in which little information is released publicly," (3) "[i]nputs other than quoted prices that are observable for the asset or liability" such as credit risks, default rates, volatilities, or interest rates and yield curves observable at commonly quoted intervals, and (4) "[i]nputs that are derived principally from or corroborated by observable market data by correlation or other means." *Id*. Adjustments to Level 2 inputs will vary depending

on factors that may include "the condition and/or location of the asset or liability, the extent to which inputs relate to items that are comparable, and the volume and level of activity in the markets." *Id*. ¶ 29. "An adjustment that is significant to the fair value measurement in its entirety may render the measurement a Level 3 measurement . . . ." *Id*.

"Level 3 inputs are unobservable inputs for the asset or liability" and "shall be used to measure fair value to the extent that observable inputs are not available," thereby allowing for situations in which there is little, if any, market activity . . . at the measurement date." *Id*. ¶ 30. Unobservable inputs "reflect the reporting entity's own assumptions about the assumptions that market participants would use in pricing the asset or liability (including assumptions about risk)." *Id*. Unobservable inputs must be "developed based on the best information available in the circumstances" and must include all "information about market participant assumptions that is reasonably available without undue cost and effort." *Id*.; *see also* John Patrick Hunt, *One Cheer for Credit Rating Agencies: How the Mark-to-Market Accounting Debate Highlights the Case for Rating-Dependent Capital Regulation*, 60 S.C. L. REV. 749, 755 (2009) ("This category apparently includes value estimates generated by internal models."). While internal inputs are used for Level 3 valuation, the objective remains the same: estimate fair value using assumptions a third party would consider in estimating fair value. "Valuation models that rely significantly on Level 3 inputs will tend to produce a wider range of

estimated fair value measurements because the essential input data inherently embodies more judgment and less precision." Ann M. Kenyon & James R. Mountain, *Accounting Issues: An Overview*, 908 PLI/Comm 791, 823 (2008); *see also* Christopher Cox, Chairman, U.S. Securities and Exchange Commission, Keynote Address to the Investment Company Institute 4th Annual Mutual Fund Leadership Dinner (Apr. 30, 2008), *available at* http://www.sec.gov/news/speech/2008/spch043008cc.htm ("[T]he fact that model-based valuations in the absence of an active market can be highly variable across companies in similar circumstances means that almost every estimate of fair value requires significant judgment.").

### c) Disclosures

A reporting entity is required to disclose specific categories of information, set forth in SFAS 157, for each interim and annual period and to disclose that information separately for each major category of assets and liabilities in order to allow users of its financial statements to assess the inputs used to develop those measurements and the effect of the measurements on earnings for the period. SFAS 157, ¶¶ 32-33.

### 2. Supplemental Guidance Regarding SFAS 157

The FASB has issued several FASB Staff Positions ("FSP") regarding SFAS 157, which are binding and intended to clarify application of SFAS 157 and provide additional guidance for estimating fair value. In particular, the FASB issued FSP SFAS 157-3 on October 10, 2008, FASB Staff Position No. 157-3 ("FSP SFAS 157-3"), and SFAS

157-4 on April 9, 2009, FASB Staff Position No. 157-4 ("FSP SFAS 157-4"). Those FSPs became effective upon issuance, and while they were applicable to the period prior to their issuance for which financial statements have not yet been issued, they did not require entities to amend previously submitted financial statements. FSP SFAS No. 157-3, ¶ 12; FSP SFAS No. 157-4, ¶¶ 21-22. Although FSP SFAS 157-3 and 157-4 were issued after Lehman's third fiscal quarter in 2008, they are nevertheless relevant because they address difficulties that reporting entities experienced in determining fair value of illiquid assets given the deteriorating market conditions.

a)  **FSP SFAS 157-3:  Determining the Fair Value of a Financial Asset When the Market for the Asset is Not Active**

The FASB issued FSP SFAS 157-3 on October 10, 2008, to clarify the application of SFAS 157 in a market that is not active and to "provide[] an example to illustrate key considerations in determining the fair value of a financial asset when the market for that financial asset is not active." FSP SFAS 157-3, ¶ 1. FASB issued FSP SFAS 157-3 because, while many constituents indicated that SFAS 157 improved "the quality and transparency of financial information, . . . certain constituents expressed concerns that [SFAS 157] does not provide sufficient guidance on how to determine the fair value of financial assets when the market for that asset is not active." *Id.* ¶¶ 4-5. Uncertainties included (1) "[h]ow the reporting entity's own assumptions (that is, expected cash flows and appropriately risk-adjusted discount rates) should be considered when measuring fair value when relevant observable inputs do not exist"; (2) "[h]ow available

observable inputs in a market that is not active should be considered when measuring fair value"; and (3) "[h]ow the use of market quotes (for example, broker quotes or pricing services for the same or similar financial assets) should be considered when assessing the relevance of observable and unobservable inputs available to measure fair value." *Id.* ¶ 5. In response to those concerns, the FASB issued FSP SFAS 157-3, and the Office of the Chief Accountant of the SEC and the FASB staff jointly issued a press release on September 30, 2008 that addressed the same issues. Press Release, SEC Office of the Chief Accountant and FAS Staff Clarifications on Fair Value Accounting, (Sept. 30, 2008); FSP SFAS 157-3, ¶ 6.

FSP SFAS 157-3 includes an example that illustrates the principles underlying SFAS 157:

1. Determining fair value in a dislocated market depends on the facts and circumstances and may require the use of significant judgment about whether individual transactions are forced liquidations or distressed sales.

2. In determining fair value for a financial asset, the use of a reporting entity's own assumptions about future cash flows and appropriately risk-adjusted discount rates is acceptable when relevant observable inputs are not available. But regardless of the valuation technique used, an entity must include appropriate risk adjustments that market participants would make for nonperformance and liquidity risks.

3. Broker (or pricing service) quotes may be an appropriate input when measuring fair value, but they are not necessarily determinative if an active market does not exist for the financial asset. For example, when markets are not active, brokers may rely more on models with inputs based on information available only to the broker. The nature of the quote (for example, whether the quote is an indicative price or a

binding offer) should be considered when weighing the available evidence.

FSP SFAS 157-3, ¶ 9.

> **b) FSP SFAS 157-4: Determining Fair Value When the Volume and Level of Activity for the Asset or Liability Have Significantly Decreased and Identifying Transactions That Are Not Orderly**

The FASB issued FSP SFAS 157-4 on April 9, 2009 to provide additional guidance for estimating fair value in accordance with SFAS 157 "when the volume and level of activity for an asset or liability have significantly decreased." FSP SFAS 157-4, ¶ 1. FSP SFAS 157-4 also "includes guidance on identifying circumstances that indicate a transaction is not orderly." *Id.*

The FASB issued FSP SFAS 157-4 because constituents had indicated that SFAS 157 and FSP SFAS 157-3 did not "provide sufficient guidance on how to determine whether a market for a financial asset that historically was active is no longer active (including guidance on when to make a significant adjustment to a transaction or quoted price) and whether a transaction is not orderly." *Id.* ¶ 6. Some FASB constituents "observed an emphasis on the use of the so-called last transaction price (or quoted price) as the sole or primary basis of fair value even when a significant adjustment to the transaction price (or quoted price) may be required or when other valuation techniques should be considered." *Id.* They expressed concern that "this emphasis resulted in a misapplication of SFAS 157 when estimating the fair value of certain financial assets." *Id.*

Moreover, the FASB released FSP SFAS 157-4 in response to Congress' efforts to address the economic crisis at the time. On October 3, 2008, Congress enacted the Emergency Economic Stabilization Act of 2008, which, among other things, mandated that the Securities and Exchange Commission ("SEC") conduct a study on mark-to-market accounting standards. Emergency Economic Stabilization Act of 2008, Pub. L. 110-343, § 133 (2008), *codified at* 12 U.S.C.A. § 5238 (West 2010); FSP SFAS 157-4, ¶ 8. In response, the SEC issued a report analyzing mark-to-market accounting to Congress on December 30, 2008. Lizabeth Ann Eiser, Office of the Chief Accountant, Division of Corporation Finance, United States Securities and Exchange Commission, *Report and Recommendations Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008: Study on Mark-to-Market Accounting*, 1734 PLI/Corp 283 (2009). The SEC's report recommended that additional measures be taken "to improve the application and practice related to existing fair value requirements[,] particularly as they relate to Level 2 and Level 3 estimates[,]" and that "[f]air value requirements should be improved through development of application and best practices guidance for determining fair value in illiquid or inactive markets." *Id.* at 301-04; FSP SFAS 157-4, ¶ 8. The SEC specifically suggested that additional guidance was needed with respect to determining when markets become inactive, so that companies must make significant adjustments to transactions or quoted prices, as well as determining whether a transaction or group of

transactions is forced or distressed. *Report and Recommendations Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008*, at 301-04; FSP SFAS 157-4, ¶ 8.

The FASB concluded that "the primary concern of many constituents was determining when a transaction or quoted price in a market that is not active should be significantly adjusted (for example, by considering multiple valuation techniques)." FSP SFAS 157-4, ¶ 9. The FASB therefore released FSP SFAS 157-4 to provide "additional guidance on determining fair value when the volume and level of activity for the asset or liability have significantly decreased when compared to normal market activity for the asset or liability (or similar assets or liabilities)." *Id.* FASB's view was that "a significant decrease in the volume and level of activity for the asset or liability is an indication that transactions or quoted prices may not be determinative of fair value, because in such market conditions there may be increased instances of transactions that are not orderly." *Id.* "In those circumstances, further analysis of transactions or quoted prices is needed, and a significant adjustment to the transaction or quoted prices may be necessary to estimate fair value in accordance with [SFAS] 157." *Id.*

FSP SFAS 157-4 "emphasizes that even if there has been a significant decrease in the volume and level of activity for the asset or liability and regardless of the valuation technique(s) used, the objective of a fair value measurement remains the same. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction (not a forced liquidation or distressed sale) between market

participants at the measurement date under current market conditions." *Id.* ¶ 2. FSP SFAS 157-4 applies to all assets and liabilities that are required or permitted by other accounting pronouncements to be measured at fair value. *Id.* ¶ 10. It confirmed that management's "intention to hold the asset or liability [to maturity] is not relevant in estimating fair value," and it reaffirmed that determining the price at which market "participants would transact . . . depends on the facts and circumstances and requires the use of significant judgment." *Id.* ¶ 15; *see also* Robert G. Fox III, Professional Accounting Fellow, U.S. Securities and Exchange Commission, Remarks before the 2008 AICPA National Conference on Current SEC and PCAOB Developments (Dec. 8, 2008), *available at* http://www.sec.gov/news/speech/2008/spch120808rgf.htm ("[T]he staff does recognize that there may be a range of reasonable accounting judgments.").

FSP SFAS 157-4 lists eight factors that a reporting entity should evaluate, among others, to determine whether there has been a significant decrease in the volume and level of activity for the asset or liability when compared with normal market activity:

1. There are few recent transactions;

2. Price quotations are not based on current information;

3. Price quotations vary substantially either over time or among market makers

4. Indexes that previously were highly correlated with fair values of the asset or liability are demonstrably uncorrelated with recent indications of fair value for that asset or liability;

5. There is a significant increase in implied liquidity risk premiums, yields, or performance indicators (for example, delinquency rates) for

observed transactions or quoted prices when compared with estimated expected cash flows, considering all available market data about credit and other nonperformance risks;

6. There is a wide bid-ask spread or a significant increase in the bid-ask spread;

7. There is significant decline or absence of a market for issuances (that is, a primary market) for the asset or liability or similar assets or liabilities; and

8. Little information is released publicly (for example, a principal-to-principal market).

FSP SFAS 157-4, ¶ 12.

A reporting entity must "evaluate the significance and relevance of those factors to determine whether, based on the weight of the evidence, there has been a significant decrease in volume and level of activity for the asset or liability." *Id.* Then, if an entity "concludes [that] there has been a significant decrease in the volume and level of activity in relation to normal market activity . . . [and that] transactions or quoted prices may not be determinative of fair value, . . . [f]urther analysis of the transaction or quoted price is needed, and a significant adjustment to the transaction or quoted prices may be necessary to estimate fair value in accordance with [SFAS] 157." *Id.* ¶ 13.

"If there has been a significant decrease in the volume and level of activity for the asset or liability, a change in valuation technique or the use of multiple valuation techniques may be appropriate (for example, the use of a market approach and a present value technique)." *Id.* ¶ 14. "When weighing indications of fair value resulting from the use of multiple valuation techniques, a reporting entity shall consider the

reasonableness of the range of fair value estimates." *Id.* "The objective is to determine the point within that range that is most representative of fair value under current market conditions," and "[a] wider range of fair value estimates may be an indication that further analysis is needed." *Id.* FSP SFAS 157-4 reiterates that "[e]ven in circumstances where there has been a significant decrease in the volume and level of activity for the asset or liability, . . . the objective and definition of a fair value measurement remains the same" as under SFAS 157. *Id.* ¶ 15. While "[d]etermining the price at which willing market participants would transact at the measurement date under current market conditions if there has been a significant decrease in the volume and level of activity . . . depends on the facts and circumstances and requires the use of significant judgment," a "reporting entity's intention to hold the asset or liability is not relevant in estimating fair value," and fair value remains "a market-based measurement, not an entity-specific measurement." *Id.*

### B. Legal Standards Governing Retrospective Review of Validity of Valuations for Bankruptcy Analysis

This Part addresses the legal standard that courts employ in deciding whether to defer to a company's contemporary asset valuations in the context of a solvency analysis.

### 1. Insolvency: Relationship to Mark-to-Market Valuations

There is a close relationship between the valuation that underlies a solvency analysis and SFAS 157.[21]   Under SFAS 157, fair value is the "price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." SFAS 157, ¶ 5.  SFAS 157 presumes that the asset will be on the market for "a period prior to the measurement date to allow for marketing activities that are usual and customary for transactions involving such assets and liabilities; it is not a forced transaction (for example, a forced liquidation or distress sale)."  *Id*. ¶ 7.  Similarly, the fair value of an asset in a solvency analysis is "the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time."  *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc).* 78 F.3d 30, 35 (2d Cir. 1996).  "[T]he market value, not the distress value, should apply, . . . as this is a valuation proceeding, not the judicial review of a sale."  *Durso Supermarkets, Inc. v. D'Urso (In re Durso Supermarkets, Inc.),* 193 B.R. 682, 701 (Bankr. S.D.N.Y. 1996). Accordingly, the two standards are closely aligned.

### 2. Hindsight Analysis in Insolvency Determinations

Courts consistently have emphasized that the determination of a company's fair value at the time of a disputed transfer must be assessed using information that was reasonably available at the time of the transfer.  *See Mellon Bank, N.A. v. Official Comm. of*

---

[21] *See* Section IV.A.2.a of this Appendix, which discusses the determination of insolvency in connection with avoidance transactions under Section 548 of the Bankruptcy Code.

*Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 155 (3d Cir. 1996) ("The use of hindsight to evaluate a debtor's financial condition for purposes of the Code's 'insolvency' element has been criticized by courts and commentators alike."); *Wolkowitz v. Am. Research Corp. (In re DAK Industries, Inc.)*, 195 B.R. 117 (Bankr. C.D. Cal. 1996) ("'[C]aution should be taken not to consider property as "dead" merely because hindsight teaches that the debtor was traveling on the road to financial ruin.'" (quoting *Matter of Taxman Clothing Co., Inc.*, 905 F.2d 166, 170 (7th Cir. 1990))); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) ("[A] court must consider the reasonableness of the company's projections, not with hindsight, but with respect to whether they were prudent when made."); *Energy Coop., Inc. v. Cities Serv. Co. (In re Energy Coop., Inc.)*, 109 B.R. 822, 824 (Bankr. N.D. Ill. 1989) ("[C]ase law precludes hindsight, perfect though that vision may be, so the inquiry as to value needs greater analysis."); *Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.)*, 91 B.R. 430, 438 (Bankr. N.D. Ohio 1988) ("The court feels that participants in an LBO must be protected from the perfect hindsight often evidenced in creditors' subsequent attack on the corporate buyout."); Raymond J. Blackwood, Note, *Applying Fraudulent Conveyance Law to Leveraged Buyouts*, 42 DUKE L.J., 340, 381 (1992) ("[C]ourts should take care not to indulge in hindsight."); Kenneth C. Kettering, *The Pennsylvania Uniform Fraudulent Transfer Act*, 65 PA.B.A.Q. 67, 75 (1994) ("The debtor

should not be responsible as a matter of hindsight for developments that could not reasonably have been foreseen at the time of the transfer.").

If a company's projections were reasonable at the time of a challenged transfer, then a court will accept the projections as accurate, even if the projections turned out to have been overly optimistic. *See, e.g., In re Mirant Corp.*, 334 B.R. 800, 825 (Bankr. N.D. Tex. 2005) ("There was substantial evidence presented to show that the Business Plan was prepared in a reasonable manner, using supportable assumptions and logically consistent computations. The court finds and concludes that the Business Plan constitutes a fair, reasonable projection of future operations of Mirant Group."); *Brandt v. Samuel, Son & Co. (In re Longview Aluminum, L.L.C.)*, Nos. 03 B 12184, 04 A 01051, 04 A 00276, 04 A 00279, 2005 WL 3021173, at *7, 9 (Bankr. N.D. Ill. July 14, 2005) (noting the importance of "avoid[ing] hindsight bias" and concluding that, "[w]ithout a firm basis to replace management's cost projections," those projections should be accepted); *In re Fiberglass Indus., Inc.*, 74 B.R. 738, 745 (Bankr. N.D.N.Y. 1987) ("The Court . . . rejects the eleventh hour revision and accepts the debtors' projections . . . as the most competent and reliable estimate of the debtors' future performance available."); *Credit Managers Ass'n v. Fed. Co.*, 629 F. Supp. 175, 186-87 (C.D. Cal. 1985) ("With 20-20 hindsight it is clear that [the debtor's] cash flows did not work out as projected . . . [but] the court's task . . . is not to examine what happened . . . but whether the . . . projections . . . were

prudent."); *In re Duplan Corp.*, 9 B.R. 921, 926 (S.D.N.Y. 1980) (deferring to "informed judgment from management regarding earnings").

The Bankruptcy Court recently applied those principles in *Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)* 373 B.R. 283 (Bankr. S.D.N.Y. 2007)). In that case, the creditors' committee sought to avoid $3.7 billion in prepetition transfers. *Id*. at 290. Following a bench trial, the court entered judgment for the defendants, concluding that the committee had not presented sufficient evidence to establish insolvency. *Id.* at 296. The court explained that "[t]he failure of a business, even a monumental failure, does not alone prove the insolvency of the business in the months and years prior to its demise." *Id.* at 346. It observed that the committee's "case relies, in part, on the common sense proposition that Iridium's failure is a strong indication of its insolvency." *Id.* at 345. However, the court "reject[ed] the use of improper hindsight analysis in valuing a company's pre-bankruptcy assets." *Id.* It concluded that the "failure to foresee that Iridium was ultimately doomed to fail does not mean that the original projections must have been wrong or were unreasonable when they were created." *Id.* at 295.

In *In re Iridium*, the court noted that the reasonableness of a valuation must be assessed according to the information available at the time of the valuation. *Id*. at 299. To the extent there is little hard data available, the company must rely on subjective, unmeasurable inputs, and there may be a broad array of reasonable valuations. The

court concluded that "[w]hen there is 'substantial evidence presented to show that [a] business plan was prepared in a reasonable manner, using supportable assumptions and logically consistent computations,' a 'business plan constitutes a fair, reasonable projection of future operations' and 'alternative projections of future operations' should be rejected.'" *Id*. (quoting *In re Mirant*, 334 B.R. at 825).

That analysis does not imply, however, that a company's internal valuations are inviolate or that subsequent events are irrelevant to a company's solvency. In *In re Iridium*, the court agreed that it is appropriate to "consider postpetition events to some extent under certain circumstances." *Id*. at 345. For instance, "'it is not improper hindsight for a court to attribute "current circumstances" which may be more correctly defined as "current awareness" or "current discovery" of the existence of a previous set of circumstances.'" *Id*. (quoting *In re Coated Sales, Inc.*, 144 B.R. 663, 668 (Bankr. S.D.N.Y. 1992)). The court also acknowledged the "case law supporting the contention that a significant business failure may indicate insolvency a short time prior to filing of the bankruptcy petition." *Id*. at 346. As the Third Circuit has held, "[f]ar from 'hindsight or 'post-hoc' analysis, a court looks at the circumstances as they appeared to the debtor and determines whether the debtor's belief that a future event would occur was reasonable. The less reasonable a debtor's belief, the more a court is justified in reducing the assets (or raising liabilities) to reflect the debtor's true financial condition at the time of the alleged transfers." *R.M.L.*, 92 F.3d at 156; *see also Gillman v. Scientific*

*Research Prods., Inc. (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 556 (10th Cir. 1995) (rejecting the use of a "going concern valuation" because "inherent defects in nearly all aspects of the manufacturing process precluded the company from producing the product it intended to sell," and "[c]ircumstances did not change between July and the November shut-down date; it simply took management a few months to 'discover' and became 'aware' of those circumstances that existed beginning in July").

Courts are not bound to accept erroneous valuations of assets appearing in the debtor's records; the court may evaluate assets by considering information originating subsequent to the transfer date that tends to shed light on a fair and accurate assessment of assets as of the day of transfer. *See, e.g., In re Coated Sales.*, 144 B.R. at 668 ("[T]he court may consider information 'originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date (transfer date),'" because "[t]his assures that valuation is based in reality." (quoting *Chem. Separations Corp. v. Rohm and Haas Co. (In re Chem. Separations Corp.)*, 38 B.R. 890, 895-96 (Bankr. E.D. Tenn. 1984))); *Knapp v. Applewhite (In re Knapp)*, 119 B.R. 285, 288 (Bankr. M.D. Fla. 1990) ("In determining the issue of 'insolvency' in preference actions, the Court may ignore pre- or even post-petition valuations of assets that are overly optimistic or unrealistic. Accordingly, courts have refused to adopt 'solvent' figures from the debtors' schedules, when those schedules were determined to be an 'overly optimistic' appraisal of the debtor's assets in an effort to secure

financing."); *In re Chem. Separations Corp.*, 38 B.R. 890, 895-96 (Bankr. E.D. Tenn. 1984) ("[M]erely because the court must assess insolvency as of the date of the transfer does not mean that the court is bound to accept an erroneous valuation appearing on the debtor's records at the time. . . . [T]he court may properly consider the existence of subsequently apparent estimating errors that caused the accrued costs on contracts and construction in progress to be inaccurately reflected at the time in question. . . . [T]he adjustments actually serve only to correct errors existing at the time of the transfers and to realistically portray the correct status of the liability."); *Foley v. Beiden (In re Arrowhead Gardens)*, 32 B.R. 296, 300 (Bankr. D. Mass. 1983) (rejecting balance sheet as an accurate portrayal of the debtor's financial condition because it contained "several erroneous asset valuations"). Furthermore, a court is not obligated to defer to a speculative or unreliable valuation technique. *See, e.g., Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 348 B.R. 234, 278 (Bankr. D. Del. 2005) ("Given the unreliability of [the debtor's] future projections[,] [t]he discounted cash flow methodology is simply an unacceptable method to be used", the debtor's projections were unreliable because they "were speculative at best," "included growth rates significantly in excess of what was projected to be reasonable growth in the telecommunications industry," "relied heavily upon equity infusion which may or may not materialize in an unstable market," and because the debtor "historically . . . understated its expenses" and "the balance sheet . . . in actuality differed significantly from what [the debtor] had projected.").

One important factor supporting the reliability of a company's valuations is that they were validated by external sources at the time they were made.  In *In re Iridium*, for instance, the court noted that Iridium's projections were validated by its then-high stock price, deeming the stock price the "ideal datapoint" to determine the company's value. 373 B.R. at 346.  The court also emphasized that substantial work went into creating and testing projections at the time by the debtors and their outside experts.  *Id*. at 348.  The court noted that contemporary analyses by sophisticated investment bankers, accounting firms, and private investors confirmed that management's projections were reasonable.  *Id.*; *see also In re Duplan Corp*, 9 B.R. at 926 n.9; *In re Fiberglass Indus., Inc.*, 74 B.R. 738, 745-746 (Bankr. N.D.N.Y. 1987); *In re Longview Aluminum*, 2005 WL 3021173, at *7; *Davidoff v. Farina*, No. 04 Civ. 7617(NRB), 2005 WL 2030501, at *10-11 (S.D.N.Y. Aug 22, 2005)); *see also VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) ("Equity markets allow participants to voluntarily take on or transfer among themselves the risk that their projections will be inaccurate; fraudulent transfer law cannot rationally be invoked to undermine that function. . . . Market capitalization is a classic example of such an anchored projection, as it reflects all the information that is publicly available about a company at the relevant time of valuation. . . . A company's actual subsequent performance is something to consider when determining *ex post* the reasonableness of a valuation . . . but it is not, by definition, the basis of a substitute benchmark."); *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002) ("When sophisticated parties make reasoned

judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight."). *But cf. LaSalle Nat'l Bank Ass'n v. Paloian*, 406 B.R. 299, 352 (N.D. Ill. 2009) ("[A] preference for contemporaneous market evidence is by no means a requirement, and even where available, contemporaneous data does not preclude a court from assigning greater weight to expert testimony, particularly where, for example, the methodology employed at the time was itself faulty or biased. The trial court is always free to consider contemporaneous data in light of the methodology employed and in light of other evidence in the record."); *Am. Classic Voyages, Co. v. J.P. Morgan Chase Bank (In re Am. Classic Voyages, Co.*), 384 B.R. 62, 64-65 (D. Del. 2008) (*VFB* did not "compel . . . in the circumstances of this case" that bankruptcy court rely on the debtor's market capitalization, because whereas "[i]n *VFB*, the plaintiffs made no attempt to reconcile the disparity between the testimony of their expert witnesses and the objective value of the company at issue in the marketplace, . . . the data and analysis accepted by the Bankruptcy Court in this case was consistent with the available marketplace data.").

Finally, a court's deference to a company's internal projections is contingent on the absence of fraud. *See In re Iridium*, 373 B.R. at 345-46 ("[T]he Committee . . . failed to show that there was concealment of relevant circumstances at the time of the transfers

or that there was a subsequent discovery of such circumstances that must to be taken into account when determining Iridium's value.").  In reaching that conclusion, the *In re Iridium* court relied on the Supreme Court decision in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), which held that market prices constitute an accurate valuation of an asset *unless* they are distorted by securities fraud.  *In re Iridium*, 373 B.R. at 347; *see also Basic*, 485 U.S. at 244-47; *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 77 (2d Cir. 2004) (*Basic* "creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value.").