UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
                                  :
In re                              :     Chapter 11 Case No.
                                    :
LEHMAN BROTHERS HOLDINGS INC.,    :     08-13555 (JMP)
*et al.*,                                 :
                                    :     (Jointly Administered)
                    Debtors.       :
---------------------------------------------------------- x

# REPORT OF
# ANTON R. VALUKAS, EXAMINER

Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
312-222-9350

919 Third Avenue
37th Floor
New York, NY  10022-3908
212-891-1600

March 11, 2010                  *Counsel to the Examiner*

## VOLUME 8 OF 9

## Appendices 8 - 22

**EXAMINER'S REPORT**

**TABLE OF APPENDICES**

**VOLUME 6**

    **Tab 1**      Legal Issues

**VOLUME 7**

    **Tab 2**      Glossary, Acronyms & Abbreviations

    **Tab 3**      Key Individuals

    **Tab 4**      Witness Interview List

    **Tab 5**      Document Collection & Review

    **Tab 6**      Lehman Systems

    **Tab 7**      Bibliography

**VOLUME 8**

    **Tab 8**      Risk Management Organization and Controls

    **Tab 9**      Risk Appetite and VaR Usage Versus Limits Chart

    **Tab 10**    Calculation of Certain Increases in Risk Appetite Limits

    **Tab 11**    Compensation

    **Tab 12**    Valuation - Archstone

    **Tab 13**    Survival Strategies Supplement

    **Tab 14**    Valuation - CDO

    **Tab 15**    Narrative of September 4 Through 15, 2008

    **Tab 16**    Valuation - Residential Whole Loans

**Tab 17**   Repo 105

**Tab 18**   Summary of Lehman Collateral at JPMorgan

**Tab 19**   Lehman's Dealings with Bank of America

**Tab 20**   Knowledge of Senior Lehman Executives Regarding The Inclusion of Clearing-Bank Collateral in the Liquidity Pool

**Tab 21**   LBHI Solvency Analysis

**Tab 22**   Preferences Against LBHI and Other Lehman Entities

**VOLUME 9**

**Tab 23**   Analysis of APB, Journal Entry, Cash Disbursement, and JPMorgan Collateral

**Tab 24**   Foreign Exchange Transactions

**Tab 25**   Intercompany Transactions Occurring Within Thirty Days Before Bankruptcy

**Tab 26**   CUSIPs with Blank Legal Entity Identifiers

**Tab 27**   CUSIPs Not Associated with an LBHI Affiliate

**Tab 28**   CUSIPs Associated Solely with an LBHI Affiliate

**Tab 29**   CUSIPs Associated with Both LBI and LBHI Affiliates

**Tab 30**   CUSIPs Associated with Subordinated Entities

**Tab 31**   CUSIPs Associated with LBHI Affiliates Not Delivered to LBI in a Financing Trade

**Tab 32**   September 19, 2008 GFS Dataset

**Tab 33**   Summary Balance Sheets of LBHI Affiliates

**Tab 34**   Tangible Asset Balance Sheet Variations

# APPENDIX 8:  RISK MANAGEMENT ORGANIZATION AND CONTROLS

This Appendix summarizes: Lehman's risk management function, Lehman's most pertinent risk-related controls, who at Lehman was tasked with monitoring and enforcing the firm's risk management metrics and controls and how Lehman's officers described the firm's risk management function to its Board of Directors ("Board")[1], the rating agencies, and regulators.

## I.     OVERVIEW

Lehman viewed risk management as one of its core competencies.[2]  Lehman maintained an extensive risk management system, which was operated by its Global Risk Management Group ("GRMG"), risk managers embedded in the various business lines, and its Finance Department.   The firm allocated "substantial resources" to measuring, analyzing, and managing risk.[3]  By 2008, Lehman's GRMG had grown to include roughly 450 professionals, with staff in each of the firm's trading centers.[4]

---

[1] References to the Board of Directors in this Appendix refer to Lehman's outside directors, not to Fuld, who was Lehman's Chief Executive Officer, in addition to serving as Chairman of the Board.

[2] Lehman, Risk Update Presentation to Lehman Board of Directors (July 18, 2006), at p. 2 [LBEX-DOCID 2125293].

[3] Lehman, Quantitative Risk Management Policy Manual (Sept. 2007), at p. 3 [LBEX-DOCID 384020].

[4] Lehman, Risk Management Update Presentation to Lehman Board of Directors (Apr. 15, 2008), at p. 3 [LBHI_SEC07940_027909]; Madelyn Antoncic, Risk Management Presentation to Standard & Poor's [Draft] (Aug. 17, 2007), at p. 14 [LBEX-DOCID 342851], attached to e-mail from Lisa Rathgeber, Lehman, to Jeffrey Goodman, Lehman, *et al.* (Aug. 15, 2007) [LBEX-DOCID 305205]; Lehman, Risk Update Presentation to Lehman Board of Directors (July 18, 2006), at p. 7 [LBEX-DOCID 2125293].

Within the industry, Lehman's risk management function was widely regarded as among the best.[5]

GRMG's mission was to "protect and enhance the value of the franchise by proactively identifying, evaluating, monitoring and controlling Firm market, credit and operational risks."[6]  In addition to understanding and measuring the risks associated with the firm's business activities, GRMG was responsible for developing various risk-related policies, procedures, models, and limits.[7]

## II.  RISK MANAGEMENT GROUP DIVISIONS AND DIVISIONAL FUNCTIONS

GRMG was organized into various departments, including: Market Risk Management ("MRM"); Credit Risk Management ("CRM"); Operational Risk Management ("ORM"); Quantitative Risk Management ("QRM"); Sovereign Risk Management ("SRM"); Investment Management Division Risk Management ("IMDRM") and Risk Control and Analysis.[8]  Outside of the United States, GRMG was

---

[5] *See, e.g.,* Bill Brodows & Til Schuermann, FRBNY, Primary Dealer Monitoring: Initial Assessment of CSEs (May 12, 2008), at pp. 12-13 [FRBNY to Exam. 000017]; Lehman, Risk Update Presentation to Lehman Board of Directors (July 18, 2006), at p. 9 [LBEX-DOCID 2125293].

[6] Lehman, Risk Management Update Presentation to Lehman Board of Directors (Apr. 15, 2008), at p. 2 [LBHI_SEC07940_027909].

[7] SEC Division of Market Regulation, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (2005), at p. 3 [LBEX-DOCID 2125011], attached to e-mail from Michelle Davis, SEC, to David Oman, Lehman, *et al.* (Apr. 21, 2006) [LBEX-DOCID 2068428].

[8] Madelyn Antoncic, Risk Management Presentation to Standard & Poor's [Draft] (Aug. 17, 2007), at p. 11 [LBEX-DOCID 342851], attached to e-mail from Lisa Rathgeber, Lehman, to Jeffrey Goodman, Lehman, *et al.* (Aug. 15, 2007) [LBEX-DOCID 305205].

divided further into regional departments.[9]  Each department within GRMG was led by a global or regional head who reported to the firm's top risk manager directly.[10]

### A.  Market Risk Management

Market risk refers to the possibility that "changes in market rates, prices and volatilities" could cause an investment portfolio or financial instrument to lose value.[11] Typically, sources of market risk fall into three categories, including movements in: (1) interest rates; (2) equity prices; or (3) foreign exchange rates.[12]

MRM was responsible for measuring, monitoring, reporting, and analyzing the firm's exposure to market risk.[13]  In addition, MRM was charged with ensuring that the market risks associated with the firm's business activities were captured by an appropriate metric[14] and monitoring the business lines' adherence to certain risk limits.[15]

---

[9] *Id.*

[10] Lehman, Risk Update Presentation to Lehman Board of Directors (July 18, 2006), at p. 4 [LBEX-DOCID 2125293].

[11] Lehman, ICAAP Supporting Document:  Market Risk Management Overview [Draft] (May 2008), at p. 4 [LBEX-DOCID 383057], attached to e-mail from Paul Shotton, Lehman, to Lisa Rathgeber, Lehman, *et al.* (July 31, 2008) [LBEX-DOCID 258308].

[12] Jared Pedowitz, E&Y, BMRM-Market Risk Management Walkthrough Template (Nov. 30, 2007), at p. 5 [EY-LE-LBHI-KEYPERS 1015089].

[13] SEC Division of Market Regulation, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (2005), at p. 8 [LBEX-DOCID 2125011], attached to e-mail from Michelle Davis, SEC, to David Oman, Lehman, *et al.* (Apr. 21, 2006) [LBEX-DOCID 2068428].

[14] Lehman, Risk Update Presentation to Lehman Board of Directors (July 18, 2006), at p. 5 [LBEX-DOCID 2125293].

[15] Jared Pedowitz, E&Y, BMRM-Market Risk Management Walkthrough Template (Nov. 30, 2007), at p. 6 [EY-LE-LBHI-KEYPERS 1015089].

The Global Head of MRM was responsible for maintaining regular contact with each trading area.[16] To encourage the development of a close working relationship between MRM and the businesses, Lehman stationed market risk managers physically on the trading floors that they covered.[17]

In May 2004, Paul Shotton became Lehman's Global Head of MRM after Madelyn Antoncic was promoted from that position to Chief Risk Officer ("CRO").[18] In late 2006, Shotton shifted roles to become Lehman's Global Head of Risk Control.[19] Throughout 2007 and 2008, the top MRM position remained vacant.[20]

### B. Credit Risk Management

Credit risk is defined as "the possibility that [a] counterparty or an issuer of securities or other financial instruments . . . will be unable to honour its contractual obligations."[21] CRM was "responsible for the continuous monitoring of counterparties' internal ratings, credit limits and exposures to ensure they remain[ed] appropriate in light of market events and each counterparty's financial condition."[22] Additionally, CRM was charged with "identifying and monitoring concentrations and correlations in

---

[16] *Id*. at p. 5.

[17] *Id*.

[18] Examiner's Interview of Paul Shotton, June 5, 2009, at p. 4.

[19] *See id*. at pp. 4-5, 24.

[20] *Id*. at p. 24.

[21] Lehman, ICAAP Supporting Document: Credit Risk Management Overview [Draft] (May 2008), at p. 4 [LBEX-DOCID 383061], attached to e-mail from Paul Shotton, Lehman, to Lisa Rathgeber, Lehman, *et al.* (July 31, 2008) [LBEX-DOCID 258308].

[22] *Id*. at p. 8.

counterparty credit risk exposures across counterparties, . . . industries, . . . products, and countries."[23]

The Global Head of CRM reported directly to the CRO.[24] From August 2006 to June 2007, Lehman's top CRM post was unoccupied.[25] In June 2007, Lehman hired Vincent DiMassimo to fill the Global Head of CRM position within GRMG.[26]

## C. Quantitative Risk Management

QRM was charged with "developing, implementing and maintaining the risk methodologies and systems used [to measure market, credit and operational risks,] . . . as well as validating the pricing and valuation models used by the trading units of the Firm."[27] QRM was comprised of four sub-groups, including: (1) Market Risk Analytics; (2) Credit Risk Analytics; (3) Operational Risk Analytics; and (4) Model Validation.[28] The Market, Credit and Operational Risk Analytics sub-groups were "responsible for the development, maintenance and operation of the [firm's] risk quantification methodologies."[29] The Model Valuation Group was "responsible for independently reviewing and approving the pricing models used across the Firm."[30]

---

[23] *Id.*
[24] *Id.* at p. 7.
[25] Examiner's Interview of Paul Shotton, June 5, 2009, at p. 25.
[26] Examiner's Interview of Vincent DiMassimo, Sept. 15, 2009.
[27] Lehman, Quantitative Risk Management Policy Manual (Sept. 2007), at p. 3 [LBEX-DOCID 384020].
[28] *Id.*
[29] *Id.*
[30] *Id.*

## III.    RISK METRICS

GRMG's "Three Core Functions" were: (1) "Understanding and identifying all risks;" (2) "Ensuring that appropriate limits [were] in place for all transactions and products;" and (3) "Protecting the Firm against 'catastrophic' loss."[31]  Each of these core functions required GRMG to develop systems to "measure the risk for all products."[32] Because "[n]o single measure [could] capture[] all dimensions of risk," GRMG "measure[d] risk from multiple perspectives, using varying methodologies."[33]

Lehman's risk management system included several central risk-related controls. Some of these controls were merely monitored or measured, while others included limits that were intended to be enforced.

These key risk-related controls were: (1) risk limits (Value-at-Risk ("VaR") and risk appetite); (2) stress or scenario tests; (3) equity adequacy or liquidity controls (of which Lehman had several); (4) single transaction limits; and (5) balance sheet limits. Although each risk-related control was different, they reinforced one another, providing multiple layers of controls and multiple signals as to whether Lehman was potentially taking too much risk.

---

[31] Lehman, Risk Update Presentation to Lehman Board of Directors, (July 18, 2006), at p. 15 [LBEX-WGM 986315].

[32] *Id.*

[33] Lehman, Risk Management Update Presentation to Lehman Board of Directors (Apr. 15, 2008) at p. 4 [LBHI_SEC07940_027909].

## A. Risk Limits

### 1. VaR

VaR is a measure of market risk, which is expressed as the "maximum amount that can be expected to be lost with a certain degree of certainty over a given time horizon."[34] More generally, VaR reflects the maximum amount that a firm's liquid trading positions could decline in value "due to normal market movements" over a fixed period of time, calculated a particular degree of certainty.[35] Lehman maintained two distinct VaR calculations to measure its market risk exposure for internal and external reporting purposes.

Lehman defined its internal VaR metric as "an estimate of the potential decline in value of the Firm's trading positions due to normal market movements over a one-day holding horizon [calculated] at a 95% confidence level."[36] Thus, Lehman's internal VaR was an expression of the firm's maximum potential one-day loss on its trading positions under normal market conditions in any one of 19 trading days over a 20 trading day period.

#### a) Regulatory Reporting Requirements

Under Item 305 of Regulation S-K of the Federal Securities Laws, Lehman and its banking industry competitors were required to make certain quantitative and

---

[34] SEC Division of Market Regulation, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (2005), at pp. 10-11 [LBEX-DOCID 2125011], attached to e-mail from Michelle Davis, SEC, to David Oman, Lehman, *et al.* (Apr. 21, 2006) [LBEX-DOCID 2068428].

[35] Jared Pedowitz, E&Y, BMRM-Market Risk Management Walkthrough Template (Nov. 30, 2007), at p. 6 [EY-LE-LBHI-KEYPERS 1015089].

[36] Lehman, Global Risk Management Second Quarter 2008 Report (July 21, 2008), at p. 26 [LBEX-DOCID 738522].

qualitative disclosures regarding market risk.[37]  Specifically, financial institutions were required to make disclosures regarding their exposure to market risk in one of three ways, one of which was publicly reporting VaR.[38]  Like many of its competitors, Lehman chose to disclose information regarding its exposure to market risk by publicly reporting VaR.[39]

For regulatory purposes, Lehman calculated VaR at a 99% confidence level.[40] Thus, whereas Lehman's internal VaR was an expression of the firm's maximum potential one day loss on its trading positions under normal market conditions in any one of 19 trading days over a 20 trading day period, its regulatory VaR calculation was an expression of the firm's maximum potential one day loss on its trading positions under normal market conditions in any one of 99 trading days over a 100 trading day period.

### b) Limits

Lehman maintained VaR limits.  Under Lehman's MRM VaR limit policy, the firm set VaR limits for the business at the firm-wide, divisional, business line, and regional levels.[41]  These limits represented the maximum amount that Lehman was willing to lose under normal market conditions in any one of 19 trading days over a 20

[37] 17 C.F.R. § 229.305(a) (2007).

[38] 17 C.F.R. § 229.305(a)(1).

[39] *See, e.g.*, Lehman Brothers Holdings Inc., Quarterly Report as of Aug. 31, 2007 (Form 10-Q) (filed on Oct. 10, 2007), at p. 78 ("LBHI 10-Q (filed Oct. 10, 2007)").

[40] Lehman, Market Risk Management: VaR Back-Testing Procedures (Mar. 2008), at p. 2 [LBEX-DOCID 382975].

[41] Lehman, Global Risk Management, Second Quarter 2008 Report (July 21, 2008), at p. 29 [LBEX-DOCID 738522].

trading day period, calculated at both the firm-wide level and each divisional, business line, and regional level within the firm. In large part, Lehman's VaR limit policy mirrored the firm's risk appetite limit policy. Because one element of Lehman's risk appetite usage calculation was essentially an annualized computation of the firm's VaR, and because Lehman placed more emphasis on risk appetite than VaR, the Examiner focused on risk appetite more heavily than VaR in his investigation of Lehman's risk management practices.

## 2. Risk Appetite

In both its internal and external communications, Lehman consistently described its risk appetite framework as the firm's primary expression of its overall "risk tolerance."[42] Whereas VaR measured the firm's exposure to market risks only, risk appetite was an integrated measurement of the firm's market, counterparty credit, and event risk.[43]

Lehman's risk appetite limit was designed to describe the maximum amount of risk that Lehman could take, and still return an acceptable profit, even if the firm suffered a loss in the 95th percentile of severity. Lehman defined risk appetite as "the amount of money that the Firm [was] 'prepared to lose' over one year due to market,

---

[42] *See, e.g.,* Lehman, Global Risk Management Second Quarter 2008 Report (July 21, 2008), at p. 22 [LBEX-DOCID 738522]; *see also* Madelyn Antoncic, Risk Management Presentation to Standard & Poor's [Draft] (Aug. 17, 2007), at p. 21 [LBEX-DOCID 342851], attached to e-mail from Lisa Rathgeber, Lehman, to Jeffrey Goodman, Lehman, *et al.* (Aug. 15, 2007) [LBEX-DOCID 305205].

[43] Lehman, Risk Update Presentation to Lehman Board of Directors (July 18, 2006), at pp. 16-19 [LBEX-WGM 986315]; Lehman, Risk Management Update Presentation to the Lehman Board of Directors (Apr. 15, 2008) at pp. 5-7 [LBHI_SEC07940_027909].

event and counterparty credit risk."[44]  The metric was designed "to maintain a minimally acceptable [return to its investors] and compensation adequacy including maintaining sufficient headcount to protect the franchise for the long-term."[45]  Thus, risk appetite was a numerical expression of "the largest reduction in revenue [that] Lehman [could] tolerate without suffering larger adverse consequences . . . such as compensation inadequacy, ratings downgrades, or loss of confidence in the Firm."[46]

In both internal communications and statements to its external constituents, Lehman consistently identified risk appetite as the "center" of the firm's "approach to risk."[47]  Between 2006 and 2008, Lehman's management discussed the firm's risk appetite figures with members of the Board at every meeting of the Finance and Risk Committee[48] and reviewed its risk appetite calculations with members of the Securities

---

[44] Lehman, ICAAP Supporting Document: Market Risk Management Overview [Draft] (May 2008), at p. 4 [LBEX-DOCID 383057], attached to e-mail from Paul Shotton, Lehman, to Lisa Rathgeber, Lehman, *et al.* (July 31, 2008) [LBEX-DOCID 258308].

[45] Lehman, ICAAP Supporting Document: Operational Risk Management Overview [Draft] (May 2008), at p. 10 [LBEX-DOCID 384019], attached to e-mail from Paul Shotton, Lehman, to Lisa Rathgeber, Lehman, *et al.* (July 31, 2008) [LBEX-DOCID 258308].

[46] Jared Pedowitz, E&Y, BMRM-Market Risk Management Walkthrough Template (Nov. 30, 2007), at p. 9 [EY-LE-LBHI-KEYPERS 1015089]; *see also* Lehman, Risk Update Presentation to Lehman Board of Directors (July 18, 2006), at p. 16 [LBEX-DOCID 1362012].

[47] *See, e.g.,* Jared Pedowitz, E&Y, BMRM-Market Risk Management Walkthrough Template (Nov. 30, 2007), at p. 9 [EY-LE-LBHI-KEYPERS 1015089]; Madelyn Antoncic, Risk Management Presentation to Standard & Poor's [Draft] (Aug. 17, 2007), at p. 23 [LBEX-DOCID 342851], attached to e-mail from Lisa Rathgeber, Lehman, to Jeffrey Goodman, Lehman, *et al.* (Aug. 15, 2007) [LBEX-DOCID 305205].

[48] *See, e.g.,* Lehman Brothers Holdings Inc., Minutes of Meeting of Finance and Risk Committee of Lehman Board of Directors (Jan. 30, 2007), at pp. 1-3 [LBEX-AM 067014]; Lehman Brothers Holding Inc., Minutes of the Finance and Risk Committee of Lehman Board of Directors (Jan. 29, 2008), at p. 3 [LBEX-AM 067022]; Lehman Brothers Holdings Inc., Minutes of Finance and Risk Committee of Lehman Board of Directors (Mar. 25, 2008) at p. 3 [LBEX-AM 003592].

and Exchange Commission ("SEC") on a monthly basis.[49]   Risk appetite was the first item listed on numerous internal periodic reports, many of which were circulated to the firm's senior management.[50]

In presentations to regulators, rating agencies, and clients, Lehman represented risk appetite as a fundamental aspect of its risk management function.[51]   Moody's believed risk appetite was a critical "constrain[t on the firm's] risk-taking at the portfolio level"[52] and stated that firm-wide risk appetite limit "determin[ed] the most appropriate overall level of risk the Firm should be taking."[53]   The SEC believed Lehman's risk management function to be uniquely comprehensive because "unlike . . . its peer firms, [Lehman was able to manage its] market and credit risk . . . in an

[49] *See* Lehman, Risk Update Presentation to Lehman Board of Directors (July 18, 2006), at p. 12 [LBEX-DOCID 1362012] ("Representatives of Finance and Risk meet monthly with the SEC (division of Market Regulation) to discuss the Firm's risk metrics . . . ").

[50] *See, e.g.*, Lehman, Firm-Wide Risk Drivers Report (Apr. 30, 2007) [LBEX-DOCID 149714]. attached to e-mail from Rui Li, Lehman, to David Goldfarb, Lehman, *et al.* (May 1, 2007) [LBEX-DOCID 152003]; Lehman, Firm-Wide Risk Drivers Report (Oct. 22, 2007), at p. 1 [LBEX-DOCID 163741], attached to e-mail from Beate Geness, Lehman, to Herbert  H. McDade, III, Lehman, *et al.* (Oct. 22, 2007) [LBEX-DOCID 177381].

[51] *See, e.g.*, Madelyn Antoncic, Risk Management Presentation to Standard & Poor's [Draft] (Aug. 17, 2007), at p. 23 [LBEX-DOCID 342851], attached to e-mail from Lisa Rathgeber, Lehman, to Jeffrey Goodman, Lehman, *et al.* (Aug. 15, 2007) [LBEX-DOCID 305205] (referring to risk appetite as the "center of [the firm's] approach to risk" in presentation to rating agency); Lehman, Risk Management: An Integrated Framework [Draft], at p. 9 [LBEX-DOCID 264161] (describing risk appetite as "the center of [the firm's] approach to risk"), attached to e-mail from Paul Shotton, Lehman, to Lisa Rathgeber, Lehman (May 19, 2008) [LBEX-DOCID 383304] (indicating that this presentation was intended to be a starting point in making presentations to clients); SEC, Lehman Monthly Risk Review Meeting Notes (Oct. 19, 2007), at pp. 5-6 [LBEX-SEC 007438] (indicating that risk appetite was extensively discussed at meeting); SEC Division of Market Regulation, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (2005), at pp. 4-6 [LBEX-DOCID 2125011] (illustrating the importance of the risk appetite limit to the SEC, derived from Lehman's representations about the metric) attached to e-mail from Michelle Davis, SEC, to David Oman, Lehman, *et al.* (Apr. 21, 2006) [LBEX-DOCID 2068428].

[52] Moody's, Risk Management Assessment of Lehman Brothers Holdings, Inc. [Draft] (Apr. 4, 2006), at p. 4 [LBEX-DOCID 1362015].

[53] Lehman, Development of the Franchise Presentation to Moody's [Draft] (May 31, 2006), at p. 44 [LBEX-DOCID 1342436].

integrated fashion, through their aggregation into a single measure called risk appetite."[54]  Similarly, Moody's believed that Lehman's risk appetite metric was a "more formalized and more holistic [risk measuring framework] than [those of] most others in the industry."[55]  The rating agencies relied on Lehman's representations regarding its risk appetite metric to support the positive ratings that they assigned to the Lehman franchise.[56]

### a)  Limit Policy

According to Lehman's Market Risk Management Limit Policy ("Limit Policy"), the "establishment and maintenance of a sound system of integrated market risk limits" was "fundamental" to Lehman's risk management function.[57]  Lehman's Limit Policy defined limits as "the level at which intervention [was] required from more Senior Management."[58]  One of GRMG's primary responsibilities was "[e]nsuring that appropriate limits [were] in place" for the business.[59]  GRMG was charged with setting various risk limits for the business, tracking the firm's actual risk against those limits and "[a]dministering limits and management action triggers" for the business.[60]

---

[54] SEC Division of Market Regulation, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (2005), at p. 1 [LBEX-DOCID 2125011].

[55] Moody's, Risk Management Assessment of Lehman Brothers Holdings, Inc. [Draft] (Apr. 4, 2006), at p. 4 [LBEX-DOCID 1362015].

[56] *See, e.g.*, Moody's, Risk Management Assessment of Lehman Brothers Holdings, Inc. [Draft] (Apr. 4, 2006), at pp. 1, 4 [LBEX-DOCID 1362015].

[57] Lehman, Market Risk Management Limit Policy Manual (Oct. 2006), at p. 1 [LBHI_SEC07940_767665].

[58] *Id.*

[59] Lehman, Risk Update Presentation to Lehman Board of Directors (July 18, 2006), at p. 15 [LBEX-DOCID 1362012].

[60] Lehman, Global Risk Management - Second Quarter 2008 Report (July 21, 2008), at p. 14 [LBEX-DOCID 738522].

Lehman's risk appetite limits were "set at a Firm-wide level, and cascaded down to the Divisions and Lines of Business within each Division on a global and regional basis."[61] The Limit Policy contained several discrete sets of policies and procedures, which were specific to each tier of limits (*e.g.*, firm-wide, divisional, and business line).

Lehman's Limit Policy expressed Lehman's "'zero tolerance' approach to the intentional breaching of limits."[62] Under the Limit Policy, individuals who were responsible for "intentionally and flagrantly" breaching limits were subject to reprimand and faced possible termination, "depending on the circumstances."[63]

### (1) Business Line and Regional Limits

Lehman's lowest level of risk appetite limits were its business line and regional limits. Because these were relatively low-level limits, Lehman's officers had more flexibility to adjust or exceed these limits than the higher-level limits discussed below.

Under the Limit Policy, Lehman's risk appetite limits set within a Division, both regionally and by Line of Business, were set by MRM in conjunction with the Division Heads.[64] MRM allocated the firm-wide limit across the firm's business lines and regions based on: (1) "the performance expectations of each business and their risk/return profiles;" (2) considerations regarding the amount of risk-taking capacity needed to

---

[61] Lehman, Market Risk Management Limit Policy Manual (Oct. 2006), at p. 1 [LBHI_SEC07940_767665].

[62] *Compare* Lehman, Market Risk Management Limit Policy Manual (Mar. 31, 2005), at p. 1 [LBEX-DOCID 363433], *and* Lehman, Market Risk Management Limit Policy Manual (Oct. 2006), at p. 1 [LBHI_SEC07940_767665], *and* Lehman, Global Risk Management, Second Quarter 2008 Report (July 21, 2008), at p. 28 [LBEX-DOCID 738522], *with* Lehman, Market Risk Management Policy [Draft] (Mar. 2008), at pp. 1-2 [LBHI_SEC07940_767662] (removing "zero tolerance" language).

[63] Lehman, Market Risk Management Limit Policy Manual (Mar. 31, 2005), at p. 1 [LBEX-DOCID 363433].

[64] Lehman, Market Risk Management Limit Policy Manual (Oct. 2006), at p. 1 [LBHI_SEC07940_767665].

support "the overall product suite" that the firm's clients desired and expected; and (3) the firm's business model and any adjustments that were planned regarding changes in the firm's "business mix."[65]

According to the Limit Policy, when a business line's or region's risk appetite limit was approached or exceeded, the division head was to determine "the appropriate course of action, taking into account the advice of [Market Risk Management]."[66] "Provided that the limit for the Division h[ad] not been breached," the division head could "re-allocate [the] intra-Divisional limits, subject to the advice of MRM" so as to bring the business line or geographic usage back under the applicable limit.[67] Alternatively, "the CRO [was] empowered to grant a temporary waiver of an intra-Divisional limit excess" at the end of which "the limit [would] revert to the previous level."[68]

In cases in which intra-divisional excesses occurred frequently, GRMG and the business were required to either: (1) take action to lower the risk within the business line or geographic region; (2) convene a meeting to review the cause of the limit excesses; (3) review the applicable risk measuring methodology; and/or (4) adjust the allocated risk limit of the business line or geographic region.[69] When a business line's risk appetite limit excess caused a divisional limit to be exceeded, the firm was required

---

[65] Lehman, Global Risk Management Second Quarter 2008 Report (July 21, 2008), at p. 22 [LBEX-DOCID 738522].
[66] Lehman, Market Risk Management Limit Policy Manual (Mar. 31, 2005), at p. 2 [LBEX-DOCID 363433].
[67] Lehman, Market Risk Management Limit Policy Manual (Oct. 2006), at p. 2 [LBHI_SEC07940_767665].
[68] Id.
[69] Id.

to resolve the issue in accordance with the Limit Policy's applicable divisional excess policies and procedures.

### (2) Divisional Limits

Divisional limits were considered somewhat harder than the business line and regional limits discussed above. When a divisional limit was "approached" or seemed "likely to be exceeded," the Limit Policy required the issue to be "escalated both within [Market Risk Management] and the Division . . . as appropriate."[70] In such situations, the division head and GHRM had to take one of three courses of action to resolve the issue.[71] These three options included: (1) "[A]llow the excess to remain for an agreed period of time;" (2) [A]gree, in some circumstances, to revise the limits if, for example, there h[ad] been a change in the business which [would] warrant[] such a change; or (3) decide to "reduce the risk profile [of the division] back within the limit." The Executive Committee, however, was required to approve MRM's allocation of the divisional limits.[72]

### (3) Overall Firm-Wide Limit

The firm-wide risk appetite limit was at the top of Lehman's risk limit structure. In some respects, this limit was the hardest of Lehman's risk appetite limits.

Finance set the firm-wide risk appetite limit,[73] and the Executive Committee (prior to 2008) or the Risk Committee (2008) approved the limit and any changes to the

---

[70] Lehman, Market Risk Management Limit Policy (Mar. 2008), at p. 2 [LBEX-DOCID 363560].
[71] *Id.*
[72] Lehman, Market Risk Management Limit Policy Manual (Oct. 2006), at p. 1 [LBHI_SEC07940_767665].
[73] Examiner's Interview of Robert Azerad, Sept. 23, 2009, at p. 3.

limit.[74]  Whereas some witnesses said that the Executive Committee needed the Board's approval to change the firm-wide risk appetite limit,[75] others stated that the Executive Committee needed only to inform the Board of any decision it made regarding changes to the firm-wide limit.[76]  Although various communications to external constituents reflect that the Board was required to approve Lehman's firm-wide risk appetite limit on an annual basis,[77] nothing on the face of the Limit Policy required the Executive Committee to obtain the Board's approval before amending the firm-wide risk appetite limit.[78]

The Limit Policy stated that "any . . . breaches of, [the firm-wide] limit require approval of the Executive Committee."[79]  The Limit Policy, however, was silent with respect to the course of action that the Executive Committee should take in response to a firm-wide risk appetite limit excess.[80]

The SEC's 2005 review of Lehman's MRM and CRM functions, which was sent to Lehman for its review and approval, says that the SEC understood the firm-wide risk appetite limit to be "a binding constraint on risk-taking," which was "not meant to be

[74] *Compare* Lehman, Market Risk Management Limit Policy (Oct. 2006), at p. 1 [LBHI_SEC07940_ 767665] *with* Lehman, Market Risk Management Limit Policy [Draft] (Mar. 2008), at p. 1 [LBHI_SEC07940_767662].

[75] Examiner's Interview of David Goldfarb, Sept. 21, 2009, at pp. 7-8.

[76] Examiner's Interview of Henry Kaufman, May 19, 2009, at p. 7.

[77] Lehman, Moody's: Development of the Franchise (May 31, 2006), at p. 44 [LBEX-DOCID 1342436].

[78] *See* Lehman, Market Risk Management Limit Policy Manual (Oct. 2006) [LBHI_SEC07940_767665].

[79] *Id.* at p. 1.

[80] *See id*.

exceeded under any conditions."[81]   Several witnesses agreed that the firm-wide risk appetite limit was a binding constraint on the business that was not to be exceeded for any significant period of time, for any reason.[82]  Additionally, Lehman's executives told the firm's external constituents repeatedly that the firm-wide risk appetite limit represented a stringent control.[83]

On the other hand, several witnesses stated that the firm-wide risk appetite limit was set below the firm's true risk-taking "capacity."[84]  Still others were of the view that the reason for the limit excess needed to be considered in evaluating whether the excess needed to be cured immediately.[85]   Others said that the risk appetite limit was a guideline, which was not intended to constrain the business' risk-taking activities at

---

[81] SEC Division of Market Regulation, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (2005), at p. 5 [LBEX-DOCID 2125011].

[82] For example, Lehman's former Head of Fixed Income Strategy, Kentaro Umezaki, said that the business had no discretion to do anything in response to breaches of the firm-wide risk appetite limit, other than bring its risk exposure down immediately.  Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 5.  Similarly, Paul Shotton said that the firm-wide risk appetite limit was "obviously" a "hard" limit, meaning that breaches needed to be cured immediately.  Examiner's Interview of Paul Shotton, June 5, 2009, at p. 10.  In July 2007, both Jeffrey Goodman, Senior Risk Manager for the Fixed Income Division, and Antoncic told members of the SEC that risk appetite represented a "hard" limit on the business' risk-taking activities.  SEC, Lehman Monthly Risk Review Meeting Notes (July 19, 2007), at p. 5  [LBEX-SEC 007363-70] ("Jeff [Goodman] told us that . . . VaR is just one measure that Lehman uses, and is more of a speed bump/warning sign that a true, hard limit -- that role falls to[risk appetite]. . . . He said that Madelyn [Antoncic], Dave [Goldfarb], and the executive committee tend to look more at [risk appetite].  As an aside, Madelyn came in after Jeff's explanation and gave virtually the same speech.").

[83] See, e.g., Madelyn Antoncic, Risk Management Presentation to Standard & Poor's [Draft] (Aug. 17, 2007), at p. 21 [LBEX-DOCID 342851] ("The overall philosophy of our Firm is that we have a zero tolerance level for ignoring limits and internal processes."), attached to e-mail from Lisa Rathgeber, Lehman, to Jeffrey Goodman, Lehman, et al. (Aug. 15, 2007) [LBEX-DOCID 305205]; see also SEC Division of Market Regulation, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (2005), at p. 5 [LBEX-DOCID 2125011] (reflecting SEC's understanding that the risk appetite limit was a hard limit not to be exceeded under any circumstances).

[84] Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009; Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at pp. 10-11.

[85] Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at p. 7.

all.[86]  Although Antoncic stated that the risk appetite limit defined the boundaries of the firm's acceptable risk profile, she also said that the limit was not "written in stone" and that excesses caused by increases in volatility were allowable.[87]

In interviews with the Examiner, representatives of the SEC said that after Lehman's officers informed them that Lehman was in excess of its risk limits, the SEC's primary concern was ensuring that the limit excesses were properly escalated and resolved within Lehman according to Lehman's procedures.[88]  The SEC did not believe that its role was to substitute its judgment for the business judgment of Lehman's management.[89]

### (4)  Calculation and Allocation of Limits

The Limit Policy was silent as to the methodology by which the firm-wide risk appetite limit was to be calculated.  In practice, Lehman's Finance Department calculated the firm-wide risk appetite limit with some input from GRMG.[90]  To calculate the firm-wide risk appetite limit, the Finance Department began with "base revenue projections and then deduct[ed] an estimate of the potential loss of revenues from non-risk-taking activities due to a downturn in customer flow and origination."[91]  The

---

[86] For example, Joe Li and Thomas Cruikshank described the firm-wide risk appetite limit as a guideline or guidepost for management.  Examiner's Interview with Thomas Cruikshank, Oct. 8, 2009, at p. 3; Examiner's Interview with Joe Li, Oct. 5, 2009.

[87] Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at p. 7.

[88] Examiner's Interview of the Securities and Exchange Commission, Aug. 24, 2009, at pp. 2, 8.

[89] *Id*. at p. 5.

[90] Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at pp. 12-13; Examiner's Interview of Robert Azerad, Sept. 23, 2009, at p. 3; Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at pp. 4-7.

[91] Jared Pedowitz, E&Y, BMRM-Market Risk Management Walkthrough Template (Nov. 30, 2007), at p. 9 [EY-LE-LBHI-KEYPERS 1015089]; *see also* SEC Division of Market Regulation, Lehman Brothers -

Finance Department then calculated the additional amount that the firm could afford to lose without compromising the firm's compensation adequacy or jeopardizing what the firm considered a minimally acceptable return to investors.[92]  The difference between those amounts equaled the firm-wide risk appetite limit.[93]

The calculation process "require[d] significant amounts of judgment.  For instance, in coming up with the firm-wide [risk appetite] limit, subjective determinations [had to] be made regarding revenues in a down year, compensation adequacy, and minimally-acceptable [return to investors]."[94]

### b)  Reporting Requirements and Practices

#### (1)  Internal Reporting

Under Lehman's internal policies and procedures, the firm disclosed information regarding risk appetite to personnel within GRMG and to senior management.  GRMG created a weekly "Firm Wide Risk Snapshot" report, which contained "Risk Appetite limits and usage by business unit" and summarized "VaR by business unit and Top Market Risk positions."[95]  In addition, Lehman circulated a "Daily Risk Appetite and VaR Report" to GRMG personnel, business heads, and upper management, which

---

Consolidated Supervised Entity Market and Credit Risk Review (2005), at pp. 4-5 [LBEX-DOCID 2125011].

[92] Jared Pedowitz, E&Y, BMRM-Market Risk Management Walkthrough Template (Nov. 30, 2007), at p. 9 [EY-LE-LBHI-KEYPERS 1015089]; SEC Division of Market Regulation, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (2005), at pp. 4-5 [LBEX-DOCID 2125011].

[93] SEC Division of Market Regulation, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (2005), at p. 5 [LBEX-DOCID 2125011].

[94] *Id.* at p. 61.

[95] Lehman, Credit Risk Reporting Manual Version 1.0 (Nov. 13, 2007), at p. 9 [LBEX-DOCID 688141].

included a cover e-mail with various spreadsheets attached.[96]  The cover e-mail included the firm's overall daily risk appetite and VaR usage figures and the day-over-day change in those figures versus the limit.[97]  The report also included divisional risk usage and limits.[98]  The spreadsheets attached to the report included detailed global and divisional risk appetite and VaR information.[99]

Another report that was circulated to the Risk Committee and/or Executive Committee was the "Firm-wide Risk Drivers" report.[100]  This one-page summary contained detailed information regarding the firm's aggregated risks, which reflected firm-wide risk appetite and VaR usage data, and explanations regarding week-over-week changes in the data.[101]  The "Firm-wide Risk Drivers" report did not include information regarding the firm's risk appetite limits.[102]

---

[96]  *See*, *e.g.*, Lehman, Daily Risk Appetite Report spreadsheet (Oct. 12, 2007) [LBEX-DOCID 150128] , attached to e-mail from Jenny Peng, Lehman, to David Goldfarb, Lehman, *et al*. (Oct. 12, 2007) [LBEX-DOCID 152049].

[97]  *See*, *e.g.*, e-mail from Jenny Peng, Lehman, to David Goldfarb, Lehman, *et al*. (Oct. 12, 2007) [LBEX-DOCID 152049].

[98] *Id.*

[99]  *See*, *e.g.*, Lehman, Daily Risk Appetite Report spreadsheet (Oct. 12, 2007) [LBEX-DOCID 150128] attached to e-mail from Jenny Peng, Lehman, to David Goldfarb, Lehman, *et al*. (Oct. 12, 2007) [LBEX-DOCID 152049].

[100]  *See*, *e.g.*, Lehman, Firm-Wide Risk Drivers: October 22, 2007 (Oct. 22, 2007) [LBEX-DOCID 163741], attached to e-mail from Beate Geness, Lehman, to Herbert H. McDade, III, Lehman, *et al*. (Oct. 22, 2007) [LBEX-DOCID 177381].

[101] *Id.*

[102] *Id.*

### (2) Board of Directors

Lehman delivered regular presentations to the Board and its committees regarding risk appetite.[103] At each regularly scheduled Board meeting, Lehman provided the Board with an update regarding the firm's financial results for the previous month or quarter, which included a discussion of the firm's risk appetite usage and limits.[104] In addition, from 2006 to 2008, both the Board and the Board's Finance and Risk Committee met and discussed the firm's annual financial plan, which included a discussion of the firm's past risk appetite usage figures and a "propose[d]" limit for the upcoming year.[105]

### c) Regulatory Agencies and Entities

In 2003 and 2004, the SEC began developing a set of rules to govern the oversight of U.S. securities firms and their affiliates on a consolidated basis.[106] The effort was a response to the European Union's ("EU") Financial Conglomerates Directive, which required financial conglomerates that operated within the EU to be supervised under

---

[103] *See* Lehman, Counterparty Risk Management Policy Group, Containing Systemic Risk: The Road to Reform, at p. 1 [LBEX-WGM 969713] ("Discussion and review of the Risk Appetite limit and its usage is conducted quarterly with the Board of Directors. . . .").

[104] *See, e.g.,* Lehman, Second Quarter 2007 Financial Information Presentation to Lehman Board of Directors (June 19, 2007), at p. 6 [LBHI_SEC07940_026226]; Lehman, October 2007 Financial Information Presentation to Lehman Board of Directors with Welikson's handwritten notes (Nov. 8, 2007), at p. 6 [WGM_LBEX_00664]; Lehman, December 2007 Financial Information Presentation to Lehman Board of Directors (Jan. 29, 2008), at p. 6 [LBHI_SEC07940_027331]; Lehman, Estimated April 2008 Financial Information Presentation to Lehman Board of Directors (May 7, 2008), at p. 6 [LBHI_SEC07940_028014].

[105] *See* Lehman, 2007 Financial Plan Presentation to the Finance and Risk Committee of Lehman Board of Directors (Jan. 30, 2007) at pp. 21-24 [LBEX-AM 067099]; Lehman, 2007 Financial Plan Summary Presentation to Lehman Board of Directors (Jan. 31, 2007) at p. 11 [LBHI_SEC07940_025712]; Lehman, 2008 Financial Plan Presentation to Finance and Risk Committee of Lehman Board of Director (Jan. 29, 2008), at p. 17 [LBHI_SEC07940_068559]; Lehman, 2008 Financial Plan Summary Presentation to Lehman Board of Directors (Jan. 29, 2008), at p. 11 [LBHI_SEC07940_027374].

[106] Examiner's Interview of Securities and Exchange Commission, Aug. 24, 2009, at pp. 3-4.

the EU's financial regulations or, internationally, under a set of substantially equivalent rules.[107]  With comments from the investment banks, the SEC constructed guidelines that met the Financial Conglomerates Directive and formed the basis of the SEC's Consolidated Supervised Entities ("CSE") Program.[108]

Firms that did not wish to be supervised under the Financial Services Authority ("FSA") protocols could choose to voluntarily participate in the CSE program instead.[109] Five registered broker-dealers, including Goldman Sachs, Morgan Stanley, Bear Stearns, Merrill Lynch, and Lehman, opted into the CSE program.[110]  By opting into the CSE program, Lehman voluntarily subjected itself to a host of regulatory reporting requirements.

The SEC had broad authority to access information from the CSEs about their operations and businesses.  Under the Code of Federal Regulations, the CSEs were required to "[m]ake available to the [Securities and Exchange] Commission information about the ultimate holding company or any of its material affiliates that the Commission finds is necessary to evaluate the financial and operational risk within the ultimate holding company and its material affiliates."[111]  The CSEs were also required to provide additional information about the financial condition of their holding companies

---

[107] *Id.* at p. 3 & n.2.
[108] *Id.* at p. 3.
[109] *Id.*
[110] *Id.* at pp. 3-4.
[111] 17 C.F.R. § 240.15c3–1E(a)(1)(viii)(G) (2007).

and affiliates, including all relevant capital requirement computations and any other agreed-upon financial information.[112]

The SEC's authority entitled it to monitor, evaluate, and assess Lehman's risk reporting policies and procedures, risk appetite and equity framework, and limit monitoring and escalation processes.[113] Thus, Lehman provided information to the SEC regarding its risk appetite usage, limits, and limit excesses.[114] In accordance with such requests, Lehman submitted intermittent daily, weekly, and monthly risk appetite reports to the SEC, which showed the firm's risk appetite usage against its limits.[115]

The SEC relied on Lehman to provide the SEC with the information it used to assess the efficacy and accuracy of Lehman's risk measurements and risk management function.[116] Under the CSE program, Lehman was required to "implement and maintain a consolidated internal risk management control system and procedures to monitor and manage group-wide risk, including market, credit, funding, operational,

---

[112] Summary for SEC 17 C.F.R. Parts 200 and 240 [Release No. 34-49830; File No. S7-21-03] (RIN 3235-A196).

[113] *See* Lehman, Corporate Audit Report: Consolidated Supervised Entity (2006), at pp. 1-3 [LBEX-AM 066214].

[114] *See* 17 C.F.R. 240.15c3-1E(a)(2)(xii) (2007).

[115] *See* Lehman, Monthly SEC Finance and Risk Review Agenda (Aug. 11, 2008) [LBEX-WGM 000294]; Lehman, Risk Update Presentation to Lehman Board of Directors (July 18, 2006), at p. 12 [LBEX-DOCID 1362012] ("Representatives of Finance and Risk meet monthly with the SEC (division of Market Regulation) to discuss the Firm's risk metrics . . . ."); Examiner's Interview of Securities and Exchange Commission, Aug. 24, 2009, at p. 7; Examiner's Interview of Paul Shotton, June 5, 2009, at pp. 20-21 (Shotton believed that Lehman reported only VaR to the SEC, and not risk appetite, but he is the only witness who expressed this position to the Examiner.).

[116] Examiner's Interview of the Securities and Exchange Commission, Aug. 24, 2009, at p. 6.

and legal risks, and make and maintain certain books and records."[117]   The SEC's monitoring team did not perform independent audits of Lehman's risk calculations, or perform independent audits of Lehman's risk metrics.[118]  However, the SEC did require Lehman to perform certain internal audits and relied on information from those audits to assess the efficacy and accuracy of Lehman's risk measurements and risk management function.[119]

The SEC had the authority to regulate Lehman's business in certain substantive ways.  For example, the SEC could strip certain capital relief entitlements from CSEs that failed to provide "information about the financial condition of the ultimate holding company."[120]

The SEC believed that its role was to oversee Lehman's risk management controls, make certain that those risk controls functioned effectively, and ensure that certain risk-related issues were communicated to Lehman's senior management.[121] Although the SEC did escalate particularly concerning risk-related issues to Matthew Eichner, the head of the CSE risk management monitoring team, it did not believe that its role was to question Lehman's management's business judgments or decisions regarding the firm's risk-taking activities.[122]

---

[117] Summary for SEC 17 C.F.R. Parts 200 and 240 [Release No. 34-49830; File No. S7-21-03] (RIN 3235-A196).

[118] Examiner's Interview of Securities and Exchange Commission, Aug. 24, 2009, at p. 6.

[119] Id.

[120] 17 C.F.R. §240.15c3-1E(a)(1)(viii)G),(I) (2007).

[121] Examiner's Interview of Securities and Exchange Commission, Aug. 24, 2009, at p. 6.

[122] Id.

## (1) Public Filings

Although Lehman was required under federal law to publicly report certain information regarding its market risk exposures (*see* Sections III.A.1.a and III.A.2.c), Lehman was not required to disclose information regarding risk appetite in its public filings. Risk appetite is not referenced in Regulation S-K of the Federal Securities Laws and no other federal law required Lehman to comprehensively disclose the entirety of its risk-related information, metrics, or calculations.[123] Until August 2007, however, Lehman publicly disclosed the fact that it monitored its risk appetite in a section of its public filings titled, "Other Measure of Risk."[124] Although Lehman did not disclose the existence of its internal risk appetite limits or any information concerning the enforcement of those limits in its public filings, Lehman did voluntarily disclose information regarding its risk appetite.[125]

Starting with Lehman's 2007 10-K and continuing with Lehman's First and Second Quarter 2008 10-Qs, Lehman removed the "Other Measures of Risk" section, which described Lehman's risk appetite metric, from its filings; no other section of those

---

[123] *See, e.g.*, 17 C.F.R. §229.305 (Item 305 of Regulation S-K) (with no reference to risk appetite).

[124] *Compare* Lehman Brothers Holdings Inc., Annual Report for 2006 as of Nov. 30, 2006 (Form 10-K) (filed on Feb. 13, 2007), at p. 60 ("LBHI 2006 10-K") *and* Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 28, 2007 (Form 10-Q) (filed on Apr. 9, 2007), at p. 71 ("LBHI 10-Q (filed Apr. 9, 2007)") *and* Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2007 (Form 10-Q) (filed on July 7, 2007), at p. 75 ("LBHI 10-Q (filed July 7, 2007)") *and* Lehman Brothers Holdings Inc., Quarterly Report as of Aug. 31, 2007 (Form 10-Q) (filed on Oct. 10, 2007) at p. 78 ("LBHI 10-Q (filed Oct. 10, 2007)") *with* Lehman Brothers Holdings Inc., Annual Report for 2006 as of Nov. 30, 2006 (filed on Feb. 13, 2007) (Form 10-K) at pp. 69-76 ("LBHI 2006 10-K").

[125] *See, e.g.*, LBHI 2006 10-K at pp. 60-61; LBHI 10-Q (filed on Feb. 28, 2007), at p. 82.

reports disclosed information on Lehman's risk appetite.[126]  No documentary evidence has identified who made the decision to omit the "Other Measures of Risk" section from those filings, nor is it clear when or why that decision was made.[127]  Neither Mark Weber, a risk manager at Lehman from July 2006 to September 2008, who was involved with drafting the "Risk Management" portion of Lehman's 2007 first quarter 10-Q, nor Goodman, Antoncic, or Christopher M. O'Meara, Lehman's Chief Financial Officer ("CFO") from 2004 to 2007 and then Lehman's CRO, recalled who made the decision to remove the risk appetite language from Lehman's filings or when or why that decision was made.[128]  Shotton told the Examiner that Ryan Traversari, Lehman's Senior Vice President of External Reporting, was responsible for the removal, and that he did so because he believed Lehman's public filings were "disjointed."[129]  In his interview with

---

[126] See LBHI 2007 10-K, at pp. 135-149 (evidencing that the "Risk Management" section no longer contains an "Other Measures of Risk" portion); Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 29, 2008 (Form 10-Q) (filed on Apr. 4, 2008), at pp. 158-73 ("LBHI 10-Q (filed on Apr. 4, 2008)"); Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2008 (Form 10-Q) (filed on July 10, 2008), at pp. 159-74 ("LBHI 10-Q (filed on July 10, 2008)").

[127] See Lehman, Form 10-K Draft A (Dec. 21, 2007) [LBEX-DOCID 1410826], attached to e-mail from Jonathan Cohen, Lehman, to Kenny Lin, Lehman, et al. (Dec. 21, 2007) [LBEX-DOCID 1437379]; Lehman, Form 10-K Draft B (Dec. 28, 2007) [LBEX-DOCID 1410829], attached to e-mail from Jonathan Cohen, Lehman, to Nancy Huie, Lehman (Jan. 2, 2008) [LBEX-DOCID 1486755]; Lehman, Form 10-K Draft C (Jan. 4, 2007) [LBEX-DOCID 98327], attached to e-mail from Ryan Traversari, Lehman, to Eric R. Addington, Lehman, et al. (Jan. 4, 2007) [LBEX-DOCID 112558]; Lehman, Form 10-K Draft D (Jan. 11, 2007) [LBEX-DOCID 98325] attached to e-mail from Ryan Traversari, Lehman, to Erin Callan, Lehman, et al. (Jan. 11, 2008) [LBEX-DOCID 112557].

[128] Examiner's Interview of Mark Weber, Aug. 11, 2009, at p. 11; Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at pp. 19-20; Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009; Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at p. 13.

[129] Examiner's Interview of Paul Shotton, June 6, 2009, at p. 22; Examiner's Interview of Ryan Traversari, Sept. 24, 2009, at p. 3.

the Examiner, Traversari said that he did not recall ever having discussed the removal, who did it, or why.[130]

Because Lehman had not previously disclosed that it had specific risk appetite limits, or that those limits were enforced (let alone how strictly they were enforced), the Examiner did not find a colorable claim that the removal of the "Other Measures of Risk" section from the 2007 10-K rendered that filing false or misleading.

### (2) Rating Agencies

The rating agencies viewed Lehman's risk appetite metric as the center of Lehman's approach to risk management and a critical "constrain[t on the firm's] risk-taking at the portfolio level."[131] In numerous presentations to rating agencies, Lehman described its firm-wide risk appetite limit as a key indicator that "determin[ed] the most appropriate overall level of risk the Firm should be taking."[132] In addition, Lehman told the rating agencies that the Board and Executive Committee were responsible for approving the overall risk appetite limit annually.[133] The rating agencies relied on

---

[130] Examiner's Interview of Ryan Traversari, Sept. 24, 2009, at pp. 3-4.

[131] Moody's, Risk Management Assessment of Lehman Brothers Holdings, Inc. [Draft] (Apr. 4, 2006), at p. 4 [LBEX-DOCID 1362015]; *see also* Lehman, Lehman Brothers Risk Management: An Integrated Framework [Draft], at p. 9 [LBEX-DOCID 264161] (stating that the risk appetite metric was at the "Center of [Lehman's] Approach to Risk"), attached to e-mail from Paul Shotton, Lehman, to Lisa Rathgeber, Lehman (May 28, 2008) [LBEX-DOCID 375356].

[132] Lehman, Moody's: Development of the Franchise (May 31, 2006), at p. 44 [LBEX-DOCID 1342436]; *accord* Lehman, Risk Management Presentation to Fitch (Apr. 7, 2006), at p. 20 [LBEX-DOCID 691768].

[133] *Id.*

Lehman's representations regarding its risk appetite metric to support their positive ratings of the Lehman franchise.[134]

## B. Stress Tests

Lehman's risk appetite and VaR limit structure was supplemented by a second risk control, its stress testing. "Stress testing is a procedure for evaluating the potential loss of a portfolio due to shocks to its underlying risk factors over a wide range of scenarios, however unlikely the probability of occurrence may be."[135] Whereas Lehman used VaR and risk appetite to "address the question of how much . . . a portfolio [could] lose over a given time-horizon and with a given degree of confidence,"[136] the firm used stress tests to address the question of "how much . . . the firm [could] lose in a plausible, if unlikely, worst case scenario."[137] "Stress testing [was] used to capture 'tail' and 'outlier' events in the market" that were not captured by VaR and risk appetite.[138]

Under the CSE Program, Lehman was required to develop and maintain a market-based stress testing program,[139] under which the firm's portfolio would be

[134] *See, e.g.*, Moody's, Risk Management Assessment of Lehman Brothers Holdings, Inc. [Draft] (Apr. 4, 2006), at pp. 1, 4 [LBEX-DOCID 1362015]; *see also* Lehman, Credit Ratings Strategy Presentation (Mar. 1, 2007), at p. 11 [LBEX-DOCID 249324] ("For Lehman, high profitability, strong risk management and liquidity are the common strengths cited by the Rating Agencies.").

[135] Jared Pedowitz, E&Y, Market Risk Management Walkthrough Template (Nov. 30, 2007), at p. 6 (EY-LE-LBHI-KEYPERS 1015089].

[136] Lehman, Market Risk Management: Stress Testing Policy and Procedures Manual (Apr. 21, 2005), at p. 1 [LBEX-DOCID 385132], attached to e-mail from Melda Elagoz, Lehman, to Paul Shotton, Lehman, *et al.* (July 18, 2007) [LBEX-DOCID 385135].

[137] *Id.*

[138] Jared Pedowitz, E&Y, Market Risk Management Walkthrough Template (Nov. 30, 2007), at p. 6 [EY-LE-LBHI-KEYPERS 1015089].

[139] Examiner's Interview of the Securities and Exchange Commission, Aug. 24, 2009, at p. 12.

tested against both hypothetical and historical stress scenarios.[140]   The SEC required

Lehman to report the results of the market-based stress tests on a monthly basis.[141]

Additionally, Lehman was required to perform both funding and liquidity stress tests at

least once per quarter.[142]

"[A]lthough the nature, form and frequency of the analysis [was] not

prescribed," Lehman was also required to perform stress testing as a supplement to

VaR under Basel Accord and Basel II.[143]   In addition, the FSA required Lehman to

perform two specific stress scenarios.  First, the FSA required Lehman to stress tests its

"capital requirements during a recessionary period such as might be experienced 'once

in 25 years'; during which time [one] might expect to see counterparty ratings

downgrades and weakening of real estate, private equity and loan portfolios."[144]

Second, the FSA required that firms run a scenario, designed to simulate the effects of a

default by a major market counterparty.[145]

[140] SEC, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (2005), at p. 63 [LBEX-DOCID 2125011], attached to e-mail from Michelle Danis, SEC, to David Oman, Lehman, *et al*. (Apr. 21, 2006) [LBEX-DOCID 2068428].

[141] Examiner's Interview of the Securities and Exchange Commission, Aug. 24, 2009, at p. 12.

[142] 17 C.F.R. § 240.15c3-1g(c)(1) (2007).

[143] Lehman, Stress Testing: Policy and Procedures Manual (Oct. 2006), at p. 2 [LBEX-DOCID 2909526], attached to e-mail from Stephen Hancock, Lehman, to Stuart Tarling, Lehman, *et al*. (May 24, 2007) [LBEX-DOCID 2909525]; *see also* Lehman, Stress Scenario Analysis (Sept. 2007) [LBEX-DOCID 687914], attached to e-mail from Paul Shotton, Lehman, to Mynor Gonzalez, Lehman, *et al*. (May 16, 2008) [LBEX-DOCID 725042].

[144] Lehman, Stress Scenario Analysis (Sept. 2007), at p. 5 [LBEX-DOCID 687914], attached to e-mail from Paul Shotton, Lehman, to Mynor Gonzalez, Lehman, *et al*. (May 16, 2008) [LBEX-DOCID 725042].

[145] *Id*. at pp. 7-8.

Lehman's stress testing did not include the application of limits.[146]   Thus, the stress loss amounts that Lehman generated were not measured against any predetermined standard.[147]

Lehman employed a variety of market stress tests to measure risk.[148]   Lehman's stress tests were designed to measure the firm's vulnerability to macro-economic events which could affect the firm's entire portfolio as well as localized stress scenarios that were "designed to explore the specific vulnerabilities of each line of business and region."[149]   For example, Lehman conducted stress tests based on historical market events such as the October 1987 market crash and the 1998 Russian financial crisis.[150]   In addition, Lehman's risk managers developed and conducted other stress tests that were based on hypothetical market scenarios such as the impact of a potential "[l]iquidity [c]runch due to central banks globally raising rates," jumps in oil prices caused by supply disruptions and "[m]ajor shifts in yield and spread curves such as steepening or flattening, or parallel shifts up or down."[151]   Lehman ran stress tests based on 13 or 14 different scenarios.[152]

[146] Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009.

[147] *Id.*

[148] *See* Lehman, Stress Testing: Policy and Procedures Manual (Apr. 21, 2005), at pp. 3-5 [LBEX-DOCID 385132], attached to e-mail from Melda Elagoz, Lehman, to Paul Shotton, Lehman, *et al.* (July 18, 2007) [LBEX-DOCID 385135].

[149] *Id.* at pp. 3-4.

[150] Lehman, Risk Management Presentation to Fitch (Apr. 7, 2006), at p. 47 [LBEX-DOCID 691768], attached to e-mail from Jeffrey Goodman, Lehman, to Donald E. Petrow, Lehman (July 2, 2007) [LBEX-DOCID 671711].

[151] Lehman, Risk, Liquidity, Capital and Balance Sheet Update Presentation to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at p. 28 [LBEX-AM 067167]; Lehman, Risk

The firm's macro-economic stress tests were designed to test the effects of a stress event that "could not be mitigated [for] two weeks."[153]  The firm's localized stress tests assumed "horizons" or time periods, which were deemed "appropriate, given the liquidity of the instruments" or affected positions.[154]

### C.  Equity, Liquidity, and Funding Adequacy Controls

Lehman defined equity sufficiency as the cushion that it needed to absorb potential economic losses, stemming from specific counterparties, illiquid positions, and general operating business and legal risks.[155]  The firm employed various metrics to gauge its equity sufficiency, including: (1) the CSE Total Capital Ratio; (2) risk equity; and (3) the Equity Adequacy Framework ("EAF").[156]  The CSE Framework was a regulatory requirement imposed by the SEC.  Risk equity and EAF were internal

---

Management Presentation to Fitch (Apr. 7, 2006), at p. 47 [LBEX-DOCID 691768], attached to e-mail from Jeffrey Goodman, Lehman, to Donald E. Petrow, Lehman (July 2, 2007) [LBEX-DOCID 671711].

[152] *See, e.g.*, Lehman, Stress Test Report for March 31, 2006 (Apr. 23, 2006) [LBEX-DOCID 2078161], attached to e-mail from Sandeep Garg, Lehman, to Paul Shotton, Lehman, *et al.* (Apr. 24, 2006) [LBEX-DOCID 2118206]; Stress Test Report for February 28, 2007 [LBEX-DOCID 632363], attached to e-mail from Melda Elagoz, Lehman, to Paul Shotton, Lehman, *et al.* (Mar. 9, 2007) [LBEX-DOCID 630356]; Lehman, Stress Test Report for October 31, 2007 (Dec. 19, 2007) [LBEX-DOCID 632432], attached to e-mail from Jeffrey Goodman, Lehman, to Cherie Gooley, Lehman (Dec. 19, 2007) [LBEX-DOCID 665513]; Lehman, Stress Test Report for April 30, 2008 (May 28, 2008) [LBEX-DOCID 3296803], attached to e-mail from Mark Weber, Lehman, to Cherie Gooley, Lehman, *et al.* (May 28, 2008) [LBEX-DOCID 3302270].

[153] Lehman, Stress Testing: Policy and Procedures Manual (Apr. 21, 2005), at p. 5 [LBEX-DOCID 385132], attached to e-mail from Melda Elagoz, Lehman, to Paul Shotton, Lehman, *et al.* (July 18, 2007) [LBEX-DOCID 385135].

[154] Lehman, Stress Testing: Policy and Procedures Manual (Apr. 21, 2005), at p. 5 [LBEX-DOCID 385132], attached to e-mail from Melda Elagoz, Lehman, to Paul Shotton, Lehman, *et al.* (July 18, 2007) [LBEX-DOCID 385135].

[155] Lehman, Risk Management: Risk Equity and Risk Appetite Models (May 17, 2005), at pp. 3-4 [LBEX-SEC 009046].

[156] Lehman, Risk Management Update Presentation to Lehman Board of Directors (Apr. 15, 2008), at p. 8 [LBHI_SEC027909].

measures that the firm employed to determine its equity needs.[157]  In addition, the firm used the Cash Capital Model to measure its liquidity and long-term ability to fund illiquid positions.[158]

Under the CSE Program, Lehman was required to maintain minimum capital. Specifically, the SEC required Lehman to maintain a total capital ratio of 10%.[159] The Tier 1 capital ratio was a measure that was similar to the total capital ratio, except that certain types of debt and hybrid securities were excluded from the calculation.[160]

In addition, Lehman used the "Risk Equity Model to determine the equity to be allocated to each of [its] businesses."[161]  Risk Equity was a numerical expression of each business' market risk, event risk, counterparty credit risk, operating risk, and legal risk, plus certain other equity that the firm needed to allocate to the businesses, such as buildings and other tangible operating assets.[162]

---

[157] *Id.*

[158] E-mail from Enrico Corsalini, Lehman, to Paolo Tonucci, Lehman, *et al.* (June 26, 2008) [LBHI_SEC07940_522785].

[159] Anna Yu and Eric Spahr, Lehman, CSE Overview Presentation to Lehman Tokyo Town Hall (Aug. 8, 2007), at p. 6 [LBEX-DOCID 382979], attached to e-mail from Paul Shotton, Lehman, to Ying Lin, Lehman (Apr. 3, 2008) [LBEX-DOCID 375347].  The 10% Total Capital Ratio requirement worked in tandem with a Tier 1 Capital minimum of 6%.

[160] *Id.* at 13.

[161] Lehman, Risk Equity Framework Presentation to Lehman Board of Directors [Draft] (Apr. 7, 2008), at p. 4 [LBEX-DOCID 687943], attached to e-mail from Ying Lin, Lehman, to Paul Shotton, Lehman (Apr. 8, 2008) [LBEX-DOCID 725313].

[162] *Id.* at 4.

In mid-2007, Lehman developed EAF as a shadow risk equity tool and supplement to Risk Equity.[163] EAF "calculate[d] the equity required to enable restructuring in a crisis" outside of bankruptcy without access to unsecured debt.[164] The metric was designed to ensure that Lehman had "sufficient time . . . to arrange for the disposition of assets or restructuring of liabilities"[165] and "assess[] [the firm's] equity adequacy in a potential Lehman-specific crisis to ensure that the Firm would have sufficient equity capital to absorb any potential losses and funding impairments caused by the . . . crisis."[166] Lehman viewed the EAF as the best measure of equity sufficiency because, unlike Lehman's other models, it "fully [met] the needs of effective capital management, e.g., transparency, practicality, and timeliness."[167] According to various

---

[163] Lehman, Equity Adequacy Framework Presentation to Standard & Poor's (Aug. 17, 2007), at p. 2 [LBEX-DOCID 505934], attached to e-mail from Albert Pulido, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 16, 2007) [LBEX-DOCID 552499].

[164] Lehman, Q2 2008 Update Presentation (June 4, 2008), at p. 11 [LBHI_SEC07940_514735], attached to e-mail from Paolo Tonucci, Lehman, to Piers Murray, JP Morgan, *et al.* (June 5, 2008) [LBHI_SEC07940_514732]; *see also* Lehman, Risk, Liquidity, Capital and Balance Sheet Update Presentation to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at pp. 51-52 [LBEX-AM 067167].

[165] Lehman, Equity Adequacy Framework Presentation to Standard & Poor's (Aug. 17, 2007), at p. 3 [LBEX-DOCID 505934], attached to e-mail from Albert Pulido, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Aug. 16, 2007) [LBEX-DOCID 552499].

[166] Lehman, Risk Equity Framework Presentation to Lehman Board of Directors [Draft] (Apr. 7, 2008), at p. 9 [LBEX-DOCID 687943], attached to e-mail from Ying Lin, Lehman, to Paul Shotton, Lehman (Apr. 8, 2008) [LBEX-DOCID 725313].

[167] Lehman, SP&A - Equity Adequacy and Equity Allocation Presentation [Draft] (Sept. 12, 2007), at p. 1 [LBEX-DOCID 1695588], attached to e-mail from Ari Axelrod, Lehman, to Kristin Pepper, Lehman, *et al.* (Sept. 13, 2007) [LBEX-DOCID 1645820].

presentation materials that Lehman distributed to its external constituents, EAF was one of "the Firm's primary economic capital model[s]."[168]

In addition, Lehman employed the Cash Capital Model ("Cash Capital") to measure itsliquidity and long-term ability to fund illiquid positions.[169]  In a liquidity event, the firm assumed that it would not be able to access the unsecured debt market and secured funding would be limited.[170]  Thus, all illiquid assets had to be funded with cash capital.[171]  Sources of cash capital included equity, long-term debt and evergreen facilities with a term of twelve months or longer.[172]

### D.  Single Transaction Limits

In 2000, Lehman began developing a single transaction limit framework,[173] which was designed to curtail the firm's head-line risk.[174]  Head-line risk refers to the risk associated with large exposures to individual issuers, which carry potential losses that are significant enough to receive "[s]crutiny from rating agencies, investors and

---

[168] *See, e.g.,* Lehman, Equity Adequacy Framework Presentation (May 19, 2008), at p. 2 [LBEX-DOCID 12353], attached to e-mail from Paolo Tonucci, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (May 21, 2008) [LBEX-DOCID 66852].

[169] Paolo Tonucci, Lehman, Liquidity Funding Overview Presentation to Standard and Poor's (Aug. 17, 2007), at p. 48 [LBEX-DOCID 2031705], attached to e-mail from Shaun K. Butler, Lehman, to Elizabeth R. Besen, Lehman, *et al.* (Aug. 28, 2007) [LBEX-DOCID 2374876].

[170] Lehman, untitled Funding Framework Presentation (Aug. 6, 2007), at pp. 3-5 [LBEX-DOCID 601791], attached to e-mail from Angelo Bello, Lehman, to Kentaro Umezaki, Lehman (Aug. 6, 2007) [LBEX-DOCID 720559].

[171] *Id.*

[172] *Id.* at 2-3.

[173] Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at p. 12.

[174] E-mail from Joe Li, Lehman, to Jeffrey L. Weiss, Lehman, *et al.* (Feb. 2, 2007) [LBEX-DOCID 383248].

creotors of the Firm."[175]   Thus, Lehman's single transaction limits were intended to limit the firm's large positions, which its aggregate risk limits might not otherwise constrain.[176]   To its outside constituents, Lehman represented its single transaction limit framework to be part of a "rigorous" system of "checks and balances," which ensured that all transactions were accommodated within the limits.[177]

Lehman's single transaction limits applied only to the firm's leveraged loan originations.[178]   Although GRMG urged the Global Real Estate Group ("GREG") to

---

[175] Lehman, Single Transaction Limit Framework Report [Draft] (Jan. 2005), at p. 1 [LBEX-DOCID 245375], attached to e-mail from Joe Li, Lehman, to Jeffrey L. Weiss, Lehman, *et al.* (Feb. 2, 2007) [LBEX-DOCID 383248].

[176] Lehman, SEC Risk Appetite, Risk Equity Review for CSE (May 24, 2005), at p. 60 [LBEX-DOCID 271652], attached to e-mail from Laura M. Vecchio, Lehman, to Mark Weber, Lehman (Oct. 29, 2007) [LBEX-DOCID 408046].

[177] *See* Madelyn Antoncic, Lehman, Lehman Brothers Risk Management: An Integrated Framework (Feb. 20, 2008), at p. 20 [LBEX-DOCID 194031], attached to e-mail from Paul Shotton, Lehman, to Christopher M. O'Meara, Lehman (Feb. 20, 2008) [LBEX-DOCID 214223]; Lehman, Current Market Background Information Talking Points [Draft] (Aug. 16, 2007), at p. 3 [LBEX-DOCID 506009], attached to e-mail from Christopher M. O'Meara, Lehman, to Ian T. Lowitt, Lehman (Aug. 19, 2007) [LBEX-DOCID 572320]; Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 11; *see also* SEC, Lehman Brothers Consolidated Supervised Entity Market and Credit Risk Review (June 2005), at pp. 6-7 [LBEX-DOCID 2125011], attached to e-mail from Michelle Danis, SEC, to David Oman, Lehman, *et al.* (Apr. 21, 2006) [LBEX-DOCID 2068428]; Lehman, SEC Risk Appetite, Risk Equity Review for CSE (May 24, 2005), at pp. 60-61 [LBEX-DOCID 271652], attached to e-mail from Laura M. Vecchio, Lehman, to Mark Weber, Lehman (Oct. 29, 2007) [LBEX-DOCID 408046]; Madelyn Antoncic, 2006 Bondholder Meeting: Risk Management Presentation (Oct. 17, 2006), at p. 25 [LBEX-DOCID 541394], attached to e-mail from Elizabeth R. Besen, Lehman, to Christopher M. O'Meara, Lehman (Aug. 2, 2007) [LBEX-DOCID 559489].

[178] Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at p. 12; Examiner's Interview of Joe Li, Oct. 5, 2009; *see* e-mail from Nachiketa Das, Lehman, to Steven Simonte, Lehman, *et al.* (Feb. 9, 2007) [LBEX-DOCID 388631]; Lehman, Single Transaction Limit Framework [Draft] (Oct. 2005), at pp. 2-3 [LBEX-DOCID 2072632], attached to e-mail from Joe Li, Lehman, to David Oman, Lehman, *et al.* (July 7, 2006) [LBEX-DOCID 2170674].

consider the firm's single transaction limits when entering into new deals,[179] the single

transaction limits did not apply in the commercial real estate space.[180]

Lehman's single transaction limit was originally set at a loss threshold of $150

million, measured by analyzing the potential loss from the transaction in question at a

99.5% confidence level.[181]  In February 2007, because the firm's capital base and

revenues had grown, GRMG revised the loss threshold to $250 million and adopted a

tandem, but separate, notional limit of $1.8 billion per unsecured and $3 billion per

secured transaction.[182]

Although Lehman was not a regulated commercial bank and therefore was not

required to institute notional transaction limits, Lehman entered into an informal

agreement with the rating agencies to abide by essentially the same notional limits that

applied to commercial banks; while commercial banks maintained a notional limit of

15% of tangible equity, Lehman maintained a notional limit of 15% of Tier 1 and 2

---

[179] E-mail from Jeffrey Goodman, Lehman, to Zev Klasewitz, Lehman (Jan. 17, 2007) [LBEX-DOCID 794864]; e-mail from Jeffrey Goodman, Lehman, to Zev Klasewitz, Lehman (Feb. 12, 2007) [LBEX-DOCID 794879].

[180] Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at p. 12.

[181] Lehman, Ambac: Due Diligence Request [Draft] (Feb. 2007), at p. 32 [LBEX-DOCID 719123], attached to e-mail from Blair Sieff, Lehman, to Raymond Kahn, Lehman, *et al.* (Feb. 5, 2007) [LBEX-DOCID 739860]; Lehman, Single Transaction Limit Framework Report [Draft] (Jan. 2005), at pp. 2-3 [LBEX-DOCID 245375], attached to e-mail from Paul Shotton, Lehman, to Ping Feng, Lehman (Feb. 2, 2007) [LBEX-DOCID 383248] (Shotton's e-mail notes the change to a $250 million threshold.).

[182] Lehman, Ambac: Draft Due Diligence Request (Feb. 2007), at p. 32 [LBEX-DOCID 719123], attached to e-mail from Blair Sieff, Lehman, to Raymond Kahn, Lehman, *et al.* (Feb. 5, 2007) [LBEX-DOCID 739860]; Lehman, Single Transaction Limit Framework Report [Draft] (Jan. 2005), at pp. 2-3 [LBEX-DOCID 245375], attached to e-mail from Paul Shotton, Lehman, to Ping Feng, Lehman (Feb. 2, 2007) [LBEX-DOCID 383248] (Shotton's e-mail notes the change to a $250 million threshold.).

capital.[183]  The agreement was a shift from Lehman's prior policy, under which Lehman maintained a notional limit of 15% of tangible common equity, plus preferred shares.[184] In contrast to tangible equity, Tier 1 capital yielded a higher notional limit because it did not include tax deferred assets.[185]

The rating agencies provided external control, as the agencies would immediately contact Lehman when a deal violated the single transaction limit.[186]  Lowitt and O'Meara would call the rating agencies and alleviate their concerns when Lehman expected a large deal to breach the limit.[187]

Executive Committee approval was required when a potential deal exceeded the single transaction limit.[188]  In other words, a deal could not get done without the blessing of the Executive Committee.[189]  Such deals came before the Executive Committee because the sheer size of the transactions required the Committee's

---

[183] Lehman, Risk Limits Presentation (Sept. 2006), at pp. 1-2 [LBEX-DOCID 1343779], attached to e-mail from Paolo Tonucci, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Sept. 28, 2006) [LBEX-DOCID 1354049].  David Goldfarb and Steve Berkenfeld both opined that no more than 15% of tangible equity should ever have been outstanding on any one deal.  Examiner's Interview of  David Goldfarb, Sept. 21, 2009, at p. 12; Examiner's Interviews of Steven Berkenfeld, Oct. 5 ands 7, 2009, at p. 11.

[184] *Id.*

[185] Lehman, Risk Limits Presentation (Sept. 2006), at pp. 1-2 & nn.1-2 [LBEX-DOCID 1343779], attached to e-mail from Paolo Tonucci, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Sept. 28, 2006) [LBEX-DOCID 1354049].

[186] Examiner's Interview of David Goldfarb, Sept. 21, 2009, at p. 12; Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 11.

[187] Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 11.

[188] Lehman, SEC Risk Appetite, Risk Equity Review for CSE (May 24, 2005), at p. 60 [LBEX-DOCID 271652], attached to e-mail from Laura M. Vecchio, Lehman, to Mark Weber, Lehman (Oct. 29, 2007) [LBEX-DOCID 408046].

[189] Examiner's Interview of Fred S. Orlan, Sept. 21, 2007, at p. 8; Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 7; Examiner's Interview of Jeremy Isaacs, Oct. 1, 2009, at p. 6.

approval separate and apart from the approval of any lower-level committees.[190] Lehman's standard risk management presentation clarifies that Executive Committee approval would allow Lehman to commit to a large deal in "rare circumstances," rather than as a matter of routine practice.[191]

In the third quarter of 2006 and the fourth quarter of 2007, Lehman adjusted its notional single transaction limit from $2.1 billion to $3.6 billion and then from $3.6 billion to $4.5 billion, respectively.[192]  In the second quarter of 2007, Lehman's quarterly loss threshold stood at $250 million, which it intended to raise to $400 million at year's end.[193]

Lehman applied the loss thresholds and notional limits only to the leveraged loan amounts that Lehman expected to retain for itself, not to the often larger amounts that the firm committed to fund in preliminary papers before syndication or sale.[194]

---

[190] Examiner's Interview of Jeremy Isaacs, Oct. 1, 2009, at p. 6.

[191] Madelyn Antoncic, Lehman, "Standard" Risk Management Presentation, at p. 21 [LBEX-DOCID 194031], attached to e-mail from Paul Shotton, Lehman, to Christopher M. O'Meara, Lehman (Feb. 20, 2008) [LBEX-DOCID 214223].

[192] Lehman, Risk Limits Presentation (Sept. 2006), at pp. 1-2 & nn.1-2 [LBEX-DOCID 1343779], attached to e-mail from Paolo Tonucci, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Sept. 28, 2006) [LBEX-DOCID 1354049] (noting $3.6 billion limit); Lehman, Leveraged Finance Risk Presentation to Executive Committee (Oct. 16, 2007), at p. 32 [LBEX-DOCID 506095], attached to e-mail from Blair Sieff, Lehman, to Steven Berkenfeld, Lehman, *et al.* (Oct. 4, 2007) [LBEX-DOCID 569902] (noting increase to $4.5 billion).

[193] *See* e-mail from Paul Shotton, Lehman, to Ping Feng, Lehman (Feb. 2, 2007) [LBEX-DOCID 383248] (noting threshold being then at $250 million); Lehman, Leveraged Finance Risk Presentation to Executive Committee (Oct. 16, 2007), at p. 11 [LBEX-DOCID 506095], attached to e-mail from Blair Sieff, Lehman, to Steven Berkenfeld, Lehman, *et al.* (Oct. 4, 2007) [LBEX-DOCID 569902] (proposing increase to $400 million).

[194] Lehman, Leveraged Finance Risk Presentation to Executive Committee (Oct. 16, 2007), at p. 11 [LBEX-DOCID 506095], attached to e-mail from Blair Sieff, Lehman, to Steven Berkenfeld, Lehman, *et al.* (Oct. 4, 2007) [LBEX-DOCID 569902] ("Notional value subject to STL is expected commitment, not amount for which the firm originally signs.").

Some leveraged loans contained a material adverse change clause and a flexible interest rate provision, which made it easier for Lehman to syndicate the exposure to other financial institutions.[195]   On these deals, the single transaction limit's loss thresholds and notional limits could be doubled, because those protections were thought to mitigate roughly 50% of the associated risk.[196]

### E.   Balance Sheet Limits

Lehman's balance sheet limit was another risk-related control that Lehman employed to allocate its resources efficiently, ensure that the business was adequately capitalized, and guarantee adequate returns on assets.[197]   The balance sheet limit is intended to restrict the amount of assets that a division or a specific business line can originate in any given quarter.[198]   A specific business or region would be able to obtain a higher balance sheet limit if the additional balance sheet capacity was supported by higher returns on assets.[199]   The firm set a minimum rate of return at 3% and increments

---

[195] Lehman, Single Transaction Limit Framework Report [Draft] (Jan. 2005), at p. 3 [LBEX-DOCID 245375], attached to e-mail from Paul Shotton, Lehman, to Ping Feng, Lehman (Feb. 2, 2007) [LBEX-DOCID 383248].

[196] *Id.*

[197] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 8.

[198] *See generally* Lehman, FID Balance Sheet Management Policy Presentation (Sept. 20, 2007) [LBEX-DOCID 253145], attached to e-mail from Kentaro Umezaki, Lehman, to Andrew J. Morton, Lehman, *et al.* (Oct. 17, 2007) [LBEX-DOCID 301274]; *see also* Lehman, FID Balance Sheet Management Presentation (Apr. 2007) at p. 3 [LBEX-DOCID 787297], attached to e-mail from Kieron Keating, Lehman, to David N. Sherr, Lehman, *et al.* (June 6, 2007) [LBEX-DOCID 808850].

[199] Lehman, FID Balance Sheet Management Presentation (Apr. 2007), at p. 3 [LBEX-DOCID 787297], attached to e-mail from Kieron Keating, Lehman, to David N. Sherr, Lehman, *et al.* (June 6, 2007) [LBEX-DOCID 808850].

in the balance sheet would not be granted when a division fell below the minimum threshold.[200]  The balance sheet limits rolled up into a firm-wide balance sheet target.[201]

Balance sheet limit breaches became an issue at Lehman as early as 2005.[202]  By February 2007, the firm had a "serious balance sheet issue."[203]  FID businesses consistently exceeded their limits even though returns on assets and earnings were decreasing.[204]  FID breached its balance sheet limit in every quarter of 2007 and in the first quarter of 2008.[205]  Balance sheet limit breaches were heavily concentrated in securitized products and real estate.[206]  The division breached the balance sheet limit for the third quarter of 2007 by a substantial margin and ended the fourth quarter of the year with usage exceeding the limit by approximately $13 billion dollars.[207]  At the end of the first quarter of 2008, Lehman had exceeded its balance sheet limit by $18 billion.[208]

---

[200] *Id.*

[201] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at pp. 8-9.

[202] *Id.*

[203] Email from Joseph Gentile, Lehman, to Michael Gelband, Lehman, *et al.* (Feb. 21, 2007) [LBEX-DOCID 810934).

[204] Lehman, FID Balance Sheet Management Presentation (Apr. 2007), at p. 2 [LBEX-DOCID 787297], attached to e-mail from Kieron Keating, Lehman, to David N. Sherr, Lehman, *et al.* (June 6, 2007) [LBEX-DOCID 808850].

[205] *See* Lehman, Balance Sheet Trend Presentation (Apr. 2007), at pp. 4-6 [LBEX-DOCID 251418], attached to e-mail from Kentaro Umezaki, Lehman, to Rebecca Miller, Lehman (May 3, 2007) [LBEX-DOCID 346520]; Lehman, 2007 Balance Sheet Targets and Usage - Global Spreadsheet (Oct. 17, 2007) [LBEX-DOCID 278229], attached to e-mail from Kentaro Umezaki, Lehman, to Andrew J. Morton, Lehman, *et al.* (Oct. 17, 2007) [LBEX-DOCID 301274]; e-mail from Clement Bernard, Lehman, to Roger Nagioff, Lehman, *et al.* (Nov. 20, 2007) [LBEX-DOCID 272199]; Andrew J. Morton, Lehman, Notes: First 60 Days Presentation (Apr. 7, 2008), at p. 4 [LBEX-DOCID 1734462], attached to e-mail from Gary Mandelblatt, Lehman, to Andrew J. Morton, Lehman, *et al.* (Apr. 7, 2008) [LBEX-DOCID 1834937] (showing first quarter 2008 limit breaches).

[206] Lehman, Balance Sheet Trend Presentation (Apr. 2007), at pp. 4-6 [LBEX-DOCID 251418], attached to e-mail from Kentaro Umezaki, Lehman, to Rebecca Miller, Lehman (May 3, 2007) [LBEX-DOCID 346520].

[207] Lehman, 2007 Balance Sheet Targets and Usage - Global Spreadsheet (Oct. 17, 2007) [LBEX-DOCID 278229], attached to e-mail from Kentaro Umezaki, Lehman, to Andrew J. Morton, Lehman, *et al.* (Oct. 17,

Senior managers in FID reacted to the limit breaches by lobbying the firm to raise the limit or give additional balance sheet capacity to businesses that were substantially over the limit.[209] Illustratively, Lehman was over the balance sheet limit for the third quarter of 2007 by $3 billion dollars at the end of June.[210] At that time, Lehman's managers expected FID's demand for balance sheet capacity to be $18 billion dollars higher than the limit.[211] Umezaki and Nagioff met with O'Meara "to lobby for more."[212] Umezaki succeeded in procuring an $8 billion dollar raise from the firm.[213] In the same vein, Umezaki told Reilly that FID needed additional balance sheet capacity for the fourth quarter of 2007 because of the high yield funding pipeline and the slow down in real estate syndications.[214] As a result, the FID's balance sheet limit for the fourth quarter of 2007 was $10 billion dollars higher than the previous quarter.[215]

2007) [LBEX-DOCID 301274]; e-mail from Clement Bernard, Lehman, to Roger Nagioff, Lehman, *et al.* (Nov. 20, 2007) [LBEX-DOCID 272199].

[208] Andrew J. Morton, Lehman, Notes: First 60 Days Presentation (Apr. 7, 2008), at p. 5 [LBEX-DOCID 1734462], attached to e-mail from Gary Mandelblatt, Lehman, to Andrew J. Morton, Lehman, *et al.* (Apr. 7, 2008) [LBEX-DOCID 1834937].

[209] E-mail from Kentaro Umezaki, Lehman, to Gerard Reilly, Lehman, *et al.* (July 23, 2007) [LBEX-DOCID 375604]; e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman (Sept. 7, 2007) [LBEX-DOCID 1357177]; e-mail from Ian T. Lowitt, Lehman, to Gerard Reilly, Lehman, *et al.* (Sept. 7, 2007) [LBEX-DOCID 1357178]; e-mail from Gerard Reilly, Lehman, to Kentaro Umezaki, Lehman, *et al.* (Sept. 7, 2007) [LBEX-DOCID 1357179]; e-mail from Kentaro Umezaki, Lehman, to Alex Kirk, Lehman, *et al.* (Sept. 17, 2007) [LBEX-DOCID 375610].

[210] Email from Kentaro Umezaki, Lehman, to Andrew J. Morton, Lehman (June 28, 2007) [LBEX-DOCID 250701].

[211] *Id.*

[212] *Id.*

[213] Email from Kentaro Umezaki, Lehman, to Alex Kirk, Lehman, *et al.* (Sep. 17, 2007) [LBEX-DOCID 375610].

[214] Email from Kentaro Umezaki, Lehman, to Gerard Reilly, Lehman, *et al.* (Sep. 7, 2007) [LBEX-DOCID 1357177].

[215] Email from Satu Parik, Lehman, to Kentaro Umezaki, Lehman, *et al.* (Oct. 10, 2007) [LBEX-DOCID 251253].

In theory, businesses that exceeded their balance sheet limits faced penalties, which could include the diminution of their compensation pool.[216]  Within FID, balance sheet limits were considered to be "harder than VaR" limits because, unlike businesses that exceeded their VaR limits, businesses that exceeded their balance sheet limits faced real penalties and consequences.[217]  Penalties for overages were set at $5 million for every billion dollars that a business was over the balance sheet limit.[218]  At the end of 2007, the penalties were revised to $2.5 million and incentives were re-set at $1.25 million.[219]  Charges were assessed in $500 million dollar increments.[220]  The business heads were unhappy with the penalties and some of them thought that the charges would make it harder for the businesses to function globally.[221]  However, penalties for balance sheet overages had never been imposed before Roger Nagioff became the head of FID.[222]  Nagioff said that the limits were ultimately imposed in either the third quarter or the fourth quarter of 2007.[223]

---

[216] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at pp. 8-9; Lehman, Global Consolidated Balance Sheet (May 31, 2007) [LBEX-DOCID 276740], attached to e-mail from Kentaro Umezaki, Lehman, to Lesley Ormas-Scala, Lehman (Aug. 23, 2007) [LBEX-DOCID 375605]; e-mail from Kentaro Umezaki, Lehman, to Kaushik Amin, Lehman, *et al.* (July 10, 2007) [LBEX-DOCID 252873].

[217] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 8.

[218] Lehman, FID Balance Sheet Management Presentation (Apr. 2007), at p. 3 [LBEX-DOCID 787297], attached to e-mail from Kieron Keating, Lehman, to David N. Sherr, Lehman, *et al.* (June 6, 2007) [LBEX-DOCID 808850].

[219] E-mail from Kentaro Umezaki, Lehman, to Kaushik Amin, Lehman, *et al.* (July 10, 2007) [LBEX-DOCID 252873].

[220] Lehman, FID Balance Sheet Management Policy Presentation (Sept. 2007), at p. 2 [LBEX-DOCID 253145], attached to e-mail from Kentaro Umezaki, Lehman, to Andrew J. Morton, Lehman, *et al.* (Oct. 17, 2007) [LBEX-DOCID 301274].

[221] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 18; e-mail from Kentaro Umezaki, Lehman, to Gregory Eikenbush, Lehman (July 12, 2007) [LBEX-DOCID 253135].

[222] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 18.

[223] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 18.

## IV.    RISK COMMITTEE

Another feature of Lehman's risk management was the firm's Risk Committee. Lehman described the Risk Committee as a weekly "forum for the senior management of the Firm to review all material risk exposures."[224]  According to its mandate, the Risk Committee's responsibilities included the "discussion and analysis of the Firm's significant credit, market and other risks, including operational risk."[225]  The "key focuses" of the Risk Committee included the firm's: (1) risk appetite;[226] (2) VaR; (3) counterparty credit risk; (4) large exposures; (5) commitments; and (6) "other topics of interest as identified by the Chief Risk Officer."[227]

Until 2008, the Risk Committee was nominally comprised of the Executive Committee, the CRO and the CFO.[228]  In 2008, Lehman expanded the nominal membership of the Risk Committee to include the heads of various business lines as well.[229]  As described more fully below, it appears that Lehman's fully constituted Risk Committee met irregularly if at all after early 2007.

---

[224] Lehman, ICAAP Supporting Document:  Operational Risk Management Overview [Draft] (July 30, 2008), at p. 6 [LBEX-DOCID 384019], attached to e-mail from Paul Shotton, Lehman, to Lisa Rathgeber, Lehman, *et al.* (July 31, 2008) [LBEX-DOCID 258308].

[225] *Id.*

[226] See Sections III.A.1.b and III.A.1.c of this Report which discuss the importance risk appetite in greater detail.

[227] Lehman, ICAAP Supporting Document:  Operational Risk Management Overview [Draft] (July 30, 2008), at p. 6 [LBEX-DOCID 384019], attached to e-mail from Paul Shotton, Lehman, to Lisa Rathgeber, Lehman, *et al.* (July 31, 2008) [LBEX-DOCID 258308].

[228] Lehman, Risk Committee Charter (Jan. 5, 2007), at p. 1 [LBEX-DOCID 719070], attached to e-mail from Robert Bing, Lehman, to Laura M. Vecchio, Lehman, *et al.* (June 11, 2007) [LBEX-DOCID 719765]; *but see* Lehman, Risk Committee Charter (Dec. 20, 2007), at p. 1 [LBEX-AM 065737] (stating that the members of the Risk Committee were the Executive Committee, the CRO and the Co-Chief Administrative Officer).

[229] Examiner's Interview of Satu Parikh, Aug. 26, 2009, at p. 6; Examiner's Interview of Kaushik Amin, Apr. 14, 2009, at p. 7; *contra* Examiner's Interview of David N. Sherr, May 6, 2009, at p. 10 (recalling that

Recollections of the form and substance of Lehman's Risk Committee meetings varied. Several members did not recall having served on the committee, or even that such a committee existed.[230] Others had varying memories of what occurred at the meetings.[231] Antoncic stated that the Risk Committee met on Wednesdays, but said that these meetings were often cancelled and that she could not attend all of them.[232] She also stated that the package given to Risk Committee members for their meetings was substantial until 2007, when Gregory changed the structure so that only the one page Firm Wide Risk Drivers sheet was provided and "made it clear" that the businesses would make risk decisions going forward.[233]

## V. CHIEF RISK OFFICER CHANGE

From 2004 to September 2007, Madelyn Antoncic, a widely respected technician who had a PhD in economics, served as the firm's CRO. In her capacity as CRO,

---

the Risk Committee was expanded to include the heads of various business lines as early as 2006); Lehman, ICAAP Supporting Document: Operational Risk Management Overview [Draft] (July 30, 2008), at p. 6 [LBEX-DOCID 384019] (stating that the Risk Committee members included members of the Executive Committee, the CRO, at the CFO), attached to e-mail from Paul Shotton, Lehman, to Lisa Rathgeber, Lehman, *et al.* (July 31, 2008) [LBEX-DOCID 25308].

[230] Examiner's Interview of George H. Walker IV, Nov. 20, 2009, at pp. 2, 5; Examiner's Interview of Hugh E. McGee III, Aug. 12, 2009, at pp. 14-15; Examiner's Interview of Andrew J. Morton, Sept. 21, 2009, at p. 13.

[231] Examiner's Interview of David Goldfarb, Sept. 21, 2009, at pp. 4-5 (Goldfarb stated that everyone on the Executive Committee was very involved in the Risk Committee but no minutes were kept because it was an active dialogue rather than a decision making meeting; Examiner's Interview of Satu Parikh, Aug. 26, 2009, at p. 6 (Parikh recalled the Risk Committee as a 40 to 50 member committee in 2008 combining top management and business heads, but without Fuld at the helm); Examiner's Interview of Kaushik Amin, April 14, 2009, at p. 7 (Amin remembered the Risk Committee as a Monday morning meeting without any formal documents that discussed various risks based on businesses' presentations); Examiner's Interviews of Steven Berkenfeld, Oct. 5 and 7, 2009, at p. 11 (Berkenfeld viewed Risk Committee discussions of deals as "broad sound bites" that had no bearing on whether a particular deal could be approved); Examiner's Interview of Christopher M. O'Meara, Sept. 23, 2009 at pp. 10, 13-14 (O'Meara, the Chief Risk Officer in 2008, stated that the Risk Committee met on Mondays with formal agendas).

[232] Examiner's Interview of Madelyn Antoncic, Feb. 25, 2009, at p. 4.

[233] Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at pp. 3, 12.

Antoncic reported directly to the Head of Strategic Partnerships, Principal Investing and Risk, David Goldfarb, who reported directly to the Chairman and CEO, Richard Fuld.[234] In September 2007, Lehman announced that effective December 1, 2007, Christopher O'Meara, who was then the CFO would replace Antoncic as Lehman's top risk manager.[235]

In his capacity as Global Head of Risk Management ("GHRM"), O'Meara was "responsible for all aspects of [Lehman's] risk profile, including oversight of risk management policies, procedures, analytics and metrics; and, in conjunction with [Lehman's] Executive Committee, monitoring Firmwide risk appetite . . . ."[236] O'Meara reported directly to Fuld as well as the firm's Co-CAO, Ian Lowitt, and its President, Joe Gregory (and then McDade).[237]

Prior to this transition, O'Meara had served as Lehman's CFO from 2004 until 2007, and from 1994 to 2004, he had filled a number of other roles at Lehman that were unrelated to risk monitoring.[238] Antoncic moved to the newly created position of Global

---

[234] Madelyn Antoncic, Risk Management Presentation to Standard & Poor's (Aug. 17, 2007), at p. 11 [LBEX-DOCID 3285232], attached to e-mail from Manhua Leng, Lehman, to Mark Weber, Lehman, *et al.* (Sept. 5, 2007) [LBEX-DOCID 3320640].

[235] *Lehman Brothers names new CFO*, Marketwatch, Sept. 21, 2007.

[236] Lehman Brothers Holdings Inc., Press Release: Lehman Brothers Announces New Appointments (Sept. 20, 2007), at p. 1 [LBEX-DOCID 533362], attached to e-mail from Brian Finnegan, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Sept. 20, 2007) [LBEX-DOCID 575413].

[237] Lehman, Risk Management Update Presentation to Lehman Board of Directors (Apr. 15, 2008) at p. 3 [LBHI_SEC07940_027909].

[238] Lehman Brothers Holdings Inc., Press Release: Lehman Brothers Announces New Appointments (Sept. 20, 2007), at p. 1 [LBEX-DOCID 533362], attached to e-mail from Brian Finnegan, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Sept. 20, 2007) [LBEX-DOCID 575413].

Head of Financial Market Policy Relations.[239]   Although O'Meara did not officially

become CRO until December 2007, he began the transition from CFO to CRO shortly

after the September 2007 press release.[240]

Several witnesses believed that O'Meara did not have the risk management

experience that they would have expected in a CRO.[241] O'Meara did not have a

background directly in risk management, and he did not have technical proficiency in

risk concepts.[242]

Notwithstanding O'Meara's atypical background, Lehman's Board and

regulators were confident that O'Meara could assume the top risk management role.

They believed that he had good managerial skills and would be able to work with the

risk managers below him.[243]   Additionally, the majority of Lehman employees

[239] *Id.*

[240] Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at pp. 7-9.

[241] Examiner's Interview of Madelyn Antoncic, Feb. 25, 2009 at p. 7  (Antoncic said that because O'Meara's background was heavily in accounting, neither she nor the members of her risk management team believed that O'Meara was capable of "challenging" management in the way that Antoncic did, and speculated that perhaps that was why O'Meara was chosen.); Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 8 (Umezaki said that O'Meara had better organizational skills than Antoncic, but that his lack of risk management experience was a significant drawback.); Examiner's Interview of Andrew J. Morton, Sept. 21, 2009, at pp. 13-14 (Morton said that O'Meara did not have time to put a qualified risk management team in place before Lehman's bankruptcy.); Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 17 (Nagioff was against the O'Meara risk appointment, saying that while O'Meara was capable, he was not well cast for risk management, as the subject matter was new for him and he had no instinct for it.); *see also* e-mail from Jeffrey Goodman, Lehman, to Mark Weber, Lehman, *et al.* (Oct. 22, 2007) [LBEX-DOCID 318367] (saying that O'Meara wanted to talk to the "exec" about getting risk down, but that he needed the e-mail recipients to decide where specific risk cuts needed to be made).

[242] Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at p. 8.

[243] Examiner's Interview of John F. Akers, Apr. 22, 2009, at p. 8 (Akers said that he had a great deal of confidence in O'Meara.); Examiner's Interview of Roger Berlind, May 8, 2009, at p. 8 (Berlind explained that he felt positive about O'Meara's move to CRO because he was impressed with O'Meara.); Examiner's Interview of Henry Kaufman, May 19, 2009, at p. 19 (Kaufman believed that O'Meara had a more comprehensive knowledge of Lehman's operation than Antoncic in a management and analytical sense,

interviewed felt that at the very least O'Meara was qualified, and Fuld defended the appointment by stating that O'Meara was a better risk manager and more practical than Antoncic.[244]

In her interview, Antoncic said that in early 2007, long before O'Meara replaced her, she believed she was being marginalized and did not fully participate in some of the risk decisions made from that point forward (particularly Archstone).[245] These events occurred after Antoncic expressed her opposition to the large increase in the 2007 risk appetite limit and to the firm's bridge equity and leveraged loan business.[246]

and that the replacement of Antoncic strengthened Lehman because O'Meara had real world experience that Antoncic lacked.); Examiner's Interview of the Securities Exchange Commission, Aug. 24, 2009, at p. 7 (The SEC told the Examiner that it received more information from O'Meara than it had under Antoncic, and its opinion was that due to O'Meara's better management skills and the fact that Antoncic remained with the firm in another capacity, the firm lost little with respect to its Risk Management function even though he did not possess a risk management background.); Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 10 (Grundhofer described O'Meara as a "first rate manager."); Examiner's Interview of Michael L. Ainslie, Sept. 22, 2007, at p. 5 (Ainslie said that Lehman's Board felt O'Meara was smart and knowledgeable about Lehman's business, and had been told that O'Meara's knowledge of Lehman would allow him to integrate into the risk business easily.); Examiner's Interview of Thomas Cruikshank, Oct. 8, 2009, at pp. 5-6 (Cruikshank explained that he had no doubts about O'Meara's ability to lead Risk Management.)

[244] Examiner's Interview of Kaushik Amin, Apr. 14, 2009, at p. 10 (According to Amin, O'Meara was qualified for the top Risk Management Group post because as CFO he had been responsible for computing profit and loss data, and that O'Meara was familiar with the risks associated with the various businesses because his ground-level experience had taught him which types of investments were susceptible to failure.); Examiner's Interview of Mark Weber, Aug. 11, 2009, at p. 13 (Weber said that O'Meara was generally able to understand the function of being CRO.); Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 20 (Fuld thought that O'Meara was a better risk manger and more practical than Antoncic.); Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 17 (Nagioff was against the O'Meara appointment, but thought O'Meara was capable and declined to criticize O'Meara's performance in the role.); Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at pp. 8-9 (Lowitt said that O'Meara and Callan were qualified for their new positions.); Examiner's Interview of George H. Walker IV, Nov. 20, 2009, at p. 6 (Walker described O'Meara as "an engaged risk manager.").

[245] Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at pp. 8-9, 11-12; Examiner's Interview of Madelyn Antoncic, Mar. 27, 2009, at pp. 13-14; Examiner's Interview of Madelyn Antoncic, Feb. 25, 2009, at pp. 4-6.

[246] Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at pp. 8-12; Examiner's Interview of Madelyn Antoncic, Mar. 27, 2009, at pp. 8-14; Examiner's Interview of Madelyn Antoncic, Feb. 25, 2009, at pp. 2-7.

Antoncic's personnel file indicates that she was on good standing with the business heads who were asked to review her until 2007, at which point some Lehman managers started to evaluate her performance more critically, partially because she was more risk averse than some of her reviewers.[247]  In their interviews with the Examiner, Fuld and Gregory denied that they had marginalized Antoncic.[248]

When O'Meara became Lehman's CRO, Callan replaced him as acting CFO.[249]  As with O'Meara, some former Lehman managers believed that Callan was not qualified for the CFO position.[250]  Because Callan did not have the typical background of a CFO, O'Meara's attention was split between adjusting to his new role as CRO and helping Callan become CFO.[251]  As O'Meara himself put it, from September to December 2007, he was "wearing two hats."[252]

Shotton also said that because of O'Meara's divided attention, Lehman effectively had no chief risk manager during the crucial period in 2007 that coincided

[247] Antoncic's personnel file (the Examiner was permitted to review but not copy the file).

[248] Examiner's Interview of Richard S. Fuld Jr., Sept. 25, 2009, at pp. 20-21; Examiner's Interview of Joseph Gregory, Nov. 5, 2009.

[249] Lehman Brothers Holdings Inc., Press Release: Lehman Brothers Announces New Appointments (Sept. 20, 2007), at p. 1 [LBEX-DOCID 533362], attached to e-mail from Brian Finnegan, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Sept. 20, 2007) [LBEX-DOCID 575413].

[250] Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at p. 9; Examiner's Interview of David Goldfarb, Sept. 21, 2009, at p. 10 (declining to comment on her expertise, but saying that she had a different skill set then most CFOs); Examiner's Interview of Paul Shotton, June 5, 2009, at p. 3.

[251] Examiner's Interview of Erin Callan, Oct. 23, 2009, at pp. 21, 24; Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at p. 8; Examiner's Interview of Paul Shotton, June 6, 2009, at pp. 24-25; e-mail from Christopher M. O'Meara, Lehman, to Erin Callan, Lehman (June 4, 2008) [LBEX-DOCID 215709]; e-mail from Christopher M. O'Meara, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (Feb. 29, 2008) [LBEX-DOCID 186993]; e-mail from Stuart M. Blount, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Oct. 18, 2007) [LBEX-DOCID 1356258].

[252] Examiner's Interview of Christopher O'Meara, Aug. 14, 2009, at p. 8; *see also* e-mail from Christopher M. O'Meara, Lehman, to Erin M. Callan, Lehman (June 4, 2008) [LBEX-DOCID 215709] (giving Callan suggested talking points for a presentation to potential investors).

with O'Meara's transition.[253]    Although the SEC was comfortable with O'Meara

assuming Antoncic's role, it similarly noted in written materials that it was concerned

with the fact that Lehman was exceeding its risk appetite limits during a period that the

CRO position was in transition.[254]

[253] Examiner's Interview of Paul Shotton, June 6, 2009, at pp. 3, 23-25.
[254] SEC, Notes from Lehman's Monthly Risk Review meeting (Oct. 11, 2007), at p. 6 [LBEX-SEC 007438].